1  XAVIER BECERRA
   Attorney General of California
2  THOMAS S. PATTERSON
   Senior Assistant Attorney General
3  MARK R. BECKINGTON
   Supervising Deputy Attorney General
4  GABRIELLE D. BOUTIN, SBN 267308
   R. MATTHEW WISE, SBN 238485
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-6046
     Fax:  (916) 324-8835
8    E-mail:  Matthew.Wise@doj.ca.gov
   *Attorneys for Plaintiff State of California, by and*
9  *through Attorney General Xavier Becerra*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14

15  **STATE OF CALIFORNIA, BY AND**
    **THROUGH ATTORNEY GENERAL XAVIER**
16  **BECERRA,**                              **COMPLAINT FOR DECLARATORY AND**
                                              **INJUNCTIVE RELIEF**
17                          Plaintiff,
                                              (Second  Cause  of  Action  –  Administrative
18         v.                                 Procedure Act Case)

19
    **WILBUR L. ROSS, JR., IN HIS OFFICIAL**
20  **CAPACITY AS SECRETARY OF THE U.S.**
    **DEPARTMENT OF COMMERCE; U.S.**
21  **DEPARTMENT OF COMMERCE; RON**
    **JARMIN, IN HIS OFFICIAL CAPACITY AS**
22  **ACTING DIRECTOR OF THE U.S. CENSUS**
    **BUREAU; U.S. CENSUS BUREAU; DOES 1-**
23  **100,**

24                          Defendants.

25

26                        **INTRODUCTION**

27        1.     The United States Constitution requires that all persons in each state be counted every

28  ten years.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2.  The Constitution mandates the

                                        1

1    "actual Enumeration" of the population for the purpose of apportioning congressional

2    representatives among the states.  U.S. Const. art. I, § 2, cl. 3.  For this foundational step in our

3    country's democratic process, the Constitution recognizes no exception based on citizenship

4    status.  It is long settled that *all* persons residing in the United States—citizens and non-citizens

5    alike—must be counted to fulfill the Constitution's "actual Enumeration" mandate.  *Id.*; *Fed'n for*

6    *Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).

7        2.    The U.S. Census Bureau (Bureau), a division of the U.S. Department of Commerce,

8    will conduct the next census, also known as the "decennial census," in 2020.  The census surveys

9    the number of persons in each household and, in the process, gathers certain demographic

10   information about those persons.  But not since 1950 has the decennial census asked whether each

11   respondent is a citizen of the United States.   Consistent with the modern practice, when in March

12   2017, as required by statute, the Bureau submitted to Congress a report of the proposed subjects

13   planned for the 2020 Census, none related to citizenship or immigration status.

14       3.    In a December 12, 2017 letter, late in the census planning process and months after

15   the statutory deadline for reporting proposed subjects, the U.S. Department of Justice requested

16   that the Bureau include a citizenship question on the 2020 Census.  While the letter suggested that

17   adding a citizenship question would assist the Department of Justice in enforcing Section 2 of the

18   Voting Rights Act, it did not address whether or how a citizenship question would facilitate the

19   Bureau's constitutional duty to capture the "actual Enumeration" of the U.S. population.  Nor did

20   the letter consider whether adding a citizenship question would serve the Voting Rights Act's

21   purpose of ensuring fair representation for all communities, ignoring substantial evidence—and

22   the Bureau's own past admissions—that fewer people would respond to the 2020 Census if it

23   included a citizenship question.

24       4.    On March 26, 2018, the Department of Commerce, setting aside decades of practice,

25   announced that the final list of census questions that it will submit to Congress will include a

26   question asking the citizenship status of every person in every household in the United States.

27   The Department of Commerce concedes that it "is not able to determine definitively how

28

2

1   inclusion of a citizenship question on the decennial census will impact responsiveness" to the

2   2020 Census. *See* Ex. 1, p. 7 [Letter of Wilbur Ross to Karen Dunn Kelley, dated Mar. 26, 2018].

3       5.      Including the citizenship question on the 2020 Census will directly impede the

4   Bureau from procuring the "actual Enumeration" of the U.S. population. Numerous studies—

5   including those conducted by the Bureau—point to the same conclusion: asking about citizenship

6   will repress responses from non-citizens and their citizen relatives. At least four former Bureau

7   directors share the view that inquiring about citizenship status on the census "would likely

8   exacerbate privacy concerns and lead to inaccurate responses from non-citizens worried about a

9   government record of their immigration status." Brief of Former Directors of the U.S. Census

10  Bureau as Amici Curiae in Support of Appellees at 23-26, *Evenwel v. Abbott,* 136 S.Ct. 1120

11  (2016) (No. 14-940), 2015 WL 5675832.

12      6.      The State of California, in particular, stands to lose if the citizenship question is

13  included on the 2020 Census. According to 2016 figures from the Bureau's American

14  Community Survey (ACS), California has more foreign-born residents (over 10 million) and non-

15  citizens (over 5 million) than any other state.[1] And a recent study from the University of

16  Southern California's Center for the Study of Immigrant Integration found that California has the

17  highest number of U.S.-born citizens who live with at least one undocumented family member.[2]

18  Undercounting the sizeable number of Californian non-citizens and their citizen relatives will

19  imperil the State's fair share of congressional seats and Electoral College electors and will cost

20  the State billions of dollars in federal funding over the next decade.

21

22

23      [1] *Selected Characteristics of the Native and Foreign-Born Population – 2012-2016 American Community Survey 5-Year Estimates*, U.S. Census Bureau,

24  https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last visited Mar. 26, 2018); *Nativity and Citizenship Status in the United States—Universe: Total*

25  *Population in the United States – 2012-2016 American Community Survey 5-Year Estimates*, U.S. Census Bureau,

26  https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_5YR _B05001&prodType=table (last visited Mar. 26, 2018).

27      [2] *Keeping Families Together*, Silva Mathema, University of Southern California's Center for the Study of Immigrant Integration and Center for American Progress (Mar. 16, 2017),

28  https://cdn.americanprogress.org/content/uploads/2017/03/15112450/KeepFamiliesTogether-brief.pdf (last visited Mar. 26, 2018).

3

1    7.   The State of California, by and through Attorney General Xavier Becerra, seeks a

2    declaration that including the citizenship question on the 2020 Census violates the Constitution's

3    "actual Enumeration" mandate and the Administrative Procedure Act's (APA) prohibition against

4    "arbitrary and capricious" agency action.  Further, to avoid irreparable harm, the State seeks an

5    injunction prohibiting the Bureau from including the citizenship question on the 2020 Census.

6                              **JURISDICTION AND VENUE**

7    8.   This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of

8    the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to

9    Plaintiff), and 5 U.S.C. §§ 701-706 (APA).  An actual controversy exists between the parties

10   within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive

11   relief, and other relief against the Defendants pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C.

12   §§ 705-706.

13   9.   Defendants' submission of the final census questions to Congress no later than March

14   31, 2018, is a final agency action and is therefore judicially reviewable under the APA.  5 U.S.C.

15   §§ 704, 706.

16   10.   Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is a judicial

17   district in which the State of California resides, and this action seeks relief against federal

18   agencies and an official acting in his official capacity.

19                           **INTRADISTRICT ASSIGNMENT**

20   11.   Under Civil Local Rules 3-5(b) and 3-2(c), Plaintiff alleges that there is no basis for

21   assignment of this action to any particular location or division of this Court.

22                                   **PARTIES**

23   12.   Plaintiff, the State of California, by and through Attorney General Xavier Becerra,

24   brings this action as a sovereign state in the United States of America.  The Attorney General is

25   the chief law officer of the State and has the authority to file civil actions in order to protect

26   public rights and interests.  Cal. Const. art. V, § 13; Cal. Gov't Code § 12511.  This challenge is

27   brought under the Attorney General's independent constitutional, statutory, and common-law

28   authority to bring suit and obtain relief on behalf of the State.

                                         4

1     13.    The State of California has standing to bring this action because Defendants' actions

2 would cause the State to suffer concrete and substantial harm, and such harm would be redressed

3 by this lawsuit. The State has an interest in ensuring that the 2020 Census counts all Californians.

4 Including the citizenship question on the 2020 Census will cause Californians to be undercounted,

5 threatening the State's fair share of congressional seats and Electoral College electors, and

6 depriving the State of billions of dollars of federal funding.

7     14.    Defendant Wilbur L. Ross is the Secretary of the Department of Commerce and is

8 sued in his official capacity. Secretary Ross is responsible for fulfilling the Department of

9 Commerce's duties under the Constitution, the APA, and the Census Act.

10     15.    Defendant Department of Commerce is a federal agency. The Department of

11 Commerce, led by Secretary Ross, oversees the Bureau, which is tasked with executing the 2020

12 Census.

13     16.    Defendant Dr. Ron Jarmin is responsible for performing the non-exclusive functions

14 and duties of the Director of the U.S. Census Bureau and is sued in his official capacity. Dr.

15 Jarmin's duties include ensuring that the Bureau executes the 2020 Census.

16                                        **LEGAL BACKGROUND**

17     17.    The Constitution provides legal authority for the census, referred to as

18 "Enumeration," in article I, section 2, clause 3, which states in relevant part, "Representatives . . .

19 shall be apportioned among the several States which may be included within this Union,

20 according to their respective Numbers . . . The actual Enumeration shall be made within three

21 Years after the first Meeting of the Congress of the United States, and within every subsequent

22 Term of ten Years, in such Manner as they shall by Law direct." The Fourteenth Amendment to

23 the Constitution makes clear that the count must include "the whole number of persons in each

24 state."

25     18.    Congress has delegated the duty of taking the census to the Secretary of Commerce.

26 Under 13 U.S.C. § 141(a), "[t]he Secretary shall, in the year 1980 and every 10 years thereafter,

27 take a decennial census of population as of the first day of April of such year." The Secretary has

28 authority to conduct the census "in such form and content as he may determine . . . ." *Id.*

5

1    Likewise, the Bureau Director "is necessarily invested with discretion in matters of form and

2    procedure when these are not specifically provided for by law . . . ." *U.S. ex rel. City of Atlanta,*

3    *Ga. v. Steuart*, 47 F.2d 979, 982 (D.C. Cir. 1931).

4        19.    Defendants' discretion in taking the census is not unfettered, and in particular, is

5    subject to congressional oversight. Three years before the census, the Secretary must submit to

6    Congress a report proposing the subjects to be included in the census. 13 U.S.C. § 141(f)(1).

7    Two years before the census, the Secretary must submit to Congress the specific questions to be

8    included in the census. 13 U.S.C. § 141(f)(2). The Secretary may only later modify the subjects

9    or questions if he submits a report to Congress finding that "new circumstances exist which

10   necessitate" the modification. 13 U.S.C. § 141(f)(3).

11       20.    Defendants' discretion in taking the census is also subject to the APA. Under the

12   APA, Defendants must ensure that any agency action is not "arbitrary, capricious, an abuse of

13   discretion, or otherwise not in accordance with law," "contrary to constitutional right, power,

14   privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of

15   statutory right." 5 U.S.C. § 706.

16       21.    Congress and the states use census data for many purposes, including for allocating

17   federal funding and for state legislative districting. *City of Los Angeles v. U.S. Dept. of*

18   *Commerce*, 307 F.3d 859, 864 (9th Cir. 2002); *Wisconsin v. City of New York*, 517 U.S. 1, 5-6

19   (1996). But the only constitutional purpose of the census is to apportion congressional

20   representatives based on the "actual Enumeration" of the population of each state.

21       22.    To fulfill this constitutional purpose, as the Bureau itself has recognized, the 2020

22   Census will succeed only if it achieves its aim "to count everyone once, only once, and in the

23   right place."[3]

24                    **FACTUAL AND PROCEDURAL BACKGROUND**

25       23.    Under the direction of the Secretary of Commerce and the Bureau Director, the

26   Bureau conducts the constitutionally required census every ten years by counting all U.S.

27       [3] *Why We Conduct the Decennial Census*, United States Census Bureau,
     https://www.census.gov/programs-surveys/decennial-census/about/why.html (last visited March
28   26, 2018).

                                          6

1  residents in the place where they live. Besides using the results of the decennial census for the

2  constitutional purpose of determining the number of seats for each state in the House of

3  Representatives, the federal government relies on census data to determine how to distribute

4  billions of dollars of funding each year, including funding for Medicaid, Medicare Part B, the

5  Supplemental Nutrition Assistance Program (SNAP), the State Children's Health Insurance

6  Program (S-CHIP), and the Highway Planning and Construction Program.

7      24.    In addition to the decennial census, every year the Bureau conducts the ACS. The

8  ACS contains a more expansive set of questions than the decennial census. Unlike the decennial

9  census, the ACS is not required by the Constitution. And while the decennial Census requires an

10  actual enumeration of all U.S. residents, the ACS surveys only a sample of the population.

11  Compared to the decennial census, the ACS gathers more detailed information about U.S.

12  residents.

13      25.    The decennial census has not included a question on citizenship since the 1950

14  Census. Since that time, the question has appeared only on the ACS.

15      26.    On March 28, 2017, Secretary Ross timely submitted a report containing the subjects

16  proposed to be included in the 2020 Census. The subjects, which were unchanged from the 2010

17  Census, did not include citizenship or immigration status.

18      27.    Nearly nine months after the subjects for the 2020 Census had been identified, on

19  December 12, 2017, the U.S. Department of Justice sent a letter to the Bureau requesting the

20  inclusion of a citizenship question on the 2020 Census. The Department of Justice's stated

21  rationale for adding a citizenship question was to assist the Department of Justice in enforcing

22  Section 2 of the Voting Rights Act. The letter failed to address the likelihood that a citizenship

23  question would decrease the accuracy of the Census by deterring responses from non-citizens and

24  their relatives and that this consequence would undermine the Voting Rights Act's purpose of

25  ensuring fair representation for all communities.

26      28.    On March 26, 2018, setting aside decades of practice, Secretary Ross and the

27  Department of Commerce announced that the final list of census questions that it will submit to

28

7

1    Congress will include a question on citizenship status.  Specifically, the question will ask, for

2    every member of every household, whether that person is a citizen of the United States.

3         29.    Secretary Ross explained that, to address the Department of Justice's request, he had

4    determined that the best option was to add the ACS citizenship question to the decennial census.

5    Secretary Ross speculated that the citizenship question may not cause an undercount because

6    "there is no information available to determine the number of people who would in fact not

7    respond due to a citizenship question being added, and no one has identified any mechanism for

8    making such a determination." Ex. 1, p. 5.  Secretary Ross concluded that "the need for accurate

9    citizenship data" was worth the risk of an undercount. *Id.*

10        30.    Notwithstanding the rationale stated in this letter, the Bureau is well aware that

11   adding the citizenship question will directly cause an undercount in the 2020 Census.  Its own

12   2017 study revealed "an unprecedented ground swell in confidentiality and data sharing concerns,

13   particularly among immigrants or those who live with immigrants" and that these concerns "may

14   present a barrier to participation in the 2020 Census."[4]  This apprehension about participating in

15   the census is unsurprising in the current political climate.  The studies' respondents "express[ed]

16   new concerns about topics like the 'Muslim ban,' discomfort 'registering' other household

17   members by reporting their demographic characteristics, the dissolution of the 'DACA' (Deferred

18   Action for Childhood Arrival) program, repeated references to Immigration and Customs

19   Enforcement (ICE), etc."[5]  These types of concerns are not new to the Bureau.  Since at least

20   1980, the Bureau has recognized that, because of immigrants' fear of how information disclosed

21   on the Census may be used against them, "any effort to ascertain citizenship will inevitably

22

23

24    [4] *See* Mikelyn Meyers, Center for Survey Management, U.S. Census Bureau, Presentation on Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census, presented at National Advisory Committee on Racial, Ethnic, and

25    Other Populations Fall Meeting (Nov. 2, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-

26    Presentation.pdf (last visited Mar. 26, 2018).
     [5] *See* Ex. 2, Memorandum from Center for Survey Measurement on Respondent

27    Confidentiality Concerns to Associate Directorate for Research and Methodology, U.S. Census Bureau (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-

28    Respondent-Confidentiality-Concerns.pdf (last visited Mar. 26, 2018).

Complaint for Declaratory and Injunctive Relief

1  jeopardize the overall accuracy of the population count." *Fed'n for Am. Immigration Reform*, 486

2  F. Supp. at 568.

3        31.    The undercount of Californians in the 2020 decennial census resulting from the

4  citizenship question will cause significant harm to the State of California, its counties, cities, and

5  residents. Before the citizenship question was added, California was predicted to retain its

6  current number of seats in the House of Representatives and, consequently, the Electoral College,

7  but only by a very slim margin. Because California has a proportionately large population of

8  non-citizens and relatives of non-citizens compared to other states, the citizenship question will

9  now likely cause California to lose seats for the first time in its history. [6]

10        30.    The undercount that will result from the citizenship question will also cause

11  California to lose federal funding. The State receives over $76 billion in funding from the sixteen

12  large federal assistance programs that distribute funds on the basis of decennial census-derived

13  statistics.[7]

14        31.    The Bureau is currently conducting its "2018 Census Test" in Providence County,

15  Rhode Island. The 2018 Census Test is a dress rehearsal for the 2020 Census. As the Bureau's

16  website states, "Throughout the decade, the Census Bureau has conducted extensive research and

17  testing to inform census design. The 2018 Census Test is the culmination of that research,

18  providing a rich environment to test all major components of the 2020 Census. The primary

19  objective of the test is to confirm key technologies, data collection methods, outreach and

20  promotional strategies, and management and response processes that will be deployed in support

21  of the 2020 Census."[8] No citizenship question or similar question was included in the 2018

22  Census Test. Having failed to adequately test the question before including it in the 2020 Census,

23        [6] Election Data Services, *Some Change in Apportionment Allocations with New 2017

24  Census Estimates; But Greater Change Likely by 2020*, Dec. 26, 2017,
   https://www.electiondataservices.com/wp-
   content/uploads/2017/12/NR_Appor17c2wTablesMapsC1.pdf (last visited Mar. 26, 2018).

25        [7] Reamer, The George Washington Institute of Public Policy, *Counting for Dollars 2020 –
   California*, Aug. 18, 2017,

26  https://gwipp.gwu.edu/sites/gwipp.gwu.edu/files/downloads/California%2008-18-17.pdf (last
   visited Mar. 26, 2018).

27        [8] 2018 Census Test—About this Test, U.S. Census Bureau,
   https://www.census.gov/programs-surveys/decennial-census/2018-census-test/about.html (last

28  visited Mar. 26, 2018).

1   the Bureau will be unable to take sufficient measures to avoid or mitigate the resulting undercount

2   of non-citizens and their citizen relatives.

3       32.   The Bureau plans to finalize the 2020 Census paper questionnaires for print in May

4   2019.  Ensuring that the 2020 Census is not compromised by the inclusion of the citizenship

5   question will become more difficult with each passing day, as more of the Bureau's resources are

6   dedicated to including the question on the census.

7                            **FIRST CAUSE OF ACTION**

8     **(Violation of Constitution's "Actual Enumeration" Mandate; U.S. Const. art. I, § 2, cl. 3)**

9       33.   Plaintiffs reallege and incorporate herein by reference each and every allegation and

10   paragraph set forth previously.

11       34.   The Constitution requires the "actual Enumeration" of all people in each state every

12   ten years for the sole purpose of apportioning representatives among the states.  U.S. Const. art. I,

13   § 2, cl. 3, and amend. XIV, § 2.

14       35.   By including the citizenship question on the 2020 Census, Defendants are in violation

15   of the "actual Enumeration" clause of the Constitution.  Because the question will diminish the

16   response rates of non-citizens and their citizen relatives, California, which has the largest

17   immigrant population in the country, will be disproportionately affected by the census

18   undercount.  Inclusion of the question thus directly interferes with Defendants' fulfillment of their

19   constitutional responsibility, as delegated by Congress, to conduct an "actual Enumeration" of the

20   U.S. population.

21       36.   This violation harms the State of California and its residents, given that the State is

22   entitled under the Constitution to a proportionate share of congressional representatives based on

23   its total population.

24       37.   Defendants' violation has caused and will continue to cause ongoing, irreparable

25   harm to California and its residents.

26       38.   An actual controversy exists between Plaintiff and Defendants regarding whether

27   Defendants' inclusion of a citizenship question on the 2020 Census violates the "actual

28   Enumeration" clause of the U.S. Constitution.

**SECOND CAUSE OF ACTION**

**(Violation of APA; 5 U.S.C. § 706)**

39.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

40.    The APA requires courts to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

41.    Defendants' inclusion of the citizenship question on the 2020 Census is all of the above. Because the question will diminish the response rates of non-citizens and their citizen relatives, California, which has the largest immigrant population in the country, will be disproportionately affected by the census undercount. Inclusion of the question thus directly interferes with Defendants' fulfillment of their constitutional responsibility, as delegated by Congress, to conduct an "actual Enumeration" of the U.S. population, as well as Secretary Ross' statutory duty to "take a decennial census of population" under 13 U.S.C. § 141(a). A citizenship question, moreover, would not serve the purpose articulated by the U.S. Department of Commerce, because an undercount of non-citizens and their citizen relatives will decrease the accuracy of census data available to prove voter dilution under Section 2 of the Voting Rights Act. Finally, Defendants failed to follow their own internal agency policies and guidelines, including under the Information Quality Act, in reaching their decision to add the citizenship question.

42.    Defendants' decision to add a citizenship question to the 2020 Census thus violates the APA's prohibition against "arbitrary and capricious" agency action.

43.    Defendants' violation has caused and will continue to cause ongoing, irreparable harm to California and its residents.

44.    An actual controversy exists between Plaintiff and Defendants regarding whether Defendants' inclusion of a citizenship question on the 2020 Census violates the APA.

11

1

**PRAYER FOR RELIEF**

2    WHEREFORE, the State of California, by and through Attorney General Xavier Becerra,

3    respectfully requests that this Court:

4    1.    Issue a declaratory judgment, under 28 U.S.C. §§ 2201 and 2202, that including the

5    citizenship question on the 2020 Census violates Article I, Section 2, Clause 3 of the United

6    States Constitution and the APA.

7    4.    Issue a preliminary injunction prohibiting all Defendants and all those acting in

8    concert with them from including a citizenship question on the 2020 Census and from taking any

9    irreversible steps to include a citizenship question on the 2020 Census;

10    5.    Issue a permanent injunction prohibiting all Defendants and all those acting in concert

11    with them from including the citizenship question on the 2020 Census;

12    6.    Award Plaintiff costs, expenses, and reasonable attorney fees; and

13    7.    Award such other relief as the Court deems just and proper.

14    Dated: March 26, 2018                                Respectfully submitted,

15

XAVIER BECERRA
Attorney General of California

16    THOMAS S. PATTERSON
Senior Assistant Attorney General

17    MARK R. BECKINGTON
Supervising Deputy Attorney General

18

19                                */s/ Gabrielle D. Boutin*

20    GABRIELLE D. BOUTIN
R. MATTHEW WISE

21    Deputy Attorneys General
*Attorneys for Plaintiff State of California, by*

22    *and through Attorney General Xavier*
*Becerra*

23

24    SA2018100200
13015330.docx

25

26

27

28

# Exhibit 1



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230


To:     Karen Dunn Kelley, Under Secretary for Economic Affairs

From:   Secretary Wilbur Ross

Date:   March 26, 2018

Re:     Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire


Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population ("CVAP") data that are not currently available from government survey data ("DOJ request"). DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census block level will permit more effective enforcement of the Act. Section 2 protects minority population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond. To that end, the Department of Commerce ("Department") immediately initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request -- as with all significant Census assessments -- prioritized the goal of obtaining *complete and accurate data*. The decennial census is mandated in the Constitution and its data are relied on for a myriad of important government decisions, including apportionment of Congressional seats among states, enforcement of voting rights laws, and allocation of federal funds. These are foundational elements of our democracy, and it is therefore incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations. As part of the process, I also met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, my questions about accuracy and response rates, and their recommendations. At present, the Census Bureau leadership are all career civil servants. In addition, my staff and I reviewed over 50 incoming letters from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

2

completeness. Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods. Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations. However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially. In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates. Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge. Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses. However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys. For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census. The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census. Further, the decennial census has differed significantly in nature from the sample surveys. For example, the 2000 decennial census survey contained only eight questions. Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete. ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent. However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS. Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

3

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C**, the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D**, which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**  I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request. To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018. I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.

CC:     Ron Jarmin, performing the nonexclusive functions and duties of the Director of the
        Census Bureau

        Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director
        of the Census Bureau

8

# Exhibit 2

September 20, 2017

MEMORANDUM FOR Associate Directorate for Research and Methodology (ADRM)

From:              Center for Survey Measurement (CSM)

Subject:           Respondent Confidentiality Concerns

CSM researchers have noticed a recent increase in respondents spontaneously expressing concerns about confidentiality in some of our pretesting studies conducted in 2017. We recommend systematically collecting data on this phenomenon, and development and pretesting of new messages to avoid increases in nonresponse among hard-to-count populations for the 2020 Census as well as other surveys like the American Community Survey (ACS).

Below is a preview of findings relating to respondent confidentiality concerns from recent CSM projects, followed by a more detailed recommendation from CSM. These findings are drawn from usability interviews with English- and Spanish-speaking respondents (N=15), cognitive interviews with Spanish-speaking respondents (N=10), four focus groups with Spanish-speaking Field Representatives (FRs) (N=16), five focus groups with Field Supervisors (FSs) and Field Representatives (N = 24), and 42 focus groups with respondents (N=366). These interviews and focus groups were conducted in different regions of the country in English, Spanish, Chinese, Korean, Vietnamese, Russian, and Arabic since January of 2017. All projects were small, qualitative studies and as such, unrepresentative of the population as a whole, and none of them were specifically designed to examine confidentiality concerns. However, respondents and field representatives spontaneously brought up these concerns at a much higher rate than CSM researchers have seen in previous pretesting projects, and as such, this information may have implications for nonresponse on U.S. Census Bureau studies and surveys.

In particular, CSM researchers heard respondents express new concerns about topics like the "Muslim ban," discomfort "registering" other household members by reporting their demographic characteristics, the dissolution of the "DACA" (Deferred Action for Childhood Arrival) program, repeated references to Immigration and Customs Enforcement (ICE), etc. FRs and FSs emphasized facing a "new phenomenon" in the field and reported that respondents' fears, particularly among immigrant respondents, have increased markedly this year. Respondents reported being told by community leaders not to open the door without a warrant signed by a judge, and CSM researchers observed respondents falsifying names, dates of birth,

and other information on household rosters.   FRs requested additional training to help them overcome respondents' fears regarding confidentiality and data sharing with other agencies like ICE, as well as materials they could share with respondents to reassure them about these concerns.

### Usability Findings (2017 PEGA Internet Self-Response Instrument; N = 15)

Overall, four of fifteen respondents who participated in usability interviews in the DC-metro area to pretest the 2017 PEGA internet self-response (ISR) instrument in English and Spanish intentionally provided incomplete or incorrect information about household members due to concerns regarding confidentiality, particularly relating to perceived negative attitudes toward immigrants.

One Spanish-speaking respondent said she was uncomfortable "registering" other household members and tried to exit the survey at the dashboard when she realized she would have to provide information on others who live with her. She mentioned being afraid because of the current political climate and news reports about changing immigration policy.  The researcher had to help the respondent delete the other household members from the roster to avoid a break-off; she only provided her own information.

A second Spanish-speaking respondent filled out information about herself and three family members but intentionally left three or four roomers off the roster because, "This frightens me, given how the situation is now" and mentioned being worried because of their "[immigration] status."  Both Spanish-speaking respondents stated that they would not complete the survey at home.

A third Spanish-speaking respondent, who the researcher had reason to believe was not concerned about whether his data would be shared with other federal agencies because of his status as legal resident in the country, commented: "Particularly with our current political climate, the Latino community will not sign up because they will think that Census will pass their information on and people can come looking for them."  This theme came up repeatedly even for those without concerns about the immigration status of members of their household.

One English-speaking respondent entered false names and some incorrect dates of birth for his roommates because he was not comfortable providing their information without their consent due to data sharing concerns.

A second English-speaking respondent did not report five unrelated household members (some of whom were immigrants) because she does not report their rental income to the IRS and because of what she referred to as the "Muslim ban."

It should be noted that this level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes toward immigrants, is largely unprecedented in the usability interviews that CSM has been conducting since 2014 in preparation for the 2020 Census. In general, we assume that pretesting respondents are in fact more willing to fill out the survey than most respondents would be during the 2020 Census, given that they are being paid a cash incentive for their participation and being interviewed by a researcher with whom they have established rapport. As such, these concerns might be even more pronounced during a production survey than researchers observed during pretesting.

### Cognitive Findings (CBAMS Paper Testing; N = 10)
Spanish-speaking respondents who participated in paper testing of the CBAMS (Census Barriers, Attitudes, and Motivators Survey) expressed concern about whether their answers might be shared with other government agencies. One respondent said, "The possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me."   Later she commented that she was worried that her information could be used against her if she answered that she is not satisfied with the government here.  She thought someone could say, 'If you're not satisfied, why are you here?' and this could be used against her to expel her from the country.

Respondent concerns on this survey were eye-opening for CSM researchers because some of the respondents who participated in cognitive interviews had previously taken part in CSM pretesting projects.  Despite having participated in the past, they seemed visibly nervous and reticent and required extensive explanations regarding how their data would be used and their personal identifying information would be redacted.  This behavior was in contrast to their demeanor during prior CSM pretesting projects.

### Multilingual Focus Groups on Doorstep Messages for the 2020 Census (N = 366)
Respondents also raised concerns in 42 focus groups conducted this spring in order to test doorstep messages that enumerators can use to overcome reluctance in the 2020 Census. These focus groups were conducted in English, Spanish, Chinese, Korean, Vietnamese, Russian, and Arabic, and the topic of confidentiality concerns came up in several groups.

For example, Spanish-speakers brought up immigration raids, fear of government, and fear of deportation. Respondents talked about having received advice not to open the door if they fear a visit from Immigration and Customs Enforcement (ICE) and that they could instead ask that warrants be slipped under the door. They suggested that the Census Bureau have something in writing that enumerators could slip under the door to indicate why an enumerator is at a respondent's home. They felt that the most important message to encourage participation was confidentiality and the greatest barriers to Latino participation are fear and mistrust.

Several Chinese-speaking focus group respondents stated that the Chinese community's main fear or concern was immigration status and how the data are used. They also expressed concern about opening the door to a government official and not wanting to be "investigated."

Arabic-speakers reported that they had concerns about their perception of the current environment as unwelcoming to Arabic-speaking immigrants and said that they feared deportation. One respondent said, "The immigrant is not going to trust the Census employee when they are continuously hearing a contradicting message from the media everyday threatening to deport immigrants." Respondents wanted to have more assurance about how the data would be used before providing personal information.

English-speakers expressed similar reservations when discussing the current "environment." In one English focus group, respondents spontaneously expressed concerns that their personal information would be shared with other agencies, and mentioned in particular that data could be shared with Immigration and Customs Enforcement and the Department of Homeland Security. One participant recommended that Census materials should explicitly explain that personal information is not shared with these agencies.

Overall, concerns about the confidentiality of data, including between agencies, negative perceptions of immigrants, and deportation emerged across languages in this project.

### Focus Groups with Spanish-speaking Field Representatives (N = 16)

CSM conducted four focus groups from July to September with Spanish-speaking Census Bureau Field Representatives who work in different states regarding the Spanish translation of a health survey. Many of the FRs spontaneously brought up the topic of an upsurge in respondent confidentiality concerns.

Many FRs stated that before they can begin an interview, they have to spend several minutes calming respondents and gaining their trust due to the current "political state." One FR said, "The politics have changed everything. Recently." Another mentioned that this is especially relevant given that the DACA (Deferred Action for Childhood Arrival) program is "on the chopping block." FRs reported that some respondents worry about giving out legitimate names or completing the roster; they often do not feel comfortable giving out information about other people in the household. One FR said, "This may just be a sign of the times, but in the recent several months before anything begins, I'm being asked times over, does it make a difference if I'm not a citizen?" FRs reported that many Spanish-speaking respondents distrust the statement on confidentiality in the survey mailing materials, even when they understand it.

Many respondents believe that "the less information they give out, the better. The safer they are."

One FR said that in June she was doing a Census Bureau survey interview with questions about citizenship status. A Spanish-speaking respondent answered that he was not a citizen, and then appeared to lie about his country of origin. When the FR started asking about his year of entry into the U.S., he "shut down" and stopped responding to her questions. He then walked out and left her alone in the apartment, which had never happened to her during an interview before.

Another FR commented that she had seen this scenario many times while administering the ACS, although this was the first time she had heard of a respondent actually leaving the FR alone in his or her home. She suggested that respondents might have concerns about confidentiality given "the current political climate."

A third Spanish-speaking FR added that she had observed Hispanic members of a household move out of a mobile home after she tried to interview them. She said, "There was a cluster of mobile homes, all Hispanic. I went to one and I left the information on the door. I could hear them inside. I did two more interviews, and when I came back, they were moving.... It's because they were afraid of being deported."

FRs reported using various strategies to overcome respondents' fears. They are often asked if they work for other federal agencies, and reassure respondents that this information is not reported to other federal agencies; their information is not shared with "immigration or taxes." They explain that the respondent's immigration status does not matter. The FRs reported that sometimes they encourage respondents to do the interview anonymously with fake names, when it seems like the respondent is about to refuse.

The FRs recommended that ad campaigns be used to reduce the mistrust the public has toward completing our surveys. They also requested "an immigration letter" like one used on the NHANES (National Health and Nutrition Examination Survey) that mentioned "la migra" [a slang term for ICE] that was very effective. The FRs could use it selectively when it was needed. It clearly said that the Census Bureau was not in any way related with "la migra".

FRs were asked to share the most important change that they wanted to see made to the Spanish translation of the survey materials. In one focus group, the three FRs agreed unanimously that they would like an "immigration statement" to appear on mailing materials because of current "political issues." They reported that immigration concerns are the "topic of

the day" and that they always have to allay fears about immigration by saying, "We do not share information with other agencies." They suggested that the statement should convey that while the Census Bureau is part of the federal government, it is a statistical agency, and that the respondent's legal status in the country does not matter at all.

### Focus Groups with Field Supervisors and Field Representatives (N = 24)
CSM conducted five focus groups in September with Field Supervisors and Field Representatives to collect feedback on FR training, the availability of printed materials in various languages, and the usage of printed materials during a recent housing survey operation. The topic of respondent concerns regarding confidentiality came up repeatedly in these focus groups.

In one focus group of Field Supervisors, an FS reported having a respondent produce papers proving US citizenship of household members during an interview. Another FS reported that each time she spoke to a Spanish-speaking respondent, her focus was on convincing the respondent of the confidentiality of their answers "given the political temperature these days." One FS said, "we have to let [respondents] know where this information is going. That's their biggest fear." When asked if the training the FRs had received was adequate, an FS commented that more training was needed on respondent confidentiality concerns, but that "this climate didn't exist before [when training was designed last time], when you did the study three years ago, so of course it wasn't planned in there." FSs reiterated that the main issue they saw was privacy concerns of Latino respondents, and that FRs should do more practice interviews where someone models those concerns and concerns about immigration so that the FRs are more prepared to respond adequately in the field.

FRs who spoke a language other than Spanish or English (e.g., Cantonese) reported that completing interviews for the survey in question this year was much harder than the last time the survey was fielded: "Three years ago was so much easier to get respondents compared to now because of the government changes... and trust factors [and] also because of what happened here [in the United States]....Three years ago I didn't have problems with the immigration questions." Another FR commented, "There will always be political situations that are out of our control .... Sometimes I just come right out and say, this isn't for immigration."

Even FRs who only speak English reported needing additional training for encountering households where respondents are especially fearful. One FR reported that respondents have been confusing him with someone from Immigration and Customs Enforcement (ICE, formerly known as INS). He reported that respondents that identified him as working for the government were hesitant to answer any questions, and it was difficult to gain their trust. Another FR agreed that most incompletes were due to a distrust of the government. When asked whether

their training adequately prepared them, several FRs mentioned that training regarding concerns about ICE could not have been included in the training they received because it was a new phenomenon. The FRs in this focus group emphasized that they were having to reorder the questions in this housing survey to collect demographics last in order to avoid breakoffs.

Spanish bilingual FRs shared many of the same concerns as the Field Supervisors, speakers of languages other than English or Spanish, and the monolingual English-speaking FRs. They emphasized that when completing interviews with Spanish-speaking households, immigration concerns were challenging and that respondents seemed fearful. They requested more training focusing on respondent fears, particularly immigrant respondents' fears. They mentioned respondents giving out false names and reordering survey questions to collect demographics last.

**Recommendation**

Overall, these findings, in various languages from respondents, Field Representatives, and Field Supervisors across the country who have participated in recent projects are raising concerns within CSM regarding potential barriers to respondent participation in the 2020 Census, as well as other Census Bureau surveys. The findings listed above are a sampling of what CSM researchers have observed on recent projects, and these concerns were all expressed spontaneously to researchers during the course of pretesting various survey materials. These findings are particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse.

A systematic pretesting study evaluating respondent confidentiality concerns, both from the perspective of respondents as well as Field Representatives, would shed light on the nature and prevalence of these concerns, particularly for Limited English Proficient (LEP) or immigrant populations in the U.S. Quantitative analysis could also be done to examine any changes in response rates, mode of administration, item non-response, or number of contact attempts for surveys such as the ACS among non-English speakers and hard-to-count, immigrant respondents. Similarly, we could review whether the number of residents reported or the number of unrelated household members within households has declined in recent months.

In addition to gathering data on any uptick in confidentiality concerns that may exist, we recommend designing and pretesting wording that could address these concerns in mailing materials, the Decennial Internet Self Response instrument, FAQs provided to enumerators, etc. This text could inform respondents that the Census Bureau does not collect information on immigration status or religion (similar to the language stating that we do not collect social security numbers), or that we do not share data with agencies like ICE. Pretesting with respondents from a variety of backgrounds would be vital given that such a message could be

reassuring to some respondents but may have other effects for different populations. Care should be taken in crafting new messages. CSM also recommends that additional training be provided to FRs across surveys regarding allaying respondents' confidentiality concerns.