Bryan K. Weir
William S. Consovoy
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd.
Suite 700
Arlington, VA 22201
(703) 243-9423
bryan@consovoymccarthy.com
will@consovoymccarthy.com

Attorneys for *Amicus Curiae*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>    Plaintiffs,<br><br>    vs.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants.<br>------------------------------------------------------<br>CITY OF SAN JOSE, *et al.*,<br><br>    Plaintiffs,<br><br>    vs.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants. | Case Numbers: 3:18-cv-01865, 3:18-cv-2279<br><br>**NOTICE OF MOTION & MOTION FOR LEAVE TO FILE BRIEF *AMICUS CURIAE* OF PROJECT ON FAIR REPRESENTATION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  August 9, 2018<br>Time: 1:30 p.m.<br>Judge: Honorable Richard Seeborg<br>Dept.: 3 |

---

1

Motion for Leave to File Brief *Amicus Curiae* of Project on Fair Representation
Nos. 3:18-cv-01865, 3:18-cv-2279

PLEASE TAKE NOTICE that on August 9, 2018, or as soon thereafter as the matter may be heard, in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, non-party, the Project on Fair Representation, will and hereby does move this Court for an order granting leave to file the accompanying Brief *Amicus Curiae* of Project on Fair Representation in Support of Defendants' Motion to Dismiss. The parties do not oppose the filing of the brief.

The Project on Fair Representation is a public interest organization dedicated to the promotion of equal opportunity and racial harmony. The Project works to advance race-neutral principles in voting, education, public contracting, and public employment. Through its resident and visiting academics and fellows, the Project conducts seminars and releases publications relating to redistricting and the Voting Rights Act. The Project also has been involved in cases involving these important issues, *see, e.g.*, *Shelby Cty. v. Holder*, 133 S. Ct. 2612 (2013), and has filed amicus briefs as well, *see, e.g.*, *Perry v. Perez*, 132 S. Ct. 934 (2012); *Riley v. Kennedy*, 553 U.S. 406 (2008). Most relevant here, the Project has supported litigation where the question and availability of data on eligible voters has been at the center of the case. *See Evenwel v. Abbott*, 136 S. Ct. 1120 (2016). And the Project has been involved in litigation under the Voting Rights Act, where such data are regularly utilized. This case squarely implicates whether States and localities will have the most accurate voter data available when they are drawing districts, and, similarly, whether parties will have a complete dataset when they engage in redistricting litigation under the Voting Rights Act.

For these reasons, the Project respectfully requests leave to file the attached *amicus* brief addressing these issues in the companion cases *California v. Ross*, 3:18-cv-01865 and *San Jose v. Ross*, 3:18-cv-2279.

Respectfully submitted,

 */s/ Bryan K. Weir*
Bryan K. Weir
William S. Consovoy
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700

1

|   |   |
|---|---|
| | Arlington, VA 22201 |
| | (703) 243-9423 |
| July 2, 2018 | *Attorneys for Amicus Curiae* |

Motion for Leave to File Brief *Amicus Curiae* of Project on Fair Representation
Nos. 3:18-cv-01865, 3:18-cv-2279

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of July 2018, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the Northern District of California via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Bryan K. Weir
Bryan K. Weir
Counsel for *Amicus Curiae*

Bryan K. Weir
William S. Consovoy
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd.
Suite 700
Arlington, VA 22201
(703) 243-9423
bryan@consovoymccarthy.com
will@consovoymccarthy.com

Attorneys for *Amicus Curiae*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>     Plaintiffs,<br><br>     vs.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>     Defendants.<br>------------------------------------------------<br>CITY OF SAN JOSE, *et al.*,<br><br>     Plaintiffs,<br><br>     vs.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>     Defendants. | Case Numbers: 3:18-cv-01865, 3:18-cv-2279<br><br>**BRIEF *AMICUS CURIAE* OF PROJECT ON FAIR REPRESENTATION IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  August 9, 2018<br>Judge: Honorable Richard Seeborg<br>Dept.: 3 |

1

Brief *Amicus Curiae* of Project on Fair Representation – Nos. 3:18-cv-01865, 3:18-cv-2279

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTEREST OF *AMICUS CURIAE* ..................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................................... 1

ARGUMENT ....................................................................................................................................... 3

    I.    It Was Not "Arbitrary and Capricious" To Reinstate a Citizenship Question Because the Resulting Data Are Immensely Helpful to Redistricting and Voting Rights Litigation. ............................................................................................................................. 3

    II.   California and Its Allies Recognize the Usefulness of These Citizenship Data. ............. 8

CONCLUSION .................................................................................................................................. 10

# TABLE OF AUTHORITIES

**CASES**

*Arrington v. Daniels*,
  516 F.3d 1106 (9th Cir. 2008) .................................................................................. 3, 7

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ........................................................................................................ 4, 5

*Burns v. Richardson*,
  384 U.S. 73 (1966) ........................................................................................................... 4

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ......................................................................................................... 3

*Davidson v. City of Cranston, Rhode Island*,
  837 F.3d 135 (1st Cir. 2016) ........................................................................................... 4

*Evenwel v. Abbott*,
  136 S. Ct. 1120 (2016) ..................................................................................... 1, 2, 3, 4, 8

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003) ......................................................................................................... 6

*Growe v. Emison*,
  507 U.S. 25 (1993) ....................................................................................................... 2, 4

*Karcher v. Daggett*,
  462 U.S. 725 (1983) ......................................................................................................... 7

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ..................................................................................................... 5, 7

*Perry v. Perez*,
  132 S. Ct. 934 (2012) ....................................................................................................... 1

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ..................................................................................................... 3, 6

*Riley v. Kennedy*,
  553 U.S. 406 (2008) ......................................................................................................... 1

*Semple v. Williams*,
  290 F. Supp. 3d 1187 (D. Colo. 2018) ............................................................................ 4

*Shelby Cty. v. Holder*,
  133 S. Ct. 2612 (2013) .................................................................................................. 1

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ....................................................................................................... 4

**OTHER AUTHORITIES**

Ana Henderson, *Citizenship, Voting, and Asian American Political Engagement*,
  3 U.C. Irvine L. Rev. 1077 (2013) ............................................................................... 6

Br. of DNC as *Amicus Curiae*,
  *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ............................................................... 10

Br. of Former Census Bureau Directors as *Amicus Curiae*,
  *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ............................................................... 10

Br. of New York et al. as *Amici Curiae*,
  *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ...................................................... 8, 9, 10

DNC on Impacts in Florida From Census Question About Citizenship, DNC (Mar. 27, 2018) ..... 9

Ga. Const. art. 3, § 2 ........................................................................................................ 6

Letter from Arthur Gary (Dec. 12, 2017) ......................................................................... 7

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count,
  and Where to Count Them*,
  32 Cardozo L. Rev. 755 (2011) ................................................................................ 5, 6

Oral Arg. Tr.,
  *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ................................................................. 6

Robert Heath, *Applying the Voting Rights Act in an Ethnically Diverse Nation*,
  85 Miss. L.J. 1305 (2017) ............................................................................................ 7

Samantha Schmidt, *California, NY sue Trump administration over addition of citizenship
  question to census*,
  Wash. Post (Mar. 27, 2018) ....................................................................................... 10

Secretary Ross Memorandum to Karen Dunn Kelley (Mar. 26, 2018) ............................ 7

U.S. Census Bureau,
  *A Compass for Understanding and Using American Community Survey Data* (Oct. 2008) ... 5, 6

U.S. Census Bureau,
  *American Community Survey Information Guide* (Oct. 2017) ................................... 5

## INTEREST OF *AMICUS CURIAE*

The Project on Fair Representation (the "Project") is a public interest organization dedicated to the promotion of equal opportunity and racial harmony. The Project works to advance race-neutral principles in voting, education, public contracting, and public employment. Through its resident and visiting academics and fellows, the Project conducts seminars and releases publications relating to redistricting and the Voting Rights Act. The Project also has been involved in cases involving these important issues, *see, e.g.*, *Shelby Cty. v. Holder*, 133 S. Ct. 2612 (2013), and has filed *amicus* briefs as well, *see, e.g.*, *Perry v. Perez*, 132 S. Ct. 934 (2012); *Riley v. Kennedy*, 553 U.S. 406 (2008).

The Project has a direct interest in this case. The Project has supported litigation where the question and availability of data on eligible voters has been at the center of the case. *See Evenwel v. Abbott*, 136 S. Ct. 1120 (2016). And the Project has been involved in litigation under the Voting Rights Act, where such data are regularly utilized. This case squarely implicates whether States and localities will have the most accurate voter data available when they are drawing districts, and, similarly, whether parties will have a complete dataset when they engage in redistricting litigation under the Voting Rights Act. For these reasons, the Project respectfully submits this brief in support of Defendants and urges the Court to grant the motion to dismiss.

## SUMMARY OF ARGUMENT

Plaintiffs' challenge to the decision of the Department of Commerce (the "Department") to reinstate a citizenship question to the decennial census should be dismissed. Plaintiffs assert, *inter alia*, that the decision was "arbitrary and capricious" under the Administrative Procedure Act ("APA"). As the Department has comprehensively explained, there is no basis for even reaching the merits of that argument. But even if the Court disagrees, the argument fails as a matter of law. The agency is entitled to significant deference under the arbitrary and capricious standard. The court evaluates only whether the agency considered the relevant aspects of the issue and provided a rational explanation for its decision. The Department complied with the APA in making this decision. As the Supreme Court recently made clear, States and localities have the constitutional prerogative to draw districts in order to equalize the total number of eligible voters in each district rather than to equalize the total number of persons. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1132-

1

Brief *Amicus Curiae* of Project on Fair Representation – Nos. 3:18-cv-01865, 3:18-cv-2279

33 (2016). Reinstating the citizenship question to the decennial census will provide States with the most reliable and usable data regarding the number of eligible voters. The Department's decision is rational for that reason alone.

Those data are also critical to the Department of Justice and to parties involved in litigation under Section 2 of the Voting Rights Act ("VRA"). The Supreme Court has interpreted Section 2 to prohibit States and localities from drawing their legislative districts to dilute the voting power of minorities. To prevail on such a claim, the minority group must prove that it "has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993). In other words, the group must prove that the State or locality could have drawn a district where the minority group comprised a majority of eligible voters. But the primary source for eligible voter data used in Section 2 litigation—the American Community Survey ("ACS")—has been subject to criticism. Unlike the census, for example, the ACS does not count every single person. It instead samples a subset of the population and estimates the total number with a margin of error. The ACS also does not provide data on the same level of granularity as the census. Unlike the census, moreover, the ACS is a rolling survey; it never provides an exact snapshot of the population upon which State and local governments can rely to draw their districts. It was thus entirely rational for the Department, at DOJ's urging, to seek more detailed eligible-voter data than currently exists in order to provide DOJ, States, localities, and Section 2 litigants a more comprehensive picture of the eligible-voter population. There is nothing arbitrary or capricious about a decision like that.

California, in particular, is one of the most unlikely candidates to bring a successful "arbitrary and capricious" challenge to the Department's decision. Just three years ago, California strongly criticized ACS data in the *Evenwel* litigation. Before the Supreme Court, California joined an *amicus* brief—filed by New York on behalf of itself, California, and 19 other States—that levied precisely the same charges against ACS data that DOJ outlined for the Department. Yet California now argues, quite hypocritically, that the decision to address and fix those perceived problems is arbitrary and capricious. This challenge is not just legally flawed—it lacks any credibility.

**ARGUMENT**

**I.     It Was Not "Arbitrary and Capricious" To Reinstate a Citizenship Question Because the Resulting Data Are Immensely Helpful to Redistricting and Voting Rights Litigation.**

The Department persuasively explains why Plaintiffs' suit should be dismissed without reaching the merits.[1] But Plaintiffs' claim that the Department's decision is "arbitrary and capricious" under the APA fails as a matter of law in any event.[2] Under that standard, the "scope of review is narrow and deferential." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). "The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). And to uphold the agency's action, the court need only conclude that the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation omitted).

The Department's decision to reinstate the citizenship question easily surpasses that low bar. When States and localities draw maps, they must equalize each district "on a population basis" to comply with the one-person, one-vote requirement of the Equal Protection Clause. *Reynolds v. Sims,* 377 U.S. 533, 568 (1964). After a dispute arose over whether States *must* use eligible voters as the population base, the Supreme Court ruled that they did not. *Evenwel*, 136 S. Ct. at 1126-33. Rather, the Supreme Court affirmed the lower court's ruling that Texas had discretion to choose whether to redistrict based on total population or eligible voters because each is a "neutral, nondiscriminatory population baseline." *Id*. at 1126; *see also id*. at 1133 (Thomas, J., concurring in the judgment) ("I agree with the majority that our precedents do not require a State to equalize the total number of voters in each district. States may opt to equalize total population."). Accordingly, the decision clarified that no decision *prevents* States from redistricting based on the

---

[1] *See California et al. v. Ross et al.*, 3:18-cv-1865, Doc. 37, at 11-26 (June 21, 2018); *San Jose et al. v. Ross et al*., 3:18-cv-2279, Doc. 55, at 12-27 (June 21, 2018).

[2] *See California et al. v. Ross et al.*, 3:18-cv-1865, Doc. 17, at ¶¶ 53-59 (Mar. 26, 2018); *San Jose et al. v. Ross et al*., 3:18-cv-2279, Doc. 1, at ¶¶ 112-17 (Apr. 27, 2018).

3

population of eligible voters. *See id*. at 1143-44 (Alito, J., concurring); *see, e.g.*, *Burns v. Richardson*, 384 U.S. 73, 90-96 (1966) (redistricting based on total number of registered voters).

In fact, "*Evenwel* reinforced ... that courts should give wide latitude to political decisions related to apportionment that work no invidious discrimination. It has long been constitutionally acceptable … to exclude non-voting persons such as 'aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime from the apportionment base,' *Burns*, 384 U.S. at 92, so long as the apportionment scheme does not involve invidious discrimination," *Davidson v. City of Cranston, Rhode Island*, 837 F.3d 135, 143 (1st Cir. 2016). The Supreme Court, in sum, has "never disagreed with the[] basic premise that a disparity in voter population among legislative districts dilutes the voting power of eligible voters in voter-rich districts as compared to districts with a lower ratio of voting-eligible population to total population." *Semple v. Williams*, 290 F. Supp. 3d 1187, 1196 (D. Colo. 2018). By asking about citizenship on the census, the Department will provide States and localities with the best possible data should they decide, as Hawaii once did, to equalize districts based on a metric other than total population. The Department's decision therefore is not arbitrary and capricious: providing States and localities with the voter data they need to fulfill their redistricting responsibilities is an indisputably rational decision.

Indeed, data that the decennial Census collects have long assisted States and localities in drawing districts that comply with Section 2 of the VRA. Having these citizenship data will be especially helpful. The Supreme Court has held that Section 2 prohibits States and localities from engaging in "vote dilution" when they redistrict. Vote dilution occurs when States and localities weaken "minority voting strength by submerging [minority] voters into the white majority, denying them an opportunity to elect a candidate of their choice." *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality op.). One of the "necessary preconditions" for proving a Section 2 vote-dilution claim, importantly, is showing that the minority group is "sufficiently large and geographically compact to constitute a majority" in a district. *Id*. (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). This "compactness" requirement ensures that "the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993).

To prove the "compactness" element, the plaintiff (which is DOJ in many cases) must establish that a minority group can make up at least 50.1% of *eligible* voters in a hypothetical district. *Bartlett*, 556 U.S. at 12-20 (plurality op.). Courts use Citizen Voting Age Population, or CVAP, as the relevant metric in making this determination because, after all, "only eligible voters affect a group's opportunity to elect candidates." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006) (opinion of Kennedy, J.) ("*LULAC*"); *see also id.* at 493-94 (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part and joined by Alito, J.) (relying on eligible voters as the relevant metric); *Bartlett*, 556 U.S. at 26-27 (Souter, J., dissenting and joined by Stevens, Ginsburg, and Breyer, JJ.) (same). "Linedrawers seeking to comply with the VRA," therefore, "are mostly interested … in the share of citizens at the neighborhood level that is [minority] and of voting age." Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardozo L. Rev. 755, 776 (2011). Without the most accurate data on eligible voters, however, those who draw the lines are handicapped in their efforts to comply with Section 2, as are plaintiffs in their efforts to enforce Section 2 through litigation.

In previous redistricting cycles (and in ongoing redistricting litigation), States and localities, the Department of Justice, and private plaintiffs all have relied on CVAP data from the ACS to calculate whether a minority group can make up over 50% of a district's eligible voters. Unlike the decennial Census, however, the ACS is an ongoing survey that "covers a broad range of topics about social, economic, demographic, and housing characteristics of the U.S. population." U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data* 1 (Oct. 2008) ("Compass"), https://bit.ly/2kBTuQH. And instead of contacting every household once a decade, ACS contacts "3 million addresses each year, resulting in nearly 2 million final interviews." *Id.* at 3. Accordingly, while the ACS data are useful, they are not nearly as complete as information collected through the decennial Census. Indeed, despite widespread reliance on ACS data, they have been subject to extensive criticism. *See, e.g.*, Persily, *supra*, at 776-80. Critics believe the data are incomplete because they sample only one in every 38 households. *See* U.S. Census Bureau, *American Community Survey Information Guide* 3 (Oct. 2017), https://bit.ly/2oNmhCo. The ACS "does not provide 'counts' of the population; it provides

estimates of the population." Ana Henderson, *Citizenship, Voting, and Asian American Political Engagement*, 3 U.C. Irvine L. Rev. 1077, 1100 (2013). This means that, "[u]nlike the redistricting data the census makes available, … ACS estimates come with a margin of error." Persily, *supra*, at 776. According to critics, that margin could be the difference in determining whether a minority-majority district is even possible. *Id.* ("The errors inherent in such estimates are necessarily greater for the populations of interest for voting rights law.").

In addition, the ACS does not provide data for all jurisdictions. The yearly report covers only those cities with over 65,000 people and the three-year report covers only those cities with over 20,000 people. *See* Compass, *supra*, at 3, 10. The ACS must therefore "combine population or housing data from multiple years to produce reliable numbers for small counties, neighborhoods, and other local areas." *Id.* at 3. Justice Sotomayor raised this concern during the *Evenwel* oral argument. In her view, the ACS data have "almost decisively been proven as inadequate" in part because the one-year data "only measure[] cities with populations or places with populations over 65,000." Oral Arg. Tr. 15:12-14, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016). But "even aggregating five years of answers, the data are still not available at the census block level." Henderson, *supra*, at 1110. "This is problematic," ACS critics argue, "because district drawing often requires precise population calculations which can even go down to the census block level." *Id.*

Moreover, because ACS data are rolling, they are not published on the timeline for redistricting. "When the decennial census numbers are released, States must redistrict [for federal elections] to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). And States typically choose to redistrict their state legislative districts at the same time as their congressional districts using the same decennial Census data. *See, e.g.*, *Reynolds*, 377 U.S. at 583; Ga. Const. art. 3, § 2 ("The apportionment of the Senate and of the House of Representatives shall be changed by the General Assembly as necessary after each United States decennial census."). But ACS data, critics emphasize, never provide a complete snapshot for all jurisdictions in the same way as Census data; it is a rolling dataset of varying measures that creates "new estimates released every year." Persily, *supra*, at 777. Because the ACS data "reflect a different time than that represented by the decennial census that typically provides the data for

6

actually drawing districts, it is not as helpful as one would like." C. Robert Heath, *Applying the Voting Rights Act in an Ethnically Diverse Nation*, 85 Miss. L.J. 1305, 1330 (2017). And using such rolling data could lead to "constant redistricting, with accompanying costs and instability." *LULAC*, 548 U.S. at 421 (opinion of Kennedy, J.). That is why the Supreme Court has explained that "the census count represents the 'best population data available.'" *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (citation omitted).

The Census Bureau recognized that reinstating a citizenship question to the decennial census addresses these criticisms of ACS data. Last December, DOJ asked the Census Bureau to reinstate the question so it could provide census-block-level CVAP data. *See* Letter from Arthur Gary (Dec. 12, 2017), https://bit.ly/2kHzMmw. DOJ explained that such "data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting." *Id.* at 1. "To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected." *Id.* DOJ noted the perceived pitfalls in ACS data: "ACS estimates are rolling and aggregated"; ACS data generally do not "align in time" with the redistricting calendar; and ACS data "are reported at a ninety percent confidence level and the margin of error increases as the sample size—and, thus, the geographic area—decreases." *Id.* at 3. The decennial census, on the other hand, has none of those defects. *See id.*

The Department agreed to DOJ's request and reinstated a citizen question in response. *See* Secretary Ross Memorandum to Karen Dunn Kelley (Mar. 26, 2018), https://bit.ly/2pIZlXr. Secretary Ross explained that "as with all significant Census assessments" he "prioritized the goal of obtaining *complete and accurate data*." *Id.* at 1. Because "DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ('VRA'), … having these data at the census block level will permit more effective enforcement of the Act." *Id.* For this additional reason, it was not "arbitrary and capricious" for the Department to reinstate the citizenship question. The Department has "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Arrington*, 516 F.3d at 1112 (citation omitted).

## II. California and Its Allies Recognize the Usefulness of These Citizenship Data.

What makes California's lawsuit so puzzling is *California* has argued that ACS data are inadequate and pointed to the decennial Census as the answer to that problem. *See* Br. of New York et al. as *Amici Curiae*, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (joined by California) ("California Am. Br."). In *Evenwel*, as noted above, two voters challenged the constitutionality of their legislative districts under the "one-person, one-vote" principle because while their districts had roughly the same total population as other districts, a much larger percentage in their districts were eligible voters. *Evenwel*, 136 S. Ct. at 1125. That disparity diminished the weight of plaintiffs' votes. *See id.* One vote among 1,000 other votes, for example, is worth less than one vote among 100 other votes. The voters therefore argued that States and localities were required to draw their districts based on CVAP rather than total population.

California joined 20 other states on an *amicus* brief in *Evenwel* arguing against that position. They argued, *inter alia*, that requiring States and localities to draw maps based on CVAP was impractical because "States lack any reliable administrative method to equalize districts based on 'eligible voter' population." California Am. Br. 14-26. "No existing source of data," in their view, "provides information about the population of potential voters as robust, detailed, or useful as the total-population enumeration provided by the Census to the States." *Id.* at 16.

They attacked ACS data specifically as insufficient. Like other critics, they complained that "[t]he Survey estimate of CVAP is not an actual count of voting-age citizens …, but rather an extrapolation from a small sample (2.5%) of households." *Id.* at 18. And the corresponding margin of error did not allow "the same level of confidence as an actual enumeration." *Id.* at 19. ACS data were also lacking, they argued, because the ACS could not "generate CVAP data with sufficient accuracy at the level of census blocks—the basic units of legislative map-making," which meant that the ACS did not provide eligible-voter data "at the level of granularity that the States require for purposes of drawing state legislative districts." *Id.* at 19. They further argued that "[a]dditional uncertainty comes from the fact that there is no single CVAP data set that is the authoritative estimate of the population of voting-age citizens." *Id.* The ACS instead "produces CVAP figures in three separate data sets encompassing survey responses from the one, three, or five years, each of which provides different CVAP estimates." *Id.*

The Department's decision addresses the concerns that California itself raised just three years ago. *See supra* Section I. The census count would not be an estimate with a margin of error; there would be CVAP data at the census block level; and the data would not be issued on a rolling, partial basis. Yet California hypocritically claims that decision to address its stated concerns is, for some reason, "arbitrary and capricious." This argument lacks credibility.

California and the other States made additional arguments in their *amicus* brief that the Department's decision remedies. They argued that, in the absence of the Census collecting CVAP data, "States are … ill-equipped to obtain an accurate count of the population of potential voters" themselves. California Am. Br. 17. And "even if States could conduct such a massive undertaking, their past experience demonstrates the high risk that state-run counts could be plagued by inaccuracies" *Id.* They explained that it was better for States to simply rely on "the Census's more accurate and reliable enumeration." *Id.* at 18. They further noted that using current CVAP estimates "raises the risk of partisan manipulation" because States could "'select among various estimation techniques' for population" and "hand[] 'the party controlling' the redistricting process 'the power to distort representation in its own favor.'" *Id.* at 20 (quoting *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 348 (1999) (Scalia, J., concurring)). They also noted that "courts may have difficulty 'reviewing estimation techniques in the future' when disputes arise[] 'to determine which of them so obviously creates a distortion that it cannot be allowed." *Id.* (citation omitted). This is "particularly true," they explained, "when … there is no actual count of voting-age citizenship population to serve as a benchmark." *Id*. The decision to reinstate a citizenship question resolves these concerns. California acknowledged as much just three years ago, positing that "the Census's 'genuine enumeration'" is "perhaps 'the most accurate way of determining population with minimal possibility of partisan manipulation." *Id*. (citation omitted).

But California is not alone in its abrupt about-face. Others who have publicly opposed the Department's decision lack credibility. For example, the Democratic National Committee ("DNC") labeled the decision "[a] craven attack on our democracy." DNC on Impacts in Florida From Census Question About Citizenship, DNC (Mar. 27, 2018), https://bit.ly/2xyP86a. Yet the DNC previously critiqued ACS data as insufficient and noted that the alleged problem existed because "[t]he United States Census does not ask questions about citizenship." Br. of DNC as

9

Brief *Amicus Curiae* of Project on Fair Representation – Nos. 3:18-cv-01865, 3:18-cv-2279

*Amicus Curiae* 15-18, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016); *compare* Samantha Schmidt, *California, NY sue Trump administration over addition of citizenship question to census*, Wash. Post (Mar. 27, 2018) (Former Census Bureau director Kenneth Prewitt noting that the Secretary's decision "makes for a stormy situation"), *with* Br. of Former Census Bureau Directors as *Amicus Curiae* 13-22, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (joining brief criticizing the use of ACS data for redistricting).

In sum, California recently lamented that "Census Bureau does not collect information about potential voters as part of its decennial count" and that it "has expressly declined to collect such information in the past." California Am. Br. 16-17. Now that the Census Bureau has decided to collect that information, Plaintiffs object. But their own prior arguments demonstrate that the Department's decision was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' memorandum, the Court should grant the motion to dismiss.

Respectfully submitted,

/s/ Bryan K. Weir
Bryan K. Weir
William S. Consovoy
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423

July 2, 2018                                    *Attorneys for Amicus Curiae*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

STATE OF CALIFORNIA,

    Plaintiffs,

vs.

WILBUR L. ROSS, JR., *et al.*,

    Defendants.

---

CITY OF SAN JOSE, *et al.*,

    Plaintiffs,

vs.

WILBUR L. ROSS, JR., *et al.*,

    Defendants.

Case Numbers: 3:18-cv-01865, 3:18-cv-2279

**[PROPOSED] ORDER**

Upon consideration of Project on Fair Representation's Notice of Motion & Motion for Leave to File Brief *Amicus Curiae*, it is hereby

ORDERED that the motion is granted.

Date: July __, 2018

_____
Honorable Richard Seeborg
United States District Judge