XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE, SBN 238485
GABRIELLE D. BOUTIN, SBN 267308
Deputy Attorney General
State Bar No. 267308
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6053
  Fax: (916) 324-8835
  E-mail: Gabrielle.Boutin@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, et al.,**<br><br>                                        Plaintiffs,<br><br>      **v.**<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>                                        Defendants. | 3:18-cv-01865<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**<br><br>Date:             August 10, 2018<br>Time:            10:00 a.m.<br>Dept:            3<br>Judge:           The Honorable Richard G. Seeborg<br>Trial Date:     None set<br>Action Filed:  3/26/2018 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.    The Constitutional, Statutory, and Regulatory Framework Governing the Decennial Census ......................................................................................... 2

II.    Allegations in the First Amended Complaint ........................................................ 5

LEGAL STANDARDS........................................................................................................ 9

ARGUMENT ...................................................................................................................... 10

I.    Plaintiffs Have Article III Standing to Challenge Defendants' Unlawful Demand for Citizenship Information on the 2020 Census.................................... 10

A.    Plaintiffs' Allegations Plausibly Allege an Imminent or Substantial Risk of Concrete and Particularized Harm Resulting from the Secretary's Action ......................................................................... 10

1.    Plaintiffs provide detailed factual support for their allegation that a citizenship question will result in a disproportionate undercount ................................................................... 10

2.    The alleged harmful impacts resulting from a disproportionate undercount are not overly attenuated or speculative................................................................................ 12

B.    Plaintiffs' Injuries Are Fairly Traceable to Defendants' Decision to Include a Citizenship Question on the 2020 Census................................ 14

II.    Defendants' Unlawful Conduct Is Subject to Judicial Review............................ 16

A.    Plaintiffs' Claims Are Not Barred by the Political Question Doctrine........................................................................................ 16

1.    The Constitution does not textually commit the conduct of the census to the sole, exclusive authority of Congress................ 17

2.    Judicially-manageable standards allow the court to review Defendants' conduct of the census............................................. 19

B.    The Secretary's Decision to Add a Citizenship Question to the 2020 Census is Reviewable Under the APA.................................................... 20

III.    Plaintiffs Have Stated a Claim Under the Actual Enumeration Clause ............... 25

CONCLUSION ................................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) .................................................................................................9

*Baker v. Carr*
    369 U.S. 186 (1962) ................................................................................16, 17, 19

*Barnum Timber Co. v. EPA*
    633 F.3d 894 (9th Cir. 2011) .................................................................................15

*Beno v. Shalala*
    30 F.3d 1057 (9th Cir. 1994) .................................................................................24

*Bowen v. Michigan Acad. of Family Physicians*
    476 U.S. 667 (1986) ..............................................................................................20

*Burlington Truck Lines, Inc. v. United States*
    371 U.S. 156 (1962) ..............................................................................................22

*Carey v. Klutznick*
    637 F.2d 834 (2d Cir. 1980) ...........................................................14, 18, 20, 23

*Carey v. Klutznik*
    508 F. Supp. 404 (S.D.N.Y. 1980) ..................................................16, 17, 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*
    401 U.S. 402 (1971) ..............................................................................................21

*City of Camden v. Plotkin*
    466 F. Supp. 44 (D.N.J. 1978) .............................................................................20

*City of Detroit v. Franklin*
    4 F.3d 1367 (6th Cir. 1993) ............................................................................14, 24

*City of Los Angeles v. U.S. Dep't of Commerce*
    307 F.3d 859 (9th Cir. 2002) .................................................................................14

*City of New York v. United States Dep't of Commerce*
    713 F. Supp. 48 (E.D.N.Y. 1989) ................................................................20, 23

*City of Philadelphia v. Klutznick*
    503 F. Supp. 663 (E.D. Pa. 1980) .................................................14, 17, 20, 23

**TABLE OF AUTHORITIES**
(continued)

Page

*Clarke v. Secs. Indus. Ass'n*
479 U.S. 388 (1987) ............................................................................................14

*Corrie v. Caterpillar, Inc.*
503 F.3d 974 (9th Cir. 2007) ..............................................................................16

*Ctr. for Biological Diversity v. Mattis*
868 F.3d 803 (9th Cir. 2017) .........................................................................10, 16

*Cuomo v. Baldrige*
674 F. Supp. 1089 (S.D.N.Y. 1987) ....................................................................20

*Dep't of Commerce v. U.S. House of Representatives*
525 U.S. 316 (1999) ...............................................................................13, 17, 26

*Dist. of Columbia v. U.S. Dep't of Commerce*
789 F. Supp. 1179 (1992) ...................................................................................23

*Evenwel v. Abbott*
136 S. Ct. 1120 (2016), 2015 WL 5675832 .....................................................6, 11

*Fed. For Am. Immigration Reform v. Klutznick*
486 F. Supp. 564 (D.D.C. 1980) .........................................................................13

*Franklin v. Massachusetts*
505 U.S. 788 (1992) (Stevens, J., concurring in part) ......................................*passim*

*Glavin v. Clinton*
19 F. Supp. 2d 543 (E.D. Va. 1998) ..............................................................13, 14

*Hanford Downwinders Coal., Inc. v. Dowdle*
841 F. Supp. 1050 (E.D. Wash. 1993) ..................................................................9

*Heckler v. Chaney*
470 U.S. 821 (1985) ...........................................................................................21

*I.N.S. v. Yueh-Shaio Yang*
519 U.S. 26 (1996) .......................................................................................21, 23

*In re Zappos.com, Inc.*
888 F.3d 1020 (9th Cir. 2018) .................................................................10, 12, 15

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*
478 U.S. 221 (1986) ...........................................................................................16

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Jewel v. Nat'l Sec. Agency*
    673 F.3d 902 (9th Cir. 2011)...............................................................................9, 12

*Juliana v. United States*
    217 F. Supp. 3d 1224 (D. Or. 2016) ...............................................................16, 17

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)...........................................................................................9, 14

*Matrixx Initiatives, Inc. v. Siracusano*
    563 U.S. 27 (2011) ...................................................................................................9

*Mendez–Gutierrez v. Ashcroft*
    340 F.3d 865 (9th Cir. 2003)............................................................................21, 23

*Mendia v. Garcia*
    768 F.3d 1009 (9th Cir. 2014)...............................................................................15

*Morgan v. United States*
    801 F.2d 445 ..........................................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) ................................................................................................22

*New York v. United States Dep't of Commerce*
    739 F. Supp. 761 (E.D.N.Y. 1990) .......................................................................20

*Newman v. Apfel*
    223 F.3d 937 (9th Cir. 2000)..................................................................................24

*Nixon v. United States*
    506 U.S. 224 (1993) ..............................................................................................17

*Organized Village of Kake v. U.S. Dep't of Agric.*
    795 F.3d 956 (9th Cir. 2015)..................................................................................13

*Pinnacle Armor, Inc. v. U.S.*
    648 F.3d 708 (9th Cir. 2011).............................................................20, 21, 23, 24

*Ridge v. Verity*
    715 F. Supp. 1308 (W.D. Pa. 1989) ......................................................................13

*Rumsfeld v. Forum for Acad. & Institutional Rights*, Inc.
    547 U.S. 47 (2006)................................................................................................12

iv

1

### TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Salazar v. King*
    822 F.3d 61 (2d Cir. 2016)................................................................................23

4

*Senate of State of California v. Mosbacher*
    968 F.2d 974 (9th Cir. 1992)............................................................................25

5

6

*Tucker v. Department of Commerce*
    958 F.2d 1411 (7th Cir. 1992)..........................................................................24

7

8

*U.S. Dept. of Commerce v. Montana*
    503 U.S. 442 (1992) ..................................................................................16, 17

9

*U.S. House of Representatives v. U.S. Dep't of Commerce*
    11 F. Supp. 2d 76 (D.D.C. 1998) ....................................................................17

10

11

*United Transp. Union v. BNSF Ry. Co.*
    710 F.3d 915 (9th Cir. 2013)..............................................................................9

12

13

*Utah v. Evans*
    536 U.S. 452 (2002) ................................................................17, 18, 21, 26

14

*Webster v. Doe*
    486 U.S. 592 (1988) ........................................................................................24

15

16

*Willacoochee v. Baldrige*
    556 F. Supp. 551 (S.D. Ga. 1983) ...................................................................20

17

18

*Wisconsin v. City of New York*
    517 U.S. 1 (1996) .................................................................................. *passim*

19

*Young v. Baldrige*
    455 U.S. 939 (1982) ........................................................................................20

20

21

*Young v. Klutznick*
    497 F. Supp. 1318 (E.D. Mich. 1980) ........................................................17, 20

22

23

**STATUTES**

24

2 United States Code § 2a(a)........................................................................................22

25

5 United States Code
    § 701(a)(2)..............................................................................................21, 23

26

    § 706..............................................................................................................8

27

    § 706(2)(a).....................................................................................................22

28

# TABLE OF AUTHORITIES
## (continued)

Page

13 United States Code
§ 2 ....................................................................................................................3
§ 4 ....................................................................................................................3
§ 141 .........................................................................................................23, 24
§ 141(a) ......................................................................................................3, 23
§ 141(f)(1) ........................................................................................................5
§ 141(f)(1), (2) .................................................................................................3

44 United States Code
§ 3501(9) ..........................................................................................................3
§ 3504(e)(3)(A) ...............................................................................................4
§ 3506(e)(1) ......................................................................................................4
§ 3506(e)(4) ......................................................................................................4

**CONSTITUTIONAL PROVISIONS**

United States Constitution, Article I
§ 2, cl. 3 ...........................................................................................................2
§ 2, cl. 3 and Amendment XIV ........................................................................1
§ 2, clause 3 ..................................................................................................2, 8
§ 2, clause 3, Amendment XIV ........................................................................2
§ 3, clause 6 ....................................................................................................17
§ 5, clause 1 ....................................................................................................17

**COURT RULES**

Federal Rules of Civil Procedure
Rule 8(a) ...........................................................................................................9
Rule 12(b)(1) ....................................................................................................9
Rule 12(b)(6) ....................................................................................................9

**OTHER AUTHORITIES**

5 Federal Regulations § 1320.18(c) .........................................................................4

71 Federal Regulations 55,522.................................................................................4

79 Federal Regulations
71,610 ...............................................................................................................4
71,615 ...............................................................................................................4

**INTRODUCTION**

The U.S. Constitution requires Defendants to take an "actual Enumeration" of the population every ten years by counting "the whole number of persons in each State," without regard to citizenship status.  U.S. Const. art. I, § 2, cl. 3 and amend. XIV.  There has been no citizenship question on the decennial census since 1950.  For nearly 40 years, the Census Bureau (Bureau) has taken the affirmative position that a citizenship question on the census questionnaire would deter participation and undermine the accuracy of the census.

Ignoring this precedent, Secretary of Commerce Wilbur Ross announced in March of 2018 his eleventh-hour decision to add a citizenship question to the 2020 Census.  Secretary Ross's politically-motivated decision was made despite:  (1) the Bureau's knowledge that the question would cause a serious undercount of certain demographic groups, particularly immigrants; (2) the Bureau's complete failure to pre-test the question for the decennial census in violation of governing regulations and established Bureau policies; and (3) the Bureau's own recommendation to Ross that he *not* include the citizenship question and instead rely on administrative records, which would provide better data.

The inclusion of the citizenship question will cause concrete harms to Plaintiffs, who have disproportionately large numbers of non-citizen residents.  These harms include the likely loss of a congressional seat for the State of California and substantial losses in federal funding for all Plaintiffs.

Defendants advance three arguments in their motion to dismiss.  First, they argue that Plaintiffs lack standing because their injuries are purportedly too speculative and not fairly traceable to Secretary Ross' decision.  Defendants' standing argument is based on nothing more than factual disputes related to Plaintiffs' alleged injuries.  While such disputes may be properly considered at summary judgment or trial, they do not provide a basis for dismissal at the pleadings stage, particularly when Plaintiffs have alleged sufficient facts to support standing.  Second, Defendants argue that the Secretary's decision is not judicially reviewable under the political question doctrine or the Administrative Procedure Act (APA).  Yet, Defendants cite virtually no relevant legal authority in support of this argument; courts in similar contexts have

squarely rejected the contention that such disputes are nonjusticiable.  Third, Defendants argue that Plaintiffs fail to state a claim under the Enumeration Clause.  Again, Defendants offer no legal support, and they are unable to meaningfully distinguish this case and the well-settled census decisions that have preceded it.

Plaintiffs' complaint alleges serious violations of the Enumeration Clause and the APA and sets forth detailed factual allegations related to Defendants' politically-motivated decision to add a citizenship question, and to the harm that such a decision will have on Plaintiffs.  As explained in greater detail below, Defendants' motion raises little more than unsupported argument and factual disputes, neither being sufficient to dismiss Plaintiffs' well-pled allegations at the pleadings stage.  Defendants' motion to dismiss should be denied in its entirety.

## BACKGROUND

### I.  THE CONSTITUTIONAL, STATUTORY, AND REGULATORY FRAMEWORK GOVERNING THE DECENNIAL CENSUS

The U.S. Constitution mandates a decennial census, referred to as the "actual Enumeration," in article I, section 2, clause 3, which states in relevant part, "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers . . . The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  The census count must include "the whole number of persons in each state."  *Id.* amend. XIV; *see also* Pub. L. No. 105-119, § 209(a)(3) (codified at 13 U.S.C. § 141 note).  The "sole" constitutional purpose of the census is congressional apportionment.  Pub. L. No. 105-119, § 209(a)(2); U.S. Const. art. I, § 2, cl. 3.   In addition to this purpose, the federal government also relies on census data to determine how to distribute billions of dollars of funding each year, including funding for Medicaid, Medicare Part B, the Supplemental Nutrition Assistance Program (SNAP), the State Children's Health Insurance Program (S-CHIP), and the Highway Planning and Construction Program.  First Amended Complaint (FAC) at ¶ 7.

2

Under the Census Act, Congress delegated its constitutional duty to conduct the census to the Secretary of Commerce and the Census Bureau, a federal statistical agency within the Department of Commerce.  13 U.S.C. §§ 2, 4, 141(a).  Congress has placed fundamental limits on the Secretary's discretion, declaring it "essential" to obtain a population count that is "as accurate as possible, consistent with the Constitution and laws of the United States," and subordinating the Secretary's authority to collect other information to this paramount goal.  Pub. L. No. 105-119 (codified at 13 U.S.C. § 141 note).  The Act also imposed strict statutory deadlines for developing and approving the content of the census questionnaire.  Under § 141(f), the Secretary must submit to Congress a final list of subjects to be covered in the census questionnaire at least three years before the census date, and must submit a final list of specific questions two years before the census date.  13 U.S.C. § 141(f)(1), (2).  Following the submission of each of these reports, the Secretary has limited discretion to alter their content, and may only do so if "new circumstances" exist that require the subjects or questions to be modified.  *Id.* § 141(f)(3).

Although Congress has delegated to the Secretary its constitutional duty to conduct the census, the Secretary does not have unfettered discretion in carrying out those duties.  *Wisconsin v. City of New York*, 517 U.S. 1 (1996).  The Secretary's actions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," which is "to determine the apportionment of the Representatives among the states."  *Id*. at 19-20.

Other federal laws prescribe the specific manner in which the census must be planned and conducted.  The Census Bureau is designated as a principal statistical agency within the federal statistical system,[1] and the development of the 2020 Census is governed by the Paperwork Reduction Act of 1995, which ensures the "integrity, quality, and utility of the Federal statistical system."[2]  44 U.S.C. § 3501(9). To regulate the activities of federal statistical agencies like the

---

[1] Office of Management and Budget, Statistical Programs of the United States Government: Fiscal Year 2018 at 6,
https://www.whitehouse.gov/wp-content/uploads/2018/05/statistical-programs-2018.pdf.

[2] 2020 Census Program Memorandum Series 2016:05 at 3-4 (Apr. 29, 2016),
https://www2.census.gov/programs-surveys/decennial/2020/program-

3

Census Bureau, the Paperwork Reduction Act directs the Office of Management and Budget

(OMB) to issue "[g]overnmentwide policies, principles, standards, and guidelines" governing

"statistical collection procedures and methods" that agencies are required to follow.  *Id.* at

§§ 3504(e)(3)(A), 3506(e)(4); 5 C.F.R. § 1320.18(c).  Moreover, each agency must "ensure the

relevance, accuracy, timeliness, integrity, and objectivity of the information collected."

44 U.S.C. § 3506(e)(1).  Pursuant to Congress's direction under the Paperwork Reduction Act,

OMB has issued Statistical Policy Directives defining the standards that agencies, including the

Census Bureau, must follow in developing and pretesting survey content.  Under these Directives,

the Bureau must:

- "function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments" and "conduct statistical activities autonomously when determining what information to collect and process";[3]

- design surveys "to achieve the highest practical rates of response, commensurate with the importance of survey uses";[4]

- pretest survey components, if they have not been successfully used before, to "ensure that all components of a survey function as intended when implemented in the full scale survey" and that "measurement error is controlled"; [5] and

- administer surveys in a way that "maximiz[es] data quality" while "minimizing respondent burden and cost."[6]

The Bureau has also issued Statistical Quality Standards that "apply to all

information products released by the Census Bureau and the activities that generate those

_____

management/memoseries/2020-memo-201605.pdf (describing Paperwork Reduction Act compliance requirements for the 2020 Census).

[3] Office of Mgmt. and Budget, Statistical Policy Directive No. 1., Fundamental Responsibilities of Fed. Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610, 71,615 (Dec. 2, 2014).

[4] Office of Management and Budget, Statistical Policy Directive No. 2, Standards and Guidelines for Statistical Surveys at §§ 1.3, 1.4, 2.3 (2006), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/statpolicy/standards_stat_surveys.pdf; see also 71 Fed. Reg. 55,522 (Sept. 22, 2006).

[5] *Id.* at § 1.4.

[6] *Id.* at § 2.3.

4

products"—including the decennial census.[7]  These standards impose rigorous pretesting requirements on the Bureau, including:

- "Data collection instruments and supporting materials must be pretested with respondents to identify problems . . . and then be refined, prior to implementation."[8]

- "Data collection instruments and supporting materials must be verified and tested to ensure that they function as intended."[9]

- Testing must be done not only in English, but also for the various foreign-language questionnaires that the Census provides.[10]

## II.   ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

The Bureau will conduct the next census, also known as the "decennial census," in 2020. FAC ¶ 2, ECF No. 12.  Although the census collects certain demographic information about the the respondents, the questionnaire has not asked about respondents' citizenship status since 1950. *Id.*  In March 2017, as required by 13 U.S.C. § 141(f)(1), the Bureau submitted to Congress a report of the proposed subjects planned for the 2020 Census; none related to citizenship or immigration status.  *Id.*

On December 12, 2017, nearly nine months after the subjects for the 2020 Census had been identified, the U.S. Department of Justice sent a letter to the Bureau requesting the inclusion of a citizenship question on the 2020 Census.  FAC ¶ 34.  The Department of Justice's stated rationale for adding a citizenship question was to assist the department's enforcement of Section 2 of the Voting Rights Act.  *Id.*

The Census Bureau has recognized for decades that adding a citizenship question to the decennial census would cause a problematic undercount of the population.  Since at least 1980, the Bureau has recognized that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count."  FAC ¶ 37 (citing *Fed. For Am. Immigration Reform v.*

---

[7] U.S. Census Bureau, Statistical Quality Standards at ii (Reissued Jul. 2013), https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf.
[8] *Id.* at 8.
[9] *Id.* at 10.
[10] *Id.*

*Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980)).  In 2016, four former Bureau Directors appointed by presidents of both parties stated in an amicus brief to the U.S. Supreme Court that "a one-by-one citizenship inquiry would invariably lead to a lower response rate to the Census in general," including "a reduced rate of response overall and an increase in inaccurate responses."[11] *Id.* at ¶ 5.

The Bureau's own 2017 study[12] revealed "an unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants," leading the Bureau to conclude that these concerns "may present a barrier to participation in the 2020 Census."  FAC ¶ 37.  Those concerns directly related to the current political climate and the current administration's controversial immigration policies, as the studies' respondents "express[ed] new concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members by reporting their demographic characteristics, the dissolution of the 'DACA' (Deferred Action for Childhood Arrival) program, repeated references to Immigration and Customs Enforcement (ICE), etc."  *Id.*

Nevertheless, on March 26, 2018, setting aside decades of practice, Secretary Ross announced in a memorandum (Ross Memo) that the final list of census questions to be submitted by the Department of Commerce to Congress would include a question on citizenship status. FAC at ¶ 35; Administrative Record (AR) at 1320, ECF No. 23-5.  Specifically, the question will ask, for every member of every household, whether that person is a citizen of the United States. *Id.*  In explaining his decision to add the citizenship question, the Secretary admitted that inclusion of the citizenship question risks causing an undercount.  *Id.* at ¶ 36.

Just a few months ago, Defendant Ron Jarmin, the Bureau's Acting Director, acknowledged in a congressional hearing that the inclusion of a citizenship question will cause more than a

---

[11] Brief of Former Directors of the U.S. Census Bureau as Amici Curiae in Support of Appellees at 23-26, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), 2015 WL 5675832.

[12] Memorandum from Center for Survey Measurement on Respondent Confidentiality Concerns to Associate Directorate for Research and Methodology, U.S. Census Bureau (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf (last visited Mar. 26, 2018).

"minimal" decline in 2020 Census participation, and that "in some communities, [the decline] might be important."  *See FY 2019 Budget Hearing – Bureau of the Census Before the H. Comm. On Appropriations*, 115th Cong. (2018)*,* Testimony of Ron Jarmin (Jarmin Testimony) starting at 1:39:47, response at 1:44:10.[13]  He further admitted that the decline "would be largely felt in various sub-groups, in immigrant populations [and] Hispanic populations."  *Id.* starting at 1:50:35, response at 1:50:48.  He also noted that Census Bureau staff had recommended that the "best approach" to obtain the information sought by the Department of Justice "would be to use administrative records rather than adding a citizenship question."  *Id.* starting at 1:19:10, response at 1:21:30.

Despite knowledge of the undercount risk and the applicable testing requirements imposed by the Paperwork Reduction Act, OMB regulations and the Bureau's own policies, the Bureau did not perform any testing related to the citizenship question before announcing that it would be included in the 2020 Census questionnaire.  FAC ¶ 38.  Shortly after the issuance of the Ross Memo, in April 2018, the Bureau began conducting the "2018 Census Test" in Providence County, Rhode Island (sometimes known as the "dress rehearsal") to "confirm key technologies, data collection methods, outreach and promotional strategies, and management and response processes that will be deployed in support of the 2020 Census."[14]  *Id.*  No citizenship question or similar question was included in the 2018 Census Test.  *Id.*

As recognized by Secretary Ross and the Bureau's own staff, inclusion of the citizenship question in the 2020 Census will likely lead to an undercount in various communities and jurisdictions.  The undercount of Californians will cause significant harm to the State of California, and its counties and cities, including Plaintiffs County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton.  FAC ¶ 40. Before the citizenship question was added, California was predicted to retain its current number

---

[13] Portions of this testimony are cited in Defendants' Memorandum in Support of Motion to Dismiss at 14 n.5.

[14] 2018 Census Test—About this Test, U.S. Census Bureau, https://www.census.gov/programs-surveys/decennial-census/2018-census-test/about.html (last visited Jul. 11, 2018).

1  of seats in the House of Representatives and, consequently, the Electoral College, but only by a

2  very slim margin.  *Id.*  Because California has a proportionately large population of non-citizens

3  and relatives of non-citizens compared to other states, the citizenship question will now likely

4  cause California to lose seats for the first time in its history.  *Id.*  Moreover, Plaintiffs, who

5  receive billions of dollars annually in funding from federal assistance programs that distribute

6  funds on the basis of census-derived statistics, will see such federal funding decrease as a result of

7  the undercount.  *Id.* at ¶ 41.

8      Plaintiffs' FAC, filed on May 4, 2018, states two causes of action.  The first cause of action

9  is for violation of the Enumeration Clause in article I, section 2, clause 3 of the Constitution.  *Id.*

10  at ¶¶ 47-52.  Plaintiffs allege that Defendants' inclusion of the citizenship question in the 2020

11  Census violates the Actual Enumeration Clause because the question will diminish the response

12  rates of non-citizens and their citizen relatives.  *Id.* at ¶ 49.  California, which has the largest

13  immigrant population in the country, and the County and City Plaintiffs will be disproportionately

14  affected by the census undercount, likely causing the state to lose a seat in Congress and all

15  Plaintiffs to lose substantial federal funding.  *Id.* at ¶¶ 40, 49-50.

16      The second cause of action is for violation of the APA.  *Id.* at ¶¶ 53-59.  Plaintiffs allege

17  that Defendants' agency action to add the citizenship question on the 2020 Census is "arbitrary,

18  capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to

19  constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction,

20  authority, or limitations, or short of statutory right" under 5 U.S.C. § 706.  *Id.* at ¶¶ 54-55.  In

21  addition to being contrary to the Constitution, the agency action did not follow required agency

22  procedures and policies and will not actually advance the stated purpose of proving voter dilution

23  under Section 2 of the Voting Rights Act.  *Id.* at ¶ 55.

24      Plaintiffs request a declaratory judgment and preliminary and permanent injunctions

25  prohibiting Defendants from including a citizenship question on the 2020 Census.  *Id.* at 15.

26

27

28

1

## LEGAL STANDARDS

2      A complaint need only set forth "a short and plain statement of the grounds for the court's

3  jurisdiction," and "a short and plain statement of the claim showing the pleader is entitled to

4  relief." Fed. R. Civ. P. rule 8(a).

5      In opposing a Rule 12(b)(1) motion, a plaintiff bears the burden of demonstrating that the

6  court has subject matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

7  (1992). However, "when the challenge to jurisdiction is based solely upon the sufficiency of the

8  complaint, the Court must accept the allegations in the complaint as true and must construe them

9  favorably to the pleader." *Hanford Downwinders Coal., Inc. v. Dowdle*, 841 F. Supp. 1050, 1057

10  (E.D. Wash. 1993), *aff'd*, 71 F.3d 1469 (9th Cir. 1995*), and aff'd sub nom. Columbia River*

11  *United v. Dowdle*, 76 F.3d 385 (9th Cir. 1996) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236

12  (1974).) "[T]he complaint should not be dismissed 'unless it appears beyond doubt that the

13  plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"

14  *Hanford Downwinders Coal.* 841 F. Supp. at 1057 (quoting *Scheur*, 416 U.S. at 236). Further, in

15  a challenge to plaintiffs' standing, "[g]eneral factual allegations of injury resulting from the

16  defendant's conduct may suffice" because courts must "presum[e] that general allegations

17  embrace those specific facts that are necessary to support the claim." *Jewel v. Nat'l Sec. Agency*,

18  673 F.3d 902, 907 (9th Cir. 2011) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)).

19      In opposing a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff "need

20  only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx*

21  *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, n.12 (2011) (quoting *Bell Atlantic Corp. v.*

22  *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

23  factual content that allows the court to draw the reasonable inference that the defendant is liable

24  for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When deciding

25  whether a pleading states a plausible claim for relief, [courts] are required by Rule 12(b)(6) to

26  consider a complaint's factual allegations together with all reasonable inferences" from those

27  allegations. *United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 930 (9th Cir. 2013).

28

1

## ARGUMENT

2

### I.   PLAINTIFFS HAVE ARTICLE III STANDING TO CHALLENGE DEFENDANTS'
### UNLAWFUL DEMAND FOR CITIZENSHIP INFORMATION ON THE 2020 CENSUS

3

4

To allege standing, Plaintiffs' complaint must state facts sufficient to demonstrate: (1)

5

injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

6

likely to be redressed by a favorable decision. *See, e.g.*, *Ctr. for Biological Diversity v. Mattis*,

7

868 F.3d 803, 816 (9th Cir. 2017).  Defendants argue that Plaintiffs have not alleged an injury in

8

fact or a sufficient causal connection between the alleged injury and Defendants' conduct. *See*

9

Defs.' Mem. at 11-18.  As the well pleaded allegations in the FAC make clear, Defendants'

arguments should be rejected.

10

11

### A.   Plaintiffs' Allegations Plausibly Allege an Imminent or Substantial Risk of
### Concrete and Particularized Harm Resulting from the Secretary's Action

12

To establish standing, a plaintiff must show that it has suffered an injury in fact that is "(a)

13

concrete and particularized and (b) actual and imminent." *In re Zappos.com, Inc.*, 888 F.3d 1020,

14

1024 (9th Cir. 2018) (citations omitted).  "A plaintiff threatened with future injury has standing to

15

sue if the threatened injury is certainly impending or there is a substantial risk that the harm will

16

occur." *Id.* (citations and quotations omitted).  Because the Bureau has recognized for decades

17

that adding a citizenship question to the decennial census will result in an undercount, and

18

because that undercount will harm California and its cities, Plaintiffs have plausibly alleged an

19

injury in fact.

20

### 1.   Plaintiffs provide detailed factual support for their allegation that a
### citizenship question will result in a disproportionate undercount

21

Defendants characterize as "entirely speculative" Plaintiffs' allegation that the addition of a

22

citizenship question to the 2020 Census questionnaire will lead to a disproportionate undercount

23

of certain demographic groups. *See* Defs.' Mem. at 13.  But Defendants completely ignore the

24

extensive allegations in the FAC detailing the prior statements of the Census Bureau and

25

numerous former Bureau directors, which affirm that the addition of a citizenship question will

26

produce just such a result.  For example:

27

28

10

(1)  Since at least 1980, the Census Bureau has recognized that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count."  FAC at ¶ 37 (citing *Fed. For Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980)).

(2)  In 2016, four former Census Bureau Directors appointed by presidents of both parties stated in an amicus brief to the U.S. Supreme Court that "a one-by-one citizenship inquiry would invariably lead to a lower response rate to the Census in general," including "a reduced rate of response overall and an increase in inaccurate responses."  FAC at ¶ 5; Brief of Former Directors of the U.S. Census Bureau as Amici Curiae in Support of Appellees at 23-26, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), 2015 WL 5675832.

(3)  In 2017, the Bureau's own study concluded that there is "an unprecedented groundswell" of concern that could "present a barrier to participation in the 2020 Census" and have a "disproportionate impact on hard-to-count populations," particularly immigrants and non-English speakers.  FAC at ¶ 37.

And just a few months ago, Defendant Jarmin acknowledged in a congressional hearing that the inclusion of a citizenship question will cause more than a "minimal" decline in 2020 Census participation, and that "in some communities, [the decline] might be important."  *See* Jarmin Testimony starting at 1:39:47, response at 1:44:10.  He further admitted that the decline "would be largely felt in various sub-groups, in immigrant populations [and] Hispanic populations."  *Id.* starting at 1:50:35, response at 1:50:48.  He also noted that Census Bureau staff had recommended that the "best approach" to obtain the information sought by the Department of Justice "would be to use administrative records rather than adding a citizenship question"—a recommendation that Secretary Ross rejected.  *Id.* starting at 1:19:10, response at 1:21:30.

Taken together, these allegations more than satisfy Plaintiffs' burden.  They suggest not only that a substantial risk of a disproportionate undercount due to the citizenship question is plausible, but that this risk is virtually certain to materialize.

Rather than addressing Plaintiffs' detailed allegations, Defendants seek to create a factual dispute by pointing to the Ross Memo's supposedly contrary conclusions (which Plaintiffs dispute).  *See* Defs.' Mem. at 13-14.  But at the pleading stage, Plaintiffs' factual allegations must

11

1    be accepted as true and construed broadly in their favor.  Defendants' argument "may be

2    appropriate for summary judgment but [is] not one that may support a facial challenge to standing

3    at the motion to dismiss stage."  *Zappos.com*, 888 F.3d at 1028; *see also Jewel*, 673 F.3d at 907

4    n.4 ("At the motion to dismiss stage, we do not consider the merits of Jewel's claim.").

5            Furthermore, even if it were appropriate for the Court to credit the Ross Memo's assertions,

6    the Memo does not suggest that a disproportionate undercount is unlikely, as Defendants argue.

7    To the contrary, the Memo cites evidence showing that Hispanics and immigrants are less likely

8    to participate in the census if it includes a citizenship question.  AR at 1315-1316 (Ross Memo),

9    ECF No. 23-5.  The Secretary concludes that this evidence does not "definitive[ly]" establish that

10   there will be an undercount, but Plaintiffs need not allege a "definitive" risk of an undercount.

11   Equally meritless is Defendants' reliance on their stated intention to develop procedures to "meet

12   the non-response challenge."  Defs.' Mem. at 14.  Even if the Court could properly rely upon such

13   unsubstantiated factual assertions in Defendants' brief at the pleadings stage, these vague

14   assurances do nothing to contravene the allegations suggesting the substantial risk of an

15   undercount.

16              **2.      The alleged harmful impacts resulting from a disproportionate**
                 **undercount are not overly attenuated or speculative**
17

18           Defendants also argue that Plaintiffs' allegations regarding the various injuries they will

19   suffer due to a disproportionate undercount are "too speculative" to plausibly plead standing.

20   Defs.' Mem. at 14.  To secure dismissal of Plaintiffs' claims on this basis, Defendants must show

21   that not a single Plaintiff has plausibly alleged that they face a substantial risk of a single injury

22   due to the disproportionate undercount.  *See Rumsfeld v. Forum for Acad. & Institutional Rights*,

23   *Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy

24   Article III's case-or-controversy requirement.").  Here, the complaint plausibly alleges that

25   Plaintiffs will suffer two different types of injury:  (1) vote dilution from malapportionment of

26   congressional representatives; and (2) loss of federal funding to the State of California and the

27   County and City Plaintiffs, including for vital programs on which they directly rely.

28

First, Defendants argue that Plaintiffs have not plausibly alleged a substantial risk that California will lose congressional representation because "Plaintiffs do not allege that their states will remain at risk of losing seats *even if potential undercounts in other states are taken into account*." Defs.' Mem. at 15.  This is flatly untrue.  The complaint specifically alleges that California is at risk of losing a Congressional seat because it "has a proportionately large population of non-citizens and relatives of non-citizens *compared to other states*." FAC at ¶ 40 (emphasis added); *see also id.*, ¶ 6; *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330-31 (1999) (finding standing for individual plaintiff based on projected loss of congressional seat resulting from proposed census procedure).[15]

Second, contrary to Defendants' contention, *see* Defs.' Mem. at 16, Plaintiffs have alleged sufficient facts to establish a concrete injury resulting from the loss of federal funding to California and its communities.  Once again, Defendants erroneously claim that Plaintiffs have not considered that the allocation of federal funds may not depend only on the population count of the area in which they live, but on the population count of other areas.  *See* Defs.' Mem. at 16. In fact, Plaintiffs expressly allege that California and its cities will suffer a reduction in federal funds because they will suffer a greater undercount than the rest of the country and their state due to their comparatively higher percentages of non-citizens and their citizen relatives.  *See* FAC at ¶¶ 6, 28, 41-46.

As the Ninth Circuit has recognized, "[l]oss of funds promised under federal law . . . satisfies Article III's standing requirement." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).  And specifically in the context of the census, courts have consistently held that individual plaintiffs have standing where they allege a loss of federal

---

[15] The cases on which the Bureau relies are inapposite because those rulings were issued on motions for summary judgment, after the parties had conducted discovery and plaintiffs were put to their proof.  *See* Defs.' Mem. at 15; *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (plaintiffs failed at summary judgment to establish that alleged inaccurate count would affect specific states in which plaintiffs resided); *FAIR v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (plaintiffs failed at summary judgment to demonstrate which states would gain or lose congressional seats); *cf. Glavin v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998) (plaintiffs established at summary judgment injury related to apportionment and redistricting), *aff'd sub nom Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).

1    funding to their states and localities resulting from a census undercount.  *See Carey v. Klutznick*,

2    637 F.2d 834, 838 (2d Cir. 1980) (holding that "citizens who challenge a census undercount on

3    the basis, inter alia, that improper enumeration will result in loss of funds to their city have

4    established . . . an injury in fact traceable to the Census Bureau"); *Glavin*, 19 F. Supp. 2d at 550

5    (holding that plaintiffs had standing because they established that the proposed census

6    methodology would "directly result in a decrease of federal funding to the states and counties in

7    which Plaintiffs reside"); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980)

8    (concluding that plaintiffs had standing even if they did not personally receive federal aid

9    allocated to the City of Philadelphia because "all enjoy the benefits yielded when the City is

10   enabled to improve quality of life through the receipt of this money"); *cf. City of Los Angeles v.*

11   *U.S. Dep't of Commerce*, 307 F.3d 859, 864 (9th Cir. 2002) (challenge to census results "because

12   of their effect on the allotment of federal and state funds").  Plaintiffs have plausibly alleged that

13   they will lose some federal funds as a result of a disproportionate undercount.  *See, e.g.*, FAC at ¶

14   42 (City of Los Angeles).  And to the extent that the precise dollars-and-cents effect of a census

15   undercount is not yet known, that does not defeat Plaintiffs' standing, because at this stage the

16   Court must "presum[e] that general allegations embrace those specific facts that are necessary to

17   support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation

18   marks omitted).[16]

19       **B.    Plaintiffs' Injuries Are Fairly Traceable to Defendants' Decision to Include
               a Citizenship Question on the 2020 Census**

20
21   Defendants also dispute Plaintiffs' standing on the ground that the alleged harms depend

22   upon "the intervening acts of third parties violating a clear legal duty to participate in the

23   ─────────────────

24       [16] Defendants also argue in passing that loss of federal funding does not provide Plaintiffs
     standing to bring their Enumeration Clause claim because loss of funding is outside the "zone of
25   interests" protected by the Enumeration Clause.  *See* Defs.' Mem. at 16-17.  Courts have
     repeatedly recognized that accurately allocating federal funding is an important use of census
26   data.  *See, e.g.*, *Wisconsin*, 517 U.S. at 5-6 (1996); *City of Los Angeles*, 307 F.3d at 864; *City of*
     *Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993); *Carey*, 637 F.2d at 838.  Given the
27   importance that census data plays in the allocation of federal funding, Plaintiffs easily satisfy the
     zone-of-interests test, which "is not meant to be especially demanding."  *Clarke v. Secs. Indus.*
28   *Ass'n*, 479 U.S. 388, 399 (1987).

                                                    14

1   decennial census" and are therefore not "fairly traceable" to the Secretary's decision to insert a

2   citizenship question on the 2020 Census questionnaire.  Defs.' Mem. at 17.  This argument also

3   has no merit, and the Court should reject it.

4        "Causation may be found even if there are multiple links in the chain connecting the

5   defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the

6   defendant's conduct comprise the last link in the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012

7   (9th Cir. 2014) (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)).  The key question is

8   whether the "government's unlawful conduct is at least a substantial factor motivating the third

9   parties' actions."  *Id.* at 1013 (internal citations and quotations omitted).  "So long as the plaintiff

10  can make that showing without relying on speculation or guesswork about the third parties'

11  motivations, she has adequately alleged Article III causation."  *Id.* (internal citations and

12  quotations omitted); *see also Barnum Timber Co. v. EPA*, 633 F.3d 894, 898-99 (9th Cir. 2011)

13  (causation established by expert opinion about "market reaction" to government conduct); *cf. In

14  re Zappos.com*, 888 F.3d at 1026 n.6 & 1028-30 (injury related to data breach fairly traceable to

15  retailer, even though third party hackers stole data).

16       Applied here, there is little question that Plaintiffs have adequately alleged Article III

17  causation.  The FAC specifically alleges that Defendants' actions will result in an injurious

18  undercount because including a citizenship question *will cause third parties not to participate in

19  the census*.  FAC at ¶¶ 5, 6, 40, 41.  Even if the addition of the citizenship question is not the *only*

20  factor influencing whether non-citizens or their citizen relatives respond to the census, Plaintiffs

21  have adequately alleged that it is a *substantial* factor motivating them not to respond.  It does not

22  require speculation or guesswork to follow the chain of causation here; as described above, the

23  Bureau and its top officials have concretely affirmed the predictable impact of a citizenship

24  question on respondents.  The alleged harms Plaintiffs will suffer follow ineluctably from the

25  disproportionate undercount of particular demographic groups that the Secretary's unlawful

26

27

28

1   decision on the citizenship question makes certainly imminent.  Beyond doubt, these alleged

2   harms are fairly traceable to that decision.[17]

3   **II.    DEFENDANTS' UNLAWFUL CONDUCT IS SUBJECT TO JUDICIAL REVIEW**

4          **A.    Plaintiffs' Claims Are Not Barred by the Political Question Doctrine**

5          Defendants do not cite a single case in which a court found that a challenge to the conduct

6   of the census presented a political question.  In fact, courts appear to have uniformly held that this

7   doctrine does <u>not</u> bar challenges to the federal government's fulfillment of its census duties.  *See*

8   *e.g. U.S. Dept. of Commerce v. Montana*, 503 U.S. 442, 457 (1992); *Franklin v. Massachusetts*,

9   505 U.S. 788, 801 n.2 (1992) (Stevens, J., concurring in part); *Carey v. Klutznik*, 508 F. Supp.

10  404, 411 (S.D.N.Y. 1980).  This case is no different.

11         The political question doctrine is a "narrow exception to the judiciary's responsibility to

12  decide cases properly before it, even those it would gladly avoid."  *Ctr. for Biological Diversity*,

13  868 F.3d at 821 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012)).

14  A political question does not exist "merely because [a] decision may have significant political

15  overtones."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 230 (1986), *accord*

16  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007).  "The decision to deny access to

17  judicial relief should never be made lightly, because federal courts have the power, and ordinarily

18  the obligation, to decide cases and controversies properly presented to them."  *Juliana v. United*

19  *States*, 217 F. Supp. 3d 1224, 1236 (D. Or. 2016) (quoting *Alperin v. Vatican Bank*, 410 F.3d 532,

20  539 (9th Cir. 2005)).

21         Applying the factors set forth in *Baker v. Carr*, 369 U.S. 186 (1962), Defendants argue that

22  Plaintiffs' claims pose a non-justiciable political question because, in their view,  (1) the

23  Constitution textually commits the content of the census questionnaire to the discretion of

24

25          [17] Whether it will be "impossible to isolate and quantify the number of individuals who
would have responded but for the addition of a citizenship question" (Defs.' Mem. at 18) is a

26  merits argument that can be raised by Defendants on summary judgment, but it has no relevance
to the question of whether the Plaintiffs have adequately pleaded that the Secretary's decision will

27  cause individuals not to respond to the census.  As described above, the Bureau itself has said that
the effect of a citizenship question on response rates will be more than "minimal."  *See* Jarmin

28  Testimony starting at 1:39:47, response at 1:44:10.

1    Congress, and (2) there are no judicially manageable standards for evaluating the Secretary's

2    decision.  Defs.' Mem. at 19-22; *see Baker*, 369 U.S. at 217.  Both arguments are meritless.

3

           **1.**      **The Constitution does not textually commit the conduct of the census**
4                   **to the sole, exclusive authority of Congress**

      Plaintiffs' claims do not implicate the first *Baker* factor, "a textually demonstrable
5

constitutional commitment of the issue to a coordinate political department."  *Baker*, 369 U.S. at
6

217.  That requires a textual delegation of authority to a political branch "and nowhere else."  *See*
7

*Nixon v. United States*, 506 U.S. 224, 229 (1993) (holding that Article I, section 3, clause 6 was a
8

textual commitment because it explicitly vested in the Senate "sole" authority to try all
9

impeachments); *Morgan v. United States*, 801 F.2d 445, 447 (D.C. Cir. 1986 (Scalia, J.)
10

(concluding that Article I, section 5, clause 1 was a textual commitment because it requested that
11

each house "shall be *the* Judge" of the election of its members, to the "exclusion of other[] . . .
12

judges (emphasis in original).  "Since *Baker*, the Supreme Court has found such 'textual
13

commitment' in very few cases."  *Juliana*, 217 F. Supp. 3d at 1237.  This is not such a case.
14

      Every court that has considered the issue has determined that the Enumeration Clause does
15

not textually commit "actual Enumeration" to Congress alone.  *See Carey v. Klutznik*, 508 F.
16

Supp. at 411; *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980) (the Constitution
17

"does not say that Congress and Congress alone has the responsibility to decide the meaning of,
18

and implement, Article 1, Section 2, Clause 3"), *rev'd on other grounds in* 652 F.2d 617 (6th Cir.
19

1981); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980); *U.S. House of*
20

*Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95 (D.D.C. 1998) ("Courts
21

routinely adjudicate [litigation concerning the census], frequently in instances where the disputes
22

pit the states against the federal government.").
23

      These decisions are consistent with the fact that the Supreme Court has never rejected a
24

challenge to conduct of the census based on the political question doctrine.  *See Utah v. Evans*,
25

536 U.S. 452 (2002); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999);
26

*Wisconsin v. City of New York*, 517 U.S. 1 (1996); *Franklin v. Massachusetts*, 505 U.S. 788
27

(1992); *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442 (1992).
28

1    Defendants contend that, whereas "actual enumeration" of the census may not be textually

2    committed to Congress, the phrase within the Enumeration Clause stating "in such manner as

3    [Congress] shall by law direct" textually commits to Congress the "manner" of conducting the

4    census.  They argue that, unlike the "manner" of conducting the census, "actual enumeration"

5    encompasses only the questions of "whom to count, how to count them, [and] where to count

6    them."  Defendants have not cited a single case that articulates, much less applies this distinction.

7    First, the distinction is unworkable because the "manner" of the headcount cannot be

8    separated from whether, as a result, a constitutionally sufficient, accurate headcount will occur.

9    For example, here, Plaintiffs challenge the manner of conducting the census (by including the

10   citizenship question), but the heart of their claims is that this "manner" will *cause* an impairment

11   to the actual enumeration.

12   Second, Defendant's distinction is inconsistent with the Supreme Court decisions in *Utah*

13   and *Wisconsin*, which expressly considered the challenged census procedures to be part of the

14   "manner" in which the census was conducted.  *See Utah*, 536 U.S. at 474 (noting that use of

15   imputation fell within the grant of "congressional methodological authority" conferred by the "in

16   such manner" language of the Actual Enumeration Clause); *Wisconsin*, 517 U.S. at 17 ("[T]he

17   Secretary's decision [not to use a post-enumeration survey] was made pursuant to Congress'

18   direct delegation of its broad authority" to "conduct the census 'in such a Manner as they shall by

19   Law direct.'"); *see also Carey*, 637 F.2d at 836, 838-39 (holding that the challenge to the

20   "manner" in which the Census Bureau assembled address registers for the census was not a

21   political question).  The plaintiffs' claims in those cases were determined on the merits and did

22   not implicate the political question doctrine.

23   Third, Plaintiffs *do* challenge "how" the Secretary has chosen to count the population.

24   "How" the census is conducted is synonymous with the "manner" in which it is conducted.

25   Plaintiffs allege that the Secretary's decision to use an untested questionnaire that demands the

26   citizenship status of every household member will lead to a disproportionate undercount of the

27   population in violation of the Constitution's "actual Enumeration" requirement.  FAC at ¶ 49.

28

18

2.     **Judicially-manageable standards allow the court to review Defendants' conduct of the census**

Plaintiffs' claims also do not implicate the second *Baker* factor—the lack of judicially-manageable standards.  *See Baker*, 369 U.S. at 217.  The Secretary's conduct of the census, including the selection of questionnaire content, is constrained by constitutional and statutory requirements, as well as binding agency standards and internal guidance.  The courts are thus fully equipped to review the Secretary's decision to add a citizenship question to the census without making policy determinations outside the scope of their constitutional duty.

As the Supreme Court has held, the Constitution itself provides a straightforward, judicially administrable standard for reviewing Defendants' conduct of the census:  it must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," which is "to determine the apportionment of the Representatives among the states."  *Wisconsin*, 517 U.S. at 19-20; *see also id.* at 24 (stating that there are "constitutional bounds of discretion over the conduct of the census).  Here, Plaintiffs alleged that the Secretary exceeded the constitutional bounds of his discretion when he made the decision to add a citizenship question—a decision that will affirmatively undermine the actual enumeration and its purpose of congressional apportionment.  FAC at ¶¶ 49-50.

The *Wisconsin* standard applies to the Secretary's "conduct of the census" generally.  *Wisconsin*, 517 U.S. at 19-20, 23.  The Supreme Court does not limit it to the Secretary's choice of calculation methodologies.  *See id.*  If accepted, Defendants' crabbed view of the courts' power to review census questions would allow patent violations of the Enumeration Clause.  Under Defendants' theory, the Secretary could engage in any information-gathering procedures that undermine an actual count of the population.  For example, he could utilize a questionnaire that is entirely in French, in two-point font, and includes highly personal and intrusive questions, or, like here, a question that will discourage some categories of respondents from responding at all.  All of these actions could affect the actual enumeration, yet, under Defendants' theory, there would be no consequence and no check on "bias, manipulation, fraud or similarly grave abuse, which is

19

1    exactly the type of conduct and temptation the Framers wished to avoid . . . ." *City of*

2    *Philadelphia*, 503 F. Supp. at 675.[18]

3         In addition to the constitutional standard applicable to Plaintiffs' claims, this court can and

4    should apply the judicially-meaningful standards found in a robust set of statutes, regulations,

5    policies, including the Paperwork Reduction Act, OMB's Statistical Policy Directives, and the

6    Bureau's own Statistical Quality Standards.  As discussed in greater detail in Argument section B,

7    *infra*, these standards establish procedures that the Bureau must and, with the exception of the

8    citizenship question, always does follow when determining the census questionnaire.  Thus, in

9    evaluating Plaintiffs' claims, the court need not weigh different policy options against one

10   another, but can assess Defendants' failure to conform to these procedures.

11        The political question doctrine does not preclude review of Plaintiffs' claims.

12        **B.    The Secretary's Decision to Add a Citizenship Question to the 2020 Census
              is Reviewable Under the APA**

13        As a starting point, there is a "strong presumption that Congress intends judicial review of

14   administrative action," and that presumption may be rebutted only upon a showing of "clear and

15   convincing evidence."  *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670

16   (1986); *Pinnacle Armor, Inc. v. U.S.*, 648 F.3d 708, 718 (9th Cir. 2011).  "The great weight of

17   authority supports the view that the conduct of the census is not 'committed to agency discretion

18   by law.'"  *Franklin*, 505 U.S. at 819 n.19 (Stevens, J., concurring in part).[19]  This case is no

19

20

21        [18] Defendants have argued in cases related to this action that the political process is an
     adequate check on potential abuses of the census.  But their proposed solution is inadequate in the

22   context of the census, because the census *itself* is "an essential element in the democratic

23   process."  *City of Philadelphia*, 503 F. Supp. at 675. Since the census determines congressional
     apportionment, a skewed census could preclude congressional accountability.

24        [19] *Citing Carey v. Klutznick,* 637 F.2d 834 (2d Cir. 1980); *New York v. United States
     Dep't of Commerce,* 739 F. Supp. 761 (E.D.N.Y. 1990); *City of New York v. United States Dep't*

25   *of Commerce,* 713 F. Supp. 48 (E.D.N.Y. 1989); *Cuomo v. Baldrige,* 674 F. Supp. 1089
     (S.D.N.Y. 1987); *Willacoochee v. Baldrige,* 556 F. Supp. 551 (S.D. Ga. 1983); *Carey v.*

26   *Klutznick,* 508 F. Supp. 404 (S.D.N.Y. 1980); *City of Philadelphia v. Klutznick,* 503 F. Supp. 663

27   (E.D. Pa. 1980); *Young v. Klutznick,* 497 F. Supp. 1318 (E.D. Mich. 1980), rev'd on other
     grounds, 652 F.2d 617 (6th Cir. 1981), cert. denied *sub nom. Young v. Baldrige,* 455 U.S. 939,

28   102 S.Ct. 1430 (1982); *City of Camden v. Plotkin,* 466 F. Supp. 44 (D.N.J. 1978).

1    different, because Defendants have failed here to make a clear and convincing showing to rebut

2    the strong presumption of APA reviewability.

3        Defendants argue that the Secretary's decision to add the citizenship question is an

4    unreviewable action "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Defs.'

5    Mem., p. 26. That subsection provides only a "narrow exception" to judicial review, and is

6    applicable only in "rare instances" where there is "no meaningful standard against which to judge

7    the agency's exercise of discretion." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

8    402, 410 (1971), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99, 104 (1977);

9    *accord Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, "meaningful standards" do exist to

10   allow the court to assess whether the Secretary's decision is arbitrary and capricious, an abuse of

11   discretion, or otherwise violates the APA.

12       To find a meaningful standard for judicial review, courts may look not only to the statute

13   authorizing the agency action, but also to other statutes and to "regulations, established agency

14   policies, or judicial decisions." *Mendez–Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003);

15   *accord Pinnacle Armor*, 648 F.3d at 719; *see also I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32,

16   (1996) ("an irrational departure from an agency policy could constitute action that must be

17   overturned as arbitrary, capricious, [or] an abuse of discretion within the meaning of the

18   Administrative Procedure Act.").

19       The Constitution itself provides the most important standard for determining whether the

20   Secretary's action here violates the APA. In *Wisconsin*, the Supreme Court defined the standard

21   with which to examine the conduct of the census: actions must bear "a reasonable relationship to

22   the accomplishment of an actual enumeration of the population, keeping in mind the

23   constitutional purpose of the census." *Wisconsin*, 517 U.S. at 19-20; *see also Utah*, 536 U.S. at

24   478 (concluding that the "interest in accuracy" favored the Census Bureau's use of imputation in

25   conducting the census). In other words, the Secretary may not take actions that unreasonably

26   threaten the accuracy of the census, particularly the resulting congressional apportionment among

27   the states. This is precisely what Plaintiffs have alleged in the Complaint: that the addition of the

28   citizenship question will depress census responses to the particular detriment of California and its

1    cities and counties, and that California will likely lose a congressional representative as a result.

2    FAC at ¶¶ 40, 49-50.  Plaintiffs have the right to develop and submit evidence to prove this

3    assertion.

4         In addition to the constitutional mandate, Congress has directed the Secretary to conduct the

5    census in a manner aimed toward accuracy, declaring that "it is essential that the decennial

6    enumeration of the population be as accurate as possible, consistent with the Constitution and

7    laws of the United States."  *See* Pub. L. No. 105-119, § 209(a)(6) (codified at 13 U.S. C. § 141

8    note); *see also* 2 U.S.C. 2a(a) (census must provide a tabulation of the "whole number of persons

9    in each State.")  This is consistent with the *Wisconsin* constitutional standard, as well as

10   Congress's express acknowledgement that "the sole constitutional purpose of the decennial

11   enumeration of the population is the apportionment of Representatives in Congress among the

12   several States."  *See* Pub. L. No. 105-119, § 209(a)(2).  While Defendants will likely argue that

13   complete census accuracy is an impossible standard, that standard still prohibits Defendants from

14   taking actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in

15   accordance with law."  5 U.S.C. § 706(2)(a).  For example, if Defendants have sacrificed any

16   degree of census accuracy by adding the citizenship question (as Plaintiffs allege) and the

17   question will not further the Defendants' stated purpose of Voting Rights Act enforcement (as

18   Plaintiffs allege), then the question violates the APA.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

19   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's

20   action must be upheld, if at all, on the basis articulated by the agency itself."); *Burlington Truck*

21   *Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962); see also FAC at ¶¶ 14-15.

22        Finally, a substantial body of federal regulations and Census Bureau policies provide

23   manageable standards for APA review of the Secretary's action.  These include regulations under

24   the Paperwork Reduction Act, OMB's Statistical Policy Directives, and the Bureau's own

25   Statistical Quality Standards, as detailed on pages 4-5, *supra*.  The Statistical Quality Standards,

26   for example, require all surveys to be pretested and refined.[20]  These regulations and policies

27

28        [20] *See* U.S. Census Bureau, Statistical Quality Standards at 8, 10 (Reissued Jul. 2013),

1    constitute "manageable standards" for APA review, regardless of whether they are otherwise

2    legally binding on the agency.  *See Yueh-Shaio Yang*, 519 U.S. at 32; *Salazar v. King*, 822 F.3d

3    61, 76-77 (2d Cir. 2016).  And, as Plaintiffs have alleged in the FAC, the Defendants violated

4    these standards by adding the citizenship question to the final version of the questionnaire without

5    any pre-testing to identify potential adverse effects.  *See* FAC at ¶¶ 38, 55.  In other words, this

6    decision was "an irrational departure from an agency policy . . . that must be overturned as

7    arbitrary, capricious, [or] an abuse of discretion within the meaning of the Administrative

8    Procedure Act.").  *Yueh-Shaio Yang*, 519 U.S. at 32.

9         Defendants ignore all of the above standards and argue that, based on the plain language of

10    13 U.S.C. §141(a), no meaningful standard of APA review exists.  That statute directs the

11    Secretary of Commerce to conduct the census "in such form and content as he may determine."

12    This argument fails for at least three reasons.

13         First, Defendants ignore that their argument—that the discretion conferred in § 141

14    precludes APA review—has been roundly rejected by almost every court that has considered it.

15    *Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (1992) ("[A]lmost

16    every court that has considered the issue has held that 13 U.S.C. § 141 does not preclude judicial

17    review."); *City of New York*, 713 F. Supp. at 53 ("The overwhelming majority of cases

18    considering the issue[] have concluded that § 701(a)(2) of the APA is inapplicable to the census

19    statute."); *see*, *e.g.*, *Carey v. Klutznick*, 637 F.2d at 838 (challenge to the "manner" in which the

20    Census Bureau assembled address registers for the census was not "committed to agency

21    discretion by law" under section 701(a)(2)); *City of Philadelphia*, 503 F. Supp. at 675; *see also*

22    *Franklin*, 505 U.S. at 818-819 (Stevens, J., concurring in part).

23         Second, by focusing exclusively on the language of § 141, Defendants ignore the fact that a

24    meaningful standard for APA review may be derived from other laws, regulations, and agency

25    policies.  *See Pinnacle Armor*, 648 F.3d at 719; *Mendez–Gutierrez*, 340 F.3d at 868.  For

26    example, Defendants fail to address the Bureau's Statistical Quality Standards that govern pre-

27    _____

      https://www.census.gov/content/dam/Census/about/about-the-
28    bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf.

                                          23

1  testing for census questions and fail to represent whether other formal or informal policies exist

2  that might provide a standard against which to measure their actions.

3      Third, it is well-established that "the mere fact that a statute contains discretionary language

4  does not make agency action unreviewable." *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)

5  (decision of the Secretary of Health and Human Services to grant California a waiver was subject

6  to review where the statute permits waivers only "to the extent and for the period the Secretary

7  finds necessary," and which "in the judgment of the Secretary [are] likely to assist in

8  promoting[statutory] objectives") *Pinnacle Armor*, 648 F.3d at 719 ("Just because a statute calls

9  on the agency to exercise its 'judgment' in making its determination does not necessarily make an

10 agency's action unreviewable."); *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) ("The fact

11 that an agency has broad discretion in choosing whether to act does not establish that the agency

12 may justify its choice on specious grounds.").  Discretion that is broad may still be abused, and

13 judicial review is available and essential to prevent that abuse.  *See Pinnacle Armor*, 648 F.3d at

14 720.

15     The cases cited by Defendants provide no assistance.  The statute at issue in *Webster v.*

16 *Doe*, 486 U.S. 592 (1988) (§ 102(c) of the National Security Act) is not analogous to § 141 of the

17 Census Act, which Defendants rely on here.  The two statutes have different language, and the

18 Census Act does not implicate the national security concerns that motivated the decision in

19 *Webster*.  *See Franklin,* 505 U.S. at 817 (Stevens, J., concurring in part) (reasoning that unlike

20 CIA intelligence operations, "[t]he open nature of the census enterprise and the public

21 dissemination of the information collected are closely connected with our commitment to a

22 democratic form of government.  The reviewability of decisions relating to the conduct of the

23 census bolsters public confidence in the integrity of the process and helps strengthen this

24 mainstay of our democracy.")  The Seventh Circuit's decision in *Tucker v. Department of*

25 *Commerce,* 958 F.2d 1411 (7th Cir. 1992) is no longer persuasive authority because the decision

26 preceded:  (1) the Supreme Court opinions in *Utah, Wisconsin*, and *Franklin*, which held that

27 census challenges were justiciable and emphasized the limits on the Secretary's discretion; (2) the

28 Paperwork Reduction Act of 1995 and the OMB and Bureau-issued standards that govern census

1   content development and testing.[21]  Finally, Defendants' reliance on *Senate of State of California*

2   *v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992) is also misplaced.  The Secretary's conduct of the

3   census was not at issue in that case.  Rather, plaintiffs there sought to compel the Secretary to

4   release internal calculations to the public——an issue not presented here.  *Id.* at 966-967.

5       In short, meaningful standards exist to permit APA review of the Secretary's decision to

6   add the citizenship question.  Defendants' reliance on inapposite authority is insufficient to defeat

7   the strong presumption of reviewability with clear and convincing evidence.

8   **III.   PLAINTIFFS HAVE STATED A CLAIM UNDER THE ACTUAL ENUMERATION CLAUSE**

9       Finally, Plaintiffs' first cause of action for violation of the Actual Enumeration Clause

10   alleges sufficient facts to state a claim upon which relief can be granted.

11       As detailed above in Argument section II(A)(2), *supra*, the Actual Enumeration Clause

12   requires the Secretary's conduct of the census to bear "a reasonable relationship to the

13   accomplishment of an actual enumeration of the population, keeping in mind the constitutional

14   purpose of the census."  *Wisconsin*, 517 U.S. at 19.  Although this standard does not require

15   Defendants to achieve a perfect count of the population, it clearly requires Defendants to conduct

16   the census in a manner that is reasonably designed to achieve accuracy, particularly distributive

17   accuracy for purposes of congressional apportionment.  Here, Plaintiffs have alleged that

18   Defendants violated this constitutional mandate by adding, at the eleventh hour, an untested

19   citizenship question that will produce a disproportionate undercount in California and likely cost

20   the state a congressional seat.  *See* FAC at ¶¶ 32-40.

21       Defendants contend that Plaintiffs have failed to state a claim by arguing, without any

22   supporting legal authority, that the Actual Enumeration Clause requires only that the population

23   be determined through a "person-by-person headcount, rather than through estimates or

24   conjecture."  Defs.' Mem. at 26.  However, the *Wisconsin* court did not limit review to any

25   particular subject matter of the Secretary's conduct under the Actual Enumeration Clause; it

26   applied the standard to "conduct of the census" generally.  *See Wisconsin*, 517 U.S. at 19-20, 23.

27   Moreover, the Court's underlying concern was for census accuracy, particularly distributive

28       [21] *See id.* at i-ii.

1   accuracy.  *See Wisconsin,* 517 U.S. at 19-20; *see also Utah*, 536 U.S. at 478.  By Defendants'

2   logic, the Secretary would be free to undermine the "person-by-person headcount" and accurate

3   congressional apportionment by any means at all other than "estimation or conjecture."  That is

4   inconsistent with the concerns expressed by the Supreme Court.[22]

5          Defendants conflate the inclusion of the citizenship question here with the general

6   historical practice of asking demographic questions as part of the census.  Contrary to

7   Defendants' assertions, Plaintiffs' claim does not challenge, and would not open the door to

8   challenging, the inclusion of any and all demographic questions that could "theoretically" cause

9   an inaccurate count.  Rather, Plaintiffs challenge the addition of a citizenship question as not

10  "reasonable" under *Wisconsin*, because there are specific reasons to conclude that the question

11  will lead to an inaccurate count affecting reapportionment.  That probable consequence overrides

12  any purported information-gathering benefit of the citizenship question, because while

13  apportionment is the "constitutional purpose" of the census that factors into reasonableness,

14  demographic information-gathering is not.[23]  *See Wisconsin* 517 U.S. at 19.

15         If, as Defendants suggest, Plaintiffs' claim is unprecedented, that is only because

16  Defendants' challenged conduct is unprecedented.  At the last moment, Defendants decided to

17  add a question that is:  (1) unusually sensitive, particularly in the current climate of

18  unprecedented fear resulting from the federal government's controversial immigration policies,

19  which is documented by the Bureau's own study (*see* FAC at ¶ 37), (2) has not been used on the

20  decennial census for the last six decades, (3) highly likely to produce a significant undercount,

21  based on the Bureau's own previous studies, (4) untested for use on the decennial censes, in

22  violation of federal law and agency standards, and (5) will not actually advance the stated purpose

---

23         [22] In addition, the Supreme Court has never even held that the Constitution requires the
24  census to be conducted by a headcount only, as opposed to estimation.  *See Utah*, 536 U.S. at
    473-75, 478-79 (approving the Bureau's use of hot-deck imputation, a methodology that fills gaps
25  in the headcount to achieve greater accuracy); *Wisconsin*, 517 U.S. at 24 (Constitution did not
    *require* the Secretary to statistically adjust census data); *House of Representatives*, 525 U.S. at
26  343-44 (holding that statistical adjustment for congressional apportionment was prohibited by the
    Census Act, but declining to reach the constitutional issue).
27         [23] In addition to the effect on apportionment, the inclusion of a citizenship question is also
    unreasonable under *Wisconsin* because the resulting harm to the "actual enumeration" of the
28  population is not counterbalanced by the government's stated purpose, since, as Plaintiffs allege,
    the question will not actually assist Voting Rights Act enforcement.  *See* FAC at ¶¶ 14-15.

of Voting Rights Act enforcement.  To suggest that a challenge to this decision is equivalent to a challenge to the use of *any* demographic question is plainly not credible.

Plaintiffs have stated a claim for violation of the Actual Enumeration Clause.

## CONCLUSION

For the reasons above, the court should deny Defendants' Motion to Dismiss in full.


Dated:  July 17, 2018                           Respectfully Submitted,

                                                Xavier Becerra
                                                Attorney General of California
                                                Mark R. Beckington
                                                Supervising Deputy Attorney General


                                                */s/ Gabrielle D. Boutin* _____
                                                Gabrielle D. Boutin
                                                R. Matthew Wise
                                                Deputy Attorneys General
                                                Attorneys for Plaintiff State of California,
                                                by and through Attorney General Xavier
                                                Becerra


Dated:  July 17, 2018                           */s/ Margaret L. Carter* _____
                                                MARGARET L. CARTER, SBN 220637
                                                DANIEL R. SUVOR
                                                O'MELVENY & MYERS LLP
                                                400 S. Hope Street
                                                Los Angeles, CA 90071
                                                Telephone: (213) 430-8000
                                                Fax: (213) 430-6407
                                                Email: dsuvor@omm.com
                                                *Attorneys for Plaintiff County of Los Angeles*

1    Dated:  July 17, 2018                           MIKE FEUER
                                                     City Attorney for the City of Los Angeles
2
                                                     /s/ Valerie Flores _____
3                                                    VALERIE FLORES, SBN 138572
                                                     Managing Senior Assistant City Attorney
4                                                    200 North Main Street, 7th Floor, MS 140
                                                     Los Angeles, CA  90012
5                                                    Telephone: (213) 978-8130
                                                     Fax: (213) 978-8222
6                                                    Email: Valerie.Flores@lacity.org

7
     Dated:  July 17, 2018                           HARVEY LEVINE
8                                                    City Attorney for the City of Fremont

9                                                    /s/ Harvey Levine _____
                                                     SBN 61880
10                                                   3300 Capitol Ave.
                                                     Fremont, CA 94538
11                                                   Telephone: (510) 284-4030
                                                     Fax: (510) 284-4031
12                                                   Email: hlevine@fremont.gov

13   Dated:  July 17, 2018                           CHARLES PARKIN
                                                     City Attorney for the City of Long Beach
14
                                                     /s/ Michael J. Mais _____
15                                                   MICHAEL K. MAIS, SBN 90444
                                                     Assistant City Attorney
16                                                   333 W. Ocean Blvd., 11th Floor
                                                     Long Beach CA, 90802
17                                                   Telephone: (562) 570-2200
                                                     Fax: (562) 436-1579
18                                                   Email: Michael.Mais@longbeach.gov

19   Dated:  July 17, 2018                           BARBARA J. PARKER
                                                     City Attorney for the City of Oakland
20
                                                     /s/ Erin Bernstein _____
21                                                   MARIA BEE
                                                     Special Counsel
22                                                   ERIN BERNSTEIN, SBN 231539
                                                     Supervising Deputy City Attorney
23                                                   MALIA MCPHERSON
                                                     Attorney
24                                                   City Hall, 6th Floor
                                                     1 Frank Ogawa Plaza
25                                                   Oakland, California 94612
                                                     Telephone: (510) 238-3601
26                                                   Fax: (510) 238-6500
                                                     Email: ebernstein@oaklandcityattorney.org

27

28

                                              28

1    Dated:  July 17, 2018                          JOHN LUEBBERKE
                                                    City Attorney for the City of Stockton
2
                                                    /s/ John Luebberke _____
3                                                   SBN 164893
                                                    425 N. El Dorado Street, 2nd Floor
4                                                   Stockton, CA 95202
                                                    Telephone: (209) 937-8333
5                                                   Fax: (209) 937-8898
                                                    Email: John.Luebberke@stocktonca.gov
6

7

8    SA2018100904
     Opposition to MTD.docx.docx
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **State of California, et al. v.**          No.   **3:18-cv-01865**
             **Wilbur L. Ross, et al.**

I hereby certify that on <u>July 17, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>July 17, 2018</u>, at Sacramento, California.


| Tracie L. Campbell | */s/ Tracie Campbell* |
|---|---|
| Declarant | Signature |

SA2018100904
13161095.docx