MICHAEL A. MUGMON (SBN: 251958)
michael.mugmon@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100

*Attorney for Amici Curiae*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra; COUNTY OF LOS ANGELES; CITY OF LOS ANGELES; CITY OF FREMONT; CITY OF LONG BEACH; CITY OF OAKLAND; CITY OF STOCKTON, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100, <br><br> Defendants. | Case No.  3:18-cv-01865-RS <br><br> **NOTICE OF MOTION AND ADMINISTRATIVE MOTION FOR LEAVE TO FILE AMICUS BRIEF** <br><br><br> **Date: August 9, 2018** <br> **Time: 1:30 p.m.** <br> **Judge: Honorable Richard Seeborg** <br> **Dept.: 3** |

    PLEASE TAKE NOTICE that The Leadership Conference on Civil and Human Rights, The

Leadership Conference Education Fund, Muslim Advocates, The Brennan Center for Justice at

1  N.Y.U. School of Law, National Coalition on Black Civic Participation, NALEO Educational Fund,

2  and other organizations committed to the advancement of civil and human rights (all listed in the

3  Appendix to this motion), request leave to file the accompanying amicus brief in support of plaintiffs

4  and in opposition to defendants' motion to dismiss.  In support of their motion, amici state as

5  follows:

6        Amici curiae are grassroots, advocacy, labor, legal services, and other organizations

7  committed to the protection and advancement of civil and human rights in the United States.  What

8  unites this coalition is an interest in ensuring that all communities—particularly young children,

9  women, immigrants, low-income communities, and communities of color—continue to enjoy the

10  recognition, freedom, and economic and political power to which they are entitled under the U.S.

11  Constitution.

12        Amici have spent decades advocating, educating the public, and litigating around issues

13  concerning full and equal participation in the American political process, and so have vast

14  knowledge and experience concerning the census and the uses to which it has been put—including,

15  as relevant here, allocation of federal programmatic funding, determining equitable political

16  representation, and enforcing voting rights.  The proposed amicus brief addresses issues on which

17  defendants and their amici have staked their defense of the citizenship question and as to which

18  amici are uniquely equipped to provide guidance to this Court.

19        "The district court has broad discretion to appoint amici curiae."  *Hoptowit v. Ray*, 682 F.2d

20  1237, 1260 (9th Cir. 1982).  The proposed amicus brief will assist the Court in addressing the issues

21  raised in defendants' motion to dismiss because they offer expertise and fresh perspective on certain

22  factual premises and legal arguments advanced by defendants and their amici.

23

24

25

1   The majority of plaintiffs[1] and all defendants have consented to the filing of this brief.  For

2   the foregoing reasons, amici request that the Court grant leave to file the attached amicus brief.

3   <u>**CONCLUSION**</u>

4   For the foregoing reasons, amici's motion for leave to file the attached amicus brief should

5   be granted.

6   DATED: July 24, 2018                          Respectfully submitted,

7

8   By:   /s/ Michael A. Mugmon
     Michael A. Mugmon (SBN: 251958)
     michael.mugmon@wilmerhale.com
9   WILMER CUTLER PICKERING
       HALE AND DORR LLP
10   950 Page Mill Road
     Palo Alto, CA 94304
11   Telephone: +1 650 858 6000
     Facsimile: +1 650 858 6100

12   *Attorney for Amici Curiae*

13

14

15

16

17

18

19

20

21

22

23

24

25

---

[1] Amici did not receive a response from the City of Fremont or the City of Stockton to their request for all parties' consent.

1  MICHAEL A. MUGMON (SBN: 251958)
   michael.mugmon@wilmerhale.com
2  WILMER CUTLER
     PICKERING HALE AND
3     DORR LLP
   950 Page Mill Road
4  Palo Alto, CA 94304
   Telephone: +1 650 858 6000
5  Facsimile: +1 650 858 6100

6  *Attorney for Amici Curiae*

7

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA**

10  **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 11  STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra; COUNTY OF LOS ANGELES; CITY OF LOS ANGELES; CITY OF FREMONT; CITY OF LONG BEACH; CITY OF OAKLAND; CITY OF STOCKTON, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100, <br><br> Defendants. | Case No.  3:18-cv-01865-RS <br><br> **BRIEF OF THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, THE LEADERSHIP CONFERENCE EDUCATION FUND, MUSLIM ADVOCATES, THE BRENNAN CENTER FOR JUSTICE AT N.Y.U. SCHOOL OF LAW, NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, NALEO EDUCATIONAL FUND, ET AL., AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS** |

28  Case No.  3:18-cv-01865-RS

BRIEF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTERESTS OF AMICI ..................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.      PLAINTIFFS HAVE STANDING TO CHALLENGE THE CITIZENSHIP QUESTION ON THE BASIS OF INJURIES THAT THE QUESTION IS INFLICTING—AND WILL CONTINUE TO INFLICT—ON THE COMMUNITIES AMICI REPRESENT .......................... 2

      A.    Inclusion Of A Citizenship Question Will Result In An Undercount Of The Communities Amici Represent ................................................................. 3

      B.    The Systematic Undercount Of The Communities Amici Represent Will Result in Plaintiffs' Districts Suffering A Direct Loss of Federal Funding ......................................................................................................... 7

      C.    The History Of The Citizenship Question Does Not Undermine Plaintiffs' Claim of Injury ................................................................................ 8

II.     A CITIZENSHIP QUESTION ON THE DECENNIAL CENSUS WILL UNDERMINE, NOT AID, OUR COMMUNITIES' ABILITY TO VINDICATE THEIR RIGHTS UNDER THE VOTING RIGHTS ACT ...................................................................................................... 10

      A.    The United States And Private Plaintiffs Have Effectively Enforced The Voting Rights Act Without Census Citizenship Data For Over 50 Years ............................................................................................................. 11

      B.    Collecting Citizenship Data Would Not Allow The Communities Amici Represent—Primary Beneficiaries Of The Voting Rights Act— To Vindicate Their Rights ................................................................................ 13

CONCLUSION .................................................................................................................... 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Bartlett v. Strickland,*
   556 U.S. 1 (2009)............................................................................11

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)........................................................................2, 7

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980)........................................................3

*Gray v. Sanders,*
   372 U.S. 368 (1963)..........................................................................8

*Matter of A-B-,*
   27 I. & N. Dec. 316............................................................................

*Thornburg v. Gingles,*
   478 U.S. 30 (1986)...........................................................................11

**LEGISLATIVE MATERIALS**

*Attorney General Nomination: Hearing Before the S. Comm. on the Judiciary,*
   115th Cong. (Jan. 10, 2017) (statement of Sen. Jeff Sessions)..........................10

*Enumeration of Undocumented Aliens in the Decennial Census: Hearing
   Before the Subcomm, on Energy, Nuclear Proliferation, & Gov't
   Processes of the S. Comm. on Governmental Affairs,* 99th Cong. (1985)
   (statement of John Keane, Dir., Bureau of the Census),
   http://www.loc.gov/law/find/hearings/pdf/00172011883.pdf .............................3

*Progress Report on the 2020 Census: Hearing Before H. Comm. on Oversight
   & Gov't Reform,* 115th Cong. (2018) (statement of Vanita Gupta,
   President & CEO, The Leadership Conference on Civil and Human
   Rights), http://civilrightsdocs.info/pdf/testimony/VG-house-OGR-
   statement-5-8-18.pdf.................................................................13

*Progress Report on the 2020 Census: Hearing Before the H. Comm. on
   Oversight & Gov't Reform,* 115th Cong. (2018) (statement of John M.
   Gore, Acting Assistant Att'y Gen., U.S. Dep't of Justice),
   https://oversight.house.gov/wp-content/uploads/2018/05/Gore-
   DOJ_Testimony-2020-Census-Hearing-05182018.pdf...............................12

*Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. (2018) (testimony of Justin Levitt, Professor, Loyola Law School), https://oversight.house.gov/wp-content/uploads/2018/05/Levitt-Testimony-2020-Census-Hearing-05082018.pdf ........................................................................................ *passim*

### OTHER AUTHORITIES

Arthur, Rob, *Latinos in Three Cities Are Reporting Fewer Crimes Since Trump Took Office, Three Cities Are Reporting Fewer Crimes Since Trump Took Office*, FiveThirtyEight (May 18, 2017), https://fivethirtyeight.com/features/latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/ .........................................................6

Artiga, Samantha & Anthony Damico, Kaiser Family Foundation, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigration Policies* (2018), http://files.kff.org/attachment/Data-Note-Nearly-20-Million-Children-Live-in-Immigrant-Families-that-Could-Be-Affected-by-Evolving-Immigration-Policies.........................8

Fishkin, Joseph, *The Administration is Lying About the Census*, Balkinization (Mar. 27, 2018), https://balkin.blogspot.com/2018/03/the-administration-is-lying-about-census.html.........................................12

Glenn, Heidi, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR (Mar. 21, 2017), https://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver .................................6

Letter from Arthur E. Gary, General Counsel, DOJ, to Ron Jarmin, U.S. Census Bureau (Dec. 12, 2017), https://www.courthousenews.com/wp-content/uploads/2018/02/doj-census.pdf .......................................10

Lewis, Brooke A., *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year*, HOUSTON CHRONICLE (Apr. 6, 2017), https://www.chron.com/news/houston-texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-11053829.php........................................................6

Mathema, Silva, *Keeping Families Together: Why All Americans Should Care About What Happens to Unauthorized Immigrants*, Center for American Progress (Mar. 16, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/03/16/428335/keeping-families-together/ ......................................6

Memorandum from Center for Survey Measurement, U.S. Census Bureau, to Associate Directorate for Research and Methodology ("ARDM"): *Respondent Confidentiality Concerns* (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf ...........................................................4

Memorandum from Ron S. Jarmin, Director, U.S. Census Bureau, to Barbara Anderson, Chair, Census Scientific Advisory Comm.: *U.S. Census Bureau Responses to Census Scientific Advisory Committee Fall 2017 Recommendations* (Jan. 26, 2018), https://www2.census.gov/cac/sac/meetings/2017-09/2018-01-26-census-response.pdf ...........................................................................................................4

Meyers, Mikelyn & Patricia Goerman, U.S. Census Bureau, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census* 25 (May 2018) (presentation at 73rd Annual Conference of the American Association for Public Opinion Research (AAPOR)), https://census.gov/content/dam/Census/newsroom/press-kits/2018/aapor/aapor-presentation-confidentiality.pdf. .......................................6

Meyers, Mikelyn, U.S. Census Bureau, *Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census* (Nov. 2, 2017) (presentation at National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting), https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf ...........................................................5

Persily, Nathaniel, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardozo L. Rev. 755, 759 (2011) ..........................................................................................................13

Reamer, Andrew, GW Institute of Public Policy, Counting For Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds, Report # 2: *Estimating Fiscal Costs of a Census Undercount to States* (2018), https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Reamer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FMAP-based%20Programs%2003-19-18.pdf ...............................7

Robbins, Liz & Katie Benner, *Documents Show Political Lobbying in Census Question About Citizenship*, N.Y. Times (June 9, 2018), https://www.nytimes.com/2018/06/09/nyregion/kobach-bannon-lobbying-census-question-on-citizenship-documents.html ............................................11

Shapiro, Robert, *Trump's Census Policy Could Boomerang and Hurt Red States as Well as Blue States*, Brookings (Mar. 30, 2018), https://www.brookings.edu/blog/fixgov/2018/03/30/trump-census-harms-red-blue-states/ .............................................................................................8

Supplemental Memorandum by Secretary of Commerce Wilbur Ross
    Regarding the Administrative Record in Census Litigation (June 21, 2018) .................10

U.S. Census Bureau, *Decennial Census and the American Community Survey
(ACS),* https://www.census.gov/programs-surveys/decennial-
census/about/census-acs.html .................................................................................................9

Urahn, Susan K., et al., The Pew Charitable Trusts, *The Children's Health
Insurance Program: A 50-state examination of CHIP spending and
enrollment* (2014),
http://www.pewtrusts.org/~/media/assets/2014/10/childrens_health_insura
nce_program_report.pdf...........................................................................................................8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INTERESTS OF AMICI

Amici are organizations committed to the protection of civil and human rights in the United States.[1]  What unites this coalition is an interest in ensuring that all communities—particularly the young children, women, immigrants, low-income communities, and communities of color whom amici represent—continue to enjoy the recognition, freedom, and economic and political power to which they are entitled under the U.S. Constitution.  The government's addition of a citizenship question to the 2020 census gravely threatens to undermine that goal.  What is more, the government cynically invokes *our* communities' purported interests as its justification for a policy that jeopardizes those interests.

Amici know very well:  A fair and accurate 2020 census is a critical civil rights issue.  The constitutionally-mandated census is central not only to apportioning political power at every level of government, but also to shaping the annual allocation of more than $800 billion in federal funding, along with countless policy and investment decisions by government agencies, nonprofit organizations, and private enterprise.  Given its foundational importance to American government and society, the census must be above partisan politics.  The misguided decision to reverse 70 years of consistent census practice and insert an untested citizenship question damages our communities, undermines the integrity of the count, and violates the Census Bureau's constitutional and statutory duties to conduct a full enumeration of the U.S. population.

### SUMMARY OF ARGUMENT

Amici have spent decades advocating, educating the public, and litigating about issues concerning full and equal participation in the American political process, and so have vast knowledge and experience concerning the census and the uses to which it has been—and should be—put.  This brief addresses several issues on which defendants have staked their defense of the citizenship question and as to which amici are uniquely equipped to provide guidance to this Court.

First, defendants contend that plaintiffs lack standing because inclusion of the citizenship question will not suppress response rates or lead to an undercount, and that in any event the deleterious effects plaintiffs allege will follow from an undercount are all speculative and contingent.

---

[1]     This brief does not purport to convey the position of the New York University School of Law.

1   Amici and our constituencies have spent decades in the field, working with communities to ensure

2   full participation in the census.  Our experience and the findings of social scientists and other census

3   experts all confirm that including the citizenship question will lead to depressed participation,

4   particularly among families that include immigrants, young children, and people of color.  Indeed,

5   the current reactions in our communities to the prospect of a citizenship question that amici are

6   witnessing first-hand fully support plaintiffs' standing.  Moreover, contrary to the government's

7   claims, the history of the census does not disprove the inevitably damaging effects of including a

8   citizenship question on the 2020 census.  In truth, the last census to have asked all respondents to

9   indicate their citizenship was in 1950, prior to the enactment of the Voting Rights Act and path-

10  marking Supreme Court decisions confirming core constitutional protections for equal voting rights

11  and political representation.

12          Second, defendants contend—cynically and incorrectly—that inclusion of the citizenship

13  question is necessary to ensure proper enforcement of the Voting Rights Act.  That claim should be

14  rejected.  As we know from our own experience, the Voting Rights Act has been enforced

15  effectively throughout its history notwithstanding the absence of a citizenship question on the

16  census.  Including the question now for the first time would only hinder, not assist, Voting Rights

17  Act enforcement.

18                                          **ARGUMENT**

19  **I.      PLAINTIFFS HAVE STANDING TO CHALLENGE THE CITIZENSHIP QUESTION ON THE
20          BASIS OF INJURIES THAT THE QUESTION IS INFLICTING—AND WILL CONTINUE TO
            INFLICT—ON THE COMMUNITIES AMICI REPRESENT**

21          Plaintiffs have standing to challenge defendants' decision to include a citizenship question on

22  the 2020 census because that decision exposes plaintiffs to present and "certainly impending" harms.

23  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The injuries of which plaintiffs

24  complain—including a differential undercount resulting in under-allocations of federal funding—are

25  the direct product of injuries that the citizenship question is imposing and will continue to impose on

26  the historically under-represented minorities, young children, and other vulnerable populations that

27  amici represent and on whose behalf amici advocate.

28

1   Inclusion of a citizenship question will inevitably lead to a differential undercount of

2   historically under-represented communities.  The injury plaintiffs allege is neither hypothetical nor

3   strictly prospective:  pre-testing shows that the mere possibility of a citizenship question has already

4   diminished response rates and increased anxiety over participation in the census among large

5   segments of the communities we represent.  This inevitable undercount will lead to a loss of federal

6   funding for plaintiffs and the jurisdictions they encompass.  These harms are directly traceable to

7   defendants' default of their constitutional duty to perform an "actual Enumeration" of the population

8   in the United States and the resultant violation of the Equal Protection Clause.

9       A.       **Inclusion Of A Citizenship Question Will Result In An Undercount Of The**

10              **Communities Amici Represent**

11   Inclusion of a citizenship question on the 2020 census will result in a differential undercount

12   of the communities we represent.  This is an intolerably anti-democratic result, which is entirely

13   avoidable.

14   The Census Bureau has long opposed adding a citizenship question to the census to avoid a

15   systematic undercount of immigrant communities.  For example, in 1980, the Bureau opined that

16   "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population

17   count. … Questions as to citizenship are particularly sensitive in minority communities and would

18   inevitably trigger hostility, resentment and refusal to cooperate."  *Fed'n for Am. Immigration Reform*

19   *(FAIR) v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980) (describing Bureau's litigation position).

20   The Director of the Census Bureau confirmed that judgment in congressional testimony in 1990,

21   explaining that census questions about citizenship status would lead to the Census Bureau's being

22   "perceived as an enforcement agency," and that such a perception would have "a major effect on

23   census coverage."[2]

24   The Bureau's longstanding opposition to the inclusion of a citizenship question is well-

25   founded, as information recently disclosed by the Bureau confirms.  As reflected in the

26   administrative record filed in this case, career Census Bureau personnel have recently highlighted

27

28
_____
[2]      *Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before the Subcomm., on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs*, 99th Cong. 16, 23, 32 (1985) (statement of John Keane, Dir., Bureau of the Census).

1   differential response rates to past American Community Survey (ACS) and long-form census

2   questionnaires for households with noncitizens versus households with citizens (AR 1280-1281), and

3   they have emphasized the additional nonresponse expected in 2020 in light of the inclusion of a

4   citizenship question (AR 1282, 1305, 1312).  The Census Bureau's own data from its Center for

5   Survey Measurement (CSM) further demonstrate that if a citizenship question is added to the census,

6   formerly willing respondents will go to extraordinary lengths to avoid participating in it.[3]

7   Prior to the addition of the citizenship question, the Bureau had compiled substantial

8   information showing the problems it was having with non-citizen response.  CSM conducted pre-

9   testing after the Census Scientific Advisory Committee expressed concerns "about the possibility

10   that 2020 could be politicized" and about the privacy of the information collected by the decennial

11   census.[4]  Through multiple methods, including Internet self-response, cognitive inquiry via the

12   Census Barriers, Attitudes and Motivators Survey, doorstep messages, and field representatives and

13   supervisors interacting with focus groups, CSM concluded that an unprecedented number of

14   respondents raised issues concerning confidentiality and immigration status while participating.[5]

15   Respondents also largely refused to share their own information with Bureau employees after

16   expressing these privacy and safety concerns, and CSM saw extremely high levels of "deliberate

17   falsification" of information on the Internet self-response instruments due specifically to

18   respondents' express concerns regarding revealing immigration status to the Census Bureau.[6]  CSM

19   declared that its findings are "particularly troubling given that they impact hard-to-count populations

20   disproportionately, and have implications for data quality and nonresponse."[7]

21   CSM's recent memorandum also included vivid examples that highlight the lengths to which

22   members of under-represented communities will go to avoid responding to the census if a citizenship

23   question is included.  One Spanish-speaking field representative, for example, "observed Hispanic

24

25   ───────────────
     [3]     Memorandum from Center for Survey Measurement, U.S. Census Bureau, to Associate Directorate for
     Research and Methodology ("ARDM"): *Respondent Confidentiality Concerns* (Sept. 20, 2017) ("CSM Memo").

26   [4]     Memorandum from Ron S. Jarmin, Director, U.S. Census Bureau, to Barbara Anderson, Chair, Census
     Scientific Advisory Comm.: *U.S. Census Bureau Responses to Census Scientific Advisory Committee Fall 2017

27   Recommendations* (Jan. 26, 2018).
     [5]     CSM Memo at 1-2.

28   [6]     *Id*. at 3.
     [7]     *Id*. at 7.

members of a household move out of a mobile home after she tried to interview them.  She said, 'There was a cluster of mobile homes, all Hispanic.  I went to one and I left the information on the door.  I could hear them inside.  I did two more interviews, and when I came back, they were moving … .  It's because they were afraid of being deported.'"[8]  Another field representative was left alone in an apartment when a respondent eventually walked out of an interview after shutting down and refusing to answer questions concerning his citizenship status.[9]  And in one instance, an English-speaking respondent declared, "The immigrant is not going to trust the Census employee when they are continuously hearing a contradicting message from the media everyday threatening to deport immigrants."[10]

These anecdotes are illustrative.  Amici's experience confirms that the prospect of a citizenship question on the census has raised already high levels of anxiety in the immigrant communities and communities of color that we represent and will undoubtedly lead to an undercount of members of these same communities.  Arturo Vargas, the Executive Director of the NALEO Education Fund, and a long-time member of the U.S. Census Bureau's National Advisory Committee on Racial, Ethnic, and Other Populations, has seen firsthand the mounting anxiety in these under-represented communities.  In a focus group organized by NALEO, one participant stated explicitly that the current Administration is "using the census as part of a strategy.  They want to know people's status and their names.  The government will make you fill out a form to tell them if you are not legal.  They want to clear the U.S. of people without papers.  That's why they are asking about citizenship."[11]

The prospect of a citizenship question is already altering the behavior of potential respondents in our communities.  A May 2018 Census Bureau presentation observed that participants in various language focus groups had expressed concerns about the citizenship question,

---

[8]      *Id.* at 5.
[9]      *Id.*
[10]     *Id.* at 4.
[11]     Vargas Decl. ¶ 9, June 7, 2018 (attached as Exhibit A). *See also* Meyers, U.S. Census Bureau, *Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census* at 9, 10, 12 (Nov. 2, 2017) (presentation at National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting) (reporting results of pre-testing focus groups including that, for example, "[t]he immigrant is not going to trust the Census employee when they are continuously hearing a contradicting message from the media every day threatening to deport immigrants").

1   which "may have a disproportionate impact on an already 'hard to count' population: immigrants."[12]

2   The presentation confirmed that these concerns were not merely speculative. Rather, the presentation

3   recounted specific statements and incidents attesting to the "unprecedented ground swell in

4   confidentiality and data sharing concerns, particularly among immigrants or those who live with

5   immigrants," which were likely to "present a barrier to participation in the 2020 census," could

6   "impact data quality and coverage for the 2020 census," and are "[p]articularly troubling due to the

7   disproportionate impact on hard-to-count populations."

8           The fears that members of the communities amici represent are feeling over giving the

9   government information about their citizenship arise amidst an all-out assault on immigrants by the

10  United States government that has placed undocumented persons and their (often citizen) families at

11  risk.  Since January 2017, the Trump Administration has adopted anti-immigrant policies in multiple

12  domains, making it harder for noncitizens to enlist in the military, seek protection from persecution,

13  apply for and receive visas, and more. President Trump has explicitly advocated for deporting

14  undocumented persons without due process of law.[13]  These concerns about the government's

15  hostility to immigrants will directly affect both citizens' and noncitizens' response rates, as more

16  than 5.9 million U.S. citizen children reside with at least one undocumented immigrant,[14] leading to

17  fears that parents or other family members will be deported or detained if they fill out the census.

18  These recent episodes come after reports of domestic abuse victims not appearing in court for fear

19  that they might be deported[15] and Hispanics and Latinos reporting fewer crimes since President

20  Trump took office.[16]  The results of the Census Bureau's research therefore reinforce a disconcerting

21  pattern of behavior among immigrant and minority groups:  the communities we represent fear the

22

23  [12]       Meyers & Goerman, U.S. Census Bureau, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census* 25, (May 2018) (presentation at

24  73rd Annual Conference of the American Association for Public Opinion Research (AAPOR)).

    [13]       *See* Rucker & Weigel, *Trump Advocates Depriving Undocumented Immigrants of Due-Process Rights*,

25  Washington Post (June 25, 2018).

    [14]       *See* Mathema, *Keeping Families Together: Why All Americans Should Care About What Happens to*

26  *Unauthorized Immigrants*, Center for American Progress (Mar. 16, 2017).

    [15]       *See* Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR (Mar. 21,

27  2017); *see also Matter of A-B-,* 27 I. & N. Dec. 316.

    [16]       *See, e.g.*, Arthur, *Latinos in Three Cities Are Reporting Fewer Crimes Since Trump Took Office*,

28  FiveThirtyEight (May 18, 2017); Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year*, Houston Chronicle (Apr. 6, 2017).

1  federal government, and their response is to recoil from any interaction with public officials.  In the

2  case of the 2020 census with a citizenship question, this will mean not responding at all.

3      The Supreme Court held in *Clapper* that a plaintiff lacks standing when his injury rests on "a

4  highly attenuated chain of possibilities[.]" 568 U.S. at 410.  There is no attenuation here.  As the

5  Census Bureau has recognized for decades, and as recent, concrete evidence confirms, inclusion of a

6  citizenship question will have the inevitable—indeed, intended—effect of diminishing the response

7  rates not only of undocumented persons, but also of U.S. citizens and lawful permanent residents

8  who nonetheless fear the implications for their families and communities of furnishing information

9  concerning citizenship.  The concrete harms plaintiffs identify—which flow directly from that

10  predictable undercount—amply satisfy Article III's requirements of a certain or impending injury.

11      **B.**    **The Systematic Undercount Of The Communities Amici Represent Will**

12  **Result in Plaintiffs Suffering A Direct Loss of Federal Funding**

13      It is not speculation that the undercount of the communities we represent will result in a loss

14  of federal funding for plaintiffs.  At least 300 financial assistance programs created by Congress rely

15  on census-specific data to apportion hundreds of billions of dollars to state and local governments.[17]

16  Although not all of these programs use headcount data derived from the decennial census, they often

17  rely on surveys calibrated based on the decennial census, or other data collected in the census, such

18  as age.[18]  Any undercounting of the population will thus skew the collection of demographic data

19  used in federal funding determinations and affect the distribution of funds to plaintiffs.

20      A study of the impact of a census undercount on the federal funding formula for several of

21  the largest programs confirms this point.  The Federal Medical Assistance Percentage (FMAP) is

22  used to determine the federal share of the costs of Medicaid, the State's Children's Health Insurance

23  Program (CHIP), the Child Care and Development Fund Matching Funds, and the Title IV-E Foster

24  Care and Adoption Assistance programs.  *Reamer Report* 2.  In Fiscal Year 2015, FMAP controlled

25  the allocation of 48% of the federal grants given to States by the federal government.  *Id.*  That year,

---

27  [17]    Reamer, GW Institute of Public Policy, Counting For Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds, Report # 2: *Estimating Fiscal Costs of a Census Undercount to States* 2 (2018) ("*Reamer Report*").

28  [18]    *Id.*

1    the average amount lost by a State was $1,091 *per person* missed in the 2010 census; the highest loss

2    was in Vermont, where the state forfeited $2,309 per person missed in the decennial census.  *Id.* at 1.

3    According to the study, even a 1% increase in an undercount can have a dramatic effect on States'

4    receipt of federal grants for these FMAP-guided programs.  *Id.*[19]

5          That a differential undercount will affect the distribution of federal funding is indisputable.

6    It is also demonstrable that the deleterious funding effects of an undercount will fall most heavily on

7    those jurisdictions that have above-average shares of low-income individuals, including plaintiff

8    California.[20]  Thus, as the data confirm, any undercount resulting from inclusion of a citizenship

9    question will itself cause tangible harms, including the potential loss of hundreds of millions of

10   dollars of federal funding.

11        **C.      The History Of The Citizenship Question Does Not Undermine Plaintiffs'**

12              **Claim of Injury**

13        Defendants attempt to sidestep plaintiffs' allegations of injury by arguing that including a

14   citizenship question on the 2020 Census represents no material break from the Census Bureau's past

15   practice.  Defendants' argument is meritless.

16        The last time all census respondents were asked to provide their citizenship information was

17   in 1950—before the passage of the Voting Rights Act, when communities of color were

18   systematically undercounted and underrepresented, and before the Supreme Court recognized,

19   among other things, the "one person, one vote" principle that undergirds contemporary voting rights

20   jurisprudence.  *See Gray v. Sanders*, 372 U.S. 368 (1963).

21        Since the passage of the Voting Rights Act—the very statute on which defendants base their

22   rationale for adding a citizenship question—most respondents to the census have not been asked to

23

24   [19]      The consequences for children living in California are particularly severe.  States with significant undercounts
     will also suffer reductions in funding for programs such as CHIP, the Children's Health Insurance Program, which is

25   funded based on census data, depriving many children in their states of essential health care or other services.  *See*
     Urahn, *et al.*, The Pew Charitable Trusts, *The Children's Health Insurance Program: A 50-state examination of CHIP*

26   *spending and enrollment* (2014); *see also* Artiga & Damico, Kaiser Family Foundation, *Nearly 20 Million Children Live*
     *in Immigrant Families that Could Be Affected by Evolving Immigration Policies* 2 (2018) ("Over 8 million citizen

27   children with an immigrant parent have Medicaid/CHIP coverage. … Recent findings indicate that growing fear and
     uncertainty among immigrant families is leading to decreased participation in Medicaid and CHIP.").
     [20]      Shapiro, *Trump's Census Policy Could Boomerang and Hurt Red States as Well as Blue States*, Brookings

28   (Mar. 30, 2018).

provide *any* citizenship information.  From 1960 until 2010, most census respondents received a short-form census questionnaire that did not include any question about citizenship.  A small portion of respondents—approximately one in six households—received a long-form questionnaire, which included a citizenship question mixed in with a battery of other personal questions, ranging from questions about mode of entry into the house to the extent of its kitchen facilities.[21]  In 2005, the long-form census questionnaire was largely displaced by the American Community Survey (ACS), which the Census Bureau launched as a monthly data-gathering exercise to collect continuous, consistent nationwide demographic data.[22]  As a result, the 2010 census was a "short-form only" census, and the same is expected for the 2020 census.

Defendants also attempt to leverage the ACS's citizenship question to demonstrate that "citizenship questions have a long and established history in the census."  MTD 28.  That argument is deceptive.  Including a citizenship question in a lengthy survey sent only to a representative sample of households is not comparable to including a citizenship question in the short list of questions asked of every individual in the country.  As Professor Justin Levitt explained in recent testimony before Congress, "[i]n the context of a lengthy and detailed survey like [the ACS], with questions that many view as quite personal (and hence asked only of a sample of the population at any one time), a question about citizenship does not tend to stand out overmuch."  Levitt Testimony 5.  The purpose of the 28-page ACS is not to count the population, but to "understand[] who and where Americans are, what we do, and how we live."  *Id.*  In contrast, the census is designed to "be short, simple, and minimally intrusive, in order to maximize response rates" and thus conduct an "actual Enumeration."  *Id.*  Response rates or reactions to questions featured on one questionnaire are therefore not indicative of how respondents would react to questions on a different questionnaire.[23]  The comparison on which defendants rely does not withstand scrutiny.

---

[21]    *See Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform,* 115th Cong. 3, 4 (2018) (testimony of Justin Levitt, Professor, Loyola Law School) ("Levitt Testimony").

[22]    *See* U.S. Census Bureau, *Decennial Census and the American Community Survey (ACS).*

[23]    Moreover, as explained further below, if an individual receiving the ACS does not answer the question (or the survey as a whole), there are a number of common statistical techniques that can and do compensate.  *See infra* Section III.B.  In other words, suppressed response rates on the ACS do not cause any systemic data problem.  That is simply not true with the census:  Statistical imputation is permitted in some limited circumstances, but there are precious few ways to compensate for nonresponse in an enumeration.  Thus, the consequences of nonresponse are more serious, and less remediable, on the decennial census than on the ACS.  Levitt Testimony 16.

1

2

**II.     A CITIZENSHIP QUESTION ON THE DECENNIAL CENSUS WILL UNDERMINE, NOT AID, OUR COMMUNITIES' ABILITY TO VINDICATE THEIR RIGHTS UNDER THE VOTING RIGHTS ACT**

3

Notwithstanding the differential undercount that including a citizenship question will

4

predictably cause and its disparate effect on the minority communities that amici represent,

5

defendants cynically seek to justify inclusion of a citizenship question as "critical to the [Justice]

6

Department's enforcement of Section 2 of the Voting Rights Act."[24]  Defendants' sudden interest in

7

enforcement of the Voting Rights Act is not credible.  The current Administration's Justice

8

Department has not brought a single enforcement action under the Voting Rights Act.  Indeed,

9

Attorney General Jeff Sessions has gone so far as to express the belief that the Voting Rights Act is

10

"intrusive."[25]   A recently released memorandum from Commerce Secretary Wilbur Ross further

11

confirms that the stated rationale of enforcing the Voting Rights Act is pretextual.  The

12

memorandum demonstrates that the Commerce Department was considering the addition of a

13

citizenship question before receiving a request from the Department of Justice.  In fact, Secretary

14

Ross asked the Justice Department to consider requesting such a question.[26]

15

Defendants' invocation of the Voting Rights Act to justify including a citizenship question is

16

not only pretextual, but also meritless, for at least two reasons.  First, the Justice Department and

17

private plaintiffs—including amici—have successfully litigated claims under the Voting Rights Act

18

using available citizenship data ever since enactment of the Voting Rights Act in 1965.  During that

19

more than half century, courts have not required citizenship data obtained from the decennial census

20

in Voting Rights Act cases.  Second, such a question will in fact undermine enforcement of the VRA

21

by causing the decennial census to undercount the very minority communities—*our* communities—

22

who are supposed to be among the primary beneficiaries of the Voting Rights Act and who rely upon

23

the Voting Rights Act to vindicate their rights.[27]

24

25

[24]     Letter from Arthur E. Gary, General Counsel, DOJ, to Ron Jarmin, U.S. Census Bureau, at 1 (Dec. 12, 2017) (cited at MTD 6).

26

[25]     *Attorney General Nomination: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 10, 2017) (statement of Sen. Jeff Sessions).

27

[26]     Supplemental Memorandum by Secretary of Commerce Wilbur Ross Regarding the Administrative Record in Census Litigation (June 21, 2018).

28

[27]     The administrative record makes clear that this was in fact the primary objective behind adding the citizenship question.  The record reveals that Kansas Secretary of State Kris Kobach, a sponsor of numerous forms of anti-immigration legislation, lobbied to add the citizenship question to the 2020 census at the suggestion of Steve Bannon,

1
2

A.       The United States And Private Plaintiffs Have Effectively Enforced The

Voting Rights Act Without Census Citizenship Data For Over 50 Years

3       Based on decades of experience, amici can authoritatively say:  Citizenship data from the

4  decennial census has never been necessary to enforce the Voting Rights Act and is not necessary

5  now.

6       In order to proceed with a claim that minority voters' votes have been diluted, a plaintiff

7  must demonstrate, among other things, that the minority group is "sufficiently large and

8  geographically compact to constitute a majority in a single-member [voting] district" if the districts

9  were drawn differently; that the minority group is "politically cohesive"; and that "the white

10  majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred

11  candidate."  *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  Because Voting Rights Act plaintiffs

12  bear the burden of establishing these preconditions, data about citizenship status may be used in vote

13  dilution litigation for a variety of purposes.  For example, data about the "citizen voting-age

14  population" (CVAP) may be used to generate a picture of the local electorate to show that members

15  of the minority group vote together as a bloc, that they are regularly defeated in the current electoral

16  configuration, or that they would be numerous enough to elect candidates of choice if the districts

17  were drawn differently.  And, in cases in which plaintiffs are successful in proving discriminatory

18  vote dilution, courts may use CVAP data to fashion an effective remedy.  Levitt Testimony 16.[28]

19       While CVAP data may be useful in vote dilution cases, in the 53 years that the Department of

20  Justice and private plaintiffs have enforced Section 2 of the Voting Rights Act, they have never tried

21  to obtain CVAP data from the decennial census.  That is because such data can be reliably obtained

22  from other sources—without the negative effects of including a citizenship question in the census.

23  From 1970 to 2005, litigants bringing Section 2 claims could obtain CVAP data from the "long

24  form" census, and from 2005 to the present, CVAP data has been obtainable from the ACS.  *See*

25

26  former White House Chief Strategist, for the very purpose of ensuring that "aliens" are not "counted for congressional apportionment purposes."  *See* Robbins & Benner, *Documents Show Political Lobbying in Census Question About Citizenship*, NY Times (June 9, 2018).

27  [28]       Notably, the Supreme Court has never held that CVAP data is required to establish a vote dilution claim under §2.  To the contrary, the Court has suggested that mere "voting-age population" data may be sufficient.  *See Bartlett v.*

28  *Strickland*, 556 U.S. 1, 18 (2009) (holding that the first *Gingles* precondition requires courts to ask: "Do minorities make up more than 50 percent of the *voting-age population* in the relevant geographic area?" (emphasis added)).

1    Levitt Testimony 16.  That data has amply sufficed to facilitate Voting Rights Act enforcement

2    without running the risk of suppressing census response rates from under-represented communities.

3          Defendants argue that collecting citizenship data in the decennial census would benefit

4    Voting Rights Act plaintiffs because it would generate CVAP data at a more granular level than the

5    ACS—at the "block level" rather than the "block group level."  MTD 6.  It is irrelevant to Voting

6    Rights Act plaintiffs that the decennial census could generate CVAP data at the block level because

7    they are already able to make their cases with existing data.  Defendants' claim ignores the fact that

8    experts can still translate that data to the block level using statistical imputation.  *See* Levitt

9    Testimony 16.  More importantly, such granular CVAP data is unnecessary in most Section 2 cases

10   because courts primarily use that data to determine whether minority groups can effectively mobilize

11   in a district.  That end determination is necessarily an estimate that depends on a variety of data in

12   addition to CVAP, including rates of voter eligibility, registration, and turnout—all of which have

13   corresponding margins of error.[29]

14         The meritless nature of defendants' argument is underscored by the fact that in all of the

15   Section 2 cases brought by the Justice Department over the past 18 years—across both Republican

16   and Democratic administrations—"there is not one of these cases in which a decennial enumeration

17   would have enabled enforcement that the existing survey data on citizenship did not permit.  Indeed,

18   not one of these cases has realistically been close to the line."  Levitt Testimony 18 & n.77

19   (gathering cases).  Acting Assistant Attorney General John Gore confirmed this assessment during

20   his testimony before Congress, in which he was unable to identify a single Justice Department

21   enforcement action that was hampered by currently available citizenship data.[30]  In short, existing

22   citizenship data available from the ACS has proven more than adequate for enforcement of Section 2

23   of the VRA.

24

25

26

27

---

[29]    *See* Fishkin, *The Administration is Lying About the Census*, Balkinization (Mar. 27, 2018).
[30]    *See Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform,* 115th

28   Cong. (2018) (statement of John M. Gore, Acting Assistant Att'y Gen., U.S. Dep't of Justice).

1

### B.     Collecting Citizenship Data Would Hinder The Communities Amici Represent—Primary Beneficiaries Of The Voting Rights Act—In Vindicating Their Rights

2

3

4     Even setting aside the adequacy of current citizenship data for Section 2 enforcement, adding

5     a citizenship question would not help the communities that amici represent to vindicate their rights

6     under the Voting Rights Act.  Indeed, it would have precisely the opposite effect.  As described

7     above, any greater precision in citizenship data obtained through the decennial census would come at

8     the expense of significantly undercounting minority populations who are reluctant to answer the

9     2020 census.  Because the ACS is administered as a survey, experts can use sampling and other

10    statistical techniques to compensate for nonresponse rates.  *See* Levitt Testimony 6-7.  By contrast,

11    federal law and Supreme Court precedent significantly limit the techniques that can be used to

12    compensate for undercounting on the decennial census.  *Id.* at 20; *see also* Nathaniel Persily, *The*

13    *Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32

14    CARDOZO L. REV. 755, 759 (2011).  In short, even if addition of a citizenship question could lead to

15    more *precise* citizenship data for those who respond, it will inevitably lead to less *accurate*

16    citizenship data that differentially undercounts the very minority populations who rely on that data to

17    bring Voting Rights Act claims.

18    Including a citizenship question on the 2020 census would therefore hobble, not bolster, the

19    ability of minority groups to prove vote dilution under Section 2 of the Voting Rights Act.  Rather

20    than helping minority groups prove their Section 2 claims, a citizenship question on the decennial

21    census would lead to undercounting precisely those individuals needed to show cohesive minority

22    populations.  *See* Levitt Testimony at 20.  Defendants' justification for the citizenship question is

23    therefore a red herring.  Any greater precision in citizenship data will hurt Voting Rights Act

24    plaintiffs because it will come at the cost of missing information and an inaccurate 2020 census.[31]

25

26    ---

[31]    *See Progress Report on the 2020 Census: Hearing Before H. Comm. on Oversight & Gov't Reform,* 115th Cong. 4-5 (2018) (statement of Vanita Gupta, President & CEO, The Leadership Conference on Civil and Human Rights) ("This decision would affect everyone, with communities that are already at greater risk of being undercounted—including people of color, young children, and low-income rural and urban residents—suffering the most … .  During the final years of the Obama administration, I was the Justice Department official responsible for overseeing voting rights enforcement.  I know firsthand that data from the ongoing American Community Survey were sufficient for

27

28

1

## <u>CONCLUSION</u>

2

For the foregoing reasons, defendants' motion to dismiss should be denied.

3

4

DATED: July 24, 2018                    Respectfully submitted,

5

6    By:    /s/ Michael A. Mugmon
     Michael A. Mugmon (SBN: 251958)
     michael.mugmon@wilmerhale.com
7    WILMER CUTLER PICKERING
        HALE AND DORR LLP
8    950 Page Mill Road
     Palo Alto, CA 94304
9    Telephone: +1 650 858 6000
     Facsimile:  +1 650 858 6100

10   *Attorney for Amici Curiae*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   us to do our work.  Rigorous enforcement of the Voting Rights Act has never required the addition of a citizenship
     question on the census form sent to all households.").

1

**APPENDIX:  LIST OF AMICI**

2  The Leadership Conference on Civil and Human Rights

3  The Leadership Conference Education Fund

4  Muslim Advocates

5  National Association of Latino Elected and Appointed Officials Educational Fund

6  National Coalition on Black Civic Participation

7  4CS of Passaic County

8  Advocates for Children of New Jersey

9  AgeOptions

10  American Anthropology Association

11  American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME)

12  American Federation of Teachers

13  American Muslim Health Professionals

14  American Society on Aging

15  Andrew Goodman Foundation

16  Anti-Defamation League

17  Arab American Institute

18  Arkansas Advocates for Children and Families

19  Asian & Pacific Islander American Health Forum

20  Asian American Legal Defense and Education Fund (AALDEF)

21  Asian Americans for Community Involvement

22  Asian Law Alliance

23  Asian Pacific American Labor Alliance

24  Asian Pacific Islander Americans for Civic Empowerment (APACE) – Washington

25  Bend the Arc: A Jewish Partnership for Justice

26  Bhutanese Community Association of Pittsburgh (BCAP)

27  California Pan-Ethnic Health Network

28

| | |
|---|---|
| 1 | Center for Law and Social Policy (CLASP) |
| 2 | Center for Popular Democracy |
| 3 | Central Conference of American Rabbis |
| 4 | Chinese-American Planning Council |
| 5 | Christian Methodist Episcopal Church – Washington-Virginia District |
| 6 | Citizen Action of New York |
| 7 | Civil Rights Project at the University of California – Los Angeles |
| 8 | Clearinghouse on Women's Issues |
| 9 | Clergy and Laity United for Economic Justice (CLUE) |
| 10 | Coalition on Human Needs |
| 11 | Colorado Center on Law and Policy |
| 12 | Colorado Children's Campaign |
| 13 | Common Cause |
| 14 | Community Service Society of New York |
| 15 | Crescent City Media Group |
| 16 | D & R Accounting & Tax Solutions, Inc. |
| 17 | Delaware Ecumenical Council on Children and Families |
| 18 | Democracy Forward Foundation |
| 19 | Dēmos |
| 20 | Disability Rights Education & Defense Fund (DREDF) |
| 21 | Empower Missouri |
| 22 | Equal Justice Society |
| 23 | Equality California |
| 24 | Faith in Public Life |
| 25 | Family Equality Council |
| 26 | FISH Hospitality Program, Inc. |
| 27 | Gilmore Memorial Preschool, Inc. |
| 28 | |

A2

1   Hindu American Foundation

2   Hispanic Federation

3   Hispanic Organization for Leadership & Action (HOLA)

4   Holy Spirit Missionary Sisters, USA-JPIC

5   Illinois Association of Area Agencies on Aging

6   Illinois Coalition for Immigrant and Refugee Rights

7   Immigrant Justice Group First Unitarian Denver

8   Impact Fund

9   In the Public Interest

10  Japanese American Citizens League

11  Jewish Council for Public Affairs

12  Justice in Aging

13  Laotian American National Alliance

14  Latino Coalition for a Healthy California

15  LatinoJustice PRLDEF (Puerto Rican Legal Defense and Education Fund)

16  League of Women Voters US

17  Legal Aid Justice Center

18  Legal Aid Society of the District of Columbia

19  Let America Vote

20  MinKwon Center for Community Action

21  Muslim Public Affairs Council

22  NAACP Legal Defense and Educational Fund, Inc.

23  National Action Network

24  National Asian Pacific American Women's Forum

25  National Association for the Advancement of Colored People, Inc.

26  National Black Justice Coalition

27  National Center for Law and Economic Justice

28

1 National Coalition for Literacy

2 National Consumers League

3 National Council of Jewish Women

4 National Employment Law Project

5 National Health Law Program

6 National Human Services Assembly

7 National Immigration Law Center

8 National Institute for Reproductive Health (NIRH)

9 National LGBTQ Task Force

10 National Organization for Women Foundation

11 National Partnership for Women & Families

12 National Women's Law Center

13 N.C. Counts Coalition

14 New Jersey Institute for Social Justice

15 New York Counts 2020

16 New York State Black, Puerto Rican, Hispanic & Asian Legislative Caucus

17 North Carolina Asian Americans Together (NCAAT)

18 Oasis - A Haven for Women and Children

19 Partnership For America's Children

20 Paterson Alliance

21 Paterson Education Fund

22 Paterson Habitat for Humanity

23 Passaic County Community College Child Development Center

24 People for the American Way Foundation

25 PolicyLink

26 Protect Democracy

27 Public Justice Center

28

A4

| | |
|---|---|
| 1 | Research Advisory Services, Inc. |
| 2 | Rock the Vote |
| 3 | Service Employees International Union |
| 4 | SOME, Inc. (So Others Might Eat) |
| 5 | South Asian Americans Leading Together |
| 6 | Southeast Michigan Census Council |
| 7 | Southern Poverty Law Center |
| 8 | Texas Civil Rights Project |
| 9 | The Enrichment Center |
| 10 | The National Urban League |
| 11 | The Sikh Coalition |
| 12 | The Southern Coalition for Social Justice |
| 13 | The Women's Law Center of Maryland |
| 14 | Theta Delta Sigma Society, Inc. |
| 15 | Tikkun Olam Chavurah |
| 16 | UnidosUS |
| 17 | Union for Reform Judaism |
| 18 | Unitarian Universalist Fellowship of Hidalgo County |
| 19 | Virginia Civic Engagement Table |
| 20 | Wisconsin Faith Voices for Justice |
| 21 | Women Employed |
| 22 | Women of Reform Judaism |
| 23 | Women's Bar Association of the District of Columbia |
| 24 | YWCA USA |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

A5

1

MICHAEL A. MUGMON (SBN: 251958)
michael.mugmon@wilmerhale.com

2

WILMER CUTLER PICKERING
   HALE AND DORR LLP

3

950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000

4

Facsimile: +1 650 858 6100

5

*Attorney for Amici Curiae*

6

7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

**SAN FRANCISCO DIVISION**

10

STATE OF CALIFORNIA, by and through
Attorney General Xavier Becerra; COUNTY OF
LOS ANGELES; CITY OF LOS ANGELES;

11

CITY OF FREMONT; CITY OF LONG
BEACH; CITY OF OAKLAND; CITY OF

12

STOCKTON,

13

Plaintiffs,

14

v.

15

WILBUR L. ROSS, JR., in his official capacity
as Secretary of the U.S. Department of

16

Commerce; U.S. DEPARTMENT OF
COMMERCE; RON JARMIN, in his official
capacity as Acting Director of the U.S. Census

17

Bureau; U.S. CENSUS BUREAU; DOES 1-100,

18

Defendants.

Case No.  3:18-cv-01865-RS

**[PROPOSED] ORDER ON MOTION FOR
LEAVE TO FILE BRIEF AN AMICUS
BRIEF FOR THE LEADERSHIP
CONFERENCE ON CIVIL AND HUMAN
RIGHTS, THE LEADERSHIP
CONFERENCE EDUCATION FUND,
MUSLIM ADVOCATES, THE BRENNAN
CENTER FOR JUSTICE AT N.Y.U.
SCHOOL OF LAW, NATIONAL
COALITION ON BLACK CIVIC
PARTICIPATION, NALEO EDUCATIONAL
FUND, ET AL. IN SUPPORT OF
PLAINTIFFS**

**Judge: Honorable Richard Seeborg**

19

20

21

22

    Good cause appearing, the Motion of The Leadership Conference on Civil and Human

23

Rights, The Leadership Conference Education Fund, Muslim Advocates, The Brennan Center for

24

Justice at N.Y.U. School of Law, National Coalition on Black Civic Participation, NALEO

25

1

2

Educational Fund, et al. to file an amicus brief in support of plaintiffs and in opposition to

defendants' motion to dismiss is hereby GRANTED.

3

     IT IS SO ORDERED.

4

5

Dated:  _____, 2018          _____

                            Hon. Richard Seeborg
                            United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25