CHAD A. READLER
Acting Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Tel.: (202) 514-9239
Email: kate.bailey@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.,* | Civil Action No. 3:18-cv-01865-RS |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS** |
| WILBUR L. ROSS, JR., *et al.*, | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

I. THIS CASE IS NOT JUSTICIABLE............................................................................ 1

    A. Plaintiffs Lack Standing to Maintain this Action. .................................................. 1

    B. Plaintiffs' Suit is Barred by the Political Question Doctrine................................ 5

    C. The Secretary's Decision is not Subject to Review under the APA. ..................... 9

II. PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM. ......................... 12

# TABLE OF AUTHORITIES

**CASES**

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................................. 5

*Borough of Bethel Park v. Stans*,
  319 F. Supp. 971 (W.D. Pa. 1970), *aff'd*, 449 F.2d 575 (3d Cir. 1971) ................................. 13

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980) ............................................................................................ 10, 11

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................................................... 12

*City of Camden v. Plotkin*,
  466 F. Supp. 44 (D.N.J. 1978) .............................................................................................. 13

*City of Phila. v. Klutznick*,
  503 F. Supp. 663 (E.D. Pa. 1980) ................................................................................... 10, 13

*Ctr. For Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) .............................................................................................. 7

*District of Columbia v. Dep't of Commerce*,
  789 F. Supp. 1179 (D.D.C. 1992) ......................................................................................... 13

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................................................... 13

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1996) ............................................................................................................... 12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................................ 5, 8

*Maxson v. Mosaic Sales Sols. Holding Co., LLC*,
  2016 WL 973248 (D. Nev. March 7, 2016) ............................................................................ 7

*McConnell v. Federal Election Comm'n*,
  540 U.S. 93 (2003) ................................................................................................................... 5

*Mendia v. Garcia*,
  768 F.3d 1009 (9th Cir. 2014) ................................................................................................. 5

*Munns v. Kerry*,
  782 F.3d 402 (9th Cir. 2015) ................................................................................................... 8

*Nelson v. King County*,
  895 F.2d 1248 (9th Cir. 1990) ................................................................................................. 8

*Senate of the State of California v. Mosbacher,*
  968 F.2d 974 (9th Cir. 1992) ............................................................................................... 15

*Speed Mining v. Fed. Mining Safety & Health Review Comm'n,*
  528 F.3d 310 (4th Cir. 2008) .......................................................................................... 13, 14

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ........................................................................................................... 6

*Springer v. IRS ex rel. U.S.,*
  231 F. App'x 793 (10th Cir. 2007) ...................................................................................... 14

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ............................................................................................................... 10

*Sutton v. Providence St. Joseph Med. Ctr.,*
  192 F.3d 826 (9th Cir. 1999) ............................................................................................... 14

*Tucker v. Dep't of Commerce,*
  958 F.2d 1411 (7th Cir. 1992) ............................................................................................. 15

*United States v. Sanchez-Gomez,*
  138 S. Ct. 1532 (2018) ........................................................................................................... 5

*U.S. House of Representatives v. U.S. Dep't of Commerce,*
  11 F. Supp. 2d 76 (D.D.C. 1998), *aff'd*, 525 U.S. 316 (1999) ...................................... 10, 11

*Utah v. Evans,*
  536 U.S. 452 (2002) .................................................................................................. 9, 10, 16

*Wisconsin v. City of NY,*
  517 U.S. 1 (1996) ........................................................................................................ passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 2, cl. 3 ...................................................................................................... passim

U.S. Const. art. I, § 2 ....................................................................................................................... 7

**STATUTES**

5 U.S.C. § 701 ......................................................................................................................... 12, 15

13 U.S.C. § 141 .................................................................................................................. 12, 13, 14

13 U.S.C. § 195 ............................................................................................................... 1, 9, 10, 12

13 U.S.C. § 221 ................................................................................................................................. 5

**LEGISLATIVE MATERIALS**

Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning
  Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the
  Census of the H. Comm. on Gov't Reform, 109th Cong. 128 (2005) .................................................4

**OTHER AUTHORITIES**

2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.3.0),
  https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-
  docs/2020-oper-plan3.pdf. ................................................................................................................3

U.S. Dep't of Commerce, Historical Statistics of the United States,
  1789-1945 (1949) ...........................................................................................................................13

## INTRODUCTION

As set forth in Defendants' Motion to Dismiss, Plaintiffs' request for an order barring the collection of demographic information through the decennial census should be rejected. Plaintiffs' opposition fails to dispel the weighty justiciability concerns implicated by this challenge to the Secretary's exercise of the broad discretion delegated to him by Congress. In particular, Plaintiffs fail to show why third parties' unlawful choices in failing to respond to the census are fairly attributable to Defendants. Their arguments with regard to injury only serve to underscore the speculative and uncertain nature of their claims—that a purported increase in the undercount of population will lead to losses in representation and funding. As for their remaining arguments concerning the Court's power to review and the existence of an Enumeration Clause claim, Plaintiffs suggest that every census procedure must be "reasonably designed to achieve accuracy, particularly distributive accuracy for purposes of congressional apportionment."  Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, at 25, ECF No. 53 ("Pls.' Opp'n"). But neither the Constitution nor the Census Act says any such thing; the census need not pursue maximum accuracy at the expense of other important goals, and there are no workable standards that restrict Defendants' discretion to achieve other legitimate data-gathering ends at the same time. Moreover, there is no allegation that the Secretary is estimating rather than counting the population, nor any allegation that he has failed to establish procedures for counting every person. For these reasons and those set forth in Defendants' previous memorandum, this case should be dismissed.

## I.   THIS CASE IS NOT JUSTICIABLE

### A.   Plaintiffs Lack Standing to Maintain this Action.

Plaintiffs fundamentally err in contending that their alleged injuries are "fairly traceable" to Defendants' decision to simply reinstate a question on the census questionnaire. *See* Pls.' Opp'n at 14-16. On the contrary, the injuries Plaintiffs allege are properly attributable to third parties who violate their legal duty to respond to the census. Such *unlawful* action cannot "fairly" be attributable

to the government's otherwise-lawful decision merely to ask a question. In other words, the unlawful acts of third parties should not disable the government from obtaining valuable information.

"When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). In such cases, the government's actions must create a "determinative or coercive effect upon the action of" those third parties. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Here, Defendants' actions do not impose a "determinative or coercive" effect causing persons *not* to respond to the census; on the contrary, the statute coerces persons *to respond to* the census by imposing a legal obligation to do so under criminal penalty. 13 U.S.C. § 221. Plaintiffs' theory of standing thus rests on the assumption that people will not comply with that legal obligation. In light of this legal obligation, Plaintiffs have failed to allege facts indicating that any third party's decision not to respond to the census would cease to be that person's "independent action." *See Bennett*, 520 U.S. at 169; *see also United States v. Sanchez-Gomez*, --- U.S. ----, 138 S. Ct. 1532, 1541 (2018) (observing that courts "have consistently refused to 'conclude that the case-or-controversy requirement is satisfied by' the possibility that a party 'will … violat[e] valid criminal laws" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)).

The Ninth Circuit's decision in *Mendia v. Garcia*, 768 F.3d 1009, 1012-1014 (9th Cir. 2014), on which Plaintiffs rely, is distinguishable because the purportedly unlawful government action there—the issuance of an immigration detainer—led directly to the *lawful* decision of private bail bondsmen to refuse to do business with the alleged U.S. citizen plaintiff, resulting in prolonged detention. But here, in contrast, third parties' illegal choices not to respond are simply that—individual choices to violate the law—not consequences fairly attributable to the government.

The other links in Plaintiffs' causal chain are no less speculative. Plaintiffs fail to distinguish between "self-response," which occurs when a household responds online or returns the paper questionnaire, and "response," which includes both self-response *and* response obtained through

Census Bureau follow-up methods. The estimated decrease mentioned by the Secretary in his decision memo refers to an estimated decrease in the initial *self*-response rate, not the total *final* response. Plaintiffs have not pleaded facts indicating that a lower self-response rate will necessarily mean a lower *final* response rate. As always, the Census Bureau is committed to a comprehensive non-response follow-up strategy to obtain responses from households that do not self-respond, involving attempts to contact households by telephone or in person, additional mailings, use of proxies, or use of administrative data. *See generally* 2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf. The Census Bureau has decades of experience in non-response follow-up operations, has developed detailed plans for such operations in the 2020 Census, and continues to test, add to, and refine its plans. Plaintiffs have not alleged facts indicating that these efforts will fail to offset any hypothetical decrease in initial self-response.

Plaintiffs' opposition also fails to cure the defects in their attempt to establish the injury-in-fact prong of the standing inquiry. First, Plaintiffs still have not alleged or pointed to sufficient facts demonstrating that a differential increase in the undercount resulting from the addition of a citizenship question is anything more than speculative. In response to Defendants' arguments in this regard, Plaintiffs assert that the question whether there will be a differential undercount is a factual issue to be resolved at summary judgment and rely on the fact that factual allegations are taken as true at the pleading stage. Pls.' Opp'n at 11-12. But Plaintiffs' suggestion that they need do nothing more than allege a speculative outcome at the pleading stage to establish standing is incorrect. Even at the pleading stage, a plaintiff must clearly … allege facts demonstrating" how it will suffer a "concrete and particularized" injury caused by the challenged conduct. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016) (citations omitted). Even at the pleading stage, a plaintiff cannot rely on "conclusory statements and legal conclusions" to establish the necessary injury-in-fact. *See Maxson v.*

*Mosaic Sales Sols. Holding Co., LLC*, 2016 WL 973248, at *4 (D. Nev. March 7, 2016); *see also Ctr. For Law & Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (dismissing case at pleading stage where plaintiff "offered this Court no actual demonstration of increased risk").

Moreover, it is insufficient for Plaintiffs to plead only a sufficiently nonspeculative disproportionate undercount; they must allege facts indicating that the level of the disproportionate undercount will be *material* to their claimed injury. Plaintiffs do not dispute that there would be no effect on representation or funding merely if there were some levels of undercount somewhere. Yet their assertions connecting the level of the purported undercount to changes in their representation and funding are entirely conclusory. *See* Pls.' Opp'n at 13 (relying on "comparatively higher percentages of non-citizens and their citizen relatives," without more, to support allegations that undercount will disproportionately affect Plaintiff jurisdictions relative to other states and cities).

Plaintiffs also point to predictions over the years regarding how questions about citizenship or legal status *might* affect response rates. Pls.' Opp'n at 10-11 (citing past opinions of former Census Bureau officials and internal study on hard-to-count populations unrelated to citizenship question); *see also* First Am. Compl. ("FAC") at ¶¶ 37, 5. But Plaintiffs have failed to allege any facts indicating that the particular questions on which those predictions were based were similar to the 2020 citizenship question in terms of wording, order, context, skip instructions, and formatting—rather, Plaintiffs simply ask the Court to assume, with no supporting factual allegations, that all questions about citizenship are the same. Furthermore, these statements are generally unsupported by any hard data, *see, e.g.,* Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform, 109th Cong. 128 (2005), and the repetition and audience for such statements do not make them any less speculative. Plaintiffs' reliance on Congressional testimony by Acting Director Ron Jarmin fares no better because Jarmin's statements acknowledging a potential decline in

participation, Pls.' Opp'n at 11, relate to initial self-response, not final response, and do not establish that a differential undercount will occur even after the Bureau's extensive follow-up operations.

At bottom, Plaintiffs' claimed injuries, which they contend will occur more than two years in the future after an unknown number of people in unknown jurisdictions refuse to be counted, simply do not rise above the speculative level. Plaintiffs' insistence that they stand to lose representatives or funding "due to the comparatively higher percentages of non-citizens and their citizen relatives" in California and its cities, Pls.' Opp'n 13, necessarily relies on conclusory assumptions that, after *all* operations for the 2020 census are completed, and despite the efforts of both the Bureau and Plaintiffs themselves to ensure a full and accurate count, the increase in incorrect enumerations will be sufficient in comparison to other jurisdictions to *actually* affect their representation or funding. Even taking well-pleaded allegations as true, this chain of speculation is simply too attenuated to establish an injury that satisfies Article III. *See Nelson v. King Cty.*, 895 F.2d 1248, 1252 (9th Cir. 1990) ("Both the Supreme Court and our circuit have repeatedly found a lack of standing where the litigant's claim relies upon a chain of speculative contingencies, particularly a chain that includes the violation of an unchallenged law"); *Munns v. Kerry*, 782 F.3d 402, 412 (9th Cir. 2015) (upholding dismissal for lack of standing on ground that claimed future injury was "too speculative to constitute injury in fact") (citing *Lujan*, 504 U.S. at 564).

Accordingly, Plaintiffs fail to meet their burden of demonstrating Article III standing, and this case should be dismissed for lack of jurisdiction.

**B.     Plaintiffs' Suit is Barred by the Political Question Doctrine.**

Plaintiffs' argument that "courts appear to have uniformly held that [the political question] doctrine does <u>not</u> bar challenges to the federal government's fulfillment of its census duties," Pls.' Opp'n at 16, is merely subterfuge designed to obscure the fact that this suit is fundamentally unlike any previous census challenge. Plaintiffs do not dispute that no challenge to the *content* of the census questionnaire ever has been maintained—and that distinction is critical, given that there is no

allegation here that the Secretary will not be conducting a person-by-person headcount. Because the Constitution's text commits the manner of conducting the census to Congress and this Court lacks judicially manageable standards for judging the propriety of reinstating a citizenship question, this suit presents a nonjusticiable political question.

Plaintiffs attempt to conflate the only judicially enforceable line drawn by the Enumeration Clause—impermissible estimation versus lawful enumeration—with the manner by which that count is conducted. That argument fails because this case has nothing to do with whom to count, how to count them, or where to count them. And it has nothing to do with the Secretary's procedures for counting every person. Instead, Plaintiffs challenge the Secretary's information-gathering decision to include a question on the census questionnaire that will be used to enumerate inhabitants almost two years from now. This is a challenge to the "[m]anner" of the census, which the Constitution expressly commits to Congress (and that Congress has expressly delegated to the Secretary). And Plaintiffs' contention that calculation methodologies *are part of* the "'manner' in which the census [is] conducted," Pls.' Opp'n at 18, is misplaced, because the fact that the *former* question—i.e., decisions related to whom and how to count individuals—may be reviewable does not establish that *all* challenges to the manner of conducting the census are similarly justiciable.

Plaintiffs also contend that the distinction between counting methodology and manner "is inconsistent with … Supreme Court decisions," Pls.' Opp'n at 18 (citing *Utah v. Evans*, 536 U.S. 452, 474 (2002) and *Wisconsin v. City of NY*, 517 U.S. 1, 17 (1996)). But neither *Utah* nor *Wisconsin* cast any doubt on Defendants' argument because both cases focused on calculation methodologies rather than pre-census information-gathering decisions. In *Utah*, the Supreme Court analyzed whether "hot-deck imputation"—a calculation methodology that infers characteristics of individuals based upon the characteristics of neighbors, resulting in inclusion of individuals who otherwise would be excluded—violated the Enumeration Clause. *Utah*, 536 U.S. at 457-58. Directly contrary to Plaintiffs' contention, the Court explicitly stated that "Utah's constitutional claim rests upon the words 'actual

Enumeration' as those words appear in the Constitution's Census Clause." *Id.* at 473 (focusing exclusively on "actual Enumeration" clause). *Wisconsin* is similarly inapposite because there the Supreme Court considered whether the Secretary's refusal to correct a census undercount with data from a post-enumeration survey (*i.e.*, a calculation methodology) violated the Enumeration Clause. *Wisconsin*, 517 U.S. at 10. True, the *Wisconsin* court cited the "manner" prong in discussing Congress' broad authority, but that does not change the fact that that decision dealt with a calculation methodology under the enumeration prong, and nothing in the decision establishes that judicially manageable standards exist for assessing determinations concerning the manner in which that enumeration is conducted.

Indeed, none of the cases cited by Plaintiffs confronted the question whether pre-census information-gathering decisions—as opposed to calculation methodologies—present a nonjusticiable political question. In *U.S. House of Representatives v. U.S. Department of Commerce*, for example, a three-judge court specifically noted that the plaintiff had Article III standing and that "a jurisdictional statute permits this plaintiff to bring the case" before holding that the calculation methodology of statistical sampling does not present a political question. 11 F. Supp. 2d 76, 95 (D.D.C. 1998), *aff'd,* 525 U.S. 316 (1999); *see Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (finding justiciable a post-census challenge to the counting accuracy of a specific city);[1] *City of Phila. v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980) (same). Plaintiffs point to no court that has reviewed a pre-census challenge to the census questionnaire's content—a purely information-gathering decision—and held that such a challenge is justiciable. And their attempt to fault Defendants for "hav[ing] not cited a single case that articulates, much less applies[,] this distinction" between counting methodology and the *manner* in which the census is conducted, Pls.' Opp'n at 18, is meaningless given the absence of cases presenting challenges to the latter.

---

[1] Not only is this Second Circuit opinion not binding on this Court, but, in any event, it also contains such scant analysis as to constitute the type of "drive-by jurisdictional ruling[]" that "ha[s] no precedential effect," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (citations omitted).

Plaintiffs' attempt to identify judicially manageable standards is equally flawed. At essence their claim rests on disagreement with the Secretary's policy choices in balancing the need for citizenship information with the cost and effectiveness of efforts to mitigate non-responses, the possibility of lower self-response rates, the cost of increased non-response follow-up procedures, and the completeness and cost of administrative records. But that decision rests with the Secretary, subject to oversight only by Congress, and, as with every pre-count information-gathering procedure, there are no judicially manageable standards for balancing those factors and a myriad of others.

Plaintiffs try to avoid this conclusion by arguing that "the Constitution itself provides a straightforward, judicially administrable standard for reviewing Defendants' conduct of the census." Pls.' Opp'n at 19. This argument fails for two reasons.[2] First, Plaintiffs derive their purported standard from *Wisconsin v. City of NY*, 517 U.S. 1 (1996), a case concerning whether the Secretary's refusal to correct a census undercount with data from a post-enumeration survey (*i.e.*, a calculation methodology) violated the Enumeration Clause's requirement of an "actual Enumeration." But the Supreme Court's decision in *Wisconsin* says nothing about standards applicable to the "[m]anner" of conducting the census. And with good reason: The Secretary's decision to correct (or not correct) a census undercount implicates an affirmative constitutional command to count, rather than estimate, the population. Hence, a court may adjudicate challenges to calculation methodologies using *Wisconsin*'s standard even before the census. *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (holding that the Secretary's pre-census decision to use statistical sampling violates the Census Act, 13 U.S.C. § 195, and declining to reach the Enumeration Clause claim). But once a court ventures beyond that affirmative constitutional command into the manner of conducting the census, there simply is no law to apply.

---

[2] Additionally, even under Plaintiffs' own standard, their claim fails as a matter of law. Plaintiffs hypothesize that a citizenship question may cause an inaccurate population count, but advance no allegation that the Secretary is doing anything other than pursuing a complete and accurate count using the census questions he submitted to Congress.

But the Constitution envisions a much more nuanced process by an institution capable of weighing the numerous factors that must be considered in such policy choices—Congress. The Secretary's decision to reinstate the citizenship question on the 2020 Census is therefore a "policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1996), and this case is barred by the political question doctrine.

**C.     The Secretary's Decision is not Subject to Review Under the APA.**

Agency actions are insulated from judicial review under the APA where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citations omitted). Plaintiffs' search for law cabining the Secretary's discretion in devising the census questionnaire is in vain; no meaningful standards exist in the relevant statutes or regulations for a court to apply to the Secretary's judgment, thus demonstrating that the decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Plaintiffs first point to the Enumeration Clause itself and contend that the "reasonable relationship to the accomplishment of an actual enumeration" standard articulated in *Wisconsin*, 517 U.S. at 20, supplies law to apply for purposes of APA review. Pls.' Opp'n at 21. But as thoroughly discussed above, *infra* Section I.B., *Wisconsin* analyzed the very different question whether the Secretary is required to adjust census figures *after* the count; the decision did not establish a standard governing *any* challenge to a decision even tangentially related to the count itself. And the *Wisconsin* court emphasized that the "text of the Constitution vests Congress with virtually unlimited discretion in conducting" the census, and "Congress has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)). Far from limiting the Secretary's authority, *Wisconsin* emphasizes its breadth. And more importantly, perhaps, the text of the Constitution itself contains *no* limiting language that may be read to provide a standard by which to judge a decision as fundamental as the form of the questionnaire itself.

Plaintiffs also contend that "[t]he great weight of authority supports the view that the conduct of the census is not 'committed to agency discretion by law.'" Pls.' Opp'n at 20 & n.19 (citing Justice Stevens's concurrence in *Franklin v. Massachusetts*, 505 U.S. 788, 819 n.19 (1992), and cases cited therein). But none of Plaintiffs' cited cases addressed the question at issue here: whether the Census Act provides any standards by which to judge the questionnaire content. *See, e.g.*, *District of Columbia v. Dep't of Commerce*, 789 F. Supp. 1179, 1189 (D.D.C. 1992) (challenging the decision to count inmates of a particular prison as residents of Virginia rather than the District of Columbia); *Carey v. Klutznick*, 637 F.2d 834 (2d Cir. 1980) (reviewing challenge to *process* used to count minority New York residents); *City of Phila. v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980) (challenging the counting accuracy of a specific city); *City of Camden v. Plotkin,* 466 F. Supp. 44, 46 (D.N.J. 1978) (same); *Borough of Bethel Park v. Stans*, 319 F. Supp. 971, 972 (W.D. Pa. 1970) (challenging the allocation of college students, members of the Armed Services, and inmates in relation to their colleges, military bases, and institutions), *aff'd,* 449 F.2d 575 (3d Cir. 1971). Given that the relevant inquiry under the APA depends on both the statutory language and "the nature of the administrative action at issue," *Speed Mining v. Fed. Mine Safety & Health Review Comm'n.*, 528 F.3d 310, 317 (4th Cir. 2008), such cases are inapposite.

Plaintiffs next rely on the Census Act to contend that Congress's direction that "the decennial enumeration of the population be as accurate as possible" supplies law to apply for purposes of APA review. Pls.' Opp'n at 22 (citing 13 U.S.C. § 141). But it cannot be that any action that "sacrifice[s] any degree of census accuracy" violates the Constitution; were that the case, any question that might cause some individuals not to respond, such as questions on race, age, or relationship status—not to mention the longstanding previous practice of using a long-form questionnaire—would all be unconstitutional. And an ill-defined "accuracy standard" would prove unworkable by engaging the courts in a complex balancing of factors committed to the Secretary's discretion. For example, has the Secretary violated the Constitution if he employs 550,000 enumerators for in-person visits instead of 560,000, because he values cost, training, testing, and timing over accuracy? Or if the census

questionnaire is distributed in 12 non-English languages instead of 13? Or if the Secretary opens six regional census centers instead of seven? Just as with the content of the census questionnaire, each of these determinations are pieces of a much larger puzzle, all of which involve a careful consideration of myriad factors. The courts are ill-equipped to second-guess the Secretary's consideration of those factors.[3]

Plaintiffs also set forth amorphous requirements of other statutes and regulations, although they fail to explain how any of them provide specific standards establishing the propriety of judicial review under the APA. *See* Pls.' Opp'n at 22-23. For example, Plaintiffs cite the Bureau's Statistical Quality Standards, which require pretesting and refinement of survey questions. *Id.* But even setting aside the fact that the citizenship question at-issue here has been extensively pretested on the American Community Survey, Plaintiffs fail to explain how a vague directive to pretest questionnaire content can supply "law to apply" sufficient to transform the nature of the agency action from an exercise of "virtually unlimited discretion," *Wisconsin*, to one that is reviewable. Plaintiffs' citation to the Paperwork Reduction Act ("PRA") suffers from the same fatal flaw, as the PRA contains no judicially enforceable private right of action *or* any standards for a court to apply. *Springer v. I.R.S. ex rel. U.S.*, 231 F. App'x 793, 800 (10th Cir. 2007); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999). And Plaintiffs cite no cases in which courts have applied the PRA's "accuracy" and "objectivity" instructions, the OMB's guidelines to "maximize[ing] data quality," or the Census Bureau's questionnaire pretest procedures to agency actions under the APA. *See* Pls.' Opp'n at 22-23. The reason is axiomatic: None of the administrative guidance referenced by Plaintiffs provides any law by which courts could judge the Secretary's exercise of discretion over questionnaire content.

---

[3]As Defendants previously noted, Defs.' Mem. at 20, Congress reserved responsibility for oversight of the Secretary's performance, requiring the Secretary to submit to Congress "not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census." 13 U.S.C. § 141(f)(2). This reporting requirement underscores that it is for Congress, not the courts, to review the Secretary's content determinations.

As a last-ditch effort, Plaintiffs seek to distinguish persuasive contrary authority. This Court should disregard *Tucker v. Dep't of Commerce*, 958 F.2d 1411 (7th Cir. 1992), Plaintiffs insist, because that opinion predated *Utah*, *Wisconsin*, and *Franklin*, as well as the PRA and OMB guidelines discussed above. Pls.' Opp'n at 24-25. But those Supreme Court opinions did not address the question here—whether the Census Act provides meaningful standards against which to gauge the Secretary's determination of census questionnaire content—and nothing in those later opinions undermines Judge Posner's observation that the governing statue is "[s]o nondirective … that you might as well turn it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add its rationality or fairness." *Tucker*, 958 F.2d at 1417-18. And Plaintiffs' attempt to distinguish *Senate of the State of California v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992), on the ground that "plaintiffs there sought to compel the Secretary to release internal calculations to the public," Pls.' Opp'n 25, is a distinction without a difference, given the Ninth Circuit's conclusion that the Constitution and Census Act provided "no law to apply."

Although Plaintiffs canvass the Constitution, the Census Act, and administrative guidance, they can point to no source of law that provides a suitable basis for judicial review of the issue raised here: the Secretary's decision to reinstate a citizenship question on the 2020 Census. Accordingly, Plaintiffs' APA claim is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

## II.     PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM.

Even if this case were justiciable, Plaintiffs' Enumeration Clause claim should be dismissed for three straightforward reasons: (1) the Enumeration Clause mandates only a person-by-person headcount, and there is no allegation that the Secretary has failed to establish procedures for counting every person; (2) the Secretary is granted "virtually unlimited" discretion in conducting the census, and he exercised that discretion to reinstate a citizenship question with a long historical pedigree; and (3) Plaintiffs' theory, if accepted, would invalidate demographic questions on nearly every decennial census since 1790. *See* Defs.' Mem. at 26-30.

Plaintiffs first contend that Defendants' argument that the Enumeration Clause requires only that apportionment be accomplished through an actual person-by-person headcount lacks "any supporting legal authority." Pls.' Opp'n at 25. On the contrary, the requirement of a person-by-person headcount derives from the same text, history, and case law that Plaintiffs themselves cite. Prior to the first census in 1790, the Framers settled on an interim number of Representatives for each state, U.S. Const. art. I, § 2, cl. 3, based on "estimates" of the population derived from "materials ranging from relatively complete enumerations … to fragmentary data such as contemporary local population estimates, militia registrations, tax records, church records, and official vital statistics." U.S. Dep't of Commerce, Historical Statistics of the United States, 1789-1945 (1949). The conjecture on which the original apportionment was based thus stands "in contrast to the deliberately taken count that was ordered for the future. What was important was that contrast—rather than the particular phrase used to describe the new process." *Utah*, 536 U.S. at 475 (citations omitted); *see id.* at 493 (Thomas, J., concurring in part and dissenting in part) ("[A]t the time of the founding, 'conjecture' and 'estimation' were often contrasted with the actual enumeration that was to take place pursuant to the Census Clause."). The Enumeration Clause was drafted to ensure that an individual headcount replaced such estimation.

Indeed, even applying the inapt "reasonably related" standard on which Plaintiffs rely, Pls.' Opp'n at 25-26 (discussing *Wisconsin*, 517 U.S. at 19-20, applying standard in challenge to calculation methodology), Plaintiffs' claim should be dismissed. The FAC sets forth no allegation that the Secretary is using "estimates" or "conjecture" rather than a headcount, nor any allegation that he has failed to establish procedures for counting every person. Because the Secretary will do precisely what the Constitution commands, his decision to collect additional, important demographic information through reinstatement of a citizenship question cannot be said to lack a "reasonable relationship" to an actual enumeration. Plaintiffs' claim fails as a matter of law even under their own standard.

Plaintiffs also try to distinguish their challenge to the citizenship question from other demographic questions, arguing that although some demographic questions "could 'theoretically' cause an inaccurate count," there are "specific reasons to conclude that the [citizenship] question will lead to an inaccurate count." Pls.' Opp'n at 26. Not only is that categorically incorrect, it misses the point. Even *accepting* Plaintiffs' allegations of an undercount, the logical conclusion of Plaintiffs' theory is that the Enumeration Clause prohibits any demographic questions because such questions are likely to reduce response rates at least somewhat, if not substantially, therefore violating the constitutional duty to pursue "census accuracy, particularly distributive accuracy." *Id.* at 25-26. But there simply is no support for the proposition that the Secretary must pursue accuracy to the exclusion of all other legitimate considerations. Indeed, the long-form questionnaire, used as recently as 2000, which likewise sought demographic information unrelated to the enumeration, indisputably resulted in a lower response rate, *see* Defs.' Mem. at 29-30 (noting the lower response rate for the long-form questionnaire), and the same is quite likely true for short-form questions like sex, Hispanic origin, race, and relationship status. Plaintiffs' theory cannot be squared with this historical practice.

Defendants note also that Judge Furman recently dismissed the Enumeration Clause claim in the citizenship-question challenges currently pending in the Southern District of New York, ruling that the conclusion "that the citizenship question is a permissible … exercise of the broad power granted to Congress and, in turn, the Secretary" is "particularly compelled … by historical practice." *See* Order on Motion to Dismiss, No. 1:18-cv-02921-JMF, Doc. 215, at 46-60 (S.D.N.Y. July 26, 2018).[4]

For these reasons, and those set forth in Defendants' previous memorandum, Plaintiffs' Enumeration Clause claim fails as a matter of law and should be dismissed.

Date: July 31, 2018                                          Respectfully submitted,

                                                             CHAD A. READLER
                                                             Acting Assistant Attorney General

---

[4] Defendants respectfully disagree with Judge Furman's decision to permit plaintiffs' other claims to proceed in the related citizenship challenges pending in New York.

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director

  /s/ Kate Bailey
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Tel.: (202) 514-9239
Fax: (202) 616-8470
Email: kate.bailey@usdoj.gov

*Attorneys for Defendants*