XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE
Deputy Attorney General
State Bar No. 238485
GABRIELLE D. BOUTIN
Deputy Attorney General
State Bar No. 267308
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-6053
 Fax:  (916) 324-8835
 E-mail:  Gabrielle.Boutin@doj.ca.gov
*Attorneys for State of California, by and through
Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>Defendants. | 3:18-cv-01865<br><br>**PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**<br><br>Dept:      3<br>Judge:     The Honorable Richard G. Seeborg<br>Trial Date:   None set<br>Action Filed:  3/26/2018 |

**INTRODUCTION**

Plaintiffs State of California, by and through Attorney General Xavier Becerra, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton (collectively, "Plaintiffs") respectfully submit the following motion for administrative relief pursuant to Civil Local Rule 7-11.  Specifically, although this Court has taken under submission the issue of whether Plaintiffs may conduct discovery in this action, Defendants subsequently produced new documents that provide strong evidence of "bad faith" that further justifies discovery.  Plaintiffs therefore request leave to file the supplemental brief and declaration attached hereto as "Exhibit A" relating to this new evidence.

**BACKGROUND**

Pursuant to the parties' stipulation and this Court's order (see ECF No. 18), in June 2018, Plaintiffs and Defendants submitted briefs on the issue of whether Plaintiffs may take discovery outside of the administrative record.  Plaintiffs asserted two primary arguments supporting their right to discovery: 1) that the Complaint includes a separate and distinct constitutional claim in addition to the APA claim, and 2) that Defendants' decision to add the citizenship question was done in "bad faith."  See ECF No. 27.   Evidence of bad faith included, among many other things, that:

- In Secretary Ross's March 26, 2018 memorandum announcing his decision to add the citizenship question, he stated that the request for a citizenship question had initially come from U.S. Department of Justice in December of 2017.  Administrative Record (AR) at 1313, ECF No. 24.  Secretary Ross had also made this representation under oath to Congress.
- An email in the administrative record showed that Kansas Secretary of State Kris Kobach contacted Ross and requested the citizenship question in spring of 2017 "at the direction of [Presidential advisor] Steve Bannon."  AR 763.
- After scrutiny of the Kobach email in the media and in Plaintiffs' opening discovery brief, on the last day for the parties to submit their responding briefs, Secretary Ross filed a "Supplement to the Administrative Record," in which he contradicted his

statements in the March 26 memorandum and to Congress by stating the idea to add a citizenship question actually came from "senior Administrative officials" soon after his appointment as Secretary.  ECF No. 33-1.

The Court heard oral argument on the discovery issue on June 28, 2018.  At the hearing, the Court took the matter under submission and advised that it would not issue a ruling until at least August 10, 2018, the date set for hearing on Defendants' motion to dismiss.

On July 5, 2018, in the related census actions in the Southern District of New York,[1] after finding the administrative record in those cases[2] to be deficient, the Honorable Judge Jesse M. Furman ordered Defendants to "complete the [administrative] record."  *See e.g. State of N.Y. v. U.S. Dept. of Commerce*, No 1:18-cv-2921 (S.D.N.Y.), ECF No. 199.

In response to that order, on July 23 and July 27, 2018, Defendants filed in the New York actions notices of filing of "supplemental materials" consisting of nearly 10,000 total pages of documents (Supplemental Record).  *See e.g. id.*, ECF Nos. 212, 217.  Although Defendants have not yet filed the Supplemental Record in this action, the Defendants made documents are publically available on the Internet.[3]  Plaintiffs did not previously have access to the documents in the Supplemental Record, with the exception of a few duplicative documents that Defendants had lodged in this action's administrative record.[4]  Declaration of Gabrielle D. Boutin in Support of Plaintiffs' Administrative Motion (Boutin Decl. I) at ¶ 3.

The Supplemental Record contains documents that provide important additional evidence that Defendants acted in "bad faith" when deciding to add the citizenship question to the 2020 Census, and therefore support Plaintiffs' right to discovery.  Specifically, the new documents flesh out a fuller picture of Secretary Ross's efforts to add the citizenship question for political

---

[1] *State of N.Y. v. U.S. Dept. of Commerce*, No 1:18-cv-2921 (S.D.N.Y.) and *N.Y. Immigration Coalition v. U.S. Dept. of Commerce*, No 1:18-cv-5025 (S.D.N.Y.).

[2] The administrative record filed in those cases at that time was identical to the administrative record filed by Defendants in this case.

[3] The documents can be viewed and downloaded at http://www.osec.doc.gov/opog/foia/documents/CensusProd001.zip and http://osec.doc.gov/opog/foia/documents/census_prod002.zip.

[4] Plaintiff's supplemental brief does not cite any of Defendants' documents that were previously available in the administrative record, with the exception of the Kobach email (AR 713), which provides an important part of the larger picture.

1   purposes at the behest of Mr. Bannon, and that Ross's office worked with Department of Justice

2   to elicit a formal request for the question based on a pretextual justification.  *See e.g.* Ex. A,

3   Declaration of Gabrielle D. Boutin in support of Plaintiffs' supplemental brief (Boutin Decl. II),

4   Ex. 1, AR 2462, 2561, 3710, 4004.

5        Plaintiffs have attached hereto as Exhibit A a short, five-page supplemental brief and

6   declaration related to these new documents.  Plaintiffs have also concurrently filed a [Proposed]

7   Order granting Plaintiffs leave to file the supplemental brief and declaration, deeming them filed,

8   and granting Defendants leave to file a responding 5-page supplemental brief by August 7, 2018.

9        Although Plaintiffs proposed to Defendants that the parties stipulate to supplemental

10   briefing related to the issues above, Defendants declined to stipulate.  Boutin Decl. I at ¶¶ 4, 5 and

11   Exhibit 1.

12                   **ARGUMENT**

13        This Court should grant Plaintiffs leave to file the supplemental brief and declaration.  It is

14   well within the Court's sound discretion to allow supplemental briefing.  *See* Civil L.R. 7-3(d)

15   (limiting right to file supplemental materials "without prior Court approval").  These materials

16   contain important evidence and argument showing that Defendants acted in bad faith in adding

17   the citizenship question to the 2020 Census and in attempting to create an artificial administrative

18   record supporting the action.  They not only justify discovery in this action, but show why

19   discovery is essential.  Plaintiffs, moreover, could not have submitted these materials previously,

20   since they did not receive the Supplemental Record documents until Defendants produced them in

21   the New York action on July 23 and 27—well after this Court took the discovery issue under

22   submission on June 28.

23                 **CONCLUSION**

24        For the reasons above, Plaintiffs respectfully request that the Court enter Plaintiffs'

25   [Proposed] Order granting them leave to file the attached supplemental brief and declaration in

26   support of their right to take discovery.

27

28

1

2

3    Dated:  August 3, 2018                      Respectfully Submitted,

4                                                XAVIER BECERRA
                                                 Attorney General of California
5                                                MARK R. BECKINGTON
                                                 Supervising Deputy Attorney General
6                                                R. MATTHEW WISE
                                                 Deputy Attorney General
7

8                                                /s/   Gabrielle D. Boutin
                                                 GABRIELLE D. BOUTIN
9                                                Deputy Attorney General
                                                 *Attorneys for Plaintiff State of California, by and*
10                                               *through Attorney General Xavier Becerra*

11

12   Dated:  August 3, 2018                      /s/ Margaret L. Carter _____
                                                 MARGARET L. CARTER, SBN 220637
13                                               DANIEL R. SUVOR
                                                 O'MELVENY & MYERS LLP
14                                               400 S. Hope Street
                                                 Los Angeles, CA 90071
15                                               Telephone: (213) 430-8000
                                                 Fax: (213) 430-6407
16                                               Email: dsuvor@omm.com
                                                 *Attorneys for Plaintiff County of Los Angeles*
17

18   Dated:  August 3, 2018                      MIKE FEUER
                                                 City Attorney for the City of Los Angeles
19
                                                 /s/ Valerie Flores _____
20                                               VALERIE FLORES, SBN 138572
                                                 Managing Senior Assistant City Attorney
21                                               200 North Main Street, 7th Floor, MS 140
                                                 Los Angeles, CA  90012
22                                               Telephone: (213) 978-8130
                                                 Fax: (213) 978-8222
23                                               Email: Valerie.Flores@lacity.org

24

25

26

27

28

| | |
|---|---|
| 1 | Dated:  August 3, 2018 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

HARVEY LEVINE
City Attorney for the City of Fremont

/s/ Harvey Levine _____
SBN 61880
3300 Capitol Ave.
Fremont, CA 94538
Telephone: (510) 284-4030
Fax: (510) 284-4031
Email: hlevine@fremont.gov

Dated:  August 3, 2018

CHARLES PARKIN
City Attorney for the City of Long Beach

/s/ Michael J. Mais _____
MICHAEL K. MAIS, SBN 90444
Assistant City Attorney
333 W. Ocean Blvd., 11th Floor
Long Beach CA, 90802
Telephone: (562) 570-2200
Fax: (562) 436-1579
Email: Michael.Mais@longbeach.gov

Dated:  August 3, 2018

BARBARA J. PARKER
City Attorney for the City of Oakland

/s/ Erin Bernstein _____
MARIA BEE
Special Counsel
ERIN BERNSTEIN, SBN 231539
Supervising Deputy City Attorney
MALIA MCPHERSON
Attorney
City Hall, 6th Floor
1 Frank Ogawa Plaza
Oakland, California 94612
Telephone: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

5

1

**FILER'S ATTESTATION**

2

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that concurrence

3

in the filing of this document has been obtained from all signatories above.

4

Dated: August 3, 2018                                   /s/   *Gabrielle D. Boutin*
                                                        GABRIELLE D. BOUTIN

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE
Deputy Attorney General
State Bar No. 238485
GABRIELLE D. BOUTIN
Deputy Attorney General
State Bar No. 267308
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-6053
 Fax:  (916) 324-8835
 E-mail:  Gabrielle.Boutin@doj.ca.gov
*Attorneys for State of California, by and through*
*Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>Defendants. | 3:18-cv-01865<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY; DECLARATION OF GABRIELLE D. BOUTIN**<br><br>Dept:       3<br>Judge:      The Honorable Richard G. Seeborg<br>Trial Date:   None set<br>Action Filed:  3/26/2018 |

**INTRODUCTION**

In response to the Southern District of New York's order to complete the administrative record in the census actions related to this case, Defendants recently made public a number of documents (Supplemental Record).[1]  Those documents, unavailable to Plaintiffs when they filed their original motion, prove that the effort to add the citizenship question was directed by then-- Presidential advisor Steve Bannon in a bad-faith effort, likely to support Republican redistricting efforts and depress the 2020 Census response rates of immigrants and their families.  The documents show that after speaking with Bannon and Kobach, Ross decided to add the citizenship question to the Census without any sort of administrative review.  Ross and his staff then asked the U.S. Department of Justice (DOJ) to formally request that the Department of Commerce add the question in an attempt to cloak the question in legitimacy.  It was Ross's request — not any independent concern about enforcing the Voting Rights Act — that prompted DOJ's December 12, 2017 letter formally addition of a citizenship question.

The newly produced documents demonstrate bad faith in connection with Defendants' decision to add a citizenship question to the 2020 Census, and thus mandate "examining the decision-makers themselves." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977).  At the very least, they raise a "substantial suspicion" of bad faith conduct that is more than sufficient to justify discovery.  *See Stand Up for California! v. U.S. Dep't of Interior*, 17-cv-00058, 2018 WL 2433576, at *6 (D.D.C. May 30, 2018).  Plaintiffs respectfully submit this supplemental brief to identify some of the salient documents for the Court's review and consideration.[2]

---

[1] *See State of New York et al. v. U.S. Dep't of Commerce et al.*, No. CV 18-02921 (JMF) (Docket No. 199), ECF. Nos. 212, 217; *see also N.Y. Immigration Coalition v. U.S. Dept. of Commerce*, No 1:18-cv-5025 (S.D.N.Y.), ECF No 67, 72.  Defendants refer to the Supplemental Record as "Supplemental Materials" and have not conceded that they are part of the administrative record.

[2] The first 1,321 pages in the administrative record were filed in this matter in Docket Nos. 38-3, 38-4, 38-5, and 52-1.  The remaining documents were produced publicly and are available for download at  http://www.osec.doc.gov/opog/foia/documents/CensusProd001.zip and http://osec.doc.gov/opog/foia/documents/census_prod002.zip.  The productions are numbered sequentially and will be cited herein as the "AR."  Cited documents are also attached hereto as exhibits to the Declaration of Gabrielle D. Boutin.

1

1

## BACKGROUND

In sworn testimony to Congress on March 22, 2018—four days before he issued a memorandum announcing the addition of the citizenship question to the 2020 Census—Secretary Ross told the House Ways and Means Committee that the DOJ had "initiated the request for inclusion of the citizenship question."[3]  Secretary Ross used the term "initiated" even as briefing materials for a similar hearing two days earlier in anticipation of the same question avoided stating that the DOJ's request had initiated the process of considering adding the citizenship question.  *See* AR004286.  Four days later, on March 26, 2018, Secretary Ross stated in his official decision memo on the citizenship question that he "set out to take a hard look at" the citizenship question "[*f*]*ollowing* DOJ's request" (emphasis added).  AR 1313.

The supplemental documents that Defendants produced in response to Judge Furman's order in the New York cases show that Ross's testimony to Congress was inaccurate. The DOJ drafted its memo requesting addition of a citizenship question only after the Department of Commerce asked it to do so. And the Department of Commerce agreed to add the citizenship question only because Steve Bannon and Kansas Secretary of State Kris Kobach lobbied Ross.

The relevant documents show that the entire process of adding the citizenship question to the 2020 Census was an attempt to support Republican redistricting efforts and depress the 2020 Census response rates of immigrants and their families.  Ross began considering adding the question no later than March 2017, when his staff began to investigate the matter based on an op-ed in the *Wall Street Journal*.  AR 2521.  In April 2017, Bannon asked Ross to "talk to someone about the Census."  AR 2561. That "someone" appears to have been Kobach, who confirmed in a July 2017 e-mail that he had spoken to Ross about adding a citizenship question to the 2020 Census "at the direction of Steve Bannon a few months earlier."  AR 763.

The documents produced to date show that, after Ross spoke with Bannon and Kobach, he decided to add the citizenship question and directed his staff to engage the DOJ, apparently in

---

[3] Hearing on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum: Hearing Before the H. Ways & Means Comm., 115th Cong. 24, 2018 WLNR 8951469 (Mar. 22, 2018) (testimony of Secretary Ross) (emphasis added).  This Court may take judicial notice of that testimony because "courts regularly take judicial notice of congressional records." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1087 (N.D. Cal. 2017).

2

order to make the request appear to have come from somewhere other than the White House.  On

May 2, 2017, Ross wrote to Earl Comstock, the Director of the Office of Policy and Strategic

Planning at the Department of Commerce, complaining that "nothing ha[d] been done" on his

"months old request that we include the citizenship question."  AR003710. Comstock revealed in

his reply that Commerce was engaging another federal agency to ask for the question, writing

"[w]e need to work with Justice to get them to request that citizenship be added back as a census

question."  *Id.*  Two days later, Comstock wrote to Mary Blanche Hankey at the DOJ, stating that

"[c]ontacts over [at] the White House said that you would be the best person for me to talk to at

DoJ on Commerce issues" and scheduling a call.  AR 2462.  In August 2017, Ross grew more

impatient, asking Comstock for an update regarding "where . . . the DoJ [is] in their analysis" and

threatening to call Attorney General Jeff Sessions if the DOJ "still have not come to a

conclusion."  AR 4004.

At around this same time, Secretary Ross was already communicating with the Department

of Commerce's Office of General Counsel (OFC) about the citizenship question.  On August 16,

2017, Comstock sent Secretary Ross an e-mail attaching "a draft memo on the citizenship

question" from OFC for Ross's review—still four months before the DOJ sent its memorandum.[4]

AR 2642.  On September 7, 2017, Comstock wrote to Peter Davidson and James Uthmeier in

OFC, stating that Secretary Ross "would like an update on progress since the discussion yesterday

regarding the citizenship question." AR 2034.

And while Ross later boasted of the "over 24 diverse, well informed and interested parties"

that he met with before issuing his March 26 decision memorandum (*see* AR 1313), the new

documents show that the Department of Commerce went to great lengths to find supportive

voices.  As an e-mail from defendant Ron Jarmin dated February 13, 2018, shows, the Census

Bureau intentionally sought meetings with those who would offer "expression of support for the

---

[4] Defendants have withheld the underlying memorandum as privileged.  But the fact that Ross received a memorandum regarding the citizenship question months before the DOJ submitted its request shows bad faith, particularly in light of his subsequent sworn testimony to Congress.

1  proposal in contrast to the many folks we can find to give professional statements against the

2  proposal."[5] AR004037.

3  **ARGUMENT**

4      When evidence, either in isolation or "in combination" raises "substantial suspicion" of bad

5  faith, extra-record discovery is appropriate. *Stand Up for California!*, 2018 WL 2433576 at *6.

6  Such discovery is critical to make a substantive claim that a challenged agency action was

7  arbitrary, capricious or otherwise contrary to law, and will help show whether the Secretary's

8  March 26, 2018 memorandum was merely a "'post hoc' rationalization[]" of a predetermined

9  decision and therefore an "inadequate basis for review." *Overton Park*, 401 U.S. at 419. For

10  example, after the court ordered additional discovery in a case involving the failure of the Food

11  and Drug Administration to approve the synthetic contraceptive "Plan B," it cited to that

12  discovery in ruling that the agency decision was arbitrary and capricious. *See Tummino v. Torti*,

13  603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) ("[T]he FDA's conduct and the chain of events

14  leading up to the decision on the Citizen Petition cannot be fully understood without reviewing

15  the administrative record the FDA compiled with respect to the Plan B sponsor's OTC switch

16  applications, ***the deposition testimony of key FDA decision-makers and other materials***

17  ***illuminating these decision-making processes and the extent to which impermissible political***

18  ***and ideological considerations influenced the FDA's decisions*** on the Plan B switch

19  applications." (emphasis added)).

20      Extra-record discovery is particularly appropriate where, as here, evidence shows that the

21  decision-makers were influenced by political actors or undertook certain actions for political

22  reasons. *See Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v.*

23  *Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997). ("If there are adequate grounds to suspect

24  that an agency decision was tainted by improper political pressure, courts have a responsibility to

25  bring out the truth of the matter."). Defendants' supplemental materials, and in particular those e-

26

27       [5] Jarmin's efforts to find support for the citizenship question was generally unsuccessful.
Michael Strain of the conservative American Enterprise Institute wrote: "None of my colleagues

28  as AEI would speak favorably about the proposal." AR 4037.

4

1   mails suggesting that the citizenship question originated at the White House, at a minimum create

2   a strong suspicion that improper political pressure was applied here.  Only by ordering extra-

3   record discovery, including depositions and responses to document requests, can the Court bring

4   out the truth of the matter and determine whether improper political pressure led to Defendants'

5   decision to add a citizenship question to the 2020 Census.

6         Finally, extra-record discovery may shed light on whether Secretary Ross acted with an

7   "unalterably closed mind," which should have demanded his recusal from the decision to add a

8   citizenship question.  *See Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1154 (D.C.

9   Cir. 1979).  An agency decision-maker must be disqualified "when there is a clear and convincing

10  showing that he has an unalterably closed mind on matters critical to the disposition of the

11  rulemaking."  *Id.*  Extra-record discovery showing evidence of bad faith may be critical in

12  determining whether a decision-maker acted with an "unalterably closed mind," which could lead

13  to compelled recusal of that decision-maker should the court remand the matter to the agency.

14  *See Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830, 847 (E.D. Cal. 2008) (remanding an

15  agency decision to the agency and disqualifying the decision-maker from participating in future

16  proceedings based on extra-record material). Here, Secretary Ross's complaint in May 2017 that

17  the citizenship question had not yet been added to the 2020 Census based on his "months old

18  request" confirms that extra-record discovery is required to determine whether he acted with an

19  unalterably closed mind.  AR003710.

20        Moreover, even if Plaintiffs volunteer to file the Supplemental Record in this case, that

21  would be an inadequate solution.  Plaintiffs do not know how Defendants selected those

22  documents for production, since they were not responsive to any requests for production and no

23  other parameters have been disclosed.

24                                  **CONCLUSION**

25        For the reasons above, Plaintiffs respectfully request that the Court issue an order affirming

26  Plaintiffs' right to take discovery in this action.

27

28

1    Dated:  August 3, 2018                Respectfully Submitted,

2                                          XAVIER BECERRA
                                           Attorney General of California
3                                          MARK R. BECKINGTON
                                           Supervising Deputy Attorney General
4                                          R. MATTHEW WISE
                                           Deputy Attorney General
5

6                                          /s/  Gabrielle D. Boutin
                                           GABRIELLE D. BOUTIN
7                                          Deputy Attorney General
                                           Attorneys for Plaintiff State of California, by and
8                                          through Attorney General Xavier Becerra

9

10   Dated:  August 3, 2018                /s/ Margaret L. Carter
                                           MARGARET L. CARTER, SBN 220637
11                                         DANIEL R. SUVOR
                                           O'MELVENY & MYERS LLP
12                                         400 S. Hope Street
                                           Los Angeles, CA 90071
13                                         Telephone: (213) 430-8000
                                           Fax: (213) 430-6407
14                                         Email: dsuvor@omm.com
                                           Attorneys for Plaintiff County of Los Angeles
15

16   Dated:  August 3, 2018                MIKE FEUER
                                           City Attorney for the City of Los Angeles
17

18                                         /s/ Valerie Flores
                                           VALERIE FLORES, SBN 138572
19                                         Managing Senior Assistant City Attorney
                                           200 North Main Street, 7th Floor, MS 140
20                                         Los Angeles, CA  90012
                                           Telephone: (213) 978-8130
21                                         Fax: (213) 978-8222
                                           Email: Valerie.Flores@lacity.org

22

23

24

25

26

27

28

Plaintiffs' Supp. Brief in Support of Their Right to Take Discovery; Decl. of Gabrielle D. Boutin (3:18-cv-01865)

1

2   Dated:  August 3, 2018                    HARVEY LEVINE
                                             City Attorney for the City of Fremont

3                                            */s/ Harvey Levine*_____
                                             SBN 61880
4                                            3300 Capitol Ave.
                                             Fremont, CA 94538
5                                            Telephone: (510) 284-4030
                                             Fax: (510) 284-4031
6                                            Email: hlevine@fremont.gov

7

8   Dated:  August 3, 2018                    CHARLES PARKIN
                                             City Attorney for the City of Long Beach

9                                            */s/ Michael J. Mais*_____
                                             MICHAEL K. MAIS, SBN 90444
10                                           Assistant City Attorney
                                             333 W. Ocean Blvd., 11th Floor
11                                           Long Beach CA, 90802
                                             Telephone: (562) 570-2200
12                                           Fax: (562) 436-1579
                                             Email: Michael.Mais@longbeach.gov

13

14  Dated:  August 3, 2018                    BARBARA J. PARKER
                                             City Attorney for the City of Oakland
15
                                             */s/ Erin Bernstein*_____
16                                           MARIA BEE
                                             Special Counsel
17                                           ERIN BERNSTEIN, SBN 231539
                                             Supervising Deputy City Attorney
18                                           MALIA MCPHERSON
                                             Attorney
19                                           City Hall, 6th Floor
                                             1 Frank Ogawa Plaza
20                                           Oakland, California 94612
                                             Telephone: (510) 238-3601
21                                           Fax: (510) 238-6500
                                             Email: ebernstein@oaklandcityattorney.org
22

23

24

25

26

27

28

**FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that concurrence in the filing of this document has been obtained from all signatories above.

Dated: August 3, 2018                                    /s/   *Gabrielle D. Boutin*
                                                        GABRIELLE D. BOUTIN

**DECLARATION OF GABRIELLE BOUTIN**

I, Gabrielle D. Boutin, declare as follows:

1.      I am a Deputy Attorney General with the California Department of Justice, duly licensed to practice law in the State of California.  I am counsel of record in this action for the State of California.  I make this declaration in support of Plaintiffs' Supplemental Brief and Declaration in Support of Their Right to Take Discovery.  I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

2.      On July 23 and July 27, 2018, in the cases of State of N.Y. v. U.S. Dept. of Commerce, No 1:18-cv-2921 (S.D.N.Y.) and N.Y. Immigration Coalition v. U.S. Dept. of Commerce, No 1:18-cv-5025 (S.D.N.Y.) Defendants filed notices of filing of "supplemental materials" (Supplemental Record) in response to that court's order to complete the administrative record.  See e.g. State of N.Y. v. U.S. Dept. of Commerce, No 1:18-cv-2921 (S.D.N.Y.), ECF Nos. 199, 212, 217.  Each notice contains a link to an Internet website at which the documents can be viewed and downloaded.

3.      Attached hereto as Exhibit 1, are true and correct copies of the documents from the Supplemental Record cited in Plaintiffs' Supplemental Brief and Declaration in Support of Their Right to Take Discovery, as well as one document from the administrative record filed in this case (AR 763-764).  The documents are in numerical order according to their Bates stamps.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on August 3, 2018, in Sacramento, California.

                                                        /s/Gabrielle D. Boutin
                                                        Gabrielle D. Boutin

8

# EXHIBIT 1

NOT RELEVANT

**From:** Kris Kobach [mailto
**Sent:** Monday, July 24, 2017 2:43 PM
**To:** Teramoto, Wendy (Federal) <
**Cc:** Alexander, Brooke (Federal) <                          ; Hernandez, Israel (Federal) <
**Subject:** Re: Follow up on our phone call

Yes.

Sent from my iPhone

On Jul 24, 2017, at 1:39 PM, Teramoto, Wendy (Federal) <                          > wrote:

> Kris- can you do a call with the Secretary and Izzy tomorrow at 11 am? Thanks. Wendy
>
> **From:** Kris Kobach [mailto:
> **Sent:** Monday, July 24, 2017 12:02 PM
> **To:** Teramoto, Wendy (Federal) <
> **Subject:** Re: Follow up on our phone call
>
> That works for me. What number should I call? Or would you like to call me?
>
> On Mon, Jul 24, 2017 at 9:12 AM, Teramoto, Wendy (Federal) <                          wrote:
>
>> We can speak today at 230. Please let me know if that works. W
>>
>> Sent from my iPhone
>>
>> On Jul 21, 2017, at 4:34 PM, Kris Kobach <                          > wrote:
>>
>>> Wendy,
>>>
>>> Nice meeting you on the phone this afternoon. Below is the email that I sent to Secretary Ross. He and I had spoken briefly on the phone about this issue, at the direction of Steve Bannon, a few months earlier.
>>>
>>> Let me know what time would work for you on Monday, if you would like to schedule a short call. The issue is pretty straightforward, and the text of the question to be added is in the email below.

Thanks.


Kris Kobach

███████████


---------- Forwarded message ----------
From: **Kris Kobach** ███████████ >
Date: Fri, Jul 14, 2017 at 9:12 AM
Subject: Follow up on our phone call
To: ███████████


Secretary Ross,

Kansas Secretary of State Kris Kobach here. I'm following up on our telephone discussion from a few months ago. As you may recall, we talked about the fact that the US census does not currently ask respondents their citizenship. This lack of information impairs the federal government's ability to do a number of things accurately. It also leads to the problem that aliens who do not actually "reside" in the United States are still counted for congressional apportionment purposes.

It is essential that one simple question be added to the upcoming 2020 census. That question already appears on the American Community Survey that is conducted by the Census Burear (question #8). A slight variation of that question needs to be added to the census. It should read as follows:

**Is this person a citizen of the United States?**

☐**Yes, born in the United States**

☐**Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas**

☐**Yes, born abroad of U.S. citizen parent or parents**

☐**Yes, U.S. citizen by naturalization – Print year of naturalization _____**

☐**No, not a U.S. citizen – this person is a lawful permanent resident (green card holder)**

☐**No, not a U.S. citizen – this person citizen of another country who is not a green card holder (for example holds a temporary visa or falls into another category of non-citizens)**

Please let me know if there is any assistance that I can provide to accomplish the addition of this question. You may reach me at this email address or on my cell phone at ███████████

Yours,

Kris Kobach

000764

**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

To:     Karen Dunn Kelley, Under Secretary for Economic Affairs

From:   Secretary Wilbur Ross

Date:   March 26, 2018

Re:     Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire

Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population ("CVAP") data that are not currently available from government survey data ("DOJ request"). DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census block level will permit more effective enforcement of the Act. Section 2 protects minority population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond. To that end, the Department of Commerce ("Department") immediately initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request – as with all significant Census assessments – prioritized the goal of obtaining *complete and accurate data*. The decennial census is mandated in the Constitution and its data are relied on for a myriad of important government decisions, including apportionment of Congressional seats among states, enforcement of voting rights laws, and allocation of federal funds. These are foundational elements of our democracy, and it is therefore incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations. As part of the process, I also met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, my questions about accuracy and response rates, and their recommendations. At present, the Census Bureau leadership are all career civil servants. In addition, my staff and I reviewed over 50 incoming letters from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

2

completeness. Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods. Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations. However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially. In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates. Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge. Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses. However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys. For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census. The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census. Further, the decennial census has differed significantly in nature from the sample surveys. For example, the 2000 decennial census survey contained only eight questions. Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete. ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent. However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS. Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

3

001315

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C,** the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D,** which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

001316

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**   I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

001317

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

6

001318

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

001319

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request. To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018. I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.

CC:   Ron Jarmin, performing the nonexclusive functions and duties of the Director of the Census Bureau

      Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau

001320

| From: | JUthmeier@doc.gov [ PII ] |
| Sent: | 9/7/2017 8:58:18 PM |
| To: | Comstock, Earl (Federal) [ PII ] |
| CC: | Davidson, Peter (Federal) [ PII ] |
| Subject: | Re: Census Matter Follow-Up |

Hi Earl-



James

On Sep 7, 2017, at 4:53 PM, Comstock, Earl (Federal) <[ PII ]> wrote:
Hi Peter and James —

As I discussed with James a little while ago, the Secretary would like an update on progress since the discussion yesterday regarding the citizenship question.

If we could get a short email or memo today that would be great.

Thanks. Earl

| From: | Comstock, Earl (Federal) ▮▮▮▮ @doc.gov] |
|---|---|
| **Sent:** | 5/4/2017 11:58:40 AM |
| **To:** | ▮▮▮▮▮▮▮ @usdoj.gov |
| **Subject:** | Call today to discuss DoC Issues |

Hi Mary Blanche --

Contacts over the White House said that you would be the best person for me to talk to at DoJ on Commerce issues. I am the new Director of Policy and Strategic Planning at Commerce and was the confirmation Sherpa on the transition for Secretary Ross.

If you or your assistant could let me know a couple of times today that work for you for a call I would appreciate it.

Thank you in advance,

Earl

Earl W. Comstock

Director

Office of Policy and Strategic Planning

United States Department of Commerce

▮▮▮▮▮▮

**To:**    Wilbur Ross ▓▓▓▓▓
**Cc:**    Branstad, Eric (Federal)[EBranstad@doc.gov]
**From:**   Comstock, Earl (Federal)
**Sent:**   Fri 3/10/2017 8:31:29 PM
**Importance:**    Normal
**Subject:**  Your Question on the Census
**Received:**     Fri 3/10/2017 8:31:30 PM

I was not able to catch anyone at their desk when I called the numbers I have for the Census Bureau from their briefing. However, the

Census Bureau web page on apportionment is explicit and can be found at
https://www.census.gov/population/apportionment/about/faq.html#Q16 It says:

> *Are undocumented residents (aliens) in the 50 states included in the apportionment population counts?*
>
> Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts.

Further, this WSJ blog post from 2010 confirms that neither the 2000 nor the 2010 Census asked about citizenship.
http://blogs.wsj.com/numbers/the-pitfalls-of-counting-illegal-immigrants-937/

<u>THE NUMBERS</u>

The Pitfalls of Counting Illegal Immigrants



By CARL BIALIK

May 7, 2010 7:05 pm ET

The debate over <u>Arizona's immigration law</u> has included several estimates of the state's illegal-immigrant population, at "<u>almost half a million</u>," "<u>half a million</u>" or "<u>more than half a million</u>." Arguing against the law, Homeland Security chief Janet Napolitano — who is the former governor of Arizona — <u>pointed to</u> decreasing illegal immigration in the state.

These estimates and claims rest on several annual efforts to count illegal immigrants in the U.S. The nonpartisan Pew Hispanic Center <u>estimated</u> that in 2008 the nationwide population was 11.9 million, and half a million in Arizona. The federal <u>Department of Homeland Security</u> and <u>the Center for Immigration Studies</u>, a Washington, D.C., research group that opposes increased immigration, agree on a figure of 10.8 million for 2009, with DHS putting the Arizona population at 460,000, down from 560,000 a year earlier.

But as <u>my print column</u> notes this week, these estimates are limited by several factors that make it difficult for researchers to count this population. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Thus estimates of the number of illegal immigrants in the country are indirect and possibly far off from the correct count.

These studies rely on census surveys, and assume that about 10% of illegal immigrants aren't counted in these surveys. But that figure largely is based on a 2001 survey of Mexican-born people living in Los Angeles. "I do not advise use of my estimated undercounts for the 2000 census outside of L.A. county, nor for migrants from other nations," said study co-author Enrico Marcelli, assistant professor of sociology at San Diego State University. "However, demographers don't have any other empirical evidence at the moment with which to proceed."

One concern is that the nearly two in five households who didn't respond to the 2001 survey may have included a

0002521

disproportionately large number who also didn't respond to census interviewers. Marcelli said further study would be needed to test that possibility, but he noted the extent of the efforts to select a representative sample and to put respondents at ease in order to elicit honest answers.

"As far as I know, there has not been a new, serious attempt to estimate the undercount of illegal immigrants in the census," said Steven Camarota, director of research for the Center for Immigration Studies.

In 2005, Robert Justich, then a portfolio manager for Bear Stearns, co-authored a report suggesting the population of illegal immigrants "may be as high as 20 million people." Jeffrey Passel, senior demographer for the Pew Hispanic Center, disputed that finding. For one thing, other data sources, such as U.S. birth rates and Mexico's own census, don't corroborate such a large number. If there were really so many more immigrants, than there would be more women of child-bearing age, and more births. And if instead the missing millions are mostly Mexican men working in the U.S. and sending money home, the flip side of that influx would be reflected as a gap in the Mexican census numbers.

"Definitely the number is not as high as 20 million," said Manuel Orozco, senior associate of the Inter-American Dialogue, a Washington, D.C., policy-analysis group.

Justich, who now owns a music and film production firm, countered that immigrants from countries other than Mexico may make up the rest. However, he added that the number is no longer as high as 20 million.

Larger estimates also sometimes are based on border-patrol counts of apprehensions, which are far from reliable proxies. No one is sure of how many people are missed for each one who is caught trying to cross into the U.S. illegally. Many of those who do get through may return quickly, or cross back and forth. Also, some people are caught more than once, inflating the count. "It seems like we're not missing that many bodies in the United States," said Camarota, referring to the gap between the 20 million figure and his own.

The immigrant counters generally have seen a decline in the illegal-immigration population. "Economic drivers are very, very powerful" in lowering the illegal-immigrant population, said Hans Johnson, associate director of the Public Policy Institute of California. Others point to stepped-up enforcement efforts.

However, because of all the assumptions baked into these numbers, such drops come with so much statistical uncertainty that they may not be statistically significant. "The methodology for doing these estimates is not really designed to measure year-to-year change," Passel said.

One key difference between his count and the federal agency's: Homeland Security uses the Census Bureau's American Community Survey, which has a much larger sample size than the Current Population Survey, which Passel used. "I developed all of my methodology and all of the things that go with it when there wasn't an ACS," Passel said, "and I haven't gotten around to shifting to the new survey."

The ACS was introduced after the 2000 census, and may help overcome a problem with census numbers exposed in the last decennial census. Many more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau. Census officials think these estimates have improved since 2000 thanks to the annual ACS surveys of three million households. "That's the source we're using to estimate the movement" of the foreign-born population, said Howard Hogan, the Census Bureau's associate director for demographic programs. "It's a huge improvement over anything we had available in the '90s."

Still, the Census Bureau doesn't ask people about their immigration status, in part because such questions may drive down overall response rates. Robert M. Groves, director of the Census Bureau, said he'd like to test that hypothesis. "We're sort of data geeks here," Groves said. "What we'd like to do to answer that question is an experiment."

That doesn't mean that census interviewers don't try to find and enumerate illegal immigrants. Groves compares counting that group to efforts to track another population that is hard to count, though not necessarily because of willful avoidance: people who are homeless. Census interviewers spend three days visiting soup kitchens, shelters and outdoor gathering spots such as under certain highway overpasses in Los Angeles. "You don't have to look at that operation very long to realize that though it's a heroic effort, there are all sorts of holes in it," Groves said. As a result, the Census Bureau includes anyone counted in that effort in the overall population, but doesn't break out a separate estimate of homeless people.

"We would like to do estimates that have the smallest number of assumptions we can't test," Groves said. When it comes to counting illegal immigrants, "there are a set of assumptions that we know we can't test. When we find ourselves in that situation, then we're uncomfortable giving a Census Bureau estimate that is subject to all of those debates."

Further reading: Passel outlined methods for counting the illegal-immigrant population, while this paper analyzed some difficulties with the estimates. Earlier the Christian Science Monitor and I have examined these numbers. Immigration statistics have become a subject of debate in the U.K., as well.

**To:**    hilary geary█████████████
**From:**  Alexander, Brooke (Federal)█████████
**Sent:**   Wed 4/5/2017 4:24:19 PM
**Importance:**  Normal
**Subject:**  tonight
**Received:**        Wed 4/5/2017 4:24:00 PM

Mrs. Ross,

Do you have plans following the Newseum? I'm asking because Steve Bannon has asked that the Secretary talk to someone about the Census and around 7-7:30 pm is the available time. He could do it from the car on the way to a dinner ...

Brooke V Alexander

Executive Assistant to the Secretary

The U.S. Department of Commerce

Washington, D.C. 20230

balexander@doc.gov

202-482-████ office

████████ cell

0002561

| | |
|---|---|
| **From:** | Comstock, Earl (Federal)▓▓▓▓▓▓▓▓▓▓▓ |
| **Sent:** | 5/2/2017 2:19:11 PM |
| **To:** | Wilbur Ross ▓▓▓▓▓▓▓ |
| **CC:** | Herbst, Ellen (Federal) ▓▓▓▓▓▓▓▓▓▓ |
| **Subject:** | Re: Census |

I agree Mr Secretary.

On the citizenship question we will get that in place. The broad topics were what were sent to Congress earlier this year as required. It is next March -- in 2018 -- when the final 2020 decennial Census questions are submitted to Congress. We need to work with Justice to get them to request that citizenship be added back as a census question, and we have the court cases to illustrate that DoJ has a legitimate need for the question to be included.  I will arrange a meeting with DoJ staff this week to discuss.

Earl


Sent from my iPhone

> On May 2, 2017, at 10:04 AM, Wilbur Ross ▓▓▓▓▓▓▓▓▓▓ wrote:
>

worst of all they emphasize
that they have settled with congress on the questions to be asked.  I am mystified why nothing have been done in response to my months old request that we include the citizenship question. Why not? ▓

> Sent from my iPhone

**To:**     Wilbur Ross[█████████]
**From:**   Comstock, Earl (Federal)
**Sent:**    Tue 8/8/2017 7:44:29 PM
**Importance:**     Normal
**Subject:**  Re: █████████████
**Received:**      Tue 8/8/2017 7:44:29 PM



Will be back shortly with an update on the census question.  I have two attorneys in the DoC General Counsel's office working on it.

Earl

On 8/8/17, 1:20 PM, "Wilbur Ross" ███████████ wrote:

████████████████████████████████████████
████████████████Were you on the call this morning about Census? █████████████████████████████████████████where is the DoJ in their analysis ? If they still have not come to a conclusion please let me know your contact person and I will call the AG.  Wilbur Ross

Sent from my iPhone

> On Aug 8, 2017, at 10:52 AM, Comstock, Earl (Federal) ████████████████ wrote:
>
> █████

| | |
|---|---|
| **From:** | Enrique.Lamas@census.gov [Enrique.Lamas@census.gov] |
| **Sent:** | 2/14/2018 12:52:02 AM |
| **To:** | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov] |
| **Subject:** | Re: Question |

Ok. I'll be in by then.

Enrique Lamas
Associate Director for Demographic Programs,
Performing the Non-Exclusive Functions and Duties of the Deputy Director
US Census Bureau
301 763 2160

On Feb 13, 2018, at 7:35 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:

Sent from my iPhone

Begin forwarded message:

**From:** "Kelley, Karen (Federal)" ▮▮▮▮▮▮▮▮
**Date:** February 13, 2018 at 7:11:49 PM EST
**To:** "Jarmin, Ron S" <ron.s.jarmin@census.gov>
**Subject: Re: Question**
Around 8:30 ish.
Sent from my iPhone

On Feb 13, 2018, at 5:45 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:
Sure. What time?
Sent from my iPhone

On Feb 13, 2018, at 4:54 PM, Kelley, Karen (Federal) ▮▮▮▮▮▮▮▮ wrote:
Thanks. Can we talk early tomorrow morning???

Sent from my iPhone

On Feb 13, 2018, at 3:48 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:
Please see the thread below. Appears no one at AEI willing to speak in favor of putting question on the 2020.

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov   Connect with us on Social Media

**From:** Ron S Jarmin (CENSUS/ADEP FED)
**Sent:** Tuesday, February 13, 2018 3:46 PM
**To:** Michael R. Strain
**Subject:** Re: Question

Thanks Michael. We are trying to find someone who can give a professional expression of support for the proposal in contrast to the many folks we can find to give professional statements against the proposal. Interesting, but perhaps not so surprising, that no one at AEI is willing to do that.

Thanks for your help.

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov   Connect with us on Social Media

**From:** Michael R. Strain <▮▮▮▮▮▮▮▮▮▮>
**Sent:** Tuesday, February 13, 2018 3:31:38 PM
**To:** Ron S Jarmin (CENSUS/ADEP FED)
**Subject:** RE: Question

Hi Ron,

Great to hear from you. I hope you are well.

None of my colleagues at AEI would speak favorably about the proposal. Is it important that the person actually be in favor of the proposal?

All the best,

Michael

**From:** Ron S Jarmin (CENSUS/ADEP FED) [mailto:Ron.S.Jarmin@census.gov]
**Sent:** Tuesday, February 13, 2018 1:48 PM
**To:** Michael R. Strain <▮▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** Question

Hi Michael,

Hope all is well. We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking to find someone thoughtful who can speak to the pros of adding such a question or perhaps addressing the fundamental data need some other way (e.g., admin records).

Do you know of anyone at AEI, or elsewhere, that could do this sometime over the next couple weeks?

Thanks

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov
census.gov   Connect with us on Social Media

**Census Hearing Prep Q&As for March 20, 2018 CJS Appropriations Hearing**

1.    **2020 Census Status Question:** You've taken several steps to correct cost overruns and systems readiness concerns by GAO and others in the 2020 Census. Have these measures worked? Is the 2020 Census on budget and on schedule?

**Answer:** We meet regularly with the Census Bureau team and their contractors to bring oversight and accountability into the Decennial operation. My staff conducts weekly 2020 Census oversight reviews to review issues related to the program's budget, scope, schedule in real-time. These management meetings include detailed reviews of the evolving budget and lifecycle cost estimate for the 2020 Census. The results of these meetings are reported directly to me by Under Secretary Kelley and her staff so that I can personally oversee the progress of the 2020 Census. These demonstrate to me that we are on track, on time, and on budget.

2.    **Accountability Question:**    Were people held accountable for the IT systems cost overruns?

**Answer:** The cost overruns that the Census Bureau experienced were unacceptable, so I have made every change warranted to ensure that costs are controlled and that functional systems are delivered on time for an accurate 2020 Census. This has included management changes and significantly more oversight. I am confident in Under Secretary Kelley's control of the program and in the leadership team we have now at the Census Bureau.

3.    **CEDCAP Cost Control Question:** The cost of the CEDCAP program was out of control; there was a 47% cost overrun reported to us less than a year ago. You've changed how it is managed. Are CEDCAP's costs under control? How can you be sure?

**Answer:** My staff and I meet regularly with the Census Bureau to review the effectiveness of the new cost controls that are in place. We must ensure that we are expending resources according to plan and that we are getting the outcomes that we expect. I've met personally with key private sector contractors to ensure their senior leadership understands the importance of delivering systems on time and on budget. Until the 2020 Census is completed, all CEDCaP work is focused specifically on the 2020 Census and the team now reports to the Associate Director for the Decennial Census. This streamlined reporting structure ensures that program requirements are fully aligned with systems development.

4.    **GAO High Risk List Question:** GAO has the 2020 Census on its High Risk List. What are you doing to address GAO's concerns?

**Answer:** As one of the largest and most complex programs in the federal sector, and because of its importance to such things as Congressional apportionment, state redistricting, and the annual allocation of over $650 billion in Federal program funding, we expected to be placed on this list as we have in past censuses. All of the things GAO has cited as major risks are part of the Census Bureau's 2020 Census risk register, and they have mitigations and action plans underway

**Comment [WRR(1]:** Verification needed on $. Confirm number for accuracy and where this total was derived from.

to address them.  In addition, the Bureau is taking action on all the recommendations GAO noted when they placed the 2020 Census on the high risk list.

5.     **GAO Open Audit Recommendations Question:** You came here are year ago and testified that you were concerned about the number of GAO open audit recommendations. Why does the 2020 Census have so many outstanding recommendations?

> Comment [WRR(2)]: When will all recommendations be complete? What would GAO's response be regarding Census current status? What is the normal timeline between GAO recommendation and close out status?

**Answer:** The Census Bureau has been working closely with GAO to close out the open recommendations.  Of the 84 recommendations on the 2020 Census issued since 2007, 51 have now been closed, and 5 have due dates in the future.  14 relate to ongoing audits on the lifecycle cost estimate, the schedule and our efforts to enumerate hard-to-count populations.  GAO will not close these until the ongoing audits are complete.  For the other 14, documentation has been provided to GAO and they are currently working to determine what else is needed to close them out.

6.     **FY 2019 Budget Question:** How does the 2019 budget request keep the Department on track to ensure the total cost of the 2020 Census is at or below the cost of the 2010 Census?

**Answer:** The FY 2019 budget request is aligned with the lifecycle cost estimate for the 2020 Census. It fully funds all of the operational and systems development necessary to ensure a comprehensive and accurate 2020 Census including opening the remaining field offices and the first major 2020 Census field operation, the In-Field Address Canvassing operation. Importantly, the request also contains contingency funding. At this point in the decade, the Census Bureau must receive its full request including an appropriate amount of contingency at the beginning of the fiscal year to stay on the critical path to a successful 2020 Census.

> Comment [VK(E3)]: This needs to be re-written to say it includes program risk funding not contingency.  The Secretary briefed the hill on not getting contingency funding and does not want back down from that stance.

7.     **Census Director Question:** When will you hire a Director for the Census Bureau?

**Answer:** We are actively recruiting, and we would welcome any suggestions from members of this committee. At the Department, the Under Secretary for Economic Affairs, Karen Dunn Kelley, who is also performing the Non-Exclusive Functions and Duties of the Deputy Secretary, has direct oversight over the 2020 Census.

8.     **Lifecycle Cost Estimate vs. FY 2019 Budget Question:** Why wasn't the 10% contingency you requested for the unknown-unknown risk to the 2020 Census included in the FY 2019 budget request?

**Answer:** The only major difference between the lifecycle cost estimate and the FY 2019 budget is that it does not include the contingency for what we call "unknown-unknowns". If the contingency already included in the FY 2019 request is insufficient, we will have to work with Congress to request additional funding.

> Comment [VK(E4)]: Same as above. Describe as Program risk funding not contingency.

9.     **Race and Ethnicity Question:** When the Administration's own research demonstrated more accurate race and ethnicity data was available by using a combined race and ethnicity

[ PAGE \* MERGEFORMAT ]

question, why did the Administration decide to leave the 2020 Census race and ethnicity question unchanged?

**Answer:** The Census Bureau follows the current federal government-wide standards set by the Office of Management and Budget. Those standards do not provide for a combined question format for collecting race and ethnicity on the census form. The Census Bureau remains on schedule and will provide the planned 2020 Census questions to Congress by March 31, 2018, as directed by law.

10.     **Sexual Orientation and Gender Identity Data Collection Question:** The LGBTQ community is an important part of our dynamic population in the U.S. and in my district. Why isn't the Census Bureau gathering information on this segment of our population in the American Community Survey?

**Comment [VK(E5)]:** Secretary thought this question was removed. Was it actually removed?

**Answer:** While requests to add a sexual orientation and gender identity question were received, the requests did not demonstrate a legal or statutory need for the data. That high bar is set to ensure the Census Bureau continues to balance the information needs of federal agencies and the public's time commitment in answering the survey. The Census Bureau is actively involved in research and federal working groups that focus on collecting accurate data on the community through other surveys.

11.     **Counting Prisoners / Residence Question:** Your decision to count prisoners in prisons on Census Day will harm my state's ability to use the 2020 Census Data for redistricting. Why did you decide to count prisoners where they are incarcerated when you know that they will return to their communities?

**Comment [VK(E6)]:** Is this the same as what we did last Census? If so, why don't we just say that?

**Answer:** Following the concept of usual residence, we are counting people where they usually live and sleep most of the time. This means we will continue counting prisoners who are incarcerated on Census Day (April 1) at the correctional facility in the 2020 Census.

However, we plan to provide states with tools to help them "move" inmates back to where they lived before incarceration, if they choose to do so.

12.     **Counting Non-Citizens Question:** Why does the Census Bureau count people who are not citizens as part of the decennial census?

**Answer:** The census is required to count every resident - not just citizens - in the nation. Since the first census was taken in 1790, the decennial census has enumerated all persons residing in the U.S. In keeping with Article I of the Constitution, the first census law, the Census Act of 1790, instructed that all inhabitants living in the United States be counted. This mandate has not been changed by any subsequent law.

13.     **Adding Citizenship Question:** How are you going to respond to DOJ's request to include a question on citizenship on the 2020 Census form? Are you concerned that adding a

[ PAGE \* MERGEFORMAT ]

question on citizenship might create fear among certain populations and possibly depress the count or make the Census Bureau's job of counting all people more difficult or expensive?

**Answer:** I take my role as the decision maker about the content of the 2020 Census very seriously as the 2020 Census is among my highest priorities as the Secretary of Commerce. I am taking a hard look at the Department of Justice's request by, among other things, consulting with critical stakeholders and technical experts to ensure I make an informed decision based on all relevant information regarding the data that the Department of Justice requests.

14. **Administrative Records to Enumerate Question:** The Census Bureau has published plans that state that there are circumstances when the Bureau will stop knocking on doors to try to collect data and instead substitute information those households have already provided the government on their tax returns for example. How do you know this will work? Why wouldn't you simply continue to try to contact that person when it has worked well in prior Censuses?

> **Comment [VK(E7]:** When did we start using Administrative records? Did we not use them in the 2010 Census? How are we using them differently this time around?

**Answer:** We hope that every household will respond on its own. We know that is not the case so, for some households, the Census Bureau's plan is to enumerate certain households using information already provided to the government (administrative records). The Census Bureau has used administrative records for decades to impute information for invalid, inconsistent, or missing responses. For the 2020 Census, this will occur only when the Census Bureau's experts have a high level of confidence that the records are of high quality and when the information can be accurately applied to the addresses and households in question. Where it does not have high quality and high confidence in the data, such as when the data in the administrative records is inconsistent or missing, the Census Bureau will send an enumerator to follow up with the household via personal visits, multiple if necessary, to collect their data.

15. **Rural Communities Question:** How will you be sure rural communities aren't negatively impacted by the push toward responding to the 2020 Census over the internet?

**Answer:** The Census Bureau has multiple strategies for ensuring that households without Internet connectivity are included in the Census. In very rural areas, and on many Tribal lands, Census enumerators will either conduct interviews with every household or walk every street and leave paper questionnaires on the doorsteps of each household while simultaneously updating the address list. The Census Bureau will use American Community Survey and Federal Communications Commission data to identify households with low levels of Internet connectivity. Those households will receive a paper questionnaire on our first mailing. Then ALL nonresponding households get a paper questionnaire on the fourth mailing. After all the mailings are complete, if a household still hasn't responded the Census Bureau will send an enumerator to gather the data in person.

> **Comment [VK(E8]:** Wants to know why we wait until the 4th mailing to follow-up? Is it the same amount of funding to do this earlier?

16. **Unconventional Housing Question:** The Census Bureau is using aerial imagery to update the address list. How can you be sure you aren't missing unconventional housing like basement apartments?

> **Comment [VK(E9]:** How does aerial imagery solve the unconventional housing issue?

[ PAGE \* MERGEFORMAT ]

0004286

**Answer:** Aerial imagery is only one source of information the Census Bureau uses. The Census Bureau is updating the address list throughout the decade with data from the U.S. Postal Service. They also receive information from state, local and Tribal governments through ongoing partnerships with them. Of course, there will be circumstances that require an on-the-ground check. In-Field Address Canvassing is the first major field operation of the 2020 Census. It will ensure an accurate address list. It is part of this critical FY 2019 funding request.

The Local Update of Census Address Program also is an important step in this process. State, local and tribal governments covering over 98% of the population have registered for the LUCA program. The Census Bureau will provide those governments with their address lists so that they can check them against their own records and provide the Census Bureau with updated information.

17.   **ISR Scale Question:** There will be millions and millions of hits on your website all at once. How can you make internet response to the 2020 Census available?

> **Comment [VK(E10]:** What are the actual numbers on this? Secretary believed we had good data on this?

**Answer:** The Census Bureau performed scalability testing on the Internet Self Response System. The test results showed successful scaling of the system in the Cloud. Based on the results, the Census Bureau believes that the Internet Self Response System will be able to handle heavy response traffic.

18.   **Fraud Question:** How can you make sure people do not purposely provide fraudulent data?

**Answer:** All self-responses are subject to a battery of automated checks that use data, matching, and security alert information to identify suspect individual responses and cumulative trends. Responses identified by automated checks are sent to analysts for further investigation. Cumulative trends are monitored by senior analysts for assessment of credible threats, and work to investigate suspect cases is coordinated with IT security.

19.   **Cybersecurity Question:** The 2020 Census will be targeted by hackers and cyber criminals. What are you doing to ensure the 2020 Census is safe and secure?

**Answer:** The Census Bureau understands the cyber risks that we face and places the highest priority on cybersecurity for the 2020 Census. Eighty-six percent of our systems have been granted the authority to operate and we are on track to have all systems secure and ready for the 2020 Census. Our dedicated team of cyber professionals is engaged with best resources from across the federal government and industry to ensure our ability identify, prevent, detect, respond and recover from any cyber threat. The Census Bureau has intentionally designed systems with many layers and levels of separation to isolate data and systems from each other, with monitoring that enables the Census to respond immediately to contain an issue if and when a threat is identified or detected.

> **Comment [VK(E11]:** Have we improved from the 86%?

20.   **Corrective Action after IT Security Assessments Question:** 2020 Census systems have authority to operate. The CIO has signed off that 2020 Census systems are secure, but there are

> **Comment [VK(E12]:** Need more clarity on how this process works. What CIO signs off?

[ PAGE  \* MERGEFORMAT ]

literally thousands of corrective actions that have resulted from security reviews. How can you say the systems are secure when you have so many actions to complete?

**Answer:** The Census grants an Authorization to Operate (ATO) after completing a robust independent security assessment according to a risk-based framework. After each ATO is granted, Plans of Action and Milestones (POA&Ms) are recorded and continuously managed for the life of the system. Census has completed a large number of new ATOs for 2020 which naturally have POA&Ms or necessary corrective actions. Systems and data are secure when all high risk POA&M findings have been addressed. The Bureau is now working to complete medium and low risk actions to further improve our security posture. Different than most federal organizations, the Bureau intentionally has more POA&Ms being tracked at a detailed level to better show progress and increase visibility for ourselves and our oversight bodies.

21.    **GAO Audit of LCCE Question:** What does GAO think of your new lifecycle cost estimate? Does GAO believe the new estimate is more accurate and reliable?

> **Comment [VK(E13]:** How far along are discussions with GAO? If GAO is asked about our LCCE, what will they say?

**Answer:** GAO has indicated that they believe the Census Bureau has significantly improved their lifecycle cost estimation process. However, they are still conducting their audit of the lifecycle cost estimation. We look forward to their findings which we expect at the end of March.

22.    **Puerto Rico Question:** You haven't done any work in Puerto Rico. Hurricane Maria has changed the landscape and the living situations of many Puerto Ricans. What are you doing to ensure an accurate count in Puerto Rico?

> **Comment [VK(E14]:** Is PR part of LUCA? How much will it cost to walk all of PR and knock on every door? How will we followup on non respondents?

**Answer:** The Census Bureau has been updating the address list for Puerto Rico all decade. Nonetheless, as a result of the devastating impact of Hurricane Maria, the Census has determined that it's in the best interest of Puerto Rico to conduct what they call "Update Leave" across the entire island. In this operation, the complete inventory of addresses will be validated and updated where appropriate by Census Bureau staff walking every road and checking every housing unit. They will leave a questionnaire package on every doorstep, and residents will have the opportunity to respond via paper questionnaire, or by telephone, or via Internet.

23.    **Self-Response Rate Question:** Distrust in the government is at an all-time high. What are you doing to make sure our people will respond to the 2020 Census?

**Answer:** The Census Bureau is planning a robust communications and partnership program. It will work with trusted voices in communities across the Nation, with a particular focus on hard-to-count populations. Partners include national organizations, local businesses, churches and other faith-based organizations, health clinics, legal aid centers, and other support organizations. The Census Bureau will also make it easier for people to respond through the internet, phone and by mail. The $500 million advertising contract will be in multiple languages and reassure respondents that the census is safe to participate in.

It is essential to the Census Bureau to know with certainty their budget level and have access to the amount they need to stay on the critical path for this program at the beginning of October.

[ PAGE \* MERGEFORMAT ]

The communications program is particularly sensitive to this timing. We need to hit the ground running in FY 2019.

24.     **Partnership Question:** Why are there delays in the partnership program compared to the successful 2010 Census partnership program?

**Answer:** In 2010, there were about 700 partnership specialists that started being hired in 2008, with the bulk coming on board from 2009-2010. We currently have 40 partnership specialists that have been on board for over 2 years and expect to have 1,000 partnership specialists by the end of next fiscal year. We have $248 million allocated to the partnership program and are already actively working with state and local governments on establishing complete count committees. I am confident that the 2020 partnership program will be more successful than the 2010 program.

25.     **Communications Question:** Why are there delays in the communications program? Why aren't you spending more now?

**Answer:** We are actively working with Team Y&R, our communications contractor, to ensure we have a robust and effective communications program. This year, Team Y&R is focused on quantitative and qualitative research that will serve as the foundation for the entire campaign. A 50,000-household survey is currently being conducted, along with 42 focus groups, across the country to understand what factors motivate or create barriers for individuals to respond to the census. The research study will help us reach the right audiences with the right messages to maximize response.

26.     **Languages Question:** How are you planning to reach people who must respond to the Census but have limited ability to speak English?

> **Comment [VK(E15]:** Need a specific list on languages supported for various different activities.

**Answer:** For the 2020 Census, the Census Bureau plans to provide the Internet Self-Response Instrument and Census Questionnaire Assistance in 12 non-English languages. The paper questionnaire and mailing materials will all be in English and Spanish. There will be additional support materials in 59 non-English languages. The Advertising and Partnership program will include materials and messaging in multiple languages as well.

27.     **Intrusive ACS Question:** The ACS is an invasion of privacy and my constituents complain that they are threatened with fine and jail time if they do not complete it. What are you doing to allay their concerns?

**Answer:** The ACS provides data that allows communities to make the best decisions about where they locate schools, hospitals, and services for veterans. The data also helps businesses from the largest corporations to the smallest emerging innovators to locate their workforces, target their customer base, and find new markets. I understand your constituents' concerns and that is why we only include questions on the ACS that support a Federal mandated, regulatory or programmatic need. The Census has an ongoing plan to reduce the burden of the survey. We commit to continue to listen and make the right changes to the American Community Survey to balance the data needs of the Nation with the cost to the individual to provide us that data.

[ PAGE  \* MERGEFORMAT ]

28.   **Late QFRs Question:** The Committee held a hearing on May 4 and asked a number of questions of the Census Bureau. We still have not received the answers to our questions. Why?

**Answer:** It should not have taken us this long to get the answers to your questions back to you. I will see to it that those answers are finished and sent to you without further delay and will ensure that this doesn't happen again.

29.   **Background Checks Question:** The OIG has issued a report that is quite critical of the background check process at the Census Bureau. How can you be sure that you are prepared to deploy a workforce with the appropriate check in place in the 2020 Census so that the public and their data are safe?

**Answer:** We are fortunate to have the Inspector General auditing key segments of the 2020 Census program to highlight weakness so they can be addressed well before the need to hire for peak operations. The Census Bureau has already addressed the key finding in the background check process itself. The corrective actions for the other findings, which were mostly relatedly to contract management, are being actively implemented and will be resolved well before we begin background checks on the 2020 Census applicants.

30.   **USPS Pilot Question:** We understand a planned pilot between the Census Bureau and the Postal Service has been canceled because, after several months of planning, lawyers discovered legal hurdles that couldn't be overcome. Why weren't these barriers identified at the outset? How much money was spent on a pilot that won't happen? What is the status of legislative language that the Postal Service drafted to amend Title 13 and accommodate this type of partnership in the future?

**Answer:** My lawyers have reviewed the USPS language and have determined that the proposal cannot work. Respondents would have to choose between fulfilling the legal obligation to respond to the decennial census and cooperating through a postal employee who would not have to provide confidentiality. Requiring respondents to choose between confidentiality and cooperation would be inconsistent with the reasons behind the passage of the Title 13 confidentiality provisions.

31.   **Number of ACOs Question:** The 2020 Census design calls for a limited number of offices around the country whereas there used to be an office in every district. How can we be confident that areas without an office will be counted accurately? How much would it cost to open an office in every location from the 2010 Census?

**Answer:** The Census Bureau plans to open 248 Area Census Offices. They will be the primary management centers for most field data collection activities on the 2020 Census.   The efficiencies gained with automation and the reduction in paper-based activities allows the Census Bureau to significantly reduce the brick and mortar footprint to support the work of census enumerators.   It does NOT reduce the ability of the Census Bureau to conduct a complete and accurate count.   The offices do not count people, they manage the enumerators who are on every

[ PAGE \* MERGEFORMAT ]

**Comment [VK(E16]:** Did we respond to all committee inquiries? If not we need a response today.

**Comment [VK(E17]:** What are we doing differently this year on background checks?

**Comment [VK(E18]:** Did we actually incur costs on this pilot? Want a flier on what the kiosk will do?

**Comment [VK(E19]:** Need a chart comparing current effort on ACO vs last census.

block counting households that haven't responded on their own. We still plan to hire staff locally and in sufficient numbers to ensure that everyone is counted.

32. **Hiring Non-U.S. Citizens Question:** It's been widely reported that you will not be able to hire enumerators with special language skills but who are not U.S. citizens. I am afraid this will harm the Census' ability to reach hard to count populations. What are your plans if you cannot hire U.S. citizens?

**Answer:** While there is more restrictive language regarding the ability to hire and pay residents who are not U.S. citizens, there is not a ban and we will use all the legal flexibilities provided by Congress to hire the workforce we need. Additionally, we are planning a robust recruiting program to reach the diverse workforce we need, a strong language program to allow people to self-respond in multiple languages which, along with a partnership and communications campaign, surpasses the 2010 effort. This will ensure that we are reach hard-to-count populations who speak English as a second language through multiple channels.

> **Comment [VK(E20]:** Are we allowed to hire non-citizens? If so, what is the requirement?

[ PAGE \* MERGEFORMAT ]

0004291

[ PAGE  \* MERGEFORMAT ]

# CERTIFICATE OF SERVICE

Case Name:  **State of California, et al. v.**          No.    **3:18-cv-01865**
            **Wilbur L. Ross, et al.**

I hereby certify that on <u>August 3, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 3, 2018</u>, at Sacramento, California.

<table>
<tr><td>Eileen A. Ennis</td><td>/s/ Eileen A. Ennis</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2018100904
13196442.docx

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
R. MATTHEW WISE
Deputy Attorney General
State Bar No. 238485
GABRIELLE D. BOUTIN
Deputy Attorney General
State Bar No. 267308
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-6053
 Fax:  (916) 324-8835
 E-mail:  Gabrielle.Boutin@doj.ca.gov
*Attorneys for State of California, by and through
Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, et al.,**<br><br>Plaintiffs,<br><br>,<br><br>v.<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>Defendants. | 3:18-cv-01865<br><br>**DECLARATION OF GABRIELLE D. BOUTIN IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**<br><br>Dept:          3<br>Judge:        The Honorable Richard G. Seeborg<br>Trial Date:   None set<br>Action Filed:  3/26/2018 |

## DECLARATION OF GABRIELLE D. BOUTIN

I, Gabrielle D. Boutin, declare as follows:

1.     I am a Deputy Attorney General with the California Department of Justice, duly licensed to practice law in the State of California.  I am counsel of record in this action for the State of California.  I make this declaration in support of Plaintiffs' Administrative Motion for Leave to File Supplemental Brief and Declaration in Support of Their Right to Take Discovery.  I have personal knowledge of the facts stated herein and, if called upon to do so, could and would testify competently thereto.

2.     On July 23 and July 27, 2018, in the cases of *State of N.Y. v. U.S. Dept. of Commerce*, No 1:18-cv-2921 (S.D.N.Y.) and *N.Y. Immigration Coalition v. U.S. Dept. of Commerce*, No 1:18-cv-5025 (S.D.N.Y.) (New York actions) Defendants filed notices of filing of "supplemental materials" (Supplemental Record) in response to that court's order to complete the administrative record.  *See e.g. State of N.Y. v. U.S. Dept. of Commerce*, No 1:18-cv-2921 (S.D.N.Y.), ECF Nos. 199, 212, 217.  Each notice contains a link to a public Internet website at which the documents can be viewed and downloaded.  The Supplemental Record consists of 9,932 pages of documents.

3.     Plaintiffs in this action did not previously have access to the documents in the Supplemental Record, with the exception of a few that Defendants had previously lodged in this action's administrative record.  Of those documents already in the administrative record, Plaintiffs' supplemental brief references only one (AR 763).

4.     Attached hereto as **Exhibit 1** is a true and correct copy of an email I sent to Defendant's counsel on July 31, 2018, including the email attachment.  In that email, I asked that Defendants to stipulate to supplemental briefing on the issue of discovery based on documents in the Supplemental Record that Plaintiffs believe provide further evidence of Defendants' bad faith. I attached to the email a proposed written stipulation and proposed order.

5.     On August 2, 2018, I spoke on the telephone with Defendants' attorney, Kate Bailey, regarding Plaintiffs' proposed stipulation.  She informed me that Defendants declined to stipulate to further briefing on discovery, because they believe the issues have been fully briefed and are unrelated to the documents in the Supplemental Record.

1

1

2      I declare under penalty of perjury under the laws of the State of California and the United

3  States that the foregoing is true and correct.  Executed on August 3, 2018, in Sacramento,

4  California.

5

6                               */s/Gabrielle D. Boutin*
                             Gabrielle D. Boutin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of Gabrielle D. Boutin Re: Plaintiffs' Administrative Motion (3:18-cv-01865)

# EXHIBIT 1

## Gabrielle Boutin

| | |
|---|---|
| **From:** | Gabrielle Boutin |
| **Sent:** | Tuesday, July 31, 2018 12:18 PM |
| **To:** | 'Bailey, Kate (CIV)' |
| **Cc:** | Federighi, Carol (CIV); Ehrlich, Stephen (CIV); Mark Beckington; Matthew Wise; 'Petrossian, Emil' |
| **Subject:** | Stipulation for supplemental briefing on discovery |
| **Attachments:** | 13182508.docx |

Kate,

As you know, Judge Seeborg is currently considering the issue of whether Plaintiffs may conduct discovery outside of the administrative record and may decide that issue at the August 10 hearing on your motion to dismiss. We believe that certain documents contained in the "supplemental materials" filed by Defendants on July 23 and 27 provide additional evidence relevant to that issue, particularly with regard to Plaintiffs' arguments about bad faith. We therefore plan to ask the court for leave to submit a short supplemental brief related to that new evidence.

We ask that Defendants stipulate to Plaintiffs filing a supplemental brief of up to five pages on or before August 3. We would agree, in turn, that Defendants may file a responding brief of the same length by August 7. Please find our proposed written stipulation attached. We would like to file by tomorrow.

Finally, I have been in touch with the *San Jose* plaintiffs and they would like to enter into the same stipulation.

Thank you for your consideration and I look forward to hearing from you soon.

Regards,

Brie

Gabrielle D. Boutin
Deputy Attorney General
California Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone:  (916) 210-6053
E-mail: Gabrielle.Boutin@doj.ca.gov

1

1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   GABRIELLE D. BOUTIN
    Deputy Attorney General
4   State Bar No. 267308
    1300 I Street, Suite 125
5   P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone: (916) 210-6053
    Fax: (916) 324-8835
7   E-mail: Gabrielle.Boutin@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
8   *through Attorney General Xavier Becerra*

9

UNITED STATES DISTRICT COURT FOR THE

10

NORTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **STATE OF CALIFORNIA, BY AND** | Case No. 3:18-cv-01865-RS |
| 15  **THROUGH ATTORNEY GENERAL XAVIER** | |
| **BECERRA; COUNTY OF LOS ANGELES;** | **STIPULATION FOR FILING** |
| **CITY OF LOS ANGELES; CITY OF** | **SUPPLEMENTAL BRIEFS RE:** |
| 16  **FREMONT; CITY OF LONG BEACH;** | **DISCOVERY OUTSIDE THE** |
| **CITY OF OAKLAND; CITY OF** | **ADMINISTRATIVE RECORD;** |
| 17  **STOCKTON,** | **[PROPOSED ORDER]** |
| 18                          Plaintiffs, | |
| 19                    v. | Dept:        3 |
| | Judge:       The Honorable Richard G. |
| 20 | Seeborg |
| **WILBUR L. ROSS, JR.,** in his official | Trial Date:  None Set |
| 21  capacity as Secretary of the U.S. | Action Filed: March 26, 2018 |
| Department of Commerce; U.S. | |
| 22  **DEPARTMENT OF COMMERCE; RON** | |
| **JARMIN,** in his official capacity as Acting | |
| 23  Director of the U.S. Census Bureau; U.S. | |
| **CENSUS BUREAU; DOES 1-100,** | |
| 24 | |
| Defendants. | |
| 25 | |

26

27

28

1

1    Plaintiffs State of California, by and through Attorney General Xavier Becerra, County of

2  Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and

3  City of Stockton (collectively, "Plaintiffs") and Defendants Wilbur Ross, U.S. Department of

4  Commerce, Ron Jarmin, and U.S. Census Bureau (collectively, "Defendants," and together with

5  Plaintiffs, "the Parties") hereby stipulate as follows:

6    1.    On June 28, 2018, following oral argument, this Court took under submission the

7  issue of whether Plaintiffs may conduct discovery outside of the administrative record.

8    2.    On July 23 and July 27, 2018, in the related actions of *State of N.Y. v. U.S. Dept. of*

9  *Commerce*, No 1:18-cv-2921 (S.D.N.Y.) and *N.Y. Immigration Coalition v. U.S. Dept. of*

10  *Commerce*, No 1:18-cv-2921 (S.D.N.Y.) before Judge Fuhrman, Defendants filed notices of filing

11  documents described as "supplemental materials" (Supplemental Materials).  The notices were

12  filed in response to that court's order directing them to complete the administrative record.  On

13  the same dates, Defendants provided the Supplemental Materials to the Plaintiffs in this action.

14    3.    Plaintiffs believe the Supplemental Materials contain documents not previously

15  available to Plaintiffs that are directly relevant to this Court's determination of whether Plaintiffs

16  may conduct discovery outside of the administrative record.  Plaintiffs therefore wish to file a

17  short supplemental brief on this issue..

18    4.    The Parties therefore stipulate that:

19    a.    Plaintiffs may file a supplemental brief on this issue, up to five (5) pages in

20  length (exclusive of any declarations or exhibits), no later than August 3, 2018, and;

21    b.    Defendants may file a responding brief, up to five (5) pages in length (exclusive

22  of any declarations or exhibits), no later than August 7, 2018.

23    **IT IS SO STIPULATED.**

24

25

26

27

28

2

1    Dated:  August 1, 2018                          Respectfully Submitted,

2                                                    XAVIER BECERRA
                                                     Attorney General of California
3                                                    MARK R. BECKINGTON
                                                     Supervising Deputy Attorney General
4                                                    R. MATTHEW WISE
                                                     Deputy Attorney General
5

6                                                    /s/  Gabrielle D. Boutin
                                                     GABRIELLE D. BOUTIN
7                                                    Deputy Attorney General
                                                     *Attorneys for Plaintiff State of California, by*
8                                                    *and through Attorney General Xavier*
                                                     *Becerra*
9

10   Dated:  August 1, 2018                          CHAD A. READLER
11                                                   Acting Assistant Attorney General

12                                                   BRETT A. SHUMATE
                                                     Deputy Assistant Attorney General
13
                                                     CARLOTTA P. WELLS
14                                                   Assistant Branch Director

15                                                   /s/  Kate Bailey
                                                     KATE BAILEY
16                                                   STEPHEN EHRLICH
                                                     CAROL FEDERIGHI
17                                                   Trial Attorneys
                                                     United States Department of Justice
18                                                   Civil Division, Federal Programs Branch
                                                     20 Massachusetts Avenue NW
19                                                   Washington, DC 20530
                                                     Phone: (202) 514-9230
20                                                   Email: kate.bailey@usdoj.gov

21                                                   *Attorneys for Defendants*

22

23

24

25

26

27

28

                                                3

1

Dated:  August 1, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ *Margaret L. Carter*
MARGARET L. CARTER, SBN 220637
DANIEL R. SUVOR
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-8000
Fax: (213) 430-6407
Email: dsuvor@omm.com
*Attorneys for Plaintiff County of Los Angeles*


Dated:  August 1, 2018

MIKE FEUER
City Attorney for the City of Los Angeles

/s/ *Valerie Flores*
VALERIE FLORES, SBN 138572
Managing Senior Assistant City Attorney
200 North Main Street, 7th Floor, MS 140
Los Angeles, CA  90012
Telephone: (213) 978-8130
Fax: (213) 978-8222
Email: Valerie.Flores@lacity.org


Dated:  August 1, 2018

HARVEY LEVINE
City Attorney for the City of Fremont

/s/ *Harvey Levine*
SBN 61880
3300 Capitol Ave.
Fremont, CA 94538
Telephone: (510) 284-4030
Fax: (510) 284-4031
Email: hlevine@fremont.gov


Dated:  August 1, 2018

CHARLES PARKIN
City Attorney for the City of Long Beach

/s/ *Michael J. Mais*
MICHAEL K. MAIS, SBN 90444
Assistant City Attorney
333 W. Ocean Blvd., 11th Floor
Long Beach CA, 90802
Telephone: (562) 570-2200
Fax: (562) 436-1579
Email: Michael.Mais@longbeach.gov

4

1   Dated:  August 1, 2018

2

3

4

5

6

7

8

9

10  Dated:  August 1, 2018

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARBARA J. PARKER
City Attorney for the City of Oakland

*/s/ Erin Bernstein*
MARIA BEE
Special Counsel
ERIN BERNSTEIN, SBN 231539
Supervising Deputy City Attorney
MALIA MCPHERSON
Attorney
City Hall, 6th Floor
1 Frank Ogawa Plaza
Oakland, California 94612
Telephone: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

JOHN LUEBBERKE
City Attorney for the City of Stockton

*/s/ John Luebberke*
SBN 164893
425 N. El Dorado Street, 2nd Floor
Stockton, CA 95202
Telephone: (209) 937-8333
Fax: (209) 937-8898
Email: John.Luebberke@stocktonca.gov

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

concurrence in the filing of this document has been obtained from all signatories above.

Dated: August 1, 2018

/s/  *Gabrielle D. Boutin*
GABRIELLE D. BOUTIN

6

1      **[PROPOSED] ORDER**

2          Based on the Parties' STIPULATION FOR FILING SUPPLEMENTAL BRIEFS RE:

3    DISCOVERY OUTSIDE THE ADMINISTRATIVE RECORD, the Court shall permit the Parties

4    to submit supplemental briefs on the issue of whether Plaintiffs may conduct discovery outside of

5    the administrative record as follows:

6              a.      Plaintiffs may file a supplemental brief on this issue, up to five (5) pages in

7    length (exclusive of any declarations or exhibits), no later than August 3, 2019, and;

8              b.      Defendants may file a responding brief, up to five (5) pages in length (exclusive

9    of any declarations or exhibits), no later than August 8, 2019.

10

11   **IT IS SO ORDERED.**

12

13   Dated: _____        _____

14                                        HON. RICHARD SEEBORG
                                          United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:  **State of California, et al. v.**          No.   **3:18-cv-01865**
            **Wilbur L. Ross, et al.**

I hereby certify that on <u>August 3, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF GABRIELLE D. BOUTIN IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 3, 2018</u>, at Sacramento, California.


|                    |                         |
| ------------------ | ----------------------- |
| Eileen A. Ennis    | */s/ Eileen A. Ennis*   |
| Declarant          | Signature               |

SA2018100904
13196449.docx

1  XAVIER BECERRA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  R. MATTHEW WISE
   Deputy Attorney General
4  State Bar No. 238485
   GABRIELLE D. BOUTIN
5  Deputy Attorney General
   State Bar No. 267308
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone:  (916) 210-6053
8    Fax:  (916) 324-8835
     E-mail:  Gabrielle.Boutin@doj.ca.gov
9  *Attorneys for State of California, by and through*
   *Attorney General Xavier Becerra*
10

11            IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15
   | | |
16 **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, et al.,**

   3:18-cv-01865

17                                    Plaintiffs,

   **[PROPOSED] ORDER GRANTING PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**
18        v.

19 **WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**
20

21
   Dept:        3
22 Judge:       The Honorable Richard G.
                Seeborg
23                                   Defendants.
   Trial Date:  None set
24 Action Filed: 3/26/2018

25

26

27

28

1

## [PROPOSED] ORDER

2      Having considered Plaintiffs' Administrative Motion for Leave to File Supplemental Brief

3 and Declaration in Support of Their Right to Take Discovery (Motion), the Court orders as

4 follows:

5      1.      Plaintiffs' Motion is granted.  Plaintiffs' supplemental brief and supporting

6 declaration attached as Exhibit A to the Motion are hereby deemed filed.

7      2.      Defendants may file a responding brief, up to five (5) pages in length (exclusive of

8 any declarations or exhibits), no later than August 7, 2019.

9

10 **IT IS SO ORDERED.**

11

12 Dated: _____

            _____
13          HON. RICHARD SEEBORG
            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **State of California, et al. v.**          No.   **3:18-cv-01865**
              **Wilbur L. Ross, et al.**

I hereby certify that on <u>August 3, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**[PROPOSED] ORDER GRANTING PLAINTIFFS' ADMINISTRATIVE MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF AND DECLARATION IN SUPPORT OF THEIR RIGHT TO TAKE DISCOVERY (CIV. L.R. 7-11)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 3, 2018</u>, at Sacramento, California.

|  |  |
|---|---|
| Eileen A. Ennis | */s/ Eileen A. Ennis* |
| Declarant | Signature |

SA2018100904
13196460.docx