1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   STATE OF CALIFORNIA, et al.,              Case Nos.  18-cv-01865-RS;

                  Plaintiffs,
11                                                         18-cv-2279-RS

12        v.

13   WILBUR ROSS, et al.,

                  Defendants.
14
     -----------------------------------------------------
15   CITY OF SAN JOSE, et al.,                 **ORDER DENYING MOTIONS TO
                                               DISMISS**
16                Plaintiffs,

17        v.

18   WILBUR ROSS, et al.,

19                Defendants.

20

21

22

23                              **I. INTRODUCTION**

24        This action arises out of a decision by the U.S. Census Bureau, a division of the U.S.

25   Department of Commerce, to include a question regarding citizenship status on the 2020 decennial

26   census questionnaire. The census surveys the number of persons in each household and in so

27   doing, collects certain demographic information about those persons. While questions relating to

28

United States District Court
Northern District of California

1   citizenship have historically been part of the census process, not since 1950 has the decennial

2   census asked whether each respondent is a citizen of the United States. Plaintiffs in these two

3   related cases contend the decision to deviate from modern practice violates both the Constitution

4   and the Administrative Procedure Act ("APA"). Plaintiffs in 18-cv-1865 are the State of

5   California, by and through Attorney General Xavier Becerra, County of Los Angeles, City of Los

6   Angeles, City of Fremont, City of Long Beach, City of Oakland, City of Stockton, and Los

7   Angeles Unified School District.[1] Plaintiffs in 18-cv-2279 are City of San Jose and Black Alliance

8   for Just Immigration ("BAJI"). Plaintiffs in each of the complaints in general contend that the

9   inclusion of a citizenship question operates by design to depress an accurate count of certain

10  immigrant communities residing in the United States. Defendants in both matters are Wilbur Ross,

11  in his official capacity as Secretary of the U.S. Department of Commerce; the U.S. Department of

12  Commerce; Ron Jarmin, in his official capacity as Acting Director of the U.S. Census Bureau; and

13  the U.S. Census Bureau.

14          Defendants move to dismiss all claims asserted against them. For the reasons set forth

15  below, the motions to dismiss are denied in their entirety. First, plaintiffs have standing to

16  challenge the decision by Secretary Ross to add a citizenship question to the 2020 Census. Second,

17  that decision is not insulated from judicial review as defendants insist. Third, assuming, as is

18  required at the pleading stage, that all facts asserted in the operative complaints are true, plaintiffs

19  have stated claims for relief under both the Enumeration Clause of the Constitution and the APA.[2]

20

21  [1] The Los Angeles Unified School District ("LAUSD") filed a motion to intervene in this case on
    the side of plaintiffs. As LAUSD states valid grounds for intervention, and defendants do not
22  oppose, the motion is granted. All arguments asserted by defendants against plaintiffs in this
    action are taken to be asserted equally against LAUSD.
23
    [2] Plaintiffs in 18-cv-2279 set out two separately articulated constitutional claims, one for violation
24  of the Constitution's "'Actual Enumeration' Mandate; U.S. Const., art. I § 2, cl. 3," and one for
    violation of the "Apportionment Clause; U.S. Const., amend. XIV § 2." At oral argument, San
25  Jose/BAJI plaintiffs took the position that the latter claim could survive independently of the
    former. While plaintiffs here allege a violation of the constitutional mandate to count the
26  population, in part because of its projected effect on apportionment, they do not allege a defect in
    the method of apportioning representatives itself. *C.f. Dep't of Commerce v. Montana*, 503 U.S.
27  442 (1992) (challenging the "method of equal proportions" that translates census data into a
    determination of how many representatives each state is accorded). Therefore, the constitutional

28

United States District Court
Northern District of California

## II. BACKGROUND[3]

The U.S. Constitution provides for an "actual Enumeration" of the population once every decade to count "the whole number of persons" in each state. U.S. Const. Art. I, § 2, cl. 3, and Amend. XIV, § 2. All residents of a state are to be counted, regardless of citizenship status. *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 567 (D.D.C. 1980). The purpose of the "actual Enumeration" is to guide the apportionment of congressional seats among the states based on their respective populations. Art. 1, § 2, cl.3. The federal government also relies on census data to determine how to distribute billions of dollars in funding each year, including funds for Medicaid, Medicare Part B, the Supplemental Nutrition Assistance Program ("SNAP"), the State Children's Health Insurance Program ("S-CHIP"), and the Highway Planning and Construction Program. State of California's First Amended Complaint ("FAC") ¶ 7; City of San Jose's Complaint ("San Jose Compl.") ¶¶ 33, 85.

Under the Census Act, 13 U.S.C. §§ 1 *et seq.* (the "Act"), Congress delegated its constitutional duty to conduct the decennial census to the Secretary of Commerce and the U.S. Census Bureau, a federal statistical agency within the Department of Commerce. 13 U.S.C. §§ 2, 4, 141(a). Under section 141(f), the Commerce Secretary must submit to Congress a final list of subjects to be covered in the census questionnaire at least three years before the census date, and must submit a final list of specific questions two years before the census date. 13 U.S.C. §§ 141(f)(1)-(2). Once these reports are submitted, the Secretary has limited discretion to alter their content and may do so only if "new circumstances exist which necessitate that the subjects, types

---

claims rise and fall together and defendants' motion to dismiss is deemed to be directed at both claims.

[3] Unless otherwise noted, this synopsis is based on facts drawn from the operative complaints, which must be taken as true for purposes of a 12(b)(6) motion. Because defendants' 12(b)(1) motion is framed as a facial rather than factual attack upon plaintiffs' claim to federal subject matter jurisdiction, the Court "must accept as true the allegations of the complaint." *U.S. ex. rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

United States District Court
Northern District of California

of information, or questions contained in reports so submitted be modified." 13 U.S.C. § 141(f)(3).

Several federal laws govern the specific manner in which the census is to be developed and conducted. For example, the Paperwork Reduction Act of 1995 ("PRA") directs the Office of Management and Budget ("OMB") to issue "[g]overnment-wide policies, principles, standards, and guidelines" governing "statistical collection procedures and methods" which the Bureau is required to follow. *See id.* §§ 3504(e)(3)(A), 3506(e)(4); 5 C.F.R. § 1320.18(c). The Information Quality Act and OMB-issued Statistical Policy Directives set standards for survey content development that guide the Bureau's activities. San Jose Compl. ¶¶ 39, 40. The Bureau itself has issued Statistical Quality Standards applicable to "all information products released by the Bureau and the activities that generate those products"—including the decennial census. San Jose Compl. ¶ 39. These standards call for rigorous pretesting requirements to identify problems and refine data collection instruments before implementation. *Id.*

The development process of each decennial census takes several years, a period during which the Bureau conducts tests regarding the content, specific language, order, and layout of the census questionnaire to improve the accuracy of the enumeration. San Jose Compl. ¶ 39. None of the tests conducted in preparation for the 2020 Census included a citizenship question or gathered data on the impact of a citizenship question. *Id.* ¶¶ 43, 47-48; FAC ¶ 38. The March 2017 report submitted by defendants to Congress set out a list of planned subjects for the 2020 Census but did not include citizenship among the topics. San Jose Compl. ¶¶ 5, 37.

On December 12, 2017, DOJ submitted a letter to the Census Bureau "formally request[ing] that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship." Letter from Arthur Gary, General Counsel, DOJ, to Ron Jarmin (Dec. 12, 2017) ("DOJ Letter"); *see* Administrative Record ("A.R.") at 663. DOJ stated the data was "critical" to the agency's ability to enforce the requirements of Section 2 of the Voting Rights Act ("VRA"), now codified at 52 U.S.C. § 10301. A.R. at 663. According to the DOJ, census-block-level data collected through the decennial census questionnaire would be more useful to the enforcement of the VRA than the census-block-group level data currently available through the

American Community Survey ("ACS"), which is sent yearly to a sample of the population—about one in 38 households. *Id.* at 663-64.

On March 26, 2018, Secretary Ross issued a memorandum announcing the inclusion of a citizenship question on the 2020 Census questionnaire. Memorandum to Karen Dunn Kelley, Under Secretary for Economic Affairs, from the Sec'y of Commerce on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire at 1 (Mar. 26, 2018), FAC ¶ 4; A.R. at 1313. The Secretary's stated justification was that the information was needed to provide DOJ with census-block-level data to assist in enforcing the VRA. A.R. at 1313. Based on a purported review of the Bureau's history of collecting citizenship information on the decennial census, the Secretary concluded that "the citizenship question has been well tested." *Id.* at 1314.

At the Secretary's request, the Census Bureau presented three alternatives for providing the data requested by DOJ: Option A called for continuing the status quo and providing DOJ with ACS citizenship data at the census-block-group level instead of the block level requested by DOJ; Option B provided for the placement of the ACS citizenship question on the decennial census; and Option C involved obtaining the requested information from existing federal administrative-record data. A.R. 1314-16. In his decision memo, the Secretary elected not to pursue Option A, as it would not provide data at the level requested by DOJ, even using sophisticated modeling methods. *Id.* at 1314-15. Instead, the Secretary chose to implement a fourth option, as a combination of Options B and C. *Id.* at 1316. Under this Option D, a citizenship question would be reinstated on the decennial census, while the Census Bureau enhanced its administrative record data sets, protocols, and statistical models to maximize its ability to match the decennial census responses to administrative records. *Id.* at 1316. This methodology would, the Secretary opined, provide DOJ with the most complete and accurate data. *Id.*

In arriving at his decision, Secretary Ross had before him the views of numerous stakeholders, many of whom expressed concern that addition of a citizenship question would negatively impact response rates and result in an undercount of the population. A.R. at 1313-14. In particular, the Chief Scientist and Associate Director of Research and Methodology at the Bureau,

Dr. John M. Abowd, conducted analysis showing that addition of a citizenship question would have a negative effect on the accuracy and quality of the 2020 Census and would negatively impact response rates from non-citizen households. A.R. at 1277, 1279-82. The Secretary acknowledged that a "significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up operations," but concluded that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially" as a consequence of his reinstating a citizenship question. A.R. at 1315. He noted that "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief." *Id.* at 1316.

Secretary Ross further offered the unadorned assumption that reduced census participation would be primarily limited to those individuals who may decline to participate regardless of whether the census includes a citizenship question. A.R. at 1317. Finally, the Secretary explained that the Census Bureau intends to take steps to conduct respondent and stakeholder-group outreach in an effort to mitigate the impact of these issues on the 2020 Census. *Id.*

In response to the Secretary's March 2018 announcement, plaintiffs in these cases filed suit to enjoin the implementation of a citizenship question on the 2020 Census questionnaire. Plaintiffs assert that that the inclusion of a citizenship question will result in an undercount of the U.S. population in the State of California and its counties and cities with sizeable minority and non-citizen communities. FAC ¶ 40. As a result of the undercount, California will lose seats in the House of Representatives for the first time in its history and will suffer the loss of federal funding allocated on the basis of census-derived statistics. *Id.* ¶ 41. These consequences will negatively impact the communities represented by plaintiffs, including those individuals BAJI serves.

### III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction over the asserted claims. It is the plaintiff's burden to prove jurisdiction at the time the action is commenced. *Tosco Corp. v. Communities for Better Environment*, 236

F.3d 495, 499 (9th Cir. 2001); *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction." *Id.* Accordingly, when considering this type of challenge, the Court is required to "accept as true the allegations of the complaint." *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). When evaluating such a motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Although a court is generally not to rely on evidence outside the pleadings in deciding a motion under Rule 12(b)(6), it "may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the

1    motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903,

2    907-08 (9th Cir. 2003). Moreover, "when faced with a motion to dismiss in the APA context, a

3    court may consider the administrative record and public documents without converting the motion

4    into a motion for summary judgment," *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013)

5    (citing *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). When a plaintiff has failed to

6    state a claim upon which relief can be granted, leave to amend should be granted unless "the

7    complaint could not be saved by any amendment." *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th

8    Cir. 2002) (citation and internal quotation marks omitted).

9                                      **IV. DISCUSSION**

10       Defendants make four arguments in support of their motion to dismiss, two that are

11   generally applicable to all claims advanced by the plaintiffs, and two that are specific to certain of

12   those claims. First, defendants argue plaintiffs lack standing to challenge the Secretary's decision

13   to add a citizenship question to the decennial census. Plaintiffs' claimed injuries are loss of

14   representation in Congress and in the Electoral College, and decreased federal funding due to

15   reduced response rates of their residents. Defendants take the position these injuries are too

16   speculative to confer Article III standing, and are not fairly traceable to the Secretary's decision.

17       Second, defendants contend plaintiffs' challenge is unreviewable under the political

18   question doctrine. According to defendants, the Constitution textually commits the "[m]anner" of

19   conducting the census to Congress, and contains no judicially discoverable or manageable

20   standards for determining which demographic questions may be included on the census form.

21   Resolution of this case would, according to defendants, require a court order dictating the form

22   and content of the decennial census, a policy determination defendants believe is ill-suited to

23   judicial resolution and is expressly committed to the political branches.

24       With respect to plaintiffs' APA claim specifically, defendants contend the Secretary's

25   actions are not subject to judicial review because the decision at issue is committed to agency

26   discretion by law. Congress has authorized the Secretary to conduct the decennial census "in such

27   form and content as he may determine," 13 U.S.C. § 141(a). This broad delegation of authority,

defendants argue, leaves a court with no meaningful standard to apply when evaluating the Secretary's choice to include certain demographic questions on the decennial census form.

Finally, defendants assert that plaintiffs' Enumeration Clause claim fails because the Secretary's decision is consistent with longstanding historical census practice of asking about citizenship and other demographic information. Success on plaintiff's theory, defendants argue, would call into question the constitutionality of asking any type of demographic question that lacks a direct relationship to the counting of the population and may cause some individuals not to respond.

### A. Standing

To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing all three requirements are met. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* Defendants contend plaintiffs in this action fail to meet their burden to allege concrete injury-in-fact. They further argue plaintiffs' alleged injuries cannot be fairly traced to government action and are instead attributable to the independent actions of third parties. Neither of these challenges is persuasive.

### 1. Injury-in-Fact

In order to demonstrate an "injury in fact," a plaintiff must allege it "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2015) (citations omitted). The injury or threat of injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560, and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505

1    (2009) (quoting *Defs. of Wildlife*, 504 U.S at 560). An alleged future injury must be "*certainly*

2    *impending*," and not a mere possibility. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

3    (2013) (emphasis in original).

4    Defendants argue plaintiffs' claims of injury are premised on a speculative assertion that

5    the addition of the citizenship question will ultimately cause a net decrease in the response rates,

6    and a corresponding undercount of the population. As defendants see it, the conjectural nature of

7    plaintiffs' theory is evidenced by the lack of "definitive, empirical" evidence regarding the effect

8    of adding a citizenship question to the decennial census. *See* A.R. at 1316; *see also id.* at 1315-18.

9    Secretary Ross also noted that households have historically failed to respond to census surveys for

10   a variety of reasons and found no evidence that there were any individuals who would otherwise

11   participate in the census but for the inclusion of a citizenship question. A.R. at 1317.

12   At the pleading stage, plaintiffs are not required to prove facts supporting each element of

13   the standing inquiry. Here, plaintiffs plausibly allege that the introduction of a citizenship question

14   to the census will depress response rates, particularly among immigrants and relatives of

15   immigrants who may feel trepidation identifying themselves or others as non-citizens. Several

16   factual allegations support this claim. As the FAC notes, since at least 1980, the Census Bureau

17   has recognized that "any effort to ascertain citizenship will inevitably jeopardize the overall

18   accuracy of the population count." FAC ¶ 37 (citing *Fed. For Am. Immigration Reform v.*

19   *Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980)). In an amicus brief to the Supreme Court in

20   2016, four former Census Bureau Directors appointed by presidents of both parties expressed their

21   belief that "a one-by-one citizenship inquiry would invariably lead to a lower response rate to the

22   Census in general," including a "reduced rate of response overall and an increase in inaccurate

23   response." FAC ¶ 5; Brief of Former Directors of the U.S. Census Bureau as Amici Curiae in

24   Support of Appellees at 23-26, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), 2015 WL 5675832. In

25   2017, the Bureau itself conducted a study that concluded there is "an unprecedented groundswell"

26   of concern that could "present a barrier to participation in the 2020 Census" and have a

27   "disproportionate impact on hard-to-count populations," particularly immigrants and non-English

United States District Court
Northern District of California

United States District Court
Northern District of California

speakers. FAC ¶ 37.

Most recently, defendant Jarmin acknowledged in a congressional hearing that the inclusion of a citizenship question would cause more than a "minimal" decline in 2020 Census participation, and that the decline "would be largely felt in various sub-groups, in immigrant populations [and] Hispanic populations." *See* Jarmin Testimony starting at 1:39, response at 1:44:10; 1:50:35, response at 1:50:48. He also reported that the "best approach" recommended by the Census Bureau staff to obtain the information sought by DOJ "would be to use administrative records rather than adding a citizenship question." *Id.* starting at 1:19:10, response at 1:21:30. Taken together, these allegations satisfy plaintiffs' burden to plead facts demonstrating injury that is likely to occur and not merely a conjectural possibility.

Defendants' other arguments also go to issues of proof. They contend plaintiffs cannot establish the probability of an undercount occurring due to the "extensive procedures" deployed by the Census Bureau to address non-responses and to obtain accurate data for those households that decline to respond. Motion to dismiss ("Mot.")[4] at 14. Thus, defendants insist, plaintiffs cannot show use of the citizenship question alone will reduce self-response rates, or that an undercount will be higher in California. Once again, there is no requirement, at this juncture, that plaintiffs produce "definitive, empirical" evidence regarding the effect of adding a citizenship question to the census in order to survive a motion to dismiss.[5] Plaintiffs have plausibly alleged that California's population includes large numbers of immigrants and non-citizens relative to other states and that logically, an appreciable undercount of those particular subgroups will have an outsized impact. *See* FAC ¶ 40; San Jose Compl. ¶¶ 85, 92.

---

[4] For the sake of clarity, references to defendants' motion to dismiss are to the motion filed in 18-cv-1865 unless otherwise noted.

[5] While plaintiffs' general allegations that the citizenship question will cause an undercount are sufficient at the pleading stage, State of California plaintiffs also aver specifically that "the Bureau will be unable to take sufficient measures to avoid or mitigate the resulting undercount of non-citizens and their citizen relatives if the citizenship question is included in the 2020 Census." FAC ¶ 38.

United States District Court
Northern District of California

Defendants next target the alleged connection between the projected undercount of the population and the risk plaintiffs will lose representation or funding as a consequence. Plaintiffs allege that an increased undercount will impact the number of representatives California has in the House of Representatives and the Electoral College and will decrease their share of federal funds under a variety of federal programs. FAC ¶¶ 40-47.  Because apportionment is a complex process that involves ranking states based on their population to determine priority for seats, *see* 2 U.S.C. § 2a(a); https://www.census.gov/population/apportionment/about/computing.html, defendants insist that the impact on California's representation is merely hypothetical. While it may be, as defendants assert, that undercounts in other states will offset the effect on California in the final apportionment calculation, that is a determination on the merits. Defendants cannot defeat plaintiffs' as yet to be proven assertions about California's projected loss of congressional representation with equally unproven assertions regarding a lack of impact. The cases defendants offer to the contrary were decided on motions for summary judgment, where the parties' offers of proof were given due consideration.

With respect to funding related concerns, defendants acknowledge that the court in *National Law Center on Homelessness and Poverty v. Kantor* found, for the purposes of ruling on summary judgment, that allegations of loss of funding are sufficient to survive motions to dismiss. *See* 91 F.3d 178, 185 (D.C. Cir. 1996) (citing cases). In the particular context of the census, courts have consistently held that individual plaintiffs have standing where they allege a loss of federal funding to their states and localities resulting from a census undercount. *See Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (holding that "citizens who challenge a census undercount on the basis, inter alia, that improper enumeration will result in loss of funds to their city have established . . . an injury in fact traceable to the Census Bureau"); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (holding that plaintiffs had standing because they established the proposed census methodology would "directly result in a decrease of federal funding to the states and counties in which Plaintiffs reside"); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (concluding that plaintiffs had standing even if they did not personally receive federal aid

allocated to the City of Philadelphia because "all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money"). Defendants, however, maintain these cases are distinguishable because they involved post-census challenges to counting methodologies, and none of them involved a challenge to the mere inclusion of a question on the census form. As with apportionment of representatives, defendants point out that allocation of funds under the programs cited by plaintiffs is "not generally proportional to population, but is a function of multiple factors including, often, the populations of *other* states." Mot. at 16 (citing 42 U.S.C. § 5305(d)(1) (public transportation funding); 20 U.S.C. § 6337 (education funding); 42 U.S.C. § 1301(a)(8)(A)(Medicaid funding)).

Defendants' attempts to distinguish the numerous cases finding standing where plaintiffs have alleged loss of funding are unpersuasive. First, the distinction between post-census challenges to calculation methodologies and pre-census challenges to the inclusion of a census question is of no consequence with respect to the nature of the injury alleged. All three of the above referenced census challenges were, as here, filed *before* the relevant decennial census was completed and *before* any alleged loss of funding could have taken place.[6] Second, as explained above with respect to defendants' challenge to plaintiffs' allegations regarding apportionment, disputes about whether California will *in fact* lose federal funding are not proper for determination on a motion to dismiss.

Finally, defendants argue that even if plaintiffs can show Article III injury, their allegations are insufficient to bring them within the zone of interests protected by the Constitution's Enumeration Clause, which "has no relation to, and was intended to, ensure that federal grant monies flow equally to all individuals." Mot. at 17. On the contrary, plaintiffs have alleged loss of funding and inadequate representation flowing from the Secretary's alleged failure to conduct an

---

[6] *Carey* challenged an undercount that was projected disproportionately to affect New York State and New York City, *Glavin* challenged the planned use of statistical sampling in the next decennial census, and *City of Philadelphia* challenged the Bureau's refusal to make adjustments to the census count on the grounds that it was likely to result in a loss of funding to the city and its residents.

1    "actual Enumeration" as required by the Constitution. These allegations easily survive the zone-

2    of-interests test.

3               **2.  Causation**

4               In the event plaintiffs state an injury that is sufficiently concrete, defendants contend they

5    cannot show the alleged injury is "fairly traceable" to the actions of defendants. *Defs. of Wildlife*,

6    504 U.S. at 560. Courts generally decline to find standing where the asserted injury results from

7    the independent actions of third parties rather than the challenged conduct of defendants. *See*

8    *Clapper*, 568 U.S. at 414 (noting the Supreme Court's "usual reluctance to endorse standing

9    theories that rest on speculation about the decisions of independent actors."); *Simon v. E. Ky.*

10   *Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

11              Specifically, defendants argue plaintiffs' allegations of harm rely upon intervening acts of

12   third parties—individuals who violate their clear legal duty to participate in the decennial census.

13   *See* 13 U.S.C. § 221. Plaintiffs allege that individuals in their communities who would otherwise

14   comply with their legal obligations to respond to the census will be deterred from participating

15   because of the addition of the citizenship question. This reluctance, defendants insist, is not fairly

16   traceable to any action by the Secretary, given that it is impossible to determine what percentage

17   of this population would be reluctant to respond to the census questionnaire regardless of what

18   questions appear on it.

19              Once again, defendants articulate a standard far higher than what is required under Article

20   III. Courts recognize that "[c]ausation may be found even if there are multiple links in the chain

21   connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement

22   that the defendant's conduct comprise the last link in the chain." *Mendina v. Garcia*, 768 F.3d

23   1009, 1012 (9th Cir. 2014), citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). The key

24   question, as plaintiffs rightly point out, is whether the "government's unlawful conduct is at least a

25   substantial factor motivating the third parties' actions." *Id.* at 1013 (internal citations and

26   quotations omitted). "So long as plaintiff can make that showing without relying on speculation or

27   guesswork about the third parties' motivations, she has adequately alleged Article III causation."

28

United States District Court
Northern District of California

*Id.* (internal citations and quotations omitted); *see also In re Zappos.com*, 888 F.3d 1020, 1026 n.6 & 1028-30 (9th Cir. 2018) (injury related to data breach was fairly traceable to retailer, even though third party hackers stole data).

Plaintiffs meet that burden here by alleging the inclusion of a citizenship question will discourage their constituents and members of their communities from participating in the census, due to anxieties about the federal government's perceived negative treatment of minority and immigrant populations. San Jose Compl. ¶¶ 6, 10, 71-73, 80-83. They also point to evidence from the Bureau itself attesting to the projected negative impact of asking a citizenship question on census response rates. That non-respondents would violate their legal duty to participate in the census and may be influenced by other factors in refusing to participate does not diminish the strength of plaintiffs' allegation that the citizenship question will be a "substantial" factor affecting non-response rates. Neither is causation defeated by defendants' assertions that refusing to respond to the census is "irrational." *See Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (holding "irrational" reactions of public leading to depressed sales did not defeat the causation element of standing in suit challenging the Department of Justice's classification of three films as "political propaganda."). Accordingly, plaintiffs in this action have standing to assert their claims.

### 3.  BAJI's Organizational Standing

An organization may show an "injury in fact" sufficient to confer direct standing by alleging: "(1) frustration of its organizational mission; and (2) diversion of its resources" to combat the challenged actions by defendant. *See Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). An organization cannot "manufacture" an injury by sustaining litigation costs or by choosing to use resources to fix problems that otherwise would not have affected it. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). It is sufficient, however, for the organization to allege defendant's actions caused it to expend additional resources and "but for" those actions it would have spent those resources to accomplish other aspects of its organizational mission. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, BAJI has alleged an injury sufficient to confer organizational standing. San Jose Compl. ¶ 23. It describes its goal as fostering racial, economic, and social equality for Black immigrants and other historically underrepresented communities. Because the inclusion of a citizenship question on the 2020 Census questionnaire, they allege, will disproportionately depress the response rates of immigrant communities, BAJI contends these communities stand to lose political representation and access to federal funding. In response, BAJI has diverted the organization's limited resources to address and counteract the anticipated effects of the Secretary's decision to reinstate the census question. These efforts include providing "dialogues, presentations, workshops, publications, technical assistance, and trainings to build alliances between African American and immigrant communities." *Id.* Taken together, these allegations are sufficient to demonstrate that BAJI's organizational mission has been frustrated due to defendants' actions, and the resources diverted to dealing with that frustration go above and beyond litigation. *See Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) (finding the resources an organization had diverted to investigate defendant's alleged discriminatory actions established standing). Therefore, at the pleading stage, BAJI has sustained its burden to show standing.

## B. Political Question

The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The presence of a nonjusticiable political question is analyzed on a case-by-case inquiry involving the following six factors:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political question already made; or [6] the

1    potentiality of embarrassment from multifarious pronouncements by various

2    departments on one question.

3    *Baker*, 369 U.S. at 217; *see Republic of the Marshall Islands v. United States*, 865 F.3d 1187,

4    1200 (9th Cir. 2017). Although the first two factors are considered the most important, *see*

5    *Zivotosky v. Clinton*, 566 U.S. 189, 195 (2012) (examining only the first two factors); *Vieth v.*

6    *Jubelirer*, 541 U.S. 267, 278 (2004), a court may find a political question if even one factor is

7    satisfied, *see Republic of Marshall Islands*, 865 F.3d at 1200. Defendants argue that at least three

8    factors are relevant here.

9              **1.   Textually Committed to Congress**

10        The Constitution provides that Representatives "shall be apportioned among the several

11   States . . . according to their respective numbers," which requires "counting the whole number of

12   persons in each State." U.S. Const. amend. XIV, § 2. To calculate the "number of persons in each

13   State," *id.*, the Enumeration Clause requires an "actual Enumeration" every 10 years "in such

14   Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3. Defendants take the position that

15   the command to conduct an "actual enumeration" presents a judicially cognizable question that

16   courts have routinely answered, while the latter command regarding the "manner" of conducting

17   the census presents a nonjusticiable political question reserved for Congress and by delegation, to

18   the Secretary.

19        Because the phrase "in such a Manner" modifies the phrase '[t]he actual Enumeration shall

20   be made," defendants argue the text of the Constitution makes clear that Congress has full and

21   exclusive control over the manner in which the decennial census is conducted. The census

22   questionnaire, they reason, is synonymous with the "form" of the census, and it is the "method" by

23   which an "actual Enumeration" is conducted. In defendants' telling, the decision to include a

24   citizenship question concerns only the "manner" in which the Secretary performs the information-

25   gathering function of the census. It does not, in their view, implicate questions of "whom to count,

26   how to count them, or where to count them." Mot. at 18. Thus, defendants read plaintiffs'

27   challenge as directed at the "way of performing or executing" the census, a determination

United States District Court
Northern District of California

Congress has reserved to itself.

These arguments fail for at least four reasons. First, while there is no question the language of the Constitution accords great deference to Congress, and by delegation to the Secretary, with respect to the methodology by which the decennial census is conducted, defendants offer no cases supporting a sharp dividing line between reviewable actions implicating the "Enumeration" prong and unreviewable actions implicating only the "Manner" prong. Courts have routinely held that the Enumeration Clause does not textually commit exclusive, non-reviewable control over the census to Congress. *See Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981) (finding the Enumeration Clause "does not say that Congress and Congress alone has the responsibility to decide the meaning of, and implement, Article I, Section 2, Clause 3."); *State of Texas v. Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (finding Congress's exclusive power to determine the manner of the census did not preclude judicial review of its actions); *City of Willacoochee v. Baldridge*, 556 F. Supp. 551, 557 (S.D. Ga. 1983) ("[T]he Court finds no support for the argument that the Framers intended that all aspects of conducting the census be exclusively within the province of Congress and exempt from judicial review.").

Second, the distinction defendants attempt to draw—between a "method" of conducting the census and considerations of "whom to count, how to count them, or where to count them"—appears to be one of semantics rather than substance. The latter considerations, which defendants concede are subject to judicial review, could reasonably be interpreted as describing different "ways" of "performing or executing" the census. In other words, both statistical adjustment to the census count and creation of the census questionnaire concern the methodology of conducting the "actual Enumeration," albeit at different points in the process.

Third, those cases that ultimately denied challenges to the decennial census did so by evaluating challenged procedures as part of the "manner" in which the census is conducted. *See Utah v. Evans*, 536 U.S. 452, 474 (2002) (holding that the use of "hot-deck" imputation to infer information about certain addresses was permissible under the Enumeration Clause under the "in

such Manner" language); *Wisconsin*, 517 U.S. 1, 17 (upholding the Secretary's decision not to adjust the population count with a post-enumeration survey as permissible under Congress' broad delegation of authority to "conduct the census 'in such Manner as they shall by Law direct'"); *Franklin v. Massachusetts*, 505 U.S. 788, 803-807 (1992) (upholding the Secretary's manner of counting federal employees serving abroad).

Finally, plaintiffs here articulate a challenge to "how" the Secretary intends to count the population—by using a questionnaire that will allegedly exacerbate non-response rates in certain communities. Even under defendants' strained reading of the Enumeration Clause, plaintiffs' claims are not insulated from judicial review by the text of the Constitution.

### 2. Judicially Manageable Standards

Defendants characterize the decision to add a citizenship question as a policy decision regarding census procedures. In this case, defendants assert, the Secretary balanced the need for citizenship information against the cost and effectiveness of efforts to mitigate non-responses, the possibility of lower response rates, the cost of increased non-response follow-up, and the completeness and cost of administrative records. Defendants contend there are no judicially manageable standards for determining how to weigh these factors because they do not implicate the constitutional command to count rather than estimate the population. Such a determination would involve cost/benefit analysis and value judgments that are beyond the province of the court's judgment.

Defendants again distinguish prior census-related cases decided by the Supreme Court on grounds that all concerned calculation methodologies, rather than pre-count information-gathering functions or content determinations. *See, e.g. Utah*, 536 U.S. at 452 ("hot-deck imputation"—a non-sampling process which infers characteristics of individuals based upon the characteristics of neighbors, resulting in inclusion of individuals who otherwise would be excluded—did not violate the Enumeration Clause); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 317-18 (1999) (holding that statistical sampling violates the Census Act, 13 U.S.C. § 195, and declining to reach the Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1 (holding that

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Secretary did not violate Enumeration Clause by failing to correct a census undercount with data

2  from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. at 788 (1992) (confirming

3  that the method used to count federal employees serving overseas did not violate Enumeration

4  Clause).

5  Yet nothing in these cases indicates that guidance regarding judicial evaluation of

6  calculation methodologies may not also govern challenges to other census-related decisions. The

7  Supreme Court has identified several guiding principles that are applicable here. Although the

8  Court has declined to "decide . . . the precise methodological limits foreseen by the Census

9  Clause," it has found a "strong constitutional interest in accuracy." *Utah*, 536 U.S. at 478. The

10  Court reviews decisions pertaining to the administration of the decennial census with an eye to

11  whether the challenged decision bears "a reasonable relationship to the accomplishment of an

12  actual enumeration of the population, keeping in mind the constitutional purpose of the census."

13  *Wisconsin*, 517 U.S. at 20. As plaintiffs point out, a "reasonable relationship" standard imposes

14  deferential yet concrete limitations on the Secretary's exercise of discretion. For example, one

15  would expect the Secretary could be precluded from printing all census questionnaires in Greek or

16  in illegible font. Here, plaintiffs allege the Secretary exceeded the constitutional bounds of his

17  discretion when he decided to reinstate a citizenship question, a decision they assert will

18  affirmatively undermine the actual enumeration and its purpose of congressional apportionment.

19  FAC ¶¶ 49-50; San Jose Compl. ¶ 26. In evaluating this claim, this Court may examine whether

20  the Secretary's policy decisions exceeded the bounds of his constitutional discretion without

21  passing judgment on the wisdom or correctness of his analysis.

22  In addition to these constitutional parameters, reference may be made to a variety of

23  judicially manageable standards from a number of statutes, regulations, and policies, including the

24  Paperwork Reduction Act, OMG's Statistical Policy Directives, and the Bureau's own Statistical

25  Quality Standards. Conformance with established procedures may be evaluated without requiring

26  a second-guess of the Secretary's balancing of various policy options. Therefore, for the reasons

27  articulated above, the political question doctrine does not preclude review of plaintiffs' claims.

28

ORDER DENYING MOTIONS TO DISMISS
CASE NO.  18-cv-01865-RS

### C. Administrative Procedure Act

The APA authorizes courts to set aside final agency actions, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law." 5 U.S.C. § 706. Although there is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670, (1986), the statute exempts from scrutiny certain categories of decisions that "courts traditionally have been regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). Agency action is committed to agency discretion by law where "'statutes are drawn in such broad terms that in a given case there is no law to apply,'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal citation omitted). In these cases, judicial review is precluded because there is no "meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Ctr. For Policy Analysis on Trade & Health v. Office of the U.S. Trade Rep.*, 540 F.3d 940, 945 (9th Cir. 2008) (applying § 701(a)(2) to bar judicial review where relevant statutes "are devoid of standards suggesting what Congress intended").

Application of section 701(a)(2) "requires careful examination of the statute on which the claim of agency illegality is based," *Webster*, 486 U.S. at 600. A court also considers whether the matter is one traditionally viewed as committed to agency discretion, *Interstate Commerce Comm'n v. Bhd. Of Locomotive Eng'rs* ("BLE"), 482 U.S. 270, 283 (1987), or whether the challenged action manifests a "general unsuitability" for judicial review because it involves a "complicated balancing of a number of factors" concerning the allocation of agency resources, or matters uniquely committed to another branch of government, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). Defendants maintain that the decision to reinstate a citizenship question is akin to any decision regarding the conduct of the census generally, a discretionary determination that is insulated from judicial review.

Under the Census Act, Congress's delegation of authority to the Secretary is a broad one: "The Secretary shall . . . take a decennial census of the population . . . in such form and content as

he may determine," and "[i]n connection with any such census, the Secretary is authorized to obtain such other census information as necessary." 13 U.S.C. § 141(a). Defendants compare the statute's "may determine" language to the discretionary language at issue in *Webster*, 486 U.S. at 600, which allowed the CIA Director to terminate an employee whenever he "shall *deem* such termination necessary or advisable in the interests of the United States." Therefore, defendants argue, just as the CIA Director's decision to terminate an employee as "necessary or advisable" is immune from judicial review, so too is the Secretary's decision to collect information through the decennial census "as necessary" and "in such form and content as he may determine." 13 U.S.C. § 141(a).

In the specific context of the census, the Supreme Court has confirmed that Congress's authority over the census is accorded substantial deference. *Wisconsin v. New York*, 517 U.S. at 19:

> The text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial "actual Enumeration," see Art. I, § 2, cl. 3, and notwithstanding the plethora of lawsuits that inevitably accompany each decennial census, there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides. . . . Through the Census Act, Congress has delegated its broad authority over the census to the Secretary.

Some courts have concluded that the absence of "guidelines for an accurate decennial census" from the Constitution, the Census Act, and the APA itself creates "the inference . . . that these enactments do not create justiciable rights." *Tucker v. Dep't of Commerce*, 958 F.2d 1414, 1417-18 (7th Cir. 1992); *see also Senate of the State of Cal. v. Mosbacher*, 968 F.2d 974, 977-79 (9th Cir. 1992) (finding "no law to apply" under the Constitution and Census Act). *Tucker* and *Mosbacher*, however, were decided before the Supreme Court's decisions in *Utah* and *Wisconsin*, without the benefit of the guidance provided in those decisions. Moreover, *Mosbacher* dealt with a plaintiff's FOIA-type request to compel the Bureau to release census count data that had not been made public, an issue that has little relationship to the facts of this case.

As described in the preceding section of this Order, the Constitution provides a standard for determining whether the Secretary's decision violates the APA. In searching for a meaningful

standard of judicial review, courts may look beyond the statute authorizing agency action and consider other statutes and "regulations, established agency policies, or judicial decisions." *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003); *accord Pinnacle Armor*, 648 F.3d at 719. Under *Wisconsin* and *Utah*, this Court may evaluate whether the Secretary's actions evidence "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Wisconsin*, 517 U.S. at 19-20. The Secretary's decision must also be consistent with the "strong constitutional interest in accuracy." *Utah*, 536 U.S. at 478; *see also* Pub. L. No. 105-119, § 209(a)(6) ("it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States.").

Plaintiffs allege that citizenship data from a decennial census will not assist enforcement of the Voting Rights Act, and will instead cause injury to those populations the Act was designed to protect. Accordingly, they accuse defendants of sacrificing census accuracy for an illegitimate and unsupported purpose. FAC §§ 14-15. While perfect census accuracy is clearly not required, a decision that both undermines the accuracy of the enumeration process and does so without reasonable justification may be adjudged "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a).

A substantial body of federal regulations and Census Bureau policies also provide manageable standards against which the Secretary's actions can be measured. In particular, the Bureau's own Statistical Quality Standards guide the process—from planning to collecting to analyzing and reporting—of producing Bureau information products. *See* Bureau's Statistical Quality Standards at i. The document instructs, "All Census Bureau employees . . . *must* comply with these standards." *Id.* at ii (emphasis added). The standards expressly identify circumstances under which pretesting "must" occur, such as when, for example, "review by cognitive experts reveals that adding pretested questions to an existing instrument may cause potential context effects" or "an existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)." *Id.* at 8. These internal agency standards provide

"law to apply" in evaluating the Secretary's exercise of his discretion. An "irrational departure from agency policy," plaintiffs argue, can constitute grounds for arbitrary and capricious review, regardless of whether the relevant standards are legally binding on the agency. *See I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *Salazar v. King*, 822 F.3d 61, 76-77 (2d Cir. 2016).

Even confined to the text of 13 U.S.C. § 141(a), the view defendants adopt, it is well established that "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Pinnacle Armor*, 648 F.3d at 719 ("Just because a statute calls on the agency to exercise its 'judgment' in making its determination does not necessarily make an agency's action unreviewable."); *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) ("Even where statutory language grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations or agency practice provide a 'meaningful standard by which this court may review its exercise of discretion.'") (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)). Moreover, the weight of authority considering section 141(a) strongly indicates the Secretary's authority and discretion is not so limitless as to foreclose APA review. *See Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (1992) ("[A]lmost every court that has considered the issue has held that 13 U.S.C. § 141 does not preclude judicial review."); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 53 (E.D.N.Y. 1989) ("The overwhelming majority of cases considering the issue[] have concluded that § 701(a)(2) of the APA is inapplicable to the census statute."); *see, e.g., Carey v. Klutznick*, 637 F.2d at 838 (challenge to the "manner" in which the Census Bureau assembled address registers for the census was not "committed to agency discretion by law" under section 701(a)(2)): *City of Philadelphia*, 503 F. Supp. at 675; *see also Franklin*, 505 U.S. at 818-819 (Stevens, J., concurring in part).

Most recently, in a thoughtful and meticulously researched analysis of the issue, District Judge Furman noted that the Census Act, read as a whole, "imposes any number of mandatory duties upon the Secretary," including obligations to prepare the census questionnaire, take a decennial census, to complete the census within nine months, and to furnish a report of the census

1    to Congress prior to the census date. *See State v. U.S. Dep't of Commerce*, No. 18-cv-2921, No.

2    18-cv-5025, 2018 WL 3581350, at *16 (S.D.N.Y. July 26, 2018). In short, Judge Furman

3    concluded, there was "strong evidence that Congress did not intend to preclude judicial review of

4    the Secretary's actions." *Id.* The single use of the word "may" does not operate to overcome the

5    presumption of review created by the statute's otherwise mandatory, non-discretionary language.

6         Defendants articulate no persuasive reasons to depart from the considerable precedent

7    identified above. For these reasons, plaintiffs are not precluded from seeking judicial review of

8    their claims under the APA.

9    **D.   Enumeration Clause**

10        Finally, even if this Court finds plaintiffs' claims justiciable, defendants argue plaintiffs'

11   claim under the Enumeration Clause should be dismissed. The Constitution's only command with

12   respect to the "actual Enumeration," defendants contend, is that the Secretary must conduct a

13   person-by-person headcount. As long as the Secretary is counting rather than estimating the

14   population, the requirements of the Enumeration Clause, they insist, are satisfied.

15        According to defendants, plaintiffs have not, and cannot, allege that the Secretary has

16   failed to establish procedures for counting every resident of the United States. The Census Bureau

17   has comprehensive procedures in place for non-response follow-up and will attempt to contact

18   every person in the country. 2020 Census Operational Plan, at 88-92, 112-21. These procedures

19   include multiple mailings, digital methods and automation, and in-person visits by a census

20   enumerator. In light of these intensive efforts, defendants argue, the mere possibility of an

21   undercount is insufficient to establish a violation of the Enumeration Clause. *See Utah*, 536 U.S. at

22   504 (Thomas, J., concurring in part and dissenting in part) (canvassing the history of census

23   undercounts, including the first Census in 1790); *Wisconsin*, 517 U.S. at 6 ("Although each [of the

24   20 past censuses] was designed with the goal of accomplishing an 'actual Enumeration' of the

25   population, no census is recognized as having been wholly successful in achieving that goal.");

26   *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely

27   accurate"); *Senate of the State of Cal.*, 968 F.2d at 979 (describing the 1990 Census as "one of the

28

United States District Court
Northern District of California

best ever taken in this country" despite counting "approximately 98 percent of the population");

*City of Los Angeles v. Evans*, No. 01-cv-1671, 2001 WL 34125617, at *2 (C.D. Cal. Apr. 25,

2001) ("Like all of its predecessors, Census 2000 produced less than perfect results.").

Plaintiffs' theory, defendants contend, would call into question a whole host of

demographic questions on the current and prior census forms—related to sex, origin, race, and

relationship status—as some people may prefer not to answer those questions either. It would also

challenge the constitutionality of asking demographic questions on the long-form questionnaire

sent to a small subset of the population, which has been shown to elicit a lower response rate. *See*

Census Topic Report No. 11, Response Rates and Behavior Analysis, at 9,

https://www.census.gov/pred/www/rpts/TR11.pdf (concluding that mail-back response rate for

2010 long form was 9.6% lower than short form). Courts recognize that demographic information-

gathering serves as "a linchpin of the federal statistical system by collecting data on the

characteristics of individuals, households, and housing units throughout the country." *Dep't of

Commerce*, 525 U.S. at 341 (quoting Nat'l Research Council, Counting People in the Information

Age 1 (D. Steffey & N. Bradburn eds. 1994). For that reason, defendants argue, the Supreme

Court has never invalidated the Secretary's population count on Enumeration Clause grounds. *See

Utah*, 536 U.S. at 474; *Dep't of Commerce*, 525 U.S. at 344; *Wisconsin*, 517 U.S. at 1; *Franklin*,

505 U.S. at 788.

The history of the census reflects that demographic questions have long been a part of the

enumeration process since its inception. *See Dep't of Commerce*, 2018 WL 3581350, at *20-22.

The first census in 1790 asked about age, race, and sex. Census Act of 1790, § 1, 1 Stat. 101

(1790). Every census since then has collected demographic information beyond the number and

location of inhabitants. Although no census since 1950 has asked ever respondent to report

citizenship status, questions relating to citizenship have appeared on a long-form questionnaire

sent to portions of the population from 1960 through 2000. Thus, it is clear that the mere asking of

a question about citizenship on the census form is consistent with the historical conduct of the

census. *See Wisconsin*, 517 U.S. at 21 (explaining that historical practice is a critical factor in

examining an alleged violation of the Enumeration Clause). As discussed at oral argument in this matter, counsel for defendants could not point to any case where the constitutionality of a citizenship question was the subject of litigation. That said, the fact remains not only has Congress itself directed the inclusion of demographic questions on the census (before such determinations were delegated to an agency), but the handful of lower courts to have entertained challenges to the Secretary's power to collect demographic information via the census questionnaire have rejected them. *See Dep't of Commerce*, 2018 WL 3581350, at *21-22 (collecting cases).

Yet plaintiffs do not frame their objection to the citizenship question as an inherent disagreement with citizenship as a proper subject for the census, nor is theirs a challenge to the general proposition that the Secretary is empowered by Congress to collect demographic information through the decennial census. The long history of demographic questions appearing on the census questionnaire, including questions regarding place of birth and immigration status, confirms that the specific act of including a citizenship question on the census is not, by and of itself, beyond the Secretary's authority under the Enumeration Clause. At oral argument, counsel for plaintiffs also made clear that they were not taking the position that every single past census that included a citizenship question was constitutionally defective. In other words, plaintiffs do not ask for a determination on whether the Constitution categorically prohibits the Secretary from asking census respondents about their citizenship, only whether he is precluded under these particular facts.

Plaintiffs agree that the standard for evaluating a challenge under the Enumeration Clause is an objective one—that is, the Secretary's actions either satisfy the constitutional mandate or they do not. Because the Constitution instructs the Secretary to count the population, plaintiffs urge the proper focus of the Court's inquiry is on the *effect* of asking a question about citizenship in the *context* of *this* decennial census taking. For that reason, plaintiffs argue, a question that chills participation in the census process today might not necessarily have been chilling in 1950. Indeed, the operative complaints are replete with examples of government policies, actions, and rhetoric within the last year that would tend to make non-citizens and their family members

1   potentially afraid to divulge their household's citizenship status to a federal agency. These

2   government activities logically shape the impact of asking a citizenship question on the 2020

3   Census questionnaire specifically. Thus, it is plaintiffs' position that the decision to ask a

4   citizenship question in 2020 is reviewable under the Enumeration Clause without implicating the

5   constitutionality of other demographic questions in general, or past iterations of the citizenship

6   question in particular.

7        Although a close question, plaintiffs' claim under the Enumeration Clause may proceed

8   past the pleading stage. First, defendants' assertion, in their papers and at oral argument, that the

9   Secretary's exercise of discretion to add questions to the census questionnaire is *never* subject to

10   constitutional scrutiny, is overbroad. Second, although the census has included questions relating

11   to citizenship and other demographic characteristics throughout its history, the constitutionality of

12   asking about citizenship in particular has never been actually tested. Third, the Supreme Court has

13   identified a "strong constitutional interest in accuracy," *Utah*, 536 U.S. at 478, and entertained

14   challenges to the mechanics of conducting the decennial census—i.e. statistical adjustment to the

15   initial census count, allocation of persons counted, procedures to tabulate survey responses, etc.—

16   under that standard. The conclusion drawn from the aforementioned points is that while the

17   content of the census questionnaire, including the specific questions that appear on it, is nearly

18   always committed to the Secretary's sound discretion, there may be a rare question that is so

19   uniquely impactful on the process of counting itself, that it becomes akin to a mechanics-of-

20   counting-type challenge, which is plainly reviewable under the Enumeration Clause.

21        Here, plaintiffs aver that the citizenship question on the 2020 Census questionnaire is one

22   such question. They argue it is unusually sensitive in light of the current political climate, that the

23   question will have a material impact on the census count, that the effects will be unevenly

24   distributed, and that the resulting undercount will be significant enough to affect the

25   reapportionment of representatives among the states. Thus, while each and every question on the

26   census need not be related to the goal of actual enumeration, *see Baldridge v. Shapiro*, 455 U.S.

27   345, 353 (1982) (acknowledging that the census "fulfils many important and valuable functions,"

28

ORDER DENYING MOTIONS TO DISMISS
CASE NO. 18-cv-01865-RS

including "provid[ing] important data for Congress and ultimately for the private sector"), the Secretary's decision to alter the census in a way that affirmatively interferes with the actual enumeration, and does not fulfill any other reasonable governmental purpose, is subject to a challenge under the Enumeration Clause. Given these facts as alleged in the operative complaints, which must be taken as true for the purposes of a motion to dismiss, plaintiffs make a sufficient showing that the Secretary's decision to add a citizenship will undermine the "strong constitutional interest in accuracy" of the census, *see Utah*, 536 U.S. at 478, and thus violate the Constitution's actual enumeration command. Whether plaintiffs can ultimately sustain this showing on the merits remains to be seen. At this juncture, dismissal is premature and plaintiffs will be allowed to develop their claims as this case proceeds in due course.

## V. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are denied.

**IT IS SO ORDERED**.

Dated: August 17, 2018

RICHARD SEEBORG
United States District Judge