ROBIN B. JOHANSEN, State Bar No. 79084
THOMAS A. WILLIS, State Bar No. 160989
MARGARET R. PRINZING, State Bar No. 209482
REMCHO, JOHANSEN & PURCELL, LLP
1901 Harrison Street, Suite 1550
Oakland, CA  94612
Phone:  (510) 346-6200
Fax:  (510) 574-7061
Email:  rj@rjp.com

Attorneys for Proposed Amicus Curiae
the Legislature of the State of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>WILBUR L. ROSS, JR.,<br><br>Defendants. | No.:  3:18-CV-01865-RS<br><br>Action Filed:  March 26, 2018<br><br>**MOTION OF THE LEGISLATURE OF THE STATE OF CALIFORNIA FOR LEAVE TO FILE BRIEF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Summary Judgment Motion Hearing:<br><br>Date:      December 7, 2018<br>Time:      10:00 a.m.<br>Dept.:     3<br><br>(The Honorable Richard Seeborg)<br><br>Trial Date:  January 7, 2019 |

The Legislature of the State of California respectfully requests leave to file the attached brief amicus curiae brief in opposition to defendants' motion for summary judgment.  All but one of the parties have consented to the filing of the brief.  The City of Stockton has not yet responded to the Legislature's request; there is no evidence that the City of Stockton would oppose the request.  The proposed amicus brief was prepared solely by counsel for amici; no party participated in preparation of the brief nor did anyone contribute money that was intended to fund preparing or submitting the brief.

The brief supports but does not repeat the legal arguments made by plaintiffs.  Rather, the brief provides context for the Court regarding the harm that will be caused to the Legislature's ability to perform its constitutional functions if defendants are permitted to include a citizenship question on the 2020 census.  Because the Legislature is the deliberative and law-making branch of California government, the harm to it alone is enough to confer standing on the State to bring this action.

### INTEREST OF THE AMICI

The California Legislature is a bicameral body consisting of the Assembly of the State of California and the Senate of the State of California.  The Assembly has 80 members representing districts of approximately 465,674 persons each.  The Senate has 40 members representing districts of approximately 931,349 persons each.[1]  Every individual who resides in the State of California at the time of the decennial census is counted toward the total population that is divided to form 80 districts for the Assembly and 40 districts for the Senate.[2]  As discussed in the attached brief, the members of the Legislature represent *all* of the people who live in their districts, whether or not they are citizens eligible to vote.  To the degree that Californians are undercounted, one member of the Legislature may

[1] California Citizens Redistricting Commission Final Report, August 15, 2011, p. 11.  Article XXI of the California Constitution provides for a redistricting commission to draw district lines for the Legislature and for California's congressional delegation.  The lines drawn for the Legislature were within plus or minus 1% of the ideal population for each district based on the 2010 census.

[2] The only exception is inmates in state correctional facilities whose last known place of residence is outside the state or for whom no last known place of residence can be ascertained.  Cal. Elec. Code § 21003.

MOTION OF THE LEGISLATURE OF THE STATE OF CALIFORNIA
FOR LEAVE TO FILE BRIEF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, NO. 3:18-CV-01865-RS

have many more constituents than another, with a concomitant impact on the representational rights of the residents in the district with the higher undercount.  An accurate census count is critical to preserving the representational rights of California residents.

An accurate census count is also critical to the Legislature's ability to shape and adopt the annual state budget, because federal funding for programs that affect many Californians is based on figures derived from the census.  To the degree that Californians are undercounted, California's share of federal funds will be lower, requiring the Legislature either to cut back or eliminate certain programs or fund them using General Fund revenues that are needed elsewhere.

Finally, the California Legislature works closely with California's congressional delegation to represent the interests of the State at the federal level.  As plaintiffs' evidence demonstrates, the addition of a citizenship question could cause the state to lose one or more seats in the House of Representatives.  With the current political climate the way it is, loss of these seats in Congress will affect the State's ability to advance and protect its interests with respect to everything from aid for natural disasters to issues involving interstate commerce.

For all of these reasons and for the reasons set forth in the attached brief, the Legislature of the State of California respectfully requests leave to file its brief amicus curiae in support of plaintiffs' opposition to defendants' motion for summary judgment.

Dated:  November 20, 2018

Respectfully Submitted,

Robin B. Johansen
Thomas A. Willis
Margaret R. Prinzing
REMCHO, JOHANSEN & PURCELL, LLP

By:  /S/ Robin B. Johansen

Attorneys for Proposed Amicus Curiae
the Legislature of the State of California

(00363228-6)

MOTION OF THE LEGISLATURE OF THE STATE OF CALIFORNIA
FOR LEAVE TO FILE BRIEF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, NO. 3:18-CV-01865-RS

ROBIN B. JOHANSEN, State Bar No. 79084
THOMAS A. WILLIS, State Bar No. 160989
MARGARET R. PRINZING, State Bar No. 209482
REMCHO, JOHANSEN & PURCELL, LLP
1901 Harrison Street, Suite 1550
Oakland, CA  94612
Phone:  (510) 346-6200
Fax:  (510) 574-7061
Email:  rj@rjp.com

Attorneys for Proposed Amicus Curiae
the Legislature of the State of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | No.:  3:18-CV-01865-RS |
| Plaintiffs, | Action Filed:  March 26, 2018 |
| vs. | **[PROPOSED] BRIEF AMICUS CURIAE OF THE LEGISLATURE OF THE STATE OF CALIFORNIA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| WILBUR L. ROSS, JR., | |
| Defendants. | |

Summary Judgment Motion Hearing:

Date:      December 7, 2018
Time:      10:00 a.m.
Dept.:      3

(The Honorable Richard Seeborg)

Trial Date:  January 7, 2019

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    California Has a Large Share of the Nation's Hard-to-Count Population ...................... 3

    B.    The California Legislature Was Compelled to Increase the State's Outreach Efforts After Learning of Defendants' Decision to Include the Citizenship Question ...................................................................... 4

ARGUMENT

I.    CALIFORNIA WILL SPEND MILLIONS ON OUTREACH BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION ................... 6

    A.    The Addition of the Citizenship Question Has Already Harmed California ................... 6

    B.    California's Harm Is Traceable To The Bureau's Decision To Include the Citizenship Question ........................................................................ 8

    C.    The Remedy Plaintiffs Seek Would Redress California's Harm ................... 8

II.    CALIFORNIANS WILL SUFFER REPRESENTATIONAL HARMS BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION ................... 9

    A.    Representation in California Is Based on Total Population ........................... 10

    B.    Substantial Evidence Demonstrates That California Will Lose Representation in Congress Due to Defendants' Actions ........................... 12

III.    CALIFORNIANS WILL LOSE FEDERAL FUNDING BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION ................... 13

CONCLUSION ................................................................................................ 15

1

## **TABLE OF AUTHORITIES**

2
**Page(s)**

3    **CASES:**

4    *Boating Indus. Ass'ns v. Marshall,* .................................................................................. 14
        601 F.2d 1376 (9th Cir. 1979)
5
     *Calderon v. Los Angeles,* ....................................................................................... 10, 11
6        4 Cal. 3d 251 (1971)

7    *Carey v. Klutznick,* ................................................................................................... 15
        637 F.2d 834 (2d Cir. 1980)
8
     *City of Oakland v. Lynch,* ........................................................................................... 7
9        798 F.3d 1159 (9th Cir. 2015)

10   *Council of Ins. Agents & Brokers v. Molasky-Arman,* ................................................ 14
        522 F.3d 925 (9th Cir. 2008)
11
     *Evenwel v. Abbott,* ................................................................................................. 9, 10
12       136 S. Ct. 1120 (2016)

13   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* ................................ 6, 8
        528 U.S. 167 (2000)
14
     *Garza v. Cnty. of Los Angeles,* ............................................................................. 10, 11
15       918 F.2d 763 (9th Cir. 1990)

16   *Ibrahim v. Dep't of Homeland Sec.,* ............................................................................. 8
        669 F.3d 983 (9th Cir. 2012)
17
     *Kirkpatrick v. Preisler,* ............................................................................................. 11
18       394 U.S. 526 (1969)

19   *Legislature v. Deukmejian,* .................................................................................... 9, 10
        34 Cal. 3d 658 (1983)
20
     *Mendina v. Garcia,* .................................................................................................... 8
21       768 F.3d 1009 (9th Cir. 2014)

22   *Mendoza v. Zirkle Fruit Co.,* ....................................................................................... 7
        301 F.3d 1163 (9th Cir. 2002)
23
     *Mont. Shooting Sports Ass'n v. Holder,* ....................................................................... 7
24       727 F.3d 975 (9th Cir. 2013)

25   *Susan B. Anthony List v. Driehaus,* .............................................................................. 6
        134 S. Ct. 2334 (2014)
26
     *United States v. Students Challenging Regulatory Agency Procedures,* ................... 13, 14
27       412 U.S. 669 (1973)
28

**TABLE OF AUTHORITIES**: (continued)                                            **Page(s)**

**UNITED STATES CONSTITUTION**:

Fourteenth Amendment ................................................................................................ 1
    Art. I, § 2 ...................................................................................................... 1, 2

**CALIFORNIA CONSTITUTION**:

Article IV
    § 6 ....................................................................................................................... 9

Article XXI
    § 1 ....................................................................................................................... 9
    § 2 ....................................................................................................................... 9

**MISCELLANEOUS**:

*Memorandum from Center for Survey Measurement on Respondent Confidentiality
Concerns to Associate Directorate for Research and Methodology,*
U.S. CENSUS BUREAU (Sept. 20, 2017) ............................................................ 11, 12

*Respondent Confidentiality Concerns in Multilingual Pretesting Studies and
Possible Effects on Response Rates and Data Quality for the 2020 Census,*
U.S. CENSUS BUREAU (May 2018) ........................................................................ 12

*Selected Characteristics of the Native and Foreign-Born Populations, 2012-2016 American
Community Survey 5-Year Estimates, All States Within United States and Puerto Rico,*
U.S. CENSUS BUREAU (2016) .................................................................................. 3

Senate Bill 866 (2017-2018 Reg. Sess.), § 45 ......................................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

The issue in this case is whether defendants' decision to add a question about citizenship to the 2020 census instrument violates the Enumeration Clause of the Constitution and the federal Administrative Procedure Act.  Because the answer to both questions is yes, defendants prefer to attack plaintiffs' standing to raise the issue at all.  As one of three coequal branches of California's government, the Legislature of the State of California offers this brief amicus curiae in support of the State's opposition to defendants' motion for summary judgment.

Like all other state legislatures, the California Legislature is a representative body.  And like all other state legislatures, the California Legislature is divided into districts that, every ten years, are redrawn to be as nearly equal in population as is practicable.  The population count on which redistricting is based, in California and the other 49 states, is the decennial census required by article I, section 2 and the Fourteenth Amendment of the federal Constitution.  Those census data in turn form the core of the statewide population database, which the California Legislature is tasked with maintaining and which is used for a myriad of other purposes at the state and local level.  The accuracy of that database will have profound effects on the representative quality not only of the state Legislature, but of every district-based city council and board of supervisors throughout the State.

The California Legislature is also tasked with passing a balanced state budget every year.  The 2018-19 state budget calls for $138.6 billion in state General Fund expenditures, but it also depends upon more than $107.4 billion in federal funds, much of which is determined by formulas based on the census count.  As demonstrated below and by the plaintiffs' briefs, to the degree that California's population is undercounted, the California Legislature will either be required to substitute state funds for the federal revenue to which it would otherwise be entitled or do without the services that would otherwise be funded by that revenue.

Finally, the California Legislature depends upon and works closely with California's Congressional delegation to represent the interests of the State and its inhabitants.  If the size of that delegation is decreased due to an undercount, the State's voice in Congress is diminished and its representational interests are harmed in violation of the Fourteenth Amendment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thus, for California, the validity of the census enumeration in this state is critically important both to its representative form of government and to its fiscal health. The federal Constitution *requires* a census that "count[s] the whole number of persons in each state, excluding Indians not taxed . . . ." U.S. CONST. amend. XIV, § 2.

That command cannot be met if the Census Bureau is allowed to include a question that well-respected experts, many of them former or current Census Bureau officials, say will decrease response rates. This is particularly the case in the current political climate with its anti-immigrant rhetoric and actions, as many of the experts have pointed out.

Despite these strong interests, defendants argue that the State of California and the other plaintiffs in these actions lack standing, because they cannot show that the inclusion of a census question will cause lower response rates to the census questionnaire. That argument conflates standing with ultimate success on the merits. As demonstrated below, the State has a more than reasonable belief that a citizenship question will lower response rates in California, and defendants' actions have forced it to act upon that belief by devoting millions of dollars to outreach efforts to counter the effect of that question. That in itself is more than sufficient to establish standing in this case.

The increased expenditure of funds on outreach is not the only basis for state standing in this case, however. The degree to which minorities and immigrants are undercounted has an immediate and detrimental effect on the representative nature of the Legislature and on the State's Congressional delegation. The right to equal representation belongs to *every* person in California, whether or not they are eligible to vote. People who live in districts with a high number of uncounted residents have less access to their representatives than those who do not, and areas with a high undercount have a lower share of representatives in the Legislature and in Congress than they would otherwise be entitled to. Finally, even according to defendants' view of the evidence, the State stands to lose millions, if not billions, of dollars in federal funding for programs that allocate funds based on census data. At this stage of the proceedings, the evidence is more than sufficient to foreclose summary judgment in favor of defendants.

2

## FACTUAL BACKGROUND

**A.**     **California Has a Large Share of the Nation's Hard-to-Count Population**

History has shown time and again that the decennial census undercounts certain categories of people, including low-income individuals, minorities, renters, foreign-born individuals, and individuals living in crowded households.  Because half of California's residents are nonwhite, over a quarter are foreign born, close to half live in rental housing, and 14% have incomes at or below the poverty line, many of California's residents fall into at least one of these categories.  Request for Judicial Notice in Support of [Proposed] Brief Amicus Curiae of the Legislature of the State of California ("RJN"), Ex. A at 42.  This not only places California at great risk of being undercounted during the Census, but, because California has disproportionately more people that fall into some of these categories than other states,[1] California is at a substantially greater risk of being undercounted than any other state in the union.

Indeed, the most significant national undercount in recent decades took place during the 1990 Census, when the Census Bureau estimated that it undercounted the national population by 1.6%, or approximately 4 million people.  *See Population Measures Are Important for Federal Funding Allocations*, GAO, https://www.gao.gov /assets/120/118299.pdf at 4-5.  Yet the undercount in California was significantly worse:  the Census Bureau missed approximately 2.7% of the State's population, or 835,000 people.  RJN, Ex. B at 6.  In 1999, California's Legislative Analyst reported "that the 1990 census undercount has likely cost California an estimated $2.2 billion during the 1990s" and an additional seat in the U.S. House of Representatives.  *Id*. at 9-10.

In the wake of the damage to California from the 1990 undercount, the State launched extensive outreach efforts to encourage full participation by every Californian in the 2000 Census.  The

---

[1] For example, California has nearly 5.3 million non-citizen residents, which is more than any other state in the union.  The next closest state is Texas, with 2.9 million.  Similarly, California has the highest number of foreign-born residents.  It has 10.4 million, whereas the next closest state of Texas has nearly 4.5 million.  *See Selected Characteristics of the Native and Foreign-Born Populations, 2012-2016 American Community Survey 5-Year Estimates, All States Within United States and Puerto Rico*, U.S. CENSUS BUREAU, https://factfinder.census.gov/faces/tableservices/jsf/pages/ productview.xhtml?src=bkmk (last visited Nov. 19, 2018).

3

[PROPOSED] BRIEF AMICUS CURIAE OF THE LEGISLATURE OF THE STATE
OF CALIFORNIA IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, NO. 3:18-CV-01865-RS

State committed $24.7 million to execute an outreach strategy among its residents. *Id.*, Ex. C at 23. Although these efforts increased the rate at which Californians responded to the Census so that the State performed better in that regard than the national average,[2] California still suffered the largest undercount of any state in the union. The total national undercount in 2000 was estimated to be more than 1.18%, or approximately 3.4 million people. *Id.*, Ex. E at 124. In California, however, the rate was 1.52%, leaving approximately 522,796 Californians uncounted. *Id.* at 124-25.

During the Great Recession, California was only able to dedicate $2 million in state funding to outreach efforts for the 2010 Census. Although the private sector supplemented that outlay with an infusion of $10 million, the mail participation rate in California still declined from 76% in 2000 to 73% in 2010. *Id.*, Ex. C at 23.

**B.      The California Legislature Was Compelled to Increase the State's Outreach Efforts
          After Learning of Defendants' Decision to Include the Citizenship Question**

In 2017, the State decided to commit substantial resources to obtaining a complete count of California residents during the 2020 Census. These efforts began last year when the State budgeted $10 million for early preparation and planning activities. *Id.*, Ex. D at 4. On January 10, 2018, Governor Edmund G. Brown Jr. proposed as part of his 2018-19 Budget that the State dedicate an additional $40.3 million for efforts to improve the State's response rate. *Id.*, Ex. F at 126.

At that point in time, the public did not know that the Census Bureau intended to include a citizenship question on the 2020 Census. Although the Department of Justice submitted a public request that the Census Bureau include a citizenship question on the 2020 Census on December 12, 2017, the Census Bureau would not announce its decision to add the question until March 26, 2018. *Id.*, Ex. G.

On April 24, 2018, the California Assembly Budget Committee held hearings on the Governor's proposal to dedicate $40.3 million to increase the response rate for the 2020 Census. In the agenda for that hearing, Committee staff advocated for providing "additional resources" over and

---

[2] *Id.*, Ex. D at 4.

[PROPOSED] BRIEF AMICUS CURIAE OF THE LEGISLATURE OF THE STATE
OF CALIFORNIA IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, NO. 3:18-CV-01865-RS

above that amount because "in only the last three months, the politics, funding, and federal approach has changed in significant ways." *Id.*, Ex. A at 45. The agenda materials described various challenges to an accurate 2020 Census, including the decision to add the citizenship question. *Id.* at 41-42. In justifying the need for more funding, Committee staff cautioned that the Census now appeared designed to harm Californians "by instilling fear in our residents" and "deliberately undercounting our true population." *Id.* at 45.

At the April 24 hearing, Assembly Member David Chiu amplified the call for more funding to mitigate the effect of the citizenship question:

> . . . I think we all appreciate the importance of the census and I do think the first amount that was suggested in the January budget was a good step in the right direction, but we're in a different world right now. *None of us expected that that citizenship question would actually become part of this, and whether the right answer to what we spend on the budget is double what we have, or five times what we have, I think we need to be thinking in terms of an order of magnitude* because if we get this wrong, I think we all know the consequences of what that's going to mean for us for a decade if not more. So I will certainly be open to supporting a much significant augmentation in this and certainly to the budget staff and leadership as we think about it, I very much hope that we put a much bigger number with a real portion of that going to outreach.

> Declaration of Michael Narciso ("Narciso Decl."), ¶ 3 (emphasis added).

The Assembly Budget Committee responded. On May 24, 2018, the Committee voted to increase funding for Census outreach by $113 million for a total of $153.3 million. RJN, Ex. M at 29-30 & Narciso Decl., ¶ 17.

In the meantime, on the Senate side, the Senate Budget and Fiscal Review Committee raised similar concerns about the citizenship question and the need for more funding. RJN, Ex. C at 23; Ex. H at 24. On May 22, 2018, the Committee voted to augment the $40.3 million proposed by the Governor with an additional $95 million, for total census outreach funding of $135.3 million. RJN, Ex. H at 24 & Narciso Decl., ¶ 11.

On June 8, 2018, the two Budget Committees met in conference and agreed to add $50 million to the Governor's proposal for a total appropriation of $90.3 million, along with legislative

language requiring reporting on the progress of the outreach plan.[3]  When the State enacted its final 2018-19 State Budget on June 27, 2018, it included $90.3 million for the State Census, a $50 million increase over the amount originally proposed by the Governor before the Bureau announced its decision to add the citizenship question.  RJN, Ex. J at 26.

## ARGUMENT

To have Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Standing can be based on a threat of future injury "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341, (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, & n.5 (2013)) (internal quotation marks omitted).

Defendants are wrong that plaintiffs cannot establish standing.  California has and will suffer three categories of harm that readily satisfy these requirements.

## I.

## CALIFORNIA WILL SPEND MILLIONS ON OUTREACH BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION

**A.     The Addition of the Citizenship Question Has Already Harmed California**

Before the Census Bureau announced its decision to include the citizenship question on the 2020 Census, California's proposed 2018-19 Budget included $40.3 million for census outreach efforts in the State.  RJN, Ex. F at 126.  After the Bureau announced its decision, and after the Assembly and Senate budget committees studied the effect of the question on the undercount in the State, the Legislature and Governor agreed to provide an additional $50 million, as well as requiring

---

[3] RJN, Ex. I at 173.

the California Complete Count Committee to report its "needs assessment" to the Legislature, in case additional funding would be necessary in future fiscal years. *Id.*, Ex. J at 26; Sen. Bill 866 (2017-2018 Reg. Sess.), § 45.

In this way, California has already been injured in a concrete and particularized manner sufficient to confer standing on the State:  it has felt compelled to divert $50 million in state revenues from other priorities to additional census outreach efforts over a three-year period in an effort to avoid future representational and economic injuries of a far greater magnitude.  If not for the Census Bureau's announcement that it will include the citizenship question on the 2020 Census, the State could have spent those funds in 2018-19 on initiatives that would have moved the State forward, like health care programs, investments in higher education, or the construction of new housing. Alternatively, the State could have directed some or all of those funds to additional outreach efforts to reduce the State's historic undercount, rather than having to fight to prevent the citizenship question from making that undercount far worse than it otherwise would have been.  This kind of economic injury fully qualifies as an "injury in fact."  *See, e.g., Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1172 (9th Cir. 2002) (the loss of money "easily meet[s]" the standing test); *see also City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015) (loss of "substantial portion" of expected $1.4 million in tax revenues for City of Oakland was sufficient to confer standing); *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 980 (9th Cir. 2013) (economic costs of complying with challenged regulation sufficient to confer standing).

Thus, even if plaintiffs could not establish that the State will in the future lose a congressional seat or federal funding as a result of the citizenship question (plaintiffs can and have), the decision to add the citizenship question has already irrevocably harmed California.  Millions of dollars that could have been spent on affirmatively improving the lives of Californians have been diverted to efforts to prevent California from losing even more ground in the next Census than it has in the past.

**B.     California's Harm Is Traceable To The Bureau's Decision To Include the Citizenship Question**

An injury is fairly traceable so long as the "government's unlawful conduct is at least a substantial factor motivating the third parties' actions." *Mendina v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).  Here, the legislative history of the census outreach budget item establishes that the Legislature provided $50 million in additional funding for outreach expressly because the Census Bureau added the new citizenship question.

**C.     The Remedy Plaintiffs Seek Would Redress California's Harm**

A plaintiff satisfies the redressability requirement where "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180-81.  Redressability is satisfied here, where the ruling plaintiffs seek would save California from having to spend millions just to combat the harm that would have been caused by the inclusion of the citizenship question on the 2020 Census.

A court ruling blocking the citizenship question would enable the State to use those funds to improve the lives of Californians.  Instead of dedicating precious revenues to minimizing the extent to which the State would fall even further behind in its undercount due to the new citizenship question, the State could use its funds to improve the Census response rate among populations that have contributed to California's historic undercount problem, such as its large populations of low-income individuals, minorities, and renters.  *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012) (redressability prong satisfied if remedy would reduce injury).

If California is able to use this funding to try to mitigate its historic undercount, it is likely that the State will succeed in reducing that undercount.  Defendants' own expert testifies that outreach efforts are generally effective in increasing census response rates.  Dr. Abowd declares that the Census Bureau's nonresponse follow up operations ("NRFU") have been successful in previous censuses. Dkt. No. 89-1, ¶ 24.

The evidence reveals that California's past outreach efforts have also been successful in mitigating the State's undercount.  As explained above, when the State committed $24.7 million to outreach efforts for the 2000 Census, it was able to increase the mail participation rate among its

8

residents to 76%.  RJN, Ex. C at 23.  By contrast, when the State and its private sector allies were only able to spend $12 million for outreach efforts for the 2010 Census, the mail participation rate among California residents declined to 73%.  *Id*.

The decrease in response rates between the 2000 and 2010 enumerations took place without a citizenship question on the census instrument.  Plaintiffs' experts and census officials themselves are of the opinion that the citizenship question alone will reduce response rates.  Given the size of California's immigrant population, it is more than reasonable for the State to conclude that it must concentrate more effort on that population in order to counteract the effect of the question on response rates.  That means, therefore, that there will be less money available to conduct outreach with the State's other hard-to-count populations, such as those who are homeless, low-income individuals, and those who live in crowded households.

Conversely, without the citizenship question, the State will be able to use its resources to address its historic undercount rate, and California will likely achieve higher participation rates than it has in the last two censuses.  This will redress the injury it now faces from having to spend millions of dollars just to defend rather than improve its position.

## II.

## CALIFORNIANS WILL SUFFER REPRESENTATIONAL HARMS BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION

As is true in every other state, every California resident, regardless of citizenship or ability to vote, is entitled to, and is counted for, representation in the state Legislature and in Congress. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1123 (2016); CAL. CONST. art. XXI, §§ 1, 2(d)(1).  Since at least 1879, the population count on which legislative and Congressional districts are based has been the federal census.  *Legislature v. Deukmejian*, 34 Cal. 3d 658, 668 (1983).[4]  Indeed, in *Legislature v. Deukmejian*, the California Supreme Court reaffirmed existing case law that legislative and

---

[4] The California Supreme Court quoted article IV, section 6 of the State Constitution:  "'[the] census taken under the direction of the Congress of the United States . . . shall be the basis of fixing and adjusting the legislative districts . . .'"  *Id.*

Congressional redistricting may *only* occur once a decade, after the federal decennial census. *Id.* at 680.[5] Thus, for the people of California, equality of representation turns on the validity of the federal census.

## A.    Representation in California Is Based on Total Population

Long before the United States Supreme Court addressed whether districting should be based on total population or the number of those eligible to vote in *Evenwel v. Abbott*, the California Supreme Court held that representation in California's legislative bodies must be based on total population, not registered voters.  The case was *Calderon v. Los Angeles*, 4 Cal. 3d 251 (1971), in which the court held that the federal equal protection clause prohibited the City of Los Angeles from drawing its City Councils districts based on registered voters.  In doing so, the court said:

> Adherence to a population standard, rather than one based on registered voters, is more likely to guarantee that those who cannot or do not cast a ballot may still have some voice in government.

> Thus a 17-year-old, who by state law is prohibited from voting, may still have strong views on the Vietnam War which he wishes to communicate to the elected representative from his area.

*Id.* at 258-59.

The court went on to note that "much of a legislator's time is devoted to providing services and information to his constituents" and that a district with a large population but few registered voters "would, under a voter-based apportionment, have fewer representatives to provide such assistance and to listen to concerned citizens."  *Id.*

In *Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), the Ninth Circuit reached much the same conclusion, noting that supervisorial districts drawn using registered voters rather than total population "result[ ] in serious population inequalities across districts" and that "[r]esidents of the more populous districts thus have less access to their elected representative."  *Id.* at 774.  Such districts, the Ninth Circuit concluded, would "constitute a denial of equal protection to these Hispanic plaintiffs and rejection of a valued heritage."  *Id.* at 776.

---

[5] The court cited cases from other states in which courts had held the same thing.  *Id.* at 669-70.

Californians who live in areas where there is a large undercount experience the same kind of harm to their representational rights as did those in *Calderon* and *Garza*, where districts were drawn on the basis of registered voters.  As noted earlier, the undercount in California is already greater than in most other states, because of California's greater share of hard-to-count populations.  In a district with significantly more people than are recorded on the census, a constituent's voice will have less impact than in a district that more nearly reflects the actual number of inhabitants.  Thus, the constituent who wants to communicate with his or her legislator or to organize fellow constituents to do so must work harder in order to be heard.  *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969) (representation based on equal numbers of people is designed to prevent both "debasement of voter power *and* diminution of access to elected representatives") (emphasis added).  As the *Garza* court observed, "[i]nterference with individuals' free access to elected representatives impermissibly burdens their right to petition the government."  918 F.2d at 775.  The court went on:

> Non-citizens are entitled to various federal and local benefits, such as emergency medical care and pregnancy-related care provided by Los Angeles County.  As such, they have a right to petition their government for services and to influence how their tax dollars are spent.

*Id.*

It is a sad fact today that even non-citizens who are here legally are not only afraid to petition their government but to participate in the census itself for fear of reprisal against them and their families.  Defendants' own research confirms this.  In a 2017 study, the Bureau reported "an unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants," leading the Bureau to conclude that these concerns "may present a barrier to participation in the 2020 Census."  The study noted that respondents "express[ed] new concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members by reporting their demographic characteristics, the dissolution of the 'DACA' (Deferred Action for Childhood Arrival) program, repeated references to Immigration and Customs Enforcement (ICE), etc."[6]

---

[6] *Memorandum from Center for Survey Measurement on Respondent Confidentiality Concerns to*

(continued . . .)

The harm caused by the addition of a citizenship question to the federal census is not speculative; it is real.  The Bureau has already documented "an unprecedented ground swell in confidentiality and data sharing concerns." *Id.*  That ground swell will be magnified exponentially if defendants are allowed to include a citizenship question on the 2020 census.

**B.      Substantial Evidence Demonstrates That California Will Lose Representation in Congress Due to Defendants' Actions**

Plaintiffs' experts have submitted substantial – and compelling – evidence that California would lose seats in Congress if a citizenship question appears on the 2020 census.  Dkt. No. 91-8 at 26-28 (describing scenarios based on citizenship question and degree of follow up; "in only a very small number of scenarios (1.3%) California is apportioned the same number of seats in 2020 that it received in 2010.").  Indeed, Dr. Fraga states that the probability of losing three or more of California's current 53 seats "is far higher (13.2%) and, again, for every potential apportionment outcome the percent of simulations where California receives fewer seats than it currently has is greater in Scenario A than for the 2020 baseline." *Id.*

The potential loss of seats will cause real harm to the State.  One need only look at the impact of the wildfires that have devastated parts of California over the last two years to understand the importance of congressional representation.  In times of natural disaster, the Governor and the Legislature need to be able to count on a strong voice in Washington to help obtain federal funding and aid for disaster victims.  To the degree that California's congressional delegation is reduced, the State's voice is not as strong and its representation is weakened in relation to the other states.

---

(. . . continued)
*Associate Directorate for Research and Methodology*, U.S. CENSUS BUREAU (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf (last visited August 6, 2018).  *See also Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census*, U.S. CENSUS BUREAU (May 2018), https://www.census.gov/content/dam/Census/newsroom/press-kits/2018/aapor/aapor-presentation-confidentiality.pdf.

1

2

3

## III.

## CALIFORNIANS WILL LOSE FEDERAL FUNDING BECAUSE OF DEFENDANTS' DECISION TO INCLUDE A CITIZENSHIP QUESTION

4

5

6

7

8

9

10

11

12

13

The amount of money the federal government returns to a particular state turns in significant part on how many people the U.S. Census Bureau counts as living in that state.  Indeed, the Census Bureau recently determined that 132 federal programs used Census Bureau data to distribute more than $675 billion in funds to states during fiscal year 2015.  RJN, Ex. K at 3.  These programs include everything from critical health care services like Medicaid, to food assistance like the National School Lunch Program, education programs like Title I and Head Start, housing assistance like Section 8 Vouchers, and transportation funding like the Highway Planning and Construction program. *Id.* at 3-7.  The importance of California's share of these funds cannot be overstated.  According to one study, sixteen of these programs delivered more than $76 billion to California in a single year (2015). *Id.*, Ex. L.

14

15

16

17

18

19

20

21

22

23

24

As plaintiffs' evidence establishes, an undercount of any size would lead to a decline of federal revenue flowing to California during the decade that follows.  Dkt. No. 91-7, 26-29. Defendants quibble with the magnitude of that decline, but they do not deny that a decline would occur.  Far from it, defendants argue that if there is an undercount, it would be reduced by NRFU efforts that defendants assume will "have the same success rate as it had in the 2010 Census:  98.58 percent."  *See* Dkt. No. 89-2, ¶¶ 54, 68-69.  Under this optimistic scenario, Dr. Gurrea predicts that "the distribution of federal funds to the State of California is estimated to decline by 0.01 percent' for Title I LEA Grants, WIC Supplemental Foods Grants, and Social Services Block Grants."  Dkt. No. 89 at 14 (quoting Dkt. No. 89-2, ¶ 11).  Defendants insist that this amount – 0.01 percent – is "negligible" and not "material," thereby precluding plaintiffs from establishing an injury sufficient to confer standing.  Dkt. No. 89 at 13-14.

25

26

27

28

The problem for defendants with this line of argument is three-fold.  As a matter of law, there is no requirement that an injury in fact be of a particular magnitude.  The United States Supreme Court has flatly rejected the notion that an injury must be "substantial" to clear the standing hurdle.  To the contrary, an "identifiable trifle" of economic harm may be enough. *United States v. Students*

13

*Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) (citing cases where a $5 fine plus costs or a $1.50 poll tax were sufficient to establish standing); *see also Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (rejecting argument that plaintiff did not have standing because her injury was only "minor"; plaintiff had standing when the injury is "concrete" and "actual"); *Boating Indus. Ass'ns v. Marshall*, 601 F.2d 1376, 1380 (9th Cir. 1979) (declaring that a person may have standing when it has "a direct stake in the actual outcome of the particular litigation, *however small* . . . .") (emphasis added).

Moreover, as a factual matter, California would suffer substantial harm even if the loss of federal funds did not exceed 0.01 percent for Title I LEA Grants, WIC Supplemental Foods Grants, and Social Services Block Grants.  Although such a small percentage may suggest otherwise, the dollars at stake are substantial.  Dr. Gurrea estimates that in a single year California could lose $215,226 in Title 1 funding, $90,263 in WIC grants, and $23,709 in Social Service Block Grant funds.  Dkt. No. 89-2, ¶ 70, & 28-30.  Considered together and multiplied by ten to account for the decade that such an undercount would remain in place, California stands to lose $3,292,980 from the three federal programs analyzed by Drs. Reamer and Gurrea, even under defendants' optimistic predictions about how effective the Bureau's NRFU operations will be in countering the effect of the citizenship question.

Finally, plaintiffs' predictions almost certainly fall far short of the mark.  As described in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, California is likely to face a far greater decline than 0.01 percent because the Bureau's NRFU efforts are unlikely to be as effective as defendants suggest.  Dkt. No. 91 at 9-11.  Taking into account the more realistic impact of the Bureau's NRFU, Dr. Reamer predicts that California would lose $2 million in Title 1 funding, $850,759 in WIC grants, and $223,450 in Social Service Block Grant funds in a single year.  Dkt. No. 91-7 at 26-28.  Over the course of a decade, California can be expected to lose over *$31 million* from these three federal programs alone.

Yet these numbers are only the beginning of the story because they predict outcomes in just three of the federal programs that rely on census data.  As noted above, the Census Bureau has

14

identified 129 additional federal programs that use Census data to distribute billions in federal funding to the states.  RJN, Ex. K at 3-7.  With so much funding at stake, even an exceptionally small undercount could deprive California of many millions – or even billions – of dollars.

In short, defendants effectively concede that California stands to lose at least millions of dollars in federal funding if the 2020 Census includes a citizenship question.  That is sufficient to establish standing.  *See*, *e.g.*, *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) ("[C]itizens who challenge a census undercount on the basis, inter alia, that improper enumeration will result in loss of funds to their city have established both an injury fairly traceable to the Census Bureau and a substantial probability that court intervention will remedy the plaintiffs' injury.").

## **CONCLUSION**

With its large immigrant population, California stands to lose more than any other state in the nation if a citizenship question appears on the 2020 census questionnaire.  The California Legislature's role and responsibilities in state government mean that it will suffer representationally, fiscally, and in its access to federal representation as a result of defendants' actions.  That alone establishes that the State has standing to bring this case.

Dated:  November 20, 2018

Respectfully Submitted,

Robin B. Johansen
Thomas A. Willis
Margaret R. Prinzing
REMCHO, JOHANSEN & PURCELL, LLP


By:  /S/ Robin B. Johansen

Attorneys for Proposed Amicus Curiae
the Legislature of the State of California

(00363399-13)

1    ROBIN B. JOHANSEN, State Bar No. 79084
     THOMAS A. WILLIS, State Bar No. 160989
2    MARGARET R. PRINZING, State Bar No. 209482
     REMCHO, JOHANSEN & PURCELL, LLP
3    1901 Harrison Street, Suite 1550
     Oakland, CA  94612
4    Phone:  (510) 346-6200
     Fax:  (510) 574-7061
5    Email:  rj@rjp.com

6    Attorneys for Proposed Amicus Curiae
     the Legislature for the State of California

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11   STATE OF CALIFORNIA, et al.,          No.:  3:18-CV-01865-RS

12            Plaintiffs,                  Action Filed:  March 26, 2018

13   vs.                                   **REQUEST FOR JUDICIAL NOTICE
                                           IN SUPPORT OF [PROPOSED] BRIEF
14   WILBUR L. ROSS, JR.,                  AMICUS CURIAE OF THE LEGISLATURE
                                           OF THE STATE OF CALIFORNIA;
15            Defendants.                  DECLARATION OF MICHAEL NARCISO**

16                                         Summary Judgment Motion Hearing:

17                                         Date:       December 7, 2018
                                           Time:       10:00 a.m.
18                                         Dept.:      3

19                                              (The Honorable Richard Seeborg)

20                                         Trial Date:  January 7, 2019

21

22

23

24

25

26

27

28

## REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, proposed amicus curiae the Legislature of the State of California requests that the Court take judicial notice of the following documents in connection with its proposed amicus curiae brief in support of plaintiffs' opposition to defendants' motion for summary judgment:

1.     Excerpts of the April 24, 2018 Agenda of the Assembly Budget Subcommittee No. 4 State Administration, attached as **Exhibit A** to the Declaration of Michael Narciso.

2.     California Legislative Analyst's Office Report:  California and the 2000 Census, attached as **Exhibit B** to the Declaration of Michael Narciso.

3.     Excerpts of the March 15, 2018 Agenda of the Senate Budget and Fiscal Review Subcommittee No. 4, attached as **Exhibit C** to the Declaration of Michael Narciso.

4.     Census 2020 California Complete Count Committee and the California Government Operations Agency Initial Report to the Office of Governor Edmund G. Brown Jr.: Counting All Californians in the 2020 Census, attached as **Exhibit D** to the Declaration of Michael Narciso.

5.      PricewaterhouseCoopers Final Report to Congress:  Effect of Census 2000 Undercount on Federal Funding to States and Selected Counties, 2002-2012, attached as **Exhibit E** to the Declaration of Michael Narciso.

6.     Excerpts of the Governor's Budget Summary, 2018-19:  Statewide Issues and Various Departments, attached as **Exhibit F** to the Declaration of Michael Narciso.

7.     December 12, 2017 U.S. Department of Justice Letter to Dr. Ron Jarmin: Request To Reinstate Citizenship Question On 2020 Census Questionnaire and March 26, 2018 Letter from Secretary Wilbur Ross to Karen Dunn Kelley:  Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire, attached as **Exhibit G** to the Declaration of Michael Narciso.

8.     Excerpts of the May 22, 2018 Agenda of the California State Senate Committee on Budget and Fiscal Review, attached as **Exhibit H** to the Declaration of Michael Narciso.

1

2
     9.     Excerpts of the 2018-19 Legislative Budget Conference Committee Close Out

3
Agenda, attached as **Exhibit I** to the Declaration of Michael Narciso.

4
     10.     Excerpts of Senate Bill No. 840 (Cal. Leg. 2017-2018 Reg. Sess.), attached as

5
**Exhibit J** to the Declaration of Michael Narciso.

6
     11.     U.S. Census Bureau Report:  Uses of Census Bureau Data in Federal Funds

7
Distribution – A New Design for the 21st Century, attached as **Exhibit K** to the Declaration of

8
Michael Narciso.

9
     12.     The George Washington Institute of Public Policy Report:  Counting for Dollars

10
2020 – 16 Large Federal Assistance Programs that Distribute Funds on Basis of Decennial Census-

11
derived Statistics (Fiscal Year 2015), attached as **Exhibit L** to the Declaration of Michael Narciso.

12
     13.     Excerpts of the May 24, 2018 Agenda of the Assembly Budget Subcommittee

13
No. 4 State Administration, attached as **Exhibit M** to the Declaration of Michael Narciso.

14
     Courts in the Ninth Circuit routinely grant requests for judicial notice by an amicus

15
curiae.  *See*, *e.g.*, *Winfrey v. McDaniel*, 487 F. App'x 331, 332 n.3 (9th Cir. 2012) (granting amicus

16
curiae's request for judicial notice of court records); *Woodfin Suite Hotels, LLC v. City of Emeryville*,

17
No. C 06-1254 SBA, 2007 U.S. Dist. LEXIS 4467, at *8-9 (N.D. Cal. Jan. 8, 2007) (granting amicus

18
curiae's request for judicial notice of information from the California Employment Development

19
Department's website, data from the United States Department of Labor's Bureau of Labor Statistics,

20
showing wages in the hotel industry compared to other industries, and two articles about hotel

21
industry revenues); *Natural Resources Defense Council v. Patterson*, 333 F. Supp. 2d 906, 922 n.10

22
(E.D. Cal. 2004) (granting amicus curiae's request for judicial notice of a California agency's

23
decision); *Murphy v. Bilbray*, 782 F. Supp. 1420, 1433 n.34 (S.D. Cal. 1991) (granting amicus curiae's

24
request for judicial notice of a letter to the editor from a local newspaper).

25
     Exhibits A, C, F, H, I, J, and M are official acts of the California State Legislature that

26
can be accurately and readily determined from sources whose accuracy cannot reasonably be

27
questioned and the proper subject of judicial notice.  *See* Fed. R. Evid. 201(b)(2); *see also Anderson v.*

28
*Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial

notice.") (citation omitted); *Daghlian v. DeVry Univ., Inc.*, 574 F.3d 1212, 1213 n.1 (9th Cir. 2009) (taking judicial notice of legislative history of a Senate bill).  Exhibits A, C, F, H, I, J, and M are relevant to show the legislative history for the 2020 Census outreach for the State of California and how funds have been allocated in the State budget for this outreach.

Exhibits B, D, E, K, and L are administrative reports that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned and the proper subject of judicial notice.  *See* Fed. R. Evid. 201(b)(2); *see also Daghlian v. DeVry Univ., Inc.*, 461 F. Supp. 2d 1121, 1146-47 (C.D. Cal. 2006) (taking judicial notice of records and reports of administrative bodies that are not subject to reasonable dispute).  Exhibits B and E are relevant to show that undercounts in California have resulted in billions of dollars in lost federal funding, and that despite the State launching extensive outreach efforts to encourage full participation by every Californian in the 2000 Census, the State still suffered the largest undercount of any state in the union.  Exhibit D is relevant to show that in anticipation of the 2020 census, in 2017 California had already dedicated $10 million for early preparation and planning activities.  Exhibit K is relevant to show that 132 federal programs used Census Bureau data to distribute more than $675 billion in funds to states during fiscal year 2015, while Exhibit L is relevant to show that sixteen of these programs delivered more than $76 billion to California in a single year (2015).

Exhibit G is comprised of federal government documents that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned and the proper subject of judicial notice.  *See* Fed. R. Evid. 201(b)(2); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 989-99 (9th Cir. 2010) (taking judicial notice of publicly available government documents, citing cases).  Exhibit G is relevant to show that while the Department of Justice submitted a public request that the Census Bureau include a citizenship question on the 2020 Census on December 12, 2017, the Census Bureau would not announce its decision to add the question until March 26, 2018.

Proposed amicus curiae respectfully requests that this Court take judicial notice of the above documents pursuant to Rule 201 of the Federal Rules of Evidence.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF [PROPOSED] BRIEF AMICUS CURIAE
OF THE LEGISLATURE OF THE STATE OF CALIFORNIA;
DECLARATION OF MICHAEL NARCISO, NO. 3:18-CV-01865-RS

Dated:  November 20, 2018

Respectfully Submitted,

Robin B. Johansen
Thomas A. Willis
Margaret R. Prinzing
REMCHO, JOHANSEN & PURCELL, LLP


By:  /S/ Robin B. Johansen

Attorneys for Proposed Amicus Curiae
the Legislature of the State of California

**<u>DECLARATION OF MICHAEL NARCISO</u>**

I, Michael Narciso, declare under penalty of perjury as follows:

1.      I am a paralegal at Remcho, Johansen & Purcell, LLP, attorneys for proposed amicus curiae the Legislature of the State of California in this case.  I submit this declaration in support of the Legislature's [Proposed] Brief Amicus Curiae in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

2.      Attached as **Exhibit A** is a true and correct copy of excerpts of the April 24, 2018 Agenda of the Assembly Budget Subcommittee No. 4 State Administration.  I obtained a copy of this agenda on November 15, 2018 from the California State Assembly Committee on Budget website at https://abgt.assembly.ca.gov/sites/abgt.assembly.ca.gov/files/Sub_4_April_24_2018%20%282%29.pdf.

3.      During the April 24, 2018 Assembly Budget Subcommittee No. 4 on State Administration meeting, Assembly Member David Chiu made the following statement regarding the 2020 Census outreach:

> I think maybe one thing I would say in addition to what the chair just
> said, I think we all appreciate the importance of the census and I do think
> the first amount that was suggested in the January budget was a good
> step in the right direction, but we're in a different world right now.  None
> of us expected that that citizenship question would actually become part
> of this, and whether the right answer to what we spend on the budget is
> double what we have, or five times what we have, I think we need to be
> thinking in terms of an order of magnitude because if we get this wrong,
> I think we all know the consequences of what that's going to mean for us
> for a decade if not more.  So I will certainly be open to supporting a
> much significant augmentation in this and certainly to the budget staff
> and leadership as we think about it, I very much hope that we put a much
> bigger number with a real portion of that going to outreach.
>
> *See Media on Demand:  Assembly Budget
> Subcommittee No. 4 on State Administration,
> Tuesday April 24, 2018*, CAL. STATE
> ASSEMBLY, https://www.assembly.ca.gov/
> media/assembly-budget-subcommittee-4-
> state-administration-20180424/video
> at 1:18:05.

4.      Attached as **Exhibit B** is a true and correct copy of the California Legislative Analyst's Office Report:  California and the 2000 Census.  I obtained a copy of this report on

November 15, 2018 from the Legislative Analyst's Office website at https://lao.ca.gov/1999/
0799_census2000.pdf.

5.     Attached as **Exhibit C** is a true and correct copy of excerpts of the March 15,
2018 Agenda of the Senate Budget and Fiscal Review Subcommittee No. 4.  I obtained a copy of this
agenda on November 15, 2018 from the California State Senate Budget and Fiscal Review Committee
website at https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/SUB4/03152018Sub4PartAHousing
Agenda.pdf.

6.     Attached as **Exhibit D** is a true and correct copy of the Census 2020 California
Complete Count Committee and the California Government Operations Agency Initial Report to the
Office of Governor Edmund G. Brown Jr.:  Counting All Californians in the 2020 Census.  I obtained a
copy of this report on November 15, 2018 from the California Census 2020 website at https://census.
ca.gov/wp-content/uploads/sites/4/2018/10/CCCC_Initial_Report_to_the_Governor-
FINAL100218.pdf.

7.     Attached as **Exhibit E** is a true and correct copy of the PricewaterhouseCoopers
Final Report to Congress:  Effect of Census 2000 Undercount on Federal Funding to States and
Selected Counties, 2002-2012.  I obtained a copy of this report on November 15, 2018 from the
University of North Texas Digital Collection of the Government Documents Department website at
http://govinfo.library.unt.edu/cmb/cmbp/reports/final_report/fin_sec5_effect.pdf.

8.     Attached as **Exhibit F** is a true and correct copy of excerpts of the Governor's
Budget Summary, 2018-19:  Statewide Issues and Various Departments.  I obtained a copy of this
document on November 15, 2018 from the Department of Finance California Budget 2018-19 website
at http://www.ebudget.ca.gov/201819/pdf/BudgetSummary/StatewideIssuesandVarious
Departments.pdf.

9.     Attached as **Exhibit G** is a true and correct copy of the December 12, 2017 U.S.
Department of Justice Letter to Dr. Ron Jarmin:  Request To Reinstate Citizenship Question On
2020 Census Questionnaire and the March 26, 2018 Letter from Secretary Wilbur Ross to Karen Dunn
Kelley:  Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire.  I

obtained copies of these letters from the Declaration of Ana G. Guardado in Support of Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 99-1 in *City of San Jose v. Ross*, 18-CV-02279-RS).

10.     Attached as **Exhibit H** is a true and correct of excerpts of the May 22, 2018 Agenda of the California State Senate Committee on Budget and Fiscal Review.  I obtained a copy of this agenda on November 19, 2018 from the California State Senate Budget and Fiscal Review Committee website at https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/FullC/05222018SBFR HearingAgendaOverviewof2018BudgetPlan.pdf.

11.     On May 22, 2018 the Senate Committee on Budget and Fiscal Review discussed and voted to augment the $40.3 million proposed by the Governor to staff the California Complete Count effort to complement the U.S. Census outreach with an additional $95 million, for a total census outreach funding of $135.3 million.  *See Media on Demand:  Senate Budget and Fiscal Review Committee, Tuesday, May 22, 2018*, CAL. STATE SENATE, https://www.senate.ca.gov/media/senate-budget-fiscal-review-committee-20180522/video at 46:46 to 1:15:00.

12.     Attached as **Exhibit I** is a true and correct copy of the 2018-19 Legislative Budget Conference Committee Close Out Agenda.  I obtained a copy of this agenda on November 15, 2018 from the California State Assembly Committee on Budget website at https://abgt.assembly.ca. gov/sites/abgt.assembly.ca.gov/files/June%208%20Final%20Close%20Out%20Agenda.pdf.

13.     Attached as **Exhibit J** is a true and correct copy of excerpts of Senate Bill No. 840 (Cal. Leg. 2017-2018 Reg. Sess.).  I obtained a copy of this bill on November 15, 2018 from the California Legislative Information website at http://leginfo.legislature.ca.gov/faces/ billPdf.xhtml?bill_id=201720180SB840&version=20170SB84095CHP.

14.     Attached as **Exhibit K** is a true and correct copy of the U.S. Census Bureau Report:  Uses of Census Bureau Data in Federal Funds Distribution – A New Design for the 21st Century.  I obtained a copy of this report on November 19, 2018 from the U.S. Census Bureau website at https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

15.     Attached as **Exhibit L** is a true and correct copy of The George Washington Institute of Public Policy Report:  Counting for Dollars 2020 – 16 Large Federal Assistance Programs that Distribute Funds on Basis of Decennial Census-derived Statistics (Fiscal Year 2015).  I obtained a copy of this report on November 19, 2018 from the George Washington Institute of Public Policy website at https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/California%2008-18-17.pdf.

16.     Attached as **Exhibit M** is a true and correct copy of excerpts of the May 24, 2018 Agenda of the Assembly Budget Subcommittee No. 4 on State Administration.  I obtained a copy of this agenda on November 19, 2018 from the California State Assembly Committee on Budget website at https://abgt.assembly.ca.gov/sites/abgt.assembly.ca.gov/files/Sub%204%20May%2024% 20%20%20May%20Revise.pdf.

17.     On May 24, 2018 the Assembly Budget Subcommittee No. 4 on State Administration voted to increase funding for Census outreach by $113 million. *See Media on Demand:  Assembly Budget Subcommittee No. 4 on State Administration, Thursday, May 24, 2018*, CAL. STATE ASSEMBLY, https://www.assembly.ca.gov/media/assembly-budget-subcommittee-4-state-administration-20180524/video at 33:32.

I declare under penalty of perjury that the foregoing is true and correct.  I have firsthand knowledge of the same, except as to those matters described on information and belief, and if called upon to do so, I could and would testify competently thereto.  Executed this 20th day of November, 2018, in Oakland, California.

Michael Narciso

(00364966-4)

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF [PROPOSED] BRIEF AMICUS CURIAE
OF THE LEGISLATURE OF THE STATE OF CALIFORNIA;
DECLARATION OF MICHAEL NARCISO, NO. 3:18-CV-01865-RS

# EXHIBIT A

# AGENDA

## ASSEMBLY BUDGET SUBCOMMITTEE NO. 4 STATE ADMINISTRATION

### ASSEMBLYMEMBER JIM COOPER, CHAIR

### TUESDAY, APRIL 24, 2018
### 1:30 P.M. - STATE CAPITOL,  ROOM 447

## VOTE-ONLY CALENDAR

| ITEM | DESCRIPTION | PAGE |
|---|---|---|
| **0845** | **DEPARTMENT  OF INSURANCE** | **3** |
| VOTE-ONLY ISSUE 1 | MENU MODERNIZATION IT PROJECT | 3 |
| VOTE-ONLY ISSUE 2 | ENHANCED FRAUD INVESTIGATION AND PREVENTION | 3 |
| VOTE-ONLY ISSUE 3 | FRAUD ANALYTICS DATA | 4 |
| VOTE-ONLY ISSUE 4 | PRODUCER LICENSING ENFORCEMENT CASES | 4 |
| VOTE-ONLY ISSUE 5 | IMPLEMENTING RECENT LEGISLATION FOR SURPLUS LINE BROKER | 4 |
| VOTE-ONLY ISSUE 6 | WORKER'S COMPENSATION FRAUD PROGRAM | 5 |
| **0650** | **OFFICE OF PLANNING AND RESEARCH** | **5** |
| VOTE-ONLY  ISSUE 7 | SPRING FISCAL LETTER FOR AFFORDABLE HOUSING AND SUSTAINABLE COMMUNITIES LIQUIDATION PERIOD | 5 |
| VOTE-ONLY  ISSUE 8 | HOUSING PACKAGE IMPLEMENTATION | 6 |
| **8860** | **DEPARTMENT OF FINANCE** | **6** |
| VOTE-ONLY  ISSUE 9 | TRAILER BILL LANGUAGE:  POOLED MONEY INVESTMENT BOARD | 6 |
| VOTE-ONLY ISSUE 10 | TRAILER BILL LANGUAGE:  STATE ADMINISTRATIVE COSTS | 7 |
| **0984** | **CALIFORNIA SECURE CHOICE RETIREMENT SAVINGS INVESTMENT BOARD** | **7** |
| VOTE-ONLY ISSUE 11 | SECURE CHOICE PROGRAM IMPLEMENTATION | 7 |
| **0840** | **STATE CONTROLLER'S OFFICE** | **8** |
| VOTE-ONLY ISSUE 12 | PERSONNEL AND PAYROLL SERVICES WORKLOADS | 8 |
| VOTE-ONLY ISSUE 13 | PAYROLL AUDITS | 10 |
| VOTE-ONLY ISSUE 14 | LOCAL APPORTIONMENTS WORKLOAD INCREASE | 10 |
| VOTE-ONLY ISSUE 15 | ROAD MAINTENANCE AND REHABILITATION PROGRAM | 11 |
| **7100** | **EMPLOYMENT DEVELOPMENT DEPARTMENT** | **12** |
| VOTE-ONLY ISSUE 16 | BENEFITS SYSTEM MODERNIZATION | 12 |
| VOTE-ONLY ISSUE 17 | IMPLEMENTATION OF SB 396 AND AB 677 – EMPLOYMENT GENDER IDENTITY AND DATA COLLECTION | 13 |
| **7350** | **DEPARTMENT OF INDUSTRIAL RELATIONS** | **13** |
| VOTE-ONLY ISSUE 18 | APPRENTICESHIP PROGRAM FOR NONTRADITIONAL INDUSTRIES | 13 |

| | | |
|---|---|---|
| VOTE-ONLY ISSUE 19 | DLSE RECRUITMENT AND ADMINISTRATIVE SERVICES | 14 |
| VOTE-ONLY ISSUE 20 | SCHOOLS' OCCUPATIONAL INJURY AND ILLNESS PREVENTION PROGRAMS | 15 |
| VOTE-ONLY ISSUE 21 | LEGISLATION | 16 |
| **7120** | **CALIFORNIA WORKFORCE DEVELOPMENT BOARD** | **17** |
| VOTE-ONLY ISSUE 22 | CALIFORNIA GLOBAL WARMING SOLUTIONS ACT OF 2006 | 17 |
| **7760** | **DEPARTMENT OF GENERAL SERVICES** | **18** |
| VOTE-ONLY ISSUE 23 | LEGISLATION | 18 |
| VOTE-ONLY ISSUE 24 | MERCURY CLEANERS SITE MONITORING | 20 |
| VOTE-ONLY ISSUE 25 | MODIFICATION OF FUNDING STRUCTURE FOR CONTRACTED FISCAL SERVICES | 21 |
| **2100** | **DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL** | **22** |
| VOTE-ONLY ISSUE 26 | INFORMATION TECHNOLOGY STAFF AUGMENTATION | 22 |
| VOTE-ONLY ISSUE 27 | PHYSICAL AND INFORMATION SECURITY POLICY OPERATION | 23 |
| VOTE-ONLY ISSUE 28 | RESPONSIBLE BEVERAGE SERVICE TRAINING PROGRAM ACT (AB 1221) | 23 |
| VOTE-ONLY ISSUE 29 | SANTA ANA STATE BUILDING RELOCATION | 24 |
| **1701** | **DEPARTMENT OF BUSINESS OVERSIGHT** | **25** |
| VOTE-ONLY ISSUE 30 | INFORMATION TECHNOLOGY OFFICE – WORKLOAD GROWTH AND RISK MITIGATION | 25 |
| VOTE-ONLY ISSUE 31 | STUDENT LOAN SERVICING ACT IMPLEMENTATION | 26 |
| **7503** | **STATE PERSONNEL BOARD** | **27** |
| VOTE-ONLY ISSUE 32 | ADMINISTRATIVE SERVICES WORKLOAD | 27 |
| **1700** | **DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING** | **28** |
| VOTE-ONLY ISSUE 33 | SYSTEMIC LITIGATION UNIT | 28 |
| VOTE-ONLY ISSUE 34 | LEGISLATION (AB 1008 AND SB 63) | 29 |
| **9210** | **LOCAL GOVERNMENT FINANCING** | **30** |
| VOTE-ONLY ISSUE 35 | TRAILER BILL LANGUAGE: STATE SUPPLEMENTATION FOR COUNTY ASSESSORS PROGRAM | 30 |
| **3100** | **CALIFORNIA SCIENCE CENTER** | **31** |
| VOTE-ONLY ISSUE 36 | INCREASE CALIFORNIA AFRICAN AMERICAN MUSEUM TEMPORARY HELP | 31 |
| VOTE-ONLY ISSUE 37 | INCREASE CALIFORNIA SCIENCE CENTER REIMBURSEMENT AUTHORITY | 31 |
| VOTE-ONLY ISSUE 38 | INCREASE OFFICE OF EXPOSITION PARK MANAGEMENT AUTHORITY | 32 |
| **7730** | **FRANCHISE TAX BOARD** | **33** |
| VOTE-ONLY ISSUE 39 | AUDIT STAFFING INCREASE | 33 |
| VOTE-ONLY ISSUE 40 | ENTERPRISE DATA TO REVENUE PROJECT | 34 |
| VOTE-ONLY ISSUE 41 | INFORMATION TECHNOLOGY SECURITY ENHANCEMENTS | 35 |
| **7600** | **CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION** | **36** |
| VOTE-ONLY ISSUE 42 | CENTRALIZED REVENUE OPPORTUNITY SYSTEM | 36 |

## ITEMS TO BE HEARD

| ITEM | DESCRIPTION | PAGE |
|------|-------------|------|
| **0511** | **GOVERNMENT OPERATIONS AGENCY** | **39** |
| ISSUE 1 | CIVIL SERVICE TRAILER BILL LANGUAGE | 39 |
| **0650** | **OFFICE OF PLANNING AND RESEARCH** | **40** |
| ISSUE 2 | 2020 CENSUS OUTREACH | 40 |
| ISSUE 3 | 2020 CENSUS OUTREACH LANGUAGE ACCESS | 46 |
| ISSUE 4 | PRECISION MEDICINE | 47 |
| **8880** | **FI$CAL** | **48** |
| **0840** | **STATE CONTROLLER'S OFFICE** | |
| ISSUE 5 | FI$CAL | 48 |
| **7502** | **DEPARTMENT OF TECHNOLOGY** | **53** |
| ISSUE 6 | DEPARTMENT OVERVIEW AND BUDGET PROPOSALS | 53 |
| **7501** | **DEPARTMENT OF HUMAN RESOURCES** | **56** |
| ISSUE 7 | STATEWIDE HUMAN RESOURCES WORKLOAD | 56 |

## 0650 OFFICE OF PLANNING AND RESEARCH

---

| ISSUE 2: 2020 CENSUS OUTREACH |
|---|

The Governor's budget includes a three-year $40.3 million plan to ensure a complete count of Californians in the 2020 Census.

| BACKGROUND |
|---|

The Governor's budget includes a census outreach proposal for the next three years. The proposed $40.3 million plan includes 22 limited term positions, $17.5 million for a media campaign and $12.5 million of outreach efforts conducted by nonprofit entities. The total budget is displayed below.

| Workload Measure | BY | BY+1 | BY+2 | Total |
|---|---|---|---|---|
| Administration – Personnel | $1,407,308 | $1,957,950 | $840,482 | $4,205,740 |
| Media Campaign (multi-lingual) | 6,000,000 | 10,000,000 | 1,500,000 | 17,500,000 |
| Admin CBOs & CBO outreach (QACs) | 5,000,000 | 7,000,000 | 500,000 | 12,500,000 |
| State Agency Outreach (SAWG) | 150,000 | 150,000 | - | 300,000 |
| Schools | 500,000 | 500,000 | | 1,000,000 |
| Case Worker Training/outreach | 250,000 | 250,000 | - | 500,000 |
| Local Complete Count Committees | 1,000,000 | 2,000,000 | - | 3,000,000 |
| Travel/Administration (travel, equipment, office rent, printing, procurement review) | 220,000 | 315,000 | 65,000 | 600,000 |
| Sector Outreach | 275,000 | 275,000 | 150,000 | 700,000 |
| Total | $14,802,308 | $22,447,950 | $3,055,482 | $40,305,740 |

The 2020 Census plan builds off the State's experience in 2000 and 2010.  The State has lead efforts both years, with the dot-com height year 2000 effort much better resourced than the depths of the Great Recession effort of 2010.  The chart below, contained in the Budget Change Proposal, shows the outcomes of the last three censuses in California.

| Census Year | 1990 | 2000 | 2010 |
|---|---|---|---|
| CA Mail Response Rate | 65% | 70% | N/A* |
| CA Mail Participation Rate | N/A* | 76% | 73% |
| Versus Previous Census | N/A | +5% (MRR) | -3% (MPR) |
| State Budget | N/A** | $24.7M | $2.1M |
| National MPR | N/A | 72% | 74% |

*There is no MPR figure for 1990 Census and no MRR for 2010.
** There was no official state Census outreach effort in 1990.

On March 23, 2018, President Trump signed the 2018 fiscal plan, which included $2.814 billion for the Census Bureau, a sharp increase from the 2017 level of funding.

**Changes to federal 2020 Census activities.**

The 2010 Census cost over $12 billion over the life cycle of the enumeration (which includes the preparation for and aftermath of the count). The Census Bureau estimated that completing the 2020 Census in a similar manner as 2010 would cost over $17 billion. To keep costs closer to the costs of the 2010 Census, the Census Bureau is making a number of significant changes to count operations, including:

- **Internet Response.** Historically, individuals primarily responded to the census via a mailed questionnaire. In 2020, only a portion of households will receive a mailed census. Most individuals will be encouraged to respond online. The Census Bureau aims to have over 50 percent of respondents respond via the internet. (Individuals also will have the option of responding by phone through the Census Questionnaire Assistance Center.)

- **Address List Update.** Typically, the Census Bureau relied heavily on field workers to update its national address list. (The national address list is used to mail census forms and follow up with non-respondents.) For the 2020 Census, the Census Bureau will rely primarily on local government data, satellite imagery, and other administrative records to update its address list.

- **Reduced Follow Up.** The Census Bureau expects to hire 50 percent fewer fieldworkers for nonresponse follow up in 2020. Consequently, field operations will be substantially reduced in 2020. In previous years, census field workers visited households that had not yet responded up to six times to complete their surveys. For 2020, the Census Bureau is committing to visiting nonrespondents at least once. Given the reduced field presence, the Census Bureau will rely heavily on administrative records—like those from the Internal Revenue Service—to complete the count.

- **Citizenship Question**. The federal government has decided to include a citizenship question in the census, which is projected to reduce the rate of response.

**Challenges with Census Administration.** Funding for the 2020 Census has been below estimated costs for a number of years. For the current year, the latest federal budget agreement provided $180 million less than was requested by the Census Bureau. These reductions have had a number of impacts to census preparations, including notable impacts to field testing:

- 2017 Field Test Canceled. The Census Bureau planned to test a number of features of the online response system in 2017, but canceled these tests due to budgetary uncertainty.

- Significantly Reduced Census "Dress Rehearsal." Typically, the Census Bureau does a comprehensive test of census operations—known as an end-to-end test—in three areas of the county. The different locations chosen reflect the differing response challenges throughout the country. This year, this rehearsal will only occur in Providence, Rhode Island.

Recent federal action has been encouraging.  The federal spending bill that was recently approved allocates $2.8 billion for Census activities, nearly twice the amount funding the previous fiscal year and $1.13 billion more than initial requested in the President's budget.

**Government Accountability Office Raises Concerns.**

In a February 2017 report, the GAO identified the Census as a "High-Risk" area of the federal government, which was vulnerable to waste, fraud, abuse and mismanagement or need transformative change.  The report cited the lack of resources, delays and missteps in the preparation phase of the census, and concerns about the Bureau's IT projects.

| LAO POTENTIAL CHALLENGES |
| --- |

The LAO has identified some key challenges for California in the upcoming census

- California Has a Large "Hard to Count" Population. Historically, the census has undercounted particular groups of people including young children, the elderly, low-income individuals, minorities, renters, foreign-born individuals, and individuals living in crowded households. As a majority-minority state, most residents of California fit into at least one of these categories. In addition to over half of residents being nonwhite, over a quarter of residents are foreign born, close to half live in rental housing, and 14 percent have incomes at or below the poverty line.

- California Was "Undercounted" in 1990 Census. California was undercounted by 2.7 percent in the 1990 Census—the fourth highest undercount percentage in the country. This cost California roughly $2 billion in federal funds over ten years. The undercount also likely cost California a seat in the House of Representatives. (See our 1999 report for more on the 1990 undercount in California.)

- Changes to 2020 Census May Affect California Count. Moving to a primarily internet-based census is a significant change from prior practice. Only a portion of households will receive a paper census; the rest will receive instructions by mail for how to respond online (or by phone). Concerns have been raised about individuals' willingness to respond via the internet given concerns about information security. These concerns—in combination with the potential for a question about citizenship—raise the possibility of an undercount in California in 2020. (By law, information collected in the census about immigration status cannot be passed on to immigration enforcement agencies.)

### ADVOCATED CONCERNS

Advocates have sent letters to the Committee that suggest that additional resources are necessary for a complete count.  Specifically:

- Nonprofit Contracts:   Advocates believe that $12.5 million funding level for nonprofit contracts is far less than what is required to achieve the outreach goals of the State plan.  Several different groups have contacted with the committee with different estimates of the funding gap.

- Local Complete Count Committees:  Los Angeles County has requested the State provide $8.7 million for county complete count efforts.  Los Angeles is considered the "hardest to count" county in California.    This amount would exceed the $3 million proposed for all local complete count efforts.

- Media Funding:  Some advocates have raised concerns that the media budget proposed in the State Plan would not be sufficient to penetrate in California's large and expensive media markets, especially in non-English media.  Advocates compare the proposed $17.5 million media budget over three years with the $111 million annual media budget for Covered California and express concerns that the investment may not be sufficient to make a difference.

- Additional State staff:  Advocates have expressed concern that the State's efforts are not ramping up fast enough and suggest the state needs to hire experience staff with grassroots organizing experience to create the regional strategies needed by 2020.  In addition, there is concern regarding the speed to which the Office can begin contracting with nonprofits given its small core staff.

POSSIBLE QUESTIONS

Staff has concerns about the two conflicting timelines included in the Supplemental Reporting Language and the timeline outlined in the Board report. Staff would like to work with CalSTRS to ensure that the oversight included in last year's budget is preserved.

- How many staff do you currently have working on the Census?  How many do you anticipate hiring and what is the timeline for getting staffed up?

- When do you plan to open an office in Southern California and what is the timeline to staff the region?

- How does the Administration plan to use the $17.5 million for media campaign?  What kind of market research and message testing will be done to ensure what we are saying resonates with individual Hard-to-Count populations?

- How does the State help support local government efforts, like Los Angeles County?  What is the State role versus that of the locals?

- What is the plan to support residents with answering questions in their language?

- In Section D of the Census BCP, Language access is listed just after Sector Outreach.  Why is it not budgeted for the in the Workload Measures?  Language access is a significant barrier to filling out the Census form.  Does the Administration plan to develop a language access program?

- Your plan calls for a post-census evaluation to determine the overall success of the Census and make plans for 2030.  However, what accountability measures will be taken to ensure public funds are used to the maximum effect during the actual count?  For example, Community Group X receives funds to go door to door to encourage residents to fill out the Census.  How would you account for their time or use of public funds to an Auditor?  Hourly? By response rate?

- Many local governments and non-profits are expressing an interest in Census outreach.  What steps are being taken to ensure efforts aren't duplicated?  How will you keep everyone on message and collaborating?

- Will there be Census 2020 Golden State Bears for the public?

---

| STAFF COMMENTS |
| --- |

Governor Jerry Brown observed that the federal government "is basically going to war against the State of California" over immigration issues.   The federal government's approach toward the Census appears to be weaponized to hurt Californians.  First by instilling fear in our residents that participate in a basic governmental function and then by punishing the State financially and politically by deliberately undercounting our true population.

California needs an aggressive and nimble approach to allow our residents to be counted in a safe and appropriate manner.  The proposed budget plan for the census is a good start given the information available when it was constructed.   However, in only the last three months, the politics, funding, and federal approach has changed in significant ways.  It is unrealistic to believe California can construct an adequate plan for the next three years given the shifting political dynamics.

Advocates make a compelling case that additional resources will be necessary for the State to meet the challenges put before us.  Staff recommends adopting a budget framework that signals that the State will provide the higher level of resources necessary to maximize a complete count of hard to reach populations.   Staff will meet with advocates over the next months to help develop a recommendation that would meet this goal.

In addition, staff believes OPR needs the flexibility to ask for additional resources as it gets its efforts underway.  As the Select Committee on the Census continues its oversight of the State's efforts, this will remove any doubt about the Legislature's commitment to devote resources to improve its overall success.

**Staff Recommendation: Hold Open**

## ISSUE 3: 2020 CENSUS OUTREACH LANGUAGE ACCESS

The Subcommittee will discuss reporting requirements to monitor language access concerns related to the census.

### BACKGROUND

Over 40 percent of Californians speak a language other than English at home, with at least 220 different languages spoken in California. As a result, language access is a major barrier to an accurate count of our population.

The Census Bureau cancelled its Spanish-language test census and has reduced funding for outreach and messaging related to the Census. This lack of planning at the federal level enhances the potential challenges in reaching all Californians.

The State Census plan does include reference to addressing language access, but does not provide a detailed description of how that would be achieved.  The State appears to use a combination of outreach and CBO activities to address the issue, but some advocates have concerns that this strategy is not cohesive enough to target hard to count populations with specific language access problems.

### STAFF COMMENTS

One of the few criticisms of the State's successful outreach efforts in 2000 and 2010 was the lack of a clear language access approach. Staff recommends OPR outline a strategy more clearly in a report, so the Subcommittee can perform further oversight of the issue in 2019.

### SUPPLEMENTAL REPORTING LANGUAGE

The Office of Planning and Research shall provide a report on the how the State's Census 2020 effort will address language access issues by April 1, 2019.  This report will include an identification of languages and populations where language access will be a challenge to a complete count, an assessment of the federal government's efforts to address language issues, and an articulation on how language gaps will be addressed by state and local efforts, including specific strategies for identified hard-to-count populations.

**Staff Recommendation: Adopt Supplemental Reporting Language**

**EXHIBIT B**



**An LAO Report**

# California and the 2000 Census

## Introduction

As the U.S. Census Bureau prepares to conduct the nation's next decennial census on April 1, 2000, controversy exists concerning plans to supplement the traditional population headcount with estimates derived from statistical sampling techniques.

## LAO Findings

In 1990, the nation's population was undercounted by roughly 1.6 percent. California's undercount, however, was much higher—2.7 percent. This higher undercount likely cost California one seat in the U.S. House of Representatives and at least $2 billion in federal funds during the 1990s.

Different subgroups of the population have been undercounted at different rates. For example, undercount rates were highest for minorities, renters, and those persons living in nontraditional households. As a result, the undercount rates varied significantly among counties. For instance, in 1990 Los Angeles County and most counties in the San Joaquin Valley had rates much higher than the statewide average.

The bureau currently plans to release two sets of population figures— one using traditional counting techniques and a second set which uses sampling to correct for the undercount. Congress, however, has not as yet provided funding for the sampling process.

If sampling-adjusted numbers are provided, state policymakers will have to decide which set of data to use for redistricting in California and for allocating state funds to localities.

**Elizabeth G. Hill**
**Legislative Analyst**

**July 15, 1999**



# BACKGROUND

In about a year, the first decennial census of the new millennium—Census 2000—will be conducted. The decennial census is the single most important source of information about the people of the United States, and the forthcoming census will be the twenty-second that has taken place over the past 200 years, beginning in 1790.

Since that first census, each decennial census has attempted to count each and every person in the country via direct contact. With recent censuses, each household receives a questionnaire to answer and return via the U.S. mail. Households that do not respond to the questionnaire are subsequently visited by census staff. This self-enumeration approach is rooted in the concept of relying on a minimally intrusive process and respect for individual privacy.

In contrast to this method, some governments use more invasive approaches. In Turkey, for example, its latest census involved counting the entire population manually in one day over a 14-hour period, with people being required to stay home and be counted under threat of punishment if found in public without special permission during this time interval.

## Why the Census Is So Important

The decennial census is important because it provides the only true statistical "snapshot" of the entire U.S. population—both in terms of its size and characteristics. It is used for a wide variety of purposes—by economists and the business community in documenting demographic trends and their implications, by policymakers to understand the characteristics of the population and its needs, by governments to allocate spending to different governmental entities, and by federal authorities to determine the allocation/apportionment of electoral districts and how many representatives each state will have in the Congress. Given these uses, the census is an extremely important undertaking, and its integrity and accuracy are of paramount importance.

## Current Controversies Regarding the Census

Conducting the census is inherently an extremely challenging undertaking involving thousands of census workers, a budget in the billions of dollars, and requiring the voluntary cooperation of hundreds of millions of people. The challenge is complicated by the sheer physical size of the country, its geographic diversity, the mobility of its population, its high rates of foreign in-migration, and its nonhomogeneous population reflecting its great ethnic diversity and wide mix of urban, suburban, and rural communities. It also appears that Americans are becoming a bit less responsive to the census questionnaire process. Given this, conducting the census today is a truly massive and difficult undertaking, and inherently open to debate and disagreement about how it can best be carried out and/or improved.

History indicates that problems with obtaining accurate census counts are not new. Even when

Thomas Jefferson—who headed-up the first census—reported the results, he noted that there was evidence that some persons had been missed. Over the years, as the country has continued to expand and society has undergone changes, there always have been new challenges to obtaining accurate census counts.

As the U.S. Census Bureau approaches the 2000 census, however, an unusual degree of controversy exists. The key issue is: Should a traditional headcount be relied on as in past years, or should this headcount be supplemented with statistical estimates to account for persons missed by the enumerators? This has been referred to as the statistical sampling debate, and has filled the newspaper headlines on-and-off, been the topic of conferences and symposiums for economists and demographers, resulted in Congressional hearings, and been the subject of litigation.

## Why Was Sampling Proposed?

The interest in statistical sampling evolved in response to documented problems experienced in previous decennial censuses in accurately measuring the population. The U.S. Census Bureau had previously determined that its decennial censuses were resulting in population *undercounts*, and the idea of sampling was proposed in part to deal with them. The fact that particularly significant undercounts occurred in the 1990 census has been especially well documented and publicized in recent years.

Of particular concern has been the fact that states experiencing larger-than-average undercounts have been "shorted" federal funds, given that many federal funding formulas use population as a factor in determining the share of funds going to individual states. As discussed below, California is significantly affected by undercounting.

# WHAT IS KNOWN ABOUT THE 1990 NATIONAL UNDERCOUNT?

## The Causes and Magnitude of the Undercount

Census undercounts can occur for two basic reasons: (1) the "master list" of households used to identify people is not completely accurate, and (2) difficulties are encountered in tracking down and collecting information on individuals who live in households. Figure 1 (see page 4) provides the Census Bureau's own estimates of the census undercount since 1940. While the accuracy of the census improved steadily (that is, the undercount declined) between 1940 and 1980, the 1990 census took a step backward on the fundamental issue of accuracy. Indeed, the 1990 count missed 4 million people, an error margin of 1.6 percent. More troubling, the 1990 census was the first to be less accurate than its predecessor.





**Figure 1**

**National Census Undercount**

*1940 Through 1990*

*Persons (In Millions) and Percent*

Net Persons Missed
Percent Undercount

census, it has been estimated that African Americans had a net undercount of 4.4 percent, compared to only 1.2 percent for non-African Americans. The latter included 0.9 percent for whites and 2.3 percent for Asian Americans.

**Factors Contributing to the Undercounting Problem**

Undercounting is caused by many factors:

◆ *Increased Population Mobility.* During the period 1990 to 1994, 17 percent of the American population on average changed residences each year. This increased mobility makes locating households harder for census-count purposes.

◆ *Changing Domestic Living Arrangements.* Households have always been the major focus of census enumeration. In eighteenth century America, nearly all citizens identified themselves with a household whose members were almost always related by blood, marriage, or through regular employment and, therefore, included servants, apprentices, and resi-dent farmworkers. Most people lived in a family-occupied dwelling, and it was much easier to provide a population count and characterize the members of the house-

**The Undercount Differs
By Population Subgroup**

Compounding the undercounting problem is that different subgroups of the population are undercounted to different degrees. For instance, African Americans tend to be undercounted to a greater degree than the population generally. After the 1940 census, for example, the Census Bureau gave the Selective Service an estimate of how many young men it could expect to answer its call for the war effort. In total, 3 percent more men registered for the draft than had been counted by enumerators. Among the African-American com-munity, however, 13 percent more men showed up for registration than had been expected based on 1940 census data. Similarly, in the 1990

**4**

# ESTIMATING THE 1990 CENSUS UNDERCOUNT

Prior to 1990, the Census Bureau primarily relied on "demographic analysis" to estimate the level of the undercount. This analysis relies on such factors as administrative records of births, deaths, immigration, and emigration to provide estimates of the true population total.

In 1990, the Census Bureau used an additional technique to generate estimates of the undercount—the Post Enumeration Survey (PES). Essentially, once the 1990 census was conducted, the bureau drew a sample of census blocks from around the country. Then, census staff knocked on the door of each housing unit in the sample census blocks—regardless of whether it was on the master address list. For each of the blocks, the Census Bureau compared the information from both sources—that is, the official census and the PES. Based on the results of the PES survey, an estimate was made of people missed in the original census count. Then, using a statistical model, these PES estimates of undercount were used to develop undercount figures for all geographic areas.

Census research indicates that the majority of the undercount is associated with incorrect reporting during the initial census. The PES relies on an intensive effort (much more so than the initial census) to count all the residents in the sample blocks. This "saturation coverage" is the key to the survey's ability to identify the undercount.

hold. Today, divorce, cohabitation without marriage, and group housing make the determination of whom to count and where to count them increasingly complex. From 1970 through 1990 alone, the number of American households grew 47 percent, while average household size shrank from 3.1 persons to 2.6 persons, and nonfamily households grew by 128 percent. Moreover, because higher proportions of the nation's children, renters, and minorities experience these living arrangements, this contributes to their undercount rates being higher than for the population generally.

◆ *Other Factors.* Other factors which influence undercounting include language barriers inhibiting the reading of census forms and responding to interviews; habitation in irregular housing units, such as illegal units, certain mobile homes, and secured buildings; and neighborhood conditions that lead to resistence to outsiders, concealment to protect resources, and disbelief of census confidentiality.



## Reduced Accuracy Occurred Despite Increased Funding

The 1990 census was the most expensive in history, costing $25 per housing unit. In contrast, on an inflation-adjusted basis, the 1970 census cost only $11 per housing unit, and the 1980 census cost $20 per housing unit. Therefore, even after accounting for inflation and increases to population, the 1990 census cost twice as much as the 1970 census.

Much of this cost increase can be explained by the decline in the percentage of households that returned the census questionnaire by mail, and the resulting need of more expensive, labor-intensive follow-up procedures using hundreds of census takers going door-to-door. When census questionnaires were mailed in 1970, 78 percent of housing units mailed back their questionnaires. By 1990, that percentage had fallen to 65 percent.

Thus, it has been argued that the 1990 census failed on two fronts: (1) it was too expensive and (2) it counted too few people. It is because of this experience of the 1990 census that many economic and demographic experts hold the view that is has become both physically impossible and cost-prohibitive to even attempt to directly count every person in the United States.

## How Big was California's 1990 Undercount?

The 1990 census undercount varied significantly by state. In large part this reflected the fact discussed above that undercount rates tend to differ for different population characteristics and living situations, and these are not the same in all states. In addition, the extent to which a state's population lives in urban versus suburban versus rural settings is a factor.

As noted above, the net 1990 national undercount was estimated to be 4 million people, or 1.6 percent of the population. As shown in Figure 2, California's undercount was disproportionately worse—an estimated 835,000, or 2.7 percent, of the state's population, was missed. In terms of the *number* of people undercounted, its 835,000 undercount was almost double that of Texas, the state with the second-highest numerical undercount. In *percentage* terms, the state's undercount rate was fourth highest—trailing only the District of Columbia, New Mexico, and Texas. The geographic distribution of the state's undercount is discussed later.

| Figure 2 | | | | |
|---|---|---|---|---|
| **1990 Census Undercount, by Region and State** | | | | |
| | **1990 Population Total** | | **Estimated Undercount** | |
| **Region/State** | **Reported** | **Adjusted for Estimated Undercount** | **Amount** | **Percent** |
| **Northeast:** | | | | |
| Connecticut | 3,287,116 | 3,308,343 | 21,227 | 0.6% |
| Maine | 1,227,928 | 1,237,130 | 9,202 | 0.7 |
| Massachusetts | 6,016,425 | 6,045,224 | 28,799 | 0.5 |
| New Hampshire | 1,109,252 | 1,118,632 | 9,380 | 0.8 |
| New Jersey | 7,730,188 | 7,774,461 | 44,273 | 0.6 |
| New York | 17,990,455 | 18,262,491 | 272,036 | 1.5 |
| Rhode Island | 1,003,464 | 1,004,815 | 1,351 | 0.1 |
| Pennsylvania | 11,881,643 | 11,916,783 | 35,140 | 0.3 |
| Vermont | 562,758 | 569,100 | 6,342 | 1.1 |
| **Midwest:** | | | | |
| Illinois | 11,430,602 | 11,544,319 | 113,717 | 1.0% |
| Indiana | 5,544,159 | 5,572,057 | 27,898 | 0.5 |
| Iowa | 2,776,755 | 2,788,332 | 11,577 | 0.4 |
| Kansas | 2,477,574 | 2,495,014 | 17,440 | 0.7 |
| Michigan | 9,295,297 | 9,361,308 | 66,011 | 0.7 |
| Minnesota | 4,375,099 | 4,394,610 | 19,511 | 0.4 |
| Missouri | 5,117,073 | 5,148,974 | 31,901 | 0.6 |
| Nebraska | 1,578,385 | 1,588,712 | 10,327 | 0.7 |
| North Dakota | 638,800 | 643,033 | 4,233 | 0.7 |
| Ohio | 10,847,115 | 10,921,741 | 74,626 | 0.7 |
| South Dakota | 696,004 | 702,864 | 6,860 | 1.0 |
| Wisconsin | 4,891,769 | 4,921,871 | 30,102 | 0.6 |
| | | | | *Continued* |



| Region/State | 1990 Population Total | | Estimated Undercount | |
| | Reported | Adjusted for Estimated Undercount | Amount | Percent |
|---|---|---|---|---|
| **South:** | | | | |
| Alabama | 4,040,587 | 4,113,810 | 73,223 | 1.8% |
| Arkansas | 2,350,725 | 2,392,596 | 41,871 | 1.8 |
| Delaware | 666,168 | 678,385 | 12,217 | 1.8 |
| District of Columbia | 606,900 | 628,309 | 21,409 | 3.4 |
| Florida | 12,937,926 | 13,197,755 | 259,829 | 2.0 |
| Georgia | 6,478,216 | 6,620,641 | 142,425 | 2.2 |
| Kentucky | 3,685,296 | 3,746,044 | 60,748 | 1.6 |
| Louisiana | 4,219,973 | 4,314,085 | 94,112 | 2.2 |
| Maryland | 4,781,468 | 4,882,452 | 100,984 | 2.1 |
| Mississippi | 2,573,216 | 2,629,548 | 56,332 | 2.1 |
| North Carolina | 6,628,637 | 6,754,567 | 125,930 | 1.9 |
| Oklahoma | 3,145,585 | 3,202,963 | 57,378 | 1.8 |
| South Carolina | 3,486,703 | 3,559,547 | 72,844 | 2.0 |
| Tennessee | 4,877,185 | 4,964,261 | 87,076 | 1.8 |
| Texas | 16,986,510 | 17,472,538 | 486,028 | 2.8 |
| Virginia | 6,187,358 | 6,313,836 | 126,478 | 2.0 |
| West Virginia | 1,793,477 | 1,819,363 | 25,886 | 1.4 |
| **West:** | | | | |
| Alaska | 550,043 | 561,276 | 11,233 | 2.0% |
| Arizona | 3,665,228 | 3,754,666 | 89,438 | 2.4 |
| **California** | **29,760,021** | **30,597,578** | **837,557** | **2.7** |
| Colorado | 3,294,394 | 3,363,637 | 69,243 | 2.1 |
| Idaho | 1,006,749 | 1,029,283 | 22,534 | 2.2 |
| Hawaii | 1,108,229 | 1,129,170 | 20,941 | 1.9 |
| Montana | 799,065 | 818,348 | 19,283 | 2.4 |
| Nevada | 1,201,833 | 1,230,709 | 28,876 | 2.3 |
| New Mexico | 1,515,069 | 1,563,579 | 48,510 | 3.1 |
| Oregon | 2,842,321 | 2,896,472 | 54,151 | 1.9 |
| Utah | 1,722,850 | 1,753,188 | 30,338 | 1.7 |
| Washington | 4,866,692 | 4,958,320 | 91,628 | 1.8 |
| Wyoming | 453,588 | 463,629 | 10,041 | 2.2 |
| **U.S. Totals** | **248,709,873** | **252,730,369** | **4,020,496** | **1.6%** |

Source: U.S. Census Bureau, based on 1990 Post Enumeraton Survey.

# EFFECTS OF THE 1990 UNDERCOUNT

As noted previously, two of the more direct effects of census undercounts are that (1) they can affect the regional distribution of representatives from different states in Congress and (2) they can affect the interstate distribution of federal funds.

## Effect of the Undercount on the House of Representatives

Article 1, Section 2, of the U.S. Constitution requires that the census be used to apportion seats in the U.S. House of Representatives (House). The effect of the 1990 undercount on the allocation of House seats to the 50 states is discussed below.

***How Seats Are Allocated Among States***. The U.S. Constitution provides that each state will have a minimum of one member in the House, and the current size of the House (435 seats) has not changed since the apportionment made following the 1910 census. Thus, the current apportionment calculation divides 385 seats (435 seats, minus the 50 seats automatically given) among the 50 states.

The method currently used for apportioning these 385 seats is called the "method of equal proportions." It was adopted in 1941 following the 1940 census, and involves establishing a listing of the states according to "priority values." These priority values are calculated using a formula which incorporates each state's population growth relative to the size of each state. Seats 51 through 435 are assigned to the 50 states on the basis of this listing of priority values.

For example, following the 1990 census, each of the 50 states was given one seat out of the current total of 435. The next, or 51st seat, went to the state with the highest priority value (California) and thus became that state's second seat. The state that had the next-highest priority value (New York) captured the 52nd seat, while the state with the third-highest priority value (California again) captured the 53rd seat. This process continued until all 435 seats had been assigned to a state.

***California Would Have Gained an Additional Seat Absent the 1990 Undercount***. Using the official 1990 census figures, California was allocated 52 seats in the House, with its 52nd seat being the 427th allocated under the priority ranking. Washington received the final 435th seat according to the priority ranking, and the next five states in priority order were Massachusetts, New Jersey, New York, Kentucky, and California (in that order). Thus, California qualified for the 440th seat, but because the total number of seats is fixed at 435, could not receive that 53rd seat.

Had the 1990 census undercount not occurred, the priority-order ranking would have been jumbled around. This is because the extent of the undercount differed by state. Adjusting for the undercount would have improved California's priority ordering for its 53rd seat from number 440 to number 434, or inside the 435 House limit. Thus, California would have picked up a seat (its 53rd), due to its large relative undercount. As it turns out, this additional seat would have been at



the expense of Wisconsin, whose 9th seat would have slipped from priority-order ranking 429 using the official census data to 436 using the adjusted data. It should be noted that California is the only state in the nation to lose a seat because of the 1990 undercount. Moreover, the National Conference of State Legislators cited in a recent report an estimate by a demographic research firm that an adjusted 2000 census count would shift at least one seat to California as well.

**Effect of the Undercount on
Federal Funding Levels**

Population helps determine the amount of federal funds states receive for a wide variety of public programs. Because of this, California's large relative census undercount caused it to receive less than it should have under a wide range of federal formula grant programs throughout the 1990s. Precise dollar figures regarding federal funding effects are difficult to pinpoint, partly because some of the formulas which are used to distribute federal funds are very complex. Figure 3 lists California's 15 largest federal grant programs, and summarizes the eight that have been short-changed because of the undercount. Note that these figures are for a *single* fiscal year only, and are for only a fraction of the grant programs under which California receives federal funds. Extrapolating these figures for the entire decade suggests that the 1990 census undercount has likely cost California an estimated $2.2 billion during the 1990s.

# CALIFORNIA'S UNDERCOUNT—
# A GEOGRAPHIC PERSPECTIVE

Just like individual states experienced different relative 1990 census undercounts, so did California's different geographic regions. This reflects such factors as regionally different population characteristics, different living styles and arrangements, and different degrees of urbanization, suburbanization, and rural living.

Figure 4 (see page 12) shows the percentage undercounts which characterized the state's broad geographic regions in 1990. For this purpose, California's counties were grouped into five regions, each of which has somewhat different and distinct economic and geographic characteristics. These regions include:

◆ ***Southern California,*** which consists of Los Angeles, Orange, San Diego, Ventura, Riverside, and San Bernardino Counties.

◆ The ***San Francisco Bay Area,*** which includes the nine counties which are proximate to the San Francisco Bay.

◆ The ***Central Valley,*** which ranges from Kern County in the south to Shasta

| Figure 3 | |
|---|---|
| **California's Estimated Loss in Federal Funding Due to 1990 Census Undercount Fifteen Largest Grant Programs** | |
| *(In Thousands)* | |
| **Federal Program** | **Amount**[a] |
| Adoption Assistance | $995[b] |
| Prevention and Treatment of Substance Abuse | 3,632[c] |
| Child Care and Development | 1,883[c] |
| Employment and Training Assistance | __[d] |
| Employment Services | __[d] |
| Foster Care | 9,353[b] |
| Highway Planning and Construction | __[d] |
| Low Income Home Energy | __[d] |
| Medicaid | 197,912[b] |
| Rehabilitation Services | 4,719 |
| Social Services | 3,213 |
| Special Education | __[d] |
| Women Infants and Children Program (WIC)—Food | __[d] |
| WIC—Nutritional Services and Administration | __[d] |
| Vocational Education | 1,128[c] |
| **Total** | **$222,835** |

[a] Federal fiscal year 1998 unless otherwise indicated.
[b] Federal fiscal year 1997.
[c] Federal fiscal year 1999.
[d] These programs do not use population data to allocate funding.
Source: United States General Accounting Office.

County in the north, and includes such midsized metropolitan areas as Sacramento, Stockton, Fresno, Modesto, and Bakersfield.

◆ The ***Central Coast,*** ranging from the counties of Santa Barbara in the south to Santa Cruz in the north.

◆ The ***Rest-of-the-State,*** which consists of the rural mountainous counties surrounding the Central Valley, and Imperial County.

Figure 5 (see page 13) and Figure 6 (see page 15) report the undercount figures for California's counties and larger cities, respectively. Note that all but two counties (Marin and Placer) and three





**Figure 4**

**California Census Undercount by Region**

*Persons and Percent
1990*

Central Valley
(2.8%)
136,939 Persons

Rest-of-State
(2.5%)
20,854 Persons

Southern
California (2.9%)
499,909 Persons

San Francisco
Bay Area (2.3%)
142,715 Persons

Central Coast
(3.0%)
37,135 Persons

high undercount. In fact, Los Angeles was the only county in this region which experienced a higher undercount than the state in its entirety. It accounted for 30 percent of the state's population but was home to almost 37 percent (about 306,000) of the statewide's undercounted individuals.

*San Francisco Bay Area*. In contrast to Southern California, the nine-county San Francisco Bay Area accounted for less of the undercount than its population share—17 percent of the undercount, three percentage points below its share of 1990 official state population. Three counties—Marin, San Mateo, and Contra Costa—all posted undercount figures considerably lower than the state (rates of 1.2 percent, 1.7 percent, and 1.8 percent, respectively). These three rates rank among the six lowest of all the counties, and offset higher undercount rates in such Bay Area counties as San Francisco and Alameda.

*Central Valley*. The Central Valley posted undercount figures which generally mirrored that of the state as a whole. That is, the region comprised 16 percent of the statewide population and accounted for 16 percent of the statewide undercount. However, like Southern California, the Central Valley also exhibited considerable

cities (Santa Clarita, Thousand Oaks, and Torrance) had undercount rates higher than the nation as a whole (1.6 percent).

**Regional Experience**

The 1990 census undercount experience in the state's five broad geographic regions was as follows:

*Southern California*. In 1990, this region contained 57 percent of the state's population, and slightly more than 60 percent of the census undercount occurred in it. The experience for this region, however, is completely explained by Los Angeles County, which itself had an extremely

| Figure 5 | | | | |
|---|---|---|---|---|
| **1990 California Census Undercount** | | | | |
| | **1990 Population Total** | | **Estimated Undercount** | |
| **Region/County** | **Reported** | **Adjusted for Estimated Undercount** | **Amount** | **Percent** |
| **Southern California:** | | | | |
| Los Angeles | 8,863,164 | 9,168,936 | 305,772 | 3.3% |
| Orange | 2,410,556 | 2,461,397 | 50,841 | 2.1 |
| Riverside | 1,170,413 | 1,199,176 | 28,763 | 2.4 |
| San Bernardino | 1,418,380 | 1,455,650 | 37,270 | 2.6 |
| San Diego | 2,498,016 | 2,560,552 | 62,536 | 2.4 |
| Ventura | 669,016 | 683,743 | 14,727 | 2.2 |
| Subtotals | 17,029,545 | 17,529,454 | 499,909 | 2.9% |
| **San Francisco Bay Area:** | | | | |
| Alameda | 1,279,182 | 1,317,262 | 38,080 | 2.9% |
| Contra Costa | 803,732 | 817,986 | 14,254 | 1.7 |
| Marin | 230,096 | 232,969 | 2,873 | 1.2 |
| Napa | 110,765 | 113,321 | 2,556 | 2.3 |
| San Francisco | 723,959 | 745,580 | 21,621 | 2.9 |
| San Mateo | 649,623 | 661,717 | 12,094 | 1.8 |
| Santa Clara | 1,497,577 | 1,531,401 | 33,824 | 2.2 |
| Solano | 340,421 | 348,548 | 8,127 | 2.3 |
| Sonoma | 388,222 | 397,508 | 9,286 | 2.3 |
| Subtotals | 6,023,577 | 6,166,292 | 142,715 | 2.3% |
| **Central Valley:** | | | | |
| Butte | 182,120 | 186,843 | 4,723 | 2.5% |
| Colusa | 16,275 | 16,992 | 717 | 4.2 |
| El Dorado | 125,995 | 128,454 | 2,459 | 1.9 |
| Fresno | 667,490 | 692,182 | 24,692 | 3.6 |
| Kern | 543,477 | 558,924 | 15,447 | 2.8 |
| Kings | 101,469 | 105,195 | 3,726 | 3.5 |
| Madera | 88,090 | 91,267 | 3,177 | 3.5 |
| Merced | 178,403 | 185,469 | 7,066 | 3.8 |
| Placer | 172,796 | 175,290 | 2,494 | 1.4 |
| Sacramento | 1,041,219 | 1,065,246 | 24,027 | 2.3 |
| San Joaquin | 480,628 | 495,277 | 14,649 | 3.0 |
| Shasta | 147,036 | 150,146 | 3,110 | 2.1 |
| Stanislaus | 370,522 | 380,819 | 10,297 | 2.7 |
| | | | | *Continued* |

13



| Region/County | 1990 Population Total | | Estimated Undercount | |
| | Reported | Adjusted for Estimated Undercount | Amount | Percent |
|---|---|---|---|---|
| Sutter | 64,415 | 66,163 | 1,748 | 2.6 |
| Tulare | 311,921 | 323,772 | 11,851 | 3.7 |
| Yolo | 141,092 | 145,974 | 4,882 | 3.3 |
| Yuba | 58,228 | 60,102 | 1,874 | 3.1 |
| Subtotals | 4,691,176 | 4,828,115 | 136,939 | 2.8% |
| **Central Coast:** | | | | |
| Monterey | 355,660 | 367,820 | 12,160 | 3.3% |
| San Benito | 36,697 | 38,192 | 1,495 | 3.9 |
| San Luis Obispo | 217,162 | 222,870 | 5,708 | 2.6 |
| Santa Barbara | 369,608 | 381,099 | 11,491 | 3.0 |
| Santa Cruz | 229,734 | 236,015 | 6,281 | 2.7 |
| Subtotals | 1,208,861 | 1,245,996 | 37,135 | 3.0% |
| **Rest of State:** | | | | |
| Alpine | 1,113 | 1,148 | 35 | 3.0% |
| Amador | 30,039 | 30,482 | 443 | 1.5 |
| Calaveras | 31,998 | 32,606 | 608 | 1.9 |
| Del Norte | 23,460 | 24,035 | 575 | 2.4 |
| Glenn | 24,798 | 25,686 | 888 | 3.5 |
| Humboldt | 119,118 | 122,441 | 3,323 | 2.7 |
| Imperial | 109,303 | 113,271 | 3,968 | 3.5 |
| Inyo | 18,281 | 18,876 | 595 | 3.2 |
| Lake | 50,631 | 51,774 | 1,143 | 2.2 |
| Lassen | 27,598 | 28,162 | 564 | 2.0 |
| Mariposa | 14,302 | 14,673 | 371 | 2.5 |
| Mendocino | 80,345 | 82,788 | 2,443 | 3.0 |
| Modoc | 9,678 | 9,921 | 243 | 2.4 |
| Mono | 9,956 | 10,328 | 372 | 3.6 |
| Nevada | 78,510 | 79,826 | 1,316 | 1.6 |
| Plumas | 19,739 | 20,195 | 456 | 2.3 |
| Sierra | 3,318 | 3,401 | 83 | 2.4 |
| Siskiyou | 43,531 | 44,578 | 1,047 | 2.3 |
| Tehama | 49,625 | 50,823 | 1,198 | 2.4 |
| Trinity | 13,063 | 13,317 | 254 | 1.9 |
| Tuolumne | 48,456 | 49,390 | 934 | 1.9 |
| Subtotals | 806,862 | 827,721 | 20,859 | 2.5% |
| **California Totals** | **29,760,021** | **30,597,578** | **837,557** | **2.7%** |

| Figure 6 | | | | |
|---|---|---|---|---|
| **1990 California Census Undercount for Larger Cities**[a] | | | | |
| | **1990 Census Total** | | **Estimated Undercount** | |
| **Region/City** | **Reported** | **Adjusted for Estimated Undercount** | **Amount** | **Percent** |
| **Southern California:** | | | | |
| Anaheim | 266,406 | 273,740 | 7,334 | 2.7% |
| Chula Vista | 135,163 | 138,715 | 3,552 | 2.6 |
| El Monte | 106,209 | 110,792 | 4,583 | 4.1 |
| Escondido | 108,635 | 111,040 | 2,405 | 2.2 |
| Fullerton | 114,144 | 116,725 | 2,581 | 2.2 |
| Garden Grove | 143,050 | 146,412 | 3,362 | 2.3 |
| Glendale | 180,038 | 184,515 | 4,477 | 2.4 |
| Huntington Beach | 181,519 | 184,639 | 3,120 | 1.7 |
| Inglewood | 109,602 | 116,991 | 7,389 | 6.3 |
| Irvine | 110,330 | 112,191 | 1,861 | 1.7 |
| Long Beach | 429,433 | 445,925 | 16,492 | 3.7 |
| Los Angeles | 3,485,398 | 3,624,206 | 138,808 | 3.8 |
| Moreno Valley | 118,779 | 121,925 | 3,146 | 2.6 |
| Oceanside | 128,398 | 131,711 | 3,313 | 2.5 |
| Ontario | 133,179 | 137,458 | 4,279 | 3.1 |
| Orange | 110,658 | 112,738 | 2,080 | 1.8 |
| Oxnard | 142,216 | 147,164 | 4,948 | 3.4 |
| Pasadena | 131,591 | 136,431 | 4,840 | 3.5 |
| Pomona | 131,723 | 137,116 | 5,393 | 3.9 |
| Rancho Cucamonga | 101,409 | 103,309 | 1,900 | 1.8 |
| Riverside | 226,505 | 232,608 | 6,103 | 2.6 |
| San Bernardino | 164,164 | 170,249 | 6,085 | 3.6 |
| San Diego | 1,110,549 | 1,143,032 | 32,483 | 2.8 |
| Santa Ana | 293,742 | 305,815 | 12,073 | 3.9 |
| Santa Clarita | 110,642 | 111,997 | 1,355 | 1.2 |
| Simi Valley | 100,217 | 102,006 | 1,789 | 1.8 |
| Thousand Oaks | 104,352 | 105,407 | 1,055 | 1.0 |
| Torrance | 133,107 | 135,125 | 2,018 | 1.5 |
| | | | | *Continued* |



| Region/City | 1990 Census Total | | Estimated Undercount | |
|---|---|---|---|---|
| | Reported | Adjusted for Estimated Undercount | Amount | Percent |
| **San Francisco Bay Area:** | | | | |
| Berkeley | 102,724 | 106,630 | 3,906 | 3.7% |
| Concord | 111,348 | 113,137 | 1,789 | 1.6 |
| Fremont | 173,339 | 176,094 | 2,755 | 1.6 |
| Hayward | 111,498 | 114,720 | 3,222 | 2.8 |
| Oakland | 372,242 | 391,553 | 19,311 | 4.9 |
| Salinas | 108,777 | 112,703 | 3,926 | 3.5 |
| San Francisco | 723,959 | 745,573 | 21,614 | 2.9 |
| San Jose | 782,248 | 801,296 | 19,048 | 2.4 |
| Santa Rosa | 113,313 | 115,898 | 2,585 | 2.2 |
| Sunnyvale | 117,229 | 119,999 | 2,770 | 2.3 |
| Vallejo | 109,199 | 112,178 | 2,979 | 2.7 |
| **Central Valley:** | | | | |
| Bakersfield | 174,820 | 179,398 | 4,578 | 2.6% |
| Fresno | 354,202 | 366,527 | 12,325 | 3.4 |
| Modesto | 164,730 | 168,849 | 4,119 | 2.4 |
| Sacramento | 369,365 | 380,736 | 11,371 | 3.0 |
| Stockton | 210,943 | 218,358 | 7,415 | 3.4 |

a  Defined as cities with populations in excess of 100,000 as of 1990.

intercounty variation. The Central Valley is essentially comprised of two subregions—the San Joaquin Valley (extending from Kern County to San Joaquin County) and the Sacramento Valley (including Sacramento County up to Shasta County). The census data reveal that the *entire* San Joaquin Valley (all eight counties) suffered a collective undercount of 3.2 percent, significantly higher than the statewide average of 2.7 percent, and easily the highest of any subregion in the state. Conversely, the Sacramento Valley counties

posted the *lowest* undercount rate of any subregion—2.3 percent. This was despite the fact that it contains Colusa County, which had the highest undercount rate of all the counties in the state.

***Central Coast and Rest-of-the-State***. The final two broad geographic regions of California—the Central Coast and the Rest-of-the-State region—together posted undercount rates proportional to their shares of population. That is, the two regions collectively accounted for about 7 percent of the state's official population count in 1990, as well as

about 7 percent of the estimated statewide census undercount. However, the Central Coast taken alone experienced the largest undercount rate of all five geographic regions (3 percent), driven by large undercount rates in San Benito and Monterey Counties. These above-average rates were offset by generally lower undercount rates for the 21 remaining, mostly rural counties.

# STATISTICAL SAMPLING— THE BUREAU'S PROPOSED SOLUTION

In response to the undercounting problem associated with past censuses—especially in 1990—the Census Bureau, as noted above, advocates the use of statistical sampling methods to increase accuracy. "Sampling" occurs whenever the information on a *portion* of the population is used to infer information on the population *at large*. This approach is intended to deal with both the component of the undercount problem associated with inaccuracies in the master list of households, as well as the component associated with imperfect information about the population residing in known households.

Actually, statistical sampling has been used since 1940 to obtain detailed demographic information about the population. In 1990, for example, about one-in-six residents were sent a special long-form questionnaire to fill out, the results of which were used to draw inferences about various attributes of the general population. (This same process with respect to the long-form questionnaire will be repeated in 2000.) Through 1990, however, the population *totals* themselves have reflected only the actual population *head count*. The Census Bureau is proposing to change this traditional practice in 2000, and augment the head count itself by incorporating the results of sampling.

## An Overview of the Proposal

*The Original Proposal.* The Census Bureau's original objective with respect to the upcoming 2000 census was to physically count the population in 90 percent of the households it was aware of in every census tract (each of which contains roughly 4,000 people). It would then account for the remainder of the population through scientific sampling techniques.

In addition to the above process, the Census Bureau wanted to conduct a second sample of 750,000 households nationwide drawn from all ethnic groups and geographic locations, as a sort of "quality assurance" check. This sample would allow the bureau's statisticians to gauge whether some particular demographic groups were miscounted in the first-round census calculations, in which case the preliminary results would then be adjusted accordingly.



According to the Census Bureau, if such a sampling method had been used, there was a 90 percent chance that its estimate of the nation's population would be within 0.1 percent of the true number. On the other hand, if no sampling methods were used, it estimated that the likely undercount would be about 1.9 percent, even higher than the 1.6 percent undercount in 1990.

***The Current Plan.*** As discussed below, recent court decisions provide that congressional seats may not be apportioned using sample-adjusted data. This means that the Census Bureau cannot rely on a 90 percent coverage plan. Rather, it must try to make its coverage as close to 100 percent as possible. As a result, the bureau recently modified its original plan for sampling. It now plans to attempt to physically count everyone and then adjust this count using an Accuracy and Coverage Evaluation (ACE) survey involving approximately 300,000 households—twice as large as the one used in 1990 but less than half of the one originally proposed. The bureau believes that this modified plan, like the original plan, will significantly improve census accuracy—both in terms of identifying missed households and obtaining more accurate data on counted households. However, the unadjusted data will be used to apportion congressional seats, and the survey-adjusted data will be available for other purposes. The bureau estimates that the cost of conducting the 2000 census will be $4.5 billion, $1.7 billion higher than its original estimate, due to the need to try to count everyone.

## A Detailed Look at How The 2000 Census Will Proceed

The initial phases of the Census 2000 project would be similar to those of previous census counts which did not use sampling. The first step calls for developing a list of every housing unit in the nation (the so-called master list). To contact all addresses, the Census Bureau plans to merge its 1990 Census Address List with a current address list from the U.S. Postal Service. Local governments would then be given the opportunity to review and update the list. The result will be a national listing consisting of about 120 million addresses. In April 2000, a series of mailings will be sent to each address on the list. Specifically, each address will be mailed a prenotice letter, followed by the official questionnaire, followed by a "reminder" or "thank you" postcard, as appropriate. To achieve as large a response rate as possible, census questionnaire forms also will be available in different languages at public places, such as libraries and post offices. Thus, the starting point for both the 1990 and 2000 censuses is in principle the same—a listing of the nation's households and other places of residences (such as nursing homes and dormitories).

As previously, the Census Bureau will focus on those households not responding to the census forms and/or other correspondence sent to them. Interviewers will go door-to-door to collect information from all the nonresponders they can locate, along with collecting information when possible about them from third-party sources such as neighbors and postal carriers.

There will still be persons who are missed or incorrectly enumerated in this process. For example, people in the responding housing units may make errors in filling out the census questionnaire. Likewise, some households may not even be included on the master-address list for the questionnaire. To address these problems, the bureau will undertake the post-census ACE survey. A similar survey was conducted in 1990, but the results were *not* incorporated into the final population figures. The ACE survey will be twice as big as the previous one and, hence, be more useful for adjusting the data.

In summary, the key difference between the 1990 census and the planned 2000 version is that in 2000 a population series will be available which incorporates the undercount identified by the post-census survey, if policymakers wish to use it.

***What About the Homeless?*** In 2000, the Census Bureau will enumerate people at service locations (such as shelters, soup kitchens, and regularly scheduled food vans) that primarily serve people without housing. Efforts are also planned to enumerate persons without housing at targeted nonsheltered outdoor locations. In this way, the Census Bureau will seek to include people without housing in the census who might be missed in the traditional enumeration of housing units and group quarters.

**Experience With Pre-Census "Trial Runs"**

In preparation for the upcoming census, the bureau conducted "dress rehearsals" at three sites around the country in the spring of 1998. The three dress rehearsal sites were Sacramento; the 11 rural counties surrounding Columbia, South Carolina; and the Menominee Reservation in Wisconsin. The three trial run sites were chosen because they have attributes reflective of the various challenges that Census 2000 will confront. Specifically, Sacramento was chosen to represent urban conditions; the multicounty area surrounding Columbia was selected because it provided an opportunity to test procedures in suburban and rural areas; and the final test site was chosen to demonstrate the special procedures planned for use on Native American Indian reservations.

The results from these three dress rehearsals will allow the bureau to evaluate the new procedures being considered for Census 2000. These include user-friendly forms and digital capture of forms. In addition, the Census Bureau tested the statistical sampling techniques it intends to use in the 2000 census. The site selection criteria for the dress rehearsal allowed populations to be assessed with certain attributes associated with the 1990 census undercount.

***The Case of Sacramento***. Sacramento was specifically selected because its population variations are felt to be reflective of those characterizing California generally, and it was felt that Sacramento provides a good "testing ground" to evaluate efforts to capture the classifications of persons generally missed in 1990. Figure 7 (see page 20) shows the results from the Sacramento trial run. These results suggest a continuation of two trends identified in the 1990 census.



◆ ***The Undercount Problem Persists.*** As the figure shows, the total undercount figure for Sacramento was 6.3 percent, more than double the reported undercount the city experienced in 1990.

◆ ***Some Ethnic Groups Are Less Likely to Be Counted Than Others.*** As the figure indicates, the undercount rates for each nonwhite subgroup exceeds that for the city as a whole. Indeed, African Americans, Native Americans, and the "Other"

category all experienced undercount rates exceeding 8 percent, and the composite rate for non-Whites was 7.7 percent. In contrast, the undercount rate for Whites was 4.9 percent.

Thus, many experts believe that the results of the Sacramento rehearsal suggest that, absent statistical sampling as a corrective remedy, the census undercount resulting from the 2000 census may be even larger and the population totals more problematic than for the 1990 experience.

**Figure 7**

**Summary Results of 1998 Census Dress Rehearsal (Sacramento)**

| Ethnic Group | Population Totals | | Undercount | |
| --- | --- | --- | --- | --- |
| | Unadjusted for Undercount | Adjusted for Undercount | Amount | Percent |
| White | 185,478 | 195,046 | 9,568 | 4.9% |
| Black/African American | 58,443 | 63,826 | 5,383 | 8.4 |
| Asian/Pacific Islander | 59,265 | 63,125 | 3,860 | 6.1 |
| American Indian, Alaskan Native | 11,270 | 12,327 | 1,057 | 8.6 |
| Other | 63,285 | 68,988 | 5,703 | 8.3 |
| **Totals** | **377,741** | **403,312** | **25,571** | **6.3%** |

# WHERE DOES THE SAMPLING CONTROVERSY STAND TODAY?

## Litigation Challenging Sampling

In 1998, in response to suits challenging the use of sampling for census purposes, it was ruled at the federal district court level that sampling methods may *not* be used to produce the population counts *used to reapportion seats* in Congress.

These rulings were upheld by the Supreme Court in January 1999, when it found that the census law directly prohibits use of statistical sampling to adjust population figures used to allocate House of Representative members among the states. The court drew a distinction, however, between using sampling to adjust the head-count figures used to apportion seats in the House among the 50 states, and statistical adjustment of those figures for other purposes (such as the distribution of federal funds to the states). While federal law bars sampling for apportionment, the court said it permits and perhaps even may require statistical adjustments for other purposes.

Thus, the court's interpretation of the Census Act suggests that population counts adjusted by sampling could or even should be used for these other purposes. Both Clinton Administration officials and Census Bureau officials have signaled their intention to do so.

Given the court decision, the Census Bureau plans to produce two sets of population figures—a traditional head-count version for the purpose of congressional apportionment, and then a second set of numbers which corrects for the undercount. The latter, more complete figures would be made available in a form that allows them to be used, if so desired by policymakers, for intrastate redistricting, determining the allocation of federal funds, and various other purposes. However, this would be contingent on Congress agreeing to appropriate the money for the Census Bureau to produce sample-adjusted figures following the regular head-count enumeration.



# WHAT COMES NEXT?

At this point, the 2000 census and the sampling controversy surrounding it remains an unfinished story. Several key issues remain to be resolved.

**Federal Issues.** At the federal level, there are two key decision points. The first involves whether Congress will fund the ACE survey. If it does *not*, that will be the end of the story, as only one set of population figures will be produced—reflecting an actual census headcount that is unadjusted for the undercount through sampling. If the ACE survey *is* funded, however, a second key decision will then have to be made—namely, what set of population data should be used to distribute federal funds amongst the states, the unadjusted or sample-adjusted census results?

**California Issues.** Should sample-adjusted census data be made available through the ACE survey, the state will have to face several important issues. The first involves redistricting—specifically, which set of population data (adjusted versus unadjusted) should be used to re-draw the boundaries of the state's Congressional districts, as well as the Legislature's Senate and Assembly districts?

The second key California issue facing the Legislature will involve the geographic dispersion of certain state funds to localities. Under current law, for example, population influences how vehicle license fee revenues, certain gasoline tax proceeds, and funds under the Citizens' Option for Public Safety (COPS) program are geographically allocated. Thus, the amounts of dollars going to different localities under these programs will depend, in part, on whether adjusted versus unadjusted population figures are used.

Thus, depending on actions at the federal level, the state may soon have to deal with the impact of sampling on the census data.

Legislative Analyst's Office



**Acknowledgments**

This report was prepared by Robert Ingenito, under the supervision of David Vasché. The Legislative Analyst's Office (LAO) is a nonpartisan office which provides fiscal and policy information and advice to the Legislature.



**LAO Publications**

To request publications call (916) 445-2375.

This report and others, as well as an E-mail subscription service, are available on the LAO's internet site at www.lao.ca.gov. The LAO is located at 925 L Street, Suite 1000, Sacramento, CA 95814.

# EXHIBIT C

*Senate Budget and Fiscal Review—Holly J. Mitchell, Chair*

# SUBCOMMITTEE NO. 4     Agenda

**Senator Richard D. Roth, Chair**
**Senator Steven M. Glazer**
**Senator Scott Wilk**



### Thursday, March 15, 2018
### 9:30 a.m. or upon adjournment of session
### State Capitol - Room 2040

## PART A
Consultant: James Hacker

**Vote Only Calendar**

| **Item** | **Department** | |
| --- | --- | --- |
| **2240** | **Department of Housing and Community Development** | |
| Issue 1 | Roberti Affordable Sales Program | 3 |
| Issue 2 | Transactions Unit Fund Shift | 3 |
| Issue 3 | Mobilehome Purchase Program Technical Assistance (SB 136) | 3 |
| Issue 4 | Mobilehome Release of Liability (SB 542) | 3 |
| **1700** | **Department of Fair Employment and Housing** | |
| Issue 1 | Job Applicant Criminal History (AB 1008) | 3 |
| Issue 2 | New Parental Leave Act (SB 63) | 3 |

**Items Proposed for Discussion**

| **Item** | **Department** | |
| --- | --- | --- |
| **2240** | **Department of Housing and Community Development** | |
| Issue 1 | Legislative Proposal: Office of Homeless Youth (SB 918) | 5 |
| Issue 2 | Statewide Housing Package (SB 2 and SB 3) | 6 |
| Issue 3 | Affordable Housing and Sustainable Communities Program | 10 |
| Issue 4 | Veteran's Housing and Homelessness Prevention Program | 11 |
| Issue 5 | Long-Term Monitoring and Default Reserve | 12 |
| Issue 6 | Housing for a Healthy California (AB 74) | 14 |
| Issue 7 | Community Development Block Grant Program Redesign | 16 |
| **1700** | **Department of Fair Employment and Housing** | |
| Issue 1 | Systemic Litigation Unit | 19 |
| **0650** | **Governor's Office of Planning and Research** | |
| Issue 1 | California Institute to Advance Precision Health and Medicine | 21 |
| Issue 2 | OPR Housing Package Response | 22 |
| Issue 3 | California Complete Count – Census 2020 | 23 |

Public Comment

*Pursuant to the Americans with Disabilities Act, individuals who, because of a disability, need special assistance to attend or participate in a Senate Committee hearing, or in connection with other Senate services, may request assistance at the Senate Rules Committee, 1020 N Street, Suite 255 or by calling (916) 651-1505. Requests should be made one week in advance whenever possible.*

## 0650  OFFICE OF PLANNING AND RESEARCH

The Office of Planning and Research (OPR) assists the Governor and the Administration in planning, research, policy development, and legislative analyses. OPR formulates long-range state goals and policies to address land use, climate change, population growth and distribution, urban expansion, infrastructure development, groundwater sustainability and drought response, and resource protection. OPR maintains and updates the General Plan Guidelines, the California Environmental Quality Act (CEQA) Guidelines, and operates the CEQA Clearinghouse. OPR also houses and supports the Strategic Growth Council (SGC).

**Budget Overview:** The Governor's budget proposes $570 million and 69.5 positions to support OPR in the budget year, as shown in the figure below. This is an increase of 24 positions and a decrease of $330 million, mainly due to a decline in Greenhouse Gas Reduction Fund resources and the addition of resources related to the Census 2020 effort.

**3-YR EXPENDITURES AND POSITIONS**

|      |                                        | Positions |         |         | Expenditures |          |          |
|------|----------------------------------------|-----------|---------|---------|--------------|----------|----------|
|      |                                        | 2016-17   | 2017-18 | 2018-19 | 2016-17*     | 2017-18* | 2018-19* |
| 0360 | State Planning & Policy Development     | 24.2      | 10.2    | 34.2    | $11,188      | $18,859  | $85,146  |
| 0365 | California Volunteers                   | 16.0      | 21.3    | 21.3    | 35,861       | 31,900   | 31,894   |
| 0370 | Strategic Growth Council               | 10.5      | 14.0    | 14.0    | 7,220        | 851,253  | 453,370  |
|      | **TOTALS, POSITIONS AND EXPENDITURES (All Programs)** | **50.7** | **45.5** | **69.5** | **$54,269** | **$902,012** | **$570,410** |
|      |                                        |           |         |         |              |          |          |
| **FUNDING** |                                 |           |         |         | **2016-17*** | **2017-18*** | **2018-19*** |
| 0001 | General Fund                           |           |         |         | $11,140      | $15,302  | $84,125  |
| 0890 | Federal Trust Fund                     |           |         |         | 34,870       | 27,966   | 27,959   |
| 0995 | Reimbursements                         |           |         |         | 877          | 7,166    | 4,500    |
| 3228 | Greenhouse Gas Reduction Fund          |           |         |         | 7,076        | 851,102  | 453,218  |
| 9740 | Central Service Cost Recovery Fund     |           |         |         | 306          | 476      | 608      |
|      | **TOTALS, EXPENDITURES, ALL FUNDS**    |           |         |         | **$54,269**  | **$902,012** | **$570,410** |

---

**Issue 1: California Institute to Advance Precision Health and Medicine**

---

**Governor's Proposal:** The budget includes trailer bill language to establish the California Institute to Advance Precision Health and Medicine as a non-profit entity, and to appropriate $30 million in one-time General Fund resources for the Institute.

**Background:** The California Initiative to Advance Precision Medicine, launched in 2015 by Governor Brown, is currently hosted by the University of California, San Francisco, under the direction of OPR and through an interagency contract between OPR and UC/UCSF. Grants to demonstration projects flow through UCSF and are approved by OPR.

To date, the state has appropriated $23 million in General Fund to OPR for precision medicine. Provisional language was included in each appropriation to ensure that funding was available for projects in both northern and southern California. The Initiative utilized a competitive, merit-based application process, with a peer-reviewed selection process. Eight demonstration projects have been funded, an asset inventory and economic analysis are both in progress, multiple convenings have been held, and a new RFP is in development. A Precision Medicine Advisory Committee was established in fall of 2017, which will issue recommendations to the state by December 2018.

**Staff Comments:** The Administration has indicated that the new Institute is intended to be a nonprofit corporation, governed by a 19-member Board of Directors, including the Director of the Office of Planning and Research, who will serve as an ex officio member of the Board. Sixteen members are to be appointed by the Governor, while two public members are to be appointed by the Legislature.

The transition to a nonprofit institute will change the administration of funds (from calls for proposals to grant oversight) from a single institution model with oversight by OPR, to an independent nonprofit with oversight from a board with broad public and private institutional representation. Additionally, the activities of the institute will be broader than the initiative. As projects mature, new technologies, tools, datasets and protocols will become available for wider use. Findings will become more actionable, and recommendations may be relevant across the health delivery network. The mission of the institute will include integrating successful precision health and medicine practices into the healthcare system.

While the Legislature has determined precision medicine enough of a priority to fund it over the last four years, this proposal raises several questions. First, staff notes that establishing a non-profit entity may not be the best approach for funding this type of research, as doing so would remove funding decisions from the annual appropriations process. Second, it is unclear whether $30 million is the appropriate level of funding. Lastly, given the potentially significant investment of General Fund dollars, a more robust level of reporting than proposed in the trailer bill is appropriate.

**Questions:**
- What kinds of flexibility does the non-profit approach give the Institute that using the annual budget process does not?
- What kind of outcomes is OPR targeting with this shift?

**Staff Recommendation:**
Hold open.

---

| Issue 2: OPR Housing Package Response |
| --- |

**Governor's Proposal:** The budget requests $333,000 in reimbursement authority and 2.0 positions in 2018-19 and 2019-20 to provide technical assistance as required by SB 2 (Atkins), Chapter 364, Statutes of 2017, and to create a technical advisory on recent statutory changes that affect the California Environmental Quality Act (CEQA).

**Background:** SB 2 created a $75 fee on the recording of every real estate instrument, paper, or notice. Fifty percent of the funds collected between January 1, 2018 and December 31, 2018, will be made available for local governments to update planning documents and zoning ordinances in order to streamline housing production. Five percent of those funds are available to the Department of Housing and Community Development (HCD) and OPR to provide technical assistance to local jurisdictions updating specified planning documents.

Public Resources Code section 21083 requires OPR to prepare and develop proposed guidelines for CEQA implementation, and OPR is responsible for drafting technical advisories on new CEQA legislation. SB 35 (Wiener), Chapter 366, Statutes of 2017; AB 73 (Chiu), Chapter 371, Statutes of 2017; and SB 540 (Roth), Chapter 369, Statutes of 2017, all provide CEQA streamlining benefits for housing projects. Specifically, SB 35 authorizes a streamlined, ministerial approval process for multifamily housing developments in localities that have failed to meet their regional housing needs assessment numbers. AB 73 provides local governments with the option of creating "housing sustainability districts" via a zoning ordinance. The ordinance must be analyzed in an environmental impact report and future housing development in the district meeting specified criteria is exempt from CEQA requirements. SB 540 permits a local government to establish a "workforce housing opportunity zone" by preparing a master plan and accompanying environmental impact report. The purpose of all three bills is to expedite housing projects by providing alternatives to project-specific environmental review.

**Staff Comments:** Staff finds this request generally reasonable. OPR has a statutorily-designated role in the implementation of the statewide housing package, and the Office has indicated that it is unable to absorb this workload within existing resources. However, it would be premature to approve this request at this juncture, given the ongoing discussions about the implementation of the first year of the housing package.

**Questions:**
- What factors in program implementation could result in more or less work for OPR in implementing the housing package?

**Staff Recommendation:**
Hold open.

| Issue 3: California Complete Count – Census 2020 |
|---|

**Governor's Proposal:** The budget requests $40.3 million (General Fund) and 22.0 limited-term positions to staff the California Complete Count effort to complement U.S. Census outreach, focusing on hard-to-count populations. This funding will be appropriated in 2018-19 and available for the duration of a three year effort crossing over fiscal years 2018-19, 2019-20, and 2020-21.

**Background:** Only once each decade, the U.S. Census Bureau attempts to count every resident in the United States. The next enumeration will be April 1, 2020, and will be the first to rely heavily on online responses. The primary and perpetual problem facing the Census Bureau is the undercount of certain population groups. Foreign-born residents, especially undocumented, non-white residents, children under five years old, especially those younger than one year old, and renters comprise the most undercounted populations. California has more residents in each of these categories than any other state.

California invested $24.7 million in outreach efforts for the 2000 Census and increased the Mail Participation Rate to 76 percent. California gained an additional Congressional seat as a result. California invested only $2 million in outreach efforts for the 2010 Census. As a result, the Mail Participation Rate declined to 73 percent. The Complete Count Committee raised roughly $10 million in private funding to augment its efforts for the 2010 Census. California's Congressional apportionment did not change as a result.

The 2010 Census cost the Federal government over $12 billion over the life cycle of the enumeration (which includes the preparation for and aftermath of the count). The Census Bureau estimated that completing the 2020 Census in a similar manner as 2010 would cost over $17 billion. To keep costs closer to the costs of the 2010 Census, the Census Bureau is making a number of significant changes to count operations, including moving to a primarily online response system; relying on local government data for address lists, rather than manually updating the lists; and reducing the follow-up field visits to increase response rates by up to 50 percent. The Census Bureau also canceled the 2017 field test of the online response system and reduced the end-to-end "field test" of the census system from three locations to one.

Moving to a primarily internet-based census is a significant change from prior practice. Only a portion of households will receive a paper census; the rest will receive instructions by mail for how to respond online (or by phone). Concerns have been raised about individuals' willingness to respond via the internet given concerns about information security. These concerns—in combination with the potential for a question about citizenship—raise the possibility of an undercount in California in 2020.

The 2017-18 Budget Act provided up to $10 million for initial census preparation activities. Of that amount, $7 million was provided for grants to local governments for participating in the Census Bureau's Local Update of Census Address (LUCA) program. (As noted previously, the Census Bureau is relying heavily on administrative data to update its national address list.) The Department of Finance also received authority to spend up to $3 million on initial outreach activities for the 2020 Census. These funds are being used to support initial activities of the Complete Count Committee.

**Staff Comments:** The Administration has indicated that the funding proposed for 2018-19 would support the activities of the committee through the 2020 Census. Almost three-quarters of the funds

would be dedicated to a media campaign ($17 million) and working with local community based organizations ($12.5 million). Community organizations would conduct most of the direct outreach to individuals to encourage them to complete the census.

The decennial census is one of the main factors that underlie how hundreds of billions of dollars of federal assistance are distributed. For instance, the census count is used to determine states' Federal Medical Assistance Percentage (FMAP) for Medicaid, known in California as Medi-Cal, which is based on per-capita income. A lower per-capita income can result in a higher FMAP and more federal funds per Medi-Cal participant. The census is used to determine each state's per-capita income. This year, California expects to receive over $60 billion in federal assistance for the Medi-Cal program. Other major federal assistance programs that use census data include highway funding, Section 8 housing vouchers, and special education grants.

**Staff notes that** this proposal would bring total state funding for census-related activities to $50 million between 2017-18 and 2019-20. Due to the significant changes to the census, providing state funding to target hard-to-count populations is reasonable. However, the specific mix of spending categories is a source of concern. The 2020 Census will be taking place in a presidential election year when advertising can be particularly expensive. Census day, however, will occur after the California primaries (which move to March in 2020). Consequently, media costs may not be as high in the weeks leading up to the census as they will be earlier in the year. Given the large amount of funding set aside for community-based organizations, it is important to determine which organizations are involved and to ensure that they have the requisite resources and capabilities to perform adequate outreach.

**LAO Comments:** California is the first state to set aside funds for census outreach. Given the major changes to the upcoming census—and the potential impacts to state funding—preparing for a significant outreach campaign can be in the state's fiscal interest.

**Questions:**
- Where are the pain points and the major risk factors? What factors could lead to a low response rate in California? How does OPR plan to address them?
- What are the key activities in the California Complete Count effort? Which activities will give us the most "bang for our buck?"

**Staff Recommendation:**
Hold open.

**EXHIBIT D**

INITIAL REPORT TO THE
OFFICE OF GOVERNOR EDMUND G. BROWN JR.

# Counting All Californians in the 2020 Census



Submitted on behalf of the Census 2020 California Complete Count
Committee and the California Government Operations Agency

October 2, 2018

# Initial Report to the Office of Governor Edmund G. Brown Jr.
# COUNTING ALL CALIFORNIANS IN THE 2020 CENSUS

## FOREWORD

**Section A.** Introduction..................................................................................... 1
**Section B.** Background on the Census and California...................................... 2
**Section C.** Census Roles and Partnerships..................................................... 7

## Initial Report to the Office of Governor Edmund G. Brown Jr.
## COUNTING ALL CALIFORNIANS IN THE 2020 CENSUS

**Section 1.** California Complete Count Committee ........................................ 11
**Section 2.** Initial Outreach Concerns and Response Strategies.................... 13
**Section 2a.** Housing ...................................................................................... 15
**Section 2b.** Trust and Confidentiality .......................................................... 17
**Section 2c.** Access and Outreach.................................................................. 20
**Section 2d.** Content and Citizenship ............................................................ 25
**Section 3.** Next Steps.................................................................................... 28

## APPENDICES

**Appendix A.** California Complete Count Committee Membership............... 29
**Appendix B.** References ............................................................................... 31

# FOREWORD

## Section A. Introduction

As mandated in Article I, Section 2 of the Constitution, every 10 years, the federal government counts all persons living in the United States (U.S.). The U.S. Census Bureau collects this information, and the U.S. Census Bureau and individual states, local governments, tribal governments and community based organizations (CBOs), non-governmental organizations (NGO), and faith based organizations conduct outreach to publicize and support the count. The federal government then uses the information to determine how many federal dollars flow to each state and how many members of Congress each state will have.

With its highly diverse population and size, the State of California (State) faces the greatest barriers in the nation to ensure that it receives an accurate count and thus receives an equitable share of funding and representation.

To overcome these challenges, the State is undertaking an extensive outreach strategy for the federal 2020 Census to encourage full participation among State residents.  In support of the strategy, the Governor has created an advisory committee, the California Complete Count Committee (Committee). The Committee is a volunteer panel of 25 community leaders representing diverse populations from across the State. It is charged with raising awareness of the Census, collaborating to support outreach efforts, and offering its expertise and insights on outreach strategies. An early step in the Committee's work is to prepare a report to the Governor describing initial concerns and recommendations about outreach and the 2020 Census.  This foreword, prepared by the California Complete Count Office of the Government Operations Agency presents essential background and context to frame the following report from the Committee to the Governor.

The State has focused its outreach and communication efforts on the areas of greatest impact: communities historically undercounted in the Census. These "hard to count" (HTC) populations are defined by the U. S. Census Bureau using several variables, including but not limited to: housing conditions, low-income status, citizen and non-citizen status, reliance on languages other than English, mobility, and displacement by disasters. Of particular note are communities of color, children, rural residents, immigrants (including those who are undocumented), LGBTQ+ and people with disabilities as these groups fall within historically undercounted populations.

The Governor's Executive Order (EO) of April 2018 (EO B-49-18) established the Committee to advise on and assist in the State's outreach strategy. The Committee and its Working Groups (described in the Committees' Initial Report) receive presentations from experts within and outside of State government and prepare recommendations to develop and implement the State's 2020 Census outreach and communication strategies. The Committee shares its thinking

and recommendations, and the status and results of outreach efforts, through its Initial Report and follow-up reports to the Governor on a biannual basis through June 30, 2021.

## Section B. Background on the Census and California

The stakes for the 2020 California Census count are high.  An undercount can result in the loss of billions of dollars of federal funds, as well as congressional representation in the U.S. House of Representatives. The data collected by the Census is used to distribute federal funds to states.  For California, this translates to funding for more than 70 federal programs including but not limited to the Supplemental Nutrition Assistance Program (commonly referred to as "food stamps" or SNAP), roads, school programs, school lunches, children's health insurance, Head Start and foster care. In short, an accurate and complete Census count is essential for the well-being of all Californians.

## 2020 Census Challenges

There are ongoing and unique challenges to ensure that all residents are accurately counted in 2020. Ongoing challenges include accurately and completely accounting for historically undercounted and HTC populations (as described in Section A).

The 2020 Census also presents several unique challenges, including the first ever digital census, the inclusion of a specific question about citizenship, intensifying fears among immigrants due to the current political and social climate, rising public distrust of government, the lack of trust in the security of personal and online information, and reduced federal funding.  The following provides brief descriptions of some of these unique challenges.

### First Digital Census
For the first time in U.S. history, as part of modernization and cost-cutting efforts, there is an expectation that most households will complete the Census survey online. While this may reduce costs and increase participation in the long run, it is a substantial change for the public and the impact is unknown. There are predictions of a depressed census count among numerous populations due to limited digital access, cybersecurity concerns, or lack of digital literacy.

### Census Citizenship Question
One of the most significant changes to the 2020 Census questionnaire is the addition of the citizenship question. Although the Census Bureau has not conducted sufficient research and testing of the citizenship question in the Census environment, as is typically done for such changes, the Census Bureau has strong evidence from its initial research that including the citizenship question suppresses responses. As such, adding this question will likely discourage immigrants, both citizens and noncitizens, from participating and will result in an inaccurate count as well as reduced representation and allocation of resources for states with large numbers of immigrants. Furthermore, the inclusion of this question will increase the cost of

conducting the Census by reducing overall response and requiring additional resources for follow up.

### Increasing Immigrant Fears & Distrust

The federal administration's focus on immigration, including rapidly changing policies and practice, and arbitrary and aggressive enforcement of immigration laws have led to uncertainty about how immigrants will respond.  This dynamic situation will remain a major concern of the Committee.

### Lack of Trust in Government & Security of Information

Surveys show a widening distrust of government and similar institutions among diverse groups of people for a variety of reasons. In addition, many Americans are concerned about data confidentiality.  The increasing distrust and concern about confidentiality may impact traditional methods of gathering Census data by causing residents to skip the Census altogether, exclude certain household members, or refuse to open doors to Census enumerators.

### Lack of Early Federal Funding

The 2020 Census has been impacted from the delayed appointment of a permanent 2020 U.S. Census Bureau Director and Deputy Director, as well as a mandate to keep costs at 2010 levels. The result has been program cuts, including cuts to usability testing, improvements to user experience, and cybersecurity safeguarding.  Congress did approve a significant increase in funding for Census in March 2018.

## California's Unique Challenges

While grappling with the same challenges faced at the federal level, California has considerable challenges of its own in the mission for an accurate and complete count. California is the largest and hardest to count state, with a large number of foreign-born residents and significant populations of some of the nation's hardest to count populations.

### Language Access Concerns

Estimates show that California's population has grown by more than two million residents since the 2010 Census, with 42% of residents speaking a language other than English at home. Californians speak more than 200 non-English languages. According to the latest Census Operational Plan draft in the Federal Register, the U.S. Census Bureau will provide the online census form and telephone/electronic census assistance in 12 languages other than English; the paper form in English and Spanish – a departure from the six languages included in 2010; and limit the language assistance provided for online and telephone questionnaires. Language guides and glossaries will be provided for 59 languages. This poses a challenge to effectively message and connect to the State's many limited English proficient, and non-English speaking individuals.

### Hard to Count Populations

Twenty percent of California census tracts are in the hardest to count category, and 66% of California census tracts are harder to count than the national average (calculated based on Low

Response Scores). Among its hard to count populations, in 2017, California was home to almost 10.7 million foreign born residents, over 17.5 million residents living in rental housing, over 24.9 million residents who are non-white, mixed race, or Hispanic, over 2.5 million children under the age of five, and an estimated 2 million undocumented residents. A very high percentage of California residents fall within at least one HTC category.

## California's Response to 2020 Census Challenges

While the 2020 Census poses challenges, lessons learned from previous census counts are informing efforts to reach historically undercounted and HTC populations in California.

### Building on Lessons Learned from 2000 & 2010 Census Efforts

During the 2000 Census effort, the Legislature and Governor allocated $24.7 million for a dual-pronged State effort involving a targeted, multi-lingual, multi-media advertising campaign and focused outreach, in partnership with regional, culturally competent organizations that used trusted messengers to engage HTC communities. The strategy achieved a 5% increase in the state response rate, and California performed better than the national average, 70% versus 67%.

In 2010, with drastically limited resources during the great recession, the California Complete Count Committee staff's efforts focused on convening, coordinating and building the capacity of embedded leaders in HTC communities to do direct outreach.  Community leaders with established networks, relationships and trust within their communities received support from the State to conduct grassroots Census outreach efforts. The U.S. Census Bureau also benefited from this level of organization, by capitalizing on valuable networks and resources at state and local levels.

### A Robust Effort for 2020

These past successful strategies provide the foundation for the State's approach to 2020 Census outreach, which the State is adapting to today's context and needs. Critical for success in 2020 will be understanding the new and challenging environment; leveraging the resources of extensive partner networks; and coordinating outreach efforts at the State, local and federal levels.

State leaders have made a sizeable commitment to the 2020 Census by investing approximately $100 million towards upcoming strategies and other tasks that will help ensure an accurate and successful count of all Californians. Specifically:

- The 2017 Budget Act provided $3 million to the Governor's Office of Planning and Research for initial planning activities.

- The 2017 Budget Act also included $7 million for the State Department of Finance to offer incentives to cities and counties to update address information for the U.S. Census Bureau's address update process, termed the Local Update of Census Address Operation (see Page 8 for more information on this operation).

- The 2018 Budget Act includes an additional $90.3 million for statewide outreach and strategies that aim to increase the participation rate of California's hard-to-count populations in the decennial census.

The State's outreach and communication strategy is in initial stages of development. Key methods executed or planned for 2020 to date include:

- Formation of the **Statewide California Complete Count Committee** in April 2018.

- Statewide needs/readiness assessment process, including conducting 24 **Regional Convenings** held throughout the State.

- Initial **strategic outreach partnering with trusted messengers** to reach and support historically undercounted and HTC communities, including greatly extended support for local community-based organizations (CBO) to conduct multi-lingual, disability and culturally competent outreach and support. Partnerships may include but may not be limited to:
  - Faith-based organizations, CBOs and NGOs
  - Foundations
  - State agencies
  - Local governments
  - Schools
  - Local Assistance Centers
  - Offices of local elected officials
  - Caseworkers
  - Unions

- **Targeted multi-media, multi-lingual messaging** with an emphasis on culturally and linguistically competent content, partnering with ethnic media, and extensive testing and the use of sector and region-specific messaging toolkits. Communications will include advertising, social media, publicity and promotions. As part of communication support, the State is helping private message testing organizations to coordinate and share information with each other to reduce gaps and duplication of effort.

- **New technological tools and capacities**. The state has contracted with ESRI, the company that makes ArcGIS mapping software, to craft and launch **SWORD**, an interactive, cloud-based **Statewide Outreach and Rapid Deployment platform**. SWORD will host and collect California Census information and foster sharing, coordination and collaboration, and informed planning and decision-making among all outreach and messaging partners, including local governments, foundations, and CBOs/NGOs. The platform will host interactive mapping capabilities to share spatial data and assist in targeting groups and census tracts with low response rates.

- **Development of school curriculum on the Census.** The State is working with the Sacramento, Los Angeles, and Fresno County Offices of Education to develop and pilot school-based 2020 Census classroom curriculum for 5th, 8th, 11th and 12th grade

students. The U.S. Census Bureau will partner in implementing these pilots in school districts in the involved counties.

The State's 2020 Census effort is staffing up, establishing operational structures, and starting to coordinate with partners. Through 2020, State outreach and communication will move through three phases:

- Phase 1: Convene, Collaborate, Capacity Build – FY 17/18
- Phase 2: Educate, Motivate, Activate – FY 18/19
- Phase 3: Count (Deploy, Count, Assess) – FY 19/20
- Closeout: Nonresponse follow up, results, report, wrap-up – July-December 2020

The State is currently completing Phase 1 and entering Phase 2.

## Section C. Census Roles and Partnerships

Many governmental and nongovernmental organizations throughout the State will have significant involvement in the 2020 Census, bringing diverse sets of strengths and expertise to the process, and working within different opportunities and constraints. To achieve a California complete count in 2020, and to utilize resources efficiently, a broad range of collaborations and partnerships will be needed. The success of a complete count is dependent on each partner fulfilling their role and bringing their resources to bear during Census outreach and enumeration efforts.  This section describes some of the core roles that various organizations will play in the 2020 Census.

### Federal Government: U.S. Census Bureau

While the State plans to dedicate extensive resources to the 2020 Census, there is a clear division of responsibility and roles between the State and the federal government.  Many areas that are within the federal government's purview are not open to State involvement. Key federal responsibilities include:

#### Design and Conduct the Census
The federal government has the constitutional responsibility to design and conduct the Census (via the work of the U.S. Census Bureau). While the federal government takes input from states, it makes the final decisions about the implementation of the Census. This includes but is not limited to tasks such as development and testing of the Census form, hiring census enumerators, and similar.

#### Update of Census Addresses
The federal government is responsible for verifying and updating the national database of addresses, referred to as the Master Address File. The U.S. Census Bureau partners with state, local and tribal governments, offering them an opportunity to review and send updates to this address list through a process called the Local Update of Census Addresses Operation (LUCA). That process has ended for the 2020 Census, but local governments will learn results of their work in summer 2019, and will have an opportunity to appeal decisions made on addresses suggested but not incorporated.

#### Data Confidentiality
The federal government is responsible for protecting confidential data that residents provide on census forms. Under Title 13 of the U.S. Code, Section 9, census data is strictly protected as confidential, and it is illegal for the U.S. Census Bureau or any federal employees to share personal information with any other government agency, local law enforcement, health and human services, the White House, etc.  Under Title 13, all Census Bureau employees swear a lifetime oath to protect confidential information and risk a felony conviction, up to five years imprisonment, and/or a $250,000 fine if they violate Title 13.

### Training of Local Complete Count Committees

The U.S. Census Bureau works with local governments to help them set up and train members of local Complete Count Committees who collaborate with CBOs, NGOs, faith based organizations and others to use local knowledge and raise local awareness of the Census.

## State Government: Governor's Office, Government Operations Agency, and California Complete Count Office

### Outreach and Communication

While the responsibility of the Census count and related data management rests with the U.S. Census Bureau, the State, through the California Complete Count Office of the Government Operations Agency will conduct a robust outreach and communication effort to reach and inform California's many diverse residents.  To accomplish this, the Complete Count Office will employ an informed, committed, diverse, multi-lingual, disability-aware staff to design and execute outreach efforts. It will partner with local governments, foundations, CBOs and NGOs to ensure outreach is undertaken by trusted messengers, is culturally, disability and linguistically appropriate, and targets the significant historically undercounted and HTC communities in the State.

### Filling Gaps

The State will help fill gaps in U.S. Census Bureau outreach, communication and support, and publicize or support federal programs and actions. For example, the State can provide outreach materials in languages not provided by the federal government; help to publicize Census enumerator hiring opportunities; and can fund navigators or other outreach to HTC populations.

### California Complete Count Committee

The Committee lends its expertise to advise the State on outreach, communication and access issues, and to make recommendations to the U.S. Census Bureau about information and materials needed. Its members work with their networks and communities to spread awareness of the Census and to collaborate with partners to support Census outreach.

### Strategic, Local Partnerships

It is envisioned that a significant part of California's outreach strategy to reach historically undercounted and HTC populations is the formation and support of strategic, local partnerships.  Foundations, CBOs, NGOs, non-profits, faith-based organizations, local government agencies, and local elected officials are critical to leverage existing networks, resources and expertise. This relational, grassroots approach will provide valuable infrastructure to adapt messaging and outreach strategies, based on continually changing political and social circumstances and incoming data on Census non-participation.  State and foundation funding will serve to enhance the resources and reach of these partner organizations during the 2020 Census.

## Local Government

Local counties and cities play a significant role to ensure their populations are aware of the Census, and are ready to be counted. The following provides examples of these roles.

### Update of Census Addresses

As mentioned above, in California, local governments update addresses for the Census through the LUCA. In addition, they may work with CBOs, NGOs and faith based organizations to canvas neighborhoods for unconventional housing and similar conditions that might result in a local undercount. The timeframe for submitting addresses for 2020, as noted above, has passed, but local governments will have an opportunity in 2019 to appeal once the U.S. Census Bureau releases its updated address list. With incentives offered by the State to local governments, California local governments participated in the 2020 LUCA operation at a significantly higher rate than the national average. More than 90 percent of California counties and more than 84 percent of California cities participated in LUCA, compared to about 60 percent of counties and about 37% of cities nationally.

### Local Government Complete Count Committees

Complete Count Committees are being formed at the local level to conduct focused outreach and increase the count. They will use local knowledge and resources to inform and promote targeted outreach efforts. They can provide a nexus between local and state governments, CBOs / NGOs, communities, the U.S. Census Bureau, and similar.

## Native American Tribal Governments and Communities

The U.S. Census Bureau conducts government-to-government relationships with federally recognized Tribes. Starting in 1990, the Bureau began hiring tribal members as enumerators and other positions. Tribes, like states, may experience reductions in federal funding because of undercounts, which are significant on tribal lands. Tribes may participate in the LUCA, or delegate their authority to a state or local government. In addition, Tribes may interact with the US Census Bureau on other Bureau programs, including sharing information about tribal boundaries for the yearly Boundary and Annexation Survey and the Tribal Statistical Areas Program. In the 2020 Census, the U.S. Census Bureau is also using a Tribal Government Liaison Program to share information and develop a trusted relationship with participating Tribes. The State government is initiating government-to-government consultation with California Native American Tribes (both federally-recognized and non-federally recognized) to explore opportunities to partner with Tribes around outreach and communication to all Native Americans in California. There is a need to outreach and engage with Native Americans in California that do not live on tribal lands. That may include California natives as well as Native Americans that work or live in California native communities, but whose tribes are located elsewhere in the U.S.

9

## Non-Governmental and Community Based Organizations, Foundations

Foundations NGOs, CBOs, faith based organizations and similar organizations are essential partners to reach, inform and support California's historically undercounted and HTC populations.

### Messaging and Outreach

Foundations, faith-based organizations, NGOs and CBOs are already leading the research on messaging and designing communication strategies. A wide variety of these organizations are involved, supporting efforts such as canvassing unconventional addresses, organizing neighborhood-based events and face-to-face efforts; serving as trusted messengers to historically undercounted and HTC communities, and offering information about where to find and count people who might otherwise be overlooked.

## Group Quarters Administrators

Administrators of jails, prisons, dormitories, long-term care facilities and other institutions that house large numbers of people who do not have other addresses, have a unique responsibility during the Census: they provide the information about the number and pertinent personal information of each resident to the U.S. Census Bureau.

# Initial Report to the Office of Governor Edmund G. Brown Jr.
## COUNTING ALL CALIFORNIANS IN THE 2020 CENSUS

## Section 1. California Complete Count Committee

The California Complete Count Committee brings together public and private partners from across the State to increase awareness about the Census, encourage all Californians to participate, and assist with the development of an effective California outreach strategy. Committee membership and associated background information is presented in Appendix A.

The Committee meets quarterly. Its activities include, but are not limited to:

- Provide expertise and insight and recommend effective outreach strategies to the California Complete Count Office (Office). A first draft of the strategy is delivered to the Governor's Office in this Initial Report.
- Use individual and collective knowledge, expertise, and influence to encourage all communities, particularly historically undercounted and HTC communities, to complete the 2020 Census questionnaire in a timely and accurate manner.

The role of each Committee member is to:

- Raise awareness about Census efforts to community leaders and guide them to develop strategies for a complete and accurate count in their respective communities.
- Provide expertise to develop an outreach strategy leveraging existing community partnerships.
- Participate as experts, and/or collaborate with other experts, on Census established working groups.
- Identify effective outreach strategies and provide recommendations to the California Complete Count Office.

### Working Groups

To help develop a robust strategy, the Committee formed four internal Working Groups to conduct focused inquiry and discussion and develop recommended strategies on specific areas of concern regarding Census outreach and participation.

- The **Content and Citizenship** Working Group considers Census questionnaire content matters, including the citizenship, gender, race and ethnicity questions.

11

- The **Trust and Confidentiality** Working Group looks at security, confidentiality of personal information, ways to build trust, and how to best educate Californians on risks, protections and benefits of census participation.

- The **Access and Outreach** Working Group's focus includes communication with diverse populations, adequate language and disability access, digital literacy, and how best to outreach to historically undercounted and HTC communities.

- The **Housing** Working Group considers the challenges of counting residents who are experiencing homelessness or housing instability, or who may live in places that lack a formal address, including where and how such populations will be counted.

Each Working Group has established its purpose and prepared an initial list of concerns and recommended strategies.  These are presented in the next section.

## Section 2. Initial Outreach Concerns and Response Strategies

Initial concerns and recommended strategies identified by the Committee are presented below. This input highlights initial perspectives to inform the State's development of its overall communication and outreach strategy for the 2020 Census.  These early concerns and recommendations represent initial thinking by the Committee and its Working Groups. Members of the Working Groups will provide expanded conclusions and refined recommendations in future reports to the Governor.

The Working Groups were tasked to specify their individual purposes and/or goals, and were given broad latitude to create their own approaches on how to identify issues of concern and develop concerns and recommendations related to their areas of focus. As a result, each Working Group chose a slightly unique way to develop and communicate outcomes from their deliberations. For that reason, the following sections are formatted similarly, but not identically.

While the Working Groups have distinct charges, and each held discussions and developed recommendations independently, several of the initial issues of concern and strategies overlap significantly between two or more of the Groups.  This congruence underscores important themes identified by a broad range of the diverse Committee membership. In addition, attendees at the 24 regional 2020 Census convenings around the State emphasized similar themes and concerns, indicating the importance of these issues across a wide variety of communities and partners.

These initial, important common topic areas include:

- Identifying trusted messengers to best communicate with historically undercounted and HTC communities
- Utilizing ethnic media to communicate with HTC communities.
- The need to conduct focused outreach to those experiencing homelessness, housing instability and/or living in unconventional housing.
- Culturally, language and disability competent messaging and outreach to diverse, historically undercounted and HTC communities.
- The growing environment of public fear and/or distrust of government, in concert with the first digital census and the question on citizenship.

### Process

The Working Groups began their work with an initial round of meetings in early to mid-July to discuss roles, areas of focus, and desired deliverables. A second round of meetings was held on July 30, 2018 in conjunction with the full Committee meeting in Sacramento. Each Working Group crafted its own agenda for the July 30th meetings; two Working Groups hosted presentations related to their area of focus; all four Working Groups held focused discussions

on topics related to this report, including purpose, desired outcomes and concerns and recommended strategies. Working Groups met again in late August to finalize their initial input to this Initial Report.

Using collaborative discussion and voting methods, the Committee reviewed the report and in particular, the initial concerns and recommended strategies.  Committee members discussed the appropriateness to include specific information and conducted numerous non-binding assessments to ensure that each member could support the initial information.  On completion of robust discussion and iterative assessments of support, the Committee Chair conducted a formal roll call vote to ensure that the content in this report reflected the Committee's collective support and that it was ready to be presented to the Governor. On October 1, 2018, this report was approved by unanimous consent of Committee members present during their quarterly meeting.

## Section 2a. Housing

### Purpose of the Housing Working Group

To identify every type of place a historically undercounted and HTC person could live in California, and to propose strategies about where and how to count them, based on their unique housing/living situation during the 2020 Census enumeration period.

_____

### Initial Issues of Concern: Non-traditionally Housed Individuals Missed in the Census Count

California communities have emerging populations of individuals who reside in unconventional housing. Traditional outreach will miss populations that do not have addresses or who experience housing instability. These individuals may live on the street, in cars, or in unconventional housing such as converted garages or backyard trailers. They may also live in non-traditional households, as when multiple families or unrelated individuals share one address.

### Initial Issues of Concern: Current Housing Identification Methods are Insufficient

The U.S. Census Bureau's LUCA does not include all unconventional housing arrangements. Recent studies conducted in Fresno, San Jose, San Francisco, and Stockton, found that up to 6% of housing units in Census tracts were not included.

### Recommended Initial Strategies

- Create a clear, comprehensive, and evidence-based description of all non-traditional places and unconventional housing units where people need to be counted.

- Clarify special populations of people who are experiencing homelessness and housing instability and where they are most likely to reside.

- Identify trusted organizations and messengers on the ground that are best suited to reach people who may be experiencing homelessness, housing instability, and/or are living in non-traditional arrangements.

- Educate and motivate local governments to continue to follow through on the LUCA appeals process to improve the accuracy of the Master Address File.

**Populations that need to be outreached to include:**

- Vulnerable populations of concern to the Housing Working Group include, but are not limited to:
  - Low-income
  - People of color
  - Immigrants
  - Limited English proficient
  - Veterans
  - People with disabilities
  - Children
  - Seniors

- Those experiencing personal circumstances during the count that make them harder for enumerators to find, such as individuals who are:
  - Experiencing homelessness and/or couch surfing
  - Migrant and seasonal farm workers
  - Previously incarcerated
  - Foster youth
  - Young and mobile
  - Transition-aged and aging out of foster care
  - College students
  - Recently arrived immigrants who have not established permanent housing
  - People with mental health and intellectual/developmental disabilities
  - Displaced people due to natural disasters

- Those living in unconventional places, such as individuals who are:
  - Living in unconventional housing
  - Living in tent cities
  - Living in vehicles
  - Members of multiple-family households
  - Incarcerated, including in juvenile detention
  - Living in developmental centers, state hospitals, nursing homes and rehabilitation facilities.

**Potential locations or organizations to outreach to these populations include:**

- Navigation centers
- Education institutions at all levels
- Safe spaces these individuals may frequently attend, including churches and other religious and community institutions
- Organizations that work with homeless communities
- Organizations that work with disability communities
- Group quarters

16

# Section 2b. Trust and Confidentiality

## Purpose of the Trust and Confidentiality Working Group

To develop goals and recommendations that build a high level of trust in confidentiality of Census information to encourage all Californians to participate fully.

_____

**Goal #1:** Provide ideas as to how the State can supplement protection for the confidentiality of peoples' Census information from federal government misuse, technological breach, or misuse by any other party.

## Initial Issues of Concern: Goal #1

- The potential for federal-level sharing of census data, between federal agency departments, in violation of Title 13.

- The possibility that CBOs, NGOs, faith based organizations and similar organizations tasked with Census outreach and/or collecting Census data are not properly trained to maintain confidentiality of data.

- Errant government employees potentially sharing data without authorization.

- Breach and hacking of the data storage systems.

- The unprecedented level of distrust in the federal government by many Californians; and the general feeling of uncertainty that the current federal administration will follow federal law.

- The inclusion of highly sensitive questions in the Census form, such as the citizenship question, generates fear, given the current federal administration's focus on expanding immigration enforcement.

- Digital census forms may provide greater opportunity for data breach.

## Recommended Initial Strategies

- The State collect and collate a list of all existing legal protections for the confidentiality of census information provided by both State and federal law.

- The State consider supplementing legal protections for Census information, even if State-level protections are redundant of federal law.  This would reassure the public on confidentiality of data. For example, the California Attorney General's Office could join with other state attorneys general to offer a shield mechanism for confidential data.

- The State consider what can be done by governments or NGOs beyond legal or legislative actions to bolster the public's trust that confidentiality will be upheld.

**Goal #2:** Suggest messaging that will build higher trust with all historically undercounted and HTC communities, and inspire census participation.

## Initial Issues of Concern: Goal #2

- California has a large number of different HTC communities, and a diverse number of residents that fall within traditionally HTC communities.

- Messaging is never "one size fits all." Messaging should be specific and tailored to different community groups, locations, etc. Furthermore, messaging, messengers and outreach methods should be culturally relevant/significant.

- The U.S. Census Bureau may not have sufficient resources to conduct outreach to all historically undercounted and HTC communities. There is an opportunity for the State to fill gaps left by federal level messaging efforts.

- California has a high number of Temporary Protected Status (TPS) communities (people who may temporarily reside legally in the United States after the federal government has determined their country's conditions are unsafe for return) In the future, these communities might transition from being lawfully permitted to undocumented in status.

## Recommended Initial Strategies

- The State should work with appropriate persons to identify how the occurrence or dissolution of TPS might impact efforts to ensure a complete count across the State.

- Incorporate the use of ethnic media (print and digital) in Census outreach methods and information distribution.

- The State should consider what can be done outside law to bolster the public's trust that confidentiality will be upheld, such as informal activity within governments or by NGOs, CBOs, faith based organizations and similar.

**Goal #3:** Identify current and developing concerns on the ground, and develop specific strategies or tactics to address these specific concerns.

## Initial Issue of Concern: Goal #3

Census is a dynamic effort. It is nearly impossible to anticipate what might trigger new Census-related concerns within communities (for example, a proposed boycott from a community, an action taken by the federal government, etc.)

## Recommended Initial Strategies

- No initial strategies suggested yet for Goal #3.

## Section 2c. Access and Outreach

### Purpose of the Access and Outreach Working Group

California and Californians are very diverse. This diversity includes but is not limited to historically undercounted communities and communities diverse in race, age, disability, level of literacy, language, language access, digital access, sexual orientation, residential status, citizenship status, and socioeconomic status.  The purpose of this Working Group is to develop recommendations and smart strategies related to:

**Access –** so that all of California's diverse communities, for the purpose of being counted, have access to:
- Official Census information and forms, via digital, paper, phone and in-person methods;
- Necessary information, materials, and support related to the Census;
- The languages necessary to understand and receive that information, materials and support; and
- Jobs related to Census enumeration and outreach.

**Outreach –** so that:
- The State and its partners can reach California's diverse, historically undercounted and HTC communities;
- Information materials and marketing strategies are developed and implemented with the State's diversity in mind;
- All diverse communities know the importance of the Census; and
- All residents have access to and assistance in being counted in 2020.

_____

### Initial Issue of Concern: Language and Language Access

The U.S. Census Bureau will provide the online census form and telephone/electronic census assistance in only 12 languages other than English, and the paper form in only English and Spanish. Language guides and glossaries will be provided for 59 languages. However, there are more than 200 different primary languages spoken throughout California, and many of those speaking these languages speak little to no English. It is important that translated materials are accurate, appropriate and culturally sensitive in the respective language.

### Recommended Initial Strategies

- State census materials should be produced in as many languages as possible, or at a minimum, for the maximum number of languages the State currently has capacity to

support. The State should place highest priority on those languages other than the 12 languages supported by the U.S. Census Bureau. Consideration also needs to be given to providing outreach to immigrants whose native language is unwritten.

- A bilingual review committee should be formed for each language to review translated materials and ensure that they are translated accurately and in a way that is culturally competent.

## Initial Issue of Concern: Digital Access

For the first time, the Census is expected to be completed online, and the U.S. Census Bureau will prioritize receiving such responses as a cost efficiency measure. The emphasis on the online mode may impose access barriers to seniors, people with disabilities, lower-income people, and populations who are less proficient at interacting online, or who have limited or no digital access.

## Recommended Initial Strategies

- Develop messaging to communities that have limited to no digital access so that they have access to census survey information via phone or paper forms.

- Ensure that all internet information is mobile accessible.

- Ensure that all internet information is accessible to people with disabilities.

## Initial Issue of Concern: Diversity of Census Enumerators

In the past, census enumerators could be non-citizens, and such individuals were considered trusted messengers. As of now, this is not the case for the 2020 Census. To increase the likelihood that the enumerator population is reflective of diverse communities, thereby increasing their access to the Census, many more historically undercounted and HTC community members must apply than the number of open positions that exists.

## Recommended Initial Strategies

- To ensure the population of enumerators hired by the U.S. Census Bureau for California is reflective of the diverse communities the enumerators will be working with, the State should include a requirement for contractors and county-level Complete Count Committees that they prioritize outreaching to historically undercounted and HTC communities about enumerator recruitment, and share job announcements when they are posted by the U.S. Census Bureau.

- The State should support and encourage hiring of local community navigators to help answer census questions and fill the gaps in enumerator HTC community expertise and familiarity.

## Initial Issue of Concern: Historically Undercounted Communities

Historically undercounted communities, particularly those that have received minimal outreach around the Census in the past, will remain at risk to be undercounted during the 2020 Census.

### Recommended Initial Strategies

- The State should:
  - Review statewide data to identify historically undercounted communities
  - Prioritize these communities' needs;
  - Identify the respective barriers these communities face; and
  - Develop approaches to overcome these specific barriers.

## Initial Issue of Concern: Accessibility of Information to People with Disabilities

People with disabilities, including sensory disabilities such as deafness or blindness, might require assistive technologies to access information, and would face barriers to access Census information and to participate in the Census if information and technology does not consider accessibility. Many web-based materials may not be easily accessible to people with disabilities.

### Recommended Initial Strategies

- State and federal Census materials should be developed to be accessible to people with disabilities. This would include making materials available in braille, extra-large font and American Sign Language, and ensuring that online materials are screen-reader and contrast/resolution accessible.

- Before being published, sample materials should be tested by a committee of diverse disability community representatives, including communities with intellectual, developmental, mental health, physical and sensory disabilities. This is in line with the state's current practices by the Secretary of State's Office.

## Initial Issue of Concern: Literacy Level of Outreach Materials

Outreach materials may not be accessible to the full range of literacy levels and thus the greatest number of people.

### Recommended Initial Strategy

- Utilize "plain language" and "information usability" practices in Census outreach and informational materials, keeping reading level in mind when developing content.

## Initial Issue of Concern: Outreach to Non-Traditional Housing and Housing Unstable Populations

The myriad of non-traditional housing arrangements of California residents will contribute to challenges in outreach, and as a result, these historically undercounted and HTC communities will be undercounted. For example, when multiple families live in a single-family residence, only one family may be targeted by U.S. Census Bureau outreach. Residents living in converted garages and basements without a separate address will be overlooked. Residents living in group quarters such as prisons, jails and dorms do not receive individually targeted census outreach. Some group quarters administrators have highly efficient systems to count and report populations to the U.S. Census Bureau, while others do not. In addition, there are outreach challenges for populations who are likely to be more mobile, such as those on probation, students who may be in-state or out-of-state, or others who may transition housing during the count.

### Recommended Initial Strategies

- Consult with the State Department of Finance and other entities with data on non-traditional housing.

- Consider how to best outreach to people in non-traditional and housing instable situations so they have information on how and when to complete the census form. For example, identify responsible administrators at prisons who will complete the census form on behalf of all persons currently residing there.

- U.S. Census Bureau provide the California Complete Count Committee a briefing on group quarters enumeration and outreach methods to better inform development of enhanced recommendations for access and outreach strategies.

## Initial Issue of Concern: Apathy and/or Lack of Trust in Government

Among the general public, there is distrust of government at the State, federal and local levels, as well as concerns around how census information about individuals might be used. This distrust may be further projected on to enumerators, census kiosk workers, trusted messengers, media campaigns, and others providing census outreach and support.

### Recommended Initial Strategy

- Create census media messaging that includes trusted messengers, and is tailored to and responsive to a particular community culture.

## Initial Issue of Concern: Media Messaging

Media messaging and associated efforts may be inconsistent with or not adequately informed by HTC and local communities over the course of the Census outreach period. In addition,

messengers may lack the evidence-based information needed to inform their messaging. Media contracts could go to organizations that do not have an established history of working in and with historically undercounted and HTC communities.

## Recommended Initial Strategies

- The State should have contracting rules in place that support smaller media entities such as ethnic and local media and additionally, provide selection priority to organizations that have a record of working with historically undercounted and HTC communities. For example, letters of recommendation from HTC community representatives might be used to determine those media entities that are trusted by communities; or other requirements may be put in place to demonstrate that contractors have a connection and commitment to local communities. This requirement may need to be written in to the State's request for proposals process for media contracting.
  - Media outlets that are contracted for Census outreach should consult with key leaders and trusted messengers within the communities of concern to develop, review and approve appropriate media campaign strategies.
  - All forms of media should be used to reach all Californians, and use of ethnic media that are trusted by local communities should be prioritized.

## Initial Issue of Concern: Efficiency of Outreach Efforts

With the diverse array of state and local governments, NGOs and CBOs, and others engaged in 2020 Census outreach, there may be an inefficient use of resources as different entities duplicate efforts.

## Recommended Initial Strategy

- Communicate with CBOs, NGOs, faith-based organizations and similar organizations to understand the types of outreach efforts they plan in order to maximize resources and avoid duplication of efforts.
- For state funded CBOs, NGOs, faith-based organizations and local CCCs, establish an information sharing system to ensure all partners are aware of efforts and are asked to coordinate to minimize duplication of effort.

## Section 2d. Content and Citizenship

### Purpose of the Content and Citizenship Working Group

Advise California Complete Count Staff and the Governor's Office on outreach and media strategies to encourage Census participation among California residents who may be deterred from filling out the census form because of the following questionnaire content issues:

1. Mixed status households, non-citizen residents and other respondents may be deterred because of a citizenship question, general distrust of, or unfamiliarity with government, and other participation barriers.

2. The lack of Census questions on gender identity and sexual orientation; the lack of a Middle Eastern or North African (MENA) category; and the framing of the race and ethnicity questions around Latino, Hispanic or Spanish origin and race. Communities need guidance to know how to accurately self-identify on the current Census form.

———————————————————————

### Initial Issues of Concern: Hiring Trusted Messengers

- Individuals with specific cultural and linguistic skills to reach households that may not trust the census process, may not be hired.

- Deferred Action for Childhood Arrivals (DACA) youth and non-citizens who can convince other non-citizens of the importance of filling out the census form may not be hired. The federal government has not approved waivers to hire non-citizens that may be trusted messengers working in census offices or as enumerators.

- There may be inadequate research and information to accurately identify who trusted messengers are for various communities across California, especially those who will be impacted most by the inclusion of the citizenship question.

### Initial Issues of Concern: Adequate Infrastructure to Address Cyber Security and Misinformation

California may not have adequate infrastructure to adequately address potential issues and concerns with cyber security, the use of social media to spread misinformation, the erosion of public trust in media and government, and the security of personal information.

### Initial Issues of Concern: Census Participation Boycotts

Various groups may boycott the census and there is a need to quickly and effectively address this through educational messaging stressing the consequences of non-participation for Californians.

## Initial Issues of Concern: Accurate Self-Identification

There is a need for education and information on how to accurately self-identify on the census questionnaire in light of limited categories for ethnicity and family structure.

---

## Recommended Initial Strategies

- Educate all Californians on what is at stake with each census count, how data is being collected and how it will be used.
  - Educational materials should provide accurate information on how to self-identify, and what happens in the case of census partial response.
  - Educational outreach efforts should focus on helping people understand their personal connection to the census and how the census will affect funding for state and local programs that rely on census data.

- Fund organizations who best understand how to reach non-citizen residents during the census count, and concentrate outreach efforts based on geographically concentrated areas of historically undercounted and HTC populations.
  - Prioritization should be given to organizations that have a proven track record and recent and long-standing historical relationships with HTC and non-citizen resident communities.
  - Focus on organizations that help non-citizens attain legal permanent residency, naturalization, health care and social services.
  - Funding should also go to civic engagement coalitions that work with mixed-status families and immigrants.

- Identify trusted messengers in multiple spheres, including family, church, and other local community leaders who can accurately convey the importance of participating in the census, and what is at stake for Californians.
  - Engage community leaders connected with smaller, targeted HTC populations (including, for example, those who curate Facebook pages).

- Launch a social media campaign to encourage Californians to participate despite the citizenship question and/or lack of options to accurately identify one's ethnicity and/or family structure.
  - Engage social media platforms and influencers in all aspects of life (i.e. sports, medicine, the arts, etc.) to explain why it is important to participate in the Census.

- o Utilize social and other media that reach specifically targeted HTC populations across all ages and ethnicities.
- o Engage people in digital dialogues around these topics.


- Employ non-traditional entertainment and ethnic media (examples include youth media hubs) to produce visually powerful, relatable content that reaches immigrant and non-citizen households through storytelling and digital media.
    - o Explore partnerships with new media organizations that focus on dispelling myths on immigration and influencing entertainment storylines.
    - o Media contracting should also be given to publishers with a proven track record of working directly with non-citizens.
    - o Develop a rapid response mechanism for potential misinformation campaigns across both print and digital mediums. State contracting for outreach and media should build on-the-ground capacity to execute rapid dissemination of counter messaging to misinformation in hard to count communities.

## Section 3. Next Steps

The Committee is moving forward to gather information and expertise to refine its recommendations for the State's strategy for outreach and communication to ensure a 2020 Census complete count in California.  These recommendations will be shared in the Committee's next report in January 2019.

## APPENDIX A: California Complete Count Committee Membership

Current positions are listed for Committee members.  For additional information visit:
https://census.ca.gov/2018/04/16/governor-brown-creates-california-complete-count-committee/.

- **Gita Amar**, Senior Director at PMK BNC
- **Tho Vinh Banh**, Supervising Attorney and Supervisor of Multicultural Affairs Outreach at Disability Rights California
- **Carolyn Coleman**, Executive Director at the League of California Cities
- **Kathleen Domingo**, Director for Office of Life, Justice and Peace at the Archdiocese of Los Angeles
- **Basim Elkarra**, Executive Director at the Sacramento Valley Chapter of the Council on American-Islamic Relations
- **Efrain Escobedo**, Vice President for Education and Immigration Programs at the California Community Foundation
- **Amy Fairweather**, Policy Director at Swords to Plowshares' Institute for Veteran Policy
- **Nicholas Hatten**, Executive Director at the San Joaquin Pride Center
- **Lisa Hershey**, Executive Director at Housing California
- **John Joanino**, Senior Communications Associate at Advancement Project California
- **Alex Johnson**, Managing Director at Californians for Safety and Justice
- **Loren Kaye**, Foundation President at the California Chamber of Commerce
- **Kate Kendell**, Executive Director at the National Center for Lesbian Rights
- **Jesus Martinez**, Executive Director at the Central Valley Immigrant Integration Collaborative
- **Gerald McIntyre**, Special Counsel at Justice in Aging, formerly the National Senior Citizens Law Center
- **Margie Mejia**, Chairwoman at the Lytton Rancheria of California
- **Eloy Ortiz Oakley**, Chancellor of the California Community Colleges
- **Jennifer Rodriguez**, Executive Director at the Youth Law Center
- **Thomas  Saenz**, President and General Counsel at MALDEF
- **Lee Salter**, Former President and Chief Executive Officer at the McConnell Foundation
- **Daniel Torres**, Director of Immigrant Integration in the Office of Governor Edmund G. Brown Jr.
- **Angie Wei**, Chief of Staff at the California Labor Federation
- **Regina Brown Wilson**, Executive Director at California Black Media
- **Christopher Wilson**, Associate Director at Alliance San Diego
- **Tom K. Wong**, Associate Professor at the University of California, San Diego

For additional information on CCCC membership, meetings, minutes, and materials, visit
https://census.ca.gov.

**CCCC Documents**

- Executive Order: https://census.ca.gov/2018/04/15/be-counted-california/
- Members: https://census.ca.gov/2018/04/16/governor-brown-creates-california-complete-count-committee/
- Meeting Agendas and Minutes: https://census.ca.gov/cccc-meetings-2018/

## APPENDIX B: References

### Section B. Background on the Census and California

Memorandum from the U.S. Census Bureau, Center For Survey Measurement, to Associate Directorate for Research and Methodology, 1, 5-7 (Sept. 20, 2017) https://www2.census.gov/cac/nac/meetings/2017-11/Memo-RegardingRespondent-Confidentiality-Concerns.pdf.

U.S. Census Bureau, National Advisory Committee on Racial, Ethnic, and Other Populations, Respondent Confidentiality concerns and Possible Effects on Response Rates and Data quality for 2020 Census, 2, 12-13, 15 (Nov. 2, 2017) https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf.

California Business, Transportation and Housing Agency, *2000 California Complete Count Report to the Governor, Counting all Californians* (2000)

California Complete Count Committee, *2010 California Complete Count Report to the Governor, Counting 2010 and Planning for 2020* (2010)

Election Data Services, *2017 Reapportionment Analysis* (2017)

Government Accountability Office, *2017 High Risk Report: 2020 Decennial Census* (2017)

Government Accountability Office, *2020 Census: Continued Management Attention Needed to Mitigate Key Risks Jeopardizing a Cost-Effective and Secure Enumeration* (2018)

Institute for Constitutional Advocacy and Protection, Georgetown University Law Center, *Letter on Census Cyber Security* (2018)

Judicial Council of California, *Strategic Plan for Language Access in the California Courts* (2015) Pew Research Center, *Public Trust in Government: 1958 - 2017* (2017)

Public Policy Institute of California, *Californians and the 2020 Census* (2018)

U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

U.S. Department of Commerce, U.S. Census Bureau, *Proposed Information Collection; Comment Request; 2020 Census*, 83 Federal Register 111, (8 June 2018), Page 26646

### Section C. Census Roles and Partnerships

U.S. Census Bureau, *Guide for Complete Count Committees* (2017); website: https://www.census.gov/programs-surveys/decennial-census/2020-census/complete_count.html

## Section 2a. Housing

Cindy Quezada, Central Valley Immigrant Integration Collaborative, *Identifying households the Census may miss in 2020: Fresno and Stockton case studies*. Presentation to the California Complete Count Committee Housing Working Group (2018); website: https://census.ca.gov/wp-content/uploads/sites/4/2018/08/073018-LUCA-Project-Gov-CCC-Presentation.pdf.

Ed Kissam, WKF Giving Fund*, An Effective Strategy To Reduce Census Undercount: Results from California Pilots of Community-Based Address Canvassing* (2018); website: https://uploads-ssl.webflow.com/59fb4f76691c1b000103c309/5a986f3918c20000013e8461_Findings%20from%20CA%20Community-based%20Address%20Canvassing%20FINAL%202-24-18.pdf.

Grantmakers Concerned with Immigrants and Refugees, *GCIR's California Counts! 2010 Census Campaign: A Network Approach to Funder Collaboration* (2012); website: https://www.gcir.org/sites/default/files/resources/California%20Counts%20July%202012_0.pdf

## Section 2b. Trust and Confidentiality

U.S. Citizenship and Immigration Services information on Temporary Protected Status (2018); website: https://www.uscis.gov/humanitarian/temporary-protected-status

32

**EXHIBIT E**

# EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND SELECTED COUNTIES, 2002-2012

prepared by *PricewaterhouseCoopers* ⓡ

## ABSTRACT

Congress relies on the census for purposes of allocating funds under various federal grant programs to state governments. Inaccuracies in the census count can cause federal funds to be distributed in a way that is not fully consistent with congressional intent. Many state-funded grant programs to localities also rely on census counts, compounding the misallocation of grant money. For those jurisdictions that are counted relatively poorly by the census, this translates into fewer services for families with the greatest needs. Analysis by the Census Bureau estimates that Census 2000 undercounted the actual U.S. population by a net of over three million individuals, representing an undercount rate of 1.18 percent.

This study focuses on eight programs with a combined total of $145 billion in federal spending in FY 2001 that would be most affected by the undercount. Because this study does not consider all programs affected by census population figures, the total effect of the Census 2000 undercount on the allocation of federal funds is likely to exceed the estimates in this report.

For the eight federal grant programs included in this study, the Census 2000 undercount is estimated to cause the District of Columbia and the 31 states adversely affected by the undercount to lose $4.1 billion in federal funding over the 2002-2012 fiscal year period. The shift in federal funds due to the undercount is most pronounced in metropolitan counties. These areas not only share in state losses from the undercount but also lose funds to other localities within the state because of the relatively high undercounts of urban areas.

The federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion over the ten year period, or $2,913 per uncounted person in these jurisdictions. The census undercount not only redistributes funds among jurisdictions, it also causes a net loss to the states of funds from federal entitlement programs, such as Medicaid and Foster Care. For the programs included in this study, the Census 2000 undercount is estimated to reduce net federal funds to the states by $478 million over the 2002-2012 period.

## Previous Research

In March 2000, PricewaterhouseCoopers prepared a study 4 for the Presidential Members of the U.S. Census Monitoring Board that estimated the impact of the projected Census 2000 undercount on the allocation of federal funds. This March 2000 report assumed similar undercount rates by demograph-

ic group as were estimated following the 1990 census and used Census population projections for 2000. The study projected that the 2000 census undercount rate would be 1.75 percent. This was considered a conservative estimate since the Census Bureau predicted an undercount rate of 1.9 percent.

Now that Census 2000 is complete, the data indicate that the Census Bureau counted a higher percentage of the population in 2000 than in 1990. The Census Bureau estimates that the Census 2000 net undercount rate was 1.18 percent. This report updates PricewaterhouseCooper's previous study by using Dr. Ericksen's analysis and extension of the information the Census Bureau has made public about the Census 2000 undercount rate rather than projections based on the 1990 Census experience.

**Methodology**

This study generally follows the same methodology for estimating funding effects as the March 2000 PricewaterhouseCoopers report.

The eight programs studied accounted for $145 billion in federal grant spending in fiscal ear 2001 (see Table A). These programs represent 87 percent of the funding of major rograms identified by the General Accounting Office (GAO) as being affected by the undercount.[1] The effect of the undercount on smaller federal programs has been excluded. State programs that rely on census data to distribute funds to localities also have been excluded. Because all federal and state grant programs affected by the undercount were not analyzed in this study, the shift in funds due to the Census 2000 undercount is likely to be larger than is estimated in this report.

The methodology used in this report can be summarized as follows:

1. Based on the Census Bureau's and Dr. Ericksen's estimates of the Census 2000 undercount rate by state and selected county, derive adjusted state and county population levels for comparison with Census 2000 population counts.

2. Determine the formulae for allocating the eight federal grant programs included in this study.

3. Project national funding levels for these federal programs through 2012.

4. Project the effect of the Census 2000 undercount on the allocation of federal funds to states and selected counties over the period affected by Census 2000 (generally, fiscal years 2002-2012).

---

[1]   General Accounting Office, Formula Grants: Effects of Adjusted Population Counts on Federal Funding to States, GAO/HEHS-99-69, February 1999.

Table A. Federal Formula Grant Programs and FY 2001 Obligations
[Dollar amounts in billions; Major programs affected by census undercount]

| | Program | Description | Obligations |
|---|---|---|---|
| 1. | Medicaid | Provides medical assistance (such as inpatient and outpatient hospital care, laboratory and x-ray services, and physician services) to low-income individuals. Eligible individuals include low-income children and pregnant women, low-income persons with disabilities, and low-income elderly persons. | $130.0 |
| 2. | Foster Care | Provides support to homes and facilities that provide homes to needy foster children. Payments cover food, shelter, and supervision costs. Any foster child eligible for Aid to Families with Dependent Children, as in effect in 1995, is eligible for the program. | 5.1 |
| 3. | Rehabilitation Services Basic Support | Provides vocational rehabilitation to disabled individuals and their families. Services include reader services for the blind, interpreter services for the deaf, prosthetic devices, and job placement. | 2.4 |
| 4. | Child Care and Development Block Grant | Provides assistance to low-income families to improve the availability and quality of childcare. Name changed to Child Care and Development Fund Discretionary Funds. | 2.0 |
| 5. | Social Services Block Grant | Provides support to states to prevent or reduce dependency; promote self-sufficiency; prevent abuse, neglect, or exploitation of children and adults; prevent inappropriate institutional care; and secure institutional care where appropriate. Funds have been used for child day care, protective and emergency services for children and adults, and counseling. | 1.7 |
| 6. | Substance Abuse Prevention and Treatment Block Grant | Provides resources to states to design and implement programs to reduce drug and alcohol abuse and provide rehabilitation to individuals with drug and alcohol problems. | 1.7 |
| 7. | Adoption Assistance | Provides support for the adoption of children with special needs. Payments train professional staff and parents involved in the adoptions, provide resources to families adopting the children, and cover costs associated with placing children in adoptive homes. | 1.2 |
| 8. | Vocational Education Basic Grants | Provides grants to states for vocational education programs for youths and adults. Funds used for activities such as purchasing occupationally-relevant equipment and curriculum materials, providing career counseling and guidance, hiring staff, and offering remedial classes. | 1.1 |
| **Total for eight programs included in this report** | | | **$145.1** |
| **Total for major grant programs affected by undercount** | | | **$166.6** |

Several key assumptions underlie the results in this report. First, Dr. Ericksen's extension of the Census Bureau's methods is assumed to be accurate. Second, the undercount rate is assumed to not vary substantially between group-quarters and non-group-quarters persons.[2] Third, current formulae for allocating federal grant programs are assumed to remain unchanged over the 2002-12 period. Fourth, the national funding level for these programs over the FY 2002-2012 period is based on the Administration's fiscal year 2001 Current Services Budget. Last, states are assumed to allocate federal funding among local governments in proportion to their respective populations, as enumerated in the decennial census. To the extent possible, the results in this study are based on federal data, estimates, and methodology.

### Effect of Census 2000 Undercount on Federal Funding to States

The Census Bureau has estimated a national net undercount rate for the non-group-quarters population in Census 2000 of 1.18 percent, totaling nearly 3.3 million persons missed. Assuming the same undercount rate for the group-quarters population, Dr. Ericksen estimates a total net undercount of 3.4 million.[3] Over the 2002-2012 fiscal year period, for the eight programs analyzed, PricewaterhouseCoopers estimates that this Census 2000 undercount will result in a loss of $4.1 billion in federal funding among the 31 states adversely affected by the undercount and the District of Columbia. Medicaid accounts for the largest shift in federal funds, representing 92 percent of all reallocated funds (see Figure A).[4]

The estimated 2000 undercount is expected to cause the biggest dollar losses in California, Texas and Georgia (see Figure B). These are large states that have relatively large undercount rates.

Even in states that are relatively well counted by the census, certain portions of the state may have high undercount rates. For example, while Massachusetts is counted relatively well, Suffolk County (containing Boston, MA) is estimated to lose $58 million in federal funds over the 2002-2012 period as a result of its high undercount. Similarly, while Illinois is counted relatively well, Cook County (containing part of Chicago, IL) is estimated to lose $193 million in federal funds over the 2002-2012 period.

Note that the funding effects of the Census 2000 undercount are not a "zero-sum game." The shift in federal funds *away from* states that are counted relatively poorly is greater than the shift in funds to states that are counted relatively well. The Census 2000 undercount is expected to result in a net loss of $478 million in federal funds to the states as a whole. This overall loss in federal funding is due to federal entitlement programs such as Medicaid, under which the national level of funding depends on population measures and is not a fixed sum.

---

[2]  The Census Bureau only provided undercount rates for the non-group-quarters population. In order to evaluate the funding effects, we require an undercount estimate for the entire population. We assumed that the undercount rate for the group-quarters population equals the undercount rate for the non-group-quarters population. The alternative assumption of a perfect count of the group-quarters population would not materially affect our results.

[3]  The Census Bureau excluded the group-quarters population (7.8 million persons) from its undercount estimates. Assuming that the group-quarters population is undercounted at the same rate as the non-group-quarters population implies a national undercount of 3.4 million persons and an overall national undercount rate of 1.18 percent. Source: *Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy,* March 1, 2001 and Dr. Eugene Ericksen, Estimates of State and County Undercount Rates, May 1, 2001.

[4]  Because of statutory provisions that guarantee minimum reimbursement rates, Medicaid funding for certain states would remain the same using either adjusted or unadjusted population counts. Some states, like New York, receive the minimum reimbursement of 50 percent of state expenditures under adjusted or unadjusted figures. The District of Columbia has a reimbursement rate set by statute at 70 percent. These areas experience significant undercounts, but the Medicaid minimum reimbursement provisions limit the federal funding losses from the undercount.

---

**Effect of Census 2000 Undercount on Federal Funding to Selected Counties**

The Census 2000 undercount also will affect counties receiving a portion of federal grants allotted to states. The net impact on county funding depends on the effect of the undercount on both the allocation of federal funds between states (the "between-state" effect) and the allocation of funds among jurisdictions within a state (the "within-state" effect). The net impact of the Census 2000 undercount on the allocation of federal funds to counties is the sum of the between-state and within-state effects.

Over the 2002-2012 period, the federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion, or $2,913 per uncounted person in these jurisdictions. Because counties with large populations generally experience undercount rates that are higher than the state average, we assume that they will fail to receive their proportionate share of any funds distributed by the state based on unadjusted population counts. These "within-state" effects cause the funding losses of metropolitan areas to exceed the funding losses at the state level.

Eight counties are estimated to lose over $100 million each in federal funds: Los Angeles County, CA; Bronx County, NY; Kings County, NY (which comprises the borough of Brooklyn, NY); Harris County, TX (which contains the city of Houston, TX); New York County, NY (which comprises the borough of Manhattan, NY); Cook County, IL (Chicago), Dallas County, TX, and Miami-Dade County, FL (see Figure C). In New York City, the funding loss across the five boroughs is estimated to reach $847 million. Because some state-funded grant programs also rely on the decennial census for purposes of allocating funds among localities, the impact of the Census 2000 undercount on metropolitan areas will be larger than the federal funding effect.



Figure A.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs:
31 States with Funding Losses and the District of Columbia, Fiscal Years 2002–2012
[Millions of Dollars]

- Medicaid
- Foster Care
- Rehabilitation Services
- Child Care and Dev't Block Grant
- Substance Abuse Block Grant
- Vocational Education
- Adoption Assistance
- Social Services Block Grant

Source: PricewaterhouseCoopers calculations.



Figure B. Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs: All States and the District of Columbia, Fiscal Years 2002-2012 [Millions of Dollars]

Source: PricewaterhouseCoopers calculations.



Figure C. Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs: 25 Selected Counties with Largest Funding Loss, Fiscal Years 2002-2012 [Millions of Dollars]

Source: PricewaterhouseCoopers calculations.

## I. INTRODUCTION

The Presidential Members of the United States Census Monitoring Board retained PricewaterhouseCoopers LLP (PwC) to conduct an independent estimate of the funding effects of the Census 2000 undercount, based on undercount rate estimated by decennial census expert and Temple University statistics professor Dr. Eugene P. Ericksen. PwC was asked to project the undercount's effects on the allocation of federal funds among states and selected counties over the next decade.

This report updates the results of the March 2000 PwC report[1] which was based on projections of the Census 2000 undercount rate made before Census 2000 was completed.

Estimates of the Census 2000 undercount at the state and selected county levels are presented in this report. These undercounts are derived from undercount rates estimated by the Census Bureau and extended by Dr. Eugene P. Ericksen of Temple University. Using these undercount estimates, we calculate adjusted population counts for the states and selected counties for comparison with the Census 2000 counts.

Additionally, the impact of the Census 2000 undercount on the allocation of federal funds to states and selected counties is estimated in this report. Formula allocations under federal grant programs that depend on population counts were calculated with unadjusted and then adjusted population figures to estimate the change in federal funds flowing to each state. Changes in funding levels at the state level were then translated into changes at the county level.

The main findings of the report are summarized in the final section.

Six appendices accompany this report:

1. Appendix A reports Census 2000 state population totals (adjusted and unadjusted) along with estimated undercounts and undercount rates of persons over and under 18 years of age.

2. Appendix B shows 2000 population totals by selected county with and without adjustments for the estimated undercount along with number of persons missed and the undercount rate.

3. Appendix C describes the federal programs analyzed in this report.

4. Appendix D provides detailed information on the estimated funding effects of the Census 2000 undercount by state by program.

5. Appendix E provides details on the funding effects for selected counties.

---

[1] "Effect of Census 2000 Undercount on Federal Funding to States and Local Areas," 2002-2012 (March 2000).

## II. ESTIMATE OF CENSUS 2000 UNDERCOUNT

### A. Methodology Used by the Census Bureau and Dr. Ericksen

For the 2000 Census, the Census Bureau conducted the Accuracy and Coverage Evaluation (A.C.E.) survey, the successor to the Census 1990 Post-Enumeration Survey (PES), to determine the accuracy of the census count. Historically the census has not achieved an exact count of the population because it has missed certain individuals and incorrectly enumerated others.[2] For the A.C.E. survey, the Bureau conducted detailed interviews with a sample of households. The results of this intensive interview process can be compared to the official 2000 census enumeration to assess the accuracy of the census. This information can be used to estimate the net undercount (persons missed less persons incorrectly enumerated) by geographic region or demographic group, and to prepare an adjusted 2000 population count (i.e., the official count plus an estimate of net uncounted persons).

The A.C.E. survey established undercount adjustment factors for 448 post-strata (e.g., Black renters in small Metropolitan Statistical Areas or White owners in large Metropolitan Statistical Areas in the North). From the results of the A.C.E. survey, the Census Bureau developed undercount rates for the 50 states, and the District of Columbia. Dr. Eugene P. Ericksen, a census expert and professor of statistics at Temple University, working on behalf of the Presidential Members of the U.S. Census Monitoring Board, has reviewed the estimates of the state undercount rates and extended the analysis for counties with population in excess of 500,000 plus Richmond County (Staten Island), NY.[3]

For the states and the District of Columbia, Dr. Ericksen obtained the undercount adjustment factors from a file that the Bureau provided. The file contains adjustment factors for 448 post-strata for each of the 50 states plus the District of Columbia.[4] For each state-level post-stratum, Dr. Ericksen divided the dual system undercount estimate by the census count to calculate the adjustment factor, or ratio. Dr. Ericksen then created a weighted average of the adjustment factors, where the population shares in the post-strata were the weights. For the large county undercount rate estimates, Dr. Ericksen did not have the exact distributions of post-strata populations by county, but he approximated them with 2000 Census state totals by racial group and 1990 census data sorted by racial group and housing tenure.

---

[2]  Incorrect enumerations would arise from the inclusion of a child born after April 1, a person who died before April 1, or a college student living away from home but counted in the parents' house instead of his or her usual place of residence.

[3]  Dr. Ericksen's estimates, like the Census Bureau rate upon which they are based, are for non-group-quarters residents. For this study we will be assuming that the undercount rate for group-quarters residents is comparable by state and post-strata.

[4]  Access to this file was given to the Census Subcommittee, the National Academy of Sciences, and the Census Monitoring Board in February 2001.

## B. Estimated 2000 Undercount by State

Based on the Census Bureau's methodology, the undercount rate for the non-group-quarters population in Census 2000 is estimated to be 1.18 percent or nearly 3.3 million persons. Assuming the same undercount rate for the group-quarters population, Dr. Ericksen estimates a total national undercount of 3.4 million (see Table 1).[5] Table A-2 in Appendix A shows net undercount rates by state for populations over and under 18 years of age. Children have undercount rates that exceed the national average. Nationally, persons under the age of 18 are estimated by Dr. Ericksen to have an undercount rate of 1.56 percent[6] of the actual population, resulting in over 1.1 million uncounted children. Consequently, funding programs targeting children, such as the Child Care and Development Block Grant, are especially vulnerable to the undercount.[7]

Four states account for nearly 40 percent of the estimated Census 2000 undercount: California (522,796), Texas (373,567), New York (209,123), and Florida (200,670). States (plus the District of Columbia) with the highest percentage undercounts are Alaska (2.67 percent), Hawaii (2.16 percent), the District of Columbia (2.15 percent), New Mexico (1.94 percent), and Texas (1.76 percent). States with the lowest undercount rates are Minnesota (0.29 percent), Missouri (0.46 percent), North Dakota (0.47 percent), Iowa (0.48 percent), Nebraska (0.56 percent), and South Dakota (0.56 percent).

---

[5]   The Census Bureau excluded the group-quarters population (7.8 million persons) from its undercount estimates. In order to evaluate the funding effects, we require an undercount estimate for the entire population. We assumed that the undercount rate for the group-quarters population equals the undercount rate for the non-group-quarters population. Assuming that the group-quarters population is undercounted at the same rate as the non-group-quarters population implies a national undercount of 3.4 million persons and an overall national undercount rate of 1.18 percent. The alternative assumption of a perfect count of the group-quarters population would not materially affect our results. Source: Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy, March 1, 2001 and Dr. Eugene Ericksen, Estimates of State and County Undercount Rates, May 1, 2001.

[6]   In the Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy, March 1, 2001, the Census Bureau reports a national undercount for the under 18 population of 1.54 percent.

[7]   See the GAO report for a detailed description of the funding formulas. General Accounting Office, Formula Grants: *Effects of Adjusted Population Counts on Federal Funding to States*, GAO/HEHS-99-69, February 1999.

### Table 1. Estimated Census 2000 Undercount by State

| State | 2000 Population Projections | | Estimated 2000 Census Undercount | |
|---|---|---|---|---|
| | Without adjustment for undercount | With adjustment for undercount | Number[a] | Rate[b] |
| United States | 281,421,906 | 284,777,491 | 3,355,585 | 1.18 |
| Alabama | 4,447,100 | 4,500,658 | 53,558 | 1.19 |
| Alaska | 626,932 | 644,130 | 17,198 | 2.67 |
| Arizona | 5,130,632 | 5,205,064 | 74,432 | 1.43 |
| Arkansas | 2,673,400 | 2,708,063 | 34,663 | 1.28 |
| California | 33,871,648 | 34,394,444 | 522,796 | 1.52 |
| Colorado | 4,301,261 | 4,356,148 | 54,887 | 1.26 |
| Connecticut | 3,405,565 | 3,438,923 | 33,358 | 0.97 |
| Delaware | 783,600 | 795,533 | 11,933 | 1.50 |
| District of Columbia | 572,059 | 584,629 | 12,570 | 2.15 |
| Florida | 15,982,378 | 16,183,048 | 200,670 | 1.24 |
| Georgia | 8,186,453 | 8,309,433 | 122,980 | 1.48 |
| Hawaii | 1,211,537 | 1,238,284 | 26,747 | 2.16 |
| Idaho | 1,293,953 | 1,315,528 | 21,575 | 1.64 |
| Illinois | 12,419,293 | 12,527,025 | 107,732 | 0.86 |
| Indiana | 6,080,485 | 6,127,668 | 47,183 | 0.77 |
| Iowa | 2,926,324 | 2,940,438 | 14,114 | 0.48 |
| Kansas | 2,688,418 | 2,706,279 | 17,861 | 0.66 |
| Kentucky | 4,041,769 | 4,092,102 | 50,333 | 1.23 |
| Louisiana | 4,468,976 | 4,529,674 | 60,698 | 1.34 |
| Maine | 1,274,923 | 1,292,108 | 17,185 | 1.33 |
| Maryland | 5,296,486 | 5,371,690 | 75,204 | 1.40 |
| Massachusetts | 6,349,097 | 6,397,720 | 48,623 | 0.76 |
| Michigan | 9,938,444 | 10,009,512 | 71,068 | 0.71 |
| Minnesota | 4,919,479 | 4,933,787 | 14,308 | 0.29 |
| Mississippi | 2,844,658 | 2,880,375 | 35,717 | 1.24 |
| Missouri | 5,595,211 | 5,621,068 | 25,857 | 0.46 |
| Montana | 902,195 | 916,585 | 14,390 | 1.57 |
| Nebraska | 1,711,263 | 1,720,900 | 9,637 | 0.56 |
| Nevada | 1,998,257 | 2,032,401 | 34,144 | 1.68 |
| New Hampshire | 1,235,786 | 1,249,910 | 14,124 | 1.13 |
| New Jersey | 8,414,350 | 8,512,241 | 97,891 | 1.15 |
| New Mexico | 1,819,046 | 1,855,034 | 35,988 | 1.94 |
| New York | 18,976,457 | 19,185,580 | 209,123 | 1.09 |
| North Carolina | 8,049,313 | 8,160,293 | 110,980 | 1.36 |
| North Dakota | 642,200 | 645,233 | 3,033 | 0.47 |
| Ohio | 11,353,140 | 11,418,224 | 65,084 | 0.57 |
| Oklahoma | 3,450,654 | 3,499,649 | 48,995 | 1.40 |
| Oregon | 3,421,399 | 3,465,410 | 44,011 | 1.27 |
| Pennsylvania | 12,281,054 | 12,382,591 | 101,537 | 0.82 |
| Rhode Island | 1,048,319 | 1,057,306 | 8,987 | 0.85 |
| South Carolina | 4,012,012 | 4,060,741 | 48,729 | 1.20 |
| South Dakota | 754,844 | 759,095 | 4,251 | 0.56 |
| Tennessee | 5,689,283 | 5,760,133 | 70,850 | 1.23 |
| Texas | 20,851,820 | 21,225,387 | 373,567 | 1.76 |
| Utah | 2,233,169 | 2,263,729 | 30,560 | 1.35 |
| Vermont | 608,827 | 618,161 | 9,334 | 1.51 |
| Virginia | 7,078,515 | 7,173,928 | 95,413 | 1.33 |
| Washington | 5,894,121 | 5,978,417 | 84,296 | 1.41 |
| West Virginia | 1,808,344 | 1,830,122 | 21,778 | 1.19 |
| Wisconsin | 5,363,675 | 5,401,485 | 37,810 | 0.70 |
| Wyoming | 493,782 | 501,607 | 7,825 | 1.56 |

Source: PricewaterhouseCoopers calculations.

[a] Adjusted minus unadjusted 2000 population projections. Dr. Ericksen's undercount totals are slightly larger than those estimated by the Census Bureau (which excluded the group-quarters population from its analysis). For further explanation see footnote 6 on page 3.

[b] Undercount as a percent of adjusted population. Source: U.S. Census Bureau and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

## II. FUNDING EFFECT OF CENSUS 2000 UNDERCOUNT

### A. Federal Programs Analyzed

This study examines the effect of the Census 2000 undercount on the allocation of funds under eight federal grant programs: (1) Medicaid; (2) Foster Care; (3) Rehabilitation Services Basic Support; (4) Social Services Block Grant; (5) Substance Abuse Prevention and Treatment Block Grant; (6) Adoption Assistance; (7) ChildCare and Development Block Grant; and (8) Vocational Education Basic Grants.These eight programs account for all of the funding shifts identified in the GeneralAccounting Office (GAO) study of the effects of the 1990 census undercount onfederal funding to states in fiscal year 1998. [8]

The GAO study focused on 25 large formula grant programs, whose funding represented 90 percent of the total federal grants affected by the census undercount. Of the 25 programs analyzed in the GAO study, ten programs (amounting to $21 billion in 2001) were excluded because their funding formulae depended on population variables for which undercount rates are not available (e.g., the population below the poverty line). Of the remaining 15 programs, five of the programs (amounting to $43 billion) were not affected by the undercount because the formulae had components which made the undercount immaterial. Two programs (amounting to $2 million) used population figures adjusted for the undercount.[9]

The remaining eight programs (listed in Table 4) were affected by the undercount. These programs represent over 87 percent of the funding under major programs that depend on unadjusted census counts.

### Table 4: Federal Grant Programs and FY 2001 Obligations

[Obligations in billions of dollars; Major programs affected by census undercount]

| Program | Obligations |
|---|---|
| Medicaid | $130.0 |
| Foster Care | 5.1 |
| Rehabilitation Services Basic Support | 2.4 |
| Child Care and Development Block Grant | 2.0 |
| Social Services Block Grant | 1.7 |
| Substance Abuse Prevention and Treatment Block Grant | 1.7 |
| Adoption Assistance | 1.2 |
| Vocational Education Basic Grants | 1.1 |
| **Subtotal, eight programs included in study** | **145.1** |
| Total for major grant programs affected by undercount | **$166.6** |

Source: Budget of the United States, FY 2002, GAO, and PricewaterhouseCoopers calculations.

---

[8] General Accounting Office, *Formula Grants: Effects of Adjusted Population Counts on Federal Funding to States,* GAO/HEHS-99-69, February 1999.

[9] These two programs, administered by the Department of Labor, rely on estimates of the civilian labor force. If the Department of Labor does not adjust its estimates of the labor force, these programs would also be affected by the undercount.

## B. Current Services Funding Levels over FY 2002-2012 Period

Depending on the first year of impact, Census 2000 will affect federal grant allocations over the 2002-2011 or the 2003-2012 period.[10]

For each of the eight federal grant programs analyzed in this report, the Administration's FY 2002 budget projects Current Services funding levels through 2011. The Current Services Budget estimates funding levels necessary to continue programs at a level equal to the most recently funded year (i.e., 2001 for the 2002 budget). In essence, it is a prediction of the funding necessary to support current law expenditures over the budget period.

The Current Services Budget projects that funding of *discretionary* programs will grow with inflation. Unlike entitlement programs, the funding of discretionary programs is dependent on the annual Congressional appropriations process. Three of the eight federal grant programs included in this study are classified as discretionary: (1) Substance Abuse Block Grant, (2) Vocational Education, and (3) Child Care and Development Block Grant.

The Current Services Budget projects that funding for *entitlement* programs will grow with the underlying eligible population and inflation. Three of the federal programs included in this study are classified as entitlement programs: (1) Medicaid, (2) Foster Care, and (3) Adoption Assistance.

The remaining two programs included in this study, Social Services Block Grant and Rehabilitation Services, are *mandatory* programs that are projected to grow at rates consistent with their enacting legislation.

The fiscal year 2002 budget includes Current Services funding levels through 2011. Funding levels for four programs included in this study were extrapolated through 2012 based on the growth rates projected by the Office of Management and Budget over the FY 2002-2011 budget period (see Table 5).

Current Services funding levels for the Substance Abuse Block Grant are extrapolated through 2012 using the annual Office of Management and Budget general budget inflator for the 2003-2011 period of 2.2 percent. The Current Services Budget projects slowing growth for the entitlement programs, and this trend is assumed to continue through 2012. No extrapolations were necessary for the mandatory programs because the 2000 Census will affect their funding allocations over 2002-2011, the current budget period.

Assuming the Current Services spending levels, census population counts from Census 2000 ultimately will be used to distribute $2.5 trillion over the 2002-2012 fiscal year period.

---

[10]  This report assumes that the effects of Census 2000 are not incorporated until 2000 population figures are used in allocation formulas. If population estimates from earlier years, such as 1999, are adjusted consistent with Census 2000, allocations could be affected before 2002.

## C. Funding Effect of Census 2000 Undercount on States

State allocation shares under federal grant programs are determined before the onset of the funding year; thus, state allocations for the current year are based on population estimates from several years earlier. The Census Bureau publishes population estimates for the years between decennial censuses. These estimates are based on the decennial population enumeration and are updated using administrative records (e.g., birth and death certificates). Consequently, errors in the decennial population count persist for ten years, until the next census enumeration. Consequently, the Census 2000 undercount will affect federal grant allocations over a ten-year period.

For example, the funding formula for the Social Services Block Grant program depends on population estimates from the second prior year. Thus, Census 2000 will affect Social Services Block Grant allocations over the 2002-2011 period. For the eight programs included in this report, Census 2000 will first affect grant allocations in either 2002 or 2003, and the effect will persist over the 2002-2011 or 2003-2012 period, depending on the program.

The effect of the Census 2000 undercount on the allocation of federal funds to states initially was calculated for a base year and then extrapolated over the 2002-2012 period. The base year for each grant program was determined as: the first year affected by the 2000 census figures or the most recent year for which data were available for all of the variables (other than population) in the funding formula. For most programs, 2002 was the base year used in the calculations. Because data for some of the formulae were not available to calculate the 2002 allocation, the base year for the corresponding programs is 2001. For example, the formula for Vocational Education depends on per capita personal income by state as released by the Bureau of Economic Analysis (BEA) for the second preceding year. Final per capita personal income figures are available for 1999; consequently, the base year for the Vocational Education program is 2001.

Once a base year was established for each program, we calculated state funding allocations using both official and adjusted 2000 state population projections. These calculations take into account all elements of the current funding formulae, including hold harmless and minimum share provisions. Each state's share of national program funding in the base year was then determined under both the official and adjusted 2000 population projections. The difference between these two shares of national program funding is an estimate of the impact of the Census 2000 undercount on the state's allocation of federal funds. For example, suppose that a state's share of federal program funds increases from 3.0 percent to 3.1 percent, in the base year, as a result of using adjusted versus official 2000 population projections. For this state, the effect of the Census 2000 undercount is estimated to be a loss of 0.1 percentage points (3.1 percent minus 3.0 percent) of national program funding.

For the eight federal grant programs analyzed in this study, the Census 2000 undercount is estimated to reduce federal funding in 31 states and the District of Columbia by $4.1 billion over the 2002-2012 period (see Table 6). In 2003 alone, the undercount is estimated to reduce federal funds allocated to these states by $277 million. By comparison, the General Accounting Office estimated that the effect of the 1990 census undercount on these federal programs was to shift $449 million among states in 1998. Because the estimated 2000 undercount is both smaller and more uniform across jurisdictions than the estimated 1990 undercount, the total amount of federal funds reallocated is smaller.

States that are counted relatively well in the census are estimated to receive higher levels of federal funding as a result of the undercount; however, the additional federal funds received by these states

are less than the loss of federal funds in the other states. The effect of census undercounts on the federal funding of *entitlement* programs is not a "zero-sum game" among the states because an increase in funding to one state does not require a reduction in funding to other states. For the federal programs analyzed in this study, federal funds allocated to all 50 states and the District of Columbia are estimated to be $478 million less over the 2002-2012 fiscal year period as a result of the Census 2000 undercount.

The loss of funds over the 2002-2012 period for the eight analyzed programs ranges from $26 per undercounted person in Colorado to over $6,300 per person missed by the census in Alaska (see Table 7).[11] In 2003, the first year fully impacted by the undercount, the funding loss in 31 undercounted states and the District of Columbia averages $114 per uncounted individual. This figure is less than GAO's 1998 estimate of $145 per uncounted individual, which was based on the higher 1990 undercount rate.

Of the eight federal programs analyzed in this report, Medicaid accounts for 92 percent of the federal funds that would be shifted as a result of the Census 2000 undercount. As a percent of total program funding, the programs most affected by theCensus 2000 undercount are Vocational Education (0.28 percent) and Rehabilitation Services (0.27 percent).[12] Table 8 summarizes the impact of the Census 2000 undercount by program.

### D. Funding Effect of Census 2000 Undercount on Counties

This section analyzes the effect of the Census 2000 undercount on counties. The county effects are estimated under the assumption that states allocate federal funds among county in proportion to their official census population counts.

The Census 2000 undercount can affect federal funding to counties in two ways. First, the undercount at the state level affects the allocation of funds among the states, which alters the amount of funds that states have available to pass through to local governments (the "between-state" funding effect). For example, the Census 2000 undercount is estimated to cause the state of Illinois to receive a larger share of the federal funds under the programs analyzed than it would with an accurate census count (other states, therefore, receive a smaller share because of the undercount). Counties in the state, such as Cook County (Chicago), benefit from the fact that the state receives these additional funds. The *between-state* effect measures the effect on metropolitan areas of the funding shifts among the states due to the census undercount.

Second, the undercount at the local level may affect a state's allocation of federal funds among its counties (the "within-state" funding effect). Assuming the state allocates funds to local areas within the state using population counts, any undercount would distort the flow of funds within the state. Because Cook County is estimated to experience a high undercount rate relative to the other areas in

---

[11] Because of statutory provisions that guarantee minimum reimbursement rates, Medicaid funding for certain states would remain the same using either adjusted or unadjusted population counts. Some states, like New York, receive the minimum reimbursement of 50 percent of state expenditures under adjusted or unadjusted figures. The District of Columbia has a reimbursement rate set by statute at 70 percent. These areas experience significant undercounts, but the Medicaid minimum reimbursement provisions limit the federal funding losses from the undercount. Table D-5 in Appendix D lists the effect of the census undercount on state funding levels under the Medicaid program.

[12] These percentages translate into $33 million for Vocational Education and $72 million for Rehabilitation Services.

Illinois, it receives a smaller share of the state funds than it would have gotten under an accurate census count. Therefore, it experiences a negative within-state effect. The *within-state* effect measures the impact of the undercount on funding allocations within states.

The "net" funding effect of the census undercount on a county is the sum of the between-state and within-state funding effects. Because the between-state and within-state effects could have the same or different signs, the *net* effect could be larger or smaller than the between-state or within-state effects alone.

### 1. Between-State Funding Effect

For the counties within each state, the between-state funding effect was estimated in two steps. The effect of the Census 2000 undercount on the state's level of federal funding was first calculated for the 2002-2012 period (see section III.C., above). The funding effect at the state level was then apportioned among the counties in proportion to their *unadjusted* population counts. Thus, counties in states that lose federal funding as a result of the Census 2000 undercount are each estimated to share proportionately in this funding loss.

### 2. Within-State Funding Effect

For the counties within each state, the within-state funding effect was estimated in four steps. First, the state's share of federal funding over the 2002-2012 period was determined based on adjusted 2000 population counts (as described in section III.C., above). Second, state funding was apportioned among the counties in proportion to their estimated 2000 *adjusted* census counts. Third, state funding was apportioned among the counties in proportion to their 2000 *official* (unadjusted) census counts. Finally, the within-state funding effect was estimated by subtracting the county funding levels determined in step two (based on *adjusted* population counts) from step three (based on *official* population counts).

Counties with an undercount rate higher than the overall state average have a negative within-state funding effect, while relatively well counted areas have a positive within-state funding effect.

### 3. Net Funding Effect

For the counties within each state, the net funding effect of the Census 2000 undercount over the 2002-2012 period was calculated as the sum of the between-state and within-state funding effects. For any county, these two funding effects can work in the same or opposite directions. For example, Cook County is estimated to have a *positive* $9 million *between-state* funding effect, because the State of Illinois is relatively well counted by the census. However, Cook County is estimated to have a *negative* $202 million *within-state* funding effect because it is relatively poorly counted by the census compared to other jurisdictions within the state. Thus, the *net* federal funding effect in Cook County of the Census 2000 undercount is *negative* $193 million ($9 million less $202 million) over the 2002-2012 period, because the funding loss from the within-state effect is larger than the funding gain from the between-state effect. The federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion over the period, or an average of $2,913 per uncounted person in these jurisdictions.

Table 9 shows the net funding effect of the Census 2000 undercount on the 25 counties that are estimated to experience the largest loss in federal funding over the 2002-2012 period. The five counties

expecting the largest funding loss from the Census 2000 undercount are Los Angeles County, CA ($636 million), Bronx County, NY ($362 million), Kings County, NY ($269 million), Harris County, TX ($234 million), and New York County, NY ($212 million). Results for all 112 selected counties are shown in Appendix E.

This analysis only considers the effect of the Census 2000 undercount on *federal* funds allocated to local governments. Because a variety of *state* grant programs are also distributed to local governments on the basis of official population counts, the total shift in funds from federal and state grant programs will likely be larger than the estimates in this report.

**EXHIBIT F**



# GOVERNOR'S BUDGET SUMMARY
# 2018-19

*Edmund G. Brown Jr. Governor*
*State of California*



To the California Legislature
Regular Session 2017-18

This page intentionally blank to facilitate double-sided printing.



**GOVERNOR**

EDMUND G. BROWN JR.

January 10, 2018

To the members of the Senate and the Assembly of the California Legislature:

In 2011, we faced "a tough budget for tough times." We cut spending, the economy recovered, and voters approved tax increases.  The $27 billion deficit became a solid surplus.

In recent years, I have warned of an inevitable recession lurking in our future, which thankfully has not yet arrived.  Nevertheless, we must remain vigilant and not let rosy statistics lull us into believing that economic downturns are a relic of the past.  Fiscal restraints are needed more than ever as California approaches the peak of the business cycle.

This budget reflects our collective priorities.  As was true in 2011, our Job Number 1 is fixing our state budget and keeping spending in line with revenue.  In a volatile and uncertain world, fixing the budget is a perpetual struggle and one we must approach with wisdom.

California has faced ten recessions since World War II and we must prepare for the eleventh.  Yes, we have had some very good years and program spending has steadily increased.  Let's not blow it now.

I urge you to debate this budget, reflect on the many uncertainties we face and fill the Rainy Day Fund.  In this way, we will avoid the drastic cutbacks suffered in previous downturns and keep faith with the people and our state on an even keel.

With respect,

/s/ Edmund G. Brown Jr.

Edmund G. Brown Jr.

STATE CAPITOL • SACRAMENTO, CALIFORNIA 95814 • (916) 445–2841

This page intentionally blank to facilitate double-sided printing.

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary Charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

K-12 Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Higher Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Health and Human Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Public Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Judicial Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Natural Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Statewide Issues and Various Departments . . . . . . . . . . . . . . . . . . . 111

Infrastructure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Demographic Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Economic Outlook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Revenue Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Staff Assignments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Appendices and Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

# STATEWIDE ISSUES AND VARIOUS DEPARTMENTS

This Chapter describes items in the Budget that are statewide issues or related to various departments.

## SUPPLEMENTAL TRANSFER TO THE RAINY DAY FUND

The Budget proposes a $3.5 billion supplemental transfer from the General Fund to the Budget Stabilization Account in addition to the current projected amounts required by Section 20 of Article XVI of the California Constitution. In total, the $5 billion transfer brings the Rainy Day Fund to $13.5 billion in 2018-19, achieving the maximum balance allowed by the Constitution for the fiscal year. In the event the amounts required to be transferred for 2017-18 through 2019-20 exceed the estimates reflected in the 2018-19 Budget (as part of the Proposition 2 "true up" process), the supplemental transfer will first be applied towards meeting those additional requirements.

## WILDFIRE RESPONSE AND RECOVERY

Beginning in October 2017, California faced the most lethal and destructive fires in the history of the state.

On October 8, 2017, a series of wildfires erupted in Northern California and engulfed 100 square miles. Sparked by the same hot, windy conditions, other major wildfires soon broke out across the state, devastating more than 245,000 acres of land and destroying over 8,900 structures.

# PRECISION MEDICINE

In 2015, the Governor created the nation's first state-level initiative on precision medicine. Precision medicine aims to improve health and healthcare through better use of advanced computing, technology and data science.  Building on the $23 million state investment in precision medicine to date, the Budget proposes to establish the California Institute to Advance Precision Health and Medicine with an additional $30 million one-time General Fund appropriation to continue developing demonstration projects, incorporate successful demonstration projects into the health delivery system, and further advance how data science can be utilized in healthcare. The institute would be administered through a collaboration between public and private nonprofit institutions, overseen by the Governor's Office of Planning and Research.

# 2020 CENSUS

The Budget includes $40.3 million for statewide outreach and other activities related to the 2020 Census count.  Statewide coordination of the multi-year, multi-lingual effort is critical to obtain a complete and accurate count of California residents.  The data collected by the decennial census determines the number of seats California has in the U.S. House of Representatives and is also used to determine federal funding levels for local communities.

# EXHIBIT G



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

**DEC 12 2017**

<u>**VIA CERTIFIED RETURN RECEIPT**</u>
*7014 2120 0000 8064 4964*

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans. In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called "long form" census. This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting. To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected. As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority. See *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district. See, e.g., *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023–24 (5th Cir. 2009); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Negrn v. City of Miami Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); see also *LULAC v. Perry*, 548 U.S. 399, 423–442 (2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation ... in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos*, 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide* at 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22, 2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

- Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

2

- Because the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

- The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunity Survey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

- Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia*, to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

3



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

To:     Karen Dunn Kelley, Under Secretary for Economic Affairs

From:   Secretary Wilbur Ross  *Wilbur Ross*

Date:   March 26, 2018

Re:     Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire

Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population ("CVAP") data that are not currently available from government survey data ("DOJ request"). DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census block level will permit more effective enforcement of the Act. Section 2 protects minority population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond. To that end, the Department of Commerce ("Department") immediately initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request – as with all significant Census assessments – prioritized the goal of obtaining *complete and accurate data*. The decennial census is mandated in the Constitution and its data are relied on for a myriad of important government decisions, including apportionment of Congressional seats among states, enforcement of voting rights laws, and allocation of federal funds. These are foundational elements of our democracy, and it is therefore incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations. As part of the process, I also met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, my questions about accuracy and response rates, and their recommendations. At present, the Census Bureau leadership are all career civil servants. In addition, my staff and I reviewed over 50 incoming letters from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

2

completeness.  Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods.  Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens.  A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations.  However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially.  In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates.  Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge.  Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses.  However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys.  For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census.  The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census.  Further, the decennial census has differed significantly in nature from the sample surveys.  For example, the 2000 decennial census survey contained only eight questions.  Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete.  ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent.  However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS.  Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

3

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C**, the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D**, which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

4

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**   I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

5

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

6

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request.  To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018.  I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.


CC:   Ron Jarmin, performing the nonexclusive functions and duties of the Director of the Census Bureau

Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau

001320

**EXHIBIT H**

COMMITTEE MEMBERS
JIM NIELSEN, VICE CHAIR
JOEL ANDERSON
JIM BEALL
STEVEN M. GLAZER
HANNAH-BETH JACKSON
MIKE MCGUIRE
WILLIAM W. MONNING
JOHN M.W. MOORLACH
RICHARD PAN
ANTHONY J. PORTANTINO
RICHARD D. ROTH
NANCY SKINNER
HENRY STERN
JEFF STONE
BOB WIECKOWSKI
SCOTT WILK

### *CALIFORNIA STATE SENATE*

COMMITTEE ON BUDGET AND FISCAL REVIEW

STATE CAPITOL – ROOM 5019
SACRAMENTO, CA 95814



### *Holly J. Mitchell, Chair*

STAFF DIRECTOR
JOE STEPHENSHAW

DEPUTY STAFF DIRECTOR
ELISA WYNNE

CONSULTANTS
CHRIS FRANCIS
JAMES HACKER
ANITA LEE
SCOTT OGUS
THERESA PEÑA
RENITA POLK
JOANNE ROY

COMMITTEE SECRETARY
SANDY PEREZ

COMMITTEE ASSISTANT
MARY TEABO

(916) 651-4103
FAX (916) 668-7004

## *Agenda*

### *May 22, 2018*

### *1:30 p.m. - State Capitol – Room 4203*

---

### Budget Act of 2018
### Overview of the Senate Budget Plan

## ITEMS PROPOSED FOR VOTE-ONLY

| <u>Item</u> | <u>Department</u> | <u>Page</u> |
|---|---|---|
| **0650**<br>Issue 1 | **Governor's Office of Planning and Research**<br>Transformative Climate Communities Reappropriation | 3 |
| **0890**<br>Issue 2 | **Secretary of State**<br>Office of Elections Cybersecurity | 4 |
| **2660**<br>Issue 3 | **Department of Transportation**<br>Capital Outlay Support Project Delivery Workload | 5 |
| **3760**<br>Issue 4 | **State Coastal Conservancy**<br>West Coyote Hills Open Space and Habitat Area | 6 |
| **3790**<br>Issue 5 | **Department of Parks and Recreation**<br>California Indian Heritage Center | 7 |
| **3860**<br>Issue 6 | **Department of Water Resources**<br>Multi-Benefit Flood Improvement Projects | 8 |

**3900**          **California Environmental Protection Agency**
Issue 7          Sacramento Headquarters Space Optimization Project                      9

**4300**          **Department of Developmental Services**
Issue 8          Transparency of Respite Policies and Protocols Trailer Bill Language      10

**5180**          **Department of Social Services – Child Welfare Services**
Issue 9          Continuum Care Reform: Caregiver Emergency Assistance Payments and Trailer 11
                 Bill Language Long-Term Funding Solutions
Issue 10         Youth and Family Civic Engagement Initiative                            12

**5225**          **California Department of Corrections and Rehabilitation**
Issue 11         Division of Fiscal and Business Services Trailer Bill Language            13

**6980**          **California Student Aid Commission**
Issue 12         Cal Grant Awards for Accredited Private For-Profit Institutions           14
Issue 13         Cal Grant for Private Non-Profit Colleges and Universities                15
Issue 14         Cal Grant B High School Entitlement Award Estimates                      16

**7100**          **Employment and Development Department**
Issue 15         Unemployment Insurance Loan Interest Rate                               17

**7600**          **California Department of Tax and Fee Administration**
Issue 16         Technical Change – Trailer Bill Language                                18

**7730**          **Franchise Tax Board**
Issue 17         New Employment Credit                                                  19
Issue 18         Earned Income Tax Credit                                               20

**7760**          **Department of General Services**
Issue 19         Lease Notification Trailer Bill Language                                21

**ITEMS PROPOSED FOR DISCUSSION AND VOTE**

**0000**          **State Taxes and Revenues and Local Property Taxes**
Issue 20         State Taxes and Revenues                                               22
Issue 21         Local Property Taxes                                                   23

**0650**          **Governor's Office of Planning and Research**
Issue 22         California Complete Count – Census 2020                                 24

**7760**          **Department of General Services**
Issue 23         State Project Infrastructure Fund                                       25

**CS 6.10**       **Control Section 6.10**
Issue 24         Statewide Deferred Maintenance                                         26

# 0650-001-0001   GOVERNOR'S OFFICE OF PLANNING AND RESEARCH

## Issue 22:  California Complete Count – Census 2020

**Legislative/Governor's Proposal.**  The Governor's budget proposes $40.3 million (General Fund) and 22.0 limited-term positions to staff the California Complete Count effort to complement U.S. Census outreach, focusing on hard-to-count populations.  This funding will be appropriated in 2018-19 and available for the duration of a three-year effort crossing over fiscal years 2018-19, 2019-20, and 2020-21.

**Subcommittee Action.**  Subcommittee No. 4 heard, but did not take action on this item.

**Staff Comments.**  The Administration has indicated that almost three-quarters of the funds would be dedicated to a media campaign ($17 million) and working with local community based organizations ($12.5 million).  Community organizations would conduct most of the direct outreach to individuals in hard-to-count populations to encourage them to complete the census.

Staff notes that, including $10 million provided in 2017-18, this proposal would bring total state funding for census-related activities to $50 million between 2017-18 and 2019-20.  Due to the significant changes to the census, providing state funding to target hard-to-count populations is reasonable.  However, the level of funding raises concerns.  California is a large and diverse state with a notably expensive media market.  Similar efforts have cost far more than $40 million.  For example, the Covered California program has spent roughly $100 million per year in outreach.

Due to both the extreme importance of an accurate census to the state and the high cost of the necessary outreach, additional funding is warranted.

**Staff Recommendation.**  Approve an additional $95 million for the California Complete Count effort, bringing the total to $135.3 million.

**Vote:**

# EXHIBIT I



# 2018-19 LEGISLATIVE BUDGET CONFERENCE COMMITTEE

**PHIL TING, CHAIR**

ROOM 4202
FRIDAY , JUNE 8, 2018

# CLOSE OUT AGENDA

(blank page)

**TABLE OF CONTENTS**

ISSUE 1: CONFERENCE REVENUES AND PROPOSITION 2 — 7

ISSUE 2: PROPOSITION 98 CERTIFICATION TRAILER BILL LANGUAGE — 9

ISSUE 3: LOCAL CONTROL FUNDING FORMULA AND SPECIAL EDUCATION — 11

ISSUE 4: K-12 ONE-TIME FUNDING AUGMENTATIONS — 13

ISSUE 5: CAREER TECHNICAL EDUCATION — 15

ISSUE 6: KINDERGARTEN, PRESCHOOL AND AFTER SCHOOL — 17

ISSUE 7: TEACHER WORKFORCE INVESTMENTS — 19

ISSUE 8: DEPARTMENT OF EDUCATION STATE OPERATIONS — 21

ISSUE 9: K-12 FEDERAL FUNDS — 23

ISSUE 10: K-12 TRAILER BILL LANGUAGE — 25

ISSUE 11: CHILD CARE — 27

ISSUE 12: UNIVERSITY OF CALIFORNIA PACKAGE — 29

ISSUE 13: CALIFORNIA STATE UNIVERSITY PACKAGE — 33

ISSUE 14: HASTINGS COLLEGE OF LAW DIVERSITY PIPELINE SCHOLARSHIPS — 37

ISSUE 15: CALIFORNIA EDUCATION LEARNING LAB — 39

ISSUE 16: CALIFORNIA STATE LIBRARY AUGMENTATIONS — 41

ISSUE 17: CALIFORNIA STUDENT AID COMMISSION AUGMENTATIONS — 43

ISSUE 18: ONLINE COLLEGE — 45

ISSUE 19: COMMUNITY COLLEGE FUNDING FORMULA — 47

ISSUE 20: COMMUNITY COLLEGE AUGMENTATIONS — 49

ISSUE 21: HEALTH CARE COVERAGE EXPANSION/AFFORDABILITY — 53

ISSUE 22: HEALTH CARE WORKFORCE — 55

ISSUE 23: PROVIDER RATES AND PROPOSITION 56 FUNDS IN MEDI-CAL — 57

ISSUE 24: HEALTH CARE LEGISLATIVE AUGMENTATIONS — 59

ISSUE 25: HEALTH CARE NO COST LEGISLATIVE ACTIONS — 61

ISSUE 26: PUBLIC HEALTH LEGISLATIVE AUGMENTATIONS — 63

ISSUE 27: PUBLIC HEALTH NO COST LEGISLATIVE ACTIONS — 67

ISSUE 28: MENTAL HEALTH LEGISLATIVE AUGMENTATIONS — 69

ISSUE 29: SSI CASH-OUT REVERSAL — 73

ISSUE 30: COUNTY ADMINISTRATION — 75

ISSUE 31: CALWORKS HOME VISITING INITIATIVE — 77

ISSUE 32: SAFETY NET RESERVE — 79

ISSUE 33: NO CHILD IN DEEP POVERTY — 81

ISSUE 34: COST OF LIVING ADJUSTMENTS — 83

ISSUE 35: WAIVER PERSONAL CARE SERVICES — 85

ISSUE 36: IHSS SICK LEAVE / PROVIDER BACK UP SYSTEM — 87

ISSUE 37: MAY REVISION TBL ON HOME-BASED FAMILY RATE — 89

ISSUE 38: OTHER LEGISLATIVE AUGMENTATIONS IN CONFERENCE                     91

ISSUE 39: OTHER LEGISLATIVE AUGMENTATIONS NOT IN CONFERENCE                93

ISSUE 40: HUMAN SERVICES LANGUAGE ONLY ISSUES                              95

ISSUE 41: BUDGET BILL LANGUAGE FOR LONG-TERM CARE OMBUDSMAN                99

ISSUE 42: BUDGET BILL LANGUAGE FOR EITC OUTREACH                          101

ISSUE 43: BUDBET BILL LANGUAGE FOR EV VERIFICATION                        103

SSUE 44: OFFICE OF LAW ENFORCEMENT SUPPORT                                107

ISSUE 45: DEVELOPMENTAL SERVICE ISSUES IN CONFERENCE                      109

ISSUE 46:  DEVELOPMENTAL SERVICE ISSUES NOT IN CONFERENCE                 111

ISSUE 47: SUSTAINABLE FUNDING FOR FISH AND WILDLIFE                       113

ISSUE 48: CLEAN DRINKING WATER                                           115

ISSUE 49: PROPOSITION 68 ALLOCATIONS                                     117

ISSUE 50: INVASIVE PETS                                                  121

ISSUE 51: VARIOUS ISSUES IN CDFA                                         123

ISSUE 52: VARIOUS ISSUES IN CALEPA                                       125

ISSUE 53: VARIOUS ISSUES IN CNRA                                         129

ISSUE 54: LEGISLATIVE INVESTMENTS IN CNRA                                131

ISSUE 55: LEGISLATIVE INVESTMENTS IN CALEPA                              137

ISSUE 56: AGRICULTURAL ENERGY EFFICIENCY PROJECTS                        139

ISSUE 57: CAP AND TRADE EXPENDITURE PLAN AND ELECTRIC VEHICLES AND ZERO-EMISSION

EVS AND CHARGING INFRASTRUCTURE PLAN                                     141

ISSUE 58: SUPPLEMENTAL REPORTING REQUIREMENTS FOR TRANSPORTATION & ENERGY   143

ISSUE 59: TRANSPORTATION LEGISLATIVE INVESTMENTS                         145

ISSUE 60: HOUSING AND HOMELESSNESS                                       149

ISSUE 61: TAX PROVISIONS                                                 151

ISSUE 62: CANNABIS                                                       153

ISSUE 63: LEGISLATIVE REQUESTS                                           155

ISSUE 64: MISCELLANEOUS ITEMS                                            157

ISSUE 65: STATE VETERANS' HOMES                                          159

ISSUE 66: DEPARTMENT OF VETERANS AFFAIRS LEGISLATIVE INVESTMENTS         161

ISSUE 67: PRO RATA AND LEGISLATIVE INVESTMENTS                           163

ISSUE 68: AB 195 SUSPENSION                                              165

ISSUE 69: CYBER SECURITY OFFICE: LEGISLATIVE INVESTMENT                  167

ISSUE 70: LANGUAGE FOR COUNTY VOTING SYSTEMS FUNDING                     169

ISSUE 71: PRECISION MEDICINE                                            171

ISSUE 72: 2020 CENSUS OUTREACH                                          173

ISSUE 73: DEFERRED MAINTENANCE AND STATE OFFICE BUILDINGS               175

ISSUE 74: RESERVE ACCOUNTS                                              177

ISSUE 75: FINANCIAL INFORMATION SYSTEM FOR CALIFORNIA 179

ISSUE 76: YOUTH REINVESTMENT FUND, ADULT REENTRY AND DIVERSION 181

ISSUE 77: JUDICIAL COUNCIL DISCRETIONARY FUNDING 183

ISSUE 78: TRIAL COURT CAPITAL OUTLAY 185

ISSUE 79: ONLINE PILOT FOR TRAFFIC ADJUDICATIONS & DRIVER LICENSE SUSPENSIONS & FAILURE TO APPEAR 187

ISSUE 80:  JUDGESHIPS AND THE EQUAL ACCESS FUND 189

ISSUE 81:  VARIOUS JUDICIAL BRANCH PROPOSALS 191

ISSUE 82: CA EARLY EARTHQUAKE WARNING SYSTEM, EMERGENCY RESPONSE OPERATIONS, AND THE DISASTER RESPONSE EMERGENCY OPERATIONS ACCOUNT (DREOA) 193

ISSUE 83: VARIOUS LEGISLATIVE PROPOSALS IN THE OFFICE OF EMERGENCY SERVICES 195

ISSUE 84: VARIOUS DEPARTMENT OF JUSTICE PROPOSALS FROM THE ADMINISTRATION 197

ISSUE 85: ANTI-TRUST WORKLOAD 199

ISSUE 86: CHAPTER 694, STATUTES OF 2017 201

ISSUE 87: STATE OFFICER INVOLVED SHOOTING INVESTIGATION TEAM 203

ISSUE 88: ARMED AND PROHIBITED PERSONS SYSTEM (APPS) 205

ISSUE 89: VARIOUS LEGISLATIVE PROPOSALS IN THE DEPARTMENT OF JUSTICE 207

ISSUE 90: SEXUAL ASSAULT KIT AUDIT AND PROCESSING UNTESTED SEXUAL ASSAULT KITS 209

ISSUE 91: VARIOUS CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION PROPOSALS FROM THE ADMINISTRATION 211

ISSUE 92: VARIOUS LEGISLATIVE PROPOSALS IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION 213

ISSUE 93: VARIOUS CDCR PROPOSALS FROM THE ADMINISTRATION 215

ISSUE 94: JUVENILE JUSTICE ID PROGRAM 217

ISSUE 95: CORRECTIONAL COUNSELOR 1 RATIO ADJUSTMENT & MENTAL HEALTH CRISIS BEDS 219

ISSUE 96: JANITORIAL SERVICES 221

ISSUE 97: VARIOUS LEGISLATIVE PROPOSALS 223

ISSUE 98: LAW ENFORCEMENT TRAINING 225

ISSUE 99: MILITARY DEPARTMENT PROPOSALS FROM THE ADMINISTRATION 227

ISSUE 100: LEGISLATIVE PROPOSALS IN THE MILITARY DEPARTMENT 229

## ISSUE 72: 2020 CENSUS OUTREACH

### Office of Planning and Research

Both houses augmented the Governor's proposed $40.3 million 2020 Census Outreach effort.  The Conference Compromise increases investments in the budget year.

The Conference Compromise provides:
- $50 million above the Governor's level for a total funding in 2018-19 of $90.3 million.
- Includes trailer bill that requires reporting on the progress, staffing, and expenditures of the 2020 Outreach Plan.
- Adopts Assembly's proposed Supplemental Report Requirement on Language Access.


**Action: Adopt the Conference Committee 2020 Census Outreach Compromise.**

**STAFF COMMENTS**

# EXHIBIT J


STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Senate Bill No. 840

### CHAPTER 29

An act making appropriations for the support of the government of the State of California and for several public purposes in accordance with the provisions of Section 12 of Article IV of the Constitution of the State of California, relating to the state budget, to take effect immediately, budget bill.

[Approved by Governor June 27, 2018. Filed with Secretary of State June 27, 2018.]

### LEGISLATIVE COUNSEL'S DIGEST

SB 840, Mitchell. Budget Act of 2018.

This bill would make appropriations for the support of state government for the 2018–19 fiscal year.

This bill would declare that it is to take effect immediately as a Budget Bill.

Appropriation: yes.

*The people of the State of California do enact as follows:*

SECTION 1.00.  This act shall be known and may be cited as the "Budget Act of 2018."

SEC. 1.50.  (a) In accordance with Sections 12460, 13338, and 13344 of the Government Code, it is the intent of the Legislature that this act and other financial transactions authorized outside of this act utilize a coding scheme or structure compatible with the Governor's Budget, the records of the Controller in legacy systems, and the Financial Information System for California (FI$Cal), and provide for the appropriation of federal funds received by the state and deposited in the State Treasury.

(b) Essentially, the format and style are as follows:

(1) Appropriation item numbers have a structure which is common to all the state's fiscal systems. The meaning of this structure is as follows:

2720—Business Unit (known as organization code in legacy systems, indicates the department or entity) (e.g., 2720 represents the Department of the California Highway Patrol)

001—Reference Code (indicates whether the item is from the Budget Act or some other source and its character (e.g., 001–100 represents state operations in the Budget Act))

0044—Fund Code (e.g., 0044 represents the Motor Vehicle Account, State Transportation Fund)

(2) Appropriation items are organized in Business Unit order.

95

| Item | Amount |
|------|--------|

30 days of making such a transfer. In no case shall a transfer or transfers made pursuant to this provision exceed the total amount of $20,000,000. Any amount transferred pursuant to this provision shall be repaid to the General Fund upon order of the Director of Finance when no longer needed to maintain a minimum required reserve.

0511-001-0001—For support of Secretary of Government Operations............................................................... **91,705,000**

Schedule:
(1) 0250-Administration of Government Operations Agency............... 4,085,000
(1.5) 0255-State Planning and Policy Development................................ 90,300,000
(2) Reimbursements to 0250-Administration of Government Operations Agency........................................... −2,680,000

Provisions:
1. The amount appropriated in Schedule (1.5) is provided for the State Census and shall be available for encumbrance or expenditure until June 30, 2021.

0511-001-3212—For support of Secretary of Government Operations, payable from the Timber Regulation and Forest Restoration Fund.................................... **500,000**

Schedule:
(1) 0250-Administration of Government Operations Agency................ 500,000

Provisions:
1. Notwithstanding any other provision of law, the funds appropriated in this item shall be available for encumbrance or expenditure until June 30, 2020, for support or local assistance, to implement a California mass timber building competition consistent with the recommendations of the California Forest Carbon Plan.

0515-001-0001—For support of Secretary of Business, Consumer Services, and Housing............................ **638,000**

Schedule:
(1) 0260-Support................................. 3,279,000
(2) Reimbursements to 0260-Support.... −2,641,000

0515-001-0067—For support of Secretary of Business, Consumer Services, and Housing, payable from the State Corporations Fund........................................... **230,000**

Schedule:
(1) 0260-Support................................. 230,000

# EXHIBIT K

# Uses of Census Bureau Data in Federal Funds Distribution

*A New Design for the 21st Century*

Issued September 2017
Version 1.0
Prepared by Marisa Hotchkiss, Jessica Phelan





U.S. Department of Commerce
Economics and Statistics Administration
U.S. CENSUS BUREAU
*census.gov*



*Page intentionally left blank.*

# Table of Contents

List of Tables ...................................................................................................................... 2

Executive Summary ........................................................................................................... 3

1.  Introduction ................................................................................................................ 8

2.  Scope ........................................................................................................................... 9

3.  Methodology ............................................................................................................. 13

4.  Limitations ................................................................................................................ 14

5.  Results ....................................................................................................................... 16

6.  Summary ................................................................................................................... 24

7.  References ................................................................................................................. 25

8.  Appendices ............................................................................................................... 27

## List of Tables

Table 1: Federal Assistance Distributed Using Census Bureau Data in Fiscal Year 2015 ........................... 16

Table 2: Largest Programs Using Census Bureau Data to Distribute Funds ................................................ 20

Table 3: Programs Not Included in the 2009 Estimate of Funds Distributed ............................................. 21

Table 4: Programs Without a Funding Estimate for Fiscal Year 2015 ........................................................ 22

Table 5: Programs With a Change in Ranking of 15 Positions or More Between Fiscal Year 2007 and Fiscal Year 2015 (Among Programs with a Funding Estimate in Each Year) ........................................................ 22

# Executive Summary

This working paper documents an updated estimate of the federal funds distributed each year in whole or in part using U.S. Census Bureau data. This paper finds that 132 programs used Census Bureau data to distribute more than $675 billion in funds during fiscal year 2015.

In 2009, the Census Bureau issued a working paper that found more than $400 billion of federal funds were distributed using Census Bureau data (Blumerman, 2009).  This estimate was frequently used to illustrate the value of accurate Census Bureau data to the public, as part of the effort to encourage timely survey and census responses. However, the "more than $400 billion" estimate was based on fiscal year 2007 funding. As the Census Bureau actively prepares for the 2020 Census, an updated estimate becomes increasingly important.

Census Bureau data, for the scope of this analysis, include decennial census program data (decennial census data, American Community Survey [ACS] data, and geographic program data) as well as data from related programs that use decennial census data as a critical input. This analysis examines the current distribution of funds, and includes those federal programs using Census Bureau data to distribute funds, in one of three ways:

- **Selection and/or restriction of recipients of funds.** Programs use Census Bureau data to define either the characteristics of populations served by the program or the characteristics of governments and organizations eligible to receive funds to provide those services.
- **Award or allocation of funds.** Programs use Census Bureau data to determine the funds distributed to eligible recipients and providers.
- **Monitoring and assessment of program performance.** Programs use Census Bureau data to ensure programs function as designed, to encourage and award effective administration of programs, and to explore alternative methods of funds distribution.

Table 1 shows the fiscal year 2015 funds distributed using Census Bureau data. The programs are ranked by the fiscal year 2015 funding, from largest to smallest.

## Table 1: Federal Assistance Distributed Using Census Bureau Data in Fiscal Year 2015

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.778 | Medical Assistance Program | HHS | $311,805,244,413 | |
| 10.551 | Supplemental Nutrition Assistance Program | USDA | $71,035,786,000 | * |
| 93.774 *(part)* | Medicare Part B Physicians Fee Schedule Services | HHS | $70,300,000,000 | ** |
| 20.205 | Highway Planning and Construction | DOT | $38,479,013,855 | |
| 84.063 | Federal Pell Grant Program | ED | $29,916,694,438 | |
| 10.555 | National School Lunch Program | USDA | $18,915,944,292 | |
| 93.558 | Temporary Assistance for Needy Families | HHS | $17,225,738,021 | |
| 14.871 | Section 8 Housing Choice Voucher | HUD | $15,761,488,440 | * |
| 84.010 | Title 1 Grants to Local Educational Agencies | ED | $14,253,154,251 | |
| 84.027 | Special Education Grants to States | ED | $11,382,885,850 | |
| 93.600 | Head Start | HHS | $8,538,887,781 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children | USDA | $6,062,899,861 | |
| 20.507 | Federal Transit Formula Grants | DOT | $5,452,882,796 | |
| 93.658 | Foster Care Title IV-E | HHS | $5,409,221,818 | |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | HHS | $5,314,103,129 | |
| 14.195 | Section 8 Housing Assistance Payments Program | HUD | $4,367,081,456 | |
| 93.767 | State Children's Health Insurance Program | HHS | $4,212,457,713 | |
| 10.553 | School Breakfast Program | USDA | $4,057,189,000 | * |
| 93.568 | Low-Income Home Energy Assistance | HHS | $3,387,315,199 | |
| 14.269 | Hurricane Sandy Community Development Block Grant Disaster Recovery Grants (CDBG-DR) | HUD | $3,347,522,549 | |
| 17.225 | Unemployment Insurance | DOL | $3,015,880,910 | |
| 84.126 | Vocational Rehabilitation State Grants | ED | $2,932,617,340 | |
| 93.659 | Adoption Assistance | HHS | $2,901,418,709 | |
| 84.367 | Improving Teacher Quality State Grants | ED | $2,321,910,864 | |
| 16.575 | Crime Victim Assistance | DOJ | $1,928,657,781 | |
| 14.218 | Community Development Block Grants/Entitlement Grants | HUD | $1,779,474,572 | |
| 93.959 | Block Grants for Prevention and Treatment of Substance Abuse | HHS | $1,723,345,919 | |
| 93.667 | Social Services Block Grant | HHS | $1,575,899,959 | |
| 20.500 | Federal Transit Capital Investment Grants | DOT | $1,491,401,116 | |
| 84.048 | Career and Technical Education - Basic Grants to States | ED | $1,098,985,194 | |
| 17.260 | WIA Dislocated Workers | DOL | $1,010,980,037 | |
| 14.239 | Home Investment Partnerships Program | HHS | $848,108,000 | * |
| 10.427 | Rural Rental Assistance Payments | USDA | $795,000,475 | |
| 17.258 | WIA/WIOA Adult Program | DOL | $771,878,641 | |
| 17.259 | WIA/WIOA Youth Activities | DOL | $764,793,658 | |
| 84.365 | English Language Acquisition Grants | ED | $727,569,726 | |
| 15.611 | Wildlife Restoration | DOI | $720,904,545 | |
| 14.872 | Public Housing Capital Fund | HUD | $719,156,346 | |
| 14.228 | Community Development Block Grants/ State's Program and Non-Entitlement Grants in Hawaii | HUD | $667,903,155 | |
| 10.558 | Child and Adult Care Food Program | USDA | $660,751,878 | |
| 93.914 | HIV Emergency Relief Project Grants | HHS | $645,489,152 | |
| 20.509 | Formula Grants for Rural Areas | DOT | $601,037,662 | * |
| 84.002 | Adult Education - Basic Grants to States | ED | $557,949,255 | |
| 93.994 | Maternal and Child Health Services Block Grant to the States | HHS | $536,169,122 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.958 | Block Grants for Community Mental Health Services | HHS | $457,267,659 | |
| 20.513 | Capital Assistance Program for Elderly Persons and Persons with Disabilities | DOT | $432,094,952 | * |
| 84.181 | Special Education Grants for Infants and Families | ED | $429,905,218 | |
| 10.760 | Water and Waste Disposal Systems for Rural Communities | USDA | $414,491,094 | |
| 10.500 | Cooperative Extension Service | USDA | $413,918,790 | |
| 17.235 | Senior Community Service Employment Program | DOL | $374,310,441 | |
| 14.867 | Indian Housing Block Grants | HUD | $368,483,675 | |
| 84.173 | Special Education Preschool Grants | ED | $352,914,028 | |
| 94.006 | Americorps | CNCS | $327,792,073 | |
| 97.044 | Assistance to Firefighters Grant | DHS | $306,000,000 | * |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | USDA | $298,883,966 | |
| 14.231 | Emergency Shelter Grants Program | HUD | $289,353,454 | |
| 16.738 | Edward Byrne Memorial Justice Assistance Grant Program | DOJ | $275,830,777 | |
| 93.645 | Child Welfare Services State Grants | HHS | $268,735,000 | * |
| 10.766 | Community Facilities Loans and Grants | USDA | $240,139,746 | |
| 10.203 | Payments to Agricultural Experiment Stations Under the Hatch Act | USDA | $223,243,781 | |
| 20.218 | National Motor Carrier Safety | DOT | $212,461,977 | |
| 14.241 | Housing Opportunities for Persons with AIDS | HUD | $174,780,730 | |
| 81.042 | Weatherization Assistance for Low-Income Persons | DOE | $172,848,875 | |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | DOL | $171,035,409 | |
| 84.358 | Rural Education | ED | $162,701,541 | |
| 45.310 | Grants to States | NFAH | $154,834,410 | |
| 20.600 | State and Community Highway Safety Grant Program | DOT | $141,907,346 | |
| 16.588 | Violence Against Women Formula Grants | DOJ | $133,026,239 | |
| 14.157 | Supportive Housing for the Elderly | HUD | $129,858,342 | |
| 20.505 | Federal Transit Metropolitan Planning Grants | DOT | $125,159,396 | * |
| 97.046 | Fire Management Assistance Grant | DHS | $123,415,762 | |
| 66.460 | Nonpoint Source Implementation Grants | EPA | $120,130,463 | |
| 59.037 | Small Business Development Centers | SBA | $114,013,850 | |
| 93.630 | Developmental Disabilities Basic Support and Advocacy Grants | HHS | $108,428,406 | |
| 14.889 | Choice Neighborhoods Implementation Grants | HUD | $102,745,388 | |
| 93.671 | Family Violence Prevention and Services/Grants for Battered Women's Shelters Grants to States and Indian Tribes | HHS | $94,500,000 | * |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | USDA | $73,712,787 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 11.307 | Economic Adjustment Assistance | DOC | $69,967,293 | |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | EPA | $68,618,949 | |
| 93.332 | Cooperative Agreement to Support Navigators in Federally Facilitated and State Partnership Marketplaces | HHS | $67,000,000 | |
| 11.419 | Coastal Zone Management Administration Awards | DOC | $66,687,490 | |
| 93.150 | Projects for Assistance in Transition from Homelessness | HHS | $61,573,000 | |
| 66.805 | Leaking Underground Storage Tank Trust Fund Program | EPA | $54,057,100 | |
| 93.623 | Basic Center Grant | HHS | $53,626,724 | |
| 15.634 | State Wildlife Grants | DOI | $53,276,493 | |
| 10.770 | Water and Waste Disposal Loans and Grants (Section 306C) | USDA | $52,409,095 | |
| 66.432 | State Public Water System Supervision | EPA | $51,795,701 | |
| 14.181 | Supportive Housing for Persons with Disabilities | HUD | $50,186,668 | |
| 84.186 | Safe and Drug-Free Schools and Communities State Grants | ED | $49,999,134 | |
| 10.205 | Payments to 1890 Land-Grant Colleges and Tuskegee University | USDA | $49,223,794 | |
| 45.025 | Promotion of the Arts Partnership Agreements | NFAH | $48,349,300 | |
| 16.540 | Juvenile Justice and Delinquency Prevention Allocation to States | DOJ | $47,659,339 | |
| 93.235 | Abstinence Education Program | HHS | $44,766,964 | |
| 17.265 | Native American Employment and Training | DOL | $43,976,172 | |
| 45.129 | Promotion of the Humanities Federal/State Partnership | NFAH | $42,483,960 | |
| 66.801 | Hazardous Waste Management State Program Support | EPA | $39,337,185 | |
| 93.138 | Protection and Advocacy for Individuals with Mental Illness | HHS | $35,314,703 | |
| 15.904 | Historic Preservation Fund Grants-in-Aid | DOI | $34,171,710 | |
| 81.041 | State Energy Program | DOE | $33,315,648 | |
| 10.923 | Emergency Watershed Protection Program | USDA | $31,140,000 | * |
| 10.769 | Rural Business Enterprise Grants | USDA | $27,176,612 | |
| 84.187 | Supported Employment Services for Individuals with Significant Disabilities | ED | $26,631,671 | |
| 93.047 | Special Programs for the Aging Title VI, Part A, Grants to Indian Tribes Part B, Grants to Native Hawaiians | HHS | $25,546,456 | |
| 93.669 | Child Abuse and Neglect State Grants | HHS | $25,310,000 | |
| 16.589 | Rural Domestic Violence, Dating Violence, Sexual Assault, and Stalking Assistance Program | DOJ | $22,055,876 | |
| 10.576 | Senior Farmers Market Nutrition Program | USDA | $19,161,760 | |
| 15.626 | Hunter Education and Safety Program | DOI | $17,494,459 | |
| 84.240 | Program of Protection and Advocacy of Individual Rights | ED | $17,325,788 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.643 | Children's Justice Grants to States | HHS | $16,647,778 | |
| 93.991 | Preventive Health and Health Services Block Grant | HHS | $16,413,552 | |
| 93.042 | Special Programs for the Aging Title VII, Chapter 2 Long Term Care Ombudsman Services for Older Individuals | HHS | $15,801,731 | |
| 93.575 | Child Care and Development Block Grant | HHS | $15,191,070 | |
| 10.763 | Emergency Community and Water Assistance Grants | USDA | $14,348,372 | |
| 84.161 | Rehabilitation Services Client Assistance Program | ED | $12,734,776 | |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | DOJ | $10,476,783 | |
| 93.193 | Urban Indian Health Services | HHS | $9,611,550 | |
| 66.472 | Beach Monitoring and Notification Program Implementation Grants | EPA | $8,990,358 | |
| 10.771 | Rural Cooperative Development Grants | USDA | $8,421,127 | |
| 66.040 | State Clean Diesel Grant Program | EPA | $7,048,631 | |
| 14.225 | Community Development Block Grants/Special Purpose Grants/Insular Areas | HUD | $6,996,000 | * |
| 93.618 | Voting Access for Individuals with Disabilities - Grants for Protection and Advocacy Systems | HHS | $4,962,522 | |
| 93.041 | Special Programs for the Aging Title VII, Chapter 3 Programs for Prevention of Elder Abuse, Neglect, and Exploitation | HHS | $4,768,508 | |
| 66.433 | State Underground Water Source Protection | EPA | $4,260,950 | |
| 93.267 | State Grants for Protection and Advocacy Services | HHS | $3,099,589 | |
| 84.169 | Independent Living State Grants | ED | $2,465,142 | |
| 16.523 | Juvenile Accountability Block Grants | DOJ | $2,447,133 | |
| 10.433 | Rural Housing Preservation Grants | USDA | $2,363,129 | |
| 20.516 | Job Access Reverse Commute | DOT | $2,176,592 | * |
| 10.864 | Grant Program to Establish a Fund for Financing Water and Wastewater Projects | USDA | $1,000,000 | |
| 15.228 | National Fire Plan - Wildland Urban Interface Community Fire Assistance | DOI | $453,418 | |
| 16.548 | Title V Delinquency Prevention Program | DOJ | $170,897 | |
| 10.556 | Special Milk Program for Children | USDA | $70,000 | |
| | | | **$689,312,279,105** | |

Source: USAspending.gov  Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance
1. Catalog of Federal Domestic Assistance program identification number.
2. Federal Executive Department or Agency acronyms are listed in Appendix A.
*For these programs, a USAspending.gov  estimate was not available and a CFDA estimate was used.
**The USAspending.gov  estimate is not available for the applicable portion of this program. The Board of Trustees Annual Report was used (Board of Trustees, 2016).

# 1. Introduction

This working paper documents an updated estimate of the federal funds distributed each year in whole or in part using U.S. Census Bureau data. This paper finds that 132 programs used Census Bureau data to distribute more than $675 billion in funds during fiscal year 2015.

In 2009, the Census Bureau issued a working paper that found more than $400 billion of federal funds were distributed annually using Census Bureau data (Blumerman, 2009).  This estimate was frequently used to illustrate the value of accurate Census Bureau data to the public, as part of the effort to encourage timely survey and census responses. However, the more than $400 billion estimate is based on fiscal year 2007 funding. Since 2007, programs have revised their processes and requirements and changes have been made to statutes, regulations, and formulas. As the Census Bureau actively prepares for the 2020 Census, an updated estimate of how these data are used in federal assistance funding becomes increasingly important.

Census Bureau data, for the scope of this analysis, include decennial census program data (decennial census data, American Community Survey [ACS] data, and geographic program data) as well as data from related programs that use decennial census data as a critical input. This analysis examines the current distribution of funds, and includes those federal programs using Census Bureau data to distribute funds, in one of three ways:

- **Selection and/or restriction of recipients of funds.** Programs use Census Bureau data to define either the characteristics of populations served by the program or the characteristics of governments and organizations eligible to receive funds to provide those services.
- **Award or allocation of funds.** Programs use Census Bureau data to determine the funds distributed to eligible recipients and providers.
- **Monitoring and assessment of program performance.** Programs use Census Bureau data to ensure programs function as designed, to encourage and award effective administration of programs, and to explore alternative methods of funds distribution.

These uses help illustrate the value of accurate Census Bureau data to the public, primarily along three common themes:

- Census Bureau data enable federal programs to fund initiatives by using population counts and characteristics to target and distribute those funds.
- Census Bureau data provide a tool for evidence-based decision making in government, communities, and industry, which builds confidence in the government and the economy.
- Census Bureau data provide a substantial return on investment to the public when considered against the total funds allocated based on these data.

At least half of respondents who participated in the 2010 Census Barriers, Attitudes, and Motivators Survey (CBAMS) indicated that these types of messages make them more likely to participate in the decennial census[1] (Bates, 2009). This is a crucial finding, given decreasing response rates and increasing costs across federal statistical programs.

---

[1]According to the 2010 CBAMS, "At least half of respondents reported that hearing a particular message [including 'Census counts decide a community share of $300 billion in federal funds for schools and other programs,' 'Filling out the Census provides opportunity to help people in your local community get certain benefits such as healthcare, school programs, day care and job training,' and 'Information from the Census helps the government

## 2. Scope

To encourage discussion and comparability between analyses, this paper defines the scope of federal assistance distributed using Census Bureau data. Descriptions of the decennial census program data, data from related programs, data not included in this analysis, and types of federal assistance, are provided in this section.

### Census Bureau Data

In this analysis, the term **Census Bureau data** is defined to include decennial census program data (data produced by the decennial census, ACS, and geographic programs supporting the decennial census and ACS), as well as data produced by programs related to the decennial census program.

### Decennial Census Program Data

Since 1790, a census of the U.S. population has been conducted every 10 years, as required by the U.S. Constitution. Beginning in 1940, most addresses received a "short" form, while a portion of addresses received a more detailed "long" form. The 2000 Census short form was designed to collect basic demographic and housing information (i.e., age, race, ethnicity, sex, relationship to the householder, and tenure of occupied housing units) to be used for apportionment and redistricting. The 2000 Census long form was sent to approximately one-in-six households and collected social, housing, and economic information (i.e., educational attainment, disability status, employment status, income, and housing costs) that was used to plan and determine funds for a wide array of federal, state, local, and tribal programs.

Since 2005, in order to provide communities, businesses, and the public with the detailed long-form information more frequently, these data have been collected monthly (and released annually) through the ACS. This innovation enabled the 2010 Census to be a short-form-only census. Decoupling the collection of short- and long-form data allowed the Census Bureau to focus decennial census efforts on the constitutional requirements to produce a count of the population, while employing technology in both the decennial census and the ACS to improve efficiencies and improve accuracy. The result has been the dissemination of more current and detailed information every year.

The 2020 Decennial Census Program, made up of the 2020 Census and the ACS, will provide the apportionment count through a "short-form-only" census, as well as a much more detailed portrait of communities across the nation through data collected by the ACS. This program is the only data-gathering effort that collects information from enough people to produce comparable data for every geographic area recognized by the Census Bureau, particularly small areas and population groups.

The data collected by the 2020 Census include the number of people in each housing unit, as well as those living in group quarters facilities (college and university housing, military barracks, nursing homes, prisons, etc.) and in transitory or outdoor locations. Data are aggregated into national population counts and characteristics as well as population counts and characteristics by geography (urban/rural, state, county, census tract, block, etc.). As such, an important output of each decennial census are new geographic delineations, boundaries, and classifications.

The Census Bureau also delineates geographic areas after each decennial census by applying local input and specified criteria to decennial census data. While geospatial data are necessary for any program or

---

plan for the future improvements to schools, roads, fire, and police stations.'] would increase their likelihood to participate…" (Bates, 2009).

formula analyzing decennial census data below the national level, the geographic concepts themselves are also used in federal funding. For example, the urban/rural classification is an important part of the U.S. Department of Agriculture (USDA) programs designed to serve rural areas. The Rural Business Enterprise Grants program defines eligible areas as "any areas other than: (1) A city or town that has a population of greater than 50,000 inhabitants; and (2) The urbanized area contiguous and adjacent to such a city or town, as defined by the U.S. Bureau of the Census using the latest decennial census of the United States" (Rural Business Services Property Eligibility, 2017).

While the most fundamental uses of decennial census program data remain the provision of population data for the allocation of seats in the U.S. House of Representative and the definition of boundaries for congressional districts, state legislative districts, school districts, and voting precincts, the uses of the data for other purposes have grown over the last two centuries. Official counts from the decennial census in combination with characteristic estimates from the ACS have many uses, including enforcement of voting rights and civil rights legislation, determination of the sampling frames for dozens of surveys throughout the U.S. federal statistical system, and in controls used in the production of important demographic and economic models and indices.

Selected examples of common program uses of decennial census program data in federal allocations are described below:

1. **Use of a population threshold to allocate funds or determine eligibility.** Programs use a population count or estimate as a factor in allocating funds or determining eligibility. For example, the U.S. Department of Transportation's Urbanized Area Formula Grants program uses population to define eligible areas (incorporated areas with a population of 50,000 or more) and as part of the formula that determines how funding is apportioned for areas of 50,000 to 199,999 in population (Urbanized Area Formula Grants, 2017).
2. **Use of demographic and/or housing estimates to allocate funds or determine eligibility.** Programs use population, demographic, economic, and/or housing characteristics in formulas used to calculate an allocation or determine eligibility for a program. For example, the U.S. Department of Housing and Urban Development's Community Development Block Grant program uses measures of poverty, population, housing overcrowding, age of housing, and population growth to allocate funding (Community Development Block Grants, 2017).
3. **Use of a data element derived from population and characteristic estimates to allocate funds or determine eligibility.** Programs use a combination of population and characteristics to derive another data element (e.g., per capita variables) that is used as a factor in allocating funds or determining eligibility. For example, the Medical Assistance Program, or Medicaid, allocates funds based on the Federal Medical Assistance Percentage (FMAP), which is based on per capita income (Financing and Reimbursement, 2017).

## Related Programs

This report also includes funding allocations made using data related to the decennial census program. The datasets described below use decennial census program data to determine sampling frames, to control and weight estimates, and/or as an input.

### Population Estimates Program (PEP)

The Census Bureau's Population Estimates Program (PEP) produces estimates of the population nationally and for state and county geographies throughout the decade. PEP uses measures of population change, such as births, deaths, and net migration, and adds this change to the most recent decennial census data to provide annual time series estimates of population and housing units. These

estimates are then used as population controls for the ACS and other federal surveys (Population Estimates Program, 2017).

**Current Population Survey (CPS)**
The Current Population Survey (CPS) is the primary source of monthly labor force statistics for the U.S. and is used to collect a variety of economic and social data. The CPS sampling frame is derived from the Census Bureau's Master Address File, which is updated continuously by decennial census program address canvassing and listing operations. In addition, the population estimates used to weight the CPS sample results come from the PEP (Current Population Survey Technical Documentation, 2017).

**Income and Poverty Estimates**
The Annual Social and Economic Supplement (ASEC) of the CPS is the official source of income and poverty estimates for the nation. The Census Bureau also reports poverty data from several other major household surveys and programs. The ACS provides single and multiyear poverty estimates for small geographic areas; the Survey of Income and Program Participation (SIPP) provides longitudinal estimates; and the Small Area Income and Poverty Estimates (SAIPE) program provides model-based poverty estimates for school districts, counties, and states (About Poverty, 2017). Federal assistance programs are not required to use the official ASEC poverty measures, but the majority of poverty estimates sourced, including those published in the U.S. Department of Health and Human Services (HHS) poverty guidelines, are from a dataset that uses decennial census program data in some way. (See "U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs" (Poverty Guidelines, 2017).

**State Personal Income Estimates**
State personal income estimates from the Bureau of Economic Analysis (BEA) primarily use administrative records data, but additional decennial census program data are used "to compensate for differences in definitions, coverage, timing, and geographic detail" (Bureau of Economic Analysis, 2016).

**Consumer Expenditure Survey (CE)**
The Consumer Expenditure Survey (CE) is a nationwide household survey that provides information on the range of consumers' expenditures as well as their incomes and demographic characteristics. Similar to the CPS, the CE sampling frame and population controls are derived using decennial census program data. In addition, the Consumer Price Index (CPI) uses the CE to apply its expenditure weights (Consumer Expenditures and Income: Overview, 2016).

**Statistical Area Delineation**
The U.S. Office of Management and Budget (OMB) delineates metropolitan and micropolitan statistical areas according to published standards based on decennial census program data. In general, a metropolitan or micropolitan statistical area is comprised of a core geographic area with a substantial population nucleus and adjacent communities that have a high degree of economic and social integration with that core. The most current vintage of these delineations uses decennial census, ACS, and PEP data (Metropolitan and Micropolitan, 2017).

## Census Bureau Data Uses Not Included

Though out of scope for this analysis, it is important to mention that Census Bureau data also play an important role in U.S. commerce and the economy. As businesses and industries expand their capacity to use data to make decisions at local and national levels, they depend on data from the Census Bureau to make these decisions. However, there is no requirement for businesses to share how Census Bureau data might inform their spending decisions, therefore an analysis is not possible.

In addition to the decennial census program, the Census Bureau also collects the economic census (the official five-year measure of American business and the economy) and the census of governments (a census which identifies the scope and nature of the nation's state and local government sector including public finance, public employment, and classifications), dozens of ongoing surveys, and produces many additional indicators. Uses of these data in federal funds distribution were not included in this analysis.

## Types of Federal Assistance

Publicly available Census Bureau data are used in at least four distinct types of federal domestic assistance. However, the Census Bureau does not distribute or determine federal funding for any program, nor does the Census Bureau determine how data are used by federal programs or in funding formulas.

The Catalog of Federal Domestic Assistance (CFDA) defines 15 different types of assistance classified by the U.S. General Services Administration (GSA), including seven financial types of assistance and eight nonfinancial types of assistance. The largest outlays of federal funds based on Census Bureau data are provided through categorical grants, in which a governmental agency provides funds and applies constraints to the provision of a service while leaving the performance of the service to the recipient entity. While categorical grants are used for a specific narrow objective, block grants consolidate or merge closely related categorical grants to cover a broader range of objectives in a particular subject (e.g., housing).

Categorical grants are either "formula" or "project" grants. **Formula grants** are defined by GSA as, "Allocations of money to States or their subdivisions in accordance with distribution formulas prescribed by law or administrative regulation, for activities of a continuing nature not confined to a specific project" (Catalog of Federal Domestic Assistance, 2017). Formula grants typically provision services in a manner consistent with national interest and use statistical factors to align with that interest. Some formula grants provide matching funds to eligible grantees, while others apportion a fixed amount of funding. Statistical factors used in the relevant formulas include such elements as population (e.g., localities with fewer than 100,000 people), specific demographic populations (e.g., number of children), per capita characteristics (e.g., per capita income), housing characteristics (e.g., age of housing stock), economic characteristics (e.g., unemployment), and other measures.

**Project grants** are defined by GSA as "The funding, for fixed or known periods, of specific projects. Project grants can include fellowships, scholarships, research grants, training grants, traineeships, experimental and demonstration grants, evaluation grants, planning grants, technical assistance grants, survey grants, and construction grants" (Catalog of Federal Domestic Assistance, 2017). Project grants are typically smaller and have a fixed start and end date.

Though most of the programs using Census Bureau data for funding allocations are grant programs, there are a few examples of **Direct Payments for Specified Use**. GSA defines this type of assistance as, "Financial assistance from the Federal government provided directly to individuals, private firms, and other private institutions to encourage or subsidize a particular activity by conditioning the receipt of the assistance on a particular performance by the recipient. This does not include solicited contracts for the procurement of goods and services for the Federal government" (Catalog of Federal Domestic Assistance, 2017).

Finally, there are a few examples of Census Bureau data used in **Direct Loans**. As defined by GSA, these are "Financial assistance provided through the lending of Federal monies for a specific period of time,

with a reasonable expectation of repayment. Such loans may or may not require the payment of interest" (Catalog of Federal Domestic Assistance, 2017).

The remaining eleven types of assistance defined by GSA are not included in the scope of this analysis. Though programs may feature multiple types of assistance, they are included in this analysis only if the primary type of assistance is one of the four types mentioned above.

**CFDA Types of Assistance**

| In Scope | Out of Scope |
|---|---|
| Direct Loans | Advisory Services and Counseling |
| Direct Payments for Specified Use | Direct Payments with Unrestricted Use |
| Formula Grants | Dissemination of Technical Information |
| Project Grants | Federal Employment |
| | Guaranteed/Insured Loans |
| | Insurance |
| | Investigation of Complaints |
| | Provision of Specialized Services |
| | Sale, Exchange, or Donation of Property and Goods |
| | Training |
| | Use of Property, Facilities, and Equipment |

# 3. Methodology

## Fiscal Year 2015

Fiscal year 2015 was chosen for this analysis, because the data are current but are also universally available across agency websites and documentation, making comparisons more consistent. Though fiscal year 2016 and 2017 estimates are available on USAspending.gov, other sources have not been fully updated.

## Determination of Program Universe

To ensure comparability with previous estimates, this analysis undertook the following phases:

1. **Update catalog of programs previously identified.** First, the programs listed in the foundational 2009 paper were reviewed in the current CFDA to ensure they still exist, are still providing funds, and are still using Census Bureau data in the funds distribution. If the program is still in scope, the allocation was updated. Fifteen programs from the 2009 inventory did not appear to be currently distributing funds based on Census Bureau data. (See Table 4.)
2. **Examine other programs, including new programs.** During the last decade, the Census Bureau conducted a robust review of the ACS questionnaire content, asking federal agencies about their current uses of Census Bureau data, including whether each use was related to funding. The inventory of programs with funding-related data uses was then compared to the 2009 inventory, and seven programs were added to the inventory. (See Table 3.)
3. **Add fiscal year 2015 allocation for programs in scope.** The programs in scope were examined in the USAspending.gov data and in the CFDA, and the new allocation was captured and aggregated.

4. **Examine alternate sources of data for programs.** In cases where the CFDA descriptions did not provide adequate information, or where conflicting information about funds distributed was discovered, alternative sources of information were examined. These alternative sources included the statutory, administrative, and regulatory language, program websites, methodological and other technical documentation, and budget documents and requests.

Programs included in the final inventory are those that meet the following criteria:

1. **The federal program distributed funds to another entity in fiscal year 2015.** Many federal programs use Census Bureau data for uses other than distributing funds. However, for this analysis, only those programs using Census Bureau data to distribute funds are in scope. Additionally, though many of these programs allocate funds to states which are then matched or redistributed through pass-through programs, only the initial federal allocation is included.

2. **Programs use Census Bureau data, in whole or in part, to distribute funds.** Some programs provide information about how these funding decisions are made with clear citations that reference a specific dataset. Others cite a generic data element, such as "income" that may be reasonably sourced from many different statistical and/or administrative datasets. If a data source cannot be easily determined, but a reasonable assumption can be made that the program uses Census Bureau data, it is included.

   In other instances, Census Bureau data are used for a specific piece of a federal allocation. Though it may not be possible to separate that portion from the total allocation, this analysis uses an alternative source to estimate only that portion when possible. For example, Census Bureau data are used in the Geographic Practice Cost Index (GPCI) for the Medicare Part B Physician Fee Schedule (MaCurdy, 2011). Though this fee schedule is not listed separately in USAspending.gov  or CFDA, these results cite only the $70,300,000,000 for Part B funding listed in the "2016 Annual Report of the Boards of Trustees of the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund" (Board of Trustees, 2016).

## Data Sources

USAspending.gov is the primary source of funds estimates for this analysis. The Federal Funding Accountability and Transparency Act of 2006 (FFATA) requires information on federal financial assistance awards of more than $25,000 to be publicly available on USAspending.gov to give the public access to detailed information about how their tax dollars are spent. Federal agencies are required to report these details to the Department of the Treasury and, per the Digital Accountability and Transparency Act (DATA), the funds data must be reported in a standardized manner (About USAspending.gov, 2017).

Information about each program, including whether funding is guided by formulas, is sourced from the *CFDA*, the "government-wide compendium of Federal programs, projects, services, and activities that provide assistance or benefits to the American public." The CFDA is a dissemination mechanism for the federal domestic assistance program information maintained by GSA. Where USAspending.gov data are incomplete for a particular program, funds estimates from the CFDA are used. A side-by-side comparison of estimates from each data source is included in Appendix A.

# 4. Limitations

There is some question as to the reliability and completeness of the estimates reported through USAspending.gov. A 2014 GAO assessment of data available through USAspending.gov determined that

"Few awards on the website contained information that was fully consistent with agency records. GAO estimates with 95 percent confidence that between 2 percent and 7 percent of the awards contained information that was fully consistent with agencies' records for all 21 data elements examined . . . GAO could not determine whether the remaining data elements were significantly consistent or inconsistent, in large part because of incomplete or inadequate agency records . . . Until these weaknesses are addressed, any effort to use the data will be hampered by uncertainties about accuracy" (Government Accountability Office, 2014).

The data elements most crucial to this analysis are the fiscal year 2015 funds distributed. However, there are some inconsistencies between USAspending.gov, CFDA, and other sources. Differences between the estimates may be methodological, as some sources aggregate awards received under specific assistance programs, while others cite enacted budgets for programs. Appendix B shows the variability in estimates from these different data sources.

In addition, this analysis is not able to guarantee an exhaustive list of all federal allocations using Census Bureau data, though it is likely that the largest programs (those providing the greatest amount of funding) are included. As a result of these noted data quality and comparability issues, estimates in this paper should be quoted and/or compared with caution.

# 5. Results

Table 1 shows the fiscal year 2015 funds distributed using Census Bureau data. The 132 programs are ranked by the fiscal year 2015 funding, from largest to smallest.

**Table 1: Federal Assistance Distributed Using Census Bureau Data in Fiscal Year 2015**

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.778 | Medical Assistance Program | HHS | $311,805,244,413 | |
| 10.551 | Supplemental Nutrition Assistance Program | USDA | $71,035,786,000 | * |
| 93.774 (part) | Medicare Part B Physicians Fee Schedule Services | HHS | $70,300,000,000 | ** |
| 20.205 | Highway Planning and Construction | DOT | $38,479,013,855 | |
| 84.063 | Federal Pell Grant Program | ED | $29,916,694,438 | |
| 10.555 | National School Lunch Program | USDA | $18,915,944,292 | |
| 93.558 | Temporary Assistance for Needy Families | HHS | $17,225,738,021 | |
| 14.871 | Section 8 Housing Choice Voucher | HUD | $15,761,488,440 | * |
| 84.010 | Title 1 Grants to Local Educational Agencies | ED | $14,253,154,251 | |
| 84.027 | Special Education Grants to States | ED | $11,382,885,850 | |
| 93.600 | Head Start | HHS | $8,538,887,781 | |
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children | USDA | $6,062,899,861 | |
| 20.507 | Federal Transit Formula Grants | DOT | $5,452,882,796 | |
| 93.658 | Foster Care Title IV-E | HHS | $5,409,221,818 | |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | HHS | $5,314,103,129 | |
| 14.195 | Section 8 Housing Assistance Payments Program | HUD | $4,367,081,456 | |
| 93.767 | State Children's Health Insurance Program | HHS | $4,212,457,713 | |
| 10.553 | School Breakfast Program | USDA | $4,057,189,000 | * |
| 93.568 | Low-Income Home Energy Assistance | HHS | $3,387,315,199 | |
| 14.269 | Hurricane Sandy Community Development Block Grant Disaster Recovery Grants (CDBG-DR) | HUD | $3,347,522,549 | |
| 17.225 | Unemployment Insurance | DOL | $3,015,880,910 | |
| 84.126 | Vocational Rehabilitation State Grants | ED | $2,932,617,340 | |
| 93.659 | Adoption Assistance | HHS | $2,901,418,709 | |
| 84.367 | Improving Teacher Quality State Grants | ED | $2,321,910,864 | |
| 16.575 | Crime Victim Assistance | DOJ | $1,928,657,781 | |
| 14.218 | Community Development Block Grants/Entitlement Grants | HUD | $1,779,474,572 | |
| 93.959 | Block Grants for Prevention and Treatment of Substance Abuse | HHS | $1,723,345,919 | |
| 93.667 | Social Services Block Grant | HHS | $1,575,899,959 | |
| 20.500 | Federal Transit Capital Investment Grants | DOT | $1,491,401,116 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 84.048 | Career and Technical Education - Basic Grants to States | ED | $1,098,985,194 | |
| 17.260 | WIA Dislocated Workers | DOL | $1,010,980,037 | |
| 14.239 | Home Investment Partnerships Program | HHS | $848,108,000 | * |
| 10.427 | Rural Rental Assistance Payments | USDA | $795,000,475 | |
| 17.258 | WIA/WIOA Adult Program | DOL | $771,878,641 | |
| 17.259 | WIA/WIOA Youth Activities | DOL | $764,793,658 | |
| 84.365 | English Language Acquisition Grants | ED | $727,569,726 | |
| 15.611 | Wildlife Restoration | DOI | $720,904,545 | |
| 14.872 | Public Housing Capital Fund | HUD | $719,156,346 | |
| 14.228 | Community Development Block Grants/ State's Program and Non-Entitlement Grants in Hawaii | HUD | $667,903,155 | |
| 10.558 | Child and Adult Care Food Program | USDA | $660,751,878 | |
| 93.914 | HIV Emergency Relief Project Grants | HHS | $645,489,152 | |
| 20.509 | Formula Grants for Rural Areas | DOT | $601,037,662 | * |
| 84.002 | Adult Education - Basic Grants to States | ED | $557,949,255 | |
| 93.994 | Maternal and Child Health Services Block Grant to the States | HHS | $536,169,122 | |
| 93.958 | Block Grants for Community Mental Health Services | HHS | $457,267,659 | |
| 20.513 | Capital Assistance Program for Elderly Persons and Persons with Disabilities | DOT | $432,094,952 | * |
| 84.181 | Special Education Grants for Infants and Families | ED | $429,905,218 | |
| 10.760 | Water and Waste Disposal Systems for Rural Communities | USDA | $414,491,094 | |
| 10.500 | Cooperative Extension Service | USDA | $413,918,790 | |
| 17.235 | Senior Community Service Employment Program | DOL | $374,310,441 | |
| 14.867 | Indian Housing Block Grants | HUD | $368,483,675 | |
| 84.173 | Special Education Preschool Grants | ED | $352,914,028 | |
| 94.006 | Americorps | CNCS | $327,792,073 | |
| 97.044 | Assistance to Firefighters Grant | DHS | $306,000,000 | * |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | USDA | $298,883,966 | |
| 14.231 | Emergency Shelter Grants Program | HUD | $289,353,454 | |
| 16.738 | Edward Byrne Memorial Justice Assistance Grant Program | DOJ | $275,830,777 | |
| 93.645 | Child Welfare Services State Grants | HHS | $268,735,000 | * |
| 10.766 | Community Facilities Loans and Grants | USDA | $240,139,746 | |
| 10.203 | Payments to Agricultural Experiment Stations Under the Hatch Act | USDA | $223,243,781 | |
| 20.218 | National Motor Carrier Safety | DOT | $212,461,977 | |
| 14.241 | Housing Opportunities for Persons with AIDS | HUD | $174,780,730 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 81.042 | Weatherization Assistance for Low-Income Persons | DOE | $172,848,875 | |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | DOL | $171,035,409 | |
| 84.358 | Rural Education | ED | $162,701,541 | |
| 45.310 | Grants to States | NFAH | $154,834,410 | |
| 20.600 | State and Community Highway Safety Grant Program | DOT | $141,907,346 | |
| 16.588 | Violence Against Women Formula Grants | DOJ | $133,026,239 | |
| 14.157 | Supportive Housing for the Elderly | HUD | $129,858,342 | |
| 20.505 | Federal Transit Metropolitan Planning Grants | DOT | $125,159,396 | * |
| 97.046 | Fire Management Assistance Grant | DHS | $123,415,762 | |
| 66.460 | Nonpoint Source Implementation Grants | EPA | $120,130,463 | |
| 59.037 | Small Business Development Centers | SBA | $114,013,850 | |
| 93.630 | Developmental Disabilities Basic Support and Advocacy Grants | HHS | $108,428,406 | |
| 14.889 | Choice Neighborhoods Implementation Grants | HUD | $102,745,388 | |
| 93.671 | Family Violence Prevention and Services/Grants for Battered Women's Shelters Grants to States and Indian Tribes | HHS | $94,500,000 | * |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | USDA | $73,712,787 | |
| 11.307 | Economic Adjustment Assistance | DOC | $69,967,293 | |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | EPA | $68,618,949 | |
| 93.332 | Cooperative Agreement to Support Navigators in Federally Facilitated and State Partnership Marketplaces | HHS | $67,000,000 | |
| 11.419 | Coastal Zone Management Administration Awards | DOC | $66,687,490 | |
| 93.150 | Projects for Assistance in Transition from Homelessness | HHS | $61,573,000 | |
| 66.805 | Leaking Underground Storage Tank Trust Fund Program | EPA | $54,057,100 | |
| 93.623 | Basic Center Grant | HHS | $53,626,724 | |
| 15.634 | State Wildlife Grants | DOI | $53,276,493 | |
| 10.770 | Water and Waste Disposal Loans and Grants (Section 306C) | USDA | $52,409,095 | |
| 66.432 | State Public Water System Supervision | EPA | $51,795,701 | |
| 14.181 | Supportive Housing for Persons with Disabilities | HUD | $50,186,668 | |
| 84.186 | Safe and Drug-Free Schools and Communities State Grants | ED | $49,999,134 | |
| 10.205 | Payments to 1890 Land-Grant Colleges and Tuskegee University | USDA | $49,223,794 | |
| 45.025 | Promotion of the Arts Partnership Agreements | NFAH | $48,349,300 | |
| 16.540 | Juvenile Justice and Delinquency Prevention Allocation to States | DOJ | $47,659,339 | |
| 93.235 | Abstinence Education Program | HHS | $44,766,964 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 17.265 | Native American Employment and Training | DOL | $43,976,172 | |
| 45.129 | Promotion of the Humanities Federal/State Partnership | NFAH | $42,483,960 | |
| 66.801 | Hazardous Waste Management State Program Support | EPA | $39,337,185 | |
| 93.138 | Protection and Advocacy for Individuals with Mental Illness | HHS | $35,314,703 | |
| 15.904 | Historic Preservation Fund Grants-in-Aid | DOI | $34,171,710 | |
| 81.041 | State Energy Program | DOE | $33,315,648 | |
| 10.923 | Emergency Watershed Protection Program | USDA | $31,140,000 | * |
| 10.769 | Rural Business Enterprise Grants | USDA | $27,176,612 | |
| 84.187 | Supported Employment Services for Individuals with Significant Disabilities | ED | $26,631,671 | |
| 93.047 | Special Programs for the Aging Title VI, Part A, Grants to Indian Tribes Part B, Grants to Native Hawaiians | HHS | $25,546,456 | |
| 93.669 | Child Abuse and Neglect State Grants | HHS | $25,310,000 | |
| 16.589 | Rural Domestic Violence, Dating Violence, Sexual Assault, and Stalking Assistance Program | DOJ | $22,055,876 | |
| 10.576 | Senior Farmers Market Nutrition Program | USDA | $19,161,760 | |
| 15.626 | Hunter Education and Safety Program | DOI | $17,494,459 | |
| 84.240 | Program of Protection and Advocacy of Individual Rights | ED | $17,325,788 | |
| 93.643 | Children's Justice Grants to States | HHS | $16,647,778 | |
| 93.991 | Preventive Health and Health Services Block Grant | HHS | $16,413,552 | |
| 93.042 | Special Programs for the Aging Title VII, Chapter 2 Long Term Care Ombudsman Services for Older Individuals | HHS | $15,801,731 | |
| 93.575 | Child Care and Development Block Grant | HHS | $15,191,070 | |
| 10.763 | Emergency Community and Water Assistance Grants | USDA | $14,348,372 | |
| 84.161 | Rehabilitation Services Client Assistance Program | ED | $12,734,776 | |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | DOJ | $10,476,783 | |
| 93.193 | Urban Indian Health Services | HHS | $9,611,550 | |
| 66.472 | Beach Monitoring and Notification Program Implementation Grants | EPA | $8,990,358 | |
| 10.771 | Rural Cooperative Development Grants | USDA | $8,421,127 | |
| 66.040 | State Clean Diesel Grant Program | EPA | $7,048,631 | |
| 14.225 | Community Development Block Grants/Special Purpose Grants/Insular Areas | HUD | $6,996,000 | * |
| 93.618 | Voting Access for Individuals with Disabilities - Grants for Protection and Advocacy Systems | HHS | $4,962,522 | |
| 93.041 | Special Programs for the Aging Title VII, Chapter 3 Programs for Prevention of Elder Abuse, Neglect, and Exploitation | HHS | $4,768,508 | |

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 66.433 | State Underground Water Source Protection | EPA | $4,260,950 | |
| 93.267 | State Grants for Protection and Advocacy Services | HHS | $3,099,589 | |
| 84.169 | Independent Living State Grants | ED | $2,465,142 | |
| 16.523 | Juvenile Accountability Block Grants | DOJ | $2,447,133 | |
| 10.433 | Rural Housing Preservation Grants | USDA | $2,363,129 | |
| 20.516 | Job Access Reverse Commute | DOT | $2,176,592 | * |
| 10.864 | Grant Program to Establish a Fund for Financing Water and Wastewater Projects | USDA | $1,000,000 | |
| 15.228 | National Fire Plan - Wildland Urban Interface Community Fire Assistance | DOI | $453,418 | |
| 16.548 | Title V Delinquency Prevention Program | DOJ | $170,897 | |
| 10.556 | Special Milk Program for Children | USDA | $70,000 | |
| | | | **$689,312,279,105** | |

Source: USAspending.gov  Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance
1. Catalog of Federal Domestic Assistance program identification number.
2. Federal Executive Department or Agency acronyms are listed in Appendix A.
*For these programs, a USAspending.gov  estimate was not available and a CFDA estimate was used.
**The USAspending.gov  estimate is not available for the applicable portion of this program. The Board of Trustees Annual Report was used (Board of Trustees, 2016).

Though the funding for certain programs has changed relative to spending on other programs, many of the larger programs from the 2009 analysis are still within the top 20 programs in fiscal year 2015. Table 2 presents the largest 20 programs in fiscal year 2015.

## Table 2: Largest Programs Using Census Bureau Data to Distribute Funds

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.778 | Medical Assistance Program | HHS | $311,805,244,413 | |
| 10.551 | Supplemental Nutrition Assistance Program | USDA | $71,035,786,000 | * |
| 93.774 (part) | Medicare Part B Physicians Fee Schedule Services | HHS | $70,300,000,000 | ** |
| 20.205 | Highway Planning and Construction | DOT | $38,479,013,855 | |
| 84.063 | Federal Pell Grant Program | ED | $29,916,694,438 | |
| 10.555 | National School Lunch Program | USDA | $18,915,944,292 | |
| 93.558 | Temporary Assistance for Needy Families | HHS | $17,225,738,021 | |
| 14.871 | Section 8 Housing Choice Voucher | HUD | $15,761,488,440 | * |
| 84.010 | Title 1 Grants to Local Educational Agencies | ED | $14,253,154,251 | |
| 84.027 | Special Education Grants to States | ED | $11,382,885,850 | |
| 93.600 | Head Start | HHS | $8,538,887,781 | |

2020 Census Research

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children | USDA | $6,062,899,861 | |
| 20.507 | Federal Transit Formula Grants | DOT | $5,452,882,796 | |
| 93.658 | Foster Care Title IV-E | HHS | $5,409,221,818 | |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | HHS | $5,314,103,129 | |
| 14.195 | Section 8 Housing Assistance Payments Program | HUD | $4,367,081,456 | |
| 93.767 | State Children's Health Insurance Program | HHS | $4,212,457,713 | |
| 10.553 | School Breakfast Program | USDA | $4,057,189,000 | * |
| 93.568 | Low-Income Home Energy Assistance | HHS | $3,387,315,199 | |
| 14.269 | Hurricane Sandy Community Development Block Grant Disaster Recovery Grants (CDBG-DR) | HUD | $3,347,522,549 | |
| | | | **$649,225,510,862** | |

Source: USAspending.gov Assistance Data, 2015 Catalog of Federal Domestic Assistance
1. Catalog of Federal Domestic Assistance program identification number.
2. Federal Executive Department or Agency acronyms are listed in Appendix A.
*For these programs, a USAspending.gov estimate was not available and a CFDA estimate was used.
**The USAspending.gov estimate is not available for the applicable portion of this program. The Board of Trustees Annual Report was used (Board of Trustees, 2016).

Table 3 lists the seven programs that are newly included (i.e., not included in the 2009 estimate). Several programs listed below existed before 2007, but were not listed.

## Table 3: Programs Not Included in the 2009 Estimate of Funds Distributed

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] | Fiscal Year 2015 Funds | |
|---|---|---|---|---|
| 93.774 (part) | Medicare Part B Physicians Fee Schedule Services | HHS | $70,300,000,000 | ** |
| 14.871 | Section 8 Housing Choice Voucher | HUD | $15,761,488,440 | * |
| 14.195 | Section 8 Housing Assistance Payments Program | HUD | $4,367,081,456 | |
| 14.269 | Hurricane Sandy Community Development Block Grant Disaster Recovery Grants (CDBG-DR) | HUD | $3,347,522,549 | |
| 84.126 | Vocational Rehabilitation State Grants | ED | $2,932,617,340 | |
| 14.889 | Choice Neighborhoods Implementation Grants | HUD | $102,745,388 | |
| 93.332 | Cooperative Agreement to Support Navigators in Federally Facilitated and State Partnership Marketplaces | HHS | $67,000,000 | |
| | | **Total** | **$93,945,837,833** | |

Source: USAspending.gov Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance
1. Catalog of Federal Domestic Assistance program identification number.
2. Federal Executive Department or Agency acronyms are listed in Appendix A.
*For these programs, a USAspending.gov estimate was not available and a CFDA estimate was used.

21

**The USAspending.gov estimate is not available for the applicable portion of this program. The Board of Trustees Annual Report was used (Board of Trustees, 2016).

Table 4 presents the 15 programs included in the 2009 paper that did not have a fiscal year 2015 estimate. Some of these programs have been discontinued, while other programs did not provide assistance during 2015.

### Table 4: Programs Without a Funding Estimate for Fiscal Year 2015

| CFDA number[1] | Program Name | Federal Executive Department or Agency[2] |
|---|---|---|
| 84.357 | Reading First State Grants | ED |
| 97.074 | Law Enforcement Terrorism Prevention Program | DHS |
| 15.226 | Payments in Lieu of Taxes | DOI |
| 84.243 | Tech-Prep Education | ED |
| 84.298 | State Grants for Innovative Programs | ED |
| 93.793 | Medicaid Transformation Grants | HHS |
| 16.744 | Anti-Gang Initiative | DOJ |
| 84.185 | Byrd Honors Scholarships | ED |
| 17.266 | Work Incentive Grants | DOL |
| 84.364 | Literacy Through School Libraries | ED |
| 93.617 | Voting Access for Individuals with Disabilities Grants to States | HHS |
| 20.521 | New Freedom Program | DOT |
| 84.332 | Comprehensive School Reform Demonstration | ED |
| 97.053 | Citizen Corps | DHS |
| 15.513 | Dutch John Federal Property and Disposition Assistance Act | DOI |

Source: USAspending.gov Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance
1. Catalog of Federal Domestic Assistance program identification number.
2. Federal Executive Department or Agency acronyms are listed in Appendix A.

While this descriptive analysis does not compare the funding for each program across fiscal years, some programs appear to have experienced more change in the amount of funding distributed than others. Table 5 presents the programs with the largest changes in rankings between fiscal years 2007 and 2015 (defined as changes of 15 positions of more).

### Table 5: Programs With a Change in Ranking of 15 Positions or More Between Fiscal Year 2007 and Fiscal Year 2015 (Among Programs with a Funding Estimate in Each Year)

| CFDA number[1] | Program Name | Fiscal Year 2007 Rank | Fiscal Year 2015 Rank | Change in Rankings Between Fiscal Years 2007 and 2015 |
|---|---|---|---|---|
| 93.575 | Child Care and Development Block Grant | 22 | 111 | -89 |

| CFDA number[1] | Program Name | Fiscal Year 2007 Rank | Fiscal Year 2015 Rank | Change in Rankings Between Fiscal Years 2007 and 2015 |
|---|---|---|---|---|
| 10.763 | Emergency Community and Water Assistance Grants | 61 | 112 | -51 |
| 16.548 | Title V Delinquency Prevention Program | 90 | 130 | -40 |
| 84.186 | Safe and Drug-Free Schools and Communities State Grants | 52 | 88 | -36 |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | 78 | 114 | -36 |
| 20.516 | Job Access Reverse Commute | 93 | 127 | -34 |
| 14.157 | Supportive Housing for the Elderly | 35 | 68 | -33 |
| 10.923 | Emergency Watershed Protection Program | 67 | 99 | -32 |
| 14.181 | Supportive Housing for Persons with Disabilities | 58 | 87 | -29 |
| 93.991 | Preventive Health and Health Services Block Grant | 81 | 109 | -28 |
| 16.523 | Juvenile Accountability Block Grants | 97 | 125 | -28 |
| 10.558 | Child and Adult care Food Program | 19 | 39 | -20 |
| 17.225 | Unemployment Insurance | 2 | 21 | -19 |
| 14.872 | Public Housing Capital Fund | 18 | 37 | -19 |
| 10.760 | Water and Waste Disposal Systems for Rural Communities | 28 | 47 | -19 |
| 66.801 | Hazardous Waste Management State Program Support | 77 | 95 | -18 |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | 62 | 78 | -16 |
| 14.231 | Emergency Shelter grants Program | 70 | 55 | 15 |
| 93.150 | Projects for Assistance in Transition from Homelessness | 96 | 81 | 15 |
| 93.623 | Basic Center Grant | 98 | 83 | 15 |
| 45.025 | Promotion of the Arts Partnership Agreements | 105 | 90 | 15 |
| 93.235 | Abstinence Education Program | 107 | 92 | 15 |
| 93.138 | Protection and Advocacy for Individuals with Mental Illness | 111 | 96 | 15 |
| 10.576 | Senior Farmers Market Nutrition Program | 120 | 105 | 15 |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | 94 | 76 | 18 |
| 10.770 | Water and Waste Disposal Loans and Grants (Section 306C) | 103 | 85 | 18 |
| 10.771 | Rural Cooperative Development Grants | 135 | 117 | 18 |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | 73 | 54 | 19 |
| 10.205 | Payments to 1890 Land-Grant Colleges and Tuskegee University | 108 | 89 | 19 |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | 84 | 63 | 21 |
| 97.046 | Fire Management Assistance Grant | 91 | 70 | 21 |
| 15.611 | Wildlife Restoration | 59 | 36 | 23 |
| 15.626 | Hunter Education and Safety Program | 131 | 106 | 25 |
| 16.575 | Crime Victim Assistance | 50 | 24 | 26 |
| 20.513 | Capital Assistance Program for Elderly Persons and Persons with Disabilities | 71 | 45 | 26 |

Source: USAspending.gov  Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance, Blumerman, 2009
1. Catalog of Federal Domestic Assistance program identification number.

# 6. Summary

This working paper documents an updated estimate of the federal funds distributed each year in whole or in part using Census Bureau data. These data include decennial census program data (decennial census data, ACS data, and geographic program data) as well as data from related programs, that are used to select and restrict eligible funding recipients, allocate funds, and monitor and assess federal financial assistance programs.

This paper documents at least 132 programs, including seven newly identified programs, that used Census Bureau data to distribute more than $675 billion in funds during fiscal year 2015.

# 7.  References

*2015 Catalog of Federal Domestic Assistance*, U.S. General Services Administration.
https://www.cfda.gov/downloads/CFDA_2015.pdf accessed on September 7, 2017.

"About Poverty" (2017). U.S. Census Bureau. https://www.census.gov/topics/income-poverty/poverty/about.html  accessed on September 7, 2017.

"About USAspending.gov" (2017). USAspending.gov.
https://www.usaspending.gov/about/usaspending/Pages/default.aspx accessed on September 7, 2017.

Bates, N., Conrey, F., Zuwallack, R., Billia, D., Harris, V., Jacobsen, L., White, T. (2009), "Messaging to America: Results from the Census Barriers, Attitudes and Motivators Survey (CBAMS)." U.S. Census Bureau, May 12, 2009, https://www.census.gov/2010census/partners/pdf/C2POMemoNo10.pdf accessed on September 7, 2017.

Blumerman, L. and P. Vidal (2009). "Uses of Population and Income Statistics in Federal Funds Distribution—With a Focus on Census Bureau Data." Governments Division Report Series, research Report #2009-1, U.S. Census Bureau, June 23, 2009, https://www.census.gov/prod/2009pubs/govsrr2009-1.pdf accessed on September 7, 2017.

Board of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds (2016). "The 2016 Annual Report of the Boards of Trustees of the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund." June 22, 2016, https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/reportstrustfunds/downloads/tr2016.pdf accessed on September 7, 2017.

"Community Development Block Grants" (2017). United States Department of Housing and Urban Development.
https://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_planning/communitydevelopment/programs accessed on September 7, 2017.

"Consumer Expenditures and Income: Overview" (2016). U.S. Bureau of Labor Statistics.
https://www.bls.gov/opub/hom/cex/home.htm accessed on September 7, 2017.

"Current Population Survey Technical Documentation" (2017). U.S. Bureau of Labor Statistics.
https://www.bls.gov/cps/documentation.htm accessed on September 7, 2017.

"Financing and Reimbursement" (2017). Medicaid.gov. https://www.medicaid.gov/medicaid/financing-and-reimbursement/ accessed on September 7, 2017.

Government Accountability Office (2014). "Oversight Needed to Address Underreporting and Inconsistencies on Federal Award Website." June 30, 2014 https://www.gao.gov/assets/670/664536.pdf accessed on September 7, 2017.

MaCurdy, T., J. Shafrin, M. Bounds, D. Pham (2011). "Revisions to the Sixth Update of the Geographic Practice Cost Index: Final Report," Acumen LLC, Burlingame, California, October, 2011, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-

Payment/PhysicianFeeSched/Downloads/CY2012_Revisions_to_the_6th_GPCI_Update-Final_Report.pdf accessed on September 7, 2017.

"Metropolitan and Micropolitan" (2017). U.S. Census Bureau. https://www.census.gov/programs-surveys/metro-micro/about.html accessed on September 7, 2017.

"Population Estimates Program" (2017). U.S. Census Bureau. https://www.census.gov/programs-surveys/popest/about.html accessed on September 7, 2017.

"Poverty Guidelines" (2017). U.S. Department of Health and Human Services. Retrieved from https://aspe.hhs.gov/poverty-guidelines accessed on September 7, 2017.

"Rural Business Services Property Eligibility" (2017). United States Department of Agriculture. Retrieved from https://eligibility.sc.egov.usda.gov/eligibility/ accessed on September 7, 2017.

"State Personal Income and Employment: Concepts, Data Sources, and Statistical Methods" (2016). Bureau of Economic Analysis, https://www.bea.gov/regional/pdf/spi2015.pdf accessed on September 7, 2017.

"Types of Assistance" (2017). Catalog of Federal Domestic Assistance. https://www.cfda.gov/?s=generalinfo&mode=list&tab=list&tabmode=list&static=assistance accessed on September 7, 2017.

"Urbanized Area Formula Grants" (2017). United States Department of Transportation. https://www.transit.dot.gov/funding/grants/urbanized-area-formula-grants-5307 accessed on September 7, 2017.

USAspending.gov Assistance Data (fiscal year 2015). https://www.usaspending.gov/transparency/Pages/AgencyProfiles.aspx accessed on September 7, 2017.

# 8. Appendices

**Appendix A**: **Federal Executive Department or Agency Acronyms**

| Acronym | Name |
|---------|------|
| BEA | Bureau of Economic Analysis |
| CNCS | Corporation for National and Community Service |
| DHS | Department of Homeland Security |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DOJ | Department of Justice |
| DOL | Department of Labor |
| DOT | Department of Transportation |
| ED | Department of Education |
| EEOC | Equal Employment Opportunity Commission |
| EPA | Environmental Protection Agency |
| FCC | Federal Communications Commission |
| FRS | Federal Reserve Board |
| HHS | Department of Health and Human Services |
| HUD | Department of Housing and Urban Development |
| NFAH | National Foundation on the Arts and Humanities |
| NIH | National Institutes of Health |
| NSF | National Science Foundation |
| NTIA | National Telecommunications and Information Administration |
| OMB | Office of Management and Budget |
| SBA | Small Business Administration |
| SSA | Social Security Administration |
| USDA | U.S. Department of Agriculture |
| VA | Department of Veteran's Affairs |

## Appendix B: Variability Between USAspending.gov and CFDA Estimates

| CFDA | Program Name | Fiscal Year 2015 USAspending.gov | Fiscal Year 2015 CFDA |
|------|--------------|----------------------------------|------------------------|
| 93.778 | Medical Assistance Program | $311,805,244,413 | $321,724,966,367 |
| 20.205 | Highway Planning and Construction | $38,479,013,855 | $39,827,738,289 |
| 84.063 | Federal Pell Grant Program | $29,916,694,438 | $28,528,650,000 |
| 10.555 | National School Lunch Program | $18,915,944,292 | $11,928,964,000 |
| 93.558 | Temporary Assistance for Needy Families | $17,225,738,021 | $16,488,667,000 |
| 84.010 | Title 1 Grants to Local Educational Agencies | $14,253,154,251 | $14,409,802,000 |
| 84.027 | Special Education Grants to States | $11,382,885,850 | $11,497,848,000 |
| 93.600 | Head Start | $8,538,887,781 | $8,602,167,185 |
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children | $6,062,899,861 | $6,670,380,000 |
| 20.507 | Federal Transit Formula Grants | $5,452,882,796 | $5,660,362,590 |
| 93.658 | Foster Care Title IV-E | $5,409,221,818 | $4,640,500,000 |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | $5,314,103,129 | $2,917,000,000 |
| 14.195 | Section 8 Housing Assistance Payments Program | $4,367,081,456 | $9,537,000,000 |
| 93.767 | State Children's Health Insurance Program | $4,212,457,713 | $11,291,546,000 |
| 93.568 | Low-Income Home Energy Assistance | $3,387,315,199 | $3,391,640,422 |
| 14.269 | Hurricane Sandy Community Development Block Grant Disaster Recovery Grants (CDBG-DR) | $3,347,522,549 | $3,477,273,000 |
| 17.225 | Unemployment Insurance | $3,015,880,910 | $2,826,000,000 |
| 84.126 | Vocational Rehabilitation State Grants | $2,932,617,340 | $3,052,453,598 |
| 93.659 | Adoption Assistance | $2,901,418,709 | $2,472,600,000 |
| 84.367 | Improving Teacher Quality State Grants | $2,321,910,864 | $2,295,784,000 |
| 16.575 | Crime Victim Assistance | $1,928,657,781 | $1,958,834,653 |
| 14.218 | Community Development Block Grants/Entitlement Grants | $1,779,474,572 | $1,943,138,000 |
| 93.959 | Block Grants for Prevention and Treatment of Substance Abuse | $1,723,345,919 | $1,723,345,919 |
| 93.667 | Social Services Block Grant | $1,575,899,959 | $1,575,900,000 |
| 20.500 | Federal Transit Capital Investment Grants | $1,491,401,116 | $1,413,706,079 |
| 84.048 | Career and Technical Education - Basic Grants to States | $1,098,985,194 | $99,381,153 |
| 17.260 | WIA Dislocated Workers | $1,010,980,037 | $0 |
| 10.427 | Rural Rental Assistance Payments | $795,000,475 | $1,088,499,996 |
| 17.258 | WIA/WIOA Adult Program | $771,878,641 | $775,000,000 |
| 17.259 | WIA/WIOA Youth Activities | $764,793,658 | $817,000,000 |
| 84.365 | English Language Acquisition Grants | $727,569,726 | $670,469,000 |
| 15.611 | Wildlife Restoration | $720,904,545 | $663,540,568 |
| 14.872 | Public Housing Capital Fund | $719,156,346 | $1,776,382,000 |
| 14.228 | Community Development Block Grants/ State's Program and Non-Entitlement Grants in Hawaii | $667,903,155 | $711,698,000 |
| 10.558 | Child and Adult care Food Program | $660,751,878 | $3,350,488,000 |
| 93.914 | HIV Emergency Relief Project Grants | $645,489,152 | $624,704,781 |
| 84.002 | Adult Education - Basic Grants to States | $557,949,255 | $568,954,515 |
| 93.994 | Maternal and Child Health Services Block Grant to the States | $536,169,122 | $539,800,880 |

| CFDA | Program Name | Fiscal Year 2015 USAspending.gov | Fiscal Year 2015 CFDA |
|---|---|---|---|
| 93.958 | Block Grants for Community Mental Health Services | $457,267,659 | $457,267,659 |
| 84.181 | Special Education grants for Infants and Families | $429,905,218 | $438,556,000 |
| 10.760 | Water and Waste Disposal Systems for Rural Communities | $414,491,094 | $1,105,989,139 |
| 10.500 | Cooperative Extension Service | $413,918,790 | $452,396,820 |
| 17.235 | Senior Community Service Employment Program | $374,310,441 | $379,000,000 |
| 14.867 | Indian Housing Block Grants | $368,483,675 | $651,593,000 |
| 84.173 | Special Education Preschool Grants | $352,914,028 | $353,238,000 |
| 94.006 | Americorps | $327,792,073 | $202,012,826 |
| 14.231 | Emergency Shelter grants Program | $289,353,454 | $270,000,000 |
| 16.738 | Edward Byrne Memorial Justice Assistance Grant Program | $275,830,777 | $316,644,881 |
| 10.766 | Community Facilities Loans and Grants | $240,139,746 | $0 |
| 10.203 | Payments to Agricultural Experiment Stations Under the Hatch Act | $223,243,781 | $228,822,740 |
| 20.218 | National Motor Carrier Safety | $212,461,977 | $168,275,000 |
| 14.241 | Housing Opportunities for Persons with Aids | $174,780,730 | $330,264,000 |
| 81.042 | Weatherization Assistance for Low-Income Persons | $172,848,875 | $175,116,268 |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | $171,035,409 | $115,915,752 |
| 84.358 | Rural Education | $162,701,541 | $169,840,120 |
| 45.310 | Grants to States | $154,834,410 | $154,848,000 |
| 20.600 | State and community Highway safety | $141,907,346 | $193,535,561 |
| 16.588 | Violence Against Women Formula Grants | $133,026,239 | $128,094,803 |
| 14.157 | Supportive Housing for the Elderly | $129,858,342 | $354,000,000 |
| 97.046 | Fire Management Assistance Grant | $123,415,762 | $7,042,961 |
| 66.460 | Nonpoint Source Implementation grants | $120,130,463 | $158,200,000 |
| 59.037 | Small Business Development Centers | $114,013,850 | $114,895,000 |
| 93.630 | Developmental Disabilities Basic Support and Advocacy Grants | $108,428,406 | $108,553,320 |
| 14.871 | Section 8 Housing Choice Voucher | $106,606,283 | $15,761,488,440 |
| 14.889 | Choice Neighborhoods Implementation Grants | $102,745,388 | $144,810,000 |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | $73,712,787 | $73,967,173 |
| 11.307 | Economic Adjustment Assistance | $69,967,293 | $38,043,134 |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | $68,618,949 | $229,292,618 |
| 93.332 | Cooperative Agreement to Support Navigators in Federally Facilitated and State Partnership Marketplaces | $67,000,000 | $67,000,000 |
| 11.419 | Coastal Zone Management Administration Awards | $66,687,490 | $71,146,000 |
| 93.150 | Projects for Assistance in Transition from Homelessness | $61,573,000 | $6,157,300 |
| 66.805 | Leaking Underground Storage Tank Trust Fund Program | $54,057,100 | $56,168,900 |
| 93.623 | Basic Center Grant | $53,626,724 | $49,040,724 |
| 15.634 | State Wildlife Grants | $53,276,493 | $49,124,000 |
| 10.770 | Water and Waste Disposal Loans and Grants (Section 306C) | $52,409,095 | $52,909,097 |

| CFDA | Program Name | Fiscal Year 2015 USAspending.gov | Fiscal Year 2015 CFDA |
|---|---|---|---|
| 66.432 | State Public Water System Supervision | $51,795,701 | $95,987,600 |
| 14.181 | Supportive Housing for Persons with Disabilities | $50,186,668 | $125,000,000 |
| 84.186 | Safe and Drug-Free Schools and Communities State Grants | $49,999,134 | $0 |
| 10.205 | Payments to 1890 Land-Grant Colleges and Tuskegee University | $49,223,794 | $49,333,707 |
| 45.025 | Promotion of the Arts Partnership Agreements | $48,349,300 | $49,277,547 |
| 16.540 | Juvenile Justice and Delinquency Prevention Allocation to States | $47,659,339 | $45,413,107 |
| 93.235 | Abstinence Education Program | $44,766,964 | $50,000,000 |
| 17.265 | Native American Employment and Training | $43,976,172 | $58,000,000 |
| 45.129 | Promotion of the Humanities Federal/State Partnership | $42,483,960 | $0 |
| 66.801 | Hazardous Waste Management State Program Support | $39,337,185 | $101,311,300 |
| 93.138 | Protection and Advocacy for Individuals with Mental Illness | $35,314,703 | $35,314,703 |
| 15.904 | Historic Preservation Fund Grants-in-Aid | $34,171,710 | $33,373,913 |
| 81.041 | State Energy Program | $33,315,648 | $33,300,285 |
| 10.769 | Rural Business Enterprise Grants | $27,176,612 | $30,923,156 |
| 84.187 | Supported Employment Services for Individuals with Significant Disabilities | $26,631,671 | $27,548,000 |
| 93.047 | Special Programs for the Aging Title VI, Part A, Grants to Indian Tribes Part B, Grants to Native Hawaiians | $25,546,456 | $0 |
| 93.669 | Child Abuse and Neglect State Grants | $25,310,000 | $25,310,000 |
| 16.589 | Rural Domestic Violence, Dating Violence, Sexual Assault, and Stalking Assistance Program | $22,055,876 | $25,000,000 |
| 10.576 | Senior Farmers Market Nutrition Program | $19,161,760 | $20,593,000 |
| 15.626 | Hunter Education and Safety Program | $17,494,459 | $7,992,000 |
| 84.240 | Program of Protection and Advocacy of Individual Rights | $17,325,788 | $17,650,000 |
| 93.643 | Children's Justice Grants to States | $16,647,778 | $17,000,000 |
| 93.991 | Preventive Health and Health Services Block Grant | $16,413,552 | $160,000,000 |
| 93.042 | Special Programs for the Aging Title VII, Chapter 2 Long Term Care Ombudsman Services for Older Individuals | $15,801,731 | $15,884,988 |
| 93.575 | Child Care and Development Block Grant | $15,191,070 | $2,435,000,000 |
| 10.763 | Emergency Community and Water Assistance Grants | $14,348,372 | $15,133,431 |
| 84.161 | Rehabilitation Services Client Assistance Program | $12,734,776 | $13,000,000 |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | $10,476,783 | $10,617,551 |
| 93.193 | Urban Indian Health Services | $9,611,550 | $8,326,505 |
| 66.472 | Beach Monitoring and Notification Program Implementation Grants | $8,990,358 | $9,484,000 |
| 10.771 | Rural Cooperative Development Grants | $8,421,127 | $6,050,000 |
| 66.040 | State Clean Diesel Grant Program | $7,048,631 | $7,500,000 |
| 93.618 | Voting Access for Individuals with Disabilities-Grants for Protection and Advocacy Systems | $4,962,522 | $0 |

| CFDA | Program Name | Fiscal Year 2015 USAspending.gov | Fiscal Year 2015 CFDA |
|---|---|---|---|
| 93.041 | Special Programs for the Aging Title VII, Chapter 3 Programs for Prevention of Elder Abuse, Neglect, and Exploitation | $4,768,508 | $4,732,000 |
| 66.433 | State Underground Water Source Protection | $4,260,950 | $8,814,700 |
| 93.267 | State Grants for Protection and Advocacy Services | $3,099,589 | $0 |
| 84.169 | Independent Living State Grants | $2,465,142 | $0 |
| 16.523 | Juvenile Accountability Block Grants | $2,447,133 | $10,328,000 |
| 10.433 | Rural Housing Preservation Grants | $2,363,129 | $3,331,378 |
| 10.864 | Grant Program to Establish a Fund for Financing Water and Wastewater Projects | $1,000,000 | $1,000,000 |
| 15.228 | National Fire Plan - Wildland Urban Interface Community Fire Assistance | $453,418 | $2,300,000 |
| 16.548 | Title V Delinquency Prevention Program | $170,897 | $0 |
| 10.556 | Special Milk Program for Children | $70,000 | $10,966,000 |
| 10.551 | Supplemental Nutrition Assistance Program | $0 | $71,035,786,000 |
| 10.553 | School Breakfast Program | $0 | $4,057,189,000 |
| 14.239 | Home Investment Partnerships Program | $0 | $848,108,000 |
| 20.509 | Formula Grants for Rural Areas | $0 | $601,037,662 |
| 20.513 | Capital Assistance Program for Elderly Persons and Persons with Disabilities | $0 | $432,094,952 |
| 97.044 | Assistance to Firefighters Grant | $0 | $306,000,000 |
| 93.645 | Child Welfare Services State Grants | $0 | $268,735,000 |
| 20.505 | Federal Transit Metropolitan Planning Grants | $0 | $125,159,396 |
| 93.671 | Family Violence Prevention and Services/Grants for Battered Women's Shelters Grants to States and Indian Tribes | $0 | $94,500,000 |
| 10.923 | Emergency Watershed Protection Program | $0 | $31,140,000 |
| 14.225 | Community Development Block Grants/Special Purpose Grants/Insular Areas | $0 | $6,996,000 |
| 20.516 | Job Access Reverse Commute | $0 | $2,176,592 |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | | $298,883,966 |
| | | $525,249,590,380 | $636,854,038,670 |

Source: USAspending.gov  Assistance Data (fiscal year 2015), 2015 Catalog of Federal Domestic Assistance

# EXHIBIT L

THE GEORGE WASHINGTON INSTITUTE OF PUBLIC POLICY

# THE GEORGE WASHINGTON UNIVERSITY

## WASHINGTON, DC

# Counting for Dollars 2020

16 Large Federal Assistance Programs that Distribute Funds on Basis of Decennial Census-derived Statistics (Fiscal Year 2015)

## California

Total Program Obligations:  $76,656,557,639

Per Capita: $1,958 (see note on proper use)

| CFDA # | Program Name | Dept. | Type | Recipients | Obligations |
|--------|--------------|-------|------|------------|-------------|
| 93.778 | Medical Assistance Program (Medicaid) | HHS | Grants | States | $44,240,036,248 |
| 10.551 | Supplemental Nutrition Assistance Program (SNAP) | USDA | Direct Pay | House-holds | $7,528,039,778 |
| 93.774 | Medicare Part B (Supplemental Medical Insurance) – Physicians Fee Schedule Services | HHS | Direct Pay | Providers | $6,467,872,889 |
| 14.871 | Section 8 Housing Choice Vouchers | HUD | Direct Pay | Owners | $3,480,189,000 |
| 20.205 | Highway Planning and Construction | DOT | Grants | States | $3,212,534,538 |
| 93.767 | State Children's Health Insurance Program (S-CHIP) | HHS | Grants | States | $1,744,125,000 |
| 84.010 | Title I Grants to Local Education Agencies | ED | Grants | LEAs | $1,691,140,742 |
| 10.555 | National School Lunch Program | USDA | Grants | States | $1,437,855,151 |
| 93.658 | Foster Care (Title IV-E) | HHS | Grants | States | $1,286,852,000 |
| 84.027 | Special Education Grants (IDEA) | ED | Grants | States | $1,208,390,002 |
| 10.557 | Supplemental Nutrition Program for Women, Infants, and Children (WIC) | USDA | Grants | States | $1,189,697,897 |
| 93.600 | Head Start/Early Head Start | HHS | Grants | Providers | $1,145,497,041 |
| 14.195 | Section 8 Housing Assistance Payments Program (Project-based) | HUD | Direct Pay | Owners | $981,354,224 |
| 93.527/ 93.224 | Health Center Programs (Community, Migrant, Homeless, Public Housing) | HHS | Grants | Providers | $573,200,313 |
| 93.596 | Child Care and Development Fund-Entitlement | HHS | Grants | States | $295,503,000 |
| 93.568 | Low Income Home Energy Assistance (LIHEAP) | HHS | Grants | States | $174,269,816 |

Notes and Findings:

- The Counting for Dollars Project will identify all federal financial assistance programs relying Decennial Census-derived data to guide the geographic distribution of funds.
- As an initial product, the project is publishing tables on the distribution, by state, of FY2015 funds from 16 large Census-guided programs.
- For every program but the National School Lunch Program, the equitable distribution of funds to a state depends on the accurate measurement of its population count and characteristics.
- There is not a straight linear relationship between state population count and federal funds flow. The per capita figure allows cross-state comparisons of fiscal reliance on census-guided programs. *It does not indicate the amount by which federal funding increases for each additional person counted*. (See The Leadership Conference Education Fund, "Counting for Dollars: Why It Matters.")

Definitions:

- Census-derived statistics – federal datasets that are extensions of or otherwise rely on the Decennial Census (list available on project website)
- Census-guided financial assistance programs – programs that rely on Census-derived statistics to determine program eligibility and/or allocate funds to states and localities
- Per capita – total FY2015 obligations for the 16 programs divided by population as of July 1, 2015 (per the Census Bureau)

Abbreviations:

- CFDA – Catalog of Federal Domestic Assistance
- USDA – U.S. Department of Agriculture
- ED – U.S. Department of Education
- HHS – U.S. Department of Health and Human Services
- HUD – U.S. Department of Housing and Urban Development
- DOT – U.S. Department of Transportation

Sources:

- USAspending.gov (20.050, 84.010, 84.027, 93.224/93.527, 93.568, 93.600, 93.778)
- President's Budget Request for FY2017 or program agency (10.511, 10.555, 10.557, 14.871, 93.596, 93.658, 93.767)
- Center on Budget and Policy Priorities (14.195)
- Centers for Medicare & Medicaid, HHS (Physicians Fee Schedule Services of 93.774)

Prepared by Andrew Reamer, Research Professor, GWIPP, with data analysis provided by Sean Moulton, Open Government Program Manager, Project on Government Oversight (POGO)

August 18, 2017

**EXHIBIT M**

# AGENDA

## ASSEMBLY BUDGET SUBCOMMITTEE NO. 4 STATE ADMINISTRATION

### ASSEMBLYMEMBER JIM COOPER, CHAIR

### THURSDAY, MAY 24, 2018
### 1:30 P.M. - STATE CAPITOL, ROOM 447

### ITEMS FOR VOTE-ONLY

| ITEM | DESCRIPTION | PAGE |
|------|-------------|------|
| **7100** | **EMPLOYMENT DEVELOPMENT DEPARTMENT** | **3** |
| VOTE-ONLY ISSUE 1 | INFORMATION TECHNOLOGY CLASSIFICATION CONSOLIDATION | 3 |
| VOTE-ONLY ISSUE 2 | ACCOUNTING RESOURCES | 4 |
| VOTE-ONLY ISSUE 3 | ADJUSTMENTS FOR BENEFIT PROGRAMS | 5 |
| VOTE-ONLY ISSUE 4 | LOCAL ASSISTANCE ADJUSTMENT BUDGET BILL LANGUAGE | 7 |
| VOTE-ONLY ISSUE 5 | WORKFORCE INNOVATION OPPORTUNITY ACT DISCRETIONARY FEDERAL FUNDS | 7 |
| VOTE-ONLY ISSUE 6 | BREAKING BARRIERS IN EMPLOYMENT FOR ADULT WITH AUTISM PILOT PROGRAM | 10 |
| **8260** | **CALIFORNIA ARTS COUNCIL** | **11** |
| VOTE-ONLY ISSUE 7 | ARTS COUNCIL LOCAL PROGRAMMING AUGMENTATION | 11 |
| **7501** | **DEPARTMENT OF HUMAN RESOURCES** | **12** |
| VOTE-ONLY ISSUE 8 | STATEWIDE TRAINING CENTER TRAILER BILL LANGUAGE | 12 |
| **2240** | **DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT** | **13** |
| VOTE-ONLY ISSUE 9 | BUDGET BILL LANGUAGE | 13 |
| VOTE-ONLY ISSUE 10 | GATEWAY CITIES COUNCIL OF GOVERNMENTS—HOUSING STRATEGY ASSESSMENT | 13 |
| VOTE-ONLY ISSUE 11 | SB 35 TECHNICAL CLEAN UP LANGUAGE | 14 |
| VOTE-ONLY ISSUE 12 | STATEWIDE HOUSING PACKAGE AND TRAILER BILL LANGUAGE | 14 |
| VOTE-ONLY ISSUE 13 | MEADOWVIEW AREA PROPOSAL | 15 |
| **7120** | **CALIFORNIA WORKFORCE DEVELOPMENT BOARD** | **15** |
| VOTE-ONLY ISSUE 14 | PRISON TO EMPLOYMENT AND AB 1111 FUNDING | 15 |
| **7320** | **PUBLIC EMPLOYMENT RELATIONS BOARD** | **16** |
| VOTE-ONLY ISSUE 15 | BUDGET AUGMENTATION | 16 |
| VOTE-ONLY ISSUE 16 | EMPLOYEE ORIENTATION | 17 |
| VOTE-ONLY ISSUE 17 | KERN COUNTY HOSPITAL | 17 |
| **7350** | **DEPARTMENT OF INDUSTRIAL RELATIONS** | **17** |
| VOTE-ONLY ISSUE 18 | DOMESTIC WORKERS | 17 |
| **0845** | **DEPARTMENT OF INSURANCE** | **19** |
| VOTE-ONLY ISSUE 19 | SAN FRANCISCO DEPARTMENT OFFICE | 19 |

| 7760 | DEPARTMENT OF GENERAL SERVICES | 20 |
|---|---|---|
| VOTE-ONLY ISSUE 20 | CAPITAL OUTLAY PROPOSALS: SACRAMENTO REGION | 22 |
| VOTE-ONLY ISSUE 21 | STATE PROJECT INFRASTRUCTURE FUND | 23 |
| VOTE-ONLY ISSUE 22 | ELECTRIC VEHICLE SERVICE EQUIPMENT INFRASTRUCTURE ASSESSMENT AND FACILITY | 24 |
| 0840 | STATE CONTROLLER'S OFFICE | 24 |
| VOTE-ONLY ISSUE 23 | CALIFORNIA STATE PAYROLL SYSTEM (CSPC) | 26 |
| VOTE-ONLY ISSUE 24 | SPRING FISCAL LETTER ON FI$CAL | 26 |
| VOTE-ONLY ISSUE 25 | SB 2 RECORDING FEE HARDSHIP REFUND PROPOSAL | 27 |
| C.S. 1.5 | CONTROL SECTION 1.5 | 27 |
| VOTE-ONLY ISSUE 26 | TECHNICAL CONFORMITY | 27 |
| 8860 | DEPARTMENT OF FINANCE | 27 |
| VOTE-ONLY ISSUE 27 | BOND DEBT SERVICE | 28 |
| 0650 | OFFICE OF PLANNING AND RESEARCH | 28 |
| VOTE-ONLY ISSUE 28 | TRANSFORMATIVE CLIMATE COMMUNITIES REAPPROPRIATION | 28 |
| VOTE-ONLY ISSUE 29 | PRECISION MEDICINE | 29 |
| VOTE-ONLY ISSUE 30 | 2020 CENSUS OUTREACH FUNDING | 30 |
| 9658 | PROPOSITION 2 INFRASTRUCTURE PAYMENTS | 30 |
| VOTE-ONLY ISSUE 31 | INFRASTRUCTURE AND FISCAL STABILITY FUND | 32 |
| VOTE-ONLY ISSUE 32 | PROPOSITION 2 DEBT PAYMENTS | 33 |
| 0540 | NATURAL RESOURCES AGENCY | 33 |
| VOTE-ONLY ISSUE 33 | INVESTMENTS | 33 |
| 9658 C.S. 35.50 | BUDGET STABILIZATION ACCOUNT CONTROL SECTION 35.50 | 33 |
| VOTE-ONLY ISSUE 34 | BUDGET DEFICIT SAVINGS ACCOUNT AND BUDGET STABILIZATION ACCOUNT | 33 |
| 7502 7760 | CALIFORNIA DEPARTMENT OF TECHNOLOGY DEPARTMENT OF GENERAL SERVICES | 34 |
| VOTE-ONLY ISSUE 35 | INFORMATION TECHNOLOGY PROCUREMENT | 34 |
| C.S. 6.1 | CONTROL SECTION 6.1 | 35 |
| VOTE-ONLY ISSUE 36 | DEFERRED MAINTENANCE | 35 |
| 8955 | DEPARTMENT OF VETERANS AFFAIRS | 36 |
| VOTE-ONLY ISSUE 37 | MENTAL HEALTH SERVICES ACT FUNDING FOR COUNTY VETERANS SERVICES OFFICERS | 36 |
| VOTE-ONLY ISSUE 38 | ALAMEDA COUNTY VETERANS SERVICES OFFICERS | 37 |
| 0890 | SECRETARY OF STATE | 37 |
| VOTE-ONLY ISSUE 39 | SECRETARY OF STATE-CYBER SECURITY COORDINATION | 37 |
| C.S. 12 0110 0120 0130 | CONTROL SECTION 12. 00 SENATE ASSEMBLY LEGISLATIVE ANALYST'S OFFICE | 37 |
| VOTE-ONLY ISSUE 40 | STATE APPROPRIATION LIMIT | 37 |
| 7730 | FRANCHISE TAX BOARD | 38 |
| VOTE-ONLY ISSUE 41 | CALIFORNIA CHILD AND DEPENDENT CARE EXPENSES CREDIT | 38 |

**ITEMS TO BE HEARD**

| | | |
|---|---|---|
| **0515** **2240** | **BUSINESS CONSUMER SERVICES AND HOUSING AGENCY** **DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT** | **40** |
| ISSUE 1 | HOMELESSNESS | 40 |
| **2240** | **DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT** | **44** |
| ISSUE 2 | OFFICE OF MIGRANT SERVICES FARMWORKER HOUSING | 44 |
| ISSUE 3 | SOUTHERN CALIFORNIA DISASTER PLANNING ASSISTANCE | 45 |
| **0515** | **BUSINESS CONSUMER SERVICES AND HOUSING AGENCY** | **46** |
| ISSUE 4 | INCREASED LEGAL AND PROGRAMMATIC WORKLOAD | 46 |
| **0890** | **SECRETARY OF STATE** | **47** |
| ISSUE 5 | AB 195 LEGISLATIVE FIX | 47 |

initiative, hosted through an interagency agreement to a more sustainable and long-standing institute beginning in 2018.

The Subcommittee heard this issue on April 24, 2018

| STAFF COMMENTS |
|---|

The existing Precision Medicine program structure has been effective and thus the proposed structure in the trailer bill is unnecessary.

In addition, this state effort would be more effective be integrating with a rare disease research effort already underway.  By appropriating $12 million, UC Davis Institute of Regenerative Cures will be able to partner with an existing nationwide research effort that is developing diagnostic and disease treatment methods from innovative collaborative research.

**Staff Recommendation:  Adopt $42 million for Precision Medicine, with $12 million for the UC Davis Institute of Regenerative Cures.  Do not adopt any Trailer Bill language and making conforming changes to budget bill language.**

| VOTE-ONLY ISSUE 30: 2020 CENSUS OUTREACH FUNDING |
|---|

The Subcommittee will adopt 2020 Census Outreach funding.

| BACKGROUND |
|---|

The Governor's budget includes a census outreach proposal for the next three years. The proposed $40.3 million plan includes 22 limited term positions, $17.5 million for a media campaign and $12.5 million of outreach efforts conducted by nonprofit entities.
On May 22, 2018, the Senate adopted $95 million additional for census outreach efforts.

| STAFF COMMENTS |
|---|

The Senate level of funding is a good start to fully funding of the necessary Census outreach efforts conducted by community based organizations, but fails to fully capture the needs for local county committees and statewide media needs.   Staff recommends an additional $12 million be allocated to cover the projected costs of the Los Angeles County complete count effort, as requested by the County and $6 million identified by the County of Santa Clara.  However, other jurisdictions have yet to identify their expected resource needs.  To allow these issues to be addressed this year, staff recommends provisional budget bill language to allow the Department of Finance to augment this item during the fiscal year, subject to the review of the Joint Legislative Budget Committee, including allowing the Office to add position authority.

To ensure that the State's efforts are moving at an aggressive pace, staff recommends adopting trailer bill language that will provide reporting over the fiscal year, so that the two select committees on the census, as well as both house's budget committees, can continue to monitor our census outreach efforts.   The reports will include the following elements:

- A report, due October 1, which articulates the Administration's contract management approach for census outreach, media, public relations, and local effort initiatives.
- A report, due December 1, which projects expenditure levels by contractor, state staffing levels, expenditures by local partners linked to the State.
- Monthly reporting of expenditures, encumbrances, and vacancies for the Census Outreach effort.

With the proposed additional funding, the State would have over $107 million for community based contracts and $26.7 million for local community count efforts, with no staff onboard to begin the contracting process. When faced with similar workload challenges, other departments that have already had staff in place have taken over 18 months to get this funding out on the street.  Staff recommends that the Subcommittee consider moving the Census Outreach effort to a more robust department or agency that can insure that these operational issues are overcome.

**Staff Recommendation:   Increase funding by $113 million for 2020 Census Outreach and adopt Placeholder Trailer Bill Language.**

## 9658 PROPOSITION 2 INFRASTRUCTURE PAYMENTS

### VOTE-ONLY ISSUE 31: INFRASTRUCTURE AND FISCAL STABILITY FUND

The proposed Assembly budget plan anticipates the future requirement—so long as the rainy day fund is filled to its constitutional maximum level—to invest around $1 billion per year from the General Fund on infrastructure or deferred maintenance projects. This item proposes a plan for how the state will invest any Proposition 2 infrastructure funds that materialize over the next few years.

### BACKGROUND

***Prop. 2 Infrastructure Investment Requirement.*** Once the rainy day fund is filled, Proposition 2 requires the State to use moneys that otherwise would go to the rainy day fund on infrastructure or deferred maintenance instead. Assuming that the rainy day fund is filled in 2018-19, the administration estimates that required Proposition 2 infrastructure investments from the General Fund would total around $1 billion per year. This infrastructure spending requirement would remain in place until the rainy day fund drops below its maximum level—presumably, the next time there is a significant economic downturn.

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                              SAN FRANCISCO DIVISION

11   STATE OF CALIFORNIA, et al.,          No.:  3:18-CV-01865-RS

12           Plaintiffs,                    Action Filed:  March 26, 2018

13   vs.                                    **[PROPOSED] ORDER GRANTING
                                            THE LEGISLATURE OF THE STATE
14   WILBUR L. ROSS, JR.,                   OF CALIFORNIA'S MOTION
                                            FOR LEAVE TO FILE BRIEF AMICUS
15           Defendants.                    CURIAE IN SUPPORT OF PLAINTIFFS'
                                            OPPOSITION TO DEFENDANTS'
16                                          MOTION FOR SUMMARY JUDGMENT**

17

18

19

20

21

22

23

24

25

26

27

28

GOOD CAUSE APPEARING, the motion of the Legislature of the State of California to file a brief amicus curiae in support of plaintiffs' opposition to defendants' motion for summary judgment is hereby GRANTED.

DATED:

_____
THE HONORABLE RICHARD SEEBORG
UNITED STATES DISTRICT COURT JUDGE

(00365600)

1