JOSEPH H. HUNT
Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director
CARLOTTA P. WELLS
Assistant Director
CAROL FEDERIGHI
KATE BAILEY
STEPHEN EHRLICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 514-1903
Email: carol.federighi@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.,*<br><br>Defendants. | Civil Action No. 3:18-cv-01865-RS<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   December 7, 2018<br>Time:   10:00 a.m.<br>Judge:  Honorable Richard Seeborg<br>Dept.:  3 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.   Defendants Are Entitled to Summary Judgment Because Plaintiffs Have Not Established Standing. 2

    A.   Plaintiffs Cannot Establish Injury by Spending Money Not Traceable to the Citizenship Question, or in Response to Less than a Substantial Risk..................................................2

    B.   Plaintiffs Have Not Demonstrated that an Undercount Will Occur Because of the Citizenship Question. ...................................................................................................3

    C.   Even If an Undercount Occurs, Plaintiffs Have Not Demonstrated an Injury.................5

II.  Plaintiffs Fail to Establish that Defendants Are Not Entitled to Summary Judgment on their Enumeration Clause Claim.................................................................................................7

III. Defendants Are Entitled to Summary Judgment on the APA Claims.....................................8

    A.   The Secretary's Decision Was Not Arbitrary and Capricious. .......................................8

        1.   The Secretary's decision was not pretextual. ................................................9

        2.   The Secretary's decision was not counter to the evidence. ...........................11

        3.   The Secretary considered the important aspects of the problem.................12

    B.   Nor Did the Secretary Act Contrary to Law. .............................................................13

        1.   The Secretary Complied with 13 U.S.C. § 141(f)..........................................13

        2.   The Secretary Complied with 13 U.S.C. § 6(c)..............................................15

CONCLUSION.....................................................................................................................15

1

# TABLE OF AUTHORITIES

2

<u>CASES</u>

3

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.,*

4
   175 F.3d 1156 (9th Cir. 1999)..................................................................................... 10

5

*Asarco, Inc. v. EPA,*
   616 F.2d 1153 (9th Cir. 1980)..................................................................................... 11

6

7

*Camp v. Pitts,*
   411 U.S. 138 (1973)...................................................................................................... 8

8

*City of Tacoma v. FERC,*

9
   460 F.3d 53 (D.C. Cir. 2006) ..................................................................................... 10

10

*Clapper v. Amnesty Int'l, USA,*
   133 S. Ct. 1138 (2013).................................................................................................. 2

11

*Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.,*

12
   450 F.3d 930 (9th Cir. 2006) ..................................................................................... 13

13

*Ctr. for Envtl. Health v. McCarthy,*

14
   192 F. Supp. 3d 1036 (N.D. Cal. 2016) ...................................................................... 15

15

*District of Columbia v. U.S. Dep't of Commerce,*

16
   789 F. Supp. 1179 (D.D.C. 1992).............................................................................. 14

17

*Edson v. Valleycare Health Sys.,*
   21 F. App'x 721 (9th Cir. 2001).................................................................................. 15

18

*FERC v. Elec. Power Supply Ass'n,*

19
   136 S. Ct. 760 (2016)............................................................................................. 8, 12

20

*Guerrero v. Clinton,*

21
   157 F.3d 1190 (9th Cir. 1998) ................................................................................... 13

22

*Herguan Univ. v. ICE,*
   258 F. Supp. 3d 1050 (N.D. Cal. 2017) ........................................................................ 8

23

*In re Dep't of Commerce,*

24
   __ S. Ct. __, 2018 WL 5259090 (Oct. 22, 2018) ........................................................ 10

25

*Jagers v. Fed. Crop Ins. Corp.,*

26
   758 F.3d 1179 (10th Cir. 2014)..................................................................................... 9

27

28

*Lands Council v. Powell,*
   395 F.3d 1019 (9th Cir. 2005) .......................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins., Co.,*
   463 U.S. 29 (1983) ..................................................................................... 12

*Nat'l Ass'n of Home Builders v. Norton,*
   340 F.3d 835 (9th Cir. 2003) .........................................................................8

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor,*
   91 F.3d 178 (D.C. Cir. 1996) .........................................................................6

*Nw. Ecosys. All. v. Fish & Wildlife Serv.,*
   475 F.3d 1136 (9th Cir. 2007) .......................................................................8

*Rempfer v. Sharfstein,*
   583 F.3d 860 (D.C. Cir. 2009) .......................................................................8

*San Luis & Delta-Mendota Water Auth. v. Locke,*
   776 F.3d 971 (9th Cir. 2014) ................................................................. 11, 13

*Stop H-3 Ass'n v. Dole,*
   740 F.2d 1442 (9th Cir. 1984) .....................................................................10

<u>STATUTES</u>

5 U.S.C. § 706 ...............................................................................................8

13 U.S.C. § 6 ...............................................................................................15

13 U.S.C. § 141 ..................................................................................... 13, 14

<u>OTHER AUTHORITES</u>

Questions Planned for the 2020 Census and American Community Survey (Mar. 29, 2018),
   https://www2.census.gov/library/publications/decennial/2020/operations/
   planned-questions-2020-acs.pdf. ................................................................ 14

U.S. Census Bureau, Statistical Quality Standards (July 2013),
   https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_
   notices/quality/statistical-quality-standards/Quality_Standards.pdf. ...........................13

## INTRODUCTION

The Secretary of Commerce is afforded virtually unlimited discretion in conducting the decennial census and exercised that discretion to reinstate a citizenship question on the 2020 census. Plaintiffs oppose Defendants' motion for summary judgment on their unfounded challenges to the Secretary's decision, yet Plaintiffs fail to meet their burden to establish Article III standing at this late stage of the proceedings and cannot identify any dispute of material fact that would preclude this Court from entering summary judgment for Defendants as a matter of law.

Plaintiffs have now had the benefit of extensive discovery into the issues central to their claims of standing—namely, that they are subject to a certainly impending harm from a loss of federal funds or congressional representation resulting from a differential undercount that is fairly traceable to the inclusion of a citizenship question on the 2020 census and redressable through an order setting aside the Secretary's decision to reinstate the question.  Plaintiffs have not met their burden because they have failed to adduce evidence, on the eve of trial, demonstrating that any such harm is sufficiently concrete and imminent given that the Census Bureau is prepared to address any decline in the self-response rates through non-response follow-up and other techniques in order to conduct a complete enumeration.  Consequently, any putative costs that Plaintiffs might have incurred to counter this non-existent harm can be no basis for Article III standing.

Plaintiffs' arguments on the merits fare no better.  Plaintiffs' arguments against summary judgment on the Enumeration Clause claim are wholly unsupported because there is no evidence to suggest that the Census Bureau is not prepared to conduct a complete enumeration, regardless of any estimated decline in self-response rates.  Plaintiffs' arguments against summary judgment on claims under the Administrative Procedure Act (APA)—which can and should be resolved exclusively at summary judgment—rest on mischaracterizations of the back-and-forth consultation process among federal agencies and a willful misunderstanding of the nature of the Secretary's decisionmaking process.  Lastly, Plaintiffs' statutory claims are a baseless attempt to find some unrelated statutory hook to challenge the Secretary's vast discretion in conducting the census, but the law simply does not support their claims.  The Court should grant Defendants' motion for summary judgment.

**ARGUMENT**

**I.    Defendants Are Entitled to Summary Judgment Because Plaintiffs Have Not Established Standing.**

Defendants are entitled to summary judgment because Plaintiffs cannot demonstrate that they have Article III standing—including demonstrating that they are at risk of an imminent injury.[1]

**A.    Plaintiffs Cannot Establish Injury by Spending Money Not Traceable to the Citizenship Question, or in Response to Less than a Substantial Risk.**

Among other injuries, Plaintiffs claim that they will be injured by expending resources to perform outreach for the 2020 decennial census. But, there are two problems with this argument. First, the mere fact that a plaintiff has expended money in response to a fear about the future does not suffice to create standing. As the Supreme Court explained, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1151 (2013) (citation omitted). "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.* Rather, there must be at least a "substantial risk" that the feared harm will occur, which thereby renders plaintiffs' mitigation efforts reasonable. *See id.* at 1150 n.5 ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."). Here, Plaintiffs fail to show that there is a substantial risk of an undercount, as discussed below, and therefore cannot establish standing through their expenditures.

Second, Plaintiffs' expenditures must be traceable to the citizenship question, rather than funding for census preparations that they would have made even if Secretary Ross had not opted to reinstate a citizenship question. Reference to the numerous sources cited by Plaintiffs reveals a

---

[1] Plaintiff-Intervenor the Los Angeles Unified School District (LAUSD) separately opposed Defendants' motion for summary judgment raising similar standing issues, LAUSD Opp'n, ECF No. 92, which fail for similar reasons.

complete absence of material attributing specific expenses *to the citizenship question*.  For example, the California budget entry Plaintiffs cite, Ex. B at CAL000147, ECF No. 91-2, refers generally to "statewide outreach and other efforts related to increasing the participation rate of Californians in the decennial census" but makes no mention of the citizenship question, only California's high hard-to-count population.  *See also* Ex. A at CAL000001-5 (discussing funding for California's outreach and mentioning a citizenship question as one of several challenges); Ex. C at CAL000152 (referring only to funding "to perform outreach focusing on hard-to-count populations for the decennial census"); Ex. D at CAL000162 (referring to only "2020 Census outreach"); Ex. D at CAL000230 (describing outreach plans without specific reference to citizenship question); Ex. E at CAL000235-253 (describing California's overall plan for outreach, while mentioning the citizenship question as just one challenge, without specifically attributing any outreach or efforts to the citizenship question); Ex. F at CAL000269-299 (describing California's overall plan for outreach, while mentioning the citizenship question as just one challenge, without specifically attributing any outreach or efforts to the citizenship question); Ex. G at CAL000322-23 (describing funding for California's outreach and mentioning the citizenship question as one of several concerns); Ex. H at CAL000364-69 (discussing funding proposals for outreach and mentioning the citizenship question as one of several challenges); Ex. I at CAL000411 (describing funding for California's outreach without mentioning the citizenship question); Ex. J at CAL000443-44 (describing funding for California's outreach without mentioning the citizenship question); Ex. K at CAL000540 (describing funding for California's outreach without mentioning the citizenship question); Ex. L at CAL000717 (describing funding for California's outreach without mentioning the citizenship question).

Because Plaintiffs cannot establish that they are responding to a substantial fear, and cannot trace their expenditures to the citizenship question, their outreach cannot support their standing.

**B.  Plaintiffs Have Not Demonstrated that an Undercount Will Occur Because of the Citizenship Question.**

Plaintiffs cannot show a substantial risk of an undercount, and indeed have not identified a single individual who will not respond to the census with the citizenship question, but would respond without it.  In attempting to establish a substantial risk of an undercount, Plaintiffs once again cherry-

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.       - 3 -

pick the Census Bureau's analysis, accepting their calculations of *past* undercounts and attempting to parlay those into predictions about the *future*, despite the contrary opinion of Dr. Abowd, as explained in Defendants' motion for summary judgment.  However, the very fact that the Census Bureau is aware of the difficulties in counting hard-to-count populations and prepared an effective plan and sufficient funds to count them nonetheless suggests that 2010 performance does not dictate the Census Bureau's future performance.[2]  The Census Bureau has spent the past ten years improving its systems after lessons learned in 2010.

Plaintiffs also seek to rely on the expert declarations of Drs. Barreto and O'Muircheartaigh. Dr. Barreto conducted a survey to attempt to gauge the impact of the citizenship question on response rates to the 2020 census.  Barreto Decl. ¶¶ 62-78, ECF No. 91-12.  This survey, however, failed to sufficiently address the ultimate enumeration after households are encourage to respond, and NRFU activities including review of administrative records and proxies, and imputation.  At the end of the survey Dr. Barreto attempted to simulate NRFU by merely asking respondents if additional contact would change their mind, Barreto Decl. ¶ 81, but this ignores the effects of administrative records proxy data, and imputation; and is an unsatisfactory measure of response to in-person contact with an enumerator because "asking someone about their intention to do something and actually measuring what they do in a field experiment is very different."  Abowd Tr. 1162:13 – 1163:3, Federighi Decl., Ex. A.  As to the Census Bureau's extensive efforts to enumerate those who do not initially respond, both Drs. Barreto and O'Muircheartaigh make highly general statements, essentially conveying that hard-to-count populations are, in fact, hard to count, but neither predicts with specificity what NRFU success-rate they would therefore expect for the households that Dr. Barreto

---

[2] LAUSD's opposition suffers from the same defects.  LAUSD places great weight on the Census Bureau's analysis of hard-to-count populations and the effectiveness of NRFU efforts in past censuses.  LAUSD Opp'n at 7-10.  Yet LAUSD places exactly *zero* weight on the Census Bureau's conclusion that it is prepared to conduct a complete enumeration, nonetheless, because it has applied the lessons of the past to improve its NRFU.  *See id.*  (Although LAUSD suggests that NRFU requires a paradigm shift, LAUSD Opp'n at 8, it ignores the Census Bureau's iterative improvements and plans to respond dynamically in difficult-to-enumerate areas.)  Without evidence to the contrary, LAUSD simply reiterates the Bureau's own findings, which *support* the Bureau's confidence in the effectiveness of its preparations.  LAUSD also makes much of Dr. Abowd's statement that the existing evidence is "consistent with the notion" that the citizenship question could result in responses being submitted that omit household members.  LAUSD Opp'n at 10.  That the evidence is consistent, of course, does not mean that Dr. Abowd affirmatively found that such a result would occur, and Plaintiffs offer no evidence of their own to indicate that it would.

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.          - 4 -

believes will choose not to self-respond due to a citizenship question.  Plaintiffs' allusion to Dr. Fraga in this section is inapt, as he is more properly addressed on the issue of whether an undercount, if one occurs, would injure Plaintiffs.  Dr. Fraga did not develop opinions about the likely rate of either initial self-response or response after follow-up, but merely applied the estimates of others.

And, of course, Plaintiffs must demonstrate that their injury is traceable to the citizenship question and redressable—that the undercount they fear will be averted if Secretary Ross removes the citizenship question.  If individuals elect not to respond to the census because of fears about the "Trump administration" sharing their data, or the "Muslim ban" or other elements of the current political climate, then their nonresponse—and any resulting undercount—will not be redressed by revisiting the Secretary's decision.[3]

### C.    Even If an Undercount Occurs, Plaintiffs Have Not Demonstrated an Injury.

As discussed above, Plaintiffs cannot establish that their feared undercount is anything more than speculative.  But, even if the undercount they fear materializes to some extent, Plaintiffs cannot show that it will result in an injury.  (Although Plaintiffs place their alleged injuries from paying for outreach in this category, Defendants have previously addressed those arguments.)

Plaintiffs criticize Dr. Gurrea's analysis of apportionment and funding, alleging that he lacks NRFU expertise, Pls.' Opp'n at 11, ECF No. 91, despite the fact that Dr. Gurrea based his analysis on the initial response rates estimated by Dr. Barreto (however unsubstantiated), and the resulting scenarios calculated by Dr. Fraga.  When Dr. Gurrea used an estimated rate for NRFU success it was 98.68%—the success rate of NRFU after the 2010 decennial census.  Gurrea Decl. ¶ 54, Defs.' MSJ, Ex. B, ECF No. 89-2.  Plaintiffs' own expert, Dr. Fraga, similarly relied on a flat assumed rate of NRFU success, except he used the rate of 86.3% success, which he does not attribute other than to say that "[he] was provided with" it.  Fraga Decl. ¶ 5.2.2, ECF No. 91-8.

---

[3] Indeed, Plaintiffs tip their hand when they complain that the Census Bureau has done "nothing that is designed to correct the massive differential decline in self response among non-citizen households . . . or *otherwise address the fear generated by the Administration's aggressive immigration related policies and rhetoric.*"  LAUSD Opp'n at 8 (emphasis added).  If Plaintiffs are correct that the current political climate, immigration policies, and accompanying rhetoric risk some individuals not responding to the census, that is regrettable but not within the scope of this Court's authority to redress by remanding the Secretary's decision on the citizenship question.

Furthermore, Plaintiffs appear to agree that their funding losses will be negligible, accepting Dr. Gurrea's estimates of a ceiling of 0.01 percent. Pls.' Opp'n at 11. Although Plaintiffs suggest that even a negligible loss of funding, such as $200,000, would injure them, that is far dwarfed by the $90.3 million that they indicate—in the next paragraph—they plan to spend on census outreach. Furthermore, Plaintiffs' expectation that they will lose funding is highly speculative in light of the complex effect that any undercount would have on other funding across all states and localities. Courts have rejected similarly vague and uncertain claims of lost funding at the summary judgment stage in census cases. *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183-85 (D.C. Cir. 1996) (holding that plaintiffs, who alleged to be injured by reduced federal funding due to an undercount of the homeless, lacked standing because they could not show with certainty how the alleged undercount affected the funding in their localities and states relative to other localities and states); *id.* at 185 (noting that although "general allegations that federal funding will be reduced by the conduct of the census have been held sufficient to withstand motions to dismiss. . . . 'mere allegations'—which appear to be all any plaintiff offered in the above cases—are not an adequate response to a summary judgment motion, when 'specific facts' are required").[4]

As to apportionment, Dr. Gurrea began his analysis with the estimated undercounts generated from Dr. Barreto's survey, assumed historical success rates for NRFU, and concluded that "congressional apportionment in any state (including California) does not change due to reinstatement of a citizenship question." Gurrea Decl. ¶¶ 11, 14, 66-70. As Dr. Gurrea notes, Dr. Fraga addressed the wrong issues because he treated missing responses the same as responses stating "no," at times projected final counts as if no NRFU efforts occurred, and never considered statistical methods of enumeration such as imputation. Gurrea Decl. ¶¶ 30, 34, 46, 50. Dr. Gurrea did the analysis, correcting for Dr. Fraga's oversights, and using the 98.68% success-rate for NRFU that occurred after the 2010 Census. Gurrea Decl. ¶ 54. This estimate is likely still conservative because it did not assume any imputation after NRFU. Gurrea Decl. ¶ 54.

---

[4] LAUSD similarly does not dispute Dr. Gurrea's estimates with respect to the potential for decline in Title I funding but likewise insists that even one dollar of difference in funding entitles them to sue to alter the course of the entire 2020 census. LAUSD Opp'n at 10-12.

1    **II.**    **Plaintiffs Fail to Establish that Defendants Are Not Entitled to Summary Judgment**

2    **on their Enumeration Clause Claim.**

3        At the motion-to-dismiss stage, the Court explained that the Enumeration Clause issue

4    presents "a close question" and noted that "[w]hether plaintiffs can ultimately sustain this showing

5    on the merits remains to be seen."  Order Denying MTDs at 29, ECF No. 75.  At summary judgment,

6    Plaintiffs must meet a higher burden, but fail to do so.  As this Court has noted, "demographic

7    questions have long been a part of the enumeration process since its inception" and Plaintiffs are,

8    therefore, necessarily "not taking the position that every single past census that included a citizenship

9    question was constitutionally defective." *Id.* at 16-17.  Instead, Plaintiffs must show, using admissible

10    evidence, that the citizenship question "is so uniquely impactful on the process of counting itself,

11    that it becomes akin to a mechanics-of-counting-type challenge." *Id.* at 28.

12        For the same reasons that Plaintiffs cannot show a substantial likelihood of an undercount

13    or of any certainly impending harm, as discussed *supra* Part I, Plaintiffs have not met their much

14    higher burden of establishing a genuine dispute of material fact regarding the likelihood of a total

15    failure of enumeration efforts such that the citizenship question "affirmatively interferes with the

16    actual enumeration" to the degree required[5] to establish a violation of the Enumeration Clause.

17    Order Denying MTDs at 29.  Nor, of course, does rejecting Plaintiffs' overbroad view of the

18    Enumeration Clause mean "the census questionnaire would never be subject to judicial scrutiny,"

19    Pls.' Opp'n at 14, as the other claims in this case make clear.  To put it plainly, Plaintiffs cannot

20    proceed on their Enumeration Clause claim not because of any particular construction of the

21    Enumeration Clause; Plaintiffs simply cannot meet their burden because the Census Bureau is

22    prepared to address any decline in self-response rates.  As discussed above, Dr. Gurrea's analysis

23    shows that, under the scenarios put forth by Plaintiffs' experts, there will be no mis-apportionment.

24    Having failed to adduce any evidence that the Census Bureau cannot fulfill its duties, there is no

25    material dispute of fact fit for trial, and Defendants thus are entitled to summary judgment.

26

27

28        [5] Although Defendants respectfully maintain that the Enumeration Clause would be violated only if the Secretary failed to conduct a person-by-person headcount, Plaintiffs fail to show that they can satisfy the standard as set forth by the Court.

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.    - 7 -

### III.    Defendants Are Entitled to Summary Judgment on the APA Claims.

#### A.  The Secretary's Decision Was Not Arbitrary and Capricious.

Plaintiffs also argue that the Secretary's decision violated the Administrative Procedure Act (APA), 5 U.S.C. § 706, because his decisionmaking process was arbitrary and capricious.  In addressing this claim, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Rather, "[t]he only question . . . is whether the [agency]" "'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Nw. Ecosys. All. v. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).  In resolving this question, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*), regardless whether the Court has ordered limited extra-record discovery, which may be considered only to "plug holes in the administrative record." *Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005).

Plaintiffs' three purported reasons that the Secretary's decision was arbitrary and capricious fail for the reasons described below.  But more fundamentally, Plaintiffs identify no disputes of material fact barring entry of summary judgment on the APA claims.  Indeed, Plaintiffs' opposition bears great resemblance to a cross-motion for summary judgment, which is unsurprising, as APA claims are resolved as a matter of law based on the record before the agency, 5 U.S.C. § 706, and the parties are briefing legal questions, not factual disputes.  *See, e.g.*, *Herguan Univ. v. ICE*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009))).  Here, the burdens of trial could be avoided and the APA claims can (and should) be resolved as a matter of law on the administrative record, one way or another, despite Plaintiffs' failure to move for even partial summary judgment on the APA claims. [6]

---

[6] Although the New York challenges to the reinstatement of a citizenship question proceeded to trial, Defendants respectfully submit that those cases could and should have been resolved on cross-motions for summary judgment.

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.          - 8 -

1          **_1._**          The Secretary's decision was not pretextual.

2          Plaintiffs' first charge is that the Secretary's decision was pretextual and must be set aside

3 because the stated explanation in the Secretary's memorandum was not his "real" reason for

4 reinstating a citizenship question.  Pls.' Opp'n at 15.  Plaintiffs allege, vaguely, that the Secretary had

5 an undisclosed ulterior motive—"to serve political interests."  *Id.* at 16.  Remarkably, after engaging

6 in extensive discovery, Plaintiffs set forth no evidence that the Secretary in fact had *any* ulterior

7 motive.  Instead, Plaintiffs insinuate that the Secretary reinstated a citizenship question with the intent

8 of affecting apportionment, yet barely even mention—much less support—that alarming contention.

9 Regardless, Plaintiffs cannot demonstrate that the Secretary did not believe the rationale set forth in

10 his memorandum or that any initial policy preferences render his decision arbitrary and capricious.

11 *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014).  So long as the Secretary sincerely

12 believed that reinstating a citizenship question on the census would aid DOJ in enforcing the VRA,

13 the Secretary's subjective deliberative process in reaching that conclusion is irrelevant to APA review.

14          Plaintiffs make much of the fact that the Secretary considered the issue of reinstating a

15 citizenship before DOJ issued its formal request, Pls.' Opp'n at 15, but the Secretary has made his

16 process clear.  After the Secretary was confirmed, he "began considering various fundamental issues"

17 regarding the 2020 Census, "including funding and content," as well as schedule, contracting issues,

18 systems readiness, and the upcoming 2018 End-to-End Test. AR 1321; *see also* AR 317-322, 1416-

19 1470.  These issues examined by the Secretary early in his tenure "included whether to reinstate a

20 citizenship question," which he and his staff "thought . . . could be warranted." AR 1321.  The

21 Secretary questioned why a citizenship question was not on the census questionnaire and sought

22 other general background "factual information."  AR 2521-2522, 12465, 12541-12543; *see also* AR

23 3699.  Plaintiffs suggest that the Secretary prejudged the issue and "placed pressure on his staff to

24 deliver," Pls.' Opp'n at 15, but the record establishes only that the Secretary urged his staff to move

25 the process along.  Plaintiffs also suggest it was improper for the Secretary to consult with a White

26 House official, Steve Bannon, and a state elected official, Kris Kobach, such that the Secretary can

27 be viewed only as placing impermissible "pressure" on staff to reinstate the question.  Yet Plaintiffs

28 have provided no compelling explanation why consultation with other officials is improper.

1    Plaintiffs reason that the Secretary's consideration of the DOJ letter was a sham because the

2    Commerce Department had earlier broached the issue with DOJ.  But as the Secretary explained, the

3    Commerce Department sought only to understand "whether the Department of Justice (DOJ) would

4    support, and if so would request, inclusion of a citizenship question as consistent with and useful for

5    enforcement of the Voting Rights Act."  AR 1321.  After all, DOJ previously had requested that the

6    ACS include a citizenship question for the purposes of enforcing the Voting Rights Act.  AR 278-

7    283, 9203-9216.  The fact that the Commerce Department and DOJ continued those discussions

8    with respect to including a citizenship question on the decennial census can hardly be surprising.

9    And there is nothing improper about the Secretary exploring whether DOJ would support inclusion

10   of a citizenship question.  As Justice Gorsuch explained, "there's nothing unusual about a new cabinet

11   secretary coming to office inclined to favor a different policy direction, soliciting support from other

12   agencies to bolster his views, disagreeing with staff, or cutting through red tape."  *In re Dep't of*

13   *Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (opinion of Gorsuch, J.).

14   Plaintiffs also incorrectly characterize DOJ's request for the reinstatement of a citizenship

15   question as pretextual.  Pls.' Opp'n at 16-17.  As an initial matter, DOJ is not a defendant in this

16   lawsuit, and the propriety of DOJ's actions is not before the Court.  In a challenge to one agency's

17   action, a court does not review the lawfulness of another agency's decision.  *See, e.g.*, *Aluminum Co. of*

18   *Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1999).  Instead, "the critical

19   question is whether the action agency's reliance was arbitrary and capricious."  *City of Tacoma v. FERC*,

20   460 F.3d 53, 75 (D.C. Cir. 2006).  In that regard, "an action agency need not undertake a separate,

21   independent analysis in the absence of new information not considered by the [other] agency."

22   *Aluminum Co.*, 175 F.3d at 1161 (citing *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984)).

23   In any event, DOJ's request was not pretextual.  DOJ has, of course, successfully brought

24   VRA suits absent block-level CVAP data.  And, given DOJ's caution in bringing cases, it should also

25   be no surprise that DOJ has not chosen to bring VRA cases that it would lose due to the lack of

26   block-level data.  Yet there may be additional VRA cases which are too marginal to bring given *current*

27   data sources, but that would be viable if better sources of block-level citizenship data were available.

28   Plaintiffs cite a statement of Dr. Lisa Handley that current data sources have been sufficient, but Dr.

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.          - 10 -

Handley is not a decisionmaker at DOJ, nor did she purport to offer an opinion about DOJ's process for deciding whether or not to file Section 2 cases. Moreover, the Ninth Circuit has emphasized that a district court may not use any "admitted extra-record evidence 'to determine the correctness or wisdom of the agency's decision.'" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)). "Such use is never permitted," as it "overstep[s] the bounds of [these exceptions] by opening the administrative record as a forum for the experts to debate the merits." *Id.* Plaintiffs are also troubled that DOJ's request for block-level citizenship data does not specify a method of collecting the data, Pls.' Opp'n at 17, but that point undermines their argument—the Secretary did not unthinkingly accept DOJ's request, instead considering what would be the most appropriate method of providing the data.

### 2.    The Secretary's decision was not counter to the evidence.

Next, Plaintiffs contend that the Secretary's decision was arbitrary and capricious because his decision was contrary to evidence about a citizenship question's effect on response rates and evidence that the Secretary's chosen policy of combining census data with administrative records—the "Option D" in his decision memorandum—would yield less accurate citizenship data than using administrative records alone ("Option C"). Plaintiffs are wrong on both counts.

First, the Secretary considered and accounted for the effect of a citizenship question on response rates. The Secretary acknowledged the Census Bureau and many stakeholders' concerns that a citizenship question would negatively affect the response rate for non-citizens, but noted the lack of evidence that the response rate would decline "materially" as a result. AR 1315. The Secretary observed that while recent self-response rates on the ACS were lower, there were a number of potential causes for this separate and apart from the citizenship question, including the better outreach efforts and public awareness for the decennial census and the increased burden of answering the much longer ACS. AR 1315. Weighing the information that had been provided to him, the Secretary concluded that "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief." AR 1316. Plaintiffs cite nothing from the Census Bureau to the contrary, instead disagreeing with the Secretary's evaluation of the January 19

memorandum—and, more fundamentally, his judgment.  But the Secretary considered the important issues, including the January 19 memorandum, and rationally explained for his decision.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Nothing more is required.

Second, the Secretary explained why the evidence before him supported Option D.  The Secretary noted that Option D would allow the Census Bureau to "compare the decennial census responses with administrative records" in order to establish the most accurate data.  AR 1317.  Option D would also "give[] each respondent the opportunity to provide an answer" to the citizenship question, potentially reducing the burden of imputation on the Bureau relative to an option using only administrative data.  AR 1317.  The Secretary did recognize that some of those answers might be inaccurate, which is why he stated that the Bureau would compare the response with administrative records, where available.  Plaintiffs do not dispute that solely relying on administrative records runs its own risks, including that "the Bureau does not yet have a complete administrative records data set for the entire population" and about 25 million voting age people lacked credible administrative data.  AR 1316.  Plaintiffs at best make an argument that the Secretary made the wrong choice, but "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives."  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).

**3.**      The Secretary considered the important aspects of the problem.

Plaintiffs' last arbitrary-and-capricious argument suggests that the Secretary did not consider important aspects of the issue, namely the potential for an undercount and a purported lack of adequate testing.  Pls.' Opp'n at 20.  As to the former, Plaintiffs address this claim in conclusory fashion, and for good reason: it is redundant with their argument that the Secretary failed to account for evidence of a decline in self-response rates.  Plaintiffs' argument is, essentially, that lower response rates would lead to a differential undercount, but Defendants have explained, *supra*, how the Secretary accounted for this issue.  Moreover, the Secretary expressly addressed how the Bureau's budget provided sufficient funding to provide for NRFU to address any undercount.  AR 1319.

As to the question of testing, the Secretary addressed this issue in his memorandum.  In reviewing DOJ's request, the Census Bureau concluded that, "[s]ince the question is already asked on the American Community Survey, [it] would accept the cognitive research and questionnaire

testing from the ACS instead of independently retesting the citizenship question." AR 1279.  In his memorandum, the Secretary thus concluded that "the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions." AR 1319.  Plaintiffs further suggest that the Secretary violated "the Bureau's mandatory standards and procedures" by forgoing pretesting, but as Plaintiffs seem to acknowledge, Pls.' Opp'n at 22, the Bureau's Statistical Quality Standards explain that "[p]retesting is not required for questions that performed adequately in another survey."   U.S. Census Bureau, Statistical Quality Standards at 8 (July 2013), https:// www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/ statistical-quality-standards/Quality_Standards.pdf.   Plaintiffs' arguments about testing protocols and procedure are rooted in expert opinions from a former Census Bureau official who believes additional testing was required.  But again, the Court "may not look to this evidence as a basis for questioning the agency's scientific analyses or conclusions."  *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993.  Plaintiffs' efforts to second-guess the agency's decisionmaking process in hindsight, pointing to experts' views or other *post hoc* considerations, simply are not permissible under the APA, as it "inevitably leads the reviewing court to substitute its judgment for that of the agency."  *Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006).

**B.  Nor Did the Secretary Act Contrary to Law.**

*1.*  The Secretary Complied with 13 U.S.C. § 141(f).

Plaintiffs' arguments that the Secretary violated 13 U.S.C. § 141(f) fail for two reasons.  First, § 141(f) is a reporting requirement, and not a substantive limitation on the Secretary's power to set the questions on the census.  As such, this Court lacks jurisdiction to review Secretary Ross's compliance with § 141(f), both because the Court cannot redress the violation (a power that lies with Congress), and because submitting the report does not constitute a final agency action from which legal consequences flow.  *See Guerrero v. Clinton*, 157 F.3d 1190, 1194 (9th Cir. 1998) (rejecting challenge to compliance with congressional reporting requirement because "nothing that we could order with respect to the reports or their adequacy can make Congress do anything" and as not relating to a final agency action because "[n]o matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act

1    upon"). Plaintiffs cite an inapposite case noting that § 141 has not been read to remove the

2    Secretary's determinations about the census from all judicial review, Pls.' Opp'n at 24 (citing *District*

3    *of Columbia v. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (D.D.C. 1992)), but cite no authority

4    for the proposition that § 141(f) makes the Secretary's decisions *separately* reviewable for compliance

5    with a reporting requirement. To the contrary, a failure to comply with a reporting requirement like

6    § 141(f) cannot render the underlying subject of the report unlawful; the unlawful action is the failure

7    to provide a report. There is no substantive limitation on the Secretary's authority in § 141(f).

8        Second, Secretary Ross met the requirements of 13 U.S.C. § 141(f). Pursuant to § 141(f)(2),

9    the intended questions for the 2020 decennial census have been submitted to Congress, including the

10   citizenship question.[7]  Questions Planned for the 2020 Census and American Community Survey

11   (Mar. 29, 2018), https://www2.census.gov/library/publications/decennial/2020/operations/

12   planned-questions-2020-acs.pdf. Congress has, therefore, been fully informed of the questions and

13   is capable of taking any action it finds necessary without assistance from this Court. If a § 141(f)(3)

14   report was required, it was satisfied by the § 141(f)(2) report—the § 141(f)(3) report need not actually

15   contain a description of the new circumstances. *See* § 141(f)(3) (requiring the Secretary to submit "a

16   report containing the Secretary's determination of the subjects, types of information, or questions as

17   proposed to be modified"). In any event, Secretary Ross could remedy any error by simply submitting

18   a § 141(f)(3) report between now and the 2020 census. *See* 13 U.S.C. § 141(f)(3) (permitting

19   submission of such a report at any time after the submission of a § 141(f)(1) or (2) report and "before

20   the appropriate census date"). New circumstances justifying an additional topic exist in the form of

21   DOJ's request to the Census Bureau, and Secretary Ross's recent understanding of the value of block-

22   level CVAP data to enforce the Voting Rights Act.[8]

23

24        [7] Plaintiffs also appear to confuse whether or not citizenship data from the decennial census
     is necessary to DOJ with § 141(f)'s statement that new circumstances must "necessitate" the

25   modifications. Pls.' Opp'n at 23-24. The only requirement is that the *circumstances* (DOJ's desire for
     additional data) necessitate the *change* (the reinstatement of a citizenship question), which is the case

26   here because Secretary Ross determined the best way to collect block-level CVAP data was through
     Option D, which necessitated reinstating a citizenship question on the census.

27        [8] The Gary Letter could represent a "new" circumstance, because Secretary Ross had not
     previously been aware of DOJ's desire for citizenship data from the decennial census. Here, of

28

**2.** The Secretary Complied with 13 U.S.C. § 6(c).

Nor has Secretary Ross acted unlawfully in light of 13 U.S.C. § 6(c). Section 6(c) provides that "To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries." 13 U.S.C. § 6(c). This provision clearly acknowledges that it will not always be possible for the Secretary to use administrative data based on the "kind, timeliness, quality and scope of the statistics required." Here, this analysis would completely overlap with the analysis that Secretary Ross performed in selecting Option D, which uses both administrative data and a question on the decennial census, over the other available options. For the same reasons discussed *infra* Part III.A, Secretary Ross reasonably declined to rely on administrative data alone for citizenship data. The same applies to the other demographic questions intended for the 2020 decennial census, which Plaintiffs do not raise § 6(c) challenges to—such as sex, race, and ethnicity—which could theoretically be obtained through administrative records. Section 6(c) contains no indication that Congress intended for the Secretary's determination of where administrative records were appropriate to be second-guessed by the courts based on which option presented the lower cost, as Plaintiffs suggest. Pls.' Opp'n at 25.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in Defendants' favor on both of Plaintiffs' claims, and this case should be dismissed with prejudice.[9]

---

course, Secretary Ross fully appreciated DOJ's views only after the Gary Letter was sent—when the initial § 141(f)(1) report had already been submitted to Congress. Because the Department of Commerce and the Census Bureau rely on other agencies to inform them about their data needs, "newness" is appropriately measured by the Secretary's knowledge, rather than how long facts have existed in the world. In any event, the Gary Letter explains that DOJ was still in the process of understanding the challenges of working with data from the 2010 decennial census, which was the first recent census not to include a "long form" questionnaire with a citizenship question. AR 664.

[9] APA cases can and should be decided at summary judgment. *See, e.g., Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016). If the Court concludes that Plaintiffs have satisfied their burden as to standing and that Plaintiffs have the better argument on the merits, the correct means of the resolving the case is through a grant of summary judgment, not trial. *Cf. Edson v. Valleycare Health Sys.*, 21 F. App'x 721, 722 (9th Cir. 2001) ("A district court may *sua sponte* grant summary judgment when the losing party has had a 'full and fair opportunity to ventilate the issues involved in the motion." (internal quotation marks omitted)).

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.                    - 15 -

1    Date:  November 26, 2018                    Respectfully submitted,

2                                                 JOSEPH H. HUNT
                                                  Assistant Attorney General
3

4                                                 BRETT A. SHUMATE
                                                  Deputy Assistant Attorney General
5

6                                                 JOHN R. GRIFFITHS
                                                  Director, Federal Programs Branch
7

8                                                 CARLOTTA P. WELLS
                                                  Assistant Director
9
                                                  _ /s/ Carol Federighi _
10                                                CAROL FEDERIGHI
                                                  KATE BAILEY
11                                                STEPHEN EHRLICH
                                                  Trial Attorneys
12                                                United States Department of Justice
                                                  Civil Division, Federal Programs Branch
13                                                1100 L Street NW
                                                  Washington, DC 20530
14                                                Tel.: (202) 514-1903
                                                  Email: carol.federighi@usdoj.gov
15
                                                  Attorneys for Defendants
16

17

18

19

20

21

22

23

24

25

26

27

28

*California v. Ross*, No. 3:18-cv-01865-RS, Reply Supp. Defs.' Mot. Summ. J.          - 16 -

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of November, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.


*/s/ Carol Federighi*

CAROL FEDERIGHI

JOSEPH H. HUNT
Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director
CARLOTTA P. WELLS
Assistant Director
CAROL FEDERIGHI
KATE BAILEY
STEPHEN EHRLICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel.: (202) 514-1903
Email: carol.federighi@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.,*<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, JR., *et al.,*<br><br>    Defendants. | Civil Action No. 3:18-cv-01865-RS<br><br>**DECLARATION OF CAROL FEDERIGHI IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   December 7, 2018<br>Time:   10:00 a.m.<br>Judge:   Honorable Richard Seeborg<br>Dept.:   3 |

**Federighi Decl. ISO Defs.' Reply ISO Their Mot. Summ. J.** – Case No. 3:18-cv-1865-RS

1

2      I, Carol Federighi, declare as follows:

3

4         1.   I am an attorney at the United States Department of Justice, counsel for Defendants

5              in the above-captioned litigation. I submit this declaration in support of Defendants'

6              reply in support of their motion for summary judgment.

7         2.   Attached as **Exhibit A** is a true and accurate copy of selections from the November

8              14, 2018, trial testimony of Dr. John Abowd, chief scientist of the Census Bureau, in

9              the matter *New York v. U.S. Dep't of Commerce*, 18-cv-2921 (S.D.N.Y.).

10

11   I declare under penalty of perjury that the foregoing is true and correct.

12

13   November 26, 2018                              _/s/ Carol Federighi_____
     Washington, D.C.                              Carol Federighi

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   **Federighi Decl. ISO Defs.' Reply ISO Their Mot. Summ. J.** – Case No. 3:18-cv-1865-RS

# EXHIBIT A

IBEsNYS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     STATES OF NEW YORK, COLORADO,
 3   CONNECTICUT, DELAWARE, ILLINOIS,
     IOWA, MARYLAND, MINNESOTA,
 4   NEW JERSEY, NEW MEXICO,
     NORTH CAROLINA, OREGON,
 5   RHODE ISLAND, VERMONT,
     and WASHINGTON, et al.,
 6

 7                    Plaintiffs,

 8            v.                          18 Civ. 2921 (JMF)

 9   UNITED STATES DEPARTMENT OF
     COMMERCE, et al.,
10                                        Trial

11                    Defendants.

12   ------------------------------x

13   NEW YORK IMMIGRATION
     COALITION, et al.,
14
                     Consolidated Plaintiffs,
15
              v.                          18 Civ. 5025 (JMF)
16
     UNITED STATES DEPARTMENT OF
17   COMMERCE, et al.,

18
                     Defendants.
19   ------------------------------x
                                          New York, N.Y.
20                                        November 14, 2018
                                          9:00 a.m.
21
     Before:
22
                          HON. JESSE M. FURMAN,
23
                                          District Judge
24

25
```

1    populations.

2    Q.   Then lastly, Dr. Hillygus says that depending on modeling

3    assumptions, Brown, et al. estimates range from 5.1 to 11.9.

4         Do you agree with that?

5    A.   I think I just expressed how that would properly be done

6    with the analysis that the ranges from 5.1 percentage points to

7    5.8 percentage points.

8    Q.   We can take this down.

9         One last point on self-response before we turn to NRFU.

10             Do you recall Dr. Barreto's testimony regarding his

11   survey he ran?

12   A.   Yes, I do.

13   Q.   What is your opinion of his survey?

14   A.   So Dr. Barreto ran a public opinion survey of a telephone

15   interview form sample from a combination of telephone lists

16   used for that purpose and asked questions about intentions to

17   do -- basically intentions to take the 2020 census in various

18   forms.

19      He randomized which questions were asked to certain

20   populations or certain sub samples.  He didn't randomize the

21   order in which the experiment was conducted.  He drew

22   conclusions about the relationship between the reported

23   intentions to do something in a single survey to various

24   operations in the 2020 census.

25             I disagree with most of those conclusions primarily

1    because the asking someone about their intention to do

2    something and actually measuring what they do in a field

3    experiment is very different.

4        Just because something is randomized doesn't make it

5    a salient, randomized controlled trial.  You are trying to

6    randomize the treatment that you actually want to implement.

7    In this case, the relevant randomization is over whether or not

8    there is a citizenship question in the census form when you're

9    asked to take it.

10       The other reason that I disagree with Dr. Barreto's

11   conclusions is that he had a 29 percent response rate, and that

12   is perfectly respectable for public opinion polling.  In fact,

13   the CBAMS survey that we discussed earlier had a 31 percent

14   response rate.  But the Census Bureau, when it used the CBAMS

15   result, used them to inform marketing and partnership

16   decisions, not to make an inference about what would happen on

17   the 2020 census, certainly not to make an inference about which

18   sizes of households might be more or less inclined to go to

19   proxy.

20       You have to be a lot more careful about the survey design

21   if you want to do those household or population comparisons.

22   In particular, you have to make sure the weights are correct

23   so, in his analysis, the average household size is bigger for

24   the whole population, is bigger than the estimate from the

25   current population survey substantially bigger, so that means

 1   he didn't control his weights to any objective population

 2   totals, which is also perfectly fine for opinion polls.  But

 3   not if you're then going to subsequently make an inference

 4   about the difference in the households sizes from two different

 5   sub populations, and particularly if you're not going to make

 6   an inference about one of those sub populations based on a very

 7   small sub sample of your survey data in the first place.

 8       When you do that, not only do you have to get the weights

 9   right, you have to get the margins of error right.  I'm not

10   able to determine whether he made any corrections to the

11   clustering that the various telephone lists that he used to

12   draw the sample would have induced.  I think the margins of

13   error are seriously understated if that wasn't done.

14       So basically you can use that survey to say exactly the

15   same thing that I've been saying since January 19.  The

16   presence of a citizenship question on the 2020 census is likely

17   to depress self-response rates, and the people who are not

18   likely to self-respond are going to be more difficult to follow

19   up.

20           I don't think those points are in contention, and

21   Dr. Barreto's survey provides additional evidence for them.  It

22   doesn't in any way explain how the NRFU component would be

23   related to the survey component.  It is all about intentions.

24   Q.  Just one more question, Dr. Abowd, on Dr. Barreto's survey.

25   We'll talk about his NRFU component in a moment.