UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR ROSS, et al.,<br><br>    Defendants.<br>------------------------------------------------------<br>CITY OF SAN JOSE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, et al.,<br><br>    Defendants. | Case No. 18-cv-01865-RS<br><br>18-cv-02279-RS<br><br>**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND FOR PARTIAL SUMMARY JUDGMENT** |

## I. INTRODUCTION

This action, comprising two related cases, arises from the U.S. Census Bureau's decision to include a question regarding citizenship status on the 2020 decennial census questionnaire. The plaintiffs in these two related cases contend the decision to include this question violated the Constitution and the Administrative Procedure Act ("APA"). Plaintiffs in Case No. 18-cv-1865 are the State of California, the County of Los Angeles, the City of Los Angeles, the City of Fremont, the City of Long Beach, the City of Oakland, the City of Stockton, and the Los Angeles Unified School District (collectively, "California Plaintiffs"). Plaintiffs in Case No. 18-cv-2279

are the City of San Jose and the Black Alliance for Just Immigration ("BAJI") (collectively, "San Jose Plaintiffs").[1] Defendants in both matters are Wilbur Ross, in his official capacity as Secretary of the U.S. Department of Commerce; the U.S. Department of Commerce; Ron Jarmin, in his official capacity as Acting Director of the U.S. Census Bureau; and the U.S. Census Bureau.

Defendants now move for summary judgment with respect to all claims asserted against them. The San Jose Plaintiffs move for partial summary judgment with respect to their APA claim. For the reasons set forth below, these motions are denied.

## II. BACKGROUND

The factual background of this case is set forth in the Order Denying Motion to Dismiss, issued on August 17, 2018.

## III. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a court must grant a motion for summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). When making this evaluation, courts must draw all reasonable inferences in favor of the non-moving party. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520-21 (1991). While summary judgment is often an appropriate mechanism for deciding claims arising under the APA, *Ctr. for Envtl. Health v. McCarthy*, 192 F. Supp. 3d 1036, 1040 (N.D. Cal. 2016), this is not the case where resolution of a claim requires credibility determinations or inferences in favor of the moving party. *See Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1165 (9th Cir. 2017); *see also Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1047-48 (W.D.N.Y. 1995) (refusing to grant summary judgment on an APA claim because of credibility issues related to bad faith and pretext).

---

[1] There is substantial overlap in the arguments presented by the San Jose Plaintiffs and the California Plaintiffs. Accordingly, certain portions of this order will treat Plaintiffs arguments jointly.

## IV. DISCUSSION

The motions for summary judgment in this matter revolve around three questions: (1) whether Plaintiffs have standing, (2) whether Defendants are entitled to summary judgment with respect to the Enumeration Clause claim, and (3) whether either Defendants or the San Jose Plaintiffs are entitled to summary judgment with respect to the APA claim.

### A. Standing

To establish standing under Article III of the Constitution, a plaintiff must show (1) it has suffered an "injury in fact," (2) the injury is "fairly traceable to" the challenged action, and (3) the injury would be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing all three requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Furthermore, plaintiffs may not rest upon mere allegations at the summary judgment stage, but must "set forth by affidavit or other evidence specific facts" that support a finding of standing. *Id.* These facts are presumed to be true at the summary judgment stage but may be challenged at trial. *Id.*

#### 1. **Injury in Fact**

To establish injury in fact, a plaintiff must demonstrate it "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (quotation omitted). This injury or threat of injury must be "concrete and particularized" rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Thus, where standing is based upon an alleged future injury, the plaintiff must demonstrate a substantial risk the harm will occur. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010).

##### a. *Injury to the California Plaintiffs*

The California Plaintiffs argue the inclusion of the citizenship question on the census will artificially depress the population count in California, resulting in a loss of federal funding and a decrease in the state's congressional apportionment. According to Defendants, however, the Census Bureau's "extensive procedures" for contacting non-responding households will prevent

any undercount from occurring. Defs.' Mot. Summ. J. 9. For example, households that do not initially respond receive follow-up mailings encouraging them to fill out the questionnaire. Households that still fail to respond are assigned an enumerator who physically visits the household to conduct an interview. If these efforts are unsuccessful, the Census Bureau attempts to contact a nearby proxy, such as a neighbor, to determine how many people live in the non-responding household. Finally, if all else fails, the Bureau will attempt to impute the number of persons in non-responding households by referring to administrative records.

Defendants further argue that, even if an undercount were to occur, it would not materially affect either apportionment or federal funding. According to defense expert Stuart Gurrea, assuming the Bureau's non-response follow up ("NRFU") operations are as successful in 2020 as they were in 2010, California's apportionment would not change even if the self-response rates dropped significantly. Gurrea also estimates California's federal funding would decline by no more than 0.01 percent under such circumstances. According to Defendants, this loss of funding is insufficient to establish injury in fact.

The California Plaintiffs respond by pointing to empirical research by expert Matthew Barreto showing that between 7.1 and 9.7 percent of the nationwide population will not respond as a result of the citizenship question. Decl. Barreto ¶ 19. Barreto estimates the drop-off rate in California would be even higher—between 12.3 and 18 percent. *Id.* ¶ 20. Furthermore, the Census Bureau itself conservatively estimated that inclusion of the citizenship question would result in a 5.8 percent decline in self-reporting in households with at least one non-citizen relative to all-citizen households.

The California Plaintiffs also point to expert testimony that the Census Bureau's NRFU procedures and use of administrative imputation will not mitigate the differential response rates between citizens and non-citizens, and may in fact exacerbate this differential. The California Plaintiffs note, and Defendants do not dispute, that the Census Bureau's NRFU procedures have historically been less effective in reaching immigrant and non-citizen populations. Furthermore, administrative records are less likely to exist for non-citizens, thereby perpetuating a systematic undercount of this population. Abowd Dep. (Oct. 12, 2018) 255:2-8; O'Muircheartaigh Decl. 14-

15.

Finally, the California Plaintiffs proffer expert testimony that any undercount of California's population relative to the rest of the country will result in a loss of federal funding to the state. Defendants attempt to minimize this injury by referring to expert testimony that California would suffer only a 0.01 percent loss in federal funding, which amounts to approximately $215,000. "For standing purposes," however, "a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (quotation marks omitted).

In sum, Plaintiffs' evidence, taken as true for the purposes of summary judgment, is sufficient to establish injury with respect to the State of California, and therefore with respect to the California Plaintiffs generally. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1994) (explaining that "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").

### b. *Injury to the San Jose Plaintiffs*

The San Jose Plaintiffs point to essentially the same evidence discussed above to establish a substantial risk of an undercount of immigrants and non-citizens. Furthermore, it is undisputed that a disproportionate number of such persons reside in San Jose. Because the City of San Jose operates at least two programs that receive federal funding based on census data, Plaintiffs contend, the city will lose federal funding if the population of San Jose is underreported in the 2020 census. Clements Decl. ¶¶ 3, 4, 12, 14, 22, 23-27.

These facts, taken as true, are sufficient to establish injury in fact with respect to the San Jose Plaintiffs. BAJI, however, also independently asserts injury in fact under both an organizational standing theory and a loss of privacy theory.[2] Under the organizational standing doctrine, a plaintiff may establish injury in fact by alleging: "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *See*

---

[2] The loss of privacy theory received relatively short shrift in the parties' briefing, accordingly resolution of this question is more appropriately addressed at trial, should the San Jose Plaintiffs choose to pursue this argument.

*Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *see also E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, 2018 WL 6428204, at *10-11 (9th Cir. Dec. 7, 2018) (reaffirming the organizational standing requirements).

In short, the organization must allege the defendant's actions caused it to expend additional resources and that, "but for" those actions, it would have used those resources to accomplish other aspects of its organizational mission. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015). An organization may not, however, manufacture an injury by expending resources to fix a problem that otherwise would not have affected it. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

According to BAJI's Executive Director, the organization was originally founded in 2006 to mobilize against "repressive immigration bills that were pending before the United States Congress at the time." Tometi Decl. ¶ 3. BAJI's broader organizational mission is to organize African American and Black immigrant communities to advocate for "racial, social, and economic justice." *Id.* ¶ 6. BAJI fulfills this mission through "dialogues, presentations, workshops, publications, technical assistance, and trainings." *Id.* ¶ 7. According to the San Jose Plaintiffs, this mission is harmed by the inclusion of the citizenship question because an undercount of immigrant populations will dilute the political power of the communities BAJI seeks to organize and diminish the amount of funding available to those communities. *Id.* ¶ 9.

In response to this threat, BAJI has diverted the organization's resources to encourage its constituents to participate in the census and to counteract the chilling effects of the citizenship question. *Id.* ¶ 12-13. BAJI specifically alleges it has already expended considerable staff time responding to constituents' concerns and plans to spend an additional $200,000 over the next two years educating constituents about the citizenship question. *Id.* ¶ 20. These averments, taken as true, are sufficient to satisfy both organizational injury in fact requirements. Accordingly, for the purposes of summary judgment, the San Jose Plaintiffs have established injury on this basis as well.

2. **Causation and Redressability**

Defendants contend that, even if Plaintiffs can establish injury in fact, they cannot show

the injury is traceable to Defendants' actions or would be redressed if the question were removed from the census questionnaire. According to Defendants, any person who is so fearful that he or she refuses to respond to the census based on the presence of the citizenship question would likely refuse to answer the census even if the citizenship question were removed. While some individuals may refuse to respond to the census regardless of whether it includes the citizenship question, Plaintiffs have adduced evidence, and the Bureau's own study revealed, that the inclusion of this question is likely further to depress the response rate of non-citizens and their relatives.

In sum, Plaintiffs have set forth sufficient evidence to support a finding of standing and therefore defeat Defendants' motion for summary judgment on this issue. The presence of disputed facts likewise precludes the San Jose Plaintiffs' motion for partial summary judgment on that question.[3]

### B. Merits

As explained above, Defendants seek summary adjudication of both the Constitutional and APA claims raised in this suit. The San Jose Plaintiffs seek summary judgment solely with respect to their APA claim while the California Plaintiffs have elected not to seek summary judgment.

#### 1. Enumeration Clause Claim[4]

Defendants seek summary judgment with respect to the Enumeration Clause claim based on two alternate theories. First, Defendants argue the Enumeration Clause only requires that "the population be determined by a person-by-person headcount, rather than through estimate or conjecture." Defs.' Mot. Summ. J. (*State of California v. Ross*) 15; Defs.' Mot. Summ. J. (*City of San Jose v. Ross*) 16. Therefore, because there is no dispute that the Census Bureau will attempt to conduct a person-by-person count, the Enumeration Clause, Defendants argue, is satisfied. In the

---

[3] Plaintiffs advance additional arguments in favor of standing which are not explicitly discussed here. Each of these arguments ultimately relies upon a question of fact that cannot be resolved at the summary judgment stage. To the extent Plaintiffs wish to raise these additional standing arguments at trial, they remain free to do so.

[4] The San Jose Plaintiffs also raise an Apportionment Clause claim. As noted in the Order Denying Motion to Dismiss, issued on August 17, 2018, the Apportionment Clause and Enumeration Clause claims rise and fall together.

order denying Defendants' motion to dismiss, issued on August 17, 2018, this argument was rejected. As explained in that order, "there may be a rare question that is so uniquely impactful on the process of counting itself, that it becomes akin to a mechanics-of-counting-type challenge, which is plainly reviewable under the Enumeration Clause." Order Deny. Mot. Dismiss 28. Accordingly, a "decision to alter the census in a way that affirmatively interferes with the actual enumeration, and does not fulfill any other reasonable governmental purpose, is subject to a challenge under the Enumeration Clause." *Id.* 29.

Second, Defendants argue, "to the extent the Court is concerned about the accuracy of the enumeration," Plaintiffs have failed to establish a genuine dispute of fact regarding the likelihood of an undercount. Defs.' Mot. Summ. J. (*State of California v. Ross*) 17; Defs.' Mot. Summ. J. (*City of San Jose v. Ross*) 18. In reaching this conclusion, Defendants rely on the same arguments advanced in the standing section. In short, Defendants argue the Census Bureau's follow-up procedures prevent Plaintiffs from showing that an undercount "sufficient to violate the Enumeration Clause" is likely to occur. Defs.' Reply (*City of San Jose v. Ross*) 7.

Plaintiffs, however, provide substantial evidence that these follow-up procedures will still systematically undercount non-citizens. In particular, Plaintiffs point to testimony by expert Colm O'Muircheartaigh that NRFU and imputation methods are unlikely to eliminate the impact of differential non-response rates between citizens and non-citizens, and may in fact exacerbate that differential. O'Muircheartaigh Decl., Ex. 2 at 2-3, 12, 16-17. This is particularly true, Plaintiffs contend, with respect to administrative imputation. *Id.*, Ex. 2 at 15. Furthermore, Plaintiffs argue it will be more difficult to find willing proxy respondents in tracts containing higher proportions of non-citizens. *Id.*, Ex. 2 at 16.

In light of the foregoing arguments, there is a material dispute of fact regarding whether, and to what extent, the addition of the citizenship question will impact the final enumeration of the public. Defendants' motion for summary judgment with respect to the Enumeration Clause claim is, accordingly, denied.

**2. APA Claim**

Plaintiffs each advance two theories in support of their respective APA claims. First, Plaintiffs contend the decision to include the citizenship question was arbitrary and capricious. Second, Plaintiffs argue the addition of the question was ultra vires, thereby giving rise to a claim under 5 U.S.C. § 706(2)(C). As a preliminary matter, Defendants argue review of Plaintiffs' APA arbitrary and capricious claim should be confined to the administrative record. It is not necessary to decide whether extra-record evidence is admissible at this stage because the San Jose Plaintiffs' motion relies exclusively on evidence in the administrative record and because Defendants' motions fail regardless of whether such evidence is considered. The scope of review remains to be resolved at trial.

### a. APA Arbitrary and Capricious Review

The standard for evaluating whether an agency's decision was arbitrary and capricious is whether the decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). This standard is deferential, *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016), and does not permit the Court to "substitute its judgment for that of the agency," *Ctr. for Bio. Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017). The focus at all times must remain on whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Nw. Ecosys. All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140, 1145 (9th Cir. 2007) (quotation omitted).

Little doubt remains that Secretary Ross entered office with an interest in reinstating the citizenship question. After some discussion of the issue with other political appointees, the Secretary solicited the views of the Department of Justice ("DOJ") on the matter. DOJ staff initially declined to request the addition of the citizenship question. After the Secretary met with then Attorney General Jeff Sessions, however, Defendants received a letter from DOJ requesting that "the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship." AR 663. This letter stated that citizenship data is "critical" to DOJ's Voting Rights Act enforcement and indicated that collecting data through the census would provide block-level

citizenship data, which would be preferable to the data available through the American Community Survey ("ACS"). *Id.* 663-65.

The Secretary subsequently requested the Census Bureau perform a technical review to determine how best to obtain the requested data. The Census Bureau evaluated three possible options: (A) make no change to the census questionnaire, but assist DOJ with statistical modeling, (B) include a citizenship question on the census, or (C) obtain citizenship data from administrative records. The Census Bureau ultimately advised against Option B, pointing out that responses to the citizenship question are frequently inaccurate and that inclusion of the question would be costly and would depress response rates. Census Bureau staff concluded that relying on administrative records to collect citizenship data would be a more effective means of providing the requested data and would avoid the drawbacks associated with the citizenship question.

At the Secretary's request, the Bureau subsequently evaluated a fourth course of action, Option D, which combined Options B and C. Census Bureau staff advised the Secretary that this hybrid option suffered from the same defects as simply adding the citizenship question. Secretary Ross, however, ultimately chose Option D. In his memo, the Secretary stated that "placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records" would "provide DOJ with the most complete and accurate [citizenship] data in response to its request." *Id.* 1317. He also asserted that "no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates." *Id.* Secretary Ross opined that any decrease in responses rates would be offset by the NRFU procedures and that, in any event, the value of providing DOJ with more complete data regarding citizenship outweighed "any adverse effect that may result from people violating their legal duty to respond." *Id.* 1319.

Defendants argue Secretary Ross's decision to add the citizenship question was not arbitrary and capricious because he evaluated the costs and benefits of adding the question and explained the reasoning behind his decision. According to the government, Secretary Ross's consultation with census bureau staff and consideration of multiple options support this

conclusion. Defendants further argue that Secretary Ross considered whether to test the citizenship question, but ultimately chose not to because "the question is already asked on the American Community Survey" and he could therefore "accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question." *Id.* 1279. Finally, Defendants argue that even if the Secretary was subjectively predisposed to reinstate the citizenship question, this does not necessarily render his ultimate decision arbitrary and capricious. *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting the idea that an agency's "subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").

Plaintiffs, for their part, argue Secretary Ross's decision to add the citizenship question was arbitrary and capricious for three reasons: (1) the agency "relied on factors which Congress has not intended it to consider,"[5] (2) the agency "entirely failed to consider an important aspect of the problem," and (3) the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Plaintiffs specifically allege: Secretary Ross's stated reasons for adding the question were pretextual and he instead relied upon improper political concerns; the Secretary failed to consider the necessity of testing the citizenship question before including it on the census; and the Secretary ignored all scientific evidence in deciding to add the citizenship question.

Considering only the administrative record, neither party is entitled to summary judgment with respect to the APA claim. First, the questions whether Secretary Ross's decision to add the citizenship question was pretextual depends upon what inferences flow from the discussions

---

[5] The California Plaintiffs propose a slightly different version of this argument. Although the San Jose Plaintiffs and the California Plaintiffs each advance an argument based on pretext, the California Plaintiffs base their pretextual argument on the theory the Secretary failed to disclose and explain the true basis of his decision, as required under the APA. *State Farm*, 463 U.S. at 48. This distinction, however, does not meaningfully affect the analysis of the parties' motions for summary judgment.

between Secretary Ross, his staff, and various other political appointees, and from Secretary Ross' belatedly admission that the DOJ request was obtained only after Secretary Ross asked DOJ to intervene. While Plaintiffs present seemingly strong evidence of an ulterior motive, this question cannot be resolved without certain inferences and credibility determinations regarding statements in the record.

Second, there are material disputes regarding whether the Secretary failed to "consider an important aspect of the problem" before making his decision. In particular, the parties disagree about the degree to which Secretary Ross considered relevant cognitive and field testing data regarding the performance of the citizenship question. While both parties agree that the addition of the citizenship question to the census was not independently tested, they disagree about the extent to which testing of the ACS's citizenship question can stand in for census-specific testing.

Defendants argue the ACS testing is an adequate substitute for independently testing the citizenship question as a part of the census instrument. Plaintiffs, however, point out the decision not to perform independent cognitive and field testing departs from the Census Bureau's past practices, AR 1296, and underscore a letter from six former Bureau chiefs emphasizing the importance of independently testing the citizenship question, *Id.* 1057-58. Accordingly, resolving whether the Secretary failed to consider "an important aspect" of the problem depends upon whether Secretary Ross could have rationally concluded ACS testing provided the necessary information. As this question cannot be resolved without the benefit of certain inferences and credibility determinations, a trial will be necessary to determine this issue.

Finally, ascertaining whether the Secretary's decision "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view" depends upon inferences that cannot be resolved at the summary judgment stage. While Plaintiffs present substantial evidence that adding the citizenship question to the census was not an effective method of obtaining the requested citizenship data, deciding the case in their favor ultimately requires a determination that the Census Bureau's analysis was credible. Assessing the credibility of the Census Bureau's analysis is, however, an issue for trial.

The Defendants, for their part, do not point to any evidence in the administrative record showing that the addition of the citizenship question was an effective method of collecting citizenship data. Rather, the Defendants argument seems to rest upon the assumption that the Census Bureau's analysis was incorrect, and that Secretary Ross was therefore free to conclude the addition of the citizenship question was an effective method of achieving his stated goals without negatively affecting the accuracy of the census count. Ruling in Defendants' favor would therefore require the Court to conclude the Census Bureau's analysis carried little to no weight and therefore could reasonably be disregarded, even absent contradictory evidence. Defendants are entitled to no such inference at the summary judgment stage. Accordingly, considering only the administrative record, both Defendants' and the San Jose Plaintiffs' motions for summary judgment must be denied.

*a. APA Ultra Vires Theory*

In addition to the APA arbitrary and capricious theory discussed above, Plaintiffs allege Secretary Ross's decision to add the citizenship question exceeded his statutory authority and therefore violated the APA. Plaintiffs specifically contend the Secretary acted in excess of his statutory authority under section 141(f) and section 6(c) of the Census Act. 13 U.S.C. §§ 141(f), 6(c). Defendants seek summary judgment with respect to both sections.[6] The San Jose Plaintiffs seek summary judgment only with respect to section 6(c).

**i. Section 141(f)**

Under section 141(f)(2), the Secretary of Commerce must submit to Congress "not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census." *Id.* § 141(f)(2). If, after submission of this report, the Secretary "finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports" be modified, he or she must submit a new report

---

[6] Defendants, in passing, request summary judgment with respect to the Information Quality Act. Plaintiffs clarified that they are not advancing an independent theory under that act, and accordingly there is no need to address this issue.

describing these modifications. *Id.* § 141(f)(3). According to Plaintiffs, Secretary Ross acted in excess of his authority by adding the citizenship question in the absence of new circumstances justifying this modification. Plaintiffs further contend the Secretary was required to disclose these new circumstances in his report to Congress. In the alternative, Plaintiffs argue they may challenge the Defendants' purported failure to report to Congress as a final agency action in its own right because it implemented a decision "from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

Defendants argue a failure to report to Congress is not an "agency action" that is subject to challenge. *See* 5 U.S.C. § 551; *Wild Fish Conserv. v. Jewel*, 730 F.3d 791, 800-01 (9th Cir. 2013). Defendants further contend that requiring Defendants to submit a new report under section 141(f)(3) would not redress any injury and therefore fails Article III's standing requirements. *See Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012). Finally, and most pertinently, Defendants ague section 141(f) does not impose any substantive limitations on the Secretary's discretion regarding the contents of the decennial census.

While Defendants are correct that the primary function of section 141(f) is to impose reporting requirements, it also imposes substantive limitations on the Secretary's ability to modify the census. Any other reading would render the "new circumstances" clause superfluous and undermine the purpose of the statute. Section 141(f)(3) requires that, "if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions" included in the census be modified, he submit a new report detailing these modifications. 13 U.S.C § 141(f)(3). Under Defendants' reading of this section, the Census Bureau could overhaul the census questionnaire the day before the census begins even if there were no new circumstances justifying this change. Furthermore, so long as this change was not based on any "new circumstances," the statute would not even require the Census Bureau to report these changes to Congress. This reading runs contrary to the purpose of the section and ascribes a perverse meaning to the "new circumstances" clause.

Perhaps the more charitable interpretation of Defendants' position is that the phrase "if the

Secretary finds new circumstances exist" has no effect whatsoever. Under this interpretation, the Census Bureau would be required to report all changes to Congress, but would be free to make these changes at any time and for any reason. Construing the statute in this manner would, of course, render the "new circumstances" clause utterly meaningless. This runs afoul of one of the most basic canons of construction, that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Furthermore, the inclusion of the "new circumstances" clause in section 141(f)(3), but not in section 141(f)(2), suggests Congress wished to limit the Secretary's ability to make changes to the census after the two year mark.

Ultimately, the more straightforward reading of this section, which gives effect to all parts of the text, is that, once the Secretary has submitted the section 141(f)(2) report, he or she may modify the questions included on the census only if "new circumstances" so require, and must report these modifications to Congress.[7]

Because the final agency action at issue here is the modification of the census, not the report itself, Defendants arguments regarding jurisdiction and standing are unavailing. There is no indication in the statute, however, that the Secretary must explain the new circumstances in the report to Congress. Accordingly, resolution of this claim ultimately turns on whether the Secretary concluded new circumstances necessitated addition of the citizenship question. In practice, there appears to be little daylight between a finding that no new circumstances necessitated addition of the citizenship question and a finding that the decision to add the census question was arbitrary capricious. Here, both arguments turn on whether the Secretary's reliance on the DOJ's formal request was mere pretext or whether the DOJ's request was in fact the basis for modifying the census questionnaire. As explained above, this question cannot be resolved without the benefit of

---

[7] Notably, Defendants do not request *Chevron* deference. Even if this argument were properly raised, *Chevron* deference is not appropriate here because the canons of construction provide a clear interpretation of the statute. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).

1  credibility determinations and inferences that cannot be made at the summary judgment stage.

### ii. Section 6(c)

Section 6(c) requires the Secretary to rely on administrative records rather than direct inquiries "[t]o the maximum extent possible" when collecting supplemental data on behalf of other agencies. 13 U.S.C. § 6(c). According to Plaintiffs, Defendants violated this provision by including the citizenship question in the census rather than relying exclusively on administrative records. Defendants respond by noting this section allows the Secretary to consider "the kind, timeliness, quality and scope of the statistics required" in determining whether to conduct direct inquiries or rely on administrative data. *Id.* Furthermore, Defendants argue, the Secretary's discretion on this matter was not meant to be reviewed by the courts.

Defendants do not cite any authority for the proposition that the Secretary's compliance with section 6(c) is immune from judicial review. Defendants are correct, however, that section 6(c) provides the Secretary with discretion to decide whether a direct inquiry is warranted. Therefore, for all intents and purposes, this question collapses with the arbitrary and capricious review inquiry. Both issues turn on whether the Secretary had a valid basis for adding the citizenship question rather than relying on administrative records as recommended by Census Bureau staff. Accordingly, the parties' motions for summary judgment on this question are denied for the reasons set forth in Part A.2.

### V. CONCLUSION

For the reasons set forth above, the parties' motions for summary judgment and for partial summary judgment are denied.[8]

**IT IS SO ORDERED**.

---

[8] In light of the denial of the San Jose Plaintiffs' motion, there is no need to reach the question of remedy. This remains an open question for resolution at the trial of this action as necessary.

Dated: 12/14/2018

_____
RICHARD SEEBORG
United States District Judge

ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT
CASE NO. 18-cv-01865-RS

17