1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    ANTHONY R. HAKL
3   Supervising Deputy Attorneys General
    GABRIELLE D. BOUTIN, SBN 267308
4   ANNA T. FERRARI, SBN 261579
    TODD GRABARSKY, SBN 286999
5   R. MATTHEW WISE, SBN 238485
    NOREEN P. SKELLY, SBN 186135
6   Deputy Attorneys General
      300 South Spring Street, Suite 1702
7     Los Angeles, CA  90013
      Telephone:  (213) 269-6044
8     Fax:  (213) 897-7604
      E-mail:  Todd.Grabarsky@doj.ca.gov
9   *Attorneys for Plaintiff State of California, by and*
    *through Attorney General Xavier Becerra*
10
    *(Additional counsel listed on signature page)*
11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16  | | |
    |---|---|
17  **STATE OF CALIFORNIA, by and through** | 3:18-cv-01865
    **Attorney General Xavier Becerra;**
18  **COUNTY OF LOS ANGELES; CITY OF**
    **LOS ANGELES; CITY OF FREMONT;**
19  **CITY OF LONG BEACH; CITY OF** | **PLAINTIFFS' OPPOSITION TO**
    **OAKLAND; CITY OF STOCKTON,** | **DEFENDANTS' MOTION IN LIMINE**

20                              Plaintiffs,   Dept:        3
                                             Judge:       The Honorable Richard G.
21           **v.**                                       Seeborg
                                             Trial Date:  January 7, 2019
22                                           Action Filed: March 26, 2018
    **WILBUR L. ROSS, JR., in his official**
23  **capacity as Secretary of the U.S.**
    **Department of Commerce; U.S.**
24  **DEPARTMENT OF COMMERCE; RON**
    **JARMIN, in his official capacity as Acting**
25  **Director of the U.S. Census Bureau; U.S.**
    **CENSUS BUREAU; DOES 1-100,**
26
                                Defendants.
27

28

Plaintiffs[1] respectfully submit the following Opposition to Defendants' Motion in Limine.[2]

## INTRODUCTION

Defendants seek to exclude Plaintiffs' newly disclosed fact witnesses from testifying at trial, yet Defendants provide no particular reason why those witnesses' testimony will be prejudicial. In fact, as explained below, inclusion of those civil servants' straightforward, non-controversial testimony about their job duties and their uses of census data will not harm Defendants in any way. And by presenting those witnesses' trial testimony via declaration, Plaintiffs have ensured that their addition will not disrupt the trial and that Defendants will be able to review their complete initial direct testimony well before trial commences.

Defendants also seek to admit the administrative record, and exclude any evidence outside that record. While Plaintiffs agree that the *complete* administrative record should be admitted, Defendants provide no basis for excluding extra-record evidence. As detailed below, extra-record evidence is relevant and admissible not only to establish Plaintiffs' standing and in support of their Enumeration Clause claim, but also to demonstrate a violation of the Administrative Procedure Act.

For the reasons explained below, the Court should (1) deny Defendants' motion to exclude witnesses Amy Bodek and Andrew Westall; (2) admit the complete administrative record; and (3) deny Defendants' motion to exclude evidence outside the administrative record.

## ARGUMENT

### I.   PLAINTIFFS' NEWLY DISCLOSED FACT WITNESSES SHOULD NOT BE EXCLUDED.

The Court should deny Defendants' motion to exclude fact witnesses Amy Bodek, Director of Department of Planning for the County of Los Angeles, and Andrew Westall, Assistant Chief Deputy of the Office of Los Angeles City Council President Herb J. Wesson, Jr., because

---

[1] Plaintiffs are the State of California, County of Los Angeles, and Cities of Los Angeles, Fremont, Long Beach, Oakland and Stockton, as well as intervenor Los Angeles Unified School District (LAUSD).

[2] This Opposition is brought solely on behalf of Plaintiffs in the present matter. Plaintiffs do not join in the separate opposition to Defendants' motion in limine brought by the plaintiffs San Jose/BAJI in the related case, *City of San Jose v. Ross*, No. 3:18-cv-02279-RS (N.D. Cal.).

Defendants have not demonstrated that they will be prejudiced by the inclusion of those witnesses.

Although Federal Rule of Civil Procedure 37(c)(1) provides for exclusion sanctions for untimely disclosures under Rule 26(a) or (e), the Ninth Circuit has recognized that "evidence preclusion is, or at least can be, a 'harsh' sanction." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). Parties may use late-disclosed witnesses to supply evidence where the late disclosure is "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). In determining whether to preclude the introduction of evidence under Rule 37, courts consider "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence, and (5) the nondisclosing party's explanation for it[s] failure to disclose the evidence." *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 733 (N.D. Cal. 2011) (internal quotation marks omitted).

Witnesses Bodek and Westall should not be precluded from testifying at trial under those factors because Defendants have not shown that the inclusion of those witnesses will harm or prejudice them in any way. Plaintiffs have ensured that their appearance will not disrupt the trial because Plaintiffs intend to present their testimony at trial by via declaration. *See* Ex. A, Trial Decl. of Amy Bodek; Ex. B, Trial Decl. of Andrew Westall. As their trial declarations show, this testimony will consist of straightforward, non-controversial assertions from civil servants related to their job duties offered to inform the Court of the ways in which local jurisdictions utilize Defendants' census data. (*Id.*) Not only does this testimony-by-declaration comport with the Court's preference for a streamlined trial proceeding, it also allows Defendants to prepare for cross-examination, if so desired.

Likewise, Defendants will not be surprised by Bodek's and Westall's testimony primarily because Plaintiffs intend to present these witnesses' testimony at trial via declaration. As their trial declarations show, this testimony consists of facts about how Defendants' census data is used by two local jurisdictions—a topic about which Defendants are undoubtedly knowledgeable.

1    Having Bodek's and Westall's complete initial direct testimony will permit Defendants to

2    determine whether they wish to cross-examine them at trial and prepare for that cross-

3    examination at trial. To whatever limited extent that Defendants may experience some surprise,

4    that surprise has been mitigated by the production of those witnesses' trial declarations and can be

5    further mitigated by Plaintiffs' willingness to produce those witnesses for deposition or engage in

6    limited discovery regarding the topics of their testimony.

7         Although Defendants assert that they are unable to conduct depositions of these newly

8    disclosed witness, Defendants have not shown how proceeding to trial without deposing them

9    will be harmful. Defendants have not deposed a single one of Plaintiffs' previously disclosed lay

10   witnesses in either this case or the related matter, *City of San Jose v. Ross*, No 3:18-cv-02279-RS

11   (N.D. Cal.). *See Ellis v. J.P. Morgan Chase & Co.*, No. 12-CV-03897 YGR, 2015 WL 9178076,

12   at *8 (N.D. Cal. Dec. 17, 2015) (permitting the testimony of a late-disclosed witness in part

13   because the objecting party failed to depose any other similar witness that had been timely

14   disclosed, which suggested that the objecting party "would also not have deposed [the new

15   witness] even if given the opportunity"). And in the other cases involving the addition of the

16   citizenship question to the 2020 Census, Defendants have not shown that deposing lay witnesses

17   has been or will be necessary for their defense at trial. In *New York v. U.S. Dep't of Commerce*,

18   No. 1:18-cv-02921 (S.D.N.Y.) (the "New York matter"), Defendants did not depose any of the

19   plaintiffs' lay witnesses that the plaintiffs called to testify at trial; for the lay witnesses that

20   Defendants *did* depose, Defendants chose not to use those depositions at trial. And in *LUPE v.*

21   *Ross*, No. 8:18-cv-01570-GJH (D. Md.), and *Kravitz v. U.S. Dep't of Commerce*, No. 8:18-cv-

22   01041 (D. Md.), Defendants have not deposed any of the plaintiffs' identified lay witnesses.

23   Accordingly, Defendants have given no reason to suggest that they will depose Bodek or Westall

24   prior to trial even if they were able to. Defendants thus cannot support their unspecified

25   contention that they will be prejudiced by their asserted inability depose those witnesses.

26        Furthermore, the evidence these witness intend to produce is greatly important because it

27   will materially assist the Court in determining Plaintiffs' standing. Bodek's and Westall's

28   testimony will provide the Court with a more complete picture of the array of uses of census data,

3

extending not just to state governments, but also to jurisdictions and organizations at the county, city, and neighborhood levels. Their testimony will demonstrate how local governments rely on the population count and demographic data at the block-level collected at the decennial census to ensure that local redistricting complies with voting rights laws and basic democratic principles of voting. They will also testify about the wider uses for census data, including ensuring that local services and resources—from social and emergency services to trash pickup—are properly allocated at the neighborhood level. And, their testimony shows how census data is essential for planning purposes in such areas as land use, zoning, housing, economic development, and the environment. Accordingly, Bodek's and Westall's testimony about how local jurisdictions use census data is crucial to demonstrate the wider-reaching harm to Plaintiffs caused by the citizenship question and its disruption to the accuracy of the census data on which local jurisdictions rely.

Defendants' delayed response to the disclosure of these witnesses also casts doubt on their unsupported claim of an unspecified prejudice. Upon sending their supplemental disclosure of these witnesses (*see* Defs.' Mot. in Lim. Ex. A) on December 12, 2018, Plaintiffs notified Defendants that, "To the extent any witness has not been previously identified, Plaintiffs agree to meet and confer regarding related discovery, if necessary." *See* Pls.' Witness List (ECF No. 108), at 1. Defendants failed to meet and confer with Plaintiffs and instead waited over a week before notifying Plaintiffs of their objection to these witnesses via the present motion in limine. If they had utilized the proposed meet and confer process, Plaintiffs could have explained in more detail what testimony Bodek and Westall will produce and worked to resolve Defendants' concerns of prejudice. Instead, Defendants seek to exclude these witnesses from testifying at trial altogether by asserting an unspecific and unsupported claim of prejudice in the present motion.

For these reasons, witnesses Bodek and Westall should not be excluded from testifying at trial because their late disclosure will not prejudice Defendants.

//

//

//

**II.     THE COURT SHOULD ADMIT THE COMPLETE ADMINISTRATIVE RECORD.**

Plaintiffs agree with Defendants that the administrative record should be admitted into evidence. But Plaintiffs further assert that the Court should admit the *complete* administrative record.

Under the APA, judicial review is required to be conducted based on the "whole record." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1977). Agencies are required to submit the "whole record" including all of the materials before the agency, not merely a subset actually considered by a decision-maker, and not merely the subset that purportedly supports the ultimate decision. *See Walter O. Boswell Mem. Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case."). And where subordinates conducted "work and [made] recommendations of subordinates, those materials should be included as well." *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)). "'The "whole" administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.'" *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981)).

Here, Defendants' initial production of administrative record materials consisted of 1320 pages of what they characterized as the record on which the agency rested its decision to add the citizenship question to the 2020 Census. However, that production consisted only of a portion of the documents the agency actually considered in arriving at its decision and omitted a multitude of documents that were before the agency, including materials created during the many months that the Secretary of Commerce sought to add the citizenship question prior to receiving the Department of Justice's formal request. *See* AR 1–1320. After being ordered to produce a complete administrative record (New York matter, ECF No. 199), Defendants supplemented the administrative record with several more productions. *See* AR 1321–13099; COM_DIS00013892–COM_DIS00020864. Because these supplemental productions contain documents that constitute

5

an important part of the complete administrative record, they should also be admitted along with Defendants' initial administrative-record production.[3] *See* Joint Pretrial Statement (ECF No. 119), at 11–12.

Presenting a *complete* administrative record is necessary to permit the Court's effective judicial review under 5 U.S.C. § 706; anything less would permit Defendants to "skew the 'record' for review in [their] favor by excluding from that 'record' information in [their] own files which has great pertinence to the proceeding in question." *Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978); *see also Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1538 (9th Cir. 1998) ("An incomplete record must be viewed as a 'fictional account of the actual decisionmaking process.'") (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977)).

For these reasons, the Court should admit the *complete* administrative record.

### III. THE COURT SHOULD DENY DEFENDANTS' MOTION TO EXCLUDE EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD.

Defendants' argument that extra-record evidence should be excluded as irrelevant is both incorrect and contrary to the Court's prior rulings on this matter. The Court has already ordered and affirmed the taking of extra-record discovery in this matter. Order Granting Request to Conduct Discovery Outside the Administrative Record, ECF No. 76; *see also* New York matter, ECF No. 199 (order authorizing extra-record discovery); New York matter, ECF No. 405 ("[T]he Court's decision to authorize extra-record discovery was, and remains, well founded."). And, the Court has also asserted that it will resolve the question about the evidentiary basis for a ruling on Plaintiffs' claims at trial. Order Den. Mots. for Summ. J. and Partial Summ. J. (ECF No. 114), at 9 ("The scope of [evidentiary] review remains to be resolved at trial."). That determination about the consideration of extra-record evidence is similar to the approach of the court in the New York matter, which allowed for the admission of extra-record evidence at trial: "I will allow the [extra-record] evidence to be admitted at trial . . . but I will reserve judgment on whether and to what

---

[3] Plaintiffs reserve the right to move that additional materials be considered part of the administrative record in this action.

extent I can or should consider that evidence." Ex. C, New York matter, Conference Tr. (Nov. 1, 2018), at 12, adopted by Minute Order (ECF No. 459).

Therefore, the best and most efficient way to proceed at present is to permit the admission of extra-record evidence along with the administrative record at trial, and then for the Court to decide at the conclusion of trial the evidentiary basis for its decision on Plaintiffs' APA claim. *See* Ex. D, Tr. of Proceedings (Dec. 7, 2018), at 85 ("And I [the Court] recognize that there may be on the plaintiffs' side some issue with respect to administrative record versus expanded administrative record. And I understand how Judge Furman did it, and I think that makes some sense.").

In any event, although Defendants do not specify what extra-record evidence they seek to exclude, evidence beyond the administrative record is relevant to Plaintiffs' claims. As an initial matter, extra-record evidence is relevant to establish Plaintiffs' standing as well as in support of the merits of their Enumeration Clause claim. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899–900 (D.C. Cir. 2002) (permitting plaintiffs to submit extra-record evidence to establish standing); Order Den. Mots. for Summ. J. and Partial Summ. J. 3–7, 7–8 (finding material disputes of fact on the issue of Plaintiffs' standing and Plaintiffs' Enumeration Clause claim based in part on the introduction of evidence outside the administrative record).

With regard to the APA claim, although judicial review of an agency decision is normally limited to the administrative record on which the agency based the challenged decision, *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005), extra-record materials are admissible under the following circumstances: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith."[4] *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of*

---

[4] Although the Ninth Circuit has held that "extra-record evidence is admissible . . . if the agency has relied on documents not in the record," *Ranchers Cattlemen*, 499 F.3d at 1117, such documents may not, in fact, be "extra-record" materials. As noted, the administrative record consists of "*all* documents and materials directly or indirectly considered by agency decision-

*Agric.*, 499 F.3d 1108, 1117 (9th Cir. 2007). Plaintiffs already have discovered and presented to the Court evidence that some, if not all, of those circumstances are present in this case. *See generally* Pls.' Opp'n to Defs.' Mot. for Summ. J. (ECF No. 91). For example, Plaintiffs have presented intra- and extra-record evidence demonstrating that the decision to add the citizenship question was made in bad faith because the Secretary's stated rationale behind his decision was pretextual, *id.* at 15–18, and that the Secretary failed to consider all important factors and aspects of the decision to add the citizenship question, *id.* at 19–23. And, extra-record evidence may be necessary at trial to explain technical issues about the census, such as whether the Census Bureau followed its well-established procedures and processes for changing the content of the decennial census questionnaire.

In fact, even considering only the administrative record, this Court has found questions of fact as to whether the agency's decision was pretextual and whether the agency considered all important aspects of the problem. Order Den. Mots. for Summ. J. and Partial Summ. J. (ECF No. 114), at 11-13. Because extra-record evidence may be necessary to resolve those factual issues, such evidence should be admissible at trial.[5]

For these reasons, evidence outside the administrative record is admissible and should not be excluded.

## CONCLUSION

For the foregoing reasons, the Court should (1) deny Defendants' motion to exclude fact witnesses Amy Bodek and Andrew Westall; (2) admit the complete administrative record evidence; and (3) deny Defendants' motion to exclude evidence outside the administrative record.

makers.'" *Thompson*, 885 F.2d at 555 (emphasis added). Therefore, any document an agency relied on may be admissible not as extra-record material, but rather, more simply, as part of the complete administrative record.

[5] Plaintiffs intend to prove at trial that there are grounds for invalidating Defendants' decision under the APA based on the complete administrative record alone, and also prove that, in the alternative, the addition of extra-record evidence compels that finding as well.

8

Dated:  December 28, 2018                    Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General
GABRIELLE D. BOUTIN
ANNA T. FERRARI
R. MATTHEW WISE
NOREEN P. SKELLY
Deputy Attorneys General


*/s/   Todd Grabarsky*
TODD GRABARSKY
Deputy Attorney General
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*


Dated:  December 28, 2018                    */s/ Charles L. Coleman*
CHARLES L. COLEMAN III, SBN 65496
DAVID I. HOLTZMAN
HOLLAND & KNIGHT LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Telephone: (415) 743-6970
Fax: (415) 743-6910
Email: charles.coleman@hklaw.com
*Attorneys for Plaintiff County of Los Angeles*


Dated:  December 28, 2018                    MIKE FEUER
City Attorney for the City of Los Angeles

*/s/ Valerie Flores*
VALERIE FLORES, SBN 138572
Managing Senior Assistant City Attorney
200 North Main Street, 7th Floor, MS 140
Los Angeles, CA  90012
Telephone: (213) 978-8130
Fax: (213) 978-8222
Email: Valerie.Flores@lacity.org

9

1

2  Dated:  December 28, 2018          HARVEY LEVINE
                                     City Attorney for the City of Fremont

3                                    */s/ Harvey Levine*
                                     SBN 61880
4                                    3300 Capitol Ave.
                                     Fremont, CA 94538
5                                    Telephone: (510) 284-4030
                                     Fax: (510) 284-4031
6                                    Email: hlevine@fremont.gov

7

8  Dated:  December 28, 2018          CHARLES PARKIN
                                     City Attorney for the City of Long Beach

9                                    */s/ Michael J. Mais*
                                     MICHAEL K. MAIS, SBN 90444
10                                   Assistant City Attorney
                                     333 W. Ocean Blvd., 11th Floor
11                                   Long Beach CA, 90802
                                     Telephone: (562) 570-2200
12                                   Fax: (562) 436-1579
                                     Email: Michael.Mais@longbeach.gov
13

14 Dated:  December 28, 2018          BARBARA J. PARKER
                                     City Attorney for the City of Oakland
15

16                                   */s/ Erin Bernstein*
                                     MARIA BEE
17                                   Special Counsel
                                     ERIN BERNSTEIN, SBN 231539
18                                   Supervising Deputy City Attorney
                                     MALIA MCPHERSON
19                                   Attorney
                                     City Hall, 6th Floor
20                                   1 Frank Ogawa Plaza
                                     Oakland, California 94612
21                                   Telephone: (510) 238-3601
                                     Fax: (510) 238-6500
22                                   Email: ebernstein@oaklandcityattorney.org

23 Dated:  December 28, 2018          JOHN LUEBBERKE
                                     City Attorney for the City of Stockton
24

25                                   */s/ John Luebberke*
                                     SBN 164893
26                                   425 N. El Dorado Street, 2nd Floor
                                     Stockton, CA 95202
27                                   Telephone: (209) 937-8333
                                     Fax: (209) 937-8898
28                                   Email: John.Luebberke@stocktonca.gov

1

2

## **FILER'S ATTESTATION**

3

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

4

concurrence in the filing of this document has been obtained from all signatories above.

5

Dated: December 28, 2018                                  */s/ Todd Grabarsky*
                                                          TODD GRABARSKY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15.  Certificate of Service for Electronic Filing

**9th Cir. Case Number(s)**    3:18-cv-01865

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
**[ X ]**  I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
**[ ]**  I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 28, 2018, at Sacramento, California.

**Description of document(s)** *(required for all documents)*:

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE**

Cecilia Apodaca
Declarant

*Cecilia Apodaca*
Signature

SA2018100904
63074693.docx

# EXHIBIT A

HOLLAND & KNIGHT LLP
Charles L. Coleman III (SBN 65496)
David I. Holtzman (SBN 299287)
50 California Street, 28th Floor
San Francisco, CA 94111
Telephone: (415) 743-6970
Facsimile: (415) 743-6910
Email: charles.coleman@hklaw.com
        david.holtzman@hklaw.com

Attorneys for Plaintiff
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | ) Case No.: 3:18-cv-01865-RS |
| Plaintiffs, | ) |
| | ) **DECLARATION OF AMY BODEK ON** |
| v. | ) **BEHALF OF THE COUNTY OF LOS** |
| | ) **ANGELES** |
| WILBUR L. ROSS, JR., *et al.*, | ) |
| | ) Date:   January 7, 2019 |
| Defendants. | ) Time:   10:00 a.m. |
| | ) Before: Hon. Richard Seeborg |
| | ) Courtroom: 3 |
| | ) |
| | ) |
| | ) |
| | ) |

*Holland & Knight LLP*
*50 California Street, Suite 2800*
*San Francisco, CA 94111*
*Tel: (415) 743-6900*
*Fax: (415) 743-6910*

I, Amy Bodek, hereby declare:

1.  I am the Director of the Department of Regional Planning ("DRP") of the County of Los Angeles ("the County"). I have been authorized by County Counsel to submit this Declaration on behalf of the County. Except as otherwise stated below, I have personal and professional knowledge of all facts contained in this Declaration, and if called upon to do so could testify competently to those facts under oath in a court of law, without waiver of any applicable privilege.

2.  Before I was appointed to my current position in February of 2018, I was the Director of the Department of Development Services for the City of Long Beach, as well as the Executive Director for the Long Beach Redevelopment Agency, since 2010. I worked for the City of Long Beach in various planning capacities for over 24 years.

3.  I hold a Bachelor of Science degree in Environmental Design from Cornell University, a Master of Urban Planning degree from New York University, and a certificate in Landscape Architecture from the University of California, Los Angeles.

4.  As further described below, DRP relies on Census demographic information from two sources—(1) obtained directly from the Census, and (2) analyzed and provided by the Southern California Association of Governments ("SCAG"). Such information, including but not limited to age, employment, special needs, and housing characteristics, is critical to the primary functions of the Department, including the creation of the County's General Plan, various area plans, and the development tools to ensure equitable development.

**General Plan**

5.  My responsibilities include overseeing the County's compliance with, and implementation of, its obligations under California's Planning and Zoning Law (Cal. Government Code §§ 65000, *et seq.*) These obligations include the promulgation, implementation, and periodic updating of the County's general plan pursuant to Government Code section 65300, which requires that: "Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

DECLARATION OF AMY BODEK                    Case No.: 3:18-cv-01865-RS

1    the physical development of the county or city, and or any land outside its boundaries which in

2    the agency's judgment bears relation to its planning."

3         6.     The Los Angeles County 2035 General Plan (the "General Plan") serves as a

4    "blueprint" for how and where the unincorporated County will grow through the year 2035.  It

5    is the guide for long-term physical development and conservation, by establishing goals,

6    policies and programs to foster health, livable and sustainable communities.  The General Plan

7    includes the following elements: Land Use, Mobility, Air Quality, Conservation and Natural

8    Resources, Parks and Recreation, Noise, Safety, Public Services and Facilities, Economic

9    Development, and Housing.  In 2017, the Legislature added (as § 65302, subd. (h)) a required

10   environmental justice element to address the unique burdens and needs of "disadvantaged

11   communities," as defined by law.   Each of these elements is assessed across the unincorporated

12   areas of the County as a whole, as well as across eleven smaller planning areas (e.g. East San

13   Gabriel Valley, San Fernando Valley, Antelope Valley and Westside Planning Areas).

14        7.     One element of the General Plan is the Housing Element, which is one of eight

15   required by the State.  It serves as a policy guide to address the housing needs of the

16   unincorporated communities, and its main focus is to ensure safe, sanitary, and affordable

17   housing for Los Angeles County residents, including those with special needs. *See, e.g.*, "Los

18   Angeles County Housing Element, 2014-2021," available at

19   http://planning.lacounty.gov/assets/upl/project/housing_element.pdf ("Housing Element"). .

20        8.     As part of the Housing Element, the County conducted a Housing Needs

21   Assessment to identify both available housing inventory and market trends that DRP will use to

22   shape housing policy for the unincorporated areas.  The Needs Assessment includes a review,

23   not only of population, but also of demographic characteristics including age, race,

24   employment, housing characteristics, and special needs. *See, e.g.*, Housing Element.

25        9.     Based on my experience heading the DRP, the decennial Census is the main

26   source of information for conducting the Housing Needs Assessment.  The County does not rely

27   on the American Community Survey ("ACS") because ACS data is not sufficiently accurate or

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

28

HOA.102428882.1

3

DECLARATION OF AMY BODEK       Case No.: 3:18-cv-01865-RS

granular. The ACS is a randomized sample of roughly three million people in the entire nation each year. Since the ACS data derives from a small sample set that is then extrapolated, it lacks the specific information the County needs to properly plan. Specifically, ACS data is not useful at the block group level, and Census data is. If DRP were to base its local data on that which is derived from such a small sample set, the County would have to make large assumptions regarding local trends. These assumptions would later cause significant financial and planning problems if they turned out to be false.

10. **Age.** DRP relies on the assessment of population characteristics such as age to identify the current and future need for types of housing. Younger residents typically seek smaller, affordable housing, while middle-aged residents will demand a variety of housing options. Senior residents are projected to need intermediate care and assisted living options. The County relies on accurate data regarding the age of its population—data that is derived almost entirely from the Census—to inform its planning with respect to each kind of housing. *See, e.g.*, Housing Element.

11. **Race and Ethnicity.** DRP also relies on the assessment of population characteristics such as race and ethnicity in its Housing Needs Assessment. Race and ethnicity Census data can potentially indicate housing demand given that certain cultures may prefer or be accustomed to living with extended family, and need larger housing units. *See, e.g.*, Housing Element.

12. **Special Needs.** DRP relies on the assessment of population characteristics such as special needs to identify the current and future need for types of housing. Residents with special needs (including seniors, farmworkers, single parent households, large households, the homeless, and persons with disabilities) face greater challenges when seeking available housing in light of the need for certain accommodations and/or retrofitting. *See, e.g.*, Housing Element.

13. **Household Population.** DRP also relies on Census data on substandard housing, overcrowding, and overpayment (i.e., percentage of income spent on rent) to assess the availability of appropriate, affordable housing in the County's unincorporated areas. Moreover,

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

HOA.102428882.1

4

DECLARATION OF AMY BODEK                                    Case No.: 3:18-cv-01865-RS

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

1  knowing household populations is critical because higher density areas have special planning

2  needs as they are more likely to need higher access to transit, have higher social service needs,

3  and be sensitive to changes in rent or employment. The County can act to avoid these issues if

4  and only if it has accurate Census data. If the County knows overcrowding is occurring, it can

5  plan for (i.e., rezone) those areas in order to accommodate more people. If these same areas

6  also lack transit, accurate information gives the County an opportunity to plan for new transit

7  service or new employment areas. *See, e.g.*, Housing Element.

8       14.    All of the above referenced demographic information and resulting analysis is

9  made available to a variety of County departments. In response, these agencies develop

10  programs and policies aimed at addressing the problems highlighted by the data.

11       15.    I am aware that in prior years, the analysis of Census demographic data has

12  resulted in the amendment of governmental constraints like the County Zoning Code, increased

13  availability of public funds/project-based vouchers, development of affordable housing units,

14  and the increased provision of rental assistance. Based on such analysis, public housing has

15  been modernized and preservation options discussed with inhabitants of at-risk housing as well.

16  *See, e.g.*, Housing Element, at Appendix C: Review of Past Accomplishments.

17  **Planning Areas**

18       16.    The General Plan is the foundation for all community-based plans, such as area

19  plans, community plans, and coastal land use plans. Area plans focus on land use and policy

20  issues that are specific to a particular planning area.

21       17.    The East San Gabriel Valley Area Plan will be the first area plan prepared under

22  the Planning Area Framework. It is a long-range planning and policy document that will help

23  guide growth and development for the unincorporated areas of the planning area. An area plan

24  will be prepared or updated for each of the County's eleven planning areas. Like the General

25  Plan, DRP relies on demographic information from the Census including the age, race,

26  employment, and housing characteristics of the community to assess the need and plan for

27  growth. *See, e.g.*, the "East San Gabriel Valley Area Plan," available at

28

HOA.102428882.1

5

DECLARATION OF AMY BODEK                Case No.: 3:18-cv-01865-RS

1   http://planning.lacounty.gov/site/esgvap/.

2   **Equitable Development**

3       18.     On December 8, 2015, the County Board of Supervisors voted to implement the

4   County General Plan in a way that would promote sustainable, healthy and well-designed

5   environments, enhancing the quality of life and public well-being for all unincorporated

6   residents.  The Board instructed the Director of Regional Planning to work with other County

7   departments to initiate an Equitable Development Work Program consisting, in part, of the

8   development of tools to evaluate, monitor, and advance equity objectives in the General Plan's

9   implementation.  *See, e.g.*, Los Angeles County Board of Supervisors Motion entitled

10  "Development and Implementation of Equitable Development Tools," available at

11  http://file.lacounty.gov/SDSInter/bos/supdocs/99751.pdf.

12      19.     In response to the Board's motion, DRP has been developing an Equity Indicators

13  Tool, the purpose of which is to facilitate the use of equity as a factor in the County's decision-

14  making.  The Tool itself is a web-based mapping program that displays demographic

15  information obtained from the Census either directly by DRP or indirectly via SCAG, to

16  identify areas that are experiencing a greater degree of challenges.  *See, e.g.*, DRP Report to the

17  Los Angeles County Board of Supervisors entitled "Report on Board Motion Regarding the

18  Equitable Development Work Program," available at

19  http://planning.lacounty.gov/assets/upl/official/official_20181129-equity.pdf. .

20      **Importance of Demographic Census Information to DRP and County Planning**

21      20.     DRP relies heavily upon demographic Census information in carrying out its

22  responsibilities under the Planning and Zoning Law, particularly since this information is

23  available on a block-by-block (detailed) basis, which is essential for the County's planning

24  purposes.  Decennial census information is particularly important for DRP's purposes because it

25  also forms the basis for measuring trends based on comparison with the previous Census.

26  DRP's future projections for General Plan purposes will need to include comparisons between

27  2010 and 2020 demographic Census figures.

Holland & Knight LLP
50 California Street, Suite 2800
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

28

HOA.102428882.1                                    6

DECLARATION OF AMY BODEK                            Case No.: 3:18-cv-01865-RS

21.     Without the reliable and precise demographic Census information, DRP would not be able to readily identify the unique needs of each community in formulating and implementing the County's General Plan and its many elements.  This lack of accurate data, in turn, could result in long-term misallocations of County resources, impairing the County's ability to balance the economic, social, environmental, and other goals set out in the Planning and Zoning Law and the County's General Plan.  Further, without reliable demographic Census information, DRP would be unable to maintain the current level of assistance to other County agencies  charged with the responsibility of making policy or financial decisions in accordance with California law and the County's Equitable Development programs and policies.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this declaration in Los Angeles, California.

Dated: December 27, 2018

/s _____
AMY BODEK

HOA.102428882.1

7

DECLARATION OF AMY BODEK

Case No.: 3:18-cv-01865-RS

# CERTIFICATE OF SERVICE

Case Name: **State of California, et al. v.**            No.    **3:18-cv-01865**
                    **Wilbur L. Ross, et al.**

I hereby certify that on <u>December 28, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF AMY BODEK ON BEHALF OF THE COUNTY OF LOS ANGELES**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>December 28, 2018</u>, at Sacramento, California.

|                          |                          |
| :----------------------: | :----------------------: |
| Eileen A. Ennis          | */s/ Eileen A. Ennis*    |
| Declarant                | Signature                |

SA2018100904

# EXHIBIT B

1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    ANTHONY R. HAKL
3   Supervising Deputy Attorneys General
    GABRIELLE D. BOUTIN, SBN 267308
4   ANNA T. FERRARI, SBN 261579
    TODD GRABARSKY, SBN 286999
5   R. MATTHEW WISE, SBN 238485
    NOREEN P. SKELLY, SBN 186135
6   Deputy Attorneys General
      1300 I Street, Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone: (916) 210-6053
      Fax: (916) 324-8835
9     E-mail: Gabrielle.Boutin@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
10  *through Attorney General Xavier Becerra*

11  *(Additional counsel listed on following page)*

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16

17  **STATE OF CALIFORNIA, by and through**      3:18-cv-01865
    **Attorney General Xavier Becerra;**
18  **COUNTY OF LOS ANGELES; CITY OF**
    **LOS ANGELES; CITY OF FREMONT;**
19  **CITY OF LONG BEACH; CITY OF**              **TRIAL DECLARATION OF ANDREW J.**
    **OAKLAND; CITY OF STOCKTON,**               **WESTALL**
20
                              Plaintiffs,
21                                                Dept:      3
              v.                                  Judge:     The Honorable Richard G.
22                                                           Seeborg
                                                  Trial Date: January 7, 2019
23  **WILBUR L. ROSS, JR., in his official**      Action Filed: March 26, 2018
    **capacity as Secretary of the U.S.**
24  **Department of Commerce; U.S.**
    **DEPARTMENT OF COMMERCE; RON**
25  **JARMIN, in his official capacity as Acting**
    **Director of the U.S. Census Bureau; U.S.**
26  **CENSUS BUREAU; DOES 1-100,**

27                            Defendants.

28

1

2

3    *Additional counsel:*

4    Charles L. Coleman III, SBN 65496
5    David I. Holtzman
     HOLLAND & KNIGHT LLP
6    50 California Street, 28th Floor
     San Francisco, CA 94111
7    Telephone: (415) 743-6970
     Fax: (415) 743-6910
8    Email: charles.coleman@hklaw.com

9

10   Mike Feuer
     City Attorney for the City of Los Angeles
11   Kathleen A. Kenealy, SBN 212289
     Senior Assistant City Attorney
12   Valerie Flores, SBN 138572
     Managing Senior Assistant City Attorney
13   200 North Main Street, 7th Floor, MS 140
     Los Angeles, CA 90012
14   Telephone: (213) 978-8130
     Fax: (213) 978-8222
15   Email: Valerie.Flores@lacity.org

16   Harvey Levine, SBN 61880
     City Attorney for the City of Fremont
17   3300 Capitol Ave.
     Fremont, CA 94538
18   Telephone: (510) 284-4030
     Fax: (510) 284-4031
19   Email: hlevine@fremont.gov

20

21   Charles Parkin
     City Attorney for the City of Long Beach
     Michael K. Mais, SBN 90444
22   Assistant City Attorney
     333 W. Ocean Blvd., 11th Floor
23   Long Beach CA, 90802
     Telephone: (562) 570-2200
24   Fax: (562) 436-1579
     Email: Michael.Mais@longbeach.gov

Barbara J. Parker
City Attorney for the City of Oakland
Maria Bee
Chief Assistant City Attorney
Erin Bernstein, SBN 231539
Supervising Deputy City Attorney
Malia McPherson
Deputy City Attorney
City Hall, 6th Floor
1 Frank Ogawa Plaza
Oakland, California 94612
Telephone: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

John Luebberke, SBN 164893
City Attorney for the City of Stockton
425 N. El Dorado Street, 2nd Floor
Stockton, CA 95202
Telephone: (209) 937-8333
Fax: (209) 937-8898
Email: John.Luebberke@stocktonca.gov

Sue Ann Salmon Evans, SBN 151562
SEvans@DWKesq.com
Keith A. Yeomans, SBN 245600
KYeomans@DKWesq.com
DANNIS WOLIVER KELLEY
115 Pine Avenue, Suite 500
Long Beach, CA 90802
Telephone: 562.366.8500
Fax: 562.366.8505
*Attorneys for Plaintiff-Intervenor*
*Los Angeles Unified School District*

25

26

27

28

I, Andrew J. Westall, do hereby declare as follows:

**Current Position:**

1.     I am currently employed as the Assistant Chief Deputy for the Office of Los Angeles City Council President Herb J. Wesson, Jr.  I have held my current position from November 2005 through November 2011, and from April 2012 to the present.

2.     Among other duties, in my current position as the Assistant Chief Deputy to Los Angeles City Council President Herb J. Wesson, I lead a staff of up to 50 employees on a wide-range of municipal issues, including intergovernmental relations, budget, revenue strategies, ballot measures, labor, housing, planning, economic development, and transportation.  As part of my job duties as Assistant Chief Deputy, I have served as the lead staff member for the Rules, Elections, and Intergovernmental Relations Committee from 2012 to the present.  That committee oversees the preparation for the Decennial Census for the City, as well as utilization of Decennial Census data for redistricting for the City Council Districts and other purposes described herein.  I am the former lead staff member for the Housing, Community, and Economic Development Committee.  For six years in that capacity, I oversaw yearly operational budgets of approximately $2 billion in contracts and construction projects administered by the Housing Department, Housing Authority, Community Development Department and the Community Redevelopment Agency.

**Educational Background:**

3.     I received a B.A. Degree in Political Science-Public Service from the University of California, Davis in 1996, with an emphasis in urban, environmental, economic, and social public policies, as well as various ethnic studies disciplines.

4.     I received a M.A. Degree in Urban Planning from the University of California, Los Angeles in 1999, with an emphasis in social policy and analysis, environmental and transportation public policy, municipal demographics, Geographic Information System (GIS) mapping, and redistricting.

**Political and Redistricting Experience:**

5.     From April of 1998 through June of 2000, I worked for the National Association of

1

1    Latino Elected and Appointed Officials as a consultant, researcher and author.  In June of 2000, I

2    prepared a publication entitled *Reapportionment, Redistricting and the Latino Community:  2000*

3    *and Beyond,* regarding reapportionment and redistricting of legislative and congressional districts

4    after the 2000 Census, focusing on the Latino communities in seven states.

5          6.      From January 2001 to November of 2001, I worked as the Assistant to the Speaker

6    for the Office of the Speaker of the California Assembly Robert M. Hertzberg.  In my role, I

7    worked on the post-2000 Census state redistricting process as the Chief Line Drawer for 38 of the

8    50 Democratic Assembly Districts in California.  The Chief Line Drawer works with decision-

9    makers, legal counsel and key stakeholders in the crafting of proposed district lines to produce

10   draft maps and data tables for consideration, along with unpublished scenarios, leading ultimately

11   to the final map and data tables for publication.  I also have performed work as the drafter of

12   alternative plans for the California Board of Equalization, California Legislature and United

13   States Congress.  Alternative plans are unpublished redistricting maps and data table scenarios

14   made available to decision-makers, including State Legislators and Members of the U.S.

15   Congress.

16         7.      From November 2001 to April of 2002, I served as the Technical Director for the City

17   of Los Angeles during the Los Angeles City Council redistricting process.  In that capacity, I was

18   the Chief Line Drawer for the City Council Districts.  I developed the demographic and

19   geographic databases utilized by the Commission and the public.  These databases relied upon,

20   and were primarily based on, Decennial Census data.  I also organized 16 public testimony

21   hearings throughout the City, which produced 3,000 attendees and 5,000 written public

22   comments.  I reviewed and assessed the voluminous public record and prepared and provided

23   technical reports to the City.  Additionally, I designed, developed, and updated the City's

24   redistricting website.

25         8.      During that same period, from November 2001 to April 2002, I simultaneously

26   worked as the Technical Director and Chief Line Drawer for the Los Angeles Unified School

27   District (LAUSD) redistricting process.

28         9.      From April of 2002 to February of 2004, I worked as Assistant to the Speaker for the

2

1    Office of the Speaker of the California Assembly Herb J. Wesson, Jr. My duties included

2    political marketing, public relations, electoral strategy, GIS mapping, demographics, statistics,

3    and redistricting.

4         10.    From February 2004 to November of 2005, I worked as the Assistant to the Speaker

5    for the Office of the Speaker of the California Assembly Fabian Nunez. My duties included

6    political marketing, public relations, electoral strategy, GIS mapping, demographics, statistics,

7    and redistricting.

8         11.    From November of 2011 to March 2012, I served as the Executive Director, Chief

9    Executive Officer and Administrator for the Los Angeles City Council Redistricting Commission,

10   overseeing six staff members and dozens of contractors in support of the Commission's work. I

11   organized 22 public testimony hearings throughout the City, with responsibility for managing a

12   process involving over 5,000 attendees and the assessment of 6,551 written public comments. I

13   also organized the Commission's meetings and prepared and issued a 950-page report to the City

14   Council regarding the Commission's recommendations for redistricting Los Angeles City Council

15   Districts after the 2010 Census.

16        12.    Attached as **Exhibit A** to this Declaration is a true and correct copy of my complete

17   and current curriculum vitae (personal contact information redacted).

18        **Redistricting in the City of Los Angeles:**

19        13.    The City of Los Angeles is a Charter City, organized under Article XI, Section 3 of

20   the California Constitution. Pursuant to Article XI, Section 5(b), the Charter of the City of Los

21   Angeles prescribes the manner in which redistricting will occur after each Decennial Census, and

22   relies upon the use of Census Data.

23        14.    Section 204 of the Los Angeles City Charter requires a redistricting process every ten

24   years. Section 204(b) of the City Charter mandates the formation of a Redistricting Commission

25   to advise the City Council on the drawing of Council district lines. No City officer or employee

26   is eligible to serve on the 21-member Commission. Pursuant to Section 204(c) of the City

27   Charter, the Redistricting Commission must be appointed no later than "the date by which the

28   Census Bureau is to release decennial census data."

                                            3

15.     With regard to the redistricting process after the 2020 Decennial Census, Charter Section 204(c) states that "The Commission shall begin the redistricting process at any time after appointment, but no later than June 1st of 2021, and each subsequent tenth anniversary of that date."

16.     Charter Section 204(c) further provides that the City Council "shall adopt a redistricting ordinance no later than December 31, 2021, and each subsequent tenth anniversary of that date."

17.     The first City election following the 2020 Decennial Census (the March 8, 2022 Primary Election) will be consolidated statutorily and contractually with the State Primary Election conducted locally by the Los Angeles County Registrar-Recorder/County Clerk.  The Los Angeles County Registrar-Recorder/County Clerk has informed the City of Los Angeles that redistricting of Council District boundaries following the 2020 census must be completed and delivered to the County no later than October 6, 2021, so that the new district lines may be implemented in time for the 2022 election cycle.

**Principles Applicable to the Redistricting Process:**

18.     During my work on redistricting for more than a decade, beginning in 2001, for the State of California, City of Los Angeles and LAUSD, I have gained an understanding of the legal and practical considerations relevant to the redistricting process.  These principles include the following: (a) ensuring districts contain equal population in compliance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (b) respecting traditional redistricting criteria such as contiguity (all parts of a district should connect), compactness (a district should be geographically compact with regard to appearance, shape, and borders), due consideration of existing boundaries (such as geographic, street, school, and political subdivisions), and preserving communities of interest (people sharing common interest); and (c) compliance with Section 2 of the federal Voting Rights Act by ensuring that minority voters are not denied equal access to voting opportunities (minority voting blocks are neither fractured nor packed into a district so as to dilute their votes).

4

19.     Section 21620 of the California Elections Code allows the City Council to give consideration in redistricting to topography, geography, cohesiveness, contiguity, integrity, compactness of territory, and communities of interest within the district.  Section 204(d) of the City Charter requires that all districts "shall be drawn in conformance with requirements of state and federal law and, to the extent feasible, shall keep neighborhoods and communities intact, utilize natural boundaries or street lines, and be geographically compact."

20.     Section 204(a) of the City Charter requires that City Council Districts "shall each contain, as nearly as practicable, equal portions of the total population of the City as shown by the Federal Census immediately preceding the formation of districts."  Thus, the City conducts redistricting based on the total population of the City, as it is constitutionally entitled to do under Supreme Court precedent.

21.     Pursuant to Section 241 of the City Charter, the City Council consists of 15 members, elected by their respective districts.

22.     Based upon the 2010 Decennial Census figures, the total population of the City of Los Angeles was 3,792,621.  Therefore, the ideal population size for each Council District would be 252,841 people.  Both law and equity disfavor large population deviations between districts.  Even a deviation of 10% (5% in either a plus or minus direction) may not be considered in a "safe harbor" for purposes of a legal challenge.

23.     As a result of the 2012 redistricting process, each Council District represents a population of approximately 250,000 residents, with a population deviation of less than +/- 2.5%.  Equal distribution of residents in each Council District ensures that every resident has equal access to their City government representative.

**Importance of Decennial Census Data for Redistricting:**

24.     During my redistricting work over more than a decade, I have become familiar with and have relied upon Decennial Census data to perform my work. The Decennial Census is the only source that provides the sufficiently granular population count and demographic data the City of Los Angeles needs for redistricting purposes.

25.    The Decennial Census provides important data points that the City uses in redistricting such as the number of people per household, household status, age, race, and ethnicity.

26.    The Decennial Census also provides data on multiple levels that are crucial for redistricting: a "Census block"; a "Census Block Group" or "Census Tract" level (comprising several groups of blocks, averaging approximately 5,000 individuals); "Census Place" (unincorporated County); and at an overall City, County and State level.

27.    The City uses granular population count data when redistricting to create Council Districts that are of equal size in terms of resident population. Without accurate population count data from the Decennial Census, the City cannot ensure that any redistricting plan complies with constitutional, state, and Charter provisions that require Council Districts be of equal size and conforms to such redistricting principles as contiguity and compactness.

28.    Data at all levels of granularity, including the most granular block-level, is necessary to ensure properly populated and lawfully formed City Council Districts. Neighborhood characteristics and population density can change dramatically in Los Angeles from block-to-block, especially near the City's core. For example, single family neighborhoods such as Hancock Park, with average lot sizes of approximately 14,000 square feet, abut very densely populated portions of Koreatown, filled with multi-family residences and notable for having one of the densest populations in the United States outside of New York City.

29.    Inaccurate population count data will thus result in an unevenly reported population distribution, which will in turn deny equal representation to the City's residents. According to data from the Census Bureau, of the nearly 3.95 million residents in the City of Los Angeles, approximately 37.6% are foreign born (https://www.census.gov/quickfacts/losangelescitycalifornia), a population of foreign-born residents greater than the entire population of twelve states with the lowest population in the United States (Alaska, Delaware, Hawaii, Maine, Montana, New Hampshire, North Dakota, Rhode Island, South Dakota, Vermont, and Wyoming (https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-total.html). Non-citizen residents in the City of Los Angeles are not distributed equally among neighborhoods

6

1  or the 15 Council Districts. For example, in Council District 9, 50% of residents over the age of

2  18 are non-citizens, compared with just 13.9% in Council District 5.

3      30.    Accordingly, residents in Council Districts with large concentrations of undercounted

4  residents would be denied equal representation. Residents in Districts with larger undercounted

5  populations would proportionally have less access to their elected representative, denying them an

6  equal ability to petition their government for redress of grievances as guaranteed by the First

7  Amendment. The residents of those Districts with more undercounted neighbors would be denied

8  equal access merely because of where they happen to reside and who their neighbors happen to

9  be.

10      31.    The City also uses granular race and ethnicity data gathered from the Decennial

11  Census when redistricting to ensure compliance with the Voting Rights Act and other state and

12  federal voting and civil rights laws. Accurate data on race and ethnicity at the block-level is

13  necessary given that population density and demographic diversity can vary sharply among

14  adjacent neighborhoods and abutting city blocks in Los Angeles. Without accurate block-level

15  race and ethnicity data, the City cannot ensure that district lines are drawn in compliance with the

16  Voting Rights Act and other voting and civil rights laws.

17      32.    Block-level demographic data is also necessary for drawing district lines and

18  determining the precise neighborhoods that will be included in particular districts in accordance

19  with the principles of redistricting. As noted, preserving communities of interest is one of the

20  principles the City must consider during redistricting. Block-level demographic data, including

21  age, race and household status, is crucial for identifying those communities of interest and

22  locating their precise geographic bounds.

23  **Importance of Decennial Census Data for the Allocation of City Services and**
**Resources:**

24  

25      33.    The City also relies on Decennial Census population count data when managing the

26  allocation of its services and resources to City residents.

27      34.    City services and resources that are allocated to particular neighborhoods are based

28  on the Decennial Census count of people in those neighborhoods. Due to the highly varying

1    nature of the population density from one neighborhood to the next, and even from one block to

2    the next, the granular block-level population count data derived from the Decennial Census is

3    crucial for properly and efficiently allocating City services and resources to ensure that the needs

4    of each neighborhood—and, even, each block—are met.

5         35.    Without reliable, precise, and accurate population count data, the City would not be

6    able to identify the needs of each community, neighborhood, or high-density city block. The

7    combination of undercounts in some neighborhoods and overcounts in others will lead to errors in

8    measuring neighborhood populations, which will in turn lead to misallocation of City resources.

9         36.    The services that the City provides to its residents are without regard to whether the

10   resident is a citizen or non-citizen. For example, members of the Los Angeles Police Department

11   respond to any call for assistance; members of the Los Angeles Fire Department do not ask for

12   proof of citizenship before rendering emergency services or extinguishing fires; and the City's

13   Bureau of Sanitation picks up trash for all residents, regardless of their immigration or citizenship

14   status. Accordingly, undercounted neighborhoods will suffer from the lack of sufficiently

15   allocated resources due to inaccurate census data. The City thus needs accurate Decennial Census

16   data to meet the needs of all of its residents and to plan for future needs.

17        37.    Having an accurate neighborhood-by-neighborhood and block-by-block population

18   count is also important in such areas as the City's Department of City Planning (for urban

19   planning and zoning updates), the City's Department of Transportation (for infrastructure project

20   assessments), the City's Economic Workforce and Development Department (for redevelopment

21   purposes), and by the Housing and Community Investment Department (for smart growth

22   analyses).

23   //

24   //

25   //

26   //

27   //

28   //

8

1    I declare under penalty of perjury under the laws of the United States and the State of

2 California that the foregoing is true and correct to the best of my knowledge, and that I have

3 executed this declaration in Los Angeles, California.

4

5  Dated: December 27TH, 2018

6               Andrew J. Westall

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

# EXHIBIT A

# Andrew J. Westall

---

## *Professional Experience*

**Office of Los Angeles City Council President Herb J. Wesson, Jr.**
*Assistant Chief Deputy*  November 2005 to November 2011
April 2012 to Present

Lead staff member for the City Council managing teams of up to 50 employees on the issues of intergovernmental relations, budget, revenue strategies, ballot measures, labor, housing, planning, economic development, cannabis, and transportation in the City of Los Angeles; lead staff member for the Rules, Elections, and Intergovernmental Relations Committee since 2012, the Ad Hoc Committee on the 2028 Olympics and Paralympic Games, the Ad Hoc Committee on Police Reform, and the Board of Referred Powers chaired by the Council President; former lead staffer for six years overseeing the management, organization, and publication of the City Council agendas three times a week; former lead staff member for the Housing, Community, and Economic Development Committee chaired by the Councilmember for six years overseeing $2 billion yearly in operational budgets, contracts, and construction projects by the Housing Department, Housing Authority, Community Development Department, and the Community Redevelopment Agency.

**Los Angeles City Council Redistricting Commission**
*Executive Director*  November 2011 to March 2012

Chief Executive Officer and Administrator for the City of Los Angeles City Council Redistricting process overseeing six staff and dozens of contractors during the Commission's work; organized twenty-two public testimony hearings from San Pedro to Sunland-Tujunga with more than 5,000 attendees and 6,551 written public comments, not including regular and special Commission meetings; issued 950 page report to the City Council on time and under budget.

**Pasadena City College**
*Adjunct Faculty*  January 2003 to May 2010

Part-time professor of Political Science and American Institutions providing instruction and mentorship to approximately two-thousand students, two to three nights a week, with an average class size of fifty.

**Office of Speaker of the Assembly Fabian Nuñez**
*Assistant to the Speaker*  February 2004 to November 2005

Staff member in the areas of political marketing, public relations, electoral strategy, GIS mapping, demographics, statistics, and redistricting; organized Assembly committee hearings and town hall meetings throughout Southern California providing logistics, public outreach, and technical support.

**Office of Speaker of the Assembly Herb J. Wesson, Jr.**
*Assistant to the Speaker*  April 2002 to February 2004

Staff member in the areas of political marketing, public relations, electoral strategy, GIS mapping, demographics, statistics, and redistricting; organized Assembly committee hearings and town hall meetings throughout Southern California providing logistics, public outreach, and technical support.

**City of Los Angeles Redistricting Commission for the LAUSD**
*Technical Director*  November 2001 to April 2002

Consultant for LAUSD redistricting process; Chief line drawer for the LAUSD Board of Education districts.

ANDREW J. WESTALL

**Los Angeles City Council Redistricting Commission**
*Technical Director*                                                                 November 2001 to April 2002
Consultant for City of Los Angeles City Council redistricting process; Chief line drawer for the City Council districts; organized 16 public testimony hearings from Watts to Pacoima with more than 3,000 attendees and over 5,000 written public comments; submitted technical reports and maintained website design, development, and updating.

**Office of Speaker of the Assembly Robert M. Hertzberg**
*Assistant to the Speaker*                                                         January 2001 to November 2001
Staff member for State Assembly redistricting process; Chief line drawer for 38 of the 50 Democratic Assembly districts in California, as well as drafter of alternative plans for the Board of Equalization, State Senate, and House of Representatives; frequent weekly travel to Sacramento, including the entire final month of the legislative session; provided guidance and negotiated between various state legislators and legislative caucuses with respect to district boundaries.

**Office of Speaker of the Assembly Robert M. Hertzberg**
*Field Representative*                                                               March 1999 to December 2000
Staff member and representative for the Speaker to community events, forums, meetings, and other policy discussions in the areas of transportation, the environment, water, health care, land use, and other issues affecting the San Fernando Valley; lead staffer for the summer intern program overseeing twenty-plus interns in each of two consecutive summers; programmer and developer of filing systems, phone logs, and phone books for the Speaker.

**National Association of Latino Elected and Appointed Officials**
*Consultant*                                                                           April 1998 to June 2000
Researcher and author of publication on reapportionment and redistricting of legislative and congressional districts after the 2000 Census, emphasizing the Latino community in seven states; Presenter and panelist at the NALEO national conference in 2000, the Orange County Business Council, and the National Hispanic Caucus of State Legislators national conference in 2001.

**Graduate Students Association, UCLA**
*President*                                                                             May 1997 to June 1998
Chief Executive and Financial Officer for the official student government of approximately 10,000 graduate and professional students; elected position; author of numerous editorials; successfully advocated for new graduate student housing near campus and free ridership for students on the Santa Monica Big Blue Bus.

**Office of Assemblymember Deborah V. Ortiz**
*Legislative Aide*                                                                   June 1997 to September 1997
Staff member and policy analyst for the Assemblymember on issues of foster care and child abuse in Sacramento County; coordinator of taskforce to reinforce the continuum of care for children to end the increase in child deaths from parental abuse.

**Office of Assistant Secretary Andrew M. Cuomo**
*Intern*                                                                               September 1995 to December 1995
Intern and policy analyst for the U.S. Department of Housing and Urban Development's Department of Community Planning and Development on empowerment communities and enterprise zones; liaison to numerous cities and counties collecting data; provided annual and periodic reports and presentations on behalf of the Assistant Secretary to congressional offices and the White House.

**ANDREW J. WESTALL**

## Education

M.A. Degree, *Urban Planning*, **UCLA,** 1999
   Emphasis in social policy and analysis, environmental and transportation public policy, municipal finance, demographics, GIS mapping, and redistricting.
      Advisors: Dr. Leobardo Estrada and Dr. J. Eugene Grigsby, III

B.A. Degree, *Political Science-Public Service*, **University of California, Davis**, 1996
   Emphasis in urban, environmental, economic, and social public policy, as well as various ethnic studies disciplines.

## Current Community Work and Affiliations

- *Member*, **UCLA Alumni Association**
- *Member*, **UC Davis Alumni Association**

## Publications

- *Author*, "Election Irregularities are Fault of City Clerk", **Glendale News-Press**, April 16, 2003.
- *Author*, Reapportionment, Redistricting and the Latino Community: 2000 and Beyond. **National Association of Latino Elected and Appointed Officials**, June, 2000.
- *Columnist*, **The Daily Bruin**, Winter 1997.
- *Author*, "Democracy Calls for Active Participation", **The Daily Bruin**, Tues. Oct 22, 1996.
- *Co-Editor*, State Enterprise Zone Update. Department of Community Planning and Development, **U.S. Department of Housing and Urban Development**, 1996.
- *Author*, "Film Creates Desire to Change", **The California Aggie**, Davis, CA, Mon. Jan. 23, 1995.

## Past Community Work and Affiliations

- *Member*, *Board of Directors*, **Exposition Metro Line Construction Authority,** 2014-2018.
- *Member*, **Los Angeles County Commission on Local Governmental Services**, 2011-2015.
- *Alternate Member*, *Board of Directors*, **Expo. Metro Line Construction Authority**, 2007-2014.
- *President,* **Greater Toluca Lake Neighborhood Council**, 2012-2013
- *Vice President,* **Greater Toluca Lake Neighborhood Council**, 2011-2012; 2013-2014.
- *Member*, **Pasadena City College Faculty Association**, 2007-2011.
- *Member*, **California Teacher's Association/CCA, Pasadena Chapter**, 2003-2007.
- *Member*, **Los Feliz Improvement Association**, 2000-2007.
- *Member*, **Los Angeles President's Joint Commission on LAUSD Governance**, 2005-2006.
- *Secretary*, **Greater Griffith Park Neighborhood Council**, 2003-2004.
- *Member*, **UCLA Alumni Association Leadership Academy**, 2003-2004.
- *Vice President*, **Greater Griffith Park Neighborhood Council**, 2002-2003.
- *External Vice President*, **Mira Hershey/Hilgard Residents Association**, UCLA, 1997.
- *Advisor*, **Sacramento County Adult and Aging Commission**, 1996.
- *President*, **Chi Phi Fraternity**, Sigma Delta Chapter, UC Davis, 1995.

# EXHIBIT C

IB15staC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   STATE OF NEW YORK, et al.,

 4
                 Plaintiffs,
 5
             v.                           18 Civ. 2921 (JMF)
 6
     UNITED STATES DEPARTMENT OF
 7   COMMERCE, et al.,
                                          Conference
 8
                 Defendants.
 9

10   ------------------------------x

11   NEW YORK IMMIGRATION
     COALITION,et al.,
12
                 Plaintiffs,
13
             v.                           18 Civ. 5025 (JMF)
14
     UNITED STATES DEPARTMENT OF
15   COMMERCE, et al.,

16
                 Defendants.
17

18   ------------------------------x

19
                                          New York, N.Y.
20                                        November 1, 2018
                                          11:15 a.m.
21   Before:

22                   HON. JESSE M. FURMAN,

23                                        District Judge

24

25
```

IB15staC

                              APPEARANCES

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
        Attorneys for Plaintiffs
BY:  MATTHEW COLANGELO
        ELENA S. GOLDSTEIN
        – and –
ARNOLD & PORTER KAYE SCHOLER
BY:  DAVID P. GERSCH
        JOHN A. FREEDMAN
        – and –
AMERICAN CIVIL LIBERTIES UNION FOUNDATION(DC)
BY:  DALE E. HO

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
        Attorneys for Defendants
BY:  KATE BAILEY
        CAROL FEDERIGHI
        CARLOTTA A. WELLS

IB15staC

1          THE COURT:  Okay.  So, why don't I tentatively admit

2     everything through 13,099 and you can talk to them and if you

3     think there is an application to be made to withdraw something

4     from the administrative record I will put the onus on you to

5     make the application.

6          MS. FEDERIGHI:  That's fair enough.

7          THE COURT:  So, AR 1 through 13,099 are admitted,

8     without objection.

9          Beyond that, think we already discussed how to proceed

10    if plaintiffs believe that there are documents that should be

11    part of the administrative record that were not filed as part

12    of the administrative record, namely you should identify those

13    with specificity, confer with defense counsel.  If you are in

14    agreement that something should be designated to be part of the

15    administrative record, great, and if not I would think that

16    that should be the subject of a separate motion.  I don't

17    particularly want piecemeal litigation about that so I think it

18    makes sense to file one motion with respect to any documents

19    that are in dispute and to do so, certainly before the close of

20    trial, if there is a trial so that everybody understands what

21    is and isn't part of the administrative record before you file

22    your post-trial briefs.  But, why don't you confer about that

23    as soon as you can so we can resolve any disagreements in a

24    timely fashion.

25          The second argument made by defendants is the

IB15staC

1  exclusion of "irrelevant evidence."  Suffice it to say, between

2  the argument or the reasoning in my opinion of last week and

3  what I said a few minutes ago with respect to the due process

4  claim, I am somewhat skeptical but I do think that that is the

5  heart of the parties' dispute, the heart of the issue that is

6  now pending before the Supreme Court and an important issue and

7  for that reason I will reserve judgment on it, which is another

8  way of saying that I will certainly tentatively -- I think

9  there is a distinction to be made, and I think I tried to draw

10  this in my opinion last week, between admitting evidence so

11  that it is part of the record and then considering that

12  evidence.  In my view, particularly given the press of time,

13  given that the last thing that anybody wants is a remand from a

14  higher court because I didn't consider something that I should

15  have, I think it makes sense to make the record as

16  comprehensive as possible and then to differentiate with

17  respect to what can and can't be considered.

18      So, I guess on that score I will allow the evidence to

19  be admitted at trial, whatever that means, but I will reserve

20  judgment on whether and to what extent I can or should consider

21  that evidence.  Having said that, there is one thing referenced

22  in that motion that I did want to flag which is that there is a

23  suggestion in the government's brief that one or more of the

24  plaintiff's experts may be offering an opinion on an ultimate

25  decision in the case, for example, that Secretary Ross'

IB15staC

1    decision is not supported by the administrative record.  I am

2    inclined to agree with the government that any such testimony

3    would be improper as it would intrude on my role as a fact

4    finder in this matter but I think that the remedy for that or

5    the proper procedure for that is for defendants to raise an

6    objection to the question or answer that would elicit that

7    testimony rather than an ex-ante preclusion order.  I just

8    wanted to flag that as something that I think has potential

9    merit.

10             Turning to the third and final issue raised in

11    defendant's motion, this is the motion to disqualify

12    plaintiff's expert Dr. Lisa Handley.  That motion is denied

13    substantially for the reasons set forth in plaintiff's

14    opposition.  First, as a procedural matter, I am not going to

15    countenance what sure seems to me like an effort to sandbag

16    Dr. Handley, as I understand it, was disclosed to defendants

17    two months ago.  They had ample opportunity to raise the issue

18    with plaintiffs and, if necessary, with me and to depose her in

19    an effort to determine whether there was any bona fide issue

20    here whether she was actually relying on any confidential

21    information.  Having failed to do those things and having

22    failed to file their motion by the deadline for summary

23    judgment as required by my individual rules, I will not

24    entertain the application now.  In any event, even if I did, I

25    would deny it on the merits.  The Department of Justice, for

# EXHIBIT D

Pages 1 - 91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

```
STATE OF CALIFORNIA, et al.,      )
                                  )
              Plaintiffs,         )
   VS.                            )  NO. C 18-01865 RS
                                  )
WILBUR ROSS, JR., et al,          )
                                  )
              Defendants.         )
_____)


CITY OF SAN JOSE, et al.,         )
                                  )
              Plaintiffs,         )
   VS.                            )  NO. C 18-02279 RS
                                  )
WILBUR ROSS, JR., et al.,         )
                                  )  San Francisco, California
              Defendants.         )
_____)
```

Friday, December 7, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff State of California:
                        OFFICE OF THE ATTORNEY GENERAL
                        Department of Justice
                        1300 I Street
                        Post Office Box 944255
                        Sacramento, California  95814
                   **BY:  R. MATTHEW WISE, ESQ.**
                        **GABRIELLE D. BOUTIN, ESQ.**
                        **DEPUTY ATTORNEYS GENERAL**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                  Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**


For Plaintiff Los Angeles Unified School District:
```
                    DANNIS WOLIVER KELLEY
                    115 Pine Avenue
                    Suite 500
                    Long Beach, California  90802
          BY:  KEITH A. YEOMANS, ESQ.
```

For Plaintiff City of Oakland:
```
                    OFFICE OF THE CITY ATTORNEY
                    1 Frank H. Ogawa Plaza
                    Sixth Floor
                    Oakland, California  94612
          BY:  MALIA MCPHERSON, ESQ.
```

For Plaintiff County of Los Angeles:
```
                    HOLLAND & KNIGHT LLP
                    50 California Street
                    Suite 2800
                    San Francisco, California  94111
          BY:  DAVID I. HOLTZMAN, ESQ.
```

For Plaintiffs City of San Jose and the Black Alliance for Just Immigration:
```
                    MANATT PHELPS & PHILLIPS, LLP
                    11355 West Olympic Boulevard
                    Los Angeles, California  90064
          BY:  JOHN F. LIBBY, ESQ.

                    MANATT PHELPS & PHILLIPS, LLP
                    One Embarcadero Center
                    30th Floor
                    San Francisco, California  94111
          BY:  ANA G. GUARDADO, ESQ.

                    MANATT PHELPS & PHILLIPS, LLP
                    7 Times Square
                    New York, New York  10036
          BY:  ANDREW C. CASE, ESQ.

                    LAWYERS' COMMITTEE
                      FOR CIVIL RIGHTS UNDER LAW
                    1500 K Street, NW
                    Suite 900
                    Washington, D.C.  20005
          BY:  EZRA D. ROSENBERG, ESQ.
```

(Appearances continued, next page)

**<u>APPEARANCES, CONTINUED:</u>**


For Defendant:

                  U.S. DEPARTMENT OF JUSTICE
                  1100 L Street, NW
                  Room 12504
                  Washington, D.C.  20005
         **BY:  MARTIN M. TOMLINSON, ESQ.**

                  U.S. DEPARTMENT OF JUSTICE
                  20 Massachusetts Avenue, NW
                  Washington, D.C.  20530
         **BY:  CARLOTTA P. WELLS, ESQ.**

1       Looking at the New York trial, there were a couple of

2  different processes that we observed, and we're not sure if

3  they would apply in this case.

4       For example, there were not opening statements in

5  New York.  The closing statements were really an oral argument.

6             **THE COURT:**  Yeah.

7             **MR. WISE:**  A couple weeks after.

8             **THE COURT:**  I saw -- I think Judge Furman had a bit

9  of a delay between the end of the evidentiary period and the

10  argument.  I didn't know if the parties had asked for that, or

11  if he had done that.

12       I don't --

13             **MS. WELLS:**  That was at his -- it was his intent.  We

14  didn't do openings there.  And what we did was we submitted

15  post -- and we didn't do -- we did do pretrial findings of

16  fact and conclusions of law.  But we had not briefed summary

17  judgment in that case.

18             **THE COURT:**  Oh, I see.

19             **MS. WELLS:**  And then after trial we did post-trial

20  findings of fact and conclusions of law.  And that was the

21  delay.  And then he had the argument after those were

22  submitted.

23             **THE COURT:**  I see.  Well, you'll see from my standing

24  order on bench trial preparation, the usual way I operate is

25  to ask for preliminary findings and conclusions by both sides.

```
 1    But then I give you an opportunity, depending on how the trial
 2    record develops, to then give me either an amended or expanded
 3    or contracted proposed findings and conclusions.  So there's
 4    preliminary, and then there's final.
 5        Now, whether or not I time that in conjunction with any
 6    final argument we can talk about on the 2nd, and see how we
 7    want to do it.  But I do want, if for no other reason than that
 8    it's a very useful almost checklist for me, to have the
 9    preliminary findings and conclusions.
10        And I recognize that there may be on the plaintiffs' side
11    some issue with respect to administrative record versus
12    expanded administrative record.  And I understand how
13    Judge Furman did it, and I think that makes some sense.
14        But on the question of opening argument, I mean, if I got
15    a request from you to have a brief opening argument, I suppose
16    -- I'm not sure I would be averse to that.
17        At the same time, I think maybe -- unlike Judge Furman's
18    case because we have had summary judgment and I've been through
19    a full and very helpful motion hear on the motion to though
20    dismiss, now a very full and helpful motion hearing on summary
21    judgment, from my perspective, I'm not sure I need it, frankly.
22    I would like to just get into the trial.
23        But if somebody feels strongly that they think I would
24    benefit from some opening, I would consider it.  I'm not asking
25    for it, is the bottom line.
```