XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General
GABRIELLE D. BOUTIN, SBN 267308
ANNA T. FERRARI, SBN 261579
TODD GRABARSKY, SBN 286999
R. MATTHEW WISE, SBN 238485
NOREEN P. SKELLY, SBN  186135
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6053
  Fax:  (916) 324-8835
  E-mail:  Gabrielle.Boutin@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra,**<br><br>Plaintiff,<br><br>v.<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>Defendants. | 3:18-cv-01865<br><br>**PLAINTIFFS' PRE-TRIAL PROPOSED FINDINGS OF FACT**<br><br>Dept:        3<br>Judge:       The Honorable Richard G. Seeborg<br>Trial Date:  January 7, 2019<br>Action Filed:  March 26, 2018 |

# TABLE OF CONTENTS

**Page**

PRE-TRIAL PROPOSED FINDINGS OF FACT ......................................................... 1

I.    Background Facts – Based on the Administrative Record and Stipulation Between the Parties ......................................................... 1

    A.    The Parties......................................................... 1

    B.    Plaintiffs' Fact Witnesses......................................................... 2

    C.    Plaintiffs' Expert Witnesses......................................................... 2

    D.    Defendant-Affiliated Fact Witnesses and Related Persons......................... 4

    E.    Defendants' Expert Witnesses ......................................................... 6

    F.    Overview of the Census, the Citizenship Question, and Processes of the Census Bureau......................................................... 6

        1.    The Decennial Census in General ............................................. 6

        2.    History of the Citizenship Question on the Census, the Long Form, and the American Community Survey ................................. 9

        3.    The 2020 Decennial Census......................................................... 11

II.    The Composition of the Administrative Record ................................................. 12

III.    The Defendants' Decision-making Process –Based only on the Administrative Record ......................................................... 13

    A.    Events Prior to DOJ's Request for the Citizenship Question ................. 13

    B.    The DOJ Letter Requesting the Citizenship Question and Defendants' Formal Review ......................................................... 17

    C.    The Census Bureau's Review of and Recommendation Against Adding a Citizenship Question to the Census............................................ 18

    D.    The Census Bureau Repeatedly Communicated its Recommendation Against the Citizenship Question to the Commerce Department ......................................................... 20

        1.    December 22 Memo (PTX-148) ............................................. 20

        2.    January 3 and January 19 Memos (PTX-101 and 22).................. 21

        3.    The Set of 35 Questions from Commerce to the Census Bureau and Commerce's Changes to the Census Bureau's Answer to Question 31 ................................................................. 23

        4.    March 1 Memo (PTX 25)......................................................... 25

        5.    Memorandum Addressing Key Differences Between Alternative C and Alternative D (PTX 24) ................................. 25

    E.    DOJ Refused to Discuss its Request with the Census Bureau ................. 26

    F.    Outside Stakeholders Urged Secretary Ross Not to Add the Citizenship Question to the Census......................................................... 26

    G.    The Citizenship Question Was Not Tested or Publicly Noticed Prior to Ross's Decision to Add it to the Census ............................................. 28

**TABLE OF CONTENTS**
(continued)

Page

H.     Defendants Did Not Evaluate DOJ's Voting Rights Act Rationale for the Citizenship Question ................................................................. 28

I.     Ross's March 26 Decision Memorandum ...................................... 29

J.     Secretary Ross's Purpose in Adding the Citizenship Question to the Census ................................................................................. 32

IV.   The Defendants' Decision-making Process – Additional Findings Based on Extra-Record Evidence ........................................................................... 34

    A.     Extra-Record Evidence Confirms that Defendants Violated Testing Requirements for the Citizenship Question ............................... 34

    B.     Extra-Record Evidence Confirms that Existing ACS Data Is Sufficient for Section 2 VRA Enforcement ............................... 37

    C.     Additional Facts Regarding Defendants' Decision-Making Process ........ 39

V.   Findings related to the Census Count and Standing – Based on the Administrative Record and Extra-Record Evidence ............................... 42

    A.     The Citizenship Question Will Damage the Census Count ..................... 42

        1.     The Citizenship Question Will Lower Self-Response Rates ........ 42

        2.     The Citizenship Question Will Cause a Differential Undercount ...................................................................... 43

    B.     The Citizenship Question Will Inflict Harm on Plaintiffs ....................... 46

        1.     Plaintiffs Have Increased Census Outreach Spending ................. 46

        2.     Plaintiffs Will Lose Federal Funding ............................................ 48

        3.     Plaintiffs Will Have Less Accurate Data to Make Decisions Related to Redistricting and Services .......................................... 49

        4.     Plaintiffs Will Lose Political Representation ................................. 50

**PRE-TRIAL PROPOSED FINDINGS OF FACT**

In anticipation of the trial of this matter, Plaintiffs State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton respectfully submit the following Pre-Trial Findings of Fact, as required by the Court's orders.  Following trial, and also in accordance with the Court's orders, Plaintiffs intend to submit Post-Trial Findings of Fact, which will be revised and updated based on the evidence and arguments actually presented at trial.

## I.    BACKGROUND FACTS – BASED ON THE ADMINISTRATIVE RECORD AND STIPULATION BETWEEN THE PARTIES

### A.    The Parties

1. Plaintiffs are the State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton.

2. Plaintiff the State of California is one of the fifty states of the United States of America. Joint Pretrial Statement and [Proposed] Order, Exhibit A ("Undisputed Facts"), ECF NO. 119, ¶ 1.

3. Plaintiff County of Los Angeles is a political subdivision of the State of California.  *Id.* ¶ 2.

4. Plaintiffs City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton are each a municipal corporation organized and existing under the laws of the State of California.  *Id.* ¶¶ 3-7.

5. Plaintiff-in-Intervention is Los Angeles Unified School District ("LAUSD").  LAUSD is the public school district encompassing the City of Los Angeles and several surrounding communities and is the largest school district within California.  *Id.* ¶ 8.

6. Defendants are Secretary of Commerce Wilbur L. Ross, Jr.; Ron Jarmin, performing the non-exclusive functions and duties of the Director of the United States Census Bureau; the U.S. Department of Commerce; and the U.S. Census Bureau.

7. Defendant Wilbur L. Ross, Jr. is the Secretary of the Department of Commerce.  *Id.* ¶ 11.

8. Defendant the United States Department of Commerce is a department of the United States Government.  *Id.* ¶ 12.

1

9. Defendant Ron Jarmin is the former Associate Director for Economic Programs of the United States Census Bureau and is currently performing the non-exclusive functions and duties of the Director of the United States Census Bureau. *Id.* ¶ 13.

10. The United States Census Bureau is a Bureau within the Department of Commerce charged with conducting the decennial census. *Id.* ¶ 14.

### B.   Plaintiffs' Fact Witnesses

11. Douglas Baron is the Senior Manager with the Chief Executive Office of the County of Los Angeles.  Mr. Baron testified about the County's request to the State of California for an increase in census outreach funding in light of the addition of a citizenship question to the 2020 Census questionnaire, and the Legislature's allocation of funding in response to the County's request.

12. Amy Bodek is the Director of the Department of Planning for the County of Los Angeles.  Ms. Bodek testified about the County's use of census data for program and planning efforts.

13. Andrew Westall is the Assistant Chief Deputy of the Office of Los Angeles City Council President Herb J. Wesson, Jr.  Mr. Westall testified about the City's use of census data for redistricting and resource allocation purposes.

14. Jefferson Crain is the Executive Officer of the LAUSD Board of Education.  Mr. Crain testified about LAUSD's decennial redistricting as called for by section 802 of the Los Angeles City Charter, including the formation of a joint city-district redistricting commission and the District's reliance upon decennial census data to review and, if necessary, redraw district lines in accordance with state and federal laws.

### C.   Plaintiffs' Expert Witnesses

15. Dr. Colm O'Muircheartaigh is an expert in survey methodology.  Dr. O'Muircheartaigh testified about the content of his expert report, the impact of the citizenship question on response rates and data quality, and the methods of and standards for testing a new question on the decennial census questionnaire.

16. Dr. Matthew Barreto is an expert in racial and ethnic politics, public opinion polling, and survey methodology.  Dr. Barreto testified about social science research and census publications

2

addressing the effect of the citizenship question on response rates, and about the survey he conducted measuring the differential response rates between the national population and certain subgroups.

17. Dr. Bernard Fraga is a political data analyst and researcher.  Dr. Fraga testified about the content of his expert report and his expert opinion on the impact the citizenship question will have on the 2020 Census population count for California and California's congressional apportionment.

18. Dr. Andrew Reamer is an expert on census-guided federal funding.  Dr. Reamer testified about the content of his expert report and about the impacts of the addition of a citizenship question to the 2020 Census on the distribution of particular types of federal domestic assistance funds to certain states.

19. Dr. Hermann Habermann is a statistician and former Chief Statistician of the United States and Deputy Director and Chief Operating Officer of the Bureau.  Pursuant to the parties' stipulation, Plaintiffs submitted prior testimony of Dr. Habermann in which he testified by declaration and live about whether the Bureau complied with the federal policies and procedures for designing, modifying, and implementing statistical instruments when the Bureau added the citizenship question; and the United Nations' recommendations on population censuses.

20. Dr. Lisa Handley is an expert in redistricting and voting rights.  Pursuant to the parties' stipulation, Plaintiffs submitted prior testimony of Dr. Handley in which she testified by declaration and live about the effectiveness of current Census Bureau data resources for enforcement of section 2 of the Voting Rights Act ("VRA").

21. Pamela Karlan is an expert on voting rights law.  Plaintiffs submitted Ms. Karlan's testimony through her preservation deposition about whether the inclusion of a question on citizenship status on the decennial census would assist the Department of Justice in enforcing section 2 of the VRA.

22. Dr. Margo Anderson is an expert on census history and practices.  Dr. Anderson testified by declaration about the history of the census, the history of questions regarding citizenship

3

status, the history of privacy concerns regarding the census, and the applicability of historical analogies from past practice to the current proposal to add the citizenship question.

23. Pia Escudero is the Executive Director of the Division of Student Health and Human Services for LAUSD.  Ms. Escudero testified by declaration about LAUSD's demographics and geography, student health and human services, and the potential impacts to student health and human services resulting from adding a citizenship question to the 2020 Census questionnaire as compared to other school districts.

24. Karen Ryback is the Executive Director for Federal and State Education Programs for LAUSD.  Ms. Ryback testified by declaration about LAUSD's receipt of funding from federal programs (Title I, Title II, and Title IV), funding allocation formulas for these programs, LAUSD demographics relevant to these programs, and the potential funding impacts to LAUSD resulting from adding a citizenship question to the 2020 Census questionnaire as compared to other school districts.

### D. Defendant-Affiliated Fact Witnesses and Related Persons

25. Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau.  Undisputed Facts ¶ 15.  Dr. Abowd testified as a fact witness for Plaintiffs about his knowledge of and involvement in the decision to add the citizenship question to the 2020 Census questionnaire.

26. Enrique Lamas is performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau.  *Id.* ¶ 16.

27. Burton Reist is the Chief of Decennial Communications and Stakeholder Relations at the Census Bureau.  *Id.* ¶ 17.

28. Victoria Velkoff is Division Chief of the American Community Survey Office at the U.S. Census Bureau.  *Id.* ¶ 18.

29. Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question on the 2020 Census between December 2017 and March 2018.  *Id.* ¶ 19.

4

30. Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross. *Id.* ¶ 20.

31. Karen Dunn Kelley is the presidentially-appointed Under Secretary for Economic Affairs at the US. Department of Commerce responsible for the operations of the Census Bureau. *Id.* ¶ 21.

32. James Uthmeier is Senior Counsel to the General Counsel, Regulatory Reform Officer, Department of Commerce. *Id.* ¶ 22.

33. Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross. *Id.* ¶ 23.

34. Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock. *Id.* ¶ 24.

35. David Langdon is a Policy Advisor within the Office of Policy and Strategic Planning, reporting to Mr. Comstock. *Id.* ¶ 25.

36. Tad Kassinger was the former General Counsel of the Commerce Department and is one of Secretary Ross's personal attorneys. *Id.* ¶ 26.

37. Peter Davidson is the General Counsel for the Department of Commerce. *Id.* ¶ 27.

38. Michael Walsh was the Deputy General Counsel for the Department of Commerce and is currently the Chief of Staff to Secretary Ross. *Id.* ¶¶ 28, 29.

39. Jeff Sessions was Attorney General of the United States.

40. John Gore is the Acting Assistant Attorney General for Civil Rights at the U.S. Department of Justice ("DOJ"). PTX-69.

41. Arthur E. Gary is General Counsel for the Justice Management Division in the U.S. DOJ. PTX-32.

42. Stephen Bannon was the White House Chief Strategist and Senior Counselor to the President.

43. Kris Kobach was the Kansas Secretary of State, and served as Vice Chair of the Presidential Commission on Election Integrity. PTX-19, 444.

5

44. A. Mark Neuman was an outside advisor to Secretary Ross on Census Bureau matters. PTX-644 (AR).

### E.    Defendants' Expert Witnesses

45. Defendants submitted Census Bureau Chief Scientist Dr. John Abowd's expert testimony. Dr. Abowd testified about the impact of the citizenship question on response rates, data quality, and census costs, as well as the potential for using administrative records to obtain citizenship data.

46. Defendants also submitted the testimony of expert Dr. Stuart Gurrea to provide rebuttal opinions to those of Plaintiffs' experts Drs. Barreto, Fraga, and Reamer.

### F.    Overview of the Census, the Citizenship Question, and Processes of the Census Bureau

#### 1.    The Decennial Census in General

47. The U.S. Constitution requires the federal government to conduct a decennial census counting the total number of "persons"—with no specific reference to citizenship status—residing in each state.  Undisputed Facts ¶ 30.

48. The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," which requires "counting the whole number of persons in each State."  *Id.* ¶ 31.

49. The Constitution requires that this count be an "actual Enumeration" conducted every ten years.  *Id.* ¶ 32.

50. Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce.  *Id.* ¶ 33.

51. The central constitutional purpose of the Census Bureau in taking the decennial census is to conduct an enumeration of the total population.  *Id.* ¶ 35.

52. The Secretary of Commerce must comply with legal requirements established by the Constitution, statutes, and regulations governing the census. For example, the Secretary's decisions must be consistent with the "constitutional goal of equal representation" and bear a

1    "reasonable relationship to the accomplishment of any actual enumeration of the population."

2    *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996).

3    53. To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually

4    every housing unit in the United States and all persons living in the United States are legally

5    required to respond.  Undisputed Facts ¶¶ 36, 37.

6    54. If the Census Bureau does not receive a response to the questionnaire, it then sends a

7    Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in-

8    person interview to collect the data.  This process is the Non-Response Follow Up ("NRFU")

9    operation.  *Id.* ¶ 39.

10   55. In the 2020 Census, the Census Bureau has proposed using administrative records to

11   enumerate a limited number of those households for which there is high quality administrative

12   data about the household if the initial NRFU visit does not result in collecting complete data for

13   that household.  *Id.* ¶ 40.

14   56. In the 2020 Census, the U.S. Census Bureau plans to have enumerators attempt to re-

15   contact in person those households without high-quality administrative records.  *Id.* ¶ 41.

16   57. Every case in the NRFU workload will have a maximum of six different contact days and

17   12 proxy attempts.  *Id.* ¶ 42.

18   58. If a third attempt to contact a household does not yield a response, a case will become

19   "proxy-eligible."  *Id.* ¶ 43.

20   59. A proxy is someone who is not a member of the household—such as a neighbor, landlord,

21   postal worker, or other knowledgeable person who can provide information about the unit and the

22   people who live there.  *Id.* ¶ 44.

23   60. An enumerator will attempt three proxies after each non-interview for a proxy-eligible

24   case.  *Id.* ¶ 45.

25   61. For the 2010 decennial census, after three proxy attempts, a household became eligible for

26   what is known as "whole-person imputation" or "whole household imputation," in which the

27   Bureau imputed the characteristics of the household, including in some circumstances the

28   household member count.  *Id.* ¶ 46.

7

62. After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, as well as the data from the other enumeration operations, to determine the population count in each state. *Id.* ¶ 47.

63. Data from the decennial census are reported down to the geographic unit known as a "census block." *Id.* ¶ 48.

64. The population data collected through the decennial census determines the apportionment of seats in the U.S. House of Representatives among the states. *Id.* ¶ 49.

65. The population data collected through the decennial census also determines the number of electoral votes each state has in the Electoral College. *Id.* ¶ 50.

66. States, counties, cities, and local public entities also use decennial census data to draw congressional, state, and local legislative districts. *Id.* ¶ 51.

67. The federal government also uses decennial census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. *Id.* ¶ 52.

68. Approximately 132 programs used Census Bureau data to distribute hundreds of billions of dollars in funds during fiscal year 2015. *Id.* ¶ 53.

69. In 2010, there was a statistically insignificant net overcount of the total U.S. population by approximately 0.01%. *Id.* ¶ 58.

70. Some demographic groups have proven more difficult to count in the decennial census than others. The Census Bureau refers to these groups as "hard-to-count. *Id.* ¶ 59.

71. Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the decennial census. *Id.* ¶ 60.

72. Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 decennial census. *Id.* ¶ 61.

73. The 2010 Census undercounted on net more than 1.5 million Hispanic and African American individuals. *Id.* ¶ 62.

74. The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. *Id.* ¶ 63.

8

75. The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. *Id.* ¶ 64.

### 2. History of the Citizenship Question on the Census, the Long Form, and the American Community Survey

76. Not since 1950 have the census questions submitted to each household included a question on citizenship. *Id.* ¶¶ 76-77.

77. A question concerning citizenship did not appear on the decennial census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010. *Id.* ¶ 77.

78. In 1960, the Census Bureau asked 25% of the population for the respondent's birthplace and that of his or her parents.  It also asked all residents of New York and the foreign-born residents of Puerto Rico about citizenship — the former "at the expense of the State, to meet State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration." *Id.* ¶ 76.

79. From at least the 1970 decennial census through the 2000 decennial census, in lieu of the short-form questionnaire, the Census Bureau sent a long form questionnaire to approximately one in six households. *Id.* ¶ 78.

80. Data collected from the sample households surveyed with the long form were used to generate statistical estimates. *Id.* ¶ 79.

81. In the 1970, 1980, 1990, and 2000 decennial censuses, the long form decennial census questionnaire contained a question about citizenship status. *Id.* ¶ 80.

82. In the 1990 and 2000 decennial censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth. *Id.* ¶ 81.

83. The citizenship data collected from the long form questionnaire was reported by the Census Bureau at the census block group level. *Id.* ¶ 82.

9

1  84. After the 2000 decennial census, the functions performed by the long form have been

2  replaced by the American Community Survey (ACS).  *Id.* ¶ 83.

3  85. The ACS is a yearly survey of approximately 2% of households across the United States.

4  *Id.* ¶ 85.

5  86. A question concerning citizenship status currently appears as one of more than 50

6  questions on the 28-page ACS questionnaire.  *Id.* ¶ 86.

7  87. The citizenship status question on the ACS is preceded by a question asking where the

8  person was born.  *Id.* ¶ 87.

9  88. The data collected by the ACS allows the Census Bureau to produce estimates of Citizen

10  Voting Age Population (CVAP).  *Id.* ¶ 90.

11  89. CVAP data based on responses to the ACS are reported by the Census Bureau down to the

12  census block group level.  *Id.* ¶ 91.

13  90. Margins of error are reported with the ACS estimates and provide a measure of the

14  sampling error associated with each estimate.  *Id.* ¶ 92.

15  91. The ACS is intended to provide information on characteristics of the population, and the

16  social and economic needs of communities.  *Id.* ¶ 93.

17  92. Unlike the decennial census, the ACS is not a complete enumeration, but rather a sample

18  survey that is used to generate statistical estimates.  *Id.* ¶ 94.

19  93. Because ACS estimates are statistical estimates based on a sample, the tabulations are

20  weighted to reflect sampling probabilities and to determine eligibility for follow-up, and are

21  controlled to align with official population totals as established by the Population Estimates

22  program.  *Id.* ¶ 95.

23  94. The ACS produces Census Bureau annual estimates for "census tract[s]" and "census-

24  block groups."  *Id.* ¶ 96.

25  95. Although the ACS survey is conducted annually, ACS data from individual years can also

26  be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3-year," or

27  "5-year" estimates, depending on the number of years aggregated together).  *Id.* ¶ 97.

28

96. Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in-every-eight-household sample. *Id.* ¶ 98.

97. Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units. *Id.* ¶ 99.

98. 1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1-year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+"; 3-year ACS estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-year estimates; and 5-year ACS estimates produce "[d]ata for all areas." *Id.* ¶ 100.

### 3.    The 2020 Decennial Census

99. The 2020 Census will also be a "short form only" census. *Id.* ¶ 102.

100. The ACS will continue to be distributed each year, as usual, and will continue to include a citizenship question. *Id.* ¶ 103.

101. The text of the question to be included on the 2020 Census in response to Secretary Ross's decision memorandum reads, "Is this person a citizen of the United States?," with the answer options "Yes, born in the United States"; "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas"; "Yes, born abroad of U.S. citizen parent or parents"; "Yes, U.S. citizen by naturalization – Print year of naturalization"; and "No, not a U.S. citizen." *Id.* ¶ 104.

102. In a December 12, 2017 letter to the Secretary of the Department of Commerce, the Department of Justice "formally request[ed] that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship," explaining that "[t]his data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting." *Id.* ¶ 105.

103. As in past years, the 2020 Census questionnaire will pose a number of questions, including questions regarding sex, Hispanic origin, race, and relationship status. *Id.* ¶ 106.

104. A planned question on the 2020 Census short form questionnaire asks "Is this person of Hispanic, Latino, or Spanish origin?" *Id.* ¶ 107.

105. A planned question on the 2020 Census short form questionnaire asks "What is this person's race?" *Id.* ¶ 108.

106. A planned question on the 2020 Census short form questionnaire asks how each person in the household is related to the person filling out the questionnaire. *Id.* ¶ 109.

107. A planned question on the 2020 Census short form questionnaire asks, "What is this person's sex?" *Id.* ¶ 110.

## II.  THE COMPOSITION OF THE ADMINISTRATIVE RECORD

108. Defendants produced an Administrative Record along with a certification and index on June 8, 2018 with only 1,320 pages. *See* PTX-1 (AR 1-1320).  These materials allude to but contain little documentation of internal deliberations before December 2017 or communications between the Departments of Commerce and Justice. *Id.*

109. On June 21, 2018, Secretary Ross filed a supplemental memorandum significantly revising the narrative as to the origin and genesis of how a citizenship question came to be placed on the decennial census.  PTX-2.

110. On July 3, 2018, and memorialized in the July 5, 2018 order, Defendants were ordered to supplement the administrative record in the related case of *State of New York, et al. v. United States Department of Commerce, et al.*, No. 18-cv-2921 (S.D.N.Y.), ECF No. 199.

111. In response to that order, Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (Bates 0003736-0012464). *State of New York v. et al. v. United States Department of Commerce, et al.*, No. 18-cv-2921, ECF Nos. 212, 216, 217; PTX-3, 4A-D.

112. Defendants' July 23 and 27, 2018, productions contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between Commerce and DOJ.  PTX-3, 4A-D.

12

113. Defendants released additional Administrative Record documents after review by the Disclosure Review Board ("DRB") on August 28, 2018 and September 4, 2018, without Bates numbers.  PTX-5.

114. Defendants produced additional small supplements to the Administrative Record on September 11, 2018 (Bates 0012464-0012543).  PTX-7.

115. Defendants produced additional sets of documents, including in responses to motions to compel, on various dates (Bates 00012544-0012826).  PTX-8-12.

116. Defendants produced an additional Administrative Record production on October 1, 2018 (Bates 0012827-0013022), PTX-13, along with further documents (Bates 0013023-0013024) on October 1, 2018, PTX-14.

117. The parties agreed that all documents bearing prefix-less Bates stamps between 000001 and 0013024 are part of the Administrative Record.  Joint Pretrial Statement and [Proposed]Order, ECF No. 119, at 11-13.

118. The initially-filed administrative record was compiled by Sahra Park-Su, a Senior Policy Advisor at the Department of Commerce.  Park-Su Dep. at 185-186.

119. Ms. Park-Su compiled the administrative record only by keeping materials that were provided to her by others.  *Id.* at 186-189.

120. No one provided Ms. Park-Su with any guidance on how to compile documents for the administrative record.  *Id.* at 187:20-25

### III.   THE DEFENDANTS' DECISION-MAKING PROCESS –BASED ONLY ON THE ADMINISTRATIVE RECORD

#### A.   Events Prior to DOJ's Request for the Citizenship Question

121. Secretary Ross admits that he discussed the issue of adding a citizenship question to the census with "senior administrative officials" even before he became Secretary.  PTX-2.

122. Secretary Ross was known to be interested in census topics in early February 2017 and, in March 2017, was exchanging emails with his Deputy Chief of Staff and Director of Policy, Earl Comstock, regarding whether non-citizens are included in the census count for the purposes of congressional apportionment.  PTX-55.

123. In March 2017, Secretary Ross submitted a report to Congress identifying the subjects planned for the 2020 Census.  PTX 264.  The subjects did not include citizenship or immigration status.  *Id.* at 5-15.

124.  In early April, 2017, Steven Bannon contacted Secretary Ross and connected him with Kris Kobach to discuss adding a citizenship question to the census.  PTX 19, 58.

125. Mr. Kobach communicated to Secretary Ross that a citizenship question was necessary to address the "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  PTX-19.

126. A few days after Secretary Ross was contacted by Bannon, Mark Neuman email Earl Comstock with the subject line "One of the Supreme Court cases that informs planning for the 2020 Census….."  PTX-182.  The email contained only a link to the Supreme Court's decision in LULAC v. Perry, which considered citizen voting age population in assessing claims under section 2 of the VRA.  *Id.*

127. On April 13, 2017 Mr. Comstock emailed Mr. Neuman, asking when the Census Bureau would need to notify Congress regarding census questions. PTX-88; PTX-181.

128. Mr. Neuman responded to Mr. Comstock on April 14, 2017, that the notification deadline for topics had already passed, and that "[t]here would be another opportunity next year." PTX-88.

129. By May 2, 2017, in an email to Comstock with the subject line "Census," Ross complained "Worst of all they emphasize that they have settled with congress on the questions to be asked.  I am mystified why nothing have [*sic*] been done in response to my months old request that we include the citizenship question.  Why not?"  PTX-89.  Mr. Comstock responded in part, "On the citizenship question we will get that in place…We need to work with Justice to get them to request that citizenship be added back as a census question…."  *Id.*

130. Other than the emails above, there is no mention in the administrative record of the Secretary's obligations under 13 U.S.C. § 141(f)(1) and (3) with respect to adding a citizenship question.  *See* AR.

14

131. Comstock subsequently reached out to DOJ to do just that.  PTX-85, 370.  In a subsequent memo to Ross, Comstock detailed that he spoke "several times" with James McHenry of DOJ about adding a citizenship question to the census.  PTX-370.

132. McHenry ultimately informed Comstock that the DOJ did not want to request the citizenship question and referred Comstock to the Department of Homeland Security.  *Id.*

133. Department of Homeland Security likewise declined to request the citizenship question. *Id.*

134. The Commerce Department next looked into whether it could request the citizenship question itself.  *Id.*

135. On August 8, 2017, Secretary Ross emailed Comstock, asking "where is DOJ in their analysis" of whether to request the addition of a citizenship question to the 2020 census, and advising "[i]f they still have not come to a conclusion please let me know your contact person and I will call the AG."  PTX-98.

136. On August 9, Mr. Comstock emailed Ross, stating "we are preparing a memo and full briefing for you on a citizenship question. The memo will be ready by Friday . . . Since this issue will go to the Supreme Court we need to be diligent in preparing the administrative record." PTX-96, 362.

137. Secretary Ross responded to Mr. Comstock the next day, "I would like to be briefed on Friday by phone . . . we should be very careful about everything, whether or not it is likely to end up in the SC."  PTX-96, 362.

138. On August 11, Mr. Comstock and Mr. Uthmeier exchanged edits on briefing materials on a citizenship question for Secretary Ross. During this exchange, Mr. Uthmeier wrote that he had "recommendations on execution," stating that he thought "our hook" was "ultimately, we do not make decisions on how the [citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide."  PTX-437.

139. On August 11, Mr. Comstock emailed Secretary Ross and Ms. Teramoto a memorandum prepared by James Uthmeier concerning the addition of a citizenship question to the Decennial

Census. PTX-3 at AR 2461; PTX-147.  The memorandum has not been produced, including as part of the administrative record.

140. On September 1, Secretary Ross complained to Mr. Comstock and Ms. Teramoto about a number of issues, including that he had "received no update [on] the issue of the census question" and Mr. Comstock responded, "Understood. Wendy and I are working on it." PTX-45, 97.

141. On September 6, Secretary Ross and his senior staff (including Messrs. Comstock, Hernandez, Davidson, Uthmeier, and Ms. Teramoto, Undersecretary Kelley, and Ms. Park-Su) had a meeting to discuss the addition of a citizenship question. PTX-31; PTX-35; PTX-36; PTX-46; PTX-47; PTX-187 at 11.

142. The next day, September 7, Secretary Ross requested from his staff an update on "progress since the discussion yesterday regarding the citizenship question." PTX-37, PTX-49.

143.  During the responding email exchange, Mr. Davidson wrote to Mr. Comstock, Mr. Uthmeier and Ms. Teramoto that, in a meeting the day before regarding the citizenship question, Secretary Ross had discussed Mr. Kobach, but Mr. Davidson was "concerned about" contacting Mr. Kobach directly, and recommended contacting a trusted advisor, such as Mark Neuman, "before we do anything externally." PTX-444.

144. The following day (September 8, 2017), Mr. Uthmeier contacted Mr. Neuman to discuss "some Census legal questions for the Secretary." PTX-38.

145. Also on September 8, 2017, Mr. Comstock sent Secretary Ross a memo reporting on his efforts to identify someone who would request the addition of a citizenship question to the 2020 Census, and advising that, as of that date, he had not been successful. PTX-48; PTX-134.

146. Mr. Comstock later forwarded that memorandum to Ms. Teramoto, PTX-58; PTX-134; PTX-363; PTX-370, presumably to prepare her for an upcoming call she was to have with DOJ regarding a citizenship question.

147. In mid-September, John Gore of DOJ contacted and later had a phone call with Ms. Teramoto "about a DOJ-DOC" issue. PTX-59; PTX-60; Gore Dep. at 95-96. Because Mr. Gore's email to Ms. Teramoto was produced as part of the administrative record for this case, and

16

1  considering all of the circumstances, it is apparent that the "DOJ-DOC" issue was the citizenship

2  question.

3      148. Following that conversation, Ms. Gore worked with an aide to Attorney General

4  Sessions to set up a phone call between Ross and Sessions. PTX-63, 67, 68

5      149. Attorney General Sessions' aide emailed, "From what John [Gore] told me, it sounds

6  like we can do whatever you all need us to do and the delay was due to a miscommunication. The

7  AG is eager to assist." PTX-67, 68.

8      150. Secretary Ross and Attorney General Sessions proceeded to speak on the phone

9  regarding the subject of Mr. Gore and Ms. Teramoto's earlier conversation, presumably about

10  adding the citizenship question to the census.  PTX-57, 61, 62.

11      151. On Sunday October 8, Secretary Ross sent an email to Mr. Davidson with the subject

12  line "Letter from DOJ" and asking "what is its status." PTX-52.

13      152. Mr. Davidson responded "I'm on the phone with Mark Neuman right now . . . he is

14  giving me a readout of his meeting last week." PTX-52.

15      153. On the evening of November 27, 2017, Secretary Ross sent Mr. Davidson, General

16  Counsel of the Department of Commerce, an email with the subject "Census Question" stating

17  that "Census is about to begin translating the questions into multiple languages and has let the

18  printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the

19  responsible person at Justice. We must get this resolved." PTX-144.

20      **B.    The DOJ Letter Requesting the Citizenship Question and Defendants'**
        **Formal Review**

21

22      154. On December 12, 2017, Arthur Gary of DOJ sent a formal letter to Ron Jarmin,

23  Acting Director of the Census Bureau, requesting the addition of a citizenship question to the

24  2020 census (December 12 Letter).  PTX-32.

25      155. The December 12 Letter requests the addition of a citizenship question on the basis

26  of VRA enforcement, and provides no other justification. *Id.*

27

28

156. The December 12 Letter sent to the Census Bureau requesting a citizenship question does not state that a citizenship question is necessary for the purposes of VRA enforcement to collect CVAP data through the census questionnaire. *Id.*

157. Rather, the letter contends, "the Department [of Justice] believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates. *Id.* at 2.

158. The December 12 Letter cites numerous published cases purportedly for the proposition that, "in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks…where potential Section 2 violations are alleged or suspected." *Id.*

159. The December 12 Letter states that one of the stated reasons that decennial census data on citizenship would be preferable to ACS data concerns the margin of error. The Letter states, "The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases . . . . By contrast, decennial census data is a full count of the population." *Id.* at 3.

160. The December 12 Letter does not state that any plaintiffs had lost any Section 2 enforcement action due to insufficient CVAP from the ACS. *Id.* at 1-2.

161. No other evidence in the administrative record indicates that any plaintiffs have lost any Section 2 enforcement action due to insufficient CVAP from the ACS. *See* AR.

162. The December 12 Letter does not state that DOJ had declined to bring any Section 2 enforcement actions due to insufficient CVAP from the ACS. PTX-32

163. No other evidence in the administrative record indicates that DOJ has declined to bring any Section 2 enforcement actions due to insufficient CVAP from the ACS. *See* AR.

## C. The Census Bureau's Review of and Recommendation Against Adding a Citizenship Question to the Census

164. Soon after the Census Bureau received the December 12 Letter, Dr. Abowd directed senior professional staff at the Census Bureau (nicknamed the "SWAT Team"), to formulate a response to the suggestion that a citizenship question be added, which Dr. Abowd managed and

18

1   reviewed. PTX-75; PTX-4 at AR 9339; PTX-148; PTX-101; PTX-22, PTX-133 ; PTX-160;

2   Undisputed Fact 19.

3          165. In a series of technical reports, responses to questions posed by Secretary Ross, and

4   other briefing documents, the Census Bureau repeatedly and consistently recommended against

5   the addition of a question. PTX-148; PTX-101; PTX-22, PTX-133; PTX-160.

6          166. The Census Bureau repeatedly and consistently concluded that the stated goals of

7   DOJ with respect to enforcement of the VRA could be accomplished, in a less costly and more

8   effective manner, by linking Census responses to other administrative data sets available to the

9   federal government. PTX-148; PTX-101; PTX-22; PTX-133; PTX-160.

10         167. The Census Bureau did not believe that inclusion of a citizenship question is

11   necessary to provide complete and accurate data in response to DOJ's request. PTX-22, PTX-101,

12   PTX-148.

13         168. The Census Bureau repeatedly and consistently concluded that adding a citizenship

14   question would involve substantial additional cost as opposed to non-action and the use of

15   administrative records.  PTX-148; PTX-101; PTX-22, PTX-133; PTX-160.

16         169. The Census Bureau concluded using administrative records would result in more

17   accurate citizenship data than adding a citizenship question to the census.  PTX-22, PTX-101,

18   PTX-148.

19         170. The Census Bureau also concluded that using administrative records alone would

20   result in more accurate citizenship data than using administrative records and adding a citizenship

21   question to the census.  PTX-24-25.

22         171. The Census Bureau examined the initial drop in self-response due to the citizenship

23   question, as well as the potential costs of NRFU as a result of that drop.  PTX-148; PTX-101;

24   PTX-22, PTX-133; PTX-160.  However, the Census Bureau analyses in the administrative record

25   do not show that the Bureau ever analyzed whether, in fact, NRFU would fully mitigate the non-

26   response or whether the question would cause an undercount.  *See AR*; PTX-148; PTX-101; PTX-

27   22, PTX-133; PTX-160.

28

### D.   The Census Bureau Repeatedly Communicated its Recommendation Against the Citizenship Question to the Commerce Department

172. On or about December 15, 2017, Dr. Abowd directed senior executives and expert employees of the Census Bureau to evaluate alternative methods of providing estimates of the Citizen Voting Age Population to support redistricting under Public Law 94 -171 (PL94) and Section 2 of the VRA. PTX-4 at AR 9339; PTX-148.

#### 1.   December 22 Memo (PTX-148)

173. This evaluation is reflected in a memorandum dated December 22, 2017 and provided to the Commerce Department (the "December 22 Memo"). PTX-4 at AR 9339; PTX-4 at AR 11634); PTX-148.

174. The December 22 Memo reflected the work of six professional Census Bureau employees: Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi, who analyzed two potential sources of citizenship data requested by the DOJ in its December 12, 2017 letter to Director Jarmin.  PTX-148.

175. The December 22 Memo identified eight administrative sources of citizenship information either already in use by the Census Bureau or available for acquisition by the Census Bureau.  PTX-148 at 3.

176. The December 22 Memo included the following conclusions:

   a. Numident, an administrative source already in use by the Census Bureau, was "the most complete and reliable administrative record source of citizenship data currently available." PTX-148 at 3.

   b. Use of these administrative records to assess CVAP was "potentially a more accurate measure of citizenship" and was also "cost efficient." PTX-148 at 11.

   c. Including a citizenship question in the 2020 Census could affect response rates for the 2020 Census because "[h]ouseholds with noncitizens could be particularly sensitive to the inclusion of citizenship questions." PTX-148 at 6.

d. "[t]o collect [citizenship] information through self-report by adding questions to the 2020 decennial would require addition unnecessary costs and burden to the Bureau." PTX-148 at 11.

e. including a citizenship question in the 2020 Census could lower the rate of voluntary compliance and would require expanded field operations for the implementation of the 2020 Census.  PTX-148 at 12.

177. As a result of the conclusions, the December 22 Memo recommended that the best way to meet DOJ's stated need was to provide it with citizenship data from administrative records. PTX-148 at 11.

178. The memo concluded that, if the recommendation were followed, "[t]he 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly." PTX-148 at 12.

### 2.    January 3 and January 19 Memos (PTX-101 and 22)

179. Following the December 22 Memo, the Census Bureau further memorialized its research and analysis of potential sources of citizenship data in a January 3, 2018 memorandum from Dr. Abowd to Director Jarmin (hereinafter the "January 3 Memo"). PTX-101.

180. The January 3 Memo analyzed three alternative methods of meeting DOJ's request for census block level estimates of the citizen voting age population ("CVAP"). PTX-101.

181. The January 3 Memo concludes that Alternative A—maintaining the status quo and providing improved statistical modeling techniques—would result in only an incremental cost of approximately $200,000. PTX-101.

182. The January 3 Memo concludes that Alternative B—adding a citizenship question to the 2020 Census—would increase census non-response rates by at least 5.1% of all households with one or more non-citizens and increase the cost of the 2020 Census by at least $27.5 million. PTX-101.

183. The January 3 Memo concludes that Alternative C—using administrative sources to provide CVAP at a census block level—would result in an incremental cost of less than $1 million. PTX-101.

184. In the January 3 Memo, the Census Bureau recommends using Alternative C because it was far less costly than adding a citizenship question to the 2020 Census, and would not harm the quality of the census count. PTX-101.

185. On January 4, 2018, Dr. Abowd wrote to various census officials, including Director Ron Jarmin, that "Ron reports that he has discussed this with the Under Secretary and she agrees with the recommendation of alternative C, but Alternative A remains a possibility as well." PTX-121.

186. On January 19, 2018, Dr. Abowd sent a memorandum to Secretary Ross on the "Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census" (hereinafter "January 19 Memo"). PTX-22.

187. The January 19 Memo presents the view of Dr. Abowd and his technical team evaluating Alternatives A, B and C. *Id.*

188. In the January 19 Memo, the Census Bureau concluded that adding a citizenship question to the decennial census, "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources." *Id.* at 1.

189. According to the January 19 Memo, Alternative C would yield more accurate citizenship data than Alternative B because based on historical census and ACS data, non-citizens misreport themselves as citizens "for no less than 23.8% of the cases, and often more than 30%." *Id.* at 7.

190. According to the January 19 Memo, Alternative B would increase the burden on census respondents, whereas Alternative C would not. PTX-22 at AR 1277, 1281.

### 3.     The Set of 35 Questions from Commerce to the Census Bureau and Commerce's Changes to the Census Bureau's Answer to Question 31

191. Following the January 19 Memo, Mr. Comstock and Mr. Uthmeier developed and sent to the Census Bureau a set of 35 questions for the Census Bureau to answer about the January 19 analysis. PTX-377.

192. The Census Bureau's responses to the questions was submitted to the Commerce Department on March 1, 2018, along with Dr. Abowd's March 1 memo to Secretary Ross (*see infra*). PTX-133.

193. Question 31 asked, "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?  PTX-133.

194. The Census Bureau answered Question 31:

> The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation.
>
> The Census Bureau and the Office of Management and Budget (OMB) have laid out a formal process for making content changes.
>
> - First, federal agencies evaluate their data needs and propose additions or changes to current questions through OMB.
> - In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.
> - Final proposed questions result from extensive cognitive and field testing to ensure they result in proper data, with an integrity that meets the Census Bureau's high standards.
> - This process includes several opportunities for public comment.
> - The final decision is made in consultation with OMB.

PTX-133 at 0009832-9833.

195. The description of the "well-established" process in the Census Bureau's response to Question 31 is consistent with other Census Bureau documents describing the process to add a question or change the content of the decennial census. PTX-4 at AR 3890, 3560, 9867; PTX-135, 141.

196. The administrative record shows that, despite the fact that the questions were directed to the Census Bureau, Commerce Department Deputy General Counsel Michael Walsh (and now Ross Chief of Staff) drafted a different answer to Question 31.  That answer states:

> No new questions were added to the 2010 Decennial Census, so there is no recent precedent for considering a request to add questions to a Decennial Census. Consistent with longstanding practice for adding new questions to the ACS survey, the Census Bureau is working with relevant stakeholders to ensure that legal and regulatory requirements are fulfilled and that the question would produce quality, useful information for the nation. As you are aware, that process is ongoing. Upon its conclusion, you will have all of the relevant data at your disposal to make an informed decision about the pending request from the Department of Justice.

PTX 14; PTX 1 at AR 1296.

197. In Defendants' first production of documents in the administrative record, which they represented at the time constituted the complete administrative record, they included only a version of the 35 questions and answers that included only Mr. Walsh's answer to Question 31. PTX 1 at AR 1-1320.  The Census Bureau's March 1 response to Question 31 was produced later and only as a result of the New York court's order to supplement the record.  PTX-132.

198. Question 1 of the 35 questions asked, "With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?"  PTX-133 at AR 9822.

199. The Census Bureau answered Question 1 by stating, between Alternatives B and C, there was no difference in the timing in which the citizenship data could be offered to the public.  *Id.*

200. There is no evidence in the administrative record indicating that it would take longer to provide citizenship data using administrative records than a citizenship question.

#### 4.   March 1 Memo (PTX 25)

201. Subsequent to his receipt of the January 19 memo regarding Alternatives A, B, and C, Secretary Ross directed the Census Bureau to consider a fourth alternative combining Alternatives B (adding a citizenship question to the census) and Alternative C (obtaining citizenship data from administrative records.  PTX 25, 133.

202. On March 1, 2018, Dr. Abowd sent an additional recommendation memorandum to Ross performing this analysis of the fourth alternative, which he called "Alternative D."  PTX 25, 133.

203. In the March 1 Memo, just as in all previous Census Bureau memos on the subject, the Census Bureau continued to recommend against the addition of a citizenship question to the census.  PTX 25, 133.

204. In the March 1 Memo, the Census Bureau concludes that, "Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce." PTX-25; PTX-133.

#### 5.   Memorandum Addressing Key Differences Between Alternative C and Alternative D (PTX 24)

205. The administrative record also includes a memorandum entitled "Summary Analysis of the Key Differences Between Alternative C and Alternative D.  PTX-24

206. Like the March 1 Memo, this memorandum also recommends using administrative data alone (Alternative C) and not adding a citizenship question, and it is otherwise consistent with the Census Bureau's other memoranda on the issue.  PTX-24.

207. None of the memoranda above analyzed whether NRFU would fully mitigate the non-response.  *See* PTX-148; PTX-101; PTX-22, PTX-133; PTX-160.  No other evidence the administrative record shows that the Defendants analyzed this issue, or whether such an undercount would have any effects on federal funding or congressional apportionment.  *See* AR.

208. None of the memoranda above analyzed the effect of the drop in self-response on count and characteristic data quality at the local level, including its effect on local governments.

**E.      DOJ Refused to Discuss its Request with the Census Bureau**

209. In December 2017 and January 2019, the Census Bureau sought to meet with DOJ to discuss DOJ's stated need for block-level citizenship data.  PTX-72; PTX 4 at AR 8651.

210. Dr. Jarmin emailed an initial response to the December 12 Letter on December 22. PTX-72.  In that letter, he advised Gary that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses. This would result in higher quality data produced at a lower cost." PTX-72.

211. In Dr. Jarmin's December 22 letter, he suggested to Mr. Gary a "meeting of Census and DOJ technical experts to discuss the details of this proposal."  *Id.*

212. On January 2, 2018, Director Jarmin sent a follow-up email to Mr. Gary requesting for a meeting during the following week. PTX-102.

213. On January 9, 2018, Director Jarmin emailed Mr. Gary and again requested to meet, stating that they "have a pretty short clock to resolve the request" and that it would be "good to meet with your team as soon as possible." PTX-192.

214. On January 10, Jarmin and Gary exchanged emails agreeing to a time and place for the meeting. PTX-191.

215. However, on February 6, 2018, Dr. Jarmin reported to Karen Dunn Kelley at Commerce, "I spoke with Art Gary.  He has spoken with DOJ leadership.  They believe the letter requesting citizenship to be added to the 2020 Census fully describes their request.  They do not want to meet."  PTX-3 at AR 3460.

216. The administrative record contains no evidence that before Secretary Ross's decision memo on March 26, 2018, the Census Bureau and DOJ ever met to discuss DOJ's request in the December 12 Letter.  *See* AR.

**F.      Outside Stakeholders Urged Secretary Ross Not to Add the Citizenship Question to the Census**

217. Prior to issuing his March 26 decision memorandum, Secretary Ross received a large number of communications from outside stakeholders expressing concern that the addition of the

26

citizenship question would put at risk a complete and accurate census count.  These included communications from:

- Six former Directors of the Census Bureau (PTX-1 at AR 1057 ("There is a well-proven multi-year process to suggest and test new questions.  We strongly believe that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the Census in all communities at grave risk.");

- Members of the Census Bureau's Census Scientific Advisory Committee (PTX-1 at AR 794 ("We hold the strong opinion that including citizenship in the 2020 Census would be a serious mistake which would result in a substantial lowering of the response rate."));

- Arturo Vargas of NALEO Educational Fund (PTX-1 at AR 778);

- Senators Feinstein, Harris, Carper, Schatz, and Cortez Masto, as well as numerous other members of Congress (PTX-1 at AR 780, 840, 908, 1086, 1223).

*See also, e.g.*, PTX-1 at AR 787, 798, 1053, 1073, 1082, 1090, 1122, 1150, 1222, 1235, 1239, 1269; PTX-3 at AR 3605, 3608.

218. Numerous stakeholder letters advised that a citizenship question was not necessary for Section 2 VRA enforcement.  *See e.g.* PTX-1 at AR 799, 1122; PTX-3 at 3605-06

219. Conversely, Defendants attempted to enlist stakeholders to express support for the citizenship question, but had trouble doing so.  PTX-71, PTX-1 at AR 1206, 1261; PTX-3 at AR4849.

220. On February 13, 2018, Director Jarmin wrote to an individual at the American Enterprise Institute (AEI) that "We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking for someone thoughtful who can speak to the pros of adding such a question . . . ." PTX-71.

221. On the same day, Michael Strain of the AEI responded that "None of my colleagues at AEI would speak favorably about the proposal." PTX-71.

27

222. On the same day, Director Jarmin wrote to Under Secretary Kelley that "Please see the thread below. Appears no one at AEI is willing to speak in favor of putting question on the 2020." PTX-71 (AR).

223. Director Jarmin later reported that Census Bureau personnel were unable to find any supporting organizations other than individuals associated with the Center for Immigration Studies and the Heritage Foundation. PTX-1 at AR 1206, 1261; PTX-3 at AR 4849; PTX-4 at AR 8325.

### G.   The Citizenship Question Was Not Tested or Publicly Noticed Prior to Ross's Decision to Add it to the Census

224. The administrative record contains no evidence that there was any cognitive or field testing of the citizenship question as required by the Census Bureau's "well-established" process described with the Census Bureau's answer to Question 31, and in other documents in the administrative record. *See* AR. *See also* PTX-4 at AR 3890, 3560, 9867; PTX-135, 141.

225. The administrative record contains no evidence Defendants discussed pretesting of the citizenship question with the Census Bureau advisory committees, the Office of Management and Budget, or any outside researchers. *See* AR.

226. The administrative record contains no evidence related to what testing was performed, and how the citizenship question performed, before it was added to the ACS. *See* AR.

227. The administrative record contains no evidence that the Census Bureau publicly noticed and provided a period for public comment about the citizenship question before Secretary Ross made the decision to add it to the Census, as required by the Census Bureau's "well-established" process described with the Census Bureau's answer to Question 31, and in other documents in the administrative record. *See* AR. *See also* PTX-4 at AR 3890, 3560, 9867; PTX-135, 141.

### H.   Defendants Did Not Evaluate DOJ's Voting Rights Act Rationale for the Citizenship Question

228. The administrative record contains no evidence that, following the December 12 Letter, any of the Defendants analyzed DOJ's Section 2 rationale for the citizenship question. *See* AR.

229. The administrative record contains no evidence that, following the December 12 Letter, any of the Defendants ever had any substantive communications with DOJ about the whether the use of administrative records would better suit assist with Section 2 enforcement than a citizenship question on the census.  *See* AR.

230. The administrative record contains no evidence that, following the December 12 Letter, DOJ was informed that non-citizens misreport their citizenship status approximately 30% of the time, as reported in the Census Bureau's January 19 memo to Secretary Ross.  *See* AR; *see also* PTX-22 at 7.

## I.    Ross's March 26 Decision Memorandum

231. On March 26, 2018, Secretary Ross issued his formal decision memorandum ("Decision Memo") announcing and explaining his decision to add a citizenship question to the decennial census.  PTX-1 at AR 1313.

232. The Decision Memo states that Secretary Ross "set out to take a hard look" at the citizenship question "[f]ollowing receipt of the DOJ request" for it.  PTX-26 at 1.  However, the evidence in the administrative record is clear that, well before DOJ's request, Secretary Ross was considering and then directing his staff to take the necessary steps to add a citizenship question to the census.

233. The Decision Memo states that DOJ seeks to obtain CVAP data for census blocks "where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA."  However, nothing in either the December 12 Letter or anything else in the administrative record provides evidence that DOJ had been unable to bring any case because of a lack of block-level CVAP data.  PTX-26 at 1.

234. The Decision Memo makes repeated statements inconsistent with the Census Bureau's estimate that the citizenship question would cause a drop in self-response rates of 5.1% of all households with at least one non-citizen.  PTX-26 at 3.  *See also* PTX-101.  These include:

   a.   The statement that, with respect to "Option B" (the option of adding a citizenship question and referred to in the Census Bureau memoranda as "Alternative B") that

29

1    neither the Census Bureau nor the concerned stakeholders could document that the

2    response rates would in fact decline materially.  PTX-26 at 3.

3    b. The statement that a former Chief Operating Officer of the Census Bureau

4      confirmed that to the best of his knowledge, "no empirical data existed on the

5      impact of a citizenship question on responses."  *Id.*

6    c. A description of numerous statistics not representing the Census Bureau's actual

7      estimate of the drop-off from the citizenship question.  *Id.* at 3-4.

8    d. Ross's conclusion that "[s]o while there is widespread belief among many parties

9      that adding a citizenship question could reduce response rates, the Census

10     Bureau's analysis did not provide definitive, empirical support for that belief."  *Id.*

11     at 4.

12    e. The statement that "the Department's review found that limited empirical evidence

13      exists about whether adding a citizenship question would decrease response rates

14      materially." *Id.* at 5.

15    f. The statement that "there is no information available to determine the number of

16      people who would in fact not respond due to a citizenship question being added,

17      and no one has identified any mechanism for making such a determination."  *Id.*

18  235. The Decision Memo states that the citizenship question is "well tested" because it has

19 been on the ACS since 2005.  *Id.* at 2.  However, it does not acknowledge the "well-established"

20 process requiring any new question to the census to first be tested, nor the fact that the Census

21 Bureau's examination of the citizenship question on the ACS showed that it causes a marked drop

22 in self-response and that non-citizens misreport their status approximately 30% of the time.  PTX-

23 22 at 7; PTX-133 at 0009832-9833.

24  236. The Decision Memo did not address whether the addition of the citizenship question

25 meets the Census Bureau's Statistical Policy standards, including whether the question was

26 performing adequately on the ACS or whether a waiver had been obtained.

27  237. The Decision Memo states that asking the citizenship question of all people, "may

28 eliminate the need for the Census Bureau to have to impute an answer for millions of people."  *Id.*

at 5.  However, the Census Bureau estimated that with a citizenship question on the census, it will have to impute the citizenship data of 13.8 million people.  PTX 24 at 2.  Nothing in the administrative record supports a contrary conclusion.

238. The Decision Memo states that Option D "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," PTX-26 at 4, so as to allow for "more complete" citizenship data.  However, the administrative record reflects that because adding a citizenship question would drive down the self-response rate and put more households into NRFU operations, Option D actually reduces the Census Bureau's ability to match survey responses with administrative records.  PTX-25 at AR 1311.

239. The Decision Memo states that stakeholders' concerns were invalid when premised upon the adequacy of ACS data for Section 2 VRA enforcement because approximately 30% of non-citizens' citizenship responses to the ACS were incorrect.  *Id.* at 6.  However, Secretary Ross does not represent, and no evidence in the administrative record supports, that those responses will be more accurate to the question on the decennial census.

240. The Decision Memo states that the Department of Commerce and Census Bureau's review of the DOJ request prioritized the goal of "obtaining *complete and accurate data*," and concludes that adding the citizenship question is the best way to obtain the most complete and accurate data.  PTX-26 at 1, 7.  In fact, the Census Bureau had consistently concluded and informed Ross that use of a citizenship question would result in *less* accurate data than administrative records alone (PTX 22, 25) and nothing in the administrative record supports a contrary conclusion.

241. The Decision Memo does not address whether the Census Bureau's Non-Response Follow-up and imputation process would fully mitigate any drop in self-response cause by the citizenship question.  PTX-26.

242. The Decision Memo does not address Secretary Ross's legal obligation "to the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to acquire and use information available from other governmental entities instead of conducting direct inquiries, as required by 13 U.S.C. § 6(c).  *Id.*

31

243. No other evidence in the administrative record indicates that Defendants considered Secretary Ross's legal obligation under section 6(c) during their decision-making process.

244. The Decision Memo does not address the fact that the Department of Justice was not advised of any details of the Census Bureau's analysis of the pros and cons of adding a citizenship question to the census or using administrative records alone. *Id.*

245. The Decision Memo does not address whether the citizenship question was among the census subjects he reported to Congress in March of 2017.

246. The Decision Memo does not address whether new circumstances have occurred that have necessitated adding the citizenship question to the census. *Id.*

**J.      Secretary Ross's Purpose in Adding the Citizenship Question to the Census**

247. The weight of the evidence demonstrates that the Secretary made the decision to add a citizenship question before knowing whether DOJ had any need or even desire for the addition of the question. See, e.g., PTX-44, PTX-49, PTX-73, PTX-89, PTX-96, PTX-98, PTX-362.

248. Secretary Ross did not decide to add the citizenship question to the decennial census to aid in enforcement of Section 2 of the Voting Rights Act.

249. There is no writing of any kind either in the Administrative Record authored by the Secretary or anyone at the Commerce Department (or anyone else) that expressly and directly describes the reasons why the Secretary wanted to add a citizenship question as early as the first quarter of 2017. PTX-1 to PTX-14.

250. However, there is enough evidence in the administrative record to infer that Secretary Ross was motivated to add the citizenship question for the partisan purpose of facilitating the exclusion of non-citizens from the population count for congressional apportionment. *See e.g.* PTX 19, 55, 58, 437.

251. This finding is particularly supported by the facts that: 1) Secretary Ross admits that he discussed a citizenship question with "senior administration officials" before he became Secretary of Commerce; 2) Steve Bannon, the Chief Strategist and Senior Counselor to the President, then asked him to speak with Kris Kobach, who wanted a citizenship question on the census to exclude non-citizens from the apportionment count; and 3) by August of 2017, when Ross's staff was

32

preparing "a memo and full briefing…on a citizenship question" (which was not disclosed in the administrative record), Commerce Department legal counsel emailed that their "hook" was that the Department "do[es] not make decisions on how the [citizenship] data will be used for apportionment…."

252. Secretary Ross did not publicly disclose in the Decision Memo or anywhere else that his purpose for adding the citizenship question was so that non-citizens could be excluded from the apportionment count.  Nor did Secretary Ross publicly disclose in the Decision Memo or anywhere also any reason for adding the citizenship question other than Section 2 enforcement.

253. The finding that Secretary Ross did not add the citizenship question for Section 2 enforcement is also supported by a dearth of evidence explaining why he would go to such lengths to persuade the Department of Justice to add the question for that purpose.

254. There is no evidence in the administrative record, other than Mr. Gary's unsupported statement, that DOJ needs block level citizenship data for Section 2 enforcement.  There is no evidence in the administrative record that any Section 2 case had ever failed due to the lack of such data, or that DOJ had ever declined to bring such an action due to the lack of data.

255. Further, the fact that the Commerce Department considered, but opted not to request the citizenship question itself, indicates that it had no legitimate need for the data for that purpose. PTX 370.  Nor is Section 2 enforcement a likely rationale to explain why Mr. Comstock would have gone to the Department of Homeland Security after initially being turned away by DOJ.  *Id.* Moreover, the administrative record evidences no effort by Ross to obtain DOJ's input after the Census Bureau had advised him of the potential pitfalls of the citizenship question.

256. The Defendants' decision-making process itself also supports the finding that Ross was not motivated by Voting Rights Act enforcement.  The administrative record contains no disclosure by the Commerce Department to the Census Bureau about the possibility of adding a citizenship question until the December 12 Letter.

257. This was despite the fact that Ross and his staff spent the better part of 2017 communicating about the citizenship question and strategizing about how to elicit a request for it.

33

258. The Defendants also did not substantively confer with DOJ about its proffered alternative of using the administrative record, despite the fact that Director Jarmin communicated to DOJ that this would yield better citizenship data.  PTX-76; PTX-102.

259. The administrative record does not indicate that Secretary Ross or anyone else at the Commerce Department made any effort to obtain DOJ's feedback on this alternative or advise DOJ on any details of the Census Bureau's analysis before making his decision.  *See* AR.

260. Finally, it does not appear that Secretary Ross's true purpose was VRA enforcement because his Decision Memo includes statements plainly at odds with the evidence in the administrative record.  PTX-26.

261. As a result, this court finds that there is very strong evidence that Secretary Ross acted in bad faith in deciding to add the citizenship question to the census and in explaining his decision to do so.  The court also finds that there is very strong evidence that Defendants acted in bad faith that compiling the administrative record in this action.  Defendants originally disclosed only 1320 pages and took the position that this constituted the entire administrative record.  *See* PTX-1 (AR 1-1320).

262. Defendants now concede that the administrative record consists of over 13,000 pages of documents, but only after being forced to produce them by a court order to supplement the record.  Joint Pretrial Statement and [Proposed]Order, ECF No. 119, at 11-13.  It is also noteworthy that Defendants initially failed to produce the Census Bureau's answer to Question 31 (and produced only the Commerce Department's more favorable version regarding question testing), and that the administrative record includes correspondence between Ross and Comstock expressing caution about what ends up in the administrative record PTX-362.

## IV.   THE DEFENDANTS' DECISION-MAKING PROCESS – ADDITIONAL FINDINGS BASED ON EXTRA-RECORD EVIDENCE

### A.   Extra-Record Evidence Confirms that Defendants Violated Testing Requirements for the Citizenship Question

263. Under Congress's direction, the Office of Management and Budget (OMB) has issued Statistical Policy Directives defining the standards that agencies, including the Bureau, must follow in developing and pretesting survey content.  PTX-821 (Trial Affidavit of Hermann

34

Habermann (*State of New York v. United States Department of Commerce*, Case No. 18-cv-2921 (S.D.N.Y); *New York Immigration Coalition, et al. v. United States Department of Commerce*, No. 18-cv-5025 (S.D.N.Y.))), at ¶¶ 55-63; PTX-262, PTX-267.

264. The Bureau has also imposed rigorous standards by which data collection instruments and supporting materials must be "pretested with respondents to identify problems . . . and then be refined, prior to implementation."  PTX-205 (U.S. Census Bureau, Statistical Quality Standards (reissued July 2013)), at i, ii, 8, 10; *see also* PTX-479; PTX-004-B, at AR 4773-4797; PTX-099; PTX-135; PTX-821 ¶¶ 56-63; Decl. O'Muircheartaigh 4-7.

265. These standards and procedures are mandatory:  all Bureau employees "must comply" with them, and they "apply to all information products released by the Bureau and the activities that generate those products," including the decennial census.  PTX-205, at ii, 2, 6.

266. When new questions are added to an existing survey, including the decennial census, pretesting "must be performed" to evaluate whether additions "cause potential context effects." PTX-205, at 8, 12-23.

267. According to Plaintiffs' expert, Dr. Hermann Habermann, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public.  PTX-821 ¶ 18.

268. Pretesting not only concerns the wording or placement of a question on a questionnaire, but also tests for respondents' cognitive perception of a question, response rates, and data quality and accuracy.  PTX-205, at 7-8; PTX-821 ¶¶ 56-60.

269. It is vital that questions are tested for the particular questionnaire on which they will appear and under similar circumstances that will govern the survey.  O'Muircheartaigh Trial Testimony.

270. This is especially salient for questions like the citizenship question that are deemed "sensitive" given the social and political context in which they are to be administered.  PTX-205, at 8-9; O'Muircheartaigh Trial Testimony.

271. There are vast contextual differences between the ACS and the decennial census. O'Muircheartaigh Trial Testimony; PTX-821 ¶¶ 65, 68.

272. For example, the 2020 Census questionnaire is much shorter than the ACS; a single question like the citizenship question could have a much greater impact on the questionnaire as a whole. O'Muircheartaigh Trial Testimony.

273. The 2020 Census is also conducted under far greater scrutiny and publicity than the ACS, which could heighten the sensitivity of the citizenship question and impact response rates. PTX-821 ¶ 68; O'Muircheartaigh Trial Testimony.

274. And the 2020 Census will be administered under a starkly different social and political climate from when the ACS questions were tested. O'Muircheartaigh Trial Testimony. Barreto Trial Testimony. PTX-465.

275. The Census Bureau's own nationwide "2020 Census Barriers, Attitudes, and Motivators" study concluded that the presence of the citizenship question could be a "major barrier" to participation in the 2020 Census due in part to those factors. PTX-465.

276. According to Dr. Abowd, the best way to test the question's effect on the census count and data collection would have been through a randomized controlled trial, yet no such test was performed before the Secretary issued his Decision Memo. Abowd Trial Testimony; Census Bureau 30(b)(6) Dep. (Aug. 29, 2018) 104-105; Census Bureau 30(b)(6) Dep. (Oct. 5, 2018) 426-430.

277. A question from another survey is exempt from pretesting only if the question "performed adequately in another survey," or if a waiver was obtained through a specified internal process. PTX-205, at 8.

278. There is no evidence that the citizenship question "performed adequately" on the ACS.

279. To the contrary, the Bureau's own analysis indicates that the question performs poorly on that questionnaire, lowering response rates, and compromising data accuracy. O'Muircheartaigh Trial Testimony; PTX-11, 24, 25, 101, 148.

280. As a result, the Bureau is presently considering removing the citizenship question from the ACS. Abowd Trial Testimony.

36

281. No waiver has been obtained for the citizenship question.  Abowd Trial Testimony.

282. In light of the above, the Court finds that the Census Bureau's Statistical Quality Standards required Defendants to test the citizenship question before deciding to add it to the decennial census.

### B. Extra-Record Evidence Confirms that Existing ACS Data Is Sufficient for Section 2 VRA Enforcement

283. Dr. Handley testified to her professional opinion that "currently available census data has proven perfectly sufficient to ascertain whether an electoral system or redistricting plan dilutes minority votes."  PTX-819 (Testimony of Dr. Lisa Handley, Trial Transcript (Nov. 13, 2018), *State of New York, et al. v. United States Department of Commerce, et al.*, No. 18-cv-2921; *New York Immigration Coalition, et al. v. United States Department of Commerce, et al.*, No. 18-cv-5025, at 797; PTX 650 (Trial Demonstrative PDX-34, Overall Opinion of Lisa Handley, *State of New York, et al. v. United States Department of Commerce, et al.*, No. 18-cv-2921; *New York Immigration Coalition, et al. v. United States Department of Commerce, et al.*, No. 18-cv-5025).

284. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court determined that minority plaintiffs need to satisfy three threshold factors to establish a violation of Section 2 of the Voting Rights Act in cases alleging vote dilution:  (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate.  PTX-819 at 797-99; Karlan Trial Dep. 30.

285. Citizenship data is most relevant to the first *Gingles* precondition.  Karlan Trial Dep. 30-31.

286. Specifically, plaintiffs in Section 2 vote dilution litigation typically use data collected and reported by the Census Bureau to determine whether there are a sufficient number of geographically concentrated minorities to satisfy the first *Gingles* precondition.  *Id.* 32-34; PTX-819 at 798-99.

287. Since the enactment of the Voting Rights Act in 1965, the decennial census questionnaire directed to every household in the United States has not included a question about citizenship.  PTX-819 at 802-03.

288. DOJ has enforced the Voting Rights Act since 1965, even though block-level citizenship data has never been available from the decennial census during this period.

289. No Section 2 case has ever failed on account of an absence of survey-based citizenship data, such as from a census questionnaire.  Karlan Trial Dep. at 49-54 (Objection); *see also* PTX-819 at 797.

290. Dr. Handley testified regarding how she is able to use five-year estimates of CVAP for purposes of analyzing the first *Gingles* precondition in Voting Rights Act cases, and as to her opinion that such data are perfectly adequate for the purposes of Voting Rights Act enforcement. Dr. Handley described how block level CVAP estimates derived from ACS data are reliable and accurate.  PTX-819 at 808-19.

291. Dr. Karlan also testified that, in her professional opinion, existing data sources are sufficient for plaintiffs to bring and prevail in litigation under Section 2 of the Voting Rights Act, and that the December 12 letter from Arthur Gary did not alter her opinion.  Karlan Trial Dep. 59, 64-67.

292. Because of confidentiality concerns, citizenship data reported in the Decennial Census will have to go through a disclosure avoidance process to prevent the personal identification of individuals or families in relation to their reported answers. Census Bureau 30(b)(6) (Aug. 29) Dep. at 50-51; Abowd Trial Testimony.

293. By nature, the disclosure avoidance process introduces further errors into CVAP data produced at the block level.  Census Bureau 30(b)(6) (Aug. 29) Dep. at 53-56, 69-71, 100-01.

294. The Census Bureau does not know if the CVAP produced based on responses to a citizenship question will have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies.  *Id.*; Abowd Trial Testimony.

295. There are no documents in the Administrative Record indicating that Secretary Ross considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.  *See* AR.

### C.   Additional Facts Regarding Defendants' Decision-Making Process[1]

296. Defendants admit that Secretary Ross talked to Steve Bannon about the citizenship question in the spring of 2017.  PTX-239 at 3.

297. Defendants admit that Secretary Ross talked to Attorney General about the citizenship question in the spring of 2017 "and at subsequent times."  *Id.*

298. Mr. Comstock set out in the spring of 2017 to come up with a "legal rationale" to support the Secretary's request to add a citizenship question. Comstock Dep. at 265-66.

299. Mr. Comstock testified that it was his job to "help [the Secretary] find the best rationale" for adding the question, because "[t]hat's what a policy person does." Comstock Dep. at 267.

300. Mr. Comstock testified that he did not "need to know what [the Secretary's] rationale might be, because it may or may not be one that is … legally-valid." Comstock Dep. at 267.

301. James McHenry was Director of DOJ's Executive Office for Immigration Review. PTX-348.

302. Mr. Gore was and is a political appointee, not career Civil Rights Division staff.  Gore Dep. at 14, 18–19.

303. Previously, as an attorney in private practice, Mr. Gore litigated numerous cases under the VRA.  Gore Dep. at 14–15.

304. In all of the cases he litigated under Section 2 of the VRA prior to coming to DOJ, Mr. Gore represented defendants rather than plaintiffs.  Gore Dep. at 16.

305. The issue of the adequacy of CVAP data never came up in any of the VRA cases litigated by Mr. Gore.  Gore Dep. at 16–17.

---

[1] Plaintiffs intend to supplement this section substantially in their post-trial Proposed Findings of Fact.

306. In his experience representing jurisdictions defending VRA lawsuits, Mr. Gore never took the position that plaintiffs' block-level CVAP data was insufficient because it was based on sample survey data rather than a "hard count" from the decennial Census.  Gore Dep. at 16–17.

307. Mr. Gore has no experience drawing districts for the purposes of complying with the *Gingles* preconditions for VRA liability or using block-level data about the characteristics of populations.  Gore Dep. at 17–18.

308. Gore testified he does not personally believe that it is necessary for DOJ's VRA enforcement efforts to collect CVAP data through the census questionnaire. Gore Dep. at 300.

309. On or about November 1, 2017, Mr. Gore wrote the initial draft of the letter from DOJ to Census Bureau requesting the inclusion of a citizenship question on the 2020 Census. Gore Dep. at 126–127 (objection).

310. The only career (as opposed to political) staffer in the Civil Rights Division that provided input at any stage of drafting was Chris Herren, in early November 2017.  Gore Dep. at 151–153.

311. After Mr. Herren provided initial edits, Mr. Gore continued to re-draft with input from DOJ political leadership and DOC legal counsel.  Gore Dep. at 151–153.

312. Before the letter was sent to the Census Bureau, Mr. Gore was aware that DOJ "staff did not want to raise the citizenship question" in the fall of 2017.  Gore Dep. at 68–69.

313. Mr. Gore is not aware of any communications between DOJ and the Census Bureau about whether or not adding a citizenship question to the census would in fact produce data that has smaller margins of error than the citizenship data currently used by DOJ, due to required disclosure avoidance techniques.  Gore Dep. at 228, 233–234.

314. Attorney General Sessions decided that DOJ would request that the Census Bureau ask a citizenship question on the Census.  Gore Dep. at 442.

315. Attorney General Sessions personally directed DOJ's refusal to meet with the Census Bureau to discuss the request in the December 12 Letter.  Gore Dep. at 271:21-272:13.

316. Mr. Comstock testified that the Secretary never told him why he wanted to add a citizenship question to the census.  Comstock Dep. at 112, 251-54.

40

317. Mr. Comstock also testified that he never asked the Secretary why he wanted to add a citizenship question.  Comstock Dep. at 171-72.

318. According to Mr. Comstock, the reasons why the Secretary wanted a citizenship question were irrelevant. Comstock Dep. at 253-54, 260-62.

319. Ms. Teramoto similarly testified that she had no knowledge of why the Secretary wanted to add a citizenship question. Teramoto Dep. at 32.

320. Undersecretary Kelley similarly testified that she had no knowledge of why the Secretary wanted to add a citizenship question. Kelley Dep. at 39.

321. No meeting between the Census and DOJ technical experts took place before issuance of the Ross Decision Memo on March 26, 2018. Census Bureau 30(b)(6) Dep. Vol. I. at 96:3-9; Gore Dep. at 259:5-11.

322. Dr. Abowd testified that he was unaware of another circumstance in which a Cabinet Secretary personally directed agency staff not to meet with the Census Bureau, and that this refusal was "unusual."

323. Dr. Hermann Habermann similarly described meetings with a requesting agency, such as the meeting Director Jarmin requested with DOJ on December 22, 2017, as "normal Census Bureau procedure. [Such a meeting] allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers."  PTX-821 ¶¶ 28-29.

324. It is unusual for the Census Bureau to receive a data request and then for the agency to refuse to meet to discuss the technical aspects of that data request. Census Bureau 30(b)(6) Dep.

325. Secretary Ross has not submitted a report to Congress finding that new circumstances exist which necessitate that the citizenship question be added to the census despite its exclusion from the topics in the March 2017 report.

**V.    FINDINGS RELATED TO THE CENSUS COUNT AND STANDING – BASED ON THE ADMINISTRATIVE RECORD AND EXTRA-RECORD EVIDENCE**

**A.    The Citizenship Question Will Damage the Census Count**

**1.    The Citizenship Question Will Lower Self-Response Rates**

326. The evidence is undisputed that the addition of the citizenship question to the 2020 Census will cause additional people to not respond to the census than would otherwise respond.

327. First, Defendant Census Bureau performed its own analysis of the potential effect of the citizenship question on non-response and currently estimates that approximately 5.8% of households with at least one non-citizen will not respond due to the citizenship question.  PTX-160.

328. Evidence of non-response due to the citizenship question is also confirmed by other Census Bureau studies.  PTX-153, 158, 307, 465.

329. The Plaintiffs offered confirming evidence of a drop in self response due to the citizenship question in the form of expert testimony from experts Dr. Matthew Barreto and Dr. Colm O'Muircheartaigh.

330. Plaintiffs' expert Dr. Matthew Barreto testified that the citizenship question will reduce self-response, particularly of immigrants and Latinos because those groups distrust the federal government with their information.  In this socio-political environment, a citizenship question is particular sensitive for these groups, particularly coming from the federal government.  Barreto Trial Testimony.  Dr. Barreto conducted a nationwide survey and concluded that the citizenship question, specifically, would create a response drop-off of between 7.1 and 9.7 percent nationally and between 12.3 and 18 percent in the State of California, the biggest drop-off among all states.  Barreto Trial Testimony; PTX-499.  Dr. Barreto testified as to ample social science research supporting these findings.  Barreto Trial Testimony.

331. Dr. O'Muircheartaigh testified that even that for households that do respond to the census, some will likely choose to report only the citizens in the household.  O'Muircheartaigh Trial Testimony.

332. The parties appear to differ only on estimated magnitude of the non-response due to the citizenship question. However, the Census Bureau admits that its estimate is conservative. PTX-160 at 39. Plaintiffs' experts' testimony shows that it is, in fact, extremely conservative.

333. The Census Bureau's report on the non-response attributed the conservative nature of its estimate to the facts that: (1) the citizenship question is more likely to stand out on the census than the ACS because the census has far fewer questions, and (2) the estimate assumes no "all-citizen" households will drop-off due to the citizenship question. *Id.*

334. Dr. Barreto's testimony confirms that, indeed, both of these two facts have large impacts on the actual expected non-response. Barreto Trial Testimony; PTX-499.

335. First, Dr. Barreto testified that the socio-political or "macro-environment" has notably shifted since 2016 so that immigrants and Latinos are especially distrustful of the federal government and are suspicious that the federal government will use their citizenship and personal-identifying information to harm them. Barreto Trial Testimony; PTX-499.

336. This opinion is supported by both social science research and Dr. Barreto's survey results. Barreto Trial Testimony; PTX-499; *see also* PTX-308, 309.

337. Second, Dr. Barreto testified, and his survey results corroborated, that non-response will occur not only in non-citizen households, but also in "citizen-adjacent" households, in particular Latinos. Barreto Trial Testimony.

338. For these reasons, Dr. Barreto's estimate of non-response is a more reliable and credible estimate of the non-response in 2020 due to the citizenship question than the estimate of the Census Bureau.

### 2.     The Citizenship Question Will Cause a Differential Undercount

339. The drop in self-response due to the citizenship question will likely result in a net undercount nationwide, and a greater proportional undercount in California than in any other state.

340. California has the highest proportions of immigrants and Latinos of all states. Barreto Testimony.

43

341. Dr. Barreto's survey also found that California was the only state with a statistically greater non-response rate than its demographics would otherwise suggest.

342. Plaintiffs' expert Dr. Fraga testified by declaration regarding the overall proportional undercount in each state under a range of undercount scenarios.  Fraga Trial Decl. ¶¶ 24-65.

343. Extrapolating for household sizes and states' populations and racial demographics, Dr. Fraga estimated that, based on Dr. Barreto's survey results, the citizenship question would cause 12.51% of Californians not to be reported in the census self-response.  *Id.* ¶¶ 57-58.  This was the largest proportional undercount of any state.  *Id.*

344.  Dr. Fraga performed the same calculation based on the Census Bureau's estimate of non-response by 5.8 percent non-citizen households.  *Id.* ¶¶ 57, 60.  Under that non-response scenario, 1.68 percent of California's population would not be counted through the self-response. *Id.* ¶¶ 57, 58.  Because California has a higher proportion of non-citizens than any other state, this was also the highest proportional undercount of all the states.  *Id.* ¶¶ 57, 65

345. Dr. Fraga testified that, in fact, using either the survey results or the Census Bureau's estimate, California will always have the highest proportional undercount as long as the Census Bureau's follow-up efforts are anything less than 100% effective.  *Id.* ¶ 65.

346. The Census Bureau's non-response follow-up (NRFU) and imputation processes will not fully mitigate this differential undercount.

347. There has been a differential undercount of hard-to-count subpopulations—in particular, the Hispanic population, the immigrant population, and non-citizens in general—in all recent censuses.  O'Muircheartaigh Trial Testimony; PTX-211, 272.

348. As the Census Bureau concedes, hard-to-count populations require more follow-up efforts by the Census Bureau to count them.  O'Muircheartaigh Trial Testimony; Jarmin Dep. at 265:6-16, 266:1-4.

349. Dr. O'Muircheartaigh testified that all available evidence indicates that this trend will continue, particularly for members of these populations who choose not to respond to the 2020 Census because of the citizenship question.  O'Muircheartaigh Trial Testimony.

350. The Census Bureau admits that, in 2020, the NRFU efforts of census enumerators will likely be less successful for hard-to-count populations than for other populations.  Abowd Trial Testimony.

351. Given the sensitivity of the citizenship question, those refusing to initially self-respond because of the question are particularly unlikely to respond to follow-up contacts.  *Id.*; PTX 160 at 42 n.59 ("If a household declines to self-respond due to the citizenship question, we suspect it would also refuse to cooperate with an enumerator coming to their door, resulting in a need to use a proxy").  O'Muircheartaigh Trial Testimony; Barreto Trial Testimony.

352. As with the initial non-response, census enumerators will fail to count many non-responders due to the citizenship question due to a lack of trust in the federal government. O'Muircheartaigh Trial Testimony; Barreto Trial Testimony; PTX-308, 309; PTX-465.  Abowd Trial Testimony.

353. Following enumerator NRFU, the Census Bureau's procedures of imputation through administrative records and proxy enumeration (information provided by a willing respondent, such as a neighbor or landlord) will also fail to fully mitigate the undercount resulting from the citizenship question.

354. The Census Bureau acknowledges that, for hard-to-count populations, there are gaps in the administrative data used for enumeration.  Abowd Trial Testimony.

355. Non-citizens, for example, are among the groups for which administrative records are least likely to exist.  O'Muircheartaigh Trial Testimony; PTX-25; Abowd Trial Testimony.

356. And, according to the Census Bureau, Hispanics are three times more likely than whites to be missing in the administrative data.  PTX-22 at 8.

357. Given the perceived threat from the citizenship question, willing and knowledgeable proxy respondents will likely be more difficult to find in neighborhoods where a substantial proportion of households contain a non-citizen.  O'Muircheartaigh Trial Testimony; Abowd Trial Testimony.

358. Because the Bureau's NRFU efforts will not fully remediate the large initial non-response caused by the citizenship question, the differential undercount of Californians will

45

1  remain after NRFU.  O'Muircheartaigh Trial Testimony; Barreto Trial Testimony; Abowd Trial

2  Testimony.

3     359. Finally, after NRFU, count imputation will not count all of the remaining non-

4  respondents due to the citizenship question.

5     360. Imputation did not prevent a differential undercount of Latinos in the 2010 Census.

6  O'Muircheartaigh Trial Testimony; PTX-211 at 4, 20.   In 2010, without the citizenship question,

7  1.54 percent of Latinos went uncounted.  PTX-211 at 20.  And, since whites were overcounted by

8  .54 percent, there was a differential undercount of Latinos compared to whites of over 2%.  *Id.*

9     361. Count imputation, by its nature, is biased towards the households that have already been

10  counted in self-response and NRFU.  O'Muircheartaigh Trial Testimony; Barreto Trial

11  Testimony.

12     362. Dr. Barreto's survey results show that, even controlling for race, households that will

13  respond to the 2020 Census have fewer people than households that will not respond due to the

14  citizenship question.  Barreto Trial Testimony; PTX 499.

15     363. As a result, imputation will undercount the people in the non-responding households.

16  Barreto Trial Testimony; PTX 499.

17     364. The differential undercount of Latinos and immigrants caused by the citizenship question

18  will remain after NRFU and imputation.

19     **B.    The Citizenship Question Will Inflict Harm on Plaintiffs**

20        **1.    Plaintiffs Have Increased Census Outreach Spending**

21     365. Plaintiffs have shown that the State of California has appropriated and will imminently

22  spend increased funds on community outreach due to the citizenship question.

23     366. California Governor Jerry Brown initially proposed to the California Legislature for the

24  fiscal year 2018-2019 budget an appropriation of $40.3 million "to be spent over a three-year

25  period for statewide outreach and other activities related to the 2020 Census count."  Undisputed

26  Facts ¶ 111.

27     367. The enacted California state budget for fiscal year 2018-2019 included an appropriation

28  of $90.3 million "to support the California Complete Count effort, which was established within

1  the Government Operations Agency to perform outreach focusing on hard-to-count populations

2  for the decennial census.  *Id.* ¶ 112

3  368. The legislative history of the state's fiscal year 2018-2019 budget shows that one of the

4  reasons for this increased appropriation was the citizenship question.  PTX-502 at CAL000002-

5  CAL000005; PTX-504 at CAL000147; PTX-505 at CAL000152; PTX-506 at CAL000162, 230;

6  PTX-509 at CAL322; PTX-510 at CAL000364-367; PTX-517 at 45:19-46:12; PTX-518 at

7  1:18:05-1:18:55; PTX-512 at CAL000411; PTX-513 at CAL000443-444; PTX-514 at

8  CAL000540; PTX-515 at CAL000717.

9  369. The citizenship question was a concern highlighted by the state's Legislative Analyst's

10  Office, and the concern was repeated in committee materials and at least one committee hearing.

11  PTX-502 at CAL0000002-CAL000005.

12  370. Since the appropriation, the California Complete Count Committee, the body in charge

13  of the outreach efforts, has submitted reports to the Governor and Legislature which highlight the

14  citizenship question as a challenge to those outreach efforts.  PTX-508 at CAL000269-270, 278,

15  284, 292-93; PTX-507 at CAL000243-244.

16  371. The State's allocation of outreach funding to the County of Los Angeles also confirms

17  increased expenditures due to the citizenship question.  *See* Trial Declaration of Douglas S. Baron

18  on Behalf of the County of Los Angeles ("Baron Dec.").

19  372. The State initially allocated to the County $8.7 million in census outreach funding.  *Id.*

20  ¶¶ 7, 11-12.

21  373. On May 18, 2018, the County requested an additional $3.3 million in funding

22  specifically due to the addition of the citizenship question on the Census.  *Id.* at 11-12 and Exhibit

23  A.

24  374. The State met the County's request, in part.  In November 2018, the State announced its

25  County outreach allocations, allocating $9,393,090 to the County of Los Angeles for 2020 Census

26  outreach to hard-to-count populations.  Undisputed Facts ¶ 113; Baron Dec. ¶ 13, 14.

27

28

## 2.      Plaintiffs Will Lose Federal Funding

375. Plaintiffs will also be injured by a decrease in federal funding due to the citizenship question.

376. As explained above, the citizenship question will cause California to experience a differential undercount among the states due to California's large immigrant and Latino populations.

377. California will lose federal funds no matter the size of that differential undercount. Reamer Trial Decl. ¶¶ 16-20, 49-50, 54-55, 64-65.

378. As Plaintiffs' expert Andrew Reamer testified, a significant portion of federal domestic financial assistance to states and local governments is distributed on the basis of statistics derived from the decennial census. *Id.* ¶ 10.

379. At least 320 federal domestic assistance programs used census-derived data to distribute about $900 billion in fiscal year 2016.  Of these, there are 24 large federal financial assistance programs with geographic allocation formulas that rely in whole or part on census-derived data. *Id.* ¶¶ 10-11.

380. Geographic allocation formulas are particularly sensitive to inaccuracies in census-derived data.  *Id.* ¶ 12.

381. If a differential undercount occurs, California and its local governments will lose funds from numerous federal programs.  This principle is illustrated by projections of loss in three example programs—Title I grants to local education agencies, the Supplemental Nutrition Program for Women, Infants, and Children grants, and Social Services Block Grants.  *Id.* ¶¶ 16-20, 49-50, 54-55, 64-65.  The same principle extends to other federal programs using census-derived allocation formulas.  *Id.* ¶ 34.

382. Within any state that would lose Title I funds due to the inclusion of a citizenship status question, individual school districts having a percentage of non-citizens higher than the percentage for the state as a whole, such as the Los Angeles Unified School District, would incur a further decrease in Title I funding when the funding received by the state is distributed to the local education agencies within that state.  *Id.* ¶ 66.

48

383. Funds from some federal programs are distributed among localities, including the local government Plaintiffs.  For example, Community Development Block Grants are allocated among smaller "entitlement communities."  Where the percentage of non-citizen residents in those localities is higher than the nationwide average, such as in Oakland, Los Angeles, Fremont, Long Beach, Stockton and the County of Los Angeles, those localities will experience a further decrease in funding with respect to those programs.  *Id.* ¶¶ 71-73.

384. Other federally-funded programs, such as grants authorized by the Workforce Innovation and Opportunity Act, award funds to states to be distributed among localities within that state. Localities within the state of California that have a percentage of non-citizen residents higher than the state average would receive a smaller share of a smaller California total, under the federally-mandated intrastate allocation formula.  *Id.* ¶¶ 67-70.

### 3.    Plaintiffs Will Have Less Accurate Data to Make Decisions Related to Redistricting and Services

385. The non-response caused by the citizenship question will harm the count and characteristic data quality produced by the 2020 Census.  Abowd Testimony.

386. Dr. Abowd stated in his memoranda in the administrative record and testified at trial that because a citizenship question will lead to a decline in self-response rates to the 2020 Census questionnaire, it will result in the enumeration of more people through nonresponse follow-up (NRFU) efforts, such as proxy responses.  Abowd Trial Testimony; PTX-22; PTX-25 at 4.

387. According to the Census Bureau, "proxies supply poor quality . . . socioeconomic characteristic information about the person on behalf of whom they are responding."  PTX 160 at 41.

388. Moreover, count imputations damage the quality of count and characteristic data at low levels of geography.  Abowd Trial Testimony.  That data is used by demographers for the allocation of resources. Abowd Trial Testimony

389. Dr. Abowd concedes that a citizenship question will reduce the accuracy of the characteristic data collected regardless of whether there is ultimately a net undercount, or differential net undercount.  Abowd Trial Testimony.

49

390. Plaintiffs will be injured by the harm to data quality that will result from the significant drop in the census self-response.

391. Dr. Abowd testified that the data quality with respect to characteristics information is important for state and local decisions relating to services and funding.  Abowd Trial Testimony. This was confirmed by Plaintiffs' witnesses.

392. The Director of Regional Planning for the County of Los Angeles testified that her department uses demographic information from the decennial census to assess local housing and development needs and planning.  She testified that decennial census demographic data is used, rather than ACS data, because the granularity of decennial census data.

393. Andrew Westall, the Assistant Chief Deputy for the Office of Los Angeles City Council President Herb J. Wesson, Jr., testified that the City of Los Angeles uses decennial census data, including data on race and population, to perform redistricting of Council district lines and to allocate City resources by neighborhood.

394. The Executive Officer to the Board of Education for LAUSD testified that LAUSD uses decennial census data in drawing districts for the Board of Education, including by allowing members to see the community demographic shaping local communities of interest and ensuring compliance with the federal Voting Right Act and California Rights Act.

**4.     Plaintiffs Will Lose Political Representation**

395. The citizenship question creates a substantial risk of California losing a congressional seat.

396. Dr. Fraga estimated population productions each state in 2020, as well as the estimated undercount of each state according to four scenarios of non-response and NRFU success.  Fraga Trial Declaration ¶ 57.

397. Dr. Fraga then estimated the likely apportionment outcomes in each of those scenarios. *Id.* ¶¶ 72-74, 78-84.

398. In the baseline scenario with no citizenship question, California is projected to keep its current 53 seats in the House of Representatives.  *Id.* ¶¶ 75, 81.

50

399. However, Dr. Fraga's calculations illustrate that, using Dr. Barreto's non-response estimates, California would be immediately in danger of losing three seats at the time of the initial self-response, even with limited NRFU success.   *Id.* ¶¶ 73-76.

400. Under scenarios using Dr. Barreto's non-response estimates and simulated follow-up estimates, Dr. Fraga's calculations illustrate that after self-response and NRFU, California would be at risk of losing one to two seats. *Id.* ¶¶ 81-85.

401. Using the Census Bureau's estimate of non-response by 5.8 percent of non-citizen households, Dr. Fraga's calculations illustrate that, with that ultimate undercount, the likelihood of California losing at least one seat nearly doubles to fifty percent probability. *Id.* ¶ 82.

402. California is the only state that would be predicted to lose more than one seat in any of the scenarios Dr. Fraga examined. *Id.* ¶¶ 83-85.

Dated:  December 28, 2018                    Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
ANTHONY R. HAKL
Supervising Deputy Attorneys General
ANNA T. FERRARI
TODD GRABARSKY
R. MATTHEW WISE
NOREEN P. SKELLY
Deputy Attorneys General


*/s/   Gabrielle D. Boutin*
GABRIELLE D. BOUTIN
Deputy Attorney General
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*

51

| | | |
|---|---|---|
| 1 | Dated:  December 28, 2018 | /s/ Charles L. Coleman |
| 2 | | CHARLES L. COLEMAN III, SBN 65496 |
| | | DAVID I. HOLTZMAN |
| 3 | | HOLLAND & KNIGHT LLP |
| | | 50 California Street, 28th Floor |
| 4 | | San Francisco, CA 94111 |
| | | Telephone: (415) 743-6970 |
| 5 | | Fax: (415) 743-6910 |
| | | Email: charles.coleman@hklaw.com |
| 6 | | Attorneys for Plaintiff County of Los Angeles |
| 7 | | |
| | Dated:  December 28, 2018 | MIKE FEUER |
| 8 | | City Attorney for the City of Los Angeles |
| 9 | | /s/ Valerie Flores |
| | | VALERIE FLORES, SBN 138572 |
| 10 | | Managing Senior Assistant City Attorney |
| | | 200 North Main Street, 7th Floor, MS 140 |
| 11 | | Los Angeles, CA  90012 |
| | | Telephone: (213) 978-8130 |
| 12 | | Fax: (213) 978-8222 |
| | | Email: Valerie.Flores@lacity.org |
| 13 | | |
| 14 | Dated:  December 28, 2018 | HARVEY LEVINE |
| | | City Attorney for the City of Fremont |
| 15 | | |
| | | /s/ Harvey Levine |
| 16 | | SBN 61880 |
| | | 3300 Capitol Ave. |
| 17 | | Fremont, CA 94538 |
| | | Telephone: (510) 284-4030 |
| 18 | | Fax: (510) 284-4031 |
| | | Email: hlevine@fremont.gov |
| 19 | | |
| 20 | Dated:  December 28, 2018 | CHARLES PARKIN |
| | | City Attorney for the City of Long Beach |
| 21 | | |
| | | /s/ Michael J. Mais |
| 22 | | MICHAEL K. MAIS, SBN 90444 |
| | | Assistant City Attorney |
| 23 | | 333 W. Ocean Blvd., 11th Floor |
| | | Long Beach CA, 90802 |
| 24 | | Telephone: (562) 570-2200 |
| | | Fax: (562) 436-1579 |
| 25 | | Email: Michael.Mais@longbeach.gov |
| 26 | | |
| 27 | | |
| 28 | | |

1  Dated:  December 28, 2018                    BARBARA J. PARKER
                                               City Attorney for the City of Oakland
2
                                               /s/ Erin Bernstein _____
3                                              MARIA BEE
                                               Chief Assistant City Attorney
4                                              ERIN BERNSTEIN, SBN 231539
                                               Supervising Deputy City Attorney
5                                              MALIA MCPHERSON
                                               Deputy City Attorney
6                                              City Hall, 6th Floor
                                               1 Frank Ogawa Plaza
7                                              Oakland, California 94612
                                               Telephone: (510) 238-3601
8                                              Fax: (510) 238-6500
                                               Email: ebernstein@oaklandcityattorney.org
9

10 Dated:  December 28, 2018                    JOHN LUEBBERKE
                                               City Attorney for the City of Stockton
11
                                               /s/ John Luebberke _____
12                                             SBN 164893
                                               425 N. El Dorado Street, 2nd Floor
13                                             Stockton, CA 95202
                                               Telephone: (209) 937-8333
14                                             Fax: (209) 937-8898
                                               Email: John.Luebberke@stocktonca.gov
15

16

17                            **FILER'S ATTESTATION**

18       Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

19  concurrence in the filing of this document has been obtained from all signatories above.

20  Dated: December 28, 2018                    /s/ Gabrielle D. Boutin
                                                GABRIELLE D. BOUTIN
21

22

23

24

25

26

27  SA2018100904
    Findings of Fact.docx
28

53

# CERTIFICATE OF SERVICE

Case Name:   **State of California, et al. v.**          No.   **3:18-cv-01865**
           **Wilbur L. Ross, et al.**

I hereby certify that on <u>December 28, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' PRE-TRIAL PROPOSED FINDINGS OF FACT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>December 28, 2018</u>, at Sacramento, California.

| Eileen A. Ennis | */s/ Eileen A. Ennis* |
|:---:|:---:|
| Declarant | Signature |

SA2018100904