1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAKL
    Supervising Deputy Attorney General
3   GABRIELLE D. BOUTIN, SBN 267308
    ANNA T. FERRARI, SBN 261579
4   TODD GRABARSKY, SBN 286999
    R. MATTHEW WISE, SBN 238485
5   NOREEN P. SKELLY, SBN 186135
    Deputy Attorneys General
6     1300 I Street, Suite 125
      P.O. Box 944255
7     Sacramento, CA 94244-2550
      Telephone:  (916) 210-6053
8     Fax:  (916) 324-8835
      E-mail:  Gabrielle.Boutin@doj.ca.gov
9   *Attorneys for State of California, by and through
    Attorney General Xavier Becerra*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

15

16  **STATE OF CALIFORNIA, by and through**        3:18-cv-01865
    **Attorney General Xavier Becerra;**
17  **COUNTY OF LOS ANGELES; CITY OF**
    **LOS ANGELES; CITY OF FREMONT;**
18  **CITY OF LONG BEACH; CITY OF**
    **OAKLAND; CITY OF STOCKTON,**               **NOTICE OF FILING TRIAL**
19                                               **DEPOSITION TRANSCRIPT FOR**
                                                 **PAMELA KARLAN**
20                                  Plaintiff,

21                    v.

22                                               Dept:        3
                                                 Judge:       The Honorable Richard G.
23  **WILBUR L. ROSS, JR., in his official**                  Seeborg
    **capacity as Secretary of the U.S.**        Trial Date:  January 7, 2019
24  **Department of Commerce; U.S.**             Action Filed: March 26, 2018
    **DEPARTMENT OF COMMERCE; RON**
25  **JARMIN, in his official capacity as Acting**
    **Director of the U.S. Census Bureau; U.S.**
26  **CENSUS BUREAU; DOES 1-100,**

27                                  Defendants.

28

1    Plaintiffs hereby submit the trial deposition transcript for Pamela Karlan, attached hereto as

2    Exhibit A.

3

4

5    Dated:  January 2, 2018                    Respectfully Submitted,

6                                              XAVIER BECERRA
                                               Attorney General of California
7                                              ANTHONY R. HAKL
                                               Supervising Deputy Attorney General
8                                              GABRIELLE D. BOUTIN
                                               ANNA T. FERRARI
9                                              TODD GRABARSKY
                                               NOREEN P. SKELLY
10                                             R. MATTHEW WISE
                                               Deputy Attorneys General
11

12                                             /s/   Gabrielle D. Boutin
                                               GABRIELLE D. BOUTIN
13                                             Deputy Attorney General
                                               *Attorneys for Plaintiff State of California, by and*
14                                             *through Attorney General Xavier Becerra*

15

16

17   Dated:  January 2, 2018                   */s/ Charles L. Coleman* _____
                                               CHARLES L. COLEMAN III, SBN 65496
18                                             DAVID I. HOLTZMAN
                                               HOLLAND & KNIGHT LLP
19                                             50 California Street, 28th Floor
                                               San Francisco, CA 94111
20                                             Telephone: (415) 743-6970
                                               Fax: (415) 743-6910
21                                             Email: charles.coleman@hklaw.com
                                               *Attorneys for Plaintiff County of Los Angeles*
22

23

24

25

26

27

28

1

1

2    Dated:  January 2, 2018                    MIKE FEUER
                                               City Attorney for the City of Los Angeles
3
                                               */s/ Valerie Flores*
4                                              VALERIE FLORES, SBN 138572
                                               Managing Senior Assistant City Attorney
5                                              200 North Main Street, 7th Floor, MS 140
                                               Los Angeles, CA  90012
6                                              Telephone: (213) 978-8130
                                               Fax: (213) 978-8222
7                                              Email: Valerie.Flores@lacity.org

8

9    Dated:  January 2, 2018                    HARVEY LEVINE
                                               City Attorney for the City of Fremont
10
                                               */s/ Harvey Levine*
11                                             SBN 61880
                                               3300 Capitol Ave.
12                                             Fremont, CA 94538
                                               Telephone: (510) 284-4030
13                                             Fax: (510) 284-4031
                                               Email: hlevine@fremont.gov
14

15

16   Dated:  January 2, 2018                    CHARLES PARKIN
                                               City Attorney for the City of Long Beach
17
                                               */s/ Michael J. Mais*
18                                             MICHAEL K. MAIS, SBN 90444
                                               Assistant City Attorney
19                                             333 W. Ocean Blvd., 11th Floor
                                               Long Beach CA, 90802
20                                             Telephone: (562) 570-2200
                                               Fax: (562) 436-1579
21                                             Email: Michael.Mais@longbeach.gov

22

23   Dated:  January 2, 2018                    BARBARA J. PARKER
                                               City Attorney for the City of Oakland
24
                                               */s/ Erin Bernstein*
25                                             MARIA BEE
                                               Special Counsel
26                                             ERIN BERNSTEIN, SBN 231539
                                               Supervising Deputy City Attorney
27                                             MALIA MCPHERSON

28

                                    2

1                                                  Attorney

City Hall, 6th Floor
1 Frank Ogawa Plaza
Oakland, California 94612
Telephone: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

Dated:  January 2, 2018

JOHN LUEBBERKE
City Attorney for the City of Stockton

*/s/ John Luebberke*
SBN 164893
425 N. El Dorado Street, 2nd Floor
Stockton, CA 95202
Telephone: (209) 937-8333
Fax: (209) 937-8898
Email: John.Luebberke@stocktonca.gov

NOTICE OF FILING TRIAL DEPOSITION TRANSCRIPT FOR PAMELA KARLAN  (3:18-cv-01865)

# Exhibit A

# EXHIBIT A

Pamela S. Karlan , J.D.

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    STATE OF CALIFORNIA, by and        ) Case No.
     through Attorney General           ) 3:18-cv-01865
4    Xavier Becerra,                     )
                                         )
5              Plaintiff,                )
                                         )
6        v.                              )
                                         )
7    WILBUR L. ROSS, JR., in his         )
     official capacity as Secretary     )
8    of the U.S. DEPARTMENT OF COMMERCE;)
     RON JARMIN, in his official         )
9    capacity as Acting Director of the )
     U.S. Census Bureau; U.S. Census    )
10   Bureau; DOES 1-100,                 )
                                         )
11             Defendants.               )
     -----------------------------------)
12   AND RELATED ACTIONS.                ) Case No.
     -----------------------------------) 5:18-cv-02279
13   SEE PAGE 2 FOR COMPLETE CAPTION

14

15                TUESDAY, DECEMBER 18, 2018

16

17       Videotaped Deposition of PAMELA S. KARLAN, J.D.,

18   taken at the offices of Manatt Phelps & Phillips LLP,

19   1050 Connecticut Avenue, Northwest, Suite 600,

20   Washington, D.C., beginning at 9:06 a.m., before

21   Nancy J. Martin, a Registered Merit Reporter,

22   Certified Shorthand Reporter.

23

24

25

Pamela S. Karlan , J.D.

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3   STATE OF CALIFORNIA, by and      ) Case No.
     through Attorney General         ) 3:18-cv-01865
 4   Xavier Becerra,                  )
                                      )
 5              Plaintiff,            )
                                      )
 6        v.                          )
                                      )
 7   WILBUR L. ROSS, JR., in his      )
     official capacity as Secretary  )
 8   of the U.S. DEPARTMENT OF COMMERCE;)
     RON JARMIN, in his official      )
 9   capacity as Acting Director of the )
     U.S. Census Bureau; U.S. Census  )
10   Bureau; DOES 1-100,              )
                                      )
11              Defendants.           )
     ----------------------------------)
12   CITY OF SAN JOSE, a municipal     ) Case No.
     corporation; and BLACK ALLIANCE FOR) 5:18-cv-02279
13   JUST IMMIGRATION, a California    )
     Non-Profit Corporation,          )
14                                    )
                Plaintiffs,           )
15                                    )
          v.                          )
16                                    )
     WILBUR L. ROSS, JR., in his      )
17   official capacity as Secretary of )
     the U.S. Department of Commerce;  )
18   U.S. DEPARTMENT OF COMMERCE;      )
     RON JARMIN, in his official      )
19   capacity as Acting Director of the )
     U.S. Census Bureau; U.S. CENSUS  )
20   BUREAU,                          )
                                      )
21              Defendants.           )
     ----------------------------------)
22
23
24
25
```

Pamela S. Karlan , J.D.

Page 3

```
 1     A P P E A R A N C E S :
 2
 3         MANATT PHELPS & PHILLIPS, LLP
           BY:  ANA G. GUARDADO, ATTORNEY AT LAW
 4         One Embarcadero Center
           30th Floor
 5         San Francisco, California   94111
           (415) 291-7409
 6         aguardado@manatt.com
           Representing City of San Jose and Black Alliance
 7         for Just Immigration
 8
           COVINGTON & BURLING, LLP
 9         BY:  P. BENJAMIN DUKE, ESQ.
10         ███████████████████  ████████
           ███████████████████
11         ██████████████
           Representing the Kravits plaintiffs in the
12         Kravits vs. United States Department of Commerce,
           et al., case in the District of Maryland
13
14         UNITED STATES DEPARTMENT OF JUSTICE
           CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
15         BY:  CAROL FEDERIGHI, ATTORNEY AT LAW
                JOSHUA GARDNER
16         P.O. BOX 883
           Washington, D.C.   20044
17         (202) 514-1903
           Representing the Defendants
18
19         STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
20         BY:  ANA FERRARI, ESQ.
           455 Golden Gate Avenue
21         Suite 11000
           San Francisco, California   94102
22         (415) 510-3779
           anna.ferrari@doj.ca.gov
23         Representing the State of California
24
25
```

Pamela S. Karlan , J.D.

```
                                                        Page 4
 1   A P P E A R A N C E S :   (CONTINUED)
 2
 3        LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
          BY:  EZRA ROSENBERG, ESQ.
 4        1500 K Street, N.W.
          Suite 900
 5        Washington, D.C.  20005
          (202) 662-8600
 6        Representing City of San Jose and the Black
          Alliance for Just Immigration
 7
 8        HOLLAND & KNIGHT    (VIA TELECON)
          BY:  DAVID HOLTZMAN, ESQ.
 9        50 California Street
          Suite 2800
10        San Francisco, California  94111
          david.holtzman@hklaw.com
11        Representing the County of Los Angeles
12
          ALSO PRESENT:
13
          MICHAEL A. CANNON, CHIEF, GENERAL LITIGATION
14                            DIVISION
15
16
17
18
19
20
21
22
23
24
25
```

Pamela S. Karlan, J.D.

1                         I N D E X

                                                         PAGE

2

TESTIMONY OF PAMELA S. KARLAN, J.D.

3

BY MR. ROSENBERG                                           8

4

BY MR. DUKE                                               64

5

BY MS. FEDERIGHI                                          68

6

BY MR. ROSENBERG                                          80

7

BY MS. FEDERIGHI                                          82

8

9                       E X H I B I T S

10   NUMBER                DESCRIPTION              MARKED

11   Exhibit 1             Expert Report and          25
                           Declaration of Pamela S.
12                         Karlan, 50 pages

13

14

15

16

17

18

19

20

21

22

23

24

25

Pamela S. Karlan, J.D.

Page 6

1       WASHINGTON, D.C., TUESDAY, DECEMBER 18, 2018;

2                    9:06 A.M.

3                  - - -

4       THE VIDEOGRAPHER:  Good morning.  We're

5 going on the record at 9:06 a.m. on December 18, 2018.

6 Please note that the microphones are sensitive and may

7 pick up whispering, private conversations, and

8 cellular interference.  Please turn off all cell

9 phones or place them away from the microphones as they

10 can interfere with the deposition audio.  Audio and

11 video recording will continue to take place unless all

12 parties agree to go off the record.

13       This is Media Unit 1 of the video recorded

14 deposition of Professor Pamela S. Karlan taken in the

15 matter of State of California, et al., plaintiff vs.

16 Wilbur L. Ross, Jr., in his official capacity as

17 Secretary of the United States Department of Commerce,

18 et al., defendants, filed in the United States

19 District Court for the Northern District of

20 California.  Case No. 3:18-CV-01865.

21       This deposition is being held at the law

22 offices of Manatt Phelps & Phillips, LLP located at

23 1050 Connecticut Avenue, Northwest, Washington, D.C.

24 My name is Solomon Francis from the firm of Veritext

25 Legal Solutions, and I'm the videographer.  The court

 1    reporter is Nancy Martin of Veritext Legal Solutions.

 2           At this time will counsel present in the room

 3    and everyone attending remotely please state their

 4    appearances and affiliations for the record.

 5           MR. ROSENBERG:  Yes.  Ezra Rosenberg from the

 6    Lawyers Committee for Civil Rights Under Law on behalf

 7    of the plaintiffs, City of San Jose and the Black

 8    Alliance for Just Immigration.

 9           MS. GUARDADO:  Ana Guardado of Manatt, Phelps

10    & Phillips on behalf of plaintiffs, City of San Jose

11    and Black Alliance for Just Immigration.

12           MS. FERRARI:  Ana Ferrari from the California

13    Department of Justice on behalf of the State of

14    California.

15           MR. DUKE:  Ben Duke from Covington & Burling

16    on behalf of the Kravits plaintiffs in the Kravits vs.

17    United States Department of Commerce, et al., case in

18    the District of Maryland.

19           Just as a note, this deposition has been

20    cross-noticed in that case as well.

21           MR. CANNON:  Michael Cannon, U.S. Department

22    of Commerce, agency counsel.

23           MR. GARDNER:  Joshua Gardner, United States

24    Department of Justice.

25           MS. FEDERIGHI:  Carol Federighi, Justice

Pamela S. Karlan, J.D.

Page 8

1    Department for the defendants.

2            THE VIDEOGRAPHER:  Counsel on the phone?

3            MR. HOLTZMAN:  Yeah.  This is David Holtzman

4    of Holland & Knight for the County of Los Angeles.

5            THE VIDEOGRAPHER:  At this time will our

6    court reporter please swear in the witness, and we can

7    proceed.

8

9                PAMELA S. KARLAN, J.D.,

10            having been first duly sworn/affirmed,

11            was examined and testified as follows:

12

13                    EXAMINATION

14   BY MR. ROSENBERG:

15       Q.  Good morning, Professor Karlan?

16       A.  Good morning.

17            MR. ROSENBERG:  And just for the record, this

18   deposition is being taken pursuant to court order in

19   the California and San Jose cases and cross-notices.

20   As Mr. Duke says, in the Maryland case as a

21   preservation deposition should any of the plaintiffs

22   choose to call Professor Karlan as a witness at trial.

23            What I would suggest is, to the extent that

24   any exhibits are marked here, that we just mark them

25   as a deposition exhibit, and then should they be moved

Pamela S. Karlan, J.D.

Page 9

1   to trial by any party, they'll be replaced by an

2   exhibit number at trial.  Is that okay?

3          MS. FEDERIGHI:  Sure.

4   BY MR. ROSENBERG:

5      Q.  Okay.  Professor Karlan, are you presently

6   employed?

7      A.  Yes, I am.

8      Q.  With whom?

9      A.  I am a professor at Stanford Law School.  I'm

10  the Kenneth and Harle Montgomery professor of public

11  interest law, and I'm the codirector of the Stanford

12  Supreme Court Litigation Clinic.

13     Q.  And what's your academic focus?

14     A.  Constitutional law and litigation with

15  special emphasis on legal regulation of the political

16  process.

17     Q.  How long have you taught at Stanford?

18     A.  I've taught there since 1998 with a 20-month

19  break to work at the United States Department of

20  Justice.

21     Q.  And what dates did you work at the Department

22  of Justice?

23     A.  From January of 2014 through September of

24  2015 I worked there full time on an interagency

25  personnel arrangement, and then I had a consulting job

Pamela S. Karlan, J.D.

1    with the Department of Justice to finish up some of

2    the cases that I had been working on.

3         Q.  What was your title at the Department of

4    Justice?

5         A.  As a deputy assistant, attorney general in

6    the civil rights division.

7         Q.  And what were your responsibilities at the

8    Department of Justice?

9         A.  My primary responsibilities were to review

10   three of the civil rights divisions litigating

11   sections; the voting section, the employment

12   litigation section, and the office of special counsel

13   for unfair immigration-related employment practices.

14   I also helped to review the voting cases that were the

15   appellate section, and then I did a number of other

16   things at the department.  I worked on a task force on

17   Windsor implementation, and I participated in the

18   general leadership of the civil rights division.

19        Q.  Did your work at DOJ include any work

20   relating to Section 2 of the Voting Rights Act?

21        A.  It did.

22        Q.  And can you tell the court what kind of work

23   that was?

24        A.  Well, there was one -- I should say at the

25   beginning there was one huge Section 2 vote dilution

Pamela S. Karlan, J.D.

Page 11

1    case that was at the department when I was there that

2    I did not participate in because I had represented

3    some of the plaintiffs before I went to the DOJ.  So I

4    was recused from that.  That's the case that comes

5    ultimately to be known as Abbott against Perez when it

6    gets to the Supreme Court.

7              So the other Section 2 work that the

8    Department was working on at the time I participated

9    in, most of that was not vote dilution work at the

10   time.  It was voter ID work and early voting, and the

11   likes are the two big cases, a case in North Carolina.

12   Chong and a case in Texas that did voter ID.  But I

13   did work on some vote dilution cases where the

14   Department was filing statements of interest and the

15   like.

16        Q.   Let's back up to the beginning of your

17   career.  Did you -- where did you graduate from

18   college?

19        A.   I graduated from Yale College in 1980.

20        Q.   And did you go on to postgraduate work after

21   that?

22        A.   Yes, I did a joint degree at Yale Graduate

23   School in the department of history and at Yale Law

24   School, and I received my J.D. and my M.A. in history

25   in 1984.

Pamela S. Karlan, J.D.

Page 12

1      Q.   And after you graduated from law school, what

2   did you do?

3      A.   I clerked for a year at the federal district

4   court in New York in the southern district of New York

5   for Judge Abraham Sofaer, and I clerked for a year at

6   the U.S. Supreme Court for Justice Harry Blackmun.

7      Q.   When you clerked for Justice Blackmun, did

8   you work on any cases involving the Voting Rights Act?

9      A.   Yes, I did.  That was the year that the

10   Supreme Court decided Thornburg against Gingles, and I

11   worked on that case.

12      Q.   Did you provide the bench memo in that case?

13      A.   I did.

14      Q.   We'll talk a little bit about Gingles in a

15   bit.

16           After your clerkship with Justice Blackmun,

17   what did you do next?

18      A.   I was an assistant counsel at the NAACP Legal

19   Defense Fund in New York.

20      Q.   And what were your responsibilities at NAACP

21   LDF?

22      A.   I was litigating, primarily doing voting

23   rights cases, but also doing Title 7 cases, and I did

24   one criminal case as well.

25      Q.   And did the voting rights case include

Pamela S. Karlan, J.D.

Page 13

1   Section 2 cases?

2        A.  Yes, it did.

3        Q.  And any other cases under the Voting Rights

4   Act?

5        A.  Yes.  So I worked on both Section 2 cases and

6   Section 5 cases.

7        Q.  Can you provide a little more detail as to

8   the number of cases that you worked on that involved

9   Section 2 or Section 5 of the Voting Rights Act?

10       A.  Sure.  So it was -- it's a little hard to

11  give the number in the following sense.  There's a

12  case that comes to be known as the Dillard litigation,

13  which has about 180 different docket numbers because

14  it started out as a defendant class action but then

15  was decertified, and I worked on that case.

16            I also worked on a case called Chisom against

17  Roemer that was the case in which the Supreme Court

18  ultimately held that Section 2 vote dilution

19  principles apply to judicial elections.  I worked on

20  judicial election cases in Mississippi as well.

21            I worked on a series of Section 2 cases in

22  Arkansas that started out with a challenge to runoff

23  primaries but ultimately became a case about the 1990

24  round of apportionment, reapportionment for the state

25  legislature in Arkansas.

Pamela S. Karlan , J.D.

Page 14

1        I worked on a series of Section 5 related

2   cases involving voter purges.

3        Did a number of amicus briefs in Section 2

4   cases around the country in which the Legal Defense

5   Fund was not representing a party.  And so that was

6   the bulk of my work at the Legal Defense Fund save for

7   two Title 7 cases that I also worked on.

8        Q.  When you talk about Section 2 vote dilution

9   cases, can you explain to the Court what you mean.

10       A.  Sure.  So Section 2 of the Voting Rights Act

11   says that no state or political subdivision can use a

12   voting practice or procedure that has the result of

13   denying minority voters, minority citizens, an equal

14   opportunity to participate and elect the candidates of

15   their choice.  And there are basically two kinds of

16   cases under Section 2.  One set of cases are about the

17   actual denial of the right to vote.  So a voter ID

18   case would be an example of that.

19       The other are cases where minority voters are

20   able to cast a ballot and to have that ballot counted,

21   but the way the elections are arranged makes it

22   impossible for them, or makes it very difficult for

23   them, to elect the candidates of their choice.  And

24   those are what they mean by vote dilution cases.  So a

25   case where the kind of paradigm is either a challenge

Pamela S. Karlan, J.D.

Page 15

1    to at large elections where the majority can keep all

2    of the seats, and the early cases I worked on were

3    mostly those kinds of cases.

4         Or later, cases about how districts are drawn

5    because how you draw the district can often determine

6    what groups are going to control the outcome in an

7    election regardless of how the votes are cast.

8         Q.  And you mentioned Section 5 cases that you

9    worked on while at NAACP Legal Defense Fund.  Were

10   they related to the issues in the Section 2 cases?

11        A.  Some of them were very much related.  So, for

12   example, one of the cases I worked on early in my time

13   at the Legal Defense Fund, helping out was a case

14   called Major against Trane, which involved

15   Congressional districts in Louisiana.  And most of the

16   case actually was litigated before I got there.

17   Initially the Department of Justice precleared the

18   Congressional districts in Louisiana, and then private

19   plaintiffs challenged those districts as violating the

20   Voting Rights Act because the act was amended in 1982

21   in a way that showed that the way districts were drawn

22   in the New Orleans area made it impossible for a

23   relatively large black population in New Orleans

24   itself to elect any members of Congress.

25        So that was a case where the first part of

Pamela S. Karlan, J.D.

Page 16

1    the case involved preclearance under Section 5, and

2    the second part of the case involved vote dilution

3    under Section 2.

4        Q.  And you mentioned the Dillard cases.  Were

5    those cases involving vote dilutions?

6        A.  Yes.  All of those were vote dilution cases.

7    It was a series of cases challenging the use of at

8    large elections to elect county commissions, county

9    boards of education, and city councils across Alabama.

10       Q.  And you mentioned judicial election cases.

11   Were those also cases involving vote dilution?

12       A.  Yes, they were.

13       Q.  How long did you stay at NAACP Legal Defense

14   Funds?

15       A.  So I was a full-time lawyer there for two

16   years, and then I continued on as a cooperating

17   attorney, really with a few breaks.  Like, for

18   example, when I was at DOJ up until the present.

19       Q.  And when you say, "cooperating attorney,"

20   what does that mean?

21       A.  Well, on some of the cases it meant I took

22   the cases with me when I left LDF and I kept being the

23   lead litigator on them.  On some of them it meant

24   writing amicus briefs.  On some of it, it involved

25   giving advice to younger lawyers at the Legal Defense

Pamela S. Karlan, J.D.

Page 17

1   Fund on voting rights related cases.

2       Q.   And the cases that you took with you from the

3   Legal Defense Funds, did they include Section 2 vote

4   dilution cases?

5       A.   Yes.  The Chisom against Roemer case is

6   probably the best example of that, but I also kept

7   litigating some of the Dillard cases up, actually,

8   into the 2000's because that was when the final set of

9   these cases, which were initially filed in 1985, I

10  believe, that was when the final round of the cases

11  finished.

12          I kept helping out on the Arkansas runoff

13  cases, which were vote dilution cases as well.

14      Q.   After you left NAACP Legal Defense Fund, what

15  did you do?

16      A.   I accepted a job as an assistant professor of

17  law at the University of Virginia in Charlottesville,

18  Virginia in 1988.

19      Q.   And how long did you teach at the University

20  of Virginia?

21      A.   Well, that was where my full-time appointment

22  was until 1998 when I left for Stanford.  But over the

23  course of the time that I was there, I was also a

24  visiting professor at various points for either a

25  semester or a year at Yale Law School, Harvard Law

Pamela S. Karlan, J.D.

Page 18

1   School, NYU Law School and at Stanford Law School.

2       Q.   And during that time period did your courses

3   that you taught cover Section 2 of the Voting Rights

4   Act?

5       A.   Yes.  I started teaching a course called

6   legal regulation of the political process in the

7   spring of 1989 and have taught it off and on fairly

8   consistently from then until quite recently.

9           In recent years I haven't taught the course

10  because I have a colleague who's also a coauthor of

11  our case book who likes to teach the course and

12  doesn't have quite the range of courses that he wants

13  to teach that I teach.  So I don't teach -- I haven't

14  taught the voting rights course itself in a couple of

15  years.

16      Q.   When you were teaching at this period of time

17  from 1988 to 1998, did you discuss issues involving

18  data relating to Section 2 of the Voting Rights Act in

19  your courses?

20      A.   I did.

21      Q.   Can you explain the sort of issues.

22      A.   So the data issues mostly were in connection

23  with Thornburg against Gingles.  As I mentioned

24  earlier, in Thornburg against Gingles the Supreme

25  Court laid out what later became as a sort of road map

Pamela S. Karlan, J.D.

1  for showing voter dilution.  A set of three

2  prerequisites that anybody who wants to win a

3  Section 2 vote dilution case is going to have to meet.

4         And in our case book we had an -- I started

5  with a set of mimeograph materials I should say, you

6  know, cut-and-paste, but ultimately, we turned those

7  into a case book, and we devoted fairly substantial

8  attention at the time to Gingles.  The Gingles

9  factors, how you went about proving them and the like.

10  Most of the discussions -- there was a little bit

11  discussion on Gingles 1, which is what I think we'll

12  be talking about later, but there was also a lot of

13  kind of ferment, methodological ferment about how you

14  prove Gingles 2 and 3, which go to the question of

15  racial block voting.

16         And so things like bivariate ecological

17  regressions, extreme precinct analysis and the like.

18  And so we spent a fair amount talking about those.

19  And, in addition, I spent a fair amount of time

20  talking about the so-called Senate report factors,

21  which come from the 1982 Senate report that

22  accompanied the amendments of Section 2 that

23  instituted the results test because a number of those

24  are data related.

25         For example, there's one that looks at

Pamela S. Karlan , J.D.

1    effective socioeconomic disparities on the ability of

2    minority citizens to participate effectively in the

3    political process.

4        Q.   After you left Stanford -- after you left

5    University of Virginia, where did you go?

6        A.   I went to Stanford in the summer of 1998.

7        Q.   And Stanford is where you still are?

8        A.   Yes, it is.

9        Q.   And what courses have you taught at Stanford

10   during this period of time?

11       A.   So I've taught a course called Constitutional

12   law that's just like what it sounds like.

13   Constitutional litigation, which is Section 1938,

14   Vivens and related issues.  Legal regulation of the

15   political process, which is the course where I teach

16   most about the Voting Rights Act, but I also teach

17   there about political parties and sometimes about

18   ballot initiatives and the like.

19           I've taught professional responsibility.

20   I've taught sex discrimination.  I teach a live client

21   clinic, the Supreme Court litigation clinic that

22   litigates cases at the U.S. Supreme Court.  This year,

23   for example, with counsel in six cases that have been

24   argued already.

25           I teach -- let's see.  What else have I

Pamela S. Karlan , J.D.

Page 21

1   taught recently.  I teach torts.  I've taught civil

2   procedure, although I really have stopped teaching

3   civil procedure.  I teach a series of undergraduate

4   classes.  Most recently a class called justice in the

5   university.  I teach a class that's a graduate-level

6   class universitywide seminar called ethics, conflicts

7   in the academy.

8           I think that covers all of them, but pretty

9   much everything that I teach is -- that I've taught

10  very recently is listed on my CV.

11      Q.  And during this period of time, have you also

12  had some visiting professorships?

13      A.  Yes.  I was a visiting professor at Tel Aviv

14  University where I taught a course on comparative

15  regulation of the political process.  I was a visiting

16  professor twice at Yale.  One time I taught regulation

17  of the political process and Constitutional

18  litigation.

19          The other time I think I taught procedure and

20  Constitutional litigation.  I was a visiting professor

21  back at the University of Virginia where I taught -- I

22  think I taught Constitutional litigation.  I know I

23  taught legal regulation of the political process

24  because I had Justice Thomas come as a guest to the

25  class, and we talked about what would he have done if

Pamela S. Karlan, J.D.

Page 22

1  he had been on the Supreme Court when they decided the

2  one-person, one-vote cases.

3       Q.  Have you ever argued before the Supreme

4  Court?

5       A.  Yes.  I've argued eight times.

6       Q.  Any of those cases voting rights cases?

7       A.  Yes.  Three of the cases are voting rights

8  cases.  So Chisom against Roemer is a Section 2 vote

9  dilution case involving judicial elections.

10          Morse vs. Republican Party of Virginia was a

11  Section 5 case involving restrictions on who could

12  vote at the Virginia Republican conventions.

13          And Riley against Kennedy was a Section 5

14  case about changes in the way that vacant offices were

15  filled.

16       Q.  Other than times you've argued before the

17  Supreme Court, have you also participated as amicus

18  curiae before the Supreme Court?

19       A.  Yes, I have.

20       Q.  On voting rights cases?

21       A.  Yes.

22       Q.  And can you estimate approximately how many

23  voting rights cases you've submitted amicus briefs?

24       A.  Somewhere between half a dozen and a dozen.

25  And, again, those would all be listed on my CV.

Pamela S. Karlan, J.D.

1      Q.   And we'll identify your CV pretty soon.

2           And did any of those voting rights cases on

3   which you participated as amicus include Section 2

4   vote dilution cases?

5      A.   They did, and before I get to that, I should

6   mention I also served as counsel but not arguing

7   counsel in Section 2 vote dilution case.  Most

8   recently in Abbott against Perez, I represented the

9   Mexican American legislative caucus Atalees in that

10  case.

11     Q.   Other than Abbott vs. Perez, have you

12  represented other parties in Section 2 vote dilution

13  cases before the Supreme Court?

14     A.   I think the other cases in which I

15  represented a party were cases -- well, let me qualify

16  that a little bit.  There's a case called Presley

17  against Etowah County.  At the Supreme Court the

18  question was a Section 5 question, but it was a

19  question that arose out of whether changes that were

20  made by counties in Alabama after they settled a

21  Section 2 case undermined the purpose of the Section 2

22  vote dilution case.

23          So, you know, when the case went back on

24  remand, it was decided on Section 2 grounds, but the

25  issue at the Supreme Court was solely a Section 5

Pamela S. Karlan, J.D.

Page 24

1   issue.

2       Q.   And I think I interrupted you when you were

3   going to discuss your amicus participation before the

4   Supreme Court in the Section 2 vote dilution cases.

5       A.   Yes.  So I'm trying to think -- I mean it's a

6   little complicated because a number of the cases had

7   Section 2 issues in them, but the issue, when it got

8   to the Supreme Court was framed in terms of either

9   Section 5 or in terms of what's called the Shaw

10  against Reno Doctrine, which says that you can't take

11  race into account too much.

12          So, for example, one of the big defenses in a

13  Shaw case is "But I had to draw the districts this way

14  in order to comply with Section 2 of the Voting Rights

15  Act."  And those are where I think more of my amicus

16  participation at the Supreme Court was involved.  That

17  is in Shaw cases where our client's position was that

18  the use of race was Constitutional here because it was

19  necessary in order to comply with the Voting Rights

20  Act, which was a compelling state interest for the use

21  of race.

22      Q.   Have you been the author of any books?

23      A.   Yes.  I'm the coauthor of three case books,

24  Constitutional Law, which is now in its eighth

25  edition, Legal Regulation of the Political Process,

Pamela S. Karlan, J.D.

Page 25

1    which is now in its fifth edition, and Civil Rights

2    Actions, which is now in its fourth edition.

3        Q.   And do any of those books cover topics

4    relating to Section 2 of the Voting Rights Act?

5        A.   Yes.  Both the Constitutional law book, which

6    covers it briefly, and Legal Regulation of the

7    Political Process, which involves several hundred

8    pages of Voting Rights Act related.

9        Q.   Including vote dilution?

10       A.   Yes.

11       Q.   Have you authored any articles that have

12   appeared in law journals and the like?

13       A.   Yes.  I've authored, I don't know, probably

14   close to 100 articles.

15       Q.   Any of those articles deal with Section 2

16   vote dilution cases?

17       A.   Yes, a number of them do.

18       Q.   Do you know approximately how many?

19       A.   Probably about a dozen of them are primarily

20   about Section 2 in one way or another, and another 15

21   discuss it in comparative terms with something else.

22           MR. ROSENBERG:   I'm going to mark as our

23   first exhibit this document.

24           (Deposition Exhibit 1 was marked for

25           identification.)

Pamela S. Karlan, J.D.

Page 26

1    BY MR. ROSENBERG:

2        Q.   And Professor Karlan, could you identify

3    what's been marked as Exhibit 1?

4        A.   Yes.  This says it's a Rule 26(A)(2)(B)

5    expert report and declaration.  It has a mistake on

6    it.  It says, "of Pamela S. Karlan Ph.D."  I'm not

7    sure where the Ph.D. came from.

8        Q.   And just for the record, you did not put that

9    on there?

10       A.   No.  No.  I've read the studies of resume

11   fraud, and I try to avoid that.

12       Q.   One of our lawyers will take responsibility

13   for that mistake.

14       A.   Yeah.  I have a master's degree in science.

15       Q.   And turning to what is marked -- what is

16   called "Appendix A-1" --

17       A.   Yes.

18       Q.   -- and then it continues through a whole

19   bunch of pages that has numbers that end around

20   Page 33.

21       A.   Yeah.

22       Q.   Can you identify that portion of Exhibit 1?

23       A.   Yes.  That is my CV.

24       Q.   And are there any additions, any material

25   additions that you'd want to add to the exhibit?

1       A.  Material additions --

2           REPORTER MARTIN:  I'm sorry.  That you want

3   to what?

4           MR. ROSENBERG:  Add to the exhibit.

5           THE WITNESS:  I don't think so.  I'm just

6   looking to see if this is of the most recent versions.

7   Hold on.  I can tell that pretty easily.  Yes, I

8   believe this is the most recent version.

9   BY MR. ROSENBERG:

10      Q.  Great.

11      A.  So, no, I would have nothing to add.

12      Q.  Did there come a time when you were retained

13  to testify as an expert in this case?

14      A.  Yes.

15      Q.  And approximately when was that?

16      A.  It was the early summer of 2018.

17      Q.  And who have you been retained by?

18      A.  Initially I was retained by you, Ezra, and

19  then the State of California asked if they could

20  retain me as well, and I said, "yes."  And then some

21  of the plaintiffs in the Maryland case, and, again, I

22  said that was fine by me.

23      Q.  And what were you asked to do in this case?

24      A.  So I was asked to offer an opinion on some

25  claims that were made in what's come to be known as

Pamela S. Karlan, J.D.

Page 28

1   the Gary letter, which is Appendix B to this report.

2   It was a letter from Arthur Gary, who's the general

3   counsel of judicial management division at the

4   Department of Justice, to an official at the Census

5   Bureau.  I'm not sure what Ron Jarmin's actual title

6   is, but he's got a long sort of -- because there's a

7   vacancy.  He's now performing the nonexclusive

8   functions and duties of the director of the Census

9   Bureau.

10      Q.  And turning your attention to what's been

11  marked as -- or what is designated Appendix B-001 --

12      A.  Yes.

13      Q.  -- through --

14      A.  It should be three pages.

15      Q.  -- 004 --

16      A.  Yeah.

17      Q.  -- in what's been marked as Exhibit 1 of this

18  deposition, is that the Gary letter you're referring

19  to?

20      A.  Yes, it is.

21      Q.  And by the way, you are being compensated for

22  your work as an expert in this case?

23      A.  No, I'm not.

24      Q.  How come?

25      A.  I'm doing it pro bono, as I do all of the

Pamela S. Karlan, J.D.

Page 29

1    outside work, basically, that I've done.  I've only

2    once done outside work -- outside legal work, I should

3    say, as opposed to like Bar review courses and things

4    like that.  But outside legal work, I've only once

5    been compensated by a client.

6         Q.  And did you reach any conclusions after your

7    review of the Gary letter and your work in this case?

8         A.  I did.

9         Q.  And what are they?

10        A.  My conclusion was that the statement that the

11   long form census was the most appropriate way to

12   answer questions regarding citizenship, that claim in

13   the letter was not accurate.

14        Q.  And we'll get into the basis for your

15   conclusions.  Are there any other conclusions other

16   than that?

17        A.  Well, the conclusion is that as a practical

18   matter, the existing data sources now from the

19   American Community Survey, which is called the ACS,

20   and before that from a sampling, which was called the

21   census long form, are perfectly adequate for

22   plaintiffs to prevail in voting rights cases and get

23   remedies from the client.

24        Q.  Okay.  Now, a few minutes ago you were

25   talking about the Thornburg vs. Gingles factors.

Pamela S. Karlan, J.D.

Page 30

1      A.  Yes.

2      Q.  Can you explain to the Court what was meant?

3      A.  Sure.  So in Thornburg against Gingles,

4   Justice Brennan's opinion for the Court identifies

5   three factors that he thinks will generally have to be

6   present in cases where plaintiffs are claiming vote

7   dilution.  Those factors -- I'll get to in a moment --

8   get kind of reunified and firmed up along the way.  So

9   it looked originally as if it was guidance, and now

10  it's absolutely clear that these form what the Supreme

11  Court calls preconditions; that is, you've got to show

12  these things in order to bring a Section 2 results

13  claim involving vote dilution.

14       The first of these is you have to show that

15  the minority group on whose behalf the case is being

16  brought is sufficiently large and geographically

17  compact so as to form a majority in a fairly drawn

18  single-member district.

19       The second prong is that you have to show

20  that the minority group is politically cohesive.

21       And the third prong is that you have to show

22  that the majority population generally votes

23  sufficiently as a block so as to defeat the

24  minorities' candidate of choice.

25      Q.  And is the issue of citizenship relevant to

Pamela S. Karlan, J.D.

Page 31

1    any of the Gingles preconditions?

2        A.   It is.   It's most relevant to the first

3    pre-condition, which is showing that the minority

4    group is sufficiently large and geographically

5    compact.   Now, in Gingles the Supreme Court just said

6    that the minority group had to be sufficiently large

7    and geographically compact.

8            The Supreme Court in a later case, Bartlett

9    against Strickland, elaborated on that and held that

10   you had to show that the minority group would be a

11   majority of the voters in the fairly drawn,

12   sufficiently compact district.   And I'll just call

13   that the illustrative district because it's easier

14   because usually, if you're the plaintiff, you draw a

15   district to illustrate that you could satisfy

16   Gingles 1.

17           And so the Supreme Court, having said that it

18   was voters, majority voters rather than just total

19   population, lower federal courts have pretty uniformly

20   said that that means citizens of voting age because

21   you don't want to use actual voters since that would

22   penalize a minority community that has had difficulty

23   registering because they wouldn't already be a

24   majority of the voters even though potentially they

25   could be.

Pamela S. Karlan , J.D.

Page 32

1        And so because at least with respect to
2   anything other than a very few number of local
3   elections only citizens can vote, you have to show
4   that a majority of the citizens of voting age are
5   members of the minority group on whose behalf you're
6   bringing the case.  And that's what's called CVAP,
7   citizen voting age population.
8        And so that's where it's most relevant.  I
9   mean it could theoretically be relevant to the other
10  two prongs, but as a practical matter, it really plays
11  no role there because those are looking at actual
12  voting behavior, and the actual voting behavior is
13  almost definitionally going to be the behavior of
14  citizens.
15     Q.  Based upon your experience, can you explain
16  where Section 2 practitioners get their data to meet
17  the Gingles 1 precondition?
18     A.  Well, they hire experts to do this sort of
19  data because lawyers are not trained directly to work
20  with the data.  So the expert gets the data -- and you
21  just want to talk about Gingles 1 now, I take it?
22     Q.  Right.
23     A.  So for Gingles 1 the expert gets the data
24  from various publications of the census, Census
25  Bureau.

Pamela S. Karlan, J.D.

1      Q.   And what publications are those?

2      A.   So they get some of the data from the

3   decennial census numbers an --

4           MS. FEDERIGHI:  Objection.  Asking for

5   hearsay.

6           MR. ROSENBERG:  Well, we can build an even

7   greater foundation just for the record.

8      Q.   What is the basis for your understanding as

9   to where experts -- well, strike that.

10          In the course of your litigating Section 2

11   cases, have you worked with experts?

12     A.   Yes, I have.

13     Q.   And have you reviewed the reports of experts?

14     A.   Yes, I have.

15     Q.   And have you discussed with experts where

16   they get their information?

17     A.   Yes.

18     Q.   And based upon the work you've done in this

19   field, what is your understanding of where the experts

20   get their data?

21          MS. FEDERIGHI:  Same objection.

22          MR. ROSENBERG:  Objection noted.

23          THE WITNESS:  So my understanding of where

24   the experts get their data is they get their data

25   from -- some of their data from the results of the

Pamela S. Karlan, J.D.

Page 34

1   decennial census.  Some of that stuff gets reported to

2   the states.  There's a law that provides that the

3   census gives the information to the states and makes

4   public information that's broken down by political

5   subdivisions in various ways.  And some of the data

6   comes from the American Community Survey now.  They

7   used to come from the census long form.

8   BY MR. ROSENBERG:

9       Q.  And a few minutes ago when you were talking

10  about your overall conclusions, I think you mentioned

11  a long form.

12      A.  Yes.

13      Q.  Do you also consider the ACS to be part of

14  what is sufficient for practitioners to prove cases?

15          MS. FEDERIGHI:  Objection.  Lack of

16  foundation.

17          THE WITNESS:  Do I answer?

18  BY MR. ROSENBERG:

19      Q.  Yes.

20      A.  Yes.  So here's the thing.  For some of the

21  data that you need, both for Gingles and for, for

22  example, the fifth of the Senate report factors, which

23  goes into socioeconomic disparities and the like, some

24  of the -- you know, the census itself, the decennial

25  census gives you population figures, but if you want

Pamela S. Karlan, J.D.

Page 35

1  more detailed information about the population, for

2  example, how many households have telephones, which is

3  relevant -- it was very relevant before the Internet.

4  Now, they also will tell you about the Internet, but

5  it's what we call the politically salient resource

6  because it tells you something about how easy or

7  difficult it is to get the vote out.

8         That information you get from the Bureau of

9  the Census, but you don't get it from the short form

10  that goes to every household.  You get it from survey

11  data.  Used to be surveys that were called the long

12  form, which were sent out, I think it was like one in

13  six households.  And now it's from something called

14  the "American Community Survey," which is a survey

15  that's sent out every year, and generally, for our

16  purposes, you use the five-year kind of aggregate of

17  data from that.

18      Q.  In your scholarship, have you reviewed

19  articles by other Section 2 practitioners concerning

20  Gingles 1 preconditions?

21      A.  By people who practice?

22      Q.  Yes.

23      A.  Yes.  But most of them are by people who are

24  primarily scholars.

25      Q.  And in that scholarship, has there been

Pamela S. Karlan, J.D.

Page 36

1    reference to reliance on ACS by experts in the field?

2         A.  Yes.

3              MS. FEDERIGHI:  Objection.

4    BY MR. ROSENBERG:

5         Q.  In your scholarship, have you come across any

6    writings by either practitioners or experts in the

7    field of Section 2 vote dilution litigation discussing

8    the need for more accurate CVAP data than that is

9    provided by ACS?

10             MS. FEDERIGHI:  Objection.

11             THE WITNESS:  Do I answer?

12   BY MR. ROSENBERG:

13        Q.  Sure.

14        A.  No, I have not.

15        Q.  In your experience, have you attended

16   conferences where Section 2 practitioners and experts

17   discuss issues relating to Section 2 vote dilution

18   litigation?

19             MS. FEDERIGHI:  Objection.

20             THE WITNESS:  I have.

21   BY MR. ROSENBERG:

22        Q.  And approximately how many such conferences

23   have you attended?

24        A.  How many conferences have I attended?

25        Q.  Uh-huh.

Pamela S. Karlan, J.D.

Page 37

1          A.   Well, I would say on average it would be at

2    least one a year, in part because the Civil Rights

3    Training Institute that the NAACP Legal Defense Fund

4    puts on virtually always has a session on voting

5    rights and vote dilution.

6               MR. ROSENBERG:  By the way, since this is a

7    preservation deposition, I think you do have to put

8    your -- the basis for your objection on the record.

9               MS. FEDERIGHI:  Okay.  The previous few were

10   hearsay, calls for hearsay.

11   BY MR. ROSENBERG:

12        Q.   And have the discussions in those conferences

13   included discussions on issues relating to proving

14   Section 2 claims?

15        A.   Yes.

16               MS. FEDERIGHI:  Objection.  Calls for

17   hearsay.

18               THE WITNESS:  Yes, they have.

19   BY MR. ROSENBERG:

20        Q.   And including meeting the Gingles

21   preconditions?

22               MS. FEDERIGHI:  Objection.  Calls for

23   hearsay.

24               THE WITNESS:  Yes, they have.

25   BY MR. ROSENBERG:

Pamela S. Karlan, J.D.

Page 38

1      Q.   Including meeting Gingles 1?

2           MS. FEDERIGHI:  Objection.  Calls for

3      hearsay.

4           THE WITNESS:  Yes, they have.

5      BY MR. ROSENBERG:

6      Q.   And, again, in any of those discussions have

7      you heard any mention of a need for more accurate CVAP

8      data than that provided by ACS?

9           MS. FEDERIGHI:  Objection.  Calls for

10     hearsay.

11          THE WITNESS:  No, I have not.

12          MR. ROSENBERG:  And just for the record,

13     obviously we do not believe any of this is hearsay,

14     and certainly not inadmissible hearsay even if it

15     could be considered hearsay.

16     Q.   In any -- by the way, based on your

17     experience, would you have expected there to be some

18     mention of a problem as to the inaccuracy of data

19     by -- at these conferences?

20          MS. FEDERIGHI:  Objection.  Lack of

21     foundation.

22          THE WITNESS:  So here's the thing.  Over the

23     course of the evolution of voting rights law from

24     Gingles forward, there have been many discussions of

25     difficulties of showing various aspects of either

Pamela S. Karlan, J.D.

Page 39

1    Gingles, the Gingles factors or the Senate report

2    factors or the like.  So I would expect if people were

3    having trouble out in the field actually proving up

4    their cases, because of a problem with either long

5    form data or ACS data, we would have heard about that,

6    and I never heard anybody say that was the problem

7    they were having in winning a case.

8    BY MR. ROSENBERG:

9        Q.  Was it typical for practitioners and experts

10   to discuss other problems that were arising in terms

11   of proving Section 2 cases at these conferences?

12            MS. FEDERIGHI:  Objection.  Calls for

13   hearsay.

14            THE WITNESS:  Yes.  We had, for example,

15   numerous discussions over the years about the various

16   methodologies for trying to estimate the race of

17   individual voters in voter ID cases.  There were lots

18   of discussions about the different methods of trying

19   to figure out racial block voting because one of the

20   ways that political scientists starting out estimating

21   it often produced -- because what you were doing was

22   you were taking essentially a scatter plot and then

23   trying to draw a line through it.  You would get

24   predictions that over 100 percent of the African

25   Americans were voting for the African American

Pamela S. Karlan, J.D.

Page 40

1     candidate, or less than zero percent of the White

2     voters were voting for the White candidate.

3              So there were discussions about, "Well, how

4     did you deal with that," and I just -- you know, I

5     remember discussions about terms that I could barely

6     pronounce, and the experts would be talking about why

7     you had to worry about heteroscedasticity, for

8     example, a word that I still have no idea exactly what

9     it means.

10    BY MR. ROSENBERG:

11        Q.   Wait until you have to explain that to the

12    reporter.

13        A.   Yeah.  I had no -- it must mean other

14    scedasticity as opposed to homoscedasticity.  So,

15    yeah, there were lots of discussions about, you know,

16    what kinds of experts you needed, what the experts

17    could or couldn't do, but I was never present at one

18    where somebody said, "My problem in meeting Gingles 1

19    is I just can't show that the minority group is

20    sufficiently numerous."

21        Q.   In your years as a private practitioner

22    bringing Section 2 vote dilution cases, have you been

23    involved in discussions as to issues relating to

24    Section 2 vote dilution litigation?

25        A.   Yes.

Pamela S. Karlan, J.D.

Page 41

1      Q.  With fellow petitioners?

2      A.  Yes.

3      Q.  With experts?

4      A.  Yes.

5      Q.  Have the discussions in those conferences

6  included discussions on issues relating to proving

7  Section 2 claims?

8           MS. FEDERIGHI:  Objection.  Calls for

9  hearsay.

10          THE WITNESS:  Yes, I have.

11 BY MR. ROSENBERG:

12     Q.  Including Gingles preconditions?

13          MS. FEDERIGHI:  Objection.  Calls for

14 hearsay.

15          THE WITNESS:  Yes.

16 BY MR. ROSENBERG:

17     Q.  And including meeting Gingles 1?

18          MS. FEDERIGHI:  Objection.  Calls for

19 hearsay.

20          THE WITNESS:  Yes.

21 BY MR. ROSENBERG:

22     Q.  In any of those discussions, has there ever

23 been mention of the need for more accurate data as to

24 CVAP for the purposes of meeting Gingles 1 then as

25 provided by ACS?

Pamela S. Karlan, J.D.

Page 42

1          MS. FEDERIGHI:  Objection.  Calls for
2    hearsay.
3          THE WITNESS:  There's never been a discussion
4    of the need for more.  I should say at the most recent
5    conference I was at there was a discussion about the
6    Gary letter and the Census Bureau's plan to add a
7    citizenship question to the 2020 short form.  There
8    was not a discussion -- there was no belief among the
9    people who were discussing this that it was necessary
10   to do so, but there was a discussion of the claim that
11   there was a need to do so.
12   BY MR. ROSENBERG:
13        Q.  In your years at DOJ, were you involved in
14   discussions as to issues relating to Section 2 vote
15   dilution litigation?
16        MS. FEDERIGHI:  Objection.  Calls for
17   hearsay.
18        THE WITNESS:  I think that would be -- I'm
19   not sure whether that's privileged.
20   BY MR. ROSENBERG:
21        Q.  Well, I'm just asking if you were involved in
22   discussions.
23        A.  Yes, I was involved in discussions.
24        Q.  In any of those discussions, was there any
25   mention of the need for more accurate data as to CVAP

Pamela S. Karlan, J.D.

Page 43

1   for purposes of meeting Gingles 1 than as provided by

2   ACS?

3           MS. FEDERIGHI:  Objection.  Calls for

4   privileged communications and hearsay.

5           THE WITNESS:  I can't answer.

6           MR. ROSENBERG:  And I assume DOJ won't waive

7   the privilege?

8           MS. FEDERIGHI:  No.  No.

9           MR. ROSENBERG:  Okay.

10      Q.  While you were at DOJ, were you involved in

11  any discussions as to census-related issues?

12          MS. FEDERIGHI:  Objection.  Calls for hearsay

13  and privileged material.

14          MR. ROSENBERG:  Okay.  And, again, you will

15  not waive the privilege?

16          MS. FEDERIGHI:  Yeah.

17  BY MR. ROSENBERG:

18      Q.  Okay.  Based upon your experience, what is

19  your opinion as to why there has not been mention of

20  the need for more accurate CVAP data than as provided

21  by ACS in the various discussions that you've had?

22          MS. FEDERIGHI:  Objection.  Calls for

23  speculation.

24  BY MR. ROSENBERG:

25      Q.  Based upon your experience.

Pamela S. Karlan , J.D.

Page 44

1        A.   Based on my experience, people have been
2   successful in Section 2 cases with the data they have,
3   and the cases that are not being brought are not being
4   brought because people don't think there are enough
5   minority voters in the jurisdiction or they don't
6   think that the racial block voting is sufficiently
7   provable, or they don't think they could draw a
8   district at the end of the day.
9            It's not because they think the people are
10   out there and just haven't been found by the ACS, if
11   you will.
12        Q.   Is CVAP data necessary to prove Gingles 1 in
13   every sort of Section 2 case?
14        A.   I mean, technically, yes, but as a practical
15   matter, there are a number of cases where you don't
16   really need it because nobody is contesting that the
17   voting age population is made up almost entirely of
18   citizens.  So, for example, in most voting rights
19   cases where the plaintiff class is Native American,
20   all you need is VAP, the voting age population,
21   because nobody suggests, for example, that there are a
22   lot of Navajo who aren't U.S. citizens or a lot of,
23   you know -- or there are a lot of tribes up in
24   South Dakota with vote dilution cases, and nobody
25   suggests that they're not citizens.

Pamela S. Karlan , J.D.

Page 45

1          So if you have the VAP, you basically almost

2     definitionally have the CVAP as well.

3          The same thing is true in at least all of

4     that vote dilution cases of which I'm aware involve

5     African Americans.  The citizenship rate among African

6     Americans in the United States is slightly higher than

7     the citizenship rate of the overall population, and

8     therefore, thereto, if you're in Mississippi and you

9     show that 55 percent of the VAP in, say, DeSoto County

10    is black, nobody is going to say, "But most of those

11    folks are probably West Africans who've only just

12    recently arrived.

13         So there too you don't really see an issue of

14    VAP versus CVAP.  The place where you see it is

15    obviously in the Latino community where there's a

16    substantial number of noncitizens in areas where you

17    might expect to see voting rights litigation.

18         Q.  Are there other categories of cases where you

19    would think that the issue of CVAP would not be

20    important to practitioners in the field?

21         A.  Well, I'm not sure exactly what you're

22    asking.

23         Q.  Let me ask you -- let me just change tack a

24    little.

25         Are you familiar with the concept of

Pamela S. Karlan, J.D.

Page 46

1    performing districts?

2         A.   Yes, I am.

3         Q.   And how does that play into the issue of

4    citizenship and Section 2 vote dilution cases?

5         A.   So a performing district is a district that

6    on election day is going to perform for the minority

7    community.  That is where the minority community is

8    likely to be able to elect a candidate of its choice

9    on election day.  So when you think about a performing

10   district, you are really thinking about on election

11   day what is the turnout going to look like.  How many

12   minority citizens are going to turn out to vote.  How

13   many nonminority citizens are going to turn out to

14   vote.

15            What's the block voting level, the level of

16   polarization in the jurisdiction, and that's what

17   you're looking at when you're thinking about

18   performing districts.

19        Q.   So is there any relationship between that

20   concept and the need for citizenship data?

21        A.   There's a theoretical need between the two

22   which is, of course, the only people who can vote are

23   citizens, and so almost by definition, you are looking

24   at citizen voting.  But once you're looking at actual

25   election data, the need for trying to estimate who the

Pamela S. Karlan, J.D.

Page 47

1   citizens are or aren't kind of drops out of the

2   picture because you know who they are.  They're the

3   ones who are voting.

4           So the turnout is a subset of the citizens of

5   voting age.

6       Q.  Is it typical for practitioners in your field

7   to bring Section 2 vote dilution cases where there's a

8   very close call as to whether there is -- you're able

9   to meet Gingles 1?

10          MS. FEDERIGHI:  Objection.  Lack of

11  foundation.

12          THE WITNESS:  I mean you might bring a case

13  that's close, but it's close once you take into

14  account the performance, the likely performance of the

15  districts.

16          So, for example, in a place where you don't

17  have -- where you have legally significant but not

18  overwhelming racial polarization in the electorate,

19  you might bring a case where the number to satisfy

20  Gingles 1 is not hugely over 50 percent because you

21  know that some share of the White population will vote

22  for the minority's candidate of choice.

23  BY MR. ROSENBERG:

24      Q.  Based upon your experience, is it typical for

25  private practitioners to bring cases that are close in

Pamela S. Karlan, J.D.

1  terms of proving Gingles 1?

2       A.   I mean so if you mean by "close" -- there are

3  two different ways you might mean "close," and I want

4  to distinguish between them.  One is where the

5  Gingles 1 number is close to 50 percent.

6       Q.   That's -- let's start with that one.

7       A.   So the answer to that is yes.  So there are

8  lots of cases where the plaintiffs illustrative

9  district, for example, will be 52 percent citizens of

10 voting age.  So in that sense it looks like a close

11 case because it's close to the line at which the

12 Supreme Court would say, "You lose."

13          That's different than asking whether people

14 are going to bring a lot of cases where they think

15 it's not really clear that at the end of the day they

16 can get a remedy that will enable the minority to

17 elect candidates of their choice.  In general, people

18 don't have the resources to bring those cases.

19          So if you think, for example, that there's

20 absolute polarization, that is, 100 percent of the

21 minority community will vote for the minority

22 community's candidate of choice and zero percent of

23 the majority will vote for the minority's candidate of

24 choice.  So the way people sometimes refer to this,

25 Blacks vote Blacks, Whites vote White.

Pamela S. Karlan, J.D.

Page 49

1          You would not bring that case if, with regard

2     to Gingles 1, you could show only that 50 percent plus

3     1 of the voters are Black.  I mean technically that

4     would satisfy Gingles 1, but then what you know is if

5     turnout rates are higher among the White community

6     than among the Black community, that district will

7     never perform for the black community.  So there's no

8     point in bringing that lawsuit because the remedy

9     doesn't get you anything.  The Black community will

10    still be politically shut out.

11         Q.  Based on your experience, have plaintiffs

12    been successful in bringing Section 2 vote dilution

13    cases based on the CVAP data provided by ACS, and

14    prior to that, the long form survey?

15         A.  Yes, they've been very successful.  I mean

16    there's a book called "Quiet Revolution in the South"

17    that talks about how the Voting Rights Act just

18    transformed who got elected to state and local office

19    and in Congressional districts.

20         Q.  And in connection with your work on this

21    case, have you studied Section 2 vote dilution cases

22    brought by other practitioners and brought by

23    yourself?

24         A.  Yes.  Yes, I have.

25         Q.  And did you review both favorable and

Pamela S. Karlan , J.D.

Page 50

1   unfavorable cases or successful and unsuccessful

2   cases?

3        A.  Yes, I did.

4        Q.  Do you recall approximately how many

5   successful cases you reviewed?

6        A.  Well, if by "reviewed" you mean how many did

7   I read, read the opinion where the court finds

8   liability?

9        Q.  How many did you consider in connection with

10  your conclusions, understanding that you may not have

11  read every one of them?

12       A.  So on the successful case side, I relied on

13  studies that have been done that kind of add up the

14  successful cases.  The two leading ones are the

15  National Commission on Civil Rights, and a study that

16  was done by some folks at the University of Michigan.

17  Those studies kind of just surveyed the landscape of

18  successful cases in conjunction with the re-enactment

19  of Section 5 in 2006.

20            And those studies found, I think it was like

21  117 reported Section 2 cases finding liability and

22  then estimated that there were roughly 10 times that

23  in terms of unreported cases.

24            MS. FEDERIGHI:  I'm just going to object on

25  the basis of outside the scope of her opinion.

Pamela S. Karlan, J.D.

Page 51

1          MR. ROSENBERG:  I don't think so.

2          THE WITNESS:  Well, I talk about this in

3   my --

4          MS. FEDERIGHI:  You talked about one study.

5   I just don't remember two studies.  I may be mistaken.

6          THE WITNESS:  If you look at Page 6 --

7          MR. ROSENBERG:  May I suggest that since this

8   is a trial preservation deposition, if you're having a

9   problem with that, you can deal with it on

10  cross-examination.

11         MS. FEDERIGHI:  Okay.

12         MR. ROSENBERG:  And we can take a break and

13  maybe, perhaps, to clear it up so we don't have to

14  devote unnecessary time to it.

15         MS. FEDERIGHI:  Okay.

16         THE WITNESS:  I can clarify, if that would be

17  helpful, which is on Page 6 of my report I talk about

18  the Ellen Katz study, which was the initial one that

19  found 117 cases in the 23-year period in which the

20  results test was operating.  That is from 1982

21  forward.

22         And then the national commission, which I

23  discuss their report, which is -- was made part of the

24  hearings in the 2006 reauthorization as saying that

25  they estimated that there were approximately 10 times

Pamela S. Karlan, J.D.

Page 52

1  the number of unreported cases as reported ones in the

2  jurisdictions that were covered by Section 5, which is

3  the south, primarily, and southwest.

4       MR. ROSENBERG:  Just for the record, that

5  exact phrase appears on Page 7, the second full

6  paragraph, it found "approximated 10 times the number

7  of" unreported cases as reported ones.

8       MS. FEDERIGHI:  I'm going to object to the

9  extent you're reading from the report.

10       MR. ROSENBERG:  Well, you raised the issue.

11       Q.  Did you also look into cases that were

12  unsuccessful?

13       A.  Yes, I did.

14       Q.  Based upon your review, were any of them

15  unsuccessful because the ACS data was insufficient to

16  prove Gingles 1?

17       A.  No.  I looked at 24 cases, which appear in

18  Appendix C of my report.  I found 24 cases where

19  people lost in reported decisions, that is, decisions

20  I could find, on Gingles 1 grounds, and in none of

21  those cases was the reason they lost that the ACS data

22  or the long form data were insufficient to satisfy

23  Gingles 1.  The reasons they lost were things like

24  they admitted that they couldn't satisfy the CVAP

25  criteria because there are a number of cases that are

Pamela S. Karlan , J.D.

Page 53

1    decided at the time that the courts were moving from

2    total population to CVAP as the number -- as the

3    number for which you needed 50 percent plus one.

4            There were cases where people couldn't draw

5    compact districts because, for example, you know, if

6    you were kind of giving somebody an example of this,

7    if you look at a checker board, there might be equal

8    numbers of black and white squares on the checker

9    board, but it would be very hard to connect the black

10   squares in any way that would make it look compact.

11           There were cases where the plaintiffs just

12   failed even to put in an illustrative district.  They

13   just didn't bother to try to satisfy Gingles 1 the way

14   Courts want you to, which is show me a district.  So

15   those are all cases where plaintiffs failed on

16   Gingles 1 grounds but they didn't fail because the ACS

17   was inadequate or the long form, for the cases prior

18   to that.

19       Q.  Based upon your reading of the Gary letter,

20   did the Gary letter identify any cases where

21   inadequate CVAP data caused the plaintiff to lose a

22   Section 2 vote dilution case?

23       A.  Yes.  I guess I should say they did not

24   identify any cases where inadequate CVAP data, by

25   which I mean not enough data was there.  There are

Pamela S. Karlan , J.D.

Page 54

1    some cases where inadequate, if what you mean is not

2    enough citizens of minority, citizens -- minority

3    citizens of voting age.

4           Q.   Let me reframe the question.

5                Based upon your reading of the Gary letter,

6    did it set forth any cases where the inaccuracy of ACS

7    or the inadequacy of ACS as data as opposed to the

8    amount of numbers, you know, the size of numbers --

9           A.   Right.

10          Q.   -- cause the plaintiffs to lose a case?

11          A.   No, they did not.  That is, they didn't

12   identify any cases that they thought would have been

13   won had there been an actual enumeration of citizens

14   of voting age but were lost because people relied on

15   the ACS instead.

16          Q.   Are you aware of any case in which a lack of

17   CVAP data from the decennial questionnaires caused a

18   potential plaintiff not to bring a case?

19          A.   No, I am unaware of any such case.

20          Q.   Do you have an opinion as to why there are no

21   cases of which you are aware in which a lack of CVAP

22   data from the decennial questionnaires could cause a

23   plaintiff to lose a case he would otherwise win?

24          A.   Could you restate that question.

25          Q.   Sure.

Pamela S. Karlan, J.D.

Page 55

1          A.   I want to make sure I get all the pieces.

2          Q.   Do you have an opinion as to why there are no

3     cases of which you are aware where plaintiffs needed

4     CVAP data from the decennial questionnaire in order to

5     win a Section 2 vote dilution case?

6          A.   Yes, I have an opinion on this.  So I guess

7     there are two pieces to the opinion.  One is that the

8     data that they do have access to, initially the long

9     form and now the ACS data, that data -- those data are

10    adequate to meet the Gingles 1 threshold.  Courts have

11    repeatedly allowed people to use that data.  So they

12    don't have the problem of the Court saying, "You don't

13    have any data to show me."

14          The second reason is a reason that has to do

15    with the fact that for a lot of things, estimates are

16    actually more accurate than actual numbers, and the

17    reason for this is what's referred to as the "under

18    count."  And it's a differential under count; that is,

19    more African Americans or more Latinos than Anglo

20    Whites don't get picked up despite the best efforts of

21    the census in the actual enumeration.

22          And so at least what my experts have

23    testified to is that the estimates give a better

24    actual picture of CVAP than would be captured by a

25    question on the actual enumeration.

Pamela S. Karlan, J.D.

1      Q.  Based upon your experience, if there were

2   data from ACS as to a certain percentage of CVAP and

3   data from a decennial questionnaire as to certain

4   percentage of CVAP, which is likely to be higher?

5           MS. FEDERIGHI:  Objection.  Calls for

6   speculation.  Outside the scope of the expert report.

7           THE WITNESS:  With one exception, the ACS

8   data are more likely to be accurate.  The one

9   exception is -- and I'll give a concrete historical

10   example of this.

11           The decennial census occurs on Date X.  It's

12   April 1 of the year ending in zero.  So the one place

13   where the ACS would give you a lower estimate than the

14   census is if you've had tremendous geographic shift

15   and depopulation of the minority community.  So, for

16   example, my guess is that if you took the census and

17   compared that to the population of New Orleans after

18   Katrina, ACS would give you a lower number than the

19   census would give you because huge numbers of African

20   Americans left New Orleans and did not return.

21           But in general, leaving aside catastrophes

22   like that, the ACS will give you a higher estimate of

23   the CVAP than you would get if you had done this as

24   part of the census because of the under count issue.

25   BY MR. ROSENBERG:

Pamela S. Karlan, J.D.

Page 57

1      Q.  Are there -- are you familiar with the

2   concept of one-person, one-vote?

3      A.  Yes, I am.

4      Q.  Can you explain what that concept is?

5      A.  So it's a little bit of a misnomer because

6   one-person, one-vote is the shorthand for the

7   Constitutional requirement that the Supreme Court

8   announced during the reapportionment revolution in the

9   early 1960's that electoral districts for anything

10  other than judicial elections.  So let's leave those

11  aside for a second.

12          But electoral districts for anything else,

13  Congressional districts, state legislative districts,

14  city council districts, school board districts and the

15  like, the districts have to be drawn with relatively

16  equal populations in them so that each of the

17  districts, depending on whether it's a Congressional

18  district where it has to be as close as you can get

19  it, or a state legislative district or a city council

20  district where there's a 10 percent deviation, you

21  look at the total populations of the districts and

22  they have to be roughly the same.

23          And that's why I say it's a misnomer because

24  it's not that you have to have equal numbers of voters

25  in the districts.  It's that you have to have equal

Pamela S. Karlan , J.D.

1  numbers of people in the districts, which includes

2  children who obviously can't vote.  People who are

3  disenfranchised for mental incapacity or in many

4  places because they're incarcerated, can't vote.

5  Noncitizens can't vote, but they get counted in the

6  one-person, one-vote apportionment basis.

7      Q.  And what is your understanding as to how the

8  one-person, one-vote calculation is arrived at?  What

9  database do experts use?

10         MR. FEDERIGHI:  Objection.  Lack of

11  foundation.

12  BY MR. ROSENBERG:

13      Q.  Based on your experience.

14      A.  Well, it depends on at what stage of the

15  process.  So federal law requires that for the

16  apportionment of seats in Congress, that is House of

17  Representative seats, the actual enumeration without

18  any adjustments has to be used.  There's a federal law

19  that says that.

20         For everything else, the jurisdiction is

21  essentially free to use any reasonable base.  Some of

22  them use the actual population.  Some of them use

23  estimates.  There's not a federal Constitutional

24  constraint.

25      Q.  Are there any benefits to using the same

Pamela S. Karlan , J.D.

1    database for one-person, one-vote requirement and for

2    Gingles 1 precondition?

3        A.  Well, there's the benefit that it looks nice

4    to do it, but there's not any necessary reason that

5    you would have to do it because for one, you're

6    concerned with the total population, and for the other

7    you're concerned with the citizens of voting age.  And

8    so you don't need to use the same number for both.

9        Q.  By the way, are you -- is it your opinion

10   that there is absolutely no conceivable circumstance

11   under which data from a citizenship question could be

12   used in a Section 2 vote dilution case?

13       A.  No, it's not that there's no conceivable

14   circumstance under which you could use it.  The

15   question that I was asked to opine on was whether it

16   would materially aid.  As a practical matter, are

17   there cases that plaintiffs could bring and win if

18   they had that data that they can't bring and win now.

19   And as to that, I don't think there are such cases.

20           As to whether conceivably you might want to

21   know that number for any one of a variety of reasons,

22   sure.

23           MR. ROSENBERG:  I would pass the witness to

24   either California or Maryland.  We can take a break.

25           THE VIDEOGRAPHER:  The time is 10:08 a.m.

Pamela S. Karlan , J.D.

Page 60

1   This completes Media Unit No. 1.  We're now off the
2   record.
3            (A recess was taken from 10:08 a.m.
4            to 10:31 a.m.)
5            THE VIDEOGRAPHER:  The time is 10:31 a.m.
6   This begins Media Unit No. 2.  We're now on the
7   record.
8            Please proceed, Counsel.
9            MR. ROSENBERG:  I do have just one area I
10  want to revisit because of the privilege objection
11  that you made.  And what I'd like to do is I'm going
12  to read into the record from the October 25, 2018
13  depositions of Professor Karlan, Page 20, beginning on
14  Line 22.
15           THE WITNESS:  May I look at mine while you're
16  doing this?
17           MR. ROSENBERG:  Sure.
18           MS. FEDERIGHI:  I'm going to object on the
19  grounds of hearsay.
20           MR. ROSENBERG:  Sure.  I understand your
21  objection.  We disagree because it's not hearsay, but
22  beyond that, it's actually Page 20, Line 15.  A
23  question by Ms. Federighi.  So turning to Page 4 of
24  your report, I'm looking at the fourth paragraph
25  answer from Dr. Karlan:

Pamela S. Karlan, J.D.

Page 61

```
 1          "A.  The one that
 2     begins:  In particular?
 3          "Q.  In particular,
 4     yes.
 5          "A.  Yes.
 6          "Q.  I'm going to start
 7     with the third -- the
 8     second sentence.
 9          "A.  Yes.
10          "Q.  That says:
11     'I was also aware of
12     ongoing discussions
13     between career staff and
14     the counterparts at the
15     Census Bureau over
16     preparation for the
17     2020 enumeration.'
18     Can you explain what
19     those discussions
20     entailed?
21          "Q.  Are you -- I
22     would have assumed
23     those discussions are
24     privileged.  Are you
25     asking me to tell you
```

Pamela S. Karlan , J.D.

Page 62

1          what happened?

2             "Q.  Oh, well, is

3          that something that

4          you are going to

5          testify about at trial?

6             "A.  No, because

7          unless you waive the

8          privilege for the

9          Department of Justice,

10         I can't."

11         THE WITNESS:  Mr. Rosenberg then says:

12            "MR. ROSENBERG:  Let

13         me just, just to be clear,

14         she's going to be

15         testifying in

16         accordance with this

17         sentence that she was

18         aware of discussions.

19            "MS. FEDERIGHI:  Umm-umm.

20            "MR. ROSENBERG:  And

21         if the Department of

22         Justice is willing to

23         waive privilege as to

24         the substance of the

25         discussions, other than

Pamela S. Karlan, J.D.

Page 63

1          the fact that nothing was
2          said concerning the
3          citizenship question,
4          which she is going to
5          testify to, I think -- I
6          think Ms. Karlan would
7          be happy to testify.
8            "MS. FEDERIGHI:  Well,
9          let me get at it this way.
10           "Q.  Was -- were any
11         of the discussions -- you
12         said they don't -- didn't
13         involve a citizenship
14         question.
15           "A.  That's correct.
16           "Q.  Does that mean they
17         also did not say:  We
18         don't need a citizenship
19         question?
20           "A.  There was no
21         discussion of the need or
22         lack of need for a
23         citizenship question.
24           "Q.  Okay.  And what --
25         so these discussions

Pamela S. Karlan, J.D.

Page 64

1          would have occurred in

2          the 2014 to 2015

3          timeframe; correct?

4             "A.  That's correct."

5          MR. ROSENBERG:  And that's the end of the

6   excerpt.

7       Q.  So my question, Professor Karlan, is that

8   still your testimony today?

9       A.  Yes, it is.

10         MR. ROSENBERG:  I think that's all I have.

11         Thank you.

12         And I pass the witness.

13

14                    EXAMINATION

15   BY MR. DUKE:

16      Q.  Good morning, Professor Karlan.

17      A.  Good morning.

18      Q.  As you know, I'm Ben Duke, and I represent

19   the Kravits plaintiffs in the -- one of the other

20   citizenship question cases that is currently pending

21   in the District Court of Maryland.

22         You answered a number of questions about

23   discussions that you've had at conferences and with

24   other lawyers about issues involved in meeting the

25   Gingles proof requirements.  Do you recall those?  Do

Pamela S. Karlan, J.D.

Page 65

1   you recall that testimony?

2       A.  Yes, I do.

3       Q.  And I just want to clarify the foundation for

4   the opinion or opinions that you're offering in that

5   regard.  And with apologies for any overlap with any

6   testimony, have you personally litigated Section 2

7   cases under Section 2 of the Voting Rights Act?

8       A.  Yes, I have personally litigated those cases.

9       Q.  And have you worked at the Department of

10  Justice in particular with responsibilities for

11  enforcement of Section 2 of the Voting Rights Act

12  through litigation?

13      A.  Yes, I did.

14      Q.  And have you written scholarly articles and

15  books on the enforcement of Section 2, the Voting

16  Rights Act in general?

17      A.  Yes, I have.

18      Q.  And with regard to the conferences that you

19  discussed earlier, just to be clear, have you

20  personally attended conferences on an annual or even

21  more frequent basis over the last decades involving

22  the Voting Rights Act, and particularly, enforcement

23  of Section 2?

24      A.  Yes, I have.

25      Q.  And are you personally familiar with the

Pamela S. Karlan, J.D.

Page 66

 1    topics of presentation and panel conferences or the

 2    like that are set, organized, and held in the context

 3    of those conferences?

 4         A.   I'm not sure what you mean by am I personally

 5    familiar.  So sometimes I appear on the panels,

 6    discussing the issues.  Sometimes I'm in the audience

 7    listening to the discussions.  Is that what you're

 8    asking?

 9         Q.   Yes.  Is it fair to say that you are an

10    active participant in those conferences and are

11    familiar with the kinds of issues and topics that are

12    raised or that are the focus of attention at those

13    conferences?

14         A.   Yes, I am.

15         Q.   And based on all of that experience as an

16    expert in the Voting Rights Act enforcement field, do

17    you have an opinion as to whether the adequacy of

18    existing sources of citizenship data is a significant

19    issue or challenge in the enforcement of Section 2 of

20    the Voting Rights Act?

21         A.   I have an opinion, and my opinion is that

22    existing sources are entirely adequate for plaintiffs

23    to bring and to win voting rights cases.

24         Q.   And I think you testified with reference to

25    the Gary letter, which is the DOJ letter conveying the

Pamela S. Karlan, J.D.

Page 67

1   request to the Department of Commerce or the Census

2   Bureau for the addition of a citizenship question to

3   the decennial 2020 census; is that correct?

4        A.  Yes, I am.

5        Q.  And based on your review of the Gary letter,

6   was there anything in the Gary letter that changed or

7   affected your opinion, the opinion that you just

8   provided?

9        A.  Well, I was asked to form the opinion after

10  reading the Gary letter.  So I didn't have a

11  pre-existing opinion on the Gary letter.  Nothing in

12  the Gary letter changed my sense that -- as to what

13  plaintiffs need in order to prevail in voting rights

14  cases.  That is, before the letter, I assumed, because

15  my experience showed me this, that the existing

16  sources of data were fully adequate for people to

17  bring and to win Section 2 cases.  Nothing in the Gary

18  letter changed my opinion that the existing sources of

19  data were sufficient to enable plaintiffs to bring and

20  to win Section 2 cases.

21            MR. DUKE:  Thank you.  That's all I have.

22  ///

23  ///

24  ///

25  ///

Pamela S. Karlan, J.D.

1                    EXAMINATION

2   BY MS. FEDERIGHI:

3        Q.  Good morning, Professor Karlan.

4        A.  Good morning.

5            MS. FEDERIGHI:  Before I get into asking you

6   some questions, I just want to address one

7   administrative matter that we just discussed off the

8   record -- I discussed with plaintiff's counsel.

9            I just want to make clear that we are

10  observing all our rights to object to the admission of

11  any exhibits that we've talked about here today into

12  the trial record, and I'm also -- we also --

13  defendants also reserve their rights to object to the

14  admission of the testimony as a whole.

15           MR. ROSENBERG:  And, obviously, if any

16  plaintiff decides to put into evidence either all or a

17  portion of the testimony here or any exhibits, we all

18  reserve our rights on that and our rights to respond

19  to whatever you assert at the time.

20           MS. FEDERIGHI:  Understood.  Okay.

21       Q.  Now, Professor Karlan, you've provided an

22  opinion on whether a citizenship question on the

23  decennial census would assist the Department of

24  Justice's enforcement of Section 2 of the Voting

25  Rights Act; correct?

Pamela S. Karlan, J.D.

Page 69

1     A.  Yes.

2     Q.  And you concluded that it would not; correct?

3     A.  That's correct.

4     Q.  In litigating what you've called "vote

5 dilution cases" citizenship information is most

6 important for the first Gingles precondition; right?

7     A.  Yes.

8     Q.  And that first precondition is whether the

9 minority group is sufficiently large and

10 geographically compact to constitute a majority in a

11 single member district; correct?

12     A.  Yes.

13     Q.  Now, you agree with the Gary letter that

14 multiple courts have held that where citizenship rates

15 are at issue, citizen voting age population is the

16 proper metric for determining whether there's a

17 representative district where a minority would

18 constitute a majority; is that correct?

19     A.  Yes.

20     Q.  And you agree, therefore, that the Department

21 of Justice or any other plaintiff needs a reliable

22 calculation of the citizenship voting age population

23 in localities where citizenship is at issue and where

24 voting rights are alleged or suspected to be violated;

25 correct?

Pamela S. Karlan, J.D.

Page 70

 1       A.   Yes.

 2       Q.   And in some cases a plaintiff would need

 3   access to citizenship level at the -- citizenship data

 4   at the block level; correct?

 5       A.   Yes.

 6       Q.   And you're aware that the American Community

 7   Survey only provides estimates down to the block group

 8   level; correct?

 9       A.   That's correct.

10       Q.   So you agree with the Gary letter that Voting

11   Rights Act plaintiffs are required to perform further

12   estimates in order to approximate citizen voting age

13   population at the level of a census block where that

14   level of data is necessary in the current regime;

15   correct?

16       A.   Yes.  Where data down to that level is

17   necessary, yes, they do need to perform some

18   estimates.

19       Q.   Okay.  You're not a statistician; correct?

20       A.   That's correct.

21       Q.   And you're also not a demographer; correct?

22       A.   That's correct.

23       Q.   Now, you said when you were at DOJ you were

24   recused from working on the Abbott vs. Paris case; is

25   that correct?

Pamela S. Karlan, J.D.

1      A.  Yes.

2      Q.  That was the only really active,

3  straightforward vote dilution case being litigated at

4  the time where the U.S. was a party; correct?

5      A.  That's correct.

6      Q.  And being recused, that means you weren't

7  allowed to talk to anyone at DOJ about the case;

8  correct?

9      A.  That's correct.

10      Q.  And you weren't -- so you weren't aware of

11  the subject of any discussions within DOJ about the

12  case; correct?

13      A.  That's correct.

14      Q.  Now, Professor Karlan, you don't have an

15  opinion on whether ACS data on citizenship is better

16  or worse than data from the long form questionnaire,

17  do you?

18      A.  No, I do not.

19      Q.  Voting Rights Act law is different now than

20  it was at the time of Gingles in 1986; correct?

21      A.  That's correct.

22      Q.  And so that means that over time the courts

23  have modified what plaintiffs have to show to make

24  their case; correct?

25      A.  That's correct.

Pamela S. Karlan, J.D.

1          Q.   In your experience, litigating Section 2

2     Voting Rights Act cases, you rely on social scientists

3     to draw representative districts -- or illustrative

4     districts -- that's what you called them -- for the

5     purposes of the first Gingles precondition; correct?

6          A.   Generally, yes.  I had some cases in Alabama

7     that involved various small jurisdictions where we

8     actually relied on community members to draw the

9     districts as opposed to social scientists, but

10    generally that would be correct.

11         Q.   So generally you do not physically draw the

12    districts yourself; correct?

13         A.   That's correct, yes.

14         Q.   And you did not yourself obtain the raw data

15    that's used to derive the districts; correct?

16         A.   That's correct.

17         Q.   You leave it up to the experts whether they

18    need to obtain block-level citizenship data to draw an

19    illustrative district; is that correct?

20         A.   That's correct.

21         Q.   And you're not aware of how they go about

22    calculating such data; correct?

23         A.   That's correct.

24         Q.   So you wouldn't know if there were any

25    problems or limitations in the data unless the social

Pamela S. Karlan, J.D.

Page 73

1    scientists brought it to your attention; correct?

2        A.  That's correct.  They would bring it to my

3    attention if they were having trouble coming up with a

4    district.  So, for example, in the Dillard cases

5    the --

6        Q.  Well, let me --

7        A.  Sure.

8        Q.  You said they would bring it to your

9    attention if there was a problem.  Do you know that

10   for a fact, or is that just an assumption?

11       A.  Well, it's an assumption because I need to

12   know what I'm going to get up in court and argue and

13   how I'm going to brief the case.

14       Q.  But, in fact, you don't really care what

15   actual number they come up with that is the percentage

16   of CVAP in the representative districts; correct?

17       A.  No, that's incorrect.  I do care what number

18   they come up with because I don't want -- for example,

19   if the case goes to trial rather than settle, I don't

20   want the other side to come in and say they've got the

21   wrong number.  So I care that they get a correct

22   number.

23       Q.  You don't care what the number is; is that

24   correct?

25       A.  Well, I care what the number is because I

Pamela S. Karlan, J.D.

Page 74

1   want the number to be a correct number, and I want it

2   to be a number that will enable us both to satisfy

3   Gingles 1, and to ultimately, if push comes to shove,

4   argue for a performing district.

5       Q.  Do you remember giving a deposition when I

6   took your deposition in this case?

7       A.  Yes.

8       Q.  And in taking -- in giving that deposition,

9   did you swear to tell the truth?

10      A.  I did.

11      Q.  And you did tell the truth, didn't you?

12      A.  I did.

13      Q.  Okay.  I'm looking at Page 84 of your --

14      A.  May I look at that page?

15      Q.  Of course.

16      A.  Thank you.

17      Q.  84, starting on Page 14.

18      A.  Page 84, Line 14.

19      Q.  Line 14, yes.  Excuse me.

20      A.  Yeah.  Line 16 on Page 84.  You're saying

21  that there is -- "Why is there no error" --

22      Q.  Yeah.  I'll read it.

23      A.  I'm just trying to make sure.

24      Q.  The question -- and there was some

25  preliminary to what I was talking about a possible

Pamela S. Karlan, J.D.

1    chart.  And then I said on Line 16:

2              "Q.  You're saying

3         that there is -- why

4         is there no errors

5         stated with those

6         charts?"

7         MS. FEDERIGHI:  And Mr. Rosenberg inserted an

8    objection and then -- do you want me to read that,

9    Ezra?

10        THE WITNESS:  Yeah.

11        MR. ROSENBERG:  I think you should read

12   the --

13        MS. FEDERIGHI:  Okay.  Mr. Rosenberg said:

14        MR. ROSENBERG:  I'm

15        sorry.  I have to object as

16        to form.  When you're talking

17        charts you've seen, I have

18        no idea if she knows what

19        you've seen, but you

20        can answer, if you can.

21          "A.  So part of it

22        is, that is going to

23        sound perhaps

24        cavalierly.

25             As long as the

Pamela S. Karlan, J.D.

Page 76

1              judge is going to

2              find that our district

3              satisfies Gingles 1, I

4              don't care about that

5              number.  What I care

6              about is the ability of

7              my clients to elect a

8              candidate of their choice."

9         MR. ROSENBERG:  I'm going to object to the

10   attempt to impeach, and I would say it's a failed

11   attempt to impeach on the basis of part of an answer

12   and -- which it comes from part of a question and

13   doesn't give the full answer but we'll deal with that

14   on redirect.

15         MS. FEDERIGHI:  Okay.  I'll read the rest of

16   the answer.

17         MR. ROSENBERG:  Well, I think also reading

18   the rest of the question may make a difference, which

19   is one of the reasons I objected as to the form, which

20   objection is still maintained.

21         MS. FEDERIGHI:  Well, okay.  I'll start on

22   Page 48, Line 9, I think, or Line 8:

23              "Q.  Yes.

24                 So I've seen

25              cases where they

Pamela S. Karlan , J.D.

Page 77

```
 1              have usually like
 2              a little chart, a
 3              table, and they say
 4              District 1 has 52%.
 5              CVAP, let's say --
 6                "A.  Yeah.
 7                "Q.  "-- you
 8              know, black CVAP.
 9                   "And there's
10              usually not -- it
11              doesn't say 52 plus
12              or minus .5%.
13              There's no error
14              associated with it.
15              You're saying that
16              there is --" or
17              "-- why is there no
18              error stated with
19              those charts?
20                   "MR. ROSENBERG:  I'm
21              sorry.  I have to object
22              as to form.  When
23              you're talking charts
24              you've seen, I have no
25              idea if she knows what
```

Pamela S. Karlan, J.D.

Page 78

1              you've seen, but you can

2              answer, if you can.

3                "A.  So part of it

4              is, that is going to

5              perhaps sounds

6              cavalierly.

7                  "As long as the

8              judge is going to find

9              that our district

10             satisfies Gingles 1, I

11             don't care about that

12             number.  What I care

13             about is the ability of

14             my clients to elect a

15             candidate of their

16             choice.

17                  "And so I

18             imagine that you can

19             have questioning of

20             the expert of when

21             you say this district

22             is 50.001 percent

23             black and CVAP, how

24             confident are you

25             about that?  And

Pamela S. Karlan , J.D.

Page 79

```
 1          experts would testify,
 2          based on whatever the
 3          expert demographer
 4          who drew the district
 5          knows.
 6               "But from my
 7          perspective as the
 8          lawyer litigating the
 9          case, what I care about
10          is my expert's
11          confidence level, if
12          you will, on whether
13          the district will
14          perform.
15               "You know, from
16          my perspective I would
17          be perfectly happy with
18          districts that don't
19          satisfy Gingles 1 at
20          all if the level of
21          block votings is such
22          that my clients and
23          their community will
24          still elect a
25          candidate of their
```

Pamela S. Karlan, J.D.

 1              choice, which is why,

 2              for example, I filed

 3              an Amicus brief on

 4              behalf of clients in

 5              the Bartlett case,

 6              which is the case

 7              the Supreme Court says

 8              you must be 50% of

 9              the voting age population."

10         MR. ROSENBERG:  And my objection stands, and

11    I would also add that all of this discussion was part

12    of a larger discussion dealing with margin of error

13    that starts, I think a page or two before, but we will

14    let the record speak for itself.

15         MS. FEDERIGHI:  Well, I have no further

16    questions.

17         MR. ROSENBERG:  I just have -- you're

18    finished?  I just have, then, just a couple

19    follow-ups.

20

21                   FURTHER EXAMINATION

22    BY MR. ROSENBERG:

23         Q.  Ms. Federighi discussed some cases where it

24    may be necessary to have block-level data.  Do you

25    recall that?

Pamela S. Karlan, J.D.

Page 81

1        A.  Yes.

2        Q.  First of all, how frequently does that arise,

3    in your experience?

4            MS. FEDERIGHI:  Objection.  Lack of

5    foundation.

6    BY MR. ROSENBERG:

7        Q.  Based upon your experience.

8        A.  It can sometimes arise, but generally, it's

9    not going to arise at the -- it would be illustrative

10   districts where that can sometimes arise at the

11   remedial stage of a case where in order to draw the

12   districts, you're also trying to satisfy other

13   criteria than can you create a performing district for

14   the minority community.

15       Q.  Based upon your experience, have you been

16   involved in cases where block-level data was part of

17   the case?

18       A.  I don't remember.

19       Q.  Do you have cases where you were -- do you

20   recall cases where you were involved -- I think you

21   mentioned the Dillard case with small districts?

22       A.  Yes.

23       Q.  In those cases did you look for block-level

24   data?

25       A.  No.  In some of those cases, like the entire

Pamela S. Karlan, J.D.

Page 82

1    minority community might be in a particular block

2    along with the majority community, and you relied on

3    community members to tell you, "Okay.  Draw the

4    district over here" or "Draw the district over there."

5    There was one part of the Dillard case where I

6    actually relied -- I think our local expert from the

7    Alabama Democratic Conference relied on the garbage

8    men in the town to kind of tell them, "Okay.  Over

9    here, this is a household that has, you know, this

10   number of people and it's African American, and over

11   here it's a White household."

12       Q.  Was that evidence admitted?

13       A.  Well, we settled on the districts.  So we

14   didn't litigate the districts.

15           MR. ROSENBERG:  Okay.  I have no further

16   questions.

17           Anyone?

18           MR. DUKE:  No further questions.

19           MS. FEDERIGHI:  I have a further question.

20

21                   FURTHER EXAMINATION

22   BY MS. FEDERIGHI:

23       Q.  Professor Karlan, in your report did you

24   make -- you did not make any distinctions between the

25   Gingles 1 pre-condition -- excuse me.  Let me just

Pamela S. Karlan, J.D.

Page 83

1    start over.

2           Professor Karlan, in your report you did not

3    make any distinction between satisfying the

4    Precondition 1 of Gingles and the remedial stage, did

5    you?

6        A.   Well, the two things are different.  I don't

7    think I was asked about the remedial stage so much as

8    I was asked about what did plaintiffs have to prove to

9    establish liability.

10       Q.   And your report just -- therefore, just

11   addressed the Gingles 1 precondition; is that correct?

12       A.   That's correct.

13           MR. ROSENBERG:  Okay.  All right.  Thank you.

14           THE VIDEOGRAPHER:  The time is 10:51 a.m.

15   This concludes today's testimony given by Professor

16   Pamela S. Karlan.  We're now off the record.

17           (Witness excused.)

18           (Deposition concluded at 10:51 a.m.)

19

20

21

22

23

24

25

Pamela S. Karlan , J.D.

Page 84

1              C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3   was taken before me, pursuant to notice, at the time

4   and place indicated; that said deponent was by me duly

5   sworn to tell the truth, the whole truth, and nothing

6   but the truth; that the testimony of said deponent was

7   correctly recorded in machine shorthand by me and

8   thereafter transcribed under my supervision with

9   computer-aided transcription; that the deposition is a

10  true and correct record of the testimony given by the

11  witness; and that I am neither of counsel nor kin to

12  any party in said action, nor interested in the

13  outcome thereof.

14

15        _____

          Nancy J. Martin, RMR, CSR

16

17  Dated:  December 18, 2018

18

19

20

21  (The foregoing certification of this transcript does

22  not apply to any reproduction of the same by any

23  means, unless under the direct control and/or

24  supervision of the certifying shorthand reporter.)

25

Pamela S. Karlan , J.D.

Page 85

1                  INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over carefully

4    and make any necessary corrections. You should state

5    the reason in the appropriate space on the errata

6    sheet for any corrections that are made.

7              After doing so, please sign the errata sheet

8    and date it.  You are signing same subject to the

9    changes you have noted on the errata sheet, which will

10   be attached to your deposition.  It is imperative that

11   you return the original errata sheet to the deposing

12   attorney within thirty (30) days of receipt of the

13   deposition transcript by you.  If you fail to do so,

14   the deposition transcript may be deemed to be accurate

15   and may be used in court.

16

17

18

19

20

21

22

23

24

25

Pamela S. Karlan , J.D.

Page 86

```
 1                        - - - - - - - -

 2                        E  R  R  A  T  A

 3                        - - - - - - - -

 4    PAGE      LINE         CHANGE

 5    _____     _____     _____

 6    _____     _____     _____

 7    _____     _____     _____

 8    _____     _____     _____

 9    _____     _____     _____

10    _____     _____     _____

11    _____     _____     _____

12    _____     _____     _____

13    _____     _____     _____

14    _____     _____     _____

15    _____     _____     _____

16    _____     _____     _____

17    _____     _____     _____

18    _____     _____     _____

19    _____     _____     _____

20    _____     _____     _____

21    _____     _____     _____

22    _____     _____     _____

23    _____     _____     _____

24    _____     _____     _____

25    _____     _____     _____
```

Pamela S. Karlan , J.D.

Page 87

1                ACKNOWLEDGMENT OF DEPONENT

2

3        I, PAMELA S. KARLAN, J.D., do hereby certify

4  that I have read the foregoing pages, _____ to

5  _____, and that the same is a correct transcription

6  of the answers given by me to the questions therein

7  propounded, except for the corrections or changes in

8  form or substance, if any, noted in the attached

9  Errata Sheet.

10

11  _____

12  DATE                 SIGNATURE

13

14

15

16  Subscribed and sworn to before me this _____ day

17  of _____, 20__.

18

19

20  My commission expires:  _____.

21

22  _____

23   NOTARY PUBLIC

24

25

Pamela S. Karlan , J.D.

| & | | |
|---|---|---|

**&**  1:18 3:3,8 4:8
6:22 7:10,15 8:4

**0**

**001**  28:11
**004**  28:15
**01865**  1:3 2:3 6:20
**02279**  1:12 2:12

**1**

**1**  5:11 6:13 19:11
25:24 26:3,16,22
28:17 31:16 32:17
32:21,23 35:20
38:1 40:18 41:17
41:24 43:1 44:12
47:9,20 48:1,5
49:2,3,4 52:16,20
52:23 53:13,16
55:10 56:12 59:2
60:1 74:3 76:3
77:4 78:10 79:19
82:25 83:4,11
**1-100**  1:10 2:10
**10**  50:22 51:25
52:6 57:20
**100**  25:14 39:24
48:20
**10018**  3:10
**1050**  1:19 6:23
**10:08**  59:25 60:3
**10:31**  60:4,5
**10:51**  83:14,18
**11000**  3:21
**117**  50:21 51:19
**14**  74:17,18,19
**15**  25:20 60:22
**1500**  4:4
**16**  74:20 75:1
**18**  1:15 6:1,5
84:17

**180**  13:13
**1938**  20:13
**1960's**  57:9
**1980**  11:19
**1982**  15:20 19:21
51:20
**1984**  11:25
**1985**  17:9
**1986**  71:20
**1988**  17:18 18:17
**1989**  18:7
**1990**  13:23
**1998**  9:18 17:22
18:17 20:6

**2**

**2**  1:13 10:20,25
11:7 13:1,5,9,18
13:21 14:3,8,10,16
15:10 16:3 17:3
18:3,18 19:3,14,22
22:8 23:3,7,12,21
23:21,24 24:4,7,14
25:4,15,20 26:4
30:12 32:16 33:10
35:19 36:7,16,17
37:14 39:11 40:22
40:24 41:7 42:14
44:2,13 46:4 47:7
49:12,21 50:21
53:22 55:5 59:12
60:6 65:6,7,11,15
65:23 66:19 67:17
67:20 68:24 72:1
**20**  9:18 60:13,22
87:17
**2000's**  17:8
**20005**  4:5
**20044**  3:16
**2006**  50:19 51:24
**2014**  9:23 64:2

**2015**  9:24 64:2
**2018**  1:15 6:1,5
27:16 60:12 84:17
**202**  3:17 4:5
**2020**  42:7 61:17
67:3
**212**  3:10
**22**  60:14
**23**  51:19
**24**  52:17,18
**25**  5:11 60:12
**26**  26:4
**2800**  4:9
**291-7409**  3:5

**3**

**3**  19:14
**30**  85:12
**30th**  3:4
**33**  26:20
**3:18**  1:3 2:3 6:20

**4**

**4**  60:23
**415**  3:5,22
**455**  3:20
**48**  76:22

**5**

**5**  13:6,9 14:1 15:8
16:1 22:11,13
23:18,25 24:9
50:19 52:2 77:12
**50**  4:9 5:12 47:20
48:5 49:2 53:3
80:8
**50.001**  78:22
**510-3779**  3:22
**514-1903**  3:17
**52**  48:9 77:4,11
**55**  45:9
**5:18**  1:12 2:12

**6**

**6**  51:6,17
**600**  1:19
**620**  3:9
**64**  5:4
**662-8600**  4:5
**68**  5:5

**7**

**7**  12:23 14:7 52:5

**8**

**8**  5:3 76:22
**80**  5:6
**82**  5:7
**84**  74:13,17,18,20
**841-1072**  3:10
**883**  3:16

**9**

**9**  76:22
**900**  4:4
**94102**  3:21
**94111**  3:5 4:10
**975**  84:14
**9:06**  1:20 6:2,5

**a**

**a.m.**  1:20 6:2,5
59:25 60:3,4,5
83:14,18
**abbott**  11:5 23:8
23:11 70:24
**ability**  20:1 76:6
78:13
**able**  14:20 46:8
47:8
**abraham**  12:5
**absolute**  48:20
**absolutely**  30:10
59:10
**academic**  9:13

Pamela S. Karlan , J.D.

**academy** 21:7
**accepted** 17:16
**access** 55:8 70:3
**accompanied** 19:22
**account** 24:11 47:14
**accurate** 29:13 36:8 38:7 41:23 42:25 43:20 55:16 56:8 85:14
**acknowledgment** 87:1
**acs** 29:19 34:13 36:1,9 38:8 39:5 41:25 43:2,21 44:10 49:13 52:15 52:21 53:16 54:6 54:7,15 55:9 56:2 56:7,13,18,22 71:15
**act** 10:20 12:8 13:4,9 14:10 15:20,20 18:4,18 20:16 24:15,20 25:4,8 49:17 65:7 65:11,16,22 66:16 66:20 68:25 70:11 71:19 72:2
**acting** 1:9 2:9,19
**action** 13:14 84:12
**actions** 1:12 25:2
**active** 66:10 71:2
**actual** 14:17 28:5 31:21 32:11,12 46:24 54:13 55:16 55:21,24,25 58:17 58:22 73:15
**add** 26:25 27:4,11 42:6 50:13 80:11

**addition** 19:19 67:2
**additions** 26:24,25 27:1
**address** 68:6
**addressed** 83:11
**adequacy** 66:17
**adequate** 29:21 55:10 66:22 67:16
**adjustments** 58:18
**administrative** 68:7
**admission** 68:10 68:14
**admitted** 52:24 82:12
**advice** 16:25
**affiliations** 7:4
**affirmed** 8:10
**aforesaid** 84:2
**african** 39:24,25 45:5,5 55:19 56:19 82:10
**africans** 45:11
**age** 31:20 32:4,7 44:17,20 47:5 48:10 54:3,14 59:7 69:15,22 70:12 80:9
**agency** 7:22
**aggregate** 35:16
**ago** 29:24 34:9
**agree** 6:12 69:13 69:20 70:10
**aguardado** 3:6
**aid** 59:16
**aided** 84:9
**al** 3:12 6:15,18 7:17
**alabama** 16:9 23:20 72:6 82:7

**alleged** 69:24
**alliance** 2:12 3:6 4:6 7:8,11
**allowed** 55:11 71:7
**amended** 15:20
**amendments** 19:22
**american** 23:9 29:19 34:6 35:14 39:25 44:19 70:6 82:10
**americans** 39:25 45:5,6 55:19 56:20
**amicus** 14:3 16:24 22:17,23 23:3 24:3,15 80:3
**amount** 19:18,19 54:8
**ana** 3:3,20 7:9,12
**analysis** 19:17
**angeles** 4:11 8:4
**anglo** 55:19
**anna.ferrari** 3:22
**announced** 57:8
**annual** 65:20
**answer** 29:12 34:17 36:11 43:5 48:7 60:25 75:20 76:11,13,16 78:2
**answered** 64:22
**answers** 87:6
**anybody** 19:2 39:6
**apologies** 65:5
**appear** 52:17 66:5
**appearances** 7:4
**appeared** 25:12
**appears** 52:5
**appellate** 10:15

**appendix** 26:16 28:1,11 52:18
**apply** 13:19 84:22
**appointment** 17:21
**apportionment** 13:24 58:6,16
**appropriate** 29:11 85:5
**approximate** 70:12
**approximated** 52:6
**approximately** 22:22 25:18 27:15 36:22 50:4 51:25
**april** 56:12
**area** 15:22 60:9
**areas** 45:16
**argue** 73:12 74:4
**argued** 20:24 22:3 22:5,16
**arguing** 23:6
**arising** 39:10
**arkansas** 13:22,25 17:12
**arose** 23:19
**arranged** 14:21
**arrangement** 9:25
**arrived** 45:12 58:8
**arthur** 28:2
**articles** 25:11,14 25:15 35:19 65:14
**aside** 56:21 57:11
**asked** 27:19,23,24 59:15 67:9 83:7,8
**asking** 33:4 42:21 45:22 48:13 61:25 66:8 68:5
**aspects** 38:25

Pamela S. Karlan , J.D.

**assert**  68:19
**assist**  68:23
**assistant**  10:5
  12:18 17:16
**associated**  77:14
**assume**  43:6
**assumed**  61:22
  67:14
**assumption**  73:10
  73:11
**atalees**  23:9
**attached**  85:10
  87:8
**attempt**  76:10,11
**attended**  36:15,23
  36:24 65:20
**attending**  7:3
**attention**  19:8
  28:10 66:12 73:1
  73:3,9
**attorney**  1:3 2:3
  3:3,15,19 10:5
  16:17,19 85:12
**audience**  66:6
**audio**  6:10,10
**author**  24:22
**authored**  25:11,13
**avenue**  1:19 3:9,20
  6:23
**average**  37:1
**aviv**  21:13
**avoid**  26:11
**aware**  45:4 54:16
  54:21 55:3 61:11
  62:18 70:6 71:10
  72:21

**b**

**b**  5:9 26:4 28:1,11
**back**  11:16 21:21
  23:23

**ballot**  14:20,20
  20:18
**bar**  29:3
**barely**  40:5
**bartlett**  31:8 80:5
**base**  58:21
**based**  32:15 33:18
  38:16 43:18,25
  44:1 47:24 49:11
  49:13 52:14 53:19
  54:5 56:1 58:13
  66:15 67:5 79:2
  81:7,15
**basically**  14:15
  29:1 45:1
**basis**  29:14 33:8
  37:8 50:25 58:6
  65:21 76:11
**becerra**  1:4 2:4
**beginning**  1:20
  10:25 11:16 60:13
**begins**  60:6 61:2
**behalf**  7:6,10,13
  7:16 30:15 32:5
  80:4
**behavior**  32:12,12
  32:13
**belief**  42:8
**believe**  17:10 27:8
  38:13
**ben**  7:15 64:18
**bench**  12:12
**benefit**  59:3
**benefits**  58:25
**benjamin**  3:9
**best**  17:6 55:20
**better**  55:23 71:15
**beyond**  60:22
**big**  11:11 24:12
**bit**  12:14,15 19:10
  23:16 57:5

**bivariate**  19:16
**black**  2:12 3:6 4:6
  7:7,11 15:23
  45:10 49:3,6,7,9
  53:8,9 77:8 78:23
**blackmun**  12:6,7
  12:16
**blacks**  48:25,25
**block**  19:15 30:23
  39:19 44:6 46:15
  70:4,7,13 72:18
  79:21 80:24 81:16
  81:23 82:1
**board**  53:7,9
  57:14
**boards**  16:9
**bono**  28:25
**book**  18:11 19:4,7
  25:5 49:16
**books**  24:22,23
  25:3 65:15
**bother**  53:13
**box**  3:16
**branch**  3:14
**break**  9:19 51:12
  59:24
**breaks**  16:17
**brennan's**  30:4
**brief**  73:13 80:3
**briefly**  25:6
**briefs**  14:3 16:24
  22:23
**bring**  30:12 47:7
  47:12,19,25 48:14
  48:18 49:1 54:18
  59:17,18 66:23
  67:17,19 73:2,8
**bringing**  32:6
  40:22 49:8,12
**broken**  34:4

**brought**  30:16
  44:3,4 49:22,22
  73:1
**build**  33:6
**bulk**  14:6
**bunch**  26:19
**bureau**  1:9,10 2:9
  2:10,19,20 28:5,9
  32:25 35:8 61:15
  67:2
**bureau's**  42:6
**burling**  3:8 7:15

**c**

**c**  3:1 4:1 52:18
  84:1,1
**calculating**  72:22
**calculation**  58:8
  69:22
**california**  1:2,3
  2:2,3,13 3:5,19,21
  3:23 4:9,10 6:15
  6:20 7:12,14 8:19
  27:19 59:24
**call**  8:22 31:12
  35:5 47:8
**called**  13:16 15:14
  18:5 19:20 20:11
  21:4,6 23:16 24:9
  26:16 29:19,20
  32:6 35:11,13
  49:16 69:4 72:4
**calls**  30:11 37:10
  37:16,22 38:2,9
  39:12 41:8,13,18
  42:1,16 43:3,12,22
  56:5
**candidate**  30:24
  40:1,2 46:8 47:22
  48:22,23 76:8
  78:15 79:25

Pamela S. Karlan , J.D.

**candidates**  14:14
  14:23 48:17
**cannon**  4:13 7:21
  7:21
**capacity**  1:7,9 2:7
  2:9,17,19 6:16
**caption**  1:13
**captured**  55:24
**care**  73:14,17,21
  73:23,25 76:4,5
  78:11,12 79:9
**career**  11:17 61:13
**carefully**  85:3
**carol**  3:15 7:25
**carolina**  11:11
**case**  1:3,12 2:3,12
  3:12 6:20 7:17,20
  8:20 11:1,4,11,12
  12:11,12,24,25
  13:12,15,16,17,23
  14:18,25 15:13,16
  15:25 16:1,2 17:5
  18:11 19:3,4,7
  22:9,11,14 23:7,10
  23:16,21,22,23
  24:13,23 27:13,21
  27:23 28:22 29:7
  30:15 31:8 32:6
  39:7 44:13 47:12
  47:19 48:11 49:1
  49:21 50:12 53:22
  54:10,16,18,19,23
  55:5 59:12 70:24
  71:3,7,12,24 73:13
  73:19 74:6 79:9
  80:5,6 81:11,17,21
  82:5
**cases**  8:19 10:2,14
  11:11,13 12:8,23
  12:23 13:1,3,5,6,8
  13:20,21 14:2,4,7

14:9,16,16,19,24
  15:2,3,4,8,10,12
  16:4,5,6,7,10,11
  16:21,22 17:1,2,4
  17:7,9,10,13,13
  20:22,23 22:2,6,6
  22:7,8,20,23 23:2
  23:4,13,14,15 24:4
  24:6,17 25:16
  29:22 30:6 33:11
  34:14 39:4,11,17
  40:22 44:2,3,15,19
  44:24 45:4,18
  46:4 47:7,25 48:8
  48:14,18 49:13,21
  50:1,2,5,14,18,21
  50:23 51:19 52:1
  52:7,11,17,18,21
  52:25 53:4,11,15
  53:17,20,24 54:1,6
  54:12,21 55:3
  59:17,19 64:20
  65:7,8 66:23
  67:14,17,20 69:5
  70:2 72:2,6 73:4
  76:25 80:23 81:16
  81:19,20,23,25
**cast**  14:20 15:7
**catastrophes**
  56:21
**categories**  45:18
**caucus**  23:9
**cause**  54:10,22
**caused**  53:21
  54:17
**cavalierly**  75:24
  78:6
**cell**  6:8
**cellular**  6:8
**census**  1:9,9 2:9,9
  2:19,19 28:4,8

29:11,21 32:24,24
  33:3 34:1,3,7,24
  34:25 35:9 42:6
  43:11 55:21 56:11
  56:14,16,19,24
  61:15 67:1,3
  68:23 70:13
**center**  3:4
**certain**  56:2,3
**certainly**  38:14
**certification**  84:21
**certified**  1:22
**certify**  84:2 87:3
**certifying**  84:24
**challenge**  13:22
  14:25 66:19
**challenged**  15:19
**challenging**  16:7
**change**  45:23 86:4
**changed**  67:6,12
  67:18
**changes**  22:14
  23:19 85:9 87:7
**charlottesville**
  17:17
**chart**  75:1 77:2
**charts**  75:6,17
  77:19,23
**checker**  53:7,8
**chief**  4:13
**children**  58:2
**chisom**  13:16 17:5
  22:8
**choice**  14:15,23
  30:24 46:8 47:22
  48:17,22,24 76:8
  78:16 80:1
**chong**  11:12
**choose**  8:22
**circumstance**
  59:10,14

**citizen**  32:7 46:24
  69:15 70:12
**citizens**  14:13 20:2
  31:20 32:3,4,14
  44:18,22,25 46:12
  46:13,23 47:1,4
  48:9 54:2,2,3,13
  59:7
**citizenship**  29:12
  30:25 42:7 45:5,7
  46:4,20 59:11
  63:3,13,18,23
  64:20 66:18 67:2
  68:22 69:5,14,22
  69:23 70:3,3
  71:15 72:18
**city**  2:12 3:6 4:6
  7:7,10 16:9 57:14
  57:19
**civil**  3:14 4:3 7:6
  10:6,10,18 21:1,3
  25:1 37:2 50:15
**claim**  29:12 30:13
  42:10
**claiming**  30:6
**claims**  27:25 37:14
  41:7
**clarify**  51:16 65:3
**class**  13:14 21:4,5
  21:6,25 44:19
**classes**  21:4
**clear**  30:10 48:15
  51:13 62:13 65:19
  68:9
**clerked**  12:3,5,7
**clerkship**  12:16
**client**  20:20 29:5
  29:23
**client's**  24:17
**clients**  76:7 78:14
  79:22 80:4

clinic  9:12 20:21
  20:21
close  25:14 47:8
  47:13,13,25 48:2,3
  48:5,10,11 57:18
coauthor  18:10
  24:23
codirector  9:11
cohesive  30:20
colleague  18:10
college  11:18,19
come  19:21 21:24
  27:12,25 28:24
  34:7 36:5 73:15
  73:18,20
comes  11:4 13:12
  34:6 74:3 76:12
coming  73:3
commerce  1:8 2:8
  2:17,18 3:12 6:17
  7:17,22 67:1
commission  50:15
  51:22 87:20
commissions  16:8
committee  4:3 7:6
communications
  43:4
community  29:19
  31:22 34:6 35:14
  45:15 46:7,7
  48:21 49:5,6,7,9
  56:15 70:6 72:8
  79:23 81:14 82:1
  82:2,3
community's
  48:22
compact  30:17
  31:5,7,12 53:5,10
  69:10
comparative
  21:14 25:21

compared  56:17
compelling  24:20
compensated
  28:21 29:5
complete  1:13
completes  60:1
complicated  24:6
comply  24:14,19
computer  84:9
conceivable  59:10
  59:13
conceivably  59:20
concept  45:25
  46:20 57:2,4
concerned  59:6,7
concerning  35:19
  63:2
concluded  69:2
  83:18
concludes  83:15
conclusion  29:10
  29:17
conclusions  29:6
  29:15,15 34:10
  50:10
concrete  56:9
condition  31:3
  82:25
conference  42:5
  82:7
conferences  36:16
  36:22,24 37:12
  38:19 39:11 41:5
  64:23 65:18,20
  66:1,3,10,13
confidence  79:11
confident  78:24
conflicts  21:6
congress  15:24
  58:16

congressional
  15:15,18 49:19
  57:13,17
conjunction  50:18
connect  53:9
connecticut  1:19
  6:23
connection  18:22
  49:20 50:9
consider  34:13
  50:9
considered  38:15
consistently  18:8
constitute  69:10
  69:18
constitutional
  9:14 20:11,13
  21:17,20,22 24:18
  24:24 25:5 57:7
  58:23
constraint  58:24
consulting  9:25
contesting  44:16
context  66:2
continue  6:11
continued  4:1
  16:16
continues  26:18
control  15:6 84:23
conventions  22:12
conversations  6:7
conveying  66:25
cooperating  16:16
  16:19
corporation  2:12
  2:13
correct  63:15 64:3
  64:4 67:3 68:25
  69:2,3,11,18,25
  70:4,8,9,15,19,20
  70:21,22,25 71:4,5

71:8,9,12,13,20,21
  71:24,25 72:5,10
  72:12,13,15,16,19
  72:20,22,23 73:1,2
  73:16,21,24 74:1
  83:11,12 84:10
  87:5
corrections  85:4,6
  87:7
correctly  84:7
council  57:14,19
councils  16:9
counsel  7:2,22 8:2
  10:12 12:18 20:23
  23:6,7 28:3 60:8
  68:8 84:11
count  55:18,18
  56:24
counted  14:20
  58:5
counterparts
  61:14
counties  23:20
country  14:4
county  4:11 8:4
  16:8,8 23:17 45:9
couple  18:14
  80:18
course  17:23 18:5
  18:9,11,14 20:11
  20:15 21:14 33:10
  38:23 46:22 74:15
courses  18:2,12,19
  20:9 29:3
court  1:1 2:1 6:19
  6:25 8:6,18 9:12
  10:22 11:6 12:4,6
  12:10 13:17 14:9
  18:25 20:21,22
  22:1,4,17,18 23:13
  23:17,25 24:4,8,16

30:2,4,11 31:5,8
31:17 48:12 50:7
55:12 57:7 64:21
73:12 80:7 85:15
**courts** 31:19 53:1
53:14 55:10 69:14
71:22
**cov.com** 3:11
**cover** 18:3 25:3
**covered** 52:2
**covers** 21:8 25:6
**covington** 3:8 7:15
**create** 81:13
**criminal** 12:24
**criteria** 52:25
81:13
**cross** 7:20 8:19
51:10
**csr** 84:15
**curiae** 22:18
**current** 70:14
**currently** 64:20
**cut** 19:6
**cv** 1:3,12 2:3,12
6:20 21:10 22:25
23:1 26:23
**cvap** 32:6 36:8
38:7 41:24 42:25
43:20 44:12 45:2
45:14,19 49:13
52:24 53:2,21,24
54:17,21 55:4,24
56:2,4,23 73:16
77:5,8 78:23

**d**

**d** 5:1
**d.c.** 1:20 3:16 4:5
6:1,23
**dakota** 44:24
**data** 18:18,22
19:24 29:18 32:16

32:19,20,20,23
33:2,20,24,24,25
34:5,21 35:11,17
36:8 38:8,18 39:5
39:5 41:23 42:25
43:20 44:2,12
46:20,25 49:13
52:15,21,22 53:21
53:24,25 54:7,17
54:22 55:4,8,9,9
55:11,13 56:2,3,8
59:11,18 66:18
67:16,19 70:3,14
70:16 71:15,16
72:14,18,22,25
80:24 81:16,24
**database** 58:9
59:1
**date** 56:11 85:8
87:12
**dated** 84:17
**dates** 9:21
**david** 4:8 8:3
**david.holtzman**
4:10
**day** 44:8 46:6,9,11
48:15 87:16
**days** 85:12
**deal** 25:15 40:4
51:9 76:13
**dealing** 80:12
**decades** 65:21
**december** 1:15 6:1
6:5 84:17
**decennial** 33:3
34:1,24 54:17,22
55:4 56:3,11 67:3
68:23
**decertified** 13:15
**decided** 12:10
22:1 23:24 53:1

**decides** 68:16
**decisions** 52:19,19
**declaration** 5:11
26:5
**deemed** 85:14
**defeat** 30:23
**defendant** 13:14
**defendants** 1:11
2:11,21 3:17 6:18
8:1 68:13
**defense** 12:19 14:4
14:6 15:9,13
16:13,25 17:3,14
37:3
**defenses** 24:12
**definition** 46:23
**definitionally**
32:13 45:2
**degree** 11:22
26:14
**democratic** 82:7
**demographer**
70:21 79:3
**denial** 14:17
**denying** 14:13
**department** 1:8
2:8,17,18 3:12,14
3:19 6:17 7:13,17
7:21,24 8:1 9:19
9:21 10:1,3,8,16
11:1,8,14,23 15:17
28:4 62:9,21 65:9
67:1 68:23 69:20
**depending** 57:17
**depends** 58:14
**deponent** 84:4,6
87:1
**depopulation**
56:15
**deposing** 85:11

**deposition** 1:17
6:10,14,21 7:19
8:18,21,25 25:24
28:18 37:7 51:8
74:5,6,8 83:18
84:9 85:3,10,13,14
**depositions** 60:13
**deputy** 10:5
**derive** 72:15
**description** 5:10
**designated** 28:11
**desoto** 45:9
**despite** 55:20
**detail** 13:7
**detailed** 35:1
**determine** 15:5
**determining** 69:16
**deviation** 57:20
**devote** 51:14
**devoted** 19:7
**difference** 76:18
**different** 13:13
39:18 48:3,13
71:19 83:6
**differential** 55:18
**difficult** 14:22
35:7
**difficulties** 38:25
**difficulty** 31:22
**dillard** 13:12 16:4
17:7 73:4 81:21
82:5
**dilution** 10:25
11:9,13 13:18
14:8,24 16:2,6,11
17:4,13 19:1,3
22:9 23:4,7,12,22
24:4 25:9,16 30:7
30:13 36:7,17
37:5 40:22,24
42:15 44:24 45:4

Pamela S. Karlan , J.D.

46:4 47:7 49:12
49:21 53:22 55:5
59:12 69:5 71:3
**dilutions** 16:5
**direct** 84:23
**directly** 32:19
**director** 1:9 2:9,19
28:8
**disagree** 60:21
**discrimination**
20:20
**discuss** 18:17 24:3
25:21 36:17 39:10
51:23
**discussed** 33:15
65:19 68:7,8
80:23
**discussing** 36:7
42:9 66:6
**discussion** 19:11
42:3,5,8,10 63:21
80:11,12
**discussions** 19:10
37:12,13 38:6,24
39:15,18 40:3,5,15
40:23 41:5,6,22
42:14,22,23,24
43:11,21 61:12,19
61:23 62:18,25
63:11,25 64:23
66:7 71:11
**disenfranchised**
58:3
**disparities** 20:1
34:23
**distinction** 83:3
**distinctions** 82:24
**distinguish** 48:4
**district** 1:1,2 2:1,2
3:12 6:19,19 7:18
12:3,4 15:5 30:18

31:12,13,15 44:8
46:5,5,10 48:9
49:6 53:12,14
57:18,19,20 64:21
69:11,17 72:19
73:4 74:4 76:2
77:4 78:9,21 79:4
79:13 81:13 82:4
82:4
**districts** 15:4,15
15:18,19,21 24:13
46:1,18 47:15
49:19 53:5 57:9
57:12,13,13,14,14
57:15,17,21,25
58:1 72:3,4,9,12
72:15 73:16 79:18
81:10,12,21 82:13
82:14
**division** 3:14 4:14
10:6,18 28:3
**divisions** 10:10
**docket** 13:13
**doctrine** 24:10
**document** 25:23
**doing** 12:22,23
28:25 39:21 60:16
85:7
**doj** 10:19 11:3
16:18 42:13 43:6
43:10 66:25 70:23
71:7,11
**doj.ca.gov** 3:22
**dozen** 22:24,24
25:19
**dr** 60:25
**draw** 15:5 24:13
31:14 39:23 44:7
53:4 72:3,8,11,18
81:11 82:3,4

**drawn** 15:4,21
30:17 31:11 57:15
**drew** 79:4
**drops** 47:1
**duke** 3:9 5:4 7:15
7:15 8:20 64:15
64:18 67:21 82:18
**duly** 8:10 84:4
**duties** 28:8

### e

**e** 3:1,1 4:1,1 5:1,9
84:1,1 86:2
**earlier** 18:24
65:19
**early** 11:10 15:2
15:12 27:16 57:9
**easier** 31:13
**easily** 27:7
**easy** 35:6
**ecological** 19:16
**edition** 24:25 25:1
25:2
**education** 16:9
**effective** 20:1
**effectively** 20:2
**efforts** 55:20
**eight** 22:5
**eighth** 3:9 24:24
**either** 14:25 17:24
24:8 36:6 38:25
39:4 59:24 68:16
**elaborated** 31:9
**elect** 14:14,23
15:24 16:8 46:8
48:17 76:7 78:14
79:24
**elected** 49:18
**election** 13:20
15:7 16:10 46:6,9
46:10,25

**elections** 13:19
14:21 15:1 16:8
22:9 32:3 57:10
**electoral** 57:9,12
**electorate** 47:18
**ellen** 51:18
**embarcadero** 3:4
**emphasis** 9:15
**employed** 9:6
**employment** 10:11
10:13
**enable** 48:16
67:19 74:2
**enactment** 50:18
**enforcement**
65:11,15,22 66:16
66:19 68:24
**entailed** 61:20
**entire** 81:25
**entirely** 44:17
66:22
**enumeration**
54:13 55:21,25
58:17 61:17
**equal** 14:13 53:7
57:16,24,25
**errata** 85:5,7,9,11
87:9
**error** 74:21 77:13
77:18 80:12
**errors** 75:4
**esq** 3:9,20 4:3,8
**essentially** 39:22
58:21
**establish** 83:9
**estimate** 22:22
39:16 46:25 56:13
56:22
**estimated** 50:22
51:25

Pamela S. Karlan , J.D.

**[estimates - full]** Page 8

| | | | |
|---|---|---|---|
| **estimates** 55:15,23 | **experience** 32:15 | **favorable** 49:25 | **firm** 6:24 |
| 58:23 70:7,12,18 | 36:15 38:17 43:18 | **federal** 3:14 12:3 | **firmed** 30:8 |
| **estimating** 39:20 | 43:25 44:1 47:24 | 31:19 58:15,18,23 | **first** 8:10 15:25 |
| **et** 3:12 6:15,18 | 49:11 56:1 58:13 | **federighi** 3:15 5:5 | 25:23 30:14 31:2 |
| 7:17 | 66:15 67:15 72:1 | 5:7 7:25,25 9:3 | 69:6,8 72:5 81:2 |
| **ethics** 21:6 | 81:3,7,15 | 33:4,21 34:15 | **five** 35:16 |
| **etowah** 23:17 | **expert** 5:11 26:5 | 36:3,10,19 37:9,16 | **floor** 3:4 |
| **evidence** 68:16 | 27:13 28:22 32:20 | 37:22 38:2,9,20 | **focus** 9:13 66:12 |
| 82:12 | 32:23 56:6 66:16 | 39:12 41:8,13,18 | **folks** 45:11 50:16 |
| **evolution** 38:23 | 78:20 79:3 82:6 | 42:1,16 43:3,8,12 | **follow** 80:19 |
| **exact** 52:5 | **expert's** 79:10 | 43:16,22 47:10 | **following** 13:11 |
| **exactly** 40:8 45:21 | **experts** 32:18 33:9 | 50:24 51:4,11,15 | **follows** 8:11 |
| **examination** 8:13 | 33:11,13,15,19,24 | 52:8 56:5 58:10 | **force** 10:16 |
| 51:10 64:14 68:1 | 36:1,6,16 39:9 | 60:18,23 62:19 | **foregoing** 84:21 |
| 80:21 82:21 | 40:6,16,16 41:3 | 63:8 68:2,5,20 | 87:4 |
| **examined** 8:11 | 55:22 58:9 72:17 | 75:7,13 76:15,21 | **form** 29:11,21 |
| **example** 14:18 | 79:1 | 80:15,23 81:4 | 30:10,17 34:7,11 |
| 15:12 16:18 17:6 | **expires** 87:20 | 82:19,22 | 35:9,12 39:5 42:7 |
| 19:25 20:23 24:12 | **explain** 14:9 18:21 | **fellow** 41:1 | 49:14 52:22 53:17 |
| 34:22 35:2 39:14 | 30:2 32:15 40:11 | **ferment** 19:13,13 | 55:9 67:9 71:16 |
| 40:8 44:18,21 | 57:4 61:18 | **ferrari** 3:20 7:12 | 75:16 76:19 77:22 |
| 47:16 48:9,19 | **extent** 8:23 52:9 | 7:12 | 87:8 |
| 53:5,6 56:10,16 | **extreme** 19:17 | **field** 33:19 36:1,7 | **forth** 54:6 |
| 73:4,18 80:2 | **ezra** 4:3 7:5 27:18 | 39:3 45:20 47:6 | **forward** 38:24 |
| **exception** 56:7,9 | 75:9 | 66:16 | 51:21 |
| **excerpt** 64:6 | | **fifth** 25:1 34:22 | **found** 44:10 50:20 |
| **excuse** 74:19 | **f** | **figure** 39:19 | 51:19 52:6,18 |
| 82:25 | **f** 84:1 | **figures** 34:25 | **foundation** 33:7 |
| **excused** 83:17 | **fact** 55:15 63:1 | **filed** 6:18 17:9 | 34:16 38:21 47:11 |
| **exhibit** 5:11 8:25 | 73:10,14 | 80:2 | 58:11 65:3 81:5 |
| 9:2 25:23,24 26:3 | **factors** 19:9,20 | **filing** 11:14 | **fourth** 25:2 60:24 |
| 26:22,25 27:4 | 29:25 30:5,7 | **filled** 22:15 | **framed** 24:8 |
| 28:17 | 34:22 39:1,2 | **final** 17:8,10 | **francis** 6:24 |
| **exhibits** 8:24 | **fail** 53:16 85:13 | **find** 52:20 76:2 | **francisco** 3:5,21 |
| 68:11,17 | **failed** 53:12,15 | 78:8 | 4:10 |
| **existing** 29:18 | 76:10 | **finding** 50:21 | **fraud** 26:11 |
| 66:18,22 67:11,15 | **fair** 19:18,19 66:9 | **finds** 50:7 | **free** 58:21 |
| 67:18 | **fairly** 18:7 19:7 | **fine** 27:22 | **frequent** 65:21 |
| **expect** 39:2 45:17 | 30:17 31:11 | **finish** 10:1 | **frequently** 81:2 |
| **expected** 38:17 | **familiar** 45:25 | **finished** 17:11 | **full** 9:24 16:15 |
| | 57:1 65:25 66:5 | 80:18 | 17:21 52:5 76:13 |
| | 66:11 | | |

Pamela S. Karlan , J.D.

[fully - inadequacy]

**fully**  67:16
**functions**  28:8
**fund**  12:19 14:5,6
  15:9,13 17:1,14
  37:3
**funds**  16:14 17:3
**further**  70:11
  80:15,21 82:15,18
  82:19,21

**g**

**g**  3:3
**garbage**  82:7
**gardner**  3:15 7:23
  7:23
**gary**  28:1,2,18
  29:7 42:6 53:19
  53:20 54:5 66:25
  67:5,6,10,11,12,17
  69:13 70:10
**gate**  3:20
**general**  1:3 2:3
  3:19 4:13 10:5,18
  28:2 48:17 56:21
  65:16
**generally**  30:5,22
  35:15 72:6,10,11
  81:8
**geographic**  56:14
**geographically**
  30:16 31:4,7
  69:10
**gingles**  12:10,14
  18:23,24 19:8,8,11
  19:14 29:25 30:3
  31:1,5,16 32:17,21
  32:23 34:21 35:20
  37:20 38:1,24
  39:1,1 40:18
  41:12,17,24 43:1
  44:12 47:9,20
  48:1,5 49:2,4

52:16,20,23 53:13
  53:16 55:10 59:2
  64:25 69:6 71:20
  72:5 74:3 76:3
  78:10 79:19 82:25
  83:4,11
**give**  13:11 55:23
  56:9,13,18,19,22
  76:13
**given**  83:15 84:10
  87:6
**gives**  34:3,25
**giving**  16:25 53:6
  74:5,8
**go**  6:12 11:20
  19:14 20:5 72:21
**goes**  34:23 35:10
  73:19
**going**  6:5 15:6
  19:3 24:3 25:22
  32:13 45:10 46:6
  46:11,12,13 48:14
  50:24 52:8 60:11
  60:18 61:6 62:4
  62:14 63:4 73:12
  73:13 75:22 76:1
  76:9 78:4,8 81:9
**golden**  3:20
**good**  6:4 8:15,16
  64:16,17 68:3,4
**graduate**  11:17,22
  21:5
**graduated**  11:19
  12:1
**great**  27:10
**greater**  33:7
**grounds**  23:24
  52:20 53:16 60:19
**group**  30:15,20
  31:4,6,10 32:5
  40:19 69:9 70:7

**groups**  15:6
**guardado**  3:3 7:9
  7:9
**guess**  53:23 55:6
  56:16
**guest**  21:24
**guidance**  30:9

**h**

**h**  5:9
**half**  22:24
**happened**  62:1
**happy**  63:7 79:17
**hard**  13:10 53:9
**harle**  9:10
**harry**  12:6
**harvard**  17:25
**heard**  38:7 39:5,6
**hearings**  51:24
**hearsay**  33:5
  37:10,10,17,23
  38:3,10,13,14,15
  39:13 41:9,14,19
  42:2,17 43:4,12
  60:19,21
**held**  6:21 13:18
  31:9 66:2 69:14
**helped**  10:14
**helpful**  51:17
**helping**  15:13
  17:12
**heteroscedasticity**
  40:7
**higher**  45:6 49:5
  56:4,22
**hire**  32:18
**historical**  56:9
**history**  11:23,24
**hklaw.com**  4:10
**hold**  27:7
**holland**  4:8 8:4

**holtzman**  4:8 8:3,3
**homoscedasticity**
  40:14
**house**  58:16
**household**  35:10
  82:9,11
**households**  35:2
  35:13
**huge**  10:25 56:19
**hugely**  47:20
**huh**  36:25
**hundred**  25:7

**i**

**idea**  40:8 75:18
  77:25
**identification**
  25:25
**identifies**  30:4
**identify**  23:1 26:2
  26:22 53:20,24
  54:12
**illustrate**  31:15
**illustrative**  31:13
  48:8 53:12 72:3
  72:19 81:9
**imagine**  78:18
**immigration**  2:13
  3:7 4:6 7:8,11
  10:13
**impeach**  76:10,11
**imperative**  85:10
**implementation**
  10:17
**important**  45:20
  69:6
**impossible**  14:22
  15:22
**inaccuracy**  38:18
  54:6
**inadequacy**  54:7

Pamela S. Karlan , J.D.

**inadequate** 53:17
53:21,24 54:1
**inadmissible**
38:14
**incapacity** 58:3
**incarcerated** 58:4
**include** 10:19
12:25 17:3 23:3
**included** 37:13
41:6
**includes** 58:1
**including** 25:9
37:20 38:1 41:12
41:17
**incorrect** 73:17
**indicated** 84:4
**individual** 39:17
**information** 33:16
34:3,4 35:1,8 69:5
**initial** 51:18
**initially** 15:17
17:9 27:18 55:8
**initiatives** 20:18
**inserted** 75:7
**institute** 37:3
**instituted** 19:23
**instructions** 85:1
**insufficient** 52:15
52:22
**interagency** 9:24
**interest** 9:11 11:14
24:20
**interested** 84:12
**interfere** 6:10
**interference** 6:8
**internet** 35:3,4
**interrupted** 24:2
**involve** 45:4 63:13
**involved** 13:8
15:14 16:1,2,24
24:16 40:23 42:13

42:21,23 43:10
64:24 72:7 81:16
81:20
**involves** 25:7
**involving** 12:8
14:2 16:5,11
18:17 22:9,11
30:13 65:21
**issue** 23:25 24:1,7
30:25 45:13,19
46:3 52:10 56:24
66:19 69:15,23
**issues** 15:10 18:17
18:21,22 20:14
24:7 36:17 37:13
40:23 41:6 42:14
43:11 64:24 66:6
66:11

**j**

**j** 1:21 84:15
**j.d.** 1:17 5:2 8:9
11:24 87:3
**january** 9:23
**jarmin** 1:8 2:8,18
**jarmin's** 28:5
**job** 9:25 17:16
**joint** 11:22
**jose** 2:12 3:6 4:6
7:7,10 8:19
**joshua** 3:15 7:23
**journals** 25:1
**jr** 1:7 2:7,16 6:16
**judge** 12:5 76:1
78:8
**judicial** 13:19,20
16:10 22:9 28:3
57:10
**jurisdiction** 44:5
46:16 58:20
**jurisdictions** 52:2
72:7

**justice** 3:14,19
7:13,24,25 9:20,22
10:1,4,8 12:6,7,16
15:17 21:4,24
28:4 30:4 62:9,22
65:10 69:21
**justice's** 68:24

**k**

**k** 4:4
**karlan** 1:17 5:2,12
6:14 8:9,15,22 9:5
26:2,6 60:13,25
63:6 64:7,16 68:3
68:21 71:14 82:23
83:2,16 87:3
**katrina** 56:18
**katz** 51:18
**keep** 15:1
**kennedy** 22:13
**kenneth** 9:10
**kept** 16:22 17:6,12
**kin** 84:11
**kind** 10:22 14:25
19:13 30:8 35:16
47:1 50:13,17
53:6 82:8
**kinds** 14:15 15:3
40:16 66:11
**knight** 4:8 8:4
**know** 19:6 21:22
23:23 25:13,18
34:24 40:4,15
44:23 47:2,21
49:4 53:5 54:8
59:21 64:18 72:24
73:9,12 77:8
79:15 82:9
**known** 11:5 13:12
27:25
**knows** 75:18 77:25
79:5

**kravits** 3:11,12
7:16,16 64:19

**l**

**l** 1:7 2:7,16 6:16
**lack** 34:15 38:20
47:10 54:16,21
58:10 63:22 81:4
**laid** 18:25
**landscape** 50:17
**large** 15:1,23 16:8
30:16 31:4,6 69:9
**larger** 80:12
**latino** 45:15
**latinos** 55:19
**law** 3:3,15 4:3
6:21 7:6 9:9,11,14
11:23 12:11 17:17
17:25,25 18:1,1
20:12 24:24 25:5
25:12 34:2 38:23
58:15,18 71:19
**lawsuit** 49:8
**lawyer** 16:15 79:8
**lawyers** 4:3 7:6
16:25 26:12 32:19
64:24
**ldf** 12:21 16:22
**lead** 16:23
**leadership** 10:18
**leading** 50:14
**leave** 57:10 72:17
**leaving** 56:21
**left** 16:22 17:14,22
20:4,4 56:20
**legal** 6:25 7:1 9:15
12:18 14:4,6 15:9
15:13 16:13,25
17:3,14 18:6
20:14 21:23 24:25
25:6 29:2,4 37:3

Pamela S. Karlan , J.D.

**legally** 47:17
**legislative** 23:9
  57:13,19
**legislature** 13:25
**letter** 28:1,2,18
  29:7,13 42:6
  53:19,20 54:5
  66:25,25 67:5,6,10
  67:11,12,14,18
  69:13 70:10
**level** 21:5 46:15,15
  70:3,4,8,13,14,16
  72:18 79:11,20
  80:24 81:16,23
**liability** 50:8,21
  83:9
**likes** 11:11 18:11
**limitations** 72:25
**line** 39:23 48:11
  60:14,22 74:18,19
  74:20 75:1 76:22
  76:22 86:4
**listed** 21:10 22:25
**listening** 66:7
**litigate** 82:14
**litigated** 15:16
  65:6,8 71:3
**litigates** 20:22
**litigating** 10:10
  12:22 17:7 33:10
  69:4 72:1 79:8
**litigation** 4:13
  9:12,14 10:12
  13:12 20:13,21
  21:18,20,22 36:7
  36:18 40:24 42:15
  45:17 65:12
**litigator** 16:23
**little** 12:14 13:7,10
  19:10 23:16 24:6
  45:24 57:5 77:2

**live** 20:20
**llp** 1:18 3:3,8 6:22
**local** 32:2 49:18
  82:6
**localities** 69:23
**located** 6:22
**long** 9:17 16:13
  17:19 28:6 29:11
  29:21 34:7,11
  35:11 39:4 49:14
  52:22 53:17 55:8
  71:16 75:25 78:7
**look** 46:11 51:6
  52:11 53:7,10
  57:21 60:15 74:14
  81:23
**looked** 30:9 52:17
**looking** 27:6 32:11
  46:17,23,24 60:24
  74:13
**looks** 19:25 48:10
  59:3
**los** 4:11 8:4
**lose** 48:12 53:21
  54:10,23
**lost** 52:19,21,23
  54:14
**lot** 19:12 44:22,22
  44:23 48:14 55:15
**lots** 39:17 40:15
  48:8
**louisiana** 15:15,18
**lower** 31:19 56:13
  56:18

**m**

**m.a.** 11:24
**machine** 84:7
**maintained** 76:20
**major** 15:14
**majority** 15:1
  30:17,22 31:11,18

31:24 32:4 48:23
  69:10,18 82:2
**management** 28:3
**manatt** 1:18 3:3
  6:22 7:9
**manatt.com** 3:6
**map** 18:25
**margin** 80:12
**mark** 8:24 25:22
**marked** 5:10 8:24
  25:24 26:3,15
  28:11,17
**martin** 1:21 7:1
  27:2 84:15
**maryland** 3:12
  7:18 8:20 27:21
  59:24 64:21
**master's** 26:14
**material** 26:24
  27:1 43:13
**materially** 59:16
**materials** 19:5
**matter** 6:15 29:18
  32:10 44:15 59:16
  68:7
**mean** 14:9,24
  16:20 24:5 32:9
  40:13 44:14 47:12
  48:2,2,3 49:3,15
  50:6 53:25 54:1
  63:16 66:4
**means** 31:20 40:9
  71:6,22 84:23
**meant** 16:21,23
  30:2
**media** 6:13 60:1,6
**meet** 19:3 32:16
  47:9 55:10
**meeting** 37:20
  38:1 40:18 41:17
  41:24 43:1 64:24

**member** 30:18
  69:11
**members** 15:24
  32:5 72:8 82:3
**memo** 12:12
**men** 82:8
**mental** 58:3
**mention** 23:6 38:7
  38:18 41:23 42:25
  43:19
**mentioned** 15:8
  16:4,10 18:23
  34:10 81:21
**merit** 1:21
**methodological**
  19:13
**methodologies**
  39:16
**methods** 39:18
**metric** 69:16
**mexican** 23:9
**michael** 4:13 7:21
**michigan** 50:16
**microphones** 6:6,9
**mimeograph** 19:5
**mine** 60:15
**minorities** 30:24
**minority** 14:13,13
  14:19 20:2 30:15
  30:20 31:3,6,10,22
  32:5 40:19 44:5
  46:6,7,12 48:16,21
  48:21 54:2,2
  56:15 69:9,17
  81:14 82:1
**minority's** 47:22
  48:23
**minus** 77:12
**minutes** 29:24
  34:9

Pamela S. Karlan , J.D.

**misnomer**  57:5,23
**mississippi**  13:20
  45:8
**mistake**  26:5,13
**mistaken**  51:5
**modified**  71:23
**moment**  30:7
**montgomery**  9:10
**month**  9:18
**morning**  6:4 8:15
  8:16 64:16,17
  68:3,4
**morse**  22:10
**moved**  8:25
**moving**  53:1
**multiple**  69:14
**municipal**  2:12

**n**

**n**  3:1 4:1 5:1
**n.w.**  4:4
**naacp**  12:18,20
  15:9 16:13 17:14
  37:3
**name**  6:24
**nancy**  1:21 7:1
  84:15
**national**  50:15
  51:22
**native**  44:19
**navajo**  44:22
**necessary**  24:19
  42:9 44:12 59:4
  70:14,17 80:24
  85:4
**need**  34:21 36:8
  38:7 41:23 42:4
  42:11,25 43:20
  44:16,20 46:20,21
  46:25 59:8 63:18
  63:21,22 67:13
  70:2,17 72:18

73:11
**needed**  40:16 53:3
  55:3
**needs**  69:21
**neither**  84:11
**never**  39:6 40:17
  42:3 49:7
**new**  3:10,10 12:4,4
  12:19 15:22,23
  56:17,20
**nice**  59:3
**non**  2:13
**noncitizens**  45:16
  58:5
**nonexclusive**  28:7
**nonminority**
  46:13
**north**  11:11
**northern**  1:2 2:2
  6:19
**northwest**  1:19
  6:23
**notary**  87:23
**note**  6:6 7:19
**noted**  33:22 85:9
  87:8
**notice**  84:3
**noticed**  7:20
**notices**  8:19
**number**  5:10 9:2
  10:15 13:8,11
  14:3 19:23 24:6
  25:17 32:2 44:15
  45:16 47:19 48:5
  52:1,6,25 53:2,3
  56:18 59:8,21
  64:22 73:15,17,21
  73:22,23,25 74:1,1
  74:2 76:5 78:12
  82:10

**numbers**  13:13
  26:19 33:3 53:8
  54:8,8 55:16
  56:19 57:24 58:1
**numerous**  39:15
  40:20
**nyu**  18:1

**o**

**object**  50:24 52:8
  60:18 68:10,13
  75:15 76:9 77:21
**objected**  76:19
**objection**  33:4,21
  33:22 34:15 36:3
  36:10,19 37:8,16
  37:22 38:2,9,20
  39:12 41:8,13,18
  42:1,16 43:3,12,22
  47:10 56:5 58:10
  60:10,21 75:8
  76:20 80:10 81:4
**observing**  68:10
**obtain**  72:14,18
**obviously**  38:13
  45:15 58:2 68:15
**occurred**  64:1
**occurs**  56:11
**october**  60:12
**offer**  27:24
**offering**  65:4
**office**  3:19 10:12
  49:18
**offices**  1:18 6:22
  22:14
**official**  1:7,8 2:7,8
  2:17,18 6:16 28:4
**oh**  62:2
**okay**  9:2,5 29:24
  37:9 43:9,14,18
  51:11,15 63:24
  68:20 70:19 74:13

75:13 76:15,21
  82:3,8,15 83:13
**once**  29:2,4 46:24
  47:13
**ones**  47:3 50:14
  52:1,7
**ongoing**  61:12
**operating**  51:20
**opine**  59:15
**opinion**  27:24 30:4
  43:19 50:7,25
  54:20 55:2,6,7
  59:9 65:4 66:17
  66:21,21 67:7,7,9
  67:11,18 68:22
  71:15
**opinions**  65:4
**opportunity**  14:14
**opposed**  29:3
  40:14 54:7 72:9
**order**  8:18 24:14
  24:19 30:12 55:4
  67:13 70:12 81:11
**organized**  66:2
**original**  85:11
**originally**  30:9
**orleans**  15:22,23
  56:17,20
**outcome**  15:6
  84:13
**outside**  29:1,2,2,4
  50:25 56:6
**overall**  34:10 45:7
**overlap**  65:5
**overwhelming**
  47:18

**p**

**p**  3:1,1,9 4:1,1
**p.o.**  3:16
**page**  1:13 5:1
  26:20 51:6,17

Pamela S. Karlan , J.D.

[page - preparation]

52:5 60:13,22,23
74:13,14,17,18,20
76:22 80:13 86:4
**pages** 5:12 25:8
26:19 28:14 87:4
**pamela** 1:17 5:2
5:11 6:14 8:9 26:6
83:16 87:3
**panel** 66:1
**panels** 66:5
**paradigm** 14:25
**paragraph** 52:6
60:24
**paris** 70:24
**part** 15:25 16:2
34:13 37:2 51:23
56:24 75:21 76:11
76:12 78:3 80:11
81:16 82:5
**participant** 66:10
**participate** 11:2
14:14 20:2
**participated** 10:17
11:8 22:17 23:3
**participation** 24:3
24:16
**particular** 61:2,3
65:10 82:1
**particularly** 65:22
**parties** 6:12 20:17
23:12
**party** 9:1 14:5
22:10 23:15 71:4
84:12
**pass** 59:23 64:12
**paste** 19:6
**pduke** 3:11
**penalize** 31:22
**pending** 64:20
**people** 35:21,23
39:2 42:9 44:1,4,9

46:22 48:13,17,24
52:19 53:4 54:14
55:11 58:1,2
67:16 82:10
**percent** 39:24 40:1
45:9 47:20 48:5,9
48:20,22 49:2
53:3 57:20 78:22
**percentage** 56:2,4
73:15
**perez** 11:5 23:8,11
**perfectly** 29:21
79:17
**perform** 46:6 49:7
70:11,17 79:14
**performance**
47:14,14
**performing** 28:7
46:1,5,9,18 74:4
81:13
**period** 18:2,16
20:10 21:11 51:19
**person** 22:2 57:2,6
58:6,8 59:1
**personally** 65:6,8
65:20,25 66:4
**personnel** 9:25
**perspective** 79:7
79:16
**petitioners** 41:1
**ph.d.** 26:6,7
**phelps** 1:18 3:3
6:22 7:9
**phillips** 1:18 3:3
6:22 7:10
**phone** 8:2
**phones** 6:9
**phrase** 52:5
**physically** 72:11
**pick** 6:7

**picked** 55:20
**picture** 47:2 55:24
**pieces** 55:1,7
**place** 6:9,11 45:14
47:16 56:12 84:4
**places** 58:4
**plaintiff** 1:5 2:5
6:15 31:14 44:19
53:21 54:18,23
68:16 69:21 70:2
**plaintiff's** 68:8
**plaintiffs** 2:14
3:11 7:7,10,16
8:21 11:3 15:19
27:21 29:22 30:6
48:8 49:11 53:11
53:15 54:10 55:3
59:17 64:19 66:22
67:13,19 70:11
71:23 83:8
**plan** 42:6
**play** 46:3
**plays** 32:10
**please** 6:6,8 7:3
8:6 60:8 85:3,7
**plot** 39:22
**plus** 49:2 53:3
77:11
**point** 49:8
**points** 17:24
**polarization** 46:16
47:18 48:20
**political** 9:15
14:11 18:6 20:3
20:15,17 21:15,17
21:23 24:25 25:7
34:4 39:20
**politically** 30:20
35:5 49:10
**population** 15:23
30:22 31:19 32:7

34:25 35:1 44:17
44:20 45:7 47:21
53:2 56:17 58:22
59:6 69:15,22
70:13 80:9
**populations** 57:16
57:21
**portion** 26:22
68:17
**position** 24:17
**possible** 74:25
**postgraduate**
11:20
**potential** 54:18
**potentially** 31:24
**practical** 29:17
32:10 44:14 59:16
**practice** 14:12
35:21
**practices** 10:13
**practitioner** 40:21
**practitioners**
32:16 34:14 35:19
36:6,16 39:9
45:20 47:6,25
49:22
**pre** 31:3 67:11
82:25
**precinct** 19:17
**preclearance** 16:1
**precleared** 15:17
**precondition**
32:17 59:2 69:6,8
72:5 83:4,11
**preconditions**
30:11 31:1 35:20
37:21 41:12
**predictions** 39:24
**preliminary** 74:25
**preparation** 61:16

Pamela S. Karlan , J.D.

**prerequisites** 19:2
**present** 4:12 7:2
16:18 30:6 40:17
**presentation** 66:1
**presently** 9:5
**preservation** 8:21
37:7 51:8
**presley** 23:16
**pretty** 21:8 23:1
27:7 31:19
**prevail** 29:22
67:13
**previous** 37:9
**primaries** 13:23
**primarily** 12:22
25:19 35:24 52:3
**primary** 10:9
**principles** 13:19
**prior** 49:14 53:17
**private** 6:7 15:18
40:21 47:25
**privilege** 43:7,15
60:10 62:8,23
**privileged** 42:19
43:4,13 61:24
**pro** 28:25
**probably** 17:6
25:13,19 45:11
**problem** 38:18
39:4,6 40:18 51:9
55:12 73:9
**problems** 39:10
72:25
**procedure** 14:12
21:2,3,19
**proceed** 8:7 60:8
**process** 9:16 18:6
20:3,15 21:15,17
21:23 24:25 25:7
58:15

**produced** 39:21
**professional** 20:19
**professor** 6:14
8:15,22 9:5,9,10
17:16,24 21:13,16
21:20 26:2 60:13
64:7,16 68:3,21
71:14 82:23 83:2
83:15
**professorships**
21:12
**profit** 2:13
**programs** 3:14
**prong** 30:19,21
**prongs** 32:10
**pronounce** 40:6
**proof** 64:25
**proper** 69:16
**propounded** 87:7
**provable** 44:7
**prove** 19:14 34:14
44:12 52:16 83:8
**provide** 12:12
13:7
**provided** 36:9
38:8 41:25 43:1
43:20 49:13 67:8
68:21
**provides** 34:2 70:7
**proving** 19:9
37:13 39:3,11
41:6 48:1
**public** 9:10 34:4
87:23
**publications** 32:24
33:1
**purges** 14:2
**purpose** 23:21
**purposes** 35:16
41:24 43:1 72:5

**pursuant** 8:18
84:3
**push** 74:3
**put** 26:8 37:7
53:12 68:16
**puts** 37:4

**q**

**qualify** 23:15
**question** 19:14
23:18,18,19 42:7
54:4,24 55:25
59:11,15 60:23
63:3,14,19,23 64:7
64:20 67:2 68:22
74:24 76:12,18
82:19
**questioning** 78:19
**questionnaire**
55:4 56:3 71:16
**questionnaires**
54:17,22
**questions** 29:12
64:22 68:6 80:16
82:16,18 87:6
**quiet** 49:16
**quite** 18:8,12

**r**

**r** 3:1 4:1 84:1 86:2
86:2
**race** 24:11,18,21
39:16
**racial** 19:15 39:19
44:6 47:18
**raised** 52:10 66:12
**range** 18:12
**rate** 45:5,7
**rates** 49:5 69:14
**raw** 72:14
**reach** 29:6

**read** 26:10 50:7,7
50:11 60:12 74:22
75:8,11 76:15
85:3 87:4
**reading** 52:9
53:19 54:5 67:10
76:17
**really** 16:17 21:2
32:10 44:16 45:13
46:10 48:15 71:2
73:14
**reapportionment**
13:24 57:8
**reason** 52:21
55:14,14,17 59:4
85:5
**reasonable** 58:21
**reasons** 52:23
59:21 76:19
**reauthorization**
51:24
**recall** 50:4 64:25
65:1 80:25 81:20
**receipt** 85:12
**received** 11:24
**recess** 60:3
**record** 6:5,12 7:4
8:17 26:8 33:7
37:8 38:12 52:4
60:2,7,12 68:8,12
80:14 83:16 84:10
**recorded** 6:13
84:7
**recording** 6:11
**recused** 11:4
70:24 71:6
**redirect** 76:14
**refer** 48:24
**reference** 36:1
66:24

Pamela S. Karlan , J.D.

referred  55:17
referring  28:18
reframe  54:4
regard  49:1 65:5
  65:18
regarding  29:12
regardless  15:7
regime  70:14
registered  1:21
registering  31:23
regressions  19:17
regulation  9:15
  18:6 20:14 21:15
  21:16,23 24:25
  25:6
related  1:12 10:13
  14:1 15:10,11
  17:1 19:24 20:14
  25:8 43:11
relating  10:20
  18:18 25:4 36:17
  37:13 40:23 41:6
  42:14
relationship  46:19
relatively  15:23
  57:15
relevant  30:25
  31:2 32:8,9 35:3,3
reliable  69:21
reliance  36:1
relied  50:12 54:14
  72:8 82:2,6,7
rely  72:2
remand  23:24
remedial  81:11
  83:4,7
remedies  29:23
remedy  48:16 49:8
remember  40:5
  51:5 74:5 81:18

remotely  7:3
reno  24:10
repeatedly  55:11
replaced  9:1
report  5:11 19:20
  19:21 26:5 28:1
  34:22 39:1 51:17
  51:23 52:9,18
  56:6 60:24 82:23
  83:2,10
reported  34:1
  50:21 52:1,7,19
reporter  1:21,22
  7:1 8:6 27:2 40:12
  84:24
reports  33:13
represent  64:18
representative
  58:17 69:17 72:3
  73:16
represented  11:2
  23:8,12,15
representing  3:6
  3:11,17,23 4:6,11
  14:5
reproduction
  84:22
republican  22:10
  22:12
request  67:1
required  70:11
requirement  57:7
  59:1
requirements
  64:25
requires  58:15
reserve  68:13,18
resource  35:5
resources  48:18
respect  32:1

respond  68:18
responsibilities
  10:7,9 12:20
  65:10
responsibility
  20:19 26:12
rest  76:15,18
restate  54:24
restrictions  22:11
result  14:12
results  19:23
  30:12 33:25 51:20
resume  26:10
retain  27:20
retained  27:12,17
  27:18
return  56:20
  85:11
reunified  30:8
review  10:9,14
  29:3,7 49:25
  52:14 67:5
reviewed  33:13
  35:18 50:5,6
revisit  60:10
revolution  49:16
  57:8
right  14:17 32:22
  54:9 69:6 83:13
rights  4:3 7:6 10:6
  10:10,18,20 12:8
  12:23,25 13:3,9
  14:10 15:20 17:1
  18:3,14,18 20:16
  22:6,7,20,23 23:2
  24:14,19 25:1,4,8
  29:22 37:2,5
  38:23 44:18 45:17
  49:17 50:15 65:7
  65:11,16,22 66:16
  66:20,23 67:13

68:10,13,18,18,25
  69:24 70:11 71:19
  72:2
riley  22:13
rmr  84:15
road  18:25
roemer  13:17 17:5
  22:8
role  32:11
ron  1:8 2:8,18
  28:5
room  7:2
rosenberg  4:3 5:3
  5:6 7:5,5 8:14,17
  9:4 25:22 26:1
  27:4,9 33:6,22
  34:8,18 36:4,12,21
  37:6,11,19,25 38:5
  38:12 39:8 40:10
  41:11,16,21 42:12
  42:20 43:6,9,14,17
  43:24 47:23 51:1
  51:7,12 52:4,10
  56:25 58:12 59:23
  60:9,17,20 62:11
  62:12,20 64:5,10
  68:15 75:7,11,13
  75:14 76:9,17
  77:20 80:10,17,22
  81:6 82:15 83:13
ross  1:7 2:7,16
  6:16
roughly  50:22
  57:22
round  13:24 17:10
rule  26:4
runoff  13:22 17:12
         s
s  1:17 3:1 4:1 5:2,9
  5:11 6:14 8:9 26:6
  83:16 87:3

Pamela S. Karlan , J.D.

[salient - state]                                                                                    Page 16

salient 35:5
sampling 29:20
san 2:12 3:5,6,21
   4:6,10 7:7,10 8:19
satisfies 76:3
   78:10
satisfy 31:15 47:19
   49:4 52:22,24
   53:13 74:2 79:19
   81:12
satisfying 83:3
save 14:6
saying 51:24 55:12
   74:20 75:2 77:15
says 8:20 14:11
   24:10 26:4,6
   58:19 61:10 62:11
   80:7
scatter 39:22
scedasticity 40:14
scholarly 65:14
scholars 35:24
scholarship 35:18
   35:25 36:5
school 9:9 11:23
   11:24 12:1 17:25
   18:1,1,1 57:14
science 26:14
scientists 39:20
   72:2,9 73:1
scope 50:25 56:6
seats 15:2 58:16
   58:17
second 16:2 30:19
   52:5 55:14 57:11
   61:8
secretary 1:7 2:7
   2:17 6:17
section 10:11,12
   10:15,20,25 11:7
   13:1,5,6,9,9,18,21

14:1,3,8,10,16
15:8,10 16:1,3
17:3 18:3,18 19:3
19:22 20:13 22:8
22:11,13 23:3,7,12
23:18,21,21,24,25
24:4,7,9,14 25:4
25:15,20 30:12
32:16 33:10 35:19
36:7,16,17 37:14
39:11 40:22,24
41:7 42:14 44:2
44:13 46:4 47:7
49:12,21 50:19,21
52:2 53:22 55:5
59:12 65:6,7,11,15
65:23 66:19 67:17
67:20 68:24 72:1
sections 10:11
see 1:13 20:25
   27:6 45:13,14,17
seen 75:17,19
   76:24 77:24 78:1
semester 17:25
seminar 21:6
senate 19:20,21
   34:22 39:1
sense 13:11 48:10
   67:12
sensitive 6:6
sent 35:12,15
sentence 61:8
   62:17
september 9:23
series 13:21 14:1
   16:7 21:3
served 23:6
session 37:4
set 14:16 17:8 19:1
   19:5 54:6 66:2

settle 73:19
settled 23:20
   82:13
sex 20:20
share 47:21
shaw 24:9,13,17
sheet 85:6,7,9,11
   87:9
shift 56:14
short 35:9 42:7
shorthand 1:22
   57:6 84:7,24
shove 74:3
show 30:11,14,19
   30:21 31:10 32:3
   40:19 45:9 49:2
   53:14 55:13 71:23
showed 15:21
   67:15
showing 19:1 31:3
   38:25
shut 49:10
side 50:12 73:20
sign 85:7
signature 84:14
   87:12
significant 47:17
   66:18
signing 85:8
single 30:18 69:11
six 20:23 35:13
size 54:8
slightly 45:6
small 72:7 81:21
social 72:2,9,25
socioeconomic
   20:1 34:23
sofaer 12:5
solely 23:25
solomon 6:24

solutions 6:25 7:1
somebody 40:18
   53:6
soon 23:1
sorry 27:2 75:15
   77:21
sort 18:21,25 28:6
   32:18 44:13
sound 75:23
sounds 20:12 78:5
sources 29:18
   66:18,22 67:16,18
south 44:24 49:16
   52:3
southern 12:4
southwest 52:3
space 85:5
speak 80:14
special 9:15 10:12
speculation 43:23
   56:6
spent 19:18,19
spring 18:7
squares 53:8,10
staff 61:13
stage 58:14 81:11
   83:4,7
stands 80:10
stanford 9:9,11,17
   17:22 18:1 20:4,6
   20:7,9
start 48:6 61:6
   76:21 83:1
started 13:14,22
   18:5 19:4
starting 39:20
   74:17
starts 80:13
state 1:3 2:3 3:19
   3:23 6:15 7:3,13
   13:24 14:11 24:20

Pamela S. Karlan , J.D.

**[state - time]** Page 17

27:19 49:18 57:13
57:19 85:4
**stated** 75:5 77:18
**statement** 29:10
**statements** 11:14
**states** 1:1 2:1 3:12
3:14 6:17,18 7:17
7:23 9:19 34:2,3
45:6
**statistician** 70:19
**stay** 16:13
**stopped** 21:2
**straightforward**
71:3
**street** 4:4,9
**strickland** 31:9
**strike** 33:9
**studied** 49:21
**studies** 26:10
50:13,17,20 51:5
**study** 50:15 51:4
51:18
**stuff** 34:1
**subdivision** 14:11
**subdivisions** 34:5
**subject** 71:11 85:8
**submitted** 22:23
**subscribed** 87:16
**subset** 47:4
**substance** 62:24
87:8
**substantial** 19:7
45:16
**successful** 44:2
49:12,15 50:1,5,12
50:14,18
**sufficient** 34:14
67:19
**sufficiently** 30:16
30:23 31:4,6,12
40:20 44:6 69:9

**suggest** 8:23 51:7
**suggests** 44:21,25
**suite** 1:19 3:21 4:4
4:9
**summer** 20:6
27:16
**supervision** 84:8
84:24
**supreme** 9:12 11:6
12:6,10 13:17
18:24 20:21,22
22:1,3,17,18 23:13
23:17,25 24:4,8,16
30:10 31:5,8,17
48:12 57:7 80:7
**sure** 9:3 13:10
14:10 26:7 28:5
30:3 36:13 42:19
45:21 54:25 55:1
59:22 60:17,20
66:4 73:7 74:23
**survey** 29:19 34:6
35:10,14,14 49:14
70:7
**surveyed** 50:17
**surveys** 35:11
**suspected** 69:24
**swear** 8:6 74:9
**sworn** 8:10 84:5
87:16

**t**

**t** 5:9 84:1,1 86:2
**table** 77:3
**tack** 45:23
**take** 6:11 24:10
26:12 32:21 47:13
51:12 59:24
**taken** 1:18 6:14
8:18 60:3 84:3
**talk** 12:14 14:8
32:21 51:2,17

71:7
**talked** 21:25 51:4
68:11
**talking** 19:12,18
19:20 29:25 34:9
40:6 74:25 75:16
77:23
**talks** 49:17
**task** 10:16
**taught** 9:17,18
18:3,7,9,14 20:9
20:11,19,20 21:1,1
21:9,14,16,19,21
21:22,23
**teach** 17:19 18:11
18:13,13,13 20:15
20:16,20,25 21:1,3
21:5,9
**teaching** 18:5,16
21:2
**technically** 44:14
49:3
**tel** 21:13
**telecon** 4:8
**telephones** 35:2
**tell** 10:22 27:7
35:4 61:25 74:9
74:11 82:3,8 84:5
**tells** 35:6
**terms** 24:8,9 25:21
39:10 40:5 48:1
50:23
**test** 19:23 51:20
**testified** 8:11
55:23 66:24
**testify** 27:13 62:5
63:5,7 79:1
**testifying** 62:15
**testimony** 5:2 64:8
65:1,6 68:14,17
83:15 84:2,6,10

**texas** 11:12
**thank** 64:11 67:21
74:16 83:13
**theoretical** 46:21
**theoretically** 32:9
**thereof** 84:13
**thereto** 45:8
**thing** 34:20 38:22
45:3
**things** 10:16 19:16
29:3 30:12 52:23
55:15 83:6
**think** 19:11 21:8
21:19,22 23:14
24:2,5,15 27:5
34:10 35:12 37:7
42:18 44:4,6,7,9
45:19 46:9 48:14
48:19 50:20 51:1
59:19 63:5,6
64:10 66:24 75:11
76:17,22 80:13
81:20 82:6 83:7
**thinking** 46:10,17
**thinks** 30:5
**third** 30:21 61:7
**thirty** 85:12
**thomas** 21:24
**thornburg** 12:10
18:23,24 29:25
30:3
**thought** 54:12
**three** 10:10 19:1
22:7 24:23 28:14
30:5
**threshold** 55:10
**time** 7:2 8:5 9:24
11:8,10 15:12
16:15 17:21,23
18:2,16 19:8,19
20:10 21:11,16,19

Pamela S. Karlan , J.D.

27:12 51:14 53:1
59:25 60:5 68:19
71:4,20,22 83:14
84:3
**timeframe**  64:3
**times**  22:5,16
50:22 51:25 52:6
**title**  10:3 12:23
14:7 28:5
**today**  64:8 68:11
**today's**  83:15
**topics**  25:3 66:1,11
**torts**  21:1
**total**  31:18 53:2
57:21 59:6
**town**  82:8
**trained**  32:19
**training**  37:3
**trane**  15:14
**transcribed**  84:8
**transcript**  84:21
85:13,14
**transcription**  84:9
87:5
**transformed**
49:18
**tremendous**  56:14
**trial**  8:22 9:1,2
51:8 62:5 68:12
73:19
**tribes**  44:23
**trouble**  39:3 73:3
**true**  45:3 84:10
**truth**  74:9,11 84:5
84:5,6
**try**  26:11 53:13
**trying**  24:5 39:16
39:18,23 46:25
74:23 81:12
**tuesday**  1:15 6:1

**turn**  6:8 46:12,13
**turned**  19:6
**turning**  26:15
28:10 60:23
**turnout**  46:11
47:4 49:5
**twice**  21:16
**two**  11:11 14:7,15
16:15 32:10 46:21
48:3 50:14 51:5
55:7 80:13 83:6
**typical**  39:9 47:6
47:24

**u**

**u.s.**  1:8,9,9 2:8,9,9
2:17,18,19,19 7:21
12:6 20:22 44:22
71:4
**uh**  36:25
**ultimately**  11:5
13:18,23 19:6
74:3
**umm**  62:19,19
**unaware**  54:19
**undergraduate**
21:3
**undermined**  23:21
**understand**  60:20
**understanding**
33:8,19,23 50:10
58:7
**understood**  68:20
**unfair**  10:13
**unfavorable**  50:1
**uniformly**  31:19
**unit**  6:13 60:1,6
**united**  1:1 2:1 3:12
3:14 6:17,18 7:17
7:23 9:19 45:6
**university**  17:17
17:19 20:5 21:5

21:14,21 50:16
**universitywide**
21:6
**unnecessary**  51:14
**unreported**  50:23
52:1,7
**unsuccessful**  50:1
52:12,15
**ups**  80:19
**use**  14:11 16:7
24:18,20 31:21
35:16 55:11 58:9
58:21,22,22 59:8
59:14
**usually**  31:14 77:1
77:10

**v**

**v**  1:6 2:6,15
**vacancy**  28:7
**vacant**  22:14
**vap**  44:20 45:1,9
45:14
**variety**  59:21
**various**  17:24
32:24 34:5 38:25
39:15 43:21 72:7
**veritext**  6:24 7:1
**version**  27:8
**versions**  27:6
**versus**  45:14
**video**  6:11,13
**videographer**  6:4
6:25 8:2,5 59:25
60:5 83:14
**videotaped**  1:17
**violated**  69:24
**violating**  15:19
**virginia**  17:17,18
17:20 20:5 21:21
22:10,12

**virtually**  37:4
**visiting**  17:24
21:12,13,15,20
**vivens**  20:14
**vote**  10:25 11:9,13
13:18 14:8,17,24
16:2,5,6,11 17:3
17:13 19:3 22:2,8
22:12 23:4,7,12,22
24:4 25:9,16 30:6
30:13 32:3 35:7
36:7,17 37:5
40:22,24 42:14
44:24 45:4 46:4
46:12,14,22 47:7
47:21 48:21,23,25
48:25 49:12,21
53:22 55:5 57:2,6
58:2,4,5,6,8 59:1
59:12 69:4 71:3
**voter**  11:10,12
14:2,17 19:1
39:17
**voters**  14:13,19
31:11,18,18,21,24
39:17 40:2 44:5
49:3 57:24
**votes**  15:7 30:22
**voting**  10:11,14,20
11:10 12:8,22,25
13:3,9 14:10,12
15:20 17:1 18:3
18:14,18 19:15
20:16 22:6,7,20,23
23:2 24:14,19
25:4,8 29:22
31:20 32:4,7,12,12
37:4 38:23 39:19
39:25 40:2 44:6
44:17,18,20 45:17
46:15,24 47:3,5

Pamela S. Karlan , J.D.

| | | |
|---|---|---|
| 48:10 49:17 54:3 54:14 59:7 65:7 65:11,15,22 66:16 66:20,23 67:13 68:24 69:15,22,24 70:10,12 71:19 72:2 80:9 **votings** 79:21 **vs** 3:12 6:15 7:16 22:10 23:11 29:25 70:24 | **whites** 48:25 55:20 **who've** 45:11 **wilbur** 1:7 2:7,16 6:16 **willing** 62:22 **win** 19:2 54:23 55:5 59:17,18 66:23 67:17,20 **windsor** 10:17 **winning** 39:7 **witness** 8:6,22 | **wrong** 73:21 |

**x**

| | | |
|---|---|---|
| | | **x** 5:1,9 56:11 **xavier** 1:4 2:4 |

**y**

| | | |
|---|---|---|
| **w** | 27:5 33:23 34:17 36:11,20 37:18,24 38:4,11,22 39:14 41:10,15,20 42:3 42:18 43:5 47:12 51:2,6,16 56:7 59:23 60:15 62:11 64:12 75:10 83:17 84:11 85:1 **won** 54:13 **word** 40:8 **work** 9:19,21 10:19,19,22 11:7,9 11:10,13,20 12:8 14:6 28:22 29:1,2 29:2,4,7 32:19 33:18 49:20 **worked** 9:24 10:16 12:11 13:5,8,15,16 13:19,21 14:1,7 15:2,9,12 33:11 65:9 **working** 10:2 11:8 70:24 **worry** 40:7 **worse** 71:16 **writing** 16:24 **writings** 36:6 **written** 65:14 | **yale** 11:19,22,23 17:25 21:16 **yeah** 8:3 26:14,21 28:16 40:13,15 43:16 74:20,22 75:10 77:6 **year** 12:3,5,9 17:25 20:22 35:15 35:16 37:2 51:19 56:12 **years** 16:16 18:9 18:15 39:15 40:21 42:13 **york** 3:10,10 12:4 12:4,19 **younger** 16:25 |
| **wait** 40:11 **waive** 43:6,15 62:7 62:23 **want** 26:25 27:2 31:21 32:21 34:25 48:3 53:14 55:1 59:20 60:10 65:3 68:6,9 73:18,20 74:1,1 75:8 **wants** 18:12 19:2 **washington** 1:20 3:16 4:5 6:1,23 **way** 14:21 15:21 15:21 22:14 24:13 25:20 28:21 29:11 30:8 37:6 38:16 48:24 53:10,13 59:9 63:9 **ways** 34:5 39:20 48:3 **we've** 68:11 **went** 11:3 19:9 20:6 23:23 **west** 45:11 **whispering** 6:7 **white** 40:1,2 47:21 48:25 49:5 53:8 82:11 | | **z** |
| | | **zero** 40:1 48:22 56:12 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# CERTIFICATE OF SERVICE

Case Name:   **State of California, et al. v.**        No.    **3:18-cv-01865**
                **Wilbur L. Ross, et al.**

I hereby certify that on <u>January 2, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF FILING TRIAL DEPOSITION TRANSCRIPT FOR PAMELA KARLAN**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>January 2, 2019</u>, at Sacramento, California.

        Tracie L. Campbell                     */s/ Tracie Campbell*
           Declarant                            Signature

SA2018100904
13387025.docx