JOSEPH H. HUNT
Acting Assistant Attorney General
BRETT A. SHUMATE
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch
MARSHA S. EDNEY
Senior Trial Counsel
KATE BAILEY
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Tel.: (202) 514-1903
Email: carol.federighi@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants. | Civil Action No. 3:18-cv-01865-RS and<br>Civil Action No. 3:18-cv-02279-RS<br><br>**NOTICE OF FILING OF PLAINTIFFS' DEPOSITION DESIGNATIONS AND DEFENDANTS' COUNTER DESIGNATIONS** |
| CITY OF SAN JOSE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., *et al.*,<br><br>    Defendants. | Dept.:  3<br>Judge:  The Honorable Richard G. Seeborg<br>Trial Date:      January 7, 2019<br>Action Filed:   March 26, 2018 |

1    Defendants hereby submit the deposition designations, attached hereto as Exhibits A-I, for

2    the Rule 30(b)(6) witness for the Census Bureau (Dr. John Abowd) (two volumes), Earl Comstock,

3    John Gore, Ron Jarmin, Karen Dunn Kelley, David Langdon, Sahra Park-Su, and Wendy

4    Teramoto.  Plaintiffs' designations are highlighted in yellow and Defendants' counter designations

5    are highlighted in blue.

6    Dated: January 6, 2019                              Respectfully submitted,

7                                                        JOSEPH H. HUNT
                                                         Assistant Attorney General
8
                                                         BRETT A. SHUMATE
9                                                        Deputy Assistant Attorney General

10                                                       JOHN R. GRIFFITHS
                                                         Director, Federal Programs Branch
11
                                                         CARLOTTA P. WELLS
12                                                       Assistant Branch Director

13                                                       /s/ Carol Federighi
                                                         MARSHA STELSON EDNEY
14                                                       Senior Trial Counsel
                                                         KATE BAILEY
15                                                       CAROL FEDERIGHI
                                                         Trial Attorneys
16                                                       United States Department of Justice
                                                         Civil Division, Federal Programs Branch
17                                                       P.O. Box 883
                                                         Washington, DC 20044
18                                                       Tel.: (202) 514-1903
                                                         Email: carol.federighi@usdoj.gov
19
                                                         *Attorneys for Defendants*
20

21

22

23

24

25

26

27

28

2

NOTICE OF FILING OF DEPOSITION DESIGNATIONS – No. 3:18-cv-01865-RS & 3:18-cv-02279-RS

# EXHIBIT A

Page 1

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

                         Plaintiffs,

5          vs.          Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                        Defendants.

     ----------------------------------------

8

9                         Washington, D.C.

10                        Wednesday, August 29, 2018

11   Deposition of:

12                   DR. JOHN ABOWD

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:06 a.m., when were present on

19   behalf of the respective parties:

20                   Veritext Legal Solutions

                         Mid-Atlantic Region

                      1250 Eye Street NW - Suite 350

21                   Washington, D.C.  20005

22

Page 2

```
 1                      CONTENT
                                          PAGE
 2
    DR. JOHN ABOWD                        9
 3  Examination by Mr. Ho                 9
    Examination by Ms. Shah              144
 4  Examination by Mr. Talik             187
    Examination by Mr. Adams             264
 5  Examination by Mr. Ehrlich           333
    Examination by Ms. Goldstein         334
 6
                ABOWD DEPOSITION EXHIBITS
 7  EXHIBIT                               PAGE
    NUMBER
 8  Plaintiffs' Exhibit 1    Questionnaire  16
                             for the
 9                           American
                             Community
10                           Survey
    Plaintiffs' Exhibit 2    Census 2000    19
11                           questionnaire
    Plaintiffs' Exhibit 3    1950 census    21
12                           questionnaire
    Plaintiffs' Exhibit 4    Federal        56
13                           Register notice
    Plaintiffs' Exhibit 5    Map            64
14  Plaintiffs' Exhibit 6    Email thread   71
    Plaintiffs' Exhibit 7    January 19,    74
15                           2018 memo
    Plaintiffs' Exhibit 8    Email          79
16  Plaintiffs' Exhibit 9    Email          82
    Plaintiffs' Exhibit 10   Email          96
17  Plaintiffs' Exhibit 11   Analysis      111
    Plaintiffs' Exhibit 12   Tables        127
18  Plaintiffs' Exhibit 13   PowerPoint    144
    Plaintiffs' Exhibit 14   Census Bureau 157
19                           statistical
                             quality
20                           standards
    Plaintiffs' Exhibit 15   Census 2000   182
21                           brief
    Plaintiffs' Exhibit 16   2005          185
22                           National
                             Content Test
```

Page 3

1    Plaintiffs' Exhibit 17   G series          254
                              documents

2    Plaintiffs' Exhibit 18   2020 CBAMS        267
                              survey

3    Plaintiffs' Exhibit 19   2020 CBAMS        278
                              brief update

4    Plaintiffs' Exhibit 20   Question 28       290

     Plaintiffs' Exhibit 21   2020 census      304
5                             integrated
                              communication
6                             plan

     Plaintiffs' Exhibit 22   OMB standards    320
7                             and guidelines
                              for statistical
8                             surveys

     Plaintiffs' Exhibit 23   Secretary Ross   325
9                             decision memo

10

        (Exhibits attached to transcript.)

11

12

13

14

15

16

17

18

19

20

21

22

Page 4

```
 1            A P P E A R A N C E S
   On behalf of New York Immigration
 2 Coalition, CASA De Maryland, American-Arab
   Anti-Discrimination Committee, ADC Research
 3 Institute and Make the Road New York:
          John Freedman, Esquire
 4        Caroline Kelley, Esquire
          ARNOLD & PORTER
 5
 6
 7
 8 On behalf of New York Immigration Coalition:
          Dale Ho, Esquire
 9        Sarah Brannon, Esquire
          AMERICAN CIVIL LIBERTIES UNION
10
11
12
13 On behalf of Kravitz Plaintiffs:
          Karun Tilak, Esquire
14        COVINGTON & BURLINGTON
15
16
17 On behalf of Los Angeles Unified School District:
          Keith Yeomans, Esquire (Telephonically)
18        DANIELS WOLIVER KELLEY
          115 Pine Avenue
19        Suite 500
          Long Beach, California 90802
20        (562) 366-8500
          kyeomans@dwkesq.com
21
22
```

Page 5

```
 1    On behalf of LUPE Plaintiffs:
           Denise Hulett, Esquire (Telephonically)
 2         MALDEF
           ███████████████████████
 3         ███████████
           ████████████████████████████
 4         ██████████████████
           ███████████████████████
 5
           Niyati Shah, Esquire
 6         ASIAN AMERICANS ADVANCING JUSTICE
           █████████████████████
 7         ████████████
           ████████████████████████████
 8         ██████████████████
           ███████████████████████████████████
 9
10    On behalf of City of San Jose & Black Alliance for
      Just Immigration:
11         Rory Adams, Esquire
           MANATT, PHELPS & PHILLIPS
12         █████████████
           ██████████████████████████
           █████████████
13         ████████████████████
14         Ezra Rosenberg, Esquire
           Dorian Spence, Esquire
15         LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
           ████████████████████████████
16         ██████████
           ███████████████████████
17         ██████████████████
           ███████████████████████████████
18         ███████████████████████████
19
20
21
22
```

Page 6

```
 1    On behalf of State of California:
           Gabrielle Boutin, Esquire
 2         R. Matthew Wise
           DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
 3         GENERAL
           1300 I Street
 4         P.O. Box 944255
           Sacramento, California 94244
 5         (916) 210-6053
           gabrielle.boutin@doj.ca.gov
 6         matthew.wise@doj.ca.gov
 7    On behalf of State of New York:
           Danielle Fidler, Esquire
 8         Elena Goldstein, Esquire
           Matthew Colangelo, Esquire
 9         Alex Finkelstein, Esquire
           ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
10         PROTECTION BUREAU
           ███████████████████████
11         █████████████████████████████
           ██████████████████
12         ███████████████████████████████
           ███████████████████████████████
13         ██████████████████████████████████
           ███████████████████████████████
14
      On behalf of Defendants:
15         Stephen Ehrlich, Esquire
           Carlotta Wells, Esquire
16         U.S. DEPARTMENT OF JUSTICE
           20 Massachusetts Avenue
17         Washington, D.C. 20530
           (202) 305-9802
18         stephen.ehrlich@usdoj.gov
           carlotta.wells@usdoj.gov
19
20
21
22
```

Page 7

1  Michael Cannon, Esquire

   U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE

2  ASSISTANT GENERAL COUNSEL FOR FINANCE &

   LITIGATION

3  1401 Constitution Avenue, NW

   Room 5890

4  Washington, D.C. 20230

   (202) 482-5395

5  mcannon@doc.gov

6

 VIDEOGRAPHER:  Dan Reidy

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

                                                        Page 8

1                    P R O C E E D I N G S

2       WHEREUPON,

3

4            VIDEOGRAPHER:  Good morning.  We're going

5       on the record at 9:06 a.m. on Wednesday August 29,

6       2018.  Please note that the microphones are

7       sensitive and may pick up whispering and private

8       conversations.  Please turn off all cell phones

9       and place them away from the microphones, as they

10      can interfere with the deposition audio.  Audio

11      and video recording will continue to take place

12      unless all parties agree to go off the record.

13            This is Media Unit 1 of the video

14      recorded deposition of Dr. John Abowd taken by

15      counsel for the plaintiff in the matter of the

16      New York Immigration Coalition, et al., v.

17      United States Department of Commerce, et al.  This

18      case is filed in the U.S. District Court of the

19      Southern District of New York.  This deposition is

20      being held at the law offices of Arnold & Porter

21      located at 601 Massachusetts Avenue Northwest,

22      Washington, D.C. 20001.

Page 9

1          My name is Dan Reidy from the firm

2     Veritext Legal Solutions, and I'm the

3     videographer.  The court reporter is

4     Karen Jorgenson from the firm Veritext Legal

5     Solutions.

6          I am not authorized to administer an

7     oath.  I am not related to any party in this

8     action, nor am I financially interested in the

9     outcome.

10         Also, counsels' appearances will be noted

11    on the stenographic record rather than orally at

12    this time.

13         Will the court reporter please swear in

14    the witness?

15                    DR. JOHN ABOWD,

16    called as a witness, and having been first duly

17    sworn, was examined and testified as follows:

18         THE WITNESS:  I do.

19                 EXAMINATION BY MR. HO:

20    Q    Dr. Abowd, before we get started, I just

21    want to confirm something on the record with your

22    counsel.

Page 14

1      A    Yes.

2      Q    And any time you want to take a break is

3  okay.  The only exception to that is if I posed a

4  question to, or if anyone else has, to answer that

5  question before your break; is that okay?

6      A    Yes.

7      Q    Great.  You understand that you're

8  testifying today as a representative of the

9  Census Bureau, right?

10      A    I do, yes.

11      Q    As a representative of the Census Bureau,

12  you'd agree that question sequencing can affect

13  the response rate to a survey, right?

14      A    Yes.

15      Q    So, in other words, you would agree that

16  if you preface one question, another question or

17  questions, that would affect the survey response

18  rate, right?

19      A    Yes.

20      Q    And as representative of the

21  Census Bureau, you'd agree that question

22  sequencing can affect the accuracy of responses to

Page 15

1    that question survey, right?

2            MR. EHRLICH:   Objection.   Form.

3            THE WITNESS:   I understood your question

4    to be that the sequence of questions on a

5    questionnaire can affect the data quality produced

6    by that questionnaire.   If that's what your

7    question was, my answer is yes.

8    BY MR. HO:

9        Q    Great.   So you'd agree that if you

10   preface one question with another particular

11   question or questions, that that could affect the

12   data quality in terms of the accuracy of the

13   response to the question, right?

14       A    Yes.

15       Q    You'd agree that question sequencing can

16   affect the response rates to a survey in ways that

17   you wouldn't necessarily anticipate at the

18   question drafting stage, right?

19       A    Yes.

20       Q    And one way you would know that -- sorry.

21   Let me start that again.

22            One way that you would know whether

401;
403

1   question sequencing affected response rates would

2   be to test a question in the sequence that it's

3   going to be asked, right?

4        A    Yes.

5        Q    I want to show you a document, we'll mark

6   it as Exhibit 1.

7             (Plaintiffs' Exhibit 1, Questionnaire for

8   the American Community Survey, was marked.)

9   BY MR. HO:

10        Q    Dr. Abowd, this is the questionnaire for

11   the American Community Survey downloaded from the

12   Census Bureau website.  Does that look correct to

13   you?

14        A    The document I see is the current paper

15   form of the American Community Survey.

16        Q    Okay.  Could we turn to Page 8 of the ACS

17   survey?  And in the left-hand column, Question

18   Number 8 is a question about citizenship; is that

19   right?

20        A    Yes.  That's correct.

21        Q    Now, Question Number 7, the question that

22   immediately precedes the question -- the

Page 17

```
 1    citizenship question, is a question about where

 2    the person was born; is that right?

 3        A    Yes.   That's correct.

 4        Q    Now, you said this is the print version

 5    of the ACS survey questionnaire, right?

 6        A    Yes.   That's correct.

 7        Q    There's also an Internet version of the

 8    ACS questionnaire, right?

 9        A    Yes.

10        Q    Now, if someone answers

11    Question Number 7, the question about where a

12    person was born and says that the person was born

13    in the United States, while taking the Internet

14    ACS survey questionnaire, does that person then

15    see Question Number 8, the question about whether

16    or not the person is a citizen?

17        A    No.

18        Q    So if someone says --

19        A    Excuse me for a second.

20             THE WITNESS:  I'm trying to speak up.  If

21    you can't hear me, let me know.  When my voice

22    fades -- I noted it just fade- -- I have to think
```

401;
403

Page 22

1  place of birth, right?

2      A   It's in the next column.  The 1950

3  questionnaire was filled out by an enumerator, not

4  by the householder.  So the exact order in which

5  the enumerator filled it out isn't controlled by

6  the way you see the questions.

7      Q   So looking at the 1950 census

8  questionnaire, we don't know how -- what sequence

9  an enumerator asked the questions in; is that

10  right?

11      A   Well, we would know from the field

12  training instructions, but I was not able to

13  locate them.

14      Q   But if you just look at the questionnaire

15  itself --

16      A   I agree, they're sequential.

17          Sorry.  I should have let you finish.

18      Q   Is it fair to say the questions about

19  citizenship on the ACS, the 2000 long form and in

20  the 1950 census questionnaire, are preceded by a

21  question about place of birth?

22      A   Yes.

1      Q    Now, as planned, the question about

2   citizenship on the 2020 decennial questionnaire,

3   that's the same citizenship question as

4   Question Number 8 on the ACS; is that right?

5      A    I'm only verifying the question numbers,

6   because I don't have it memorized.

7      Q    Sure.   It's on Page 8.

8      A    Yes.   That's correct.

9      Q    At present, there are no plans to add a

10   place of birth question to the decennial census

11   questionnaire, right?

12      A    That's correct.

13      Q    There has been no cognitive testing of

14   this citizenship question without a question about

15   place of birth; is that right?

16            MR. EHRLICH:   Objection.   Form.

17            THE WITNESS:   I'm not prepared to answer

18   whether there has been no cognitive testing of

19   this question without being preceded by what we

20   would call a nativity question.   In the

21   experiments and the evaluations that the

22   Census Bureau has been able to locate, the survey

1    testing has not been conducted without a nativity

2    question preceding the citizenship question.

3    BY MR. HO:

4        Q    So you're not aware of any testing -- any

5    cognitive testing of the citizenship question

6    without a preceding question about nativity; is                    401;

7    that right, Dr. --                                                 403

8        A    I'm not aware of -- sorry.  I'm not aware

9    of any, no.

10        Q    Are you aware of any prior census in

11    which cognitive testing of the full short form

12    questionnaire had not been conducted before using

13    that questionnaire for the actual census?

14        A    I am not aware of any -- well, let me be

15    careful.

16            Many censuses were conducted without

17    cognitive testing, the equivalence of cognitive

18    testing existed for much of the 20th century.  In

19    preparing for this deposition, I reviewed the

20    generic answer to the question, how was this

21    tested, and in some cases, that question elicited

22    some cognitive testing, for example, the

Page 25

1    Current Population Survey, and the

2    American Community Survey.   In other cases,

3    historical censuses back in the '80s, '70s and

4    '60s, no one could produce cognitive testing.

5         Q    So --

6         A    I didn't specifically ask -- I asked, any

7    testing?   And what I got was the sort of standard

8    protocol testing.

9         Q    So you're not aware of any

10   circumstance -- any previous decennial

11   census -- excuse me.   Let me start that again.

12            Since there's been cognitive testing of

13   the decennial short form questionnaire, you're not

14   aware of any time in which a full short form

15   questionnaire has been deployed without

16   cognitively testing that full short form

17   questionnaire, are you, Dr. Abowd?

18        A    I need to answer that question in a more

19   nuanced form.

20            I am not certain that the full

21   questionnaire was cognitively tested for the

22   period in which the question appeared on the long

1    form.  I am certain that the questions for the

2    American Community Survey and the 2010 census were

3    put through the full battery of the tests.

4           If you would like, during the break, I

5    will call and ask for cognitive testing of the

6    censuses prior to the 2010.

7        Q    Well, so just stick with the 2010.  The

8    full short form census enumeration questionnaire

9    was cognitively tested before being deployed for

10   the actual 2010 census, correct?

11       A    That is my understanding.  But it may

12   have been question by question.  I will -- I will

13   actually, during a break, ask a more specific

14   question about the form of the testing.

15       Q    Dr. Abowd, has there been any field

16   testing of the citizenship question that's going

17   to be used on the 2020 census without a prefatory

18   question about nativity?

19       A    No.

20       Q    And there's been no field testing of the

21   full 2020 census questionnaire, including the

22   citizenship question, correct?

401;
403

Page 27

1       A    That's correct.

2       Q    And before the 2010 census, as far as you

3   know, there was field testing of the full short          401;

4   form census questionnaire, right?                         403

5       A    Yes.

6       Q    At present, there are no plans for field

7   testing of the full 2020 census questionnaire,

8   including the citizenship question; is that right?

9       A    That's correct.

10      Q    Why not?

11      A    In May of 2016 the -- Enrique Lamas, the

12  associate director for demographic programs, who

13  is performing the nonexclusive functions and

14  duties of the deputy director -- and I'm going to

15  call him the acting deputy director from now on --

16  the acting deputy director asked Victoria Velkoff,

17  the chief of the American Community Survey Office,

18  to design a field experiment for the census

19  questions in the exact ACS form and without a

20  lead-in nativity question using the experimental

21  components of the American Community Survey, which

22  allow us to deploy test instruments without

1  that there is no longer a valid use case for

2  producing an information product based on the

3  answer to that question.

4          Another reason might be because there's

5  an alternative way of developing as good or better

6  quality information product without asking the

7  question on the survey.  I anticipate -- but this

8  is a predetermining decision-making process that

9  hasn't happened -- that there would be a

10 continuing valid-use case for citizenship data.

11 So even if we took it off the American Community

12 Survey, we would not stop producing statistical

13 information products that contain citizenship

14 data.

15 BY MR. HO:

16     Q    Let's talk about some of those

17 information products.  Now, the Census Bureau      401;
                                                     403
18 produces various data files for redistricting

19 purposes, right, Dr. Abowd?

20     A    Yes.

21     Q    And one of those redistricting data

22 products by the Census Bureau is the P.L. 94-171

Page 39

1    data file, right?

2        A    Yes.

3        Q    The Department of Justice uses the

4    P.L. 94-171 data file; is that your understanding?

5        A    Yes.

6        Q    And the P.L. 94-171 data file is also

7    available to the public, right?

8        A    Yes.

9        Q    The P.L. 94-171 data file has information

10   in it concerning the population and

11   characteristics of people at various levels of

12   census geography, including census blocks, right?

13       A    Correct.

14       Q    And the PL 94-171 data file is based on

15   responses to the decennial enumeration, correct?

16       A    Correct.

17       Q    The P.L. 94-171 data file is considered

18   reliable, correct?

19            MR. EHRLICH:   Objection.   Form.

20            THE WITNESS:   The P.L. 94-171

21   redistricting data are produced under the law of

22   the same name by negotiation between the

Page 40

1   Census Bureau redistricting office and 51 state

2   and the Washington, D.C. redistricting offices to

3   meet the requirements of redistricting legislative

4   districts in the states.  The Census Bureau

5   provides data to the states and District of

6   Columbia in the support of redrawing every

7   legislative district in the country.

8   BY MR. HO:

9        Q   Dr. Abowd, the Census Bureau doesn't

10   consider the P.L. 94-171 data file unreliable,

11   does it?

12       A   No.  I was trying to state the use case

13   for which reliable is defined, but I forgot to

14   finish my answer.

15           We believe that the P.L. 94-171 data are

16   reliable for redistricting and reliable for their

17   Department of Justice Voting Rights Act

18   enforcement uses.

19       Q   The P.L.94-171 data file has never had       401;

20   citizenship data in it; is that correct?              403

21       A   That is correct.

22       Q   Now, another redistricting product

Page 41

1    produced by the Census Bureau is the special

2    tabulation of CVAP and other ACS data; is that

3    right?

4         A    So that's not technically right.

5         Q    Okay.

6         A    The redistricting office initially

7    request -- initially assisted the

8    Department of Justice in the design and production

9    of a special tabulation of Citizen Voting Age

10   Population by Race and Ethnicity and at the block

11   group level.  I'm just going to say CVAP from now

12   on.

13        CVAP, because of a use case that the

14   Department of Justice had, it was subsequently put

15   into regular production, so it's produced

16   regularly.  And its timing is now such that it can

17   be used in conjunction with the P.L. 94-171 data,

18   but no statute obligates the production of CVAP

19   and no statute obligates the negotiation with part

20   of government on to its form and content.

21        Q    That special tabulation of CVAP data

22   is available to the public, right, Dr. Abowd?

401;
403

1    A    So I just corrected your word of special

2    tabulation.   It's a regular tabulation now.

3    Q    Sorry.   Thank you.

4    A    And yes.   It and all tabulations released

5    for any purpose are released to everyone.

6    Q    The tabulation of CVAP data, it's

7    considered reliable by the Census Bureau, right?

8              MR. EHRLICH:  Objection.  Form.

9              THE WITNESS:  The Census Bureau -- the

10   CVAP table, as produced from the American

11   Community Survey, is tabulated at the block group

12   level with margins of error.  And so it is

13   incumbent upon the user of the CVAP table to

14   understand the limitations of data that are

15   produced with margins of error and to use them in

16   a manner that they're fit for.

17   BY MR. HO:

18   Q    The estimates and margins of error in the

19   tabulation of CVAP data produced by the

20   Census Bureau are considered accurate by the

21   Census Bureau, right, Dr. Abowd?

22             MR. EHRLICH:  Objection.  Form.

Page 43

1        THE WITNESS:  The estimates in the CVAP

2   table are considered correct by the Census Bureau.

3   Meaning, that they were processed from the

4   American Community Survey according to a survey

5   design that was properly executed, and the steps

6   that were taken in the post processing of those

7   results are also according to the survey design.

8   So that when they are estimated, that is the

9   proper design estimate, and when this margin of

10  error is released, that is the number that we

11  believe is an appropriate indication of the

12  90 percent confidence interval.

13  BY MR. HO:

14      Q    Now, the data in that tabulation, that's

15  based on five-year pooled ACS data; is that                401;

16  correct?                                                   403

17      A    The CVAP is produced from what we call

18  the five-year ACS data, which is a rolling

19  five-year window on the American Community Survey.

20      Q    The tabulation of CVAP data is not based

21  on a single year of ACS respondents, correct?

22      A    That's correct.

Page 44

1      Q      Why is the tabulation based on five-year

2   ACS pooled estimates instead of single-year

3   estimates?

4      A      In the design of the American Community

5   Survey tabulations that are produced using a

6   single year of data, we only believe sufficiently

7   reliable for communities that are at least 65,000

8   population.

9      Q      Now, unlike the P.L. 94-171 file, the

10  tabulation of CVAP data obviously includes

11  citizenship information, right, Dr. Abowd?

12     A      Yes.

13     Q      Now, prior to the December 2017 letter

14  from Arthur Gary at the Department of Justice, had

15  you ever heard any suggestion that the citizenship

16  data contained in the tabulation of CVAP was

17  insufficient for the purposes of DOJ's

18  Voting Rights Act enforcement?

19     A      From the Department of Justice, no.

20     Q      Had you heard that the -- let me start

21  again.

22             Prior to the 2017 Gary letter, had you

401;
403

401;
403

1   of them.  I recall talking to Professor Gary King

2   at Harvard.  Professor Mike -- I believe his last

3   name is McMahn, at the University of Florida.

4        Q    Could it be Mike McDonald at Florida?

5        A    That's it.

6             And the chief of the bipartisan

7   commission at -- in California.  I remember her

8   title but not her name.  And I don't have notes.

9             And I may have talked to some others, but

10  it was those three primarily, especially the

11  California one.  She was able to give me very

12  detailed use cases.  Not actual code, but

13  precisely how they combined various things.

14       Q    Let's talk about you mentioned disclosure

15  avoidance.  I want to ask you a couple questions

16  about that.

17            The citizenship data in the CVAP

18  tabulation, I believe you said before, those are

19  estimates at the block group level, correct?

20       A    That's correct.  Technically, so are the

21  P.L. 94-171, but they're official estimates.

22       Q    Now -- but the difference is, the P.L. 94

Page 49

1    data, that data doesn't have error margins

2    associated with it in the way that the CVAP

3    tabulation, which is based on a survey sample does

4    have error margins, correct?

5        A    The P.L. 94-171 data are not sample

6    based.  They do have margins of error.  We don't

7    discuss it very much, but they're not -- they're

8    not because of the sample.  They're because of the

9    statistical methods that intervene in converting

10   the responses to tabular data, including

11   disclosure avoidance.  The CVAP table is based on

12   a multistage probability sample, and so it has a

13   design that implies that it has a sampling error.

14   And it is the sampling error that we tabulate in

15   our margins of error.

16       Q    Okay.  So just to be clear about the

17   different data forms.  The P.L. data, that has

18   some errors associated with it, right?

19       A    Yes.

20       Q    It doesn't have the kind of standard

21   error associated with an estimate based on a

22   statistical sample, right?

401;
403

Page 50

1    A    It doesn't have sampling error.

2    Q    Thank you.

3         The tabulation of CVAP data does have

4    sampling error associated with it, correct?

5    A    Yes.

6    Q    So when you publish the CVAP tabulation,

7    you're not publishing any particular person's

8    responses to the ACS citizenship question in a way

9    that would enable you to identify that person's

10   responses, correct?

11   A    If we did not apply disclosure avoidance

12   prior to the tabulation, then the CVAP table, as

13   well as the P.L. 94 tables, would be subject to

14   reidentification risks.

15   Q    So what are the disclosure avoidance

16   steps that are used for the tabulation of CVAP

17   data?

18   A    The CVAP data are tabulated from the

19   production of the American Community Survey Office

20   tabulation system.   The exact specification for

21   the disclosure avoidance that has been applied to

22   them is confidential and I can't give you those

401;
403

1    specifications.   What we say in our technical

2    documents is that we apply household-level

3    swapping and some synthetic data noise infusion.

4        Q    Let's talk about those two things.

5    What's household-level swapping?

6        A    Household-level swapping means that the

7    certain variables on the household record, not the

8    person record, certain variables on the household

9    record are matched to variables on a household

10   record in a different geographic area.   And if the

11   household is selected for swapping, and when the

12   match is found, essentially all the values are

13   swapped, except the address ID.   So it looks as if

14   the data from a different address lived at the

15   address of the original and vice versa.

16       Q    So when you're building the CVAP

17   tabulation, in some cases, it's based on data

18   that's been swapped between two households where

19   the ACS citizenship response for one household has

20   been swapped with another; is that right?

21       A    I am only allowed to tell you the

22   variables that are used in the swap that are in

401;
403

Page 52

1    public documents.  And I told you what was in the

2    public documents.

3        Q    Okay.

4        A    So the swap controls for family size, for

5    the number of persons in -- not family size.  That

6    was not a correct technical term.

7        Q    Household?

8        A    Household size.  Thank you.

9             And the number of members of the            401;

10   household above voting age -- voting age or above.    403

11       Q    When households are swapped, at what

12   level of geography are they swapped?

13       A    I'm only allowed to say that the search

14   is over nearby geographic regions.

15       Q    So you're not swapping someone from Maine

16   with someone in Arizona?

17       A    I'm also allowed to say that the swap

18   never crosses state lines.

19       Q    Does the swap ever cross county lines?

20       A    If you can produce a technical document

21   that says it does or doesn't, I can confirm it.  I

22   can't remember ever reading that, one way or

Page 53

1    another.

2        Q    And can you say, one way or another,

3    whether or not the swap ever occurs across census

4    block group lines?

5        A    I have read a lot of the public

6    documents.  I have also read a lot of the

7    confidential documents.  I do not recall any          401;

8    public document explicitly saying anything other      403

9    than we don't swap across state boundaries.

10       Q    And do -- so that would -- okay.

11   Thank you.

12            Well, does swapping ever occur between

13   census blocks?

14            MR. EHRLICH:  Objection.  Form.

15            THE WITNESS:  Of course swapping occurs

16   across census blocks, because there would be no

17   point in it otherwise.

18   BY MR. HO:

19       Q    You mentioned synthetic data noise

20   infusion for disclosure avoidance.  Can you

21   describe what you mean by that?

22       A    There are two methods of doing that.  The

Page 54

1    one that is used in the American Community Survey

2    is to develop a model for when a particular record

3    or item on a record is sensitive.  The models are          401;

4    more precise, but, again, their parameters are not          403

5    confidential.  Basically, you think of extreme

6    values as sensitive.

7           And then the statistical model replaces

8    the sensitive value with a value that's sampled

9    from the model and from the error distribution of

10   the model.

11        Q   The plan after collecting the citizenship

12   responses from the enumeration is to deliver

13   block-level citizenship data to the

14   Department of Justice for the purposes of VRA

15   enforcement, right, Dr. Abowd?

16        A   Yes.

17        Q   The block-level citizenship data that the

18   Census Bureau is going to deliver to the

19   Department of Justice, will that be based

20   primarily to the citizenship question on the

21   decennial enumeration questionnaire?

22        A   The internal expert panel has been

Page 55

1  charged explicitly with determining both the

2  processing of the answers to the citizenship

3  question in the internal files and the formulation

4  for the CVAP table at the block level.

5       Q    So as of right now, a decision has not

6  been made yet as to whether or not the CVAP

7  table -- table that is produced to the

8  Department of Justice is going to be based

9  primarily on responses to the citizenship question

10  on the decennial enumeration or on a different          401;

11  source; is that right, Dr. Abowd?                        403

12       A    With one correction.  We are not

13  producing a CVAP for the Department of Justice.

14  We are producing a CVAP table at the block level

15  as a public use product.

16       Q    But otherwise, the answer to my question

17  is yes?

18       A    We have not made a decision on the way in

19  which we will aggregate the data to the block

20  level.

21       Q    Other than responses to the citizenship

22  question on the decennial questionnaire, what

Page 56

1   other data sources might you use in the production

2   of the block-level CVAP table?

3        A    We have said that we will use

4   the -- what's called the census NUMIDENT data.   In

5   addition, we are negotiating with the

6   U.S. CIS -- Customs and Immigration Service, did I

7   expand it right -- U.S. CIS and with the

8   State Department to acquire additional citizenship          401;

9   data and data on visas that have been issued to            403

10   legal visitors to the United States.

11       Q    Is it fair to say that it has not yet

12  been decided precisely how the block-level CVAP

13  table will be assembled?

14       A    That's correct.

15       Q    Has it been decided whether or not the

16  block-level CVAP data will be included in the

17  P.L. 94-171 data file?

18       A    It has not.

19       Q    Let me show you a document.   We'll mark

20  this as Exhibit 4.

21            (Plaintiffs' Exhibit 4, Federal Register

22  notice, was marked.)

Page 57

1    BY MR. HO:

2        Q    This is a Federal Register notice.   This

3    is a Federal Register notice from the

4    Department of Commerce on proposed information

5    collection and a comment request and the 2020

6    census.

7            Have you seen this document before?

8        A    Yes, I have.

9        Q    I want to turn to the second page of the

10    document -- oh, sorry, just for the record, it's

11    dated June 8, 2018, and the first page on it is

12    26643.

13            I'd like to turn to the second page of

14    the document, that's Page 26644.   And the middle

15    column, the second paragraph, about halfway down

16    there is a sentence that starts with "If

17    stakeholders."

18            Do you see that?

19        A    Yes.

20        Q    The sentence reads, "If stakeholders such

21    as the National Conference of State Legislatures

22    elect to receive tabulations of citizenship data,

401;
403

Page 58

1    the Census Bureau will make/require" -- I think

2    that's a typo -- "a change" -- "a design change to

3    include citizenship as part of the Public Law

4    94-171 redistricting data file."

5            So I want to ask you a question about

6    that sentence.  If stakeholders do elect to

7    receive citizenship data, what kind of design

8    change can be made to the P.L. 94-171 file to

9    include citizenship information at the census

10   block level?

11        A   So I was, of course, aware of that

12   sentence.  The way that redistricting office

13   interacts with the National Conference of

14   State Legislatures, as is described in the

15   statute, as I understand it, is to attempt to meet

16   their data needs, and their data needs are

17   specifically what's required to redraw legislative

18   districts.  So that's why the redistricting office

19   worked with the American Community Survey office

20   to get the CVAP tabulation to be released in a

21   timely manner with respect to redistricting in the

22   first place.

401;
403

Page 59

1          My understanding -- careful.  I was told

2    very carefully -- the Census Bureau's

3    understanding is that if the partners, the

4    National Conference of State Legislatures, wish to

5    receive the CVAP table at the block level,

6    simultaneous with the P.L. 94-171 tabulation --

7    that we announced the design of a previous          401;

8    Federal Register notice, but I don't know the       403

9    notice number -- that we would facilitate that.

10          Since the tabulations are all done using

11    census geography, there are a number of relatively

12    straightforward ways to facilitate simultaneous

13    release and use of a CVAP block-level table and

14    the P.L. 94-171 table that we've prespecified in a

15    previous Federal Register notice.

16     Q    Have there been any conversations with

17    the Department of Justice about the format in

18    which the Census Bureau will deliver block-level

19    citizenship data?

20     A    I believe the answer to that question is

21    no.  There have been meetings with the

22    Department of Justice, and they have been about

1   the form of the CVAP and P.L. 94 data, but I don't

2   believe we've had any specific discussion about

3   the format.  I believe that we presume that our

4   data production systems, when we say we're going

5   to deliver data at the block level, we'll deliver

6   data at the block level in a way that the

7   receiving users already understand how to use.  So

8   we're planning to disseminate the products in

9   CEDSCI system at the block level and that's the --

10  that is the distribution medium that we would be

11  working towards using.  No one has mentioned that

12  that's problematic.

13        Q   I'm sorry.  I think I probably asked the

14  wrong question.

15        A   That's possible.

16        Q   So --

17        A   I hope I answered the right one.

18        Q   We talked earlier about how the

19  Census Bureau has not yet determined how it's

20  going to assemble the CVAP tables, whether it will

21  be based on the census enumeration questionnaire

22  responses, some other data source, what mix of

Page 61

1    those things.

2              Do you remember that, Dr. Abowd?

3        A    Yes.

4        Q    Have there been conversations with the

5    Department of Justice about how the

6    Department -- sorry -- how the Census Bureau is

7    going to assemble that block-level CVAP data, that

8    is, whether it will be based on the enumeration

9    questionnaire responses or the administrative data    401;

10   or something else?                                     403

11       A    There have been conversations with the

12   voting rights division or branch -- I'm not sure

13   which -- the voting rights section of the

14   Department of Justice about the consequences of

15   the disclosure modernization on the tabular data.

16   And so we were trying to educate them on that.

17   That doesn't affect how the census responses and

18   the administrative data might be combined to

19   produce those tabular data.  There's a variety of

20   ways in which they can be combined that are going

21   to result in tabular data with the same

22   statistical properties.

Page 62

401;
403

1    Q   So just to be clear, there have been no

2  conversations with the Department of Justice about

3  how the different forms of citizenship data are

4  going to be combined for purposes of assembling

5  the CVAP table?

6    A   None that I'm aware of, and during a

7  break, I'll ask to make sure there aren't some

8  that I wasn't aware of.

9    Q   Now, you did mention some conversations

10  between the Census Bureau and the voting section

11  at DOJ.  Who were those conversations between,

12  both on the DOJ and the census side?

13    A   So the meeting was arranged by

14  James Whitehorne, who is the chief of the

15  redistricting office.  On the Census Bureau side,

16  a number of experts were present, primarily

17  disclosure avoidance experts, but there were also

18  subject matter experts present.  On the DOJ side,

19  the chief of the section was present and staff

20  familiar with the Voting Rights Act.

21    Q   Was Mr. Whitehorne present at that

22  meeting?

Page 64

1      A    I believe the answer to that is no,

2   because James has been inviting me to those, but I

3   will also check to make sure.

4      Q    Roughly, how long did the meeting last?

5      A    About an hour.

6      Q    Where was it?

7      A    DOJ.

8      Q    Just backing up for a moment, a census

9   block is the lowest level of census geographic,

10   correct?

11      A    Correct.  Tabular geographic.

12      Q    Census block could have as few as ten                401;

13   people it in, right, Dr. Abowd?                                403

14      A    A census block can have no people in it.

15      Q    And a census block could have one person

16   in it, right?

17      A    That's also correct.

18      Q    I want to show you a document -- let's

19   mark this as Exhibit 5.

20           (Plaintiffs' Exhibit 5, Map, was marked.)

21   BY MR. HO:

22      Q    I will represent to you this is a map

Page 65

1    derived from census data on the Census website.

2    It was produced by adjoining tiger files with the

3    P.L. 94 data file after the 2010 census, and it's

4    a map of an area in Fort Myers, Florida.

5            So you recognize the rectangles and other

6    shapes on this map as census blocks, right,

7    Dr. Abowd?

8        A   Well, I can't independently verify that,

9    but certainly looks like it's right.

10       Q   And some of these census blocks have no

11   people in them, some of them have just a single

12   person on it, right?

13       A   Are you asking me to say that the number

14   that's sitting in the middle there is a population

15   count?

16       Q   I'll represent to you that that's -- that    401;

17   the numbers are population counts, and assuming     403

18   that that's correct, some of the census blocks

19   represented on this map have only one person on

20   them, right, Dr. Abowd?

21       A   Yes.  I found a singleton.

22       Q   Let's talk about that singleton.  Now,

Page 66

1    you'd agree with me, Dr. Abowd, that if you

2    publish citizenship information at the block level

3    based on the responses to the decennial

4    enumeration solely -- so ignore the administrative

5    data for a second -- then any singleton, any

6    person who is the one individual on a census

7    block, you would be publicizing that person's

8    response to the citizenship question, correct?

9         A    No.

10             MR. EHRLICH:   Objection.   Form.

11             THE WITNESS:   No.

12   BY MR. HO:

13        Q    Why not?

14        A    Hasn't been correct since 1990.

15        Q    Please explain to me why that's the case.

                                                         401;
                                                         403

16        A    Even before we considered the citizenship

17   variable, that one person, that household that has

18   only one person in it, had other characteristics,

19   and the goal of our disclosure avoidance system

20   has been to inhibit a user's ability to say that

21   the person identified as that one count here has

22   these characteristics.

Page 67

1          In 2000 and 2010, that was accomplished
2    by swapping, primarily.   In 2020, that's going to
3    be accomplished by what's called differential
4    privacy.   They amount to similar goals.   One is a
5    more hardened technique.
6        Q    Uh-huh.
7        A    But, basically, if you do it properly,
8    then everything is an estimate and nothing is an
9    exact tabulation of what happened there.
10        Q    Okay.   So for these singletons, when you
11   publish block-level CVAP data, a census block with
12   one person on it and you publish data that shows
13   whether or not that person is a citizen, you're
14   telling me that's not going to disclose that
15   person's actual citizen status?
16        A    It's not even going to be that person's
17   actual citizenship value for any person.
18        Q    So the -- just to be clear -- I just want
19   to be clear about this.   The CVAP block-level data
20   that gets produced by the Census Bureau, in some
21   cases, the block-level citizenship values that are
22   reported on that table are not going to be the

401;
403

Page 68

1   actual citizen statuses of the person or persons

2   on that census block; is that right?

401;
403

3       A    No, not in some cases.  In all cases.

4       Q    Okay.

5       A    There won't be a single block in which

6   the citizenship variables or the race and

7   ethnicity variables are the values reported by the

8   people who live there.

9       Q    So I'm new to this, so I just -- forgive

10  me.

11      A    You're not the only one.

12      Q    I want to come back to that.

13           But just explain this to me like a fifth

14  grader, okay?  When you publish -- after the 2020

15  enumeration, when you publish block-level

16  citizenship data and you say X number of people on

17  a particular census block, whether it's one out of

18  one people, eight of ten people, whatever the

19  number is, are citizens, according to the table,

20  that table will not accurately reflect the

21  citizenship status of the people enumerated in

22  those citizen blocks; is that right, Dr. Abowd?

1       A    No.   But I'm actually going to treat you

2   like a college-aged person and not a fifth grader.

3       Q    Let me just get a clarity on what the no

4   was, no.   No, I was not right or no --

5       A    That's correct.   No, you were not right.

6       Q    Please explain to me.

7       A    The use case for block-level data is not

8   that when I take a microscope to the census and I

9   look at a block, the answers I get there are right

10  for that block.   That would be enormously

11  disclosive and would be almost impossible to

12  prevent reidentification of the confidential Title

13  13 data, and we haven't done that -- we didn't do

14  it in 2010.   We didn't do it in 2000.

15          What has happened between 2010 and 2020

16  is that we now actually know how to produce

17  block-level data that are suitable for their use

18  without having to put the exact -- what you call

19  accurate, but I think you really mean exact

20  tabulation in that block.   It's too dangerous in

21  terms of the confidentiality of the underlying

22  records to put the exact tabulation there.   So you

401;
403

1    have to introduce randomness, and what -- we

2    introduced that randomness through a swapping

3    system in 2010 and in 2000.  We're replacing that

4    swapping system with a system that introduces the

5    randomness in a much more controlled way for 2020.

6    Such that, as you take those blocks -- even though

7    the block number is going to be noisy and we're

8    going to tell you how noisy it is -- when you add

9    them up to voting districts, the more people that

10   are in that voting district, the more accurate

11   estimate you get of all of the things you're

12   trying to tabulate.  Not just citizenship,

13   race/ethnicity.

14        Q    Just to clarify my understanding again,

15   my question wasn't about fitness of use.  My

16   question was just about exact measurement.

17             And is it correct that after you received

18   the decennial enumeration questionnaire responses

19   and you tabulate CVAP data at the block level,

20   that the numbers that you produce for CVAP at

21   particular census blocks will not reflect the

22   exact actual values of the number of citizen of

1    voting age at each of those census blocks?

2        A    Could you read his question back to me?

3            (Thereupon, the reporter read the record

4    as requested.)

5            THE WITNESS:   As read to me, that

6    statement is correct.

7    BY MR. HO:

8        Q    Another way to put it is, after you          401;

9    tabulate the CVAP data at the block level, those      402

10   CVAP numbers at the block level will have error

11   margins associated with them, right, Dr. Abowd?

12       A    That's correct.

13       Q    Now, in your previous deposition, I

14   remember reading that you discussed that there is

15   sometimes disagreement between a person's

16   citizenship status as reflected in the NUMIDENT

17   data and the person's response to the citizenship

18   question on the ACS; is that right?

19       A    That's correct.

20       Q    I want to show you a document.  We'll

21   mark this as Exhibit 6.

22            (Plaintiffs' Exhibit 6, Email thread, was

Page 74

1      Q    Do you know anything about their
2    reputation as political scientists or -- social
3    scientists?   I'm sorry.
4      A    I remember looking at the article and
5    noting where it was published, but I did not look
6    at the research activities of the authors.
7      Q    Let me show you another document.   We'll
8    mark this as Exhibit -- this is going to get a
9    little confusing now.   I'm going to mark this as
10   Exhibit 7.   This was Exhibit 6 in your previous
11   deposition.   This was your January 19, 2018 memo.
12           (Plaintiffs' Exhibit 7, January 19, 2018
13   memo, was admitted into evidence.)
14           THE WITNESS:   Yes, it is.
15   BY MR. HO:
16      Q    Okay.   I want to ask you about Page 7 of
17   the document, which is AR1282.   You know, I'm
18   sorry, I think I have the wrong page number here.
19           It's Page 12 -- AR1283.   It should be the
20   second paragraph after the Header C1, quality of
21   administrative record versus self-report
22   citizenship status.

Page 75

1      A   The paragraph that begins "For all of

2   these analyses"?

3      Q   Yes.

4      A   Okay.

5      Q   Now, the second sentence here reads, "The

6   NUMIDENT data contained information on every

7   person who has ever been issued a Social Security

8   number or an individual taxpayer identification

9   number.  Since 1972, SSA has required proof of

10  citizenship or legal resident alien status from

11  applicants.  We use this verified citizenship

12  status as our administrative citizenship

13  variable."

14          I want to ask you about what you wrote

15  there.  You described citizenship status in the

16  NUMIDENT data as verified, right, Dr. Abowd?

17      A   Yes.

18      Q   And you described citizenship status as

19  reported in the NUMIDENT as verified, because

20  everyone who obtains an SSN or an ITIN has had to

21  show a document concerning their citizenship or

22  legal noncitizenship status, correct?

401;
403

1      A     Correct.

2      Q   So if someone shows up in the NUMIDENT as

3  a noncitizen, just to put this in plain language,

4  that's because the Social Security Administration

5  records reflect that a document has been shown

6  identifying that person as a noncitizen, right?

7           MR. EHRLICH:  Objection to form.

8           THE WITNESS:  No.  It's the citizenship

9  status that's been documented or if you add an

10  ITN, the eligibility for an ITIN.

11  BY MR. HO:

12      Q   And the eligibility for an ITIN, if that

13  record in the NUMIDENT indicates that a person is

14  a noncitizen, it's because they've submitted a

15  document that indicates that they're a noncitizen,

16  right?

17      A   Correct.

18      Q   Now, in your view, if someone is

19  identified as a noncitizen in the NUMIDENT, that

20  reflects that person's current noncitizenship

21  status except for where there's a lag time between

22  when a noncitizen naturalizes and when the SSA

1   updates the person's record to reflect that change

2   in status, correct?

3       A   Approximately correct.  Not everyone is

4   obligated to notify SSA of a change in their

5   status.  So the things you said, plus the

6   possibility that it never gets updated.

7       Q   Generally speaking, you would agree that

8   if someone is denoted in the NUMIDENT as a

9   noncitizen, that that person is likely to be a

10  noncitizen, subject to a few exceptions?

11      A   I won't agree with the last statement.

12  Subject to a few exceptions, we would intend to

13  quantify that, but subject to the exceptions in

14  whatever quantity they are.

15      Q   Generally speaking, if someone is -- let

16  me just try this again.

17          Generally speaking, if someone is

18  identified in the NUMIDENT as a noncitizen, you

19  think it's reasonable to conclude that that person

20  is likely a noncitizen at present, correct,

21  Dr. Abowd?

22      A   If the person is actually coded as a

Page 78

1  noncitizen, then I believe it is reasonable that

2  they were issued an SSN with SSA believing that

3  they were not a citizen.  If it's missing, that's

4  a different matter.

5      Q   Now, if someone is identified through ACS

6  questionnaire as a noncitizen, that's based

7  exclusively on a survey self-response that is not

8  verified by an actual document regarding the

9  person's legal status, right?

10      A   In the case of the respondent, that's

11  correct.  In the case of the other members of the

12  household, it's based on the information provided

13  by the respondent about those other members of the

14  household.

15      Q   So for anyone on the ACS who is                401;

16  designated as a noncitizen, it's based on a survey  403

17  response, not an actual document about the

18  person's noncitizen status, correct?

19      A   That's correct.

20      Q   Let me show you another document.  We can

21  mark this as Exhibit 8.  It's another email thread

22  you're on.  The top email is from Paul Beatty.

Page 79

1          (Plaintiffs' Exhibit 8, Email, was

2     marked.)

3     BY MR. HO:

4          Q    It is from Paul Beatty to you, dated

5     January 2, 2018, and the Bates number of the first

6     page of this thread is AR6629.

7               Now, the third email in the chain is an

8     email that you write to -- it's on the first page,

9     Dr. Abowd.  It on an email that you write to

10    Mr. Beatty and John Elting --

11         A    Elting.

12         Q    Elting, E-L-T-I-N-G-E [sic] -- dated

13    January 2, 2018, 9:35 a.m.

14              Do you see that email?

15         A    Yes, I do.

16         Q    Okay.  You wrote, "I spent the entire

17    week of December 18 through 22 working on the

18    response to this for Ron.  He sent it to DOJ on

19    Friday afternoon, December 22.  We proposed adding

20    citizenship to the P.L. 94-171 to the

21    administrative records, not a new question on the

22    2020 census.  This proposal had the backing of the

Page 80

1    redistricting office."

2           You wrote that, right?

3       A   Yes.

4       Q   And the redistricting office is the

5    redistricting office at the Census Bureau run by

6    James Whitehorne, right?

7       A   Yes.

8       Q   Now, when you -- what do you mean when

9    you say that the option of using administrative

10   records to generate citizenship information for          401;

11   the P.L. 94 file had the backing of the                  403

12   redistricting?

13      A   Okay.  I was writing an email and I

14   didn't take my assistant director's advice as

15   seriously as I should have, to reread every

16   sentence before you click send.  I meant that I

17   had discussed it with James Whitehorne.  I meant

18   that we would produce a CVAP table in support of

19   P.L. 94-171.

20      Q   Okay.  Fair enough.

21          So you're referring to, in this email,

22   the production of a CVAP table with block-level

Page 81

1    CVAP data, right?

2        A    Yes.

3        Q    Okay.   And when you say that that

4    proposal -- the proposal to generate that table

5    using administrative records had the backing of

6    the redistricting office led by Mr. Whitehorne,

7    what did you mean by that?

8        A    It meant that I had previously discussed

9    with him whether this was a -- a tabulation that

10   we could make that would be considered politically

11   neutral and appropriate in support of state

12   redistricting efforts.

13       Q    Was one of the reasons why the proposal

14   to use administrative records to generate

15   block-level CVAP data have the support of the

16   redistricting office, the fact that administrative

17   records are based on verified information about a

18   person's citizenship status instead of a

19   self-report on a survey?

20       A    Not precisely.   What it was based on was

21   our ability to produce fit-for-use statistics that

22   we could document the quality of.   The fact that

401;
403

1    citizenship status is verified, at least for

2    people since 1972 in the NUMIDENT, is evidence

3    that the quality of the administrative record has

4    already received some scrutiny.

5        Q    So you would agree with the statement

6    that you -- I'm sorry.  Let me just -- let

7    me -- start that question again.

8            You described citizenship data from the

9    NUMIDENT as verified, because it's based on the

10   receipt of an actual legal document; is that

11   right, Dr. Abowd?

12       A    Yes.

13       Q    Okay.  And you would describe responses

14   to a citizenship question as unverified, right,

15   Dr. Abowd?

16       A    Yes.

17       Q    Let me show you another email.  We'll

18   mark this as Exhibit 9.

19           (Plaintiffs' Exhibit 9, Email, was

20   marked.)

21   BY MR. HO:

22       Q    This is an email from Ron Jarmin to a

401;
403

Page 85

1      Q    Okay.   Mr. -- Dr. Jarmin writes, "They

2    have now briefed me, and their findings suggest

3    that the best way to provide P.L. 94 block-level

4    data with Citizen Voting Age Population by Race

5    and Ethnicity would be through utilizing a linked

6    file of administrative and survey data the

7    Census Bureau already possesses."

8           When Dr. Jarmin refers to a linked file     401;

9    of administrative and survey data, that's a        403

10   reference to what you were describing earlier in

11   your email to Mr. Beatty about adding citizenship

12   or -- creating a citizenship table via

13   administrative records, correct?

14     A    Yes.   That's a shorthand way of

15   expressing that.

16     Q    And when Dr. Jarmin writes using this

17   administrative record would result in higher

18   quality data, do you understand that to be a

19   reference, in part, to the fact that information

20   about citizenship status in the administrative

21   record is based, in part, on legal documents about

22   a person's citizenship status as opposed to a

 1   BY MR. HO:

 2      Q    Is the linkage performed by the

 3   Census Bureau between ACS survey respondents and

 4   the NUMIDENT data what you would describe as high

 5   quality?

 6      A    Sometimes, yes, and sometimes, no.

 7   Generally, yes.

 8      Q    For purposes of the analysis that you

 9   conducted referenced in your January 19th memo,

10   was the linkage between the ACS respondents and

11   the NUMIDENT data about citizenship status, was

12   that a high-quality match?

13      A    So the average statistic for that match

14   was that it was a high-quality match, but not all

15   of the records matched with high quality.

16      Q    Okay.

17      A    And some didn't match, at all.

18      Q    Generally speaking, when there was

19   disagreement -- in the analysis that you performed

20   in your January 19th memo between the

21   administrative record and a person's survey

22   response about citizenship data, is it reasonable

Page 91

1   to conclude that the administrative record is more

2   likely to be correct about the person's

3   citizenship status than the response to the ACS

4   question?

5        A    When the administrative record says you

6   are a citizenship and when the linkage of high

7   quality, as it generally is for people whom the

8   administrative record says you're a citizen, then,

9   yes.   When the administrative record says that

10  you're not a citizen and the linkage is of high

11  quality, then subject to the caveats I have

12  already expressed, I would also say yes.   But as

13  the linkage quality deteriorates, then you're not

14  sure you're looking at the same person and you're

15  also not confident of the -- either the survey

16  responses or the administrative record.

17       Q    So let's just talk about the

18  noncitizens --

19       A    Okay.

20       Q    -- in the NUMIDENT data.   When you have a

21  non- -- someone who is identified as a noncitizen

22  in the NUMIDENT data and you link that person to

401;
403

Page 92

1   an ACS response and there's disagreement, that is,

2   the person who is identified in the NUMIDENT as a

3   noncitizen, but their ACS response is citizen,

4   when you conducted that analysis for purposes of

5   your January 19th memo, do you have confidence

6   that person is likely a citizen -- sorry -- likely

7   a noncitizen and that the response to the ACS

8   question was incorrect?

9           MR. EHRLICH:  Objection.  Form.

10          THE WITNESS:  We believe that the most

11  likely conclusion is that the administrative

12  record is correct and the survey response is not.

13  BY MR. HO:

14      Q   And I believe in your January memo, you

15  conclude that about 30 percent of ACS respondents

16  who are identified as noncitizens in the NUMIDENT,

17  respond to the ACS citizen question by stating

18  they are citizens, right, Dr. Abowd?

19      A   We agreed to use 30 percent as the

20  summary for a range, but yes, I think that's a

21  representative statistic.

22      Q   So based on your previous responses

401;
403

Page 93

1    today, you think it's likely that 30 percent of

2    noncitizens who responded to the ACS citizenship

3    question responded incorrectly about their

4    citizenship status to the ACS question, right,

5    Dr. Abowd?

6        A    I -- the correct statement is that the

7    data provided for 30 percent of the survey

8    respondents who indicated citizens, that wasn't

9    necessarily provided by that person -- that's what

10   I'm trying to correct -- is likely incorrect, yes.

401;
403

11       Q    Do you have any empirical basis to expect

12   that noncitizens who respond to a citizenship

13   question on the 2020 decennial enumeration

14   questionnaire will respond more accurately than

15   noncitizens who have responded to the citizenship

16   question on the ACS?

17       A    No.

18       Q    Is there any reason to think that

19   noncitizens who respond to the citizenship

20   question on the 2020 enumeration will respond less

21   accurately than noncitizens who respond to the

22   citizenship question on the ACS?

Page 94

1      A    We have identified an upward trend in the

2  disagreement between the survey responses and the          401;

3  administrative record.   It's not precise enough            403

4  for us to label as a definitive upward trend, but

5  it -- there are definitely indications in the data

6  that the willingness to respond accurately to that

7  question is declining.

8      Q    Would you expect noncitizens responding

9  to the citizenship question on the 2020 decennial

10  enumeration questionnaire to respond inaccurately

11  at a higher rate than the inaccuracies you

12  documented among noncitizens responding to the

13  citizenship question on the ACS?

14      A    I don't have a well-formed opinion on

15  that.   I have told you that there's a -- the

16  appearance of a trend that we have not determined

17  has the statistical quality to say is a trend, but

18  is -- so in the absence of that, I would have to

19  say my expectation is the same as the most recent

20  data, which would be the 2016 ACS.   That's where

21  the 30 percent number comes from.

22      Q    For producing the block-level CVAP data,

Page 95

1    there are, at present, no plans in place to

2    address situations where a person's self-report in

3    response to the citizenship question on the 2020

4    enumeration questionnaire disagrees with that

5    person's citizenship status as noted in the

6    NUMIDENT data file; is that right, Dr. Abowd?

7            THE WITNESS:  I'm sorry.  Could you read

8    the first part of his question back to me?

9            (Thereupon, the reporter read the record

10   as requested.)

401;
403

11           THE WITNESS:  I think you're asking me

12   about the processing decisions for the 2020 census

13   and the subsequent production decisions for the

14   CVAP tabulation; is that right?

15   BY MR. HO:

16       Q    Right.

17       A    There are no current decisions about how

18   that's going to be done.

19       Q    There are no current decisions about how

20   you're going to reconcile differences between the

21   responses to the citizenship question and a

22   person's citizenship status as defined in the

1    NUMIDENT?

2        A    That's correct.

3        Q    The last sentence of Exhibit 9,

4    Dr. Jarmin's email says, "I suggest we schedule a

5    meeting of Census and DOJ technical experts to

6    discuss the details of this proposal."

7            That meeting did not take place, did it,      401;

8    Dr. Abowd?                                            403

9        A    That's correct.

10       Q    You anticipated having such a meeting in

11   January of 2018, right?

12       A    I wouldn't say that the Census Bureau

13   anticipated having such a meeting.  I would say

14   that we offered DOJ the opportunity to meet with

15   us and hoped that they would.

16       Q   I'm going to show you a document.  We'll

17   mark it as 10.

18           (Plaintiffs' Exhibit 10, Email, was

19   marked.)

20   BY MR. HO:

21       Q   This is an email thread, the top email is

22   from Misty Heggeness to you dated January 2, 2018

Page 98

1      Q   When you say the meeting would be mostly

2   about messaging, what did you mean by that?

3      A   To be honest, I'm not sure.  I believe

4   that on the 2nd of January, we were discussing the

5   wording of a short summary memorandum that I was

6   working on for the acting director, summarizing

7   the state of the research through the end of

8   December.

9      Q   You testified a moment ago that DOJ

10  declined to take the meeting that was referenced

11  in Dr. Abowd -- Dr. Jarmin's email; is that right?

12      A   That's correct.

13      Q   Do you know why?

14      A   I believe it's in the administrative          401;

15  record, the reply to this email.  I'll summarize.   403

16  Again, if you say this is the author of the

17  letter, I believe you, but names haven't stuck.

18         Said that the basis for our request is

19  adequately documented in the letter and we decline

20  to further meet.

21      Q   In your experience, is it unusual to

22  receive a data request from an agency to the

Page 99

1   Census Bureau and then for the agency to refuse to

2   meet to discuss the technical aspect of that data        401;

3   request?                                                  403

4        A   My experience in my current position is

5   only two years old.   I will answer on behalf of

6   the agency.   Yes.

7            MR. HO:  We've been going for about an

8   hour 50, 55 or so.  Would now be an okay time for

9   a bathroom break?

10           MR. EHRLICH:  It's okay with me.

11           VIDEOGRAPHER:  This concludes Media Unit

12  Number 1.  The time on the video is 10:55 a.m.  We

13  are off the record.

14           (Off the record.)

15           VIDEOGRAPHER:  This begins Media Unit

16  Number 2.  The time on the video is 11:19 a.m.  We

17  are on the record.

18           MR. EHRLICH:  Just to clarify something

19  we were discussing earlier on the record when we

20  were talking about you had received documents

21  yesterday evening that you wanted to talk to

22  Dr. Abowd about.  We wanted to clarify that you

Page 100

1  get seven hours for the 30(b)(6).  If you want to

2  reserve time at the end of today in order to

3  review those documents and ask him more questions,

4  we can produce him again for you.

5          MR. HO:  Thanks for that offer.  I'll

6  confer with co-counsel and counsel for the other

7  plaintiffs --

8          MR. EHRLICH:  Okay.

9          MR. HO:  -- and we'll talk.

10          MR. EHRLICH:  Thank you.

11  BY MR. HO:

12      Q    Dr. Abowd, before moving on to another

13  topic, I just want to ask a few questions about

14  some things we discussed earlier.

15          You testified that when the

16  Census Bureau, after the 2020 decennial census,      401;

17  produces the block-level CVAP data, that there      403

18  will be error margins associated with that

19  block-level CVAP data.  Do you remember that?

20      A    Yes.

21      Q    Okay.  Today, does the Census Bureau know

22  whether or not the error margins associated with

Page 101

1  that block-level CVAP data will be larger or

2  smaller than the error margins associated with the

3  block-level CVAP data that DOJ currently uses,

4  based on ACS estimates?

5      A    I have to give a nuanced answer to that

6  question.  We don't know, because we haven't set

7  the parameters of the disclosure avoidance system          401;

8  yet.  That's somewhat new territory for my                  403

9  colleagues, and I am certain that one of the

10 things we will be discussing is whether the error

11 margins associated with both the P.L. 94 and the

12 CVAP table at the block level still allow

13 redistricting offices and the

14 Department of Justice to use the data effectively.

15 That is the use case for those data.

16     Q    Would you agree -- never mind.  That's

17 fine.

18          You testified a little bit about a

19 possible RCT of the citizenship question and

20 request from, I believe it was Enrique Lamas, to

21 get a proposal for doing an RCT of the citizenship

22 question without the prefatory nativity question

1  responsibility, in conjunction with the acting

2  director, for giving me the no-go, but he didn't

3  tell me whether he discussed with anyone else

4  outside the Bureau.

5      Q   So you're aware that Dr. Jarmin and -- I

6  don't know if it's Dr. or Mr. Lamas?

7      A   It's doctor.  It's Dr. Velkoff, too.

8      Q   Okay.  You don't know if anyone other

9  than Dr. Jarmin and Dr. Lamas were involved in

10  this -- the decision not to do the RCT of the

11  citizenship question?

12      A   I do not know.

13      Q   You testified at one point whether or

14  not -- excuse me -- you testified at one point

15  that there are indicators in that -- let me try

16  again.

17          I think you testified earlier that there

18  are indicators suggesting that nonresponse rates

19  to a citizenship question among noncitizens are

20  increasing; is that right?

21      A   Yes.

22      Q   What are those indicators that you were

Page 106

1    referring to?

2        A    In our technical research, we've

3    conducted statistical experiments that attempt to

4    estimate the extent to which certain categories of

5    households that either include a noncitizen or

6    include someone for whom we don't know the

7    citizenship status might not respond to

8    questionnaires that include a citizenship

9    question.   In the analysis for the 2000 census,

10   that number was around 3 percentage points.   In

11   the analysis circa 2010, it was closer to 5

12   point -- 5 percentage points.   And the most recent

13   analyses we have produced, it's closer to five and

14   a half percent -- 5.8 percentage points and

15   applies to a bigger subpopulation of households

16   than our previous analyses.

17       Q    Any other analyses suggesting that there

18   are indications of greater nonresponse over time

19   from noncitizens to a citizenship question other

20   than the ones you've just described?

21       A    If you look at the item nonresponse rates

22   and the break-off rates, the reason I said that

1    they didn't meet statistical standards for saying

2    we think there's a trend is because they're short

3    and there have been some procedural changes that

4    materially affect the year-to-year comparisons,

5    but they are higher now than they were earlier in

6    the decade.

7         Q    So we have increasing unit nonresponse,

8    increasing item nonresponse and increasing

9    break-off rates, all suggesting that noncitizens'

10   sensitivity to a citizenship question have been

11   increasing over time; is that right, Dr. Abowd?

12        A    You have to permit the caveat that I

13   didn't say increasing.  I said they're going up,

14   but that, specifically, I don't have sufficient

15   statistical evidence to conclude there's an

16   increase in trend.

17           In the case of the -- of the item

18   nonresponse rates, it's because of the change in

19   design that occurred in 2013.  In the case of the

20   break-off rates, it's because we haven't been able

21   to analyze full 2017 data, and we only had 2016

22   data.  So we don't -- I don't, really, even have

Page 108

1    two points for the break-off rates.

2           But at the time we prepared our technical

3    report for the Secretary, we had the 2000 and the

4    2010, and those two numbers are statistically

5    different from each other, and the one in 2010 is

6    larger.

7        Q    But you would agree that the item

8    nonresponse and the break-off rate analysis that

9    you've done, they're both consistent with the

10   notion that noncitizens' sensitivity to a

11   citizenship question and unwillingness to respond

12   to such a question, have increased over time?

13          MR. EHRLICH:   Objection.   Form.

14          THE WITNESS:   I will agree to the

15   statement, consistent with the -- with the

16   increase over time, yes.

17   BY MR. HO:

18       Q    Other than the three things we've

19   discussed, unit nonresponse, item nonresponse and

20   break-off rates, are there any other indicators

21   suggesting that noncitizens' sensitivity to a

22   citizenship question has been increasing over

1   time?

2       A   There are survey indicators from the

3   Census Barriers, Attitudes and Motivators Survey

4   and qualitative analysis from focus groups that

5   also suggest it.

6       Q   Other than the CBAMS and the focus

7   groups, any other indicators that you're aware of

8   suggesting that noncitizens sensitive to a

9   citizenship question has been increasing?

10      A   None that I can recall at this moment.

11      Q   Okay.  You said something about the 5.8

12  percentage point reduction in response rates among

13  noncitizens to a citizenship question -- because

14  of the presence of a citizenship question; is that

15  right, Dr. Abowd?

16      A   I can restate the question so it's right.

17      Q   Please.

18      A   We did analyses -- we did analyses that

19  compared different categories of households that

20  included citizens with categories of households

21  that either didn't or may not include citizens.

22  And the most reset of them -- which is in the

1  to the Department of Commerce in response to a

2  discovery request we were processing.

3      Q  Do you know when the August 6th version

4  of that paper was produced from the Census Bureau

5  to the Department of Commerce?

6      A  I do not.

7      Q  Was it yesterday?

8      A  I don't think so -- no.  It definitely

9  wasn't yesterday.  It -- because I asked for a

10  copy at the Department of Commerce on Monday, and

11  I was given a copy with the August 6th date.  I

12  was expecting to see a copy with a July date.

13  There's no difference between them, other than

14  some grammar mistakes that have been corrected.

15      Q  I want to show you a document that you

16  talked about at your last deposition.  This was a

17  short version, I think, of the analysis we were

18  just talking about.  It was the first Abowd

19  Deposition Exhibit 4, marking it as Exhibit 11 for

20  this deposition.

21        (Plaintiffs' Exhibit 11, Analysis, was

22  marked.)

1      A    In this case, yes.  That's right.

2      Q    Now, the first sentence in the paragraph

3    above Table 6 reads:  Other proxy measures for

4    understanding response sensitivity to questions of

5    citizenship can be examined with longitudinal

6    data.

7           What does that sentence mean?

8      A    It's a -- it's terse technical writing

9    for it, and now we're going to do things similar

10   to what we just did for cross-sectional studies

11   with some longitudinal data.

12     Q    And the premise here is that a

13   longitudinal analysis could shed some light on the

14   sensitivity of citizen- -- or the question on

15   citizenship, right, Dr. Abowd?

16     A    Yes.

17     Q    The SIPP, S-I-P-P, that's a longitudinal

18   survey featuring a citizenship question, correct?

19     A    That's correct.  It's the Survey of

20   Income and Program Participation.

21     Q    And who is it conducted by?

22     A    The Census Bureau.

1     Q   According to the table, in Wave 1 of the

2  SIPP, noncitizens were 6.1 of respondents but by

3  Wave 2, they were only 5.7 percent of SIPP

4  respondents, correct?

5     A   That's correct.

6     Q   So just to explain what that means,

7  noncitizens shrank as a share of respondents to

8  this longitudinal survey because they dropped out

9  of responding to the survey at a higher rate than

10  did citizens, correct, Dr. Abowd?

11     A   So the two point estimates, 6.1

12  percentage point and 5.7 percentage point -- the

13  5.7 is less than the 6.1.  I think I asked the

14  authors to ensure that the standard error of the

15  difference was -- which is negative -- was also

16  sufficiently precise.  On the hypothesis that

17  that's the case -- I don't have the standard or

18  the difference here -- then, yes, that's the

19  correct conclusion.

20     Q   So the idea that the white paper's

21  authors are operating under here is that if

22  noncitizens dropped out of a longitudinal survey

1  featuring a citizenship question at a higher rate

2  than did citizens, then that suggests that

3  noncitizens are more sensitive to a citizenship

4  question and might fail to respond to a survey

5  with a citizenship question at a higher rate than

6  citizens; is that right?

7       A    So the nuanced answer to your question is

8  that it is suggestive of that.   In these kinds of

9  survey situations, we can't design the gold

10  standard randomized controlled trial for which the

11  precise hypothesis that you stated would be the

12  one you could precisely test.   So the

13  questionnaire does include a citizenship question.

14  It includes lots of other questions, as well.   And

15  subject to that caveat, the conclusions that you

16  drew about the difference between Wave 1 and

17  Wave 2 participation -- sorry, response rates --

18  is correct.

19  BY MR. HO:

20       Q    And the Census Bureau agrees with the

21  authors of the white paper that this longitudinal

22  analysis is suggestive of the notion that

1   noncitizens are more sensitive to a question about

2   citizenship and less likely to respond to a survey

3   featuring a citizenship question, correct?

4          MR. EHRLICH:   Objection.   Form.

5          THE WITNESS:   The Census Bureau considers

6   the evidence from the SIPP to be consistent with

7   the other evidence that we have examined

8   suggesting that households that either contain a

9   noncitizen or contain at least one person for whom

10  we do not know the citizenship status are more

11  sensitive to questionnaires that include questions

12  about citizenship status.

13  BY MR. HO:

14      Q   There are other longitudinal studies

15  conducted by the Census Bureau featuring a

16  question on citizenship, right, Dr. Abowd?

17      A   Yes.

18      Q   For example, the Current Population

19  Survey, CPS, is a longitudinal survey conducted by

20  the Census Bureau featuring a citizenship

21  question, correct?

22      A   So that's not technically correct.   The

Page 123

1      A    It's a housing unit --

2      Q    I think I understand.

3      A    You don't know who is in the housing unit

4  when you go the second month and second sample.

5  That's the point I'm trying to make.

6      Q    I think I understand.

7      A    Okay.

8      Q    All right.   Let me try this again.

9           Time 1, right, we have a group of CPS

10  respondents.   Some housing units have a

11  noncitizen, some housing units do not have a

12  noncitizen.   Time 2, the share of respondents to

13  the CPS from the housing units that at Time 1 had

14  a noncitizen has shrunk.   Would that be suggestive

15  of the notion that noncitizens are more sensitive

16  to a citizenship question than are U.S. citizens?

17           MR. EHRLICH:   Objection.   Form.

18           THE WITNESS:   Replace Time 1 and Time 2

19  with Month and Sample 1 and Month and Sample 2.

20  If you look at statistics for Month and Sample 2

21  for households for Month and Sample 1 that

22  identified as citizen versus for households for

1    Month and Sample 1 that identified as noncitizen

2    and you found differences in the Month and

3    Sample 2 statistics, that would be as similar as

4    you could construct to the hypothetical in Table 6

5    of the working paper we're talking about.

6    BY MR. HO:

7        Q    And would that analysis -- if I showed

8    that Month and Sample 1 housing units that

9    featured a noncitizen responded at a lower rate at

10   Month and Sample 2 than the households that at

11   Month and Sample 1 were all citizen households,

12   would that be suggestive of greater sensitivity of

13   noncitizens to a citizenship survey question?

14           MR. EHRLICH:   Objection.   Form.

15           THE WITNESS:   That would have an

16   interpretation similar to Table 6 in the working

17   paper, yes.

18   BY MR. HO:

19       Q    Now, during your last deposition, do you

20   remember talking about the acronym C-A-P-I or

21   CAPI?

22       A    Computer-assisted personal interview,

Page 125

1   yes.

2          (Conference call interruption.)

3   BY MR. HO:

4      Q   CAPI is, basically, a nonresponse

5   follow-up for the ACS; is that right?

6      A   As of right now, that is correct.

7      Q   Okay.  And what --

8      A   That is the field technical technique

9   used for nonresponse follow-up in the ACS.

10     Q   Okay.  And what it means is you send,

11  basically, a census employee out with some kind of

12  personal handheld computer device to try to get an

13  answer to the ACS from a household that didn't

14  respond; is that right?

15     A   That's correct.

16     Q   Okay.  Now, the SWAT team that did the

17  white paper that we talked about earlier,

18  conducted a stratified analysis of the CAPI

19  response rates breaking census tracts into deciles

20  from those with the -- the lowest percentage of

21  household with the noncitizen to those with the

22  most; is that right?

1        A    If you're going to ask me about one of

2   the analyses that's in this early draft, I need to

3   know which one.

4        Q    Sure.

5        A    If you're going to ask me about something

6   else, I need to have my memory refreshed as to

7   what you're asking me about.

8        Q    I understand.  I don't think it made its

9   way into that version of the white paper.

10       A    Okay.

11       Q    But my understanding is that at some

12  point, the SWAT team looked at CAPI response rates

13  and they compared census tracts to a stratified

14  analysis, deciles -- percentage -- a household --

15  census tracts with the lowest percentage of

16  households with a noncitizen and -- you know, from

17  1 to 10, those with the greatest percentage of

18  households with a noncitizen, and compared the

19  CAPI response rates.  Does that help refresh your

20  memory?

21       A    You've refreshed my memory to the point

22  that I acknowledge that an analysis was done in

Page 127

1    which tracts were stratified by decile.   But I

2    would like to review what it is you're asking me

3    about, because I don't remember specifically what

4    the stratifier was and what the response was.

5    I've had to look at a lot of documents over the

6    last several weeks.   I simply am not sure what the

7    exact analysis is you're asking me about.

8              (Plaintiffs' Exhibit 12, Tables, was

9    marked.)

10       Q    Okay.   Let me show you a document.   It's

11   been marked as Exhibit 12.   It's a series of

12   tables.   The first page on the document is

13   AR10408.

14             And I'm looking at the third table, the

15   CAPI response rate.   Now, this table shows an

16   analysis of census tracts broken into deciles from

17   least to most percentage of households with a

18   noncitizen comparing CAPI response rates; is that

19   right, Dr. Abowd?

20       A    Yes.   I don't recall exactly how the

21   tract deciles were determined, but they are from

22   least to most noncitizen.   That's right.

1      Q    So one is the decile of census tracts

2   with the lowest percentage of households with a

3   noncitizen.   Ten is the decile of census tracts

4   with the largest percentage with households with a

5   noncitizen, correct?

6      A    That's correct.

7      Q    And, basically, what that means is, as

8   you go from 1 to 10, the percentage of households

9   in a census tract increases, correct?

10     A    Percentage of households with a

11  noncitizen.

12     Q    Noncitizen, sorry.

13          And when we look at -- just to take one

14  number from the table -- for the 10th decile, year

15  2016, the CAPI response rate is 87.4, bottom right

16  corner of the table.   What does that mean for the

17  CAPI response rate to be 87.4 for that decile

18  census tract?

19     A    I'm going to check with the author of

20  this table on the next break to make certain that

21  the CAPI here means only the nonresponse follow-up

22  that was followed up by computer-assisted personal

Page 129

1    interview.  We sometimes lump Internet

2    self-response in, but I don't think that was done

3    here, because Internet self-response is by itself

4    separately, and it didn't start until 2013.

5         Q    Uh-huh.

6         A    And up until 2016, you could also be

7    followed up with CATI, computer-assisted telephone

8    interview.  So I think I've told you correctly,

9    that this is nonresponse follow-up

10   computer-assisted personal interview.

11          In that case, it means that the subsample

12   of nonrespondents that was selected for

13   nonresponse follow-up in the ACS were successfully

14   followed up with the percentages indicated in the

15   table.

16        Q    So just to be clear, the subset of

17   non- -- of households chosen for nonresponse

18   follow-up on the ACS for the tenth decile in 2016,

19   nonresponse follow-up on the ACS was successful

20   87.4 percentage of the time?

21        A    That's correct.

22        Q    Now, if we look at this table, correct,

1    that the Bureau found that nonresponse follow-up

2    for the ACS has declined each year for each

3    decile; is that correct?

4        A    That -- that seems to be correct.

5        Q    Okay.  And is that consistent with the

6    notion that citizenship has become a more

7    sensitive question on surveys since the year 2010?

8        A    One of the reasons that this particular

9    analysis doesn't appear in some of the technical

10   papers that were relied upon by the larger group

11   of senior executives at the Census Bureau in

12   drawing their conclusions, is that the internal

13   peer review of this particular analysis suggested

14   that there were enough qualifications to that

15   conclusion that many of them were unwilling to

16   make it.

17           You correctly characterized the trend

18   lines, that there were changes to the design of

19   the survey that occurred here and there were also

20   potential other differences that -- that many of

21   the people who looked at this found qualifications

22   that -- so that's the right conclusion.  But it

Page 131

1    isn't a conclusion that the Census Bureau,

2    speaking collectively for the people who peer

3    reviewed this analysis, would have jointly made.

4         Q    I understand there are caveats, but

5    notwithstanding those caveats, is the decline in

6    successful nonresponse follow-up for the ACS since

7    2010 suggestive of the notion that citizenship

8    questions on surveys have become more sensitive

9    since 2010?

10        A    It's consistent with that interpretation,

11   yes.

12        Q    It also appears that in each year, as a

13   census tract has greater percentage of households

14   with a noncitizen, that nonresponse follow-up,

15   generally, is less successful.  Would you agree

16   with that?

17        A    Yes.  It's consistent with that

18   interpretation, as well.

19        Q    Okay.  So is it consistent -- is that

20   data consistent with the notion that noncitizen

21   households are less likely to cooperate with

22   nonresponse follow-up to the ACS?

1     A    So we didn't -- well, if we did a

2  difference-and-difference analysis of this table,

3  I don't remember it.   And I flipped and it doesn't

4  seem to be in here.  So without a

5  difference-and-difference analysis, I'm not able

6  to draw a conclusion like the one you just

7  suggested.

8     Q    But as a census tract gets a greater

9  percentage of households with a noncitizen,

10  generally speaking, nonresponse follow-up in that

11  census tract is less successful, correct,

12  Dr. Abowd?

13     A    Is less successful than?

14     Q    Than it is for a census tract with a

15  lower percentage of households with a noncitizen?

16     A    You're asking me do the numbers go down

17  when the deciles go up, and that's correct, yes.

18     Q    Now, I believe when you testified at your

19  last deposition, when you were talking about the

20  CAPI analysis, you described something like a

21  spreadsheet that had all the tables that you

22  looked at which had been cleared for release by

1          Q    Has the Census Bureau, in response to

2    this analysis or for any reason, taken any

3    measures specifically to address the lower success

4    rate of nonresponse follow-up in census tracts

5    with higher percentages of noncitizen households?

6               MR. EHRLICH:   Objection.   Form.

7               THE WITNESS:   I don't believe that you

8    could point to any specific activity that would

9    have been explicitly stratified by this decile

10   analysis.   The declining response rate is a

11   general problem, and we attempt to manage field

12   operations in a manner that is consistent with

13   keeping those response rates up.   In fact, one of

14   the reasons we switched to Internet self-response

15   in the ACS was in an effort to increase the

16   voluntary response rate.   So -- so, generically,

17   we're, of course, interested in keeping the

18   response rate high.   It's a mandatory survey, but

19   voluntary or self-response is a critical cost

20   control factor.

21               That said, the budget for the

22   American Community Survey has not been increased

1    in proportion to the cost of living, so we don't

2    have the same resources to do nonresponse

3    follow-up.   So we focus on -- we focus on those

4    things that are going to get the total nonresponse

5    follow-up on the --

6    BY MR. HO:

7        Q    But has -- sorry.

8             Has the Census Bureau done anything to

9    try to address the lower rates of nonresponse

10   follow-up success in areas that have higher

11   percentages of noncitizen households?

12       A    I believe I just said that I'm not aware

13   of any activity specifically correlated with --

14   explicitly correlated with these indicators.

15       Q    Thank you.  Sorry.

16            Just a few other quick questions.  You're

17   familiar the acronym of C-S-A-C or CSAC?

18       A    Yes.

19       Q    And that stands for Census Scientific

20   Advisory Committee?

21       A    Yes.

22       Q    And the members of CSAC advised the

1   my rank, but some will send a specialist.  And

2   then the director conveys to the Department of

3   Commerce a set of recommendations to fill a

4   vacancy.  It's the Department of Commerce then

5   decides to whom to extend that invitation.

6        Q    Is it fair to say that, generally

7   speaking, CSAC members are highly regarded as

8   social scientists by the Census Bureau?

9        A    Yes.

10       Q    You're familiar with former Census Bureau

11  director John Thompson?

12       A    I have met Dr. Thompson.  Mr. Thompson,

13  excuse me.

14       Q    Fair to say that the Census Bureau has a

15  high opinion of Dr. Thompson as a scientist?

16       A    It is Mr., and yes.

17       Q    Fair to say the Census Bureau considers

18  him well versed in standard Census Bureau testing

19  practices?

20       A    Yes.

21       Q    Has the Census Bureau contracted with any

22  private companies or PR firms to conduct research

Page 139

1    citizenship question?

2            Reingold spelled R-E-I-N-G-O-L-D.

3        A   I do not know whether Reingold is a

4    subcontractor in the integrated communication

5    contract.  If they are, then the answer could be

6    yes.  I'm not aware of another contract, but I

7    will check during a break.

8        Q   Okay.  Does the Census Bureau think that

9    adding a citizenship question to the 2020

10   enumeration questionnaire is a good idea?

11       A   No.

12           MR. HO:  Can we go off the record for a

13   second?

14           VIDEOGRAPHER:  We're going off the

15   record.  The time on the video is 12:07 p.m.

16           (Off the record.)

17           VIDEOGRAPHER:  This begins Media Unit

18   Number 3.  The time on the video is 1:03 p.m.  We

19   are on the record.

20   BY MR. HO:

21       Q   Dr. Abowd, I don't have any other

22   questions for you at this time, but I know you

Page 142

 1   field period.

 2   BY MR. HO:

 3       Q    Thank you.  And this would have been the

 4   only testing of the 2020 decennial questionnaire

 5   with a citizenship question in it, correct?

 6       A    This is the only field testing with and

 7   without citizenship question, directly analyzing

 8   the citizenship question that we have considered

 9   at the Census Bureau.

10           I also verified that the 2010 census

11   questionnaire had full cognitive and field

12   testing.  That the 2020 questionnaire without the

13   citizenship question had -- so I asked him the

14   same way you asked me, was adequately, cognitively

15   tested; yes.

16       Q    I'm sorry.  Who did you ask whether or

17   not?

18       A    I asked my staff -- the same group that I

19   had been asking generally about the testing, I

20   specifically asked about the cognitive testing for

21   the 2020 questionnaire, with and without the

22   citizenship question, and their answer was that it

1    was adequately tested with the citizen- -- without

2    the citizenship question, but not adequately

3    tested with the citizenship question, cognitive

4    testing.

5         Q    Thank you.

6         A    Okay.

7              And, thirdly, in this table, Exhibit 12,

8    the third panel, the CAPI response rate, I

9    confirmed, so I can now say the way the tract was

10   put into deciles was based on the five-year

11   American Community Survey for the middle five

12   years of the table, so 2011 through 2015.  That

13   the CAPI response rate is just the CAPI response

14   rate in the nonresponse follow-up system, okay.

15             I think those were all the things we had

16   unresolved.  If you think there were others -- we

17   went over our notes, but I think I've answered the

18   questions that that were unresolved.

19             MR. HO:  I don't have any others right

20   now, so I'm going to pass you along to one of the

21   other lawyers for one of the other plaintiff

22   groups, subject, of course, to the issue that I've

1    enumeration, but it is part of census.  And so the

2    process that we had in place for evaluating which

3    questions would be on the long form dates from the

4    creation of the long form.  And it was inherited

5    by the American Community Survey and modernized

6    for the American Community Survey, and the way in

7    which these bullets on this page -- page AR4804

8    describe the process as adaptation of the process

9    that is in place and is used for questions on the

10   American Community Survey.

11        Q    But to go back to my question,

12   this -- this process that we've just talked about,

13   the three reviews that are on this page, 4804, if

14   any one of those reviews advises against the

15   addition of a question, does the question get                401;

16   added?                                                       403

17        A    So it would be more iterative than that.

18   If a technical review revealed that it was going

19   to be difficult to ask the question for some

20   reason -- let's speak hypothetically -- then we

21   would probably not prepare a clearance package

22   supported by a technical analysis that says this

Page 155

1    is not likely to work very well.  The

2    Census Bureau would re-examine the use case for

3    the particular request.  If it's a -- if it's a

4    specific agency of the executive branch, one of

5    our principal statistical clients, we would work

6    with that agency to refine the request.  What we

7    were attempting to determine is the least

8    burdensome way of delivering statistics that are

9    suitable for the purpose that we're being asked to

10   produce them.

11          So in that iterative process, would

12   attempt to identify a technically better way of

13   addressing the data need.  And, generally

14   speaking, that -- in that iterative process, both

15   the Census Bureau and the principal client -- all

16   these data are going to be released for public

17   use, so the principal client is acting as the

18   agent of the general public in design of a

19   product.  If there was an agreement that this

20   particular technical solution will work and it

21   will meet the needs, then we would -- and then it

22   would involve a modification or a question -- a

401;
403

1    new question on the survey, then we would move

2    forward with the questionnaire design and the

3    testing that we would normally do, and we would

4    eventually get to the point where a clearance

5    package would be sent forward.

6            There might be some other regulatory

7    barriers.  There are lots of -- I shouldn't say

8    lots of.  There are several very specific

9    categories of data that statistical agencies and

10   other agencies of the federal government collect

11   that are governed by regulations of OMB.  And so

12   if the request involved something that inherently

13   meant you had to modify or update one of those

14   standards, then that would also come into play.

15   And those standards are regularly modified and

16   updated, and there, the Office of the Chief

17   Statistician takes charge of creating the relevant

18   working group, preparing the modification, doing

19   the Federal Register notices on the modifications.

20   So if you have to modify the standards before you

21   can produce a survey instrument, then that process

22   would happen.

401;
403

Page 157

1          This would all basically go on

2    simultaneously, but no OMB clearance package would          401;

3    be sent to the Office of the Statistician prior to          403

4    doing the ground work that the chief statistician

5    is known to require before she, in this case,

6    would approve the clearance request.

7          Q   So did I understand you correctly that

8    the clearance package has not yet been submitted

9    to OMB with regard to the citizenship question?

10         A   The clearance package for the specific

11   forms for the 2020 census has not yet been

12   submitted to OMB.

13   BY MS. SHAH:

14         Q   I'm going to hand you what's Exhibit 14,

15   and I only have two copies, because they're very

16   large.  I'm going to have this marked as

17   Exhibit 14, which is statistical quality standards

18   from the Census Bureau.

19             (Plaintiffs' Exhibit 14, Census Bureau

20   statistical quality standards, was marked.)

21   BY MS. SHAH:

22         Q   Are you familiar with this document?

Page 159

1    A   So the guidelines are Census Bureau

2  guidelines, and the employee, in the conduct of

3  his or her job, when preparing an information

4  product covered by the standards, that's what I

5  just explained, would be expected to abide by

6  standards, yes.

7    Q   And what about the Secretary?

8    A   The Secretary is not bound by the

9  standards.

10   Q   And we talked about some of the products

11  that this applies to.  Does it apply to the

12  decennial census questionnaire?

13   A   Yes.

14   Q   And, more specifically, the citizenship

15  question, as well?

16   A   Yes.

17   Q   So is it fair to say that the

18  Census Bureau has to follow these standards when

19  they develop and design survey questionnaires?

20   A   It is fair to say that every information

21  product and statistical program within the

22  Census Bureau is expected to follow these

Page 160

1    standards?   Yes.

2        Q    And if you can turn to Page 5 of this

3    document -- and it's a large one, so, you

4    know -- when we're talking about Requirement A16,

5    which says that, "Quality control checks must be

6    performed to ensure the accuracy and completeness

7    of the program plans including, among other

8    things, survey designs."

9            Does this requirement apply to the

10   decennial census questionnaire?

11       A    Yes.

12       Q    And what does it mean, survey design?

13       A    In this -- on Page 5, it has a very broad

14   interpretation.  We might sometimes call it the

15   lifecycle design, all of the components that go

16   into executing a -- an information product,

17   including, to be frank, a case where there's no

18   actual survey --

19       Q    Uh-huh.

20       A    -- but it's the design of an information

21   product.

22       Q    And has this quality check been done for

1      Q    So was a waiver for a quality check

2   obtained in the question -- in this instance?

3   Sorry.

4      A    So the answer to the question whether a

5   waiver was obtained for any part of the end-to-end

6   operation is no.

7           The question that I heard was, should a

8   waiver have been obtained because of the quality

9   variation over the -- over the life of the -- of

10  the survey?  Let me also say that these are

11  quality standards that bind the agency, but a

12  sitting director and a sitting acting director can

13  instruct the staff to do something and they're

14  expected to do something.  And while we would

15  expect a sitting director or acting director to

16  check whether there was a standard, there was a

17  lot of urgency here.  So the next methods and

18  standards meeting would have been after the whole

19  decision process was made.

20          But the quality of the process by which

21  we conducted the end-to-end test was extensively

22  peer reviewed inside the Census Bureau by the

1  Census Bureau conducts testing throughout the

2  decade preceding the decennial census?

3      A   Yes.

4      Q   Would such testing reveal

5  whether -- would that be considered pretesting?

6      A   Yes.

7      Q   And would such testing reveal whether a

8  question is unduly sensitive?

9      A   Yes.

10      Q   And if so, responses collected from a

11  survey or testing aren't used for data production,

12  would you say that that question can be construed

13  as unduly burdensome?

14          MR. EHRLICH:   Objection.   Form.

15          THE WITNESS:   I think you just asked me

16  if you collect an item and then you don't use it

17  to tabulate anything, is that undue burdensome?

18  Yes.

19  BY MS. SHAH:

20      Q   And would the Census Bureau run --

21  typically run pretesting to identify issues with

22  order, context or formatting?

1       A    Yes.

2       Q    And did it do so with -- in the context

3  of order, context and formatting to the

4  citizenship question?

5            MR. EHRLICH:   Objection.   Form.

6            THE WITNESS:   If you're asking

7  specifically with respect to the questionnaire for

8  the 2020 census, no.

9  BY MS. SHAH:

10      Q    And if we can go, actually, back a page,

11  to Page 7, and look at Requirement A2-2, it's at

12  the top of the page.  It begins that -- a plan

13  must be produced that addresses four different

14  requirements, and I want to go through each

15  requirement separately.

16           If -- "The plan must address program

17  requirements for the data collection instrument

18  and the graphical user interface or GUI, if

19  applicable."

20           Does this requirement apply to the 2020

21  census paper questionnaire?

22      A    Yes.

1    the 2015 National Content Tests.  There were

2    separate evaluations of all of those materials.

3        Q    And can supporting materials include

4    things like questionnaire instructions?

5        A    Yes.

6        Q    What about language-assistance materials?

7        A    Yes.

8        Q    And promotions or advertising materials?

9        A    Most of our data collection programs

10   don't have communication campaigns associated with

11   them -- special communications.  We have an

12   ongoing one that's the whole Bureau.  The 2020

13   census does have a special communication campaign.

14   So specifically for 2020, there would be a special

15   communication campaign being developed.

16       Q    And then we've talked a little bit about

17   this already, but it also has to address the

18   pretesting of the data collection instrument and

19   supporting materials.

20            Has that been done here for the 2020

21   census?

22       A    Within the time constraints of the

1    Secretary's decision, the different components of

2    the 2020 questionnaire have been pretested.  They

3    will get their first test in their presumed form

4    some time after those forms are ready.  It won't

5    be an extensive field test.  We have neither

6    budget or time for that.  The last chance for that

7    was probably before March of 2018.

8         Q    So for the full 2020 census

9    questionnaire, which would include the citizenship

10   question, has there been a waiver requested for

11   this requirement?

12        A    So -- we don't think we need a waiver.

13        Q    Okay.

14        A    And this is not a piece of legislation.

15   It's operating principles for the agency.  So an

16   example for a census that would request a waiver

17   is the economic census in 2012.  The economic

18   census is a survey-based instrument.  It's not an

19   enumeration.

20             So the standards say that when you

21   release the data from an economic census, since it

22   was a survey, all the data items have to be

1    accompanied by a margin of error.  They weren't.

2    So the 2012 economic census did request a waiver

3    for that because that's a clear indication from

4    the Census Bureau that a piece of quality

5    information that we expect to be produced couldn't

6    be produced.

7            In this operational context, our

8    standards allow us to ask the professionals at

9    Census Bureau in a consensus form, do you believe

10   this has been adequately tested, given the time

11   and operational and financial constraints?  Our

12   conclusion is that the citizenship question has

13   been sufficiently tested to not require a waiver.

14       Q    Okay.

15       A    The Office of Management and Budget can

16   disagree, and it can refuse the clearance package

17   without further testing of the specific form that

18   we intend to go to field with.  That is within

19   their authority.  And were they to do that, we

20   would, obviously, have to do something in order to

21   come into compliance.  But at the moment, we do

22   not feel that question needs a waiver for testing

Page 181

1  reasons.

2      Q   So let me ask you a separate question.

3  Secretary Ross, in his supplemental memorandum,

4  stated that he began considering the citizenship

5  question when he first started, and I'm

6  paraphrasing here.  If you had known that, then at

7  that time, could the citizenship question have          401;

8  been added to the end-to-end testing?                    403

9          MR. EHRLICH:  Objection.  Form.

10          THE WITNESS:  If the Secretary had asked

11  us to test the citizenship question in -- after

12  his arrival in the Department of Commerce, we

13  could have engineered one into the end-to-end

14  test, yes.

15  BY MS. SHAH:

16      Q   All right.  I think we're done with this

17  document for the moment.

18          We talked a little bit earlier

19  about -- or you had talked earlier a little bit

20  about the race and ethnicity question.  And is it

21  correct that the race and Hispanic origin or

22  ethnicity question for the 2000 census short form

1    before the last one ends, yes.

2        Q    And over the course of that time, the

3    Census Bureau administers a series of tests to

4    prepare for the decennial census, correct?

5        A    In modern history, that's correct.

6        Q    Let me clarify.  I'm speaking

7    specifically about the 2020 census as it

8    administers a series of tests in order to prepare

9    for the 2020 census.

10       A    All right.  I thought, initially, you

11   asked me about the 2010 census.  Was that question

12   also about the 2020?

13       Q    About 2020, correct.

14       A    The 2020 had an associate director about

15   the same time as the 2010 census was in the field

16   and the office was put in place in 2012.

17       Q    And now -- approximately how many tests

18   has the Census Bureau run in order to prepare for

19   the 2020 census?

20       A    '12, '13, '14, '15, '16 and '18, six.

21       Q    And some of those years, have there been

22   multiple tests?

401;
403

Page 190

1    A    We often lump them together, but yes.

2    Q    And did -- was 2017 a year where testing

3    was conducted?

4    A    Yes.

5    Q    So, basically, every year since 2012?    401;
                                                       403
6    A    Yes.   -- wrong -- not 2019.   There's no

7    operational plan test.   There will be testing.

8    There's -- testing is continuous.   We're talking,

9    really, about these formal designed tests that

10   usually have an RCT component to them, but not

11   always.

12   Q    And why does the Census Bureau run this

13   series of tests to prepare for 2020?

14   A    In a modern business, when you develop a

15   tool that you're going to use for your flagship

16   product, you're usually going to use it

17   continuously.   So in a modern business, there's a

18   continual improvement and implement phase.

19        For the census of population, that tool

20   is going to be used exactly once.   So you can't

21   guess how you're going to do it.   You have to take

22   the accumulated knowledge from the last times you

Page 192

1    decennial census environment might be like,

2    correct?

3        A    They help you predict the quality of the

4    instrument and the cost of the operations to

5    implement it and collect and process the data.

6        Q    And would you agree trying to count more

7    than 300 million people across the country is a

8    fairly complex undertaking?

9        A    Yes.

10       Q    So the Census goes through these multiple

11   years of tests in order to make sure it get things

12   right for the 2020 census, correct?

13       A    Actually, we hold ourselves to a higher

14   standard.  We like to do them better than we did

15   them last time.

16       Q    Because the decennial census is a

17   once-in-a-decade event?

18       A    It is authorized in the Constitution.

19       Q    And we discussed testing, at length,

20   earlier.   Is one of the purposes that testing is       401;
                                                             403
21   used for to develop predictions about field

22   operations?

Page 193

```
 1      A    Yes.
 2      Q    And particularly options for --                    401;
 3   operations for nonresponse follow-up?                       403
 4      A    Among other operations, yes.
 5      Q    And is it okay if I refer to nonresponse
 6   follow-up as NRFU going forward?
 7      A    I'll recognize it if you call it NRFU.
 8      Q    Okay.  Are the tests used to help
 9   project, for example, staffing levels for NRFU
10   operations?
11      A    They're used to help refine the
12   projections.  They're usually our early on
13   projections that are based on the most recent
14   census and then they're refined.
15      Q    How are they refined?
16      A    So the relevant history is the post-war
17   history of the census, and that is the era in
18   which we moved from the primary operational mode
19   is you send an enumerator into a space that is
20   defined by a physical area, and you ask that
21   enumerator to find every domicile or other place
22   where people can live, and then after finding
```

1  those domiciles, to count the number of people

2  that are there and to collect other information

3  about them.

4        We moved from that mode to asking the

5  residents of the United States to supply that

6  information for themselves in a manner that would

7  allow us to control whether we had received

8  information about a particular physical address.

9  So the field operators are different in those two.

10  There really -- it wasn't really NRFU before there

11  was NR to follow up.

12     Q   So just talking about the 2020 census,

13  have these tests been used to project the number

14  of NRFU enumerators that the Census Bureau may

15  need to hire?

16     A   Yes.  They have been used along with

17  other data to do that projection.

18     Q   What is the other data that's been used?

19     A   Historical practice, feedback from the

20  field office and tests for the various forms of

21  the operational control systems.

22     Q   And when were those tests for the

1  operations control systems performed?

2       A    So every time we do a test, there's an

3  operational control system.  So it's a component

4  of the data that we gather in order to revise our

5  estimates of how much effort is going to be needed

6  at each phase of the census.

7       Q    And have these tests over the last

8  several years also been used to project the number

9  of census offices that the Census Bureau will need

10  to open up for the 2020 census?

11       A    They have been used to revise the area

12  census office plan, yes.

13       Q    Have these tests been used to test the

14  adequacy or the amount of training that

15  enumerators will receive?

16       A    Yes.

17       Q    And have these tests been used to test

18  NRFU -- methods of NRFU contact with households?

19       A    If I rephrase your question, have they

20  been used to test a variety of NRFU protocols and

21  modes, yes.

22       Q    Have these tests been used to -- in

1    relation to the census questionnaire assistance

2    telephone service?

3        A    Yes.    Not all of them, but some of them.

4        Q    Which tests have been used for that

5    purpose?

6        A    So I will have to review which of the

7    tests included a CQA.  That's what we call it,

8    census questionnaire -- census questionnaire

9    assistance, which is the telephone component.  The

10   end-to-end test did.  The 2015 National Content

11   Test did.  I can't remember whether the 2017 test

12   did or not.

13           In the next break -- I have notes on

14   this.  I'll just -- fleshed short-term memory, so

15   I'm not sure.  Some of them did and some of them

16   didn't.

17       Q    And is it accurate that the census

18   questionnaire assistance service is there for

19   people to ask questions that they might have about

20   the 2020 census questionnaire?

21       A    So the goal of the CQA is to get to the

22   point where during what we call peak operations,

1    once we mail out the invitation to take the

2    census, that we would be able to take a call load

3    that would support a large proportion of the

4    population making inquiry, expect to actually

5    enumerate a nontrivial fraction of the household

6    directly on the CQA.

7        Q   By enumerate, you mean get people to

8    respond to the census over the phone?

9        A   The training for the CQA operators is to

10   ask early on in the contact, would you like us to

11   just do it right now, and then begin the

12   telephone-administered instrument.

13       Q   And has the testing program for the 2020

14   census been used to project the call load that

15   might be expected for that peak operations period?

16       A   It has.  And so has the question -- the

17   equivalent operation for the economic census,

18   which is a field mode.

19       Q   Has the testing program since -- the

20   testing program for the 2020 census been used to

21   test the role of administrative records in

22   reducing the NRFU workload?

1      A     Yes.

2      Q     Now, for -- have any of the tests to date

3   in the 2020 census testing program, have any of

4   them included a citizenship question?

5      A     No.

6      Q     And so none of these tests, to the extent

7   that they were used to project staffing levels or

8   to refine the projections, would have accounted

9   for the citizenship question?

10     A     Directly, no.

11     Q     Would they have done so indirectly?

12     A     Well, we used -- we didn't use evidence

13  from a test, but we used evidence similar to the

14  evidence generated in the test to make indirect

15  inferences.   But directly, no.

16     Q     What was -- what were the sources you

17  used for the indirect inferences?

18     A     These are the experiments that I

19  described -- the natural experiments that I

20  described in my fact witness testimony.

21          Do you want to go through them again?

22     Q     Are those the ones discussed in your

Page 199

1    January 19th memo?

2         A    The ones that existed at that point in

3    time are discussed in the memo, yes.

4         Q    And since then, are there any other ones

5    that have been done?

6         A    There are more extensive ones that have

7    been done in the full version of the technical

8    paper that was developed after the memo was

9    written.

10        Q    Is that the document that was just

11   produced to us yesterday?

12        A    Yes.

13        Q    And besides those two sources, are there

14   any other -- let me rephrase.

15             Besides the sources discussed in those

16   two documents, are there any other sources that

17   you used to develop indirect inferences?

18        A    They haven't been used yet, but we intend

19   to examine the field operation data from the

20   end-to-end test, because it occurred as the

21   information about the citizenship question was

22   becoming public.  It's not clear how useful it

1    would be, but that would be another form of

2    indirect inference.   There was no citizenship

3    question, but there were environmental factors

4    that intervene.

5         Q    Besides that, are there any other

6    sources?

7         A    None that I'm aware of.

8              Sorry.   From our test operations.

9         Q    And so to the extent that any tests

10   conducted to date have been used to project the

11   number of offices that the Census Bureau will open

12   in 2020, those projections would not have

13   accounted from the citizenship question, correct?

14        A    In general, that's correct, yes.

15        Q    And to the extent the tests were used to

16   test the adequacy or amount of enumerator

17   training, they would not have accounted for the

18   citizenship question, correct?

19        A    That's correct.

20        Q    And the same question with respect to the

21   testing of NRFU protocols.   To the extent that

22   testing has been used to test the adequacy of

1   those protocols, they would not have accounted for

2   the citizenship question, correct?

3       A    That's correct.

4       Q    And the same question with respect to the

5   census questionnaire assistance.  To the extent

6   the testing was used to develop a projection about

7   call loads for peak operations, those projections

8   would not account for the citizenship question,

9   correct?

10      A    That's correct.

11      Q    In light of the Secretary's decision to

12  add the citizenship question, will the

13  Census Bureau conduct any testing on the impact of

14  that question on staffing levels?

15          MR. EHRLICH:  Objection.  Form.

16          THE WITNESS:  It's hard to imagine what

17  kind of testing we might do, other than on a

18  relatively small scale.  However, we are working

19  closely with the integrated communication

20  campaign, which the Secretary has recommended

21  increasing the budget to 500 million.  They are

22  developing messaging and other tools that we fully

Page 206

1   randomization something -- randomization is

2   surprisingly more expense than you realize,

3   including me when I first got into a position

4   where I could randomize.

5       Q   Besides CBAMS, is there a specific test

6   for which the form has been decided that the          401;

7   Census Bureau will undertake related to the           403

8   citizenship question?

9       A   Not that I'm aware of.

10      Q   And when does the Census Bureau intend to

11  make a decision about the form of these tests?

12      A   So what has happened is the different

13  components of the Census Bureau with expertise in

14  this, have been consulting with the operational

15  program attempting to provide them with feedback

16  on how this kind of -- this kind of testing can be

17  done without disrupting the timeline.  That's a

18  good question to pose at a quarterly program

19  management review.  Because when you do, then from

20  out of the woodwork come the different ways in

21  which that has happened.  I'm not aware of any

22  specific way in which that has happened

1   research, yes.

2       Q    And those would be resources you would

3   have to ask the Secretary for under the

4   contingency program you described?

5       A    Under the current management of the

6   contingency funds for the 2020 census, the

7   Secretary has the authority to release them.

8       Q    Does the Census Bureau have any plans to

9   increase the number of census offices it will open

10  in 2020 in light of the citizenship question?

11      A    The area census office plan has not been

12  revised.

13      Q    Are there plans to revise it?

14      A    Not that I'm aware of.  The agency's

15  answer to that question is no.

16      Q    Is there a final date by which the 2020

17  census questionnaire has to be finalized?

18      A    The agency's answer to that question is

19  we expect to finalize the questionnaire by June of

20  2019, the paper form.  That's the -- in current

21  operational plan, that is the due date -- the due

22  month for the final artwork.

Page 212

```
 1      Q    And is that the date on which printing of
 2   the questionnaire will begin?
 3      A    When you deliver the final artwork, then
 4   the printer starts to implement it.
 5      Q    And is that also the same month in which
 6   you would have to finalize the Internet
 7   self-response instrument?
 8      A    There is more flexibility for the
 9   Internet self-response instrument.  So we
10   don't -- sorry.  I'm blanking.  There's an
11   industry term for the software development system
12   that we're using for the software components of
13   the 2020 census, and it will come into short-term
14   memory, but it probably will by the time I finish
15   this answer.
16           In that timeline, what would happen if
17   we -- in that timeline, the instrument will be in
18   the form where we expect to be able to scale it
19   after the sprint that ends in the middle of
20   September.  So that means that the software is in
21   its -- in the form in which you then move into
22   test readiness and then production.  So -- but it
```

Page 214

1   system, in the middle of next month.

2        Q    Going back to the paper questionnaire,

3   under the current budget, if there are changes to

4   the paper questionnaire after June of 2019, would

5   that impair the Census Bureau's ability to timely

6   administer the 2020 census?

7        A    Without appropriate funding adjustments?

8        Q    Under the current cost estimates and

9   budget?

10       A    Under the cost estimates and budget, yes.

11       Q    Has the Bureau developed an estimate for

12  how much additional funding it would need to

13  timely administer the 2020 census if the

14  questionnaire is modified after June of 2019?

15       A    We do not have well-articulated lifecycle

16  cost estimates for such a contingency.

17       Q    And for the Internet self-response

18  instrument, is there a drop-dead date by which it

19  has to be finalized in order to timely administer

20  the 2020 census under current cost estimates and

21  budget?

22       A    Under current cost estimates, it should

1    citizenship question may make modifications.

2         Those modifications will have to be made

3    relatively soon.  The field operations actually

4    start with address canvass and address canvases

5    start next summer.  So we don't have a lot of

6    time.  But the final forms of the training

7    materials and the final onboarding of those

8    activities hasn't happened.  So we do have the

9    scope to make modifications, and we are intending

10   to analyze the data from the end-to-end test and

11   other data as they became available to us in order

12   to optimize that.

13       Q   And the end-to-end didn't test

14   citizenship, right?

15       A   There was no citizenship question on the

16   form.

17       Q   And these additional data you mentioned

18   with respect to citizenship, those are possible

19   small scale tests that the Census might do, right?

20       A   What I said was that the focus groups

21   from CBAMS were small scale tests and the in place

22   testing of instruments would necessarily be small

Page 231

```
 1   can be used to enumerate a household after just
 2   one household visit?
 3       A   Yes.  There are multiple cutoff criteria
 4   that have been honed over the course of the decade
 5   and will probably be honed again from the
 6   end-to-end test.
 7       Q   And none of those tests have been used to
 8   hone these quality requirements, including the
 9   citizenship question, correct?
10       A   That's correct.
11       Q   What proportion of the NRFU population do
12   you expect can be enumerated through
13   administrative records?
14           MR. EHRLICH:  Objection.  Form.
15           THE WITNESS:  In the current lifecycle
16   cost estimate -- I'm going to check this on the
17   break, because I actually know this is true for
18   Version 2 but I'm not sure it's true for Version 3
19   -- that was 6 million households we expected to be
20   able to enumerate with ad recs.
21   BY MR. TILAK:
22       Q   Has any research been done on the
```

1    differential availability or quality of these

2    records for households with noncitizens compared

3    to the U.S. population generally?

4         A    The research that has been done is

5    germane to that question, not necessarily because

6    it's specifically looking at a citizenship

7    variable, but one of the things that matter is

8    quality of the personal identifying information in

9    the ad recs.   And people who file income tax

10   returns on time, in particular, are much more

11   likely to have useable PII.   And that PII is the

12   language we were talking about in the early part

13   of this deposition verified -- it's audited by the

14   Internal Revenue Service.   So we know the

15   characteristics of that subpopulation are much

16   more likely to be citizens, but that's not

17   specifically using the citizenship variable.   It's

18   just announcing that a characteristic of the way

19   we created the administrative record eligible

20   enumerations is going to favor citizens.

21        Q    So these indicative --

22        A    I didn't mean favor.   I'm very

1   sensitive -- is going to more likely select

2   citizens.

3       Q    So is that indicative that administrative

4   records meeting the Census Bureau's quality

5   requirements are more likely to exist for citizens

6   than for noncitizen households?

7       A    They are more likely to exist for persons

8   who file -- persons and households that file an

9   income tax return, and that is more likely to be

10  the case for higher income people who are more

11  likely to be citizens.

12      Q    How about for racial and ethnic

13  minorities, for example, Hispanics?

14      A    So this is the reason why we use Medicare

15  records, because that -- that is nearly exhaustive

16  for the population over age 65.  But, again, it's

17  only if you have a Social Security number that

18  you're going to be eligible.  So you have to be

19  eligible for social benefits in the United States,

20  and some noncitizens are and they're going to be

21  in those records.  They're also often eligible for

22  State programs.  And we did a plan to assemble

1   State records, but that's what's been evaluated

2   before we finalize which kinds of records we're

3   going to use.

4          We're making a push to require SNAP

5   records, Supplemental Nutrition Assistance Program

6   records, and we don't have them for every state,

7   and we need to make a decision about whether --

8   sufficiently complete that we will go forward.

9   That decision hasn't been made.

10      Q   Returning, briefly, to proxy enumeration.

11  Will the default of three visits before proxy

12  eligibility apply across the country?

13      A   It -- well, the answer is in the current

14  design, yes.  But then I will say, again, that

15  field staff have the authority from the very first

16  visit to pile on, so they -- they can redeploy

17  enumerators if they -- for example, if they

18  deployed one early on in the process and our

19  quality evaluation of that enumerator's work is

20  going to cause that enumerator not to get any more

21  work, the field staff can redo some of that.

22          And we do continuous quality control on a

1    sample, so that's going to involve additional

2    visits, as well.

3         The six visits is the operational

4    guideline and the training and the expectation,

5    but the discretion of the field staff and the

6    discretion of the operational staff back at the

7    census headquarters can modify that, even if the

8    protocol was not officially modified.

9         Q    And to date, are there any guidelines for

10   varying the number of visits before proxy

11   eligibility?

12        A    I believe that there are not, but I

13   believe that will be part of the end-to-end test

14   evaluation, whether we should modify that.

15        Q    And, again, end-to-end did not include

16   the citizenship question, correct?

17        A    That's correct.

18        Q    Dr. Abowd, in the memos that you wrote --

19   is that correct?

20        A    That I supervised the preparation of.

21        Q    That you supervised the preparation of,

22   is it accurate that you found evidence of a lower

1    alternative estimates of the total population.

2    One is developed by what's called demographic

3    analysis and we only do that at a national level,

4    although we do have some subnational controls in

5    the demographic analysis, and the other is done by

6    the dual-system estimation and we -- in the

7    1990s -- for the 1990 census and for the 2000

8    census, we did attempt to implement a dual-system

9    estimation that would be capable of doing accurate

10   dual-system estimation below the state level.  But

11   our current dual-system estimator is only accurate

12   at the national.  The state level estimates for

13   the dual-system estimator are what statisticians

14   call synthetic, what econometricians call

15   estimated.

16        Q    And earlier you had said that the ability

17   to abate the undercount depends on the energy and

18   efficacy of nonresponse follow-up; is that right?

19             Has the Census Bureau developed a budget

20   of how much it would need to increase its

21   nonresponse follow-up to address any decline in

22   self-response as associated with the citizenship

1    question?

2        A    So we have not yet formally modified any

3    budgets.  The $91.2 million estimate that I gave

4    you earlier is our current -- we should start

5    there, because that's a conservative estimate.  It

6    assumes that households that are all citizens are

7    going to respond the same way they would have

8    responded in earlier surveys, and they may not be

9    true either.

10       Q    Yeah.  What is the basis for that

11   assumption, that households will respond in the

12   same way as before?

13       A    In social science, that's called the

14   counterfactual.  There's no basis for it.  I state

15   it because that's a maintained hypothesis that the

16   other -- the hypothesis under test can be compared

17   to.  So if you don't make an assumption about the

18   component of the hypothesis that you can't test,

19   you can't interpret the component of the

20   hypothesis you can accept in a randomized

21   controlled trial.

22            So in a natural experiment, you have to

1    accept which things you can estimate and which

2    things you have to make a hypothesis on.  So

3    making the hypothesis that households that contain

4    all citizens won't change their response behavior,

5    it's not making the prediction that they won't

6    change their response behavior.  It's allowing you

7    to interpret the 5.1 percentage points or now it's

8    5.8 percentage points, and apply to a larger base

9    in a proper manner.  That's why I say it's

10   probably an underestimate, because it's probably

11   not a reasonable hypothesis that the households

12   that are all citizens won't change their behavior,

13   but we don't have any evidence.

14        Q    So it's your view that that's not a

15   reasonable hypothesis but it's the assumption?

16        A    It's not a reasonable projection, let me

17   say that.

18        Q    But it's the assumption that you had?

19        A    It's not a reasonable projection.  It is

20   the assumption in that analysis for the purposes

21   of generating that budget number.

22        Q    And if it's not a reasonable hypothesis,

1   is it a reasonable assumption?

2       A    Sorry.   You keep changing my words.   I

3   keep changing them back.   I said you have to make

4   a hypothesis, and it's the one we made.   It's not

5   a reasonable projection.   That is to say, if you

6   ask us collectively do we think that the

7   self-response of all citizen households is going

8   to stay changed in an environment where a

9   controversial citizen question is on the census,

10  we would say no, we expect that their cooperation

11  would be expected, too.   But we don't have any

12  scientific evidence to do the sign or the

13  magnitude of that, and we can't rule out the

14  hypothesis that they would be more cooperative.

15      Q   Is there any empirical evidence that they

16  would be more cooperative, that you're aware of?

17      A   I'm not aware of any empirical evidence

18  for either side of it.   I have consistently said

19  that it was maintained or a counterfactual

20  hypothesis for the purposes of interpreting the

21  coefficients that you can estimate, and I've now

22  said that it's not a reasonable projection, okay,

Page 249

1     Q    But no final decision has been made?

2     A    No.

3     Q    When does the Census Bureau expect to

4   make a final decision?

5     A    A necessary condition for a final

6   decision is to have the processing software that

7   the various files must move through in order to

8   produce final estimates in place, and it's not.

9   It will be in place -- it's not off schedule.  It

10  will be in place as the rest of the end-to-end

11  test is completed.  And then when you have that in

12  place, you can actually start testing these things

13  in the operational environment.  They're currently

14  being tested in a research environment, and that

15  research has been going on for more than a decade.

16    Q    Has any of that research looked at the

17  accuracy of whole person substitutes for

18  noncitizen households versus the rest of the U.S.

19  population?

20    A    No.

21    Q    Has any of that research looked at the

22  accuracy of whole person substitutes for other

Page 250

1    hard-to-count communities as compared to the U.S.

2    population?

3        A    The research that was done with the 2010

4    Census Coverage Measurement studies included

5    analyses of the components of the year-end census

6    by characteristics like the ones you just recited.

7        Q    And that's the G1 --

8        A    That's the G series.

9        Q    The G series may help us, okay.

10           Has the Census Bureau decided what

11   geographical unit will be used for whole person

12   substitutions?

13       A    I'm not sure I know what the question

14   means.

15       Q    In general, when imputation is done -- or

16   substitution is done, does that rely on records

17   from surrounding communities?

18       A    The hot-deck imputation algorithms that

19   were in place for the 2000 and 2010 census did use

20   nearby records.  Statistical imputation systems do

21   not have to.

22       Q    Is that still the plan for 2020?

1      A    There is no plan for 2020.  That is among

2    the candidate algorithms.

3      Q    So no final decision has been made?

4      A    That's right.

5           MR. TALIK:  If we could go off the record

6    and take a short break.

7           VIDEOGRAPHER:  This is the end of

8    Media Unit Number 4.  The time on 3:40 p.m. and we

9    are off the record.

10          (Off the record.)

11          VIDEOGRAPHER:  This begins Media Unit

12   Number 5.  The time on the video is 4:04 p.m.  We

13   are on the record.

14   BY MR. TILAK:

15      Q    Dr. Abowd, is there any empirical

16   evidence that someone who chooses not to respond

17   to this 2020 census because of the citizenship

18   question would respond in a face-to-face

19   interaction with a census enumerator?

20          MR. EHRLICH:  Objection.  Form.

21          THE WITNESS:  Not that I'm aware of.

22   BY MR. TILAK:

1      Q    And if that household doesn't respond,

2    census enumerator would then try to find a proxy,

3    correct?

4      A    That's correct.

5      Q    And is there any empirical evidence on

6    the accuracy of proxy enumerations for areas with

7    large noncitizen populations compared to the rest

8    of the United States?

9      A    Only indirect.

10      Q    And what is that indirect evidence?

11      A    That evidence that's in the technical

12    reports that you've seen.

13          THE WITNESS:  The evidence that's in the

14    technical reports that you have seen.

15    BY MR. TILAK:

16      Q    And if a proxy is not found, the census

17    could then also use administrative records to

18    enumerate the household, correct?

19      A    The census may use administrative records

20    whether or not a proxy respondent is found.

21      Q    But based on your earlier testimony, the

22    characteristics of the administrative records are

Page 253

1   such that there are more likely to be

2   administrative records for citizens compared to

3   noncitizens?

4       A    I think that's a reasonable hypothesis.

5   I don't actually have any empirical data to

6   support it.

7       Q    And this, finally, this whole person

8   imputation, is there any empirical evidence on the

9   accuracy of a whole person imputation for

10  noncitizen households versus the U.S. population?

11      A    So whole person substitutions and whole

12  person imputations are not very accurate.  We've

13  documented that for multiple censuses, but we

14  documented it most carefully for the 2010 census

15  where we explicitly looked at it.  We know that.

16      Q    And so you would agree that --

17      A    We don't count them as correct

18  enumerations, because we require that the

19  characteristics be correct, not just the count.

20      Q    So you wound agree with all the censuses

21  procedures to try to enumerate a household, some

22  people are always missed in the decennial census?

Page 254

```
 1       A    If the question to me is do we
 2   acknowledge that some people are always missed in
 3   a census, the answer is yes.   Some people are also
 4   counted twice.
 5       Q    And those would be erroneous
 6   enumerations, correct?
 7       A    So one's omissions and the other is
 8   erroneous enumerations, yes.
 9       Q    I'd like to have this marked as
10   Exhibit 17.
11            (Plaintiffs' Exhibit 17, G series
12   documents, was marked.)
13   BY MR. TALIK:
14       Q    Dr. Abowd, do you recognize this
15   document?
16       A    Yes.  I was looking for the number, it's
17   G4.
18       Q    Is this one of the G series documents we
19   spoke about earlier?
20       A    Yes, it is.
21       Q    If I could just refer you to Page 1 of
22   the executive summary, and the last full paragraph
```

Page 258

1    don't know its order of magnitude.

2        Q    Would you agree that the undercount is

3    differential between different subpopulations in

4    the United States?

5        A    We have documented that the net

6    undercount is differential.

7        Q    And are hard-to-count populations

8    specifically likely to be undercounted

9    differentially compared to the rest of U.S.

10   population?

11       A    That's almost tautological.  When we

12   label a subpopulation hard-to-count, one of the

13   indicators we use is its net undercount.

14       Q    Let's next turn to Page 9, and the

15   last -- the paragraph, it says, "The black alone

16   or in combination and the Hispanic populations had

17   a larger percent omissions than the non-white

18   Hispanics" --

19       A    Sorry.  Sorry.  You got there too fast.

20   Point.

21       Q    It's the second paragraph.

22       A    Got it.  Okay.

1     Q    "The black alone or in combination and

2   Hispanic populations have larger percent

3   omissions, 9.3 percent and 7.7 percent,

4   respectively, than the nonwhite -- non-Hispanics

5   white-alone population."

6           Is it accurate that the census's

7   enumeration procedures are more likely to the

8   Hispanics -- members of the Hispanic population

9   compared to the non-Hispanic white population?

10    A    I think the answer to that question is

11  yes, but I would not use the information in this

12  table to answer that question.  I would use the

13  information in the net undercount table, which

14  is -- it might not be in this report, but there's

15  a summary in G01.

16    Q    Got it.

17          And then turning to Page 17, this refers

18  to -- refers to bilingual mailing areas.  Are

19  bilingual mailing areas where the population is

20  likely to have limited English proficiency?

21    A    So bilingual mailing areas for the 2010

22  census would have been predicted from the 2005 to

Page 260

1  2009 language questions in the American Community

2  Survey.  So they're indicators of households that

3  speak more than one language.

4      Q    And, again, the omission percentage for

5  bilingual mailing areas in Table 9 is 7.3 percent

6  compared to 5.3 percent for the U.S. total.  Is it

7  accurate that the census's enumeration procedures

8  are more likely to miss people living in bilingual

9  mailing areas compared to the U.S. population,

10  generally?

11      A    I'll correct your question.  If you mean

12  gross omissions, that's what the table describes.

13  If you meant net undercount, you can't get that

14  from this table.

15      Q    What table would you refer to for that?

16      A    If we have a net undercount estimate, it

17  would be in one that is labeled net undercount

18  as -- or percentage net undercount, one of those

19  two.  I don't know -- I don't know the contents of

20  all of those G series reports.  They're summarized

21  in G01.

22      Q    If I can refer you to the column just to

Page 261

1   the left of omissions percentage undercount, is

2   that the net undercount?

3        A    Thank you.  Thank you.

4        Q    And is the Number .80 for bilingual

5   mailing areas?

6        A    Yes.

7        Q    And the asterisk indicates that it's

8   statistically significant, correct?

9        A    At the 90 percent level, yes.  That's

10  correct.

11       Q    And so given that information, is it more

12  likely that the census's enumeration procedures

13  would miss people living in bilingual areas

14  compared to the U.S. population?

15       A    Yes.  That's what a positive differential

16  net undercount is.

17       Q    And then going back to Page 9 on Table 2,

18  which we were at earlier.

19       A    Was there one there, too, and I missed

20  it?  Yes, there was.  Okay.

21       Q    If we look at the bottom of Table 2, the

22  net -- the percent undercount is 1.54 percent?

Page 262

```
 1        A      Yes.
 2        Q      And that's statistically-significant --
 3        A      Yes.
 4        Q      -- compared to the U.S. population?
 5               So with that information, is it more
 6   likely that the census's enumeration procedures
 7   will miss members of the Hispanic population
 8   compared to population --
 9        A      There's a differential net undercount for
10   Hispanics, yes.
11        Q   Now, this is all for the 2020 census.
12   Does the Census Bureau expect not to have a
13   differential undercount of Hispanics for the 2020
14   census?
15               MR. EHRLICH:  Objection.  Form.
16               THE WITNESS:  The Census Bureau expects
17   to improve its net undercount performance every
18   census and targets the populations that had
19   previous net undercounts for special attention.
20   Sometimes with tests that have been demonstrated
21   to be more effective and sometimes with
22   advertising campaigns that have looser empirical
```

1  with the Voting Rights Act and to do the scrutiny

2  of that compliance.

3      Q   So it has been required since 1965 when

4  the Voting Rights Act was passed?

5      A   So this is why I say these are -- these

6  are fluid.  It -- tabulations from the long form

7  were used when they started to be -- they weren't

8  available in the 1960s, because we didn't ask the

9  question in 1960 on the long form.  So we did ask

10 it again on this long form in 1970s and

11 tabulations were produced of citizenship

12 population, I believe.  I don't have specific

13 knowledge of how they were used in the '70s but I

14 believe used like the Citizen Voting Age

15 Population tabulations that we now produce.

16     Q   And that the Census Bureau has been

17 producing for decades?

18     A   When we collect data on citizenship, we

19 produce statistical products based on those data.

20     Q   So you mentioned the advisory committees      401;

21 just a moment ago.  What is the role of the          403

22 advisory committees with respect to the decennial

Page 297

1  census?

2       A    So the Census Bureau is an agency that

3  benefits from three advisory committees, the CSAC,

4  the Census Scientific Advisory Committee, the

5  National Advisory Committee on Race, Ethnicity and

6  Other Populations, and the Federal Economic

7  Statistics Advisory Committee, so they're usually

8  called CSAC, NAC and FESAC.

9           I'm going to do FESAC really quickly.

10  It's chartered in the Department of Commerce but

11  it advises the Census Bureau, the BLS, the Bureau          401;

12  of Labor Statistic, and the Bureau of Economic            403

13  Analysis, BEA, primarily about economic products,

14  but the census of population would be a subject

15  that would be presented to them on which we might

16  ask their advice and they do get updates on it as

17  well as other products.

18           But they focus on economic products, and

19  although they're charted in Commerce, the BLS is a

20  full partner.

21           The other two, CSAC and NAC, are

22  chartered in the Department of Commerce for the

Page 298

1    benefit of the Census Bureau, and they are

2    advisory committees under the Federal Advisory

3    Administrative Committee, FACA.  So they operated

4    according to the FACA rules.  The nomination

5    procedure has to be public.  Because they're

6    charted in Commerce, Commerce determines the

7    membership.  The agenda has to be public.  The

8    meetings have to be public.  There has to be a                401;

9    public comment period.                                        403

10           But, generally, they are for our benefit

11   in the sense that we actively seek to put on those

12   advisory committees people and representatives or

13   organizations who can be helpful in the scientific

14   committee on many different technical issues in

15   the National Advisory Committee on the full gamut

16   of issues, in particularly, for the census --

17        Q    Sure.

18        A    -- not just the one in 2020, that has

19   been a source of advice and outreach to many of

20   the populations that we -- that it's important to

21   have partnerships with when you collect the data.

22        Q    So is it fair to say that the

Page 299

1    Census Bureau typically consults with CSAC and the

2    NAC about significant changes to the decennial

3    census?

4            MR. EHRLICH:  Objection.  Form.

5            THE WITNESS:  It is correct to say that

6    we regularly consult with CSAC and the NAC about

7    the ongoing operations of all our major

8    statistical programs and some of our not-so-major

9    statistical programs.

10   BY MS. GOLDSTEIN:

11       Q   And that includes the census?

12       A   That includes the census.

13       Q   Do you know the dates of the NAC

14   committee -- withdrawn.

15           Was the NAC consulted about the

16   citizenship question prior to the March 26th            401;

17   decision by Secretary Ross?                              403

18       A   With your permission -- are you going to

19   ask me the same question about CSAC?

20       Q   I will.

21       A   I'm sorry?

22       Q   I will.

Page 300

1      A    Can I do them at the same time?   It will

2   be easier.

3      Q    Please.

4      A    So both NAC and CSAC meet twice a year on

5   an approximately September/March schedule.   So

6   when they met for what they call the fall meeting

7   of 2017, there was nothing in the air.   And when

8   they met for the spring meeting, in the case of

9   CSAC, the Secretary had just announced his

10  decision.   And in the case of NAC, the Secretary's

11  decision had been out for, I believe, about a

12  month, but nothing in the administrative record

13  had been released yet.   So for both of those

14  spring meetings, we had what I think we would all

15  characterize in the Census Bureau a very awkward

16  meeting.

17          Had the question been before us long

18  enough, we would certainly have consulted with

19  them.   And because the entire decision-making

20  process was compressed into a few months, we did

21  not.   And we did not have working groups in place

22  that we thought we could effectively use in

401;
403

Page 301

1   preparing the materials that the Secretary relied

2   upon for his decision.

3       Q   So I just want to make sure I understand,

4   that if the Census Bureau had had adequate time,

5   you would have consulted the NAC regarding the

6   citizenship question proposal?

7       A   Yes.                                          401;
                                                          403
8       Q   And if the Census Bureau had had adequate

9   time, you would have consulted the --

10      A   CSAC.

11      Q   -- CSAC about the citizenship question?

12      A   Yes.

13      Q   And if the Census Bureau had had adequate

14  time, you would have convened working groups at

15  these advisory committees to study the citizenship

16  question?

17      A   We might have, yes.  It would have been

18  actively discussed.

19      Q   Now, recognizing that these committees

20  did not have an opportunity to weigh in prior to

21  the Secretary's decision, following that decision,

22  did these committees at your awkward meetings

Page 304

1    to be marked as Plaintiffs' Exhibit 21.

2           (Plaintiffs' Exhibit 21, 2020 census

3    integrated communication plan, was marked.)

4           MS. GOLDSTEIN:  And this is a 208-page

5    document, and so I only printed a couple copies.

6    My apologies to the world and counsel.

7    BY MS. GOLDSTEIN:

8       Q   This is document entitled 2020 census

9    integrated communication plan.  As I mentioned,

10   209-page [sic] version.  This is version 1.1 dated

11   6/2/2017.

12          Do you recognize this document?

13      A   Yes.

14      Q   What is this?

15      A   This is one of the many plans that the

16   2020 census releases periodically to supply

17   transparent detailed information about the

18   planning and operations of the 2020 census.

19      Q   And is another version of this document

20   planned?

21      A   So I've been asking about these

22   throughout the day but I didn't ask about this

Page 306

1    to revise the plan as a consequence of what we

2    learned there.

3        Q    Why did you not have a communications --

4        A    Component.

5        Q    -- component in the end-to-end test?

6        A    It was not sufficient --

7             (Thereupon, the court reporter

8    clarified.)

9             THE WITNESS:  There was not sufficient

10   budget.

11   BY MS. GOLDSTEIN:

12        Q    So if you can turn to Page 7 of this

13   plan, and if you go down to Bullet Point 1,

14   "Detail the research and database approach:  A

15   successful campaign must be based on a solid

16   foundation of research and have strong internal

17   systems for collecting and analyzing data to

18   optimize performance."

19             Do you agree with this statement?

20        A    Yes.

21        Q    And given the timing of when the

22   citizenship question was added, is there a solid

Page 307

1   foundation of research that informs the

2   communication plan -- the communication planning

3   process about the citizenship question and its

4   implications?

5        A    No.

6        Q    And are there stronger internal systems

7   for collecting and analyzing data to optimize

8   performance, given the recent addition of the

9   citizenship question?

10       A    So we have tried to optimize performance

11  by using the instruments that we have available to

12  us, and there are additional planned task orders

13  for this communication, the integrated

14  communication contract, that will involve

15  additional collection of data, realtime tracking

16  data, both survey-based and other ways.  So there

17  are definitely plans to collect data, and they

18  will be checked with -- with the census design as

19  it exists today in mind.  So they will be fully

20  cognizant of the citizenship question.

21       Q    Is it fair to say that the late addition

22  of the citizenship question will make it harder to

1    that process a little bit more difficult --

2        A   Yes.

3        Q   -- fair to say?

4        A   Yes.

5        Q   Okay.  So let's go to Page 37, and if you

6    go one, two, three, four, bullet points down,

7    "With young children having a highest net census

8    undercount rate than any other age group, Hispanic

9    children account for more than 36 percent of the

10   total net undercount for all children younger than

11   five."

12           Did I read that correctly?

13       A   Yes.

14       Q   So there is a -- prior to any addition of

15   the citizenship question, the Census Bureau has

16   recognized that there is a net undercount for

17   Hispanic children, correct?

18       A   Yes.

19       Q   Is it fair to say that the NRFU -- NRFU

20   efforts that the Census Bureau puts in place are

21   less effective with respect to this population?

22           MR. EHRLICH:  Objection.  Form.

1        THE WITNESS:  So these are estimates

2    based on the 2010 census coverage measurement

3    program.

4    BY MS. GOLDSTEIN:

5        Q   Sure.

6        A   So they were in an environment -- a

7    different political environment and a

8    questionnaire without a citizenship question on

9    it.  And this identification of children, age zero

10   to four, this is the first time that that had

11   popped out as such a large net undercount.

12            There's a couple of possible reasons for

13   that.  Our demographic data -- so one of the

14   things we would measure against better now are for

15   that age group because of accuracy of birth

16   records.  So we have, consistently, throughout

17   this decade, focused on ways in which we can

18   improve our undercount.  The -- the end-to-end

19   test does have a coverage evaluation component,

20   but it wasn't structured to provide statistical

21   information.  So we have only the direct analysis

22   of the test to see if we have improved it.

Page 312

1        I don't want to say it's a crap shoot.  I

2   think that there is solid evidence that design

3   changes that have been made, particularly queues

4   and reminders, and these are actually easier to do

5   on the Internet self-response instrument than on a

6   paper instrument, because you can blow by the

7   reminders and the queues on the paper one, but

8   it's harder to blow by the ones on the Internet

9   instrument, too, but it's harder to because of the

10  way it's structured.  So we put some considerable

11  effort --

12  BY MS. GOLDSTEIN:

13      Q    Sure.

14      A    -- into trying to alert people who have

15  answered someplace else on the form, correlates to

16  there might be a young -- an uncounted person here

17  on this, but we don't have the statistical

18  evidence to back up a claim that that will reduce

19  the net undercount.  We have the statistical

20  correlates to suggest it might.

21      Q    Is it possible that the presence of the

22  citizenship question on the decennial census will

1   exacerbate this kind of net undercount of Hispanic

2   children?

3       A    Yes.   That is what we mean when we say

4   the quality of the census count will be harmed.

5       Q    Let's go to Page 53.  And I just want

6   to -- you got -- direct you to the very last

7   paragraph in bold.  Leading up to the 2020 count,

8   all communication elements, including advertising,

9   earned media, collateral and other items designed

10  for public dissemination will be pretested and

11  refined.

12          Has that process happened yet?

13      A    I'm sure that some parts of that process

14  have happened already.  But a systemic part of it

15  would have been part of the 2018 end-to-end test

16  and so -- yeah, at the point at which this plan

17  was written, I believe -- I get my budget years

18  and my calendar years -- I believe -- we were

19  still in fiscal 2017.  The full design for the

20  end-to-end test was still on the table.  That was

21  the three site and it included a media campaign.

22  So those comment components were not done.

Page 314

1          The other components that are part of the

2     integrated communication contract and the ongoing

3     activities of the decennial census were done.

4          Q    Earlier you testified that the political

5     environment can affect response rates, correct?

6          A    I know I just said political.  I've been

7     trying very hard to say macroenvironment.  If

8     you'll give me leave to say macroenvironment,

9     that's what I meant.

10         Q    And one of the things that goes into

11    macroenvironment is the political context, fair to

12    say?

13         A    That's fair to say.  But another thing

14    that goes into it is the state of the economy.

15         Q    Absolutely.

16              So let's say -- so would you -- you've

17    also testified that the macroenvironment can

18    affect the efficacy of NRFU, correct?

19         A    Correct.

20         Q    Is there -- is it possible that the

21    presence of a citizenship question will exacerbate

22    those effects?

Page 315

1       A      It's certainly possible, yes.

2       Q      Does the Census Bureau believe that that

3   is likely?

4       A      So what we believe is likely is that

5   we're going to need more intensive nonresponse

6   follow-up than the baseline lifecycle cost

7   estimate.   One of our big concerns -- macro

8   concerns is when you ramp up the NRFU, you have to

9   hire the planned number of enumerators so that

10  they're available to deploy.   If you discover one

11  week into NRFU that you're short of enumerators,

12  the six- to seven-week onboarding process defeats

13  you.

14          So let me just say there are many

15  professionals at the Census Bureau painfully aware

16  of the consequences of not being able to onboard

17  enough enumerators.   As I understand it, we had to

18  ask for a budget supplement in 1990 because of

19  difficulties onboarding.

20          We had the best possible macroenvironment

21  for conducting a census in this regard in 2010,

22  for all the wrong reasons, but, nevertheless, it

1   was extraordinarily easy to onboard very good,

2   quality enumerators.

3           So in terms of macroenvironment,

4   we're -- the red lights are flashing around can

5   you hire enough enumerators?  And the cost

6   estimate is designed -- assuming that we can, if

7   we can, then where the extra cost from the

8   nonresponse follow-up might be caused by the

9   citizenship question will come from having to

10  deploy them more intensively than we had planned.

11      Q   And it's fair to say that there are

12  aspects of the macroenvironment currently that are

13  making it difficult to hire as many enumerators as

14  the Census Bureau needs?

15      A   So I don't have to hypothesis, we had

16  difficulty hiring enumerators in Rhode Island for

17  the test.

18      Q   And you expect that problem to be the

19  case for the -- as you attempt to onboard more

20  enumerators, correct?

21      A   I would say we used that experience

22  to -- as an opportunity to revisit some components

1    of that recruitment plan.

2          Q    But it's fair to say that the low levels

3    of unemployment right now will make it more

4    difficult to hire enumerators?

5              MR. EHRLICH:   Objection.   Form.

6              THE WITNESS:   It's fair to say it will

7    make it more expensive to hire enumerators.   And

8    if that's not acknowledged, then it will make it

9    more difficult to hire enumerators.

10   BY MS. GOLDSTEIN:

11        Q    So, previously, you testified about the

12   work that Young & Rubicon was retained to do,

13   correct?

14        A    So I testified about the work of the

15   integrated communication contract for which Y&R is

16   the lead contractor.

17        Q    Have they done attitudinal studies on the

18   citizenship question as part of that contract?

19        A    I do not know whether they have done

20   them.   I do know that they are being actively

21   discussed.

22        Q    And has Reingold performed attitudinal

Page 320

1   from those studies.

2          MS. GOLDSTEIN:  Can I have this marked,

3   please?

4          (Plaintiffs' Exhibit 22, OMB standards

5   and guidelines for statistical surveys, was

6   marked.)

7   BY MS. GOLDSTEIN:

8      Q    Actually, before I get to this, you had

9   testified at your previous deposition regarding

10  Census's statutory charge to seek alternative

11  sources for information before asking a question

12  of the population.

13         Where does that statutory charge come

14  from?                                              401;
                                                       403
15     A    Yeah.  In Title 13 -- I'm sorry, I can't

16  identify the clause -- we are instructed to use

17  administrative records and other sources of data

18  before attempting to gather the data by direct

19  instrument.  That's a paraphrase, but that is

20  certainly the way we interpret that clause in the

21  Title 13.

22     Q    And that is a well-established

Page 321

1  Census Bureau practice, correct?

2       A    Correct.

3       Q    I'm handing you what has been marked as

4  Plaintiffs' Exhibit 22.   It is a copy of the

5  standards and guidelines for statistical surveys,

6  September 2006, from the Office of Management and

7  Budget.

8            Do you recognize this document?

9       A    I think your handed me SPD2.

10      Q    I think that's the shorter way to say it,

11  yes.

12      A    Okay.

13           Yes.  I do.

14      Q    The Census Bureau is obligated to comply

15  with the standards set forth in this document,

16  correct?

17      A    Yes.  That's right.

18      Q    I'm going to ask you to turn to Page 11           401;
                                                               403
19  of this document, Standard 2.3.  "Agencies must

20  design and administer their data collection

21  instruments and methods in a manner that achieves

22  the best balance benefit maximizing data quality

1    and controlling measurement error" --

2         A    I'm sorry.   I started reading -- 2.3.

3         Q    I'm sorry?

4         A    I was down in the guidelines.   Go ahead.

5    Yes, I've got it.   Go ahead.

6         Q    -- "controlling measurement error while

7    minimizing respondent burden and cost."

8              Now, at prior depositions, we have looked

9    at the many Census Bureau memoranda that your team

10   of experts put forth, and the Census Bureau has

11   concluded that Alternative D resulted in lower

12   quality data than Alternative C, correct?

13        A    Yes.

14        Q    And Alternative D has a higher respondent

15   burden than Alternative C, correct?

16        A    Yes.

17        Q    And Alternative D has a higher cost than

18   Alternative C, correct?

19        A    Yes.

20        Q    And I believe you've testified previously

21   that no decision has yet been made on whether or

22   not the Census Bureau will use the self-response

401;
403

Page 323

1    data gathered pursuant to a citizenship question;

2    is that correct?

3         A    I believe I said that no decision has

4    been made on how the Census Bureau will process

5    the respondent data into the final record of the

6    2020 census and use the respondent data and the

7    administrative data in producing a CVAP table.

401;
403

8         Q    And one possibility that you raised at

9    your deposition was to implement

10   Alternative D -- "One way to" -- I'm reading from

11   your deposition, "One way to implement

12   Alternative D is to conduct Alternative B, ignore

13   it and do Alternative C."

14              Correct?

15        A    That is one way to implement

16   Alternative D, yes.

17        Q    So one possibility that the team of

18   experts is considering is to conduct

19   Alternative B, ignore it and do Alternative C; is

20   that correct?

21        A    It's more nuance than that.  One

22   possibility they're considering is how to do a

Page 325

1      Q    Lawyers have the same problem.

2           But it is still the case that today, no

3   conclusion has been reached, correct?

4      A    That's correct.  Yes.

5      Q    If the Census Bureau does not make

6   use -- if the Census Bureau concludes that the

7   self-response data from the citizenship question

8   should be disregarded with respect to the ultimate

9   processing of the response data, would that use

10  minimize response -- respondent burden --

11     A    No.

12          MR. EHRLICH:  Objection.  Form.

13          THE WITNESS:  No.

14  BY MS. GOLDSTEIN:

15     Q    Alternative D has a higher respondent

16  burden than Alternative C, correct?

17     A    Yes.

18          MS. GOLDSTEIN:  May I have one more

19  exhibit, please?

20          (Plaintiffs' Exhibit 23, Secretary Ross

21  decision memo, was marked.)

22  BY MR. HO:

Page 326

1     Q    I'm going to show you what has been

2   marked as Plaintiffs' Exhibit 23.   This is the

3   decision memo from Secretary Ross dated

4   March 26, 2018 that begins at Bates stamp 1313,

5   and I'd like you to just turn to Page 1317.

6          So I'd like to direct you to the last

7   half of the top paragraph on this page.   The

8   sentence that begins "Finally."

9     A    Yes.

10     Q    "Finally placing the question on the

11   decennial census and directing the Census Bureau

12   to determine the best means to compare the

13   decennial census responses with administrative

14   records will permit the Census Bureau to determine

15   the inaccurate response rate for citizens and

16   noncitizens alike using the entire population."

17          Has that statement been evaluated by the

18   Census Bureau?

19     A    As a statement of fact, that statement is

20   correct.

21     Q    Okay.   "This will enable the

22   Census Bureau to establish, to the best of its

401;
403

Page 327

1   ability, the accurate ratio of

2   citizen-to-noncitizen responses to impute for that

3   small percentage of cases where it is necessary to

4   do so."

5          How does adding a question -- a

6   citizenship question to the census and determining

7   the incorrect response rate for citizens and

8   noncitizens who respond help the Census Bureau

9   impute with respect to folks who do not respond at

10  all and who do not have administrative records?

                                                    401;
                                                    403

11       A   The Census Bureau did not write that

12  sentence, so I suggest you ask the Secretary what

13  he meant by it.

14       Q   Well, let me back -- let me ask the

15  question a slightly different way.

16          Do you agree that this will enable the

17  Census Bureau to establish, to the best of its

18  ability, the accurate ratio of citizen to

19  noncitizen responses to impute for that small

20  percentage of cases where it is necessary to do

21  so?

22       A   The Census Bureau does not yet have a

Page 329

1  responses to the Secretary, that indicated that

2  that is the methodology that we would use to

3  produce the CVAP table.  We were, in fact, very

4  careful to say that we hadn't yet finalized a

5  methodology to do that, especially in the presence

6  of multiple responses for the same -- what we'd

7  call indicator.

8       Q    So is it fair to say that at the very

9  least, it is premature to say that this ratio will

10 help the Census Bureau establish, to the best of

11 its ability, an accurate ratio that will help you

12 to impute for that small percentage -- for that

13 whatever it is percentage of cases where it is

14 necessary to do?

15      A    Speaking on a purely statistical basis,

16 having population data of self-responses and

17 population data of administrative responses does

18 contribute to more accurate statistical analysis.

19           As to how they would be used to impute

20 the problematic cases in either direction, that is

21 not yet determined.

22      Q    And this is complicated by the

Page 330

1    significant inaccuracy issues that were

2    noticed -- that were noted in your technical

3    memos, correct?

4              MR. EHRLICH:  Objection.  Form.

5              THE WITNESS:  This is complicated by the

6    need to resolve, with defensible evidence,

7    conclusions that you draw from those

8    inconsistencies, especially for the administrative

9    record noncitizens.

10   BY MS. GOLDSTEIN:

11        Q    So the Census Bureau has not yet

12   completed its analysis that would support or not

13   support Secretary Ross's conclusion in that

14   sentence; is that fair to say?

15        A    Yes.

16             MS. GOLDSTEIN:  Let's take a short break

17   and see where we're at.  Off the record.

18             VIDEOGRAPHER:  Going off the record.  The

19   time on the video is 5:59 p.m.

20             (Off the record.)

21             VIDEOGRAPHER:  This begins Media Unit

22   Number 7.  The time on the video is 6:09 p.m.  We

Page 331

1   are on the record.

2   BY MS. GOLDSTEIN:

3        Q    Dr. Abowd, I think I have just one more

4   question.

5             If you will turn to the last page of the

6   exhibit in front of you Bates marked 1320.

7        A    Okay.

8        Q    In light of the Census Bureau's analysis          401;
                                                                 403
9   of Alternative C versus Alternative D, do you

10  agree that reinstatement of a citizenship

11  question on the 2020 decennial census is necessary

12  to provide complete and accurate data in response

13  to the DOJ request?

14       A    No.

15       Q    And that is the position of the

16  Census Bureau, correct?

17       A    Yes.

18            MS. GOLDSTEIN:

19       Q    Thank you, Dr. Abowd.

20            I just want the record to reflect and

21  that plaintiffs -- and I speak to all plaintiffs

22  with respect to this -- are leaving the record

Page 337

1          ACKNOWLEDGEMENT OF DEPONENT

2          I, DR. JOHN ABOWD, do hereby acknowledge I

3    have read and examined the foregoing pages of

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any changes or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10

11

12

13    _____      _____

14    Date                  DR. JOHN ABOWD

15

      Stephen Ehrlich, Esquire

16    U.S. DEPARTMENT OF JUSTICE

      20 Massachusetts Avenue

17    Washington, D.C. 20530

18    IN RE:  New York Immigration Coalition, et al., v.

      United States Department of Commerce, et al.

19

20

21

22

Page 339

1              E R R A T A   S H E E T

2    Case Name:  New York Immigration Coalition, et

3    al., v. United States Department of Commerce, et

4    al.,

5    Witness Name:  DR. JOHN ABOWD

6    Deposition Date:  Wednesday, August 29, 2018

7    Page No.   Line No.       Change/Reason for Change

8

9

10

11

12

13

14

15

16

17

18    _____          _____

19    Signature                          Date

20

21

22

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - - x

4     STATE OF NEW YORK, et al.,        :

5                      Plaintiffs,      :

6         vs.                           : Civil Action No.

7     UNITED STATES DEPARTMENT OF       : 1:18-cv-2921-JMF

8     COMMERCE, et al.,                 :

9                      Defendants.      : Volume II

10    - - - - - - - - - - - - - - - x

11        CONTINUED VIDEOTAPED 30(b)(6)DEPOSITION OF:

12     UNITED STATES CENSUS BUREAU GIVEN BY JOHN M. ABOWD

13    DATE:        Friday, October 5, 2018

14    TIME:        9:05 a.m.

15    LOCATION:    Arnold & Porter Kaye Scholer

16                 601 Massachusetts Avenue, N.W.

17                 Washington, D.C.

18    REPORTED BY: Denise M. Brunet, RPR

19                 Reporter/Notary

20                 Veritext Legal Solutions

21        1250 Eye Street, N.W., Suite 350

22                 Washington, D.C.  20005

Page 341

```
 1              A P P E A R A N C E S

 2

 3   On behalf of the New York Immigration Coalition:

 4              DALE HO, ESQUIRE

 5              American Civil Liberties Union

 6                Foundation

 7              ███  ████  █████

 8              ████  █████

 9              ████  ████  ████  █████  █████

10              █████  █████

11              ███████████

12

13              SARAH BRANNON, ESQUIRE

14              American Civil Liberties Union

15                Foundation

16              ████  ████  █████  ███████

17              ████████  █████  █████

18              █████  █████

19              ████████████

20

21

22   (Appearances continued on the next page.)
```

Page 342

1    APPEARANCES (continued):

2

3    On behalf of the New York Immigration Coalition

4    (continued):

5                    JOHN A. FREEDMAN, ESQUIRE

6                    DAVID GERSCH, ESQUIRE

7                    Arnold & Porter Kaye Scholer, LLP

8          ███  ████████  ████████  ████

9          ████████  ████  █████

10         █████  ██████

11         ████████████████████████

12

13   On behalf of the State of New York:

14                   DANIELLE FIDLER, ESQUIRE

15                   Assistant Attorney General

16                   Environmental Protection Bureau

17         ███  █████  █████

18         ████  █████  ███  ████  █████

19         █████  ██████

20         ██████████████████████

21

22   (Appearances continued on the next page.)

1    APPEARANCES (continued):

2

3    On behalf of the Kravitz Plaintiffs:

4            KARUN TILAK, ESQUIRE

5            Covington & Burling

6            ███ ███ ██████ ██████

7            █████████ █████ █████

8            ██████ ██████

9            ███████████

10

11   On behalf of the Lupe Plaintiffs:

12           NIYATI SHAH, ESQUIRE

13           ERI ANDRIOLA, ESQUIRE

14           Asian Americans Advancing Justice

15           █████ █ █████ ████████

16           █████ ████

17           █████████ █████ █████

18           █████ ██████

19           ███████████████████████████

20

21

22   (Appearances continued on the next page.)

```
                                              Page 344
1    APPEARANCES (continued):

2

3    On behalf of the City of San Jose & Black Alliance

4    for Just Immigration:

5                 DORIAN L. SPENCE, ESQUIRE

6                 Lawyers Committee for Civil Rights

7                   Under Law

8    ████████████████████████████

9    ██████████

10   ████████████████   █████████

11   ██████████████████

12   █████████████████████████████

13

14   On behalf of the State of California:

15                 ANNA FERRARI, ESQUIRE

16                 Department of Justice

17                 Office of the Attorney General

18                 Government Law Section

19                 455 Golden Gate Avenue, Suite 11000

20                 San Francisco, California  94102

21                 (415) 510-3779

22   (Appearances continued on the next page.)
```

Page 345

```
 1    APPEARANCES (continued):

 2

 3    On behalf of the State of California (continued):

 4                 R. MATTHEW WISE, ESQUIRE

 5                   (via telephone)

 6                 Department of Justice

 7                 Office of the Attorney General

 8                 1300 I Street

 9                 P.O. Box 944255

10                 Sacramento, California  94244

11                 (916) 210-6053

12                 matthew.wise@doj.ca.gov

13

14    On behalf of Los Angeles Unified School District:

15                 KEITH YEOMANS, ESQUIRE

16                   (via telephone)

17                 Dannis Woliver Kelley

18                 115 Pine Avenue, Suite 500

19                 Long Beach, California  90802

20                 (562) 366-8500

21                 keyomans@dwk.com

22    (Appearances continued on the next page.)
```

Page 346

1    APPEARANCES (continued):

2

3    On behalf of the County of Los Angeles:

4                   DAVID I. HOLTZMAN, ESQUIRE

5                      (via telephone)

6                   Holland & Knight

7                   50 California Street

8                   Suite 2800

9                   San Francisco, California  94111

10                  (415) 743-6909

11                  david.holtzman@hklaw.com

12

13   On behalf of Defendants:

14                  STEPHEN EHRLICH, ESQUIRE

15                  U.S. Department Of Justice

16                  Civil Division

17                  20 Massachusetts Avenue, Northwest

18                  Washington, D.C.  20530

19                  (202) 305-9802

20                  stephen.ehrlich@usdoj.gov

21

22   (Appearances continued on the next page.)

Page 347

1    APPEARANCES (continued):

2

3    On behalf of Defendants (continued):

4                    MILES RYAN, ESQUIRE

5                    Office of the Chief Counsel for

6                      Economic Affairs

7                    Office of the General Counsel

8                    U.S. Department of Commerce

9                    U.S. Census Bureau

10                    4600 Silver Hill Road

11                    Suitland, Maryland  20746

12                    (301) 763-9844

13                    miles.f.ryan.iii@census.gov

14

15    ALSO PRESENT:  Nhat Pham, Videographer

16

17

18

19

20

21

22

Page 348

1                C O N T E N T S

2    EXAMINATION BY:                        PAGE:

3    Mr. Ho                                 349

4    Ms. Fidler                             436

5

6    ABOWD DEPOSITION EXHIBITS:             PAGE:

7    24 - Bates COM_DIS00009833 - 9909      349

8    25 - Bates COM_DIS0012757 - 762        349

9    26 - DSSD 2010 Census Coverage Measurement

10        Memorandum Series #2010-G-01      399

11   27 - Proposed Content Test on Citizenship

12        Question                          425

13   28 - Bates COM_DIS00010669 - 684       436

14   29 - Bates COM_DIS0013025 - 55         436

15

16        (*Exhibits attached to the transcript.)

17

18

19

20

21

22

Page 349

```
 1              P R O C E E D I N G S
 2          (Abowd Deposition Exhibit Numbers 24 and
 3     25 were marked for identification.)
 4          THE VIDEOGRAPHER:  We're now on the
 5     record at 9:05 on October 5th, 2018.  This is the
 6     continuation of the 30(b)(6) deposition of the
 7     Census Bureau, given by John Abowd, taken in the
 8     matter of the New York Immigration Coalition, et
 9     al., v. United States Department of Commerce, et
10     al.
11          Our court reporter is Denise Brunet,
12     camera operator is Nhat Pham, both on behalf of
13     Veritext.
14          Attorneys present and attending remotely
15     will be noted on the stenographic record.  Will
16     the court reporter please swear in the witness.
17     WHEREUPON,
18                    JOHN M. ABOWD,
19     called as a witness, and having been sworn by the
20     notary public, was examined and testified as
21     follows:
22              EXAMINATION BY COUNSEL FOR
```

Page 351

```
 1    no unless I'm unclear or if I've misstated

 2    something or if my question necessarily calls for

 3    a longer answer.  Would that be okay?

 4         A    Yes, sir.

 5         Q    Okay.  Picking up from last time, I've

 6    given you an exhibit that's been marked as

 7    Exhibit 24.  Do you see that?

 8         A    Yes, sir.

 9         Q    Now, this is a white paper titled,

10    Understanding the quality of alternative

11    citizenship data sources for the 2020 census,

12    dated August 6th, 2018, the first page of which

13    has the Bates number COM_DIS09833.  Is that

14    correct?

15         A    Yes, sir.

16         Q    Now, this document was created by the

17    Census Bureau in the ordinary course of its

18    business and not for litigation purposes, correct?

19         A    That is correct.

20         Q    I'm going to refer to this as the white

21    paper.  Okay?

22         A    That's fine.
```

1      Q     Now, the analysis in this white paper was

2  begun in response to the Department of Justice's

3  request for citizen voting age population data at

4  the census block level, correct?

5      A     Yes.

6      Q     Now, the analysis in this paper attempts,

7  among other things, to assess the quality of

8  citizenship data available to the Census Bureau

9  from different sources, like surveys and

10  administrative records, correct?

11      A     Yes.

12      Q     The analysis in this paper also

13  represents, among other things, the Census

14  Bureau's efforts to assess the effect that the

15  inclusion of a citizenship question would have on

16  self-response rates the 2020 census; is that

17  correct?

18      A     May I make one clarification?

19      Q     Sure.

20      A     A white paper is produced as a research

21  product by the authors and does not necessarily

22  represent the views of the Census Bureau, but I do

1    today.

2        Q    And the paper includes an assessment of

3    the possible effect of the inclusion of the

4    citizenship question on self-response rates to the

5    2020 census, correct?

6        A    Yes.

7        Q    Now, the bureau is in the process of

8    getting this white paper peer reviewed; is that

9    right?

10        A    Externally peer reviewed.

11        Q    Why?

12        A    We consider it a valuable scientific

13    contribution made by the authors in the course of

14    their work.  The authors are in research positions

15    at the Census Bureau, and so part of their job

16    requirement is to have their technical work

17    externally peer reviewed and appear in the

18    scientific journals.

19        Q    Is this the most recent version of the

20    paper currently available?

21        A    Yes, sir.

22        Q    The authors of the white paper, they are

Page 354

1  the members of the SWOT team that you assembled at

2  the direction of Acting Census Bureau Director Ron

3  Jarmin to respond to the DOJ request, correct?

4      A    A subset, yes.

5      Q    Is there anyone better at the Census

6  Bureau for conducting the analysis that --

7  contained in the white paper other than the

8  authors of the white paper?

9      A    I honestly don't know.

10     Q    You wouldn't have chosen people who

11  weren't the best people for this job, would you,

12  Dr. Abowd?

13     A    I attempted to choose the best people

14  known to me for this job, yes.

15     Q    Do you think you succeeded in choosing

16  the best people known to you for conducting this

17  analysis?

18     A    Yes, sir.

19     Q    To your right, there's a document that

20  was marked as Exhibit 7 early -- during the first

21  part of your deposition.  This is a memo under

22  your name dated January 19th, 2018.  Do you see

Page 355

1    that?

2         A    Yes, sir.

3         Q    Now, this memo of yours, Exhibit 7,

4    relies on a preliminary version of the analysis

5    that's contained in the white paper; is that

6    right?

7         A    Yes.

8         Q    Is it fair to say that the white paper

9    that's Exhibit 24 represents an extended and more

10   up-to-date version of the analysis that you relied

11   on in preparing your memo, Exhibit 7?

12        A    Yes.

13        Q    Now, in the -- we don't have to talk

14   about your memo anymore.  Just back to the white

15   paper.  In the Census Bureau's view, the various

16   analyses contained in the white paper, Exhibit 24,

17   were methodologically appropriate for the

18   questions that the white paper attempted to

19   answer, correct?

20        A    Yes.

21        Q    Now, does this white paper represent the

22   Census Bureau's best possible analysis based on

1   existing data regarding the impact of the

2   citizenship question on self-response rates to the

3   2020 census?

4       A    I would say it represents the primary

5   research effort, but not all of the research

6   effort.

7       Q    And when you say it represents the

8   primary research effort, would you say that it

9   represents the best analysis that the Census

10  Bureau has of the possible effect of adding the

11  citizenship question on self-response rates for

12  the 2020 census?

13      A    I think it provides the inputs for doing

14  the best analysis that we can of the consequences

15  of the question on the 2020 census.

16      Q    Is there any better analysis that the

17  Census Bureau has of the effect of adding the

18  citizenship question on self-response rates to the

19  2020 census that's not contained in the white

20  paper?

21      A    There's one additional analysis in my

22  expert report that's already been disclosed that

1    is not in the white paper.

2        Q    Okay.   Which analysis is that

3    specifically?

4        A    The one of the short-form test that

5    followed the 1990 census.

6        Q    Does the white paper represent the Census

7    Bureau's best possible analysis of existing data

8    regarding the quality of citizenship data that's

9    available from different sources, such as surveys

10   and administrative records?

11       A    Yes.

12       Q    Does the Census Bureau agree with the

13   conclusions expressed in the white paper?

14       A    I'll deal with that on a specific

15   conclusion-by-conclusion basis.

16       Q    As a general matter, are there

17   conclusions in the white paper -- I'm sorry.

18           Are there conclusions in the white paper

19   that the Census Bureau disagrees with?

20       A    There are no conclusions in the white

21   paper that the Census Bureau disagrees with.

22   There are some of the author's interpretations

Page 358

1    that I might not agree with.

2         Q    Let's turn to page 2 of the white paper,

3    Bates COM_DIS09834.   The last sentence of the

4    abstract reads, "The evidence in this paper also

5    suggests that adding a citizenship question to the

6    2020 census would lead to lower self-response

7    rates in households potentially containing

8    non-citizens, resulting in higher field work costs

9    and a lower quality population count."

10             Did I read that accurately?

11        A    Yes, you did.

12        Q    Does the Census Bureau agree that the

13   balance of evidence available suggests that adding

14   a citizenship question to the 2020 census would

15   lead to lower self-response rates in households

16   potentially containing non-citizens?

17        A    Yes.

18        Q    Does the Census Bureau agree that the

19   balance of evidence available suggests that adding

20   a citizenship question to the 2020 census would

21   lead to a lower quality population count?

22        A    I have to define lower quality population

1    count to answer that question.   May I?

2        Q       Yes, please.

3        A       So the usual accuracy measures are two:

4    Net undercount and then its components, gross

5    omissions and erroneous enumerations and

6    whole-person census imputations.   We have no

7    evidence that it would affect the quality as

8    regards net undercount.   We have evidence that it

9    would affect the count -- the quality as regards

10   components of the errors in the enumeration.

11       Q     We'll get back to that.   Thank you for

12   that clarification.

13             Could you turn to page 8 in the white

14   paper, Bates number COM_DIS09840?   And I want to

15   look at figure 1, panel A.   This graph shows item

16   non-response, which is the failure to answer

17   certain questions, on the American Community

18   Survey, or ACS, in the year 2016, broken down by

19   various racial and ethnic subgroups; is that

20   correct?

21       A       Racial, ethnic and demographic subgroups,

22   yes.

Page 360

1       Q    And the data here does not distinguish
2   between citizens and non-citizens, correct?   I'm
3   referring to panel A only.
4       A    Oh.   That's correct.
5       Q    So in panel A, when we look at data for a
6   group like Hispanics on this chart, we're talking
7   about a group that includes both Hispanic citizens
8   and Hispanic non-citizens, correct?
9       A    Correct.
10      Q    Is it fair to say that on the ACS in 2016
11  the item non-response rate for Hispanics on the
12  citizenship question was more than twice as high
13  as it was for non-Hispanic whites?
14      A    Yes.
15      Q    And let's look at figure 1, panel B on
16  the same page.   Now, this graph shows item
17  non-response rates on the ACS in 2016 for
18  respondents who were identified in the NUMIDENT
19  data as non-citizens broken down by racial, ethnic
20  and demographic subgroups, correct?
21      A    Correct.
22      Q    And is it fair to say that on the 2016

1    ACS, the item non-response rate for Hispanic

2    non-citizens on the citizenship question was more

3    than twice as high as it was for non-Hispanic

4    white non-citizens?

5        A    Yes.

6        Q    Let's look at page 11, Bates number

7    COM_DIS9843, table 1.  This table lists the

8    breakoff rates for various questions on the ACS

9    broken down by race and ethnicity, correct?

10       A    Correct.

11       Q    And the breakoff rate is the rate at

12   which, when people are responding to the ACS

13   questionnaire online, that they stop answering the

14   survey upon encountering a screen with a

15   particular question, correct?

16       A    Correct.

17       Q    If we look at the breakoff rates to the

18   citizenship question and compare Hispanics to

19   non-Hispanic whites, the breakoff rate on the 2016

20   ACS for Hispanics on the citizenship question is

21   more than ten times what it is for non-Hispanic

22   whites, correct?

Page 362

1        A     Yes.

2        Q     Can we look back at page 10, Bates number

3   COM_DIS9842?   In the last paragraph, about a

4   little more than halfway down, the third to last

5   sentence starts with "Citizenship-related

6   questions."   It reads, "Citizenship-related

7   questions have the most heterogenous rates across

8   race/ethnicity groups; the ratio of breakoff rates

9   for Hispanics versus non-Hispanic whites is much

10  higher for year of entry and citizenship than any

11  of the other question screens in the ACS, except

12  for English proficiency, included in table 1 for

13  reference purposes."

14           Now, in the view of the Census Bureau,

15  what is the significance of the observation that

16  breakoff rates for Hispanics versus non-Hispanic

17  whites are much higher for year of entry and

18  citizenship than any other question screen on the

19  ACS, except for English proficiency?

20       A     That the question is sensitive to that

21  subpopulation.

22       Q     When you say the question is sensitive to

1    that subpopulation, you mean it is -- the

2    citizenship question is sensitive for Hispanics

3    relative to non-Hispanic whites?

4         A    Yes.

5         Q    I want to ask you about what's been

6    premarked as Exhibit 25, just to your right.  It's

7    a chart, the footer of which reads, 2017 breakoff

8    rates by race group augmented 20180915.pdf, and

9    the first page is Bates number 126757.  Do I have

10   that right?

11        A    Mine says 20180917.pdf.

12        Q    Sorry.

13        A    Okay.

14        Q    Other than that?

15        A    Yes.

16        Q    Okay.  Now, let's look at the citizenship

17   question breakoff rate on the 2017 ACS for

18   non-Hispanic whites.  That rate is .03489 percent,

19   correct?

20        A    Correct.

21        Q    And the citizenship question breakoff

22   rate on the 2017 ACS for Hispanics is

Page 364

1  .4343 percent, correct?

2       A    Yes.

3       Q    So on the 2017 ACS, is it correct to say

4  that the citizenship question breakoff rate for

5  Hispanics is more than 12 times what it is for

6  non-Hispanic whites?

7       A    I didn't calculate the ratio myself, but

8  that looks about right.

9       Q    Okay.  And if you look back to the 2016

10  ACS breakoff rates on page 11 of the white paper

11  and compare them to the 2017 breakoff rates, is it

12  correct that the citizenship question breakoff

13  rate for non-Hispanic whites stayed about the same

14  in 2016 and 2017?

15       A    Yes.

16       Q    And is it correct that the citizenship

17  question breakoff rate for Hispanics increased

18  between 2016 and 2017?

19       A    The point estimate increased.  I didn't

20  calculate a margin of error of the difference.

21       Q    Okay.  Now, is it correct to say, given

22  the analysis of item non-response rates and

1    breakoff rates that we've talked about, that the

2    Census Bureau believes that it is more likely than

3    not that Hispanics will respond to the citizenship

4    question on the 2020 census at a lower rate than

5    non-Hispanic whites?

6        A    Yes.

7        Q    Is it also correct to say that the Census

8    Bureau believes, based on the item non-response

9    and breakoff rate analyses that we've discussed,

10   that it is more likely than not that there will be

11   a greater decline in unit self-response rates to

12   the 2020 census due to the citizenship question

13   among Hispanics than there will be among

14   non-Hispanic whites?

15       A    I'm not prepared to draw that conclusion

16   from the analysis that you just showed me.  Do you

17   have other analyses you want me to look at?

18       Q    Well, let's stay here.  Is it fair to say

19   that none of the analyses of ACS data that the

20   Census Bureau has conducted suggests that

21   self-response rates to the 2020 census among

22   Hispanics and non-Hispanic whites will decline at

1   the same rate as a result of the citizenship

2   question?

3            THE WITNESS:   Could you read the question

4   back, please?

5            (The reporter read the record as

6   requested.)

7            THE WITNESS:   Yes.

8   BY MR. HO:

9      Q    Is it fair to say that the Census Bureau

10  believes that unit self-response rates to the 2020

11  census will decline more among Hispanics than

12  non-Hispanic whites as a result of the citizenship

13  question?

14     A    To the extent that Hispanic is correlated

15  with households containing non-citizens or persons

16  of unknown citizenship status, yes.

17     Q    Let's go back to the white paper and

18  let's look at page 9, Bates number COM_DIS09841.

19  And I'm looking at figure 2, panel A.   This graph

20  shows the difference in item non-response on

21  various questions comparing the 2013 and 2016 ACS

22  broken down by various racial, ethnic and

1    demographic subgroups, correct?

2         A     Yes.

3         Q     And according to the Census Bureau's

4    analysis, for non-Hispanic whites, non-response to

5    the citizenship on the ACS did not change between

6    2013 and 2006 [sic], correct?

7         A     Yes.

8         Q     And according to the Census Bureau's

9    analysis for Hispanics, non-response to the

10   citizenship question on the ACS increased between

11   2013 and 2016, correct?

12        A     Yes.

13        Q     And during this same period for

14   Hispanics, non-response to the sex question on the

15   ACS actually decreased between 2013 and '16,

16   correct?

17        A     Hispanics, right?

18        Q     Yes.

19        A     Yes.

20        Q     Let's go to the next page, page 10, and

21   I'm looking at figure 2, panel B.  This is the

22   same analysis comparing 2013 and 2016 item

1    non-response rates but among individuals

2    identified as non-citizens in the NUMIDENT data,

3    correct?

4         A    Yes.

5         Q    And according to the Census Bureau's

6    analysis, for non-Hispanic white non-citizens,

7    non-response to the citizenship question on the

8    ACS increased by less than 0.5 percentage points

9    between 2013 and '16, correct?

10        A    Yes.

11        Q    And during the same period, for Hispanic

12   non-citizens, non-response to the citizenship

13   question on the ACS increased by more than 1.5

14   percentage points, correct?

15        A    Yes.

16        Q    So is it fair to say that among

17   non-citizens, the non-response rate to the

18   citizenship question on the ACS between 2013 and

19   2016 increased for Hispanics at more than three

20   times the rate that it did for non-Hispanic

21   whites?

22        A    Yes.

1      Q     Is it fair to say that, based on the

2  Census Bureau's analysis of item non-response

3  rates and breakoff rates, that the Census Bureau

4  believes that Hispanics are more sensitive to

5  survey questions about citizenship than they were

6  a few years ago?

7      A     Yes.

8      Q     Is it fair to say that based on its

9  analysis of item non-response rates and breakoff

10  rates, the Census Bureau believes that whites are

11  not more sensitive to citizenship questions than

12  they were a few years ago?

13      A     Yes.

14      Q     Is it fair to say that the Census Bureau

15  believes that, among non-citizens in particular,

16  the sensitivity of Hispanics to survey questions

17  about citizenship has grown more than it has for

18  non-Hispanic whites?

19      A     Yes.

20      Q     Now, you testified during one of your

21  depositions that the Census Bureau's best estimate

22  as to the differential effect of the citizenship

1    question on self-response rates for non-citizens

2    is that the addition of the citizenship question

3    will cause non-citizen self-response rates to

4    decline by 5.8 percentage points relative to

5    citizens, correct?

6         A    Households containing a non-citizen or a

7    person of unknown citizenship status relative to

8    households containing all persons with known

9    citizenship status -- known citizens.  And then --

10   yes.

11        Q    Yes, that's correct?

12        A    With my correction of your definitions,

13   yes.

14        Q    Okay.  Now, given that opinion, if

15   someone said to you that the Census Bureau could

16   not articulate a rationale to support its belief

17   that there would be a decline in the response rate

18   as a result of adding the citizenship question to

19   the 2020 census and that the Census Bureau simply

20   made an assumption that the self-response rate

21   would decline, would you agree with that person?

22        A    No.

Page 371

1          MR. EHRLICH:  Objection.  Form.

2          THE WITNESS:  Sorry.

3  BY MR. HO:

4     Q    Did you ever tell --

5          THE WITNESS:  Did my answer of "no" get

6  recorded?

7          THE REPORTER:  Yes, it did.

8          THE WITNESS:  Thank you.

9          MR. HO:  Thank you.

10  BY MR. HO:

11     Q    Did you ever tell Earl Comstock from the

12  Department of Commerce or give him the impression

13  that the Census Bureau could not articulate a

14  rationale to support its belief that there would

15  be a decline in the self-response rate to the 2020

16  census as a result of the citizenship question?

17     A    No.

18     Q    Did you, in fact, ever explain to

19  Mr. Comstock the basis for the Census Bureau's

20  belief that the addition of the citizenship

21  question would reduce self-response rates to the

22  2020 census?

Page 372

1      A      Yes.

2      Q      Now, the Census Bureau's estimate of a

3  5.8 percentage point reduction of households

4  containing a non-citizen or someone of unknown

5  citizenship status relative to households

6  containing all citizens, that's an upward revision

7  of an earlier estimate of a 5.1 percentage point

8  reduction, right, Dr. Abowd?

9      A      The two numbers aren't directly

10 comparable because the reference populations

11 aren't the same.  It is a bigger number, but it

12 applies also to a larger reference population.

13     Q      Okay.  And let me see if I understand

14 this.  The difference is -- the 5.1 percentage

15 point differential was a comparison of households

16 with a non-citizen as compared to all-citizen

17 households; is that right?

18     A      Where both of those are administrative

19 record definitions of citizen, that's correct.

20     Q      Okay.  And the 5.8 percentage point

21 number, that is a comparison of households where

22 there is a non-citizen as identified by the

1   administrative records or a person with unknown

2   citizenship status in the administrative records

3   compared to households with all citizens as

4   defined in the administrative records, correct?

5        A    Not quite.  Th all household population

6   had to be both in administrative records and

7   self-declared.  And then the comparison group is

8   every other household.

9        Q    Got it.  Okay.  So let me try this again.

10  The 5.8 percentage point number, that's a

11  comparison of households where the response to the

12  ACS and the administrative records indicate that

13  every member of the household is a citizen and all

14  other households, right, Dr. Abowd?

15       A    Yes.

16       Q    Okay.  That analysis -- if we look at

17  page 38 of the white paper, Bates number

18  COM_DIS09870, that analysis producing the 5.8

19  percentage point differential that we've

20  discussed, that is set forth on this table,

21  correct?

22       A    Which table are you asking me to

Page 374

1    reference?

2         Q     Table 8.

3         A     And which number?

4         Q     The 5.8 percentage point differential.

5         A     No, you have the wrong table.

6         Q     Okay.  Could you show me --

7         A     Although you have that right number.

8         Q     Could you show me the right table?

9         A     9, second panel.

10        Q     Got it.  Okay.  So this analysis, the 5.8

11   percentage point -- that produces the 5.8

12   percentage point differential, that's based on a

13   comparison of 2016 ACS data to -- response rates,

14   I'm sorry, to 2010 decennial response rates,

15   correct?

16        A     Yes.

17        Q     Okay.  So in the Census Bureau's

18   estimation, it's more accurate -- if you're trying

19   to assess the impact of the addition of the

20   citizenship question on self-response rates, it's

21   more reliable to use more recent ACS non-response

22   data in calculating your estimate; is that

1   correct?

2            MR. EHRLICH:  Objection.  Form.

3            THE WITNESS:  Generally, yes.

4   BY MR. HO:

5       Q    Let's look at page 46 of the report,

6   Bates number COM_DIS9878, and I'm looking at the

7   third full paragraph here.

8       A    "As mentioned above"?

9       Q    "As mentioned above."  It reads, "As

10  mentioned above, the estimated reduction in

11  self-response due to the inclusion of a

12  citizenship question is based on a comparison of a

13  long 2010 ACS questionnaire to a short 2010 census

14  questionnaire.  The visibility of the citizenship

15  question may be more prominent when added to a

16  short questionnaire, resulting in a larger

17  reduction in self-response than what we have

18  estimated here."

19           Did I read that right?

20      A    Yes, you did.

21      Q    Would it be accurate to say that the

22  Census Bureau believes that the effect of a

Page 376

1  citizenship question in terms of reducing response

2  rates among households that have a non-citizen or

3  someone of undefined citizenship status,

4  et cetera, as compared to all citizen households

5  might be even larger than 5.8 percentage points

6  because that estimate is based on ACS data, and

7  here the citizenship question would have more

8  prominence on the relatively shorter 2020 census

9  questionnaire?

10    A    If the question is does the Census Bureau

11  agree with the question -- with the sentences in

12  the paragraph that you read me, the answer is yes.

13    Q    Okay.  Let me try this again.  Does the

14  Census Bureau believe that 5.8 percentage

15  points -- that that estimate is conservative?  Let

16  me stop there.

17    A    Yes.

18    Q    Okay.  And one of the reasons why the

19  Census Bureau believes that that estimate is

20  conservative is that it's based on ACS

21  non-response rates, whereas, here, if you add the

22  citizenship question to the census questionnaire,

1    the citizenship question could have more

2    prominence and a greater effect in terms of

3    reducing self-response rates; is that right,

4    Dr. Abowd?

5         A    Yes.

6         Q    Now -- okay.  The Census Bureau's view,

7    Dr. Abowd, which you articulated earlier, is that

8    the Census Bureau is going to enumerate most of

9    the people who failed to respond to the census

10   questionnaire because of the citizenship question;

11   is that right?

12              MR. EHRLICH:  Objection.  Form.

13              THE WITNESS:  The vast majority, yes.

14   BY MR. HO:

15        Q    Now, one of the ways that you have of

16   enumerating people when their household does not

17   self-respond to the census questionnaire is by

18   sending census enumerators in person to that

19   household, correct?

20        A    That's correct.

21        Q    And we would call that -- we could call

22   that part of the non-response follow-up, or

1      A     Not completely.

2      Q     Is there an empirical basis for the

3  Census Bureau's incomplete agreement with that

4  sentence?

5      A     The sentence represents a summary of

6  qualitative evidence with which the Census Bureau

7  agrees that hard-to-count subpopulations are less

8  cooperative in NRFU and, to that extent, the

9  Census Bureau agrees with that sentence.

10     Q     Okay.  And that sentence was written by

11 the authors of this white paper whom you selected

12 as the best people at the Census Bureau to conduct

13 the analysis reflected in the white paper,

14 correct, Dr. Abowd?

15     A     Yes.

16     Q     Let's turn forward two pages to page 43,

17 Bates number COM_DIS09875.  And let's look at

18 footnote 60, which reads, "These enumeration

19 errors may not be avoidable simply by spending

20 more money on field work.  Once a household

21 decides not to cooperate, it may not be possible

22 to obtain an accurate enumeration no matter how

Page 381

1    many times an enumerator knocks on their door."

2            In this footnote, the term "these

3    enumeration errors" refers to enumeration errors

4    that arise as a result of increased non-response

5    to the census questionnaire due to the addition of

6    a citizenship question, correct?

7        A    Yes.

8        Q    And the view of the Census Bureau is that

9    enumeration errors arising from the decline in

10   self-response caused by the citizenship question

11   may not be avoidable simply by spending more money

12   on field work, correct?

13       A    Yes.

14       Q    And it is the view of the Census Bureau

15   that once a household decides not to cooperate

16   with the census because of the citizenship

17   question, it may not be possible to obtain an

18   accurate enumeration of that household no matter

19   how many times an enumerator knocks on their door,

20   correct?

21       A    Accurate in this sentence means erroneous

22   enumerations and whole-person census imputations.

Page 382

1    It does not mean net undercount.

2              THE REPORTER:   Could you please repeat

3    your answer.

4              THE WITNESS:   Accurate enumeration in

5    this sentence means enumeration errors and

6    whole-person census imputations.   It does not mean

7    net undercount.

8    BY MR. HO:

9        Q     Now, if you send an in-person enumerator

10   to a household that doesn't self-respond and that

11   doesn't result in a response, one way that you

12   could -- another way you could have of enumerating

13   that household is through a proxy response, which

14   means trying to obtain a response from someone who

15   is not a member of that household about that

16   household, correct?

17       A     Yes.

18       Q     And the Census Bureau agrees that proxy

19   enumeration generally results in lower quality

20   enumeration data than self-responses, correct?

21       A     Yes.

22       Q     And the Census Bureau agrees that a proxy

1    response is more likely to result in the omission

2    of a household member than a self-response,

3    correct?

4         A     I haven't looked at the table recently,

5    but I believe that's correct, yes.

6         Q     Let's go to the white paper again.   And I

7    want to look at page 12, Bates number

8    COM_DIS09844, figure 3.

9         A     Figure 3, did you say?

10        Q     I believe so.   On page 12?

11        A     Okay.   I thought I heard 4.

12        Q     Okay.   Figure 3 depicts unit non-response

13   to the ACS from 2010 through 2016 comparing census

14   tracts with the lowest decile of housing units

15   containing a non-citizen to the census tracts in

16   the highest decile of housing units containing a

17   non-citizen, correct?

18        A     Correct.

19        Q     And for each year of ACS depicted here,

20   census tracts in the highest decile of housing

21   units containing a non-citizen have a lower

22   response rate to the ACS than do census tracts in

Page 384

1    the lowest decile of housing units with a

2    non-citizen, correct?

3        A    Yes.

4        Q    And for both groups, unit non-response to

5    the ACS declined between 2010 and 2016, correct?

6        A    No.  It increased between 2010 and 2011

7    and then declined from 2011 forward.

8        Q    But if we just compare 2016 to 2010 --

9        A    Yes.

10       Q    -- the unit non-response rate for both

11   groups in 2016 was lower than it was in 2010,

12   correct?

13       A    That's correct, yes.

14       Q    Okay.  And the decline amongst -- I'm

15   sorry, let me start that again.

16            The decline in census tracts in the

17   highest decile of housing units including a

18   non-citizen -- the decline in unit self-response

19   rates for that group was sharper than the decline

20   in unit self-response rates by households in

21   census tracts with the -- in the lowest decile of

22   housing units with a non-citizen, correct?

1      A      I think the answer to your question is

2    yes.   Does the record reflect colors?

3      Q    We'll put it in in color.   That's the

4    orange line, right?

5      A    The orange line declines more sharply

6    than the blue line.

7      Q    Now, last time in your deposition, we

8    talked about a similar census tract stratification

9    analysis for ACS NRFU efforts.   Does that ring a

10   bell?

11     A    Yes.

12     Q    Okay.  And you remember that census

13   tracts with higher percentages of households

14   including a non-citizen had lower ACS NRFU success

15   rates than census tracts with lower percentages of

16   non-citizens?

17     A    So -- I think you're right, but I don't

18   want to rely on my memory.  If you show me the

19   exhibit, I will answer the question.  But I'm not

20   sure --

21     Q    Okay.

22     A    -- that you and I are both referring to

1    the same exhibit.

2         Q    Okay.  Well, given what we've talked

3    about, that unit non-response is lower in census

4    tracts that have higher percentages of

5    non-citizens and that ACS NRFU is less successful

6    in census tracts that have higher percentages of

7    households including a non-citizen, does the

8    Census Bureau expect that people who live in

9    census tracts with higher percentages of

10   households with a non-citizen would also be less

11   likely to provide proxy responses to the census

12   than people who live in other areas?

13        A    Accepting your premise about my testimony

14   from before, the Census Bureau believes that that

15   is likely, yes.

16        Q    Let's look at page 43 of the white paper,

17   Bates number COM_DIS09875.  Let's look at the last

18   full paragraph on this page.  About halfway down,

19   the second to last sentence starts -- it's about

20   halfway down in that paragraph.  The second to

21   last sentence starts with, "As shown above."

22        A    Yes.

1    Q    "As shown above, reference persons are

2    much less likely to answer the citizenship

3    question for non-relatives in the household than

4    for themselves, so may be even less likely to

5    answer it for neighbors."

6         Does the Census Bureau agree with the

7    statement that people are less likely to answer

8    the citizenship question for their neighbors than

9    for themselves?

10   A    Yes.

11   Q    Now, another way that you can enumerate

12   people when they don't self-respond to the census

13   is to try to enumerate them using administrative

14   records like tax returns; is that right?

15   A    All the way up to "like tax returns,"

16   yes.

17   Q    Okay.  Forget the tax returns.  One way

18   that -- if you don't get a self-respond to the

19   census questionnaire, one way that you might try

20   to enumerate that household is with administrative

21   records, correct?

22   A    Yes.

1  primarily why the Census Bureau would be unable to

2  link an ACS respondent to an administrative record

3  indicating citizenship status:  One, because the

4  personally identifiable information on the survey

5  response might not be high quality enough to link

6  that person to administrative records; and, two,

7  because the survey respondent is not in the

8  administrative records at all; is that correct?

9            MR. EHRLICH:  Objection.  Form.

10            THE WITNESS:  Yes.

11  BY MR. HO:

12       Q    And if we look back at the graph,

13  figure 4, among 2016 ACS respondents, Hispanics

14  could not be linked to an administrative record at

15  a higher rate than non-Hispanic whites, correct?

16       A    Correct.

17       Q    Now, based on this data, would you agree

18  that the available evidence indicates that the

19  Census Bureau, generally speaking, cannot link

20  Hispanic survey respondents to administrative

21  records at as high a rate as it can for

22  non-Hispanic whites?

Page 390

1        A        Yes.

2        Q        The administrative records referenced

3    here are the SSA and tax records, correct?

4        A        The individual tax identification number

5    records.

6        Q        You corrected me earlier when we talked

7    about enumeration via administrative records.

8    Could you just clarify what administrative records

9    the Census Bureau relies on when it tries to

10    enumerate people using administrative records?

11        A        There's two parts to the process for

12    using administrative records for enumeration.  One

13    part is performing the record linkage to identify

14    all of the administrative records that might apply

15    to a particular household.  And the other part is

16    constructing a candidate administrative record

17    enumeration to be used during the NRFU process if

18    the first NRFU follow-up visit doesn't produce a

19    successful interview.

20            In the former part of the process,

21    there's extensive use of tax records.  In the

22    latter part of the process, by agreement with the

Page 391

```
 1   IRS, none of the tax data survive to the record
 2   that will be used for a candidate enumeration.
 3   That was the distinction I was trying to...
 4        Q    Would you agree that undocumented
 5   individuals are less likely to be found in the
 6   administrative records -- and when I say
 7   undocumented individuals, I mean undocumented
 8   immigrants -- are less likely to be found in the
 9   administrative records that the Census Bureau uses
10   to enumerate people than persons who have legal
11   status in this country?
12        A    Yes.
13        Q    And would you agree that the Census
14   Bureau would have a more difficult time
15   enumerating undocumented immigrants through the
16   use of administrative records than it will for
17   persons with legal status?
18            MR. EHRLICH:  Objection.  Form.
19            THE WITNESS:  Yes.
20   BY MR. HO:
21        Q    Overall, would you agree that the Census
22   Bureau does not expect enumeration by
```

1   administrative records to be as successful for

2   non-citizens as it is for citizens?

3           MR. EHRLICH:   Objection.   Form.

4           THE WITNESS:   Yes.

5   BY MR. HO:

6       Q     Let's go to page 5 of the white paper,

7   Bates number COM_DIS09837.  And I'm looking at the

8   last paragraph on the page that starts with,

9   "Camarota."

10          "Camarota and Capizzano, 2004, conducted

11  focus groups with over 50 field representatives

12  (FRs) for the 2000 supplemental survey, a pilot

13  for the ACS.  FRs reported that foreign-born

14  respondents living in the country illegally or

15  from countries where there is distrust in

16  government were less likely to cooperate.  Some

17  foreign-born respondents failed to list all

18  household members.  FRs suspected that some

19  foreign-born respondents misreported citizenship

20  status, and they" -- continuing to the next

21  page -- "believed this was due to recall bias, a

22  fear of the implications of certain responses or a

Page 394

 1    households to include a response for every member

 2    of their household, such as children, correct?

 3              MR. EHRLICH:  Objection.  Form.

 4              THE WITNESS:  Are you referring to a

 5    specific study that you want me to comment on?

 6    BY MR. HO:

 7         Q    I'm not.  I'm just -- my understanding

 8    is -- and I just want you to correct me if my

 9    understanding is mistaken -- that the Census

10    Bureau has looked at the historical undercount of

11    Hispanics in previous censuses.  That's correct,

12    right?

13         A    Yes.

14         Q    Okay.  And one of the reasons that the

15    Census Bureau has attributed the undercount of

16    Hispanics to in previous censuses has been the

17    failure of Hispanic households to provide a

18    response for every member of their household,

19    correct?

20         A    Yes.

21         Q    Okay.  Now, the Census Bureau agrees that

22    if the citizenship question is included in the

Page 395

1    census, that would likely cause some households,

2    such as those including a non-citizen or those

3    including an undocumented immigrant, to fail to

4    provide a response for every member of the

5    household when they respond to the census,

6    correct?

7              THE WITNESS:   Could you read the question

8    back?

9              (The reporter read the record as

10   requested.)

11             THE WITNESS:   The Census Bureau believes

12   that the households in your question might be

13   unlikely to provide a full enumeration whether or

14   not there's a citizenship question on the census

15   and does not have evidence of an incremental

16   effect from the citizenship question.

17   BY MR. HO:

18        Q    Well, does the Census Bureau believe that

19   the citizenship question could have an incremental

20   effect in certain households failing to enumerate

21   every member of their household when they respond

22   to the census?

Page 396

```
 1       A    I think I just answered that question.
 2       Q    Is the evidence that we've seen and
 3  discussed about item non-response, unit
 4  non-response, breakoff rates with a citizenship
 5  question, is that evidence consistent with the
 6  notion that adding a citizenship question to the
 7  census would cause an incremental increase in the
 8  number of households that respond to the census
 9  but don't provide a response for every member of
10  their household?
11       A    Yes.
12       Q    Now, NRFU efforts are only initiated if a
13  household fails to provide a response for that
14  household altogether, correct?
15       A    With a few minor exceptions outlined in
16  my expert report, correct.
17       Q    So if a household responds to the census,
18  but omits some of the members of that household,
19  the Census Bureau doesn't send in-person
20  enumerators to that person's door because you'd
21  have no way of knowing if they omitted some
22  members of their household, correct?
```

1    A   If the household's response passes the

2   sufficiency condition for being considered an

3   essentially complete response, then, yes.

4    Q   What's a sufficiency condition for being

5   considered a complete response?

6    A   It's a set of conditions that are checked

7   before the NRFU workload is generated to see

8   whether the response that came in from the

9   household is complete enough to essentially fill

10   in the rest with imputations or not.  It varies by

11   type of enumeration area, but -- and the actual

12   conditions haven't been set for 2020 yet.

13        It is my way of saying there are some

14   cases that go to NRFU where there was an

15   incomplete response.  And I don't have

16   quantitative evidence on how many of those there

17   are, but, generally, you're right.  Generally, if

18   you submit a self-response, it doesn't go to NRFU.

19    Q   Generally speaking, if you answer the

20   questions on the census questionnaire, the 10

21   questions, or 11, but you don't list every member

22   of the household, the Census Bureau is not going

Page 398

1   to send an in-person enumerator to your door,

2   correct?

3       A    Correct.

4       Q    Okay.  And if you fill out the census

5   response, answer the 10 or 11 questions, but don't

6   list every member of your household, the Census

7   Bureau is not going to try to get a proxy response

8   for your household, right?

9       A    Correct.

10      Q    And if you answer the census

11  questionnaire, but you don't list every member of

12  your household, the Census Bureau is not going to

13  start imputing -- sorry -- the Census Bureau is

14  not going to start using administrative records to

15  enumerate additional members of your household,

16  correct?

17      A    That actually hasn't been determined, but

18  it's probably correct.

19      Q    Okay.  And if you answer the census

20  questionnaire, but you don't list every member of

21  your household, the Census Bureau isn't going to

22  start imputing additional members of your

Page 399

1    household, correct?

2        A      Correct.

3        Q      I want to show a document that's been

4    marked as Exhibit 26.

5             (Abowd Deposition Exhibit Number 26 was

6    marked for identification.)

7    BY MR. HO:

8        Q      This is an official memo published by the

9    Census Bureau, correct?

10       A      It's part of the public memorandum series

11   following the 2010 census that documents the

12   coverage measurement studies, yes.

13       Q      And this memo, Exhibit 26, it was

14   produced by the Census Bureau in the ordinary

15   course of its business, not for the purposes of

16   litigation, correct?

17       A      Correct.

18       Q      Okay.  And the subject line of this

19   Census Bureau memo is, "2010 census coverage

20   measurement estimation report, summary of

21   estimates of coverage for persons in the United

22   States," correct?

Page 400

1      A      Correct.

2      Q      The lead author or the person that's

3  prepared by is Thomas Mule, correct?

4      A      Mule.

5      Q      Mule.  Thank you.  He is in the decennial

6  statistical studies division where he's an

7  economist in the Census Bureau, correct?

8      A      He's a mathematical statistician,

9  otherwise correct.

10      Q      Okay.  And this memo is cited in the

11  white paper, Exhibit 24, correct?

12      A      Yes.

13      Q      Okay.  Now, it's fair to say that

14  Exhibit 26, the Mule memo, that a purpose of it is

15  to estimate how well the 2010 census covered the

16  total population of the United States?

17      A      Its purpose is to summarize a series of

18  studies that had that goal, among others.

19      Q      And the 2010 census, that included NRFU

20  efforts for households that did not self-respond

21  to the census questionnaire, correct?

22      A      Yes.

1      Q      The 2010 census NRFU efforts included

2  sending in-person enumerators to households that

3  didn't self-respond, correct?

4      A      Correct.

5      Q      And the 2010 census included the use of

6  proxy enumeration for households that didn't

7  self-respond, correct?

8      A      Correct.

9      Q      And the 2010 census also included efforts

10  to enumerate using administrative records

11  households that didn't self-respond, correct?

12      A      I believe only on a experimental basis.

13      Q      But it did include the use of enumeration

14  via administrative records in the 2010 census,

15  correct?

16      A      I'm actually not sure that's correct.  I

17  believe it was only experimental.

18      Q      The 2010 census NRFU efforts included

19  whole-person imputation for households that did

20  not self-respond, correct?

21      A      Correct.

22      Q      Let's turn to page 17 of the Mule memo,

Page 402

```
 1    table 9, titled, "Components of census coverage by
 2    race and Hispanic origin."
 3              The far right column in this table is
 4    labeled, "Omissions," correct?
 5        A      Yes, although I prefer the term "gross
 6    omissions."
 7        Q      Okay.
 8        A      Some of the experts use one and some use
 9    the other.  As long as we understand, whenever I
10    say omissions, it's gross omissions.
11        Q      Okay.  Omissions in this column, or gross
12    omissions as you would have it, refers to
13    percentage of people whom the Census Bureau
14    estimated were not counted in the 2010 census,
15    correct?
16        A      It refers to the difference between the
17    dual-system estimator and the number of persons
18    that the coverage evaluation survey determined the
19    estimate were correct enumerations.
20        Q      Well, one way of characterizing this is
21    you have that dual estimator calculation of the
22    total population and you also have the number of
```

Page 403

1    people who the Census Bureau believes were

2    correctly enumerated in the 2010 census through

3    self-responses or in-person enumerators or proxy

4    responses, et cetera, and omissions is the

5    difference between the two, correct?

6        A    No.

7        Q    All right.  Try to explain it to me

8    again.  I'm sorry.

9        A    So net undercount is the difference

10   between the dual-system estimator and the census

11   count.

12       Q    Yes.

13       A    Okay?  Gross omissions is the difference

14   between the dual-system estimator and correct

15   enumerations, which is not the same thing as the

16   census count.  Okay?

17       Q    Okay.

18       A    Is that what you think you said?  Because

19   that's not what I heard.  I'm sorry.  I'm not

20   supposed to ask the questions.  I'm sorry.

21       Q    I'll ask the questions here.  The Census

22   Bureau estimates that it omitted 5.3 percent of

1    the population in the 2010 census, correct?

2         A    Gross omissions, correct.

3         Q    Okay.  Now, the second to right-hand

4    column is the percent undercount, which is a

5    different number, right?

6         A    Correct.

7         Q    And if we look at percent undercount, the

8    Census Bureau estimates that the 2010 census

9    actually overcounted the total population of the

10   United States by 0.01 percent, correct?

11        A    That overcount is not statistically

12   significant, but that's the correct point

13   estimate.

14        Q    Okay.  Now, the omissions are not evenly

15   distributed across racial and ethnic groups,

16   correct?

17        A    The gross omissions are not, correct.

18        Q    And the undercount is not distributed

19   evenly among racial and ethnic groups, correct?

20        A    That's correct.  And undercount here is

21   net undercount.

22        Q    So let's start with non-Hispanic whites.

Page 405

1    The Census Bureau estimates that 3.8 percent of
2    non-Hispanic whites were omitted in the 2010
3    census, correct?
4        A    You're using non-Hispanic white alone
5    row, correct?
6        Q    And the Census Bureau estimates that
7    people who are non-Hispanic white alone were
8    overcounted in the 2010 census by 0.83 percent,
9    correct?
10       A    Correct.  And that one is statistically
11   significant.
12       Q    If we look at people who are identified
13   as black in the census, the Census Bureau
14   estimates that 9.3 percent of blacks were omitted
15   in the 2010 census, correct?
16       A    Correct.
17       Q    And the Census Bureau estimates that
18   blacks were undercounted in the 2010 census by
19   2.06 percent, correct?
20       A    Correct.  And that one is also
21   statistically significant.
22       Q    Let's look at Hispanics.  The Census

1  Bureau estimates that 7.7 percent of Hispanics

2  were omitted in the 2010 census, correct?

3       A    That's the last row, and correct.

4       Q    And the Census Bureau estimates that

5  Hispanics were undercounted in the 2010 census by

6  1.54 percent, correct?

7       A    Yes, and it's statistically significant.

8       Q    So if we summarize the data that we just

9  discussed, the racial or ethnic group with the

10  highest percentage of omissions, blacks, also had

11  the highest percentage undercount, correct?  Just

12  of the three groups that we discussed.

13       A    Oh.  Of the three groups we discussed,

14  that is correct.

15       Q    And Hispanics had a higher omission rate

16  than people who are non-Hispanic white alone and

17  also had a higher undercount rate as compared to

18  people who were non-Hispanic white alone, correct?

19       A    Correct.

20       Q    Overall, there was no net undercount in

21  2010, but there were undercounts of particular

22  racial and ethnic subgroups, correct?

Page 407

1      A      Those are called differential net
2   undercounts, and that is correct.
3      Q      And while there was overall across the
4   nation no net undercount, there were also in
5   certain states and localities net undercounts,
6   correct?
7      A      We did produce estimates that suggest
8   that, yes.
9      Q      Okay.  I want to go back to the white
10  paper and I want to ask you questions about
11  different alternatives for obtaining citizenship
12  data described in the white paper.  Do you
13  remember alternative C, which is the exclusive
14  reliance on administrative records, Dr. Abowd?
15     A      Yes.
16     Q      Now, one limitation of alternative C is
17  that, if you use alternative C, you won't be able
18  to match every person enumerated in the census to
19  an administrative record containing citizenship
20  data, correct?
21     A      Correct.
22     Q      So let's flip to page 49, figure 11,

401;
403

1    alternative C.  This is Bates COM_DIS09881.  Now,

2    there are two figures here that present two

3    different scenarios for alternative C and how many

4    people for whom the Census Bureau estimates you'd

5    be able to obtain citizenship data using

6    administrative records, correct?

7        A    Correct.

8        Q    Let's look at panel B, which is the

9    revised assumptions for alternative C.  Among the

10   two scenarios, panel B, with the revised

11   assumptions, is the worse scenario in terms of the      401;

12   accuracy of alternative C, correct?                     403

13       A    It is worse than panel A.

14       Q    Okay.  So let's use the worse scenario.

15   Under the worse scenario, the revised assumptions,

16   the Census Bureau expects that, under

17   alternative C, you'd be able to link 289.6 million

18   people, out of the 330 million people you expect

19   to enumerate in the census, to administrative

20   records, correct?

21       A    Correct.

22       Q    That's about 88 percent of the

Page 409

1   population.  Sound right?

2        A    I didn't do the calculation, but I'll

3   accept that.

4        Q    Thanks.  And the Census Bureau expects

5   under this scenario that, under alternative C, you

6   would not be able to link about 40.4 million

7   people to administrative records on citizenship,

8   correct?

9        A    Correct.

10       Q    So under this scenario, if you use

11   alternative C, the Census Bureau would have to

12   model or impute the citizenship status of about

13   12 percent of the population to produce the CVAP

14   data that DOJ has requested, correct?

15       A    Correct.

16       Q    Now, let's talk about alternative D,

17   which is to both include a citizenship question on

18   the census and to rely on administrative records.

19   Now, the Census Bureau did not recommend

20   alternative D, correct?

21       A    Correct.

22       Q    And the Census Bureau still does not

401;
403

Page 410

1   recommend alternative D, correct?

2       A    Correct.

3       Q    Let's look at page 51, figure 12,

4   panel B, alternative D.  Now, this has -- this

5   figure has estimates for, if you use

6   alternative D, how many people you would determine

7   the citizenship status of using various methods,        401;

8   correct?  At a high level, that's a correct           403

9   description, right?

10      A    Yes.

11      Q    And this uses the same revised

12  assumptions that we -- that were employed

13  regarding alternative C that you and I discussed a

14  moment ago in panel B of figure 11, correct?

15      A    That's correct.

16      Q    In addition to those revised assumptions,

17  it also includes an assumption that, when you get

18  proxy respondents for people who don't respond to

19  the census, that, generally speaking, those proxy

20  responses are going to report citizenship status,

21  correct?

22      A    I actually don't recall.  Did you --

Page 411

1      Q    Well, under -- it says --

2      A    Oh, yeah, sorry.

3      Q    -- here, panel B, alternative --

4      A    Yes.  Okay.

5      Q    -- D.

6      A    Yes, that's right.  Thank you.  Next

7   time, I'll read the panel titles before I answer.

8      Q    My fault.  It's probably an unrealistic

9   rosy assumption, Dr. Abowd, wouldn't you agree,

10   that proxies in the 2020 census are, as a general

11   matter, going to report the citizenship status of

12   their neighbors or for whomever else they're

13   giving a proxy response?

14            MR. EHRLICH:  Objection.  Form.

15            THE WITNESS:  Yes, it's optimistic.          401;
                                                           403
16   BY MR. HO:

17      Q    Okay.  So let's take this optimistic

18   scenario for alternative D.  On the right side of

19   the chart, under alternative D, in this scenario,

20   there are 20.9 million people for whom you

21   estimate there will be no census response as to

22   that person -- those people's citizenship status,

Page 412

1  correct?

2       A     Correct.

3       Q     And if we look at the far left side of

4  the chart, under alternative D, this optimistic

5  scenario, there are 260.9 million people who can

6  be linked to an administrative record and whom you

7  estimate their response to the citizenship

8  question is going to be consistent with the

9  administrative record on citizenship, correct?

10      A     Yes.

11      Q     And for both these groups that we just

12 discussed, the 20.9 million people that don't give          401;
                                                                403
13 a census response as to citizenship, and the 260.9

14 million people for whom the census response is the

15 same as the administrative record, adding the

16 citizenship question doesn't in any way improve

17 our ability to get citizenship data about these

18 two groups of people, correct?

19      A     Yes.

20      Q     So that's a total of 281.8 million

21 people, out of the 330 million the Census Bureau

22 expects to enumerate, for whom the addition of the

Page 413

1   citizenship question does not improve our ability

2   to get citizenship data on, correct?

3        A    Correct.

4        Q    And that's about 85.4 percent of the

5   population for whom the addition of the

6   citizenship question makes no improvement in terms

7   of the availability of citizenship data, correct?

8        A    Again, I didn't calculate the proportion,

9   but that sounds right, yes.

10       Q    Okay.  Now, the Census Bureau under

11  alternative D expects that the effect on a                    401;

12  reduction of self-response rates would be the same           403

13  as under alternative B, which is just adding the

14  citizenship question without using administrative

15  records, correct?

16       A    Correct.

17       Q    And that means that the Census Bureau

18  expects that, under alternative D, there are more

19  people who would end up getting enumerated by

20  proxy than if you used alternative C, which is

21  administrative records only, no citizenship

22  question, correct?

Page 414

1        A      Correct.

2        Q      And so that means that, under

3    alternative D, as compared to alternative C, the

4    Census Bureau believes that it's going to be able

5    to link fewer people to administrative records

6    because there will be more people enumerated by

7    proxy and proxies generally have lower quality

8    data than self-responses, correct?

9        A      Yes.                                    401;

10       Q      Now, let's go back to this chart.  In   403

11   this scenario, there are 39.5 million people under

12   alternative D who would provide a census response

13   to citizenship, but who could not be linked to an

14   administrative record, right?

15       A      Yes.

16       Q      And you also have a total of 4.9 million

17   people who have no census response on citizenship

18   and have no administrative record on citizenship,

19   correct?

20       A      Correct.

21       Q      So that means, under the scenario in

22   alternative B -- D, I'm sorry, if you add those

Page 415

1    two numbers together, it's a total of 44.4 million

2    people who can't be linked to administrative

3    records, correct?

4        A      Correct.

5        Q      So that means, if you'll accept my math,

6    that under alternative D, about 13.5 percent of

7    the population you won't be able to link to

8    administrative records, right?

9        A      Correct.

10       Q      And that's more people that you would not

11   be able to link to administrative records than if

12   you used alternative C, just using the

13   administrative records with no citizenship

14   question, correct?

15       A      Correct.

16       Q      Back to the chart, if we look at the left

17   branch of the chart, but the middle sub-branch,

18   under alternative D in this optimistic scenario,

19   you expect that there are about 8.7 million people

20   for whom the survey response about citizenship and

21   the administrative data on citizenship will not

22   agree, correct?

401;
403

Page 416

1    A    Yes.

2    Q    That means that currently under

3  alternative D, under this scenario, the Census

4  Bureau at present estimates that there are

5  8.7 million people for whom it doesn't know how

6  it's going to determine their citizenship status

7  for purposes of assembling DOJ's CVAP data,

8  correct?

9    A    At the moment, that's correct.

10    Q    Okay.   That problem of not knowing how to

11  assign citizenship status for millions of people,

12  that problem does not exist under alternative C,        401;

13  correct?                                                403

14    A    Correct.

15    Q    Now, the traditional Census Bureau

16  practice, in general, is that if you have a survey

17  response that conflicts with an administrative

18  record, you generally rely on the survey response,

19  correct?

20    A    Correct.

21    Q    But here, you would agree that, under

22  alternative D, if you use the survey response for

Page 417

1   these 8.7 million people for whom you estimate the

2   survey response and the administrative record

3   conflict, that that would be more inaccurate on

4   average than just relying on the administrative

5   record, correct?

6        A     We have said there's a disagreement and

7   that is probably an inaccuracy, correct.

8        Q     Conversely, you would expect, under

9   alternative D, when you have this conflict between

10  the survey response and the administrative record

11  for this 8.7 million people, if you were to rely

12  by default on the administrative record rather

13  than the survey response, then for that population

14  of 8.7 million people, there was no reason to ask

15  them the citizenship question, correct?

16       A     Correct.

17       Q     Let me ask about a different issue.

18  Under alternative D, with some of the people for

19  whom you lack citizenship data through

20  administrative records, you at least now have a

21  survey self-response about citizenship, right?

22       A     Are you talking about the one that comes

401;
403

Page 418

1    down to 39.5 million?

2         Q    Yeah.

3         A    Okay.   Yes.

4         Q    So you would expect that, under                    401;

5    alternative C, some of these 39.5 million people              403

6    you actually would have been able to have linked

7    to administrative records because your survey

8    responses to the census, if you did include the

9    citizenship question, would be higher quality,

10   correct?

11        A    Yes.

12        Q    Now, some of these 39.5 million people,

13   you're not going to be able to link to

14   administrative records under alternative C or

15   alternative D, correct?

16        A    Correct.

17        Q    Under alternative C, for the people that

18   you can't link to administrative records, the plan

19   is you're going to model or impute the citizenship

20   status --

21        A    Which alternative, I'm sorry?

22        Q    Alternative C.   Under alternative C, for

Page 419

1    that subset of people who are not matchable to

2    administrative records, the Census Bureau's plan

3    would be to model or impute the citizenship status

4    of those people, correct?

5         A    Correct.

6         Q    Under alternative D, however, if you

7    can't match someone to the administrative record,

8    but you have a survey response, there's no

9    scientifically defensible method for rejecting

10   that survey response, correct?

11        A    Correct.

12        Q    So under alternative D, just so we're

13   clear, you get a survey response on citizenship

14   and no administrative record; you're stuck using

15   the survey response, correct?

16        A    We would use the survey response.

17        Q    So key difference between C and D for

18   these people who are not matchable to

19   administrative records and don't give you a survey

20   response under D, under C, you impute their

21   citizenship status; under D, you use the survey

22   response, correct?

401;
403

Page 420

1      A      Yes.

2      Q      There is no reason to think, Dr. Abowd,

3  that for this group of unmatchable people, that on

4  average the survey response about citizenship is

5  going to be more accurate than the imputation

6  method that you would use under alternative C,

7  correct?

8      A      Correct.

9      Q      Dr. Abowd, if someone argued that

10 alternative D was justified because alternative C      401;

11 requires the imputation of citizenship status of      403

12 people who lack administrative records, would the

13 Census Bureau agree with or disagree with that

14 argument?

15         MR. EHRLICH:   Objection.   Form.

16         THE WITNESS:   Disagree.

17 BY MR. HO:

18     Q    Has the Census Bureau communicated to the

19 Commerce Department that it disagrees with the

20 notion that alternative D is justified because

21 alternative C requires the imputation of

22 citizenship status for some people?

Page 421

1      A    Is the question have we communicated

2   consistently our preference for C as opposed to D?

3      Q    It's a more specific question than

4   that --

5      A    Okay.

6      Q    -- Dr. Abowd.  Has the Census Bureau

7   specifically communicated its rejection of the

8   argument that alternative D is better than

9   alternative C because alternative C requires

10  imputation of citizenship status of people for

11  whom there is no linked administrative record?

401;
403

12      A    So I'm not sure how to answer that

13  question because I don't know that the advice ever

14  took that specific form.  We have consistently

15  communicated that the modeled response was better

16  than the survey responses in the unlinked data.

17      Q    Okay.  So the modeled responses under

18  alternative C for the group of people who can't be

19  matched to citizenship records, in the Census

20  Bureau's view, that's more accurate than the

21  self-responses about citizenship that you would

22  get from adding the citizenship question to the

Page 422

1    survey?

2        A    Yes.

3        Q    Okay.   Have you heard Commerce Department

4    officials opine that alternative D is better than

5    alternative C because alternative C requires the

6    imputation of citizenship status of people who

7    can't be linked to administrative records?

8        A    Yes.

9        Q    Have you heard Earl Comstock offer that

10   opinion?

11       A    Yes.

12       Q    Do you disagree with that opinion?   Does       401;

13   the Census Bureau disagree with that opinion?           403

14       A    Yes.

15       Q    Has the Census Bureau communicated its

16   disagreement of that opinion to Mr. Comstock?

17       A    Yes.

18       Q    If Mr. Comstock said that the Census

19   Bureau never communicated its disagreement with

20   that opinion, would Mr. Comstock be wrong?

21            MR. EHRLICH:   Objection.   Form.

22            THE WITNESS:   As far as I know, yes.

Page 424

1    because Acting Director Jarmin and Acting Deputy

2    Director Lamas and Special Assistant to the

3    Director Christa Jones were in daily contact with

4    the Under Secretary and with the Secretary's

5    staff.

6             And we were in the process of developing

7    the numbers that you've asked me about that appear

8    in the technical paper in support of the

9    discussion about the difference between

10   alternative C and alternative D.  I didn't

11   personally communicate.

12   BY MR. HO:

13        Q    But to be clear, the Census Bureau

14   communicated its disagreement with alternative D        401;

15   before the Secretary issued his decision               403

16   memorandum to include the citizenship question in

17   late March 2018, correct?

18        A    Yes.

19        Q    I want to ask you one question --

20   follow-up question about a line in the white

21   paper, page 41, last paragraph, the sentence about

22   a third of the way down that begins with,

1    "Households deciding."

2        A    Page?

3        Q    41, last paragraph.

4        A    Yes.

5        Q    "Households deciding not to self-respond

6    because of the citizenship question are likely to

7    refuse to cooperate with enumerators coming to

8    their door in NRFU, resulting in the use of

9    neighbors as proxy respondents on their behalf."

10        I believe you testified that the Census

11    Bureau agrees with part of that statement.  What's

12    the part that the Census Bureau disagrees with?

13        A    So the Census Bureau would say that

14    qualitative evidence suggests that this sentence

15    is correct, and the problem is that the

16    qualitative evidence is difficult to generalize,

17    but we wouldn't ignore it.  And so we would say

18    the best evidence we have suggests that this

19    sentence is correct, but it's not as strong as the

20    evidence that we have when we're able to do both

21    qualitative and quantitative analyses.

22        (Abowd Deposition Exhibit Number 27 was

Page 426

1    marked for identification.)

2    BY MR. HO:

3        Q    I want to ask you about a document,

4    Exhibit -- that has been marked as Exhibit 27, the

5    title of which is, Proposed content test on

6    citizenship question.  This document sets forth a

7    proposal for two different RCTs for the

8    citizenship question on the census, correct?

9        A    It's one RCT with two different

10   precisions of estimation.

11       Q    And the RCT, as proposed here, would have

12   taken six weeks to collect the data, correct?

13       A    Correct.

14       Q    And the proposal was to initiate the RCT

15   in either November of 2018 or February of 2019,

16   correct?

17       A    Correct.

18       Q    In either case, the RCT could have been

19   completed before census forms are due to be

20   printed, correct?

21       A    Correct.

22       Q    The cost of this proposal, there are two

401;
403

Page 427

1    variations on it, but it ranges from 2 million for

2    one option to 4.1 million for the other option,

3    correct?

4         A    Correct.

5         Q    Does the Census Bureau have the money to

6    conduct either option?

401;
403

7         A    Yes.

8         Q    This proposal was rejected by a group of

9    decision-makers, including Dr. Lamas, Dr. Jarmin

10   and Under Secretary Karen Dunn Kelley, correct?

11        A    That is what I testified, yes.

12        Q    Is it your understanding that the

13   proposal was rejected by a different

14   decision-maker than those three people?

15        A    I wasn't in the conversation.  I'm

16   reporting it based on a summary given to me by

17   Dr. Jarmin and Lamas.

18        Q    Is it the Census Bureau's understanding

19   that these three individuals jointly made the

20   decision to reject the RCT proposal?

21        A    Yes.

22        Q    What is the Census Bureau's understanding

Page 430

1   headquarters staff time devoted to the experiment.

2           So an active resource allocation decision

3   was made that that staff time would be better

4   spent doing the activities that it would be able

5   to do if we didn't do this experiment.

6       Q    If you had conducted the RCT, you would

7   have had quantitative data on how the citizenship     401;

8   question would perform in the context of the          403

9   decennial enumeration questionnaire in terms of

10  response rates, correct?

11          MR. EHRLICH:   Objection.   Form.

12          THE WITNESS:   Yes.

13  BY MR. HO:

14      Q    And if the RCT like this had been

15  performed, you would have had quantitative data on

16  how well NRFU efforts could have addressed a

17  decline in self-response resulting from the

18  addition of the citizenship question in the census

19  enumeration questionnaire, correct?

20          MR. EHRLICH:  Objection.  Form.

21          THE WITNESS:  No.

22  BY MR. HO:

1  will be forced to spend, and staff time, due to

2  the citizenship question being included on the

3  decennial questionnaire given the utility of the

4  data that will be on it?

5      A    The Census Bureau has been instructed to

6  include a citizenship question on the 2020 census

7  and has attempted to quantify the consequences of

8  that for the operations of the 2020 census.  That

9  quantification suggests increases in the

10 non-response follow-up costs and a deterioration

11 in the quality of the response data.  And we are

12 prepared to conduct the census with those extra

13 resources in NRFU and taking account of the change

14 in the quality of the data.

15     Q    Dr. Abowd, you testified that one of the

16 reasons why the Census Bureau rejected the RCT

17 proposal is that it didn't make sense from a

18 cost-benefit perspective, correct, in the view of

19 the Census Bureau?

20     A    Correct.

21     Q    In the view of the Census Bureau, does it

22 make sense from a cost-benefit perspective to add

Page 433

401;
403

1    the citizenship question to the census?

2        A    It has been our consistent recommendation

3    not to do so.

4        Q    Would the Census Bureau welcome a

5    decision from a court of law relieving the Census

6    Bureau of the obligation to include a citizenship

7    question on the 2020 census enumeration

8    questionnaire?

9            MR. EHRLICH:  Objection.  Form.

10           THE WITNESS:  The Census Bureau is

11   prepared to conduct the 2020 census with or

12   without the citizenship question as instructed by

13   the Secretary, Congress or the courts, depending

14   upon the final determination.

15   BY MR. HO:

16       Q    Given the Census Bureau's views about the

17   cost benefits -- the costs and benefits of

18   including the citizenship question, would it be

19   desirable, from the Census Bureau's perspective,

20   from a cost-benefit perspective, if a court issued

21   a ruling stating that the Census Bureau no longer

22   had to include a citizenship question on the

Page 436

1          (Whereupon, a short recess was taken.)

2          (Abowd Deposition Exhibit Numbers 28 and

3     29 were marked for identification.)

4          THE VIDEOGRAPHER:   Back on the record at

5     11:24.

6              EXAMINATION BY COUNSEL FOR

7                 THE STATE OF NEW YORK

8     BY MS. FIDLER:

9        Q    Good morning, Dr. Abowd.   I'm Danielle

10    Fidler with the New York attorney general's office

11    representing the State of New York in this matter.

12       A    Hi.

13       Q    We just wanted to -- we had asked you,

14    before we took a break, about trying to get a

15    sense -- because a court will certainly need to

16    know the answer -- of how long it has to decide

17    this matter.   And so does the Census Bureau --

18    given existing resources, what's the drop-dead

19    date by which the Census Bureau could guarantee

20    implementation of the 2020 census without a

21    citizenship question?

22       A    So I did check.   I actually asked the

1   acting director to give me an answer that is the

2   agency's answer.  With existing resources,

3   June 30th of 2019 is the content lock-down date.

4   With exceptional effort and additional resources,

5   October 31st, 2019 is the final date.  Any date

6   after that would require major redesigns in the

7   2020 census, and some might require congressional

8   authorization to change the census date.

9        Q    I'd like to turn to what has been marked

10  in advance as Exhibit 28.  You have it before you.

11  It's the 2020 census -- census barrier attitudes

12  and motivators survey, CBAMS, high-level findings,

13  dated August 29th, 2018.  Are you familiar with

14  this document?

15       A    I have seen this document before.  I

16  haven't reviewed it.

17       Q    Can you please describe what the census

18  barriers, attitudes and motivators surveys are?

19       A    We expand that acronym differently in

20  some places.  So there's the census barrier,

21  attitudes and motivators studies.  One component

22  was survey and one component was focus group.

1            So the survey component was a probability

2    sample of 50,000 households, of which 17,000

3    responded.  And the focus group component was a

4    series of 42 focus groups that were conducted.

5    And they have both been entitled CBAMS.  So --

6    this is about the survey.

7         Q    Okay.  How is the information from the

8    CBAMS used by the Census Bureau?

9         A    The primary reason for conducting the

10   CBAMS is to inform the communication -- integrated

11   partnership and communication program in the

12   development of the partnership materials and the

13   communication materials.  It is a part -- CBAMS,

14   both the survey and the focus groups, are a part

15   of the integrated communication contract.  And

16   Young & Rubicam is the prime contractor on that.

17        Q    And that plan actually does form a

18   significant part of the Bureau's NRFU plan,

19   correct?

20             MR. EHRLICH:  Objection.  Form.

21             THE WITNESS:  So the integrated

22   partnership and communications program runs

Page 440

```
 1    to be quantitative data?
 2         A    Yes.
 3         Q    And would you consider the focus group
 4    responses to be qualitative data?
 5         A    Yes.
 6         Q    And does the bureau find the findings
 7    from the CBAM, both -- well, we'll start with the
 8    quantitative data -- to be generalizable in its
 9    conclusions about the questions that it's seeking
10    to answer?
11         A    We found, in advance of the 2010 census,
12    that the much more limited CBAMS survey that we
13    ran at that time provided actionable information
14    that informed and improved the communication and
15    partnership campaign during that census.  And
16    that's what we expect from the survey and the
17    focus group components this time.
18         Q    Okay.  And I'd like to have you take a
19    look at what's been marked as Exhibit 29.  This
20    is -- it starts with administrative record 13025
21    at the bottom.  And the first page says, 2020
22    CBAMS focus groups - audience summary report.
```

Page 441

```
 1              Have you seen this document before?
 2      A      Yes.
 3      Q      Okay.  Is it -- these are summary reports
 4  of the focus groups; is that correct?
 5      A      That's correct.
 6      Q      And is this -- is information from these
 7  focus groups summarized in Exhibit 28, the
 8  PowerPoint?
 9      A      I'm going to have to look.  I didn't
10  think so, but I might be wrong.
11              Yes, it is.
12      Q      Okay.
13      A      So the cover of this presentation should
14  say survey and focus groups.
15      Q      Thank you.  I'd like to turn to -- let's
16  see.  There's a slide -- it's slide 5.  The Bates
17  number is COM_DIS00010674.  And the title is,
18  "Distrust in census and government may complicate
19  outreach to some communities."
20              Have you found that page?
21      A      Yes.
22      Q      Okay.  Just as a background question, are
```

Page 442

1    there any revised or more recent versions of this

2    PowerPoint that you know of?

3         A    Not that I'm aware of.

4         Q    Okay.  The last bullet states that a

5    number of focus group participants -- or the

6    second to the last bullet -- "A number of focus

7    group participants responded negatively to adding

8    the citizenship question, most notably Spanish

9    (U.S. mainland) as well as Vietnamese, Chinese,

10   NHPI, and members of the female MENA group."

11             What does that mean?

12        A    So the way that we draw conclusions from

13   focus groups is that we follow a similar protocol

14   in stimulating conversation in each focus group,

15   take the transcripts from those focus groups and

16   double-code the responses, and then look for

17   common answers across the focus groups, and then

18   see what was the target recruitment group for that

19   set of focus groups that had common responses.

20   And that's what's being characterized here.

21             So that people recruited in the focus

22   groups who mentioned citizenship as a barrier came

1    from focus groups that were recruited to have

2    Chinese, Vietnamese, Spanish, Native Hawaiian and

3    Pacific Islander, and MENA, Middle Eastern and

4    North Africa.

5        Q    And why was this bullet included in the

6    PowerPoint?

7        A    I believe to draw the attention of people

8    who are using this to -- that finding of the focus

9    groups.

10       Q    And what significance, if any, does the

11   Census Bureau accord to these focus groups with

12   respect to self-response rates on the 2020 census?

13       A    I think I've been asked this before, so

14   I'm trying to give a consistent answer.  The

15   quantitative evidence from the survey comes from

16   probability samples.  And the recruitment targets

17   in the focus groups are from groups that we have

18   trouble getting responses to the probability

19   samples.  So they're complementary in that sense.

20          We learn from the focus groups because we

21   try to be successful in recruiting into the focus

22   groups people who are hard to count, and in fact,

Page 444

1    you actually had to score high on a hard-to-count

2    index in order to be recruited into these focus

3    groups.  That basically means that they're the

4    groups that are most difficult to get responses in

5    the survey, not necessarily for the same reasons,

6    but as a general category.

7           And so we view this as being able to

8    interview the people that either didn't respond or

9    were very reluctant to respond to a survey

10   component and attempt to discover what it is about

11   the process or about any other aspect of the data

12   collection activity that makes them reluctant to

13   respond.

14          And then we try to design a partnership

15   and communication campaign that addresses those

16   issues, run additional tests, qualitative tests,

17   to see if the messaging is successful in

18   overcoming the barriers.

19      Q    Thank you.  Were you aware that this

20   document was saved electronically under the file

21   name 2020 CBAMS preliminary findings deck for

22   Under Secretary 8/29/18?

Page 445

```
 1     A    No.
 2     Q    Was this PowerPoint presented to the
 3   Under Secretary for Commerce?
 4     A    To the --
 5     Q    Was this PowerPoint presented to the
 6   Under Secretary, Ms. Dunn Kelley?
 7     A    I believe so, yes.
 8     Q    Okay.  Anyone else that you know of?         401;
 9     A    I don't have personal knowledge other      403
10   than the -- it was presented to the Secretary as
11   well.
12     Q    Okay.  And do you know when it was
13   presented to them?
14     A    I don't.
15     Q    Roughly?
16     A    Sorry?
17     Q    Roughly, even?
18     A    Within the last month.
19     Q    Okay.  And what was the context for
20   presenting it to them?
21     A    The Secretary -- the presentation that I
22   know about is the regular meeting that the
```

1      Q     And is there -- was there a response that
2    was noted?
3      A     I think that that's a more appropriate
4    question for the regular attendees of this
5    meeting.  There was a discussion.  I was in the
6    room.  I did hear the discussion.  I don't know
7    what constitutes a response in that context
8    because I -- that's the only one I've ever been in
9    and I wasn't there as a part of this discussion.
10            So I know it was presented to him.  And
11   if you would like me to clarify, I will clarify.
12            The Secretary was looking for indications
13   from the team that they were responding in the
14   development of the communication and partnership
15   campaign -- there was -- there were people from
16   the partnership campaign there, too -- responsive
17   to this information.  And the questions indicated
18   that he thought that we should be responsive to
19   this information.  And the partnership and
20   communication people both communicated that they
21   intended to be responsive to it.
22            But this was the first presentation of

Page 448

1   what we learned, and now the intensive effort to

2   design both the partnership materials and the

3   communication campaign was going to kick off and

4   would be informed by this.

5       Q    And since you were in the room, was there

6   concern expressed about this particular -- the

7   response to the citizenship question to these

8   groups?  Was that highlighted -- did the Secretary

9   or Under Secretary have a concern about this?

10      A    I'm very reluctant to characterize either

11  the Under Secretary or the Secretary's actions as

12  a concern or not a concern.  Attention was paid.

13  It was acknowledged to be a challenge in

14  conducting the census.  And much more of the

15  attention was focused on how this information

16  would be used to inform the partnership and

17  communication campaign.

18      Q    Okay.  What, if anything, was discussed

19  with respect to the negative focus group response

20  to the citizenship question?  Like, any -- was

21  there anything in particular beyond what you've

22  discussed right now?

401;
403

Page 449

1      A    Time was spent on that slide --

2      Q    Okay.

3      A    -- and attention was drawn to that fact

4  and it was discussed.

5      Q    Okay.  Turning to Exhibit 28, which is

6  the summary -- I'm sorry, Exhibit 29, my

7  apologies -- the summary of the CBAM focus groups.

8  Could you please go to what's -- and that starts

9  with the -- 13025.  If you could please go to

10  13045.  This is titled at the top the 2020 CBAMS

11  focus groups - audience summary report for

12  Spanish, U.S. mainland.  Do you see that?

13      A    Yes.

14      Q    Okay.  And if you go to the next page,

15  which is 13046, this is the summary of emerging

16  themes from that focus group, correct?

17      A    Okay.

18      Q    And this is prepared by the team after

19  having watched the focus group, correct?

20      A    And processed the transcripts.

21      Q    Okay.  If you go down to the third

22  emboldened sentence, it says, "The citizenship

Page 450

1   question is a determining factor for

2   participation."   Then it says, "All four Spanish,

3   U.S. mainland, focus groups took place after the

4   March 27, 2018 announcement that the 2020 census

5   will include a question on citizenship.

6   Participants in all locations mentioned the

7   citizenship question before the moderator asked

8   about, except for Houston Group 1 participants.

9   Most participants said that though they personally

10  are citizens or legal residents and are not afraid

11  to answer the citizenship question, they know many

12  others who will not fill out the question or the

13  form altogether out of fear.   While all

14  participants expressed the desire to be counted,

15  fear of deportation outweighs any benefits."

16          Isn't this a strong indication that the

17  citizenship question will drive down participation

18  significantly among this community?

19          MR. EHRLICH:   Objection.   Form.

20          THE WITNESS:   This is a focus group

21  indication from a hard-to-count population that

22  the citizenship question is viewed as extremely

Page 451

1    problematic in that population.

2    BY MS. FIDLER:

3        Q    And aren't people afraid of deportation

4    the least likely to participate at all in the

5    census or to be swayed by NRFU efforts?

6        A    I'm not prepared to say the least likely

7    to participate at all.  I'm prepared to

8    acknowledge that they're an extremely difficult

9    group to count.

10       Q    Isn't it reasonable to conclude that if

11   there's a fear of deportation, that NRFU efforts

12   are unlikely to be successful?

13           MR. EHRLICH:  Objection.  Form.

14           THE WITNESS:  No.

15   BY MS. FIDLER:

16       Q    And why not?

17       A    We define NRFU success as our ability to

18   characterize a housing address as vacant, occupied

19   or non-existent, and to process the information

20   about the occupants when we deem it occupied.

21       Q    In light of the concerns raised by this

22   community, doesn't this indicate that if there's a

Page 452

1    citizenship question on the census, trusted

2    partners will have additional challenges in

3    convincing this community to participate?

4         A    Yes.

5         Q    Wasn't it also indicated from this focus

6    group that this community does care about

7    participation in the census?

8         A    Yes.

9         Q    That they would like to participate in

10   the census, in fact?

11        A    That's a reasonable conclusion.

12        Q    They expressed that they understand the

13   benefits to their community of participating in

14   the census; isn't that correct?

15        A    Yes.

16        Q    And so it indicates that the community

17   would participate -- would be more likely to

18   participate in the census if there was not a

19   citizenship question, correct?

20        A    Should I interpret "participate" to mean

21   self-respond?

22        Q    Yes, self-response.

Page 453

1          A      Yes.

2          Q      It mentions that, in this focus group, on

3    the fear of -- the paragraph above the one we read

4    states, in the middle of that paragraph,

5    "Additionally, while there were suggestions of

6    trusted voices, there does not seem to be a single

7    trusted voice that could mitigate their distrust

8    of the government to uphold the promise of

9    confidentiality."

10              So doesn't that indicate that trusted

11   partners will have a difficult time convincing

12   this community to participate in the census with a

13   citizenship question?

14         A      Again, if participate means

15   self-response --

16         Q      Self-response.

17         A      -- yes.

18         Q      Just generally speaking, this information

19   is noted in all of these -- all of the summaries,

20   that -- by way of background, that the information

21   will be used to inform the 2020 census

22   communications campaign.   Has that already -- has

Page 454

1    this information already been incorporated into

2    the integrated communication plan?

3         A     The -- team Y&R, in collaboration with

4    its census staff, with census staff who are

5    working with them, were taking this information

6    immediately into the design of the media and

7    partnership materials which are -- they're in

8    content design phase now.

9         Q     Okay.  So then is there anything we could

10   look to currently that would reflect this -- the

11   influence of this information?

12        A     Do you mean have they produced any

13   materials?

14        Q     Correct.

15        A     None that I'm aware of.

16        Q     Okay.  On page 13031, in the fourth major

17   heading, the last sentence --

18        A     Community benefits?

19        Q     Community benefits.  The last sentence of

20   that paragraph says, "In addition, since many

21   participants had varying grasps about census

22   outcomes, the more they understood how the census

1    drove resources and services to any given

2    community, the greater they felt compelled to

3    participate."

4            This is an indication that the moderators

5    indicate that local counts, local census counts,

6    are critical to ensuring representative levels of

7    funding for particular communities, and they

8    convey this information to the participants,

9    correct?

10       A    Yes.

11       Q    And part of the reason the Census Bureau

12   is trying to inform people of this connection

13   between the census and the funding is because in

14   order to ensure adequate funding, communities need

15   accurate enumeration, correct?

16            MR. EHRLICH:  Objection.  Form.

17            THE WITNESS:  Correct.

18   BY MS. FIDLER:

19       Q    And many of the respondents in the CBAM

20   summaries indicate they already know about this

21   connection, correct?

22       A    Your characterization.  I haven't read

Page 456

1   through all the data, but I won't dispute it.

2      Q    Okay.  The Census Bureau acknowledges,

3   and you mentioned earlier, that there are local

4   undercounts for many hard-to-reach populations

5   that can exist and have sometimes persisted for

6   some time, for example, with the Hispanic

7   community, correct?

8           MR. EHRLICH:  Objection.  Form.

9           THE WITNESS:  So I don't think I said

10  that.  I said that we had documented differential

11  net undercounts at the national level.

12  BY MS. FIDLER:

13     Q    And those -- at the national level and

14  there can -- and there are -- there's data to show

15  that there have been persistent undercounts of the

16  Latin -- of the Hispanic community in particular,

17  correct?

18           MR. EHRLICH:  Objection.  Form.

19           THE WITNESS:  At the national level,

20  correct.

21  BY MS. FIDLER:

22     Q    With regard to local population, if there

1    are undercounts, funding for things like schools

2    and Medicare that rely on census population

3    numbers can be decreased, correct?

4           MR. EHRLICH:  Objection.  Form.

5           THE WITNESS:   The relation between

6    population measures for local communities and

7    funding is sometimes direct and sometimes

8    indirect.  In most cases, having a larger

9    population implies a larger share of the total

10   resource being allocated.

11   BY MS. FIDLER:

12       Q    Many respondents throughout the study

13   indicated an understanding that information is

14   required to be kept confidential, but also

15   indicated a fear that this could change and be

16   used against them in the future.  Are you familiar

17   with that?

18       A    Yes.

19       Q    Is that a concern of the Census Bureau?

20       A    The Census Bureau is not concerned about

21   the current confidentiality protections embodied

22   in title 13.  Like any law, a law can be modified,

1    amended.  Statistical agencies in general, and the

2    Census Bureau among them, would be extremely

3    concerned if the respondent confidentiality

4    clauses were removed from title 13.

5        Q    For those who have this fear about the

6    potential for change, aren't those who have this

7    belief less likely to self-respond to the census

8    or to respond to an enumerator?

9            MR. EHRLICH:  Objection.  Form.

10           THE WITNESS:  I'm willing to summarize

11   both the quantitative and the qualitative evidence

12   suggesting that the groups that you have isolated

13   in your question are less likely to self-respond.

14   BY MS. FIDLER:

15       Q    On page 13040 in this summary, one of the

16   emerging themes identified -- and this is a native

17   Hawaiian and Pacific Islander, but it comes up

18   elsewhere as well -- is multigenerational housing

19   as a potential barrier.  "Participants expressed

20   concerns about sharing information about the

21   number of people who live in their households.  It

22   is a common practice on the islands to live with

1   extended family or to have more people living in

2   their house than are listed on the lease or

3   official documents.  These concerns present a

4   potential barrier for the NHPI audience, as some

5   participants were worried about landlords finding

6   out the number of people living in their

7   residence."

8           This is another area where you could

9   potentially have either a complete non-response,

10  non-self-response or, as was described earlier,

11  you could have a census response that did not

12  include all of the members of the household,

13  correct?

14      A    Yes.

15      Q    And when this occurs, the members that

16  are not identified are the ones least likely to be

17  found via imputation or other methods, correct?

18  They're the most likely to be omitted as part of a

19  gross omission.

20      A    Could you unpack that question, please?

21      Q    Sure.  For the -- for the households that

22  have multigenerational housing, as described here,

Page 460

1    who do not want to disclose all of the members of

2    their household, to the extent that they do not do

3    so, that is where you are likely to have

4    omissions, correct?

5        A    That is where nothing in the current

6    census protocol would correct that particular

7    omission.

8        Q    And these types of omissions can lead to

9    localized or -- undercounts, correct?

10            MR. EHRLICH:  Objection.  Form.

11            THE WITNESS:  So net undercount is the

12   difference between omissions and erroneous

13   enumerations and whole-person census imputations.

14   And these kinds of errors can affect both sides of

15   that equation.

16   BY MS. FIDLER:

17       Q    For those who have these

18   multigenerational households, they're the -- it's

19   unlikely that their landlord would be able to

20   provide information about them, correct, because

21   they wouldn't know?

22            MR. EHRLICH:  Objection.  Form.

1    BY MS. FIDLER:

2        Q     Let me back up.  This is a focus group

3    that's describing that they do not want to provide

4    information because it is their understanding that

5    their landlords do not know that these numbers are

6    living in their household, correct?

7        A     Understood, yes.

8        Q     And in those cases when the census is

9    relying on proxy information, in part -- one of

10   the sources for proxy information are landlords,

11   correct, and landlord records, correct?

12       A     Yes.

13       Q     But in those cases where the landlords do

14   not know about the multigenerational housing, that

15   information would not be there, correct?

16       A     That's a reasonable presumption, yes.

17       Q     And so for subpopulations where

18   multigenerational housing is common, this could

19   present a problem for an accurate count of that

20   subpopulation, correct?

21       A     Yes.

22             MR. EHRLICH:  Objection.  Form.

Page 462

1              THE WITNESS:   Yes.

2    BY MS. FIDLER:

3        Q    This is also an area where reliance on

4    trusted partners is actually quite helpful for the

5    Census Bureau, correct?

6        A    I'm sorry.  I was asking Mr. Ehrlich a

7    question.

8        Q    The -- the types of housing where there's

9    multigenerational housing or people living in

10   basements is an area where trusted partners are

11   actually critical to helping the census get

12   accurate information, correct?

13       A    They're very important, yes.

14       Q    And as we've discussed, trusted partners

15   may have a difficult time convincing these

16   communities to provide that information if there's

17   a citizenship question on the census, correct?

18            MR. EHRLICH:   Objection.   Form.

19            THE WITNESS:   Yes.

20   BY MS. FIDLER:

21       Q    How do omissions affect both sides --

22            MR. EHRLICH:  Counsel, can I just

Page 463

1   interrupt for one second?  I think we've reached

2   our time.  Are you nearing an end of the

3   questioning?

4           MS. FIDLER:  Yeah.  I've got, like, one

5   question, possibly two.

6           MR. EHRLICH:  Okay.  Because I think

7   Dr. Abowd also needs a break anyway.  So it works

8   out.

9           MS. FIDLER:  Thank you.

10  BY MS. FIDLER:

11      Q      How do omissions affect both sides of net

12  undercount calculations?

13      A      No, what I said is that net undercount is

14  the difference between omissions and erroneous

15  enumerations, plus whole census [sic] imputations.

16  And the enumeration difficulties that you were

17  asking me about can both affect gross omissions

18  and erroneous enumerations and whole-person

19  imputations; since there's a difference, they can

20  cancel.

21          MS. FIDLER:  That's actually my last

22  question.  Thank you so much for your patience.

Page 468

1    New York Immigration Coalition v. US Dept.of Commerce

2    John Abowd, 30(b)(6)

3           ACKNOWLEDGMENT OF DEPONENT

4              I, _____, do

5      hereby certify that I have read the foregoing

6      pages and that the same is a correct

7      transcription of the answers given by

8      me to the questions therein propounded,

9      except for the corrections or changes in form

10     or substance, if any, noted in the attached

11     Errata Sheet.

12

13     _____        _____

14     DATE                   SIGNATURE

15

16

17

18

19

20

21

22     3028797

# EXHIBIT C

# EXHIBIT A

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3   ---------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

 4

                      Plaintiffs,

 5         vs.        Case No.  1:18-CF-05025-JMF

 6   UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 7                    Defendants.

     ---------------------------------------

 8
     Global
 9   Objection:       Washington, D.C.
     401; 403
10                    Thursday, August 30, 2018

11   Deposition of:

12                    EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22
```

Page 2

1                          CONTENT

                                          PAGE
2
     EARL COMSTOCK                          9
3    Examination by Mr. Colangelo           9
     Examination by Mr. Gersch             241
4    Examination by Mr. Rosenberg          336
     Examination by Ms. Senteno            381
5    Examination by Ms. Boutin             419
6
7             COMSTOCK DEPOSITION EXHIBITS
8    EXHIBIT                               PAGE
     NUMBER
9    Plaintiffs' Exhibit 1    Email         56
     Plaintiffs' Exhibit 2    Email         62
10   Plaintiffs' Exhibit 3    Email         82
     Plaintiffs' Exhibit 4    Email         87
11   Plaintiffs' Exhibit 5    Memo          93
     Plaintiffs' Exhibit 6    Email        114
12   Plaintiffs' Exhibit 7    Email        120
     Plaintiffs' Exhibit 8    Email        123
13   Plaintiffs' Exhibit 9    Email        137
     Plaintiffs' Exhibit 10   Email        145
14   Plaintiffs' Exhibit 11   Email        147
     Plaintiffs' Exhibit 12   Email        158
15   Plaintiffs' Exhibit 13   Email        164
     Plaintiffs' Exhibit 14   Email        167
16   Plaintiffs' Exhibit 15   Memo         182
     Plaintiffs' Exhibit 16   Memo         189
17   Plaintiffs' Exhibit 17   Meeting      194
                              notification
18   Plaintiffs' Exhibit 18   Email        199
     Plaintiffs' Exhibit 19   Email        212
19   Plaintiffs' Exhibit 20   Email        215
     Plaintiffs' Exhibit 21   Email        218
20   Plaintiffs' Exhibit 22   Email        219
     Plaintiffs' Exhibit 23   Email        221
21   Plaintiffs' Exhibit 24   Email        224
     Plaintiffs' Exhibit 25   Email        226
22   Plaintiffs' Exhibit 26   Email        234
     Plaintiffs' Exhibit 27   Testimony from  293

Page 3

| | | | |
|---|---|---|---|
| 1 | | Committee on Oversight and | |
| 2 | | Government Reform | |
| 3 | Plaintiffs' Exhibit 28 | Memo | 309 |
| | Plaintiffs' Exhibit 29 | Memo | 317 |
| 4 | Plaintiffs' Exhibit 30 | Decisional memorandum | 326 |
| 5 | Plaintiffs' Exhibit 31 | Questions on draft Census | 372 |
| 6 | | memo | |
| | Plaintiffs' Exhibit 32 | Memo | 374 |
| 7 | Plaintiffs' Exhibit 33 | Questions on draft Census | 376 |
| 8 | | memo | |
| | Plaintiffs' Exhibit 34 | Email | 378 |
| 9 | Plaintiffs' Exhibit 35 | Trump campaign email | 383 |

10

11         (Exhibits attached to transcript.)

12

13

14

15

16

17

18                Veritext Legal Solutions
                    Mid-Atlantic Region
                1250 Eye Street NW - Suite 350
19               Washington, D.C.  20005

20

21

22

```
                                                        Page 4
 1              A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
            David Gersch, Esquire
 4          ARNOLD & PORTER

 5

 6

 7          Perry Grossman, Esquire
            New York Civil Liberties Union
 8

 9

10

    On behalf of Kravitz Plaintiffs:
11          Daniel Grant, Esquire
            COVINGTON & BURLINGTON
12

13

14

    On behalf of Los Angeles Unified School District:
15          Brian Park, Esquire (Telephonically)
            DANIELS WOLIVER KELLEY
16          115 Pine Avenue
            Suite 500
17          Long Beach, California 90802
            (562) 366-8500
18          bpark@dwkesq.com
19  On behalf of County of Los Angeles:
            David I. Holtzman, Esquire
20          HOLLAND & KNIGHT
            50 California Street, Suite 2800
21          San Francisco, California 94111
            (415) 743-6909
22          david.holtzman@hklaw.com
```

Page 5

```
1    On behalf of LUPE Plaintiffs:
         Andrea Senteno, Esquire
2        MALDEF
```



```
5

6        Niyati Shah, Esquire
         John C. Yang, Esquire
         ASIAN AMERICANS ADVANCING Justice
7

8

9

10

11       Ezra Rosenberg, Esquire
         Dorian Spence, Esquire
         LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
12

13

14

15
     On behalf of State of California:
16       Gabrielle Boutin, Esquire
         R. Matthew Wise, Esquire (Telephonically)
17       DEPARTMENT OF JUSTICE
         OFFICE OF THE ATTORNEY GENERAL
18       1300 I Street
         P.O. Box 944255
19       Sacramento, California 94244
         (916) 210-6053
20       gabrielle.boutin@doj.ca.gov
         matthew.wise@doj.ca.gov
21

22
```

Page 6

```
 1   On behalf of State of New York:
          Danielle Fidler, Esquire
 2        Elena Goldstein, Esquire
          Matthew Colangelo, Esquire
 3        Alex Finkelstein, Esquire
          ASSISTANT ATTORNEY GENERAL
 4        ENVIRONMENTAL PROTECTION BUREAU

 5        ████ ██████  ████████
          ████████ █████  ██████
          ██████ █████
 6        ███████████████████████████
          ███████████████████████████
 7        ████████████████████████████████
 8
     On behalf of Defendants:
 9        Kate Bailey, Esquire
          Joshua Gardner, Esquire
10        U.S. DEPARTMENT OF JUSTICE
          20 Massachusetts Avenue
11        Washington, D.C. 20530
          (202) 305-9802
12        kate.bailey@usdoj.gov
          joshua.gardner@usdoj.gov
13
          Michael Cannon, Esquire
14        David M.S. Dewhirst,Esquire
          U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
15        ASSISTANT GENERAL COUNSEL FOR FINANCE &
          LITIGATION
16        1401 Constitution Avenue, NW
          Room 5890
17        Washington, D.C. 20230
          (202) 482-5395
18        mcannon@doc.gov
          ddewhirst@doc.gov
19
          Michael Walsh, Jr., Esquire
20        DEPUTY GENERAL COUNSEL
          1401 Constitution Avenue, NW
21        Washington, D.C. 20230
          (202) 482-4772
22        mwalsh@doc.gov
```

Page 7

1    VIDEOGRAPHER:   Dan Reidy

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 8

1                   P R O C E E D I N G S

2       WHEREUPON,

3              VIDEOGRAPHER:  Good morning.  We are

4       going on the record at 9:01 a.m. on Thursday,

5       August 30, 2018.  Please note that the microphones

6       are sensitive and may pick up whispering, private

7       conversations and cellular interference.  Please

8       turn off all cell phones or place them away from

9       the microphones, as that can interfere with the

10      deposition audio.  Audio and video recording will

11      continue to take place unless all parties agree to

12      going off the record.

13              This is Media Unit 1 of the video

14      recorded deposition of Earl Comstock to be taken

15      by counsel for the plaintiff in the matter of the

16      New York Immigration Coalition, et al., v. The

17      United States Department of Commerce, et al.  This

18      case is filed in the United States District Court

19      for the Southern District of New York.  This

20      deposition is being held at the law office of

21      Arnold & Porter located a 601 Massachusetts Avenue

22      Northwest, Washington, D.C. 20001.

                                                          Page 9

1            My name is Dan Reidy from the firm

2    Veritext Legal Solutions, and I am the

3    videographer.  The court reporter is Karen

4    Jorgenson from Veritext Legal Solutions.

5            I am not authorized to administer an

6    oath.  I am not related to any party in this

7    action, nor am I financially interested in the

8    outcome.

9            Also, counsel appearances will be noted

10   on the stenographic report rather than orally at

11   this time.

12           Will the court reporter please swear in

13   the witness?

14                    EARL COMSTOCK,

15   called as a witness, and having been first duly

16   sworn, was examined and testified as follows:

17           THE WITNESS:  I do.

18             EXAMINATION BY MR. COLANGELO:

19    Q    Please state your name and work address.

20    A    Earl Comstock, U.S. Department of

21   Commerce.

22    Q    And we met a minute ago, but for the

Page 13

1          And are you currently admitted to the

2   practice?

3        A    In the District, yes.

4        Q    In D.C.

5          Is your registration active or inactive?

6        A    I believe it's active.  I'd have to go

7   double-check.

8        Q    Okay.  And are you admitted in any other

9   states?

10        A    I was admitted in Alaska and that's

11   inactive.

12          (Thereupon, the court reporter

13   clarified.)

14   BY MR. COLANGELO:

15        Q    And tell me what your college degree

16   field of study was?

17        A    Political science.

18        Q    Do you have any education training or

19   experience in statistics?

20        A    Did -- well, George Mason University does

21   accounting, statistics and economics for lawyers,

22   which is a required part of the course.  So I had

Page 14

1   two years of that, and also had an environmental

2   science minor at UCSB, so did a number of

3   statistics and chemistry and biology courses in

4   relation to that.

5        Q    And by in relation to that, you mean in

6   relation to the environmental science degree?

7        A    Correct.

8        Q    Okay.  Do you have any education,

9   training or experience in survey methodology?

10       A    No.

11       Q    Do you have any education, training or

12  experience in demography?

13       A    Other than basic introduction to

14  demography, no.

15       Q    What do you mean by introduction?

16       A    Well, what you take in an undergraduate

17  course that covers demography.

18       Q    Okay.  Do you have any education,

19  training or experience in voting rights law?

20       A    No.

21       Q    Do you have any education training or

22  experience in redistricting?

1      A    No.

2      Q    Do you have any education, training or

3  experience in election law?

4      A    Again, other than as an attorney and the

5  ability to read laws, no.

6      Q    Okay.  By as an attorney and the ability

7  to read laws, you mean if you needed to read a

8  law, you could?

9      A    Meaning if I had read a statute related

10  to those, then I would be able to understand it,

11  yes.

12      Q    But you've never studied election law?

13      A    I've never studied election law.

14      Q    You've never practiced election law?

15      A    No.

16      Q    Okay.  Were -- between November 2016 and

17  February 2017, you were a member of the

18  presidential transition team?

19      A    From November -- yeah, just after

20  Thanksgiving until I began working for the

21  Department of Commerce, yes.

22      Q    Okay.  And when did you begin working at

1        A    Yes.

2        Q    Do you remember a meeting that you and

3   Wendy and the Secretary attended on the 18th after

4   the confirmation hearing?

5        A    Not with any particularity, no.

6        Q    Okay.   Mr. Comstock, tell me what your

7   current position is?

8        A    I'm the deputy chief of staff and

9   director of policy.

10        Q    Deputy chief of staff and director of

11   policy.

12             When did you become the director of

13   policy?

14        A    On January 31st --

15        Q    January 31st.

16        A    -- 2017.

17        Q    The -- was January 31, 2017 your first

18   day in the office at the Commerce Department?

19        A    Yes.   If I'm recalling correctly, that

20   that was Monday, yes.   It was the 30th or 31st.

21   It was whatever the Monday was at the end of

22   January.

Page 35

1      Q    Other than the personnel onboarding, did

2   you have conversations --

3      A    No.

4      Q    -- with anyone at the Commerce Department

5   between January 20th and January 30th of 2017?

6      A    No.

7      Q    Did you have any conversations with

8   Secretary Ross between January 20th and

9   January 30th of 2017?

10     A    Nothing particularly that I recall, but

11  I'm sure I talked to him, yes.

12     Q    Okay.  You mentioned that your title is

13  deputy chief of staff and director of policy.

14          When did you became deputy chief of

15  staff?

16     A    In April of this year.

17     Q    So from January 30, 2017 until

18  April 2018, you were director of policy?

19     A    Correct.

20     Q    Is director of policy a position within

21  the Office of the Secretary?

22     A    Yes.

Page 36

1      Q    And is that the same as director of

2   policy and strategic planning?

3      A    Correct.

4      Q    Who do you report to?

5      A    The Secretary.

6      Q    Directly to the Secretary?

7      A    Well, and to the chief of staff and to

8   the deputy secretary.

9      Q    Okay.  Was there a chief of staff on

10   January 30, 2017?

11      A    There was not.

12      Q    Okay.  So until there was a chief of

13   staff, who would you say you reported to?

14      A    Well, until the Secretary came on board,

15   sort of no one.

16      Q    Okay.

17      A    No.  The -- the acting deputy secretary,

18   obviously, was the career official who was in

19   charge of making any final decisions for the

20   department, so --

21      Q    And can you identify her for the record?

22      A    Ellen Herbst.

Page 40

```
 1      Q   2018?

 2      A   Sorry.  2017.

 3      Q   So you mentioned you work on whatever the

 4   Secretary wants you to work on?

 5      A   Correct.

 6      Q   How does he identify matters that he

 7   wants you to work on?

 8      A   He says, Earl, can you get this done?  Or

 9   we attend this meeting, and he says, can you

10   follow up on that?

11      Q   And how do you keep the Secretary

12   informed about what you are doing on important

13   matters or on assignments that he's given you?

14      A   By email, by oral briefing, and sometimes

15   by memos.

16      Q   How do you decide whether you're going to

17   update Secretary Ross by email, by briefing or by

18   memo?

19      A   Just depends on the time frame, the speed

20   of which I need to get something to him, how

21   extensive it is.  You know, if there's a lot of

22   information that it would be helpful for him to
```

1      A    No.

2      Q    Please explain.

3      A    Well, again, it depends on who you're

4  talking about at the policy office.  If you're

5  talking about my staff at the policy office, they

6  do not, as a general rule, develop the policy.

7  The policy is generally developed by the Secretary

8  with input from me and with input from them when

9  needed.

10     Q    And not with input from the bureaus?

11     A    Well, absolutely.  We go back and forth

12  with the bureaus all the time.

13     Q    You mentioned that the individuals in the

14  policy office monitor specific areas; is that

15  right?

16     A    Correct.

17     Q    Do you have somebody assigned to monitor

18  the Census Bureau?

19     A    Yes.

20     Q    Who is that?

21     A    David Langdon.

22     Q    And what is David Langdon's background?

```
 1      A    He is in the Economic & Statistics
 2   Administration and knows -- knows the people down
 3   there, knows how to get stuff done, so --
 4      Q    Okay.  And did you hire Mr. Langdon?
 5      A    I did not.
 6      Q    Was he in the policy office when you got
 7   there?
 8      A    He was.
 9      Q    How often do you interact with the
10   Census Bureau?
11      A    Directly?  Depends on the issue.  Like
12   when we were doing the lifecycle cost estimate,
13   quite a bit.  When we were doing the census -- the
14   citizenship question, interacted with the staff
15   there -- the senior staff on a fairly frequent
16   basis.
17      Q    Do you have any standing meetings with
18   the Census Bureau?
19      A    No.  Well, other than when they come and
20   brief the Secretary sort of on a monthly basis,
21   I'll attend those meetings.
22      Q    Okay.  I'll come back to the monthly
```

Page 54

1   stakeholders?

2       A   I take meetings when the Secretary can't,

3   yes.

4       Q   Do you ever take meetings independent of

5   filling in for the Secretary?

6       A   Yeah, on major policy issues I'm working

7   on.

8       Q   Did you meet with outside stakeholders on

9   the citizenship question?

10      A   No.

11      Q   You didn't attend any meetings, including

12  with the Secretary, on the citizenship question --

13      A   I --

14      Q   -- with outside stakeholders?

15      A   With the outside stakeholders groups, no.

16      Q   When did you first hear about the notion

17  of adding a question about citizenship to the

18  decennial census?

19      A   Sometime in -- shortly after the

20  confirmation.

21      Q   And who did you hear it from?

22      A   The Secretary.

1      Q   And the Secretary was confirmed on

2  February 28, 2017; is that right?

3      A   I -- like I said, you'd have to confirm

4  that date, but I think that was the date, yes.

5      Q   And what did the Secretary tell you about

6  the idea of adding a question on citizenship to

7  the census during that first conversation shortly

8  after his confirmation?

9      A   Again, the exact time frame of the

10  conversation, I can't tell you.  It was sometime

11  in that spring period.  I don't recall the

12  details.  I think he simply inquired as to why

13  don't we have a citizenship question on the

14  census.

15      Q   Okay.  And what did you say to him when

16  he inquired?

17      A   Short answer, I don't know.  I'll check.

18      Q   Okay.  And would that interaction be

19  reflected in any documents?

20      A   I don't -- I don't believe so, but it's

21  possible it's in an email exchange.

22        MR. COLANGELO:  Can we mark as Exhibit 1,

Page 58

1      A   I see it, yes.

2      Q   And I take it that you would assume that

3  Earl refers to you?

4      A   I'm not aware of another Earl that works

5  at the department at the moment, so --

6      Q   Okay.  Certainly, not another Earl that

7  works at the Office of Secretary who's a political

8  appointee?

9      A   Correct.

10     Q   And then Mr. Langdon then says, "Earl is

11  very" -- underlined very -- "interested and thinks

12  the Secretary will be, as well."

13         Do you see that?

14     A   Yes.

15     Q   On February 2nd of 2017 would have been

16  your fourth day on the job; is that right?

17     A   Yep.

18     Q   Okay.  And do you recall telling

19  Mr. Langdon that you were very interested in

20  Congressional notification of decennial ACS

21  topics?

22     A   I recall telling him that we were very

Page 59

1    interested in the census and getting a briefing on

2    it.

3         Q    Okay.

4         A    I don't specifically recall that, but --

5         Q    Were you very interested in the decennial

6    topics on February 2, 2017?

7         A    What probably would have caught my

8    attention is if we had to notify Congress about

9    something, I would want to make sure we were up to

10   speed on what we needed to notify them about.

11        Q    As of this date, February 2, 2017, do you

12   recall if you had already had discussions

13   regarding adding a citizenship question to the

14   census?

15        A    I don't recall having a discussion before

16   that.

17        Q    Mr. Langdon's email says, quote, it would

18   make sense for John Thompson to touch on this

19   topic in his overview briefing and then to have a

20   follow-up briefing very soon.

21             Was Mr. Thompson the Census Bureau

22   director at the time?

1      A    Yes.

2      Q    And did that overview briefing take place

3   that's referred to in this email?

4      A    I imagine it did.

5      Q    Do you remember when that happened?

6      A    I couldn't tell you.

7      Q    Do you keep a calendar?

8      A    Yeah.  There's an electronic calendar

9   somewhere.

10      Q    And your calendar records the meetings

11   that you attend?

12      A    Generally, yes.

13      Q    Would it typically record a meeting with

14   the Census director?

15      A    It would depend if somebody sent me a

16   calendar invite.

17      Q    Would somebody typically send you a

18   calendar invite for a meeting with the Census

19   director?

20      A    At that point in time, possibly.  Yeah, I

21   don't know.

22      Q    The email refers, also, to a follow-up

Page 62

1      Q   We'll mark this exhibit Comstock

2   Exhibit 2.

3          (Plaintiffs' Exhibit 2, Email, was

4   marked.)

5   BY MR. COLANGELO:

6      Q   We are marking as Comstock 2 Document

7   Bates numbered 2521.

8          Mr. Comstock, take a look at this email.

9   You've seen this email before, right?

10     A   I sent it.

11     Q   So that's a yes?

12     A   Yes.

13     Q   Were you shown this email in preparation

14   for your deposition today?

15         MR. GARDNER:   I'm going to object and

16   instruct the witness not to answer on the grounds

17   of attorney work product.

18         I'm happy to let you answer when was the

19   last time you saw the document.

20         But you're asking about documents counsel

21   may have shown that would be protected.

22   BY MR. COLANGELO:

Page 63

1        Q    When's the last time you saw this

2    document, Mr. Comstock?

3        A    Yesterday.

4        Q    And do you see the subject line of this

5    email is your question on the census?

6        A    Yep.

7        Q    Okay.  And Secretary Ross was confirmed

8    on February 28th, I think we agreed; is that

9    right?

10        A    Like I said, if that's the date, yes.

11        Q    Okay.  So this would have been

12    Secretary Ross's eleventh day on the job as

13    Commerce Secretary, give or take?

14        A    Approximately, yes.

15        Q    And the subject line of this email is

16    your question on the census?

17        A    Right.

18        Q    What was the Secretary's question on the

19    census?

20        A    He appeared to have asked whether

21    undocumented people were counted in the census.

22        Q    Okay.  And how did he ask you that

Page 64

1  question?

2      A   I don't recall.  Probably at a meeting,

3  possibly following up on a census briefing.  I

4  don't know.

5      Q   Have you checked your calendar for

6  March 10, 2017 recently?

7      A   I was going to say I probably haven't

8  checked it from March 10, 2017 for that particular

9  date.

10      Q   Okay.

11      A   By the way, I wanted to add one point.

12  On the prior document, you need to understand that

13  at that time, there were a number of questions

14  that the prior administration had requested be

15  placed, potentially, on the census that would have

16  been involved in that notification.  So that would

17  have been a reason of why I would have been

18  interested in that, on sexual orientation and

19  gender identity.  So that was an issue that was

20  very at the forefront at the time of what to do

21  about those requests.

22      Q   So let's go back to Exhibit 2, your email

Page 65

1    to Secretary Ross on Friday, March 10th.  Do you

2    know why the Secretary asked you whether

3    undocumented people were counted?

4        A   I have no idea.

5        Q   Okay.  Did he ask you whether noncitizen

6    people were counted for apportionment purposes?

7        A   Well, based on the answer, it appears he

8    might have.

9        Q   Appears he might have or appears he did?

10       A   I couldn't tell you the answer on that.

11       Q   Okay.

12       A   I don't recall the question, so --

13       Q   Okay.  But you sent this email to the

14   Secretary in response to a question?

15       A   Yes.

16       Q   And you would have presumably tried to

17   make your answer responsive to his question?

18       A   I generally do that, yes.

19       Q   So you think it's likely that his

20   question was about whether undocumented immigrants

21   were counted for apportionment purposes?

22       A   That's entirely possible, but he might

Page 66

1    have also just asked do we count undocumented

2    persons, and this is what I found on the Census

3    website.

4        Q   How do you think you found it on the

5    Census website?

6        A   By typing in census and going to their

7    website and seeing what their FAQs say.

8        Q   So you think you would have gone directly

9    to the frequently asked questions page?

10       A   That would not be unusual for me to do,

11   yes.

12       Q   This link you've identified at

13   www.census.gov, that's the Census Bureau's

14   frequently asked web page for Congressional

15   apportionment; is that right?

16       A   Again, without pulling it up, I couldn't

17   tell you specifically what it says.

18       Q   Okay.  If I represent to you that if you

19   pulled up that website, it would say frequently

20   asked questions for Congressional apportionment,

21   would that assist you?

22       A   I'd be happy to take your word for it.

Page 67

1        Q    So does that assist you in recalling that

2    the Secretary asked whether noncitizens were

3    counted for apportionment purposes?

4        A    And I have no recollection of the

5    question, so I can only go by the answer.

6        Q    Okay.   The email also includes a blog

7    post from the Wall Street Journal; is that right?

8        A    Uh-huh.

9        Q    Okay.   And your email to the Secretary

10   says that this blog post, quote, confirms that

11   neither the 2000s, nor the 2010 census asked about

12   citizenship?

13       A    Correct.

14       Q    So does that lead you to conclude that

15   the Secretary asked about whether the decennial

16   census asks about citizenship?

17       A    That would be a reasonable supposition,

18   based on the response.

19       Q    And this blog post is called the pitfalls

20   of counting illegal immigrants; is that right?

21       A    Yep.

22       Q    And were you concerned on March 10, 2017

Page 68

1    about counting illegal immigrants?

2        A    I -- no, not personally.

3        Q    Was the Secretary concerned on

4    March 10, 2017 about counting illegal immigrants?

5        A    Again, I have no recollection of the

6    question, so I couldn't speculate as to what his

7    concern was.

8        Q    But you testified that a significant part

9    of your job function involves answering questions

10   from the Secretary on issues that matter to him,

11   right?

12       A    Correct.

13       Q    And if he asked you a question, you would

14   try to be responsive?

15       A    Generally, yes.

16       Q    You wouldn't ordinarily send him

17   information that wasn't responsive to a question

18   he asked, would you?

19       A    Not -- not characterized this way, no.

20       Q    So you testified a minute ago that the

21   Secretary -- that you first heard about the notion

22   of adding a question about citizenship to the

1   census when the Secretary raised it with you

2   shortly after his confirmation.   Does this email

3   indicate to you that it was by March 10th that the

4   Secretary first raised it with you?

5       A   I wouldn't necessarily draw that

6   conclusion from this email.

7       Q   Would you draw the conclusion that it was

8   later than March 10?

9       A   No, I wouldn't.   Again, this -- this

10  question does not directly address -- it's a

11  question about how -- who do we count, not whether

12  or not -- and whether there's a citizenship

13  question.   So I don't know at this point whether

14  he indicated he was interested in such a question,

15  other than getting the factual information.

16      Q   Okay.   Who would know when the Secretary

17  was interested in adding a citizenship question?

18          MR. GARDNER:   Objection.   Calls for

19  speculation.

20  BY MR. COLANGELO:

21      Q   You can answer.

22      A   My counsel just objected, so why can --

1   March of 2017?

2        A    Again, not that I recall.

3        Q    Let me direct you to the highlighted line

4   about three-quarters of the way down on the page

5   that is stamped 2521 -- and we apologize for the

6   copy quality.

7        A    I was going to say --

8        Q    This is how the document --

9        A    Think you highlighted it so nobody could

10  read it.

11       Q    -- was produced to us.

12       A    So this is not a redaction is what you're

13  telling me?

14       Q    Correct.  This is not a redaction.

15       A    If you can tell me what it says, I'd be

16  happy to --

17       Q    Sure.  The highlighted line says, "No

18  major government survey, including the decennial

19  census now underway, asks Americans about their

20  citizenship status."

21            And you see that this blog post is dated

22  May of 2010, correct?

1       A     Uh-huh.

2       Q     So the decennial census now underway, do

3   you understand we refer to --

4       A     Would have been the 2010, yeah.

5       Q     Remember to please wait for me to finish

6   my question before you answer.

7       A     Sure.

8       Q     Did you highlight this line?

9       A     Well, unless you did, then I'm assuming I

10  did.

11      Q     I can represent to you we did not

12  highlight this line.

13      A     Okay.  Then I will assume that it was

14  highlighted in the email.

15      Q     And why did you highlight this line of

16  the blog post before sending it to the Secretary?

17      A     Well, it appears that the question was

18  whether or not the citizenship question had been

19  asked, at least on the 2010 census, and so I'm

20  highlighting for him where in this article, so he

21  doesn't have to read the whole thing that I found

22  the information responsive to his question, which

Page 80

1    is a statement by somebody in Wall Street Journal,

2    which is, you know, in some circles considered a

3    reasonably accurate paper.   Stating that it was

4    not collected in the 2010 census.

5        Q    Okay.   And take a look -- let's do that

6    again.   We had some interference from the

7    conference line.

8            Take a look at the second page of

9    Comstock Exhibit 2.   This is the page marked 2522.

10       A    Yep.

11       Q    And, again, about two-thirds of the way

12   down the page, there's another highlighted line.

13           Do you see that?

14       A    I -- yep.

15       Q    I'll represent to you this line was

16   highlighted as the documents were produced to the

17   plaintiffs in this lawsuits.   We did not

18   highlight.

19       A    Okay.

20       Q    That line reads --

21       A    I can't read what it says.

22       Q    -- "Many more foreign-born residents were

1  counted in 2000 than was expected based on annual

2  estimates produced by the Bureau."

3       Do you see that line?

4    A   Yep.  I'm -- I see the highlighted line,

5  but I'm taking it at your word that that's what it

6  says.

7    Q   Okay.  The -- do you know why you

8  highlighted that line when you sent this blog post

9  to the Secretary?

10   A   Again, it would appear to indicate that

11 the census may have underestimated the number of

12 undocumented folks.

13   Q   Okay.  So you told me that the Secretary

14 first raised the idea of adding a citizenship

15 question to the census shortly after he was

16 confirmed.  You've testified that on March 10th,

17 you emailed him information showing that

18 undocumented residents are included in the

19 apportionment counts.  You've testified on

20 March 10th, you emailed him a blog post from the

21 Wall Street Journal highlighting a line that no

22 major government survey asks American's about

Page 82

1    their citizenship status.

2            Does that help you remember when the

3    Secretary first expressed interest in adding a

4    citizenship question to the decennial census?

5        A    No.

6        Q    And does that help you remember that it

7    was no later than March 10th that the Secretary

8    first asked you that question?

9        A    Again, you're speculating as to when he

10   asked.   But he appeared to have inquired about

11   some relevant aspects of it --

12       Q    Okay.

13       A    -- on March 10th.

14       Q    We'll mark this Comstock Exhibit 3.   And,

15   Mr. Comstock, is being handed Document Bates stamp

16   3685.

17           (Plaintiffs' Exhibit 3, Email, was

18   marked.)

19   BY MR. COLANGELO:

20       Q    Mr. Comstock, do you have Exhibit 3 in

21   front of you?

22       A    I do.

Page 93

1    is David Langdon asking you what your schedule --

2        A    Right.

3        Q    -- looks like to receive a briefing on

4    the 2020 census --

5        A    Right.

6        Q    -- and ACS topics; is that right?

7        A    Correct.

8        Q    So is it your understanding that he was

9    briefing the acting deputy secretary or that he

10   was arranging everything for you?

11       A    Again, I have no recollection of this

12   exchange.  So it's entirely possible that this

13   briefing in the 3/10 email and briefing in the

14   3/15 email are one in the same or they could be

15   different.  I don't know.

16       Q    Okay.  Let's mark this Comstock 5.  This

17   is document Bates -- the witness has been handed

18   Comstock Exhibit 5 stamped 1321.

19           (Plaintiffs' Exhibit 5, Memo, was

20   marked.)

21   BY MR. COLANGELO:

22       Q    Mr. Comstock, do you have Exhibit 5 in

Page 94

1    front of you?

2         A    I do.

3         Q    Have you seen this document before?

4         A    I have.

5         Q    When's the first time you saw this

6    document?

7         A    Probably when we reviewed a draft in the

8    Justice Department.

9         Q    Okay.   When was that?

10        A    I couldn't tell you the date.

11        Q    Was it near in time to the date below

12   Secretary Ross's signature, which is June 21,

13   2018?

14        A    I'd say that's likely, yes.

15        Q    When's the last time you saw this

16   document?

17        A    Right now.

18        Q    When's the last time before right now

19   that you saw this document?

20        A    I think maybe yesterday.   I can't recall.

21        Q    Okay.   Did you draft this memo?

22        A    I did not draft this memo, no.

Page 95

1    Q    Did you assist in drafting this memo?

2    A    I provided some edits to this memo.

3    Q    Okay.  Who else assisted in providing

4  edits to the memo?

5    A    The Office of General Counsel.

6    Q    Who in the Office of General Counsel?

7    A    I believe Mike Walsh.

8    Q    Anyone else?

9    A    There may have been other counsel.  I

10  don't know.

11    Q    Did Peter Davidson provide edits to this

12  memo?

13    A    It's entirely possible he did.

14    Q    Did James Uthmeier provide edits to this

15  memo?

16    A    It's possible, yes.

17    Q    The second sentence of this memo says,

18  "Soon after my appointment as Secretary of

19  Commerce, I began considering various fundamental

20  issues regarding the upcoming 2020 census,

21  including funding and content.  Part of these

22  considerations included whether to reinstate a

1  citizenship question, which other senior

2  administration officials had previously raised."

3       A    Yes.

4       Q    Do you see that?

5       A    I do.

6       Q    Do you recall when -- strike that.

7            Do you know what time period the

8  Secretary is referring to in this memo when he

9  says, "Soon after my appointment, I began

10 considering various fundamental issues"?

11      A    Well, it appears that he would be talking

12 about spring of 2017.

13      Q    And the Secretary says in this memo, "My

14 staff and I thought reinstating a citizenship

15 question could be warranted."

16           Do you see that line?

17      A    Yep.

18      Q    Okay.  Who is the Secretary referring to

19 when he says my staff and I?

20      A    That probably includes me and could

21 include other staff.

22      Q    Which other staff?

1      A    Other staff involved in this process

2    would include James Uthmeier, Mike Walsh,

3    Wendy Teramoto, the Census staff.  You know,

4    again, the entire department that works for him,

5    so --

6         Q    Okay.  He refers in that line to, "My

7    staff and I thought reinstating a citizenship

8    question could be warranted."

9           Is that right?

10      A    Right.  So he's likely talking about me.

11    And, again, whether he discussed this with

12    Eric Branstad, I have no idea.  Izzy Hernandez was

13    working on this for a while, so he might have

14    talked to him about it.  And then, obviously,

15    James Uthmeier was working on this.  Ellen Herbst,

16    whether he discussed it with her, I don't know.

17      Q    Let me ask you another question about

18    your review of this memo.  You mentioned that

19    before today, the last time you saw it was

20    yesterday; is that right?

21      A    Right.  Counsel showed it to me.

22      Q    And who was present at that meeting?

Page 99

1      Q    And who did you discuss it with when you
2    were shown this -- the draft of this memo before
3    June 21st?
4      A    I would have discussed it with counsel.
5      Q    The same counsel you just identified?
6      A    No.  Because I wasn't working with the
7    Justice Department folks at the time.  So this
8    would have been internal at Commerce.
9      Q    Okay.  I thought you said it came over
10   from the Justice Department.
11     A    It did, the first draft.
12     Q    Okay.  What do you mean by I wasn't
13   working with Justice Department folks at the time?
14     A    I was not involved with direct
15   interaction with the Justice Department --
16     Q    Okay.
17     A    -- I was seeing them through the Office
18   of General Counsel.
19     Q    So you discussed with your colleagues in
20   OGC?
21     A    Correct.
22     Q    The same colleagues who are here today?

Page 100

```
 1        A   Michael Walsh, I know I did.  I don't

 2   recall if I discussed with David or not.

 3        Q   Anyone else?

 4        A   I likely talked to James Uthmeier.

 5        Q   Anyone else outside --

 6        A   Peter Davidson.

 7        Q   I'm sorry.  Please answer.

 8        A   No.  Peter Davidson.  But those would

 9   have been the likely candidates.  Again, I don't

10   recall the exact discussions.

11        Q   This was two months ago, correct?

12        A   Correct.

13        Q   Did you discuss the draft of this memo

14   with anybody outside the Office of the General

15   Counsel at Commerce?

16        A   Other than when the Secretary signed it,

17   no.

18        Q   Okay.  Tell me who you discussed it with

19   when the Secretary signed it?

20        A   The Secretary.

21        Q   And what did you discuss with him when he

22   signed it?
```

1      A    Mr. Secretary, the Justice Department

2  recommends that we file this supplemental memo,

3  and so we recommend you sign it.

4      Q    And did he read it when you showed it to

5  him?

6      A    I believe he did, yes.

7      Q    Had you shown it to him before that

8  conversation?

9      A    I -- I don't know.

10      Q    Do you know if OGC had shown it to him

11  before that conversation?

12      A    It's entirely possible, yes.

13      Q    Do you know if the Justice Department

14  showed it to him before that conversation?

15      A    I don't believe the Justice Department

16  came over to meet with them.

17      Q    Did you talk with anyone other than the

18  Secretary or your colleagues from the Office of

19  General Counsel about this memo before June 21st?

20      A    Not that I recall.

21      Q    Did you discuss with it

22  Karen Dunn Kelley?

 1      A    That's entirely possible, yeah.

 2      Q    Okay.  Anyone else?

 3      A    Again, don't recall specific meetings on

 4  this.  I think it was done largely in back and

 5  forth as people were available.

 6      Q    Did you discuss it with Wendy Teramoto?

 7      A    No.  I don't believe I discussed it with

 8  Wendy.

 9      Q    Wendy is the chief of staff?

10      A    Yes.

11      Q    And you report to her?

12      A    Yes.

13      Q    Do you know why you wouldn't have

14  discussed it with Wendy?

15      A    Wendy doesn't get very involved in the

16  policy matters, typically.

17      Q    Why not?

18      A    Because she's chief of staff.  That's her

19  call.

20      Q    Got it.

21           You mentioned that you were likely one of

22  the people the Secretary's referring to when he

1    says my staff and I thought reinstating a

2    citizenship question could be warranted.

3        A    Uh-huh.

4        Q    Why did you think in the spring of 2017

5    that reinstating a citizenship question could be

6    warranted?

7        A    Because a citizenship question had

8    previously been asked.  It's asked by every other

9    major democracy in the world, so why wouldn't we

10   ask?

11       Q    And why did you want a citizenship

12   question?

13       A    Again, I think it provides important

14   information that's used for all kind of programs.

15   And if you want a complete and accurate census,

16   you would provide it.

17       Q    What caused you to form a view on whether

18   the citizenship question should or should not be

19   added?

20       A    When I was -- and I didn't really know

21   that it wasn't included in the census, but once I

22   became informed of that, it struck me as odd that

Page 104

1   we don't ask the question.

2       Q    And you testified earlier that the

3   Secretary is the first person who raised it to

4   you?

5       A    In my employment at the Department of

6   Commerce, yes.

7       Q    Do you recall discussing it before you

8   worked at the Commerce Department?

9       A    Probably sometime in the last 30-odd

10  years, I'm in -- you know, in political science

11  and politics, so I'm sure I discussed at.

12      Q    But the first time in 2017 that you

13  recall considering this issue is when the

14  Secretary raised it with you?

15      A    Correct.

16      Q    And this memo says the Secretary began

17  considering it soon after his appointment?

18      A    Correct.

19      Q    And his appointment was February 28th

20  we've established --

21      A    That's correct.

22      Q    -- of 2017?

1    Census Bureau's processes for changing statistical

2    instruments when you formed a view that the

3    citizenship question should be added?

4            MR. GARDNER:  Objection.  Form.

5    BY MR. COLANGELO:

6        Q   You can answer.

7        A   Okay.  Well, again, I think you need to

8    separate this out.  My decision or my belief that

9    a -- a citizenship question should be included

10   does not in any way change the process by which it

11   might get included.  So they're two separate

12   things.  I can hold the belief that a certain

13   action might be warranted or should be taken

14   independent of any analysis of whether or not that

15   should be done.  That's two separate things.  So I

16   think you're conflating the two.

17           The fact that I may think that as an

18   objective, hypothetical question should one be

19   added, I can form that belief quite quickly and

20   hold that.  That's, then, separate from is that

21   the right decision to make for a variety of

22   reasons, including some of the issues that you

Page 107

1    just outlined.

2        Q    And so in forming your view that a

3    citizenship question should be added --

4        A    Again, you're characterizing it in a way

5    that I'm not.   In forming my view that a

6    citizenship question would be appropriate to

7    include in a census, that's one thing.

8        Q    Okay.

9        A    Should be added is a separate --

10        Q    Hang on a second.   I haven't added a

11    question yet.

12            The Secretary's memo says my staff and I

13    thought reinstating a citizenship question could

14    be warranted, right?   And you've testified that

15    you were among the people he was referring to when

16    he says my staff and I.

17        A    Right.

18        Q    So you were of the view that the

19    citizenship -- adding a citizenship question could

20    be warranted?

21        A    Yes.

22        Q    And I'm asking in forming the view that

1  adding a citizenship question could be warranted,

2  you relied only on common sense; is that what you

3  testified?

4          MR. GARDNER:   Objection.

5  Mischaracterizes the witness's prior testimony.

6  BY MR. COLANGELO:

7      Q   What did you rely on in forming that

8  view?

9      A   So, again, the key word is could.   Could

10  be warranted, meaning it is worthy of

11  investigating further.   That is what the document

12  says.

13      Q   What did you rely on in forming that

14  view?

15      A   The fact that other countries ask this

16  information; the fact that we ask it on the ACS of

17  a percentage of the population every year; the

18  fact that as a citizen, most people wouldn't be

19  concerned with answering that question.   All of

20  those things are relevant.

21      Q   Did you research the statistical

22  practices of other countries in the spring of

Page 109

```
 1    2017?
 2        A    No.
 3        Q    When did you -- did there come a time
 4    when you researched the statistical practices of
 5    other countries?
 6        A    Why would that be relevant?
 7        Q    Mr. Comstock, you just testified that in
 8    forming the view that adding a citizenship
 9    question could be warranted, among the things you
10    considered was that other countries do.  So I'm
11    asking you --
12        A    Okay.
13        Q    -- did you research the practices of
14    other countries?
15        A    By that, you mean did I -- did I
16    determine that other countries ask the question?
17    Yes.
18        Q    In the spring of 2017?
19        A    Yeah.  I think we did a quick Google
20    search, you know.
21        Q    So you Googled the census practices of
22    other countries in order to determine that adding
```

Page 110

1   a citizenship question could be warranted?

2       A   Again, my formulation of a -- of a

3   decision that it could be warranted is largely

4   based on common sense.

5       Q   Okay.  I just want to make sure that I

6   understand.  That as to the part of your answer

7   that related to the practices of other countries,

8   in the spring of 2017, you formed that view by

9   Googling it?

10      A   I may have asked if other countries did

11  it or I may have gotten online and looked.  I

12  don't recall.

13      Q   Who would you have asked if you asked?

14      A   I likely would have asked somebody from

15  Census or I might have asked David Langdon.

16      Q   And if you asked, would that be reflected

17  in your -- in your email or your memo somewhere?

18      A   If it was, you could have found the

19  email.  So I, obviously, did not send an email if

20  I asked that question.

21      Q   Okay.  The --

22          MR. GARDNER:  Matt, I'm sorry.  I didn't

Page 112

1     Q   Who are those other senior administration

2  officials?

3     A   You'd have to ask the Secretary.

4     Q   You don't know yourself?

5     A   I don't.

6     Q   You have no idea which other senior

7  administration officials raised this question,

8  other than the Secretary?

9     A   No.

10     Q   You never asked him where the idea came

11  from?

12     A   Nope.

13     Q   He never told you where the idea came

14  from?

15     A   Nope.

16     Q   You spent a lot of time on this issue?

17     A   Not relative to a lot of other things I

18  work on, no.

19     Q   How would you characterize the amount of

20  time you spent on this issue?

21     A   One one-hundredth of my time.

22     Q   You agree that it's an important issue?

Page 113

1        A       Correct.

2        Q       It was important to the Secretary?

3        A       Correct.

4        Q       He was motivated to get this done?

5        A       He was working on a lot of different

6    issues at the time.

7        Q       But this one was important to him?

8        A       Yes.  Absolutely.

9        Q       Okay.  And when you saw the draft of this

10   memo before June 21st and it refers to other

11   senior administration officials, you didn't

12   yourself have any view or understanding of who

13   those other administration officials were?

14       A       I did not, no.

15       Q       You didn't ask the secretary who those

16   other administration officials were?

17       A       No.

18       Q       Okay.  When recommending that he sign the

19   memo, he didn't say to you who are the other

20   senior -- who the other senior administration

21   officials were?

22       A       We did not discuss that, no.

Page 114

1    Q    And you said this came over from the

2    Justice Department?

3    A    Correct.

4    Q    Who sent it over, do you remember?

5    A    I don't know.

6    Q    Let's mark Exhibit 6.

7         (Plaintiffs' Exhibit 6, Email, was

8    marked.)

9         MR. COLANGELO:  The witness has been

10   handed document stamped 2561.  This has been

11   marked Exhibit 6.

12   BY MR. COLANGELO:

13   Q    Do you have Exhibit 6 in front of you?

14   A    I do.

15   Q    Have you seen this email before?

16   A    I'm not on the email, so, no.

17   Q    So this is the first time you've seen

18   this message?

19   A    Yeah.  I -- I don't recall seeing this

20   when it was sent.

21   Q    Is today the first time you've seen this

22   email?

Page 117

1  talk to.

2      Q    Did the Secretary speak with Mr. Bannon

3  that night?

4      A    I don't know.

5          MR. GARDNER:   Objection.   Calls for

6  speculation.   Lack of foundation.

7          THE WITNESS:   I do not know.

8  BY MR. COLANGELO:

9      Q    Did the Secretary speak with Kris Kobach

10 on April 7, 2017?

11     A    No idea.

12     Q    Did you join a call with the Secretary

13 regarding the census on April 5th of 2017?

14     A    I have no idea.

15     Q    You don't know if you joined the call

16 with the Secretary on April 5th of 2017?

17     A    I don't know what I was doing on

18 April 5, 2017 without looking at a calendar or

19 something else that would remind me.   I'd have to

20 go through my emails that day.   I could not tell

21 you what I was doing on that day.

22     Q    Do you know who Kris Kobach is?

1      A    I believe he's somebody with State of

2   Kansas maybe.

3      Q    And have you spoken to Mr. Kobach before?

4      A    I've never spoken to Mr. Kobach.

5      Q    Have you emailed with Mr. Kobach?

6      A    I've never emailed with Mr. Kobach.

7      Q    And after the call that's referred to in

8   this email, did the Secretary tell you what he

9   discussed?

10     A    No.

11          MR. GARDNER:   Objection.   Lack of

12   foundation.

13          THE WITNESS:   No.

14   BY MR. COLANGELO:

15     Q    Who would know what was discussed on this

16   phone call?

17          MR. GARDNER:   Objection.   Calls for

18   speculation.   Also, lack of foundation.

19   BY MR. COLANGELO:

20     Q    You can answer.

21     A    The parties to the call.

22     Q    You were working on the census in the

Page 119

1    spring of 2017, correct?

2         A    Yes.

3         Q    And the Secretary frequently asked you

4    for updates on the census-related matters in the

5    spring of 2017, right?

6         A    I wouldn't characterize it as frequently.

7         Q    Did the Secretary ever ask you for

8    updates on census matters in the spring of 2017?

9         A    Yes, he did.

10        Q    Did he ever update you on developments

11   that he was aware of regarding the census in the

12   spring of 2017?

13        A    It's unusual for the Secretary to update

14   me on anything.

15        Q    Would the Secretary have told you if he

16   had a conversation with Steven Bannon about the

17   census?

18        A    Not necessarily.

19        Q    Would he have told you if he had a

20   conversation about the census with Kris Kobach?

21        A    Not necessarily.

22        Q    Why not?

1      MR. GARDNER:  Objection.  Form.

2      THE WITNESS:  I wouldn't speculate, but

3  he's the Secretary.  He makes his own decisions.

4  BY MR. COLANGELO:

5      Q    So has the Secretary ever told you about

6  a conversation he had with someone else?

7      MR. GARDNER:  Objection.  Form.

8      THE WITNESS:  Yes.  He reports to me

9  sometimes if he feels that it's essential that I

10  know the substance of conversation.

11  BY MR. COLANGELO:

12      Q    Okay.

13      MR. COLANGELO:  Can we mark this

14  Exhibit 7?

15      (Plaintiffs' Exhibit 7, Email, was

16  marked.)

17      THE WITNESS:  Thank you very much.

18  BY MR. COLANGELO:

19      Q    Handed the witness a document stamped 763

20  and marked Exhibit 7.

21      Mr. Comstock, do you have Exhibit 7 in

22  front of you?

Page 121

1       A    I do.

2       Q    Have you seen this email before?

3       A    No, I haven't.

4       Q    This is the first you've ever seen this

5   email?

6       A    Yes.

7       Q    Okay.  If you turn to the second page --

8       A    I'm sorry.  I'm just reading the

9   document.

10          Okay.

11      Q    Do you see at the bottom of page -- of

12  the first page of this exhibit, Mr. Comstock,

13  there's an email from Kris Kobach to

14  Wendy Teramoto --

15      A    Right.

16      Q    -- on July 21, 2017; is that right?

17      A    That's what it says.

18      Q    And the email says, "Wendy, nice meeting

19  you on the phone this afternoon.  Below is the

20  email that I sent to Secretary Ross.  He and I had

21  spoken briefly on the phone about this issue at

22  the direction of Steven Bannon a few months

Page 122

1    earlier."

2            Do you see that?

3       A    I see that.

4       Q    Okay.   That was the call on April 5th

5    that we were just talking about, right?

6            MR. GARDNER:   Objection.   Lack of

7    foundation.   Calls for speculation.

8            THE WITNESS:   Doesn't specify when the

9    phone call took place.

10   BY MR. COLANGELO:

11      Q    And did Wendy tell you she got this email

12   from Kris Kobach in July of 2017?

13      A    No.

14      Q    You've never spoken to Wendy about

15   Kris Kobach, at all?

16      A    Not that I recall.

17      Q    Is there anyone else that you're aware of

18   that Steven Bannon directed the Secretary to talk

19   to about the census, other than Kris Kobach?

20           MR. GARDNER:   Objection.   Lack of

21   foundation.

22           THE WITNESS:   I have no knowledge of any

1   conversations with Steven Bannon, so I wouldn't

2   know who he might have suggested the Secretary

3   talk to.

4   BY MR. COLANGELO:

5       Q    Have you ever spoken to Steven Bannon

6   yourself?

7       A    I have never spoken to Steven Bannon

8   myself.

9           MR. COLANGELO:  Can we have this marked

10  Exhibit 8?

11          (Plaintiffs' Exhibit 8, Email, was

12  marked.)

13  BY MR. COLANGELO:

14      Q    This is document stamped 3709.

15      A    Uh-huh.

16      Q    Do you have Exhibit 8 in front of you?

17      A    Uh-huh.

18      Q    Who's Mark Neuman?

19      A    Mark Neuman is a former -- I think he was

20  formally chair of a census advisory committee, and

21  he was a member of the transition -- I don't know

22  which aspect of transition but, basically,

Page 134

1          THE WITNESS:  Again, if we were
2    considering changing the questions, it would be
3    important to know.
4    BY MR. COLANGELO:
5       Q   And if you're considering adding a
6    citizenship question, it would also be important
7    to know the response rates on all demographic
8    questions; is that right?
9       A   That would be one of the questions you
10   would ask, yes.
11      Q   Okay.  Did the Secretary discuss the
12   citizenship question with Mr. Newman in the spring
13   of 2017?
14      A   You'd have to ask the Secretary.
15          MR. GARDNER:  Objection.  Lack of
16   foundation.
17   BY MR. COLANGELO:
18      Q   I'm sorry.  You were both speaking at the
19   same time.
20          MR. GARDNER:  Objection.  Lack of
21   foundation.
22   BY MR. COLANGELO:

Page 135

```
1        Q    And now please answer.
2        A    I would say you'd have to ask the
3   Secretary.
4        Q    Did he ever tell you that he spoke with
5   Mr. Newman about the citizenship question?
6        A    I'm fairly certain he was -- he did talk
7   to him at some point.
8        Q    Okay.  When was that?
9        A    I couldn't tell you.
10       Q    Did Mr. Newman ever say to you that he
11   had spoken to the Secretary about adding a
12   citizenship question?
13       A    It's possible, yeah.
14       Q    Okay.  When did he tell you?
15       A    Again, I don't recall the exact date.
16       Q    Try to place it, roughly.
17       A    To your question, was there discussion of
18   the possibility of adding a citizenship question
19   in the spring?  Yes.  That does not mean any firm
20   decision had been made.  We were exploring the
21   opportunity.
22       Q    I'm not asking you about decisions.  I'm
```

Page 137

1    information, so, clearly, at some point, it was

2    asked.  I cannot tell you.

3        Q   Can you tell me what you mean by decision

4    memo?

5        A   The memo that the Secretary produced

6    documenting his decision.  There was a reference

7    to other response rates and demographic.  So,

8    clearly, at some point, the information became

9    available.

10       Q   And you're referring to the

11   March 26, 2018 from the Secretary to Karen

12   Dunn Kelley?

13       A   Yes.

14       Q   But you don't recall seeing that

15   information -- strike that.

16           MR. COLANGELO:  Let's mark Exhibit 9.

17           (Plaintiffs' Exhibit 9, Email, was

18   marked.)

19   BY MR. COLANGELO:

20       Q   We have marked a document stamped 3694 as

21   Exhibit 9.  Do you have this email in front of

22   you?

Page 138

1        A    I do.

2        Q    Have you seen this email before?

3        A    Yes.

4        Q    Before today, when is the last time you

5   saw this email?

6        A    Yesterday.

7        Q    And this is an email from

8   Brooke Alexander to you with a copy to

9   Wendy Teramoto; is that right?

10       A    Correct.

11       Q    Dated April 20, 2017?

12       A    Yep.

13       Q    And did you understand this to be a

14   message from the Secretary?

15       A    That's what Brooke's message says.

16       Q    Brooke has access to the Secretary's

17   email?

18       A    Yes.

19       Q    And is it -- okay.  Withdrawn.

20            Are you familiar with the National

21   Advisory Committee on Racial, Ethnic and Other

22   Populations?

Page 139

1      A    No.

2      Q    You have no idea what the National

3   Advisory Committee is?

4      A    I mean, I know it's an advisory committee

5   to Census, but outside of that, I -- I couldn't

6   tell you what they do, other than what their title

7   suggests that they do.

8      Q    So you're aware that there's a National

9   Advisory Committee on Racial, Ethnic and Other

10  Populations that advises the Census Bureau?

11     A    I take that from this email that's

12  correct, yes.

13     Q    And what do you understand the role of

14  the advisory committee to be?

15     A    To provide advice to the Census Bureau.

16     Q    Okay.  The message from Brooke speaking

17  for the Secretary to you says, "Earl, Census

18  director has on April 29th a meeting of the

19  National Advisory Committee.  We must get our

20  issue resolved before this" -- exclamation point,

21  and the must is underlined.

22          Do you see that?

1       A    I see that.

2       Q    What is our issue?

3       A    I couldn't tell you.

4       Q    Our issue is the citizenship question,

5   right?

6            MR. GARDNER:   Objection.   Calls for

7   speculation.   Lack of foundation.

8            THE WITNESS:   I would say likely not,

9   actually, given there's no reason to believe the

10  National Advisory Committee on Racial, Ethnic and

11  Other Populations would be advising on a

12  citizenship question.

13  BY MR. COLANGELO:

14      Q    Were there other issues that you'd been

15  talking about with the Secretary involving the

16  census in the spring of 2017 that would relate to

17  the National Advisory's mandate?

18      A    Certainly the SOGI question would, and

19  the MENA question would.

20      Q    But the notification date for the SOGI

21  question was at the end of March in 2017 -- for

22  the SOGI topics, I should say, correct?

Page 141

1       A    Correct.

2       Q    So that was already resolved by April,

3   right?

4       A    I'm not certain of the timing, but MENA,

5   I think, was not resolved until sometime in the

6   spring or summer.

7       Q    And sticking with the SOGI question --

8   and for the record, that' S-O-G-I.   SOGI stands

9   for sex orientation and gender identity.

10      A    Correct.

11      Q    Would you conclude if the Secretary

12  referred to a National Advisory Committee on

13  Racial and Ethnic, Populations that the SOGI

14  question would be what he had in mind?

15      A    I would guess.   Again, this is

16  speculation, but my best guess, based on this

17  reference, is probably more like the MENA issue is

18  what was in front of us.

19      Q    Okay.   And describe the MENA issue?

20      A    The Middle Eastern North African

21  question.   There's a question as to whether you

22  ask two questions or you ask one question.   And

Page 142

1    it's not a topic I spent a tremendous amount of

2    time on, but it was something that the Census was

3    very much discussing at the time.

4         Q    And had you discussed that issue with the

5    Secretary?

6         A    We had a conversation or two about it.

7    And, again, it was largely in the context of which

8    way to go on that question.

9         Q    And why would the Secretary have said

10   that that issue must be resolved by April 29th?

11            MR. GARDNER:   Objection.   Calls for

12   speculation.   Lack of foundation.

13   BY MR. COLANGELO:

14        Q    You can answer.

15        A    You know, again, at that point -- this is

16   shortly before a -- if I recall correctly, a

17   Congressional hearing that was going to go into

18   the census and probably wanted to have a position

19   to recommend to Director Thompson as to what he

20   should say to the advisory group.   Again, I don't

21   recall this reference or precisely what he was

22   speaking to.

Page 143

1      Q   Okay.  This isn't a topic you'd spent a
2   lot of time on, right, the Middle Eastern
3   North African question?
4      A   Correct.
5      Q   There's no reason the Secretary would
6   have referred to it as our issue, is there?
7          MR. GARDNER:  Objection.  Calls for
8   speculation.  Lack of foundation.
9          THE WITNESS:  Again, depending on if his
10   perception was that there was an administration
11   policy call to make on it, he would refer to it as
12   our issue.
13   BY MR. COLANGELO:
14      Q   He could also have referred to the
15   citizenship issue as your issue, right?
16          MR. GARDNER:  Objection.  Calls for
17   speculation.  Lack of foundation.
18          THE WITNESS:  Again, I would say looking
19   at the context of the email, I would say that's an
20   unlikely connection.
21   BY MR. COLANGELO:
22      Q   And by April 20th of 2017, how many times

Page 144

1    had you discussed the citizenship question with

2    Secretary Ross?

3         A    I have no idea.

4         Q    More than a handful?

5         A    Possibly.

6         Q    Okay.  Would you say he was extremely

7    interested in the issue?

8         A    Certainly, when he raised it, he was

9    interested in it.

10        Q    Okay.  You wouldn't say he was extremely

11   interested in the MENA question, right?

12        A    When we discussed it, he was equally

13   interested in that.

14        Q    He didn't raise it with you with the same

15   frequency he raised the citizenship question,

16   right?

17        A    That's correct.

18        Q    Why was Wendy Teramoto copied on this

19   email?

20             MR. GARDNER:  Objection.  Calls for

21   speculation.

22             THE WITNESS:  Couldn't tell you.

Page 145

BY MR. COLANGELO:

Q    Did you speak with her about this issue
after you got this message?

A    It's possible.  I don't recall.

MR. COLANGELO:  Can we mark this
Exhibit 10?

(Plaintiffs' Exhibit 10, Email, was
marked.)

BY MR. COLANGELO:

Q    Handed the witness a document stamped
3710 and we've marked it as Exhibit 10.

A    Okay.

Q    Have you read this email?

A    Yep.

Q    Okay.  You've seen this email before?

A    I have.

Q    When's the last time you saw this email?

A    Yesterday.

Q    When you saw this email yesterday, was it
redacted as it is in the form I've shown it to you
now or was it unredacted?

A    It was redacted.

1      Q    Okay.  And you see that the Secretary has

2  written you an email on May 2, 2017 that says,

3  quote, worst of all, they emphasize they have

4  settled with Congress on the questions to be

5  asked.  I am mystified why nothing has been done

6  in response to my months' old request that we

7  include the citizenship question.  Why not?

8          Do you see that?

9      A    I see that.

10     Q    When did the Secretary make his months'

11  old request to include the citizenship question?

12     A    Again, sometime in the spring.

13     Q    Probably on March 10th when you emailed

14  him the Wall Street Journal blog post?

15     A    Potentially.  I don't recall.

16     Q    Who does the "they" refer to in the line

17  I just read you from the Secretary's email?

18          MR. GARDNER:  Objection.  Calls for

19  speculation.

20          THE WITNESS:  I don't know.

21  BY MR. COLANGELO:

22     Q    You mentioned a minute ago the Census

```
 1   director in the -- this time period, had an
 2   upcoming House appropriation hearing; is that
 3   right?
 4       A   I believe I said the Secretary had an
 5   upcoming House appropriation hearing.
 6       Q   Do you remember the date of that hearing?
 7       A   I don't.
 8           MR. COLANGELO:   Can we mark this Exhibit
 9   Number 11?
10           (Plaintiffs' Exhibit 11, Email, was
11   marked.)
12   BY MR. COLANGELO:
13       Q   Okay.   This is -- have you had a chance
14   to look at this email?
15       A   Lot of black spots on it.   Okay.
16       Q   Have you seen this email before?
17       A   Apparently I must have seen it when I
18   wrote it.
19       Q   When's the last time before today you saw
20   this email?
21       A   Probably May 1, 2017.
22       Q   Okay.   And does this email reflect that
```

1    you sent the Secretary, Director Thompson's House

2    appropriation subcommittee written testimony?

3         A    Yes.

4         Q    And his testimony was for, quote, this

5    Wednesday?

6         A    Right.   That's what it appears.

7         Q    And if I told you that -- oh, if you look

8    at the subject line it says, Wednesday, May 3rd;

9    is that right?

10        A    That's correct.

11        Q    Okay.   So let's refer back to Exhibit 10.

12        A    Yep.

13        Q    Now that you see the day before you had

14   sent the Secretary Mr. Thompson's written

15   testimony for the House appropriation subcommittee

16   hearing --

17        A    Right.

18        Q    -- what do you understand, worst of all

19   they emphasize they have settled with Congress to

20   mean?

21             MR. GARDNER:   Same objection.   Calls for

22   speculation.

1        THE WITNESS:  Again, I'm not sure without

2   further context who they is.  He could be

3   referring to that advisory committee that you had

4   had in a previous email.  He could be referring to

5   Census.

6   BY MR. COLANGELO:

7        Q   Does the advisory committee establish the

8   content for the census?

9        A   Again, the context of this email is that

10  somebody appears to be emphasizing that they've

11  settled with Congress on the questions.  That

12  clearly is not the case, because questions aren't

13  due until March of 2018.  So they couldn't have

14  settled on the questions.

15       Q   And you see that at the top of

16  Exhibit 10, you email the Secretary saying, "On

17  the citizenship question, we will get that in

18  place"?

19       A   Uh-huh.

20       Q   Do you see that?

21       A   Yep.

22       Q   What did you mean by that?

1       A    Well, it means that we're, as instructed,

2    going to continue to work on developing a

3    citizenship question, and that process -- again,

4    it's probably helpful at this point to explain on

5    the policy side, right, you formulate -- you

6    formulate something that you think you would like

7    to do, and then you go explore that.   That's my

8    job, is to go.   Secretary says, I think this might

9    be a good idea, you run it down, and you track

10   down the issues, and you say -- you know, first

11   question I usually ask is, okay, is this something

12   that Department of Commerce does?   Do we have

13   legal authority to do this?   Once you clear those

14   two thresholds, now you get to work.

15           But I don't spend a lot of time chasing

16   down things that people are not planning on doing.

17       Q    So you --

18       A    So there has to be some initial threshold

19   decision that this is worth pursuing.

20       Q    Now, let me stop you there, because you

21   said a minute ago, as instructed.   And you're

22   referring to instructions from the Secretary,

Page 151

1    correct?

2         A    To pursue, exploring the question.

3         Q    This was instructions to add the question

4    in response to my months' old request that we

5    include the citizenship question, correct?

6         A    This would be instructions to review and

7    consider and present to him information that would

8    allow him to make a decision on whether or not to

9    take final action.

10        Q    Mr. Comstock, I'm just asking you what

11   you understood on May 2nd --

12        A    And that's what I'm telling you I

13   understood on May 2nd.

14        Q    Hold on one second.  Let me finish the

15   question.

16        A    Uh-huh.

17        Q    The Secretary wrote, "I am mystified why

18   nothing has been done in response to my months'

19   old request that we include the citizenship

20   question."

21             And you responded, "On the citizenship

22   question, we will get that in place"?

Page 152

1     A    Correct.

2     Q    Okay.  So my question is:  By we will get

3  that in place, what did you mean?

4     A    I meant that I will present to you the

5  information and the process necessary for you to

6  decide if you would like to pursue this question.

7     Q    Your email says we will get that in

8  place, correct?

9     A    I mean, we will get in front of you the

10  necessary information for you to make a decision.

11  Part of my role in this process is explaining to

12  people who have never worked in government before

13  that there are processes that you have to follow

14  in order to make an action happen.  You're dealing

15  with people who are used to being able to make a

16  decision and it simply goes into effect.

17     Q    Okay.

18     A    That's not the way the U.S. government

19  works.

20     Q    So the process that you then go on to

21  tell the Secretary he has to follow is later in

22  your message; is that right?

Page 153

1    A    That part of the process, yes.

2    Q    And that email says we need to work with

3 Justice to get them to request that citizenship be

4 added back as a census question; is that right?

5    A    That's right.

6    Q    Why would you say you needed to work with

7 the Justice Department to get them to request that

8 citizenship be added back?

9    A    Because based on a very preliminary

10 review, they appeared to be the most likely

11 government body that would have a specific need

12 for the information that would support adding a

13 citizenship question to the decennial census.

14    Q    Who conducted that preliminary review?

15    A    We were told by the Census Bureau that

16 the Justice Department was the person that had

17 requested the citizenship question on the ACS and

18 that they utilized the ACS data for Voting Rights

19 Act information.

20    Q    Who in the Census Bureau told you that?

21    A    I couldn't tell you.

22    Q    And why did you need a request from

Page 154

1   Justice?

2       A    Again, based on the preliminary review,

3   the understanding we had was questions are added,

4   based on requests from a government agency.   There

5   is such a thing as the Paperwork Reduction Act

6   where you have to justify to OMB why do I need

7   this information?   That has to get cleared.   So

8   there are certain hurdles you have to get through.

9   So if at the end of the day the Secretary decided

10  to pursue this question, we would need to clear

11  certain legal thresholds.

12      Q    Why not just tell the Census Bureau to

13  add the citizenship question and say the Secretary

14  wanted it?

15      A    Because I'm not sure that that would be

16  the process they would necessarily agree to

17  follow.

18      Q    So you had to have it come from DOJ in

19  order for the Census Bureau to agree to follow it?

20      A    Again, that was a preliminary conclusion

21  based on a cursory analysis.

22      Q    Your email then says, "We have the court

1   cases to illustrate that DOJ has a legitimate need

2   for the question to be included."

3              What court cases were your referring?

4        A    I don't recall the exact court cases.

5        Q    Did you research those court cases?

6        A    I did research a court case where there

7   was a scenario in which you would need -- it would

8   be important to have Citizen Voting Age Population

9   data in order to make a Voting Rights Act claim.

10       Q    How did you identify that case?

11       A    By a legal research.

12       Q    What do you mean by legal research?

13       A    Well, I think I talked to -- I'm trying

14  to think -- I think Mark Neuman may have provided

15  a case name.  I talked to James Uthmeier, who

16  looked at some cases.  Basically said, okay, if

17  this is the question -- I mean, it's what you do

18  as an attorney all day long, is to go find cases

19  to support what you're looking for.

20       Q    So Mark Neuman identified for you a case

21  that would support DOJ's need for this

22  information?

1      A    Yeah.   I said I may have spoken to

2  Mark Neuman on that.   I think he may have provided

3  it.   I don't recall.   I know James Uthmeier looked

4  at some cases.

5      Q    Would he have provided that case for you

6  on a phone call or by email?

7      A    James?

8      Q    Pardon me?

9           I'm sorry.   Withdraw that question.

10          Would Mr. Newman have provided that case

11  to you by email or on the phone?

12     A    Well, if he provided it by email, you'd

13  have it.   I don't have the emails in front of me,

14  so I can't tell you.

15     Q    So by May of 2017, you'd come to the view

16  that you needed another agency to request a

17  citizenship question on the census?

18     A    That was based on the preliminary

19  analysis, yes.

20     Q    You then say in your email, "I will

21  arrange a meeting with DOJ staff this week to

22  discuss."

1        Do you see that?

2    A    Yes.

3    Q    Okay.   So before May 2, 2017, you had not

4 had any discussions with the Department of Justice

5 about the citizenship question, right?

6    A    Not to my knowledge.

7    Q    What did you do to arrange a meeting with

8 DOJ staff to discuss?

9    A    I asked Eric Branstad for a name over at

10 DOJ, and he provided me the name of

11 Mary -- Mary Jane [sic] Hankey I think it was,

12 whom I then contacted.

13    Q    Okay.   Your email refers to the court

14 cases to illustrate that DOJ has a legitimate need

15 for the question to be included.

16    A    That's what it says, yes.

17    Q    What were the other needs that you had

18 talked about for including the citizenship

19 question?

20    A    I don't recall.

21    Q    Okay.   And by legitimate need, were you

22 concerned that other needs that didn't come from

Page 158

1    DOJ would not be legitimate needs?

2        A   No.   I think that's just an

3    imprecise -- the use of the term legitimate,

4    something to say that it would be a need that

5    would be considered a government need for the

6    information.

7            MR. COLANGELO:  Counsel, five-minute

8    break.  Let's go off the record.

9            VIDEOGRAPHER:  Going off the record.  The

10   time on the video is 11:31 a.m.

11           (Off the record.)

12           VIDEOGRAPHER:  This begins Media Unit

13   Number 3.  The time on the video is 11:45 a.m.  We

14   are on the record.

15   BY MR. COLANGELO:

16       Q   Okay.  Let's mark as Exhibit 11 --

17           MR. GARDNER:  No.  I think 12.

18           MR. COLANGELO:  12.  Sorry.  Thank you.

19           (Plaintiffs' Exhibit 12, Email, was

20   marked.)

21   BY MR. COLANGELO:

22       Q   This is document stamped 3699.

Page 161

1        Q   Why would the Secretary's concern about

2    the citizenship question prompt Wendy to bring up

3    Mark Neuman?

4            MR. GARDNER:  Objection.  Lack of

5    foundation.  Calls for speculation.

6            THE WITNESS:  Again, he was the primary

7    transition team person advising us on Census.

8    BY MR. COLANGELO:

9        Q   Okay.  And the email also says, "Do you

10   want me to set up another meeting?"

11           Do you see that?

12       A   I see that.

13       Q   What's the earlier meeting that she's

14   referring to?

15           MR. GARDNER:  Objection.  Calls for

16   speculation.

17           THE WITNESS:  I don't know.

18   BY MR. COLANGELO:

19       Q   Had you attended the meetings with the

20   Secretary and Mr. Neuman on the citizenship

21   question before May 2, 2017?

22       A   I don't know.  I had attended meetings

Page 162

1    with the Secretary and Mr. Newman on the census.

2         Q    Before May 2017?

3         A    Yes.

4         Q    How many times?

5         A    I don't know.  Two times, three times.

6    I'd -- you'd have to check his count.

7         Q    Okay.  And the citizenship question was

8    discussed in those earlier meetings?

9         A    I don't recall.

10        Q    And you see the Secretary writes back and

11   says, "Let's try to stick him in there for a few

12   days to fact find."

13        A    Yes.

14        Q    Do you see that?

15             Were you aware of that request?

16        A    I was aware that the Secretary was

17   distressed with Director Thompson who had just

18   told us that he had massively overrun the CEDCaP

19   budget and failed to warn us that that was coming.

20   So the Secretary was not happy with the Census

21   leadership at the time and was trying to find

22   someone who could be -- provide us better

Page 166

1    May 4th early in the morning.

2    BY MR. COLANGELO:

3        Q    Saying, "Thanks, Eric.  Earl."

4             Correct?

5        A    Yes.

6        Q    So on May 2nd, the Secretary asked you

7    why nothing had been done in response to his

8    months' old request.  You told him you needed to

9    get the Justice Department to request the

10   question.  You also told him that you would set up

11   meetings with the Justice Department to discuss.

12   And then after that, you asked Eric Branstad to

13   get you a point of contact at the Justice

14   Department and he did, right?

15             MR. GARDNER:  Objection.  Form.

16             THE WITNESS:  That appears to be the

17   sequence.

18   BY MR. COLANGELO:

19       Q    Okay.  And you testified earlier that you

20   hadn't ever spoken to the Justice Department

21   before that on the citizenship issue?

22       A    That's correct.

Page 167

```
 1            MR. COLANGELO:  Let's mark Exhibit 14.

 2            (Plaintiffs' Exhibit 14, Email, was

 3   marked.)

 4   BY MR. COLANGELO:

 5       Q    Exhibit 14 is document stamped 2462.  You

 6   have Exhibit 14 in front of you?

 7       A    I do.

 8       Q    And why were you contacting Mary Blanche?

 9   Her surname is redacted on this email, I assume

10   for personal privacy reasons.  But this is Mary

11   Blanche Hankey, correct?

12       A    Yes.

13       Q    Why were you contacting Mary Blanche

14   Hankey?

15       A    That was the name that Eric Branstad said

16   he'd provide me.

17       Q    Okay.  And do you know where in the

18   White House -- strike that.

19            Do you know where in the

20   Justice Department she worked?

21       A    She was advisor for -- to

22   Attorney General Sessions.
```

1      Q      So she worked for the Attorney General?

2      A      Correct.

3      Q      And you reached out to her to talk about

4   the citizenship question, right?

5      A      Amongst other things, yes.

6      Q      And you reached out to her and asked her

7   for times for a call that day, right?

8      A      That's what I'm asking for, yes.

9      Q      Okay.   Is that because this was an urgent

10   priority for the Secretary?

11      A      I think you can divine from his prior

12   email that he was hoping I might take a quick

13   action on this, so I was trying to be responsive.

14      Q      So the answer is yes?

15      A      I'm not going to speculate as to whether

16   he thought it was urgent or not, but he was

17   conveying he would like me to get moving.

18      Q      You were treating it as an urgent matter?

19      A      Correct.

20      Q   And then you -- did you speak to

21   Ms. Hankey?

22      A   I did speak to Ms. Hankey.

Page 169

1       Q    How many times?

2       A    I met with her -- I think I spoke with

3   her by phone and then met with her in her office.

4       Q    When did you speak with her by phone?

5       A    I couldn't tell you.

6       Q    Was it on May 4th?

7       A    It's possible.

8       Q    And then you met with her in her office,

9   you said?

10      A    Yes.

11      Q    When was that meeting?

12      A    I don't know the exact date.

13      Q    When you spoke to her on the phone, was

14  anyone else on the call with you?

15      A    No.

16      Q    Was anyone else on the call on her end?

17      A    Not that I was aware of, no.

18      Q    When you met with her in person, did

19  anyone from the Commerce Department go with you?

20      A    No.

21      Q    Did anyone from the Census Bureau go with

22  you?

1    A    No.

2    Q    Was there anyone else in the meeting that

3  she brought?

4    A    No.

5    Q    What did you say to her when you spoke to

6  her on the phone?

7    A    That I'd like to come over and discuss

8  what issues the Justice Department might have with

9  Commerce that I could be helpful on and talk to

10  her about an issue that we were interested in.

11    Q    And that issue was the citizenship

12  question?

13    A    Correct.

14    Q    And what did she say about that?

15    A    Let's get together and meet.

16    Q    So then you went over to meet with her.

17  Did she have any issues that she wanted to raise

18  with you?

19    A    I don't recall that Justice had any

20  particular Commerce issues, no.

21    Q    So this was a meeting about the

22  citizenship question?

Page 171

1        A    I'd say that was the primary topic.

2        Q    Okay.   And what did you say to her when

3   you met with her in person?

4        A    That we -- the Secretary had asked us to

5   look into the possibility of adding a citizenship

6   question, and that since the Justice Department

7   was the agency that had sponsored the question for

8   the ACS, it seemed that that was a logical place

9   to start, and was there someone in the

10  Justice Department with whom I should speak about

11  that.

12       Q    And what did she say?

13       A    Let me look into it.

14       Q    How long was the meeting?

15       A    Well, we met for about 20 minutes.

16       Q    Did you explain why the Secretary wanted

17  the citizenship question?

18       A    No.

19       Q    Did you have an understanding at that

20  point as to why the Secretary wanted the

21  citizenship question?

22       A    I've never asked the Secretary why he

1    wanted a citizenship question.

2         Q    Did she ask you why it was important to

3    Commerce Department to add a citizenship question?

4    She being Ms. Hankey.

5         A    No.

6         Q    You mentioned earlier that you did some

7    legal research or that Mark Neuman or others may

8    have identified cases for you.  Did you identify

9    those cases to Ms. Hankey in that conversations?

10        A    I don't recall.

11        Q    Did you bring any paper with you to that

12   meeting?

13        A    Not that I recall.

14        Q    Did you take notes?

15        A    No.

16        Q    After the meeting, did you update anyone

17   at the Commerce Department and your discussion?

18        A    I don't recall.

19        Q    Did you speak to the Secretary to tell

20   him that -- on an issue that you understand to be

21   a priority, you'd gone over to the

22   Justice Department to make some progress on his

Page 174

```
1       A    Not that I recall.
2       Q    And after you met with Ms. Hankey and she
3    said she'd look into it, what was the next that
4    you heard from the Justice Department on this
5    issue?
6       A    I think when she contacted me, provided a
7    name.
8       Q    How long after your meeting did she
9    contact you and provide a name?
10      A    There's an email that documents it, you
11   could tell from that, but otherwise, I have no
12   idea.
13      Q    Okay.
14      A    I mean, it was sometime in the next
15   couple weeks, but --
16      Q    And what name did she give you?
17      A    I -- I know I put it in a memo to the
18   Secretary later on, so you'd have to look at that
19   memo.
20      Q    Is it James McHenry?
21      A    That sounds like the right name.
22      Q    When she spoke to you to pass along
```

1  James McHenry's name, what did she say about why

2  she was directing you to him?

3      A    She didn't say much.   Just said this

4  would be the best guy to talk to.

5      Q    Okay.   Had you spoken to James McHenry

6  before?

7      A    Never talked to him before.

8      Q    Did she tell you what his position was in

9  the Department of Justice?

10      A    She might have.

11      Q    What was his position?

12      A    I don't know, actually.

13      Q    After she gave you Mr. McHenry's name,

14  what did you do next to contact him?

15      A    I called him on the phone.

16      Q    And when you spoke to him on the phone

17  what did you say?

18      A    I outlined that we were interested in

19  seeing what kind of level of interest the

20  Justice Department would have in requesting the

21  citizenship question be asked -- added to the

22  decennial census.

Page 176

1      Q    And did you tell him why the

2  Commerce Department wanted the Justice Department

3  to make that request?

4      A    Because that was our understanding of the

5  process.   They were the people that needed it for

6  ACS, and our understanding was that it might be

7  useful for them to have it at a more granule

8  level, which would be needed -- you'd need to put

9  it on the decennial census to do that.

10      Q    So you were -- you told him that the

11  Commerce Secretary wanted the question and wanted

12  to know if DOJ would ask for the Census Bureau to

13  add the question; is that right?

14      A    Those are your words.

15      Q    Well, I'm asking you to tell me yes or

16  no.

17      A    Well, if the question is yes or no, then

18  the answer is no.

19      Q    Okay.   How would you put it in your

20  words?

21      A    In my words, what I told him was that we

22  were exploring the possibility and wanting to know

Page 177

1    the level of interest at the Justice Department in

2    making such a request, would this be information

3    they could use?

4        Q    So this is the shortly -- this is shortly

5    after the Secretary of Commerce emailed you and

6    said I am mystified why nothing had been done in

7    response to my months' old request?

8        A    Right.

9        Q    But your testimony is that you conveyed

10   to the Justice Department that you were exploring

11   the issue?

12       A    As I explained before, when -- when the

13   Secretary says he would like to do something,

14   there's a presumption that we will attempt to do

15   that.  That's subject to revision as more

16   information is made available.  So I'm exploring

17   what is necessary to follow through on the

18   Secretary's request.  That request may be modified

19   or changed, based on the information that I

20   provide.

21       Q    Okay.  How many times did you speak to

22   Mr. McHenry?

Page 178

1      A      I think three or four times.

2      Q      And what was the next time you spoke to

3  him after the initial phone call?

4      A      Maybe a week later.

5      Q      Okay.  And what did he say when he -- did

6  he call you or did you call him?

7      A      I don't recall.

8      Q      And what did you discuss on that

9  conversation?

10     A      That he was still exploring the question.

11     Q      How long was that conversation?

12     A      Five minutes.

13     Q      Okay.  So he didn't have anything new to

14  report?

15     A      Right.

16     Q      Okay.  And you said you spoke to him at

17  least a couple more times; is that right?

18     A      Again, I don't recall the exact number of

19  times, but somewhere in the vicinity of three or

20  four times.

21     Q      So after the second call where he said he

22  was still exploring it, tell me about the next

1    conversation?

2        A    Memory serves, I think the next

3    conversation was a similar one.  He was still

4    looking into the matter and then -- and then the

5    last conversation he and I had, he directed me to

6    somebody at the Department of Homeland Security.

7        Q    Okay.  And over what period of time were

8    you talking to Mr. McHenry on the phone?

9        A    Probably over the course of a month.

10       Q    So this was primarily in May of 2017?

11       A    I honestly don't recall, but sometime in

12   May, early June.

13       Q    And who did he direct you to at the

14   Department of Homeland Security?

15       A    I don't remember the person's name.

16       Q    Was it Gene Hamilton?

17       A    Again, I know I prepared a memo for the

18   Secretary that had the name.  So if that's the

19   name that was on the memo, then, yes, that would

20   be the person I spoke with.

21       Q    How many times did you speak to your

22   point of contact at the Department of

1   Homeland Security?

2       A    Again, I think it was -- I think this was

3   like two or three times.

4       Q    And what did you say when you first spoke

5   to Mr. Hamilton?

6       A    Same -- same basic message, we're looking

7   into the -- exploring the possibility of putting a

8   census question on -- a citizenship question on

9   the decennial census, would this be information

10  that the Department of Homeland Security would

11  need or use, and could he answer that, and his

12  response was, let me look into it.

13      Q    Now, the Department of Homeland Security

14  wasn't the original requester for the ACS

15  citizenship question, to your understanding,

16  correct?

17      A    Correct.

18      Q    Was it your view that the Department of

19  Homeland Security would also be a legitimate

20  requester of this information?

21      A    Legitimate is not the right word, but

22  the -- I think my view was, let me see if

Page 181

1    there's -- what their explanation would be, but

2    they were obviously not our first choice.

3        Q   So you were looking for an agency to make

4    this ask?

5        A   Again, my understanding of the process,

6    based on the research I've been able to do, and

7    consequently was advising the Secretary was an

8    agency needed to make the request; therefore, you

9    have to find an agency that would have a reason to

10   be using this information.   And Justice,

11   obviously, was the primary recipient of the CVAP

12   data from the ACS, so they were the logical place

13   to start.   Justice then says go to

14   Homeland Security, and I say, okay, maybe there's

15   something about Homeland Security that I don't

16   know about that might justify this data.   So you

17   follow up on a call, get more information, informs

18   your decision, you might change it.

19       Q   And so my question was:   So you were

20   looking for an agency to make this ask and --

21       A   Correct.   In order to implement the

22   process that had been outlined to us, you needed

Page 182

1    an agency.  So that was my task at the time.

2         Q    Thank you.

3              MR. COLANGELO:   Let's mark this

4    Exhibit --

5              MR. GARDNER:   15.

6              MR. COLANGELO:   -- 15.

7              (Plaintiffs' Exhibit 15, Memo, was

8    marked.)

9              THE WITNESS:   The very memo I was

10   speaking of.

11   BY MR. COLANGELO:

12        Q    Exhibit 15 is document stamped 9834.

13             Mr. Comstock, do you have Exhibit 15 if

14   front of you?

15        A    I do.

16        Q    Is this the very memo you were just

17   speaking about?

18        A    It's the very memo I was just speaking

19   about.

20        Q    And what's the date on this memo?

21        A    September 8th.

22        Q    And you see in the second paragraph of

Page 183

1    this memo, the sentence that says, "James directed

2    me to Gene Hamilton at the Department of

3    Homeland Security."

4         A    Correct.

5         Q    So the person you were speaking to at DHS

6    was Gene Hamilton, right?

7         A    Apparently so, yes.

8         Q    The -- in that paragraph -- strike that.

9              This is a memo from you to the Secretary

10   dated September 8th of 2017, correct?

11        A    Correct.

12        Q    Why did you prepare this memo?

13        A    Because the Secretary was asking about

14   the lack of progress and said he was prepared to

15   call the Attorney General, and so he needed the

16   timeline of who I had spoken to.

17        Q    Okay.  What do you mean by lack of

18   progress?

19        A    Well, obviously, we're now September 8th,

20   and he inquired on May -- May whatever the date

21   was, 2nd, 5th, whatever it was, saying how come we

22   haven't made more progress?  Three months later we

Page 184

```
 1    don't have any response from the

 2    Justice Department, so --

 3        Q    In his May 2nd email it said, why has

 4    nothing been done in response to my months' old

 5    request?

 6        A    That is what it says, yes.

 7        Q    So the Secretary had been asking about

 8    this since the early spring of 2017?

 9        A    Yes.

10        Q    And you testified and this memo says you

11    met in person with Mary Blanche and she said what?

12        A    Well, as I said, she directed me to

13    James McHenry.

14        Q    And then after speaking with Mr. McHenry,

15    he told you what?

16        A    He directed me to Gene Hamilton.

17        Q    Okay.  And then after several phone calls

18    with Gene Hamilton, according to this memo, he

19    relayed that, "After discussion, DHS really felt

20    it was best handled by the Justice Department."

21            Do you see that?

22        A    I see that.
```

Page 185

1       Q    Why did Mr. Hamilton feel this was best

2   handled by the Justice Department?

3       A    As relayed to me, DHS felt the agency

4   that would most utilize this data was

5   Department of Justice, which was our

6   original conclusion.

7       Q    So DHS said they were not going to make

8   this request, right?

9       A    Well, Gene never made a commitment, one

10  way or the other, for the department.  He simply

11  directed me back to the other department.  It's

12  not an uncommon experience in the federal

13  government.

14      Q    Tell me what's not uncommon in the

15  federal government.

16      A    Being directed to somebody.

17      Q    Your memo then says at that point the

18  conversation ceased.

19      A    Correct.

20      Q    What do you mean by that?

21      A    Means that I did not talk to

22  Mary Blanche, James McHenry or Gene Hamilton after

1   that point in time.

2      Q   You didn't, at this point, have a request

3   from the Justice Department, right?

4      A   That's correct.

5      Q   Okay.  And what did you ask

6   James Uthmeier after that point?

7         MR. GARDNER:  Objection.  Calls for

8   information --

9         (Thereupon, the court reporter

10  clarified.)

11        MR. GARDNER:  Sorry.  I have a cold.

12        Objection.  Calls for information that's

13  subject to privilege.  I'll instruct the witness

14  not to answer.

15        MR. GERSCH:  What privilege?

16        MR. GARDNER:  Attorney -- thank you.  I

17  thought we were doing one at a time.

18        Attorney-client privilege.

19        MR. GERSCH:  Sorry.

20  BY MR. COLANGELO:

21      Q   Did you identify any facts for

22  Mr. Uthmeier?

Page 189

1          MR. GARDNER:  Objection to form.

2          THE WITNESS:  To my knowledge, the first

3     time I interacted with James, he was in the

4     Office of General Counsel.

5          MR. COLANGELO:  Okay.  Okay.  Let's mark

6     Exhibit 16.

7          (Plaintiffs' Exhibit 16, Memo, was

8     marked.)

9     BY MR. COLANGELO:

10        Q    Exhibit 16 is document stamped 2458.

11        Do you have Exhibit 16 in front of you,

12    Mr. Comstock?

13        A    I do.

14        Q    Have you seen this email before?

15        A    Not since I've sent it to Wendy on

16    Saturday the 16th of September.

17        Q    Why did you send Ms. Teramoto your

18    September 8th memo on September 16, 2017?

19        A    I don't recall exactly, but, likely,

20    because she may have been setting up the call with

21    the Attorney General.

22        Q    And which call with the Attorney General

Page 190

1   was that?

2       A    A call from the Secretary to talk to the

3   Attorney General about whether or not Justice

4   would be interested in a citizenship question.

5       Q    And why was the Secretary talking to the

6   Attorney General about whether or not Justice

7   would be interested in the citizenship question?

8       A    Again, if -- if the -- if the

9   Justice Department was not going to request the

10  question, had no use for the information, then

11  that would probably put an end to the citizenship

12  question.

13      Q    And the Secretary wanted the citizenship

14  question?

15      A    I think he felt -- well, I don't know

16  what he felt.  Yes.  He was continuing to explore

17  that possibility.

18          MS. BOUTIN:  I'm sorry.  Can you speak

19  up?

20          THE WITNESS:  I don't know what he felt,

21  but he was continuing to explore the possibility.

22  BY MR. COLANGELO:

Page 192

1          MR. COLANGELO:  This is Exhibit -- no.  I

2    was thinking of Exhibit 10.

3    BY MR. COLANGELO:

4      Q   How did you come to the view before ever

5    talking to DOJ that DOJ should request this

6    information?

7      A   Again, if DOJ was the governmental

8    organization that had questioned the information

9    on the ACS, then it would stand to reason that

10   they would be the people that would also be

11   interested in the information on the decennial,

12   and they're also the party responsible for

13   enforcing the voting rights.

14     Q   And how did you come to the view before

15   ever talking to DOJ that DOJ had a legitimate need

16   for the question to be included?

17     A   If they enforced the Voting Rights Act --

18   if you're going to make a Voting Rights Act case,

19   then they would be the people that would

20   have -- need the information.

21     Q   And you researched those Voting Rights

22   Act cases or that Voting Rights case on your own?

Page 193

1        A    Again, I think in doing some basic

2    research on it, it was pointed out there was a

3    case where the Court had said you could -- you

4    would need more granule information to answer this

5    question, which would then support a citizenship

6    question.

7        Q    And you told me before that you're not a

8    voting rights lawyer, right?

9        A    Again, what do you mean by a voting

10   rights lawyer?

11       Q    Have you ever practiced voting rights

12   law?

13       A    No.

14       Q    Have you ever tried a voting rights case?

15       A    No.

16       Q    Have you ever advised a client on a

17   voting rights matter?

18       A    No.

19       Q    Have you ever practiced redistricting

20   law, tried a redistricting case --

21       A    No.

22       Q    -- or advised a client on a redistricting

Page 194

1    matter?

2         A    No.

3              MR. GARDNER:   Make sure he finishes his

4    question before you answer.

5              THE WITNESS:   No.

6    BY MR. COLANGELO:

7         Q    Have you ever litigated a case under the

8    Voting Rights Act?

9         A    No.

10        Q    Have you ever litigated a redistricting

11   case?

12        A    No.

13             MR. COLANGELO:   Let's mark as Exhibit 17

14   a document Bates-stamped 3705.

15             (Plaintiffs' Exhibit 17, Meeting

16   notification, was marked.)

17   BY MR. COLANGELO:

18        Q    Mr. Comstock, do you have 3705 in front

19   of you?

20        A    I do.

21        Q    And what is this?

22        A    It appears to be some kind of meeting

1    I would instruct the witness not to answer.

2          Can you answer the question without

3    disclosing confidential communications?

4          THE WITNESS:  I have no recollection of

5    this meeting, so I couldn't tell you what we

6    discussed.

7          MR. GARDNER:  Problem solved.

8    BY MR. COLANGELO:

9      Q   Easy enough.

10         Was this your first interaction with the

11   Office of General Counsel on this issue?

12     A   Again, I have no idea.

13     Q   As you were talking to Ms. Hankey at the

14   Justice Department, Mr. McHenry at the

15   Justice Department and Mr. Hamilton at DHS --

16     A   Yeah.

17     Q   -- in the spring of 2017, were you

18   keeping the Secretary informed of those

19   conversations?

20     A   I might have mentioned them.

21     Q   In what context would you have mentioned

22   them?

Page 197

1       A    Mr. Secretary, I contacted the

2   Justice Department today.  I would not have

3   given -- I mean, there was nothing to report.  So

4   I hadn't made any progress.

5       Q    Well, he was frustrated there was no

6   request yet?

7       A    Right.

8       Q    So one of the things to report might have

9   been --

10      A    That I contacted them, yes.

11      Q    Okay.  And did you keep Ms. Teramoto

12   informed during that time period?

13      A    Again, I might have.  At that time

14   period, we operated in bullpens, so we were

15   all -- there were five people in the same room.

16   So it's entirely possible I might have mentioned I

17   was going to the Justice Department or I had

18   spoken with the Justice Department, yes.

19      Q    I'm sorry.  If you were not finished.

20      A    Nope.

21      Q    Who was sitting in the bullpen with you?

22      A    Wendy Teramoto, Eric Branstad,

Page 198

1    James Rockas, me, and occasionally Izzy Hernandez.

2         Q    Who is James Rockas?

3         A    He was acting press secretary at the

4    time.

5         Q    And who is Izzy Hernandez?

6         A    Israel Hernandez, he was the acting -- or

7    I'm not sure what his formal title was.  I think

8    he was deputy chief of staff.

9         Q    And where was the bullpen you referred

10   to?

11        A    It was the -- what is now the chief of

12   staff.

13        Q    And there were five of you working in the

14   office?

15        A    Correct.

16        Q    How long were the five of you working in

17   that office together?

18        A    Maybe nine months.

19        Q    So from January of 2018 through the

20   end -- strike that.

21             From January 2017 through the end of

22   the --

Page 199

1      A    No.

2      Q    -- summer --

3      A    No.   The bullpen was set up, I think, in

4  March through the end of the year.

5      Q    Why did you work in a bullpen?

6      A    Because that was the form that the

7  Secretary and Ms. Teramoto felt was most

8  effective.

9      Q    And was it near the Secretary's office?

10     A    It's located -- there's the Secretary's

11  office, there's the anteroom to the Secretary's

12  office, and it's located right next to that.

13     Q    And at some point, you stopped working in

14  a bullpen?

15     A    Yes.

16     Q    Did it become less effective?

17     A    I think that was the chief of staff's

18  determination, yes.

19         MR. COLANGELO:   Let's mark Document 3702

20  as Exhibit 18.

21         (Plaintiffs' Exhibit 18, Email, was

22  marked.)

1      A   Just a minute.

2          Yes.

3      Q   Okay.  And Exhibit 7 is the email

4  exchange with Kris Kobach; is that right?

5      A   It's an email exchange between

6  Kris Kobach and Wendy Teramoto.

7      Q   And the Secretary, correct, on the second

8  page?

9      A   Yes.  Appears to be one to the Secretary

10  on the second page.

11      Q   Okay.

12      A   Though it's blanked out as to who it goes

13  to.

14      Q   If I represent to you that the government

15  has represented to us that this was an email to

16  the Secretary and that they've blanked out his

17  name for personal privacy reasons, can we agree

18  that it's an email to the Secretary on July 14th?

19      A   I'll stipulate to that, yes.

20      Q   And Mr. Gardner will tell me after lunch

21  if that's wrong.

22          The -- so you see that the -- that

Page 206

1  Mr. Kobach, who identifies himself as the Kansas

2  Secretary of State, emailed the Secretary on

3  July 14, 2017, correct?

4       A    Correct.

5            MR. GARDNER:  Objection.  Lack of

6  foundation.

7  BY MR. COLANGELO:

8       Q    And you'll see that it says I'm following

9  up on our telephone discussion from a few months

10  ago, correct?

11           MR. GARDNER:  Objection.  Lack of

12  foundation.

13           THE WITNESS:  And you're reading from the

14  email.  So I have no idea if the email is correct

15  or not.

16  BY MR. COLANGELO:

17       Q    Did the Secretary ever tell you that he

18  spoke to Kris Kobach?

19           MR. GARDNER:  Objection.  Asked and

20  answered.

21  BY MR. COLANGELO:

22       Q    You can still answer.

1     A    No.

2     Q    Sorry.  We were speaking at the same

3   time.

4     A    I don't recall him ever telling me that

5   he spoke to Kris Kobach.

6     Q    This email reads, "As you may recall, we

7   talked about the fact that the U.S. Census does

8   not currently ask respondents their citizenship."

9         Do you see that?

10    A    I see that.

11    Q    The email also reads, "It also leads to

12  the problem that aliens who do not actually reside

13  in the United States are still counted for

14  Congressional apportionment purposes."

15        Do you see that?

16    A    I see that.

17    Q    Did the Secretary ever tell you he was

18  concerned about the problem that aliens who do not

19  reside in the United States are still counted for

20  Congressional apportionment purposes?

21    A    He never expressed an opinion on that.

22    Q    And when the Secretary asked you on

1   March 10, 2017 about the census and the

2   citizenship question, did he ask you in the

3   context of whether noncitizens should be included

4   for Congressional apportionment purposes?

5       A    He discussed Congressional apportionment

6   purposes.   If asked were the noncitizens counted,

7   and we answered the question, which is they are

8   counted.

9       Q    Well, you testified the link you sent him

10  was the link to the Census Bureau's web page on

11  whether noncitizens are counted for apportionment?

12      A    That's correct.   Well, I don't believe

13  you can find a web page on the Census that doesn't

14  speak to it in that context, whether noncitizens

15  are counted other than for apportionment.   That's

16  the question that we asked.   Do we count

17  noncitizens?   The answer is yes.   What is the

18  Census used for?   It's used for apportionment.

19  That's its primary function.

20      Q    And you'll see that -- going back to the

21  first page of Exhibit 7, Ms. Teramoto has written

22  to Mr. Kobach, "Kris, can you do a call with the

1    Secretary and Izzy tomorrow at 11:00 a.m.?"

2        A    Correct.

3        Q    And that's Izzy Hernandez, correct?

4        A    I would believe that's the reference

5    she's making, yes.

6        Q    And he's copied at the top of this page,

7    correct?

8        A    Yes, he is.

9        Q    Did you ever discuss with Izzy Hernandez

10   a call with Mr. Kobach and the Secretary?

11       A    I did not.

12       Q    Did you ever discuss the citizenship

13   question with Mr. Hernandez, at all?

14       A    I think we discussed it once or twice.

15       Q    And when were those conversations?

16       A    I don't recall exactly.

17       Q    Was it in the summer of 2017?

18       A    It was sometime in the spring/summer of

19   2017.

20       Q    Okay.  So you had been working on the

21   citizenship question for some number of months by

22   late July of 2017; is that right?

Page 210

1       A     Correct.

2       Q     Okay.  But your testimony is that the

3   Secretary had a phone call with Kris Kobach on

4   that issue and nobody told you about it?

5           MR. GARDNER:  Objection.

6   Mischaracterizes the witness's testimony.

7           THE WITNESS:  My testimony is he did not

8   discuss it with me.

9   BY MR. COLANGELO:

10      Q     Did anyone tell you that the Secretary

11  spoke to Kris Kobach about this issue?

12      A     Wendy might have mentioned it.

13      Q     And what do you remember Wendy said about

14  it?

15      A     That the Secretary had a conversation

16  with Kris Kobach.

17      Q     What did she describe about that phone

18  call?

19      A     She didn't.

20      Q     And did you ask for any other information

21  on it?

22      A     I didn't.

1     A   Well, obviously, when I wrote it.

2     Q   Okay.  This is an email from the

3  Secretary to you on August 8, 2017, and the

4  Secretary asks were you on the call this morning

5  about census?

6        Do you see that?

7     A   Uh-huh.

8     Q   What call is he referring to?

9     A   I don't know.  I'm not sure I was on it.

10    Q   Okay.  Did you hear from anybody about a

11  call on the census on August 8th?

12    A   I have no idea.

13    Q   And you'll see that later in the email,

14  the Secretary says, "Where is the DOJ in their

15  analysis?  If they still have not come to a

16  conclusion, please let me know your contact person

17  and I will call the AG.  Wilbur Ross."

18       Do you see that?

19    A   I see that.

20    Q   And what analysis is the Secretary

21  referring to?

22    A   Again, this pre-dates the memo I wrote

Page 214

1  outlining my contacts with the DOJ.  So this is a

2  question about where are we with the DOJ?

3      Q    Okay.  And you wrote back that evening

4  saying, "We'll be back shortly with an update on

5  the census question."

6      A    Yes.

7      Q    I have two attorneys in the DOC's general

8  counsel's office working on it?

9      A    Yes.

10     Q    And you testified one of those two

11 attorneys was James Uthmeier; is that right?

12     A    That's correct.

13     Q    And who was the other?

14     A    I don't recall.

15     Q    Okay.  Going back to the Secretary's

16 email where he says, "If they still have not come

17 to a conclusion, please let me know your contact

18 person and I will call the AG."

19     A    Yes.

20     Q    Did you understand that to mean that the

21 Secretary was concerned this was not done yet?

22     A    He was concerned that we had not made

Page 215

1    more progress.

2        Q    Okay.   How did he communicate that

3    concern to you?

4        A    By saying let me know who your contact

5    person is and I will call the AG.

6        Q    This email that you sent in your response

7    doesn't identify your contact person; is that

8    right?

9        A    That -- well, at least not in the part

10   that's not blacked out.

11       Q    Okay.   Do you recall identifying for the

12   Secretary before the September 8, 2017 memo who

13   your contact person was at DOJ?

14       A    I might have.   I probably would have had

15   to go back and look and see who I spoke to.

16       Q    Okay.

17            MR. COLANGELO:   Let's mark Document 3984

18   as Exhibit 20.

19            (Plaintiffs' Exhibit 20, email, was

20   marked.)

21            THE WITNESS:   Thank you.

22   BY MR. COLANGELO:

Page 216

```
 1        Q    Mr. Comstock, have you seen this email
 2   before?
 3        A    It's to me, so, yes.
 4        Q    Okay.  And this is in further response to
 5   the Secretary's August 8th question; is that
 6   right?
 7        A    Would appear to be, yes.
 8        Q    Okay.  And it says, "Mr. Secretary, we
 9   are preparing a memo and full briefing for you on
10   the citizenship question.  The memo will be ready
11   by Friday, and we can do the briefing whenever you
12   are back in the office."
13             Do you see that?
14        A    Yes.
15        Q    And at this point, you had not received
16   any information from the Justice Department; is
17   that right?
18        A    That's correct.
19        Q    Okay.  So the memo that you're referring
20   to is a memo on the citizenship question that
21   includes no input from DOJ; is that right?
22        A    I -- I don't know.  I had not spoken to
```

1  DOJ, no.

2      Q    You're not aware that anyone else had

3  spoken to DOJ on it?

4      A    Actually, I believe counsel might have

5  been talking to DOJ, but I don't know who they

6  were talking to.

7      Q    And which counsel is that?

8      A    James Uthmeier.

9      Q    And did he tell you he was talking to

10  DOJ?

11      A    I don't recall.

12      Q    So you're not aware that anybody had been

13  in touch with DOJ in order to get information for

14  this memo going to the Secretary?

15      A    I -- I'm not sure exactly the contents of

16  the memo to which you're referring, so I don't

17  know if it contained information from DOJ or not.

18      Q    And the Secretary responded by saying, "I

19  would like to be briefed on Friday by phone."

20      A    Yes.

21      Q    So it's fair to say that this reflects

22  the Secretary's continued impatience about getting

Page 218

1    an answer to his question?

2         A    I would say he clearly wanted to keep

3    moving forward.

4              MR. COLANGELO:   Let's mark as 21

5    Document 3983.

6              (Plaintiffs' Exhibit 21, email, was

7    marked.)

8              THE WITNESS:   Thank you very much.

9    BY MR. COLANGELO:

10        Q    Do you have Exhibit 21 in front of you?

11        A    Yes.

12        Q    Okay.  And this is an email from you to

13   the Secretary passing along the draft memo on the

14   citizenship question?

15        A    Correct.

16        Q    Okay.  And you'll see that Wendy Teramoto

17   responded a few days later saying, "Peter Davidson

18   and Karen Dunn Kelley will both be here Monday.

19   Let's spend 15 minutes together and sort this

20   out."

21        A    Right.

22        Q    And who is Peter Davidson?

1      Q    And we just saw an email from a few weeks

2    earlier where Ms. Teramoto says let's keep

3    Mr. Davidson and Ms. Kelley involved in a

4    conversation about this, right?

5      A    I wouldn't say keep, but --

6      Q    Introduce them to this conversation?

7      A    Introduce, yes.

8      Q    So to your understanding, this was a

9    meeting to discuss the citizenship question?

10     A    Again, my understanding of this was to

11   discuss key legal issues regarding the census.

12     Q    Do you remember this meeting?

13     A    Not specifically, no.

14     Q    Do you remember any meetings with the

15   Secretary and with this group on the census?

16     A    Again, not specifically, no.

17          MR. COLANGELO:   Okay.   Let's have this

18   marked as Exhibit 23.   It's Document 2424.

19          (Plaintiffs' Exhibit 23, Email, was

20   marked.)

21   BY MR. COLANGELO:

22     Q    Do you have Exhibit 23 in front of you,

Page 222

1    Mr. Comstock?

2         A    I do.

3         Q    And do you recognize this document?

4         A    Again, it's an email from the Secretary

5    to me, so presumably I saw it then.   There's a lot

6    blanked out.

7         Q    And you understand that the

8    Justice Department has applied those redactions,

9    correct?

10        A    I do.

11        Q    And in this email dated September 1,

12   2017, the Secretary says, "I have received no

13   update, nor has there been an updated," -- blocked

14   out -- "nor the issue of the census question, nor

15   whether KDB thinks we have our arms around the

16   census cost data."

17             Do you see that?

18        A    Yes.

19        Q    And by KDB, do you think he meant KDK?

20        A    I believe that would be who he would be

21   referring to, yes.

22        Q    Referring to Karen Dunn Kelley?

Page 223

1      A    Yes.

2      Q    And did you understand this to be a

3 request for information on the status of the

4 citizenship question?

5      A    Well, I understood this to be a request

6 for information on a whole series of information

7 that were presented in the census.

8      Q    Including the citizenship question?

9      A    Including the citizenship.   He mentions

10 that.

11     Q    And the Secretary is frustrated, right?

12     A    That would appear so, yes.

13     Q    He's frustrated because he's asked for it

14 repeatedly and hasn't seen anything yet telling

15 him that it's done; is that right?

16     A    Well, I would not agree with your

17 characterization.  I think what this memo -- this

18 email shows is that there were a tremendous number

19 of issues connected to Census.  At this time, we

20 were working a tremendous amount on the lifecycle

21 cost estimate.

22          So we -- I mean, we had a huge issue.

Page 224

1   They were $3 billion -- basically, 25 percent of

2   their budget off, which is a shocking figure --

3       Q   Does the Secretary --

4           MR. GARDNER:  Let him finish his answer.

5           THE WITNESS:   -- that does not inspire

6   confidence in the Census Bureau or its current

7   leadership at the time.   So we were dealing with

8   quite a few issues connected with Census,

9   primarily related to the budget, trying to find

10  people to run the Census that we could count on.

11          So, yes, citizenship was one small piece

12  of this, but it was by no means the driving piece.

13      Q   Thank you.

14          MR. COLANGELO:  Let's mark Document 2034

15  as Exhibit 24.

16          (Plaintiffs' Exhibit 24, Email, was

17  marked.)

18  BY MR. COLANGELO:

19      Q   Mr. Comstock, do you have Exhibit 24 with

20  you?

21      A   I do.

22      Q   Have you seen this email before?

Page 226

1    it appears there might have been.

2    BY MR. COLANGELO:

3        Q    And why would the Secretary have asked

4    for an update by the next day?

5            MR. GARDNER:   Objection.   Calls for

6    speculation.

7            THE WITNESS:   As I've mentioned before,

8    we like to get things done.   We're not here to do

9    this all year long.   So I was asked similar

10   questions on numerous other issues I was working

11   on.

12   BY MR. COLANGELO:

13       Q    But it's fair to say the Secretary wanted

14   an answer quickly?

15       A    He always wants an answer quickly.

16           MR. COLANGELO:   Let's mark Document 2395

17   as Exhibit 25.

18           (Plaintiffs' Exhibit 25, Email, was

19   marked.)

20   BY MR. COLANGELO:

21       Q    Mr. Comstock, do you have Exhibit 25?

22       A    I do.

Page 227

```
1        Q    Okay.  Have you seen this document
2   before?
3        A    Yes.
4        Q    When's the last time you saw it before
5   today?
6        A    Yesterday counsel pointed it out to me.
7        Q    And did you review a version yesterday
8   that was redacted like this or unredacted?
9        A    I did.
10       Q    Pardon me?
11       A    It was redacted.
12       Q    Okay.  Like this?
13       A    Exactly like this.
14       Q    And this is an email from Mr. Uthmeier to
15   you on the evening of September 7th saying, "Earl,
16   I touched base with Peter," redacted, "He spoke
17   with Kassinger this evening."
18            Do you see that?
19       A    Yes.
20       Q    Who is Kassinger?
21       A    That would be Ted Kassinger, former
22   general counsel for the Department of Commerce.
```

1    Q    And where does Mr. Kassinger work now?

2    A    He works at O'Melveny & Myers.

3    Q    A law firm?

4    A    Correct.

5    Q    In Washington?

6    A    Yes.

7    Q    And what did Mr. Davidson and

8    Mr. Kassinger discuss?

9         MR. GARDNER:   Objection -- sorry.

10   Restate that one more time.

11   BY MR. COLANGELO:

12   Q    What did Mr. Davidson and Mr. Kassinger

13   discuss?

14   A    I don't know.

15   Q    Did Mr. Davidson tell you what he and

16   Mr. Kassinger discussed?

17   A    Not to my knowledge.

18   Q    Did Mr. Uthmeier tell you what he and

19   Mr. Kass- -- what Mr. Davidson and Mr. Kassinger

20   discussed?

21   A    Well, it appears he might have, but it's

22   blanked out.

1      Q    And Mr. Kassinger doesn't work for the

2   government, correct?

3      A    Correct.

4      Q    And did not at the time, correct?

5      A    Correct.

6           I would just observe, based on the all

7   blanked out here, we really have no idea what this

8   email is referring to.  It says a Census matter,

9   but it could have been any number of things,

10  including the numerous budget issues we were

11  talking about.  So let's make clear I don't know

12  what this email was in reference to.

13     Q    Okay.  Let's take a look at Exhibit 24.

14     A    Uh-huh.

15     Q    So this appears to be an unredacted

16  version --

17     A    Of the last part.

18     Q    -- of the last part --

19     A    Right.

20     Q    -- which appears to be redacted on 2396;

21  is that correct?

22     A    That certainly seems to be the case, yes.

1      Q    They're both dated the same date,

2   correct?

3      A    Same date, same time.

4      Q    So --

5      A    Just to be precise.

6      Q    Thank you.  Same date and same time, to

7   be precise.

8           So on an email chain that you commenced

9   by saying the Secretary would like an update on

10  progress since the discussion yesterday regarding

11  the citizenship question.  Is it your

12  understanding that the reference to the Census

13  matter in the subject line, in fact, refers to the

14  citizenship question?

15     A    That would appear to be the case.

16     Q    Okay.  So it would also be your

17  conclusion that Mr. Davidson and Mr. Kassinger

18  were talking about the citizenship question; is

19  that right?

20     A    No.  It would not.

21     Q    Why not?

22     A    Because I get lots of email that start on

1    one chain that go to another matter.  So it's

2    possible, but it's also possible it was discussing

3    something else.

4         Q   And did the general counsel talk to

5    Mr. Kassinger about a lot of issues you were

6    updated on?

7         A   I have no idea what Mr. Davidson and

8    Mr. Kassinger discussed.

9         Q   Do you see the email below the Kassinger

10   reference?

11        A   Uh-huh.

12        Q   There's a message from you to

13   Mr. Davidson, Mr. Uthmeier and Ms. Teramoto that

14   says, "I suggest setting up a call for tomorrow.

15   The Secretary is asking for progress on this."

16        A   Correct.

17        Q   And that's a reference to the citizenship

18   question, correct?

19        A   Without seeing the blanked out matter

20   below that from Peter Davidson, I don't know if

21   the email chain switched subjects or not.

22        Q   Okay.  So your -- your testimony is that

1      A    Again, I think -- I would agree that I

2  sent an email on the 7th asking for an update on

3  progress regarding the citizenship question, and I

4  would agree that I sent a memo to the Secretary

5  updating him on who I had spoken to at Justice.

6  But that's all I would know about what the

7  substance of the conversations were.

8      Q    And then after that exchange, did there

9  come a time when the Secretary and Attorney

10  General spoke about this issue?

11      A    Correct.

12      Q    And about how long after was that?

13      A    I don't recall.

14      Q    Was it about a week after?

15      A    Possibly.  I would imagine it was on the

16  Secretary's calendar.

17      Q    And after the Secretary spoke with the

18  Attorney General, was the substance of that

19  conversation relayed to you?

20      A    Beyond -- beyond the fact that they had

21  spoken and that the Attorney General was going to

22  look into the matter, no.

1    Q   Okay.  What did you say to the Secretary
2  about the December 2017 letter when it came in?
3    A   Justice Department has requested this, so
4  now we can start the formal process.
5    Q   And what formal process are you referring
6  to?
7    A   Well, as I've outlined before, in order
8  for the government to take an action, you have to,
9  basically, create a record and make your decision
10  on the basis of that record.  So without a request
11  from an agency to ask for the inclusion of
12  citizenship, you were -- this was, basically, a
13  hypothetical question.
14    Q   Okay.  But you had told the Secretary in
15  May, we will get the Justice Department to request
16  the question?
17    A   I am going to do everything I can to
18  carry out the Secretary's wishes, if they are
19  legal, and so I will do my best.  I can't promise
20  things.
21    Q   You mentioned in reference to your
22  May 2nd email that you'd identified a case or

Page 242

```
1        Q    Ah.  If I said --

2        A    The prior questions were very focused on

3   March 2017, so I want to be clear we're now

4   talking about the following year.

5        Q    Absolutely.  Sorry.  Yes.  These

6   questions -- the question I'm going to ask you now

7   is about 2018.

8              You recall there was a time,

9   March 26, 2018, when the Secretary issued a

10  decisional memorandum regarding his decision to

11  add a citizenship question?

12       A    Yes.

13       Q    You worked on that memorandum?

14       A    Yes.

15       Q    Okay.  Were you the principal drafter?

16       A    I was one of the principal drafters.

17       Q    Who were the other principal drafters?

18       A    James Uthmeier was the primary other

19  drafter.

20       Q    Did you have a division of responsibility

21  between the two of you?

22       A    No.  I believe he did the first draft.
```

Page 243

1       Q    He did the first draft?

2       A    Well, the Secretary actually probably

3    made -- indicated what he wanted in a draft and

4    then James would have put it together.

5       Q    And then you would have worked on it

6    after James?

7       A    Correct.

8       Q    All right.  Was that a typical way in

9    which the two of you worked?

10       A    Sure.  I edit lots of documents.

11       Q    I mean --

12            (Thereupon, the court reporter

13    clarified.)

14            THE WITNESS:  I edit lot of documents.

15    BY MR. COLANGELO:

16       Q    I meant with you and Mr. Uthmeier?

17       A    Yeah.  It would be unusual for me to

18    prepare the first draft and him to edit it, yes.

19       Q    That's what I'm getting at.  All right.

20    Thank you.

21            And did anyone else work on the draft

22    besides you, the Secretary and Mr. Uthmeier?

Page 244

```
 1      A    Yes.   I think numerous other people
 2   reviewed the draft, and --
 3      Q    How about people who contributed to the
 4   language?
 5      A    Again, without seeing various drafts, it
 6   would be hard to say who contributed to which
 7   language.
 8      Q    Okay.  Okay.  Couple more questions
 9   before we take our break.
10           You were shown earlier today a supplement
11   to the decisional memorandum --
12      A    Yes.
13      Q    -- issued by Secretary Ross in June of
14   this year.
15           You recall that?
16      A    Right.  You're referring to Exhibit 5?
17      Q    Yes.  And there's language in
18   Exhibit 5 -- get the exact language -- there's
19   language in Exhibit 5 that says referring to
20   fundamental issues regarding the upcoming 2020
21   census, "part of these considerations included
22   whether to reinstate a citizenship question which
```

Page 247

1          MR. GARDNER:  Objection.

2     Mischaracterizes the witness's previous testimony.

3          THE WITNESS:  My previous testimony was

4     the Department of Justice sent to the

5     Department of Commerce, from the Justice

6     Department to the Office of General Counsel, a

7     draft document suggesting that the Secretary

8     needed to sign this.  That document was reviewed

9     by the Office of General Counsel and myself, edits

10    were made, the document produced, and the

11    Secretary then signed it.

12    BY MR. GERSCH:

13        Q    Yeah.  My question was a little

14    different.

15          My understanding of your testimony this

16    morning was you recommended that the Secretary

17    sign this supplemental memorandum based on advice

18    you received from the Department of Justice; is

19    that correct?

20          MR. GARDNER:  Objection.

21    Mischaracterizes the witness's previous testimony.

22               THE WITNESS:  Once again, the

 1   Department of Justice, who are our counsel,

 2   suggested that a supplemental memorandum was

 3   needed.  This was not something Department of

 4   Commerce generated.  This was something the

 5   Department of Justice, as our counsel, recommended

 6   be provided.  Following up on that advice, we

 7   worked on the document and then had the Secretary

 8   sign it.  We were following advice of counsel.

 9   BY MR. GERSCH:

10       Q   Well, again, I'm not sure I've got an

11   answer to my question.

12           My understanding -- well, I'll put it --

13   without respect to what you testified to this

14   morning, is it correct that you advised the

15   Secretary to sign the supplemental memorandum

16   based, in part, on advice from the

17   Department of Justice?

18       A   Again, I'm not sure I'm following the

19   logic of your question.  But, once again, this

20   document was produced initially by the

21   Department of Justice, who sent it to the

22   Department of Commerce with the recommendation

Page 250

1      A    That's correct.

2      Q    Okay.

3           MR. GERSCH:  Let's take our short break

4   here.

5           MR. GARDNER:  How long?

6           MR. GERSCH:  Ten minutes or so.

7           VIDEOGRAPHER:  This is the end of Media

8   Unit Number 4.  The time on the video is 1:58 p.m.

9   We are off the record.

10          (Off the record.)

11          VIDEOGRAPHER:  This begins Media Unit 4.

12   The time on the video is 2:14 p.m.  We are on the

13   record.

14   BY MR. GERSCH:

15      Q    Mr. Comstock, we're back on the record.

16   Before the break, I was asking some questions

17   about 2018.  Now I want to go back to 2017.

18      A    Okay.

19      Q    You with me?

20      A    I'm with you.

21      Q    All right.  I want to go back to the

22   spring of 2017 when Secretary Ross requests the

Page 251

1   inclusion of a citizenship question on the census.

2   At that point in time, the Department of Justice

3   had made no request to Commerce for the addition

4   of a citizenship question, correct?

5        A    That's correct.

6        Q    And they certainly hadn't

7   asked -- withdrawn.

8             The Department of Justice certainly

9   hadn't asked Commerce to add a citizenship

10  question because of the VRA.   That's also correct;

11  isn't it?

12       A    Well, they didn't ask us to add a

13  citizenship question at that point.   So

14  speculating as to why they would ask is

15  irrelevant.

16       Q    I'm not asking you to speculate.   The one

17  thing we can be sure of is they didn't ask about

18  the VRA is because they didn't ask at all?

19       A    Correct.

20       Q    All right.   And when Secretary Ross says

21  to you in the spring, in whatever words he used,

22  that he wants a citizenship question added to the

Page 252

1    census, wouldn't you have had a discussion with

2    him at the time about why he wants that?

3              MR. GARDNER:   Objection.   Asked and

4    answered.

5              THE WITNESS:   Again, the answer is no, I

6    would not have a discussion.   My boss, if he asked

7    me to investigate something, I investigate it and

8    report back the results.

9    BY MR. GERSCH:

10       Q    Is your testimony you did not have a

11   discussion?

12       A    I did not.

13       Q    And you're not saying -- well, withdrawn.

14            Wouldn't it be helpful to you in your job

15   to assist the Secretary to have an understanding

16   of why he wanted the citizenship question?

17            MR. GARDNER:   Objection.   Form.

18   BY MR. GERSCH:

19       Q    You can answer.

20       A    Again, I didn't have any particular

21   doubts about why a citizenship question would be

22   useful, so, no, it would not have hurt me to ask.

Page 253

1        Q   I'm not asking whether you had doubts.

2    My question to you is a little bit --

3        A   I understand your question.

4        Q   My question, sir, is:  Wouldn't it be

5    helpful to you in your job of assisting the

6    Secretary to have a complete understanding of why

7    the Secretary wants to add a citizenship question?

8            MR. GARDNER:   Objection.   Form.

9            THE WITNESS:   Again, it's not relevant to

10   the question of whether or not he needs -- of

11   whether or not a question should be added, so, no.

12   BY MR. GERSCH:

13       Q   Is it your testimony that why he wants a

14   citizenship question to be added is not relevant

15   to whether it should be added?   Did I -- did I

16   hear that right?

17           MR. GARDNER:   Objection.

18   Mischaracterizes the witness's prior testimony.

19           THE WITNESS:   My test- --

20           MR. COLANGELO:   That's exactly what he

21   said, Counsel.

22           THE WITNESS:   No.   My testimony is:   The

Page 254

1   rationale for why he would want it added is not

2   relevant to my initial inquiry as to whether or

3   not a question can be added.

4   BY MR. GERSCH:

5       Q   Yeah.  My question was a little

6   different.  The question I am trying to get you to

7   focus on is:  In your work for the Secretary,

8   wouldn't it be helpful to you to understand as

9   fully as possible why he thinks it's a good idea

10  to add a citizenship question?

11      A   And let --

12          MR. GARDNER:  Objection.  Asked and

13  answered.

14          THE WITNESS:  And let me get you to

15  understand my answer, which is, no, it would not

16  make a difference, because I don't need that

17  information to investigate the question.

18  BY MR. GERSCH:

19      Q   Anyone ever say anything to you about why

20  the Secretary thought it was a good

21  idea -- withdrawn.

22          Am I right that your testimony is that

1      Q   No one says the reason the Secretary

2   wants to add a citizenship question is whatever

3   the reason is, no one ever said anything like

4   that?

5      A   No.

6          MR. GARDNER:  Objection to form.

7          THE WITNESS:  Not to my recollection.

8   BY MR. GERSCH:

9      Q   Okay.  Did you ever have a discussion

10  with people from the Office of General Counsel at

11  Commerce about why the Secretary wanted to add a

12  citizenship question?

13     A   No.

14     Q   And in your time there, did you never see

15  a document analyzing why it was a good idea for

16  Census to add a citizenship question?

17     A   Again, you're -- we have a fundamental

18  disagreement on the premises of your question.

19  Your premise is that somehow a reason needs to be

20  provided.  The question before us is the Secretary

21  has the legal authority to add questions to the

22  census.  Is there a governmental need?  And if

Page 259

1   there is, then you're off to the races.

2       Q   My question was a little different.  My

3   question was --

4       A   I understand your question.

5       Q   Sir, I'll repeat it for you.

6           My question is:  In all the time you're

7   there, did you never see a document spelling out

8   the reasons why it would be a good idea to add a

9   citizenship question?  Why it would be good from

10  Commerce's perspective?

11          MR. GARDNER:  Objection.  Form.

12          THE WITNESS:  Again, that's not the

13  question.  Commerce --

14  BY MR. GERSCH:

15      Q   Excuse me, sir.  That is my question.

16  Could you answer my question?

17      A   Okay.  No.

18      Q   Not even a scrap of paper, right?

19      A   Nope.

20      Q   No memoranda, right?

21      A   No.

22      Q   No emails?

Page 260

1      A    Not that I recall.

2      Q    And I just want to be straight on my

3  understanding.  I think I got you correctly, but I

4  just want to make sure and test that I'm right.

5          It couldn't possibly assist you in your

6  work, in any way, to know why the Secretary wanted

7  to add a citizenship question?  Do I understand

8  that correctly?

9      A    It's not relevant to my analysis.

10     Q    And so it couldn't possibly help you in

11 any way in your work?

12     A    I'm not going to agree with your

13 statement that way, no.

14     Q    Well, that's my question -- withdrawn.

15          Well, is there any way in which knowing

16 what the Secretary's reason was for wanting to add

17 a citizenship question, is there any way that

18 could assist you in your work at

19 Department of Commerce?

20     A    Assist me on my work at the Department of

21 Commerce, no.

22     Q    Is there any way that it could help you

1    help the Secretary add a citizenship question?

2         A    If I had found it difficult or

3    challenging, yes.   Knowing more about why he

4    wanted it would have been helpful, but I didn't

5    say that there was an issue.   It had been asked

6    for hundreds of years, and it had been asked on

7    the ACS.   So, clearly, there's a need for it.   And

8    so, no, that was not a particularly troublesome

9    aspect of the question I was being asked to look

10   into.

11        Q    When you said if I had found it difficult

12   or challenging, what did you mean?   What's the it?

13        A    If -- if what I had been requested to do

14   seemed to have significant legal obstacles to the

15   ability to do that question or take that action,

16   then I would probably inquire more fully to see if

17   there's an alternative way to address what the

18   Secretary is trying to get to.   In this particular

19   case, you have something that has been on the

20   decennial census before that is currently being

21   asked on the ACS.   There's clear legal authority

22   for him to add the question.   So, frankly, the

Page 262

1    reasons that he wants to add it doesn't add

2    anything to the analysis.   There is a governmental

3    need for this information.   That's a question

4    that's already established, so I don't need to

5    inquire further as to what his personal beliefs

6    regarding this question might be.

7        Q    What's the governmental need for the

8    question?

9        A    Enforcement to the Voting Rights Act,

10   determining how many undocumented citizens there

11   are.   You name it, there's a whole bunch of

12   reasons.   That's why every government in the world

13   collects this information.

14       Q    Well, correct me if I'm wrong, we're

15   talking about at a period in the spring of 2017

16   when the Voting Rights Act hadn't come up, the

17   Department of Justice hadn't made a request for

18   it.   What does the Voting Rights Act got to do

19   with it in the spring of 2017?

20       A    When you inquire as to what does the

21   Department of Justice use the citizenship data

22   on --

1      Q    That wasn't my question.    My question

2   is --

3      A    I'm answering your --

4      Q    -- why is it a good idea, why does the

5   government need it back in the spring of 2017?

6      A    Finished with your question?

7      Q    That's my question.

8      A    The answer is for the same reason they've

9   been collecting it for the last 200-plus years.

10     Q    What's the government need in the spring

11  of 2017?

12     A    I already answered that question.    If

13  they collect the data under the ACS for Voting

14  Rights Act enforcement, that is one of the primary

15  reasons they collect the data.

16     Q    Okay.    It's on the ACS.    What's the

17  need -- governmental need for it to be on the

18  census?

19          MR. GARDNER:    Objection.    Asked and

20  answered.

21          THE WITNESS:    The governmental need is,

22  again, if you're going to get more detailed

Page 264

1   information, then you need that information.

2   BY MR. GERSCH:

3       Q   Who said in the spring of 2017 that the

4   government needed more detailed information?

5       A   Again, I'm presented with a request by

6   the Secretary to say, can we add this question to

7   the census?  I inquire about that, and I looked at

8   it.  One of the reasons you would need it is

9   voting rights.  If you're going to do voting

10  allocations on the basis of census allocations,

11  that's the reason it's perfectly sufficient.

12      Q   Who said that in the spring of 2017?

13      A   That was -- that was determined after

14  taking a quick look at the issue.  I don't need

15  more than that to continue to pursue the question.

16      Q   Who told you that the government needed,

17  in the spring of 2017, more detailed information

18  about citizenship than was contained in the ACS?

19      A   Nobody.

20      Q   You came to that decision on your own; is

21  that right?

22      A   Correct.

Page 265

1       Q    But you're not a voting rights lawyer,

2   right?

3       A    Irrelevant to the question.

4       Q    That's not my question.  You're not a

5   voting rights lawyer, right?

6       A    I've already said that.

7       Q    So you decided on your own in the spring

8   of 2017 that it would be a good idea for the

9   government to have more information than was

10  available from the ACS about citizenship to

11  enforce the Voting Rights Act, even though you're

12  not a voting rights lawyer?

13      A    I don't agree with that characterization,

14  at all.  I decided that there was sufficient

15  information for me to pursue the Secretary's

16  request to consider placing a citizenship question

17  on the decennial census and that there was

18  sufficient potential reason to collect that

19  information to warrant moving forward.  If I'd

20  come to an opposite conclusion that there was not

21  sufficient potential reason or that there was some

22  insurmountable legal bar, then I would have

Page 266

1    reported back to the Secretary, I'm sorry,

2    Mr. Secretary, it does not appear we can

3    accomplish this objective.

4        Q    Why did you need to come up with a reason

5    for asking the question, separate and apart from

6    whatever reason the Secretary had in his own head?

7        A    Again, my job is to figure out how to

8    carry out what my boss asks me to do.  So you go

9    forward and you find a legal rationale.  Doesn't

10   matter what his particular personal perspective is

11   on it.  It's not -- it's not going to be the basis

12   on which a decision is made.

13       Q    That's your understanding, that the way

14   you should do it, is come up with a rationale that

15   has nothing to do with what's in the Secretary's

16   mind as to why he wants it; is that your

17   understanding of how it's supposed to work?

18       A    No.  Again, you continue to characterize

19   things in a way that you believe may be correct,

20   but not the way I believe to be correct.  My job,

21   as a person who has been doing this for 30-plus

22   years for clients and people in the government, is

Page 267

1    if they would like to accomplish an objective, I

2    see if there's a way to do that.   And, again, if

3    it's not legal, you tell them that.   If it can't

4    be done, you tell them that.   If there's a way to

5    do it, then you help them find the best rationale

6    to do it.   That's what a policy person does.

7             And so, again, if I came up with a

8    rationale that the Secretary didn't agree with or

9    didn't support, then he was going to tell me that.

10   I have no doubt about that.   But in the meantime,

11   he doesn't -- I don't need to know what his

12   rationale might be, because it may or may not be

13   one that is -- that is something that's going to a

14   legally-valid basis.

15            So, again, he's got -- he's asked, can we

16   put -- can we put a question on?   The job of a

17   policy person is go out and find out how you do

18   that.   Whether that decision is going to be made

19   ultimately to do it or not, that's up to the

20   decision-maker.

21      Q   Are you saying you're better off not

22   knowing what the Secretary's own rationale is for

Page 269

```
 1      A    That's correct.
 2      Q    Counsel asked you about contact you made
 3  with the Department of Justice --
 4      A    Correct.
 5      Q    -- starting with a Ms. Haney [sic], I
 6  believe.
 7           Do you recall that?
 8      A    Yes.  I believe her name is Hankey,
 9  but --
10      Q    Hankey.  I apologize.
11           What was the full name?  I can get it out
12  if you don't know it offhand.
13      A    Mary Blanche, but --
14      Q    I'll find it in here.
15      A    It's in one of these exhibits, the memo
16  that I wrote.  Here.
17      Q    Mary Blanche --
18      A    Yep.
19      Q    -- Hankey; is that right?
20      A    Yeah.
21      Q    All right.  So you went -- you called
22  Mary Blanche Hankey --
```

Page 270

1      A    Correct.

2      Q    -- with regard to adding a citizenship

3  question to the census, right?

4      A    Correct.

5      Q    And you wanted to see if the

6  Department of Justice would sponsor the question?

7      A    Correct.

8      Q    And you had a phone call with her, and

9  you had at least a meeting with her, right?

10     A    Right.

11     Q    So at least two contacts?

12     A    Three, when she called me back with

13 somebody else's name.

14     Q    Fair enough.

15          Didn't -- didn't Ms. Hankey say, why do

16 you want to have a citizenship question?

17     A    No, she didn't.

18     Q    Didn't come up, at all?

19     A    Nope.

20     Q    She referred you to a Mr. McHenry; is

21 that right?

22     A    Correct.

Page 271

1        Q     And he's not a voting rights guy, right?

2        A     I don't actually know what his background

3   is.

4        Q     Well, you went ahead, back and forth with

5   him over about a month; is that right?

6        A     I mean, we spoke on the phone probably

7   three or four times, yeah.

8        Q     Going from, I think, the period you

9   mentioned was --

10       A     Yeah.  It was --

11       Q     -- early May to early June, roughly?

12       A     Approximately a month, yeah.

13       Q     And didn't you learn in that time that

14  he's not a voting rights guy?

15       A     No.

16       Q     Never came up?

17       A     We didn't get into great detail on the

18  rationale.

19       Q     You did ask him would you sponsor a

20  census question for -- I'm sorry.  Withdrawn.

21            You did ask Mr. McHenry if he would be

22  willing to sponsor a request for the addition of a

1   citizenship question on the census, right?

2        A    I didn't ask Mr. McHenry if he would.   I

3   asked if the Department of Justice would be

4   inclined to send a letter asking us to add the

5   citizenship question.

6        Q    Fair enough.

7             And when you did that, you didn't explain

8   to Mr. McHenry why the Secretary wanted a

9   citizenship question?

10       A    I would have no reason to.

11       Q    And Mr. McHenry never asked, hey, you

12  want me to do this?   Why do you need it?   He never

13  asked you that?

14       A    I think I explained at the outset that

15  the department currently got a report from the ACS

16  on citizenship level -- I mean, on

17  census -- certain census size, Citizen Voting Age

18  Population, and if they were to get it from the

19  decennial, that would allow them a greater

20  granularity and would that be useful to them, and

21  he said he would inquire.

22       Q    You asked Mr. McHenry if the

Page 273

1   Department of Justice would find it useful to have

2   more granularity about citizenship?

3       A   Correct.

4       Q   But at no point did Mr. McHenry say,

5   look, if we want it, we'll ask for it, but how

6   come you want it?  Didn't he ask you something

7   like that?

8       A   No.

9       Q   When people call you and say, hey, will

10  the Department of Commerce do this or do that,

11  don't you say, why do you want that, why do you

12  need that?

13      A   I usually say is there a reason that you

14  think the Department of Commerce would need

15  that -- and if they have a reason, then I'll look

16  into it.  I don't say, hey, why does your boss

17  want this?  That's not part of lexicon.

18      Q   No.  No.  If another agency calls and

19  says --

20      A   I don't --

21      Q   Let me finish the question and you can

22  answer any way you want.

1    If another agency calls and says, will

2  the Department of Commerce do such and such,

3  whatever it is --

4     A   Right.

5     Q   -- don't you say to them in some form or

6  another, why do you want this?

7         MR. GARDNER:  Objection.  Hypothetical.

8  BY MR. GERSCH:

9     Q   Why does your agency need this?

10        MR. GARDNER:  Objection.  Hypothetical.

11        THE WITNESS:  Again, I don't question why

12  their boss might want it.  I might say, what is it

13  you think we can provide or why do you think the

14  Department of Commerce is the right agency for

15  this?  But if they say we need this data because

16  we're negotiating a trade agreement, whatever,

17  that's fine.  I don't question their basis.

18  BY MR. GERSCH:

19    Q   Okay.  But if I understood your last

20  answer, you added something important, you said,

21  if they call and say we need this for the trade

22  ag- -- trade agreement, you say I don't question

Page 275

1    them.  But if they don't give a reason, sir, don't
2    you say to them, why do you want it?
3            MR. GARDNER:  Objection.  Calls for a
4    hypothetical.
5            THE WITNESS:  Again, I already provided
6    the reason for Department of Justice.  I said,
7    would it be useful for you to have more granular
8    voting data at the census lock level?  He said he
9    would inquire.  That answers your question.  I'd
10   already provided the answer.
11   BY MR. GERSCH:
12       Q    Mr. McHenry comes back at some point and
13   he says he's not interested, right, in words or
14   substance?
15       A    He suggested that I contact the
16   Department of Homeland Security.
17       Q    But I take it he makes it clear to you in
18   some fashion -- withdrawn.
19            Let's start with this.  What did he say
20   to you?
21       A    He suggested I talk to the Department of
22   Homeland Security.

1      Q    Did he also say, listen, I don't really

2   need that information, or my guys don't need that

3   information, or my department doesn't need that

4   information or something like that?

5           MR. GARDNER:   Objection to form.

6           THE WITNESS:   Again, no, he did not

7   indicate that they did not need the information.

8   He simply suggested that they were rather busy and

9   why don't I talk to the Department of

10  Homeland Security.

11  BY MR. GERSCH:

12     Q    It's your testimony that he said they

13  were too busy to do it?

14     A    Unfortunately, that's not an uncommon

15  response from other agencies.  They don't

16  necessarily look for extra work.

17     Q    Okay.  So they were too busy to ask for

18  it, that's what you understood them to say?

19     A    Yeah.  Their inclination was they weren't

20  inclined to do the work, to ask for it, yeah.

21     Q    Okay.  Okay.  So Mr. McHenry let's you

22  know he's not inclined or the department is not

Page 277

```
1   inclined to do the work, to ask for it, and he

2   refers you to Homeland Security, correct?

3        A    Correct.

4        Q    And you speak to a Mr. Hamilton, right?

5        A    Right.

6        Q    And Mr. Hamilton, he's not a VRA guy,

7   right?

8        A    I have no idea what his background is.

9        Q    Certainly, it's your understanding that

10  the Department of Homeland Security has nothing to

11  do with enforcing the Voting Rights Act?

12       A    It would not normally be something I

13  would think they would do, no.

14       Q    And you talked to Mr. Hamilton how many

15  times?

16       A    I don't know, three or four times.

17       Q    Over what period?

18       A    Again, two weeks.  I don't know.

19       Q    And don't you say to Mr. Hamilton, here's

20  why we want the information, here's why we want

21  you to ask for the citizenship question?

22       A    Again, it was the same explanation as I
```

1  gave the Department of Justice.  And as you

2  pointed out, DHS doesn't really do that.  So I was

3  simply following up on the suggestion that

4  Mr. McHenry had made, and perhaps there was

5  something that DHS did that I was unaware of that

6  would have them -- have the need for this

7  information.  Turns out they didn't, so back to

8  Square 1.

9      Q    Yeah.  My question is -- and maybe I

10  didn't phrase it exactly right.

11          Did you explain to Mr. McHenry [sic] in

12  any of these several calls, here's why it's

13  important to the Department of Commerce, or your

14  boss or whomever, here's why it's important

15  that -- to get a citizenship question added?

16          MR. GARDNER:  I think you mean

17  Mr. Hamilton.  You said Mr. McHenry.

18          MR. GERSCH:  Withdrawn.  Let me rephrase.

19  Thank you, Counsel.

20  BY MR. GERSCH:

21      Q    In any of these several calls, you say to

22  Mr. Hamilton, here's why it's important to

1   Department of Commerce to have you folks request

2   the addition of a citizenship question.

3        A    No.  I never explained that to him.

4        Q    And is it your testimony that in your

5   several conversations with Mr. Hamilton, he never

6   says, hey, why do you want this?

7        A    That's correct.

8        Q    He never says, why do you want a

9   citizenship question added?

10       A    Again, when somebody calls up and says --

11  my boss, you know, Secretary Ross, AG Sessions,

12  whomever has asked us to pursue this, I don't

13  typically question back and say, well, why do you

14  think -- does your boss think this is needed?  I

15  just don't do that.  It's kind of discourteous to

16  other staff.  So no, he took me at face value.

17  I'm calling to inquire, would they find this

18  useful?  He gets back to me, no.

19       Q    I just want to make sure I caught part of

20  what you're saying correctly.

21            Are you saying it would have been

22  discourteous for Mr. Hamilton at Homeland Security

Page 280

1    to say, hey, why do you guys at Commerce want us

2    to ask for a citizenship question?

3        A    For him to challenge why my boss might

4    ask for it.

5        Q    I didn't say challenge.

6             Is it your testimony it would be

7    discourteous for him to say, hey, you're asking me

8    to do something --

9        A    Uh-huh.

10       Q    -- something which involves some work --

11       A    Uh-huh.

12       Q    -- would you just explain to me why it's

13   important for you to have me ask for a citizenship

14   question?

15            MR. GARDNER:   Objection.   Form.

16            THE WITNESS:   No such conversation

17   occurred.

18   BY MR. GERSCH:

19       Q    Yeah.   My question is:   Would that have

20   been discourteous for him to say that to you?

21       A    Depends on how he phrased it.

22       Q    He could have phrased it in a way that

Page 281

1    was properly respectful, right?

2        A    Theoretically, yes.

3        Q    In the time that you were dealing with

4    Mr. McHenry or getting ready to deal with

5    Mr. McHenry -- this is back at the Justice

6    Department now -- did you ever learn that he was

7    director of the Executive Office of Immigration

8    Review?

9        A    I never learned that, no.

10       Q    How about Ms. Hankey, did she say why she

11   was going to refer you to Mr. McHenry?

12       A    No, she didn't.

13       Q    Is it common for you to call people like

14   Mr. McHenry without knowing what their position

15   is?

16       A    Certainly at that time, yes.

17       Q    What was it about that time?

18       A    Well, it was shortly into the

19   administration, and titles are not necessarily

20   informative of what people do, so --

21       Q    Did you have an understanding of what

22   Mr. McHenry's portfolio was, independent of his

Page 282

1    title?

2        A    No.

3        Q    About what his expertise was independent

4    of his title?

5        A    No.

6        Q    You didn't know -- withdrawn.

7             You're trying to accomplish something for

8    your boss, right?

9        A    Correct.

10       Q    And you're calling another agency and

11   you're going to ask them to do some work, right?

12       A    Right.

13       Q    And you know from your vast experience

14   that sometimes people just say no because they

15   just don't want to do the work, right?

16       A    Correct.

17       Q    That's not uncommon, right?

18       A    It's been my experience.

19       Q    So in order to have the best possible

20   chance of persuading a person like Mr. McHenry,

21   don't you want to do a little research beforehand?

22       A    Again, I was dealing with, literally,

1    hundreds of issue, as well as clearing

2    correspondence, clearing Federal Register notices,

3    no.  I did not have time to research this guy's

4    background.  That's why I went through

5    Eric Branstad to say, hey, get me somebody over at

6    DOJ who I can talk to.  I want to Hankey -- and I

7    don't know her from Adam, but relying on the fact

8    that she was recommended by folks over at the

9    White House as somebody who was connected with

10   AG Sessions, I'm assuming she's going to steer me

11   in the right direction.  So I take on faith who

12   she suggested I talked to.  Turned out they

13   weren't the right person, so we didn't get

14   anywhere.

15       Q    Did you have an assistant during this

16   period?

17       A    No.

18       Q    Any staff?

19       A    I had my OPSP staff.

20       Q    Who's that?

21       A    Office of Policy and Strategic Planning.

22   They were the detailees I discussed earlier.

Page 284

1      Q      Got it.

2             You couldn't ask one of them, hey, I'm

3      supposed to have a call with Mr. McHenry, can one

4      of you figure out what he is and why --

5      A      No.

6      Q      Excuse me.  I got to -- just a second.

7      I've got to finish the question.  You can answer

8      it any way you want.

9             Didn't you want to call -- talk to one of

10     your staff people and say, listen, I got a call

11     with Mr. McHenry, I got to persuade him to do some

12     work he's not going to want to do, to help out our

13     boss, Mr. Ross, Secretary Ross, and can one of

14     your look up and tell me who he is and what levers

15     we might be able to pull to persuade him to do

16     this work for us?

17            MR. GARDNER:  Objection.

18     BY MR. GERSCH:

19     Q      You didn't want to ask someone on your

20     staff to do some work like that for you?

21            MR. GARDNER:  Objection.  Form.

22            THE WITNESS:  Again, that's a view of

1    both the workload I was under and the workload

2    that they're under that I think is misinformed.

3            In fact, several of my calls with

4    Mr. McHenry were made while I was driving into

5    work, so there was no opportunity to call somebody

6    and do that research.

7            And, besides, this wasn't about getting

8    leverage on Mr. McHenry.  This was simply to

9    ask -- following up on the person I'd been

10   directed to, who, based on the fact that it was

11   recommended by an assistant to the AG, I'm

12   assuming is going to at least be somewhat

13   receptive.  Probably an error on my part, but

14   that's -- I've got a dozen other things I'm

15   dealing with at the same time.  So, no, I'm not

16   going to spend a lot of time researching this guy.

17   BY MR. GERSCH:

18       Q   You didn't spend any time researching

19   this guy?

20       A   Correct.  I didn't.

21       Q   Secretary Ross certainly knows why he

22   wanted a citizenship question back in the spring

Page 286

1    of 2017, right?

2        A    You'd have to ask him.

3        Q    Is there anyone besides Secretary Ross

4    who we could go to who would have that

5    information?

6            MR. GARDNER:   Objection.   Lack of

7    foundation.   Calls for speculation.

8            THE WITNESS:   I'm not aware of anybody.

9    BY MR. GERSCH:

10       Q    Do you have any reason to believe that

11   Secretary Ross's rationale for wanting to add a

12   citizenship question is some kind of supersecret?

13       A    No.

14       Q    Doesn't involve national security, right?

15           MR. GARDNER:   Objection.   Lack of

16   foundation.   Calls for speculation.

17           THE WITNESS:   I don't know what the

18   Secretary's rationale is.   You'd have to ask him.

19   BY MR. GERSCH:

20       Q    But you don't think it involves national

21   security?

22           MR. GARDNER:   Same objections.

1          THE WITNESS:  I'm not going to speculate

2    on that.

3    BY MR. GERSCH:

4          Q    You heard about this suit back when it

5    was filed, right, this lawsuit?

6          A    Yeah.

7          Q    Okay.  And there's several lawsuits,

8    right?

9          A    Lost count, but yes.

10         Q    And you've known that you were going to

11   sit for a deposition for a while, also?

12         A    Maybe for two weeks or so.

13         Q    Okay.  Well, at any time since these

14   lawsuits started to get filed, did you have a

15   discussion with anyone about why it is the

16   Secretary wanted a citizenship question added?

17         A    No.

18         Q    Secretary Ross gave Congressional

19   testimony in March of 2018 in advance of his

20   decisional memorandum.  Do you remember that?

21         A    I'll take your word for it.

22         Q    Testified before committees of both --

1  both House, right?

2      A    Again, I'd have to look at a calendar to

3  refresh my memory as to when he testified.  But,

4  yes, he testified to Congress during the course of

5  the year.

6      Q    Fair enough.

7          And he was asked questions about a

8  citizenship question?

9      A    I believe that's correct.

10     Q    Who prepared him to testify on that

11 subject?

12     A    He -- he does a lot of his own hearing

13 prep, but we would have -- I would have been

14 involved, as well as James Uthmeier,

15 Peter Davidson, of course, Karen Dunn Kelley.  I

16 mean, this was not a hearing specifically on the

17 citizenship question, so we mostly would have been

18 preparing for the broad range of questions on

19 whatever the topic was.  We were going up and

20 testifying on the steel tariffs.  We were going up

21 and testifying on the lifecycle cost estimate, a

22 whole series of things, so --

1    Q    Sure.   You want to get him prepped on

2    everything, though, right?

3    A    Yeah.

4    Q    And one of the things that you

5    anticipated would come up was the question about

6    the citizenship question, right?

7    A    Seems reasonable if that was the time

8    frame, yes.

9    Q    And were you the one who worked with

10   Secretary Ross on how he was going to answer those

11   questions?

12   A    I would have been one of the people, yes.

13   Q    Was there a division of responsibility

14   between the folks you mentioned just a minute ago,

15   the people who helped prepare him?

16   A    Not per se.   I think he's fairly open to

17   suggestions from staff of what to consider.   So if

18   somebody had an idea, he would consider it.

19   Q    Did you tell the Secretary, listen, you

20   can expect that someone is going to ask

21   whether -- whether you're going to add a

22   citizenship question?   Did you have that

1  discussion with him?  That would have been normal,

2  right?

3      A    Well, again, if this is in the time

4  period after we received the DOJ letter and while

5  he was considering making his decision, then, yes,

6  we might have anticipated.  But the answer would

7  have been fairly straightforward, which is we have

8  that matter under review, and I'm considering

9  all -- all information.  So there would have been

10  very little we're prepping for on that.

11      Q    Didn't you discuss with the

12  Secretary -- withdrawn.

13          First of all, I'll represent that he

14  did -- the Secretary did, in fact, testify before

15  multiple committees after the

16  Department of Justice request came in in December

17  of 2017 and before the issuance of the March

18  decisional memorandum.

19      A    Okay.

20      Q    And my question to you is:  In those

21  discussions that you had with the Secretary to

22  prepare him, wasn't it discussed whether the

1    Secretary was going to reveal the reasons he had

2    wanted to the addition of a citizenship question?

3       A    No.

4       Q    Subject never came up?

5       A    Never came up.

6       Q    Didn't it come up whether the Secretary

7    would reveal that the reason that Commerce had

8    received a request from DOJ to add a citizenship

9    question is because Commerce had gone to DOJ and

10   asked DOJ to make that request?

11      A    No.

12      Q    Never came up?

13      A    Never came up.

14           (Conference call interruption.)

15           THE WITNESS:  In case we were falling

16   asleep.

17   BY MR. GERSCH:

18      Q   You testified with respect to the

19   citizenship question; isn't that right?

20      A   That's correct.

21      Q   You gave testimony before the House

22   Committee on Oversight and Government Reform?

Page 295

1   Voting Rights Act was not available."

2          That's the testimony you gave, correct?

3      A   Again, this is not the official

4   transcript, but presuming your person transcribed

5   this correctly, that appears to be what I said.

6      Q   And this squares with your memory of what

7   you said, right?

8      A   Correct.

9      Q   And when she says, why did this question

10  get added, and you say, we received a request from

11  the Department of Justice, that's not the whole

12  truth; is it?

13     A   That's a -- that's a factual statement.

14     Q   It's a factual statement that you

15  received a request from Department of Justice,

16  right?

17     A   Correct.

18     Q   But the reason the Department of Justice

19  made the request is because you guys at the

20  Department of Commerce put them up to it; isn't

21  that right?

22     A   I don't agree with that characterization.

Page 296

1    But, again, the Department of Justice decided that

2    this was information they could use and they made

3    the request.  That starts the formal process for

4    us to review the question.  Had they decided they

5    did not need that information and not made the

6    request, then the Commerce Department would have

7    had to decide if there was some rationale that the

8    Commerce Department needed this information.

9         Q    Sure.  But the reason the

10   Department of Justice made this request of the

11   Department of Commerce was that the Department of

12   Commerce went to the Justice Department and said,

13   will you please make this request of us, right?

14        A    We asked them if they could use this

15   information.  That was an independent decision on

16   their part.

17        Q    You asked them if they could use

18   information from a citizenship question, right?

19        A    At the block level, which is not

20   currently available.

21        Q    And you asked them if they would be

22   willing to request that from the

Page 297

1    Department of Justice [sic]?

2        A    If that was information that they found

3    useful, then they could request it, yes.

4        Q    You asked them to request it from the

5    Department of Justice, correct?

6        A    Again, what we asked them was if they

7    could use this information, and if so, then they

8    would need to request it.

9        Q    Do you deny that you personally went to

10   representatives in the Department of Justice and

11   asked them if they would request the addition of a

12   citizenship question?

13           MR. GARDNER:   Objection.   Asked and

14   answered.

15           THE WITNESS:   To answer, once again, I

16   went to representatives of the

17   Department of Justice and asked them if this would

18   be information that they would find useful, and if

19   so, they could request it.

20   BY MR. GERSCH:

21       Q    Yeah.   I got that part, and I'm asking a

22   slightly different question now.

1    A    Okay.

2    Q    Didn't you say to the

3  Department of Justice when you were talking to

4  them, in words or substance, we would appreciate

5  it if you would ask us to include a citizenship

6  question?

7    A    I never made such a request.

8    Q    And I take it, based on your prior

9  testimony, you don't know what conversation

10 occurred between the Secretary and the Attorney

11 General?

12   A    That's correct.

13   Q    Did you understand that Ms. Teramoto was

14 on that call between the Secretary and the

15 Attorney General?

16   A    I don't know who was on the call.

17   Q    In any case, however we word it, you

18 didn't tell Representative Norton when she asked

19 why is this question being added, that you had

20 gone to the Department of Justice and suggested

21 that this might be something they'd be interested

22 in?

Page 300

1      Q    Let me put a different question to you.

2      A    Sure.

3      Q    When Representative Norton asks you the

4   why question, don't you think it's responsive to

5   the why question that the Secretary of Commerce

6   wanted to add a citizenship question independent

7   of the Department of Justice's request?

8      A    No.  I don't think it's relevant.  His

9   decisional memo laid out very clearly the

10  rationale that was the basis of his decision.

11  Whatever his personal feelings may have been are

12  irrelevant to that decision.

13     Q    It laid out a rationale.  We can agree on

14  that, right?

15     A    That's what he's required to do under the

16  law, is lay out a rationale.  That is the

17  rationale for his decision and that's what he's

18  standing on.

19     Q    Okay.  He laid out a rationale.  Is it

20  your understanding, under the law, that if the

21  rationale is not his real reason for doing it, we

22  should ignore the real reason, and we should only

Page 301

1    focus on the pretextual reasons that he offers up?

2         MR. GARDNER:  Objection.  Calls for a

3    legal conclusion.

4         THE WITNESS:  The Secretary's decision

5    memo lays out a valid reason that's consigned to

6    his discretion under the law, and that is the

7    rationale he provided to staff, and that is the

8    rationale that we placed in the record.  So that

9    is his reason for having the question.

10   BY MR. GERSCH:

11        Q   My question is a little different.  If

12   the Secretary's real rationale is something

13   different than the rationale he lays out in his

14   decisional memo, is it your understanding, under

15   the law, that we're to ignore the real reason and

16   only focus on what's in the decisional memorandum?

17        MR. GARDNER:  Objection.  Calls for a

18   legal decision.

19        THE WITNESS:  Your hypothetical is

20   premised on the false conclusion that there is

21   some illegal rationale that would be provided and

22   be exposed and be referenced.  There is none.

1   It's committed to his discretion to add a

2   question, as long as you make it through the other

3   things, Paperwork Production Act, et cetera.   So

4   it's -- I don't understand the basis for your

5   question.   But there's -- at the base of your

6   question is this hypothetical that there's some

7   supposed illegal reason that would be -- that

8   would nullify a perfectly valid decision.   I don't

9   agree with that assessment.

10  BY MR. GERSCH:

11       Q    Mr. Comstock, I want you to listen to my

12  question carefully, because there was no reference

13  to any illegal rationale, and I'm going to put it

14  to you again and there will be no reference to an

15  illegal rationale.   And my only question -- and,

16  by the way, I'm happy if you want to take this as

17  a hypothetical.

18       My only question is:   If the Secretary

19  lays out a rationale in his decisional memorandum

20  which is different than his real rationale, is it

21  your understanding that we're supposed to ignore

22  the real rationale and only focus on what's in the

Page 303

1    decision memo?

2            MR. GARDNER:   Given your introductory

3    clause, objection.   Calls for a hypothetical.

4    Objection.   Calls for a legal conclusion.

5            THE WITNESS:   Again, a decision is valid

6    if a valid reason has been spelled out, and that

7    is what we did.

8    BY MR. GERSCH:

9        Q    Could you answer my question?

10       A    Again, I don't accept the premise of your

11   question, which is that there's some other reason

12   besides what was provided in the memo.

13       Q    It's a hypothetical question, sir.   The

14   question is --

15       A    I'm not going to answer a hypothetical on

16   that basis.

17       Q    I'm asking you to answer it, and you're

18   here to answer questions, and I think I'm fairly

19   following up on your testimony.

20           My question to you is real simple:   If

21   the Secretary lays out a rationale in his

22   decisional memorandum and it's not his real

Page 304

1    rationale, is it your understanding that what

2    we're supposed to focus on is what's in the

3    decisional memorandum and we're not supposed to

4    look at the rationale?

5           MR. GARDNER:   Objection.   Calls for

6    hypothetical.   Objection.   Calls for legal

7    conclusion.

8           THE WITNESS:   Again, we're at loggerheads

9    here because you keep spelling out something that

10   is -- that presupposes there is some other

11   rationale that would be sufficient to outweigh a

12   legitimate rationale and, therefore, must be

13   noticed and taken care of.   I mean, the government

14   makes decisions all the time and spells out a

15   rationale.   Do some of decision-makers have,

16   perhaps, other reasons, maybe, but it's not

17   relevant to the legal analysis.

18      Q   We shouldn't know what Secretary --

19   withdrawn.

20           We shouldn't know what the real rationale

21   is; is that testimony?

22      A   I --

1          MR. GARDNER:  Objection.  Calls for a

2     legal conclusion.

3          THE WITNESS:  Again, I have no reason to

4     believe that the rationale is anything other than

5     what's in the memo.

6     BY MR. GERSCH:

7        Q    Well, sir, actually, you testified

8     previously that the Secretary had a rationale for

9     asking this question, which he didn't reveal to

10    you and had nothing to do with the

11    Department of Justice's request.

12       A    I disagree with that statement.

13       Q    Let's try this one other way.  You don't

14    disagree with the proposition that a

15    decision-maker could have a rationale that is

16    different than what he chooses to spell out in his

17    decisional memorandum, right?

18          MR. GARDNER:  Objection.  Calls for

19    hypothetical.

20          THE WITNESS:  Again, I don't know -- I

21    don't -- it's impossible to answer that question,

22    because you -- I'm not sure where you're going

Page 306

1    with it.

2    BY MR. GERSCH:

3        Q    I'm not asking you to know where I'm

4    going with it.  I'm asking you to answer the

5    question.  I'll put it to you again.

6            You don't disagree with the proposition

7    that it's possible for the decision-maker to have

8    one rationale which he puts in the decisional

9    memorandum and a completely different rationale

10   which is the real reason he wants the decision

11   done?

12            MR. GARDNER:  Objection.  Calls for a

13   hypothetical.

14            THE WITNESS:  Again, in the context we're

15   dealing with, I don't agree with that statement.

16   BY MR. GERSCH:

17       Q    It's not possible for that to happen,

18   it's not possible for the decision-maker to put

19   one rationale in the decisional memo and have a

20   completely different rationale for why he wants

21   the decision?

22            MR. GARDNER:  Objection.  Calls for a

Page 307

1    hypothetical.

2           THE WITNESS:   In my experience with the

3    federal government service across 30 years, both

4    Democrat and Republican, I'm not aware of

5    decision-makers who would do such a thing.

6    BY MR. GERSCH:

7       Q    This would never happen, in your view,

8    right?

9       A    I'm not going to use the word never.

10   Clearly, in the course of human history, things

11   like that do happen.   That's not been my

12   experience that it generally is the case.

13      Q    That's fine.   Put aside your experience.

14   I'm just asking you conceptually, you don't have

15   difficulty understanding that a decision-maker

16   could say I'm doing this for one reason without

17   revealing that he is actually doing it for a

18   different reason.   You understand that concept,

19   right?

20          MR. GARDNER:   Objection.   Calls for a

21   hypothetical.

22          THE WITNESS:   Yeah.   It's a hypothetical

1    to which the answer is always going to be yes.   So

2    to the extent that makes you happy, sure.

3    BY MR. GERSCH:

4         Q    Okay.   So you do understand that concept.

5    So when that occurs, when it is the case that the

6    decision-maker puts forth a stated rationale,

7    which is, in fact, not his real rationale, is it

8    your understanding that we should pay no attention

9    to his real rationale and focus only on his stated

10   rationale?

11             MR. GARDNER:   Objection.   Calls for

12   hypothetical objection.   Calls for a legal

13   conclusion.

14             THE WITNESS:   I'm not going to answer

15   that question.

16             MR. GARDNER:   Would now be a good time

17   for a break?   We've been going about an hour.

18             VIDEOGRAPHER:   This concludes Media Unit

19   Number 5.   The time on the video is 3:11 p.m.   We

20   are off to record.

21             (Off the record.)

22             VIDEOGRAPHER:   This begins Media Unit

Page 309

1    Number 6.  The time on the video is 3:37 p.m.  We

2    are on the record.

3          (Plaintiffs' Exhibit 28, Memo, was

4    marked.)

5    BY MR. GERSCH:

6      Q   Mr. Comstock, we're back on the record.

7          After the Department of Justice made

8    their formal request for the addition of a

9    citizenship question in December of 2017, you

10   understand that the Census Bureau did some

11   analysis with respect to that request, right?

12     A   Correct.

13     Q   All right.  And one of the things that

14   the Census Bureau produced is a document that's

15   been marked Exhibit 28.

16     A   Okay.

17     Q   Is that fair to say?

18     A   It appears to be a memo from John Abowd

19   to the Secretary, so will -- oh, it's marked

20   draft, so --

21     Q   Dated January 19, 2018, as you say, from

22   John Abowd, Chief Scientist at the Census Bureau,

Page 310

1    to Secretary Ross through Karen Dunn Kelley.

2         You've seen this before, haven't you?

3    A    I don't know that I've seen this

4    particular draft.  It's marked draft, so I don't

5    know that this document ever made it up to the

6    Secretary's office.

7    Q    Did you see a form of this document,

8    whether it was this one or not?

9    A    I saw some form of this document, yes.

10   Q    I want to direct your attention to the

11   one, two, three -- third full paragraph, last

12   sentence, and in it Mr. Abowd addresses

13   Alternative B -- and, by the way, you understand

14   Alternative B is adding a citizenship question to

15   the census, right?

16   A    That appears to be what the memo says,

17   yeah.

18   Q    So what Mr. Abowd reports is

19   Alternative B -- that is adding a citizenship

20   question -- is, quote, very costly, harms the

21   quality of the census count, and would use

22   substantially-less active citizenship status data

1    that are available from administrative sources.

2            You knew that that is what the

3    Census Bureau had concluded, right?

4        A    Well, again, that's a -- this is a draft

5    pre-decisional memo.  So I'm not sure if this was

6    the final document that was sent to us or not.

7        Q    I'll represent to you that this

8    is -- that the record made in this case so far is

9    that this is the last draft produced.  Does that

10   help you --

11       A    Is that -- okay.

12       Q    I'm happy if you want to consult with

13   your counsel.

14           MR. GARDNER:  If you -- you can answer

15   the question, yes.

16           THE WITNESS:  Sure.  Assuming this is the

17   final version, then that's what the document says,

18   yes.

19   BY MR. GERSCH:

20       Q    That's not my question.  You came to

21   understand, isn't that right, that the view of the

22   Census Bureau was that asking the citizenship

1  question is very costly, harms the quality of the

2  census count and would use substantially-less

3  citizenship status than are available from

4  administrative sources?

5       A   I would agree that that's the summary

6  statement here.  That it overstates the case they

7  made further in the document.  But that is not an

8  accurate representation of what's actually

9  reflected in the document.

10      Q   I want to make sure I understand your

11  testimony.  You're saying you disagree with their

12  conclusion?

13      A   I disagree with that characterization as

14  being the final conclusion of the Census Bureau,

15  yes.

16      Q   Ah.  Okay.  So you think that what I just

17  read to you doesn't fairly reflect the view of the

18  Census Bureau; is that right?

19      A   I think that reflects the view of

20  Dr. Abowd and that it's very imprecisely stated.

21  If you read the rest of the memo, it provides more

22  detail, and so I would not agree with the

1    statement, because it's not backed up in the

2    document that it would be very costly.  That's a

3    relative term.  And that it would use

4    substantially-less accurate, I disagree with those

5    statements.

6         Q    Yeah.  I understand, and I stipulate that

7    you disagree with them.  My question is a little

8    different.  I'm asking if you understand this is

9    the position of the Census Bureau, whether you

10   agree with it or not, and I stipulate that you

11   don't.

12        A    And just, again, I'm being very clear

13   that this sentence taken out of context, I would

14   say is not the position of the Census Bureau.  The

15   position of the Census Bureau is reflected in this

16   full memo, which provides greater detail, which is

17   not, I would say, accurately characterized in this

18   summary statement at the front.

19        Q    Did you ever meet with the folks at the

20   Census Bureau about this analysis?

21        A    Yes, we did.

22        Q    Okay.  When did you do that?

1    A    I couldn't tell you the exact date.

2    Q    Who did you meet with?

3    A    Dr. Abowd, Dr. Jarmin.  It was a large

4    meeting.

5    Q    And Dr. Abowd and Dr. Jarmin, they stood

6    by this analysis, right, the analysis in

7    Exhibit 28?

8    A    I'd say that, yeah, they stood by the

9    entire analysis, not necessarily that statement.

10   Q    And the entire analysis includes the

11   statement that I read to you, right?

12   A    Again, you're -- I think you're taking a

13   single statement out of context.

14   Q    My question is a little different.  I'm

15   saying when you said, they stood by the entire

16   analysis, that includes the statement that I read

17   you?

18   A    And, again, I will say that I think

19   you're trying to get me to say that particular

20   statement represents the view of the

21   Census Bureau, and that is not my understanding.

22   Q    Okay.  When you say it's not your

1   understanding, at no point did Dr. Jarmin or

2   Dr. Abowd say, no, we don't believe that

3   Alternative B is very costly, harms the quality of

4   the census count and would use substantially-less

5   accurate citizenship status data that are

6   available from administration sources; isn't that

7   right?  They never took it back?

8        A    We never asked them to take it back.

9        Q    And they never did?

10       A    I don't know if they took it back or not.

11       Q    In your presence, sir.

12       A    Again, they were never asked, to my

13  knowledge, to take that statement back, so there

14  would be no reason for them to take it back.

15       Q    And they didn't take it back, did they?

16       A    I don't know whether they took it back.

17       Q    In your presence, they didn't take it

18  back?

19       A    Again, I look at their entire memo, not

20  that statement.

21       Q    I'm not asking that question.  They

22  didn't take this statement back that I just read

Page 316

1    to you three times?

2         A    Again, my point is, they were never asked

3    to take it back, so there would be no reason for

4    them to take it back.

5         Q    I just want there to be no

6    misunderstanding, Mr. Abowd [sic], if at trial

7    you're going to say they took it back, I want to

8    hear that right now.

9              MR. GARDNER:   He's not Mr. Abowd.

10   BY MR. GERSCH:

11        Q    I'm sorry, Mr. Comstock.   It's late in

12   the day.

13             Mr. Comstock, if you're going to say at

14   trial that Dr. Abowd or Dr. Jarmin took this

15   statement back, I want to hear that right now.

16   Can we agree on that, that you'll tell me right

17   now?

18        A    I will agree -- I will agree that I would

19   say that is not representative of the data that

20   was presented to us in the course of extensive

21   discussions.   That that statement is an early

22   statement that mischaracterizes the final

Page 317

1    conclusions that we understood.

2        Q    When you say earlier, it's the statement

3    as of the January 19th memo, you don't disagree

4    with that?

5        A    Again, I'm not contesting they provided

6    this investigation.

7        Q    Focus on timing.   You said this was an

8    early statement and you don't think it was

9    reflective of their final conclusions.

10       My question is:   You're not saying it

11   doesn't reflect their position as of January 19th,

12   are you?

13       A    I am saying, again, that I think you're

14   taking a single statement out of context and

15   trying to represent it has the position of the

16   Bureau as conclusive, and I'm saying I disagree

17   with that statement.

18       Q    Let me show you -- let's mark this as

19   Exhibit 29.

20           (Plaintiffs' Exhibit 29, Memo, was

21   marked.)

22   BY MR. GERSCH:

1        Q    You see what's been marked as Comstock

2    Exhibit 29, it is a March 1, 2018 memo from

3    Dr. Abowd for Secretary Ross, Bates stamp first

4    Page 001308.

5            Do you have that in front of you?

6        A    I do.

7        Q    Have you seen this document before?

8        A    I believe I've seen this document.

9        Q    Okay.   And this document relates to an

10    Alternative D, right?

11        A    Correct.   But I'll note, again, it's

12    marked draft, and I'm just mystified as to why we

13    keep getting draft documents as opposed to finals.

14    Certainly draft documents don't normally come to

15    us.

16            MR. WALSH:   Counsel, would it be possible

17    to hand out --

18            MR. GERSCH:   Oh, I'm sorry.

19            MR. WALSH:   Thanks.

20    BY MR. GERSCH:

21        Q    This is about Alternative D; is that

22    right?

1      A    That's correct.  But I'm still asking a

2   question, why am I getting a draft version of this

3   instead of a final?

4      Q    I don't get to testify.  All I can do is

5   ask the questions.

6           And Alternative D was the idea of

7   Secretary Ross, that perhaps you could combine

8   Alternative B, which is asking the citizenship

9   question of every household in the decennial

10   census, and Alternative C, which was don't ask the

11   question but use administration data to figure out

12   citizenship status, correct?

13      A    Correct.

14      Q    And at the back of this memo, the last

15   sentence says, "In sum, Alternative D would result

16   in poorer quality citizenship data than

17   Alternative C.  It would still have all the

18   negative cost and quality implications of

19   Alternative B outlined in the draft January 19th

20   memo to the Department of Commerce."

21           You saw this at the time, right?

22      A    Again, I can't say that this was the

1    document I saw, because I did not see something

2    marked draft pre-decisional V10.

3        Q    You think you saw a version of it that

4    didn't have draft on it?

5        A    I have no idea.  But we don't typically

6    see documents that say draft.

7        Q    I'll represent that we've never seen a

8    version of either of these documents that aren't

9    marked draft.  If there is one -- if there are

10   versions, I would like them right now.

11           MR. GARDNER:  I represent we've produced

12   what we have.

13   BY MR. GERSCH:

14       Q    Regardless of the format, you became

15   acquainted with the views of Census that

16   Alternative B would result in poorer quality

17   citizenship data than Alternative C and still have

18   all the cost and quality implications of

19   Alternative B outlined in the draft January 19th

20   memo to the Department of Commerce; you became

21   acquainted with that conclusion of theirs, right?

22       A    I did.

1      Q    Okay.  By the way, you'll notice it

2  says -- this refers to the January 19th memo as

3  being a draft.

4      A    Okay.  Like I said --

5      Q    Do you see that?

6      A    I see it.  That it says that, yes.

7  Perhaps that is what they provided to us.  I don't

8  know.  We produced whatever is in the record, so

9  if this is what's in the record -- as long as I'm

10  being given the final version, then okay.

11      Q    All right.  You're not saying that the

12  Census Bureau took back the conclusion reflected

13  in this last paragraph that I've read you from

14  Exhibit 29, are you?

15      A    Again, I think there was iterative

16  exchange in which the conclusions of the

17  Census Bureau to staff and some of their

18  assertions did not hold up under

19  cross-examination.

20      Q    Whether you think they held up or not, my

21  question to you is:  Did the Census Bureau ever

22  take back the conclusion that's in the last

1    paragraph of this March 1 memo?

2         A    You'd have to ask them.

3         Q    In your presence, did they say any such

4    thing?

5         A    I didn't ask them to take it back.

6         Q    I'm not asking whether you asked them.

7    I'm asking -- withdrawn.

8              There were other people in the meeting

9    besides you, right?

10        A    There were a series of meetings, so --

11        Q    How many meetings did you have about this

12   memo, this March 1 memo?

13        A    I couldn't tell you.

14        Q    About?

15        A    Might have met once or twice.  I really

16   couldn't tell you.

17        Q    And who did you remember being there

18   besides Dr. Abowd and Dr. Jarmin?

19        A    Again, I don't know if it was

20   specifically on this memo or this presentation or

21   whether they sent it to us.  There were multiple

22   meetings on the question.  Who was at each

1    meeting, I couldn't tell you.

2        Q    I think it would be fair to say there

3    were multiple meetings about Census Bureau's

4    analysis of the citizenship question, right?

5        A    Yes.

6        Q    Okay.  And what's your best recollection

7    of how many meetings there were?

8        A    I don't know.  Two or three.

9        Q    And if this memo is dated March 1 and the

10   decisional memo is dated March 26th.  What's your

11   best recollection about when the last -- the last

12   meeting was, the last of these two or three

13   meetings?

14       A    Probably somewhere in the vicinity of

15   March 20th.

16       Q    Okay.  And my question simply to you is,

17   sir:  Did the Census Bureau people ever say we're

18   taking it back, you've convinced us, we don't

19   agree with the conclusion we put forth in the last

20   paragraph?

21       A    No.

22       Q    And did you ever have -- withdrawn.

Page 324

1        Did you have a meeting about the wording
2    of the March 26th memo with the Census Bureau?
3        A    I don't believe so.
4        Q    You didn't have a meeting with Dr. Abowd
5    with Secretary Ross there on the morning of the
6    26th or thereabouts?
7        A    No, not to my recollection.  But it's
8    entirely possible.
9        Q    So it's your -- and all I can ask for is
10   your best recollection.
11       It's your best recollection that you
12   never had a meeting with the Census Bureau about
13   the wording of the March 26 decisional memo?
14       A    Not that I recall, no.
15       Q    Did you ever have any analysis of the
16   citizenship question prepared by experts other
17   than the folks at the Census Bureau?
18       A    Not that I know of, no.
19       Q    Did you ever get any input from somebody
20   with technical expertise with respect to the
21   Census Bureau's analysis of the citizenship
22   question who was not from the Census Bureau?

Page 325

1      A    No.

2      Q    Did anyone review the Census Bureau's

3  analysis of what was wrong with the citizenship

4  question who was not a lawyer?

5      A    The Secretary.

6      Q    Other than the Secretary?

7      A    Karen Dunn Kelley.

8      Q    Other than the Secretary and Karen Dunn

9  Kelley?

10     A    Obviously, Dr. Jarmin, Dr. Abowd.

11     Q    I'm talking about people outside the

12 Census Bureau.

13     A    Census Bureau.

14          Well, let's see -- well, Wendy Teramoto

15 might have.  But, no, primarily would have been

16 Office of General Counsel doing the review.

17     Q    And you?

18     A    And me.

19     Q    And you're a lawyer?

20     A    Yes, I am a lawyer.

21     Q    All right.  Let's mark the decisional

22 memorandum as Exhibit 30.

Page 329

```
 1      Q   -- those are empirical analyses, right,
 2  they count?
 3          MR. GARDNER:  Objection.  Form.
 4          THE WITNESS:  You'd have to ask the
 5  Census Bureau how they do their analysis.
 6  BY MR. GERSCH:
 7      Q   Right.  But you understand what empirical
 8  means, right?
 9      A   I understand the use of the term, but I
10  don't know if all of their analyses are based on
11  empirical or some other method.
12      Q   Certainly, some of their analyses are
13  empirical, right?
14      A   Sure.  And some are sampling and some of
15  them are imputation.  They use a variety of
16  statistical methods.
17      Q   Just a few more questions.  Now, turn to
18  Exhibit 30 if you would and turn to Page 7.
19      A   Yeah.
20      Q   Last paragraph, first sentence reads,
21  "The Department of Commerce is not able to
22  determine definitively how inclusion of a
```

1    citizenship question on the decennial census will

2    impact responsiveness."

3          You saw that, right?

4      A    Yep.

5      Q    It says the Department of Commerce is not

6    able to determine definitively.  What does that

7    mean, determine definitively?

8      A    What it says.  In other words, the

9    evidence presented to us was not determinative,

10   and it was not definitive that there would be a

11   drop in response rate.  There was a widely-held

12   belief that there would be a drop in response, but

13   many of those same people that they were not

14   answering the citizenship question, were already

15   not answering the census because of distrust of

16   government, because of whatever the other reasons

17   may be.

18         So they could not identify with any

19   specificity that the addition of a citizenship

20   question would, in fact, cause a decrease in

21   response rate.  They estimated there could be a

22   decrease of a certain number of households, which

Page 331

1   was less than half a percent.  And based on the

2   size and volume of the exercise we were

3   undertaking, that is not sufficient to say it's an

4   insurmountable obstacle.

5         MR. GERSCH:  I'll move to strike it as

6   nonresponsive.

7   BY MR. GERSCH:

8      Q   My question --

9      A   It was responsive.

10     Q   What do you mean by definitively?

11        MR. GARDNER:  Objection.  Asked and

12   answered.

13        THE WITNESS:  What I mean by definitive

14   is they did not provide evidence that you could

15   draw a straight line and say if you do this, this

16   will happen.  They speculated it, and they drew

17   some conclusions based on other information, but

18   logical people can look at that information and

19   say, yes, but that's not a necessary conclusion

20   that, in fact, as was pointed out, the same

21   hard-to-count populations who were already not

22   responding to the census were likely the very same

Page 332

1    ones that might not answer the census.

2          And just to your point, just to

3    illustrate this, we do know from the ACS that

4    70 percent of the people who are presented with

5    the citizenship question answer it correctly, who

6    are, in fact, noncitizens and 30 percent don't.

7    So it doesn't necessarily mean that you add a

8    citizenship question and people refuse to answer.

9    We have a population that does answer.

10          I know that's not the answer you wanted.

11   BY MR. GERSCH:

12       Q    Mr. Comstock, we're missing each other,

13   so let me try it a little differently.

14          I'm not asking you whether you didn't

15   think the Census Bureau's answer was definitive.

16   I'm asking what is -- what would be -- let's try

17   it this way, what would you consider to be

18   definitive evidence?

19       A    If they had evidence that showed that the

20   addition of a citizenship question would cause a

21   number of people that otherwise would have

22   responded to the census to not respond.

Page 333

1       Q    And what would they need to show you
2  that?
3       A    They would problem have to put the
4  question on the decennial census and compare it to
5  prior decennial censuses and eliminate for the
6  errors.   And, unfortunately, they don't have that
7  data from when they were asking that question, so
8  they couldn't make the comparisons.
9       Q    Well, they could have done it on a test
10  basis for the 2020 census, right?
11      A    They already asked the ACS to 43 million
12  households.   So we'd asked and answered that
13  question already.
14      Q    My question --
15      A    It's been well tested.
16      Q    My question is:   They could do it on the
17  2020 census on a trial basis, right?
18      A    And that's, basically, what the Secretary
19  has determined to do.
20      Q    No.   The Secretary has not decided to do
21  it on a trial basis.   He wants everyone asked,
22  right?

Page 334

1     A    Well, that would be a trial basis.

2     Q    Let me do it differently.  You could do

3  it on the 2020 census as a test where it's being

4  asked as a sample of the people, right?

5     A    That would not give you -- actually, that

6  would give you no more information than you get

7  from the ACS, so we already have that information.

8     Q    You think asking the question on the

9  decennial census is the same thing as asking on

10  the ACS?

11     A    No, I don't.

12     Q    Okay.  How about a randomized control

13  study of some kind, randomized controlled testing?

14     A    We already have that.

15     Q    You think you already have that?

16     A    Sure, through the ACS.

17     Q    Okay.  Was a proposal to do a randomized

18  controlled test in May of this year from the

19  Census Bureau?

20          MR. GARDNER:  Objection.  Lacks

21  foundation.

22          THE WITNESS:  Not that I'm aware of.

1      Q    The initial impetus for putting the

2  citizenship question on the 2020 census was not

3  DOJ's idea; is that correct?

4      A    That's correct.

5      Q    It was Secretary Ross's idea, I think

6  you've testified to that, correct?

7      A    He was the one who asked me to

8  investigate it, yes.

9      Q    He told you sometime shortly after he was

10  confirmed that he wanted the question on the 2020

11  census, correct?

12      A    He asked me to explore putting it on,

13  yes.

14      Q    Well, he actually said he requests the

15  question be put on the census, correct?

16      A    That was the way he phrased it, yes.

17      Q    You said you would make that happen,

18  correct?

19      A    I said I would do my best.

20      Q    And you would get the citizenship

21  question in place, I think was -- were your words?

22      A    I said I would work to get that in place.

Page 340

1      A    You'd have to ask the Justice Department

2  redactors.

3      Q    Do you -- without saying what is said

4  there, do you know what you wrote there that's

5  been blocked out?

6      A    I don't recall.

7      Q    You did not ask her for legal advice, did

8  you?

9      A    No.

10     Q    Do you have any reason to believe there

11 is some privileged information in what's been

12 blocked out?

13          MR. GARDNER:  Objection.  Calls for a

14 legal conclusion.

15          MR. ROSENBERG:  He's always the client,

16 and the client holds the privilege.

17          THE WITNESS:  I don't know what it says,

18 so I trust the folks who redacted it believe

19 there's a conclusion of some kind that is relevant

20 to the investigation.

21 BY MR. ROSENBERG:

22     Q    Anyone at Commerce who was more involved

1   in the citizenship question other than you during

2   the period from the time you came to Commerce

3   until the citizenship question issue was resolved?

4        A    Probably not, no.

5        Q    Let me -- take a look at C5 that's been

6   marked, which is the supplemental memorandum.

7        A    Uh-huh.  I've got it somewhere.  It's a

8   supplemental memorandum.

9        Q    It's dated June 21 --

10           MR. GARDNER:  You want to look at my

11   copy?

12           THE WITNESS:  Okay.  All right.  Go

13   ahead.

14   BY MR. ROSENBERG:

15        Q    When did you first hear that this

16   document was going to be created?

17        A    Sometime shortly before June 21st.

18        Q    Do you recall approximately how many days

19   before June 21st?

20        A    I don't.

21        Q    But before you got a copy of the

22   document; is that correct?

Page 346

1    Q    Are you going to follow counsel's advice?

2    A    I'll follow my counsel's advice, yes.

3    Q    By the way -- by the way, I think you

4  testified that you made some edits to C5, the June

5  21st supplemental memorandum; is that correct?

6    A    I think I may have suggested a wording

7  change or two.

8    Q    Do you know what wording change or two

9  you made?

10    A    I have no recollection of that.

11    Q    Did you maintain the original draft of

12  the June 21st memorandum?

13    A    I imagine I made it -- my edits in

14  electronic form, but that would be, probably,

15  privileged, under the administrative record.

16    Q    Let's turn to C30, which is the

17  March 26th memo.  Now, is it stated anywhere in

18  this memorandum that the Secretary had begun,

19  considering the question of adding the citizenship

20  question to the census almost a year prior or more

21  than a year prior to the March 26th memorandum?

22    A    It wouldn't be relevant to the

Page 347

1    memorandum.

2        Q    So you don't think that's important

3    information?

4        A    The government has lots of processes

5    where -- and I've been involved in lots of

6    processes throughout the government where things

7    have been under consideration for months, years,

8    decades, even, prior to an administrative record,

9    and that's not usually included in the decision.

10            The question is once you began the formal

11   action of considering this decision and in which

12   you're presented with a situation where you need

13   to make a decision, you document at how you arrive

14   at your conclusion.

15       Q    It's your testimony that the formal

16   action is when?

17       A    When we received the letter from the

18   Department of Justice.  Because prior to that,

19   this was all speculation.

20       Q    Well, but prior to that, you had been

21   directed by the Secretary of the Commerce to put

22   the citizenship question on the census --

Page 348

1      A    I'd --

2      Q    -- isn't that correct?

3      A    I'd been directed to explore putting a

4  citizenship question on the census.

5      Q    He said he wanted it on the census,

6  correct?

7      A    That was certainly his expressed

8  interest.

9      Q    It was an expressed statement, was it

10  not?

11     A    That's the way he phrased it.  But,

12  again, he can't put something on the census

13  without having the legal authority or process in

14  place to do so.

15     Q    You agree it would have been more

16  accurate if the first sentence of C30 said, as you

17  know, pursuant to my request on December 12, 2017,

18  the Department of Justice requested that the

19  Census Bureau reinstate a citizenship question;

20  isn't that more accurate?

21     A    I wouldn't agree that's more accurate.

22     Q    Isn't that what happened?

Page 349

1      A    Again, the Department of Justice decision

2   to ask -- send a letter requesting this is a

3   decision they made independently.  We cannot

4   compel them to make that request.

5      Q    By the way, what does Section 2 of the

6   Voting Act provide?

7      A    Well, my understanding of it -- and,

8   again, it's been established that I'm not a Voting

9   Rights Act expert -- is that there are cases in

10  which you might have a population where as they

11  set up a district, you have two minority

12  populations.  If one of those minority

13  populations, for example, Hispanics population,

14  has a large under of undocumented people, they

15  might appear on paper to have a majority.  When,

16  in fact, they can never actually execute that

17  majority because they don't have enough Citizen

18  Voting Age Population people to carry that out.

19         Now, under the census, we already ask

20  about age and we ask about race, so we can

21  determine those two questions.  What you can't

22  determine is how many people of that population

Page 350

1  are, in fact, eligible to vote.

2        Now, using the ACS data, the census

3  provides estimates that the Justice Department

4  uses for that very purpose.  We know, in fact, as

5  a result of this analysis, in the Census Bureau's

6  efforts to promote Alternative C, they, in fact,

7  did an analysis of that ACS data, and lo and

8  behold, it came back that the data that we've been

9  providing to the Justice Department is, in fact,

10 at a fairly significant error.  It's off by a

11 factor of about a third.  And so in light of that

12 information, you'd absolutely want to go forward

13 with this.

14    Q    But the Census Bureau, nevertheless,

15 recommended from a standpoint of accurate and

16 completeness and quality of the census that there

17 should not be a citizenship question added to the

18 census, as opposed to continuing to rely on ACS

19 data supplemented by the administrative records?

20    A    No.  In the process of this memorandum,

21 back and forth, they could not articulate a

22 rationale to support their belief that there would

Page 351

1   be this decline in this response rate.  Their

2   entire analysis relied on the assumption that

3   there would be this decline in response rate of a

4   certain percentage and that that would, therefore,

5   make the data less reliable.

6           What they couldn't refute was the fact

7   that under their proposed approach, they would

8   have had to impute -- again, based on statistical

9   models -- the citizenship of 25 million voting age

10  citizens.  That was not a complete and accurate

11  picture as far as the Secretary was concerned.  So

12  the Secretary said this is why we need to look at

13  combining the two approaches, B and C, to come up

14  with Alternative D.  Because in the absence of

15  that, we don't have good enough data on which to

16  build the formula to impute those people that we

17  would have to because we don't have answers on

18  what their citizenship is.  So that's the

19  rationale that's laid out in this memo, and as far

20  as I know, that's been the rationale that's been

21  the Secretary's all along.

22          Q   But not the rationale that was accepted

1   by the Census Bureau, which nevertheless, rejected

2   as -- from a technical perspective, the

3   Secretary's rationale; isn't that correct?

4       A    I disagree that they rejected it from a

5   technical perspective.   They made some assumptions

6   in making their recommendation -- and that's

7   exactly what it is, it's a recommendation -- that

8   this would be the case.

9       Q    Let me turn your attention to C30,

10  Page 001314, which is Page 2 of the March 26th

11  memo.   And turning your attention to the Option A,

12  the third line in the sentence that says,

13  "Additionally, the block group levels CVAP data

14  currently obtained through the ACS has associated

15  margins of error" --

16      A    Correct.

17      Q    -- "because the ACS is extrapolated based

18  on the sample servers of the population."

19      A    That's correct.

20      Q    Do you know what the margins of errors

21  are that are referred to in this sentence?

22      A    I think you go on and see, you'll see it

Page 353

1   described later in the same memo, which is that

2   they have an error of approximately 30 percent, 28

3   to 34, I believe, is the range.

4           Yeah.  If you look on Page 4,

5   "Census Bureau analysis showed that between 28 and

6   34 percent of citizenship self-responses for

7   persons with administrative records show are

8   noncitizen were inaccurate.  In other words, when

9   noncitizens respond to long form or ACS questions

10  on citizenship, they inaccurately mark citizen

11  about 30 percent of the time.  However, the

12  Census Bureau is still evolving its use of

13  administrative records.  The Bureau does not have"

14  --

15          (Thereupon, the court reporter

16  clarified.)

17          THE WITNESS:  This is in the -- under

18  Option C of Page 4.

19          MR. GARDNER:  You're going to have to

20  slow down for the court reporter.

21          THE WITNESS:  "So they inaccurately mark

22  noncitizen about 30 percent of the time.  However,

Page 354

1    the Census Bureau is still evolving its use of

2    administrative records, and the Bureau does not

3    yet have a complete administrative record set for

4    the entire population.   Thus, using administrative

5    records alone would provide DOJ data with CVAP

6    data that was not a" -- "that would provide an

7    incomplete picture."

8    BY MR. ROSENBERG:

9        Q    And that's your understanding of what

10   margins of error means as used on Page 01314?

11       A    Well, yes.   They're referring to that --

12   that margin of error they're referring to is the

13   28 to 34 percent they were off.

14       Q    Do you know whether the data that would

15   be provided to DOJ if a citizenship question were

16   added to the 2020 census would also have margins

17   of error associated with that data?

18       A    It would almost certainly have some small

19   margin of error, yes.

20       Q    When you say a small margin of error, can

21   you quantify that?

22       A    Well, yeah.   I think if you look at the

Page 355

1   decision memo, it spells out that by providing the

2   question on the census, you'll give 100 percent of

3   the population to answer that question.  For

4   90 percent of the people that are citizens, that

5   is not a problem.  For the remaining 10 percent,

6   approximately, again, based on -- again, on the

7   ACS error rate, you can expect that approximately

8   70 percent of those people will also answer that

9   data correctly.  So you're looking at, basically,

10  what is the situation with the remaining

11  30 percent?  And based of the data we get from the

12  actual responses, comparing that with the

13  administrative records, which we're also working

14  to improve, so that that 88.6 from the 2010 census

15  is expected to go up, should be closer to 90 to

16  95, we'll be able to narrow to down to about a 5

17  percent of the population that we'll have to

18  impute.  It's a much smaller number than the

19  number that's being --

20      Q   And that's your understanding of how the

21  phrase margins of error is used in the Secretary's

22  memo?

Page 356

1      A    Well, I'm not sure -- you're focused on

2    the words margins of error.

3      Q    Right.  All of my questions had to do

4    with the phrase margins of error.

5      A    And you're saying --

6      Q    I'm just trying to get your understanding

7    of the phrase.

8      A    No.  I was focusing on the ACS.  I mean,

9    you're isolating the term margins of error.

10     Q    Yes.

11     A    When you do sampling or other things,

12   there is a margin of error associated with that,

13   and that margin of error can be larger or it can

14   be smaller.  And so they would provide, typically,

15   a confidence interval connected with their data,

16   and, again, depending on how the survey is

17   conducted, it could be large or small.

18     Q    Well, that sounds a little bit different

19   than what you testified to earlier, when I asked

20   you about the phrase margins of error as used in

21   the sentence I read to you from C003134.

22     A    You'll have to remind me what the

Page 357

1    sentence is again --

2         Q    Sure.   "The Census was additionally" --

3         A    -- because I focused on the ACS.

4         Q    -- "block group level CVAP data currently

5    obtained through the ACS has associated margins of

6    error because the ACS is extrapolated, based on

7    sample surveys of the population."

8         A    And I believe that reference in the

9    context of this memo may be scientifically

10   incorrect, but it's referring to the fact that

11   there's this error in the data of roughly

12   30 percent.   So this was not drafted by, quote,

13   scientists.   So we may have inaccurately used the

14   term margin of error.   But what the Secretary was

15   referring to was the fact that we had now learned

16   that the ACS data was fairly significantly

17   inaccurate.

18        Q    Do you know whether the Census Bureau's

19   use of margins of error, quote, end quote, is the

20   same as you have just described?

21        A    I have no idea.   I mean, I would guess

22   that in other context, that the Census Bureau uses

Page 358

1    the term margin of error differently.  I'm saying

2    in the context of this memo, I think the reference

3    of margin of error is referring to that margin of

4    inaccurate information in the ACS.  That is what

5    the Secretary was focused on in making his

6    decision.

7        Q    I'd like to turn your attention to

8    001315, Page 3, the second full paragraph that

9    begins "the Census Bureau."

10       A    Uh-huh.

11       Q    And the Census -- I'm sorry -- the

12   sentence that reads, "However, neither the

13   Census Bureau, nor the concerned stakeholders

14   could document that the response rate would, in

15   fact, decline materially."

16            Do you see that?

17       A    I see that.

18       Q    Can you tell me what you understand the

19   word materially to mean?

20       A    Yes.  In that context, it's, basically,

21   saying they could not, as I explained earlier,

22   demonstrate that the decline because of the

Page 359

1    addition of a citizenship question would be any

2    greater than the decline that we already

3    anticipated we would face because of the current

4    political climate and people's concerns about

5    government.

6            And, frankly, the folks bringing this

7    lawsuit are contributing to that.  We already

8    anticipated this was going to be -- this census

9    was going to be more difficult than other

10   censuses, and that was a lot of the reasons behind

11   some of the changes that were made in the

12   lifecycle cost estimate.  So we anticipated there

13   were going to be hard-to-count populations, and

14   many -- many of the same hard-to-count populations

15   would have been disinclined to answer the census

16   with or without a citizenship question.

17       Q   When you say that the -- when you talk

18   about the material decline, are you talking about

19   the decline overall or are you talking about a

20   differential decline depending on what demographic

21   group is being discussed?

22       A   If the data had shown conclusively that

1    the addition of a citizenship question would cause

2    a material -- in other words, significant and

3    major decline in any particular group, I'm sure

4    the Secretary would have considered that quite

5    carefully.

6        Q    When the Secretary used the word material

7    or phrase material decline, was he referring to

8    any decline of any demographic group or was he

9    referring to a decline across the board?

10       A    Again, based on the subject of the

11   discussion here, would there be a significant

12   increase in the number of nonresponse follow-ups

13   that we had to go do because people failed to

14   respond?  The data that was being presented did

15   not isolate the citizenship question as being a

16   material source of potential decline.  There were

17   a lot -- there was a lot of speculation that

18   would, there was a lot of assertions it would.

19   And upon review and analysis, it appears that many

20   of the same populations that were already going to

21   be difficult to count for lots of other reasons

22   would be the same people who might be disinclined

1  because of citizenship.  So you cannot say that

2  adding citizen is going to materially increase the

3  nonresponse follow-up rate.

4      Q    Can you quantify what you mean by a

5  material decline?

6      A    Well, I mean, the Census Bureau,

7  basically, under their best analysis, was saying

8  that there might be a decline that would cause an

9  increase of $27 and a half million.  In a

10  $15.6 billion budget, that is -- I mean, that's so

11  far within the margin of error it's not even a

12  fact.

13      Q    Well --

14      A    We could have a bad snow day that would

15  cause bigger damage than that.

16      Q    Was -- do you consider an undercount

17  resulting from the addition of any question to the

18  census of a quarter of a percentage point in a

19  specific population to be material?

20      A    I have no reason to believe the addition

21  of a citizenship question would cause such a

22  thing.

Page 363

1  response of a demographic group a material decline

2  in your estimation?

3      A   Again, without context, I can't give you

4  an answer.  If that demographic group is composed

5  of 100 people, it may not be --

6      Q   What if the demographic is Hispanics?

7      A   I don't know that -- well, again, no.

8  That's a weighing question that the decision-maker

9  is free to make.

10     Q   Again, you're going back to weighing.

11  I'm talking about the phrase declining material --

12  materially.  I'm not weighing it yet.  You can

13  weigh it later if you want.  I'm just talking

14  about one side of the balance that I think you're

15  suggesting is being applied.

16         Is a quarter decline in response to the

17  census among Hispanics a material decline in your

18  estimation?

19     A   The -- the -- I think the short answer

20  is, the decline identified by -- the potential

21  decline identified by the Census Bureau was not

22  material enough to outweigh the benefits the

Page 364

1    Secretary saw in adding the question.

2         Q    It still doesn't answer my question.

3         A    You're asking me to answer in a

4    hypothetical, which I'm not going to do because I

5    don't have the number of Hispanic voters.  I don't

6    know what 4 percent decline would represent.  I --

7    it's impossible for me to evaluate.  I've never

8    looked at the population numbers of Hispanics

9    versus any other.

10        Q    Well, you know that the number of

11   Hispanics in American is in the tens of millions;

12   is that correct?

13        A    I honestly haven't really given it much

14   thought.

15        Q    Do you know if it's more than a million?

16        A    I think it safe to say it's more than a

17   million.

18        Q    More than five million?

19        A    I think so.

20        Q    More than ten million?

21        A    Let's see.  If the population of the

22   United States is 360 million, and I believe

```
 1   Hispanic are somewhere in the 10, 12, 15 percent

 2   range, they're, obviously, well above that.

 3   They're like -- I don't know, like -- 79 million.

 4        Q   Of how many did you say?

 5        A   70 -- I can't do the math that quickly,

 6   so let's say, whatever, 70 million.  I don't know.

 7        Q   Let's use 70 million.  So if there

 8   were -- let's make it easier, for my head.  Let's

 9   say there was a 1 percent decline in response rate

10   among Hispanics due to the inclusion of a question

11   on the census, would you consider that a material

12   decline?

13        A   I would consider that a factor that you

14   need to take into account.

15        Q   And if it were a 3 percent decline, would

16   you consider that even more of a factor?

17        A   Three percent is greater than 1 percent,

18   so, presumably, it would be greater.  But, again,

19   it depends on, again, what I'm deciding against.

20        Q   Would you consider that material?

21        A   That depends on the context.

22        Q   The context of adding a question to the
```

1    census resulting in a 3 percent decline in

2    responsiveness among Hispanics?

3         A    All of the factors outlined in this memo

4    are material.  It's a question for the

5    decision-maker to decide which are -- which to

6    give greater or lesser weight to.

7         Q    But the phrase here was material

8    decline --

9         A    And, again --

10        Q    -- correct?

11        A    -- in the context of conducting a

12   nationwide census, the half percent change in

13   response rates for NRFU was not something we

14   considered material because there were lots of

15   other factors that would cause an even greater

16   decline.

17        Q    And if the response rate was shown to be

18   greater than a half percent decline, if it was

19   shown to be a 3 percent decline?

20             MR. GARDNER:  Objection.  Calls for

21   hypothetical.

22             THE WITNESS:  I understand you're trying

1   to get a certain answer, but I'm just telling you

2   in the context of this, in the context of this

3   memo, the half percent increase in NRFU response

4   rate was not material.

5   BY MR. ROSENBERG:

6        Q    By the way, earlier you said that 30

7   percent of noncitizen citizens answering the ACS

8   citizenship question responded accurately.  Do you

9   recall that?

10       A    That was data provided by the Census

11  Bureau.

12       Q    Okay.  What, if any, evidence is there

13  that noncitizens would respond to a citizenship

14  question on the 2020 census questionnaire at a

15  more accurate rate than they currently do on the

16  ACS?

17       A    That's -- I think we assumed in doing

18  this that they would continue at that potential

19  rate.

20       Q    At a 30 percent inaccurate rate?

21       A    Which is why you have to do both

22  administrative records and put the question on.

Page 368

1    You can't do just one or the other.

2         Q    But the administrative records could be

3    used with ACS; isn't that correct?

4         A    No, they couldn't.

5         Q    They could not be used --

6         A    Because you can't extrapolate from the

7    ACS to the whole population.

8         Q    No.   That wasn't my question.

9              The administrative records could be used

10   in conjunction with the information from ACS?

11        A    Again, you don't get an accurate sampling

12   because you're extrapolating from the ACS to the

13   larger population, so you can't apply your

14   administrative records across in the same way.

15   That's why the census was proposing to just use

16   administrative records and they were prepared,

17   apparently, to have to impute 25 million voting

18   age citizen citizenship records.   Now, on what

19   basis, they would do that, we weren't sure.

20        Q    But both Options C and D require some

21   imputation; isn't that correct?

22        A    Potentially, to get a complete and

1  accurate count, because we don't have 100 percent

2  matching between the administrative records and

3  the respondents.  Yes.  That's correct.

4       Q    Let me draw your attention to the period

5  around January 2018.  Do you recall taking part in

6  the signing of the list of 35 questions to the

7  Census Bureau to answer?

8       A    Yes.  I helped prepare that list.

9       Q    Do you -- who else helped prepare that

10 list?

11      A    The Secretary, Karen Dunn Kelley,

12 James Uthmeier, myself.  There may have been

13 others.

14      Q    Were you the prime drafter?

15      A    Of that particular list, I may have been

16 the prime assembler.  I was not necessarily the

17 prime drafter of all the questions.

18      Q    And what was your purpose -- what was the

19 purpose in proposing those questions?

20      A    Basically, it has -- I think it was

21 pointed out earlier we got an analysis from the

22 Census Bureau that seemed to have a particular

Page 370

1  viewpoint, and it wasn't well supported in some

2  cases. So those are the questions that arose

3  after reviewing their memo.

4      Q    And when you -- after the questions were

5  formulated, whom did you send them to?

6      A    I believe they were sent to the

7  Census Bureau.

8      Q    And the idea was the Census Bureau would

9  answer the questions; is that correct?

10      A    They would provide that input, yes.

11      Q    And you gave them a deadline, did you

12  not?

13      A    I imagine we did, yeah.

14      Q    Four days; is that correct?

15      A    I don't recall.

16      Q    Was it your understanding that the

17  answers were going to be provided solely by the

18  Census Bureau to those questions?

19      A    I believe all the questions were directed

20  to the Census Bureau, but if they were directed to

21  somebody else, then, obviously, they would provide

22  them.

1        Q    But it was your understanding that the

2    Census Bureau would answer them; is that correct?

3        A    Again, without going back and looking at

4    the documents and the accompanying emails, I can't

5    tell you exactly who it was.  But my understanding

6    was, yes, they were drafted for the Census Bureau.

7        Q    Did there come a time when you reviewed

8    the answers for the questions?

9        A    I imagine there was.

10       Q    Well, was there?

11       A    Again, I know all of you are focused on

12   this case and everything else.  This was one small

13   fraction of the work I was doing at that time.  So

14   I'm quite certain I reviewed the answers.  Exactly

15   when, I can't tell you.  But, clearly, they

16   went -- the responses to those questions were

17   considered in the decision memo.  So I, obviously,

18   reviewed them at some point.

19       Q    Do you recall whether you reviewed those

20   responses all at once or some kind of rolling

21   basis?

22       A    If memory serves, I believe the Census

1    responded back to some, and then provided

2    follow-up answers to others that took more time.

3         Q    Do you recall whether in connection with

4    any of the questions the Census Bureau was asked

5    to change their answers to any questions?

6         A    I believe -- well, I believe in one case,

7    they provided a response that indicated that there

8    was a very set format for putting questions on the

9    census.   And we went back to them and said, how

10   can that be?   You haven't -- there hasn't been a

11   question added to the long form?   They went back

12   and reviewed and said, yes, that's correct.   This

13   was the process we used for the ACS.

14        Q    Let me -- let's have this marked as 31.

15             (Plaintiffs' Exhibit 31, Questions on

16   draft Census memo, was marked.)

17   BY MR. ROSENBERG:

18        Q    Showing you what's been marked as --

19             MR. GARDNER:   Ezra, we need a --

20             MR. ROSENBERG:   Can you give me one more

21   copy?

22             I just need one.   Thank you.

Page 373

1    BY MR. ROSENBERG:

2        Q    Showing you what's been marked as

3    Exhibit 31, have you ever seen this document

4    before?

5        A    Again, I'd have to go back and check

6    emails.  It appears to be an incomplete response

7    to the 35 questions.

8        Q    And when you say it's an incomplete

9    response to the 35 questions, why do you say that?

10       A    Well, Question 4 is not answered.

11   Question 9 is not answered.  Question 11 is not

12   answered.  Question 15 is not answered.

13   Question 20 is not answered.  Question 27 is not

14   answered.  It appears to be -- I'm not sure that's

15   the entire list, but some of that -- some of

16   these -- obviously, it's not a final, because at

17   least five questions are unanswered, so --

18       Q    Let's have this marked as -- one question

19   on that.  Turning our attention to Question 31 --

20       A    Okay.

21       Q    -- is that the question you were

22   referring to before as a question whose answer was

Page 374

1    changed at some point?

2       A   Yeah.   Because this was -- as I said,

3    when we explored the question further, it became

4    evident that this was not, in fact, an accurate

5    representation for the process for the decennial.

6       Q   Do you know when that answer was changed?

7       A   I don't.

8           Is there a date on this?

9       Q   We just give you them as we got them.

10      A   No.  Well, no, unfortunately nobody dated

11   this.  So I don't know -- is there a -- do you

12   have a final --

13      Q   Well --

14      A   -- with all the questions answered?

15      Q   You're going to have to tell me.

16      A   I believe there was one where they

17   managed to answer all the questions.

18      Q   Okay.  Let's have this marked as the next

19   exhibit.

20          (Plaintiffs' Exhibit 32, Memo, was

21   marked.)

22   BY MR. ROSENBERG:

Page 403

1   a general knowledge of the issue, but no specific

2   interests.  The Department of Commerce doesn't do

3   immigration enforcement, so --

4       Q   Did you believe at the time of the DOJ

5   letter to the Census Bureau that the

6   Attorney General was committed to the enforcement

7   of the Voting Rights Act but that his hindrance or

8   the hindrance of the DOJ was the availability of

9   data?

10          MR. GARDNER:  I'm sorry.  Can you repeat

11  that question?

12          MS. SENTENO:  Yeah.

13  BY MS. SENTENO:

14      Q   Did you believe at the time of the DOJ

15  letter, that the Attorney General was committed to

16  the enforcement of the Voting Rights Act but that

17  what was holding them up was -- were data issues?

18      A   Their letter communicated that they could

19  use census block-level data, which they currently

20  don't get for that, and if, therefore, we would

21  add a question to the decennial census that would

22  provide that data.

Page 409

```
 1              MR. GARDNER:  Objection.  Form.
 2              THE WITNESS:  I'm not aware of any
 3   conversations regarding adding a citizenship
 4   question for immigration enforcement.
 5   BY MS. SENTENO:
 6         Q    How about voter fraud?
 7         A    No.
 8         Q    Congressional apportionment?
 9         A    No.
10         Q    Redistricting?
11         A    No.
12              I mean, I will note there was an earlier
13   conversation about that Wall Street Journal
14   article that mentioned -- that referenced
15   apportionment.  So outside of that response with
16   the Secretary, there's never been a discussion of
17   it.
18         Q    Have you spoken to anyone at
19   Department of Justice's voting rights section?
20         A    Not to my knowledge.
21         Q    So you were never referred to anyone or
22   you never inquired from anyone, a contact within
```

Page 410

1  the voting rights section, to discuss this

2  request --

3          MR. GARDNER:   Objection.   Form.

4  BY MS. SENTENO:

5      Q   -- for a citizenship question?

6          MR. GARDNER:   Sorry.   Objection to form.

7          THE WITNESS:   No.   Again, as I think we

8  established in the earlier testimony, I was

9  referred to Mary Blanche Hankey by someone in the

10 Department of Commerce, by Eric Branstad, who I

11 think got her name from a contract of his at the

12 White House.   She referred me to -- I'm already

13 blanking on his name -- John McHenry.   I did not

14 investigate John McHenry's position in the

15 department.   I just took it on face value he would

16 be the right person to talk to and those are the

17 two people I spoke to at Department of Justice,

18 so -- outside of litigation counsel, obviously.

19 BY MS. SENTENO:

20     Q   You testified earlier in the memo that

21 you drafted for the Secretary that stated that

22 once you had been told by DHS that your request

1   would be more appropriately handled by the

2   Department of Justice, you said that the

3   interaction ceased; is that correct?

4        A    Well --

5        Q    From you?

6        A    My efforts at that point to track down

7   somebody ceased because they had run into a dead

8   end.  I mean, our initial conclusion was that

9   Department of Justice was the right place to go.

10  They seemed occupied on other matters, so they

11  referred us to DHS.  DHS referred us back, so now

12  I'm back to where I started.

13       Q    So once you were referred back to DOJ,

14  you didn't ask another follow-up as to who in the

15  voting section would be more appropriate to talk

16  about this particular issue?

17       A    Again, I was working on literally dozens

18  of issues that consumed a lot of time.  And so I

19  had put the time into it that I could afford to

20  put into it and had come up empty.  So I reported

21  that to my boss, and basically, said if absent

22  some instruction from higher up, it appears that

1   the DOJ staff is not particularly interested in

2   expending resources on this right now.

3       Q    Did you or Secretary Ross consider having

4   anyone else, any other governmental department or

5   any other jurisdiction make a request to the

6   Census Bureau to add a citizenship question --

7           MR. GARDNER:   Objection.

8   BY MS. SENTENO:

9       Q    -- other than the DOJ and DHS?

10          MR. GARDNER:   Objection.   Form.   And

11  objection.   Foundation.

12          THE WITNESS:   Again, nobody would make a

13  request to the Census Bureau to add it because the

14  statute commits that discretion to the Secretary,

15  not the Census Bureau.   So it's not their decision

16  to make.   It's the Secretary's decision to make.

17  So we would not seek someone else to contact the

18  Census Bureau about the question, no.

19  BY MS. SENTENO:

20      Q    But the DOJ letter was directed to the

21  Census Bureau requesting an addition of the

22  question?

1      A    I did not draft that letter, so I -- but

2   their choice of who to send the request to was

3   dictated by the Department of Justice, not by us.

4      Q    Did you or Secretary Ross consider having

5   anyone else make -- anyone else, other than the

6   DOJ to DHS, to make that request to Commerce?

7           MR. GARDNER:   Objection.   Lack of

8   foundation.

9           THE WITNESS:   No.   I think upon further

10  analysis, we determined that the Secretary

11  probably could determine that Commerce had a need

12  for it, but that was not before us at the time,

13  so --

14  BY MS. SENTENO:

15     Q    Can you explain your subsequent research?

16     A    Well, as I mentioned, the United Nations

17  recommends that all countries ask, frankly, rather

18  detailed questions about citizenship,

19  naturalization, et cetera.   So it's considered

20  good practice, good demographic information to

21  have.   It was asked for 150-plus years without any

22  problem.   So -- and every other major democracy

Page 414

1    inquires of all their citizens on a regular basis

2    of it.  So it's -- I think there's a perception

3    out there -- where it came from, I don't know --

4    that somehow asking a citizenship question is a

5    problem.

6           And I would, again, refer you back to the

7    fact that 70 percent of the noncitizens in the ACS

8    actually answer the question correctly.  So,

9    apparently, those people don't consider it a

10   problem.  So it appears to be a rather small

11   demographic that is concerned about this.  And

12   again, I would point out that when you understand

13   that the data that is being protected by law,

14   cannot be used for any enforcement purpose, cannot

15   be used to identify an individual, there's

16   absolutely no reason I can think of why someone

17   would not answer the census honestly on that,

18   citizen or noncitizen.  It's demographic

19   information.

20      Q   So based on that, was it your

21   understanding that if the DOJ did not make this

22   request to the Department of Commerce or the

1     speculate on that.

2     BY MS. SENTENO:

3          Q    Okay.   Are you aware of any VRA cases

4     that the Department of Justice declined to bring,

5     only because they needed block-level citizenship

6     data?

7          A    I'm not aware of that, but I didn't

8     research that either.

9          Q    So no -- neither yourself or anyone else

10    at the Department of Commerce asked DOJ for this

11    information?

12         A    I did not.   I can't say whether anybody

13    else did.

14         Q    So -- just a couple more questions.

15              The ACS is not a head count, correct?

16         A    That's right.   It's a sample.

17         Q    But the decennial census is a head count,

18    correct?

19         A    That's correct.   Counts all persons.

20         Q    And a decrease in the response rate in

21    the citizen question on the 2016 ACS caused an

22    underestimate of the percent of noncitizens; is

Page 417

1      that correct?

2           A    No.   That's not correct.

3           Q    Can you explain?

4           A    Well, you're asserting that it's because

5      of the citizenship question, and I'm not sure that

6      the data supports that statement.

7           Q    What are you -- what do you believe the

8      data supports?

9           A    Again, without the data sitting in front

10     of me, it would be hard to make an analysis.   But

11     basically, the Census Bureau has reported that

12     certain number of people may drop off at certain

13     questions.   It's not dissimilar for citizenship

14     versus other questions.   There was not a major

15     statistical variation.   So, yes, a certain percent

16     of people do not complete the 45, 48 or 70

17     questions that are on the ACS or the long form,

18     and they have various break-off rates under the

19     Internet thing to tell where they stopped.

20          But, again, whether citizenship was a

21     determinative factor in any of those cases, it's

22     hard to determine.

1      Q    But the data suggests -- the data that

2  the Census Bureau provided suggests that the

3  break-off rate for noncitizens was higher with

4  respect to a citizen question; is that correct?

5      A    Higher than noncitizen?

6      Q    Yes.

7      A    Yes.   That's true.

8      Q    Okay.   So if the same people who did not

9  respond to the citizen question on the ACS also

10 didn't respond to the short form of the decennial

11 census, that would cause a drop in the total head

12 count, correct?

13     A    No.   It would not.

14     Q    Could you explain?

15     A    Secretary Ross placed the question at the

16 end of the census so they would be able to not

17 answer that and still complete the census.   We

18 also have administrative records and

19 Secretary Ross directed we use administrative

20 records, which we're actively doing for a variety

21 of reasons, not just citizenship.

22          So we have every confidence between the

1   increased outreach that's planned, the additional

2   money and resources that are to be put into the

3   advertising and other things, that we will more

4   than compensate -- in fact, our objection is to

5   have a complete and accurate count above and

6   beyond the count that was done in 2010.

7        Q   But every individual is required to

8   answer the census fully and completely, including

9   all questions; is that not right?

10       A   That's correct.  Yes.

11           Though I would note, we've never

12  prosecuted anybody for failure to do so.

13           MS. SENTENO:  Okay.  Go off the record.

14           VIDEOGRAPHER:  We're going off the

15  record.  The time on the record is 5:46 p.m.

16           (Off the record.)

17           VIDEOGRAPHER:  We're back on the record.

18  The time on the video is 5:43 p.m.

19               EXAMINATION BY MS. BOUTIN:

20       Q   Sir, I'd like to talk about the time

21  period between the December 12th DOJ letter

22  requesting the citizenship question and before

1   Secretary Ross issued the March 26 memo --

2   decision memo.

3       A    I'm sorry.   Could you tell me who you're

4   with?

5       Q    Sure.   My name is Gabrielle Boutin.   I'm

6   with the Attorney General's of the State of

7   California, and I represent plaintiffs, the

8   State of California -- excuse me -- State of

9   California v. Ross in the Northern District of

10  California.

11      A    Okay.   Thank you.

12      Q    So during the time period between the

13  December 12th DOJ letter and the issuance of

14  Secretary Ross's March 26th memorandum, that's

15  what we're talking about.

16      A    I understand.

17      Q    Do you understand?

18      A    So far so good.

19      Q    Good.

20          During that time period, did the

21  Department of Commerce ever inform the

22  Department of Justice that the Census Bureau

Page 421

1   recommended using administrative records alone to

2   meet Justice's December 12th request rather than

3   adding the citizenship question to the census?

4        A    I believe that was part of the purposes

5   of the meeting they were seeking with the -- the

6   Census Bureau was seeking with the

7   Justice Department.

8        Q    Okay.   My question is:   Did the

9   Commerce Department ever inform DOJ that the

10  Census Bureau recommended using administrative

11  records alone to meet their requests, rather than

12  adding a citizenship question to the census?

13       A    Again, I'm not privy to all the

14  conversations with the Justice Department, so --

15       Q    Do you --

16       A    -- I was not --

17       Q    -- know --

18       A    I was not involved in such a discussion,

19  no.

20       Q    Okay.   But you were one of the primary

21  people working on this at Commerce; isn't that

22  right?

Page 422

1     A     Yes.

2     Q     Do you think you would have known if

3   someone from Commerce conveyed that information to

4   the Department of Justice?

5          MR. GARDNER:  Objection.  Calls for

6   speculation.

7   BY MS. BOUTIN:

8     Q     Do you think it's likely you would have

9   known?

10    A     It's possible, yes.

11    Q     Did the Department of Commerce ever

12  transmit to the Department of Justice any of the

13  Census Bureau memos analyzing options for

14  providing block-level -- excuse me -- block-level

15  citizenship data to the Department of Justice?

16         MR. GARDNER:  Objection.  Lack of

17  foundation.

18  BY MS. BOUTIN:

19    Q     That was repetitive.  Let me rephrase.

20    A     All right.

21    Q     Did Commerce ever transmit to

22  Department of Justice any of the Census Bureau's

Page 423

1  memos that analyzed the options for providing to

2  DOJ block-level citizenship data?

3          MR. GARDNER:   Objection.   Lack of

4  foundation.

5          THE WITNESS:   I would just note it's the

6  Secretary of Commerce's decision as to whether

7  this goes forward.   His focus is on a complete and

8  accurate count.

9          And as explained earlier, the Option C

10 alternative, which was to use the administrative

11 records only, would have inquired us to impute --

12 so, in other words, fill in the blanks -- for 25

13 million voting age citizens.   That was not

14 something Secretary Ross was prepared to have the

15 department do.

16 BY MS. BOUTIN:

17     Q   Mr. Comstock, I understand that.   Your

18 counsel is -- wants us to limit the amount or time

19 that we're here today, and the best way to do that

20 is if you would answer my questions directly.   So

21 I'll ask you again.

22          Did the Department of Justice ever --

1          A      Not to my knowledge.

2          Q      Okay.   Thank you.

3                 And again, we're talking about between

4    December 12th and the March 26th.

5          A      Right.

6          Q      Did the Department of Commerce ever

7    inform DOJ that the Census Bureau believed that

8    administrative records alone would be more

9    complete -- would create more complete and

10   accurate citizenship data than asking a

11   citizenship question on the census and then

12   combining the data from that question with

13   administrative records?

14                MR. GARDNER:   Objection.   Form.

15   Objection.   Lack of foundation.

16   BY MS. BOUTIN:

17         Q      Do you want me to re-ask that question?

18         A      Sure.

19         Q      Did the Department of Commerce ever

20   inform Justice that the Census Bureau believes

21   that admin -- using administrative records alone

22   would provide more complete and accurate data than

1    instead of doing that asking the citizenship

2    question on the census and then combining that

3    with the use of administrative records?

4            MR. GARDNER:   Same objection.

5            THE WITNESS:   Again, I think you

6    mischaracterize the Census Department's -- Census

7    Bureau's analysis.   But, again, it's the

8    Secretary of Commerce's decision as to what to

9    make, and so he would only transmit to the

10   Justice Department what he considered that would

11   provide complete and accurate data.

12   BY MS. BOUTIN:

13       Q    But the Commerce Department did inform

14   the Department of Justice about that belief by the

15   Census Bureau?

16           MR. GARDNER:   Same objections.

17           THE WITNESS:   Again, not to my knowledge.

18   BY MS. BOUTIN:

19       Q    Okay.  But did the Commerce Department

20   ever inform Justice that the Census Bureau

21   believed that 30 percent of responses by

22   noncitizens as to citizen status are incorrect?

Page 429

1   full paragraph, but I also want you to understand

2   the context, so let's start at the top of the

3   first paragraph.

4       A   Okay.

5       Q   It says, "In my judgment that Option D

6   will product DOJ with the most complete and

7   accurate CVAP" -- excuse me.  Let me start again.

8           "It is my judgment that Option D will

9   provide DOJ with the most complete and accurate

10  CVAP data in response to its request."

11          The paragraph then goes on to give a few

12  reasons why Option D would be the best option in

13  his opinion and then about in the middle of the

14  paragraph, it gives one final reason starting with

15  the word "finally," so I'm going to read that

16  portion.

17      A   Okay.

18      Q   It says, "Finally placing the question on

19  the decennial census and directing the

20  Census Bureau to determine the best means to

21  compare the decennial census responses with

22  administrative records will permit the

1   Census Bureau to determine the inaccurate response

2   rate for citizens and noncitizens alike using the

3   entire population.  This will enable the

4   Census Bureau to establish, to the best of its

5   ability, the accurate ratio of citizen to

6   noncitizen responses to impute for that small

7   percentage of cases where it is necessary to do

8   so."

9        A    Yes.

10       Q    So with respect to those two sentences

11  starting with the word finally, who wrote that

12  language?

13       A    I couldn't say for certain, but I likely

14  had a hand in drafting that.

15       Q    Okay.  Can you explain, how does adding a

16  citizenship question to the census and determining

17  the incorrect response rate for citizens and

18  noncitizens help the Census Bureau impute with

19  respect to people who did not respond at all and

20  did not have administrative records?

21       A    I mean, you could ask the Census Bureau

22  for a fuller explanation of imputation, but

1   basically, they do a formula that looks at data

2   that they have.  And so if they know for the

3   people -- let's say 95 percent of the population

4   that they have accurate records for and which they

5   have responses for, if they discover that -- pick

6   a number -- it's now 10 percent of the people who

7   aren't citizens, are, in fact, noncitizens, then

8   they would probably apply that to 5 percent

9   remaining.  So they would take whatever number of

10  people who are citizens, multiply that by that 5

11  percent, and then they would take the noncitizens

12  and say, okay, we now know the accurate count,

13  based on the entire population of what we have,

14  there's a 10 percent error rate, 10 percent of the

15  people that might say they're citizens are

16  noncitizens, so we're going to multiply that

17  number out.  That's going to give you the most

18  accurate count that you can get.

19       Q   So what's your source of that

20  explanation?

21       A   Based on the briefings.

22       Q   So you're saying that the Census Bureau

Page 432

1    supports this statement here?

2         A    This is the Secretary's statement.

3    Whether the --

4         Q    But did the Census Bureau explain,

5    say -- explanation you just offered me -- did

6    they -- did they explain it that way to you?

7         A    More or less, yeah.

8         Q    And do you believe they support this

9    statement in this memo?

10        A    I'm going to make no representations

11   about what the Census Bureau would or would not

12   support.

13        Q    Would it surprise you if you learned that

14   they did not support that statement, that they did

15   not ever represent to you or the Secretary that

16   establishing that ratio would help impute for

17   nonresponders?

18        A    I would not be surprised if that was the

19   opinion of Dr. Abowd, no.

20        Q    Do you believe that Dr. Abowd wrote this

21   memos on his own?

22        A    I believe he had the help of lots of

Page 433

1   staff.   I have no --

2        Q    Do you believe he acted against the

3   opinions of his staff when he wrote the memos?

4        A    I have no idea.

5        Q    So -- but you believe that it was his

6   opinion alone that contributed to -- that was

7   reflected in those memos?

8        A    No.   Dr. Abowd is the head of the

9   division that does that, so at the end of the day,

10  he gets the final call, so --

11            And, again, just to be clear, do I think

12  that there may be other opinions in the

13  Census Bureau?   Absolutely.

14       Q    So do you have any source, other than the

15  Census Bureau, for believing in the scientific

16  empirical accuracy of these last two sentences of

17  this paragraph?

18            MR. GARDNER:   Objection.   Form.

19            THE WITNESS:   Yes.   My experience, my

20  knowledge and other people who also, including the

21  Secretary, who is a very smart man, who also came

22  to a similar conclusion.

Page 434

BY MS. BOUTIN:

Q    Do you believe you have more expertise in the science of imputation than the experts at the Census Bureau?

A    I'm not going to get caught in making such a statement, but I'm perfectly capable of looking at the analysis they provided and deciding whether or not I agreed with that analysis.

Q    What's your background in statistical imputation?

A    I --

(Conference call interruption.)

BY MS. BOUTIN:

Q    What is your background in statistical imputation?

A    I don't have one.

Q    Okay.  Switching gears.  Did you ever ask anyone at the Census Bureau whether placing the citizenship question on the census could affect the apportionment of the Congressional representatives to the state?

A    I never asked that question.

Page 435

1       Q      Are you aware of whether anyone else at

2    Commerce ever asked that question to the

3    Census Bureau?

4       A      Not to my knowledge.

5       Q      Okay.

6              MS. BOUTIN:  I believe that's all I have.

7              MS. GOLDSTEIN:  Let's go off the record.

8              MS. BOUTIN:  Yeah.  Let's go off the

9    record.

10             VIDEOGRAPHER:  We're going off the

11   record.  The time on the video is 5:56 p.m.

12             (Off the record.)

13             VIDEOGRAPHER:  We're back on the record.

14   The time on the video is 6:02 p.m.

15             MS. BOUTIN:  We have completed our

16   questions for today.  However, based on the fact

17   that there are still outstanding discovery

18   responses and discovery documents, we are keeping

19   the deposition open at this time.

20             MR. GARDNER:  We oppose that, of course.

21   You had the option to put this off, if you wanted

22   to, knowing there were outstanding issues and

Page 438

1                    ACKNOWLEDGEMENT OF DEPONENT

2         I, EARL COMSTOCK, do hereby acknowledge I

3    have read and examined the foregoing pages of

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any changes or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10

11

12

13    _____      _____

14    Date                  EARL COMSTOCK

15

      Joshua E. Gardner, Esquire

16    U.S. DEPARTMENT OF JUSTICE

      20 Massachusetts Avenue

17    Washington, D.C. 20530

18    IN RE:  New York Immigration Coalition, et al., v.

      United States Department of Commerce, et al.

19

20

21

22

```
                                          Page 440

1                 E R R A T A   S H E E T

2     Case Name:  New York Immigration Coalition, et

3     al., v. United States Department of Commerce, et

4     al.,

5     Witness Name:  EARL COMSTOCK

6     Deposition Date:  Thursday, August 30, 2018

7     Page No.   Line No.      Change/Reason for Change

8

9

10

11

12

13

14

15

16

17

18    _____         _____

19    Signature                        Date

20

21

22
```

# EXHIBIT D

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - -x
3     NEW YORK IMMIGRATION
      COALITION, et al.,             :
4                                    :
         Plaintiffs,                 :
5                                    :  Case No.
         v.                          :
6                                    :  1:18-CF-05025-JMF
      UNITED STATES DEPARTMENT       :
7     OF COMMERCE, et al.,           :
                                     :
8        Defendants.                 :
   - - - - - - - - - - - - - - -x
9                          Friday, October 16, 2018
                                 Washington, D.C.
10
11                               Global objection:
12  Videotaped Deposition of:      401; 403
13                      JOHN GORE,
14  called for oral examination by counsel for the
15  Plaintiffs, pursuant to notice, at the law offices of
16  Covington & Burling, LLP, One City Center, 850 Tenth
17  Street, Northwest, Washington, D.C. 20001-4956,
18  before Christina S. Hotsko, RPR, CRR, of Veritext
19  Legal Solutions, a Notary Public in and for the
20  District of Columbia, beginning at 9:05 a.m., when
21  were present on behalf of the respective parties:
22

```
 1              A P P E A R A N C E S
 2  On behalf of New York Immigration Coalition:
       DALE HO, ESQUIRE
 3     JONATHAN TOPAZ, ESQUIRE
       American Civil Liberties Union Foundation
 4     ████████████████████████
       ███████████████████████
 5     ██████████████████
       ████████████████████
 6
 7  On behalf of Lupe Plaintiffs:
       DENISE HULETT, ESQUIRE
 8     MALDEF
       ███████████████████
 9     ████████████████████████████
       ████████████████
10     ████████████████████
11     ERI ANDRIOLA, ESQUIRE
       Asian Americans Advancing Justice
12     ███████████████████████████████████
       ██████████████████████
13     ██████████████████
14
    On behalf of City of San Jose and Black Alliance for
15  Just Immigration:
       JON M. GREENBAUM, ESQUIRE
16     DORIAN L. SPENCE, ESQUIRE
       Lawyers Committee for Civil Rights Under Law
17     ██████████████████████████████████████
       ██████████████████████
18     █████████████████
       ████████████████████████████
19     ██████████████████████████
20
21
22
```

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2
    On behalf of Kravitz Plaintiffs:
 3       TINA M. THOMAS, ESQUIRE
         Covington & Burling, LLP
 4       ██████  █████  ███████
         ████████████   █████████████
 5       ███████████  ██████████████████
         ███████  ████████
 6       ██████████████████
 7
    On behalf of the State of California:
 8       GABRIELLE D. BOUTIN, ESQUIRE (Via Telephone)
         California Department of Justice
 9       Office of the Attorney General
         1300 I Street
10       P.O. Box 944255
         Sacramento California 94244-2550
11       (916) 210-6053
         gabrielle.boutin@doj.ca.gov
12
13  On behalf of Defendants:
         JOSH GARDNER, ESQUIRE
14       REBECCA KOPPLIN, ESQUIRE
         ALICE LACOUR, ESQUIRE
15       BRETT SHUMATE, ESQUIRE
         U.S. Department of Justice, Civil Division
16       20 Massachusetts Avenue, Northwest
         Washington, D.C. 20530
17       (202) 514-4522
18       VALERIE M. NANNERY, ESQUIRE
         ANDREW SAINDOM, ESQUIRE
19       Office of the Attorney General for D.C.
         One Judiciary Square
20       441 Fourth Street, Northwest, Suite 600 South
         Washington, D.C. 20001
21       (202) 442-9596
         valerie.nannery@dc.gov
22
```

Page 4

1          A P P E A R A N C E S   C O N T I N U E D

2     On behalf of Defendants:

          DAVID DOREY, ESQUIRE

3         DAVID DEWHIRST, ESQUIRE

          U.S. Department of Commerce

4         1401 Constitution Avenue Northwest

          Washington, D.C. 20230

5         (202) 482-2000

6

     Also Present:

7         Dan Reidy, Video Technician

8

9

10

11

12

13

14

15

16

17

18                    Veritext Legal Solutions

                      Mid-Atlantic Region

                  1250 Eye Street NW - Suite 350

19               Washington, D.C.  20005

20

21

22

1                    C O N T E N T S

2    EXAMINATION BY:                              PAGE

3       Counsel for Plaintiffs

            Mr. Ho                                11

4           Ms. Hulett                            335

            Mr. Greenbaum                         414

5

6

     GORE DEPOSITION EXHIBITS:   *                PAGE

7

     Exhibit 1    E-mail Chain                    22

8

     Exhibit 2    Bloomberg Transcript of Gore    26

9                 Testimony - 21 May 2018

10   Exhibit 3    Letter - 4 Nov 2016            47

11   Exhibit 4    Memo - 8 Sept 2017             58

12   Exhibit 5    E-mail Chain                   79

13   Exhibit 6    E-mail Chain                   95

14   Exhibit 7    E-mail Chain                   101

15   Exhibit 8    E-mail Chain                   105

16   Exhibit 9    E-mail Chain                   110

17   Exhibit 10   E-mail Chain                   115

18   Exhibit 11   E-mail Chain                   125

19   Exhibit 12   E-mail Chain                   132

20   Exhibit 13   E-mail Chain                   135

21   Exhibit 14   E-mail Chain                   138

22   Exhibit 15   E-mail Chain                   142

Page 6

```
 1   GORE DEPOSITION EXHIBITS:  *                    PAGE
 2     Exhibit 16   E-mail Chain                       145
 3
       Exhibit 17   Letter - 12 Dec 2017               155
 4
       Exhibit 18   Screenshot from Census Bureau      178
 5                  Website
 6     Exhibit 19   Map derived from Census Data on    204
                    Census Bureau Website
 7
       Exhibit 20   Printout from DOJ Website          240
 8
       Exhibit 21   E-mail Chain                       254
 9
       Exhibit 22   E-mail Chain                       282
10
       Exhibit 23   Fourth Privilege Log from DOJ in   292
11                  Response to Plaintiffs' Document
                    Subpoenas
12
       Exhibit 24   E-mail Chain                       296
13
       Exhibit 25   Exhibit 24 Attached Draft Letter   297
14
       Exhibit 26   E-mail Chain                       300
15
       Exhibit 27   2020 Census Hearing Gore QFRs CRT  300
16                  Draft
17     Exhibit 28   DOJ Office of Legal Counsel        303
                    Opinion - 4 Jan 2010
18
       Exhibit 29   E-mail Chain                       311
19
       Exhibit 30   Article                            312
20
       Exhibit 31   E-mail Chain                       315
21
       Exhibit 32   Memo - 19 Jan 2018                 319
22
       Exhibit 33   E-mail Chain                       330
```

Page 7

GORE DEPOSITION EXHIBITS:   *                      PAGE

1

2     Exhibit 34    Census Citizenship Question       330

3     Exhibit 35    District Court Opinion in Reyes   349
                    versus City of Farmers Branch

4

      Exhibit 36    Fabela versus City of Farmers     350

5                   Branch

6     Exhibit 37    Negron versus City of Miami Beach  358

7     Exhibit 38    Campos versus City of Houston     362

8     Exhibit 39    E-mail Chain                      365

9     Exhibit 40    E-mail Chain                      369

10    Exhibit 41    E-mail Chain                      371

11    Exhibit 42    E-mail Chain                      398

12    Exhibit 43    E-mail Chain                      403

13    Exhibit 44    Karlan Report                     416

14    Exhibit 45    E-mail Chain                      443

15    Exhibit 46    E-mail Chain                      445

16    Exhibit 47    Gore Written Testimony            446
                    18 May 2018

17

18

19

20

21          *   (Exhibits attached to transcript.)

22

Page 8

1                    P R O C E E D I N G S

2              VIDEO TECHNICIAN:  Good morning.  We are

3    going on the record at 9:05 a.m. on Friday,

4    October 26th, 2018.

5              Please note that the microphones are

6    sensitive and may pick up whispering, private

7    conversations, and cellular interference.  Please

8    turn off all cell phones or place them away from

9    the microphones, as they can interfere with the

10   deposition audio.

11             Audio and video recording will continue

12   to take place unless all parties agree to go off

13   the record.

14             This is media unit 1 of the

15   video-recorded deposition of John Gore, taken by

16   counsel for the plaintiff in the matter of the

17   New York Immigration Coalition, et al. versus the

18   United States Department of Commerce, et al.

19             This case is filed in the United States

20   District Court for the Southern District of New

21   York.

22             This deposition is being held at the law

Page 9

1  offices of Covington & Burling, LLP, located at

2  850 Tenth Street, Northwest, Washington, D.C.

3  20001.

4          My name is Dan Reidy from the firm

5  Veritext Legal Solutions, and I'm the

6  videographer.  The court reporter is Christina

7  Hotsko from the firm Veritext Legal Solutions.

8          I am not authorized to administer an

9  oath, I am not related to any party in this

10  action, nor am I financially interested in the

11  outcome.

12          Counsel and all present in the room will

13  now state their appearances and affiliations for

14  the record.  If there are any objections to

15  proceeding, please state them at the time of your

16  appearance, beginning with the noticing attorney.

17          MR. HO:  Detail Ho for the New York

18  Immigration Coalition plaintiffs.

19          MR. TOPAZ:  Jonathan Topaz for NYC

20  plaintiffs.

21          MS. HULETT:  Denise Hulett for Lupe

22  plaintiffs.

Page 10

1          MR. SPENCE:  Dorian Spence for BAJI and
2    the City of San Jose.
3          MS. ANDRIOLA:  Eri Andriola for the Lupe
4    plaintiffs.
5          MR. GREENBAUM:  John Greenbaum from the
6    City of San Jose and BAJI.
7          MS. THOMAS:  Tina Thomas for the Kravitz
8    plaintiffs.
9          MS. KOPPLIN:  Rebecca Kopplin from the
10   Department of Justice.
11         MS. LACOUR:  Alice Lacour from the
12   Department of Justice.
13         MR. SHUMATE:  Brett Shumate from the
14   Department of Justice.
15         MR. GARDNER:  Josh Gardner for the
16   Department of Justice on behalf of the defendants.
17         MR. SAINDOM:  Andrew Saindom on behalf of
18   the District of Columbia.
19         MS. NANNERY:  And Valerie Nannery from
20   the District of Columbia attorney general's
21   office.
22         MR. DOREY:  David Dorey from the

Page 11

1    Department of Commerce.

2          MR. DEWHIRST:  David Dewhirst from the

3    Department of Commerce.

4          VIDEO TECHNICIAN:  Will the court

5    reporter please swear in the witness.

6    Whereupon,

                                    Global objection:

7                   JOHN GORE,          401; 403

8    being first duly sworn or affirmed to testify to

9    the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11              EXAMINATION BY COUNSEL FOR

12          THE NEW YORK IMMIGRATION COALITION

13   BY MR. HO:

14       Q.  Mr. Gore, have you been deposed before?

15       A.  No.

16       Q.  But you have been in depositions before,

17   correct?

18       A.  Yes.

19       Q.  Roughly how many times have you attended

20   a deposition?

21       A.  Ten.

22       Q.  You understand that you're under oath

Page 14

1    Dr. Lisa Handley and also one submitted by Pam

2    Karlan.

3         Q.  Are you aware of topics that were covered

4    in any of the depositions in any of the litigation

5    over the citizenship question?

6              MR. GARDNER:  Objection.  Vague.

7    BY MR. HO:

8         Q.  You can answer.

9         A.  No, I don't believe so.

10        Q.  Did you consult with any staff in the

11   civil rights division such as voting section chief

12   Chris Herren in preparation for your deposition?

13        A.  Yes.

14        Q.  Who did you consult with in the civil

15   rights division in preparation for your

16   deposition?

17        A.  Chris Herren.

18        Q.  Anyone else?

19        A.  No.

20        Q.  Before you began working at DOJ, you were

21   an attorney in private practice, correct?

22        A.  Yes.

Page 15

```
1        Q.   And as an attorney in private practice,
2   you litigated some cases involving claims under
3   Section 2 of the Voting Rights Act, correct?
4        A.   Yes.
5        Q.   You're familiar with the term citizen
6   voting age population, the acronym C-V-A-P, or
7   what I'll refer to as CVAP today?
8        A.   Yes.
9        Q.   And you're familiar with the term ACS for
10  American Community Survey?
11       A.   I am.
12       Q.   You're familiar with the first
13  precondition for Section 2 liability under
14  Thornburg versus Gingles?
15       A.   Yes.
16       Q.   And one way of describing the first
17  Gingles precondition for Section 2 liability under
18  the Voting Rights Act is that plaintiffs must
19  demonstrate that racial minorities are
20  sufficiently numerous so as to form a majority of
21  a compact single-member district.  Is that your
22  understanding?
```

1      A.   That's -- more or less.   Yeah.

2      Q.   Prior to coming to the Department of

3   Justice, with respect to all of the cases that you

4   litigated under Section 2 of the Voting Rights

5   Act, you represented defendants, correct?

6      A.   That's correct.

7      Q.   In all of your experience representing

8   defendants in cases under Section 2 of the Voting

9   Rights Act, you never took the position that the

10   plaintiffs block-level CVAP data was insufficient

11   to establish the first Gingles precondition

12   because it was a statistical estimate, correct?

13      A.   When I was in private practice, I was

14   representing a client, so my clients took various

15   positions.  And as a lawyer, I pursued those

16   positions on behalf of clients in court.  I can't

17   recall an instance where a client of mine took

18   that position.

19      Q.   And in all of your experience litigating

20   cases under Section 2 of the Voting Rights Act,

21   you're not aware of, in any of your cases, a

22   situation where a court held that block-level CVAP

Page 17

1  data was insufficient to satisfy the first Gingles

2  precondition because it was a statistical

3  estimate, correct?

4      A.   You're talking about cases I actually was

5  involved in?

6      Q.   That's correct.

7      A.   As a litigant or as attorney?

8      Q.   As an attorney.

9      A.   As an attorney.   No, I'm not aware of any

10  such case.

11      Q.   Do you have any experience drawing

12  districts for purposes of complying with the first

13  Gingles precondition?

14      A.   That's a -- that's a fair question.   In

15  one of our cases, we did have a case that went to

16  a remedial phase.   I wouldn't say I was involved

17  in drawing the district, but I was certainly

18  involved in reviewing various remedial proposals

19  and other proposals that were submitted to the

20  court in the course of litigation.

21      Q.   So let me clarify my question.   My

22  question is about the technical aspects of

Page 18

1  actually getting the census data, taking the

2  mapping software, and drawing a district.

3          You don't have any experience doing that,

4  correct?

5      A.  That's correct.  I've never sat in front

6  of a computer with Maptitude and drawn a district.

7      Q.  Okay.  You don't have any experience --

8  so that would mean you don't have any experience

9  drawing districts using ACS data, correct?

10      A.  That's correct.

11      Q.  And you don't have any experience taking

12  census block-group level data and performing an

13  estimation procedure to produce block-level data,

14  correct?

15      A.  No, I don't have that experience.

16      Q.  You're currently acting assistant

17  attorney general for civil rights at the U.S.

18  Department of Justice, correct?

19      A.  Correct.

20      Q.  And when did you become the acting AAG

21  for civil rights?

22      A.  July 28th, 2018.

Page 19

1        Q.   In that position, you are the head of the

2   civil rights division, correct?

3        A.   Correct.

4        Q.   And you're a political appointee; you're

5   not career civil rights division staff, correct?

6        A.   Correct.

7        Q.   One of the sections under your purview

8   within the civil rights division is the voting

9   section, correct?

10        A.   Correct.

11        Q.   And one of the duties of the voting

12   section is to enforce Section 2 of the federal

13   Voting Rights Act of 1965, correct?

14        A.   That's correct.

15        Q.   Is it fair to say that, as acting AAG for

16   civil rights, you are authorized to speak on

17   behalf of the civil rights division?

18        A.   I think with respect to matters that fall

19   within the purview of the civil rights division

20   and the Office of the Assistant Attorney General

21   for the civil rights division, that's correct, as

22   a general matter.

Page 20

```
 1      Q.  You take your interactions with DOJ staff

 2   from outside of the civil rights division

 3   seriously, right?

 4           MR. GARDNER:  Objection.  Vague.

 5           THE WITNESS:  I take all of my

 6   interactions in a professional capacity

 7   professionally and, hopefully, seriously as well.

 8   BY MR. HO:

 9      Q.  When you interact with DOJ staff who are

10   not members of the civil rights division, you are

11   in some sense acting as a representative of the

12   civil rights division in those interactions with

13   non-civil rights division DOJ staff, correct?

14      A.  Not necessarily.  In certain cases that

15   would be true, but there are instances in which

16   that wouldn't necessarily be correct.

17      Q.  The Department of Justice sent a letter

18   to the Census Bureau on December 12th, 2017,

19   requesting that a citizenship question be included

20   on the 2020 decennial census questionnaire,

21   correct?

22      A.  I have no basis to dispute the date
```

1   there.   Yes, the department did send a letter.

2   Whether it was December 12th -- I believe that's

3   correct, but I don't have the letter in front of

4   me, so I can't testify to that date necessarily.

5   But yes, there was a letter that was sent in that

6   time frame from the Department of Justice to the

7   Census Bureau.

8        Q.   There's no other reason besides Voting

9   Rights Act enforcement that formed the basis of

10   the Department of Justice's request that a

11   citizenship question be added to the 2020

12   decennial census questionnaire, correct?

13             MR. GARDNER:  Objection to the extent it

14   calls for the disclosure of information subject to

15   the deliberative process privilege.

16             To the extent you can answer the question

17   without divulging such information, you may do so.

18   Otherwise, I instruct you not to answer.

19             THE WITNESS:  I think the letter speaks

20   for itself.  Again, I don't have it in front of

21   me.

22

Page 22

1    BY MR. HO:

2        Q.   The letter does not express any reason

3    for requesting a citizenship question be added to

4    the 2020 decennial census questionnaire besides

5    Voting Rights Act enforcement, correct?

6        A.   Again, I think the letter speaks for

7    itself.   And I don't have a copy of it in front of

8    me, so I can't say what it does or doesn't say.

9            (Gore Deposition Exhibit 1 marked for

10               identification and attached to the

11               transcript.)

12   BY MR. HO:

13       Q.   I'm going to show you something that's

14   been marked as Plaintiff's Exhibit -- as, sorry,

15   Exhibit 1.

16       A.   Okay.

17       Q.   This is an e-mail from you to Arthur Gary

18   dated December 18th, 2017, correct?

19       A.   It appears to be.   Yes.

20       Q.   The subject line of this e-mail is

21   talking points, correct?

22       A.   Correct.

Page 24

1          Did I read that correctly?

2      A.   Yes, you did.

3      Q.   You agree that the department is seeking

4  the most complete and accurate data regarding

5  total citizenship rates in voting districts that

6  the Census Bureau can provide, correct?

7      A.   Yes, that's correct.

8      Q.   And do you believe that the letter from

9  the Department of Justice to the Census Bureau

10  requesting the inclusion of a citizenship question

11  is consistent with the department's goal of

12  seeking the most complete and accurate data

13  regarding total citizenship rates that the Census

14  Bureau can provide?

15      A.   I think it's consistent with that

16  objective, but is not the full picture of the data

17  that the Department of Justice would use and would

18  want to have at its disposal.

19      Q.   When you say that it is not the full

20  picture of the data that the Department of Justice

21  would use and want to have, what did you mean by

22  that?

Page 25

1        A.  Well, what I mean is there are various

2    sources of data on citizenship.  And in the modern

3    world, we live in a data-driven world.  And the

4    Department of Justice is always trying to find the

5    best possible data, whether it's from one source

6    or multiple sources, to analyze jurisdictions for

7    potential Section 2 violations and to bring

8    appropriate Section 2 enforcement actions.

9             And the letter lays out reasons why -- is

10   my recollection -- reasons why collecting data

11   from the census questionnaire, in addition to

12   other sources, would be an appropriate means for

13   the Department of Justice to collect the best

14   possible total data that it could collect.

15        Q.  What are the other sources other than the

16   decennial census questionnaire that you're

17   referring to for the collection of citizenship

18   data?

19        A.  We already have a citizenship question on

20   the ACS.  And there may be other sources that I'm

21   not aware of, but that's the source that comes to

22   mind.

Page 26

1          Q.   Okay.  Decennial census questionnaire,

2     American Community Survey.  Besides those two

3     sources, are there other sources of citizenship

4     data that you're aware of that the Department of

5     Justice could rely on for purposes of Section 2

6     enforcement?

7          A.   Not that I'm aware of.

8          Q.   You agree that having the most complete

9     and accurate data regarding citizenship rates that

10    the Census Bureau could provide would allow the

11    department to fulfill its commitment to robustly

12    enforcing the Voting Rights Act?

13         A.   Yes, I do.

14         Q.   I want to show you another document.

15    It's been pre-marked as Exhibit 2.

16              (Gore Deposition Exhibit 2 marked for

17              identification and attached to the

18              transcript.)

19    BY MR. HO:

20         Q.   This is a Bloomberg transcript of your

21    testimony on May 21, 2018, before the House

22    Oversight Committee.

401

1        Do you remember your testimony that day?

2        A.   I do.

3        Q.   You were under oath that day under

4   penalty of perjury, correct?

5        A.   I was.

6        Q.   And you testified truthfully that day,

7   correct?

8        A.   I did.

9        Q.   Now, although you testified before the

10   House Oversight Committee on May 21st, you were

11   previously called to testify before the committee

12   on -- I'm sorry; I may have said the wrong -- no,

13   I said the right date.  Let me start that again.

14        A.   Go ahead.

15        Q.   Although you testified before the House

16   Oversight Committee on May 21st, you were

17   previously called to testify before the committee

18   on May 8th, 2018, correct?

19        A.   That's actually not correct.  I was never

20   called to testify before the committee.  I was

21   invited to testify.  The committee invited me to

22   testify on May 8th alongside witnesses from the

401

Page 29

1   but you ended up not testifying on May 8th,

2   correct?

3        A.   That's correct.

4        Q.   And you're aware that when you didn't

5   testify on May 8th, the chairman of the oversight

6   committee, Representative Gowdy, stated that he

7   would ask you to appear by legal compulsory -- is

8   how he put it -- if necessary.

9             You're aware of that?

10       A.   That sounds right.  Yeah.

11       Q.   And so when you did appear on May 21st,

12   you understood that it was an important hearing,

13   right?

14       A.   I believe that -- I would hope that every

15   hearing before Congress is an important hearing.

16   Yeah.

17       Q.   We would all hope.

18            You wanted to make sure that your

19   testimony on May 21st was accurate, right?

20       A.   Yes.

21       Q.   And you wanted to make sure that -- to

22   the extent you could discuss the issues that were

401

Page 30

1    raised that day, you wanted to make sure that your

2    testimony was complete, right?

3         A.   Yes, to the extent I was able to testify

4    about matters consistent with Department of

5    Justice policy and privileges.

6         Q.   And you didn't want to leave anything

7    important out of your testimony on May 21st,

8    correct?

9              MR. GARDNER:   Objection.   Form.

10             THE WITNESS:   I think that's largely

11   correct, although again, there were strict limits

12   on the testimony that I could give, the topics

13   that I was authorized to discuss, and how I could

14   go about answering questions.

15   BY MR. HO:

16        Q.   You prepared for your testimony on May

17   21st.  You didn't just show up without preparing,

18   right?

19        A.   I prepared.  Yeah.

20        Q.   And you held a moot to prepare for your

21   testimony on May 21st, right?

22        A.   That sounds right.

401

401

Page 32

1   Affairs.  And I can't speak for who they did or

2   did not invite.  I can remember some people who

3   were there, but I don't know who they all did or

4   did not invite.

5        Q.  You're not aware of any voting section

6   staff being invited to participate in your moot to

7   prepare for the May 21st hearing, correct?

8        A.  To the -- I think that's correct.

9        Q.  And no career voting section staff

10  attended your moot on -- to prepare for the May

11  21st hearing, correct?

12       A.  That's correct, although voting section

13  staff did help me prepare for the hearing.

14       Q.  So I want to ask about your testimony.

15  If you could turn to page 20 of the Bloomberg

16  transcript, Exhibit 2.

17       A.  Sure.

18       Q.  So on the top of the page, I believe you

19  testified, "Let me just be clear, Congressman,

20  there's no dispute that the Department of Justice

21  needs citizenship voting population data to

22  enforce Section 2 or that it needs that data at

401

1   the block level."

2              It's still your view that the Department

3   of Justice needs citizen voting age population

4   data at the census block level to enforce

5   Section 2 of the Voting Rights Act, correct?

6        A.   Yes, in some form or another.  The

7   citizenship data at the block level is necessary

8   to bring Section 2 cases.

9        Q.   And the census block is the smallest unit

10  of census geography, right?

11       A.   That is correct.

12       Q.   The next sentence of your testimony

13  reads, "And our letter explains why hard count

14  census data would be better suited for that

15  purpose than the ACS.  It's easier to use because

16  it's already available at the block level and more

17  accurate because it's hard count and not a" -- and

18  then you were interrupted.

19              When you say hard count census data,

20  you're drawing a distinction between an actual

21  count, like the decennial census enumeration, and

22  statistical estimates based on a sample survey

1    like the ACS, correct?

2         A.   That's correct.

3         Q.   Okay.   And your testimony is that hard

4    count data is preferable to available statistical

5    estimates, like the ACS, for purposes of VRA

6    enforcement, correct?

7         A.   Yes.   And I think what I was testifying

8    to here is what's in the letter, which again, is

9    not in front of me.   But my recollection of the

10   letter is that it laid out reasons why that hard

11   count data would be more appropriate than an ACS

12   estimate for that purpose.

13        Q.   How about -- turn to page 27 of the

14   transcript.   In the first full paragraph on page

15   27, you testified, "And having more -- having it

16   on the census would make it easier for us to use

17   and it would also make it more accurate, or at

18   least that's the judgment of the Census Bureau."

19             When you referred to the judgment of the

20   Census Bureau, what were you referring to?

21        A.   I think I was referring to two things.

22   First of all, I was -- I only know anything about

Page 35

1   the judgment of the Census Bureau from publicly
2   available information.   Secretary Ross issued a
3   memo of decision with respect to the letter that
4   the Department of Justice submitted in which he
5   decided, among other things, to order
6   reinstatement of the citizenship question on the
7   census questionnaire.
8           I also had watched at least portions of
9   the May 8th hearing before the committee that you
10  referenced earlier, and understood from testimony
11  at that hearing that that was the position of the
12  Census Bureau.
13          Q.   So when you say the judgment of the
14  Census Bureau, whose judgment, if you could
15  identify individuals, are you referring to?
16          A.   Secretary Ross would be one.   And the
17  other would be -- I can't remember who it was who
18  testified at the hearing, but it was whoever
19  testified at the hearing about the accuracy of a
20  hard count versus an estimate.   It may have been
21  Ron Jarmin or somebody else.   I just can't
22  remember.

1       Q.   May 8th -- the May 8th hearing?

2       A.   The May 8th hearing, yeah.

3       Q.   And when you say Ron Jarmin, you're

4  referring to the acting director of the Census

5  Bureau?

6       A.   That's who I understand he is.  I've

7  never met him.

8       Q.   When you testified that it was the

9  judgment of the Census Bureau that CVAP data

10  collected through the decennial enumeration would

11  be more accurate, what did you mean by more

12  accurate?

13       A.   As I understand the judgment of the

14  Census Bureau, it's that the hard count would be

15  more accurate than an ACS estimate because an ACS

16  estimate has a margin of error associated with it

17  and also requires an extrapolation because, as

18  you're no doubt aware, the ACS estimates are only

19  released at the block group level, and so further

20  extrapolation is required to estimate CVAP levels

21  at the block level.

22            And it was my understanding, from

Page 37

 1    Secretary Ross' memo and the testimony that I
 2    believe I heard on May 8th, that the Census Bureau
 3    believed that a hard count would be more accurate
 4    than estimates of an extrapolation with an
 5    associated margin of error.
 6        Q.  And just so we're clear on your
 7    understanding, your understanding is that, in the
 8    judgment of the Census Bureau, it would be more
 9    accurate to have CVAP data collected through the
10    decennial enumeration than the existing ACS data
11    for two reasons:  One, the decennial enumeration
12    data is a hard count and not an estimate; and,
13    two, the decennial enumeration data is available
14    at the census block level, and so you wouldn't
15    have to perform an estimation procedure the same
16    way that you do with the ACS; is that right?
17            MR. GARDNER:  Objection.  Compound.
18            THE WITNESS:  As I understand your
19    question, I believe that was Secretary Ross'
20    judgment on behalf of the Department of Commerce,
21    of which the Census Bureau is part.  I don't have
22    his memo right in front of me, so I can't -- I'm

Page 38

```
 1   going off of my memory rather than a document

 2   that's in front of me.  But my recollection of

 3   that is that he analyzed a number of different

 4   options and concluded that reinstating the

 5   question on the census questionnaire, in addition

 6   to other data, would provide the most accurate and

 7   complete picture of data for the Department of

 8   Justice's purposes.

 9   BY MR. HO:

10       Q.   Now, all things being equal, the

11   Department of Justice would want to use the CVAP

12   data that was, in the Census Bureau's view, the

13   more accurate data available, correct?

14       A.   I think that's probably correct.  I guess

15   I could imagine a scenario, which I don't know is

16   present here or not, where we would make a

17   different judgment as to what was more accurate

18   than the Census Bureau might.  But that's correct.

19       Q.   When you say we would make a different

20   judgment as to what is more accurate than the

21   Census Bureau might, who's we?

22       A.   The Department of Justice.
```

1      Q.   Who's we at the Department of Justice who

2   is in a position to make an assessment as to

3   whether or not CVAP data is more accurate than the

4   Census Bureau?

5      A.   I don't know.  I can't point to any

6   individual person.  But, of course, we're

7   constantly reviewing the data, the various data

8   sources, the academic literature.  We send people

9   to conferences so that we can understand the

10   latest about data in this area and other

11   demographic areas.

12        But I don't believe there's any dispute

13   at this point about what would be more accurate.

14   And the Census Bureau is charged to make that

15   judgment, as I understand it, as a matter of law.

16      Q.   Do you think you're better situated than

17   career Census Bureau professionals to make an

18   assessment as to the accuracy of various forms of

19   CVAP data?

20      A.   Me personally?

21            MR. GARDNER:   Objection to form.

22            THE WITNESS:   Me personally?

Page 40

1    BY MR. HO:

2        Q.   Yes.

3        A.   No, I don't.

4        Q.   Let's look at page 2 of your testimony.

5    Oh, I'm sorry --

6        A.   It appears to be a list of the committee

7    members' names.

8        Q.   Yeah.

9        A.   I'm happy to review that.

10       Q.   We'll come back to that.

11            Let's look at page 37 of your testimony.            401

12   So the second-to-last question here is from

13   Representative Krishnamoorthi.   And he asks you,

14   "Let me shift to another issue, which is, is the

15   DOJ aware of any study, analysis, or projection of

16   how the inclusion of the citizenship question will

17   affect the response rate for the census?"

18            Your response was, "That's a great

19   question, Congressman.   I don't know the

20   Department of Justice is aware of that.   That's

21   really a question for the Department of Commerce

22   and the Census Bureau, since it is the Secretary

1    of Commerce's province to decide which questions

2    get included or are not within the bounds set by

3    law."

4          When Representative Krishnamoorthi used

5    the term --

6          A.   Can you read the rest of my answer for

7    completeness?

8          Q.   "My understanding is that, from Secretary

9    Ross' memo, that he took a hard look at that issue

10   and didn't find empirical evidence to suggest that

11   the question would lead to a reduction in response

12   rates.   That's based on the memo of decision that

13   he issued.   I obviously can't speak on his

14   behalf."

15         Did I read that right?

16   A.   Thank you.  Yes.

17         Q.   When the representative uses the term

18   "response rates," what did you understand him to

19   mean?

20         A.   I understood him to be suggesting that

21   adding a question and, in particular, reinstating

22   a citizenship question might cause people not --

1   some incremental number of people not to answer

2   the -- that question or fill out the census form.

3        Q.  And your testimony was, on May 21st, that

4   DOJ was not aware of any analysis indicating that

5   the inclusion of the citizenship question will

6   affect response rates to the census?

7              MR. GARDNER:  Objection.

8   Mischaracterizes the document.

9              THE WITNESS:  I think what I've testified

10  to is -- is what is here in the record, and that

11  answer speaks for itself.

12  BY MR. HO:

13       Q.  Well, what did you mean by that?  Were

14  you aware of any analysis as to whether or not

15  including the citizenship question on the census

16  could affect the rate at which the people respond

17  to the census?

18       A.  As I said then, and as I sit here today,

19  no, I'm not aware of any -- any data on that

20  issue.  And as I further explained, Secretary Ross

21  in his memo explains that he took a hard look at

22  that issue and found no empirical evidence to

Page 43

1  support the conclusion that there be a reduction

2  in response rates from reinstatement of the

3  citizenship question on the census questionnaire.

4       Q.   One more question about your testimony

5  for now.   On page 27, the last question on the

6  page from Representative Gowdy:   "So if

7  Secretary Ross wanted to include a question,

8  what's your favorite movie, how would a court

9  determine whether or not that was an appropriate

10  question?   I mean, I guess what I'm getting at is,

11  what is the standard by which you judge the

12  legitimacy of the inclusion or exclusion of a

13  question on the census form?"

14          Your response:   "I think that is a very

15  good question.   It's probably better directed to

16  the commerce department.   I'm not involved in the

17  litigation.   That's being handled out" -- and then

18  you got cut off.

19          What do you mean when you testified on

20  May 21st that you're not involved in the

21  litigation over the citizenship question?

22       A.   I am not a counsel of record in that

401

Page 44

401

1   case.  I have not been involved in litigating that

2   case on behalf of the United States.  I have not

3   written any of the briefs, filed any of the

4   pleadings, or done anything like that.  I am a

5   witness in the case, obviously here -- sitting

6   here today, and was involved in the decision that

7   was made by the Department of Justice.

8           But under Department of Justice

9   regulations, this is defensive litigation that's

10  being handled by the civil division, and the

11  counsel of record is in the civil division, not

12  the civil rights division.

13      Q.  When you say that you're not counsel of

14  record, are you counsel in some other capacity in

15  this litigation?

16          MR. GARDNER:  Objection.  Vague.

17          THE WITNESS:  No.

18  BY MR. HO:

19      Q.  And you're not a party in this case,

20  right?

21      A.  No.

22      Q.  And neither the civil rights division nor

Page 45

401

1   the Department of Justice itself is a party in

2   this case, correct?

3        A.   That's my understanding.   I believe the

4   case was brought against the Department of

5   Commerce, but I've not studied the pleadings

6   closely enough to know whether or not the

7   Department of Justice is a party, but I believe

8   it's not.

9        Q.   And you wouldn't describe yourself as a

10  consultant giving legal advice to counsel of

11  record in this case, would you?

12       A.   No.

13       Q.   Mr. Gore, you sometimes use personal

14  e-mail, text messages or private messaging apps to

15  communicate about DOJ work, correct?

16       A.   I believe I may have done that.  Yeah.

17       Q.   Which of those things have you used for

18  DOJ work before?

19       A.   Well, actually, I don't think I have used

20  it for DOJ work, now that I think about it.

21       Q.   You've sometimes sent e-mails between

22  your personal gmail account and your DOJ account,

Page 47

1          Q.   I want to show you a document which we'll
2     mark as Exhibit 3.
3               (Gore Deposition Exhibit 3 marked for
4               identification and attached to the
5               transcript.)
6     BY MR. HO:
7          Q.   This bears the Bates number 000311.   It's
8     a letter dated November 4th, 2016, from Arthur
9     Gary to then Census Bureau Director John Thompson.
10              We discussed Mr. Gary before.   You sent
11    him those talking points in December of 2017,
12    right?
13         A.   I did.   Yes.
14         Q.   And Mr. Gary is the general counsel of
15    the justice management division, or JMD, at the
16    Department of Justice, correct?
17         A.   That's correct.
18         Q.   And JMD is the principal organizational
19    unit responsible for management and administrative
20    support of the Department of Justice, correct?
21         A.   I trust you took that off of a website,
22    because that was pretty fancy.   That sounds right

1    to me.  It's my understanding.

2            Q.  In his first sentence, Mr. Gary writes to

3    Mr. Thompson, "This letter supplements my letter

4    of July 1st, 2016, in which I advised that, at

5    that time, the Department of Justice had no needs

6    to amend the current content or uses or to request

7    new content in the American Community Survey (ACS)

8    for the 2020 census."

9            Did I read that right?

10   A.  Yes.

11           Q.  On July 1, 2016, DOJ sent a letter to the

12   Census Bureau indicating that it had no need to

13   amend the current content or to request new

14   content in the ACS for the 2020 census, correct?

15           MR. GARDNER:  Objection.  Lack of

16   foundation.

17           THE WITNESS:  I have no basis to answer

18   that question.  I wasn't employed at the

19   department on July 1, 2016.  And I don't believe

20   I've ever seen a July 1, 2016, letter from the

21   department to the Census Bureau.

22           That's certainly what that sentence says,

601/
802

Page 49

1   but I can't verify or testify to that.   I have no

2   firsthand knowledge on that topic.

3   BY MR. HO:

4       Q.   You're not aware of the Department of

5   Justice, on July 1st, 2016, requesting new content

6   for the American Community Survey or the 2020

7   decennial census, are you, Mr. Gore?

8          MR. GARDNER:   Objection.   Lack of

9   foundation.

10         THE WITNESS:   I don't believe I am, no.

11  BY MR. HO:

12      Q.   This letter on November 4th, 2016,

13  formally requested that the Census Bureau include

14  a new topic in the ACS relating to LGBT

15  populations, correct?

16      A.   Let me read this.

17      Q.   Sure.

18      A.   Okay.   Can you repeat your question?

19      Q.   Sure.   This November 4th, 2016, letter

20  formally requested that the Census Bureau include

21  a topic on the ACS relating to LGBT populations,

22  correct?

601/
802

Page 50

1            MR. GARDNER:   Objection.   Lack of
2     foundation.
3            THE WITNESS:   It appears to.   Yeah.
4     BY MR. HO:
5        Q.   This letter on November 4th, 2016, makes
6     no other requests for changes to the 2020 census
7     questionnaire or the ACS, correct?
8            MR. GARDNER:   Objection.   Lack of
9     foundation.
10           THE WITNESS:   Again, it doesn't -- what
11    I've read so far doesn't mention any other
12    request.
13    BY MR. HO:
14       Q.   When you say what you've read so far,
15    have you read the complete letter?
16       A.   I've read the complete letter.   There's a
17    reference to an attached spreadsheet in the letter
18    that's not attached here, so I haven't looked at
19    that just now.
20       Q.   Okay.   But the face of this letter does
21    not make requests for any additional information
22    on either the ACS or the 2020 census questionnaire

601/
802

Page 51

1    other than a request about LGBT populations for        601/

2    the ACS, correct?                                       802

3            MR. GARDNER:  Objection.  Lack of

4    foundation.

5            THE WITNESS:  That appears to be correct

6    on the face of the letter.

7    BY MR. HO:

8        Q.  This letter does not make any mention of       601/

9    a request for citizenship data, correct?               802

10           MR. GARDNER:  Same objection.

11           THE WITNESS:  It does not on its face.

12   BY MR. HO:

13       Q.  This letter does not make any request for      601/

14   the inclusion of a citizenship question on the         802

15   census questionnaire, correct?

16           MR. GARDNER:  Same objection.

17           THE WITNESS:  It does not appear to.

18   BY MR. HO:

19       Q.  You're not aware of any changes in

20   circumstances since the date of this letter,

21   November 4th, 2016, that would require a change to

22   the Department of Justice's view that, as of the

Page 54

1          MR. GARDNER:  Objection.  Form.
2    Objection.  Lack of foundation.
3          THE WITNESS:  What -- I'm still not
4    following the circumstances.
5    BY MR. HO:
6       Q.  Let me -- let me try again.
7       A.  Can you specify?
8       Q.  Are you aware of any changes in law since
9    November 4th, 2016, with respect to requirements
10   for enforcing Section 2 of the federal Voting
11   Rights Act?
12          MR. GARDNER:  Objection.  Form.
13   Objection.  Lack of foundation.
14          THE WITNESS:  I do believe -- since
15   November of 2016, I can think of at least one
16   Supreme Court case dealing with Section 2 of the
17   Voting Rights Act.  I'm not sure this is what
18   you're asking, but I am aware of court cases that
19   have been decided since November of 2016 on that
20   issue.
21   BY MR. HO:
22       Q.  Are you aware of any changes in law since

 1   November 4th, 2016, with respect to the data that
 2   plaintiffs can rely on to establish the first
 3   Gingles precondition for Section 2 liability under
 4   the Voting Rights Act?
 5        A.   I'm not aware of any changes in law on
 6   that point, I don't believe.
 7        Q.   Are you aware of any changes to the forms
 8   of data available to plaintiffs bringing voting
 9   rights challenges since November 4th of 2016?
10             MR. GARDNER:  Objection to form.
11             THE WITNESS:  I do believe, at least in
12   one case, the Department of Justice has advocated
13   a new form of data for conducting a racially
14   polarized voting analysis in the Eastpointe case,
15   United States versus Eastpointe, Michigan, which
16   at least the United States had not previously
17   advocated.  That's the analysis conducted at
18   steps 2 and 3 of the Gingles analysis.
19   BY MR. HO:
20        Q.   My question is just about the first
21   Gingles precondition.
22        A.   Okay.

Page 56

1     Q.  Are you aware of any changes to the forms

2   of citizenship data available to plaintiffs

3   bringing Voting Rights Act claims in order to

4   satisfy the first Gingles precondition?

5     A.  I'm not aware of any changes in the forms

6   of data.  I guess what I'm struggling with on your

7   question is I don't think that that forecloses a

8   request to reinstate the citizenship question on

9   the census questionnaire.

10    Q.  That's not my question.

11    A.  So what the department is looking for is

12  the most complete and accurate data it can

13  possibly have to perform it function, and this is

14  one more source of data that would allow the

15  Department of Justice to carry out its enforcement

16  mission.

17    Q.  I understand what your position is on why

18  you've requested the data.  That's not my

19  question.  My question is --

20    A.  Okay.

21    Q.  -- just about any changes since

22  November 4th of 2016 outside of the Department of

Page 57

1    Justice.

2            And my question is, are you aware of any

3    changes in the forms of citizenship data that are

4    available for establishing the first precondition

5    for Gingles -- the first Gingles precondition for

6    Section 2 liability since November 4th, 2016?

7            A.  Let me give you this answer.  As I

8    understand what people were using in Section 2

9    cases in November of 2016 for citizenship

10   purposes, it was ACS data.  And I understand that

11   litigants are still using ACS data today.

12           Q.  Are you aware of any changes in the          601

13   social sciences about the assessment in that

14   community of the accuracy of citizenship estimates

15   based on ACS data since November 4th, 2016?

16              MR. GARDNER:  Objection.  Form.

17              THE WITNESS:  Which community?

18   BY MR. HO:

19           Q.  The social scientific community.

20           A.  Okay.

21              MR. GARDNER:  Same objection.

22              THE WITNESS:  I'm not aware of any

Page 58

601

1  changes.  I am aware that there are questions that

2  have been raised in the social science community

3  about the accuracy of the estimates and

4  extrapolations that are derived from the ACS data.

5           (Gore Deposition Exhibit 4 marked for

6           identification and attached to the

7           transcript.)

8  BY MR. HO:

9        Q.  I'm going to show you a document,

10  Exhibit 4.  This is a memo data November --

11  September 8th, 2017, from Earl Comstock to

12  Commerce Secretary Wilbur Ross.  It's in the

13  administrative record in this case.  Although this

14  printout doesn't bear the number, I believe it is

15  AR12756.

16           Do you know Mr. Comstock?

17        A.  No, I don't, actually.

18        Q.  The first paragraph of Mr. Comstock's

19  memo reads, "In early May, Eric Branstad put me in

20  touch with Mary Blanche Hankey as the White House

21  liaison in the Department of Justice.  Mary

22  Blanche worked for AG Sessions in his senate

Page 59

1  office and came with him to the Department of

2  Justice.  We met in person to discuss the

3  citizenship question.  She said she would locate

4  someone at the department who could address the

5  issue.  A few days later, she directed me to James

6  McHenry in the Department of Justice."

7           Now, before I read that, were you aware

8  that sometime prior to September 8th, 2017,

9  officials from the Department of Commerce had

10  spoken with officials within the Department of

11  Justice regarding the issue of a citizenship

12  question on the census?

13       A.  Yes.

14       Q.  What were you aware of with respect to

15  conversations between Department of Commerce

16  officials and the Department of Justice officials

17  prior to September 8th, 2017, with respect to the

18  issue of a citizenship question on the census?

19           MR. GARDNER:  Objection to the extent

20  that you're asking for information subject to the

21  deliberative process privilege.

22           To the extent you can answer without

Page 61

```
 1   think -- I think so, but I'm not certain on --

 2   with respect to the involvement of the people

 3   mentioned in this particular paragraph.

 4        Q.  So your answer is, yes, you think that

 5   you were aware of communications between the

 6   Department of Justice and the Department of

 7   Commerce prior to September 8th, 2017 -- you think

 8   you were aware of those conversations before the

 9   request letter went out from the Department of

10   Justice to the Census Bureau?

11        A.  I'm sorry.  Could we try that again?

12        Q.  Sure.  The conversations --

13        A.  You're dealing with two different

14   timelines.

15        Q.  Sure.

16        A.  Okay.

17        Q.  The conversations that occurred that are

18   referenced in this paragraph that happened between

19   Commerce and Justice officials before

20   September 8th, 2017 --

21        A.  Yes.

22        Q.  -- you were aware of those conversations
```

Page 62

1 prior to the date when the Department of Justice's

2 letter went to the Census Bureau to request a

3 citizenship question in December of 2017, correct?

4   A. Yes.

5   Q. Okay.  What were you aware of before that

6 letter went out?

7     MR. GARDNER:  Same objection.

8     To the extent you can answer the question

9 without divulging information subject to the

10 deliberative process privilege, you may answer.

11 To the extent you can't, I'd instruct the witness

12 not to answer.

13     MR. HO:  Josh, let me finish the question

14 before your objection --

15     MR. GARDNER:  I thought you were done.

16     MR. HO:  -- if that's okay.

17     MR. GARDNER:  I apologize.  I didn't mean

18 to interrupt you.

19 BY MR. HO:

20   Q.  When you say that you were aware of

21 pre-September 8th conversations between Commerce

22 and Justice about the citizenship question before

Page 63

```
 1   your letter from Justice to the Census Bureau went

 2   out requesting a citizenship question, what were

 3   you aware of with respect to the nature of those

 4   pre-September 8th conversations?

 5           MR. GARDNER:  Same objection.  Same

 6   instruction.

 7           THE WITNESS:  I can tell you that I was

 8   aware of the fact that conversations had occurred.

 9   And beyond that, I don't believe I can give an

10   answer in light of the instruction I've just

11   received.

12   BY MR. HO:

13       Q.  When you say that you were aware of the

14   fact that conversations occurred, what do you mean

15   by conversations?

16       A.  I mean -- a conversation is a

17   communication between two or more people, and I

18   was aware that two or more people had talked to

19   each other.

20       Q.  When you say that you were aware that two

21   or more people had talked to each other, which

22   people were you aware had talked to each other?
```

1      A.  It was my understanding that somebody

2   from Commerce had spoken to Mary Blanche Hankey,

3   that someone had spoken to James McHenry, and that

4   Secretary Ross had spoken to the attorney general.

5      Q.  And that all of those conversations were

6   about the inclusion of a citizenship question on

7   the census?

8      A.  I wasn't a party to those conversations,

9   but my understanding is that they would have

10  touched on that issue.

11     Q.  James McHenry is the director of the

12  Executive Office for Immigration Review within

13  DOJ, correct?

14     A.  He is now, although at that time he

15  wasn't.  At that time, he was on detail to the

16  Office of the Associate Attorney General.  And he

17  had come from somewhere else.  I can't remember.

18  I think it was OCAHO, which is -- since we're in

19  D.C. and talking about government things, it's an

20  acronym that -- I don't know what it stands for.

21  But Mr. McHenry has been involved -- has been an

22  employee of the department for some time, but in

1   early 2017, was on detail to the Office of the

2   Associate Attorney General.

3       Q.   During this period, Mr. McHenry was not

4   staff in the civil rights division, correct?

5       A.   That's correct.

6       Q.   And Mr. McHenry did not have any formal

7   duties with respect to enforcement of the Voting

8   Rights Act during this period, correct?

9       A.   He had no formal duties.  As I recall, he

10  was for some period of time our point of contact

11  in the Office of the Associate Attorney General,

12  which is why I remember he was there.  But he did

13  not have formal duties with respect to

14  enforcement.

15      Q.   Do you know of any reasons why

16  Mr. McHenry could address the issue of including a

17  citizenship question on the census?

18          MR. GARDNER:  Objection.  Calls for

19  speculation.

20          THE WITNESS:  Yeah, I'd be speculating.

21  I don't know.

22

1    BY MR. HO:

2         Q.   So you don't know of any reasons why

3    Mr. McHenry could address the issue of including a

4    citizenship question on the census?

5              MR. GARDNER:   Same objection.

6              THE WITNESS:   I -- I don't know one way

7    or the other.

8    BY MR. HO:

9         Q.   When you say you're aware that

10   conversations took place between Commerce

11   officials and Mary Blanche Hankey and James

12   McHenry, what were you aware of with respect to

13   the content of those conversations prior to --

14   those conversations that took place prior to

15   September 8th, 2017?

16             MR. GARDNER:   Objection.

17             To the extent that you can answer that

18   question without divulging information subject to

19   deliberative process privilege, you may do so.

20   Otherwise, I instruct you not to answer.

21             THE WITNESS:   As I testified before, I

22   understood that those conversations related to the

1   issue of reinstating a citizenship question on the

2   census questionnaire.  Beyond that, I can't

3   answer.

4   BY MR. HO:

5       Q.  What was your understanding of who

6   initiated those conversations?

7       A.  My understanding was that those

8   conversations were initiated by the Department of

9   Commerce.

10      Q.  Those initial conversations that are

11  referred to in this memo, your testimony is that,

12  to the best of your knowledge, those conversations

13  were not initiated by the Department of Justice,

14  correct?

15      A.  Again, I wasn't a party to those

16  conversations, but that's been my working

17  understanding.

18      Q.  And your working understanding is that

19  the Department of Justice did not reach out to the

20  Department of Commerce to initiate those

21  conversations for the purposes of obtaining better

22  data to enforce the Voting Rights Act, correct?

Page 68

1          MR. GARDNER:   Objection.   Lack of

2     foundation.

3          THE WITNESS:   Again, I wasn't a party to

4     those conversations, but that's been my working

5     understanding.

6     BY MR. HO:

7          Q.   The second paragraph in this memo reads,

8     "I spoke several times with James McHenry by phone

9     and, after considering the matter further, James

10    said that Justice staff did not want to raise the

11    question, given the difficulties Justice was

12    encountering in the press at the time, the whole

13    Comey matter.   James directed me to Gene Hamilton

14    at the Department of Homeland Security."

15          So were you aware, before I read that,

16    that as of September 8th, 2017, Justice staff did

17    not want to raise the citizenship question?

18          MR. GARDNER:   Objection.   Lack of

19    foundation.

20          THE WITNESS:   Before you read that, yes,

21    I was aware of that.

22

601

1   BY MR. HO:

2        Q.   Okay.   When did you become aware -- so --

3   I'm sorry.   Let me start that question.

4            So your understanding is that, as of

5   September 8th, 2017, Justice staff did not want to

6   raise the citizenship question, correct?

7        A.   Yes, that's my understanding, although it

8   wasn't my understanding on September 8th; it was

9   an understanding that I acquired later.

10       Q.   When did you acquire the understanding

11   that, as of September 8th, Justice staff did not

12   want to raise the issue of a citizenship question?

13       A.   Again, I think it was along the same

14   timeline that I learned that these conversations

15   had taken place, the conversations referenced in

16   the first paragraph and the second paragraph

17   involving Mr. McHenry.   And I believe I became

18   aware of those sometime after September 8th and

19   before the letter was sent from the Department of

20   Justice.

21       Q.   How did you become aware of the fact

22   that, as of September 8th, 2017, the Department of

1    BY MR. HO:

2         Q.   When did you first become involved in

3    deliberations about whether or not to request a

4    citizenship question on the decennial census

5    questionnaire?

6         A.   I first became involved in either late

7    August or early September of 2017.

8         Q.   You can't get more precise than late

9    August or early September?

10        A.   Well, I think it was either a day or two

11   before Labor Day in 20 -- the Labor Day weekend in

12   2017 which I think that year may have fallen in

13   late August.

14        Q.   So as of September 8th, 2017, the date of

15   Mr. Comstock's memo, your best recollection is

16   that, as of that date, you were already involved

17   in deliberations over whether or not to include a

18   -- to request a citizenship question for the 2020

19   census questionnaire?

20        A.   That is correct.  And I don't know --

21   Mr. Comstock's memo is dated September 8th.  He

22   doesn't give any dates for any of these

Page 74

1   conversations, so I don't know if this memo was

2   contemporaneous to conversations or related back

3   to prior conversations he'd had.

4           But yes, that's my recollection, that, as

5   of September 8th, I would have been involved in

6   those deliberations.

7       Q.   How did you become involved in

8   deliberations over whether or not to request the a

9   citizenship question be included on the

10  2020 census questionnaire?

11          MR. GARDNER:   Objection.

12          To the extent that that answer would

13  cause you to reveal information subject to

14  deliberative process privilege, I instruct you not

15  to answer.  To the extent you can answer that

16  question without divulging such information, you

17  may do so.

18          THE WITNESS:   I became involved through a

19  conversation I had with two individuals at the

20  Department of Justice.

21  BY MR. HO:

22      Q.   Which two individuals at the Department

 1    of Justice?

 2        A.   The attorney general and Mary Blanche

 3    Hankey.

 4        Q.   Roughly when did your conversations with

 5    Mary Blanche Hankey and the attorney general

 6    occur?

 7            MR. GARDNER:   Objection.   Compound.

 8            THE WITNESS:   It was the day or two

 9    before the Labor Day weekend.   The reason I

10    remember that is that the attorney general is a

11    college football fan, and he's a fan of the Auburn

12    Tigers, so I ended the call with the cry for War

13    Eagle, since the Auburn Tigers were playing their

14    first game of the season that weekend.

15    BY MR. HO:

16        Q.   What was communicated to you during that

17    conversation with Attorney General Sessions?

18            MR. GARDNER:   Objection.   Calls for

19    information subject to deliberative process

20    privilege.

21            I instruct you not to answer.

22            THE WITNESS:   Consistent with that

Page 77

1    ask the question when was the decision made, I can

2    let him answer that question.  I'm not trying to

3    be difficult.  I just need to be careful here.

4    BY MR. HO:

5         Q.   Had the decision already been made as of

6    the date of your conversation with Attorney

7    General Sessions to request a citizenship question

8    be included on the 2020 census questionnaire?

9         A.   The decision was made when the letter was

10   sent in December of 2017.

11        Q.   As of the date of Mr. Comstock's memo,

12   September 8th, 2017, did you already have a view

13   as to whether or not CVAP data based on

14   statistical estimates were problematic in any way

15   for purposes of VRA enforcement?

16        A.   I was generally aware of issues related

17   to ACS data from my prior work on cases involving

18   Section 2 of the Voting Rights Act and cases

19   involving gerrymandering claims under Shaw versus

20   Reno.  And I was aware that there were some

21   limitations on the ACS data from that prior work.

22        Q.   As of the date of your first conversation

1    with Attorney General Sessions, did you already

2    have a few that hard count CVAP data would better

3    suit DOJ's needs with respect to VRA enforcement

4    than ACS estimates?

5         A.   No, I don't believe I did.

6         Q.   When did you arrive at the view that

7    hard count decennial census data with respect to

8    citizenship would better suit DOJ's VRA

9    enforcement needs as compared to ACS citizenship

10   estimates?

11        A.   I'm sorry.  Your question was when?

12        Q.   Yes.

13        A.   Sometime before the letter was sent.

14        Q.   Can you give a more specific time frame

15   than that?

16        A.   Probably not.

17        Q.   How did you arrive at the view that

18   hard count citizenship data collected through the

19   decennial census would better suit DOJ's

20   enforcement needs than ACS estimates?

21             MR. GARDNER:  Objection.  Calls for

22   information subject to deliberative process

```
1    privilege.  I instruct the witness not to answer.
2    BY MR. HO:
3         Q.  As of the date of your conversation with
4    Attorney General Sessions, did you already have
5    the view that the decennial census questionnaire
6    would be the best vehicle for collecting CVAP data
7    for purposes of VRA enforcement?
8         A.  I don't recall having a view on that one
9    way or the other as of that time.
10        Q.  As of the date of Mr. Comstock's memo
11   on September 8th, 2017, did you already have the
12   view that the decennial census would be the best
13   vehicle for collecting CVAP data for purposes of
14   VRA enforcement?
15        A.  I don't recall having a view on that
16   issue one way or the other.
17        Q.  Let me show you a document.  We'll mark
18   this as Exhibit 5.
19             (Gore Deposition Exhibit 5 marked for
20             identification and attached to the
21             transcript.)
22
```

Page 83

```
 1   right.  I could be off by a week or two.  So it
 2   may have happened later.  So I don't know exactly
 3   how that would align in time with this
 4   September 11th communication.
 5           But I would say that it was -- so I stand
 6   on that answer.
 7       Q.  So that communication between the
 8   Secretary of Commerce and the attorney general,
 9   that was initiated by the Secretary of Commerce,
10   correct?
11           MR. GARDNER:  Objection.  Lack of
12   foundation.
13           THE WITNESS:  I don't know.  I wasn't a
14   party to that conversation.
15   BY MR. HO:
16       Q.  You mentioned you had a conversation with
17   the attorney general around Labor Day.  Did you
18   understand from that conversation that the
19   Secretary of Commerce initiated the conversation
20   between the Secretary of Commerce and the attorney
21   general?  Correct?
22       A.  That's been my working understanding.
```

Page 84

1    Yes.

2         Q.   Your working understanding is not that

3    the attorney general initiated a conversation with

4    the Secretary of Commerce about the citizenship

5    question, correct?

6         A.   That's correct.

7         Q.   You responded to Mr. Gary's e-mail by

8    asking him to give you a call.  Did you have a

9    conversation with Mr. Gary?

10        A.   I don't know.  I don't know if I had a

11   conversation with him with specific reference to

12   this e-mail.  I can't -- I don't recall that.

13        Q.   After receiving this e-mail, did you

14   learn more from Mr. Gary about what he was

15   referring to when he talked about concerns that

16   the Commerce Secretary had?

17        A.   I don't recall -- as I said, I don't

18   recall discussing this with Mr. Gary.  Obviously,

19   we had some short e-mail correspondence, as this

20   document lays out, but that's all I recall about

21   it at this time.

22        Q.   Mr. Gary said in this e-mail that he

Page 91

```
 1   BY MR. HO:

 2        Q.   Anyone who works in the front office of

 3   the Department of Commerce.  Were you ever

 4   consulted by front office Department of Commerce

 5   employees -- that's what I mean by Secretary Ross'

 6   staff --

 7        A.   Okay.

 8        Q.   -- regarding whether the Department of

 9   Justice would support or request the inclusion of

10   a citizenship question on the census?

11            MR. GARDNER:  Same objection.

12            THE WITNESS:  I guess I'm still not clear

13   on what you mean by the front office of the

14   Department of Commerce.  I can recall speaking to,

15   I believe, three individuals at the Department of

16   Commerce about this issue.

17   BY MR. HO:

18        Q.   Who are the three individuals at the

19   Department of Commerce --

20        A.   Sure.

21        Q.   -- that you spoke to about the

22   citizenship question on the census?
```

Page 92

1      A.  I didn't mean to cut you off, and I

2   apologize, again, to the court reporter for being

3   a fast talker.

4           I recall speaking to Peter Davidson,

5   James Uthmeier, U-T-H-M-E-I-E-R -- and Wendy

6   Teramoto.

7      Q.  When was the first occasion on which you

8   consulted with one of those three individuals

9   about the inclusion of a citizenship question on

10  the census?

11     A.  I'm not sure I would describe it as a

12  consultation as much as I would describe it as a

13  conversation about various issues related to the

14  reinstatement of a citizenship question on the

15  census questionnaire.  I can recall having

16  conversations starting sometime around this

17  September 2017 time frame.

18     Q.  Who was the first of those three

19  individuals that you had a conversation with about

20  the inclusion of a citizenship question on the

21  2020 census?

22     A.  Peter Davidson.

Page 93

1      Q.   And roughly when was your first
2  conversation with Peter Davidson about including a
3  citizenship question on the 2020 census?
4      A.   I don't recall exactly, but I would say
5  it was probably around mid-September of 2017 or
6  somewhere in that time frame.
7      Q.   After you spoke to Mr. Davidson in
8  mid-September, what was the next conversation that
9  you had among those three individuals from
10  Commerce about the citizenship question?
11      A.   I don't recall exactly when it was.  I
12  had several conversations with Peter Davidson
13  beginning in September and continuing through
14  December.  I had a couple of conversations as well
15  with Mr. Uthmeier, including at least one between
16  just Mr. Uthmeier and me and one, and maybe two,
17  where Mr. Uthmeier and Peter Davidson were both
18  involved.  Then I had a conversation at one point
19  with Wendy Teramoto about a scheduling issue that
20  I think took place in October of 2017, but I don't
21  recall exactly.  Somewhere in that time frame.
22      Q.   Roughly when was your first conversation

Page 94

1   with Mr. Uthmeier about the citizenship question?

2        A.   I think it would have been either late

3   September or sometime in October of 2017.

4        MR. HO:   We've been going for a little

5   over an hour, about an hour-ten.   Would now be an

6   okay time for a first break?

7        MR. GARDNER:   That's fine with me, yeah.

8        MR. HO:   Great.

9        VIDEO TECHNICIAN:   This concludes media

10  unit number 1.   The time on the video is

11  10:19 a.m.   And we are off the record.

12        (A recess was taken.)

13        VIDEO TECHNICIAN:   This begins media unit

14  number 2.   The time on the video is 10:37 a.m.   We

15  are on the record.

16  BY MR. HO:

17        Q.   Mr. Gore, I just want to follow up

18  on something from before the break.   The

19  communications between the Department of Justice

20  and the Department of Commerce about the

21  citizenship question, those communications were

22  not initiated by the voting section, correct?

1        A.   That's correct.   That's my understanding.

2        Q.   And those communications were not

3    initiated by anyone else in the civil rights

4    division, correct?

5        A.   Correct.

6        Q.   And you did not initiate the

7    communications between Commerce and Justice about

8    the citizenship question, correct?

9        A.   That's correct.

10           (Gore Deposition Exhibit 6 marked for

11           identification and attached to the

12           transcript.)

13   BY MR. HO:

14       Q.   In front of you is a document that's been

15   marked as Exhibit 7.   It's an e-mail thread

16   between, among other people, you, Macie Leach, and

17   Wendy Teramoto.   The first page of the document is

18   Bates marked 0002628.   It's from the

19   administrative record.

20           MR. GARDNER:   I think you may have said

21   Exhibit 7.   It's Exhibit 6.

22           MR. HO:   Oh, I'm so sorry.   Exhibit 6.

1   Thank you for clarifying, Josh.

2        MR. GARDNER:  Sure.

3   BY MR. HO:

4        Q.  The first e-mail on this thread is on the

5   second page -- first in time, I mean.  It's from

6   you to Wendy Teramoto on Wednesday,

7   September 13th, 2017, correct?

8        A.  It appears to be.  Yes.

9        Q.  And that's two days after your exchange

10  with Mr. Gary regarding 2020 census questions,

11  correct?

12       A.  Correct.

13       Q.  And at the time that you sent this

14  e-mail, you knew that Ms. Teramoto was the chief

15  of staff to Commerce Secretary Ross, correct?

16       A.  Correct.

17       Q.  In the second sentence of your e-mail to

18  Ms. Teramoto, you write, "I would like to talk to

19  you about a DOJ-DOC issue," correct?

20       A.  Correct.

21       Q.  The DOJ-DOC issue that you're referring

22  to in this e-mail is the citizenship question,

1    correct?

2         A.   Correct.

3         Q.   What prompted you to reach out to

4    Ms. Teramoto to talk to her about the citizenship

5    question?

6              MR. GARDNER:   Objection.

7              To the extent that that answer calls for

8    the divulsion of information subject to

9    deliberative process privilege, I instruct you not

10   to answer.   To the extent you can answer that

11   question without divulging such information, you

12   may do so.

13             THE WITNESS:   It was a conversation I had

14   with Peter Davidson.

15   BY MR. HO:

16        Q.   When was that conversation with

17   Mr. Davidson?

18        A.   I don't recall exactly.

19        Q.   And what is Mr. Davidson's role at

20   Commerce?

21        A.   I don't know what his current role is.

22   At the time, I understood him to be the general

Page 98

1    counsel of the Department of Commerce.

2         Q.   How did you come to talk to Mr. Davidson?

3         A.   He called me.

4         Q.   Did you know Mr. Davidson prior to that

5    call?

6         A.   No.

7         Q.   Roughly when did that conversation with

8    Mr. Davidson take place?

9         A.   As I mentioned before, I had several

10   conversations with Mr. Davidson over time.  I

11   don't know when exactly any of those conversations

12   took place, and I don't know when this particular

13   conversation took place.

14        Q.   And Mr. Davidson asked you to reach out

15   to Ms. Teramoto?

16        A.   Yes, he did.

17        Q.   Why did he ask you to reach out to

18   Ms. Teramoto?

19             MR. GARDNER:  Objection.  To the extent

20   that that answer calls for disclosing information

21   subject to deliberative process privilege, I

22   instruct the witness not to answer.

Page 101

1  was to be about the citizenship question, correct?

2      A.  That, I don't know.

3      Q.  Well, the scheduling of that conversation

4  that you were supposed to take part of [sic] came

5  out of your e-mail to Ms. Teramoto about the

6  citizenship question, correct?

7      A.  I was not to take part in that

8  conversation.  I never did take part in that

9  conversation, so I don't know.

10      Q.  I meant the conversation between you and

11  Ms. Teramoto to schedule a meeting between the

12  attorney general and the Commerce Secretary, that

13  conversation that you had with Ms. Teramoto arose

14  out of your e-mail to Ms. Teramoto concerning the

15  citizenship question, correct?

16      A.  That sounds right.  I can't remember

17  whether we discussed exactly what the call between

18  the attorney general and the Secretary would be

19  about, is what I'm trying to convey.

20          (Gore Deposition Exhibit 7 marked for

21          identification and attached to the

22          transcript.)

Page 102

1   BY MR. HO:

2        Q.   Okay.   I'm going to show you an e-mail

3   that's been marked as Exhibit 7.   It's an e-mail

4   exchange between, among other people, you and

5   Ms. Teramoto.   The first page of it bears the

6   Bates number 0002657.   The top e-mail on the chain

7   is dated 9/16/2017 from Danielle Cutrona to you,

8   Mr. Gore, with a cc to Ms. Teramoto.   It's part of

9   the administrative record.

10            This e-mail thread -- or the top e-mails

11  on this thread, these are subsequent to the e-mail

12  that we talked about earlier between you and

13  Ms. Teramoto, correct?

14        A.   Correct.

15        Q.   And these -- the top e-mails took place

16  after your conversation with Ms. Teramoto,

17  correct?

18        A.   Correct.

19        Q.   And you, after speaking with

20  Ms. Teramoto, then introduced her to Danielle

21  Cutrona from the Department of Justice, correct?

22        A.   That's correct.

1    Q.  And Ms. Cutrona was a senior advisor to

2  the attorney general at this time, correct?

3    A.  That's probably a fair characterization,

4  yeah.

5    Q.  Prior to when Attorney General Sessions

6  became attorney general, Ms. Cutrona worked for

7  him previously in the Senate as his counsel on the

8  judiciary committee, correct?

9        MR. GARDNER:  Objection.  Lack of

10  foundation.

11        THE WITNESS:  I do know that she worked

12  for him.  I don't know what her title was.

13  BY MR. HO:

14    Q.  And Ms. Cutrona also served on the Trump

15  transition team in charge o immigration reform and

16  building the wall, correct?

17        MR. GARDNER:  Same objections.  Same

18  objection.

19        THE WITNESS:  I actually don't know.

20  BY MR. HO:

21    Q.  To your knowledge, Ms. Cutrona has no

22  experience with enforcing Section 2 of the Voting

Page 104

1    Rights Act, correct?

2           A.   I don't know one way or the other.

3           Q.   You're not aware of any experience that

4    Ms. Cutrona has with respect to enforcing

5    Section 2 of the Voting Rights Act, correct?

6           A.   That's correct.

7           Q.   Did Ms. Teramoto and Ms. Cutrona connect

8    after this e-mail exchange?

9           A.   I believe that they did.

10          Q.   How do you know that?

11          A.   Because I believe that Danielle let me

12   know that they had.

13          Q.   What knowledge do you have of what they

14   discussed?

15               MR. GARDNER:   Objection.

16               To the extent you can answer that

17   question without divulging information subject to

18   deliberative process privilege, you may do so.

19   Otherwise, I instruct you not to answer.

20               THE WITNESS:   Consistent with that

21   instruction, I can't answer.

22

Page 105

1    BY MR. HO:

2         Q.   I'm going to show you another document.

3    We'll mark this as Exhibit 8.

4              (Gore Deposition Exhibit 8 marked for

5              identification and attached to the

6              transcript.)

7    BY MR. HO:

8         Q.   This is a continuation of the e-mail

9    chain between you and Ms. Cutrona and

10   Ms. Teramoto.   The first page of it has the Bates

11   number 0002653.   It's part of the administrative

12   record in this case.   And the e-mail at the top is

13   dated September 17th, 2017, from Ms. Cutrona to

14   Ms. Teramoto.

15             The e-mail from Ms. Cutrona to

16   Ms. Teramoto at the top reads, "Wendy, the

17   attorney general is available on his cell.   His

18   number is" -- and then the number is redacted.

19   "He is in Seattle, so he's three hours behind us.

20   From what John told me, it sounds like we can do

21   whatever you all need us to do and the delay was

22   due to a miscommunication.   The AG is eager to

Page 106

1    assist."

2              So you had a conversation with

3    Ms. Cutrona, correct?

4         A.   Yes.

5         Q.   And when Ms. Cutrona in this e-mail

6    writes, "from what John told me," what is she

7    referring to?  What did you tell Ms. Cutrona?

8              MR. GARDNER:  Objection.  To the extent

9    that information would be subject to deliberative

10   process privilege, I instruct the witness not to

11   answer.

12             To the extent you can answer that without

13   divulging such privileged information, you may do

14   so.

15             THE WITNESS:  Consistent with that

16   instruction, I can't do so.

17             MR. HO:  I just want to understand the

18   position here.  The conversation and -- the

19   content of the conversation is referenced in the

20   administrative record.  The court has granted our

21   motion to compel Mr. Gore's testimony based on his

22   role in the request to include a citizenship

1   BY MR. HO:

2       Q.  When Ms. Cutrona writes, "We are eager to

3   assist," what did you understand her to mean by

4   "assist"?

5           MR. GARDNER:  Same objection.  Same

6   instruction.

7           THE WITNESS:  Consistent with that

8   instruction, I can't answer.

9   BY MR. HO:

10      Q.  What was your reaction to receiving this

11  e-mail?

12          MR. GARDNER:  Objection.  Lack of

13  foundation.

14          THE WITNESS:  I'm not sure I ever did

15  receive this e-mail.  I'm not copied on this

16  e-mail between Wendy and Danielle.

17  BY MR. HO:

18      Q.  Okay.  I'm going to show you another

19  document.  We'll mark this as Exhibit 9.

20          (Gore Deposition Exhibit 9 marked for

21          identification and attached to the

22          transcript.)

Page 111

1   BY MR. HO:

2       Q.   This is another e-mail from the

3   administrative record, the first page of which --

4   the only page of which has Bates number 0002636.

5   The top e-mail is an e-mail to you dated

6   September 18th, 2017.   September 18th, 2017,

7   that's two days after you connected Ms. Teramoto

8   and Ms. Cutrona, correct?

9       A.   That seems to be correct.   Yes.

10      Q.   And the e-mail to you states, "Hi.   AG

11  and Sec spoke.   Please let me know when you have a

12  minute."

13          What did you understand that to mean, AG

14  and Sec spoke?

15      A.   I understood it to mean what it says it

16  means, that the attorney general and the Secretary

17  spoke.

18      Q.   Secretary Ross, right?

19      A.   Secretary Ross.   Yes.

20      Q.   Okay.   What did you understand that they

21  had spoken about?

22          MR. GARDNER:   Objection.   Calls for

1   information subject to deliberative process

2   privilege.  I instruct the witness not to answer.

3           THE WITNESS:  Consistent with that

4   instruction, I can't answer.

5   BY MR. HO:

6       Q.   I'm not asking for the content of the

7   conversation, just whether or not they spoke about

8   the citizenship question.   Is that your

9   understanding?

10      A.   Yes, that would be my understanding.

11      Q.   What significance, if any, did you take

12  from the fact that the attorney general and the

13  Secretary of Commerce had spoken about the

14  citizenship question?

15          MR. GARDNER:  Objection.  Vague.

16          THE WITNESS:  I'm not sure I assigned any

17  significance to it.  I understood from this e-mail

18  chain that the Secretary was interested in

19  speaking to the attorney general.

20  BY MR. HO:

21      Q.   What reaction, if any, did you have to

22  the fact that the attorney general and

1    Secretary Ross and the Attorney General spoke?

2         A.   Are you referring to the conversation

3    between the attorney general and the Secretary

4    that's documented here on September 18th?

5         Q.   Yes.  Ms. Teramoto, after telling you

6    that the Attorney General and the --

7    Secretary Ross spoke, says -- or writes, please --

8    let me know when you have a minute."

9              Did you follow up with Ms. Teramoto to

10   have a conversation with her --

11        A.   I see.

12        Q.   -- after this e-mail?

13        A.   I don't recall.

14        Q.   Let me show you another document.  We'll

15   mark this as Exhibit 10.

16             (Gore Deposition Exhibit 10 marked for

17             identification and attached to the

18             transcript.)

19   BY MR. HO:

20        Q.   This is an e-mail to you dated

21   September 22nd, 2017.  Just so the record is

22   clear, this was produced to us in discovery.  The

802

802

1    electronic version has a file name that's stamped

2    DOJ 30651, but the document itself does not bear a

3    Bates number.

4            Mr. Gosre, this is an e-mail to you from

5    Camille Legore-Traore, correct?

6        A.   Legore-Traore is I believe how she says

7    it, but yes.

8        Q.   And it's dated September 22nd, 2017?

9        A.   Correct.

10       Q.   And this e-mail informs you that James

11   Uthmeier from the Department of Commerce called to

12   speak with you, correct?

13       A.   That's correct.

14       Q.   Okay.  Prior to this e-mail, September

15   22nd, 2017, had you spoken with Mr. Uthmeier about

16   the citizenship question?

17       A.   I don't recall.

18       Q.   You and Mr. Uthmeier had been colleagues

19   at Jones Day, correct?

20       A.   Correct.

21       Q.   You knew each other from your time there,

22   correct?

1      A.  Yes.

2      Q.  Since -- did you socialize with

3  Mr. Uthmeier?

4      A.  Not regularly, no.

5      Q.  But at some point, if not regularly, you

6  socialized with him?

7      A.  I might have spent time with him at

8  events sponsored by the law firm.

9      Q.  Between the time that you became a DOJ

10  employee and the date that you received this

11  e-mail, September 22nd, 2017, did you have any

12  other conversations with Mr. Uthmeier?

13      A.  Not that I can recall.

14      Q.  And at the time Mr. Uthmeier -- of this

15  e-mail -- at the time of this e-mail, Mr. Uthmeier

16  worked in the general counsel's office in the

17  Commerce Department, correct?

18      A.  That's correct.

19      Q.  To the best of your knowledge,

20  Mr. Uthmeier does not have any Voting Rights Act

21  enforcement responsibilities, correct?

22      A.  Correct.

Page 118

1        Q.   And to the best of your knowledge,

2   Mr. Uthmeier does not have any experience

3   enforcing the Voting Rights Act, correct?

4        A.   That is correct as well.   Yeah.

5        Q.   Did you ever return Mr. Uthmeier's call?

6        A.   Yes.   I believe I did.

7        Q.   Roughly when?

8        A.   Sometime around when I received this

9   message.   I can't remember if it was that day or

10   the following week.

11        Q.   Roughly how long did you speak with

12   Mr. Uthmeier?

13        A.   Not particularly long.   Maybe 15 or

14   20 minutes.

15        Q.   Did you talk to him about the citizenship

16   question?

17        A.   Yes, among other things.

18        Q.   At some point you received a note and a

19   memo from Mr. Uthmeier concerning the citizenship

20   question, correct?

21        A.   That's correct.

22        Q.   Was the note handwritten?

Page 119

1        A.   Yes, it was.

2        Q.   How was the note transmitted to you?

3        A.   Along with the memo, it was delivered to

4   my office.

5        Q.   When did you receive the note and memo?

6        A.   I don't recall exactly.

7        Q.   Was it after receiving this phone call to

8   your office from Mr. Uthmeier on September 22nd,

9   2017?

10        A.   I believe so, yes.

11        Q.   Was it before the Department of Justice

12   sent its letter to the Census Bureau on

13   December 12th, 2017, requesting the citizenship

14   question?

15        A.   Yes.

16        Q.   You showed that note to other people,

17   right?

18        A.   Yes.

19        Q.   Who did you show that note to?

20        A.   I showed it to -- I know I've shown it to

21   Kathleen Toomey in the civil rights division as

22   part of the document collection.  And I understand

Page 120

1    that it was shown to a couple of other people in

2    the civil division who are responsible for

3    litigating this case on behalf of the United

4    States.

5           I don't recall showing it to anyone else.

6       Q.   Do you know if anyone to whom you showed

7    the note showed it to anyone else?

8       A.   I don't.

9       Q.   Did you ever have any discussions with

10   anyone about the note?

11      A.   No, I don't believe so.

12      Q.   You just showed it to some people, but

13   you never discussed it?

14      A.   Well, I showed it to them after receiving

15   a document request in this litigation and I gave

16   it to them as part of the collection of documents

17   responsive to that -- potentially responsive to

18   that request.

19           I may have had a question with Ben

20   Aguinaga about it, but I don't recall.

21      Q.   Did the note solicit legal advice from

22   you?

Page 121

1        A.  No.

2        Q.  And you didn't provide legal advice in

3   response to that note, correct?

4        A.  I believe I may have, actually.

5        Q.  You testified earlier you weren't

6   providing legal advice in connection to the

7   citizenship question, I thought.

8            MR. GARDNER:  Objection.

9   Mischaracterizes the witness' prior testimony.

10           THE WITNESS:  I don't believe that was my

11  testimony.

12  BY MR. HO:

13       Q.  Okay.  So you think you did provide legal

14  advice to Mr. Uthmeier in response to the memo?

15       A.  Now you've changed the question.

16       Q.  Yeah.

17       A.  No, I didn't provide legal advice to

18  Mr. Uthmeier.

19       Q.  Did you provide legal advice to the

20  Department of Commerce in response to the note

21  from Mr. Uthmeier?

22       A.  I did -- I did discuss -- now that you

Page 122

1   mention it, I did discuss the note with

2   Mr. Uthmeier and Mr. Davidson.

3        Q.  Did you provide legal advice to the

4   Department of Commerce in connection with the note

5   from Mr. Uthmeier?

6        A.  Yes.

7        Q.  At this point were you anticipating

8   litigation over the possibility of including a

9   citizenship question in the census?

10       A.  I'm sorry.  Can you say that again?

11       Q.  At this point --

12       A.  Right.

13       Q.  -- when you received the handwritten note

14   from Mr. Uthmeier, were you anticipating

15   litigation over the possibility of the inclusion

16   of the citizenship question on the census?

17       A.  Absolutely.

18       Q.  Did the -- was the note shared with you

19   in anticipation of litigation over the citizenship

20   question?

21            MR. GARDNER:  Objection.  Lack of

22   foundation.  Calls for speculation.

601

Page 123

601

1    BY MR. HO:

2         Q.   If you know.

3         A.   That would be speculating.   I don't know.

4         Q.   Did the note state one way or the other

5    whether or not it was prepared in anticipation of

6    litigation?

7         A.   I don't recall that it did.

8         Q.   And did the note state one way or the

9    other whether or not it was requesting legal

10   advice from you?

11        A.   Yes, it did.

12        Q.   And your answer is it was requesting

13   legal advice, the note?

14        A.   Yes.

15        Q.   Did you -- let me start this again.

16             Did the Department of Justice rely on

17   that note in drafting its request to the Census

18   Bureau to include a citizenship question on the

19   census?

20             MR. GARDNER:   Objection.   Vague.

21             THE WITNESS:   The note contained

22   information regarding that issue that was

1  considered by the Department of Justice in

2  drafting its request.

3  BY MR. HO:

4      Q.  Does inform -- did -- does any

5  information contained on that note appear in the

6  Department of Justice's letter to the Department

7  of -- to the Census Bureau requesting a

8  citizenship question on the 2020 census?

9          MR. GARDNER:  Objection to the extent

10 that that calls for the disclosure of information

11 that may be subject to deliberative process

12 privilege.

13         To the extent you can answer that

14 question without divulging that, you may.

15 Otherwise, I instruct you not to answer.

16         THE WITNESS:  Consistent with that

17 instruction, I can't answer that question.

18         MR. HO:  Just so I understand the

19 position, even if information from that was on

20 that letter that became public, your position is

21 that's protected from my question about whether or

22 not --

Page 125

1          MR. GARDNER:  Your question wasn't

2    whether it was expressly incorporated by reference

3    in the letter, at which point I would agree with

4    you that that would waive the privilege.  You just

5    asked if information in that letter was somehow

6    used in forming the letter.  That is classic

7    deliberative process protection.

8          MR. HO:  I don't think that was my

9    question, but I'll ask a question that --

10         MR. GARDNER:  Ask it again.

11   BY MR. HO:

12      Q.  Does information on the handwritten note

13   from Mr. Uthmeier appear in the Department of

14   Justice's letter requesting a citizenship question

15   on the 2020 census questionnaire?

16         MR. GARDNER:  Same objection.  Same

17   instruction.

18         THE WITNESS:  Consistent with that

19   instruction, I can't answer.

20         (Gore Deposition Exhibit 11 marked for

21         identification and attached to the

22         transcript.)

Page 126

802

1   BY MR. HO:

2         Q.   This is marked as Exhibit 11.   This is an

3   e-mail to you -- from you to Mr. Herren -- Chris

4   Herren, sorry -- dated November 1st, 2017, with a

5   cc to Ben Aguinaga, correct?

6         A.   That is correct.

7         Q.   Chris Herren is the chief of the voting

8   section, correct?

9         A.   Yes.   And a great lawyer.

10        Q.   The subject line of your e-mail is,

11   Confidential and closehold draft letter, correct?

12        A.   That's correct.

13        Q.   And in your e-mail to Mr. Herren you say

14   that the draft letter is attached, correct?

15        A.   Correct.

16        Q.   Did you write the draft letter that is

17   attached to this e-mail?

18        A.   Yes, I did.

19        Q.   The draft letter that is attached to this

20   e-mail is an early draft of the December 12th

21   letter from the Department of Justice to the

22   Census Bureau requesting a citizenship question on

Page 127

802

1   the 2020 census questionnaire, correct?

2       A.  Correct.

3       Q.  Is it fair to say that you wrote the

4   first draft of the letter from the Department of

5   Justice to the Census Bureau requesting a

6   citizenship question on the 2020 census

7   questionnaire?

8       A.  Is that a question?  I'm sorry.  That

9   sounded like a statement.

10      Q.  No.  It was a question.

11      A.  Okay.

12      Q.  Is it fair to say that you wrote the

13  first draft of the letter from the Department of

14  Justice to the Census Bureau requesting a

15  citizenship question on the 2020 census

16  questionnaire?

17      A.  Yes.

18      Q.  You write in this e-mail that you

19  discussed the draft letter with Mr. Herren

20  yesterday.

21          Would that have been your first

22  conversation with Mr. Herren about the citizenship

Page 128

1    question on the census?

2          A.  I don't recall.

3          Q.  When was your first conversation, if you

4    recall, with Mr. Herren about the citizenship

5    question on the census?

6          A.  I don't recall.

7          Q.  Did you have any conversations with

8    Mr. Herren about the citizenship question before

9    you sent this letter to him?

10          A.  Yes.

11          Q.  How many conversations did you have with

12    Mr. Herren before you sent the draft of the letter

13    to him?

14          A.  I don't recall exactly.  It would have

15    been a few.

16          Q.  More than one?

17          A.  Yes.

18          Q.  Days before you sent him the letter?

19    Weeks before?  Months before?  Do you have a

20    recollection about approximate time?

21          A.  I don't have an exact recollection.  I

22    would say in the days before I sent him the

Page 129

 1    letter.

 2         Q.   Were those conversations in person or by

 3    phone?

 4         A.   I can recall conversations by phone.  And

 5    there may have been conversations in person.  I

 6    can't recall.

 7         Q.   Did you have more than five conversations

 8    with Mr. Herren about the citizenship question?

 9         A.   At what time?

10         Q.   Before you sent him the draft letter.

11         A.   Probably not.

12         Q.   So more than one but fewer than five

13    conversations about the citizenship question

14    before you sent him the draft letter?

15         A.   Sounds about right.

16         Q.   You describe this as confidential and

17    closehold.

18              What do you mean by confidential and

19    closehold?

20         A.   I meant that Mr. Herren should review the

21    letter and this was not for broad dissemination,

22    as it represented a draft.  And I had asked him to

Page 130

 1    take a look at it.

 2         Q.   When you say confidential and closehold,

 3    does that mean that Mr. Herren was not permitted

 4    to share the draft letter with anyone?

 5         A.   No.   It meant that if he was interested

 6    in sharing the draft letter with someone, he could

 7    ask me if he was allowed to do that.

 8         Q.   So your understanding was that Mr. Herren

 9    should ask you before sharing any drafts of the

10    letter with anyone?

11         A.   I believe my understanding was that he

12    should communicate with me if he wanted to share

13    this particular draft with anyone.

14         Q.   Did Mr. Herren ever communicate with you

15    that he wanted to share the draft letter with

16    anyone?

17         A.   I can't recall.

18         Q.   Do you know whether or not Mr. Herren

19    shared this draft letter with anyone?

20         A.   I don't.

21         Q.   Do you know if Mr. Herren discussed the

22    issues in the draft letter with anyone?

1    A.  Whether he discussed the issues in the

2    draft letter?  At what time?

3    Q.  Around the time that you sent the copy of

4    the draft letter to him.

5    A.  Well, I know he discussed them with me.

6    Other than that, I don't know.

7    Q.  Do you know if Mr. Herren discussed the

8    issues raised in the draft letter with any voting

9    section personnel?

10   A.  I don't.

11   Q.  Why did you consider this letter to be

12   confidential and closehold?

13   A.  I considered it to be confidential and

14   closehold because it was a draft and related to an

15   issue that was important to people in the

16   department.

17   Q.  Did you not want it to become public

18   information that the Department of Justice at this

19   point was drafting a letter to request a

20   citizenship question on the 2020 census

21   questionnaire?

22        MR. GARDNER:  Objection to form.

Page 132

1          THE WITNESS:   I never want any of our

2     drafts to become public information unless

3     required by legal process because I believe that

4     the Department of Justice should facilitate robust

5     and open conversation and deliberations at all

6     level before a decision is made.

7     BY MR. HO:

8          Q.   I didn't ask if you wanted the draft to

9     not become public.   I just asked if you wanted the

10    fact that the Department of Justice was drafting a

11    letter to request a citizenship question on the

12    2020 census questionnaire, if you wanted that fact

13    to remain non-public at this time.

14          A.   I would have preferred that that fact

15    remain non-public because the final letter hadn't

16    been issued and no final decision had yet been

17    made about it.

18              (Gore Deposition Exhibit 12 marked for

19               identification and attached to the

20               transcript.)

21    BY MR. HO:

22          Q.   I'm going to show you a document.   We've

1   marked this as Exhibit 12.  This has Bates number

2   DOJ 00003740.  It was produced to us in discovery.

3   The top e-mail is from Ben Aguinaga on November

4   3rd to Bethany Pickett.

5         Here, Mr. Aguinaga is forwarding the

6   e-mail that you sent to Mr. Herren with the draft

7   letter to Bethany Pickett, correct?

8         A.  That appears to be correct, yes.

9         Q.  Did you authorize Mr. Aguinaga to send

10  the draft letter that you had sent to Mr.  -Herren

11  to forward that to Bethany Pickett?

12        A.  Yes.

13        Q.  Now, at the time, Mr. Aguinaga and

14  Ms. Pickett both worked with you in the front

15  office of the civil rights division, correct?

16        A.  That's correct.

17        Q.  Both of them were political hires rather

18  than career staff, correct?

19        A.  Correct.

20        Q.  And you hired both Mr. Aguinaga and

21  Ms. Pickett, correct?

22        A.  No, I did not.

Page 134

1      Q.   Who hired Mr. Aguinaga and Ms. Pickett?

2      A.   I believe it was my predecessor, Tom

3   Wheeler.

4      Q.   Both of them had been law clerks for

5   Judge Edith Jones on the Fifth Circuit, correct?

6      A.   That's correct.

7      Q.   Just like Mr. Shumate, correct?

8      A.   I don't know.

9      Q.   Both of them graduated from law school in

10   2015 or more recently, correct?

11     A.   Sounds about right.

12     Q.   Before coming to the civil rights

13   division, neither Mr. Aguinaga nor Ms. Pickett had

14   any experience as counsel in cases under the

15   Voting Rights Act, correct?

16          MR. GARDNER:  Object to lack of

17   foundation.

18          THE WITNESS:  I don't know.

19   BY MR. HO:

20     Q.   You're not aware of any experience that

21   Mr. Aguinaga or Ms. Pickett had as counsel in

22   Voting Rights Act cases prior to them coming to

Page 135

1    the civil rights division, correct?

2            A.   That's correct.

3            Q.   You're not aware of any experience that

4    either Mr. Aguinaga or Ms. Pickett had assessing

5    the reliability of CVAP data for purposes of VRA

6    enforcement, correct?

7            A.   That's correct.

8                 (Gore Deposition Exhibit 13 marked for

9                 identification and attached to the

10                transcript.)

11   BY MR. HO:

12           Q.   I'll give you a document marked as

13   Exhibit 13.   This is an e-mail from Ms. Pickett to

14   you also on November 3rd, 2017, correct?

15           A.   Appears to be, yes.

16           Q.   Ms. Pickett writes to you, "I have

17   attached the letter that we discussed yesterday.

18   I would be happy to discuss this further.   Please

19   let me know if you have any questions regarding

20   any comments and edits."

21                It's accurate to say that Ms. Pickett

22   offered comments and edits to the draft of the

1   letter requesting a citizenship question on the

2   census that you had previously sent to Mr. Herren,

3   correct?

4        A.   Correct.

5        Q.   What were the substance of the

6   conversations that you had had with Ms. Pickett

7   about that letter?

8             MR. GARDNER:   Objection.   Calls for

9   information subject to deliberative process

10   privilege.   I instruct the witness not to answer.

11            THE WITNESS:   Consistent with that

12   instruction, I can't answer.

13   BY MR. HO:

14       Q.   What were the substance of her edits to

15   the draft of the letter?

16            MR. GARDNER:   Same objection.   Same

17   instruction.

18            THE WITNESS:   Consistent with that

19   instruction, I can't answer.

20   BY MR. HO:

21       Q.   Other than Ms. Pickett, Mr. Aguinaga, and

22   Mr. Herren, did you solicit input on the draft

Page 137

1   letter from anyone else within the civil rights

2   division?

3        A.   Not that I can recall.

4        Q.   Other than Ms. Pickett, Mr. Aguinaga, and

5   Mr. Herren, did you receive input on the draft

6   letter from anyone else within the civil rights

7   division?

8        A.   Not that I can recall.

9        Q.   Sometime after you wrote the first draft

10  of this e-mail, you had a conversation with Peter

11  Davidson at the Department of Commerce, correct?

12       A.   Yes.   That would be correct.

13       Q.   So sometime in November of 2017, you had

14  conversation -- you had a conversation with

15  Mr. Davidson about the citizenship question,

16  correct?

17       A.   Yes.   At some point I would have.

18       Q.   How many conversations did you have with

19  Mr. Davidson in November of 2017 about the

20  citizenship question?

21       A.   I don't recall exactly how many.

22       Q.   What, if anything, did you communicate to

Page 138

1    Mr. Davidson about the Department of Justice's

2    process for requesting a citizenship question on

3    the census during November of 2017?

4             MR. GARDNER:  Objection.  Vague.  Also

5    objection -- to the extent it calls for

6    information subject to deliberative process

7    privilege, I instruct you not to answer.  To the

8    extent you can answer that without divulging such

9    information, you may answer.

10            THE WITNESS:  Consistent with that

11   instruction, I can't answer.

12            (Gore Deposition Exhibit 14 marked for          802

13            identification and attached to the

14            transcript.)

15   BY MR. HO:

16       Q.  I show you a document that's been marked

17   as Exhibit 14.  It's an e-mail exchange between

18   you, Robert Troester, T-r-o-e-s-t-e-r, and

19   Rachael, spelled R-a-c-h-a-e-l, Tucker.

20            The top e-mail on the thread is

21   November 30th, 2017.  This was produced to us in

22   discovery.  The electronic version has DOJ 14798

Page 139

802

1    on it, although the hard copy doesn't have that

2    Bates number.

3            It we look at the bottom of this page,

4    the first e-mail on this thread is from you to

5    Ms. Tucker and Mr. Troester on November 27th,

6    2017, correct?

7        A.  That's correct.  Except that he

8    pronounces his last name Troester.

9        Q.  Troester.  Thank you.

10           You had a conversation on this day, the

11   same day, with Mr. Davidson, correct?

12       A.  On November 27th?

13       Q.  2017.  Correct?

14       A.  I don't recall that specifically, but

15   it's certainly possible.

16       Q.  Now, at this time, Ms. Tucker was counsel

17   in the front office of the attorney general,

18   correct?

19       A.  That's correct.

20       Q.  And Mr. Troester was associate deputy

21   attorney general, correct?

22       A.  That's my understanding, yes.

1    Q.  Okay.  Now, neither Ms. Tucker nor

2  Ms. [sic] Troester, as far as you're aware, had

3  any experience as counsel in Voting Rights Act

4  cases, correct?

5    A.  Mr. Troester -- yes.  That's correct.

6    Q.  What about Ms. Tucker?

7    A.  Also correct.  You called him

8  Ms. Troester, so -- sorry.

9    Q.  Thank you.

10    A.  But, yes, I was not aware that either had

11  any enforcement responsibility or experience with

12  respect to the Voting Rights Act.

13    Q.  And as far as you're aware, neither of

14  them had any experience assessing the reliability

15  of CVAP data used in Voting Rights Act litigation,

16  correct?

17    A.  Correct.

18    Q.  Ms. Tucker and Mr. Troester were both

19  political appointees in the Department of Justice

20  at this time, correct?

21    A.  That's correct for Ms. Tucker.  I believe

22  Mr. Troester was a career employee on detail to

Page 141

1    the office of deputy attorney general and had

2    served a long career in the Department of Justice

3    as an assistant United States attorney, and maybe

4    even more than once as the acting United States

5    attorney in his home state of Oklahoma.

6         Q.   In your e-mail to them on November 27th,

7    you wrote, "Attached please find the near final

8    draft of the letter to census on the citizenship

9    issue we discussed a couple of weeks ago."

10        So you had discussed the citizenship

11   issue with Ms. Tucker and Mr. Troester a few weeks

12   before the date of this e-mail, November 27th,

13   2017, correct?

14        A.   Correct.

15        Q.   When were your first conversations with

16   either Ms. Tucker or Mr. Troester about the

17   citizenship question?

18        A.   I don't recall specifically when they

19   were.  Probably in September of 2017 or early

20   October.  And I had a handful to several

21   conversations with each of them about that issue.

22        At the time, Ms. Tucker was responsible

Page 142

1    for the civil rights division portfolio in the

2    Office of Attorney General and Mr. Troester was

3    responsible for the civil rights division

4    portfolio in the Office of the Deputy Attorney

5    General.   So I had many conversations with them

6    over time about issues related to the civil rights

7    division.

8        Q.   You described the draft of the letter as

9    a near final draft, correct?

10        A.   Correct.

11        Q.   So fair to say that on November 27th,

12    2017, a decision had already been made to request

13    a citizenship question on the census?

14        A.   No, I don't think that's fair to say.

15        Q.   Okay.   Ms. Tucker and Mr. Troester both

16    offered you edits to the letter, correct?

17        A.   I believe that's correct.

18            (Gore Deposition Exhibit 15 marked for

19            identification and attached to the

20            transcript.)

21    BY MR. HO:

22        Q.   This is a document marked as Exhibit 15.

802

1          (Gore Deposition Exhibit 16 marked for

2          identification and attached to the

3          transcript.)

4     BY MR. HO:

5          Q.  Exhibit 16 is what I'm handing to you

6     now.  Another e-mail chain between you and

7     Mr. Gary.  The top e-mail on the thread is dated

8     December 8th, 2017.  The subject line of this is,

9     Request for citizenship information.December 8

10    red-line edits, 002.  Is that right?

11         A.  Appears to be right, yeah.

12         Q.  When you say leadership's final changes

13    in this e-mail in the second line -- you write,

14    "Attached is a red-line of a letter with

15    leadership's final changes" -- you're referring to

16    additional edits that you received from Ms. Tucker

17    and Mr. Troester, correct?

18         A.  Possibly.  I don't know exactly which

19    edits I'm referring to here.

20         Q.  Well, what were the final edits from

21    leadership?  I mean, who was leadership?  When you

22    wrote "leadership" here, who were you referring

1   to?

2       A.   I would have been referring to the

3   leadership offices at the Department of Justice,

4   which may have included the Office of Attorney

5   General, the Office of Deputy Attorney General,

6   and the Office of Associate Attorney General.

7       Q.   Is there anyone that you can think of who

8   was giving you edits in the last few days before

9   this letter was sent from any of those offices

10  other than Ms. Tucker and Mr. Troester?

11      A.   Not that I can specifically recall.

12      Q.   So fair to say, when you're referring to

13  leadership's final changes, you're referring to,

14  to the best of your recollection, some edits from

15  Ms. Tucker and Mr. Troester, correct?

16          MR. GARDNER:   Objection.

17  Mischaracterizes the witness' prior testimony.

18          THE WITNESS:   Yeah, I don't recall

19  whether they came from Ms. Tucker, Mr. Troester,

20  or somebody else.

21  BY MR. HO:

22      Q.   You write, "With these changes, we are

802

Page 147

802

1    authorized to send.   Sending on Monday is fine."
2         Did I read that correctly?
3    A.   That's correct.
4    Q.   Okay.   When you say, "authorized to
5    send," who provided authorization to send the
6    letter with those changes?
7    A.   I don't recall specifically who
8    communicated that.   It would have come from
9    someone in the leadership office.
10   Q.   Was it Ms. Tucker or Mr. Troester?
11   A.   Again, I don't recall specifically who it
12   was.
13   Q.   Was it Attorney General Sessions who gave
14   your authorization to send the letter with these
15   edits?
16        MR. GARDNER:   Objection.   Asked and
17   answered.
18        THE WITNESS:   Again, I don't recall
19   exactly who it was.
20   BY MR. HO:
21   Q.   When you say, "With these changes we are
22   authorized to send," on December 8th, 2017, when

Page 148

1    you wrote that, a decision had been made as of

2    December 8th, 2017, to send the citizenship

3    question -- the request for the citizenship

4    question as long as it had these changes, correct?

5        A.   No, I don't think that's correct.

6        Q.   You wrote, "With these changes, we are

7    authorized to send."

8        A.   That's correct.

9        Q.   So as soon as you made those changes to

10   that letter, you had authorization to send that

11   letter, correct?

12       A.   I believe we might have had authorization

13   to send, but it would have been my practice to

14   check in one last time before the letter was sent.

15       Q.   Okay.  You didn't have reason to believe

16   that you weren't authorized to send the letter

17   once you had made those changes as of

18   December 8th, 2017, right, Mr. Gore?

19       A.   I don't recall what I thought or didn't

20   think on December 8th of 2017.

21       Q.   Okay.  You didn't say in this e-mail to

22   Mr. Gary that you were going to check in again

Page 149

1    after you made these changes, did you?

2            MR. GARDNER:   Objection.

3    Mischaracterizes the document.

4            THE WITNESS:   I did not use those words

5    in that e-mail.

6    BY MR. HO:

7       Q.   You didn't tell Mr. Gary in this e-mail

8    that, after these changes were made, you would

9    have to check in with leadership one more time

10   before sending it, right?

11      A.   Again, I did not use those words in that

12   e-mail, but that's standard practice, certainly my

13   standard practice, and I believe the standard

14   practice of others at the Department of Justice.

15      Q.   You sent this e-mail on Friday,

16   December 8th, which means Monday would have been

17   Monday, December 11th, correct?

18      A.   That's correct.

19      Q.   And you wrote that sending on Monday,

20   which would have been December 11th, would be

21   fine, correct?

22      A.   Correct.  And what I was -- I believe I

Page 150

1   was conveying there is that Mr. Gary didn't need

2   to work late on a Friday night during the holiday

3   season to send the letter out.

4        Q.   So just so I understand the process here,

5   you had -- you first had communications about the

6   issue of a citizenship question sometime around

7   Labor Day of 2017, correct?

8        A.   Give or take, yes, that's correct.

9        Q.   You drafted the initial draft of the

10  letter to request the citizenship question

11  sometime around the end of October or early

12  November of 2017, correct?

13       A.   Correct.

14       Q.   The conversations to add the citizenship

15  question with the Department of Commerce were not

16  initiated by the civil rights division, correct?

17       A.   Correct.

18       Q.   And they were not initiated by the

19  Department of Justice, correct?

20       A.   That's my working understanding.

21       Q.   Around the time that you wrote the first

22  draft of this letter, you received input from

Page 151

1    three individuals:  Mr. Herren, Ms. Pickett, and

2    Mr. Gary, correct?

3        A.  Yes.  And I may have received input from

4    others as well.

5        Q.  Around the time of the first draft of the

6    letter in early November of 2017, who else did you

7    receive input from other than Mr. Herren,

8    Ms. Pickett, and Mr. Gary?

9        A.  Mr. Aguinaga would have provided -- may

10   have provided some input.  I would have had

11   discussions on -- regarding the letter generally

12   with Patrick Hovakimian, who at the time was

13   detailed to the Office of Associate Attorney

14   General, and with Jesse Panuccio in the Office of

15   the Associate Attorney General.

16           And I had various conversations with

17   others at various times throughout this process.

18   But I don't recall who else I would have spoken to

19   at that particular moment in time, around

20   November 1st of 2017.

21       Q.  Okay.  Around November 1st of 2017, the

22   only career staff in the civil rights division

1    from whom you received input on the letter was

2    from Mr. Herren, correct?

3         A.   That's correct.

4         Q.   After that period of early November

5    of 2017 when you had drafted the initial draft of

6    that letter, Mr. Herren gave you some edits,

7    correct?

8         A.   That's correct.

9         Q.   After that time, did you receive any

10   further edits from Mr. Herren to the draft letter?

11        A.   I don't recall one way or the other.

12        Q.   So you have no recollection of receiving

13   input from career civil rights division staff on

14   the letter requesting a citizenship question other

15   than that one occasion in early November around

16   the time of the first draft from Mr. Herren,

17   correct?

18        A.   I believe that's correct.  Yeah.

19        Q.   You continued to revise the letter after

20   early November of 2017 with input from different

21   people.  But after that first round of edits from

22   Mr. Herren, you received no subsequent edits from

Page 153

1  people who were career staff in the civil rights

2  division, correct?

3            MR. GARDNER:   Objection.   Compound.

4            THE WITNESS:   To the extent I understand

5  your question, I believe that's correct.

6  BY MR. HO:

7       Q.   During this period when you were revising

8  the letter to request a citizenship question, you

9  had multiple conversations with legal staff at the

10  Department of Commerce, correct?

11       A.   Yes.

12       Q.   And the edits that you were receiving to

13  the letter from other DOJ personnel included

14  political appointees in the front office of the

15  Department of Justice and in the front office of

16  the civil rights division, correct?

17       A.   I -- certainly that's correct with

18  respect to the leadership offices at the

19  Department of Justice.   I can't remember if I was

20  receiving edits from the front office of the civil

21  rights division at that time after receiving the

22  edits from Ms. Pickett.

1      Q.   Who made the final decision to send the

2   letter requesting the citizenship question be

3   added to the 2020 census questionnaire?

4      A.   I'm not sure I know.   And I can't recall

5   who communicated the final decision to me.

6      Q.   The letter was ultimately sent on

7   December 12th, 2017 --

8      A.   Correct.

9      Q.   -- correct?

10      A.   Correct.

11      Q.   Who gave the final signoff to put that

12   letter in the mail?

13          MR. GARDNER:   Objection.   Asked and

14   answered.

15          THE WITNESS:   I don't recall who gave the

16   final signoff.

17   BY MR. HO:

18      Q.   Was it you?

19      A.   No, I don't believe I would have given

20   the final signoff.   But maybe.   I guess it depends

21   on what you're asking.   Like, who told Art Gary he

22   could press "send" on the e-mail?   I don't

Page 155

 1   understand your question.

 2        Q.   Yes, that's my question.

 3        A.   I don't know.

 4        Q.   You don't know whether or not you did?

 5        A.   I don't recall whether it was me or

 6   somebody else.

 7        Q.   All right.

 8        A.   It's possible it could have been me.

 9             (Gore Deposition Exhibit 17 marked for

10             identification and attached to the

11             transcript.)

12   BY MR. HO:

13        Q.   I'm going to show you what's been marked

14   as Exhibit 17.   This is a document in the

15   administrative record, the first page of which has

16   the number 000663.   This is a letter stamped

17   December 12th, 2017, from Arthur Gary at the

18   Department of Justice addressed to Ron Jarmin at

19   the Census Bureau, correct?

20        A.   Yes.   It appears to be.

21        Q.   And this is the letter we've been talking

22   about in which the Department of Justice

Page 159

1    from either Ms. Tucker or Mr. Troester, correct?

2        A.  Correct.

3        Q.  And your recollection is you received

4    final authorization to send that letter either on

5    Monday, December 11th or on Tuesday, December

6    12th, correct?

7        A.  That's my best recollection -- well,

8    although I may be wrong about that, now that I

9    think about that.  I can't remember the date the

10   letter was sent.  And I don't believe -- so it

11   could have been a couple of days later.  I don't

12   remember exactly.

13       Q.  Well, the letter is stamped

14   December 12th, 2017.

15       A.  Okay.

16       Q.  That's a Tuesday.

17       A.  Okay.

18       Q.  You said that you -- you testified that

19   you had spoken with either Ms. Tucker or

20   Mr. Troester on either Monday or Tuesday, December

21   11th or December 12th.

22           So it was when you had a conversation

1   with them, with one of them, on either the 11th or

2   the 12th, that you received final authorization

3   for the letter to go out, correct?

4        A.   I believe that's correct.

5        Q.   So one of them, either Ms. Tucker or

6   Mr. Troester, gave final authorization to send the

7   letter, and it was either on December 11th or on

8   December 12th, correct?

9        A.   I would say that one of them communicated

10  final authorization on one of those dates, and I

11  imagine it was the 12th, since that's the date the

12  letter went out.

13       Q.   If one of them, as you say, communicated

14  final authorization, where did that final

15  authorization come from?

16            MR. GARDNER:   Objection.  Vague.

17            THE WITNESS:   I believe it would have

18  come from the attorney general.

19  BY MR. HO:

20       Q.   Okay.  Let's talk about Exhibit 17, the

21  December 12th, 2017, letter that's in front of

22  you.

Page 161

```
 1        A.  I'm just going to finish reading it.
 2        Q.  Well, you've looked at the first page of
 3   this letter, right, Mr. Gore?
 4        A.  Yes.  Ever.  Yes.
 5        Q.  From looking at the first page of this
 6   letter, does it refresh your recollection that
 7   this is the letter that the Department of Justice
 8   sent to the Census Bureau to request a citizenship
 9   question on the 2020 census?
10        A.  Again, if I can finish reading the
11   letter, I can verify whether I believe it's the
12   same letter.
13        Q.  So the first -- reading the first page
14   doesn't refresh your recollection as to whether or
15   not this is the letter?
16        A.  It appears to be the letter.
17        Q.  Okay.  The letter signed by Mr. Gary
18   represents the Department of Justice's final
19   decision and statement of position with respect to
20   the issue of the citizenship question on the
21   census, correct?
22        A.  Yes.
```

Page 162

1      Q.  And this letter represents the views of

2   the Department of Justice, connect?

3      A.  Correct.

4      Q.  And Attorney General Sessions agrees with

5   the views expressed in this letter, correct?

6           MR. GARDNER:  Objection.  Calls for

7   speculation.  Lack of foundation.

8           THE WITNESS:  I can't speak for what

9   Attorney General Sessions believes or does not

10  believe.

11  BY MR. HO:

12     Q.  You believe that the attorney general

13  agrees with the views expressed in this letter,

14  correct?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.  Calls for speculation.

17          THE WITNESS:  I would be speculating.  I

18  don't think I can answer that question.

19  BY MR. HO:

20     Q.  Mr. Gore, can you look at what we marked

21  earlier as Exhibit 12 -- I'm sorry, Exhibit 2.  It

22  was your testimony in Congress.

802

Page 163

802

1     A.  Uh-huh.

2     Q.  Please turn to page 23.

3     A.  Sure.

4     Q.  Sorry.  I think I meant page 24.  Oh, no,

5  no.  I'm sorry.  I had it right.  Page 23.

6          The fourth paragraph down here, there's a

7  question from Member Lynch:  "This is Attorney

8  General Sessions you're talking about."

9          Your answer is, "It represents the view

10  of the department, so I believe the attorney

11  general agrees with that view.  Yes."

12          That was your testimony in Congress,

13  correct?

14     A.  Yes.

15     Q.  And you gave truthful testimony that day,

16  correct?

17     A.  I did.

18     Q.  Are there any reasons that the Department

19  of Justice has for wanting a citizenship question

20  on the census that were communicated to the

21  Department of Commerce but are not contained in

22  this letter?

1          MR. GARDNER:  To the extent you're asking

2     for a yes or no, you may answer that question.

3          THE WITNESS:  I don't know.

4     BY MR. HO:

5          Q.  Are there any -- just to be clear, there

6     are no reasons that you're aware of that the

7     Department of Justice wants a citizenship question

8     on the 2020 census that are not reflected in this

9     letter, correct?

10         A.  That's correct.  I'm aware of no such

11    reasons.

12         Q.  This letter is addressed to Dr. Ron

13    Jarmin, correct?

14         A.  Yes, it is.

15         Q.  And Dr. Jarmin is the acting director of

16    the Census Bureau, correct?

17         A.  That's my understanding.  Yes.

18         Q.  Why is the letter addressed to him?

19         A.  Because he is the acting director of the

20    Census Bureau.

21         Q.  Why isn't it addressed to someone from

22    the Department of Commerce?

1        A.   I believe that you showed me a letter

2    earlier that was sent from the Department of

3    Justice to then Acting Director Thompson.   And so

4    I understand it to be the practice, when the

5    Department of Justice wants additional questions

6    or information collected by the Census Bureau,

7    either through the census or the ACS or some other

8    instrument, to address that request to the head or

9    acting head of the Census Bureau.

10       Q.   You're aware that Dr. Jarmin has worked

11   at the Census Bureau for 25 years?

12       A.   I'm not aware of that, no.

13       Q.   Okay.  You're aware that Dr. Jarmin has a

14   Ph.D. in economics?

15       A.   I take from his title that he has a Ph.D.

16   in something.  I don't know what it's in.

17       Q.   Who do you think knows more about the

18   accuracy of various forms of CVAP data, Dr. Jarmin

19   or you?

20            MR. GARDNER:   Objection.   Calls for

21   speculation.   Lack of foundation.

22            THE WITNESS:   I have no idea.

Page 166

1   BY MR. HO:

2        Q.   You have no idea whether or not the

3   director of the Census Bureau knows more about the

4   accuracy of various forms of CVAP data than you

5   do?

6             MR. GARDNER:   Objection.   Calls for

7   speculation.   Lack of foundation.

8             THE WITNESS:   Again, I don't know

9   anything about Mr. Jarmin -- Dr. Jarmin's

10  background or the work he's done at the Census

11  Bureau.   So I have no basis to answer that

12  question.

13  BY MR. HO:

14        Q.   Do you think that you know more about the

15  accuracy of various forms of CVAP data than the

16  professionals at the Census Bureau?

17             MR. GARDNER:   Objection.   Calls for

18  speculation.   Lack of foundation.

19             THE WITNESS:   Again, I don't know what

20  the professionals at the Census Bureau know or

21  don't know.

22

1  BY MR. HO:

2      Q.  If the professionals of the Census Bureau

3  told you that a particular form of CVAP data were

4  the most accurate form of CVAP data at the census

5  block level, would you trust their judgment?

6          MR. GARDNER:  Objection.  Calls for a

7  hypothetical.

8          THE WITNESS:  Again, that calls for a

9  hypothetical, and I would want to know more

10  information about why they reached that decision

11  or that judgment and what other information were

12  available in making that judgment.

13  BY MR. HO:

14      Q.  Do you have any background in statistics,

15  Mr. Gore?

16      A.  No.

17      Q.  No graduate degree in survey -- I'm

18  sorry, in anything quantitative?

19      A.  No.

20      Q.  Any experience collecting survey data?

21      A.  I think I did a survey collection in

22  college.  But other than that, no.

Page 168

1    Q.  Any experience assessing the statistical

2    validity of survey data?

3    A.  No.

4    Q.  You know that people in the Census Bureau

5    do have a lot of experience assessing the

6    statistical validity of survey data, right?

7    A.  I imagine that there are people in the

8    Census Bureau who have that expertise and

9    experience.  I don't know whether Dr. Jarmin or

10   anyone else in particular does.  And I couldn't

11   identify anyone at the Census Bureau who has that

12   expertise.

13   Q.  But you would expect that there are

14   people in the Census Bureau with expertise in

15   assessing the validity of various forms of survey

16   data, wouldn't you, Mr. Gore?

17   A.  I would certainly hope so.

18   Q.  And you don't have any such expertise,

19   right?

20   A.  That's correct.

21   Q.  Okay.  Prior to this letter, in the

22   entire 53-year history of the Voting Rights Act,

601

601

1    the Department of Justice had never requested a

2    citizenship question on the decennial census

3    questionnaire that's sent to every household in

4    the United States, correct?

5              MR. GARDNER:   Objection.   Lack of

6    foundation.

7              THE WITNESS:   That is correct.   To my

8    knowledge.

9    BY MR. HO:

10        Q.   The first page of this letter, in the

11   first paragraph, the second-to-last sentence

12   reads, "To fully enforce those requirements, the

13   department needs a reliable calculation of citizen

14   voting age population in localities where voting

15   rights violations are alleged or suspected.   As

16   demonstrated below, the decennial census

17   questionnaire is the most appropriate vehicle for

18   collecting that data and reinstating a question on

19   citizenship will best enable the department to

20   protect all American citizens' voting rights under

21   Section 2."

22              It's the position of the Department of

1  Justice that the decennial census questionnaire is

2  the most appropriate vehicle for collecting CVAP

3  data for purposes of VRA enforcement, correct?

4      A.  Yes.  And -- I think the letter speaks

5  for itself.  But yes, that's the position.

6      Q.  And the letter purports to establish why

7  the decennial census questionnaire is the most

8  appropriate vehicle for collecting CVAP data for

9  purposes of VRA enforcement, correct?

10     A.  Correct.

11     Q.  You testified in Congress that your

12  belief is that the decennial census questionnaire

13  is the most appropriate vehicle for collecting

14  CVAP data for purposes of VRA enforcement,

15  correct?

16     A.  I believe I did.  Yes.

17     Q.  Let's look at page 2 of the Gary letter.

18  That's what I'm going to refer to as shorthand,

19  this request, Exhibit 17.

20     A.  Okay.

21     Q.  So the second paragraph on page 2, the

22  second sentence reads -- it's about four lines

1   down -- "From 1970 through the 2000 census, the

2   Census Bureau collected citizen" -- I'm sorry.

3           "From 1970 to 2000, the Census Bureau

4   included a citizenship question on the so-called

5   long-form questionnaire that it sent to

6   approximately one in every six households during

7   each decennial census."

8           To your understanding, is it accurate to

9   say the from the 1970 through the 2000 censuses,

10  the Census Bureau collected citizenship

11  information through the census long form?

12      A.  That's my understanding.

13      Q.  And the long form was not sent to every

14  household in the United States, correct?

15      A.  That's my understanding.

16      Q.  The long form was sent to a sample of

17  households in the United States, correct?

18      A.  That appears to be correct.

19      Q.  And because the long form was sent only

20  to a sample of households, the citizenship data

21  that the Census Bureau published based on

22  long-form responses were statistical estimates,

Page 173

1    way?

2         A.  No.  That's fine.

3         Q.  So you agree with me that, if you take a

4    survey sample and you try to derive generalizable

5    data from that survey sample, that that

6    generalized data would be a statistical estimate,

7    correct?

8         A.  Sure.

9         Q.  Okay.  So you understand that citizenship

10   data derived from the long form was a statistical

11   estimate, right, Mr. Gore?

12        A.  What I'm trying to convey to you -- let

13   me go straight to the heart of the matter.  I'm

14   not sure how the Census Bureau reported this

15   citizenship data in these years.  I haven't seen

16   it, so I don't know.

17        Q.  My question wasn't about the how the

18   Census Bureau reported it.  My question was --

19        A.  I think that was your question.  Your

20   question was the Census Bureau reported it in a

21   particular way.  And I don't know that.

22        Q.  My question was, you understand that

1  citizenship data derived from the long form would

2  be a statistical estimate, correct?

3      A.  I believe that to be correct.

4      Q.  Okay.  The last sentence in the second

5  paragraph reads, "For years, the department used

6  the data collected in response to that question in

7  assessing compliance with Section 2 and in

8  litigation to enforce Section 2's protections

9  against racial discrimination in voting."

10      Where the letter says, "that question,"

11  it's referring to the citizenship question on the

12  long form, correct?

13      A.  Yes.  That appears to be correct.

14      Q.  Okay.  So for years, the Department of

15  Justice relied on citizenship data collected

16  through the census long form for purposes of VRA

17  enforcement, correct?

18      A.  That's my understanding.  Yes.

19      Q.  And after the long form was discontinued,

20  the Department of Justice began relying on

21  citizenship data collected through the ACS for

22  purposes of VRA enforcement, correct?

Page 175

1    A.  Correct.

2    Q.  And -- so it would be accurate to say

3    that even when there was a citizenship question on

4    the census long form, the Department of Justice,

5    when it was using citizenship data for purposes of

6    VRA enforcement, it was using data that were

7    statistical estimates based on a sample, correct?

8    A.  I believe that's correct, if I follow

9    your question.

10    Q.  So it's accurate to say that the

11    Department of Justice, for as long as it's been

12    enforcing the Voting Rights Act, when it's needed

13    citizenship data, it has always relied on

14    statistical estimates rather than hard count data,

15    correct?

16        MR. GARDNER:  Objection.  Lack of

17    foundation.

18        THE WITNESS:  To the best of my

19    knowledge, I think that's correct.

20    BY MR. HO:

21    Q.  You're not aware of any period of time in

22    which the Department of Justice had access to hard

601

Page 176

1    count citizenship data for purposes of VRA

2    enforcement, are you, Mr. Gore?

3        A.  I'm not aware of that, no.

4        Q.  Now, you're aware the ACS is sent to

5    about 2 percent of households in the United States

6    every year, right?

7        A.  Sounds about right.

8        Q.  And you're aware that the Census Bureau

9    produces different estimates based on the ACS in

10   the form of one-year ACS estimates and five-year

11   ACS estimates, right, Mr. Gore?

12       A.  That's correct.  I think they have

13   three-year ACS estimates as well.

14       Q.  The three-year ACS estimates have been

15   discontinued, right, Mr. Gore?

16       A.  That could be.  I don't know.

17       Q.  You don't know one way or the other if --

18       A.  I don't --

19       Q.  -- the three-year estimates still exist?

20       A.  I'm aware that they existed at one time.

21       Q.  One-year ACS estimates are statistical

22   estimates based on a single year of ACS survey

Page 177

1   responses, correct?

2           A.   That's my understanding.

3           Q.   And five-year ACS estimates are

4   statistical estimates that are based on ACS

5   responses that are aggregated from a consecutive

6   five-year period, correct?

7           A.   It's my understanding.   Yes.

8           Q.   As of the date of the Gary letter, you

9   understood the difference between one-year and

10  five-year ACS estimates, right?

11          A.   Yes.

12          Q.   ACS one-year estimates are intended for

13  use -- let me start that again.

14          The Census Bureau intends that ACS

15  one-year estimates be used for areas with a

16  population larger than 65,000, right?

17          A.   I think that's right.

18          Q.   Okay.   Let me show you a document.   This

19  is a screenshot from the Census Bureau website.

20  We'll mark it as Exhibit 18.

21

22

Page 178

1          (Gore Deposition Exhibit 18 marked for

2          identification and attached to the

3          transcript.)

4    BY MR. HO:

5        Q.   It's a screenshot from the Census Bureau

6    website entitled, American Community Survey (ACS):

7    When to use one-year, three-year, or five-year

8    estimates.

9              Do you see this table titled,

10   Distinguishing features of ACS one-year, one-year

11   supplemental, three-year, and five-year estimates,

12   Mr. Gore?

13       A.   I do, yes.

14       Q.   And the far left-hand column has

15   information about one-year estimates, correct?

16       A.   Correct.

17       Q.   And do you see in the third row of that

18   table, second depending on whether you include the

19   header, that the Census Bureau states that

20   one-year estimates are data for areas with

21   populations of 65,000-plus?

22       A.   Yes, I see that.

1    Q.  So that comports with your understanding,

2  right, that one-year ACS estimates are intended

3  for use only in areas with a population larger

4  than 65,000, correct?

5    A.  Yes, that's correct.

6    Q.  And did you understand that one-year ACS

7  estimates were intended for use in areas with a

8  population over 65,000 as of the date of the Gary

9  letter?

10    A.  Yes.

11    Q.  The far right-hand column of the table

12  has information on five-year ACS estimates.  Do

13  you see that?

14    A.  Yes, I do.

15    Q.  And you see where the Census Bureau

16  indicates that five-year ACS estimates have the

17  largest sample size of different ACS estimates?

18    A.  I do see that on this chart.  Yes.

19    Q.  You don't have any reason to doubt that,

20  right?

21    A.  No.

22    Q.  Okay.  And you see where on the chart it

Page 180

1   states -- the Census Bureau states that five-year

2   ACS estimates are data for all areas, correct?

3        A.   Yeah, I do see that.

4        Q.   As of the date of the Gary letter on

5   December 12th, 2017, were you aware that the

6   Census Bureau considers five-year ACS estimates to

7   be usable data for all geographic areas regardless

8   of population size?

9        A.   Yes.

10        Q.   All right.   Let's talk about the Gary

11   letter a little bit more.   Back to page 2.   The

12   second-to-last paragraph, the last sentence reads,

13   "The ACS, however, does not yield the ideal data

14   for such purposes for several reasons."

15           In the sentence when the letter refers to

16   "such purposes," that means for purposes of VRA

17   enforcement, correct?

18        A.   It refers to that and other purposes.

19        Q.   Okay.   What other purposes?

20        A.   It also refers to use by state and local

21   jurisdictions in drawing our redistricting plans.

22        Q.   Redistricting plans for purposes of

1 compliance with the Voting Rights Act, correct?

2       A.   Yes, with the Voting Rights Act, and with

3 other federal and state law requirements.

4       Q.   Why would you need ACS citizenship data

5 to draw districts to comply with other federal and

6 state legal requirements other than Section 2 of

7 the Voting Rights Act?

8       A.   Section 2 would be predominant.  I don't

9 know every state law requirement that might be

10 implicated by that.  There might be state law

11 requirements that require a reference to

12 citizenship data.  Currently, to my knowledge,

13 every state in the union uses total population to

14 achieve compliance with the equal protection

15 clause's one-person/one-vote mandate.  But I

16 believe that in the past there have been

17 jurisdictions that have used other measures.  And

18 whether a jurisdiction might choose to use that

19 measure, I don't know -- measure of citizenship as

20 opposed to something else.

21       Q.   You're not aware of jurisdictions using

22 ACS data for purposes of complying with legal

1  requirements other than Section 2 of the Voting

2  Rights Act, right, Mr. Gore?

3      A.  That is correct.

4      Q.  Okay.

5      A.  Yeah.

6      Q.  So when you say that -- sorry.

7          When the letter says that ACS data does

8  not yield ideal data for such purposes, the

9  predominant purpose that you're referring to there

10  for which the ACS is not ideal is Section 2

11  compliance, correct?

12      A.  I think the predominant purpose to which

13  the letter is referring is Section 2 compliance.

14  That's correct.

15      Q.  Okay.  After the letter has that

16  statement, there are four bullet points, correct?

17      A.  That is correct.

18      Q.  Okay.  I want to ask you about each of

19  these bullets.

20          Let's start with the first bullet which

21  reads, "Jurisdictions conducting redistricting and

22  the department, in enforcing Section 2, already

Page 183

```
 1   use the total population data from the census to
 2   determine compliance with the Constitution's
 3   one-person/one-vote requirement (see Evenwel v.
 4   Abbott, 136 S.Ct. 1120, April 4th, 2016).  As a
 5   result, using the ACS citizenship estimates means
 6   relying on two different data sets, the scope and
 7   level of detail of which vary quite
 8   significantly."
 9            Did I read that right?
10       A.  Yes, you did.
11       Q.  Okay.  So tell me if I have this right.
12   The point that's being expressed in this bullet is
13   that citizenship data from the ACS is not ideal
14   for purposes of Section 2 compliance and
15   enforcement because ACS citizenship data is a
16   different data set that's separate and apart from
17   the total population data derived from the
18   decennial census; is that right?
19       A.  I believe the point speaks for itself,
20   and I think the way you've described it is more or
21   less correct.
22       Q.  Okay.  Any ways in which the way I just
```

Page 184

1   described it strike you as incorrect?

2        A.   Not as I sit here right now, no.

3        Q.   Okay.   The total population data from the

4   decennial census used for redistricting purposes

5   is part of what the Census Bureau calls the

6   PL94-171 data file, right?

7        A.   That's right.

8        Q.   Okay.   And currently, the citizenship

9   data from the ACS is produced as part of a

10  different data set, the CVAP table from ACS data

11  produced by the Census Bureau, correct?

12       A.   That's my understanding, yes.

13       Q.   Now, how does the fact that the decennial

14  enumeration data is in one data set, the PL data

15  file, whereas the ACS citizenship data is in a

16  different data set, the CVAP table -- how does the

17  fact that they're in two different data sets

18  render the ACS not ideal data for purposes of

19  Section 2 enforcement?

20       A.   Particularly for a map drawer, if -- a

21  map drawer drawing a map in Maptitude or some

22  other software needs to have both of these forms

Page 185

1   of information in order to draw districts that

2   comply with the 14th Amendment and with Section 2.

3   And map drawers currently have to go to two

4   different data sets and try to match up those data

5   sets in geography and specificity to the block

6   level in order to perform that function.

7           If all of the data were available in the

8   PL94-171 data set, they wouldn't have to do that.

9   And experts engaged in redistricting litigation,

10  including analyzing alleged violations of

11  Section 2 and proposed remedial plans for proven

12  violations of Section 2, could use a single

13  data set to draw maps and otherwise to analyze

14  Section 2 claims.

15      Q.   If the Census Bureau could produce

16  citizenship data as part of the PL data file

17  without including a citizenship question on the

18  census, would that resolve the concern that's

19  expressed in this bullet point?

20           MR. GARDNER:   Objection.   Calls for a

21  hypothetical.

22           THE WITNESS:   Yeah, again, that's

601

Page 186

601

1    hypothetical.  I don't know they can do that

2    either as a matter of law or technical capacity.

3    And I think -- so I don't know the answer to that

4    question.

5    BY MR. HO:

6         Q.  But if the Census Bureau came to you and

7    said, Mr. Gore, you've requested -- or the

8    department has requested a citizenship question on

9    the census; one of the reasons why is because the

10   citizenship data we're currently giving you is in

11   a different data set, but we've got a solution for

12   you; we're going to put it all in one data set,

13   and we've got a way of doing that without

14   including a citizenship question on the census,

15   would that resolve the bullet -- the concerns

16   expressed in this bullet?

17        MR. GARDNER:  Objection.  Calls for a

18   hypothetical.  Also, objection, form.

19        THE WITNESS:  Again, I can't engage in a

20   hypothetical on that.

21   BY MR. HO:

22        Q.  Would you be interested in learning from

1   the Census Bureau if the Census Bureau came to you

2   with that suggestion?

3            MR. GARDNER:  Objection.  Hypothetical.

4            THE WITNESS:  Again, that's a

5   hypothetical.  I can't engage in a hypothetical.

6   BY MR. HO:

7       Q.  You don't know whether or not you'd be

8   interested in a proposal from the Census Bureau to

9   give you CVAP data as part of the PL data file

10   without including a citizenship question on the

11   census?

12            MR. GARDNER:  Same objection.

13            THE WITNESS:  Again, you're asking me a

14   hypothetical without fleshing out all the facts

15   and circumstances, so I can't tell you how anyone,

16   the department or anyone else, would respond to

17   that.

18   BY MR. HO:

19       Q.  Has anyone with technical knowledge of --

20   strike that.  Never mind.

21            Prior to the Department of Justice's

22   reliance on the ACS, the citizenship data from the

Page 188

1    Census Bureau that DOJ used, we established

2    earlier, that came from the census long form,

3    correct?

4         A.   Correct.

5         Q.   And the census long form citizenship data

6    was not produced as part of the PL data file,

7    correct?

8         A.   I don't know the answer to that question.

9         Q.   Okay.   So you're not aware of any time

10   where the Department of Justice, in enforcing the

11   Voting Rights Act, had a single data set which had

12   total population data and citizenship data in it,

13   right, Mr. Gore?

14        A.   I'm not aware one way or the other.

15        Q.   Okay.   So the bullet in this letter is

16   not expressing a preference for a return to a

17   prior point in time when DOJ had total population

18   data and citizenship data in a single data set,

19   correct?

20        A.   Again, I don't know the answer to that

21   question because I don't know what occurred at a

22   prior point in time, as I've just testified.

1        Q.   But you're not saying that -- this letter

2   is not saying that there was a prior point in time

3   in which the Department of Justice had both total

4   population and citizenship data in a single data

5   set, correct?

6        A.   I think the letter speaks for itself, and

7   this particular bullet doesn't say that.

8        Q.   Okay.  Are you aware of a case where the

9   Department of Justice was unable to succeed on a

10  VRA claim because citizenship data and total

11  population data were in two different data sets?

12            MR. GARDNER:  I'm going to object to the

13  extent that that calls for the disclosure of

14  information subject to law enforcement privilege.

15            You can answer that question to the

16  extent you can do that without disclosing

17  privileged information.

18            THE WITNESS:  I'm not aware of any such

19  publicly disclosed case.

20  BY MR. HO:

21       Q.   Okay.

22            MR. HO:  So I'm going to sometimes ask

Page 190

1   questions about whether or not DOJ has been able

2   to succeed on cases.  I'm going to make clear that

3   those questions with limited to cases that have

4   been filed -- right?

5          MR. GARDNER:  Okay.

6          THE WITNESS:  Okay.

7          MR. HO:  And litigated in court.

8          MR. GARDNER:  That's fair enough.

9          THE WITNESS:  Thank you.

10  BY MR. HO:

11        Q.  So the cases that DOJ has filed, you're

12  not aware of any of those cases being unsuccessful

13  because citizenship data and total population data

14  were in two different data sets, correct?

15        A.  That's correct.  Again, we're not talking

16  about cases that weren't filed.  And, obviously,

17  any case that was filed was a case that the

18  Department of Justice believed it could win.

19        Q.  Okay.  You're not aware of any case filed

20  by any plaintiff anywhere under the Voting Rights

21  Act where the claim failed because of the fact

22  that total population data and citizenship data

Page 191

1    were in two different data sets, correct?

2         A.   Again, that's correct with respect to

3    cases that were actually filed.   And we're not

4    talking about cases that weren't filed.

5         Q.   You're not aware of a case -- and I'm not

6    even going to talk about the Department of

7    Justice -- where people have talked about filing a

8    case publicly, but said, you know what, we're just

9    not going to file this case because population

10   data and citizenship data, they're in two

11   different data sets, right?

12            MR. GARDNER:   Objection to form.

13            THE WITNESS:   I believe that's right, as

14   I understand your question.

15   BY MR. HO:

16       Q.   The second bullet here, which is on page

17   3, top of page 3, reads, "Because the ACS

18   estimates are rolling and aggregated into

19   one-year, three-year, and five-year estimates,

20   they do not align in time with the decennial

21   census data.   Citizenship data from the decennial

22   census, by contrast, would align in time with the

1   total and voting age population data from the

2   census that jurisdictions already use in

3   redistricting."

4        Did I read that right?

5   A.   Yes, you did.

6   Q.   The point that's being expressed --

7   correct me if I'm wrong -- in this bullet is that

8   citizenship data from the ACS is not ideal for VRA

9   enforcement purposes because ACS citizenship data

10  purportedly does not align in time with the

11  decennial census data, correct?

12  A.   That's correct.

13  Q.   What do you mean when you say that ACS

14  citizenship data do not align in time with the

15  decennial census?

16  A.   What do I mean or what does the

17  department mean?

18  Q.   What does the department mean?

19  A.   I believe what the department means is --

20  it dovetails with the conversation we had just a

21  moment ago about what the ACS data are.

22        So the ACS data are -- at least for the

1    five-year estimates, are rolling.  So they

2    represent some estimate over five consecutive

3    years.  And the one-year estimate is a snapshot of

4    one single year.

5             Now, the citizenship data from the

6    decennial census is a recording of data at that

7    point in time, and the ACS data doesn't always

8    align with that particular point in time.  So you

9    may be measuring citizenship data from, if you're

10   using a five-year estimate, four or five years

11   before the census or four or five years after the

12   census.  And jurisdictions use the total

13   population data in the census, and courts use that

14   as well, throughout the entire decade.

15        Q.  So is it your understanding that when

16   experts give testimony in VRA cases using

17   five-year ACS estimates for CVAP, that they are

18   unable to give testimony about CVAP rates that

19   align in time with the decennial census?

20        A.  My understanding is that they may or may

21   not be testifying as to CVAP levels that align

22   with the census.  It might be possible that they

Page 194

1    do that in some cases; in other cases, they might

2    be looking to data that predates the census or

3    post-dates the census, again, because it's a

4    five-year window as opposed to the same snapshot

5    in time as the decennial census.

6        Q.   Are you aware of a filed case by the

7    Department of Justice under the Voting Rights Act

8    where the department was unable to succeed on a

9    VRA claim because of the fact that ACS citizenship

10   data does not align in time with the decennial

11   census data?

12       A.   I am not aware of any such filed case.

13       Q.   Okay.  Are you aware of any case filed by

14   any plaintiff anywhere where the court found

15   that -- against the plaintiffs because the ACS

16   data does not align in time with the decennial

17   census?

18       A.   I am not aware of any such filed case.

19       Q.   Are you aware of any plaintiff ever

20   declining to file a case because ACS data -- and

21   I'm not talking about the department, not filed

22   cases, because I understand that that's

Page 195

1   privileged.

2           But just based on your knowledge as

3   someone who's knowledgeable about the Voting

4   Rights Act, are you aware of any case where any

5   plaintiff outside of DOJ did not bring a case

6   under Section 2 of the Voting Rights Act because

7   ACS data does not align in time with the decennial

8   census?

9       A.   I'm not aware of that, and certainly not

10   aware of it from any public information.

11      Q.   Okay.  Third bullet, which is the second

12   on this page, reads, "The ACS estimates are

13   reported at a 90 percent confidence interval, and

14   the margin of error increases as the sample size

15   and, thus, the geographic area decreases.  See

16   U.S. Census Bureau glossary, confidence interval

17   (American Community Survey), available at" -- and

18   then there's a website.  I'm not going to read the

19   URL.

20           After the URL, it says, "By contrast,

21   decennial census is a full count of the

22   population."

1           Did I read that right --

2      A.   Yes.

3      Q.   -- other than the URL?

4           Okay.  When the letter says, "margin of

5      error," what do you understand that to mean?

6      A.   Because the ACS estimates are estimates,

7      and not a hard count, there's an associated margin

8      in which -- that the Census Bureau assigns a

9      value, usually a percentage, that the Census

10     Bureau assigns to convey that, from a matter of

11     statistics, it has confidence that the true result

12     is somewhere within that range.  And that's

13     referred to as the margin of error.

14     Q.   Okay.  So something like, you know,

15     91 percent -- this is just an example; I just want

16     to see if we understand margin of error the same

17     way -- 91 percent of the voting age people in this

18     area are citizens plus or minus 2 percentage

19     points?

20     A.   I believe the plus or minus is my

21     understanding of what the margin of error is.

22     Q.   Means it could be -- if the point

1  estimate is 91 percent, it could be 89 -- and it's

2  plus or minus 2 points, it could be 89, it cold be

3  93; somewhere in that range?

4        A.   That's my understanding.

5        Q.   And you'd agree with me that estimates

6  with a smaller margin of error are more precise

7  than an estimate with a bigger margin of error,

8  right?

9        A.   Yes.

10       Q.   Now, the point that's being expressed in

11  this bullet is that citizenship data from the ACS

12  is not ideal for purposes of VRA enforcement

13  because ACS citizenship data has a margin of error

14  that increases as you get to smaller and smaller

15  geographic units, correct?

16       A.   That's correct.

17       Q.   Okay.  And the letter contrasts those ACS

18  estimates with those margins of error with

19  decennial census data, which are a full count of

20  the population, right?

21       A.   That's correct.

22       Q.   You're aware that decennial census data

Page 198

1    that's published at the block level also has a

2    margin of error associated with it; it's just not

3    published by the Census Bureau, right?

4        A.   I'm aware of that.   Yes.

5        Q.   You were aware -- so -- I'm sorry.

6             As of the date of the Gary letter, were

7    you already aware that the decennial enumeration

8    data contained margins of error?

9        A.   I was aware generally that there were

10   margin of errors that the Census Bureau imputed to

11   that data.   I don't know what those margins were.

12       Q.   But as of the date of the Gary letter,

13   you knew that even what is referred to in the Gary

14   letter as full count data has margins of error

15   associated with it, too, correct?

16       A.   Yes.

17       Q.   Okay.   The Gary letter doesn't mention

18   that full count data from the decennial census has

19   margins of error, does it?

20       A.   It doesn't appear to, no.

21       Q.   Okay.   So just so I'm clear here, the

22   Gary letter contrasts full count decennial census

1  quote, full count of the population, correct?

2      A.  No, that's incorrect.

3      Q.  The letter reads --

4      A.  It's not a confidence interval or a

5  margin of error.  It's a confidence interval and a

6  margin of error.

7      Q.  Okay.  So let's try this again.

8      A.  Please.

9      Q.  The ACS data is criticized in this bullet

10 as having a margin of error, correct?

11     A.  I don't believe it's criticized.  I

12 believe it's described as having a margin of

13 error.

14     Q.  Okay.  So let's try that again.  The ACS

15 data are described in this bullet as having a

16 margin of error, correct?

17     A.  That's correct.

18     Q.  And the letter reads, "By contrast,

19 decennial census data is a full count of the

20 population," correct?

21     A.  That's correct.

22     Q.  And the bullet does not mention that

1   decennial census data have margins of error

2   associated with them, correct?

3        A.   That's correct, as I've already

4   testified.

5        Q.   Okay.   Now, when citizenship data was

6   derived from the long form questionnaire, that was

7   data that also had a margin of error associated

8   with it, correct?

9        A.   I would imagine that's correct.

10       Q.   Okay.   So you'd agree that, as far as you

11   know, the Department of Justice, when it's relied

12   on citizenship data, that citizenship data has

13   always had a margin of error associated with it,

14   correct?

15       A.   That's my understanding.

16       Q.   Okay.   This letter doesn't mention the

17   fact that citizenship data collected from the

18   census long form were, like the ACS, also

19   statistical estimates with a margin of error

20   associated with them, correct?

21       A.   I'm sorry, can you repeat the question?

22       Q.   Sure.

1          This letter, the Gary letter, it doesn't

2    mention the fact that citizenship data collected

3    from the long form were statistical estimates with

4    a margin of error associated with them, just like

5    the ACS, correct?

6          A.   If I can just say, I think what you mean

7    is citizenship data reported from the long form

8    questionnaire, not collected by the long form

9    questionnaire.

10          But my understanding is that, yes,

11    citizenship data reported from the long form

12    questionnaire were estimates.

13          Q.   And the letter doesn't mention the fact

14    that citizenship data collected from the long form

15    questionnaire and reported from the long form

16    questionnaire were, like the ACS, also statistical

17    estimates that had margins of error, correct?

18          A.   I think that's correct with respect to

19    reported from the long form questionnaire.  I

20    don't know if that's correct with respect to

21    collected by the long form questionnaire because I

22    don't know if the Census Bureau engaged in

1    statistical estimates when it was actually

2    collecting the responses to the long form

3    questionnaire.

4         Q.   Thank you.

5              The letter doesn't mention that the

6    Department of Justice has always relied on

7    statistical estimates of citizenship with margins

8    of error for purposes of VRA enforcement, does it?

9         A.   I believe that's correct.  Again, the

10   letter speaks for itself.

11        Q.   Okay.  You're not aware of a single filed

12   case by the Department of Justice where the

13   Department of Justice was unable to succeed on a

14   VRA claim because of the fact that the CVAP data

15   on which DOJ was relying was a statistical

16   estimate with a margin of error that increases as

17   the geographic area decreases, correct?

18        A.   I am not aware of any such filed case.

19        Q.   You're not aware of any case where a

20   plaintiff was unable to succeed on a VRA claim

21   because of the fact the five-year ACS citizenship

22   data have a margin of error associated with them,

1    correct?

2          A.   Five-year estimates?   That's correct.

3          Q.   Okay.   You're not aware of any case where

4    plaintiffs, other than DOJ, declined to bring a

5    VRA case -- let me start that question again.

6                You're not aware of any case where

7    plaintiffs declined to bring a VRA claim because

8    ACS data are statistical estimates with a margin

9    of error, correct?

10         A.   That is correct.   I am aware of one case

11   in which a court held that the one-year ACS

12   estimate, because of its associated margin of

13   error, was insufficiently reliable to allow the

14   plaintiff in that case to proceed with a Section 2

15   claim.

16         Q.   Right.   That's the Benavidez case, right?

17         A.   That is correct.

18         Q.   We'll talk about that in a bit, but I

19   want to talk about something else first.

20              (Gore Deposition Exhibit 19 marked for

21              identification and attached to the

22              transcript.)

1   BY MR. HO:

2        Q.  I'm going to show you a document that's

3   marked as Exhibit 19.

4            MR. HO:  You guys have seen this on your

5   side.  It was used in the Abowd 30(b)(6)

6   deposition.

7   BY MR. HO:

8        Q.  I'm going to represent to you that this

9   is a map derived from census data from the Census

10  Bureau website.  And it was joined with Tiger

11  files to show census blocks in the Fort Myers,

12  Florida, area with total population numbers for

13  each census block.

14           So the lines represent the borders of

15  census blocks.  The numbers represent the total

16  population in each census block.  Okay?

17  Everything I say make sense to you?

18       A.  I accept your representation.

19       Q.  Thank you.  Okay.

20           So I just want to try to understand DOJ's

21  position here about why you need CVAP data at the

22  block level.

Page 206

1              Is it correct that the Department of

2     Justice, when you look at a map like this and you

3     want to bring a Section 2 case, and you see these

4     population numbers here, you want to know how many

5     of the people in each of these blocks with hard

6     count numbers are voting age citizens as opposed

7     to simply having a statistical estimate of the

8     voting age citizens in each block, correct?

9              MR. GARDNER:  Objection to the extent

10    that that calls for information that is subject to

11    deliberative process privilege.

12              To the extent you can answer that

13    question without divulging that information, you

14    may do so.

15              THE WITNESS:  The position of the

16    Department of Justice is that we want to have the

17    most complete, accurate, reliable data we can

18    possibly have.

19              We have the ACS data.  We have been

20    bringing cases using the ACS data.  We believe

21    that having a hard count citizenship data from the

22    census questionnaire would give us another

1   data point that we could use to identify

2   jurisdictions for potential Section 2

3   investigations and enforcement.

4         I don't believe it's disputed by anybody

5   that a litigant, any plaintiff, the Department of

6   Justice or a private plaintiff, needs block-level

7   data in order to bring Section 2 redistricting

8   claims -- now, whether that's derived from the ACS

9   or from some other source -- because when

10  jurisdictions draw districts to achieve equal

11  population, they use block-level data.

12        So, for example, on this map you've

13  handed me, a map drawer might draw various lines

14  through this area.  And understanding what

15  population is moving between those areas and what

16  the citizenship composition and the racial

17  composition of those areas is is essential to

18  identifying potential Section 2 violations.

19  BY MR. HO:

20       Q.   Okay.  So let's look at the middle of the

21  map.  Do you see where it says Lee?

22       A.   Yes.

Page 209

1   This is one point of data that we would want to

2   use, and we're using other data as well to

3   identify potential Section 2 investigations and

4   enforcement actions.

5   BY MR. HO:

6       Q.   So the way things work right now is, you

7   take an ACS estimate of the percentage of voting

8   age people in a census block who are citizens, and

9   then you look at the census blocks within that --

10  sorry.  You look at the individual census blocks

11  within that census block group, and then you

12  estimate how many of the people in that census

13  block are actually citizens of voting age based on

14  the ACS estimate, right?

15      A.   I think that's right to the extent I

16  understood your question.  I believe what you're

17  saying is the ACS data is reported at the census

18  block group level, and then estimates can be

19  derived for individual census blocks based on that

20  data at the group level.

21      Q.   Right.  So let's take this block of five    601

22  people.  Right?  If the block group that this was

601

1    in, the ACS reported 60 percent of the people in

2    that block group are citizens, what you would do

3    right now is you take that 60 percent number and

4    then you apply it to the individual blocks.  So

5    you would look at this group of five and you'd

6    say, well, our estimate is three of those five

7    people are citizens, correct?

8              MR. GARDNER:  Objection.  Form.

9    Objection.  Hypothetical.

10             THE WITNESS:  That would be one way to

11   estimate census block citizenship data from an ACS

12   estimate at the block group level.

13   BY MR. HO:

14        Q.  And what the Department of Justice is

15   saying is that we have these estimates, but we'd

16   also like a hard count, because if we had the

17   decennial census questionnaire out there and had

18   the citizenship question posed, we would know with

19   a hard count instead of an estimate -- instead of

20   only an estimate -- how many of those five people

21   are, in fact, citizens, correct?

22             MR. GARDNER:  Objection.  Form.

1          THE WITNESS:   That's more or less

2   correct.   I believe we want to have the best, most

3   accurate and most complete data we can possibly

4   have.

5   BY MR. HO:

6        Q.   Okay.   Now, you know that the only data

7   the Census Bureau makes available to DOJ is

8   aggregate statistical data over a geographical

9   area and not individual census responses, right?

10       A.   That's correct.

11       Q.   And your understanding is that individual

12  responses to the census questionnaire by law have

13  to stay with the Census Bureau and can't be shared

14  with the Department of Justice or the public,

15  correct?

16       A.   That is my understanding.   Correct.

17       Q.   And the reason why the Census Bureau can

18  only give you that aggregate statistical

19  information covering a geographical area rather

20  than an individual response is because title 13

21  prohibits disclosure of individual responses to

22  the census, correct?

Page 213

1          THE WITNESS:  I haven't studies title 13,

2     so I don't know the exact parameters of it.

3     BY MR. HO:

4          Q.  Well, you just told me before that

5     individual census responses are prohibited from

6     disclosure.  You understand that, right?

7          A.  I do.

8          Q.  Okay.

9          A.  What I don't know is what exceptions, if

10    any, apply to that particular prohibition.  As a

11    general matter, I understand that that's a

12    prohibition.  I've not studied the issue, and so

13    I'm not in a position to give a legal opinion on

14    it one way or the other.  But that's my -- what I

15    testified to before was my general understanding

16    of title 13.

17         Q.  Okay.  Your expectation is that when you

18    requested a citizenship question on the census

19    questionnaire, that the Census Bureau was going to

20    include it, collect that information, and give it

21    to the Department of Justice on a block-by-block

22    level, correct?

1        A.   Yes.

2        Q.   Okay.  How can the Census Bureau give you

3    block-by-block information based on responses to

4    the census questionnaire for this block with one

5    person on it without telling you how that person

6    responded to the citizenship question on the

7    census questionnaire?

8             MR. GARDNER:  Objection.  Calls for a

9    legal conclusion.  Lack of foundation.

10             THE WITNESS:  Again, I haven't studied

11    the question as a legal matter.  I would not

12    anticipate, in any event, that the Census Bureau

13    would provide an individual's actual questionnaire

14    to the Department of Justice in connection with

15    our request.

16   BY MR. HO:

17        Q.   That wasn't my question about whether or

18    not they were going to give you a questionnaire.

19             You want individual block-level data

20    derived from the census questionnaire --

21        A.   I actually think it was your question.

22    Because, as I understand title 13, it's a

1  prohibition on providing the individual

2  questionnaire.

3       Q.  So your understanding is that when the

4  Census Bureau includes a citizenship question on

5  the 2020 census questionnaire, collects it,

6  aggregates it block by block, that for this census

7  block with one person on it, what they tell you is

8  going to reflect that one person's answer to the

9  citizenship question?

10          MR. GARDNER:  Objection.

11  Mischaracterizes the witness' prior testimony.

12          THE WITNESS:  I don't believe that's what

13  I testified to.

14  BY MR. HO:

15       Q.  Okay.  What's your understanding of what

16  the Census Bureau is going to give you for this

17  census block of one person in terms of CVAP data

18  when the citizenship question is included on the

19  census?

20          MR. GARDNER:  Objection.  Calls for a

21  hypothetical.

22          THE WITNESS:  I have no understanding of

Page 216

1   what the Census Bureau is going to do or what data

2   it's going to provide us in the future related to

3   this request.

4   BY MR. HO:

5        Q.  You don't know one way or the other, is

6   what you're saying, whether or not, when the

7   Census Bureau gives you block-by-block CVAP data

8   derived from responses to the census

9   questionnaire, whether or not, with respect to a

10  block that has one person on it, that that

11  individual block-level CVAP data is going to

12  reflect that person's response to the citizenship

13  question on the census, correct?

14            MR. GARDNER:  Objection.  Form.

15  Objection.  Hypothetical.

16            THE WITNESS:  Again, that's hypothetical.

17  What I'm telling you is I don't know how the

18  Census Bureau planned to report the data that

19  we've requested.

20  BY MR. HO:

21       Q.  So you don't know one way or the other

22  whether or not the data that you've requested

1    that's reported from the Census Bureau is going

2    to, in fact, be derived from responses to the

3    citizenship question on the census questionnaire,

4    correct?

5         A.   That's not what I said.   What I said was

6    I don't know the form that the reporting is going

7    to take.   I don't know what information the Census

8    Bureau -- what form they're going to provide the

9    information to us in.

10        Q.   Well, that wasn't my question about the

11   form.   I'm just talking about a census block with

12   one person on it.

13             You want block-by-block data from the

14   Census Bureau.   That's what you've requested,

15   correct?

16        A.   That is correct.

17        Q.   Okay.   So when you get block-by-block

18   level -- block-by-block CVAP data from the Census

19   Bureau derived from responses to the citizenship

20   questionnaire, you don't know whether or not, when

21   you get data back from the Census Bureau about a

22   block that has one person on it, whether or not

Page 219

1  data, like if it's in an Excel spreadsheet

2  or something like that, and I'm not --

3      A.  No, of course you are.

4      Q.  -- asking about -- and I'm not asking

5  about whether or not you plan on violating title

6  13.  I'm asking a much simpler question than that.

7          It's that when the Census Bureau gives    601

8  you block-by-block citizenship data, as you've

9  requested, based on responses to the citizenship

10 questionnaire, right now, you don't know, if

11 you're looking at a block with one person on it,

12 whether or not that citizenship data that you get

13 from the Census Bureau is going to reflect the

14 response to the citizenship questionnaire,

15 correct?

16          MR. GARDNER:  Same objections.

17          THE WITNESS:  Of course I don't know

18 that, because I don't know what the data is going

19 to be.  And I don't know whether the person who

20 completes the census questionnaire is going to

21 complete it fully or something else.  I have no

22 idea.

 1   BY MR. HO:

 2        Q.   Okay.

 3        A.   You're asking about something that might

 4   happen in the future.  That's a hypothetical.  I

 5   don't know.

 6        Q.   Well, this is the data that the

 7   Department of Justice has requested.  You've

 8   requested that the Census Bureau go block by

 9   block and ask --

10        A.   That's correct.

11        Q.   -- people block by block, every member of

12   every household, how many people are citizens and

13   not, correct?

14        A.   That is correct.

15        Q.   And you expect that the CVAP table that

16   you get from the Census Bureau on a block-by-block

17   basis is going to reflect answers to those

18   citizenship questions, correct?

19        A.   That would be my expectation.  Yes.

20        Q.   Okay.  But my question for you is -- and

21   if you don't know the answer, just say you don't

22   know; that's okay --

Page 221

1      A.   I've said now five or six times that I

2   don't know, because you're asking me a

3   hypothetical question.

4      Q.   I haven't asked the question yet.

5      A.   You've asked it now six or eight times

6   and --

7      Q.   Well, Mr. Gore, it's not hypothetical.

8   You understand that there are census blocks with

9   one human on them, correct?

10      A.   I do understand that.  Yes.

11      Q.   Okay.  If the Census Bureau is going to

12   give you CVAP data for that block and tell you

13   whether or not that person is a citizen, you don't

14   know, sitting here today, whether or not that --

15   that data that the Census Bureau is going to give

16   you is going to reflect that person's answer to

17   the citizenship question on the census, correct?

18      A.   I don't know what that data is going to

19   reflect because, again, you're asking me about a

20   hypothetical.

21      MR. GARDNER:  I don't want to interrupt

22   you line of questions, but it's about a quarter to

1    1:00.  Do you want to break for lunch soon?

2              MR. HO:  In a minute.

3    BY MR. HO:

4        Q.  Is it your understanding that, when the

5    Census Bureau reports citizenship data after the

6    2020 census about a block that has one person on

7    it, that that citizenship data reported by the

8    Census Bureau will indicate whether or not that

9    person responded to the citizenship question on

10   the census by stating whether he or she is a

11   citizen?

12       A.  I'm sorry, can you try that again?  I

13   didn't follow that.

14       Q.  Sure.  Is it your understanding that,

15   when the Census Bureau reports CVAP data block by

16   block after the 2020 census, that, with respect to

17   blocks that have only one person on it, that the

18   CVAP data reported by the Census Bureau will

19   reflect the answer that that person gave to the

20   citizenship question on the census questionnaire?

21             MR. GARDNER:  Objection.  Form.

22             THE WITNESS:  My understanding is that

1   that would certainly be possible, just like it

2   would reflect information about that person's race

3   that they would have provided on the census

4   questionnaire.

5   BY MR. HO:

6        Q.   Now, you're aware that the Census Bureau

601

7   intends to use techniques such as synthetic data

8   noise infusion to avoid the disclosure of people's

9   responses to the census questionnaire?

10            MR. GARDNER:   Objection.   Lack of

11   foundation.

12            THE WITNESS:   I'm aware that there are

13   some techniques.   I don't know that particular

14   technique.   I'm not familiar with it.

15   BY MR. HO:

16        Q.   So you've never heard the term "synthetic

17   data noise infusion" before?

18        A.   I believe I may have heard it.   I just

19   don't understand it.

20        Q.   You're not aware that synthetic noise

21   infusion is a practice whereby the Census Bureau

22   intends to replace some sensitive information

1  about a census respondent with different

2  information based on sample data from a

3  statistical model when it publishes the data?

4       A.   I generally have that understanding.  I

5  cannot perform that particular data manipulation

6  myself.

7       Q.   You're aware that, because of disclosure

8  avoidance procedures, that when CVAP data is

9  reported by the Census Bureau after the

10 2020 census, that even with a citizenship question

11 on the 2020 census, that that CVAP data at the

12 block level will have error margins associated

13 with it, correct?

14      A.   I believe -- I'm sorry, can you repeat

15 the question?

16      Q.   Sure.  You're aware that, because of

17 disclosure avoidance procedures like synthetic

18 noise infusion, which we talked about a second

19 ago, that even with the citizenship question on

20 the 2020 census questionnaire, the CVAP data

21 produced by the Census Bureau at the block level

22 will have error margins associated with it,

1    correct?

2         A.   I'm not aware of that because I don't

3    understand the causal relationship between those

4    masking techniques and any margin of error.

5    Moreover, I don't know what techniques the Census

6    Bureau plans to use or how it plans to deploy

7    those with respect to responses to the

8    2020 census.

9         Q.   Okay.  So before you requested -- I'm

10   sorry.  Let me start that again.

11        Before the Department of Justice

12   requested a citizenship question be added to the

13   2020 census questionnaire, you didn't attempt to

14   ascertain whether or not the data derived from the

15   question would produce error margins or not,

16   correct?

17        A.   I believe what I said was I was aware

18   that there are margins of error that can be

19   associated with the census data.  I don't know how

20   the Census Bureau plans to ask this question or

21   what it plans to do with respect to data collected

22   in response to that question.

1      Q.  But you're aware, are you not, that the
2  Census Bureau today does not know whether or not
3  the margins of error associated with the CVAP data
4  that it produces based on responses to the census
5  questionnaire will have margins of error that are
6  larger or smaller than the CVAP data currently
7  used by the Department of Justice?
8           MR. GARDNER:  Objection.
9  BY MR. HO:
10      Q.  Right?
11           MR. GARDNER:  Objection.  Lack of
12  foundation.
13           THE WITNESS:  I am not aware of the
14  Census Bureau's view on that issue.
15  BY MR. HO:
16      Q.  Okay.  So you didn't try to determine,
17  before requesting a citizenship question on the
18  census questionnaire, whether or not CVAP data
19  derived from that citizenship question would, in
20  fact, have smaller margins of error than the CVAP
21  data currently relied on by the Department of
22  Justice, correct?

1      A.   Are you asking about me, personally?  You

2   used the word "you" in your question.  I just want

3   to understand who you're asking --

4      Q.   The Department of Justice.

5      A.   Ah.  I'm not aware of what the Department

6   of Justice may or may not have done.

7      Q.   When did you become aware of the fact

8   that, due to disclosure avoidance techniques, CVAP

9   data derived from responses to the citizenship

10  questionnaire would have margins of error

11  associated with it?

12     A.   Again, I have testified that I'm not

13  aware of the causal relationship that you're

14  talking about, so I'm not sure I ever have become

15  aware of that because I don't know what those

16  techniques are, I don't know how they relate to

17  the citizenship question, and I don't know how the

18  Census Bureau plans to deploy them and -- with

19  respect to the 2020 census.

20     Q.   So you've -- and when I say "you," the

21  Department of Justice -- hasn't reached out to the

22  Census Bureau to try to understand the causal

Page 228

1    relationship, as you put it, between disclosure

2    avoidance and margins of error associated with

3    CVAP data collected from the 2020 census

4    questionnaire, correct?

5            MR. GARDNER:  Objection.  Lack of

6    foundation.

7            THE WITNESS:  I'm not aware of what

8    everyone in the Department of Justice may or may

9    not have done.

10   BY MR. HO:

11       Q.  You're not aware of any such

12   communications between the Department of Justice

13   and the Census Bureau about whether or not, due to

14   disclosure avoidance techniques, the CVAP data

15   produced from responses to the decennial census

16   questionnaire, would, in fact, have smaller

17   margins of error than the CVAP data currently

18   relied on by the Department of Justice, correct?

19       A.  I don't believe I'm aware of any such

20   communication.

21       Q.  Okay.  The Gary letter, when it describes

22   decennial census data as a full count of a

Page 229

1    population, it doesn't mention the fact that
2    citizenship data based on responses to the
3    decennial census questionnaire would also have
4    margins of error associated with it, correct?
5              MR. GARDNER:  Objection.  Asked and
6    answered.
7              THE WITNESS:  And again, I think your
8    question assumes that there are going to be these
9    margins of error tied to these disclosure masking
10   techniques, and I'm not sure whether that --
11   whether or not that's correct.  I don't know one
12   way or the other.
13   BY MR. HO:
14        Q.   The Gary letter doesn't mention the fact
15   that CVAP data derived from the decennial census
16   would have margins of error due to disclosure
17   avoidance techniques that might even be larger
18   than the margins of error currently associated
19   with ACS CVAP data relied on by the Department of
20   Justice at present, correct?
21        A.   Again, I don't -- I'm not sure I'm
22   following all the chains of that hypothetical, and

1    I don't know one way or the other.

2        Q.  If the Census Bureau could produce full

3    count CVAP data at the block level without margins

4    of error and without including a citizenship

5    question on the census, would that alleviate the

6    concerns expressed in this bullet?

7            MR. GARDNER:  Objection.  Hypothetical.

8    Also, objection, compound.

9            THE WITNESS:  And we're so far removed

10   from the Gary letter at this point, I don't know

11   which bullet you're referring to.

12   BY MR. HO:

13       Q.  I'm referring to the third bullet, the

14   same one we've been talking about this entire

15   time.

16       A.  You just put another exhibit in front of

17   me, so --

18       Q.  It's on page 3, the second bullet on that

19   page about the ACS estimates being reported at a

20   90 percent confidence interval, and the letter

21   which contrasts that to decennial census data,

22   which is a full count of the population.

1      A.  I understand that the Census Bureau --

2      Q.  I haven't posed a question yet.

3      A.  Oh, I'm sorry.  I thought you posed a

4   question and then pointed me back to it.

5      Q.  So here's my question with respect to       601

6   this bullet.  If the Census Bureau could produce

7   to you full count CVAP data that didn't have

8   sampling margins of error like the ACS CVAP data

9   but -- and could do so without including a

10  citizenship question on the census, that would

11  resolve the concerns expressed in this bullet,

12  correct?

13          MR. GARDNER:  Objection.  Calls for

14  hypothetical.

15          THE WITNESS:  That's hypothetical.  I

16  can't answer that.

17  BY MR. HO:

18      Q.  You don't know one way or the other?

19          MR. GARDNER:  Objection.  Calls for

20  hypothetical.

21          THE WITNESS:  It's a hypothetical.  I

22  can't answer a hypothetical.

Page 232

1    BY MR. HO:

2         Q.   The fourth bullet here --

3         A.   Before moving on to a new bullet, can we

4    take a break for lunch?

5              MR. GARDNER:  Yeah.  It's 12:55.  We've

6    been going over an hour now.

7              MR. HO:  Okay.  Sure.

8              THE WITNESS:  Thank you.

9              VIDEO TECHNICIAN:  This concludes media

10   unit number 3.  The time on the video is

11   12:55 p.m.  We are off the record.

12             (A recess was taken.)

13             VIDEO TECHNICIAN:  This begins media unit

14   number 4.  The time on the video is 2:05 p.m.  We

15   are on the record.

16   BY MR. HO:

17        Q.   Mr. Gore, before the break do you

18   remember talking about margins of error?

19        A.   Yes.

20        Q.   Do you remember how we talked about how,

21   when data has smaller margins of error, we'd --

22   you and I agree that that data would be more

1   precise than data that has larger margins of

2   error, right?

3          A.   Yes.

4          Q.   Today, do you believe that CVAP data

5   produced from responses to a question about

6   citizenship on the census questionnaire will be

7   more precise than the data that the Department of

8   Justice is currently relying on with respect to

9   CVAP for purposes of VRA enforcement purposes?

10         A.   I'm not sure I have a view on that one

11  way or the other, since I don't know what the

12  margin of error is that the Census Bureau will

13  assign to census responses and, particularly, the

14  citizenship question should it be asked on the

15  2020 census.

16         Q.   So just to clarify, right now you don't

17  know whether or not CVAP data produced from

18  responses to the citizenship question on the

19  census questionnaire will, in fact, be more

20  precise than the CVAP data on which DOJ is

21  currently relying for purposes of VRA enforcement?

22         A.   I believe that's correct.   I don't know

1  what the margin of error is that will be assigned

2  to that, to that data.

3       Q.  I want to turn back to the Gary letter.

4  And the last bullet, which is the fourth bullet

5  overall, it's the third bullet on page 3 of the

6  letter, it reads, "Census data is reported to the

7  census block level, while the smallest unit

8  reported in the ACS estimates is the census block

9  group.  See American Community Survey data 3, 5,

10  10.  Accordingly, redistricting jurisdictions and

11  the department are required to perform further

12  estimates and to interject further uncertainty in

13  order to approximate citizen voting age population

14  at the level of a census block, which is the

15  fundamental building block of a redistricting

16  plan.  Having all of the relevant population

17  citizenship data available in one data set at the

18  census block level would greatly assist the

19  redistricting process."

20       Did I read that correctly?

21       A.  Yes, you did.

22       Q.  Okay.  Correct me if I'm wrong, but the

Page 235

1   point that's being expressed in this bullet is

2   that citizenship data from the ACS is not ideal

3   for purposes of VRA enforcement because ACS

4   citizenship data is published at the block group

5   level and DOJ is required to perform further

6   estimates to generate CVAP data at the census

7   block level, correct?

8        A.   Correct.

9        Q.   Historically, CVAP data broken down by

10  race and ethnicity derived from the census long

11  form was not published at the census block level,

12  correct?

13       A.   I don't know the answer to that.

14       Q.   You're not aware of any time previously

15  where DOJ has had at its disposal CVAP data broken

16  down by race and ethnicity at the census block

17  level, correct?

18       A.   I am not aware of that.

19       Q.   You're not aware of any time previously

20  where DOJ did not have to use an estimated -- an

21  estimation procedure in order to convert CVAP data

22  from the Census Bureau from one geographical level

1 into block level data broken down by race or

2 ethnicity, correct?

3     A.  As I understand your question, that's

4 correct.

5     Q.  The Gary letter doesn't mention the fact

6 that, for purposes of VRA enforcement, DOJ has

7 always had to use an estimated -- an estimation

8 procedure in order to convert CVAP data from the

9 Census Bureau at one geographic level into CVAP

10 data by race and ethnicity at the block level,

11 correct?

12     A.  I've just testified that I don't know

13 whether that's a fact or not.  But there's no

14 mention of that issue in the Gary letter.

15     Q.  You've never assessed the statistical

16 reliability of estimation techniques for deriving

17 block level CVAP data from block group level CVAP

18 data, correct?

19         MR. GARDNER:  Objection.  Form.

20         THE WITNESS:  I don't believe I have, no.

21 BY MR. HO:

22     Q.  You're not aware of any case that was

1  filed by DOJ where DOJ was unable to succeed on a

2  VRA claim because of the fact that DOJ performed

3  an estimation procedure to derive census block

4  level CVAP data correct?

5      A.  I'm not aware of any such filed case.

6      Q.  You're not aware of any case where any

7  plaintiff was unable to succeed on a VRA claim

8  because of the fact that the plaintiff had to

9  perform an estimation procedure to derive

10 block-level CVAP data, correct?

11     A.  I'm not aware of any such filed case, and

12 I understand your question to be limited to filed

13 cases.

14     Q.  You're not aware of any situation where a

15 plaintiff did not bring a case because of the fact

16 that the plaintiff would have to perform an

17 estimation procedure in order to generate CVAP

18 data at the census block level, correct?

19         MR. GARDNER:  Objection to the extent

20 that you're calling for information subject to the

21 law enforcement privilege.  To the extent you are

22 asking for that information, I would instruct the

Page 238

1   witness not to answer.

2          To the extent you can answer that

3   question without divulging law

4   enforcement-sensitive information, you may do so.

5          THE WITNESS:  I am not aware of any

6   public, nonprivileged information to indicate the

7   existence of any such case.

8   BY MR. HO:

9      Q.  If the Census Bureau could produce CVAP

10   data at the block level for the Department of

11   Justice instead of at a different level of

12   geography, and could do so without including a

13   citizenship question on the census, would that

14   alleviate the concern that's expressed in this

15   bullet point?

16          MR. GARDNER:  Objection.  Calls for a

17   hypothetical.

18          THE WITNESS:  It's a hypothetical I can't

19   engage in.

20          MR. HO:  You're not instructing -- Josh,

21   you're not instructing him not to answer the

22   question, right?  You're just lodging an

601

Page 240

BY MR. HO:

1   BY MR. HO:

2       Q.   You're just refusing to answer the

3   question, correct?

4       A.   I'm telling you my answer is I won't

5   engage in a hypothetical.

6       Q.   Okay.  Aside from the four bullets

7   expressed in this letter, are there any other

8   reasons why ACS CVAP data are not the ideal data

9   for purposes of VRA enforcement of which you are

10  aware?

11      A.   Not that I'm aware of.

12      Q.   Okay.  I'm going to show you a document.

13  We'll mark this as 20.

14          (Gore Deposition Exhibit 20 marked for

15          identification and attached to the

16          transcript.)

17  BY MR. HO:

18      Q.   This is a printout from the Department of

19  Justice website listing cases brought by the

20  voting section.  The URL for this is on the bottom

21  left-hand corner of the first page.  The first

22  page, the cases -- under the first header, Cases

601

1   foundation.

2          THE WITNESS:  I'm not aware of any such

3   case.  I will note that some of these cases are

4   not redistricting cases, and so would not have

5   implicated that issue.

6   BY MR. HO:

7      Q.  Okay.  The issue of CVAP, your testimony

8   is it's only relevant in Section 2 redistricting

9   cases, but not other kinds of Section 2 cases?

10     A.  There may be other kinds of Section 2

11  cases where it's also relevant, but I believe that

12  at least a couple of these cases were cases where

13  it would not have been relevant.

14     Q.  You're not aware of any of these cases          601

15  failing because of the quality of CVAP data

16  available to the Department of Justice, correct?

17          MR. GARDNER:  Objection.  Lack of

18  foundation.

19          THE WITNESS:  I am not aware.

20  BY MR. HO:

21     Q.  You mentioned earlier a case, the

22  Benavidez case.  Do you remember that?

Page 243

1        A.   Yes.

2        Q.   It's a case from the Northern District of

3   Texas, right?

4        A.   Yes.

5        Q.   It's not a circuit court case, right?

6        A.   That is correct.

7        Q.   Okay.  That's the only case in which you

8   are aware that the plaintiff's claim failed in

9   part due to reliance on ACS data, correct?

10        A.   No, I don't think that's correct.  I

11   think it's the only case of which I'm aware where

12   the plaintiff's case failed in part because of

13   reliance on ACS CVAP data.  I believe there's

14   another case out there where plaintiff may have

15   tried to use ACS total population data, and that

16   was not upheld by the court.

17        Q.   Okay.  That case that you're referring

18   to, that doesn't really have any bearing on the

19   issue of the quality of citizenship data from the

20   ACS, right?

21        A.   That's correct.  I'm just trying to be

22   responsive to your question.

Page 244

1        Q.   No, I appreciate that.

2             So just so that the record is clear, the

3    Benavidez case is the only case that you're aware

4    of where the plaintiff's claim failed in part due

5    to reliance on ACS CVAP data, correct?

6        A.   Correct.

7        Q.   And just to be clear, the Benavidez case

8    was not brought by the Department of Justice,

9    correct?

10       A.   Correct.

11       Q.   Now, your understanding is that the

12   plaintiffs in the Benavidez case relied on

13   one-year ACS estimates, correct?

14       A.   That's my recollection from the case.

15   Yes.

16       Q.   And your recollection is that the

17   plaintiffs in the Benavidez litigation did not

18   rely on five-year ACS estimates, correct?

19       A.   That is my recollection.   Correct.

20       Q.   And your recollection is that, in the

21   Benavidez case, the court found that the one-year

22   ACS data that the plaintiffs were relying upon was

1   not sufficiently reliable for the geographic areas

2   at issue in that case, correct?

3       A.   Correct.

4       Q.   Okay.  We established earlier that your

5   understanding is that the Census Bureau publishes

6   the five-year ACS estimates as reliable for any

7   geographic area regardless of population size,

8   correct?

9       A.   I believe you showed me a page on the

10  website that says that.  I don't know what the

11  Census Bureau means by that or what purposes it

12  intends the ACS data to be used for.  But that is

13  the statement that you showed me earlier.

14      Q.   And the plaintiffs in the Benavidez case

15  didn't rely on those five-year ACS estimates,

16  correct?

17      A.   That's correct.

18      Q.   And you --

19      A.   That's my recollection.

20      Q.   And you're not aware of a single case in

21  which a plaintiff's VRA claim failed due to

22  reliance on five-year ACS estimates, correct?

1        A.  Correct.   I'm not aware of any such case.

2        Q.  You described the Benavidez case in your

3    testimony to Congress, correct?

4        A.  I believe I mentioned it.   Yes.

5        Q.  At the time you testified in Congress,

6    you were aware that the plaintiffs in the

7    Benavidez case relied on one-year rather than

8    five-year ACS data, correct?

9        A.  I believe that's correct.

10       Q.  Okay.   In your testimony in Congress, you

11   didn't mention the fact that although the Census

12   Bureau considers one-year ACS estimates to be

13   reliable only for areas that are -- have 65,000

14   people or more, it considers five-year ACS

15   estimates to be reliable for any geographic area,

16   correct?

17       A.  I don't recollect the specifics of my

18   testimony on that point.

19       Q.  You don't recall making clear to Congress

20   that there are five-year ACS estimates, as

21   distinct from the one-year ACS estimates relied on

22   by the plaintiffs in Benavidez, that are

1   considered by the Census Bureau to be reliable for

2   any geographic area, correct?

3       A.  I do not recall every word that I said in

4   my testimony to Congress.

5       Q.  That wasn't my question.  My question

6   was, you don't recall mentioning the five-year ACS

7   estimates during your testimony in Congress,

8   correct?

9       A.  I don't recall mentioning it or not

10  mentioning it.

11      Q.  In fact, you didn't mention the five-year

12  ACS estimates during your testimony, correct?

13      A.  I answered that question.  I don't recall

14  whether I did or I didn't.

15      Q.  And you didn't mention that the Census

16  Bureau publishes ACS estimates that it considers

17  reliable for any geographic area during your

18  testimony in Congress, correct?

19      A.  I don't recall whether I did or I didn't.

20  And as I said before, I don't know what the Census

21  Bureau means by that or the uses to which it

22  intends the ACS can be put.

Page 248

 1        Q.   Can you think of any reason why you
 2   wouldn't mention the fact that the -- that there
 3   are five-year ACS estimates during your
 4   congressional testimony?
 5        A.   I was not asked -- I don't believe I was
 6   asked the intervals of estimates that are
 7   available through the ACS.   I was responding to a
 8   different question, as I recall my testimony.   But
 9   if you point me to where my testimony is in the
10   transcript, I'd be happy to discuss it further.
11        Q.   Can you think of any reason why you
12   wouldn't mention the fact that the Census Bureau
13   produces estimates that have greater reliability
14   at smaller geographic areas than the one-year ACS
15   estimates that you did discuss during your
16   congressional testimony?
17        A.   Again, I'm happy to comment on my
18   testimony if you want to point me to a specific
19   page of it, and I can try to reconstruct why I did
20   or did not give a particular piece of information.
21   It may not have been responsive or relevant to the
22   question.

Page 249

 1      Q.  You don't think Congress would have

 2  wanted to know that there are ACS estimates that

 3  are more reliable than the one-year ACS estimates

 4  that the plaintiffs relied on in the Benavidez

 5  case?

 6          MR. GARDNER:  Objection.  Calls for

 7  speculation.

 8          THE WITNESS:  These days, I have no idea

 9  what Congress wants.

10  BY MR. HO:

11      Q.  Going back to the list of cases that's in

12  front of you --

13      A.  Exhibit 20?

14      Q.  Yes.

15      A.  Okay.

16      Q.  None of these cases have been filed since

17  you were acting assistant attorney general for

18  civil rights, correct?

19          I meant just the Section 2 cases on the

20  first page, sorry.

21      A.  That is correct.

22      Q.  In fact, none of the Section 2 cases

Page 250

1    listed on the first page have been filed since the

2    start of the Trump administration, correct?

3        A.   That is correct.

4        Q.   Okay.   The previous administration -- for

5    part of its time, the previous administration, in

6    addition to having responsibilities under

7    Section 2 of the Voting Rights Act, also had

8    obligations under Section 5 of the Voting Rights

9    Act, correct?

10       A.   That's correct.

11       Q.   The current administration does not have

12   obligations under Section 5 of the Voting Rights

13   Act to the same extent, correct?

14           MR. GARDNER:   Objection to form.

15           THE WITNESS:   That's correct.

16   BY MR. HO:

17       Q.   What obligations, if any, does the

18   current administration have with respect to

19   Section 5 enforcement?

20       A.   That is a fair question.   There are a

21   couple of jurisdictions that are covered under

22   Section 3(c) of the Voting Rights Act, which is

1   similar to Section 5.   We may, in fact, have no

2   obligations with respect to Section 5 at this

3   point due to the Supreme Court's decision in

4   Shelby County, which was a 2013 decision, so it

5   was about in the middle of the prior

6   administration's tenure.

7        Q.   Okay.   If you look at the previous

8   administration, 2009 through the beginning of

9   2017, it looks like the Department of Justice

10  filed five Section 2 cases during that period.

11       A.   I believe that's correct.

12       Q.   Okay.   So previous administration had

13  Section 5 obligations to review voting changes in

14  all or part of 16 states for part of that time,

15  correct?

16       A.   I believe until the Shelby County

17  decision in 2013.

18       Q.   Okay.   And the current administration

19  doesn't have those obligations and hasn't filed

20  any Section 2 cases?

21       A.   That's correct.   We also haven't had a

22  decennial census which has required every state in

1   the union to redistrict during the time of this

2   administration, which the prior administration did

3   in the 2010 census.

4        Q.   You would say that it is not unusual for

5   the Department of Justice to go several years

6   without filing a Section 2 case, right?

7        A.   While I review this list, I think

8   that's -- that may or may not be correct.   But

9   there have certainly been years and multiyear

10  periods where the Department of Justice has not

11  filed Section 2 cases.

12       Q.   You're not saying that reliance on ACS

13  CVAP data is the reason why the Department of

14  Justice has failed to file a Section 2 case since

15  the start of the Trump administration, right?

16       A.   Again, I didn't think we were going to

17  talk about cases that hadn't been filed.   And I

18  believe that's covered by law enforcement

19  privilege and I can't talk about why or why not --

20  why certain cases were or were not filed.

21       Q.   Well, your counsel didn't object to my

22  question.

Page 254

1    Otherwise, I instruct you not to answer.

2           THE WITNESS:  Consistent with that

3    instruction, I can't answer.

4    BY MR. HO:

5       Q.  Okay.  You're not saying that if you had

6    different CVAP data at your disposal, you would

7    have filed some additional Section 2 cases, right?

8           MR. GARDNER:  Same objection.  Same

9    instruction.

10          THE WITNESS:  Consistent with that

11   instruction, I can't answer.

12          MR. HO:  We'll mark this as Exhibit 21.          802

13          (Gore Deposition Exhibit 21 marked for

14          identification and attached to the

15          transcript.)

16   BY MR. HO:

17      Q.  It's an e-mail exchange between you,

18   Arthur Gary, and others.  The top e-mail on the

19   thread is from you to Arthur Gary dated

20   January 29th, 2018.  The first page bears Bates

21   number DOJ 00002712.

22          I want to go through the individual

Page 255

1    e-mails on here.  Okay?                          802

2            So the top e-mail, this is Arthur Gary

3    e-mailing you, correct?

4         A.  I don't believe so, actually.

5         Q.  Oh, I'm sorry.  The top is you e-mailing

6    Arthur Gary, correct?

7         A.  Appears to be, yes.

8         Q.  Okay.  And the second e-mail, the second

9    to most recent one on the first page here, Arthur

10   Gary is forwarding to you an e-mail chain between

11   him and Ron Jarmin, the acting director of the

12   Census Bureau, correct?

13        A.  That appears to be correct.

14        Q.  Okay.  I want to look at the first e-mail    802

15   in time on this chain.  It's on the last page,

16   page 5, Bates number DOJ 2716.

17           This is an e-mail from Ron Jarmin to

18   Arthur Gary, cc'ing Enrique Lamas of the Census

19   Bureau.  And it has the date December 22nd, 2017,

20   right?

21        A.  Yes, that's correct.

22        Q.  Okay.  The e-mail from Acting Director

Page 257

1    expressing the view that the best way to provide

2    block-level CVAP data for purposes of VRA

3    enforcement is not to add a citizenship question

4    to the census?

5        A.   No, that's not what I understand.

6        Q.   What do you understand the Census Bureau

7    director to be saying?

8        A.   I believe he is saying that he's had

9    staff review the question, and the staff had

10   briefed him, and their findings suggest that the

11   best way to provide that data would be through the

12   linked file of administrative and survey data.

13       Q.   Okay.

14       A.   And then requesting to set up a meeting

15   about that issue.

16       Q.   Okay.  So just to clarify, your                601/

17   understanding is that, in this e-mail, the acting     802

18   director of the Census Bureau is expressing -- is

19   stating that Census Bureau staff have briefed him

20   and sug -- and -- on their findings which suggest

21   that the best way to provide block-level CVAP data

22   is not to add a citizenship question to the

1  decennial census questionnaire, correct?

601/
802

2       A.  I think that's right.  This e-mail speaks

3  for itself, and obviously I didn't write it and it

4  wasn't addressed to me.

5       Q.  Your understanding is that the Census

6  Bureau director is -- or acting Census Bureau

7  director is stating that Census Bureau staff have

8  conducted an analysis and briefed him on their

9  findings which suggest that the best way to

10 provide block-level CVAP data for DOJ's needs is

11 through a linked file of administrative and survey

12 data that the Census Bureau already possesses,

13 correct?

14      A.  That's my understanding of what this

15 says.  Yeah.

16      Q.  And your understanding is that the Census

17 Bureau director is -- acting Census Bureau

18 director is writing and stating that his staff --

19 that Census Bureau staff have analyzed this issue

20 and briefed him on their findings that the linked

21 file of administrative and survey data would

22 result in higher quality data produced at lower

Page 259

1   cost than including a citizenship question on the

2   census questionnaire, correct?

3        A.  I understand that he is communicating

4   that the findings of the staff suggest that.  Yes.

5        Q.  Okay.  No meeting between the technical

6   experts at DOJ and the Census Bureau took place

7   between the date of the December 12th Gary letter

8   requesting a citizenship question and the Ross

9   decision memo in March of 2018 directing the

10  inclusion of a citizenship question, correct?

11       A.  I am not aware of any such meeting.

12       Q.  You're not aware of any such meeting of

13  technical staff in the civil rights division,

14  which you are the head of, and the Census Bureau's

15  technical staff to discuss this proposal -- or

16  these findings, rather, about a different way of

17  generating block-level CVAP data referenced in

18  this e-mail, correct?

19       A.  I am not aware of any such meeting.

20       Q.  The next e-mail on this chain is on

21  December 22nd, 2017.  It's on page 4.  Arthur Gary

22  writes to Dr. Jarmin, "Dr. Jarmin, thank you for

601/
802

Page 260

1      your response.  We look forward to meeting with

2      you and your team in early January.  Best

3      regards."

4                Did I read that right?

5           A.  Looks right, yeah.

6           Q.  Okay.  On page 3, page DOJ 2714, on          601/

7      January 2nd, Arthur Gary writes to Ron Jarmin, "It     802

8      should work fine.  Let me get back to you.  Best

9      wishes to you for 2018 as well."

10               I read that correctly, right?

11          A.  Yes, you did.

12          Q.  That's in response to a meeting -- an

13     e-mail on the following page which is from Ron

14     Jarmin to Arthur Gary which reads, "Arthur, happy

15     new year.  Would the late next week work for a

16     meeting?"  Right?

17          A.  Appears -- that appears correct.

18          Q.  Okay.  So at this point, it looked like

19     Mr. Gary was planning on having a meeting or

20     suggested that a meeting the following week with

21     the Census Bureau would work fine, correct?

22          A.  Again, these e-mails speak for

Page 261

1    themselves.  And I can't speak for Mr. Gary.  But    601/

2    that seems about right.                              802

3        Q.  Okay.  One week later -- I'm on page 3 --

4    Ron Jarmin writes to Arthur Gary on January 9th,

5    2018, "Gary, any updates?  We have a pretty short

6    clock to resolve the request.  Would be good to

7    meet with your team as soon as possible.  Thanks."

8            Do you see that?

9        A.  I do.

10       Q.  Okay.  In the next e-mail, also on

11   January 9th, 2018, Arthur Gary writes back to Ron

12   Jarmin and suggests a number of times, including

13   Friday, January 19th, at 11:00 a.m., correct?

14       A.  I'm sorry, which page are you on?

15       Q.  Page 2.

16       A.  I don't see any e-mail from January 13th.

17       Q.  January 9th, 2018.

18       A.  Okay.  Which e-mail are we talking about?

19   I'm sorry.

20       Q.  From Arthur Gary to Ron Jarmin --

21       A.  At the bottom of the page?

22       Q.  At the bottom of the page.

Page 262

1      A.   Okay.

2         Q.   Mr. Gary writes back to Ron Jarmin and

3    offers a number of options for a meeting,

4    including Friday, January 19th, at 11:00 a.m.,

5    right?

6         A.   That appears to be correct.

7         Q.   And in the next e-mail on the thread,

8    Dr. Jarmin writes to Arthur Gary on January 10th,

9    "Thanks, Gary.   Let's do Friday at 11:00.   We're

10   fine meeting at main Justice."   Right?

11        A.   Right.

12        Q.   The next e-mail, which is on the first

13   page at the bottom, on January 16th, 2018, Arthur

14   Gary writes to cancel the meeting with Ron Jarmin,

15   correct?

16        A.   Well, it looks like -- he says

17   they're unable -- "We" -- I don't know who "we"

18   are -- "will be able to meet on Friday or this

19   week."

20        Q.   Did you have any conversations with

21   Mr. Gary about meeting with the Census Bureau

22   between the date of Dr. Jarmin's e-mail on

601/
802

1   December 22nd requesting a meeting between Census

2   Bureau and DOJ staff and Arthur Gary's e-mail on

3   January 16th stating, due to some scheduling

4   conflicts, we will be unable to meet on Friday?

5       A.   Yes.

6       Q.   When did those conversations take place?

7       A.   I don't remember the specific dates.

8       Q.   What was the content of that

9   conversation?

10      A.   I believe the content of that

11  conversation related to this request that the

12  Census Bureau and the Department of Justice hold a

13  meeting.

14      Q.   And what did Mr. Gary convey to you about

15  the Census Bureau's request to have a meeting

16  between DOJ and Census Bureau technical staff?

17      A.   He conveyed to me that the request had

18  been made.

19      Q.   What did he -- did he convey to you

20  anything other than the fact that a request had

21  been made?

22      A.   I believe he mentioned that they had

802

1   offered certain dates for that meeting, but

2   that -- I don't recall the specifics of that

3   conversation beyond that.

4        Q.   Did Mr. Gary tell you that, in

5   Dr. Jarmin's e-mail, he had written that Census

6   Bureau staff had briefed him on their analysis

7   which suggested that there was a way to produce

8   higher quality CVAP data at lower cost for the

9   Department of Justice through a means other than

10  including a question about citizenship on the

11  2020 census questionnaire?

12       A.   I don't believe he conveyed that.  I

13  believe what he conveyed was that the Census

14  Bureau thought there might be another way to get

15  the data to the Department of Justice.

16       Q.   And what was your response to receiving

17  that information?

18       A.   I listened to what Mr. Gary had to say

19  and told him that I would think about the issue

20  and discuss it further with others.

21       Q.   Did you instruct Mr. Gary not to hold the

22  meeting with the Census Bureau that was scheduled

802

1   for Friday, January 19th?

2        A.   I don't believe so, no.

3        Q.   Do you know why that meeting did not

4   occur?

5        A.   I believe that -- I believe at the time

6   we were trying to gather more information within

7   the department about this meeting and whether it

8   was consistent with our -- with what we wanted to

9   do.   And I believe that -- if I recall correctly,

10  this was a request for more time from the Census

11  Bureau that Mr. Gary submitted.

12       Q.   What, if anything, did you do with the

13  information that the Census Bureau had an

14  alternative means for providing DOJ with

15  block-level CVAP data?

16       A.   I discussed that with various people at

17  the Department of Justice.

18       Q.   And who did you discuss that with?

19       A.   I discussed it with Rachael Tucker, Pat

20  Hovakimian.   I may have discussed it with Danielle

21  Cutrona.   I'm not sure.   And I eventually

22  discussed it with the attorney general.

1      Q.  You didn't discuss the fact that the

2  Census Bureau had an alternative idea for

3  producing block-level CVAP data for purposes of

4  VRA enforcement with voting section employees?

5      A.  I may have discussed it -- I think I

6  probably did discuss it with Chris Herren as well.

7  I may have discussed it with him.  I don't recall

8  specifically.

9      Q.  You mentioned that you discussed it with

10  the attorney general.  When did you discuss the

11  fact that the Census Bureau had an alternative

12  means of producing block-level CVAP data with the

13  attorney general?

14      A.  It would have been at some point after I

15  spoke to Art Gary.  I don't remember the exact

16  date.

17      Q.  Roughly when did you speak to Art Gary?

18      A.  Again, I don't remember the exact date of

19  that either.  It would have been before this

20  January 16th e-mail.

21      Q.  So sometime after this conversation -- so

22  let me just back up here.

1      Q.  And at some point after that, you had a

2   conversation about this proposal with the attorney

3   general, correct?

4      A.  I don't know if it was so much about the

5   proposal, because I wasn't up on what the

6   specifics of the proposal were.  I think we had

7   a -- we may have had a conversation related to

8   this issue of Census Bureau wanting to meet.

9      Q.  You didn't ask Arthur Gary for the

10  specifics of the proposal from the Census Bureau?

11     A.  No, I don't believe I did.

12     Q.  You didn't ask Arthur Gary to get more

13  information about the specifics of the proposal

14  from the Census Bureau to get higher quality CVAP

15  data at lower cost?

16     A.  I don't recall asking him that and I

17  don't recall him conveying that to me that that

18  was a representation that the Census Bureau had

19  made.

20     Q.  Okay.  You at some point had a

21  conversation with the Attorney General about this.

22  Was that in person or by phone?

1       A.   In person.

2       Q.   And it was in January of 2018?

3       A.   Probably.  Yeah.

4       Q.   What was discussed with respect to the

5  Census Bureau's alternative proposal for producing

6  block-level CVAP data?

7            MR. GARDNER:  Objection.  Calls for

8  information that's subject to deliberative process

9  privilege.  I instruct the witness not to answer.

10           MR. HO:  Can I just ask you what decision

11 this deliberation went to, given that the

12 department had already at this point --

13           MR. GARDNER:  Sure.

14           MR. HO:  -- made the request?

15           MR. GARDNER:  It's embedded in your

16 actual question about the consideration of

17 alternatives.

18           Remember, the deliberative process

19 privilege can apply even if no final decision is

20 made.

21           MR. HO:  So this is not about the

22 decision to request the citizenship question.

Page 271

1   that --

2           MR. GARDNER:  Decision as to whether to

3   pursue that proposal.

4           MR. HO:  Okay.  That's what I just wanted

5   to clarify because --

6           MR. GARDNER:  Yeah.  Okay.

7           MR. HO:  -- it wasn't clear to me.

8           MR. GARDNER:  Sorry.  I thought that was

9   clear.  I apologize.  Yeah, that's the decision.

10  BY MR. HO:

11      Q.  Okay.  So the conversation with the

12  attorney general included a discussion about

13  whether or not to pursue the Census Bureau's

14  proposal to produce block-level CVAP data for DOJ

15  for VRA enforcement purposes without including a

16  citizenship question, correct?

17      A.  That is correct.  And just to clarify, I

18  wasn't familiar with all the particulars of their

19  proposal.

20      Q.  That's fine.

21          The decision was made not to pursue the

22  Census Bureau's alternative proposal for producing

1  block-level CVAP data for purposes of VRA

2  enforcement through a means other than including a

3  citizenship question on the census, correct?

4       A.  That is correct.

5       Q.  Who made that decision?

6       A.  The attorney general.

7       Q.  When was that decision made?

8       A.  Around this time.  I don't know exactly

9  when it was made.  I can't remember the specific

10  date.

11       Q.  When you say "around this time," you mean

12  around January of 2018, correct?

13       A.  That is correct.

14       Q.  Are the reasons for that decision

15  memorialized anywhere?

16       A.  Not to my knowledge.

17       Q.  Were those reasons ever communicated to

18  you?

19       A.  Yes.

20       Q.  What were those reasons?

21           MR. GARDNER:  Objection.  Calls for

22  information subject to deliberative process

Page 273

1    privilege.  I instruct the witness not to answer.

2              THE WITNESS:  Consistent with that

3    instruction, I can't answer.  But I do admire your

4    tenacity.

5    BY MR. HO:

6         Q.  On the first page, the second e-mail

7    listed here is from Ron Jarmin to Art Gary on

8    January 26th, 2018 and reads, "Art, any chance of

9    meeting late next week?  Thanks.  Ron."

10             As of this date, it had not yet been

11   communicated to the Census Bureau that the --

12   whether or not the Department of Justice would

13   meet to discuss the Census Bureau's other proposal

14   for producing block-level CVAP data, correct?

15        A.  I'm not sure I know the answer to that

16   question.

17        Q.  Who informed Art Gary of the decision not

18   to meet with the Census Bureau to discuss their

19   alternative proposal for producing block-level

20   CVAP data?

21        A.  I did.

22        Q.  When did you inform Mr. Gary of that

Page 274

1    decision?

2          A.   It would have been around this

3    January 29th date, I believe.   But I don't recall

4    specifically.

5          Q.   And who informed you that the Department

6    of Justice should not meet with the Census Bureau

7    to discuss the Census Bureau's alternative

8    proposal for producing block-level CVAP data?

9          A.   The attorney general.

10         Q.   You received this e-mail thread from

11   Arthur Gary, which includes the initial e-mail

12   from Dr. Jarmin describing the alternative

13   proposal for collecting CVAP data at higher

14   quality produced at lower cost on January 29th,

15   2018, correct?

16         A.   On this e-mail chain, that's correct.   I

17   don't know whether I received it before then or

18   not.   But yes, this e-mail -- the e-mail dated

19   January 29th, 2018, at 2:33 p.m., is the first

20   e-mail in this chain where Mr. Gary sent me that

21   information.

22         Q.   When you told Congress on May 21st, 2018,

Page 277

1      Q.  Your understanding is that Secretary Ross

2   speaks for the Census Bureau?

3      A.  Yes.  On this -- at least on this issue.

4   I understand that -- and again, I've not studied

5   the legal questions in this case, but it's my

6   understanding that the Secretary of Commerce has

7   the authority to determine which questions will

8   and will not be asked on the census questionnaire.

9      Q.  Do you have any reason to think that                  601

10   Secretary Ross knows more about the accuracy of

11   various forms of CVAP data than the career

12   professionals at the Census Bureau?

13           MR. GARDNER:  Objection.  Lack of

14   foundation.

15           THE WITNESS:  I have no basis to answer

16   that question.

17   BY MR. HO:

18      Q.  You don't know one way or the other

19   whether or not Secretary Ross knows more about the

20   accuracy of various forms of CVAP data than the

21   career professionals who work with statistical

22   research and survey data at the Census Bureau?

Page 278

1        MR. GARDNER:  Same objection.

2        THE WITNESS:  I don't know one way or the

3   other, and I don't know what Census Bureau staff

4   ultimately concluded since the e-mail said there

5   were suggestions made by particular findings.

6        It's my understanding that Secretary Ross

7   has the legal right and the legal authority to

8   make that determination on behalf of the Commerce

9   Department and the Census Bureau under the

10  relevant statutes that Congress has enacted.

11  BY MR. HO:

12      Q.  So let's leave aside legal right and

13  legal authority and let's just talk about the

14  Census Bureau and what Dr. Jarmin represented in

15  this e-mail.

16           Just here today, you know that Dr. Jarmin

17  wrote to Arthur Gary and said Census Bureau staff

18  have looked at this issue, and their analysis

19  suggests that there's a way to get CVAP data for

20  DOJ that would produce higher quality data at

21  lower cost, and wanted to meet with DOJ about

22  that.  You understand that, right?

Page 279

1          A.   Yes, I believe I've testified that I

2     understand that.

3          Q.   Okay.   And when you told Congress that

4     the best vehicle -- or the most appropriate

5     vehicle for obtaining CVAP data was through the

6     decennial census questionnaire, you didn't mention

7     Dr. Jarmin's proposal, right?

8               MR. GARDNER:   Objection.   Asked and

9     answered.

10              THE WITNESS:   Again, I don't remember

11    exactly everything that I testified to on May

12    21st.   I'm happy to read that testimony now and

13    answer your question and verify -- or give you the

14    verification or confirmation that you seem to be

15    asking me for.

16              But no, I didn't mention this.   I didn't

17    mention everything about the decision or the issue

18    in that testimony to Congress.   I was asked

19    specific questions by congresspeople and gave

20    answers to the best of my ability and recollection

21    within the constraints that the Department of

22    Justice places on witnesses who testify before

1   Congress.

2         Moreover, all it says here is that there

3   were some career staff who made findings that

4   suggested a particular thing, not that they had

5   firmly reached that conclusion.  And of course, as

6   I mentioned before, it's up to Secretary Ross to

7   make that determination as a matter of law, or at

8   least that's my understanding.

9   BY MR. HO:

10        Q.  I mean, this isn't an e-mail from just a

11  random Census Bureau staffer.  This is an e-mail

12  from the acting director of the Census Bureau,

13  correct?

14            MR. GARDNER:  Objection.  Argumentative.

15            THE WITNESS:  I understand that

16  Dr. Jarmin was the acting director of the Census

17  Bureau, yes.

18  BY MR. HO:

19        Q.  He is the acting director of the Census

20  Bureau today, right?

21        A.  That, I don't know.  But sure, he could

22  be.

1    Q.  Okay.  Are you satisfied that your

2  testimony to Congress, which omitted Dr. Jarmin's

3  proposal to meet with the DOJ to discuss the

4  Census Bureau's findings that there was a way to

5  produce higher quality data at lower cost aside

6  from the census [sic] question -- are you

7  satisfied that that was complete testimony to

8  Congress?

9    A.  Absolutely.  I -- I testified completely

10  and honestly to Congress on the matters that I was

11  in a position to testify on.

12    Q.  Your goal is to get the most complete and

13  accurate CVAP data from the Census Bureau, right?

14    A.  That would be the Department of Justice's

15  goal.  Yes.

16    Q.  And despite having that goal, you did

17  not -- and when I say "you," the Department of

18  Justice did not have a meeting of its technical

19  staff with the Census Bureau to discuss the Census

20  Bureau's proposal to get higher quality CVAP data

21  at lower cost, correct?

22    MR. GARDNER:  Objection.  Asked and

1   answered.

2           THE WITNESS:   I believe that's correct.

3   BY MR. HO:

4       Q.   Are you aware of any other circumstance

5   where the Department of Justice asked the Census

6   Bureau to collect data but then refused to have a

7   technical meeting to discuss that data request?

8       A.   I'm not aware of that, nor am I aware of

9   any instance where the Census Bureau has offered

10  that kind of meeting.

11      Q.   All right.

12           (Gore Deposition Exhibit 22 marked for

13           identification and attached to the

14           transcript.)

15  BY MR. HO:

16      Q.   This is marked as Exhibit 22.   It's an

17  e-mail from Ron Jarmin to Census Bureau personnel

18  in the administrative record with Bates number

19  9074.

20           In this e-mail, Dr. Jarmin is forwarding

21  to Census Bureau personnel an e-mail that he had

22  previously written on February 6th, 2018, to

 1    Enrique Lamas and, it appears, Karen Dunn Kelley.

 2            Do you see that?

 3        A.  I do see that.

 4        Q.  Dr. Jarmin writes to Ms. Kelley, "Karen,

 5    I spoke with Jarmin is Gary.  He has spoken with

 6    DOJ leadership.  They believe the letter

 7    requesting citizenship be added to the 2020 census

 8    fully describes their request.  They do not want

 9    to meet.  Thanks, Ron."

10            Did I read that right?

11        A.  Yes, you did.

12        Q.  You're part of the DOJ leadership to whom

13    Art -- Arthur Gary spoke about a possible meeting

14    between the Census Bureau and DOJ, correct?

15            MR. GARDNER:  Objection.  Calls for

16    speculation.  Lack of foundation.

17            THE WITNESS:  I don't know who Jarmin is

18    Gary spoke to or who he was referring to.  As I

19    testified previously, I did talk to him about this

20    issue.

21    BY MR. HO:

22        Q.  Are you aware of anyone else speaking

Page 284

1  with Arthur Gary about the decision over whether

2  or not to meet with Census Bureau personnel to

3  discuss their proposal to produce block-level CVAP

4  data without a citizenship question?

5       A.  I have no awareness on that one way or

6  the other.

7       Q.  Dr. Jarmin is correct that DOJ leadership

8  did not want to meet to discuss the technical

9  aspects of the citizenship question request,

10  correct?

11       A.  I'm sorry, can you repeat that question?

12       Q.  Dr. Jarmin was correct that DOJ

13  leadership did not want to have a technical

14  meeting to discuss DOJ's request for block-level

15  CVAP data, correct?

16       A.  I believe that's correct.

17       Q.  The reason you didn't want to have that

18  meeting is because it was more important to the

19  Department of Justice to get a citizenship

20  question on the 2020 census questionnaire than to

21  get accurate block-level CVAP data, correct?

22            MR. GARDNER:  Objection.  Calls for

Page 286

1    record.

2            MR. GARDNER:  Whatever you wish.

3            VIDEO TECHNICIAN:  This concludes media

4    unit number 4.  The time on the video is 2:55 p.m.

5    We are off the record.

6            (A recess was taken.)

7            VIDEO TECHNICIAN:  This begins media unit

8    number 5.  The time on the video is 3:16 p.m.  We

9    are on the record.

10   BY MR. HO:

11       Q.  Mr. Gore, as the head of the civil rights

12   division, you want the civil rights division to

13   have access to the most accurate CVAP data for

14   purposes of VRA enforcement, right?

15       A.  Right.

16       Q.  You would like it if technical staff from

17   the civil rights division could meet with the

18   Census Bureau to discuss what the Census Bureau

19   believes is the most accurate CVAP data for

20   purposes of VRA enforcement, right?

21           MR. GARDNER:  Objection.  Form.

22           THE WITNESS:  Again, I think you're

1    Congress on May 8th.

2    BY MR. HO:

3         Q.   Well, before Secretary Ross' decision

4    memo -- that decision memo was in March of 2018,

5    correct?

6         A.   Sounds right.

7         Q.   Okay.  So before Secretary Ross' memo,

8    you didn't know what the Census Bureau's views

9    were about the most accurate form of CVAP data,

10   correct?

11        A.   That's probably correct.  Yeah.

12        Q.   Okay.  So before March of 2018, as

13   someone who wants the Department of Justice to

14   have the most accurate CVAP data for VRA

15   enforcement, you wanted to be able to have a

16   meeting of DOJ technical staff with the Census

17   Bureau to learn about the Census Bureau's views

18   about the most accurate CVAP data, correct?

19             MR. GARDNER:  Objection.  Hypothetical.

20             THE WITNESS:  That's a hypothetical.

21             MR. HO:  It's not a hypothetical.

22

Page 293

1    entry number 694.  It refers to a document with

2    the Bates number DOJ 30395.

3            Do you see that?

4       A.  I do.

5       Q.  The description of this document is that

6    it is an e-mail from Brett Shumate to you dated

7    March 25th, 2018, correct?

8       A.  Yes.

9       Q.  And the description of this document

10   reads, "E-mail among DOJ attorneys discussed and

11   providing legal advice on a draft of Commerce's

12   decision memo concerning the reinstatement of a

13   citizenship question on the census.  The e-mail

14   includes attorneys' thoughts and mental

15   impressions concerning anticipated litigation and

16   would reveal deliberative material that pre-dates

17   Commerce's final decision memo."

18           Did I read that right?

19      A.  Yes.

20      Q.  Okay.  So it's correct that you received

21   a draft of Commerce's decision memo before the

22   final memo became public, correct?

1      A.   That appears to be correct.   Yes.

2      Q.   You don't remember receiving a draft of

3   Secretary Ross' decision memo directing the

4   inclusion of a citizenship question from

5   Mr. Shumate?

6      A.   No, I do recall that.  I was saying it

7   appears to be correct based on the information you

8   just read.

9      Q.   Okay.  Did you discuss or provide to

10  Mr. Shumate legal advice on a draft of Commerce's

11  decision memo concerning a citizenship question on

12  the census?

13     A.   Yes.

14     Q.   Did Mr. Shumate share with you his

15  thoughts or mental impressions concerning

16  anticipated litigation over the citizenship

17  question?

18     A.   Yes, I believe he did.

19     Q.   Did you share with Mr. Shumate any

20  thoughts or mental impressions concerning

21  anticipated litigation over the citizenship

22  question?

Page 297

1  BY MR. HO:

2      Q.  This is Exhibit 24.  The document and the

3  attachment.

4          MR. GARDNER:  Which one do you want to be

5  24 and which do you want to be 25?

6          MR. HO:  We'll make the e-mail 24 and the

7  attached draft letter 25.

8          (Gore Deposition Exhibit 25 marked for

9          identification and attached to the

10         transcript.)

11 BY MR. HO:

12     Q.  So 24 is an e-mail from Mr. Aguinaga to                802

13 you dated June 13th, 2018, correct?

14     A.  Yes.

15     Q.  And it makes reference to attachments of

16 draft responses to members of Congress, correct?

17     A.  I believe that's correct.                              601/

18     Q.  Okay.  Exhibit 25 is a draft letter to                 802

19 Congresswoman Carolyn Maloney.  Do you see that?

20     A.  Yes.

21     Q.  Okay.  And I want to ask you about the

22 draft letter, specifically, the second paragraph,

Page 298

1    the second sentence.

2              Before the red-line, that sentence

3    appears to read, "As you noted, the department

4    sent a letter to the Census Bureau asking that the

5    Census Bureau reinstate a question regarding

6    citizenship on the 2020 census questionnaire in an

7    effort to obtain accurate data needed to protect

8    against racial discrimination in voting."

9              Does that appear correct to you?

10        A.   That appears to be correct, yes.

11        Q.   It was revised to read, "As you noted,

12   the department sent a letter to the Census Bureau

13   asking the Census Bureau -- asking that the Census

14   Bureau reinstate a question regarding citizenship

15   on the 2020 census questionnaire in an effort to

16   obtain the most accurate data to protect against

17   racial discrimination in voting" with the

18   word "needed" struck out, correct?

19        A.   That appears to be correct.

20        Q.   Okay.   The comment bubble reads, "This                601/

21   edit is designed conform to the original JMD                     802

22   letter, which did not say the data was necessary,

Page 299

1  but did indicate it would assist our enforcement

2  efforts.   John's note to CIV specifically noted

3  that the letter did not say the data

4  was 'necessary,' and I think we should avoid that

5  term."

6          Did I read that right?

7      A.   Yes, you did.

8      Q.   Okay.   So is it correct, as this comment

9  notes, that the December 12 letter requesting a

10  citizenship question be added to the census did

11  not say that it was necessary to collect CVAP data

12  through the census questionnaire for VRA

13  enforcement?

14      A.   That is correct.

15      Q.   And as the comment bubble indicates, you,

16  Mr. Gore, have at some point specifically noted

17  that the letter did not use the word "necessary"

18  with respect to collecting CVAP data through the

19  census questionnaire, correct?

20      A.   That is what the comment says.   Correct.

21      Q.   And you -- my question was, you,

22  yourself, have specifically noted that the

601/
802

Page 300

1   December 12 letter, the Gary letter, did not use

2   the word "necessary" with respect to the inclusion

3   of a citizenship question on the 2020 census,

4   correct?

5        A.   Yes, I have just noted that in my

6   testimony.   I will say I don't know -- I have no

7   recollection of what this comment is referring to.

8        Q.   You agree, right, Mr. Gore, that CVAP

9   data collected through the census questionnaire is

10  not necessary for DOJ's VRA enforcement efforts?

11       A.   I do agree with that.   Yes.

12       Q.   I'm going to show you another document.

13  We'll mark this as 26 and 27.

14            (Gore Deposition Exhibits 26 and 27

15            marked for identification and attached to

16            the transcript.)

17  BY MR. HO:

18       Q.   26 is an e-mail from Mr. Aguinaga to you        802

19  dated June 12th, 2018, correct?

20       A.   Yes, it is.

21       Q.   And the subject is, QFR responses,

22  correct?

802

1      A.   That is correct.

2      Q.   And there's an attachment of 2020 census

3  hearing Gore QFRs CRT draft, correct?

4      A.   Correct.

5      Q.   Exhibit 27 has draft responses from you

6  to questions posed by Congressman Jimmy Gomez,

7  correct?

8      A.   Yes, that's correct.

9      Q.   The second answer on Exhibit 27 -- or the

10  second question and answer on Exhibit 27 read, "To

11  Mr. Gore:  Is the DOJ and Attorney

12  General Sessions still in agreement with that

13  opinion?  Is there any provision of any law that

14  may compel census to disclose confidential census

15  data for law enforcement or national security

16  purposes?"

17           And the response, as drafted, reads, "No

18  one should have to fear responding to the census

19  questionnaire or to a citizenship question if, in

20  fact, it is included.  To that end, the department

21  is committed to abiding by all laws protecting the

22  confidentiality and non-disclosure of such

Page 302

1    responses."

2          Did I read that right?

3          A.   Yes.

4          Q.   If we look back at Exhibit 26,          802

5    Mr. Aguinaga's e-mail to you, the fourth sentence

6    in his e-mail, beginning with the second draft

7    answer at the end of the second line, it reads,

8    "The second draft answer does not directly address

9    the question because the question asks whether the

10   department agrees with the 2010 OLC opinion and

11   whether any law compels the disclosure of

12   confidential questionnaire responses.  I don't

13   think we want to say too much there in case the

14   issues addressed in the OLC opinion or related

15   issues come up later for renewed debate."

16          Did I read Mr. Aguinaga's words

17   correctly?

18          A.   Yes.

19          Q.   Okay.  I'm going to show you a document

20   which we'll mark as Exhibit 28.

21

22

Page 320

1          A.  Yes, I do.

2          Q.  Okay.  This is a document from the

3     administrative record.  The first page is Bates

4     number 1277.

5               You're familiar with this document?

6          A.  No, I'm not.

7          Q.  You've never seen this document before?

8          A.  No, I don't believe I have.

9          Q.  The fifth page of this document, Bates

10    number 1281, the first paragraph, last sentence,

11    about four lines from the bottom, reads, "It is,

12    therefore, a reasonable inference that a question

13    on citizenship would lead to some decline in

14    overall self-response because it would make the

15    2020 census modestly more burdensome in the direct

16    sense, and potentially much more burdensome in the

17    indirect sense, that it would need to a larger

18    decline in self-response for non-citizen

19    households."

20               Did I read that right?

21          A.  Yes, you did.

22          Q.  Okay.  So before I read that to you, you

1   were not aware that the chief scientist of the

2   Census Bureau had opined, based on an analysis of

3   ACS data, that the inclusion of a citizenship

4   question would lead to a larger decline in

5   self-response for non-citizen households?

6           MR. GARDNER:   Objection.   Lack of

7   foundation.

8           THE WITNESS:   That is -- I'm not sure

9   you've correctly characterized this statement.

10  But no, I was not aware of this statement until

11  just now.

12  BY MR. HO:

13      Q.   Okay.   So --

14      A.   Or of the fact that Mr. -- I'm sorry.   Is

15  it Dr. Abowd?   Mr. Abowd.   I'm not sure.   I've

16  never met him.

17      Q.   Abowd.

18      A.   Abowd, thank you.

19           -- had espoused that view.

20      Q.   So you're not aware that the Census

21  Bureau has conducted an analysis of ACS response

22  rates and, based on that analysis, has concluded

Page 326

```
 1   BY MR. HO:
 2        Q.  I'm not actually talking about
 3   Exhibit 32.
 4             The chief scientist of the Census Bureau,    601
 5   I'm representing to you, has given deposition
 6   testimony in this litigation stating that the
 7   analysis conducted by the Census Bureau indicates
 8   that the best quantitative evidence that's
 9   available to the Census Bureau at present suggests
10   to the Census Bureau and leads the Census Bureau
11   to conclude that the inclusion of a citizenship
12   question is likely to reduce self-response rates
13   to the census questionnaire.
14             Do you understand the representation that
15   I've just made to you?
16        A.  I do.  I can't verify whether it's
17   accurate, since I'm not familiar with that
18   deposition testimony.
19        Q.  That's fine.  But assuming that it is,
20   does that concern you about the inclusion of a
21   citizenship question on the census, given that the
22   department that you run relies upon accurate
```

Page 328

1    would expect --

2         Q.   It's actually a question about your

3    current intentions.

4         A.   My current intentions.  I would expect

5    that conversations like that could occur.  Sure.

6         Q.   Are there any planned meetings between

7    the civil rights division and the Census Bureau

8    about the effect that the citizenship question on

9    the 2020 census is going to have on the accuracy

10   of census data?

11        A.   I'm not aware of any such meetings, nor

12   do I know whether any such meetings would be

13   productive at this point, since the 2020 census

14   hasn't yet been conducted and nobody knows what

15   the effect of the citizenship question on that

16   particular census will be.

17        Q.   Mr. Gore, are you aware of any other

18   circumstance in which the Department of Commerce

19   has reached out to the Department of Justice to

20   see if the Department of Justice would request

21   data from the Census Bureau?

22        A.   I'm not aware of any other such instance,

Page 329

1    no.

2              MR. HO:  Can we go off the record?

3              VIDEO TECHNICIAN:  We are going off the

4    record.  The time on the video is 3:57 p.m.

5              (A recess was taken.)

6              VIDEO TECHNICIAN:  This begins media unit

7    number 6.  The time on the video is 4:15 p.m.  We

8    are on the record.

9    BY MR. HO:

10        Q.  Mr. Gore, just to circle back on

11   something we talked about earlier, when Attorney

12   General Sessions made the decision for there not

13   to be a meeting between DOJ technical staff and

14   the Census Bureau, at that time, Secretary Ross

15   had not yet issued his decision memo directing the

16   inclusion of a citizenship question on the census,

17   correct?

18        A.  That is correct.

19        Q.  So it's accurate to say, since that

20   decision memo had not yet been issued, that that

21   decision memo did not play any role in the

22   decision that was made not to have a meeting

1  between Census Bureau and technical staff,

2  correct?

3      A.  That is -- I believe that's correct.

4  Yes.

5      Q.  Okay.

6          (Gore Deposition Exhibits 33 and 34

7          marked for identification and attached to

8          the transcript.)

9  BY MR. HO:

10     Q.  I just want to show you two more

11 documents that have been marked as Exhibits 33 and

12 34.

13         33 is an e-mail from Ben Aguinaga to you

14 and Prim Escalona dated April 6th, 2018, correct?

15     A.  Are you referring to the e-mail at the

16 top of the page?

17     Q.  Correct.

18     A.  Yes, that's correct.

19     Q.  It's a thread, but the top e-mail is from

20 Ben Aguinaga to you and someone else dated

21 April 6th, 2018, correct?

22     A.  That is correct.

802

Page 331

1      Q.   Okay.   And there are various attachments

2  to this e-mail, one of which is census citizenship

3  question briefing paper, correct?

4      A.   That is correct.

5      Q.   Okay.   And if you look at Exhibit 34,     802

6  it's a document titled, Census citizenship

7  question.

8           This is the briefing paper that was

9  attached to that e-mail, correct?

10     A.   I can't verify that for sure, but --

11     Q.   Does it appear to be?

12     A.   It appears to be -- yes, it appears to be

13  a briefing paper on that topic.

14     Q.   Okay.   And the subject is, AG prep for

15  CJS Approps. hearing, correct?

16     A.   That is correct.

17     Q.   Okay.   So this citizenship -- census

18  citizenship question briefing paper, Exhibit 34,

19  it's for the attorney general, correct?

20     A.   That is correct.

21     Q.   Okay.   Exhibit 34, at the top, the first

22  bullet under the section background reads, "Not

1   public.  In 2017, Secretary of Commerce Wilbur     **802**

2   Ross requested that the Justice Department send a

3   letter requesting the addition of a citizenship

4   question on the 2020 census."

5       Is that statement accurate, as far as you   **601/**

6   know?                                       **802**

7       MR. GARDNER:  Objection.  Lack of

8   foundation.

9       THE WITNESS:  As far as I know, yes.

10  BY MR. HO:

11    Q.  And when in 2017, if you know, did

12  Secretary of Commerce Wilbur Ross request that the

13  Justice Department send a letter requesting the

14  addition of a citizenship question?

15    A.  I don't know.

16    Q.  And it's correct that, as of the date of

17  this e-mail, April 6th, 2018, the fact that

18  Secretary of Commerce Ross requested that the

19  Justice Department send a letter requesting the

20  addition of a citizenship question was not public,

21  correct?

22       MR. GARDNER:  Objection.  Lack of

Page 333

1    foundation.

2          THE WITNESS:  I believe that was -- I

3    believe that's correct.  I don't remember for

4    sure.

5    BY MR. HO:

6         Q.  And it's also correct that, as of

7    April 6th, 2018, the Department of Justice was

8    attempting to maintain the fact that

9    Secretary Ross had requested that the Justice

10   Department send a letter requesting the addition

11   of a citizenship question -- that the Justice

12   Department was attempting to maintain the fact

13   that that information was not public, correct?

14        A.  I'm not sure whether that's correct or

15   not.

16        Q.  Were you authorized, as of April 6th,

17   2018, to publicly discuss the fact that the

18   Secretary of Commerce had requested that the

19   Justice Department send a letter requesting the

20   addition of a citizenship question?

21          MR. GARDNER:  Objection.  Vague.

22          THE WITNESS:  Yeah, I don't know what you

Page 334

1   mean by that, but I don't know that I was

2   authorized or not authorized to do so.

3   BY MR. HO:

4        Q.  As far as you know, it had not yet been

5   made public as of April 6th, 2018, that Secretary

6   of Commerce Ross had requested the Justice

7   Department send a letter requesting the addition

8   of a citizenship question, correct?

9        A.  As far as I know and can recall, that's

10  correct.

11       Q.  Why, if you know, was it not public by

12  April 6th, 2018, that Secretary Ross had requested

13  that the Justice Department send a letter

14  requesting the addition of a citizenship question?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.  Calls for speculation.

17          THE WITNESS:  I don't know.

18  BY MR. HO:

19       Q.  You don't know one way or the other?

20       A.  I don't know one way or the other.

21          MR. HO:  Okay.  We can go off the record.

22  I think those are all the questions --

```
 1   BY MS. HULETT:
 2        Q.  Okay.  But just so I'm clear on it, you
 3   have had discussions with Attorney
 4   General Sessions on the topic of whether
 5   apportionment or redistricting should be conducted
 6   using total population or some other measure?
 7             MR. GARDNER:  Objection to the extent it
 8   mischaracterizes the witness' previous testimony.
 9             THE WITNESS:  I stand by my prior answer
10   that I had a conversation with the attorney
11   general about the question of the use of total
12   population or some other measure for apportionment
13   purposes.
14   BY MS. HULETT:
15        Q.  And you can't disclose that conversation
16   because it was during the pre-deliberative process
17   leading to the decision as to whether to request
18   that the Census Bureau include a citizenship
19   question on the decennial census?
20        A.  That is correct.
21        Q.  Okay.  Have you had any conversations
22   with anyone else about whether apportionment or
```

1   well.  But I'm familiar that its current practice

2   is to use the ACS data.

3         And the decennial census data obviously

4   is only available every ten years, not every five

5   years.

6         Q.  I'd like to draw your attention back to

7   this Exhibit 17, which is the December 12th,

8   2017 -- I think we've been referring to it as the

9   Gary letter.

10        A.  Yes.  Bear with me one moment.  My

11  exhibits are not in order.

12        Q.  Okay.

13        A.  Let me see if I can find it.  Got it.

14  Thank you.

15        Q.  When you were -- do you see that you've

16  cited several cases in this letter?

17        A.  I see that the department has cited

18  several cases in the letter.  Yes.

19        Q.  You drafted -- did the initial draft of

20  this letter, correct?

21        A.  That is correct.

22        Q.  And when you were drafting the letter,

Page 344

1  did you, personally, do the research that resulted

2  in the citation to these particular cases or did

3  someone else do it for you and send them to you?

4         MR. GARDNER:  Objection.  Calls for

5  information subject to deliberative process

6  privilege.  I instruct the witness not to answer.

7         THE WITNESS:  Consistent with that

8  instruction, I can't answer.

9  BY MS. HULETT:

10     Q.  So you can't tell me whether you chose

11  these cases or whether someone else chose these

12  cases for inclusion in the letter because that's

13  deliberative process?  I just want to make sure I

14  understand what you're refusing to answer.

15     A.  Yes.  That's on the instruction of

16  counsel.

17     Q.  Okay.  Did you read the opinions that are

18  cited in the letter?

19     A.  Yes, I did.

20     Q.  How recently have you read the opinions?

21     A.  Well, let me look at which opinions we're

22  talking about.

1        Q.   Well, to start with, I'm talking about

2   Reyes versus City of Farmers Branch, Barnett

3   versus City of Chicago, Negron versus City of

4   Miami Beach, Romero versus City of Pomona, and

5   LULAC versus Perry.

6        A.   I read all of those cases before this

7   letter was sent.   And I may have read the LULAC

8   versus Perry decision more recently than that.

9        Q.   And before you list these cases, the

10   sentence right before the cases in the second

11   paragraph says, "Multiple federal courts of appeal

12   have held that, where citizenship rates are at

13   issue in a vote dilution case, citizen voting age

14   population is the proper metric for determining

15   whether a racial group could constitute a majority

16   in a single-member district."

17        Did I read that correctly?

18        A.   Yes, you did.

19        Q.   These are all appellate court or Supreme

20   Court cases.   Did you read any of the lower court

21   opinions in these cases?

22        A.   I believe I did.   Yes.

Page 346

1      Q.   And do any of these appellate court

2  opinions that are cited in this paragraph hold

3  that long-form data or ACS survey data is

4  deficient or unsuitable for use in a Section 2

5  analysis?

6           MR. GARDNER:   Objection.   Compound.

7           THE WITNESS:   I don't believe so.

8  BY MS. HULETT:

9      Q.   Would you agree that the Supreme Court

10 has not yet adopted a standard requiring proof of

11 citizen voting age majority to meet the prong 1

12 Gingles test?

13     A.   I think you're asking me for a legal

14 conclusion, and I don't believe the Supreme Court

15 has addressed that question squarely.  The LULAC

16 versus Perry decision does analyze vote dilution

17 claims by reference to citizen voting age

18 population.  That's a case out of the State of

19 Texas.  And that's my recollection of that case.

20          But to the extent you're asking me for a

21 legal opinion, I don't know that I can provide

22 one.

Page 365

```
 1              (Gore Deposition Exhibit 39 marked for

 2              identification and attached to the

 3              transcript.)

 4   BY MS. HULETT:

 5        Q.   I'd like to show you Exhibit 39, which is

 6   a series of January 2nd, 2018, e-mails between you

 7   and Devin O'Malley regarding review of a statement

 8   in response to citizenship question on census.

 9              Who is Devin O'Malley?

10        A.   Devin O'Malley at the time was employed

11   in the Department of Justice's Office of Public

12   Affairs.

13        Q.   Is that a Ms. or a Mr.?

14        A.   Mr.

15        Q.   Do you recall this exchange, this e-mail

16   exchange?

17        A.   Yes, I do.

18        Q.   On page 2, Mr. O'Malley asks you at

19   4:28 -- it's right in the center of the page on

20   page 2 -- "There's no reason I can't point the

21   reporter to the Constitution on background and

22   make the point that there's somewhat of a
```

1   constitutional basis for using the census in this

2   process and not the ACS, right?"

3           And right above it is your response:

4   "It's a little bit of a stretch, but it's okay

5   with me."

6           How is there a constitutional basis for

7   using a census rather than the ACS to collect

8   citizenship data?

9       A.   Unlike the ACS, the census is actually

10  mentioned in the Constitution.  The Constitution

11  directs the federal government to conduct a census

12  every ten years.  There's no mention of the ACS in

13  the Constitution.

14      Q.   The ACS is run by the Census Bureau,

15  right -- conducted by the Census Bureau?

16      A.   Yes.

17      Q.   But you don't consider it to be part of

18  the census?

19      A.   I consider -- I believe what Mr. O'Malley

20  is referring to here is a decennial census versus

21  the ACS.  I understand the ACS is not part of the

22  decennial census.

1        Q.   And what did you mean that it's a

2   stretch?

3        A.   I believe what I meant was it's certainly

4   correct that the census is mentioned in the

5   Constitution and that the ACS isn't.   But I

6   wasn't -- I don't believe that that was a reason

7   mentioned in the Gary letter for seeking

8   reinstatement of the citizenship question on the

9   census questionnaire.

10        Q.   And you think the argument is a bit of a

11   stretch?

12        A.   Which argument?

13        Q.   The argument that the Constitution

14   supports -- that there's a constitutional basis

15   for using the decennial census instead of the ACS.

16        A.   I -- yeah, I believe that's a little bit

17   of a stretch.

18        Q.   On page 3, in another e-mail from you in

19   this exchange at 4:04, you say, "Unfortunately,

20   it's not accurate to blame the prior

21   administration for abandoning the citizenship

22   question on the census questionnaire.   That move

1    BY MS. HULETT:

2        Q.  Can you name any case in which a court

3    required for prong 1 purposes any level of

4    certainty about the margin of error in each and

5    every block of the district?

6        A.  Again, I can't name such a case, as I sit

7    here today either way.

8        Q.  So is the point that's being expressed in

9    this bullet is that citizenship data from the ACS

10   is not ideal for purposes of redistricting because

11   it's an estimate with a margin of error that

12   increases for smaller geographic areas?

13       A.  I think the bullet speaks for itself.  I

14   believe it does mention the margin of error and

15   the increase in that margin of error as the

16   geographic area decreases.  It also mentions the

17   90 percent confidence interval associated with the

18   ACS.

19       Q.  So when you're drawing a district and you

20   want to know what percent of adult citizens are of

21   a particular racial group, let's say, Latinos, and

22   when you look at the margin of error for the

1    increases; is that correct?

2         Q.   Yes.

3         A.   That's my understanding.

4         Q.   So when you combine block groups into

5    census tracts and then combine the census tracts

6    into districts, the margin of error shrinks each

7    time as the level of geography grows?

8         A.   I'm not sure what you mean by combining

9    all of that.  I do believe the ACS estimates are

10   reported at certain levels and, at a larger

11   geographic area, there is a smaller margin of

12   error assigned to the ACS estimate that at a

13   smaller geographic area.

14        Q.   All right.  Say at the level of a typical

15   congressional district, you would expect the

16   margin of error on CVAP to be much smaller than

17   the margin of error in each block in that

18   district, correct?

19        A.   I would -- with respect to ACS estimates?

20        Q.   Yes.

21        A.   Yes.  And I would expect that with

22   respect to any statistical sampling or with

1    respect to hard count data.

2        Q.  And by the time you get to the size of a

3    congressional district, the margin of error is

4    likely to be quite small; isn't that correct?

5        A.  I don't know what you mean by quite

6    small.  I mean, you could certainly conceive of

7    districts or hypothetical districts where the

8    margin of error would still matter at the size of

9    a congressional district or a state house or state

10   senate district.  You might have a hypothetical

11   district that is close to the line of 50 percent,

12   but because of the margin of error associated with

13   the ACS data, you wouldn't know one way or the

14   other whether it's over 50 percent or slightly

15   under 50 percent.

16           And that's what we are trying to avoid.

17   We are trying to get the best possible, most

18   accurate, more reliable, most comprehensive and

19   complete data that we possibly can because --

20   there's been a lot of talk today about file cases.

21   We're trying to identify good cases for

22   investigation and filing.

1  prosecutions on that basis, at least at all

2  recently.  And I think I might have read something

3  once that suggested there might have been one

4  decades ago, but I don't know that for sure.

5      Q.  And just a few final questions.  Have you

6  ever communicated in any way -- by phone, in

7  person, by e-mail, text -- have you ever

8  communicated about the citizenship question with

9  Kris Kobach?

10      A.  No.

11      Q.  Have you ever communicated in any of

12  those ways about the citizenship question with

13  Steve Bannon?

14      A.  No.

15      Q.  Have you ever communicated in any of

16  those ways about the citizenship question with

17  Stephen Miller?

18      A.  No.

19      Q.  Have you ever communicated with anyone at

20  the White House about the citizenship question?

21      A.  Yes.

22      Q.  Who?

1        A.   I communicated with John Zadrozny.

2        Q.   And who is he?

3        A.   Z-a-d-r-o-z-n-y, I believe, is how he

4    spells his last name.   And at the time, he was

5    working, I believe, for the Domestic Policy

6    Council.

7        Q.   And when did you communicate with him?

8        A.   I believe it was sometime in October of

9    2017.

10       Q.   Who initiated the contact?

11       A.   I don't recall.   What I recall about it

12   is that I participated in a conference call on the

13   issue on which Mr. Zadrozny -- in which

14   Mr. Zadrozny also participated.

15       Q.   Conference call on the issue of adding

16   the citizenship question?

17       A.   That's correct.

18       Q.   In October of 2017?

19       A.   I believe it was October of 2017.

20       Q.   Who else was on that conference call?

21       A.   I can recall that other people from the

22   Department of Justice were on the call.   Rachael

Page 411

1  Tucker, who we've discussed previously, and Gene

2  Hamilton I believe was on the call.  And there may

3  have been others, but I can't remember

4  specifically who they were.

5       Q.  Other than the addition of the

6  citizenship question to the census, was that the

7  only topic --

8       A.  Yes.

9       Q.  -- discussed in the call?

10      A.  Yes, it was.

11      Q.  And were there people from the Department

12  of Commerce on that call?

13      A.  No, there were not.  Or at least not to

14  my knowledge.

15      Q.  So to your knowledge, it was one White

16  House official, and the rest of you were all from

17  the Department of Justice?

18      A.  To the best of my knowledge and

19  recollection, yes.

20      Q.  And who set up this conference call?

21      A.  I don't recall who set it up.  I know it

22  wasn't me.

1     Q.  Do you know at whose request the

2  conference call happened?

3     A.  I do not recall that.

4     Q.  And did you know before the call why you

5  were invited?

6     A.  Yes.

7     Q.  And why were you invited?

8     A.  Because I was involved in this issue on

9  behalf of the Department of Justice.

10     Q.  And did the -- John -- I'm sorry, how do

11  you say his name again?

12     A.  I think it's Zadrozny, but I don't know

13  for sure.

14     Q.  Zadrozny.  Do you remember what he

15  contributed to that conference call?

16          MR. GARDNER:  Objection.  That question

17  calls for the disclosure of information subject to

18  executive privilege.

19          To the extent you can answer that

20  question without divulging such information, you

21  may.  Otherwise, I instruct you not to answer.

22          THE WITNESS:  Consistent with that

Page 422

1   Gary letter, because that's not what it says.

2        Q.   Does the Gary letter say that citizenship

3   data provided from decennial census questionnaires

4   is critical to Section 2 enforcement?

5        A.   I think the Gary letter speaks for

6   itself, and I think there's no dispute that

7   citizenship data is crucial -- accurate

8   citizenship data is crucial to carrying out the

9   Department of Justice's Section 2 enforcement

10  mission.

11       Q.   Do you -- are you of the view that that

12  citizenship data needs to be taken from decennial

13  census questionnaires?

14       A.   And by "you," are you referring to the

15  Department of Justice or me personally?

16       Q.   I'm referring to you, personally.

17       A.   No.

18       Q.   Okay.  All right.  And then is there

19  anything else in the Karlan report that you would

20  characterize as inaccurate?

21       A.   There are a couple of things that come to

22  mind.  Again, if I had time to read it all, I

1        Q.   Going back to Exhibit 17 --

2        A.   Yes.

3        Q.   -- the Gary letter.  In the Gary letter,

4   when talking about how the citizenship data is

5   critical to the department's enforcement of

6   Section 2 of the Voting Rights Act, was that only

7   with reference to Gingles 1 or was it reference to

8   any other aspect of Section 2 enforcement?

9        A.   Well, I believe the letter speaks for

10  itself.  Is there a particular sentence you're

11  referring to?

12       Q.   Sure.  I'm just -- I'm referring to -- in

13  the first paragraph --

14       A.   Okay.

15       Q.   -- at the end, it says that, "As

16  demonstrated below, the decennial census

17  questionnaire is the most appropriate vehicle for

18  collecting that data and reinstating a question on

19  citizenship will best enable the department to

20  protect all American citizens' voting rights under

21  Section 2."

22       A.   Well, as I've just laid out, we do use

Page 427

1    citizenship data at all three steps of the Gingles

2    analysis.  The letter speaks for itself in terms

3    of what it talks about.  And --

4        Q.  Does the letter in any place mention any

5    other aspect of Section 2 enforcement other than

6    Gingles 1?

7        A.  I don't believe that it does, but I don't

8    know -- again, I haven't gone back and reviewed

9    all these cases recently, so I don't know what

10   they do or do not say or may or may not say with

11   respect to the use of citizenship data, Gingles

12   steps 2 and 3.

13       Q.  You don't see anything in the letter,

14   correct, that references any aspect of how this

15   data is relevant to Section 2 enforcement other

16   than with respect to Gingles 1, correct?

17       A.  I don't see anything like that.  That's

18   correct.

19       Q.  And isn't it the case that the

20   department, in making a request to the Census

21   Bureau about the need for -- the need for having a

22   citizenship question on the census and why it's

1  the term "jurisdictions"?

2       A.  I am not familiar with any redistricting

3  plan that's ever been drawn by someone who wasn't

4  a map drawer, so yes.

5       Q.  All right.  Have you -- strike that.

6            Has any map drawer, outside of somebody

7  employed by the federal government, ever

8  communicated to you that it would be better if the

9  citizenship data were in the same data set as the

10  total population data?

11            MR. GARDNER:  Could you re-ask that

12  question again?  I'm sorry.  I missed the first

13  clause.

14            MR. GREENBAUM:  Can you read it back?

15            (The reporter read the record as

16            requested.)

17            THE WITNESS:  I don't know who you mean

18  by "you."  If you mean the Department of Justice,

19  I can't answer that question because I don't know

20  what conversations have happened between map

21  drawers outside of the federal government and

22  members of the Department of Justice.

Page 435

1    BY MR. GREENBAUM:

2          Q.   I mean you, John Gore.

3          A.   Me, personally?   I don't believe I've

4    ever had any such conversation that I can recall.

5          Q.   At the time that the Gary letter was

6    issued on December 12th, did you know what the

7    position of the Census Bureau was that --

8    regarding whether citizenship data would be more

9    accurate if there was a citizenship question on

10   the census?

11              MR. GARDNER:   Objection.   Assumes facts

12   not in evidence.

13              THE WITNESS:   I'm not sure I have a basis

14   to answer that question.

15   BY MR. GREENBAUM:

16        Q.   I'm asking you whether you knew, yes or

17   no.

18        A.   Whether I knew what?

19        Q.   Okay.   I'll --

20        A.   Sorry, can you just rephrase the

21   question?

22        Q.   -- go back -- I will state the question

Page 437

1   not have authority or standing to assert such

2   constitutional claims.  The Department of Justice

3   has, in the past, gotten involved in racial

4   gerrymandering claims, either as an intervener or

5   as an amicus because frequently those claims

6   implicate districts that were drawn or preserved

7   to comply with Section 2 or Section 5 of the

8   Voting Rights Act, which the Department of Justice

9   does enforce.

10          Q.  So a citizenship question would not help

11   DOJ bring racial or partisan gerrymandering claims

12   because DOJ doesn't have jurisdiction to bring

13   them in the first place, correct?

14          A.  That's correct, although it would

15   facilitate DOJ's participation in such cases if it

16   chose to participate for -- because, again,

17   particularly, racial gerrymandering cases can

18   implicate Section 2 and Section 5 districts where

19   CVAP data is not necessary.

20          Q.  Prior to December 12th, 2017, did you

21   have any communication with anybody who was not a

22   federal employee at the time about having a

Page 438

1    citizenship question on the census?

2         A.   Yes.

3         Q.   Who?

4         A.   I had a conversation with a gentleman

5    named Mark Neuman, who I believe was not a federal

6    employee at the time.

7         Q.   Who is Mark Neuman?

8         A.   I understand Mark Neuman to be a former

9    employee of the Census Bureau or the Department of

10   Commerce -- I'm not sure which one.  And I

11   understood that he was advising the Department of

12   Commerce and the Census Bureau with respect to

13   this issue.

14        Q.   And what was the substance of your

15   conversation with Mr. Neuman?

16             MR. GARDNER:  Objection.  Calls for

17   information subject to deliberative process

18   privilege.  I instruct the witness not to answer.

19             THE WITNESS:  Consistent with that

20   instruction, I can't answer.

21

22   BY MR. GREENBAUM:

Page 440

1          MR. GARDNER:  Objection.  Calls for

2    information subject to deliberative process

3    privilege.  I instruct the witness not to answer.

4          THE WITNESS:  Consistent with that

5    instruction, I can't answer.

6    BY MR. GREENBAUM:

7          Q.   Okay.  Mr. Ho earlier showed you a map

8    that had the number of people in particular census

9    blocks in it.  Do you recall that?

10         A.   I do recall that.

11         Q.   And some of those blocks had one person

12   in the census block, correct?

13         A.   That is correct.

14         Q.   And if the Census Bureau were providing

15   census data at the block level, isn't it true

16   that, for those census blocks that have one

17   person, that that person's answer to the census

18   question regarding citizenship would be revealed

19   in the data itself?

20              MR. GARDNER:  Objection.  Calls for a

21   hypothetical.

22              THE WITNESS:  Again, I believe I had this

1   discussion with Mr. Ho earlier.  I don't know the

2   answer to that question.  It's a hypothetical

3   question.

4        Mr. Ho also talked about data masking

5   techniques that the Census Bureau might use.  I

6   don't know how those would implicate the answer to

7   the question.  I don't know how the Census Bureau

8   is planning to report the results of this data or

9   this question from the questionnaire to the

10  Department of Justice.

11       There's a lot I don't know, so I can't

12  take a view on that and I, unfortunately, can't

13  answer your question.

14  BY MR. GREENBAUM:

15       Q.  But if it were the case that the Census

16  Bureau was providing the block-specific --

17  accurate block-specific data for blocks that have

18  one person in it, that it would reveal the

19  citizenship status as reported by that person?

20       A.  Again, I've answered this question.  I

21  don't think I can add anything to my answer.  It's

22  a hypothetical.  I don't know, again, how that

1   data is going to be reported and whether your

2   definition of accurate includes any data masking

3   techniques that Mr. Ho referred to earlier.

4           To the extent it would reveal that

5   information, it would also reveal information

6   responsive to the other questions on the census,

7   which include questions about sex, race, Hispanic

8   origin, and sexual orientation.  And if those

9   questions were all -- the results of those

10  questions were also divulged, that information, I

11  guess, would be available on parity with the

12  response to the citizenship question.

13       Q.  You may have answered this earlier, but

14  I'm going to ask it again.  Who decided that the

15  Department of Justice would request that the

16  Census Bureau add a citizenship question to the

17  census?

18       A.  I believe I've answered that earlier, and

19  it was the attorney general.

20       Q.  Okay.  And do you recall the date in

21  which the attorney general made that decision?

22       A.  I don't know exactly when he, in his own

1        A.   It appears to.   And Ben Aguinaga is also

2   copied on some of those e-mails.

3        Q.   And do the e-mails reflect that you asked

4   Mr. Herren for comments and edits to the draft

5   letter that was a -- that was the first draft that

6   you discussed this morning of what became the

7   December 12th letter?

8        A.   The e-mail on the bottom of page 1,

9   carrying over to the top of page 2, appears to be

10  an e-mail that I've already discussed today.   And

11  yes, it does appear to be an e-mail conveying a

12  draft to Chris Herren and asking for his comments

13  and edits regarding that particular draft.

14       Q.   And did Mr. Herren provide comments and

15  edits on or about November 3rd?

16       A.   Yes, he did.

17       Q.   And do you recall sharing any subsequent

18  drafts of what became the December 12th letter

19  with Mr. Herren?

20       A.   I don't recall one way or the other.

21       Q.   Do you recall him giving you comments on

22  any subsequent drafts?

Page 445

1        A.  I don't recall one way or the other.

2             MR. GREENBAUM:  All right.  I want to

3    mark as Exhibit 46 a series of e-mails.  At the

4    top is an e-mail from John Gore to Chris Herren.

5    It's marked as DOJ 28354.

6             (Gore Deposition Exhibit 46 marked for

7             identification and attached to the

8             transcript.)

9    BY MR. GREENBAUM:

10       Q.  Mr. Gore, do you recognize these e-mails?

11       A.  I'm not sure whether I recognize these

12   e-mails, but I -- I believe I recall them.

13       Q.  Okay.  Do you recall responding to

14   questions from the civil division about the census

15   citizenship question litigation case?

16       A.  Yes, I do.

17       Q.  And do you recall seeking Mr. Herren's

18   comments?

19       A.  Yes, I do.

20            MR. GREENBAUM:  All right.  I'm going to

21   mark as Exhibit 47 a document that you probably

22   recognize, but I want to make sure we've got it in

Page 453

1      NEW YORK IMMIGRATION COALITION, et al., vs.

2      UNITED STATES DEPARTMENT OF COMMERCE, et al.

3                      JOHN GORE

4

5              ACKNOWLEDGMENT OF DEPONENT

6      I, _____, do hereby certify

7  that I have read the foregoing pages and that the

8  same is a correct transcription of the answers given

9  by me to the questions therein propounded, except for

10  the corrections or changes in form or substance, if

11  any, noted in the attached Errata Sheet.

12

13

14  _____         _____

15  DATE                    SIGNATURE

16

17

18

19

20

21

22  PA 3072371

# EXHIBIT E

Page 1

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

                    Plaintiffs,

5          vs.      Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                    Defendants.

     ---------------------------------------

8

9                    Washington, D.C.

10                   Monday, August 20, 2018

11   Deposition of:

12              DR. RON JARMIN

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:03 a.m., when were present on

19   behalf of the respective parties:

20              Veritext Legal Solutions

                 Mid-Atlantic Region

                1250 Eye Street NW - Suite 350

21              Washington, D.C.  20005

22

Page 2

1                    CONTENT
                                              PAGE
2
    DR. RON JARMIN,                           11
3   Examination by Ms. Goldstein             11
    Examination by Mr. Tilak                 258
4   Examination by Ms. Shah                  309
    Examination by Ms. Brannon               343
5   Examination by Mr. Case                  376
    Examination by Ms. Bailey                415
6   Further Examination by Mr. Case          417
7
8          JARMIN DEPOSITION EXHIBITS
9   EXHIBIT                                   PAGE
    NUMBER
10  Plaintiffs' Exhibit 1   Gary letter      17
    Plaintiffs' Exhibit 2   Email            27
11  Plaintiffs' Exhibit 3   Email            29
    Plaintiffs' Exhibit 4   Email            31
12  Plaintiffs' Exhibit 5   Email            40
    Plaintiffs' Exhibit 6   2020 Census:     44
13                          Adding Content
                            to the
14                          Questionnaire
    Plaintiffs' Exhibit 7   Email            63
15  Plaintiffs' Exhibit 8   Email            76
    Plaintiffs' Exhibit 9   Email            79
16  Plaintiffs' Exhibit 10  Email            89
    Plaintiffs' Exhibit 11  Email            94
17  Plaintiffs' Exhibit 12  Email            98
    Plaintiffs' Exhibit 13  Email            102
18  Plaintiffs' Exhibit 14  Email            108
    Plaintiffs' Exhibit 15  Email            129
19  Plaintiffs' Exhibit 16  Email            133
    Plaintiffs' Exhibit 17  Email            152
20  Plaintiffs' Exhibit 18  Email            155
    Plaintiffs' Exhibit 19  Email            203
21  Plaintiffs' Exhibit 20  Questions on     204
22  the Jan 19 draft Census Memo on the DOJ

Page 3

|    |                              |                        |     |
|----|------------------------------|------------------------|-----|
| 1  |                              | Citizenship Question   |     |
| 2  |                              | Reinstatement Request  |     |
| 3  |                              | attachment             |     |
|    | Plaintiffs' Exhibit 21       | Memo                   | 226 |
| 4  | Plaintiffs' Exhibit 22       | U.S. Department        | 244 |
| 5  |                              | of Commerce Census Bureau |  |
| 6  |                              | National Advisory      |     |
| 7  |                              | Committee on Racial, Ethnic |  |
| 8  |                              | and Other Populations  |     |
|    |                              | Charter                |     |
| 9  | Plaintiffs' Exhibit 23       | Emails                 | 249 |
|    | Plaintiffs' Exhibit 24       | U.S. Department        | 253 |
| 10 |                              | of Commerce            |     |
| 11 |                              | Bureau of the Census   |     |
| 12 |                              | Scientific Advisory    |     |
| 13 |                              | Committee Charter      |     |
|    | Plaintiffs' Exhibit 25       | Memorandum             | 324 |
| 14 | Plaintiffs' Exhibit 26       | Prepared               | 331 |
| 15 |                              | statement to the House |     |
|    | Plaintiffs' Exhibit 27       | Letter                 | 333 |
| 16 | Plaintiffs' Exhibit 28       | Template               | 344 |
|    | Plaintiffs' Exhibit 29       | Email                  | 347 |
| 17 | Plaintiffs' Exhibit 30       | Letter                 | 351 |
|    | Plaintiffs' Exhibit 31       | Email                  | 354 |
| 18 | Plaintiffs' Exhibit 32       | Email                  | 362 |
|    | Plaintiffs' Exhibit 33       | Planned                | 365 |
| 19 |                              | questions overview     |     |
| 20 | Plaintiffs' Exhibit 34       | Email                  | 377 |
|    | Plaintiffs' Exhibit 35       | Email                  | 381 |
| 21 | Plaintiffs' Exhibit 36       | Email                  | 385 |
|    | Plaintiffs' Exhibit 37       | Email                  | 389 |
| 22 | Plaintiffs' Exhibit 38       | Email                  | 401 |

Page 4

1    (Exhibits retained by reporter for other
     depositions in this matter.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

```
 1              A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
            David Gersch, Esquire
 4          Peter Grossi, Esquire
            Caroline Kelly, Esquire
 5          ARNOLD & PORTER

 6

 7

 8

 9  On behalf of New York Immigration Coalition:
            Sarah Brannon, Esquire
10          AMERICAN CIVIL LIBERTIES UNION

11

12

13  On behalf of Kravitz Plaintiffs:
            Karun Tilak, Esquire
14          COVINGTON & BURLINGTON

15

16

17  On behalf of Los Angeles Unified School District:
            Keith Yeomans, Esquire (Telephonically)
18          DANIELS WOLIVER KELLEY
            115 Pine Avenue
19          Suite 500
            Long Beach, California 90802
20          (562) 366-8500
            kyeomans@dwkesq.com

21

22
```

```
                                                    Page 6

 1    On behalf of County of Los Angeles:
            David I. Holtzman, Esquire
 2          HOLLAND & KNIGHT
            50 California Street
 3          Suite 2800
            San Francisco, California 94111
 4          (415) 743-6909
            david.holtzman@hklaw.com
 5
      On behalf of Lupe Plaintiffs:
 6          Denise Hulett, Esquire (Telephonically)
            Andrea Senteno, Esquire
 7          MALDEF
 8
 9
10
11          Niyati Shah, Esquire
            Terry Minnis, Esquire
12          ASIAN AMERICANS ADVANCING JUSTICE
13
14
15
16    On behalf of City of San Jose & Black Alliance for
      Just Immigration:
17          Andrew Case, Esquire
            MANATT, PHELPS & PHILLIPS
18
19
20
21
22
```



Page 7

1    On behalf of City of San Jose & Black Alliance for
     Just Immigration continued:
2           John Libby, Esquire (Telephonically)
            MANATT, PHELPS & PHILLIPS
3           ███████████████████████████████
            ████████████████████████████████
4           ███████████████████
            ██████████████████████
5

            Ezra Rosenberg, Esquire
6           David Brody, Esquire
            Dorian Spence, Esquire
7           LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
            ████████████████████████████
8           ██████████████
            ███████████████████████████
9           ███████████████████
            ████████████████████████████████████
10          ██████████████████████████████
            ██████████████████████████
11

     On behalf of State of California:
12          Gabrielle Boutin, Esquire (Telephonically)
            R. Matthew Wise, Esquire
13          DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
            GENERAL
14          1300 I Street
            P.O. Box 944255
15          Sacramento, California 94244
            (916) 210-6053
16          gabrielle.boutin@doj.ca.gov
            matthew.wise@doj.ca.gov
17
18
19
20
21
22

Page 8

```
 1    On behalf of State of New York:
          Danielle Fidler, Esquire
 2        Elena Goldstein, Esquire
          Ajay Saini, Esquire (Telephonically)
 3        ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
          PROTECTION BUREAU
 4        ███████ ████████ ████████
          ████████ ████ █████  ██████
 5        █████  ████ ████████
          ████████████████████████████
 6        ████████████████████████████
          ████████████████████
 7
      On behalf of Defendants:
 8        Kate Bailey, Esquire
          Carlotta Wells, Esquire
 9        U.S. DEPARTMENT OF JUSTICE
          20 Massachusetts Avenue
10        Washington, D.C. 20530
          (202) 305-9802
11        kate.bailey@usdoj.gov
          carlotte.wells@usdoj.gov
12
          Michael Cannon, Esquire
13        David M.S. Dewhirst,Esquire
          U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
14        ASSISTANT GENERAL COUNSEL FOR FINANCE &
          LITIGATION
15        1401 Constitution Avenue, NW
          Room 5890
16        Washington, D.C. 20230
          (202) 482-5395
17        mcannon@doc.gov
          ddewhirst@doc.gov
18
          Miles Ryan, Esquire
19        U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
          CHIEF COUNSEL FOR ECONOMIC AFFAIRS
20        4600 Silver Hill Road
          Washington, D.C. 20233
21        (301) 763-9844
          miles.f.ryan.iii@census.gov
22
```

Page 9

1    ALSO PRESENT:   Herman Habermann

                     Katherine Wallman

2

     VIDEOGRAPHER:   Solomon Francis

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 10

```
1              P R O C E E D I N G S
2    WHEREUPON,
3         MR. YEOMANS:  I'd like the same order as
4    Dr. Abowd.
5         VIDEOGRAPHER:  Good morning.  We're going
6    on the record at 9:03 a.m., August 20, 2018.  This
7    begins Media Unit 1 of the video recorded
8    deposition of Dr. Ron Jarmin taken in the matter
9    of New York Immigration Coalition, plaintiffs
10   v. U.S. Department of Commerce and all defendants,
11   Case Number is 1:18-CV-05025-JMF and
12   1:18-CV-2921-JMF filed in the U.S. District Court
13   for the Southern District of New York.
14         This deposition is being held at the law
15   office of Arnold & Porter Kaye Scholer, LLP,
16   located 601 Massachusetts Avenue Northwest,
17   Washington D.C.
18         My name is Solomon Francis with the firm
19   of Veritext Legal Solutions.  I am the
20   videographer.  The court reporter is
21   Karen Jorgenson with Veritext Legal Solutions.
22   Counsels' appearances will be noted on the
```

Page 11

1   stenographic record.

2          Will the court reporter please swear in

3   the witness, and you may proceed?

4                    DR. RON JARMIN,

5   called as a witness, and having been first duly

6   sworn, was examined and testified as follows:

7          THE WITNESS:  Yes, I do.

8             EXAMINATION BY MS. GOLDSTEIN:

9      Q   Can you please state your name for the

10  record?

11     A   Ron Jarmin.

12     Q   Good morning.  My name is

13  Elena Goldstein.  I'm one of the attorneys for the

14  State of New York in this case, and I'll be

15  starting the deposition today.

16          Have you ever been deposed before?

17     A   Not like this, no.

18     Q   So I'm just going to go through some of

19  the basic ground rules.  I'm going to ask, because

20  we have the court reporter who is taking down all

21  of my questions and your answers, that you ask --

22  answer questions orally rather than nodding your

1      Q    So it is fair to say that questions on

2  the census also need to show a statutory or

3  regulatory need, correct?

4      A    Uh-huh.   Yes.

5      Q    Thank you.

6           Does the Census Bureau solicit questions

7  or new data requests from the agencies?

8      A    So, yeah.   There is a process where we

9  inform people, and, you know -- so the ACS goes

10 through a content review and agencies participate

11 in that.

12     Q    Does the Census also go through a contact

13 review?

14     A    Typically not, no.   Not that I recall.

15     Q    Is there a timeline by which the

16 Census Bureau asks agencies if they have new data

17 needs?

18     A    So I would say -- I mean, there was a

19 content review for the -- for the ACS, and I think

20 agencies are informed of that.   But agencies often

21 approach us outside of that review, as well.

22           (Plaintiffs' Exhibit 1, Gary letter, was

1    employer, business in the country.  A number of

2    current economic indicator surveys, monthly retail

3    trade, wholesale trade, those sorts of things.

4         Q    Okay.  I'll take that back.

5              When did you first learn of the

6    possibility of adding a citizenship question to

7    the census?

8         A    So I think around the time that

9    John Thompson was retiring, I had -- I had

10   heard -- I think from John, but I'm not exactly

11   sure -- that there was interest in a citizenship

12   question, which is, you know, not a necessarily

13   new thing.  There was interest in the citizenship

14   question in 2010, as well.  So that's -- that's --

15   but other than a vague notion that there may be

16   folks asking for a citizenship question, that was

17   the extent of my knowledge of that.

18        Q    And when was that conversation with

19   Mr. -- Dr. Thompson?

20        A    So that would have been May, June-ish of

21   2017.

22        Q    And what do you recall Dr. Thompson

Page 21

1    telling you about the citizenship question?

2        A    Basically what I just -- that there may

3    be interest putting it on there.   It was not a

4    particularly detailed conversation.

5        Q    Do you remember asking him questions

6    about that?

7        A    No.

8        Q    Do you remember anything else about that

9    conversation?

10       A    No.   It was a conversation about, you

11   know, him leaving, and Enrique and I sort of

12   taking over.   So it was, you know, all the fun

13   stuff that was in store for us.

14       Q    I'm sure that's a big list.

15       A    It was a big list.

16       Q    Sure.

17            When was the next time you heard about

18   the possibility of a citizenship question being

19   added to the census?        401/403

20       A    Probably shortly before the -- the letter

21   came from Art Gary.

22       Q    Tell me how you learned about this.

Page 22

```
 1        A    Folks at the department were asking
 2   if -- were saying that a letter was forthcoming --
 3        Q    And when you --
 4        A    -- and that we should be looking out for
 5   it.
 6        Q    And when you say "the Department," what
 7   do you mean?
 8        A    Department of Commerce.
 9        Q    And who told you this, that you should be
10   looking out for this?
11        A    I don't recall exactly who told me.  But
12   I think, you know -- I think there was multiple
13   people that expressed, so, you know, I think
14   Earl Comstock and Karen Dunn Kelley had both
15   expressed, but I think I actually learned it from
16   somebody else before that, so.
17        Q    Do you remember who you learned it from?
18        A    I don't.
19        Q    What were your conversations with
20   Comstock?
21        A    Well, there were no --
22             MS. BAILEY:  Objection.  Vague.
```

Page 23

1          THE WITNESS:  So there were no    401/403

2    conversations.  It was -- it was information

3    transfer.  I was told to keep an eye out for a

4    letter.  We didn't have any conversations.

5    BY MS. GOLDSTEIN:

6        Q    So how were you told to keep an eye out

7    for a letter?

8        A    We're expecting a letter from the

9    Department of Justice, you know, keep an eye out

10   for.

11       Q    Was that an oral conversation or

12   email --

13       A    Yes.  It was oral.

14       Q    And what did -- did you have

15   communications with Karen Dunn Kelley prior to

16   receiving the letter?

17       A    Yeah.  It would have been the same

18   nature.  Nothing in detail.

19       Q    Did you have any conversations with

20   Secretary Ross about adding a citizenship question

21   prior to receiving the Gary letter?

22       A    No.

Page 24

```
 1       Q    With Wendy Teramoto?

 2       A    No.

 3       Q    Any other communications with anyone from

 4   the Department of Commerce about the citizenship

 5   question --

 6       A    No.

 7       Q    -- before you received --

 8       A    No.

 9       Q    -- the letter?

10       A    No.

11       Q    And I'm just going to ask just for the

12   record --

13       A    That's fine.

14       Q    -- I know that my questions are often

15   going to be really predictable, and that's really

16   just for the Court and for the transcript, if I

17   can finish first and then you answer.

18       A    Go ahead.

19       Q    Thank you.

20            So how many days prior to receiving the

21   Gary letter did you hear about the possibility of

22   a citizenship question?        401/403
```

Page 25

1    A    I don't recall for sure.  I would say not

2    much more than a couple weeks.

3    Q    And after you learned a couple weeks

4    before receiving this Gary letter that this

5    request was coming, what did you do?

6    A    We didn't do anything in particular.

7    Q    What did you do in general?

8    A    I mean, nothing.  Kept an eye out for the

9    letter.

10    Q    Did you tell anyone in Census to also

11    keep an eye out for this letter?

12    A    So, yeah.  You know, my assistant, folks

13    in -- in our correspondence office, you know.

14    Q    Anyone else?

15    A    I don't think so, no.

16    Q    Did you speak to Dr. Abowd about it?

17    A    I don't recall having a particular

18    conversation about the citizenship letter or

19    anything, but, you know, with anyone, other than

20    front office staff before the -- so.

21    Q    Did you start any preparations for that

22    letter prior to receiving it?

1    they wanted a question.

2    BY MS. GOLDSTEIN:

3        Q    Do you remember any other details?

4        A    Of -- prior to the letter?

5        Q    Exactly.

6        A    No.

7        Q    Okay.

8            (Plaintiffs' Exhibit 2, Email, was

9    marked.)

10   BY MS. GOLDSTEIN:

11       Q    I'm showing you what's been marked as

12   Plaintiffs' Exhibit 2.   Is there a difference

13   between wanting a question and wanting citizenship

14   information?

15            MS. BAILEY:   Objection.   Vague.

16            THE WITNESS:   So there -- there is.

17   There's the need for the data, and then there's

18   how you source the data to fulfill that need.

19   BY MS. GOLDSTEIN:                401/403

20       Q    Can you explain a little bit more to me?

21       A    So there's often multiple sources of

22   information that could be used to either fully or

1   partially meet a particular measurement objective.

2   And so the Census Bureau often explores whether

3   there's a nonsurvey source that we could use

4   rather than putting a burden on the public through

5   a survey question.

6        Q    So is it fair to say that a citizenship

7   question is one way to get that data?

8        A    Yes.

9        Q    And there are other ways, as well?

10       A    In this case, yes.

11       Q    Okay.  So let's look at this Exhibit 2.

12  It is Bates number 1332.  Do you recognize this

13  document?

14       A    Yeah, I guess.

15       Q    What is it?

16       A    An email.

17       Q    This is an email from Aaron Willard dated

18  12/15/2007 [sic] to you, correct?

19       A    Uh-huh.

20       Q    I'm sorry.  You need yes or no.

21       A    Yes.

22       Q    Thank you.

Page 32

1    Plaintiffs' Exhibit 4.  It's Bates stamp 1357.

2            Do you recognize this document?

3        A   Yes.

4        Q   What is it?

5        A   An email.

6        Q   Are these emails that you received or

7    sent?

8        A   Looks like one of each.

9        Q   So if you go to the bottom on

10   Monday, December 18th, you email

11   Karen Dunn Kelley, "any news"; is that correct?

12       A   Yes.

13       Q   What are you referring to?

14       A   So I don't recall this exactly, but I

15   think we were -- Barry Robinson, who was at OGC at

16   the time, was reaching out to Art Gary at DOJ to

17   see if we could set up a time to discuss the

18   letter.          401/403/802

19       Q   What is OGC?

20       A   Office of General Counsel.

21       Q   And is that -- which department is that?

22       A   Commerce.

Page 33

1      Q    And why was Barry reaching out to Gary to

2  set up a time to discuss the letter?          401/403

3      A    So I believe that Barry knew Gary,

4  and, you know, we wanted -- we wanted to meet with

5  them to discuss their request.

6      Q    Why is that?

7      A    Because we typically meet with folks who

8  have a data request.

9      Q    And what's the purpose of that meeting?

10     A    To understand their -- their needs.

11     Q    Can you tell me a little bit more?

12     A    So to have them describe what they need

13  from a technical perspective so that we can best

14  understand how we would go about seeing if we

15  could fulfill it.

16     Q    Who typically attends those meetings?

17     A    Usually, methodologists and technical

18  people.

19     Q    From?

20     A    From Census, along with the subject

21  matter experts from the requesting organization.

22     Q    Who are the subject matter experts that

Page 34

1   would attend -- that would typically attend from

2   the Department of Justice?   401/403

3        A    So in this case, I guess it would be the

4   folks that were involved in Voting Rights Act

5   enforcement.

6        Q    Do you know who those people are?

7        A    I don't have firsthand knowledge, no.

8        Q    Do you know what job titles they have?

9        A    I can't tell you.

10       Q    Are there statisticians or methodologists

11   at the Department of Justice who are involved in

12   voting rights enforcement?   602/401/403

13            MS. BAILEY:   Objection.

14            THE WITNESS:   I don't know.

15   BY MS. GOLDSTEIN:

16       Q    Why is it important to have a meeting to

17   understand their technical needs?

18       A    So it's important so that when you go

19   through the expense and effort of a data

20   collection, that it actually solves the

21   measurement objective that the subject matter

22   experts have in mind.

Page 35

1      Q    How long do those meetings typically

2    take?

3      A    You know, they vary.   Some requesting

4    agencies have very well-defined requests and we

5    understand it clearly and it could happen

6    efficiently, and some requesting organizations are

7    less organized.   So, you know, it's context

8    specific.                        401/403

9      Q    Can you give me a range?

10      A    I mean, anywhere from, you know, one or

11    two meetings to many months of negotiations.

12      Q    Prior to the citizenship question, had

13    you received requests for data from the

14    Department of Justice specifically?

15      A    Well, we do -- so I don't know if we

16    received requests or not.   I mean, we do produce

17    Citizen Voting Age Population data from the ACS,

18    and I know there had been conversations between

19    Census and Justice regarding those data.   So I

20    would assume so, but I was not involved in any of

21    those conversations or how that was initiated.

22      Q    And those were prior to your becoming --

1        A    Yes.

2        Q    -- acting director?

3        A    Yes.

4        Q    Is it fair to say that part of the

5   purpose for these technical meetings is to

6   determine the fit between the data that the agency

7   is requesting and the way in which the

8   Census Bureau obtains that data?

9            MS. BAILEY:   Objection.   Vague.

10            THE WITNESS:   So I'll answer what I think

11   your question is

12   BY MS. GOLDSTEIN:

13        Q    All right.

14        A    The reason is there's a subject matter

15   need for information, and the Census Bureau will

16   try to understand what that need is and best

17   design a data collection and processing

18   methodology to meet the subject matter experts'

19   requirement.

20   BY MS. GOLDSTEIN:

21        Q    Has DOJ ever asked for a question to be

22   added to the short form of the census prior and

1   persistent to the citizenship question? 401/403

2           MS. BAILEY:   Objection.

3           THE WITNESS:   Not that I know of.

4   BY MS. GOLDSTEIN:

5       Q    Are you aware of any agency asking for a

6   question to be added to the short form?

7       A    Not to my knowledge, no.

8       Q    Do agencies -- agencies typically request

9   data, not questions, correct?

10      A    No.   That -- agencies often will request

11  a question when they're really requesting data,

12  because they don't know the difference.

13      Q    And that's why you have those meetings,

14  correct?                    401/403

15      A    Yes.

16      Q    So turning back to Exhibit 4, did you get

17  any more information from Barry about his efforts

18  to reach out to Gary?

19      A    I -- I don't think that we did.   I mean,

20  it was -- you know, this was coming up on the

21  holidays.   I'm getting -- communicating with folks

22  was a little hit or miss.   And so we certainly

Page 38

1    didn't get anything that was substantive [sic]

2    that I recall.  But it was -- I think there was

3    some -- some inefficiencies in the communication

4    channel.  So --                401/403

5         Q    Why do you say that?

6         A    -- I -- it didn't seem like, you know,

7    that he was making himself available to talk to

8    Barry, so.

9         Q    And when you say he, "he," you're

10   refer- --

11        A    Gary, yeah.        802

12        Q    It's a rhyme.  It's like a limerick.

13        A    Yeah.

14        Q    But at some point, looking at the top

15   email here, Barry did speak to Mr. Gary, correct?

16        A    Correct.  Yes.

17        Q    And do you know what they conversed

18   about?                802

19        A    I think they were trying to set up a

20   meeting, and that didn't happen.

21        Q    Okay.  Did Barry -- did you learn

22   anything else from Barry, other than what you told

Page 44

1   folks from the White House about the citizenship

2   question?

3        A    No.

4        Q    Prior to receiving the Gary letter, did

5   you have communications with anyone associated

6   with the White House about the citizenship

7   question?

8        A    No.

9        Q    And after receiving the Gary letter, did

10  you have communications with anyone affiliated

11  with the White House about the citizenship

12  question?

13       A    No.

14       Q    I'll take that.

15            MS. GOLDSTEIN:  I apologize I do not have

16  a lot of those exhibits.

17            (Plaintiffs' Exhibit 6, 2020 Census:

18  Adding Content to the Questionnaire, was marked.)

19  BY MS. GOLDSTEIN:

20       Q    I'm showing you what's been Bates stamped

21  Plaintiffs' Exhibit 6.  It is a two-page document

22  marked 9865 and 9867 entitled 2020 Census:  Adding

Page 45

1    Content to the Questionnaire.

2           Do you recognize this document?  Let's

3    look at the first page first.        401/403

4        A    You know, I recognize -- I mean, I'm not

5    sure where this came from, but I think this looks

6    like the process, yes.

7        Q    When you say this looks like the process,

8    what does that mean?

9        A    The process for adding questions to

10   the -- the ACS and decennial.

11       Q    And the process for adding to the ACS and

12   decennial is the same, correct?

13       A    Yes.  We call it the ACS, used to be the

14   long form of the census.

15       Q    And when we refer to the decennial or the

16   census, we're referring to the short form?

17       A    The short form.

18       Q    So if you look at the very top, it says,

19   "The Census Bureau follows a well-established

20   process when adding questions to the decennial

21   census."

22       A    Uh-huh.

Page 46

1    Q    Do you agree with that statement?

2    A    Uh-huh.  Yes.                401/403

3    Q    And it says that -- and is it part of

4  that well-established process having those

5  technical meetings that you just referred to?

6    A    Yes.  I mean, it's not laid out in here,

7  but that is generally part of the process.

8    Q    So looking at Step 1 --

9    A    Uh-huh.

10    Q    -- do you agree that typ- -- the

11  typical -- well -- or I'm sorry.  Withdrawn.

12         Do you agree the well-established process

13  first provides that upon receiving requests,

14  lawyers at the Department of Commerce work closely

15  with OMB to determine whether data fulfill legal,

16  regulatory or constitutional requirements?

17    A    Yes.

18    Q    And Step 2, do you agree that upon

19  determining that a new question is warranted, that

20  the Census Bureau must notify Congress of its

21  intent to answer the question?

22    A    Uh-huh.

Page 47

1      Q    I'm sorry.  I need --

2      A    Yes.  Yes.                    401/403

3      Q    Thank you.

4           And how does the Census Bureau determine

5    that a new question is warranted?

6      A    So, again, that's -- you know,

7    there's -- whether there's a legal or statutory,

8    regulatory reason, and then whether it's feasible

9    to ask that question.

10     Q    What does that mean?

11     A    That we can actually get valid responses

12   from respondents.

13     Q    How do you -- how does the Census Bureau

14   determine that?

15     A    Often through testing or what have you.

16   So we do cognitive testing to see if people

17   understand questions.

18     Q    What other kinds of testing do you do?

19     A    That's really the primary type of

20   testing.  You know, look at the quality of the

21   data we get back from that, determine how best to

22   word the question.

Page 48

1      Q   Other than testing wording, are there

2  other things the Census Bureau looks at to

3  determine whether or not a question is feasible?

4      A   So not -- so they -- the -- you know, on

5  the business side, we look to see whether the

6  companies keep records of the thing that we're

7  requesting.  On the household side, that's usually

8  less formal.  So it's whether they understand the

9  question and can answer it, so.          401/403

10     Q   Are there other issues that go into

11  whether or not a question will lead to a valid

12  response from respondents?

13     A   So, you know, there's testing.  There's

14  comparing it to other sources of information,

15  trying to understand whether we're getting

16  high-quality responses.  That's not always

17  possible.

18     Q   What do you mean?

19     A   Sometimes there's not another source of

20  data.

21     Q   Is there another source of data for the

22  citizenship information?

Page 49

1      A    In this case, yes, there is another

2    source of data.                401/403

3      Q    And what was that source of data?

4      A    Administrative records from, primarily

5    from the Social Security Administration, but also

6    from USCIS and the State Department.

7      Q    Are there any other aspects of this

8    process of determining whether or not a new

9    question is warranted?

10          MS. BAILEY:  Objection.  Vague.

11          THE WITNESS:  So the warranted is a

12    different term.  Census Bureau is usually looking

13    for feasible.  So the subject matter expert

14    requesting the information is assumed to know

15    whether the information is needed or not, and we

16    look for a way to see if we can provide the

17    information that they need.

18    BY MS. GOLDSTEIN:

19      Q    And that, again, goes back to those

20    technical meetings --

21      A    Yes.

22      Q    -- between the subject matter experts at

Page 50

```
1    Census and the subject matter experts at the
2    agency --
3         A    Correct.
4         Q    -- correct?
5         A    Correct.                              401/403
6         Q    So continuing on Step 2, this says,
7    skipping down a line, "This is an intentionally
8    [sic] process designed to give Congress the
9    ability to review the topics and questions on the
10   questionnaire before they're finalized?"
11        A    Uh-huh.
12        Q    Do you agree with that statement?
13        A    Uh-huh.   Yes.   Sorry.
14        Q    "If an additional topic is required, it
15   is imperative that Congress be notified as soon as
16   possible."
17             Do you agree?
18             MR. ROSENBERG:   Excuse me.   I think
19   people that are dialed in can no longer hear the
20   deposition.
21             MS. GOLDSTEIN:   Can we go off the
22   deposition for a minute?
```

Page 51

```
 1          VIDEOGRAPHER:   The time is 9:46 a.m.

 2   We're going off the record.

 3          (Off the record.)

 4          VIDEOGRAPHER:   The time is 9:48 a.m.   We

 5   are back on the record.

 6          Please proceed, Counsel.
                                              401/403
 7   BY MS. GOLDSTEIN:

 8      Q    So we're still on 9865.   And if we look

 9   to Step 3, "The Census Bureau must notify the

10   public and invite comments regarding the change in

11   the questionnaire with the Federal Register

12   notice."

13          Is that correct?

14      A    Yes.

15      Q    And do you agree that that is also part

16   of the well-established process?

17      A    Yes.

18      Q    And has this step of the process been

19   followed for the citizenship question?

20      A    It has not.   This is in process.   This

21   part is to have the Paperwork Reduction Act

22   package that goes to the Office of Management and
```

Page 52

1     Budget, to Nancy Potok's office.  I'm not sure

2     where in the process, but the whole package for

3     the census will be sent out.  The citizenship

4     question will be part of that package.

5          Q    And Step 4, "The Census Bureau must test

6     the wording of the new question."

7          A    Right.                    401/403

8          Q    Do you agree that that is also part of

9     the well-established process of adding content to

10    the census questionnaire?

11         A    Yes.

12         Q    And the citizenship question has not been

13    tested, correct?

14         A    That's -- that's not correct.

15         Q    Okay.  The citizenship question has not

16    been tested in the context of the decennial

17    census, correct?

18         A    That's correct.

19         Q    The next sentence says, "It is too late

20    to add a question to the 2018 end-to-end test, so

21    additional testing on a smaller scale would need

22    to be developed and implemented as soon as

Page 53

1    possible."

2         Do you agree that this is part of the

3    well-established process of adding content to the

4    questionnaire?

5         A    No.   No.   This is in addition.

6         Q    Can you explain?

7         A    I'm just saying it's too late to add

8    something to 2018 end-to-end test, and if there

9    was a new question, we would have to find another

10   way to test it.

11        Q    Do you know when 9865, Exhibit 6, was

12   created?

13        A    I'm not sure.

14        Q    Do you know who created it?

15        A    Census staff, I believe.

16        Q    Do you know who on census staff?

17        A    I'm not sure.

18        Q    What is the 2018 end-to-end test?

19        A    It's a test in three different sites

20   that's just wrapping up right now in

21   Providence, Rhode Island, where we did a full

22   end-to-end test to make sure all the systems and

Page 54

1    everything work so we are ready to go into the

2    field in 2020.

3        Q    And when you say a full end-to-end test,

4    can you just tell me a little bit what that means?

5        A    So it wasn't all of the operations, but

6    most of the major operations that are involved in

7    the 2020, from address canvassing, all the way

8    through nonresponse follow-up and publishing the

9    data will be our test.

10       Q    And what's the purposes of the end-to-end

11   testing?

12       A    To work out any bugs or kinks, things

13   that -- that we didn't foresee in sort of the

14   smaller scale system specific testing that we do

15   all the time.

16       Q    And why is that important?

17       A    So that we're prepared.

18       Q    Was the citizenship question tested on

19   the -- on any of the end-to-end testing --

20       A    No.                    401/403

21       Q    -- for the 2020 census?

22       A    It was not.

Page 55

1     Q    And did additional testing on a smaller

2    scale get developed for the 20- -- for the

3    citizenship question --

4     A    No.                              401/403

5     Q    -- for the 2020 census?

6     A    No.

7     Q    And was additional testing on a smaller

8    scale implemented for the citizenship question on

9    the 2020 census?

10    A    No.

11    Q    Why not?

12    A    The citizenship question that we'll be

13   using on the 2020 census is the same question

14   that's on the American Community Survey and has

15   been answered by between 40 and 50 million

16   households over many years.  The question performs

17   quite well, so we're confident that -- that it's

18   fully tested.

19    Q    Step 4 was not followed with respect to

20   the citizenship question, correct?

21    A    The Step 4 was obviated by the fact that

22   the -- it has been on the ACS for many years.  We

Page 56

1    did not think that this step was necessary.

2         Q    So Step 4 was not followed, correct?

3         A    No.

4         Q    I'm sorry?          401/403

5         A    It was not.

6         Q    Okay.  Step 5 is, "The Census Bureau must

7    make additional operational adjustments beyond

8    testing to include new content.  This includes

9    redesigning the paper questionnaire and adjusting

10   the paper data capture system."

11        Has that occurred for the citizenship

12   question?

13        A    I believe this is ongoing.

14        Q    So it's in progress for the citizenship

15   question?

16        A    Yes.

17        Q    "For Internet self-response, the

18   additional question will require system

19   redevelopment, once for English and then again for

20   Spanish."

21        Has that occurred for the citizenship

22   question?

Page 58

1     Q   Is it fair to say it's another -- another

2  version of the process that's listed on 9865?

3     A   Yes.

4     Q   And do you agree that this is another

5  version of the well-established process when

6  adding questions to the decennial census?

7     A   Sure.  Yes.

8     Q   Anything you disagree with in 9867?

9        MS. BAILEY:  Objection.  Vague.

10       THE WITNESS:  No.

11 BY MS. GOLDSTEIN:

12    Q   I'll take that back.

13       After you learned of the citizenship

14 question, were you given any instructions

15 about -- withdrawn.

16       After you learned about this citizenship

17 question, a couple of weeks before receiving the

18 Gary letter, were you given any instructions?

19    A   No.

20    Q   After receiving the Gary letter, were you

21 given any instructions about next steps?     401/403

22    A   I don't think we were given explicit

Page 59

1  instructions.  I think it was taken for granted
2  that we were going to start this process.  401/403
3      Q    The well-established process for adding a
4  question to the census?
5      A    Yes.
6      Q    The first step of which is the technical
7  meetings.
8      A    Technical meetings.
9      Q    Did you have any conversations about
10  getting this process started after you received
11  the letter?
12      A    Well, I recall meeting with my staff and
13  discussing, you know, how we were going to
14  proceed, and we were trying to take as broad a
15  view as possible.  So I believe, you know, it was
16  agreed that we would -- we would explore the use
17  of administrative records to fulfill the request,
18  as well.  401/403
19      Q    And why was that an area that you were
20  exploring?
21          MS. BAILEY:  Objection.  Vague.
22          THE WITNESS:  Well, it's an area that we

1   always explore.  So for -- you know, it's often

2   easier, potentially more accurate to          401/403

3   administrative records, but it's also the

4   intention of Congress in Title 13, the census

5   code, that when possible, we use administrative

6   records in lieu of direct collection.  So this is

7   something that we typically -- typically do.

8   BY MS. GOLDSTEIN:

9       Q   Did you receive any direction from

10  Secretary Ross at this point?

11      A   No.

12      Q   Did you receive any directions from

13  Karen Dunn Kelley at this point?

14      A   No.  Other than, you know, proceed

15  with, you know, our analysis.

16      Q   Any other instructions from Ms. Kelley?

17      A   No.

18      Q   Any directions from anyone else at

19  Commerce at this time?

20      A   No.

21      Q   So let's talk a little bit more about

22  what you did after you first received the Gary

Page 61

1  letter.  What exactly did you ask your staff to

2  do?                        401/403

3       A   So we -- you know, we knew that the

4  question was already on the ACS, so the testing

5  thing was not a priority.  You know, I think we

6  all agreed that the question on the ACS performed

7  as well as it could.  The focus was primarily on

8  seeing whether the administrative records assets

9  that we have at the Census Bureau were useful in

10 this regard to do a comparison of administrative

11 records and -- and survey responses on the ACS and

12 to come up with a -- with an analysis and

13 suggestions as to what's the best way to proceed.

14      Q   Did you have a timeline that you were

15 working on?

16      A   So we were on a tight timeline because,

17 obviously, we needed to provide the questions to

18 Congress by the end of March.  So the Secretary

19 needed to make a decision prior to that, so we

20 were trying to work as quickly as we could.

21      Q   And had anyone from Commerce given you

22 any interim timelines before the point at which

Page 62

1  you knew Congress had to get these questions?

2      A   No.  I don't think -- I think everybody

3  knew the time was short.          401/403

4      Q   Who did you speak to on staff at the

5  outset?

6      A   So I primarily worked through

7  John Abowd -- who you spoke with last week, I

8  believe -- who is the chief scientist and

9  associate director for research and methodology,

10 and he assembled the team that did the analysis.

11     Q   So you said a moment ago that the

12 citizenship question on the ACS performed as well

13 as it could.  What do you mean by that?

14     A   I'm not really sure what I meant by that,

15 but it performs well.  So it -- relative to other

16 questions on the form, it has about, you know, a

17 middle range of allocation rates, and that

18 means, you know, what we have to do for imputation

19 and whatnot.  You know, compared to a question

20 like income, it's a much better performing

21 question.

22     Q   And what do you mean by better

Page 63

```
 1   performing?

 2       A    We have to impute much less than we do

 3   for other questions.

 4       Q    Is that related to the item nonresponse?

 5       A    Yes.

 6       Q    Can you explain?

 7       A    So item nonresponse is how many people

 8   fill out the survey that choose not to answer a

 9   particular question.

10       Q    So when you say that the citizenship

11   question on the ACS performs as well as it could,

12   that is related to how many folks are answering

13   that question on the ACS?

14       A    Yeah.

15       Q    I'm sorry?

16       A    Yes.

17       Q    Okay.

18           (Plaintiffs' Exhibit 7, Email, was

19   marked.)

20           MS. GOLDSTEIN:  Hold on one second,

21   please.

22   BY MS. GOLDSTEIN:
```

Page 64

1      Q     So I'm showing you a document that's been

2   marked as Plaintiffs' Exhibit 7.  It is Bates

3   number 3289.

4           COUNSEL:  Can you repeat the Bates number

5   again, please?

6           MS. GOLDSTEIN:  3289.

7   BY MS. GOLDSTEIN:

8      Q     And it is a set of emails that were sent

9   on December 22, 2017.

10          Do you recognize this email?

11     A     Yes, I do.

                          401/403

12     Q     What is this?

13     A     In was an email from me to Art Gary with

14   survey results of a preliminary analysis that our

15   staff had put together very quick.

16     Q     And why did you send this email?

17     A     To try to motivate a meeting with

18   Department of Justice technical experts.

19     Q     So this response to Mr. Gary was sent

20   about a week after the DOJ's request?

21     A     Yep.

22     Q     Is that a typical time frame for the

Page 65

1  Census Bureau to respond to an agency's data

2  response?

3      A    It is when we have a tight deadline to

4  get the questions to Congress.          401/403

5      Q    Have you ever had such a tight deadline

6  to get a -- the questions to Congress?

7      A    So, I wouldn't know.  I wasn't involved

8  with prior decennials in this fashion.  This is

9  the only thing where we have to do this with, so.

10  On the business side of the house, we have a

11  luxury of not having to get Congress's permission

12  on every change to a survey, so we didn't have

13  this constraint.

14      Q    So prior to your current role, you

15  weren't involved in the question-making process

16  for the census?

17      A    For the decennial, no.

18      Q    Okay.  And the to line here is entirely

19  redacted, but this email was sent to Art Gary,

20  correct?

21      A    Yes.  I believe so.

22      Q    And so this email says that you directed

1   staff to review all possible ways to address the

2   needs expressed in the letter.

3        A    Uh-huh.

4        Q    I need yes or no.                401/403

5        A    Yes.

6        Q    That's the Gary letter, correct?

7        A    Yes.

8        Q    And your staff found that, "The best way

9   to provide PL94 block-level data with citizen

10  voting population by race and ethnicity would be

11  used by outlining a linked file of administrative

12  and survey data the Census Bureau already

13  possessed."                         401/403/802

14       Correct?

15       A    Correct.

16       Q    That is what your staff found?

17       A    Yes.

18       Q    And did you agree with that conclusion?

19       A    I did.

20       Q    And the next line says, "This would

21  result in higher-quality data produced at a lower

22  cost."

Page 67

1          Do you agree with that conclusion?

2      A    Yes.

3      Q    And then you write that -- you suggest we

4  schedule a meeting of Census and DOJ technical

5  experts to discuss the details of this proposal,

6  correct?

                        401/403/802

7      A    Uh-huh.  Yes.

8      Q    And that's the technical meeting that we

9  spoke about earlier, correct?

10      A    Yes.

11      Q    To your knowledge, had DOJ ever requested

12  PL94 block-level data with citizen voting age

13  population by race and ethnicity before?

14      A    Not that I know of.

15      Q    Did you communicate your conclusion in

16  this email that you should use a linked file,

17  administrative and survey data to the

18  Department of Commerce prior to sending this email

19  to DOJ?

20      A    No.   I don't believe I did, but I think I

21  forwarded this email to Karen Dunn Kelley shortly

22  afterwards, so.

Page 68

1    Q    When you sent this email to Mr. Gary, did

2  Karen Dunn Kelley know that the Census Bureau had

3  concluded that using this linked file of

4  administrative records and survey data was the

5  Census Bureau's preferred approach?    401/403

6    A    So I don't think it's fair to say at this

7  time that it was a conclusion necessarily.

8    Q    Sure.

9    A    I mean, this was sort of a preliminary

10  finding, and we wanted to get together with folks

11  at DOJ to discuss that, so.

12    Q    Absolutely.  So was Ms. Dunn Kelley aware

13  of that preliminary finding?

14    A    I don't recall discussing it with her

15  before I forwarded this to -- to her, but she knew

16  that we were trying to work with the folks from

17  DOJ.  So -- but I don't recall -- I mean, she knew

18  we were also looking into administrative records.

19  So I mean --

20    Q    How did she know that?    401/403

21    A    I think we said that we were.

22    Q    When?

1      A    Probably shortly after getting the

2   letter, that we were going to review our options

3   and see what we could do.

4      Q    And do you recall how she responded to

5   that?

401/403

6      A    I -- I don't actually, no, so.

7      Q    Do you remember any other communications

8   between yourself and the folks at Commerce about

9   the citizenship question in the time period

10   between receiving the Gary letter and sending this

11   email?

12      A    You know, other than we were getting to

13   work and, you know -- the time frame was short and

14   the people saying the time frame was short was

15   primarily us, because I think we knew we needed to

16   get the questions to Congress by the end of March,

17   so.

18      Q    Any instructions from Commerce?

19      A    No.

20      Q    Typically, when an agency requests for

21   data -- I'm sorry.  Withdrawn.

22          Typically, when an agency requests data,

1   knowledge of what the sign off typically is, but

2   we probably would not add questions to the ACS

3   without Commerce knowing that we were doing so.

4        Q    Do you know if the Secretary --

5        A    So -- so I will add that there's -- you

6   know, when PRA packages do go to OMB, they do get

7   routed through Congress.

8        Q    Do you know who they get routed through?

9        A    Through the economic and statistics

10  administration.  So Karen Dunn Kelley's, you know,

11  current role as Under Secretary, through that

12  office.

13       Q    Okay.  Do you know if the Secretary

14  typically reviews requests to add questions to the

15  ACS?                        401/403/602

16       A    I'm not sure.  I don't think that the

17  Secretary usually gets involved in ACS questions.

18       Q    Do you know if the Secretary --

19       A    But I -- I'm not sure about that.

20            COUNSEL:  Excuse me.  Sorry.  I got an

21  email that apparently the folks on the phone can't

22  hear again.

1          MS. GOLDSTEIN:  Off the record, please.

2          VIDEOGRAPHER:  The time is 10:11 a.m.  We

3   are going off the record.

4          (Off the record.)

5          THE VIDEOGRAPHER:  Time is 10:13 a.m.

6   We're back on the record.

7          Please proceed.

8   BY MS. GOLDSTEIN:

9      Q      Do you know if the Secretary is typically

10  involved in approving changes to the decennial

11  census?

12     A      So there hasn't been any changes to the

13  long form -- or short form for some time, so I

14  can't tell you what the typical practice is,

15  because it hasn't been exercised.  But a change to

16  the short form census would get a lot of

17  visibility at the Department and the

18  Secretary -- it would seem reasonable that the

19  Secretary would do that in a typical course if

20  there was a typical course.

21     Q      The Census Bureau considered changes to

22  the decennial census for this year, correct, apart

Page 74

```
 1    from the citizenship question?

 2         A    Yes.                         401/403

 3         Q    Changes to the race and ethnicity

 4    question?

 5         A    Changes to the race and ethnicity

 6    question, yes.

 7         Q    Any other changes?

 8         A    No.

 9         Q    And did the Secretary weigh in on those

10    proposed changes to the race and ethnicity

11    question?

12         A    Not that I'm aware of.   He was briefed on

13    them, but I don't think he weighed in, one way or

14    the other.

15         Q    And did other folks at Commerce weigh in

16    on the proposed changes to the race and ethnicity

17    question?

18         A    No.

19         Q    Is it fair to say that the

20    Commerce Department accepted the Census Bureau's

21    recommendations with respect to the race and

22    ethnicity question on the short form?
```

Page 75

```
1        A    Yes.   There was a PRA package requesting

2    that change that went to OMB.              401/403

3        Q    So turning back to this exhibit,

4    Exhibit 7, what happened after you sent this email

5    to Mr. Gary?

6        A    I'm not sure if he responded immediately,

7    but he eventually responded that DOJ did not need

8    to meet.

9        Q    Did you get any directions from

10   Karen Dunn Kelley after you forwarded this email

11   on to her?

12       A    Directions of what sort?

13       Q    Any instructions about how to proceed.

14       A    No.   She knew that we were trying to set

15   up a meeting.

16       Q    Did you have any substantive

17   conversations with Ms. Kelley about trying to set

18   up this meeting?

19       A    Other than we're trying to set up the

20   meeting, I don't think so, no.

21       Q    Did you have any substantive

22   questions -- or discussions with anyone else at
```

Page 82

1   data request?

2       A    So, yes, probably.

3       Q    Do you think you would remember if

4   Department of Commerce told Census not to meet on

5   the citizenship question?

6           MS. BAILEY:  Objection.  Calls for

7   speculation.

8           THE WITNESS:  So -- well, they didn't

9   tell us no, so.

10  BY MS. GOLDSTEIN:

11      Q    So no one at Commerce told you not to

12  meet with the Department of Justice technical

13  team, correct?

14          MS. BAILEY:  Objection.  Asked and

15  answered.

16  BY MS. GOLDSTEIN:

17      Q    Correct?

18      A    No.

19      Q    Okay.  This email says, "Technical

20  meetings will follow."

21          Does that refer to the technical meetings

22  we've discussed?

Page 83

1     A     Yes.

2     Q     And then it says, "We do not have a green

3  light to approach outside experts or DOJ at this

4  time."

5           What does that mean?          401/403

6     A     That's the technical team reaching out

7  directly.

8     Q     You were reaching out directly in --

9     A     Yes.  I was reaching out directly.

10    Q     Now, this reference to outside experts,

11 what role do outside experts typically play in

12 this process?

13    A     So outside experts here could mean

14 several things, but I think that this probably

15 means folks that we would request peer review or

16 something from to see if the methods that we were

17 suggesting were appropriate.  And that the

18 methods, I think, that they're probably referring

19 to is some sort of modeled approach using ACS and

20 administrative data.  So you would want other

21 statisticians to weigh in on the appropriateness

22 of that approach.

Page 84

1      Q    Is that a typical part of the process in

2  meeting an agency's data needs?

3      A    Often it is, yes.          401/403

4      Q    Did that occur --

5      A    Especially in a more -- but that's a

6  relatively more complicated way of approaching the

7  problem than strict survey methodology.  But -- so

8  we have a scientific advisory committee.  We have

9  regular contacts with other folks in the

10  scientific community.  Census Bureau tries to be

11  as transparent in its methods as possible and

12  have -- to the best as we can have some buy-in

13  from the scientific community that we're doing

14  things appropriate.

15      Q    And did that happen with the citizenship

16  question?

17      A    Well, the citizenship question on the

18  ACS, yes.  In this case, you know, we did not have

19  those discussions yet, so --

20      Q    In this case, meaning the citizenship

21  question --

22      A    For --

Page 85

1    Q    -- on the decennial?

2    A    -- at -- during this time frame.

3    Q    After 12/19/2017, were outside experts

4    approached about the citizenship question?

5    A    No.   The Census Scientific Advisory

6    Committee did opine on it at a meeting, and now

7    that we have a decision from the Secretary and the

8    team -- the similar team is working on what the

9    methodology of using the -- the combined census

10   question and the administrative records that will

11   be peer reviewed, both by the scientific advisory

12   committee and others.                401/403/802

13   Q    When you say that the Census Scientific

14   Advisory Committee opined, what do you mean?

15   A    So they -- they had -- during the opening

16   of the meeting, they had some comments on the

17   question, so --

18   Q    Were those comments so listed

19   by -- Census Bureau?

20   A    I don't believe it was -- they were

21   solicited, because the meeting was right after

22   the decision, so the agenda had already been sent

Page 86

```
 1    prior to that.
 2        Q    And what did that advisory committee
 3    opine?
 4        A    That they were not in support of adding
 5    the question to the census.        401/403/802
 6        Q    What reasons did they give?
 7        A    The primary technical reason that they
 8    gave is that it wasn't tested, which we argued
 9    back against, but that was the primary technical
10    reason.
11        Q    Were there other reasons?
12        A    I think they thought it would be
13    disruptive to the -- to the decennial.
14        Q    Do you agree?
15        A    It can be disruptive, yes.
16        Q    Why do you say that?
17        A    We're here in a -- having a deposition.
18    I think that's clear why it's disruptive.
19            So there are parts of society that would
20    not like to have the question.  There are parts of
21    society that would like to have the question.
22        Q    Any other reasons why the citizenship
```

Page 87

1    question could be disruptive to the process?

2         A    Just -- if there's controversy

3    surrounding the census, which there always is any

4    way, it makes conducting a full census more

5    difficult.                    401/403

6         Q    What do you mean by a full census?

7         A    Complete, accurate census.

8         Q    What's a complete census?

9         A    That we count everybody once in the right

10   place.

11        Q    Did you have any discussions with

12   Earl Comstock about setting up a technical

13   meeting --

14        A    No.

15        Q    -- with DOJ?

16        A    No.

17        Q    And did you -- you didn't have any

18   conversations with anyone at Commerce about

19   setting up a technical meeting with DOJ, other

20   than Karen Dunn Kelley, correct?

21        A    No.   We have lots of -- we have regular

22   meetings where there's many people in the room.

Page 88

1   So Earl may have been in the room, but I did not

2   have a conversation with Earl about this.

3       Q     What happened after this email was sent?

4           MS. BAILEY:   Objection.   Vague.

5           THE WITNESS:   After this email?

6   BY MS. GOLDSTEIN:

7       Q     Yes.   Did you receive a response from

8   DOJ?

9       A     I already sort of hinted at that

10  eventually I got a response that they didn't need

11  to meet, but I don't think that came at this time.

12      Q     Do you remember how you first received a

13  response from DOJ?   Was it a phone call?   Was it

14  an email?

15      A     So there was a couple emails back and

16  forth with Art Gary and I about trying to set a

17  meeting up and that he was working on that.

18      Q     And then what happened?

19      A     And then, eventually, I got a reply back

20  that they did not want to meet.

21      Q     Did you get a -- was that in a phone call

22  or was that an email?

401/403/802

Page 100

1    meeting was cancelled.

2        Q    Do you remember if this cancelation came

3    as a surprise to you?

4        A    Well, meetings get cancelled all the

5    time, so probably not.

6        Q    Do you know if you had any -- did you

7    have any conversations with Mr. Gary about this

8    cancellation?

9        A    No.

10       Q    What did you do after you received this

11   email?

12           MS. BAILEY:  Objection.  Vague.

13           THE WITNESS:  I assume I probably tried

14   to reach out to see if we could get it

15   rescheduled, but I don't know if I did that for

16   sure.

17   BY MS. GOLDSTEIN:

18       Q    After Mr. Gary cancelled the meeting on

19   January 16th, do you -- did you reach out to him

20   again?

21       A    I'm -- I'm not sure that I did, but I

22   imagine that I probably would have tried.

1      Q      Anything that would help you remember?

2      A      Well, at some point, he sent me an email

3  saying that they were not going to meet.

4  So whether that was prompted by me or not, I don't

5  know.

6      Q      Do you recall any phone calls with him at

7  this time?

8      A      No.

9      Q      Were you ever given a reason why DOJ was

10  cancelling this meeting?                401/403

11      A      As I recall from the email that he

12  sent -- that I imagine you have in your packet

13  there -- that DOJ believed that their technical

14  specifications were completely laid out in

15  their -- in the December letter.

16      Q      Do you agree with that?

17      A      I probably don't agree with that because

18  I think we wanted to understand how they used the

19  data, so -- so we would have liked an

20  additional -- additional meeting with them.

21      Q      Let's go to that one.  Can I have that

22  back, please?

Page 105

```
 1   as surprised.  You know, it was what it was.
 2        Q    What does that mean?
 3        A    It's business.  They didn't want to meet,
 4   so.
 5        Q    Other than these communications with
 6   Mr. Gary that you've described so far, did you
 7   have any communications with anyone at the
 8   Department of Justice about the citizenship
 9   question?                    401/403
10        A    No.
11        Q    To your knowledge, did the Census Bureau
12   have any communications with the
13   Department of Justice about the citizenship
14   question?
15        A    No.
16        Q    After you spoke with Art Gary and he
17   indicated that DOJ did not want to meet with the
18   Census Bureau, did you speak to anyone at Commerce
19   about that refusal?
20        A    This is an email to Karen Dunn Kelley, so
21   yes.
22        Q    And did you speak to her about this
```

1    following this email?

2        A    I mentioned that we probably discussed it

3    at some point, but I think this was the gist of

4    that conversation.

5        Q    Did Ms. Dunn Kelley have any response to

6    the DOJ's refusal to meet?

7        A    I don't recall.

8        Q    Is there anything that would help you

9    recall?

10       A    Whether she had a response?  I doubt it.

11   I don't -- so.

12       Q    Did you ask anyone in Commerce to help

13   you set up a meeting with DOJ?

14       A    We'd already had Barry Robinson try to do

15   that, so I think this is where we left it, or this

16   is where we left it.

17       Q    I'll take that, please.

18           Do you believe that the letter requesting

19   citizenship be added to the 2020 census from DOJ,

20   the Gary letter, fully describes the DOJ request?

21           MS. BAILEY:   Objection.   Vague.

22           THE WITNESS:    It does spell out the need

Page 107

1  to have citizenship status added to the -- the

2  PL94 level data.  To that extent that it requires

3  block level data, it is a pretty well-formulated

4  request, so.

5  BY MS. GOLDSTEIN:

6       Q    Does the Gary letter answer all of the

7  Census Bureau's technical questions about the Gary

8  letter's request?

9            MS. BAILEY:  Objection.  Form.

10           THE WITNESS:  Yeah.  We would have had

11  additional questions.

12  BY MS. GOLDSTEIN:                401/403

13       Q    What kind of questions would you have

14  had?

15       A    Questions that would have helped us

16  strategize how we would perform disclosure

17  avoidance on these files.  You know, so that's

18  another technical matter how we -- you know, by

19  law, we can't disclose the identity of any

20  particular individuals, so there's a process

21  afterwards that we -- that we -- you know, sum of

22  the data, perhaps add some noise.  Understanding

Page 108

1   how the data are used to help us do that in a way

2   that optimizes the data for their intended use.

3       Q   What else would have been discussed at

4   the technical meeting between DOJ and the

5   Census Bureau?

6       A   So there might have been discussions

7   about, you know, various cross tabulations of the

8   data, what characteristics were the most important

9   for their purposes.                    401/403

10      Q   And does that go to the fit between the

11  method proposed and the data used?

12      A   And what they're using.

13      Q   What else?

14      A   That's about it.

15      Q   And so is it fair to say that the

16  Census Bureau has never had conversations with the

17  Department of Justice about that fit question?

18      A   That's correct.

19          (Plaintiffs' Exhibit 14, Email, was

20  marked.)

21  BY MS. GOLDSTEIN:

22      Q   I'm showing you what's been marked as

Page 109

1    Plaintiffs' Exhibit 14.  It is a document Bates

2    stamped 9008 to 9012.  I would ask that you focus

3    on the first page.

4         A    Uh-huh.

5         Q    Do you recognize the email here at the

6    top?

7         A    Yes.

8         Q    What is this?

9         A    An email from John to the technical team

10    and others about how things were progressing.

11         Q    So John reports that you report that you

12    had discussed this with the Under Secretary,

13    correct?

14         A    Uh-huh.  Uh-huh.  Yes.

15         Q    And the Under Secretary, that's

16    Karen Dunn Kelley, correct?

17         A    Yes.

18         Q    Agrees with the recommendation of

19    Alternative C but Alternative A remains a

20    possibility, as well, correct?

21         A    Yes.

22         Q    Can you explain to me what this all

Page 110

1    means?

2        A    So, you know, this is where I have to

3    admit I have a vague recollection of this -- this

4    stage of the process, but I think this was we had

5    discussed -- I had discussed with Karen that the

6    preliminary findings, which we -- you had earlier,

7    and she was supportive of Alternative C and A, but

8    I don't recall a detailed conversation about that

9    with her.                    401/403/802

10       Q    What was recommended -- what was

11   Alternative C?

12       A    That was administrative records.

13       Q    And what was Alternative A?

14       A    Using the ACS combined -- or

15   Alternative A was to do nothing but add some

16   additional modeling, use -- use the ACS data.

17       Q    The status quo?

18       A    Yeah, essentially.

19       Q    When did you discuss the Census Bureau's

20   recommendation with -- first discuss them with

21   Karen Dunn Kelley?

22       A    I think -- well, shortly after getting

Page 111

1    the stuff from John, I think we -- I forwarded

2    that information to her, so.

3         Q    Can you describe your conversations with

4    Ms. Karen Dunn Kelley?          401/403

5         A    I'm not sure there was a conversation,

6    so.

7         Q    So how do you know --

8         A    So --

9         Q    -- Ms. Karen Dunn Kelley?

10        A    Again, I don't recall this conversation

11   directly.

12        Q    Do you recall that Ms. Dunn Kelley agreed

13   with the recommendation of Alternative C?

14        A    I don't recall her saying that.

15        Q    Do you know why you put this in --

16        A    I didn't put this in --

17        Q    -- by you -- I'm sorry.  Can I -- let me

18   try again.

19             Do you recall telling John that

20   Karen Dunn Kelley agrees with the recommendation

21   of Alternative C?

22        A    I don't recall telling John this.  This

Page 112

1   is -- so -- just so you know, this is, you know,

2   January 4th.  There was professional meetings

3   about to happen.  I was probably involved in

4   several different things at the time.  I don't

5   recall this conversation.          401/403

6       Q   Do you remember, separate from the email,

7   what Ms. Dunn Kelley's view was with respect to

8   which alternative was preferable, A, B, C, around

9   the beginning of January 2018?

10      A   So I don't recall a view so much as I

11  think she was supportive of the process that the

12  Census Bureau was following, and that, you know,

13  she was looking for -- to see what -- where that

14  came out.  So I don't -- I don't recall her

15  stating a preference on one alternative or the

16  other.        802

17      Q   Do you recall --

18      A   Perhaps she did.  I'm just saying I don't

19  recall.

20      Q   Do you recall Ms. Dunn Kelley disagreeing

21  with any of the recommendations of the

22  Census Bureau around this time with respect to

Page 113

1    this question?

2        A    Yeah.  I don't recall her agreeing or

3    disagreeing.                401/403/802

4        Q    Now, this email was sent back in early

5    January of 2018.  And you were cc'd on this email,

6    correct?

7        A    Yes.

8        Q    Do you recall writing back to Mr. -- to

9    Dr. Abowd saying, no, this is not what I discussed

10   with the Under Secretary?

11       A    No.  I don't -- I don't recall doing

12   that.

13       Q    Did you do that?

14       A    I said, no, I do not recall doing that.

15       Q    And did you write back to Dr. Abowd and

16   say Karen Dunn Kelley does not agree with the

17   recommendation of Alternative C?

18       A    I don't think I did that, no.        401/403

19       Q    Okay.  So is it fair to say that you

20   received this email back on January 4, 2018, yes?

21       A    Yes.

22       Q    And that you agreed with this email when

Page 114

1    you received it?

2            MS. BAILEY:  Objection.  Form.

3            THE WITNESS:  So I get lots of emails

4    that I pay some attention to or less attention to.

5    So as you might imagine, I get cc'd on lots of

6    email.  So -- so saying that I agreed with it,

7    is -- is saying that I read it and fully

8    internalized it when I was busy with other

9    activities, as well.  So I don't recall doing

10   that.                          401/403

11   BY MS. GOLDSTEIN:

12       Q   If you received an

13   email -- Ms. Dunn Kelley is your boss; is that

14   correct?

15       A   That's correct.

16       Q   If you received an email that

17   mischaracterized a conversation that you had with

18   your boss, would you have corrected that

19   mischaracterization?

20       A   If I'd read the email, yeah.

21       Q   Are you in the habit of not reading

22   emails that you receive?

Page 115

```
 1      A    There are many emails that I do not read.
 2      Q    Have you read this email before?
 3      A    So I do not recall getting this email on
 4   January 4th -- or -- yeah, January 4th.
 5      Q    Is it fair --                    401/403
 6      A    Or that -- or in more particular, the
 7   conversation that I would -- I supposedly had with
 8   the Secretary -- Under Secretary.
 9      Q    Is it fair to say that if you had
10   received this email, read it, and disagreed with
11   the characterization, you would have said
12   something about it?
13           MS. BAILEY:   Objection.   Asked and
14   answered.
15           THE WITNESS:   Yes.   Probably.
16   BY MS. GOLDSTEIN:
17      Q    Do you know what memo was attached to
18   this email?
19      A    No.
20      Q    I'm going to show you what's been marked
21   as Exhibit 6 to the Abowd deposition -- previously
22   marked as Exhibit 6 to the Abowd deposition.   It
```

Page 116

1    is a January 19, 2018 memorandum entitled

2    technical review of the Department of Justice

3    request to add the citizenship question to the

4    2020 census.

5           Do you recognize this document?

6       A    I do.

7       Q    What is this?

8       A    This is the memo that we prepared for the

9    Secretary.

10      Q    We previously looked at a white paper

11   from the Census Bureau, correct?

12      A    Uh-huh.   Yes.

13      Q    Why was there -- was this nec- -- this

14   memo necessary, given the prior white paper?

15      A    I think it was just a more formal

16   representation.

17      Q    Did you have any input into this

18   document?

19      A    Not on a technical level, no.

20      Q    Who do you rely on for the technical

21   component?

22      A    John and his team.

1      Q      And when we're talking about the

2   technical component, we're talking about the

3   science of --

4      A      Right.   Yes.

5      Q      So you rely on John Abowd and his team

6   for the science with respect to the citizenship

7   question?

8      A      Yes.   In this case, yeah.   I don't have

9   time to do science anymore.

10      Q      And did you review the findings of this

11   memo?

12      A      Yes.                401/403

13      Q      And did you agree with the findings of

14   this memo?

15      A      I did.

16      Q      And when this memo says -- I'm looking

17   here at the last paragraph on Page 1277.

18      A      Correct.

19      Q      "Alternative C best meets DOJ's stated

20   uses, is comparatively far less costly than

21   Alternative B, does not increase response burden,

22   and does not harm the quality of the census

Page 118

1   count."

2       You agree with that statement?

3   A   I did.                                      401/403

4   Q   And when you look at the last sentence of

5   that paragraph, "However, Alternative B is very

6   costly, harms the quality of the census count, and

7   would use substantially less accurate citizenship

8   status data that are available from administrative

9   sources," you agree with that statement, correct?

10  A   Yes.

11  Q   Who -- do you know if Karen Dunn Kelley

12  reviewed this memo?

13  A   She did.

14  Q   How do you know that?

15  A   Because we gave it to her.

16  Q   Did you speak with her in person about

17  this memo?

18  A   Yeah.  We -- we met about this memo.

19  Q   When?

20  A   I'm not sure exactly the date, but I

21  believe shortly after we sent it down.  It was

22  either late January or early February.

Page 121

1     A   I don't recall.  Probably not much more

2  than an hour.

3     Q   What happened at this meeting?

4     A   We had a discussion of the -- of the

5  recommendations.

6     Q   Who is we?

7     A   The people I just mentioned at the

8  meeting.

9     Q   Who led the meeting?

10     A   I think the meeting was led -- so the

11  Secretary typically reads these things.  So to say

12  that these meeting are led, it's kind of you come

13  in the room and you are talking about it.  He'll

14  ask questions, so.

15     Q   And did the Secretary ask questions?

16     A   He did.

17     Q   What did the Secretary ask?

18     A   He was -- he quickly honed in on that

19  none of the three options were perfect.

20     Q   What do you mean?

21     A   So -- so each one has respective

22  strengths and weaknesses.   In particular, when we

Page 122

1  started focusing between Options B and Options C,

2  you know, we don't have administrative records for

3  every person in the country, so we would miss

4  folks that we would have to impute citizenship

5  status for.   Obviously, Option B had cost

6  ramifications and also would miss some people.

7  And so that's when the discussion sort of turned

8  to a sort of hybrid model.

9      Q    Tell me what else was discussed at this

10 meeting.

11     A    That was essentially what was discussed.

12     Q    What was the discussion of this hybrid

13 model?

14     A    So could we use both sources of data to

15 produce sort of the block-level estimates

16 that -- that DOJ needed?

17     Q    And who asked for the hybrid model?

18     A    So the Secretary asked for the hybrid

19 model.                401/403/802

20     Q    What else did the Secretary say at this

21 meeting?

22     A    That's about it.

Page 124

1      Q    Can you describe a bit more specifically

2    what the Census Bureau was asked to do coming out

3    of that meeting?          401/403/802

4      A    To explore a fourth option, a hybrid

5    option that included a question on the short-form

6    census and administrative records.

7      Q    Any other details that the Census Bureau

8    was given?

9      A    No.

10     Q    Any timeline the Census Bureau was given?

11     A    So, obviously, the timeline was very

12   compressed, so we still needed to get the

13   questions to Congress by March, so.

14     Q    Were you given any more specifics about

15   your time frame?

16     A    No.

17     Q    Do you recall anything that --

18     A    As soon as possible, I think, is the time

19   frame that we're dealing with here.

20     Q    Do you recall anything that Mr. Comstock

21   said in that meeting?          401/403/802

22     A    So he asked similar questions to the

1   Secretary and about the -- about the ability of us

2   to do sort of a hybrid approach.   I think, you

3   know, the -- the missing -- the miss- -- the

4   people missing from the different options was

5   something that they were -- seemed particularly

6   concerned about.   I think they wanted to avoid

7   imputing as many people as they could.

8        Q    Do you know why?            401/403/802

9        A    I -- for data quality reasons, to have a

10  direct measurement.

11       Q    Do you remember anything else that

12  Mr. Comstock said at this meeting?

13       A    No.

14       Q    Do you remember anything that

15  Ms. Dunn Kelley said at this meeting?

16       A    No.

17       Q    Do you remember anything that Mr. Lamas

18  said at this meeting?

19       A    No, I don't.

20       Q    Anything else you remember about this

21  meeting?

22       A    No.

Page 127

1      Q    What is this?

2      A    I think it was a summary of the white

3   paper findings.

4      Q    And this is a document that's

5   Bates-stamped 8614 to 8616.   It is a memorandum

6   addressed to you entitled summary of

7   costs -- quality/cost of alternatives for meeting

8   Department of Justice's request for citizenship

9   data.
                        401/403

10     A    Yep.

11     Q    If you turn to the last page of this

12  document, it states that "Alternative C even

13  better meets DOJ's stated uses."

14          Do you agree with that?

15     A    I do.

16     Q    "Is comparatively far less costly than

17  Alternative B."

18          Do you agree with that?

19     A    Yes.

20     Q    "And does not harm the quality of the

21  census count."

22          Do you agree?

Page 128

1     A     Yes.

2     Q     "For these reasons, we recommend

3     Alternative C for meeting              401/403

4     the Department of Justice data request."

5           Who is we?

6     A     The technical team.

7     Q     And you agree with that, as well?

8     A     Yes.

9     Q     I'll take that back.

10          Other than the meeting you just described

11    regarding the citizenship question with

12    Secretary Ross, did you have any other questions

13    for Secretary Ross about the citizenship question?

14    A     Did I have any extra questions for the

15    Secretary?

16    Q     Any other discussions with Secretary Ross

17    about the citizenship question?

18    A     Nothing that I recall as being important,

19    that's for sure.  So probably not, no.

20    Q     Do you recall anything that was

21    unimportant?

22    A     No.

Page 133

1  scroll towards the back of it, it begins

2  on -- sorry -- the first page of the document you

3  have is what number, Dr. Jarmin?

4       A   1286.  The first page?

5       Q   Oh.  I'm sorry.  Can I have that back?

6           MS. GOLDSTEIN:  Actually, can I have one

7  of those, please?  Let's do it this way, can you

8  just mark that?

9           (Plaintiffs' Exhibit 16, Email, was

10  marked.)

11  BY MS. GOLDSTEIN:

12       Q   I'm showing you what's been marked as 16,

13  Exhibit 16 to your deposition, and it begins 9812.

14  It goes to 9833.

15           Can you please turn to 9822?  Do you

16  recognize this document?

17       A   Yeah.  This is responses to Commerce's

18  questions about the memo to the Secretary.

19       Q   How did this document come about?

20       A   We received these questions, and these

21  are the responses to them.                 401/403

22       Q   Who did you receive these questions from?

Page 134

1      A      I'm not sure.   I think it might have been

2   Earl Comstock.                        401/403

3      Q      Anyone else?

4      A      These things are often cc'd across a

5   number of people, so.

6      Q      And when did you receive these questions?

7   Do you recall?

8      A      I believe it was shortly after meeting

9   with the Secretary, but I'm not sure.

10      Q      Who wrote the answers to these questions?

11      A      Folks on the technical team, for the most

12   part.

13      Q      From the Census Bureau?

14      A      Yeah.

15      Q      And when you say for the most part, what

16   do you mean?

17      A      Well, that's my understanding of who

18   answered these questions.

19      Q      It was all folks from the technical

20   team --

21      A      Yeah.

22      Q      -- correct?   Yes?

Page 135

1      A    Yes.

2      Q    And did you have a role in developing the

3  answers to these questions?

4      A    Not a -- I mean, I was cc'd on things,

5  but I was not -- I did not play a role in

6  addressing the questions directly.

7      Q    Did you review the answers that the

8  Census Bureau came up with?          401/403

9      A    Yeah.   I probably looked at some of this.

10  Probably -- not all of this, because this came in

11  drips and drabs, so.

12     Q    How was this document transmitted to

13  Commerce?

14     A    I believe it was sent probably by Abowd

15  or someone like that, or maybe by -- I mean, it

16  might have been sent by me forwarding on what the

17  team had done.

18     Q    Do you --

19     A    Someone would have forwarded down to

20  them.

21     Q    Is it fair to say you I agreed with what

22  the technical team wrote in this document?

Page 137

1   you.

2       Q   Did the Census Bureau receive any

3   feedback on these questions from Commerce?

4       A   Other than the like, you know,

5   clarifications or anything like that, no.  No.

6       Q   So it's my understanding that Dr. Abowd

7   testified this was the final Census Bureau version

8   of these questions and answers.  Can you tell if

9   that's accurate?                    401/403

10      A   As far as I -- I've never seen another

11  set of them go out, so.

12      Q   What do you mean?

13      A   I mean, I never saw anything after this,

14  so.

15      Q   So, to your knowledge, this is --

16      A   This is the final, yeah.

17      Q   And if you go to 9832, Question 31 --

18      A   Uh-huh.

19      Q   -- it states, "The Census Bureau follows

20  a well-established process when adding or changing

21  content on the census for ACS to ensure the data

22  fulfill legal and regulatory requirements

Page 138

1    established by Congress."

2           Do you agree with that?

3    A    Yep.                                402/403

4    Q    "Adding a question or making a change to

5    the decennial census or the ACS involves extensive

6    testing, review and evaluation."

7           Do you agree?

8    A    Uh-huh.

9    Q    I'm sorry.  I need a yes or --

10   A    Yes.

11   Q    "This process ensures the changes

12   necessary and will produce quality, useful

13   information for the nation."

14          Do you agree?

15   A    We've already gone over that, yes.

16   Q    And when you look down at the steps here

17   that are listed in Question 31, do you agree that

18   each of these steps represents part of the

19   well-established process when adding or changing

20   content on the census?

21   A    Yes.                                401/403

22   Q    "Including that final proposed questions

Page 139

1   result from extensive cognitive and field testing

2   to ensure their result and proper data"?

3       A    Yes.

4       Q    "With an integrity that meets the

5   Census Bureau's highest standards"?

6       A    Correct.        401/403

7       Q    What's the difference between cognitive

8   and field testing?

9       A    So cognitive is making sure people

10  understand the question.  Field testing is making

11  sure that we can actually implement the question

12  in the field.

13      Q    What does that mean?

14      A    So does it work in a -- in -- on a

15  survey.

16      Q    How -- how do you tell if it works on a

17  survey?

18      A    Well, whether we get good response or

19  not.

20      Q    How do you test that?

21      A    So by doing a test survey or in another

22  survey.

Page 140

1      Q    Can you help me understand the difference

2   between cognitive and field testing?

3           MS. BAILEY:   Objection.   Asked and

4   answered.

5           THE WITNESS:   So cognitive is when I

6   understand whether you can read and understand the

7   question and what is being asked of you, so.

8   BY MS. GOLDSTEIN:

9      Q    And field testing is about how a question

10  performs on a survey instrument?

11     A    Right.   People may understand it and

12  still choose not to answer it.

13     Q    And that's --

14     A    Or answer it incompletely or something,

15  right.

16     Q    And is that the sort of thing you find

17  out from field testing?

18     A    Yes.

19     Q    Was the citizenship question field

20  tested?

21     A    Of course.   It's been in the ACS for

22  years.   So it's been answered by 40 to 50 million

Page 141

1   households.

2        Q    So it was field tested in the context of

3   the ACS, yes?

4        A    Yes.

5        Q    Was the citizenship question ever field

6   tested in the context of the short form?

7             MS. BAILEY:  Objection.  Asked and

8   answered.

9             THE WITNESS:  We never asked it on the

10  short form before.  The only way to do that would

11  be to ask it on the short form.

12  BY MS. GOLDSTEIN:

13       Q    Couldn't you have put it on the

14  end-to-end test?

15       A    The end-to-end test goes to fewer people

16  than the ACS does.  So I don't know how that would

17  achieve the objective.

18       Q    When it says here that final proposed

19  questions result from extensive cognitive and

20  field testing, typically, final proposed questions

21  are fielded before they're put on a survey,

22  correct?

Page 142

1       A    Correct.

2       Q    So, for example --

3       A    This question has been field tested --

4       Q    On --

5       A    -- on the ACS, three and a half million

6   households a year.  Providence would have asked it

7   of a couple hundred households.

8       Q    Uh-huh.

9       A    So it's been field tested.

10      Q    In the context of the ACS, correct?

11      A    Correct.  There is no field test for the

12  decennial.  There's either the decennial or

13  there's not.

14      Q    The end-to-end test tests --

15      A    Tests systems, not questions.

16      Q    What does that mean?

17      A    It tests all of our processes and systems

18  to see if they work.

19      Q    Take that back -- actually, if you flip

20  to the first page of it.  Is this the preliminary

21  analysis of Alternative D?

22      A    Uh-huh.

Page 143

1      Q   Combined B and C, can you tell me what
2   this is?
3      A   This is a short description of the
4   analysis that the team did of Alternative D.
5      Q   And did you review this document?
6      A   Yes.

401/403

7      Q   Do you agree with it?
8      A   I do.
9      Q   Who else reviewed this document?
10     A   The team, John Abowd.
11     Q   Karen Dunn Kelley reviewed it?
12     A   Yeah.
13     Q   Did Secretary Ross review it?
14     A   I would assume so.  Again, this was
15   information provided for his review.
16     Q   Did you have conversations about this
17   memo with Ms. Dunn Kelley?
18     A   Yeah.  I don't recall a -- a discussion
19   particularly about this memo, no.
20     Q   Do you recall having any conversations
21   with Secretary Ross about this memo?
22     A   No.

Page 144

1      Q    Did you have any conversations with

2  anyone else at Census -- at Commerce regarding

3  this memo?

401/403

4      A    At --

5      Q    At -- did you have any conversations

6  about this memo with anyone else at Commerce --

7      A    So, again, I'm not recalling

8  conversations about this memo.  I mean, you know,

9  obviously, when we came back with Alternative D,

10  we said what, you know, we gave our, you

11  know -- our assessment of Alternative D, and they

12  took that into consideration.  We did not have

13  detailed conversations like we did about the

14  original three alternatives.

15      Q    You said you didn't have detailed

16  conversations.  Do you remember any conversations

17  with Commerce about your analysis

18  of Alternative D?

19      A    I don't recall that.

20      Q    If you go to 9816.  You say that in

21  sum -- this memo says that, "In sum, Alternative D

22  would result in poorer quality citizenship data

Page 145

1    than in Alternative C."

2            Do you agree?                    401/403

3        A    Yes.

4        Q    "It would still have all the negative

5    cost and quality implications of Alternative B

6    outlined in the draft January 19th memo to the

7    Department of Commerce."

8            Do you agree?

9        A    Yes.

10       Q    So you said a moment ago that the

11   Secretary took this memo into consideration?

12       A    I believe so.                   802

13           MS. BAILEY:  Objection.  Mischaracterizes

14   prior testimony.

15   BY MS. GOLDSTEIN:

16       Q    Why do you say that?

17       A    Say what?

18       Q    That they took that into consideration.

19       A    It was provided for his consideration.

20       Q    Okay.  But do you have any personal

21   knowledge as to what was done with this memo after

22   Census prepared it?

1      A    So Karen -- I think Karen did.

2      Q    Anyone else?

3      A    I don't think so, no.

4      Q    Do you remember exactly what Karen asked

5  you to do?

6      A    Can you help identify people that the

7  Secretary should talk to?

8      Q    And was there a parallel process for

9  folks in the Census Bureau to talk to stakeholders

10  about the citizenship question?

11     A    A parallel process for us to talk to them

12  about what?

13     Q    About adding the citizenship question.

14     A    So, no.  So, I mean, the decision point

15  laid with the Secretary, so Census was not

16  involved in a side deliberative process on that.

17     Q    And other than thinking about who would

18  have a broad range of perspectives, were there

19  other considerations in determining who the

20  Secretary should talk to and who the Secretary

21  shouldn't?

22     A    So I may I -- I think he, you know,

Page 149

1   wanted to get a broad set of interpretations, both

2   pro and con.

3        Q   Why do you say that?

4        A   You know, because most of the feedback in

5   the -- initially, was all in the con.  So they

6   were looking for, you know, was there somebody who

7   would speak in favor of the addition of the

8   question?                              401/403/802

9        Q   How did -- who told you that?

10        A   So I think we were looking for -- we were

11   trying to find -- the charge was to get a broad

12   set of perspectives, and that's why we wanted to

13   have people on both sides.

14        Q   So you just testified that most of the

15   feedback, initially, was all in the con.

16        A   Yeah.

17        Q   How did you know that most of the

18   feedback, initially, was all in the con?

19        A   Well, you know, it was in the newspaper.

20   And, you know, people that we had dealt with

21   before had sent letters to both Secretary and to

22   me.  So that's how we knew.

Page 150

```
 1        Q    Did anyone at Commerce instruct you to
 2   find stakeholders who were in favor of the
 3   citizenship question?
 4        A    No.   It was not an instruction.   I mean,
 5   I think we sat around trying, talking about who
 6   the Secretary should talk to, and we wanted to
 7   find, you know, a full range of opinions.
 8        Q    And we is you and Mr. Lamas?
 9        A    And Karen, yeah.
10        Q    And Karen.
11             Anyone else?
12        A    I don't remember anyone else being there,
13   but there -- you know, there often are others in
14   the room, but that was the primary people.
15        Q    And do you remember anyone else in the
16   room?
17        A    No.
18        Q    And do you remember anything else that
19   Ms. Dunn Kelley said --
20        A    No.
21        Q    -- concerning this?
22        A    No.
```

Page 153

1    Q    What are these?

2    A    This was -- I reached out to a person I

3    know at AEI, Michael Strain, to see if he or

4    anyone else would be willing to -- to talk to the

5    Secretary more from the pro side, as opposed to

6    con side.  So, again, trying to get a more rounded

7    set of stakeholders involved here.

8    Q    Did anyone instruct you to reach out to

9    AEI?

                        401/403

10   A    No.

11   Q    And AEI, for the record, stands for?

12   A    American Enterprise Institute.

13   Q    Whose idea was it to send solicitations

14   like this out?

15   A    So this was -- to sending it to -- I

16   mean, it was the general idea that we would try to

17   find somebody.  I knew Michael.  I reached out to

18   him.

19   Q    Who else did that team reach out to to

20   try to find a pro side?

21   A    I don't know.  I mean, again, this

22   is -- I think everyone was trying to reach out to

Page 155

```
 1        A    No.
 2        Q    Are you aware of anyone else on that team
 3   that made phone calls seeking stakeholders for the
 4   pro side?
 5        A    I'm not aware.
 6        Q    And Mr. Strain advised you that no one at
 7   AEI was willing to speak favorably about the
 8   proposal, correct?                401/403/802
 9        A    That is correct.
10        Q    Did you have any conversations about
11   Mr. Strain with Karen Dunn Kelley?
12        A    No.   This is -- this is the complete
13   record on that.
14        Q    Did you have conversations with anyone
15   else at Commerce about your communications with
16   AEI?
17        A    No.
18        Q    Did you have communications with anyone
19   else about your communications with AEI on the
20   citizenship question?
21        A    No.
22             (Plaintiffs' Exhibit 18, Email, was
```

Page 167

```
 1        Q    Did she email you the decision memo?

 2        A    I don't recall.

 3        Q    Do you know if you saw the decision memo

 4   before it was finalized?

 5        A    I think we had a quick turnaround on

 6   something about Option D.

 7        Q    Did you ask --

 8        A    But that was -- that was, you

 9   know -- everything was hurried at that stage.

10        Q    We'll talk about that in just a moment.

11             Did you ask Ms. Dunn Kelley why the

12   Census Bureau's recommendations were overruled?

13        A    I did not.                    401/403/802

14        Q    Did she tell you?

15        A    She -- well, we were all in the meeting

16   where the Secretary had expressed some interest in

17   the -- in the hybrid solution, and that's what he

18   chose.  And so it was, essentially, the Secretary

19   decided to go with the hybrid solution.

20        Q    Is it fair to say, though, that census

21   never had -- apart from the memos that were

22   sent --
```

Page 168

1      A    Right.

2      Q     -- that Census never had substantive

3   conversations with anyone at Commerce about

4   Option D?                          401/403

5      A    No.  I mean, I'm not sure what you mean

6   by substantive.  Be more specific.

7      Q    Other than the memos that were sent from

8   Census to Commerce about Option D, did anyone from

9   Census have any conversations about the

10  Census Bureau's analysis of Option D?

11     A    Not that I'm aware of, so.

12     Q    And would you have been aware if there

13  were conversations?

14     A    I think I would have been aware, yes.

15     Q    So let's talk about what you just

16  mentioned with the quick turnaround on Option D.

17  What happened?

18          MS. BAILEY:  Objection.  Vague.

19          THE WITNESS:  So I don't know what you

20  mean by what happened -- what happened.

21  BY MS. GOLDSTEIN:

22     Q    Sure.

Page 169

1          So we were talking about seeing a draft

2     of the decision memo, correct?

3          A    Yes.

4          Q    When did you first see a draft of the

5     decision memo?

6          A    I don't recall exactly when, but, I mean,

7     it was -- we had an opportunity to make sure that

8     it was technically correct.

9          Q    Who is we?                401/403

10         A    The Census Bureau.

11         Q    And what do you mean by technically

12    correct?

13         A    That, you know, there wasn't any

14    information about Census Bureau, you know,

15    operations, costs, you know, that sort of stuff

16    that wasn't accurate.

17         Q    So what was this opportunity that you had

18    to make sure that the memo was technically

19    correct?

20              MS. BAILEY:   Objection.   Vague.

21              THE WITNESS:   It was that.

22    BY MS. GOLDSTEIN:

Page 171

1       A    Yeah.

2       Q    Led by Dr. Abowd?

3       A    Yeah.

4       Q    Did you discuss any of the changes that

5  were proposed to the memo?

6       A    I don't recall any major discussions

7  about that.

8       Q    Do you recall what any of the changes

9  were?

10      A    I don't.

11      Q    Is there anything that would help you

12  remember?

13      A    Seeing the two versions, but I -- other

14  than that, I don't recall.

15      Q    Other than this process where the

16  Census Bureau checked to make sure that the

17  decision memo was technically correct, did the

18  Census Bureau have any input into that decision

19  memo?                              401/403

20      A    No.

21      Q    How long did the process of the

22  Census Bureau making sure that the decision memo

Page 173

1      A    Yes.

2      Q    And looking at this document now, does

3  this help -- are you able to identify any changes

4  that the Census Bureau made to make this document

5  more technically correct?            401/403

6      A    I can't identify changes.  But if I

7  recall correctly, there were some issues

8  about, you know, various response rates.  You

9  know, there were, like, corrections to numbers and

10  stuff like that.

11     Q    Do you remember what any of those

12  corrections to numbers were?

13     A    I don't.

14     Q    Do you remember which direction the

15  correction to numbers went, made corrections

16  higher or lower?

17     A    I don't that either.

18     Q    Who would be the right person to ask

19  that?

20     A    You know, John Abowd might have

21  better --

22     Q    Anyone else?

Page 174

1      A    That's where I would start.

2      Q    So who wrote this memo?

3      A    I don't know.

4      Q    Is there anyone who would know?

5      A    I imagine the Secretary would know.

6      Q    Anyone else?

7      A    I don't know.  I don't know who wrote

8  this let- -- memo.

9      Q    So if you go to Page 3, the second full

10 paragraph references surveys from Nielsen.  Do you

11 see that?

12     A    Uh-huh.                    401/403

13     Q    I'm sorry.  I need a yes or no.

14     A    Yes.

15     Q    Did you ever see these surveys from

16 Nielsen that are referenced in this decision memo?

17     A    No.

18     Q    Did anyone from the Census ever see the

19 surveys that were referenced in this decision

20 memo?

21     A    I don't know.  But as far as I know,

22 nobody did.

1      Q    When did you first hear about these

2   surveys from the Nielsen?

3      A    I think in the context -- I mean, you

4   know, Nielsen obviously does surveys --

401/403

5      Q    Sure.

6      A    -- and we have some interaction with them

7   on other things.  So, you know, I think this was

8   the first that I had heard about these surveys in

9   this context, for sure.

10     Q    So this was the first time reviewing --

11     A    Right.

12     Q    -- this March decision memo when you

13   heard about Nielsen adding questions on the ACS --

14     A    Uh-huh.

15     Q    -- on sensitive topics?

16     A    Uh-huh.

17     Q    Sorry.  I need a yes or no.

18     A    Yes.

19     Q    And I just want to make sure I'm clear.

20   No one at Census has reviewed the actual surveys,

21   correct?

22     A    Not that I know of.

Page 176

1        Q    Did you participate in any calls with

2   anyone from Nielsen regarding the citizenship

3   question?

                            401/403

4        A    No.

5        Q    Do you know if anyone at Census did?

6        A    No.

7        Q    Have you seen the underlying data from

8   these Nielsen surveys?

9        A    I have not.

10        Q    Do you know if anyone at Census has?

11        A    I don't.

12        Q    I will take that back.

13             MS. GOLDSTEIN:  I'm about to move on to

14   another topic.  So I don't know if you want to

15   take a break for lunch or keep going.

16             MS. BAILEY:  Do you know how lengthy that

17   topic's going to be?

18             MS. GOLDSTEIN:  It's going to be a little

19   bit long.

20             MS. BAILEY:  Do you have a preference?

21   We're at three hours now.

22             How do you feel?

Page 177

1          THE WITNESS:  Just keep going.

2          MS. BAILEY:  Okay.

3   BY MS. GOLDSTEIN:

4      Q    Is there any reason why the procedures

5   for adding questions to the decennial would be

6   less rigorous than the process of adding questions

7   to the ACS?                    401/403

8          MS. BAILEY:  Objection.

9          THE WITNESS:  No.

10  BY MS. GOLDSTEIN:

11     Q    No reason why adding changes to the short

12  form would require less testing than changes to

13  the ACS, correct?

14     A    Not for an untested question, so, no.

15     Q    There's no reason why adding changes to

16  the short form would require less testing than

17  changes to the ACS?

18     A    No.

19     Q    I'm going to hand you back what I had

20  previously marked as Exhibit 16 to this

21  deposition.

22          And let's go back to Question 31, which

1    is over on 9832.   And we had talked before about

2    the cognitive and field testing the question --

3    the proposed questions typically undergo, correct?

4         A    Right.

5         Q    What testing was done for the proposed

6    changes to the race and ethnicity question?

7         A    So those were part of the

8    National Content Test --

9         Q    What is that?

10        A    -- mid decade.

11             It's a survey that tried different

12   versions of the race and ethnicity questions to

13   see how people would answer them.

14        Q    And what's the purpose of that?

15        A    To understand the data quality for

16   different versions of the question.

17        Q    And I know that one thing that goes into

18   data quality is the number of people responding.

19        A    Yep.

20        Q    Anything else that goes into data quality

21   in that context?

22        A    How -- how, you know, sort of easily,

401/403

Page 179

1    people sort of respond to the questions and

2    the -- in the case of the race and ethnicity,

3    the -- you know, the number of people that are

4    sort of classified as -- you know, that don't have

5    a precise race and ethnicity category.

6         Q    How can you tell?                    401/403

7         A    So, you know, the current method

8    classifies lots of people as -- as -- you know,

9    there are -- there's kind of a catchall category.

10   I'm not the expert on this.

11        Q    Who is?

12        A    I would call Karen Battle.  So I know

13   that we were looking for ways to have more precise

14   data, so.

15        Q    What other kinds of testing was done for

16   the purposed changes to the race and ethnicity

17   question?

18        A    I believe that's the primary testing that

19   was done.  I mean, there was a part of the 2020

20   census, the alternative questionnaire experiment;

21   that was an early version of that.

22        Q    And what is that?

Page 180

1      A    That was another -- you know, that was

2  part of the census that was sent to a small number

3  of housing units as a test.

4      Q    And what was it testing?

5      A    Alternative forms of questions that were

6  already on the census, like race and ethnicity.

7      Q    And more than just race and ethnicity?

8      A    I think it was just race and ethnicity.

9      Q    And what's the goal of testing those

10  alternative forms?                          401/403

11      A    To get more precise data.

12      Q    And to determine the quality of the

13  question?

14      A    Yeah.

15      Q    And the quality of the data received?

16      A    Yeah.  Yeah.

17      Q    And when a new question is added to the

18  census, what kind of cognitive testing is done?

19      A    So -- so -- with a completely new

20  question, there could be both some small scale

21  tests done in a lab setting and then some sort

22  of, you know, test questionnaire that would be

1    sent out.

2        Q    What are these small scale tests that are

3    done in a lab?

4        A    Where you're actually administering the

5    survey and getting immediate feedback from --

6    like, people having difficulty understanding the

7    question.                        401/403

8        Q    Why is that important?

9        A    Just to understand what are the reasons

10   that people don't -- can't answer the question

11   correctly.

12       Q    Any other reasons why that's important?

13       A    No.   That's -- to understand that when we

14   ask a question, people understand it and are

15   giving us an answer that meets the objective.

16       Q    Sure.   And you mention test

17   questionnaires as a kind of cognitive research?

18       A    Yeah.

19       Q    Can you tell me what that entails?

20       A    So the -- just -- so the -- then you'd

21   send it out into the field and see if you get good

22   responses.   So there's a difference between

Page 182

1    sitting in a lab and asking some more questions

2    and somebody actually filling it out when they

3    have it in their house.

4        Q    Other kinds of testing to new or changed

5    questions, other than the Content Test, the

6    cognitive testing, and you discussed before the

7    end to end.

8        A    Yeah.                          401/403

9        Q    Anything else?

10        A    That's about it.

11        Q    So earlier, you testified that the

12    end-to-end testing tests systems, correct?

13        A    Correct.

14        Q    What systems do you refer to?

15        A    The systems with which we use to conduct

16    the census.

17        Q    What are those?

18        A    So data capture, so the -- you know,

19    electronic, you know, survey instrument.

20        Q    Uh-huh.

21        A    The paper data capture systems, all the

22    mailing, all the receipt of mail, the electronic

Page 183

1   systems, the telephone questionnaire assistance

2   center, the iPhones that enumerators use out in

3   the field, all of that.

4        Q    Uh-huh.  Does the Census Bureau test

5   how -- the order of questions?

401/403

6        A    Yes.

7        Q    Where?  What?  Which of these tests?

8        A    So like the National Content Test might

9   be a place -- I don't think they did -- I don't

10  think they did in that particular instance, so.

11       Q    Does the end-to-end test test the order

12  of questions?

13       A    No.  The end-to-end test doesn't have any

14  test about the questions, at all.

15       Q    There's no response rates for the

16  end-to-end test?

17       A    We track the response rates, but we're

18  not -- it's not a life measurement exercise.  It's

19  really more of a testing systems exercise.  So

20  tracking response rates while we're live in the

21  field is something we do in 2020, so we do that

22  during the end-to-end test, as well.  For

1    operational reasons, not for --

2         Q    So if --

3         A    -- not for quality assessment reasons.

4         Q    If the citizenship question had been on

5    the 2018 end-to-end test, would that provide data

6    as to the response rates for the citizenship

7    question?

8              MS. BAILEY:  Objection.  Calls for

9    speculation.                           401/403

10             THE WITNESS:  We would have had

11   some -- we could have gained some insight into the

12   item nonresponse rates for that question.

13   BY MS. GOLDSTEIN:

14        Q    And would you have also gained insight

15   into effects on total response rate if this

16   citizenship question was on the test questionnaire

17   for the 2018 end-to-end test?

18             MS. BAILEY:  Objection.  Calls for

19   speculation.

20             THE WITNESS:  That would have to have

21   been a test objective, and we would have to set up

22   an experiment to do that.

1   BY MS. GOLDSTEIN:

2       Q    How would you -- how could you do that?

3            MS. BAILEY:  Objection.  Calls for

4   speculation.

5   BY MS. GOLDSTEIN:

6       Q    How could you set up a test objective

7   that would test response rates with the inclusion

8   of a citizenship question?

9            MS. BAILEY:  Same objection.

10           THE WITNESS:  Some sort of randomized

11  experiment.

12  BY MS. GOLDSTEIN:          401/403

13      Q    What would that be?

14      A    I can't tell you exactly what that would

15  be.  We'd have to have some methodologist work on

16  that.

17      Q    But that's the kind of thing the

18  Census Bureau is equipped to do?

19      A    Yes.

20      Q    And it did not happen with the

21  citizenship question, correct?

22      A    No.

Page 186

1      Q   Why is it -- is it important to see how a

2   question -- withdrawn.

3          The content testing that was performed,

4   were all of the questions that are on the planned

5   short form, other than the citizenship question,

6   included in the content testing?

7          MS. BAILEY:  Objection.  Form.

8          THE WITNESS:  I don't know, actually.

9   BY MS. GOLDSTEIN:

10     Q   Who would know?

11     A   Karen Battle.

12     Q   Did the questionnaire that was used for

13  the end-to-end testing include all questions on

14  the short form except for the citizenship

15  question?

16     A   Yes.                401/403

17     Q   Does the Census Bureau do focus group

18  testing?

19     A   So, for cognitive testing?

20     Q   Is that the same thing?

21     A   No.

22     Q   Okay.

1    sensitivity.  Sometimes it's things people don't

2    know.  Like, we ask them about how -- when

3    their -- when their housing unit was built.

4    People often seem not to know the answer to that

5    question.

6        Q    Any other ways to test for sensitivity?

7            MS. BAILEY:  Objection.  Vague.

8            THE WITNESS:  No.  To test for

9    sensitivity?  No.

10   BY MS. GOLDSTEIN:

11       Q    To see how sensitive a question is on a

12   survey?

13       A    No.  Not that I -- I mean, that's not my

14   field, so I don't know.

15       Q    And just remind me, who is the expert on

16   this at the Census Bureau?

17       A    Nancy Bates.

18       Q    Is it fair to say that the sensitivity of

19   a question can change over time?          401/403

20       A    Yes.

21       Q    Why?

22       A    Lots of attitudes change over time.

1      Q    Can the political climate impact the

2   sensitivity of a question?

3           MS. BAILEY:   Objection.   Calls for

4   speculation.                      401/403

5           THE WITNESS:   Potentially.

6   BY MS. GOLDSTEIN:

7      Q    Can you think of other things that might

8   impact the sensitivity of a question?

9           MS. BAILEY:   Objection.   Calls for

10  speculation.

11          THE WITNESS:   Not off the top of my head,

12  no.

13  BY MS. GOLDSTEIN:

14     Q    Can the order of questions impact results

15  to a survey?                      401/403

16     A    You know, I understand from the

17  literature that it can.   I'm not -- you know, I'm

18  not an expert on that, but, you know, I think

19  especially in a large survey, I think it can.

20     Q    Is that something that the Census Bureau

21  tests for the decennial?

22     A    So for the decennial, the short form, I

1    think, it's less of a concern than it is for

2    something large, like the ACS, where you have

3    different topic modules and stuff like that.

4         Q    Why do you say that?

5         A    So -- because I think that's when

6    question order matters, is in a large complex

7    survey.  There's various framing issues and stuff

8    like that for people.

9         Q    Are you aware of any studies that say

10   that question order does not matter for a shorter

11   survey?

12        A    So I know that people are more concerned

13   about it on a longer survey.  I've never seen

14   anyone argue the counter -- you know, the other

15   way, saying that it doesn't -- I've never seen

16   anyone say it doesn't matter.  I just see that it

17   matters more for a large complex survey.

18        Q    But it matters some for a short survey?

19        A    Yeah, again, I'm not a survey

20   methodologist, especially a household survey

21   methodologist, so I can't speak expertly towards

22   that.

Page 197

1   that sort of stuff, you know, it all matters, so.

2        Q    Is there a -- we talked a few minutes ago

3   about the political climate might impact the

4   sensitivity of a question?

5        A    Uh-huh.  Yes.

6        Q    Can political climate impact how a

7   question functions?

8             MS. BAILEY:  Objection.  Calls for

9   speculation.

10            THE WITNESS:  I don't know what you mean

11  by how a question functions.

12  BY MS. GOLDSTEIN:

13       Q    Fair enough.

14            Can the political climate impact response

15  rates?                    401/403

16            MS. BAILEY:  Objection.  Calls for

17  speculation.

18            THE WITNESS:  So, you know, if, you know,

19  one of the factors in response rates is distrust

20  in government generally, if the political climate

21  increases or decreases that, it could have an

22  impact on response rates.

1          THE WITNESS:  Take this one back, too?

2          MS. GOLDSTEIN:  Can you mark this for me,

3     please?

4               (Plaintiffs' Exhibit 19, Email, was

5     marked.)

6     BY MS. GOLDSTEIN:

7          Q    I'm showing you what's been marked as

8     Plaintiffs' Exhibit 19.  It is Bates stamped 2292

9     and 2293.  It is an email from Earl Comstock dated

10    2/2/18.                           401/403

11             Do you recognize this document?

12         A    You know, not per se, but this

13    is -- looks like a transmission of the answers

14    from Burton to Earl.

15         Q    And does that comport with your

16    recollection as to how those 35 questions and

17    answers were sent over to Commerce?

18         A    Yeah.  There was drips and drabs.

19         Q    And the subject of this is citizenship

20    question complete set?

21         A    Yeah.

22         Q    So it is your understanding that on

Page 204

1   February 2, 2018 the complete set of those 35

2   questions were sent to Commerce, correct?

3       A   If that's what that means, yeah.

4       Q   Let me give you the attachment to this

5   email.

6           (Plaintiffs' Exhibit 20, Questions on the

7   Jan 19 draft Census Memo on the DOJ Citizenship

8   Question Reinstatement Request attachment, was

9   marked.)          401/403

10  BY MS. GOLDSTEIN:

11      Q   I'm showing you what's been marked as

12  Plaintiffs' Exhibit 20 -- I'm sorry.

13          MS. BAILEY:   Thank you.

14  BY MS. GOLDSTEIN:

15      Q   It is 2294 --

16      A   Right.

17      Q   -- to 2305.   It is another copy of the 35

18  questions that we had just reviewed on Exhibit 16,

19  correct?

20      A   Okay.

21      Q   Yes?

22      A   Yes.

1        Q    And this is, as I understand it, the

2    attachment to Exhibit 19.

3        A    Okay.

4        Q    So would this be the final version that

5    is sent over to Commerce?

6        A    I'm not sure that's the final version,

7    but it's probably pretty close.

8        Q    Do you recall any changes that were made

9    after this?

10       A    I -- after February 2nd, I -- you know, I

11    can't tell you whether there were or not.

12       Q    From Census?

401/403

13       A    Yeah.

14       Q    Do you recall asking for any changes

15    after December 2nd to the 35 questions?

16       A    No.

17       Q    If someone had made changes, from Census,

18    to these questions, would you have seen it?

19       A    Probably.  But I'm just saying I

20    don't -- I don't recall whether this was the last

21    version or not, so.

22       Q    If you go to Question 31 --

1        A      Okay.

2        Q      -- it begins on 2303 to 2304, this is the

3    same language that we saw on Exhibit 16, correct?

4        A      I think so.

5        Q      And, to your knowledge, is this -- this

6    is the well-established process, correct?

7        A      Yes, a summary of it.

8        Q      And this Question 31 on 2303 and 2304,

9    this is the language that the Census Bureau

10   believes describes that well-established process,

11   correct?                        401/403

12           MS. BAILEY:  Objection.  Form.

13           THE WITNESS:  Yes.

14   BY MS. GOLDSTEIN:

15       Q      The Census Bureau wrote the language in

16   31?

17       A      Yes.

18       Q      To your knowledge, did Census ever change

19   the language in Question 31?

20       A      Again, I don't know.  I don't know for

21   sure that this is the last version we sent.

22       Q      Do you recall anyone at Census proposing

1    any changes to the language in Question 31?

2         A    No.  I mean, but, obviously, we're still

3    editing responses here, so that -- that could

4    happen.  It's a relatively longer answer than most

5    of the other ones, so.                401/403

6         Q    But you do not recall anyone at Census

7    changing the language of Question 31 following

8    this language, correct?

9         A    No.  I don't recall, one way or the

10   other.

11        Q    And is there anything that would help

12   your recollection?

13        A    I mean, again, if this is not the last

14   version, the last version would answer that

15   question.

16        Q    Well, this one was in -- okay.

17             So who is Mr. Reist?

18        A    He works for Al.

19        Q    Who is Al?

20        A    Al Fontenot.

21        Q    And what is Al Fontenot's job?

22        A    He's the head of decennial.

Page 208

1      Q      And what is Mr. Reist's job?

2      A      So he's the head of their budget and

3   communications area.

4      Q      And Mr. Reist sends this, to among

5   others, Earl Comstock, correct?

6      A      Uh-huh.

7      Q      I'm sorry.  I need a yes or no.

8      A      Yes.

9      Q      And you were cc'd on this?

10      A      Yes.

11      Q      And had you reviewed these responses

12   before Mr. Reist sent them to Mr. Comstock?

13      A      You know, I probably perused them.  I

14   certainly didn't proof them or anything like that.

15      Q      But as we had talked about before, these

16   responses, these 1 to 35 questions were, in your

17   view, accurate, correct?                401/403

18      A      Yes.

19      Q      Because you wouldn't --

20             So -- and that includes Question 31,

21   correct?

22      A      Yes.

1       Q     I'll take that back.

2             I'm going to show you what had been

3   previously marked as Exhibit 16 to the Abowd

4   deposition.  If you bear with me for just a

5   moment.

6             It is another version of those 35

7   questions, this time that were received in the

8   original administrative record.  It is Bates

9   stamped 1286 to 1297.  And if we could go back

10  over to Question 31, it is on 1296.      401/403

11            The answer to Question 31 in this version

12  says, "Because no new questions had been added to

13  the decennial census for nearly 20 years, the

14  Census Bureau did not feel bound -- bound by past

15  precedent when considering the

16  Department of Justice's request.  Rather, the

17  Census Bureau is working with all relevant

18  stakeholders to make ensure that the legal and

19  regulatory requirements are filled and that

20  questions will produce quality and useful

21  information for the nation.  As you're aware, that

22  process is ongoing at your direction."

Page 210

```
 1          That's pretty different than the language
 2   of Question 31 we've seen before, right?
 3       A   Yes.
 4       Q   It does not describe the well-established
 5   process we've been discussing, correct?
 6       A   It does not.          401/403
 7       Q   It does not talk about the
 8   well-established process, at all, correct?
 9       A   Correct.
10       Q   It doesn't --
11       A   Well, it sort of summarizes.
12       Q   Where?
13       A   To work with all relevant stakeholders to
14   ensure the legal and regulatory requirements are
15   filled and questions will produce quality
16   information, so --
17       Q   Does this --
18       A   -- that's what the process is meant to
19   do.
20       Q   Does this answer to Question 31 discuss
21   the process by which agencies evaluate their data
22   needs?
```

Page 211

1      A    No.

2      Q    And does it say that in order to be

3    included, proposals must demonstrate a clear

4    statutory and regulatory need for data?

5      A    It does say legal and regulatory

6    requirements are filled.

7      Q    Does it mention testing, at all?

8      A    No.                              401/403

9      Q    Does it mention public comment?

10     A    No.

11     Q    Does it mention --

12     A    No -- I don't -- it says all relevant

13   stakeholders.   That includes public comment.

14     Q    Okay.   Does it mention OMB specifically?

15     A    It says relevant stakeholders, so, you

16   know --

17     Q    Does it mention OMB specifically?

18     A    No.   It does not.

19     Q    Okay.   Do you know who wrote the language

20   in Number 31?

21     A    I do not.

22     Q    When was the first time you saw the

Page 212

1   language in -- on 1296?

2       A   On 1296, I think I've seen a version like

3   this before, but, you know, I'm not sure where

4   this came from.

5       Q   Have you seen it before today?

6       A   Yes.

7       Q   On Question 31?                  401/403

8       A   On Question 31.

9       Q   Do you know if Commerce wrote this

10  language or Census Bureau wrote this language?

11      A   I don't know.

12      Q   What would tell you?

13      A   I -- you know, seeing who wrote -- who

14  sent the last version.  So, I don't know.

15      Q   So I previously showed you a version that

16  Dr. Abowd represented was the final version --

17      A   Right.

18      Q   -- do you recall?

19      A   Yeah.

20      Q   And that version had the longer

21  Question 31 language --

22      A   Right.

Page 213

1     Q     -- correct?

2     A     Yes.

3     Q     Yeah?

4     A     Yes.

5     Q     And so if we understand the version that

6   Dr. Abowd said was final to include the longer

7   Question 31, does that tell you anything about who

8   changed the language on 1296?     401/403

9          MS. BAILEY:   Objection.   Form.

10         THE WITNESS:   Yeah.   I don't -- no, not

11   particularly.   Probably -- not Dr. Abowd, but --

12   BY MS. GOLDSTEIN:

13    Q     Did you change the language in 31?

14    A     I did not.

15    Q     Did anyone at Census change the language

16   in 31?

17    A     I don't know.

18    Q     Did you review this language in 31 before

19   it was sent to Commerce?

20    A     I --

21         MS. BAILEY:   Objection.   Asked and

22   answered.

Page 214

1          THE WITNESS:  I don't recall.

2     BY MS. GOLDSTEIN:

3          Q    Is there anything that would help you

4     recall?

5          A    I don't know.

6          Q    Do you know why this language was

7     changed?

8               MS. BAILEY:  Objection.  Asked and

9     answered.

10              THE WITNESS:  I assume it's an attempt to

11     summarize the longer answer of the question.

12     BY MS. GOLDSTEIN:                    401/403

13         Q    Were there any discussions that you took

14     part in as to why this language was changed?

15              MS. BAILEY:  Objection.  Asked and

16     answered.

17              THE WITNESS:  Do not recall.

18     BY MS. GOLDSTEIN:

19         Q    If the Census Bureau had changed this

20     language, would John Abowd have been aware of the

21     change?

22         A    Yes.  I would think so.

1      Q    Yes, you would?

2      A    Yes.

3      Q    Had Census Bureau, to your knowledge,

4    ever taken the position that it was not bound by

5    past precedent when considering an agency's

6    request before?

7      A    No.  And I think -- I think the only

8    degree to which the Census Bureau in this instance

9    was not following past procedures is because the

10   Census Bureau took the position that the question

11   had been tested via the ACS.  That's the only

12   aspect of the process that -- that we believed

13   didn't need to be undergone.

14     Q    And when you say the Census Bureau took

15   that position, who in the Census Bureau?

16     A    You know, I think the technical team,

17   every -- you know, management, everybody agreed

18   that this question has been thoroughly tested on

19   the ACS.

20     Q    Are there -- has a question ever moved

21   from the ACS to the short form before?

22     A    Not that I know of.

Page 216

1        Q    And are there any quality standards that

2    address moving questions from one survey to

3    another?

4        A    Not in particular.  I mean, quality

5    standards are roughly the same across all the

6    surveys.  Obviously, the census is different than

7    the surveys in the sense that it's a census.  We

8    ask everybody.  So, you know, generally, you get

9    better quality on the census than you would in a

10    survey because you're asking everybody.

11        Q    Any statistical standards that govern

12    moving a question from the ACS to the decennial?

13        A    Not standards that don't apply everywhere

14    else.

15        Q    What do you mean?

16        A    I mean, the statistical standards

17    are -- count for everything, not just -- so --

18        Q    But you're not aware of any guidance that

19    goes to the process of moving a question from the

20    long form to the short form or the ACS to the

21    short form, correct?          401/403

22        A    No.

1      Q    Some are on paper?

2      A    Yes.

3      Q    Some are in person?

4      A    Well, most surveys are multimode --

5      Q    Okay.

6      A    -- any more, so.

7      Q    Is it fair to conclude that a question is

8  going to perform the same way on one survey that

9  it might on a different survey?

10         MS. BAILEY:   Objection.   Calls for

11  speculation.

12         THE WITNESS:   It isn't necessarily.

13  BY MS. GOLDSTEIN:                401/403

14     Q    Why not?

15     A    Well, the -- you know, the modes will

16  matter.

17     Q    What else matters?

18     A    The -- you know, the length and

19  complexity of the survey.

20     Q    What other sorts of things can cause a

21  question to perform different ways on different

22  surveys?

1      A    You know, we talked earlier about, you

2   know, changing attitudes about the government and

3   stuff like that.  So if one survey is seen as --

4   as, you know, coming from the government or a part

5   of the government that they have bigger issues

6   with, it may perform differently than, you

7   know -- so Census Bureau does pretty well with the

8   surveys because the public generally tends to

9   trust the Census Bureau, so.        401/403

10      Q    But even within the same survey, can a

11   changing political climate impact how a question

12   performs?

13          MS. BAILEY:  Objection.  Calls for

14   speculation.

15          THE WITNESS:  Again, it might.  There's

16   been no analysis to say that, one way or the

17   other.

18   BY MS. GOLDSTEIN:

19      Q    And that's my next question.  Has the

20   Census Bureau performed any analysis as to whether

21   or not the citizenship question will perform the

22   same way on the short form as it has on the ACS?

Page 222

```
1      A    No.    We don't -- but I'll come back to

2   say we don't have a good way of doing that.

3      Q    Would the National -- if the citizenship

4   question had been included in the
                                          401/403
5   National Content Test --

6      A    So that -- go ahead.

7      Q    I'm sorry.

8           If the citizenship question had been

9   included in the National Content Test, would that

10  have given the Census Bureau any information as to

11  response rates?

12          MS. BAILEY:   Objection.   Hypothetical.

13          THE WITNESS:   Most likely not.   So you

14  have to remember that the context of the decennial

15  census is done as a nationwide activity with a

16  huge advertising outreach and partnership campaign

17  that you're never going to replicate in a small

18  scale test.   You're not going to replicate it on

19  the ACS.   To the degree that you think the

20  political environment is something that might

21  impact response rates to a particular question,

22  you need to mimic the political environment that
```

1   will exist when they're doing it.  And the -- you

2   know, the amount of exposure that the census will

3   get during the live census is, you know, part of

4   that environment, and we just can't test that.  So

5   the only thing we can test right now is whether

6   people understand the question, and whether they

7   can answer it, and whether they answer it at a

8   rate sufficient to provide high-quality data.  The

9   answer to those questions is all in the

10  affirmative.

11  BY MS. GOLDSTEIN:

12      Q    In the context of the ACS, correct?

13      A    In the context of the ACS.  Or in the

14  context of -- of that 2018 end-to-end test.  We

15  wouldn't have learned anything in addition to

16  that, so.

17      Q    The -- if the citizenship question had

18  been included in the 2018 end-to-end test, would

19  you have gotten item nonresponse rate data?

20          MS. BAILEY:  Objection.  Calls for

21  speculation.                    401/403

22          THE WITNESS:  Yes.  We would have gotten

Page 224

1   item nonresponse rate data.  It would not

2   have -- it would not have answered the question of

3   what things would look like during the 2020

4   census, no more than the ACS does.          401/403

5   BY MS. GOLDSTEIN:

6       Q   Why do you say that?

7       A   Because they're both done outside of that

8   context.

9       Q   So the race and ethnicity proposed

10  changes were tested, correct?

11      A   They were tested to see if people

12  understood and could answer the question and what

13  the relative data quality of the different

14  questions was.  The experiment was against the

15  different questions.

16      Q   Is it possible to test a survey -- so --

17      A   We could have tested two versions of a

18  citizenship question --

19      Q   And the census --

20      A   -- that might have been informative, but

21  not whether a, you know, citizenship question

22  versus no citizenship question.

1       Q    Why couldn't you have tested that?

2       A    What?

3       Q    Why could -- a citizenship question

4  versus a non- -- no citizenship question?

5       A    I think -- I just argued that.  Without

6  doing it in decennial, we won't know what

7  that -- in that context.

8       Q    So just to make sure I understand.  It's

9  your position that we can't know how the

10 citizenship question performs on the census until

11 you have a census?

12          MS. BAILEY:   Objection.  Mischaracterizes

13 prior testimony.

14 BY MS. GOLDSTEIN:

15      Q    Is that a fair summary?

16      A    So that in -- in the 2020 census, the

17 environment will be radically anything that we can

18 mimic in a test.

19      Q    Which is always the case for the

20 decennial?

21      A    Which is always the case.

22          MS. GOLDSTEIN:  Why don't we take a break

1      A    Uh-huh.

2      Q    I'm sorry?

3      A    Yes.

4      Q    And if we look at F, explore nonfederal

5   surveys for research on the impact of citizenship

6   questions on survey response rates, do know you if

7   the Census Bureau has done that?

8      A    I -- I don't know.

9      Q    And, again, would Ms. Battle be the

10  person who knows this?

11     A    Yes.

12     Q    Anyone else?

13     A    Well, members of her team.

14     Q    Sure.  And what would nonfederal surveys

15  for research on the impact of citizenship

16  questions on survey response rates tell us?

17     A    Same thing that E would, what other

18  people have experienced.

19     Q    And let's look at G, conduct a

20  National Content Test with a split sample where

21  half the respondents received the citizenship

22  question and half do not.  Comparing the response

1    rates across the two groups would be the primary

2    way to test the impact of the citizenship question

3    on survey response rates.

4            Has this sort of test been run for the

5    citizenship question?                   401/403

6        A    It has not, as far as I know.

7        Q    And do you agree that this methodology

8    set forth in Subparagraph G would be a way to test

9    the impact of the citizenship question on survey

10   response rates?

11           MS. BAILEY:   Objection.   Form.

12           THE WITNESS:   It -- yes.   It could be.

13   BY MS. GOLDSTEIN:

14       Q    Do you know of any plans to test the

15   citizenship question in this form?

16       A    No, I do not.

17       Q    I'll take that back.   Thank you.

18           Part of your job, Dr. Jarmin, is to

19   appoint people to advisory committees; is that

20   correct?

21       A    Yes.

22       Q    And what is the role of advisory

1   committees in the decennial census?

2           MS. BAILEY:  Objection.  Vague.

3           THE WITNESS:  So advisory committees,

4   largely, are to give advise on various

5   Census Bureau methods and operations, how Census

6   can reach out to various communities to do our

7   job.

8   BY MS. GOLDSTEIN:

9       Q    Why does the Census Bureau have advisory

10  committees?

11      A    Well, I think we try to be, generally,

12  transparent in how we do our business.  The

13  advisory committees are one way of achieving that.

14      Q    How many advisory committees does the

15  Census Bureau have that are involved in the

16  decennial census?

17      A    Two.                    401/403

18      Q    What are those two?

19      A    The National Advisory Committee and the

20  Census Scientific Advisory Committee.

21      Q    Can you tell me what the responsibilities

22  of the National Advisory Committee are?

1    A    So National Advisory Committee is largely

2    made up of stakeholder -- representative

3    stakeholder groups, largely from hard-to-count

4    communities to advise us on how to properly reach

5    out to be able to make sure those communities are

6    counted.                      401/403

7    Q    And the Census Scien- -- the Census

8    Scientific Advisory Committee, what is that?

9    A    Sort of all scientific methodology

10   matters across the Bureau.

11   Q    So can you talk to me about how the

12   National Advisory Committee is typically involved

13   in the decennial census process?

14   A    So -- well, we have, you know, two

15   meetings a year, and, you know, they've been kept

16   apprised of all the planning and development of

17   the 2020 design throughout the decade.  So, you

18   know, been able to comment on it all along.

19   Q    When you say they've been kept apprised

20   of the 2020 design, what do you mean?

21   A    Of how we're going to do the 2020 census.

22   Q    When was, if at all, was the

1   National Advisory Committee notified of the

2   citizenship question?

3       A    So I believe when it became public, that

4   the request from Art Gary had come in.

5       Q    Is the National Advisory Committee

6   typically consulted by Census Bureau before the

7   Census Bureau makes decisions --

8           MS. BAILEY:   Objection.   Vague.

9   BY MS. GOLDSTEIN:                          401/403

10      Q    -- regarding the decennial census?

11      A    With a subset of decisions.

12      Q    What kind --

13      A    We can't consult them on every decision

14  we make on a huge program like the census --

15      Q    Of course.

16      A    -- but generically, they're kept apprised

17  of our plans and in a timely input, that they

18  could have input on ultimate decisions.

19      Q    And why is it important for the

20  National Advisory Committee to have input on these

21  decisions?

22      A    We think that it helps us do a better

1    census.

2        Q    And you just distinguished between some

3    decisions that you're not able to keep the

4    National Advisory Committee in the loop for and

5    some that you are.

                                        401/403

6        A    Right.

7        Q    Can you explain the kinds of decision

8    that the National Advisory Committee is brought

9    into the loop on?

10       A    So they were brought in, you know, on our

11   basic, you know, multimode collection strategy.

12   They're -- they have some input on our

13   communications and outreach program that's been

14   particularly interesting to them.  They were

15   apprised of the National Content Test and other

16   sort of mid-decade testing activities.

17       Q    Is it fair to say that the

18   National Advisory Committee is involved in the

19   bigger decisions of the Census Bureau with respect

20   to the decennial census?

21       A    Generally, yeah.

22       Q    Okay.  And is there a specific mechanism

1    for the --

2         A    So can I go back?

3         Q    Absolutely.

4         A    They have input on -- let's be clear.

5    They are not involved in any decision-making

6    processes.

7         Q    So that's what I'm curious about.  How --

8    what's the process for the National Advisory

9    Committee to give input, and how does that get

10   back to the Census?          401/403

11        A    So there's --

12             MS. BAILEY:  Objection.  Compound.

13             THE WITNESS:  There's a formal way that

14   all the advisory committees, CSAC and NAC, after

15   each meeting, they give written recommendations to

16   the Bureau.

17   BY MS. GOLDSTEIN:

18        Q    What form do those recommendations take

19   place?

20        A    What do you mean, what form?  They're

21   written.

22        Q    It's like a memo?

Page 241

1      A    Yeah.

2      Q    Who does it go to?

3      A    The director.

4      Q    Who is you, right now?

5      A    And then, you know, disbursed to various

6   parts of the Bureau for response and action.

7      Q    And typically, when you get a memo from

8   NAC or CSAC, what is your process for dealing with

9   it?                            401/403

10        MS. BAILEY:  Objection.  Vague.

11        THE WITNESS:  So we have a relatively

12   formal process by which it gets disseminated to

13   the various subject matter experts that need to

14   weigh in on it, and then responses are drafted

15   and, you know, it's all, you know, delivered back

16   to NAC or CSAC, whichever the case may be.

17   BY MS. GOLDSTEIN:

18      Q    And it's the same for NAC and CSAC?

19           What's the timeline for delivering back

20   to the NAC?

21      A    So we usually try do it as quickly as

22   possible, but sometimes some of these things take,

1   you know, some time to sort through.   But

2   certainly before the next meeting.

3        Q    Does the NAC play any role in changing or

4   adding questions to the census?

5        A    When we've contemplated changes, they've

6   weighed in on that, but they don't play a role

7   in -- I mean, they can suggest, like anybody else

8   can, but they don't have a -- they don't have any

9   more formal role than anybody else does in that

10  regard.                        401/403

11       Q    Did the NAC weigh in on the proposed

12  changes to the race and ethnicity question?

13       A    I believe they did.   I was not an active

14  NAC meeting attendee at that time, but it's my

15  understanding that they -- that they weighed in on

16  that.

17       Q    Do you know how they weighed in?

18       A    You know, I think the NAC is a diverse

19  group of people.   Race and ethnicity questions are

20  something that never make everybody happy, so I

21  think there was lots of discussion amongst

22  different viewpoints of the NAC about what was the

Page 243

1    best approach to make.

2        Q    Did the NAC ultimately make a

3    recommendation?

4        A    I'd have to go back to see what their

5    recommendation was.            401/403

6        Q    You don't recall?

7        A    I don't recall.

8        Q    What about the MENA changes?

9        A    Yes.   That would be one of the

10   controversial issues that was discussed amongst

11   the NAC, so.

12       Q    For the record, can you just explain what

13   the proposed MENA changes were?

14       A    It was to add MENA as a separate category

15   on a combined race and ethnicity question.

16       Q    So when we talk about changes to the race

17   and ethnicity question, are the MENA changes part

18   of that conversation?

19       A    Yes.

20            MS. GOLDSTEIN:   Can we stamp this,

21   please?

22            I'm going to apologize.   These are not

Page 244

1       stamped.

2               (Plaintiffs' Exhibit 22, U.S. Department

3       of Commerce Census Bureau National Advisory

4       Committee on Racial, Ethnic and Other Populations

5       Charter, was marked.)                401/403

6       BY MS. GOLDSTEIN:

7           Q    I'm showing what's been marked as

8       Plaintiffs' Exhibit 22.   It's titled U.S.

9       Department of Commerce Census Bureau National

10      Advisory Community on Race and Ethnicity and Other

11      Populations Charter.   It is a four-page document.

12              Do you recognize this document?

13          A    I'm not sure I've seen this or not.   It

14      looks like pretty standard -- standard boilerplate

15      for advisory committee charter.

16          Q    So you've seen charters like this before?

17          A    Yes.

18          Q    Okay.   And if we go to Section 3,

19      objectives and scope of activities, it states that

20      "The committee will advise the director of the

21      Census Bureau."

22              That's you, correct?

Page  245

1          A     Yep.

2          Q      "On  the  full  range  of  economic  housing,

3    demographic  socioeconomic,  linguistic,

4    technological,  methodological,  geographic,

5    behavioral  and  operational  variables  affecting  the

6    cost  accuracy  and  implementation  of  Census  Bureau

7    programs  and  surveys,  including  the  decennial

8    census."                         401/403

9                Correct?

10         A     Uh-huh.    Yes.

11         Q      And  so  this  charter  --  does  the

12   citizenship  question  fall  within  this  scope  of

13   activities?

14                MS.  BAILEY:    Objection.    Form.

15                THE  WITNESS:    Yes,  it  would.

16   BY  MS.  GOLDSTEIN:

17         Q      If  you  go  further  down,  it  explains  that

18   "The  committee  will  address  census  policies,

19   research  and  methodology  tests,  operations,

20   communications/messaging  and  other  activities  to

21   ascertain  the  need  --  ascertain  needs  and  best

22   practices  to  improve  Census's  surveys,  operations

Page 246

1    and programs."

2          Correct?                      401/403

3     A    Correct.

4     Q    As part of this mandate, did the

5    NAC -- you've mentioned that the NAC weighed in on

6    the citizenship question, correct?

7     A    Yes, they did.

8     Q    And --

9     A    I was not in attendance at that meeting,

10   though, so.

11    Q    Other than the meeting that you've

12   referred to before, did the NAC weigh in, at all,

13   on the citizenship question?

14    A    Not that I know of.

15    Q    If you go to the next paragraph, it

16   mentions that the committee, the NAC, will review

17   and provide formal recommendations and feedback on

18   working papers, reports and other documents

19   related to the design and implementation of

20   Census Bureau programs and surveys, correct?

21    A    Yes.

22    Q    Did the NAC review any of the memos that

1    the Census Bureau prepared regarding the

2    citizenship question?

3        A    Not that I know of.

4        Q    Did you or anyone on your staff, to your

5    knowledge, provide the NAC with copies of those?

6        A    No.  What this refers to is the items

7    that are part of an agenda of a meeting.  There

8    was not an agenda of a meeting --    401/403

9        Q    Okay.

10       A    -- in that early 2018 time frame, so.

11       Q    When were the meetings for the NAC?

12       A    I think the NAC meeting was June, if I'm

13   not mistaken.

14       Q    And then there would be a second one?

15       A    You know, late in December.

16       Q    Did the NAC provide any formal

17   recommendations or feedback on the citizenship

18   question?

19       A    I mean, they certainly have not read the

20   recommendation, the -- or at least I don't recall

21   reading the recommendation on this.  They

22   certainly verbally and have PowerPoint slides in

1    relationship to this, so.

2        Q    Is there a process by which the

3    Census Bureau formally reaches out to ask for the

4    NAC's advice?

5        A    So --

6        Q    Is that what you described before?

7        A    So -- so we have a group that's in charge

8    of the -- the advisory committees.  They meet with

9    the chair and sometimes other parts of the

10   committee to discuss upcoming meetings and ongoing

11   response to recommendations, and so there's

12   relatively regular communications between our

13   staff and the committees.    401/403

14       Q    And who is the group that's in charge of

15   the NAC?

16       A    So they're in our communications area,

17   so.

18       Q    Who is that?

19       A    Tara Dunlop Jackson.

20       Q    Anyone else?

21       A    She's the person in charge.

22       Q    And is that also for the CSAC?

Page 249

1       A    CSAC, yep.   And the FESAC.

2       Q    What is the FESAC?

3       A    The Federal Economic Statistics Advisory

4    Committee.

5       Q    So can I have that one back?

6            (Plaintiffs' Exhibit 22, Email, was

7    marked.)                401/403

8    BY MS. GOLDSTEIN:

9       Q    Did you see the PowerPoint presentation

10   that the NAC prepared that you referred to

11   earlier?

12           MS. BAILEY:   Objection.   Vague.

13           THE WITNESS:   Are you referring to the

14   one by Arturo Vargas?

15   BY MS. GOLDSTEIN:

16      Q    Yes.

17      A    Yes.

18           (Plaintiffs' Exhibit 23, Emails, was

19   marked.)

20   BY MS. GOLDSTEIN:

21      Q    I'm showing what has been marked as

22   Plaintiffs' Exhibit 23.   It is an email chain

1    Bates-stamped 8630, 8631.  Do you recognize this

2    document?

3        A    I think so, yeah.

4        Q    What is this?

5        A    So I think we were referring back to

6    their recommendations.

7        Q    What were the NAC's recommendations with

8    respect to the citizenship question?

9        A    To not ask it.          401/403/802

10       Q    After the NAC made the recommendation to

11   not ask the citizenship question, what was the

12   Census Bureau's next steps in response to that

13   recommendation?

14       A    I'm sure we're working on the response.

15   Say, you know, decision's been made, as was

16   communicated in the meeting.

17       Q    Has that response gone out yet?

18       A    No.  I don't know.

19       Q    Who would know?

20       A    Tara.

21       Q    So in this email, it states towards the

22   very bottom on 8630 that, "The committee believes

Page 251

1    the situation is so dire that it considers it a

2    crisis and requires the immediate attention of the

3    U.S. Secretary of Commerce and the Acting Deputy

4    Secretary of Commerce."

5         Did the NAC ever have any direct

6    communications or meetings with the U.S. Secretary

7    of Commerce?

8         MS. BAILEY:  Objection.  Foundation.

9         (Thereupon, the court reporter

10   clarified.)

11        THE WITNESS:  So I don't believe that the

12   NAC as a committee has.

13   BY MS. GOLDSTEIN:                401/403

14      Q    Okay.

15      A    It's my understanding that Arturo was one

16   of the people that the Secretary spoke to.

17      Q    Was there -- what was the result of this

18   email?

19      A    I don't know what you mean by that.

20      Q    So you mentioned that Arturo Vargas met

21   with Ross?

22      A    Prior to the decision.

Page 252

1        Q    Prior to the decision.

2             Do you know how, if at all, the NAC's

3    recommendation with respect to the citizenship

4    question was taken into account by the Commerce

5    Department?

6             MS. BAILEY:  Objection.  Form.

7             THE WITNESS:  I don't know.  I am pretty

8    sure that Arturo and the Secretary spoke and

9    Arturo had his opportunity to state his case to

10   the Secretary.              401/403/802

11   BY MS. GOLDSTEIN:

12       Q    And other than that one meeting that

13   you've referred to, the NAC meeting, did the

14   Census Bureau have any additional meetings about

15   the citizenship question with NAC?

16            MS. BAILEY:  Objection.  Foundation.

17            THE WITNESS:   No.

18   BY MS. GOLDSTEIN:

19       Q    Other than the meeting that you've

20   described with the NAC, did the Census Bureau have

21   any meetings --

22       A    I'm sorry.

Page 253

1      Q   Go ahead.

2      A   I mean, so they're -- on other work,

3  there are ongoing discussions with the NAC and a

4  range of matters.  The NAC has subcommittees that

5  work with staff directly.

6      Q   Uh-huh.

7      A   You know, I'm sure in those meetings the

8  topic came up.

9      Q   What are those subcommittees where you

10  think the topic came up?

11      A   So I think there's -- you know, I can't

12  remember the names of the subcommittees, but

13  there's some that work on the ACS.  I think one

14  that's roughly on administrative records.  So

15  various sort of subtopics.  CSAC has them, as

16  well.          401/403

17      Q   And what is the CSAC's role?

18      A   Very similar.  I'm sure if you go back

19  and read the charter, it reads almost probably

20  exactly the same.

21          (Plaintiffs' Exhibit 24, U.S. Department

22  of Commerce Bureau of the Census Scientific

Page 254

1    Advisory Committee Charter, was marked.)

2    BY MS. GOLDSTEIN:

3        Q    I'm showing what has been marked as

4    Plaintiff's Exhibit 24.   It is the U.S. Census

5    Scientific Advisory Committee Charter.   Is this

6    the CSAC charter?

7        A    Yes.

8        Q    And this charter also provides that it

9    will provide formal review and feedback on

10   internal and external working papers, reports and

11   other documents related to the design and

12   implementation of census programs and surveys?

13       A    Yep.                    401/403

14       Q    Did the CSAC provide any formal review of

15   the memos relating to the citizenship question?

16       A    No.

17       Q    Did the CSAC provide any feedback on any

18   of the memos relating to the citizenship question?

19       A    No.

20       Q    Why not?

21       A    Again, it was not part of an organized

22   agenda in the meeting where they were -- where

1   those -- this was something that happened in the

2   compressed time frame, and we didn't have the

3   normal period through which we could have these

4   sorts of engagements.

5       Q    Is it fair to say in the normal course,

6   when a change is proposed to the decennial census,

7   it's on a longer time frame?

8           MS. BAILEY:  Objection.  Speculation.

9           THE WITNESS:  I mean --

10  BY MS. GOLDSTEIN:                    401/403

11      Q    For example, the --

12      A    No.

13      Q    -- race and ethnicity proposed changes?

14      A    Yes.  It was on a longer time schedule

15  that allowed more feedback from the advisory

16  committees.

17      Q    And typically, in the ordinary course,

18  when there is a proposed change to a question,

19  that proposed change is raised to the advisory

20  committees, correct?

21      A    If it's significant.

22      Q    So, typically, in the ordinary course,

Page 256

1  where there is a proposed significant change to

2  the census questionnaire, that proposed change is

3  raised to the advisory committees, correct?

4       A    Yes.

5       Q    Including the NAC?

6       A    Yes.

7       Q    And including the CSAC?

8       A    Correct.

9       Q    But that did not happen with the

10  citizenship question, correct?                401/403

11      A    It did not.

12      Q    Because there wasn't time?

13      A    Because there wasn't time.

14      Q    Were there any other reasons why the

15  citizenship question was not raised to the

16  advisory committee?

17           MS. BAILEY:   Objection, speculation.

18           THE WITNESS:   No.

19           That timing was the primary issue, yeah.

20  BY MS. GOLDSTEIN:

21      Q    Were there any --

22      A    No.

1       Q       -- other issues?

2       A       Not that I know of.

3       Q       Okay.  Did CSAC, which is the

4    Census Scientific Advisory Committee, right?

5       A       Yes.

6       Q       Provide any feedback on the citizenship

7    question?

8       A       Yes, they did.

9       Q       What was their feedback on the

10   citizenship question?

11      A       So they had a short presentation about it

12   at the spring CSAC meeting where they argued

13   against it.
                                401/403/802
14      Q       For what reasons?

15      A       For many of the normal reasons, the short

16   time frame.  They were concerned about it not

17   being tested.

18      Q    Has the Census Bureau responded to CSAC's

19   recommendation yet?

20      A    I think we have, but I'm not sure.  I'd

21   have to see if that's gone out or not.

22      Q    Who would know?

Page 259

1          I'd like to follow up on something you

2     said earlier.  I believe your testimony was that

3     it's difficult to simulate the decennial census

4     because it's unique.  Is that a fair

5     characterization?

6          A    Correct.

7          Q    Okay.  But, in fact, that the

8     Census Bureau does the multiyear testing program

9     to prepare for the census; is that correct?

10         A    That's correct.

11         Q    Do you know when that testing process

12    started?                     401/403

13         A    2013.

14         Q    So seven years in advance of the

15    decennial census, correct?

16         A    Correct.

17         Q    And from that testing, the Census Bureau

18    determines -- obtains various pieces of

19    information that are useful for development of the

20    2020 census?

21         A    Correct.

22         Q    For example, self-response rates?

Page 260

1      A    That's one thing that --

2      Q    Okay.

3      A    So a testing self-response rate is not

4  that indicative of a census self-response rate

5  because of the lack of advertising and --

6      Q    But, in fact, you do do tests to

7  determine self-response rates in preparation for

8  the decennial census?

9      A    I don't think we did any tests whose

10  purpose it was to determine what the self-response

11  rate was.

12      Q    Do you also use these tests to determine

13  or to obtain information about nonresponse

14  follow-up procedures?                401/403

15      A    About procedures, yes.

16      Q    And about the use of administrative

17  records?

18      A    And about -- yes.

19      Q    And about the use of data capture systems

20  or the functionality of the those systems?

21      A    Correct.

22      Q    How about for language support

Page 261

1    systems --

2              (Conference call interruption.)

3              THE WITNESS:  Okay.  All right.  Please

4    say the question again.

5    BY MR. TILAK:                    401/403

6         Q    And how about language support systems or

7    translations services?

8              MS. BAILEY:  Objection.  Vague.

9              THE WITNESS:  So there was some stuff

10   done with language, yes.

11   BY MR. TILAK:

12        Q    So in short, this multiyear testing

13   program does provide meaningful information that

14   the Census Bureau uses to prepare for the 2020

15   census?

16        A    Yes.

17        Q    Did you do any tests where the sole

18   purpose was not self-response rates but one of the

19   items that was looked at was self-response rates?

20             MS. BAILEY:  Objection.  Form.

21             THE WITNESS:  So we always look at the

22   self-response rate as a matter of course.

Page 262

1    BY MR. TILAK:

2        Q    And would it be fair to say this

3    multiyear testing program imposes a cost upon the

4    Bureau?

5        A    Absolutely.

6        Q    And would it also be fair to say that

7    none of these tests over the last seven --

8    five years have included -- or included a

9    citizenship question?

10       A    Over the last --

11       Q    Five years, since 2013 to 2018.

12       A    No.   None of the census tests included a

13   citizenship question.

14       Q    We have just touched on self-response.

15   Briefly, self-response, could you provide a short

16   definition for that?

17       A    Self-response is when a survey is -- when

18   we ask someone to do a survey, they, you know,

19   fill it out either online, on paper, over the

20   phone, and provide us their answers by themselves.

21       Q    And where a households fail to

22   self-respond to the census, there are other ways

Page 265

1    that's not necessarily the rule.

2        Q    It's not a prerequisite to be hired as a

3    decennial census enumerator?

4        A    Not if you're going to try to hire

5    hundreds of thousands of people, it's not.

6        Q    Earlier today you mentioned the concept

7    of a hard-to-count population.  What is a

8    hard-to-count population?

9        A    So there are certain subpopulations that

10   are lower self-response rates.  You know, recent

11   immigrants, you know, people in poverty, you know,

12   folks on tribal lands.                401/403

13       Q    How about noncitizen?

14            MS. BAILEY:  Objection.  Vague.

15            THE WITNESS:  Noncitizen, their recent

16   immigrants would be included in that.

17   BY MR. TILAK:

18       Q    How about households with limited English

19   proficiency, are they considered --

20       A    Yes.

21       Q    -- considered a hard-to-count population?

22       A    Yes.

Page 266

1     Q    In general, isn't it the case that more

2     nonresponse follow-up is needed for hard-to-count

3     populations compared to the population at large?

4     A    Yes.                        401/403

5     Q    Now, for the 2020 census, what is the

6     maximum number of times that an enumerator will

7     visit a household that has not self-responded?

8     A    I think, by design, six times.

9     Q    And six is not the number at which the

10    Census Bureau expects every household to have

11    responded, correct?

12            MS. BAILEY:   Objection.   Vague.

13            THE WITNESS:   So most households that

14    respond to NRFU will respond before six visits.

15    It's just some households are harder to get than

16    others.

17    BY MR. TILAK:

18    Q    Sir, so after six visits, some households

19    may still not have responded?

                                    401/403

20    A    Correct.

21    Q    And as compared to the U.S. population as

22    a whole, is it more likely that hard-to-count

Page 267

1   populations would still not be counted after those

2   maximum of six visits?

3          MS. BAILEY:  Objection.  Form.

4          THE WITNESS:  It is.  Hard-to-count

5   populations will have a higher proportion in the

6   higher count of NRFU visits.

7   BY MR. TILAK:

8       Q   And would they also have a higher

9   proportion in the amount of people who have not

10  been enumerated after the maximum of NRFU visits?

11         MS. BAILEY:  Objection.  Form.

12         THE WITNESS:  That's actually more

13  difficult to say.

14  BY MR. TILAK:

15      Q   Are you aware of any studies assessing

16  that question?

17      A   I know that imputation rates are slightly

18  higher, but it's hard to -- you know, the -- what

19  happens at the end of NRFU is -- is -- you know,

20  we seek proxy responses and that sort of thing, as

21  well.  So proxy rates are definitely higher

22  for hard-to-count communities.

Page 268

1     Q    And are proxy rates -- are proxies sought

2   for households that do not respond to nonresponse

3   follow-up?

4     A    Yes.

5     Q    Are they sought in any other circumstance

6   in the context of the decennial census?

7     A    If we received a response, we wouldn't

8   use a proxy response.

9     Q    So the only time you would use a proxy

10   response is if a household didn't respond in NRFU?

11     A    Yes.

12     Q    Now, the maximum of six visits, is that

13   set, in part, based on budgetary and staffing

14   considerations?

15     A    Yes.

16     Q    Because the census has a limited staff?

17     A    Yes.

18     Q    And limited budget?

19     A    And a limited budget --

20     Q    Budget?

21     A    -- and a limited schedule.

22     Q    And we just mentioned proxies.   Who

1    qualifies as a proxy for a nonresponding

2    household?

3         A    I don't understand the --

4         Q    Is it neighbors or landlords --

5         A    So you're asking who could give a proxy

6    response for --

7         Q    Right.

8         A    Typically, neighbors or other -- you

9    know, neighbors, sometimes maybe a postal worker.

10   You know, somebody with direct knowledge of the

11   number of people living in that house.

12        Q    How does the Census Bureau go about

13   identifying who has this knowledge, minimum

14   knowledge --

15             MS. BAILEY:  Objection.  Vague.

16             THE WITNESS:  So there are procedures and

17   NRFU training about what to do.  And, you know,

18   obviously, asking a neighbor is the key.

19   BY MR. TILAK:

20        Q    For the 2020 census, is there a maximum

21   number of proxy visits?

22        A    So we try -- if we haven't found anybody

1  by four or five, we start looking for a proxy

2  then.

3      Q    Is there a point in which you stop

4  looking for a proxy?

5      A    So, you know, the design is to stop at

6  six.

7      Q    And it's possible that after six visits,

8  you haven't gotten the response in nonresponse

9  follow-up and you also haven't gotten the response

10  in proxy; is that right?

11     A    That is true, yes.

12     Q    And is that the situation -- where you

13  haven't gotten the response in nonresponse

14  follow-up or proxy, is that a situation where you

15  would apply imputation?

16     A    Yes.

17     Q    And I think you mentioned this earlier,

18  but compared to the U.S. population generally, are

19  proxy rates for hard-to-count populations higher?

20     A    Yes.

21     Q    Are administrative records another way

22  that the Census Bureau can use to enumerate a

Page 271

1   household that has not self-responded?

2       A    Yes.

3       Q    And to determine the number of people who

4   live in a household, what administrative records

5   does the Census Bureau look at?

6       A    So a variety of administrative records.

7   So, importantly, you know, income tax returns,

8   other government administrative records from

9   Social Security or -- or various, you know,

10  assistance programs, SNAP or -- but also using

11  other information like, you know, whether the mail

12  is being delivered to the house at the current

13  time and that sort of stuff.

14          It's actually a pretty small share of

15  the -- you know, it's only like 4 percent of the

16  households can be enumerated that way, where we

17  have high -- high-quality records that are very

18  stable over a period of time.

19      Q    So the ability to use administrative

20  records applies to a fairly small portion of the

21  population; is that correct?          401/403

22      A    Of the NRFU population, yes.

1      Q    Of the NRFU population.

2           Compared to the U.S. population at large,

3    is the -- can administrative records be used to

4    enumerate hard-to-count populations at a smaller

5    rate than the U.S. population at large?

6           MS. BAILEY:   Objection.   Form.    401/403

7           THE WITNESS:   That is the case.

8    BY MR. TILAK:

9      Q    Is whole person imputation a mechanism

10   that the Census Bureau uses to enumerate

11   households that have failed to self-respond?

12     A    And failed -- non- -- didn't respond in

13   nonresponse follow-up.

14     Q    Does the Census Bureau try to obtain a

15   proxy response before resorting to --

16     A    Yes.

17     Q    -- whole person imputation?

18     A    Yes.

19     Q    And briefly, what is whole person

20   imputation?                    401/403

21     A    It's when the count in the house is

22   imputed and their characteristics are imputed.

Page 273

1      Q    How is that done?

2      A    Using neighborhood characteristics

3  and -- so --                401/403

4      Q    Where does the Census -- sorry.   Finish

5  your answer.

6      A    From the other people that have

7  responded.

8      Q    From what sources does the Census Bureau

9  determine the neighborhood characteristics that it

10 then uses to impute to the households?

11     A    So from the ACS, from administrative

12 records, but also, really important here, from the

13 other responses to the Census.

14     Q    Now, besides NRFU and proxy responses and

15 administrative records and whole person

16 imputations, are there any other methods that the

17 Census Bureau can use to enumerate a household

18 that fails to self-respond?

19     A    That's pretty much it.

20     Q    That's the whole list.

21          If there is a decline in the

22 self-response for a subpopulation within the U.S.

Page 274

1  population, is it your understanding that this

2  will be associated with an increase in the net

3  undercount of that population?

4      A    That's not necessarily the case.   It

5  would be an increase in the NRFU workload for that

6  population.

7      Q    And so if there's a decline in

8  self-response, then the NRFU workload would be

9  increased, correct?                    401/403

10     A    Yes.

11     Q    Are you aware of any studies that have

12  analyzed the relationship between a decline in

13  self-response in a particular subpopulation and

14  the net undercount for that subpopulation?

15     A    I'm not familiar with any.   That doesn't

16  mean they don't exist, so -- again, this is -- I'm

17  an economist, not a demographer.

18     Q    Do you know who would be the right person

19  to ask about this at the Census Bureau?

20     A    Karen Battle I would start with.   Or I

21  would add -- no.   Karen is a good person.

22     Q    And if there's a decline in the

1    self-response for a hard-to-count population,

2    would that be associated with the net undercount

3    for that hard-to-count population?

4        A    Again, not necessarily.  It means that we

5    would have a higher NRFU workload for that

6    population, and we may capture all of those folks

7    being NRFU.

8        Q    So the net undercount would be avoided if

9    the NRFU procedures were as effective for that

10   hard-to-count population as for the population at

11   large; is that a fair statement?

12       A    Or as is -- as good as they were for that

13   subpopulation before.

14       Q    Could you explain that?

15       A    Well, you know, you're trying to

16   enumerate this subpopulation, so if only the

17   self-response is now at issue but NRFU is not an

18   issue, you should be able to pick everybody else

19   up with NRFU, so.

20       Q    Now, you testified earlier about the

21   memos that Dr. Abowd prepared on January 19th and

22   March of 2018.  Was it your testimony that you

Page 278

```
 1      A   No.
 2      Q   So you would agree that the
 3   inclusion -- or the citizenship question could
 4   potentially be much more burdensome and would lead
 5   to a larger decline in self-response for
 6   noncitizen households?
 7      A   Correct.
 8      Q   And noncitizen households here are any
 9   households with at least one noncitizen?
10      A   Correct.
11      Q   And then if we could turn to Exhibit 16,
12   which I believe is the March 2018 memo, starting
13   Bates was 0009812, I believe.
14      A   I don't have it.
15          Thank you.  This is the questions.  It's
16   not the -- you're looking for the Secretary's
17   memo?
18      Q   Correct.  Yes.  I apologize for that
19   confusion.
20          If I can direct you to Bates ending on
21   15, the last full paragraph that starts, "how
22   might inclusion."
```

1      A    Uh-huh.

2      Q    Halfway through that paragraph,

3  "Inclusion of a citizenship question on the 2020

4  census questionnaire is very likely to reduce the

5  self-response rate pushing more households into

6  NRFU."

7          Do you agree with that statement?

8      A    Yes.

9      Q    And then the last statement in that -- or

10  the second to last sentence in that paragraph,

11  "Those refusing to self-respond to the citizen

12  question are particularly likely to refuse to

13  respond in NRFU, as well, resulting in a proxy

14  response."

15      A    Uh-huh.

16      Q    Do you agree with that statement?

17      A    Yes.

18      Q    So would it be fair to say between these

19  two memos, that it is likely that a citizenship

20  question will lead to a decline in self-response

21  among noncitizen households?

22      A    That's what the analysis predicted, yes.

Page 280

1      Q    And then these noncitizen households who

2   did not respond because of the citizenship

3   question were particularly likely to refuse to

4   respond in NRFU, as well?

5      A    Yes.

6      Q    And that would result in a proxy

7   response?

8      A    Correct.

9      Q    In evaluating the citizenship question,

10   did anyone at the Bureau look at the efficacy of

11   non-response follow-up procedures for noncitizen

12   households in comparison to other segments of the

13   population?

14      A    Not in -- I don't think that was -- we

15   have other things that look at efficacy of NRFU

16   procedures.   That was not done as part of this

17   analysis.

18      Q    Apart from this analysis, was any study

19   of the efficacy of nonresponse follow-up

20   procedures for noncitizen households compared to

21   other parts of the population done at the

22   Census Bureau?

Page 281

1      A    So I'm not sure if there -- I'd have to

2   go back and see if there was really a study that

3   had that as its goal, but analyzing the -- you

4   know, procedures and how well, you know, our

5   instruments work and stuff like that was,

6   obviously, a big part of the '18 test, so --

7      Q    But you're not aware of a study that

8   focused specifically on looking at efficacy for

9   the noncitizen --

10     A    No.

11     Q    -- households --

12     A    No.

13     Q    And you said that was tested in the

14  end-to-end test?

15     A    NRFU procedures were, yes.

16     Q    And the end-to-end test did not contain

17  the citizenship question, correct?

18     A    Correct.

19     Q    Did anyone at the Bureau evaluate the

20  efficacy of nonresponse follow-up procedures for

21  Hispanic households or households with limited

22  English proficiency as compared to the general

1    U.S. population?

2        A    So, again, you know, the answer there is

3    the same.   We do try to have in-language people as

4    enumerators.   So there's often an after-event

5    analysis of how well that seems to work, so.

      401/403

6        Q    But you're not aware of any specific test

7    that targeted that question?

8        A    No, not -- not specifically.

9        Q    How about -- did the Bureau evaluate the

10   efficacy of nonresponse follow-up procedures based

11   on census tract or based on state?

12       A    On census or state?

13       Q    Yes.

14       A    I mean, obviously, we look at -- we look

15   at things by the characteristics of different

16   units of geography, but, you know, I'm not sure

17   what you mean by -- what -- what specifically are

18   you trying to get at here?

19       Q    Are there any tests that look at whether

20   certain census tracts are harder to enumerate

21   through nonresponse follow-up procedures than

22   other citizen tracts?

1      A   So, I mean, we already -- we already know

2   that, to some degree, because we know that those

3   tracts are made up of higher proportions of

4   hard-to-count populations, so that's -- I don't

5   know what the test is that you're looking for

6   here.  So --

7      Q   And then you mentioned for these

8   noncitizen households that are likely to not

9   self-respond and then will refuse to answer in

10   NRFU, that a proxy response would be required.  In

11   evaluating the citizenship question, did the

12   Bureau consider whether -- consider the

13   availability of proxies -- let me rephrase.

14          In evaluating the citizenship question,

15   did anyone at the Bureau consider whether the

16   availability of proxy was the same for noncitizen

17   households as for other parts of the U.S.

18   population?

19      A   Not that I know of.

20      Q   How about for Hispanic households or

21   households with limited English proficiencies?

22      A   Yeah.  I don't think we've broken

Page 284

1    that -- I mean, neighbors are neighbors, so.

2        Q    And has the Bureau done any analysis of

3    the availability of proxies that's broken down by

4    census tract or by state?                401/403

5        A    No.

6        Q    Has any analysis been done by the Bureau

7    on the willingness of proxies to respond for

8    noncitizen households versus the U.S. population

9    at large?

10       A    Not that I know of.

11       Q    The same question with respect to proxies

12   for Hispanic households or households with limited

13   English proficiency.

14       A    No.

15       Q    If proxies were less available for

16   noncitizen households, then fewer of these

17   noncitizen households that did not respond to NRFU

18   would be enumerated through proxies, correct?

19           MS. BAILEY:   Objection.   Calls for

20   speculation.

21           THE WITNESS:   Presumably.

22   BY MR. TILAK:

1       Q    We already briefly discussed

2    administrative records.   In evaluating the

3    citizenship question, did anyone at the Bureau

4    consider the differential quality or availability

5    of administrative records for noncitizen

6    households as compared to the U.S. population?

7             MS. BAILEY:   Objection.   Form.

8             THE WITNESS:   Yeah.   That was analyzed in

9    2010.                    401/403

10   BY MR. TILAK:

11       Q    What test was that analyzed in?

12       A    I believe it was called the census 2010

13   match study.

14       Q    What was the impetus for that test?

15       A    It was one of the regular tests we ran as

16   part of the 2010 program.

17       Q    Briefly, what were the findings of that

18   study?

19       A    So the study basically documented how

20   well we could match census responses, including

21   NRFU and proxy responses, to administrative

22   records.

Page 286

1        Q    And did that study also look at the

2    availability of administrative records for

3    Hispanic households --

4        A    That --

5        Q    -- and households of --

6        A    That --

7        Q    -- limited English --

8        A    That would --

9        Q    -- proficiency?

10       A    -- so it was able to demonstrate that

11   hard-to-count populations had lower-quality

12   administrative records.

13            (Thereupon, reporter requested to speak

14   one at a time.)

15   BY MR. TILAK:

16       Q    And when you say lower-quality

17   administrative records, that means that the

18   administrative records could be used to enumerate

19   those households less of the time?

20       A    Correct.

21       Q    Now, with respect to whole person

22   imputation, in evaluating the citizenship

Page 287

1   question, did anyone evaluate whether whole person

2   imputation was less accurate for households with

3   noncitizen as opposed to the population at large?

4       A    I'm not sure that that -- that's been

5   done.  I imagine it probably would be, but I don't

6   know what study that is.

7       Q    You haven't seen any study that looks at

8   this question?                          401/403

9       A    I don't recall seeing it, no.

10      Q    Has anyone evaluated the accuracy of

11  whole person imputation for Hispanic or households

12  with limited English proficiency compared to the

13  population at --

14      A    Same.

15      Q    -- large?

16      A    Same.

17           My guess is there's a study out there,

18  I'm just not familiar with it.

19      Q    Was any such study, to your knowledge,

20  part of the review of the citizen question in

21  preparation for the decennial --

22      A    No.

Page 288

1      Q      -- census?

2             Did anyone evaluate the accuracy of whole

3      person imputation based on census tract or state?

4      A      I -- I don't know, but that would have

5      been done, probably, in a post-enumeration survey

6      type thing.   Would not have been able to evaluate

7      it by state, so.                401/403

8      Q      And by post-enumeration survey, what do

9      you mean by that?

10     A      So that's something we do afterwards to

11     assess the quality of the census.

12     Q      So the last time that that would have

13     been done would have been after the 2010 census?

14     A      2010, yes.

15     Q      Do you know if any such survey was used

16     in preparations for this 2020 census?

17     A      So you can only do a post-enumeration

18     survey after you do a census.   So we did use those

19     results to inform our plans and procedures for

20     2020.

21     Q      Are you aware of any specific calculation

22     of the additional costs that would be incurred to

1    make up for a decline in self-response or failure

2    to not -- failure to answer a NRFU as a result of

3    this citizenship question?

4             MS. BAILEY:   Objection.   Compound.

5             THE WITNESS:   So I believe in the -- in

6    the -- not this memo -- well, it probably is in

7    this memo, too -- but there was a computation of

8    what the expected increase in nonresponse

9    follow-up costs would be.

10   BY MR. TILAK:

11        Q    Do you remember what the calculation was?

12        A    Offhand, I think it was in the, you know,

13   20 to $40 million range, something like that.

14        Q    Was that a conservative estimate?

15        A    A conservative -- yeah.   I think they

16   thought it -- that that was potentially a lower

17   bound.

18        Q    Are you aware of any calculation at the

19   upper bound of what the cost might be?

20        A    Not of an upper bound, no.

21        Q    Earlier today we discussed sensitive

22   questions.   Is it accurate that if a question is

Page 290

1   sensitive to a particular population, that

2   population might fail to respond to that

3   particular question?   401/403

4        MS. BAILEY:   Objection.   Calls for

5   speculation.

6        THE WITNESS:   So to the degree that

7   sensitive questions have lower self-response

8   rates, that could potentially be true, yeah.

9   BY MR. TILAK:

10      Q   And if there's a sensitive question on a

11  questionnaire, does the presence of that question

12  increase the likelihood that a person will not

13  respond to the questionnaire as a whole?

14      A   Again, that -- that could happen, yes.

15      Q   We -- you also talked about cognitive

16  testing at some length this morning.   What does it

17  mean for a question to be cognitively difficult?

18      A   So the person doesn't understand what

19  we're asking.

20      Q   And if a question is cognitively

21  difficult, does that increase the likelihood that

22  the respondent will fail to answer that specific

1    question on the questionnaire?

2         A    Yes.

3         Q    Does it also increase the likelihood that

4    the respondent will fail to respond to the

5    questionnaire as a whole?

6         A    That, I -- I -- I'd have to see studies

7    on that.  As surveys go, census questions are

8    typically not that cognitively difficult.  Health

9    surveys are far more cognitively difficult, just

10   to give you a -- some parameters.

11        Q    Is there -- is there a threshold in your

12   mind for when a question is cognitively difficult?

13        A    Not in my mind.  I would leave that up to

14   the folks that would evaluate that sort of thing.

15        Q    And who would those people be?

16        A    So we have some survey methodologies that

17   look at that type of thing, as do other survey

18   organizations.

19        Q    For the 2020 census, the citizenship

20   question will be placed at the end, correct?

21        A    Correct.                    401/403

22        Q    What was the reason for that?

Page 292

1      A    Since it was added late, it was placed at

2   the end.

3      Q    That particular ordering was not tested

4   in any way, correct?                401/403

5      A    No, it wasn't.

6      Q    But households are still required to

7   answer the citizenship question, correct?

8      A    Yes, they are.

9      Q    Even though it's placed at the end?

10     A    Yes.

11     Q    The Census Bureau has not communicated to

12   the public that the citizenship question is

13   optional, to your knowledge?

14     A    No.

15     Q    Do you know if DOJ has communicated to

16   the public whether the citizenship question is

17   optional?

18         MS. BAILEY:  Objection.  Foundation.

19         THE WITNESS:  Well, the Census Bureau's

20   position is that it is not, so.

21   BY MR. TILAK:

22     Q    In fact, a person faces penalty for

Page 295

1  questionnaires must satisfy some statutory or

2  regulatory need; is that correct?

3      A   Correct.

4      Q   And generally, the Census Bureau only

5  asks questions that are requested by an agency,

6  correct?

7      A   Yes.  That's correct.

8      Q   And the impetus for adding the

9  citizenship question here was the DOJ's Gary

10  letter --

11      A   Yes.

12      Q   -- correct?

13          And this letter asked for block-level

14  citizenship data, correct?

15      A   Correct.

16      Q   And the Census Bureau decided to use the

17  ACS question, correct?

18      A   That's correct.

19      Q   When in the process did the Census Bureau

20  decide that if they were going to ask a

21  citizenship question, it would be the ACS

22  question?

1      A    Early in the process.   Given the tight

2   time constraint, we didn't really have time to

3   consider an alternative, and this has the added

4   benefit that it's completely comparable with the

5   ACS data.

6      Q    The ACS question asks for more than just

7   citizenship, though, correct?

8      A    It has multiple questions.    401/403

9      Q    It asks whether someone was born in the

10  United States or U.S. territories?

11     A    Correct.

12     Q    Did DOJ ask for data on where a person

13  was born?

14     A    They did not.

15     Q    To your knowledge, was this information

16  necessary to satisfy DOJ's needs?

17         MS. BAILEY:   Objection.   Foundation.

18         THE WITNESS:   Which information?

19  BY MR. TILAK:

20     Q    The information on whether someone was

21  born, for example, in the U.S. territories?

22     A    I don't think that -- that -- I'm not

Page 297

1    sure what you're asking here.

2        Q    Well, the DOJ asked for citizenship

3    information?

4        A    Right.

5        Q    Is information on where someone was born

6    responsive to that request apart from the earlier

7    question, are you a citizenship or not?

8        A    No.   So, I mean, that's the way the ACS

9    question is read, so that's what we went with, so.

10       Q    The ACS question also requests whether

11   individuals were born abroad to U.S. citizens?

12       A    Correct.                          401/403

13       Q    DOJ did not specifically ask for that

14   information, correct?

15       A    No.   They did not.

16       Q    The ACS question asks if a citizen is

17   naturalized, correct?

18       A    Correct.

19       Q    And, again, that was not specifically

20   requested by DOJ?

21       A    No.

22       Q    It also asks the year someone was

Page 298

1    naturalized, if they were a naturalized citizen?

2        A    Yes.

3        Q    And DOJ doesn't ask for this information

4    either, correct?                    401/403

5        A    No, it does not.

6        Q    At any point, did the Census Bureau ever

7    consider a question that simply asked, are you a

8    citizen; yes or no?

9        A    Again, that would have required a much

10   lengthier period of time.  It would have required

11   testing and what have you.  And so given the time

12   frame and the desire to have comparability to the

13   ACS, a decision was made to go with the ACS.

14       Q    So is it a fair statement that because of

15   the compressed timeline, the Census Bureau went

16   with a question that asks for extraneous

17   information not responsive to the DOJ's request?

18            MS. BAILEY:  Objection.

19            THE WITNESS:  That information is

20   currently used by -- by DOJ right now.  I would

21   assume that, you know, they would still find that

22   useful.

Page 299

1    BY MR. TILAK:

2         Q    Did they specifically request it --

3         A    They did not.

4         Q    Now, we talked a little bit about some of

5    the evidence that Dr. Abowd cites in his memos for

6    why there might be a decline in self-response

7    rates.                    401/403

8              Was there any affirmative evidence you're

9    aware of suggesting that there would not be a

10   decrease in response rates as a result of this

11   citizenship question?

12        A    No.

13        Q    To go back for a second, when the

14   decision was made to use the ACS formulation, who

15   made that decision?

16        A    That was a conversation within the

17   Census Bureau.

18        Q    Was the Commerce Department involved in

19   any way?

20        A    No.

21        Q    Do you know if DOJ was involved in any

22   way?

1      Q    And how are they different?

2      A    Well, they're meant to test procedures

3  and processes and --

4      Q    If the Census Bureau had known about the

5  citizenship question request in February of 2017,

6  would it have been able to do more testing of that

7  question?

8      A    We certainly would have had more time to

9  do testing.  Whether it would have been as

10  definitive as we would have liked, I doubt it.  It

11  still would not have been in the decennial

12  environment of, you know, this spring, summer of

13  2020.

14      Q    Would it have been -- let me rephrase.

15          If the citizenship question had been

16  requested in February of 2017, would the

17  Census Bureau have been able to include it in the

18  2018 end-to-end test?

19          MS. BAILEY:   Objection.   Calls for

20  speculation.

21          THE WITNESS:   So if a decision had been

22  made prior to the development of the materials for

1    the 2018 end-to-end test, we would have included

2    it because it was part of the census.  We ran what

3    we thought was the census.  Again, we weren't

4    testing the questions in the 2018 end-to-end test.

5    We were testing the systems and procedures.

6    BY MR. TILAK:

7        Q    And what systems and procedures,

8    specifically?

9        A    All of the data collection procedures,

10   all of the data processing procedures, the review

11   and publication of the date products.

12       Q    Did that include nonresponse follow-up

13   procedures?

14       A    It did.

15       Q    And did it include proxy response

16   procedures?

17       A    It did.

18       Q    And whole person imputation procedures?

19       A    It will.

20       Q    And based on Dr. Abowd's analysis, is it

21   accurate that the inclusion of a citizenship

22   question will increase the NRFU workload?

```
 1      A    That's -- we believe that to be the case,
 2  yes.
 3      Q    And is it also an accurate statement
 4  because people who chose to -- who refuse to
 5  respond -- self-respond because of a citizenship
 6  question will also not respond to NRFU and the
 7  proxy workload will also be increased --
 8          MS. BAILEY:   Objection.
 9  BY MR. TILAK:
10      Q    -- in the 2020 census?
11      A    So we do believe it will lead to an
12  increase in the proxy rate.  Less confident about
13  that rate, though, because it's a smaller rate.
14      Q    What do you mean by that?
15      A    Well, the number of proxy responses at
16  the end is relatively small compared to the NRFU
17  workload.
18      Q    And of that proportion that's left over
19  for proxy are hard-to-count populations a
20  disproportionate part of the proxy response
21  population as it --
22      A    Yeah.  That's part of what it means to be
```

1    hard to count, I believe.

2        Q    Turning to 1317 on this memo, the last

3    sentence -- well, let's start with the sentence

4    above that.   "No one provided evidence that there

5    are residents who would respond accurately to a

6    decennial census that did not contain a citizen,

7    but would not respond if it did, although many

8    believe that such residents had to exist."

9            Does the Census Bureau have any evidence

10   responsive to this question here?

11       A    So I think the Census Bureau's analysis

12   suggested that there would be some folks who would

13   have answered the question through

14   self-response -- or responded via self-response

15   that would now have to go to NRFU.   Accuracy of

16   NRFU responses is less than self-response and

17   proxy response is less than NRFU responses.

18       Q    So this is -- it's your testimony that

19   this is not an accurate statement, that the

20   Census Bureau did, in fact, provide evidence?

21       A    So this is the Secretary's assessment of

22   the evidence that was provided to him total, so.

Page 309

1      Q    But your testimony is the Census Bureau
2   did provide evidence; is that correct?
3      A    Yes.
4          MR. TILAK:  We can go off the record for
5   five minutes.
6          MS. BAILEY:  Oh.  Taking a break?
7          MR. TILAK:  Yeah.
8          VIDEOGRAPHER:  The time is 3:44 p.m.
9   This completes Media Unit Number 3.  We are now
10  off the record.
11          (Off the record.)
12          VIDEOGRAPHER:  The time is 3:56 p.m.
13  This begins Media Unit Number 4.  We're now on the
14  record.
15          Please proceed, Counsel.
16          EXAMINATION BY MS. SHAH:
17      Q    Good afternoon.  My name is Niyati Shah,
18  and I represent the plaintiffs in Lupe v. Ross in
19  the District or Maryland, Case Number 8:1801570.
20          Dr. Jarmin -- of course.
21          I'd like to actually just go back to the
22  discussion we had earlier today about the race and

Page 310

1    ethnicity question.

2           Would you characterize combining the two

3    census questions on race and ethnic origin for the

4    2020 census as modifying the 2020 census

5    questionnaire, as compared to 2020 census, or

6    adding a new question to the 2020 census?

7           MS. BAILEY:  Objection.  Compound.

8           THE WITNESS:  As modifying.

9    BY MR. SHAH:

10       Q    Okay.  Is it your understanding that the

11   Census Bureau fielded a National Content Test or

12   the NCT in 2015 in large part to evaluate the best

13   way to collect race and ethnicity data for the

14   2020 census?

15       A    Yes.

16       Q    And that included the possibility of a

17   combined race and ethnicity question, correct?

18       A    It did.

19       Q    Among other things, did the NCT test for

20   the wording of a combined race and ethnicity, as

21   well as revised wording for a separate race and

22   ethnicity question?

Page 311

1       A    I --

2            MS. BAILEY:   Objection.   Compound.

3            THE WITNESS:   I believe it did both.

4   BY MS. SHAH:                401/403

5       Q    And did the NCT test for a design and

6   placement of the combined race and ethnicity

7   question?

8       A    I'm not sure if it did placement or not.

9       Q    And did the NCT test for instructions for

10  each iteration of the race and ethnicity question?

11      A    Yes.

12      Q    And as well for the questionnaire, as

13  well?

14      A    I'm not sure for the -- entire

15  question -- I mean, I know for each of the

16  versions of the question, it had different

17  versions of the instructions.

18      Q    And would you characterize the NCT as a

19  randomized controlled test?

20      A    It was.

21      Q    And would the NCT also be considered

22  field testing?

Page 312

1        A    Yes.

2        Q    And from the NCT, would the Census Bureau

3   be able to tell how certain demographic subgroups

4   responded to the race and ethnicity question?

5        A    Yes.                    401/403

6        Q    Would they be able to tell how Hispanics

7   responded?

8        A    Yes.

9        Q    How about Asians?

10       A    Yes.

11       Q    What about Native Americans?

12       A    I believe so, yes.

13       Q    And would they also be able to show how

14   populations in certain geographic regions

15   responded?

16       A    I'm not sure about geographic regions, so

17   I'd have to go back and review the -- it was a

18   large test, because it needed to be able to

19   breakdown by these various race and ethnic

20   categories.  But, obviously, some of those get

21   pretty small if you break it into smaller

22   geographies.  So I'm not sure that it had much to

Page 313

1    say geographically, but I'd have to go back and

2    review the parameters of the test to answer that

3    more fully.

4        Q    Okay.  Fair enough.

5             And it's correct that the Census Bureau

6    staff recommended that the 2020 census include a

7    combined race and ethnicity question with a new

8    MENA category and check boxes for collection of

9    racial subgroup data pending a parallel effort at

10   OMB to revise the official standards?

11       A    Yes.                    401/403

12       Q    After the Census Bureau staff made this

13   recommendation to the Census director, they

14   initially planned to include this race and

15   ethnicity question in the 2018 end-to-end test in

16   Rhode Island, correct?

17       A    That is correct.

18       Q    And if that combined race and ethnicity

19   question stayed in the testing -- the end-to-end

20   testing, would that represent a redesign of the

21   questionnaire for 2020 census?

22       A    So --

Page 317

1      Q   Would it have -- I asked if it would have

2   informed the Census Bureau's development of the

3   data collection instruments for the nonresponse

4   follow-up?

5          MS. BAILEY:  Same objection.

6          THE WITNESS:  So I'm not sure how it

7   would have informed.  The other forms, when you

8   asked if it was going to be on there --

9   BY MS. SHAH:

10     Q   Yeah.

11     A   -- the answer was yes, so.

12     Q   Okay.  And would -- would the results of

13  the end-to-end test, if the race and ethnicity

14  question was -- remained in there as recommended

15  by the staff, would it have informed the

16  development of training modules for enumerators?

17          MS. BAILEY:  Objection.  Calls for

18  speculation.

                                    401/403

19          THE WITNESS:  So part of the end-to-end

20  test is to review procedures.  So regardless of

21  what form of various questions are on there, it's

22  going to inform refinements to training

Page 318

1    procedures.

2    BY MS. SHAH:

3        Q   Okay.  Just, generally speaking, how

4    would the Census Bureau go about estimating costs

5    for a nonresponse follow-up program?

6        A   So a lot of it is based on past practice.

7    So we know, approximately, what the workload's

8    going to be.  We know what we're going to pay our

9    enumerators, sort of a -- there's a rough formula

10   that they use to estimate these things, based

11   on -- you know, historical practice of NRFU and

12   other things we've learned from the ACS and what

13   have you.

14       Q   Anything else?

15       A   No.

16       Q   Would a scientifically-rigorous

17   calculation of these costs include basing

18   estimates on iterative field testing and other

19   research conducted over the years in the census

20   planning phase?

21            MS. BAILEY:   Objection.   Compound.

22   Objection.   Form.                    401/403

1        THE WITNESS:   So we try to update the

2    cost models as best we can with relevant

3    information.   If some of that was gleaned from

4    mid-decade tests, we would have added that in

5    there.                401/403

6    BY MS. SHAH:

7        Q    Okay.   And would the final calculation or

8    estimate also factor in results from the

9    end-to-end test?

10        A    So, yes.   It may.   So, I mean, we have

11    changed procedures that affect the productivity of

12    the enumerators, which is a large cost driver, so

13    that will be incorporated into updated models.

14        Q    But cal- -- so would calculations be

15    based solely on the self-response rate from the

16    previous census or ACS?

17        A    No.   So it's based on the self-response

18    rate.   It's based on the productivity of the

19    enumerators in the field, based on wages and what

20    have you.   So, you know, those are the three main

21    cost drivers.   What's the workload?   What's

22    productivity?   What's the cost per hour of

Page 324

1       A    So this was a team put together that

2   consisted of both Census and Commerce Department

3   officials at the direction of the Secretary.  So

4   shortly after he came on board, there was some --

5   some cost overruns on various things, and this was

6   an attempt to get a broad handle on things.

7       Q    And the -- did this assumption of a

8   3 percent increase factor in the addition of a

9   citizenship question?    401/403

10      A    No.

11      Q    Okay.  I'd like to mark the next document

12  as Exhibit 25, I believe.

13           (Plaintiffs' Exhibit 25, Memorandum, was

14  marked.)

15  BY MS. SHAH:

16      Q    So are you familiar with this memo?

17      A    I am, yes.

18      Q    What is this memo about?

19      A    This was some work that was being done

20  looking at, you know, sort of various response

21  propensity type things for the ACS, I believe.

22      Q    What do you mean by various response

1      Q   Where enumerators are --

2      A   Temporary.

3      Q   And are they trained differently, field

4  representatives?

5      A   Well, field representatives are trained

6  to do the surveys that they conduct.  So they go

7  out in the field and do far more complex surveys

8  than the decennial.  So they're trained for each

9  of surveys that they do.  So they do the current

10  population surveys, the SIPP, the ACS, the

11  American Housing -- you know, there's a long list

12  of surveys that they do that are either

13  Census Bureau surveys or surveys we do on a

14  reimbursable basis for government agencies.

15      Q   So is it fair to say field

16  representatives have more training than

17  enumerators?                          401/403

18      A   They would certainly have more experience

19  and training.

20      Q   And then on Page 2, field representatives

21  have asked for additional training to help them

22  overcome these fears regarding confidentiality and

Page 335

1   So there's a lot of stuff in here that doesn't

2   refer to the technical characteristics that Census

3   did not opine on.

4   BY MS. SHAH:

5       Q   And from the technical perspective, was

6   there anything that they opined on?

7           MS. BAILEY:   Objection.   Vague.

8           THE WITNESS:   No.   I think we took what

9   we -- what we perceived from this letter as the

10  technical requirements from DOJ for block-level

11  data and tried to come up with a solution for that

12  problem.

13  BY MS. SHAH:

14      Q   And did you discuss this letter with any

15  knowledge of jurisdictions actually going about

16  drawing districts?

17      A   No, not really.   I mean, we have people

18  in our redistricting office that had some input on

19  this.   But they provide the data.   They're not

20  involved in redrawing districts.

21      Q   Did you discuss this letter with anyone

22  who had knowledge or experience with litigating

1    Section 2, voting rights cases?

2          A    No.                               401/403

3          Q    And what was your understanding of why

4    DOJ needs to have this citizenship question asked

5    on the short form?

6          A    So they needed more geographically

7    granular data.  So right now, the no PL94 data at

8    the block level, these data for the five-year ACS

9    are at the block group level, and they have to

10   model them down to the block level.  They just

11   wanted the data at the same level of geographic

12   specificity that would be more accurate data.

13         Q    Okay.  If you look at the bottom of

14   Page 2, the General Counsel sets out a bulleted --

15   bulleted reasons why he believes the ACS does not

16   yield annual data for enforcing the Voting Rights

17   Act.  The first bullet contends jurisdictions

18   conducting redistricting use -- redistricting use

19   total population data from Census to determine

20   compliance with the Constitution's one-person,

21   one-vote requirement.  What is your understanding

22   of that requirement?

Page 350

1   on what we're going to do.  So --

2        Q    And what would be the purposes of talking

3   points in this context?

4        A    So to be able to have a clear message

5   about, you know, how we were responding with the

6   citizenship -- the process that we were following

7   on the citizenship question.

8        Q    And if I can turn your attention back to

9   the draft, which is marked as Exhibit 28, do you

10  recall if that letter and the content in that

11  letter seemed to you to be an appropriate basis

12  for creating talking points to address questions

13  about the citizenship question?

                                    401/403

14       A    Yeah.  And it wasn't about the

15  citizenship question.  It was about what we were

16  doing in response to the question.  So --

17       Q    And -- and to clarify, what you were

18  doing in response to DOJ's inquiry about --

19       A    Right.

20       Q    -- adding a citizenship question?

21       A    Right.

22            So this seems to be a consistent -- so I

Page 351

1  don't remember if this is exactly what we agreed

2  to, but --      401/403

3      Q    And the middle of this letter, it goes

4  through five steps, correct?

5      A    Uh-huh.

6      Q    And those five steps are summarized in

7  numerous documents that we've looked at today --

8      A    Right.

9      Q    -- for your deposition?

10     A    Yes.

11     Q    Is this a standard process that the

12  Census Bureau uses for adding questions to the ACS

13  and then also to the decennial census?

14     A    Correct.                    401/403

15     Q    Okay.  I want to mark this as Exhibit 30?

16          (Plaintiffs' Exhibit 30, Letter, was

17  marked.)

18  BY MS. BRANNON:

19     Q    Are you familiar with this document?

20     A    I'm not sure if I've seen this or not,

21  but I think I've seen other letters like this,

22  though.

Page 353

1      Q   Would you typically approve a letter like

2   this?

3      A   I mean, especially if it's a form and we

4   were discussing it in, you know, sort of the

5   correspondence group, I probably would have seen

6   it.

7      Q   Would your log show whether you approved

8   this letter or not?

9      A   I'm not sure that it would show that I

10  approved it or not.

11     Q   Would it show whether you received a

12  letter that was dated January -- January 31, 2018?

13     A   So it -- it would show if I received a

14  letter, yes.

15     Q   Would it show if you received a draft of

16  a letter that was to go out on January 31, 2018

17  from Secretary Ross?

18     A   That, I'm not sure.

19     Q   This letter is markedly different than

20  what we have marked as Exhibit 28, correct?

21     A   Correct.                    401/403

22     Q   And none of the five steps are

Page 354

1    removed -- or all of the five steps were removed,

2    none of those are in the January 31, 2018 letter?

3        A    That's correct.                    401/403

4        Q    Do you remember any discussions with

5    anyone at Commerce about the changes of this

6    letter to the draft of the version that Secretary

7    Ross sent out?

8        A    I don't -- not offhand, no.

9        Q    Would you have had any conversations with

10   Karen Dunn Kelley about this letter?

11       A    I don't know.

12       Q    I'm going to turn your attention to what

13   I'm going to mark as Exhibit 31.

14           (Plaintiffs' Exhibit 31, Email, was

15   marked.)

16   BY MS. BRANNON:

17       Q    Are you familiar with this document?

18       A    This sounds like KDK responding to my

19   original email that we discussed earlier.

20       Q    And she says, "Gentlemen, can you please

21   sort through the issues below?"        401/403/802

22           Do you know what she meant by that?

Page 355

```
 1       A    I think we were trying to track down the

 2   changes, yeah.

 3       Q    And when you say track down the changes,

 4   these were changes that were made by somebody at

 5   the Commerce Department?              401/403

 6       A    I think so, yeah.

 7       Q    And that would have been at some point

 8   before January 24, 2018?

 9       A    The changes?

10       Q    Yes.

11       A    Yeah.  I assume so, yeah.

12       Q    And do you have any recollection as to

13   whether you received those changes?

14       A    So I don't recall, per se.

15       Q    Do you remember having any conversations

16   with anyone about -- at Commerce about the content

17   of the letters that Secretary Ross was sending to

18   members of Congress in response to inquiries about

19   the citizenship question?

20       A    No.  I mean, again, this was -- you know,

21   there was lots going on.  This was not a -- you

22   know, a key focus point.  We were trying to
```

Page 363

1     A   I think this looks familiar.

2     Q   I'm going to direct your attention to the

3  email from Burton Reist on January 24, 2018, which

4  I acknowledge you were not cc'd on, but I just

5  have a question for you, if you know.  In the

6  middle of the email that's at the bottom of

7  Page 8558, it says, "We pulled the residence

8  criteria topics from the PMR."

9        What is the PMR?

10    A   Program management review.  We do one

11 quarterly for the decennial census.

12    Q   Was there a program management review

13 done in January of 2018?

14    A   I have to go back and look, but there

15 probably would have been one in there -- at some

16 point.                    401/403

17    Q   Okay.  And then if you'll turn the page

18 over to 8559 it says, "We also haven't heard

19 anything about the response to the

20 senator" -- "about the response to Senator Harris

21 on the citizenship question.  That response is to

22 inform the talking points we use on this issue for

Page 364

1    the PMR."

2        A    Correct.

3        Q    And that's the performance management

4    review?

5        A    Program management review.    401/403

6        Q    Program management review.

7        A    Right.  And we're only two days out from

8    the PMR, so there you go.

9        Q    Right.  Okay.  So we're only two days

10   out, so there was one coming?

11       A    So there's some urgency that we were

12   going to be expected to say something about this.

13       Q    Right.  Are you involved in the drafting

14   materials for the PMR?

15       A    No, we're not directly.

16       Q    Not directly.

17       A    No.

18       Q    Do you have any awareness of whether the

19   materials drafted for the PMR that was done two

20   days after this email was sent relied on that

21   draft email -- that draft letter from

22   Senator Harris?

1     Q    In the middle, the second thing down says

2    testing, correct?

3     A    Uh-huh.

4     Q    Let me go back.   This looks similar to

5    the five points that were outlined in that draft

6    letter to Senator Harris, correct?

7     A    Correct.                    401/403

8     Q    So it doesn't appear that there were any

9    changes that were made between the time that email

10    took place on the 24th and when this presentation

11    was done?

12     A    That's correct.

13     Q    So then I'm going to direct your

14    attention to the testing, which is the second

15    point down on Page 23.

16     A    Right.

17     Q    And it says, "Question performance is

18    evaluated in a field test."

19     A    Uh-huh.

20     Q    What do you mean -- what is meant by

21    question performance?

22     A    So, again, there's sort of the cognitive

1      A    I don't understand the -- so we've jumped

2    to NRFU here?

3      Q    Yes.

4      A    So are you talking about NRFU generally

5    or are you --

6      Q    Yes.  When you're doing field testing,

7    are you looking for things like the efficacy of

8    nonresponse follow-up?

9      A    So I don't know what you mean by

10   efficacy, per se.  But certainly in the, like,

11   2018 end-to-end field test --

12     Q    Yes.

13     A    -- we tested our systems and procedures

14   for NRFU during that test.

15     Q    And when you say you tested your system

16   and procedures, that was to do an evaluation of

17   how effective the nonresponse follow-up was during

18   the 2018 end-to-end test?        401/403

19     A    Yes.

20     Q    So that is something you would learn from

21   a field test?

22     A    Yes.  And primarily to see that the

Page 369

1   systems and procedures worked as planned.

2       Q    And is that an evaluation as part of the

3   evaluation that is currently going on right now

4   for -- of the results of the end-to-end field

5   test?                        401/403

6       A    Yes.

7       Q    All right.  I'm going to switch gears,

8   and I just have a few more questions, and then I

9   think we have one more person who is going to

10  -- and then we'll be done with you for tonight.

11           I think you testified earlier citizenship

12  is on the CPS, this --

13      A    Current Population Survey.

14      Q    -- Current Population Survey; is that

15  correct?

16      A    That's my understanding, yes.

17      Q    And then I think you said the

18  Census Bureau is tracking item nonresponse rates

19  on the CPS to the citizenship question; is that

20  correct?

21      A     We tracked item nonresponse rates for all

22  of the questions.

Page 376

1        A    I'm not sure.

2             MS. BRENNAN:   That's all I have.   Can we

3    go off the record just for a minute?

4             VIDEOGRAPHER:   Time is 5:07 p.m.   We're

5    going off the record.

6             (Off the record.)

7             VIDEOGRAPHER:   The time is 5:17 p.m.

8    We're back on the record.

9             Please proceed, Counsel.

10            EXAMINATION BY MR. CASE:

11       Q    Dr. Jarmin, my name is Andrew Case.   I'm

12   from Manatt Phelps & Philips.   We represent the

13   City of San Jose and Black Alliance for

14   Just Immigration in the Northern District of

15   California, Case Number 18-CV-2279.

16            Did the Census Department submit a list

17   of topics to be included in the 2020 decennial

18   census to Congress in March of 2017?        401/403

19       A    Yes.

20       Q    Was citizenship one of those topics?

21       A    Not for the census.

22       Q    Not for the short-form decennial census?

1     A     Correct.

2     Q     Did you discuss with anyone at Commerce

3  that submission prior to receiving the letter from

4  the DOJ in December?

5     A     So I did not.   So I wasn't involved in

6  the submission of that document prior to that, and

7  that probably would have been when those          401/403

8  conversations would have taken place, so.

9     Q     After you took over, as we'll call it,

10 acting director --

11    A     Much easier.

12    Q     -- did you have conversations about the

13 submission of topics that had previously been

14 made?

15    A     Not that I recall, no.

16        (Plaintiffs' Exhibit 34, Email, was

17 marked.)

18 BY MR. CASE:

19    Q   Give you a document that's been marked as

20 Exhibit 24.   This is Bates number 3470.   I know

21 you're not on the forwarded email, but you're on

22 the email below dated October 11, 2017.   I'd like

Page 378

1   you first to identify the people on this email.

2        A    On which one?

3        Q    The one below, the October 11th one.

4        A    So Joanne Crane is our CFO.

5   Lisa Blummerman was, I think, still at that time

6   the head of decennial, and Enrique as acting

7   deputy director.

8        Q    And in the subject line, there's two

9   questions from Molly McCarthy on citizenship as a

10  topic.  Who is Molly McCarthy?

11       A    She's a Hill staffer, I believe.

12       Q    For whom?

13       A    I don't know.

14       Q    Do you know which party?

15       A    No.

16       Q    Okay.  And the first question, in short,

17  is whether the topics are closed or whether a new

18  question can be added that's not one of the

19  topics.  Is that a fair summary of that?

20       A    Yes.                    401/403

21       Q    And what was your answer to that question

22  in October of 2017?

Page 379

1      A      You know, I don't recall what we told

2      Molly at the time.         401/403/802

3      Q      What did you believe the answer to that

4      question was in October of 2017?

5      A      I think -- in October of 2017, I think we

6      thought it was closed.

7      Q      Okay.  And you see that Enrique Lamas

8      sends this to Karen Dunn Kelley?

9      A      Correct.

10     Q      Did he speak to you about sending this to

11     Karen Dunn Kelley?

12     A      I mean, I think it was something that we

13     often -- you know, we like to keep Karen in the

14     loop on things, and so we got an inquiry from the

15     Hill, so we let her know.  I don't recall talking

16     to Enrique directly about it, but, obviously, I

17     would have agreed, obviously, to forward it to

18     her.

19     Q      Did it surprise you that someone from the

20     Hill was asking about adding a citizenship

21     question to the census in October of 2017?

22     A      I don't think -- you know, again, this

Page 398

1      A    Yes.   That's -- that's the one we

2   discussed this morning.

3      Q    So at least two?

4      A    Yeah.

5      Q    Okay.   During that second

6   meeting -- you're talking about the February 19th

7   letter, but I think it was a January 19th letter.

8   Is that -- is there a February 19th letter, as

9   well?

10     A    I think -- wasn't it February 19th?

11     Q    Well, there's a lot of letters,

12   but -- during the meeting where Secretary Ross

13   expressed concern about imputation --

14     A    Right.

15     Q    -- whatever day it took place on, did

16   Secretary Ross state that he had scientific data

17   to suggest that asking the citizenship question

18   would provide better information than imputation?

19     A    So the total number of cases that you

20   would have to impute asking the question is lower

21   than if you used administrative data.

22     Q    What did Secretary Ross say regarding his

Page 399

1   concerns about imputation?

2       A   I think his concern is the same concern

3   that we all have, that imputed data is lower

4   quality than nonimputed data.   401/403/802

5       Q   Did he say there was any scientific basis

6   he was relying on that had -- that said asking the

7   question would produce better results?

8       A   He did not cite any, no.

9       Q   And did anyone from Census cite data that

10  imputation would provide better results?

11      A   So I think that the comparison on our end

12  was that -- that there would be an increase in the

13  NRFU workload, and that, you know, for some

14  cases, you know, the administrative data appeared

15  to be more accurate than self-response data.

16      Q   Does the Census impute data for any items

17  that are on the ACS and are not on the

18  short-form census?

19      A   We impute data for almost every item,

20  yeah.

21      Q   And did Secretary Ross express any

22  concern about the quality of that data?

Page 400

1      A    He did not.

2      Q    Grandparents as caregivers?

3      A    We don't -- weren't discussing that,

4  though.

5      Q    Has he ever -- has anyone from Commerce

6  ever expressed concern about imputed data for

7  items on the ACS that weren't on the short form?

8          MS. BAILEY:  Objection.  Foundation.

9          THE WITNESS:  No.          401/403/802

10 BY MR. CASE:

11     Q    In either of the meetings that you had

12 where Secretary Ross was present, did he say that

13 he had been interested in the question before the

14 DOJ letter?

15     A    He did not.

16     Q    Did he say that the Census Department had

17 reached out to DOJ to create that letter?

18          MS. BAILEY:  Objection.  Assumes facts

19 not in evidence.

20          THE WITNESS:  That the Census Department

21 had reached out --

22 BY MR. CASE:

Page 405

1      A    Right.

2      Q    -- or when --

3      A    Right.

4      Q    -- the document is talking about

5    Alternative B will result in erroneous

6    enumerations.                                401/403

7           Do you agree with that statement?

8      A    Yes.

9      Q    That Alternative B will result in

10   erroneous enumerations?

11     A    Yes.

12     Q    I'd like you to look to your Exhibit 16,

13   which is that March 1 letter I gave you before.

14     A    Which one?  This one?

15     Q    Yeah, 9182.  Look on Page 9816, if you

16   would, near the front, the cover letter.

17          Do you see the statement of how

18   Alternative D will include all the negative -- I

19   don't have it in front of me -- but all the

20   negative impacts --

21     A    Right.

22     Q    -- of Alternative B?

Page 406

1    A    Right.

2    Q    Do you agree with that statement?

3    A    Yes.

4    Q    Do you agree, therefore, that

5  Alternative D will include the erroneous

6  enumerations for Alternative B?

7    A    Yes.

8    Q    Alternative D will result in erroneous

9  enumerations?

10   A    Yes.

11   Q    Just -- yeah.  One quick thing on the

12  actual decisional memo, which is Abowd Exhibit 12.

13  Page 5, which is 1317, on the top of the page,

14  fourth line down, "For the approximately

15  90 percent of the population who are citizens,

16  this question is no additional imposition."

17       What do you understand that sentence to

18  mean?                              401/403

19   A    So that's -- that those -- those people

20  will not have any objections to filling out the

21  questionnaire.

22   Q    But it will be an imposition, won't it?

Page 407

401/403

1        A    All questions are an imposition, yes.

2        Q    So -- okay.  So, yes, it would be an

3   imposition.

4             And one quick thing, on the front here,

5   first page, bottom paragraph, "I also met with

6   Census Bureau leadership on multiple occasions."

7        A    Uh-huh.

8        Q    How many times did you meet with

9   Secretary Ross to discuss the DOJ request?

10       A    I don't know the number.  I'd have to go

11  back and look at my calendar.

12       Q    More than once?

13       A    We've already established at least twice.

14       Q    At least twice.

15            More than twice?

16       A    So, you know, I mean, there was -- there

17  was discussions where we didn't have much of a

18  discussion, just that we were looking at it and

19  then there was more meeting discussions that

20  happened later.

21       Q    What were the discussions where you were

22  just looking at it like --

Page 408

```
 1       A    That we were beginning our process and
 2    doing a technical review.
 3       Q    Were these face-to-face meetings or phone
 4    calls?
 5       A    Face-to-face.
 6       Q    Okay.  You testified this morning with
 7    regard to finding people to speak to the
 8    Secretary, that you reached out to AEI because
 9    they are, quote, I believe this is correct, on the
10    conservative side of D.C. politics; is that
11    correct?                    401/403
12       A    Correct.
13       Q    What about the citizenship question led
14    you to believe that a group on the conservative
15    side of the D.C. politics would be in favor of it?
16       A    Because that's where the support for the
17    question has been generated in the past.
18       Q    And what groups in the past have
19    supported this question?     401/403/802
20          MS. BAILEY:  Objection.  Calls for
21    speculation.
22    BY MR. CASE:
```

Page 409

1      Q      The support that you just referenced?

2      A      Republicans in Congress.

3      Q      Which Republican specifically that you

4  recall.                          401/403/802

5      A      I believe it was Vitter.

6      Q      And what is Vitter's reason for adding a

7  citizenship question, if you know?

8          MS. BAILEY:   Objection.   Calls for

9  speculation.

10          THE WITNESS:   I don't recall his exact

11  reason.

12  BY MR. CASE:

13      Q      But your association with the citizenship

14  question is with the David Vitter amendment of

15  2009?

16      A      That's -- that -- my association?

17      Q      You understand --

18      A      I recall that that happened, yes.

19      Q      Do you recall any groups that are

20  associated with voting rights having support for

21  the citizenship question on the census?

22      A      No.

1       Q    Did you reach out to any groups or people

2    who have experience enforcing the Voting Rights

3    Act while looking for people to speak to --

4            MS. BAILEY:   Objection.   Asked and

5    answered.                          401/403

6            THE WITNESS:   I did not.

7    BY MR. CASE:

8       Q    One of the other people I believe

9    mentioned in the email thread was Mr. Camorrota.

10   Does that name sound familiar to you?

11      A    From this morning, yeah.

12      Q    Yeah.   And what organization is he

13   associated with?

14      A    I believe Heritage.

15      Q    Is he also associated at some point with

16   the Center for Immigration Studies?

17      A    I -- that seems to ring a bell, yes.

18      Q    Do you know the Center for Immigration

19   Studies?

20      A    Not intimately, no.

21      Q    Do you understand them to be a group that

22   is supportive of enforcing the Voting Rights Act?

Page 417

1        MR. CASE:  Can I ask just one question

2   based on that?

3        FURTHER EXAMINATION BY MR. CASE:

4    Q   You testified that the process is for the

5   short form.  Is there any reason that there should

6   be --

7        MS. BAILEY:  Mischaracterizes testimony.

8        MR. CASE:  I'm sorry.

9   BY MR. CASE:

10   Q   Tell me what you understood the answer to

11   be there about the five-step process.

12   A   So we've not entertained additions to the

13   long form of the census.  The process was for the

14   census generally -- I mean, the short form.  So

15   prior to the ACS, people requested new questions,

16   they were put on the long form, not on the short

17   form.  The short form has gotten shorter over the

18   years, not longer.

19   Q   Is there any reason to engage a less

20   robust process for the short-form census than for

21   the long-form census?                    401/403

22   A   No.

Page 420

1          ACKNOWLEDGEMENT OF DEPONENT

2          I, DR. RON JARMIN, do hereby acknowledge I

3     have read and examined the foregoing pages of

4     testimony, and the same is a true, correct and

5     complete transcription of the testimony given by

6     me, and any changes or corrections, if any, appear

7     in the attached errata sheet signed by me.

8

9

10

11

12

13     _____      _____

14     Date                  DR. RON JARMIN

15

       Kate Bailey, Esquire

16     U.S. DEPARTMENT OF JUSTICE

       20 Massachusetts Avenue

17     Washington, D.C. 20530

18     IN RE:  New York Immigration Coalition, et al., v.

       United States Department of Commerce, et al.

19

20

21

22

# EXHIBIT F

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3    ---------------------------------------

      NEW YORK IMMIGRATION COALITION, ET AL.,

 4

                       Plaintiffs,

 5         vs.        Case No.  1:18-CF-05025-JMF

 6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 7                     Defendants.

      ---------------------------------------

 8

 9                     Washington, D.C.

10                     Tuesday, August 28, 2018

11    Deposition of:                    Global
                                        Objection:
12             KAREN DUNN KELLEY        401; 403

13    called for oral examination by counsel for

14    Plaintiffs, pursuant to notice, at the office of

15    Arnold & Porter, 601 Massachusetts Avenue NW,

16    Washington, D.C., before KAREN LYNN JORGENSON,

17    RPR, CSR, CCR of Capital Reporting Company,

18    beginning at 9:04 a.m., when were present on

19    behalf of the respective parties:

20             Veritext Legal Solutions

                   Mid-Atlantic Region

                1250 Eye Street NW - Suite 350

21             Washington, D.C.  20005

22
```

```
                                              Page 2

1                      CONTENT
                                              PAGE
2
   KAREN DUNN KELLEY                          9
3  Examination by Mr. Grossi                  9
   Examination by Ms. Goldstein               269
4  Examination by Ms. Boutin                  323
   Examination by Ms. Shah                    339
5  Examination by Mr. Adams                   349
6
7      KAREN DUNN KELLEY DEPOSITION EXHIBITS
8  EXHIBIT                                    PAGE
   NUMBER
9  Plaintiffs' Exhibit 1    Statement         33
   Plaintiffs' Exhibit 2    Email chain       47
10 Plaintiffs' Exhibit 3    Email chain       52
   Plaintiffs' Exhibit 4    Supplemental      65
11                          memorandum
   Plaintiffs' Exhibit 5    Defendants'       65
12                          objections
   Plaintiffs' Exhibit 6    Email train       78
13 Plaintiffs' Exhibit 7    Emails            84
   Plaintiffs' Exhibit 8    Email             90
14 Plaintiffs' Exhibit 9    Email             105
   Plaintiffs' Exhibit 10   Email             107
15 Plaintiffs' Exhibit 11   Email             119
   Plaintiffs' Exhibit 12   Declaration       119
16 Plaintiffs' Exhibit 13   Email             135
   Plaintiffs' Exhibit 14   Email             145
17 Plaintiffs' Exhibit 15   Email             156
   Plaintiffs' Exhibit 16   January 3, 2018   159
18                          memorandum
   Plaintiffs' Exhibit 17   Email             183
19 Plaintiffs' Exhibit 18   Email             186
   Plaintiffs' Exhibit 19   Email             194
20 Plaintiffs' Exhibit 20   Email             195
   Plaintiffs' Exhibit 21   January 9, 2018   203
21                          memorandum
   Plaintiffs' Exhibit 22   Email             219
   Plaintiffs' Exhibit 23   Email             235
22 Plaintiffs' Exhibit 24   Email             242
```

                                                        Page 3

1    Plaintiffs' Exhibit 25   Email              243

     Plaintiffs' Exhibit 26   Questions          249

2    Plaintiffs' Exhibit 27   March 1, 2018      252

                              memorandum

3    Plaintiffs' Exhibit 28   Final decision     258

     Plaintiffs' Exhibit 29   September 20,      355

4                             2017 memorandum

5           (Exhibits attached to transcript.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 4

```
 1            A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
            David Gersch, Esquire
 4          Peter Grossi, Esquire
            John Freedman, Esquire
 5          Caroline Kelly, Esquire
            ARNOLD & PORTER
 6
 7
 8
 9
10          Perry Grossman, Esquire
            New York Civil Liberties Union
11
12
13
    On behalf of Kravitz Plaintiffs:
14          Daniel Grant, Esquire
            COVINGTON & BURLINGTON
15
16
17
    On behalf of Los Angeles Unified School District:
18          Keith Yeomans, Esquire (Telephonically)
            DANIELS WOLIVER KELLEY
19          115 Pine Avenue
            Suite 500
20          Long Beach, California 90802
            (562) 366-8500
21          kyeomans@dwkesq.com
22
```

Page 5

```
 1    On behalf of County of Los Angeles:
           David I. Holtzman, Esquire
 2         HOLLAND & KNIGHT
           50 California Street
 3         Suite 2800
           San Francisco, California 94111
 4         (415) 743-6909
           david.holtzman@hklaw.com
 5
      On behalf of Lupe Plaintiffs:
 6         Andrea Senteno, Esquire (Telephonically)
           MALDEF
 7

 8

 9

10         Niyati Shah, Esquire
           ASIAN AMERICANS ADVANCING JUSTICE
11

12

13

14    On behalf of City of San Jose & Black Alliance for
      Just Immigration:
15         Rory Adams, Esquire
           MANATT, PHELPS & PHILLIPS
16

17

18

           Ezra Rosenberg, Esquire
19         Dorian Spence, Esquire
           LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
20

21

22
```

Page 6

1

On behalf of State of California:
        Gabrielle Boutin, Esquire
        R. Matthew Wise, Esquire (Telephonically)
        DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
        GENERAL
        1300 I Street
        P.O. Box 944255
        Sacramento, California 94244
        (916) 210-6053
        gabrielle.boutin@doj.ca.gov
        matthew.wise@doj.ca.gov

On behalf of State of New York:
        Elena Goldstein, Esquire
        Matthew Colangelo, Esquire
        Alex Finkelstein, Esquire
        ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
        PROTECTION BUREAU

On behalf of Defendants:
        Kate Bailey, Esquire
        Joshua Gardner, Esquire
        U.S. DEPARTMENT OF JUSTICE
        20 Massachusetts Avenue
        Washington, D.C. 20530
        (202) 305-9802
        kate.bailey@usdoj.gov
        joshua.gardner@usdoj.gov

Page 7

```
 1          Michael Cannon, Esquire
            David M.S. Dewhirst,Esquire
 2          U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
            ASSISTANT GENERAL COUNSEL FOR FINANCE &
 3          LITIGATION
            1401 Constitution Avenue, NW
 4          Room 5890
            Washington, D.C. 20230
 5          (202) 482-5395
            mcannon@doc.gov
 6          ddewhirst@doc.gov
 7          Michael Walsh, Jr., Esquire
            DEPUTY GENERAL COUNSEL
 8          1401 Constitution Avenue, NW
            Washington, D.C. 20230
 9          (202) 482-4772
            mwalsh@doc.gov
10
     VIDEOGRAPHER:  Dan Reidy
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 8

1               P R O C E E D I N G S

2    WHEREUPON,

3         VIDEOGRAPHER:  Good morning.  We are

4    going on the record at 9:04 a.m. on Tuesday,

5    August 28, 2018.  Please note that the microphones

6    are sensitive and may pick up whispering, private

7    conversations and cellular interference.  Please

8    turn off all cell phones and place them away from

9    the microphones, as they can interfere with the

10   deposition audio.  Audio and video recording will

11   continue to take place unless all parties agree to

12   go off the record.

13        This is Media Unit 1 of the deposition of

14   Karen Dunn Kelley taken by counsel for the

15   plaintiff in the matter of New York Immigration

16   Coalition, et al., versus U.S. Department of

17   Commerce, et al.  This case is filed in the U.S.

18   District Court for Southern District of New York.

19   This deposition is held at the law offices of

20   Arnold & Porter located at 601 Massachusetts

21   Avenue Northwest, Washington, D.C. 20001.

22        My name is Dan Reidy from the firm

Page 9

1   Veritext Legal Solutions, and I'm the

2   videographer.  The court reporter is

3   Karen Jorgenson from the firm Veritext Legal

4   Solutions.

5           I am not authorized to administer an

6   oath.  I am not related to any party in this

7   action, nor am I financially interested in the

8   outcome.  Also, counsels' appearances will be

9   noted on the stenographic record rather than

10  orally at this time.

11          Will the court reporter please swear in

12  the witness?                            Global
                                            Objection:
13                  KAREN DUNN KELLEY,       401; 403

14  called as a witness, and having been first duly

15  sworn, was examined and testified as follows:

16          THE WITNESS:  Yes, I do.

17              EXAMINATION BY MR. GROSSI:

18     Q   Good morning, Secretary Kelley.  We met

19  briefly in the hall.  But for the record, my name

20  is Peter Grossi, and I'm an attorney here with

21  Arnold & Porter.  And I'm going to be leading off

22  this morning.  We represent the plaintiffs, the

Page 13

1    just said?

2            You're good.  And I just would like to

3    say good morning.  I think I said good morning to

4    each of you, but I did miss one or two as I

5    came -- as you came in.  So if I missed you, I

6    apologize and good morning.

7    BY MR. GROSSI:

8        Q    That's okay.  Lots a people.

9        A    Yes.  A lot of people.

10       Q    So let's begin a little bit with your

11   background, for the record.

12       A    Yes.

13       Q    So I understand you graduated with a BS

14   degree from the College of Commerce and Finance at

15   Villanova University?

16       A    Yes, I did.

17       Q    And you then pretty much started in the

18   investment business in 1982 with Drexel Burnham?

19       A    Yes, sir.

20       Q    And then you joined a different firm,

21   Federated Investors in 1986; is that right?

22       A    Yes.

Page 14

1    Q    Then in 1989, you joined a firm known as

2    Invesco, correct?

3    A    Not -- no.

4    Q    Okay.  Clarify, please.

5    A    I joined a legacy firm called

6    AIM Management, which, through a series of mergers

7    and acquisitions became Invesco when I left.  But

8    when I started in 1986, it was AIM Management.

9    Q    Okay.  Thank you for the clarification.

10        You then worked at either AIM or Invesco

11   itself until fairly recently, 2017?

12   A    Yes.  I -- from the time I started AIM

13   through its legacy companies until I left last

14   summer.

15   Q    Okay.  You initially started as a money

16   market portfolio manager?

17   A    Yes.  Money market and government

18   portfolio.

19   Q    But by the end, you hold -- held various

20   positions and, ultimately, were in senior

21   management of Invesco; is that correct?

22   A    That is correct.

1    have you ever had training and experience in

2    conducting surveys --

3         A    No.

4         Q    -- of the public?

5             Let me finish.

6             Okay.  Let me ask now a little bit about

7    your early --

8         A    So excuse me.  Could you please then

9    repeat that whole question so I --

10        Q    Sure.

11        A    -- I did not interrupt you.  That was

12   rude.  I apologize.

13        Q    No.  Not at all.

14            Did you ever have any training or

15   experience in conducting surveys of the public?

16        A    No.

17        Q    Okay.  Now, let me ask about your

18   relationship with now Secretary Ross.  Originally,

19   it was Mr. Ross when you met him, right?

20        A    Yes.

21        Q    Okay.  And did you first meet him in

22   about 2006 when his company was folded in or

Page 17

1      became part of Invesco?

2          A    Yes.

3          Q    You didn't know him before then?

4          A    I might have met him or been at a panel

5      with him or an event with him, but I did not know

6      him.

7          Q    Okay.  And his company was an investment

8      company that became part of Invesco?

9          A    Yes.

10         Q    And you worked with him while you were at

11     Invesco, correct?

12         A    Yes.  I would -- I would like you to

13     clarify the word "with."

14         Q    Okay.  Specifically around 2008, 2009 in

15     the financial crisis, did you do a great deal of

16     work with him in various deals?

17         A    Yes.  I did not work within his silo or

18     his company, but we actually did partner on

19     certain aspects in particular during the financial

20     crisis, yes.

21         Q    Okay.  Good.

22              You attended meetings, I guess, when he

Page 20

```
 1      A   No.  She did not stay on throughout that
 2   whole time.
 3      Q   About how long did she stay on?
 4      A   I don't remember, sir.
 5      Q   Okay.  Fair enough.
 6          Now, I would like to switch a little bit
 7   to your nomination, which brings us here, your
 8   nomination for -- to become Under Secretary of
 9   Commerce for Economic Affairs.
10          That was formally announced by the
11   president on May 25, 2017?
12          I'm not going to hold you to the date.
13      A   Okay.  Then the answer is yes, it was
14   announced -- I would not -- I would not swear to
15   that date.
16      Q   Okay.  Fair enough.  And I wanted to ask
17   you a little bit, because I'm assuming that you,
18   obviously, heard about the possibility and then
19   agreed to take the position earlier.  So let me
20   back up.
21          When were you first approached or when
22   did you first get any inkling that they might want
```

Page 24

```
 1      Q   Do you recall around that time having
 2   conversations with Mr. -- then Mr. Ross or
 3   Secretary Ross?
 4      A   I -- I don't have a time reference.  I
 5   apologize.
 6      Q   So you don't really have a clear
 7   recollection of one particular interaction, maybe
 8   by phone or in person, where he said something
 9   like the job we have in mind is Under Secretary
10   for Economic Affairs?
11      A   After he was the Secretary, he clarified
12   that that was the position he would want for me to
13   take.
14      Q   Did he send you any paperwork or any
15   information about what that Under Secretary did?
16      A   I was -- I had all of the requisite
17   information that was on the website on -- you
18   know, on the Commerce Department websites and
19   those things, and I had certainly done a
20   tremendous amount of homework --
21      Q   Okay.  Sure.
22      A   -- on that position --
```

Page 25

```
 1        Q    Absolutely.

 2        A    -- once we discussed it.

 3        Q    And do you remember before you were even

 4   nominated, discussing with Secretary Ross the

 5   specific responsibilities or jurisdiction of the

 6   Under Secretary For Economic Affairs?

 7        A    I don't recall.

 8        Q    Okay.   When do you think it was the first

 9   time that you found out that one of the three

10   branches that the Under Secretary supervises is

11   the Census Bureau?

12        A    Early on, early on.

13        Q    Sure.  I mean, one of -- there are just

14   three major branches, right, that the Under

15   Secretary For Economic Affairs supervises?

16        A    Yes.  Yes.

17        Q    All right.

18        A    Well, it's really -- it supervisors ESA,

19   and ESA supervises two branches.

20        Q    Fair enough.

21        A    So I don't want to -- a little bit of

22   semantics, but there is a nuance difference, and
```

Page 26

1   so I don't want to misrepresent.

2       Q   Okay.  I appreciate that.  When do you

3   think it first occurred to you that this would be

4   an important job, in part, because Census Bureau

5   was going to do the 2020 census and fairly soon

6   you'd be involved in that process?

7       A   Oh, absolutely understood.  It was a huge

8   program, and it was a management responsibility.

9       Q   And you understood that even before you

10  were officially nominated?

11          Go ahead.  You have to answer.

12      A   Yes, sir.  But allow me to say, as I have

13  learned more, it has certainly -- the gravity of

14  the position has -- you know, I always recognized

15  the importance.

16      Q   Sure.  Okay.  So it's fair to say that by

17  the spring of 2017, you knew you were going to be

18  nominated for a position which would have, among

19  other things, significant responsibility for the

20  2020 census?

21      A   Yes, sir.

22      Q   Now, when do you think you first talked

Page 37

1    priorities, you were talking about the president,

2    right?

3        A    So if I can back up, I need to clarify my

4    last answer.  Because we -- you said that I went

5    and spoke specifically of the census throughout

6    the rest of the document, and that is not correct.

7    Because I also indicate economical statistical

8    programs, which have -- would have included BEA

9    programs, such as GDP and recreational numbers and

10   things like that.  So I have to clarify my

11   original answer that I said it was only specific

12   to census.  That is not true.

13       Q    Let's go back to that phrase about, "one

14   of his priorities is effective and meaningful

15   management and oversight of the 2020 census."

16            The context there was one of the

17   President's priorities, right?

18       A    Yes.  The --

19       Q    How did you learn the President's

20   priorities with respect to the census?

21       A    When I interviewed with the White House

22   under PPO, during the process -- and we knew what

1  the role was at that point, had been clarified.

2  The census was one of the portfolio

3  responsibilities of that role, and they said that

4  was an important -- that was -- that it was

5  important.  As well as the Secretary reiterated

6  that that was a priority of the Department, and it

7  was priority.

8      Q    And, specifically, it was a priority of

9  the President, it was one of his priorities was

10  managing the 2020 census, right?

11      A    Yes.

12      Q    Okay.  What specifically did you

13  understand the President's priorities to be with

14  respect to the 2020 census?

15      A    Complete and accurate count.

16      Q    As complete and as accurate as it could

17  be?

18      A    Complete and accurate.

19      Q    And you always understood sometime in

20  that spring or summer, that one of the priorities

21  of the White House was adding a citizenship

22  question, correct?

Page 39

1          MR. GARDNER:  Objection.  Lack of

2     foundation.

3          THE WITNESS:  I said that I learned it

4     was a priority of the Secretary's.

5     BY MR. GROSSI:

6       Q   Okay.  Did you -- did the Secretary tell

7     you that he was interested in it, in part, because

8     it was also one of the President's priorities or

9     perhaps he used the phrase the White House's

10    priorities?

11      A   No.

12      Q   He never, ever has told you that one of

13    his reasons for wanting the census question added

14    was because the White House staff thought that was

15    a good idea?

16      A   No.

17      Q   Never?

18      A   Not to my recollection, no.

19      Q   Do you think it's possible and you just

20    don't recall at this moment?

21          MR. GARDNER:  Objection.  Form.

22          THE WITNESS:  No, not -- not to my

1  recollection.

2  BY MR. GROSSI:

3      Q    You talked to the Secretary quite a bit

4  about the census -- citizenship question over the

5  year, right?

6          MR. GARDNER:   Objection.   Lack of

7  foundation.

8  BY MR. GROSSI:

9      Q    Well, you have talked to the Secretary

10  about adding the citizenship question, correct?

11      A    Yes.   Correct.

12      Q    How often would you say?

13      A    In May -- and I apologize if this is a

14  little long-winded.

15          In May, after the GAO report, and I came

16  in August, the immediate -- my immediate

17  responsibilities were to address the issues in

18  that GAO report, which talked about the budget,

19  the leadership and the operational readiness and

20  those things.   And there -- we were also at that

21  same time preparing for the 2018 end-to-end test,

22  which started this past April 1st.

Page 41

1          So as I came in, those were the

2     priorities we -- we spent time on and that I

3     operationally spent time on as we went through

4     when I started my work.

5          So I would suggest to you between August

6     and beginning of November, we spent time on the

7     lifecycle cost, the lifecycle budget, the

8     budgetary issues.

9          We also spent a tremendous amount of time

10    in the October, beginning of November -- November

11    time frame, on the management of the census,

12    because we were moving from research and

13    development to actual execution, if you will.  And

14    so we spent time on the leadership and what was

15    happening there.

16          And then, thirdly, we spent time

17    throughout that entire process on operational

18    readiness, systems readiness, responding to the

19    GAO report, making sure we were prepared, making

20    sure we had everything in line to start the test

21    and there were other decisions that needed to be

22    made.  So at -- I did know the citizenship

Page 42

1   question was going to be on there, but that was an

2   issue that I didn't need to deal with until later

3   on, because they -- in a time frame, other issues

4   needed to get addressed immediately --

5        Q    Okay.

6        A    -- from an operational perspective.

7        Q    So your recollection is as early as May,

8   you had heard about the citizenship question, but

9   it was only one feature of an overall review of

10  the census that kept you busy?

11       A    And --

12            MR. GARDNER:   Objection.

13  Mischaracterizes the witness's testimony.

14  BY MR. GROSSI:

15       Q    Correct?

16       A    No.   It was not part of the review I was

17  doing on the census at that time.

18       Q    But you knew that adding a citizenship

19  question was something that Secretary Ross wanted

20  to do, right?

21       A    At -- yes.

22       Q    Okay?

1    various responsibilities, that adding a

2    citizenship question was a topic under discussion,

3    correct?

4        A    I'm sorry.  Please repeat the question.

5        Q    As of July 2017, when you testified to

6    Congress, you knew that the potential of adding a

7    citizenship question to the 2020 decennial census

8    was under consideration by Secretary Ross,

9    correct?

10       A    I do not know exactly when I learned

11   that.  It is very plausible I did know it by that

12   time.

13       Q    Okay.  Who was responsible for helping

14   you prepare for this testimony in your nomination

15   process at Commerce?

16       A    The Legislative Affairs department is

17   responsible for helping the process.  And so in

18   that process, I was assigned three individuals to

19   help me go through the process.  And those three

20   individuals I worked -- I worked -- let's say four

21   individuals, one was the senior, but assigned the

22   three, four, and then that was who I was assigned.

1     A   They were all public documents.   They

2    have a quarterly review, a PMR they call it, for

3    the census.   On a quarterly basis, they would --

4    provided me all those public documents so I could

5    review them, ask questions, and then they provided

6    me the websites for the 2020 census.   Census has a

7    very large website, and so they provided me all

8    the website information, and so we looked at that.

9    I was only provided public information.

10     Q   Okay.   Let me have this exhibit marked as

11    Exhibit 2.

12        (Plaintiffs' Exhibit 2, Email chain, was

13    marked.)

14    BY MR. GROSSI:

15     Q   Okay.   Secretary Kelley, this is an email

16    chain, Exhibit 2, begins with the Bates 1404 and

17    runs to 1406, and like all of those email chains I

18    think we'll be doing today, it goes in reverse

19    order.   As you know, they keep piling on top.

20        So I'm going to go to the end first, and

21    ask you if it refreshes your recollection that on

22    or about July 24, 2017 you had communicated in

1  some fashion with Mr. Willard, asking for a review

2  of the process of how questions are created and

3  chosen for the ACS.  Do you remember making that

4  type of inquiry through Mr. Willard?

5      A    Yes.

6      Q    Okay.  And then he enlisted the help of a

7  Victoria Velkoff.  You know her?  Or at least you

8  know her now?

9      A    I know her now, Tori.

10     Q    Right.

11     A    She goes by Tori, yes.

12     Q    Tori.  And she works at Census?

13     A    And, in fact, I'm sort of amazed -- I'm

14  saying, oh, there's -- that -- I didn't know that

15  was Tori.

16         THE WITNESS:  Does everybody have this

17  paper in the room?

18  BY MR. GROSSI:

19     Q    Anybody who has it, needs it.

20         And then Mr. Willard refined his request

21  above and said, "What we would primarily like to

22  discuss with you today, is the" -- "is how the

Page 49

1   process works to when questions are discussed and

2   are approved to be used on the ACS and also those

3   on the census questionnaire."

4           Does that refresh your recollection, that

5   one of the things that you discussed with

6   Ms. Velkoff, perhaps, and Mr. Willard, in

7   July 2017, was specifically how questions are

8   added to a decennial census questionnaire?

9       A   Yes.

10      Q   Okay.  So we're clear, that as of late

11  July 2017, you had a specific interest in how a

12  question would be added to the decennial census,

13  correct?

14      A   As it applied to a particular topic that

15  was being discussed.

16      Q   And what topic was that?

17      A   The SOGI topic.

18      Q   Just the SOGI topic?

19      A   Yes.

20      Q   You didn't know that they were also

21  dealing at that same time with a citizenship

22  question?

1    A    I --

2         MR. GARDNER:   Objection to form.

3         THE WITNESS:   I was --

4    BY MR. GROSSI:

5    Q    Is that your testimony?

6    A    I was dealing -- this has to do with the

7    SOGI question.

8         And would you like me to explain?

9    Q    I don't need to know about that.   I just

10   need to make it clear that your conversation was

11   also at a time when you knew they were thinking

12   about adding a citizenship question, as well.

13        MR. GARDNER:   Objection.

14   Mischaracterizes the witness's prior testimony.

15   BY MR. GROSSI:

16   Q    I mean, it can be both, Sec- --

17   Ms. Madam Secretary?

18        MR. GARDNER:   Objection.   Form.

19        THE WITNESS:   Sir, you're going to have

20   to go back.   Because you're starting to tie things

21   together with ends and -- you know, ands and buts

22   that I'm not following.

Page 51

1        This topic, let me be very clear, had to

2   do with the SOGI issue.   I was going to be -- I

3   was going to be asked a SOGI question on the -- at

4   the testimony.   There was a -- the topics -- and

5   I'm sorry if I'm boring you and you all know

6   this -- the topics for inclusion in the census

7   need to be given the March prior, so not March of

8   '18 but March of --

9        Q    '19?

10       A    -- '17.

11  BY MR. GROSSI:

12       Q    '17, right.

13       A    And there was an issue whether there

14  would be a SOGI question or not.   And when I was

15  told I was going to be asked about that, I said I

16  would like to know the process.   Topics go on.   I

17  did not know the details to know how the topics

18  get put on it, and then it's a year later, the

19  questions get put on it, and how does that work?

20  And I asked for that information in regard to the

21  SOGI question.

22       Q    Were you also advised that at that point

Page 52

1    in time, Mr. Ross -- Secretary Ross was being

2    approached by various people to put a citizenship

3    question on --

4        A    No.

5        Q    -- the 2020 census?

6             You're very confident that he never told

7    you that?

8        A    I don't know.  And I've repeated that.  I

9    don't know when I learned that information.  And

10   I'm very sorry I don't, but I don't.

11       Q    Okay.  Let's see if we can maybe do a

12   little refreshing.

13            I'm marking as Exhibit 3,

14   Bates Number 0763-64, which is an email chain,

15   again, that runs from July 14, 2017 to

16   July 24, 2017.

17            (Plaintiffs' Exhibit 3, Email chain, was

18   marked.)

19   BY MR. GROSSI:

20       Q    Before we begin this, just one quick

21   follow-up question on the last bit of testimony.

22   Was that --

1    A    May I finish reading this?

2    Q    Oh.  I'm sorry.  Go ahead.

3    A    Yes, sir.

4    Q    Before we turn to the exhibit, I just

5    want to follow up on one thing.

6         The SOGI topic that you mentioned a

7    moment ago, was that topic being considered and

8    included in the ACS or also in the decennial

9    census?

10         MR. GARDNER:  Objection.  Form.

11         THE WITNESS:  I was not there at the

12    time, but there was a discussion at the time that

13    the information was going on the topics as to

14    whether or not that would be a topic back in

15    March of '17 that would be put forth when the

16    topics are put forth.

17    BY MR. GROSSI:

18    Q    For the -- for the ACS study?

19    A    I don't know which -- which, but that was

20    pulled as a topic being discussed.

21    Q    Okay.

22    A    And, therefore, there was a discussion

Page 54

1    about the SOGI issue and how it would -- why it

2    was pulled, why it was not pulled, why it was on

3    there.  There was a whole myriad of discussion

4    around it.  Of course, I knew nothing about that

5    topic.  So I, just for an educational purpose,

6    said if I'm going to ask, I wanted to learn how

7    this works.  Going from a topic to inclusion on

8    any or either, it didn't matter to me.  How does

9    this happen?

10       Q   But you're not testifying that you were

11   ever told that the SOGI topic would be included on

12   the decennial census, correct?

13       A   I am not testifying to that.

14       Q   And so when Mr. Willard said you were

15   interested in how citizenship -- how questions

16   were added to the decennial census, that was

17   somewhat broader than the SOGI topic, correct?

18       A   No.  It was written in regards to the

19   SOGI topic.

20       Q   Okay.  Let's take a look at what's been

21   written in regard to Exhibit 3.

22       A   Yes.

Page 65

1    BY MR. GROSSI:

2        Q    Okay.  Let me actually turn to that.

3             MR. GARDNER:  Tell you what, Counsel,

4    before we go to the next document, take a break?

5             MR. GROSSI:  Sure.

6             MR. GARDNER:  We've been going about an

7    hour.

8             VIDEOGRAPHER:  This concludes Media Unit

9    Number 1.  The time on the record is 10:06 a.m.

10   We are off the record.

11             (Off the record.)

12             VIDEOGRAPHER:  This begins Media Unit

13   Number 2.  The time on the video is 10:18 a.m.  We

14   are on the record.

15             (Plaintiffs' Exhibit 4, Supplemental

16   memorandum, was marked.  Plaintiffs' Exhibit 5,

17   Defendants' objections, was marked.)

18   BY MR. GROSSI:

19        Q    Secretary Kelley, I'd like to hand you

20   two exhibits.  The first is Exhibit 4, which is a

21   supplemental memorandum by Secretary of Commerce

22   Wilbur Ross, has Bates number 1321.  And I will

Page 66

1   also give you a copy as Exhibit 5 of the

2   defendants' objections and responses to

3   plaintiffs' first set of requests of

4   interrogatories.  And I've tabbed Page 14, and

5   I'll let you know that that's the only page I'll

6   be asking you about.

7            MR. GARDNER:  Peter, you said 14?

8   BY MR. GROSSI:

9        Q    Okay.

10       A    No.  Where on --

11       Q    Just on the bottom --

12       A    Where on Page 14 do you want me to --

13       Q    The list of names at the bottom, and I'll

14   direct your attention to it and give you plenty of

15   time.

16       A    The list of names at the bottom?

17       Q    Yeah.

18       A    Okay.  And then -- yes, sir.

19       Q    Okay.  Do you see in Exhibit 4, this is a

20   supplemental memorandum?  Have you seen this

21   document before?

22       A    One other time.

Page 67

1      Q     When was that?

2      A     Yesterday.

3      Q     Okay.   Not before it was issued?

4      A     No.   I was not part of the issuing of

5    this.

6            THE WITNESS:  I'm sorry.  Did you not

7    hear me?  I -- did you hear me?  I apologize.

8    Speak up?

9            MS. BOUTIN:  Just a little bit.

10           THE WITNESS:  I'm sorry.  And usually I'm

11   very loud, so I apologize.  I -- I --

12   BY MR. GROSSI:

13      Q    Do you know why this supplemental

14   memorandum was added to the record so late as June

15   of this year?

16           MR. GARDNER:  Objection.  Lack of

17   foundation.

18           THE WITNESS:  To supplement the

19   information is my assumption.

20   BY MR. GROSSI:

21      Q    The information that Congress was

22   concerned about after they learned that people,

1    other Census and Commerce Department officials,

2    had talked about the citizenship question,

3    correct?

4          MR. GARDNER:  Objection.  Lack of

5    foundation.

6          THE WITNESS:  To supplement the

7    memorandum of the Secretary regarding the

8    administrative record.

9    BY MR. GROSSI:

10       Q    You were involved in that original

11   memorandum, correct, March 26th?

12       A    Which memorandum are you speaking, sir?

13       Q    The March 26, 2018 memorandum of

14   decision.

15       A    The decision memorandum to me.

16       Q    Okay.  Right.  But you were also

17   involved -- you were actually involved in its

18   preparation, correct?

19       A    I was involved in the proofing, not the

20   preparation.

21       Q    Okay.  You didn't actually draft any

22   portions of it?

1      A    No.

2      Q    You weren't asked for your input before

3   it was essentially put in the final form?

4      A    I -- I looked at it over the few days

5   before it was released, in proofing it.

6      Q    What changes did you make?

7      A    I don't remember.  Minor changes.  I

8   don't remember anything substantive.

9      Q    How about any other people in the

10  Census Bureau, did they make any changes?

11     A    The Census Bureau?

12     Q    Yes.

13     A    The Census Bureau made a few -- a few

14  changes, but, again, nothing substantial.

15     Q    They had not been involved in drafting

16  it, correct?

17     A    Could --

18        MR. GARDNER:  Objection to form.

19        THE WITNESS:  Could you define the word

20  drafting?  To me, anything up to a final form is

21  still in draft.  So you're -- I don't want to get

22  balled up with your nomenclature.  To me, anything

Page 88

```
 1      A    In preparation for my -- my hearing.

 2      Q    Okay.  And you -- did you communicate

 3  with any of those people by email?

 4      A    No.  They were communicated by -- with

 5  the people at -- the four people that worked with

 6  me.  I didn't have an email at Commerce at that

 7  time.

 8      Q    I understand.  You had an email at

 9  Invesco or your personal email account?

10      A    Right.  And we did not -- we did not

11  email.

12      Q    But we haven't checked that out yet,

13  right?

14      A    Right.

15      Q    Okay.  Well, let me just ask about

16  Exhibit 7, in the hopes it might refresh your

17  recollection about other things.

18           Do you recall hearing, perhaps when you

19  came in in late August, that Secretary Ross was

20  attempting to get the Department of Justice to

21  request that the citizenship question be added?

22  And maybe it's August, maybe it's September of
```

Page 89

1    2017, when you first came on board.

2         A    No.  I was not aware of that.

3         Q    You didn't know that he was attempting to

4    get people at the Department of Justice to say

5    they wanted a citizenship question?

6         A    I knew he was in conversation with

7    people, but you said that he was trying to get

8    them to do something.  I have no -- what the

9    Secretary tried to get people to do or try to do.

10        Q    Is that another question that we could

11   ask Secretary Ross --

12             MR. GARDNER:  Objection.  Form.

13   BY MR. GROSSI:

14        Q    -- best?

15             MR. GARDNER:  Calls for speculation.

16   BY MR. GROSSI:

17        Q    Would Secretary Ross be the best person

18   to ask about what Secretary Ross was doing with

19   the Department of Justice on this issue?

20        A    I would always say that -- best to ask

21   the person that you're speaking about questioning.

22   I don't exactly know how to answer that.  I mean,

1   just as we asked Karen what I said, which was on

2   the record.

3       Q   Let me have marked the next exhibit.

4           (Plaintiffs' Exhibit 8, Email, was

5   marked.)

6   BY MR. GROSSI:

7       Q   We're marking as Exhibit 8 a

8   memorandum -- I'm sorry -- an email.  The top one

9   of which is dated August 16, 2017.

10          Now, this email indicates that

11  Mr. Earl Comstock wrote to Secretary Ross on

12  August 11th and he stated, quote, per your

13  request, here is a draft memo on the citizenship

14  question that James Uthmeier in the Office of

15  General Counsel prepared and I reviewed.  Once you

16  have had a chance to review, we should discuss so

17  we can refine the memo to better address any

18  issues.

19          And it appears that Ms. Teramoto then

20  followed up on that by saying that Peter Davidson

21  and Karen Dunn Kelley will both be here Monday.

22  Let's spend 15 minutes together and sort this out.

Page 91

1         And then Mr. Comstock responded to

2    Ms. Teramoto and to Secretary Ross by copy saying,

3    "Thanks, Wendy, that works for me."

4         Now, Wednesday was August 16th, and I'll

5    represent that the Monday was August 20th.  Is

6    that consistent with your recollection that you

7    came in on August 20th and had a discussion about

8    various things?

9         MR. GARDNER:  I think your math is wrong.

10        THE WITNESS:  Sir, I think it was the

11   21st.

12        MR. GARDNER:  The 21st.

13        THE WITNESS:  August 21st.  Or I said the

14   wrong date before, as well, so we have to correct

15   Monday -- Monday was the 21st.

16   BY MR. GROSSI:

17      Q   You're right.  Absolutely right.

18        So Monday was the 21st, and that's the

19   day you came in and assumed your position, okay.

20        And so you discussed with them on

21   August the 21st, among other things, I'm sure, the

22   draft memo on the citizenship question that had

 1   been prepared for Secretary Ross, correct?

 2        A    I do not recall any conversations like

 3   that.

 4        Q    Do you think that might have been the

 5   first time you really got into the details of

 6   adding it?

 7        A    I don't recall a conversation about it.

 8        Q    Okay.   But you wouldn't deny that as of

 9   August 21st, you had been briefed on the

10   citizenship issue?

11             MR. GARDNER:   Objection.   Mischaracterize

12   the witness's testimony.

13             THE WITNESS:   As I said, I do not,

14   unfortunately, remember when I first learned about

15   it.   It is possible.   I'm not denying it.   I'm not

16   confirming it.   I just don't know.   I wish I

17   could -- I wish I could tell you.   I just don't

18   know.

19   BY MR. GROSSI:

20        Q    Did you receive memoranda about the

21   citizenship question, and that's a shorthand of,

22   obviously, adding a citizenship question to the

1    BY MR. GROSSI:

2        Q    Were you relying on the experts in the

3    Census Bureau?

4        A    I was not relying on anything, but I rely

5    heavily on the experts at the Census Department

6    for many things.  But in terms of your question,

7    was I relying on it for the citizenship question?

8    That preassumes that I'm answering the

9    question -- I'm making the decision, and I was not

10   making the decision.

11       Q    Other than Secretary Ross, as the

12   Secretary, and the people in the Census Bureau, as

13   the experts, who else decided who else made

14   recommendations concerning whether or not there

15   should be a citizenship question?

16       A    In October -- in December, when this

17   came, that the question needed to be evaluated and

18   a discussion about whether the question would be

19   on the 2020 -- 2020 form of questions going to

20   Congress in March of '18, I spoke to the senior

21   people at the Census, the senior team.  And I

22   said, we have this letter.  We need to now give

1   the Secretary all the information.  He needs to

2   make this decision.  And there are pieces of it,

3   and what is your recommendation?  And when we

4   spoke to them, we said at the top of the house,

5   there needed to be a legal review.  There needed

6   to be a technical/operational review and a policy

7   position.  Those were the three major things that

8   needed to take place.

9           Obviously, the legal review being done by

10  the legal department.  The Census handling the

11  technical and operational -- technical or

12  operational, whatever term you prefer, review, and

13  the combination of those plus auxiliary

14  information that would be provided would create

15  the ability for the Secretary to make a policy

16  position on that.

17       Q   And that was something you did in

18  December of 2017, after you received a letter from

19  the Department of Justice; is that right?

20       A   All of those things?

21       Q   Yes.

22       A   What we did in December and at -- what we

1  did in December is came up with a strategy on how

2  to -- how to work through this process, working

3  very much with Census, because I went to them and

4  said, have we done this before -- you know, you

5  always go back, have we done this before, how do

6  you do it, what do we think about it?  And, of

7  course, the answer is no, this really -- there was

8  not precedence on it.

9          And that's where we said, okay, at the

10  top of the house has to have a legal review, a

11  technical/operational review and then that leads

12  to a policy decision or policy review.

13          And so we then said okay, if, in fact,

14  the question needs to be to Congress, by law, on

15  March 31st, which -- and not that I want you to

16  think I'm a walking calendar, because I've already

17  made mistakes -- but March 31st was the date that

18  it has to legally be there, that happened to be

19  Good Friday.  So for courtesy, you would bring it

20  to them on the Thursday.  So we sort of walked

21  back and said, what are we going to do over the

22  next months?

1      Q    Or did you?

2      A    I don't recall.

3      Q    Do you think you might have discussed

4   with it Mr. Jarmin?

5      A    We certainly laid out what events had to

6   take place through next March, and we sort of

7   looked at that big timeline of what had to happen.

8   And when the conversations of the questions needed

9   to get to Congress by the 31st, I can't recall if

10  there was a discussion on that.

11     Q    Let me be very clear.  You testified a

12  moment ago, I thought, that it was the

13  Department of Justice letter in December that

14  prompted you to call in Mr. Jarmin and others in

15  the Census Bureau and ask for their input on the

16  citizenship question, correct?

17     A    It was that letter that -- that we then

18  sat with the people from the Census Bureau to say,

19  it's coming up in March now.  We've got this

20  letter.  We need to address how do we do this,

21  what is the process that would take place and the

22  strategy around how to make this happen.

Page 105

1    exhibit.

2            (Plaintiffs' Exhibit 9, Email, was

3    marked.)

4    BY MR. GROSSI:

5        Q    Exhibit 9.

6            Exhibit 9 is an email chain that begins

7    on August 29th where Mr. Davidson wrote to

8    Mr. Hernandez, Comstock, Uthmeier and other names

9    that have been blocked out, as well as a copy to

10   Ms. Teramoto.

11       A    Excuse me.   Are they other names or are

12   they just simply the email addresses?

13       Q    I'm not sure.   I really don't know.

14           It says, "The Secretary asked to set up

15   briefing" -- "a briefing on some key legal issues

16   he is concerned about."   And the overall subject

17   line is census.   "Can we get something on the

18   books for next week when Izzy returns.   I can't

19   find Karen in the directory, but she should be

20   included, as well."   And then there is additional

21   information about scheduling leading to an email

22   from a Chelsey Neuhart -- haus to various people

1   indicating that she wanted to confirm that the

2   attendees at the next census briefing regarding

3   legal questions should be Ms. Teramoto,

4   Mr. Hernandez, Mr. Comstock, Mr. Uthmeier,

5   Mr. Davidson and you, Ms. -- Secretary Kelley.

6           Now, we have not been provided with any

7   information about what the subject matter was,

8   other than it has been produced in the case.  And

9   what I want to ask you is:  Do you recall in late

10  August 2017, attending a meeting where legal

11  issues involving the census were discussed?

12      A   No.  I do not recall that.

13      Q   Do you think it's possible --

14      A   I do not remember is what I said.  I

15  apologize.

16      Q   Is it possible that one of those legal

17  issues was this question you mentioned about the

18  legal implications of adding a citizenship

19  question to the census?

20          MR. GARDNER:  Objection.  Form.

21          THE WITNESS:  Sir, I don't remember the

22  meeting.  I don't know that the meeting got

Page 107

1    cancelled, took place, whether I could be there or
2    not be there.  So for me to speculate, at all, as
3    to what was discussed or not discussed would be an
4    erroneous things.  I just have no recollection of
5    this whatsoever.  And even if there was a meeting,
6    did I get called to something -- I just don't
7    know.  I would be speculating if I said anything
8    to this.
9    BY MR. GROSSI:
10        Q    And you don't recall specifically on the
11   last page, what legal issues -- key legal issues
12   Secretary Ross was interested in pertaining to the
13   census at about this time?  Doesn't refresh your
14   recollection?
15        A    No, it does not, sir.  It does not.  I'm
16   sorry.  It does not.
17        Q    Let's take the next one.
18            (Plaintiffs' Exhibit 10, Email, was
19   marked.)
20   BY MR. GROSSI:
21        Q    I marked as Exhibit 10, 9799 and 9800.
22   It's an email sent to Karen Kelley on

1   December 5, 2017 from Mr. Willard.   The subject is

2   items to cover with Izzy.   I'm just going to refer

3   you to one portion of it.   It says, "Karen, please

4   find below and attached a list of items to cover

5   with Izzy today."

6          And I'm going to direct your attention to

7   the 11th numbered item on the second page, which I

8   will read that says, Higgins amendment:   House

9   Rules committee considering today, at 4:00 p.m.,

10  an amendment that would block all fiscal 2018

11  funding for the 2020 decennial census unless the

12  survey includes questions about residence,

13  citizenship and immigration status.   The amendment

14  comes amid concerns that the 2020 census is

15  already in danger of being underfunded, unquote.

16          Do you recall attending a meeting and

17  discussing with Mr. Hernandez and others the issue

18  of adding a census question to the 2020 census,

19  either in context of the Higgins amendment or

20  anything else in September 2017?

21     A   Allow me to take a look at this email,

22  please.

Page 109

1    BY MR. GROSSI:

2        Q    Sure.   My question, again, is:   Whether

3    this refreshes your recollection that on or about

4    September 5th, you were meeting with various

5    people at the Commerce Department to talk about,

6    among other things, an amendment that would block

7    fiscal funding unless a citizenship question was

8    added to the 2020 census?

9        A    I do not recall this document, at all,

10   but at the beginning, we were meeting with several

11   people.   And, in fact, you can see in here it

12   says, "Izzy also confirmed that there is a 3:30

13   p.m. with the Secretary to discuss the budget,"

14   which I said has -- a big topic and one I was

15   spending a lot of time on.

16            I -- I will tell you that there were a

17   lot of topics on this discussion -- on this

18   agenda, and I cannot confirm or deny that they

19   took place.   The meeting was scheduled once and

20   then rescheduled, so I couldn't even tell you that

21   this meeting actually took place, to my

22   recollection.   But I'm not saying to you these

Page 110

1    would not have been topics we would have

2    discussed.

3        Q    You might have been discussing adding a

4    citizenship question as of September of 2017?

5        A    Well, if we went through this agenda and

6    actually got through it all, we would certainly

7    have been discussing the Higgins amendment, which

8    would have made sense, because you would have been

9    discussing topical news on the -- on the census.

10       Q    And that would have a big impact on the

11   census, right, in terms of its funding?   That's

12   what the message says.

13            MR. GARDNER:   Objection.   Lack of

14   foundation.

15            THE WITNESS:   Sir, I -- the last thing I

16   want to do is be, at all, argumentative with you.

17   But it says, "The amendment comes amid concerns

18   that the 2020 census is already in danger of being

19   underfunded."

20            So it sort of dissects those and says

21   there is already a concern here and now this has

22   come up.

Page 111

BY MR. GROSSI:

    Q   Because the amendment would have not funded the census, at all, if it didn't have this question?

    A   It certainly would be a problem, wouldn't it?

    Q   Right.  And do you remember discussing that issue?

    A   No.  I do not.  Do not.

    Q   Is there anybody on this email that you can identify as a member of the Census Bureau? Just a minute.

    A   Repeat your question, sir.

    Q   It's simply, are there any of the names on this as people who were aware of this meeting or attended this meeting who were members of the Census Bureau?

        MR. GARDNER:  Objection.  Lack of foundation.

        THE WITNESS:  The memo came to two people, myself and Aaron Willard.

BY MR. GROSSI:

Page 114

1   saying I wasn't there.  I'm not denying it.  I'm

2   not confirming it.  I'm saying I wasn't there, so

3   I, therefore, cannot answer who was at the

4   meeting.

5   BY MR. GROSSI:

6        Q    Do you recall, at all, telling people

7   such as Mr. Hernandez or Mr. Willard that if they

8   were considering matters of great importance to

9   the census, they should consult with Mr. Jarmin

10  and other people at the Census Bureau?

11       A    That question is out of context of this

12  memo, but from August 21st when I showed up, we

13  consulted and had communication and conversation

14  all the time with the senior officials at the

15  Census, Dr. Jarmin included.  We were -- I said

16  and we lived by we were going to live under

17  the -- we were going to be very communicative and

18  talk with them.

19           So your question was:  Did I tell people

20  of anything of importance with the census -- to

21  talk with them?  The answer is:  We would have had

22  that conversation.

Page 115

1    Q   I'm sure.  That's all I was trying to

2    establish.  That, as a general rule, a general

3    policy, when issues of importance to the Census

4    were developed by people of Commerce -- I'm

5    distinguishing the superiors at Commerce -- your

6    role was to tell those people to discuss it with

7    the people at the Census Bureau, correct?

8    A   That would have been my policy.

9    Q   Yes.  Right.  But your best recollection,

10   and from all that we can tell and from what

11   Mr. Jarmin told us, you did not discuss adding a

12   citizenship question with Mr. Jarmin and other

13   people at the Census Bureau prior to

14   December 2017; is that also your best

15   recollection?

16        MR. GARDNER:  Objection.  Form.

17        THE WITNESS:  My best recollection, which

18   I've told you, is that I don't remember when I

19   discussed that for the first time with the people

20   at Census.  You then indicated that Dr. Jarmin

21   said -- you asked if I would say he was lying, I

22   said absolutely not.  I would not say that.  But

1   though, is, simply, he's saying he's going to drop

2   off some review materials, conveying that they

3   were physical.  Do you remember him doing that?

4        A   No.  I do not.

5        Q   Can't help us, at all, about whether you

6   ever saw a legal memorandum from him?

7        A   I cannot help you, at all.

8        Q   Now, before the break, we were talking

9   about some documents that showed that Mr. Comstock

10  was working with Mr. Ross to determine if the

11  Department of Justice had any interest in adding a

12  citizenship question.  And what I'd like to

13  determine is whether, in fact, you knew anything

14  about that effort prior to the time that the

15  letter came over from Justice in December of 2017.

16           MR. GARDNER:   Objection.   Form.

17  BY MR. GROSSI:

18        Q   So my question is:  Did you know anything

19  about an effort to get the Department of Justice

20  to send such a letter?

21        A   I knew there were conversations between

22  Commerce and Justice.

Page 127

1      Q    And did you know the substance of those

2  conversations, even in summary form?

3      A    That it was about the citizenship

4  question, yes.

5      Q    Okay.  And that Secretary Ross was hoping

6  to get the Department of Justice to support a

7  request for such information, correct?

8      A    And that's where you're taking it to I --

9  those are details that I do not know.

10      Q    You just know he was discussing it with

11  the Department of Justice?

12      A    Yes.

13      Q    And you didn't have anything to do with

14  any of those discussions; is that right?

15          MR. GARDNER:  Objection.  Form.

16          THE WITNESS:  No.

17          Are you asking me if I participated in

18  any of those discussions?  The answer is:

19  Absolutely not.

20  BY MR. GROSSI:

21      Q    And he didn't brief you of any of those

22  discussions in the fall of 2017?

Page 130

1    been a cursory conversation with the

2    Census Bureau.  I do not recall.  I know when it

3    was -- when we were clear there was going to be a

4    letter, that I spoke with Dr. Jarmin and others at

5    the Census.

6        Q    What about at the Department of

7    Homeland Security, do you recall being told that

8    Secretary Ross and Mr. Comstock and others were

9    attempting to elicit their support for a

10   question -- citizenship question?

11       A    No.  I do not know anything about that.

12       Q    Did anybody --

13       A    I'm not aware of that.

14       Q    Nobody ever told you of an interest in

15   the Department of Homeland Security about having

16   Census include a citizenship question; is that

17   right?

18       A    Not to my recollection, no.

19       Q    Okay.  And you don't recall hearing,

20   around Thanksgiving, around the end of November,

21   that Secretary Ross had finally lost patience with

22   the Department of Justice and needed to get

Page 131

1    something from them to justify a citizenship

2    question?  Does that ring a bell with you?

3        A    No.

4        Q    You never talked with Secretary Ross in

5    November about his frustrations with the

6    Department of Justice; is that right?  Or is it

7    possible?

8           MR. GARDNER:  Objection.  Form.

9           THE WITNESS:  Sir, you are -- I could

10   have been briefed.  I could have been told that

11   there was frustration.  We don't know if we're

12   getting a letter, but it was not -- it was not at

13   the top -- if I can use the -- you know, the old

14   -- front -- front burner, it was not a

15   front-burner issue.  We had front-burner issues to

16   get ready for the '18 end-to-end test.  We, at

17   that point, had a -- were in a situation where

18   AT&T protested the group that was using the

19   handhelds.  So if we didn't get through the

20   protest, we wouldn't have handhelds for the '18

21   end-to-end test.  So I apologize, but those were

22   top-of-the-house issues to me.  That -- we were

1   dealing with those.   We had so many fires to be

2   putting out on those kinds of issues that were

3   happening and the time frame prep -- getting ready

4   for the end-to-end test in April, those were the

5   topics we were -- I was spending my time on.   So

6   if somebody over here said we're working on the

7   citizenship question and the Secretary is

8   frustrated, I would not know it.   It would not be

9   top of my mind.

10  BY MR. GROSSI:

11      Q   Were you surprised, though, they wanted

12  to add a question with all the rest of what was

13  going on and the need to test that question ahead

14  of time?

15      A   Sir, you already asked me earlier.   This

16  question was not for the end-to-end test.

17      Q   Okay.

18      A   We were prepping up for the end-to-end

19  test, which would then be, obviously, into the

20  2020 census.

21      Q   But you said earlier you were concerned

22  or it was a difficult thing, because when you

Page 135

1    BY MR. GROSSI:

2        Q    Right.  Did you express any frustration

3    to anyone that you had not focused on this issue

4    until the mid-December, period?

5        A    Not to my recollection.

6        Q    Okay.  Did any of the people at the

7    Census Bureau say that this was a very short time

8    frame in order to properly vet and test a new

9    question?

10       A    Not that I recall.

11       Q    Let's have this marked.

12            (Plaintiffs' Exhibit 13, Email, was

13    marked.)

14    BY MR. GROSSI:

15       Q    I'm marking as Exhibit 13.

16            MR. GARDNER:  Is the second page supposed

17    to be blank -- Peter, is the second page supposed

18    to be blank?

19            MR. GROSSI:  Yes.

20            THE WITNESS:  Second page blank?

21            MR. GARDNER:  Yes.

22    BY MR. GROSSI:

1    Q    What I've marked as Exhibit 13 is an

2  email from Mr. Jarmin to various people identified

3  by email addresses at the Census saying, as of

4  Friday, December 15, 2017 that he needed to huddle

5  with that staff and propose a time of 8:30 the

6  following morning -- the following Monday, which

7  would have been December 18th.

8         Do you recall Mr. Jarmin -- Dr. Jarmin

9  telling you that he would want to involve a number

10  of technical experts in evaluating the request to

11  add a citizenship question to the 2020 census?

12    A    Yes.

13    Q    What did he tell you?

14    A    He told me he was going to get the team

15  together and come up with it.

16    Q    Did he express surprise at that point

17  because he had not heard previously that this was

18  a possibility?  What do you remember about that

19  meeting or phone call?

20    A    Prior to -- so if you go down to this

21  December 15th bottom email, if you --

22         THE WITNESS:  Does everybody have this

1    paper?

2           Okay.  If you go down to that

3    December 15th, what had happened was the

4    Department of Justice said they were sending a

5    letter, a letter was forthcoming.  And I -- I

6    called -- I told the Census that a letter was

7    forthcoming, but they did not get it because they

8    sent it to the Department -- excuse me -- the

9    Census Bureau, not the Department -- they sent it

10   to the Census Bureau with a stamp, in the mail, in

11   the postal.  Somebody, as a courtesy, legal to

12   legal, or whatever, as a courtesy, sent a copy to

13   the Department.  So I asked that it got sent to

14   Dr. Jarmin and Enrique Lamas, who is also a

15   doctor.  I don't want to be rude there.

16           So I asked that that be sent to them.  So

17   they -- before -- you said were they surprised, so

18   before that, they knew something was coming.  This

19   was what was sent with the -- with the note.

20           I -- I -- I'm -- I'm just reading it.

21   I'm like a little confused because it says, "I

22   understand the Department of Justice sent the

1   attached letter."   But there's no attachment, and

2   this is a blank page, so maybe there's a --

3        Q    Well, I can give you the letter --

4        A    No.  No.  No.  But I -- it was

5   attached --

6        Q    Right.

7        A    It was attached to this.

8        Q    Right.

9        A    And it's just not on here --

10       Q    So the situation was --

11       A    So I then sent them -- I had asked

12  Mr. Uthmeier to send them the letter, so they then

13  had the first chance to read it.   But they knew it

14  was coming, so there was no shock in law [sic] in

15  that conversation.

16            He said -- we talked.   He said, fine.

17  Let me get a group together.   Let us think about

18  it.   And we said at that point -- we had a

19  conversation between Ron Jarmin, Enrique Lamas and

20  myself -- and I don't want to tie it to any time

21  or date on this letter -- but at the time, I said

22  what -- I said, tell me historically what happens,

1   what do we do here?   You're the technical experts.

2   Well, really, a question hadn't been added, but

3   they said the fundamental things that need to take

4   place is there needs to be a legal review, a

5   technical operational review and a policy decision

6   review from that.   And that's the guiding

7   principles in how we had to work on it.

8           And so I said, fine, let's get thinking

9   about this, and we need -- you need to do your

10  thing as the experts at the Census.   And from my

11  position, as a convener, if you will, having that

12  we need to put a -- a strategy, as I said earlier,

13  in place, so that we can back up to the date of

14  the 31st of March, which was very much what we did

15  on many things.

16          There were other decisions that the

17  Census had to make by certain dates, such as race

18  and ethnicity, and other decisions that needed to

19  be done, such as where to count certain -- certain

20  groups, and all of those things would have a date

21  they need to be done by here, how do you back up

22  so we can get all the information?   So this took

Page 140

1    on the similar process.

2        Q    And who --

3        A    Does that help answer your question?

4        Q    Yes.   Thank you.

5             And who was it that said there should be

6    a legal review?

7        A    I asked the Census, and it was a

8    conversation I had with the Census.  So I don't

9    remember exactly who at the table said this is

10   what needs to happen, and that's when I said,

11   okay, so that's the guiding principles that we

12   should work from.

13       Q    And I want to flesh that out.   What sort

14   of legal review do you recall them discussing?

15   What needed to be reviewed?   What aspects of

16   legalities?

17       A    The rule of thumb on -- at the

18   census -- and, again, I'm not giving

19   you -- I'm -- I'm not a Census employee for

20   30 years, and I'm not a technical expert on these

21   things, and I am not a lawyer, okay.

22             So in a very layman's terms, the rule of

1    thumb when we looked at legal reviews was two

2    things.   Number 1, is there a statutory reason or

3    a program-added reason that this question that

4    this -- that this should happen?   And that was

5    some of the things we talked about.

6    Whether -- and I am not a lawyer, so handing it to

7    legal guys -- if there was further review they

8    wanted to do, but that was two things that was --

9    that were always important.

10       Q   And who made that legal review at Census

11   or for Census?

12       A   That was done by the legal team, and I

13   know there were a number of lawyers on it.   I

14   can't speak to all of them.

15       Q   Who?  Give us the name of the people you

16   recall.

17       A   I just said there was a number of people

18   involved, and I can't speak to all of them.

19       Q   But do you know any of them?

20       A   Sure.  Some of them would have included

21   Barry Robinson, who was with Census.

22   Melissa Creech -- Creech, I think is how you

Page 144

1      A    They were absolutely involved.  To my

2   knowledge sound -- absolutely sounds --

3      Q    And you saw copies of those memorandum?

4      A    No.  I did not.  Well, I did -- I saw

5   some documents.  So I -- but I -- I was not an

6   expert on those documents.

7      Q    Okay.  Now, we're going to go right now,

8   in a few minutes, into the technical aspects that

9   were mentioned, and I think you're going to

10  hear -- see a number of memoranda in January and

11  February of 2018.

12          With that as background, do you remember

13  when you saw or knew about the legal reviews?  Was

14  it before, in the same time frame or after you

15  knew about the technical reviews?

16     A    I would -- I would want to leave the

17  group with the understanding that there were

18  paths -- two simultaneous paths going on.  There

19  was a legal review happening.  There was a

20  technical review happening.  And that was

21  informing the policy review.

22     Q    And you had understood determining

1  whether it was statutorily mandated or appropriate

2  was something that was normally done when a new

3  census -- citizenship question was asked -- I'm

4  sorry -- when a new census question was asked?

5      A    That was my understanding from the

6  technical experts at the Census.

7          The -- it was also my understanding that

8  the Census lawyers and the Department lawyers

9  worked together.

10     Q    I'm going to mark as Exhibit 14 another

11  email from the same day, the same time.

12         (Plaintiffs' Exhibit 14, Email, was

13  marked.)

14  BY MR. GROSSI:

15     Q    And this is from Enrique Lamas.  He is

16  the assistant director of the Census, correct?

17     A    He is the acting assistant director, sir,

18  to be technical.

19     Q    And it's to, again, Mr. Willard, that

20  we've talked about, but also cc's to Mr. Jarmin,

21  and he's responding to an earlier email from 12:01

22  from Mr. Willard saying, "Hey, guys.  Karen got a

1  call from the Secretary and has an update for all

2  of you.  If you can step away from the FESAC" --

3  F-E-S-A-C -- "it is regarding a letter from the

4  Department of Justice," unquote.

5          Do you recall getting a call from

6  Secretary Ross presumably either on or shortly

7  before December 15th?

8      A   I don't recall what this is about.  I

9  don't recall what this is about, but --

10     Q   Well, it says it is regarding a letter

11 from DOJ.

12         Do you see that?

13     A   And if you see the page before, which

14 your handed me, and the bottom, which I

15 articulated to you that I asked James Uthmeier

16 that -- and I told you -- it doesn't say it

17 here -- but that James sent them the letter that

18 afternoon, the -- the problem with making

19 assumptions or speculating is that I could be

20 totally wrong.  So I am -- I -- I don't

21 necessarily want to do that.

22         But if I were to be making an educated

Page 147

1    guess, would you tolerate an educated guess --

2        Q    Yes, please.

3        A    -- that could be wrong?

4             I learned we had the letter.   I said

5    let's get those guys, but they're in the FESAC

6    meeting, which is federal economic statistical

7    committee, so it's an important committee, so I

8    didn't want to -- if they could come out, and that

9    we would -- we got the letter, we will send it to

10   them.

11            That would be me taking a -- seeing these

12   things and saying -- but do I specifically

13   remember this?   No, I can't tell you I do.

14       Q    Okay.   That was helpful.   So what you're

15   saying is you do -- do you remember calling them

16   out of a meeting that was important?

17       A    No.   That's -- that -- that says if you

18   can step away the FESAC.   That means if there's a

19   break or whatever.   I am extremely respectful of

20   these guys, and I think you've met Dr. Jarmin and

21   you've met Dr. Abowd.   These guys are brilliant.

22   They are hard working.   They are incredible.   I

Page 148

1  don't call them out of anything.  I say when you

2  can speak to me, I appreciate.  No.  No.  No.  I

3  would never call anybody out of anything, sir.

4      Q   So this was a relatively unusual thing,

5  for you to be pressing on their time in this way,

6  right?

7      A   Yes.

8      Q   What was it that Secretary Ross told you

9  was so important?

10     A   As I said, sir, I don't remember -- and,

11  also, I didn't write this.  So people love to use

12  the Secretary's name in the vernacular of, the

13  Secretary called.  It could have been the

14  Secretary's office.  It could have been somebody

15  in connection.  So people love to use that,

16  Number 1.  Whether the Secretary called or not, I

17  can't speak to that, okay.

18         And all I'm trying to do is say from this

19  document, because I generically remember what

20  happened, that we got the letter.  They did not

21  get the letter until later, because it came with a

22  post stamp on it, and I felt very strongly as soon

Page 154

1        A    I do not recall.

2        Q    Okay.  But what you did was you turned to

3   your experts in the Census Bureau, correct?

4        A    That is correct.  Because what I felt

5   was -- you are characterizing this as the

6   Secretary put pressure on me to make this a

7   priority at the Census.  Once I told the Census

8   this letter was somewhere in the works and they

9   hadn't got it yet, it was priority for them to get

10  it, and it was priority to service the

11  Census Bureau and --

12       Q    And that's --

13       A    -- the executives.

14       Q    And that's what, then, you did?

15       A    That's what I did.

16       Q    And in January, February, March, you

17  worked with the Census Bureau people to prepare

18  drafts and respond to various questions of

19  Secretary Ross concerning the addition of the

20  citizenship question, correct?

21       A    Correct.

22       Q    Now, I want to --

1      A    I want to be sort of -- yes.   But as in

2  my role, what I did is I sort of was the convener,

3  and I got a group together to say, Census said

4  these are the three aspects we need to deal with.

5  So we know we've got legal people.   We know we've

6  got Census people, and we know we've got policy

7  people so that we can go down this path.   It

8  becomes very iterative and evolutionary at that

9  point.   So we put a team together that could look

10  at these things.

11      Q    And as the Under Secretary responsible

12  for the Census Bureau, and someone who had told

13  Congress that you wanted to make a complete and

14  accurate 2020 census a high priority, are you

15  saying that you did not feel it was your place to

16  make a recommendation or conclusion about whether

17  the citizenship question should be added?

18      A    That decision was a decision that the

19  Secretary makes.   It was absolutely my job to make

20  sure he got a full breadth of information and

21  opinions.   There were certain decisions that the

22  director made.   And so we'd have meetings, and I

Page 156

1    would not give Ron Jarmin -- excuse me --
2    Dr. Jarmin my opinion on what he should do.  It
3    was his decision to make.  It was my position
4    to help and facilitate.
5        Q    Right.
6        A    So there was all kinds of decisions that
7    needed to be made by all kinds of people, and I
8    can promise you I didn't tell you -- the
9    technology people how to do their jobs either.
10       Q    Okay.  Let me go through some documents
11   that I think I saw you were involved in.  I just
12   want to get your recollection of how that process
13   proceeded.
14       A    Great.
15       Q    We're marking as Exhibit 15 a one-page
16   email Bates number 9679.
17            (Plaintiffs' Exhibit 15, Email, was
18   marked.)
19            THE WITNESS:  I'm sorry.
20   BY MR. GROSSI:
21       Q    Now, this is an email chain, on the
22   bottom, Mr. Jarmin wrote to Karen, "Happy New

Page 157

1  Year.  I'd like to discuss the following with you

2  as soon you have a chance."  And the third item

3  mentioned is strategy to the Department -- to the

4  DOJ letter on citizenship.  And then that is

5  followed by an email from the name is blacked out,

6  however, the initials KDK are at the bottom of

7  that email, saying, "Perfect.  Let's discuss

8  tomorrow."  Which I guess would have been the 3rd

9  of 2018 -- 3rd of January 2018.

10        Despite the fact that someone has blacked

11 out the name, can you confirm that is your email?

12     A    Again, can I confirm that I wrote this

13 email on January 2nd of 2018, that many months

14 ago?  The answer is no, I can't confirm that.

15 Somebody could have written this.  But would I

16 suspect and would I -- would I say yes, most

17 likely, that is mine, that --

18     Q    Right.

19     A    And I do sign things by KDK, which are my

20 initials.  So I have no problem going forward.

21 But I cannot promise you absolutely, categorically

22 that I wrote this email.

Page 167

1   That's what the memo says right here.

2   BY MR. GROSSI:

3       Q   But you remember this information being

4   conveyed to you, correct?

5       A   Sir, are what you asking me, do I

6   remember me getting a memo where these

7   alternatives were in here and these numbers were

8   herein?

9       Q   That's one question, yes.  Do you

10  remember that?

11      A   Yes.  I remember that.

12      Q   And do you remember discussing it with

13  them?

14      A   We discussed it on multiple -- multiple

15  occasions.

16      Q   Okay.  Let me ask this:  In all the

17  time -- and now I'm taking it all the way through

18  the March 26th final decision -- did the Census

19  experts ever conclude that there would not be

20  additional costs to adding -- as a result of

21  adding the question on citizenship?

22      A   The discussions we had went not only with

Page 168

1    a complete, accurate and the cost, and yes, we did

2    say that there would be an additional cost.

3         Q    And they always maintained that view, to

4    this day, as far as you?

5         A    As far as I know.

6         Q    Okay.   That's what I'm looking for.   I'm

7    looking for them ever coming to you and saying,

8    you know, Under Secretary, we were wrong?

9         A    But they didn't know it.   They didn't

10   know it.   It was what they thought.   They did not

11   know what would happen.   We won't know the answer

12   to that until 2020.

13        Q    And you knew that the Census people were

14   providing you with their best estimate, correct?

15        A    They were certainly doing -- coming up

16   with their conclusion.

17        Q    We don't know how bad it might be; is

18   that right?

19        A    We -- we cannot -- you and I cannot

20   speculate on the future.

21        Q    But the Census experts can give you and

22   Secretary Ross their best estimates?

1      A    I'm sorry?

2      Q    You have to -- you have to say yes for

3   the record.

4          MR. GARDNER:  She's asking you to repeat

5   the question.

6          THE WITNESS:  Sorry.  Could you repeat

7   the question?  I'm sorry.

8   BY MR. GROSSI:

9      Q    Oh.  I'm sorry.

10          Dr. Jarmin asked these various people to

11   be involved, to prepare a memorandum for him on

12   this issue?

13      A    That is my assumption.

14      Q    And Dr. Jarmin understood that he should

15   enlist the best people at the Census Bureau?

16          MR. GARDNER:  Objection.  Calls for

17   speculation.

18          THE WITNESS:  I can't --

19          MR. GARDNER:  No foundation.

20          THE WITNESS:  I can't tell you what

21   Dr. Jarmin was thinking.

22   BY MR. GROSSI:

1      Q    Did you ever say to Dr. Jarmin, why

2   didn't you include, Mr. X, Ms. X?

3           MR. GARDNER:   Objection.   Form.

4           THE WITNESS:   Dr. Jarmin is an -- is the

5   direct- -- is the acting director of the Census.

6   I did not question him.   I asked him if he would

7   put together the team he wanted to put together.

8   BY MR. GROSSI:

9      Q    Okay.   Let me ask you this:   Are you

10  satisfied that he did a good job selecting the

11  right people and coming up with a competent

12  assessment, or not?

13     A    The Census did the very best job they

14  could on this.

15     Q    Now, it goes on on the next page, 5474,

16  again, to say with respect to Alternative B,

17  quote, it would lower -- I'm sorry -- it would

18  result in lower quality enumeration date, unquote.

19          Do you remember that being the view of

20  the Census experts as of early January 2018?

21     A    At this point in the decision, that was

22  their assessment.

1      Q    Did they ever change that assessment,

2  which is specifically that adding the citizenship

3  question would result in lower quality enumeration

4  data?

5      A    I do not believe so.

6      Q    And then it goes on to say, that they

7  also estimate that asking the citizenship

8  question, quote, would result in 154,000

9  fewer -- and they emphasize that

10 word -- enumerations.   This is also a lower bound

11 estimate on the loss of accuracy, unquote.

12         Let's take them in pieces.   Did -- have

13 the Census Bureau experts ever changed their

14 opinion that asking the citizenship question would

15 result in 154,000 fewer correct enumerations?

16         MR. GARDNER:   Objection.   Lack of

17 foundation.

18         THE WITNESS:   Conceptually, I -- they

19 have not, but this has evolved, and the numbers

20 have evolved.   And I don't want to get caught

21 saying absolutely that number did not change over

22 three months and a whole lot of work, so please

Page 174

1    don't put me in that box.

2    BY MR. GROSSI:

3        Q    Okay.   We'll look at this.   I don't mean

4    to do that.   We'll look at the subsequent ones.

5            Do you also remember that when they made

6    these estimates, they were emphasizing that this

7    was the lower bound, which is to say it could have

8    been worse?

9        A    It says it right there.   This is the

10   lower bound estimate.

11       Q    And they've never changed their view

12   about that, have they?

13           MR. GARDNER:   Objection.   Lack of

14   foundation.

15   BY MR. GROSSI:

16       Q    To your knowledge, as the person who

17   supervised their work, they never changed that to

18   you, correct?

19       A    Not to my knowledge.

20       Q    Okay.   Now, let's go to the last page,

21   two points here.   At the very beginning, it says,

22   "Alternative C delivers higher quality data for

1    Alternative B for DOJ's stated uses," unquote.

2          Now, let's just change the nomenclature.

3    Alternative C was a program of using

4    administrative data and not asking the citizenship

5    question, correct?

6        A    Correct.

7        Q    Alternative B --

8          THE WITNESS:   Correct.   I said correct,

9    everybody.

10   BY MR. GROSSI:

11       Q    Alternative B was asking the citizenship

12   question, correct?

13       A    Correct.

14       Q    So it was the view of the Census experts

15   that as between the two, using this administrative

16   data without a citizenship question or asking the

17   citizenship question, it would be preferable in

18   terms of getting quality data for DOJ's stated

19   uses to go with the administrative data, correct?

20          MR. GARDNER:   Objection.

21   Mischaracterizes the document.

22   BY MR. GROSSI:

1    Q    That's how you understood it, right?

2    A    Please repeat your question, sir.

3    Q    Yeah.

4    A    You -- you -- you --

5    Q    Fair enough.

6    A    You're jumbling it.  And I will accept

7    this document as it is written here.

8    Q    Okay.  I just want to be clear, because

9    we're getting Alternative C and B here.

10        What they were telling you --

11   A    And A.

12   Q    And A, too.

13        But what they were telling you here was

14   that as between --

15   A    At this junction in time --

16   Q    Right.

17   A    -- when they wrote this memo --

18   Q    They thought it would be better to use

19   administrative data and not ask the citizenship

20   question from the standpoint of the

21   Department of Justice quality data, correct?

22   A    It says right here, "Alternative C even

Page 177

1    better meets DOJ's stated use."

2         Q    Than Alternative B, right?

3              And they've never changed their view on

4    that either, have they?

5              MR. GARDNER:   Objection.   Lack of

6    foundation.

7              THE WITNESS:   Not to my knowledge.

8    BY MR. GROSSI:

9         Q    Okay.   And then it comes down to the

10   recommendation, and they say Alternative A isn't

11   costly and doesn't harm the count, but then

12   referring specifically to the idea of adding or

13   not, it says, "Alternative B better addresses the

14   DOJ's stated uses.   However, it is very costly and

15   does harm the quality of the census count by

16   increasing erroneous enumerations," and then as

17   you just said a moment ago, they also said,

18   "Alternative C even better meets DOJ's stated

19   uses."

20             Let me take each little piece, all right.

21   As the Census -- have the Census experts ever

22   changed their view that Alternative B is very

1    costly?

2              MR. GARDNER:   Objection.   Lack of

3    foundation.

4              THE WITNESS:   Not to my knowledge.

5    BY MR. GROSSI:

6         Q    Have they ever changed their view that

7    Alternative B, adding the question, harms the

8    quality of the census count by increasing

9    erroneous enumerations?

10             MR. GARDNER:   Same objection.

11             THE WITNESS:   Not to my knowledge.

12   BY MR. GROSSI:

13        Q    Have they ever changed their view that

14   Alternative C, using administrative data without a

15   question, even better meets DOJ's stated uses?

16             MR. GARDNER:   Same objection.

17             THE WITNESS:   Not to my knowledge.

18   BY MR. GROSSI:

19        Q    Have they ever changed their view that

20   Alternative C, administrative data, is

21   comparatively far less costly than Alternative B?

22             MR. GARDNER:   Same objection.

 1          THE WITNESS:   Not to my knowledge.

 2     BY MR. GROSSI:

 3        Q    And then they say, "For these reasons, we

 4     recommend Alternative C, using administrative

 5     records without the citizenship question for

 6     meeting the Department of Justice's data request."

 7          Have they ever changed their final

 8     recommendation to use administrative data without

 9     a citizenship question additional rather than

10     adding such a question?   Have they ever changed

11     their recommendation in that respect?

12          MR. GARDNER:   No objection.

13          THE WITNESS:   Not to my knowledge.

14     BY MR. GROSSI:

15        Q    Okay.

16          MR. GARDNER:   Tell you what, we've been

17     going a long time.   Why don't we go off the record

18     and grab lunch?

19          MR. GROSSI:   I think this is a good time.

20     I agree.

21          VIDEOGRAPHER:   This concludes Media Unit

22     Number 3.   Time on the video is 12:34 p.m.   We are

1   not give an opinion on C or A or B.  I did not do

2   that.  It is a misrepresentation of what I said.

3   It could be a confusion or it's a game of

4   telephone tag, because it went from me to somebody

5   else.  I can't speak to it.

6        Q    Okay.  Is that because you never took any

7   position on how the citizenship issue should be

8   handled?

9        A    I never took a position on how the

10  citizenship issue should be handled.

11       Q    So if Dr. Jarmin testified, as he did,

12  that you never disagreed with the recommendations

13  of the experts at the Census Bureau to use

14  administrative records rather than a citizenship

15  question, you're not contradicting that testimony

16  in any way?

17       A    I didn't take a stance.  So I didn't

18  agree or disagree.

19       Q    Okay.  Fair enough.

20            Now I'd like to talk about a little bit

21  of a different topic.  Let's mark -- I'm marking

22  as Exhibit 18 some emails where the Bates number

Page 186

1    begins 5489 and runs to 5491.  The top email being

2    an email from Dr. Jarmin 1/3/2018 at 6:55 p.m.

3          (Plaintiffs' Exhibit 18, Email, was

4    marked.)

5    BY MR. GROSSI:

6        Q    Okay.  Now, Secretary Kelley, I think you

7    testified in words or substance before the break

8    that you viewed your job primarily as facilitating

9    and making sure that the best possible people at

10   Census focus on this particular issue of adding

11   the citizenship question; is that right?

12       A    I -- I said that I felt it was my job to

13   convene and organize and work with Census to put a

14   strategy in place for the overall timeline, as

15   well as provide the Secretary with the best

16   information for him to make a decision.

17       Q    Okay.  And this was specifically in the

18   context of a request that was received in December

19   from the Department of Justice about their needs

20   for certain data, correct?

21       A    Correct.

22       Q    Okay.  Did you also feel that as part of

1  your job, it was important to make sure that your

2  folks in the Census Department were talking

3  productively with the appropriate people in the

4  Department of Justice about what they needed and

5  how they could best -- how Census could best serve

6  their needs?

7      A   Quite frankly, the suggestion of a

8  meeting between Census and DOJ came from Census.

9  In one of our conversations, as we were going

10 through strategies and timelines, we talked about

11 what would you normally do when this comes up, how

12 would you normally handle it?  And they said they

13 would try to set up a meeting with the agency or

14 department or whatever it may be that wanted the

15 information and see -- you know, fine tune and

16 discuss and those kinds of things, and I said

17 super.

18     Q   Good.  I mean, and someone is asking

19 you --

20     A   I don't know if I actually said super.  I

21 want to be really clear.

22     Q   That's okay.

1    happening.  I'm talking to the Census.  We're

2    saying what do we do, what's the strategy?  They

3    say we're going to call -- and I support that

4    decision, if that's what they want to do and have

5    that meeting.

6    BY MR. GROSSI:

7        Q    Okay.

8        A    But I'm not hoping and -- you know --

9        Q    Poor choice of words.  I'm sorry.

10           Let's go over the particulars here.

11   Let's go to the last page -- actually, take a look

12   at the bottom of 5490.

13           A    Got it.

14           Q    And it indicates that Director Jarmin, on

15   Friday the 22nd of December, is sending an email

16   to Arthur Gary, who is later identified as someone

17   at the Department of Justice, and the subject is

18   the request to reinstate the citizenship question

19   on the 2020 census.  Dr. Jarmin writes -- first,

20   he thanks him for the letter of December 12th

21   about the request by the Department of Justice,

22   and then says the Bureau is fully supportive of

Page 190

1    working with Justice.

2            And then says, quote, to that end, I

3    directed staff to review all possible ways to

4    address the needs expressed in the letter.  They

5    have now briefed me, and their findings suggest

6    that the best way to provide P.L. 94 block-level

7    data, with Citizen Voting Population By Race and

8    Ethnicity would be through utilization of a linked

9    file of administrative and survey data the

10   Census Bureau already possessed.  This would

11   result in higher quality data produced at lower

12   costs.

13           Do you see that?

14      A    I see.

15      Q    And that's what we had referred to in the

16   Abowd memo that refers to as Alternative C,

17   correct?

18           MR. GARDNER:  Objection.  Lack of

19   foundation.

20           THE WITNESS:  It would appear that way.

21   BY MR. GROSSI:

22      Q    Okay.  And then to follow the train,

1   working backwards, very quickly, on the afternoon

2   of December 22nd, Mr. Gary, who's identified as

3   the general counsel of the justice management

4   division of the Department of Justice, writes back

5   to Dr. Jarmin saying, "Thank you.  We look forward

6   to meeting you and your team in early January,"

7   since now we're pretty much into the Christmas

8   season.

9          And then there is that break, and on

10  January 2nd, Dr. Jarmin writes back to Mr. Gary

11  and asks him if late the following week would work

12  for a meeting.  And then Mr. Gary quickly responds

13  back and says, "It should work fine.  Let me get

14  back to you."

15          And then on the very top, on January 3rd,

16  Dr. Jarmin writes to Mr. Gary and says, quote, I'm

17  bringing technical, program and legal folks.  It

18  would be good if some technical folks on the DOJ

19  side were there so we can ensure we understand and

20  can meet your requirements, unquote.  And then he

21  suggests a couple different days.

22          Were you aware at about this time that

1    Dr. Jarmin was trying to set up a meeting with the

2    Department of Justice including their technical

3    and program people?

4        A    As I indicated before, I knew he was

5    setting up a meeting.  The full compliment of

6    staff he was bringing, I would not have

7    questioned, and I'm not sure I knew or did not

8    know, but --

9        Q    Now, in fact, the meeting never took

10   place, right?

11       A    No.  The meeting did not take place.

12       Q    Why?

13            MR. GARDNER:  Objection.  Calls for

14   speculation.  Lack of foundation.

15   BY MR. GROSSI:

16       Q    Well, you would know why, wouldn't you?

17   You were involved in hoping that -- or planning

18   that Dr. Jarmin would set it up, right?

19            MR. GARDNER:  Objection.  Form.

20   Objection.  Mischaracterizes witness's prior

21   testimony.

22            THE WITNESS:  Again, Dr. Jarmin told me

Page 193

1    he was going to set up the meeting.  I did not get
2    involved in helping him plan to do that.  I
3    just -- he said he was going to set up the
4    meeting, I said good.  I support that.  That makes
5    sense.  Great.  So that is that issue.
6            Do I know that the meeting did not take
7    place?  Yes, I do know the meeting did not take
8    place.
9    BY MR. GROSSI:
10       Q    And do you know why?
11       A    It was under -- my understanding that the
12   Justice came back and said we really don't need to
13   meet.  We do not need to meet.  Our request is
14   what we've got in the letter, is the written
15   request.
16       Q    Basically, they didn't even want to
17   discuss the use of administrative data?
18       A    That's exactly right.  And we had seen
19   that before in a couple other examples.  Where we
20   wanted to meet with OMB on a topic, and they said,
21   no, what we've given you is what we've got, so we
22   don't need to meet.  I've seen that happen before.

1  that I would -- I can't personally say I remember

2  this agenda on January 11th.  I don't really even

3  know if I remember January 11th, but this would be

4  a typical agenda of the topics that now are

5  topical that we need to discuss.

6      Q   I take it you don't remember anybody

7  saying that the citizenship question should be

8  added at this meeting?

9      A   I do not remember that, but I do not

10 remember.

11     Q   Okay.  Let's go on, now, to the next one.

12         (Plaintiffs' Exhibit 21, January 9, 2018

13 memorandum, was marked.)

14 BY MR. GROSSI:

15     Q   All right.  I'm marking as Exhibit 21 a

16 memorandum and the Bates number is 1277 to 1285,

17 and it indicates it's dated January 9, 2018.  It

18 states to be a memorandum for Secretary Ross that

19 has been transmitted from Dr. Abowd through

20 Enrique Lamas, the acting deputy director, and

21 then Dr. Jarmin, the acting director -- or the

22 director, and then you, now performing the duties

Page 204

1    of deputy secretary.

2         Before we start, let me just ask you:

3    You assumed acting deputy secretary role in

4    November of 2017?

5         A   Yes.  I just want to clarify one thing,

6    and for those that do know this or don't know

7    this, there is in government -- and I'm new to

8    government -- a distinct difference between the

9    acting and the person who is performing the

10   nonexclusive functions and duties.  I just want to

11   be very clear that in any colloquialism, if

12   somebody calls me the acting, I am not the acting

13   deputy secretary.  I am performing the

14   nonexclusive functions and duties of the deputy

15   secretary.

16        Q   And so for a single salary, you're doing

17   two jobs.  You are performing the nonexclusive

18   duties of secretary and you're also the

19   Under Secretary; is that right?

20        A   Yes, I am.

21        Q   Well, I think that you should get a

22   raise.

```
 1      A   I am not an expert and technical genius
 2  on this -- what is the actual technical, but this
 3  goes through our exec seg process and all the
 4  people that should know and this is the process.
 5      Q   As a practical matter?
 6      A   As a practical matter, yes.
 7      Q   Fair enough.
 8      A   Yes.
 9      Q   And you sent this to Secretary Ross?
10      A   Yes.
11      Q   Now, I want to discuss this document in
12  some detail, and you can read the whole thing or
13  I'm going to direct your attention to specific
14  questions, and I think they'll be in fair context.
15      A   Okay.  May I just say that this memo was
16  from Dr. Abowd and it came through myself,
17  Dr. Jarmin and Dr. Lamas.  So you said you sent
18  this.  This actually was sent through the three of
19  us, okay.
20      Q   And all of you concurred it ought to go
21  up to Secretary Ross?
22      A   Indeed.
```

1      Q    Just to get the nomenclature correct

2   again, on the first page, the memo states, as

3   we've previously discussed, that the Census

4   experts had discussed three alternatives --

5      A    Excuse me, sir.   If you would not mind,

6   we've said prior to this that there have been many

7   iterations, many versions, many everything.   If

8   you wouldn't mind, I would like to take a minute

9   to look at this, as we are going to go through

10  this document.

11     Q    Sure.

12     A    Thank you.

13     Q    Ready to go.   Okay.   Secretary Kelley, in

14  this memo that we've marked as Exhibit 19 --

15     A    21.

16          MR. GARDNER:   21.

17  BY MR. GROSSI:

18     Q    Oh, I'm sorry.   21.   Thank you.

19          The first page is sort of a summary of

20  the recommendations, and I want to ask you about a

21  couple of them.   The Census experts begin by

22  saying that the Department of Justice has

Page 208

1   requested block-level citizen voting age

2   population estimates.

3           Do you see that?

4   A   Yes.

5   Q   That's what we've been referring to as

6   the DOJ request, correct?

7   A   Correct.

8   Q   And then they say, as they did in the

9   earlier versions, the prior memos, that they

10  considered three alternatives, A, no change in

11  data collection.  That is no additional

12  citizenship question, correct?

13  A   Correct.

14  Q   And B would be adding the question to the

15  2020 census, correct?

16  A   Correct.

17  Q   And C would be obtaining the citizenship

18  data and status from administrative records for

19  all of the census --

20  A   Right.

21  Q   -- population?

22          And then the Census experts in the memo

Page 209

1    that you forwarded to Secretary Ross states,

2    quote, we recommend either Alternative A or

3    Alternative C, correct?

4        A    Says right there in the memo.

5        Q    So they were not recommending adding a

6    question?

7        A    They were recommending A or C.

8        Q    Correct.  Neither of which added the

9    citizenship question, correct?

10       A    Correct.

11       Q    And they then go on to explain that in

12   their view, quote, Alternative C best meets DOJ's

13   stated uses, is comparatively far less costly than

14   Alternative B, does not increase response burden,

15   and does not harm the quality of the census count.

16       Do you see that?

17       A    Yes, I do.

18       Q    At no time have the experts in the Census

19   recanted or changed their view on any of those

20   four propositions with respect to Alternative C,

21   correct?

22           MR. GARDNER:   Objection.   Lack of

1    foundation.  Calls for speculation.

2         THE WITNESS:  I can't speak to what all

3    the people of the Census who participated in

4    putting this memo together, I can't speak to that.

5    I can agree with what you're saying on the page.

6    BY MR. GROSSI:

7       Q    What I'm asking you is:  You're not aware

8    of anybody -- anybody at the Census Bureau coming

9    to you or writing you and saying I disagree with

10   any of those four facts, correct?

11      A    Correct.  And your four facts are --

12      Q    We can take them one at a time.  C best

13   meets the DOJ's stated uses:  That was their

14   position then and it's their position now,

15   correct?

16         MR. GARDNER:  Objection.  Calls for

17   speculation.  Lack of foundation.

18   BY MR. GROSSI:

19      Q    I mean, in terms of lack of foundation,

20   these people do work under your supervision,

21   correct?

22      A    That is what they wrote in the letter.  I

1  don't know every single person at the Census -- I

2  don't want to get caught up in that situation.

3      Q    But they --

4      A    But they have written that here in this

5  memo, and I agree that that's what they wrote

6  here.

7      Q    And you also agree that from your own

8  knowledge of dealing with these people on this

9  issue and otherwise, you've never heard anybody

10  from Census saying that it was wrong that

11  Alternative C best meets DOJ's stated uses?

12     A    Not to my knowledge.

13     Q    And the same with no one ever said to you

14  that it was wrong that Alternative C is

15  comparatively far less costly than Alternative B?

16     A    Not to my knowledge.

17     Q    And Alternative C does increase the

18  response burden:  They never changed their mind

19  about that as far as you know, correct?

20     A    Not to my knowledge.

21     Q    And Alternative C does not harm the

22  quality of the census count:  You have no reason

1  to think that's not their view today, correct?

2          MR. GARDNER:   Objection.   Calls for

3  speculation.   Lack of foundation.

4          THE WITNESS:   Not to my -- not to my

5  knowledge.

6  BY MR. GROSSI:

7      Q    Now, let's talk about Alternative B,

8  which is adding the question.   And the Census

9  experts said that, in their view, Alternative B is

10  very costly.

11          Are you aware of anybody at the

12  Census Bureau who has said that that is not true

13  in their view?

14      A    It is costly if they are -- their

15  conclusions are correct.

16      Q    Okay.

17      A    It is more costly if their conclusions

18  are correct.

19      Q    And they've never suggested, as best they

20  understand it and believe, that their conclusions

21  in this memo are incorrect, they've never said

22  that?

Page 213

1      A    Not to my knowledge.

2      Q    They've also said that adding the

3  question would harm the quality of the census

4  count, correct --

5      A    That is what they said.

6      Q    -- they said that?

7           And you're not aware of any place where

8  they've changed their minds since this memo was

9  written?

10     A    Not to my knowledge.

11     Q    And then they finish off Alternative B by

12  saying that it would use substantially less

13  accurate citizenship status data that are

14  available from the administrative sources.

15          Do you see that?

16     A    I do.

17     Q    And you understood that was their view.

18          And as far as you know, that's still

19  their view today?

20     A    Not to my knowledge.  It did not change.

21     Q    Now, I'm going to go into the specifics

22  on the next page a little bit more, but let me

Page 219

1    are off the record.

2            (Off the record.)

3            VIDEOGRAPHER:  This begins Media Unit

4    Number 5.  The time on the video is 2:35 p.m.  We

5    are on the record.

6            (Plaintiffs' Exhibit 22, Email, was

7    marked.)

8    BY MR. GROSSI:

9        Q    Secretary Kelley, I'm going to give you a

10   document -- and I'm going to tell you right now,

11   I'm going to ask you about the front page and not

12   the attachment.  I'm going to show you a later

13   version of the questions, and we'll get into it

14   then.  If you want to just look at the first page,

15   I just want to get context of when you began to be

16   aware, again, of these questions that were being

17   floated.  And I'll just read in for the record,

18   and tell you why I'm interested, the top page,

19   2292, on Exhibit 22 is an email to Mr. Comstock

20   from Burt Reist, and it talks about the

21   citizenship questions complete set as of that

22   date, February 2nd, and then there is a set of the

Page 220

1    questions and answers.

2         A    We're not looking at those?

3         Q    Right.   And all I'm asking you is:   Was

4    it about the first week in February when you

5    returned that you learned that these questions and

6    answers were being circulated and being addressed

7    by the Census experts?

8         A    To back up, the day that we had the

9    meeting, there were questions being thrown out by

10   a lot of people.   Again, I want you to understand.

11   This process was iterative.   It was collaborative.

12   We were sitting around, people were asking

13   questions.   I was jotting down questions.   Other

14   people were jotting down questions.   We were sort

15   of compiling questions.   Then people had the

16   ability to come back later on and say, I just

17   thought of this.   There's another question.   So we

18   were sort of keeping a pile of the questions.

19             I was the keeper of the questions.   They

20   weren't all my questions, but they would refer to

21   them as Karen's questions or Karen's list or

22   Karen's whatever, just because I had them.   When I

1  did leave, I handed that document, that list of

2  questions to somebody else so that they would have

3  it so the work could continue, they knew where it

4  was.  And so when I returned, I knew the questions

5  were in process -- or some had been answered, some

6  had been processing, and I just needed to get

7  caught up on where they stood.

8      Q   Good.  Thank you.

9          Let me ask you a little bit more about

10  this meeting.  Whenever the date actually was, who

11  was present, the best you can remember?

12     A   There were -- certainly, Enrique Lamas,

13  Dr. Abowd, Dr. Jarmin -- I should say Dr. Lamas.

14  We had people from legal -- legal there.  We had

15  people from policy there.  Earl was there.

16  Comstock was there.  I believe both James and

17  Peter were there, but I -- I don't know exactly.

18     Q   Peter Davidson?

19     A   Yeah.  But, again, I'm not exactly

20  100 percent sure.  But it was a compliment of the

21  entire group of the three groups that I talked

22  about being involved.

1    Q    It was all Commerce and/or Census people,

2    correct?

3    A    Oh, yes.  As opposed to who?

4    Q    As opposed to the Department of Justice?

5    A    Oh.  No.  No.  No.  It was just Commerce

6    people, yes.

7    Q    And Secretary Ross was not there?

8    A    No.  He was there.

9    Q    Oh.  He was there?

10   A    He was there.  Absolutely.

11   Q    And he had, by this time, received and

12   digested the memo --

13   A    The memo, not the -- the question --

14   Q    -- we talked about earlier, the January

15   19th memo?

16   A    Yes.

17   Q    Did he express his view that he thought

18   the citizenship question should be added?

19   A    No.  He asked questions.  It was really a

20   very open dialog with a lot of questions going

21   back and forth and clarification and can we find

22   this out, which led to many of the questions.

1      Q    Did Secretary Ross know at that time that

2   Justice had declined to meet about this --

3           MR. GARDNER:   Objection.   Calls for

4   speculation.

5   BY MR. GROSSI:

6      Q    -- something had happened a couple weeks

7   earlier?

8           MR. GARDNER:   Objection.   Calls for

9   speculation.   Lack of foundation.

10           THE WITNESS:   I don't know the answer to

11   that.

12   BY MR. GROSSI:

13      Q    Did Secretary Ross express to you that it

14   would be important for the Justice people to meet

15   with the Census people so that they could

16   understand the technical aspects of why Census was

17   saying that administrative records would be better

18   than adding a citizenship question?

19      A    I -- I don't recall the dialog around

20   that.

21      Q    You don't recall anybody expressing the

22   view that they should meet with Justice to explain

1    to them why the Census solution was better than

2    adding a question?  You don't remember that coming

3    up?

4        A    No.  In regard to my conversation with

5    Ron and the notes that you told me that I knew the

6    meeting wasn't happening, I mean, I knew all that.

7    You were speaking specifically in reference to the

8    Secretary, and I don't recall the conversations

9    around that with the Secretary.

10       Q    All right.  Okay.  I want to switch

11   topics slightly, and we're going to come back to

12   the questions in chronological order.

13       A    And are these the questions we're using,

14   or are you giving me --

15       Q    I'll give you a later version.

16       A    Because, like the letter, there were lots

17   of versions of the questions.

18       Q    Right.  As you look at that, as best you

19   can, do you think that it refreshes your

20   recollection that by about February 2nd you were

21   back focusing in on this issue?

22       A    That would have been the Friday after

Page 225

1    I -- if I were back that day -- and I believe I

2    was -- I was just sort of cleaning up and prepping

3    up.

4        Q    That was the transitional time.   Okay.

5    Fair enough.

6        A    And, in fact, I'm not even on this email

7    that went to Earl.

8        Q    Right.   I noted that.   I just wanted to

9    see if, perhaps, they gave you a copy as soon as

10    you got back.

11           Do you remember a meeting with the

12    Secretary -- a further meeting with the Secretary

13    around February 12th?

14        A    Again, I don't remember the dates, but

15    there was a second -- secondary meeting that --

16        Q    Who was present at that meeting?

17        A    So I want to be very clear that at the

18    time that this was going on, this became an

19    iterative process.   It was evolutionary.   People

20    were working collaboratively together.   It wasn't

21    a work, stop, hand all the documents.   It was

22    answering questions.   It was dialog.   And so there

1    were other questions -- there were other meetings.

2    If there was an oversight meeting or steering

3    committee meeting, a group may have joined at the

4    end of it to discuss this.  So there were lots of

5    dialog and conversation going on.

6        Q    And Secretary Ross attended that meeting?

7        A    Not all, but many of them.

8        Q    He attended that meeting -- if it might

9    be the first week or second week in February.

10       A    I believe that sounds reasonable.

11       Q    And it was, otherwise, all Commerce and

12   Census people, correct?

13       A    Yes.

14       Q    No Justice people?

15       A    No Justice people.

16       Q    And is it essentially the same group you

17   think you had before, Mr. Comstock?

18       A    We had, clearly, representation from

19   legal, policy, Census.

20       Q    Okay.

21       A    Because you wouldn't want to have the

22   meeting unless you had representation from all

Page 227

1   three of these groups we were using as guiding

2   principle as we looked at this.

3       Q   Now, Secretary Ross by this point had

4   heard from the Census experts that they

5   recommended against adding this -- the citizenship

6   question, correct?

7       A   Right.  He asked many questions of them,

8   and he said they are valid questions, and we will

9   get back to you.  So it was a dialog going on.

10      Q   And they had, in fact, prepared a set of

11  those questions to provide to him?

12          MR. GARDNER:  Objection.  Form.

13  BY MR. GROSSI:

14      Q   That was -- part of the process on

15  February 12th was to receive, either in written

16  form or in oral form, the answers to his

17  questions?

18      A   I don't want to get hung up on the date

19  of the meeting, but, yes, there was a later

20  meeting for him to get the answers to the

21  questions.

22      Q   Actually, I think now that we know that

Page 228

1    this may be a more important document, let's go

2    through it.   I just want to point out the answers

3    to three questions, okay?

4        A    In this document that we weren't going to

5    use?

6        Q    Right.   The one we have the attachment

7    on.

8        A    Which we don't know if this was a draft

9    or final copy, do we?

10       Q    It is not the final copy, but it is the

11   copy closest to the mid-February meeting.   That's

12   why I'm going to ask you about it.

13       A    I said I don't know if there was meet- --

14   when the date was of that mid-February meeting

15   was.

16       Q    Okay.

17       A    So I don't want to --

18       Q    Well, we have had testimony that there

19   was a big meeting with Secretary Ross on

20   February 12th.

21            Does that refresh your recollection?

22       A    I know there was a meeting around that

1   time, so I'm not disputing that.   If my colleagues

2   said it was on February 12th, I wouldn't disagree

3   with them.   I'm just saying I don't specifically

4   remember.

5        Q    Okay.   Just take a look --

6             MR. GARDNER:   Exhibit 23.

7   BY MR. GROSSI:

8        Q    So 22.

9        A    I have one big packet of stuff here and

10  it --

11       Q    Right.   And it should have the questions

12  attached.

13            MR. GARDNER:   No.

14            MS. KELLY:   It's --

15            MR. GARDNER:   You intended it to be a

16  single exhibit?

17  BY MR. GROSSI:

18       Q    Okay.   So we're -- and to be very

19  precise, in Exhibit 22 on Page 2294, it begins the

20  questions and answers to the questions that were

21  asked about the January 19th draft.

22            Do you see that?

Page 230

1       A    Yes.

2       Q    Okay.   I want to just ask you about

3  three, all right.

4            The first one is Question Number 10.

5  Someone was interested and asked the question,

6  "The NRFU numbers are comparatively small.

7  Approximately one additional house for NFRU [sic]

8  percent enumerator.   Is this really a significant

9  source of concern?"

10            Let me just ask:   Do you recall who posed

11  that question initially?

12       A    No, I don't.

13       Q    Okay.   The answer of Census experts is,

14  quote, yes, this is a significant concern.   First,

15  it gives rise to incremental NRFU costs of at

16  least 27.5 million.   This is a lower bound because

17  it assumes the households do not self-respond

18  because we added a question on citizenship, have

19  the same follow-up costs as an average U.S.

20  household.   They won't, because they -- these

21  households overwhelmingly contain at least one

22  noncitizen, and that is one of our acknowledged

Page 231

1   hard-to-count subpopulations.

2          Do you remember that the Census Bureau

3   responded to the question by saying that it really

4   was a significant concern in their minds that

5   adding the citizenship question would increase the

6   nonresponse rate?

7      A   So my vernacular here will be NRFU,

8   that's what they call it, N-R-F-U is called NRFU.

9   And there was a discussion about this, and there

10  was a discussion about the fact that one

11  percentage point out there is -- there's

12  $15.6 billion lifecycle cost estimate to get this,

13  and -- to do this census and, quite frankly, as

14  we're going through this and there were many

15  new -- new ways the census was being taken by

16  Internet self-response and telephone and there

17  were other things, there was -- at least the 27.5

18  million, which is in this.

19          This -- because of the conversation

20  around the fact that it would be a noncitizen who

21  would not answer this, in their opinion, this is

22  their conclusion of the data, they looked at it.

Page 232

1   It would be those households, you know, at least

2   one noncitizen are the hard-to-count population,

3   and that is absolutely right.  We consider that

4   the hard-to-count population, and we spend a

5   tremendous amount of time on how to count the

6   hard-to-count population.

7           The Census Bureau, if you ever have been

8   with the Census, you can do all the technology you

9   want in the background and we can provide

10   everything.  It's the people -- feet on the

11   ground, those people that are out there

12   enumerating, doing the job, which the Secretary

13   did when he was himself in college.  So he is very

14   familiar with that exercise -- they do this and

15   they did -- they did state this concern.

16           We also talked about mitigation to this

17   concern, and we talked about the fact that we

18   were, in this census, increasing the number of

19   partnership programs that we were having.  We were

20   rethinking the way things were being done, so we

21   were already talking about if -- not on this

22   date -- but what our mitigation strategies were if

Page 233

1   this were to be the case.

2       Q    But Census never changed its view and

3   never changed their answer to this question,

4   correct?

5       A    No, they did not, as far as I know.

6       Q    Let me ask you about another one

7   that's --

8           (Conference call interrupted.)

9   BY MR. GROSSI:

10      Q    Okay.  Let me state it again.

11          Directing your attention to Page 2299,

12  the Question 13 and answer -- excuse me -- the

13  question is, quote, if Census is confident that

14  administrative data will be available to be used

15  to determine citizenship for all persons, e.g.,

16  not all citizens have Social Security numbers,

17  unquote.

18          I think you alluded to this a moment ago

19  when you talked about having MOUs in place to have

20  the right administrative data.  Do you remember

21  that?

22      A    Yes, I did.

1      Q    But the answer of the Census experts was,

2    quote, we are confident that Alternative C is

3    viable, and that we already have invested enough

4    high quality citizen administrative data from SSA

5    and IRS, unquote, and then it goes on to elaborate

6    a little bit.

7          I'll represent to you that this answer

8    was never changed in any subsequent draft of these

9    Q&As.   Is that also your recollection, that the

10   Census experts believed they had the data in place

11   to make administrative data use viable?

12      A    They answered the Question Number 13, to

13   say yes.   But also in the original document, which

14   has the three alternatives, they do say that they

15   would want to put a memorandum of understanding in

16   place so they would have higher quality data in

17   order to do that.   But it is not my understanding

18   that they have changed that answer to that

19   question.

20      Q    So they thought it was viable six months

21   ago and they think it's viable now, right,

22   Alternative C?

1      A    They've not -- to my knowledge, they have

2    not changed that.

3      Q    All right.  Let's leave that, and I just

4    want to ask about a couple more things.

5      A    Are we leaving this?

6      Q    Yes.  We may be returning to it, but for

7    right now, we're leaving it.

8           I'm marking as Exhibit 23 an email that

9    begins on Bates number 4853.

10          (Plaintiffs' Exhibit 23, Email, was

11   marked.)

12   BY MR. GROSSI:

13     Q    Now, this is an email chain on

14   February 13th, which if Dr. Jarmin's recollection

15   is correct, was the day after the meeting with

16   Secretary Ross.  And if you go to the first item,

17   which is the last on the chain, we find Mr. Jarmin

18   writing to a Michael Strain, and he says, "We are

19   trying to set up some meetings for Secretary Ross

20   to discuss the proposed citizenship question on

21   the 2020 census with interested stakeholders.

22   Most stakeholders will speak against the proposal.

1   We're looking to find someone thoughtful who can

2   speak to the pros of adding such a question or

3   perhaps addressing the fundamental need, some

4   other" -- I'm sorry -- "the fundamental data need

5   some other way (e.g., admin records.)  Do you know

6   of anyone at AIE or elsewhere that could do this

7   sometime over the next couple weeks?"

8          And Michael responds by saying, "None of

9   my colleagues at AIE would speak favorably about

10  the proposal.  It is -- is it important that the

11  person actually be in favor of how -- the

12  proposal?"

13         You were involved in efforts to discuss

14  the possibility of adding a citizenship question

15  with what has been referred to as stakeholders?

16      A   Uh-huh.

17      Q   Correct?

18      A   Yes.  I'm sorry.

19          THE WITNESS:  Yes, Karen.

20  BY MR. GROSSI:

21      Q   You attended some meetings with some of

22  those people?

1        A    I attended some meetings.  Did not attend

2    all the meetings.

3        Q    Did you also, on one occasion, listen in

4    by telephone, because maybe you were in a

5    different location?

6        A    Yes.  Yes.

7        Q    AIE is the American Enterprise Institute

8    in this context, correct?

9             MR. GARDNER:  Objection.  Lack of

10    foundation.  Calls for speculation.

11             THE WITNESS:  I honestly am not 100

12    percent sure, but I believe so.  I do not know

13    Michael Strain, at all.  So I have no basis --

14    BY MR. GROSSI:

15        Q    Dr. Jarmin was tasked with trying to find

16    someone who would speak in favor of adding the

17    citizenship question, correct?

18        A    I'm going to say that is incorrect.  What

19    we sat in the meeting and discussed with the

20    people from the Census, the entire group that were

21    there, we said that the Secretary wanted to get

22    opinions of stakeholders.  We then wrote those

1   stakeholders, and it was a group effort and group

2   discussion to say we want pros, we want cons, we

3   want him to hear from federal, local businesses,

4   businesses, special interest groups, so on and so

5   forth, former directors, so that he could get an

6   academic, intellectual -- he could get a full look

7   at the -- at people who wanted to comment on it.

8   And we wanted to get -- a combination of views,

9   because we wanted it to be very objective.

10       Q   And what Mr. Jarmin -- Dr. Jarmin

11   responded to Mr. Strain, as indicated on the first

12   page, 4853, is, "We are trying to find someone who

13   can give us a professional expression of support

14   for the proposal in contrast to the many folks we

15   can find to give professional statements against

16   the proposal," unquote.

17           So bottom line was you had plenty of

18   people who were against adding the question, so

19   Dr. Jarmin was trying to balance that out with

20   someone who would speak in favor of the proposal;

21   isn't that right?

22           MR. GARDNER:   Objection.   Lack of

Page 239

1   foundation.  Calls for speculation.

2         THE WITNESS:  Yeah.  I wouldn't say that

3   as much as I would say that what we did is we

4   had -- we were trying to make the list, we were

5   trying to make it very fair, very balanced, and we

6   were looking at it.  And I don't know where it was

7   in the process of discussing this.  But, for

8   example, I don't know a lot of people in this

9   town.  I wouldn't -- I wasn't involved in making

10  many calls, but one person I did know, a gentleman

11  named Arturo Vargas, who I had met with before,

12  who I knew was against this.  I said, let's make

13  sure he's on the question -- on the list, because

14  he had been vocal, and he came to meet with me on

15  other topics well before the question.  I said,

16  let's make sure we get his opinions on this.  So

17  we were getting opinions.  We were filling out the

18  list.  So I can't tell you at this point how they

19  were filling out the list.

20  BY MR. GROSSI:

21       Q   Okay.  In any event, he told you at the

22  top in an email to you that, "It appears that no

Page 240

1  one at AIE willing to speak in favor of putting

2  question on the 2020," unquote, correct?

3      A    Yeah.   That's exactly what it says.   He

4  wrote to me.

5      Q    And did Dr. Jarmin keep looking for

6  people who would speak in favor of putting the

7  question on the proposal?

8      A    I believe as we sat in that meeting, we

9  had a list of groups and/or people that would make

10 sense to talk to.   And so -- I don't know where he

11 was on the list.   If he was at the beginning, the

12 end, where he was exhausted on the list, but there

13 would be other people on the list that he could

14 call and not call.   And we actually felt very

15 important, that we had the Census input on who

16 they wanted us to speak to.

17     Q    You figured the Census people would be

18 the best judges of who would be an effective

19 person, one way or the other?

20     A    Well, they would certainly know experts

21 in the field.

22     Q    Right.

1      A    They would certainly know -- and we had

2   the business liaison talk to us about which

3   business people we should put on, and, you know,

4   that kind of thing.

5      Q    Sure.

6      A    But very much with a view we wanted the

7   Secretary to have not only geographic,

8   demographically, but across multiple -- multiple

9   groups.

10      Q    One group that you were particularly

11   interested in were the prior Census directors,

12   correct?

13      A    Yes, we did.  We put that as one of our

14   categories.

15      Q    And did Mr. Jarmin

16   provide -- Dr. Jarmin -- I'm sorry -- provide you

17   with the input of Census directors?

18      A    No.   The Secretary had calls with them.

19      Q    The Secretary directly called up prior

20   Census directors?

21      A    So let me be very clear on this.  We put

22   together -- from the lists that we produced from

1    these meetings and the work people did, we

2    produced a list and then worked with his

3    scheduling to have meetings so he could hear what

4    these people said.  I would say to you that the

5    Secretary has schedulers and other people that

6    probably made the phone calls for him.  Very

7    specific to your question, did he make phone

8    calls, but he did have -- he participated in phone

9    calls.

10        Q    And did you participate in any of those

11   calls by listening in?

12        A    I participated in some, not all.

13        Q    Let me mark two related documents as

14   Exhibit 24, 8554, an email from John Thompson to

15   Ron Jarmin dated January 29, 2018, and

16   sequentially, 8555, which is Exhibit 25, which is

17   a letter to Secretary Ross.

18             MR. DEWHIRST:  Is this two exhibits or

19   one?

20             MR. GARDNER:  Two exhibits.

21             MR. GROSSI:  Two.

22             (Plaintiffs' Exhibit 24, Email, was

Page 243

1    marked.   Plaintiffs' Exhibit 25, Email, was

2    marked.)

3    BY MR. GROSSI:

4        Q    Okay.   Have you seen copies of this

5    document before?

6        A    Yes.

7        Q    Did you see it at about the time that, I

8    guess, Dr. Thompson sent it to Dr. Jarmin in

9    either late January or more likely, in your case,

10   early February 2018?

11       A    I would -- I would have probably seen it,

12   yes.   I would probably have seen it in February.

13       Q    And, for the record, what Exhibit 25 is,

14   is a letter that was addressed to Secretary Ross

15   on January 26th by six different former

16   Census directors, correct?

17       A    Yes.

18       Q    And it's fair to sum this up by saying

19   that they were against adding the citizenship

20   question, correct?

21       A    They suggest to not put the question on

22   the census because of the testing.

Page 244

1     Q     Uh-huh.

2     A     They don't bring up, to my knowledge, or

3   to my quick review here, they don't bring up other

4   reasons for not putting it on, but that it has not

5   been well tested.

6           The question had been on the ACS

7   since -- for many years and had been many -- had

8   been tested over and over with that wording.  So

9   there was a discussion about whether or not the

10  testing was tested.

11    Q     You think maybe those former Census

12  directors didn't know about the question on the

13  ACS?

14          MR. GARDNER:  Objection.  Calls for

15  speculation.

16          THE WITNESS:  I --

17  BY MR. GROSSI:

18    Q     Because that is what was suggested?

19          MR. GARDNER:  Objection.  Argumentative.

20          THE WITNESS:  I'm not commenting on that.

21  I'm just saying this was a letter that talked

22  about the testing.  We then had a full discussion

Page 245

1  with the Census Bureau on the testing of the

2  question on the ACS, and if they thought that that

3  was acceptable amount of testing and that the

4  testing was sufficient, and that that is what I am

5  suggesting.   I am not suggesting and would not

6  suggest making any comments about what these

7  individuals were thinking.

8  BY MR. GROSSI:

9       Q    So when they state on the first page,

10  quote, we strongly believe adding an untested

11  question on the citizenship status at this late

12  date in the decennial planning progress would put

13  the accuracy of the enumeration and success of the

14  census in all communities at grave risk.   That is

15  what they told Secretary Ross, correct?

16       A    That is what is written here.

17       Q    And was there anyone among your Census

18  experts who said, you know, these guys are wrong

19  about that, I disagree with them?

20       A    Our Census experts talked to us about the

21  testing that had taken place under the ACS and the

22  fact that that was adequate testing.

1    Q    Did they say they disagreed with the

2    conclusions of the former Census directors?

3    A    I do not believe we ever asked the

4    question in relation to.   But when we read this

5    letter, said we need to discuss with Census

6    whether they think the testing is correct.   But we

7    did not -- you're making it did we put this letter

8    down, and, therefore, they answered these

9    questions.   Once this letter was read, we said

10   we've got to discuss testing with the

11   Census Bureau, who said that they believed

12   adequate testing had been done --

13   Q    Okay.

14   A    -- over the years of the ACS.

15   Q    Now I'd like you to go back to those

16   questions and answers from the prior draft, and I

17   want you to turn in Exhibit 22 to Page 2303 and,

18   specifically, Question 31 in the answer.

19   A    I'm on the wrong page.   Excuse me.

20   Q    You see that?   And it has to do with this

21   issue of process.   And it says, what was the

22   process that was used in the past to get questions

Page 247

1    added to decennial census, or do we have something

2    similar where a precedent was established?

3            And then in a very long answer, it says

4    that the Census Bureau follows a well-established

5    process that involves extensive testing, review

6    and evaluation.  And then specifically on the next

7    page, outlines six steps that are taken.

8            Do you remember that?

9        A   I see this, yes.

10       Q   Okay.  In this case, had the federal

11   agencies evaluated their needs and proposed

12   additions through the OMB?

13       A   So let me be really clear on this.  When

14   we started down the process of putting this

15   question on, we said to Census, how do we go

16   about -- what is it that we need to come up

17   with -- what do we need to do in order to put this

18   question on?  And the answer was, at the top of

19   the house, the guiding principles were we needed

20   to have a legal review, an operational/technical

21   review, and we needed to have a policy decision

22   made.

1      We then said, have you had any other

2  likewise times where this has happened?  And they

3  said, well, it's kind of complicated, because

4  before, for 2000 -- in 2000, we had the long form,

5  we had the short form, so we really didn't -- we

6  really didn't change much there.  And then we went

7  to the ACS, and we think about how we put the

8  question on the ACS, and sort of talked about all

9  of these things down -- down the path, and I have

10  seen this written -- this same language -- this

11  same dialog written in about four, five, six

12  different ways.  And so what I would always go

13  back to with Ron, Enrique and others was, what is

14  it that we need?  We need a legal review.  We need

15  a technical policy review -- excuse

16  me -- technical/operational view, scientific

17  review, and we need a -- a policy decision made.

18      So I will tell you the way this question

19  Number 31 is written here, there had been other

20  iterations of this same thing written by different

21  people, but there was no hard fast guideline in

22  terms of this is a statutory requirement or this

Page 249

1    is a requirement that has been passed down.

2       Q    This question was assigned to

3    Victoria Velkoff to answer initially?

4       A    I don't know the answer --

5            MR. GARDNER:  Objection.  Foundation.

6            THE WITNESS:  I don't know the answer to

7    that.

8    BY MR. GROSSI:

9       Q    The answer that appears on 2302, 3 and 4

10   that we just referred to, that's the answer of the

11   Census Bureau; isn't it?

12      A    Yes.  I believe so.

13      Q    Okay.

14      A    But the Census Bureau has answered that

15   same question several different ways in other

16   discussions.

17      Q    Okay.  That's what I want to try to

18   understand.  I'm going to mark as Exhibit 26 a

19   later version.

20           (Plaintiffs' Exhibit 26, Questions, was

21   marked.)

22   BY MR. GROSSI:

Page 250

1     Q   Now, on Page 1296 of Exhibit 26, there's

2   the same question about what process has been

3   used, but a very different answer, a much shorter

4   answer that doesn't mention all the steps that

5   have typically been taken.  All I want to know is:

6   Who wrote that?

7          MR. GARDNER:  Objection.  Lack of

8   foundation.  Calls for speculation.

9          THE WITNESS:  I don't know who wrote

10   that.

11   BY MR. GROSSI:

12     Q   Do you think it was anybody in the Census

13   or do you think it was someone else not in the

14   Census Bureau?

15          MR. GARDNER:  Objection.  Form.

16   Objection.  Lack of foundation.  Calls for

17   speculation.

18          THE WITNESS:  Oh, no.  I will tell you I

19   truly believe that any answers that were written

20   were viewed and looked at across the groups.

21   BY MR. GROSSI:

22     Q   That wasn't my question, ma'am.  My

Page 251

1   question was:  Do you know who wrote the

2   answer --

3       A   And I told you I don't know.  I don't

4   know.  And then you ask me a subsequent

5   question --

6       Q   And you're not prepared to say that you

7   swear that it was written by somebody in the

8   Census Bureau, correct?  You don't know?

9       A   I don't.  I -- I would assume so, but I

10  can't assume --

11      Q   I would not want you to assume here.

12      A   But everybody proofed the questions.

13  Everybody had a look at the questions.  So

14  everybody looked at these questions.

15      Q   All right.  I have just a couple more

16  exhibits.  Okay.  I'm marking as Exhibit 27 a

17  document that begins with Bates number 9812.  It's

18  dated March 1, 2008 [sic].  It does have a list of

19  those questions, but I'm not going to ask you

20  anything about them.  My questions are going to be

21  entirely about the first three pages of the

22  document.

Page 252

1              (Plaintiffs' Exhibit 27, March 1, 2018

2      memorandum, was marked.)

3      BY MR. GROSSI:

4          Q    I'm sorry.   Five pages before the

5      questions begin, up through 9816.

6              Okay.   Okay.   On this exhibit, is it the

7      same type of format at the beginning that shows

8      that the views of Dr. Abowd and then Director

9      Jarmin, Assistant Director Lamas, and then you,

10     you were sending this up to Secretary Ross,

11     correct?

12             MR. GARDNER:   Objection.

13     Mischaracterizes the document.

14     BY MR. GROSSI:

15         Q    Let me ask, you sent this document to

16     Secretary Ross, correct?

17         A    It went from -- through Dr. Abowd,

18     Dr. Lamas, Dr. Jarmin to the Secretary.

19         Q    And according to Dr. Jarmin, you had

20     reviewed this memorandum before it was sent to

21     Secretary Ross.   Is that your recollection, also?

22         A    Yes.

1     Q    And what's going on here on March 1, 2018

2   is that by now, someone has come up with the idea

3   of an Alternative D, which would, in a sense,

4   combine the old Alternatives B and C, in that a

5   census -- the census would contain a citizenship

6   question, but in addition, they would use the

7   administrative data to link up to answer needs of

8   Department of Justice and other people, correct?

9     A    Correct.

10     Q    Who came up with that Alternative D

11   first?

12     A    I honestly do not remember.  I'll tell

13   you we were in a meeting.  We were talking about

14   all the different facts.  And, again, it was an

15   iterative, evolving process, as I said.  The

16   questions were being reviewed.  We were

17   talk- -- and -- and somebody said, why don't we

18   look at the combination of B and C and see what

19   that would do.

20          Because one of the things that we

21   determined as we looked at it, that there was no

22   baseline.  So you really didn't have a baseline.

1  So if you did this, you would create that baseline

2  and then the administrative records,

3  which -- which we are going to be using much more

4  in the census than in other censuses prior, we

5  could then have a baseline in to which use -- use

6  that going forward.

7      Q   D wasn't proposed by anybody at the

8  Census Bureau, correct?  It was someone else,

9  right?

10         MR. GARDNER:  Objection to form.

11         THE WITNESS:  I -- yeah.  You're asking

12  me who proposed the question.  I don't remember

13  who was sitting around -- we were sitting around a

14  table, in a group.  I remember discussing the

15  baseline, and the Census Bureau clearly agreed

16  that there was a lack of issue -- there was a lack

17  of a baseline, and that this would -- that that

18  was, as well as others, a -- a flaw, if you will,

19  in Option C.  And I don't know who said it.

20         It was one of those things where -- and,

21  again, I don't want to sound simpleton, but, you

22  know, when a whole group of people are sitting in

1  a room and trying to work through a problem the

2  best they can, and these people are throwing out

3  suggestions, what about this, what about this,

4  what about this question and then it came up.

5  BY MR. GROSSI:

6      Q    Then it was decided that the experts in

7  the Census Bureau would analyze that in detail,

8  correct?

9      A    Absolutely.  Yes.

10     Q    And that's the product --

11     A    The product that --

12     Q    -- that's here?

13     A    That product --

14     Q    And what they concluded on Page 9816 --

15  and I'm not going to go through all the reasons

16  they set forth -- is they say in their last

17  paragraph, "In sum, Alternative D would result in

18  poor quality citizenship data than does

19  Alternative C" -- the old Alternative C.  They

20  concluded that, correct?

21     A    Yes.  It says that right on Page 9816.

22     Q    And they've never taken that back,

Page 256

1    correct?

2         MR. GARDNER:   Objection.   No foundation.

3    Calls for speculation.

4         THE WITNESS:   I -- not that I -- not that

5    I know of.

6    BY MR. GROSSI:

7    Q    They further say that, "Alternative D

8    would have all the negative cost and quality

9    implications of Alternative B outlined in the

10   draft January 19th memo to the Department of

11   Commerce."

12        Correct?

13   A    Correct.

14   Q    So Alternative D was not going to solve

15   any of those problems in adding the census --

16   citizenship question, correct, according to the

17   experts at the Census?

18   A    Certainly from Dr. Abowd's comments here.

19   But it -- it did not still -- and we discussed it

20   at length, addressed the baseline situation.

21   Q    There were no subsequent memoranda like

22   this from the Census Bureau up the chain to

1   Secretary Ross concerning this issue of whether or

2   not to add a citizenship question, correct?

3           MR. GARDNER:  Objection.  Form.

4           THE WITNESS:  Okay.  And I want to be

5   very clear on this, and I want people to

6   understand what I'm saying.

7           When we discussed this memo -- and I

8   think many people, not all, would say this is

9   reasonably complicated -- we tried to look at what

10  was a schematic that we could make this easier to

11  understand, and, therefore, later, a schematic was

12  produced that was -- I don't want to say added to

13  this -- but complimented this.  So I don't want to

14  say nothing -- you're saying to me, was anything

15  created from this document?  I don't want to

16  play -- I don't want to get in a nomenclature

17  issue with you.  I want to be very honest with

18  this group that, yes, there was a schematic that

19  was produced to help understand what this looked

20  like.

21  BY MR. GROSSI:

22      Q   And I appreciate the answer.

Page 258

1          The schematic addition or iteration did

2     not change the conclusion that we just talked

3     about of the Census Bureau, that Alternative D was

4     not preferable to C, and, in fact, had all of the

5     problems of B adding to the question, correct?

6          A     In Dr. Abowd's memo, yes.  That is

7     correct.

8          Q     And there is no subsequent

9     Census-authored memorandum?

10          A     Not that I am aware of.

11          Q     On this issue?

12          A     Not that I'm aware of.

13          Q     And I'm going to ask in a moment, but I

14     want to clarify one thing.

15          (Plaintiffs' Exhibit 28, Final decision,

16     was marked.)

17     BY MR. GROSSI:

18          Q     Exhibit 28 is what I believe you've

19     referred to as the final decision of

20     Secretary Ross.  Can you confirm that that's what

21     you had in mind when we talked about it?

22          A     Yes.  Yes.

1        Now, I know that you testified earlier

2   that funding was one of your big priorities when

3   you first became Under Secretary; is that fair?

4        A    Yes.

5        Q    So is the census still in danger of being

6   underfunded?

7        A    No.

8        Q    Can you explain?

9        A    Yes.   I'd be happy to.   And I don't have

10  all the numbers in front of me, so we will -- if

11  we will directionally correct.

12           When the GAO put our their report in May

13  and the Secretary articulated about that report,

14  he said he would look at the lifecycle cost

15  estimate and the budget for the census.   And so

16  for those who would obviously assume -- that,

17  again, remember the Census has the economic,

18  demographic, so they have a baseline budget that

19  keeps going.   But once the decennial gets into

20  play, the decennial budget goes up expeditiously,

21  expeditiously and then it comes back down, and so

22  you get the big hump.

1    So what our job was to do was really look

2    at what should the lifecycle cost be in terms of

3    the -- in terms of this -- there were already

4    projects and programs -- and, again, I was not

5    there at the time -- that were going over budget.

6    So you really needed to look at this and say, what

7    is the reality of doing the budget?   So what we

8    did is we went through the entire budget.   We got

9    certified independent cost estimators to come in

10   and work with us.   So there was a co-project

11   between the Department of Commerce and

12   Census Bureau that would look at these two

13   budgets.   And then when I got -- by the time I got

14   there, again, August -- not July -- August 21st,

15   the first meeting, big meeting with all the groups

16   to review this budget was taking place within two

17   days.   So that is one of the first things we did.

18         Once we identified that budget and made

19   adjustments to that budget and everybody agreed to

20   the budget -- because we didn't want -- very

21   important part of -- if you will, not to deviate,

22   part of the governance I talked about before, that

1   steering committee, we didn't want the Census

2   running a budget and the Department of Commerce

3   running a budget, and then all of a sudden, a year

4   later, oh, my goodness gracious.  We wanted them

5   on a periodic basis to get together, meet, make

6   sure we were all agreeing on the numbers.  So that

7   was part of that steering committee's reason for

8   kind of putting those kind of governance

9   structures in place.

10          So what we did is we worked on

11  those -- we also invited -- and when I say "we," I

12  want it to be colloquial we.  I was not there when

13  all this work was done.  They also invited people

14  from OMB to participate in the project with the

15  independent cost estimators, because OMB has been

16  looking at the census for so long.

17          So at the end of this analysis, we

18  determined -- we being -- the large we being

19  inclusive of Census and the Department of

20  Commerce -- that there needed to be a new

21  lifecycle cost estimate.  That we needed to go

22  back to Congress, which the Secretary had said he

1  would do.  We were then prepped up, prepared, went

2  to some briefing meetings, so on and so forth, and

3  went to Congress at the end of October, beginning

4  of November, if my time frame is correct, and we

5  talked about the funding, the change of the

6  funding, the estimate, so on and so forth.

7        And, actually, the Congress has been

8  extremely, extremely responsive to our needs, and

9  we have the funding we want.  And they actually --

10  if I may compliment them -- did something that we

11  very rarely see before, and they said that we

12  could actually -- because at the time, if you

13  remember, one of the other things in the GAO

14  report was how are the systems going, scalability,

15  all these kinds of issues.  And they actually said

16  that even though this was earmarked -- this is an

17  example, '19 money, if you are ready to use it in

18  '18 and you document why and you bring it to OMB

19  and it is approved, we will let you use '19 money

20  in '18.  So, actually, that has been a very, very,

21  very successful collaborative process.

22        I've answered enough of your questions.

Page 274

1     Q    You have.  Let me just make sure I
2     understand a couple smaller pieces of it.
3          Around October or November, you folks at
4     Commerce finalized a lifecycle estimate; is that
5     right?
6     A    Yes.
7     Q    And you brought that to Congress?
8     A    Yes.
9     Q    And Congress approved the budget that you
10    were requesting?
11    A    For '18 -- '19, now we're working on the
12    '20 budget right now.  But we have no reason to
13    believe that they would not.
14    Q    Has the funding request that you've made
15    changed since the citizenship question
16    determination in March of 2018?
17    A    No.  It has not.
18    Q    Now, let's turn back to Exhibit 28, which
19    is that decision memo.
20         Do you know who primarily wrote this
21    document?
22    A    No, I don't know who primarily wrote the

1    make sure the process was working.  We wanted to

2    see what was the U.N. recommendations, what did

3    other developed countries do, those kind of

4    things.  But I was not -- those assignments were

5    given to the most appropriate people to do.

6        Q    Okay.  So let's start from the second

7    paragraph and Secretary Ross writes -- or let's

8    say that he writes, because this is his memo, he

9    signed it.  "I had set out to take a hard look at

10   the request and ensure that I considered all the

11   facts and data relevant to the question so I could

12   make an informed decision on how to respond."

13           Now, it's my understanding that you

14   testified that Secretary Ross saw those memos that

15   Census prepared, correct?

16       A    Correct.

17       Q    And you testified that he spoke to a

18   number of stakeholders about this?

19       A    Correct.

20       Q    Are you aware of any other information or

21   facts or data relevant to this question that

22   Secretary Ross reviewed, other than those sources?

1      A    Well, as I said, there were legal

2   documentation produced, right.

3      Q    Okay.

4      A    There was information about what do other

5   developed countries do.   There was information on

6   what the UN sources do.

7      Q    Uh-huh.   Anything else that you can think

8   of?

9      A    Not off the top of my head.

10     Q    Anything you can think of that would

11   refresh your recollection?

12     A    No.

13     Q    Now, you reported directly to

14   Secretary Ross, correct?

15     A    Yes, ma'am.

16     Q    And Census was within your purview?

17     A    Yes.

18     Q    So did you have access to all of the

19   information that Secretary Ross looked at in

20   considering whether or not to add the question?

21          MR. GARDNER:   Objection.   Form.

22          THE WITNESS:   I do not have access to all

1    of the Secretary's files, information, and over a

2    time span, I just would not have it.  So I would

3    have to answer that question as I do not believe I

4    do -- I do not.

5    BY MS. GOLDSTEIN:

6        Q   So Secretary Ross had some meetings with

7    stakeholders that you did not attend, correct?

8        A   Correct.

9        Q   And he may have reviewed documents

10   germane to this question that you are unaware of,

11   correct?

12       A   Over the course of time or in reading

13   public documents or in whatever, I can't speak to

14   what the Secretary did in full.

15       Q   Okay.  So let's go down this document.

16   If you go to the last paragraph on this page,

17   three lines down, it says that, "I also met with

18   Census Bureau leadership on multiple occasions."

19           Now, you've testified already about a

20   couple of those meetings that Secretary Ross had

21   with Census Bureau leadership.  Are there any

22   other meetings that Secretary Ross held with

1   testified to earlier and the meeting on the

2   timeline and the meeting on the forms, do you

3   recall any other meetings that you attended with

4   Secretary Ross and Census Bureau leadership?

5       A   I cannot recall, but he had access to

6   anybody he wanted to along this process.

7       Q   Do you know if he spoke to the Census

8   Bureau leadership without you present?

9       A   I don't know the answer to that.

10      Q   So let's turn the page.   And if you go to

11   the second full paragraph, the last --

12      A   Can I -- he says here that he has been

13   monitoring press coverage.   So when you talk about

14   things he was looking at, I'm sure that -- he says

15   right there that was also there.   I failed to

16   remember to say that.

17      Q   Terrific.  And if you remember other

18   things as we go on, just go ahead and tell me.

19      A   I read that.

20      Q   So the last sentence of that second full

21   paragraph, it says that "Following the 2020" --

22   "the 2000 census, decennial census -- "the long

Page 283

1    form sample was replaced by the American Community

2    Survey, ACS, which has included a citizenship

3    question since 2005.  Therefore, the citizenship

4    question has been well tested."

5           Now, are you aware of whether the

6    Census Bureau performed any research on how the

7    citizenship question will perform specifically in

8    the decennial census environment?

9        A    The Census Bureau told us that they felt

10   that it was well tested to be on the form.

11       Q    Are you aware of any research that has

12   been done with respect to how the citizenship

13   question will perform on the decennial census

14   environment?

15       A    Not that I'm aware of.  I am not aware.

16       Q    And did you or anyone at Commerce ask the

17   Census Bureau to research that question?

18       A    We asked them if they felt that the

19   question had been tested sufficiently enough to be

20   on the -- on the form.  We did not dictate

21   research or tell them not to do research.  We

22   asked them for their opinion and gave them free

Page 284

1    reign to do what they wanted to give us that

2    opinion.

3         Q    Within the time constraints that you were

4    working, correct?

5         A    Correct.

6         Q    Do you know when the citizenship question

7    was last tested in the context of the ACS or long

8    form?

9         A    No, I'm not -- I do not.

10        Q    Was Census asked that question?

11             MR. GARDNER:  Objection.  Lack of

12   foundation.  Calls for speculation.

13   BY MS. GOLDSTEIN:

14        Q    To your knowledge.

15        A    To my knowledge, I'm not sure.

16        Q    Did you or, to your knowledge, anyone

17   else at Commerce see the results of the testing

18   that had been performed on the citizenship

19   question in the context of the ACS?

20        A    No, not to my knowledge.

21        Q    So let's go down to the next paragraph,

22   and I'm just going to start in the middle of the

Page 285

1    sentence, because it's a long one.  "DOJ states

2    that the current data collected under the ACS are

3    insufficient in scope, detail and certainty to

4    meet its purpose under the VRA."

5            Do you see that?

6        A    And DOJ states current data collected

7    under -- yes.

8        Q    What, if anything, did Commerce do to

9    validate that rationale, to your knowledge?

10       A    I'm not aware.  I'm not aware of

11   anything.

12       Q    And, to your knowledge, what, if

13   anything, did the Census Bureau do to validate

14   that rationale?

15       A    You have to ask Census that question.

16       Q    You're not aware of anything, correct?

17       A    Correct.

18       Q    To your knowledge, did the --

19       A    I know that they have fully researched

20   and they fully understand -- they've been doing

21   this for a long time, but you need to get into

22   details with them on that.

Page 286

1        Q    And who is they?

2        A    The Census Bureau.

3        Q    And the Census Bureau, to be clear, asked

4    to meet the Department of Justice's technical

5    experts, correct?

6        A    I believe the note said that they sent it

7    to Art Gary, and they said they were bringing

8    their technical so they knew who to bring.

9        Q    You understand that the Census Bureau

10   asked to meet with the technical experts at DOJ,

11   correct?

12           I don't want you to look at the

13   documents, Secretary Kelley.

14           You understand that, right?

15       A    There's a nomenclature issue here.  They

16   sent the letter to Art Gary, they said we're going

17   to bring our technical people.  Right.  So the

18   answer is, they did not -- I don't know if they

19   reached out to the technical guys.  I know they

20   reached out to Art Gary from this, but I know they

21   wanted to meet with him.

22       Q    So Census asked Art Gary to set up a

1    meeting, yes?

2         A    Yes.   Absolutely.   Yes.

3         Q    And ultimately -- and that meeting was

4    going to involve experts, correct?

5         A    Yes.

6         Q    And that meeting didn't happen, correct?

7         A    Correct.   Yes.

8         Q    Okay.

9         A    Well, what I don't know is who the DOJ

10   was going to bring to the meeting.   I do know who

11   Census was going to bring to the meeting.

12        Q    Who was Census going to bring to the

13   meeting?

14        A    Well, they said they were going to bring

15   some technical people --

16        Q    Oh, the categories?

17        A    Yes.

18        Q    To your knowledge, did the Department of

19   Justice ever identify a number of cases that they

20   would have brought, but for the absence of

21   block-level citizenship data?

22        A    And I'm not aware of that.

Page 289

```
 1          THE WITNESS:  It is their conclusion.
 2    It's not a fact.  We won't know until after.
 3    BY MS. GOLDSTEIN:
 4       Q   So let's talk about it in conclusion.
 5          The Census Bureau concluded that the
 6    response rate would decline materially, correct?
 7          MR. GARDNER:  Objection.
 8    Mischaracterizes the document.
 9    BY MS. GOLDSTEIN:
10       Q   Correct?
11          Let's go over to Exhibit --
12       A   You got to help me out here.
13       Q   Sure.  And I'd like you to turn
14    to -- this is the January 19th memo.
15       A   Uh-huh.
16       Q   And let's go to Page 1281.
17    And -- actually, let's go to the page right before
18    that, 1280.  Now, B2 of this is entitled
19    self-response rate analysis, correct?
20       A   Yes.
21       Q   In the last sentence on this page states
22    that, "Once again, the self-response rates were
```

1        You can look at me.

2     A    Describe what you mean by that.

3     Q    What do you think I mean?  What does

4  empirical data mean to you?

5     A    Is this data that Census Bureau produced?

6  Absolutely.  They produced this on a factual

7  basis.  Is that where you're going?

8     Q    I just want to make sure -- so if you

9  look at the last line of that paragraph that we

10  were just looking at in the decision memo?

11     A    Okay.

12     Q    "No empirical data existed on the impact

13  of a citizenship question on responses."

14        You see that?

15     A    So --

16     Q    Did I read it right?

17     A    No.  You read it -- that's Nielsen,

18  senior vice-president, from the Nielsen Group who

19  said that.

20     Q    Okay.  So -- I see your point.

21     A    That's the opinion of the --

22     Q    Okay.  So let's go back to the sentence

Page 293

1  we were reading a moment ago, that neither the

2  Census Bureau or the concerned stakeholders could

3  document that the response rate would, in fact,

4  decline materially.

5          Is that whether testing a question is

6  for -- or one thing that testing can be for, to

7  determine if response rates will decline

8  materially?

9      A   Yes.

10     Q   And, for example, an end-to-end test

11 that -- could test whether or not a question

12 causes response rates to decline, correct?

13     A   Yes.  But an end-to-end test does a whole

14 lot more than that.

15     Q   Of course.  But that's one thing it could

16 do, right?

17     A   It's one thing it could do.

18     Q   And another thing that an end-to-end test

19 can do is test whether or not NRFU -- or how

20 effective NRFU is in the context of a citizenship

21 question, correct?

22     A   Correct.

Page 294

1      Q    And that was not done with the

2   citizenship question, correct?

3      A    Correct.   It was done with the ACS over

4   the year's time frame that was shown at the

5   percent numbers and the amount of people.

6      Q    And it's my understanding that you have

7   not seen that data with respect to the ACS

8   testing, correct?

9      A    You said the testing.   I've seen the

10  results on the ACS, how many -- how many ACSs are

11  out there, how many times the question's been

12  asked, which is what this paragraph refers to.

13     Q    So then the paragraph goes on to talk

14  about Secretary Ross's discussion with Nielsen.

15  Were you part of that conversation?

16     A    I don't remember, but I -- I don't

17  remember if I was on that call or not.

18     Q    Is there anything that would help you

19  remember if you were on that call?

20     A    I could reconstruct the day, I guess.   I

21  mean --

22     Q    Okay.   Have you -- so you see that

1    Nielsen is referencing that it had added questions

2    on the ACS on sensitive topics to certain short

3    survey forms without any appreciable decrease in

4    response rates.

5            Did you ever see those surveys from

6    Nielsen -- that are referenced from Nielsen in

7    that sentence?

8        A    No.

9        Q    Do you know if anyone at Commerce did?

10       A    I don't know.

11       Q    I would have to ask other people at

12   Commerce to find out, correct?

13       A    Correct.

14       Q    Including Secretary Ross, to find out if

15   Secretary Ross saw those, correct?

16       A    Correct.

17       Q    So let's go -- let's go to the last

18   paragraph here, and this states that, "The

19   Census Bureau determined that for 2013 to 2016,

20   ACS surveys nonresponses to the citizenship

21   question for non-Hispanic whites ranged from 6.0

22   to 6.3, for non-Hispanic blacks ranged from 12.0

1  to 12.6 percent, and for Hispanics ranged from

2  11.6 to 12.3 percent.  However, these rates were

3  comparable to nonresponse rates for other

4  questions on the 2013 and 2016 census."

5        And one of the examples that is

6  giving --

7        MR. GARDNER:  You misread.  It's 2016

8  ACS.

9        MS. GOLDSTEIN:  2016, I apologize.

10 BY MS. GOLDSTEIN:

11    Q   And one of the examples that they give,

12 "The Census Bureau estimates" -- "Census Bureau

13 estimates showed similar nonresponse rate ranges

14 occurred for questions on the ACS asking the

15 number of times the respondent was married, 4.7 to

16 6.9 percent."

17        Now, do you agree that the 4.7 to 6.9

18 percent nonresponse rate for the question, the

19 number of times the respondent was married, is

20 similar to the nonresponse rates to the

21 citizenship question for non-Hispanic blacks and

22 Hispanics that ranged from 11.6 to 12.6 percent?

1          MR. GARDNER:  Objection.  Lack of

2    foundation.   Objection.

3          (Thereupon, the court reporter

4    clarified.)

5          MR. GARDNER:  Objection.  Form.

6          THE WITNESS:  The way this reads --

7    BY MS. GOLDSTEIN:

8       Q    I just want to know if you agree that 4.7

9    to 6.9 percent for the marriage rates, if you

10   agree that is similar to the 11.6 to 12.6 rates

11   for the citizenship question for non-Hispanic

12   blacks and Hispanics?

13         MR. GARDNER:  Same objections.

14         THE WITNESS:  You are taking it out of

15   context of how this was written, but you're asking

16   me where it is comparing three sets of numbers

17   with a group of numbers which I count down below.

18   You're asking me to isolate two or three of those

19   numbers and make a comparison, which is taking

20   this paragraph out of context.  So if you're

21   asking me simply to say is that comparable, the

22   answer would be, they are dissimilar.

1    BY MS. GOLDSTEIN:

2        Q    Okay.  And are you aware -- and that last

3    half of that last paragraph that we've just been

4    reading lists a number of estimates that this memo

5    says showed similar nonresponse rate ranges.  Are

6    you aware or have you seen any evidence that those

7    questions add a racially or ethnically

8    differential response rate?

9        A    I don't recall.  I don't know if I saw

10   that.

11       Q    Let's go to the next page.  So let's go

12   to the middle of that first paragraph.  It says,

13   "However, Census was not able to isolate what

14   percentage of decline that was caused by the

15   inclusion of a citizenship question rather than

16   some other aspect of the long form survey."

17            Do you see that?

18       A    I see that sentence.

19       Q    Now, if we go back over to 1280, this is

20   Exhibit 21.

21       A    Page 1280, yeah.  Got it.

22       Q    That last sentence, "Census is isolating

Page 300

```
 1    rates for the citizenship question are much

 2    greater than comparable rates for other

 3    demographic variables like sex, birth date/age and

 4    race/ethnicity, data not shown."

 5           Do you see that?

 6       A    I wasn't with you.  Whether the response

 7    is by mail-in questionnaire or --

 8       Q    No.  The very last line of the last

 9    paragraph in B1.

10       A    Right.  But there's a full sentence that

11    starts with "whether."

12       Q    Sure.

13       A    "The response is by mail-in questionnaire

14    or ISR instrument and item response -- nonresponse

15    rates for citizenship question are much greater

16    than the comparable rates for other demographic

17    variables like sex, birth/age, race/ethnicity

18    not" -- "data not shown."

19       Q    Have you seen any empirical data that

20    contradicts this analysis on Page 1280?

21       A    No.

22       Q    And, to your knowledge, has anyone in
```

Page 301

1   Commerce seen any empirical data or studies that

2   contradict the Census Bureau's analysis on

3   Page 1280?

4        A    Not that I'm aware of.

5        Q    And that includes Section B2 on

6   self-response rates, correct?

7        A    Right.   And it's interesting, because

8   this talks about -- well, not being asked that

9   question.

10       Q    And that includes Section B2 on

11   self-response rates?

12       A    Well, we only looked at that one little

13   part of -- if you want --

14       Q    That one little part of that?

15       A    -- me to take the --

16       Q    That one little part of the sentence.

17       A    What's the question?   You'd rather me --

18       Q    Sure.   Let me rephrase it.   Let me re-ask

19   it then.

20            Have you seen any -- apart from the

21   Census Bureau memos, have you seen any empirical

22   data or studies that contradict the

Page 302

1   Census Bureau's analysis of self-response rates

2   with respect to the citizenship question?

3       A   Not that I'm aware of.

4       Q   And, to your knowledge, has anyone in

5   Commerce seen any empirical data or studies that

6   contradict the self-response rate analysis that

7   the Census Bureau put forth in Section B2 on

8   Page 1280?

9           Just asking what you know.

10      A   I don't know.

11      Q   And if you go to Page 1281, let me ask

12  this more generally so we don't have to bother

13  with the documents.

14          Have you seen -- other than the materials

15  that the Census Bureau prepared for you, the Abowd

16  memos that we've been talking about a lot today,

17  have you seen any scientific studies or data that

18  contradict those analyses?

19          Have you --

20      A   These specific analyses, not that I'm

21  aware of.

22      Q   And, to your knowledge, has anyone in

Page 303

1    Commerce?

2        A    I don't know.   I can't speak to anybody

3    in Commerce -- everybody in Commerce.

4        Q    I'd have to speak to the other people in

5    Commerce who were involved, correct?

6        A    Correct.

7        Q    To see if they saw other science that you

8    haven't seen?

9            MR. GARDNER:   Objection to form.

10           THE WITNESS:   Yes.

11   BY MS. GOLDSTEIN:

12       Q    Okay.  So let's go back to the decision

13   memo, and let's go to -- you see where it says

14   "Option C"?

15       A    Yes, ma'am.

16       Q    So in the middle of that paragraph,

17   Secretary Ross writes, "That Census Bureau

18   analysis showed that between 28 and 34 percent of

19   citizenship for self-responses for persons that

20   administrative records show are noncitizens are

21   inaccurate."

22           Did I read that correctly?

Page 307

1      Q    Sure.

2      A    -- and tie it back.

3      Q    So let's step away from the document for

4  a second.  It sounds like you just testified -- I

5  just want to make sure I understand -- that the

6  Census wanted an accurate and complete count,

7  correct?

8      A    The Census wants?

9      Q    Or I'm sorry.  Commerce wants an accurate

10 and complete count?

11     A    A complete and accurate census, yes.

12     Q    And that the Secretary's goal in choosing

13 between these options, he wanted to pick an option

14 that would provide a great amount of accuracy,

15 correct?

16     A    I can't speak for the -- now you're

17 asking me to speak for the Secretary.

18     Q    To your knowledge, you talked to the

19 Secretary?

20     A    Yes.

21     Q    You know what the Secretary prioritized,

22 correct?

1    A    Correct.

2    Q    Accuracy was important to the Secretary?

3    A    Complete and accurate were important to

4  the Secretary.

5    Q    And the Census Bureau concluded that

6  Option D was not the most accurate option,

7  correct?

8         If you're not sure, you can tell me.

9  We'll go back to the document.

10         You want to read my question one more

11  time?  Thanks.

12         (Thereupon, the reporter read the record

13  as requested.)

14         THE WITNESS:  But this -- okay.

15  BY MS. GOLDSTEIN:

16    Q    Correct?

17    A    In the opinion of the Census Bureau, this

18  is opinion, it's not conclusive fact --

19    Q    I'm not asking for conclusive fact.  The

20  Census Bureau --

21    A    Their opinion was --

22    Q    -- concluded that the most accurate

1   option was not Option D, correct?

2        A   In their opinion, yes.

3        Q   So let's turn the page.

4        A   Do you not want to discuss, "This

5   approach would maximize the ability to match the

6   responses to the administrative records"?

7        Q   We are running out of time, Under

8   Secretary.  Let's keep going.  Let's go to the

9   next page.

10       A   But I think there's a lot in this letter

11   that you're not --

12       Q   I know.  I've only got -- you want to

13   stay longer?  If you're going to consent to it, I

14   will absolutely ask you more.

15           MS. GOLDSTEIN:  Consent?

16           MR. GARDNER:  No.  Keep cherry picking.

17   Go for it.

18   BY MS. GOLDSTEIN:

19       Q   So let's go back to the top page of this

20   document, which is 1371.  "It is my judgment that

21   Option D will provide DOJ with the most complete

22   and accurate CVAP data in response to its

1    request."

2            Did I read that correctly?

3    A    Yes, ma'am.

4    Q    The Census Bureau concluded that Option D

5    would not provide DOJ with the most complete and

6    accurate CVAP data in response to its request,

7    correct?

8    A    In their judgment.   And this is the

9    Secretary's judgment.

10   Q    I just need to make the record clear.

11          So in the Census Bureau's judgment,

12   Option D would not provide DOJ with the most

13   complete and accurate CVAP data, correct?

14   A    Your question again?

15   Q    So in the Census Bureau's judgment,

16   Option D would not provide DOJ with the most

17   complete and accurate CVAP data, correct?

18   A    I don't want to speak for the Census, so

19   I want to make -- if it's in data.

20   Q    Okay.   So let me direct you to the right

21   place.   So why don't you go to 9816.   It's the

22   last page of that March 1 memo, and in this --

Page 313

```
1       Q    I'd have to ask him?

2       A    Please.

3       Q    And then it says, the next full sentence,

4   "But no one provided evidence that reinstating a

5   citizenship question on the decennial census would

6   materially decrease response rates among those who

7   generally distrusted government and government

8   information collection efforts, dislike the

9   current administration or fear of law

10  enforcement."

11           Do you see that?

12      A    Yes.

13      Q    You didn't ask the Census Bureau to test

14  that question, correct?

15      A    The Census Bureau indicated that they

16  felt the question had been tested.

17      Q    Now, this says that no one provided

18  evidence that reinstating the question -- I'm just

19  going to paraphrase -- that reinstating the

20  question in this climate with these people who

21  generally distrusted government would decrease

22  response rates, correct?
```

Page 314

1      A    That's what it says, which is
2  paraphrased.
3      Q    Yeah.
4      A    You read it verbatim before.
5      Q    But fair enough, right?
6            No one in Commerce asked the
7  Census Bureau to provide that evidence through
8  additional testing, correct?
9            MR. GARDNER:  Objection.  Calls for
10  speculation.  Lack of foundation.
11  BY MS. GOLDSTEIN:
12      Q    To your knowledge?
13      A    The Census Bureau -- excuse
14  me -- Commerce asked the Census Bureau whether
15  they felt the question was adequately tested.
16      Q    And Secretary Ross felt that there was no
17  evidence, at least with respect to this
18  implication of the citizenship question, correct?
19      A    I can't tell you what he felt or anything
20  else.
21      Q    That's just what he wrote --
22      A    We know what he wrote.

Page 315

1      Q    Okay.   And you never asked the

2  Census Bureau to run tests on the impact of

3  reinstating the citizenship question on this

4  population described in that sentence we've just

5  been reading, correct?

6      A    We asked them if they felt that this

7  question had been tested appropriately enough to

8  be put on the 2020 decennial.

9      Q    I'm just going to try my question one

10 more time.

11          You didn't ask the Census Bureau to

12 provide evidence that reinstating the citizenship

13 question would impact or -- the response rates on

14 the population that is referenced in that sentence

15 we've just been reading, correct?

16     A    So if --

17     Q    I just want to know whether you asked for

18 testing on that subject.

19     A    If you are asking me if I asked the

20 Census to provide testing on response rates of

21 people who -- among those who generally distrust

22 government and government information collected

Page 316

1  efforts, dislike the current political climate, or

2  fear law enforcement, I did not do that.

3       Q   And, to your knowledge, did anyone at

4  Commerce ask the Census Bureau to provide evidence

5  of that?

6       A   I do not know.

7       Q   Okay.   So let's go to the last sentence

8  of that paragraph.   "While it is possible that

9  this belief is true, there is no information

10 available to determine the number of people who

11 would, in fact, not respond due to a citizenship

12 question being added and no one has identified any

13 mechanism for making such a determination."

14       Do you see that?

15       A   I do.

16       Q   Did you ask the Census Bureau if they

17 could design a test to make this determination?

18       A   No.   I did not ask them to make -- to

19 create a test.

20       Q   And, to your knowledge --

21       A   I --

22       Q   I just have to ask it for the record.

1        -- did anyone at Commerce ask the

2    Census Bureau to design a test to make this

3    determination?

4        A    Not that I know of.

5            But I repeat, we asked the Census Bureau

6    if they felt that this question had been

7    thoroughly tested on a number of occasions.

8        Q    Okay.  Let's go to the next page.

9            And I want to go to the middle of that

10   first paragraph.  The same former director

11   noted -- do you see where I'm starting?  "In the

12   years preceding" --

13       A    Yes.

14       Q    -- "certain interest groups consistently

15   attacked the census and discouraged

16   participation."

17           Do you know what Secretary Ross is

18   referring to here?

19           Just with respect to those interest

20   groups, do you know what he's referring to?

21           MR. GARDNER:  Objection.  Calls for

22   speculation.

Page 319

1    BY MS. GOLDSTEIN:

2        Q    Have you seen studies or other evidence

3    regarding that?

4              MR. GARDNER:   Same objection.

5              THE WITNESS:   This is going to be a fuzzy

6    answer, so I --

7    BY MS. GOLDSTEIN:

8        Q    Sure.

9        A    There have been conversations with Census

10    that in past decennials, that there have been

11    special interest groups of certain varieties that

12    have been negative about the census, but I cannot

13    tell you technical details on any of that, but I

14    do recall having conversations about that topic.

15        Q    Do you remember who those conversations

16    were with?

17        A    It would have to be the Census

18    leadership.

19        Q    Okay.  But you don't recall seeing any

20    documents related to that, correct?

21        A    No.  But I don't remember.

22        Q    Okay.  And right below that it says,

Page 320

1    "While the reinstatement of a citizenship question

2    may be a data point on which these interest groups

3    seize in 2019, past experience demonstrates that

4    it is likely efforts to undermine the decennial

5    census will occur -- will occur again, regardless

6    of whether the decennial census includes a

7    citizenship question."

8             Now, I only want to know, have you seen

9    any empirical data that relates to that point?

10       A    No.

11       Q    And do you know if Secretary Ross has

12   seen any empirical data --

13            MR. GARDNER:  Objection.

14   BY MS. GOLDSTEIN:

15       Q    -- relating to that point?

16            MR. GARDNER:  Calls for speculation.

17            THE WITNESS:  I'm not going to speak for

18   Secretary Ross.

19   BY MS. GOLDSTEIN:

20       Q    I need to speak to him --

21            MR. GARDNER:  Objection

22   BY MS. GOLDSTEIN:

1  citizenship question request before December, just

2  to make sure you would have enough time?

3      A   And I think I said earlier I'm not

4  exactly sure what was the first time we discussed

5  it.

6      Q   But you did not discuss what those steps

7  would be in terms of the legal review and the

8  technical review and the policy decision until

9  mid-December; is that right?

10      A   Correct.

11      Q   Did anyone ever ask or instruct you not

12  to reveal to the Census Bureau that there may be a

13  request for a citizenship question on the census

14  or to delay informing the Census Bureau?

15      A   No.  And as I said, I don't know.  I

16  could have discussed that with them early.  It

17  just was not in the priorities of the things we

18  were discussing.

19      Q   So no one ever instructed you or asked

20  you not to inform the Census Bureau?

21      A   No.

22      Q   So you testified that during that fall of

Page 329

1      Q   Do you recall ever asking anyone at

2  Census about the effect of the -- the potential

3  effect of the citizenship question on the budget,

4  prior to the December 12th DOJ letter?

5      A   No.  When we did the budget, we discussed

6  what percentages we wanted to use as NRFU numbers,

7  and we actually said we -- we needed to put more

8  into those numbers and make sure we had enough for

9  NRFU, we had enough for the partnerships, enough

10  for those kind of things, but -- and we put

11  contingencies in those numbers.  But there was

12  never a --

13      Q   But before the DOJ letter was received by

14  Census, did you ever look into what the effect of

15  the citizenship question could be on the costs of

16  NRFU?

17      A   No.

18      Q   You understand that the stated

19  justification for the citizenship question by the

20  Secretary is Voting Rights Act enforcement; is

21  that right?

22      A   That is what the letter from DOJ

1          What time frame are we talking about?

2     I'm not sure which communications you're referring

3     to.

4          A    I have no idea what you're -- you're

5     asking me the questions, and you're asking me what

6     time frame we're talking about.  This has gotten

7     off the rails a little.

8          Q    It's late in the day.

9          A    And I really want to be as helpful as

10    possible, so, please.

11         Q    Understood.  Understood.

12              So let's say March 2018, so after the

13    March 1st memo, before the March 26th decision,

14    and from understanding of the documents, that's

15    the time period when he was doing a lot of the

16    discussions with stakeholders.  So during that

17    time period, did he have communications with DOJ

18    about the citizenship question?

19         A    I don't know the answer to that.

20         Q    You don't know?

21         A    I do not know the answer to that.

22         Q    Okay.  Do you know whether he had any

Page 333

1  stakeholder conversations with any Voting Rights
2  Act -- I should say organizations interested in
3  Voting Rights Act enforcement, such as, for
4  example, the ACLU, MALDEF, any other such groups
5  that occasionally bring Section 2 enforcement
6  actions?
7          MR. GARDNER:  Objection.  Form.
8          THE WITNESS:  I would have to refer to
9  the list of everybody and want you to ask the
10  question.
11  BY MS. BOUTIN:
12      Q   Okay.  But do you recall any, offhand, as
13  you sit here?
14      A   No, I don't.
15      Q   Did you ever suggest to Secretary Ross or
16  Earl Comstock that they hold stakeholder
17  conversations about the citizenship
18  questions -- question -- excuse me -- with DOJ or
19  any groups interested in Voting Rights Act
20  enforcement?
21          MR. GARDNER:  Objection.  Form.
22          THE WITNESS:  We certainly talked and

1   took great, earnest interest in making sure we had

2   a broad -- a broad and comprehensive group for the

3   Secretary to talk to.

4   BY MS. BOUTIN:

5       Q   But you don't remember any suggestion, as

6   far as stakeholders go, whose specific interests

7   were Voting Rights Act enforcement?

8       A   I can't speak to -- I don't know that

9   somebody wasn't spoken to that are --

10      Q   But you don't know of anyone?

11      A   Not to my knowledge.

12      Q   Earlier, you stated that there are other

13  instances in which an agency has refused to meet,

14  and you referred to as an example -- you referred

15  to OMB as an example.  What was that in reference

16  to.

17      A   The race and ethnicity question, which is

18  a question that its form is dictated by a group

19  called oh OIRA, which is part of OMB.  And because

20  the question needed to be -- the questions needed

21  to be done by a certain point when we're talking

22  about theses timelines, OIRA would have had to

Page 335

1   change how it -- it mandated race and ethnicity to

2   be viewed and how it would be broken out.   And so

3   we were getting towards -- closer to them, and we

4   would call and say, do you have an update, do you

5   want us to come meet?   And they'd say no, we don't

6   have an update.   At that point, we're not --

7        Q    Had there been previous meetings prior to

8   their refusal to meet?

9        A    They did not meet.   I don't want to go

10  all the way to they refused -- they refused to

11  meet, but they did not meet.   Do I know if there

12  were any meetings before that?

13       Q    About the race and ethnicity question?

14       A    Not prior to my arrival, but prior to

15  that, I don't -- not after my arrival.   Prior to

16  that, I don't know.   I do know that over the

17  years, there was communication and correspondence,

18  that they worked closely together.

19       Q    Okay.

20       A    So I believe they did meet prior.

21       Q    Okay.   So did they -- and I'm sorry.   You

22  say OIRA is the name of --

1        Okay.  Did -- what -- was the final

2    result in that process such that OIRA got what

3    they wanted?  Did the race and -- let me rephrase.

4        Did the race and ethnicity question end

5    up in the form that they had advocated?

6        A    OIRA, yes.

7        Q    Okay.  This question was asked earlier,

8    but I don't think -- I think things got

9    sidetracked.

10        Were you surprised by Secretary Ross's

11   decision to add the citizenship question against

12   the recommendation of the Census Bureau?

13        A    It wasn't my place to be surprised or

14   not.  It was my place to do --

15        Q    But were you surprised?

16        A    -- what the Secretary asked.

17        Q    But were you surprised?

18        A    I was not surprised or not surprised.  I

19   said, okay, that's the decision, now we need to

20   say, how do we implement it?  How do we go

21   forward?

22        Q    So I think without looking at them, I

1    importance of concerns from the feet on the

2    ground.

3        A   I'm sorry.  I got -- give me the first

4    part of what you're talking about.

5        Q   Sure.  Sure.

6            So I was just recalling earlier

7    testimony, and it -- we were talking generally

8    about meetings with Secretary Ross, and one of the

9    phrases that you used was the feet on the ground,

10   and how it was important to consider concerns

11   stated from the feet on the ground.

12       A   Yeah.

13       Q   What do you mean -- what do you mean by

14   feet on the ground?

15       A   And Census refers to it as boots on the

16   ground.  That's what they always say when they

17   talk about those people out in the field

18   conducting NRFU.  The enumerators, I should say.

19       Q   Are you familiar with the Center For

20   Survey Management?

21       A   Not particularly.

22       Q   I'm sorry.  Center For Survey

Page 355

1   Measurement?

2       A   Not intimately.

3       Q   Okay.  I will represent to you that it is

4   an office within Census, and I'd like to show

5   you --

6       A   Please show me.

7       Q   -- a September 20, 2017 memorandum for

8   Associate Director Research and Methodology, and I

9   think it will be Exhibit 29.

10          (Plaintiffs' Exhibit 29, September 20,

11  2017 memorandum, was marked.)

12          THE WITNESS:  I was afraid you were going

13  to give me that without a number and I couldn't

14  take it.

15          May I clarify, Rory, my last statement?

16  BY MR. ADAMS:

17      Q   Yes.

18      A   When you said the Center for Survey

19  Measurement, I thought you were talking about an

20  outside concern.  As a group inside of the

21  research and methodology, they have all kinds of

22  teams.

Page 356

1    BY MR. ADAMS:

2        Q    Okay.

3        A    So I -- I recognize they do all these

4    things, but I -- I did not understand the context

5    in which you were talking.

6        Q    Okay.

7        A    So I would not say to you I've never seen

8    any work by CSM before, but there's lots of

9    acronyms, as you can well imagine.

10       Q    I can.

11            Are you familiar with this document?

12       A    No.  I am not familiar with this

13    document.

14       Q    I'd like to read a number of statements

15    in the document and ask if you are familiar

16    with -- in general, with the concerns that are

17    expressed in the document.  So beginning at the

18    bottom of the first page, "FRs, field" --

19    sorry -- "field representatives, and FS is field

20    supervisors, emphasized facing a, 'new phenomenon'

21    in the field, and reported that respondent's

22    fears, particularly among immigrant respondents,

Page 357

1   have increased markedly this year.  Respondents

2   reported being told by community leaders not to

3   open the door without a warrant signed by a judge,

4   and CSM researchers observed respondents

5   falsifying names, dates of birth and other

6   information on household rosters."

7        Were you aware that these observations

8   had been made in the field in the context of CSM's

9   various research projects?

10      A   I understood the concerns were made, but

11  not under this particular research paper or other

12  things, and I think we've seen today where -- but

13  this is from the field itself.  I have not seen

14  this document, but we have talked about concerns.

15      Q   Turning to the third page, which is Bates

16  number 2448, the very top, "It should be noted

17  that this level of deliberate falsification of the

18  household roster and spontaneous mention of

19  concerns regarding negative attitudes towards

20  immigrants is largely unprecedented in the

21  usability interviews that CSM has been conducting

22  since 2014 in preparation for the 2020 census."

Page 364

1              ACKNOWLEDGEMENT OF DEPONENT

2          I, KAREN DUNN KELLEY, do hereby acknowledge I

3    have read and examined the foregoing pages of

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any changes or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10

11

12

13   _____      _____

14   Date                  KAREN DUNN KELLEY

15

     Joshua E. Gardner, Esquire

16   U.S. DEPARTMENT OF JUSTICE

     20 Massachusetts Avenue

17   Washington, D.C. 20530

18   IN RE:  New York Immigration Coalition, et al., v.

     United States Department of Commerce, et al.

19

20

21

22

# EXHIBIT G

Page 1

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MARYLAND

3    - - - - - - - - - - - - - - - x

4    ROBYN KRAVITZ, et al.,           :

                 Plaintiffs,          :

5        vs.                          : Civil Action No.

     U.S. DEPARTMENT OF COMMERCE,     : 8:18-cv-01041-GJH

6    et al.,                          :

                 Defendants.          : Global

7    - - - - - - - - - - - - - - - x  objection:

     LA UNION DEL PUEBLO ENTERO,      : 401; 403

8    et al.,                          :

                 Plaintiffs,          :

9        vs.                          : Civil Action No.

     WILBUR L. ROSS, sued in his      : 8:18-CV-01570-GJH

10   official capacity as U.S.        :

     Secretary of Commerce, et al.,:

11               Defendants.          :

     - - - - - - - - - - - - - - - x

12     VIDEOTAPED DEPOSITION OF: DAVID SANFORD LANGDON

13   DATE:        Friday, October 26, 2018

14   TIME:        9:08 a.m.

15   LOCATION:    Covington & Burling

16                850 Tenth Street, D.C.

17                Washington, D.C.

18   REPORTED BY: Denise M. Brunet, RPR,

19                Reporter/Notary

20                Veritext Legal Solutions

21           1250 Eye Street, D.C., Suite 350

22                Washington, D.C.  20005

Page 2

1              A P P E A R A N C E S

2

3    On behalf of the Kravitz Plaintiffs:

4              SHANKAR DURAISWAMY, ESQUIRE

5              Covington & Burling, LLP

6        ██████  ██████  ████████  ███████

7        ███████████  ██████  ██████

8        ██████  ██████

9        ███████████████

10

11   On behalf of New York Immigration Coalition:

12             DYLAN SCOT YOUNG, ESQUIRE

13             Arnold & Porter Kaye Scholer, LLP

14       █████  ████████████  ████████  ████████

15       ███████████  ██████  ██████

16       ██████  ██████

17       ████████████████████

18

19

20

21

22   (Appearances continued on the next page.)

Page 3

1    APPEARANCES (continued):

2

3    On behalf of the Lupe Plaintiffs:

4              NIYATI SHAH, ESQUIRE

5              ERI ANDRIOLA, ESQUIRE

6              Asian Americans Advancing Justice

7              ████ ▌ █████  ██████

8              ████  ████

9              ███████  █████  █████

10             █████  █████

11             ████████████████████████

12

13   On behalf of the State of California:

14             TODD GRABARSKY, ESQUIRE

15                (via telephone)

16             Deputy Attorney General

17             Office of the Attorney General

18             300 S. Spring Street, Suite 1700

19             Los Angeles, California  90013

20             (213) 269-6044

21             todd.grabarsky@doj.ca.gov

22   (Appearances continued on the next page.)

```
                                              Page 4

 1    APPEARANCES (continued):

 2

 3    On behalf of Defendants:

 4              CARLOTTA P. WELLS, ESQUIRE

 5              U.S. Department of Justice

 6              Civil Division

 7              1100 L Street, Northwest

 8              Washington, D.C.  20530

 9              (202) 514-4522

10              carlotta.wells@usdoj.gov

11

12              MICHAEL A. CANNON, ESQUIRE

13              United States Department of Commerce

14              Office of the Assistant General

15                Counsel for Finance and Litigation

16              1401 Constitution Avenue, Northwest

17              Room 5890

18              Washington, D.C.  20230

19              (202) 482-5395

20              mcannon@doc.gov

21

22    (Appearances continued on the next page.)
```

```
                                              Page 5

 1   APPEARANCES (continued):

 2

 3   ALSO PRESENT:   B.J. Altvater

 4                   Eric Xi

 5                   Glen Fortner, Videographer

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Page 6

```
 1                    C O N T E N T S

 2     EXAMINATION BY:                              PAGE:

 3     Counsel for Kravitz Plaintiffs              11

 4

 5     DEPOSITION EXHIBITS:                         PAGE:

 6     1 -   E-mail from Herbst to Langdon dated

 7           2/2/17                                 71

 8     2 -   E-mail from Langdon to Comstock dated

 9           3/10/17                                93

10     3 -   E-mail from Langdon to Comstock and

11           Herbst dated 3/15/17                   95

12     4 -   E-mail chain starting with e-mail from

13           Comstock to Ross dated 5/2/17          125

14     5 -   E-mail from Comstock to Ross dated

15           3/10/17                                137

16     6 -   E-mail chain starting with e-mail from

17           Langdon to Blumerman dated 5/24/17     143

18     7 -   E-mail from Langdon to Comstock and

19           Herbst dated 5/24/17                   171

20

21

22     (Exhibits continued on the next page.)
```

Page 7

```
 1   DEPOSITION EXHIBITS:                             PAGE:

 2    8 -  E-mail chain starting with e-mail from

 3         Langdon to Comstock and Herbst dated

 4         5/24/17                                      190

 5    9 -  Memo from Ross dated 6/21/18                 205

 6   10 -  E-mail chain starting with e-mail from

 7         Langdon to Park-Su dated 6/22/18             211

 8   11 -  E-mail chain starting with e-mail from

 9         Uthmeier to Langdon dated 1/29/18            232

10   12 -  Letter and attachment from Gary to

11         Thompson dated 11/4/16                       249

12   13 -  E-mail from Quinley to Kelley dated

13         1/10/18                                      253

14   14 -  Agenda for steering committee meeting

15         dated 1/11/18                                253

16   15 -  Questions on the January 19 draft

17         census memo on the DOJ citizenship

18         question reinstatement request              264

19   16 -  E-mail chain starting with e-mail from

20         Comstock to Langdon, et al., dated

21         1/30/18                                      268

22   (Exhibits continued on the next page.)
```

Page 8

1    DEPOSITION EXHIBITS:                          PAGE:

2    17 - E-mail chain starting with e-mail from

3         Abowd to Reist and Lamas dated 1/31/18  268

4    18 - Memo from Abowd dated 1/19/18            296

5

6         (*Exhibits attached to the transcript.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 9

1                      P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We are

3      going on the record at 9:08 a.m. on October 26th,

4      2018.  Please note the microphones are sensitive

5      and may pick up whispering, private conversations

6      and cellular interference.  Please turn off all

7      cell phones or place them away from the

8      microphones as they can interfere with the

9      deposition audio.  Audio and video recording will

10     continue to take place unless all parties agree to

11     go off the record.

12              This is media unit 1 of the

13     video-recorded deposition of David Langdon taken

14     in the matter of Robyn Kravitz, et al., v. U.S.

15     Department of Commerce, et al., and La Union Del

16     Pueblo Entero, et al., v. Wilbur Ross, et al.,

17     filed in the United States District Court for the

18     District of Maryland.

19              This deposition is being held at

20     Covington & Burling, LLP, located at 850 10th

21     Street, Northwest, Washington, D.C.

22              My name is Glen Fortner from the firm

Page 10

1    Veritext, and I am the videographer.  The court

2    reporter is Denise Brunet from the firm Veritext.

3    I am not related to any party in this action, nor

4    am I financially interested in the outcome.

5           Counsel and all present in the room and

6    everyone attending remotely will now state their

7    appearances and affiliations for the record.  If

8    there are any objections to proceeding, please

9    state them at the time of your appearance,

10   beginning with the noticing attorney.

11          MR. DURAISWAMY:  Shankar Duraiswamy for

12   the Kravitz plaintiffs.

13          MR. ALTVATER:  B.J. Altvater, law clerk,

14   Covington & Burling, for the Kravitz plaintiffs.

15          MS. SHAH:  Niyati Shah for the Lupe

16   plaintiffs and the District of Maryland case

17   number 8:18-01570.

18          MR. YOUNG:  Dylan Young from Arnold &

19   Porter for the NYIC plaintiffs.

20          MR. CANNON:  Michael Cannon, U.S.

21   Department of Commerce agency counsel.

22          MS. WELLS:  And Carlotta Wells from the

1   Department of Justice representing the defendants.

2             THE VIDEOGRAPHER:   The court reporter

3   will please swear in the witness.

4   WHEREUPON,

5             DAVID SANFORD LANGDON,

6   called as a witness, and having been sworn by the

7   notary public, was examined and testified as

8   follows:

9     EXAMINATION BY COUNSEL FOR KRAVITZ PLAINTIFFS

10  BY MR. DURAISWAMY:

11      Q    Good morning, Mr. Langdon.  As you just

12  heard, my name is Shankar Duraiswamy.  I represent

13  the plaintiffs in one of the cases that we're here

14  about today.  Let me start with a simple question.

15  Could you please state and spell your name for the

16  record.

17      A    State and spell?

18      Q    Yes.

19      A    David Sanford Langdon.  D-A-V-I-D,

20  S-A-N-F-O-R-D, L-A-N-G-D-O-N.

21      Q    And could you provide your home and work

22  addresses for the record, please?

Page 17

```
 1          At a later point in time, you received a

 2    master's in applied economics from Johns Hopkins;

 3    is that right?

 4        A    Yes.

 5        Q    That was in 2003?

 6        A    Yeah.

 7        Q    Is there any other educational background

 8    that we've missed?

 9        A    In terms of university education, no.

10        Q    What about -- how about non-university

11    education?

12        A    I mean, all federal employees, we take,

13    you know, training courses and, you know,

14    continuing education.

15        Q    Understood.  Why did you decide not to

16    finish the degree in Spain?

17        A    It was a personal lifestyle decision.  So

18    my later wife and I decided that we wanted to look

19    for work in the United States, settle down, and we

20    chose Washington, D.C.

21        Q    And as I understand it, when you settled

22    down in D.C., you took a job with the Bureau of
```

Page 18

1  Labor Statistics; is that right?

2      A      Correct.

3      Q      What was your job there?

4      A      I was an economist, a staff economist, at

5  BLS.  I worked on the current employment

6  statistics program, which is part of the Office of

7  Employment and Unemployment Statistics.

8      Q      How did you end up in that job?

9      A      They were hiring a lot.  This was 1998.

10  I interviewed -- I started in July, interviewed in

11  January.  And they had a lot of open positions,

12  and I chose that office to work in.

13      Q      And how long did you have that position?

14      A      Around seven years.

15      Q      What were your job responsibilities?

16      A      So we -- this office was in charge of

17  producing the monthly payroll survey numbers.  So

18  there's two major sets of employment data that go

19  in the monthly jobs report, typically published on

20  the first Friday of the month.  It's a principal

21  federal economic indicator.

22              My office was responsible for the editing

1  of microdata, the preparations of the analysis,

2  and discussion and economic analysis of them with

3  senior BLS management.  We also did --

4           THE REPORTER:  Senior --

5           THE WITNESS:  BLS, Bureau of Labor

6  Statistics.  It's the acronym.

7           Senior BLS management.  And we did

8  research reports as well.

9  BY MR. DURAISWAMY:

10     Q    And that describes your responsibilities

11  during the entire seven years that you had that

12  position?

13     A    Yeah.  I mean, I became a supervisory

14  economist.  So at some point in that time -- I

15  became a team lead and, later, a supervisory

16  economist.  So, you know, staff economists, you

17  know, reported to me.  But we did -- it was the

18  same office, same, you know, general

19  responsibilities.

20     Q    Did you have any responsibility for the

21  design or administration or execution of the

22  payroll survey?

1     A     Yeah.

2     Q     Could you describe what your

3 responsibilities were?

4     A     So we -- I mean, it varied, really.  I

5 mean, we worked with the data collection team.

6 There's a separate collection data team.  So the

7 monthly payroll surveys is a massive business

8 survey.  It goes to around 300,000 U.S. -- between

9 300 and 400,000 U.S. business establishments every

10 month, and it collects information on their

11 payrolls, so employment, female employment, total

12 payroll dollars, total hours worked, and then

13 manufacturing total overtime hours.

14          And we -- during that period, we went

15 through a major transition in how the -- and the

16 industry framework that was used to assign a

17 company to a specific industry within

18 manufacturing, a shift from the standard

19 industrial classification system to the North

20 American industry classification system.  So we

21 were involved with that.

22          We were involved with a potential

1  decision to remove -- to stop collecting data on

2  female employment --

3            THE REPORTER:  Stop collecting data on...

4            THE WITNESS:  Data on the number of women

5  employed by companies.  So, I mean, it was a

6  variety of things.

7  BY MR. DURAISWAMY:

8      Q    Did you have any prior background in

9  survey methodology or design?

10     A    Some.  I mean, I took classes on it when

11  I was in Seville.  So I took classes on survey

12  methodology and survey design.  And I learned a

13  lot on the job.

14     Q    Did you have any involvement with any

15  other surveys or survey data while you were there?

16     A    On BLS?  As an analyst.  I used data from

17  other BLS programs in research reports I did.  So

18  I used data -- we worked closely with the people

19  on the current population survey.  So it's a

20  monthly household survey that actually the Census

21  Bureau administrates -- administers, but BLS is

22  one of the major users.

Page 22

1      Q     Other than the current population survey,

2  did you have any -- did you do any work related to

3  any other surveys administered by the Census

4  Bureau during that period of time?

5      A     A little bit on the American Time Use

6  Survey, which is also administered by the Census

7  Bureau, mostly as an analyst.   We used the data.

8      Q     So with respect to both of those, you

9  weren't working at the Census Bureau, you weren't

10  involved in the execution of the survey --

11      A     No.

12      Q     -- but you were analyzing the data that

13  came out of the survey?

14      A     Correct.

15      Q     Okay.  Other than the census surveys, any

16  other surveys that you had any experience with

17  while you were at BLS?

18      A     No, not that I recall.

19      Q     As I understand it, you then moved in

20  2006 to the Office of Chief Economist at the

21  Department of Labor; is that right?

22      A     Within the Office of the Assistant

1   Secretary for Policy.  And the chief -- at that

2   time, the chief economist was -- this was in the

3   Bush 43 administration.  The chief economist at

4   that point was housed within that, the policy

5   office.

6        Q     How did you end up in that position?

7        A     I applied for the job.  There was an

8   opening on USAJobs.  It looked interesting and I

9   applied for it and got it.

10        Q     What were your responsibilities there?

11        A     So we -- it varied.  It varied quite a

12   bit.  We did a lot of -- principally, a lot of

13   economic analysis for the Secretary and for her

14   team.  It was Secretary Chao at that point.  So

15   macroeconomic analysis, labor market analysis --

16             THE REPORTER:  I'm sorry.  Could you slow

17   down a little bit?

18             THE WITNESS:  Sure.  I'm sorry.

19             Macroeconomic analysis, labor market

20   analysis, some of it connected to the policy

21   agenda of the department at that point.

22   BY MR. DURAISWAMY:

Page 29

1   jointly between two statistical agencies, and

2   there's lots of modules to it, and there's an

3   opportunity for all sorts of conversations about

4   what content there might be in specific pieces and

5   for what purposes.  So, I mean, really -- I just

6   can't answer that.

7        Q    Is it fair to say that, generally, the

8   Labor Department determined the priorities for

9   what it needed from survey data -- for what the

10  Labor Department needed?

11       A    The Labor Department sets its policy

12  priorities, but as far as the content goes, I

13  mean, I think it just -- it depends.

14       Q    Any other work related to surveys while

15  you were at the Labor Department in the Office of

16  Chief Economist?

17       A    Not that I recall.

18       Q    Okay.  And your tenure there ended around

19  2011; is that right?

20       A    Yep.

21       Q    And that's when you transitioned to the

22  Department of Commerce, correct?

1      A      Correct.

2      Q      What brought about that transition?

3      A      Same answer as previously.  So I learned

4   about a job posting.  It was on USAJobs.  I

5   applied for it, interviewed and was accepted.

6      Q      What was the job?

7      A      It was as a senior economist in the

8   Economics and Statistics Administration and then,

9   within the Economics and Statistics

10  Administration, the Office of the Chief Economist.

11     Q      What -- well, let me do this first.  Is

12  that the position you still hold today?

13     A      No.

14     Q      Can you just walk me through the

15  different positions that you've held in the

16  Commerce --

17     A      Yeah.  It can be a --

18     Q      -- Department since 2011?

19     A      -- bit confusing.  So I --

20     Q      Sorry.  I just want to --

21            MR. DURAISWAMY:  Do you need him to slow

22  down?

```
 1              THE REPORTER:  You're going fast and
 2      you're talking over each other.
 3              Can you just walk me through the
 4      different position that you've held in the
 5      Commerce Department in 2011 --
 6              MR. DURAISWAMY:  Since 2011.
 7      BY MR. DURAISWAMY:
 8        Q    So -- sorry, Mr. Langdon.  If you could
 9      do you -- you talk fast, as I do naturally.  If
10      you could just try to slow down and wait till I
11      get my question out and then start, that will make
12      it easier --
13        A    Understood.
14        Q    -- for Denise, I think.
15              So, yeah.  Could you just walk me through
16      the different positions you've held at the
17      Commerce Department since 2011?
18        A    Yeah.  I started at Commerce in
19      January 2011.  I was hired as a senior economist
20      in -- the acronym is ESA.  And I continued in that
21      position until about a month or so ago, actually.
22      But in addition to that, in October of 2012, I was
```

1   asked to also go on detail, essentially a

2   part-time detail, in the office of policy --

3   Office of Policy and Strategic Planning, which is

4   part of the Office of the Secretary of Commerce.

5   So I was basically doing two jobs.  And I was on

6   detail in the policy office and I was an economist

7   in ESA.

8            I actually subsequently became a

9   supervisory economist in ESA.  So I had a staff.

10  So I was managing a staff of economists.  And then

11  I was doing policy work under various Secretaries.

12  And I've continued to do that policy work up until

13  now.

14            Because of a reorganization that was

15  announced in March of 2017, the Office of the

16  Chief Economist was eliminated, and the staff of

17  that office and actually the staff of ESA were

18  reassigned to different positions in the

19  Department of Commerce, some in the Census Bureau,

20  some in the Bureau of Economic Analysis and some

21  in other areas.

22            I was assigned to -- actually, moved

Page 33

1   full-time as a permanent employee of the Office of

2   Policy and Strategic Planning, and so that's my

3   single job now.

4        And there's a lot of overlap of sort of

5   research and responsibilities and content area

6   between those two jobs.

7      Q   So just to be clear, from about

8   October 2012 until March 2017, you essentially had

9   a dual role as a senior economist in ESA and as a

10   senior policy advisor; is that fair to say?

11      A   That's exactly right.

12      Q   In the Office of Policy and Strategic

13   Planning?

14      A   Yes.

15      Q   Is it possible to estimate roughly how

16   much of your time was devoted to one role versus

17   another during that period of time?

18      A   It varied a lot.  It varied by

19   assignment, by work flow.  I mean, at times -- it

20   was never 50/50.  Actually, somebody joked it was

21   more like 70/70.

22      Q   What were your responsibilities with

1    respect to ESA?

2         A     As a policy advisor?

3         Q     I guess I'm referring to the first role

4    you identified as a senior economist in ESA.

5         A     So think about the -- sort of talk about

6    the structure of ESA.  Okay?  So ESA is an

7    umbrella -- or was an umbrella organization that

8    had three pieces underneath:  The Census Bureau,

9    the Bureau of Economic Analysis, and then the

10   small Office of the Chief Economist.  And so the

11   chief economist's office essentially was -- like

12   an on-call research -- a group of research -- a

13   research agency within the Department of Commerce

14   that would largely support the missions of the two

15   statistical agencies.  So -- and also, you know --

16   they would also conduct research to support

17   whichever administration's policy agenda.

18            So I, or my staff later on, would do a

19   lot of either internal or external research

20   reports on all sorts of topics.  A lot of mine had

21   a labor focus, and there was a strong demand for

22   that.  But the office itself, I mean, did a

Page 35

1      variety of research.

2          Q      And you said the research was done in

3      part to support the work of the other two

4      statistical agencies that fell within the ESA,

5      correct?

6          A      Yeah.

7          Q      What kinds of work did you do to support

8      the work of the Census Bureau?

9          A      So, I mean, one thing we could do would

10     be research reports that would demonstrate the

11     value or the utility of data that they produced.

12     So for example, we -- I co-authored a few studies

13     on the STEM workforce, you know, so the science,

14     technology, engineering and math workforce.  And

15     for those studies, we used American Community

16     Survey data a lot, and current population survey

17     data.  So -- and we showed, you know, interesting

18     analysis you could do about that workforce and

19     interesting aspects of those data sets.

20         Q      Did any of the work you did have an

21     impact or relate to the content of the surveys

22     administered by the Census Bureau?

1      A      It related to, yes.

2      Q    Let me try to be more specific.  Did it

3  relate to decisions about what the content of

4  those surveys should be?

5      A    I'm not -- I'm not sure.  Maybe

6  indirectly.  So to be specific, like, one of the

7  studies we did looked at -- used a variable on the

8  degree -- the major of -- that bachelor degree

9  holders had.  So, basically, like, the survey form

10  asked people about their educational attainment.

11  If you indicated you had a bachelor's degree, you

12  would receive a subsequent question on what your

13  first major or second major was.  And so our STEM

14  studies looked at that.

15          And during a subsequent content review

16  that I was not involved with for the American

17  Community Survey, that was one of the questions

18  that, you know, was up for potential elimination.

19  And I think -- you know, so there was some overlap

20  and discussion with, you know, probably Census

21  Bureau staff about, you know, things along those

22  lines.

Page 39

1    looking, you know, one by one, okay, is this --

2    you know, at every question.  Right?  But just --

3    I can't speak specifically about which questions

4    we had conversations about and which ones we

5    didn't.

6         Q    Well, let me try to narrow it down for

7    you.  Do you recall any work that was done

8    regarding the uses of the citizenship question on

9    the ACS survey?

10        A    No.

11        Q    Do you recall any work that was done

12   regarding the place of origin questions on the

13   citizenship survey?

14        A    Nope.

15        Q    Do you have any reason to believe that

16   those items would have fallen within the scope of

17   the work that you all were doing in the Office of

18   Chief Economist?

19        A    We never looked at them specifically.  We

20   used the data sometimes, but we never looked into,

21   you know, the content review or whether they

22   should be on the survey or not.

Page 40

```
 1        Q    Well, maybe I misunderstood, but I
 2   thought you told me a minute ago that you were
 3   involved in conversations about the potential uses
 4   of the -- of the --
 5        A    Correct, and --
 6        Q    -- questions, correct?
 7        A    -- I also indicated that, you know, we
 8   looked potentially at the entire survey, but we
 9   didn't -- I can't say that we were involved with
10   looking at every single question.
11        Q    Right.  My question now is, do you have
12   any reason to believe that you would have been
13   focused on a citizenship question or place of
14   origin question as part of your efforts to assist
15   in evaluating the uses of ACS survey?
16        A    I don't recall that.
17        Q    I know you don't recall.  I'm saying, do
18   you have any reason to believe that you would have
19   been involved?  Is that the type of thing that
20   potentially the people in the Office of Chief
21   Economist would have been analyzing or opining on?
22        A    Absolutely, but I don't recall it coming
```

Page 41

1    up.

2        Q    What possible analysis could you imagine

3    the Office of Chief Economist providing regarding

4    the utility of the citizenship question?

5            MS. WELLS:   Object to the form.

6    BY MR. DURAISWAMY:

7        Q    You can answer.

8        A    Okay.   So a lot of the analysis that was

9    done at that point was basically around use cases,

10   so how -- you know, among researchers, the public

11   states, all the different stakeholders who might

12   use ACS data would say, okay, well, you know, how

13   are they -- just what examples are that -- you

14   know, where the data is being disseminated in some

15   way, input, created as an input into some sort of

16   data tool, things like that.   So use cases.

17       Q    Can you think of any use for the

18   citizenship question on the ACS survey that

19   relates to economic/statistical analysis that the

20   Office of Chief Economist was concerned about?

21       A    I can't say to it specifically, but I

22   mean, throughout -- I mean, when I was at the

Page 42

1   Labor Department and the Commerce Department, you

2   know, we would look at labor force status, so

3   employment, unemployment, labor force

4   participation.  And we certainly looked at it at

5   times with respect to foreign-born population.  So

6   not as much, maybe, with respect to citizenship

7   that I can recall, but certainly foreign-born and

8   unforeign-born.  That's a regular thing that's

9   looked at.

10      Q     Do you have an understanding as to why

11   the citizenship question was included on the ACS

12   survey?

13      A     Do I have an understanding as to why?  I

14   mean, I've looked at the information at times.  I

15   mean, there's a whole Census Bureau report I've

16   read that outlines all the different federal uses

17   of that data.  So I've certainly looked at that.

18      Q     What's your understanding of why the

19   citizenship question is on the ACS survey?

20      A     I mean, there's a -- well, first of all,

21   there's a historical need for that.  I mean, it

22   dates from the -- I mean, it's been on the census

1    form at different points in time going back

2    decades.   And it's been -- it was a regular part

3    of the long form of the decennial census.   And the

4    long form eventually became the American Community

5    Survey.   So that content carried over.

6              There's some federal uses tied to it.

7    The one that pops to mind right now is the DOJ has

8    used it.   But I believe other ones -- there's

9    other ones as well, other federal uses as well.

10        Q     Any that you can remember, sitting here

11   today?

12        A     I can't recall.   But there's abundant

13   online documentation that goes through that.

14        Q     Do you have an understanding as to why it

15   was on the long form before it was on the ACS?

16        A     You know, general idea, but I can't speak

17   specifically to it.

18        Q     What's your general idea?

19        A     I mean, there's -- you know, when -- it's

20   one of a variety of demographic -- standard

21   demographic questions that help people understand

22   the portrait of the U.S. population, you know,

Page 44

1    along with sex, age, race, ethnicity, place of

2    birth, educational attainment, and citizenship.

3    It's a natural part of the catalog of data you

4    would need to understand what the U.S. population

5    looks like nationally on a local level [sic].

6        Q    That's your understanding of why it might

7    have been on the long form, but do you have a

8    specific understanding as to why it was, in fact,

9    included in the long form?

10       A    No.

11       Q    This work that you described in the

12   Office of the Chief Economist that related to

13   content reviews for Census Bureau surveys, did any

14   of that relate to decennial census content

15   reviews?

16       A    No.

17       Q    Could you describe your responsibilities

18   in the office with respect to your role in the

19   Office of Policy and Strategic Planning from

20   October 2012 to March 2017?

21       A    So the -- there's a team of policy

22   advisors that supports the director of policy and,

Page 45

1    ultimately, the Secretary of Commerce.   The policy

2    advisors represent and are assigned a portfolio of

3    bureaus.    In the Department of Commerce, we have

4    13 bureaus.    But assignments can change over time.

5              But as representing those bureaus, you

6    would engage -- review documents for policy

7    content.    And documents can be anything from, you

8    know, research reports to press releases to

9    actually -- you know, actually, serious policy

10   memos.    You would represent the department or

11   sometimes the bureaus in interagency policy

12   discussions, both internally and externally.    You

13   represent the Secretary.

14             My -- my portfolios varied a little bit

15   over time, but one constant piece has been our

16   statistical agencies, so the Census Bureau and the

17   Bureau of Economic Analysis.

18        Q     In that role, have you been involved in

19   content reviews for Census Bureau surveys?

20        A     I mean, involved, yeah, for example --

21   yeah.   Yeah.   More on the tail end, but yeah.

22        Q     Can you describe those instances?

1      A     So -- I mean, it varies, but, I mean,

2   there's been -- I'm trying to think with ACS.   I

3   mean, I've attended meetings that dealt, for

4   example, with the race and ethnicity questions and

5   the -- that review that was contacted over several

6   years.   In the Obama administration, I attended

7   some meetings that dealt with potential inclusion

8   of questions that covered the LGBTQ community.

9   Some on health insurance coverage.

10              I mean, I can't recall everything, but

11   it's -- you know, the thing about the policy job

12   is that it's -- it's quite variable, and the

13   engagement can be deep or light depending on the

14   needs of the Secretary.   So I can't recall

15   everything, but, yeah, it's a natural part of the

16   job.

17      Q     Do I recall attending meetings concerning

18   the addition of a citizenship question to the

19   decennial census?

20      A     So the content of the 2020 census came up

21   in -- I mean, like, organically in this

22   administration.   And we -- it's something -- the

Page 47

1    content, in general, would come up as a natural

2    part of larger meetings regarding Census Bureau

3    operations and planning.   And that's where I've

4    been in meetings that related to that.

5              In other words, the Secretary would hold

6    regular meetings with Census Bureau staff to

7    review all sorts of issues:   Budget, operations,

8    you know, IT, cyber security.   And content -- I

9    mean, I believe it came up sometimes certainly,

10   so -- yeah.

11        Q    Any other -- let's -- strike that.

12             Any other Census Bureau survey content

13   issues that you recall being involved in as part

14   of your role in the Office of Policy and Strategic

15   Planning?

16        A    I mean, I've been -- dealt with -- I've

17   worked with the Census Bureau on a variety of

18   issues related to their business and their

19   household surveys.   And questions that would come

20   up would, I mean, naturally be, you know, what

21   questions are asked, you know -- you know, a

22   broad -- a recurring issue with all surveys in the

1    United States is just response rates, and

2    something that relates to response rates is the

3    length of the surveys and the burden.

4            And so a natural part of conversations

5    along those lines are, well, what questions do you

6    ask, how you ask them?  And so that -- those types

7    of policy discussions have come up, I mean, in all

8    sorts of contexts in a variety of the household

9    and business surveys for the Census Bureau and the

10    Bureau of Economic Analysis.

11        Q    As a general proposition, the longer the

12    survey, the greater the burden on the respondent,

13    correct?

14        A    Yes.

15        Q    And the greater the burden, the lower the

16    response rate, correct?

17        A    Generally, yeah.  That's a general...

18        Q    Any involvement in evaluating the

19    citizenship question on the ACS survey as part of

20    this role that you had?

21        A    No.  It never -- it never came up

22    specifically.  Like, I do not recall any times

1  where we examined the specific need for the

2  citizenship question.  Or at least I was not part

3  of those conversations.  I mean, I was part of the

4  content review, obviously, but nothing that

5  specifically I was involved with.

6      Q    Even beyond just examining the specific

7  need for the citizenship question, do you recall

8  any other conversations, discussions about the

9  citizenship question on the ACS survey?

10     A    On the ACS?

11     Q    Let's say, prior to 2017.

12     A    I don't recall any.  I mean, I could have

13  had them.  I certainly don't recall any.

14     Q    Okay.  What's your understanding of the

15  history and status of the consideration of the

16  merged race/ethnicity question?

17     A    Can you --

18          MS. WELLS:  Object to the form.

19  BY MR. DURAISWAMY:

20     Q    I'm sorry.  Let me -- that's an objection

21  well taken.

22          You mentioned, I think, that you were

Page 50

1  involved in discussions about the race/ethnicity

2  question on the decennial census; is that right?

3       A       Uh-huh.

4       Q       Did that relate to a possible merge to

5  the race/ethnicity question?

6       A       Yes.

7       Q       And what discussions were you involved

8  in?

9       A       I mean, there was an OMB -- if I recall

10  the process correctly, there was an OMB working

11  group that dated back quite a few years that was

12  involved with research on potential changes to the

13  way that federal surveys asks about race and

14  ethnicity, going from -- basically from two

15  questions to one, and whether or not the quality

16  of the responses was better in one approach or the

17  other.

18            And there's other nuances as well.  But,

19  I mean, that's the broad difference.

20       Q       And what's your recollection of what was

21  done within the department generally to evaluate

22  whether to move from two questions to one

1    question?

2        A    I mean, the typical approach that the

3    Census Bureau uses is to conduct research, so

4    to -- you know, either focus groups or surveys.  I

5    can't speak -- remember specifically this one,

6    but, you know, focus groups or surveys to field

7    and test different questions and see what the

8    results are and understand why there might be

9    differences in the types of responses that people

10   give.

11       Q    Do you recall the period of time over

12   which this research was done?

13       A    For race and ethnicity?  I mean, it was

14   much of the last decade.  I don't recall -- I

15   mean, it came out -- it followed the 2010 census,

16   but I don't recall what year it started.

17       Q    Is it still ongoing, to your knowledge?

18       A    I don't know.  Not to my knowledge, but I

19   don't know.

20       Q    Do you have an understanding as to what

21   decisions were made about whether to consider

22   including a single race/ethnicity question on the

Page 54

1        A     I'm not a political appointee.  I've

2    worked for political appointees in the Bush

3    administration, the Obama administration, and now

4    the Trump administration.

5        Q     And you've never been a political

6    appointee, correct?

7        A     No.  No.

8        Q     How many people are there in the Office

9    of Policy and Strategic Planning?

10        A     Currently?

11        Q     Sure.  Currently.

12        A     There are a policy director, special

13    assistant and five advisors.  There's a vacancy

14    right now, but it will be filled soon.

15        Q     You're one of the advisors?

16        A     Correct.

17        Q     Who is the policy director?

18        A     Earl Comstock.

19        Q     Who is the special assistant?

20        A     Annie Teague.  T-E-A-G-U-E.

21        Q     You report to Mr. Comstock?

22        A     Yes.

1      Q    Has that been the case since he took that

2    position at the outset of the Trump

3    administration?

4      A    So I reported to whoever was the policy

5    director, and Earl is the current policy director.

6      Q    And he has been since the start of the

7    Trump administration, as far as you recall?

8      A    He was one of the first political

9    appointees to arrive.  I can't recall -- I don't

10   know which date, but yeah.

11     Q    Who did you report to before him?

12     A    The last policy director under Secretary

13   Pritzker was John Ratliff.

14     Q    Has the size of the office in terms of

15   personnel changed since 2011?

16     A    It's smaller.

17     Q    Could you just describe the -- how the

18   numbers have changed over time?

19     A    Yeah.  We're about, I'd say, less than

20   half as large as we were previously.

21     Q    Previously, about -- maybe about 15 --

22     A    So we maybe had 15 people under Secretary

Page 60

1    Secretary Pritzker, but there were -- we've

2    suggested ways in which the Office of the

3    Secretary, Penny herself, could engage with

4    businesses to encourage them to respond to the

5    surveys, because there were issues with response

6    rates.

7                And so that -- you know, that was -- we

8    had a lot of conversations with the Census Bureau

9    about how she could support them.  That was sort

10   of the way she operated.

11        Q    Also fair to say that sometimes policy

12   ideas come either from policy director or from the

13   Secretary or others within the Office of the

14   Secretary?

15        A    Yeah.  They can come from many locations.

16   We take all good ideas.

17        Q    And once the Secretary makes a policy

18   decision, part of your job is to implement that

19   decision or execute on it, correct?

20        A    And communicate it.

21        Q    Communicate it.  And advocate for it; is

22   that right?

Page 61

1      A      Yeah.  I mean, to -- yeah, to -- I would

2  call it communication, really, yeah.

3      Q      Both with external stakeholders and with

4  others within the government, correct?

5      A      Yes.

6      Q      In your position, how often do you

7  interact directly with the Secretary?

8      A      With Secretary Ross?

9      Q      Yes.

10     A      Infrequently.

11     Q      In the last two years, how many meetings

12  have you been in with him?

13     A      With him one-on-one?  Well, I mean, it

14  varies.  I've had very, very, very few, like,

15  one-on-one conversations with him.  I have

16  attended a handful of meetings in his office.  And

17  where I've seen him most frequently are as part of

18  the regular oversight meetings he conducts for --

19  regarding the 2020 census.  Those are large group

20  meetings.

21     Q      How many in the group?

22     A      It can be anywhere from 20 or more.  I

1  census.  Can you recall any meetings other than

2  the monthly oversight meetings that you referenced

3  in which the Census Bureau surveys generally have

4  been discussed, including perhaps the ACS?

5          MS. WELLS:  Object to the form.

6          THE WITNESS:  No, not that I can recall.

7  BY MR. DURAISWAMY:

8      Q    Has your role changed substantively since

9  the transition from one administration to the

10  next?

11     A    It changes depending on who the policy

12  director is and who the Secretary is.  It's not

13  really -- it's not an administration question.

14  It's who the boss is and their needs can vary

15  pretty dramatically.

16     Q    Understood.  How did your role change

17  when Secretary Ross came into office and when

18  Mr. Comstock, you know, came into his position?

19     A    So I -- we're a smaller office, so my

20  policy portfolio is broader.  So I now cover

21  also -- like, I cover the Economic Development

22  Administration and the U.S. Patent and Trademark

Page 66

1    Office, in addition to the two statistical

2    agencies.

3        Q    And before that, you covered only the two

4    statistical agencies?

5        A    I covered some -- it was more nebulous

6    under Penny.  But, I mean, I covered some EDA

7    issues.  And I interact with other agencies as

8    well.  But, you know, there's -- as far as, like,

9    clearances go and sort of the regular sort of

10   paper movement -- that part of our job, it was

11   basically those two, and some Economic Development

12   Administration.

13            MR. DURAISWAMY:  Why don't we take, like,

14   a five-minute break.

15            THE VIDEOGRAPHER:  Going off the record.

16   The time is 10:04.

17            (Whereupon, a short recess was taken.)

18            THE VIDEOGRAPHER:  Going back on the

19   record.  The time is 10:15.

20   BY MR. DURAISWAMY:

21       Q    Mr. Langdon, do you recall that

22   Mr. Comstock started at the Commerce Department

1      Q    Did you have an understanding as to what

2    his transition team responsibilities were relative

3    to others --

4      A    No.

5      Q    -- that you were meeting with?

6      A    Not really.

7      Q    Did the question of the content of the

8    decennial census come up at any transition team

9    meetings?

10     A    No, not that I recall.  That's a very

11   weighty subject for a transition team meeting.

12     Q    How long were these meetings, typically?

13     A    Half an hour, an hour.  Honestly, that

14   period is kind of a blur to me, really.  You know,

15   there was a lot of new faces, a lot -- you know,

16   just a lot of upheaval when you're, you know,

17   having many people exit and many people enter.

18              (Deposition Exhibit Number 1 was marked

19   for identification.)

20   BY MR. DURAISWAMY:

21     Q    I'll hand you what we've marked as

22   Exhibit 1.  So this is an e-mail from you to Ellen

1    Herbst dated February 2nd, 2017 with the subject

2    line "Census Bureau briefing for OS politicals,"

3    correct?

4        A    I'm sorry, I didn't catch that.

5        Q    Is that what this is?  Just for the

6    record --

7        A    Yeah.

8        Q    -- confirming this is an e-mail from you

9    to Ellen Herbst dated February 2nd, 2017, correct?

10       A    That's what I'm reading, yeah.

11       Q    And the subject of the e-mail is, "Census

12   Bureau briefing for OS politicals," correct?

13       A    Yeah.

14       Q    Did you review this e-mail in preparing

15   for your deposition?

16       A    No.

17       Q    OS is a reference to Office of the

18   Secretary, correct?

19       A    Correct.

20       Q    And what are OS politicals?

21       A    Political appointees working in the

22   Office of the Secretary.

1   be brought up on a temporary detail while there's

2   no political staff in certain positions.  So he

3   was the acting head of that office.

4        Q    And that's another office within the

5   Office of the Secretary?

6        A    Correct.

7        Q    Do you have -- well, strike that.

8             During this period of time, did you have

9   regular communications with him?

10       A    With Jim?

11       Q    Yeah.

12       A    Sure.  Yeah.

13       Q    About what?

14       A    The transition, basically.  Transition

15   issues.

16       Q    When you say -- you say in this sentence,

17   "I ask because Jim S. reminded me about the

18   upcoming congressional notification of decennial

19   and ACS topics and the need to gauge Earl's

20   interest in it."

21            Do you see that?

22       A    Uh-huh.

1      Q    When you say he reminded you about the

2   upcoming congressional notification of decennial

3   and ACS topics, what is that referring to?

4      A    So by calendar -- and I may not get all

5   the details right on this -- but, basically, by --

6   by law and by calendar, the Census Bureau has to

7   notify Congress first of the subjects on the

8   ACS -- on the decennial census, and the ACS would

9   have been by the end of March of 2017.  And then

10  the year after that, it would actually notify

11  Congress of the questions on those surveys.  So, I

12  mean, that was -- you know, March 2017 was

13  right -- you know, shortly after this.

14      Q    And this is your -- personally, your

15  first experience with this process, correct?

16      A    No, it's not my first transition.  I was

17  at the Labor Department at the transition from --

18  working with politicals from the transition from

19  the Bush administration to the Obama

20  administration.

21      Q    I apologize.  I was unclear.  When I said

22  "this process," I mean the congressional

Page 80

1  notification of decennial and ACS topics.

2      A      Correct.

3      Q      How did this come up in conversation with

4  Jim?

5      A      I would have to be guided by what the

6  e-mail says here.  I don't recall the

7  conversation.  But it indicates that he initiated

8  the conversation or reminded me about it.

9      Q      Do you have any recollection of whether

10  it was just part of a general conversation about

11  transition-related issues or whether he

12  specifically reached out about this issue?

13      A      I have no idea.  I do not recall.

14      Q      You said that Jim reminded you about the

15  need to gauge Earl's interest in it.  Why was

16  there a need to gauge Earl's interest in it?

17      A      So if I understand the e-mail correctly,

18  you know, there's -- we're referring to a briefing

19  that is going to cover a large bureau, actually,

20  one of our largest, and that could cover a lot of

21  different topic.  And so it's important to make

22  sure that that briefing is not overwhelming as a

1  first briefing, but it touches on topics of policy

2  content that are going to be immediately relevant.

3  And that was, you know, a congressional

4  notification about our most -- our flagship survey

5  and the decennial census -- rises to that level.

6     Q    And so, according to the e-mail, you then

7  did reach out to Mr. Comstock to gauge his

8  interest in hearing about that issue at the

9  briefing.  Is that fair to say?

10     A    Yeah.  I mean, based on what I'm reading

11  here, yeah.

12     Q    But I'm just trying to -- if I understand

13  what you're -- the answer you just gave, you were

14  reaching out to gauge his interest in including

15  that in the briefing that he was going to receive;

16  is that right?

17     A    Yep.  Exactly.

18     Q    Then you asked -- and you say, "Earl is

19  very interested and thinks the Secretary will be

20  as well," correct?

21     A    Uh-huh.  Yep.

22     Q    Was the conversation in which you asked

1   him about this, was that by phone?  By e-mail?  In

2   person?

3       A    I can only guess.  I don't -- yeah, I

4   don't recall.

5       Q    Well, based on your typical practice and

6   how you interact with him, what's your --

7       A    Earl is hard to track down --

8       Q    -- belief?

9       A    -- is hard to track down, so probably

10  would have been me popping into his office at some

11  point and being lucky to find him and asking him

12  quickly.

13      Q    And what was the substance of the

14  discussion?

15      A    I don't recall.  I mean, obviously,

16  what's reflected here.  I don't know if we had

17  talked about other things.

18      Q    What was your understanding of why he was

19  very interested in this issue?

20      A    So Secretary Ross -- this is across the

21  board -- is -- is very interested in all aspects

22  of, you know, policy decisions across the

1   department.  And this was actually one of the

2   first indications we got that, you know, that --

3   you know, a lot of decisions that -- you know,

4   would begin rising to his level that maybe under

5   other Secretaries might not.

6       Q    My question was a little bit different, I

7   this.

8       A    Okay.

9       Q    What was your understanding as to why

10  Earl was very interested?

11      A    Actually, what I just said.  That's a

12  process question.  I think it's a process response

13  as much as maybe a content response.

14      Q    He was very interested -- your

15  understanding is he was very interested because

16  Secretary Ross was very interested; is that right?

17      A    Yeah.  But like I say, I think it's

18  probably -- keep in mind that, you know, if we're,

19  as a department, notifying Congress about

20  something that's a major policy decision, across

21  the board, he wanted to know.  And so this was a

22  major one.  This was one that touched on me and --

1    you know, so in that vein, that -- that's

2    consistent with how things have operated under

3    Secretary Ross.

4         Q    When you say he wanted to know, you're

5    referring to Secretary Ross?

6         A    Yeah.

7         Q    Okay.  So just so I understand, your

8    understanding as to why Earl was very interested

9    in this is because Secretary Ross was very

10   interested in it?

11        A    I -- I don't know.  I mean, he -- Earl,

12   you know, represents the Secretary's views.  He --

13   you know, obviously, he interacts with him

14   regularly.  And so he can -- somehow, you know,

15   felt that the Secretary, you know -- I'm not sure

16   based on what, but felt that the Secretary would,

17   you know, want to be briefed on this.

18        Q    Did you say why he thought the Secretary

19   would be interested?

20        A    I don't recall.

21        Q    Did he indicate whether he had discussed

22   the issue with the Secretary?

```
 1        A    I don't recall.

 2        Q    Did you have an understanding at that

 3   point, February 2nd, 2017, why Secretary Ross was

 4   interested in this?

 5        A    I don't recall.

 6        Q    You underscored the word "very," correct?

 7        A    I did.  Yeah.

 8        Q    Indication to you that Mr. Comstock

 9   expressed an especially high degree of interest in

10   this topic?

11        A    That's what the underlining would

12   suggest.

13        Q    More than you expected?

14        A    I can't say what I expected or didn't

15   expect.  I came away with the impression that, you

16   know, he -- at least based on my reading of this

17   e-mail, that he felt that this was a topic that

18   needed to be on the briefing.

19        Q    And you have absolutely no recollection

20   of that conversation?

21        A    Of this conversation?  Out of all the,

22   you know, conversations I've had with Earl?  No.
```

1      A    I don't understand the -- certainly?

2    I -- I don't know.

3      Q    Okay.  Well, let's try to refresh your

4    recollection since --

5      A    Okay.

6      Q    -- it's -- apparently some of these

7    things are challenging for you to recall.

8            (Deposition Exhibit Number 2 was marked

9    for identification.)

10   BY MR. DURAISWAMY:

11     Q    I'm handing you what we've marked as

12   Exhibit 2.

13     A    Okay.

14     Q    So this is an e-mail from you to

15   Mr. Comstock dated March 10, 2017, correct?

16     A    Correct.

17     Q    And it was sent at 7:50 p.m., right?

18     A    Yep.

19     Q    Do you recall this e-mail?

20     A    This specific e-mail?  I don't recall it,

21   but it looks -- looks like an e-mail I would have

22   written.

1    Q    Do you recall e-mails about this topic?

2    A    About this briefing?

3    Q    Yes.

4    A    Not specifically.  I mean, like I say, it

5  was -- we were in a period of transition where we

6  would normally schedule briefings for Earl or for

7  others on specific topics that they cared about.

8  So this is consistent with the way things operate,

9  yeah.

10    Q    For the record, in this e-mail, you ask

11  Mr. Comstock, "What does your schedule look like

12  to receive a one-hour (max) briefing on 2020

13  census and ACS topics later next week?"

14         Correct?

15    A    Correct.

16    Q    And you say, "The goal is help you

17  understand the congressional notification process

18  as well as the actual topics themselves," correct?

19    A    Correct.

20    Q    Do you know if this is the follow-up

21  briefing that you were referring to in your

22  February 2nd e-mail?

Page 95

 1      A    I don't know if it's that specific
 2  briefing, but it's -- that's -- it's consistent
 3  with what the goal would have been.  The goal
 4  would have been to help them understand the
 5  subject, so how we notified Congress and the --
 6  you know, the actual -- what we ask in these
 7  surveys.  You know, they didn't -- yeah.
 8      Q    And if you -- let me hand you what we've
 9  marked as Exhibit 3.
10          (Deposition Exhibit Number 3 was marked
11  for identification.)
12  BY MR. DURAISWAMY:
13      Q    This is an e-mail from you to
14  Mr. Comstock and Ellen Herbst, copying Dennis
15  Alvord, dated March 15th, 2017.  Do you see that?
16      A    Yes.
17      Q    And in this e-mail you say, "Earl and
18  Ellen:  I would like to schedule a Census Bureau
19  briefing on the 2020 census and ACS topics before
20  the Census Bureau does its Hill notifications on
21  March 31," correct?
22      A    Yep.

1      Q      And you say, "The goal is for all to be
2  on the same page about the notification process
3  for the topics this year and questions next year."
4      A      Uh-huh.
5      Q      Correct?
6      A      Yep.
7      Q      So this is five days after the last
8  e-mail.  You're still trying to schedule this
9  briefing, correct?
10     A      That's par for course, yeah.
11     Q      Okay.  And you're trying to schedule this
12 particular briefing because Mr. Comstock had
13 indicated to you that this was a topic of
14 particular interest to him and the Secretary,
15 correct?
16           MS. WELLS:  Object to the form.
17           THE WITNESS:  So -- yeah.  I mean, so
18 this is -- like I say, this is par for course with
19 Earl and with the Secretary.  They -- you know,
20 when we're notifying, in this case, the Hill on a
21 major policy decision, they want to know how it
22 works and what the content is.

1  BY MR. DURAISWAMY:

2      Q    Why did you understand it to be a major

3  policy decision?

4      A    Well, I mean, you know, it's the nature

5  of the surveys.  It's the 2020 census.  It's, you

6  know, one of our, you know, congressionally -- or

7  constitutionally mandated operation that we do.

8  And on the ACS which is our -- you know, the

9  largest survey that the Census Bureau conducts.

10         And there's -- you know, there's a lot of

11  sensitivity around topics, particularly at that

12  point.  The background I'm coming into this with

13  is probably largely on the ACS as well.  There was

14  a lot of sensitivity about the topics actually on

15  that, so...

16      Q    When you say there was a lot of

17  sensitivity about the topics, what are you

18  referring to?

19      A    Kind of what I mentioned earlier.  I

20  mean, there's a history that that survey in

21  particular has had with the Hill that's perceived

22  as burdensome.  That includes topics that don't

1   really need -- that some members of the Congress

2   or the public feel shouldn't be on there.

3          And so, you know, notifying Congress

4   that, you know, these -- that we're going to ask

5   about any number of things could, you know,

6   trigger concerns.  Yeah.  It's been a sensitive --

7   the ACS part has been sensitive for years and

8   so...

9       Q    Was there any change to the content of

10  the ACS that was being contemplated at the time

11  that would make you think it was a major issue?

12      A    I'm trying to think.  So, I mean, there

13  had been -- let's see.  I mean, there was

14  sensitivity about health -- health insurance and

15  then the -- sexual orientation.  I mean, some --

16  you know, some -- there had been discussions about

17  that as well, so...

18      Q    I assume that all these efforts to

19  schedule this briefing on the notification process

20  regarding decennial and ACS topics was in response

21  to some conversations you had with Mr. Comstock

22  about his interest in these issues, correct?

1      A     Yeah.  That would be natural, yeah.

2      Q     Okay.  And what do you recall about those

3   conversations by roughly mid-March of 2017?

4      A     Like I say, I don't recall specific

5   conversations, but this is consistent with how --

6   you know, Earl would indicate interest in a topic,

7   and we would work with his tricky schedule to make

8   sure that he would get briefed on it.

9      Q     I'm not asking you to recall specific

10  conversations.  I'm asking you, what do you recall

11  about conversations generally with Mr. Comstock

12  regarding this issue by March 15, 2017?

13     A     I dont' really -- help me understand the

14  question.

15     Q     What do you recall talking to

16  Mr. Comstock about with respect to notifying the

17  Hill about census and ACS topics?

18     A     What this indicates, that it would be --

19  that he wanted to understand the process and what

20  we were -- what was going to Hill and how -- you

21  know, basically.

22     Q     I understand that's what this indicates.

Page 105

1      Q    Roughly later?

2      A     And to be clear, I mean, I think I would

3    distinguish between interest in the topics and an

4    interest in -- or the need for adding topics or

5    changing them.

6           You know, a lot of the conversations at

7    this point, you know -- you have to understand

8    that people come in, in this job, with -- you

9    know, unless they have worked with these surveys

10    before or have some sort of background on the

11    Census Bureau, they have a lot to learn.

12           And so -- and the 2020 census is complex.

13    The ACS is complex.  And so there's a lot of just

14    a natural learning process that the principals

15    have to go through.  And this is part of it.

16           MR. DURAISWAMY:  Move to strike as

17    nonresponsive.

18    BY MR. DURAISWAMY:

19      Q     Do you recall that at some point --

20    strike that.

21           At some point, you came to understand

22    that Secretary Ross was interested in adding a

Page 106

1    question to the decennial that inquired about

2    citizenship or immigration status, correct?

3          A    Correct.

4          Q    When was that, approximately?

5          A    It would have been in the summer of that

6    year.  I can't say if it was early or late summer,

7    but it was --

8          Q    How did you come to that understanding?

9          A    I think it would have been in -- most

10   likely, it would have been in, like, one of these,

11   like, regular meetings that he was holding

12   regarding, you know -- the large group meetings

13   that we had.

14         Q    And what do you recall he communicated at

15   that meeting?

16         A    Specifically?  I -- I don't remember.

17         Q    But you recall that he communicated that

18   he was interested in adding a question about

19   citizenship status to the decennial; is that

20   right?

21         A    Yeah, I'm trying to think about how to

22   characterize that.  Yeah, I mean, that's probably

1  about right.  Yeah.  I mean, there was -- he was

2  interested in -- in the topics, yeah.  I mean,

3  yeah, so...

4      Q    And do you recall -- strike that.

5           What do you recall about why he was

6  interested in adding a citizenship question to the

7  decennial?

8      A    I don't think the why ever came up.

9      Q    Is your recollection that he simply

10 communicated to everyone that he was interested in

11 adding a question about citizenship but didn't say

12 why?

13     A    Uh-huh.  I mean, that's -- yeah.

14     Q    And is it your recollection that nobody

15 asked why?

16     A    I do not recall anybody asking why.

17     Q    And you don't recall any conversations

18 with anyone at the Commerce Department about why

19 Secretary Ross might be interested in adding a

20 citizenship question?

21     A    Well, you know, it would come up

22 subsequently.  And -- yeah.  Obviously, it would

1    come up.  But -- I mean, yeah.

2         Q    When you say subsequently, roughly when

3    are we talking about?

4         A    Again, I mean, from summer onward.

5    Right?  I mean, yeah.

6         Q    And as it came up, what was your

7    understanding as to why he was interested?

8         A    That there was -- you know, so we already

9    collect data on citizenship through the ACS.  And

10   so the question about why it would be added to the

11   2020 census is, you know, that there was a need

12   for more geographically granular data than the ACS

13   could provide.  So, my recollection, it would be

14   along those lines, you know, that there was a data

15   need for it.

16        Q    Is it your recollection that that need --

17   the articulation of that need originated with

18   Secretary Ross himself?

19        A    Yeah.  I mean, we didn't question, you

20   know -- I mean, I guess Secretary Ross versus,

21   like, what?

22        Q    Well, let me ask you.  Who came up with

1   the idea that there was a need for citizenship

2   data at a more granular geographic level?

3            MS. WELLS:  Object to form.

4            THE WITNESS:  I -- so I can't recall.  I

5   mean, if the Secretary asked us to look into it,

6   we look into it.  Now, then -- I mean, the

7   actual -- the need for it?  The way the 2020

8   census and the ACS work, particularly the ACS, is

9   that there is a federal nexus -- right?  There's a

10  federal need for data to be collected.

11           I don't recall when that federal need was

12  articulated, but it was associated with -- you

13  know -- like I say, I guess I'm trying to -- I'm

14  trying to think about how that came up, but -- I'm

15  not quite sure how it was.  But, I mean, at some

16  point, you know, I learned that there was -- you

17  know, that the need was tied to a need from the

18  DOJ for more data.

19           I mean, again, it goes back to the nexus

20  between 2020 census and ACS.  The main customer

21  for the -- the main federal --

22           THE REPORTER:  You need to slow down,

Page 110

1   please.

2              The main...

3              THE WITNESS:   The main federal customer

4   for the ACS is the Department of Justice.   And so

5   the question was whether DOJ -- you know, so given

6   that as a baseline, the question is, you know,

7   does DOJ need more -- like, more specific data?

8   But how -- you know, how that came up, I don't

9   know.

10  BY MR. DURAISWAMY:

11      Q    Just to be clear, when you say the

12  Secretary asked us to look into it, we look into

13  it, the actual -- the need for it, et cetera,

14  what's the "it" that you're referring to in your

15  answer?

16      A    Which -- where are you referring to?

17      Q    I'm sorry.  I'm reading your answer,

18  which I'm getting --

19      A    Oh.

20      Q    -- a real time transcript.  The answer

21  you just gave, you used the word "it" several

22  times.  For example, you said, the Secretary asked

Page 111

1    us to look into it, we look into it, the need for
2    it, and so forth.
3            What's the "it" that you're referring to?
4        A    So I think part of it was that there was
5    a need to understand, like, the historical context
6    for asking about citizenship.  So it could well be
7    that, you know, when -- you know, does -- where
8    does the Census Bureau ask about citizenship?
9    When has it asked about citizenship?  You know,
10   why did it ask about citizenship?
11       Q    And you did look into those things,
12   correct?
13       A    Uh-huh.  Yeah.
14       Q    You were specifically asked to, correct?
15       A    I -- yeah.  At least at one point early
16   on.  I mean, I think Ellen and -- yeah, briefly.
17       Q    And you understood that that request was
18   related to the Secretary's interest in that issue,
19   correct?
20       A    I don't recall the context.  You know,
21   like I say, if somebody like Earl or Ellen asks
22   for something, I don't need to ask, like, well,

Page 112

1   why do you need it?  I mean, they ask for it and,

2   you know, I do it.

3        Q    And they were interested in -- or they

4   asked you to research the history of whether

5   undocumented immigrants were included in the

6   apportionment count, correct?

7             MS. WELLS:  Object to form.

8             THE WITNESS:  I'd have to go back and

9   look into it.  But, I mean, there's one thing

10  that -- I mean, comes up sometimes, and probably

11  came up, was, you know, who is in scope of the

12  decennial census?  Who -- who responds to the

13  survey?  Who's counted?  Yeah.

14  BY MR. DURAISWAMY:

15       Q    And that was something that you didn't

16  raise.  It was something that the politicals in

17  the Office of Secretary raised, correct?

18       A    Ellen is not a political.

19       Q    Well, was it --

20       A    Leadership.  Leadership.

21       Q    Are you telling me that it was Ellen who

22  raised it or that it was Earl or someone else?

Page 114

1    oh, I didn't know this was -- so, yeah.

2        Q    Right.   And you understand that there was

3    a deadline of March 31st, 2017 to identify the

4    topics that were to be included on the decennial

5    census, correct?

6        A    Yeah.

7        Q    And that, after that date, you would have

8    less leeway to modify the topics to be included on

9    the census, correct?

10       A    Less leeway.

11       Q    And that's why it was important to get on

12   the same page about it, right?

13       A    Uh-huh.   Yeah.   It's a public statement.

14   And -- I mean, so when I say -- it's a

15   congressional notification, but it's also --

16   there's a public aspect to it.   So the Census

17   Bureau is saying to the world and to Congress --

18   you know, and principally to Congress, but to the

19   world, here's what we're asking on these two

20   instruments.

21       Q    And you understood, from your

22   conversations with Mr. Comstock about his interest

1    in this issue, that he did want to consider

2    changing the topics to be included on the census,

3    correct?

4            MS. WELLS:  Object to the form.  And

5    mischaracterizes testimony.  I think that question

6    has been asked.

7            MR. DURAISWAMY:  I just asked it.  It is

8    a question.  And, please, no speaking objections.

9    BY MR. DURAISWAMY:

10       Q    Go ahead.

11       A    So, yeah, I -- the -- my desire to make

12   sure Earl and I and everybody were on the same

13   page wasn't with respect to him necessarily coming

14   in and -- and saying there needed to be a change.

15   And I don't recall him asking for a change at that

16   point.  I think it was just to make sure that he

17   understood -- you know, that, like I say, there

18   were no surprises.

19       Q    Yeah, but you understood that he was

20   considering a change, correct?

21           MS. WELLS:  Object to the form.

22           THE WITNESS:  As of this date?

Page 116

1    BY MR. DURAISWAMY:

2         Q      Yes.

3         A      No.  Not really, no.

4         Q      When did you first come to understand

5    that he was considering a change to the topics on

6    the decennial census?

7         A      I believe I've said, and I stand by my

8    answer, that it was summer of 2017.

9         Q      Okay.  At this time, your testimony is

10   all you understood is that he was interested in

11   knowing more about the process, correct?

12        A      That's my understanding of it, yeah.

13        Q      But you have no recollection as to why he

14   was concerned about -- why he was interested in

15   knowing more about the process; is that right?

16        A      I can't recall that, yeah.

17        Q      All right.  During these discussions

18   about the process for notifying Congress,

19   presumably, you pointed out to Mr. Comstock that

20   there was this March deadline -- strike that --

21   this March -- let me start over.

22               During these discussions with

1    Mr. Comstock, I assume that you informed him that

2    there was a March 2017 deadline for identifying

3    the topics to be included on the 2020 census,

4    correct?

5        A    For notifying Congress of these topics.

6    Like I say, you asked -- you raised a question

7    about leeway.  I'm not -- even today, I'm not sure

8    what the specific leeway is for changing these

9    topics afterwards, or what the process would be

10   for saying to Congress, actually, we're going to

11   roll out -- we're going to do something different.

12       Q    Okay.  Did you also explain to him that

13   there was a March 2018 deadline for notifying

14   Congress of the questions to be included on the

15   decennial?

16       A    It was in the earlier e-mail you showed

17   me.  At least I thought so.  I thought so.  No,

18   maybe not.  No.  Okay.  It's not.

19       Q    But presumably, you did, correct?

20       A    Yeah, I would have, yeah.  It's a

21   two-stage -- sorry, my misrecollection.  But it's

22   a two-stage process.  First topics -- no, it's

Page 118

1    actually in this e-mail right here, yeah.   The

2    goal is for -- the March 15th e-mail from

3    8:30 p.m.

4         Q    Right.   I see.   You're referring to the

5    process for the topics this year and questions --

6         A    And questions next year.   Okay.   Yeah.

7         Q    Did you have any discussion about the

8    significance of the two different deadlines?

9         A    I didn't hear you, I'm sorry.

10        Q    Did you have any discussions with

11   Mr. Comstock or any of the other individuals in

12   the Office of the Secretary about the significance

13   of those two deadlines?

14        A    Probably.   I can't remember specific

15   conversations, but I'm sure I did.   Yeah.   When

16   you say significant, it's, like -- I would say the

17   difference, like, what -- you know, what's the

18   difference between talking about topics and what

19   delivering the questions actually means.

20        Q    Did you have any discussion about what

21   leeway you would have to change the questions on

22   the decennial census after submitting the

1  year there was discussion about adding a

2  citizenship question to the census, correct?

3      A    Uh-huh.   Uh-huh.

4      Q    Was there any discussion about whether

5  the citizenship question fell within one of the

6  topics that was identified in the submission to

7  Congress in March 2017?

8      A    I guess I don't understand the question

9  in the sense it's sort of black and white.  Right?

10  I mean, you can look on paper and say, here's what

11  Congress got.  Right?  I mean, there's no -- I

12  mean, there's not much to discuss there, is there,

13  really?  I don't recall.  I mean, is the question,

14  you know, did we say we would include citizenship

15  on the 2020 census, for example?

16      Q    No.  Well, what's your understanding of

17  the difference between the notification deadline

18  for topics and questions?  What's the difference

19  between topics and questions?

20      A    Okay.  So topic is just a list of, like,

21  data fields.  We're going to ask about age.  The

22  question would be, how do you ask about age?  You

1    know, is it multiple choice?  How do you phrase

2    the question?  These are actual questions on the

3    survey form that people would be getting.

4         Q    And agree that citizenship or immigration

5    status was not one of the topics that was

6    identified in the March 2017 submission to

7    Congress?

8         A    Immigration status has never come up.

9    The Census Bureau doesn't ask about that in any of

10   its surveys and it's never come up, as far as I

11   know, in any conversations.  So we can set that

12   aside.

13            Citizenship -- yeah, like I say, I

14   don't -- the actual notification -- I guess, if

15   the question is, you know, did Earl ask about how

16   we would let Congress know or if we decided to

17   change things, I don't recall that.  That's not

18   typically, like, an area where I would work.

19   Yeah.

20        Q    That's -- so that's not the question.

21        A    Okay.

22        Q    My question now is, you agree that in the

1   March 2017 submission of decennial census topics

2   to Congress, citizenship was not included,

3   correct?

4       A     It was included only for the ACS.

5       Q     And it was not included for the decennial

6   census, correct?

7       A     I do not recall -- yeah, I don't think

8   so, no.

9       Q     Okay.  And so to try to go back to my

10  previous question, and keeping in mind why you

11  were struggling with it, agree, then, that when

12  the citizenship question came up for discussion

13  later that year, it was clear that it was not

14  included or among the topics that had been

15  identified for Congress --

16      A     That's demonstrable.  I mean, that's --

17  you can look it up online and -- in the March

18  submission and then -- I'm pretty certain it

19  wasn't on there as something on the 2020 census.

20      Q     Do you have an understanding of the

21  circumstances in which the department can add --

22  include questions in its March 2018 submission to

Page 124

1    Congress that are not covered by the topics in its

2    March 2017 submission?

3         A    Yeah, I don't know the specific process.

4    And that's a legal question, and I'm not a

5    department lawyer.

6         Q    And to be clear, you don't recall being

7    involved in any discussions or conversations about

8    that?

9         A    Like, how are we going to tell Congress?

10   No.

11        Q    No.  About the circumstances in which you

12   can include a question in the March 2018

13   submission that wasn't in the March 2017 topics.

14        A    That's a process question that I don't

15   recall being a part of.

16             MR. DURAISWAMY:  Why don't we take a

17   five-minute break?

18             THE VIDEOGRAPHER:  Going off the record.

19   The time is 11:08.

20             (Whereupon, a short recess was taken.)

21             THE VIDEOGRAPHER:  Going back on the

22   record.  The time is 11:23.

1      Q     When were those discussions?

2      A     When I was aware of them?  I don't know

3   when the discussions were.  I mean, I became aware

4   of them, like, you know, later in the summer and

5   the fall.  Yeah.

6      Q     What discussions with DOJ did you become

7   aware of?

8      A     You know, just around sort of -- I mean,

9   around the process.  Like I said, I never -- I

10  don't know specifically -- I've never looked into,

11  like, the analytical need for the data.  Right?  I

12  mean, the actual -- you know, how the data was

13  specifically going to be used.

14     Q     Your sentence kind of broke up there, so

15  I'm not sure which part goes with which.

16     A     We can start over.

17     Q     Okay.  Fair enough.  What do you -- what

18  did you become aware of with respect to

19  conversations with DOJ about this in the summer

20  and fall?

21     A     That there were conversations with DOJ

22  about their need for the data.

1      Q      And did you have an understanding of who

2  was involved in those conversations?

3      A      On our side?  James Uthmeier was the --

4  you know --

5            THE REPORTER:  Say it again, please.

6            THE WITNESS:  James Uthmeier.  U-T-H --

7            THE REPORTER:  No.  On our side...

8            THE WITNESS:  Yeah.  On our side, it was

9  James Uthmeier.  U-T-H-M-E-I-E-R.

10  BY MR. DURAISWAMY:

11      Q      Who else do you recall was involved in

12  those discussions?

13      A      I don't know.  I don't know.  I wasn't

14  part of the discussions, so you're asking me sort

15  of secondhand who was part of conversations I

16  wasn't part of.

17      Q      Well, just to your knowledge.  I mean,

18  you know that Mr. Uthmeier was involved in those

19  discussions, right?

20      A      Yeah.

21      Q      Okay.  Do you know if anyone else was

22  involved in those discussions?

Page 143

1   about whether undocumented residents are included

2   in apportionment population counts?

3       A    To my knowledge, Earl doesn't share with

4   me his conversations with the Secretary or his

5   e-mails with the Secretary.

6       Q    That's not my question.  My question is,

7   were you aware of that?

8       A    No.  That's another way of saying no.

9       Q    Okay.  Were you aware, at the time, that

10  Mr. Comstock was already communicating with

11  Secretary Ross about the absence of a citizenship

12  topic or question on the 2020 census?

13      A    Communicating with the Secretary about

14  that?

15      Q    Yes.

16      A    I don't recall him, like -- no, I don't.

17  No.

18      Q    Okay.  Let's talk about something that I

19  know that you were aware of.

20           (Deposition Exhibit Number 6 was marked

21  for identification.)

22  BY MR. DURAISWAMY:

Page 144

1      Q     Handing you what we've marked as

2   Exhibit 6.

3      A     Okay.

4      Q     You see this is a series of e-mails

5   between you and Census Bureau staff from May 24th,

6   2017?

7      A     Correct.

8      Q     And the subject of these e-mails is

9   regarding requested information - legal review all

10  residents.  Do you see that?

11     A     Yeah.

12     Q     Do you want to take a minute to review

13  this e-mail?

14     A     Yeah.  Uh-huh.  Yeah.

15     Q     Okay.  Look at the second e-mail from the

16  bottom from Burton Reist to you dated May 24,

17  2017.  Do you see that?

18     A     Yeah.

19     Q     Who is Burton Reist?

20     A     He is a senior executive in the Census

21  Bureau.  I can't exactly remember his, you know,

22  title.  He's a go-to person for me in the Census

Page 145

1    Bureau.

2         Q       Is it correct that he is the -- provides

3    oversight for the Census Bureau's redistricting

4    data program?

5         A       Like I say, I can't remember his exact

6    role.  I mean, I work with a lot of different

7    people at the Census Bureau who contribute to the

8    2020 program.  So, I mean, if -- I don't recall if

9    he's a part of that piece or not -- part of that

10   operation or not.

11        Q       He says, "This is the more complete set

12   of documents that I referenced in my earlier

13   e-mail," correct?

14        A       Uh-huh.

15        Q       Do you know what the earlier e-mail is

16   that he's referring to?

17        A       I'd have to see it.  I mean, I can't --

18   you're asking me to recall, like, one of 10,000

19   e-mails.

20        Q       Fair to say that it relates to a subject

21   matter that's similar to this e-mail?

22        A       That would be a reasonable conclusion.

1      Q     Okay.  The subject line, legal review all

2   residents, what does that refer to?

3      A     I don't know.  I didn't write that

4   subject line.  Based on these e-mails, the subject

5   line originally -- originated from Misty Reed.  So

6   I can't speak to why they phrased it that way.

7      Q     Could be that it relates to a legal

8   review pertaining to whether all residents are

9   accounted in the census?

10           MS. WELLS:  Object to form.

11           THE WITNESS:  It could be that, yeah.

12   BY MR. DURAISWAMY:

13      Q     Could be that it relates to a legal

14   review of whether all residents are included in

15   the apportionment counts?

16           MS. WELLS:  Object to form.

17           THE WITNESS:  It could be that as well.

18   Like I say, I don't know.  It's a -- it's a

19   subject line in a e-mail which is, by definition,

20   abbreviated.

21   BY MR. DURAISWAMY:

22      Q     Do you know what the documents are that

1   Mr. Reist is referring to in his e-mail?

2       A    I can't remember.  Based on the next

3   e-mail up, it looks like it references to some

4   court cases, but I don't know.

5       Q    Right.  What's Louisiana v. Bryson?

6       A    That specific case?  I don't know.

7       Q    Could be that it relates to including

8   undocumented residents in apportionment counts?

9           MS. WELLS:  Object to form.

10          THE WITNESS:  It could be, yeah.

11  BY MR. DURAISWAMY:

12      Q    It could be that the 1989 DOJ letter

13  relates to the same thing?

14      A    Yeah.  It's not a subject area I'm, like,

15  fluent in.  But, yeah, it could be.

16      Q    Okay.  It was a subject matter that you

17  were asked to research, right?

18          MS. WELLS:  Object to form.

19          THE WITNESS:  It looks like, I'm -- yeah.

20  I'm gathering those documents.  So...

21  BY MR. DURAISWAMY:

22      Q    You recall -- sir, you recall being asked

Page 148

1    to look into this, don't you?

2            MS. WELLS:  Object to the form.

3            THE WITNESS:  From Earl?

4            MR. DURAISWAMY:  What's wrong with the

5    form of the question?

6            MS. WELLS:  It's, like, argumentative and

7    leading.  And you could have -- you haven't laid

8    the foundation for what the context might have

9    been.  Just -- to me, I don't think it's a totally

10   appropriate question.

11           MR. DURAISWAMY:  I can ask leading

12   questions.  It's not argumentative.  All I've

13   asked is -- it is a foundational question, if he

14   recalls being asked to look into this.

15           MS. WELLS:  You didn't ask it that way.

16   But, I mean, that's fine.  He can go ahead and

17   answer.

18   BY MR. DURAISWAMY:

19       Q    You recall being asked to look into this,

20   correct?

21       A    Yeah.

22       Q    Okay.  And what do you recall about that?

1     A     I was asked to look into it.  I gathered

2   information, provided an answer.

3     Q     Okay.  And the "it" is this question of

4   whether certain populations, including certain

5   immigrant populations, are counted in the census

6   and included in the counts for apportionment

7   purposes, right?

8     A     So who's in scope of the 2020 census, who

9   it measures, and then what data tabulations are

10   produced with that information.

11     Q     Right.  And you were --

12     A     Apportionment counts are one of the set

13   of data tabulations.

14     Q     Right.  And you were asked to look into

15   it around this time, in May 2017, correct?

16     A     Yeah.  Based on these e-mails, yeah.

17     Q     And this related to consideration of

18   whether to include a citizenship question on the

19   census, correct?

20     A     I don't believe Earl gave me the context

21   about why he was asking about it.

22     Q     Do you recall that you had subsequent

Page 157

1    content of the decennial census at this meeting?

2              MS. WELLS:  Object to form.

3              THE WITNESS:  Like I say, I don't recall

4    the specific agenda of that meeting.  But it's all

5    documented.

6    BY MR. DURAISWAMY:

7        Q    Documented where?

8        A    In the PowerPoints that I, you know,

9    mentioned earlier.  The Census Bureau, when it has

10   meetings like this, you know, prepares slide

11   decks.  Makes it easier for everybody to follow

12   what's going on.

13       Q    If you go up to the next e-mail, which is

14   the third one on the first page.

15       A    Okay.

16       Q    There's an e-mail from Mr. Reist back to

17   you.

18       A    Uh-huh.

19       Q    Actually, strike that.

20            Just to be clear, on the e-mail that you

21   sent at 5:24 p.m., you write, "This is a lot to

22   digest, but Louisiana v. Bryson seems the most

1    timely, along with the 1989 DOJ letter," correct?

2         A    Uh-huh.

3         Q    What does "this is a lot to digest" refer

4    to?

5         A    I'm not a lawyer, so, like, to read

6    through, you know, like, court cases and legalese

7    is not something I enjoy or am good at.

8         Q    And your point being that he had

9    apparently sent you several documents related to

10   legal issues, correct?

11        A    Either several or just dense ones.

12        Q    Okay.  And just so I'm clear, sitting

13   here today, you have no recollection of what

14   Louisiana v. Bryson is about?

15        A    No.

16        Q    Or what the 1989 DOJ letter was about?

17        A    No.

18        Q    Okay.  So then Mr. Reist responds at

19   5:42 p.m.  Did you have any follow-up

20   conversations with either him or Melissa Creech or

21   James Dinwiddie or Lisa Blumerman about the

22   contents of the materials that Mr. Reist had sent

Page 160

1    included him, which would have been Burton.

2         Q    Do you have a sense of what his

3    responsibilities were that related to the subject

4    matter of these e-mails?

5         A    No.  I think I just answered that.  So

6    no.

7         Q    You don't?

8         A    No.

9         Q    Okay.  You respond at 5:53 p.m. and you

10   say, "Actually, the Secretary seemed interested on

11   subjects and puzzled why citizenship is not

12   included in 2020."

13             What subjects was Secretary Ross

14   interested in at that meeting on May 24th?

15        A    So "subjects" references the -- you know,

16   the actual topics of the -- that are on the 2020

17   census, you know, what -- what gets asked, like

18   the topic areas, you know, like, age -- you know,

19   as examples of subjects would be like age, race,

20   ethnicity, number of people in your household.

21   That's what that refers to.

22             And citizenship is not on the list, or at

Page 161

1    that point wasn't on the list.

2        Q    Why -- why was he puzzled?

3            MS. WELLS:  Object to form.

4            THE WITNESS:  I can't answer why the

5    Secretary was puzzled or not.  I don't know.

6    BY MR. DURAISWAMY:

7        Q    Did he express puzzlement about why

8    citizenship was not included in the 2020 --

9        A    Yeah, he would have.

10       Q    -- topics?

11       A    Based on this e-mail -- I don't recall

12   the meeting, but, yeah, based on this e-mail, he

13   would have inquired -- not understood why

14   citizenship was not part of it.

15       Q    And what was your understanding as to why

16   he was puzzled about that?

17       A    I don't know.  I don't know why he was

18   puzzled about that.

19       Q    Was there a discussion about that at the

20   meeting?

21       A    Like I not, I don't recall the specific

22   aspects of the meeting.  But, you know, this --

1    like I say, there's a learning process that --

2    this is one example of it -- that people go

3    through when they're dealing with these surveys,

4    in trying to figure out what we ask, why we ask

5    it, why things are on there.

6        Q    Right.  But he didn't -- you didn't write

7    that he was puzzled about why some other --

8        A    Yeah.

9        Q    -- topics or questions --

10       A    That's true.

11       Q    -- were not included.

12       A    Yeah.

13       Q    You wrote only that he was puzzled about

14   why citizenship was not included, correct?

15       A    That's right.  Yep.

16       Q    Can you recall any other issues that

17   Secretary Ross was concerned about or took an

18   interest in with respect to the content of the

19   2020 census questionnaire?

20       A    No.

21       Q    You then say, "It might be good to have

22   in our back pocket the criteria used to pick

1      Q    When did you become more fluent on the

2  subject matter?

3      A    I mean, over time, really.  I mean, it

4  was, like -- it was engaging with -- you know,

5  with Melissa -- particularly with Melissa, but

6  also with Lisa on basically trying to gain an

7  understanding of a lot of the questions.  I was

8  particularly interested for one -- one that's

9  unrelated to this, but was on the 2020 census I

10 didn't understand was, for example, the housing

11 tenure question.  There's a question on there, do

12 you own or rent your house?  And it didn't really

13 enter into my mind why --

14     Q    Right.  So --

15     A    -- that question was on the form.

16     Q    Okay.  So in the context of pursuing this

17 idea of adding a citizenship question to the

18 decennial census, you developed a greater

19 understanding of why some -- the criteria for

20 including some topics on the ACS versus the

21 decennial, correct?

22     A    Yeah.  And why -- why every question

Page 168

1   that's on the decennial is actually on there.  It

2   was something at that point that I was not -- I

3   was generally aware of, but not specifically aware

4   of.

5       Q    Why were you asking for an answer that

6   evening at 10:51 at night?

7       A    Good question.  Yeah, good question.  I

8   don't know.

9       Q    It suggests there was some urgency to

10  this, correct?

11      A    Oh, yeah.  Yeah.  Based on the e-mails,

12  probably just given, like, the fact that the

13  Secretary himself was asking as opposed to, like,

14  me just, you know, interested and trying to do

15  some, you know, research.

16      Q    Right.  So this is -- you're trying to

17  respond promptly to questions that he asked at

18  this meeting on May 24th about why citizenship --

19  the citizenship question is on the ACS but not the

20  Census; is that right?

21      A    Well, not just -- that is one example.  I

22  mean, it's the broader question of what's on each

Page 171

1      A     Well, what's on here.

2      Q     -- trying to understand --

3      A     What's on here, I mean, you know...

4      Q     Anything else that you recall?

5      A     I mean, there wouldn't be anything else.

6   This is how I would respond, would be to go to the

7   people who are the subject matter experts and ask

8   for information.

9      Q     No.  I'm asking if you recall any other

10  follow-up actions that you took after this meeting

11  that related to this issue of the citizenship

12  question not being on the 2020 census?

13     A     Not that I recall.  This is what I would

14  do.  I mean, this is -- you go to the subject

15  matter experts and you get information from them.

16     Q     Okay.

17           (Deposition Exhibit Number 7 was marked

18  for identification.)

19  BY MR. DURAISWAMY:

20     Q     I'm handing you what we've marked as

21  Exhibit 7, Mr. Langdon.

22     A     Okay.

1      Q    You see that this is an e-mail that you

2   sent to Earl Comstock and Ellen Herbst on the

3   evening of May 24th after the meeting with

4   Secretary Ross?

5      A    Yes.

6      Q    And it's in the midst of the other

7   e-mails that you were exchanging with census

8   staff --

9      A    Yep.

10      Q    -- that are in Exhibit 6, correct?

11      A    Yeah, exactly.

12      Q    Okay.  I assume that you were sending

13   e-mails late at night like this because you felt

14   it important to respond to urgent inquiries raised

15   by the Secretary at the meeting with him, correct?

16      A    That's one possibility.  Other times I

17   might be doing evening work because I had to,

18   like, leave work early to do kids' stuff, and so

19   I'm trying to catch up late at night.  So it could

20   be urgency or because I was making up for lost

21   time.

22      Q    Okay.  Presumably that was not the case

1  on this date, because you had a very long meeting

2  with the Secretary --

3       A    That's probably true, yeah.

4       Q    -- that you just got out of in the late

5  afternoon, right?

6       A    Yeah.  So I'm probably trying to be

7  responsive to Earl on something that was

8  important.

9       Q    Okay.  And the important issue in this

10  e-mail is the counting of illegal immigrants,

11  correct?  That's the subject?

12       A    Let me take a look at it.

13       Q    Sure.

14       A    Uh-huh.  Okay.  Can you ask the question

15  again?

16       Q    Yeah.  So the important issue that you

17  were trying to be responsive to Earl about on the

18  night of May 24th, after the meeting with

19  Secretary Ross, was the counting of illegal

20  immigrants, correct?

21       A    So the -- the two cases I was looking

22  into here, based on these e-mails, dealt

1    specifically with illegal immigrants.

2        Q     Right.

3        A     And so I was answering that question.

4        Q     Right.  And that was the important issue

5    that you were trying to be responsive to Earl

6    about, correct?

7        A     Uh-huh.  Because that's what the two

8    documents dealt with.

9        Q     Right.  And the subject -- the subject --

10   in fact, the subject of the e-mail is counting of

11   illegal immigrants, correct?

12       A     Yeah.  That's correct.

13       Q     Okay.  And you say, in the first

14   paragraph, "Earl and Ellen:  Long story short is

15   that the counting of illegal immigrants (or of the

16   larger group of non-citizens) has a solid and

17   fairly long legal history," correct?

18       A     Correct.

19       Q     And you go on to discuss a case,

20   Louisiana v. Bryson, in which the courts rejected

21   a challenge to including illegal immigrants in the

22   census totals for apportionment purposes, correct?

Page 175

1      A      Uh-huh.

2      Q      And that's the same case, Louisiana v.

3  Bryson, that you referenced in your e-mail

4  exchange with Mr. Geist [sic] in Exhibit 6,

5  correct?

6      A      Unless there's another Louisiana versus

7  Bryson, it's the same case, yeah.

8      Q      Fair to say it's the same case, given the

9  timing of these e-mails?

10      A      Yeah.

11      Q      Okay.  And that's a case that was passed

12  along to you as part of the research package that

13  Mr. Geist [sic] sent to you, correct?

14      A      Yeah, exactly.

15      Q      And you were sending this to address the

16  question of whether certain immigrants should not

17  be included in the apportionment count, correct?

18          MS. WELLS:  Object to the form.

19          THE WITNESS:  Yeah, I can't say that.  I

20  mean, what I'm answering here is actually just --

21  it goes back to sort of scoping questions --

22  right? -- I mean, who is counted and who is not

Page 176

1    counted in the surveys.

2    BY MR. DURAISWAMY:

3        Q    But specifically whether illegal

4    immigrants are counted in the census counts for

5    apportionment purposes, correct?

6        A    That's what these cases dealt with.

7    Yeah.  So --

8        Q    Right.  And that's --

9        A    -- Earl asked -- let me finish.

10       Q    Go ahead.

11       A    Earl asked me to basically review these

12   and summarize them from my non-lawyerly point of

13   view.  And that's what I did.

14       Q    Okay.  He wanted you to provide some

15   information about the history of including or

16   excluding illegal immigrants from the census

17   counts for apportionment purposes, correct?

18           MS. WELLS:  Object to the form.

19           THE WITNESS:  He wanted me to answer the

20   question of how -- of what these cases actually

21   looked at, which was whether or not illegal

22   immigrants were part of the -- first of all -- two

1    things here.   There's whether they're counted and

2    then whether they're part of the apportionment

3    counts, and distinguish between them.

4    BY MR. DURAISWAMY:

5        Q    And which was it that you were

6    addressing?

7        A    Both, according to -- I mean, I'm just

8    summarizing the cases.   Right?   So --

9        Q    Right.

10        A    -- I mean, the one case was dealing with

11    apportionment.   And the second one was actually

12    just the broader question, based on this e-mail,

13    of just whether or not illegal immigrants even

14    should be counted.

15        Q    Right.   And you were conveying that

16    there's a long history of both including illegal

17    immigrants in the census count and including them

18    in the counts for apportionment purposes, correct?

19        A    Yeah.

20        Q    Okay.   Because Mr. Comstock wanted you to

21    look into that issue, right?

22        A    Yeah, he asked me to look into the --

Page 181

BY MR. DURAISWAMY:

     Q     Or in the apportionment count.

               MS. WELLS:  Object to the form.

               THE WITNESS:  Yeah, I don't recall that

specifically.  I mean, what I asked about and --

in my e-mail, and I think I would have been pretty

precise, was citizenship.

BY MR. DURAISWAMY:

     Q     Mr. Langdon, it's not your sworn

testimony here under oath that this issue was not

discussed at that meeting, is it?

               MS. WELLS:  Object to the form.

               THE WITNESS:  I can't recall everything

that was discussed in that meeting.

BY MR. DURAISWAMY:

     Q     Okay.

     A     As I -- actually, the e-mail suggested,

it was a long meeting.

     Q     Okay.  And in this midst of sending

e-mails to census staff, to Mr. Comstock and

Mr. Herbst on issues that were raised at the

meeting earlier that day -- well, strike that.

Page 182

1    Let me start over.

2              That evening, as you were exchanging

3    e-mails with census staff about issues raised at

4    the meeting with Secretary Ross, you were also

5    exchanging e-mails with census staff and with

6    Mr. Comstock and Ms. Herbst about the history of

7    counting or not counting illegal immigrants in the

8    census or in the apportionment counts, correct?

9        A    So it's two related lines of -- it's two

10   related questions.  So I was getting information

11   on both.  One question was Earl's, and it was

12   specific to these court cases dealing with illegal

13   immigrants.

14             A related issue is whether or not -- you

15   know, whether or not or how we count citizens in

16   the decennial census.

17       Q    Right.  And why is it related?

18       A    Well, because illegal immigrants are a

19   subset of non-citizens.

20       Q    In fact, you state that in this e-mail,

21   correct?

22       A    Which e-mail?

1      Q      In this e-mail that we're looking at

2   right now.

3      A      I've got a couple --

4      Q      Exhibit 7.  You say, "Illegal immigrants

5   (or of the larger group of non-citizens)," right?

6      A      Yep.  Actually, yeah.  Making that

7   connection right there.  There you go.

8      Q      Right.  So this question of counting

9   illegal immigrants is fundamentally connected to

10  this issue of whether you are identifying citizens

11  or non-citizens in the census, right?

12     A      They're related, but that -- yeah.  I

13  mean, they're related, because you're talking

14  about different subsets of, you know, the

15  non-citizen population.

16     Q      Right.  And presumably they came up

17  together in the meeting earlier that day, correct?

18     A      I wouldn't --

19            MS. WELLS:  Object to the form.

20            THE WITNESS:  I don't share that

21  presumption.

22  BY MR. DURAISWAMY:

1      Q     You think it's a coincidence that you

2   just happened to be writing an e-mail about

3   counting of illegal immigrants at the same time

4   that you're exchanging e-mails about Secretary

5   Ross' curiosity about the citizenship question?

6           MS. WELLS:   Object to the form.

7           THE WITNESS:   Yeah.   I do not recall the

8   Secretary ever asking specifically about illegal

9   immigrants that are counting [sic]on the decennial

10   census.   Citizenship, certainly, but not illegal

11   immigrants specifically.

12   BY MR. DURAISWAMY:

13      Q     So what prompted this e-mail?

14           MS. WELLS:   Objection.

15           THE WITNESS:   A request from Earl.

16   BY MR. DURAISWAMY:

17      Q     When did you receive that request?

18      A     I don't know.   I'd have to go back and

19   check.   You know, if he sent me an e-mail,

20   whenever I got that e-mail, if he asked me,

21   then -- or Ellen, who is also on this.

22      Q     What did he tell you about why he was

Page 185

1    asking you to look into this?

2            MS. WELLS:  Object to the form.  You're

3    assuming that he told you [sic].  He said he

4    wasn't sure.

5    BY MR. DURAISWAMY:

6        Q    You can answer.

7        A    I do not recall whether Earl asked me or

8    e-mailed me about it.  And what the context was,

9    you know, I can't give you the context on an ask

10   that I don't remember.

11       Q    Okay.  You attached a memo to this

12   e-mail, correct?

13       A    The DOJ memo, somebody else's memo, yeah.

14       Q    Well, those are my next questions.  But

15   there's an attachment to this e-mail that says --

16   it's titled Crawford letter and DOJ memo.PDF,

17   correct?

18       A    Yeah.

19       Q    What is that?

20       A    I'd have to go back and look at it to see

21   exactly what it was.  I don't know.

22       Q    It presumably relates to the subject of

Page 186

1    your e-mail, correct?

2        A    I hope so.   Or Earl would not have been

3    happy.

4        Q    Fair to say that it is a memo addressing

5    the counting of illegal immigrants either in the

6    decennial census, period, or for purposes

7    apportionment?

8        A    Yeah.

9             MS. WELLS:   Object to the form.

10            THE WITNESS:   I would presume it relates

11   to, as I reference in the e-mail, a Bush era --

12   Bush 41 era DOJ opinion that proposed legislation

13   excluding illegal immigrants from the decennial

14   census.

15   BY MR. DURAISWAMY:

16       Q    Okay.  Do you know if you were involved

17   in preparing the document?

18       A    The DOJ opinion?

19       Q    The attachment to your e-mail.

20       A    Like, assembling it?

21       Q    Drafting it.

22       A    Well, there's nothing -- if I'm

Page 190

```
 1                    AFTERNOON SESSION

 2                                         (1:16 p.m.)

 3          THE VIDEOGRAPHER:  Going back on the

 4     record.  The time is 1316.

 5             (Deposition Exhibit Number 8 was marked

 6     for identification.)

 7     Whereupon,

 8                DAVID SANFORD LANGDON,

 9     was called for continued examination, and having

10     been previously duly sworn was examined and

11     testified further as follows:

12        EXAMINATION BY COUNSEL FOR KRAVITZ PLAINTIFFS

13     BY MR. DURAISWAMY:

14        Q    Good afternoon, Mr. Langdon.  Handing you

15     what we've marked as Exhibit 8.

16             Have you had a chance to review the

17     document, Mr. Langdon?

18        A    This one, yes.

19        Q    Okay.  This is a further e-mail exchange

20     in response to what I believe is Exhibit 7, the

21     e-mail that you sent to Mr. Comstock and

22     Ms. Herbst on May 24th about the counting of
```

Page 191

1  illegal immigrants, correct?

2      A    Correct.

3      Q    Okay.  And in his response, Mr. Comstock

4  raises the question of whether the -- strike that.

5           In response to Mr. Comstock asks about

6  why the decennial census does not include the

7  citizenship question, but the ACS does, correct?

8      A    Yeah.

9      Q    Okay.  And then he identifies a case that

10  he believes is relevant to the governmental need

11  for citizenship data, correct?

12      A    Uh-huh.

13      Q    Okay.  And you respond and say that you

14  have asked the Census Bureau team for more clarity

15  on how they decide what topics to include in the

16  decennial versus ACS, correct?

17      A    Yes.

18      Q    And that is consistent with the e-mail

19  that I believe we saw in Exhibit 6 where you were

20  posing that question, I believe, to Lisa

21  Blumerman, correct?

22      A    And Burton Reist and Melissa Creech, yes.

1      Q    Right.  And you say that your hunch is

2    "that the policy change on the citizenship

3    question is tied to the creation of the ACS.  I

4    will share what they say and will review the court

5    case."

6           You recall that they, meaning the Census

7    Bureau staff, came back to you with an explanation

8    as to why the citizenship question was on the ACS,

9    but not the decennial?

10     A    I can't remember the exact answer.  My

11   hunch wasn't entirely correct, actually, so, I

12   mean, the -- it was only a hunch.  The -- I mean,

13   the -- there was confusion here between the --

14   what used to be the short-form --

15     Q    Right.

16     A    -- census, which is now the regular

17   census, the long-form census and then ACS.

18     Q    So what do you recall that the Census

19   Bureau staff told you after looking into this

20   question?

21     A    Regarding the citizenship specifically?

22     Q    Yes.  As to why it was on the ACS but not

Page 193

1    the decennial.

2        A    Actually, I don't recall exactly why it

3    was not on, like, what would have been, like, the

4    short form or the decennial.  The question -- I

5    think a lot of the conversation was about -- more

6    about what actually is on there and what the

7    justifications are for it, what the legal

8    justifications are.

9        I mean, to be frank, I mean, if nobody

10   asks for something to be on the census, it's not

11   on there.  Right?  So I mean -- so I'm not sure if

12   they could have answered why -- I don't know.  I

13   don't recall the specific answer to the question.

14   Probably well documented.

15       But in any case, I mean, there's always a

16   decision on -- going back to, actually, our much

17   earlier conversation about this survey length and

18   response rates and such -- I mean, there's a

19   decision about what needs to be asked of the

20   entire U.S. and what could be asked of a really

21   large sample.

22       Q    And to your recollection, that was part

1    of the consideration as to why the citizenship

2    question was asked on the ACS but not on the

3    decennial, correct?

4        A    It presumes that somebody actually

5    asked whether there should be -- I mean, the

6    citizenship question hadn't been on what was the

7    short form in, if I recall right, you know, at

8    least a couple of -- a few decades.  And so, I

9    mean, that would suggest that there hadn't been a

10   strong case made for it to be on there at that

11   point.  There hadn't been a need.  But I don't

12   know specifically.  I'm just, you know...

13       Q    Right.  And you indicate in your previous

14   answer that it's also presumably connected to this

15   concern about survey length and response rates as

16   well, correct?

17       A    Yeah.  Exactly.

18       Q    You also say that you're going to look

19   into -- review the court case, correct?

20       A    Yep.

21       Q    Your understanding that this court case

22   regarding the governmental need for citizenship

1      Q    Okay.  Prior to learning about the

2   discussions with DOJ regarding this issue in late

3   summer or early fall of 2017, did you have any

4   discussions with anyone about the need for

5   citizenship data for voting rights purposes other

6   than what's reflected in Exhibit 8?  Let me try

7   that again, because it's kind of a long question.

8      A    Yeah, it was.  Thank you.

9      Q    What I'm trying to understand is, in

10   Exhibit 8, Mr. Comstock e-mails you with this,

11   quote/unquote, relevant court case on the

12   governmental need for citizenship data, correct?

13      A    Uh-huh.

14      Q    And then some months later you become

15   aware of conversations between Commerce Department

16   and Department of Justice regarding the potential

17   need for citizenship data for DOJ purposes,

18   correct?

19      A    Uh-huh.

20      Q    Prior to your becoming aware of those

21   conversations and separate and apart from this

22   communication, do you recall any other discussions

Page 203

1    with anyone else about whether DOJ had a need for

2    citizenship data?

3        A    So I've looked on the ACS side -- yeah --

4    I mean, conversations isn't the right word.   But

5    in my -- as I gathered background just to

6    become -- to gain a better understanding of why

7    topics are included on the ACS in particular --

8    and I looked at, you know, the publicly available

9    documentation --

10               THE REPORTER:   And I looked at the...

11               THE WITNESS:   Publicly available

12   document, you know, the report the Census Bureau

13   does on federal uses, and I looked at, for

14   example, citizenship, and there it outlined

15   pretty -- you know, all the different uses,

16   including the Voting Rights Act uses.

17               And so that, at some point -- I mean, it

18   probably fell within this window of time.   And at

19   some point, I would have discussed it or shared

20   with it James Uthmeier.

21   BY MR. DURAISWAMY:

22       Q    When?

1      A      I don't know.  I mean, it would have

2    been -- it could have been, like, probably late

3    fall.  There was, like, a point where I, like,

4    gained better understanding, and there was a

5    point, like, later on where, like, I actually

6    discussed it with him.

7      Q      Do you recall if it was before or after

8    the late summer, early fall time period when

9    you --

10      A      After.  It was after.

11      Q      Okay.

12      A      Yeah.  It was -- yeah.

13      Q      Okay.  So prior to the late

14    fall -- strike that.

15            Prior to late summer, early fall time

16    period, and separate and apart from what's in

17    Exhibit 8, do you recall any other discussions

18    with anyone else about whether DOJ had a need for

19    citizenship data from the decennial census?

20      A      I don't think so, no.  I mean, no, I

21    don't think so.

22      Q      You don't remember anything?

Page 211

1  mentioned this earlier -- that he's been heavily

2  engaged with Census Bureau staff practically since

3  he came on as Secretary on a whole variety of

4  issues -- actually, kind of -- basically what it

5  says here, on a whole variety of issues regarding

6  the census.

7          MR. DURAISWAMY:  Move to strike as

8  nonresponsive everything after "it would be

9  unusual for somebody to do it on their own."

10          (Deposition Exhibit Number 10 was marked

11  for identification.)

12  BY MR. DURAISWAMY:

13      Q    Mr. Langdon, I'm handing you what we've

14  marked as Exhibit 10.

15      A    Uh-huh.

16      Q    This is an e-mail that you sent to Sahra

17  Park-Su --

18      A    Yep.

19      Q    -- a few months ago, June 22nd, 2018.  Do

20  you see that?

21      A    Uh-huh.

22      Q    And you forwarded her a news article

1    titled, "Commerce Secretary suggested citizenship

2    question to Justice Department, according to memo,

3    contradicting his congressional," correct?

4         A    Uh-huh.

5         Q    And that's a reference to the memo that

6    we just looked at in Exhibit 9, correct?

7         A    Uh-huh.

8         Q    Why did you send this to her?

9         A    Sahra and I were colleagues.  We worked

10   together both on Census Bureau issues, and so it's

11   par for the course that we would share, you know,

12   relevant press articles about things we're working

13   on.

14        Q    What was your reaction to this article

15   when you read it?

16        A    My reaction to the article?

17        Q    Yeah.

18        A    Surprise, yeah.

19        Q    Why were you surprised?

20        A    Well, I mean, the idea of saying

21   something and then contradict -- you know, saying

22   something else that appears to contradict it is --

1    it surprised me.

2        Q     What he had testified to in Congress

3    appeared to be contradicted by the memo that's

4    Exhibit 9, correct?  That's what the article

5    indicated?

6        A     Yeah.

7        Q     Was that -- that was concerning to you?

8        A     Concerning to me?  No.  I thought it was

9    interesting.

10       Q     Surprising?

11       A     Yeah, surprising.

12       Q     Okay.  Is there a particular reason that

13   you wanted Ms. Park-Su to be aware of this?

14       A     As I stated before, we worked a lot on

15   Census Bureau issues in the policy office

16   together.  We sit also literally right next to

17   each other, from here -- we sat from here to

18   there, so we --

19       Q     No, I understand.  And I'm trying to

20   understand if this was more of, like, here's

21   something related to the census that you might be

22   interested in, or if there was something specific

Page 215

1    not part of.

2        Q    No, I'm not asking you if you can

3    affirmatively corroborate everything that's in

4    Exhibit 9.  I'm just asking to confirm that you

5    don't have a basis to dispute anything that's in

6    Exhibit 9.  Either these are things that you agree

7    with or there are things of which you have no

8    knowledge; is that correct?

9        A    No, it's -- I think it's a reasonable

10   statement.

11       Q    What statement?  What I just said or --

12       A    No.

13       Q    -- Exhibit 9?

14       A    Exhibit 9.  Your question was reasonable

15   too.

16       Q    I appreciate that.

17            We talked earlier about the census

18   oversight meetings which occur approximately

19   monthly, correct?

20       A    Yep.

21       Q    One of which was the May 24th meeting

22   that we've talked about, correct?

1    Ross or Mr. Comstock or anyone else about

2    Secretary Ross' request to include the citizenship

3    question by May of 2017, correct?

4         A    Yeah.  I mean, that's -- yeah, that's not

5    my recollection.

6         Q    Okay.  But it could have been shortly

7    thereafter?

8         A    That he wanted there to be a citizenship

9    question added?

10        Q    That you came to understand that.

11        A    It was certainly after that.  I can't say

12   shortly or longly.  I mean, it would have been

13   from May through the summer.

14        Q    At some point between May and the end of

15   the summer, correct?

16        A    I would say probably, yeah.

17        Q    Okay.  And what was your involvement in

18   acting on his request from the summer of 2017

19   through the March 2018 announcement of the

20   addition of the citizenship question on the 2020

21   census?

22        A    It was light.  I mean, it was pretty

Page 223

1   sometime during the summer, give or take a month.

2   When I say late summer, it would be, like, August.

3   Maybe August -- August could have been July; July

4   could have been September.  I don't know exactly,

5   to be frank.

6       Q    But the conversation -- the first

7   conversation with Earl that you recall would have

8   been roughly around the time that you first

9   remember learning that Secretary Ross was

10  interested in adding the question to the census,

11  correct?

12      A    Yeah.  I mean, because that's -- that --

13  the Secretary expressing interest in it would lead

14  to follow-up activity, and that would include

15  conversation with Earl or others.

16      Q    Okay.  That's all I'm trying to

17  understand.  It's not a trick question.  I'm just

18  trying to make sure I understand what you remember

19  and what you don't remember.

20      A    Yeah.

21      Q    Okay.  So apart from reviewing the draft

22  Abowd memo, what other involvement did you have in

Page 224

1   assessing this issue or pursuing it between the

2   summer of 2017 and March 2018?

3       A    I don't think anything, really.  I mean,

4   the main case was reviewing that memo.

5           THE REPORTER:  I'm sorry.

6           THE WITNESS:  Nothing that I can recall.

7   That was -- that was the meat of it, really, was

8   that analysis.

9   BY MR. DURAISWAMY:

10      Q    Do you recall attending meetings where

11  this issue was discussed?

12      A    No.  I mean, I knew that -- I was aware,

13  certainly, that the Secretary was scheduling quite

14  a few meetings and calls regarding this, you know,

15  different experts and such.  I was aware of that.

16  But I didn't -- I didn't take part of in any of

17  them.

18      Q    Do you believe the issue being discussed

19  at any of the monthly oversight meetings?

20      A    No.  Because it was sort of a -- it was

21  a -- sort of separate line of work.  Right?  I

22  mean, it was something that -- it was something --

Page 238

1  correct?

2     A    Yeah.  I'd have to go back and see

3  when -- I think the memo came in December, maybe.

4  I don't remember exactly.

5     Q    Did you ever do any work assessing the

6  possible effects of adding a citizenship question

7  to the decennial census?

8     A    Analysis?  No.  No, we relied on what the

9  Census Bureau prepared.

10     Q    My question is whether you ever did any

11  work related to that issue.

12     A    I guess I don't understand the question.

13     Q    Well, let me ask it differently.  Did you

14  ever have any discussions with anyone about the

15  potential effects of adding a citizenship question

16  to the decennial?

17     A    I talked to John a couple of times after

18  we got the memo, just to make sure I understood

19  some of the analysis, had some questions about it.

20     Q    What was the substance of those

21  conversations?

22     A    I'd have to go back and look.  I mean, I

1   making in your previous answer?   How --

2       A     That it's not easy.   It's not easy.   It

3   takes a lot of work.   And you have to -- the

4   reason it takes a lot of work is because the

5   administrative data may not measure what you think

6   it's measuring, how you think it's measuring it.

7       Q     Are you aware of any testing that's been

8   done to evaluate the effects of including a

9   citizenship question on the 2020 decennial on

10  response rates or the accuracy of -- and quality

11  of survey data?

12      A     So the -- no, so there hasn't been.

13  There hasn't been any testing to date.   And the

14  time frame wouldn't -- the Secretary's decision

15  wouldn't -- you know, wouldn't accommodate that

16  kind of testing.

17            That said, the Census Bureau presented a

18  reasonable -- very reasonable alternative to get

19  at those kinds of issues, which was looking at,

20  you know, the impacts -- there was no change.

21  Citizenship has always been part of the American

22  Community Survey, but nonetheless, looking at

1  how -- you know, just how that plays out, you

2  know, what impact -- the John Abowd memo goes into

3  that --

4           THE REPORTER:   I'm sorry.

5           THE WITNESS:   The John -- the memo he

6  prepared goes into how citizenship might

7  potentially -- how information from the American

8  Community Survey and how it's collected may

9  indicate potential impacts on self-response rates

10  in the 2020 census.

11  BY MR. DURAISWAMY:

12      Q    Did you have any conversations with

13  outside stakeholders or parties outside the

14  Commerce Department about the effects of adding a

15  citizenship question to the 2020 census?

16      A    No.  I did not.

17      Q    Do you know who was principally

18  responsible for those conversations?

19      A    For organizing them?  For, like -- or for

20  scheduling them?

21      Q    Both organizing and actually

22  participating in the conversations.

Page 248

1    number of reasons, because of the quality of the

2    answers, because they're burdensome, or whatever,

3    and whether or not we should consider using

4    administrative data as a substitute for that.  And

5    nowhere in that content review had any problems

6    with the question ever surfaced in terms of either

7    people not wanting to respond to it ever or in

8    terms of quality issues with the responses.

9         Q     In the time that you've worked at the

10   Commerce Department and had a responsibility for

11   issues related to the work of the Census Bureau,

12   do you recall ever hearing about the Department of

13   Justice being interested in census block-level

14   citizenship data for purposes of Voting Rights Act

15   enforcement?

16        A     No.

17        Q     There's a process by which government

18   agencies communicate with the Census Bureau about

19   their data needs, correct?

20        A     Yeah.  I mean, "process" is maybe a

21   generous word for it.  But, yeah, there's a

22   protocol by which -- that the Census Bureau has

1    actually developed with the -- actually, as part

2    of the last content review for the American

3    Community Survey --

4              THE REPORTER:   Part of the last...

5              THE WITNESS:   The content review for the

6    American Community Survey through which, you know,

7    they conducted outreach on to the need for data

8    and examined that need and weighed it.   And it's

9    come up in a few different contexts, most recently

10   with the same SOGI, the sexual orientation and

11   gender identification question.   It came up with a

12   health insurance question in the last couple of

13   years related to the Affordable Care Act.

14             And so there's -- there's not -- I

15   wouldn't say there's a linear process.   There's

16   frequently a dialogue between agencies at

17   different levels and the Census Bureau regarding

18   data needs and the right way to meet those needs.

19   BY MR. DURAISWAMY:

20       Q    Let me hand you what we've marked as

21   Exhibit 12.

22             (Deposition Exhibit Number 12 was marked

1      Q    Right.   But my question is, does the

2  bureau periodically seek input from other

3  agencies, not just as to the ACS, but to other

4  surveys that it administers?

5      A    Yeah.   So keep in mind that the Census

6  Bureau has a lot of reimbursable surveys.   So

7  these are surveys that it conducts for any number

8  of agencies.   An agency has a need, like, say, HUD

9  or DOJ, to have a specific survey on a specific

10  topic, and it will come to the Census Bureau, pay

11  them for it, and develop the survey together.   So

12  that's one venue of dialogue.   This -- so, yeah,

13  absolutely.

14          And this is another venue, which was part

15  of the ACS content review, and reaffirmations from

16  agencies about what data they needed.

17      Q    You don't see any indication in this

18  letter that the Department of Justice is

19  dissatisfied with the nature or quality or --

20  nature or quality of the citizenship data that's

21  provided from the ACS survey, do you?

22      A    They don't make any statement about the

1    make sure that the 2020 census is operationally

2    ready.

3        Q    Have you had any conversations with

4    Mr. Comstock regarding the citizenship question

5    that you can recall since late summer 2017?

6        A    No.

7        Q    Apart from Mr. Uthmeier, do you recall

8    any conversations -- well, strike that.

9            Apart from Mr. Uthmeier and whatever

10   conversations you have had at these meetings

11   related to responding to citizenship inquiries, do

12   you recall any other conversations with folks at

13   the department about the citizenship question?

14           MS. WELLS:  Object to the form.

15           THE WITNESS:  Okay.  Actually, to go back

16   on the question about Earl, I would have -- I

17   mean, to be clear, as far as, like, the clearances

18   go, that's quite -- I'm sure I've, you know,

19   brought, you know, responses to him and discussed

20   with him, you know, edits and such that he's had

21   to the citizenship question.  That's certainly the

22   case.

Page 264

```
 1          THE REPORTER:  Slow down, please.
 2          THE WITNESS:  It's an implementation
 3   phase.  The Secretary -- it's on the Census Bureau
 4   now to implement his decision to add this question
 5   and, you know, get the systems ready.  And
 6   that's -- there's really not much more to discuss
 7   in a way.  We're not Monday morning -- I'm not the
 8   Monday morning quarterback for the Secretary's
 9   decision on this.
10          (Deposition Exhibit Number 15 was marked
11   for identification.)
12   BY MR. DURAISWAMY:
13      Q    I'm handing you what we've marked as
14   Exhibit 15.  Have you seen this document before?
15      A    Let me take a look at it.
16      Q    Sure.
17      A    Not this exact one.  I've seen, like,
18   versions of it.
19      Q    What is it?
20      A    As I look at it, it's sort of a Q&A,
21   right, regarding the -- so it's -- basically, it's
22   a Q&A document regarding aspects of the decision
```

1  to include the citizenship question.

2       Q      Were you involved in preparing this

3  document?

4       A      Not drafting it.

5       Q      Well, what involvement did you have?

6       A      I might have sort of -- like, you know,

7  like in my policy role, I reviewed or cleared

8  parts of it.  I can't remember specifically.  I've

9  seen the document before.

10             And some of it -- the reason I'm waffling

11 on it is because some of the pieces are -- I've

12 seen in different contexts, you know, in, you

13 know, letter responses or other places.  I'm

14 generally familiar with the content.

15      Q      What was the purpose of the document?

16             MS. WELLS:   Object to the form.

17 BY MR. DURAISWAMY:

18      Q      Why was the document prepared?

19      A      I can't say specifically why it was

20 prepared, but its purpose is -- essentially, it's

21 a Q&A document, almost like an FAQ.  That's the

22 way I see it.

1      Q    For whom?

2      A    I don't know.  I mean, I'm not sure.  I

3    can't remember the context under which it was put

4    together.

5         Oh, wait a second.  No, actually, this

6    may have been -- actually, no, this is my mistake.

7    This is -- it looks like it's a response -- it's

8    responses from the Census Bureau regarding

9    questions from -- about John's memo.

10   BY MR. DURAISWAMY:

11      Q    Questions prepared by whom?

12      A    By the department.  I would have had a

13   role in preparing -- you know, in raising issues

14   to include.  I didn't -- I think the questions

15   probably came from Earl, ultimately.  But, you

16   know, there are a variety of people who reviewed

17   John's memo and provided -- you know, had

18   questions about the content of it, analytical

19   questions.  I mean, these are all, like, you

20   know...

21      Q    You had a role in drafting these

22   questions, correct?

Page 267

1      A     Yeah, I did.

2      Q     At whose direction?

3      A     At -- either Earl or James.

4      Q     What did they -- what did they tell you

5    when they asked you to prepare these questions?

6      A     Well, not -- I mean, when they asked me

7    to review the memo and provide input, it was

8    basically, you know, review it and give me your

9    opinion on it, really.

10      Q     Well, these are -- this is a list of

11    questions.

12      A     Yeah.

13      Q     And you said that --

14      A     And my opinion would be through -- like,

15    what -- in other words, what -- you know, go

16    through it, and sort of like I mentioned earlier,

17    so I go through and I flag things that weren't

18    clear to me or that, you know, the analysis wasn't

19    clear or, like -- you know, it's like a peer

20    review almost.

21      Q     Somebody decided that you should respond

22    to the Abowd memo in the form of a series of

Page 268

1    questions, correct?

2        A    Uh-huh.

3        Q    Who decided that?

4        A    Either Earl or James.

5        Q    Okay.  And one of them directed you to

6    participate in preparing those questions, correct?

7        A    Yes.

8             (Deposition Exhibit Numbers 16 and 17

9    were marked for identification.)

10   BY MR. DURAISWAMY:

11       Q    And if you look at Exhibits 16 and 17,

12   which I've just given you -- sorry, they're on the

13   way to you -- these are e-mail exchanges among

14   individuals involved in preparing those questions,

15   including yourself, correct?

16       A    Let me look at it.

17       Q    Sure.

18            MR. CANNON:  Counsel, can you verify 16

19   and 17, please?

20            MR. DURAISWAMY:  Fair point.  So 16 is

21   Bates number 1976.  And 17 is, I believe, 5212.

22            MR. CANNON:  Thank you.

Page 269

1          MS. WELLS:  Thanks.

2          MR. DURAISWAMY:  Sure.

3          THE WITNESS:  So this was -- yeah.

4    There's John's reference to our conversation.

5          Yeah.  So, I mean, the nature of the

6    questions was, you know, probably just -- it was a

7    very tactical memo.  It wasn't written for, like,

8    a lay audience, I thought.  And so part of our

9    questions were just to help us understand it

10   better just in general.  And part of it was to

11   actually question -- you know, to raise questions,

12   like a peer review, of aspects of the analysis.

13   BY MR. DURAISWAMY:

14      Q    To raise questions to push back on

15   aspects of the analysis, correct?

16      A    Push back is not the word -- phrasing I

17   would use.  But it's just to -- you know, it's

18   like a peer review.  So you're picking apart

19   different aspects of it.  That's -- this is

20   something we do, like, when we do economic

21   reports.  We would send things around and --

22   and -- yeah, you know, you're just, you know,

1  trying to, you know, make sure that the analysis

2  is rock solid and all the implications of it are

3  clear.

4        Q      You understood at the time that senior

5  officials in the Commerce Department wanted to

6  move forward with the citizenship question on the

7  2020 census, correct?

8        A      Uh-huh.

9        Q      And you understood that this memo from

10 John Abowd was taking the position that it would

11 be a bad idea to do that, correct?

12       A      Yep.

13       Q      And --

14       A      Well, let me -- bad idea.  He

15 presented -- what's "it" here?  I guess "it" is,

16 is it adding -- he provided -- the Secretary

17 wanted data on citizenship at a granular level.

18 And the options -- he laid out options for doing

19 that.  It was an options memo.  So one of the

20 options was not get it, not do it.  The second

21 option I remember was relying on the ACS.  The

22 third option was add it to the Census Bureau

Page 271

1    survey.  And another option was, like,

2    administrative data.

3             So it's, like -- you know, the analytical

4    question is, okay, we want more granular

5    citizenship data; how are we going to get it?

6    Does it make sense to use the 2020 census for

7    those purposes?

8             And so -- I mean, bad idea, I think, is

9    an exaggeration of it, but it's a -- he -- John

10   advocated for administrative data and not for

11   using it on the 2020 census.

12       Q    The -- he characterized the proposal to

13   add a citizenship question to the 2020 census as

14   something that would be very costly, harm the

15   quality of the census count, and use substantially

16   less accurate citizenship status data than are

17   available from administrative sources, correct?

18       A    Uh-huh.

19       Q    This was not a recommendation to proceed

20   with the plan to add a citizenship question to the

21   2020 census, correct?

22       A    So he was -- he was not a fan of it, to

1   say the least, but --

2        Q        It was critical of the idea, correct?

3        A        Yeah, but --

4        Q        Okay.

5        A        -- so -- but then my role was to sort

6   of -- that draft -- that draft.  I didn't see the

7   final memo.  And then our -- my job was to read

8   through it and say, okay, well, there's a

9   narrative here, and there's data that supports it,

10  and then there's sort of the way the Census Bureau

11  operates.  And not all those aspects actually

12  added up.

13              And so, for example, his statement -- and

14  I raised this for Earl -- was, you know, his

15  statement about the quality of the data.  So my

16  reaction was, well, if there are data quality --

17  he basically suggested the survey question is not

18  going to get you good data.  And so my response

19  was, well, you're trying to have it both ways as

20  the Census Bureau.  You're flagging this issue,

21  but at the same point, we've had this question on

22  the ACS for years.  We've been giving it to DOJ

Page 273

1   and other users, through special tabulations, for

2   years.   It's never surfaced until now.   And even

3   now that the Census Bureau is arguing that there

4   are these data quality issues -- and we can set

5   aside whether or not there actually are data

6   quality issues, but let's say there are.   Then I

7   questioned him, why is the Census Bureau not

8   taking action to address the fact that they're

9   still using this question on the American

10  Community Survey?   And there was the dissonance

11  there that didn't make sense.   It still doesn't

12  make sense to me.

13       Q   So you don't know if there are data

14  quality issues with asking people to self-report

15  citizenship or not?

16       A   So you could --

17       Q   Or you don't have an opinion about that?

18       A   He argued in the memo that there were --

19  there were, you know, problems with the

20  non-citizenship estimate.   And so my response is,

21  okay, that's fine.   You're saying this.   I

22  understand your point.   But then if it's such an

1    questions you put on it, but it's the flow of

2    them.  So that's -- you know, it's not a minor

3    issue.  It's not something you take lightly.

4         Q    I agree.

5         A    The other thing I just wanted to flag --

6    the other thing I thought was inconsistent was

7    this question about his recommendation to use

8    administrative records.  And so again, I raised

9    for Earl that the Census Bureau was pretty much on

10   the tail end of having done, you know, a lot of

11   years of research on how to use administrative

12   records to conduct a successful decennial census.

13   A lot of work.  And so -- and it was good work.

14        And it's inconsistent with that long,

15   thoughtful, methodological, careful approach to

16   say, okay, well, here's this data field that the

17   Secretary would like to add to the decennial

18   census, and we think we should just go ahead and,

19   two years from now, get this data through

20   administrative records.  That's not consistent

21   with the way the Census Bureau tends to approach

22   those kinds of decisions.

1            It's a very short time frame.   And they

2    had a limited -- at least at that point -- I don't

3    know what they have now, but they had a limited

4    set of administrative records to go on.

5        Q    Did you participate in any meetings with

6    Secretary Ross in January, March -- February or

7    March regarding this addition of a citizenship

8    question to the census?

9        A    No.  Like -- like, reviewing the

10   research, do you mean?  Like -- or pondering it

11   or...

12       Q    Any meetings with Secretary Ross

13   regarding the additional of a citizenship question

14   to the 2020 census?

15       A    I don't think so, no.  No.  I mean, the

16   kind of meetings with the agenda you just showed

17   me, like the steering committee?  Those kind of

18   things?

19       Q    Any meetings.  Is there something unclear

20   about my use of the word "meeting"?

21       A    No.  Meeting is very clear.  I appreciate

22   that.

Page 281

1    the questions in -- I believe it's Exhibit 15?

2         A    Like, specifically?

3         Q    Yeah.

4         A    No, I can --

5         Q    Or generally.

6         A    I mean, generally, it probably would have

7    been John, and then it would have been cleared

8    through -- you know, all the way up through Ron

9    Jarmin.

10        Q    Do you know if anyone at the Commerce

11   Department changed any of the answers that the

12   Census Bureau provided?

13        A    I don't know.  I did not.  I don't have

14   any reason to believe anybody else did.  It's a

15   Census Bureau product.

16        Q    Do you think it would be appropriate if

17   someone at the Commerce Department changed answers

18   that were provided by the Census Bureau?

19             MS. WELLS:  Object to form.

20             THE WITNESS:  I mean -- appropriate?  I

21   mean, look, when we receive materials of any

22   nature -- this could be an example from the Census

1   Bureau -- there can be questions about it and

2   there can be a process by which it gets reviewed

3   and edited or revised.  You know, that would

4   involve a dialogue with the Census Bureau about

5   what did you mean here, you know, what -- what is

6   this, and it could involve Commerce Department

7   staff taking a pen and -- you know, and revising

8   an answer, but not on a sort of one-off, freelance

9   basis.

10  BY MR. DURAISWAMY:

11      Q      Are you aware of any external analyses

12  that were solicited regarding the impact of the

13  citizenship question on the quality or accuracy of

14  the census data?

15      A      Like, written analyses?  Not that I'm

16  involved with, no, I don't know of any.  I mean,

17  the Secretary had a lot of outside meetings, you

18  know, like, for example, with former Census Bureau

19  directors, people like that, but not that I'm

20  aware of.  Certainly nothing I reviewed.

21      Q      I mean, is the answer, no, you're not

22  aware of any external analyses beyond what the

1    Census Bureau did regarding the effects of adding

2    a citizenship question to the census?

3         A    That's a good summary of my answer.

4         Q    Okay.  Do you know if your e-mail files

5    were searched for purposes of producing documents

6    in this lawsuit?

7         A    I do know that and, yes, they were

8    searched.

9         Q    Were your paper files searched?

10        A    Yes, I provided a folder of paper files.

11        Q    You mentioned that you have -- sometimes

12   take notes on the PowerPoint presentations that

13   are essentially -- it sounds like pre-reads for

14   these monthly census team meetings, correct?

15        A    They're more handouts during the meetings

16   as opposed to pre-reads.  But, yeah, I had a

17   file -- I have a file and I provided that.

18        Q    For purposes of responding to discovery

19   in this case?

20        A    Yes.

21        Q    Do you ever send text messages for work

22   purposes?

Page 292

```
 1        A     Yeah, I don't know.

 2        Q     Did you have any involvement in preparing

 3   the March 26th memo announcing the decision to add

 4   a citizenship question for the 2020 census?

 5        A     No.

 6        Q     Do you know who was involved in that

 7   process?

 8        A     Not off the top of my head.  I don't

 9   know.

10        Q     So you testified earlier that you were

11   not -- strike that.

12              You testified earlier that you first

13   learned about Secretary Ross' intent to add a

14   citizenship question around late summer of 2017,

15   correct?

16        A     Mid to late summer, I think I said, yeah.

17        Q     Okay.  And I believe you testified that

18   you were not aware of or involved in any

19   discussions regarding the need for a citizenship

20   question for DOJ or voting rights purposes before

21   that time, correct?

22        A     Not that I recall, no.
```

1      Q     Okay.  And the discussions about adding a

2    citizenship question to the census were not part

3    of the monthly census briefings that you

4    participated in, correct?

5      A     No, not -- no.  Like the -- like the

6    analysis, you mean?  Not that I can recall, no.

7      Q     And, in fact, I believe you testified

8    that there was sort of a separate process at the

9    senior level that was handling that, correct?

10     A     I did testify to that, yep.

11            THE REPORTER:  I'm sorry?

12            THE WITNESS:  I did testify to that.

13   BY MR. DURAISWAMY:

14     Q     You are the senior policy advisor for

15   statistical agencies at the Department of

16   Commerce, correct?

17     A     Uh-huh.

18     Q     And you are the senior-most career

19   staffer for issues of policy and strategy as it

20   relates to the Census Bureau, correct?

21     A     Yeah.  Although at that time I shared a

22   lot of the policy duties regarding -- specific to

1   to 2020 census with Sahra Park-Su.  So we -- we

2   shared a lot of that work for a while.

3        Q     She was a policy advisor as well?

4        A     Yes.

5        Q     Do you know if she was involved in any of

6   those discussions that you were not involved in?

7        A     I don't know.

8        Q     There's no one else in the Office of the

9   Secretary who has more experience dealing with

10  issues of policy and strategy as it pertains to

11  the Census Bureau than you, correct?

12       A     Currently, yeah.  I mean, just by merit

13  of age and experience in the department, that's

14  probably accurate, yeah.

15       Q     And you were basically not involved in

16  the process of deciding to add a citizenship

17  question, right?

18            MS. WELLS:  Object to the form.

19            THE WITNESS:  I was not involved in --

20  yeah.  I mean, I provided input -- I mean, this is

21  the way I operate -- I mean, the way I work.  I

22  mean, I -- I respond to the needs of my boss.

1   And, you know, when he engaged me on specific

2   matters, I responded and provided input.

3          But if he didn't engage me and ask for my

4   input, then I didn't provide it.  I had no

5   shortage of policy matters to deal with.  So...

6   BY MR. DURAISWAMY:

7       Q    And you can't recall being engaged on --

8   for your input on the issue of whether to add a

9   citizenship question until, at the earliest,

10  January 2018; is that correct?

11          MS. WELLS:  Object to the form.

12          THE WITNESS:  I provided input to John's

13  memo, whenever that came in -- I mean, whatever

14  the date is on that.  That came in.  That was a --

15  you know, that was the Census Bureau's analysis

16  regarding, you know, what they -- their views on,

17  you know, how to provide citizenship data to the

18  Secretary at the level that DOJ was asking for.

19  And I provided input into that.

20  BY MR. DURAISWAMY:

21      Q    Take a look at Exhibits 15, 16 and 17.

22  Does that refresh your recollection that that was

1    day.  Right?

2        Q    Did you review any other memos prepared

3    by John Abowd regarding the addition of a

4    citizenship question?

5        A    No.

6        Q    Did you review the memo analyzing

7    alternative D?

8        A    So alternative D, just to be clear, is

9    that the one with the blending of the survey and

10   administrative data?

11       Q    Is that your understanding of

12   alternative D?

13       A    I'm asking.  I mean, like I say, this was

14   an iterative process, so...

15       Q    Well, do you recall reviewing a memo

16   analyzing alternative D?

17       A    I'm aware of alternative D.  I mean, I

18   think I may have seen a version of it, yeah,

19   but it's...

20       Q    Did you ever have any discussions with

21   the Secretary about alternative D?

22       A    No.  I mean, as I stated earlier, the

1    Secretary and I have not had conversations about

2    this -- this matter, really.

3        Q    So when these parallel meetings were

4    going on regarding the addition of a citizenship

5    question that were taking place outside the

6    context of the monthly census briefings, who was

7    participating in those meetings, if not you?

8            MS. WELLS:   Object to form.

9            THE WITNESS:   I believe you asked this

10   earlier, and --

11   BY MR. DURAISWAMY:

12       Q    If you know.

13       A    -- I said I don't know.   Yeah, you've

14   asked this before.   But -- yeah.

15       Q    You have, like, not the slightest idea --

16   like, you don't even have a reasonable basis to

17   believe that Earl Comstock was involved in those

18   meetings?

19       A    And, of course -- I mean, yeah, but, I

20   mean, that's -- you know, it's a question of who

21   is meeting when on what.   And it's not my -- I can

22   hypothesize, of course.   I mean, it would be

Page 304

1    New York Immigration, Et. Al, v. US. Dept. of Commerce.

2    David Langdon

3            ACKNOWLEDGMENT OF DEPONENT

4            I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____        _____

14   DATE              SIGNATURE

15

16

17

18

19

20

21   3073342

22

# EXHIBIT H

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                    SAN FRANCISCO DIVISION
3
4         _____
                                   :
5      CITY OF SAN JOSE, et al.,:
                                   :
6              Plaintiffs,     :
                                   : Case No.
7         vs.                  : 3:18-cv-2279-RS
                                   :
8      WILBUR ROSS, JR., et al.,:   Global objection:
                                   :   401; 403
9              Defendants.     :
         _____:
10
11
12              Thursday, October 25, 2018
13
14              Videotape Deposition of SAHRA PARK-SU,
15      taken at the Law Offices of Manatt, Phelps &
16      Phillips, LLP, 1050 Connecticut Avenue NW,
17      Washington, D.C., beginning at 9:40 a.m.,
18      before Ryan K. Black, a Registered Professional
19      Reporter, Certified Livenote Reporter and Notary
20      Public in and for the District of Columbia.
21
22              Veritext Legal Solutions
                   Mid-Atlantic Region
                 1250 Eye Street NW - Suite 350
23               Washington, D.C.  20005
24
25

Page 2

```
 1        A P P E A R A N C E S:

 2

 3        MANATT, PHELPS & PHILLIPS LLP

 4        BY:  RORY E. ADAMS, ESQUIRE

 5        ██████  ████████████  ████████

 6        ████████████  ██  ████████

 7        ████████████

 8        ████████████████

 9        Representing - City of San Jose

10

11        ASIAN AMERICANS ADVANCING JUSTICE

12        BY:  NIYATI SHAH, ESQUIRE

13        ██████ █ ████████ ██

14        ██████ ████

15        ████████████ ██ ████████

16        ████████████

17        ██████████████████████

18        Representing - Lupe, et al.

19

20

21

22

23

24

25
```

Page 3

1      A P P E A R A N C E S (Cont'd):

2

3      ARNOLD & PORTER LLP

4      BY:  CHASE RAINES, ESQUIRE

5      ███  █████████  ██████  ██

6      ██████████  █  █████

7      █████████

8      ████████████████████

9      Representing - NYIC Plaintiffs

10

11     COVINGTON & BURLING LLP

12     BY:  DANIEL GRANT, ESQUIRE

13     ██  █████

14     ██████  ███████

15     ██████  █  █████

16     ██████

17     ████████

18     Representing - Kravitz Plaintiffs

19

20

21

22

23

24

25

Page 4

```
 1        A P P E A R A N C E S (Cont'd):

 2

 3        UNITED STATES DEPARTMENT OF COMMERCE

 4        OFFICE OF THE GENERAL COUNSEL

 5        BY:  MEGAN HELLER, ESQUIRE

 6        Herbert C. Hoover Building

 7        Room 5890

 8        1401 Constitution Avenue, NW

 9        Washington, DC  20230

10        202.482.4837

11        mheller@doc.gov

12        Representing - Department of Commerce

13

14        UNITED STATES DEPARTMENT OF JUSTICE

15        BY:  KATE BAILEY, ESQUIRE

16        Federal Programs Branch

17        20 Massachusetts Avenue, NW

18        Washington, DC  20530

19        202.514.9239

20        kate.bailey@usdoj.com

21        Representing - Department of Commerce

22

23

24

25
```

Page 5

1          A P P E A R A N C E S (Cont'd):

2

3          CALIFORNIA OFFICE OF THE ATTORNEY GENERAL

4          BY:  GABRIELLE D. BOUTIN, ESQUIRE

5               (Via Teleconference)

6          P.O. Box 944255

7          Sacramento, California  94244

8          916.323.5313

9          gabrielle.boutin@doj.ca.gov

10         Representing - State of California

11

12         HOLLAND & KNIGHT LLP

13         BY:  DAVID I. HOLTZMAN, ESQUIRE

14              (Via Teleconference)

15         50 California Street

16         Suite 2800

17         San Francisco, California  94111

18         415.743.6900

19         david.holtzman@hklaw.com

20         Representing - County of Los Angeles

21

22

23

24

25

Page 6

1          A P P E A R A N C E S (Cont'd):

2

3          DANNIS WOLIVER KELLEY

4          BY:   KEITH A. YEOMANS, ESQUIRE

5               (Via Teleconference)

6          115 Pine Avenue

7          Suite 500

8          Long Beach, California  90802

9          562.366.8500

10         kyeomans@dwkesq.com

11         Representing - Los Angeles Unified School
                               District

12

13

14

15

16

17

18

19

20

21

22

23

24         ALSO PRESENT

25          Gene Aranov - Legal Videographer

1                        I N D E X

2     TESTIMONY OF:  SAHRA PARK-SU              PAGE

3     By Mr. Adams..........................14, 207

4     By Ms. Bailey.........................32, 199

5                     E X H I B I T S

6     EXHIBIT           DESCRIPTION             PAGE

7     Exhibit 1    a printout of Ms. Park-Su's

8                  former LinkedIn page............57

9     Exhibit 2    a document Bates Numbered 2630..71

10    Exhibit 3    an e-mail from Secretary Ross

11                 to Earl Comstock on August 10th,

12                 2017...........................80

13    Exhibit 4    an e-mail from Ms. Park-Su to

14                 Earl Comstock copying others sent

15                 on August 29th, 2017...........82

16    Exhibit 5    an e-mail.......................87

17    Exhibit 6    a document Bates Numbered

18                 1378...........................89

19    Exhibit 7    a document Bates Numbered

20                 COM_DIS14166...................92

21    Exhibit 8    a document Bates Numbered

22                 2446..........................100

23    Exhibit 9    a document Bates Numbered

24                 3691..........................105

25

Page 8

```
 1                    I N D E X (Cont'd)

 2        EXHIBIT           DESCRIPTION              PAGE

 3        Exhibit 10    a document Bates Numbered

 4                      663...........................107

 5        Exhibit 11    a June 22nd, 2018, e-mail from

 6                      David Langdon to Ms. Park-Su...110

 7        Exhibit 12    a document Bates Numbered

 8                      3549..........................118

 9        Exhibit 13    a document Bates Numbered

10                      1984..........................127

11        Exhibit 14    a document Bates Numbered

12                      3503..........................129

13        Exhibit 15    a document Bates Numbered

14                      1277..........................134

15        Exhibit 16    a document Bates Numbered

16                      3706..........................138

17        Exhibit 17    Defendant's Objections and

18                      Responses to Plaintiff's Third Set

19                      of Interrogatories in the New York

20                      Action, Case No. 18-2025.......139

21        Exhibit 18    a document Bates Numbered

22                      1286..........................140

23        Exhibit 19    a document Bates Numbered

24                      1616..........................145

25
```

Page 9

1                      I N D E X (Cont'd)

2        EXHIBIT            DESCRIPTION              PAGE

3        Exhibit 20    a document Bates Numbered

4                      1964.........................150

5        Exhibit 21    a document Bates Numbered

6                      13023........................151

7        Exhibit 22    a document Bates Numbered

8                      9812.........................160

9        Exhibit 23    a document Bates Numbered

10                     3403.........................160

11       Exhibit 24    a document Bates Numbered

12                     2935.........................164

13       Exhibit 25    the schedule of Secretary

14                     Wilbur Ross for Wednesday

15                     March 7th, 2018..............174

16       Exhibit 26    a document Bates Numbered

17                     0003566......................177

18       Exhibit 27    an Outlook calendar invite.....179

19       Exhibit 28    a document Bates Numbered

20                     001313.......................181

21       Exhibit 29    a certification by Ms.

22                     Park-Su......................185

23       Exhibit 30    a document Bates Numbered

24                     001321.......................192

25

Page 10

1                  I N D E X (Cont'd)

2        EXHIBIT           DESCRIPTION              PAGE

3        Exhibit 31    a document Bares Numbered

4                      COM_DIS14052..................196

5        Exhibit 32    a letter to Catherine Lhamon

6                      from Secretary Ross dated

7                      July 5, 2018..................199

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 11

```
 1              THE VIDEOGRAPHER:  Good morning.
 2              We are going on the record at 9:40
 3      a.m. on October 25th, 2018.  Please note that
 4      the microphones are sensitive and may pick up
 5      whispering, private conversations and cellular
 6      interference.  Please turn off all cell phones,
 7      or place them away from the microphones, as they
 8      can interfere with the deposition audio.  Audio
 9      and video recording will continue to take place
10      unless all parties agree to go off the record.
11              This is Media Unit 1 of the
12      video-recorded deposition of Sahra Park-Su taken
13      by counsel for plaintiff in the matter of the
14      City of San Jose, et al., versus Wilbur M.
15      Ross, Jr., et al., filed in the United States
16      District Court for the Northern District of
17      California, San Francisco Division, Case Number
18      3:18-cv-2279-RS.
19              This deposition is being held at
20      Manatt Phelps & Phillips, located at 1050
21      Connecticut Avenue Northwest, Suite 600,
22      Washington, D.C.
23              My name is Gene Aranov, from the
24      firm Veritext Legal Solutions, and I'm the
25      videographer.  The court reporter is Ryan Black,
```

1          from the firm of Veritext Legal Solutions.

2                    I'm not authorized to administer

3          an oath, I'm not related to any party in this

4          action, nor am I financially interested in the

5          outcome.

6                    Counsel and all present in the room,

7          and everyone attending remotely, will now state

8          their appearances and affiliations for the

9          record.  If there are any objections to

10         proceeding, please state them at the time of

11         your appearance, beginning with the noticing

12         attorney.

13                   MR. ADAMS:  Good morning.  This is

14         Rory Adams.  I represent Plaintiffs City of

15         San Jose and the Black Alliance for Just

16         Immigration.

17                   MS. SHAH:  Hi.  My name is Niyati

18         Shah.  I represent the plaintiffs in Lupe,

19         et al., versus Ross, et al., Case Number

20         8:18-01570, in the District of Maryland.

21                   MR. RAINES:  Hi.  My name is Chase

22         Raines.  I represent the NYIC plaintiffs in

23         2:18-cv-5025, which is now consolidated with

24         2921 in the Southern District of New York.

25                   MR. GRANT:  My name is Dan Grant,

Page 13

```
 1        from Covington & Burling.  I represent the
 2        plaintiffs in Kravitz v. Department of
 3        Commerce, et al., in the District of Maryland.
 4                  MS. HELLER:  My name is Megan Heller.
 5        I'm agency counsel for the Department of
 6        Commerce.
 7                  MS. BAILEY:  My name is Kate Bailey.
 8        I'm with the Department of Justice, representing
 9        defendants in this matter.
10                  THE VIDEOGRAPHER:  Anybody on the
11        phone?
12                  MS. BOUTIN:  Yes.  This is Gabrielle
13        Boutin --
14                  MR. HOLTZMAN:  David Holtzman --
15                  MS. BOUTIN:  -- rep --
16                  MR. HOLTZMAN:  Go ahead, please.
17                  MS. BOUTIN:  Thank you.
18                  This is Gabrielle Boutin, representing
19        the State of California in the State of
20        California v. Roth.
21                  MR. HOLTZMAN:  This is David Holtzman
22        of Holland & Knight, representing the County of
23        Los Angeles.
24                  MR. YEOMANS:  Keith Yeomans,
25        representing Los Angeles Unified School District
```

Page 14

1      in California v. Ross.

2                    THE VIDEOGRAPHER:   Is that everyone?

3                    MR. ADAMS:   Is anyone else on the

4      line?

5                    THE VIDEOGRAPHER:   Will the court

6      reporter please swear in the witness?

7                              *    *    *

8      Whereupon --

9                    SAHRA PARK-SU,

10     called to testify, having been first duly sworn

11     or affirmed, was examined and testified as

12     follows:

13                         EXAMINATION

14     BY MR. ADAMS:

15          Q.   Good morning.   We met briefly in

16     the hall.   I'm Rory Adams, and I represent the

17     City of San Jose and the Black Alliance for Just

18     Immigration.

19                Ms. Park-Su, have you ever been

20     deposed before?

21          A.   No.

22          Q.   Have you ever provided testimony in

23     court before?

24          A.   No.

25          Q.   I'd like to go over in some basic

1          A.   My understanding at the time was

2     that if there are any issues that I was familiar

3     with, that I had expertise in, that I would have

4     an opportunity to review it and provide any

5     comment, input or suggestions.

6          Q.   Has your understanding of that role

7     changed?

8          A.   Yes.

9          Q.   In what ways?

10          A.   I was assisting with Census, and I

11     don't think that title necessarily applied to my

12     role regards to Census.  It did, however, with

13     regards to the International Trade

14     Administration.

15          Q.   When did you start working at the

16     Department of Commerce?

17          A.   I believe it was the end of June,

18     early July of 2017.

19          Q.   And when you started working at the

20     Department of Commerce, did you have the title

21     senior policy adviser?

22          A.   Yes.

23          Q.   Have you had any other titles while at

24     the Department of Commerce?

25          A.   Currently, I have a different title.

1        Q.    What is that?

2        A.    Senior counselor.

3        Q.    Have you had any other titles, other

4   than senior policy adviser and senior counselor

5   at the Department of Commerce?

6        A.    No.

7        Q.    Who did you report to at the

8   Department of Commerce when you first joined?

9        A.    When I first joined, I was working

10  most closely with Israel Hernandez.

11            MS. BAILEY:  Counsel, can we specify

12  that -- are these directed to this current

13  tenure at the Department of Commerce versus the

14  previous tenure?

15            MR. ADAMS:  Yes.  This is directed

16  to the current tenure at the Department of

17  Commerce.

18            THE WITNESS:  Okay.  Yes.  Thank you.

19  Israel Hernandez.

20  BY MR. ADAMS:

21        Q.    What were your -- what were your job

22  responsibilities while you were reporting to

23  Mr. Hernandez?

24        A.    Sure.  It was assisting Izzy with both

25  any International Trade Administration matters,

1          as well as helping to pull together materials

2          that Census was sending over to the Department

3          of Commerce.

4                Q.   How long was -- how long did you

5          report to Mr. Hernandez?

6                A.   Until his departure.

7                Q.   When was that?

8                A.   December of 2017.

9                Q.   Who do you report to -- who did you

10         report to after December of 2017?

11               A.   It was sort of split.   I was assisting

12         Karen Dunn Kelly, the Undersecretary for ESA,

13         and I still, technically, was reporting

14         to Earl Comstock since they had placed me in

15         his organization.

16               Q.   What was his organization?

17               A.   The Office of Policy and Strategic

18         Planning.

19               Q.   When did you become a senior

20         counselor?

21               A.   Probably almost three months ago.

22               Q.   So when you started reporting to

23         Secretary Kelly and Mr. Comstock, you were still

24         a senior policy adviser?

25               A.   Correct.

Page 34

1       Q.   Would you do anything else?

2       A.   If I had questions, I'd ask them to

3  clarify.

4       Q.   Anything else?

5       A.   No.

6       Q.   So you would not, for example, edit

7  draft responses?

8       A.   If there are grammatical suggestions,

9  I'd make those, but, substance-wise, we would

10  keep it consistent with what Census had told us.

11       Q.   Do you recall ever making substantive

12  revisions to responses to QFRs?

13       A.   There was one.

14       Q.   What was that?

15       A.   I believe that was asking what the

16  process was.

17       Q.   The process for what?

18       A.   For adding a question to the Decennial

19  Census.

20       Q.   Do you recall when that question came

21  in -- when did you first see that question?

22       A.   I can't remember when I first saw

23  that question.  The Office was handling three

24  Questions For The Record that were sent to us

25  simultaneously.

1    them properly revise that answer that they had

2    provided to the QFR.

3            Mind you, things were very busy

4    at this time, and it still is.  Days, if not

5    maybe a week or so had gone by, and it had

6    occurred to me that Census had not provided

7    an updated response, probably because they were

8    just crashing.  And so, at the time, I remember

9    we had just finished a call with Census, I think

10   it was one of our weekly meetings with Census,

11   but for some reason we didn't have it at

12   Commerce.  So what we sometimes will do is

13   we'll do a call-in in lieu of an actual physical

14   meeting.

15           After the call-in meeting, I believe

16   I had a paper copy of that particular question

17   that I was going to ask Census to help revise,

18   to ask them where it was.  Unfortunately, I had

19   forgotten to ask them on that call, and, when it

20   ended, I was in Mike Walsh's office, our Deputy

21   General Counsel.  Our Deputy General Counsel was

22   also at -- present at that meeting where we had

23   asked Census to specify what the process was.

24   And I had asked the Deputy General Counsel,

25   could you put the together a draft response from

Page 41

1   your understanding of what Census had told us so

2   I can send this to Census and see whether they

3   accept, reject, edit or accept so I can get the

4   ball rolling, because we need to finalize the

5   QFRs.

6          Q.   Did Mr. Walsh provide you with a draft

7   response to that question?

8          A.   He did.

9          Q.   What did you do with his draft

10  response?

11         A.   I typed it and sent it to Census for

12  their comments and approval or any suggestions.

13         Q.   Did Census provide comments, approval

14  or suggestions?

15         A.   Census did respond.

16         Q.   What was their response?

17         A.   They were okay with the Deputy General

18  Counsel's draft response.

19         Q.   How was that communicated to you?

20         A.   By e-mail.

21         Q.   And what did you do after receiving

22  that communication with respect to the response

23  to the question?

24         A.   I then took that response and put it

25  into the QFR.

1      administrative related to Secretary Kelly's

2      calendar?

3             A.    Right.

4             Q.    Did you do any other work that was

5      not administrative and not related to Secretary

6      Kelly's calendar?

7                   MS. BAILEY:   Objection; vague.

8                   THE WITNESS:   Could you give me an

9      example?

10     BY MR. ADAMS:

11            Q.    No.

12            A.    Okay.   Well, we did more than just

13     scheduling.   We would, oftentimes, look at

14     a document and if there are any additional

15     information that need -- was needed we would

16     ask bureaus for more information.   But, again,

17     neither Aaron or I, to my knowledge, were Census

18     experts, so we would rely on Census to give us

19     as much information as possible.

20            Q.    Why do you say that you're not a

21     Census expert?

22            A.    Because I'm not.

23            Q.    Have you tried to -- strike that.

24                  When you provide information to others

25     within the Department of Commerce related to the

Page 58

1        Census, do you create independent work product
2        without the input of experts from Census?
3                MS. BAILEY:  Objection; vague.
4                THE WITNESS:  I do not create my own
5        work product without Census's input.
6        BY MR. ADAMS:
7            Q.    If you're providing information
8        to others related to the Census, would the
9        information that you provide come from experts
10       at Census?
11           A.    They would come from people at Census.
12           Q.    Any other sources?
13           A.    Public sources, like the internet.
14           Q.    That you would look up?
15           A.    Mm-hmm.
16           Q.    Any other sources?
17           A.    Those sources were, actually, all
18       directed towards Census's website.
19           Q.    So aside from direct input from
20       experts at Census and publicly available
21       information on the internet, did you use any
22       other sources to gather and provide information
23       to others at Commerce about the Census?
24               MS. BAILEY:  Objection; form.
25               THE WITNESS:  Could you rephrase that

1    testimony.

2              THE WITNESS:  I don't believe so.

3    One thing I want to clarify, Rory, is that any

4    document that is provided or created by me is

5    done, primarily, with input from Census.  And

6    when those documents are created, they're always

7    ran through Census.  I try to make sure that

8    Census sees it so that if there's anything

9    that's incorrect or mischaracterized that they

10   can then make that correction, and I would not,

11   typically, move forward without Census's final

12   say.

13   BY MR. ADAMS:

14        Q.   Would you move forward without

15   Census's final say under any circumstances?

16              MS. BAILEY:  Objection; vague.

17              THE WITNESS:  I don't know what that

18   means.

19   BY MR. ADAMS:

20        Q.   I believe you just testified you would

21   not move forward without Census's input.

22        A.   Typically.

23        Q.   Typically.

24              So are there circumstances when you

25   would move forward without Census's input?

1          A.   I would try not to.  That would be --

2     that would be foolish since I'm not an expert.

3          Q.   Do you recall any instances where that

4     may have occurred?

5          A.   I do not recall an instance.

6          Q.   Okay.  When did you first do work at

7     the Department of Commerce during your current

8     tenure with respect to the 2020 Census?

9          A.   Gosh.  Probably around the time when I

10    first started back at Commerce.

11         Q.   Which was the summer of 2017?

12         A.   2017.

13         Q.   Did someone give you assignments

14    related to the Census?

15         A.   No.

16              MS. BAILEY:  Objection; vague.

17              THE WITNESS:  It was, specifically,

18    just asking for help.

19    BY MR. ADAMS:

20         Q.   Who asked you for help?

21         A.   Israel Hernandez.

22         Q.   What did he ask you to do?

23         A.   Sure.

24              I think around that time Director

25    Thompson had resigned not too long ago, and

1          Q.    My question was inexact.   I'll

2     rephrase.

3          A.    Sorry.   That's a Census administrative

4     record.

5          Q.    No.   No.   I get it.   I -- no -- no

6     problem.   I -- I can ask the question a better

7     way.

8               You've worked in -- in government

9     agencies for a number of years, and what I'm

10    talking about is the administrative record that

11    underlies agency decisions.

12         A.    Mm-hmm.   Okay.

13         Q.    What is an administrative record in

14    that sense?

15         A.    My understanding is -- is that it's a

16    compilation of information that is used to make

17    a decision.

18         Q.    What's included within an -- an

19    administrative record?

20               MS. BAILEY:   Objection.   Calls for a

21    legal conclusion.

22               THE WITNESS:   I have no idea.   What

23    -- could you --

24    BY MR. ADAMS:

25         Q.    Have you ever been tasked with

Page 125

1    assembling an administrative record?

2         A.    No, but I've assisted.

3         Q.    How have you assisted in assembling

4    an -- an administrative record?

5         A.    I've assisted when I was in the Import

6    Administration, where we administer Trade Remedy

7    laws, the Antidumping and Countervailing Duty

8    laws.  And, as you can imagine, there are a lot

9    of cases that are filed.  And so anytime you

10   have an outside party that comes in with regards

11   to a pending case, we would have to then record

12   those conversations and put them on the record

13   and include that in Commerce's deliberation in

14   making determination on a ADCDV case.

15             And so when those happen, I remembered

16   the teams would put together the information,

17   which would then come to my front office, which

18   I would make sure it had everything it needed

19   prior to going to the assistant secretary for

20   review and meeting with the team.

21        Q.    And that was -- that was be -- that

22   was before your current tenure at the Department

23   of Commerce?

24        A.    That was in 2007.

25        Q.    Did you receive any training about

Page 126

1      assembling administrative records?

2                    MS. BAILEY:   Objection; vague.

3                    THE WITNESS:   Training?

4      BY MR. ADAMS:

5           Q.    Training.

6           A.    There's training?

7           Q.    I'm asking did you receive any?

8           A.    Not that I know of.

9                    MS. BAILEY:   Same objection.

10                   THE WITNESS:   Not that I'm aware of.

11     If there's official training, I did not receive

12     official training.

13     BY MR. ADAMS:

14          Q.    Did you receive unofficial training?

15          A.    What do you mean unofficial training,

16     on the job?

17          Q.    Yes.

18          A.    The work that I described in Import

19     Administration is probably the closest to

20     compiling information.

21          Q.    Did anyone ever explain to you what

22     types of information should or should not be

23     included within an administrative record?

24          A.    No.

25          Q.    Have you ever assembled an

1     administrative record at the Department

2     of Commerce?

3          A.    I had assembled -- helped assemble

4     the Secretary's deliberation in considering the

5     citizenship question.

6               MR. ADAMS:  I'd like to show you

7     Exhibit Number 13.

8               (Deposition Exhibit No. 13, a document

9     Bates Numbered 1984, was marked.)

10    BY MR. ADAMS:

11         Q.    This is Bates Number 1984.

12              The second e-mail in this chain is

13    dated January 28th, 2018, from James Uthmeier.

14         A.    Mm-hmm.

15         Q.    And he says, additionally, I know that

16    KDK, --

17              That's Secretary Kelly?

18         A.    Karen Dunn Kelly, yes.

19         Q.    -- wanted to do a follow-up meeting

20    to tomorrow's Steering Committee -- steering

21    meeting, --

22         A.    Mm-hmm.

23         Q.    -- at which we could visit directly

24    with Ron and Enrique about the admin record.

25              And you responded, also, I spoke with

Page 136

1      about this document?

2           Q.   In -- in the latter half of January

3      2018.

4           A.   Possibly.  I don't know.

5           Q.   Did you attend any meeting where this

6      document was discussed?

7           A.   Not that I can recollect.

8           Q.   Did you attend any meeting where

9      Options A, B and C were discussed?

10               THE WITNESS:  I'm sorry.  Just to

11     clarify, discussed this with Karen Dunn Kelly or

12     with Census?

13     BY MR. ADAMS:

14          Q.   With anyone within the Department of

15     Commerce or the Census Bureau.

16          A.   Around this time in late January, I

17     don't -- I don't recall.

18          Q.   Do you recall the Department of

19     Commerce coming up with a set of 35 questions

20     for the Census Bureau?

21          A.   I don't know if there are 35

22     questions.  I know that Commerce did come up

23     with a list of questions based off of this

24     options paper that was provided by Census.

25          Q.   How did Commerce come up with those

Page 137

1    questions?

2            A.   So Commerce was given a copy of this

3    document, the options paper, and it was shared

4    with some of us at Commerce.   And I believe

5    after reviewing it there's some folks that came

6    back with questions.   And so there was an effort

7    to compile those questions because different

8    people had different questions.

9            Q.   Do you recall who had questions?

10           A.   I believe David Langdon, I think James

11   Uthmeier may have, and I think Earl may have, as

12   well.   I don't know if there would be more or --

13   or less.

14           Q.   Karen Dunn Kelly, --

15           A.   Mm-hmm.

16           Q.   -- did -- did she have questions, that

17   you recall?

18           A.   I don't know.   I can't remember.

19   Somebody was collecting everybody's questions,

20   so she may or may not have.   But I wasn't

21   compiling everybody's questions, so I don't

22   know.

23           MR. ADAMS:   I'm showing you what's

24   been marked as Exhibit 16.   This is Bates Number

25   3706.

Page 138

1            (Deposition Exhibit No. 16, a document

2      Bates Numbered 3706, was marked.)

3            THE WITNESS:   Mm-hmm.   Okay.

4   BY MR. ADAMS:

5         Q.    Does this refresh your recollection

6   as to whether Secretary Kelly may have had

7   questions?

8         A.    I do not know.

9            Just to clarify, I don't know if

10  they're Karen's questions or if they're a

11  compilation of questions, but it sounds like

12  I had a copy of some questions -- her copy at my

13  desk.

14        Q.    At some point were the que -- were the

15  questions transmitted to the Census Bureau?

16        A.    I don't know.   I'd imagine they were,

17  because Census provided responses.

18        Q.    But you did not transmit them?

19        A.    I did not transmit those questions.

20        Q.    Did you receive responses to the

21  questions --

22        A.    I think --

23        Q.    -- from Census?

24        A.    -- I may have seen a copy of them.

25  I don't know if I was on an e-mail.  I can't

Page 139

```
 1        recall.
 2             Q.   The administrative record reflects
 3        multiple versions of these questions.  What do
 4        you recall about the process of preparing a
 5        final set of responses?
 6                  MS. BAILEY:  Objection; foundation.
 7                  THE WITNESS:  All I know was a final
 8        copy was given to me to keep for record's sake,
 9        and that's all I know.
10                  MR. ADAMS:  I'd like to show you
11        what's been marked as Exhibit 17.
12                  (Deposition Exhibit No. 17,
13        Defendant's Objections and Responses to
14        Plaintiff's Third Set of Interrogatories in the
15        New York Action, Case No. 18-2025, was marked.)
16        BY MR. ADAMS:
17             Q.   Exhibit 17 is Defendant's Objections
18        and Responses to Plaintiff's Third Set of
19        Interrogatories in the New York -- in the
20        related New York action, Case Number 18-5025.
21        I'd like to direct your attention to Page 2 of
22        the document.
23             A.   Mm-hmm.
24             Q.   And at the bottom of the page
25        is Interrogatory Number 5.  With regard to
```

1  draft and final response to Question 31 in the

2  questions on the January 19th draft census memo

3  on the DOJ Citizenship Reinstatement Request,

4  found at Administrative Record 2303 to 2304 and

5  Administrative Record 196, please identify, A,

6  all persons who worked on any draft of the

7  response.

8       A.   Mm-hmm.

9       Q.   And in response the Department of

10 Commerce responded with a list of names, among

11 others, yours, correct?

12      A.   Mm-hmm.  Yes.

13      Q.   In what ways did you work on a

14 draft of the response to Question 31, and I

15 can -- would it help to show you Question 31?

16      A.   Sure.  That would be helpful.  I think

17 it's in reference to what we spoke about

18 earlier, --

19      Q.   It is.

20      A.   -- but I'd love to see a copy.

21          MR. ADAMS:   Sure.  So what I'm marking

22 as Exhibit Number 18 is Bates Number 1286 from

23 the administrative record.

24          (Deposition Exhibit No. 18, a document

25 Bates Numbered 1286, was marked.)

Page 141

1    BY MR. ADAMS:

2         Q.    And Question 31 appears on Page 11.

3         A.    Mm-hmm.

4         Q.    What is the process that was used

5    in the past to get questions added to the

6    Decennial Census, or do we have something

7    similar where a precedent was established?

8         A.    Mm-hmm.

9         Q.    And as we saw in Exhibit 17, the

10   Department of Commerce responded with your name

11   when asked for all people who worked on any

12   draft of the response.

13        A.    Yep.

14        Q.    And what work did you do on a draft of

15   re -- of the response to this question?

16        A.    Yes.   It goes back to what I mentioned

17   earlier.   Census, based off of our understanding

18   of our meetings with them, had indicated that

19   there was a distinction between the process

20   that's used at questions to the American

21   Community Survey, which they had shared with

22   us, and that the Decennial Census did not

23   necessarily have a similar process, to their

24   knowledge, that they could point to.

25   And, therefore, it would not be an accurate

1  characterization to say that it was the same.

2           And so based off of that, Census was

3  to go about -- my understanding from the meeting

4  was that Census was going to go back and work on

5  the draft response to Question 31.

6           Now, as I mentioned, these were

7  extremely busy times.  And I think a few days,

8  if not a week or so had gone by, and this was

9  not updated.  And I was in a meeting with Mike

10  Walsh, we had a call with Census in lieu of an

11  in-person meeting that we typically have, and

12  had a hard copy of this and had asked Mike

13  Walsh, our Deputy General Counsel, based off

14  of his recollection of our meeting with Census,

15  could he draft together a draft response so that

16  I can send it to Census for clearance, comments

17  or edits so I could get the ball rolling so we

18  can finalize these answers.

19           Mike Walsh then handwrote the draft

20  response for me on my paper, which then I then

21  went back and typed it up and sent it to Census.

22  I sent it to -- by e-mail to Ron Jarmin, I

23  believe Enrique Lamas, Christa, which those are,

24  typically, the people that I'll e-mail asking

25  for their comments, suggestions or clearance on

Page 143

1      this.

2                    And that was my involvement regarding

3      this question and answer.

4            Q.    When was -- so Census sent a draft

5      response to Question 31 to Commerce?

6            A.    Mm-hmm.

7            Q.    And you asked at some point for a

8      revision to that response?

9            A.    I don't recall myself asking.  I

10     remember at the meeting the understanding was

11     Census was going to go back, because I don't

12     believe this was the only one where they were

13     going to revisit.  This was one of some that

14     Census was supposed to come back with their

15     revision.

16           Q.    Do you recall when Census was first

17     asked to revisit their initial response to

18     Question 31?

19           A.    I don't.  I would imagine it

20     probably wasn't too long after they provided

21     this response, and it was probably during the

22     course of one of our subsequent meetings with

23     them, either weekly or biweekly, or even a phone

24     conversation -- no, it was an in-person meeting.

25     Excuse me.

1      to prepare the questions to send up to Congress.

2           Q.   Did Mike Walsh draft revised responses

3      to any questions, other than Question 31?

4           A.   Not that I'm aware of.

5           Q.   In terms of timing, would you agree

6      that Census provided initial responses to most

7      of the 35 questions by the beginning of February

8      2018?

9           A.   Likely.  Census tries to turn around

10     information as quickly as they can.

11           But as you can see from Question 30,

12     there's a lot of back and forth where Census

13     would come back and ask, we're not sure what

14     you're asking for, please clarify the question.

15           MR. ADAMS:  I'd like to show you

16     what's been marked as Exhibit Number 19.

17           (Deposition Exhibit No. 19, a document

18     Bates Numbered 1616, was marked.)

19     BY MR. ADAMS:

20           Q.   This is Bates Number 1616, and I'd

21     like to turn to Question Number 31.

22           A.   Mm-hmm.

23           Q.   And if you could review the response

24     to Question 31 and let me know when you've had a

25     chance to look at it.

Page 146

1        A.      Mm-hmm.

2                Okay.

3        Q.      Does this -- does this look to you

4   like the initial response that Commerce received

5   from the Department of Census to Question 31?

6                MS. BAILEY:   Objection; vague.

7                THE WITNESS:   Question to 31?   Could

8   you --

9                MR. ADAMS:   Could you repeat the

10  question?

11               THE REPORTER:   The last question, or

12  the one prior?

13               MR. ADAMS:   The last question.

14               (Referred-to testimony read back.)

15               MS. BAILEY:   Same objection.

16               THE WITNESS:   It looks similar, but

17  I cannot tell you if this is exactly what it

18  looked like word for word.

19  BY MR. ADAMS:

20       Q.      This is not the response that

21  Mr. Walsh drafted?

22       A.      That's correct.

23       Q.      The re -- the response says

24  that adding a question or making a change to

25  the Decennial Census toward the ACS involves

1    extensive testing, review and evaluation.

2            Did you have any reason to believe

3    that that statement was inaccurate in this

4    response?

5        A.   Yes.   My understanding from the

6    meetings that we had from Census was that

7    this statement was very true for the American

8    Community Survey, and I believe when we

9    had asked about the Decennial Census, my

10    understanding was that Census said it had been a

11    very long time since they have added a question,

12    to which I believe there was an effort that was

13    made by Census to see if they could find the

14    last time a question was added to the Decennial

15    and, when it was added, what process, any

16    historical record that Census could show us

17    to support that statement.   And Census, to my

18    recollection, did not have anything to provide.

19        Q.   What prompted the Department of

20    Commerce to dig deeper into this initial

21    response to Question 31?

22            MS. BAILEY:   Objection; foundation.

23    Mischaracterizes previous testimony.

24            THE WITNESS:   Could you repeat

25    that question or miss -- rephrase it for me.

Page 151

1    in connection with considering the process

2    for adding a question to the 2020 Census?

3         A.   Not to my recollection.  This looks

4    like this was in preparation for the PMR, the

5    quarterly Performance Management Review that

6    Census hosts to provide the public an update on

7    the progress that they've made in preparation

8    for the Decennial.  And I think this may be

9    one of those public presentations that Census

10   provided.

11        It says here that they were including

12   a slide to send to Ellen Johnson, who is a

13   staffer in the House Oversight and Government

14   Reform Committee, who I guess she might have

15   inquired about that.

16        Q.   That's HOGR?

17        A.   Mm-hmm.

18        MR. ADAMS:  I'd like to show you what

19   I've marked as Exhibit 21.  It's Bates Number

20   13023.

21        (Deposition Exhibit No. 21, a document

22   Bates Numbered 13023, was marked.)

23        THE WITNESS:  Mm-hmm.

24   BY MR. ADAMS:

25        Q.   And this is an e-mail from you on

1    February 23rd, 2018, to Ron, Enrique and

2    Christa at the Census Bureau, correct?

3         A.    Correct.

4         Q.    And you would agree that the bolded

5    question that appears beneath your name is

6    Question 31?

7         A.    Mm-hmm.   Yes.

8         Q.    Are you familiar with this draft

9    response to Question 31?

10        A.    I believe this is Mike Walsh's draft

11   response that I typed and sent to Census asking

12   for their thoughts.

13        Q.    When you say the -- Mike Walsh wrote

14   an answer, --

15        A.    Mm-hmm.

16        Q.    -- I believe you said that he wrote

17   it on a hard copy document that you had of the

18   questions?

19        A.    He wrote it for me because I had a

20   hard copy and I asked him on the spot after we

21   had concluded a call with Census.

22        Q.    Did you -- strike that.

23              Who came up with the language that he

24   wrote down?

25        A.    I believe it was based off of

1   his understanding from the meeting that he

2   participated in with Census when they went over,

3   among many things, what the process was for the

4   Decennial Census where Census clarified to us.

5        Q.   Did you make suggestions for the

6   language to be used in the revised version of

7   the response to Question 31?

8        A.   Could you rephrase that?

9        Q.   The -- the version of -- the revision

10  of the response to Question 31 that Mr. Walsh

11  wrote on your hard copy, --

12       A.   Mm-hmm.

13       Q.   -- did you provide suggestions as to

14  what wording should be used for that response?

15       A.   No.  I typed it verbatim.

16       Q.   And Mr. Walsh came up with the

17  language independently?

18       A.   No.  It was based off of his

19  understanding from the meeting he had

20  participated in with Census, that we had all

21  participated in.

22       Q.   Let me rephrase -- ask a different

23  question.

24       A.   Okay.

25       Q.   He came up with the -- is it correct

Page 154

1    to say that he came up with the language

2    independent of substantive input from you?

3              MS. BAILEY:  Objection; form.

4    Objection.  Mischaracterizes previous testimony.

5              THE WITNESS:  I did not provide any

6    input with regards to the response to Question

7    Number 31.

8    BY MR. ADAMS:

9        Q.   Part of this response in your e-mail

10   says, consistent with longstanding practice

11   for adding new questions to the ACS survey,

12   the Census Bureau is working with relevant

13   stakeholders to ensure that legal and regulatory

14   requirements are fulfilled and that the

15   questions would produce quality, useful

16   information for the nation.

17       A.   Mm-hmm.

18       Q.   Who provided the information used

19   to come up with that language to Mr. Walsh?

20             MS. BAILEY:  Objection; form.

21             THE WITNESS:  I believe this language

22   was based off of Census's explanation to us

23   about the process for the American Community

24   Survey.

25   BY MR. ADAMS:

1      aware, that process is ongoing.  I think "as

2      upon its conclusion" probably should have been

3      a separate paragraph and it should have been

4      clarified that "upon its conclusion of looking

5      at the Department of Justice request with

6      regards to Decennial Census", that it's still

7      ongoing and that the information would be

8      provided to the Secretary for consideration.

9      But, again, I wrote this based upon what was

10     given to me --

11          Q.   Typing --

12          A.   -- without any corrections.  Right.

13          Q.   Typing up verbatim what you received

14     from Mr. Walsh?

15          A.   Correct.

16          Q.   Christa Jones responded to you and

17     said, Sahra, I'm fine with this.  This is not

18     to say that there weren't some improvements and

19     presentation changes for the topics between

20     1990, 2000, 2010 and planned for 2020.  I just

21     want us all to be clear that the questionnaires

22     were not -- was not identical from 1990 to now.

23          A.   Mm-hmm.

24          Q.   Aside from this response from

25     Ms. Jones, did you receive any other responses

1    or feedback from Mr. Jarmin, Mr. Lamas or

2    Ms. Jones about this proposed response?

3         A.   No.  And the reason why Christa is

4    always copied on any e-mail to Ron and Enrique

5    is so that she can also ping them and check with

6    them in the event that they missed an e-mail

7    from us.

8              And so Christa was my liaison

9    over there to ensure that we could get a timely

10   response from Census, and, if she responded,

11   then that was good as -- as what census was

12   going forward with, so that was my

13   understanding.

14        Q.   So your understanding -- was it

15   your understanding that Census had reviewed and

16   approved of the language that Mr. Walsh wrote on

17   your hard copy and you retyped here?

18        A.   That's what I took it as.

19        Q.   Following -- following this exchange,

20   did Commerce send to you any other revisions to

21   a response to Question 31?

22        A.   No, not that I can recall.

23        Q.   Can you recall -- do you know whether

24   they -- whether Census sent anyone within the

25   Department of Commerce a further revision of the

Page 160

 1      response to Question 31?

 2            A.    I do not know.  As far as I was

 3      concerned, this was done and over and we can

 4      move on.

 5            Q.    From your perspective, you said it's

 6      done and over and we can move on, so you view

 7      this language as having been approved final

 8      language for the response to Question 31?

 9            A.    With regards to Census's review, that

10      was my understanding.

11            Q.    Was there further review of the

12      response within the Department of Commerce?

13            A.    I do not know.  At this point there

14      are a lot of e-mails going back and forth,

15      so ...

16            MR. ADAMS:  I'd like to show you

17      what's been marked as Exhibit Number 22, and

18      this is Bates Number 9812.

19            (Deposition Exhibit No. 22, a document

20      Bates Numbered 9812, was marked.)

21            MR. ADAMS:  Before we go to this

22      exhibit, I want to go back to what we were just

23      discussing and show you Exhibit 23.

24            (Deposition Exhibit No. 23, a document

25      Bates Numbered 3403, was marked.)

Page 165

1    know if they came in together or if they came in

2    separately, the attachment.

3         Q.   Taking a look at Exhibit 22, --

4         A.   Mm-hmm.

5         Q.   -- if we could turn to page -- it's

6    the second-to-last page, --

7         A.   Mm-hmm.

8         Q.   -- Question 31.  So the version of

9    the response to Question 31 that's in this

10   document --

11        A.   Mm-hmm.

12        Q.   -- is not the version that was

13   prepared by Mike Walsh.

14        A.    Correct.

15        Q.   Do you know why, as late as March 1st,

16   2018, Dr. Abowd would be using this version of

17   the response to Question 31?

18             MS. BAILEY:  Objection.  Calls for

19   speculation.  Foundation.

20             THE WITNESS:  I do not know why,

21   but this is not the version he should have been

22   using.

23   BY MR. ADAMS:

24        Q.   He should have been using the version

25   as drafted by Mr. Walsh?

1         A.   The one that was cleared by Census.

2              MR. ADAMS:   Could we go off the record

3    for two minutes?

4              THE VIDEOGRAPHER:   We're going off the

5    record.   The time is 1:53 p.m.

6              (Brief recess.)

7              THE VIDEOGRAPHER:   We're back on the

8    record.   The time is 1:55 p.m.

9    BY MR. ADAMS:

10        Q.   I'd like to compare the different

11   versions of the response to Question 31 that we

12   have.

13        A.   Okay.

14        Q.   So there is the version in Exhibit 22,

15   which is the March 1st, 2018, memo from

16   Dr. Abowd.

17        A.   Okay.

18        Q.   There's the version in Exhibit 19.

19             I think this might be it.

20        A.   No, that's 18.   You said 19, right?

21   So Exhibit 19, --

22        Q.   Exhibit 19.

23        A.   -- and then what was the one before

24   that that you asked?   Oh, and then this one, --

25        Q.   And Exhibit --

1        A.    -- Exhibit 22?

2        Q.    So 18, 19, --

3        A.    Nineteen.

4        Q.    -- 21 and 22.   So we have four -- four

5    documents.

6        A.    Okay.   Okay.

7        Q.    Starting with 19 and 22, --

8        A.    19 and 22.   Okay.

9        Q.    Okay.

10             -- would you agree that these versions

11   of the response to Question 31 are the same?

12       A.    I'm sorry.   That the response to --

13       Q.    Question 31.

14       A.    -- 31 for Exhibit 18 --

15       Q.    19 and 22.

16       A.    -- 19 -- I'm sorry.

17       Q.    I'm sorry.

18       A.    I'm sorry.   One more time.   For 19 and

19   22, are they the same?

20       Q.    Yes.

21       A.    Okay.   Yes, they read the same.

22       Q.    Turning to the version in Exhibit 21,

23   this is the e-mail version with the typed-up

24   version of Mr. Walsh's response?

25       A.    Mm-hmm.   Twenty-one.   Okay.   Sorry.

Page 168

1    There's -- okay.

2         Q.   This had been communicated to Census

3    prior to March 1st, 2018, correct?

4         A.   Correct.

5         Q.   Are you aware of any reason why

6    Dr. Abowd would not be using this version of the

7    response to Question 31?

8              MS. BAILEY:  Objection.  Objection.

9    Calls for speculation.  Objection; foundation.

10             THE WITNESS:  I don't know.

11   BY MR. ADAMS:

12        Q.   Did -- did Dr. Abowd, to your

13   knowledge, express to anyone at the Department

14   of Commerce disagreement with the version of the

15   response in Exhibit 21?

16        A.   You mean the one that the Commerce

17   Department provided --

18        Q.   Yes.

19        A.   -- to 21?

20             I don't know.  I believe Dr. Abowd

21   is not in that e-mail that I had sent to Census.

22   I only had sent it, it seems, to Ron Jarmin,

23   Enrique Lamas, Christa Jones, Karen Dunn Kelly,

24   Mike Walsh and Brian Lenihan.

25        Q.   Before we compare the version of the

Page 169

1      response in Exhibit 21 to the version that's in

2      Exhibit 18, --

3          A.   Okay.

4          Q.   -- I just want to go back to 21

5      and make sure I understand what, if anything,

6      happened to this version of the response after

7      February 23rd, 2018.  Did you make any further

8      revisions to the response to Question 31?

9          A.   No.

10         Q.   To your knowledge, did Mr. Walsh

11     make any further revisions to the response?

12         A.   No.

13         Q.   To your knowledge, did Secretary Kelly

14     make any revisions to this version?

15         A.   No.

16         Q.   Are you aware of anyone who made

17     revisions to this version of Question 31 after

18     February 23rd?

19              MS. BAILEY:  Objection.  Asked and

20     answered.

21              THE WITNESS:  No.

22     BY MR. ADAMS:

23         Q.   If we could compare Exhibit 21 with

24     Exhibit 18, --

25         A.   Okay.

Page 170

1          Q.    Okay.

2                -- you would agree that these are not

3    identical, correct?

4          A.    Correct.

5          Q.    And the sentence, consistent with

6    longstanding practice for adding new questions

7    to the ACS survey, the Census Bureau is working

8    with relevant stakeholders.

9                MS. BAILEY:   Sorry.   Can we clarify

10   which exhibit?   I'm sorry.

11               MR. ADAMS:   Yes.   Exhibit 21.

12   BY MR. ADAMS:

13         Q.    There is a sentence in 21, consistent

14   with longstanding practice for adding new

15   question -- for adding new questions to the

16   ACS survey, the Census Bureau is working with

17   relevant stakeholders to ensure that legal and

18   regulatory requirements are fulfilled and that

19   the question would produce quality and useful

20   information for the nation.

21         A.    Mm-hmm.

22         Q.    That initial phrase, consistent with

23   longstanding practice for adding a new question

24   to the ACS survey, does not appear in the

25   version of the answer in Exhibit 18, --

Page 171

1        A.    Mm-hmm.

2        Q.    -- correct?

3        A.    Correct.

4        Q.    Do you know why?

5        A.    I do not know why.  It seems like

6   it's a truncated version of Exhibit 21.  It's

7   the same answer, just shortened.

8        Q.    You testified, and correct me if I'm

9   wrong, that you're not aware of anyone having

10  made further revisions to Question 31 as

11  reflected in Exhibit 21.

12       A.    Correct.

13       Q.    In terms of control of the -- the

14  document that had the responses to all of these

15  questions, I'd imagine it changed hands a number

16  of times; is that correct?

17       A.    Yes.  I would imagine.

18       Q.    And after February 23rd, people in

19  addition to you made revisions; is that correct?

20            MS. BAILEY:  Objection.  Calls for

21  speculation.

22            THE WITNESS:  I don't know.  I don't

23  know.

24  BY MR. ADAMS:

25       Q.    How many -- strike that.

1      responses to these questions after February

2      23rd?

3                    MS. BAILEY:  Objection.

4                    THE WITNESS:  The Secretary?

5                    MS. BAILEY:  Objection.  Asked and

6      answered several times.

7                    THE WITNESS:  No.

8      BY MR. ADAMS:

9          Q.   I've been asking about revisions by

10     people at the Department of Commerce.  Are you

11     aware of whether anyone within the Census Bureau

12     revised answers -- the answer to Question 31

13     after February 23rd, 2018?

14                    MS. BAILEY:  Objection; foundation.

15                    THE WITNESS:  No.  I don't know.

16     BY MR. ADAMS:

17         Q.   Who changed the response to Question

18     31 from the version reflected in Exhibit 21 to

19     the version reflected in Exhibit 18?

20                    MS. BAILEY:  Objection.  Calls for

21     speculation, foundation, asked and answered.

22                    THE WITNESS:  I don't know.

23     BY MR. ADAMS:

24         Q.   Okay.  With respect to -- with respect

25     to the process of considering DOJ's request,

1        A.    That's what it looks like from the
2   scheduler.
3        Q.    And it lists calls with members of
4   Congress and others, such as Kay Coles James
5   with the Heritage Foundation, Christine Pierce,
6   a demographer at Nielsen.  Did these calls take
7   place?
8        A.    Some did and some didn't.  It was
9   tricky.  Like, the scheduling team tried to
10   squeeze in as many calls during certain hours,
11   but then they were shifting and changing, and
12   sometimes the members or people were not
13   available.  So the final list of summaries based
14   off these stakeholder calls were all the people,
15   to my recollection, that we -- that the
16   Secretary was able to get ahold of and have a
17   listening session.
18        Q.    For each of the calls you participated
19   in, did you take contemporaneous notes?
20        A.    Yes.  I tried.
21              I think I may have missed a couple
22   with the members at the tail end, but Kasey was
23   in those meetings so she would have read the
24   summaries.
25        Q.    Do you recall whether you were on the

Page 181

1    phone call with Christine Pierce from Nielsen?

2         A.    If my notes show it, maybe.

3         Q.    You don't recall either way, though?

4         A.    I don't.  There were so many.  I mean,

5    that's why we were taking notes.

6              MR. ADAMS:  I'd like to show you

7    what's been marked as Exhibit Number 28.

8              (Deposition Exhibit No. 28, a document

9    Bates Numbered 001313, was marked.)

10   BY MR. ADAMS:

11        Q.    Are you familiar with this document?

12        A.    I believe it was the Secretary's

13   decision.

14        Q.    Who drafted the Secretary's decision?

15        A.    Boy, I don't know, but it wasn't me.

16        Q.    Did you work on preparing any inputs

17   into this decision?

18              MS. BAILEY:  Objection; vague.

19              THE WITNESS:  Inputs?  No.

20   BY MR. ADAMS:

21        Q.    Did you provide any information

22   -- strike that.

23              Did you have any role in the creation

24   of this document, in particular?

25        A.    No.  I think I saw the final finished

```
 1     product.
 2           Q.   As this was being drafted, did
 3     anyone ask you any questions about formulations
 4     -- strike that.
 5                As this was being drafted, did
 6     anyone ask you questions about preparing the
 7     Secretary's final decision?
 8                MS. BAILEY:  Objection; vague.
 9                THE WITNESS:  Preparing his final
10     decision for ...
11     BY MR. ADAMS:
12           Q.   Preparing this document.
13           A.   No.
14           Q.   If you could turn to Page 6 -- oh,
15     that has my underline in it.
16           A.   Is this your copy?
17           Q.   That's all right.
18           A.   Okay.
19           Q.   So what I have underlined is the
20     sentence, first, several stakeholders who
21     opposed reinstatement of the citizenship
22     question did not appreciate that the question
23     had been asked in some form or another for
24     nearly 200 years.
25           A.   Mm-hmm.
```

1    Q.   Do you recall -- do you recall

2    stakeholder phone calls where stakeholders

3    expressed opposition to the reinstatement of

4    the citizenship question?

5    A.   The stakeholders, I think they were --

6    they were folks who were not fans of the

7    request.

8    Q.   And do you recall, based on those

9    phone calls, whether stakeholders who were

10   opposed appreciated that the question had been

11   asked in some form or another for nearly 200

12   years?

13             MS. BAILEY:   Objection; vague.

14             THE WITNESS:   I don't know.   I'd have

15   to go back and look at those notes.

16   BY MR. ADAMS:

17   Q.   Without looking at those notes, would

18   you be able to say what the source of this

19   statement is?

20   A.   I do not.

21             MR. ADAMS:   If we could take a

22   10-minute break, I think we're approaching the

23   end.   So why don't we take a 10-minute break and

24   come back?

25             THE VIDEOGRAPHER:   We're going off the

Page 185

1    answer on your hard copy?

2         A.   I don't remember when, but I'd imagine

3    once he provided edits, typically, I would try

4    to send it back as soon as possible, but I don't

5    know when.

6         Q.   Do you know the date of the meeting

7    -- do you know the date of the meeting where

8    Mr. Walsh received what information he needed

9    to receive to draft that response?

10        A.   I don't recall the date of the

11   meeting, but I remember it was the same briefing

12   that I had participated in, and it was the

13   bigger group meeting with Census, but I don't

14   remember which one.  We had a lot of them.

15              (Deposition Exhibit No. 29, a

16   certification by Ms. Park-Su, was marked.)

17   BY MR. ADAMS:

18        Q.   Okay.  Earlier we spoke about

19   -- generally, about administrative records,

20   and I'm going to show you what's been marked as

21   Exhibit Number 29.

22        A.   Mm-hmm.

23        Q.   Do you recognize -- do you recognize

24   this document?

25        A.   I do.

1    Q.   And is this your signature in the

2  middle of the document?

3    A.   That is my signature.

4    Q.   What is this document?

5    A.   What do you mean?

6    Q.   What do you understand this document

7  to be?

8    A.   I mean it to be what it says on

9  the paper where it says, I here certify that

10  the annexed is a true copy of the complete

11  administrative record upon which the Secretary

12  of Commerce based his decision to reinstate a

13  question concerning citizenship on the 2020

14  Decennial Census.  I base this certificate on my

15  personal involvement with the compilation review

16  of the documents comprising the administrative

17  record.

18    Q.   How were you personally involved with

19  the compilation of the documents comprising the

20  administrative record?

21    A.   Yeah.  As I told you, I was usually

22  given final versions, to my understanding, of

23  documents that were going back and forth, and

24  it was my responsibility to hold on to those

25  documents because there was so many paper

Page 187

1    movements.

2         Q.    Was that the extent of your personal

3    involvement on the compilation of documents?

4         A.    I believe I had also looked up

5    online a history that Census had in one of their

6    reviews about questions regarding citizenship

7    that was added.  So a lot of the public

8    historical documents that Census had, I had

9    gone back to find them online or verify that

10   they were, in fact, there.

11        Q.    When compiling documents comprising

12   the administrative record, did you affirmatively

13   reach out to others and ask for documents that

14   should be included in the record?

15        A.    Ask for other documents?

16        Q.    Yes.

17        A.    Besides what we had from Census?

18        Q.    Yes.

19        A.    Not that I recall.

20        Q.    Did anyone provide you guidance on

21   how to compile documents for the administrative

22   record?

23        A.    No.  My only under -- understanding

24   was that I was going to keep the record of all

25   documents that were handed to me.

1    Q.   So just to clarify, aside from

2  documents that were handed to you, you did

3  not affirmatively reach out to others within

4  Commerce --

5    A.   No.

6    Q.   -- to send you documents for the

7  record?

8    A.   No.  I had asked Commerce, though, if

9  there are any documents that Census had sent to

10  them that I was not copied on, please send them

11  to me.

12    Q.   So that referred to documents from

13  Census?

14    A.   Right.  Just as a precautionary

15  measure, but I don't believe that -- that they

16  had.

17    Q.   From whom were you receiving documents

18  that you compiled for the administrative record?

19    A.   I think it varied.  Oftentimes,

20  they were given to me when we had our meeting

21  with Karen Dunn Kelly or with Census.  So,

22  oftentimes, people would hand what I believe

23  to be a final version of a document.  So, for

24  instance, the Department of Justice letter in

25  early January was one that a hard copy was given

Page 189

1    to me to keep, so it varied.

2        Q.    Were all documents that you compiled

3    for the administrative record hard copy

4    documents?

5        A.    Most of them, but not all of them.

6        Q.    The documents that were not hard copy

7    documents, --

8        A.    Mm-hmm.

9        Q.    -- did you have them saved on your

10   computer?

11       A.    Mm-hmm.  I believe so.

12       Q.    And from whom did you receive

13   electronic copies of documents for the

14   administrative record?

15            MS. BAILEY:  Objection; vague.

16            THE WITNESS:  I don't know.

17   BY MR. ADAMS:

18       Q.    When people provided you with various

19   documents, did anyone indicate, this is a

20   document that should be part of the

21   administrative record?

22       A.    No.

23       Q.    You decided which documents should

24   be part of the administrative record?

25            MS. BAILEY:  Objection.

1    Mischaracterizes witness's previous testimony.

2              THE WITNESS:   No, I would just hold on

3    to documents that people would give me when it

4    came to Department of Justice's inquiry.

5    BY MR. ADAMS:

6         Q.   Did you consider all documents that

7    you received related to the Department of

8    Justice's inquiry to be part of the

9    administrative record?

10        A.   I don't know.

11             MS. BAILEY:   Objection; vague.

12             THE WITNESS:   Sorry.

13   BY MR. ADAMS:

14        Q.   Part of the certification says that

15   it was based on your personal review of the

16   documents comprising the administrative record.

17        A.   Personal involvement --

18        Q.   I base this --

19        A.   -- and the compilation and review of

20   the documents?

21        Q.   Yes.

22        A.   Mm-hmm.

23        Q.   So how did you review the documents

24   comprising the administrative record?

25        A.   Sure.

Page 191

1    Counsel's office had asked if I would

2    sign this document that contained information

3    about the Secretary's decision to consider the

4    citizenship question, and so it was a massive

5    electronic file of documents.  And I went

6    through each and every one of them and I

7    looked at them, and that's what I reviewed.

8    Q.   The compilation of documents that you

9    reviewed, did you create that compilation of

10   documents?

11   A.   I didn't create it.  I had -- it was

12   -- most of them were documents that were given

13   to me that I had in hard copy.

14   Q.   Mm-hmm.

15   A.   And it looked like most -- it

16   looked like counsel's office had scanned them

17   individually and had saved them, and that was

18   part of the administrative record.

19   Q.   From whom did you receive the

20   compilation of documents that you reviewed?

21   A.   I can't remember.  It was from one

22   of the attorneys in General Counsel's office.

23   Q.   Did you select the documents that were

24   part of that compilation?

25   A.   I did not select the documents.  I

 1    held on to the documents that were given to me.

 2          Q.    Do you know who selected the documents

 3    that were part of that compilation?

 4          A.    I do not know.

 5          Q.    Did anyone ask you which documents

 6    ought to be part of the compilation?

 7          A.    No.

 8          Q.    Did you have any say whatsoever in

 9    determining the content of that compilation?

10          A.    No.

11                MS. BAILEY:  Objection; vague.

12    Confusing.

13                MR. ADAMS:  I'd like to show you

14    what's been marked as Exhibit Number 30.

15                (Deposition Exhibit No. 30, a document

16    Bates Numbered 001321, was marked.)

17                THE WITNESS:  Okay.

18    BY MR. ADAMS:

19          Q.    Are you familiar with this document?

20          A.    This is the first time I'm seeing this

21    document.

22          Q.    You've never seen this document

23    before?

24          A.    I have not seen this document.

25          Q.    To your knowledge, have you seen any

1          MR. RAINES:  No.

2          MS. BAILEY:  Okay.  I have a couple of

3     redirect questions, please.

4          MR. RAINES:  No.

5                    EXAMINATION

6     BY MS. BAILEY:

7          Q.    You spoke earlier about Exhibit 29, --

8          A.    Mm-hmm.

9          Q.    -- which is the certification to the

10    admini -- administrative record produced in this

11    litigation?

12         A.    Yes.

13         Q.    I think you testified that this

14    -- that the designation of documents compiled

15    was given to you by the Office of General

16    Counsel; is that correct?

17         A.    Correct.

18         Q.    Okay.  And is it your understanding

19    that attorneys within the Office of General

20    Counsel worked on compiling that designation?

21         A.    Yes.

22         Q.    Have you worked on -- have you

23    certified an administrative record in other

24    litigation?

25         A.    No.

1    Q.   And did you familiarize yourself with

2    the documents selected before certifying the

3    record?

4         A.   I looked at the documents at the

5    General Counsel's Office provided prior to

6    signing.

7              MS. BAILEY:  Thank you.  That's all I

8    have.

9                   FURTHER EXAMINATION

10   BY MR. ADAMS:

11        Q.   Did you make an independent

12   determination that the compilation you received

13   was complete?

14        A.   No.

15             MR. ADAMS:  I have no further

16   questions.

17             MS. BAILEY:  And, I'm sorry.  I forgot

18   one.  I'm sorry.

19                  FURTHER EXAMINATION

20   BY MS. BAILEY:

21        Q.   Do you have an understanding

22   as to whether individuals who worked on the

23   citizenship question inquiry for Secretary Ross

24   were consulted as far as providing potential

25   documents for the record before that

Page 208

1          certification was compiled?

2                A.   One more time.   I apologize.

3                Q.   Do you have an understanding as to

4    whether -- in the designation of the documents

5    compiled for the administrative record, whether

6    individuals who had worked on the potential

7    reinstatement of the citizenship question were

8    consulted in order to gather documents to be

9    compiled for that record?

10               A.   Yes.   That was my understanding.

11               Q.   And do you have any knowledge as to

12   whether it is customary to have an attorney or

13   to have a person serving in a nonlegal role

14   certify an administrative record within the

15   agency?

16               A.   That's my understanding.

17               MR. ADAMS:   I have no further

18   questions.

19               MS. BAILEY:   Thank you.

20               THE VIDEOGRAPHER:   We are off the

21   record at 3:09 p.m., and this concludes today's

22   testimony given by Sahra Park-Su.   The total

23   number of media units was five and will be

24   retained by Veritext Legal Solutions.

25               (Deposition concluded -- 3:09 p.m.)

Page 212

1      Sahra Park-Su

2

3                   ACKNOWLEDGMENT OF DEPONENT

4                      I, _____, do

5      hereby certify that I have read the foregoing

6      pages and that the same is a correct

7      transcription of the answers given by

8      me to the questions therein propounded,

9      except for the corrections or changes in form

10     or substance, if any, noted in the attached

11     Errata Sheet.

12

13     _____          _____

14     DATE                  SIGNATURE

15

16     Subscribed and sworn to before me this

17     _____ day of _____, 20___.

18

19     My commission expires: _____

20     _____

21     Notary Public

22

23   Job No. PA3072227

24

25

# EXHIBIT I

Page 1

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    Case No. 1:18-CF-05025-JMF
4    ----------------------------------x
     NEW YORK IMMIGRATION COALITION, ET AL.,
5
             Plaintiffs,
6                                      Global
7                                      objection:
                                       401, 403
         - against -
8

9

     UNITED STATES DEPARTMENT OF COMMERCE,
10   ET AL.,
11           Defendants.
     ----------------------------------x
12                 August 24, 2018
                   9:07 a.m.
13

14

15       Videotaped Deposition of WENDY
16   TERAMOTO, taken by Plaintiffs, pursuant to
17   Notice, held at the offices of Arnold &
18   Porter Kaye Scholer LLP, 250 West 55th
19   Street, New York, New York, before Todd
20   DeSimone, a Registered Professional
21   Reporter and Notary Public of the State of
22   New York.
23           VERITEXT LEGAL SOLUTIONS
                MID-ATLANTIC REGION
24       1250 Eye Street NW - Suite 350
                Washington, D.C. 20005
25

Page 2

```
 1    A P P E A R A N C E S:
 2    ARNOLD & PORTER KAYE SCHOLER LLP
      ███████ ███████████ ██████████ ████
 3    ████████████████████ ███████ ██████
              Attorneys for New York Immigration
 4            Coalition, CASA De Maryland,
              American-Arab Anti-Discrimination
 5            Committee, ADC Research Institute and
              Make the Road New York
 6    BY:   DAVID GERSCH, ESQ.
                    ████████████████████████████
 7            DYLAN SCOT YOUNG, ESQ.
                    █████████████████████████
 8            CHASE R. RAINES, ESQ. (Via Phone)
                    ███████████████████████████
 9
10
11    AMERICAN CIVIL LIBERTIES UNION
      █████ █████ ███████████
      ██████ █████ ████████
12    █████ ██████ ██████ ███████
              Attorneys for New York Immigration
13            Coalition
      BY:   DALE HO, ESQ.
14            ████████████████████
15
16
17    COVINGTON & BURLINGTON LLP
      █████████ █████████ ██████ ██████
18            Attorneys for Kravitz Plaintiffs
      BY:   DANIEL T. GRANT, ESQ.
19            ████████████████████
20
21
      DANIELS WOLIVER KELLEY
22    115 Pine Avenue
      Suite 500
23    Long Beach, California 90802
              Attorneys for Los Angeles Unified
24            School District
      BY:   KEITH YEOMANS, ESQ. (Via Phone)
25             kyeomans@dwkesq.com
```

```
 1   A P P E A R A N C E S: (Continued)
 2   MALDEF
     ████████  ██████  █████████
     ████████████████   ████████████   █████████
          Attorneys for LUPE Plaintiffs
 4   BY:   DENISE HULETT, ESQ.
             ████████████████████████
 5           JULIA GOMEZ, ESQ.
 6           ANDREA SENTENO, ESQ. (Via Phone)
             ████████████████████████
 7
 8
     ASIAN AMERICANS ADVANCING JUSTICE
 9   ████████  █  █████████   ████████
     █████████████████
10   ██████████████████  █████████  ███ 036
          Attorneys for LUPE Plaintiffs
11   BY:   NIYATI SHAH, ESQ. (Via Phone)
             ███████████████████████████████████████
12
13
14
     MANATT, PHELPS & PHILLIPS LLP
15   █ ████████  ████████  ████████
     ████████  ████████  ████████
16        Attorneys for City of San Jose & Black
          Alliance for Just Immigration
17   BY:   ANDREW CASE, ESQ.
             ████████████████████████
18
19
20   LAWYERS COMMITTEE FOR CIVIL
     RIGHTS UNDER LAW
21   ████████  ████████  ████████  █████████  ████
     ████████  ████████
22   ████████  █████████  █████████
          Attorneys for City of San Jose & Black
          Alliance for Just Immigration
23
     BY:   EZRA ROSENBERG, ESQ.
24           ████████████████████████████████████████
25
```

Page 4

```
 1   A P P E A R A N C E S: (Continued)
 2   STATE OF CALIFORNIA
     DEPARTMENT OF JUSTICE
 3   OFFICE OF THE ATTORNEY GENERAL
     1300 I Street
 4   P.O. Box 944255
     Sacramento, California 94244
 5        Attorneys for State of California
     BY:   GABRIELLE BOUTIN, ESQ.
 6          gabrielle.boutin@doj.ca.gov
            MATTHEW WISE, ESQ. (Via Phone)
 7          matthew.wise@doj.ca.gov
 8
     STATE OF NEW YORK
 9   OFFICE OF THE ATTORNEY GENERAL
10   ███   █████   ████
     ████   ████   ████   █████
          Attorneys for State of New York
11   BY:   ELENA GOLDSTEIN, ESQ.  █████
12          MATTHEW COLANGELO, ESQ.
            ████████████
13          ALEX W. FINKELSTEIN, ESQ.
            █████████
14
15
16   U.S. DEPARTMENT OF JUSTICE
     20 Massachusetts Avenue
17   Washington, D.C. 20530
          Attorneys for Defendants
18   BY:   CARLOTTA WELLS, ESQ.
            carlotta.wells@usdoj.gov
19          KATE BAILEY, ESQ.
            kate.bailey@usdoj.gov
20
21
22
23
24
25
```

Page 5

1  A P P E A R A N C E S: (Continued)

2  U.S. DEPARTMENT OF COMMERCE

   1401 Constitution Avenue, NW

3  Washington, D.C. 20230

         Attorneys for Defendants

4  BY:   MICHAEL J. WALSH, JR., ESQ.

            mwalsh@doc.gov

5         DAVID M.S. DEWHIRST, ESQ.

            ddewhirst@doc.gov

6

7

8

9  ALSO PRESENT:

10   CARLOS KING, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                          I N D E X
2
3     WITNESS           EXAMINATION BY          PAGE
4     TERAMOTO    GERSCH                          9
                  GOMEZ                         142
5                 CASE                          170
                  WELLS                         241
6
7

             E X H I B I T S
8
      TERAMOTO        DESCRIPTION            PAGE
9     Exhibit 1   Bates 001321                 23
      Exhibit 2   Bates 0003699                28
10    Exhibit 3   Bates 000763-000764          38
      Exhibit 4   Bates 0002461                49
11    Exhibit 5   Bates 0001411-0001412        58
      Exhibit 6   Bates 0002519-0002520        63
12    Exhibit 7   Bates 0002458                67
      Exhibit 8   Bates 0002628-0002629        71
13    Exhibit 9   Bates 0002651-0002652        75
      Exhibit 10  Bates 0002528                83
14    Exhibit 11  Bates 0002636-0002638        87
      Exhibit 12  Bates 001313-001320         115
15    Exhibit 13  Bates 0003694               195
      Exhibit 14  Bates 0003695-0003697       199
16    Exhibit 15  Prepared Statement of       205
                  John H. Thompson
17    Exhibit 16  Bates 0002167-0002169       211
      Exhibit 17  Bates 0002646-0002648       216
18    Exhibit 18  Bates 0002160-0002162       221
      Exhibit 19  Bates 0002199-0002204       223
19    Exhibit 20  Bates 0002525               226
      Exhibit 21  Bates 0003597               229
20
21
22
23
24
25

Page 7

1    DIRECTIONS NOT TO ANSWER

2    Page        Line

     72          1

3    72          13

     81          11

4    114         16

5

6    REQUESTS

7    Page        Line

         (NONE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1            THE VIDEOGRAPHER: Good morning.

2    We are going on the record at 9:07 a.m. on

3    August 24th, 2018.

4            Please note that the

5    microphones are sensitive and may pick up

6    whispering, private conversations and

7    cellular interference.  Please turn off all

8    cell phones or place them away from the

9    microphones as they can interfere with the

10   deposition audio.  Audio and video

11   recording will continue to take place

12   unless all parties agree to go off the

13   record.

14            This is media unit number one

15   of the video-recorded deposition of Wendy

16   Teramoto taken by counsel for plaintiffs in

17   the matter of New York Immigration

18   Coalition, et al., versus United States

19   Department of Commerce, et al., filed in

20   the United States District Court, Southern

21   District of New York, case number

22   1:18-CF-05025-JMF.  This deposition is

23   being held at the offices of Arnold &

24   Porter located at 250 West 55th Street, New

25   York, New York.

Page 9

1            My name is Carlos King from the

2     firm of Veritext and I am the videographer.

3     The court reporter is Todd DeSimone also

4     from Veritext.  I'm not authorized to

5     administer an oath, I'm not related to any

6     party in this action, nor am I financially

7     interested in the outcome.

8            All appearances will be noted

9     on the steno record.  Will the court

10    reporter please swear in the witness.

11       *   *   *

12    W E N D Y   T E R A M O T O,

13    called as a witness, having been first duly

14    sworn, was examined and testified

15    as follows:

16    EXAMINATION BY MR. GERSCH:

17       Q.    Please state your name and work

18    address.

19       A.    My name is Wendy Teramoto and I

20    work at the Department of Commerce in

21    Washington.

22       Q.    Do you do your work in

23    Washington D.C.?

24       A.    Yes, sir.

25       Q.    And how are you employed at the

Page 10

1   Department of Commerce?  What is your

2   position or title?

3       A.      I am the chief of staff and

4   senior advisor.

5       Q.      And for how long have you held

6   that position?

7       A.      Just about a year.

8       Q.      Let's go back a little.  I want

9   to get some background first and then we

10  will move forward.

11          I understand that you graduated

12  from the University of Colorado at Boulder;

13  is that right?

14      A.      Yes, sir.

15      Q.      In 1996?

16      A.      Yes, sir.

17      Q.      With a degree in accounting?

18      A.      Yes, sir.

19      Q.      And graduated with honors?

20      A.      Yes, sir.

21      Q.      You are a founding partner of

22  WL Ross & Company in 2000?

23      A.      I believe it was 2000, yes,

24  sir.

25      Q.      What did you do between

Page 22

1      A.      Well, she did not work at WL
2   Ross & Co., but she had worked at Invesco
3   and Invesco purchased WL Ross & Co.
4      Q.      Other than yourself -- and I
5   take it Under Secretary Kelley would have
6   known Secretary Ross from that context?
7      A.      Sure.
8      Q.      Other than yourself and Under
9   Secretary Kelley, is there anyone else at
10  the Commerce Department now in a senior
11  position who has had a prior relationship
12  with Secretary Ross?
13          MS. WELLS:  I object to the
14  form.
15      A.      I mean, not to my knowledge,
16  but when you say prior relationship, I
17  mean, the Secretary knows a lot of people,
18  so if he had known somebody and met
19  somebody at some other gathering ten years
20  ago and they happened to now work at
21  Commerce, sir, I just -- I don't know.
22      Q.      I understand.
23      A.      To the -- I'm just thinking
24  through.  I can't think of anybody now.
25      Q.      All right.  When did you first

Page 23

1    hear about the notion of adding a question

2    about citizenship to the census?

3         A.    I just don't remember.

4         Q.    Is there any way you would be

5    able to date that?

6         A.    No.

7         Q.    Is there any kind of document

8    that you remember as -- well, withdrawn.

9              How did you first hear about

10   the notion of adding a citizenship question

11   to the census?

12        A.    I don't remember.

13        Q.    Would that be reflected in any

14   documents?

15        A.    Not that I would be aware of.

16             MR. GERSCH:  Let's mark as

17   Teramoto Exhibit 1 a document Bates stamped

18   1321.

19             (Teramoto Exhibit 1 marked for

20   identification.)

21        Q.    I have handed the witness an

22   exhibit marked Teramoto Exhibit 1 titled

23   The Supplemental Memorandum of Secretary of

24   Commerce Wilbur Ross Regarding the

25   Administrative Record in Census Litigation.

Page 26

```
 1              The second thing that was
 2    talked about a lot was how is the Census
 3    Department going to be able to ramp up the
 4    employment of I believe it is half a
 5    million people over a very short amount of
 6    time and how are we going to do that
 7    effectively.  And then, you know, what do
 8    you do to ensure that there is the most
 9    accurate count.
10              I mean, those are the themes.
11    I don't remember specifically the question
12    that you are talking about.
13         Q.    You don't remember the -- well,
14    withdrawn.
15              Do you remember that there was
16    a time when the question of adding a
17    citizenship question to the census came up?
18              MS. WELLS:   I object to form.
19         A.    I don't remember a specific
20    conversation or meeting where it came up.
21              And I should also tell you,
22    sir, you know, I was not -- I was not
23    involved in most of the census meetings at
24    all.  I mean, you know, when you look at
25    Commerce, some of the departments that we
```

1   have are extremely scientific and

2   technical.  NOAA is one of them and Census

3   is another one.  So, you know, I was not

4   involved in those areas.

5         Q.     Did you have any responsibility

6   or did you undertake to do anything with

7   respect to getting the citizenship question

8   on the census?

9         A.     I'm not sure what you mean by

10  any responsibility.

11        Q.     Did you undertake any tasks

12  related to trying to get a citizenship

13  question put on the census?

14        A.     Did I personally?  No.

15        Q.     None whatsoever?

16        A.     Did I ever -- I guess I'm a

17  little confused.  You are asking if I did

18  anything for the citizenship question?

19        Q.     I'm asking if you did anything

20  to try and help get a citizenship question

21  put on the census.

22        A.     No.

23               MR. GERSCH:  Let's mark

24  Teramoto Exhibit 2.

25               Counsel, this is a two-page

Page 28

1    document.  The second page, for reasons I

2    don't understand, are blank.  I propose

3    only to mark the first page, unless you

4    object.

5              MS. WELLS:  No objection.

6              (Teramoto Exhibit 2 marked for

7    identification.)

8        Q.    For the record, this is Bates

9    stamped 3699.  It is an e-mail thread, the

10   top one of which states that it is from

11   Secretary Ross sent May 2nd, 2017 to Wendy

12   Teramoto, "Re: Census."

13             Take a moment to read this, I

14   think most of it is blacked out, and let me

15   know when you've had a chance to do that.

16             (Witness perusing document.)

17       A.    Okay.

18       Q.    Ms. Teramoto, let me direct you

19   to the middle of the document where it says

20   "Begin Forwarded Message: From: Alexander,

21   Brooke, To: Wendy Teramoto."

22             Do you see that?

23       A.    Uh-huh.  Yes, sir.

24       Q.    So this appears that she is

25   forwarding a message, and then the message

1    that she appears to be forwarding is headed

2    Original Message from Wilbur Ross to Earl

3    Comstock and Ellen Herbst.

4              You see that, right?

5         A.    Correct.   I'm not on the

6    original e-mail.

7         Q.    Correct.

8              And then Secretary Ross has

9    written "Worst of all, they emphasize they

10   have settled with Congress on the questions

11   to be asked.   I am mystified why nothing

12   have been done in response to my months old

13   request that we include the citizenship

14   question.   Why not?"

15             All right, this question

16   appears to have been forwarded to you May

17   2nd, 2017.   Do you remember that?

18        A.    I don't -- I don't remember

19   receiving it.

20        Q.    Do you deny receiving it?

21        A.    No.

22        Q.    And then above the forwarding

23   part, there is a message that says "Wendy

24   Teramoto wrote:   I continue to talk

25   frequently with Marc Neumann and we often

Page 30

1   have dinner together.  He will not leave

2   les, but is in love with the census and

3   talks about it nonstop.  Do you want me to

4   set up another meeting?  Let me know if you

5   want to have a drink or get together over

6   the weekend."

7              Then Secretary Ross has written

8   in response to you, "Let's try to stick him

9   in there for a few days to fact-find."

10             Do you see that?

11      A.     Yes, sir.

12      Q.     So you would have received this

13   at the beginning of May, and the message

14   that is forwarded to you has Secretary Ross

15   complaining that nothing has been done in

16   response to his months-old request that we

17   include a citizenship question.

18             Does this help you remember

19   that you had some involvement in getting

20   the citizenship question on the census?

21      A.     No.

22             MS. WELLS:  Objection to form.

23      A.     Well, wait a minute.  First of

24   all, this is -- this is two sentences out

25   of an e-mail that I have no idea what else

1  was said.   It is titled Census.

2            So this has -- I mean, just

3  because, you know, for you to imply that

4  because I had suggested he set up a meeting

5  or talk to somebody who worked on the

6  transition team for census has nothing to

7  do with, in my eyes, the citizenship

8  question.   It has to do with the census as

9  a whole.

10      Q.    Ms. Teramoto, you started

11  earlier in your answer referencing that

12  there were things in the message that you

13  can't read.

14            Do you understand that it is

15  the government lawyers who have blocked

16  that information out?

17      A.     Between all the lawyers, I

18  mean, you know, it's not -- I'm not part of

19  the process of what is shown or what's not.

20  I know that they follow the rules and

21  regulations of what they are supposed to

22  do.

23      Q.    My question is, do you

24  understand that it is the government

25  lawyers who have blocked that information

Page 32

1   out that you say you can't read on here?

2        A.      If that's what you are telling

3   me, I have no reason to believe that it's

4   not true.

5        Q.      All right.   When Secretary Ross

6   says "I'm mystified why nothing have been

7   done in response to my months old request,"

8   why did Secretary Ross request as of

9   several months apparently before May 2nd,

10  2017, why did he request that a citizenship

11  question be included on the census?

12       A.      I have no idea.   I mean, as you

13  have correctly pointed out, this was in

14  May.   I didn't write the e-mail and I

15  wasn't even -- he didn't even send it to

16  me.

17       Q.      I take it your testimony is

18  that Secretary Ross never told you the

19  reason that he made such a request?

20       A.      I have never asked.

21       Q.      That's not my question.   Did he

22  ever tell you?

23       A.      No.

24       Q.      Did you ever learn to whom he

25  made that request?

Page 33

1        A.      Of what?
2        Q.      The request to add a
3    citizenship question.
4                MS. WELLS:  I object to form.
5        A.      I guess I'm confused.  Can you
6    please repeat the question?
7        Q.      Certainly.
8                He says he "made a months old
9    request that we include a citizenship
10   question."  Did you ever learn to whom he
11   made the request?
12       A.      I have no idea.
13       Q.      All right.  So this is
14   forwarded to you by Brook Alexander, and
15   you respond by saying that you talk
16   frequently with Marc Neumann and asking if
17   the Secretary wants to meet with him.
18               Who is Marc Neumann?
19       A.      So Marc Neumann was somebody
20   that I met on the transition team who had
21   worked at Census before.
22       Q.      And did you discuss the
23   citizenship question with Marc Neumann?
24       A.      Did I?
25       Q.      Yes.

Page 34

1      A.      Not that I remember.

2      Q.      And --

3      A.      Again, a lot of the census

4  focus was on the budget and how are you

5  going to properly ramp up half a million

6  employees in such a short amount of time.

7      Q.      When Secretary Ross says "Let's

8  try to stick him in there for a few days to

9  fact-find," did you do that?

10      A.      I believe so, but I don't -- I

11  believe I did, but I don't remember when.

12      Q.      Okay.  And when you say you

13  believe you did, what is it that you had

14  him do?  Did you have him go down to the

15  Census Bureau?

16      A.      Have who go down?

17      Q.      Mr. Neumann.

18      A.      No.

19      Q.      When it says "Let's try to

20  stick him in there a few days to

21  fact-find," who is the "him"?

22      A.      I mean, I didn't write the

23  e-mail.  If you want me to guess.

24      Q.      This is from the Secretary to

25  you, correct?

Page 38

```
1    but it was -- I believe it was right at the
2    end of July of 2017.
3         Q.      Did you ever speak with Marc
4    Neumann about the citizenship question?
5         A.      Not that I remember.
6         Q.      You are still chief of staff
7    today, correct?
8         A.      As far as I know, sir.
9         Q.      Let's mark another document.
10   Let's have this marked as Teramoto Exhibit
11   No. 3.   It is a two-page document, 763 and
12   764.
13              (Teramoto Exhibit 3 marked for
14   identification.)
15        A.      Is this the entire e-mail, sir?
16        Q.      That's what has been produced
17   to us.
18        A.      Okay.  Would you like me to
19   read it, sir?
20        Q.      I'm going to ask you a question
21   about it, and at that point I would say
22   read it to the extent you need to read it
23   to answer the question.
24        A.      Okay.
25        Q.      So this is an e-mail chain,
```

Page 40

1    of State of Kansas, have you heard that

2    before?

3         A.    Well, I just read it right

4    here.

5         Q.    So you would have known that

6    back in the day?

7         A.    No.

8         Q.    All right.  So Kris Kobach

9    writes an e-mail to you, if you look down

10   that first page, July 21, 2017, he writes

11   "Wendy, nice meeting you on the phone this

12   afternoon.  Below is the e-mail I sent to

13   Secretary Ross" --

14        A.    Sir, can I read the whole

15   e-mail, please?

16        Q.    Sure.

17        A.    Thank you.

18              (Witness perusing document.)

19        A.    Okay.

20        Q.    All right.  So there is an

21   e-mail from Kris Kobach to you, July 21, in

22   which he says -- he references meeting you

23   on the phone this afternoon.

24              Do you recall speaking with

25   Kris Kobach?

Page 41

```
 1        A.      Not at all.
 2        Q.      You don't deny speaking with
 3   him?
 4        A.      I think you asked me if I
 5   remember.  I don't remember talking to him.
 6        Q.      This is a different question.
 7                You don't deny speaking with
 8   him?
 9        A.      Given this e-mail, I would
10   assume that I spoke to him, but I don't
11   remember ever speaking to him.
12        Q.      All right.  And he asks --
13   withdrawn.
14                He says that he had sent an
15   e-mail to Secretary Ross and he attaches it
16   here.  You see that, correct?
17        A.      Well, I see his e-mail to me
18   says "Below is the e-mail that I sent to
19   Secretary Ross."
20        Q.      Okay.
21        A.      So I assume however this is
22   produced, it would have been this e-mail.
23        Q.      All right.  And one of the
24   things that the e-mail that Kris Kobach
25   forwards to you, one of the things in it is
```

Page 42

1   the statement "It is essential that one

2   simple question be added to the upcoming

3   2020 census," that's the first sentence of

4   the second paragraph of this forwarded

5   e-mail; do you see that?

6        A.    The second -- the first

7   sentence of the second paragraph that Kris

8   Kobach sent to, I believe it is Secretary

9   Ross, but I can't say his -- there is no

10  e-mail address -- says "It is essential

11  that one simple question be added to the

12  upcoming 2020 census."

13       Q.    All right.  When you spoke with

14  Kris Kobach, didn't he talk to you about

15  adding a citizenship question to the

16  census?

17       A.    Again, I have no recollection

18  ever speaking to him.

19       Q.    Who did you understand Kris

20  Kobach to be at the time?

21       A.    I had no idea.

22       Q.    Do you typically set up

23  meetings with the Secretary or calls with

24  the Secretary to people -- with people you

25  have no idea who they are?

Page 43

1      A.      You asked me, sir, if at the
2  time if I knew who Kris Kobach was, and I
3  said I didn't.
4      Q.      Correct.  I have asked you a
5  different question now.
6      A.      Okay.  Could you please repeat
7  it?
8      Q.      My question is, would you
9  typically set up a call for the Secretary
10 with somebody who you didn't know anything
11 about who they were?
12     A.      Well, no.
13     Q.      Why did you do so on this
14 occasion?
15     A.      Here it looks as though he
16 forwarded to me and told me who he was.
17     Q.      Okay.  And why did you set up a
18 call with him with the Secretary?
19     A.      At this point in time, I don't
20 remember.
21     Q.      It had to do with the
22 citizenship question, didn't it?
23     A.      He had sent an e-mail
24 requesting a call, and I don't remember,
25 well, it looks like I set it up, so, you

```
 1   know --
 2        Q.     Ms. Teramoto, my question is
 3   simply, the call that you set up, that was
 4   for the purpose of discussing the
 5   citizenship question, correct?
 6        A.     It was -- I would have set up
 7   the call because somebody had asked for a
 8   call with the Secretary.
 9        Q.     Didn't you set it up for the
10   Secretary in part because it was about the
11   citizenship question?
12        A.     I would have set up the call
13   because somebody had asked for the call
14   with the Secretary.  It wouldn't be
15   specifically because of a certain question.
16        Q.     You wouldn't set up a call for
17   anyone who asks for a call with the
18   Secretary, would you?
19        A.     If there is somebody who wants
20   to speak to the Secretary and it seems like
21   it is something that he would want to talk
22   about, then I would set it up.
23        Q.     So I take it he would, in your
24   mind, he would have wanted to talk about
25   the citizenship question?
```

Page 45

1       A.      I would have set up the call if
2   somebody like this would have asked for a
3   call with the Secretary, so if another
4   Secretary of State had asked for some call
5   with the Secretary, I would have tried to
6   facilitate that.
7       Q.      Wouldn't you have told the
8   Secretary what the topic of the call was?
9               MS. WELLS:  I object to the
10  form.
11      A.      It depends.
12      Q.      Wouldn't you have told him what
13  the topic of this call was?
14              MS. WELLS:  I object to the
15  form.
16      A.      Somebody would have told him
17  what the topic was.
18      Q.      In this time period, July 2017,
19  and earlier, hadn't you heard talk like
20  this before that it is essential that the
21  citizenship question be added to the
22  census?
23      A.      I don't remember anything
24  specific.
25              Again, sir, I was not involved

Page 46

1   in the day-to-day workings of the census.

2   I think that's also demonstrated by the

3   fact that I wasn't -- I don't remember ever

4   being on this call, and it doesn't look

5   like when I set it up, I had any intention

6   of being on that call.

7        Q.      In his e-mail to you, Kris

8   Kobach also said that when he spoke to the

9   Secretary, he did so at the direction of

10  Steve Bannon.

11              Steve Bannon worked in the

12  White House, correct?

13       A.      Yes.

14       Q.      Did you ever talk to Steve

15  Bannon about the census?

16       A.      Never.

17       Q.      Did you ever set up a call for

18  the Secretary and Steve Bannon about the

19  census?

20       A.      No.

21       Q.      Would there be notes of the

22  Secretary's conversation with Kris Kobach?

23       A.      I have no idea, sir, because I

24  wasn't part of that call.

25       Q.      Were there -- but as his chief

Page 50

1    10:01 a.m. and this marks the end of media

2    unit number one.

3              (Recess taken.)

4              THE VIDEOGRAPHER:  The time is

5    10:10 a.m. and this begins media unit

6    number two.

7    BY MR. GERSCH:

8         Q.    Ms. Teramoto, you have in front

9    of you what has been marked Teramoto

10   Exhibit 4.

11             My first question, simple one,

12   the top line of this memo, I'm sorry, this

13   exhibit, indicates that it is an e-mail

14   from Earl Comstock dated August 16, 2017 to

15   you, CC'd to the Secretary; is that

16   correct?

17        A.    So that's not the original

18   thread of the e-mail, right?  The original

19   e-mail looks as though it is August 11th

20   from Earl to -- I still can't see how --

21        Q.    My question was a little bit

22   different.

23        A.    Okay.

24        Q.    My question was simply, the top

25   part of the e-mail, the top part of the

1  exhibit, I'm sorry, the top part of the

2  exhibit indicates that it is an e-mail from

3  Earl Comstock to you dated August 16, 2017

4  and CC'd to the Secretary?

5      A.      Yeah.

6      Q.      And its subject is Memo on

7  Census Question, correct?

8      A.      Sure.

9      Q.      And the e-mail immediately

10  below that is from you to Mr. Comstock,

11  CC'd to the Secretary, also on the subject

12  Memo on the Census Question, correct?

13      A.      From me to Earl, correct?  It

14  looks like I'm responding to --

15      Q.      We will get to that.

16      A.      -- an original e-mail.

17      Q.      Who is Earl Comstock?

18      A.      So Earl Comstock is the current

19  director of policy at the Department of

20  Commerce.

21      Q.      And what do you understand his

22  responsibility to be in that function?

23  Actually, I withdraw that.

24          Was he in this position at that

25  time, roughly?

Page 54

1      Q.      All right.  You have read it.
2              You see, I take it, that
3  Mr. Comstock has written the Secretary that
4  he is enclosing a draft memo on the
5  citizenship question, and then that e-mail
6  has found its way to you because you are on
7  this chain, correct?
8      A.      I believe so.  Again, I know,
9  sir, it's not your fault, but I find it
10  just tricky to follow the e-mail chains,
11  because, again, here we have an e-mail from
12  Earl Comstock, and it's, you know,
13  addressed to the Secretary, so I assume he
14  e-mailed it to the Secretary.  I just can't
15  see it.
16      Q.      All right.  In any event, you
17  respond to Mr. Comstock, CC to the
18  Secretary, that "Peter Davidson and Karen
19  Dunn Kelley will both be here Monday.
20  Let's spend 15 minutes together and sort
21  this out.  W."
22      A.      Sure.
23      Q.      And this is on the memo on the
24  citizenship question?
25      A.      Sure.

Page 55

1      Q.      So it appears that you had some
2  involvement with the citizenship question,
3  correct?
4      A.      If setting up a meeting -- it
5  looks like I set up a meeting for them.   I
6  don't ever remember being at that meeting.
7      Q.      All right, thank you for that.
8              But it does suggest -- am I
9  reading it right when it suggests that you
10 are going to participate in this meeting?
11 "Let's spend 15 minutes together and sort
12 this out."
13             MS. WELLS:   Objection to form.
14     A.      No.
15     Q.      You don't read that as saying
16 you would participate in the meeting?
17             MS. WELLS:   I object to the
18 form.
19     A.      When I say "let's," it doesn't
20 mean I always join the meetings.   Let's
21 have the group get together.
22     Q.      All right.   I'm sorry, finish
23 your answer.
24     A.      I don't remember -- I don't
25 remember ever participating in this

1   meeting.

2       Q.    If there was such a meeting,

3   would you have typically put it on your

4   calendar if you were participating?

5       A.    If there was such a meeting?

6   No, I mean, again, again, I did not

7   participate in very many census meetings at

8   all.

9       Q.    Is it your testimony that you

10  did not participate in this meeting?

11      A.    My testimony is that I don't

12  remember being in a meeting with Peter

13  Davidson and Karen Dunn Kelley specifically

14  talking about the census memo.

15      Q.    Do you have an understanding as

16  to why this is coming to you if you have no

17  involvement with the citizenship question?

18      A.    Sure.  People CC me on things.

19      Q.    Why are you the one setting up

20  the meeting?

21      A.    Probably because I said people

22  should get together and discuss it.

23      Q.    Why do they need you to do

24  that?  Why can't they do that without you?

25      A.    I'm sure they can.

Page 57

1       Q.      You agree that someone would
2   have had to forward Earl Comstock's
3   original e-mail to the Secretary about this
4   to you for you to be setting up the
5   meeting?
6       A.      Somebody would have had to
7   forward -- I'm sorry, can you say that
8   again?
9       Q.      Yeah.  For you to be setting up
10  this meeting and for you to have a copy of
11  Earl Comstock's e-mail to the Secretary
12  about the citizenship question memo,
13  someone would have had to forward you that
14  e-mail?
15      A.      Sir, that's the exact thing I
16  was telling to you earlier, is that the way
17  these are laid out, I know it is not your
18  fault, it is just confusing.  I don't know
19  if it was forwarded or if I was CC'd on it.
20          And I can't tell, you know,
21  who -- I mean, it says that it is what Earl
22  Comstock wrote, but I don't see who he sent
23  it to, so I share your frustration.
24      Q.      You don't deny getting a copy
25  of Earl Comstock's e-mail to Secretary

Page 58

1    Ross, do you?

2         A.    Again, from what I can see

3    here, it looks as though I was either

4    forwarded or CC'd it.  I don't know.  I'm

5    guessing like you are, sir.

6         Q.    My question was a little more

7    specific.

8              You don't deny receiving a copy

9    of Earl Comstock's e-mail at the bottom of

10   that page --

11             MS. WELLS:  I object to the

12   form.

13        Q.    -- saying that he has got a

14   memo for the Secretary about the

15   citizenship question?

16             MS. WELLS:  Objection to form.

17        A.    My best guess, sir, is that it

18   was sent to my e-mail.

19        Q.    Thank you.

20             Let's mark this as Teramoto

21   Exhibit No. 5.  It is a two-page document

22   Bates stamped 1411 and 1412.

23             (Teramoto Exhibit 5 marked for

24   identification.)

25        Q.    All right.  You have in front

Page 59

1    of you what has been marked as Exhibit 5.

2              My first question is going to

3    go to what is on the second page, that is

4    the first e-mail in the thread, which says

5    it is sent from Peter Davidson August 29,

6    2017, to Israel Hernandez, Earl Comstock,

7    James Uthmeier, CC'd to you, and it says

8    "The Secretary asked to set up a briefing

9    on some of the legal questions he is

10   concerned with."  The subject is the

11   Census.  And it goes on.

12             Do you know why this was CC'd

13   to you?

14       A.    Sir, can I read the e-mail,

15   please?

16       Q.    Sure.

17       A.    Thanks.

18             (Witness perusing document.)

19       A.    Okay.  Could you please repeat

20   your question, sir?

21       Q.    Do you know why this was CC'd

22   to you?

23       A.    Probably for situational

24   awareness or seeing if when he had time on

25   his calendar.

Page 60

1       Q.      All right.  And then --

2       A.      Because this is, again, I was

3   only CC'd, this isn't even to me.

4       Q.      Understood.

5       A.      Okay.

6       Q.      Then the scheduler, who at the

7   time, who is Chelsey Neuhaus, she sends

8   around an e-mail August 29, 2017, this is

9   on the first page, that says "Would one of

10  you be able to confirm that these are the

11  only attendees that should be included in

12  next Wednesday's census briefing."

13              Do you see that?

14      A.      Yes, sir.

15      Q.      The first name of the people to

16  be included is you, right?

17      A.      Yes, sir.

18      Q.      You participated in this

19  briefing; is that right?

20      A.      Not that I'm aware of.

21      Q.      Do you deny that you

22  participated in this meeting?

23      A.      I don't remember attending this

24  meeting.  And just so you understand, sir,

25  they usually include me as an attendee for

Page 61

1   every single meeting of the Secretary.

2   Many of them I don't attend.

3       Q.     Okay.  I understand you saying

4   that you don't recall.

5              My question is, as you sit here

6   today, do you deny attending this meeting?

7       A.     As I sit here today, I don't

8   remember going to this and I highly doubt

9   that I went to it.  Again, I was not

10  involved in the day-to-day interactions on

11  the census.

12      Q.     And you didn't provide any

13  information to the Secretary to assist him

14  in arriving at his decision to add a

15  citizenship question to the census?

16             MS. WELLS:  I object to the

17  form.  Asked and answered.

18      A.     Again, you know, relating to

19  census, there is an entire Census Bureau,

20  so I would have facilitated a meeting, but

21  I clearly would not be the one to -- I'm

22  not the appropriate person to provide

23  information for him on these types of

24  things.

25      Q.     My question was a little

Page 63

```
 1       Q.     Sure.  Did you provide any
 2  information to Secretary Ross to assist him
 3  in arriving at his decision to add the
 4  citizenship question?
 5              MS. WELLS:   I will say asked
 6  and answered again.
 7       A.     Okay, thank you.
 8              I certainly did not create any
 9  information to give to the Secretary
10  relating to the citizenship question.
11       Q.     Let's have this marked as
12  Teramoto Exhibit 6.
13              (Teramoto Exhibit 6 marked for
14  identification.)
15       Q.     For the record, this is
16  Teramoto Exhibit 6, Bates stamped 2519 and
17  2520.  At the top, it is an e-mail from
18  Earl Comstock to Wilbur Ross, CC'd Wendy
19  Teramoto, "Re: IT Request."
20              And I will add for the record
21  there are seven lines of substantive text
22  in this e-mail.
23              Ms. Teramoto, the subject line
24  is "Re: IT Request" and then something is
25  blanked out.  What is IT request?  Does
```

Page 65

1   e-mail, I would have been aware that he was

2   asking about it.

3        Q.     Would you read e-mails from the

4   Secretary?

5        A.     It depends.

6        Q.     Are there e-mails from the

7   Secretary that you choose not to read?

8        A.     Sure, or that I skim.

9        Q.     At the top, Mr. Comstock says

10  "Understood.  Wendy and I are working on

11  it."  Then he says "On census, I have a

12  meeting tomorrow with Ellen and Karen where

13  they are supposed to have definitive

14  numbers.  I will send you a report on the

15  meeting and the numbers," and he goes on.

16             When he says "Wendy and I are

17  working on it," do you know what that

18  means?

19        A.     I assume it is some ITA

20  request.

21        Q.     Did you learn that, through the

22  course of 2017, either directly from the

23  Secretary or from other people who worked

24  at Commerce, that the Secretary was very

25  interested in adding a census question --

Page 66

1   I'm sorry, a citizenship question to the
2   census?
3                   MS. WELLS:   I object to form.
4       A.      Did I learn throughout 2017?
5       Q.      During 2017.
6       A.      It is hard for me to say very
7   interested.  It clearly was a topic that
8   had come up.
9       Q.      Did you learn that it was a
10  matter of importance for him?
11      A.      I don't know how to engage
12  matter of importance.  There is a lot of
13  things that are important to him.
14          The budget on census, I
15  remember that being extremely important to
16  him.  I remember --
17      Q.      Wasn't the -- I'm sorry, go
18  ahead.
19      A.      -- spending time trying to
20  figure out how we are going to ramp up the
21  employment for census.  I remember those.
22      Q.      Wasn't the citizenship question
23  important to Secretary Ross?
24                  MS. WELLS:   I object to the
25  form.

Page 67

1          A.      Again, I can't answer, sir,

2    what is or is not important to the

3    Secretary.

4          Q.      Who could?

5          A.      The Secretary.

6                  (Teramoto Exhibit 7 marked for

7    identification.)

8          Q.      Ms. Teramoto, I have handed you

9    what has been marked Teramoto Exhibit 7,

10   which at the top is a memo -- an e-mail,

11   sorry, from Earl Comstock dated September

12   16, 2017 to you.  Do you see that?

13         A.      Yes, sir.  Would you like me to

14   read it?

15         Q.      In a moment.

16                 Earl's memo to you says

17   "Morning Wendy:  Here is the memo I gave

18   SWLR regarding my discussions with DOJ.

19   Earl."

20                 I take it SWLR will refer to

21   the Secretary, Secretary Wilbur L. Ross?

22         A.      Yes, sir.

23         Q.      And then below that is the memo

24   or e-mail that he sent to the Secretary

25   which is dated September 8, 2017 from Earl

```
                                                    Page 68
 1   Comstock to Secretary Wilbur Ross, Census
 2   Discussions with DOJ.
 3               And let me ask you to read that
 4   e-mail there.
 5         A.      Sure.
 6         Q.      And then I will ask you
 7   questions about it.
 8         A.      Okay.
 9               (Witness perusing document.)
10         Q.      Who is Eric Branstad?
11         A.      Just a minute, sir.
12               (Witness perusing document.)
13         A.      I'm sorry?
14         Q.      Who is Eric Branstad?
15         A.      Eric Branstad used to be the --
16   I forgot his exact title.  He was -- I
17   don't know if he was Senior White House --
18   I think he was the White House liaison, or
19   the White House advisor, I'm not sure, for
20   Commerce.
21         Q.      Did he have a role with respect
22   to the citizenship question?
23         A.      Not that I'm aware of.
24         Q.      Mr. Comstock -- withdrawn.
25               You understood that
```

Page 69

1    Mr. Comstock forwarded this e-mail to you

2    on a Saturday because he wanted you to have

3    background on what was going on with the

4    citizenship question, correct?

5                   MS. WELLS:  I object to form.

6         A.      I have no idea why he sent it,

7    but he did forward me his memo to the

8    Secretary.

9         Q.      Did you discuss -- did you have

10   discussions with Mr. Comstock about the

11   citizenship question in connection with

12   this e-mail or for any reason on or about

13   September 16th, 2017?

14        A.      I don't believe so.

15        Q.      And when I say on or about, I

16   mean the day before, the day after.  You

17   don't believe you had any discussions with

18   him?

19        A.      I don't believe I actually read

20   the memo.

21        Q.      Why do you think that?

22        A.      Because I wasn't involved with

23   the census.

24        Q.      You had no involvement as far

25   as you could tell?

Page 70

1        A.        Very limited involvement.

2        Q.        Didn't you have involvement on

3   the citizenship question on or about

4   September 16, 2017, and isn't that why he

5   is sending you this e-mail?

6               MS. WELLS:   I object to the

7   form.

8        A.        No.   Again, as I've said, I'm

9   copied or sent things for my situational

10  awareness.   I don't know if receiving an

11  e-mail constitutes being involved.

12       Q.        And you did nothing with

13  respect to the citizenship question in this

14  time frame?

15               MS. WELLS:   Objection, form,

16  asked and answered.

17       A.        I don't remember receiving this

18  e-mail.   I don't remember reading this

19  e-mail.   And I certainly don't recall ever

20  having a discussion specifically on this

21  e-mail train with Earl Comstock around

22  September.

23       Q.        You didn't ask Mr. Comstock

24  what's the latest on the citizenship

25  question, what's DOJ doing on the

Page 71

1    citizenship question, anything like that?

2                 MS. WELLS:   I object to form.

3         A.      Not that I remember.

4                 Again, I'm CC'd on a lot of

5    things.  Just because I received the e-mail

6    does not mean that, A, I read it, and B, I

7    then get involved in it.   There is too much

8    stuff going on at Commerce.

9         Q.      Let's have this marked as

10   Teramoto Exhibit 8.

11                (Teramoto Exhibit 8 marked for

12   identification.)

13        Q.      You know, before I ask you to

14   look at that document, how did you prepare

15   for this deposition?

16        A.      I met with the lawyers, who I

17   guess would have gave me the outlines of

18   how the depositions work in terms of, you

19   know, make sure I'm truthful, answer the

20   questions that you've asked.

21        Q.      Were you shown any documents?

22        A.      Sure.

23        Q.      Were you shown any of the

24   documents that have been marked as exhibits

25   in this case?

```
 1        A.       Am I --
 2        Q.       Are you refusing to answer my
 3   questions about the documents you reviewed
 4   based on the advice or instructions of your
 5   counsel?  You will want to answer that yes.
 6        A.       Yes, sir.  Thank you for the
 7   help.
 8        Q.       All right.  Let's turn to
 9   Teramoto Exhibit No. 8.
10        A.       Okay.
11        Q.       All right.  This is an e-mail
12   thread with five lines of substantive text.
13                 Fair to say this is an
14   introduction from John Gore, he is
15   introducing himself and asking if you have
16   time for a call, and you say yes?
17                 (Witness perusing document.)
18        A.       I'm sorry, sir, I don't know if
19   that's a question.
20        Q.       Yes.  Did I summarize that
21   fairly, John Gore writes you an e-mail
22   introducing himself, he wants to speak with
23   you and set up a call with you, and you say
24   yes?
25        A.       Yes, sir.
```

Page 74

```
 1        Q.      Is this the first time you
 2   spoke to someone from the Department of
 3   Justice?
 4               MS. WELLS:  I object to the
 5   form.
 6        A.      I don't know.  The only other
 7   person that I would have -- when is this --
 8   September -- the Cabinet Affairs Director
 9   generally holds a chief of staff meeting
10   either every other week or weekly, so I may
11   have met somebody who works at Department
12   of Justice at that meeting, but -- should I
13   wait for you?
14        Q.      No.
15        A.      I may have met somebody from
16   the Justice Department, but it would have
17   been -- the only time I can think of would
18   have been at the chief of staff meeting,
19   but I don't remember a name.
20        Q.      This call that you had --
21   withdrawn.
22               You did have a call with
23   Mr. Gore, didn't you?
24               MS. WELLS:  I object to the
25   form.
```

Page 75

1       A.      I believe so, but I don't
2   remember.
3       Q.      And the call was about the
4   citizenship question, wasn't it?
5               MS. WELLS:   I object to form.
6       A.      I don't remember.
7       Q.      Let's have this marked as
8   Exhibit 9.
9               (Teramoto Exhibit 9 marked for
10  identification.)
11      Q.      For the record, Exhibit 9 is a
12  two-page exhibit Bates stamped 2651 and 52,
13  the top of which is headed with an e-mail
14  from Danielle Cutrona to Wendy Teramoto,
15  "Re: Call."
16      A.      Would you like me to read it,
17  sir?
18      Q.      Let me ask you a question and
19  then you can read whatever you need to to
20  answer it.
21              Ms. Teramoto, you will see at
22  the beginning of this e-mail, at the bottom
23  of 2652, is Mr. Gore's e-mail introducing
24  you, and then at the very bottom -- and
25  there is an e-mail thread.

Page 76

1              At the very bottom of 2651, he
2      says to you "By this e-mail, I introduce
3      you to Danielle Cutrona from DOJ.  Danielle
4      is the person to connect with about the
5      issue we discussed earlier this afternoon."
6              Take a look at the e-mail.  The
7      question I have for you is, I take it you
8      spoke with Acting Assistant Attorney
9      General Gore?
10             MS. WELLS:  I'm going to object
11     to the form.
12             (Witness perusing document.)
13     A.     Okay.  I'm sorry, sir, what was
14     your question?
15     Q.     My question was, I take it you
16     spoke to Assistant Attorney General Gore?
17             MS. WELLS:  Objection to form.
18     A.     I don't remember speaking to
19     him.
20             The e-mail that he sent to me
21     said Danielle is the person to connect with
22     about the issue we discussed earlier this
23     afternoon.  So I have no reason to believe
24     that I did not talk to him, but I don't
25     remember speaking to him.

Page 77

1      Q.      Understood.   And the issue that

2   you spoke with Assistant Attorney General

3   Gore about, that was about the citizenship

4   issue; is that correct?

5                  MS. WELLS:   I object to the

6   form.

7      A.      Again, I don't remember -- I

8   don't remember speaking to John Gore.

9      Q.      Higher up on the page,

10  September 17, 2017 at 12:10, Ms. Cutrona

11  e-mails you that "the Attorney General is

12  available on his cell," and then she goes

13  on to say "the AG is eager to assist."

14                 Wasn't that in connection with

15  the citizenship question?

16                 MS. WELLS:   I object to the

17  form, lack of foundation.

18     A.      I mean, I didn't -- I didn't

19  write the e-mail.   You would have to ask

20  Danielle Cutrona.

21     Q.      You were the recipient of the

22  e-mail; is that correct?

23     A.      Well, it says to me.   Again, I

24  can't see how these e-mails are sent to,

25  but I have no reason to believe I didn't

602

Page 78

1  receive this e-mail.

2      Q.     It says "Wendy," comma, at the

3  beginning of the e-mail, right?  You are

4  the recipient?

5      A.     Again, I agree with you, I'm a

6  Wendy.  It is just frustrating that you

7  can't see who is actually -- these are

8  addressed to.  I have no reason to believe

9  I didn't receive this.

10     Q.     All right.  And in this period

11  of time, September 18th, 2017, you would

12  have been chief of staff for the Secretary

13  of Commerce, right?

14     A.     Yes.

15     Q.     And you knew that the AG was

16  eager to assist with respect to the

17  citizenship question, didn't you?

18             MS. WELLS:  I object to form,

19  mischaracterizes her testimony.

20     A.     You would have to ask Danielle

21  Cutrona, because she is the one who wrote

22  this e-mail.

23     Q.     Didn't you learn that the

24  Secretary -- I'm sorry, didn't you learn

25  that the Attorney General of the United

602

Page 79

1    States wanted to assist with respect to the
2    citizenship question?
3                   MS. WELLS:   I object to the
4    form, asked and answered.
5         A.     Again, I didn't write the
6    e-mail.   I'm reading the exact same e-mail
7    that you are.
8         Q.     My question has nothing to do
9    with the e-mail now.
10                  Didn't you learn that the
11   Attorney General of the United States
12   wanted to assist Secretary Ross with
13   respect to adding a citizenship question?
14                  MS. WELLS:   I object to form.
15        A.     Sir, I'm reading the same
16   e-mail that you are.   I don't see in here
17   that it says the citizenship question.   It
18   says "the AG is eager to assist."   I have
19   no idea what else the Secretary and the AG
20   may or may not have been working on.
21        Q.     Ms. Teramoto, for the third
22   time, my question is not about the e-mail.
23                  My question is, you came to
24   learn, did you not, that the Attorney
25   General of the United States was interested

Page 82

1    that.

2          Q.      Yes or no.

3          A.      Did I know -- I would say --

4          Q.      One or the other.

5          A.      Could you please -- could you

6    please repeat the question?

7          Q.      Sure.  Whether or not you

8    recall speaking to the Attorney General,

9    you knew that the Attorney General of the

10   United States and Secretary Ross were

11   working together to add a citizenship

12   question to the census, didn't you?

13                 MS. WELLS:  I object to form.

14         A.      I was not part of discussions

15   between the Attorney General and Secretary

16   Ross.

17         Q.      Do you have that understanding

18   from any source?

19                 MS. WELLS:  I object to the

20   form.

21         Q.      You've got to answer that.

22         A.      Do I have -- could you repeat

23   it, please?

24         Q.      Yeah.  I have been asking you

25   didn't you know that Secretary Ross and the

1  Attorney General were working together to
2  add a citizenship question to the census,
3  and I understood you to say that you don't
4  remember being in discussions with them.
5      A.     Right.
6      Q.     And so my question is, did you
7  learn this from any source, whether you
8  were in discussions with them or not?
9      A.     I don't remember any specific
10 discussions from others.
11     Q.     All right.  At the top of this
12 e-mail you say, in response to Ms. Cutrona,
13 you say "They connected.  Thanks for the
14 help.  Wendy."
15          I take it you are saying the
16 Attorney General and the Secretary spoke
17 with each other?
18          MS. WELLS:  I object to form.
19     A.     Yes, sir.
20     Q.     And that e-mail is September
21 18th, 2017.  Let's mark this as Teramoto
22 Exhibit 10.
23          (Teramoto Exhibit 10 marked for
24 identification.)
25     Q.     For the record, this is an

Page 84

1  exhibit Bates stamped 2528.  It is a single
2  page and it is an e-mail from Wilbur Ross
3  to Peter Davidson, "Subject: Census."
4          It contains a single line of
5  text which reads as follows:  "Wendy and I
6  spoke with the AG yesterday.  Please follow
7  up so we can resolve this issue today.
8  WLR."
9          Didn't you and Secretary Ross
10  speak to the Attorney General on September
11  18th, 2017?
12          MS. WELLS:  I object to form.
13      A.    I don't remember being a part
14  of that call at all.
15      Q.    Do you deny being part of the
16  call?
17      A.    I said I don't remember being a
18  part of that call.  I remember calls with
19  different cabinet members.  I don't ever
20  remember being on a call with the AG.
21      Q.    Can you think of any reason why
22  Mr. Ross would get this wrong just a day
23  after the call?
24          MS. WELLS:  I object to form.
25      A.    You would have to ask him, but

Page 85

1    I don't remember being on the call with the
2    AG.
3          Q.    Do you have any reason to
4    believe Mr. Ross would make up the fact
5    that you were on the call with him and the
6    Attorney General on or about September
7    18th, 2017?
8                MS. WELLS:  I object to form.
9          A.    You would have to ask him.
10   Again, I don't remember being on the call
11   with the AG.
12         Q.    "Him" being Secretary Ross?
13               MS. WELLS:  I object to the
14   form.
15         A.    I don't remember being on a
16   call with the AG.
17         Q.    You said you will have to ask
18   him.  By "him," you meant Secretary Ross,
19   correct?
20         A.    Yes, sir.
21         Q.    Okay.  Regardless of whether
22   you remember being on the call, isn't it
23   true that this call had to do with adding a
24   citizenship question to the census?
25               MS. WELLS:  Objection to the

Page 87

```
 1        A.        Again, I wasn't -- I'm not John
 2    and I'm not Danielle, so I don't -- I don't
 3    know what their conversation was.
 4        Q.        Well, I'm asking about a
 5    conversation that you had with Mr. Gore.
 6    Presumably she is referencing that
 7    conversation.
 8                  Didn't you have a discussion
 9    with Mr. Gore about what you at Commerce
10    needed them at DOJ to do?
11                  MS. WELLS:  I object to form.
12        Q.        Wasn't that the purpose of the
13    call with Mr. Gore?
14                  MS. WELLS:  I object to the
15    form.
16        A.        I think what I testified
17    earlier is I don't remember talking to John
18    Gore, and I still don't remember talking to
19    John Gore.
20        Q.        Let's have this marked Teramoto
21    Exhibit 11.
22                  (Teramoto Exhibit 11 marked for
23    identification.)
24        Q.        All right.  For the record,
25    this is a three-page exhibit.  It is 2636
```

Page 88

1    through 2638.   It includes much of the

2    e-mail chain between Mr. Gore,

3    Ms. Teramoto, and Ms. Cutrona that we have

4    seen before.

5                My question is going to have to

6    do with the e-mail at the very top of this

7    chain in which someone who the government

8    tells me is you e-mails Mr. Gore and says

9    "Hi.  AG and Sec spoke.   Please let me know

10   when you have a minute."

11               You understand that you are the

12   sender of this e-mail, correct?

13        A.    I mean, I can't see the address

14   either.

15        Q.    The government has represented

16   that you are the sender.

17        A.    Okay.  Then okay.

18        Q.    Do you accept their

19   representation?

20        A.    Sure.

21        Q.    So when you write "Hi.  AG and

22   Sec" -- first of all, Sec means Secretary

23   Ross, right?

24        A.    Sure.

25        Q.    So "the Attorney General and

1    Secretary spoke.  Please let me know when
2    you have a minute."
3              So certainly you know that the
4    Attorney General Sessions and Secretary
5    Ross had a conversation because you are
6    reporting that, correct?
7              MS. WELLS:   I object to the
8    form.  But go ahead.
9         A.    My e-mail said the AG and
10   Secretary spoke, so I must have known that
11   they spoke.
12        Q.     And then you say "Please let me
13   know when you have a minute."
14             Did you call -- didn't you call
15   Assistant Attorney General John Gore?
16        A.     Again, to this day, again, I
17   don't ever remember speaking to him on the
18   phone.
19        Q.    All right.  But certainly as
20   the author of this e-mail, you would read
21   this that way, that, in other words, you
22   would read this e-mail as saying you want a
23   call with Assistant Attorney General Gore?
24             MS. WELLS:   Objection to form.
25        A.     Again, this is, you know, an

Page 90

1    e-mail from a year ago that I'm reading to
2    you that I must have written saying "Hi.
3    AG and Sec spoke.   Please let me know when
4    you have a minute."
5         Q.     Right.   My question to you is,
6    don't you understand that to be a request
7    for Mr. Gore to speak with you further or
8    request by you saying you would like to
9    speak with him further?
10              MS. WELLS:   I object to form.
11        A.     When I read this, it would be,
12   you know, let me know when you have a
13   minute.
14        Q.     So that you can speak with him,
15   right?
16              MS. WELLS:   I object to form.
17        A.     Sure.
18        Q.     And what did you speak with him
19   about?
20        A.     Again, I don't ever remember
21   speaking to John Gore.
22        Q.     You get that adding the
23   citizenship question to the census is an
24   important matter, don't you, Ms. Teramoto?
25              MS. WELLS:   I object to the

Page 94

```
 1   person to be involved with census issues.
 2        A.     And I'm still not.
 3        Q.     I hear you on that, which is
 4   why I'm asking, so if you're not the best
 5   person to be involved, why is it that the
 6   documents make it seem like you were
 7   involved in speaking to the Assistant
 8   Attorney General of the United States about
 9   this, the Acting Assistant Attorney
10   General, and the Attorney General of the
11   United States?
12              MS. WELLS:   I object to form.
13        A.     You are asking me.  I think you
14   have to ask John Gore why he reached out to
15   me.  I can't answer why John Gore reached
16   out to Wendy Teramoto.
17        Q.     Was someone in the Department
18   of Commerce the Secretary's point person on
19   the citizenship question in this period?
20        A.     I wouldn't characterize it like
21   that.  There was Karen Dunn Kelley, where
22   census falls under her group, so she would
23   have been the point for the census issues.
24        Q.     Do you have an understanding as
25   to why these calls don't go to Karen Dunn
```

Page 98

```
 1   it.  You are the chief of staff.  You

 2   certainly know that, right?

 3              MS. WELLS:  I object to the

 4   form.

 5        A.    I remember there being some

 6   discussion.  I don't ever remember reading

 7   any of the correspondence.

 8        Q.    You remember that members of

 9   Congress having received this June 21, 2018

10   memorandum from Secretary Ross, you

11   remember that they accused Secretary Ross

12   of having given them misleading testimony;

13   is that right?

14              MS. WELLS:  I object to the

15   form.

16        A.    Again, I've heard that, but I

17   haven't actually read if there has been

18   correspondence.  I have not read any direct

19   correspondence.

20        Q.    I'm curious, you are the chief

21   of staff.  If members of Congress, and this

22   is multiple members of Congress, accuse the

23   Secretary of not being candid with them in

24   sworn testimony, that's not something you

25   want to read?
```

Page 99

1                    MS. WELLS:   I object to the

2      form.

3          Q.     You don't say to somebody, get

4      me that letter from Congress?

5                    MS. WELLS:   I object to the

6      form.   Go ahead.

7          A.     There are many important

8      letters and correspondence throughout all

9      of the different departments in Commerce.

10     I'm not physically able to read every

11     single one, I'm just not, sir.

12         Q.     I believe that.   But when you

13     hear that members of Congress have written

14     a letter accusing the Secretary of not

15     being candid with them, you don't say to

16     somebody I would like to see a copy of that

17     letter?

18         A.     No.

19         Q.     Have I got that right?   No?

20                   MS. WELLS:   I object to the

21     form.   Asked and answered.

22         A.     That's correct.

23         Q.     It doesn't appear to be showing

24     up on the transcript.   I heard you to say

25     no.   Did I hear that right?

Page 100

1            MS. WELLS:   I object to the

2    form, and it also mischaracterizes the

3    testimony, I believe.

4        Q.     I'm characterizing the

5    transcript, which I'm looking at.

6        A.     I have not specifically asked

7    for this letter that you're talking about.

8        Q.     I take it you haven't asked for

9    it generally either?

10       A.     I don't know what you mean,

11   generally.

12       Q.     You said specifically.  I don't

13   know if you are meaning to exclude

14   something.

15       A.     I'm not a lawyer, so all I'm

16   saying is I have not asked for it.

17       Q.     Okay.  I know you haven't seen

18   this before today, but I want to point you

19   to something just so we can have a

20   framework.

21            Sort of almost halfway down the

22   first paragraph of Teramoto Exhibit 1,

23   Secretary Ross says that with respect to

24   the fundamental issues regarding the

25   census, he says "Part of these

Page 101

1    considerations included whether to

2    reinstate a citizenship question which

3    other senior Administration officials had

4    previously raised."

5                Do you know who the other

6    senior Administration officials are?

7        A.    I have no idea.

8        Q.    Who would know?

9        A.    You would have to ask Secretary

10   Ross.

11       Q.    I will represent to you that

12   the Commerce Department, through its

13   lawyers at the Department of Justice, said

14   they can't figure out the answer to this

15   question.

16                Do you have reason to believe

17   that the identity of the senior

18   Administration officials is some kind of

19   state secret?

20                MS. WELLS:  I object to the

21   form of the question.

22       A.    Are you being serious?

23       Q.    Yeah.  I'm, frankly, shocked

24   that the Commerce Department and the United

25   States Justice Department can't figure out

Page 102

1  who these senior Administration officials

2  are.

3            So I'm asking you, is this some

4  kind of state secret?

5            MS. WELLS:  I object to the

6  form of the question and also --

7       Q.      Is it any kind of secret?  You

8  can withdraw "state."

9            MS. WELLS:  -- the

10  characterization of what the government has

11  said in connection with the request for the

12  information that you have presented in your

13  interrogatory.

14            But you can answer the

15  question, if you remember it.

16            THE WITNESS:  I don't.  Can you

17  please read it back?

18       Q.      I will rephrase it.

19       A.      Okay.

20       Q.      Can you think of any reason why

21  the identity of the senior Administration

22  officials who had raised the citizenship

23  question to whom Mr. Ross refers, can you

24  think of any reason why this is secret or

25  why we can't know the answer to who those

Page 103

1    people are?

2              MS. WELLS:   I object to form.

3         A.       I have no idea.

4         Q.       I take it you have not heard

5    any discussion of that issue?

6         A.       Of the issue of the senior

7    Administration officials?

8         Q.       Yeah.

9         A.       Right, I have not.

10        Q.       You have not been -- you have

11   not been asked to find out the answer to

12   that question?

13        A.       I have not been a part of it at

14   all.  You are the first person who has

15   raised it with me.

16        Q.       Still on Teramoto Exhibit No.

17   1, when Secretary Ross says that soon after

18   his appointment as Secretary of Commerce,

19   he starts to have considerations into

20   whether to reinstate a citizenship

21   question, have you seen any documents about

22   that of any kind, e-mails, scraps of paper,

23   memoranda?

24        A.       Where are you, sir?

25        Q.       So second sentence is "Soon

Page 104

1   after my appointment as Secretary of

2   Commerce, I began considering various

3   fundamental issues regarding the upcoming

4   2020 census, including funding and

5   content."

6           Then he says, the next sentence

7   says "Part of these considerations included

8   whether to reinstate a citizenship question

9   which other senior Administration officials

10  had previously raised."

11          My question to you is, have you

12  seen -- so he is talking about a period

13  starting soon after his appointment as

14  Secretary of Commerce.

15          So I'm asking, have you seen

16  any documents, any memoranda, any e-mail,

17  scraps of paper, what have you, about the

18  Secretary's consideration of whether to

19  reinstate a citizenship question?  Have you

20  seen any such documents?

21      A.    Outside of what you provided me

22  here?

23      Q.    Correct.

24      A.    No.

25      Q.    Did you ever hear or be told

1  reason that the Department of Justice asked

2  the citizenship question is because

3  Secretary Ross asked the Department of

4  Justice to ask the citizenship question?

5           MS. WELLS:  I object to form.

6      A.    I'm sorry if I don't understand

7  your question, but when you ask it to me,

8  it makes it sound like you are asking me if

9  I understand why the Justice Department did

10 something, and, again, I have no idea how

11 the Justice Department works, so I can't

12 tell you why they do or do not do anything;

13 I'm sorry, I just don't.

14     Q.    Do you understand from any

15 source that Secretary Ross went to the

16 Department of Justice and asked them to ask

17 for a citizenship question on the census?

18     A.    Again, I don't know what direct

19 conversations the Secretary has had with

20 the Justice Department.

21     Q.    You haven't heard about that

22 from any source?

23     A.    Heard about what?

24     Q.    That Secretary Ross went to the

25 Department of Justice and asked the

Page 119

1    Department of Justice to please request the
2    addition of a citizenship question.
3         A.    I have no recollection of the
4    Secretary ever going to the Department of
5    Justice.
6         Q.    Including you have no
7    recollection of the Secretary talking to
8    Assistant Attorney -- I'm sorry, to
9    Attorney General Jeff Sessions about that?
10        A.    No, that's not what I said.
11        Q.    I know.  That's a different
12   question.
13        A.    Okay.  Can you ask your new
14   question, please?
15        Q.    Yes.
16             You understand that Attorney
17   General Jeff Sessions spoke to Secretary
18   Ross about asking a citizenship question on
19   the census?
20             MS. WELLS:  I object to the
21   question, the form of the question.
22        A.    From the e-mails, I can see
23   that the Secretary and the AG spoke.  What
24   they spoke about, I don't know, because, as
25   I said, I have no recollection of ever

Page 120

1    being on a call between the two of them.

2         Q.    Did you learn from any source

3    that the Department of Commerce had made a

4    decision in connection with the decisional

5    memorandum not to let Congress and the

6    public know that it was the Secretary who

7    wanted the Department of Justice to add the

8    citizenship question?

9              Withdrawn.  Let me rephrase

10   that.

11        A.    Okay.

12        Q.    Did you learn from any source

13   that the Department of Commerce had made a

14   decision in connection with the decisional

15   memorandum not to let Congress and the

16   public know that it was the Secretary who

17   went to the Department of Justice, and it

18   was the Secretary, the Secretary of

19   Commerce, that is, who pressed the

20   Department of Justice to ask for a

21   citizenship question?

22        A.    Sir, I'm not trying to be

23   difficult.  Can you shorten your questions,

24   because there is a lot of nots and --

25        Q.    Sure.

Page 121

1              So the question is, did you

2    learn from any source --

3         A.     Okay, so did I learn from any

4    source?

5         Q.     Right, that the Commerce

6    Department --

7         A.     Okay.

8         Q.     -- didn't want Congress or the

9    public to know that the Secretary of

10   Commerce --

11             (Telephonic interruption.)

12        Q.     Let's take it -- for the

13   record, we have had a little interruption.

14   Let's just take it from the top.

15        A.     Okay.

16        Q.     So the first part was, did you

17   learn from any source; you are with me on

18   that, right?

19        A.     Yes.

20        Q.     And the second part was that

21   the Commerce Department didn't want the

22   Congress or the public to know that it was

23   Secretary Ross who went to the Department

24   of Justice and asked the Department of

25   Justice to request the citizenship

Page 122

1   question.

2          A.     I have not heard from any

3   source that the Commerce Department did not

4   want Congress or the public to know.

5          Q.     Have you heard of any

6   discussion even touching that subject?

7          A.     Not that -- not that I can

8   remember.  I mean, again, sir, I'm not

9   involved in the detailed discussions on

10  census.  I'm not involved in the meetings.

11         Q.     I take it Secretary Ross never

12  said to you, in words or in substance, I'm

13  not going to tell Congress that I was the

14  one who went to the Department of Justice

15  and asked for the citizenship question?

16         A.     Secretary Ross has never said

17  that to me.

18         Q.     Do you remember any discussion

19  with Secretary Ross about the citizenship

20  question?

21         A.     I don't remember having any

22  direct conversations with him on it.

23         Q.     Is it your best recollection

24  that you had no such conversations, or are

25  you saying there were, but you don't

Page 123

1  recall?

2      A.    I'm saying I don't remember

3  having any direct conversations with the

4  Secretary on the question.

5      Q.    Do you believe that you had

6  some?

7      A.    Again, I don't remember having

8  any direct conversations with him on the

9  citizenship question.

10      Q.    My question is a little

11  different.  I'm not asking for your memory

12  now.

13          I'm asking for whether you

14  think you had some, for example, I can

15  think of lots of conversations that I have

16  had with my spouse, with my children, on

17  certain subjects, but I can't remember the

18  conversations, I just know I had them.

19          So I'm asking in that context,

20  do you believe you had conversations

21  with --

22      A.    I don't think we did.

23      Q.    Let me just finish the

24  question.

25      A.    I'm sorry.

Page 124

1       Q.      I have your answer.   Let me
2    just finish the question.
3               Do you believe you had?
4       A.      I don't believe I have.
5               Again, again, I'm not the
6    census person, so if there is issues
7    related to census, I'm not the first person
8    or even the second or third, fourth, fifth
9    person that I believe the Secretary would
10   call.
11      Q.      Let me follow up on the last
12   question.
13              Does anyone at the Commerce
14   Department, to your knowledge, have a
15   longer relationship with the Secretary?
16      A.      Not that I'm aware of.
17      Q.      Do you believe you have a
18   relationship of trust with the Secretary?
19      A.      I would hope so.
20      Q.      Do you believe anyone else has
21   a better relationship of trust with the
22   Secretary at Commerce, anyone at Commerce?
23      A.      I mean, you would have to ask
24   the Secretary who he trusts the most.
25      Q.      You're not aware of anyone

Page 125

1    else?

2         A.     I can't speak for who the

3    Secretary trusts or doesn't trust.

4         Q.     Besides yourself, is there

5    anyone else the Secretary uses as a close

6    advisor on issues of importance?

7                MS. WELLS:  I object to the

8    form.

9         Q.     I will withdraw the question.

10               Is there anyone the Secretary

11   uses as a close advisor on questions of

12   importance and sensitivity?

13               MS. WELLS:  I object to the

14   form.

15        A.     Sure, yes.

16        Q.     Who are those people?

17        A.     Karen Dunn Kelley, Earl

18   Comstock.

19        Q.     Anyone else?

20        A.     I mean, I would say those are

21   the immediate ones.  There is other people.

22   I mean, if it is something related to

23   patents, he would speak to Andre Iancu.

24   There is the Under Secretary Gil Kaplan,

25   Matt Borman.

1      Q.      How about people outside of

2   Commerce, is there anyone outside of

3   Commerce that the Secretary likes to talk

4   to about important issues?

5                MS. WELLS:  I object to the

6   form.

7      Q.      For advice.

8      A.      On anything?

9      Q.      On matters relating to

10  Commerce.

11     A.      Well, sure.  I mean, a lot of

12  the -- I would say a wide majority of the

13  Secretary's time is spent on the trade

14  issues as well as the tariffs and the 232s

15  on steel and aluminum.

16     Q.      How about on census, are there

17  people outside of the Commerce Department

18  that the Secretary turns to for advice on

19  either the citizenship question or on the

20  census generally?

21     A.      If he goes outside of Commerce,

22  you know, other than, you know, he has

23  spoken to Marc Neumann, but anybody else, I

24  wouldn't know, unless there are other

25  people at the transition that talked to him

Page 127

1   about it, but I wasn't part of the

2   transition team, so I wouldn't know.

3       Q.    If someone -- why Marc Neumann?

4   Let me come back to him.

5       A.    Sure.  I think as I stated

6   before, Marc Neumann was part of the

7   transition team who used to work at -- I

8   think he worked at Census, so he was the

9   one who would brief the Secretary just on

10  census during the transition.

11      Q.    In that summer of 2017 and

12  going to September when we saw those

13  e-mails between you and Assistant Attorney

14  General Gore and the other e-mails on those

15  chains, if someone had come to you then and

16  said Ms. Teramoto, I need -- I have got an

17  important issue that I want to talk to you

18  about regarding adding a citizenship

19  question, who would you have put them in

20  touch with?

21              MS. WELLS:  I object to the

22  form.

23      A.    Well, I mean, I think I did put

24  them in touch with Izzy Hernandez.

25      Q.    And what was his position?

1    A.      He was the deputy chief of
2    staff.
3    Q.      Did he have any special, you
4    know, was the census question, citizenship
5    question on the census, was that something
6    that he had particular responsibility for?
7    A.      I mean, I don't know.  He
8    worked on the census.
9    Q.      You said he was deputy chief of
10   staff.  I take it that meant he reported to
11   you?
12   A.      Sure.
13   Q.      So when he worked on the
14   census, was that because you assigned it to
15   him?
16   A.      I don't remember how that came
17   about.  I don't know if he said he wanted
18   to work on it or if I said we need somebody
19   to work on it.  I'm not sure which one.
20   Q.      Did you hire Mr. Hernandez or
21   play a role in his hiring?
22   A.      Yeah.  I had met -- I had met
23   Izzy during the transition and he had
24   helped the Secretary through his
25   confirmation process.

1       Q.      Do you understand any further
2    details about, for example, why some people
3    don't think the citizenship question should
4    be on the census?

5       A.      I mean, the controversy, as I
6    understand it, is, you know, does the
7    question change or increase the ability to
8    have an accurate count.

9       Q.      And prior to the lawsuits, had
10   you -- had anyone expressed this concern --
11   are you aware that anyone ever expressed
12   this concern regarding the count and the
13   citizenship question?

14      A.      Well, I don't know when the
15   lawsuits were filed.

16      Q.      Prior to March 26th when the
17   decision was made to add the citizenship
18   question, were you aware that there were
19   concerns about the count if the citizenship
20   question was added?

21      A.      I can't -- I don't remember
22   anything specific.

23      Q.      Other than attorneys at the
24   Department of Justice and Department of
25   Commerce, have you talked to anyone else

Page 152

1  that the addition of the citizenship

2  question might make it more difficult to

3  hire enough -- let me rephrase that.

4          Were there any concerns that

5  adding a citizenship question would require

6  that the Census Bureau hire more people?

7          A.      No, I have never heard that.

8          Q.      If Secretary Ross were to be

9  deposed in this case and he asked you for

10  help with prepping him, what would you do

11  to assist him in prepping?

12          A.      I wouldn't.  That's for the

13  lawyers.

14          Q.      What if he asked you about the

15  call you had with Mr. John Gore in the

16  summer of 2017?

17               MS. WELLS:  I object to the

18  form.

19          A.      I would tell him the same thing

20  that I've told your colleagues, I don't

21  remember talking to John Gore.

22          Q.      You wouldn't offer to search

23  through your e-mail to see if you can write

24  down sort of a timeline of how you were

25  involved?

```
 1    attend the transition meeting?
 2         A.      No.
 3         Q.      You just showed up?
 4         A.      I was with him -- I was with
 5    him at his hearing, and then after his
 6    hearing he went to have a meeting with the
 7    transition team, and I just went with him.
 8         Q.      Who was at the transition
 9    meeting?
10         A.      I won't remember everybody.
11    There was Marc Neumann, there was Lilly
12    Gaynor, Earl Comstock, I believe Eric
13    Branstad was there.
14                 Let me see.  There were other
15    people there, but I don't know -- I didn't
16    know who they were.  And you should be
17    reminded this is well over a year and a
18    half ago.
19         Q.      Did you discuss the census at
20    that meeting?
21         A.      I don't believe so.
22         Q.      Do you remember what topics you
23    discussed?
24         A.      No.
25         Q.      Did you discuss reapportionment
```

1    during that meeting?

2         A.    No.  I don't think I have ever

3    been in a discussion about reapportionment.

4         Q.    Immigration enforcement?

5         A.    No.

6         Q.    How about not counting

7    non-citizens?

8         A.    No.  Again, this was a

9    transition meeting about him and coming in

10   on his, you know, initial days.  None of

11   that I remember being discussed.

12        Q.    Have you spoken with Stephen

13   Bannon before?

14        A.    I believe I testified that I

15   have.

16        Q.    How many times?

17        A.    I'm guessing, maybe three,

18   tops.

19        Q.    When?

20        A.    I mean, I don't know.  I mean,

21   I'm sure at some point I saw him in the

22   White House and I said hello.  I don't know

23   if he said hi back to me, so I don't know

24   if that is actually a conversation or not.

25              And then he rode on the same

1  plane back from Saudi Arabia as we did, but

2  I didn't really talk to him because you

3  can't hear anybody on those planes.

4      Q.    You said it was three, tops.

5  Do you remember the third time?

6      A.    No.  I mean, I'm guessing.

7      Q.    So have you ever had a

8  substantive conversation with him about

9  anything?

10     A.    No.  I don't think he knows who

11 I am or what my name is.

12     Q.    Does Secretary Ross speak to

13 Stephen Bannon, maybe not anymore, but in

14 2017?

15           MS. WELLS:  I object to the

16 form.

17     A.    I don't know.

18     Q.    Are you aware that they ever

19 spoke?

20     A.    I'm sure there were

21 pleasantries.  If there was more discussion

22 beyond that, I don't know.

23     Q.    Is there anyone at the

24 Department of Commerce that you are aware

25 that has had conversations with Stephen

Page 161

1    Bannon?

2         A.     I have no way -- I have no way

3    of knowing.

4         Q.     So you mentioned that you are

5    at the White House sometimes almost every

6    day?

7         A.     Sometimes.  I mean, and

8    sometimes there is weeks that I'm not

9    there.

10        Q.     When you go to the White House,

11   do you go there -- what is it that you go

12   to do?

13        A.     Well, there will be trade

14   meetings that I go there for.  There will

15   be meetings on Ivanka's Workforce Council.

16   There will be meetings in the situation

17   room on various topics.  I will go there

18   and have lunch.

19        Q.     Have you ever had any meeting

20   at the White House regarding the census

21   generally?

22        A.     No.

23        Q.     How often does Secretary Ross

24   go to the White House?

25        A.     All the time.

Page 162

```
1        Q.      Are you aware of him having
2    meetings there regarding the census?
3        A.      No.
4        Q.      Not --
5        A.      Not to my knowledge.
6        Q.      What topics are you aware that
7    he discusses when he goes to the White
8    House?
9        A.      Well, you mean topics or
10   meetings?
11       Q.      Well, what is discussed during
12   these meetings as far as you're aware?
13       A.      I'm not always there, so I
14   don't know.
15       Q.      When you are there.
16       A.      He will go there for trade
17   meetings, and I'm a part of some of those.
18   I have never heard census mentioned once in
19   a single trade meeting the entire time I've
20   been there.
21               And he will go for other
22   meetings that I'm not a part of.  So I
23   don't know what's discussed at the meetings
24   that I'm not a part of.
25       Q.      Do you know if he has ever had
```

Page 168

1          A.        I think I might have said hi to

2    him at the chief of staff meeting, but now

3    that I think about it, I was late, so I

4    don't even think I even shook his hand.

5          Q.        How about Secretary Ross and

6    Attorney General Jeff Sessions, are you

7    aware of conversations between them?

8          A.        I'm aware that they've had

9    conversations.   I'm not aware of the

10   content of those conversations.

11         Q.        Do you know if they have ever

12   spoken about the census generally?

13         A.        I have no idea.

14         Q.        Do you know if they have ever

15   spoken about immigration enforcement?

16         A.        I have no idea.

17         Q.        Voter fraud?

18         A.        Zero idea.

19         Q.        An undercount?

20         A.        No idea.

21         Q.        Congressional apportionment?

22         A.        No idea.

23         Q.        Redistricting?

24         A.        No idea.

25         Q.        So earlier you mentioned you

Page 189

1    months?

2         A.      It would depend on the week.  I

3    mean, if I just guessed, maybe 60/40,

4    depending, 70/30.

5         Q.      60 and 70 with Invesco or with

6    Commerce?

7         A.      It just depends.  I mean, it

8    just depends.  Most of it was with

9    Commerce.

10        Q.      Forgive me if I'm paraphrasing

11   wrong, and correct me if I am, but I think

12   one of the things you said this morning is

13   that you were copied on a lot of e-mails in

14   order to gain situational awareness; is

15   that fair?

16        A.      Something like that, just

17   aware.

18        Q.      What do you mean by situational

19   awareness?

20        A.      Here is something, just I'm

21   e-mailing it to the Secretary and you are

22   copied on it.

23        Q.      Does it mean you are aware of

24   the people who are working on a particular

25   issue?

Page 190

```
 1          A.      It depends if I read it or not.
 2          Q.      Are you copied on these to gain
 3    awareness with the expectation that you
 4    will read them?
 5          A.      I don't know.  I mean, you
 6    know, it is a very good question, because
 7    sometimes people copy me on e-mails that
 8    are totally irrelevant to me and have
 9    nothing to do with anything that I deem of
10    utmost urgency, and sometimes they forget
11    to copy me on things that I would have
12    thought I would have been copied on.
13               So I wish I could answer that.
14    I don't know, when people copy me, what
15    makes them decide whether a particular
16    e-mail is something that I should be on or
17    not.
18          Q.      Would you say that you were
19    situationally aware of who was working on
20    the decision to add a citizenship question
21    to the 2020 census?
22               MS. WELLS:  I object to form.
23          A.      No.  I would say that I was
24    aware of who was working on census.
25          Q.      Did you make any distinction
```

Page 191

1    between working on census and working on

2    the citizenship question?

3         A.      No.

4         Q.      And who was working on census?

5         A.      Karen Dunn Kelley and Earl

6    Comstock were the main people within the

7    immediate.

8              Now, Census has, you know,

9    Census has a huge amount of employees, and

10   I have even been told when they come in, I

11   don't sit in on these meetings, but when

12   they come in to brief the Secretary, they

13   literally have a van of people who are

14   driven to Commerce, and, you know, I don't

15   know those people.

16        Q.      Have you ever met any of the

17   people at Census?

18        A.      So I have met Ron and Enrique,

19   but I always get them confused.  Those are

20   the two that I remember.

21        Q.      Forgive me again also if I'm

22   paraphrasing, but I think this is something

23   you said this morning, that you're not

24   generally involved in census because of the

25   scientific and technical nature of census;

1    is that a fair summary of your testimony?

2          A.      Yeah.   I mean, the census, I

3    mean, the analysis and the people who work

4    there, I mean, this stuff is very

5    technical, and I don't have the background

6    for that.

7          Q.      Who does have the scientific

8    and technical background with regard to

9    census issues?

10         A.      Well, I clearly don't.

11         Q.      Do you know who does?

12         A.      I think the people at Census

13   do.

14         Q.      Does Earl Comstock?

15         A.      I think he has a very good

16   command of a lot of the technical issues.

17         Q.      Does he have a scientific

18   background?

19         A.      I don't know what he studied,

20   but I think -- I mean, I think he actually

21   does.

22         Q.      Does Karen Dunn Kelley have a

23   command of the scientific and technical

24   issues regarding census?

25         A.      Much better than I would.

Page 194

1   adding a citizenship question to the 2020

2   census?

3        A.     The decision-maker?

4        Q.     Who was ultimately responsible

5   for the decision?

6        A.     I believe it would be the

7   Secretary, but I'm not a lawyer, so if

8   there is some other --

9        Q.     I'm not asking -- I'm asking

10  for your understanding --

11       A.     Okay.

12       Q.     -- sitting here as to what you

13  understand.  I obviously know you're not a

14  lawyer, and I'm not asking you a legal

15  question.  If I am, she is free to stop me.

16             Who is John Thompson?

17       A.     He used to work at Census.  I

18  don't -- I don't know what his title was,

19  but I know he is no longer there.

20       Q.     Did you ever meet John

21  Thompson?

22       A.     I may have, but I don't

23  remember.

24       Q.     I'm going to show you what is

25  being marked as Exhibit 13.

Page 195

1               (Teramoto Exhibit 13 marked for

2      identification.)

3          Q.      This is Bates number 3694.

4      This is an April 20th, 2017 e-mail.   It is

5      quite short.

6          A.      Okay.   So this is basically a

7      year and a half ago?

8          Q.      Yeah.

9          A.      Would you like me to read it,

10     sir?

11         Q.      I have a question about the

12     subject line first, and I will ask it, and

13     then you can talk about the subject line

14     and then talk about the thing.

15         A.      Okay.

16         Q.      This appears to me to be from

17     Brooke Alexander, trying to send an e-mail

18     from Secretary Ross' e-mail and doing it

19     herself; is that what you understand from

20     that subject line?

21         A.      Let me read it, sir.

22                 (Witness perusing document.)

23         A.      Okay.

24         Q.      Can Brooke Alexander send

25     e-mails from the Secretary's e-mail

1    ordinarily?

2         A.      Well, Brooke Alexander is no

3    longer there.

4         Q.      Could she when she was?

5         A.      Well, it says right here she

6    couldn't, so I don't know.

7         Q.      Are you aware of anyone having

8    the ability to send e-mails from the

9    Secretary's e-mail account?

10        A.      The best person to ask is our

11   IT person.   I suppose somebody could send

12   an e-mail from his phone.

13        Q.      Simply by holding his phone and

14   logging in as him?

15        A.      Yeah.   I mean, you could send

16   an e-mail from his phone.

17        Q.      Is it your understanding that

18   people ever did send e-mails under the

19   Secretary's e-mail account?

20        A.      I don't know.   I mean, I would

21   be -- I would be surprised if somebody

22   would send something from his e-mail

23   account.

24        Q.      And remind us of Brooke

25   Alexander's title at this point, as best

1    you recall, or her position in general.

2         A.    I mean, in the private world, I

3    would say she was a secretary.  In the

4    government world, I don't even actually

5    know.  They call them -- they are not --

6    it's not an executive assistant, but it is

7    not an assistant.  So I don't know what her

8    title was.

9         Q.    And on the body of the e-mail,

10   this says "we," underlined, "must get our

11   issue resolved before this."

12               What is "our issue"?

13        A.    I have no idea.

14        Q.    You understood Earl Comstock to

15   work on the potential addition of a

16   citizenship question to the 2020 census?

17              MS. WELLS:  I object to form.

18        A.    I would say Earl worked on

19   census.

20        Q.    What other issues did Earl work

21   on on census besides the addition of a

22   citizenship question?

23              MS. WELLS:  I object to form.

24        A.    Again, like I said, Earl and

25   Karen have worked on the census.  All the

Page 201

1              Just to confirm the first one,
2    is it fair to say this is a submission of
3    draft testimony of John Thompson from
4    Census to Commerce for review?
5         A.    I don't know who Beth is, so I
6    don't know if she is with Census or not.
7         Q.    Okay.  Is it fair to say this
8    is a draft of testimony of John Thompson
9    being submitted to Commerce for review?
10        A.    Yes.
11        Q.    Now let's look at the e-mail
12   three days later from Comstock to the
13   Secretary, copying you and Mr. Branstad.
14             (Witness perusing document.)
15        A.    Okay.
16        Q.    Is it standard practice for
17   Commerce to review and approve
18   Congressional statements by chiefs of the
19   bureaus?
20        A.    Yes.
21        Q.    And do you do that review?
22        A.    No.
23        Q.    Who does that review?
24        A.    Normally Earl reviews it.  I
25   can't imagine general counsel not.  The

Page 202

1   lawyers, they like to review everything.
2   And then I believe that also the Leg
3   Affairs Office reviews those types of
4   things as well.
5       Q.     And what is the purpose of that
6   review?
7       A.     To, I mean, my understanding is
8   to have -- one is to be aware of what the
9   bureau chiefs, or whomever is testifying,
10  what they are testifying, and, two, to make
11  sure that it is consistent with the
12  Secretary's views.
13      Q.     And these are revisions to
14  public statements; is that correct?
15      A.     Revisions?
16      Q.     Or additions or changes or
17  review, this is a review of a public
18  statement.
19             MS. WELLS:  I object to the
20  form.
21      Q.     A Congressional testimony.
22      A.     So this would be I believe a
23  review of something that eventually would
24  be public.
25      Q.     And is the advice given on

Page 204

1   Thompson, the director of the Census

2   Bureau, to give the House Appropriations

3   Subcommittee this Wednesday.  I have

4   reviewed the testimony, and there are a

5   couple of points that I wanted to bring to

6   your attention and be sure you approved

7   of."

8           So, I mean, I'm not a

9   dictionary, but when I read these words, he

10  is basically bringing attention of certain

11  things that are in this testimony that he

12  thinks that the Secretary should be aware

13  of.

14      Q.    When you said that Comstock

15  would do these reviews, were you referring

16  specifically to the Census Bureau, or does

17  he do that review for chiefs of any bureau?

18      A.    I don't know about any, but I

19  know he generally likes to review them

20  himself.

21      Q.    And just to refer, again, who

22  is Eric Branstad?

23      A.    So Eric Branstad, and this is

24  when I testified earlier, I don't remember

25  if he was -- his title was either White

Page 205

1   House liaison or senior White House
2   advisor, but he was a Commerce employee who
3   was supposed to be interacting with the
4   White House more than some of the others.
5             (Teramoto Exhibit 15 marked for
6   identification.)
7        Q.    This is Exhibit 15.  This does
8   not have a Bates number.
9        A.    Would you like me to read it?
10        Q.    I will show you which part of
11   it I would like you to read, and I'm going
12   to tell you that I got this from the
13   internet while searching for the public
14   testimony delivered on May 3rd, so I
15   believe this is the public testimony as at
16   least submitted.  It is not a recording,
17   obviously, of it.
18        A.    And this was pulled from the
19   Commerce website or something else?
20        Q.    Or the Census website, I can't
21   recall at this moment, or the Congress --
22        A.    But it wasn't just posted --
23        Q.    No, this is an official -- this
24   is a document from some government website.
25   I don't know if it was from the committee

```
 1        A.      Sure.

 2        Q.      Okay.

 3                (Witness perusing document.)

 4        Q.      Actually, yeah, in the second

 5   paragraph, just down to "local update."

 6   You don't need to read anything from there.

 7        A.      So you do or do not want me to

 8   read that paragraph?

 9        Q.      The second paragraph, the

10   paragraph that you are on now, you can

11   read, and I would like you to stop at

12   "local update."

13        A.      Okay.

14                (Witness perusing document.)

15        A.      Okay.  So I just read --

16        Q.      The topics in question --

17        A.      -- the two paragraphs out of

18   your ten pages.

19        Q.      That's correct.

20                Were you present for any

21   conversations regarding a March 2017

22   deadline for submitting topics to the

23   census?

24        A.      Not that I remember.

25        Q.      Were you present for any
```

1  conversations regarding a March 2018
2  deadline for submitting questions on the
3  census to Congress?
4        A.      Not that I remember.
5        Q.      Did Earl Comstock, to your
6  knowledge, discuss with John Thompson the
7  deadline for submitting topics to Congress
8  on the census?
9        A.      I have no idea.
10       Q.      Did Earl Comstock, to your
11 knowledge, discuss with John Thompson the
12 deadline for submitting questions on the
13 census to Congress?
14       A.      I have no idea.
15       Q.      Who would know?
16       A.      Earl Comstock.
17       Q.      And did Secretary Ross have any
18 conversations with John Thompson regarding
19 the March 2017 deadline for submitting
20 census topics to Congress?
21       A.      I have no idea.
22       Q.      Who would know?
23       A.      Wilbur Ross.
24       Q.      Did Secretary Ross have any
25 discussions with John Thompson about the

1   2018 deadline for submitting questions to

2   Congress for the 2020 census?

3        A.     I have no idea.

4        Q.     And who would know?

5        A.     Wilbur Ross.

6        Q.     And I want you to look at what

7   I believe was marked as Exhibit 2 today,

8   which is document number 3699.  Is it not?

9   Is it Exhibit 3?  It is the May 2nd e-mail.

10       A.     Mine are all messed up.

11       Q.     It is Exhibit 2.  I have

12   another copy of it if you want to look at

13   it.  It is not stamped.

14       A.     I have it.  I will find it.

15       Q.     It is this one, if you want to

16   go visually.  I think that's it, the next

17   one there.

18       A.     Okay.

19       Q.     Great.

20              Looking at the May 2nd e-mail

21   from Ross to Comstock, copying Ellen

22   Herbst, I understand you're not on that

23   original e-mail, the sentence "Worst of

24   all, they emphasize that they have settled

25   with Congress on the questions to be

1   asked."

2              Do you know who Secretary Ross

3   means when he says "they"?

4        A.    I have no idea.

5        Q.    And who would know?

6        A.    Wilbur Ross.

7        Q.    And in the e-mail that you

8   write above, in this e-mail, are you

9   providing any information to Wilbur Ross to

10  assist him in arriving at his decision to

11  add the citizenship question to the 2020

12  census looking at just what you wrote?

13             MS. WELLS:  I object to the

14  form.

15       A.    What I wrote is "I continue to

16  talk frequently with Marc Neumann and we

17  often have dinner together.  He will not

18  leave les, but is in love with the census

19  and talks about it nonstop.  Do you want me

20  to set up another meeting?  Let me know if

21  you want to have a drink or get together

22  with him over the weekend.  Wendy."

23             I don't see anything in there

24  about the citizenship question.

25       Q.    In fact, you have testified

Page 211

1    that on no occasion did you provide Ross

2    information that you drafted that was

3    helping him with his decision?

4         A.    I think I testified that I

5    never created any documents related to

6    that.

7         Q.    Just for reference, what is

8    "les" there, is that a person, is that a

9    company?

10        A.    Les is a person.

11        Q.    Who is it?

12        A.    It is who Marc Neumann works

13   for.

14        Q.    And just for the record, who is

15   that?

16        A.    I don't know the guy's last

17   name.

18              (Teramoto Exhibit 16 marked for

19   identification.)

20        Q.    I'm showing you a document

21   marked as Teramoto Exhibit 16, No. 2167.

22   It is an e-mail from you to James Rockas

23   and Earl Comstock.

24              To the extent you can review

25   it, I would like you to review it.

Page 216

1    exclamation points after "does Karen know

2    about this"?

3         A.      Sure.

4         Q.      How often do you use

5    exclamation points in e-mail?

6         A.      All the time.

7         Q.      Does this show that this is a

8    particularly important communication?

9         A.      Or I was just being dramatic.

10        Q.      And in your e-mail to

11   Mr. Rockas, are you providing information

12   for the Secretary to make a decision on the

13   citizenship question?

14        A.      In my e-mail to James?

15        Q.      Yeah.

16        A.      "Does Karen know about

17   this!!!!!!  She just had discussion with

18   him."

19               I don't see anything on this

20   about citizenship.

21               (Teramoto Exhibit 17 marked for

22   identification.)

23        Q.      Let's mark this next one.  This

24   is going to be Teramoto Exhibit 17.

25               What does this look like?

1    A.    It looks like an e-mail chain.

2    Q.    Okay.  From whom to whom?

3    A.    It looks like from James to

4 people.  I don't know who James sent it to.

5         And then I'm on it, from myself

6 to James, Karen Dunn Kelley, Mike Walsh and

7 Earl Comstock, and then there is an e-mail

8 back from James to me.

9    Q.    And you're asking if he sent

10 these quotes before.  "Did you already send

11 this to a reporter?"

12    A.    I said to him, "Did you already

13 send this to reporter?"

14    Q.    Do you typically approve

15 communications from the Public Information

16 Office to reporters?

17    A.    Well, "approve" is a different

18 word.  I, on occasion, may have comments.

19    Q.    Do you typically review draft

20 statements to reporters from the Public

21 Information Office?

22    A.    It depends.  I haven't reviewed

23 this.

24    Q.    We will in just a second.  I

25 want to ask you questions about process, if

Page 218

1    you don't mind.

2         A.      Sure.

3         Q.      Is it typical for the Public

4    Information Office to send you drafts of

5    what they are planning to send to

6    reporters?

7         A.      They will generally copy me on

8    it, depending on what it is, not always,

9    and they will send it to a group for

10   comment.

11        Q.      And does it matter whether the

12   issue is more or less important as to

13   whether you will be copied before or after

14   it is sent to the reporter?

15              MS. WELLS:   I object to the

16   form.

17        A.      I have no idea how they decide

18   when they start to include me in these

19   things.

20        Q.      And how often do you have

21   comments back to the Public Information

22   Office when you get comments from --

23        A.      Rarely, because it's not my

24   expertise.

25        Q.      So when you do respond to the

Page 219

1    Public Information Office on a draft to a
2    reporter, it's not particularly common; is
3    that correct?
4        A.      No, I didn't say that.  It just
5    depends.
6        Q.      What does it depend on?
7        A.      It depends, A, if I read it, B,
8    where it is in the system, C, if anything
9    pops out at me.
10       Q.      I guess I would like you to
11   review this, but I want you to review this
12   with the question in mind as to whether you
13   see anything in here that is relevant to
14   the decision to add a citizenship question
15   to the 2020 census.
16           So just review it with that in
17   mind and tell me if you find anything.
18       A.      So you want me to read this?
19   Because I don't remember having read this
20   before.
21       Q.      Okay.  Then let's ask this
22   question:
23           Why would you ask him if he had
24   already sent it to the reporter without
25   reading it?

Page 220

1          A.       I'm wondering if he already

2   sent it without getting comments from

3   people.

4          Q.       Do you believe you did read

5   this at any point?

6          A.       No.  I mean, I might have

7   skimmed it, but I've got to tell you, an

8   e-mail this long, I wouldn't read.

9          Q.       What would you skim it for?

10          A.       Anything that pops out.  But I

11   don't remember reading this.  If you would

12   like me to, I'm happy to read it now.

13          Q.       If you are representing that

14   you didn't read it at the time, I'm --

15          A.       I'm saying I don't remember

16   reading it.  I don't believe I have read

17   it, but I'm happy to read it now if you

18   would like me to.

19          Q.       Just for the ease of our court

20   reporter, we both have done this a little

21   bit, but let's let each other finish before

22   we start --

23          A.       Oh, I'm sorry.

24          Q.       I have interrupted you a few

25   times.  That's all right.  I just want to

Page 226

1      A.      Not that I remember.

2      Q.      About the budget for the

3  census?

4      A.      I'm sorry, is this about public

5  statements?

6      Q.      Have you made edits to public

7  statements about census budgeting?

8      A.      No, I don't believe so.

9      Q.      Have you reviewed public

10  statements about hiring enumerators for the

11  census?

12      A.      I don't remember reviewing any

13  public statements regarding hiring

14  enumerators.

15              (Teramoto Exhibit 20 marked for

16  identification.)

17      Q.      We are on No. 20.  This is an

18  e-mail stamped 2525.  It is blissfully

19  short, so I think you can review it in full

20  before I ask you questions about it.

21              Let me know when you're ready.

22              (Witness perusing document.)

23      A.      Okay.

24      Q.      The subject is Census, and the

25  e-mail is "Please arrange a quick update

1    for me tomorrow a.m."

2                What steps would you take to

3    arrange for a quick update for the

4    Secretary on census issues?

5         A.        So, first, I don't remember

6    specifically what I did here.

7                My best guess, if that's okay

8    with you, sir --

9         Q.        Sure.

10        A.        -- is I would have forwarded

11   that e-mail to Karen and Earl and said

12   "here."

13        Q.        Would you have contacted anyone

14   else?

15        A.        Maybe I would have CC'd the

16   scheduler and his assistant just so they

17   have this situational awareness that he is

18   asking for it, but no.

19        Q.        Would you contact anyone at

20   Census?

21        A.        No.

22        Q.        Would you contact anyone at

23   DOJ?

24        A.        No.

25        Q.        Would you contact anyone at the

1    brief him?

2          A.      Sure.

3          Q.      What are the issues that that

4    would be true of?

5          A.      I would say when we were

6    talking about the China discussions, he had

7    asked me for an update.

8          Q.      And that's something that you

9    would work directly on, the China

10   discussions?

11         A.      I would say I was more

12   knowledgeable.

13         Q.      Okay.  And do you recall what

14   Karen or Earl said when you reached out to

15   them, if you did?

16         A.      I think the first thing I said

17   in my -- when I testified was I don't

18   remember what I did.  So I don't know if I

19   actually reached out to Karen and Earl.

20         Q.      Okay.

21                 (Teramoto Exhibit 21 marked for

22   identification.)

23         Q.      This is Exhibit 21.  It is

24   Bates stamped 3597.

25                 Let's identify the people on

Page 230

1    it, to the extent we haven't identified

2    them before, and then we can read the

3    e-mail.

4              Starting with the sender on

5    March 20th, do you know who Michael Phelps

6    is?

7        A.    Yes.   He is in the Budget

8    Office.

9        Q.    Of which department?

10       A.    Oh, of Commerce.

11       Q.    Mike Platt?

12       A.    Mike Platt is the head of our

13   Leg Affairs.

14       Q.    And Ross Branson?

15       A.    And Ross works with Mike Platt.

16       Q.    The only other name we don't

17   know is Lisa Casias.

18       A.    So Lisa Casias is -- I think

19   she is the acting CFO right now.

20       Q.    And the date of this e-mail is

21   March 20th, 2018?

22       A.    Correct.

23       Q.    And the people mentioned are

24   Bob Bonner and Mr. Serrano, and tell me if

25   you can identify them, and then we will

1      Q.      Do you recall this e-mail at

2    all?

3      A.      No.

4      Q.      Did you take any action when

5    you got this e-mail?

6      A.      Not that I can remember.

7      Q.      Who did prepare the Secretary

8    for his Congressional testimony?

9      A.      So I guess depending on the

10   topic, but normally it is prepared by the

11   Leg Affairs Group, general counsel.

12           So that would be Mike Platt and

13   Ross, and just depending on what he is --

14   what the hearing is on sort of depends

15   which group is most involved in his

16   testimony.

17      Q.      And would you be present for

18   that preparation?

19      A.      No.

20      Q.      Would you know it was going on?

21      A.      Loosely.

22      Q.      Would they be -- would they

23   provide him with written talking points in

24   advance of his preparation generally?

25      A.      I believe he has written

Page 247

1    New York Immigration Coalition v. US Dept. of Commerce

2    Wendy Teramoto

3              ACKNOWLEDGMENT OF DEPONENT

4              I, _____, do

5    hereby certify that I have read the foregoing

6    pages and that the same is a correct

7    transcription of the answers given by

8    me to the questions therein propounded,

9    except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____        _____

14   DATE                 SIGNATURE

15

16

17

18

19

20

21

22

23

24

25   2991395