MANATT, PHELPS & PHILLIPS, LLP
JOHN F. LIBBY (Bar No. CA 128207)
E-mail:  jlibby@manatt.com
JOHN W. MCGUINNESS (Bar No. CA 277322)
E-mail:  jmcguinness@manatt.com
EMIL PETROSSIAN (Bar No. CA 264222)
E-mail:  epetrossian@manatt.com
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

*Attorneys for Plaintiffs*
CITY OF SAN JOSE and BLACK ALLIANCE
FOR JUST IMMIGRATION

*[Additional Counsel Listed on Signature Page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California Non-Profit Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; et al.,<br><br>Defendants. | Case No. 3:18-cv-02279<br><br>**STIPULATION TO ADMIT TRIAL TRANSCRIPT IN LIEU OF TESTIMONY FOR DR. JOHN ABOWD; [PROPOSED] ORDER**<br><br>Dept:       3<br>Judge:      The Honorable Richard G. Seeborg<br>Trial Date:  January 7, 2019<br>Complaint Filed: April 17, 2018 |
| STATE OF CALIFORNIA by and through Attorney General Xavier Becerra; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; et al.,<br><br>Defendants. | Case No. 3:18-cv-01865 |

1

## JOINT STIPULATION REGARDING TRIAL TESTIMONY OF
## DR. JOHN ABOWD

To promote efficiency and preserve judicial resources, Plaintiffs, Plaintiff-in-Intervention, (collectively, "Plaintiffs") and Defendants (collectively, "Parties") in the cases of *San Jose et al. v. Ross et al.*, 18-cv-2279, and *California et al. v. Ross et al.*, 18-cv-1865 have reached an agreement regarding the admission of transcripts of Dr. John Abowd's trial testimony in *State of New York, et al. v. United States Department of Commerce, et al.*, case no. 1:18-cv-02921 ("New York matter").  The Parties hereby stipulate as follows:

1.   The trial testimony of Dr. Abowd set forth in pages 876:1 - 1048:19 of the transcript of trial proceedings on November 13, 2018 in the New York matter (Dr. Abowd's testimony during direct examination) attached hereto as **Exhibit A** shall be admitted into evidence during trial in the above-captioned cases.

2.   The following exhibits admitted in the New York matter during Dr. Abowd's direct examination shall be admitted into evidence during trial in the above-captioned cases subject to Defendants' standing objection to the admission of evidence outside of the filed administrative record in this case:[1] PX-2 (PTX-002), PX-4 (PTX-004-A through PTX-004-D), PX-9 (PTX-009), PX-22 (PTX-022), PX-23 (PTX-023), PX-24 (PTX-024), PX-25 (PTX-025), PX-26 (PTX-026), PX-109 (PTX-110), PX-140 (PTX-141), PX-152 (PTX-153), PX-162 (PTX-160), PX-163 (PTX-161), PX-268 (PTX-212), PX-271 (PTX-214), PX-359 (PTX-266), PX-448 (PTX-326), and PX 662 (PTX-465).  In addition, the following exhibit identified as a demonstrative in the New York matter during Dr. Abowd's direct examination shall be identified for the same purpose during trial in the above-captioned cases subject to Defendants' standing objection to the admission of evidence outside of the filed administrative record in this case: PX 513 (PTX 359).

3.   Plaintiffs City of San Jose and Black Alliance for Just Immigration do not seek to admit or rely on those portions of Dr. Abowd's testimony or exhibits which relate to the decision-making process at the U.S. Department of Commerce that led to the addition of the citizenship

[1] The New York trial exhibit number is followed by the trial exhibit number in this matter in parentheses.

2

question to the 2020 Census.  They do, however, seek to admit and rely on those portions of Dr. Abowd's testimony which relate to Plaintiffs' standing and Enumeration Clause claims.

4.   Plaintiffs in both cases reserve their right to introduce new exhibits and to cover additional topics in direct not covered in the New York matter.  Such exhibits and questions in direct may be presented after the initial examination of Dr. Abowd by the Defendants.

**IT IS SO STIPULATED.**

**[SIGNATURES ON THE FOLLOWING PAGE]**

| | |
|---|---|
| 1 | Dated:  January 13, 2019 |

**MANATT, PHELPS & PHILLIPS, LLP**

By: */s/ John F. Libby*
John F. Libby
John W. McGuinness
Emil Petrossian
Andrew Case
Ana G. Guardado
Olufunmilayo O. Showole
Salvador E. Perez
11355 West Olympic Boulevard
Los Angeles, California 90064
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Kristen Clarke
Jon M. Greenbaum
Ezra D. Rosenberg
Dorian L. Spence
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone:  (202) 662-8600
Facsimile:  (202) 783-0857

**PUBLIC COUNSEL**
Mark Rosenbaum
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone:  (213) 385-2977
Facsimile:  (213) 385-9089

**CITY OF SAN JOSE**
Richard Doyle, City Attorney
Nora Frimann, Assistant City Attorney
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113-1905
Telephone Number: (408) 535-1900
Facsimile Number: (408) 998-3131
E-Mail:  cao.main@sanjoseca.gov

*Attorneys for Plaintiffs* CITY OF SAN JOSE and BLACK ALLIANCE FOR JUST IMMIGRATION

1   Dated:  January 13, 2019

XAVIER BECERRA
Attorney General of California

2   MARK R. BECKINGTON
ANTHONY R. HAKL

3   Supervising Deputy Attorneys General
GABRIELLE D. BOUTIN

4   ANNA T. FERRARI
TODD GRABARSKY

5   NOREEN P. SKELLY
R. MATTHEW WISE

6   Deputy Attorneys General

7

8   */s/ Matthew Wise*
R. MATTHEW WISE
Deputy Attorney General

9   *Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*

10

11   Dated:  January 13, 2019

DANNIS WOLIVER KELLEY

12   SUE ANN SALMON EVANS
KEITH A. YEOMANS

13   */s/ Keith A. Yeomans*

14   KEITH A. YEOMANS
*Attorneys for Plaintiff-Intervenor*

15   *Los Angeles Unified School District*

16   Dated:  January 13, 2019

JOSEPH H. HUNT
Assistant Attorney General

17

18   BRETT A. SHUMATE
Deputy Assistant Attorney General

19   CARLOTTA P. WELLS
Assistant Branch Director

20

21   */s/ Carlotta P. Wells*
KATE BAILEY

22   STEPHEN EHRLICH
CAROL FEDERIGHI

23   Trial Attorneys
United States Department of Justice

24   Civil Division, Federal Programs Branch
1100 L Street NW

25   Washington, DC 20530
Phone: (202) 514-9230

26   Email: kate.bailey@usdoj.gov
*Attorneys for Defendants*

27

28

5

1

**FILER'S ATTESTATION**

2

Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

3

concurrence in the filing of this document has been obtained from all signatories above.

4

Dated:  January 13, 2019                                          */s/ Anna T. Ferrari*
                                                                                 ANNA T. FERRARI

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

1

**[PROPOSED] ORDER**

2      Based on the parties' Stipulation to Admit Trial Transcript in Lieu of Testimony for Dr.

3   John Abowd, and good cause appearing, the trial testimony of Dr. Abowd set forth in pages 876:1

4   - 1048:19 of the transcript of trial proceedings on November 13, 2018 in *State of New York, et al.*

5   *v. United States Department of Commerce, et al.*, case no. 1:18-cv-02921 (the "New York

6   matter"), shall be admitted into evidence during trial in the above-captioned cases.

7      The following exhibits admitted in the New York matter during Dr. Abowd's direct

8   examination shall be admitted into evidence during trial in the above-captioned cases (subject to

9   Defendants' standing objection to the admission of evidence outside of the filed administrative

10   record):[1] PX-2 (PTX-002), PX-4 (PTX-004-A through PTX-004-D), PX-9 (PTX-009), PX-22

11   (PTX-022), PX-23 (PTX-023), PX-24 (PTX-024), PX-25 (PTX-025), PX-26 (PTX-026), PX-109

12   (PTX-110), PX-140 (PTX-141), PX-152 (PTX-153), PX-162 (PTX-160), PX-163 (PTX-161),

13   PX-268 (PTX-212), PX-271 (PTX-214), PX-359 (PTX-266), PX-448 (PTX-326), and PX 662

14   (PTX-465).  In addition, the following exhibit identified as a demonstrative in the New York

15   matter during Dr. Abowd's direct examination shall be identified for the same purpose during

16   trial in the above-captioned cases subject to Defendants' standing objection to the admission of

17   evidence outside of the filed administrative record in this case: PX 513 (PTX 359).

18      The Court acknowledges that Plaintiffs City of San Jose and Black Alliance for Just

19   Immigration seek only to admit and rely on those portions of Dr. Abowd's testimony or exhibits

20   which relate to Plaintiffs' standing and Enumeration Clause claims – and not those portions

21   which relate to the decision-making process at the U.S. Department of Commerce that led to the

22   addition of a citizenship question to the 2020 Census questionnaire.

23      **IT IS SO ORDERED.**

24

25   DATED: _____          _____
                                          HON. RICHARD SEEBORG
26                                        United States District Court Judge

27      _____
        [1] The New York trial exhibit number is followed by the trial exhibit number in this matter
28   in parentheses.

# EXHIBIT A

IBD7COM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATES OF NEW YORK, COLORADO,
CONNECTICUT, DELAWARE, ILLINOIS,
IOWA, MARYLAND, MINNESOTA,
NEW JERSEY, NEW MEXICO,
NORTH CAROLINA, OREGON,
RHODE ISLAND, VERMONT,
and WASHINGTON, *et al.*,

                    Plaintiffs,

          v.                              18 Civ. 2921 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,
                                          Trial

                    Defendants.

------------------------------x
NEW YORK IMMIGRATION
COALITION,*et al.*,

                    Consolidated Plaintiffs,

          v.                              18 Civ. 5025 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,


                    Defendants.
------------------------------x
                                          New York, N.Y.
                                          November 13, 2018
                                          9:00 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                          District Judge

IBD7COM1

1                                  APPEARANCES

2

BARBARA D. UNDERWOOD
3        Acting Attorney General of the State of New York
         Attorney for Plaintiff State of New York
4   BY:  MATTHEW COLANGELO
         ELENA S. GOLDSTEIN
5        DANIELLE FIDLER
         SANIA W. KAHN
6        ELIZABETH MORGAN
         AJAY P. SAINI
7        LAURA J. WOOD
         DAVID E. NACHMAN
8        Assistants Attorney General

9

ARNOLD & PORTER KAYE SCHOLER LLP
10       Attorneys for Consolidated Plaintiffs NYIC
    BY:  DAVID P. GERSCH
11       JOHN A. FREEDMAN
         ADA AÑON
12       - and -
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
13  BY:  DALE E. HO
         DAVIN ROSBOROUGH
14       SARAH E. BRANNON

15  GURBIR S. GREWAL
         Attorney General of the State of New Jersey
16       Attorney for Plaintiff State of New Jersey
    BY:  MELISSA MEDOWAY
17       Assistant Attorney General

18

THOMAS J. DONOVAN, JR.
19       Attorney General of the State of Vermont
         Attorney for Plaintiff State of Vermont
20  BY:  JULIO A. THOMPSON
         Assistant Attorney General

21

22  ROBERT W. FERGUSON
         Attorney General of the State of Washington
23       Attorney for Plaintiff State of Washington
    BY:  LAURA K. CLINTON
24       Assistant Attorney General

25

1              (In open court)

2        JOHN MARON ABOWD,

3            called as a witness by the plaintiffs,

4            having been duly sworn, testified as follows:

5                THE COURT:  You may proceed, Mr. Ho.

6    DIRECT EXAMINATION

7    BY MR. HO:

8    Q.  Dr. Abowd, you're the chief scientist at the United States

9    Census Bureau, correct?

10   A.  Yes, sir.

11   Q.  You're also associate director for research and methodology

12   at the United States Census Bureau, correct?

13   A.  That's correct.

14   Q.  And in that role, you lead a directorate of research

15   centers across all statistical programs of the Census Bureau,

16   correct?

17   A.  That's correct.

18   Q.  You're one of the senior executives at the Census Bureau,

19   correct?

20   A.  That's correct.

21   Q.  And you testified on behalf of the Census Bureau at a

22   30(b)(6) deposition, correct?

23   A.  Yes, sir.

24   Q.  You assumed your current role at the Census Bureau on June

25   1, 2016, correct?

1    A.   Yes.

2    Q.   You had previously been a part-time employee at the Census

3    Bureau dating back to 1998, correct?

4    A.   Yes.

5             MR. HO:   I'd like to bring up Plaintiffs' Exhibit 26.

6             For the record, your Honor, this has been admitted in

7    evidence, and it is part of the administrative record.

8    Q.   Dr. Abowd you recognize this as Secretary Ross's decision

9    memo, dated March 26, 2018, directing the inclusion of a

10   citizenship question on the 2020 census questionnaire, correct?

11   A.   Yes.

12            MR. HO:   I'd like to highlight on the first page the

13   second paragraph.

14   Q.   Dr. Abowd, when this memo was issued, it was your

15   understanding that Secretary Ross set out to take a hard look

16   following receipt of a December 2017 request from the

17   Department of Justice for census block-level citizen voting-age

18   population data for purposes of enforcing the Voting Rights

19   Act, correct?

20   A.   Yes.

21            MR. HO:   Let's turn to page 8 of this letter, please,

22   and let's look at the first paragraph.

23   Q.   Dr. Abowd, you understand that Secretary Ross wrote that a

24   citizenship question on the decennial census is necessary to

25   provide complete and accurate data in response to the DOJ

IbdWnys3                          Abowd - Direct

1    request, correct?

2    A.   Correct.

3    Q.   And with that conclusion, Secretary Ross ordered the

4    inclusion of a citizenship question on the 2020 census,

5    correct?

6    A.   That's correct.

7    Q.   And Secretary Ross ordered the bureau to combine data

8    collected through a citizenship question on the 2020 census

9    with the use of administrative records for developing

10   block-level CVAP, or citizenship voting-age population, for the

11   Department of Justice, correct?

12   A.   He instructed us to use both the citizenship responses on

13   the 2020 census and administrative data and to produce a

14   citizen voting-age population by race and ethnicity table as we

15   deemed best.

16   Q.   And Secretary Ross refers to that as option D in his memo,

17   is that correct?

18   A.   That's correct.

19   Q.   Dr. Abowd, as the chief scientist at the Census Bureau, you

20   do not think that adding a citizenship question to the 2020

21   census is a good idea, correct?

22   A.   Correct.

23   Q.   And Dr. Abowd, the leadership of the Census Bureau does not

24   think that adding a citizenship question to the 2020 census is

25   a good idea, correct?

IbdWnys3                          Abowd - Direct

1   A.  Correct.

2   Q.  And Dr. Abowd, your consistent recommendation has been not

3   to include a citizenship question on the 2020 census, correct?

4   A.  Correct.

5   Q.  And Dr. Abowd, the consistent recommendation from the

6   leadership of the Census Bureau has been not to include a

7   citizenship question on the 2020 census, correct?

8   A.  Correct.

9   Q.  Let's back up for a moment, Dr. Abowd.  I want to talk

10  about how you arrived at those recommendations.  Now, you first

11  learned about the Department of Justice's December 12, 2017,

12  request to add a citizenship question to the 2020 decennial

13  census from Acting Census Bureau Director Ron Jarmin, correct?

14  A.  That's correct.

15  Q.  And you learned about that via email on December 15, 2017,

16  correct?

17  A.  That's correct.

18  Q.  And your understanding is that the reason for the request

19  was that the Department of Justice wants block-level citizen

20  voting-age population data, which I'll sometimes call CVAP, for

21  purposes of enforcing the Voting Rights Act of 1965, correct?

22  A.  That's correct.

23  Q.  Now, Acting Director Jarmin asked you to assemble a team of

24  experts to begin discussing how the Census Bureau might respond

25  to the DOJ request, correct?

1    A.  He asked me to assemble a team of technical experts, that's

2    correct.

3    Q.  And you refer to that team of technical experts as your

4    SWAT team, right?

5    A.  That's correct.

6    Q.  And over the course of discussions with Dr. Jarmin, it

7    became clear to you that he wanted a technical report as to how

8    the Census Bureau could respond to the DOJ request, correct?

9    A.  That's correct.

10   Q.  And so you asked the SWAT team to write a white paper to

11   summarize what they could learn about citizenship data that

12   might be used to satisfy the DOJ request, correct?

13   A.  That's correct.

14   Q.  And you eventually wrote a memo addressed to Secretary Ross

15   summarizing the work of the SWAT team, correct?

16   A.  Summarizing the opinions of the senior executive staff that

17   were based on that work and other research done by other

18   persons in the Census Bureau.

19          MR. HO:  Let's look at Plaintiffs' Exhibit 26, the

20   Ross decision memo again.  Let's look at page 4, the first

21   paragraph on the page, the last sentence.

22   Q.  Secretary Ross writes:  "So while there is widespread

23   belief among many parties that adding a citizenship question

24   could reduce response rates, the Census Bureau's analysis did

25   not provide definitive, empirical support for that belief."  Do

1    you see that, Dr. Abowd?

2    A.  Yes, I do.

3         MR. HO:  We can take that down.

4    Q.  Dr. Abowd, the memo that you wrote to Secretary Ross, in

5    your opinion, that memo memorialized the Census Bureau's

6    credible, quantitative evidence that the addition of a

7    citizenship question to the 2020 census could be expected to

8    lower the self-response rate in households that may contain

9    noncitizens, correct?

10   A.  Yes, that's correct.

11   Q.  And you would describe noncitizens as an identifiable and

12   large subpopulation, correct?

13   A.  We identified households that either contained a noncitizen

14   or might contain a noncitizen or a person of unknown

15   citizenship status as a large subpopulation, yes.

16   Q.  And that opinion is based upon the work of the SWAT team

17   that was conducted under your direction, correct?

18   A.  That's correct.

19   Q.  And Dr. Abowd, you agree that the balance of evidence

20   available suggests that adding a citizenship question to the

21   2020 census would lead to a lower self-response rate in

22   households that potentially contain a noncitizen, correct?

23   A.  Yes, I agree with that conclusion.

24   Q.  And the Census Bureau agrees with that conclusion, right,

25   Dr. Abowd?

1   A.  Yes, they do.

2   Q.  And reducing the self-response rate in that way, that's a

3   bad thing, right, Dr. Abowd?

4   A.  I have consistently characterized data produced by lower

5   self-response rates as being less accurate.

6   Q.  OK.  I want to talk about your memo, Plaintiffs' Exhibit

7   22.

8           MR. HO:  For the record, this has been admitted into

9   evidence and is in the administrative record.

10  Q.  Dr. Abowd, this is a memo that was prepared under your

11  supervision, correct?

12  A.  I'd like to clarify that the memo that I'm familiar with

13  contains a watermark with a version number on it, and this

14  doesn't.

15  Q.  I think it may just be a function of it being on the

16  screen.  Do you see at the bottom of the page, Dr. Abowd, on

17  the right-hand side, it has a Bates number, 1277?

18  A.  Yes, I see that.

19  Q.  Is your understanding that that number reflects the fact

20  that this memo was part of the administrative record in this

21  case?

22  A.  Yes, Bates 1277 is definitely my memo.

23  Q.  OK.  Great.

24      So this is a memo that was prepared under your supervision,

25  correct?

```
 1    A.  Yes.

 2    Q.  And the views are expressed in this memo are the views of

 3    the technical team, the SWAT team that assisted you, correct?

 4    A.  The views in this memo are a summary of the technical work

 5    that that SWAT team did and the contributions made by other

 6    senior executives at the Census Bureau.

 7    Q.  You agree with the conclusions in this memo, right,

 8    Dr. Abowd?

 9    A.  Yes, I do.

10    Q.  And Acting Census Bureau Director Ron Jarmin reviewed and

11    approved this memo, correct?

12    A.  Yes, he did.

13    Q.  And this is the last version of this memo, correct?

14    A.  Yes, it is.

15    Q.  This memo was routed to the secretary of commerce, correct?

16    A.  Yes, that's correct.

17    Q.  And you eventually had a meeting to discuss this memo with

18    Secretary Ross on February 12, 2018, correct?

19    A.  Yes, that's correct.

20    Q.  Now, before your meeting with Secretary Ross that day, you

21    had a premeeting on the same day with Undersecretary Karen Dunn

22    Kelley in the Department of Commerce, correct?

23    A.  Yes, that's correct.

24    Q.  And during that premeeting with the undersecretary, you

25    discussed this memo, correct?
```

IbdWnys3                          Abowd - Direct

1    A.  We all discussed it, yes.

2    Q.  And when you met with Undersecretary Kelley, she did not

3    express any disagreements with the analysis in this memo,

4    correct?

5    A.  That's my recollection from the meeting, yes.

6    Q.  And during the meeting that you had with Secretary Ross

7    later that day, he asked you questions that indicated to you

8    that he had a thorough understanding of the issues in this

9    memo, correct?

10   A.  Yes, that's correct.

11   Q.  And that was the only meeting that you had with Secretary

12   Ross to discuss the citizenship question before Secretary Ross

13   issued his March 26 decision memo, correct?

14   A.  Yes, that's correct.

15   Q.  So let's be clear.  Secretary Ross had only one meeting

16   with the chief scientist at the Census Bureau about the

17   citizenship question before he issued his decision memo,

18   correct?

19   A.  Yes, that's correct.

20   Q.  Now, your memo here, it addresses -- I'm sorry.

21          MR. HO:  Let's bring up your memo, Plaintiffs' Exhibit

22   22.

23   Q.  It addresses three alternatives in response to the

24   Department of Justice request, correct?

25   A.  Yes, that's correct.

1    Q.  And those alternatives are, A, make no change in data

2    collection; B, add a citizenship question to the 2020 census;

3    and, C, obtain citizenship status from administrative records,

4    correct?

5    A.  You didn't finish the sentence, but yes, that's correct.

6    Q.  You don't disagree with how I characterized it, do you,

7    Dr. Abowd?

8    A.  I do not.

9           MR. HO:  Let's look at the last paragraph on the page

10   and highlight it.

11   Q.  Dr. Abowd, you did not recommend alternative B, which was

12   adding a citizenship question, correct?

13   A.  The memo does not recommend it, and I supervised the

14   preparation of the memo, that's correct.

15   Q.  So you did not recommend alternative B, correct?

16   A.  That's correct.

17   Q.  In fact, you described alternative B in the memo as "very

18   costly, harms the quality of the census count and would use

19   substantially less accurate citizenship status data that are

20   available from administrative sources," correct?

21   A.  Yes, that's correct.

22   Q.  That's adding a citizenship question, correct?

23   A.  Alternate B is the addition of the citizenship question to

24   the 2020 census, yes.

25   Q.  OK.  So instead of alternative B, you recommended either

1   alternative A, no change, or alternative C, using

2   administrative records, correct?

3   A.  Yes, that's correct.

4   Q.  And your memo's conclusion was that using administrative

5   records instead of asking the citizenship question -- that is,

6   alternative C -- would best meet DOJ's stated uses, correct?

7   A.  Yes, that's correct.

8   Q.  And your memo concluded that that using administrative

9   records instead of asking a citizenship question "is

10  comparatively far less costly than alternative B, does not

11  increase response burden and does not harm the quality of the

12  census count," correct?

13  A.  That's correct.

14          MR. HO:  Let's talk about the analysis of alternative

15  B in your memo, and I want to look at page 4 of PX-22.  I'm

16  looking at the header under -- I'm looking at the header in

17  Section B2, self-response rate analysis, and I want to ask you

18  about the first paragraph here.

19  Q.  This paragraph is describing an analysis of unit

20  nonresponse rates to the 2000 census questionnaire as compared

21  to the 2000 long form, right, Dr. Abowd?

22  A.  Yes, that's correct.

23  Q.  And by unit nonresponse, we mean the rate at which people

24  fail to respond to a survey, correct?

25  A.  Fail to self-respond, correct.

IbdWnys3                         Abowd - Direct

1    Q.   The 2000 short-form census questionnaire did not have a

2    citizenship question on it, correct?

3    A.   Yes, that's correct.

4    Q.   But the 2000 census long form did have a citizenship

5    question on it, correct?

6    A.   Yes, that's correct.

7    Q.   And so what you did here is you compared unit self-response

8    rates on these two questionnaires between noncitizens, on the

9    one hand, and citizen households, on the other, correct?

10   A.   That's not all we did, but you got the first step right,

11   yes.   Correct.

12   Q.   OK.   Let's just talk about the long-form analysis.   We'll

13   talk about the ACS analysis in a second.

14   A.   Well, I meant that you hadn't completely characterized how

15   we did the short and long-form analysis in 2000.

16   Q.   You compared the decline in self-response on the census

17   long form as compared to the census short form for households

18   that contain a noncitizen to that same decline for households

19   that were all citizens, correct?

20   A.   Yes, that's correct.

21   Q.   OK.   And when you conducted this analysis, you found that

22   for both citizen households and households had that had one

23   noncitizen, the response rate on the long form was lower than

24   on the short form?

25   A.   The self-response rates on the long form were lower than

1    those on the short form, that's correct.

2    Q.  But for households that had one or more noncitizen in them,

3    the decline in the self-response rate between the long form and

4    the short form was 3.3 percentage points more than it was for

5    all citizen households, correct?

6    A.  Yes, that's correct.

7    Q.  And you considered that decline to be evidence that a

8    citizenship question causes households containing a noncitizen

9    to self-respond to a survey at lower rates, correct?

10   A.  We considered that credible, quantitative evidence that

11   such a question might cause a decline on the magnitude of 3.3

12   percent in 2000.

13   Q.  OK.  Now, you also conducted similar analyses for the

14   American Community Survey, correct?

15   A.  That's correct.

16   Q.  And that analysis in your memo -- and that analysis is

17   reflected in your memo here, correct?

18   A.  As it existed as of January 19, that's correct.

19   Q.  OK.  We'll get to the later analysis.  Let's just stick to

20   the January 19 for now.  Is that all right?

21   A.  Yes, sir.

22   Q.  OK.  Now, just to pause for a moment here, Dr. Abowd, I

23   want to just make sure the record's clear here.  Your analysis

24   of unit nonresponse rates here applies not just to alternative

25   B but also to option D, the choice that the secretary of

1    commerce ultimately made, correct?

2    A.  It would apply to any alternative in which the citizenship

3    question was asked on the short form.

4    Q.  And that includes option D, what Secretary Ross ultimately

5    ordered, correct?

6    A.  Yes, that's correct.

7    Q.  Now, before we talk about your analysis of ACS data, I just

8    want to back up and ask a few questions about the ACS.

9        The ACS is an ongoing sample survey, correct?

10   A.  Yes, that's correct.

11   Q.  Sent to a little more than 2 percent of the population

12   annually, correct?

13   A.  It's sent to a larger percentage than that, but the

14   responses come from between two and two and a half percent of

15   the population annually.

16   Q.  Responses to the ACS are required by law, correct?

17   A.  That's correct, but the nonresponse follow-up is a sample,

18   not universally selected households.

19   Q.  We'll talk about the nonresponse follow-up to the ACS in a

20   second.  I just want to make clear that just like responses to

21   the decennial enumeration questionnaire are required by law,

22   responses to the ACS are also required by law, correct?

23   A.  Yes, that's correct.

24   Q.  Now, the ACS contains dozens of questions, correct?

25   A.  Yes, at least dozens.

1    Q.  And one of the questions on the ACS is a question about

2    citizenship status?

3    A.  Yes, that's correct.

4    Q.  Now, your memo here has three different kinds of analyses

5    of American Community Survey, or ACS, data that bear upon the

6    potential adverse impact of a citizenship question on the 2020

7    census, correct?

8    A.  I think you're referring to the Section B1, 2 and 3 in the

9    memo?

10   Q.  I'm referring to your analysis of unit nonresponse rates,

11   item nonresponse rates and breakoff rates.

12   A.  Yes, that's correct.

13   Q.  OK.  All three of those analyses bear upon the potential

14   effect of a citizenship question on the 2020 census, correct?

15   A.  Yes, that's correct.

16   Q.  And it's the opinion of the executive staff of the Census

17   Bureau that all three analyses were appropriate in support of

18   your conclusion that using administrative records would be a

19   better option for producing block-level CVAP data for VRA

20   enforcement purposes than adding a citizenship question to the

21   census, correct?

22   A.  Yes, that's correct.

23   Q.  And this memo included that all three analyses support the

24   conclusion of an adverse impact on self-response and as a

25   result on the accuracy and quality of the 2020 census, correct?

1    A.  I don't remember it using adverse impact, but they support

2    the conclusion that there would be a lower self-response rate

3    and the consequences of that lower self-response rate, yes.

4              MR. HO:  OK.  Let's just look at the bottom of -- I'm

5    sorry.  At page 4 in your memo, the first two sentences there

6    at the top.  I'm sorry.  Not the bottom but just the top,

7    "before these reasons" sentence, the top paragraph on the page.

8    Q.  You used the term "adverse impact" to describe the effect

9    of the citizenship question on self-response rates, right,

10   Dr. Abowd?

11   A.  Thank you for refreshing my memory.  Yes, I did.

12             MR. HO:  OK.  Let's talk about your analysis of unit

13   self-response rates, and let's stay on page 4 and let's look at

14   the bottom paragraph, starting with "we compared."

15   Q.  Now, Dr. Abowd, in this paragraph, you're describing an

16   analysis comparing response rates on the 2010 census to the

17   2010 American Community Survey, correct?

18   A.  That's correct.

19   Q.  And the 2010 census, let's just be clear, that

20   questionnaire did not have a citizenship question on it, right?

21   A.  That's correct.

22   Q.  But the 2010 ACS did have a citizenship question, right?

23   A.  Yes, that's correct.

24   Q.  And when you conducted this analysis, you found that

25   self-response rates to the 2010 ACS declined more for

1    households that had one or more noncitizens in comparison to

2    the 2010 census, on the one hand, as in comparison to

3    households that consisted solely of citizens, correct?

4    A.  Yes, you've got the contrast correct.

5    Q.  OK.  And the magnitude of that difference was 5.1

6    percentage points, correct?

7    A.  Yes, that's correct.

8              MR. HO:  Let's bring up page 5 of your memo, and I

9    want to ask about the first paragraph, last sentence.

10   Q.  You wrote that, "It is therefore a reasonable inference

11   that a question on citizenship would lead to some decline in

12   overall self-response because it would make the 2020 census

13   modestly more burdensome in the direct sense and potentially

14   much more burdensome in the indirect sense that it would lead

15   to a larger decline in self-response for noncitizen

16   households."  Did I read that right?

17   A.  Yes, you did.

18   Q.  And when you say noncitizen households, you mean a

19   household, for purposes of this analysis, that has one or more

20   noncitizens in it, correct?

21   A.  Yes, that's correct.

22   Q.  Now, it's fair to say that this 5.1 percentage point

23   estimate at the time, that you considered that a conservative

24   estimate of the differential impact of a citizenship question

25   on the self-response rates of noncitizens as compared to

1    citizens if you were to place such a question on the 2020

2    census, correct?

3    A.  Yes, I believe I have characterized that estimate as

4    conservative, but we haven't discussed exactly what a

5    statistician might mean by conservative.  What I mean in this

6    context is that it is performed in the context of a natural

7    experiment, although you haven't used those words yet.

8            THE WITNESS:  Your Honor, "natural experiment" is the

9    technical name for the way this analysis was conducted.  Happy

10   to elaborate if you have questions.

11   BY MR. HO:

12   Q.  I'll have plenty of questions unpacking what you mean by

13   conservative, and we're going to spend some talking about what

14   a natural experiment means too, Dr. Abowd.  Don't worry.  But

15   let's just stick with my questions for now, and my question is

16   at the time that you wrote this memo, 5.1 percentage points was

17   your best conservative estimate of the effect of adding a

18   citizenship question in terms of the differential impact of

19   self-responses of noncitizen households as compared to citizen

20   households if you were to put that question on the 2020 census.

21   Correct?

22   A.  Yes, that's correct.

23           MR. HO:  Let's turn to page 6 of your memo.  I want to

24   ask you about the middle paragraph, the last sentence.  I'm

25   sorry.  Not the last sentence, just the middle paragraph here.

1  Q.  Now, in this memo, for purposes of calculating some of your

2  estimates, you expect there are about 126 million occupied

3  households to be enumerated in the 2020 census, is that right?

4  A.  Yes, that's correct.

5  Q.  And you estimate that 9.8 percent of households contained

6  at least one noncitizen, correct?

7  A.  Yes, that's correct.

8  Q.  And so a reduction of 5.1 percentage points in the

9  self-response of those households would translate to about

10  630,000 households, correct?

11  A.  630,000 households in NRFU that would not otherwise have

12  been there, yes.

13  Q.  OK.  And that likely translates into millions of people,

14  right, Dr. Abowd?

15  A.  At average household sizes, it's more than a million

16  people, yes.

17  Q.  Now, today, the Census Bureau's best conservative estimate

18  of the differential effect of adding a citizenship question to

19  the census in terms of self-responses of all citizen households

20  to other households is not 5.1 percentage points, right,

21  Dr. Abowd?

22  A.  Yes, that's correct.

23  Q.  Today, the best conservative estimate of the Census Bureau

24  for that differential effect in self-response is 5.8 percentage

25  points, correct?

IbdWnys3                          Abowd - Direct

1   A.  Best estimate we have at the moment is 5.8 percentage

2   points.

3            MR. HO:  OK.  Let's bring up Plaintiffs' Exhibit 162,

4   which is also Defendants' Exhibit 2.  For the record, it's been

5   admitted.

6   Q.  Dr. Abowd, we talked about a white paper earlier and how

7   you were charged with putting a white paper together.  Do you

8   remember that?

9   A.  Yes, I do.

10  Q.  Is this the white paper?

11  A.  This is the most recent version of the technical report

12  performed under my supervision, yes.

13  Q.  And you've been sitting through trial for the last week or

14  so; sometimes people have referred to this as the Brown memo

15  during their testimony, right?

16  A.  Yes, I believe that's right.

17  Q.  OK, so white paper, Brown memo, different colors, different

18  names, but the same document, right?

19  A.  Yes, in deference to the authors, I usually call it Brown

20  *et al.*

21  Q.  OK.  The analysis in Brown *et al.*, or the white paper, that

22  was begun in response to the Department of Justice's request

23  for block-level CVAP data, correct?

24  A.  Yes, that's correct.

25  Q.  And the authors of this paper, they're a subset of the SWAT

1    team that you assembled, right?

2    A.  Yes, that's correct.

3    Q.  And you chose the best people at the Census Bureau for

4    conducting the analysis that's reflected in the Brown memo,

5    correct?

6    A.  Yes, I did.

7    Q.  And this white paper, this version here, dated August 6,

8    2016, you've described this as an extended and more up-to-date

9    version of the analysis that you relied on when you prepared

10   your January memo to Secretary Ross, Plaintiffs' Exhibit 22,

11   right?

12   A.  Yes, I did.

13   Q.  Now, this is the most recent version of the white paper

14   available, correct?

15   A.  Yes, it is.

16           MR. HO:  Just as a brief aside, I want to bring up

17   Plaintiffs' Exhibit 4, and I want to look at page AR-11634,

18   which should be about page 8,000-something in here.  Sorry.

19   Q.  While he's bringing this on the screen, I just want to ask

20   you, Dr. Abowd, your understanding is that there's an earlier

21   draft of the Brown *et al.* paper, the white memo that is

22   contained in the administrative record in this case, right?

23   A.  It's my understanding that an earlier draft was produced in

24   discovery, yes.

25   Q.  And is part of the administrative record in this case,

1   correct?

2   A.  I believe there's some discussion on the record of finding

3   the Bates number for it, but that is my understanding, yes.

4   Q.  OK.  We'll come back to this and identify it at a later

5   time, but I just want to ask you, Dr. Abowd, you believe that

6   the analysis reflected in the Brown *et al.* memo was

7   methodologically appropriate, right?

8   A.  Yes, I do.

9   Q.  And you believe that the Brown memo constitutes the best

10  analysis that the Census Bureau can do of the consequences of

11  adding the citizenship question to the 2020 census, right?

12  A.  With the available data, correct.

13  Q.  And there are no conclusions in the Brown memo that the

14  Census Bureau disagrees with, correct?

15  A.  That's correct.

16  Q.  OK.  The analysis that produced the 5.8 percentage point

17  estimate, the best conservative estimate of the differential

18  effect of the citizenship question on self-responses, that's

19  contained in the Brown memo, right?

20  A.  Yes, it is.

21          MR. HO:  Let's turn to page 39 of the Brown memo.

22  Q.  And looking at table 9, the second panel here on table 9,

23  on the bottom half of the table, with the minus 5.8 percentage

24  point figure there, that's the, where the .58 percentage point

25  estimate is found in this paper, correct?

IbdWnys3                          Abowd – Direct

1    A.  Yes, that's correct.

2    Q.  Now, several factors account for the difference between

3    your current best estimate of 5.8 percentage points and your

4    older estimate of 5.1 percentage points, correct?

5    A.  Yes, that's correct.

6    Q.  OK.  I want to talk through some of these.  One difference,

7    one factor that accounts for the difference is you compared

8    different households at this time, right?

9    A.  The comparison households are constructed differently,

10   that's correct.

11   Q.  Right, so for the 5.1 percentage point estimate, you

12   compared households that were all citizen, as identified in the

13   administrative records, to households that had one or more

14   noncitizens, as identified in the administrative records,

15   right?

16   A.  That's correct.

17   Q.  And for the 5.8 percent comparison, you compared households

18   for which their ACS response was "all members of the household

19   are citizens" and the administrative records indicate that

20   they're all citizens, on the one hand, and all the other

21   households, on the other hand, correct?

22   A.  Yes, that's correct.

23   Q.  Another difference is that the 5.8 percentage point

24   estimate is based on more recent ACS data, correct?

25   A.  It's based on the 2016 ACS data, that's correct.

IbdWnys3                          Abowd – Direct

Q.   Right, so the 5.1 percentage point estimate, that's based

on a comparison of 2010 decennial census response rates and

2010 ACS response rates whereas the 5.8 percentage point

estimate, that's based on a comparison of 2010 decennial

response rates to 2016 ACS response rates, correct?

A.   Yes, that's correct.

            (Continued on next page)

1    BY MR. HO:

2    Q.  And the reason you like the 5.8 percentage point estimate

3    better is because you think that when you're trying to assess

4    the impact of a citizenship question today, it is more reliable

5    to use more recent ACS data, correct?

6    A.  You wanted more currency, that's correct.

7    Q.  And you view this five point -- I'm sorry.  Let me start

8    that question again.

9        When you look at that 5.8 percentage point estimate and you

10   view it in light of the 3.3 percentage point estimate from the

11   2000 short form and long form comparison and the 5.1 percentage

12   point estimate from the 2010 census and ACS 2010 ACS

13   comparison, you agree that this 5.8 percentage point figure is

14   an indicator that nonresponse rates to surveys with a

15   citizenship question are increasing for households that might

16   have a noncitizen, right?

17   A.  I think we discussed this before.  I've said that I am

18   reluctant as a statistician to fit a trim line to those three

19   numbers, but I did say that 5.8 is bigger than 5.1 and 5.1 is

20   bigger than 3.3.

21   Q.  Dr. Abowd, the 5.8 percentage point estimate, that is a

22   conservative estimate, right?

23   A.  We still haven't discussed what a statistician would mean

24   by conservative, but assuming we are using that as an undefined

25   term for the moment, yes.

1    Q.  Lets define it.

2        One of the reasons why you consider the 5.8 percentage

3    point estimate conservative is that it is based on ACS data,

4    right, but the citizenship question could have more prominence

5    on the decennial census questionnaire, correct?

6    A.  The reason that I have characterized the 5.8 percentage

7    point estimate as conservative is because it was translated

8    into what I believe, and others at the Census Bureau believe,

9    is a conservative estimate of the cost implications of that

10   self-response.

11          As a point estimate itself, it is what it is.  It

12   is the best available point estimate of the decline in

13   self-response that the data could produce.  So it was used in a

14   conservative way in the sense that it produced a conservative

15   cost estimate.  A point estimate has a standard error band

16   around it, and in that sense, it is as good as the analysis

17   that led up to it can be for the purposes of estimating the

18   decline in self-response rates.

19   Q.  Dr. Abowd, I didn't ask you about all the different reasons

20   why you would describe it as a conservative estimate.  My

21   question was much simpler than that.  It was simply this.

22          One reason why the 5.8 percentage point estimate is

23   conservative is because it is based on a comparison of

24   self-response rates on the ACS, but a citizenship question on

25   the decennial census questionnaire, which is much shorter,

1    could have much more prominence.

2                You agree with that, right, Dr. Abowd?

3    A.   I didn't think I heard the "could" the first time, but yes,

4    I do agree with that statement.

5    Q.   Now, the greater prominence of a citizenship question on

6    the decennial census questionnaire means that it could have a

7    larger effect in terms of depressing self-response rates to the

8    questionnaire than a citizenship question would have when

9    placed among the dozens of questions on the ACS, correct?

10   A.   That's what could have a greater impact means, yes.

11   Q.   Now, another issue is that the 5.8 percentage point

12   estimate as we discussed earlier, that is based on 2016 data,

13   which is more recent than 2010 data, right?

14   A.   Yes, that's correct.

15   Q.   And, Dr. Abowd, you agree that a question that was already

16   sensitive at one point could become more sensitive at a later

17   time due to a change in the political environment, right?

18   A.   Yes, it could.

19   Q.   And it is safe to say that if something happened after 2016

20   that might have made citizenship a more salient issue, that

21   that would not be reflected in your 5.8 percentage point

22   estimate, correct?

23   A.   Anything that happened after 2016 would not be reflected in

24   that estimate, correct.

25   Q.   OK.  We'll come back to that later.

1        But just to round out the issues, Dr. Abowd, one other

2    issue is that the 5.8 percentage point estimate, that's only an

3    estimate about the reduction in self-response for households

4    where everyone has not been confirmed to be a citizen, correct?

5    A.  That's correct.

6    Q.  So it doesn't take into account any reduction in

7    self-response rates from all citizen households, correct?

8    A.  That's correct.

9    Q.  You would agree that the assumption that a citizenship

10   question on the census in 2020 will have no effect on all

11   citizen households, that that assumption is probably wrong,

12   right, Dr. Abowd?

13   A.  That is an assumption and there is no evidence in the data

14   to say whether it is right or wrong.

15   Q.  But you think, Dr. Abowd, that to assume that a citizenship

16   question would have no effect on all citizen households, that

17   to make that assumption, that would probably be wrong, right

18   Dr. Abowd?

19   A.  It would be better to have information about how all

20   citizen households actually responded to a citizenship question

21   on the census.

22   Q.  Dr. Abowd, do you remember giving a deposition in this case

23   on October 12, 2018?

24   A.  There were so many.  Yes, I do.

25   Q.  I believe it was your fourth deposition in the case.

1    A.  Yes, it was.

2    Q.  OK.  Can we bring up that deposition transcript and page

3    198, starting at line 7, please.

4        Dr. Abowd, you were under oath that day, correct?

5    A.  Yes, I was.

6    Q.  And you told the truth that day, correct?

7    A.  Yes, I did.

8    Q.  All right.

9    "Q.  And what's your basis for saying it would fall in that

10   part of the range?

11   "A.  The -- the recent data that we analyzed underlies the 5.8

12   percent and 28.6 percent that's in column two, give you -- on

13   this estimate, 82.5 million and, in the working paper, 91.2

14   million.  No significance should be attributed to that

15   difference in the estimate.  It has to do with the base that

16   was used in calculating them.

17       We said in our advice to the secretary, and I continue to

18   believe in my expert opinion, that that's a lower bound, a

19   cautious estimate, and that the hypothesis underlying that

20   estimate that there won't be any effect in the households that

21   have citizens is probably wrong.  It's only maintained in order

22   to be able to say something about the target population, which

23   is the ones that might have a noncitizen or that definitely

24   have a noncitizen.

25   Q.  Was that the question that was posed to you that day and

1   your answer to it?

2   A.  Yes, they were.

3   Q.  Dr. Abowd, to the best of your knowledge, no one at the

4   Census Bureau has conducted any statistical analysis

5   specifically addressing the question of whether even among

6   households that are all citizens, the inclusion of a

7   citizenship question could have some effect on their response

8   rates, correct?

9   A.  That's correct.

10  Q.  I want to talk about a different analysis in your January

11  memo, Plaintiffs' Exhibit 22, about the effect of the

12  citizenship question that's not exclusively about noncitizen

13  households.  And lets turn to page four in your memory and the

14  header B1, quality of citizenship responses.

15       Now, in this section of your memo, Dr. Abowd, you discuss

16  item nonresponse rates for the citizenship question on the

17  American Community Survey, correct?

18  A.  Yes, that's correct.

19  Q.  And item nonresponse is different from unit nonresponse,

20  right?

21  A.  Yes, that's correct.

22  Q.  Item nonresponse is when someone returns a survey, but they

23  don't answer a particular question on that survey, correct?

24  A.  That's correct.

25  Q.  OK.  I want to focus on the second paragraph under this

1    header.  Starting with in the period.

2         Now, in this paragraph, you're describing an analysis of

3    item nonresponse rates to the citizenship question on the

4    American Community Survey, right?

5    A.  Yes, that's correct.

6    Q.  And you're looking at item nonresponse rates on the

7    American Community Survey from 2013 to 2016, right?

8    A.  Yes, that's correct.

9    Q.  And in that analysis, you're comparing racial and ethnic

10   subgroups, correct?

11   A.  Yes.

12   Q.  And you found that the item nonresponse rate to the

13   citizenship question for the mail in ACS for non-Hispanic

14   whites during this period raged from 6 to 6.3 percent, correct?

15   A.  Yes.

16   Q.  And you also found that during the same period, the item

17   nonresponse on the citizenship question for the mail in ACS for

18   non-Hispanic blacks ranged from 12 percent to 12.6 percent,

19   correct?

20   A.  Correct.

21   Q.  So that is twice as high as the item nonresponse rate

22   during this period on the ACS citizenship question for blacks

23   as compared to non-Hispanic whites, correct?

24   A.  Correct.

25   Q.  You also found during this period that the item nonresponse

 1    rate on the citizenship question for the mail-in ACS for

 2    Hispanics ranged from 11.6 percent to 12.3 percent, correct?

 3    A.   Correct.

 4    Q.   And you also looked at the ISR instrument.

 5         That's the Internet version of the ACS, correct?

 6    A.   Yes, that's correct.

 7    Q.   So in 2016, the Internet ACS item nonresponse rates for the

 8    citizenship question for non-Hispanic whites was 6.2 percent,

 9    correct?

10    A.   Yes.

11    Q.   But for Hispanics, the item nonresponse rate to the

12    citizenship question on the Internet version of the ACS was

13    more than twice as high, it was 15.5 percent, correct?

14    A.   I am pausing because you highlighted the 2013 answer first,

15    and then the 2016 answer, I think.  Unless I'm just confused

16    reading the text.

17    Q.   I think you're right.  But the numbers for item nonresponse

18    on the 2013 and 2016 ISR for non-Hispanic whites were the same,

19    right, Dr. Abowd, 6.2 percent?

20    A.   Yes.  OK.  All right.

21    Q.   If we compare the 2016 ACS item nonresponse for

22    non-Hispanic whites to Hispanics, it is 6.2 percent for

23    non-Hispanic whites, 15.5 percent for Hispanic whites?

24    A.   That's correct.

25    Q.   More than twice as high for Hispanics, correct?

1    A.  Correct.

2    Q.  You would characterize the item nonresponse rate for

3    Hispanics on the 2016 ACS Internet version for the citizenship

4    question as much higher than they are for non-Hispanic whites,

5    right?

6    A.  I believe that is what I said, yes.

7              THE COURT:  Can I interrupt for one moment?

8              Can you tell me what the Internet version of the ACS

9    is, who does that, and how it differs?

10              THE WITNESS:  Yes, your Honor.

11              American Community Survey has a fixed set of

12   questions, but they are delivered in two formats.  One is a

13   paper questionnaire that you fill out with pencil and mail

14   back, but you can also elect to do it online.  And you go to

15   our website and you bring up the questionnaire and put in your

16   invitation to respond, and then you're asked the questions in

17   an online instrument.  You are still self-administering.  You

18   take the ACS in an Internet instrument, which we call an

19   Internet self-response instrument.

20              THE COURT:  All right.  When you say invited to, is

21   that you received the form in the mail and it instructs you

22   that you can either fill it out and mail it back, or

23   alternatively, you can go online and do it online?

24              THE WITNESS:  That's correct.

25              THE COURT:  What proportion of the people who respond

1   use the Internet version versus the paper version?

2          THE WITNESS:  Oh, I have memorized so many numbers

3   for this trial.  I don't have that one memorized.

4          It is a substantially higher proportion use the

5   Internet self-response instrument than the mail-back

6   instrument, but I don't recall the exact proportions, your

7   Honor.

8          THE COURT:  Do you know or do you have an opinion why

9   the rates would differ on the Internet version versus the paper

10  version?

11         Is there some difference that you know of or

12  understand with respect to the population that does it on the

13  internet versus mailing it in?

14         THE WITNESS:  Generically, the reason why the item

15  nonresponse rates differ on an Internet self-response

16  instrument is because we sometimes prompt and we sometimes let

17  the items go through without prompting.  We generally prompt on

18  demographic items, including items, like, race and ethnicity.

19         THE COURT:  When you say prompt, what do you mean?

20         THE WITNESS:  Make sure that the respondent didn't

21  want to respond to that question.

22         THE COURT:  So in other words, you would say are you

23  sure you didn't want to respond to the previous question or

24  something of that nature?

25         THE WITNESS:  Yes, something like that.

1              THE COURT:  And obviously you can't do that on the

2      paper form?

3              THE WITNESS:  That's correct.

4              THE COURT:  Mr. Ho.

5              MR. HO:  Thank you, your Honor.

6      BY MR. HO:

7      Q.  Dr. Abowd, you included this analysis of item nonresponse

8      to the citizenship question on the American Community Survey

9      because it suggests or, I'm sorry, because it is suggestive

10     statistical evidence that a citizenship question on the census

11     could see higher nonresponse rates from Hispanics as compared

12     to non-Hispanic whites, correct?

13     A.  Yes.

14     Q.  I just want to talk about change over time here.

15             According to your memo for non-Hispanic whites, the item

16     nonresponse rate to the citizenship question on the ACS between

17     2013 and 2016 either didn't change at all on the Internet or

18     didn't change much for the mail-in version, right?

19     A.  For which group?

20     Q.  Non-Hispanic whites.

21     A.  Correct.

22     Q.  But item nonresponse to the citizenship question on the ACS

23     increased for Hispanics during the same period of time,

24     correct?

25     A.  Yes, it did.  I think it is called out on the paragraph

1    there.

2    Q.  OK.  Lets look at how you analyzed this in the <u>Brown,</u>

3    <u>et al</u>. memo, Plaintiffs' Exhibit 162.  I want to look at page

4    nine, figure two.

5              THE COURT:  While we're doing that, let me go back to

6    what I asked before.

7              I would think, just intuitively, that the prompt would

8    actually increase the response rate because it would catch some

9    people who might not have meant to skip it.

10             Why would you point to that as a reason that it would

11   actually be higher?

12             THE WITNESS:  I apologize, your Honor.  I gave you the

13   explanation for why we generally get low nonresponse rates on

14   self-response than on paper.

15             In this case, it is probably a difference in the

16   proporation of people from the different sub populations who

17   respond in the two modes.

18             THE COURT:  Meaning?

19             THE WITNESS:  I don't have any specific data with me.

20             THE COURT:  So your opinion or speculation is that

21   when you say difference just in terms of the kinds of the

22   people who elect to respond online versus on paper, that there

23   is some difference in that population?

24             THE WITNESS:  Yes.  Yes, that's right.

25             THE COURT:  All right.

1                You may proceed, Mr. Ho.

2                MR. HO:  Thank you, your Honor.

3      BY MR. HO:

4      Q.  Now, during this same period that we have been discussing,

5      2013 to 2016, item nonresponse for Hispanic to the question

6      about sex, that is, are you male or female on the American

7      Community Survey declined, correct?

8      A.  So that is the blue checkered or dotted bars, and they are

9      all below the zero line.  So yes, correct.

10     Q.  Just so the record is clear, between 2013 and 2016, item

11     nonresponse for Hispanic on the citizenship question increased

12     but item nonresponse on the question about sex decreased,

13     correct?

14     A.  Yes.

15     Q.  So, Dr. Abowd, it is correct to say that the increase in

16     item nonresponse to the citizenship question on the ACS among

17     Hispanic does not reflect a trend of item nonresponse to all

18     questions increasing during that same period, correct?

19     A.  Yes, that would be a correct conclusion.

20     Q.  I want to talk about the third analysis in your January

21     memo, the one related to breakoff rates.

22          Lets turn back to Plaintiffs' Exhibit 22.

23                THE COURT:  Before we do that, this chart is for

24     Hispanic respondents?

25                THE WITNESS:  Your Honor, the chart has three

1   different questions on it.  The item nonresponse rate for sex,

2   which is the blue bar; for age, which is the -- I think that is

3   orange, might be red hashed bar; and for citizenship, which is

4   the gray bar.

5           Then the first set of three bars is for all

6   respondents.  The next set is non-Hispanic white.

7           THE COURT:  I missed the bottom labels.  Sorry about

8   that.  Thank you.

9           THE WITNESS:  No problem.

10          MR. HO:  I'm sorry.  I should have pointed that out,

11  your Honor.

12  BY MR. HO:

13  Q.  Can we now turn to the breakoff rate analysis, the third

14  analysis in your January memo, page five of Plaintiffs'

15  Exhibit 22.  I want to look under header B3, breakoff rate

16  analysis.

17      This is the part of your memo where you describe the

18  analysis of breakoff data for the 2016 ACS, correct?

19  A.  Yes, it is.

20  Q.  Just to define it, a breakoff rate is the rate at which,

21  when people are responding to the ACS questionnaire online,

22  they stop answering the survey upon encountering a screen with

23  a particular question, correct?

24  A.  Yes, that is how it is defined.

25  Q.  In 2016, breakoff rates on the citizenship question on the

1   ACS for Hispanic were much higher than they were for

2   non-Hispanic whites, correct?

3   A.   I think you're summarizing the second sentence in the

4   second paragraph, and that's correct.

5   Q.   As the data is presented in this memo, the breakoff rate on

6   the citizenship question on the 2016 ACS for Hispanic was eight

7   times what it was for non-Hispanic whites, correct?

8   A.   Yes, that's correct.

9   Q.   This breakoff rate analysis indicates that the citizenship

10  question is more sensitive for Hispanic than for non-Hispanic

11  whites, correct?

12  A.   That is what we concluded, correct.

13  Q.   Now, it is also correct, Dr. Abowd, that the difference in

14  breakoff rates for Hispanic as compared to non-Hispanic whites

15  is much higher for questions concerning year of entry and

16  citizenship than for any other of the questions on the ACS with

17  the exception of English proficiency, correct?

18  A.   So I'm happy to go over those data with you if you bring up

19  the chart, but I don't have them memorized.  It is one of the

20  high breakoff rates.  I am willing to say that without seeing

21  the table.

22  Q.   OK.  Lets bring up the white paper, Plaintiffs' Exhibit

23  162, and page ten.  Lets look at the last paragraph here.

24        Starting with the second to last sentence, citizenship

25  related questions.  Why don't you go ahead and read that to

1   yourself, Dr. Abowd, and let me know when you're ready.

2       (Pause)

3   A.  Yes, I've read it.

4   Q.  So it is correct, right, Dr. Abowd, that breakoff rates for

5   the citizenship question on the ACS for Hispanics are much

6   higher than for non-Hispanic whites generally, first of all,

7   that's correct, right?

8   A.  That's correct.

9   Q.  And that the difference between those breakoff rates is

10  higher for questions concerning year of entry and citizenship

11  than for any other question on the ACS, with the exception of

12  English language proficiency, correct?

13  A.  Yes, that's correct.

14  Q.  Now, your January memo presents only 2016 ACS breakoff

15  data, correct?

16  A.  That's correct.

17  Q.  But the Brown memo here also has 20 -- I'm sorry.  Strike

18  that.

19      The reason why your memo to Secretary Ross only has 2016

20  breakoff data in it is because the 2017 ACS breakoff data was

21  incomplete as of that time, correct?

22  A.  That's correct.

23  Q.  But the swat team has looked at 2017 ACS breakoff data,

24  right?

25  A.  Yes, they are.

1    Q.  And the Census Bureau has now made the 2017 ACS breakoff

2    data available as part of this litigation, correct?

3    A.  We released it as a public document, yes.

4    Q.  OK.  Lets turn to Plaintiffs' Exhibit 9.  This has been

5    admitted.

6        Dr. Abowd, this is a table summarizing the rate at which

7    different groups break off on the ACS on different questions,

8    correct?

9    A.  Yes.  That's correct.

10   Q.  If we go down to citizenship, the left-hand column, the

11   breakoff rate for non-Hispanic whites on the citizenship

12   question in the 2017 ACS is .03489, correct?

13   A.  Yes, I see it.  Yes, that's correct.

14   Q.  OK.  The citizenship question breakoff rate on the 2017 ACS

15   for Hispanic is .4343, correct?

16   A.  The highlighting just disappeared.

17           Yes, that's correct.

18   Q.  OK.  So just to summarize this, it is correct to say that

19   the citizenship question breakoff rate on the 2017 ACS for

20   Hispanic is more than 12 times what it is for non-Hispanic

21   whites, correct?

22   A.  Yes, that's correct.

23   Q.  OK.  So just to summarize, in 2016, the Hispanic breakoff

24   rate was eight times what it was for whites, in 2017, it was

25   12 times what it was for whites, correct?

1          MR. EHRLICH:  Objection, asked and answered.

2          THE COURT:  Overruled.

3   A.  Yes, it's correct.

4   Q.  It is fair to say that in your January memo to Secretary

5   Ross, you concluded that adding a citizenship question would be

6   a sensitive question for Hispanics, correct?

7   A.  I believe we did, yes.

8   Q.  You believe, Dr. Abowd, that Hispanic are more sensitive to

9   survey questions about citizenship than they were a few years

10  ago, correct?

11  A.  Yes, that is what's the data appear to show.

12  Q.  That increased sensitivity, you would agree, is reflected

13  in the 2017 ACS data, correct?

14  A.  Increased sensitivity is reflected in the 2017 data, yes.

15  Q.  That postdates your 5.8 percentage point estimate, which

16  was based only on data through the 2016 ACS, correct?

17  A.  That's correct.

18  Q.  Non-Hispanic whites by contrast, Dr. Abowd, are not more

19  sensitive to survey questions about citizenship than they were

20  a few years ago, correct?

21  A.  I think, are you characterizing all the evidence?

22          In which case I think that is probably right.

23  Q.  Yes.

24  A.  OK.

25  Q.  I am characterizing all of the evidence.

1          Is that correct?

2     A.  Yes.

3     Q.  Dr. Abowd, the Census Bureau believes that Hispanics will

4     respond to the citizenship question on the 2020 census at lower

5     rates than non-Hispanic whites, correct?

6     A.  To the extent that Hispanicity is related -- to ethnic

7     origin Hispanic is related to a household that potentially

8     contains at least one noncitizen, we have credible quantitative

9     evidence that there could be a lower self-response rate, yes.

10    Q.  Dr. Abowd, it is fair to say that you believe that unit

11    self-response rates, that is, refusing to self-respond to the

12    2020 census questionnaire at all, that that will happen at a

13    higher rate for Hispanics than non-Hispanic whites as a result

14    of the citizenship question, correct?

15    A.  So what I think I've said consistently is the Hispanic

16    origin, Hispanic ethnicity, is highly correlated with being in

17    what we would call the treatment group from that natural

18    experiment.  To the extent that that correlation is true.  The

19    conclusions of the natural experiment hold.

20    Q.  The answer to my question is yes, Dr. Abowd?

21    A.  I am trying to qualify that we didn't specifically analyze

22    it for Hispanics, because that is not the question that the

23    data analysis addressed.

24          But I concur that they are highly correlated with the

25    households that may include a noncitizen or person of unknown

1   citizenship status.

2           To that extent, the conclusion is correct.

3   Q.  Dr. Abowd, you agree, do you not, that the analysis of item

4   nonresponse on the ACS and breakoff rates to the ACS for

5   Hispanics suggests that response rates to the 2020 census will

6   fall more for Hispanics than for non-Hispanic whites as a

7   result of the citizenship question, correct?

8   A.  Item response rates on the citizenship question, that's

9   what that shows.

10  Q.  That's not my question, Dr. Abowd.

11  A.  That is why I answered what I did.

12  Q.  OK.  But my question, Dr. Abowd, is this:  You agree, do

13  you not, that the item nonresponse rate analysis that you

14  conducted for the ACS and the breakoff rate analysis that you

15  conducted for the ACS, suggest that unit nonresponse on the

16  2020 census will decline more for Hispanics than for

17  non-Hispanic whites as a result of the citizenship question,

18  correct?

19          MR. EHRLICH:  Objection.

20          THE COURT:  Basis?

21          MR. EHRLICH:  Asked and answered several times, your

22  Honor.

23          THE COURT:  I don't think it has been answered.

24          Overruled.

25  A.  I imagine you're going to show me in the record why you

1    think I've already said that.

2             All I want to say is that, to the extent that Hispanic

3    and being in the treatment group for the natural experiment are

4    highly correlated, that would justify that conclusion.

5             The breakoff analysis and the item analysis justify

6    the conclusion that the citizenship question itself won't be

7    responded to as at higher rate by Hispanics.

8             THE COURT:  Is there a high correlation between the

9    treatment group and Hispanic origin?

10            THE WITNESS:  Yes, your Honor, there is.

11            MR. HO:  Thank you, your Honor.

12   BY MR. HO:

13   Q.  You used the phrase natural experiment or the term natural

14   experiment before.

15            Do you remember that, Dr. Abowd?

16   A.  Yes, I do.

17   Q.  Would you agree that a natural experiment is an

18   observational study in which one group of individuals has been

19   exposed to control conditions while another group has been

20   exposed to treatment conditions, such that a change in outcome

21   between the two groups could plausibly be ascribed to the

22   treatment?

23   A.  I agree with everything that you said and would add that

24   the definitions that put you into either the treatment or the

25   control group have to contain some element of natural

1    randomization.

2    Q.  Here, the control is for purpose -- when we talk about the

3    natural experiments that you conducted here, the control is the

4    2010 decennial census questionnaire without a citizenship

5    question, and the treatment is the 2010 ACS or the 2016 ACS,

6    which has a citizenship question, correct?

7    A.  Technically, the treatment is the change, but yes, that's

8    basically right.

9    Q.  The premise then behind this natural experiment is that it

10   is reasonable to infer that a differential lower self-response

11   on the ACS questionnaire for households that have a noncitizen

12   or a person of unknown citizenship status is due to the

13   citizenship question on the ACS, which is sensitive for that

14   population, correct?

15   A.  So the goal of the natural experiment is to do that

16   difference indifference with the plausible, the actual

17   randomization, which in this case is who got the ACS -- that's

18   a random subset of the population -- and then to explore the

19   answer you get to make sure that there aren't confounders that

20   could have explained that difference in the case of the

21   comparison of the ACS to the 2010 census.  There are potential

22   confounders.  So the initial analysis did not make any effort

23   to control for those confounders and the subsequent analyses

24   did.

25   Q.  Dr. Abowd, you would characterize the analysis that is

1  reflected in your January memo as a well-designed natural

2  experiment, correct?

3  A.  Yes.

4  Q.  Dr. Abowd, notwithstanding what Secretary Ross says in his

5  memo about evidence of an effect of a citizenship question on

6  self-response rates, you believe that the Census Bureau did

7  provide empirical support for its belief that adding a

8  citizenship question will reduce response rates to the 2020

9  census, correct?

10  A.  Self-response rates, correct.

11  Q.  And, in fact, Dr. Abowd, when you met with Secretary Ross

12  on February 12, you told him that the Census Bureau thought

13  that the difference in self-response rates on the ACS and the

14  census, when comparing citizen and noncitizen households, was

15  probably related to the citizenship question on the ACS,

16  correct?

17  A.  That's my recollection, yes.

18  Q.  Dr. Abowd, I want to bring up again your January memo,

19  Plaintiffs' Exhibit 22, page five.  I want to look at the last

20  sentence.

21      I'm sorry.  We want Dr. Abowd's January memo, which I

22  believe is Plaintiffs' Exhibit 22.  Maybe I have that number

23  wrong.

24              THE COURT:  I believe that is right.

25              MR. HO:  It is 22, page five.  I want to look at the

1    last sentence.

2              Sorry.  The last sentence of the first paragraph.

3    Excuse me.

4         Sorry.  I guess I have this wrong again.  The top

5    paragraph, last sentence.

6         Thanks.

7    BY MR. HO:

8    Q.  You wrote in your memo:  It is therefore a reasonable

9    inference that a question on citizenship would lead to some

10   decline in overall self-response because it would make the

11   2020 census modestly more burdensome in the direct sense and

12   potentially much more burdensome in the indirect sense that it

13   would lead to a larger decline in self-response for noncitizen

14   households, correct?

15   A.  That is what it says, yes.

16   Q.  And here, that is consistent with what your opinion is

17   about having produced credible qualitative evidence of the

18   effect of the citizenship question on self-response rates,

19   correct?

20   A.  Yes, that's correct.

21   Q.  Now, this opinion, which is based on a natural experiment,

22   Dr. Abowd, that is not the same as a randomized control test or

23   RCT, correct?

24   A.  That's correct.

25   Q.  If you had done an RCT, that would have been if you had

1    conducted a new randomized experiment with control and

2    treatment groups instead of trying to observe something that

3    had already occurred, correct?

4    A.   There is more to it than that, but that is -- all that you

5    said is correct.

6    Q.   OK.  An RCT, that would provide what you would describe

7    as gold standard evidence for assessing the effect of a

8    citizenship question on response rates, correct?

9    A.   Yes, that's correct.

10   Q.   OK.  If the Census Bureau had conducted an RCT, it would

11   have had quantitative data that could isolate the effect of a

12   citizenship question in terms of how that would perform in the

13   context of the decennial census enumeration questionnaire,

14   correct?

15   A.   If there had been an RCT available, we would have been able

16   to make an internally valid comparison of a questionnaire with

17   and without a citizenship question as to its effect on

18   self-response rates for the whole population.

19   Q.   Do you remember in Secretary Ross' memo where he uses the

20   word isolate and he said that the Census Bureau could not

21   isolate the percentage in the self-response decline that could

22   be attributable to the citizenship question?

23        Does that ring a bell?

24   A.   A sentence like that rings a bell, yes.

25   Q.   If you had conducted an RCT, you could have isolated the

1   effect of the citizenship question on self-response rates in

2   the way that Secretary Ross described, correct?

3   A.   I think I've said consistently that I am very reluctant to

4   interpret what the Secretary meant by sentences in his memo.

5   If we had run a randomized control trial on self-response

6   rates, we would have been able to say, without qualification,

7   that the difference between the self-response rate with and

8   without a citizenship question was X.

9          THE COURT:  And putting aside what the Secretary may

10   or may not have meant, I take it an RCT would allow you to

11   isolate the effect of a particular question on response rates?

12          THE WITNESS:  Yes, it would, your Honor.

13   Q.   Dr. Abowd, there has been no RCT of the census enumeration

14   questionnaire with the citizenship question, correct?

15   A.   That's correct.

16   Q.   A group of decision-makers, including Commerce Under

17   Secretary Karen Dunn Kelley decided not to conduct an RCT of

18   the citizenship question, correct?

19   A.   A group of decision-makers at the Census Bureau with

20   collaboration of the Under Secretary decided not to conduct a

21   randomized controlled trial of the content of the citizenship

22   question.

23   Q.   But if you had conducted that RCT, you would have had the

24   data that would have allowed you to isolate the effect of a

25   citizenship question in the context of the decennial census

1    enumeration questionnaire, correct?

2    A.  So you haven't shown me the RCT we're talking about, but

3    I'll assume it is the one we've talked about several other

4    occasions.

5        That RCT did have a treatment and control that would have

6    isolated the effect of the citizenship question by itself on

7    self-response, yes.

8    Q.  We'll get back to that in a minute, Dr. Abowd.

9        I just want to ask you, even in response of that RCT, you

10   agree that the Census Bureau can use the results of its

11   analysis of the natural experiment to draw conclusions about

12   the effect of a citizenship question on the 2020 census,

13   correct?

14   A.  You're using the results of the natural experiment to do

15   planning for the 2020 census based on its quantitative

16   implications, yes.

17   Q.  You believe that the results from your natural experiment

18   are sufficiently reliable for the census Bureau to make

19   decisions planning for the 2020 census, correct?

20   A.  We believe they are the best available data, correct.

21   Q.  Dr. Abowd, you agree that the macro environment can affect

22   response rates?

23   A.  Yes.

24   Q.  Part of the macro environment is the political context,

25   right?

1   A.  Yes, it is.

2   Q.  So the political context can affect response rates,

3   correct?

4   A.  Yes, it can.

5   Q.  You agree that the political environment around immigration

6   could amplify the effect of a citizenship question on response

7   rates in comparison to, say, 2010, correct?

8   A.  Yes, it could.

9   Q.  And it could do that in comparison to, say, 2016, correct?

10  A.  Yes, it could.

11  Q.  You know, the last time there was an inquiry of the

12  citizenship status of every member of every household in the

13  United States was 1950, correct?

14  A.  Yes, that's correct.

15  Q.  You would agree that the macro environment is a little

16  different now, right, Dr. Abowd?

17  A.  Well, I'm not a macro economist, but I think it is, yes.

18  Q.  I want to ask you about CBAMs research, Dr. Abowd.

19          CBAMs stands for census barriers, attitudes, and

20  Motivator studies, correct?

21  A.  Excuse me.  Yes, it is.

22  Q.  The CBAMs research, that tells you a little something about

23  the macro environment, right?

24  A.  That is what it was designed to do, yes.

25  Q.  OK.  CBAMs consists of a survey of 50,000 households in a

1    series of more than 40 focus groups, correct?

2    A.   42 focus groups.

3    Q.   The primary reason for conducting CBAMs is to inform the

4    integrated partnership and communication program for the 2020

5    census, correct?

6    A.   Yes, that's correct.

7    Q.   The Census Bureau finds that the CBAMs research that you do

8    is sufficiently reliable as to provide actionable information

9    that informs the communication and partnership campaigns

10   conducted by the Census Bureau predicting, correct?

11   A.   Yes, that's correct.

12   Q.   Lets look at Plaintiffs' Exhibit 163.  I believe this has

13   been admitted into the record.

14        Dr. Abowd, this is a PowerPoint summarizing rising

15   information from the 2018 CBAMs focus groups, correct?

16   A.   I am only pausing because I am not sure it is exclusively

17   the focus groups, but it is about the CBAMs research.

18   Q.   This PowerPoint was created by Young & Rubicam at the

19   direction of the Census Bureau, correct?

20   A.   Young & Rubicam is the prime contractor on the integrated

21   communication contract.  It is working with a team of internal

22   Census Bureau specialists.  They jointly prepared this

23   PowerPoint labeled with both logos, I believe.

24   Q.   This PowerPoint was presented to Under Secretary Kelley and

25   to Secretary Ross, correct?

1   A.  I believe I testified at deposition that I believe that is

2   correct, but I wasn't at either of those -- I wasn't at the

3   presentation of the Under Secretary, so I'm not sure whether

4   this is exactly the same one that she saw and the Secretary

5   saw.  I believe the content was very similar, but that is what

6   I know.

7   Q.  You were in the room when this was presented to Secretary

8   Ross?

9   A.  I was in the room when a similar presentation was made to

10  Secretary Ross that had a different date on it.

11  Q.  But it was materially identical to the PowerPoint here

12  before you, correct?

13  A.  Yes, that's right.

14  Q.  You're not aware of any revised or more recent versions of

15  this PowerPoint?

16  A.  No, I'm not.

17  Q.  Lets turn --

18  A.  Actually, excuse me, I haven't compared this PowerPoint to

19  the recent presentation to the National Advisory Committee, so

20  I think, absent that comparison, I didn't notice any big

21  differences.  They give a more comprehensive version than what

22  I remember being presented to the Secretary, but I don't think

23  that the general conclusions or even a lot of the specific

24  conclusions are very different.

25  Q.  We'll go over that PowerPoint too, Dr. Abowd.

1           Lets stick with this one for now.

2   A.  All right.

3   Q.  And look at page five, which I believe is page six of the

4   PDF.  So the next page.  Thank you.

5       The title of this slide is Distrust in Census and

6   Government May Complicate Outreach to Some Communities,

7   correct?

8   A.  Yes, it is.

9   Q.  OK.  The second bullet from the bottom reads:  A number of

10  focus group participants responded negatively to adding the

11  citizenship question, most notably Spanish (U.S. mainland) as

12  well as Vietnamese, Chinese, NHPI, and members of the female

13  MENA group.

14          Did I read that right?

15  A.  Yes, you did.

16  Q.  Now, most of these focus groups were conducted after the

17  announcement of a citizenship question to be included in the

18  census, correct?

19  A.  30 of 42, yes.

20  Q.  And people recruited into the focus groups referenced in

21  that bullet that we just discussed, they mentioned the

22  citizenship question as a barrier to census participation,

23  correct?

24  A.  Yes, that's correct.

25  Q.  This bullet in this PowerPoint was included to draw the

1    attention of the people for whom the PowerPoint was intended,

2    correct?

3    A.  Would you mind restating that question?  I couldn't unpack

4    it.

5    Q.  Sure.

6        This bullet, starting with the number of focus group

7    participants, that was included in this PowerPoint in order to

8    draw the attention of the people for whom the PowerPoint is

9    intended, right, Dr. Abowd?

10            MR. EHRLICH:  Objection.

11            THE COURT:  Sustained.

12   Q.  Dr. Abowd, why was this bullet included in the PowerPoint?

13   A.  The PowerPoint was prepared, as I understand it, to inform

14   the Under Secretary.

15   Q.  But why was this particular bullet included in the

16   PowerPoint?

17   A.  It summarizes one of the conclusions of the CBAMs focus

18   group studies.

19   Q.  Dr. Abowd, do you remember your third deposition in this

20   case which occurred on October 5, 2018?

21   A.  Yes.

22   Q.  You were under oath that day, right?

23   A.  Yes, I was.

24   Q.  And you told the truth that day, right?

25   A.  Yes, I did.

1   Q.  OK.  Lets bring that up and look at page four 43, starting

2   with line five.

3   "Q.  And why was this bullet included in the PowerPoint?

4   "A.  I believe to draw the attention of people who are using

5   this to -- that finding of the focus groups.

6   Q.  Was that my question -- was that the question that was

7   posed to you and your answer that day, Dr. Abowd?

8   A.  Yes, it was.

9   Q.  OK.  And during the presentation of this PowerPoint to

10  Secretary Ross, it was acknowledged that the citizenship

11  question would be a challenge in conducting the 2020 census,

12  correct?

13  A.  Yes, it was.

14  Q.  OK.  Lets bring up Plaintiffs' Exhibit 152 now.  This has

15  also been admitted into the trial record.

16          Dr. Abowd, this is the 2020 CBAMs focus group audience

17  summary reports, correct?

18  A.  Yes, that's what they are.

19  Q.  You've seen this document before, right?

20  A.  Yes, I have.

21  Q.  Lets go to page 22 of this document, which is Bates number

22  13046.

23          This is part of the summary for focus groups

24  consisting of participants who are U.S. mainland residents who

25  speak Spanish, correct?

1      I believe that is at the top of the page.

2    A.   This is the top of the page you said who speaks Spanish.  I

3    know there was both a Spanish-speaking Spanish and an

4    English-speaking Spanish, so I'm not sure whether this

5    particular page is both or one.

6    Q.   When you say Spanish U.S. mainland, what does that refer

7    to?

8    A.   It means that the people recruited for this focus group

9    were Hispanic origin and living in the U.S. mainland.

10   Q.   Lets look at the third bolded paragraph on this summary.

11        The title or the first sentence is the citizenship question

12   is a determining factor for participation, correct?

13   A.   Yes.

14   Q.   It reads:  All four Spanish, U.S. mainland focus groups

15   took place after the March 27, 2018, announcement that the 2020

16   census will include a question on citizenship, correct?

17   A.   Yes.

18   Q.   And Spanish means Hispanic, Dr. Abowd, in that sentence?

19   A.   I believe so, yes.

20   Q.   OK.  It goes on to read:  Participants in all locations

21   mentioned the citizenship question before the moderator asked

22   about it, except for Houston group one participants, correct?

23   A.   Yes.

24   Q.   And it goes on to read:  Most participants said that though

25   they personally are citizens or legal residents and are not

1    afraid to answer the citizenship question, they know many

2    others who will not fill out the question or the form

3    altogether out of fear.  While all participants expressed the

4    desire to be counted, fear of deportation outweighs any

5    benefit.

6         Did I read that right?

7    A.  Yes, you did.

8    Q.  Dr. Abowd, you agree that this focus group result is an

9    indication from a hard-to-count population that the citizenship

10   question viewed as extremely problematic for that population,

11   correct?

12   A.  It is an indicator of that, yes.

13   Q.  And you acknowledge that with the citizenship question on

14   the census, people who are afraid of deportation will be an

15   extremely difficult group to count, correct?

16   A.  They will be a very difficult group to count.

17   Q.  Extremely, right, Dr. Abowd?

18   A.  So I suppose we can discuss what the difference between

19   "very" and 'extremely' is.

20   Q.  In your words, Dr. Abowd, you would describe people, who

21   are fearing deportation, as extremely hard to count in the 2020

22   census, when you put a citizenship question on it, correct?

23   A.  So very hard to get to self-respond.  Whether they are hard

24   to count or not depends on other operations in the 2020 census.

25   Q.  All right.  Dr. Abowd, lets go back to your October 5, 2018

1    deposition, page 451, line three.

2            MR. EHRLICH:  Your Honor, I would note that the

3    deposition testimony we're using here is his 30(b)(6) testimony

4    in his capacity as a representative of the Census Bureau, and

5    would object on that basis, to the extent it is asking him for

6    personal knowledge that he may have.

7            THE COURT:  Mr. Ho, that seems well founded.

8            MR. HO:  I mean, he is testifying as a representative

9    of the Census Bureau under the 30(b)(6), but, I mean, he uses

10   the first person quite frequently in the deposition and

11   expresses his understanding of events in his capacity as the

12   chief scientist of the Census Bureau.  I don't think there is

13   any reason that I can't use his deposition testimony to impeach

14   him on that basis.

15           MR. EHRLICH:  His first person use was for ease of

16   reference during the deposition, your Honor.  You can't draw

17   from this personal knowledge of what he may or may not know

18   based on what the agency knows and what he testified on behalf

19   of the agency.

20           THE COURT:  All right.  Tell you what.  You'll have an

21   opportunity to conduct cross-examination.

22           I think in that context, you can elicit from him the

23   extent to which this testimony, if it is being offered as an

24   inconsistent statement, is actually not his personal statement

25   as opposed to his representative statement.

1           With that, you may proceed, Mr. Ho.

2           MR. HO:  Thank you, your Honor.

3   BY MR. HO:

4   Q.  Page 451, line three.

5   "Q.  And aren't people afraid of deportation the least likely

6   to participate at all in the census or to be swayed by NRFU

7   efforts?

8   "A.  I'm not prepared to say the least likely to participate at

9   all.  I'm tried to acknowledge that they're an extremely

10  difficult group to count.

11  Q.  Was that the question posed to you and was that your

12  answer?

13  A.  Yes, it was.

14  Q.  Now, going back to the focus group summary, page 22 of it.

15  It indicated here that Hispanic focus group members, that

16  members of their community care about participation in the

17  census, correct?

18  A.  Yes.

19  Q.  They express that they understood the benefits to their

20  community of participating in the census, correct?

21  A.  Yes, they did.

22  Q.  And, Dr. Abowd, it is reasonable to conclude that they

23  would like to participate in the census, correct?

24  A.  That seems reasonable, yes.

25  Q.  And what you get from this focus group is an indication

1    that members of this group would be more likely to self-respond

2    if there was not a citizenship question on the 2020 census,

3    correct?

4    A.  Yes.

5    Q.  I'm sorry?

6    A.  Yes.

7         Sorry.  Am I fading?

8    Q.  Thank you.

9         This also indicates that if there is a citizenship question

10   on the census, that trusted partners who try to carry forth the

11   Census Bureau's message are going to have additional challenges

12   in convincing members of this community to participate,

13   correct?

14   A.  I don't think you called out those sentences, but I assume

15   they're in there.

16   Q.  But you agree with that, right, Dr. Abowd, that given the

17   results of this focus group, that you would conclude that the

18   trusted partners that the Census Bureau relies on to carry

19   forth the message that it is important to participate in the

20   census, that they are going to have additional challenges

21   carrying that message out than if there were no citizenship

22   question on the census, correct?

23   A.  Yes.

24   Q.  I want to ask about a different document now, a different

25   PowerPoint I think you referred to earlier why.

1            This is Plaintiffs' Exhibit 662, entitled 2020 Census

2    Barriers, Attitudes, and Motivators study (CBAMs) Survey and

3    Focus Groups:  Key Findings for Creative Strategy.  October 31,

4    2018.

5        For the record, it has been admitted.

6        This is the PowerPoint that you were talking about earlier

7    which includes both CBAMs survey results and focus group

8    information, right, Dr. Abowd?

9    A.  That's correct.

10   Q.  Lets go to page 16 of the PowerPoint.  It is page 16 of the

11   PowerPoint, but 17 of the PDF.

12       This slide has some results of the CBAMs survey, correct?

13   A.  Yes, it does.

14   Q.  The fifth line here indicates that:  10 percent of

15   respondents to the CBAMs survey think that the census is used

16   to locate people living in the country without documentation,

17   right?

18   A.  Yes.

19   Q.  And 37 percent aren't sure one way or the other whether or

20   not that is the case, correct?

21   A.  That's correct.

22   Q.  All right.  Lets turn to page 19 of the PowerPoint, which

23   is page 20 of the PDF.

24       Dr. Abowd, this slide indicates that 19 percent of Asian

25   and black CBAMs survey respondents think that the census is

1   used to locate people without documentation, correct?

2   A.  Yes.

3   Q.  Lets turn to the next page of the PowerPoint.

4        This slide summarizes some comments from Hispanic CBAMs

5   focus group participants, correct?

6   A.  Yes.

7   Q.  And one Hispanic focus group participant said, I feel that

8   it does go to the immigration agency, in regard to census

9   responses, correct?

10  A.  I think you're calling out the first quote there?

11          Yes.

12  Q.  Yes.

13          Another Hispanic focus group participant said that

14  they would not participate in the census because they --

15  meaning immigration -- will know where we are and what our

16  names are and where we live, correct?

17  A.  That's what the quote says, yes.

18  Q.  And another Hispanic focus group participant stated, I

19  feel -- I'm sorry -- stated a concern that immigration

20  enforcement, quote, will know where we are and what our names

21  are and where we live, correct?

22       I'm sorry.  I already did that one.

23       Lets look at page 29 of the PowerPoint, slide 30.

24       This has results from the CBAMs survey, correct?

25  A.  Yes.

1    Q.  The title of the slide is Respondents Worry About

2    Confidentiality, correct?

3    A.  That's correct.

4    Q.  Specifically, 41 percent of Asians CBAMs survey respondents

5    expressed worry about confidentiality, correct?

6    A.  Yes, that is correct.

7    Q.  And so did 41 percent of low English proficiency CBAMs

8    survey respondents, correct?

9    A.  Yes.

10   Q.  Great.  Lets turn to page 31 of the PowerPoint.

11        This had some results about concerns about data sharing of

12   census responses, correct?

13   A.  Yes.

14   Q.  37 percent of low English proficiency CBAMs respondents

15   expressed concern about data sharing, right?

16   A.  Yes.

17   Q.  36 percent of CBAMs respondents who responded in Spanish

18   did too, correct?

19   A.  Yes.

20   Q.  And 32 percent of CBAMS respondents born outside of the

21   United States did as well, correct?

22   A.  Yes.

23   Q.  And 32 percent of Hispanics overall believe that the census

24   shares data with other agencies, correct?

25   A.  Concerned about the census sharing data, correct.

```
 1    Q.  Thank you.
 2         Can we turn to page 35.  According to this slide, one in
 3    four CBAMS survey respondents fear that their answers to the
 4    2020 census will be used against them, correct?
 5    A.  Yes.
 6    Q.  And that's true for 41 percent of Asian CBAMs respondents,
 7    correct?
 8    A.  Yes.
 9    Q.  And true of 39 percent of CBAMs respondents born outside of
10    the United States, correct?
11    A.  Yes.
12    Q.  And 34 percent of CBAMs respondents who responded in
13    Spanish, correct?
14    A.  Yes.
15    Q.  Lets turn to page 42 of the PowerPoint.  Page 43 of the
16    PDF.
17         The title of this slide is The Citizenship Question
18    May Be a Major Barrier, correct?
19    A.  Yes, that is the title.
20    Q.  And focus group participants expressed concern that the
21    purpose of the question is to find undocumented immigrants,
22    correct?
23    A.  The call-outs in red up at the top?
24    Q.  Yes.
25    A.  Yes, that's correct.
```

```
 1    Q.  And there also was an indication from focus group

 2    participants that there is a concern due to the political

 3    discourse that we currently have, correct?

 4    A.  Yes, that is what it says.

 5    Q.  OK.  In the bottom left-hand corner, there is a Hispanic

 6    focus group participant who stated, A lot of people are afraid.

 7    It doesn't matter if they ask you whether or not you're a

 8    citizen.  The first question they ask you, are you Hispanic or

 9    Latino?  And that's enough.  That's all they need and people

10    are scared.

11         Do you see that?

12    A.  Yes, I do.

13    Q.  Do you see the one on the right that reads:  Latinos will

14    not participate out of fear.  There was practically a hunt for

15    us.  Latinos are going to be afraid to be counted because of

16    the retaliation that could happen.  It's like giving the

17    government information saying, oh, there are more here.

18              Correct?

19    A.  That is what the quote says, correct.

20    Q.  Lets turn to page 57 of the PowerPoint.  Page 58 of the

21    PDF.

22              This is a summary of Hispanics participating in the

23    CBAMS research, correct?

24    A.  Yes.

25    Q.  So among Hispanics, 10 percent believe that the census is
```

1   used to locate people living in the country without

2   documentation, correct?

3   A.   That's not on this slide, I don't think, but you already

4   showed it to me.   That -- there it is.   Yes, correct.

5   Q.   And 34 percent express concern about the confidentiality of

6   their answers, correct?

7   A.   Correct.

8   Q.   32 percent express concern that their answers will be

9   shared with other government agency, correct?

10  A.   Correct.

11  Q.   33 percent express fear of repercussions from their census

12  answers, correct?

13  A.   Correct.

14  Q.   The bullet under other considerations reads, focus group

15  participants expressed intense fear that information will be

16  shared with other government agency to help them find

17  undocumented immigrants.   Participants worried that their

18  participation in the census could harm them personally or

19  others in their communities/households they care about,

20  correct?

21  A.   Yes, that is what it says.

22  Q.   That is Hispanic focus group participants, correct?

23  A.   Correct.

24  Q.   Now, Dr. Abowd, overall, you would describe this focus

25  group research as qualitative research, correct?

1    A.   That's correct.

2    Q.   And all of the CBAMS focus group research that we have

3    discussed happened in 2017 and '18, correct?

4    A.   I think it all happened in 2018.

5    Q.   All happened in 2018?

6    A.   Yes.

7    Q.   OK.   You agree, Dr. Abowd, that the CBAMS focus group

8    research conducted by the Census Bureau suggests a greater

9    sensitivity to a citizenship question today than there was a

10   few years ago, correct?

11   A.   The CBAMS research, both the focus group and the survey,

12   have alerted us to what we consider a major difficulty in

13   fielding the 2020 census to regain the trust of the Hispanic

14   community, yes.

15   Q.   The research suggests that the macro environment today,

16   which affects the sensitivity of citizenship questions on

17   Census Bureau surveys, is different than it was a few years

18   ago, correct, Dr. Abowd?

19   A.   So the research that you just showed me doesn't support an

20   inference of change, so I won't make one.

21        But it does support that it is a major concern now, whether

22   it is greater or less than it was for the 2010 census.   It

23   wasn't supported by what you said, but it does support that it

24   is a major concern now.

25   Q.   Dr. Abowd, the sensitivity to a citizenship question that's

1   reflected in the 2018 CBAMS research, that degree of

2   sensitivity would not be captured in the 5.8 percentage point

3   estimate that is based on data only up through 2016, correct?

4   A.  It is -- yes, that is right.

5   Q.  Dr. Abowd, you're aware that there are recent news reports

6   that President Trump is contemplating an executive order that

7   provide that citizenship will no longer be conferred on all

8   persons born on United States soil?

9   A.  I have read the news reports, yes.

10  Q.  Dr. Abowd, you would agree that that is something that

11  could affect the macro environment around the census, correct?

12  A.  Yes.

13  Q.  You're aware that on November 2 of this year, the Census

14  Bureau's National Advisory Committee on racial, ethnic, and

15  other populations, recommended that the Census Bureau evaluate

16  and report on the potential effects of such an order on census

17  operations for 2020, correct?

18  A.  So I was called to litigation on the day the

19  recommendations were read out loud.  I assume you're quoting

20  them right, but I wasn't there, and they haven't been delivered

21  to my inbox yet.

22  Q.  But you're aware of that recommendation, right, Dr. Abowd?

23  A.  You just made me aware of it, yes.

24  Q.  The Census Bureau has not conducted any analysis that

25  you're aware of about how the macro environment may have

1   changed in light of that announcement of the executive order

2   that President Trump is contemplating, correct?

3   A.   That's correct.

4            THE COURT:  Mr. Ho, would this be a good time to take

5   our lunch break?

6            MR. HO:  Sure.

7            THE COURT:  All right.  Question.  We're technically

8   on direct, but in some respects, this is more properly viewed

9   as cross.

10           Does anyone have a view on whether Dr. Abowd should be

11  permitted to speak with defense counsel during the break?

12           MR. HO:  Our view, your Honor, is that he should not

13  be permitted to because it is like a cross.  It is an adverse

14  direct like a cross-examination, so we think he should be

15  sequestered from speaking about the substantive subject of the

16  litigation while he remains on the stand.

17           THE COURT:  Mr. Ehrlich, any objection to my so

18  instructing Dr. Abowd?

19           MR. EHRLICH:  No objection, your Honor.

20           THE COURT:  Dr. Abowd, because you're on what is

21  functional equivalent of cross-examination, the rules dictate

22  that you shouldn't speak with defense counsel concerning the

23  substance of your testimony.

24           If you have logistical conversation with them or the

25  like, that is fine, but please don't speak about the substance

1    of your testimony.  And if it would be easier not to speak with

2    them at all, don't speak with them at all.

3               It is 1:01.  We'll pick up again at 2:00 p.m.

4               Enjoy your break.  Thank you.

5               (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                             2:00 p.m.

 3              THE COURT:  You may be seated.

 4              Apologies for a slightly late start.  Something came

 5    up that I needed to deal with.

 6              We will continue with the direct examination.

 7              Dr. Abowd, I remind you that you are under oath.

 8              Mr. Ho, you may proceed.

 9              MR. HO:  Thank you, your Honor.

10    Q.  Dr. Abowd, I just wanted to go back to a couple of exhibits

11    that we talked about before the lunch break briefly before we

12    move on.

13              MR. HO:  I'd like to go back to Plaintiffs' Exhibit 4,

14    which is a portion of the administrative record in this case.

15    This is page 7,913 of this exhibit, AR No. 11634.  This is a

16    document in the administrative record that's been admitted into

17    evidence.

18    Q.  Dr. Abowd, is this an earlier draft version of the Brown *et*

19    *al.* memo that we were discussing earlier?

20    A.  Yes, it is.

21    Q.  It's dated December 22, 2017?

22    A.  Yes, it is.

23    Q.  And it's in the administrative record in this case?

24    A.  Yes, it is.

25    Q.  And this draft contains earlier versions of the same
```

IbdWnys5                          Abowd - Direct

1    analyses of ACS data, unit nonresponse, item nonresponse, etc.,

2    that we discussed earlier?

3    A.   Contains many of the analyses we discussed earlier, yes.

4    Q.   Thank you.

5        I want to talk about, briefly, Plaintiffs' Exhibit 448.

6    This is a different PowerPoint, one given to the national

7    advisory committee on racial, ethnic and other populations.  Do

8    you see that, Dr. Abowd?

9    A.   Yes, I do.

10        MR. HO:  This has been admitted into the record.  I'd

11   like you to look at page 13 of this document, and the third

12   bullet.

13   Q.   That's a quote from an interviewer from the CBAMS work,

14   right?

15   A.   It's a quote from an interviewer during field studies that

16   the center for survey methods -- survey measurement was

17   conducting before this report was written.

18   Q.   Sorry.  My apologies.  Thank you for that correction,

19   Dr. Abowd.

20        The interviewer from the Census Bureau stated:  "Three

21   years ago was so much easier to get respondents compared to now

22   because of the government changes and trust factors.  Three

23   years ago I didn't have problems with the immigration

24   questions."  Did I read that correctly?

25   A.   Yes, you did.

1    Q.  And that's some qualitative evidence suggesting that

2    questions related to immigration status asked by the Census

3    Bureau have a greater sensitivity today than they did a few

4    years ago, correct?

5    A.  Yes, it is.

6              MR. HO:  Dr. Abowd, I want to go back to your January

7    memo to Secretary Ross, Plaintiffs' Exhibit 22, and I want to

8    ask you about a passage on page 5 under the header B4, cost

9    estimates.

10   Q.  Dr. Abowd, the lower self-response rates resulting from the

11   addition of a citizenship question to the 2020 census, you

12   would expect would increase the cost of conducting the 2020

13   census, correct?

14   A.  That's correct.

15   Q.  And the reason why that is is that when you have lower

16   self-response rates, you have to try to enumerate more people

17   through nonresponse follow-up efforts, or NRFU, correct?

18   A.  That's correct.

19   Q.  And NRFU costs money, right?

20   A.  Yes, it does.

21   Q.  Part of the NRFU process includes sending Census Bureau

22   enumerators in person to nonresponding households, correct?

23   A.  That's correct.

24             MR. HO:  Let's turn to page 6 of your memo and the

25   second-to-last paragraph, if we could blow it up.

1    Q.  This paragraph describes the cost estimates that you

2    presented in this memo for the estimated cost of including the

3    citizenship question on the 2020 census, correct?

4    A.  That's correct.

5    Q.  And in this memo, you estimated that the inclusion of the

6    question could increase NRFU costs by at least $27.5 million,

7    correct?

8    A.  Yes, that's correct.

9           MR. HO:  And if we could blow up the last paragraph on

10   this page.

11   Q.  Dr. Abowd, as you presented your findings in this memo, you

12   describe the $27.5 million estimate as a conservative estimate,

13   is that correct?

14   A.  That's correct.

15   Q.  And one reason why it's a conservative estimate is because

16   the differences in self-response rates to the 2020 census

17   between citizen and noncitizen households may be even greater

18   than estimated in this memo, correct?

19   A.  That's correct.

20   Q.  And so, the memo describes the $27.5 million cost as a

21   lower-bound estimate, correct?

22   A.  Yes, that's correct.

23   Q.  Now, one reason why you describe it as a lower-bound

24   estimate in your memo is that the estimate assumes that --

25   well, strike that.

IbdWnys5                        Abowd - Direct

1          MR. HO:  Let me try that again.

2   Q.  One reason why you describe this as a lower-bound estimate

3   in your memo is that it may take more NRFU visits to enumerate

4   households that don't respond to the citizenship question than

5   you assumed in generating the $27.5 million estimate, correct?

6   A.  That's one of the reasons, yes.

7   Q.  And another reason is that this lower-bound cost estimate

8   does not incorporate any estimate about the effect of a

9   citizenship question on reducing self-response rates from all

10  citizen households, correct?

11  A.  That's correct.

12  Q.  And another reason why this estimate is conservative and a

13  lower-bound estimate is that it does not capture increased

14  communication campaign costs that may be needed as a result of

15  the citizenship question, correct?

16  A.  That's correct.

17         MR. HO:  I want to bring us back to page 1 of the

18  memo, and I just want to look at the last sentence on page 1.

19  Q.  Given everything that we've described, Dr. Abowd, your memo

20  describes adding a citizenship question to the 2020 census as

21  very costly, correct?

22  A.  Correct.

23  Q.  Now, the lower self-response rates resulting from the

24  addition of the citizenship question will also reduce the

25  quality of the data resulting from the 2020 census, correct?

1   A.  That's correct.

2   Q.  And one reason for that is that when you get lower

3   self-response rates, you have to try to enumerate people

4   through NRFU efforts like proxies, correct?

5   A.  That's correct.

6   Q.  And generally speaking, when you do nonresponse follow-up,

7   you don't get answers that are as reliable as when you get

8   self-responses, correct?

9   A.  By the coverage error measures that we use, that's correct,

10  yes.

11  Q.  Your memo, in this same last sentence on the first page,

12  concludes that adding a citizenship question to the census

13  would harm the quality of the census count, correct?

14  A.  That's correct.

15  Q.  And that applies to both alternatives B and option D, which

16  Secretary Ross ultimately chose, correct?

17  A.  That's correct.

18  Q.  Dr. Abowd, harming the quality of the census data, that's a

19  bad thing, right?

20  A.  Something we try to avoid, yes.

21  Q.  I'd like to ask you about different data quality issue with

22  respect to the citizenship question.  Dr. Abowd, you agree --

23  I'm sorry.

24          MR. HO:  Let me start that again.

25  Q.  Dr. Abowd, sometimes it happens that there's disagreement

1    between a person's citizenship status as reflected in

2    administrative records and what that person reports or what's

3    reported for that person in response to the citizenship

4    question on the American Community Survey, correct?

5    A.  That's correct.

6    Q.  So sometimes administrative records indicate that someone

7    is a noncitizen but the ACS response indicates that that

8    person's a citizen, right?

9    A.  Yes, that's correct.

10   Q.  And in your memo, Plaintiffs' Exhibit 22, you describe

11   citizenship status as reflected in the administrative records

12   as "verified," correct; that's the term you use?

13   A.  Yes, that's the term we use.

14   Q.  And the reason you use the term "verified" is because the

15   person's citizenship status as reflected in administrative

16   records is based upon a legal document indicating that person's

17   citizenship status, correct?

18   A.  That's correct.

19   Q.  Now, by contrast, someone's citizenship status as reported

20   in response to the ACS citizenship question is based on a

21   survey response, not a legal document, correct?

22   A.  That's correct.

23   Q.  And so, you would describe that person's citizenship status

24   as referred to -- as reported, I'm sorry, in the ACS as

25   unverified, correct?

1    A.   Or a survey response, yes.

2    Q.   Now, you agree, Dr. Abowd, that if someone is coded in

3    administrative records as a noncitizen, then it's reasonable to

4    conclude that that person is, in fact, a noncitizen, correct?

5    A.   At the time at which the coding was done, yes.

6    Q.   And you believe that when someone's ACS response says that

7    they are a citizen but the administrative records says that

8    they're not a citizen, then the most likely conclusion is that

9    the person is, in fact, a noncitizen, correct?

10   A.   The survey response was citizen and the administrative

11   record response was noncitizen?

12   Q.   Yes.

13   A.   Correct, insofar as the administrative record is

14   contemporaneous with the survey response, yes.

15   Q.   If all you have is an administrative record and all you

16   have is a survey response, the administrative record says

17   noncitizen, survey response says citizen, then you'd agree that

18   it's more likely than not that that person's a noncitizen,

19   right?

20   A.   That's correct.

21   Q.   So, Dr. Abowd, is it correct to say that citizenship status

22   is one characteristic where you believe that administrative

23   records tend to be more accurate than survey responses?

24   A.   Yes, that's correct.

25            MR. HO:  Let's bring back up Plaintiffs' Exhibit 22,

1    your January memo, page 8.  I want to look at the second full

2    paragraph.

3    Q.  Now, according to your memo, in the 2016 ACS, individuals

4    whom the administrative records indicate are noncitizens

5    responded "citizen" 34.7 percent of the time on the ACS

6    citizenship question, correct?

7    A.  Did you say 2016; that's the number you read?

8    Q.  Yes.

9    A.  Yes.

10   Q.  And overall, in the Census Bureau's research on this issue,

11   you've determined that for people for whom the administrative

12   records indicate that they're noncitizens, there's disagreement

13   between the administrative record and the ACS survey response

14   between 30 to 37 percent of the time, correct?

15   A.  That's correct.

16   Q.  And you'd agree, then, given what we discussed earlier,

17   that it's likely that for more than 30 percent of noncitizens

18   who provide a response to the ACS citizenship question, the

19   response is incorrect, right?

20   A.  Response is in disagreement with the administrative record

21   and probably incorrect.

22   Q.  Now, the Census Bureau has no empirical basis to believe

23   that noncitizens for whom a response is provided to a

24   citizenship question on the census will have more accurate

25   responses than they do to the citizenship question on the ACS,

1    correct?

2    A.   That's correct.

3    Q.   And in fact, Dr. Abowd, the Census Bureau believes that

4    there are definitely indications that responses by noncitizens

5    to a citizenship question on the 2020 census will be even less

6    accurate than they have historically been on the ACS, correct?

7    A.   That's correct.

8    Q.   The Census Bureau still hasn't made any determination about

9    how it will address disagreement between survey responses and

10   the administrative records when producing block-level CVAP data

11   for the Department of Justice after the 2020 census, correct?

12   A.   For a public-use tabulation that will be used by the

13   Department of Justice, that's correct.

14   Q.   Now, alternative C, Dr. Abowd, is to use administrative

15   data and no citizenship question to collect citizenship data

16   and then to rely principally on that administrative data to

17   produce block-level CVAP data for the Department of Justice,

18   correct?

19   A.   That's correct.

20   Q.   And under alternative C, you would take responses to the

21   census questionnaire and then link those responses to

22   administrative data with citizenship information in it,

23   correct?

24   A.   That's correct.

25   Q.   And the particular administrative records that you would

1    use under alternative C are the social security numerical

2    identification system, or NumIdent, data, correct?

3    A.  I've never heard the acronym expanded, but yes, NumIdent is

4    the correct file.

5             MR. HO:  Let's bring your memo back up, Plaintiffs'

6    Exhibit 22.  I want to look at the first page, the last

7    paragraph, second sentence.

8    Q.  Dr. Abowd, the conclusion that you reached in your memo is

9    that unlike including a citizenship question, using

10   administrative records to provide DOJ with block-level CVAP

11   data would not harm the quality of the census count, correct?

12   A.  As long as it's done without simultaneously asking the

13   question on the census, yes.

14   Q.  And if you just used the administrative records, you didn't

15   ask the citizenship question, under alternative C, you would

16   have to deal with a problem of survey responses and

17   administrative records that disagree, correct?

18   A.  Correct.

19   Q.  And so, the Census Bureau concluded that using

20   administrative records would deliver higher quality block-level

21   CVAP data by race and ethnicity than including a citizenship

22   question on the census, correct?

23   A.  Yes.

24   Q.  The Census Bureau's proposal to generate such block-level

25   CVAP data using administrative records rather than a

IbdWnys5                         Abowd - Direct

1    citizenship question had the backing of the Census Bureau's

2    redistricting office, correct?

3    A.  Yes, it did.

4    Q.  Now, this memo also concludes that using administrative

5    records would be far less costly than including a citizenship

6    question on the 2020 census, correct?

7    A.  That's correct.

8    Q.  And part of the reason is that if you use administrative

9    records but you don't include a citizenship question on the

10   census, you don't have increased NRFU costs, correct?

11   A.  That's correct.

12   Q.  And the conclusion of the Census Bureau that was reached in

13   this memo is that using administrative records and not

14   including a citizenship question on the census would best meet

15   DOJ's stated uses, correct?

16   A.  That's correct.

17   Q.  And you communicated that conclusion to Secretary Ross

18   during your meeting with him on February 12, 2018, correct?

19   A.  Yes, we did.

20   Q.  Now, the Census Bureau, during this period of time, also

21   offered to meet with the Department of Justice to discuss its

22   recommendations, correct?

23   A.  That's correct.

24   Q.  The analyses that we've been discussing, those began after

25   Arthur Gary -- or after a letter signed by Arthur Gary from the

1    Department of Justice was sent to the Census Bureau requesting

2    a citizenship question on December 12, correct?

3    A.  We got it on December 15, but that's correct, yes.

4    Q.  And you're aware that Acting Census Bureau Director Ron

5    Jarmin subsequently wrote an email to Arthur Gary, correct?

6    A.  Yes, I'm aware of that email.

7              MR. HO:  OK.  Let's bring up Plaintiffs' Exhibit 109.

8    This is in the administrative record and has been admitted into

9    evidence.

10   Q.  Dr. Abowd, this is the email that we discussed from Acting

11   Census Bureau Director Ron Jarmin to Arthur Gary at the

12   Department of Justice, correct?

13   A.  That's correct.

14   Q.  And the top email on this thread is Acting Director Jarmin

15   forwarding to you and someone else the email that he had

16   written to Arthur Gary, correct?

17   A.  That's correct.

18             MR. HO:  Let's look at the email that Acting Director

19   Jarmin forwarded to you, the one that he wrote to Mr. Gary.

20   Acting Director Jarmin wrote to Mr. Gary on December 22:

21             "Thank you for your letter dated 12/12/2017 regarding

22   improving the quality of citizenship information for DOJ

23   enforcement of the Voting Rights Act.  Let me start by saying

24   the bureau is fully supportive of providing DOJ with the

25   highest quality statistical information possible.  To that end

1    I've directed staff to review all possible ways to address the

2    means expressed in the letter."

3    Q.  Did I read that correctly?

4    A.  Yes, you did.

5    Q.  Dr. Abowd, when Acting Director Jarmin wrote this email,

6    you understand him to be making -- you understand him to be

7    referring to the analysis that you were working on with the

8    SWAT team, correct?

9    A.  That's correct.

10   Q.  This email, dated February 22, 2017, that's the same date

11   as the draft version of the Brown *et al.* memo in the

12   administrative record that we talked about, beginning after the

13   lunch break, correct?

14   A.  That's correct.

15          MR. HO:  Now, the next two sentences of Acting

16   Director Jarmin's email to Mr. Gary read:

17          "They have now briefed me and their findings suggest

18   that the best way to provide PL 94 block level data with

19   citizen voting population by race and ethnicity would be

20   through utilizing a linked file of administrative and survey

21   data the Census Bureau already possesses.  This would result in

22   higher quality data produced at lower cost."

23   Q.  Did I read that right?

24   A.  Yes, you did.

25   Q.  When Acting Director Jarmin referred to a linked file of

1    administrative and survey data, your understanding is that's a

2    reference to alternative C in your memo, creating a citizenship

3    voting-age population table using administrative records,

4    right?

5    A.   It is a reference to alternative C, but I believe he

6    intended to also discuss with them whether they would like us

7    to do it enhancing the American Community Survey or with some

8    other survey basis.

9    Q.   And in his email to Mr. Gary, Acting Director Jarmin

10   referred to this as the "best way" to provide block-level CVAP

11   data to DOJ, correct?

12   A.   That's correct.

13   Q.   And Acting Director Jarmin, in his email to the Department

14   of Justice, referred to this option of using administrative

15   records as producing "higher quality data produced at lowest

16   cost," right?

17   A.   That's correct.

18   Q.   The last sentence of Acting Director Jarmin's email to Mr.

19   Gary at the Department of Justice says, "I suggest we schedule

20   a meeting of census and DOJ technical experts to discuss the

21   details of this proposal."

22        You're aware that a meeting was tentatively scheduled

23   between Mr. Gary and Acting Director Jarmin for mid-January,

24   right, Dr. Abowd?

25   A.   I'm aware from the administrative record, yes.

1   Q.  And you're aware that that meeting never took place,

2   correct?

3   A.  That meeting never took place, that's correct.

4   Q.  And in fact, Dr. Abowd, the Department of Justice refused

5   to take the meeting referenced here in this email for the

6   purpose of discussing the Census Bureau's proposal to produce

7   higher quality CVAP data at lower cost than adding a

8   citizenship question to the census, correct?

9   A.  I don't know personally that the Department of Justice

10  refused.  I've read in the administrative record the same

11  things that you have; it never happened.

12  Q.  And the reason it never happened is because DOJ leadership

13  didn't want that meeting to take place, right, Dr. Abowd?

14          MR. EHRLICH:  Objection.

15          THE COURT:  Sustained.

16  Q.  Your understanding is that DOJ leadership didn't want that

17  meeting to take place, right, Dr. Abowd?

18  A.  That is my understanding, yes.

19  Q.  Dr. Abowd, I'd like to show you some deposition testimony

20  that has been designated as evidence in this case and ask you

21  about your knowledge of it.

22          MR. HO:  With the Court's permission, your Honor, we'd

23  like to play a very short clip of acting -- Assistant Attorney

24  General John Gore's deposition designations, which have been

25  filed with the Court, which have been lodged with the Court and

1    filed publicly.

2              THE COURT:  Any objection?

3              MR. EHRLICH:  We don't see any need to do that, your

4    Honor.  He can ask Dr. Abowd his opinion and Dr. Abowd can give

5    his opinion.  I'm not sure why we need to watch a video clip,

6    which your Honor said you would watch on your own time.

7              THE COURT:  And I've already watched on my own time,

8    but that being said, I'll let Mr. Ho engage in his examination

9    the way he would like if there's no basis to object.

10             You may proceed.

11             MR. HO:  Thank you, your Honor.  The clip is very

12   short.  It's from page 274 of Mr. Gore's deposition.  The lines

13   have been designated lines 5 through 9, and we'll try to play

14   it now.

15             (Video played)

16   BY MR. HO:

17   Q.  Dr. Abowd, at the time the bureau was informed that the

18   Department of Justice did not want to meet to discuss the

19   Census Bureau's proposal for higher quality CVAP data at the

20   lower cost, were you aware that the attorney general personally

21   made that decision?

22   A.  I was not.

23   Q.  When did you become aware of that?

24   A.  When the administrative record revealed it.

25   Q.  Have you ever heard of another circumstance in which the

attorney general personally directed staff at the Department of

Justice not to meet with the Census Bureau to discuss a

proposal for higher quality data that the Department of Justice

requested?

A.  I have not, no.

Q.  Are you aware of any other circumstance in which a cabinet

secretary personally directed agency staff not to meet with the

Census Bureau?

A.  I'm not aware of any circumstances, no.

Q.  Dr. Abowd, in your experience, is it unusual for the Census

Bureau to receive a data request from an agency and then for

that agency to refuse to meet with the Census Bureau to discuss

the technical aspects of that data request?

A.  Yes, it is.

Q.  Now, sometime, Dr. Abowd, after your meeting with Secretary

Ross on February 12, you were asked to consider a fourth

alternative, which we've been referring to as option D or

alternative D.  Is that correct?

A.  That's correct.

Q.  Just so we're clear, alternative D combines both

alternatives B and C; that is, you both add a citizenship

question to the census and you look at administrative records

on citizenship under alternative D, correct?

A.  That's correct.

Q.  And your understanding was that after that February 12

IbdWnys5                        Abowd - Direct

1    meeting, Secretary Ross and Undersecretary Kelley wanted you to

2    work on alternative D, correct?

3    A.  To evaluate it, yes, that's correct.

4    Q.  And Acting Director Jarmin told you that, right?

5    A.  Yes, he did.

6              MR. HO:  I want to look at Plaintiffs' Exhibit 25.

7    This is admitted into the trial record as a part of the

8    administrative record.

9    Q.  Dr. Abowd, this is a memo under your name assessing

10   alternative D, correct?

11   A.  That's correct.

12       I want to note the watermark isn't on this page again, but

13   it is the administrative record.

14   Q.  I think it has something to do with the screen.  I

15   apologize for that.

16       But this is the version, 1.0, of the draft memo that you

17   prepared at the request of Acting Director Jarmin on the

18   subject of alternative D, right, Dr. Abowd?

19   A.  That's correct.

20   Q.  And it was directed through Acting Director Jarmin to the

21   undersecretary and to the secretary of commerce, correct?

22   A.  That's correct.

23   Q.  And the views expressed in this memo are those of the

24   senior executive straff at the Census Bureau, correct?

25   A.  That's correct.

1    Q.  And you're not aware of any subsequent versions of this

2    memo, correct?

3    A.  I am not.

4              MR. HO:  Let's turn to page 5 of this memo, which is

5    administrative record page 1312.

6    Q.  The final paragraph sets forth the conclusion of the Census

7    Bureau about alternative D in comparison to alternative C,

8    correct?

9    A.  Yes, it does.

10   Q.  And you concluded that alternative D would result in poorer

11   quality citizenship data than alternative C; it would still

12   have all the negative cost and quality implications of

13   alternative B outlined in the draft January 19, 2018, memo to

14   the Department of Commerce, correct?

15   A.  That's correct.

16   Q.  And so, the Census Bureau did not recommend alternative D,

17   correct?

18   A.  That was also correct.

19   Q.  And the Census Bureau still does not recommend alternative

20   D, correct?

21   A.  That's correct.

22   Q.  But Secretary Ross selected alternative D anyway, correct?

23   A.  The secretary instructed us to do alternative D, that's

24   correct.

25             MR. HO:  Now, I want to ask you about overall census

IbdWnys5                           Abowd - Direct

1   data quality under C and D.  And let's look at page 4 of this

2   memo, the last full paragraph.  I want to highlight the third

3   sentence, beginning with "however," about five lines down.

4   Q.  Now, your March memo here notes that because alternative D

5   involves adding a citizenship question to the census, the

6   Census Bureau expects to see the same reduction in

7   self-response rates that you would see under alternative B,

8   correct?

9   A.  That's correct.

10         MR. HO:  I want to ask you about the next sentence,

11  starting with "not only."

12  Q.  Your memo notes that the reduction in response rates, under

13  alternative D, would lead to more enumerations through the NRFU

14  process and more incorrect enumerations than you'd have under

15  alternative C, correct?

16  A.  Yes.

17         MR. HO:  And then let's highlight the next sentence,

18  starting with "in the 2010 decennial census."

19  Q.  The memo notes that the increased number of enumerations

20  through the NRFU process under alternative D will produce lower

21  quality personal data on the census responses as compared to

22  alternative C, correct?

23  A.  That's correct.

24  Q.  So if your goal is to have an accurate census, then

25  alternative C is superior to alternative D, correct?

1    A.   That's correct.

2    Q.   Now, under alternative D, due to the lower quality personal

3    data on census responses from increased number of households

4    going through NRFU, there will also be a reduction in the

5    number of individuals whom the Census Bureau can link to

6    administrative records, correct?

7    A.   Yes.  I thought that's what we were talking about, but yes,

8    that's correct.

9    Q.   OK.  Well, if we look at this, here, if we look at the last

10   sentence here, for the 2010 census, you're able to link 93

11   percent of self-responses to administrative records, correct?

12   A.   Yes.

13   Q.   But for proxy responses obtained through the NRFU process,

14   you're only able to link 33.8 percent of such individuals

15   through administrative records, correct?

16   A.   That's correct.

17   Q.   So just to be clear, under alternative D, there are going

18   to be fewer people that you can link to administrative records

19   than if you had -- if the secretary had instead chosen

20   alternative C, correct?

21   A.   That's correct.

22        I said yes.  I must be getting -- I'm sorry.  Yes, that's

23   correct.

24   Q.   OK.

25             MR. HO:  Now, let's turn back to Secretary Ross's

IbdWnys5                          Abowd - Direct

1    decision memo, Plaintiffs' Exhibit 26, and I want to look at

2    page 5 of the memo, the first paragraph on page 5.

3    Q.  The secretary's discussing alternative D in this paragraph,

4    correct?

5    A.  Yes, he is.

6              MR. HO:  And I want to ask you about the third

7    sentence in this paragraph, starting with "this may eliminate."

8    I want to ask you about what Secretary Ross is referring to

9    here.

10   Q.  One limitation of alternative C, using administrative

11   records, Dr. Abowd, is that not every person who is enumerated

12   in the census can be linked to administrative records, correct?

13   A.  That's correct.

14   Q.  So if you rely on administrative records -- excuse me,

15   under alternative C, to produce block-level CVAP data for DOJ,

16   there's a portion of the population for whom you're going to

17   have to impute, or model, their citizenship status, correct?

18   A.  I prefer model, but yes, that's correct.

19   Q.  The secretary's decision memo suggests that under

20   alternative D, that might eliminate the need for such modeling

21   of citizenship status for people who cannot be matched to

22   administrative records, right?

23   A.  That's what he says, yes.

24   Q.  Dr. Abowd, you analyzed the question of whether alternative

25   D could potentially address this gap in the administrative

1    records, right?

2    A.  Yes, we did.

3            MR. HO:  All right.  Let's bring your memo back up,

4    from March, Plaintiffs' Exhibit 25.  Let's look at page 4.

5    Q.  And under the header "can survey data address the gaps in

6    alternative C," this is the section where you address this

7    issue that Secretary Ross is talking about in his memo that we

8    talked about a moment ago, whether or not alternative D can

9    effectively address that gap in the administrative records,

10   right?

11   A.  There may have been other paragraphs, but it's certainly

12   discussed in this one as well.

13   Q.  Now, under alternative D, if you get a survey response on

14   citizenship status for someone who can't be matched to the

15   administrative records, you're going to use that survey

16   response, right?

17   A.  We're going to include that survey response in the record

18   of the 2020 census, yes.

19   Q.  Right.  I mean, you wouldn't, if you -- for this group of

20   people who can't be matched to administrative data but you get

21   a survey response, you wouldn't model their citizenship status;

22   you would take the survey response as to citizenship for that

23   person, right?

24   A.  As I think I've explained in several depositions, we've

25   charged a high-level expert panel that I'm the chair of inside

1   the Census Bureau to develop a scientific answer to the

2   question you just asked.  In the presence of a dual set of

3   records on citizenship status, it isn't obvious what the best

4   way to translate that into an estimate of citizen voting-age

5   population is.

6   Q.  I apologize, Dr. Abowd.  My question was probably

7   confusingly worded.  I wasn't talking about people for 94 whom

8   there are dual records.  I mean people who can't be linked to

9   the administrative record but for whom you do have a survey

10  response as to their citizenship status.  You're going to use

11  the citizenship response for that person rather than

12  modeling -- you're going to use the survey response for that

13  person rather than modeling their citizenship status, correct?

14  A.  I suspect that the internal expert panel will draw that

15  conclusion, but I want to say, once again, it is unusual to

16  dual source this, and it's not necessarily the best scientific

17  answer that you always use the survey if you don't have an

18  administrative record or that you always use the administrative

19  record when you don't have a survey.  The modeled answer can be

20  defended on objective ground, but we haven't developed it yet.

21  Q.  There's currently no objective grounds on which if all you

22  have about a person's citizenship status is their survey

23  response for you to reject the survey response, correct,

24  Dr. Abowd?

25  A.  That's correct.

1    Q.  Now, as we established earlier, though, Dr. Abowd, the

2    Census Bureau believes that noncitizens give an answer to the

3    citizenship question on the ACS that's probably wrong more than

4    30 percent of the time, right?

5    A.  That disagrees with the administrative record more than 30

6    percent of the time, yes.

7    Q.  And you noted in this March memo that a problem with

8    relying on the citizenship question to fill gaps in the

9    administrative record is that people who are not citizens have

10   a strong incentive to provide an incorrect answer to a

11   citizenship question if they answer at all, right?

12   A.  That's correct.

13   Q.  And the memo notes that even a large fraction of legal

14   permanent residents provide incorrect answer, survey responses

15   to the citizenship question on the ACS, correct?

16   A.  That's correct.

17   Q.  And so, a key difference between alternatives C and D is

18   for this population of people for whom you can't link to

19   administrative records, under alternative C, you model their

20   citizenship status and, under alternative D, if you get it, you

21   try to use the survey self-response, right?

22   A.  I think that's a fair characterization, yes.

23   Q.  But given the errors in survey responses to citizenship

24   questions that we discussed earlier, this memo, Dr. Abowd,

25   concludes that survey-collected citizenship data may not be

1    reliable for many of the people falling in the gaps in the

2    administrative record, correct?

3    A.  Correct.

4           MR. HO:  And let's look at page 4 of your memo.

5    Q.  The second-to-last sentence in the last paragraph, starting

6    with "this suggests," that's where you made that conclusion in

7    this memo, right, Dr. Abowd?

8    A.  That's correct.

9           MR. HO:  Let's turn to page 5 of the memo and look at

10   the first sentence, full sentence, starting with "thus, not

11   only are citizenship data."

12   Q.  Your March memo to Secretary Ross, Dr. Abowd, states that

13   citizenship survey data gathered under alternative D, it

14   describes such data as being of "suspect quality," correct?

15   A.  Correct.

16   Q.  But the memo --

17          MR. HO:  Let's flip back to page 4 of the memo, and

18   the second paragraph, the first sentence.

19   Q.  The memo describes the administrative data on citizenship

20   as "high quality," correct?

21   A.  Correct.

22   Q.  Dr. Abowd, there's no reason to think, for the group of

23   people that you can't match to administrative records, that on

24   average the survey responses under alternative D would be more

25   accurate than the modeling that you would conduct under

1    alternative C, right?

2    A.  That's correct.

3    Q.  And in fact, Dr. Abowd, for this group of people falling in

4    the gaps of the administrative records, your view is that the

5    modeled responses to citizenship status under alternative C

6    would be more likely to be accurate than the survey

7    self-responses to a citizenship question under alternative D,

8    correct?

9    A.  That's correct.

10   Q.  So, Dr. Abowd, for this group of people who can't be

11   matched to administrative records, the Census Bureau's view is

12   that the modeled responses to citizenship status under

13   alternative C would be more likely to be accurate than the

14   survey self-responses to a citizenship question under

15   alternative D, correct?

16   A.  That's correct.

17   Q.  And as we established earlier, Dr. Abowd, the number of

18   individuals you can't match at all to administrative records,

19   that's going to be higher under alternative D than under

20   alternative C, right?

21   A.  Also correct.

22   Q.  So for people who can't be linked to administrative

23   records, if you're attempting to determine their citizenship

24   status, Dr. Abowd, you would prefer modeling it to a survey

25   self-response, right?

1   A.   A little too compound.  Could you ask it --

2   Q.   Sure.

3   A.   -- straightforwardly.

4        Thank you.

5   Q.   If you want to get accurate citizenship information about

6   people who fall in the gaps of the administrative records, Dr.

7   Abowd, your recommendation would be to model their citizenship

8   status rather than to try to collect it through a survey

9   self-response, correct?

10  A.   That's correct.

11  Q.   And Dr. Abowd, if the Department of Justice's goal is to

12  get accurate block-level CVAP data, then for this group of

13  people who fall in the gaps of the administrative records, the

14  best course of action is to use -- is to impute their

15  citizenship status rather than use a survey question, correct?

16  A.   Most accurate data would come from modeling their

17  citizenship status, that's correct.

18            MR. HO:   OK.  Now let's turn back to Secretary Ross's

19  decision memo, page 5.  I want to look at the first paragraph

20  and the last two sentences that start with "finally."

21  Q.   I'd like you to read that to yourself and then, when you're

22  ready, let me know.

23  A.   I'm ready.

24  Q.   In these two sentences in this paragraph, Dr. Abowd, is it

25  your understanding that Secretary Ross is suggesting that

1   including a citizenship question on the 2020 census will enable

2   the Census Bureau to model citizenship status more accurately

3   by determining the accurate ratio of citizen to noncitizen

4   responses?

5   A.  So, once again, the secretary did not discuss this with me

6   so I don't know exactly what nuances he meant.  He appears to

7   believe that we would get more accurate CVAP data if we had

8   access to both the survey responses and the administrative

9   data, yes.

10  Q.  And the assertions in this, these two sentences of this

11  paragraph, Dr. Abowd, the commerce department never discussed

12  this with the chief scientist at the Census Bureau, right?

13  A.  It was not discussed with me, that's right.

14  Q.  Dr. Abowd, the two sentences here, they make technical

15  presumptions that the Census Bureau does not currently endorse,

16  correct?

17  A.  Once again, I'm not privy to the technical assumptions.

18  They appear to say that the secretary believes it would be more

19  accurate if we had access to both the survey responses and the

20  administrative data.

21  Q.  That assertion, as you understand it, Dr. Abowd, makes

22  technical presumptions that the Census Bureau would not

23  currently endorse, correct?

24  A.  That's correct.

25  Q.  And as of March 26, 2018, when Secretary Ross issued this

1   memo, the Census Bureau had not completed any analysis as to

2   whether or not the inclusion of a citizenship question would

3   better -- would enable the Census Bureau to more accurately

4   model citizenship status for people falling in the gaps of the

5   administrative records, correct?

6   A.  We hadn't done any of that modeling at that time, that's

7   correct.

8          MR. HO:  I want to ask you about another memo of yours

9   that's in the administrative record, Plaintiffs' Exhibit 24.

10  This is in the administrative record and has been admitted into

11  the trial record.

12  Q.  You recognize this memo, right, Dr. Abowd?

13  A.  Yes, I do.

14  Q.  It's a memo that quantifies, under one set of assumptions,

15  some of the data quality differences between alternatives C and

16  D, right?

17  A.  Yes.

18          MR. HO:  Let's turn to page 3 of the memo and figure

19  1.

20  Q.  Now, this is a breakdown of the Census Bureau's analysis of

21  data quality under alternative C, right?

22  A.  Yes, it is.

23  Q.  So at the time of this analysis, the bureau posited that

24  under alternative C, you could link 295 million out of the 330

25  million people whom you expect to enumerate during the 2020

1   census to administrative records containing citizenship, right?

2   A.  Yes.

3   Q.  That's about 89.4 percent of the population; sound right?

4   A.  That does sound right, yes.

5   Q.  According to this analysis, there's about 35 million people

6   whom you'd expect not to be able to link to administrative

7   records, right?

8   A.  That's correct.

9   Q.  That's about 10.6 percent of the population that would fall

10  into that gap of the administrative records that we've been

11  discussing, right?

12  A.  That's correct.

13  Q.  So under alternative C you would model citizenship status

14  for this about 10 percent of the population, right?

15  A.  That's correct.

16          MR. HO:  Let's turn to the next page, page 4 of the

17  memo, figure 2.

18  Q.  Now, this is a breakdown of data quality under alternative

19  D, correct?

20  A.  Yes, it is.

21  Q.  Little more complicated than alternative C, right?

22  A.  It has more boxes, yes.

23          MR. HO:  All right.  Let's walk through this.

24  Q.  On the right side of this chart, the bureau posited that

25  there would be 35.4 million people for whom you would not get a

IbdWnys5                         Abowd - Direct

1   response to the citizenship question on the 2020 census, right?

2   A.   Yes.

3   Q.   And if we look at the far left-hand side of the chart, the

4   bureau posits that there are 263 million people who you would

5   get a response to the citizenship question and whom you could

6   link to administrative records, and the administrative record

7   and the citizenship response would be the same, right?

8   A.   You're on the far left, right?

9   Q.   Yes.

10  A.   263 million?

11  Q.   Yes.

12  A.   Yes, that's right.

13  Q.   So if we add these two groups together, 263 million, where

14  the question response and the administrative records are the

15  same, and 35.4 million people for whom you don't get an answer

16  to the citizenship question at all, that group together,

17  collectively, putting a citizenship question on the census

18  doesn't give us any better information than if we had no

19  citizenship question on the census, right?

20  A.   Yes, that's right.

21  Q.   OK.   So if we add them together, that's 298.4 million

22  people for whom the citizenship question doesn't give us better

23  information about their citizenship status?

24  A.   That's correct.

25  Q.   That's 90.4 percent of the population, right?

1   A.  You've been doing well on the ratios, so I assume you did

2   that one right too.  Thank you.

3   Q.  OK.  Now let's talk about the rest of the population.  You

4   have, in the middle branch of this chart, 22.2 million people,

5   under alternative D, who you'd expect to give a response to the

6   citizenship question and who couldn't be linked to an

7   administrative record on citizenship, right?

8   A.  That's correct.

9   Q.  And you also have, on the far right-hand side here, 13.8

10  million people who have no response to a citizenship question

11  and no administrative record on citizenship, right?

12  A.  That's correct.

13  Q.  So you add those two numbers together, that's 36 million

14  people, under alternative D, who can't be linked to

15  administrative records on citizenship, right?

16  A.  Yes.

17  Q.  Now, that's more people who can't be linked to

18  administrative records than you had under alternative C, right?

19  A.  That is correct.

20  Q.  That's because of the reduction in data quality because of

21  more NRFU under alternative D, right?

22  A.  That's correct.

23  Q.  And that's one of the manifestations in which alternative D

24  produces worse data than alternative C, right?

25  A.  Yes, that's right.

IbdWnys5                        Abowd - Direct

1    Q.  OK.  Let's look again at the chart and the sort of middle

2    subbranch of the left branch of the chart, the 9.5 million.

3         Under alternative D, the Census Bureau posited you'd have

4    9-1/2 million people for whom the survey self-response on

5    citizenship and the administrative record disagree, right?

6    A.  That's right.

7    Q.  And you don't have any plan for what you would do with

8    those people right now, right?

9    A.  That we'd have to study, yes.

10   Q.  And the traditional Census Bureau practice is that if you

11   have a survey response that conflicts with an administrative

12   record, you generally rely on the survey response, right?

13   A.  So, I hope that I didn't say so unambiguously in any of the

14   depositions that there was a general practice here.  I thought

15   I said that this was a pretty unusual situation and that's why

16   we are going to study it further.  We don't generally put

17   ourselves in the situation where we have a disagreement and --

18   we try to address the disagreements in the design of the data

19   product.

20   Q.  Dr. Abowd, I want to bring you back to your October 5

21   deposition, your third deposition in this case.

22   A.  OK.

23   Q.  And specifically page 416, line 15:

24   "Q.  Now, the traditional Census Bureau practice, in general,

25   is that if you have a survey response that conflicted with an

1    administrative record, you generally rely on the survey

2    response, correct?

3    "A.  Correct."

4        Was that my question for you and your answer that day?

5    A.  Yes, it was.

6            MR. HO:  OK.  Can we come back to the chart from the

7    memo, figure 2.

8    Q.  Dr. Abowd, for that group of people, the 9-1/2 million

9    people for whom the survey response and the administrative

10   record conflict, if you use what you described in your 30(b)(6)

11   deposition as the traditional Census Bureau practice of relying

12   on the survey response instead of the administrative record,

13   you agree that that would probably be more accurate -- more

14   inaccurate, excuse me, than relying on the administrative

15   record, correct?

16   A.  Yes, I do.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. HO:

2   Q.  But if you relied on the administrative record instead of

3   a survey response, there would have been no reason to ask a

4   survey question in the first place, right?

5   A.  That's correct.

6   Q.  Now, to be clear, this problem doesn't exist under the

7   alternative C, right?

8   A.  Also correct.

9   Q.  Lets come back to this chart.

10      Now I asked you a while ago about the 22.2 million people

11  who fall in that gap, can't be linked to administrative

12  records, but from whom you anticipate getting a response to the

13  citizenship question.

14      That's an accurate characterization of the 22.2, right?

15  A.  Not linked?

16          Yes, that's correct.

17  Q.  That is about 6.7 percent of the population that can't be

18  linked to administrative records, but under alternative D, you

19  have a survey response, right?

20  A.  That's correct.

21  Q.  Now, under alternative C, you would expect to be able to

22  link some of these people to administrative records, right,

23  Dr. Abowd?

24  A.  Yes, that's correct.

25  Q.  But leave that aside.

1        For this group of 22.2 million people under alternative D,

2   if you follow traditional Census Bureau practices, you would

3   use the survey response rather than modeling their citizenship

4   status, right?

5   A.   That's correct.

6   Q.   And in your opinion, that would be less accurate than if

7   you just went with modeling their citizenship status, right?

8   A.   That's correct.

9   Q.   Dr. Abowd, if someone argued that alternative D was

10  justified because alternative C requires modeling citizenship

11  status for people who can't be linked to administrative

12  records, you would disagree with that conclusion, right?

13  A.   I would like you to ask it again.  If you could just read

14  it back, if you want.  I want to make sure I heard the

15  qualifying statements exactly.

16  Q.   Dr. Abowd, if someone argued to you that alternative C

17  is -- excuse me -- I'll try that again.

18       Dr. Abowd, if someone argued to you that alternative D is

19  justified because under alternative C, you would have to model

20  the citizenship status for this pool of people who can't be

21  linked to administrative records, you would disagree with that

22  conclusion, right?

23  A.   Yes, I would.

24  Q.   And the Census Bureau would disagree with that argument,

25  right?

```
 1    A.  Yes.

 2    Q.  Now, this chart, Dr. Abowd, there is a version of this --

 3    excuse me -- there are multiple versions of this in the Brown

 4    memo, right?

 5    A.  That's correct.

 6    Q.  I just want to identify them so that the court is aware of

 7    where they are.

 8              If we can turn back to Plaintiffs' Exhibit 162, and

 9    page 50 of the paper.

10         Starting on page 50 through pages 53, you go through four

11    possible scenarios for data quality under alternative D, is

12    that right?

13              And can we scroll through those, please.

14    A.  Yes, that's correct.

15    Q.  These scenarios all are constructed under different

16    assumptions, right, Dr. Abowd?

17    A.  Yes, that's correct.

18    Q.  And after conducting all of these scenarios, the conclusion

19    of the Census Bureau remains that alternative D produces worse

20    data quality than alternative C, correct?

21    A.  That's correct.

22              THE COURT:  Did you explain what AD REC means?

23              Did I miss that?

24              THE WITNESS:  I did not, your Honor.  It is a

25    shorthand for administrative record, ad. rec.
```

1          THE COURT:  Thank you.

2    BY MR. HO:

3    Q.  Lets go back to the Ross memo, Plaintiffs' Exhibit 26.  I

4    want to look at page five.

5          I think that's the Brown memo.  The Ross memo, Plaintiffs'

6    Exhibit 26.

7          The first three sentences of the first paragraph.  I want

8    to compare this, if we can, to your March memo, Plaintiffs'

9    Exhibit 25, page five of your memo, the second to last

10   paragraph.

11         So Secretary Ross orders option D, but your conclusion

12   before he made that decision was that including a citizenship

13   question on the 2020 census does not solve the problem of

14   incomplete person linkages when producing citizenship

15   statistics after 2020, correct?

16   A.  I confess that I've gotten the providence of boxes

17   confused.

18   Q.  Sure.

19         The one on the bottom, that has your conclusion that

20   including a citizenship question in the 2020 census does not

21   solve the problem of incomplete citizenship linkages when

22   producing citizenship statistics?

23   A.  From the March 1 memo?

24   Q.  Yes.

25   A.  OK.  Yes.

```
 1   Q.  That's correct, Dr. Abowd?

 2   A.  Yes, that's correct.

 3   Q.  When Secretary Ross in his decision memo wrote that

 4   alternative D may eliminate the need for the Census Bureau to

 5   have to model citizenship status for millions of people, you

 6   had already concluded, in fact, that alternative D did not

 7   solve that problem, right?

 8   A.  That's correct.

 9   Q.  And you also concluded in this memo that alternative C is

10   cheaper than alternative D, right?

11   A.  That's correct.

12   Q.  And you also concluded that using administrative records

13   alone would be more accurate than attempting to combine

14   administrative records and survey responses under alternative

15   D, right?

16   A.  That's correct.

17   Q.  And you communicated all of that to Secretary Ross through

18   your memo before his decision memo was issued, correct?

19   A.  That's correct.

20   Q.  I want to bring up Plaintiffs' Exhibit 359.  This has been

21   admitted into the trial record.

22       Dr. Abowd, you're familiar with this, right?

23   A.  Yes.  It's statistical policy directive number two.

24   Q.  From the Office of Management and Budget, correct?

25   A.  Yes.
```

1   Q.   The Census Bureau is bound by OMB standards and guidelines,

2   correct?

3   A.   The office of the chief statistician is charged with

4   supervising the activities of the statistical agencies of the

5   United States Government, yes.

6   Q.   I want to turn to page 16 of the document, of the PDF which

7   is page 11 of the document for the record.

8        Standard 2.3 reads:  Agencies must design and administer

9   their data collection instruments and methods in a manner that

10  achieves the best balance between maximizing data quality and

11  controlling measurement error while minimizing respondent

12  burden and cost.

13       I read that correctly, right?

14  A.   Yes, you did.

15  Q.   And the Census Bureau is bound by standard 2.3, correct?

16  A.   The Census Bureau is required by the Office of Management

17  and Budget to justify its actions in light of standard 2.3.

18  Q.   Dr. Abowd, within the meaning of standard 2.3, the

19  Secretary's chosen option, alternative D, results in lower data

20  quality than the Census Bureau's recommendation of

21  alternative C, correct?

22  A.   That's correct.

23  Q.   Dr. Abowd, within the meaning of standard 2.3, the

24  Secretary's chosen option of alternative D also has a higher

25  respondent burden than the Census Bureau's recommendation of

1   alternative C, correct?

2   A.  That's correct.

3   Q.  Dr. Abowd, within the meaning of standard 2.3, the

4   Secretary's chosen option of alternative D has a higher cost

5   than the Census Bureau's recommendation alternative C, correct?

6   A.  That's correct.

7   Q.  Guideline 2.3.1 reads:  Design the data collection

8   instrument in a manner that minimizes respondent burden, while

9   maximizing data quality.

10      Did I read that right?

11  A.  Yes, you did.

12  Q.  Dr. Abowd, choosing alternative D over alternative C does

13  not comport with guideline 2.3.1, correct?

14  A.  So the Census Bureau's obligation is not to determine how

15  OMB will interpret guideline 2.3.1 in terms of our actions.

16      I think I already said alternative D deliveries higher

17  quality data at lower cost.

18  Q.  And alternative C --

19  A.  I'm sorry.  I misspoke.

20  Q.  Alternative C deliveries high quality data at lower cost?

21  A.  That's what I meant to say.  Sorry.

22  Q.  It does so with lower respondent burden, correct?

23  A.  Yes, it does.

24  Q.  All of that and choosing alternative C would be consistent

25  with guideline 2.3.1, correct?

1   A.  Yes, it would.

2   Q.  In the meetings that you had with Commerce Department

3   officials, you heard Commerce Department officials opine that

4   alternative D would be better than alternative C, right?

5   A.  So in none of the meetings -- first of all, I only met with

6   the Secretary once on this subject.  I believe with the Under

7   Secretary only once.

8        And I believe in those meetings, some staff members

9   may have opined there are reasons why they thought that certain

10  alternatives would be better.  But, frankly, I don't remember

11  any such conversations.  I remember being asked a lot of

12  questions and being asked questions that suggested that one or

13  another of the persons in the room thought one way of doing it

14  might be better than the other.

15       I'm sure I said this in my fact deposition.  There was

16  a very open discussion with both the Under Secretary and the

17  Secretary in the only time I was in a meeting with them on this

18  subject.  Subsequently, Dr. Lamas had additional discussions

19  with them, I think primarily Dr. Jarmin, and I won't

20  characterize those because I wasn't in those meetings.

21  Q.  Dr. Abowd, you remember a meeting where a member of

22  Secretary Ross' staff, Earl Comstock, expressed the opinion

23  that alternative D would be superior to alternative C because

24  it would enable you to fill the gaps in the administrative

25  record?

1    A.  So, frankly, I don't remember being in a meeting when

2    alternative D was already on the table.  He was in the meeting

3    on February 12, but I don't believe we were discussing

4    alternative D at that time, except in the sense of comparing

5    B to C.  I don't recall being in a meeting with him.

6    Q.  Dr. Abowd, I'm going to bring up for you a section of your

7    deposition transcript on October 5, 2018, page 422, lines 3

8    through 11.

9        Go ahead and read that and see if it refreshes your

10   recollection.

11   A.  OK.  Out loud?

12            (Pause)

13   Q.  Does that refresh your recollection, Dr. Abowd?

14            MR. EHRLICH:  Your Honor, I would say, again, he is

15   testifying there as a 30(b)(6) witness for the Census Bureau.

16            THE COURT:  I think the law is clear you can show a

17   witness absolutely anything to refresh his recollection, so

18   that is what is being done here.

19            The objection's overruled.

20   A.  May I ask to see the question that preceded this?

21   Q.  You could.  Sure.

22            THE COURT:  For the record, I recall a lecture for the

23   bar saying that you could refresh recollection with a bowl of

24   fettuccine alfredo.  By that standard, this is certainly

25   proper.

1          Go ahead.

2     BY MR. HO:

3     Q.  The previous question is on page 421, line 17.  Feel free

4     to read that to yourself.

5          Just let me know when you're ready.

6          (Pause)

7     A.  I would like to qualify that --

8     Q.  I haven't put a question to you yet, Dr. Abowd.

9     A.  OK.  Go ahead.

10    Q.  Could I?

11    A.  Yes.  Go ahead.

12    Q.  Reading that, does that refresh your recollection about

13    whether or not you've ever heard Earl Comstock express the view

14    that alternative D is superior to alternative C because it

15    fills in the gaps in the administrative record?

16    A.  So I understood my duty when I was testifying as the

17    agency's 30(b)(6) witness --

18         THE COURT:  Hold on, Doctor.  The answer to that

19    question is either yes or no.  It either refreshes your

20    recollection --

21         THE WITNESS:  Yes, it does refresh my recollection.

22         THE COURT:  Now I'm sure Mr. Ho will ask you another

23    question.

24    BY MR. HO:

25    Q.  You don't agree with Mr. Comstock's opinion, right,

1    Dr. Abowd?

2    A.   That's correct.

3    Q.   And the Census Bureau does not agree with Mr. Comstock's

4    opinion, right, Dr. Abowd?

5    A.   That is correct.

6    Q.   The Census Bureau communicated its disagreement with that

7    opinion to Mr. Comstock, right?

8    A.   Yes, that is correct.

9    Q.   And if Mr. Comstock testified in a deposition, Dr. Abowd,

10   that the Census Bureau never communicated its disagreement with

11   that opinion, Mr. Comstock would be wrong, right, Dr. Abowd?

12   A.   I believe that's the case, yes.

13   Q.   Secretary Ross didn't choose alternative C, he chose

14   alternative D anyway, right, Dr. Abowd?

15   A.   That's correct.

16   Q.   Now, I just want to back up and ask you a few questions

17   about how this process unfolded.

18        Dr. Abowd, you would agree that normally, the process of

19   testing content on the census, is a decade-long process

20   involving multiple tests and various randomized control tests,

21   correct?

22   A.   Yes.

23   Q.   Lets bring up Plaintiffs' Exhibit 271.  This has been

24   admitted into the trial record.  This is 2020 census program

25   memorandum series 2016.05, dated April 29, 2016, from Lisa

1    Blumerman.

2    A.   Blumerman.

3    Q.   Blumerman.   Thank you, Dr. Abowd.

4         The subject of this memo is:  Plan development and

5    submission of subjects planned for the 2020 census program and

6    questions planned for the 2020 census program.

7         Right, Dr. Abowd?

8    A.   Yes.

9    Q.   I'm going to refer to this document as the Blumerman memo.

10   OK?

11   A.   Yes.

12   Q.   Now, as of the date that she signed this memo, Lisa

13   Blumerman was an associate director for the 2020 census,

14   correct?

15   A.   That's correct.

16   Q.   Lets turn to page three.  I want to look at the section

17   under the header Federal Agency Input.

18        The first paragraph, the last sentence reads:  Federal

19   agencies with known uses of the 2020 census or ACS content, and

20   sector agencies, will receive a letter with instructions for

21   how federal data users may provide updates to the documentation

22   of data uses.  Responses should be received before July 1,

23   2016.  Census Bureau staff may follow up with federal users

24   directly if more clarification is required.

25        Dr. Abowd, do these sentence conform to your understanding

1    of how the content review was conducted and presented to

2    members of the 2020 census executive steering committee?

3    A.  Yes.

4    Q.  The Department of Justice's request to add a citizenship

5    question was not received by July 1, 2016, correct?

6    A.  That's correct.

7    Q.  To the best of your knowledge, the Department of Justice

8    did not previously write to the Census Bureau about adding a

9    citizenship question prior to December 2017, right?

10   A.  That's correct.

11   Q.  And prior to December 2017, in fact, the Census Bureau had

12   never heard from the Department of Justice that existing CVAP

13   data produced by the Census Bureau was not ideal for purposes

14   of DOJ's VRA enforcement work, correct?

15   A.  I'll answer your question, but I want to just see if you

16   misspoke.

17           Did you mean prior to July 1, 2016?  You said '17.

18   Q.  I said December 2017.  I think I meant December 2017.

19       Before the request, the Gary letter came into the Census

20   Bureau, the Department of Justice had never communicated to the

21   Census Bureau that ACS CVAP data was not ideal for DOJ's VRA

22   enforcement purposes, right, Dr. Abowd?

23   A.  That's correct.

24   Q.  Lets go back to the Blumerman memo, and I want to look at

25   page four of the memo.

1          There is a header that reads Content Determination, and the

2     second paragraph, last sentence reads:  Final proposed

3     questions are based on the results of extensive cognitive

4     testing, field testing, other ongoing research, and input from

5     advisory committees.

6          That is your understanding of what the process for the 2020

7     census was presented to the Census Bureau's 2020 executive

8     steering committee, right?

9     A.   The memo simultaneously describes ACS and 2020 census, but

10    I believe that sentence was intended to apply to both, yes.

11    Q.   Now, your understanding is that the 2010 full census

12    questionnaire was subjective to cognitive testing, right,

13    Dr. Abowd?

14    A.   Yes.

15    Q.   There has been no cognitive testing, however, of the full

16    2020 census questionnaire, including a citizenship question,

17    correct?

18    A.   That's correct.

19    Q.   Now, lets talk about the second component here, the next

20    component after cognitive testing, field testing.

21         To the best of your knowledge, Dr. Abowd, the full 2010

22    decennial census questionnaire was field tested, correct?

23    A.   That's correct.

24    Q.   The full 2020 census questionnaire, including a citizenship

25    question, has not been field tested, correct?

1    A.  That's correct.

2    Q.  Now, there were, I believe, some recent trials that have

3    been described as the end-to-end test this year, Dr. Abowd?

4    A.  So the 2018 end-to-end census test was conducted this year,

5    yes.

6    Q.  And that is sort of like the last dress rehearsal for the

7    2020 census, right?

8    A.  It's the last large scale test of the 2020 census, correct.

9    Q.  The end-to-end test did not include a citizenship question,

10   correct?

11   A.  That is correct.

12   Q.  And as of the date of your last deposition in this case,

13   October 12, 2018, there were still no plans for field testing

14   of the full 2020 census questionnaire, including a citizenship

15   question, correct?

16   A.  I don't know that you asked me the question in that form at

17   my October 12 deposition.

18   Q.  I wasn't there, so I certainly couldn't have, but let me

19   put a different question to you, Dr. Abowd.

20        At the time that Secretary Ross made his decision to

21   include a citizenship question on the census, there were no

22   plans for field testing of the census questionnaire, including

23   a citizenship question, correct?

24   A.  That's correct.

25   Q.  Now, Dr. Abowd, after the 1990 census, the Census Bureau

1    investigated the possibility of adding a question concerning

2    respondents' Social Security numbers on the census short form,

3    correct?

4    A.   Yes.

5    Q.   And the Census Bureau conducted an RCT comparing a version

6    of the short form with and without a question asking for a

7    Social Security number, correct?

8    A.   That's correct.

9    Q.   And the RCT assessed the impact on self-response rates of a

10   Social Security number question, correct?

11   A.   That's correct.

12   Q.   And in the RCT, the self-response rate fell off in the

13   group that had the Social Security number question by 3.4

14   percent, correct?

15   A.   That's correct.

16   Q.   And the conclusion that was drawn from that RCT was that

17   asking for a Social Security number would be sensitive, right?

18   A.   Yes.

19   Q.   And today, the Census Bureau does not request for Social

20   Security numbers on the census questionnaire, right?

21   A.   We never have.

22   Q.   And one of the reasons for that is a concern about the

23   effect of that question on self-response rates, correct?

24   A.   I believe that's correct, yes.

25   Q.   And it is your opinion, Dr. Abowd, that for some sub

1   populations, asking about citizenship might be just as

2   sensitive as asking a question about Social Security numbers,

3   right?

4   A.  Yes.

5   Q.  In fact, it is your opinion that for some sub populations,

6   asking a question about citizenship would be more sensitive

7   than asking a question about Social Security numbers, correct?

8   A.  I think I said could, but yes.

9   Q.  The RCT to assess the effect of a Social Security number on

10  self-response rates to the census was conducted before any

11  decision was made about whether to include a Social Security

12  number question on the census, right?

13  A.  Yes.

14  Q.  And no similar RCT has taken place here along those lines

15  before a decision was made to include a citizenship question,

16  correct?

17  A.  Yes.

18  Q.  Lets bring up Plaintiffs' Exhibit 268.

19          THE COURT:  Actually, lets take our break here instead

20  of doing that.  It is 3:22.  We'll start again at 3:32.

21          Because we're still in the direct examination,

22  Dr. Abowd, you should not communicate about the substance of

23  your testimony with defense counsel.

24          I'll see you in ten minutes.  Thanks.

25          (Recess)

1    THE COURT:  All right.  Dr. Abowd, you're still under

2    oath.

3    Mr. Ho, you may continue.

4    MR. HO:  Thank you, your Honor.

5    BY MR. HO:

6    Q.  Dr. Abowd, I want to ask you about Plaintiffs' Exhibit 268,

7    which has been admitted into evidence.

8    Dr. Abowd, this is a proposed content test on a citizenship

9    question dated May 3, 2018, correct?

10   A.  Yes.

11   Q.  This is a proposal for an RCT for a citizenship question on

12   the census, correct?

13   A.  It is an RCT for the content of alternative versions of the

14   citizenship question on the -- using the ACS, yes.

15   Q.  This RCT proposal was created by Census Bureau staff,

16   correct?

17   A.  Yes.

18   Q.  And it was made in May of 2018?

19   A.  That's correct.

20   Q.  And the proposal was to initiate an RCT in either November

21   of 2018 or February of 2019, correct?

22   A.  That's correct.

23   Q.  The RCT, as proposed here, would have taken six weeks to

24   collect the data, correct?

25   A.  Yes.

IBDsNYS6                        Abowd - Direct

1    Q.  Either if it had been in November of 2018 or February of

2    2019, either way the RCT could have been completed before

3    census forms are due to be printed, correct?

4    A.  Yes.

5    Q.  And the cost of this proposal ranges depending upon the

6    options you chose between $2 million for one option to

7    $4.1 million for another option, correct?

8    A.  Yes.

9    Q.  The Census Bureau has that money, right, Dr. Abowd?

10   A.  Yes.

11   Q.  This proposal was rejected by a group of decision-makers,

12   including Under Secretary Karen Dunn Kelley, correct?

13   A.  As I testified in my 30(b)(6), the decision not to conduct

14   this RCT was made by -- excuse me -- Dr. Enrique Lamas'

15   consultation with the Under Secretary, yes.

16   Q.  I would like to bring up Plaintiffs' Exhibit 271, the

17   Blumerman memo.

18           THE COURT:  Who was the second person, Dr. Jarmin?

19           THE WITNESS:  Deputy, Acting Deputy Director Enrique

20   Lamas.  Dr. Lamas.

21           THE COURT:  Thank you.

22   BY MR. HO:

23   Q.  Back to page four of the Blumerman memo.

24       The page entitled Content Determination, and that last

25   sentence in the second paragraph.

1    We talked about cognitive testing, field testing, and RCT,

2    which I put in the category of ongoing research.  Those are all

3    different things, right, Dr. Abowd; like doing an RCT and

4    conducting that, that doesn't take the place of cognitive

5    testing and field testing, right?

6    A.  In some cases, they are intertwined, but they are

7    considered distinct activities, yes.

8    Q.  Lets talk about -- I'm sorry.  One other question.

9        If you do an RCT and the results come out suggesting that a

10   question could reduce response rates, do you just plow ahead

11   and do that, or would you conduct more analysis before using a

12   question that you had tested?

13   A.  When we conduct an RCT, we expect it to produce actionable

14   data, and exactly what actions would be taken as a consequence

15   of those data depends on the structure of the RCT and the point

16   in the survey development cycle that it is conducted.

17   Q.  Just to be clear, doing an RCT, it is not like a box that

18   you check, and regardless of what the results are, you just

19   say, Great, we've conducted an RCT, we can go ahead now?

20       You have to actually look at the results of the RCT

21   and incorporate that into your process, correct?

22   A.  That is the justification for running an RCT, yes.

23   Q.  OK.  Lets talk about the next item here, input from

24   advisory committees.

25       Input was not solicited from the Census Bureau's advisory

1    committees before Secretary Ross made his decision to add a

2    citizenship question to the 2020 census, correct?

3    A.  That's correct.

4    Q.  If you had been given more advance notice, then the Census

5    Bureau could have consulted with, for example, CSAC, the Census

6    Scientific Advisory Committee, before a decision was made,

7    right?

8    A.  Yes.

9    Q.  And if you had been given more advance notice, you would

10   have convened a working group with the advisory committees to

11   study the citizenship question, right?

12   A.  Probably.

13   Q.  And you would have discussed that question actively with

14   the working groups, right?

15   A.  Yes.

16   Q.  But no such act of discussions with the advisory committees

17   happened before Secretary Ross made his decision, correct?

18   A.  That's correct.

19   Q.  Now, backing up to talk again a little bit more about the

20   process before Secretary Ross made his decision, Dr. Abowd,

21   after you communicated the Census Bureau's initial views in

22   your February 12 memo with Secretary Ross, the Commerce

23   Department sent a list of 35 followup questions to the Census

24   Bureau, correct?

25   A.  Yes.

1    Q.  And some of those questions concerned testing, right?

2    A.  Yes, they do.

3    Q.  OK.  Lets bring up Plaintiffs' Exhibit 140.

4        These are draft responses to those 35 questions from

5    the Commerce Department, right?

6    A.  Draft responses from the Census Bureau to the Commerce

7    Department, yes.

8    Q.  Thank you for that correction.

9        Just for the record, this document has been admitted into

10   the trial record, and it is part of the supplemental

11   administrative record in this case.

12       Dr. Abowd, it is your belief that Acting Director Jarmin

13   intended for you to take responsibility for making sure that

14   the answers to these questions were accurate, correct?

15   A.  For the vast majority of them, yes.  He asked me to track

16   that the person assigned to deliver an answer had done so, to

17   vet that answer, to communicate that answer to Burton Reist,

18   the chief of the decennial communications office, and then

19   Burton Reist was charged with delivering those answers to the

20   Commerce Department on a flow basis.  They did go back and

21   forth before we determined that we adequately answered each of

22   the questions.

23   Q.  It is your understanding that Acting Director Jarmin

24   intended you to be ultimately responsible for making sure that

25   the answers to these questions were accurate, correct?

1    A.  Yes.

2    Q.  Lets turn to page six in these draft responses, which is

3    administrative record page 10900.

4        I want to ask you about question 31.  Question 31 asks:

5    What was the process that was used in the past to get questions

6    added to the decennial census, or do we have something similar

7    where a precedent was established.

8        Did I read that right?

9    A.  Yes.

10   Q.  The draft response reads:  The Census Bureau follows a

11   well-established process when adding or changing content on the

12   census or ACS to ensure the data fulfill legal and regulatory

13   requirements established by congress.  Adding a question or

14   making a change to the decennial census or the ACS involves

15   extensive testing, review, and evaluation.  This process

16   ensures the change is necessary and will produce quality,

17   useful information for the nation.

18       Did I read that right?

19   A.  Yes, you did.

20   Q.  OK.  The text here in this draft response, this was sent

21   from the Census Bureau to the Commerce Department, correct?

22   A.  As I said before, several versions were sent, but I believe

23   this is one of them, yes.

24   Q.  This is one of the versions of the draft response to

25   question 31 that the Census Bureau sent to the Commerce

 1    Department?

 2    A.  Yes.

 3    Q.  And this states that, in this draft response, that adding

 4    a question to the decennial census or ACS involves extensive

 5    testing, review, and evaluation, correct?

 6    A.  Yes.

 7    Q.  And as of March 1, 2018, that was your understanding, that

 8    adding a new question to the decennial census involves

 9    extensive testing, review, and evaluation, correct?

10    A.  Correct.

11    Q.  I want to show you a different version of this document.

12        I'm sorry.  Before we move on, could we bring that back up

13    just for a second.  On the next page, I just want to look at

14    the bullets here.

15        I'm sorry.  Can we get the text just above the bullets too.

16        This is part of the draft response to question 31, right,

17    Dr. Abowd?

18    A.  Yes.

19    Q.  It reads:  The Census Bureau and the Office of Management

20    and Budget (OMB) have laid out a formal process for making

21    content changes.

22        Then there is a series of six bullets after that, right?

23    A.  Correct.

24    Q.  And is it an accurate summary to say that this formal

25    process, as described in these draft responses, includes

1    federal agencies evaluating their data needs, a proposal that

2    demonstrates a clear statutory regulatory need for the data,

3    final proposed questions resulting from extensive cognitive and

4    field testing, several opportunities for public comment, a

5    decision made in consultation with OMB, and then finally, if

6    approved, the Census Bureau implementing the change, is that

7    right?

8    A.  Yes.

9    Q.  OK.  Now, I want to show you Plaintiffs' Exhibit 23.

10        Dr. Abowd, this has been admitted into evidence, and it is

11   in the initial administrative record in this case as the final

12   version of responses to the 35 questions.

13        Does that comport with your recollection?

14   A.  May I see all the pages of the document, please?

15   Q.  Sure.  Maybe we could scroll through.

16        Does that look right to you, Dr. Abowd?

17   A.  Yes.

18   Q.  Just to be clear, this version of the document was produced

19   in the initial administrative record in this case, but the

20   draft responses that we were talking about earlier, those were

21   not in the initial administrative record in this case, is that

22   your recollection?

23   A.  It's my recollection that this is the version that was in

24   the first 1300 or so pages of administrative record that were

25   these, yes.

1  Q.  Lets look at page 11 and the response to question 31 that

2  is in the final version of these responses in the

3  administrative record.

4      Question 31 about the process used in the past for adding

5  questions to the decennial census, the final version of this

6  response reads:  Because no new questions have been added to

7  the decennial census (for nearly 20 years), the Census Bureau

8  did not feel bound by past precedent when considering the

9  Department of Justice's request.  Rather, the Census Bureau is

10 working with all relevant stakeholders to ensure that legal and

11 regulatory requirements are filled and that questions will

12 produce quality, useful information for the nation.  As you are

13 aware, that process is ongoing at your direction.

14     Did I read that correctly?

15 A.  Yes, you did.

16 Q.  OK.  So the final version of these responses, as found in

17 the initial administrative record in this case, makes no

18 reference to a well-established process for adding content to

19 the census, right?

20 A.  That's correct.

21 Q.  Instead, the final version in the administrative record

22 says that the Census Bureau did not feel bound by past

23 precedent, right?

24 A.  That's what it says.

25 Q.  And this final version here in the initial administrative

 1    record in this case, it makes no reference to extensive

 2    testing, review, and evaluation, correct?

 3    A.  That's correct.

 4    Q.  It also makes no reference to ensuring that a change to the

 5    census is necessary, right?

 6    A.  It makes reference to consulting with stakeholders, but it

 7    doesn't explicitly say the things that the original answer

 8    said.

 9    Q.  It doesn't use the word necessary to ensure that a change

10    is necessary to the 2020 census, right, Dr. Abowd?

11    A.  That's correct.

12    Q.  Dr. Abowd, you didn't write this final version of the

13    response to question 31 that appear in the administrative

14    record, right?

15    A.  That's correct.

16    Q.  You're not sure who wrote it, right?

17    A.  That's also correct.

18    Q.  You don't know if someone at the census -- I mean, you're

19    not aware of someone at the Census Bureau having written this,

20    Dr. Abowd?

21    A.  I had the control copy, and it is not in the last version

22    of the control copy in the folders that were searched for the

23    production of the administrative record.

24    Q.  So this version, Dr. Abowd, that says that the Census

25    Bureau did not feel bound by past precedent, that phrase is not

1    in the last version of this document in the possession of the

2    Census Bureau, correct?

3    A.   As far as I know, correct.

4    Q.   This final version, Dr. Abowd, which makes representations

5    about what the Census Bureau felt bound by, was not written by

6    someone at the Census Bureau, right, Dr. Abowd?

7    A.   Not to the best -- not to the best of my knowledge.

8    Q.   Are you aware, Dr. Abowd, that this was written by someone

9    at the Commerce Department?

10   A.   I don't know who wrote this.

11           THE COURT:  Do you know if any of the other questions

12   changed between the final copy that you had on your computer

13   and this copy?

14           THE WITNESS:  I do not believe any other answers are

15   changed.

16   BY MR. HO:

17   Q.   Dr. Abowd, just to close the loop on something you

18   mentioned earlier.  You made a reference to a control copy.

19           What did you mean by that?

20   A.   I meant that because I was keeping track of who had been

21   assigned to answer the questions, and then when I got an answer

22   back from that person getting that answer vetted, and then

23   copying it into the control copy -- master copy, I think, is a

24   synonym -- that I understood to be the final versions of each

25   of those answers.

1   Q.  So you maintain possession of the master version of

2   responses to these questions, right?

3   A.  We had some custody issues.  Burton Reist also had a

4   version that he exchanged without passing through the control

5   copy, but we did synchronize them.

6   Q.  OK.  And as far as you know, the final version of the

7   answer to question 31, a question that was posed by the

8   Commerce Department to the Census Bureau and which makes

9   representations about what the Census Bureau felt bound by,

10  was not written by someone at the Census Bureau, correct?

11              MR. EHRLICH:  Objection.

12              THE COURT:  Sustained.

13              Can you tell me what you did with the control copy as

14  you've described it?

15              In other words, where did it go between the time that

16  you considered it to be final and the creation of this

17  document; do you know?

18              THE WITNESS:  So, I do, your Honor.  I know that

19  Deputy Director, Acting Deputy Director Lamas asked Burton

20  Reist, who is the chief of the decennial communications office,

21  to communicate the answers back to Commerce on a flow basis.

22              So I was keeping a master copy, but Burton was sending

23  answers by e-mail as we made them and as they were vetted up to

24  Commerce.  Several incomplete copies of the document were

25  exchanged back and forth, and eventually inside the Census

Bureau, around March -- 1, there is a date on the control copy,

I think it is March 1 -- we agreed that these were the final

answers.

That is the copy that I have sitting in my -- well,

there was an area of secured disk that we were using to store

the documents related to the citizenship question that is still

there.

THE COURT:  What, if anything, did you do with it

after March 1, when, as far as you were concerned, it was the

final version?

THE WITNESS:  I believe I was copied on an e-mail

where it was communicated back, then I just moved on.

THE COURT:  Communicated back meaning sent?

THE WITNESS:  Sent to Commerce.

THE COURT:  By Commerce, you mean who at Commerce

would have received it?

THE WITNESS:  So these e-mail threads tended to grow

organically.  Burton Reist would initiate them, and then there

would be a back-and-forth exchange, and then someone like

Dr. Lamas would ask to put a consolidated set together and send

them up and say these are -- he would have called it the latest

version.  There was a lot of back and forth because they asked

for a lot of clarifications as we were developing the answers.

And, in fact, the final version has a spreadsheet addendum that

I haven't been shown, but I think is the next thing in the

1  administrative record.

2           So around March 1, after we had all agreed that these

3  were the answers, and as we understood it, Commerce had agreed

4  that we had answered their questions, I marked the March 1 copy

5  that was sent, whatever date it was sent, I believe it was

6  March 1, I marked that copy in the secured folder the final

7  one.

8           THE COURT:  All right.  But do you, sitting here

9  today, do you know who that copy was sent to at Commerce?

10          THE WITNESS:  I believe it is in the administrative

11 record, the e-mail that conveyed it, but I don't remember.  I

12 believe at least the Under Secretary would have been on the

13 list.

14          THE COURT:  The Under Secretary being Kelley?

15          THE WITNESS:  Dunn Kelley.

16          THE COURT:  Thank you.

17 BY MR. HO:

18 Q.  The text written in this final version of the response to

19 question 31 posed by the Commerce Department to the Census

20 Bureau, Dr. Abowd, this is not the text in the final version

21 that the Census Bureau transmitted to the Commerce Department,

22 correct?

23 A.  That's correct.

24 Q.  Lets go back to Plaintiffs' Exhibit 26, Secretary Ross'

25 decision memo.

1        I want to look, again, at that second paragraph on the

2    first page, following receipt of the DOJ request.  That

3    sentence.

4        Dr. Abowd, the analyses that we've been discussing that you

5    conducted of a possible effect of a citizenship question on the

6    census, you did all that on pretty short notice, right?

7    A.  Relatively quickly, yes.

8    Q.  I mean, you learned about it around December 15, 2017, and

9    you turned around a memo to the Commerce Secretary January 19,

10   right?

11   A.  That's correct.

12   Q.  A lot of analysis in a short period of time, right?

13   A.  I have to say, that isn't particularly unusual, but it is

14   correct.

15   Q.  It was over the holidays too, right?

16   A.  That is also true.

17   Q.  And you performed that work to the best of your ability,

18   right?

19   A.  Yes.

20   Q.  Do you think it was an impressive amount of work that the

21   swat team under your direction produced in that period of time,

22   Dr. Abowd?

23   A.  My understanding is they didn't get a lot of sleep.

24   Q.  I mean, you're submitting it for peer review for

25   publication, right?

IBDsNYS6                        Abowd - Direct

1   A.  So I'm not an author of the technical paper.  It has not

2   yet been submitted for peer review, but we do expect to do

3   that.  That is the reason it was released as a technical paper,

4   yes.

5   Q.  The entire time you were conducting that analysis over the

6   holidays, you were operating under the impression that the

7   Secretary set out to take a hard look at this issue following

8   the Department of Justice's request, correct?

9   A.  Yes.

10  Q.  And you were under the impression that all that hard work

11  that you were doing might have some bearing on the Secretary's

12  ultimate decision, correct?

13  A.  Yes.

14  Q.  I want to bring up Plaintiffs' Exhibit 2.  This is the

15  supplemental memorandum by Secretary of Commerce Ross in the

16  administrative record that's been admitted.  I want to

17  highlight the first three sentences.

18      I want to talk about -- well, lets just talk about the

19  second sentence.

20          Soon after my appointment as Secretary of Commerce, I

21  began considering various fundamental issues regarding the

22  upcoming 2020 census, including funding and content.

23      The next sentence reads:  Part of these considerations

24  included whether to reinstate a citizenship question, which

25  other senior administration officials had previously raised.

1    Dr. Abowd, now, you know that Secretary Ross, as stated in

2    his supplemental memo in the administrative record, began

3    considering this issue of a citizenship question soon after his

4    appointment as Commerce Secretary in early 2017, correct?

5    A.  Yes.

6    Q.  OK.  But during that period, when you and the swat team

7    were working hard on your analysis between the middle of

8    December of 2017 and January of 2018, you were not aware that

9    Secretary Ross had begun considering a citizenship question in

10   early 2017, right?

11   A.  That's correct.

12   Q.  And at the meeting that you had with Secretary Ross on

13   February 12, when you presented your findings from all of that

14   analysis that you conducted, no one mentioned to you that

15   Secretary Ross had already begun considering this question in

16   early 2017, correct?

17   A.  That's correct, but we did have a very open discussion.

18   Q.  That open discussion didn't include the fact that Secretary

19   Ross had already begun considering this issue in early 2017,

20   right, Dr. Abowd?

21   A.  That's correct.

22   Q.  And as of the date of Secretary Ross' decision memo, you

23   were not aware that Steve Bannon and Secretary Ross had had

24   conversations about whether or not Secretary Ross would speak

25   to Kansas Secretary of State Kobach about Mr. Kobach's ideas

1   for a citizenship question on the census, correct?

2   A.  That's correct.

3   Q.  As of the date of Secretary Ross' decision memo, you were

4   not aware that Secretary Ross had a telephone conversation with

5   Mr. Kobach about Mr. Kobach's ideas for a citizenship question

6   on the census, right?

7   A.  That's correct.

8   Q.  And as of the date of Secretary Ross' decision memo, you

9   were not aware that in May of 2017, seven months before the

10  Department of Justice's request to the Census Bureau, Secretary

11  Ross wrote an e-mail to Earl Comstock stating that he was,

12  quote, mystified why nothing have been done in response to my

13  months' old request that we include a citizenship question,

14  correct?

15  A.  I was not aware of that, correct.

16  Q.  And as of the date of Secretary Ross' decision memo, you

17  were not aware that in response to that e-mail, Earl Comstock

18  wrote to Secretary Ross that, quote, on the citizenship

19  question, we will get that in place and, quote, and that it

20  would be necessary to, quote, work with justice to get them to

21  request that citizenship be added back to a census question,

22  correct?

23  A.  I was not aware of that, correct.

24  Q.  Dr. Abowd, I want to show you again some deposition

25  testimony that has been designated as evidence in this case.

1           For the record, your Honor, it is page 67, line five,

2     of Acting Attorney General John Gore's deposition through line

3     five of page 68.

4        I want to ask you some questions.

5               MR. EHRLICH:  Your Honor, same objection as last time.

6               THE COURT:  Same ruling.

7               (Videotape played)

8     BY MR. HO:

9     Q.  Dr. Abowd, when you conducted all this work up through the

10    date of Secretary Ross' decision memo, you were not aware that

11    the Department of Commerce had initiated conversations with the

12    Justice Department about the citizenship question rather than

13    the other way around, correct?

14    A.  That's correct.

15    Q.  During your meeting with Secretary Ross on February 12, no

16    one told you that, right?

17    A.  That's correct.

18    Q.  You didn't learn that it was Department of Commerce

19    officials who had requested that a citizenship question be

20    added to the census, rather than the other way around, until

21    after this litigation was initiated, right, Dr. Abowd?

22    A.  That's correct.

23    Q.  And that was when the administrative record in this

24    litigation was lodged in June of this year, right, Dr. Abowd?

25    A.  That's correct.

1    Q.  Dr. Abowd, you were surprised, weren't you, when you

2    learned that it was Commerce officials who had requested that

3    the Department of Justice request a citizenship question on the

4    census, correct?

5    A.  Yes.

6    Q.  And among the senior executives at the Census Bureau,

7    everyone you know was also surprised to learn that the

8    Department of Commerce had initiated conversations with the

9    Department of Justice to convince the Department of Justice to

10   request that the citizenship question be added to the 2020

11   census, correct?

12              MR. EHRLICH:  Objection, mischaracterizes the

13   evidence.

14              THE COURT:  Overruled.

15   A.  Could you restate the question, please?

16   Q.  Sure.

17        Among the senior executives at the Census Bureau,

18   Dr. Abowd, everyone you know was also surprised to learn that

19   it was the Department of Commerce that reached out to the

20   Department of Justice to ask the Department of Justice to

21   request a citizenship question, correct?

22   A.  Everyone I know at the Census Bureau, including all the

23   senior executives, were surprised by the portion of the

24   administrative record that predates December 12, 2017.

25   Q.  Dr. Abowd, as recently as August of this year, Commerce

1   Department officials still hadn't spoken with you about the

2   fact that it was the Department of Commerce that had requested

3   the Department of Justice request that a citizenship question

4   be added to the 2020 census, correct?

5   A.  That's correct.

6   Q.  So to be clear, Dr. Abowd, that entire period of time from

7   December, the middle of December, when you began analyzing the

8   effect of the citizenship question, up through until June, when

9   the administrative record in this case was lodged, your

10  impression was that all that work that you were doing mattered,

11  that it might affect the secretary's decision-making, right?

12          MR. EHRLICH:  Objection.

13          THE COURT:  Overruled.

14  A.  From the beginning of the time we spent working on our

15  technical response until today, I am discharging my obligations

16  as the chief scientist at the Census Bureau.

17  Q.  Dr. Abowd, my question, though, was that entire period of

18  time from when you began conducting your analysis in the middle

19  of December of 2017 up until when you saw the administrative

20  record lodged in this case, you were under the impression that

21  all of that work that you had done analyzing the effect of a

22  citizenship question, that it mattered as far as the

23  Secretary's decision-making process, right?

24  A.  I was under the impression that it mattered in the conduct

25  of the 2020 census, yes.

1    Q.   And no one ever told you during that entire period of time

2    that Commerce Department officials had initiated this entire

3    process, correct?

4    A.   No one told me that, but I am still under the impression it

5    matters for the 2020 census.

6         (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IbdWnys7                          Abowd - Direct

1   BY MR. HO:

2   Q.  Dr. Abowd, the 2020 census questionnaire will be finalized

3   by June of 2019, correct?

4   A.  That's when the final artwork is due at the printers, yes.

5   Q.  With existing resources the Census Bureau can lock down the

6   content of the census questionnaire by June 30, 2019, correct?

7   A.  That's correct.

8   Q.  Under the current budget, if there are changes to the paper

9   questionnaire after June of 2019, that would impair the Census

10  Bureau's ability to timely administer the 2020 census, correct?

11  A.  That is correct.

12  Q.  With exceptional resources, the final date for locking down

13  the content of the census questionnaire is October 31, 2019,

14  correct?

15  A.  That is correct.

16  Q.  Changes after October 31, 2019, would require major

17  redesigns and might require congressional authorization, in

18  your understanding, right, Dr. Abowd?

19  A.  That is correct.

20          MR. HO:  I want to return again to the Ross decision

21  memo, Dr. Abowd, Plaintiffs' Exhibit 26.  I want to look at the

22  final page, page 8, the top paragraph, here.

23  Q.  The secretary concluded that a citizenship question on the

24  decennial census was necessary to provide a complete and

25  accurate response to the DOJ request, correct?

IbdWnys7                          Abowd - Direct

1   A.  Yes.

2   Q.  I want to ask you about that and I want to -- before

3   getting too deep into that determination, I want to ask you

4   about the kinds of data that DOJ currently has available.  The

5   Census Bureau produces various data files for redistricting

6   purposes, right, Dr. Abowd?

7   A.  Yes.

8   Q.  And one of those redistricting data products from the

9   Census Bureau is called the PL 94-171 data file, correct?

10  A.  Yes.

11  Q.  The PL 94-171 data file has information in it concerning

12  total population at various levels of census geography,

13  correct?

14  A.  Yes, it does.

15  Q.  And it has voting-age population at various levels of

16  census geography, correct?

17  A.  Yes.

18  Q.  And it has voting-age population broken down by race and

19  ethnicity at the census block level in it, correct?

20  A.  Yes.

21  Q.  But it does not have citizen voting-age population in it

22  broken down by race and ethnicity at the individual block

23  level, correct?

24  A.  That's correct.

25  Q.  The data in the PL 94-171 data file, that's based on

IbdWnys7                         Abowd – Direct

1   responses to the decennial enumeration, correct?

2   A.  Yes.

3   Q.  And the Department of Justice uses that data file, right?

4   A.  That's my understanding, yes.

5   Q.  Also available to the public?

6   A.  Yes, it is.

7   Q.  The PL 94-171 data file, that's never had citizen

8   voting-age population by race and ethnicity down to the block

9   level, correct?

10  A.  The PL 94-171 data have never included citizenship, that's

11  correct.

12  Q.  Never included citizenship data in it at any level of

13  geography, correct?

14  A.  To the best of my knowledge, yes.

15  Q.  So, for citizen voting-age population, the Department of

16  Justice, when it's doing its redistricting-related work, uses a

17  separate tabulation of data from the Census Bureau, correct?

18  A.  That's correct.

19  Q.  And that's what we could call the CVAP tabulation?

20  A.  Yes, sir.

21  Q.  That's publicly available not just for the Department of

22  Justice, right?

23  A.  All such tabulations are publicly available, yes.

24  Q.  Now, before the ACS -- I'm sorry.

25      And the CVAP tabulation, that's based on responses to the

IbdWnys7                        Abowd - Direct

1   American Community Survey, correct?

2   A.  That's correct.

3   Q.  Now, before the American Community Survey, the Census

4   Bureau produced CVAP data based on responses to the census long

5   form, right?

6   A.  Yes.

7   Q.  Census long form was not distributed to the entire

8   population, correct?

9   A.  That's correct.

10  Q.  So data derived from the long form, those were statistical

11  estimates based on a sample survey, right?

12  A.  Yes.

13  Q.  That's also true of the ACS; that citizenship data derived

14  from the ACS is also a statistical estimate based on a

15  statistical sample, correct?

16  A.  Yes.

17  Q.  So both the long-form CVAP data used in the past and the

18  ACS CVAP data used at present, both statistical estimates based

19  on survey samples, correct?

20  A.  Yes.

21  Q.  And they both had margins of error, correct?

22  A.  Sampling error, yes.

23  Q.  Now, the total population data in the PL 94-171 data file,

24  that's not sample-based, right?

25  A.  That's correct.

IbdWnys7                          Abowd - Direct

1    Q.  But that data still does have some margins of error

2    associated with it, right?

3    A.  It has a nonsampling error, is what we call it, yes.

4    Q.  The citizenship question, the proposal to add a citizenship

5    question to the 2020 census is sometimes referred to as

6    "reinstating a citizenship question."  Have you heard that

7    phrase, Dr. Abowd?

8    A.  I believe that's the phrase the secretary used, yes.

9    Q.  OK.  And just to be clear, the 2000 census form sent to

10   every household in America, that didn't have a citizenship

11   question on it, right?

12   A.  That's correct.

13   Q.  And the citizenship data that DOJ currently uses based on

14   statistical -- based on survey sample, that's not different

15   from long-form citizenship data that the Department of Justice

16   used to rely on in the sense that both are statistical samples

17   with margins of error, right?

18   A.  Both are samples with sampling error.  Their designs are

19   very different, so I don't -- I'm not saying yes to them being

20   identical.  They're both sample-based.  The design of the

21   American Community Survey is very different from the design of

22   the old long-form sample.

23   Q.  But it's not the case that one's a hard count and the other

24   is not; they were both statistical samples with margins of

25   error, right?

1  A.  That's correct.

2  Q.  That's never changed, as far as you know; the Department of

3  Justice, when it's needed CVAP data, it's always needed -- it's

4  always relied on statistical samples with margins of error,

5  right?

6  A.  To the best of my knowledge, yes.

7  Q.  Now, the ACS data are produced in both one-year and

8  five-year bases, correct?

9  A.  Tabulations of at least, yes, one-year and five-year

10  summaries.  Yes.

11  Q.  One-year ACS estimates are produced from data collected in

12  a single calendar year, right?

13  A.  Yes.

14  Q.  And five-year ACS estimates are produced based on data

15  collected over a consecutive five-year period, correct?

16  A.  That's correct.

17  Q.  You'd agree that five-year ACS estimates have larger sample

18  sizes than one-year ACS estimates, right?

19  A.  For the same geographic area, yes.

20  Q.  And five-year ACS estimates in comparison to one-year ACS

21  estimates for the same geographic area would have smaller

22  margins of error, correct?

23  A.  Yes.

24  Q.  And that would mean they're more precise than one-year ACS

25  estimates, right?

1   A.  As long as timeliness is not a salient feature, yes.

2   Q.  The tabulation of CVAP data produced from the ACS is based

3   on five-year ACS estimates, not one-year ACS estimates,

4   correct?

5   A.  Correct.

6   Q.  And the reason for that is that one-year ACS estimates are

7   deemed sufficiently reliable only for areas that have a

8   population of more than 65,000 people, correct?

9   A.  There are a few additional criteria, but that's basically

10  correct.

11  Q.  By contrast, five-year ACS estimates are published by the

12  Census Bureau as being reliable for smaller -- geographic areas

13  with smaller populations, correct?

14  A.  That's correct.

15  Q.  As of today, it still hasn't been decided whether the PL

16  94-171 file with total population data will also include the

17  block-level CVAP data that the Census Bureau expects to

18  assemble after the 2020 census, correct?

19  A.  That's correct.

20  Q.  So even if a citizenship question is included on the census

21  questionnaire, as of now, we don't know whether or not there's

22  going to be a single data set that has both total population

23  and block-level CVAP data broken down by race or ethnicity,

24  correct?

25  A.  We don't know there will be a single data set, but we did

1    commit to delivering block-level CVAP data in a timely fashion

2    consistent with the delivery date for the PL 94.

3    Q.   The Census Bureau hasn't made a decision yet about how it

4    will process responses to the citizenship question alongside

5    the administrative citizenship data that you have, correct?

6    A.   That's correct.

7    Q.   Dr. Abowd, even if a citizenship question remains on the

8    2020 census questionnaire, the Census Bureau hasn't determined

9    whether the block-level CVAP data that it produces will, in

10   fact, be based primarily on responses to the citizenship

11   question, correct?

12   A.   That is correct.

13   Q.   Dr. Abowd, let's assume now that the citizenship question

14   stays on the 2020 census questionnaire and let's talk about

15   how, to the extent you know right now, that would play out in

16   practice in terms of producing a block-by-block-level-CVAP

17   data.  Responses to the census questionnaire are prohibited

18   from disclosure under Title 13, correct?

19   A.   Publications identifying a business or individual or

20   household specifically and providing identifiable data on that

21   entity are prohibited.

22   Q.   And that prohibition on disclosure also applies, as far as

23   you know, on prohibiting the disclosure of that information to

24   the Department of Justice, correct?

25   A.   That's correct.

1   Q.   Now, census blocks vary significantly in terms of the size

2   of their populations, correct?

3   A.   Yes, they do.

4   Q.   Some census blocks have fewer than ten people on them,

5   right?

6   A.   Yes.

7   Q.   Some census blocks have one person on them, right?

8   A.   That's correct.

9         MR. HO:  I want to bring up Plaintiffs' Exhibit 513,

10  which we're using purely for demonstrative purposes.  This is a

11  map of the Fort Myers area, census blocks in Fort Myers, and if

12  we could blow up kind of the middle of the map around where it

13  says Lee.  This was built using data from the Census Bureau's

14  publicly available website of the total population on various

15  census blocks.

16  Q.   Dr. Abowd, if we look at some of these squares right around

17  Lee, I mean, all of the census blocks right around where Lee is

18  written have fewer than ten people on them, right?

19  A.   Yes.

20  Q.   And several of them have only one person on them, right?

21  A.   Yes.

22  Q.   So, Dr. Abowd, you'd agree with me that with respect to a

23  census block that has only one person on it, when the Census

24  Bureau produces block-by-block citizenship data, the Census

25  Bureau was legally prohibited from producing data that would

IbdWnys7                      Abowd - Direct

1  accurately reflect what that one person said in response to a

2  citizenship question on the census, correct?

3  A.  We interpret that provision of Title 13 as prohibiting us

4  from releasing data at the block level that would make it

5  possible to identify the person who supplied those data.

6  Q.  So when you produce block-by-block CVAP data, for a block

7  with one person, you're not going to produce data that reveals

8  that person's response to the citizenship question, right?

9  A.  We'll apply disclosure avoidance before tabulating that

10  block, yes.

11  Q.  So if a person exists in a block with one person on it,

12  right where it says Lee, to the right, diagonally above it,

13  that person says "I'm not a citizen" in response to the

14  citizenship question, and you publish a total number of

15  noncitizens for that block, can you publish one?

16  A.  If they said they're not a citizen?

17  Q.  Yes.  Can you publish one for there's one noncitizen on

18  this block?

19  A.  So what we would do is we would add random noise to the

20  tabulation, reconstruct the microdata and then publish the

21  counts from the random noise.  The random noise introduces

22  substantial uncertainty about the single person and less and

23  less uncertainty as the number of persons involved increases.

24  Q.  And the reason why you do that, Dr. Abowd, is because if

25  you didn't do it, publishing the CVAP data at the block level

IbdWnys7                          Abowd – Direct

1    would create what you might call re-identification risks for

2    that person, right?

3    A.  Yes.

4    Q.  And just so we're all clear, re-identification is when

5    there's data that's anonymous but a third party can look at it

6    and then manage to discover the individual to which that data

7    belongs, right?

8    A.  That's correct.

9    Q.  And you apply data disclosure-avoidance techniques to

10   prevent that from happening, right?

11   A.  That's correct.

12   Q.  And you don't just do that for census blocks that have a

13   single person on them; you do that for every census block,

14   right?

15   A.  That's right.

16   Q.  So, Dr. Abowd, there won't be a single census block in

17   which the citizenship numbers, as reported by the census after

18   the 2020 census questionnaire, reflect the actual responses

19   reported by the people who live there in their responses to the

20   citizenship question on the 2020 census, correct?

21   A.  Except randomly, correct.

22            THE COURT:  Can I just ask a few questions about how

23   this works.

24            First of all, by way of background, how is it

25   determined what a census block is?  Why do some have zero

1    people, some have one, some have hundreds?

2              THE WITNESS:  So, your Honor, census blocks are used

3    for two basic purposes.  One purpose is to organize the work

4    flow in collecting census, we generally call enumeration

5    blocks.  And the other is for producing summaries later on.  We

6    generally call them tabulation blocks.  They're not exactly the

7    same, but they're very similar.

8              A tabulation block is the lowest level of geography,

9    smallest level of geography that we publish any data on, and we

10   publish it so that users of those data can assemble arbitrary

11   geographic areas, like school districts or voting districts,

12   with enough granularity so that they can meet the purpose of

13   making a school district or a voting district.  And so the

14   granularity in the block definitions is determined over the

15   course of the decade by negotiation in many cases with

16   bipartisan redistricting offices to determine that the,

17   basically the pixel that you're going to build geographic units

18   from is sufficiently small that you can get the geographic

19   areas you're trying to draw accurate enough but not so small

20   that we're simply releasing one -- the contents of each address

21   in the MAF.

22             THE COURT:  All right.  Thank you.  That's helpful.

23             And then could you just flesh out what the process

24   involves of introducing random noise, what that means in

25   practice.  I don't know if it's helpful to use some of these

IbdWnys7                          Abowd - Direct

1    census blocks by way of example, but how would you mask, in

2    this Lee census block that has only one person in producing

3    that data to the Justice Department or whomever, how would you

4    mask that person's citizenship?

5           THE WITNESS:  So, one of the things we're doing with

6    the 2020 census is we are moving from what is called

7    traditional statistical disclosure limitation to modern

8    disclosure limitation processes that were invented by

9    cryptographers, and the particular process that we're using is

10   called differential privacy.  That's a system where you -- you

11   set up a mathematical guarantee about how much any user of the

12   data can learn about an individual who contributes to those

13   data, and that mathematical guarantee looks like, if I do the

14   tabulation with your data in or out of the overall database,

15   the statistics that I produce are only allowed to be different

16   by an amount epsilon.  So basically, your -- the statistics

17   with or without your data are indistinguishable from the

18   statistics, the statistics with your data are indistinguishable

19   from the statistics without your data by an amount that

20   controls the randomness that we add.

21          We have developed a lot of public materials on this,

22   but we're not as practiced in talking about it as the

23   historical methods that we use, as you might have noticed from

24   the awkwardness of that answer, for which I apologize.  So it

25   basically says you make the tabulation from the real data, you

IbdWnys7                          Abowd - Direct

1    add an amount of noise to each, in this case block, in the real

2    data that's been calibrated so that I can make that promise to

3    you that your data didn't affect this overall tabulation by any

4    more than epsilon, and then you take the noisy data and

5    re-create the microdata from the tabulated.

6           THE COURT:  All right.  Let me see if I can translate

7    this into more plain English.  Would there be any way, for

8    example, to take the census block just above the E that has a

9    one in it -- right, that's one person in that census block?

10          THE WITNESS:  Yes.

11          THE COURT:  I presume there would be no way to

12   disclose the data for that particular person without, at the

13   census block level in an accurate way that wouldn't reveal

14   things that you're prohibited from revealing under Title 13, is

15   that correct?

16          THE WITNESS:  That's our interpretation of the law,

17   yes, sir.

18          THE COURT:  OK.  So by introducing noise, I take it

19   you need to go out to a broader geographic range, and in

20   essence, you're sort of swapping people between the blocks?

21   How does it work?

22          THE WITNESS:  We're not -- excuse me, your Honor.  I

23   didn't mean to interrupt.

24          We're not swapping.  We're basically replacing the

25   real microdata with microdata that tabulate up accurately as

1    the more -- as there are more and more people in the area that

2    you're looking at, but in the block that had one person on it,

3    basically every characteristic of that person has been infused

4    with noise, so changed, if you like.

5              THE COURT:  So swapped.

6              THE WITNESS:  Well, swap implies that it came from

7    someplace else.  That's why --

8              THE COURT:  But in other words, presumably any change

9    up on one dimension or characteristic would have to be matched

10   somewhere else by a change down.

11             THE WITNESS:  The population totals are controlled to

12   the national level, that's right.  And so are the tabulations

13   of the detailed variables, but even the national table has been

14   protected except for the population total.

15             THE COURT:  In other words, if someone, I don't know

16   what this red box is, but if someone within this Lee area, the

17   local jurisdiction wanted to get accurate citizen voting-age

18   population for within that area, is that something that could

19   be done consistent with the disclosure restrictions in Title

20   13?

21             THE WITNESS:  Yes, your Honor.

22             THE COURT:  And how would that be done?

23             THE WITNESS:  Well, we actually had to work pretty

24   hard to do it.  We had to design the algorithm so that it could

25   publish at the block level so you could build the arbitrary

IbdWnys7                        Abowd - Direct

1   geographic areas that you needed, and the statistics kept

2   getting more and more accurate as the number of people in that

3   geographic area increased.  So there are --

4          Perhaps Mr. Ho knows the total of the number of people

5   in that red box, but looks like there's about 50 or 60.  The

6   data will be quite accurate for such advocation.  That's enough

7   people so that the fact that we added noise to the individual

8   data doesn't affect the tabulations very much.

9          THE COURT:  How many people would you need for it to

10  remain accurate but still allow you to mask in the way that

11  you're required to do?

12         THE WITNESS:  So, your Honor, that's not a question

13  that can be answered in a vacuum.  The way we are doing it is

14  when you add the noise this way, you can produce a drawing that

15  shows how the accuracy of various tabulations is affected by

16  the amount of noise that you've infused, and it gives you the

17  feasible levels.  If you're going to protect the

18  confidentiality, then you have to choose a point on this graph.

19         What we have to do is we have to decide, based on the

20  use cases for the data, how to allocate that accuracy so that

21  it meets the client use cases.  So we're evaluating the way we

22  will do this at the block level so that it would be useful for

23  redistricting and for Section 2 scrutiny under the Voting

24  Rights Act, and we have been given test cases from the

25  Department of Justice in order to facilitate this evaluation so

1    that we can show them that it's still fit for use.

2              We did not ever previously do this.  Previously we

3    just added the noise and told the users that we weren't going

4    to tell them anything about it.

5              THE COURT:  And maybe this is an unintelligible

6    question, but is there a census block size that is adequate

7    enough that you would not need to introduce noise in order for

8    the relevant data to be masked?

9              THE WITNESS:  No.  You have to introduce noise, your

10   Honor, to every block, to every tabulation, but you control the

11   amount of noise that you introduce so as to guarantee accuracy

12   along the dimensions that the use case requires.

13             THE COURT:  All right.

14             Mr. Ho.

15             MR. HO:  I may have some questions that might clarify

16   some of this, your Honor.

17   Q.  Dr. Abowd, with respect to what the Census Bureau's done in

18   the past, the publicly available technical documents state that

19   in the past the Census Bureau has applied household-level

20   swapping and synthetic data noise infusion, correct?

21   A.  That's correct.

22   Q.  Let's talk about those two different things, and let's

23   start with household-level swapping.

24        Household-level swapping would be where you take certain

25   variables on one household's record and you match them up to

1    the variables on another household's record, located in a

2    different geographic area, and then you swap those values

3    except the address so that it looks like essentially one

4    household lives at one location and the other household lives

5    in another location, right?

6    A.  Yes, that's essentially correct.

7    Q.  And when you do that, when you've done that in the past,

8    you would swap the households across census blocks, correct?

9    A.  Yes, sir.

10   Q.  And you do that because there would be no point in swapping

11   households within a census block, right?

12   A.  That's right.

13   Q.  Now, let's talk about synthetic data noise infusion.

14   That's a different technique, right?

15   A.  That is correct.

16   Q.  And that's what you were talking about with Judge Furman

17   earlier, right?

18   A.  I was talking about a particular form of that, yes.

19   Q.  Right, because there are multiple forms of synthetic data

20   noise infusion, correct?

21   A.  They're multiple forms of noise infusion.  They don't all

22   involve synthetic data.

23   Q.  Thank you.

24        Now, one way of doing noise infusion is to develop a model

25   for when you have a particular item or variable on a

IbdWnys7                         Abowd - Direct

1    household's record that's sensitive and then replacing that

2    variable as reported by the household with synthetic,

3    essentially made-up data based on the model, is that right?

4    A.  With a draw from the model's predictive distribution,

5    that's correct.

6    Q.  And the idea is that at a high level of geography, like a

7    county, the overall aggregate numbers are going to remain

8    essentially the same, right, Dr. Abowd?

9    A.  So, some disclosure-avoidance methods have that property

10   and some don't.  Without getting into the deep weeds of ones

11   that you're talking about, the particular synthetic data

12   property that you just described won't have that feature unless

13   it is engineered into the synthesizer.

14   Q.  For the use case that you have here -- right -- when you're

15   talking about higher levels of geographic units, like counties,

16   when you infuse the synthetic data, the idea is that the

17   aggregate numbers are going to be basically the same?  Right?

18   A.  The idea is not with respect to the geographic area but

19   with respect to the population within the geographic area.

20   Q.  Thank you.

21   A.  The denser the population the more accurate the statistics.

22   Q.  OK.  So, the larger the population size of the geographic

23   area the more accurate the data will remain even after

24   synthetic data noise infusion, correct?

25   A.  After the disclosure-avoidance procedure we're implementing

IbdWnys7                        Abowd - Direct

1   for the 2020 census, that's correct.

2   Q.  But at the smaller levels of geographic specificity, like

3   the individual census block, the more noise there's going to

4   be -- I mean, in terms of the population --

5           MR. HO:  Let me start that question again.

6   Q.  Areas with smaller population sizes -- like census blocks

7   typically have smaller population sizes than counties --

8   there's going to be more noise at that level of geographic

9   specificity once you employ noise infusion, correct?

10  A.  That's correct.

11  Q.  So, leaving all the noise infusion and the CVAP data using

12  responses to the citizenship question, today, when we use ACS

13  CVAP data, generally speaking, we have more accuracy at

14  geographic levels of specificity that have larger populations

15  and more uncertainty at lower levels, correct?

16  A.  That's correct.

17  Q.  And that's also going to be true with CVAP data produced

18  based on responses to the decennial census question due to

19  noise infusion at higher levels of geography with more people,

20  more accuracy but greater uncertainty at smaller levels of

21  geography with smaller populations, correct?

22  A.  It's the smaller populations that make the sentence

23  correct, and yes, it is, with that qualification.

24  Q.  Now, the Census Bureau has not yet set the parameters for

25  disclosure avoidance for the CVAP table that will be created

IbdWnys7                         Abowd - Direct

1  after the 2020 census, correct?

2  A.  That's correct.

3  Q.  If you do data disclosure avoidance properly, then the

4  block-level CVAP data that you produce after the 2020 census

5  including a citizenship question, the block-level data is going

6  to be a series of estimates for each block rather than an exact

7  tabulation of census responses, correct?

8  A.  I have difficulty answering that question because

9  "estimates" has a specific legal meaning that's not quite the

10  same as the generally understood statistical meaning.  The data

11  produced for each block and for the entire country and for

12  every geographic area in between will be based on the entire

13  enumeration, so in that sense not an estimate.

14      In the sense that they have been infused with noise to

15  protect confidentiality and therefore have margins of error

16  that resemble the margins of error that you would get in

17  statistical processes that become more accurate as the number

18  of cases increases, then it is correct.  So they are not

19  estimates in the sense that the law understands sample-based

20  estimates.  They're based on the entire population.

21  Q.  Well, let's not talk about the law for a moment.  I just

22  want to -- and let's not worry about sample-based estimates, or

23  whatever.

24      Just in your words, Dr. Abowd, you would describe the

25  block-level CVAP data that's produced even after a citizenship

1  question is on the census as an estimate rather than a precise

2  tabulation, correct?

3  A.  Yes.

4  Q.  So the block-level CVAP tabulation produced by the Census

5  Bureau will not reflect the actual values of the number of

6  citizens of voting age in each of those census blocks after the

7  2020 census, correct?

8  A.  It will not be exactly equal to that number.  It will be

9  approximately equal to that number, with the approximation

10  improving as the population increases.

11  Q.  And after the 2020 decennial census even if there is a

12  citizenship question, when the Census Bureau produces

13  block-level CVAP data, there will be error margins associated

14  with that data, correct?

15  A.  Yes.

16  Q.  And after the 2020 decennial census, when the Census Bureau

17  produces block-level CVAP data, even if there is a citizenship

18  question on the census, as of right now, the Census Bureau

19  doesn't know whether the margins of error associated with that

20  block-level CVAP data will be larger or smaller than the CVAP

21  data that DOJ currently uses, correct?

22  A.  We don't know, but we are able to control the margin of

23  error in different ways, and so we intend to produce those

24  tables in a manner that is fit for use by the Department of

25  Justice.

IbdWnys7                          Abowd - Direct

Q.  But you don't know right now whether or not the margins of error associated with block-level CVAP data produced after the 2020 census, assuming that there's a citizenship question on it, that those block-level estimates will have margins of error that are any smaller than the block-level CVAP data that DOJ currently relies on, correct?

A.  I'd like to answer your question, Mr. Ho, but the DOJ doesn't currently work with any block-level CVAP data, so --

Q.  Well, the DOJ does translate ACS CVAP data at one level of geographic specificity and combines it with decennial census data to produce block-level CVAP estimates, correct?

A.  That's not my understanding of how it's done.  My understanding of how it's done is that they combine block-level CVAP data with block-level other data, PL 94 data, and they estimate the citizen population in the voting districts that they're trying to supply -- to do scrutiny of.  Sometimes that involves having to model down to the block level, but it doesn't always.

Q.  OK.  Dr. Abowd, this is a very simple question.  The CVAP data that the Census Bureau's going to produce after the 2020 census, assuming that the 2020 census includes a citizenship question, we don't know today whether or not that data will have margins of error that are any more precise than the CVAP data on which the Department of Justice currently relies, correct?

IbdWnys7                          Abowd - Direct

1    A.   Because the parameters have not been set, the answer to

2    that question has to be yes.

3    Q.   Dr. Abowd, there were never any conversations between the

4    Department of Justice and the Census Bureau about this issue

5    prior to Secretary Ross's issuance of his decision memo

6    ordering the inclusion of the citizenship question on the

7    census, correct?

8    A.   That's correct.

9    Q.   DOJ refused to meet with you to discuss, right?

10   A.   So, I don't know that DOJ would have refused to meet with

11   us to discuss disclosure avoidance on the PL 94 and CVAP table.

12   All I know is that they didn't meet with us to discuss the

13   specific request about adding a citizenship question to the

14   2020 census.

15   Q.   During that whole process, between when you began your

16   analysis with the SWAT team and when Secretary Ross issued his

17   decision memo, there were never any conversations between

18   commerce and the Census Bureau about how disclosure avoidance

19   might affect the precision of the CVAP data that the Census

20   Bureau could produce after the 2020 census, correct?

21   A.   Not entirely.  I had already briefed Undersecretary Kelley

22   on the consequences of modernizing the disclosure-avoidance

23   system at the Census Bureau.  I briefed her, I believe, in

24   November of 2017.

25   Q.   That was before you began working on the citizenship

1   question, right, Dr. Abowd?

2   A.   That's correct.

3   Q.   OK.   My question was meant to be a little more precise, and

4   I apologize if I didn't word it correctly.   But my question is

5   from the time that you started analyzing the citizenship

6   question request from the Department of Justice to when

7   Secretary Ross issued his decision memo, there were no

8   conversations between the Census Bureau and commerce department

9   officials about whether disclosure avoidance might affect the

10  precision of the block-by-block CVAP data that the Census

11  Bureau could produce based on responses to the citizenship

12  question on the census, correct?

13  A.   Not quite.   We did, both in discussing it with the

14  secretary and in discussing it with the undersecretary, remind

15  them both that we would be using disclosure-avoidance

16  procedures at the block level.

17  Q.   And in spite of that reminder, the secretary forged ahead

18  and ordered a citizenship question anyway, right, Dr. Abowd?

19  A.   The secretary was aware of our intention to use disclosure

20  avoidance --

21  Q.   There are no documents in the administrative record that

22  you're aware of, Dr. Abowd, that reflect the way in which

23  disclosure avoidance might affect the precision of

24  block-by-block CVAP data that the Department of Justice was

25  requesting from the Census Bureau through a citizenship

1    question on the census, correct?

2    A.  That's correct.

3            MR. HO:  Let's go back to Secretary Ross's memo,

4    Plaintiffs' Exhibit 26.  I want to go to page 8.

5    Q.  Secretary Ross says that he has determined that

6    reinstatement of a citizenship question on the 2020 decennial

7    census is necessary to provide complete and accurate data in

8    response to the DOJ request.  Do you see that?

9    A.  Yes, I do.

10   Q.  Dr. Abowd, you don't agree that a citizenship question on

11   the 2020 census is necessary to provide a complete and

12   accurate, to provide complete and accurate data in response to

13   the DOJ request, correct?

14   A.  That's correct.

15   Q.  And Dr. Abowd, the position of the Census Bureau is that a

16   citizenship question on the 2020 decennial census is not

17   necessary to provide complete and accurate data in response to

18   the DOJ request, correct?

19   A.  That's correct.

20           MR. HO:  Dr. Abowd, I don't have any other questions

21   for you right now, but your Honor, the plaintiffs, because we

22   still have a few exhibit issues to sort out, although my

23   questioning of Dr. Abowd is complete, we would not like to

24   close the record just yet.

25           THE COURT:  All right.  I also assume you want to