1  **GIBSON, DUNN & CRUTCHER LLP**
   Stuart F. Delery (*pro hac vice* pending)
2  SDelery@gibsondunn.com
   1050 Connecticut Avenue, N.W.
3  Washington, DC 20036-5306
   Tel.: 202-887-3650
4  Fax: 202-467-0539

5  Alexander H. Southwell (*pro hac vice* pending)
   ASouthwell@gibsondunn.com
6  200 Park Avenue
   New York, New York 10166
7  Tel.: 212-351-3981
   Fax: 212-351-6281
8
   Julian W. Kleinbrodt (CA Bar # 302085)
9  jkleinbrodt@gibsondunn.com
   555 Mission Street, Suite 3000
10 San Francisco, CA 94105-0921
   Tel.: 415-393-8382
11 Fax: 415-374-8470

12 *Attorneys for Proposed Amici Curiae*

13

14                UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17 STATE OF CALIFORNIA, *et al.*,        Case Nos.    18-cv-01865-RS
                                                      18-cv-02279-RS
18              Plaintiffs,
                                         **NOTICE OF MOTION AND MOTION FOR
19      v.                               LEAVE TO FILE AMICI CURIAE BRIEF**

20 WILBUR L. ROSS, *et al.*,             Date:       March 7, 2019
                                         Time:       1:30 p.m.
21              Defendants.              Judge:      Honorable Richard Seeborg
                                         Dept.:      3
22
   ─────────────────────────────
23 CITY OF SAN JOSE, *et al.*,

24              Plaintiffs,

25      v.

26 WILBUR L. ROSS, *et al.*,

27              Defendants.

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 7, 2019 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Richard Seeborg in Courtroom 3 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue in San Francisco, California, 94102, non-parties Tech:NYC, Univision Communications Inc., General Assembly, Topia, and the Minneapolis Regional Chamber of Commerce, request leave to file the accompanying *amici curiae* brief in support of Plaintiffs.  In support of their motion, *amici* state as follows:

*Amici curiae* are businesses and organizations that represent businesses in the United States. *Amici* and their members operate in various industries, but they are united in ensuring that they continue to have access to accurate Census data, which play an indispensable role in their operations.

This Court has "broad discretion to appoint amici curiae."  *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982)*,* and "generally courts have exercised great liberality" in permitting *amici curiae* to participate in an action, *Woodfin Suite Hotels, LLC v. City of Emeryville*, 2007 WL 81911, at *3 (N.D. Cal. Jan. 9, 2007) (citation and quotation marks omitted).  Indeed, "there are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful or otherwise desirable to the court." *Id.* (brackets omitted).

The proposed, attached *amici curiae* brief satisfies these liberal requirements.  *Amici*'s brief offers the Court insights into the role that accurate Census data play in businesses' decision-making. It also addresses the substantial harms that businesses would face with the addition of the Census Bureau's proposed citizenship question, which threatens to undermine the Census's accuracy and integrity.  Proposed *amici curiae* filed an amicus brief in similar litigation in the Southern District of New York action, *State of New York, et al. v. United States Department of Commerce, et al.*, Case Nos. 1:18-cv-02921-JMF &  1:18-cv-05025-JMF.

NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF

Except as noted below, counsel for Plaintiffs and Defendants have consented to the filing of this brief:

-Counsel for the City of Stockton could not be reached.

-Counsel for the City of Fremont did not respond to the request for consent.

For the foregoing reasons, *amici* request that the Court grant leave to file the attached brief of *amici curiae*.

Respectfully submitted,

*/s/ Julian W. Kleinbrodt*
Julian W. Kleinbrodt (CA Bar # 302085)
jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Tel.: 415-393-8382
Fax: 415-374-8470

Stuart F. Delery (*pro hac vice* pending)
sdelery@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202-887-3650
Fax: 202-467-0539

Alexander H. Southwell (*pro hac vice* pending)
asouthwell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel.: 212-351-3981
Fax: 212-351-6281

*Attorneys for Proposed Amici Curiae*
Tech:NYC, Univision Communications Inc.,
General Assembly, Topia, and the Minneapolis
Regional Chamber of Commerce

**GIBSON, DUNN & CRUTCHER LLP**
Stuart F. Delery (*pro hac vice* pending)
sdelery@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202-887-3650
Fax: 202-467-0539

Alexander H. Southwell (*pro hac vice* pending)
asouthwell@gibsondunn.com
200 Park Avenue
New York, New York 10166
Tel.: 212-351-3981
Fax: 212-351-6281

Julian W. Kleinbrodt (CA Bar # 302085)
jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Tel.: 415-393-8382
Fax: 415-374-8470

*Attorneys for Proposed Amici Curiae*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, *et al.*,<br><br>    Defendants. | Case Nos.   18-cv-01865-RS<br>           18-cv-02279-RS<br><br>**BRIEF OF *AMICI CURIAE* TECH:NYC,<br>UNIVISION COMMUNICATIONS INC.,<br>GENERAL ASSEMBLY, TOPIA, AND THE<br>MINNEAPOLIS REGIONAL CHAMBER OF<br>COMMERCE IN SUPPORT OF PLAINTIFFS** |
| CITY OF SAN JOSE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, *et al.*,<br><br>    Defendants. | Date:   March 7, 2019<br>Time:   1:30 p.m.<br>Judge:  Honorable Richard Seeborg<br>Dept.:  3 |

# TABLE OF CONTENTS

Page

I.  INTERESTS OF *AMICI CURIAE* .................................................................. 1

II.  INTRODUCTION ........................................................................................ 2

III.  ARGUMENT ................................................................................................ 4

    A.  The Census Requires An Accurate Count Of The Entire Population, Which The Citizenship Question Threatens ...................................................... 4

    B.  Inaccurate Census Data Will Harm Businesses That Rely On The Census For Marketing, Product Development, Operations, And Other Purposes .................... 6

        1.  Inaccurate Census Data Will Harm Businesses That Use That Data In Deciding Where To Open Brick-And-Mortar Locations ... 7

        2.  The Citizenship Question And Its Concomitant Reduction In Census Response Rates Will Harm Businesses That Use Census Data In Product Development, Marketing, And Placement ........... 8

        3.  Inaccurate Census Data Will Impair The Ability Of Businesses To Make Informed Judgments About Eligibility For Federal Support ......................................................................................... 9

        4.  Inaccurate Census Data Will Harm Businesses That Rely On Proportionate Allocations Of Federal Funding ............................ 10

    C.  Inaccurate Census Data Will Impact Businesses More Substantially As Businesses Become Increasingly Data-Driven .................................... 13

IV.  CONCLUSION .............................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Balridge v. Shapiro,*
    455 U.S. 345 (1982) ...........................................................................................................7

*Bode v. Nat'l Democratic Party,*
    452 F.2d 1302 (D.C. Cir. 1971) .........................................................................................4

*Colo. Fire Sprinkler, Inc. v. Nat'l Labor Relations Bd.,*
    891 F.3d 1031 (D.C. Cir. 2018) .........................................................................................5

*Fed'n for Am. Immigration Reform v. Klutznick,*
    486 F. Supp. 564 (D.D.C. 1980) ........................................................................................5

*Genuine Parts Co. v. Envt'l Prot. Agency,*
    890 F.3d 304 (D.C. Cir. 2018) ...........................................................................................5

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.,*
    482 F.3d 79 (2d Cir. 2006) .................................................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .........................................................................................................3, 5

*New York v. U.S. Dep't of Commerce,*
    2019 WL 190285 (S.D.N.Y. Jan. 15, 2019) ...................................................................6, 7

*New York v. U.S. Dep't of Commerce,*
    315 F. Supp. 3d 766 (S.D.N.Y. 2018) ........................................................................3, 5, 10

*Utah v. Evans,*
    536 U.S. 452 (2002) ...........................................................................................................4

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ...............................................................................................................4

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) .........................................................................................................4, 10

**Statutes**

13 U.S.C. § 9(a) .......................................................................................................................2

13 U.S.C. § 141(a) ...................................................................................................................5

26 U.S.C. § 45D(e) .................................................................................................................10

29 U.S.C. § 3162 .....................................................................................................................11

29 U.S.C. § 3172 .....................................................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

ii

## TABLE OF AUTHORITIES
(continued)

Page(s)

29 U.S.C. § 3242(a) ...............................................................................................11

Permanent Census Act, Pub. L. 27 (1902) .............................................................5

**Other Authorities**

154 Cong. Rec. H4890 (June 4, 2008) ....................................................................5

A.R. 1252–54, Public Comment – Ready Nation (Mar. 22, 2018) .........................3

A.R. 8375, Public Comment – Coalition of Philanthropic Organizations (Mar. 21,
   2018) ..................................................................................................................10

AJ Agrawal, *Why Data Is Important for Companies and Why Innovation Is On the
   Way*, Inc.com (Mar. 24, 2016), https://www.inc.com/aj-agrawal/why-data-is-
   important-for-companies-and-why-innovation-is-on-the-way.html ..................13

*CDBG: Community Development Block Grant Programs*, HUD Exchange,
   https://www.hudexchange.info/programs/cdbg/; ..............................................12

*Census and ACS*, Esri Demographics, https://doc.arcgis.com/en/esri-
   demographics/data/census-acs.htm ....................................................................7

Census Business Builder, https://www.census.gov/data/data-tools/cbb.html .........6

*Census Data Trends*, Zillow Blogs (Sept. 13, 2006),
   https://www.zillow.com/blog/census-data-trends-3888/ ...................................14

Consortium of Social Science Ass'ns, COSSA Statement on the Impact of a
   Citizenship Question in the 2020 Decennial Census (Mar. 27, 2018),
   http://www.cossa.org/wp-content/uploads/2018/03/Census-Citizenship-Question-
   3-27-18.pdf..........................................................................................................2

Paul Farhi, *For Business, Census Is a Marketing Data Motherlode*, Wash. Post, Mar.
   17, 1990................................................................................................................3

Tom Foster, *Warby Parker Grew to $250 Million in Sales Through Disciplined
   Growth.  Now It's Time to Get Aggressive*, Inc. (June 2017),
   https://www.inc.com/magazine/201706/tom-foster/warby-parker-eyewear.html ...........................7

Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds
   Distribution: A New Design for the 21st Century* 3 (Sept. 2017) .....................10

*Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*,
   U.S. Dep't of Educ., https://www2.ed.gov/programs/titleiparta/index.html?exp=0.....................12

Douglas A. Kysar, *Kids & Cul-de-Sacs: Census 2000 and the Reproduction of
   Consumer Culture*, 87 Cornell L. Rev. 853, 854–56 (2002) .......................6, 9

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Learn About the Water Pollution Control (Section 106) Grant Program*, U.S. Envtl.
    Prot. Agency, https://www.epa.gov/water-pollution-control-section-106-
    grants/learn-about-water-pollution-control-section-106-grant ......................................12

Scott McDonald, *A 2020 Census Flop Would Pose a Danger to U.S. Businesses*,
    Forbes (Dec. 6, 2017)...................................................................................................13

Amy Merrick, *New Data Will Let Starbucks Plan Store Openings, Help Blockbuster
    Stock Its Videos*, Wall St. J., Feb. 14, 2001 ...............................................................7

Mikelyn Meyers & Patricia Goerman, *Respondent Confidentiality Concerns in
    Multilingual Pretesting Studies and Possible Effects on Response Rates and Data
    Quality for the 2020 Census* 24–25 (U.S. Census Bureau May 2018) ............................6

National Research Council, *Modernizing the U.S. Census* 297 (1995) ........................8, 9, 10

*New Markets Tax Credit Program*, Community Development Financial Institutions,
    https://www.cdfifund.gov/programs-training/Programs/new-markets-tax-
    credit/Pages/default.aspx;..............................................................................................9

William P. O'Hare, *Citizenship Question Nonresponse: A Demographic Profile of
    People Who Do Not Answer the American Community Survey Citizenship
    Question* 6–7 (Georgetown Center on Poverty and Inequality Sept. 2018)......................6

Kenneth Prewitt, *The American People Census 2000: Politics and Science in Census
    Taking* 6 (Russell Sage Foundation 2003), http://www.washingtonpost.com/wp-
    srv/politics/documents/Pol_Sci.pdf?noredirect=on ......................................................4

Andrew D. Reamer, *Counting for Dollars: The Role of the Decennial Census in the
    Geographic Distribution of Federal Funds* 10, Brookings Inst. (Mar. 9, 2010),
    https://www.brookings.edu/wp-content/uploads/2016/06/0309_census_report.pdf..........10, 11, 12

Report, Council of Economic Advisers, *The Use of Census Data: An Analytical
    Review* (Apr. 1, 2000),
    https://clintonwhitehouse3.archives.gov/WH/EOP/CEA/html/censusreview.html ......................2, 8

Diane W. Schanzenbach & Michael R. Strain, *Act Now to Save the 2020 Census*,
    Bloomberg Opinion (Aug. 11, 2017),
    https://www.bloomberg.com/view/articles/2017-08-11/act-now-to-save-the-2020-
    census .............................................................................................................................8

Robert Shapiro, *The 2020 Census May Be Wildly Inaccurate—And It Matters More
    Than You Think*, Brookings Inst. (Aug. 31, 2017),
    https://www.brookings.edu/blog/fixgov/2017/08/31/the-2020-census-may-be-
    wildly-inaccurate-and-it-matters-more-than-you-think/ ................................................9

*Small Business Development Center*, U.S. Small Business Administration,
    https://www.sba.gov/tools/local-assistance/sbdc ..........................................................11

Gibson, Dunn &
Crutcher LLP

iv

**TABLE OF AUTHORITIES**
(continued)

*State Wildlife Grant Program – Overview*, U.S. Fish & Wildlife Serv.,
     https://wsfrprograms.fws.gov/subpages/grantprograms/swg/swg.htm ...........................................11

Greg Sterling, *Chipotle Customers Are Smarter Than McDonald's And Other Insights
     From Smartphone Data* (June 24, 2014), https://marketingland.com/chipotle-
     customers-smarter-mcdonalds-insights-smartphone-data-88637 ....................................................13

United States Census Bureau, Directors 1790 – 1810, (Aug. 2, 2017),
     https://www.census.gov/history/www/census_then_now/director_biographies/
     directors_1790_-_1810.html ...................................................................................................................4

Malcolm Wheatley, *Data-Driven Location Choices Drive Latest Starbucks Surge*,
     SiteTech Systems, http://www.sitetechsystems.com/data-driven-location-choices-
     drive-latest-starbucks-surge/ ...............................................................................................................7

*Wildlife Restoration Program – Overview*, U.S. Fish & Wildlife Serv.,
     https://wsfrprograms.fws.gov/subpages/grantprograms/wr/wr.htm.................................................11

*Zillow: Ahead of Its Time or Falling Behind*, Harvard Business School: Open
     Knowledge by Digital Initiative (Nov. 18, 2016),
     https://rctom.hbs.org/submission/zillow-ahead-of-its-time-or-falling-behind/..............................14

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 3...................................................................................................................2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTERESTS OF *AMICI CURIAE*

*Amici* submit this brief to provide important context regarding how *amici* and businesses like them rely on Census data, how the proposed citizenship question will make the Census less reliable, and how inaccurate Census data harms businesses and ultimately consumers.

Tech:NYC is a nonprofit organization working to bring principled New Yorkers together to support a successful technology ecosystem.  Tech:NYC has approximately 650 member companies, including some of the most prominent and successful tech companies in the nation.  Many of its members receive federal funding based on Census data or use Census data to plan their operations. Tech:NYC and its members would be harmed by inaccurate Census data.

Univision Communications Inc. is the leading media company serving Hispanic America.  It uses and relies on Census data in conveying accurate news and information to its viewers and in conducting its business operations, in addition to doing business regularly with advertisers that also rely on such data in their decision making. Univision and its viewers would be harmed by inaccurate Census data.

General Assembly is a global educational institution with 22 locations around the world, offering online courses, onsite trainings for Fortune 500 companies and governmental organizations, and a global community of professionals. General Assembly and many of its students rely on federal funding that is impacted by Census data.  General Assembly and its students would be harmed by inaccurate Census data.

Topia is a talent mobility software suite that companies use to move their employees between locations and roles.  Topia values being a global citizen and equality of opportunity for everyone.

The Minneapolis Regional Chamber of Commerce advocates on behalf of the business community in the Minneapolis Saint Paul region and provides various services for its members. Many of the Chamber's members and the communities in which they operate depend on accurate Census data to plan their operations or receive federal funding impacted by Census data.  The Regional Chamber and its members would be harmed by inaccurate Census data.

## II.    INTRODUCTION

Accurate Census data is important to businesses.  They use that data to plan new locations and future projects, and rely on that data for the allocation of important federal funding.  But the Census Bureau's proposed Citizenship Question threatens to reduce response rates, particularly by naturalized citizens and immigrants, and thereby to impair the accuracy of the Census.  *Amici* submit this brief to explain their perspective on the serious harm that will result if the Citizenship Question is adopted—harm that the Secretary should have considered before deciding to ask it.

The United States Constitution requires an "actual Enumeration" of the people to allow the "Representatives" to "be apportioned among the several states which may be included within this union, according to their respective numbers."  U.S. Const. art. I, § 2, cl. 3.  But the importance of accurate Census data extends well beyond its constitutional purpose of apportioning congressional representation.  Census data is made public, *see* 13 U.S.C. § 9(a), and social scientists have called Census responses "an irreplaceable source of data for researchers," Consortium of Social Science Ass'ns, COSSA Statement on the Impact of a Citizenship Question in the 2020 Decennial Census (Mar. 27, 2018), http://www.cossa.org/wp-content/uploads/2018/03/Census-Citizenship-Question-3-27-18.pdf.  "Today, policy makers at all levels of government, as well as private businesses, households, researchers, and nonprofit organizations, rely on an accurate census in myriad ways that range far beyond the single fact of how many people live in each state."  Report, Council of Economic Advisers, *The Use of Census Data: An Analytical Review* (Apr. 1, 2000), https://clintonwhitehouse3.archives.gov/WH/EOP/CEA/html/censusreview.html.

*Amici* are businesses and organizations that represent businesses in numerous industries that routinely use Census data to make business decisions and that will be impacted by an inaccurate Census.  *Amici* include Univision Communications Inc., which uses Census data in conveying accurate news and information to its viewers and in conducting its business operations, in addition to doing business regularly with advertisers that also rely on such data in their decision making; and General Assembly, an educational institution whose students rely on federal funding impacted by Census data.  *Amici* also include Tech:NYC and the Minneapolis Regional Chamber of Commerce,

Gibson, Dunn & Crutcher LLP

which represent hundreds of businesses that rely on Census data in making business decisions or receive federal funding tied to Census data.

While businesses have a number of resources at their disposal to help them understand the traits, preferences, and distribution of their customers, the Census is a particularly important tool.  *See* Paul Farhi, *For Business, Census Is a Marketing Data Motherlode*, Wash. Post, Mar. 17, 1990.  In the words of a large group of current and former business leaders—"[t]he decennial Census provides critical data that informs decision-making in both the private and public sectors," and which is regularly used "to determine where to locate stores and facilities, find qualified workers, and market products and services," to name just a few of its many crucial applications.  A.R.1252–54, Public Comment – Ready Nation (Mar. 22, 2018).

But as the Census Bureau's own officials have concluded (backed by research the Bureau itself recently conducted), asking about a respondent's citizenship as a part of the United States Census will result in reduced response rates, particularly by naturalized citizens and immigrants, and will thus yield inaccurate census data.  *See New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 782 (S.D.N.Y. 2018).  The inaccuracy resulting from the Citizenship Question will harm businesses.  Put simply, Census data can play a role in many decisions by large and small businesses alike; as demonstrated below, introduction of the Citizenship Question and a resulting reduction in response rate and accuracy would negatively affect businesses in a variety of ways.

Plaintiffs challenge the Secretary of Commerce's decision to add a question to the Census asking respondents about their citizenship.  They contend that using the question violates the Enumeration Clause and that the Secretary failed to follow the requirements of the Administrative Procedure Act ("APA").  Whether the Secretary adequately considered the threat to Census accuracy the Citizenship Question poses—and the attendant harms—is at the core of Plaintiffs' APA challenge.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").  *See* First Am. Compl. ¶¶ 27,  53–59 (Dkt. 3:18-cv-01865,

ECF 12); Compl. ¶¶ 4, 31, 112–17 (Dkt. 3:18-cv-02279, ECF 1).  And whether the Census is accurate is central to the Enumeration Clause claim.  *See Wisconsin v. City of New York*, 517 U.S. 1, 6 (1996). This brief provides important context for Plaintiffs' Enumeration Clause and APA claims.

## III.    ARGUMENT

### A.    The Census Requires An Accurate Count Of The Entire Population, Which The Citizenship Question Threatens

An accurate Census is a cornerstone of our democracy.  Knowing that the "calculation of populations could be and often were skewed for political or financial purposes," the Framers "chose to make an 'actual Enumeration' part of our constitutional structure" in order "to preclude the availability of methods that permit political manipulation."  *Utah v. Evans*, 536 U.S. 452, 500, 507, 510 (2002) (Thomas, J., concurring in part and dissenting in part); *Wisconsin*, 517 U.S. at 6 ("[E]ach [decennial Census] was designed with the goal of accomplishing an 'actual Enumeration' of the population.").  The Census was an integral part of the design of the new government at the Founding—an attempt to ensure that the House of Representatives would be based on proportional representation, itself essential to the "Great Compromise" that yielded our bicameral legislature.  *See Wesberry v. Sanders*, 376 U.S. 1, 12–14 (1964); *Bode v. Nat'l Democratic Party*, 452 F.2d 1302, 1307 (D.C. Cir. 1971).

Indeed, our nation's earliest leaders recognized the importance of Census accuracy.  For instance, when Thomas Jefferson supervised the nation's first Census as Secretary of State in 1790, he expected a population count of at least 4 million people.  Yet the Census ultimately revealed a nation of just 3.9 million people, much to his and President George Washington's surprise and concern.  Jefferson thought that the Census had significantly undercounted the population, perhaps by several hundred thousand residents.  United States Census Bureau, Directors 1790 – 1810, (Aug. 2, 2017), https://www.census.gov/history/www/census_then_now/director_biographies/ directors_1790_-_1810.html.  And Washington, who had expected a population count about 5 percent higher, was similarly chagrined, blaming the "'inaccuracy' on avoidance by some residents as well as on negligence by those responsible for taking the census."  Kenneth Prewitt, *The American People Census 2000: Politics and Science in Census Taking* 6 (Russell Sage Foundation 2003),

http://www.washingtonpost.com/wp-srv/politics/documents/Pol_Sci.pdf?noredirect=on.  By making these concerns about the Census public, then-Secretary Jefferson "helped alert the Nation to the importance of accuracy in the numbers used to describe the society."  154 Cong. Rec. H4890 (June 4, 2008) (statement of Rep. Johnson).

At the turn of the twentieth century, as the Census grew more complex, Congress created the Census Bureau, which opened its doors in 1902.  *See, e.g.*, Permanent Census Act, Pub. L. 27 (1902).  Congress authorized the Secretary of Commerce to "obtain . . . census information as necessary."  13 U.S.C. § 141(a).  And as this Court has recognized, the Secretary does not have unreviewable discretion in carrying out that task.  Instead, his decisions regarding the Census are judicially reviewable, and so a decision of the Secretary to add or remove a Census question must comply with all relevant laws, including the APA.  *See Dep't of Commerce*, 315 F. Supp. 3d at 793, 806.

In assessing the impact of various questions, the Secretary, the Commerce Department, and the Census Bureau must take into account the impact of the question on the conduct of the Census and on various communities.  *Cf. State Farm*, 463 U.S. at 43.  A failure to consider an "important aspect of the problem," such as "evidence that runs counter to the agency's decision," will render agency action arbitrary and capricious.  *Genuine Parts Co. v. Envt'l Prot. Agency*, 890 F.3d 304, 307 (D.C. Cir. 2018) (internal quotation marks omitted).  Courts have not hesitated to vacate agency action where the agency failed to meet this mandate.  *See, e.g.*, *Colo. Fire Sprinkler, Inc. v. Nat'l Labor Relations Bd.*, 891 F.3d 1031, 1041 (D.C. Cir. 2018); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 101 (2d Cir. 2006).

Available evidence indicates that the Citizenship Question threatens to impair the accuracy of the Census.  For decades, the Census Bureau has recognized the negative impact a Citizenship Question would have, telling a court in 1980 that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count" because "[q]uestions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980); *see also Dep't of Commerce*, 315 F. Supp. 3d at 782.  And even *recent* research by the Census Bureau confirms that multilingual Census respondents fear their answers will not be kept

confidential, and may be reluctant to answer certain questions for that reason.  *See* Mikelyn Meyers & Patricia Goerman, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census* 24–25 (U.S. Census Bureau May 2018).  Indeed, research shows that respondents are becoming more hesitant to answer a comparable question about citizenship included in the American Community Survey.  *See* William P. O'Hare, *Citizenship Question Nonresponse: A Demographic Profile of People Who Do Not Answer the American Community Survey Citizenship Question* 6–7 (Georgetown Center on Poverty and Inequality Sept. 2018).  Lower response rates from such communities means less accurate Census data, inconsistent with the fundamental mandate of the Enumeration Clause.

**B.**    **Inaccurate Census Data Will Harm Businesses That Rely On The Census For Marketing, Product Development, Operations, And Other Purposes**

Businesses have long used Census data in a variety of strategic ways to plan their operations, enhance their understanding of their customer base, and develop products that meet consumer needs. *See* Douglas A. Kysar, *Kids & Cul-de-Sacs: Census 2000 and the Reproduction of Consumer Culture*, 87 Cornell L. Rev. 853, 854–56 (2002).  The Census Bureau itself recognizes the value businesses derive from the types of data the Census provides.  The Bureau even provides businesses with a "Census Business Builder," "a suite of services that provide selected demographic and economic data from the Census Bureau tailored to specific types of users in a simple to access and use format."  *See* Census Business Builder, https://www.census.gov/data/data-tools/cbb.html.  The Bureau notes that this data can "help you start or grow a business or understand the business landscape for a region."  *Id*.  If the Citizenship Question is adopted—rendering Census data less accurate—each business that uses Census data for these purposes will be harmed.

A recent decision in the Southern District of New York expressly recognized businesses' reliance on accurate Census data in striking down the Census Question as a violation of the APA. *See New York v. U.S. Dep't of Commerce*, 2019 WL 190285 (S.D.N.Y. Jan. 15, 2019).  The court noted that businesses, among others, rely on accurate census data in ways that go far beyond simply calculating the number of people living in a state.  *See id.* at *5.  The court went on to point out that Census data is used "for such varied purposes as computing federal grant-in-aid benefits, drafting of

Gibson, Dunn & Crutcher LLP

1   legislation, urban and regional planning, business planning, and academic and social studies." *Id.*

2   (quoting *Balridge v. Shapiro*, 455 U.S. 345, 353 n.9 (1982)).  The court was right.  As demonstrated

3   further below, its observations on the importance of Census data to businesses are both accurate and

4   relevant.

5   **1.    Inaccurate Census Data Will Harm Businesses That Use That Data In Deciding**

6   **Where To Open Brick-And-Mortar Locations**

7   Businesses rely on Census data when they plan the placement and construction of new

8   locations.  That data lets businesses maximize the effectiveness of a location and capitalize on a

9   particular region's needs or preferences.  Building a new location is a significant undertaking,

10   requiring major capital investments.  Mistakes about where to place a store, warehouse, or other

11   facility can harm not only a business's overall outlook, but also the communities that need (or don't

12   need) such a facility.  If a business misjudges where to place a new retail location, an operations hub,

13   or other facility—and if a business incorrectly estimates demand for its products due to inaccurate

14   data—both the business and its community will be harmed.

15   Many retail merchants use Census data to strategically place their stores and other facilities.

16   *See* Amy Merrick, *New Data Will Let Starbucks Plan Store Openings, Help Blockbuster Stock Its*

17   *Videos*, Wall St. J., Feb. 14, 2001; Malcolm Wheatley, *Data-Driven Location Choices Drive Latest*

18   *Starbucks Surge*, SiteTech Systems, http://www.sitetechsystems.com/data-driven-location-choices-

19   drive-latest-starbucks-surge/ (highlighting value of "the demography, the data, the science" in site

20   selection and new store openings).  Some businesses, for instance, rely on Census data to place their

21   brick-and-mortar locations in areas where customers are most likely to visit a store in person (as

22   opposed to shop online).  *See* Tom Foster, *Warby Parker Grew to $250 Million in Sales Through*

23   *Disciplined Growth.  Now It's Time to Get Aggressive*, Inc. (June 2017),

24   https://www.inc.com/magazine/201706/tom-foster/warby-parker-eyewear.html.  Indeed, some

25   companies offer business analytics solutions based, in part, on Census data to assist with these

26   location decisions.  *Census and ACS*, Esri Demographics, https://doc.arcgis.com/en/esri-

27   demographics/data/census-acs.htm.  Without accurate Census data on which to base location

28   decisions, businesses would lose a tool that has become crucial to their survival and growth.

The effects of inaccurate Census data on a business's decision as to where to place a new location would not only harm that business but also its surrounding community. For example, healthcare providers use Census data to understand community needs. *See* National Research Council, *Modernizing the U.S. Census* 297 (1995). A hospital can use Census data for residents in the area of a new location to determine how many and what kind of doctors will likely be needed at that location. *See id.* This same analysis can be performed to determine the need for certain health services, like obstetrical or family practice services, in a given area. *See id.* at 298. Inaccurate census data thus may lead to some communities having inadequate healthcare in light of business decisions driven by this data, just as other communities may face an inefficient influx of healthcare resources beyond what is actually needed. These important healthcare decisions affect members of the community, and depend on accurate Census data.

With a Census whose accuracy is impaired by the Citizenship Question, businesses will have less ability to design and build stores and service locations that meet the needs of local communities. Businesses, their customers, and the communities they serve will all suffer.

**2.      The Citizenship Question And Its Concomitant Reduction In Census Response Rates Will Harm Businesses That Use Census Data In Product Development, Marketing, And Placement**

Inaccurate Census data will also affect the development and marketing of numerous products around the country. Businesses use Census data to inform decisions about product development and placement. A retail business may, for instance, rely on demographic data to determine which products are going to sell best in which regions, and calibrate each store's stock accordingly. *See* Diane W. Schanzenbach & Michael R. Strain, *Act Now to Save the 2020 Census*, Bloomberg Opinion (Aug. 11, 2017), https://www.bloomberg.com/view/articles/2017-08-11/act-now-to-save-the-2020-census ("If you walk into a Target store in suburban Florida, the items on the shelves are different from what is in a Target store in downtown Washington D.C. Target makes these decisions in large part using government data."). Entire product lines may even be developed based on data culled from the Census. *See, e.g., The Use of Census Data: An Analytical Review, supra* (noting that accurate Census data helps "[m]anufacturers of baby products such as baby food, clothes, diapers,

Gibson, Dunn & Crutcher LLP

and toys, and manufacturers of maternity clothes and greeting cards . . . develop . . . their product lines").).

Flawed Census data can also impact customer outreach.  For example, because utility companies often offer lower rates for poorer, elderly, or disabled customers, utility customers use Census data to determine which areas are most likely to need those special rates and reach out to customers in those areas to evaluate eligibility.  *See Modernizing the U.S. Census*, *supra*, at 297. Cable television companies may use Census data to target advertising for pay-per-view events to those areas whose residents are most likely to purchase the event.  *See id.* at 296.  And when a car manufacturer learned through customer research that its vehicles were popular with people in the nursing profession, it used data from the Census to tailor its regional advertising to that demographic. *See* Kysar, *supra*, at 885.  Inaccurate Census data would weaken the ability of businesses to adapt their marketing and outreach strategies to a changing population, resulting in wasted dollars for businesses and unwanted advertising for customers.

Product design, placement, and marketing are essential aspects of any business, and each phase can rely on—and many businesses do rely on—accurate Census data.

### 3. Inaccurate Census Data Will Impair The Ability Of Businesses To Make Informed Judgments About Eligibility For Federal Support

Inaccurate Census data threatens to harm businesses that use such data to evaluate their eligibility for certain federal support.  For example, under the New Market Tax Credit ("NMTC")—a federal program designed to stimulate investment in distressed communities—an investment may qualify for special tax treatment if it occurs in an area with certain concentrations of low- or moderate-income households.  *See New Markets Tax Credit Program*, Community Development Financial Institutions, https://www.cdfifund.gov/programs-training/Programs/new-markets-tax-credit/Pages/default.aspx; Robert Shapiro, *The 2020 Census May Be Wildly Inaccurate—And It Matters More Than You Think*, Brookings Inst. (Aug. 31, 2017), https://www.brookings.edu/blog/fixgov/2017/08/31/the-2020-census-may-be-wildly-inaccurate-and-

Gibson, Dunn & Crutcher LLP

it-matters-more-than-you-think/.[1]  Or a nonprofit organization, such as a rural health clinic, may use Census data for a special federal designation based on location and population served.  *See Modernizing the U.S. Census*, *supra*, at 298.  But miscalculating whether a community has a certain economic demographic means that a business may well miscalculate its investment's tax treatment, and may miscalculate its estimated bottom line.  If margins are tight, inaccurate Census data and its effect on tax treatment could be the difference between a new business that survives and one that falters.

### 4.      Inaccurate Census Data Will Harm Businesses That Rely On Proportionate Allocations Of Federal Funding

Finally, the federal government relies on Census data to allocate and distribute federal funding—to the tune of about $700 billion—and where inaccurate Census data threatens the proper allocation of federal funds, it also affects businesses that rely directly or indirectly on those funds.  *See* A.R.8375, Public Comment – Coalition of Philanthropic Organizations (Mar. 21, 2018) ("[R]ecent decennial censuses have resulted in net undercounts of many communities, with consequences for . . . disbursing roughly $700 billion in federal funds.").  In 2015 alone, the federal government used Census data to distribute over $675 billion in federal funding to a variety of programs.  *See* Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds Distribution: A New Design for the 21st Century* 3 (Sept. 2017) (on file with the U.S. Census Bureau); *see also Wisconsin*, 517 at 5–6 ("Today, census data also have important consequences not delineated in the Constitution: The Federal Government considers census data in dispensing funds through federal programs to the States . . . .");  *see also Dep't of Commerce*, 315 F. Supp. 3d at 782–83.  Those billions of dollars were funneled through 132 different programs, ranging from subsidies for school lunches to historic preservation.  *See* Hotchkiss & Phelan, *supra*, at 16–17.

The bulk of Census-guided federal assistance goes to state governments through a handful of grant programs that aid low-income households and support highway infrastructure.  *See* Andrew D.

---

[1] An NMTC-eligible investment must be located in a designated "low-income community," defined by U.S. Census data as a Census tract with a poverty rate of at least 20 percent or with a median family income that does not exceed 80 percent of the statewide median family income.  26 U.S.C. § 45D(e).

10

Reamer, *Counting for Dollars: The Role of the Decennial Census in the Geographic Distribution of Federal Funds* 10, Brookings Inst. (Mar. 9, 2010), https://www.brookings.edu/wp-content/uploads/2016/06/0309_census_report.pdf.  In 2008, using Census data, the federal government distributed over $36 billion in federal funds via the Federal-Aid Highway Program, and distributed an additional $10 billion to fund other transportation needs.  *See id.* at 11–12.  Businesses have an interest in ensuring that the basic infrastructure of their communities—including the availability of accessible and well-kept highways—is supported by federal funding.  And an inaccurate Census threatens the proper allocation of that funding.

Businesses also have an interest in the federal funding allocated to various programs.  For example, through the Workforce Innovation and Opportunity Act ("WIOA"), the federal government subsidizes the education and workforce training of youths and adults from disadvantaged backgrounds and areas.  *See* 29 U.S.C. §§ 3162, 3172.  The allocation of those subsidies is determined using the "most recent satisfactory data from the Bureau of the Census."  29 U.S.C. § 3242(a).  Some organizations, like *amicus curiae* General Assembly, enroll students that rely entirely on that federal funding, or operate in cities that are fully funded by WIOA.  And the Department of Labor allocated over $7 billion in 2008 on the basis of Census data, *see* Reamer, *supra*, at 13, some of which went to educational institutions like General Assembly providing free training programs to underserved and overlooked talent.

Companies may have more specific interests depending on their size or line-of-business.  For example, many new businesses have an interest in the federal funding that goes to Small Business Development Centers, which receive federal funding to provide small businesses and entrepreneurs with free consulting and training services.  *See Small Business Development Center*, U.S. Small Business Administration, https://www.sba.gov/tools/local-assistance/sbdc.  A local outdoors-equipment retail store, whose business depends in part on the availability and quality of nearby outdoor activities, will likely have an interest in ensuring that the surrounding community is receiving

adequate support from federal programs such as the Wildlife Restoration Program[2] and  the Water

Pollution Control Grant Program,[3] both of which rely on the Census to determine allocation of

funding.

Businesses with deep roots in particular communities may also have a more general interest in

ensuring that the communities they serve—and that make up their customer and employee bases—are

receiving the needed federal assistance to which they are entitled.  The U.S. Department of

Education, for instance, relies on Census data to allocate funds to educational agencies and schools

with high numbers or percentages of children from low-income families.[4]  The Department of

Education allocated over $10 billion in special education grants to states in 2008, based in large part

on Census data.  *See* Reamer, *supra*, at 11.  It distributed over $7 billion in Title I grants to local

educational agencies during the same time period.  *Id.*  Businesses in such a community, like all

members of a community, benefit from strong educational programs.  Federal funds are also allocated

through Community Development Block Grant Programs—again on the basis of Census data—to

help develop urban communities and improve living and economic conditions.[5]  Again, businesses

benefit when their communities receive the infrastructure support they need to thrive.  But an

inaccurate Census risks misallocating funds to each of these programs, harming businesses and their

communities.

* * *

---

[2] *See    Wildlife    Restoration    Program – Overview*,    U.S.    Fish    &    Wildlife    Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/wr/wr.htm (providing funding to restore, conserve, manage, and enhance wild birds and mammals and their habitat); *see also State Wildlife Grant Program – Overview*, U.S. Fish & Wildlife Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/swg/swg.htm (providing funding to develop and implement programs that benefit wildlife and their habitats).

[3] *See Learn About the Water Pollution Control (Section 106) Grant Program*, U.S. Envtl. Prot. Agency, https://www.epa.gov/water-pollution-control-section-106-grants/learn-about-water-pollution-control-section-106-grant (providing funding to states and agencies to build and sustain effective water quality programs).

[4] *See Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*, U.S. Dep't of Educ., https://www2.ed.gov/programs/titleiparta/index.html?exp=0.

[5] *See    CDBG:    Community    Development    Block    Grant    Programs*,    HUD    Exchange, https://www.hudexchange.info/programs/cdbg/; *see also Dep't of Commerce*, 315 F. Supp. 3d at 782–83.

These varied and documented uses of Census data are possible only because businesses can depend on the Census to provide accurate demographic information about customers.  The Citizenship Question, however, threatens to undermine that reliability of Census data and therefore substantially reduce its value to businesses.  If businesses cannot rely on the Census to provide usable, accurate data, they will be hamstrung in their ability to track and adapt to customers' changing needs and preferences.  Competitive businesses must always be evolving to respond to changes in the market, and the Citizenship Question will impede their ability to do so.

## C.   Inaccurate Census Data Will Impact Businesses More Substantially As Businesses Become Increasingly Data-Driven

Inaccurate Census data would be more disruptive to businesses now than ever before. Businesses are relying more and more on data-driven analytics to plan their operations and reach customers in the most efficient ways possible.  Census data has been, and will continue to be, integral to this change, rendering an accurate Census imperative to business growth and innovation in this country.  *See* AJ Agrawal, *Why Data Is Important for Companies and Why Innovation Is On the Way*, Inc.com (Mar. 24, 2016), https://www.inc.com/aj-agrawal/why-data-is-important-for-companies-and-why-innovation-is-on-the-way.html (asserting that in an era in which "[p]eople are generating more [data] than ever before," this data is becoming "essential for companies and it's going to spell an era of innovation").

And not only have businesses begun focusing data to drive their operations, but also entire businesses have sprung up around processing, analyzing, and advising consumers based on available data—including that provided in the Census.  For instance, numerous businesses have developed commercial databases that contain information gathered about their customers and target audience. But in order to make use of these commercial databases—whether, for instance, in an effort to understand and cater to the preferences of a local market segment, or to understand the national population at large—businesses need what are called "truth sets."  These are sets of data that serve as benchmarks to evaluate the quality of the data contained in the commercial database, and to provide a basis for statistical adjustments.  The information that the Census generates "usually provide[s] a

13

definitive benchmark."  Scott McDonald, *A 2020 Census Flop Would Pose a Danger to U.S. Businesses*, Forbes (Dec. 6, 2017).

Some companies, like location intelligence providers, repurpose Census data to provide insights to customers and to help them draw better, data-driven inferences about how to run their organizations.  *See* Greg Sterling, *Chipotle Customers Are Smarter Than McDonald's And Other Insights From Smartphone Data*,  (June 24, 2014), https://marketingland.com/chipotle-customers-smarter-mcdonalds-insights-smartphone-data-88637.  Real estate aggregators can use Census data to compile its listings and real estate estimates.  *Zillow: Ahead of Its Time or Falling Behind*, Harvard Business School: Open Knowledge by Digital Initiative (Nov. 18, 2016), https://rctom.hbs.org/submission/zillow-ahead-of-its-time-or-falling-behind/; *see also Census Data Trends*, Zillow Blogs (Sept. 13, 2006), https://www.zillow.com/blog/census-data-trends-3888/.  Businesses like these might not exist without the internet and advanced data processing.  And among the information these businesses process is Census data, the accuracy of which is and will continue to be essential to the existence of these businesses.  Indeed, the fact that these businesses exist in the first place is a testament to just how important Census data and information like it has become to the business world.

Although it is impossible to determine how innovators and entrepreneurs will use Census data in the future, one thing is clear: businesses will keep using it so long as it is accurate.  They will seek to leverage key data and determine new, profitable uses to draw from it.  Ensuring the accuracy of this data is essential, and any attempt by the federal government to diminish the Census data threatens businesses and economic growth nationwide.

## IV.    CONCLUSION

For the reasons stated above, *amici* support judgment in favor of Plaintiffs.

1   DATED: February 1, 2019                  Respectfully submitted,

2                                            */s/ Julian W. Kleinbrodt*
3                                            Julian W. Kleinbrodt (CA Bar # 302085)
                                             jkleinbrodt@gibsondunn.com
4                                            GIBSON, DUNN & CRUTCHER LLP
                                             555 Mission Street, Suite 3000
5                                            San Francisco, CA 94105-0921
                                             Tel.: 415-393-8382
6                                            Fax: 415-374-8470

7
                                             Stuart F. Delery (*pro hac vice* pending)
8                                            sdelery@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
9                                            1050 Connecticut Avenue, N.W.
                                             Washington, DC 20036-5306
10                                           Tel.: 202-887-3650
                                             Fax: 202-467-0539
11

12                                           Alexander H. Southwell (*pro hac vice* pending)
                                             asouthwell@gibsondunn.com
13                                           GIBSON, DUNN & CRUTCHER LLP
                                             200 Park Avenue
14                                           New York, NY 10166-0193
                                             Tel.: 212-351-3981
15                                           Fax: 212-351-6281

16
                                             *Attorneys for Proposed Amici Curiae*
17                                           Tech:NYC, Univision Communications Inc.,
                                             General Assembly, Topia, and the Minneapolis
18                                           Regional Chamber of Commerce

19

20

21

22

23

24

25

26

27

28

**GIBSON, DUNN & CRUTCHER LLP**
Stuart F. Delery (*pro hac vice* pending)
SDelery@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202-887-3650
Fax: 202-467-0539

Alexander H. Southwell (*pro hac vice* pending)
ASouthwell@gibsondunn.com
200 Park Avenue
New York, New York 10166
Tel.: 212-351-3981
Fax: 212-351-6281

Julian W. Kleinbrodt (CA Bar # 302085)
jkleinbrodt@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Tel.: 415-393-8382
Fax: 415-374-8470

*Attorneys for Proposed Amici Curiae*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, *et al.*,<br><br>        Defendants. | Case Nos.  18-cv-01865-RS<br>        18-cv-02279-RS<br><br><br>**[PROPOSED] ORDER** |
| CITY OF SAN JOSE, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WILBUR L. ROSS, *et al.*,<br><br>        Defendants. | |

Upon consideration of the Notice of Motion & Motion for Leave to File Brief *Amici Curiae* in Support of Plaintiffs of Tech:NYC, Univision Communications Inc., General Assembly, Topia, and the Minneapolis Regional Chamber of Commerce, it is hereby

ORDERED that the motion is GRANTED.

Date: _____2019

_____
Honorable Richard Seeborg
United States District Judge