1   JOSEPH H. HUNT
    Acting Assistant Attorney General
2   BRETT A. SHUMATE
    Deputy Assistant Attorney General
3   JOHN R. GRIFFITHS
    Director, Federal Programs Branch
4   CARLOTTA P. WELLS
    Assistant Director, Federal Programs Branch
5   MARSHA S. EDNEY
    Senior Trial Counsel
6   KATE BAILEY
    CAROL FEDERIGHI
7   Trial Attorneys
    United States Department of Justice
8   Civil Division, Federal Programs Branch
    P.O. Box 883
9   Washington, DC  20044
    Tel.: (202) 514-9239
10  Email: kate.bailey@usdoj.gov

11  Attorneys for Defendants

12                    UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

14

15  STATE OF CALIFORNIA, *et al.*,        | Civil Action Nos. 3:18-cv-01865-RS

16          Plaintiffs,

17  v.                                    **DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

18  WILBUR L. ROSS, JR., *et al.*,

19          Defendants.                   Dept.:  3
                                          Judge:  The Honorable Richard G. Seeborg
20                                        Trial Date:      January 7, 2019
                                          Action Filed:   March 26, 2018

21

22

23

24

25

26

27

28

Defendants United States Department of Commerce, Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce, the U.S. Census Bureau, and Dr. Steven Dillingham, in his official capacity as the Director of the U.S. Census Bureau, hereby submit the following revised proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

**I.    Background**

1.    The Undisputed Facts, attached as Exhibit A to the Joint Pretrial Statement and Proposed Order, ECF No. 119 in No. 18-1865, are hereby incorporated by reference.

**II.    Facts Relevant to Plaintiffs' Standing**

### A.  Injury in Fact.

#### 1.  NRFU Can Mitigate a Potential Decline in Self-Response

2.    The Census Bureau's comprehensive non-response follow-up ("NRFU") operation, which includes multiple mailings, in-person follow-up visits, the use of high-quality administrative records, and proxy responses from knowledgeable individuals, "can mitigate the consequences of the decline in self-response with respect to the accuracy of the actual count."  Tr. 798:8-12.

#### a.  *Any potential decline in self-response is unknown*

3.    Although the Census Bureau's estimate of "5.8 percent is the best available evidence of the decline in the self-response rate for households that may contain a noncitizen," Tr. 859:18-20, the true extent of any decline is unknown.

4.    Dr. Barreto's testimony that the Census Bureau's own analysis supports an 11.9 percent drop-off in nonresponse, Tr. 487:1-488:8, is inaccurate and misleading.  As Dr. Abowd explained, the 11.9 percent figure referenced by Dr. Barreto is not "a reliable predicter of the likely impact on self-response . . . [b]ecause it hasn't been adjusted for the confounding factors."  *Id.* 860:7-13.  On the contrary, "the 5.8 percentage point decline among households that may contain a noncitizen is the best available quantitative evidence."  *Id.* 861:4-6.

5.      A decline in self-response for a subpopulation is not necessarily associated with an increase in the net undercount of that population.  Tr. 917:6-10 (Dr. Abowd testimony  that "a substantial number of households avoid[ing] the census and refus[ing] to cooperate with enumerators and NRFU" would not necessarily "lead to an increased undercount").  A decline in self-response means that the non-response follow-up workload may be increased, but the Census Bureau may capture all of the additional nonresponding households during NRFU and subsequent imputation procedures.  *Id.* 918:11-16.

6.      Self-response rates have been steadily declining for decades.  AR 162.

7.      The Census Bureau projects an overall self-response rate in the range of 55.5% to 65.5%, and while it uses the midpoint (60.5%) for certain purposes, it uses the low point (55.5%) for budgeting and other planning purposes.  Tr. 852:5-10; 877:13-18.  These projections are consistent with the decades-long decline in self-response rates.  AR 172.

8.      For the 2020 decennial census, households will be given the option to complete the questionnaire via the Internet or by telephone, in addition to printed questionnaires.  AR 165.

9.      The presence of a citizenship question on the 2020 census will not affect whether addresses are included in the Master Address File.

10.     Regardless how a household responds to the 2020 census, if the household simply skips the citizenship question, that household will nonetheless be enumerated in full.  Tr. 851:10-12.  And if a household reaches the citizenship question and refuses to respond beyond that point, that household will nonetheless be enumerated in full.  *Id.* 851:13-15.  It is only if a household does not substantially complete the questionnaire that the household is included in the NRFU workload.  *Id.* 926:22-23.

11.     Scientists at the U.S. Census Bureau issued a working paper in August 2018 evaluating the citizenship question's impact on the potential decline in self-response rates.  *See* PTX 160, Brown, J. David, Misty L. Heggeness, Suzanne M. Dorinski, Lawrence Warren, and Moises Yi, U.S. Census Bureau, Center for Economic Studies, Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census, Working Paper, CES 18-38, Aug., 2018 ("Brown

2

paper"). Using available data from the 2010 census, the 2010 and 2016 American Community Surveys, and administrative records, the paper produced an estimate of 5.8 percentage points as "the best available evidence of the decline in the self-response rate for households that may contain a noncitizen." Tr. 859:18-20. Because this number is an estimate, however, it is unknowable to what extent such a decline will occur.

12.     The analysis of Plaintiffs' expert, Dr. Matthew Barreto, does not provide reliable evidence of a different or greater decline in self-response rates to the 2020 census. Dr. Barreto conducted a public opinion survey designed to look at response rates to the 2020 census in the face of a citizenship question, Tr. 376:24-25, but his results are unreliable because asking someone about their intention to do something and measuring what they actually do in a field experiment are very different. *Id.* 869:22-870:24. As Dr. Abowd explained, Dr. Barreto's methodology merely asked people in the context of one interview to predict whether they likely would participate in the census, with no opportunity to validate those results with a comparison to real-world behavior. *Id.*

13.     Nor does the analysis of Dr. Barreto provide reliable evidence of an undercount. Dr. Barreto conducted a public opinion survey "to evaluate participation in the 2020 census," Tr. 411:15-23, but the fundamental flaws in the design of that survey render its results unreliable. For instance, although Dr. Barreto "fielded a pilot test of the survey to test the efficacy of the questions," *id.* 566:4-6, he did not test either the wording or ordering of his first two questions, designed to measure nonresponse rates—meaning "no respondents were asked whether they would answer a census with a citizenship question, without having just been asked about a census that did not contain that question," *id.* 570:23-571:3. Dr. Barreto also failed to test any alternate wording of question two, which asked respondents whether they would respond to a census conducted by *the federal government*, rather than the *Census Bureau*, *id.* 576:4-13, and that choice of wording—associating the request for information with the government writ large, rather than the nonpartisan, statistical Census Bureau—likely influenced respondents' choices.

14.     Although Dr. Barreto attempted to determine the decline in self-response rates due to a citizenship question by conducting his own opinion poll, the conclusions drawn therefrom are

fatally flawed and not credible.  As Dr. Abowd explained in response to a question from the Court, Dr. Barreto's conclusion that "those who will not respond to the census come from statistically larger households than those who say they will respond" is not entitled to "the confidence he gave it" because Dr. Barreto's "very small sample of . . . [l]ess than 200 people . . . suggests that his measures of margins of error are way understated."  Tr. 873:19-874:3.  Dr. Barreto also failed to control the weighting of his household-size estimates by using objective population totals, with the result that "his estimated household sizes are much bigger than the actual household sizes in the United States, because he didn't control his weights."  *Id.* 874:4-9.

15.     Dr. Barreto classifies as "nonresponses" those individuals who indicated they would participate in the census during question one of his survey, but then changed their answer to "no" in question two, which asked about a census containing a citizenship question.  Tr. 568:1-21.  But his definition of nonresponse also included individuals whom, upon being told about a census containing a citizenship question in question two of his survey, did not immediately know whether they would respond or needed more time to decide whether they would participate.  *Id.* 574:4-8.  Dr. Gurrea, Defendants' expert who also has considerable experience with surveys, testified that this classification of responses made Dr. Barreto's, and Dr. Fraga's, interpretations of the results unreliable.  *Id.* 695:16-22, 703:21-704:1.  Dr. Barreto's survey misclassifies many responses as "nonresponsive" when instead they are neutral regarding a citizenship question, skewing the results in favor of his conclusion.  *Id.* 703:21-705:12.  Indeed, at trial Dr. Barreto did not know how many of the individuals he classified as "nonresponsive" simply expressed indecision or ambivalence as to whether they would participate in the census with a citizenship question.  *Id.* 574:10-20.  In fact, approximately a third of respondents classified as unwilling to participate in a census with a citizenship question actually merely refused to answer survey question two.  *Id.* 706:2-23.  As Dr. Gurrea explained, this misclassification of respondents has the effect of overstating the drop-off in self-response rate that Dr. Barreto allegedly measured by comparing the responses to questions one and two.  *Id.* 706:24-707:8.

16.     Question two of Dr. Barreto's survey also required individuals to respond that they would either participate in the census *or not*—meaning it failed to offer the real-world option of responding to the census *without* providing citizenship information.  *Id.*  This false dichotomy likely captures as "nonresponsive" individuals who either would answer the census but omit their citizenship information, or falsely claim citizenship status—even though, as Dr. Barreto himself admitted, "[i]f somebody submits a partial form, the census will still count household counts for purposes of enumeration." *Id.* 569:16-17.

17.     Survey question two was also flawed because it was compound, asking respondents whether they would "participate *and* submit [their] household information."  PTX-824, at 2 (emphasis supplied).  Therefore, as Dr. Gurrea observed, negative answers to the question did not distinguish between those who would be unwilling to participate entirely in the census and those who would be willing to participate but who would not submit all of the requested household information.  Tr. 707:17-708:12.  Dr. Gurrea identified this as a flaw in the survey because those latter individuals might still provide enough information to be fully enumerated but the survey does not provide any evidence to determine who will or will not do so.  *Id.*: *see also id.* 737:7-14.

18.     Dr. Barreto opined that the citizenship question is sensitive for Latino communities and immigrant-adjacent communities, Tr. 576:14-21, but his survey did not allow him to distinguish between the proportion of citizens versus noncitizens in his survey that indicated they would not participate in a census containing a citizenship question, *id.* 577:4-7.  This incongruity undermines any connection between Dr. Barreto's results and his ultimate opinions, and it is borne out by the fact that Dr. Barreto's survey found that "63.9% of African-Americans think the Trump administration will share their information," when "the share of African Americans nationally who are immigrant or immigrant-adjacent isn't anywhere near 63.9 percent." *Id.* 580:12-20.  Dr. Barreto insisted that his data reveal that "63.9 percent of blacks think that *Trump will share their citizenship status*" while simultaneously admitting that "a large share of those 63.9 percent would be U.S.-born non-immigrants," *id.* 582:6-20 (emphasis added).  This demonstrates that Dr. Barreto's survey results were highly influenced by respondents' perceptions of the current political administration as

opposed to concerns purely about citizenship as a census topic.  In other words, a lack of trust in the current administration among populations for whom citizenship is not a sensitive topic, such as the 63.9% of African-Americans reporting distrust, has no implication for the inclusion of the citizenship question on the census.

19.    Dr. Barreto's survey found that the drop-off, or nonresponse rate, *increased for every racial and ethnic group* from the beginning of his survey (question two, the first time respondents were asked about a census containing a citizenship question) to the end (question eight, when respondents were asked again about participation in a census containing that question).  Tr. 584:5-11; 585:23-586:3.  Dr. Barreto used those responses "as a proxy for NRFU."  *Id.* 583:10-17.  But this is illogical, since, as Dr. Barreto agreed,  "you would expect the nonresponse follow-up operations conducted by the Census Bureau to result at least in some . . .  increased responses, not a decline overall," *id.* 586:4-10.

20.    Dr. Barreto testified that, with respect to survey research, there is a process whereby survey research is submitted for academic peer review.  Tr. 419:9-12.  Despite the existence of this process, Dr. Barreto did not submit the survey underlying his testimony in this case for peer review before it was implemented.  *Id.* 566:7-9.

21.    Plaintiff's expert, Dr. O'Muircheartaigh, testified that the inclusion of a citizenship question on the 2020 census will exacerbate a differential net undercount for certain hard-to count populations, namely non-citizens and Latinos.  Tr. 40:1-4.  Dr. O'Muircheartaigh admitted that historically there has been a differential net undercount of these populations in the decennial census, including in the 2010 decennial census despite that it did not include a citizenship question. *Id.* 219:17-25.  He further acknowledged that therefore the differential net undercount for the 2010 census could not be attributed to a citizenship question.  *Id.* 220:1-4.

22.    Dr. O'Muircheartaigh based his overall conclusion regarding the differential net undercount in part on his opinion that the Census Bureau's NRFU efforts will be deleteriously affected by the introduction of a citizenship question on the 2020 census.  Tr. 40:20-41:3.  As support, Dr. O'Muircheartaigh relied on the American Community Survey ("ACS") Computer-

Assisted Personal Interviewing ("CAPI") follow-up data which shows declining follow-up response rates for the ACS between 2010 and 2016.  *Id.* 40:20-41:9; 179:19-181:3.  Dr. O'Muircheartaigh admitted that this data does not explain why there is a decline in the response rate, and further, that factors other than a citizenship question could be a reason for the decline.  *Id.* 220:13-20. Additionally, he admitted that even without a citizenship question on the 2020 census, he would expect that NRFU would be less successful than it was in 2010.  *Id.* 220:21-24.

23.     Dr. O'Muircheartaigh's use of the ACS CAPI data to support his opinion that NRFU will be deleteriously affected by the introduction of a citizenship question on the 2020 census is of limited evidentiary value given the differences in the follow-up processes between the ACS and census.  As Dr. Abowd testified, the NRFU for the census is much more exhaustive than the ACS CAPI.  Tr. 810:21-811:16.

24.     Dr.  O'Muircheartaigh admitted that he had not performed any quantitative data analysis regarding NRFU success and a citizenship question on the 2020 census.  Tr. 220:25-221:7. In fact, Dr. O'Muircheartaigh admitted that he had not produced any quantitative evidence that the citizenship question will increase the differential net undercount or any quantitative evidence for any of his expert opinions in this case.  *Id.* 221:4-25.

### b. *Partnership and communication/outreach efforts will increase the self-response rate*

25.     Outreach and communications efforts by the Census Bureau during the 2020 census will have the effect not only of increasing the overall self-response rate, but also of reducing the net differential self-response rate.  *See generally* 2020 Census Operational Plan (DTX-020); *see also* Tr. 799:23-800:14.

26.     The Census Bureau will utilize an integrated communications and partnership campaign to recruit national, regional, and local partners and develop effective messages stressing the confidentiality of census data, the statistical purposes for census data, and the statutory prohibition against sharing those data with any agency.  *See generally* 2020 Census Operational Plan (DTX-020); *see also* Tr. 799:23-800:14.

27.     Partners will include both state and local governments and private organizations.

While partners are welcomed to spend their own money to aid the Census Bureau's mission, the federal government compensates partners for any expenditures specifically requested by the Census Bureau.  *See generally* 2020 Census Operational Plan, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf.

### c.  *NRFU efforts are comprehensive, well-funded, and flexible*

28.     At the end of the self-response period, six weeks into the 2020 Census, households without a self-response become part of the NRFU workload.  Tr. 851:16-852:2.

29.     Any decline in the self-response rate due to the citizenship question is currently expected to be well within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  Tr. 879:24-880:3.  "In general, Congress has produced appropriations for the census of population in what we call the 'nine and ten years' that are consistent with what the Census Bureau has requested to conduct the census," *id.* 877:7-10, and assuming the trend continues and Congress appropriates funds in accordance with the Life Cycle Cost Estimate, the Census Bureau will have $1.5 billion to conduct NRFU operations, along with another $1.7 billion in contingency funding, *id.* 876:21-877:3.

30.     For every one percent increase or decrease in the overall self-response rate above or below the budget planning self-response rate of 55.5%, the Census Bureau assumes $55 million will be saved or spent in NRFU operations.  AR 1282.  Even if the Brown paper has accurately predicted a 5.8% decline in self-response rate for potential noncitizen households—*i.e.*, a decline affecting approximately 28.6% of the population—this leads to only a 1.5% decline in the overall self-response rate across the entire population and an extra $82 million in NRFU expenditures.  Tr. 878:4-20.  A higher, hypothetical 10% decline in the self-response rate among potential noncitizen households results in a 2.5% decline in overall self-response rate with an estimated $137.5 million in NRFU costs.  *Id.* 879:10-17.  These estimates are all far below the projected $1.7 billion in contingency funding, and this remains true even if one assumes six enumerator attempt days per household, rather than three, the impact of which would concomitantly double all estimated NRFU

8

costs.  *Id.* 879:18-23.  In other words, the Census Bureau will have the funds necessary to ensure appropriate follow-up efforts in virtually any conceivable self-response scenario.

31.     Because "the enumerator pool in each area census office is several orders of magnitude larger than the expected number of enumerators that have to be deployed," Tr. 880:14-16, the Census Bureau will have a sufficient number  of enumerators ready to deploy in the event self-response rates decline.  *Id.* 880:16-20.  These enumerators are drawn from the communities in which they will be deployed, helping households feel comfortable in responding.   *Id.* 883:17-884:15.

32.     Enumerators are also deployed in an efficient manner to best obtain census enumerations.  Using a state-of-the-art optimizer, 2020 census enumerators will be assigned households to visit, provided the most efficient route to reach each household, and then given the optimal times to visit each household based on statistical models of the local area.  The optimizer also will allow Area Census Office managers and staff to identify the most effective enumerators and adjust NRFU workloads accordingly.  Tr. 881:2-6; 881:14-882:19.

33.     While many of the historical documents describing the number of NRFU attempts use a hypothetical limit of six visits, in the 2020 Field Operational Control System the actual measure is an "attempt day"—the number of days that NRFU enumerators attempt to obtain a response from a household.  During an attempt day, there can be multiple attempts.  In addition, near the end of NRFU operations, closeout procedures allow the number of attempt days to exceed six.  The binding constraint is the date that NRFU operations close, not a maximum number of attempt days.  Tr. 884:23-886:13.

34.     If an address in the NRFU workload receives one unsuccessful in-person visit, it becomes eligible for enumeration by administrative records.  Administrative records are electronic records compiled by another unit of the federal government, including the Internal Revenue Service, Health and Human Services, the Bureau of Indian Affairs, the Postal Service, and the Social Security Administration.  Tr. 888:18-890:4.

9

35. If no high-quality administrative records exist for a household, the address stays in the NRFU workload and gets the full NRFU consideration. Tr. 890:5-17.

36. There is no credible quantitative evidence that the use of administrative records will exacerbate or increase any differential net undercount. Tr. 890:18-23. Administrative records simply supply a method of low-cost enumeration when high-quality records are available; if no such records exist, then the full NRFU protocol will be used. *Id.* 890:7-17. The fact that hard-to-count groups are relatively underrepresented in administrative records thus does not establish that the use of administrative records will result in those groups ultimately being undercounted when all enumeration operations are completed.

37. If a household does not self-respond and cannot be enumerated using administrative records, and the Census Bureau is unable to get a response through in-person visits, enumerators may interview a proxy. A proxy could be a landlord, a neighbor, a postal carrier, or another person with knowledge of the household. The proxy process is specifically designed to obtain a head count for the number of people residing at an address. Tr. 886:14-23.

38. The Census Bureau is unaware of any credible empirical evidence suggesting that use of proxies in the census causes a greater net undercount or differential net undercount in comparison to self-response or in-person interviews. Tr. 887:13-888:5. There is no credible evidence that households enumerated via proxy responses are more likely to be undercounted relative to self-responding households due to systematic underreporting of residents by proxy respondents. *Id.* 887:13-888:5.

39. The fact that proxy responses tend to generate less accurate demographic data also does not indicate that proxy responses tend to result in higher net undercounts. Inaccurate demographic data does not affect the actual enumeration. Tr. 888:10-15.

40. Dr. Barreto's conclusion that "NRFU . . . will actually exacerbate the gap between response rates" in Latino and immigrant communities," Tr. 490:3-5, is not credible. Dr. Barreto "simulated nonresponse followup" using the difference in responses to questions seven and eight on his survey—asking again whether respondents would participate in a census without and with a

10

1   citizenship question, *id.* 583:10-17. But what Dr. Barreto proffers as "a proxy for NRFU," *id.*, does

2   not resemble even remotely an actual recontact effort.  First, his follow-up consisted of "repeating

3   again in the same phone call" the same questions respondents already had answered, meaning Dr.

4   Barreto "didn't actually recontact anyone on another day, or even at a later time in the same day."

5   *Id.* 583:10-22.  And this purported "simulated recontact" came on the heels of "the intervening

6   discussion about trust in the Trump administration."  *Id.* 584:1-4.  It therefore is unsurprising that

7   *every racial or ethnic group*, including those with low rates of immigrants, evidenced an increase in

8   nonparticipation from the beginning to the end of the survey.

9          41.      Dr. Barreto opined that "most members of the general public probably don't know

10  a huge amount about the Census Bureau," Tr. 574:21-24, while acknowledging that he "would

11  expect that most people have some opinion of the federal government" before encountering his

12  survey.  *Id.* 574:25-575:2.  But in the section of his survey purporting to measure trust, Dr. Barreto's

13  survey pivoted from a description of Title XIII's assurances of confidentiality to ask "Do you trust

14  *the Trump administration* to protect your personal information, including citizenship, *or do you think*

15  *they will share* this information*," id.* 578:2-15 (emphasis added).  This jarring and unexpected

16  reference to trust in the Trump administration—rather than the Census Bureau—almost certainly

17  colored respondents' answers, rendering his measure of "trust" unreliable.  This is particularly true

18  given that, as Dr. Barreto testified, the President's approval ratings during the survey fell to the low

19  40s and was "at least 10 points lower" among Latino communities, *id.* 578:20-579:2, and that

20  neither Dr. Barreto's survey *nor* the pretesting he conducted in advance "included an alternate

21  wording asking respondents whether they trust the Census Bureau—as opposed to the Trump

22  administration—to protect their data," *id.* 579:3-19. And Dr. Barreto neglected to "include any

23  follow-up qualitative component to determine why respondents reported a lack of trust in the

24  administration," *id.* 581:11-14.

25         42.      Dr. Barreto's conclusions regarding the likely impact of the citizenship question are

26  further undermined by the fact that in California a full "48 percent of respondents reportedly think

27  the Trump administration will share their citizenship information," Tr. 579:20-25, even though the

28

1  percent of California residents who are immigrants is much lower. *Id.* 580:1-4. This discrepancy

2  demonstrates that Dr. Barreto's survey results reflect political views of the current administration,

3  not actual concerns over the confidentiality of citizenship data.

4        43.   Regarding Dr. Barreto's "simulated or proxy NRFU," Dr. Abowd credibly testified

5  "that simulating NRFU by changing questions over the course of a single interview is not a realistic

6  simulation of the operations, especially of the census NRFU." Tr. 873:12-18. This is borne out by

7  the fact that Dr. Barreto's "proxy NRFU" obtained numbers *wildly* different from the actual success

8  of NRFU in census operations; specifically, his survey found that 29.66 percent of Californians and

9  49.29 percent of non-Californians change to responders in his "simulated NRFU." *Id.* 587:21-588:7.

10  These numbers are not remotely comparable to the actual NRFU success rate of 98.58 percent in

11  the most-recent decennial census, *see* Tr. 721:11-14, demonstrating that Dr. Barreto's results bear

12  little resemblance to real-world behavior.

13        44.   Dr. Barreto opined that NRFU will be less successful in CA than in the rest of

14  country, Tr. 546:8-547:18, but the results underlying these conclusions consisted of *only 186*

15  *respondents* nationwide, and only 84 respondents in California. *Id.* 590:9-591:8; 592:5-10. Although

16  Dr. Barreto attempted to obscure the paltry sample size by relaying that "of people in the state of

17  California . . . 29.6 percent" change to responders in his "simulated NRFU," as compared to "for

18  the rest of the country . . . 49.2 percent," *id.* 591:20-592:1, no reliable conclusions can be drawn

19  from the difference between such small samples.

20        45.   Dr. Barreto's conclusions are further undercut by the fact that he omitted from his

21  expert report and failed to disclose to opposing counsel tables of data he had created, Tr. 589:19-

22  590:3, the results of which run directly contrary to his ultimate conclusions. For example, the tables

23  inexplicably omitted from Dr. Barreto's report show that "44 percent of Latino respondents

24  changed their answer at Question 8 [simulated NRFU] to indicate they would participate" with a

25  citizenship question, including "45 percent of *foreign-born Latinos*," *Id.* 594:15-595:2 (emphasis

26  added), compared to "only 20 percent of white respondents chang[ing] their answer . . . after [his]

27  assurances of confidentiality." *Id.* 595:3-7. Indeed, Dr. Barreto agreed that his "survey found that

28

[his] simulated NRFU was more effective for Latino respondents in California than for white respondents." *Id.* 595:16-21.  This finding indicates that Dr. Barreto's "proxy NRFU" was *twice* as effective for Latinos relative to whites—a result diametrically opposed to Dr. Barreto's ultimate opinion that NRFU "will be far less effective in 2020 in the Latino and immigrant community." *Id.* 543:1-3.; *see also id.* 490:3-5 ("And where NRFU will be less successful in converting people is in Latino and immigrant communities.").  The missing tables also disclose that the survey found that "followup had no effectiveness for the Asian population," *id.* 596:9-13, a finding that stands in stark contrast to the results obtained by the Census Bureau in its surveys.

46.     The tables omitted from Dr. Barreto's expert report also reveal that his "simulated NRFU" was *more* effective for Latinos in California than Latinos in the rest of the country. Tr. 598:8-599:1 (44 percent "NRFU" efficacy for California Latinos versus 36 percent for Latinos in other states).  This result is irreconcilable with Dr. Barreto's fourth opinion—that "the impact [of the citizenship question] will be more severe in places like San Jose, or statewide in California," *id.* 547:14-15.

47.     Further evidence that Dr. Barreto's survey questionnaire measured respondents' feelings toward the Trump administration, rather than concerns over disclosing citizenship on the census, comes from the fact that he found that whites in California changed to responders in his "simulated NRFU" only 20 percent of the time—versus 50 percent for whites in the rest of the country, Tr. 597:7-14, although there is no evidence that the white California population contains a greater share of immigrants or those concerned with their citizenship status.  This finding also was first revealed by the tables omitted from Dr. Barreto's expert report, and provided to defense counsel shortly before trial. *Id.*

48.     Dr. Barreto tacitly admitted that he had ignored the evidence, outlined above, which ran contrary to his conclusions.  Tr. 601:23-602:2 (testifying, in response to a question from Plaintiffs' counsel, "I did not rely on the data in Tables 15 or 16 in my report, at all.").

13

## 2. Imputation Will Adequately Account for Any Remaining Households

49. The use of imputation to enumerate the limited number of households not captured by self-response and NRFU operations is designed to accomplish a complete and accurate enumeration. Tr. 892:10-19.

50. No credible, quantitative evidence demonstrates that whole-person census imputations tend to systematically overcount or undercount the number of people in a household. Tr. 893:14-15.

51. The Census Bureau uses imputation to enumerate housing units that remain unresolved after the self-response and NRFU operations (in-person interviews, administrative records, and proxy responses) are exhausted. *See generally* 2020 Census Operational Plan, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf.

52. The Census Bureau has not yet determined the final imputation algorithms it will use in the 2020 census. Tr. 892:16-19. In general, the Census Bureau uses statistical criteria to aggregate nearby housing units that have characteristics matching those of the missing unit in the Master Address File, taking into account the distribution of household sizes. The Census Bureau then randomly selects one of those nearby units and uses the number of people in that unit to fill in the number of people in the missing unit. *Id.* 892:10-893:11.

53. Based on assumptions built into the Life Cycle Cost Estimate, along with the rate of imputation from the 2010 Census, the Census Bureau projects that, without a citizenship question, 0.38% of all households would be imputed. Tr. 893:18-895:17. Using these same assumptions, along with the Brown paper's 5.8% estimate for the decline in self-response rate for potential noncitizen households, the Census Bureau projects imputation of 0.40% of all households in the 2020 census, assuming the average rate of resolution through the NRFU process. *Id.* 895:18-896:18. Even assuming that all households not self-responding due to a citizenship question would go through the full NRFU process without achieving the average rate for resolution, the result would be a projected imputation of 0.60% of all households. *Id.* 896:19-897:11.

14

54.     In none of these scenarios would a household go uncounted simply because it did not self-respond due to a citizenship question.  Even in the worst-case scenario, the result is simply more imputations.  Tr. 896:19-897:17.

55.     Increased imputations by themselves do not lead to an increased differential net undercount.  Tr. 897:12-17; 897:25-898:12.  To produce a differential net undercount, properties of the imputation model must be credibly linked to non-response due to the presence of a citizenship question, which Plaintiffs have not done.

56.     The fact that imputation may generate less accurate demographic data does not indicate that imputation tends to result in higher net undercounts.  Tr. 893:14-15.  Likewise, the fact that a greater number of imputations may impact the accuracy of demographic data does not "necessarily lead to an increased undercount."  *Id.* 917:6-918:10.

57.     Dr. O'Muircheartaigh testified that imputation methods differentially disfavor subpopulations with lower response rates, including Latinos and noncitizens, Tr. 217:18-20, and that imputation cannot remediate such a differential undercount. *Id.* 212:7-12.  Yet, he also acknowledged that the Census Bureau has not yet determined what the imputation process will be for the 2020 census. *Id.* 207:20-208:5; 210:1-11.  Moreover, Dr. Abowd testified that he was unaware of any credible quantitative data suggesting that imputation over- or undercounts certain subpopulations, *id.* 893:12-15, and Dr. O'Muircheartaigh did not perform any such quantitative analysis. *Id.* 221:17-25.

### 3.   Plaintiffs Have Not Proven that Any Increased Differential Undercount Will Occur After NRFU Operations and Imputation

58.     Plaintiffs have not established that inclusion of a citizenship question will increase any differential undercount that may remain after NRFU operations and imputation, meaning an undercount that may impact a particular racial or ethnic group to a greater or lesser extent than the overall net undercount or overcount of the population.  Tr. 918:4-919:6.

59.     There have been net differential undercounts in past censuses, including when there was no citizenship question on the "short form" of the census questionnaire sent to every American.

60.     Plaintiffs have not proven whether the citizenship question will impact the differential net undercount.  Tr. 918:4-919:6.

61.     That the citizenship question may be "sensitive" for certain persons, or groups of persons, does not, without more, establish that the citizenship question is likely to exacerbate the net differential undercount for the 2020 Decennial Census.  Tr. 918:4-919:6.

### 4.  Specific Claims of Injury

62.     Any differential undercount that remains after NRFU operations and imputation will not be sufficiently large to cause any impact on apportionment or federal funding or produce any of the other specific injuries claimed by Plaintiffs.

### a.  *Apportionment*

63.     After the census is taken, congressional seats are distributed pursuant to "the method of equal proportions," a complex process that ranks states in order of priority based on their populations (multiplied by a multiplier).  *See* 2 U.S.C. § 2a(a).

64.     The Plaintiffs have provided no evidence of any adverse effect on their federal representational interests in any reasonable scenario that can be anticipated to occur as a result of the 2020 census.

65.     Plaintiffs' expert, Dr. Bernard Fraga, calculated the possible effects on apportionment under four different scenarios.  Fraga Trial Decl. ¶ 26, ECF No. 130 in No. 18-1865.  The starting point for all of the scenarios was his projected "baseline" population estimates resulting from the 2020 enumeration if there were no citizenship question.  *Id.* ¶¶ 5, 10-23; Tr. 620:25-621:5.  Each of his specific scenarios then estimated the results that would follow under different assumptions of a possible undercount attributable to the inclusion of a citizenship question.  Fraga Trial Decl. ¶ 24.

66.     Scenarios A and B relied on numbers derived from Dr. Barreto's study, *id.* ¶¶ 27-40; Tr. 621:10-14, which, as described above, is unreliable for a number of reasons.  In addition to these flaws described previously, additional problems are created by Dr. Fraga's attempt to separate out Dr. Barreto's results for California from those of other states in calculating the specific impact

1   on California in his Scenario B, which relied on  the results from the  "proxy NRFU" purportedly

2   conducted by Dr. Barreto.  *See* Tr. 737:24-739:20.  First, for the purpose of analyzing the responses

3   to survey question eight (the attempt to measure the responses after NRFU), Dr. Fraga assumed

4   that there were no differences between any states other than California.  *Id.* 713:25-714:13.

5   Defendants' expert, Dr. Gurrea, pointed out that this method is improper as it erases likely

6   differences between those other states.  *Id.*  Second, the numbers of California respondents in

7   certain subpopulations were very limited—for example, there were only three Asian respondents

8   and only one black respondent who received question 8.   *Id.* 715:2-23.  The effect is that the

9   results for California alone are very unreliable, with, for example, Dr. Barreto reporting that 62% of

10  black respondents outside of California responded "yes" while only 30% of black California

11  respondents were reported as saying "yes."  *Id.* 716:13-24.  Moreover, neither Dr. Barreto nor Dr.

12  Fraga reported the statistical significance of the California-specific numbers or of the

13  corresponding numbers for all states.  *Id.* 716:25-717:4.  It therefore is impossible to conclude that,

14  for example, the differences between Latino respondents and the full sample were statistically

15  significant either in California or in all other states.  *Id.* 717:8-18.

16          67.     Dr. Fraga's Scenarios C and D are also flawed.  Both of these scenarios began by

17  assuming a 5.8% decrease in self-response among households with at least one individual without

18  confirmed citizenship (derived from the Brown paper).  Fraga Trial Decl. ¶¶ 42-49.  Scenario C did

19  not account for any mitigation in that decrease in self-response through NRFU.  *Id.* ¶ 46.  Scenario

20  D assumed a NRFU success rate among these households of 86.63%.  *Id.* ¶ 48.  This NRFU

21  success rate was taken from another of Plaintiffs' experts, Dr. Colm O'Muircheartaigh, *id.*: Tr.

22  631:24-632:9, who obtained that number from a study of the ACS CAPI follow-up response rates.

23  Fraga Trial Decl. ¶ 50; Tr. 178:24-180:11, 183:10-185:19 & PTX-138.  However, the ACS follow-up

24  procedures are completely different from the NRFU and imputation procedures used in the

25  decennial census context, and hence ACS CAPI rates are, as Dr. Abowd testified, "not a good

26  indication" of the NRFU success rate for the decennial census.  Tr. 809:9-12, 810:21-811:16.  In

27  addition, as Dr. O'Muircheartaigh admitted, there may be other factors that have contributed to the

28

1    past ACS follow-up rates, independent of the presence or absence of a citizenship question.   *Id.*

2    220:5-20.

3        68.    Dr. Fraga did not calculate margins of error for the population estimates for any of

4    his four scenarios.  Tr. 636:17-23.

5        69.    Dr. Fraga found that, in the scenarios based on the Census Bureau's study (his

6    scenarios C and D), California would not, on average, lose a seat in the House of Representatives.

7    Fraga Trial Decl. ¶ 73.  He further calculated that the probability that California would lose one or

8    more seats increased from 26.14% to 49.86% (Scenario C, with no NRFU) or to 29.96% (Scenario

9    D, with an 86.63% NRFU success rate).  *Id.* ¶ 81.

10       70.    Dr. Stuart Gurrea, Defendants' expert, calculated the effect on apportionment

11   assuming a higher and more realistic NRFU success rate than that used by Dr. Fraga in his Scenario

12   D.  Tr. 697:14-22, 720:23-25.  In Dr. Gurrea's alternative scenario, he assumed a 5.8% decrease in

13   self-response among households with at least one individual without confirmed citizenship, the

14   number derived from the Brown paper and the same number assumed by Dr. Fraga in his

15   Scenarios C and D.  *See* Tr. 720:23-25.  Dr. Gurrea then factored in a NRFU success rate in 2020 of

16   98.58%, which was equal to the 2010 census NRFU success rate.  *Id.* 697:14-22, 721:3-17.  Dr.

17   Gurrea did not assume any additional undercount mitigation through imputation.  *Id.* 698:1-5.

18   With these assumptions, congressional apportionment in any state (including California) does not

19   change as a result of the inclusion of a citizenship question.  *Id.* 723:16-724:6.

20       71.    Dr. Gurrea's testimony and calculations are more credible and persuasive than those

21   of Dr. Fraga.  Because of the flaws in his assumptions, Dr. Fraga's undercount estimates in his four

22   scenarios are unreliable and overstated.  Tr. 695:2-696:11.  First, his interpretation of the results

23   from Dr. Barreto's survey is unsupported by the evidence from that survey, which has the effect of

24   overstating the self-response drop-off rate. *Id.* 695:9-22, 703:5-10.  Notably, Dr. Fraga's calculations

25   using Dr. Barreto's numbers result in the largest change in population estimate and the largest

26   change in apportionment. *Id.* 718:23-719:3.  Second, Dr. Fraga also understates or ignores the

27   effectiveness of the Census Bureau's NRFU and imputation procedures in mitigating any initial

28

DEFS.' POST-TRIAL PROP. FINDINGS OF FACT/CONCL. OF LAW–Nos. 3:18-cv-1865-RS

decrease in self-response rate. *Id.* 695:25-696:4. Specifically, his Scenarios A and C make no attempt to account for either NRFU or imputation. *Id.* 709:21-710:8.  Scenario B is based on the flawed assumption that Dr. Barreto's survey question eight mimics NRFU, which results in understatement of the success rate of NRFU.  *Id.* 710: 12-16. Scenario D uses an understated NRFU success rate taken from a different context.  Tr. 710:12-16.  Neither Scenarios B nor D account for imputation (in fact, none of Dr. Fraga's Scenarios A-D do). *Id.* 710:3-4. These errors also have the effect of overstating the effect of the citizenship question on the undercount.  *Id.* 752:7-12.  In contrast, Dr. Gurrea relied on more plausible assumptions for his alternative scenario.

72.      In Dr. Fraga's Scenarios C and D, there was no change in apportionment on average for California.  In Dr. Gurrea's more plausible scenario, there also was no change in apportionment for California.  In any event, any attempt to predict the outcome after the 2020 census is speculative at best.

### b.  Federal funding

73.      A differential net undercount would not have an impact on federal funding under the vast majority of federal funding programs.  Tr. 667:1-7.

74.      Out of the approximately 2,249 government funding programs, only approximately 320 use census-derived data to allocate funds.  Second Updated Trial Declaration of Andrew Reamer, Ph.D (ECF No. 182-1) ("Reamer Trial Decl.") ¶ 10; Tr. 666:10-25.

75.      Out of the approximately 320 federal government funding programs that use census-derived data to allocate funds, Plaintiffs' expert, Dr. Reamer, identified only twenty-four programs which used geographic allocation formulas that rely in whole or part on census-derived data, and he performed calculations for only three such programs.  Reamer Trial Decl. ¶¶ 11, 33. Geographic allocation formulas are particularly sensitive to fluctuations in census data.  Tr. 667:21-668:11.

76.      Only one dataset used in federal funding formulas, the Census Bureau's Urban-Rural Classification, relies solely on decennial census data, reflecting Congress' judgment that

census numbers alone are not an adequate basis to equitably distribute federal funds.  Reamer Trial Decl. ¶¶ 24-26; Tr. 664:2-13.

77.     In performing his calculations for three federal funding programs, Dr. Reamer assumed (1) a 5.8% decrease in self-response among households with at least one individual without confirmed citizenship (derived from the Brown paper), and (2) a NRFU success rate among these households of 86.63%.

78.     As he did for Dr. Fraga's apportionment calculations, Dr. Gurrea calculated the effect on the three federal funding programs highlighted by Dr. Reamer using the following alternative assumptions—he assumed a 5.8% decrease in self-response among households with at least one individual without confirmed citizenship (derived from the Brown paper and the number used in both of Dr. Reamer's scenarios), Tr. 701:15-702:2, along with a NRFU success rate among these households in 2020 equal to the 2010 census NRFU success rate, 98.58%.  As with his apportionment calculation, Dr. Gurrea assumed no additional undercount mitigation through imputation.  *Id.* 728:11-13.  With these assumptions, Dr. Gurrea estimated that the distribution of federal funds to the State of California after the 2020 census will be only 0.01% less than it would be in the absence of a citizenship question, for each of these three programs examined by Dr. Reamer.  *Id.* 726:17-728:6.  Additional mitigation achieved through imputation would reduce this impact even further.  *Id.* 728:11-18, 729:18-730:14.

79.     Dr. Reamer's opinions are of limited evidentiary value  because his analysis relies entirely on two flawed undercount scenarios performed by Plaintiff's expert Dr. Fraga; Dr. Reamer acknowledged that he did not take any steps to determine the accuracy or validity of Dr. Fraga's methodology or undercount projections.  Tr. 663:4-10.  In fact, he admitted that he had no opinion on whether Dr. Fraga's undercount projections were valid.  *Id.* 663:11-14.

80.     Because Dr. Reamer's calculations are based entirely upon undercount scenarios which fail to take into account the effect of full NRFU and imputation on response rates, they are inaccurate, unreliable, and of limited evidentiary value.  In contrast, Dr. Gurrea relied on more plausible assumptions for his alternative scenario.  In Dr. Gurrea's scenario, the effect on federal

1    funding, without taking into account imputation, is de minimis.  This minimal amount will shrink

2    even further once imputation is taken into account.  In any event, any attempt to predict the

3    outcome after the 2020 census is speculative at best.

4    　　　　81.　　Dr. Reamer's calculations are also of limited evidentiary value because they do not

5    purport to predict what will happen in 2020.  Tr. 672:24-672:2.  Instead, his calculations look

6    backwards—to what would have happened in fiscal years 2015 and 2016 had there been an

7    additional undercount due to the presence of a citizenship question on the 2010 decennial census.

8    *Id.* 672:9-23; Reamer Trial Decl. ¶ 37.

9    　　　　82.　　The evidentiary value of Dr. Reamer's calculations is further diminished because his

10   calculations rest upon the assumption that allocation formulas and funding levels for the three

11   programs in question will remain similar in the coming years.  Reamer Trial Decl. ¶¶ 18-19; Tr.

12   669:24-670:9.  However, as Dr. Reamer testified at trial, Congress could alter the funding amounts

13   and allocation formulas, including the manner and extent to which they rely upon census-derived

14   data.  Tr. 671:7-19.

15   　　　　83.　　Plaintiffs have not adduced specific quantitative evidence of the amount of federal

16   funding any specific county, city or municipal government would lose under any federal program if

17   there were an increase in the differential undercount resulting from the inclusion of a citizenship

18   question.

19   　　　　84.　　Plaintiff-Intervenor Los Angeles Unified School District ("LAUSD") submitted two

20   trial declarations of individuals employed by LAUSD.  Trial Declaration of Pia Escudero (ECF No.

21   126) ("Escudero Decl."); Declaration of Karen Ryback (ECF No. 125) ("Ryback Decl."). Neither

22   of these individuals provided sufficient evidence to establish that LAUSD would lose a quantifiable

23   amount of federal funding if the 2020 census resulted in a differential undercount.

24   　　　　85.　　Pia Escudero, Executive Director of the Division of Student Health and Human

25   Services for LAUSD, testified that she oversees a number of offices and programs that use census

26   data to allocate resources and funding.  Escudero Decl. ¶¶ 5, 10, 11.  However, she did not testify

27

28

21

that the amount of funding that LAUSD receives will decrease because of the citizenship question, nor did she quantify any loss of resources or funding.

86.     Karen Ryback, Executive Director for the Federal and State Education Programs Branch of LAUSD, testified that her office provides technical support and oversight to LAUSD for various federal educational funding programs.  Ryback Decl. ¶¶ 2, 5.  She further testified that LAUSD, as the largest school district in the State, receives a greater allocation of these funds than other school districts.  *Id.* ¶ 18-28.  She also stated  that LAUSD's share of these funds are directly tied to census population and data and, therefore, any differential net undercount of several subpopulations will result in a decreased share  of these funds.  *Id.* ¶¶ 32-33.  However, Ms. Ryback has no personal knowledge that there will be a differential net undercount of any particular subpopulation and thus, her conclusion that there will be a loss of funding is speculative.  Nor can she quantify any specific loss of funds in any of the programs due to the inclusion of a citizenship question on the census.

### c.  *Other financial harm*

87.     Douglas Baron, the Senior Manager of the County of Los Angeles, alleged that, due to the inclusion of a citizenship question, the County reviewed ACS microdata "to determine the number of non-citizens (both documented and undocumented) living in the County, as well as the estimated County population having at least one family member with undocumented status … then applied a per capita funding ratio" based on the proposed state budget "to calculate the additional funding needed for increased on-the-air and on-the-ground outreach."  Baron Decl. ¶ 8.  He further attested that this analysis led to a "determin[ation] that [the County] needed an additional $3.3 million to complete additional outreach … because of recent Federal government actions that may compound the difficulty of counting local communities."  *Id.* ¶ 10.  But Mr. Baron did not establish (1) that he or anyone working for the County is qualified to analyze ACS microdata; (2) that there is any direct link between the raw *number* of immigrants living in an area and "a per capita funding ratio," *id.* ¶ 8, needed to counteract any expected drop in self-response; (3) how this "funding ratio" was calculated or applied; or (4) how the County determined any per-person dollar

amount of funding necessary to complete census outreach.  As a result, Mr. Baron's conclusory allegations fail to concretely link the County's request for additional funding to any non-speculative, imminent injury.  Plaintiffs cannot manufacture injury through a voluntary expenditure of funds.

88.     Mr. Baron further averred that the state refused to allocate the $12 million the County requested for purposes of 2020 census outreach and instead appropriated only $9.3 million. Baron Decl. ¶¶ 13-15.  The most reasonable inference is that the state deemed the County's request excessive and unsupported.

89.     Mr. Baron's assertion that the $9.3 million "allocated by the Legislature for the 2020 Census is $2.6 [million] below the $12 [million] amount the County determined to be  necessary," resulting in a need for the County "to either supply the difference … or face what the County has determined to be a significantly enhanced risk of an undercount," Baron Decl. ¶¶ 15-16, is speculative and fails to establish that this additional spending by the County will (1) occur at all and (2) be based on a sufficiently reasonable fear of harm if it does occur.

90.     Overall, Plaintiffs have not established that their perceived need to increase or divert expenditures is caused by the citizenship question rather than by the general fear and distrust of government among immigrants and communities of color due to the macro-environment.

### d. Decrease in data quality

91.     Plaintiffs did not provide sufficient evidence that, should the inclusion of the citizenship question result in inaccurate demographic data, that result will be harmful to them.

92.     For example, LAUSD presented the testimony of Jefferson Crain, Executive Officer to the Board of Education for LAUSD, who explained LAUSD is divided into seven board districts and testified regarding the redistricting process in the past.  *See generally* Second Amended Declaration of Jefferson Crain (ECF No. 179).  Mr. Crain testified generally that census data is part of the redistricting process, and that after the 2020 census, these board district lines will need to be redrawn.  *Id.* ¶¶ 10, 22-23, 25.  Rather than testify as to any concrete specific harm that will arise from a citizenship question on the 2020 census, Mr. Crain's testimony merely demonstrated that these board districts are redrawn after each decennial census.  *Id.* ¶¶ 8, 10, 25.  This testimony does

1   not establish any specific harm to LAUSD that is traceable to the inclusion of a citizenship question

2   on the 2020 census.

3         93.    Amy Bodek, Director of the Department of Regional Planning ("DRP") for the

4   County of Los Angeles, attested that her office "does not rely on the American Community Survey

5   ("ACS") because ACS data is *not sufficiently accurate or granular*" for her office's community planning

6   needs. Bodek Decl. ¶ 9 (emphasis added).  This directly supports DOJ's stated need for more

7   accurate and granular data to be collected through the decennial census, rather than the ACS, and

8   undercuts Plaintiffs' claims in this litigation.

9         94.    Ms. Bodek further asserted that the County uses census data on demographic

10   characteristics including age, race/ethnicity, special needs, and household population to meet

11   housing planning needs, Bodek Decl. ¶¶ 9-13.  Ms. Bodek opined that, "[w]ithout the reliable and

12   precise demographic Census information, DRP would not be able to readily identify the unique

13   needs of each community in formulating and implementing" planning goals, which "could result in

14   long-term misallocations of County resources." *Id.* ¶ 21.  But these conclusory allegations are

15   utterly unconnected to any proof (or even reasonable inference) that inclusion of a citizenship

16   question will, in fact, impact data quality to such an extent that the County's use of census data

17   would be impaired.  Ms. Bodek failed to establish a reasonable basis for belief that the harms to

18   census data she fears will, in fact, occur to an extent sufficient to cause the County concrete harm.

19         95.    Andrew Westall, the Assistant Chief Deputy for the Los Angeles City Council

20   President, opined in great detail as to the need for accurate, granular population data for various

21   redistricting needs. Westall Decl. ¶¶ 24-32.  But this testimony is irrelevant because there is no

22   dispute that accurate census data is vital for redistricting efforts nationwide.  Plaintiffs nonetheless

23   have failed to prove that any harm to the actual enumeration will, in fact, occur—with the result

24   that Mr. Westall's testimony does not help Plaintiffs carry their burden to establish injury-in-fact

25   because he provided no basis for concluding that the harms about which he testified will result.

26         96.    Mr. Westall also discussed the need for accurate population count data for

27   "managing the allocation of … services and resources to City residents."  Westall Decl. ¶¶ 33-37.

28

1    This testimony is similarly irrelevant; although Mr. Westall asserted that, "[w]ithout reliable, precise,

2    and accurate population count data, the City would not be able to identify the needs of each

3    community, neighborhood, or high-density city block," *id.* ¶ 35, Plaintiffs have failed to prove that

4    the citizenship question *will* impact the count itself.

5              *e.   Loss of privacy*

6              97.      The Census Bureau is barred from disclosing individual responses to a citizenship

7    question on the decennial census questionnaire, and cannot disclose any information through which

8    the data furnished by any particular establishment or individual can be identified.  Tr. 900:23-

9    901:17.

10             98.      The Census Bureau does not disclose citizenship information that has not gone

11   through an approved disclosure avoidance process.  Tr. 900:23-901:17.  The disclosure avoidance

12   "procedure that's going to be used for the 2020 data is much stronger than the one that was used in

13   2010" and is "known in the scientific literature as differential privacy." *Id.* 902:4-7.  This process

14   will ensure and "quantif[y] the extent to which you have protected the confidentiality of every

15   person in the United States in every publication from the 2020 census." *Id.* 901:8-10.

16             99.      Plaintiffs' alleged confidentiality or privacy concerns about the possible disclosure

17   of their citizenship information are wholly lacking in any evidentiary basis and therefore untethered

18   to any actual risk.  *See Suppl. Tometi Trial Aff.* ¶¶ 9, 10, ECF No. 154 (referencing newspaper

19   articles).

20             **B.  Causation and Redressability**

21             100.     No credible, quantitative evidence proves that any differential undercount that

22   occurs in 2020 can specifically be attributed to the citizenship question separate from other,

23   independent factors such as the general macro-environment.  As Dr. Abowd testified, "the macro

24   environment is going to be a serious problem in conducting the 2020 census" and that would be

25   the case absent inclusion of a citizenship question.  Tr.862:4-19.

26             101.     Dr. Abowd confirmed that the macro-environment, including the political

27   environment, can affect response rates.  Tr. 861:10-863:3.

28

                                                            25

102.    The macro-environment may make persons from some subgroups reluctant to respond to the census questionnaire regardless whether it contains a citizenship question. Tr. 861:10-863:3.

103.    There is no evidence that removal of the citizenship question from the census will redress Plaintiffs' claimed injuries because the macro environment would remain problematic. Tr. 862:16-19.

104.    The Census Bureau's own research demonstrated that concerns about confidentiality predate the Secretary's decision to include a citizenship question. For example, a presentation by a Census Bureau researcher in November 2017—more than four months before the Secretary's decision—included findings that respondents had spontaneously expressed fears that, *inter alia*, "the Census could give my information to internal security and immigration could come and arrest me," and that in "our current political climate, the Latino community will not sign up because they will think that Census will pass their information on." PTX-326 at 8. The same 2017 presentation relayed anecdotes in which census field staff reported "unusual respondent behavior" when approached to take part in surveys. *Id.* at 12.

105.    The Census Bureau's CBAMS research found that 28% of respondents were "extremely" or "very" concerned with confidentiality. PTX-465 at 29. These concerns would exist absent a question on citizenship.

106.    One respondent reported in during a CBAMS focus group that, "[f]or this census, a lot of people are afraid. It doesn't matter if they ask you whether or not you're a citizen. The first question they ask you, are you Hispanic or Latino … that's enough." PTX-465 at 43.

107.    Dr. Barreto testified extensively as to the impact of the current macro environment on survey participation. He opined specifically that currently "many in the immigrant community feel at threat because of the immigration policies that our country currently faces," and that "it is not just a political attitude that they don't like that might be creating discomfort, but it is an actual real threat to themselves and to their families." Tr. 397:1-9.

108.     As a result, the harm Plaintiffs allege cannot be shown to be specifically attributable to the citizenship question rather than to other, independent factors, such as the general macro-environment.

## III.    Administrative Record Facts

The merits of Plaintiffs' Administrative Procedure Act ("APA") and Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial.  Accordingly, set forth below are those facts from the administrative record on which this Court bases its legal review of the Secretary's decision.

### A.  Secretary Ross's Examination of Census Issues

109.     Soon after Wilbur L. Ross was appointed and confirmed as Secretary of Commerce, he "began considering various fundamental issues" regarding the 2020 census, "including funding and content," as well as schedule, contracting issues, systems readiness, and the upcoming 2018 End-to-End Test.  AR 1321; *see also* AR 317-322, 1416-1470.  The Secretary's ultimate goal in reviewing these issues is "make every effort to provide a complete and accurate decennial census." AR 1313.

110.     One of the issues Secretary Ross examined early in his tenure "included whether to reinstate a citizenship question," which he and his staff "thought . . . could be warranted."  AR 1321, 2521-2522, 12465, 12541-12543; *see also* AR 3699 (referring in a May 2017 email to his "months['] old request that we include the citizenship question").

111.     Secretary Ross and his staff "had various discussions with other governmental officials about reinstating a citizenship question to the Census" and, "[a]s part of that deliberative process, [they] consulted with Federal governmental components."  AR 1321.  In particular, they inquired "whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act."  *Id.*

112.     DOJ has requested a special tabulation of citizenship data derived from the American Community Survey ("ACS") for the purposes of carrying out its enforcement responsibilities under the Voting Rights Act.  AR 278-283, 9203-9216.

113.     Department of Commerce Deputy Chief of Staff and Chief of Policy Earl Comstock initially reached out to DOJ in May 2017.  AR 2462, 12755.

114.     In August and September 2017, Secretary Ross requested an update on the status of the inquiries regarding the reinstatement of a citizenship question.  AR 2034, 2424, 2459-2460, 4004, 12476.

115.     Secretary Ross spoke with the Attorney General on September 18, 2017, about whether DOJ would find citizenship data from the decennial census useful.  AR 2528, 2636.

**B.  DOJ's Request to Reinstate a Citizenship Question on the 2020 Decennial Census to Facilitate Enforcement of the Voting Rights Act**

116.     On December 12, 2017, Arthur E. Gary, General Counsel of DOJ's Justice Management Division, sent a letter to Dr. Ron Jarmin, who was then performing the non-exclusive functions and duties of the Director of the Census Bureau.  AR 663-65.

117.     In that letter, Mr. Gary stated that "[t]he Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans.  In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census.  This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting.  To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected.  As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2."  AR 663.

118.     Mr. Gary noted the importance of obtaining citizen voting-age population for determining whether a racial group could constitute a majority in a single-member district, and its

28

utility for avoiding the "wrong result" of drawing a single-member district in which a minority group constituted a majority of the voting-age population but not the majority of the citizen voting-age population.  AR 663-64.

119.     Mr. Gary stated that "in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected."  AR 664.

120.     Mr. Gary stated that the Census Bureau had included a citizenship question on the "long form" questionnaire from 1970 to 2000, and that DOJ had formerly used that data to assess compliance with Section 2 and in Section 2 enforcement litigation.  AR 664.

121.     Mr. Gary noted that DOJ had begun using citizenship data from the ACS after the Census Bureau discontinued the use of the "long form" questionnaire, but he explained that the ACS does not yield the ideal data for such purposes for four reasons.  AR 664-65.

122.     First, Mr. Gary explained that "[j]urisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, *see Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly."  AR 664.

123.     Second, because the ACS estimates are rolling and aggregated into one-year, three-year, and five- year estimates, Mr. Gary stated that "they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting."  AR 665.

124.     Third, Mr. Gary explained that "the ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases.  *See* U.S. Census Bureau, Glossary: Confidence interval (American Community

29

Survey), https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunitySurvey (last visited Nov. 22, 2017).  By contrast, decennial census data is a full count of the population." AR 665.

125.    Fourth, Mr. Gary noted that "[c]ensus data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group.  *See* American Community Survey Data 3, 5, 10.  Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan."  AR 665.  Mr. Gary explained that "[h]aving all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process."  *Id.*

126.    For all these reasons, DOJ stated that it "believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates."  Accordingly, "the Department formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship" and "that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census."  AR 677.

## C.  The Department Of Commerce's Analysis of DOJ's Request

127.    Following receipt of DOJ's request, the Secretary of Commerce "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond."  AR 1313.  To that end, Commerce "immediately initiated a comprehensive review process led by the Census Bureau."  *Id.* "The Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations."  *Id.*  As part of this process, the Secretary "met with Census Bureau leadership on multiple occasions to discuss their process for reviewing

the DOJ request, their data analysis, [his] questions about accuracy and response rates, and their

recommendations." *Id.*

128.    The Census Bureau assembled a team to perform the technical analysis, led by Dr.

John M. Abowd, Chief Scientist and Associate Director for Research and Methodology.  AR 3354,

5539-5542, 9339; *see also, e.g.*, AR 8990, 9005, 9244.  That team conducted preliminary analyses

during the period from December 2017 to January 2018.  *See* AR 5495-5511; *see also* AR 3713-3720,

5538, 5539-5542, 5553-5564, 5658-5677, 5656-5717, 6489-6495, 6533-6542, 7763-8261.

129.    On January 19, 2018, Dr. Abowd and his team, on behalf of the Census Bureau,

submitted a detailed memorandum (hereinafter referred to as the "January 2018 Abowd Memo") to

Secretary Ross.  AR 1277-85.  This memorandum analyzed three alternatives to provide DOJ with

the data it had requested—Option A (make no change), Option B (add the question on the 2020

census questionnaire), and Option C (use administrative data to provide citizenship information).

AR 1277.

130.    The January 2018 Abowd Memo described certain advantages of Option B, adding

a citizenship question to the 2020 decennial census, including that it would improve block-level

data and would provide a direct measure of self-reported citizenship for the whole population.

AR 1278.

131.    The January 2018 Abowd Memo also reported that because the citizenship question

was already asked on the ACS, the Census Bureau "would accept the cognitive research and

questionnaire testing from the ACS instead of independently retesting the citizenship question.

This means that the cost of preparing the new question would be minimal."  AR 1279; *see also*

AR 415 (Census Bureau presentation on adding questions to the census, stating that "[i]f the

question is not currently used in an ongoing survey, the Census Bureau must test the wording of

the question").

132.    The January 2018 Abowd Memo also addressed the potential shortcomings of

including a citizenship question on the census, including that there would likely be a decrease in the

self-response rate, which would lead to higher nonresponse follow-up costs and fewer correct

enumerations.  AR 1280-82.  The Memo estimated a potential 5.1% decrease in self-response among noncitizen households.  AR 1280; *see also* AR 456.  The Memo also concluded that the anticipated decrease in self-response would lead to lower quality citizenship data.  AR 1280.

133.    The Census Bureau's conservative estimate that an additional 5.1% of households with at least one noncitizen may not self-respond to the 2020 census questionnaire if a citizenship question were included was based, in the absence of a randomized controlled experiment, on a natural experiment that could not definitively assign causation to the citizenship question itself. AR 1280.

134.    The January 2018 Abowd Memo concluded that Option C, using administrative records for citizenship data, would yield more accurate results—because administrative records relating to citizenship are more accurate than self-reports—and would be less costly.  AR 1283-1285; *see also* AR 284-310.  *But see* AR 534-544.  However, high-quality administrative records on citizenship do not cover the entire population.  AR 1283-1285; *see also* AR 66-67, 108-09, 116, 660-62.

135.    The January 2018 Abowd Memo recommended that the Secretary either make no change to the Census Bureau's data collection on citizenship or obtain citizenship status from administrative records for the whole 2020 census population.  AR 1277.

136.    Following submission of the January 2018 Abowd Memo to Commerce leadership, Commerce prepared a list of 35 questions to the Census Bureau to obtain more details about and to probe the rationale underlying its analysis.  AR 1286-1303, 8987.  The questions represented a range of perspectives and concerns among the Secretary and his staff regarding the Census Bureau's analysis and recommendations.  *See* AR 1335, 1976-1978, 1980, 2043-44, 2046, 2472-2475, 2504-2505, 8678-8680.  The final list of questions was delivered to the Census Bureau on January 30, 2018.  AR 1974, 12902-12904.

137.    The Census Bureau provided answers to the questions through an iterative process, whereby Commerce received many drafts and partial responses before receiving the final response. *See, e.g.*, AR 1340-1352, 1599-1626, 1903-1963, 2316-2376, 5212-5215, 5583-5589, 7638-7645.  The

Census Bureau provided its final draft of the responses to Commerce on February 2, 2018.  AR 2292-2315, though some further revisions were made resulting in an updated final draft on February 6, 2018.  AR 2954-2981, 3441-3459; *see, e.g.,* AR 2702-2711, 3142-3181, 6222-6232.  The final version of the questions and answers included a revised answer to question 31, regarding the process that had been used in the past to add questions to the decennial census.  AR 1286-1303, 13023.  The revised answer specified that, because no new questions had been added to the decennial census in recent years, past precedent relating to changes to the ACS did not govern the process for considering DOJ's request.  AR 1296; *see* AR 13023.

138.    Secretary Ross and his immediate staff reviewed Census's analyses.  *See, e.g.,* 12479.

139.    On February 12, 2018, Commerce and Census Bureau personnel, including Secretary Ross, met to discuss the Census Bureau's analysis to date.  AR 9334-9335.  At this meeting, the Secretary requested that the Census Bureau analyze a fourth alternative, Option D, which would combine Options B and C.  AR 1309; AR 9433-9434.

140.    The Census Bureau provided two memoranda analyzing Option D on February 23, 2018, and March 1, 2018.  AR 1304-1312, 2935-2940, 4713-4721; *see, e.g.,* AR 2180-2198, 4454-4462, 5613-22, 5945-5948, 5967-6155, 6159-6173.  In addition, the Census Bureau continued to answer questions posed by Commerce until late March, 2018.  *See, e.g.,* AR 2670-2680, 2894-2901, 5577-5581, 5608-5610, 5798-5803, 9370, 9680-9721.

141.    The Secretary reviewed over 50 incoming letters and emails from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census.  AR 1313; *see* AR 775-792, 794-1165, 1176-1193, 1195-1197, 1210-1212, 1217-1220, 1222-1255, 1262-1273; *see also* AR 1768-1771, 3563-3565, 3915-3917.  He also monitored views of the public more generally, as represented in media accounts.  AR 1313; *see* AR 666-733.  In addition, he discussed the citizenship question with over 24 diverse, well-informed and interested parties, selected by his staff to represent a broad range of views.  AR 1313; *see* AR 1194, 1198-1209, 1213-1216, 1221, 1256-1261, 1274-1276; *see also* AR 1638, 1798, 1807-08, 1815-1816, 2599-2600, 2604, 3491, 8392-8467.

142.     In considering all available information in determining whether to include a citizenship question, officials at the Department of Commerce recognized that citizenship is one of the core recommendations in the United Nations Principles and Recommendations for Population and Housing Censuses.  AR 1319.

**D.  The Secretary's Decision Memorandum**

143.     On March 26, 2018, Secretary of Commerce Wilbur Ross announced his decision to reinstate a citizenship question on the 2020 decennial census.  AR 1313-20.

144.     In the decision memo, the Secretary stated that the decision was being made in response to the December 12, 2017, DOJ letter, and that, after he had received the DOJ request, "I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond.  To that end, the Department of Commerce ('Department') immediately initiated a comprehensive review process led by the Census Bureau."  AR 1313.

145.     The Secretary stated that this review included legal, program, and policy considerations, and that he had met with Census Bureau leadership on multiple occasions to discuss their review of the DOJ request and their recommendations.  He also noted that he had received and reviewed over fifty letters from stakeholders regarding the issue of reinstatement of a citizenship question on the 2020 Census.  AR 1313.

146.     The Secretary first observed that the citizenship question had been a feature of almost every decennial census for over a century, and had been included in some form on the "long form" or ACS for decades, and was thus a well-tested question.  AR 1314.

147.     The Secretary stated that many stakeholders as well as the Census Bureau itself had raised concerns that the reinstatement of a citizenship question would have a negative impact on the response rate for non-citizens, but also noted that no one had produced evidence that the response rate would decline "materially" as a result of the inclusion of a citizenship question.  AR 1315.

148.     The Secretary observed that although there was recent evidence that self-response rates to the ACS were lower than in the 2010 decennial census, there were a number of potential causes for this separate and apart from the citizenship question, including the outreach efforts resulting in increased public awareness for the decennial census and the greater burden of responding to the much longer ACS.  AR 1315.

149.     Weighing the information that had been provided, the Secretary concluded that, "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief."  AR 1316.

150.     The Secretary considered the alternative option of only using administrative records to provide the citizenship data requested by DOJ, but noted that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  AR 1316.  The Secretary specifically noted that this meant that a significant portion of the American voting age population could not be matched to administrative records and, thus, would have to have citizenship information be imputed.  AR 1316.

151.     The Secretary concluded that a combination of using administrative records, the development of which the Census Bureau could prioritize before the 2020 census, and reinstating a citizenship question on the 2020 decennial census questionnaire was the best option to provide DOJ the data it requested.  AR 1317.

152.     In making this determination, the Secretary explained that including the question on the 2020 decennial census will give each person an option to provide an accurate answer, and would only impose a minimal imposition of a single extra question which by law could only be used anonymously and for statistical purposes.  AR 1317.

153.     The Secretary also noted that the use of administrative records in conjunction with a question on the 2020 decennial census questionnaire would provide a method for obtaining

citizenship data for people who do not respond, as well as providing a check for accuracy for those who respond with an inaccurate answer.  AR 1317.

154.    The Secretary noted that "I have carefully considered the argument that the reinstatement of a citizenship question on the decennial census would depress response rate." AR 1317.  However, the Secretary determined that the "need for accurate citizenship data" outweighed such concerns, particularly in light of the lack of empirical evidence that the self-response rate would be materially impacted by the reinstatement of a citizenship question.  AR 1317.

155.    The Secretary also considered the concern that reinstatement of a citizenship question would increase non-self-response rates by imposing an additional burden on those responding to the questionnaire.  However, the Secretary noted that there was very limited empirical evidence that the inclusion of one additional question would have any material impact on self-response rates.  AR 1318.

156.    In addition, the Secretary considered whether the sensitivity of a question about citizenship could lead to a decrease in self-response rates.  The Secretary noted that there was evidence from Nielsen studies, as well as past census initiatives, that the inclusion of such a sensitive question would not materially change the response rate.  AR 1318.

157.    The Secretary further considered the potential that the reinstatement of a citizenship question on the 2020 decennial census would lead to increased costs.  The Secretary determined that it was difficult to assess whether, if the citizenship question led to lower initial self-response rates, it would lead to an increase in costs for NRFU efforts.  The Secretary noted that the available evidence demonstrated that the impact on the cost of NRFU would likely be very small as the percent decrease in overall self-response estimated to be potentially caused by the citizenship question (.5%) was within the percent decrease (3%) accounted for in the Department's recent Life Cycle Cost Estimate for the 2020 census.  AR 1319; *see* AR 173.

158.    The Secretary noted not only that some form of citizenship question had been a part of census questionnaires for centuries, but also that censuses in many other major democratic

nations, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, include a question asking about citizenship.  AR 1319.

159.    The Secretary ultimately concluded that, while it could not definitively be determined what the impact of a citizenship question would be on response rates, the value of having more complete and accurate citizenship data outweighed those concerns.  AR 1319.

160.    The Secretary announced that "after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request.  To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form."  AR 1320.

161.    The Census Bureau's August 2018 analysis estimating a potential 5.8 percentage point decline in self-response from households containing a noncitizen (the "Brown Paper") did not exist and was not considered or relied upon by the Secretary when he reached his decision to include a citizenship question on the 2020 questionnaire.

## IV.    Extra-Record Evidence

The merits of Plaintiffs' APA and Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial.  Accordingly, any facts derived from extra-record evidence cannot form the basis for this Court's decision.  However, because the Court allowed extra-record discovery and admitted such evidence at trial, a response to Plaintiffs' extra-record arguments is set forth below.

### A.  Plaintiffs Have Failed to Show That the Secretary's Decision Was a "Pretext"

162.    Plaintiffs failed to produce evidence sufficient to rebut the presumption of regularity accorded to government officials.

163.    Plaintiffs have no evidence that the Secretary disbelieved the rationale set forth in his decision memorandum or that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious.

164.     Plaintiffs also have failed to prove that Secretary Ross had irreversibly prejudged the decision before he received DOJ's letter requesting reinstatement of a citizenship question.

165.     It is unremarkable for an agency head to enter office with predispositions toward certain policy choices.  That the Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, and asked his staff to explore such an action, is neither irregular nor evidence of improper decisionmaking.  In general, inquiries regarding the presence or absence of a citizenship question on the census questionnaire were not unusual from new leadership at the Commerce Department.  Former Acting Census Bureau Director and current Deputy Director Ron Jarmin testified that "[t]here was interest in the citizenship question in 2010, as well."  Jarmin Dep. 20:5-14, ECF No. 175-5.  Senior Policy Adviser David Langdon explained that, in general, "there's a learning process that . . . people go through when they're dealing with these surveys, in trying to figure out what we ask, why we ask it, why things are on there."  Langdon Dep. 162:1-8, ECF No. 175-7.

166.     When Mr. Comstock reached out to DOJ in May 2017, what he "asked them was if they could use this information, and if so, then they would need to request it."  Comstock Dep. 297:4-8.  Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 decennial census with former Attorney General Sessions in the spring of 2017 and at subsequent times, including on September 18, 2017.  ECF No. 146-6 at 3; Comstock Dep. 233:17-22.

167.     To the extent Plaintiffs rely on statements by officials other than the Secretary himself, such reliance is misplaced.  That other officials might have supported the reinstatement of a citizenship question for different reasons does not indicate that the reasons given by the actual decisionmaker—the Secretary—were pretextual.  And most of the officials' statements regarding immigration generally, on which Plaintiffs rely, do not in any way concern the census or the citizenship question.

168.     Even if relevant, the statements of other officials do not prove pretext motivated *Ross's* decision.  For example, the Secretary's communication with Kris Kobach early in his tenure at the Department of Commerce about the potential inclusion of a question on *lawful status* does

not by itself prove that the Secretary shared or was influenced by Mr. Kobach's outreach.  Indeed, the Secretary rejected that proposed question.   Without more, Plaintiffs' reliance on this isolated, unsolicited communication as evidence of pretext cannot carry their burden.

169.    The Secretary's congressional testimony also is insufficient to establish pretext.  For example, the Secretary's statement in his March 2018 memorandum that he "set out to take a hard look at the request" to "ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond," AR 1313, does not necessarily imply either that he had not previously considered whether to reinstate a citizenship question, or that he had not had discussions with other agencies or government officials before he received DOJ's formal request.  Nor would it have made sense for the Secretary to take a "hard look" at DOJ's request before receiving it.

170.    The Secretary's March 20 statement to Congress that he was "'responding solely to the Department of Justice's request,'" Hr'g on FY 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. On Commerce, Justice, Sci. & Related Agencies of the H. Comm. on Appropriations, 115th Cong. 9 (2018), at 2018 WLNR 8815056, was in response to a question asking whether he was also responding to requests from third parties, *see id.*

171.    The Secretary's March 22 statement that DOJ "'initiated the request for inclusion of the citizenship question,'" Hr'g on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum, Hr'g Before the H. Ways & Means Comm., 115th Cong. 24 (2018), at 2018 WLNR 8951469, was in response to a question about whether Commerce planned to include a citizenship question on the 2020 census, not a question about the Secretary's decision-making process.  The statement was immediately followed by an acknowledgment that he had been communicating with "quite a lot of parties on both sides of [the] question" and that he "ha[d] not made a final decision, as yet" on this "very important and very complicated question," *id.*

### B.  DOJ's Request for Citizenship Data Serves Legitimate VRA Enforcement Purposes

172.    After being contacted by the Secretary of Commerce, the Attorney General decided that DOJ would request that the Census Bureau reinstate a citizenship question on the census questionnaire.  Gore Dep. 442:13-19, ECF No. 175-4 in No. 18-1865.

173.    John Gore, former Acting Assistant Attorney General and current Principal Deputy Assistant Attorney General for the Civil Rights Division, drafted the letter requesting the reinstatement of the citizenship question.  Gore Dep. 127:12-17.

174.    "[C]itizenship data at the block level is necessary to bring Section 2 cases."  Gore Dep. 33:2-8; *see also* Karlan Dep. 70:2-5, ECF No. 145 in No. 18-1865.  Some appellate courts have determined that CVAP data at the block level is necessary to determine if Hispanics meet the first prong of *Gingles* in Section 2 enforcement cases involving vote dilution claims.  AR 663; *see also* Handley Trial Testimony (SDNY), 843:23-844:12, 844:22-845:1, PTX-819; Karlan Dep. 14:8-15:7, 18:21-19:3 (discussing vote dilution cases), 45:13-15 (discussing need for CVAP data in cases involving  Latinos), 69:13-19.

175.    "The Department of Justice is always trying to find the best possible data, whether it's from one source or multiple sources, to analyze jurisdictions for potential Section 2 violations and to bring appropriate Section 2 enforcement actions."  Gore Dep. 25:1-8.

176.    The Department of Justice investigates hundreds of Section 2 matters, and not all investigations result in the filing of a complaint in district court.  Handley Trial Testimony (SDNY) 853:9-15.

177.    Having the most complete and accurate data regarding citizenship rates that the Census Bureau could provide would allow DOJ to fulfill its commitment to robustly enforcing the Voting Rights Act.  Gore Dep. 26:8-13.  Plaintiffs' expert, Professor Karlan, agrees that "the Department of Justice or any other plaintiff needs a reliable calculation of the citizenship voting age population in localities where citizenship is at issue and where voting rights are alleged or suspected to be violated."  Karlan Dep. 69:20-70:1.

178.    It is the position of DOJ that the decennial census questionnaire is the most appropriate vehicle for collecting CVAP data for purposes of VRA enforcement, Gore Dep. 169:22-170:5, although CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts.  Gore Dep. 300:8-11.  However, Mr. Gore is not a statistician and has no experience drawing districts or using census block-group-level data to estimate block-level data.  Gore Dep. 17:21-18:15, 167:14-19.

179.    Plaintiffs' expert, Professor Pamela Karlan, also is not a statistician and has no experience drawing districts or using census block-group-level data to estimate block-level data. Karlan Trial Dep. 70:19-22, 72:1-23.  She is not aware of how the expert analysts go about calculating block-level citizenship data to draw illustrative voting districts.  Karlan Trial Dep. 72:21-23.  In fact, she could not remember if she was ever involved in cases where block-level data was used.  Karlan Trial Dep. 81:15-18.

180.    Because of the limitations on the data contained in the ACS, analysts use estimation techniques on occasion to estimate block-level data for the purposes of the first *Gingles* precondition in section 2 Voting Rights Act cases.  Karlan Trial Dep. 70:10-18.

181.    The first *Gingles* precondition does not require a functional analysis; rather, it simply requires a bare majority of voting-age citizens.  Handley Trial Testimony (SDNY) 851:1-9.  The Gary letter focuses on the first *Gingles* precondition.  *Id.* 851:10-12; *see also* Karlan Trial Dep. 30:25-32:14.  The functional analysis that Plaintiffs' expert, Dr. Handley, has employed does not relate to the first of the *Gingles* preconditions.  Handley Trial Testimony (SDNY) 850:22-25.

182.    Dr. Handley is aware that studies show that people do not answer the citizenship question accurately on the ACS, and that could affect her analysis under the first *Gingles* precondition.  Handley Trial Testimony (SDNY) 841:20-842:5.

183.    Dr. Handley is not an attorney and is not an employee of the Justice Department's Civil Rights Division.  Handley Trial Testimony (SDNY) 853:16-20.  She therefore is not a decision-maker for DOJ.  *Id.* 853:21-23.  She was not involved in drafting the Gary letter, and was not involved in DOJ's decision-making process concerning the letter.  *Id.* 851:13-19.

1   184.    Dr. Handley is not offering an opinion in this case about the decision-making

2   process DOJ uses in deciding whether to bring a Section 2 case.  Handley Trial Testimony (SDNY)

3   852:24-853:8.

4   185.    Professor Karlan was Deputy Assistant Attorney General in the Civil Rights

5   Division at DOJ from 2014-2015 but was recused from, and therefore did not work on, the major

6   Section 2 vote-dilution (i.e., *Gingles*-type) case being handled by DOJ when she worked there.

7   Karlan Dep. 9:21-11:15, 70:23-71:13.

8   186.    DOJ's letter explained that using statistical methods to estimate block-level

9   citizenship data from block-group-level citizenship data results in uncertainty in the estimates.  AR

10  665.  The letter also explained that, unlike ACS citizenship data, citizenship data from the decennial

11  census would align in time with the total and voting-age population data from the census already

12  used in redistricting (called the P.L. 94-171 data).  AR 665.  Finally, the letter stated that census

13  citizenship data would allow the same data set to be used for redistricting, enforcing the Voting

14  Rights Act, and determining compliance with the Constitution's one-person, one-vote requirement.

15  AR 664.

16  187.    The P.L. 94-171 data, providing population numbers by race, does not have the

17  kind of standard errors associated with an estimate based on a statistical sample.  Census Bureau

18  30(b)(6) Dep. 49:16-50:1, ECF No. 175-1 in No. 18-1865.

19  188.    In contrast, the tabulation of CVAP data does contain sampling errors.  Census

20  Bureau 30(b)(6) Dep. 50:3-5.

21  189.    The Census Bureau has not made a decision on the way in which it will aggregate

22  the data to the block level for the CVAP table as a public use product, which would be available to

23  DOJ.  Census Bureau 30(b)(6) Dep. 55:5-20.  Nor has the Census Bureau decided whether the

24  block-level CVAP data will be included in the P.L. 94-171 data file.  Census Bureau 30(b)(6) Dep.

25  56:15-18.

26  190.    Although the Census Bureau's position is that administrative data would be the best

27  way to provide block-level CVAP data, it is still working to acquire additional data from certain

28

1    federal agencies to make this option more practicable.  PTX 234 at 36-37 (response to Census RFA

2    No. 113).

3           191.    The Census Bureau's use of disclosure avoidance procedures in reporting block-

4    level citizenship data from the 2020 census will not impair DOJ's intended use of that data to

5    assemble voting districts for Voting Rights Act purposes.  Tr. 901:18-902:16.  It is therefore true

6    that data for a particular census block may be obscured for confidentiality purposes.  *Id.* 901:15-17.

7    However, for the 2020 census, the Census Bureau is using Department of Justice input—

8    specifically, examples of cases in which DOJ has used demographic data in Voting Rights Act

9    cases—to adjust the accuracy of the Census Bureau's disclosure avoidance procedures so that when

10   census blocks are combined to build voting districts, the resulting data will be fit for DOJ's

11   intended use.  *Id.* 901:4-16, 903:6-21.

12          192.    Plaintiffs' expert Dr. Hermann Habermann testified that the Department of Justice

13   letter did not sufficiently justify a need for block-level citizenship data to warrant a citizenship

14   question on the 2020 decennial census.  Hermann Habermann Aff. ¶¶ 5, 22–33 (PTX-821).   426.

15   However, Dr. Habermann acknowledged that using statistical methods to estimate block-level

16   citizenship data from block-group-level citizenship data results in uncertainty in the estimates. Trial

17   Tr. 463:11–17 (PTX 820).  However, the Department of Justice letter explained that using statistical

18   methods to estimate block-level citizenship data from block-group-level citizenship data results in

19   uncertainty in the estimates—a principle that Dr. Habermann acknowledged.  AR 665; Tr. 463:11-

20   17 (PTX-820).  The Department of Justice letter also explained that, unlike ACS citizenship data,

21   citizenship data from the decennial census would align in time with the total and voting-age

22   population data from the census already used in redistricting.  AR 665.  Finally, the Department of

23   Justice letter explained that census citizenship data would allow the same data set to be used for

24   redistricting, enforcing the Voting Rights Act, and determining compliance with the Constitution's

25   one-person, one-vote requirement.  AR 664.

26

27

28

1

### C.  The Citizenship Question Was Adequately Tested.

2

3       193.    As Dr. Abowd persuasively testified, "the American Community Survey question on

4  citizenship was adequately tested and was properly placed on the census."  Tr. 797:13-15.

5       194.    "The citizenship question on the American Community Survey was thoroughly

6  tested.  Most recently with the full battery of tests that [the Census Bureau] applied to questions in

7  the ACS in 2006."  Tr. 827:9-12; 827:24-829:1 (discussing in detail the "full battery of required

8  testing" the citizenship question received before its inclusion in the ACS survey instrument).

9  Dr. Abowd explained that neither the Bureau's "own quality standards nor the Office of

10  Management and Budget's statistical policy directives require further testing of this question before

11  it can be used on the 2020 census."  *Id.* 827:13-16.

12      195.    The Census Bureau has developed and implemented Statistical Quality Standards to

13  meet the guidelines set forth in the OMB Statistical Policy Directives.  *See generally* Tr. 829:8-833:5

14  (discussing requirements of the OMB guidelines and the Census Bureau standards promulgated

15  under that guidance).  As career scientists, including Dr. Abowd, at the Census Bureau concluded,

16  further pretesting was not required prior to inclusion of the citizenship question on the decennial

17  census because the question satisfied an exception to the Bureau's standards that affirms that

18  "[p]retesting is not required for questions that performed adequately in another survey."  *Id.* 833:6-

19  834:7.  The citizenship question met the requirements for this exception notwithstanding the

20  discrepancies discovered between some noncitizens self-reported citizenship status on the ACS and

21  the citizenship status observed through administrative records.  *Id.* 834:8-835:24.

22      196.    If the OMB concludes that further testing is necessary, it can require additional

23  testing before approving the proposed 2020 census questionnaire. *Id.* 827:16-18.

24      197.    Dr. O'Muircheartaigh testified that the citizenship question has not been adequately

25  tested and that it is improper and against the government's own standards to add the question to

26  the 2020 census without proper testing.  Tr. 84:17-85:22.  But his opinion is directly contrary to the

27  opinion of the chief scientist at the Census Bureau, Dr. John Abowd, a person whom he considers

28  to be a "fine scholar" and "excellent scientist."  *Id.* 38:2-6.  Dr. Abowd testified that the addition of

the citizenship question is in compliance with the relevant government standards. *Id.* 839:24-840:7. This extra-record evidence is therefore not probative, even if it could properly be considered in this case.

## PROPOSED CONCLUSIONS OF LAW

**I.   Plaintiffs Have Failed to Prove Standing.**

**A.  General Legal Standards for Article III Standing**

1.      The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citation omitted).

2.      At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

3.      The standing requirement of "injury in fact" requires proof that the plaintiff "'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).

4.      The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560).

5.      Thus, an alleged future injury must be "*certainly* impending"; "'[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

6.      The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and

not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

7.     In the census context, a mere showing of differential net undercount is not enough, as there has never been a perfect census count.  *See Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981).  Plaintiffs instead must prove by a preponderance of the evidence that any differential net undercount (1) is specifically attributable to the citizenship question and (2) has an actual injurious effect on Plaintiffs.

8.     As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing these elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561.  "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

9.     If Plaintiffs cannot prove standing by a preponderance of the evidence, *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014), the Court must refrain from addressing the merits of Plaintiffs' APA and Enumeration and Apportionment Clause claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

10.    Plaintiffs have not established, by a preponderance of the evidence, the three elements of Article III standing: Plaintiffs have not established a concrete and particularized injury-in-fact, that there is a fairly traceable causal connection between their alleged injury and the inclusion of the citizenship question, and a likelihood that the injury will be redressed by a favorable decision.  *Defs. of Wildlife*, 504 U.S. at 560.

### B. Plaintiffs Have Failed to Prove a Concrete, Non-Speculative Injury That Is Certainly Impending.

#### 1. Plaintiffs Failed to Prove that They Face Any Imminent Risk of Concrete Injury in the Form of Lost Representation or Federal Funding.

11.     Plaintiffs' claims regarding a loss of representation or funding due to a net undercount resulting from the inclusion of a citizenship question are too speculative to satisfy Article III's requirements.  *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding lack of standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some of the communities' shares, it likely would have reduced the shares of others communities"); *id.* at 186 ("interstate vote dilution injury is difficult to establish"); *Strunk v. U.S. Dep't of Commerce*, Civ. A. No. 09-1295, 2010 WL 960428, at *3 (D.D.C. Mar. 15, 2010) (rejecting vote dilution claim for lack of standing where plaintiff was "but one citizen of New York and one voter in New York's 11th Congressional District"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which states would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding that "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, inter alia, on "the interplay of all other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but for every other State as well").

12.     Plaintiffs' asserted dilution of representation in the House of Representatives and in the Electoral College purportedly stemming from inclusion of the citizenship question is inherently speculative.  Plaintiffs have not, and cannot, establish that the citizenship question will affect the

share of Representatives to Congress allocated to the State of California.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992) (because the plaintiffs had not "shown … that Massachusetts would have an additional Representative if the allocation had been done using some other source of 'more accurate' data," they "d[id] not have standing to challenge the accuracy of the data."  *Id.* at 802 (plurality opinion)).

13.     The evidence adduced at trial does not show that the inclusion of the citizenship question "will *likely* result" in a loss of representation for Plaintiffs.  *See* PFOFs ¶¶ 58-72.  Thus, Plaintiffs have fallen short of demonstrating an "injury in fact" that is "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alleged future injury must be '*certainly impending*'; "'[a]llegations of *possible* future injury' are not sufficient") (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

14.     Moreover, the process of apportionment itself makes any pre-census allegations as to the distribution of representatives (and, therefore, electors) speculative.  Because the apportionment process is based on the population of every state, Plaintiffs cannot establish an imminent injury here because the 2020 census has not yet taken place and projections of state populations will continue to change between now and 2020.  It is therefore impossible to "accurately measure" the population until the decennial census is taken in 2020.  *See Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570, 572 (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" when plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" depending on "the interplay of all the other population factors which affect apportionment").

15.     Plaintiffs also have not shown by a preponderance of the evidence that any potential differential undercount that may remain after NRFU operations and imputation will have an impact on federal funding.  *Defs. of Wildlife*, 504 U.S. at 560; *see* PFOFs ¶¶ 73-86.

## 2.  Plaintiffs Failed to Prove They Have Been Required to Expend Additional Resources

16.     The governmental Plaintiffs' alleged expenditure of resources is not sufficient to establish Article III injury because they have not shown whether, absent any expenditure they choose to make, the inclusion of a citizenship question on the 2020 census would likely cause a differential net undercount. *La Asociacion de Trabajadores*, 624 F.3d at 1088; *see Clapper*, 133 S. Ct. at 1151 (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). In other words, Plaintiffs cannot premise standing on a diversion-of-resources theory without showing that they "would have suffered some other injury if [they] had not diverted resources to counteracting the problem." *Blunt*, 767 F.3d at 285 (emphasis deleted) (internal citation omitted). Plaintiffs also must show that any expenditure of resources is "beyond those normally expended" in the absence of the challenged action. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995*); accord Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 182–83 (D.C. Cir. 1996) (organization's expenditure of resources not sufficient to create standing because it was "part of its ordinary program expenditures"). *See* PFOFs ¶¶ 28-61.

17.     The record demonstrates that Plaintiffs failed to establish any tangible, cognizable harm associated with the alleged expenditure of resources associated with the reinstatement of a citizenship question on the 2020 decennial census. *See* PFOFs ¶¶ 73-90.

### 3.   Plaintiffs Failed to Prove That Any Lower Quality Demographic Data Will Perceptibly Impair Any Concrete and Cognizable Interest.

18.     Lower quality data in the abstract is insufficiently "concrete" and "tangible" to constitute an Article III injury in fact. *See Warth*, 422 U.S. at 508. Instead, Plaintiffs must show that that lower quality data will perceptibly impair some concrete and tangible cognizable interest. *See Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality op.) (no standing for claim challenging use of inaccurate data in reapportionment because plaintiffs "have neither alleged nor shown … that Massachusetts would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data"); *id.* at 823–29 (Scalia, J., concurring in judgment) (no standing for any claims); *Whitmore v. Arkansas*, 495 U.S. 149, 156–57 (1990) (death-row inmate lacked standing to challenge state's incomplete and skewed database of other capital

crimes against which his case could be compared because he failed to show that corrected database would lead state court to set aside his death sentence).

19.     Plaintiffs failed to adduce evidence necessary to establish any tangible, cognizable harm based on alleged lower quality data resulting from the inclusion of a citizenship question on the 2020 decennial census.  *See* PFOFs ¶¶ 91-96.

### C. Plaintiffs Failed to Prove That Any Injury is Traceable to the Inclusion of the Citizenship Question or that Any Alleged Injury Could be Redressed.

20.     To ensure that a plaintiff's allegations of harm are fairly attributable to the challenged action, it is necessary to allege "a causal connection between the injury and conduct complained of so that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court." *Defs. of Wildlife*, 504 U.S. at 560; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 ("[A] federal court [must] act only to redress injury that fairly can be traced to the challenged conduct of the defendant, and not injury from independent action of some third party not before the court."); *see also Warth,* 422 U.S. at 504 (finding standing lacking where alleged injury resulted from outside forces, "rather than . . . respondents' assertedly illegal acts").

21.     The evidence demonstrates that Plaintiffs did not meet their burden of establishing that any differential undercount remaining after NRFU operations and imputation is traceable specifically to the citizenship question rather than to the general macro-environment and political climate.  Plaintiffs' own expert testified about challenges facing the census in the current macro-environment, and did not attempt to uncouple any incremental impact on census participation from those pre-existing factors.  *See* PFOFs ¶¶ 107.

22.     Because Plaintiffs cannot decouple any impact on census participation due to the purported impact of the citizenship question from other, pre-existing factors, it follows they cannot demonstrate that  their alleged injuries would be redressed by the removal of the citizenship question. *Defs. of Wildlife*, 504 U.S. at, 560.

1

**II.    Plaintiffs Failed to Prove that the Secretary's Decision to Reinstate a Citizenship Question was Arbitrary and Capricious.**

2

**A.  Legal Standards for Review Under the Administrative Procedure Act**

3

23.     Under the APA, a court is not authorized to set aside agency action as arbitrary and

4

capricious if the agency's decision "was the product of reasoned decisionmaking."  *Motor Vehicle*

5

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983).  "This

6

standard of review is highly deferential, presuming the agency action to be valid and affirming the

7

agency action if a reasonable basis exists for its decision."  *Pacific Dawn LLC v. Pritzker*, 831 F.3d

8

1166, 1173 (9th Cir. 2016) (citation omitted).

9

24.     An agency decision will only be set aside if it "has relied on factors which Congress

10

had not intended it to consider, entirely failed to consider an important aspect of the problem,

11

offered an explanation for its decision that runs counter to the evidence before the agency, or is so

12

implausible that it could not be ascribed to a difference in view or the product of agency expertise."

13

*Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1244 (9th Cir. 2013) (citation omitted).

14

25.     The Court's role is limited to determining whether the agency has "examine[d] the

15

relevant data and articulate[d] a satisfactory explanation for its action including a rational

16

connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43.  And "[t]hat

17

requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably

18

be discerned.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).

19

26.     The Court's review in this case must be particularly deferential because Plaintiffs

20

challenge the Secretary's broad discretion over the census.  "The text of the Constitution vests

21

Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and

22

"there is no basis for thinking that Congress' discretion is more limited than the text of the

23

Constitution provides."  *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting art. 1, § 2, cl. 3)

24

(emphasis added).

25

27.     Congress, in turn, "has delegated its broad authority over the census to the

26

Secretary."  *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)).

27

28

28.     Plaintiffs' arbitrary-and-capricious claim should be resolved as a matter of law based on an evaluation of the record before the agency decisionmaker.  Where, as here, "a party seeks review of agency action under the APA …, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  *Herguan Univ. v. ICE*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).

29.     The testimony on the merits introduced by Plaintiffs at trial should not properly be considered on APA review because such evidence was not before the Secretary and thus is irrelevant to his decision.  Considering expert testimony after the fact is inconsistent with the APA standard of review and the required deference to the agency's factfinding.  *See, e.g., Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

30.     Similarly, materials produced in discovery are not, as a general matter, properly considered in a review of agency action under the APA because those materials are not considered part of the "whole record" before the agency.  5 U.S.C. § 706; *see e.g., Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (discussing exceptions).

31.     The Administrative Record contains all relevant information pertaining to Secretary Ross's decision.

32.     Under Title 13, Secretary Ross has virtually unlimited discretion to consider and weigh evidence in the record to make policy decisions regarding the census, including such decisions made in response to agency requests.

**B.  The Secretary's Decision to Reinstate a Citizenship Question on the 2020 Decennial Census was Reasonable.**

**33.**     The administrative record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census was reasonable and fully consistent with the APA.  *See* AR 1-13,024.

34.     The Secretary's decision is reasonable because his memorandum reflects that he conducted "a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Bureau leadership and interested stakeholders." *See, e.g.,* AR 1320.

35.     The Secretary's decision is reasonable, and specifically his Decision Memorandum does not run counter to the evidence, because the memorandum reflects that he determined that adding the citizenship question "is necessary to provide complete and accurate data in response to the DOJ request." AR 1320.

36.     The Secretary's decision is reasonable because he considered and accounted for the effect of a citizenship question on census response rates and correctly noted in his decision the lack of evidence that response rates would decline materially because of the question, and because the Secretary expressly addressed how the Bureau's budget provided sufficient funding for NRFU efforts to prevent an undercount. AR 1315-1319.

37.     The Secretary's decision is reasonable because he explicitly recognized that both stakeholders and the Census Bureau had raised concerns that the inclusion of a citizenship question on the census could have a negative impact on self-response rates for non-citizens, but correctly noted that no one had produced evidence that the response rate would decline materially as a result of the inclusion of a question that had previously been on the census for decades.  AR 1315.

38.     The Secretary's decision is reasonable because, as he explained in his Decision Memorandum, asking a citizenship question in conjunction with using administrative records allows the Bureau to compare the responses to the records to establish the most accurate, usable, and complete citizenship data and could reduce the Bureau's burden of imputing missing citizenship data.   AR 1317.

39.     The Secretary's decision is reasonable because he considered alternative options, such as the use of administrative records only, but concluded that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  AR 1316.

40.     The Secretary's decision is reasonable because he carefully considered the possibility of depressed self-response rates before making the determination that "the need for accurate citizenship data and the limited burden that the inclusion of the citizenship question would impose outweigh fears about a potentially lower response rate."  AR 1317.

41.     The Secretary acknowledged the macro-environment and that there may be distrust of government, and recognized that this distrust would exist regardless of a citizenship question. AR 1317.  The Secretary correctly noted that no one could provide an analysis showing a material decline in self-response rates among those who generally distrusted the government.  *Id.*

42.     The Secretary's decision to add the citizenship question is reasonable because the Secretary expressly addressed how the Bureau's budget provided sufficient funding for NRFU efforts to prevent an undercount, and because "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond."  AR 1319.

43.     The Secretary's decision is reasonable because he weighed the evidence, including the possible cost and quality implications of reinstating a citizenship question, and concluded that a combination of using administrative records and reinstating a citizenship question on the 2020 decennial census, was the best option to provide DOJ the data it requested.  AR 1317.

44.     Secretary Ross's decision was not pretextual because Plaintiffs did not establish that Secretary Ross did not believe the stated rationale in his Decision Memorandum or that he had irreversibly prejudged the issue.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014).  *See* PFOFs ¶¶ 162-71.

45.     Secretary Ross's decision to add the citizenship question was not contrary to law because he reasonably explained why pretesting wasn't required.  The Bureau's internal data collection standards do not require pretesting for questions that perform adequately in another survey, and the Bureau's senior executive staff determined and informed Secretary Ross that the question was adequately tested, given the thorough cognitive and field testing of the citizenship question on the American Community Survey and the logistical constraints that prevented further

54

pretesting.  AR 1279.  In any event, the Census Bureau's guidelines are not legally binding on the Secretary.  "There is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level."  *Comcast Corp. v. F.C.C.*, 526 F.3d 763, 769 (D.C. Cir. 2008).

46.     The administrative record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census was reasonable and fully consistent with the APA. *See* PFOFs ¶¶ 143-61.

## III.     The Secretary's Decision to Reinstate a Citizenship Question Was in Accordance With Law.

### A.  The Secretary's Decision Fully Complies with 13 U.S.C. § 6(c).

47.     There is a statutory requirement that, "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries."  13 U.S.C. § 6(c).

48.      DOJ specifically requested that a citizenship question be included on the 2020 decennial census to gather census-block level data to facilitate its enforcement efforts under Section 2 of the Voting Rights Act (VRA).  AR 663-64.

49.     The Secretary determined that the information that could be gained from administrative records alone was not of "the kind, timeliness, quality, and scope of the statistics required" for DOJ's VRA enforcement efforts because administrative records would be inadequate for a significant portion of the population.  *See* AR 1316.  Therefore, 13 U.S.C. § 6(c) does not prohibit the Secretary from including a citizenship question on the 2020 decennial census in addition to the use of administrative records.

### B.  The Secretary's Decision Was in Accordance with 13 U.S.C. § 141(f).

#### 1.  The Court Lacks Jurisdiction to Review Plaintiffs' Claim that Secretary Ross Violated the Reporting Requirement of § 141(f)(3).

50.     Plaintiffs' assertion that the Secretary violated Section 141(f) of the Census Act because he did not identify "citizenship" as a subject for the 2020 census in his March 2017 report

to Congress, and "there are no 'new circumstances . . . which necessitate' the inclusion of the citizenship question on the census" must be rejected as a matter of law.

51.     Congressional reporting requirements—like § 141(f)—are beyond the courts' jurisdiction to review for two reasons: (1) the courts cannot redress any injury resulting from an inadequate report because it is Congress's sole decision how to respond to a report, adequate or inadequate; and (2) submitting an informational report to Congress is not the type of "final agency action" covered by APA review because it does not determine rights or obligations or trigger legal consequences.  5 U.S.C. §§ 551 (13), 701(a); *Guerrero v. Clinton*, 157 F.3d 1190, 1191-92, 1196 (9th Cir. 1998) ("[T]his issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." (quoting *Nat. Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)); *see also, e.g., Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006) (declining to review agency's required submission of recommendations to the President, because "[t]here is no good reason to believe that such an order will redress [plaintiffs'] injuries. No legal consequences flow from the recommendations"); *Taylor Bay Protective Ass'n v. Adm'r, EPA*, 884 F.2d 1073, 1080-81 (8th Cir. 1989) (declining to review agency compliance with a congressional reporting provision because "nothing in the scheme indicat[es] that judicial review . . . . is necessary or advisable. … Additionally, the nature of the agency action here is distinct from the type of agency action normally reviewable"); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (declining to review an agency's compliance with a congressional reporting requirement because "[t]his court will not scrutinize the merits or timeliness of reports intended solely for the benefit of Congress"); *Natural Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) (declining to review an agency's allegedly insufficient report under a congressional reporting provision because managing the reports should be left to Congress, and the Court "despair[ed] at formulating judicially manageable standards" to evaluate the reports on Congress's behalf); *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (holding that

1    plaintiffs could not bring an APA claim to challenge an agency's misstatements to Congress under a

2    reporting statute because "[w]here a report is not explicitly or implicitly intended as anything more

3    than a vehicle to inform Congress, it is for Congress alone to determine if the Report satisfies the

4    statutory requirements it enacted" (internal quotation marks and citation omitted)).

5         52.    Furthermore, even if § 141(f) represented a substantive requirement rather than a

6    reporting requirement, it would not be reviewable under the APA. Under 5 U.S.C. § 701(a), APA

7    review is precluded where "Congress expressed an intent to prohibit judicial review." *Webster v. Doe*,

8    486 U.S. 592, 599 (1988). Congress has expressed its intent to prohibit judicial review of the

9    Secretary's compliance with § 141(f) in two ways. First, § 141(f)(3) explicitly leaves the decision of

10   when to modify questions or topics to the Secretary. *See* § 141(f)(3) (calling for a report "if *the*

11   *Secretary finds* new circumstances exist" (emphasis added)). Second, § 141(f)(3) requires only that the

12   Secretary inform Congress of modifications to subjects or questions, not the "new circumstances"

13   leading thereto. *See* § 141(f)(3) (requiring the Secretary to submit "a report containing the

14   Secretary's determination of the subjects, types of information, or questions as proposed to be

15   modified"). Congress, let alone the courts, would therefore have little basis to review the Secretary's

16   exclusive determination of "new circumstances."

17        **2.  Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper**

18        53.    Even if the Secretary's compliance with Section 141(f) were reviewable, the statute

19   has been fully satisfied.  Pursuant to 13 U.S.C. § 141(f)(2), the intended questions for the 2020

20   decennial census have been submitted to Congress.  *See* Questions Planned for the 2020 Census

21   and American Community Survey (Mar. 29, 2018),

22   https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-

23   2020-acs.pdf.  Through that report, Secretary Ross informed Congress of the questions for the

24   2020 decennial census, including the citizenship question, *id.* at 7, thus satisfying the requirements

25   of § 141(f)(3), if a 141(f)(3) report were required.   There is no requirement that the Secretary

26   inform Congress of the new circumstances triggering modifications to subjects submitted under

27   (f)(1).  13 U.S.C. § 141(f)(3).

28

54.     The Secretary's decision to add the citizenship question also was not contrary to law because his Decision Memorandum responds to a new circumstance—DOJ's request to the Bureau for block-level CVAP data to enforce the Voting Rights Act—and reflects the Secretary's understanding of the value of such data, and because the Secretary made an explicit determination based on the information provided by the Census Bureau that using administrative records alone would be inadequate for a significant portion of the population.  AR 1316.

55.     In any event, Secretary Ross could remedy any error by simply submitting a §141(f)(3) report at any time between now and the 2020 census.  *See* 13 U.S.C. § 141(f)(3) (permitting submission of such a report at any time after the submission of a § 141(f)(1) or (2) report and "before the appropriate census date").   Accordingly, if a §141(f)(3) report is required, the Secretary has fully satisfied the Census Act, or could do so any time before April 1, 2020.

## IV.     Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext"

56.     "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 394 n.7 (2d Cir. 2000) ("Absent a showing to the contrary, it is presumed the agency considered all evidence in the record when making its determination.").

57.     As the Supreme Court repeatedly has explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding."  *Camp*, 411 U.S. at 143.  Because the Court should be applying "the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 743-44 (1985) (internal citation omitted), Plaintiffs may not rely on material outside the properly designated administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

58.     Even if the Secretary had additional reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").

59.     Plaintiffs have failed to prove that the Secretary did not actually believe the rationale set forth in his decision memorandum or that he acted with an unalterably closed mind. Nor can they show that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").  As Justice Gorsuch has explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."  *In re Dep't of Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring in part and dissenting in part).

**V.     Plaintiffs' Enumeration Clause Claim Must Be Rejected**

60.     The Enumeration Clause of the Constitution confers upon Congress (which has delegated to the Secretary of Commerce) "virtually unlimited discretion" to conduct an "actual Enumeration" of the American public every 10 years, with the primary purpose of providing a basis for apportioning political representation among the states.  *Wisconsin v. City of New York*, 517 U.S. 1, 19, 24 (1996).

61.     The Supreme Court has found that the clause "suggests that the Framers expected census enumerators to seek to reach each individual household" and that the constitutional choices embodied in the Enumeration Clause "suggest a strong constitutional interest in accuracy."  *Utah v. Evans*, 536 U.S. 452, 478 (2002).

62.     The Supreme Court reviews decisions pertaining to the administration of the decennial census under the Enumeration Clause with an eye to whether the challenged decision bears "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census."  *Wisconsin*, 517 U.S. at 20.

63.     In denying Defendants' motion to dismiss, this Court interpreted the foregoing authorities as dictating that "[t]he Secretary's decision to alter the census in a way that affirmatively interferes with the actual enumeration, and does not fulfill any other reasonable governmental purpose, is subject to a challenge under the Enumeration Clause."  ECF No. 75, at 29.

64.     The Court further held that, "while the content of the census questionnaire, including the specific questions that appear on it, is nearly always committed to the Secretary's sound discretion, there may be a rare question that is so uniquely impactful on the process of counting itself, that it becomes akin to a mechanics-of-counting-type challenge, which is plainly reviewable under the Enumeration Clause."  ECF No. 75, at 28.

65.     The "standard for evaluating a challenge under the Enumeration Clause is an objective one—that is, the Secretary's actions either satisfy the constitutional mandate or they do not."  ECF No. 75, at 27.

66.     Plaintiffs' Enumeration Clause claims must be decided on the basis of the administrative record, without consideration of extra-record evidence produced in discovery or at trial, because the APA provides the waiver of sovereign immunity for this claim and the APA's strictures on judicial review accordingly apply with equal force to the Enumeration Clause claims. *See, e.g.*, *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237 (D.N.M. 2014) (explaining that the case "alleges constitutional violations as well as statutory ones does not take it outside of the APA"); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018) ("[W]hen a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that challenge must be judged on the record before the agency"); *Chiayu Chang v. U.S. Citizenship & Immigration Servs.*, 254 F. Supp. 3d 160, 161

(D.D.C. 2017) (summarizing cases holding that the assertion of constitutional claims does not remove a matter from the APA's procedural strictures).

67.     Plaintiffs have not shown that the inclusion of a citizenship question will prevent the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census.  *Wisconsin*, 517 U.S. at 20 (1996).  Nor have Plaintiffs shown that the inclusion of a citizenship question undermines the strong constitutional interest in the accuracy of the census.  Utah, 536 U.S. at 478 (2002).

68.     To the extent that the Court's standard, see supra ¶¶ 4-5, which Defendants accept for the purposes of this filing as law of the case, extends beyond that developed by the Supreme Court in *Wisconsin* and *Utah*, Plaintiffs have not shown that this standard has been violated.

69.     The Supreme Court has explained that historical practice is a critical factor in examining an alleged violation of the Enumeration Clause.  *See Wisconsin*, 517 U.S. at 21; *State of New York*, 315 F. Supp.3d at 800 (recognizing that in interpreting the Enumeration Clause, significant weight is placed on historical practice.)  It is undisputed that a citizenship question has a lengthy historical pedigree, appearing on the census for most of the last two hundred years.  *See* ECF No. 75, at 26 ("The history of the census reflects that demographic questions have long been a part of the enumeration process since its inception. The first census in 1790 asked about age, race, and sex. Every census since then has collected demographic information beyond the number and location of inhabitants."); *State of New York v. Dep't of Commerce*, 315 F. Supp.3d 766, 804-806 (S.D.N.Y 2018).  Thus, it is "clear that the mere asking of a question about citizenship on the census form is consistent with the historical conduct of the census." ECF No.75 at 26, ("The long history of demographic questions appearing on the census questionnaire, including questions regarding place of birth and immigration status, confirms that the specific act of including a citizenship question on the census is not, by and of itself, beyond the Secretary's authority under the Enumeration Clause.") *See* Undisputed Facts, ECF Nos. 119 and 125 at 67-81.

70.     Defendants have demonstrated that obtaining citizenship data serves a "reasonable governmental purpose," ECF No. 75, at 29, because the collection of citizenship data "has been a

long-standing historical practice" in the United States, AR 1386; *see* PFFOF ¶¶ 146, 158; AR 1319 ("[O]ther democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few."). Furthermore, it is undisputed that DOJ and the courts need citizenship data "for determining violations of Section 2 of the Voting Rights Act." AR 1319.

71.     Even assuming Secretary Ross failed to reasonably explain his decision to reinstate a citizenship question on the census for purposes of the Administrative Procedure Act, Plaintiffs have not shown that the collection of citizenship data does not fulfill a reasonable governmental purpose for Enumeration Clause purposes. *See Dalton v. Specter*, 511 US 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution.").

72.     There is no violation of the Enumeration clause because during the 2020 census, the Census Bureau intends "to seek to reach each individual household" and to count each such household, and will deploy a variety of methods to reach and count everyone. *Utah v. Evans*, 536 U.S. 452, 478 (2002). The record demonstrates that the Census Bureau has put in place procedures to achieve an actual enumeration of all persons in the United States. *See* PFFOF ¶¶ 28-39; 49-56.

73.     The possibility of an undercount exists in every census and the Constitution does not require perfection, *Utah*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part); *Wisconsin*, 517 U.S. at 6 (recognizing that no census has been wholly successful in achieving goal of complete enumeration). Some of the more-recent censuses incorporated a long-form questionnaire that included a citizenship question, yet the incremental impact on accuracy created by these instruments was never determined to implicate constitutional accuracy. The facts establish that the 2020 census will achieve both absolute and distributive accuracy within this historical context that does not rise to the level of a "uniquely impactful" inaccuracy of constitutional magnitude.

74.     Plaintiffs' evidence that there will be a loss of representation due to the inclusion of a citizenship question is insufficient to establish a violation of the Enumeration Clause because it is based on flawed assumptions and is speculative. *See* PFFOF ¶¶ 65-72.

1

2

**VI.** **Any Relief Granted to Plaintiffs Must Comport with the APA and Art. III's Limitations**

3

**A.  Remand to the Agency Is the Only Potentially Appropriate Remedy**

4

75.     This Court should uphold the Secretary's decision to include a citizenship question

5

and enter judgment in Defendants' favor.

6

76.     If the Court were to conclude that the Secretary's decision is not supported by the

7

administrative record or is otherwise unlawful, the appropriate remedy would be to remand to the

8

agency for further consideration.  5 U.S.C. § 706(2); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory*

9

*Comm'n.* 988 F.2d 146, 151 (D.C. Cir. 1993) (holding that remand without vacatur was appropriate

10

when "the consequences of vacating may be quite disruptive" and "the possibility that the [agency]

11

may be able to justify" the decision on remand); *California Communities Against Toxics v.  EPA.* 688

12

F.3d 989, 992 -94 (9th Cir. 2012)(recognizing that a flawed rule need not be vacated and can be left

13

in place while the agency follows the necessary procedures to correct its action); *Idaho Farm Bureau*

14

*Federation v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir.1995) (holding that although "ordinarily"

15

regulations that are not promulgated in compliance with the APA are invalid, "when equity

16

demands, the regulation can be left in place while the agency follows the necessary

17

procedures.");.*Nat. Res. Def. Council v. U.S. Envt'l Prot. Agency*, 676 F. Supp. 2d 307, 312 (S.D.N.Y.

18

2009) ("Where an agency action is remanded for further proceedings, the determination of whether

19

or not also to vacate the agency action is left to the court's discretion.") (citing *Sugar Cane Growers*

20

*Co-op. of Fla. v. Veneman,* 289 F.3d 89, 98 (D.C. Cir. 2002)).

21

77.     A remand to the agency without vacatur is appropriate here because the agency

22

could correct any procedural deficiencies on remand, and vacatur would be extremely disruptive to

23

the agency. *Allied-Signal*, 988 F.2d at 151; *AquaAlliance v. Bureau of Reclamation*, 312 F. Supp. 3d 878,

24

881 (E.D. Cal. 2018)(stating that in "determining whether to vacate an agency decision, courts in

25

the Ninth Circuit look to the factors described in *Allied-Signal*").

26

78.     Courts have repeatedly emphasized that remand without vacatur is appropriate even

27

if there is only "'a non-trivial likelihood' that the [agency] will be able to state a valid legal basis for

28

its rules," *In re Core Comm'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008) (quotation omitted), or a "significant possibility" that the agency may be able to explain itself on remand. *Williston Basin Interstate Pipeline Co v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

79.    Should the Court determine that the decision should be remanded, Plaintiffs' request that this Court enjoin Secretary Ross and his staff at the Department of Commerce from participating in the decision on remand must be rejected as beyond the scope of relief contemplated by the APA and unjustified by the record in this case.

### B. Any Relief Granted in this Case Should Not Extend Beyond the Plaintiffs That Demonstrate an Injury-in-Fact Traceable to Defendants

80.    **Any request by** Plaintiffs for an injunction that would extend beyond the Plaintiffs in this litigation must be rejected. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (to establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought."); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").

81.    Article III requires this Court to reject any relief to Plaintiffs that extends beyond the injuries they have proven they have sustained and that are directly attributable to the Defendants' conduct. *See Gill v. Whitford*, 138 S. Ct. 1916, 1930-31 (holding in case challenging alleged gerrymandering, that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts.") *Id.* at 1934 (cautioning that, on remand, "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353).

82.    Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

Dated:  February 1, 2019                         Respectfully submitted,

                                                 JOSEPH H. HUNT
                                                 Assistant Attorney General

                                                 BRETT A. SHUMATE
                                                 Deputy Assistant Attorney General

                                                 CARLOTTA P. WELLS
                                                 Assistant Branch Director

                                                 MARSHA S. EDNEY
                                                 Senior Trial Counsel

                                                 */s/ Kate Bailey*
                                                 KATE BAILEY
                                                 CAROL FEDERIGHI
                                                 Trial Attorneys
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street NW
                                                 Washington, DC 20530
                                                 Phone: (202) 514-9239
                                                 Email: kate.bailey@usdoj.gov
                                                 *Attorneys for Defendants*