1   MARY KELLY PERSYN (CABN 264782)
    **PERSYN LAW & POLICY**
2   **912 Cole Street PMB 124**
    **San Francisco, CA 94117**
3   **(628) 400-1254**
    **marykelly@persynlaw.com**
4
    GREGORY L. DISKANT*
5   ARON FISCHER*
    BENJAMIN F. JACKSON*
6   JACOB NEWMAN*
    **PATTERSON BELKNAP WEBB & TYLER LLP**
7   **1133 Avenue of the Americas**
    **New York, NY 10036-6710**
8   **(212) 336-2000**
    **(212) 336-2222**
9   *Not admitted in this jurisdiction

10  *Attorneys for Amici Curiae*

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

                      **SAN FRANCISCO DIVISION**
14

15

16  STATE OF CALIFORNIA, *et al.*                 Case Nos.  3:18-cv-01865-RS,
                                                             3:18-cv-02279-RS
17                      Plaintiffs,

18          vs.                                    **COMMON CAUSE, TREVOR
                                                   POTTER, REP. JODY L.
19  WILBUR ROSS, JR., *et al.*                     MCNALLY, AND JUSTICE
                                                   ROBERT ORR (RET.)'S
20                      Defendants.                MOTION FOR LEAVE TO FILE
                                                   BRIEF AS AMICI CURIAE IN
21  -------------------------------------------    SUPPORT OF PLAINTIFFS'
                                                   POSITION AT TRIAL
22  CITY OF SAN JOSE, *et al.*

                        Plaintiffs,
23

24          vs.                                    Date: February 1, 2019
                                                   Time: N/A
25  WILBUR ROSS, JR., *et al.*                     Judge: Honorable Richard Seeborg
                                                   Dept.: 3
26                      Defendants.

27

*Amici Curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Rober Orr (Ret.) respectfully move this Court for leave to file the accompanying amicus brief in support of Plaintiffs' Position at Trial.  In support of their motion, *amici* state as follows:

Common Cause is one of the nation's leading democracy organizations and currently has over 1.2 million members and supporters nationwide and local chapters in 25 states, including states that will be disproportionately impacted by the inclusion of a citizenship question on the 2020 Census, including California, Colorado, Illinois, New York, Pennsylvania, Rhode Island, and Texas. Common Cause has been a leading advocate for policies that ensure a responsive and representative government.  Common Cause has an interest in this case because it concerns how the 2020 Census will be conducted, which could have dramatic impacts on apportionment and representation.

Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.) are current and former Republican officials (elected and appointed) with an interest in good government, appropriate apportionment, and representative democracy.  These individuals have an interest in this case because of their status as current and former officials and specifically because issues of apportionment and representation are not partisan issues and should not be viewed as such.

*Amici* believe this brief will be helpful to the court in considering whether a violation of the Enumeration Clause and the Administrative Procedure Act occurred.  In particular, this brief adds substantial historical information about the considerations and motivations informing the enactment of both the Enumeration Clause and the Fourteenth Amendment.  It also adds helpful information about the impact of the addition of a citizenship question on communities—both urban and rural— with high numbers of non-citizen residents.  It provides a non-partisan, democracy-focused view of why the question proposed by Secretary Ross harms a core commitment of our constitutional democracy.

Counsel for Plaintiffs the County of Los Angeles, the City of Los Angeles, the City of Fremont, the City of Oakland, the City of Long Beach, the City of San Jose, the Black Alliance for Just Immigration, and counsel for defendants have consented to the filing of this brief.  Counsel to the remaining plaintiffs did not respond to a request for consent.

COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY,  AND JUSTICE ROBERT ORR (RET.)'S MOTION FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL

Case Nos. 3:18-cv-01865-RS, 3:18-cv-02279-RS

1    WHEREFORE, Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Rober Orr

2  (Ret.) respectfully request that this Court grant them leave to file the proposed, attached *amici* brief.

3

4  Dated:  January 31, 2019

5                                                            */s/ Mary Kelly Persyn*____
                                                          Mary Kelly Persyn (CABN 264782)
6                                                          PERSYN LAW & POLICY
                                                          912 Cole Street PMB 124
7                                                          San Francisco, CA 94117
                                                          (628) 400-1254
8                                                          marykelly@persynlaw.com

9                                                          Gregory L. Diskant*
10                                                         Aron Fischer*
                                                          Benjamin F. Jackson*
11                                                         Jacob Newman*
                                                          PATTERSON BELKNAP WEBB & TYLER LLP
12                                                         1133 Avenue of the Americas
                                                          New York, New York 10036
13                                                         (212) 336-2000
                                                          gldiskant@pbwt.com
14                                                         afischer@pbwt.com
                                                          bjackson@pbwt.com
15                                                         jnewman@pbwt.com
16                                                         *not admitted in this jurisdiction

17                                                         *Attorneys for* Amici Curiae *Common Cause,*
18                                                         *Trevor Potter, Rep. Jody L. McNally, and*
                                                          *Justice Robert Orr (Ret.)*
19

20

21

22

23

24

25

26

27

28
COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY,  AND JUSTICE ROBERT ORR (RET.)'S MOTION FOR LEAVE TO FILE
BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL

2

Case Nos. 3:18-cv-01865-RS, 3:18-cv-02279-RS

1    MARY KELLY PERSYN (CABN 264782)
     **PERSYN LAW & POLICY**
2    **912 Cole Street PMB 124**
     **San Francisco, CA 94117**
3    **(628) 400-1254**
     **marykelly@persynlaw.com**
4
     GREGORY L. DISKANT*
5    ARON FISCHER*
     BENJAMIN F. JACKSON*
6    JACOB NEWMAN*
     **PATTERSON BELKNAP WEBB & TYLER LLP**
7    **1133 Avenue of the Americas**
     **New York, NY 10036-6710**
8    **(212) 336-2000**
     **(212) 336-2222**
9    *Not admitted in this jurisdiction

10   *Attorneys for Amici Curiae*

11

12                    **UNITED STATES DISTRICT COURT**

13                    **NORTHERN DISTRICT OF CALIFORNIA**

14                        **SAN FRANCISCO DIVISION**

15

16   STATE OF CALIFORNIA, *et al.*                Case Nos.  3:18-cv-01865-RS,
                                                              3:18-cv-02279-RS
17                          Plaintiffs,

18          vs.                                   **[PROPOSED] ORDER
                                                  GRANTING COMMON CAUSE,**
19   WILBUR ROSS, JR., *et al.*                   **TREVOR POTTER, REP. JODY
                                                  L. MCNALLY, AND JUSTICE**
20                          Defendants.           **ROBERT ORR (RET.)'S
                                                  MOTION FOR LEAVE TO FILE**
21   ---------------------------------------------- **BRIEF AS AMICI CURIAE IN
                                                  SUPPORT OF PLAINTIFFS'**
22   CITY OF SAN JOSE, *et al.*                   **POSITION AT TRIAL**

23                          Plaintiffs,           Date: February 1, 2019

24          vs.                                   Time: N/A
                                                  Judge: Honorable Richard Seeborg
25   WILBUR ROSS, JR., *et al.*                   Dept.: 3

26                          Defendants.

27

28   [PROPOSED] ORDER GRANTING COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY, AND JUSTICE ROBERT ORR
     (RET.)'S MOTION FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL
                                                          Case Nos. 3:18-cv-01865-RS, 3:18-cv-02279-RS

1   Now, therefore, it is hereby ORDERED that:

2   Upon consideration of Common Cause, Trevor Potter, Rep Jody L. McNally, and Justice

3   Robert Orr (Ret.)'s Motion for Leave to File Brief as *Amici Curiae* in Support of Plaintiffs' Position

4   at Trial, the Court finds that the proposed *amici curiae* brief may assist in the determination of the

5   matters before this Court.

6   *Amici* are granted leave to file their brief.

7

8   Dated: _____, 2018        _____

9                                        HON. RICHARD SEEBORG
                                         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [PROPOSED] ORDER GRANTING COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY, AND JUSTICE ROBERT ORR
     (RET.)'S MOTION FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on February 1, 2019. I further certify that counsel of record for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February, 2019.

/s/ Mary Kelly Persyn
Mary Kelly Persyn

[PROPOSED] ORDER GRANTING COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY, AND JUSTICE ROBERT ORR (RET.)'S MOTION FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL

Case Nos. 3:18-cv-01865-RS, 3:18-cv-02279-RS

1   MARY KELLY PERSYN (CABN 264782)
    **PERSYN LAW & POLICY**
2   **912 Cole Street PMB 124**
    **San Francisco, CA 94117**
3   **(628) 400-1254**
    **marykelly@persynlaw.com**
4
    GREGORY L. DISKANT*
5   ARON FISCHER*
    BENJAMIN F. JACKSON*
6   JACOB NEWMAN*
    **PATTERSON BELKNAP WEBB & TYLER LLP**
7   **1133 Avenue of the Americas**
    **New York, NY 10036-6710**
8   **(212) 336-2000**
    **(212) 336-2222**
9   *Not admitted in this jurisdiction
10  *Attorneys for Amici Curiae*

11

12              **UNITED STATES DISTRICT COURT**

13             **NORTHERN DISTRICT OF CALIFORNIA**

14                **SAN FRANCISCO DIVISION**

15

16  STATE OF CALIFORNIA, *et al.*
                                            Case Nos.  3:18-cv-01865-RS,
17              Plaintiffs,                            3:18-cv-02279-RS

18      vs.                                 **BRIEF OF COMMON CAUSE,**
                                            **TREVOR POTTER, REP. JODY**
19  WILBUR ROSS, JR., *et al.*              **L. MCNALLY, AND JUSTICE**
                                            **ROBERT ORR (RET.) AS** *AMICI*
20              Defendants.                 *CURIAE* **IN SUPPORT OF**
                                            **PLAINTIFFS**
21  -------------------------------------------------------
22  CITY OF SAN JOSE, *et al.*

23              Plaintiffs,                 Date: February 1, 2019
                                            Time: N/A
24      vs.                                 Judge: Honorable Richard Seeborg
                                            Dept.: 3
25  WILBUR ROSS, JR., *et al.*

26              Defendants.

27

28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

INTEREST OF AMICI CURIAE ..................................................................................................1

ARGUMENT .................................................................................................................................2

I.      EQUAL REPRESENTATION OF PERSONS IS THE CORE CONSTITUTIONAL VALUE OF ARTICLE I, SECTION 2 AS AMENDED BY THE FOURTEENTH AMENDMENT. ..................................3

      A.      The Founders agreed that all persons—not just citizens—must be included in the representation base for members of Congress. .........................................3

      B.      The Constitution resolves the tension between the broad right to equal representation and the then-narrow right to vote by distinguishing between those who can vote and those who are counted for census purposes............................5

      C.      The Fourteenth Amendment reaffirmed the representation of all persons as a foundational principle of our democracy. .........................................................6

II.     CENSUS RESULTS DRIVE BOTH POLITICAL REPRESENTATION AND FUNDING FOR LARGE GROUPS OF PEOPLE IN BROAD AREAS...............................................................................7

III.    SECRETARY ROSS'S FAILURE TO CONSIDER THE RISK THAT INCLUDING A CITIZENSHIP QUESTION ON THE 2020 CENSUS WOULD UNDERMINE EQUALITY OF REPRESENTATION CONFIRMS THAT HIS DECISION TO ADD THE QUESTION VIOLATES THE ENUMERATION CLAUSE AND THE ADMINISTRATIVE PROCEDURE ACT. ...............................................................9

      A.      Being counted, and being included in the apportionment process, is integral to the fundamental right to political representation. .........................................9

      B.      Secretary Ross's decision to add the citizenship question—and thereby undermine a core constitutional commitment—violates both the substantive and procedural protections of the APA.......................................................11

CONCLUSION.............................................................................................................................12

1

## TABLE OF AUTHORITIES

2
Page(s)

3
**Cases**

4
*California v. Ross,*
    18-cv-01865-RS (N.D. Cal August 17, 2018) ...............................................................3

5

6
*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971)...................................................................................................12

7

8
*Common Cause et al. v. Rucho et al.,*
    1:16-CV-1026 (M.D.N.C.)...........................................................................................1

9
*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016)...................................................................................... passim

10

11
*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick,*
    486 F. Supp. 564 (D.D.C. 1980) ..................................................................................3

12
*Harper v. Va. Bd. of Elections,*
    383 U.S. .....................................................................................................................10

13

14
*Kadrmas v. Dickinson Pub. Sch.,*
    487 U.S. 450 (1988) ...................................................................................................10

15
*Lindsey v. Normet,*
    405 U.S. 56 (1972)......................................................................................................10

16

17
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.* (*State Farm*),
    463 U.S. 29 (1983) .....................................................................................................11

18

19
*New York v. U.S. Dep't of Commerce* (*New York*),
    Nos. 18-CV-2921 & 18-CV-5025, 2019 U.S. Dist. LEXIS 6954 (S.D.N.Y. Jan.
    15, 2019) .........................................................................................................  passim

20

21
*Rucho, et al. v. Common Cause, et al.,*
    No. 18-422, *consideration of appellate jurisdiction postponed to hearing on
    merits*, 586 U.S. --- (Jan. 4, 2019) ...............................................................................1

22

23
*Shaw v. Reno,*
    509 U.S. 630 (1993).....................................................................................................6

24

25
*Utah v. Evans,*
    536 U.S. .....................................................................................................................12

26

27
*Wesberry v. Sanders,*
    376 U.S. 1 (1964)..........................................................................................................4

28

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)..................................................................................7

**Other Authorities**

86 Cong. Rec. 4372 (1940) ....................................................................3

*5 Facts About Illegal Immigration in the U.S.*, PEW RES. CTR. (Apr. 27, 2017),
   http://www.pewresearch.org/fact-tank/2017/04/27/5-facts-about-illegal-
   immigration-in-the-u-s/.........................................................................5

Richard Briffault, *Legal History: The Contested Right to Vote*, 100 MICH. L. REV.
   1506, 1510 (2002) ................................................................................5

CONSTITUTIONAL RIGHTS FOUND., *Who Voted in Early America?*, BILL OF RIGHTS IN
   ACTION (Fall/Winter 1991)....................................................................5

THE FEDERALIST No. 54 ..........................................................................6

FOUNDING FAMILIES: DIGITAL EDITIONS OF THE PAPERS OF THE WINTHROPS AND THE
   ADAMSES (C. James Taylor ed., 2015) ................................................4

MICHAEL J. KLARMAN, THE FRAMERS' COUP (2016) .................................4

Justin Levitt, *Citizenship and the Census*, 119 COLUM. L. REV. (forthcoming 2019) ..........7

*National Demographic Characteristics*, U.S. DEP'T OF LABOR,
   https://www.doleta.gov/naws/pages/ ....................................................8

U.S. CENSUS, FOREIGN-BORN: 2014 CURRENT POPULATION SURVEY DETAILED
   TABLES tbl.1.1 (2014), *available at*
   https://www.census.gov/data/tables/2014/demo/foreign-born/cps-2014.html ..............8

U.S. CENSUS, USES OF CENSUS BUREAU DATA IN FEDERAL FUNDS DISTRIBUTION 3-8
   (2017), *available at* https://www2.census.gov/programs-
   surveys/decennial/2020/program-management/working-papers/Uses-of-Census-
   Bureau-Data-in-Federal-Funds-Distribution.pdf ..................................8

UNIV. OF CAL. AGRIC. ISSUES CTR., AGRICULTURAL WORKFORCE (2009), *available at*
   https://www.cdfa.ca.gov/agvision/docs/Agricultural_Workforce.pdf.........................9

GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787, at 170
   (2d ed. 1998) .........................................................................................4

1

## INTEREST OF *AMICI CURIAE*

2    *Amicus curiae* Common Cause was founded by John Gardner in 1970 as a nonpartisan

3    "citizens lobby" whose primary mission is to protect and defend the democratic process and make

4    government accountable and responsive to the interests of ordinary people, and not merely to those

5    of special interests.  Common Cause is one of the nation's leading democracy organizations and

6    currently has over 1.2 million members and supporters nationwide and local chapters in 25 states,

7    including states that will be disproportionately impacted by the inclusion of a citizenship question on

8    the 2020 Census, including California, Colorado, Illinois, New York, Pennsylvania, Rhode Island,

9    and Texas.  Common Cause has been a leading advocate for policies that ensure a responsive and

10   representative government.

11   Common Cause filed an *amicus* brief in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).  Common

12   Cause also recently filed an *amicus* brief in litigation in the U.S. District Court for the Southern

13   District of New York concerning Secretary Ross's decision to include a citizenship question on the

14   2020 Census.  *New York v. U.S. Department of Commerce* (*New York*), Nos. 18-CV-2921 &

15   18-CV-5025, 2019 U.S. Dist. LEXIS 6954 (S.D.N.Y. Jan. 15, 2019).  Additionally, Common Cause

16   is a leading organization challenging the practice of partisan gerrymandering.  Common Cause is the

17   lead plaintiff in the challenge to the congressional gerrymander in North Carolina that will be argued

18   before the Supreme Court this March.  *Rucho, et al. v. Common Cause, et al.*, No. 18-422,

19   *consideration of appellate jurisdiction postponed to hearing on merits*, 586 U.S. --- (Jan. 4, 2019)

20   (appealing the three-judge district court's decision in *Common Cause et al. v. Rucho et al.*,

21   1:16-CV-1026 (M.D.N.C.)).

22   *Amicus curiae* Trevor Potter is a former Republican Chairman of the Federal Election

23   Commission.  He is one of the country's most prominent and experienced campaign and election

24   lawyers, and served as general counsel to John McCain's 2000 and 2008 presidential campaigns.

25   Mr. Potter is currently the President of the Campaign Legal Center, a nonprofit nonpartisan

26   organization that fights the current threats to our democracy in the areas of campaign finance, voting

27   rights, redistricting, and ethics.  Mr. Potter has long been engaged with good government issues and

28   has served as *amicus curiae* in a number of cases.

1    *Amicus curiae* Representative Jody L. McNally is a Republican representative in the

2    Strafford 10 district in the New Hampshire House of Representatives.  As an elected representative,

3    she has a vested interest in ensuring a full and accurate count in the 2020 Census.

4    *Amicus curiae* Justice Robert Orr is a retired Associate Justice of the North Carolina Supreme

5    Court.  Justice Orr was elected as a Republican to the Supreme Court and is a former Republican

6    candidate for governor of North Carolina.  After retiring from the Supreme Court, Justice Orr headed

7    the North Carolina Institute for Constitutional Law.  Justice Orr has also served on the United States

8    National Park System Advisory Board, as an adjunct faculty member at North Carolina Central

9    University ("NCCU"), and as a member of the Board of Visitors for NCCU's Law School.  A former

10   justice and a constitutional scholar, Justice Orr is dedicated to the rule of law and the preservation of

11   our system of representative government.

12                                                    **ARGUMENT**

13   In our constitutional democracy, *all* persons who reside within the United States—including

14   non-citizens—are granted the equal right to be represented by a member of Congress.  This core

15   constitutional principle is as old as our democracy itself.  The Founders introduced it in Article I,

16   Section 2 of the Constitution, and the country reaffirmed and perfected it in the Fourteenth

17   Amendment.  Although the right to vote in federal elections has expanded over time, it has always

18   been the case that the right to representation in Congress belongs to persons, not to voters or citizens.

19   The primary constitutional purpose of the census is to ensure that our constitutional

20   commitment to equal representation of all persons is fully realized.  Nevertheless, Secretary Ross has

21   decided to include a citizenship question on the 2020 Census, despite—or, perhaps, precisely

22   because of—the fact that doing so will cause undercounts in areas with large non-citizen

23   populations.  This, in turn, will mean that states—California, particularly—stand to lose

24   representation in Congress based on the undercounting of certain demographic groups, *see New*

25   *York*, 2019 U.S. Dist. LEXIS 6954, at *241 ("[T]he Court finds by a preponderance of the evidence

26   that California residents face a certainly impending loss of representation in the House of

27   Representatives."), and that areas with large non-citizen populations—again, like California—will

28   not receive their fair share of federal attention and resources, *see id.* at *246 ("[T]he Court finds

1  that . . . California . . . will lose some amount of federal funding as a result of the addition of the

2  citizenship question.").

3        In denying motions to dismiss and motions for summary judgment on Plaintiffs' claims, this

4  Court reasoned that while "demographic questions have long been a part of the enumeration process

5  since its inception," the claims survived because "there may be a rare question that is so uniquely

6  impactful on the process of counting itself, that it becomes akin to a mechanics-of-counting-type

7  challenge."  Order Denying Motions to Dismiss at 27-28, *California v. Ross*, 18-cv-01865-RS, slip

8  op. at 26-28 (N.D. Cal August 17, 2018) (ECF No. 75).  In reaching a final disposition on the merits

9  of this case, the Court should consider not only the uniquely harmful impact of the citizenship

10  question, but also the constitutional purpose of Article I, Section 2.  Secretary Ross's failure to

11  account for the risk that including a citizenship question on the 2020 Census would undermine the

12  fundamental constitutional principle of equality of representation is an important reason that his

13  decision to add the question violates both the Enumeration Clause and the Administrative Procedure

14  Act ("APA").  Because Secretary Ross's decision would undermine a core constitutional

15  commitment without any reasoned explanation for doing so, it violates both the Enumeration Clause

16  and the substantive and procedural protections of the APA.  The core constitutional value embodied

17  in Article I, Section 2, the right to equal representation—"the right to be counted and

18  represented"[1]—should inform the district court's analysis of the claims in this litigation.

19 **I.    EQUAL REPRESENTATION OF PERSONS IS THE CORE CONSTITUTIONAL VALUE OF ARTICLE I,**
20       **SECTION 2 AS AMENDED BY THE FOURTEENTH AMENDMENT.**

      **A.    The Founders agreed that all persons—not just citizens—must be included in**
21              **the representation base for members of Congress.**

22        Equal representation of all persons in the United States is, and has always been, a

23  foundational principle of our republican system of government.  The Founders firmly believed that

24  all persons living in the United States must be included in the representation base for Congress.

25  They enshrined this belief in Article I, Section 2 of the Constitution, which apportions congressional

26  representatives based on an "actual Enumeration" of the residents of each state.

27

28  [1] *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge district court) (quoting 86 Cong. Rec. 4372 (1940)).

The Founders disagreed on a great many things.  The process of debating and ratifying the Constitution was tumultuous, discordant, and heavily politicized.  *See generally* MICHAEL J. KLARMAN, THE FRAMERS' COUP (2016).  But the Founders were in accord on one very important thing: that members of Congress should represent *all* of the persons within their districts—not just citizens, and not just voters.  *See Evenwel*, 136 S. Ct. at 1132 ("As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote."); *see also* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787, at 170 (2d ed. 1998) (Of all "the electoral safeguards for the representational system," none "was as important to Americans as equality of representation.").

John Adams, a Federalist, and Thomas Jefferson, a Democratic Republican, agreed that equality of representation was a core principle of the new American political order.  *See* John Adams, Letter to Joseph Hawley (Aug. 25, 1776), quoted in FOUNDING FAMILIES: DIGITAL EDITIONS OF THE PAPERS OF THE WINTHROPS AND THE ADAMSES (C. James Taylor ed., 2015) ("Equality of Representation in the Legislature, is a first Principle of Liberty, and the Moment, the least departure from such Equality takes Place, that Moment an Inroad is made upon Liberty." ); Thomas Jefferson, Letter to William King (1819), Jefferson Papers, Library of Congress, Vol. 216, p. 38616 ("Equal representation [was] so fundamental a principle in a true republic that no prejudice [could] justify its violation . . . .").  Alexander Hamilton likewise said, "[t]here can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government."  *Evenwel*, 136 S. Ct. at 1127; *see also New York*, 2019 U.S. Dist. LEXIS 6954, at *275 n.49.

This foundational principle of representational equality ultimately found its way into Article I, Section 2 of the Constitution, which provides that "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons . . . three fifths of all other Persons."  U.S. CONST. art. I, § 2, cl. 3; *see also Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (stating that "equal representation for equal numbers of people" is "the fundamental goal for the House of Representatives").  Obviously and infamously, the Constitution as originally drafted, in distinguishing between "free Persons" and "all other Persons" and thereby ratifying slavery, fell

woefully short of giving full effect to the principle.  But even as written, Article I, Section 2 of the Constitution bases political representation on an individual's status as a "Person"—not as a citizen or a voter.

### B. The Constitution resolves the tension between the broad right to equal representation and the then-narrow right to vote by distinguishing between those who can vote and those who are counted for census purposes.

Although the original Constitution provided for a broad right to representation for free persons, it did not give every free person the right to vote.  Rather, the Constitution envisioned a system where a limited subset of all persons would vote for the representatives who would represent all (free) persons.  *See Evenwel*, 136 S. Ct. at 1127 ("[T]he basis of *representation* in the House was to include all inhabitants—although slaves were counted as only three-fifths of a person—even though States remained free to deny many of those inhabitants the right to participate in the selection of their representatives."); *id.* at 1129 ("[I]t remains beyond doubt that the principle of representational equality figured prominently in the decision to count people, whether or not they qualify as voters.").

The Founders frankly did not believe in the principle of universal enfranchisement.  They limited the franchise to adult white males who satisfied various state-imposed religious tests and property requirements—amounting to only about 10%–20% of the total national population at the time.  Richard Briffault, *Legal History: The Contested Right to Vote*, 100 MICH. L. REV. 1506, 1510 (2002); CONSTITUTIONAL RIGHTS FOUND., *Who Voted in Early America?*, BILL OF RIGHTS IN ACTION (Fall/Winter 1991).  Even today, many persons who reside in the United States cannot vote.  For instance, many states permanently disenfranchise people with prior felony convictions.  Minors cannot vote.  Non-citizen immigrants who are authorized to be in the United States for work or education cannot vote in federal elections.  Nor can the 11 million undocumented immigrants who live here.  Jens Manuel Krogstad et al., *5 Facts About Illegal Immigration in the U.S.*, PEW RES. CTR. (Apr. 27, 2017), http://www.pewresearch.org/fact-tank/2017/04/27/5-facts-about-illegal-immigration-in-the-u-s/.

Despite having unjustly limited views of the right to vote, the Founders believed that all persons, voters or non-voters, deserved representation in Congress.  As James Madison wrote in *The*

*Federalist*,

> It is a fundamental principle of the proposed Constitution, that as the aggregate number of representatives allotted to the several States is to be determined by a federal rule, founded on the aggregate number of inhabitants, so the right of choosing this allotted number in each State is to be exercised by such part of the inhabitants as the State itself may designate.

THE FEDERALIST No. 54 (James Madison); *see also Evenwel*, 136 S. Ct. at 1127. Thus, representatives would be apportioned based on the state's "aggregate number of inhabitants," while the state itself would decide which particular "part of the inhabitants" would be permitted to vote for those representatives.

The Founders included this concept in Article I by providing that those who cast their ballots as "Electors" do so on behalf of the broader "People":

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

U.S. CONST., art. 1, § 2, cl. 1 (emphasis added). *Cf. Evenwel*, 136 S. Ct. at 1132 ("By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation."); *Shaw v. Reno*, 509 U.S. 630, 648 (1993) (congressional representatives are "obligat[ed]" to "represent . . . their constituency as a whole"). By permitting states to determine who shall qualify as an "Elector," while also apportioning representation uniformly based on the number of "People," the Constitution therefore provides for a hybrid system of representation.

## C.    The Fourteenth Amendment reaffirmed the representation of all persons as a foundational principle of our democracy.

The Fourteenth Amendment, which amended Article I, Section 2, reaffirmed and perfected the principle of representational equality. *See id.* at 1128–29. The first sentence of the Fourteenth Amendment defines "citizen." U.S. CONST. amend. XIV, § 1. The next sentence contains the Equal Protection Clause, which protects "any person within [the] jurisdiction [of the states]." *Id.* This juxtaposition makes clear that the Equal Protection Clause protects "all *persons* within [a state's]

1   territorial jurisdiction," and "is not confined to the protection of citizens."  *Yick Wo v. Hopkins*, 118

2   U.S. 356, 369 (1886) (emphasis added).  The Fourteenth Amendment went on to replace Article I,

3   Section 2's reference to "the whole Number of free Persons" in the state with "the whole number of

4   persons" in the state.  In reaffirming and expanding the principle of representation for "persons" in

5   the same breath that it provided a new definition of "citizens," the Fourteenth Amendment

6   unmistakably provides that the right to political representation flows to persons, not citizens.

7          This reaffirmation was intentional.  During the debates over the Fourteenth Amendment,

8   many in Congress sought a drastic change in our constitutional principles of equal representation,

9   arguing that only citizens or voters should be counted in determining representation.  *See Evenwel*,

10  136 S. Ct. at 1128.  But, in the end, the Amendment retained—with its framers' and ratifiers' full

11  awareness of the available alternatives—the commitment to apportionment based on total

12  population.  *See id.* ("The product of these debates was § 2 of the Fourteenth Amendment, which

13  retained total population as the congressional apportionment base.").  The Framers of the Fourteenth

14  Amendment decisively rejected apportionment based on a privileged subset of the whole population,

15  choosing to cement the Constitution's commitment to apportionment based on total population,

16  without regard to citizenship or enfranchisement.  *See id.* (quoting Senator Jacob Howard

17  introducing the final version of the Amendment:  "[The] basis of representation is numbers . . . this is

18  the theory of the Constitution.").

19  **II.    CENSUS RESULTS DRIVE BOTH POLITICAL REPRESENTATION AND FUNDING FOR LARGE**
20  **GROUPS OF PEOPLE IN BROAD AREAS.**

21         Because the enumeration of all persons is so fundamental to our system of representational

22  equality, census results inevitably drive political representation and government policymaking.  *See*

23  Justin Levitt, *Citizenship and the Census*, 119 COLUM. L. REV. (forthcoming 2019) at 20 ("The

24  enumeration drives the apportionment of congressional districts; redistricting for federal, state, and

25  local districts of all kinds; and the distribution of billions of dollars in government grants tied by

26  formula to population.  Communities that are undercounted lose political voice and substantial

27  government aid.").  Each year, census results are used to allocate more than $600 billion in funding

28  to over a hundred federal programs, including programs for healthcare, nutrition assistance, highway

1    planning and construction, student financial aid, housing assistance, and childcare.  U.S. CENSUS,

2    USES OF CENSUS BUREAU DATA IN FEDERAL FUNDS DISTRIBUTION 3-8 (2017), *available at*

3    https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-

4    papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

5         When fear and distrust depress the census response in some areas more than others, those

6    areas in which the response has been reduced lose political clout as well as funding for local

7    programs, hurting long-time residents, citizens, and newly arrived immigrants.  Differential

8    undercounts do not merely impact undocumented individuals, or lawful permanent residents, or

9    minority citizens; everyone in an area with depressed census participation also loses clout and cash.

10   Adding a citizenship question to the 2020 Census will cause an undercount in any community that

11   thrives because of non-citizens by depressing response rates—whether that area is an urban minority

12   community or a rural area dependent on immigrant farm laborers .

13        Of course, the vast majority of non-citizens reside in cities and large urban areas, which are

14   magnets for immigrants drawn to build new lives in this country.  *See, e.g.*, U.S. CENSUS, FOREIGN-

15   BORN: 2014 CURRENT POPULATION SURVEY DETAILED TABLES tbl.1.1 (2014), *available at*

16   https://www.census.gov/data/tables/2014/demo/foreign-born/cps-2014.html.  The concentration of

17   foreign-born residents in cities and urban areas is almost always greater—sometimes vastly

18   greater—than the concentration in the rest of the states in which they are situated.  Cities need

19   representation commensurate with their population in order to ensure they receive their fair share of

20   federal resources so that they can provide the services their many residents require.

21        But many rural communities are also home to a disproportionate number of non-citizens,

22   millions of whom work as agricultural laborers.  In fact, the vast majority—approximately 73%—of

23   America's agricultural laborers are foreign-born.  *National Demographic Characteristics*, U.S.

24   DEP'T OF LABOR, https://www.doleta.gov/naws/pages/research/docs/

25   Table1.NAWS_National_Demographics.xlsx (last visited Oct. 15, 2018).  Adding a citizenship

26   question to the 2020 Census would undoubtedly harm the rural communities in which these

27   agricultural laborers live.  Levitt, *supra*, at 21.

28        The state of California, which contains both of these kinds of areas, provides an illuminating

example.  Its major cities such as Los Angeles and Oakland contain huge immigrant non-citizen populations.  Its rural areas such as the Central Valley are heavily dependent on immigrant or migrant farmworkers, predominantly from Mexico.[2]  If the 2020 Census count is not accurate, California stands to lose federal aid and congressional seats.

New Hampshire is another illustrative example.  Approximately 37% of New Hampshire residents live in rural communities.[3]  Additionally, for smaller states, such as New Hampshire, domestic migration patterns can have an outsized effect.  Among the states east of the Mississippi River, New Hampshire has the second largest percentage of residents that were not born in the state in the United States.[4]  An accurate census count is essential to track population changes and ensure that New Hampshire is receiving the federal funding it needs to serve its residents.  New Hampshire counts on over $2 billion dollars per year that is based on census data, amounting to $1,590 per capita.[5]  Even in smaller states, an undercount would have an outsized impact.

Adding a citizenship question to the 2020 Census will result in a differential undercount in areas with large non-citizen populations—whether those areas are cosmopolitan metropolises with vibrant immigrant communities, or rural areas dependent on foreign-born agricultural labor.  This will cause these areas to lose ground in the competition for federal resources, depriving their residents of vital services and programs, and hurting everyone who lives there in the process.

**III.    SECRETARY ROSS'S FAILURE TO CONSIDER THE RISK THAT INCLUDING A CITIZENSHIP QUESTION ON THE 2020 CENSUS WOULD UNDERMINE EQUALITY OF REPRESENTATION CONFIRMS THAT HIS DECISION TO ADD THE QUESTION VIOLATES THE ENUMERATION CLAUSE AND THE ADMINISTRATIVE PROCEDURE ACT.**

**A.    Being counted, and being included in the apportionment process, is integral to the fundamental right to political representation.**

As discussed above, the history of Article I and the Fourteenth Amendment demonstrates that

---

[2] *See, e.g.*, UNIV. OF CAL. AGRIC. ISSUES CTR., AGRICULTURAL WORKFORCE (2009), *available at* https://www.cdfa.ca.gov/agvision/docs/Agricultural_Workforce.pdf.

[3] *See, e.g., Rural Health for New Hampshire*, RURAL HEALTH INFO. HUB (June 5, 2017), https://www.ruralhealthinfo.org/states/new-hampshire.

[4] *See, e.g.,* Michael Kitch, *State's Population Growth All Depends on Migration*, N.H. BUS. REV. (Sept. 13, 2018), https://www.nhbr.com/September-14-2018/States-population-growth-all-depends-on-migration/.

[5] *See, e.g.*, REAMER, *supra* note **Error! Bookmark not defined.** (data for New Hampshire), *available at* https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/New%20Hampshire%20CFD%2008-18-17.pdf.

the concern animating both the enactment and the subsequent modification of the Enumeration

Clause is that all persons living in the United States be counted for the purposes of apportionment.

This core constitutional commitment is embodied in Article I, Section 2 and the Fourteenth

Amendment, which provide that representatives and direct taxes be apportioned based on "the whole

number of persons."  U.S. CONST. amend. XIV, § 2 (modifying U.S. CONST. art. I, § 2, cl. 3).

Because this value is embodied directly in the text of the Constitution,[6] both as ratified at the

Founding and as improved by the Fourteenth Amendment, it should be treated as a foundational right

worthy of protection.  *Cf. New York*, 2019 U.S. Dist. LEXIS 6954, at *275 n.49 (explaining that the

"Article III injury that a person suffers when his or her state loses a representative in congressional

reapportionment, ultimately traces to a legally protected interest that does not depend on that

person's citizenship status or eligibility to vote" because there is an injury to the "representational

rights of every individual of the community at large," regardless of eligibility to vote).

The right to be counted, and thereby to be represented in our constitutional system, is no less

important than the other "fundamental rights" that the Court has sought to protect.  For instance, in

*Harper v. Virginia Board of Elections*, the Supreme Court concluded that a denial of the right to vote

on the basis of indigency (an unprotected class in other contexts[7]) was an equal protection violation

because it implicated a "fundamental right" explicitly protected by the Constitution.  383 U.S. at

667.  As discussed above, the right to be counted, and thereby represented, is as essential for non-

citizens as the right to vote is for citizens.  It works to further their interests and guarantee that their

voices are heard.  In *Shapiro*, the Supreme Court concluded that strict scrutiny was warranted not

based on the nature of the classification being made, but rather based on the foundational nature of

the right in question: the right to interstate travel.  *See* 394 U.S. at 629-30.  In *Skinner*, the Court

concluded that strict scrutiny was warranted because the legislation at issue touched on "[m]arriage

and procreation," which are "one of the basic civil rights of man" and "fundamental to the very

---

[6] *Cf. Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("[T]he Constitution does not provide judicial remedies for every social and economic ill. We are *unable to perceive in that document* any constitutional guarantee of access to dwellings of a particular quality." (emphasis added)).

[7] *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988) ("We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.").

1   existence and survival of the race."  316 U.S. at 541.

2       The right to be counted is the essential right for representation in American government, and

3   it has clear roots in the text of the Constitution.  It is, therefore, a fundamental constitutional right.

4   Secretary Ross's decision to include a citizenship question in the on the 2020 Census violates that

5   fundamental constitutional right, and thereby violates the Enumeration Clause.

6       **B.      Secretary Ross's decision to add the citizenship question—and thereby
          undermine a core constitutional commitment—violates both the substantive and**
7       **procedural protections of the APA.**

8       The Court's analysis of Plaintiffs' APA claims should be informed by the Secretary's failure

9   to adequately consider the way that his decision undermines the core constitutional commitment to

10  representational equality.  By willfully turning a blind eye to the constitutional issues with his

11  decision to add the citizenship question to the 2020 Census, Secretary Ross violated both the

12  procedural and substantive requirements of the APA.

13      As Plaintiffs articulate, the Secretary's politically motivated decision did not consider the

14  relevant data or articulate a satisfactory explanation.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

15  *Auto Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983).  His explanation for the decision—that it would

16  aid in enforcement of the Voting Rights Act ("VRA")—was irrational, because to the contrary it

17  would undermine representation of those whom the VRA is intended to protect.  *See id.* (an agency

18  may not make a "decision that runs counter to the evidence"); *see also New York*, 2019 U.S. Dist.

19  LEXIS 6954, at *376 ("[I]n a startling number of ways, Secretary Ross's explanations for his

20  decision were unsupported by, or even counter to, the evidence before the agency."); *id.* at *386

21  ("[T]here was no evidence in the Administrative Record that would support a finding that more

22  granular CVAP data is 'necessary' for enforcement of the VRA and plenty of evidence to the

23  contrary.").  It was also pre-textual, as demonstrated by the Secretary's now-admitted conversations

24  with anti-immigrant advisors to the President, Steve Bannon and Kris Kobach.  *See id.* at *404

25  ("[T]he evidence is clear that Secretary Ross's rationale was pretextual.").  A decision that lacks a

26  coherent rationale violates the APA.  *See, e.g.*, *State Farm*, 463 at 43–44.  So too does a decision that

27  fails to account for why it undermines a core constitutional objective.  *See id.* at 43 (explaining that it

28  violates the APA to "entirely fail[] to consider an important aspect of the problem").

Based on the pre-trial record, it is evident that the Secretary's stated rationale of enforcing the VRA is a mere pretext to obscure his actual purpose: artificially depressing the response rate of both documented and undocumented immigrants, and diminishing the representation and provision of government services to the communities in which they live. *Cf. Utah v. Evans*, 536 U.S. at 500-01 (Thomas, J., concurring in part and dissenting in part) ("The Framers knew that the calculation of populations could be and often were skewed for political or financial purposes. Debate about apportionment and the census consequently focused for the most part on creating a standard that would limit political chicanery."). To achieve this political objective, Secretary Ross sought to undermine the core constitutional principle embodied in the Enumeration Clause.

In analyzing Plaintiffs' APA claims, the Court should weigh the Secretary's intentions to directly undermine this core constitutional value. Here, the intended attack on a core constitutional principle that guided the Secretary's decision to add the citizenship question gives additional weight to the already persuasive evidence supporting a finding that the decision violated the APA because the decisionmaking process was marred by bad faith. *Cf. Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (explaining that, while "inquiry into the mental processes of administrative decisionmakers is usually to be avoided," "[t]he court may require the administrative officials who participated in the decision to give testimony explaining their action," where there is either "a strong showing of bad faith" or there have been no "formal findings" such that "the only way there can be effective judicial review is by examining the decisionmakers themselves"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Had the Secretary engaged in that undertaking in good faith—looking at the core constitutional objective furthered by the census and the past practices and legislative enactments that have sought to effective it—there would have been no possible conclusion that he could have drawn except that the addition of this question to the census would likely undermine the primary purpose of the census, a core constitutional objective, the accurate accounting of the entire population of people living within the United States.

## CONCLUSION

The Court should enjoin Secretary Ross's decision to add the unnecessary citizenship question to the 2020 Census because it violates both the Enumeration Clause and the procedural and

1  substantive requirements of the APA.  As described here, Secretary Ross's decision is inconsistent

2  with the values enshrined in the Constitution by the Founders and reaffirmed by the Congress that

3  enacted the Fourteenth Amendment.  The addition of this question will depress representation of

4  communities in California—both urban and rural—with significant immigrant populations that

5  deserve to be adequately represented.  Further, it undermines the core constitutional value that the

6  Enumeration Clause of Article I, Section 2 seeks to protect.  The Court's analysis should be informed

7  by the unavoidable reality that Secretary Ross's decision will undermine the very purpose for which

8  the Census exists, namely the "actual Enumeration" of "the whole number of persons in each state."

9  U.S. CONST. art. 1, § 2, cl. 3; *id.* amend. XIV, § 2.  Even if the court finds that the challenged

10  question does not have such an unusual impact that it violates the Enumeration Clause, the principles

11  embodied in Article I, Section 2 should nonetheless inform the Court's decision in favor of Plaintiffs.

12

13  Dated:  February 1, 2019

14  /s/ Mary Kelly Persyn_____
    Mary Kelly Persyn (CABN 264782)
    PERSYN LAW & POLICY
15  912 Cole Street PMB 124
16  San Francisco, CA 94117
    (628) 400-1254
17  marykelly@persynlaw.com

18  Gregory L. Diskant*
19  Aron Fischer*
    Benjamin F. Jackson*
20  Jacob Newman*
    PATTERSON BELKNAP WEBB & TYLER LLP
21  1133 Avenue of the Americas
22  New York, New York 10036
    (212) 336-2000
23  gldiskant@pbwt.com
    afischer@pbwt.com
24  bjackson@pbwt.com
    jnewman@pbwt.com
25  *not admitted in this jurisdiction

26  *Attorneys for* Amici Curiae *Common Cause,*
27  *Trevor Potter, Rep. Jody L. McNally, and*
    *Justice Robert Orr (Ret.)*
28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

3

United States District Court for the Northern District of California by using the CM/ECF system on

4

February 1, 2019. I further certify that counsel of record for all parties in this case are registered

5

CM/ECF users and that service will be accomplished by the CM/ECF system.

6

I certify under penalty of perjury that the foregoing is true and correct.  Executed this 1st day

7

of February, 2019.

8

9

/s/ Mary Kelly Persyn

Mary Kelly Persyn

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28