Nicholas Espíritu (SBN 237665)
National Immigration Law Center
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: 213-639-3900
Email: espiritu@nilc.org

Attorneys for *Amici Curiae*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra,** | 3:18-cv-01865 |
| Plaintiff, | **MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, UNITED FARM WORKER FOUNDATION, NATIONAL IMMIGRATION LAW CENTER, ET AL. FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'** |
| v. | |
| **WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,** | |
| Defendants. | Dept: 3<br>Judge:  The Honorable Richard G. Seeborg<br>Trial Date:  January 7, 2019<br>Action Filed:  March 26, 2018 |

1
2
3
4
5
6

The Central Valley Immigrant Integration Collaborative, United Farm Work Foundation, National Immigration Law Center and 15 other organizations respectfully seek leave to file a post-trial brief as *amici curiae*. Amici Curiae submit this brief to present the Court with recently published (January 2019) research[1] addressing whether the inclusion of the Citizenship Question on the 2020 Census will lead to an undercount of immigrant and Latino populations in San Joaquin Valley region and the State of California as a whole.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Amici are community organizations, philanthropic institutions, and service providers who are focused on ensuring that the all Californians—including those in the San Joaquin Valley—are able to live in fully represented, fully resourced, empowered, and healthy communities. Differential undercount in the decennial census is a critical public policy concern. Any such undercount will lead to a misallocation of census-driven federal and state funding and inequitable political representation. Overcoming differential undercount of racial/ethnic minorities has been a challenge throughout the history of the U.S. Census. There has been widespread and well-justified alarm about the U.S. Department of Commerce's plans to add a Citizenship Question to the decennial census, which will undoubtedly exacerbate this problem. In the ten months since the Secretary of Commerce announced his decision to add the proposed Citizenship Question, broad public consensus has underscored the grave concern that his decision would decrease Census 2020 response rates among non-citizens more than among U.S.-born citizens. Given the San Joaquin Valley region and California's relatively high proportions of Latino and immigrant populations as compared to the rest of the Country, the San Joaquin Valley region and California will ultimately be disproportionately harmed by any resulting undercount of these populations.

22
23
24
25
26

Moreover, adding the proposed Citizenship Question will likely have more than simply fiscal implications. The transformation of the decennial census from a civic ritual of affirmation—securing an accurate picture of the U.S., a "mirror of America"—into an exercise in government-sponsored efforts to diminish the importance of immigrants and blur our vision of a diverse American nation, will take a severe toll on civic life. The damage wrought by efforts to add the

27
28

---

[1] This research is attached as Exhibits A and B to the *Amicus Curaie* Brief

proposed Citizenship Question to Census 2020 will negatively impact a wide range of immigrant integration initiatives. The State of California itself, through legislative and regulatory action, along with a multitude of public institutions in California and the San Joaquin Valley, have worked for decades to effectively integrate immigrants into community life. A 2020 Census with the proposed Citizenship Question—widely recognized as a proxy for an inquiry into immigration status—will only serve to undermine the decades of work that public institutions throughout California have invested in this mission, accelerating rapid growth in government distrust and disengagement, and will only further foment community disappointment and anger regarding anti-immigrant policies.

*Amici* have a significant interest to the case. The following briefly describes each organization:

**Blue Shield of California Foundation** (the "Foundation") is a private foundation whose mission is to build lasting and equitable solutions to make California the healthiest state in the country and end domestic violence. To achieve this mission, the Foundation builds strong, safe, and vibrant communities in California where all people are heard, respected, and have opportunities to contribute. The Foundation's interest in this case arises from a deep concern that, if included in the Census, a question about citizenship will significantly undermine efforts to achieve a fair and comprehensive Census in 2020. As shown by the Foundation-funded research described in this Brief, inclusion of a citizenship question would decrease the willingness of many first-and second-generation immigrants to respond to the Census. The Foundation, our grantees, and our governmental partners in California all rely on accurate Census data as a necessary foundation for a well-functioning government and robust civil society. Accurate Census data helps identify community needs, informs grantmaking priorities, and drives funding for many government programs that are necessary supports for the well-being of our communities. Inclusion of a citizenship question in the Census would strike at the heart of our ability to accurately assess, and take into account, the assets and needs of vulnerable communities – a step that is essential for us to achieve our goal of making California the healthiest state.

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

1    **The California Endowment** ("The Endowment") is a private statewide health foundation,

2    established in 1996, with the stated mission to expand access to affordable quality health care for

3    underserved individuals and communities, and to promote fundamental improvements in the health

4    status of all Californians. This commitment to improving health beyond access to health care is

5    globally recognized by the term "social determinants of health." Pursuant to our mission, therefore,

6    The Endowment works to improve the social determinants of health of Californians by investing

7    in the social, economic, and civic power of residents and communities who have been the targets

8    of exclusion, stigma, and discrimination and by collaborating with public and private sector

9    partners at the state and local levels to improve health outcomes for all Californians.

10    The Endowment's interest in the outcome of this case arises out of grave concerns that the

11    inclusion of a citizenship question in the 2020 Census will adversely impact the health and

12    wellbeing of California residents as a whole, the effectiveness of our nonprofit and public partners,

13    and the lives and livelihoods of our most vulnerable Californians, namely, our immigrant and

14    language-minority families, many of whom struggle to secure basic needs for their families and

15    maintain healthy and vibrant communities.

16    As the most populous and diverse state in the nation, the impact of any proposed changes

17    to the 2020 Census are most profoundly felt in California. Under the United States Constitution,

18    the census serves as a fundamental building block for our democracy, affecting not only the

19    apportionment of each state's representation in the U.S. House of Representatives, but also the

20    allocation of more than $800 billion in federal government resources annually to states and

21    localities. Because 2020 Census data is used to determine the allocation of federal funding levels

22    and democratic representation for a decade, any changes to the census that would dissuade

23    participation or exclude entire populations from being counted must be assessed very carefully, as

24    such changes could initiate a ripple of long lasting negative and potentially irreversible effects.

25    The Endowment relies on data collected through an accurate census to inform not only our

26    work and strategies, but that of our philanthropic, governmental and business partners throughout

27    the state.  Census data informs a range of local services and decisions including the location of

28    schools, hospitals and housing. An accurate census helps the private sector make investment

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

decisions about facilities, hiring, and marketing. Census data serves as an essential tool that allows health care service providers, public health officials, practitioners, and advocates to effectively anticipate and address public health issues, assess health risks and trends over time and deploy limited resources where they may be most needed. Our partners in state and local government likewise have a major stake in assuring that the census is fair and accurate. A census undercount will lead to serious distortions in our collective ability to understand and direct appropriate resources to those who make up California's diverse population. In short, an accurate census is essential to our ability to achieve our mission.

For the census to serve its intended purpose, meet its constitutional mandate and remain an essential data utility for both the public and the private sectors, it must be inclusive of all persons living in California, not just citizens. The Endowment believes that inclusion of a citizenship question in the 2020 Census will lead to a serious undercount across the state, especially in those communities with significant numbers of immigrant families. Not only will a citizenship question discourage noncitizens from responding to the census, but it will likely discourage other family and household members as well. The impact of excluding so many California residents from participating in the census, especially in communities with concentrations of immigrants, will dramatically change the purpose and value of the census. Communities would be disempowered by the loss of representation in the political process and disadvantaged by reductions in necessary health and social services – especially the most vulnerable populations prioritized by The California Endowment. Philanthropic organizations will not be able to fill the gaps created by this anticipated undercount in Census 2020. A failed and unreliable Census helps no one and harms everyone. A fair and accurate census that includes effective measures to count "hard-to-count" people is imperative for The California Endowment and for all Californians.

The **California Pan-Ethnic Health Network** (CPEHN) is a statewide multicultural health advocacy organization. Founded over 25 years ago, CPEHN unites communities of color to achieve health and wellness, and to eliminate persistent health inequities. CPEHN derives its strength from its mobilizing arm, the Having Our Say (HOS) coalition which consists of over 30 community-based organizations across California working together to improve access to care and

4

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

1   health outcomes as well as through its Behavioral Health Equity Collaborative (BHEC) and

2   California Oral Health Network (COHN) partners. California has made huge strides in reducing

3   health disparities and improving health outcomes for all Californians. CPEHN's interest in the

4   outcome of this case arises out of a concern that, if adopted, the inclusion of the Citizenship

5   Question would have an adverse impact on the health of California's low-income communities of

6   color, including immigrants and their families, and mixed status families, who would be

7   disempowered by the loss of representation in the political process.

8       The **California Rural Legal Assistance Foundation** (CRLA Foundation) advocates for

9   low-income, predominantly immigrant, rural communities in the agricultural regions of California.

10  CRLA Foundation's advocacy includes health, education, housing, immigration, employment

11  rights, community environment, and infrastructure issues affecting rural areas. CRLA Foundation

12  addresses practices by both private and public entities that disproportionately and negatively affect

13  communities of color and relies on demographic mapping and other analyses that derive from

14  census reports to support this work. Undercounting of immigrants will directly affect the reliability

15  of this data. CRLA Foundation represents populations that historically have been subject to a

16  differential undercount in the Decennial Census, including, migrant and seasonal farmworkers,

17  immigrants, limited English proficient speakers, racial and ethnic groups, children, renters, large

18  families, complex households, people who reside in hidden housing and hard to reach

19  communities, and other difficult to reach, lower income, especially rural geographies. CRLA

20  Foundation's work will be harmed if responses to census questionnaires in rural communities

21  decline for fear of responding to questions regarding citizenship. A question about citizenship

22  status, in the current anti-immigrant atmosphere, will only contribute to reluctance to participate

23  in the Census and feed uncertainties about privacy and confidentiality. Fewer census responses

24  and a resulting increase in the differential undercount in these rural communities and the resulting

25  lack of accurate data would have an adverse effect on the very funding CRLA Foundation has

26  advocated needs to be fairly apportioned in the areas of health, education, housing, land use and

27  planning and basic community infrastructure and on civil rights enforcement.

28

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

The **California Wellness Foundation** (Cal Wellness) is a statewide organization with a mission to protect and improve the health and wellness of the people of California. California is home to the largest population of immigrants, making our state one of the most diverse in the country. Cal Wellness relies on census data to help identify and serve the needs of our diverse communities, particularly communities that are often underrepresented and underserved. Cal Wellness believes every person in California should be able to enjoy good health and experience wellness. To achieve our mission, Cal Wellness makes grants to support organizations that increase access to health care, quality education, good jobs, healthy environments, and safe neighborhoods. Cal Wellness funds direct services that address the urgent needs of low-income individuals, people of color, immigrants and refugees, youth and residents of rural areas. As a statewide funder, Cal Wellness' interest in the outcome of this case comes from concern that if adopted, the addition of a citizenship question would compromise a fair and accurate count and would hinder participation of many California residents in the 2020 Census. As a result, allocation of federal dollars to support essential safety net services that keep our communities healthy and well would be compromised.

**Californians for Pesticide Reform** (CPR) is a diverse, statewide coalition of over 190 member organizations working with communities on the frontlines of pesticide exposure to strengthen pesticide policies in California and protect public health and the environment. Member groups include public and children's health advocates, clean air and water groups, health practitioners, environmental justice groups, labor, education, farmers and sustainable agriculture advocates from across the state. CPR works primarily with Latinx farmworker communities throughout California, but particularly in the San Joaquin Valley, who are disproportionately burdened with multiple health hazards, usually without insurance, and have the least political power to confront the problem. CPR is strongly opposed to adding a citizenship question to the census as research shows it will dramatically reduce (in some cases by half) the number of people within certain, primarily Latinx, populations in the San Joaquin Valley who respond to the census. This decline in response is expected among undocumented immigrants who grow the nation's produce, legal residents, naturalized citizens, and U.S.-born citizen children of foreign-born parents who are concerned about the racist and anti-immigrant enforcement actions

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

1   that could arise from responding to such a census question. This decline in response rate will not

2   be made up for by proxy interviews as neighbors are rightly reluctant to provide information about

3   their neighbors without permission. In the San Joaquin Valley, the expected region-wide

4   undercount of nearly 200,000 people is likely to have a fiscal impact of billions of dollars over the

5   next decade, a serious problem for the low-income, Latinx communities we work with who are

6   already underrepresented and underserved, with some of the highest levels of poverty, pollution

7   and food insecurity in the United States.

8       The **Central Valley Immigrant Integration Collaborative** (CVIIC) serves immigrant

9   families in California's San Joaquin Valley. The region's residents include some 900,000

10  immigrants and over half a million children with at least one immigrant parent. Immigrants in the

11  region are for the most part long-term residents, with deep roots in the region's economy and

12  society. As part of CVIIC's work in preparation for the 2020 Census, CVIIC has helped establish

13  local census coalitions and complete count committees in Fresno, Tulare, Kern, Merced, Stanislaus

14  and San Joaquin counties. The local groups include a wide range of organizations with a presence

15  in the region, ranging from nonprofit organizations to public sector agencies, health advocates,

16  faith-based communities, chambers of commerce, and others. Invariably, a major concern of all

17  the committees is that the inclusion of a citizenship question in the 2020 Census will have a

18  significant impact on the participation of the families they serve and undermine their efforts to

19  promote an accurate and complete count of immigrant families and their social networks. The

20  opposition to the inclusion of the proposed citizenship question is widespread among these

21  agencies, which work on a daily basis with immigrants and other hard to count populations. The

22  costs of a significant undercount would be devastating to a region of the state and the country that

23  is already suffering from some of the highest levels of poverty in the nation. Moreover, it would

24  exacerbate the problem of political underrepresentation and heighten alienation from our

25  democratic process. For these and numerous other reasons, CVIIC opposes the inclusion of the

26  proposed citizenship question in the 2020 Census.

27      The **Community Water Center** ("CWC") is a not-for-profit organization based in

28  California working to ensure all Californians have access to safe, clean, and affordable

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

drinking water. We work with communities and strive to achieve our goal through the use of education, outreach, and advocacy. CWC has worked with low-income communities throughout the South San Joaquin Valley, and now Salinas Valley, for over 12 years. Many of the residents within these communities are undocumented and often filling important roles within the heart of agriculture industry in California. CWC's interest in the outcome of this case arises out of a concern that the inclusion of a "citizenship" question on the 2020 census will result in the significant under-counting of a portion of our country, and thus result in under representation for many Americans. Undocumented populations will be deterred out of fear for themselves and their families from either answering honestly as to their immigration status or from filling out the census at all, effectively and unfairly erasing them from our understanding of the makeup of our country's population. An inaccurate accounting will also result in many communities appearing less populated, causing an under representation at all levels of government and even less essential state and federal funding flowing to keep communities alive and grow their resiliency.

Incorporated in 1986, the **Grove Foundation** is dedicated to grant making in the areas of reproductive rights, safety net, immigration, environmental justice and civic engagement. The Grove Foundation has a particular interest in ensuring the rights of low income, unrepresented and marginalized people. The Grove Foundation's interest in the 2020 census centers around its concerns over a full and accurate count. The Grove Foundation believes that including the question will undermine the census count impacting representation as well as resource allocation for the communities we support.

The **Immigrant Legal Resource Center** (ILRC) is a national non-profit resource center on immigration law and policy. The ILRC is committed to the fair and humane administration of United States immigration laws and respect for the civil and constitutional rights of all persons. The ILRC's interest in this case stems from its work to promote civic engagement by immigrant communities. The ILRC also has full-time staff based in California's San Joaquin Valley that work with local immigrant communities and legal service providers. Inclusion of the citizenship question in Census 2020 will deter participation by immigrant community members and ultimately lead to diluted political representation and inadequate levels of federal funding. For a region like

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

the San Joaquin Valley, which has a large immigrant population and some of the highest levels of poverty in the state, this would have dire consequences.

**The Jakara Movement** is a primary organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of Sikh-Americans, many of which are mixed-status. A "mixed-status family" is a family whose members include people with different citizen- ship or immigration statuses. One example of a mixed-status family is one in which the parents are undocumented and the children are U.S.-born citizens. The Jakara Movement's interest in the outcome of this case arises out of a concern that the inclusion of a Citizenship Question would have an adverse impact on Sikh-American immigrants and their families, including mixed status families, who would be disempowered by the loss of representation in the political process.

The **Latino Community Foundation** (LCF) is the premier statewide foundation focused on unleashing the power of Latinos in California. LCF fulfills its mission by building a movement of civically engaged philanthropic leaders, investing in Latino-led organizations, and increasing political participation of Latinos. LCF believes that the U.S. Census is a cornerstone of our democracy. It is responsible for distributing $76 billion in federal funds to California annually and ensures our fair political representation. An accurate count is necessary for California's Latino community to assert their rightful claim to tax dollars to build necessary infrastructure, schools, and access to healthcare—among other things. The census also secures political voice and representation at the federal level. The citizenship question on the next census will disincentivize Latinos from participating in the 2020 Census. Latinos across California, especially the undocumented community, are fearful and anxious over how their response to this question be will be used. Research has already validated these assertions. A January 2018 poll commissioned by LCF showed that over 50% of California's Latinos believe that their responses to the census might be shared with immigration authorities. Moreover, a recent survey from the San Joaquin Valley Health Fund showed that only 25% of undocumented immigrants in the San Joaquin Valley would respond to a census that includes a citizenship question. For LCF, it is imperative that a citizenship

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

question is left off the census because politicizing the census by adding a citizenship question would do great harm to the future of our state and nation.

**Leadership Counsel for Justice and Accountability** (Leadership Counsel) is a not-for-profit 501(c)(3) organization based in the San Joaquin Valley and Eastern Coachella Valley. Leadership Counsel works with lower income, majority Latino communities and neighborhoods in the San Joaquin and Eastern Coachella Valleys on issues related to neighborhood health and community sustainability including access to housing, safe drinking water, and transit. Leaders from the under-resourced neighborhoods struggle each day to draw state and federal resources to their communities to address decades of underinvestment in their neighborhoods, to improve public health, and increase access to economic opportunity. They also work hard to ensure fair representation in decision-making bodies from city hall to Congress. A census undercount would undermine the work that communities throughout the San Joaquin Valley and the state are engaged in to secure resources for basic services and infrastructure and fair representation by government, thereby threatening community health, well-being, and economic opportunity.

The **National Immigration Law Center** ("NILC") is the primary national organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and advanced policies that reinforce our nation's values of equality, opportunity, and justice. NILC's interest in the outcome of this case arises out of a concern that the inclusion of a citizenship question in the 2020 Census will have an adverse impact on low-income immigrants and their families because it will lead to a undercount of these communities, which would then be disempowered by loss of representation in the political process and disadvantaged by a reduction in necessary services.

Founded in 1976, **Radio Bilingüe** (RB), is California nonprofit based in Fresno, California. RB is a trusted, ethnic, community media platform broadcasting particularly to indigenous migrant communities, farm workers, mono-lingual Spanish-speakers and other hard to reach populations, and across multiple generations. Radio Bilingüe has 3 full power FM radio stations that serve the entire San Joaquin Valley 24/7 and an additional 3 radio stations

10

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

in California, and an additional 8 full power FM radio stations in Arizona, New Mexico, Colorado and south Texas; RB also has 9 translators.  RB's programming for the San Joaquin Valley is on-air 24/7, and includes coverage of local and national news, public affairs and cultural issues, as well as rapid-response broadcasting to relay urgent updates or to clarify misinformation circulating in communities.

The vast majority of Radio Bilingüe's public radio listeners are Latinos in mixed-immigration-status families including native-born citizens, naturalized citizens, legal and undocumented residents and new immigrants. RB listeners are primarily Spanish-speaking, but also from Mixteco- and Triqui-speaking indigenous communities, who are among the poorest in California. Considering this profile, and from audience surveys, RB knows that very few listen to traditional English language public radio and deeply trust the news and information broadcast by RB.

In recent months RB has heard from many in its audience through its live interactive radio talk shows that they are not likely to participate in the Census count if there is a citizenship question on the questionnaire. Radio Bilingüe has hosted academic researchers on our information radio platforms that have done research on the prospects of Latino participation if there is a citizenship question on the Census form; the results are not encouraging. Many Latinos will not participate. The prospects of Latinos, the largest racial group in the San Joaquin Valley, not participating would be devasting. The Latino population is relatively young with the Latino community having about two thirds of the children or more; the majority population of all residents in the San Joaquin Valley depend on MediCal for their healthcare; there is deep poverty in the Valley. Fresno, which is Radio Bilingüe's headquarters, has among the poorest zip codes in the nation and the highest concentration of children living in poverty. Since the Census data will be used in the allocation of significant programs serving the poor in health care and programs for children, the nonparticipation by Latinos will be seriously detrimental.

**Sierra Health Foundation** is a private foundation whose mission is to improve the health and quality of life for all who live in a 26-county Northern California region. The foundation relies heavily on census and American Community Survey data for our own planning, grant-making, and

engagement with grantees and philanthropic and community partners. The foundation is one of 18 funder partners of the San Joaquin Valley Health Fund, a project of The Center for Health Project Management, Sierra Health Foundation's 501(c)(3) public charity. Given the important role census data has in federal (and state) program funding and political representation, and the data implications for advancing the foundation's mission and service to communities in need, the foundation is a significant stakeholder in this litigation. Sierra Health Foundation believes strongly that the inclusion of a citizenship question on Census 2020 would deter non-citizens, relatives and other community members throughout the United States from responding to the census, thereby detrimentally impacting the health and wellbeing of millions of children and families.

The **United Farm Workers Foundation** (UFW Foundation) is a dynamic nonprofit organization established in 2006 with the core purpose of empowering communities to ensure human dignity. UFW Foundation serves over 90,000 immigrants annually through a holistic approach; UFW Foundation provides critical services and engage our constituents in systemic change to break the cycle of poverty. UFW Foundation's regional offices—located in the San Joaquin Valley region and other regions in the state of California— are safe havens that provide resources and services such as credible immigration legal advice and act as hubs for educational outreach and organizing. The UFW Foundation's interest in the outcome of this case is of great concern as this will disproportionately negatively impact our members who are farm worker families, low-income immigrants, immigrants with disabilities and persons of color. UFW Foundation believes that adding this question to the census is a racist stunt that will have dangerous consequences for all of our families, friends, and neighbors as it continues to exacerbate the rhetoric of hate. Farm working and immigrant families in the Central Valley are not only vital to our economy and food security; they are also vital to our communities. UFW Foundation believes that it is crucial that a citizenship question is not included in the Census.

**Westside Family Prevention Services Network** (WFPSN) is a non-profit, grassroots CBO headquartered, for the past twenty years, in the agricultural city of Huron, California. WFPSN's mission is family strengthening and it works to prevent child abuse. It operates two Neighborhood Resource Centers, one in Huron and another in a nearby community

1  with similar demographics, Coalinga, and provides home visiting services for vulnerable families

2  in sixteen, similar, rural communities on the West side of Fresno County. The Citizenship Question

3  will result in a severe undercount in the rural, agricultural communities of West Fresno County. If

4  these communities are undercounted they will lose representation in the political process, and they

5  will lose the social and human services upon which they depend for survival like access to quality

6  and affordable health care, parenting and life skills trainings, resume and employment assistance,

7  and crisis management services for victims of violent crime.

8       *Amici* have a significant stake in this case, and their brief highlights the new research on

9  the impact of the proposed Citizenship Question on the San Joaquin Valley and to California as a

10  whole. For the reasons stated above, *amici* respectfully request that the Court grant their motion to

11  file a brief as *amici curiae*.

12  Dated: February 1, 2019          Respectfully submitted,

13            /s/Nicholas Espíritu

14            Nicholas Espíritu
          National Immigration Law Center

15            3450 Wilshire Boulevard, #108-62
          Los Angeles, CA 90010

16            Telephone: 213-639-3900
          Email: espiritu@nilc.org

17

18            Attorney for *Amici Curiae*

19

20

21

22

23

24

25

26

27

28

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

1

## CERTIFICATE OF SERVICE

2

3      The undersigned certifies under penalty of perjury under the laws of the United
States and the laws of the State of California, that on the 1st day of February, 2019, the
foregoing document will be served electronically upon registered participants identified
on the Notice of Electronic Filing.

4

5

6      *Attorney for Amici*                    By /s/Nicholas Espíritu
                                                Nicholas Espíritu

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, FOR LEAVE
TO FILE BRIEF AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

1
2  Nicholas Espíritu* (SBN 237665)
3  National Immigration Law Center
   3450 Wilshire Boulevard, #108-62
4  Los Angeles, CA 90010
   Telephone: 213-639-3900
5  Email: espiritu@nilc.org

6  Attorney for *Amici Curiae*

7
8
9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11 **STATE OF CALIFORNIA, by and through**      3:18-cv-01865
   **Attorney General Xavier Becerra,**
12                                              **BRIEF OF CENTRAL VALLEY**
              Plaintiff,                        **IMMIGRANT INTEGRATION**
13                                              **COLLABORATIVE, UNITED FARM**
                                                **WORKER FOUNDATION,**
14       v.                                     **NATIONAL IMMIGRATION LAW**
                                                **CENTER, ET AL. AS** *AMICI CURIAE*
15 **WILBUR L. ROSS, JR., in his official**     **IN SUPPORT OF PLAINTIFFS**
   **capacity as Secretary of the U.S. Department**
16 **of Commerce; U.S. DEPARTMENT OF**
   **COMMERCE; RON JARMIN, in his official**   Dept: 3
17 **capacity as Acting Director of the U.S. Census**  Judge:  The Honorable Richard G. Seeborg
   **Bureau; U.S. CENSUS BUREAU; DOES 1-**     Trial Date:  January 7, 2019
18 **100,**                                     Action Filed:  March 26, 2018

19            Defendants.
20
21
22
23
24
25
26
27
28

---
BRIEF OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................................. ii

INTRODUCTION .......................................................................................................................... 1

INTERESTS OF AMICI CURIAE ................................................................................................. 2

ARGUMENT ................................................................................................................................. 4

I.    The SJVCRP Research Demonstrates that the Proposed Citizenship Question Will Cause a Significant Undercount of Immigrant and Latino Populations in the San Joaquin Valley Region and Throughout California ...................................................... 4

    A.    SJVCRP Research Design ............................................................................ 4

    B.    Inclusion of the Proposed Citizenship Question Will Significantly Reduce First and Second-Generation Latinos' Willingness to Respond to the 2020 Census ....................................................................................................... 6

    C.    Inclusion of the Proposed Citizenship Question Will Lead to a Significant Undercount of Latino Populations in the San Joaquin Valley Region and throughout California ................................................................................ 8

II.    The SJVCRP Research Demonstrates that Inclusion of the Proposed Citizenship Question Will Frustrate Census Bureau Efforts to Mitigate Non-Responsiveness .. 11

    A.    The Inclusion of the Proposed Citizenship Question Decreased First and Second-Generation Latinos' Willingness to Respond to an Enumerator Who Came to the Door ................................................................................ 12

    B.    The Inclusion of the Proposed Citizenship Question Decreased First and Second-Generation Latinos' Willingness to Respond to Enumerator Who Requests for Proxy Interviews ............................................................... 13

CONCLUSION ........................................................................................................................... 13

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

4

Karen R. Humes, Nicholas A. Jones, & Roberto R. Ramirez, *Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs* .................................................1

5

*HTC 2020: Mapping Hard to Count (HTC) Communities for a Fair and Accurate 2020 Census* .................................................................................................10

6

*HTC 2020 California* .................................................................................11

7

8

Edward Kissam, Richard Mines, Cindy Quezada, Jo Ann Intili, and Gail Wadsworth, *Census Response Among San Joaquin Valley Latino 1st and 2nd  Generation Immigrants: Findings from the San Joaquin Valley Survey and Implications for Census 2020* ...................................... passim

9

10

Edward Kissam, *A Cascade Model: How Latino Immigrants' Lowered Response Will Lead to Differential Undercount in Census 2020* ............................................................ passim

11

Terri Ann Lowenthal, *Race and Ethnicity in the 2020 Census*: *Improving Data to Capture a Multiethnic America* .................................................................................10

12

*Merriam-Webster Dictionary*.......................................................................1

13

14

Michael Wines, "Critics Say Questions About Citizenship Could Wreck Chances for an Accurate Census", *New York Times,* Jan. 2, 2018...........................................................3

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# INTRODUCTION

Amici Curiae submit this brief to present the Court with recently published (January 2019) research[1] addressing whether the inclusion of the Citizenship Question[2] on the 2020 Census will lead to an undercount of immigrant and Latino[3] populations in San Joaquin Valley region and the State of California as a whole. The issue in this case is whether Defendants' decision to include the Citizenship Question on the 2020 Census violates the Administrative Procedures Act and Enumeration Clause of the Fourteenth Amendment. Whether the inclusion of a Citizenship Question will impact the undercount of discrete populations is central to both of these claims.

Since one out of four potential census respondents in the San Joaquin Valley are immigrants, concern about the consequences of a serious census undercount of immigrants in this region is very high. To understand how prevalent this concern will be, the San Joaquin Valley Heath Fund launched the San Joaquin Valley Census Research Project ("SJVCRP") to provide data-based insights into the impact the Citizenship Question would have on immigrant household census response throughout the region. To determine this impact, the SJVCRP conducted interviews of first and second-generation Latino immigrants in the San Joaquin Valley region—

---

[1] Exhibit A (Edward Kissam, Richard Mines, Cindy Quezada, Jo Ann Intili, and Gail Wadsworth, *Census Response Among San Joaquin Valley Latino 1st and 2nd Generation Immigrants: Findings from the San Joaquin Valley Survey and Implications for Census 2020), https://www.shfcenter.org/assets/SJVHF/SJVCRP_Survey_Findings_Report_011819_Web.pdf* (last visited January 31, 2019) and Exhibit B (Edward Kissam, *A Cascade Model: How Latino Immigrants' Lowered Response Will Lead to Differential Undercount in Census 2020*, *available at https://www.shfcenter.org/assets/SJVHF/SJVHF_Census_Cascade_Model_Report_012519_Web.pdf* (last visited January 31, 2019).

[2] *See* ECF 12 ¶ 3.

[3] "Latina", "Latino" and "Hispanic" are used interchangeably herein to refer to the group designated by the U.S. Census Bureau as "Hispanic." Specifically, the interchangeable terms "'Hispanic or Latino' refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Karen R. Humes, Nicholas A. Jones, & Roberto R. Ramirez, *Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs,* 1, 2 (March 2011) https://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (last visited January 31, 2019). The gender-neutral term "Latinx" is also used to refer to this population. *See also generally*, "Latinx", *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/Latinx (last visited January 31, 2019) (defining "Latinx" as a gender-neutral alternative to "Latino" or "Latina").

1

throughout the eight counties of Kern, Fresno, Kings, Tulare, Madera, Merced, Stanislaus, and San Joaquin.

The results of this survey research demonstrate that inclusion of the proposed Citizenship Question will cause a significant decrease in the willingness of first and second-generation Latino immigrant households to respond to the 2020 Census, which will in turn invariably lead to a significant reduction in 2020 Census participation rates for these populations. Moreover, inclusion of the proposed Citizenship Question will undermine the effectiveness of the primary remedial mechanism utilized by the Census Bureau: follow-up visits by enumerators and proxy interviews by enumerators that attempt to account for non-responsive households. Ultimately, this research further confirms that, because the Citizenship Question will diminish the response rates of non-citizens and their citizen relatives, the San Joaquin Valley region, and California as a whole, will be dramatically impacted by a 2020 Census undercount resulting from the inclusion of the Citizenship Question.

## INTEREST OF AMICI CURIAE

Amici are community organizations, philanthropic institutions, and service providers who are focused on ensuring that the all Californians—including those in the San Joaquin Valley—are able to live in fully represented, fully resourced, empowered, and healthy communities. Amicus Curiae are:

Blue Shield of California Foundation

The California Endowment

California Pan-Ethnic Health Network

California Rural Legal Assistance Foundation

California Wellness Foundation

Californians for Pesticide Reform

Central Valley Immigrant Integration Collaborative

Community Water Center

Grove Foundation

Immigrant Legal Resource Center

2

1    Jakara Movement

2    Latino Community Foundation

3    Leadership Counsel for Justice and Accountability

4    National Immigration Law Center

5    Radio Bilingüe

6    The Sierra Health Foundation

7    United Farm Workers Foundation

8    Westside Family Prevention Services Network

9    Differential undercount in the decennial census is a critical public policy concern. Any

10   such undercount will lead to a misallocation of census-driven federal and state funding and

11   inequitable political representation. Overcoming differential undercount of racial/ethnic minorities

12   has been a challenge throughout the history of the U.S. Census. There has been widespread and

13   well-justified alarm about the U.S. Department of Commerce's plans to add a Citizenship Question

14   to the decennial census, which will undoubtedly exacerbate this problem. In the ten months since

15   the Secretary of Commerce announced his decision to add the proposed Citizenship Question,

16   broad public consensus has underscored the grave concern that his decision would decrease Census

17   2020 response rates among non-citizens more than among U.S.-born citizens.[4] Given the San

18   Joaquin Valley region and California's relatively high proportions of Latino and immigrant

19   populations as compared to the rest of the Country, the San Joaquin Valley region and California

20   will ultimately be disproportionately harmed by any resulting undercount of these populations.

21   Moreover, adding the proposed Citizenship Question will likely have more than simply

22   fiscal implications. The transformation of the decennial census from a civic ritual of affirmation—

23   securing an accurate picture of the U.S., a "mirror of America"—into an exercise in government-

24   sponsored efforts to diminish the importance of immigrants and blur our vision of a diverse

25   American nation, will take a severe toll on civic life. The damage wrought by efforts to add the

26

27   _____

28   [4] *See e.g.* Michael Wines, "Critics Say Questions About Citizenship Could Wreck Chances for an Accurate Census", *New York Times,* Jan. 2, 2018, https://www.nytimes.com/2018/01/02/us/census-citizenship-status-immigrants.html.

3

proposed Citizenship Question to Census 2020 will negatively impact a wide range of immigrant integration initiatives. The State of California itself, through legislative and regulatory action, along with a multitude of public institutions in California and the San Joaquin Valley, have worked for decades to effectively integrate immigrants into community life. A 2020 Census with the proposed Citizenship Question—widely recognized as a proxy for an inquiry into immigration status—will only serve to undermine the decades of work that public institutions throughout California have invested in this mission, accelerating rapid growth in government distrust and disengagement, and will only further foment community disappointment and anger regarding anti-immigrant policies.

## ARGUMENT

### I.   The SJVCRP Research Demonstrates that the Proposed Citizenship Question Will Cause a Significant Undercount of Immigrant and Latino Populations in the San Joaquin Valley Region and Throughout California

The findings of the SJVCRP research builds upon a growing body of research to improve understanding of how the proposed Citizenship Question may impact California's San Joaquin Valley. The findings from survey data collected from Latino immigrants and their social networks in eight (8) San Joaquin Valley counties show that adding the proposed Citizenship Question to the 2020 Census is expected to have a major impact in suppressing the 2020 Census response among San Joaquin Valley Latino immigrants. This will lead to a differential undercount of Latino households in the San Joaquin Valley and a subsequent decrease in the census-based estimates of the overall population in the region, ultimately leading to disparities in political representation and allocation of government sourced program funding.

### A.  SJVCRP Research Design

The SJVCRP research contributes to the existing research on potential non-responsiveness to the 2020 Census by looking into the willingness of different sub-populations of Latino immigrants to respond to a 2020 Census with the proposed Citizenship Question. The SJVCRP research also makes a unique contribution to the prior research on the proposed Citizenship Question's impact, in that the methodology consisted of interviews with immigrant community members via face-to-face discussion with interviewers who are mostly immigrants like

4

1  themselves. Moreover, the discussions took place in the real-world street-level environment of
2  day-to-day life in local communities.[5]

3       The interviews were conducted in the San Joaquin Valley region. This area has a population
4  slightly more than 4.2 million persons, about 900,000 of whom are foreign-born. Ex. A at 10. The
5  region's population is projected to grow to about 4.6 million by 2020. *Id.* Slightly more than half
6  (52%) of the San Joaquin Valley's entire population is of Hispanic origin and about seven out of
7  ten foreign-born residents in the region are of Mexican or Central American origin. *Id.* Latino
8  immigrants are less likely to have naturalized than immigrants of other national origin, so they
9  make up more than eight out of ten (84%) of the region's non-citizen population that is 18 years
10  of age or older. *Id.* About 20% of the region's overall adult population 18 years of age and older
11  are adult Latino foreign-born, *i.e.*, first-generation immigrants. *Id.* Another 15% of the region's
12  adult Hispanic population 18 years of age or older are the U.S. born adult children of foreign-born
13  Latinos, *i.e.,* second-generation immigrants. *Id.* In terms of immigration and citizenship status, the
14  SJVCRP estimates that about two out of five in the adult foreign-born Latino population (about
15  8.5% of the region's entire adult population 18 years of age or older) are undocumented Latino
16  immigrants, while slightly less than a third of the foreign-born Latino adults (5.3% of the overall
17  adult population in the region) are legal residents. *Id.* at 11.

18       The SJVCRP conducted interviews with 414 Latino survey respondents in 104 venues in
19  31 communities in the San Joaquin Valley region. These respondents lived in households in 66
20  San Joaquin Valley cities and towns throughout the region, and sampling at places where
21  immigrants and people in immigrant social networks congregate was designed to assure
22  geographic and sociological diversity in the sample, as well as to assure inclusion of respondents
23  who might be living in hidden or unconventional housing. About one-third of respondents reside
24  in urban neighborhoods in major cities such as Bakersfield, Visalia, Fresno, Merced, Modesto, and
25  Stockton. The remaining majority of respondents live in medium-size towns such as Porterville,

26

27
28       [5] Thus, this research model complements the studies performed by Plaintiffs' expert Dr.
Matt Barreto, who examined propensity to respond to a 2020 Census with the proposed Citizenship
Question in a telephone survey, with a different research methodology.

5

Selma, Orange Cove, Madera, Merced, in small rural communities such as Dinuba, Huron, Kettleman City, Woodlake, Firebaugh, and remote rural unincorporated areas such as Cantua Creek in Fresno County, Stratford in Tulare County, and Stevinson in Merced County.

The survey respondents are sociologically and demographically representative of the San Joaquin Valley population of foreign-born Latino immigrants and their social networks—most importantly with respect to legal status/citizenship. Overall, more than one-third (37%) of the all the survey respondents are undocumented and more than one-quarter (27%) are legal residents. One-quarter (24%) are U.S.-born citizens (second-generation children of immigrants), and 12% are naturalized citizens.

A central question for the SJVCRP research was the proportion of Latino immigrants and U.S.-born adult children of immigrants (second-generation) willing to respond to the 2020 Census—without and with the proposed Citizenship Question, either through self-response or through an interview with an enumerator. The SJVCRP research compared willingness to respond without or with the proposed Citizenship Question as a quantitative indicator of the impact of adding the proposed Citizenship Question.

**B. Inclusion of the Proposed Citizenship Question Will Significantly Reduce First and Second-Generation Latinos' Willingness to Respond to the 2020 Census**

SJVCRP interviewees were asked, as a baseline, what their willingness to respond to the census would be without the proposed Citizenship Question. The vast majority (84%) of survey respondents said they were willing to answer the census without the proposed Citizenship Question, while 10% said "maybe", and 6% said they would not answer the census. Ex. A at 14-15. Subsequently, after securing responses about "baseline" willingness to respond to the census without a proposed Citizenship Question, interviewers asked the survey respondents about their willingness to participate in the Census if it were to include the proposed Citizenship Question. Adding the proposed Citizenship Question greatly decreases overall willingness to respond to the census, dropping the willingness to respond rate by nearly half, to 46%, for all respondents. *Id.* at 14.

6

BRIEF OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

| Willingness to Self-Respond to the Census or Enumerator Interview With and Without the Citizenship Question by Demographic Subgroup | | |
|---|---|---|
| *Willingness to Respond* | *Willing to Respond to Census <u>without</u> the CQ* | *Willing to Respond to Census <u>with</u> the CQ* |
| Undocumented (N=147) | 80% | 25% |
| Legal Residents (N=108) | 85% | 63% |
| Naturalized Citizens (N=44) | 89% | 70% |
| U.S.-Born Citizens-Second-Generation (N=97) | 89% | 49% |

One major finding was that the impact of the proposed Citizenship Question was not confined to non-citizens. Second-generation Latino immigrants, U.S.-born citizens, were also much less willing to answer the census if it were to include the proposed Citizenship Question, than the naturalized citizens. *Id.* at 15.[6]

Accordingly, adding the proposed Citizenship Question would irrevocably undermine the accuracy and reliability of census data in Latino immigrant communities. As is further explained in Section I.C., the resulting non-response rate among undocumented Latino immigrants would undoubtedly reduce the numbers enumerated and would likely result in a significant undercount of the Latino population in the San Joaquin Valley by at least 11.7%, a gross margin of error that will severely skew census data on race/ethnicity and result in a misrepresentation of the demographic profile of the population in the region. Ex. A at 4, 24, 25.

---

[6] Indeed, 34% of Latino U.S.-born citizens and 16% of Latino naturalized citizens respondents were "pushed" from outright willingness or potential willingness to definitive unwillingness to respond to the census due to the addition of the proposed Citizenship Question. Ex. A at 16. These findings further reinforce Dr. Barreto's findings that increased levels of non-response will extend to citizen households, particularly Latino-citizen households. ECF. 140 ¶ 337.

7

### C.  Inclusion of the Proposed Citizenship Question Will Lead to a Significant Undercount of Latino Populations in the San Joaquin Valley Region and throughout California

The San Joaquin Valley region, despite its broad distribution among major urban centers, medium-size communities, and small rural towns, will have a total population of about 4.6 million people in 2020, making it much larger than many major urban areas such as Chicago, Illinois or Houston, Texas, and comparable in population to the City of Los Angeles. Thus, differential undercount in the San Joaquin Valley needs to be understood not only as a regional concern but, also, as an issue of statewide and national concern. The SJVCRP survey results show that adding the proposed Citizenship Question to Census 2020 is likely to have a major impact in suppressing census response among San Joaquin Valley Latino immigrants and their social networks, which comprise more than one-third of the region's total population.

The compromised willingness to respond to Census 2020, in combination with other factors such as omission of low-visibility housing units from the Census Bureau's address list, language and literacy barriers, and lack of internet access for online response, will create a "cascade" of errors that will almost certainly result in severe differential undercount of Latino households in the San Joaquin Valley and therefore decrease the census-based estimates of the overall population in the region. Ex.  B at 16-24.[7] The SJVCRP, by providing key information on the numbers and

---

[7] These estimates utilized a "cascade" model of census undercount developed to understand how dramatically increased levels of non-response among certain populations in certain community contexts would be transformed into differential undercount. Census non-response does not immediately translate into undercount, in part because the Census Bureau has traditionally worked hard to implement a methodological strategy designed to compensate for survey non-response during the non-response follow-up ("NRFU") process. Nonetheless, the research literature demonstrates that census data quality is continuously eroded in communities where there are high levels of non-response among some sub-populations, despite the Census Bureau's best efforts to secure complete enumeration. This is because, when confronted with high levels of household non-response, the Census Bureau is forced to rely on additional operational and statistical procedures—most notably, proxy interviews, recourse to administrative records, and, finally, imputation, to generate published tabulations of raw census data. Each of these efforts, while partially compensating for non-response, introduces errors into the eventual tabulations of census data that provide the official basis for apportionment and for allocation of federal funding. For a full discussion of the cascade model utilized in the SJVCRP research and reports *see generally* Exhibit B.

characteristics of households not likely to respond, provides an empirical basis for determining the severity of the undercount and how much it will skew the demographic and socioeconomic profile of San Joaquin Valley communities. By the conservative estimations of this modeling, the aggregate undercount of first and second-generation Latinos in the San Joaquin Valley will be 11.7%. This will lead to an overall 4.1% undercount of the population of the San Joaquin Valley in the 2020 Census. Ex. A at 24.

**Cascade Model Estimate of San Joaquin Valley Undercount in Latino Immigrant Networks**

| San Joaquin Valley Latino Sub-Population as Defined by Status | Undercount for Sub-Populations | Impact on Overall San Joaquin Valley Census Count |
|---|---|---|
| Non-citizens-Undocumented | 21.1% | -1.8% |
| Non-citizens-Legal Residents | 7.5% | -0.4% |
| Foreign-born-Naturalized Citizens | 5.9% | -0.4% |
| U.S.-born -Second-Generation | 10.3% | -1.5% |
| **Aggregate Impact- Undercount of First and Second-Generation Latinos** | **11.7%** | **-4.1%** |

The resulting patterns and extent of the undercount can be expected to create significant disparities in allocation of federal (and state) census-driven program funding.[8] The projected level of 11.7% undercount among immigrant Latinos and their social networks reaches a level that some

---

[8] The differential undercount of the immigrant Latino population would also seriously skew the racial/ethnic profile of the San Joaquin Valley region and, consequently, undermine the reliability of detailed demographic and socioeconomic data collected in the American Community Survey ("ACS") over the post-censal decade from 2021-2030, causing a ripple effect in the margin of error, further degrading and calling into question the accuracy of citizen voting age tabulations, due to unreliable tabulations of responses to the Citizenship Question, the underrepresentation of the Latino population as a whole, and serious uncertainties about the age profile of the population. Ex. A at 26; *see also discussion infra* ("a projected level of 11.7% undercount among immigrant Latinos and their social networks reaches a level that some experts would consider to be indicative of a 'failed' census.").

BRIEF OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

experts would consider to be indicative of a "failed" census.[9] With a decennial census undercount of close to 188,000 Latino immigrant persons in the San Joaquin Valley region alone—the fiscal impact will result in a significant loss of at least $198 million dollars per year in federal funding for the region—a total of almost $2 billion over the post-censal decade from 2021-2030. Ex. A at 25.

Extrapolated to California at large , the impact of the proposed Citizenship Question on first and second-generation Latinos would cause an aggregate undercount of 900,000 to 1.3 million Californians. Ex. B at 21. At this level of undercount, California would be very likely to lose at least one Congressional seat from Hispanic/Latino immigrant undercount alone, and even more if one considers the balance of "hard to count"[10] U.S.-born and foreign-born persons in California.

---

[9] These findings are generally consistent with the findings of Plaintiffs' experts, Dr. Matthew Barreto and Dr. Bernard Fraga. Dr. Barreto found that the Citizenship Question will reduce self-response, particularly of immigrants and Latinos. ECF. 140 ¶ 330. Dr. Barreto conducted a nationwide survey and concluded that the Citizenship Question would create a response drop-off of between 7.1 and 9.7 percent nationally and between 12.3 and 18 percent in the State of California, the biggest drop-off among all states. *Id.* Plaintiffs' expert Dr. Bernard Fraga estimated that, based on Dr. Barreto's survey results, the Citizenship Question would cause 12.51% of Californians not to be reported in the census self-response, and that this would be the largest proportional undercount of any state. ECF. 140 ¶ at 343.  Given that the extrapolations provided in SJVCRP's publications only pertain to first and second-generation *Latino* immigrants, the SJVCRP research indicates that if the percentage of nonresponse amongst Latino first and second-generation immigrants projected in the San Joaquin Valley remains consistent throughout the State, the total undercount in California will at the very least meet Dr. Fraga's estimations.

[10] "A census tract is considered hard-to-count ["HTC"] if its self-response rate in the 2010 decennial census was *73% or less*", *i.e.,* if its mail-return rate for self-responses are in the bottom 20% of 2010 mail return rates, the tract has no mail return rates, or a low statistical response score. *HTC 2020: Mapping Hard to Count (HTC) Communities for a Fair and Accurate 2020 Census, "*What is the 'hard to count' population and why does it matter?" (hereinafter, "*HTC 2020*"), https://www.censushardtocountmaps2020.us (last visited January 31, 2019) (emphasis in original).  "Historically, the census has undercounted young children, people of color, rural residents, & low-income households at higher rates than other population groups." *Id.;*  Terri Ann Lowenthal, *Race and Ethnicity in the 2020 Census*: *Improving Data to Capture a Multiethnic America* (Leadership Conference Education Fund, Asian Americans Advancing Justice, and NALEO Educational Fund, November 2014) at 17, http://civilrightsdocs.info/pdf/reports/Census-Report-2014-WEB.pdf (noting same).  Groups "with low self-response rates in prior censuses or census tests [also] include 'linguistically isolated' households; frequent movers; foreign born residents; [and] households below the poverty line", among others.  *HTC 2020*.  Moreover, "people who distrust government authorities and/or have been or could be targets of law enforcement or heightened surveillance may be less likely to respond to the census." *Id.*  For the 2020 Census, the HTC analysis would

10

Ex. B at 21.The corresponding fiscal losses would likely range from $970 million to $1.5 billion per year during the decade from 2021-2030, unless there were to be provisions for statistical adjustment for the purpose of allocating federal funding. *Id.*

## II. The SJVCRP Research Demonstrates that Inclusion of the Proposed Citizenship Question Will Frustrate Census Bureau Efforts to Mitigate Non-Responsiveness

While the factors likely to lead to the significant undercount estimated by the SJVCRP are the result of numerous factors,[11] the research demonstrates that one major issue impacting the ability to address the potential undercount is that the inclusion of the proposed Citizenship Question carries dramatic impacts on the NRFU process to count the population that declines to self-respond. Specifically, if a household fails to self-respond to the census, after continued non-response to several reminders, an enumerator is asked to visit the non-responding household. When an enumerator tries to contact a non-responding household but fails to convince the householder to participate in an interview, the enumerator is instructed to attempt a "proxy interview" with a neighbor. The SJVCRP research demonstrates that the inclusion of the proposed Citizenship Question significantly raises already-high levels of non-response to enumerators' visits among these populations and decreases the accuracy and efficacy of Census Bureau efforts to enumerate the non-responding households by increasing "proxy interviews" about the household which could not be contacted or which refused.[12]

---

also include households without internet access.  *See id.*  Approximately 25% of California's current population, an estimated 9,741,425 people, live in HTC census tracts. *HTC 2020 California*,  https://www.censushardtocountmaps2020.us/img/mappdfs/California.pdf  (last visited January 31, 2019).

[11] Eventual census accuracy, with or without the proposed Citizenship Question, will rest in part on the Census Bureau's ability to effectively collaborate with concerned community groups in designing and implementing initiatives to overcome the chronic barriers to census participation. As the SJVCRP research shows, the inclusion of the proposed Citizenship Question substantially increases the difficulty the Bureau will have in mitigating these long-standing barriers to a full enumeration.  Ex. B at 23.

[12] Accordingly, the SJVCRP research corroborates Plaintiffs' experts' findings that the sensitivity of the proposed Citizenship Question will not only lead to higher failure to self-respond rates, but will also increase the likelihood that these same households will fail to respond to follow-up contacts. ECF. 140 ¶ at 351.

11

A. **Inclusion of the Proposed Citizenship Question Decreased First and Second-Generation Latinos' Willingness to Respond to an Enumerator Who Came to the Door**

SJVCRP survey respondents who had said they were not willing to self-respond to the census were asked if they would respond to an enumerator who came to the door. If contacted by an enumerator in the course of a census without the proposed Citizenship Question, slightly more than one out of four who were not inclined to self-respond (29%) said they would be willing to talk with the enumerator and slightly more said they might perhaps answer the door and the questions. Overall, slightly more than half were inclined to answer an enumerator's questions (*i.e.,* the "yes" and the "maybe" responses). Ex. A at 18.

However, with the proposed Citizenship Question added, those willing to respond to an enumerator who contacted them because their household had not previously self-responded declined sharply—from 29% down to 4%. Moreover, the proportion of respondents who said they would not talk to the enumerator at the door almost doubled—to 84%. The proportion of respondents who said they were uncertain as to whether they would respond to an enumerator visit decreased sharply—from 30% to 12%—if the proposed Citizenship Question ("CQ") were to be added (with the "maybe" responses pushed toward "no" responses). *Id.*

| Proportions of Latino Immigrants Not Inclined To Self-Respond Who Would Respond to a Follow-Up Visit by an Enumerator | | |
|---|---|---|
| **Would Respond to Enumerator** | *Census 2020 without the CQ (N=69)* | *Census 2020 including the CQ (N=170)* |
| Yes | 29% | 4% |
| No | 43% | 84% |
| Maybe | 30% | 12% |

The SJVCRP research clearly found that the proposed Citizenship Question has a clear negative impact on this mode of response as well as on initial willingness to self-respond. Thus, based on these responses regarding willingness to talk with enumerators, these NRFU efforts will likely fail to improve the already-low response rates.

12

### B.   Inclusion of the Proposed Citizenship Question Decreased First and Second-Generation Latinos' Willingness to Respond to Enumerator Requests for Proxy Interviews

Similar to the survey results related to attempts by enumerators to directly visit the household, the SJVCRP research shows extraordinarily low willingness to respond to enumerator requests for proxy interviews when the Citizenship Question is included. Even without the proposed Citizenship Question, only 19% of the Latino survey respondents were willing to participate in a proxy interview to provide information about their neighbors. Adding the proposed Citizenship Question significantly decreased this minimal willingness to provide any information about one's neighbors. With the proposed Citizenship Question, only 8% of the respondents said they would provide an enumerator with information about a neighboring household. Ex. A at 19. Thus, based on these responses regarding willingness to talk with enumerators, these NRFU efforts will likely fail to improve the already-low response rates.

## CONCLUSION

The survey conducted by the SJVCRP complements and corroborates the findings made by Plaintiffs' experts, demonstrating the dramatic negative impact of the proposed Citizenship Question on undocumented and mixed-status households' willingness to respond to the 2020 Census, as well as the remarkable impact dampening second-generation Latino immigrants' willingness to participate in the census at all. The SJVCRP research further demonstrates that the introduction of the proposed Citizenship Question will undoubtedly lead to a dramatic undercount of these populations that is not likely to be remedied by enumerator interviews. The result will lead to a statistically significant gross undercount of immigrant and Latino populations in the San Joaquin Valley region and the State of California, initiating a cascade of "proxy" mechanisms riddled with tabulation errors, further undermining census data accuracy and reliability, grossly skewing the demographic and sociological profile of the San Joaquin Valley region and the State of California as a whole, over the next decade. The result risks inaccurate apportionment, potential loss of Congressional representation, the loss of an estimated $970 million to $1.5 billion in federal funding for the entire population of California over the next decade—and, perhaps most significantly, an irreversible loss of public trust in the U.S. Census Bureau and in public

13

institutions—state, local, and federal—to adequately serve and remain responsive to the needs of the entire population.

Dated: February 1, 2019                    Respectfully submitted,

                                           /s/ Nicholas Espiritu
                                           Nicholas Espíritu
                                           National Immigration Law Center
                                           3450 Wilshire Boulevard, #108-62
                                           Los Angeles, CA 90010
                                           Telephone: 213-639-3900
                                           Email: espiritu@nilc.org

                                           Attorneys for *Amici Curiae*

BRIEF OF CENTRAL VALLEY IMMIGRANT INTEGRATION COLLABORATIVE, *ET AL.*, AS *AMICI CURIAE*, CALIFORNIA v. ROSS, CASE NO. 3:18-cv-01865

# EXHIBIT A

# San Joaquin Valley Latino Immigrants: Implications of Survey Findings for Census 2020

San Joaquin Valley Census Research Project
San Joaquin Valley Health Fund

By Edward Kissam, Richard Mines, Cindy Quezada, Jo Ann Intili and Gail Wadsworth









January 2019

The San Joaquin Valley Health Fund is managed by The Center at Sierra Health Foundation
with funding support from 18 state and national funders: Sierra Health Foundation,
The California Endowment, Rosenberg Foundation, The California Wellness Foundation,
W.K. Kellogg Foundation, Blue Shield of California Foundation,
Wallace H. Coulter Foundation, Dignity Health, Tides, Hellman Foundation,
The James Irvine Foundation, Convergence Partnership, Health Net,
The Grove Foundation, Werner-Kohnstamm Family Giving Fund, New Venture Fund,
Sunlight Giving and Heising-Simons Foundation.

To learn more about this unique community-first funder collaborative,
visit www.shfcenter.org/sjvhealthfund.

The San Joaquin Valley Health Fund census-related work is made possible with
the support from Sierra Health Foundation, Blue Shield of California Foundation,
Hellman Foundation, The James Irvine Foundation, The Grove Foundation,
Werner-Kohnstamm Family Giving Fund, New Venture Fund,
Sunlight Giving and Heising-Simons Foundation.

Access San Joaquin Valley Census Research Project reports online at:
www.shfcenter.org/sjvhealthfund
www.cirsinc.org/publications/current-publications

Dear Colleagues,

In 2020, the United States Census Bureau will conduct its decennial population census as required by the Constitution. The federal government and the states will use the resulting population enumerations to allocate funding in each state, county and community, as well as to determine equitable political representation. These high-stakes decisions must be based on complete and accurate data. Undercount is a controversial issue with each census, but the 2020 Census is at particular risk of undercount due to the Department of Commerce's plan to add a citizenship question.

There is widespread consensus that adding the citizenship question will suppress census response among low-income immigrant and minority-headed households, some of which include people who are not citizens. If there is an undercount of these residents, equitable access to a wide range of programs for which funding is allocated based on census-derived data is put at risk. Because an undercount affects the resources available for all, this issue is not just a concern for the immigrant population. It touches the region overall. Lack of access to these resources has a direct effect on community health and well-being, and political representation.

In 2014, we launched the San Joaquin Valley Health Fund in response to the severe disparities in health, social and economic outcomes experienced by communities of color and low-income people in California's San Joaquin Valley. Along with our 17 state and national funding partners, and more than 90 community partner organizations working on the ground in the San Joaquin Valley, we are committed to improving health and racial equity for all residents—including immigrants. Accordingly, we believe it is important to learn exactly how a census with a citizenship question would affect individuals and families in California, and particularly in the San Joaquin Valley, which is home to a significant percentage of the state's immigrant population.

The San Joaquin Valley Census Research Project is an effort supported by Sierra Health Foundation and eight of our funding partners. It was initiated to provide data-based insights into the impact the citizenship question would have on immigrant household census response throughout the region. This, the first of six working papers on consequences of adding the citizenship question to Census 2020, and other barriers to a complete count, presents key findings from the project's regionwide survey of and focus groups with 414 first- and second-generation Latino immigrants. Subsequent reports will present in-depth details, gathered from surveys and focus groups, on the perspectives of Latino and non-Latino immigrant communities.

We believe the findings in this report show that going forward with a decennial census that includes the citizenship question will have short-term and long-lasting negative health and social impacts on individuals, families and communities in the San Joaquin Valley. The research also provides insights about how advocacy, strategic collaboration, and outreach can help ensure a complete count for Census 2020 in hard-to-count communities.

Our hope is that this report and its companion reports will shine a light on the challenges we face in the coming year, and we encourage you to join with us and countless other concerned individuals and organizations to ensure that Census 2020 results in a fair and accurate count of all residents in the San Joaquin Valley, in California and throughout our country.

Chet P. Hewitt

President and CEO

Sierra Health Foundation

The Center at Sierra Health Foundation

# Foreword

The San Joaquin Valley is home to agriculture, technology and service industries, and to the people who spend their lives working in these industries, raising and educating their children, and caring for their loved ones. It's made up of about 18,000 square miles of land in eight counties. It is by far the most productive agricultural region in the U.S. and was home to almost 4 million people in 2017. These are people of diverse demographic profiles, but all of them contribute vastly to the success of the Valley and the industries and people living there. All of them, regardless of legal or economic status, depend on the services and funding provided as a result of an accurate census.

The California Institute for Rural Studies has done research based in community in rural areas of California for 42 years. We know how important the Census is to decision-makers and researchers. Allocating resources to our most vulnerable populations and providing information to and about these communities are dependent on full participation in the census. When the opportunity arose to lead a research project on how plans for Census 2020 might affect the health and well-being of the San Joaquin Valley, we were thrilled to do so, with Valley-based community members leading the work.

The research presented from the San Joaquin Valley Census Research Project builds on a growing body of research. The overall goal of this project is to improve understanding of how the citizenship question may impact California's San Joaquin Valley, a vast region with a large and diverse immigrant population. This report presents the findings from an analysis of initial survey data collected from Latino immigrants and their social networks in eight San Joaquin Valley counties. These survey results show that adding the citizenship question to the 2020 Census is expected to have a major impact in suppressing census response among San Joaquin Valley Latino immigrants.

Lack of willingness to respond to the 2020 Census, in combination with other factors discussed in this report, will most probably result in widespread differential undercount of Latino households in the Valley and a subsequent decrease in the census-based estimates of the overall population in the region. The resulting patterns and extent of undercount can be expected to create significant disparities in allocation of government-sourced program funding. The long-term effects of this differential undercount could seriously skew the data on the racial/ethnic profile of the San Joaquin Valley and, consequently, undermine the reliability of detailed demographic and socioeconomic data collected in the American Community Survey over the decade following the 2020 Census.

The conclusion reached from this research is that the damage from adding a citizenship question to Census 2020 will negatively impact a wide range of initiatives in the San Joaquin Valley and will undermine decades of work in immigrant integration. It will also accelerate an already rapidly growing distrust in the government. As one respondent explained, "It's not that the question bothers me but that there may be consequences."

California Institute for Rural Studies is grateful to our tireless research team. We especially value the work on the ground that Central Valley Immigrant Integration Collaborative (CVIIC) carried out. We could not have done this without them! Additional thanks to our generous funders through the San Joaquin Valley Health Fund.

Gail Wadsworth, Executive Director
California Institute for Rural Studies



CALIFORNIA
INSTITUTE FOR
RURAL STUDIES

# TABLE OF CONTENTS

Executive Summary … 1

Overview … 6

San Joaquin Valley Census Research Project Rationale … 7
    Prior Research on the Impact of the Citizenship Question on
    Response and Non-Response … 7

The San Joaquin Valley Survey Research Project Design … 7
    Factors Affecting Census Non-Response and
        Subsequent Undercount … 8
    Objectives of the Research … 9

The San Joaquin Valley Population … 10
    The Survey Sampling Matrix … 11
    The Latino Survey Respondents … 11

Key Findings … 13
Willingness to Respond to the Census Without or
  With the Citizenship Question … 13
    Baseline—Willingness to Respond to the Census
      Without the Citizenship Question … 13
    Impact of the Citizenship Question on Willingness to Respond … 14
    Overall Impact of the Citizenship Question … 14
    Impact of the Citizenship Question for Undocumented,
      Legal Residents and U.S. Citizens … 15
    Beyond Willingness to Estimating Eventual Response … 16
    Factors Affecting Eventual Propensity to Respond … 17
    Willingness to Respond to a Follow-up Enumerator
      Visit during Nonresponse Follow-up … 18
    Response to Enumerator Requests for Proxy Interviews … 19
    Implications of Reluctance to Participate in Proxy Interviews … 20
    Other Factors Affecting Likelihood of Enumeration … 20
      Mail Delivery … 21
      Internet Access … 21
      Respondents in Complex Households … 21
      English-Language Skills as a Constraint on Census Response … 22
      Language and Literacy as Dual Constraints … 23
      Prevailing Beliefs about Who Should Respond to the Census … 23
Projections of Differential Undercount and Aggregate Regionwide
  Undercount Based on Observed Patterns of Non-Response … 23

The Bottom Line: Serious Differential and Aggregate Undercount
  Throughout the Region … 25

Summary Conclusions … 25

Selected References … 27

Appendix A — Methodology … 29

References for Methodology Section … 37

## TABLES

Table 1—Characteristics of Foreign-born Latino survey respondents vs. San Joaquin Valley Foriegn-born Population 18+ … 12

Table 2—Educational Attainment-Latino Survey Respondents … 13

Table 3—Willingness to Respond: Latino Immigrants and their Social Networks … 14

Table 4—Latino Sub-Populations' Willingness to Respond to Census by Legal Status/Citizenship … 15

Table 5—Proportions of Latino Immigrants Who Were Not Inclined to Self-Respond Who Would Respond to a Follow-up Visit by an Enumerator … 18

Table 6—Self-Reported English-Language Skills: Latino Survey Respondents … 22

Table 7—Cascade Model Estimate of San Joaquin Valley Undercount in Latino Immigrant Networks … 24

## FIGURES

Figure 1—Proportions of Respondents Unwilling to Answer the Census if the Citizenship Question is Added … 16

Figure 2 – San Joaquin Valley Immigrant Internet Access … 21

# Executive Summary

## Overview: The Prospect of Census 2020 with a Citizenship Question

The San Joaquin Valley, a large and diverse region with dense immigrant settlement, faces major challenges as a result of efforts by the Department of Commerce to add a question on citizenship to Census 2020. Because federal and state funding throughout the post-census decade are allocated based on census-derived data and political representation is determined by a community's, county's or state's share of the national population, census fairness and accuracy is crucial to community well-being.

There is widespread consensus that adding the citizenship question will suppress census response among non-citizens and result in differential undercount of low-income immigrant and minority-headed households. However, although the research to date shows there would clearly be a serious problem and that states such as California would be disproportionately impacted, there have so far been only limited opportunities to project what the quantitative impacts would be at the community, regional and state levels.

## The Current Report

The San Joaquin Valley Census Research Project was initiated to provide data-based insights into the impact the citizenship question would have on immigrant household census response throughout the region. This first of six working papers on consequences of adding the citizenship question to Census 2020 presents key findings from the project's regionwide survey of and focus groups with first- and second-generation Latino immigrants. Subsequent reports will present in-depth details on survey respondents' and focus group perspectives in the Latino and non-Latino immigrant communities.

## The Survey and Focus Group Research

The eight-county San Joaquin Valley region has a current population of more than 4.2 million—more than major cities such as Los Angeles or Chicago—and a foreign-born population of more than 900,000. Slightly more than two-thirds of the region's foreign-born population are Latino immigrants. Moreover, the majority (52%) of the region's population are of Hispanic origin. The study population—first- and second-generation Latino immigrants 18+ years of age (representing the population of "householders" who would choose to respond or not respond to the census) make up more than one-third

(about 35%) of the San Joaquin Valley adult population.[1]

Survey data are drawn from face-to-face interviews by interviewers who are themselves immigrants, with 414 Latino respondents. Interviews took place in 31 communities throughout the region, in a range of venues frequented by the hard-to-count Latino population: remates (flea markets), parks, malls, laundromats, community celebrations, college campuses and community food distribution events. The survey was fielded during September and October 2018.

Because it is expected that response to Census 2020 with the citizenship question would be related to legal and citizenship status if the citizenship question is added, interviewers elicited information to determine status for each survey respondent to provide a basis for detailed analysis of patterns of non-response. More than one-third (37%) of the interviews were with undocumented respondents, 27% with legal residents, 12% with naturalized citizens and 24% with second-generation (U.S.-born) immigrants.

Focus groups were conducted with three sub-populations of Latino immigrants: indigenous-origin Mexican immigrants, DACA recipients, and young U.S.-born second-generation adults.

## Key Findings on the Negative Impact of the Citizenship Question on Latino Immigrants' Willingness to Participate in the Census

***Adding the citizenship question dramatically decreases willingness to participate in Census 2020.***
Most survey respondents (84%) were willing to respond to a "simple" census without the citizenship question, but if the citizenship question were added, only 46% said they would be willing to participate.

The Census Bureau's Census Barriers, Attitudes and Motivators Study research shows that actual response in Census 2010 was 10% lower than a sample of survey respondents had indicated when asked in 2008 if they were planning to respond. This implies a San Joaquin Valley census self-response rate no higher than 40%. This is much lower than the 52.3% observed in the 2018 end-to-end test and the Census Bureau's expectation of an overall 60% self-response rate in 2020.

1 Data on the Latino immigrant population are drawn from the 2017 American Community Survey. The first- generation (foreign-born) Latino immigrants 18+ make up 20% of the San Joaquin Valley population. The second-generation immigrants are the adult children of foreign-born parents. Census Bureau research shows they make up close to one-third of the Hispanic population nationally. We estimate they make up 15% of the region's population.

***Willingness to respond to a census with the citizenship question varies greatly by legal and citizenship status.***
As might be expected, adding the citizenship question had the greatest impact on undocumented immigrants' willingness to respond. Only 25% said they would participate in a census with the citizenship question.

Although they have status, legal residents' willingness to respond would also be dramatically reduced from an enthusiastic 85% willingness to participate in a simple census (as it was in 2010) down to 63%. Naturalized citizens, having initially expressed enthusiasm about census participation, were also pushed toward not responding by the citizenship question—down from 89% willingness to 70%.

In contrast to the widespread expectation that adding a citizenship question would only affect the response rate among non-citizens, the second-generation Latino immigrants, grown U.S.-born citizen children of foreign-born parents, initially very enthusiastic about census participation also were strongly pushed toward non-response. Their willingness to respond decreased from 89% to 49%.

Survey respondents' comments show that practical concerns about the confidentiality of household information provided to the Census Bureau being shared and used to adversely impact households was widespread.

However, just as important as practical worries about misuse of census data, there was widespread anger and disapproval about the government having added the question. Many of the second-generation U.S.-born Latino citizen survey respondents considered the citizenship question to be divisive and racist.

Few of the survey respondents saw the prospect of answering a census with the citizenship question as an isolated one. Instead, they saw the question as another piece in a panorama of anti-immigrant rhetoric, policy decisions and immigration enforcement actions by the federal government. Many who were aware of the census as the process of counting the U.S. population questioned the rationale for an intrusive personal question about citizenship status.

## Response to proxy interviews as part of non-response follow-up
An important part of the census enumeration process is for enumerators to go to neighbors to try to secure a proxy interview about the size and characteristics of a household that has failed to self-respond and which has not been successfully contacted. These proxy interviews usually account for 25% to 30% of the enumerations of households that failed to self-respond, were not home when the enumerator stopped by or who refused to respond to an enumerator.

Survey respondents were adamant that it was not their place to provide information about their neighbors—under any circumstances. Even when considering a census without the citizenship question, only 19% were willing to provide information about their neighbors. In the eventuality of a census with the citizenship question included, only 8% said they would provide information about a neighboring household.

Considerations entering into respondents' thinking about providing information about their neighbors to a census enumerator included a widespread shared perspective that census information belonged to each household. It also included a practical concern that neighbors would be angry if their information were shared. There was widespread concern that providing such information might adversely affect undocumented neighbors. And, finally, respondents said that they did not know much about some of their neighbors, so their ability to do a proxy interview, even if they might be willing to do so, was uncertain.

***Structural Barriers to an Accurate Census Count in San Joaquin Valley Latino Immigrant Communities***
In addition to respondent motivation, additional structural factors are causes of undercount. The study examined several of these factors.

## Mail delivery
Invitations to respond to the census online and paper census form are mostly delivered by the U.S. postal service—except in areas designated as "Update/Leave."

More than one-quarter (28%) of respondents said they did not have standard mail delivery to the door or a household mailbox. One out of eight (13%) said they only received mail at a PO Box. Another 12% said they only got mail at a mailbox they shared with others. The remaining 3% said they either had no mail delivery or had some other arrangement, such as getting mail at a relative's house.

Those with only a PO Box will not get census mailings, which go to housing units with city-style addresses. Those

who share mailboxes or get mail at neighbors' houses may not be recognized by the Census Bureau as being a separate distinct household.

## Internet access

A major element in the Census Bureau's re-engineering of census processes for 2020 has been to encourage online census response. This has many benefits, but also serious drawbacks stemming from lack of Internet access and/or lack of digital literacy among the first-generation immigrant households.

One-quarter (24%) of the Latino immigrant survey respondents lack Internet access. The most prevalent mode of Internet access is via cell phone.

Internet access is closely related to age. While more than 90% of the respondents 25 years of age or younger had Internet access, less than 20% of the older respondents (65+) did. This presents a challenging problem because the older householders, many of them naturalized citizens or legal residents, are the demographic group most willing to respond but least able to respond online.

Use of tablets, laptops or desktop computers to access the Internet is much lower than cell phone access. This is a particularly important consideration vis-à-vis response mode for the large 46- to 64-year-old demographic group in which cell phone access is more than 80%, but where access via computer or tablet is available to only about 30% of the households.

Design for Internet response mode will need to have a robust, user-friendly interface easily usable by respondents with relatively low levels of literacy and digital literacy going online using their cell phones.

## Enumerating Complex Households

The survey found that a very high proportion (22%) of the Latino immigrants live in complex households where multiple families live under the same roof or at properties where there are multiple low-visibility hidden and/or unconventional dwellings and a single street address. Although census form instructions tell the householder to include everyone living at a place on their census household roster, the Census Bureau's own research and comments from respondents in the current survey show that "extra people" who are not part of the core household/budget social unit will usually not be included.

For several decades, there has been—and continues to be—a conflict between Latino immigrant (and other) groups' conceptualization of "household" and the Office of Management and Budget's residence rules governing Census operations. These conflicts will persist, but could be addressed helpfully with explicit interviewer training and collaborations with community groups to persuade households to include other non-family members in their census response. Such efforts will be made much more challenging in the context of a census with the citizenship question because, in many cases, some of the doubled-up families in a complex household are undocumented.

## Language and Literacy as Dual Constraints on Census Response

The San Joaquin Valley Census Research Project survey secured information on each respondent's educational attainment and English-language ability. Analysis showed that more than one-third (37%) of the first-generation Latino immigrants have only an elementary school education and know only a little English or no English. They will have serious difficulties in responding to the census—either online or by filling out and returning a paper form sent to them.

As is the case with respect to online response, the problem is that the households headed by the least-educated, limited-English-speaking immigrants are those of legal permanent residents, a sub-population relatively oriented toward census participation but constrained in following through due to these barriers to census participation.

Although the Census Bureau did a good job in 2010 in getting bilingual census forms to the Spanish-speaking households in the San Joaquin Valley where no adult spoke English (linguistically isolated households), one-quarter did not receive the bilingual form.

A practical priority in efforts to assure the highest possible level of census response will be to provide in-person questionnaire assistance, since the Census 2020 redesign does not include physical Questionnaire Assistance Centers. If there were an adequate level of community engagement, sending bilingual/bicultural digitally literate community navigators (mobile questionnaire assistance teams) out to offer assistance to low-literate, limited-English-speaking households could make a significant contribution to lowering response barriers.

## Heightened Levels of Non-Response Will Result in Serious Differential Undercount Throughout the San Joaquin Valley

Patterns of census non-response do not immediately translate into undercount because Census Bureau operational teams work hard to implement a methodological strategy to compensate for non-response during the non-response follow-up process.

Although each stage of the Census Bureau's enumeration process will meet with some success, widespread non-response will lead to errors and, ultimately, census omission. This cascade of errors will erode data quality and seriously distort the Census Bureau's reporting on the size and demographic characteristics of the San Joaquin Valley region.

Incorporating the San Joaquin Valley Census Research Project survey findings into a "cascade model" explains how multiple factors, including both propensity to respond and the structural barriers to census participation (such as uneven mail delivery of census material, limited Internet access, limited literacy and English-language ability) are transformed into differential undercount. The model provides a sound, but conservative, estimate of eventual undercount in the region.

The model also makes it possible to see the extent of differential undercount among sub-populations of Latino immigrants. This estimate is provided in Figure 1.

### FIGURE 1—ESTIMATE OF SAN JOAQUIN VALLEY UNDERCOUNT OF LATINO FIRST- AND SECOND-GENERATION IMMIGRANT POPULATION

| San Joaquin Valley Latino Sub-Population as defined by status | Undercount for Lation Sub-Populations | Impact on overall San Joaquin Valley Census Count (% undercount in sub-population X sub-population as % of region) |
|---|---|---|
| Undocumented | 21.1% | -1.8% |
| Legal residents | 7.5% | -0.4% |
| Naturalized citizens | 5.9% | -0.4% |
| U.S.-born generation | 10.3% | -1.5% |
| Aggregate impact— undercount of first and second-generation Latinos | 11.7% | -4.1% |

*Technical details on components and coefficients used in the cascade model are presented in a companion report to this one, "A Cascade Model Explaining How Latino Immigrants' Non-Response To Census 2020 is Transformed into Regional Undercount," San Joaquin Valley Health Fund, January 2019.

To place the projections presented here in historical context, the officially acknowledged Hispanic undercount in Census 2010 was 1.54%, while the non-Hispanic White overcount was 0.8%.[2] Differential undercount of minorities has persisted in the decennial census for many decades, but no census in the past half-century has had an undercount of a minority population of more than 10%.

## Regionwide Impacts of Latino Immigrant Undercount

### Population undercount and fiscal impacts

The regionwide undercount of Latino immigrants can be expected to decrease the aggregate Census 2020 San Joaquin Valley population count by about 188,000 persons. The fiscal impact of this aggregate undercount can be expected to be about $200 million per year—simply from the Latino undercount. Unfortunately, since decennial census data are used in allocation of funding for many federal programs, the eventual impact would be more than $2 billion over the decade from 2021-2030.

In general, the patterns of undercount identified in the San Joaquin Valley Census Research Project survey will also shift census-driven funding away from smaller, rural municipalities that have higher proportions of foreign-born Latinos toward urban areas, exacerbating pre-existing tensions. At the county level where many social programs are administered, the varying proportions of foreign-born Latino adults suggests that Madera, Merced and Tulare counties will be disproportionately affected by the patterns of undercount identified in the research because they have higher proportions of foreign-born Latino non-citizens than other counties in the region.

It must also be stressed that the cascade model of census undercount is conservative because it does not seek to quantify the extent to which Census Bureau operational shortcomings, such as inability to hire enough enumerators to handle the increased non-response follow-up workload, from greatly increased levels of non-response may affect enumeration. Inability to hire culturally and linguistically competent local enumerators who can persuade undecided households that they should respond may further compromise census accuracy.

2 Mule T. 2010 "Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States," Decennial Statistics Studies Division, U.S. Census Bureau, May 2012.

## Consequences of expected undercount for equitable political representation

Undercount of Latino immigrants has a direct and significant impact on political equity within the San Joaquin Valley region because representation in the California Legislature and configuration of legislative districts also relies heavily on decennial census data for apportionment. Jurisdictions with higher proportions of Latino non-citizens would be disproportionately affected.

Ironically, one of the consequences of the skewed demographic profile that would result from adding the citizenship question to Census 2020 is that the reliability of citizen voting-age population tabulations that the Department of Commerce has alleged would be improved by adding the citizenship question to the decennial census would be seriously degraded. Adding the citizenship question not only degrades the reliability of data on citizenship status. It also makes profiles of the racial/ethnic composition and age structure of communities, crucial elements in Voting Rights Act enforcement, inaccurate. In communities, counties, regions and states with higher than average concentrations of Latino immigrants, census-derived racial/ethnic profiles at every geographic level would be skewed to so as to dilute the voting power of Hispanics.

## Consequences for immigrant integration and civic life

Adding the citizenship question has more than simply fiscal and political implications. It transforms the decennial census from a civic ritual of affirmation—a collaborative effort to secure an accurate picture of the U.S., a "mirror of America"—into an exercise in government-sponsored efforts to diminish the importance of immigrants and blur our vision of a diverse American nation. This will take a toll on civic life.

There is already widespread distrust of the federal government and diversity of opinion within Latino immigrant networks about the usefulness of becoming engaged in civic life. Census 2020 with a citizenship question will fuel the growth of a mindset Census Bureau researchers describe as "cynical and suspicious," while eroding the numbers who fall into mindsets broadly defined as "dutiful and local-minded" and "compliant and caring."

Many in the Latino immigrant community believe that adding the citizenship question provides clear-cut evidence of federal government animus against Latinos, specifically those of Mexican origin. This is a harbinger of further weakening of bridging social capital—the ability of diverse individuals and groups in a community to overcome differences and work together to improve community well-being.[3]

## In Summary

Proceeding with a politicized decennial census—widely understood by Latino first- and second-generation immigrants as compromising a potentially attractive collective endeavor, the process of "standing up and being counted" to assure one's community gets its fair share of federal funding and equitable political representation—will further erode already-wavering trust in government.

Going forward with a decennial census that includes the citizenship question will have short-term and long-lasting negative impacts on individual, household and community well-being in the San Joaquin Valley.

Community stakeholders will need to work diligently during the spring of 2019 to assure the citizenship question is removed from the 2020 decennial census by summer 2019, when the Census Bureau needs to move forward and begin printing census forms.

Even if the citizenship question is removed from the census, it will still be necessary to work energetically and strategically to restore Latino (and other) immigrant communities' willingness to participate in a census when so many questions have arisen about the federal government's commitment to faithfully carrying out its constitutional mandate to conduct a fair and accurate census.

3 The overall community impact on all groups' social life— "hunkering down" as Robert Putnam calls it—despite being gradual and insidious, is a serious concern.

# Overview

Differential undercount in the decennial census is a major public policy concern. An undercount results in misallocation of census-driven federal and state funding and inequitable political representation.[1] Overcoming differential undercount of racial/ethnic minorities and sociologically defined sub-populations (such as pre-school age children, migrant and seasonal farmworkers, young African-American men) has been a challenge throughout the history of the U.S. Census.

Just as importantly, differential undercount skews the demographic and socioeconomic profiles of the U.S. population. The accuracy of the American Community Survey, the primary source of detailed information for the nation, as well as for states and local communities, rests on the accuracy of underlying data from the decennial census. This affects a broad range of organizational planning and decision-making in the public and the private sectors.

Research on differential undercount has seldom focused explicitly on the undercount of immigrants, although major urban areas with concentrations of immigrants such as New York City, Houston and Los Angeles have long been aware of the problem, and have sued the Census Bureau to secure statistical adjustment for the undercount of minority households.[2]

Nonetheless, although there is consensus regarding a census undercount of immigrants, the Census Bureau has not provided an estimate of the magnitude at any point. We face a completely new situation at this point in time as a result of the Commerce Department's efforts to add a citizenship question to Census 2020. Longstanding concerns about chronic undercount in communities and states with the most immigrants have ramped up, because adding the citizenship question to the decennial census has long been an important strand in anti-immigrant strategies.[3] Confronted with this possibility, it is important to gain a solid understanding about how such a question might affect the accuracy of census enumeration of immigrants.

The San Joaquin Valley Census Research Project was designed to provide crucial insights about the perspectives held by immigrants and others in their social networks about Census 2020, and to explore their willingness to respond to Census 2020—in the event that the decennial census goes forward with a citizenship

question proposed by the Department of Commerce, or in the event the question is left off the questionnaire. These insights then provide a basis for projecting patterns of differential undercount in 2020. The project's research also explores other factors affecting undercount, such as the prevalence of complex households, mail delivery and Internet access in the region.

The overall project research involves interviews and focus groups with a broad spectrum of immigrant populations in the San Joaquin Valley. This report presents the findings from an analysis of survey data collected from Latino immigrants and their social networks from August 29, 2018, to October 21, 2018. One companion report presents details from analysis of comments and responses to probes about census response with a discussion of implications for message development and census promotion. Another report analyzes how the elevated levels of non-response initiate a "cascade" of operational problems that, despite the Census Bureau's best efforts, transform non-response into differential undercount.

A subsequent report will present findings from interviews with San Joaquin Valley non-Latino immigrants—primarily Hmong, Mien, Cambodian, Punjabi and Arab immigrants. The final report on Census 2020 undercount in the region will weave together quantitative analyses of survey data, analysis of qualitative data from conversations with survey respondents and focus groups to probe deeper into the distinctive perspectives of the full spectrum of diverse San Joaquin Valley immigrant sub-populations.

---

1 Reamer A. "Counting For Dollars: The Role of the Decennial Census in the Geographic Distribution of Federal Funds" https://gwipp.gwu.edu/counting-dollars-role-decennial-census-geographic-distribution-federal-funds

2 There is a body of valuable research on enumeration of sub-populations including immigrants stemming from a Census Bureau research initiative in connection with Census 1990. This program of ethnographic alternative enumeration developed by the Census Bureau's Center for Survey Methods Research generated a number of excellent studies, some of which focused on undercount of immigrants. They were summarized in several papers (De la Puente 1992, De la Puente 1993) and individual research monographs are posted online. Particularly illuminating ones for understanding Latino immigrant undercount include a study by Sarah Mahler of undercount of Salvadorans on Long Island (Mahler 1992), of Mexicans in New York City (Dominguez and Mahler 1992) and one of Guatemalans in Houston (Hagan 1992). There are also several analyses of migrant and seasonal farmworker undercount—relevant since most farmworkers are Mexican immigrants (see Montoya 1992, Gabbard, Martin, and Kissam 1993, Kissam and Jacobs, 2007, and Kissam, 2012). Analysis by William P. O'Hare has been very important in documenting the undercount of Hispanic children under 6 years of age—in general and among minority populations (O'Hare 2016, O'Hare 2013).

3 January 23, 2017, draft memo by Andrew Bremberg, Assistant to the President and Director of the Domestic Policy Council, proposing an Executive Order on "Protecting American Jobs" shows the Trump administration was exploring the possibility of adding a question, not only on citizenship status but also one on immigration status immediately after the inauguration. Subsequent e-mails between Chris Kobach and Secretary of Commerce Wilbur Ross, as well as Ross's e-mails to his staff, show that the idea was pursued throughout 2017, well before he proposed adding the citizenship question (CQ) on March 26, 2018.

# San Joaquin Valley Census Research Project Rationale

There has been widespread and well-justified alarm about the Department of Commerce's plans to add a citizenship question to the decennial census. Six former Census Bureau directors, survey research experts, scientific associations, philanthropy networks, cities and counties, and community service and advocacy organizations all wrote to Secretary of Commerce Wilbur Ross to strongly recommend against this plan. Nonetheless, Secretary Ross announced his decision to add the question on March 26, 2018. Subsequently, notices to a Federal Register request for comments on overall Census 2020 operations (including the addition of the citizenship question) generated further opposition from experts—most notably the National Academy of Science's Committee on National Statistics.[4]

The current research builds on previous research and analysis conducted by the Census Bureau and other researchers. This prior research is of high quality and provides a sound basis for concern about the impact of the citizenship question on census response rates. However, the available research has limitations due to the methodologies available to the researchers.

## Prior Research on the Impact of the Citizenship Question on Response and Non-Response

The Census Bureau itself first revealed the serious problems that might ensue from adding the citizenship question to the decennial census based on observations from focus groups in formal settings (Meyers 2017; Meyers and Goerman 2018).

Additional Census Bureau research in the Census Barriers, Attitudes and Motivators Study research program provides valuable insights into factors related to census non-response, but has some limitations stemming from the fact that its findings rest on a mail survey with a relatively low response rate of 35% (17,500 respondents from a sample of 50,000). The survey research findings are supplemented with information from 42 focus groups.

A third strand of prior research providing insights on the impact of the citizenship question stems from analysis of unit non-response in the American Community Survey, which does include a citizenship question. This research includes data analysis from internal Census Bureau research and external experts (O'Hare 2018).

In an apparent acknowledgement of the limitations of available research, the Census Bureau is planning to conduct a split-panel field test of a census questionnaire with and without the citizenship question during the summer of 2019.[5] Unfortunately, the results probably will not be available before the deadline to decide whether to print the Census 2020 questionnaires with or without the citizenship question.

# The San Joaquin Valley Survey Research Project Design

The San Joaquin Valley Survey Research Project has been designed to generate findings to build on important prior studies. The contribution made by the project to the body of research on the citizenship question's impact is that the analysis reported here and in companion reports stems from interviews with immigrant community members via face-to-face discussion with interviewers, most of whom are immigrants themselves. Moreover, the discussions were in real-world environments of day-to-day life in local communities and in immigrant-friendly settings.

The San Joaquin Valley Survey Research Project uses a time-space continuum sampling design. Interviews were conducted at a broad range of venues where immigrants congregate using a target sample matrix to approximate the distribution sub-populations of immigrants in the region (cf. Steuve, et al., 2001; Parsons, et al., 2008; Hall, et al. 2013; and Ott, et al., 2018, for good descriptions of the methodology; details in Appendix A).

---

4 Committee on National Statistics, "Letter Report on the 2020 Census," comments submitted in response to RE: FR Doc. 2018-12365, Proposed Information Collection; Comment Request; 2020 Census. Docket number USBC- 2018-0005, August 7, 2018.
5 The Census Bureau's summer 2019 split-panel research on the impact of the citizenship question on patterns of response envisions a large sample of 480,000 households (Terri Ann Lowenthal e-mail, December 6, 2018). Presumably, half of the households would receive the census form with the citizenship question and half would receive the form without it. However, the test will only test self-response, not cumulative response, i.e. it will not examine response to enumerator follow-up and proxy interviews—probably due to budget constraints. Unfortunately, this research is scheduled to take place after the decision on including the citizenship question or leaving it off will have been made. We do not know at this point whether the test will include over-sampling of non-citizen households, but this would be the expected research design.

## Factors Affecting Census Non-Response and Subsequent Undercount

Many factors give rise to census non-response and subsequent undercount (West 1988; West and Fein 1989). Potential respondents' level of motivation is a very important element in determining patterns of non-response and subsequent undercount. However, some who are motivated to respond may not have much of an opportunity to respond if they live in a housing unit not on the Census Bureau's address list. Others who wish to respond may find it difficult because the questionnaire is not in a language they know, or they may not read or write well. Or they may live in a complex household and deliberately be omitted by the householder (P1) who fills out the census form.

Therefore, several other factors also need to be considered in efforts to assure a fair and accurate census.[6] These include: completeness of the decennial census sampling frame, language, literacy, access to online modes for response, as well as aspects of Census Bureau operations that may lead to erroneous tabulation and reporting of census data (e.g. availability and accuracy of administrative records used in lieu of actual enumeration, accuracy of procedures for imputing the characteristics of non-responding households, data-editing of responses submitted via NID—non-ID processing of online responses from households in housing units not on the Census Bureau's address list that did not receive an invitation to respond or a mailed census form).

Consequently, the research reported in this paper was designed to go beyond examination of willingness to respond in order to secure data on additional factors contributing to non-response and subsequent undercount, including the following:

- living in a housing unit omitted from the Census Bureau's sampling frame,
- prevalence of "complex" multi-family households where people may be left off census responses,
- prevailing beliefs about who should be counted in the decennial census,
- low literacy/digital literacy as a barrier to census participation,
- limited availability of census forms in languages other than English for language minorities.

Designing the research to look closely at multiple barriers to census participation makes it possible for study findings to provide a sound basis, not only for advocacy about the citizenship question, but also to nurture reflection about how to move toward a simpler, more user-friendly census for immigrants, as well as pathways forward to develop innovative approaches to overcome major operational barriers to census response.

Members of the San Joaquin Valley Survey Research Project team have, for example, generated quantitative estimates showing the extent to which unconventional and hidden housing units omitted from the Census Bureau's Master Address File contribute to overall undercount in immigrant-dense communities in California. These findings, along with the current survey data, are included in the analysis.[7]

Other factors such as living in a complex household shared by several families, literacy and online access have been addressed in Census Bureau research (e.g. Schwede 2003 on complex households). Level and quality of Census Bureau staffing in different hard-to-count areas will also contribute to census non-response (Salvo and Lobo 2013).

Patterns of census non-response do not immediately translate into undercount, because Census Bureau operational teams work hard to implement a methodological strategy designed to compensate for household non-response during the non-response follow-up process. Therefore, the study does not simply examine self-response, but also subsequent stages and operational procedures in the census process.

This provides useful empirical evidence to generate solid estimates of undercount among different sub-populations via a "cascade" model that analyzes how the response rate at successive stages in the census enumeration process (self-response, response to enumerator visits, response to requests for proxy interviews, and availability of administrative records for non-responding households) contribute to undercount.

Using this empirical evidence, the model then goes on to examine how Census Bureau efforts to impute the size and characteristics of non-responding households introduce errors into the census count, along with deficiencies in the Census Bureau's sampling frame and systematic under-reporting among the households that do respond.

6  See James Christy's presentation to the California Complete Count Committee Meeting on December 3, 2018, for a summary overview of challenges to census operations.  The Census Bureau has acknowledged these multiple factors in a number of recent public presentations—to its advisory committees and in other fora.
7 Edward Kissam, Cindy Quezada, and Jo Ann Intili, "Community-Based Canvassing to Improve the Census Bureau's Master Address File: California's Experience in LUCA 2018", Statistical Journal of the International Association of Official Statistics, Vol. 35, December, 2018.

## Objectives of the Research

The overall San Joaquin Valley Census Research Project seeks to improve the field's understanding of how the citizenship question will affect a region that has been notably affected by the administration's policies vis-à-vis immigrants.[8] The objective is to inform strategic pro-census efforts by diverse stakeholders: statistical researchers, Census Bureau managers and operations supervisors, grassroots community advocacy groups, and local public and nonprofit immigrant service providers.

The research design used in the San Joaquin Valley Census Research Project provides a basis not only to measure the impact that adding a citizenship question might have on immigrant non-response, but also a basis to estimate the resulting differential undercount after the Census Bureau has attempted to compensate for non-response.

Central research questions explored in the study include the following:

- How willing are San Joaquin Valley immigrant households and those in their social networks to respond to Census 2020—with or without the citizenship question? How will region-wide response patterns vary among particularly vulnerable sub-populations (e.g. undocumented immigrants, households headed by persons with limited schooling)? This can provide a basis for a fine-grained analysis about variations in response from community to community and reasons for non-response within each sub-population.
- What beliefs, attitudes and prevalent perspectives in San Joaquin Valley immigrant communities about the purpose and meaning of the decennial census are likely to affect response patterns? Exploring these questions provides a useful foundation for effective design of messages and complements other ongoing research about messaging to promote census participation—in California and nationally.
- What are the geographic impacts of variations in the response rate of sub-populations likely to be undercounted? Analysis of variations of differential undercount among different sub-populations will provide a basis for understanding the resulting undercount in different counties in the region.

- How do expected levels of census participation in three distinct stages of census enumeration—self-response, response to follow-up by enumerators, and willingness to participate in proxy interviews to secure information on non-responsive households—affect eventual undercount?[9] This analysis is designed to ameliorate undercount by identifying pressure points where local collaboration can complement and enhance Census Bureau operations. It also will provide guidance in designing appropriately targeted census promotion messages.
- To what extent will immigrant response strategies to cope with the citizenship question, such as responding to the census but skipping the citizenship question or leaving some household members off the form, affect undercount?[10] This provides a basis both to understand how these problems affect undercount and how they degrade the quality of census-based demographic data.
- In aggregate, what can we project as likely undercount and skew in the demographic profile of the region and the state of California resulting from lowered response rates from households of immigrants and others in their social networks? This is crucial in determining the overall impact adding the question will have on census accuracy in the state.

There have now been six lawsuits filed to block the citizenship question. Plaintiffs in New York v. U.S. Department of Commerce include 16 state attorneys general. California Attorney General Xavier Becerra and the City of San Jose have filed a separate suit in California, while the Mexican American Legal Defense and Education Fund and the American Civil Liberties Union have filed in Maryland.[11] There are also several bills in Congress to

---

8  In the spring of 2018, there was a particularly high level of regional concern due to ICE detention efforts, including measures seen as targeting agriculture and farmworkers—early-morning roadside detentions and increases in employer I-9 audits.

9 The Census Bureau has devoted extensive research to predicting patterns of self-response to the decennial census—starting with the original hard-to-count score for census tracts and the subsequent low-response score predictor. This is because non-response follow-up is very expensive, but it does not provide the ideal basis for strategic intervention because self-response is only one of several factors contributing to undercount.

10 Analysis of item non-response in the American Community Survey (ACS) shows that skipping the citizenship question (CQ) is a relatively common phenomenon. William O'Hare's analysis of ACS non-response shows a level of CQ non-response of 7.7% for California overall, 8.1% for Asians, 7.4% for Hispanics, and 8.3% for foreign-born respondents and 11.6% for foreign-born Hispanics (O'Hare 2018). This sort of analysis is currently the primary source for assessing the impact of the CQ on decennial census response. However, it cannot provide definitive insights about the likely behavior of those who do not respond to the ACS. Recent analysis by Jacob Model of Community Connect Labs shows that CQ non-response was as high as 17.5% in some California census tracts (Jacob Model, personal communication, December 3, 2018).

11 The Brennan Center for Justice tracks progress in each case and publishes all filings in the cases at https://www.brennancenter.org/analysis/2020-census-litigation . Hansi Lo Wang at National Public Radio has also posted much of the evidence introduced to date (December 17, 2018) in the New York case.

prohibit the Department of Commerce/Census Bureau from adding the question because of the major negative impact it is expected to have on non-citizen census response. Recently, budget negotiations for Department of Commerce funding for FY2019 have included discussion of provisions to forbid the citizenship question from being included in Census 2020.

Whether or not ongoing litigation or congressional action is successful in blocking the administration's efforts to add the citizenship question to Census 2020, it is important to generate the best possible estimates regarding the real-world impact that adding the question, combined with other barriers to census enumeration, will have on differential undercount in Census 2020 and, consequently, on apportionment and equitable access to federal program funding.

The survey findings reported here detail the extent of response suppression among San Joaquin Valley Latinos, and show that adding the citizenship question seriously undermines census accuracy in the region, depriving the federal government, state government and other data users such as foundations and businesses a reliable statistical basis for allocating funding within the region and the state. The survey findings also provide an indicator of the extent to which Latino immigrant undercount in Census 2020 would disadvantage California and other states with higher-than-average numbers of foreign-born Hispanic immigrants. The final report will assess the impact for all immigrants in the region and augment the analysis with qualitative findings from focus groups.

# The San Joaquin Valley Population

The San Joaquin Valley region—made up of the eight counties of Kern, Fresno, Kings, Tulare, Madera, Merced, Stanislaus and San Joaquin—is one with dense immigrant settlement. Currently, it is estimated to have a population slightly more than 4.2 million, about 900,000 of whom are foreign-born.[12] The region's population is projected to grow to about 4.6 million by 2020.

Slightly more than half (52%) of the San Joaquin Valley's entire population is of Hispanic origin and about seven out of 10 foreign-born adult residents in the region are of Mexican or Central American origin. Latino immigrants

are less likely to have naturalized than immigrants of other national origin, so they make up more than eight out of 10 (84%) of the region's non-citizen population 18+ years of age.[13]

Potential census respondents are generally considered to be the population 18+ years of age, although, in some immigrant households, teenagers may sometimes be the actual respondent. For the purposes of determining the distribution of Hispanics/Latinos within the population of potential census respondents, we analyzed American Community Survey 2017 data on foreign-born Hispanics 18+ years of age in the region.

The 2017 American Community Survey data show that about 20% of the region's overall adult population 18+ years of age are adult Latino foreign-born, i.e. first-generation immigrants.[14] The vast majority of the Latino foreign-born adults are of Mexican origin, although there are some communities with significant numbers of Salvadorans. About 10% of the Mexican immigrant population is of indigenous origin—predominantly Mixtecs, Zapotecs and Triqui.[15]

Another 15% of the region's adult Hispanic population 18+ years of age are the U.S.-born adult children of foreign-born Latinos, i.e. second-generation immigrants.[16] Consequently, the San Joaquin Valley Census Research Project study population—Latino immigrants and their social networks—makes up slightly more than one-third (35%) of the entire adult population of the San Joaquin Valley—the universe of potential census respondents.[17]

12 Based on American Community Survey 2017 data.
13 Based on American Community Survey 2017 data. The region is important on the national map of the Hispanic population. The Pew Hispanic Center's analysis of the top 60 Hispanic metro areas in the U.S. ranks the Fresno metro area as #17, the Bakersfield metro area as #25, Visalia-Tulare-Porterville as #32, Stockton as #33, Modesto as #39, and Merced as #48. See Pew Hispanic Center, "Mapping the Latino Population by State, County, and City," August 2013.
14 We base our estimate of the proportions of the foreign-born Hispanic population 18+ years of age on tabulations of American Community Study 2017 data. However, it should be noted that mixed-status households are prevalent and an immigrant householders' census response will determine whether or not their U.S.-born children are enumerated or not. In some households, a naturalized or U.S.-born Hispanic citizen or non-Hispanic citizen may be reluctant to respond to the census due to concerns about implications for children or other relatives who lack legal status.
15 The National Agricultural Worker Survey has reported higher proportions of indigenous immigrants in the farmworker population in the past, but proportions may be decreasing. The definitive study of this population is Richard Mines, David Runsten, and Sandra Nichols, "California's Indigenous Farmworkers," 2010.
16 Census Bureau analysis of the generational profile of U.S. Hispanic population shows that 31.5% are second-generation. Therefore, we estimate that about 15% of the region's adult population are second-generation adult Hispanics since the 2017 American Community Survey data show that 47% of the San Joaquin Valley adult population are of Hispanic origin. In the San Joaquin Valley region and other areas of labor-intensive agriculture, this sub-population may actually be still larger due to the demographic bulge of Mexican immigrants, particularly farmworkers benefitting from the law's SAW provisions who settled in the region after 1986 passage of the Immigration Reform and Control Act.
17 For the purpose of estimating the size of the study population, defined as foreign-born Latinos and their social networks, we can only generate quantitative estimates of the first- and second-generation, i.e. U.S.-born adult children of Latino immigrants. In actuality, the Latino immigrant social networks also include significant, but difficult to quantify, numbers of non-Latino relatives, friends, neighbors and co-workers whose propensity to respond to the census may also be affected by the beliefs, attitudes and aspirations of Latinos.

In terms of immigration and citizenship status, we estimate that about two out of five in the adult foreign-born Latino population (about 8.5% of the region's entire adult population 18+ years of age) are undocumented Latino immigrants, while slightly less than a third of the foreign-born Latino adults (5.3% of the overall adult population in the region) are legal residents.[18] Slightly less than one-third of the foreign-born Latinos (6.2% of the overall adult population 18+ years of age in the region), are likely to be naturalized citizens.[19]

## The Survey Sampling Matrix

For the purposes of comparing the population targeted in the survey—Latino immigrants and their social networks—to the overall regional population, we considered the size and characteristics of Latino first-generation (i.e. foreign-born) and second-generation (i.e. U.S.-born children of foreign-born parents) immigrants in the region along with several key socioeconomic and demographic indicators: legal status, age, length of time in the U.S., educational attainment and gender.

It should, at the same time, be noted that the American Community Survey-derived population estimates, despite being the "gold standard" for demographic studies, are very likely to underrepresent Latino immigrants—particularly those living in low-income households.[20]

A detailed description of the survey methodology, including questionnaire development, information on the field research team, interviewer training and choice of venues, is presented in Appendix A to this report.

## The Latino Survey Respondents

The analysis in this preliminary report draws on interviews conducted with 414 Latino survey respondents in 104 venues in 31 communities. Survey respondents lived in households in 66 San Joaquin Valley cities and towns throughout the region. Sampling at places where immigrants and people in their social networks congregate was designed to assure geographic and sociological diversity in the sample, as well as to assure inclusion of respondents who might be living in hidden or unconventional housing. It achieved this objective.

About one-third of respondents live in urban neighborhoods in major cities such as Bakersfield, Visalia, Fresno, Merced, Modesto and Stockton. The rest live in medium-size towns such as, Porterville, Selma, Orange Cove, Madera and Merced, in small rural

communities such as Dinuba, Huron, Kettleman City, Woodlake and Firebaugh, and remote rural unincorporated areas such as Cantua Creek in Fresno County, Stratford in Tulare County and Stevinson in Merced County.

The survey respondents are sociologically and demographically representative of the San Joaquin Valley population of foreign-born Latino immigrants and their social networks—most importantly with respect to legal status/citizenship. Overall, more than one-third (37%) of the survey respondents are undocumented and more than one-quarter (27%) are legal residents. One-quarter (24%) are U.S.-born citizens (children of immigrants) and 12% are naturalized citizens.[21]

Almost all of the respondents are of Mexican origin, as are almost all Latino immigrants in the region.[22] Major Mexican migrant-sending states—Michoacan, Guanajuato, Oaxaca and Guerrero—are well represented in the sample. The survey sample also provides good representation of indigenous Mexican immigrants.[23]

An important consideration is that the San Joaquin Valley has been a migration destination for many decades because of the amount of agricultural employment available.

18 Our analysis refers to legal residents rather than legal permanent residents because there were a few respondents identified as having U visas. The sample also includes five DACA recipients who are tabulated as undocumented, although they are lawfully present. The foreign-born Latino population has relatively more undocumented adults than the other non-Latino immigrant groups because more of the (predominantly Mexican) Latinos have entered without inspection. More of the non-Latino immigrants have refugee status or some other sort of legal status. Our analysis considers Salvadorans with TPS status as being legal residents, although their status is threatened by current DHS plans to terminate TPS status for them by September 2019.

19 We use the 2017 American Community Survey-based estimate here and in our projection of the regional impact of Hispanic undercount. The survey data provides a direct 2017 estimate that 6.2% of the region's population 18+ years of age are naturalized Hispanic citizens and that 13.8% are non-citizens. The breakout of the non-citizens into those without legal status (8.5%) and legal residents (5.3%) is derived from Center for Migration Studies of New York estimates using American Community Survey 2012 and ACS 2015 data. The estimate of the size of the adult population of second-generation Latino immigrants—the grown children of first-generation or a foreign-born parent is based on U.S. Census Bureau analysis of the generational composition of the national Hispanic population and the American Community Survey-based estimate of Hispanic adults as % of the San Joaquin Valley population. If one takes into account presumed patterns of differential undercount among Hispanics in the American Community Survey, the proportion of naturalized citizens might be expected to be slightly lower, the proportion of legal residents slightly higher, and the proportion of undocumented Hispanic immigrants slightly higher also.

20 Kissam E. "Differential undercount of Mexican immigrant families in the U.S.", Statistical Journal of the International Association of Official Statistics. 2017.  This paper reviews the ethnographic literature on Latino immigrant undercount and incorporates Kissam's research on census undercount in 2010 in hard-to-count census tracts in farmworker areas of California, including many in the San Joaquin Valley.

21 The survey sample over-represents undocumented immigrants (48% of the foreign-born respondents), accurately represents legal residents (36% of the foreign-born respondents) and somewhat under-represents naturalized citizens (16% of the respondents). Of necessity, it also underrepresents U.S.-born second-generation adult children. Estimates of impact of non-response on resulting undercount weight subgroup responses to account for this.

22 Just under 4% of the sample are of Central American origin—El Salvador, Honduras or Guatemala, close to their numbers in the overall Latino population of the region.

23 The survey includes a question on country of birth, but interviewers were not required to secure information on state of origin. However, when respondents volunteered information about their state of birth in conversation with the interviewer, it was recorded. Many respondents are from the states of Oaxaca (12%) or Guerrero (1%) and a significant proportion of the Mexican immigrants from these regions are of indigenous origin. Moreover, two of the interviewers are immigrants of Mexican indigenous origin, so their observations also provide assurance that the important Mexican indigenous minority (about 10% of the Mexican population) was adequately represented. With unlimited resources, it might have been desirable to over-sample the sub-population of indigenous Mexican immigrants (as well as other ethnic/racial minorities). Such research could be conducted in 2019 if there were interest.

Consequently, the region's Latino immigrants are mostly long-term settlers. Due to post-2001 increases in border enforcement, there is a dwindling proportion of newcomers.[24] Pastor and Marcelli estimate that the average undocumented immigrant has lived in the U.S. for 12 years, legal residents on average 21 years and naturalized citizens 29 years. In the early 1990s, after the IRCA legalization program, many transnational migrants settled in the region, while others from their hometowns came north. After border enforcement escalated in 2001, the flow of new migrants began to decrease. It dwindled further with the 2007 recession. The aging of the Mexican population and progress in jobs creation also has dampened migration flows.

The Latino immigrants of all legal and citizenship statuses have much in common. Although many of those who have not been able to secure status remain more economically marginal, they are an important and integral part of civic life in communities throughout the region.

### TABLE 1—CHARACTERISTICS OF FOREIGN-BORN LATINO SURVEY RESPONDENTS VS. SAN JOAQUIN VALLEY FOREIGN-BORN POPULATION 18+

| CHARACTERISTICS | FOREIGN-BORN LATINO SURVEY RESPONDENTS | OVERALL SAN JOAQUIN VALLEY FOREIGN-BORN LATINOS 18+ |
| --- | --- | --- |
| Survey and region population | N=317 | 602,898 |
| % Undocumented | 49% | 42% |
| % Legal resident | 36% | 27% |
| % Naturalized citizen | 15% | 31%[26] |
| Average age—undocumented immigrant | 39 years | 31 years |
| Average age—legal residents | 50 years | 46 years |
| Average age—naturalized citizens | 52 years | 48 years |
| Time in the U.S.—undocumented | 16 years | 12 years |
| Time in the U.S.—legal residents | 31 years | 21 years |
| Time in the U.S.—naturalized citizens | 36 years | 29 years |
| Gender=female | 47% | 49% |

*Estimates of overall San Joaquin Valley immigrant demographic characteristics are from Manuel Pastor and Enrico Marcelli, "What's At Stake for the State: Undocumented Californians, Immigration Reform, and our Future Together", Center for Immigrant Studies, University of Southern California, 2013. The estimate of Hispanic foreign-born population 18+ is from ACS 2017 data. The estimate of distribution by legal/citizenship status is based on ACS 2017 data (for non-citizens and naturalized citizens) and CMSNY data for estimating the proportions of undocumented and legally resident non-citizens.

Table 1 compares the foreign-born Latino survey respondents to the overall population of Latino immigrants 18+ with respect to several important demographic and sociological characteristics.

As Table 1 shows, the profile of survey respondents closely resembles the Latino immigrant population of the Valley overall. Thus, their responses should provide reliable insights on the perspectives of the entire San Joaquin Valley adult population of first- and second-generation Latino immigrants 18+ years of age who face the task of responding to the census—the 20% who are foreign-born first-generation immigrants and the 15% who are the U.S.-born second generation adult children of immigrant parents.[25]

By design, the survey oversampled undocumented immigrants—since there has not been previous research providing a quantitative estimate of this sub-population's census participation or the impact of the citizenship question on their willingness to respond—although it is universally agreed they are the sub-population most likely to be deterred from response.[26] The project's design and reliance on local, mostly immigrant interviewers, made it possible to assure they were included.

The survey was quite successful in matching the profile of foreign-born Latinos in each legal/citizenship status, since length of time in the U.S. is likely to be linked to extent of assimilation/integration and, therefore, to perspectives on U.S. social issues. Since the Latino survey respondents are slightly older than the overall immigrant population, if there is age-based bias in the survey responses, it is likely to result in a slightly conservative estimate of the impact of the citizenship question because the older, longer-settled population, with a slightly higher proportion of naturalized citizens, is more integrated into civic life.

24 This is most clearly evident in an analysis of the California farm labor force from the National Agricultural Worker Survey (NAWS 2015) because it secures information on length of time in the U.S. for all respondents and has documented the decrease in new Mexican-born entrants to the California farm labor force. See also a recent report on declining immigrant population in the U.S. (Pew Hispanic Research Center, November 2018).
25 Nationally, almost one-third of Hispanics are second-generation immigrants. In the San Joaquin Valley, Hispanics are about half of the entire population of the region. Therefore, we estimate that about 15% of the San Joaquin Valley population are second-generation Hispanics.
26 San Joaquin Valley Census Research Project survey responses can, ultimately, be weighted to project patterns of overall non-response throughout the region and the state.

## Table 2—Educational Attainment-Latino Survey Respondents (N=414)

| Legal and citizenship status | Latino Survey Respondents' Educational Attainment | | | | |
|---|---|---|---|---|---|
| | 0-6 years school | 7-9 years school | 10-12 years school | Some college | Total |
| Undocumented | 56% | 18% | 21% | 5% | 100% |
| Legal resident | 60% | 17% | 17% | 6% | 100% |
| Naturalized citizen | 40% | 4% | 29% | 27% | 100% |
| U.S.-born citizen | --- | 6% | 30% | 64% | 100% |

Another factor relevant to the perspectives regarding census response is educational attainment. Table 2 shows the level of education differences for the undocumented, legally resident, naturalized citizen and U.S.-born citizen survey respondents. The survey respondents are very similar to the overall population in this regard.

As can be seen from Table 2, the legal residents and undocumented respondents in the sample are quite similar in terms of educational attainment, but many of the naturalized citizens have gone further in the education system—an important factor in their decision to apply for and successfully secure citizenship status.[27] As might be expected, many in the Latino second generation have a high school education or some college.[28]

# Key Findings

## Willingness to Respond to the Census Without or With the Citizenship Question

A central question in our research is the proportion of Latino immigrants and U.S.-born adult children of immigrants (second generation) willing to respond to the census—without and with the citizenship question. In this section, we describe study findings regarding patterns of non-response. Our analysis includes information on willingness to respond by citizenship and legal status. Comparing willingness to respond without or with the citizenship question provides a good quantitative indicator of the impact of adding the citizenship question.

## Baseline—Willingness to Respond to the Census Without the Citizenship Question

After asking survey respondents several initial questions to learn their beliefs about who should respond to the census, about their experience in the 2010 decennial census, and what they had already heard about Census 2020, interviewers went on to ask respondents about their willingness to answer the census.[29] A high proportion of respondents said they would be willing to answer the census without the citizenship question. Interviewers posed this question as follows.

*Q 4.1 The Census asks nine simple questions about you and the people you live with. For example, they ask—how many people live in the house where you live (even if they're not part of your immediate family), whether you're a renter or the homeowner. They also ask about race, names, ages and relationship with other people in your household....Knowing what the census asks about you, your family and others who may live there with you, would you answer? [coded by interviewer as Y/N/maybe and respondent comments and responses to probes noted in text box]*

The vast majority (84%) of survey respondents said they were willing to answer the census as it had been described to them, while 10% said "maybe" and 6% said they would not answer the census. This level of expressed willingness to respond is consistent with that reported in the Census Barriers, Attitudes and Motivators Study (CBAMS) survey in 2008 (86%), but substantially higher than in the 2018 CBAMS survey (67%). It should be recognized, however, that the CBAMS survey asked respondents whether they were "extremely" or "very" likely to respond to the census "if it were held today."[30] In contrast, the San Joaquin Valley Census Research survey asked simply if they would be willing to respond to Census 2020.

The comments, even at this point in the interviews, made by the 16% of the survey respondents who said initially they might not or that they certainly would not answer the census, were enlightening. About one-half of the already dubious respondents, when asked if they would explain the reasons for their decision, said they would be reluctant to participate due to potential government misuse of their

27 Low rates of naturalization among Mexican and Central American immigrants to the San Joaquin Valley stem in part from self-selection among the less-educated who opt not to apply. Statistically speaking, the rate of naturalization is strongly correlated with educational attainment. A detailed analysis by the Public Policy Institute of California (Johnson and Reyes 1999) showed that in 1997, the naturalization rate for immigrants with eight years or less schooling was 25%, while the rate for those with some college was 48%. Current naturalization rates are likely to be similar to the 1996-1997 ones where there was high motivation to naturalize due to the political threats posed by Proposition 187 in California and passage of IIRIRA in 1996.

28 The Pew Research Center reported in 2017 that, nationally, 47% of Hispanic high school graduates 18-24 went on to college. See John Gramlich, "Hispanic Dropout Rate Hits New Low, College Enrollment at a New High," September 29, 2017.

29 Few (3%) had yet heard about plans to add the citizenship question when the survey was conducted (September-October 2018). Most of those who had understood the question as being about immigration status.

30 Presentation by Young & Rubicam and Census Bureau, "2020 Census Barriers, Attitudes and Motivators (CBAMS) Survey and Focus Groups: Key Findings for Creative Strategy," October 31, 2018, Funders' Committee for Civic Participation/Census Funders Initiative webinar.

information, i.e. "no trust," "fear" or specific reference to government utilization of the information to target detentions of unauthorized immigrants ("too dangerous").

## Impact of the Citizenship Question on Willingness to Respond

Subsequently, after securing responses about "baseline" willingness to respond to the census without a citizenship question, interviewers asked the survey respondents about their willingness to participate in the census, if it were to include the citizenship question. The question was posed as follows to those who had previously said they would respond:

*Q. 5.1 The Census Bureau has proposed adding a question on citizenship to the census questionnaire. If this question were to be added, you would be asked if you and other people in your household are citizens or not....You've already said you'd answer the census, if the census included this question would you respond to the census completely?*

Respondents who had previously said they would not respond to the census were asked the question in a slightly modified form,

*Q. 5.1Alt. The Census Bureau has proposed adding a question on citizenship to the census questionnaire. If this question were to be added, you would be asked if you and other people in your household are citizens or not....I know you already told me you wouldn't answer the census but it's important to understand what you think about adding this question?. . [coded by interviewer as Y/N/maybe and respondent comments noted in text box]*

## Overall Impact of the Citizenship Question

As expected, we found that adding the citizenship question would have a dramatic impact on response rates throughout the Latino immigrant population and their social networks. Table 3 shows how adding the citizenship question would push potential respondents toward non-response.

The survey finding that about two out of five (41%) survey respondents would not be willing to respond to the decennial census with the citizenship question is almost four times greater than the previous published national estimate of citizenship question non-response based on analysis of item non-response to the American Community Survey (ACS) citizenship question, which shows a citizenship question allocation rate (i.e. number skipping the citizenship question) of 11.6% for Hispanic

### TABLE 3—WILLINGNESS TO RESPOND: LATINO IMMIGRANTS AND THEIR SOCIAL NETWORKS

| Willingness to Respond | Census 2020 *without* the CQ (N=407) | Census 2020 *with* the CQ (N=405) |
|---|---|---|
| Yes | 84% | 46% |
| No | 6% | 41% |
| Maybe | 10% | 13% |

*Percentage for valid cross-tabulations for responses to both Q. 4 and Q. 5. Rounded to nearest percent. Missing data for cross-tabulation of response to Q. 4 is 7 people (2%) and Q.5=9 people (2%). Willingness was coded as "yes" if a respondent said they would be willing to self-respond or, if unwilling to self-respond, if they would be willing to respond to an enumerator visit. The "no's" are those who would neither self-respond or respond to an enumerator.*

foreign-born ACS respondents.[31] However, a recent unpublished analysis of ACS item allocation rates for California for 2017 shows even higher levels of ACS item non-response to the citizenship question for foreign-born California respondents.[32]

The difference between the American Community Survey-based citizenship question allocation rate as an indicator of unwillingness to respond to a census with a citizenship question is likely due at least in part to the fact that the American Community Survey allocation rates, which are calculated based on those who were willing to respond to a Census Bureau survey that is even more burdensome than the decennial census.

The survey finding regarding decrease in willingness to respond if the citizenship question is included is dramatic—since the Latino immigrants' and those in their social networks' initially expressed willingness to respond to the census without the citizenship question was so high—even higher than the proportion of the general population in the Census Barriers, Attitudes and Motivators Study 2018 mail survey who said they were "extremely" or "very willing" to respond to the census. It indicates there will likely be very large disparities in willingness to respond, which may lead to total non-response from the household or omission of some persons in the household that will, in turn, give rise to undercount in communities with concentrations of Latino immigrants in the region resulting from inclusion of a question on citizenship.

31 At the national level, there is 11.6% non-response to the citizenship question among for-eign-born Hispanics. William P. O'Hare, "Citizen Question Nonresponse: Demographic Profile Who Do Not Respond To The American Community Survey Question," Georgetown Center on Poverty and Inequality, September 2018. Foreign-born Hispanics' responsiveness to the citizenship question may be higher than California Latinos' because it has a different mix of national origins.
32 Jacob Model, personal communication, December 10, 2018. Model's analysis graphs the distribution of foreign-born Californians' response to the ACS citizenship question by PUMA for 2015-2017. It shows most California foreign-born individuals' non-response in 2017 clustering around 10%—with rates up to 25% in a noticeable proportion of PUMAs. The shift in levels of non-response from 2015 and 2016 is statistically significant.

The survey result presented here makes an important contribution to currently available research due to the fact that the sample is made up of predominantly low-income Latino immigrants living in hard-to-count census tracts. It includes many who would not be willing or able to respond to a mailed or online survey, while research and analysis of patterns of response to the citizenship question in both the Census Barriers, Attitudes and Motivators Study and American Community Survey reports relies on this methodology.[33]

### Impact of the Citizenship Question for Undocumented, Legal Residents and U.S. Citizens

The San Joaquin Valley Census Research Project is unique in that the methodology was designed to permit candid communication between bilingual/bicultural, mostly immigrant interviewers and survey respondents so as to provide a basis to analyze differences in response among sub-groups based on legal status/citizenship.

Table 4 presents the survey findings about the Latino immigrant population's willingness to respond to Census 2020 without or with the citizenship question in relation to respondents' legal status/citizenship status.[34]

This more detailed understanding of patterns of response and non-response to a census with the citizenship question is useful both to examine how multiple factors—causes of census undercount—interact to give rise to differential undercount and in developing messaging strategies to encourage census participation. There is widespread agreement that the most effective messaging will be highly targeted, customized messaging, but the effectiveness of such a strategy rests on solid understanding of different sub-groups' beliefs, attitudes and aspirations.[35]

The findings in Table 4 have important implications.

The first is that the broad generalization currently prevailing in public dialogue about the citizenship question, that it will have little impact on U.S. citizens and only affect the response of non-citizens, is inaccurate. Willingness to respond varies substantially among non-citizen households.

Contrary to what is generally believed, Table 4 shows that the impact of the citizenship question is not confined to non-citizens. It also will have a major impact on the second-generation U.S.-born Latino citizens' response, even though it generally has been assumed that refusal to respond would be driven only by worries about breach of confidentiality and potential misuse of census data by immigration authorities. The second-generation Latino immigrants, U.S.-born citizens, were much less willing to answer the census if it were to include a citizenship question than the naturalized citizens (see Figure 1).

Secondly, Table 4 shows that adding the citizenship question has a much greater impact on undocumented immigrants' willingness to respond than on legal residents' and citizens'.  The fact that adding the citizenship question would cut undocumented immigrants' willingness to respond by two-thirds leaves no doubt that, if allowed, adding the question would irrevocably undermine the reliability of census data in Latino immigrant communities. The resulting non-response among undocumented Latino immigrants would be likely to reduce both the numbers enumerated and seriously skew census data on race/ethnicity and demographic profile of the population in the region. These distortions would ripple onward through the

### TABLE 4—LATINO SUB-POPULATIONS' WILLINGNESS TO RESPOND TO CENSUS BY LEGAL STATUS/CITIZENSHIP

| Willingness to Respond | Census 2020 *without* the CQ (N=406) | Census 2020 *with* the CQ (N=404) |
|---|---|---|
| Undocumented (N=147) | 80% | 25% |
| Legal residents (N=108) | 85% | 63% |
| Naturalized citizens (N=44) | 89% | 70% |
| U.S.-born citizens-second generation (N=97) | 89% | 49% |

*Missing cases for Q. 4=8 and missing cases for Q. 5=10

33 Previous quantitative analysis of the impact that adding the citizenship question might have on response rates, unavoidably, has needed to rely primarily on item non-response rates, i.e. skipping the question in the American Community Survey (ACS). This analysis is problematic, first of all, because item non-response is a relevant but imperfect indicator of unit non-response (not responding to a survey) and, secondly, because the ACS sample is likely to seriously underrepresent the hard-to-count populations that are the focus of the San Joaquin Valley Census Research study.

34 Legal/citizenship status was not directly asked, but was often volunteered in the course of interviewers' conversations with respondents, mentioned in the course of answering questions about reasons for deciding to answer or not answer the census. All respondents were asked place of birth and length of time in the U.S. This provided a basis to impute legal status/citizenship. Interviewers provided information on the basis for their assessment of respondents' status—direct or indirect. Status determination made by interviewers was subsequently reviewed by research analysts Ed Kissam and Richard Mines, taking into consideration factors such as length of time in the U.S. (strongly related to LPR or undocumented status), education and English-language ability (strongly related to LPR status vs. naturalized citizen).

35 See, Frederika Conrey, Randall ZuWallack, and Robyn Locke, "Census Barriers, Attitudes and Motivators Survey II Final Report," ICF Macro report to U.S. Census Bureau, June 2012. Their use of market segmentation analyses to examine "mindsets" regarding the census is powerful and their over-arching taxonomy of mindsets (government-minded, compliant and caring, dutiful, local-minded, uninformed, cynical, suspicious) appears to be relevant to the Latino immigrant survey respondents' perspectives.

American Community Survey data that provides detailed insights about population composition throughout the post-census decade.

The third finding that 25% of undocumented immigrants say they are willing to respond to a census with the citizenship question is also important. Comments from the undocumented but compliant potential census respondents make it clear that the dilemma faced by Latino advocates, activists and service organizations seeking to promote census response while also opposing addition of the citizenship question is a street-level one. Many of the undocumented respondents were fairly anguished in weighing the importance of being counted, asserting their identity and right to be part of the communities they live in against the potential repercussions of government violation of confidentiality. Others believed that the government already had almost universal information about everyone, so it didn't matter if they responded to the census.

Figure 1 presents a "push" analysis of the proportion of respondents whose initial "yes" or "maybe" answer about willingness to respond to the census becomes a "no" if the Citizenship question is added.

### FIGURE 1—PROPORTIONS OF RESPONDENTS UNWILLING TO ANSWER THE CENSUS IF THE CITIZENSHIP QUESTION IS ADDED



The high proportion of undocumented respondents "pushed" from outright willingness or potential willingness toward definitive unwillingness to respond to the census by addition of the citizenship question is dramatic, but not surprising. What is more surprising is the citizenship question's impact on the second-generation U.S.-born Latino's willingness to respond—depressing it by 34%.

### Beyond Willingness Toward Estimating Eventual Response

An important consideration in interpreting these San Joaquin Valley Census Research findings about willingness to respond in relation to eventual census response is that the Census Barriers, Attitudes and Motivators Study survey results from 2008, when linked to actual census response two years later in Census 2010, showed that 10.2% of respondents who had said they were extremely or very likely to respond to the census eventually did not. Consequently, we project that the actual overall Census 2020 response rate among San Joaquin Valley first- and second-generation Latino immigrants will not be higher than 36% if the citizenship question is included.

We gave special attention to assessing the eventual response of undocumented immigrants because they are the group whose willingness is most impacted by adding the citizenship question. Review of the comments made by undocumented respondents who were willing to participate in the census even with the citizenship question suggest there might not be as dramatic a fall-off between aspiration and behavior in this group as might be expected, based on the Census Barriers, Attitudes and Motivators Study analysis, because the comments of these undocumented respondents who expressed a willingness to answer often showed they had weighed the pros and cons and came to a fairly solid resolution.

For example, one respondent commented, "I'm not a legal resident, but I think it's important to answer the census. I'm not scared of the government." Another said, "I don't have papers, but I pay taxes, I pay rent. I think it's important to be counted in this country." Another said, "It (the citizenship question) doesn't change anything, the government already knows where we are". But others who inclined toward answering were still somewhat uncertain. One, for example, said, "Look—I'd answer the census with that question, but I sure hope they wouldn't give it to immigration to use." Others said they would simply skip the citizenship question or answer untruthfully about their citizenship.

On the other hand, review of comments from the undocumented respondents who had said that "maybe" they'd respond rested in part on the enumerator who came to seek an answer if they had not self-responded. Consequently, if NRFU is not well-staffed, a number of the "maybes" would become "no's."

For the purposes of projecting eventual undercount, we assume that the actual response rate among undocumented immigrant households will be mid-range between their expressed willingness to respond and the fall-off in response that might be expected based on the Census Barriers, Attitudes and Motivators Study findings, i.e. 20%.

For modeling the undercount resulting from non-response, it was conservatively assumed that the fall-off between expressed willingness and actual census response was lower than in the Census Barriers, Attitudes and Motivators Study 2008-2010 analysis, i.e. actual response rates 5% below expressed willingness. In some scenarios, however, the fall-off may be higher since, especially if the undecided—the "maybes"—are pushed toward non-response. As discussed below, eventual levels of response will probably also be negatively affected by structural barriers to census participation affecting those willing to respond (e.g. non-receipt of a census invitation, lack of Internet access).

## Factors Affecting Eventual Propensity to Respond

Whether the eventual drop-off between intent to respond and actual response will be lower or greater than that observed in comparing 2008 Census Barriers, Attitudes and Motivators Study survey respondents' intent to their eventual Census 2010 behavior is uncertain. Nonetheless, it is unlikely that the gap between intent and behavior will narrow much in the current sociopolitical environment.

An important consideration is what the eventual census response rate will be among the overall 13% of the survey respondents who answered "maybe" to the query as to whether they would answer the census if it included the citizenship question. Well-designed and well-targeted pro-census messaging has promise in nudging the "maybes" toward response. However, if the "maybes" are pushed toward non-response by further developments suggesting that census information might be mis-used, or if developments in immigration policy and enforcement further erode confidence in the federal government, the resulting levels of response will be that much lower overall.

If the citizenship question is ultimately left off the Census 2020 questionnaire, it is reasonable to expect the current levels of willingness to respond we report here would rebound somewhat. However, the administration's efforts to add the citizenship question may have irrevocably compromised Latino immigrants' willingness to respond. Some prominent researchers have expressed concern that the effort to add the question may have lasting damage.[36] Surely, if there is a summer 2019 decision for the citizenship question to be left off the Census 2020 questionnaire, census promotion efforts during the fall and winter of 2019 should focus on re-establishing the pre-citizenship question willingness to respond—but the extent to which

even strategic and well-designed messaging can restore pre-2018 willingness to respond is not clear.

Comments in the course of interviews suggest that a small proportion of the "maybes" (in about 2%-3% of the interviews) are from potential respondents who might, with help from a sympathetic Spanish-speaking enumerator, be convinced to respond. Some in this group directly said they could not read or write.

Immigrant social networks' perspectives on census response are understandably intertwined with consciousness about the administration's immigration policy, rhetoric and enforcement activities. Comments from respondents about responding to a census with the citizenship question also suggest that the eventual response rate will rest not only on the question itself, but also on other contextual factors that could nudge response rates still lower than we project. Perspectives on the census itself are catalyzed by external factors that might raise or lower the perceived level of direct threat posed by the question.

Research shows that these decisions about interactions with government institutions and programs are not entirely fact-based. An excellent statistical analysis by the Bureau of Economic Research showed that even Hispanic citizens in counties where the 287g program (local law enforcement collaboration with ICE) was being implemented were less likely to use social services than those in counties where the program was not in effect—even though the program did not have a direct impact on them.[37]

Similarly, widespread anecdotal reports are that immigrant use of public services has already dropped in anticipation of new DHS "public charge" regulations. It appears that families that have decided not to make use of services for which they are eligible include many who would not, in fact, be affected by the new DHS regulations. Social networks are rapid and effective mechanisms not only for information transfer, but also for modulation of beliefs, attitudes, aspirations and eventually behavior.

36 Constance Citro, a highly-respected census researcher, raised this issue in a June 2018 discussion among researchers and policy advocates. Her concern appeared to be shared by all participants on the call.
37 Marcella Alsan and Crystal Yang, "Fear and the Safety Net: Evidence from Secure Communities," National Bureau of Economic Research Working Paper # 24731, June 2018.

## Willingness to Respond to a Follow-up Enumerator Visit during Nonresponse Follow-up

If a household fails to self-respond to the census, after continued non-response to several reminders, an enumerator is asked to visit the non-responding household.

San Joaquin Valley Census Research Project survey respondents who had said they were not willing to respond to the census were asked if they would respond to an enumerator who came to the door. This query was posed as follows in questioning those who had said they would not self-respond (to the census without the citizenship question):

*Q 4.2 When people don't respond to the census, they get a reminder. And if they still don't respond, the Census Bureau sends someone to their house to contact them and get their response in person....I know you said you didn't plan to respond to the census, but would you be willing to answer the questions about yourself and those who live in your household if someone from the Census Bureau (with their official ID) came to the door to explain to you that your answers to the census are totally confidential?*

Subsequently, in asking about willingness to respond to an enumerator who followed up to get a response from a household which was unwilling to answer a census with the CQ the question was posed similarly:

*Q. 5.2 I understand that you said you didn't want to answer the census under these new circumstances. But, as we talked about before, when people don't respond to the census questionnaire, the Census Bureau sends someone to get the answers in person...If the census included this question about citizenship, would you answer if a person (with their proper identification) came to your door and reminded you that your answers to the census are confidential and that they wouldn't be shared with anyone for any reason?*

Table 5 shows responses regarding willingness to provide information to an enumerator who came to the door. It is clear that the citizenship question has a powerful negative impact on this mode of response as well as on willingness to self-respond.

### TABLE 5—PROPORTIONS OF LATINO IMMIGRANTS WHO WERE NOT INCLINED TO SELF-RESPOND BUT WHO WOULD RESPOND TO A FOLLOW-UP VISIT BY AN ENUMERATOR

| Would Respond to Enumerator | Census 2020 *without* the CQ (N=69) | Census 2020 *including* the CQ (N=170) |
|---|---|---|
| Yes | 29% | 4% |
| No | 43% | 84% |
| Maybe | 27% | 12% |

*Q. 4.2B and 5.2B were asked only of respondents who said they were unsure or unwilling to respond to the census—without the CQ (Question 4) or with the CQ (Question 5)

If contacted by an enumerator in the course of a census without the citizenship question, slightly more than one out of four who were not inclined to self-respond (29%) said they would be willing to talk with the enumerator, and a similar proportion said they might perhaps answer the door and answer the questions. Overall, slightly more than half were inclined to answer the door.

However, with the citizenship question added, those willing to respond to an enumerator who contacted them because their household had not responded previously declined sharply—from 29% down to 4%, and the proportion of respondents who said they would not talk to the enumerator at the door almost doubled—to 84%. Notably, several of those had said they would not or might not respond to the census but who were willing to respond to an enumerator were those who had difficulty with reading and writing, although they were basically inclined to respond. However, comments from other survey respondents often suggest that an enumerator visit was seen as more intrusive than a mailed request.

The proportion of respondents who said they were uncertain as to whether they would respond to an enumerator visit decreased sharply—from 27% to 12%—if the citizenship question were to be added with the "maybes" becoming "no's."

Those who said that maybe they'd talk to an enumerator often stated that their response would depend on how the enumerator approached them and whether or not they had an official ID (due to concerns about scammers/con artists). This finding underscores the strategic importance of hiring culturally competent/linguistically competent enumerators

and training them to engage in persuasive exchanges with uncertain potential respondents.[38]

Ultimately, it is uncertain to what extent those in this group of immigrants who are inclined not to respond but who are wavering about talking with an enumerator would be successfully contacted, or if they would actually respond if contacted in the course of nonresponse follow-up, since the outcome depends so heavily on rapport in face-to-face conversations.

However, based on respondent comments about their attitudes toward the citizenship question, it is, ultimately, not likely that many of those who initially uncertain, or still more problematically, those who were inclined not to self-respond, would actually be successfully contacted and converted into successful nonresponse follow-up interviews. Consequently, based on the answers regarding willingness to talk with enumerators, it is likely that nonresponse follow-up will not have great success in improving on the already low rates of self-response.

## Response to Enumerator Requests for Proxy Interviews (providing Information about neighboring households)

It is important to remember that the process of enumeration in the decennial census is operationally complex. The Census Bureau, in accordance with well-established survey principles, works hard to secure whatever information it can about households that have not taken the initiative to respond.

When an enumerator tries to contact a non-responding household to convince the householder to answer and fails to secure an interview (either because no one is at home or because the household refuses the interview), they are instructed to then attempt a "proxy interview" with a neighbor. A General Accountability Office report on the Harris County and Los Angeles County 2016 test censuses notes that it is estimated that in Census 2010, about 25% of non-response follow-up "enumerations" were actually proxy interviews with neighbors to get information on a nearby non-responding household.

Securing a proxy interview is generally becoming more difficult because levels of concern about "big data" and government misuse of data. Moreover, as sociologist Robert Putnam has observed, community diversity, while desirable, does decrease prevailing levels of mutual trust in communities as different ethnic groups "hunker down."[39]

In an environment where there is widespread apprehension about government misuse of information for immigration enforcement, the old-fashioned idea that it is one's civic duty to "help out" the census by providing an enumerator with information about one's neighbors is losing ground.[40] The San Joaquin Valley Census Research survey shows extraordinarily low willingness to respond to enumerator requests for proxy interviews.

- Even without the citizenship question, only 19% of the Latino survey respondents were willing to participate in a proxy interview to provide information about their neighbors.
- Adding the citizenship question decreased this minimal willingness to provide information about one's neighbors. With the question, only 8% of the respondents said they would provide an enumerator with information about a neighboring household.

Respondents frequently mentioned a concern related to privacy/confidentiality: 42% said that it was not their business to provide that information; 13% mentioned the issue of privacy, and 16% said that was the neighbors' information, that they should be the ones to decide about sharing it or not or that they wouldn't want the neighbors providing information about them.

This perspective, stemming both from underlying cultural views on ownership of personal information and a sociopolitical environment that has become riskier than ever before for immigrants, overshadowed respondents' practical concerns about misuse of information—10% commented that providing such information was "dangerous" and 14% commented that they wouldn't want to have the neighbors get upset with them for providing information about their household. A few framed this as not wanting to be thought of as a neighborhood gossip (metiche).[41] Revealingly, some said their willingness to provide information about the neighbors depended on

38 In his study of Census 2010 census coverage in hard-to-count rural areas with concentrations of farmworkers in the San Joaquin Valley and Central Coast, Kissam found that two-thirds (64%) of Spanish-speaking households that had been contacted during non-response follow-up (NRFU) said the enumerator spoke Spanish well, while 14% said they spoke "a little" Spanish. The remaining 22% said the enumerator who came to the door spoke no Spanish. The respondents in the 2010 study said that the enumerators were generally courteous and professional, but 8% said they had difficulty understanding the enumerator (Kissam 2010).
39 Robert Putnam, "E Pluribus Unum: Diversity and Unity in the 21st Century", Scandinavian Political Studies, Vol. 30, 2007.
40 A specific concern within immigrant communities has to do with whether information provided to the government for one purpose can be used for another purpose. For example, in principle, information provided by DACA applicants regarding their family was protected by a USCIS firewall keeping it from being used by ICE. This was threatened in the context of the Obama administration's effort to implement DAPA. This concern has been extended to potential mis-use of census data as a result of discovery in the California litigation to prohibit the citizenship question being added to Census 2020. https://www.brennancenter.org/blog/trump-administration-discussed-ille-gally-sharing-census-data-law-enforcement
41 Someone who sticks their nose into affairs that don't concern them.

whether they were legal or not and whether it would harm them. Some respondents specifically mentioned their concern about use of census information for immigration enforcement.

One-third of those who were willing to provide information about their neighbors in a census with the citizenship question (2.5% of all) expressed some hesitation and said their willingness would depend on whether their neighbors were undocumented or not. They said they would give basic information about the neighboring household, but not provide the enumerator information about the citizenship of the household members.

Aside from the question of willingness, comments made in conversations with interviewers regarding the idea of providing information about their neighbors show the challenges in relying on proxy interviews for enumeration. Two-thirds (67%) thought they could provide basic information about a neighboring household, but one quarter (25%) said they couldn't. Reasonably enough, for some, their ability and willingness to respond to a request for a proxy interview depended on which particular neighboring household was involved. Obviously, even in the proxy interviews that are successful, the completeness and accuracy of information elicited is suspect.

Nonetheless, although willingness to agree to a proxy interview and ability to respond were intertwined, the overwhelming majority of those who said they would refuse a proxy interview were clear in stating that, in their view, it was not "correct" to share personal information about the neighbors.

## Implications of Reluctance to Participate in Proxy Interviews

The eventual consequence of negative attitudes about participating in proxy interviews is fairly complex in terms of statistical policy and operational implications. We asked respondents about their willingness to provide the full set of answers to the census questions as per the official Census Bureau position that the respondent should provide complete information about a neighboring household. In practice, there appears to be a disjunction between Census Bureau policy (that proxy interviews should be complete and accurate) and operational practice where proxy interviews will be accepted as "enumeration" even if a neighbor can or will only provide skeletal information on the number of persons living in the

non-responding household, in which case household characteristics have to be imputed.

Moreover, there are problems with the quality of household "enumerations" based on proxy interviews in an environment where reluctance to provide information about the neighbors is pervasive. The responses that are provided may well be uneven—resting on individual enumerators' ability to establish rapport, a households' relationship with a neighboring family and their individual perspective on the appropriateness of information-sharing.

Messaging to explain that Census Bureau operational practice is to only require information on numbers of persons in a non-responding household would compromise census data quality since, in many cases, information on household characteristics would be missing. However, if census promotion included messaging suggesting that the information needed would be simply the size of a neighboring household, this could contribute to a more complete count—especially if it were made clear that proxy interviewees would not need to provide information on legal and/or citizenship status of their neighbors.[42]

## Other Factors Affecting Likelihood of Enumeration

The San Joaquin Valley Census Research Project survey gathered information on six other factors that might affect enumeration of Latino immigrants and their social networks: mail delivery at the household, Internet access, living in a complex household/housing unit, English-language skills, and educational attainment/presumed literacy. These factors are, to some extent, co-variant and interactions among them, in addition to potential respondents' willingness to respond, will affect 2020 census response rates.

The issue as to whether the Census Bureau's Master Address File includes the housing unit where a household lives and, thus, whether they will receive a mailed census form (or in 2020, an invitation to respond online) is a perennial one, as is the problem of assuring enumeration of everyone who lives in a complex household. The issue of Internet access and response is a novel and complex one; however, Census Bureau research to date shows that online response rates are lower than mail response rates. These issues play out

---

42 The idea of securing reliable data on citizenship status from proxy interviews is obviously untenable in general and particularly in immigrant communities. The Census Bureau's terminology referred to households where data are collected via proxy interview as "enumerated" is conceptually misleading. Technically speaking, determination of household characteristics via proxy interviews (or reference to administrative records) should not be considered to be "enumeration." In the current context, it is striking that proxy interviews are likely to be particularly unreliable regarding the two key elements necessary for estimating citizen voting-age population—age and citizenship status.

distinctively in the San Joaquin Valley towns and urban neighborhoods where most of the Latino immigrants live.

### *Mail Delivery*

Overall, almost three-quarters (72%) of the San Joaquin Valley Latino immigrant survey respondents had postal delivery to their house or their own mailbox. There will, hopefully, be few problems in their receiving an invitation to respond. The Census Bureau did a good job of sending bilingual (English/Spanish) census forms to census tracts with high concentrations of linguistically isolated households in 2010. However, there will be challenges in assuring the remaining 28% are enumerated—stemming from their access to mail delivery.

About one out of eight survey respondents (13%) said they only received mail at a PO Box. These households include not only those in areas already recognized as not having "city-style" addresses, but some living in areas with city-style addresses where the invitation to respond to the census (either Internet First or Internet Choice) will not be delivered.

The Census Bureau typically mails one census form or invitation to respond to each address. This affects response in cases where multiple families share a single postal address. One out of eight (12% of all respondents)—many of them in complex households—said they received their mail at a mailbox they shared with others.

The existence of shared mailboxes at a property is a concern because it is possible that in cases where there are multiple housing units at a single address, only the "main house" will be included in the Census Bureau's Master Address File and will be sent an invitation to respond. Alternatively, there may be multiple family units living in a single dwelling, i.e. complex households, where each family considers itself a separate unit and where only the "core" household members will be included in the householder/ P1's census response. The remaining 3% either said they had no mailing address or described some other sort of access to mail delivery.

### *Internet Access*

Overall, three-quarters (76%) of survey respondents have Internet access. Internet access is not related to legal or citizenship status but, rather, to age.  Figure 2 shows the level of Internet access and type of Internet access by age and shows significant differences in Internet access for different age groups.

### Figure 2—San Joaquin Valley Latino Immigrant Access (N=407)



This pattern of Internet access has important practical implications for eventual efforts to "get out the count" and is very important to consider—in addition to geographic patterns of Internet availability. As can be seen from Figure 2, older immigrants are much less likely to have any Internet access; moreover, their access is usually via cell phone, not via home computer or tablet. In contrast, younger immigrants—many of them second-generation U.S.-born with a high school education or some college— have Internet access via either tablet/computer or cell phone.

This finding underscores how critical it will be for the Census Bureau to assure that its online response modality is implemented so as to support cell phone access, that the access is available in Spanish as well as English, and that it is user-friendly for less-educated users whose primary use of the Internet is for social media or entertainment. It was not possible to explore in the survey the extent to which those who did have Internet access used interactive web sites (e.g. for online purchases, banking, drivers' license applications). Examining the types of Internet use that are prevalent in the region will be important in efforts to promote and facilitate online self-response.

The age differential in Internet connectivity and online experience also supports the concept of mobile question-naire assistance centers (QACs) where bicultural/bilingual census response navigators would do outreach to homes of the older immigrants to assist them with online response. Such an approach is strategically attractive.

### *Respondents in Complex Households*

Living in a complex household is a significant cause of undercount. In the current study, we have defined "complex household" somewhat differently from the way it is defined

by the Census Bureau. By complex household, we mean the domicile of a survey respondent who said that there were "extra" members living at the same place/address where they lived.[43]

Our definition, therefore, includes complex households as defined by the Census Bureau where multiple family/social units live under the same roof, but also households where the respondent lives at one of several hidden housing units (e.g. backyard trailers, sheds, converted garages) with a single address. Family/social units in both types of living arrangements are at risk of being omitted from the Census 2020 count.

The San Joaquin Valley Census Research Project survey found that 22% of the Latino immigrant population live in complex households. There are, on the average, 5.3 persons living at each of these places. In these complex households, there were, on the average, 2.9 "extra" people in addition to the respondent's family household. It is extremely likely that these "extra" individuals will not be enumerated.

If they live under the same roof as the census respondent (P1), they are likely not to be included on the household census roster (despite the census form instruction to "include everyone").

If they live in a hidden housing unit that's not in the Census Bureau's Master Address File, they will have no chance of being enumerated—except via the Census Bureau's non-identification processing (NID) option. Unfortunately, due in part to cost constraints, the Census Bureau decided to abandon its "Be Counted" enumeration option that previously was available at Questionnaire Assistance Centers and replaced it with an online option. However, this requires a potential respondent to be motivated, and to have Internet access and digital literacy—very uncommon among the most economically peripheral individuals who are the "extra" persons in the complex households.

In subsequent analyses, we will seek to estimate the proportion of complex households that would be considered complex households using the Census Bureau residence rules (even when multiple social/budgetary units live under the same roof) and what proportion are hidden housing units omitted from the Census Bureau's Master Address File (MAF). In either case, housing arrangements are an important factor leading to undercount among low-income households in the region.

## English-Language Skills as a Constraint on Census Response

Research on Census 2010 coverage in 40 rural hard-to-count tracts in agricultural areas of California (including the San Joaquin Valley) showed that the Census Bureau did a very good job in sending bilingual census forms to Spanish-speaking households. More than three-quarters (76%) of the linguistically isolated Latino households in the 2010 survey received the Spanish-English bilingual form and this contributed to a high mail response rate.

Nonetheless, English language skills remain a concern with respect to self-response for the San Joaquin Valley immigrant households where no adult speaks English. Online response is, in principle, an attractive solution to the language barrier, but overall decennial census strategy still rests ultimately on linguistic accessibility—for both the Internet First and the Internet Choice households. It is not clear if Census 2020 targeting of areas for mailout of paper forms will be improved from 2010, but the evidence, for the moment, suggests that about one in four non-English households will only get a paper form or invitation to respond online in English.

Table 6 shows that this may be a significant factor contributing to undercount among those who do, in fact, want to respond to the census.

### Table 6—Self-Reported English-Language Skills: Latino Survey Respondents (N=413)

| | Latino Survey Respondents' English-Language Ability | | | |
|---|---|---|---|---|
| Legal and citizenship status | Speak No English | Speak Only a Little English | Speak English OK | Speak Perfectly or Very Well |
| Undocumented (N=155) | 25% | 46% | 23% | 7% |
| Legal resident (N=113) | 22% | 32% | 34% | 11% |
| Naturalized citizen (N=47) | 9% | 18% | 36% | 36% |
| U.S.-born citizen (N=98) | --- | --- | --- | 100% |

43 In the SJVCRP survey, we defined "household" based on budgetary unit. The problem with the current OMB residence rules is that the prevalent view of "household" in Latino (and other) immigrant communities is that a household is defined as a budgetary unit, not by who lives under the same roof in crowded, doubled-up housing. Technically speaking, crowded housing results in partial household omission in the complex households as defined by the OMB residence rules, and total household omission in the hidden housing units in the subsidiary housing units at a place/address that are, typically, not included in the MAF because they lack a postal address. This issue is discussed in detail in Richard Mines' study of farmworker housing in the Salinas and Pajaro Valleys (CIRS, 2018), in Kissam's analysis of Mexican immigrant undercount (Kissam 2017), and in the recent study of hidden housing units added to the MAF as a result of California's LUCA-linked community-based address canvassing results (Kissam, Quezada, and Intili 2018).

### Language and Literacy as Dual Constraints

It is important to recognize also that the educational attainment of San Joaquin Valley Latino immigrants means that their print literacy as well as digital literacy will remain a constraint on self-response in 2020.

Limited English and limited literacy combine to make self-response to the census difficult for most. Research conducted for the Census Bureau several decades back, coupled with fundamental literacy research from the National Adult Literacy Survey, suggests that the sorts of print literacy required for census form completion begins to be a significant factor for respondents with less than nine years of schooling.[44]

Looking at the intersection of educational attainment and English-language ability of the foreign-born Latino respondents shows that more than one-third of the first-generation Latino immigrants (37%) have only an elementary school education and only a little English or no English language skills. Another 28% with seven to nine years of schooling will have some difficulty with the form—depending on the quality of schooling and whether or not they actually receive a bilingual census form or invitation to respond. The level of digital literacy in the low-literate/limited-English population is not known, but it is not likely to be higher than their print literacy.

Consequently, literacy constraints may affect self-response among two-thirds (65%) of the Latino immigrants in the San Joaquin Valley—even if their household is successfully targeted to receive a bilingual (Spanish-English) form.

Low literacy will be a particularly serious factor affecting self-response among indigenous Mexican respondents because, although Spanish is the lingua franca in Latino immigrant communities throughout the U.S., those whose native language is one of the indigenous ones (e.g. Mixtec, Zapotec, Triqui) have lower levels of Spanish-language literacy than immigrants whose first language is Spanish. This will contribute to differential undercount of these ethnic minority groups.

### Prevailing Beliefs about Who Should Respond to the Census

Lack of knowledge about who should participate in the census is another factor that will affect the Latino immigrants' levels of response and, ultimately, undercount. Overall, 12% of survey respondents thought that only citizens and legal residents should participate in the

census. Another 8% were unsure and said they didn't know. The aggregate 20% of the San Joaquin Valley Census Research Project respondents who didn't know the correct answer that everyone should be counted is only slightly higher than the numbers of Census Barriers, Attitudes and Motivators Study respondents who didn't know that the census is meant to count both citizens and non-citizens—16%.

Practically speaking, there is the additional problem that the undocumented survey respondents were more likely to think that only citizens or citizens and legally resident immigrants should be counted. Among the undocumented respondents, 16% incorrectly believed they should not participate (whether or not they were inclined to) and 11% were unsure.

### Projections of Differential Undercount and Aggregate Regionwide Undercount Based on Observed Patterns of Non-Response

Patterns of census non-response do not immediately translate into undercount because Census Bureau operational teams work hard to implement a methodological strategy designed to compensate for survey non-response during the non-response follow-up process. At each stage of the Census Bureau's enumeration process, it meets with some success, but widespread non-response will lead to errors and, ultimately, census omission.

In areas such as the San Joaquin Valley, incomplete/inaccurate address lists, errors introduced through reliance on proxy interviews, errors from incomplete and/or inaccurate administrative records used to compensate for non-response, and the limitations of hot-deck imputation used to impute the number and characteristics of people living in non-responding households are inevitable. This cascade of errors will erode and distort the tabulations the Census Bureau ultimately generates to report the numbers and characteristics of the population. These errors are significant—at all levels of census geography—but their largest negative impact is on neighborhoods, communities and counties with more "hard-to-count" households and, consequently, more widespread and higher levels of non-response.[45]

44 Kissam E, Herrera E, Nakamoto J. "Hispanics' Response to Census Forms and Procedures." Aguirre International, Final Report to Population Division, U.S. Census Bureau, 1993. The National Adult Literacy Survey research analyzes literacy in a way that is particularly relevant here—examining reading competencies in processing highly formatted print material such as that used in question-naires as compared to reading the typical text in elementary school books, novels and magazines.
45 A particularly thorough and definitively documented description about how these errors emerge in the course of multiple stages of census enumeration efforts—omission of hidden housing units, erroneous deletion of housing units believed not to be occupied, use of proxy interviews to secure information on non-responding households, and imputation—was prepared by census expert Joseph Salvo for his testimony in the NY v. Department of Commerce. (See Joseph Salvo, "Expert Rebuttal Report: Errors in the Local Census," November 11, 2018).

Nonetheless, it is possible to model how, despite the Bureau's best efforts, a cascade of non-response to successive Census Bureau enumeration efforts and subsequent efforts to overcome the problem of non-response ("enumeration" based on recourse to administrative records or hot-deck imputation), gives rise to undercount.[46]

Adding the citizenship question unquestionably introduces bias, but the key research question is, "How much?" The San Joaquin Valley Census Research Project survey, by providing key information on the numbers and characteristics of households likely not to respond, provides an empirical basis for answering the question about how serious the undercount will be and how it will skew the demographic and socioeconomic profile of affected communities.

Table 7 shows our estimate of the Census 2020 consequences for undercount of first-generation foreign-born Latino immigrants and second -generation U.S.-born Latinos in the San Joaquin Valley if the citizenship question is included in the census.

### Table 7—Cascade Model Estimate of San Joaquin Valley Undercount in Latino Immigrant Networks

| San Joaquin Valley Latino Sub-Population as defined by status | Undercount for sub-populations | Impact on overall San Joaquin Valley Census Count (% undercount in sub-population X sub-population as % of region) |
|---|---|---|
| Undocumented | 21.1% | -1.8% |
| Legal residents | 7.5% | -0.4% |
| Naturalized citizens | 5.9% | -0.4% |
| U.S.-born citizens | 10.3% | -1.5% |
| Aggregate impact—undercount of first- and second-generation Latinos | 11.7% | -4.1% |

*Working paper discussion and technical details for the cascade model are presented in the companion report to this one, "A Cascade Model Explaining How Latino Immigrants' Non-Response to Census 2020 is Transformed into Regional Undercount," San Joaquin Valley Health Fund, January 2019.

To place the projections presented here in context, the officially acknowledged Hispanic undercount in Census 2010 was 1.54%, while the non-Hispanic White overcount was 0.8%.[47] The model projects that the likely undercount among sub-populations within the Latino immigrant population in the San Joaquin Valley will, in 2020, be from two to 14 times higher than the officially acknowledged overall national Hispanic undercount in Census 2010.

Table 7 indicates that the San Joaquin Valley region, and municipalities within the region, will be disproportionately impacted by differential undercount stemming from the citizenship question, and will not secure an equitable share of federal census-driven funding or secure equitable political representation in Congress.

Geographic disparities in expected allocation of funding and political representation resulting from differing levels of undercount among the harder-to-count Latino sub-populations result primarily from variation in numbers of foreign-born from community to community. However, the maturity of migration networks bringing newcomers to different communities may also lead to variations in the local mix of legal and citizenship statuses in each county, so this, too, will contribute to differences in undercount from one town to another.[48]

Census undercount of Latino first- and second-generation immigrants will generally shift funding and political representation away from the smaller rural municipalities, which have more concentrated immigrant populations, toward the larger, urban areas. For example, the population of Firebaugh in western Fresno County is 92% Hispanic and 38% foreign-born, while another west side small town, Kettleman City, is 100% Hispanic and 46% foreign-born.

The estimate of undercount presented in Table 7 is conservative. It does not, for example, attempt to estimate the negative impact that constrained access to the Internet and low digital literacy, coupled with print literacy, might have on self-response rates.[49] Eventual census accuracy will rest, in part, on the Census Bureau's ability to effectively collaborate with concerned community groups in designing and implementing initiatives to overcome these chronic barriers to census participation.

46 The "cascade model" showing how high levels of non-response degrade the accuracy of census tabulations due to the inevitable errors that arise from successive stages to compensate is described in a companion report to this one, the San Joaquin Valley Health Fund Working Paper #2: "A Cascade of Errors: How Low Levels of Latino Immigrant Response Undermine San Joaquin Valley Census Accuracy."
47 Mule T. 2010 "Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States," Decennial Statistics Studies Division, U.S. Census Bureau, May 2012.
48 The Center for Migration Studies of New York has developed good estimates of the proportions of the non-citizen population who are legal residents and undocumented at the PUMA (Public-Use Microdata area)—an area generally (but not always) smaller than a county. They have used these estimates to develop county-level estimates of numbers of undocumented immigrants by country of origin for each of the counties in the San Joaquin Valley region.
49 The data on survey respondents' level of educational attainment is relevant here. About half of the population have only an elementary school education. A number of respondents' comments about considerations entering into their response included reference to their inability to read or write (in Spanish or in English). Interestingly, even some who had access to the Internet and used applications such as Facebook, for example, said they were illiterate.

# The Bottom Line: Serious Differential and Aggregate Undercount Throughout the Region

As Table 7 clearly shows, some sub-groups among Latino first- and second-generation immigrants will suffer more from undercount than others. This differential undercount will affect the entire census count for the region because these immigrant households make up such a substantial portion of the overall population.

The San Joaquin Valley region is projected to have a population of about 4.6 million by 2020. With Latino first- and second-generation immigrant undercount alone resulting in a 4.1% reduction in overall regional population census count, census undercount will have a major negative impact on the entire region.

The aggregate regional census undercount of Latino first- and second-generation immigrants in the San Joaquin Valley is likely to result in about 188,000 persons being left out of the census count.

The households not included in the census count for the San Joaquin Valley region will include a disproportionate number of low-income households—since the most seriously undercounted group, the undocumented immigrant households, typically have lower earnings than those where the head of household has legal status or citizenship. The fiscal and civic implications of this loss are discussed in the conclusions section of this report.

# Summary Conclusions

Although the population of the San Joaquin Valley is distributed among major urban centers, medium-size communities and small rural towns, the region will probably have a total population of about 4.6 million people in 2020, making it much larger than many major urban areas such as Chicago or Houston, and comparable in population to the city of Los Angeles. Differential undercount in the San Joaquin Valley needs to be understood not only as a regional concern, but also as an issue of statewide and national concern.

The San Joaquin Valley Census Research Project survey results show that adding the citizenship question to the decennial census is likely to have a major impact in suppressing census response among San Joaquin Valley Latino immigrants and their social networks who make up one-third of the region's total population. Compromised willingness to respond to Census 2020, in combination with other factors such as omission of low-visibility housing units from the Census Bureau's address list, language and literacy barriers, and lack of Internet access for online response, will almost certainly result in serious differential undercount of Latino households in the San Joaquin Valley and, therefore, decrease the census-based estimates of the overall population in the region.

The resulting patterns and extent of undercount can be expected to create significant disparities in allocation of federal and state census-driven program funding. Just as importantly, differential undercount might seriously skew the racial/ethnic profile of the San Joaquin Valley region and, consequently, undermine the reliability of detailed demographic and socioeconomic data collected in the American Community Survey over the post-censal decade from 2021-2030.

The projected level of 11.7% undercount among first- and second-generation Latino immigrants is at a level that some experts would consider to be indicative of a failed census. The fiscal impact would result in a potential federal funding loss to the region of about $198 million—a total over the post-censal decade from 2021-2030 of about $2 billion.[50]

---

50 Professor Andrew Reamer's expert analysis of the fiscal implications of undercount suggest that California would lose about $1,050 for each Californian omitted from the census. The amount would be higher except for the fact that the FMAP portion of California's federal funding is unaffected by census omission. For details, see Andrew Reamer, "Counting for Dollars 2020: The Role of the Decennial Census in Geographic Distribution of Federal Funds—Report #2 Estimating Fiscal Costs of an Undercount to States," George Washington Institute for Public Policy, March 19, 2018. The eventual level of fiscal losses depends on other states' and communities' undercount. Thus, the eventual impact remains uncertain—but there undoubtably will be a shift in funding and political representation away from the communities, regions and states with larger Hispanic populations.

By providing new insights into the willingness of different sub-populations of Latino immigrants to respond to a census with the citizenship question, the San Joaquin Valley Census Research Project makes a significant contribution to a body of research that has been forced to rely on research tools (the Census Bureau's focus groups and the Census Barriers, Attitudes and Motivators study mail survey) and analytic methodologies (analysis of allocation rates in the American Community Survey question about citizenship) that have inherent limitations. The prior research is sound, but the research reported here provides new insights about the dynamics and extent of undercount in the real-world conditions prevailing in communities with concentrations of low-income immigrant households.

Ironically, one of the results of the skewed demographic profile resulting from differential undercount is that the quality of citizen voting-age population tabulations that the Department of Commerce has alleged would be improved by adding the citizenship question to the decennial census would be seriously degraded. This is due to unreliability of tabulations of responses to the citizenship question, a racial/ethnic profile skewed to underrepresent Hispanics, and serious uncertainties about the age profile of the population.

Understandably, adding the citizenship question has a dramatic negative impact on undocumented and mixed-status households' willingness to respond to the census, but it also has a remarkable impact in dampening second-generation Latino immigrants' willingness to participate in the census. The full impact of adding the citizenship question will almost certainly be broader and deeper than might be expected simply from looking at individual households' response rates.

Adding the citizenship question has more than simply fiscal implications. The transformation of the decennial census from a civic ritual of affirmation—securing an accurate picture of the U.S., a "mirror of America"—into an exercise in government-sponsored efforts to diminish the importance of immigrants and blur our vision of a diverse American nation will take a toll on civic life.

Survey respondents' discussions with interviewers echo the findings from the Census Barriers, Attitudes and Motivators Study II report identifying diverse mindsets vis-à-vis the census among all Americans. The research shows households falling into one of seven response segments: the government-minded, the compliant and caring, the dutiful, the local-minded, the uninformed, the cynical, and the suspicious.

The survey findings make it clear that if Census 2020 includes a question on citizenship, the cynical and suspicious segments—estimated in Census Barriers, Attitudes and Motivators Study II as making up about one-quarter of U.S. households—will grow dramatically among Latino immigrant households, while competing with the mindset of the compliant and caring.

There are also, among the Latino survey respondents, a fair number who fall into the mindset the Census Barriers, Attitudes and Motivators Study identifies as dutiful and local-minded. But their conversations with interviewers show they are struggling to resolve a conceptual/values conflict between a positive outlook about the importance of the census to their community and the competing wave of escalating cynicism and suspicion about what the census is for.

The consequences are worrisome not only in the short-term, but in the long-term. The San Joaquin Valley Census Research Project finding that the federal government's effort to add the citizenship question undermines U.S.-born second-generation immigrants' willingness to participate in the census, along with that of the very large population of settled immigrants who lack legal status, is a harbinger of further weakening of community bridging social capital—the ability for diverse individuals in a community to over-come individual differences and work together to advance common objectives for improving community well-being.[51]

We emphasize here the negative impact a decennial census that includes the citizenship question may have on social capital and second-generation immigrants' attitudes about civic participation, because these adult children of immigrants play an important role in bridging the gap between native-born and foreign-born families in rural communities with large numbers of settled immigrants. By the same token, the findings suggest that the young second-generation Latino adults can play a significant role in immediate efforts to promote census participation.

51 Ed Kissam describes these dynamics in "Migration Networks and the Process of Community Transformation in Arvin, California and Woodburn, Oregon," The Journal of Latino and Latin American Studies, Vol. 2 (4), Fall 2007, pp 87-116.  Despite the distinctive concerns about impact within the second-generation, the overall community impact on all groups' social life—"hunkering down" as Robert Putnam calls it—despite being gradual and insidious, is a serious concern.

Local and state government, along with local institutions—the schools, community service programs, immigrant advocacy organizations—will need to work hard to reinforce immigrant community perspectives about Census 2020 actually being an affirmation of their presence as citizens of local communities (with or without formal legal/citizenship status).

The damage wrought by efforts to add the citizenship question to Census 2020 will negatively impact a wide range of immigrant integration initiatives. A multitude of public institutions in California and in the San Joaquin

Valley have worked for decades in efforts to effectively integrate immigrants into community life. A census with a citizenship question—widely recognized as being a surrogate for an inquiry about immigration status—will undermine the decades of work they have invested in this mission, accelerating already-rapid growth in distrust of government and disappointment and anger regarding its anti-immigrant policies.

# Selected References

Alsan, M. and C. Yang, "Fear and the Safety Net: Evidence from Secure Communities," National Bureau of Economic Research Working Paper # 24731, June 2018. (footnote 14).

Elijah Anderson, "The Social Meaning of the Census to the Inner-City Poor," (ND).

Bhaskar, Renuka & Fernández, Leticia & Porter, Sonya. (2015). Assimilation and Coverage of the Foreign-Born Population in Administrative Records. CARRA Working Paper Series #2015-02. Center for Administrative Records Research and Applications U.S. Census Bureau, April 21, 2015.

Bhaskar, Renuka, et al, "Assimilation and coverage of the foreign-born population in administrative records," Statistical Journal of the International Association of Official Statistics, June 2018.

Brown, J. David, "Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census," Center for Economic Studies, CES 18-28, U.S. Census Bureau, August 2018.

Bruce A, Robinson G, Devine J.E. "A Planning Database to Identify Areas That Are Hard-to- Enumerate and Hard-To- Survey in the United States." Proceedings of the Conference on Hard-to-Reach Populations, 2012 http://www.eventscribe. com/2012/ASAH2R/assets/pdf/50020.pdf.

California Institute of Rural Studies, "Farmworker Housing Study and Action Plan for the Salinas Valley and Pajaro Valley," April 2018.

Census Bureau, 2020 Census Operational Plan: A New Design for the 21st Century (v. 3), September 2017.

Census Bureau, 2020 Census Barriers, Attitudes and Motivators Study (CBAMS) Survey and Focus Groups: Key Findings for Creative Strategy. Team Y&R, U.S. Census 2020, October 31, 2018.

Chapin, Maryann, et. al., "2020 Census: Counting Everyone Once, Only Once, and in the Right Place: A Design for Hard to Count Populations," presentation to National Advisory Committee Fall 2018 Meeting.

De La Puente M. "Using Ethnography to Explain Why People are Missed or Erroneously Included by the Census: The Evidence from Small Area Ethnographic Studies," Center for Survey Methods Research, U.S. Census Bureau https://www.census.gov/srd/papers/pdf/mdp9501.pdf.

De la Puente M. "An Analysis of the Underenumeration of Hispanics: Evidence from Small-area Ethnographic Studies," Proceedings of the 1992 Bureau of the Census Annual Research Conference, 1992.

De Maio, Theresa, and Kirsten Hughes, "Report of Cognitive Research on the Residence Rules and Seasonality Questions on the American Community Survey, Statistical Research Division, U.S. Census Bureau, July 2003.

Elias-Olivares, Lucia, and Farr, Marcia, Sociolinguistic Analysis of Mexican-American Patterns of Non-Response to Census Questionnaires," Final Report for Joint Statistical Agreement 88-25, Mexican Origin-Language and Literacy Project, Office of Social Science Research, University of Illinois at Chicago, November 1990.

Escudero, Kevin, Becerra, Marisol, "The Last Chance to Get It Right: Implications of the 2018 Census Test for Latinos and the General Public," NALEO, December 2018.

Fein D.J. "The social sources of census omission: Racial and ethnic differences in omission rates in recent censuses," Ph.D. dissertation, Princeton University, 1989.

Fein D.J, West K.K. "The Sources of Census Undercount: Findings from the 1986 Los Angeles Test Census," Survey Methodology, 1988 Dec.

Government Accountability Office, Lessons Learned for Locating and Counting Migrant and Seasonal Farmworkers. 2003.

Government Accountability Office, "2020 Census: Actions Needed to Address Challenges to Enumerating Hard-to-Count Groups," July 2018.

Hall, M.G., et al. Respondent-Driven Sampling and Time-Location Sampling: A Comparison of Implementation and Operational Challenges for HIV Behavioral Research in Guatemala (2013) http://paa2013.princeton.edu/papers/130591.

Hamid A, Brownrigg L. "Accurate Address Listings to Improve Housing and Population Counts: A Comparison of Address Listings and Enumerations of Four Sample Areas by the 1990 Decennial Census, the Post- Enumeration Survey (PES) and the Alternative Enumeration (AE)." 1992. https://www.census.gov/srd/papers/pdf/lab9301.pdf

Kissam E, Herrera E, Nakamoto J. "Hispanics' Response to Census Forms and Procedures." Aguirre International, Final Report to Population Division, U.S. Census Bureau, 1993.

Kissam E. "Differential undercount of Mexican immigrant families in the U.S.," Statistical Journal of the International Association of Official Statistics. 2017.

Edward Kissam, Cindy Quezada, and Jo Ann Intili, "Community-Based Canvassing to Improve the Census Bureau's Master Address File: California's Experience in LUCA 2018," Statistical Journal of the International Association of Official Statistics, Vol. 35, December 2018.

Mahler, Sarah. "Alternative Enumeration of Undocumented Salvadorans on Long Island." Prepared under Joint Statistical Agreement 89-46 with Columbia University. Bureau of the Census, Washington, D.C. 1993.

Mathiowetz, N, DeMaio, T, and Martin, E. "Political Alienation, Voter Registration and the 1990 Census," paper presented at the AAPOR annual conference, May 1991.

Meyers, M. Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for the 2020 Census. U.S. census Language and Cross-Cultural Research Group, Center for Survey Measurement. Paper presented to the Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting, November 2, 2017.

Meyers, M. and P. Goerman. Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census.  U.S. Census Bureau. Persented at the 73rd annual conference of the American Association for Public Opinion Research (AAPOR), Denver, Colorado, May 16-19, 2018.

Muhib, F. B., Lin, L. S., Stueve, A., Miller, R. L., Ford, W. L., Johnson, W. D., & Smith, P. J. (2001). A Venue-Based Method for Sampling Hard-to-Reach Populations. Public Health Reports, 116(1_suppl), 216–222. https://doi.org/10.1093/phr/116.S1.216

Mule T. 2010 "Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States," Decennial Statistics Studies Division, U.S. Census Bureau, 2012 May 22.

National Academies of Sciences, Engineering, and Medicine 2018. Letter Report on the 2020 Census. Washington, DC: The National Academies Press. https://doi.org/10.17226/25215.

O'Hare, W.P. Citizenship Question Nonresponse: A Demographic Profile of People Who Do Not Answer the American Community Survey Citizenship Question. Economic Security and Opportunity Initiative, Center on Poverty and Inequality. Georgetown Law, September, 2018.

Ott, M.A., et al. "Community Engagement and Venue-based Sampling in Adolescent Male Sexually Transmitted Infection Prevention Research," Journal of Adolescent Health, 62(2018) S58–S64.

Parsons, J. T., Grove, C., & Kelly, B. C. (2008). "Comparing the Effectiveness of Two Forms of Time-Space Sampling  to Identify Club Drug-Using Young Adults." Journal of Drug Issues, 38(4), 1061-1081.

Pastor, Manuel and Enrico Marcelli, "What's At Stake for the State: Undocumented Californians, Immigration Reform, and our Future Together," Center for Immigrant Studies, University of Southern California, 2013.

Lopez, G. et al., Key Findings about U.S. Immigrants.  FacTank Pew Hispanic Research Center. November 30, 2018.

Putnam, R. "E Pluribus Unum: Diversity and Unity in the 21st Century," Scandinavian Political Studies, Vol. 30, 2007.

Reamer, Andrew, "Counting for Dollars 2020: The Role of the Decennial Census in Geographic Distribution of Federal Funds—Report #2 Estimating Fiscal Costs of an Undercount to States," George Washington Institute for Public Policy, March 19, 2018.

Schwede L "Complex Households and Relationships in the Decennial Census and in Ethnographic Studies of Six Race/Ethnic Groups: Final Report," Statistical Research Division, U.S. Census Bureau 2003 Aug. https://www.census. gov/pred/www/rpts/Complex%20Households%20Final%20 Report.pdf.

Semann, S. Time-Space Sampling and Respondent-Driven Sampling with Hard to Reach Populations.  journals.sagepub.com/doi/pdf/10.4256/mio.2010.0019

State of CA Senate Office of Research "A Statistical Picture of Latinos in California: 2017 Update prepared for the Latino Legislative Caucus," 2017.

Sherman J, Villarejo D, Garcia A, McCurdy S, Mobed K, Runsten D, et al. "Finding Invisible Farmworkers: The Parlier Survey." California Institute of Rural Studies, 1997.

Steuve, A. et al.  "Time-space sampling in minority communities: results with young Latino men who have sex with men," American Journal of Public Health 91, no. 6 (June 1, 2001): pp. 922-926. DOI: 10.2105/AJPH.91.6.922 PMID: 11392935.

Trevelyan, E., et al., Characteristics of the U.S. Population by Generational Status: 2013.  Current Population Survey Reports, P23-214. US Census Bureau, November 2016.

Turner K, Guzman L, Wildsmith E, Scott M. "The Complex and Varied Households of Low-Income Hispanic Children" National Center for Research on Hispanic Families and Children, 2015 Jan.

West, Kirsten, "Causes of Coverage Error: What Can We Learn from the Respondent," paper presented at the annual meeting of the Demographic Association, October 1985.

West K, Fein D.J. "Census Undercount: An Historical and Contemporary Sociological Issue," Sociological Inquiry, Vol. 60 #2, 1990.

West, K. K. and J. G. Robinson. "What Do We Know about the Undercount of Children?" U.S. Census Bureau Population Division, Working Paper No. 39, August 1999.

Young and Rubicam – see Census Bureau, 2020 Census Barriers, Attitudes, and Motivators Study (CBAMS) Survey and Focus Groups: Key Findings for Creative Strategy. Team Y&R, U.S. Census 2020, October 31, 2018.

# APPENDIX A — Methodology

The San Joaquin Valley Health Fund's San Joaquin Valley Census Research Project was conducted through face-to-face interviews with 414 Latino first- and second-generation immigrant respondents in eight counties and focus groups in three counties in the San Joaquin Valley of California, from early September 2018 through mid-October 2018.

Focus groups with three sub-populations of Latinos—indigenous-origin immigrants, DACA recipients and second-generation immigrants were conducted during December 2018 to provide additional insights into the perspectives of these sub-groups among Latino immigrants. The implications of survey respondents' comments in the course of the survey, along with focus group discussions, is analyzed in a companion report, "The Personal Geography of Census Non-Response: Implications for Promoting Census Participation" from the San Joaquin Valley Health Fund.

## The Survey Research Team

The core research team for the study consisted of five researchers with long experience working in national research with farmworkers and rural Mexican immigrants and in health-related studies, housing studies, Spanish-language radio audience research, and research on immigrant community life in the San Joaquin Valley. This team developed both of the research instruments (survey form and the focus group agenda) as well as developing data management, data entry and data validation procedures.

While all team members participated in the survey design elements, Cindy Quezada of Central Valley Immigrant Integration Collaborative fulfilled the role of Survey Data and Operations Manager and Latino Focus Group Manager; Dr. Richard Mines fulfilled the role of Data Manager and analyst; Gail Wadsworth, Director of California Institute for Rural Studies, fulfilled the role of Project Director and Analyst of qualitative data; Ed Kissam fulfilled the role of Census Research Advisor and Report Writer; and JoAnn Intili fulfilled the role of Research Project Advisor. Interviews were carried out by Rafael Flores, Jorge San Juan, Morena Fuentes, Marco Antonio Fuentes, Rigoberto Garcia and Lilia Becerril.

## Form Development

Five of the six survey team members spoke Spanish fluently, and all had experience doing both quantitative and qualitative research in Spanish and English, with indigenous and mestizo and in non-indigenous or mestizo communities. The survey form initially was developed in English, and then translated into Spanish. The form was translated by an immigrant who had lived and worked in the San Joaquin Valley for more than 10 years. It was then checked and re-translated, where necessary.

The form was then field tested with four people, revised again and field tested with about 30 people, revised and then tweaked by the survey interviewers as part of the training. Altogether the survey development passed through about 15 different iterations before the form was finalized.

The survey instrument was designed to generate information about respondents' understanding of the census, willingness to self-respond to a census with or without the citizenship question, willingness to participate in a non-response follow-up interview with an enumerator and participate in a proxy interview. The survey also elicited key information on household composition and respondent characteristics.

To assure potentially worried respondents about confidentiality, interviewers explicitly told them that they did not want their names and that, although they would be asked the town and zip code they lived in, the survey would not include information on their address.

The survey questions that related to beliefs, attitudes or decision-making related to the census were designed so that interviewers would elicit conversational answers, which were written down as textbox entries as well as clear-cut responses of yes, no or maybe with respect to willingness to answer a census without the citizenship question or a census that included it. This provided a means to review interviewers' coding as well as to capture some of the colloquial tone of interviews designed to engage respondents by having a conversational tone.

As is usual, one of the challenges the team sought to address in the development of the survey was the issue of length and burden. The team was well aware of the price paid for making an interview too long, and the first tests of the form indicated that was an issue—some of the respondents evidenced boredom and distraction. As a result, the team ended up adopting an elaborate skip pattern, short circuiting most of the more complicated sessions for those

respondents who said they would self-respond to the census.

The analytic limitations imposed by the skip patterns utilized relate primarily to the fact that the sub-set respondents asked about response to an enumerator visit were those who had said they would not respond. These issues are addressed in more depth in our companion report on the focus group discussions and survey respondents' comments.

### Survey Data Collection Team and Training

A team of 20 people was recruited and trained by the Survey and Data Managers to undertake the data collection. Interviewers were recruited through individuals who participated with organizations working in the San Joaquin Valley.  Of those 20, 10 actually continued on to do interviews. These included six women and four men, ranging in age from about 25 to 52 years of age. Three spoke only Spanish; two spoke Spanish, Mixteco and English; and five spoke English and Spanish. Regarding preparation for this kind of work, all had experience doing outreach and seven had worked in survey research projects in the past. One was a teacher, another a college instructor; one a student; three were in private-sector work (construction/farmwork); three worked for community-based organizations and one was a housewife. The four interviewers who collected the majority of the data had previous survey research experience.

Training took place over three days—two days in the classroom and one in the field. It was led by the Research Manager, Dr. Cindy Quezada, and was assisted by Dr. Rick Mines, who helped design the instrument, the training and data collection management tools, based on his long experience as head of the National Agricultural Worker survey for the U.S. Department of Labor, and his extensive research interviewing California farmworkers over more than four decades.

See the Training Agenda presented in Exhibit 1.

Training was conducted in Spanish and English (where needed); and introduced the organizations doing the research, the reason for the research and the timeline, how to approach potential respondents and gain consent from the targeted sub-populations that were to be priorities at the venue, orientation to the interview/questionnaire format and how to record data, and an interviewing practicum.

Data entry was done by some of the same people who collected the interviews, but each interview was reviewed by the Research Manager before being turned over to the data entry workers. Dr. Mines undertook the major data preparation and analysis.

### Sample Design and Implementation

The designation of harder-to-count populations is amply documented in previous census research (see, for example, Bruce and Robinson 2003, and Census Hard to Count Maps 2020) on development of the HTC score. Kirsten West, David Fein and a range of ethnographers involved in the Census Bureau's alternative enumeration initiative have provided rich descriptions of community, household and individual characteristics that make census participation difficult. While a variety of persons may be less likely to respond to the census, the group that is termed harder-to-count includes a preponderance of those who are poorer, minority and immigrants. Thus, we were concerned to use a methodology that was efficient in capturing the harder-to-count as well as being able to provide a reliable and accurate assessment of their willingness to respond to the census.

As Steuve (et al. 2001) have noted, household sampling and traditional random sampling techniques are not necessarily appropriate if one needs to capture respondents who are likely to be dispersed across an area, or who experience stigma. Multi-stage random sampling techniques are expensive and do not necessarily lead the researcher to the appropriate respondents, as has been documented in research on omission of low-visibility housing from the Census Bureau's sampling frame. Given a limited research budget and limited time, we were looking for a strategy that would concentrate resources where the harder to count are.

Please contact Ellen Braff-Guajardo at ebraff-guajardo@sierrahealth.org if you would like a copy of the survey form.

## Exhibit 1: Interviewer Training Agenda

DDAY 1 (8 de Septiembre, 2018)
9-9:15— Llegada (fruta, café)
9:15-9:45—Presentación individual ante el grupo
9:45-10:15—Introducción del proyecto:

- CIRS y CVIIC - quiénes somos?
- ¿Qué es el censo y por qué es importante?
- El propósito de este estudio

10:15-11:00—Revisión del Manual de Instrucciones (disponible en la reunión)

- Cronología de la recolección y análisis de datos
- Como presentarse a los entrevistados en distintos lugares
- Consideraciones especiales  para los lugares de muestreo
- Cuotas para el muestreo

11:00-11:15 Pausa
11:15-12:00pm—Continuación de la Revisión del Manual de Instrucciones (disponible en la reunión)

- Consentimiento VERBAL
- Lenguaje
- Estilo de presentación
- Como registrar y revisar datos en una encuesta
- El formato de la encuesta
- Como percibir el estatus legal del entrevistado

12:00-12:30—Almuerzo— Logística- Revisión del papeleo - W9's, ID's, depósito directo
12:30-1:00

- Como entregar las encuestas
- Horas de oficina de Cindy
- Como trabajar en parejas

1:00-1:15pm Pausa
1:15-3:15 Revisión de las preguntas de la encuesta  (1ra sesión)

DAY 2 (9 de Septiembre, 2018)
9:00-9:15— Llegada (café y fruta)
9:15-10:45— Revisión de las preguntas de la encuesta  (2da sesión)
10:45-11:45— Práctica de entrevista
11:45-12:00— Pausa
12:00-12:30pm   Almuerzo— discusion de los resultados de la práctica realizada
12:30 -1:30pm—  Seguir practicando la entrevista
1:30pm-1:45pm—  Preguntas y discusión

DAY 3 (Fecha no todavía determinada) Las Primeras Entrevistas en Lugar

The methodology selected for this is time-space sampling (TSS), pioneered by the Center for Disease Control in its AIDS research—the Young Men's Survey. Parsons (2008) notes "Time-space sampling is named for the randomization of time (whether it be day of week, and/or segment times during a particular day), space (venue/location to which participants are to be drawn from), and often individuals (every nth person entering a venue);" although Parsons also finds that the selection of every 'nth person' is not necessary for maintaining the integrity of the findings.

Steuve describes the strategy as "a probability based method for enrolling members of a target population at times and places where they congregate rather than where they live." (Steuve, 2001). For other researchers, TSS seems like a form of cluster-based sampling (cf. Wikipedia, Sampling). It walks the line between convenience and snowball sampling (each not considered to be probability-based sampling one can generalize from) and the more precision-oriented household and other systematic, random-based, sampling strategies.

For this research, we took the approach members of the research team had utilized previously in a decade of audience research for Radio Bilingue, which compared favorably with Arbitron audience research based on standard multi-stage sampling (cf. Kissam, et al., 2003), that mitigates the downsides of potential biases associated with specific venues, with a firmly community-context rooted and tested survey. (cf. Parsons, 2008; Ott, 2018).

Muhib (2001) credits TSS with the ability to generate a relatively diverse sample at higher efficiency and lower cost. Samaan (2010) avers that with good planning and implementation, TSS can produce representative samples. (Weir, et al, 2012, note significant differences among venue samples of sex workers in China, but their analysis seems to suggest that the reason might be specific requirements by individual venues for types of sex workers. Those sorts of requirements do not apply here.)

The process for recruitment used in the San Joaquin Valley Census Research Project survey followed a three-step process similar to the one Steuve used. First, venues where the population might congregate in an area were identified and reviewed, and then those that represented high probability areas for different targeted population subgroups were identified and selected. Second, for each

venue, days and times of day when higher numbers of people congregated were determined.

Venues were chosen to be geographically dispersed and diverse with respect to the types of individuals frequenting them. We improved the likely representativeness of the sample by relying on a community-based field research team, with many of the same characteristics of the targeted respondents, to identify and characterize specific venues. The field researchers knew the range of potential venues and could assess the likelihood each would prove effective.

Ott, et al. (2018) used much the same approach, and found the approach viable as an alternative for household-based sampling, when based in a deep-seated community engagement context. As she points out, "A common critique of [time-space sampling, sic.] is that, while providing access to hidden populations, it makes it difficult to generalize. ... sampling approaches may ultimately be a trade-off of biases [16]. Although household approaches to sampling may be conducted in such a way as to be statistically generalizable to a community, these approaches pose nonresponse biases of their own, due to particular confidentiality concerns within the household and lack of availability at the time the researchers come." These concerns, and her and her colleagues' conclusions about them based on their study, are very much in line with our own.

The entire sample for the San Joaquin Valley Census Research Project was targeted at 600 individual interviews. This figure was decided upon in order to meet budget and time constraints, while at the same time affording sufficient bandwidth to conduct statistical comparison among the Valley's harder-to-count ethnic sub-groups (principally Latino, Asian and Punjabi). Table A-1 presents the relative proportion of Latino population in each of the eight San Joaquin Valley counties, and the number of Latino immigrant interviews targeted and achieved.

## TABLE A-1: APPROXIMATE GEOGRAPHIC SAMPLING TARGETS—LATINO RESPONDENTS

| County | Average HH Size | Foreign-born Population | Hispanic as % of County Population | Survey Target (# of Latino interviews) | Actual Latino interviews (N=416) |
|---|---|---|---|---|---|
| Fresno | 3.18 | 207,744 (23%) | 50% | 100 (24%) | 116 (28%) |
| Kern | 3.19 | 176,647 (20%) | 49% | 80 (19%) | 48 (12%) |
| Kings | 3.28 | 27,620 (3%) | 50% | 15 (4%) | 10 (2%) |
| Madera | 3.37 | 32,947 (4%) | 53% | 30 (7%) | 52 (13%) |
| Merced | 3.36 | 69,190 (8%) | 54% | 50 (12%) | 37 (9%) |
| San Joaquin | 3.14 | 173,684 (19%) | 38% | 40 (10%) | 34 (8%) |
| Stanislaus | 3.07 | 107,953 (12%) | 41% | 50 (12%) | 34 (8%) |
| Tulare | 3.35 | 102,459 (11%) | 60% | 50 (12%) | 85 (20%) |
| Average SJV Household Size | 3.2425 | 898,243 (100%) | 49% | 415 (100%) | 416 (100%) |

Within this geographic target matrix, quotas were set for different population sub-sets, roughly proportional to their representation among the foreign-born immigrant population in 2010.

Table A-2 presents the targeted and actually realized sample for Latinos overall and by categories of age and gender and immigration status.

## TABLE A-2: SAMPLING TARGETS FOR LATINOS BY AGE, GENDER, IMMIGRATION AND LEGAL STATUS

| Survey Participant Characteristics | Latino | Young 18-25 | Mid 26-64 | Older 65+ | Total % Female |
|---|---|---|---|---|---|
| **Foreign Born (75%) N=315** | 100% | 15% | 80% | 10% | 49% |
| · Target – | 315 | 45 | 240 | 30 | 47% |
| · Actual – | 316 | 19 | 259 | 38 | 46% |
| **Naturalized Status** | | | | | |
| · Target – 21% of FB | 65 | - | 50 | 15 | 47% |
| · Actual – 15% of FB | 48 | 4 | 28 | 16 | 46% |
| **Legal Resident Status** | | | | | |
| · Target – 35% of FB | 110 | 15 | 90 | 15 | 47% |
| · Actual – 36% of FB | 113 | 4 | 92 | 17 | 43% |
| **Undocumented Status** | | | | | |
| Target – 44% of FB | 140 | 30 | 100 | - | 47% |
| Actual – 49% of FB | 155 | 11 | 139 | 5 | 50% |
| **US Born  (25%) N=100** | 100% | 50% | 50% | - | 50% |
| · Target Second-generation | 100 | 50 | 50 | - | 50% |
| · Actual Second-generation | 98 | 60 | 34 | 4 | 49% |
| **Total Sample Comparison with Targeted Sample** | | | | | |
| · Targeted Sample | 415 | 95 (23%) | 290 (70%) | 30 (7%) | 198 (48%) |
| · Actual Realized Sample | 414 | 79 (19%) | 293 (70%) | 42 (10%) | 193 (47%) |

Table A-2 shows a slightly higher number of older Latinos interviewed at the expense of younger Latinos. However, there is representation of the full age range, gender, and legal and immigration status.

Focus groups following the termination of the interview portion were conducted with a variety of population subgroups in order to sound out types of participants we might have missed on how they feel about the census (mirroring the actual survey). The companion report to this one summarizes these findings and the comments collected from participants in the course of the interviews.

### Data Collection

Data collection took place with (at least) pairs of interviewers going out to different venues. The Research Manager selected venues and assigned data teams, and most times the teams were accompanied by the Research Manager, who also did interviews. In total, interviews were conducted at 104 venues in the San Joaquin Valley. The types of venues selected are presented in Table A-3.

## Table A-3: Types of Venues Where Interviews Were Conducted

| Venue Types | # of Venues | # of Interviews |
|---|---|---|
| Laundromat | 28 | 62 |
| Remate (flea market) | 17 | 137 |
| Ethnic food store | 7 | 20 |
| College campus | 9 | 35 |
| Park | 11 | 28 |
| Mall or mainstream retail—groceries, restaurant | 9 | 35 |
| Food distribution event | 6 | 42 |
| Barber/salon | 3 | 4 |
| School | 3 | 3 |
| Special events (e.g. Fiestas Patrias, Health Fair, Consulado Sobre Ruedas, DACA Workshops, Wedding, Community spaces) | 10 | 41 |
| Total Venues | 104 | 416 |

The venues were selected for the appropriate population and ability to conduct interviews. The specific sub-population to be interviewed at each venue was identified beforehand. For example, some venues were selected to likely have a younger group or an older group or more women or more men, etc. Progress in meeting sample targets was registered in the data management software developed by the research management team.

All interviews were conducted in the language of choice of the respondent. Over the course of the interview period (September 2018 through October 2018), we were able to successfully interview 414 Latinos. These included:

- 116 respondents from Fresno County (28%), in venues in seven towns
- 48 respondents from Kern County (12%), in venues in three towns
- 10 respondents from Kings County (2%), in venues in two towns
- 52 respondents from Madera County (13%), in venues in three towns
- 37 respondents from Merced County (9%), in venues in two towns
- 34 respondents from San Joaquin County (8%), in venues in three towns

- 34 respondents from Stanislaus County (8%), in venues in three towns
- 84 respondents from Tulare County (21%), in venues in eight towns

While we generally targeted different sample subgroups for each of the venues, we were very careful to work toward dampening bias by:

- Instituting similar practices for each to control possible selection bias,
- Limiting the number of individuals who could be interviewed who were part of the apparently same friend/family group,  Equipping the interview location with a place to sit with some privacy,
- Relying on trained interviewers who were drawn from the population we had targeted, and who could interview either in English or the potential respondent's native language, whichever was preferred.

Interviewers approached all those who were present in the location who fit the specified target groups (i.e., likely age, gender or ethnicity). The team did not specify every 'nth' person, as that was not feasible with the staffing available.

## Respondents' Reaction to the Invitation to Participate in this Survey

Interviews took 10-20 minutes and respondents received a token remuneration of $20, in the form of cash in a plain envelope, presented at the end of the survey.

While the remuneration was appreciated at the end, it was not enough to ensure busy, reluctant shoppers (for example) would assent to participate in the survey.

There are two types of refusal—those who refuse to participate initially, before one gets a chance to start the survey, and those who quit when they realize the nature of the questions. Our approach to survey design was successful in dealing with the second—nobody changed their mind mid-stream. However, many were just too busy or too nervous about what we might want (e.g. to sell them something), or the weather was too hot (over 95 degrees several days, since interviews took placed in the fall in the San Joaquin Valley of California). So, some were not willing to take the time to talk with the interviewers.

The heat at the time and the specific community climate surrounding the intended survey respondents (ICE raids in Spring 2018, news reports of impending DHS "public charge" regulations, local courtroom detentions of unauthorized immigrants and uncertainty about possible termination of DACA) are factors that make it difficult to set and use an appropriate benchmark drawn from other studies where the particular social environment of social pressure undermining willingness to talk with "outsiders" was different.

Additionally, as with many other studies, keeping accurate track of who did not want to participate at all is difficult, as some just signal and you cannot get their attention; others say 'no' in some fashion; and others want to be interviewed in a group; and one doesn't have enough staff. The kind of reception to the interview and willingness to participate in the interview varied a lot by type of venue. As one might expect, success was higher in laundries, in some of the flea markets, although it varied from place to place, and food distribution lines than in shopping malls.

On average, the response rate went from a low of about 30% of potential respondents who agreed to talk with interviewers, to almost all. (This is the estimate of the Research Manager who was present at almost all of the interviews). While, ideally, it is possible to get a 60% to

90% response rate, these rates generally occur where the interviews are about a topic that will directly benefit the individual respondent, or which they can see benefit in, e.g. HIV prevention, African-American community-building, etc. Few had heard of the public controversy regarding the citizenship question, but, as discussed in study findings, levels of community trust have been eroded by the immigration enforcement environment.

In a more neutral environment, the Census Test in 2017 yielded a 50% response rate, transit rider response rates for intercept interviews hovered around 35 to 40%, and mall interview response rates varied from about 20% to 90%. In the case for this study, conditions were worse, and these positive factors were not at play.

The major positive factor for potential respondents were the interviewers themselves, and their cultural competence, language and social skills; as well as maybe a place to sit on a hot day, and the respect given them with a token of remuneration for their time.

However, all that being said, the important thing is whether the respondents do in fact represent the hard-to-reach, immigrant population that we were trying to reach. The answer seems clearly to be YES. This has been shown in Table A-2 and was discussed in Tables 1 and 2 of the body of the report. We are particularly pleased that the eventual sample appropriately represented countries and states of origin for the Mexican immigrants, and that it included indigenous-origin respondents, and Central American immigrants. The sample is also representative of the foreign-born Latino immigrant population in the region with respect to educational attainment and representative of the U.S.-born second-generation immigrant population in terms of education.

# References for Methodology Section

**The Hard-to-Count Population**

Bruce, A. and J.G. Robinson. THE PLANNING DATABASE: Its Development and Use as Effective Targeting Tool in Census 2000. U.S. Census Bureau, Paper presented at the Annual Meeting of the Southern Demographic Association, Arlington, Va., October 23-25, 2003. http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.115.3349&rep=rep1&type=pdf

Boone, T. and S. Proudfoot. 2017 Census Test Preliminary Findings. US Bureau of the Census 7 July 2017. https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/07-11-2017/pmr-update-testing-2017-07-11.pdf

De La Puente M. "Using Ethnography to Explain Why People are Missed or Erroneously Included by the Census: The Evidence from Small Area Ethnographic Studies," Center for Survey Methods Research, U.S. Census Bureau https://www.census.gov/srd/papers/pdf/mdp9501.pdf.

De la Puente M. "An Analysis of the Underenumeration of Hispanics: Evidence from Small-area Ethnographic Studies," Proceedings of the 1992 Bureau of the Census Annual Research Conference, 1992.

Kissam E. "Differential undercount of Mexican immigrant families in the U.S.," Statistical Journal of the International Association of Official Statistics. 2017.

Mahler, Sarah. "Alternative Enumeration of Undocumented Salvadorans on Long Island." Prepared under Joint Statistical Agreement 89-46 with Columbia University. Bureau of the Census, Washington, D.C. 1993.

**Intercept Survey Response Rates**

Barajas, J.M. "Immigration, Income, and Public Transit Perceptions: Findings from an Intercept Survey," Journal of Public Transportation Vol. 21(2), 2018. Pp1-18. https://scholarcommons.usf.edu/cgi/viewcontent.cgi?article=1696&amp=&context=jpt&amp=dir=1&referer=https%253A%252F%252Fwww.bing.com%252Fsearch%253Fq%253Dpublic%252Bintercept%252Bsurvey%2526FORM%253DQSRE6#search=%22public%20intercept%20survey%22

Hornik, J. and S. Ellis "Strategies to Secure Compliance for a Mall Intercept Interview," Public Opinion Quarterly, 1988. http://www.communicationcache.com/uploads/1/0/8/8/10887248/strategies_to_secure_compliance_for_a_mall_intercept_interview.pdf

SFMTA. Polk Street Intercept Survey Results. 2013. https://www.sfmta.com/sites/default/files/projects/PolkIntereptSurveyFindings.pdf

Miller, K.W. et al., The Feasibility of a Street-Intercept Survey Method in an African-American Community," American Journal of Public Health, Vol. 87(4) April 1997. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1380849/pdf/amjph00503-0129.pdf

Hall, M.G., et al. Respondent-Driven Sampling and Time-Location Sampling: A Comparison of Implementation and Operational Challenges for HIV Behavioral Research in Guatemala (2013). http://paa2013.princeton.edu/papers/130591

Kissam, E. et al. "Spanish-Language Community Radio as a Resource for Health Promotion Campaigns Targeted to Farmworkers and Recent Immigrants," Californian Journal of Health Promotion 2003, Volume 1, Issue 2, 183-197.

Muhib, F. B., Lin, L. S., Stueve, A., Miller, R. L., Ford, W. L., Johnson, W. D., & Smith, P. J. (2001). A venue-Based Method for Sampling Hard-to-Reach Populations. Public Health Reports, 116(1_suppl), 216–222. https://doi.org/10.1093/phr/116.S1.216

Ott, M.A., et al. "Community Engagement and Venue-based Sampling in Adolescent Male Sexually Transmitted Infection Prevention Research,"Journal of Adolescent Health, 62(2018) S58–S64. https://reader.elsevier.com/reader/sd/pii/S1054139X17304986?token=ABF9FCFBA19A9AFC23D4A29976C44A-271B76E54187375BEE36C13770EDC3137A821DBA32E9517235882D6AC4351F59B6

Parsons, J. T., Grov, C., & Kelly, B. C. (2008). COMPARING THE EFFECTIVENESS OF TWO FORMS OF TIME-SPACE SAMPLING TO IDENTIFY CLUB DRUG-USING YOUNG ADULTS. Journal of drug issues, 38(4), 1061-1081.

Semann, S. Time-Space Sampling and Respondent-Driven Sampling with Hard to Reach Populations. journals.sagepub.com/doi/pdf/10.4256/mio.2010.0019

Steuve, A. et al. "Time-space sampling in minority communities: results with young Latino men who have sex with men," American Journal of Public Health 91, no. 6 (June 1, 2001): pp. 922-926. DOI: 10.2105/AJPH.91.6.922 PMID: 11392935.

Weir, S.S. et al. A comparison of respondent-driven and venue-based sampling of female sex workers.



www.shfcenter.org/sjvhealthfund

# EXHIBIT B

# A Cascade Model: How Latino Immigrants' Lowered Response Will Lead to Differential Undercount in Census 2020

San Joaquin Valley Census Research Project
San Joaquin Valley Health Fund

By Edward Kissam





January 2019

The San Joaquin Valley Health Fund is managed by The Center at Sierra Health Foundation
with funding support from 18 state and national funders: Sierra Health Foundation,
The California Endowment, Rosenberg Foundation, The California Wellness Foundation,
W.K. Kellogg Foundation, Blue Shield of California Foundation,
Wallace H. Coulter Foundation, Dignity Health, Tides, Hellman Foundation,
The James Irvine Foundation, Convergence Partnership, Health Net,
The Grove Foundation, Werner-Kohnstamm Family Giving Fund, New Venture Fund,
Sunlight Giving and Heising-Simons Foundation.

To learn more about this unique community-first funder collaborative,
visit www.shfcenter.org/sjvhealthfund.

The San Joaquin Valley Health Fund census-related work is made possible with
the support from Sierra Health Foundation, Blue Shield of California Foundation,
Hellman Foundation, The James Irvine Foundation, The Grove Foundation,
Werner-Kohnstamm Family Giving Fund, New Venture Fund,
Sunlight Giving and Heising-Simons Foundation.

Access San Joaquin Valley Census Research Project reports online at:
www.shfcenter.org/sjvhealthfund
www.cirsinc.org/publications/current-publications

# Table of Contents

Executive Summary   1

Introduction   4

Overview of the Cascade Model and Its Utility   4

The San Joaquin Valley Census Research Project Survey and the Cascade Model: Understanding the Dynamics of Census Undercount   4

Litigation Seeking Adjustment for Erroneous Census Tabulations that Arise from Differential Undercount   5

Understanding the Dynamics of Differential Undercount   6

Moving Beyond a Focus on Self-Response Toward Understanding Multiple Causes of Undercount   6

Using the Cascade Model to Estimate Differential Undercount of Latino First- and Second-generation Immigrants in the San Joaquin Valley   7

How Variations in Response Rate and Structural Causes of Undercount Will Be Transformed Into Eventual Differential Undercount in Census 2020   8

The Cascade Model of Census Undercount in the San Joaquin Valley   9

Survey-Derived and Estimated Coefficients in the Cascade Model   10

The Cascade of Semi-Successful Efforts in the Nonresponse Follow-up Process Meant to Compensate for Households' Failure to Self-Respond   10

Key Threats to San Joaquin Valley Census Data Quality and the Components of the Cascade Model   11

    Before Enumeration Begins—Housing Units Omitted from the Census Bureau's Address List   12

    NRFU Step 1: Adequacy of Administrative Records for Identifying Occupied vs. Vacant Housing Units   13

    NRFU Step 2: Direct Interview Completion (Interview with a non-responding household, excluding proxy interviews)   13

    NRFU Step 3: Efforts to Secure Proxy Interview Response Rate   15

    NRFU Step 4: Using Administrative Records to Impute Household Size and Characteristics   15

    Erroneous Enumerations in the Course of NRFU: Partial Household Omission in Complex Households that Do Self-Respond or Respond to an Enumerator Visit   17

    Statistical Efforts after NRFU: Erroneous Enumerations from Hot-Deck Imputation of the Size and Characteristics of Non-Enumerated Households   18

    Estimating the Impact of Hot-Deck Imputation from Relying on Average San Joaquin Valley Households for Imputing the Size and Characteristics of Non-Responding Latino Immigrant Households   18

Weighting Survey-based Estimates of Latino Immigrant Household Census Participation and     19
Household Size to Project Undercount for the San Joaquin Valley Region

Survey and Cascade Model Implications for Undercount of Latino First- and Second-generation     19
Immigrants throughout California

Conclusions and Implications     22

Appendix A: Cascade Model Estimating San Joaquin Valley Latino First- and     24
Second-generation Undercount

Appendix B: Estimate of Distribution of First- and Second-generation Latino Immigrants     26
as % of  SJV Population and Resulting Undercount

# Executive Summary

## A Cascade Model: How Latino Immigrants' Lowered Response Will Lead to Differential Undercount in Census 2020

This is the second in a series of six reports by the San Joaquin Valley Census Research Project based on Fall 2018 survey research assessing the likely impact that adding a citizenship question to Census 2020 will have on Latino first- and second-generation immigrant undercount in the region.

The Census Bureau has been consistently optimistic about the viability of streamlined census procedures introduced as part of modernizing and re-engineering Census 2020. However, the new procedures, while cost-effective and probably satisfactory for easier-to-count populations and communities, are likely to have serious limitations when utilized in neighborhoods and communities such as those of the San Joaquin Valley.

Most problematic, the reliability of the planned data collection strategies has not been assessed or tested in the distinctive societal context where addition of the sensitive question about citizenship is expected to lead directly to pronounced response bias within an already hard-to-count population. We expect the re-engineered procedures will exacerbate differential undercount, at least in immigrant communities, and quite possibility in others with high proportions of low-income households.

The cascade model presented here draws both on the research done in the San Joaquin Valley and presented in the first of these reports and on previous analysis and research. It describes how lowered response rates are likely to affect each stage in the census process of data collection/processing.

This San Joaquin Valley Census Research Project-based model explains how lowered response is transformed into undercount. It is referred to as a "cascade" model because the level of success and failure at each stage in decennial census operational procedures determines the parameters for census operations at the next stage. Level of self-response, for example, determines extent of reliance on enumerator efforts to secure information from the households that fail to self-respond. Enumerator success in this endeavor then determines the extent of reliance on proxy interviews for information on households. Cumulative success at this stage, then, determines the

extent of efforts to secure data from administrative records. And finally, cumulative success determines the need for reliance on count and whole-person imputation. The accuracy of the census count (and demographic profile of the population) depends on the level of reliance on each data-collection or analytic operation, since some (e.g. proxy interviews) are known to be more error-prone than others.

The cascade of census stages in decennial census collection/imputation are visualized in the cascade model of undercount of the San Joaquin Valley Latino first- and second-generation immigrants in Figure 1.

## Figure 1—The Cascade Model of Diminishing Data Quality in Successive Census Operations



Compilation of Master Address File

↓

Delivering Invitations to Respond (Internet Choice and Internet First) and Securing Self-Response

↓

Non-Response Follow-up: Enumerator Household Interviews

↓

Non-Response Follow-up: Proxy Interviews with Neighbors if no "Direct" Interview is possible

↓

Search for "High Quality" Matching Administrative Records for HH Imputation

↓

Hot Deck Imputation to estimate size and characteristics of HH's not enumerated otherwise

↓

Census Tabulations Reporting Population Count and Demographic Characteristics

The current paper incorporates empirical data collected in the San Joaquin Valley Census Research Project survey to estimate the Census Bureau's success/failure in the following stages of the process: MAF-building, self-response, NRFU direct interview response, and proxy interview response. It also relies on the project's survey data to estimate the systematic undercount resulting from use of hot-deck imputation due to differences in size between the households likely to respond to the census and those likely not to respond.

Despite the valiant but compromised efforts by the Census Bureau to generate accurate census tabulations in the face of greatly elevated and uneven non-response, we believe the result will be attrition in data quality that ultimately results in flawed tabulations of both the size and demographic characteristics of the region's population.

The stakes are high for the San Joaquin Valley because the hard-to-count population of Latino immigrants makes up more than one-third of the entire population in the region. The model estimates the level of Latino immigrant undercount in the region as being 11.7% if the citizenship question is added. Given the size of the Latino immigrant population likely to be undercounted, it is reasonable to expect a 4.1% undercount in the total population of the San Joaquin Valley.

One of the issues it will be particularly important to consider is not just the overall flawed tabulations, but the differential undercount of sub-groups within the Latino population. Different levels of census response among undocumented immigrants, legal residents, naturalized citizens and the U.S.-born second-generation will skew the census-derived demographic profile of Latinos, as well as give rise to geographic disparities in census count. The model also identifies some potential ways for the Census Bureau to collaborate with local stakeholders in combined efforts to ameliorate likely undercount. This paper makes it clear that "Get Out The Count" campaigns focused primarily on impacting respondent motivation will not yield adequate results unless they also incorporate strategies to improve operational processes of census data collection.

It appears that the Census Bureau's view about the efficacy of its procedures to "cure" widespread non-response stemming from inclusion of the citizenship question in Census 2020 is misplaced. The cascade model in its present (initial) stage is essentially an exercise in hypothesis generation—tracing how patterns of non-response ripple onward through NRFU into flawed tabulations. We cannot yet definitively determine the model's predictive accuracy, in part because details on some aspects of Census 2020 operations (particularly those relating to reliance on administrative records and algorithms for hot-deck imputation) are unclear or unavailable.

We also recognize that the San Joaquin Valley Census Research Project initial findings about the prevalence and structure of complex households need to be further researched, due to the variety of housing accommodation and living arrangements, and the need to better understand how adding a citizenship question would exacerbate pre-existing patterns of partial household undercount in these sorts of crowded housing. The contribution of the project's initial research in this specific area is to highlight issues that have not yet been adequately addressed by the Census Bureau.

The current analysis and estimate of Latino immigrant undercount can and should be refined as Census 2020 operations are finalized. Nonetheless, we think it is critical at this juncture of census planning to think clearly and practically about operational adjustments that might contribute to an accurate and fair census.

Our hope is that the analysis presented here provides a useful framework to re-assess how the re-engineered decennial census operations will affect differential undercount in different regions and among ethnic groups with specific demographic profiles. The model's projection of the likely magnitude of differential undercount in Latino immigrant communities, even if subsequently adjusted, suggests the need for a commitment to carry out the research needed to yield fine-grained measurement of Census 2020 differential undercount and to use ethnographic research and demographic analysis in addition to dual-system estimation. It is unfortunate that the Census Bureau's ethnographic research efforts, which so powerfully illuminated crucial understanding of multiple causes of differential undercount, have languished over the past decade. Such research might well have shown, as the

San Joaquin Valley Census Research Project has sought to do, that the dynamics of census undercount cannot be adequately understood in isolation, that real-world context and operational implementation need to be carefully considered concurrently.

Being a work in progress, the San Joaquin Valley Census Research Project will update the analyses in the model to incorporate forthcoming survey-based findings about patterns of census response among non-Latino immigrants in the San Joaquin Valley when they become available in February 2019.

Meanwhile, we encourage readers who are concerned about the possibility of differential undercount in communities with high concentrations of low-income minority and immigrant households to consider using the cascade model analytic framework in combination with local survey and ethnographic research to examine the distinctive configuration of operational risks they face if Census 2020 includes the citizenship question.

## Introduction

An important issue in projecting the impact of the Department of Commerce's efforts to add a question on citizenship to Census 2020, given consensus that adding the question will decrease census response rates among Latino and other immigrants, is to determine the extent to which the problem of lowered response can be overcome in the course of non-response follow-up (NRFU).[1] This report describes a "cascade" model of census undercount developed to demonstrate how dramatically increased levels of non-response among certain populations in certain community contexts would be transformed into differential undercount.

The cascade model of undercount provides a basis to generate a sound empirically based estimate of the regional impacts that a 2020 decennial census with an added citizenship question (CQ) might have on undercount of Latino first- and second- generation immigrants. The report is drawn from interviews  with Latino immigrants in the eight counties of the San Joaquin Valley and, based on their responses, shows how widespread differential undercount of this population arises and how it would affect the total Census 2020 accuracy for the region.

The analysis presented here details the development of the cascade model based on survey data from the San Joaquin Valley, on review of previous research on census undercount describing how multiple causes of undercount interact, and on examination of the likely impact of the Census Bureau operational plans for implementing a re-engineered Census 2020 on census enumeration. It shows that, even if there were more funding, and vigorous efforts by the Census Bureau and local stakeholders, the lowered response rates of Latino first- and second-generation immigrants in the San Joaquin Valley will still result in serious differential undercount.

At the same time, by closely examining the extent to which different factors might contribute to undercount, the cascade model provides guidance for strategic efforts to adapt census operations to improve census accuracy in the region—by identifying operational pressure points where collaborative efforts with local stakeholders might, at least, mitigate serious differential undercount.

The model presented here also provides insights for designing an alternative enumeration research initiative, whereby states and other census stakeholders might independently evaluate census coverage of hard-to-count

populations in geographic areas with concentrations of immigrants where already-problematic standard census operational procedures may fail due to unprecedented high levels of non-response occasioned by the CQ.

## Overview of the Cascade Model and Its Utility

During the non-response follow-up (NRFU) process, the Census Bureau works hard to implement a methodological strategy designed to compensate for household non-response. Nonetheless, census data quality is eroded in communities when there are high levels of non-response among some sub-populations, despite the Census Bureau's best efforts to secure complete enumeration. This is because, when confronted with high levels of household non-response, the Census Bureau is forced to rely on additional operational and statistical procedures—most notably proxy interviews, recourse to administrative records and, finally, imputation—to generate published tabulations of raw census data. Each of these efforts, while partially compensating for non-response, introduces errors into the eventual tabulations of census data that provide the official basis for apportionment and for allocation of federal funding.

The cascade model of undercount described here draws on earlier researchers' powerful insights that patterns of differential undercount do not stem from certain populations being intrinsically hard to count, but rather from the interactions between the census system of enumeration and the population being enumerated, as well as on findings from the San Joaquin Valley Census Research Project of Latino first- and second-generation immigrants to estimate the extent of undercount in this population and the resulting patterns of regional undercount.

## The San Joaquin Valley Census Research Project Survey and the Cascade Model: Understanding the Dynamics of Census Undercount

The Census Bureau has been consistently optimistic about the viability of streamlined census procedures introduced as part of modernizing and re-engineering Census 2020. Unfortunately, there are reasons to believe that the new procedures, while cost-effective and satisfactory for easier-to-count populations and communities, have serious limitations when utilized in neighborhoods, communities, counties, regions and states with higher-than-average concentrations of non-citizens.

1 See the January 15, 2019, decision by the District Court, Southern District of New York in New York Immigration Coalition et. al. v. United States Department of Commerce "Findings of Fact and Conclusions of Law."

The specific ways in which the Census Bureau's system of data collection and analysis leads to differential undercount stem in part from the characteristics of the population being enumerated, but also from the structural characteristics of a geographic area—housing patterns and living arrangements and local socioeconomic context.[2] For better or worse, the population and housing characteristics of the San Joaquin Valley make it a natural laboratory for exploring the extent to which adding a sensitive question such as the citizenship question to the decennial census gives rise to differential non-response, which then results in severe differential undercount of, at least, immigrants and, presumably, other socioeconomically defined groups too.

Of particular concern in the San Joaquin Valley and regions with dense concentrations of low-income immigrant households are use of "in office" address canvassing as a substitute for "in field" address canvassing, efforts to rely on administrative records as a source of information on household size and characteristics, and ultimately, reliance on hot-deck imputation when other efforts fail. The re-engineered Census 2020 procedures may sometimes be more cost-effective than old-fashioned operational processes, but the apparent cost-effectiveness of these operational innovations may well undermine census accuracy—especially in geographic areas where non-response is extremely high. This appears to be a likely outcome in California's San Joaquin Valley.

The Department of Commerce's decision to add a citizenship question (CQ) to Census 2020 was clearly bound to result in differential undercount in the San Joaquin Valley. It is a large region with an expected 2020 population of about 4.6 million that is 52% Hispanic and where slightly more than one-third (35%) of the adult Hispanic population of potential census respondents, i.e. "householders" (P1), are first- or second-generation Hispanic immigrants. What was less clear was how to develop a quantitative estimate of the dynamics, whereby elevated non-response among immigrants resulting from adding the question might interact with existing structural barriers and thus undermine efforts to secure a fair and accurate census count.

The current iteration of the cascade model is specific to estimating the undercount of Latino first- and second-generation immigrants in the San Joaquin Valley because it

incorporates survey-based coefficients from the October-November 2018 San Joaquin Valley Census Research Project survey. However, the model framework can be adapted for use in any community or geographic area to generate an estimate of the magnitude of undercount of any identified vulnerable hard-to-count population in the context of any specific geographic area, assuming appropriate survey-based coefficients are available to describe a particular hard-to-count population's propensity to self-respond, respond to enumerators, respond to proxy interviews, size of responding and non-responding households, and likely representation in administrative records.

## Litigation Seeking Adjustment for Erroneous Census Tabulations that Arise from Differential Undercount[3]

Differential undercount of minorities has been a longstanding <u>statistical</u> problem in the decennial census and a practical <u>policy</u> problem because the flawed census data resulting from differential undercount leads to misallocation of federal funding that relies on census-derived data. At the same time, it also reduces political equity.

In 1980, several major cities sued the Census Bureau and sought to have census data statistically adjusted in order to correct for what was universally recognized to be not just random errors and omissions, but systematic errors in census enumeration. These systematic errors gave rise to flawed tabulations of the population in geographic areas, cities and states with higher concentrations of minorities and immigrants. There was similar litigation around the 1990 decennial census and, once again, efforts to secure statistical adjustment failed.[4]

2 Census Bureau ethnographic research began to provide useful insights in the 1980s, but the most important research for understanding the multiple causes of undercount stems from the Bureau's 1986 TARO (Test of Adjustment-Related Operations) research in the Los Angeles Basin. Analysis by David Fein and Kirsten West of finding from that initiative, particularly their analysis of data from the "Causes of Undercount" survey component have been crucial (Fein and West 1988; Fein 1989; West and Fein 1990). The Census Bureau's subsequent ethnographic research program in connection with the 1990 decennial census also has provided very important insights. I reviewed this research in detail and relied on it in several studies of differential undercount of migrant and seasonal farmworkers (Kissam and Jacobs 2006; Kissam 2012) and to estimate the overall under-count of Mexican immigrants in the United States (Kissam 2017).
3 Differential undercount is analyzed here in the context of census tabulations of data because census operations always include a number of procedural steps that seek to augment, enhance and/or adjust for non-response or erroneous response. What is often thought of as "census data" are actually the result of a sequence of data analysis procedures.
4 See Linda Greenhouse, "High Court Rules Results Are Valid in Census of 1990," New York Times, March 21, 1996, for details on the decision. The 1990 plaintiffs included the cities of New York, Los Angeles, Chicago, the U.S. Conference of Mayors, Dade County (Miami), Florida, the states of California and New York, and national groups such as LULAC and NAACP. With an expected 2020 population of about 4.6 million, the San Joaquin Valley's population is larger than the cities of Chicago and Los Angeles, and Dade County, Florida.

The plaintiffs did not prevail in the litigation seeking statistical adjustment for the 1980 or the 1990 Census, in part because it was ultimately determined that technical limitations in efforts to adjust would not necessarily yield a more accurate result. However, the Census Bureau did, then, undertake a program of research to better understand the causes of census undercount and, if necessary, go forward with statistical adjustment to correct the systematic undercount.[5] Review of that research indicates that in a census with a much higher level of census undercount than was observed in 1980 or 1990 (as is likely in Census 2020 if the citizenship question is included), statistically reliable analysis of differential undercount would be feasible.

What is new with respect to the attempt to add the CQ to Census 2020 is that adding the question will decrease census response among certain sub-populations of respondents—most definitively non-citizens and, among the non-citizens, Hispanic non-citizens and others in their social networks. There also will be negative impacts from other re-engineered but inadequately tested census operations.[6]

With improved research/analysis methodology, statistical adjustment may be feasible, but would require re-examination of old assumptions and research due to the dramatic changes in census questionnaire design and operations.

The quest for a fair and accurate census requires not only national estimates of differential undercount, but also robust efforts for smaller geographic areas, most obviously the political jurisdictions where census accuracy has the greatest impact on equity—counties, sub-state regions such as the San Joaquin Valley, as well as entire states.

If it were to rely on multiple methodological approaches, supplementing standard dual-system (DSE) analysis currently planned by the Census Bureau, with enhanced demographic analysis (DA) and ethnographic analysis (EA), such research might make an important contribution toward overcoming what will almost certainly be regional disparities resulting from shortcomings in Census 2020 design and implementation.

## Understanding the Dynamics of Differential Undercount

In the mid-1980s, as a result of growing policy concern and litigation about the impact of differential undercount of minorities, the Census Bureau initiated a research program to better understand patterns of undercount. This program resulted in greatly improved understanding about the multiple causes of census undercount.

Two lines of research were particularly fruitful in improving researchers' understanding of the dynamics of undercount—a multi-stranded research initiative in the Los Angeles basin as part of the 1986 Test of Adjustment Related Operations (TARO) and a subsequent national initiative as part of the 1990 Decennial Census—the ethnographic alternative enumeration research conducted by the Census Bureau's Center for Survey Research.

Based on the Los Angeles research, a sound theoretical framework to understand the causes of census undercount, not simply correlations, emerged (Fein 1989, Fein and West 1988, West and Fein 1990). The powerful insight stemming from this research is that undercount results from conflict between the census system processes for enumeration/data collection and the social universe in which respondents live.

The ethnographic research program made important contributions to understanding undercount. It analyzed how different interactions between the socioeconomic and cultural context of potential census respondents' lives and census operations gave rise to differential undercount of low-income minority and immigrant families (De La Puente 1992, De La Puente 1993). The program meticulously documented undercount in 31 distinct ethnic groups in different communities across the U.S.

## Moving Beyond a Focus on Self-Response Toward Understanding Multiple Causes of Undercount

A major preoccupation in the Census Bureau, which has emerged from a decade of budget constraints and constant

---

5 The organizational and statistical issues are discussed in detail by Barbara Bailar, who had been involved in the 1980 controversy over statistical adjustment and who, after becoming Association Director for Statistical Standards and Methodology for the Census Bureau, became convinced that adjustment was feasible and desirable. (Affidavit of Barbara A. Bailar in The City of New York et al. vs. United States Department of Commerce, November 2, 1988.
6 Several expert witnesses in the New York et. al. v. Department of Commerce litigation testified about the patterns and extent of non-response resulting from adding the CQ. Most relevant here is the testimony of Dr. Matt Barreto about the impact of macro-environment on response and his findings in a recent random-control trial survey that there would be a drop-off rate of 14.9% among Latinos. For key issues addressed in Dr. Barreto's testimony, see pp. 176-178 "Plaintiffs' Joint Proposed Post-Trial Findings of Fact" in State of New York and New York Immigrant Coalition v. U.S. Department of Commerce," filed November 21, 2018.

effort to cut the costs of non-response follow-up (NRFU), is self-response—because it is seen as the first stage in the census process.[7]

Differential undercount in the decennial census, and the American Community Survey (ACS), stems not only from lack of motivation among respondents but also from operational shortcomings embedded in census operations. Effective strategies for implementing a decennial census that both accurately counts the population and provides a reliable demographic and socioeconomic profile of the population require not only attention to self-response in the decennial census, but also careful in-depth attention to the multiple causes of differential census undercount.

The ubiquitous mapping of census tracts based on their projected low-response score (LRS) and corresponding plans for outreach to hard-to-count populations provides valuable insights for census strategy, but has distracted the Census Bureau and census advocates alike from adequately addressing structural causes of undercount stemming from the mismatch between decennial census operational strategies for Census 2020 and community context described by Kirsten West and David Fein more than three decades ago.

Although the bulk of public discussion of the impact of the citizenship question on census fairness and accuracy has focused on the citizenship question's impact on self-response, in actuality, eventual differential undercount is determined not simply by self-response, but also by subsequent enumeration efforts—enumerator visits to non-responding households and efforts to secure proxy interviews—as well as by subsequent statistical procedures used by the Census Bureau to compensate for non-response.

Widespread attention has been given to promoting census response among less-motivated households, but the most effective strategies to work toward a fair and accurate census in 2020 will need to also include a firm understanding of the ways in which census non-response initiates a cascade of subsequent operational steps to overcome the initial problems of non-response, and what may be possible pressure points for intervention once the cascade has begun.[8]

In addition to longstanding nonresponse follow-up operations seeking to increase enumeration of

households—including enumerator follow-up visits and proxy interviews—the Census Bureau has made a notable change in its re-engineering for Census 2020. Plans for implementing nonresponse follow-up now include the proposition that it will be possible to rely on administrative records to determine the size and characteristics of non-responding households. This notion is problematic as part of a strategy to accurately enumerate immigrant neighborhoods. In hard-to-count areas such as those where the San Joaquin Valley Latino immigrants live, diligent as they are, these efforts to assure census accuracy will inevitably fall short.

The analysis presented here of the cascade of valiant but compromised Census Bureau efforts to generate accurate census data provides a basis for examining how each step in the census enumeration process in hard-to-count areas in regions such as the San Joaquin Valley contribute to a cumulative regional undercount.

## Using the Cascade Model to Estimate Differential Undercount of Latino First- and Second-generation Immigrants in the San Joaquin Valley

An important consideration in the San Joaquin Valley Census Research Project (SJVCRP) survey design, given well-justified and widespread concern about the impact of adding the CQ to Census 2020, was to examine undercount not simply for an ethnic/racial group, i.e. Hispanics, but for sub-populations distinguished on the basis of immigration and citizenship status:

- undocumented immigrants,
- foreign-born legal residents,
- naturalized citizens,
- second-generation immigrants (the adult U.S.-born children of Latino immigrant parents).

Consequently, the Latino immigrant population surveyed in the research consists of potential census respondents 18+ years of age, referred to in census terminology as the "householder" or "P1," the person who is the census

---

7 In actuality, as discussed subsequently in this paper, "MAF-building," the Census Bureau's process of developing its Master Address File presumed to represent the universe of housing units in the U.S., is the first stage in census data collection and an important cause of census undercount, even before households have begun to respond (or not).

8 The Census Bureau's framing of its findings regarding NRFU in its 2016 Census Tests in Los Angeles and Houston and the 2018 End-to-End Test in Providence, Rhode Island, presume that observed self-response rates and NRFU interview success rates will be substantially improved in the 2020 decennial census. There is not much evidence to support this overly optimistic assessment. Messaging helps, but is not a magic bullet. Self-response rate in the 2016 test in Harris County(Houston) Texas, was 39.3% and, in Los Angeles, 52.5% (Jennifer Reichert, "Findings from the 2016 and 2017 Census Tests," presentation to State Data Centers Annual Meeting, April 6, 2018).

respondent and to whom the household census roster is referenced.[9]

Based on survey findings and assumptions about MAF completeness, availability and accuracy of administrative records for non-responding households, partial household undercount in "complex" households, and errors arising from hot-deck imputation, the cascade model provides the basis for generating the San Joaquin Valley Census Research Project estimate of undercount.

The model projects there will be a 21.1% undercount of Latino households headed by undocumented immigrants, 7.5% for those headed by foreign-born legal residents, 5.9% for those headed by naturalized citizens, and 10.3% for those headed by second-generation citizens.

The aggregate undercount in any geographic region is the sum of undercount among households in each undercounted population within the region.

The first- and second-generation Latino immigrants surveyed and for whom we can empirically project self-response, response to enumerator visits and response to requests for proxy interviews is large—making up about 35% of the entire universe of potential census respondents in the San Joaquin Valley. The ancillary component of the cascade model computes regionwide undercount for each sub-population surveyed, by weighting the sample to approximate the prevalence of each of the survey sub-populations in the region. This indicates that the undercount of Latino first- and second-generation immigrant households will result in a 4.1% undercount of the entire population in the region—an undercount of about 188,000 persons.

## How Variations in Response Rate and Structural Causes of Undercount Will Be Transformed Into Eventual Differential Undercount in Census 2020

The ways in which non-response erodes census accuracy are complex and vary in relation to specific populations being enumerated, survey design and community context. But there is no doubt that when any survey—decennial census included—encounters high levels of non-response, accuracy is degraded because the process comes to rely less on "data" collected, actual empirical data, than on statistical processes utilized to adjust for lack of data or erroneous information supplied by reluctant respondents.[10]

Higher levels of non-response predictably result in incremental errors and uneven levels of non-response among different groups. This, in turn, inevitably results in differential undercount of hard-to-count sub-populations. However, it cannot be stressed too often that many of the causes of undercount are structural. That is, they derive from the way in which census operations play out in different neighborhoods, with distinct housing patterns and ethnicities. Essentially, dramatically heightened levels of non-response among the Latino immigrant population studied in the SJVCRP set the cascade of flawed enumeration in motion—because the errors arise from standardized but imperfect efforts to compensate for non-response.

Factors in the cascade of census operations, the model described here, identifies as determinants of the eventual accuracy of the census count for a neighborhood, community, county or state include the following:

- Success/failure in MAF-building, i.e. generating a complete address list with omissions of housing units leading to total HH omissions
- Success/failure in securing self-response (via return mail or online)
- Success/failure in securing an in-person NRFU interview with a non-responding HH
- Success/failure in securing a proxy interview if a non-responding neighbor's HH is unavailable for an interview or refuses
- Success/failure in securing a high-quality administrative record match for HH's that did not self-respond, respond to an enumerator or be "enumerated" via proxy interview
- Bias in HH size and characteristics stemming from under-reporting in complex HH's (partial HH undercount)
- Bias in HH size and characteristics due to available administrative records omitting some HH members (partial HH undercount)

9 In the real world of day-to-day household life in Latino immigrant communities, a decision to re-spond or not respond to the census may often be more a family decision than the decision of a par-ticular person. The notion that there is an easily identifiable "householder," possibly a male "head of household," who fills out the census form is antiquated and ethnocentric. For example, a number of second-generation Latino immigrants told the project's researchers, as part of survey response or in focus groups, that they would advise about response and help them if they were to respond.
10 See Joseph Salvo, "Expert Rebuttal Report: Errors in the Local Census," November 11, 2018). Interestingly, an important legal consideration in the 1980 and 1990 strategy to oppose statistical adjustment was the constitutional reference to "actual enumeration." The cascade model suggests the situation will be subtly different in Census 2020 because Census Bureau re-engineering has shifted census data collection methodology away from actual in-field data collection (in-field address canvassing, survey design to encourage higher response rates, robust NRFU) toward efforts that, however characterized, involve some form of alternative to actual enumeration (proxy inter-views, reliance on administrative records, and count and whole-person imputation).

- Bias in HH size and characteristics stemming from recourse to hot-deck imputation of non-responding HH size due to systematic differences in HH size between donor HH's and non-responding HH's

The cascade model indicates that, at each stage, there is erosion in data quality despite Census Bureau efforts to secure information from respondents and from inaccuracies in the surrogate sources of information it utilizes in lieu of household census responses.

The major sources of error are omission of housing units from the decennial census sampling frame (either due to not being in the MAF or being erroneously identified as vacant) and systematic bias in hot-deck imputation. Data quality is further eroded by partial household undercount stemming from incomplete/out-of-date administrative records being used as a basis for enumeration, from under-reporting in complex households and, quite possibly, from systematic bias in proxy interviews.

Moreover, in areas such as the San Joaquin Valley (and most other immigrant communities across the U.S.) where the CQ is widely believed to represent a threat or to be improper, there is decreased willingness to participate in an apparently politicized census and data may be incomplete or partially falsified. Here it is particularly important to remember that incomplete or partially falsified responses affect the enumeration of different individuals in the households where householders filling out the census form modify their responses due to apprehension about the consequences of providing information to the government.

## The Cascade Model of Census Undercount in the San Joaquin Valley

The San Joaquin Valley Census Research Project estimate of an 11.7% undercount of Latino immigrants in the region is conservative. It does not, for example, attempt to estimate the additional negative impact that constrained access to the Internet and low digital literacy, coupled with print literacy, might have on self-response rates.[11]

The model, first, gives attention to the Census Bureau's limitations in generating a complete address list that includes low-visibility unconventional or hidden housing units (the "bad MAF" problem). It does not include an estimate of possible erroneous deletions of occupied housing units that are incorrectly believed to be vacant (due either to errors in administrative records or enumerator judgment).

The model also gives special attention to the extreme reluctance observed in the San Joaquin Valley Census Research Project survey to proxy interviews used by the Census Bureau to secure information on non-responding households. As well as being difficult to secure, it is crucial to understand that proxy interviews are error-prone because they are, at best, estimates by neighbors—some accurate, but some inaccurate—of the number and characteristics of neighboring households. Another important cause of undercount is due to the serious problems with enumerations based on securing an apparently matching administrative record that the Census Bureau envisions using to determine the characteristics of a household that has not self-responded, has not been contacted by an enumerator or removed from the NRFU workload by a proxy interview with a neighbor. These characterizations of household size and demographic profile based on reference to administrative records are, of course, not actually enumerations and are an element of Census 2020 operations that has not been adequately tested. Even when an apparently matching administrative record is found for an immigrant household, it is suspect as a source of information about household size and composition because it may be out of date and is very unlikely to include peripheral household members who are not part of the primary core family living in the housing unit.

Finally, at the end of the cascade of Census Bureau efforts to secure information on non-responding households, there is the last-ditch attempt to use hot-deck imputation to determine the characteristics of households that have not responded, for which there is no information from a proxy interview, and where no matching administrative record can be found.

This final stage in the decennial census process is particularly problematic in the San Joaquin Valley and probably in other communities with dense concentrations of immigrants. The ubiquitous problem in use of hot-deck imputation in the San Joaquin Valley is that the non-responding Latino households are systematically larger than those that do respond.[12] Therefore, when a nearby responding household is considered to be the

---

11 The data on survey respondents' level of educational attainment is relevant here. About half of the population has only an elementary school education. A number of respondents' comments about considerations entering into their response included reference to their inability to read or write (in Spanish or in English). Interestingly, even some who had access to the Internet and used applications such as Facebook, for example, said they were illiterate.

12 Hot-deck imputation refers to efforts to impute the size and characteristics of a non-responding household where information from a proxy interview or an administrative record is also unavailable by assigning it the characteristics (size and/or demographic profile) of nearby households.

donor for imputing the size and characteristics of a non-responding household, each imputation will contribute to systematic differential undercount.

There are inevitably some uncertainties in the cascade model of undercount used here to generate an estimate of regional undercount projections. It has not yet been possible to adequately explore a full range of assumptions/scenarios regarding availability of administrative records or variations in errors introduced by hot-deck imputation. The assumptions incorporated in the model where there is the greatest uncertainty relate primarily to two factors: availability and accuracy of administrative records to be used in lieu of actual enumeration (i.e. via self-response or household response to an enumerator), and the composition of the pool of households used as donors for imputing the characteristics of non-responding households for which administrative records are not available.[13]

Despite uncertainties inherent in the cascade model, there is, nonetheless, no doubt that non-response will result in very elevated levels of differential undercount in the San Joaquin Valley and other similar areas of the U.S. For example, in the neighborhoods where there are the densest concentrations of households headed by undocumented immigrants, hot-deck imputation may not generate errors as serious as in more mixed neighborhoods—but in these neighborhoods, more of the households will lack matching administrative records so relatively more will need to be imputed.

Coefficients used in the cascade model will be adjusted in subsequent iterations of the model, as further details on Census Bureau implementation of its 2017 Operational Plan become available (scheduled for March 2019), additional findings from the 2018 End-to-End Test of census operations in Providence County, Rhode Island, are reported, and a proposed Census Bureau split-panel mail survey of response and non-response planned for summer 2019 are published.

The model framework for analyzing undercount and factors that affect undercount that enter into the cascade model projection of undercount are discussed in more detail below.

## Survey-Derived and Estimated Coefficients in the Cascade Model

The cascade model of undercount incorporates empirical data from the San Joaquin Valley Census Research

Project survey for modeling expected success rates for self-response, response to enumerators, and proxy response in the census process among the first- and second-generation Latino population.

The model also incorporates empirical data from the survey regarding the size of non-responding and responding Latino households. These data provide the basis for estimating inaccuracies resulting from use of hot-deck imputation (because non-responding households are generally larger than those likely to respond).

The model also incorporates survey-derived estimates of the proportion of persons in complex households that do respond to the census, but where "extra" non-family members are likely to be left off the household census roster.

The cascade model also incorporates assumptions regarding the Census Bureau's success in securing administrative records for non-responding households where no proxy interview can be conducted, and the reliability of the information in the administrative records is questionable. It also projects the impact of hot deck imputation on the eventual undercount.

## The Cascade of Semi-Successful Efforts in the Nonresponse Follow-up Process Meant to Compensate for Households' Failure to Self-Respond

The success of NRFU depends on many factors—some of which can be predicted more reliably than others. Key considerations are discussed below.

### Receiving an Enumerator Visit During NRFU if the Housing Unit is not in the MAF?

An important consideration, in addition to a householder's willingness to self-respond, has to do with their having an opportunity to self-respond or respond to an enumerator during the course of NRFU.

One-fifth of the SJVCRP Latino survey respondents who were in the U.S. in 2010 say they never received a census form in 2010 and were not contacted by an enumerator. Their recollection may be imperfect, but surely there is reason to be concerned about thoroughness of NRFU due to errors in the MAF.

13 Andrew Keller has reported details of Census Bureau research on imputation (Keller 2015). What is most relevant in the current context is that, although extent of reliance on imputation was low at the national level in 2010, it can be expected to be much higher in 2020 and that it will be higher in some geographic areas (such as the San Joaquin Valley) than others. Moreover, imputation of household characteristics was more often necessary than count imputation (of HH size). See Keller, A., "Imputation Research for the 2020 Census," Statistical Journal of the IAOS 32 (2016) 189–198.

***Operational/Logistics Shortcomings in Implementing NRFU in Areas with Extremely High Non-Response Rates?***
Operational failures in NRFU, a likely consequence of overly optimistic Census Bureau projections of 2020 self-response rates, would, inevitably, make the actual undercount higher than the cascade model currently projects.

Salvo and Lobo (2013) argue, for example, that an unmanageable NRFU workload in parts of New York City resulted in many occupied housing units being incorrectly classified as vacant—just to get them removed from an enumerator's work assignment. Enumerators are also able to remove a housing unit from their workload if it is deemed unsafe—an understandable provision, but worrisome as an option for an individual enumerator without the requisite communication/social skills—to reduce their workload.

A December 2018 GAO report, for example, also points to Census Bureau research showing that rushed enumeration where there is a higher-than-expected nonresponse follow-up (NRFU) workload contributes to enumeration errors.[14] Problems encountered by the Census Bureau in accurately gauging the extent of non-response in the Latino immigrant neighborhoods and staffing NRFU operations may contribute to differential undercount.

***Impact of the Logistics Challenges Involved in Enumerating Households of Working Poor?***
Another uncertainty is that it is not known exactly how many of NRFU enumerator visits may fail to yield an interview simply because the enumerator visit took place when there was no household respondent at home. The current operational plan (as per the Census Bureau's June 8, 2018, Federal Register Notice) is that enumerators will be required to make three attempts to contact a non-responding household; after three unsuccessful contact attempts, three efforts will be made to conduct a proxy interview.

We know, from research on 2010 Census coverage in hard-to-count tracts in agricultural areas of California, for example, that enumerators' ability to establish rapport with non-responding households (likely to be similar to those in our survey who responded that "maybe" they would answer the census) will affect completion both of NRFU direct interviews (with reluctant households) and proxy households. Another challenge is that, as discussed

in the report on San Joaquin Valley Census Research Project survey findings, reluctance to participate in proxy interviews is extremely high.

***Limitations of Reliance on Administrative Records to Enumerate Households in NRFU?***
One of the most serious potential problems connected to Census Bureau operational plans for Census 2020 implementation in the San Joaquin Valley is the viability of using administrative records to enumerate non-responding households. The uncertainties here stem from the fact that there is no empirical data on the proportion of Latino immigrant-headed households in the region for which there will be high-quality matching administrative records. The cascade model projects that there will be serious limitations on finding matching administrative records for non-responding households.

Moreover, it is assumed that, despite the appearance of a match between a household and an administrative record for the address in some cases, apparently matched records will systematically omit some of the actual household members because they are out of date or underlying information is inaccurate. The entire Census Bureau proposition of relying on administrative records to impute household size (and characteristics) of non-responding households is a novel and untested one introduced only after efforts were made to add the citizenship question.[15]

## Key Threats to San Joaquin Valley Census Data Quality and the Components of the Cascade Model

Below are details on key components of the cascade model used in estimating how non-response translates into undercount.

The model predicts Census Bureau <u>success</u> rate at each step in the census process and estimates the percent of actual population enumerated at each stage. This prediction then provides, as the analysis moves through each stage in the process, an estimate of <u>cumulative</u> enumeration—after self-response, after response to enumerator NRFU visits, after enumeration via proxy interview, and enumeration via reference to administrative records.

---

14 Government Accountability Office, ""2020 Census: Additional Steps Needed to Finalize Readiness for Peak Operations, GAO Report 19-140, December, 2018
15 Census Bureau research on use of administrative records has focused primarily on using such records to reduce NRFU workload (and cost) by identifying vacant housing units that do not need to be enumerated.

It is then assumed the remainder of non-responding households that have not been enumerated in any of these operations will need to be imputed. Although, historically, it has not been necessary to rely extensively on imputation, there are many reasons to believe the situation will be different in Census 2020, at least in communities of Latino and other immigrants, because of the anticipated high levels of non-response among these populations, along with serious difficulties to be expected in "refusal conversion" efforts if the CQ is included. There are reasons to believe that some of the standard census procedures such as reminder postcards will be minimally effective in the sociopolitical context of a census with the CQ.

Having determined the proportion of households in each sub-population where size and household characteristics will have to be imputed, the model then examines under-count that stems from erroneous hot deck imputations of the size and characteristics of the remaining residents of households that have not been enumerated.

The cascade model also takes into account errors introduced in the course of enumeration—most notably errors stemming from undue reliance on inaccurate administrative records, but also enumeration errors stemming from complex household respondents' omission of peripheral household members.

### Before Enumeration Begins—Housing Units Omitted from the Census Bureau's Address List

It is generally agreed that the sampling frame for the decennial census always omits some low-visibility unconventional and/or hidden housing units. Although there is limited data on the pervasiveness of this problem, we have recently documented the prevalence of missing housing units in several major California counties and communities (Kissam, Quezada, and Intili, 2018). This research generated relevant empirical data on the completeness of the Census Bureau's address list (MAF – Master Address File) in the San Joaquin Valley.

Community-based address canvassing linked to LUCA was conducted in Stockton and in Fresno in areas where unconventional and/or hidden housing units were prevalent. MAF quality varied from census tract to census tract in the community-based canvassing, but prevalence of hidden housing units averaged 4.8% in canvassed areas (Kissam, Quezada, and Intili 2018). The San Joaquin Valley cascade model assumes that for U.S-born citizens, naturalized citizens and legal residents, 3% of the

population live in unconventional and/or hidden housing and that, for undocumented immigrants, 5% of households live in this type of low-visibility housing.

Therefore, the San Joaquin Valley cascade model begins with the assumption that, as a result of incomplete address canvassing at the first stage in the census process, only 95% to 97% of the Latino immigrant study population live in housing units included in the Census Bureau's MAF and can be enumerated.

Persons living in housing units that are not included in the MAF do not generally get a mailed invitation to respond to the census, a follow-up paper form if they fail to respond or an enumerator visit. A few hidden housing units not in the MAF may be identified in U/L (Update–Leave) areas of the San Joaquin Valley, but, nonetheless, the assumption of 3%-5% total household omissions due to low-visibility occupied housing units not being on the Census Bureau's address list appears to be well-founded.

If there were to be higher-than-expected designation of TEA's[16] for U/L and increased use of U/E (update–enumerate), it would ameliorate the impact of this particular cause of undercount, but current plans and budget constraints make this unlikely.[17]

The cascade model is conservative in its estimate of undercount in that it does not seek to further adjust for barriers to self-response noted in the discussion of the SJVCRP survey findings, e.g. substantial numbers of households without their own mail address (28%). The 13% of households who report they have a PO Box may or may not receive an invitation to respond to the census (depending on Census Bureau determination regarding TEA), and the 15% who share a mailbox with others also may or may not receive an invitation or mailed paper form.

Conceivably, innovative and aggressive messaging campaigns to urge households living in hidden housing units and those without their own mailbox to proactively respond via the online non-ID processing option (essentially, an online "Be Counted" option) might have a positive impact, but this only would have promise if there were also facilities to assist these households in submitting an online response.

16 TEA's—Types of Enumeration Areas is a classification that reflects the various operations and methods of enumeration used to collect addresses and enumerate areas.
17 The Census Bureau's 2017 Operational Plan and quarterly Program Management presentations make it clear that there will be virtually no use of U/E and limitations on use of U/L. While reductions in utilization of these old-fashioned enumeration approaches were curtailed as part of cost containment efforts, estimates of the negative impact on data quality are sketchy.

It is unclear to what extent online non-ID (NID) processing might contribute to inclusion of households living in the hidden housing units and those without their own mail delivery, but what is clear is that there are many barriers in the way—both inadequate motivation to take proactive steps to be counted in the context of a census perceived as being unfriendly to immigrants and lack of Internet access.[18]

### Level of Self-Response—the Key Determinant of NRFU Workload

The cascade model uses self-response rates derived from the San Joaquin Valley Census Research Project survey. These are computed based on expressed willingness to respond minus 5%—half the CBAMS-based adjustment of 10% accounting for the gap between stated willingness and eventual response behavior.

The resulting presumed self-response rates are: 58% for legal residents, 65% for naturalized citizens, 44% for U.S.-born second-generation immigrants, and 20% for undocumented immigrants. These rates of self-response are not inconsistent with those observed in the 2016 Los Angeles and Houston test censuses or the 2018 End-to-End Test. In fact, they might be considered optimistic given the fact that both of these tests took place before the decision to add the CQ to the census was announced.

The actual fall-off from expressed willingness to respond to eventual self-response might be lower if assurances about confidentiality of census data could be framed so as to gain widespread acceptance. Conversely, fall off might be higher if concerns about possible government misuse of census data continue to rise despite repeated assurances from the Census Bureau and census promoters regarding confidentiality of individual responses and disclosure avoidance. A very specific challenge is that the Latino survey respondents did not view the issue of confidentiality in a context specific to the Census Bureau, but, rather, as part of their overall environmental scan of federal government behavior and presidential rhetoric about immigrants and, specifically, about Mexicans.[19]

Even if overall levels of non-response among Latino immigrants were to be reduced somewhat, the survey findings suggest that there would continue to be disparities in response between sub-groups of Latino immigrants. Naturalized citizens might be more likely to

respond and there might even be slightly higher rates of response than the survey and focus group discussions indicate among second-generation immigrants. But it is very unlikely that response among undocumented households, a substantial sub-population of immigrants, would increase.

### NRFU Step 1: Adequacy of Administrative Records for Identifying Occupied vs. Vacant Housing Units

Census Bureau research from Census 2010 shows that, nationally, the NRFU workload lacked 4% of all actual housing units (based on results of Vacancy Deletion Checks).[20] This may be a problem in the San Joaquin Valley in Census 2020—particularly in areas with major fluctuations in seasonal occupancy and sub-standard housing conditions. This potential problem is not, however, explicitly included in the cascade model calculations at this point because we do not yet have a basis for assessing how serious this problem will be. It is a consideration, however, in working to refine estimates of the proportions of actual occupied housing units that will be enumerated in NRFU.

### NRFU Step 2: Direct Interview Completion (Interview with a non-responding household, excluding proxy interviews)

The cascade model assumes that respondents' willingness to respond to an enumerator who comes to interview a non-responding household is the general willingness to respond expressed in their answers in the San Joaquin Valley Census Research Project survey answers to Q. 5. In actuality, the rate of success in securing direct interviews rests not only on a household's willingness to respond to the enumerator, but also the basic logistic challenge faced by enumerators in making contact and in finding an adult householder willing and able to respond at home.

GAO's report on the 2016 Census Tests conducted in Harris County, Texas, and Los Angeles County, California, mention a NRFU interview completion rate of 70% (Harris County) to 80% (Los Angeles County). However, the definition of "NRFU interview completion" included both direct enumerator interviews with non-responding households and proxy interviews (which made up 25% of all NRFU interview completion in 2010). Therefore, the

---

18 For a full description of this process, see Census Bureau, "Census 2020 Detailed Operation Plan for: 13- Non-ID Processing (NID)," June 2018. There would appear to be undercount risks in areas with impaired Master Address File quality in response processing to the extent this relies on matching Non-ID ISR (Internet Self-Responses) to addresses in administrative records.
19 The SJVCRP report on Latino immigrant survey respondents' perspectives on census response or non-response, "Troubled Reflections: San Joaquin Valley Immigrant Perspectives on Census 2020" (forthcoming, February 2019) shows that response is likely to be very sensitive to sociopolitical context and media coverage of administration policies vis-à-vis immigrants.
20 Thomas Mule, Census Coverage Measurement Memorandum Series #2010-G-01, May 22, 2012.

cascade model estimate can be compared to the test census results by recognizing that the direct interview rate in Harris County was about 52.5% and in Los Angeles County about 60%. A still more worrisome recent report from GAO is that in the Providence, Rhode Island, End-to-End 2018 Test, there was a 33% non-interview rate in the NRFU workload.[21]

**Consequences of Truncation of Enumerator Return Visits?**
As noted in the prior discussion of NRFU plans, the current Census Bureau operational plan (as per its June 8, 2018, Federal Register Notice) is that enumerators will be required to make three attempts to contact a non-responding household. After three unsuccessful contact attempts, three efforts will be made to conduct a proxy interview.

The Census Bureau's decision to truncate the number of enumerator return visits seeking a direct interview may be particularly problematic in the Latino immigrant neighborhoods in 2020. The Census Bureau's 2010 NRFU Contact Strategy experiment showed that nationally about 42% of non-responding households had been successfully interviewed after three NRFU contact attempts. Although refusals were low (<3%) at the third visit, a substantial number of contact attempts (26%) resulted simply in a "notice of visit" being left or recorded as "no contact" (Compton and Bentley 2012). It is also important to note in the tabulation of results from the experiment that the level of proxy interviews for occupied households was very high (30%) at the third contact attempt.

The Census Bureau's basic NRFU plan vis-à-vis number of visits to non-responding households apparently may also involve reliance on a business model to determine the cost-effectiveness of return visits by enumerators. A NRFU algorithm for authorized number of enumerator return visits to a non-responding household based on cost-effectiveness is worrisome because it might predict that return visits were less cost-effective in neighborhoods such as those that San Joaquin Valley immigrants live in, where willingness to respond is lower and where making contact is more challenging because low-income family members may work longer hours.

In some cases, a household may only be visited once before an attempt is made to enumerate it via proxy interview or by recourse to administrative records. Even in cases where more than one visit may have been made to a household that is, in fact, willing to respond, a NRFU

interview may still not be completed because the business model required the enumerator to give up too soon and because the alternative strategies for securing data from the household (e.g. a reminder postcard left at the door) may be ineffective.

The Census Bureau alleges that its enumerator deployment software will optimize enumerator visits to make it as likely as possible for the enumerator to find an adult at home. However, it is very unlikely that the standard optimization model will do well in the San Joaquin Valley Latino immigrant community, where work hours are often long and where weekend work is common. It deserves note also that the 2018 End-to-End Test showed that unaccountably there were fewer enumerator visits scheduled for Saturdays, the day when actual chance of contacting a household respondent was highest.

**Consequences of Limited Availability of Waivers to Hire Non-Citizens as Enumerators?**
Another area of uncertainty vis-à-vis enumerator success in securing household interviews stems from concerns about the Census Bureau's ability to hire enough linguistically competent/culturally competent enumerators to successfully persuade undecided households to respond. Current management priorities in the Census Bureau are focused on hiring enough enumerators to get the job done and there is less attention to reliably assessing enumerators' ability to persuade reluctant households that have failed to self-respond to go ahead and consent to an interview with the enumerator.

The survey findings suggest that refusals of enumerators' interview requests in NRFU may turn out to be higher in 2020 than ever before based not only on apprehension about the consequences of providing information in the course of a census that includes the CQ, but also on survey respondents' frequent comments that they have learned not to open the door to strangers—due to a variety of commercial scams and guidance from immigration legal advisors regarding ICE visits.

**The Model Estimate of Enumerator Success in Securing Interviews with Households That Failed to Self-Respond**
For the purpose of projecting undercount, the cascade model uses the specific levels of response for undocumented and legal resident non-citizens and for naturalized and U.S.-born Hispanic second-generation immigrants for the

---

21 See page 22, GAO Report 19-140, December 2018.

respective groups as a proxy for estimating direct interview success rate. The aggregate level of response for all Latino immigrants will probably be about 41% for the overall population of Latino immigrant households, depending on the eventual behavior of those in each sub-population of potential census respondents who said that "maybe" they would respond to the census if it included the citizenship question.

### NRFU Step 3: Efforts to Secure Proxy Interview Response Rate

Proxy interviews are an important component of NRFU. The 2017 GAO report suggests they made up 25% of enumerations in the 2017 census tests in Los Angeles and Houston. The 2010 NRFU contact strategy experiment showed that 30% of NRFU interviews after the third contact attempt were proxy interviews. The 2018 End-to-End Test showed that they accounted for 27% of NRFU interviews.[22]

The San Joaquin Valley Census Research Project survey data are clear-cut in projecting response rate to enumerator requests for information on neighboring households as being only 8% affirmative if Census 2020 includes the citizenship question. There will also be variations that may further decrease proxy interview completion rate—depending on proxy interview respondents' knowledge regarding a specific household they might be asked about. The SJVCRP survey findings, including survey respondents' discussion of their perspectives of willingness and ability to provide information on neighboring households to a census enumerator, indicate that the 8% rate is the best that can possibly be expected.

It is also worthwhile to note that the Census Bureau's discussion of its procedures for securing proxy interviews is extraordinarily ill-suited to the San Joaquin Valley, apparently being based on assumptions about urban neighborhoods (e.g. enumerators requesting information from local real-estate agents or landlords).[23] However, Joseph Salvo, New York City's Demographic Unit Director for the city's Planning Department, a leading census expert, recently explained that this sort of effort is not well-suited to urban neighborhoods either.

### NRFU Step 4: Using Administrative Records to Impute Household Size and Characteristics

Perhaps the greatest challenge is the Census Bureau's ability to compensate for dramatically increased levels of non-response due to the citizenship question by relying on administrative records to secure information on non-responding households. There are many questions regarding the eventual viability of such record-matching and using such records to enumerate non-responding households.

### Extent to Which the Census Bureau Will Attempt to Use Administrative Records?

The Census Bureau's Federal Register Notice regarding its proposed Census 2020 operations states that administrative records will be used as follows, "enumerating households that do not self-respond and whom we were unable to contact after six mailings and one in-person field visit."[24]

In the neighborhood/community context in the San Joaquin Valley where Latino immigrant households are concentrated, if there is a very low initial response rate and contacts are difficult due to many adults in households working long hours, there will be very heavy reliance on administrative records for enumeration.

It is only recently that the idea of using administrative records to impute characteristics of entire households was adopted (see *Wall Street Journal* April 3, 2018, story by Paul Overberg and Janet Adamy, "*Trump Administration Plans to Check Your Answer On Citizenship Question.*") This element of the Census Bureau's planning was only introduced after publication of its 2017 Operational Plan, where administrative records were to be used only for identifying vacant housing units to be excluded from the NRFU workload. It was not part of the census test in Rhode Island and is, therefore, almost completely untested.

The Census Bureau has said in various public statements that it is very optimistic about being able to secure high-quality administrative records to provide information on non-responding households. However, Census Bureau research over the decade has focused on a specific and justifiable (though possibly flawed) use of administrative records—to identify and eliminate from the NRFU workload housing units that are not occupied—not on use of administrative records as a source of information on household characteristics.

22 See page 24, GAO Report 19-140, December 2018.
23 Described in the Census Bureau's July 2018 Federal Register Notice requesting comments on planned census operations.
24 Federal Register, June 8, 2018 (Vol. 83, No. 111, page 26643).

Although the *Wall Street Journal* article focuses on Secretary Wilbur Ross's announcement that the Census Bureau would refer to administrative records to check the correctness of answers provided by respondents regarding citizenship status, it is obvious that such an endeavor presumes the possibility of securing comprehensive household data from administrative records. Census Bureau Scientific Director John Abowd is quoted in the article, referring to Secretary Ross's statement that Social Security applications would be used for this purpose, as saying that "the bureau would have to create a statistical model but hadn't begun to figure out how."

### *Availability of High Quality Matching Administrative Records for Latino Immigrant Households?*

The Census Bureau's own research shows there will be limited availability of administrative records for the kinds of households most prevalent in San Joaquin Valley immigrant communities, because those who are least likely to respond are also those for whom there is least likely to be an administrative record match.[25] Census Bureau researcher Rhenuka Bhaskar and her colleagues explain that matching a household to an administrative record requires a Personal Identification Key (PIK). Bhaskar's research on administrative records shows that there are much lower levels of PIKs for foreign-born households than U.S.-born populations.

Characteristics associated with lacking a PIK include: number of persons in household, living in a tract where more than 45% of the population is foreign-born, Hispanic race/ethnicity, not being a U.S. citizen, limited English or no English, and being a recent immigrant (<10 years in the U.S.). These characteristics are, of course, prevalent in the San Joaquin Valley Latino immigrant networks and the study population. Administrative records will often be unavailable. It should also be remembered that Bhaskar's excellent analysis is based on examination of availability of matching records for households that are ACS respondents. It is more likely that high-quality matching administrative records are available for the immigrant households that do respond to the ACS than for those that do not—so the ACS-based estimate of availability is probably high.

### *Securing High Quality by Matching Administrative Records with Households or Housing Units?*

Bhaskar's analysis of the availability of administrative records to be used in determining the household size and characteristics examines the Census Bureau's ability to match an administrative record to a household that has responded to the ACS, not a housing unit. It is difficult to understand how a match could easily be made at all between a non-responding household and an administrative record—based simply on housing unit information.

In the context of NRFU, the Census Bureau must secure a matching administrative record for a non-responding housing unit. Since the Census Bureau's plan is to rely on an administrative record when there is no response from a household, nothing is known about the household characteristics. All that is available is a non-responding housing unit address.

Similarly, it is entirely unclear how the Census Bureau might propose to assess the quality of an apparent administrative record match based simply on an address. Serious discrepancies can be expected in neighborhoods where low-income renter households move often. Especially in the low-income neighborhoods in the San Joaquin Valley, where families may often be forced to move due to cash flow crises stemming from seasonal unemployment, the year-old SSA or IRS record for a household may often not match up with the household currently living at an address.

Presumably, attempts would be made to secure SSA or IRS records for the address of a non-responding housing unit to an income tax filer or individual in the SSA Numident database whose record has that address. But in many cases, especially for undocumented immigrants, the Latino immigrant sub-population most likely to fail to self-respond, respond to an enumerator, or be enumerated via proxy interview, reliably matching Social Security Administration or IRS records will not be possible or will be unreliable. Moreover, such records are very likely to be out-of-date so that, consequently, newly born children will be disproportionately omitted.

The Institute of Taxation and Economic Policy has estimated that about half of all undocumented workers in the U.S. file income tax returns (Gee et. Al 2017). It is likely that still fewer of the undocumented workers in the San Joaquin Valley—many of whom are farmworkers—are likely to actually file income taxes and, thereby, generate an administrative record with the IRS.

25 Rhenuka Bhaskar et al, "Assimilation and coverage of the foreign-born population in administrative records," SJIAOS (2018).

Although employer reports to the SSA of employees' earnings may be quite complete, they provide limited and unreliable information about household size (as defined by the Census Bureau OMB residence rules to refer to everyone living under the same roof—irrespective of economic/social relationships).

*The Cascade Model's Conservatively Projected Level of Census Bureau Success in Relying on Administrative Records for Enumeration*

Provisionally, the cascade model very optimistically assumes that matching administrative records are available for 80% of the U.S.-born non-responding householders, 70% of the naturalized citizen non-responding householders, 60% of the legal resident non-responding householders, and 30% of the undocumented non-responding householders.[26] However, as discussed above, we believe that the Census Bureau's actual ability to match administrative records to housing units is very unlikely to achieve this level of success.

The latest Census Bureau estimate is that only about 5% of U.S. households would be enumerated via use of administrative records.[27] However, this assumption seems extraordinarily optimistic with respect to the San Joaquin Valley. The cascade model projects, based on the assumption there will be high proportions of households that fail to self-respond, as well as limited success in securing direct interviews with households or proxy interviews, and limitations on securing high-quality matching administrative records, that about 8% of Latino naturalized citizens, 9% of legal residents, 23% of U.S.-born second-generation immigrants, and 17% of undocumented immigrants might eventually be successfully enumerated using administrative records.[28]

Even if administrative records are more readily available for the Hispanic first- and second-generation immigrants than is assumed in the cascade model, there remain serious questions about the impact Census Bureau efforts to rely on administrative records might have on the accuracy of census data in regions such as the San Joaquin Valley. This is because they may be out-of-date or reflect only a single family/budgetary unit in an extended family or complex household.

San Joaquin Valley Census Research Project research team members' experience in three decades of national farm labor research, as well as published reports, suggest that Social Security data on farmworkers, a population made up almost entirely Mexican-origin, often undocumented, immigrants is compromised.[29] It is common in the agricultural employment sector (and in other immigrant-dominated segments of the labor market) for unauthorized new arrivals to secure a falsified green card (mica) or to work using one borrowed from a friend or relative or purchasing one.

Moreover, in cases where matching records <u>are</u> available, it is unwise to assume that the administrative record will include everyone actually living in a housing unit where the householder has failed to self-respond to the census. The culturally misguided assumption that all or most immigrant households are <u>reliably</u> profiled in any administrative record system, including the SSA Numident database the Census Bureau envisions using or IRS records, is a serious source of potential undercount (since administrative records are unlikely to show <u>more</u> people living at an address than actually live there but often show fewer).

*Erroneous Enumerations in the Course of NRFU: Partial Household Omission in Complex Households that Do Self-Respond or Respond to an Enumerator Visit*

The prevalence of complex households, where non-family members are very commonly excluded from census responses by householders, means there will be a substantial partial household undercount due to omission of "extra" household members within the complex households that do respond to the census.

The problem here is that the OMB/Census Bureau residence rules continue to be indifferent to the ways in which cultural concepts of household in immigrant communities differs from the official definition. Census form instructions ask respondents to be sure they have remembered to include everyone living in a housing unit (referred to by the Census Bureau as "household") on their

26 The SJVCRP survey data show that many of the complex households and unconventional hidden housing units at an address are occupied by undocumented immigrants, making it very unlikely that the landlord's or property manager's administrative records will somehow include these economically and socially distinct households.
27 Census Bureau submission for OMB clearance for the 2020 Census—Request for Comments, December 28, 2018.
28 Differences in projected reliance on administrative records for the different Latino immigrant sub-populations stems from differing levels of self-response and enumerator response in each and availability of administrative records for each sub-population.
29 Data analyst Richard Mines has conducted research on California farmworkers for more than four decades and was the Department of Labor Project Officer for the National Agricultural Worker Survey for more than a decade. Researcher Ed Kissam has conducted research on farmworkers and immigrant settlers in rural communities for more than three decades.

census form. In fact, the prevailing concept of household is that it consists of a core family/budget unit. Other family units living under the same roof are typically distinguished as not being household members.

The SJVCRP survey provides a good estimate of the prevalence of complex households in San Joaquin Valley Latino immigrant communities (22% of all households), but there remain uncertainties about the extent of partial undercount in these places since it is not clear whether, in some cases, how many of the "extra" persons living at the place might be included on the primary household's census response—even though generally they are not.

The current model assumes that 20% of the non-family "extra" members in undocumented complex households are included on householders' census rosters, but that the remaining 80% are omitted. In households of legal residents, naturalized citizens, and U.S.-born immigrants, it is assumed that only 60% are left off the household roster.

### Statistical Efforts after NRFU: Enumeration Errors from Hot-Deck Imputation of the Size and Characteristics of Non-Enumerated Households

An important cause of differential undercount is the reliability of hot-deck imputation used to determine the characteristics of households that have not self-responded, have not been successfully interviewed by an enumerator, have not been enumerated via proxy interview, and for which there is no high-quality matching administrative record. In such cases, hot-deck imputation is the last resort for the census count.

Household characteristics of non-responding households are imputed from the characteristics of nearby households that have responded—the donor pool. If these households are similar in size, imputations will, at least, provide an acceptable estimate of the census count. However, if they are systematically different in size, the hot-deck imputation process will lead to a systematic undercount of the population residing in non-responding households.

The problem in this sort of imputation is that the Latino immigrant households that do respond to the census are smaller than those that fail to respond, as well as the fact that the average San Joaquin Valley non-immigrant household is much smaller than the non-responding Latino households. The error introduced through hot-deck imputation will depend on whether a nearby responding

Latino household is chosen as the donor household or whether a non-Latino household is chosen.

The San Joaquin Valley Census Research survey shows that the average household size for the non-responding Latino immigrant households is 4.6 persons. This contrasts sharply with overall average household size in the San Joaquin Valley region of 3.24 persons. The relative size of the non-responding and the responding Latino households varies by legal and citizenship status.

### Model Coefficients for Estimating the Impact of Hot-Deck Imputation from Relying on Responding Latino Immigrant Household as the Information Source for Imputing Size and Characteristics of Non-Responding Latino Immigrant Households

The cascade model incorporates estimates of errors introduced by hot-deck imputation where a responding Latino immigrant household is the donor for a non-responding household by comparing the average household size of those willing to respond to Census 2020 with the citizenship question and those unwilling to respond based on analysis from the San Joaquin Valley Census Research survey.

- The Latino U.S.-born second-generation immigrant households not willing to respond are 0.67 persons larger than the responsive ones.
- The naturalized citizen headed households not willing to respond are 0.6 persons smaller than the responsive ones.
- The households of legal residents not willing to respond are 0.15 persons larger than the responsive ones.
- Finally, the households headed by an undocumented immigrant not willing to respond are .45 persons larger than the responsive ones.

### Estimating the Impact of Hot-Deck Imputation from Relying on Average San Joaquin Valley Households for Imputing the Size and Characteristics of Non-Responding Latino Immigrant Households

The San Joaquin Valley Census Research Project survey data shows that about one-third of the survey respondents live in census tracts with 28% or more non-citizens, another one-third in census tracts with 20%-27% non-citizens, and the remaining third in census tracts with 20% or less non-citizens.

The cascade model assumes that the donor households for hot-deck imputation will be about a 50/50 mix of Latino immigrant and non-Latino average-sized households. In the 50% of the cases where a non-Latino household is used as the donor household for imputing the size of the non-responding Latino household, the size differential is greater.

Consequently, the model assumption that there is a 50/50 mix of Latino and non-Latino responding households as the donor pool for imputing the size of Latino immigrant non-responding households is conservative. Ongoing modeling will be done to further examine how residential patterns would affect hot-deck imputation once details of the Census Bureau's final methodology become available.

The model uses the average San Joaquin Valley household size as the estimated household size for donor households in this case: 3.2 persons per household. In contrast, the mean household size for non-responding households in the Latino survey population is 4.6 persons. Therefore, the size differential in these imputations where an "average" household is the "donor" for imputing non-responding household size is 1.4 persons per household.

## Weighting Survey-based Estimates of Latino Immigrant Household Census Participation and Household Size to Project Undercount for the San Joaquin Valley Region

The cascade model weights calculated undercount rates for each sub-population of survey respondents and adjusts for survey over-sampling of undocumented immigrants and under-sampling of naturalized immigrants and U.S.-born citizens in relation to the proportion of the San Joaquin Valley population they represent.

Weights for estimating regionwide population undercount are derived by weighting the calculated undercount rate for each of the San Joaquin Valley Census Research Project survey sub-populations to the estimated proportion of each in the entire San Joaquin Valley population of potential census respondents (18+ years of age).

The weighting is based on the following estimated proportion of the actual population for each of the survey's Latino immigrant sub-population categories of legal and citizenship status: 8.5% undocumented first-generation Hispanic immigrants, 5.3% legally resident first-generation Hispanic immigrants, 6.2% foreign-born Hispanic naturalized citizens, and 14.8% second-generation

U.S.-born Hispanic immigrants. These estimates of the composition of the Latino non-citizen population are based on 2017 ACS data on the Hispanic foreign-born population 18+ years of age and estimates by the Center for Migration Studies of New York demographer, Robert Warren, of the undocumented population in the San Joaquin Valley—by county and by national origin. The estimate of the size of the naturalized Hispanic population is directly available in the ACS 2017 dataset. The estimate of the size of the Hispanic second-generation adults is estimated based on Census Bureau demographic research.

## Survey and Cascade Model Implications for Undercount of Latino First- and Second-generation Immigrants throughout California

Projections of anticipated undercount among different sub-groups within the Latino immigrant population in California are an important part of public discussion and decision-making in efforts to work as effectively as possible toward a fair and accurate census. Such analysis is also important in planning strategic response to the possibility of a deeply-flawed Census 2020. The cascade model provides a basis for assessing the extent to which different facets of decennial census enumeration will contribute to undercount, the varying levels of undercount within the Latino population and geographic patterns of differential undercount.

The key technical/data analysis questions relating to the generalizability from the cascade model results for Latino first- and second-generation immigrants in the San Joaquin Valley are likely to relate primarily to the extent to which educational attainment, occupation and media exposure to news about anti-immigrant government actions, actual ICE enforcement and other contextual factors affect propensity to respond to the census.

Although there are uncertainties inherent in generalizing from the San Joaquin Valley regional survey to assess the impact of a census with the CQ on California as a state, there is some reason to undertake this endeavor, because other efforts to project undercount are already underway.[30]

30 See Eric McGhee, Sarah Bohn, and Tess Thurman for a technically sophisticated estimate of possible undercount and implications for reapportionment using a different methodology, "The 2020 Census and Political Representation in California," Public Policy Institute of California, October 2018. A critical consideration is to assess the extent to which differential undercount of immigrants will affect other states with substantial immigrant populations such as Florida, Texas and New York. Demographer Robert Warren and his colleagues at the Center for Migration Studies of New York, a well-known research and policy organization with deep expertise regarding the national distribution of undocumented immigrants and legal permanent residents, is examining this issue. Their assessment of the ways in which state and regional variations in immigrant population mix affect overall population undercount will be important in understanding California impacts.

### Examination of Neighborhood Effects as a Factor in Extrapolating from the San Joaquin Valley Census Research Project Survey Data

In principle, the San Joaquin Valley findings about undercount of first- and second-generation Latino immigrants can be used as a basis for estimating statewide undercount of this large sub-group of California's Hispanic population. An issue to examine in relation to such a projection is to determine if non-response and the resulting undercount it engenders is context-sensitive, that is if there are neighborhood effects that affect levels of household response and non-response. This particular issue is discussed below.

Respondents to the San Joaquin Valley Census Research Project survey live in areas with varying density of immigrant settlement and predicted self-response (LRS).[31] Among the factors that might affect responsiveness, the study examined the willingness of undocumented, legally resident, naturalized citizen, and U.S.-born citizens to respond to the census with a citizenship question in census tracts with different concentrations of non-citizens—0-20% (low), 21-27% (medium), 28%+ (high).[32] This analysis seemed useful to assess the extent responsiveness to Census 2020 with the citizenship question might be affected not only by household characteristics, but also by neighborhood and community environment.

As part of our examination of the generalizability of the survey findings, we analyzed respondents' willingness to respond to a census with the citizenship question in relation to the proportion of non-citizens in the community and average LRS score of the tracts in the area in which they lived. We hypothesized that these variations in neighborhood context might affect willingness to respond if, as seems to be the case, there is, or if there comes to be, some discussion within social networks about deciding to respond or not respond.

Overall levels of response/non-response among the U.S.-born second-generation immigrants, the legal residents and the naturalized citizens were not significantly correlated with concentration of non-citizens in a census tract. However, undocumented immigrants' willingness to respond was lower in the communities with higher concentrations of non-citizens. In areas with higher concentration of non-citizens (>28% non-citizens in an area) only 23% of the undocumented respondents said they were willing to respond—implying an 18% eventual response rate, while in the areas with lower concentrations of

non-citizens, 38% expressed a willingness to respond—implying an eventual 33% response rate among undocumented households.

Therefore, we believe that there is a modest relationship between individuals' propensity to respond and "neighborhood" involved in, at least, undocumented individuals' propensity to respond even though households with undocumented immigrants will have a markedly lowered willingness to respond to a census with the CQ wherever they live. This finding implies that varying concentrations of non-citizens will result in somewhat deeper pockets of undercount in communities with relatively more non-citizen Latino households.

Within the San Joaquin Valley, Census 2020 undercount resulting from adding the citizenship question to the census would result in inequitable allocation of funding and political representation. The smaller rural communities with higher proportions of Latino, predominantly farmworker, immigrants would be disproportionately undercounted. There would be parallel inequities in other regions within California and across the nation.[33]

Approximations of patterns of the aggregate undercount resulting from undercount of Latino first- and second-generation immigrants in any sub-state geographic region can, therefore, be developed based on ACS or Census Bureau Planning Database data. These ACS-based estimates of non-citizens in any geographic area can then be adjusted to incorporate estimates of the proportions of Latino legal resident and undocumented immigrants within their Latino non-citizen population using analyses produced by the Center for Migration Studies of New York.[34]

31 The LRS (low-response score) is an updated version of the initial "hard to count" (HTC) score developed by Antonio Bruce, J. Gregory Robinson, and Monique Sanders. See Chandra Erdman and Nancy Bates, "The Low-Response Score (LRS): A Metric To Locate, Predict, and Manage Hard-to-Survey Populations," Public Opinion Quarterly, Vol. 81, #1, Spring, 2017.
32 Neighborhood concentrations of non-citizens (and low-response scores) in the areas where individual respondents lived were estimated using Census Planning Database data drawn from the ACS.
33 ACS data provides a readily-accessible way to generate rough estimates of undercount resulting from Latino immigrant non-response in different communities, counties and states since it includes information on numbers of non-citizens and naturalized citizens down to the census tract level. For example, the national distribution of the population of about 4.7 million farmworkers and dependents has been estimated using two independent methodologies (e.g. Kissam and Williams 2013 estimates for the National Legal Aid and Defenders' Association, and Aguirre International's, "Locating Migrant and Seasonal Farmworkers," report to Population Division, Census Bureau, 2007 developed as a resource for guiding outreach/census promotion in Census 2010.)  Although there are regional variations in the proportion of farmworker households who are Mexican or Central American immigrants, three-quarters (73%) of U.S. farmworkers are Latino immigrants. For detailed demographic breakdowns, see Table 1, NAWS National Demographics at https://www.doleta.gov/naws/pages/research/data-tables.cfm
34 The CMSNY estimates of numbers of undocumented immigrants in any geographic area are reliable to the PUMA level (in the San Joaquin Valley, therefore, available for each county). These estimates, developed by demographer Robert Warren, rely on a methodology that has evolved over the past several decades. Versions of the analysis are used also by the Pew Hispanic Institute, the Migration Policy Institute, and the Center for the Study of Immigrant Integration at the University of Southern California. The SJVCRP has used the CMSNY estimates to project the region-wide extent of undercount stemming from undercount of undocumented Latino immigrants.

It is not easy, at this point, to definitively determine, based on San Joaquin Valley Census Research Project survey data, how neighborhood effects might affect willingness to participate in a proxy interview. This analysis is not feasible simply because the overall willingness to participate in proxy interviews is so low already (8%) and because the characteristics of households contacted by enumerators as potential proxy interviewees is not known. Nonetheless, we believe that proxy interviews are likely to be more difficult to secure in neighborhoods densely settled by undocumented immigrants than in other areas.

Given these considerations, projecting geographic patterns of differential undercount is feasible—examining the distribution of the affected population (Latino immigrants) and the concentration of Latino non-citizens in any area. This analysis can be relatively easily be done using ACS data.[35]

### The Projection of Statewide Impact in California

Because the cascade model provides an estimate of undercount linked to the immigration status and naturalization status of Latino immigrant heads of households, we believe that it is useful to at least consider what the implications would be for statewide undercount—since the Latino first- and second-generation immigrants make up about two-thirds of the Hispanic population in California.

Since about 39% of Californians are of Hispanic origin and about two-thirds of California Hispanics are first- or second-generation immigrants, about 26% of California's population of 40 million are first- or second-generation Hispanics. Therefore, there are slightly more than 10 million Californians in this undercounted population.

If we assume—based on the predicted 11.7% undercount of Latino immigrants in the San Joaquin Valley and acknowledge uncertainties in the model coefficients— that the statewide undercount of Hispanic first- and second-generation immigrants would likely fall into a range of 9%-13%, this level of undercount would result in an aggregate census undercount of 900,000 to 1.3 million Californians.

The eventual aggregate statewide differential undercount in California in Census 2020 would, of course, be even higher due to undercount of other Hispanic-headed households, undercount of African-American households, and undercount of American Indian households. It is likely that there would also be a significant undercount of Asian-headed households, although the Census Bureau's PES-based analysis could not detect it. The San Joaquin Valley Census Research Project will publish in the next two months an estimate of non-response among non-Latino immigrants, primarily those of Asian origin.[36] We expect that it will be lower than that observed among the Latino first- and second-generation immigrants, but higher than would be expected from PES-based official reports of undercount.

At the level of undercount implied by the cascade model, California would be very likely to lose at least one Congressional seat just from Hispanic immigrant undercount, and more if one also considers the undercount among other hard-to-count U.S.-born and foreign-born populations in California. The corresponding fiscal loss from the Latino immigrant undercount alone would likely range from $970 million to $1.5 billion per year during the decade from 2021-2030, unless there were to be statistical adjustment for the purpose of allocating federal funding.

35 The impact that density of Latino immigrant settlement has in transforming non-response into undercount is probably attenuated by the fact that, on the one hand, denser settlement appears to play a modest role in decreasing propensity to respond to a census that includes the citizenship question while, on the other hand, errors stemming from systematic bias in hot-deck imputation are greater in less-densely settled neighborhoods where non-Latino households are more likely to become donors for non-responding households where proxy interviews and administrative records have failed to yield information. Modeling scenarios should be developed to explore these countervailing factors.

36 The Census Bureau's reliance on the overly-broad characterization of a range of ethnic groups as Asian is likely to have played a large role in its inability to detect undercount in this population. Given the interactions of multiple factors in determining undercount in a particular group, it is unlikely that standard coverage measurement methodology (the DSE used in PES-based estimates of undercount) would have discerned some deep pockets of undercount in different ethnic groups among Asians. For example, the Census Bureau's ethnographic research in 1990 showed significant undercount of Cambodians in Long Beach. Pamela Bunte and Rebecca Joseph reported that only 212 out of 229 Cambodians in their alternative enumeration area were enumerated (a 7.4% undercount) and that 26 who were enumerated were not identified as Cambodian. It is hoped that the SJVCRP survey samples of Hmong and Cambodian immigrants will be large enough to generate a reasonable estimate of likely undercount in these groups.

# CONCLUSIONS AND IMPLICATIONS

In communities with concentrations of Latino immigrants and low levels of self-response, increased Census Bureau reliance on untested procedures to compensate for household non-response threatens to transform the decennial census from an empirical data-gathering statistical endeavor into an exercise in unreliable statistical imputation.

In particular, efforts to rely on often-unavailable administrative records to compensate for non-response, where even apparent matching records will often be out-of-date and incomplete, is extremely problematic. Moreover high-quality matching records will not be available at the rate the Census Bureau has implied and, when available, will be systematically biased to inaccurately represent the actual numbers of people residing in a housing unit where no one responded.

A second major cause of undercount is reliance on hot-deck imputation in lieu of actual data collection. This will result in unreliable census counts and population profiles in the San Joaquin Valley region, and in other regions like it, with the extent of resulting undercount varying in relation to housing conditions in each area and socioeconomic profile of the local community.

A third major cause of undercount stems from omissions of hidden and/or unconventional housing units from the Census Bureau's Master Address File. This, too, will vary in relation to local housing condition, local economy and the quality of housing records maintained by each municipality or county.

Incorporating San Joaquin Valley Census Research Project survey findings into the cascade model framework for estimating census undercount based on patterns of non-response shows that the Department of Commerce's decision to add the citizenship question seriously degrades census accuracy for the San Joaquin Valley region, and quite probably for other regions of California and the U.S.

The cascade model developed in the San Joaquin Valley Census Research Project has practical utility for census planning because it provides a basis for going beyond current reliance on the LRS indicator of expected level of non-response/response in a census tract to include other factors that contribute to eventual undercount in operational planning and targeted census promotion.

The analysis of the dynamics through which non-response translates into undercount, based on the cascade model, underscores how important it will be for census accuracy to include attention not only to messaging and outreach focused on improving self-response, but also to give careful attention to strategies for overcoming operational causes of census undercount.

Such efforts might, for example, include the following:

- **To improve the number of hidden housing units included in census count:** Collaboration between local organizations in immigrant-dense and other low-income neighborhoods and Census Bureau address listing teams in targeting Summer 2019 "in field" address canvassing and successfully identifying the sorts of low-visibility housing units that are missed in diverse neighborhoods (e.g. converted garages in some, "back houses" in others).
- **To reduce partial household undercount in complex households:** Amplified messaging focused on the safety and importance of including non-family members in complex households on a census form. Omission of "extra persons" is not usually due to forgetting; it is intentional.
- **To reduce partial household undercount in complex households:** Partnerships to send "community navigators" out with Census Bureau enumerators to help persuade reluctant census respondents in complex households to include everyone in the household.
- **To reduce partial undercount in complex households and total household undercount in hidden housing units:** Provide additional support to assist community organizations in setting up and establishing online response centers and/or roving mobile virtual online assistance response teams to provide easily accessible help to low-literate respondents and to promote and facilitate NID response for those who did not receive an invitation or mailed census form.
- **To improve NRFU "direct interview" completion rate:** Advice to Census Bureau NRFU supervisors regarding optimal scheduling to secure response from households where most adults work.
- **To improve NRFU "direct interview" completion rate:** Census promotion focusing not simply on self-response, but also on the safety of responding to enumerators who come to visit in the course of NRFU.

- **To improve NRFU "direct interview" completion rate:** Targeted hiring of local naturalized citizens, second-generation immigrants, and local employment-authorized non-citizens with experience in community outreach enthusiastic about census response in efforts as promotore/as encouraging their neighbors who are concerned about confidentiality to respond to enumerators.

The cascade model suggests that "Get out the Count" strategies focused only on messaging and outreach and exclusively on self-response are misguided. To be effective, messaging efforts will also need to include explicit attention to getting households to respond to enumerators and helping those with digital or print literacy problems.

However, the San Joaquin Valley Census Research Project survey data, coupled with data from the Latino focus groups, suggests that efforts to increase willingness to participate in proxy interviews will be futile. Because there is an underlying resistance to providing strangers with other households' personal information and because the resistance is amplified by inclusion of the citizenship question, it is unlikely this aspect of census response behavior can be significantly changed.

Past experience does not provide sound guidance for planning census operational efforts in 2020, because outright refusals have been relatively infrequent in the past. It should be assumed they will be much higher in 2020—if the citizenship question is included and quite possibly even if it is not included (due to residual apprehension about the purpose of the census). Self-response rates will decrease dramatically, but the cascade model analysis supports experts' concerns that the Census Bureau's efforts during NRFU will not be able to compensate for greatly reduced self-response.

The Census Bureau should revise its overly-optimistic assumptions regarding likely success during operations conducted at successive stages of NRFU—in securing direct enumerator interviews, in securing proxy interviews, and in recourse to administrative records as a source of accurate information on household size. Revised estimates should be used in planning NRFU staffing in order to avoid serious disruption of data collection protocols.

It is likely that Census Bureau current estimates of non-response will not predict the serious decrease in self-response in the Latino immigrant neighborhoods. The Census Bureau should revise its current estimates of NRFU workload for these areas.

Strategic planning for Census 2020 should include vigorous efforts to not only increase respondent motivation to participate in the census, but also efforts to overcome at least some of the operational barriers in the census process that contribute to undercount. This would require institutional flexibility to craft effective partnerships between local and state census stakeholders—including local government and community-based organizations—willing to work collaboratively with the Census Bureau toward achieving an accurate decennial census in 2020.

However, given the many uncertainties involved in undertaking this sort of collaboration, which would inevitably require an unlikely Census Bureau commitment to innovation, it is unlikely that even strategic and vigorous efforts to ameliorate the impacts of the proposal to add the CQ will be successful enough to avert a serious differential undercount.

It would also be wise for California and other states with higher-than-average concentrations of Latino (and other) immigrants to prepare carefully for independent high-quality research to measure Census 2020 coverage and determine patterns of differential undercount. Such preparation would require a firm state commitment to engage in independent census coverage measurement using all the methodological tools at its disposal—demographic analysis (DA), adaptations of the triple-system estimation used in the Los Angeles TARO in 1986, coupled with ethnographic research and documentation of deep pockets of undercount, pioneered by the Census Bureau in its Census 1990 Alternative Enumeration initiative.

# Appendix A: Cascade Model Estimating San Joaquin Valley Latino First- and Second-generation Undercount

The table describing the overall cascade model of undercount below has two sections. The first section reports the coefficients relating to projected errors from reliance on administrative records, under-reporting in complex households, and systematic differences between the size of households likely to respond and those unlikely to respond. The second section on the following page has assumptions and calculations regarding the numbers of households enumerated at each stage in the census process and, finally, the estimated contributions made by partial household undercount, reliance on administrative records, hot-deck imputation, and the incomplete Census Bureau address list to aggregate undercount.

| Calculation and Estimation of Model Coefficients Based on HH Size | Undocumented Immigrant | Legal Resident | Naturalized Citizen | U.S.-Born Citizen |
|---|---|---|---|---|
| Av. HH size—responding complex HH's | 5.09 | 5.09 | 5.09 | 5.09 |
| Av. extra persons—responding complex HH's | 2 | 1 | 1 | 1 |
| Av. size –responding HH's | 4.12 | 4.17 | 3.44 | 4.6 |
| Av. size—non-responding HH's | 4.61 | 4.32 | 4.06 | 5.32 |
| Estimated % loss in HH size for complex HH that do report. Under-reporting of 80% for UNDOC, 60% for LPR, NATZ and USCIT. Av. 2 extra persons in UNDOC responding HH's and 1 extra person in LPR, NATZ, USCIT HH's | -0.31 | -0.12 | -0.12 | -0.12 |
| Estimated % loss in HH size due to error in size of responding HH's enumerated via administrative records. Loss of 1.5 PPH in undocumented HHs and 1 PPH in others. | -0.36 | -0.24 | -0.29 | -0.21 |
| Estimated # of persons loss per HH Imputed with responding Latino HH as donor | -0.49 | -0.15 | 0.62 | -0.69 |
| Estimated # of persons loss in HH size—imputed w/ av. SJV HH size (3.24 persons) | -1.37 | -0.9 | -0.2 | -2.11 |
| Estimated % loss per HH Imputed w/ responding Latino HH as donor (PPH/HH size) | -0.11 | -0.035 | 0.34 | -0.13 |
| Estimated % loss per HH—imputed w/ average SJV HH size  (PPH/HH size) | -0.2973 | -0.208 | -0.202 | -0.394 |

| Model Components in Cascade | Undocumented Immigrant | Legal Resident | Naturalized Citizen | U.S.-Born Citizen |
|---|---|---|---|---|
| Universe | 100% | 100% | 100% | 100% |
| Housing Units In Sampling Frame (MAF) Available to Enumerate | 95% | 97% | 97% | 97% |
| SJVCR Self-response rate | 20% | 58% | 65% | 43% |
| Enumerated via Self-response (% in sampling frame X self-response rate | 19.00% | 56.3% | 63.0% | 41.7% |
| SJVCR Enumerator Response Rate-Direct Interviews | 20% | 58% | 65% | 43% |
| Enumerated via Direct Enumerator Interview (remaining HH's not enumerated by self-response X Enumerator Response Rate) | 15.20% | 23.63% | 22.07% | 23.77% |
| SJVCR Proxy Interview enumeration rate | 8% | 8% | 8% | 8% |
| Enumerated via proxy Interview (remaining HH's not enumerated by either self-response or direct enumerator interview | 4.86% | 1.37% | 0.95% | 2.52% |
| Assumptions re availability of "high quality" matching administrative record | 30% | 60% | 70% | 80% |
| HH's "Enumerated" via Admin records (% available records X not enumerated via self-response or direct enumerator interview or proxy interview) | 16.78% | 9.45% | 7.65% | 23.20% |
| HH's "Enumerated" via Hot-deck imputation (remainder of HH's not enumerated in earlier stages of NRFU) | 44.02% | 6.30% | 3.28% | 5.80% |
| Assumption- 20% of complex HH's are actually housing units missing from MAF and 80% are bona fide complex HH | 18% | 22% | 12% | 16% |
| Undercount from erroneous enumeration due to partial HH undercount in responding complex HH's (% complex HH's X assumed 80% non-reporting X "extra" non-family members in responding undocumented HH's), 60% in LPR, NATZ, and US-born citizen HHs | -1.11% | -1.48% | -0.92% | -0.81% |
| Undercount from erroneous enumeration due to out-of-date and/or inaccurate Admin. Records (Est. loss of 1 person/HH X % of HH's enumerated via admin record) | -6.11% | -2.27% | -2.22% | -4.99% |
| Undercount from erroneous enumeration due to bias in hot-deck imputation (SJVCR-based size of non-responding HH's vs. responding HH's and average SJV HH size assuming 50% "donor" HH's are responding Latino and 50% are "average" SJV HH's) | -8.88% | -0.77% | 0.23% | -1.52% |
| Undercount due to total household omission from sampling frame (bad MAF) | -5% | -3% | -3% | -3% |
| Cumulative Undercount (Sum from multiple causes of undercount) | -21.10% | -7.51% | -5.91% | -10.32% |

## Appendix B: Estimate of Distribution of First- and Second-generation Latino Immigrants as % of SJV Population and Resulting Undercount

| Sub-population of Latino first- and second-generation Immigrants | Undercount rate for survey sub-sample | Population share of SJV region-ACS 2017 and CMSNY | Weighting factor for sub-populations | Impact on aggregate SJV regional undercount (% undercount for group X % of total population in region) |
|---|---|---|---|---|
| Undocumented Immigrants | -21.1% | 8.5% | 0.24 | -1.7945% |
| Legal Residents | -7.5% | 5.3% | 0.15 | -0.3980% |
| Naturalized Citizens | -5.9% | 6.2% | 0.18 | -0.3664% |
| U.S.-born second-generation | -10.3% | 14.8% | 0.43 | -1.5279% |
| First- and second-generation Latino Immigrants | -11.7% | 34.8% | — | — |
| Latino Immigrant Contribution to SJV Total Undercount | | | | -4.0858% |

# SELECTED REFERENCES

Aguirre Division, JBS International, "Identifying High Concentrations of Migrant and Seasonal Farmworkers," Final Report to Census Bureau, 2007.

Bhaskar, Renuka & Fernández, Leticia & Porter, Sonya. (2015). Assimilation and Coverage of the Foreign-Born Population in Administrative Records. CARRA Working Paper Series #2015-02. Center for Administrative Records Research and Applications U.S. Census Bureau, April 21, 2015.

Bhaskar, Renuka, et al, "Assimilation and coverage of the foreign-born population in administrative records," *Statistical Journal of the International Association of Official Statistics*, June 2018.

Census Bureau, *2020 Census Operational Plan: A New Design for the 2first- Century (v. 3),* September 2017.

Census Bureau, "Census Detailed Operational Plan for: 12. Internet Self-Response Operation (ISR: A New Design for the 21st Century), Decennial Census Management Division, Version 1.0, August 22, 2018.

Compton, Elizabeth, and Bently, Michael, "2010 Census Contact Strategy Non-Response Followup (NRFU) Experiment, Decennial Census Division, U.S. Census Bureau, February 2012.

Erdman, Chandra, and Bates, Nancy, "The Low-Response Score (LRS): A Metric To Locate, Predict, and Manage Hard-to-Survey Populations," *Public Opinion Quarterly*, Vol. 81, #1, Spring 2017.

Fein D.J. "The social sources of census omission: Racial and ethnic differences in omission rates in recent censuses," Ph.D. dissertation, Princeton University, 1989.

Fein D.J, West K.K. "The Sources of Census Undercount: Findings from the 1986 Los Angeles Test Census," *Survey Methodology*, 1988 Dec.

Government Accountability Office, *Lessons Learned for Locating and Counting Migrant and Seasonal Farmworkers*. 2003.

Government Accountability Office, "Additional Actions Could Strengthen Field Data Collection Efforts," GAO-17-191 January 2017.

Government Accountability Office, "2020 Census: Actions Needed to Address Challenges to Enumerating Hard-to-Count Groups," July 2018.

Government Accountability Office, "2020 Census: Additional Steps Needed to Finalize Readiness for Peak Operations," GAO Report 19-140, December 2018.

Keller, A., "Imputation Research for the 2020 Census" https://www.census.gov/content/dam/Census/library/working-papers/2015/dec/DSSD-WP2015-03.pdf

Kissam E., Herrera E., Nakamoto J. "Hispanics' Response to Census Forms and Procedures." Aguirre International, Final Report to Population Division, U.S. Census Bureau, 1993.

Kissam E. "Differential undercount of Mexican immigrant families in the U.S.," *Statistical Journal of the International Association of Official Statistics.* 2017.

Kissam, E., Quezada, C. and Intili, J. "Community-Based Canvassing to Improve the Census Bureau's Master Address File: California's Experience in LUCA 2018," *Statistical Journal of the International Association of Official Statistics*, Vol. 35, December 2018.

Kissam, E., and Jacobs, I. (2004). "Practical research strategies for Mexican indigenous communities in California seeking to assert their own identity. In J. Fox & G. Rivera-Salgado (Eds.), Indigenous Mexican migrants in the United States. San Diego, CA: Center for U.S. Mexican Studies, University of California.

Jennifer Reichert, "Findings from the 2016 and 2017 Census Tests," presentation to State Data Centers Annual Meeting, April 6, 2018.

Schwede L "Complex Households and Relationships in the Decennial Census and in Ethnographic Studies of Six Race/Ethnic Groups: Final Report", Statistical Research Division, U.S. Census Bureau 2003 Aug. https://www.census. gov/pred/www/rpts/Complex%20Households%20Final%20 Report.pdf.

Trevelyan, E., et al., Characteristics of the U.S. Population by Generational Status: 2013. *Current Population Survey Reports*, P23-214. US Census Bureau, November 2016.

Turner K, Guzman L, Wildsmith E, Scott M. "The Complex and Varied Households of Low-Income Hispanic Children" National Center for Research on Hispanic Families and Children, 2015 Jan.

West, Kirsten, "Causes of Coverage Error: What Can We Learn from the Respondent," paper presented at the annual meeting of the Demographic Association, October 1985.

West K, Fein D.J. "Census Undercount: An Historical and Contemporary Sociological Issue," *Sociological Inquiry*, Vol. 60 #2, 1990.

West, K. K. and J. G. Robinson. "What Do We Know about the Undercount of Children?" U.S. Census Bureau Population Division, Working Paper No. 39, August 1999.



www.shfcenter.org/sjvhealthfund

1   Nicholas Espíritu (SBN 237665)
    National Immigration Law Center
2   3450 Wilshire Boulevard, #108-62
    Los Angeles, CA 90010
3   Telephone: 213-639-3900
    Email: espiritu@nilc.org
4

5   Attorneys for *Amici Curiae*

6

7

8                   **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10  | **STATE OF CALIFORNIA, by and through** | 3:18-cv-01865 |
    | **Attorney General Xavier Becerra,** | |

11
    |  | **[PROPOSED] ORDER GRANTING** |
12  | Plaintiff, | **MOTION OF CENTRAL VALLEY** |
    |  | **IMMIGRANT INTEGRATION** |
13  | v. | **COLLABORATIVE, UNITED FARM** |
    |  | **WORKER FOUNDATION,** |
14  |  | **NATIONAL IMMIGRATION LAW** |
    | **WILBUR L. ROSS, JR., in his official** | **CENTER, ET AL. LEAVE TO FILE** |
15  | **capacity as Secretary of the U.S. Department** | **BRIEF AS *AMICI CURIAE* IN** |
    | **of Commerce; U.S. DEPARTMENT OF** | **SUPPORT OF PLAINTIFFS'** |
16  | **COMMERCE; RON JARMIN, in his official** | |
    | **capacity as Acting Director of the U.S. Census** | |
17  | **Bureau; U.S. CENSUS BUREAU; DOES 1-** | Dept: 3 |
    | **100,** | Judge:  The Honorable Richard G. Seeborg |
18  |  | Trial Date:  January 7, 2019 |
    | Defendants. | Action Filed:  March 26, 2018 |
19

20

21

22

23

24

25

26

27

28

---

1    The Court has received a motion for leave to file a amici curiae brief on behalf of the

2  Central Valley Immigrant Integration Collaborative, United Farm Work Foundation, National

3  Immigration Law Center, et al.

4    The Court GRANTS the motion and the proposed brief is deemed filed.

5

6  IT IS SO ORDERED.              Dated: _____, 2019

7

8                                 _____

9                                 Richard G. Seeborg

                                   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1