1   XAVIER BECERRA
    Attorney General of California
2   MARK R. BECKINGTON
    ANTHONY R. HAKL
3   Supervising Deputy Attorneys General
    GABRIELLE D. BOUTIN, SBN 267308
4   ANNA T. FERRARI, SBN 261579
    TODD GRABARSKY, SBN 286999
5   NOREEN P. SKELLY, SBN 186135
    R. MATTHEW WISE, SBN 238485
6   Deputy Attorneys General
     1300 I Street, Suite 125
7    P.O. Box 944255
     Sacramento, CA 94244-2550
8    Telephone: (916) 210-6046
     Fax: (916) 324-8835
9    E-mail: Matthew.Wise@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
10  *through Attorney General Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12             FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15  | **STATE OF CALIFORNIA, by and through** | 3:18-cv-01865 |
16  | **Attorney General Xavier Becerra;** | |
    | **COUNTY OF LOS ANGELES; CITY OF** | |
17  | **LOS ANGELES; CITY OF FREMONT;** | |
    | **CITY OF LONG BEACH; CITY OF** | **PLAINTIFFS' POST-TRIAL PROPOSED** |
18  | **OAKLAND; CITY OF STOCKTON,** | **FINDINGS OF FACT** |
19  | Plaintiffs, | Dept: 3 |
    | | Judge: The Honorable Richard G. |
20  | v. | Seeborg |
    | | Trial Date: January 7, 2019 |
21  | | Action Filed: March 26, 2018 |
    | **WILBUR L. ROSS, JR., in his official** | |
22  | **capacity as Secretary of the U.S.** | |
    | **Department of Commerce; U.S.** | |
23  | **DEPARTMENT OF COMMERCE; RON** | |
    | **JARMIN, in his official capacity as Acting** | |
24  | **Director of the U.S. Census Bureau; U.S.** | |
    | **CENSUS BUREAU; DOES 1-100,** | |
25  | Defendants. | |
26

27

28

# TABLE OF CONTENTS

Page

I.    Background Facts – Based on the Administrative Record and Stipulation Between the Parties ................................................................................................ 1

     A.    The Parties ........................................................................................... 1

     B.    Plaintiffs' Fact Witnesses ................................................................... 2

     C.    Plaintiffs' Expert Witnesses ............................................................... 2

     D.    Defendant-Affiliated Fact Witnesses and Related Persons ................... 5

     E.    Defendants' Expert Witnesses ............................................................ 7

     F.    Overview of the Census, the Citizenship Question, and Processes of the Census Bureau ........................................................................... 7

         1.    The Decennial Census in General ................................................... 7

         2.    History of the Citizenship Question on the Census, the Long Form, and the American Community Survey .............................. 10

         3.    The 2020 Decennial Census ......................................................... 12

II.    The Composition of the Administrative Record ................................................. 13

III.    The Defendants' Decision-Making Process for Adding the Citizenship Question – Based Only on the Administrative Record ........................................ 15

     A.    Events Prior to DOJ's Request for the Citizenship Question ................. 15

     B.    Census Bureau Memorandum Re: "Respondent Confidentiality Concerns" (PTX-157) .................................................................... 21

     C.    The DOJ Letter Requesting the Citizenship Question ............................ 22

     D.    The Census Bureau's Review of and Recommendation Against Adding a Citizenship Question to the Census ........................................... 24

     E.    The Census Bureau Repeatedly Communicated Its Recommendation Against the Citizenship Question to the Commerce Department ............................................................................ 25

         1.    December 22 Memo (PTX-148) ................................................... 25

         2.    January 3 Memo from Dr. Abowd to Dr. Jarmin (PTX-101) ....... 26

         3.    January 19 Memo from Dr. Abowd to Secretary Ross (PTX-22) ................................................................................................ 28

         4.    The Set of 35 Questions from the Department of Commerce to the Census Bureau and the Commerce Department's Changes to the Census Bureau's Answer to Question 31 ............ 30

         5.    February 12 Meeting Between Census Bureau and Secretary Ross ............................................................................................. 32

         6.    March 1 Memo from Census Bureau to Secretary Ross (PTX-133) ........................................................................................... 32

         7.    Memorandum Addressing "Key Differences Between Alternative C and Alternative D" (PTX-24) ................................. 33

i

**TABLE OF CONTENTS**
(continued)

Page

F.    DOJ Refused to Discuss Its Request with the Census Bureau................. 34

G.    Outside Stakeholders Urged Secretary Ross Not to Add the Citizenship Question to the Census........................................................... 35

H.    The Citizenship Question Was Not Tested or Publicly Noticed Prior to Ross's Decision to Add It to the Census............................................. 36

I.    Defendants Did Not Evaluate DOJ's Voting Rights Act Rationale for the Citizenship Question ...................................................... 37

J.    Ross's March 26 Decision Memorandum.................................................. 38

K.    Secretary Ross's Purpose in Adding the Citizenship Question to the Census .................................................................................................. 42

IV.    The Defendants' Decision-Making Process for Adding the Citizenship Question – Additional Findings Based on Extra-Record Evidence ..................... 45

A.    Additional Facts Regarding Defendants' Decision-Making Process........ 45

1.    Secretary Ross's Early Desire to Add the Citizenship Question ...................................................................................... 45

2.    The Role of the Department of Justice........................................... 47

3.    The Role of the Census Bureau...................................................... 54

4.    The January 19 Memo from Dr. Abowd to Secretary Ross .......... 55

5.    The Set of 35 Questions from the Commerce Department to the Census Bureau ...................................................................... 58

6.    February 12 Meeting Between Census Bureau and Secretary Ross ............................................................................................... 59

7.    March 1 Memo from the Census Bureau to Secretary Ross ......... 60

8.    Memo on Key Differences Between Alternatives C & D............. 61

9.    Ross's March 26 Decision Memorandum...................................... 62

10.    Additional Facts About the Decision-Making Process ................. 64

B.    Extra-Record Evidence Confirms that Defendants Violated Testing Requirements for the Citizenship Question ............................................. 65

1.    The Census Bureau's Standards, Guidelines, and Processes Require Extensive Pretesting Before Adding Questions to the Decennial Census ........................................................................ 65

a.    The Census Bureau's Statistical Quality Standards .......... 65

b.    The OMB's Standards and Guidelines for Statistical Surveys.............................................................................. 66

c.    The Census Bureau's established process for adding or modifying content on the decennial census ................. 68

d.    Past practices for testing decennial census questionnaires and proposed added questions.................. 71

**TABLE OF CONTENTS**
(continued)

Page

2. The Addition of the Citizenship Question on the Decennial Census Was Not Adequately Tested ............................................................ 72

   a. There was no testing of the citizenship question for the 2020 Census ............................................................ 72

   b. The presence of the citizenship question on the ACS does not obviate the need to test the question for the 2020 Census ............................................................ 73

3. The Inadequate Testing of the Citizenship Question for the 2020 Census Violated the Census Bureau's Pretesting Requirements, Standards, and Practices ............................................................ 77

C. Extra-Record Evidence Confirms that Existing ACS Data Is Sufficient for Section 2 VRA Enforcement ............................................................ 81

1. CVAP Data Produced by the Census Bureau that Is Used by DOJ for VRA Enforcement Purposes ............................................................ 81

2. The Census Bureau's Use of Disclosure Avoidance Techniques to Protect the Confidentiality of Census Respondents ............................................................ 84

3. Dr. Handley's Opinions on the Adequacy of Existing CVAP Data Sources and the Impact of Disclosure Avoidance on CVAP Data Quality ............................................................ 87

4. Professor Karlan's Opinions Regarding the Adequacy of Existing CVAP Data Sources ............................................................ 91

V. Findings Related to the Census Count and Standing – Based on the Administrative Record and Extra-Record Evidence ............................................................ 92

A. The Citizenship Question Will Cause a Differential Undercount and Harm Data Quality ............................................................ 92

1. The Citizenship Question Will Cause a Differential Decline in Self-Response Rates ............................................................ 92

   a. The Census Bureau concluded, in three memoranda, that the citizenship question will cause a differential decline in self-response rates ............................................................ 93

   b. Recent Census Bureau qualitative research suggests that the citizenship question will cause an even greater differential decline in self-response rates than estimated by Brown, et al. ............................................................ 97

   c. Plaintiff experts' testimony further supports the conclusion that the citizenship question will cause a greater differential decline in self-response rates than estimated by Brown, et al. ............................................................ 99

2. The Census Bureau's NRFU Processes, Including Imputation, Will Not Remediate the Differential Decline in Self-Response Rates ............................................................ 105

iii

**TABLE OF CONTENTS**
(continued)

Page

        a.    The Census Bureau has always struggled to count hard-to-count subpopulations, including noncitizens and Latinos ................................................................ 105

        b.    2020 Census NRFU and associated operations will be differentially less effective at counting nonresponders deterred by the citizenship question ........ 107

        c.    The Census Bureau's NRFU Processes will not prevent a differential undercount in the 2020 Census ..... 117

    3.    The Citizenship Question Will Damage the Quality of Census Data ................................................................... 119

  B.    The Citizenship Question Will Inflict Harm on Plaintiffs ..................... 122

    1.    Plaintiffs Have Increased Census Outreach Spending Because of the Citizenship Question ............................................. 122

    2.    Plaintiffs Will Lose Federal Funding ........................................ 124

        a.    Plaintiff State of California will lose federal funding ..... 124

        b.    LAUSD and the County and City Plaintiffs will lose federal funding ....................................................... 128

    3.    Plaintiffs Will Have Less Accurate Data to Make Decisions Related to Redistricting and Services .......................................... 129

        a.    Poor-quality census data will impair County and City Plaintiffs' decisions related to redistricting and the distribution of resources ........................................... 129

        b.    Poor-quality census data will impair the allocation of federal domestic financial assistance .............................. 136

    4.    Plaintiffs Will Lose Political Representation ............................. 137

# POST-TRIAL PROPOSED FINDINGS OF FACT

Plaintiffs State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton respectfully submit the following Post-Trial Findings of Fact.

## I.   BACKGROUND FACTS – BASED ON THE ADMINISTRATIVE RECORD AND STIPULATION BETWEEN THE PARTIES

### A.   The Parties

1.      Plaintiffs are the State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton.

2.      Plaintiff State of California is one of the fifty states of the United States of America.  ECF No. 119 [Joint Pretrial Statement and [Proposed] Order, Exhibit A (Undisputed Facts)]. ¶ 1.

3.      Plaintiff County of Los Angeles is a political subdivision of the State of California. *Id.* ¶ 2.

4.      Plaintiffs City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton are each a municipal corporation organized and existing under the laws of the State of California.  *Id.* ¶¶ 3-7.

5.      Plaintiff-in-Intervention is Los Angeles Unified School District (LAUSD). LAUSD is the public school district encompassing the City of Los Angeles and several surrounding communities and is the largest school district within California.  *Id.* ¶ 8.

6.      Defendants are Secretary of Commerce Wilbur L. Ross, Jr.; Ron Jarmin, performing the nonexclusive functions and duties of the Director of the United States Census Bureau; the U.S. Department of Commerce; and the U.S. Census Bureau.

7.      Defendant Wilbur L. Ross, Jr. is the Secretary of the Department of Commerce. *Id.* ¶ 11.

8.      Defendant United States Department of Commerce is a department of the United States Government.  *Id.* ¶ 12.

1

9.     Defendant Ron Jarmin is the former Associate Director for Economic Programs of the United States Census Bureau and, at the relevant time frame in this litigation, was performing the nonexclusive functions and duties of the Director of the United States Census Bureau.  *Id.* ¶ 13.

10.    Defendant United States Census Bureau is a Bureau within the Department of Commerce charged with conducting the decennial census.  *Id.* ¶ 14.

**B.     Plaintiffs' Fact Witnesses**

11.    Douglas Baron is the Senior Manager with the Chief Executive Office of the County of Los Angeles.  Mr. Baron testified about Plaintiff County of Los Angeles's request to the State of California for an increase in census outreach funding in light of the addition of a citizenship question to the 2020 Census questionnaire, and the Legislature's allocation of funding in response to the County's request.  ECF No. 132 [Baron Trial Decl.].

12.    Amy Bodek is the Director of the Department of Planning for the County of Los Angeles.  Ms. Bodek testified about Plaintiff County of Los Angeles's use of census data for program and planning efforts.  ECF No. 133 [Bodek Trial Decl.].

13.    Andrew Westall is the Assistant Chief Deputy of the Office of Los Angeles City Council President Herb J. Wesson, Jr.  Mr. Westall testified about the Plaintiff City of Los Angeles's use of census data for redistricting and resource allocation purposes.  ECF No. 173 [Westall Trial Decl.].

14.    Jefferson Crain is the Executive Officer of the Board of Education for the Los Angeles Unified School District (LAUSD).  Mr. Crain testified about Plaintiff-in-Intervention LAUSD's decennial redistricting, including the formation of a joint city-district redistricting commission and LAUSD's reliance upon decennial census data to review and, if necessary, redraw district lines in accordance with state and federal laws.  ECF No. 179 [Crain Trial Decl.].

**C.     Plaintiffs' Expert Witnesses**

15.    Dr. Colm O'Muircheartaigh is a professor in the Harris School of Public Policy and senior fellow at the National Opinion Research Center (NORC), both at the University of Chicago.  Tr. 33:4-17 (O'Muircheartaigh).  He is an expert in survey methods, research design,

2

1   statistical analysis, and the United States Census.  *Id.* at 39:11-16 (O'Muircheartaigh).  Dr.

2   O'Muircheartaigh testified about how the methods of and standards for testing a new question on

3   the decennial census questionnaire were, and in many cases, were not applied in relation to the

4   decision to add a citizenship question to the 2020 Census; the deleterious impact of the

5   citizenship question on data quality and self-response rates, particularly for noncitizens and

6   Hispanics; and the lack of effectiveness of the Census Bureau's Non-Response Follow Up

7   (NRFU) processes in remediating the differential self-response.  *Id.* at 39:19-41:17, 113:4-114:3

8   (O'Muircheartaigh).

9       16.     Dr. Matthew Barreto is a professor of political science and Chicano studies at the

10  University of California, Los Angeles.  Tr. 366:12-14 (Barreto).  He is an expert in racial and

11  ethnic politics, public opinion polling, and survey methodology.  *Id.* at 373:14-25 (Barreto).

12  Dr. Barreto testified about social science research and census publications that find that the

13  citizenship question will lower self-response rates, particularly among immigrants and Latinos,

14  resulting in harm to the count and quality of the census; how the Census Bureau's NRFU

15  processes will be disproportionately ineffective in mitigating the nonresponse of immigrants and

16  Latinos; and how these circumstances will cause a greater net differential undercount of

17  immigrants and Latinos, resulting in harm that is more severe in California than in any other state.

18  *Id.* at 374:3-375:7 (Barreto).

19      17.     Dr. Bernard Fraga, assistant professor of political science at Indiana University

20  Bloomington, is a political data analyst and researcher.  ECF No. 130 [Fraga Trial Decl.]  He is

21  an expert in political data analytics, demographic analysis, and census data analysis."  Tr. 616:25-

22  617:7 (Fraga).  Dr. Fraga testified about the impact the citizenship question will have on the 2020

23  Census population count for California and California's congressional apportionment, specifically

24  that adding a citizenship question to the 2020 Census is likely to reduce the congressional

25  representation apportioned to California.  Fraga Trial Decl. ¶¶ 5, 8.

26      18.     Dr. Andrew Reamer is a research professor in the George Washington Institute of

27  Public Policy at The George Washington University in Washington, D.C.  ECF No. 182-1

28  [Reamer Trial Decl.] ¶ 2.  He is an expert on the relationship between census data and federal

3

1    funding.  Tr. 661:13-22 (Reamer).  Dr. Reamer testified about the impact the citizenship question

2    will have on the distribution of particular types of federal domestic financial assistance funds to

3    certain states and localities, specifically that for programs with allocation formulas based on a

4    state's population relative to the nation, a differential undercount of noncitizens would lead to

5    measurable fiscal losses for those states, such as California, with percentages of noncitizens

6    above the nationwide average.  Reamer Trial Decl. ¶ 18.

7          19.    Dr. Hermann Habermann is a statistician and former Chief Statistician of the

8    United States and Deputy Director and Chief Operating Officer of the Census Bureau.  He is an

9    expert on the policies and procedures federal statistical agencies follow when designing,

10   modifying, and implementing statistical instruments.  Pursuant to the parties' stipulation,

11   Plaintiffs submitted prior testimony of Dr. Habermann in the consolidated case of *State of New*

12   *York v. United States Department of Commerce*, 18-cv-2921 (S.D.N.Y) and *New York*

13   *Immigration Coalition v. United States Department of Commerce,* 18-cv-5025 (S.D.N.Y) (*State*

14   *of N.Y. v. U.S. Dep't of Com.*).  Dr. Habermann testified by declaration on direct examination, and

15   live on cross-examination and redirect, about whether the Bureau complied with the federal

16   policies and procedures for designing, modifying, and implementing statistical instruments when

17   the Bureau added the citizenship question; and the United Nations' recommendations on

18   population censuses.  PTX-820 [Habermann New York trial testimony (New York Tr.)], PTX-

19   821 [Habermann Trial Aff.].

20         20.    Dr. Lisa Handley holds a Ph.D. in political science from The George Washington

21   University and is currently a visiting research academic at Oxford Brookes University in the

22   United Kingdom.  PTX-819 [Handley New York trial testimony (New York Tr.)].  She is an

23   expert in redistricting and voting rights.  Pursuant to the parties' stipulation, Plaintiffs submitted

24   prior testimony of Dr. Handley in *State of N.Y. v. U.S. Dep't of Com.*, in which she testified by

25   declaration on direct examination, and live on cross-examination and redirect, about the

26   effectiveness of current Census Bureau data resources for enforcement of section 2 of the Voting

27   Rights Act (VRA).  *Id.*

28

21.     Pamela Karlan, the Kenneth and Harle Montgomery Professor of Public Interest Law at Stanford Law School, is an expert in voting rights law.  ECF No. 145.  Because Ms. Karlan was unavailable to testify at trial, ECF No. 103 [Stipulation and Order to Conduct Trial Deposition], Plaintiffs submitted Ms. Karlan's testimony about whether the inclusion of a question on citizenship status on the Decennial Census would assist the Department of Justice in enforcing Section 2 of the VRA via a trial deposition transcript, ECF No. 145, and video recording, ECF No. 180.

22.     Pia Escudero is the Executive Director of the Division of Student Health and Human Services for LAUSD.  Ms. Escudero testified by declaration about LAUSD's demographics and geography, student health and human services, and the potential impacts to student health and human services resulting from adding a citizenship question to the 2020 Census questionnaire as compared to other school districts.  ECF No. 126 [Escudero Trial Decl.].

23.     Karen Ryback is the Executive Director for Federal and State Education Programs for LAUSD.  Ms. Ryback testified by declaration about LAUSD's receipt of funding from federal programs (Title I, Title II, and Title IV), funding allocation formulas for these programs, LAUSD demographics relevant to these programs, and the potential funding impacts to LAUSD resulting from adding a citizenship question to the 2020 Census questionnaire as compared to other school districts.  ECF No. 125 [Ryback Trial Decl.].

**D.     Defendant-Affiliated Fact Witnesses and Related Persons**

24.     Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau.  Undisputed Facts ¶ 15.  Dr. Abowd testified as a fact witness for Plaintiffs about his knowledge of and involvement in the decision to add the citizenship question to the 2020 Census questionnaire.

25.     Enrique Lamas is performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau.  *Id.* ¶ 16.

26.     Burton Reist is the Chief of Decennial Communications and Stakeholder Relations at the Census Bureau.  *Id.* ¶ 17.

27.     Victoria Velkoff is Division Chief of the American Community Survey Office at the U.S. Census Bureau.  *Id.* ¶ 18.

28.     Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question on the 2020 Census between December 2017 and March 2018. *Id.* ¶ 19.

29.     Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross.  *Id.* ¶ 20.

30.     Karen Dunn Kelley is the presidentially-appointed Under Secretary for Economic Affairs at the US. Department of Commerce responsible for the operations of the Census Bureau. *Id.* ¶ 21.

31.     James Uthmeier is Senior Counsel to the General Counsel, Regulatory Reform Officer, Department of Commerce.  *Id.* ¶ 22.

32.     Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross.  *Id.* ¶ 23.

33.     Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock.  *Id.* ¶ 24.

34.     David Langdon is a Policy Advisor within the Office of Policy and Strategic Planning, reporting to Mr. Comstock.  *Id.* ¶ 25.

35.     Tad Kassinger was the former General Counsel of the Commerce Department and is one of Secretary Ross's personal attorneys.  *Id.* ¶ 26.

36.     Peter Davidson is the General Counsel for the Department of Commerce.  *Id.* ¶ 27.

37.     Michael Walsh was the Deputy General Counsel for the Department of Commerce and is currently the Chief of Staff to Secretary Ross.  *Id.* ¶¶ 28-29.

38.     Jeff Sessions was Attorney General of the United States.

39.     John Gore is the Acting Assistant Attorney General for Civil Rights at the U.S. Department of Justice (DOJ).  PTX-69.

6

40.     Arthur E. Gary is General Counsel for the Justice Management Division in the U.S. DOJ.  PTX-32.

41.     Stephen Bannon was the White House Chief Strategist and Senior Counselor to the President.

42.     Kris Kobach was the Kansas Secretary of State, and served as Vice Chair of the Presidential Commission on Election Integrity.  PTX-19, PTX-444.

43.     A. Mark Neuman was an outside advisor to Secretary Ross on Census Bureau matters.  PTX-644.

44.     John Zadrozny is a Special Assistant to President Trump in the area of "Justice and Homeland Security."  PTX-412 at 4.

**E.     Defendants' Expert Witnesses**

45.     Defendants submitted Census Bureau Chief Scientist Dr. John Abowd's expert testimony.  Dr. Abowd testified about the impact of the citizenship question on response rates, data quality, and census costs, as well as the potential for using administrative records to obtain citizenship data.

46.     Defendants also submitted the testimony of expert Dr. Stuart Gurrea to provide rebuttal opinions to those of Plaintiffs' experts.

**F.     Overview of the Census, the Citizenship Question, and Processes of the Census Bureau**

**1.     The Decennial Census in General**

47.     The U.S. Constitution requires the federal government to conduct a decennial census counting the total number of "persons"—with no specific reference to citizenship status—residing in each state.  Undisputed Facts. ¶ 30.

48.     The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," which requires "counting the whole number of persons in each State."  *Id.* ¶ 31.

49.     The Constitution requires that this count be an "actual Enumeration" conducted every ten years.  *Id.* ¶ 32.

7

1   50.   Through the Census Act, Congress assigned the responsibility of making this

2   enumeration to the Secretary of Commerce.  *Id.* ¶ 33.

3   51.   The central constitutional purpose of the Census Bureau in taking the decennial

4   census is to conduct an enumeration of the total population.  *Id.* ¶ 35.

5   52.   The Secretary of Commerce must comply with legal requirements established by

6   the Constitution, statutes, and regulations governing the census.  For example, the Secretary's

7   decisions must be consistent with the "constitutional goal of equal representation" and bear a

8   "reasonable relationship to the accomplishment of any actual enumeration of the population."

9   *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996).

10   53.   To enable a person-by-person count, the Census Bureau sends a questionnaire to

11   virtually every housing unit in the United States and all persons living in the United States who

12   are legally required to respond.  Undisputed Facts. ¶¶ 36, 37.

13   54.   If the Census Bureau does not receive a response to the questionnaire, it then sends

14   a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in-

15   person interview to collect the data.  This process is the Non-Response Follow Up (NRFU)

16   operation.  *Id.* ¶ 39.

17   55.   In the 2020 Census, the Census Bureau has proposed using administrative records

18   to enumerate a limited number of those households for which there is high quality administrative

19   data about the household if the initial NRFU visit does not result in collecting complete data for

20   that household.  *Id.* ¶ 40.

21   56.   In the 2020 Census, the U.S. Census Bureau plans to have enumerators attempt to

22   re-contact in person those households without high-quality administrative records.  *Id.* ¶ 41.

23   57.   Every case in the NRFU workload will have a maximum of six different contact

24   days and 12 proxy attempts.  *Id.* ¶ 42.

25   58.   If a third attempt to contact a household does not yield a response, a case will

26   become "proxy-eligible."  *Id.* ¶ 43.

27

28

8

1    59.    A proxy is someone who is not a member of the household—such as a neighbor,

2    landlord, postal worker, or other knowledgeable person who can provide information about the

3    unit and the people who live there.  *Id.* ¶ 44.

4    60.    An enumerator will attempt three proxies after each non-interview for a proxy-

5    eligible case.  *Id.* ¶ 45.

6    61.    For the 2010 decennial census, after three proxy attempts, a household became

7    eligible for what is known as "whole-person imputation" or "whole household imputation," in

8    which the Bureau imputed the characteristics of the household, including in some circumstances

9    the household member count.  *Id.* ¶ 46.

10    62.    After the NRFU process is completed, the Census Bureau then counts the

11    responses from every household, including those completed through the NRFU process, as well

12    as the data from the other enumeration operations, to determine the population count in each state.

13    *Id.* ¶ 47.

14    63.    Data from the decennial census are reported down to the geographic unit known as

15    a "census block."  *Id.* ¶ 48.

16    64.    The population data collected through the decennial census determines the

17    apportionment of seats in the U.S. House of Representatives among the states.  *Id.* ¶ 49.

18    65.    The population data collected through the decennial census also determines the

19    number of electoral votes each state has in the Electoral College.  *Id.* ¶ 50.

20    66.    States, counties, cities, and local public entities also use decennial census data to

21    draw congressional, state, and local legislative districts.  *Id.* ¶ 51.

22    67.    The federal government also uses decennial census data to allocate hundreds of

23    billions of dollars in public funding each year, including to states and local governments.  *Id.* ¶

24    52.

25    68.    Approximately 132 programs used Census Bureau data to distribute hundreds of

26    billions of dollars in funds during fiscal year 2015.  *Id.* ¶ 53.

27    69.    In 2010, there was a statistically insignificant net overcount of the total U.S.

28    population by approximately 0.01 percent.  *Id.* ¶ 58.

9

70.     Some demographic groups have proven more difficult to count in the decennial census than others. The Census Bureau refers to these groups as "hard-to-count. *Id.* ¶ 59.

71.     Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the decennial census. *Id.* ¶ 60.

72.     Individuals identifying as Hispanic were undercounted by almost 5 percent in the 1990 decennial census. *Id.* ¶ 61.

73.     The 2010 Census undercounted on net more than 1.5 million Hispanic and African American individuals. *Id.* ¶ 62.

74.     The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. *Id.* ¶ 63.

75.     The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. *Id.* ¶ 64.

**2.     History of the Citizenship Question on the Census, the Long Form, and the American Community Survey**

76.     Not since 1950 have the census questions submitted to each household included a question on citizenship. *Id.* ¶¶ 76-77.

77.     A question concerning citizenship did not appear on the decennial census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010. *Id.* ¶ 77.

78.     In 1960, the Census Bureau asked 25 percent of the population for the respondent's birthplace and that of his or her parents.  It also asked all residents of New York and the foreign-born residents of Puerto Rico about citizenship — the former "at the expense of the State, to meet State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration." *Id.* ¶ 76.

10

79.     From at least the 1970 decennial census through the 2000 decennial census, in lieu of the short-form questionnaire, the Census Bureau sent a long form questionnaire to approximately one in six households.  *Id.* ¶ 78.

80.     Data collected from the sample households surveyed with the long form were used to generate statistical estimates.  *Id.* ¶ 79.

81.     In the 1970, 1980, 1990, and 2000 decennial censuses, the long form decennial census questionnaire contained a question about citizenship status.  *Id.* ¶ 80.

82.     In the 1990 and 2000 decennial censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth.  *Id.* ¶ 81.

83.     The citizenship data collected from the long form questionnaire was reported by the Census Bureau at the census block group level.  *Id.* ¶ 82.

84.     After the 2000 decennial census, the functions performed by the long form were replaced by the American Community Survey (ACS).  *Id.* ¶ 83.

85.     The ACS is a yearly survey of approximately 2 percent of households across the United States.  *Id.* ¶ 85.

86.     A question concerning citizenship status currently appears as one of more than 50 questions on the 28-page ACS questionnaire.  *Id.* ¶ 86.

87.     The citizenship status question on the ACS is preceded by a question asking where the person was born.  *Id.* ¶ 87.

88.     The data collected by the ACS allows the Census Bureau to produce estimates of Citizen Voting Age Population (CVAP).  *Id.* ¶ 90.

89.     CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level.  *Id.* ¶ 91.

90.     Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate.  *Id.* ¶ 92.

91.     The ACS is intended to provide information on characteristics of the population, and the social and economic needs of communities.  *Id.* ¶ 93.

92.    Unlike the decennial census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates.  *Id.* ¶ 94.

93.    Because ACS estimates are statistical estimates based on a sample, the tabulations are weighted to reflect sampling probabilities and to determine eligibility for follow-up, and are controlled to align with official population totals as established by the Population Estimates program.  *Id.* ¶ 95.

94.    The ACS produces Census Bureau annual estimates for "census tract[s]" and "census-block groups."  *Id.* ¶ 96.

95.    Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3-year," or "5-year" estimates, depending on the number of years aggregated together).  *Id.* ¶ 97.

96.    Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in-every-eight-household sample.  *Id.* ¶ 98.

97.    Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units.  *Id.* ¶ 99.

98.    1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1-year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+"; 3-year ACS estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-year estimates; and 5-year ACS estimates produce "[d]ata for all areas."  *Id.* ¶ 100.

### 3.    The 2020 Decennial Census

99.    The 2020 Census will also be a "short form only" census.  *Id.* ¶ 102.

100.    The ACS will continue to be distributed each year, as usual, and will continue to include a citizenship question.  *Id.* ¶ 103.

101.    The text of the question to be included on the 2020 Census in response to Secretary Ross's decision memorandum reads, "Is this person a citizen of the United States?," with the answer options "Yes, born in the United States"; "Yes, born in Puerto Rico, Guam, the

U.S. Virgin Islands, or Northern Marianas"; "Yes, born abroad of U.S. citizen parent or parents";

"Yes, U.S. citizen by naturalization – Print year of naturalization"; and "No, not a U.S. citizen."

*Id.* ¶ 104.

102.    In a December 12, 2017 letter to the Secretary of the Department of Commerce,

the Department of Justice "formally request[ed] that the Census Bureau reinstate on the 2020

Census questionnaire a question regarding citizenship," explaining that "[t]his data is critical to

the Department's enforcement of section 2 of the Voting Rights Act and its important protections

against racial discrimination in voting." *Id.* ¶105.

103.    As in past years, the 2020 Census questionnaire will pose a number of questions,

including questions regarding sex, Hispanic origin, race, and relationship status.  *Id.* ¶ 106.

104.    A planned question on the 2020 Census short form questionnaire asks "Is this

person of Hispanic, Latino, or Spanish origin?"  *Id.* ¶ 107.

105.    A planned question on the 2020 Census short form questionnaire asks "What is

this person's race?"  *Id.* ¶ 108.

106.    A planned question on the 2020 Census short form questionnaire asks how each

person in the household is related to the person filling out the questionnaire.  *Id.* ¶ 109.

107.    A planned question on the 2020 Census short form questionnaire asks, "What is

this person's sex?"  *Id.* ¶ 110.

## II.    THE COMPOSITION OF THE ADMINISTRATIVE RECORD

108.    Defendants produced an Administrative Record along with a certification and

index on June 8, 2018, consisting of only 1,320 pages.  *See* PTX-1 (AR 1-1320).  These materials

refer to, but contain little documentation of, internal discussions that took place before December

2017, as well as communications between the Departments of Commerce and Justice about the

citizenship question.  *Id.*

109.    On June 21, 2018, Defendants filed a supplemental memorandum composed by

Secretary Ross that significantly revised their existing narrative as to the origin and genesis of

how a citizenship question came to be placed on the decennial census.  PTX-2.

13

110.     On July 3, 2018, and memorialized in the July 5, 2018 order, Defendants were ordered to supplement the Administrative Record in *State of N.Y. v. U.S. Dep't of Com.*, ECF No. 199.

111.     In response to that order, Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (Bates 0003736-0012464).   *State of N.Y. v. U.S. Dep't of Com.*, ECF Nos. 212, 216, 217; PTX-3, PTX-4A through PTX-4D.

112.     Defendants' July 23 and 27, 2018, productions contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between the Commerce Department and DOJ.   PTX-3, PTX-4A through PTX-4D.

113.     Defendants released additional Administrative Record documents after review by the Census Bureau's Disclosure Review Board (DRB) on August 28, 2018 and September 4, 2018, without Bates numbers.   PTX-5.

114.     Defendants produced additional small supplements to the Administrative Record on September 11, 2018 (Bates 0012464-0012543).   PTX-7.

115.     Defendants produced additional sets of documents, including in responses to motions to compel, on various dates (Bates 00012544-0012826).   PTX-8; PTX-9; PTX-10; PTX-11; PTX-12.

116.     Defendants produced an additional Administrative Record production on October 1, 2018 (Bates 0012827-0013022), PTX-13, along with further documents (Bates 0013023-0013024) on October 1, 2018, PTX-14.

117.     The parties agreed that all documents bearing prefix-less Bates stamps between 000001 and 0013024 are part of the Administrative Record.   ECF No. 119 [Joint Pretrial Statement and [Proposed] Order] at 11-13.

118.     The initially-filed administrative record was compiled by Sahra Park-Su, a Senior Policy Advisor at the Department of Commerce.   ECF No. 175-8 [Park-Su Dep.] 185-186.

14

119.    Ms. Park-Su compiled the Administrative Record solely by keeping materials that were provided to her by others. *Id.* at 186-189.

120.    No one provided Ms. Park-Su with any guidance on how to compile documents for the Administrative Record. *Id.* at 187:20-25

### III.    THE DEFENDANTS' DECISION-MAKING PROCESS FOR ADDING THE CITIZENSHIP QUESTION – BASED ONLY ON THE ADMINISTRATIVE RECORD

#### A.    Events Prior to DOJ's Request for the Citizenship Question

121.    In 2016, Arthur Gary of DOJ sent two letters to the Census Bureau about DOJ's potential need to amend the content of the ACS or 2020 Census.  PTX-17.  In its letter of July 1, 2016, DOJ stated that it had no need to amend any content.  *Id.*  In its letter of November 4, 2016, DOJ requested that the Census Bureau consider adding a topic to the ACS related to LGBT populations.  *Id.*  In neither letter did the DOJ request or reference a citizenship question or any need for additional CVAP data.  *Id.*

122.    Secretary Ross admits that he discussed the issue of adding a citizenship question to the census with "senior administrative officials" even before he became Secretary in early 2017.  PTX-2.

123.    Secretary Ross was interested in census topics in early February 2017.  PTX-30.

124.    In March 2017, Secretary Ross submitted a report to Congress identifying the subjects planned for the 2020 Census.  PTX 264.  The subjects did not include citizenship or immigration status.  *Id.* at 5-15.

125.    In March 2017, Secretary Ross exchanged emails with his Deputy Chief of Staff and Director of Policy, Earl Comstock, regarding whether noncitizens are included in the census count for the purposes of congressional apportionment.  PTX-30; PTX-55.

126.    In early April, 2017, Stephen Bannon contacted Secretary Ross and connected him with Kris Kobach to discuss adding a citizenship question to the census.  PTX 19; PTX-58.

127.    Mr. Kobach told Secretary Ross by phone that a citizenship question was necessary to address the "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  PTX-19.

15

128.     A few days after Secretary Ross was contacted by Mr. Bannon, Mark Neuman emailed Earl Comstock with the subject line "One of the Supreme Court cases that informs planning for the 2020 Census. . . ."  PTX-182.  The email contained only a link to the Supreme Court's decision in *LULAC v. Perry*, which considered citizen voting age population in assessing claims under section 2 of the VRA.  *Id.*

129.     On April 13, 2017, Mr. Comstock emailed Mr. Neuman, asking when the Census Bureau would need to notify Congress of the questions that would appear on the 2020 Census.  PTX-88; PTX-181.

130.     Mr. Neuman responded to Mr. Comstock on April 14, 2017, that the notification deadline for topics had already passed, and that "[t]here would be another opportunity next year."  PTX-88.

131.     By May 2, 2017, Secretary Ross emailed Comstock to complain, "Worst of all they emphasize that they have settled with congress on the questions to be asked.  I am mystified why nothing have [*sic*] been done in response to my months old request that we include the citizenship question.  Why not?"  PTX-89.  Mr. Comstock responded in part, "On the citizenship question we will get that in place…We need to work with Justice to get them to request that citizenship be added back as a census question. . . ."  *Id.*

132.     Other than as stated in the emails referred to above, there is no mention in the Administrative Record of the Secretary's obligations under 13 U.S.C. § 141(f)(1) and (3) with respect to adding a citizenship question.

133.     On May 4, 2017, Comstock contacted Senior White House Advisor Eric Branstad and inquired as to the "best counterpart to reach out to at DOJ – Regarding Census and Legislative issue?"  PTX-85.

134.     In response, Mr. Branstad referred Comstock to Mary Blanche Hankey who previously served as legislative counsel to then-Senator Jeff Sessions, and was the White House liaison at the DOJ.  *Id.*; PTX-370.

135.     On May 4, Mr. Comstock sent an email to Ms. Hankey, asking to speak with her sometime that day.  PTX-51.

16

136.     Mr. Comstock and Ms. Hankey met in person to "discuss the citizenship issue." PTX-363.  A few days later, she referred Comstock to James McHenry at DOJ.  PTX-370.

137.     Comstock spoke "several times" with James McHenry of DOJ about adding a citizenship question to the census.  *Id.*

138.     McHenry ultimately informed Comstock that the DOJ did not want to request the citizenship question "given the difficulties Justice was encountering in the press at the time (the whole Comey matter)."  *Id.*

139.      McHenry therefore referred Comstock to the Department of Homeland Security. *Id.*

140.     Department of Homeland Security likewise declined to request the citizenship question.  *Id.*

141.     Following his failed discussions with the Department of Homeland Security, Mr. Comstock asked James Uthmeier to investigate "how Commerce could add the question to the Census itself."  *Id.*

142.     On May 24, 2017, at least Secretary Ross and David Langdon met "all afternoon." PTX-151 at 2.

143.     During that meeting, Secretary Ross asked questions about the content of the decennial Census and "seemed . . . puzzled why citizenship is not included in the 2020" census. PTX-86

144.     Late that afternoon, Burton Reist, Chief of Decennial Communications and Stakeholder Relations at the Census Bureau emailed Mr. Langdon a 1988 internal DOJ memorandum that opined that the Constitution does not mandate the counting of undocumented U.S. residents in the census apportionment count.  PTX-448, PTX-449 at 1-2.

145.     That evening, Mr. Langdon requested further information from Census Bureau staff including Mr. Reist regarding "the criteria used to pick topics for 2020 versus ACS. Say, citizenship."  PTX-151.

146.     Also on May 24, 2017, Mr. Langdon sent an email to Mr. Comstock entitled "Counting of illegal immigrants," which states "the counting of illegal immigrants (or of the

17

larger group of noncitizens) has a solid and fairly long legal history . . . [there is] a Bush 41 era DOJ opinion that proposed legislation to exclude illegal aliens from the decennial census was illegal."  PTX-397.

147.    Mr. Comstock responded to Mr. Langdon that day, asking for further information on the selection of questions for the census versus the ACS, and passing along the Supreme Court decision of *LULAC v. Perry* that Mr. Neuman had previously provided for the proposition that the government might have a use for citizenship data.  *Id.*; *see also* PTX-182.

148.    On July 14, 2017, Mr. Kobach emailed Secretary Ross to remind him of their prior telephone discussion "a few months ago."  PTX-19.

149.    Mr. Kobach wrote that during their earlier discussion, he and Secretary Ross "talked about the fact that the US census does not currently ask respondents about their citizenship," and further advised Secretary Ross that the absence of such a question "leads to the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  *Id.*

150.    Mr. Kobach further wrote that "it was essential that one simple question be added to the upcoming 2020 census" and that a variant of the question that appears on the American Community Survey "needs to be added to the census."  *Id.*

151.    On July 21, 2017, Mr. Kobach called Ms. Teramoto.  He also emailed her, forwarding his July 14 email to Secretary Ross stating that he had spoken to Secretary Ross about adding a citizenship question to the 2020 Census "at the direction of Steve Bannon…."  *Id.*

152.    Following their conversation, Ms. Teramoto arranged a call between Mr. Kobach and Secretary Ross for a few days later.  *Id.*

153.    On August 8, 2017, Secretary Ross received a memorandum with census updates including that Representative Steve King of Iowa had announced that he would introduce legislation to add a citizenship question to the 2020 Census questionnaire.  PTX-18 at 2.

154.    Later that day, Secretary Ross emailed Comstock, asking "where is DOJ in their analysis" of whether to add a citizenship question to the 2020 Census, and advising "[i]f they still

1  have not come to a conclusion please let me know your contact person and I will call the AG."

2  PTX-98.

3        155.    On August 9, Mr. Comstock emailed Ross, stating "we are preparing a memo and

4  full briefing for you on a citizenship question. The memo will be ready by Friday . . . Since this

5  issue will go to the Supreme Court we need to be diligent in preparing the administrative record."

6  PTX-96, PTX-362.

7        156.    Secretary Ross responded to Mr. Comstock the next day, "I would like to be

8  briefed on Friday by phone . . . we should be very careful about everything, whether or not it is

9  likely to end up in the SC." *Id*.

10       157.    On August 11, Mr. Comstock and Mr. Uthmeier exchanged edits on briefing

11  materials for Secretary Ross related to a citizenship question. During this exchange, Mr. Uthmeier

12  wrote that he had "recommendations on execution," stating that he thought "our hook" was

13  "ultimately, we do not make decisions on how the [citizenship] data will be used for

14  apportionment, that is for Congress (or possibly the President) to decide."  PTX-437.

15       158.    On August 11, Mr. Comstock emailed Secretary Ross and Ms. Teramoto a

16  memorandum prepared by James Uthmeier concerning the addition of a citizenship question to

17  the decennial census.  PTX-3 at AR 2461; PTX-147.  The memorandum has not been produced.

18       159.    On September 1, 2017, Secretary Ross complained to Mr. Comstock and Ms.

19  Teramoto about a number of issues, including that he had "received no update [on] the issue of

20  the census question" and Mr. Comstock responded, "Understood. Wendy and I are working on

21  it."  PTX-45; PTX-97.

22       160.    On September 6, Secretary Ross and his senior staff (including Messrs. Comstock,

23  Hernandez, Davidson, Uthmeier, and Ms. Teramoto, Undersecretary Kelley, and Ms. Park-Su)

24  had a meeting to discuss adding a citizenship question to the decennial census.  PTX-31; PTX-35;

25  PTX-36; PTX-46; PTX-47.

26       161.    The next day, September 7, Secretary Ross requested from his staff an update on

27  "progress since the discussion yesterday regarding the citizenship question."  PTX-37, PTX-49.

28

162.     During the responding email exchange, Mr. Davidson wrote to Mr. Comstock, Mr. Uthmeier, and Ms. Teramoto that, in a meeting the day before regarding the citizenship question, Secretary Ross had discussed Mr. Kobach, but Mr. Davidson was "concerned about" contacting Mr. Kobach directly, and recommended contacting a trusted advisor, such as Mark Neuman, "before we do anything externally."  PTX-444.

163.     The following day (September 8, 2017), Mr. Uthmeier contacted Mr. Neuman to discuss "some Census legal questions for the Secretary."  PTX-38.

164.     Also on September 8, Mr. Comstock sent Secretary Ross a memo reporting on his efforts to identify someone who would request that a citizenship question be added to the 2020 Census, and advising that, as of that date, he had not been successful.  PTX-48; PTX-134.

165.     Mr. Comstock later forwarded that memorandum to Ms. Teramoto, PTX-58; PTX-134; PTX-363; PTX-370, presumably to prepare her for an upcoming call she was to have with DOJ regarding a citizenship question.

166.     In mid-September, John Gore of DOJ contacted and later had a phone call with Ms. Teramoto "about a DOJ-DOC" issue.  PTX-59; PTX-60.  Because Mr. Gore's email to Ms. Teramoto was produced as part of the Administrative Record for this case, and considering all of the circumstances, it is apparent that the "DOJ-DOC" issue was the citizenship question.

167.     Following that conversation, Mr. Gore worked with an aide to Attorney General Sessions to set up a phone call between Secretary Ross and A.G. Sessions.  PTX-63, PTX-67, PTX-68

168.     A.G. Sessions' aide emailed, "From what John [Gore] told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist."  PTX-67; PTX-68.

169.     Secretary Ross and A.G. Sessions proceeded to speak on the phone regarding the subject of Mr. Gore and Ms. Teramoto's earlier conversation, presumably about adding the citizenship question to the census.  PTX-57; PTX-61; PTX-62.

170.     On Sunday, October 8, Secretary Ross sent an email to Mr. Davidson with the subject line, "Letter from DOJ" and asking "what is its status."  PTX-52.

20

171.    Mr. Davidson responded, "I'm on the phone with Mark Neuman right now . . . he is giving me a readout of his meeting last week."  *Id*.

172.    On the evening of November 27, 2017, Secretary Ross emailed Peter Davidson, stating, "Census is about to begin translating the questions into multiple languages and has let the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must get this resolved."  PTX-144.

173.    There is no writing of any kind in the Administrative Record authored by the Secretary or anyone at the Commerce Department (or anyone else) that describes the reasons why the Secretary wanted to add a citizenship question as early as the first quarter of 2017.  The Administrative Record does indicate that, at the same time the Secretary was discussing adding a citizenship question to the census in the spring and summer of 2017, he was asking Mr. Comstock questions about whether congressional apportionment based on the census included noncitizens, he was informed that including noncitizens in congressional apportionment was legally required, but that Mr. Kobach was advising him that it was nonetheless a "problem."  PTX-19; PTX-55; PTX-58; PTX-86; PTX-89; PTX-151; PTX-397; PTX-437; PTX-444.

**B.    Census Bureau Memorandum Re: "Respondent Confidentiality Concerns" (PTX-157)**

174.    The Administrative Record includes a September 20, 2017, "Memorandum For Associate Directorate for Research and Methodology (ADRM)" from the Census Bureau's Center for Survey Measurement (CSM), with the subject line "Respondent Confidentiality Concerns" (CSM Memo).  PTX-157.

175.    The CSM Memo began:

> "CSM researchers have noticed **a recent increase in respondents spontaneously expressing concerns about confidentiality** in some of our pretesting studies conducted in 2017.  We recommend systematically collecting data on this phenomenon, and development and pretesting of new messages **to avoid increases in nonresponse among hard-to-count populations for the 2020 Census** as well as other surveys like the American Community Survey (ACS)."

*Id.* at 1 (emphasis added).

176.    The findings of the memo were drawn from over 50 focus groups and other studies.  *Id.*

177.    The memo reported that CSM had "heard respondents express new concerns about topics like the "Muslim ban," discomfort "registering" other household members by reporting their demographic characteristics, the dissolution of the "DACA" (Deferred Action for Childhood Arrival) program, repeated references to Immigration and Customs Enforcement (ICE), etc.  *Id.*

178.    Bureau field staff emphasized that this was a "new phenomenon" and that immigrant respondents' fears had markedly increased during the year.  *Id.*

179.    According to the CSM Memo, respondents reported being told by community leaders not to open the door without a warrant and field staff "observed respondents falsifying names, dates of birth, and other information on household rosters."  *Id.*

180.    Field staff also noted household members being left off of rosters due to immigration concerns.  *Id.* at 2-3.

181.    The CSM Memo stated, "[i]t should be noted that this level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes toward immigrants, is largely unprecedented in the usability interviews that CSM has been conducting since 2014 in preparation for the 2020 Census."  *Id.* at 3.

182.    The CSM Memo concluded with two main recommendations to address these new issues.  *Id.* at 7.  First, it recommended a "systematic pretesting study evaluating respondent confidentiality concerns to shed light on the nature and prevalence of these concerns among non-English speakers and immigrants."  *Id.*  Second, it recommended designing a pretesting language in mailing materials to allay these concerns, with the particularly suggestion that the text could inform respondents that the Census Bureau does not collect information on immigration status. *Id.*

C.    **The DOJ Letter Requesting the Citizenship Question**

183.    On December 12, 2017, Arthur Gary of DOJ sent a formal letter to Ron Jarmin, Acting Director of the Census Bureau, requesting that a citizenship question be added to the 2020 Census (December 12 Letter).  PTX-32.

184.    The December 12 Letter requests to add a citizenship question for purposes of VRA enforcement, and provides no other justification.  *Id.*

185.    The December 12 Letter sent to the Census Bureau requesting a citizenship question does not state that a citizenship question is necessary for the purposes of VRA enforcement to collect CVAP data through the census questionnaire.  *Id.*

186.    Rather, the letter contends, "the Department [of Justice] believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates."  *Id.* at 2.

187.    The December 12 Letter cites numerous published cases for the proposition that, "in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks…where potential Section 2 violations are alleged or suspected."  *Id.*

188.    The December 12 Letter states that one of the reasons that decennial census data on citizenship would be preferable to ACS data concerns the margin of error:  "The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases . . . By contrast, decennial census data is a full count of the population."  *Id.* at 3.

189.    The December 12 Letter does not state that any plaintiffs had lost any section 2 enforcement actions due to insufficient CVAP data from the ACS.  *Id.* at 1-2.

190.    The Administrative Record contains no evidence that any plaintiffs have lost any section 2 enforcement action due to insufficient CVAP data from the ACS.

191.    The December 12 Letter does not state that DOJ had declined to bring any section 2 enforcement actions due to insufficient CVAP data from the ACS.  PTX-32.

192.    The Administrative Record contains no evidence that DOJ has declined to bring any section 2 enforcement actions due to insufficient CVAP data from the ACS.

193.    On December 31, Special Assistant to President Trump John Zadrozny exchanged emails with James Uthmeier regarding a Pro Publica news article on the December 12 Letter. PTX-412.  Mr. Zadrozny asked Mr. Uthmeier to schedule a phone call to discuss.  *Id.* at 2.

23

**D.    The Census Bureau's Review of and Recommendation Against Adding a Citizenship Question to the Census**

194.    Soon after the Census Bureau received the December 12 Letter, Dr. Abowd directed senior professional staff at the Census Bureau (nicknamed the "SWAT Team"), to formulate a response to the suggestion that a citizenship question be added, which Dr. Abowd managed and reviewed.  PTX-75; PTX-4 at AR 9339; PTX-148; PTX-101; PTX-22; PTX-133; Undisputed Facts ¶ 19.

195.    In a series of technical reports, responses to questions posed by Secretary Ross, and other briefing documents, the Census Bureau repeatedly and consistently recommended against adding a citizenship question to the 2020 Census.  PTX-148; PTX-101; PTX-22, PTX-133.

196.    The Census Bureau repeatedly and consistently concluded that the stated goals of DOJ with respect to enforcement of the VRA could be accomplished, in a less costly and more effective manner, by linking Census responses to other administrative data sets available to the federal government.  PTX-148; PTX-101; PTX-22; PTX-133.

197.    The Census Bureau concluded that including a citizenship question on the decennial census is not necessary to provide complete and accurate data in response to DOJ's request.  PTX-22; PTX-101; PTX-148.

198.    The Census Bureau repeatedly and consistently concluded that adding a citizenship question would involve substantial additional cost as opposed to non-action and the use of administrative records.  PTX-148; PTX-101; PTX-22; PTX-133.

199.    The Census Bureau concluded that using administrative records would result in more accurate citizenship data than adding a citizenship question to the census.  PTX-22; PTX-101; PTX-148.

200.    The Census Bureau also concluded that using administrative records alone would result in more accurate citizenship data than using administrative records and adding a citizenship question to the census.  PTX-24; PTX-25.

201.     The Census Bureau examined the initial drop in self-response due to the citizenship question, as well as the potential costs of NRFU as a result of that drop.  PTX-148; PTX-101; PTX-22; PTX-133.  Yet the Administrative Record does not contain any information showing that the Bureau ever considered whether, in fact, NRFU could or would fully mitigate the nonresponse or whether the citizenship question would cause an undercount.  *See* PTX-148; PTX-101; PTX-22; PTX-133.

**E.     The Census Bureau Repeatedly Communicated Its Recommendation Against the Citizenship Question to the Commerce Department**

202.     On or about December 15, 2017, Dr. Abowd directed senior executives and expert employees of the Census Bureau to evaluate alternative methods of providing estimates of the CVAP to support redistricting under Public Law 94 -171 (P.L. 94-171) and section 2 of the VRA. PTX-4 at AR 9339; PTX-148.

**1.     December 22 Memo (PTX-148)**

203.     This evaluation is reflected in a memorandum dated December 22, 2017, and provided to the Commerce Department (December 22 Memo).  PTX-148.

204.     The December 22 Memo reflected the work of six professional Census Bureau employees: Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi, who analyzed two potential sources of citizenship data requested by the DOJ in the December 12 Letter to Dr. Jarmin.  PTX-148.

205.     The December 22 Memo identified eight administrative sources of citizenship information either already in use by the Census Bureau or available for acquisition by the Census Bureau.  *Id.* at 3.

206.     The December 22 Memo included the following conclusions:

- Numident, an administrative source already in use by the Census Bureau, was "the most complete and reliable administrative record source of citizenship data currently available."  *Id.* at 3.

- Use of these administrative records to assess CVAP was "potentially a more accurate measure of citizenship" and was also "cost efficient."  *Id.* at 11.

25

- Including a citizenship question in the 2020 Census could affect response rates for the 2020 Census because "[h]ouseholds with noncitizens could be particularly sensitive to the inclusion of citizenship questions." *Id.* at 6.

- "To collect [citizenship] information through self-report by adding questions to the 2020 decennial would require additional unnecessary costs and burden to the Bureau." *Id.* at 11.

- Including a citizenship question in the 2020 Census could lower the rate of voluntary compliance and would require expanded field operations for the implementation of the 2020 Census. *Id.* at 12.

207.    As a result of the conclusions, the December 22 Memo recommended that the best way to meet DOJ's stated need was to provide it with citizenship data from administrative records. *Id.* at 11.

208.    The memo concluded that, if the recommendation were followed, "[t]he 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly." *Id.* at 12.

### 2.    January 3 Memo from Dr. Abowd to Dr. Jarmin (PTX-101)

209.    Following the December 22 Memo, the Census Bureau further memorialized its research and analysis of potential sources of citizenship data in a January 3, 2018 memorandum, from Dr. Abowd to Dr. Jarmin (January 3 Memo).  PTX-101.

210.    The January 3 Memo explained that the Census Bureau currently produced CVAP data in "two related data products: the P.L. 94-171 redistricting data produced by April 1st of the year following a decennial census under the authority of 13 U.S.C. Section 141, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) tables produced every February from the most recent five-year American Community Survey data." *Id.* at 1.  The memo explained that while the P.L. 94-171 data are released at the census block level, the CVAP data are released at the census block group level. *Id.*

26

211.    The January 3 Memo analyzed the cost and data quality implications of three alternative methods of meeting DOJ's request for census block-level estimates of CVAP: Alternative A, Alternative B, and Alternative C.  *Id.*

212.    Alternative A was to "[m]aintain the status quo for data collection, preparation and publication," but then prepare a special product for DOJ that combines the P.L. 94-171 and CVAP tables to produce the Bureau's best estimate of block-level CVAP data.  PTX-101 at 1. Alternative A was estimated to cost approximately $200,000.  *Id.* at 2.

213.    The January 3 Memo concluded that Alternative A was "not very costly and does not harm the quality of the census count."  *Id.* at 3.

214.    Alternative B was to "[a]dd the citizenship question to the 2020 Census questionnaire."  The memo estimated that Alternative B would increase census nonresponse rates by at least 5.1 percent of all households with one or more noncitizens, or 700,000 households.  *Id.* at 2.  This would increase the NRFU workload and increase the cost of the 2020 Census by "at least $27.5 million."  *Id.*

215.    The January 3 memo concluded that while Alternative B suited DOJ's stated uses better than Alternative A, it would be "very costly" and, because NRFU is less accurate than self-responses, harm the accuracy of the census.  *Id.* at 2, 3.

216.    Alternative C was to not add a citizenship question to the census, but instead create block-level citizenship data using administrative records.  *Id.* at 1.  Alternative C was estimated to cost less than $1 million.  *Id.* at 2.

217.    The January 3 memo concluded that Alternative C would deliver higher quality citizenship data than Alternative B because the administrative records provide "very accurate" citizenship information.  *Id.* at 3.  The memo explained this is because the administrative record data required proof of citizenship, citizenship information is self-reported less accurately, and proxies report citizenship even less accurately.  *Id.*

218.    The Census Bureau therefore expressly recommended Alternative C in the January 3 memo, reasoning that, compared to Alternatives A and B, Alternative C "even better meets

DoJ's stated uses, is comparatively far less costly than Alternative B, and does not harm the quality of the census count." *Id.*

219.    On January 4, 2018, Dr. Abowd wrote to various census officials, including Dr. Jarmin, "Ron reports that he has discussed this with the Under Secretary and she agrees with the recommendation of alternative C, but Alternative A remains a possibility as well." PTX-121.

### 3.    January 19 Memo from Dr. Abowd to Secretary Ross (PTX-22)

220.    On January 19, 2018, Dr. Abowd sent a memorandum to Secretary Ross on the "Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census" (January 19 Memo). PTX-22.

221.    The January 19 Memo presents the view of Dr. Abowd and his technical team evaluating Alternatives A, B and C. *Id.* It contains the same recommendation and rationale as in the January 3 Memo, along with some additional details of their analysis. *Id.*

222.    The January 19 Memo examined the issue of item nonresponse to the citizenship question, i.e. nonresponse to only the particular question, rather than the whole questionnaire. *Id.* at 4. It stated that item nonresponse rates for the citizenship question "are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity." *Id.* And, between 2013 and 2016, item nonresponse rates of Hispanics to the citizenship question had been approximately double than of non-Hispanic whites. *Id.*

223.    The January 19 Memo also examined the break-off rate for internet responses to the 2016 ACS, i.e. at what question people stopped taking the survey. *Id.* at 5. The memo found that "[b]ecause Hispanics and non-Hispanic non-whites breakoff much more often than non-Hispanic whites, especially on the citizenship-related questions, their survey response quality is differentially affected." *Id.*

224.    The January 19 Memo explained the Census Bureau's estimate based on the 2010 census and ACS that Alternative B would cause a 5.1 percent drop in self response from households containing at least one noncitizen. *Id.* at 4-5. It explained that while both citizen and noncitizen households responded to the ACS (which had a citizenship question) at lower rates

28

than to the census (which did not), the decline between the two surveys was 5.1 percent greater for noncitizen households.  *Id.* at 4.

225.    The memo explained, "Survey methodologists consider burden to include both the direct time costs of responding and the indirect costs arising from nonresponse due to perceived sensitivity of the topic."  *Id.* at 5.  Thus, a citizenship question "would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households.  *Id.*

226.    The January 19 Memo explained that lowered self-response rates would lower census data quality because data obtained in NRFU have greater rates of erroneous enumeration and whole-person imputation.  *Id.* at 5-6.  (Erroneous enumerations are enumerations of a person who should not have been counted and whole-person imputations are enumerations of all characteristics of a person.  *Id.* at 5.)  In support, the January 19 Memo cites a memo in the Bureau's coverage analysis for the 2010 census, which is in the Administrative Record (PTX-211) (G-01 Memo).  *Id.*  The January 19 Memo does not discuss the differential undercount results from the G-01 Memo or the potential effect of lowered self-response on a differential undercount of any subpopulation.  *See* PTX-22.

227.    The January 19 Memo stated the Census Bureau's conclusion that the $27.5 million increased cost estimate of Alternative B "is a conservative estimate because the other evidence cited in this report suggests that the differences between citizen and noncitizen response rates and data quality will be amplified during the 2020 Census compared to historic levels. Hence, the decrease in self-response for [non]citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census." *Id.* at 6.

228.    According to the January 19 Memo, Alternative C would yield more accurate citizenship data than Alternative B because based on historical census and ACS data, noncitizens misreport themselves as citizens "for no less than 23.8% of the cases, and often more than 30%." *Id.* at 7.

229.    Alternative C would also provide more accurate data because administrative record citizenship data is "verified" because it requires proof of citizenship or legal resident alien status.  *Id.*

230.    According to the January 19 Memo, Alternative B would increase the burden on census respondents, whereas Alternative C would not.  *Id.* at 1.

231.    The Census Bureau concluded that adding a citizenship question to the decennial census, "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  *Id.*

### 4.    The Set of 35 Questions from the Department of Commerce to the Census Bureau and the Commerce Department's Changes to the Census Bureau's Answer to Question 31

232.    Following the January 19 Memo, Mr. Comstock and Mr. Uthmeier developed and sent to the Census Bureau a set of 35 questions for the Census Bureau to answer about the analysis in the January 19 Memo.  PTX-377.

233.    The Census Bureau's responses to the questions was submitted to the Commerce Department on March 1, 2018, along with Dr. Abowd's March 1 memorandum to Secretary Ross.  PTX-133.

234.    Question 31 asked, "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?"  *Id.* at 21.

235.    The Census Bureau answered Question 31:

The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation.

The Census Bureau and the Office of Management and Budget (OMB) have laid out a formal process for making content changes.

- First, federal agencies evaluate their data needs and propose additions or changes to current questions through OMB.

- In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.
- Final proposed questions result from extensive cognitive and field testing to ensure they result in proper data, with an integrity that meets the Census Bureau's high standards.
- This process includes several opportunities for public comment.
- The final decision is made in consultation with OMB.

*Id.* at 21-22.

236.   The description of the "well-established" process in the Census Bureau's response to Question 31 is consistent with other Census Bureau documents describing the process to add a question or change the content of the decennial census.  PTX-4 at AR 3890, 3560, 9867; PTX-135; PTX-141.

237.   The Administrative Record shows that, despite the fact that the questions were directed to the Census Bureau, Commerce Department Deputy General Counsel Michael Walsh drafted a different answer to Question 31.  That answer states:

> No new questions were added to the 2010 Decennial Census, so there is no recent precedent for considering a request to add questions to a Decennial Census. Consistent with longstanding practice for adding new questions to the ACS survey, the Census Bureau is working with relevant stakeholders to ensure that legal and regulatory requirements are fulfilled and that the question would produce quality, useful information for the nation. As you are aware, that process is ongoing. Upon its conclusion, you will have all of the relevant data at your disposal to make an informed decision about the pending request from the Department of Justice.

PTX 14; PTX 1 at AR 1296.

238.   In Defendants' first production of documents in the Administrative Record, which they represented at the time constituted the complete administrative record, they included only a version of the 35 questions and answers that included only Mr. Walsh's answer to Question 31. *See* PTX-1 at 1296; *see also* PTX 1 at AR 1-1320.  The Census Bureau's March 1 response to Question 31 was produced later and only as a result of the New York court's order to supplement the record.  *See* PTX-133.

239.   Question 1 of the 35 questions asked, "With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?"  PTX-133 at 11.

240. The Census Bureau answered Question 1 by stating, between Alternatives B and C, there was no difference in the timing in which the citizenship data could be offered to the public. *Id.*

241. There is no evidence in the Administrative Record indicating that it would take longer to provide citizenship data using administrative records than a citizenship question.

### 5. February 12 Meeting Between Census Bureau and Secretary Ross

242. The Administrative Record contains evidence of only one meeting between the Census Bureau and Secretary Ross on the topic of the citizenship question, on February 12, 2018. PTX-128.

### 6. March 1 Memo from Census Bureau to Secretary Ross (PTX-133)

243. Following his receipt of the January 18 Memo, Secretary Ross directed the Census Bureau to consider a fourth alternative combining Alternatives B (adding a citizenship question to the census) and Alternative C (obtaining citizenship data from administrative records). PTX-133 at 2.

244. On March 1, 2018, Dr. Abowd sent an additional recommendation memorandum to Secretary Ross performing this analysis of this fourth alternative, "Alternative D." PTX-133 [March 1 Memo].

245. In the March 1 Memo, the Census Bureau concluded that, "Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce." *Id.* at 5.

246. The Census Bureau also identified additional problems with Alternative D in the March 1 Memo.

247. First, census responses would be unreliable for filling in the data gaps for those who do not match to administrative records, because undocumented immigrants "have a strong incentive to provide an incorrect [citizenship] answer, if they answer at all." *Id.* at 4.

248.     Second, lowered self-response rates due to the citizenship question would decrease the number of people who can be linked to administrative records, because NRFU personal-identifying information (PII) is lower quality than self-response PII.  *Id.*

249.     Just as in all previous Census Bureau memoranda on the subject, the March 1 Memo recommended against adding a citizenship question to the 2020 Census.  *Id.* at 5.

### 7.     Memorandum Addressing "Key Differences Between Alternative C and Alternative D" (PTX-24)

250.     The Administrative Record also includes a memorandum entitled "Summary Analysis of the Key Differences Between Alternative C and Alternative D."  PTX-24.

251.     Like the March 1 Memo, this memorandum also recommends using administrative data alone (Alternative C) and not adding a citizenship question, and is otherwise consistent with the Census Bureau's other memoranda on the issue.  *Id.* at 1-2.

252.     The Census Bureau explained that while both Alternative C and D will require the citizenship of a portion of the population to be imputed, or "modeled," Alternative D will suffer from accuracy issues because many noncitizens self-report as citizens, which also will, in turn, systematically bias the modeling in Alternative D.  *Id.* at 2.  In contrast, the modeling in Alternative A will be benchmarked against the more accurate "truth deck" of the administrative records.  *Id.* at 13.

253.     None of the memoranda above analyzed whether NRFU would fully mitigate the nonresponse.  *See* PTX-148; PTX-101; PTX-22; PTX-133.  No other evidence Administrative Record shows that the Defendants analyzed this issue, or whether such an undercount would have any effects on federal funding or congressional apportionment.

254.     None of the memoranda above analyzed the effect of the drop in self-response on count and characteristic data quality at the local level, including its effect on local governments.  *See* PTX-148; PTX-101; PTX-22; PTX-133.  No other evidence Administrative Record shows that the Defendants analyzed this issue.

33

255.    None of the memoranda above mentioned the CSM Memo on Respondent Confidentiality Concerns or any of its findings or recommendations regarding pretesting. *See* PTX-148; PTX-101; PTX-22; PTX-133.

**F.    DOJ Refused to Discuss Its Request with the Census Bureau**

256.    Following the Census Bureau's receipt of the December 12 Letter from DOJ, Census Bureau sought to meet with DOJ to discuss its stated need for block-level citizenship data. PTX-72; PTX-4 at AR 8651.

257.    Dr. Jarmin emailed an initial response to the December 12 Letter on December 22. PTX-72.  In that letter, he advised Mr. Gary that "the best way to provide P.L. 94-171 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses. This would result in higher quality data produced at a lower cost."  PTX-72.

258.    In Dr. Jarmin's December 22 letter, he suggested to Mr. Gary a "meeting of Census and DOJ technical experts to discuss the details of this proposal." *Id.*

259.    On January 2, 2018, Director Jarmin sent a follow-up email to Mr. Gary requesting a meeting during the following week.  PTX-102.

260.    On January 9, 2018, Director Jarmin emailed Mr. Gary and again requested to meet, stating that they "have a pretty short clock to resolve the request" and that it would be "good to meet with your team as soon as possible."  PTX-192.

261.    On January 10, Jarmin and Gary exchanged emails agreeing to a time and place for the meeting.  PTX-191.

262.    However, on February 6, 2018, Dr. Jarmin reported to Karen Dunn Kelley at the Commerce Department, "I spoke with Art Gary.  He has spoken with DOJ leadership.  They believe the letter requesting citizenship to be added to the 2020 Census fully describes their request.  They do not want to meet."  PTX-3 at AR 3460.

263.    The Administrative Record contains no evidence that before Secretary Ross issued his ultimate decision memorandum on March 26, 2018 (Decision Memo), DOJ ever met with

34

1  either the Census Bureau or the Commerce Department to discuss the request in the December 12

2  Letter.

3      **G.    Outside Stakeholders Urged Secretary Ross Not to Add the Citizenship
           Question to the Census**

4

5      264.    Prior to issuing the Decision Memo, Secretary Ross received a large number of

6  communications from outside stakeholders expressing concern that adding the citizenship

7  question would put at risk a complete and accurate census count.  These included

8  communications from:

9    • Six former Directors of the Census Bureau (PTX-1 at AR 1057 ("There is a well-proven

10      multi-year process to suggest and test new questions.  We strongly believe that adding

11      an untested question on citizenship status at this late point in the decennial planning

12      process would put the accuracy of the enumeration and success of the Census in all

13      communities at grave risk."));

14    • Members of the Census Bureau's Census Scientific Advisory Committee (PTX-1 at AR

15      794 ("We hold the strong opinion that including citizenship in the 2020 Census would

16      be a serious mistake which would result in a substantial lowering of the response

17      rate."));

18    • Arturo Vargas of NALEO Educational Fund (PTX-1 at AR 778);

19    • Senators Feinstein, Harris, Carper, Schatz, and Cortez Masto, as well as numerous other

20      members of Congress (PTX-1 at AR 780, 840, 908, 1086, 1223).

21  *See also, e.g.*, PTX-1 at AR 787, 798, 1053, 1073, 1082, 1090, 1122, 1150, 1222, 1235, 1239,

22  1269; PTX-3 at AR 3605, 3608.

23      265.    Numerous stakeholder letters advised that a citizenship question was not necessary

24  for section 2 VRA enforcement.  *See e.g.*, PTX-1 at AR 799 [letter from The Leadership

25  Conference on Civil and Human Rights], 1122 [letter from national Jewish organizations]; PTX-3

26  at AR 3605-06 [letter from Constitutional Accountability Center].

27      266.    In January and February 2018, before Secretary Ross issued the March 26 decision

28  memo, the Leadership Conference on Civil and Human Rights, the Constitutional Accountability

1    Center, and more than 15 other external stakeholders and voting rights experts, submitted letters

2    to Secretary Ross explaining that that enforcement of section 2 of the VRA has never once

3    previously depended upon having enumerated citizenship data since the statute's enactment in

4    1965.  PTX-1 at AR 798-800, AR 1122-23; PTX-3 at AR 3605-06.

5         267.    Conversely, Defendants attempted to enlist stakeholders to express support for the

6    citizenship question, but had trouble doing so.  PTX-71; PTX-1 at AR 1206, 1261; PTX-3 at AR

7    4849.

8         268.    On February 13, 2018, Dr. Jarmin wrote to an individual at the American

9    Enterprise Institute (AEI) that "We are trying to set up some meetings for Secretary Ross to

10   discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most

11   stakeholders will speak against the proposal. We're looking for someone thoughtful who can

12   speak to the pros of adding such a question…."  PTX-71.

13        269.    On the same day, Michael Strain of the AEI responded that "None of my

14   colleagues at AEI would speak favorably about the proposal."  *Id*.

15        270.    Dr. Jarmin then wrote to Under Secretary Kelley, "Please see the thread below.

16   Appears no one at AEI is willing to speak in favor of putting question on the 2020." PTX-71 at 1.

17        271.    Director Jarmin later reported that Census Bureau personnel were unable to find

18   any supporting organizations other than individuals associated with the Center for Immigration

19   Studies and the Heritage Foundation.  PTX-1 at AR 1206, 1261; PTX-3 at AR 4849; PTX-4 at

20   AR 8325.

21        **H.    The Citizenship Question Was Not Tested or Publicly Noticed Prior to
               Ross's Decision to Add It to the Census**

22

23        272.    The Administrative Record contains no evidence that there was any cognitive or

24   field testing of the citizenship question as required by the Census Bureau's "well-established"

25   process described with the Census Bureau's answer to Question 31, and in other documents in the

      Administrative Record.  *See also* PTX-4 at AR 3890, 3560, 9867; PTX-135, 141.

26

27

28

                                          36

273.     The Administrative Record contains no evidence Defendants discussed pretesting of the citizenship question with the Census Bureau advisory committees, the Office of Management and Budget, or any outside researchers.

274.     The Administrative Record contains no evidence that Defendants considered any testing requirements from the Office of Management and Budget.

275.     The Administrative Record contains no evidence related to what testing was performed, and how the citizenship question performed, before it was added to the ACS.

276.     The Administrative Record contains no evidence that Defendants considered obtaining any kind of waiver of any applicable agency guidelines regarding testing.

277.     The Administrative Record contains no evidence that the Census Bureau publicly noticed and provided a period for public comment about the citizenship question before Secretary Ross made the decision to add it to the Census, as required by the Census Bureau's "well-established" process described with the Census Bureau's answer to Question 31, and in other documents in the Administrative Record.  *See also* PTX-4 at AR 3890, 3560, 9867; PTX-135, 141.

278.     The Administrative Record contains no evidence that Defendants took any steps to address the concerns raised in the CSM Memo on Respondent Confidentiality Concerns or to conduct of its recommended pretesting related to those concerns.

### I.     Defendants Did Not Evaluate DOJ's Voting Rights Act Rationale for the Citizenship Question

279.     The Administrative Record contains no evidence that, following the December 12 Letter, any of the Defendants analyzed DOJ's section 2 rationale for adding the citizenship question.

280.     The Administrative Record contains no evidence that, following the December 12 Letter, any of the Defendants ever had any substantive communications with DOJ about the whether the use of administrative records would better assist with section 2 enforcement than a citizenship question on the census.

281.    The Administrative Record contains no evidence that, following the December 12

Letter, DOJ was informed that noncitizens misreport their citizenship status approximately 30

percent of the time, as reported in the Census Bureau's January 19 memo to Secretary Ross.  *See*

PTX-22 at 7.

**J.    Ross's March 26 Decision Memorandum**

282.    On March 26, 2018, Secretary Ross issued his formal decision memorandum

(Decision Memo) announcing and explaining his decision to adopt "Option D" (known in the

Census Bureau memoranda as "Alternative D") and add a citizenship question to the decennial

census.  PTX-26.

283.    The Decision Memo states that Secretary Ross "set out to take a hard look" at the

citizenship question "[f]ollowing receipt of the DOJ request" for it.  PTX-26 at 1.  However, the

evidence in the Administrative Record is clear that, well before DOJ's request, Secretary Ross

was considering and then directing his staff to take the necessary steps to add a citizenship

question to the census.

284.    The Decision Memo states that DOJ seeks to obtain CVAP data for census blocks

"where potential Section 2 violations are alleged or suspected, and DOJ states that the current

data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose

under the VRA."  PTX-26 at 1.  However, nothing in either the December 12 Letter or anything

else in the Administrative Record provides evidence that DOJ had lost any case or been unable to

bring any case because of a lack of block-level CVAP data.  *See* PTX-32; *see also* AR.

285.    The Decision Memo makes repeated statements inconsistent with the Census

Bureau's estimate that the citizenship question would cause a drop in self-response rates of 5.1

percent of all households with at least one noncitizen.  PTX-26 at 3; *see also* PTX-101.  These

include:

- The statement that, with respect to "Option B" (the option of adding a citizenship
  question and referred to in the Census Bureau memoranda as "Alternative B") neither
  the Census Bureau nor the concerned stakeholders could document that the response
  rates would in fact decline materially.  PTX-26 at 3.

38

- The statement that a former Chief Operating Officer of the Census Bureau confirmed that to the best of his knowledge, "no empirical data existed on the impact of a citizenship question on responses." *Id.*

- A description of numerous statistics not representing the Census Bureau's actual estimate of the drop-off from the citizenship question. *Id.* at 3-4.

- Ross's conclusion that "[s]o while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief." *Id.* at 4.

- The statement that "the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially." *Id.* at 5.

- The statement that "there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination." *Id.*

286.   The Decision Memo attempts to justify the selection of Option D by citing purported "[a]dditional empirical evidence about the impact of sensitive questions on survey response rates… from the SVP of Data Science at Nielsen."  However, the only evidence in the Administrative Record from this Nielsen representative are notes from a telephone call three days earlier between her (Christine Pierce) and Secretary Ross.  Those notes actually indicate, "Ms. Pierce stated that her biggest concerns [sic] was that the reinstatement of a citizenship question could lead to a lower response rate…."  PTX-1 at 1276.  During that call, Ms. Pierce also "noted the importance of testing questions." *Id.*  There is no "empirical evidence" in the Administrative Record at all from Ms. Pierce.

287.   The Decision Memo states that the citizenship question is "well tested" because it has been on the ACS since 2005. *Id.* at 2.  However, it does not acknowledge the "well-established" process requiring any new question to the census to first be tested, nor the fact that the Census Bureau's examination of the citizenship question on the ACS showed that it causes a

39

1    marked drop in self-response and that noncitizens misreport their status approximately 30 percent

2    of the time.  PTX-22 at 7; PTX-133 at 21-22.

3        288.    The Decision Memo does not what testing standards apply to adding the

4    citizenship question to the census or whether those standards have been met.

5        289.    The Decision Memo states that asking the citizenship question of all people, "may

6    eliminate the need for the Census Bureau to have to impute an answer for millions of people."  *Id.*

7    at 5.  However, the Census Bureau had estimated that with a citizenship question on the census, it

8    will have to impute the citizenship data of 13.8 million people.  PTX-24 at 2; *see also* PTX-133 at

9    7-10.  Nothing in the Administrative Record supports a contrary conclusion.

10       290.    The Decision Memo states that Option D "would maximize the Census Bureau's

11   ability to match the decennial census responses with administrative records," PTX-26 at 4, so as

12   to allow for "more complete" citizenship data.  However, the Administrative Record reflects that

13   because adding a citizenship question would drive down the self-response rate and put more

14   households into NRFU operations, Option D actually reduces the Census Bureau's ability to

15   match survey responses with administrative records.  PTX-25 at 4.

16       291.    The Decision Memo states that stakeholders' concerns were invalid when

17   premised upon the adequacy of ACS data for section 2 VRA enforcement because approximately

18   30 percent of noncitizens' citizenship responses to the ACS were incorrect.  *Id.* at 6.  However,

19   Secretary Ross does not represent, and no evidence in the Administrative Record supports, that

20   those responses will be more accurate to the question on the decennial census.

21       292.    The Decision Memo states that the Department of Commerce and Census Bureau's

22   review of the DOJ request prioritized the goal of "obtaining *complete and accurate data*," and

23   concludes that adding the citizenship question is the best way to obtain the most complete and

24   accurate data.  PTX-26 at 1, 7.  In fact, the Census Bureau had consistently concluded and

25   informed Ross that use of a citizenship question would result in *less* accurate data than

26   administrative records alone (PTX-22, PTX-25) and nothing in the Administrative Record

27   supports a contrary conclusion.

28       293.    The Decision Memo also attempts to justify Option D, stating:

40

Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses to administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and noncitizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to noncitizen responses to impute for that small percentage of cases where it is necessary to do so.

PTX-26 at 5. However, nowhere in the Administrative Record, including in the Abowd memos, does the Census Bureau state that adding a citizenship question would increase the accuracy of its estimate of inaccurate citizenship responses. *See* PTX-22, PTX-24, PTX-25, PTX-101, PTX-148. Nor is it apparent from the Administrative Record why the inaccuracy rate of responders would help impute the citizenship data of non-responders. If actual citizenship is benchmarked to administrative records, and the Bureau would use those records in any event, then adding a citizenship question to the decennial census would not assist in the imputation.

294.    The Decision Memo does not address whether the Census Bureau's NRFU and imputation processes would fully mitigate any drop in self-response cause by the citizenship question. PTX-26.

295.    The Decision Memo does not address Secretary Ross's legal obligation "to the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to acquire and use information available from other governmental entities instead of conducting direct inquiries, as required by 13 U.S.C. § 6(c). *Id.*

296.    No other evidence in the Administrative Record indicates that Defendants considered Secretary Ross's legal obligation under section 6(c) during their decision-making process.

297.    The Decision Memo does not address the fact that the DOJ was not advised of any details of the Census Bureau's analysis of the pros and cons of adding a citizenship question to the census or using administrative records alone. *Id.*

298.    The Decision Memo does not address whether the citizenship question was among the census subjects he reported to Congress in March of 2017 or whether he had submitted a report to Congress addressing the modification to those subjects. *Id.*

41

1    299.    The Decision Memo does not address whether he has found that new

2    circumstances occurred since March of 2017 that necessitate adding the citizenship question to

3    the census.  *Id.*

4        **K.    Secretary Ross's Purpose in Adding the Citizenship Question to the Census**

5        300.    The weight of the evidence demonstrates that the Secretary made the decision to

6    add a citizenship question before knowing whether DOJ had any need or even desire to add the

7    question. *See, e.g.*, PTX-44, PTX-49, PTX-73, PTX-89, PTX-96, PTX-98, PTX-362.

8        301.    Secretary Ross did not decide to add the citizenship question to the decennial

9    census to aid in enforcement of section 2 of the Voting Rights Act.

10       302.    There is no writing of any kind either in the Administrative Record authored by

11   the Secretary or anyone at the Commerce Department (or anyone else) that expressly and directly

12   describes the reasons why the Secretary wanted to add a citizenship question as early as the first

13   quarter of 2017.

14       303.    Conversely, the Administrative Record also shows that Secretary Ross was

15   motivated to add the citizenship question for the purpose of facilitating the exclusion of

16   noncitizens from the population count for congressional apportionment.  *See, e.g.* PTX 19, PTX-

17   55, PTX-58, PTX-86, PTX-437, PTX-448, PTX-449.

18       304.    This finding is particularly supported by the facts that: 1) Secretary Ross admits

19   that he discussed a citizenship question with "senior administration officials" before he became

20   Secretary of Commerce; 2) Steve Bannon, the Chief Strategist and Senior Counselor to the

21   President, then asked him to speak with Kris Kobach, who wanted a citizenship question on the

22   census to exclude noncitizens from the apportionment count; 3) on May 24, 2017, following

23   Secretary Ross's meeting with David Langdon regarding the citizenship question, Mr. Langdon

24   exchanged emails with the Census Bureau and received from them a 1988 DOJ memo about

25   excluding "illegal immigrants" from the census count, and; 4) by August of 2017, when Ross's

26   staff was preparing "a memo and full briefing…on a citizenship question" (which was not

27   disclosed in the Administrative Record), Commerce Department legal counsel emailed that their

28

42

"hook" was that the Department "do[es] not make decisions on how the [citizenship] data will be used for apportionment…."

305.    On the other hand, prior to the December 12 Letter, the Administrative Record includes no communications at all of Ross or any other Commerce Department officials indicating that they wanted to add the citizenship question for the purpose of aiding VRA enforcement.  The only implicit reference to the VRA in the Administrative Record prior to December 12 is the *LULAC v. Perry* court opinion that Mr. Neuman emailed to Secretary Ross shortly after Ross's communication with Steve Bannon, and that Mr. Comstock emailed to Mr. Langdon in May 2017 as the Commerce Department was investigating whether it could request the citizenship question itself.  There is no discussion in the record at all about the meaning of that case.  In addition to the other evidence, this indicates that Defendants intended to use the VRA enforcement as a justification for adding the citizenship question, when VRA enforcement was not, in fact, their true purpose.

306.    Secretary Ross did not publicly disclose in the Decision Memo or anywhere else that his purpose for adding the citizenship question was so that noncitizens could be excluded from the apportionment count.  Nor did Secretary Ross publicly disclose in the Decision Memo or anywhere else any reason for adding the citizenship question other than section 2 enforcement.

307.    The finding that Secretary Ross did not add the citizenship question for section 2 enforcement is also supported by a dearth of evidence explaining why he would go to such lengths to persuade DOJ to add the question for that purpose.

308.    There is no evidence in the Administrative Record, other than Mr. Gary's unsupported statement in the December 12 Letter, that DOJ needs block-level citizenship data for section 2 enforcement.  There is no evidence in the Administrative Record that any section 2 case had ever failed due to the lack of such data, or that DOJ had ever declined to bring such an action due to the lack of data.

309.    Further, the fact that the Commerce Department considered, but opted not to request the citizenship question itself, indicates that it has no legitimate need for the data for section 2 enforcement purposes.  PTX-370.  Nor is section 2 enforcement a likely rationale to

43

1   explain why Mr. Comstock would have gone to the Department of Homeland Security after

2   initially being turned away by DOJ.  *Id.*  Moreover, the Administrative Record evidences no

3   effort by Ross to obtain DOJ's input after the Census Bureau had advised him of the potential

4   pitfalls of the citizenship question.

5       310.    The Defendants' decision-making process itself also supports the finding that Ross

6   was not motivated by Voting Rights Act enforcement.  The Administrative Record contains no

7   disclosure by the Commerce Department to the Census Bureau about the intent to add a

8   citizenship question until after the December 12 Letter was delivered.

9       311.    This was despite the fact that Ross and his staff spent the better part of 2017

10  communicating about the citizenship question and strategizing about how to elicit a request for it.

11      312.    The Defendants also did not substantively confer with DOJ about its proffered

12  alternative of using the Administrative Record, despite the fact that Dr. Jarmin communicated to

13  DOJ that this would yield better citizenship data.  PTX-76; PTX-102.

14      313.    The Administrative Record does not indicate that Secretary Ross or anyone else at

15  the Commerce Department made any effort to obtain DOJ's feedback on this alternative or advise

16  DOJ on any details of the Census Bureau's analysis before making his decision.

17      314.    Finally, it does not appear that Secretary Ross's true purpose was section 2

18  enforcement because his Decision Memo includes statements plainly at odds with the evidence in

19  the Administrative Record.  PTX-26.

20      315.    As a result, there is strong evidence that (1) Secretary Ross acted in bad faith in

21  deciding to add a citizenship question to the census and in explaining his decision to do so, and

22  (2) Defendants acted in bad faith in compiling the Administrative Record in this action, given that

23  they originally disclosed only 1,320 pages and took the position that this constituted the entire

24  Administrative Record.  *See* PTX-1 (AR 1-1320).

25      316.    Defendants now concede that the Administrative Record consists of over 13,000

26  pages of documents, but only after being forced to produce them by a court order to supplement

27  the record.  *See* Joint Pretrial Statement and [Proposed] Order, ECF No. 119, at 11-13.  It is also

28  noteworthy that Defendants initially failed to produce the Census Bureau's answer to Question 31

44

(and produced only the Commerce Department's more favorable version regarding question

testing), and that the Administrative Record includes correspondence between Ross and

Comstock expressing caution about what ends up in the Administrative Record.  PTX-362.

## IV.   THE DEFENDANTS' DECISION-MAKING PROCESS FOR ADDING THE CITIZENSHIP QUESTION – ADDITIONAL FINDINGS BASED ON EXTRA-RECORD EVIDENCE

### A.   Additional Facts Regarding Defendants' Decision-Making Process

#### 1.   Secretary Ross's Early Desire to Add the Citizenship Question

317.   Defendants admit that Secretary Ross talked to Steve Bannon about the citizenship

question in the spring of 2017.  PTX-239 at 3; PTX-472.

318.   Mr. Bannon asked Secretary Ross to speak with Kris Kobach about adding a

citizenship question to the decennial census.  ECF No. 146-6 at 3; ECF No. 146-3 at 31, RFA No.

56.

319.   Secretary Ross also admits that he did, in fact, speak with Kris Kobach about

adding a citizenship question to the Census.  PTX-472; ECF No. 146-6 at 2-3.

320.   The Commerce Department admits that Secretary Ross's conversation with Kris

Kobach about adding a citizenship question to the 2020 Census came before any request from

DOJ to add a citizenship question to the decennial census.  ECF No. 146-3 at 39, RFA No. 80.

321.   Defendants admit that Secretary Ross talked to Attorney General Sessions about

the citizenship question in the spring of 2017 "and at subsequent times."  *Id.*

322.   The Commerce Department admits that, on or about January 31, 2017, the press

reported that the Trump administration had drafted an Executive Order proposing census

questions to determine immigration and citizenship status.  ECF No. 146-3 at 25-26, RFA No. 42.

323.   Mr. Comstock set out in the spring of 2017 to come up with a "legal rationale" to

support the Secretary's request to add a citizenship question. ECF No. 175-3 [Comstock Dep.]

266:4-12

324.   Mr. Comstock believed that he needed another agency to request to add the

question because OMB and the Paperwork Reduction Act required the Commerce Department to

"justify" why a citizenship question was "need[ed]," and Mr. Comstock understood that simply

1   saying that "the Secretary wanted it" would not "clear [the] legal thresholds." *Id.* at 153:6-

2   154:11.

3        325.   Mr. Comstock testified that it was his job to "help [the Secretary] find the best

4   rationale" for adding the question, because "[t]hat's what a policy person does." *Id.* at 266:4-

5   267:6.

6        326.   Mr. Comstock testified that he did not "need to know what [the Secretary's]

7   rationale might be, because it may or may not be one that is … legally-valid." *Id.* at 267:10-14.

8        327.   Mr. Comstock testified that the Secretary never told him why he wanted to add a

9   citizenship question to the census. *Id.* at 112, 251-54.

10       328.   Mr. Comstock also testified that he never asked the Secretary why he wanted to

11   add a citizenship question. *Id.* at 171-72.

12       329.   According to Mr. Comstock, the reasons why the Secretary wanted a citizenship

13   question were irrelevant. *Id.* at 253-54, 260-62.

14       330.   Ms. Teramoto similarly testified that she had no knowledge of why the Secretary

15   wanted to add a citizenship question. ECF No. 175-9 [Teramoto Dep.] 32.

16       331.   Undersecretary Kelley similarly testified that she had no knowledge of why the

17   Secretary wanted to add a citizenship question. ECF No. 175-6 [Kelley Dep.] 39.

18       332.   Undersecretary Kelley testified that it is "very plausible" that she knew as early as

19   July 2017 that Secretary Ross was considering adding a citizenship question to the 2020 Census.

20   *Id.* at 45:5-12.

21       333.   During her testimony, Ms. Teramoto denied knowledge of her conversation with

22   Mr. Kobach and denied knowing who he was. Teramoto Dep. 40–41.

23       334.   On July 25, 2017, Defendant Ross had a further telephone conversation with Mr.

24   Kobach concerning the addition of the citizenship question to the 2020 Census. ECF No. 146-3

25   at 40, RFA No. 84.

26       335.   Ms. Teramoto testified she had no recollection of this call and denied knowing

27   who Mr. Kobach was. Teramoto Dep. 40–41.

28

46

336.     Mr. Comstock, Ms. Teramoto, and Undersecretary Kelley have all denied having any recollection of their September 5 meeting with Secretary Ross to discuss adding the citizenship question.  Comstock Dep. 221:1-16; Teramoto Dep. 60:6-61:11; Kelley Dep. 105–07.

337.     Secretary Ross has publicly claimed that "what triggered the investigation, the real study, what triggered the process that led to the determination to [add the citizenship question] was the letter from the Department of Justice."  PTX-472.

338.     Secretary Ross testified before the House Committee of Ways and Means on March 22, 2018.  PTX-346.  When asked whether the Department of Commerce planned to add a citizenship question to the 2020 Census, Secretary Ross began his response by stating, "Department of Justice, as you know, initiated the request for inclusion of the citizenship question."  *Id.*

339.     When Mr. Comstock contacted DOJ on May 4, 2017, for the purpose of adding a citizenship question to the 2020 Census, Mr. Comstock was not seeking to promote more effective enforcement of the VRA.  Comstock Dep. 167-172.

340.     There is no writing of any kind produced in discovery authored by the Secretary or anyone at the Commerce Department (or anyone else) that describes the reasons why the Secretary wanted to add a citizenship question as early as the first quarter of 2017.

**2.     The Role of the Department of Justice**

341.     The Census Bureau informed federal agencies that they were to submit requests for 2020 Census content by July 1, 2016.  ECF No. 172-1 [Trial Transcript in *State of N.Y. v. U.S. Dep't of Com.*, hereinafter "New York Tr."] at 995:18-996:3 (Abowd); *see also* PTX-214.

342.     DOJ's request to add a citizenship question was not received by July 1, 2016.  New York Tr. 996:4-6 (Abowd).

343.     DOJ did not contact the Census Bureau about adding a citizenship question prior to December 2017.  *Id.* at 996:7-10 (Abowd).

344.     Prior to the December 2017 request, DOJ had never communicated to the Census Bureau that ACS CVAP data was not ideal for DOJ's VRA enforcement purposes.  *Id.* at 996:19-23 (Abowd).

345.    Mary Blanche Hankey, Mr. Comstock's first contact at DOJ, was an advisor to Attorney General Sessions.  Comstock Dep. 167:19-22.

346.    According to Mr. Comstock, when he met with Ms. Hankey, he did not explain to her why Secretary Ross wanted a citizenship question on the census and she did not ask why.  *Id.* at 171:16-172:5.

347.    James McHenry, the DOJ official whom Earl Comstock first solicited to request the citizenship question, has no responsibility for enforcement of the Voting Rights Act.  ECF No. 146-3 at 36, RFA No. 71.

348.    The Department of Homeland Security, to which Mr. McHenry referred Mr. Comstock regarding the citizenship question, has no responsibility for enforcement of the VRA. ECF No. 146-3 at 36, RFA No. 74.

349.    John Gore was the Acting Assistant Attorney General (AAAG) for Civil Rights at DOJ.  Gore Dep. 18.

350.    Mr. Gore was and is a political appointee, not career Civil Rights Division staff. *Id.* at 14, 18–19.

351.    In his role as AAAG, Mr. Gore was the head of DOJ's Civil Rights Division.  *Id.* at 18-19.

352.    One of the sections within the DOJ Civil Rights Division is the Voting Section. Among the duties of the Voting Section is to enforce section 2 of the VRA.  *Id.* at 18-19.

353.    Prior to becoming AAAG, Mr. Gore was previously an attorney in private practice. *Id.* at 14.

354.    As an attorney in private practice, Mr. Gore litigated numerous cases under the VRA.  *Id.* at 14–15.

355.    In all of the cases he litigated under section 2 of the VRA prior to coming to DOJ, Mr. Gore represented defendants rather than plaintiffs.  *Id.* at 16.

356.    The issue of the adequacy of CVAP data never came up in any of the VRA cases litigated by Mr. Gore.  *Id.* at 16–17.

48

357.    In his experience representing jurisdictions defending VRA lawsuits, Mr. Gore never took the position that plaintiffs' block-level CVAP data was insufficient because it was based on sample survey data rather than a "hard count" from the decennial Census.  *Id.* at 16–17.

358.    Mr. Gore has no experience drawing districts for the purposes of complying with the *Gingles* preconditions for VRA liability or using block-level data about the characteristics of populations.  *Id.* at 17–18.

359.    Mr. Gore became involved in the issue of the citizenship question through conversation with Ms. Hankey and A.G. Sessions.  *Id.* at 73-75.

360.    On or around Labor Day of 2017, Mr. Gore had a conversation with A.G. Sessions regarding a citizenship question.  *Id.* at 83; ECF No. 146-6 at 2-3.

361.    Secretary Ross initiated that conversation.  Gore Dep. 83:16–84:6.

362.    Mr. Gore learned from that conversation with A.G. Sessions that Secretary Ross had initiated an earlier discussion between Secretary Ross and A.G. Sessions regarding a citizenship question.  *Id.* at 83-84.

363.    Mr. Gore was also aware that someone from the Department of Commerce had spoken to Ms. Hankey and Mr. McHenry before September 8, 2017.  *Id.* at 61-62, 63-64. The Commerce Department initiated all of the prior DOC-DOJ conversations (with Sessions, Hankey and McHenry); these conversations were not initiated by DOJ, either for the purpose of obtaining better data for VRA enforcement or for any other purpose.  *Id.* at 67-68.

364.    Beginning roughly in mid-September, the Commerce Department initiated direct conversation with Mr. Gore.  *Id.* at 91–92, 94–95.

365.    Between September and October 2017, Gore spoke with three individuals from the Commerce Department about a citizenship question:  Peter Davidson, James Uthmeier, and Wendy Teramoto.  *Id.* at 92-94, 118. Mr. Gore participated in various conversations with Mr. Davidson, Mr. Uthmeier, and Ms. Teramoto through the autumn of 2017.  *Id.* at 92-94.  None of these conversations were initiated by Gore or anyone in DOJ's Civil Rights Division.  *Id.* at 94-95.

49

366.    Mr. Gore recalls first being contacted by Mr. Davidson in mid-September.  *Id.* at 92-93, 97-98.  Mr. Davidson called Mr. Gore to discuss adding a citizenship question to the census.  *Id.* at 97-98.  Mr. Davidson asked Mr. Gore to reach out to Ms. Teramoto.  *Id.*

367.    The "DOJ-DOC" issue referred to in Mr. Gore's email to Ms. Teramoto was the addition of a citizenship question to the 2020 Census.  *Id.* at 96-97; *see also* PTX-59.

368.    Mr. Gore and Ms. Teramoto spoke about the citizenship question on September 15, 2017.  Gore Dep. 102-103.  Ms. Teramoto testified that she had no recollection of this conversation.  Teramoto Dep. 74-77.

369.    Mr. Gore confirmed that in September 18, 2017, Secretary Ross again spoke to Attorney General Sessions specifically about adding the citizenship question.  Gore Dep. 112.

370.    On September 22, 2017, Mr. Uthmeier reached out to Mr. Gore.  *Id.* at 117-18 (objection).

371.    Mr. Gore returned Mr. Uthmeier's call, on or about September 22, 2017, and they discussed adding a citizenship question to the 2020 Census.  *Id.* at 118, 119.

372.    Mr. Uthmeier has no experience as counsel in VRA cases, litigating section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation.  *Id.* at 117-118.

373.    After their call, Mr. Gore was also provided Mr. Uthmeier's August 11 memorandum discussing the addition of a citizenship question.  *Id.* at 118.

374.    With the August 11 memorandum, Mr. Gore also received a handwritten note from Mr. Uthmeier.  *Id.* at 118–119. This handwritten note from Uthmeier to Gore contained information that DOJ considered in drafting the final letter requesting a citizenship question.  *Id.* at 123-24.  That note was not produced in the Administrative Record and Defendants withheld it on the basis of privilege.

375.    Mr. Gore responded to that note in a discussion with Mr. Uthmeier and Mr. Davidson, purportedly to provide legal advice in anticipation of litigation.  *Id.* at 120-124.

376.    DOJ relied, in part, on Mr. Uthmeier's input in reaching its decision to send the December 12 Letter to the Census Bureau.  *Id.* at 123-124.

377.    In October of 2017, AAAG Gore, John Zadrozny of the White House Domestic Policy Council, along with Rachael Tucker, and others from DOJ participated in a conference call to discuss adding a citizenship question to the 2020 Census without the participation of any Commerce Department or Census Bureau personnel.  *Id.* at 409-12.

378.    During the autumn of 2017, Mr. Gore also discussed a citizenship question with Mr. Neuman with the understanding that Mr. Neuman was advising the Department of Commerce and Census Bureau on the issue.  *Id.* at 438.

379.    On or about November 1, 2017, Mr. Gore wrote the initial draft of the December 12 Letter.  *Id.* at 126–127 (objection).

380.    The only career (as opposed to political) staffer in the Civil Rights Division that provided input at any stage of drafting the December 12 Letter was Chris Herren, in early November 2017.  *Id.* at 151–153.

381.    On Wednesday, November 1, 2017, Mr. Gore emailed Chris Herren, Chief of DOJ's Voting Section, and copied Ben Aguiñaga.  *Id.* at 126 (objection).

382.    The subject of the email was: "Confidential & Close Hold: Draft Letter." Gore Dep. 126 (objection).  Mr. Gore testified that he intended that Herren could not share the draft letter without Mr. Gore's approval.  *Id.* at 130.

383.    Mr. Gore attached to the email a draft letter that he had written requesting a citizenship question be added to the 2020 Census questionnaire.  Mr. Gore asked for input from Mr. Herren on the draft.  *Id.* at 126-27 (objection).

384.    Ben Aguiñaga and Bethany Pickett were political appointees in the front office of the Civil Rights Division who began working there in 2017, having graduated from law school around 2015.  *Id.* at 133-34.

385.    Mr. Gore received substantive input from Mr. Herren, Mr. Aguiñaga, and Ms. Pickett.  *Id.* at 136–137.

386.    Mr. Gore did not solicit or receive substantive input at this stage from anyone besides Mr. Gary, Ms. Pickett, Mr. Aguiñaga, and Mr. Herren.  *Id.* at 136–137.

387.    Mr. Gore does not recall either sharing subsequent drafts of the December 12 Letter with Herren or Herren giving him comments on any subsequent drafts.  *Id*. at 444-45.

388.    Mr. Gore has no recollection of receiving any input or edits from career DOJ Civil Rights Division staff on the letter requesting a citizenship question aside from the first round of edits from Herren.  *Id.* at 152-53.

389.    The only other people in DOJ's Civil Rights Division from whom Gore can recall soliciting or receiving input on the draft December 12 Letter were Ms. Pickett and Mr. Aguiñaga. *Id.* at 136-37.

390.    Sometime in mid-November ("a few weeks" before November 27) Mr. Gore discussed adding a citizenship question with Rachael Tucker, then counsel in the front office in the Office of the Attorney General, and Robert Troester, then Associate Deputy Attorney General.  *Id.* at 141.

391.    Neither Ms. Tucker nor Mr. Troester had experience as counsel in VRA cases, litigating section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation.  *Id.* at 140.

392.    On or about November 26, 2017 (Thanksgiving weekend), Secretary Ross conversed with President Trump.  ECF No. 146-3 at 47-48, RFA No. 103.  This was one day before Secretary Ross emailed Peter Davidson, stating that "Census is about to begin translating the questions into multiple languages and has let the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must get this resolved."  PTX-144.

393.    In late November 2017, Gore solicited and received edits on the draft letter requesting a citizenship question from Rachael Tucker, Counsel in the front office of the Attorney General; and Robert Troester, then-Associate Deputy Attorney General.  Gore Dep. 138-142 (objection).

394.    Mr. Gore did not receive substantive edits from anyone besides Ms. Tucker and Mr. Troester in the last few days before the December 12 Letter was sent.  *Id.* at 146.

52

395.    Final authorization to send the letter came from either Ms. Tucker or Mr. Troester on behalf of Attorney General Sessions, probably on Tuesday, December 12, 2017.  *Id.* at 158–160.

396.    Attorney General Sessions made the decision for DOJ to request that the Census Bureau ask a citizenship question on the Census.  *Id.* at 442.

397.    Before the December 12 Letter was sent to the Census Bureau, Mr. Gore was aware that DOJ "staff did not want to raise the citizenship question" in the fall of 2017.  *Id.* at 68-69.

398.    Mr. Gore testified he does not personally believe that it is necessary for DOJ's VRA enforcement efforts to collect CVAP data through the census questionnaire.  *Id.* at 300.

399.    A.G. Sessions personally directed DOJ's refusal to meet with the Census Bureau to discuss DOJ's request in the December 12 Letter.  *Id.* at 271:21-272:13.

400.    No meeting between the Census and DOJ technical experts took place before issuance of the Decision Memo on March 26, 2018.  ECF No. 175-1 [Census Bureau 30(b)(6) Dep. Vol. I] 96:3-9; Gore Dep. 259:5-11; New York Tr. 962:22-963:3 (Abowd).

401.    Dr. Hermann Habermann described meetings with a requesting agency, such as the meeting Director Jarmin requested with DOJ on December 22, 2017, as "normal Census Bureau procedure. [Such a meeting] allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers."  Habermann Trial Aff. ¶¶ 28-29.

402.    Dr. Jarmin testified that it was typical for the Census Bureau to meet with federal agencies requesting data in order to understand their needs and come up with the best way to meet those needs.  ECF No. 175-5 [Jarmin Dep.] 33:1-15, 36:14-19.

403.    Dr. Abowd testified that it is "very unusual" for an agency to make a request to the Census Bureau to collect data through the census but then refuse to meet to discuss the technical aspect of that data request.  Tr. 1055:5-9 (Abowd).

404.    Dr. Abowd testified that it is "very unusual" for the head of a cabinet agency to personally direct staff not to meet with the Census Bureau to discuss the Census Bureau's ideas for producing better quality data for that agency at a lower cost.  Tr. 1055:10-14 (Abowd).

53

405.     Dr. Jarmin did not agree with DOJ's reasoning for refusing to meet because the Census Bureau would have liked additional information on how DOJ used CVAP data.  Jarmin Dep. 101:9-20.

406.     Prior to the Decision Memo, there were no conversations between the Census Bureau and DOJ regarding the issue of disclosure avoidance of block-level citizenship data.  New York Tr. 1046:3-8 (Abowd).

407.     It is unknown whether the block-level CVAP data collected with a citizenship question on the 2020 Census will have a margin of error any more precise than the CVAP data on which the Department of Justice currently relies.  *Id.* at 1045:1046:2 (Abowd).

408.     Mr. Gore is not aware of any communications between DOJ and the Census Bureau about whether or not adding a citizenship question to the census would in fact produce data that has smaller margins of error than the citizenship data currently used by DOJ, due to required disclosure avoidance techniques.  Gore Dep. 228, 233-234.

### 3.     The Role of the Census Bureau

409.     The leadership of the Census Bureau, including Dr. Abowd, has consistently recommended has against including a citizenship question on the 2020 Census.  New York Tr. 879:2-8 (Abowd).

410.     The leadership of the Census Bureau does not think that adding a citizenship question to the 2020 Census is a good idea.  *Id.* at 878:23-879:1 (Abowd).

411.     Dr. Abowd is the Chief Scientist and Associate Director for Research and Methodology at the U.S. Census Bureau.  *Id.* at 876:8-13 (Abowd).

412.     Dr. Abowd leads a directorate of research centers across all statistical programs of the Census Bureau.  *Id.* at 876:14-17 (Abowd).

413.     Dr. Abowd is a senior executive at the Census Bureau.  *Id.* at 876:18-20 (Abowd).

414.     Dr. Abowd assumed his current role at the Census Bureau on June 1, 2016.  *Id.* at 876:24-877:1 (Abowd).

415.     Dr. Abowd first learned about DOJ's request to add a citizenship question via email on December 15, 2017.  *Id.* at 879:9-17 (Abowd).

54

416. Following receipt of the December 12 Letter, Dr. Jarmin asked Dr. Abowd to assemble a team of technical experts known as the "SWAT" team to discuss how to respond to the DOJ request. *Id.* at 878:23-880:5 (Abowd).

417. In response to the December 12 Letter, the Census Bureau had the SWAT team look into using administrative records in lieu of a citizenship question on the census because, under Title 13, the Bureau is supposed to use administrative records in lieu of direct collection when possible. Jarmin Dep. 59:9-60:7.

418. A group of Census Bureau decision-makers in collaboration with Undersecretary Kelley decided not to conduct a randomized controlled trial of the content of the citizenship question. New York Tr. 925:19-22 (Abowd).

### 4. The January 19 Memo from Dr. Abowd to Secretary Ross

419. The January 19 Memo to Secretary Ross summarized the opinions of the Census Bureau senior executive staff that was based on the SWAT team's work and other Census Bureau research. New York Tr. 880:10-18 (Abowd).

420. The January 19 Memo memorializes the Census Bureau's credible, quantitative evidence, as well as its analysis, that adding a citizenship question to the 2020 Census could be expected to lower the self-response rate in households that may contain noncitizens. *Id.* at 881:4-10 (Abowd).

421. The analysis in the January memo is a well-designed natural experiment. *Id.* at 921:25-922:3 (Abowd).

422. The January 19 Memo was prepared under Dr. Abowd's supervision. *Id.* at 882:22-883:1 (Abowd).

423. The views in the January 19 Memo are a summary of the technical work that that SWAT team did and the contributions made by other senior executives at the Census Bureau. *Id.* at 883:4-6 (Abowd).

424. Dr. Abowd agrees with the conclusions in the January 19 Memo. *Id.* at 883:7-9 (Abowd).

425.   Dr. Jarmin reviewed and approved the January 19 Memo.  *Id.* at 883:10-12 (Abowd).

426.   The analyses in section B1, 2, and 3 of the memo all support the conclusion that the citizenship question would cause a lower self-response rate to the 2020 Census.  *Id.* at 890:891:3 (Abowd).

427.   At the time of the memo, 5.1 percent was the Census Bureau's best estimate of the effect of adding a citizenship question in terms of the citizenship question's differential impact of self-responses of noncitizen households as compared to citizen households.  *Id.* at 893:15-22 (Abowd).

428.   A reduction in self response of 5.1 of noncitizen households would send more than a million additional people into NRFU.  *Id.* at 894:1-16 (Abowd).

429.   The lower self-response rates resulting from adding a citizenship question will increase the cost of conducting the 2020 Census.  *Id.* at 950:10-13 (Abowd).

430.   This is because more people will have to be enumerated through NRFU, which costs money.  *Id.* at 950: 15-20 (Abowd).

431.   One of the reasons that the $27.5 million increased NRFU cost estimate is conservative is because the differences in self-response rates to the 2020 Census between citizen and noncitizen households may be even greater than estimated in the memo.  *Id.* at 951:11-19 (Abowd).

432.   The $27.5 million is a lower-bound estimate.  *Id.* at 951:20-22 (Abowd).

433.   One reason it is a lower-bound cost estimate is that it may take more NRFU visits to enumerate households that do not respond due to the citizenship question than assumed.  *Id.* at 952:2-6 (Abowd).

434.   Another reason it is a lower-bound cost estimate is that it does not incorporate any estimate about the effect of a citizenship question on reducing self-response rates from all-citizen households.  *Id.* at 951:7-11 (Abowd).

56

435.   Another reason it is a lower-bound cost estimate is that it does not capture increased communication campaign costs that may be needed as a result of the citizenship question. *Id.* at 952:12-16 (Abowd).

436.   NRFU obtains census answers that are less reliable than self-responses. *Id.* at 953:6-10 (Abowd).

437.   The conclusion in the memo that adding a citizenship question to the census would harm the quality of the census count applies both to Alternative B and Option D, which the Secretary chose. *Id.* at 953:11-17 (Abowd).

438.   When someone's ACS response says that they are a citizen but the administrative records says that they're not a citizen, then the most likely conclusion is that the person is, in fact, a noncitizen. *Id.* at 955:6-20(Abowd).

439.   Citizenship status is a characteristic where administrative records tend to be more accurate than survey responses. *Id.* at 955:21-24 (Abowd).

440.   For more than 30 percent of noncitizens who provide a response to the ACS citizenship question, the response is probably incorrect. *Id.* at 956:16-21 (Abowd).

441.   The Bureau has no empirical basis to believe that noncitizens for whom a response is provided to citizenship question on the census will have more accurate responses than they do to the citizenship question on the ACS. *Id.* at 956:22-957:2 (Abowd).

442.   The Census Bureau found that there are definitely indications that responses by noncitizen to a citizenship question on the 2020 Census will be even less accurate than they have historically been on the ACS. *Id.* at 957:3-7 (Abowd).

443.   The Census Bureau still hasn't made any determination about how it will address disagreement between survey responses and the administrative records when producing block-level CVAP data used by the Department of Justice after the 2020 Census. *Id.* at 957:8-13 (Abowd).

444.   The Census Bureau concluded that using administrative records would deliver higher quality block-level CVAP data by race and ethnicity than including a citizenship question on the census. *Id.* at 958:19-22 (Abowd).

445.     The Census Bureau's proposal to generate such block-level CVAP data using administrative records rather than a citizenship question had the backing of the Census Bureau's redistricting office.  *Id.* at 958:24-959:3 (Abowd).

446.     In the January 19 Memo, the Census Bureau concluded that a citizenship question on the 2020 Census would be a sensitive question for Hispanics.  *Id.* at 917:4-7 (Abowd).

447.     The analysis in the January 19 Memo of Alternative B also applies to Option D.  *Id.* at 888:22-889:6 (Abowd).

448.     In the January 19 Memo, the Census Bureau did provide empirical support for its conclusion that adding a citizenship question will reduce self-response rates to the 2020 Census.  *Id.* at 922:4-10 (Abowd).

449.     Dr. Jarmin agrees with the findings in the January 19 Memo, including that using administrative records would provide higher quality CVAP data at a lower cost than a citizenship question on the 2020 Census.  Jarmin Dep. 65-67, 115:20-117:15.

**5.      The Set of 35 Questions from the Commerce Department to the Census Bureau**

450.     After the Census Bureau communicated its views to Secretary Ross, the Commerce Department sent a list of 35 follow-up questions to the Census Bureau.  New York Tr. 1004:21-15 (Abowd).

451.     Dr. Abowd was charged with making sure that the responses to the 35 questions were accurate.  *Id.* at 1005:23-1006:1 (Abowd).

452.     As of March 1, 2018, it was Dr. Abowd's understanding that adding a new question to the decennial census involves extensive testing, review, and evaluation.  *Id.* at 1007:7-9 (Abowd).

453.     The answer to Question 31 in AR 10900 accurately summarizes the Census Bureau and OMB's formal process for making content changes to the census.  *Id.* at 1007:19-1008:8 (Abowd); Jarmin Dep. 137-138; *see also* PTX-4-D at AR 10900.

58

454. Dr. Abowd did not write the answer to Question 31 that appeared in the initial administrative record, he does not know who wrote it, and it does not appear in the last version of the document in the possession of the Census Bureau. New York Tr. 1010:12-1011:3 (Abowd).

455. The text in that document is not the text that the Census Bureau transmitted to the Commerce Department. *Id.* at 1014:18-23 (Abowd).

456. That document is also not the final Census Bureau version according to Dr. Jarmin. Jarmin Dep. 137:6-139:6. He also does not know who wrote it. *Id.* at 211:19-21.

### 6. February 12 Meeting Between Census Bureau and Secretary Ross

457. Dr. Abowd met with Ross to discuss the January 19 Memo on February 12, 2018. New York Tr. 883:17-19 (Abowd).

458. In addition to Dr. Abowd, the Census Bureau staff attending the meeting were Dr. Jarmin, Dr. Llamas, Associate Director for the 2020 Census Al Fontenot, Assistant Director for the 2020 Census Jim Treat, and Special Assistant to the Director Krista Jones. Tr. 824:10-18 (Abowd).

459. The February 12 meeting also included several members of Secretary Ross's staff. *Id.* at 824:10-18 (Abowd).

460. Prior to the meeting with Secretary Ross, Dr. Abowd had a pre-meeting with Undersecretary Kelley to discuss the memo. New York Tr. 883:20-884:1 (Abowd).

461. During that meeting, she did not express any disagreements with the analysis in the memo. *Id.* at 884:2-5 (Abowd).

462. At the time of the February 12 meeting, Dr. Abowd was not aware that the citizenship question had been "in the air" in the early days of the Trump Administration. Tr. 1045:6-12 (Abowd).

463. Secretary Ross did not disclose at the February 12 meeting that Ross had begun considering a citizenship question in early 2017. New York Tr. 1017:12-21 (Abowd).

464. The February 12 meeting was the only meeting Dr. Abowd had with Ross to discuss the citizenship question before Ross issued the Decision Memo. *Id.* at 884:11-14 (Abowd).

465.     At the February 12 meeting, Ross immediately dismissed Alternative A (not collecting block-level CVAP data) as a possibility.  Tr. 827:18-25 (Abowd).

466.     Dr. Abowd informed Ross during the February 12 meeting that the Census Bureau thought that the difference in self-response rates on the ACS and the census, when comparing citizen and noncitizen households, was probably related to the citizenship question on the ACS. New York Tr. 922:11-17 (Abowd).

467.     The Census Bureau concluded in the January 19 Memo that using administrative records and not including a citizenship question on the census would best meet DOJ's stated uses. *Id.* at 959:12-15 (Abowd).

468.     The Census Bureau communicated that conclusion to Secretary Ross during the February 12 meeting.  *Id.* at 959:17-19 (Abowd).

469.     After February 12 meeting, Dr. Jarmin told Dr. Abowd that Secretary Ross and Undersecretary Kelley wanted Abowd to evaluate an Alternative D.  *Id.* at 965:25-966:5 (Abowd).

### 7.     March 1 Memo from the Census Bureau to Secretary Ross

470.     The views in the memo are those of the senior executive staff at the Census Bureau.  New York Tr. 966:23-25 (Abowd).

471.     The Census Bureau did not recommend Alternative D and still does not recommend Alternative D.  *Id.* at 967:16-21 (Abowd).

472.     Alternative C is superior to Alternative D for achieving an accurate census.  *Id.* at 968:24-969:1 (Abowd).

473.     Under Alternative D, due to the lower quality personal data on census responses from increased number of households going through NRFU, there will also be a reduction in the number of individuals whom the Census Bureau can link to administrative records.  *Id.* at 969:2-23 (Abowd).

474.     This memo, concludes that survey-collected citizenship data may not be reliable for many of the people falling in the gaps in the administrative record.  *Id.* at 973:23-974:3 (Abowd).

60

1    475.    The memo states that citizenship survey data gathered under Alternative D would

2    be of "suspect quality" and that administrative data on citizenship is "high quality."  *Id.* at

3    974:12-20 (Abowd).

4    476.    For the portion of the population that cannot be linked to administrative records, it

5    would be more accurate to impute/model their citizenship status (Alternative C) than to obtain the

6    information through their survey responses (Alternative D).  *Id.* at 974:22-975:9 (Abowd).  This

7    is the view of both Dr. Abowd and the Census Bureau.  *Id.* at 974:22-975:15.

8    477.    To obtain accurate citizenship information about people who fall in the gaps of the

9    administrative records, Dr. Abowd's recommendation would be to model their citizenship status

10   rather than to try to collect it through a survey self-response.  *Id.* at 976:5-10 (Abowd).

11   478.    To provide DOJ with accurate block-level CVAP data, for the group of people

12   who fall in the gaps of the administrative records, the best course of action is to model their

13   citizenship status rather than use a survey question.  *Id.* at 976:11-17 (Abowd).

14   479.    The number of individuals that cannot be matched to administrative records will

15   be higher under Alternative D than under Alternative C.  *Id.* at 975:17-21 (Abowd).

16   480.    The Census Bureau concluded in this memo that Alternative C is cheaper than

17   Alternative D.  *Id.* at 988:9-11 (Abowd).

18   481.    The Census Bureau concluded in the memo that using administrative records alone

19   would be more accurate than attempting to combine administrative records and survey responses

20   under Alternative D.  *Id.* at 988:12-16 (Abowd).

21   482.    All of this was communicated to Secretary Ross in the memo before his Decision

22   Memo was issued.  *Id.* at 988: 17-19 (Abowd).

23         **8.    Memo on Key Differences Between Alternatives C & D**

24   483.    Under Alternative C, the Bureau would model citizenship status for about 10

25   percent of the population.  New York Tr. 979:13 (Abowd).

26   484.    More people would not be linked to administrative record data under Alternative D

27   than Alternative C.  *Id.* at 979:16-20, 981:17-19 (Abowd).

28

485.     The Census Bureau has no plan on what do with people whose census responses on citizenship disagree with the administrative records.  *Id.* at 982:1-9 (Abowd).

486.     It is an unusual situation for there to be disagreement between survey response data and administrative record data.  *Id.* at 982:982:10-19 (Abowd).

487.     When there is disagreement between a survey response and administrative citizenship data, it would be less accurate to rely on the survey response.  *Id.* at 983:8-16 (Abowd).

488.     If there is disagreement between a survey response and administrative citizenship data and the Census Bureau relies on the administrative record data, there would have been no reason to ask the citizenship question in the first place.  *Id.* at 984:2-5 (Abowd).

489.     For people whose response and administrative citizenship data disagree, the traditional Census Bureau practice would be to use their response, but that would be less accurate than modeling their citizenship status.  *Id.* at 985:1-8 (Abowd).

490.     Dr. Abowd and the Census Bureau disagree with the argument that Alternative D is justified because under Alternative C, you would have to model the citizenship status for a pool of people who cannot be linked to administrative records.  *Id.* at 985:18-986:1 (Abowd).

491.     The Census Bureau "consistently communicated" to the Commerce Department that for people who could not be matched to administrative records, it would be more accurate to impute their citizenship status than to use their survey responses.  ECF No. 175-2 [Census 30(b)(6) Dep. Vol. II] 421:6-16.

### 9.     Ross's March 26 Decision Memorandum

492.     Although Secretary Ross repeatedly claims in the Decision Memo that there was a lack of evidence that the citizenship question would lower self-response rates, Dr. Abowd testified that the Census Bureau did provide to Secretary Ross credible, quantitative evidence that doing so would lower the self-response rate for households that may contain a noncitizen.  New York Tr. 1059:16-21 (Abowd).

493.     The Decision Memo states that Option D will provide more "complete and accurate" citizenship data than using administrative records alone.  PTX-26 at 5, 7.  However, the

62

1   Census Bureau concluded that adding a citizenship question is not necessary to provide complete

2   and accurate data in response to the Department of Justice's request.  Tr. 1063:18-22 (Abowd).

3   The Census Bureau's conclusion is the same today, and Dr. Abowd agrees with it.  *Id.* at 1063:23-

4   1064:1 (Abowd).

5   494.    The Decision Memo stated that Option D "may eliminate the need for the Census

6   Bureau to have to model citizenship status for millions of people.  PTX-26 at 5.  However, Dr.

7   Abowd's testimony confirmed that he and the Census Bureau had actually concluded that Option

8   D would not solve that problem.  New York Tr. 988:3-8 (Abowd).

9   495.    The Decision Memo stated:

10  Finally, placing the question on the decennial census and directing the Census Bureau
    to determine the best means to compare the decennial census responses to
11  administrative records will permit the Census Bureau to determine the inaccurate
    response rate for citizens and noncitizens alike using the entire population.  This will
12  enable the Census Bureau to establish, to the best of its ability, the accurate ratio of
    citizen to noncitizen responses to impute for that small percentage of cases where it is
13  necessary to do so.

14  PTX-26 at 5.  However, as of March 26, 2018, the Census Bureau had not analyzed these

15  presumptions.  New York Tr. 977:25-978:7 (Abowd).  The presumptions were never discussed

16  with Dr. Abowd and the Census Bureau does not agree with them.  *Id.* at 976:18-977:24

17  (Abowd).  In fact, adding a citizenship question will make it more difficult for the Census Bureau

18  to establish the accurate ratio of citizen to noncitizen responses to impute.  Tr. 1061:8-11

19  (Abowd).

20  496.    The March 26 Decision Memo states that "no one has identified any mechanism"

21  for determining whether the citizenship question would cause a drop in self-response.  PTX-26 at

22  5.  There were, in fact, "mechanisms" to determine whether the citizenship question would cause

23  people not to participate in the census.  Tr. 1061:23-1062:11 (Abowd).  One such mechanism was

24  the statistical analysis performed by the Census Bureau.  *Id.* at 1061:23-1062:3 (Abowd).

25  497.    Another mechanism would have been an RCT, which the Census Bureau could

26  have conducted, but did not.  *Id.* at 1062:4-11 (Abowd).  A group-of decision-makers in

27  collaboration with Undersecretary Kelley decided not to conduct a randomized controlled trial of

28  the content of the citizenship question.  New York Tr. 925:19-22 (Abowd).

63

498.    Although the Decision Memo refers to purported evidence from Nielsen regarding sensitive questions and response rates, Dr. Jarmin had never heard of any such evidence or any communications with Nielsen on the issue until he reviewed the Decision Memo.  Jarmin Dep. 174:9-11.

### 10.    Additional Facts About the Decision-Making Process

499.    As of March 26, 2018, Dr. Abowd was not aware that Secretary Ross had had conversations with Steve Bannon and Kris Kobach about adding a citizenship question to the census.  New York Tr. 1017:22-1018:7 (Abowd).

500.    Dr. Abowd did not learn that it was Department of Commerce officials who had requested that a citizenship question be added to the census, rather than the other way around, until the Administrative Record was lodged in this and related cases in June of 2018.  New York Tr. 1019:18-25 (Abowd).

501.    He was surprised when he learned this.  *Id.* at 1020:1-5 (Abowd).

502.    Dr. Abowd and everyone he knows at the Census Bureau, including all the senior executives, were surprised by the portion of the Administrative Record that predates December 12, 2017.  *Id.* at 1020:17-24 (Abowd).

503.    Dr. Abowd would have preferred to have begun evaluating the citizenship question as soon as possible, but instead was forced to do so in the four-month period between December 2017 and March 2018, at which time the census questions were required by statute to be announced.  Tr. 1041:21-1042:10 (Abowd).

504.    The Census Bureau is guided by a policy of independence from political and other undue external influence.  *Id.* at 1055:1-4 (Abowd).

505.    Secretary Ross's spokesperson publicly stated that he decided to add the citizenship question "in part due to the Census Bureau's assurances that any drop in self-response rates [due to the citizenship question] can and will be remediated by non-response follow[up] operations."  PTX-470.

506.    This purported position and assurance by the Census Bureau appears nowhere in the Administrative Record or the Decision Memo.

507.     According to Dr. Abowd, although the Census Bureau informed Secretary Ross that NRFU could remediate the drop in self-response, it never stated that it "will" do so.  Tr. 1057:3-8 (Abowd).

508.     Secretary Ross has not submitted a report to Congress finding that new circumstances exist which necessitate that the citizenship question be added to the census despite its exclusion from the topics in the March 2017 report.  *Id.* at 1045:24-1046:7 (Abowd).

**B.     Extra-Record Evidence Confirms that Defendants Violated Testing Requirements for the Citizenship Question**

**1.     The Census Bureau's Standards, Guidelines, and Processes Require Extensive Pretesting Before Adding Questions to the Decennial Census**

**a.     The Census Bureau's Statistical Quality Standards**

509.     The Census Bureau's Statistical Quality Standards set forth the Bureau's internal standards, guidelines, and requirements on pretesting questionnaires and data collection instruments.  PTX-205; Tr. 82:6-19 (O'Muircheartaigh), 832:1-833:8 (Abowd); Habermann Trial Aff. ¶¶ 59-63.

510.     The Census Bureau must follow these guidelines and standards.  Tr. 113:14-18 (O'Muircheartaigh).

511.     The Statistical Quality Standards apply when new questions are added to a data collection instrument or existing questions are revised.  PTX-205 at 8.

512.     Sub-Requirement A2-3.3 of the Statistical Quality Standards requires that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." *Id.* at 8; Tr. 82:9-84:13 (O'Muircheartaigh), 833:11-18 (Abowd).

513.     Sub-Requirement A2-3.3 allows the Census Bureau to gather testing data and determine the effectiveness on responses to data collection instruments.  Tr. 82:25-84:13 (O'Muircheartaigh).

514.    In order to meet Sub-Requirement A2-3.3, testing must occur on all aspects of the data collection instrument or questionnaire to which the new question is being added.  Tr. 82:25-84:13 (O'Muircheartaigh).  Thus, pretesting must test not only the response to the question itself, but also the design of the entire questionnaire in light of the new question as well as the total effect of the combination of questions on responses to the entire questionnaire.  *Id.*

515.    Under Sub-Requirements A2-3.3-1c and A2-3.3-1d, pretesting must be performed when "c. Review by cognitive experts reveals that adding pretested questions to an existing instrument may cause potential context effects" and "d. An existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)."  PTX-205 at 8.

516.    One exception to the pretesting requirement of the Statistical Quality Standards is that, "On rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting.  In such cases, subject matter and cognitive experts must discuss the need for and feasibility of pretesting.  The program manager must document any decisions regarding such pretesting, including the reasons for the decision.  If no acceptable options for pretesting can be identified, the program manager must apply for a waiver."  *Id.* at 8; Tr. 833:19-834:7, 1046:18-1047:19 (Abowd).

517.    Another exception is that, "Pretesting is not required for questions that performed adequately in another survey."  PTX-205 at 8; Tr. 833:19-834:7, 1047:12-19 (Abowd).

518.    Those and other similar pretesting standards are used in the survey methodology and data collection profession more generally.  Tr. 84:19-21 (O'Muircheartaigh).

**b.    The OMB's Standards and Guidelines for Statistical Surveys**

519.    Under Congress's direction, the Office of Management and Budget (OMB) has also issued standards that agencies must follow when designing, developing, and pretesting survey content.  Habermann Trial Aff. ¶¶ 55-56; PTX-262; PTX-266; PTX-267; PTX-612.

520.    The OMB-promulgated standards for pretesting content on data collection instruments can be found in the OMB Standards and Guidelines for Statistical Surveys.  PTX-266.

521.    The Census Bureau must follow the OMB Standards and Guidelines for Statistical Surveys when preparing for and implementing the decennial census.  Census Bureau 30(b)(6) Dep. Vol. I 321:14-17; New York Tr. 989:15-17 (Abowd); Habermann Trial Aff. ¶¶ 55-56; Tr. 88:22-89:12 (O'Muircheartaigh).

522.    These guidelines require that agencies conduct a pretest of all components of a survey, including by conducting a field test and full "dress rehearsal" for "highly influential surveys."  PTX-266 at 14.

523.    OMB Standard 1.4 requires that agencies "ensure that all components of a survey function as intended when implemented in the full-scale survey and that measurement error is controlled" prior to implementing the data collection instrument.  *Id.* at 14; Habermann Trial Aff. ¶ 56.  This is done either by "conducting a pretest of the survey components" or by "having successfully fielded the survey components on a previous occasion."  PTX-266 at 14.

524.    OMB Standard 2.3 states that "[a]gencies must design and administer their data collection instruments and methods in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost."  *Id.* at 16.  OMB Guideline 2.3.1 similarly demands that agencies "[d]esign the data collection instrument in a manner that minimizes respondent burden, while maximizing data quality."  *Id.* at 16.

525.    OMB Standard 2.3 requires the actual testing of a question in its totality.  Tr. 90:8-21 (O'Muircheartaigh); Habermann Trial Aff. ¶ 58.  That means that testing must occur on the content, comprehensibility, and response rates to the question itself, but also on the question's impact on the overall response to the instrument on which the question appears.  Tr. 90:8-21 (O'Muircheartaigh).

526.    The Census Bureau has conceded that—within the meaning of OMB Standard 2.3—Alternative D would result in lower data quality, higher cost, and higher respondent burden than the Census Bureau's recommended Alternative C.  Census Bureau 30(b)(6) Dep. Vol. I 321:18-322:19; New York Tr. 989:6-990:6 (Abowd).  While Alternative C would comport with

67

OMB Guideline 2.3.1, New York Tr. 990:7-991:1 (Abowd), Alternative D would not, given the degradation to data quality that would result.  *See* Section V(A)(III), *infra*.

### c. The Census Bureau's established process for adding or modifying content on the decennial census

527.    In addition to abiding by those standards, the Census Bureau follows a well-established practical process for adding or modifying questions to the Decennial Census.

528.    That well-established process is a decade-long process involving multiple tests and various randomized control tests.  New York Tr. 994:18-22 (Abowd).

529.    The well-established process for evaluating and adopting proposed changes to questions on the 2020 Census involves extensive cognitive and field testing, ongoing research, and input from advisory committees.  *Id.* at 996:24-997:14 (Abowd); PTX-214 at 4; Jarmin Dep. 47:13-48:17, 52:5-11, 138:16-139:19.

530.    The "Planned Development and Submission of Subjects Planned for the 2020 Census Program and Questions Planned for the 2020 Census Program" Memorandum contains a description of the process by which the Census Bureau is to determine the content of the 2020 Census.  PTX-214; New York Tr. 994:23-995:15, 996:24-997:10 (Abowd).  As part of that description, that Memorandum states, "Final proposed questions are based on the results of extensive cognitive testing, field testing, other ongoing research, and input from advisory committees."  PTX-214 at 4; New York Tr. 996:24-997:10 (Abowd).

531.    As of March 1, 2018, it was Dr. Abowd's understanding that the Census Bureau's process for adding a new question to the decennial census involves extensive pretesting, review, and evaluation.  New York Tr. 1007:7-9 (Abowd).

532.    Cognitive and field testing will enable the Census Bureau to understand, inter alia, how the proposed question will be received by different respondents, what the response rates to the question will be, the quality and accuracy of responses, what wording of the question performs best, the question's impact on other questions, and the best placement of the question on the survey or data collection instrument.  Habermann Trial Aff. ¶ 58.

68

533.    As a general matter, pretesting the citizenship question on the decennial census should test how different groups and segments of society will react to such a question, and the best way to prepare for the additional question.  *Id.* at ¶ 68; New York Tr. 464:3-8 (Habermann).  Testing to determine ways to improve methods for outreach to these groups would "seem to be mandatory."  Habermann Trial Aff. ¶ 68.

534.    Cognitive testing involves interviewing potential respondents to ascertain the process they use in developing their answer to a question, what they understand the question to mean, and how they relate to the question.  Tr. 110:18-111:11 (O'Muircheartaigh).

535.    Cognitive testing and interviewing is a key pretesting method because it can indicate whether a survey question captures the intended construct, and can identify difficulties respondents experience in understanding and accurately responding to proposed question.  Habermann Trial Aff. ¶ 57.

536.    Cognitive testing includes testing the wording of the proposed question, and it is part of the Census Bureau's "well established" process for adding content to the decennial census.  *Id.* at ¶ 60; Jarmin Dep. 47:13-48:17, 52:5-11.

537.    Field testing involves testing the question, survey, or questionnaire in the context in which it will be conducted.  Tr. 91:4-16 (O'Muircheartaigh).  Field testing requires testing with respondents who are the equivalent of or parallel to the intended respondents to whom the actual operation would be directed.  *Id.*

538.    The final field test for the 2020 Census is the 2018 End-to-End Test, which was conducted at one site, Providence, Rhode Island.  *Id.* at 91:17-24, 93:18-94:1 (O'Muircheartaigh), 816:18-817:21 (Abowd); PTX-760.

539.    The 2018 End-to-End Test is intended to test all aspects of the planned decennial census, so as to "stitch together all the components of the system."  *Id.* at 816:18-820:15 (Abowd), 91:17-24, 93:18-94:1 (O'Muircheartaigh).

540.    Another standard pretesting method is the randomized control trial (RCT), which tests an operation with an added element and compares that to a test of the operation without the

69

element.  *Id.* at 102:7-23 (O'Muircheartaigh).  The difference between the two tests would be ascribed to the addition of that element.  *Id.*

541.  According to Dr. Abowd, the RCT is the "gold standard" for testing a proposed question's effect on the census count and data collection.  *Id.* at 874:10-23, 1039:10-17 (Abowd); New York Tr. 923:16-924:9 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II 426-430.  Dr. Abowd testified that an RCT would be the best way to assess the effect of a citizenship question on response rates.  New York Tr. 924:6-9 (Abowd).

542.  An RCT would allow the Census Bureau to isolate the effect of the citizenship question on response rates not only to that question but to the overall census questionnaire.  Tr. 102:7-104:2, 106:21-107:23 (O'Muircheartaigh).

543.  Another standard pretesting method is "natural experiment" pretesting, which analyzes data collected by others to identify the impact of individual factors on different parts of the population.  Tr. 108:2-109:1 (O'Muircheartaigh).

544.  In addition to pretesting, the Census Bureau must also make additional operational adjustments when adding a new question to a data collection instrument.  Habermann Trial Aff. ¶ 61.  That includes re-designing the paper questionnaires and adjusting the paper data capture system.  *Id.*  For automated data collection instruments (including Internet self-response, Census Questionnaire Assistance, and Non-Response Follow Up), the additional question requires system redevelopment.  *Id.*  The training for the enumerators and Census Questionnaire Assistance agents will also need redevelopment in light of new questions.  *Id.*

545.  Based on the result of pretesting, the Census Bureau must finalize the actual 2020 Census questionnaires and then must submit them for OMB approval of the 2020 Census information collection.  *Id.* at ¶ 62.  This submission also requires notifying the public and inviting comments through a Federal Register Notice.  *Id.*

546.  The Census Bureau's step-by-step process for adding or changing content on the decennial census is also described in the Administrative Record.  *See* Section III(H), *supra*.

### d. Past practices for testing decennial census questionnaires and proposed added questions

547.     Past decennial census questionnaires—the complete 2010 Census questionnaire, for example—were subject to extensive cognitive testing and field testing.  New York Tr. 997:11-23 (Abowd).

548.     When considering adding a new question, the Census Bureau has historically conducted extensive testing to gauge the proposed question's impact.  For example, after the 1990 Decennial Census, the Census Bureau investigated the possibility of adding a question concerning respondents' Social Security numbers on the decennial census short form questionnaire.  *Id.* at 998:25-999:4 (Abowd).

549.     To test that potential Social Security number question, the Census Bureau conducted an RCT comparing a version of the short form with the Social Security number question and one without.  *Id.* at 999:5-8 (Abowd).  That RCT allowed the Bureau to assess the impact on self-response rates of a Social Security number question.  *Id.* at 999:9-11.

550.     In that RCT, the self-response rate fell off in the group that had the Social Security number question by 3.4 percent.  *Id.* at 999:12-15.

551.     The conclusion drawn from that RCT was that asking for a Social Security number would be sensitive.  *Id.* at 999:16-18 (Abowd).

552.     As a result, the Census Bureau decided not to include a Social Security number question on the decennial census questionnaire.  *Id.* at 999:19-24 (Abowd).  The Census has never requested Social Security numbers on the census questionnaire, and one of the reasons is the effect of the question on self-response rates, as revealed by the RCT.  *Id.*

553.     The RCT to assess the impact of a Social Security number question was conducted before any decision was made about whether to include a Social Security number question on the decennial census.  *Id.* at 1000:8-13 (Abowd).

## 2. The Addition of the Citizenship Question on the Decennial Census Was Not Adequately Tested

### a. There was no testing of the citizenship question for the 2020 Census

554.    The Census Bureau has never conducted any testing of a citizenship question within the context of the entire 2020 Census questionnaire.  New York Tr. 997-98 (Abowd); Jarmin Dep. 262:6-13; ECF No. 175-7 [Langdon Dep.] 243:7-16.

555.    Testing of the citizenship question for the 2020 Census was "not a priority" for the Census Bureau.  Jarmin Dep. 61:3-5.

556.    There has been no cognitive testing of the full 2020 Census questionnaire, including a citizenship question.  New York Tr. 997:15-18, 997:24-998:1 (Abowd).

557.    It is the Census Bureau's opinion that the complete 2020 Census questionnaire, including a citizenship question, has not undergone adequate cognitive testing.  Tr. 1049:19-24 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 143.

558.    The wording of the citizenship question has not been adequately tested for the 2020 Census.  Jarmin Dep. 55:1-10, 56:2-5.

559.    There had been no field testing of the full 2020 Census questionnaire that includes a citizenship question.  New York Tr. 997:24-998:1 (Abowd); Tr. 113:24-114:1 (O'Muircheartaigh).

560.    At the time that Secretary Ross made his decision to include a citizenship question on the census, there were no plans for field testing of the entire 2020 Census questionnaire, including a citizenship question.  New York Tr. 998:20-24 (Abowd); Census 30(b)(6) Dep. Vol. I 26.

561.    The questionnaire used for the 2018 End-to-End Test, which was the final "dress rehearsal" preparation for the 2020 Census, did not include a citizenship question.  Tr. 820:14-15 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 225; Jarmin Dep. 54:18-55:10; Tr. 94:2-4 (O'Muircheartaigh).

562.    No RCT was performed on the citizenship question for the 2020 Census before the Secretary issued his Decision Memo.  New York Tr. 925:13-22, 1000:14-17 (Abowd); Tr.

72

1    1016:8-13, 1039:18-1040:6, 1062:4-11 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 115;

2    Census Bureau 30(b)(6) Dep. Vol. II 426-430.

3          563.    If the Census Bureau had performed an RCT, it would have had quantitative data

4    that would isolate the effect of the citizenship question on how it would perform in the context of

5    a decennial census questionnaire.  New York Tr. 924:10-925:12, 925:23-926:7 (Abowd).  That

6    would have allowed the Bureau to quantify, without qualification, the difference between the self-

7    response rate with and without a citizenship question.  *Id.* at 925:9-15.

8          564.    The Census Bureau had the time, resources, and plan to conduct an RCT for the

9    content of the citizenship question prior to printing the questionnaires for the 2020 Census.  *Id.* at

10   1001:6-1002:15 (Abowd); Tr. 1062:4-8 (Abowd), 104:4-106:20 (O'Muircheartaigh).

11         565.    Employees at the Census Bureau developed a proposed RCT test for the content of

12   a citizenship question on the 2020 Census.  PTX-162; PTX-163.  The proposal would have taken

13   six weeks to collect the data, and would have cost between $2 million and $4.1 million, which is

14   money that the Census Bureau has.  PTX-163; PTX-212; Census Bureau 30(b)(6) Dep. Vol. II

15   426-27; New York Tr. 1001:6-1002:15 (Abowd).

16         566.    A group of decision makers including Under Secretary Kelley made the decision

17   not to conduct this proposed RCT.  Census Bureau 30(b)(6) Vol. II. at 427:8-11; New York Tr.

18   925:16-22, 1002:11-15 (Abowd).

19         567.    There has also been no testing on the impact of a citizenship question on the

20   willingness of people to give proxy responses for the 2020 Census.  Tr. 951:24-952:2 (Abowd).

21                          **b.    The presence of the citizenship question on the ACS does not**
                                 **obviate the need to test the question for the 2020 Census**
22
23         568.    The citizenship question on the ACS was last tested in 2006.  Tr. 1049:25-1050-6

24   (Abowd).

25         569.    The citizenship question's presence on the ACS is an inadequate substitute for

26   pretesting and does not obviate the need for pretesting the question for the decennial census.  New

27   York Tr. 468:17-469:24 (Habermann); Tr. 64:7-9, 113:20-22 (O'Muircheartaigh).  There are

28   several reasons why this is the case.

1      570.    First, the citizenship question is not performing adequately on the ACS.  New

2  York Tr. 953:18-957:11 (Abowd); Tr. 1050:17-1052:17 (Abowd), 87:1-2, 87:15-88:13

3  (O'Muircheartaigh).

4      571.    In January of 2018, the Census Bureau reported to the Commerce Department the

5  following statistics concerning the citizenship question's performance on the ACS:  29.9 percent

6  of all people identified as noncitizens by administrative records reported themselves as citizens on

7  the 2000 long-form census questionnaire; 32.7 percent of all people identified as noncitizens by

8  administrative records reported themselves as citizens on the 2010 ACS; and 34.7 percent of all

9  people identified as noncitizens by administrative records reported themselves as citizens on the

10  2016 ACS.  PTX-22 at 7-8; New York Tr. 953:18-957:11 (Abowd); Tr. 1050:17-1052:17

11  (Abowd).

12      572.    In August of 2018, the Census Bureau reported that between 30 percent and 37

13  percent of all people who identified as noncitizens by administrative records reported themselves

14  as citizens on the ACS.  PTX-160; Tr. 947:9-18, 1050:17-24 (Abowd).

15      573.    Accordingly, for more than 30 percent of noncitizens who provide a response to

16  the citizenship question on the ACS, the response is probably incorrect.  New York Tr. 956:16-21

17  (Abowd).

18      574.    The Census Bureau views this "disagreement" between administrative records and

19  ACS survey responses as a "problem" with the citizenship question on the ACS.  Tr. 1051:5-8

20  (Abowd).

21      575.    There is no consensus view within the Census Bureau on how to deal with this

22  problem. Tr. 1051:9-13 (Abowd).

23      576.    Given this problem, the Census Bureau plans on conducting a content review

24  process to determine how the citizenship question is performing on the ACS.  *Id.* at 1051:11-20

25  (Abowd).  One possible result of that content review process is that the citizenship questions will

26  be removed from the ACS.  *Id.*

27      577.    The Census Bureau has no empirical basis to believe that noncitizens for whom a

28  response is provided to the citizenship question on the decennial census will have more accurate

1   responses than they do to the citizenship question on the ACS.  New York Tr. 956:22-957:2

2   (Abowd).  In fact, the Census Bureau believes that if the citizenship question is placed on the

3   2020 Census, noncitizens are going to respond to the question with an inaccurate answer even

4   more frequently than they do on the ACS.  *Id.* at 957:3-7, 1050:25-1051:4, 1062:22-1063:9

5   (Abowd).

6        578.   In light of these and other issues, Dr. Abowd testified that the citizenship question

7   was not performing adequately on the ACS for the subpopulation of households that may contain

8   at least one noncitizen.  *Id.* at 837:24-839:3, 1052:13-17, 1058:14-23 (Abowd).

9        579.   The Census Bureau believes that the problems with the performance of the

10   citizenship question on the ACS will worsen when the question is placed on the decennial census

11   questionnaire.  *Id.* at 1050:25-1051:4, 1062:22-1063:9 (Abowd).

12       580.   Second, any testing for the citizenship question on the ACS was done in a different

13   context than the operation of the decennial census.  Habermann Trial Aff. ¶ 68.  The operating

14   conditions of an annual survey like the ACS and the operating conditions of the decennial census

15   are "vastly different," in terms of, for example, publicity and the national effort in completing the

16   survey.  *Id.*

17       581.   Furthermore, comparing the state of the country now with that of ten years ago

18   "ignores the added complexities that are now involved in conducting a decennial census."

19   Habermann Trial Aff. ¶ 68.

20       582.   In that regard, the Census Bureau expects the macro-environment to be different in

21   2020 than in 2006.  Tr. 1050:7-16 (Abowd).  As Dr. Habermann explained, "[t]he country is more

22   polarized now and the ability of individual groups to disseminate their views and possibly

23   provoke dissent is much greater."  Habermann Trial Aff. ¶ 68.

24       583.   According to the Census Bureau, the present macro-environment for a decennial

25   census questionnaire with a citizenship question is particularly difficult.  *Id.*; PTX-161; PTX-465.

26       584.   The Census Bureau's own nationwide 2020 Census Barriers, Attitudes, and

27   Motivators Study concluded that the presence of the citizenship question could be a "major

28

75

1    barrier" to participation in the 2020 Census due in part to the current macro-environment.  PTX-

2    465.

3         585.    Similarly, qualitative research conducted by the Census Bureau reveals concerns in

4    the population about the confidentiality of data collected by the census.  Tr. 112:4-10

5    (O'Muircheartaigh); PTX-157. Those concerns will only be magnified by the addition of the

6    citizenship question, which will thus exacerbate the difficulty in obtaining accurate responses to

7    the 2020 Census.  Tr. 112:13-113:3 (O'Muircheartaigh).

8         586.    Accordingly, the environment and context in which the ACS is deployed is

9    different from the environment in which the decennial census is taken.  *Id.* at 1047:20-23

10   (Abowd).

11        587.    Third, the way the citizenship question will appear on the 2020 Census

12   questionnaire is markedly different from the way it appears on the ACS.

13        588.    The ACS has many more questions than the decennial census questionnaire, the

14   sequence of questions on each questionnaire differs, and the question or questions that precede

15   the citizenship question on each questionnaire is different.  *Id.* at 1048:4-1049:7 (Abowd).

16        589.    Question sequencing can affect response rates, including in unanticipated ways

17   that could be discovered through testing.  *Id.* at 1048:7-9 (Abowd); Census Bureau 30(b)(6) Dep.

18   Vol. I 14-15; Jarmin Dep. 194:14-19.

19        590.    In contrast to the ACS, the 2020 Census will ask about citizenship status without a

20   preceding nativity question regarding place of birth.  Tr. 1049:2-7 (Abowd); Census Bureau

21   30(b)(6) Dep. Vol. I 22-23.  The citizenship question on the 2020 Census questionnaire will be

22   asked of all individuals regardless of their method of response to the nativity question.  *Id.*

23        591.    The Census Bureau is not aware of any testing of the citizenship question without

24   a preceding question about nativity.  Census Bureau 30(b)(6) Dep. Vol. I 24-26.

25        592.    Fourth, the Census Bureau conducted a natural experiment analysis based on ACS

26   data to produce an estimate of the impact of the citizenship question on the self-response rate in

27   the 2020 Census.  Tr. 109:18-22 (O'Muircheartaigh); PTX-160.  That test compared the impact of

28

the citizenship question on self-response rates among households containing noncitizens with self-response rates among all-citizen households. *Id.*

593. As a result of that natural experiment, the Census Bureau concluded that the citizenship question would reduce self-response rates among noncitizen households by an estimated 5.8 percent, at the minimum. Tr. 109:25-110:9 (O'Muircheartaigh); PTX-160.

594. That natural experiment strongly suggests that the citizenship question has been performing poorly on the ACS and will continue to perform poorly on the decennial census. Tr. 114:1-3 (O'Muircheartaigh), 1050:25-1051:4, 1062:22-1063:9 (Abowd).

### 3. The Inadequate Testing of the Citizenship Question for the 2020 Census Violated the Census Bureau's Pretesting Requirements, Standards, and Practices

595. The lack of testing of the citizenship question for inclusion on the 2020 Census violated the pretesting requirements set forth in the Census Bureau's Statistical Quality Standards, Sub-Requirement A2-3.3 in particular. PTX-205 at 8; Tr. 84:14-85:13 (O'Muircheartaigh), 832:1-833:8 (Abowd). Dr. O'Muircheartaigh described the Census Bureau's failure to follow its own standards and guidelines as "distressing." Tr. 85:2-10 (O'Muircheartaigh).

596. The first exception to the pretesting requirement of the Census Bureau's Statistical Quality Standards—concerning a pretesting waiver, PTX-205 at 8—was not met because the Census Bureau never applied for a waiver pursuant to that exception before the citizenship question was decided to be added to the 2020 Census. Tr. 1047:6-11 (Abowd). The Administrative Record contains no evidence that Defendants considered applying for a waiver.

597. The second exception to the pretesting requirement of the Census Bureau's Statistical Quality Standards—concerning questions that performed adequately in another survey, PTX-205 at 8—was not met because the citizenship question has performed poorly on the ACS. New York Tr. 953:18-957:11 (Abowd); Tr. 837:24-839:3, 1050:17-1052:17, 1058:14-23 (Abowd), 87:1-2, 87:15-88:13 (O'Muircheartaigh).

598. As noted above, for more than 30 percent of noncitizens who provide a response to the citizenship question on the ACS, the response is probably incorrect. New York Tr. 956:16-21 (Abowd); Tr. 947:9-18, 1050:17-24 (Abowd); PTX-22 at 7-8; PTX-160. The Census Bureau

77

1  views those extensive inaccuracies of responses to the citizenship question on the ACS as a

2  "problem" with the ACS citizenship question.  Tr. 1051:5-20 (Abowd), 87:1-88:13

3  (O'Muircheartaigh).  In light of that problem, the Census Bureau is reevaluating the presence of

4  the citizenship question on the ACS.  *Id.* at 1051:5-20 (Abowd).

5  599.  The Census Bureau also believes that the problems with the performance of the

6  citizenship question on the ACS will be worse when the question is placed on the decennial

7  census questionnaire.  *Id.* at 1050:25-1051:4, 1062:22-1063:9 (Abowd).

8  600.  The second exception to the pretesting requirement of the Census Bureau's

9  Statistical Quality Standards was also not met because the addition of the citizenship question to

10  the 2020 Census represents a "fundamental change" to a survey instrument.  *Id.* at 86:20-23

11  (O'Muircheartaigh).

12  601.  The testing of the addition of a citizenship question to the 2020 Census also

13  violated the standards set out in the OMB Standards and Guidelines for Statistical Surveys, which

14  require pretesting of all components of the decennial census to gauge how individual questions

15  perform on their own and in the full context in which those questions appear.  PTX-266 at 14, 16

16  (Standards 1.4, 2.3); Habermann Trial Aff. ¶¶ 55-58; Tr. 88:22-89:12, 90:8-21

17  (O'Muircheartaigh); *see* Section IV(B)(1)(b), *supra*.  For example, OMB Standard 2.3 requires

18  the actual testing of a question in its totality, but the Census Bureau did not conduct pretesting to

19  determine whether the burden of the citizenship question on respondents would outweigh the

20  usefulness of the question.  Tr. 90:8-21 (O'Muircheartaigh); Habermann Trial Aff. ¶ 58.  Indeed,

21  there was no pretesting of the citizenship question in the context of the 2020 Census, which

22  violated the OMB pretesting standards.

23  602.  The lack of testing of the addition of a citizenship question to the 2020 Census

24  violated the Census Bureau's "well established" process for making changes to the decennial

25  census questionnaire, which requires extensive cognitive and field testing.  New York Tr. 994:18-

26  22, 996:24-997:14 (Abowd); Jarmin Dep. 47:13-48:17, 52:5-11, 138:16-139:19; PTX-214.

27

28

603.    The lack of testing violated the Census Bureau's "well established" process for adding content to the decennial census questionnaire, which includes testing the wording of the new question.  Habermann Trial Aff. ¶¶ 59-63; Jarmin Dep. 44:20-49:6, 47:13-48:17, 52:5-11.

604.    The lack of testing violated the standards set forth in the "Planned Development and Submission of Subjects Planned for the 2020 Census Program and Questions Planned for the 2020 Census Program" Memorandum (PTX-214), which include extensive cognitive testing, field testing, other ongoing research, and input from advisory committees for proposed changes to census instruments.  New York Tr. 996:24-997:14 (Abowd); PTX-214 at 4.

605.    The testing of the citizenship question did not comply with the Census Bureau's step-by-step process for adding or changing content on the decennial census as described in the Administrative Record.  *See* Section III(H), *supra*.

606.    The failure to test the complete 2020 Census questionnaire that included the citizenship question broke with past testing practices, e.g., the extensive cognitive and field testing of the complete 2010 Census questionnaire.  New York Tr. 997:11-23 (Abowd).

607.    The failure to conduct an RCT for the citizenship question on the 2020 Census questionnaire violated best practices for testing and gathering quantitative data on a proposed added question's effect on the census count and data collection, which would have been through an RCT.  Tr. 874:10-23, 1039:10-17 (Abowd); New York Tr. 923:16-924:9 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II 426-430.

608.    The lack of an RCT also broke with past testing practices for proposed added questions, e.g., the RCT on the proposed Social Security number question after the 1990 Census.  New York Tr. 998:25-1000:17 (Abowd).  As noted, no similar RCT was ever conducted on the citizenship question for the 2020 Census as it was for the proposed Social Security number question.  *Id.* at 1000:14-17 (Abowd).  Dr. Abowd believes that for some subpopulations, asking about citizenship status could be more sensitive than asking a question about Social Security numbers.  *Id.* at 1000:5-8 (Abowd).

609.    The decision not to conduct an RCT for the citizenship question on the decennial census conflicted with Census Bureau employees' RCT proposal, which demonstrated that the

Bureau had the time, resources, and plan to conduct an RCT.  PTX-162; PTX-163; PTX-212; New York Tr. 1001:6-1002:15 (Abowd).

610.    The lack of testing for the addition of the citizenship question to the 2020 Census violated collection data quality standards used more generally in the survey methodology and data collection profession.  Tr. 84:19-21 (O'Muircheartaigh).

611.    Without adequate testing, the Census Bureau will be forced into conducting the 2020 Census with limited awareness of the impact that the citizenship question will have on the implementation of the census.  Habermann Trial Aff. ¶ 68.

612.    Six former Census Bureau directors wrote to the Commerce Department to state their view that the citizenship question had not been adequately tested, stating, "There is a well-proven multi-year process to suggest and test new questions.  We strongly believe that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk."  PTX-117; Tr. 80:24-82:5 (O'Muircheartaigh); Habermann Trial Aff. ¶ 66.  According to Dr. O'Muircheartaigh, those former Census Bureau directors "are certainly among the most informed people about the execution and processes of censuses in the country."  Tr. 81:22-82:5 (O'Muircheartaigh).  Drs. O'Muircheartaigh and Habermann agree with the views of those former Bureau directors.  *Id.* at 80:24-82:5 (O'Muircheartaigh); Habermann Trial Aff. ¶¶ 66, 68.

613.    The National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics (CNSTAT) Task Force on the 2020 Census concluded that the citizenship question had not been properly tested for inclusion on the decennial census.  PTX-371; Habermann Trial Aff. ¶ 15.

614.    If Census Bureau had been given more advance notice about the decision to add the citizenship question on the 2020 Census, it probably would have convened a working group with the advisory committees to study and test the citizenship question.  New York Tr. 1004:9-12 (Abowd).

615.     If the Census Bureau had been given more advance notice about the decision to add the citizenship question on the 2020 Census, it could have consulted with the Census Scientific Advisory Committee before a decision was made.  *Id.* at 1004:4-8 (Abowd).

616.     Finally, Dr. Habermann testified that in determining whether a question should be added to a Census Bureau Survey, "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified. When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public." Habermann Trial Aff. ¶ 18.

**C.     Extra-Record Evidence Confirms that Existing ACS Data Is Sufficient for Section 2 VRA Enforcement**

**1.     CVAP Data Produced by the Census Bureau that Is Used by DOJ for VRA Enforcement Purposes**

617.     The Census Bureau produces two data files for redistricting purposes.  New York Tr. 1024:4-7 (Abowd); Census Bureau 30(b)(6) Dep. Vol. 1 38:16-392, 40:22-41:20.

618.     One file, known as the P.L. 94-171 after a law of the same name, provides data to be used in redistricting at various levels of census geography, including census blocks.  *Id.* 1024:8-10; Census Bureau 30(b)(6) Dep. Vol. 1 38:6-40:7.

619.     The P.L. 94-171 data file is based on responses to the decennial enumeration. New York Tr. 1024:25-1025:2 (Abowd).

620.     The P.L. 94-171 data file contains information on total population at various levels of census geography, as well as voting-age population broken down by race and ethnicity at the census block level.  *Id.* at 1024:15-20.

621.     The P.L 94-171 data file has never included citizenship data at any level of geography.  *Id.* at 1025:7-14; Census Bureau 30(b)(6) Dep. Vol. I 40:19-21; ECF No. 146-2, RFA No. 116.

622.    P.L. 94-171 data has associated margins of error known as non-sampling error. New York Tr. 1026:23-1027:3 (Abowd); Census Bureau 30(b)(6) Vol. I 48:22-49:19.

623.    The other file is a tabulation of citizen age voting age population (CVAP) data broken out by race and ethnicity.  *Id.* 40:22-41:20.  It is referred to by the Census Bureau as the "CVAP tabulation."  New York Tr. 1025:15-20 (Abowd).

624.    The CVAP tabulation is based on statistical estimates from responses to the ACS sample survey.  *Id.* at 1025:25-1026:2; 1026:13-16 (Abowd).

625.    The ACS is a yearly survey of approximately two percent of households—about 3.5 million—across the United States, and it contains a question about citizenship status. Undisputed Facts ¶¶ 85, 86.

626.    The CVAP tabulation is reported by the Census Bureau at the block group level, not at the block level.  Undisputed Facts ¶¶ 90, 91; New York Tr. 805:14-16 (Handley).

627.    The Census Bureau's tabulation of CVAP data is produced regularly and is publicly available.  Census Bureau 30(b)(6) Dep. Vol. I 40:22-42:5.

628.    The CVAP tabulation has an associated margin of error referred to as a sampling error.  New York Tr. 1026:17-22; 1027:13-1028:1 (Abowd); New York Tr. 805:11-13 (Handley).

629.    The Census Bureau produces different forms of CVAP data, including one-year statistical estimates based on a single year of ACS survey responses for CVAP (1-year ACS estimates) and five-year statistical estimates aggregated from a consecutive 5-year period for CVAP (5-year ACS estimates).  Undisputed Facts ¶ 97; New York Tr. 1028:7-16 (Abowd).

630.    The 5-year ACS estimates represent a sample of about one in eight households, roughly comparable to the long form's sample of about one in six households.  Undisputed Facts ¶¶ 78, 98 (ECF 119); New York Tr. 807:2-9 (Handley).

631.    The 5-year ACS estimates have larger sample sizes, and thus smaller margins of error, than the one-year estimates across the same geographic area. The 5-year ACS estimates are more precise than the 1-year ACS estimates, except with respect to the age of the data.  *Id.* at 806:6-13 (Handley), 1028:17-1029:1 (Abowd).

632.     The 1-year ACS estimates are deemed by the Census Bureau as reliable for only those areas having a population of more than 65,000 people, whereas the five-year estimates are reliable for areas with smaller populations.  *Id.* at 807:15-21 (Handley), 1029:6-14 (Abowd); PTX-356.

633.     From the 1970 Census through the 2000 Census, before the advent of the ACS, the Census Bureau included a citizenship question on the "long form" questionnaire; in 2000, the long form was sent to about one in every six households during each decennial census. Undisputed Facts ¶ 78; New York Tr. 802:14-803:3 (Handley).

634.     Because the long form questionnaire was not sent to every household in the U.S., citizenship data based on responses to the long form were estimates based on a statistical sample and which had an associated margin of error.  Undisputed Facts ¶ 79; New York Tr. 802:4-803:8 (Handley), 1026:3-12 (Abowd).

635.     The citizenship data collected from the long form questionnaire was reported by the Census Bureau at the block group level, not at the block level.  Undisputed Fact ¶ 82; ECF No. 146-2, RFA No. 156; New York Tr. 805:17-20 (Handley).

636.     Between the 2000 Census and the 2010 Census, the long form was discontinued and its functions were replaced by the ACS.  Undisputed Facts ¶¶ 83-84.

637.     Since the enactment of the Voting Rights Act in 1965, CVAP data has never been available through the decennial enumeration, and the decennial questionnaire has never included a question about citizenship.  New York Tr. 802:6-13 (Handley); Undisputed Facts ¶ 77.

638.     Since the passage of the Voting Rights Act of 1965, DOJ has never had access to CVAP data based on "hard-count" total population data from the Decennial Census.  Gore Dep. 203:5-10.

639.     When it has needed citizenship data for purposes of VRA enforcement, DOJ has always relied on CVAP data that are based on statistical estimates and subject to a margin of error.  New York Tr. 1028:2-6 (Abowd); New York Tr. 802:6-13 (Handley); Gore Dep. 174:4-175:19 (objection), 203:5-10.

640.     In the event a citizenship question is included in the 2020 Census, it is unknown whether the P.L. 94-171 data file would include block-level citizen voting-age population data, and it is therefore unknown whether CVAP data broken down by race and ethnicity will be available at the block level in a single data set.  New York Tr. 1029:15-1030:6 (Abowd).

641.     In the event a citizenship question is included in the 2020 Census, the Census Bureau has not yet determined whether the block-level CVAP data that it produces will be based primarily on responses to the citizenship question on the decennial questionnaire.  New York Tr. 1030:3-12 (Abowd).

### 2.   The Census Bureau's Use of Disclosure Avoidance Techniques to Protect the Confidentiality of Census Respondents

642.     Title 13, section 9, of the U.S. Code prohibits disclosure of identifiable data from individual household responses to the decennial census.  New York Tr. 1030:17-21 (Abowd).

643.     Title 13 prohibits the Census Bureau from releasing data at the block level that could be used to identify the person who supplied those data.  *Id.* at 1031:22-1032:5 (Abowd); ECF No. 146-2, RFA No. 138.

644.     This prohibition includes individual responses to a question about citizenship status on the decennial questionnaire.  *Id.* at RFA No. 139.

645.     This prohibition includes disclosures to DOJ.  New York Tr. 1030:22-25 (Abowd); ECF No. 146-2, RFA No. 141.

646.     Because of confidentiality concerns, citizenship data reported in the Decennial Census will be subject to disclosure avoidance process to prevent the personal identification of individuals or families in relation to their reported answers.  *Id.* at 1032:6-10, 1032:24-1033:15 (Abowd), 834:19-835:3 (Handley); Census Bureau 30(b)(6) Dep. Vol. I 50:6-51:3.

647.     The size of census blocks is determined through negotiations with bipartisan redistricting offices in order to create blocks that are sufficiently small to accurately represent its population (because this information is used to create, for example, school and voting districts), but not small enough to reveal the addresses of all residents.  New York Tr. 1033:22-1034:21 (Abowd).

84

648.    One disclosure avoidance technique used by the Census Bureau is "household-level swapping," which involves matching certain variables in one household's records with those of another household within a different geographic area, such as a different census block. *Id.* at 1039:22-1040:12 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 51:4-53:17.

649.    Another of the Census Bureau's more modern techniques is "noise infusion," which involves adding "random noise" to the tabulation, reconstructing the microdata, and publishing the count from the data to which the random noise has been added.  The random noise introduces "substantial uncertainty" about the characteristics of the single person, which uncertainty decreases as the number of persons involved increases.  New York Tr. 1032:17-23, 1034:23-1036:5, 1040:13-1041:22 (Abowd).

650.    A type of noise infusion called "synthetic noise infusion" involves replacing certain variables in one household's records with synthetic data based on a predictive distribution. *Id.* at 1040:24-1041:5 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 53:19-54:10.

651.    The Census Bureau applies these disclosure avoidance techniques to all census blocks, such that no reported data reflects the responses of the actual residents of that block, unless by random chance.  New York Tr. 1033:16-21 (Abowd).

652.    Where a census block has only one resident, the disclosure avoidance technique infuses noise, and thereby changes, every characteristic associated with that individual.  *Id.* at 1036:18-1037:4 (Abowd); *see also id.* at 835:17-836:20, 837:17-22 (Handley).

653.    By its nature, the disclosure avoidance process introduces further errors into CVAP data produced at the block level.  Census Bureau 30(b)(6) Dep. Vol. I 53:12-17, 69:6-71:12.

654.    The use of disclosure avoidance techniques impacts the accuracy of the CVAP data produced by the Census Bureau to an extent that may not be within an acceptable dimension for the particular use case for the data.  New York Tr. 1038:9-1039:12 (Abowd).

655.    The smaller the population within the geographic area to which noise infusion is applied, the less accurate the resulting data will be for that area.  *Id.* at 1041:6-1042:16 (Abowd).

85

656.     The accuracy of CVAP data produced based on responses to a citizenship question on the decennial census, to which noise infusion has been applied, will be more uncertain at smaller levels of geography and with smaller populations.  *Id.* at 1042:17-23 (Abowd).

657.     The Census Bureau has not yet set parameters or procedures for disclosure avoidance for the CVAP data that will be collected from the 2020 Census if a citizenship question is included. *Id.* at 1042:24-1043:2 (Abowd); ECF No. 146-2, RFA Nos. 103, 152, 153.  Dr. Abowd does not yet know what these procedures will be.  ECF No. 146-2, RFA No. 154.

658.     The block-level CVAP data that would be created after the 2020 Census if a citizenship question is included will be an estimate, rather than a precise tabulation, and will have error margins associated with it.  *Id.* at 1043:24-1044:3, 1044:11-15 (Abowd).

659.     The Census Bureau does not know whether the block-level CVAP data collected with a citizenship question on the 2020 Census will have a margin of error any more precise than the CVAP data on which DOJ currently relies.  *Id.* at 1045:19-1046:2 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 100:12-101:15.

660.     Dr. Abowd advised Secretary Ross about the impact of the Census Bureau's disclosure avoidance protocols on the accuracy and quality of enumerated citizenship data during a February 12, 2018 meeting.  New York Tr. 1046:15-1048:2; PTX-128.

661.     Prior to the March 26 Decision Memo, there were no conversations between the Census Bureau and DOJ regarding the issue of disclosure avoidance of block-level citizenship data.  New York Tr. 1046:3-8 (Abowd).

662.     There are no documents in the Administrative Record reflecting the way in which disclosure avoidance might affect the precision of block-level CVAP data that DOJ was requesting from the Census Bureau.  *Id.* at 1047:21-1048:2 (Abowd).

663.     There are no documents in the Administrative Record indicating that Secretary Ross considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.

664.     The position of both the Census Bureau and Dr. Abowd is that a citizenship

question on the 2020 Census is not necessary to provide complete and accurate data in response

to the DOJ request.  New York Tr. 1048:10-19 (Abowd).

### 3. Dr. Handley's Opinions on the Adequacy of Existing CVAP Data Sources and the Impact of Disclosure Avoidance on CVAP Data Quality

665.     Plaintiffs have offered the expert testimony of Dr. Lisa Handley regarding the

effectiveness of current Census Bureau data resources in determining whether the citizenship rate

of a minority group impacts its ability to participate in the electoral process and elect candidates

of its choice in litigation under section 2 of the VRA.  Dr. Handley is a consultant in redistricting

and in electoral district design.  She has over thirty years of experience as an expert in

redistricting, minority voting rights, and the use of census data for voting rights enforcement

purposes, advising governments, non-profits, and NGOs on minority voting rights and

redistricting-related issues and serving as an expert in dozens of voting rights cases, including

five section 2 redistricting cases on behalf of DOJ.  New York Tr. 788:22-796:3 (Handley), PTX-

647.

666.     Based on her education, experience, and knowledge, Dr. Handley is well-qualified

to offer reliable and credible opinions on section 2 of the VRA, and the use of census data in

section 2 litigation and enforcement proceedings.

667.     Dr. Handley testified to her professional opinion that "currently available census

data has proven perfectly sufficient to ascertain whether an electoral system or redistricting plan

dilutes minority votes."  New York Tr. 796:22-797:12, 819:19-23 (Handley); PTX-650.

668.     In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court determined

that minority plaintiffs need to satisfy three threshold factors to establish a violation of section 2

of the Voting Rights Act in cases alleging vote dilution:  (1) the minority group must be

sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) the minority group must be politically cohesive; and (3) the minority group must be able to

demonstrate that the white majority votes sufficiently as a bloc to enable it to usually defeat the

1    minority's preferred candidate.  New York Tr. 797:16-799:19 (Handley); PTX-651; *see also* ECF

2    No. 145 [Karlan Trial Dep.] 30:2-24.

3           669.    Citizenship data is most relevant to the first *Gingles* precondition.  New York Tr.

4    798:15-799:19 (Handley); *see also* Karlan Trial Dep. 30:25-32:14.

5           670.    Specifically, Dr. Handley testified that plaintiffs in section 2 vote dilution

6    litigation typically use data collected and reported by the Census Bureau—currently, the ACS,

7    and previously, the long-form census questionnaire—to determine whether there are a sufficient

8    number of geographically concentrated minorities within a geographic area to satisfy the first

9    *Gingles* precondition.  New York Tr. 798:25-799:6 (Handley); *see also* Karlan Trial Dep. 33:18-

10   34:7 (objection).

11          671.    Dr. Handley testified that she occasionally uses Census Bureau data to conduct an

12   analysis under the third *Gingles* precondition of voting patterns by race/ethnicity if registration or

13   turnout data by race/ethnicity is not available.  New York Tr. 799:9-800:10 (Handley).

14          672.    Dr. Handley testified that if a court finds that a jurisdiction is violating section 2,

15   Census Bureau data regarding the demographic composition of geographic area can be used in

16   part to draw effective remedial districts, but the electoral behavior of those within the district—

17   participation rates and cohesiveness by race—plays a far more important role.  *Id.* at 800:11-

18   801:6 (Handley).

19          673.    When crafting remedial districts, Dr. Handley explained that she uses a district-

20   specific, functional approach in which an analysis of voting patterns by race and ethnicity plays

21   the essential role in the evaluation, and citizenship rates are taken into account only indirectly.

22   This is the same approach DOJ has adopted.  *Id.* at 800:11-801:6, 823:12-824:11 (Handley);

23   PTX-247.

24          674.    Dr. Handley testified that, in her experience, CVAP estimates at the census tract or

25   block group level are generally sufficient to satisfy the first *Gingles* precondition in Voting Rights

26   Act cases. New York Tr. 807:24-811:6 (Handley).

27          675.    Dr. Handley testified that, where it would be helpful to present CVAP data at the

28   block level, this information can be reliably and accurately estimated using block-level CVAP

1   data by applying the CVAP ratios from the census tract level to the block-level figures for total

2   voting-age population.  *Id.* at 808:10-815:5 (Handley). Dr. Handley described how block-level

3   CVAP estimates derived from ACS data at the census tract or block group levels are reliable and

4   accurate.  *Id.* at 815:8-819:23, 855:23-856:10 (Handley).

5          676.    Dr. Handley further explained that, in the district-specific functional analysis that

6   she employs in VRA analysis, and used by DOJ, the outcome does not depend on a precise

7   measurement of CVAP at the individual block level, but rather on an analysis of turnout rates and

8   voting patterns within a district. The number of minority citizens of voting age at the block level

9   is "essentially irrelevant" to the analysis.  *Id.* at 820:2-823:11 (Handley); PTX-247.

10          677.    Dr. Handley's work as a VRA expert has never been impeded by her use of 5-year

11   ACS CVAP data, and Dr. Handley is also not aware of any VRA claim that failed due to a

12   plaintiff's reliance upon 5-year ACS CVAP data.  New York Tr. 832:14-21 (Handley).

13          678.    The Census Bureau is also not aware of any case in which the U.S. or any other

14   plaintiff was unable to succeed on a VRA claim due to reliance on CVAP data from the ACS,

15   including 5-year ACS data.  ECF No. 146-2, RFA Nos. 163-169.

16          679.    The Census Bureau is also not aware of any case in which the U.S. or any other

17   plaintiff was unable to succeed on a VRA claim because of the fact that ACS data has a margin of

18   error that increases as the size of the geographic area in question decreases.  *Id.*, RFA Nos. 116,

19   117.

20          680.    With respect to the December 12, 2017 letter from Arthur Gary requesting that a

21   citizenship question be added to the decennial questionnaire, Dr. Handley noted that what cases

22   were cited in the DOJ's December 12 Letter all predated the availability of ACS data and

23   therefore did not speak to its adequacy.  New York Tr. 824:12-825:13 (Handley); PTX-32.

24          681.    The December 12 Letter identifies as a purported limitation of using CVAP data

25   from the ACS the fact that it comes from a separate data set than the total population data on

26   which DOJ also relies.  PTX-32 at 2.  Dr. Handley testified that, in her decades of practice, she

27   has never had access to a single data set combining total population data and block-level CVAP

28   data.  New York Tr. 827:13-19 (Handley).

89

682.    Dr. Handley further explained how, in her experience, it has not been problematic to work with population data from two different sets. Both data sets are integrated harmoniously in the GIS mapping system she uses to draw districts, and her work as a voting rights expert has never been impeded by the fact of having to work with multiple data sets.  *Id.* at 826:14-828:23 (Handley).

683.    Dr. Handley is not aware of any VRA claim that failed on account of a plaintiff's reliance upon total population data and CVAP data coming from different data sets.  *Id.* at 828:24-829:3 (Handley).

684.    The December 12 Letter identifies as a purported limitation of using CVAP data from the ACS the fact that some ACS data, unlike data from the decennial questionnaire, is collected over a span of multiple years.  PTX-32 at 3.

685.    Dr. Handley testified that it is possible to align multi-year ACS estimates with single-year census data by using data from a multi-year span, the midpoint of which is the decennial year.  New York Tr. 829:5-830:5 (Handley).

686.    Dr. Handley is not aware of any VRA claim that failed due to reliance upon ACS and decennial census data spanning different years or time periods, and she testified that her work as voting rights expert has never been impeded by the use of data spanning different years or time periods.  *Id.* at 830:6-15 (Handley).

687.    The December 12 Letter identifies as a purported limitation of using CVAP data from the ACS the fact that ACS data is a statistical sample and has an associated error margin. PTX-32 at 3. Dr. Handley testified that, in her decades of practice, she has never had access to CVAP data broken out by race and ethnicity without an associated margin of error.  New York Tr. 830:16-831:19 (Handley).

688.    Dr. Handley is not aware of any VRA claim that failed due to reliance on CVAP data having an associated margin of error, and she testified that her work as voting rights expert has never been impeded the lack of CVAP data without error margins.  *Id.* at 831:5-11 (Handley).

689.    The December 12 Letter identifies as a purported limitation of relying on CVAP data from the ACS the fact that data can only be generated at the block levels using estimates.

90

PTX-32 at 3.  As discussed above, Dr. Handley testified that such estimates can be prepared in an accurate and reliable manner.  New York Tr. 808:10-819-23 (Handley).

690.    Dr. Handley is not aware of any VRA claim that failed on account of a plaintiff's use of estimation procedures to generate block-level CVAP data, and the use of such procedures has never impeded her work as a voting rights expert.  *Id.* at 831:21-832:18 (Handley).

691.    Dr. Handley opined that the Census Bureau's disclosure avoidance practices will prevent the generation of accurate data regarding the actual number of citizens of voting age residing in a particular census block.  *Id.* at 835:4-10 (Handley).

692.    Dr. Handley testified to a reasonable degree of scientific certainty that CVAP data collected though a citizenship question on the decennial questionnaire would not be more accurate than the CVAP data on which she currently relies.  *Id.* at 839:23-840:4 (Handley).

### 4.    Professor Karlan's Opinions Regarding the Adequacy of Existing CVAP Data Sources

693.    Plaintiffs have offered the expert testimony of Professor Pamela S. Karlan regarding whether the inclusion of a question about citizenship status in the Decennial Census would assist DOJ in enforcing section 2 of the VRA.  Professor Karlan's area of academic specialty is constitutional law and litigation, with a special emphasis on legal regulation of the political process.  Karlan Trial Dep. 9:13-16.

694.    Professor Karlan has served as Deputy Assistant Attorney General in DOJ's Civil Rights Division from January 2014 through September 2015, overseeing the work of the Voting Section, which enforces the VRA, and as assistant counsel to the NAACP Legal Defense Fund, litigating voting rights cases on behalf of plaintiffs and *amici curiae*, including numerous cases brought under section 2 of the VRA before the U.S. Supreme Court, among other federal courts. *Id.* at 10:9-21, 12:18-14:7, 22:3-15. She has co-authored two casebooks which covers the VRA, among other topics, and she has written approximately one dozen academic articles about the VRA. *Id.* at 18:2-20:3; 24:22-25:21.

695.     Based on her education, experience, and knowledge, Ms. Karlan is well-qualified to offer reliable and credible opinions on section 2 of the VRA, and the use of census data in section 2 litigation and enforcement proceedings.

696.     Ms. Karlan testified to her professional opinion that existing data sources from the ACS are sufficient for plaintiffs to bring and prevail in cases brought under section 2 of the VRA. *Id.* at 29:14-23, 66:15-23.

697.     Ms. Karlan explained that section 2 of the VRA protects the rights of minority voters to elect candidates of their choosing, and that section 2 cases can proceed under either of two theories—an actual denial of one's right to vote, or the dilution of one's vote by factors such as the drawing of legislative districts.  *Id.* at 14:8-15:7.

698.     Ms. Karlan testified that no reported section 2 case has ever failed on account of the purported inadequacy of ACS data (or, prior to the advent of the ACS, data from the long-form census questionnaire) as a measure of CVAP.  *Id.* at 52:14-53:18.

699.     Ms. Karlan testified that nothing in the December 12 Letter altered her professional opinion that existing data sources are sufficient for plaintiffs to bring and prevail in litigation under section 2 of the Voting Rights Act.  *Id.* at 66:24-67:20.

700.     Ms. Karlan noted that the December 12 Letter did not identify any cases in which the inaccuracy or inadequacy of ACS data caused a plaintiff to lose a section 2 case.  *Id.* at 54:5-15.

V.     **FINDINGS RELATED TO THE CENSUS COUNT AND STANDING – BASED ON THE ADMINISTRATIVE RECORD AND EXTRA-RECORD EVIDENCE**

   A.     **The Citizenship Question Will Cause a Differential Undercount and Harm Data Quality**

      1.     **The Citizenship Question Will Cause a Differential Decline in Self-Response Rates**

701.     The evidence is undisputed that adding a citizenship question to the 2020 Census will cause additional people not to respond to the census than would otherwise have responded—and in particular, that the citizenship question will cause a net differential decline in self-response rates for noncitizen and Hispanic households.

92

702.   Given this evidence, Dr. Abowd and the Census Bureau leadership have consistently recommended not to include a citizenship question on the 2020 Census.  New York Tr. 879:2-8 (Abowd).  Dr. Abowd's expert opinion is that the research that was done under his supervision established that there was credible quantitative evidence that adding a citizenship question to the 2020 Census is expected to lower self-response rates.  Tr. 797:20-25 (Abowd).  More specifically, Dr. Abowd endorses Census Bureau research findings that the citizenship question will lead to a lower self-response rate in households that potentially contain a noncitizen, New York Tr. 881:19-882:1 (Abowd), and that lower self-response rates will harm the quality of census data, *id.* at 882:2-5 (Abowd).

**a.   The Census Bureau concluded, in three memoranda, that the citizenship question will cause a differential decline in self-response rates**

703.   These opinions, which are shared by the experts for all parties, are stated in three memoranda issued by the Census Bureau:  the December 22 Memo (PTX-148), the January 19 Memo (PTX-22), and the Brown, et al. Memo (PTX-160).  New York Tr. 896:7-15 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II 353:2-6, 353:19-21.

**(1)   The December 22 Memo**

704.   The December 22 Memo authored by Dr. Abowd's SWAT team of technical experts found that, based on a comparison of self-response rates to the 2010 Census and the 2010 ACS (which included a citizenship question), noncitizen households were 5.1 percent less likely than all-citizen households to respond to a survey with a citizenship question.  PTX-103 and PTX-148 at 6-7.  This finding is "consistent with citizenship questions being more sensitive for households with noncitizens," *id.* at 7—a fact that is not in dispute.  *See* PTX-146-2 at RFA 70.

**(2)   Dr. Abowd's January 19 Memo to Secretary Ross**

705.   Dr. Abowd's January 19 Memo conveyed the 5.1 percent estimate to Secretary Ross.  PTX-22 at 4.  That a citizenship question would cause a 5.1 percent differential decline in the self-response rate of noncitizen households was the result of just one of the "[t]hree distinct analyses" in the January 19 Memo that "support the conclusion of an adverse impact on self-response and, as a result, on the accuracy and quality of the 2020 Census."  *Id.*  The other two

93

analyses focused on indicators that suggest that Hispanic households are disproportionately less likely to respond to a survey with a citizenship question.

706.    The first was an analysis of item nonresponse rates—the rate at which respondents do not answer a particular survey question.  New York Tr. 905:22-24 (Abowd).  Item nonresponse rates for the citizenship question on the ACS were more than twice as high for Hispanics as for non-Hispanic whites from 2013 through 2016, and increased for Hispanics by 2.5 percent over that span.  PTX-22 at 4; *see also* New York Tr. 906:12-908:6 (Abowd); Tr. 156:4-157:19 (O'Muircheartaigh).

707.    The second was an analysis of breakoff rates—the rate at which respondents stop completing a survey when presented with a particular question.  New York Tr. 913:13-24 (Abowd).  The breakoff rate for the citizenship question on the 2016 ACS was more than eight times higher for Hispanics than for non-Hispanic whites.  PTX-22 at 5; *see also* New York Tr. 914:5-8 (Abowd); Tr. 158:4-21 (O'Muircheartaigh).  Similarly, the breakoff rate for three related questions on immigration status (citizenship, place of birth, and year of entry) on the 2016 ACS was more than three times higher for Hispanics than for non-Hispanic whites.  PTX-22 at 5; *see also* New York Tr. 915:9-13 (Abowd).

708.    Based on its analysis of item nonresponse rates and breakoff rates, Dr. Abowd concluded that a citizenship question would be sensitive for Hispanics, and that the sensitivity of the question is increasing for Hispanics (but not for non-Hispanic whites).  New York Tr. 917:4-918:2 (Abowd).

### (3)    The Brown, et al. Memo

709.    The Brown, et al. Memo extends upon and updates the analysis in Dr. Abowd's January 19 Memo.  New York Tr. 896:7-12 (Abowd).  The initial draft of this memorandum is in the Administrative Record.  *See* PTX-4B at AR 5500; PTX-4D at AR 11364.  The Census Bureau believes that the Brown, et al. Memo's analysis is methodologically sound and represents the Census Bureau's best analysis of the consequences of adding a citizenship question to the 2020 Census.  Census Bureau 30(b)(6) Dep. Vol. II 355:15-356:15; New York Tr. 897:4-15 (Abowd).

710.    The Brown, et al. Memo summarized its findings as follows:

94

1
2
3
4

> This paper's examination of several Census Bureau surveys with and without citizenship questions suggests that households that may contain noncitizens are more sensitive to the inclusion of citizenship in the questionnaire than all-citizen households. The implication is that adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in more nonresponse follow-up (NRFU) fieldwork, more proxy responses, and a lower-quality population count.

5   PTX-160 at 54. The Brown, et al. Memo also presented data showing that citizenship-related

6   questions are more sensitive for Hispanics and that, because Hispanics have higher rates of

7   nonresponse for citizenship than for sex or age, they "could be disproportionately impacted" by

8   adding a citizenship question to the 2020 Census questionnaire. PTX-160 at 7-10.

9        711.   The Brown, et al. Memo updated the estimated 5.1 percent differential decline in

10  the self-response rate of noncitizen households to 5.8 percent. PTX-160 at 39; Census Bureau

11  30(b)(6) Dep. Vol. II 372:2-12; New York Tr. 897:16-20 (Abowd); Tr. 161:13-21

12  (O'Muircheartaigh). The 5.8 percent figure represents the Census Bureau's best conservative

13  estimate of the differential effect of the citizenship question on noncitizen household self-

14  response. New York Tr. 894:17-895:2, 897:9-12 (Abowd). This estimate is the result of a natural

15  experiment that compared response rates on the 2016 ACS, which included a citizenship question,

16  to response rates on the 2010 Census, which did not incorporate a citizenship question, and then

17  compared the change in response rates between all-citizen households and all other households

18  (*i.e.*, households that contain or may contain one or more noncitizens). PTX-160 at 33-34;

19  Census Bureau 30(b)(6) Dep. Vol. II 373:9-15, 374:10-16; New York Tr. 898:2-899:6 (Abowd);

20  Tr. 161:22-164:17 (O'Muircheartaigh).

21       712.   The Brown, et al. Memo emphasized that the 5.8 percent estimate was

22  "conservative," PTX-160 at 39; New York Tr. 900:21-25 (Abowd); Tr. 164:21-24

23  (O'Muircheartaigh)—in other words, it may have underestimated the impact of the citizenship

24  question on census self-response rates—for two reasons: (1) the question will be more prominent

25  on the 2020 Census questionnaire, which has just ten other questions, than it was on the ACS

26  questionnaire, which has 75 questions, PTX-160 at 39; New York Tr. 901:22-902:10 (Abowd);

27  Tr. 164:25-165:14 (O'Muircheartaigh), and (2) given "the level of concern about using

28  citizenship data for enforcement purposes," the macro-environment at the time of the 2020

1    Census may be worse than it was when the ACS data were collected, PTX-160 at 39; New York

2    Tr. 902:11-24 (Abowd); Tr. 165:15-21 (O'Muircheartaigh).

3         713.    The 5.8 percent estimate may also be conservative because of limitations in the

4    design of the natural experiment.  For example, the natural experiment only accounts for the

5    decline in the self-response rate for noncitizen households, and the assumption that there will not

6    be any decline in the self-response rate for all-citizen households is "probably wrong."  New

7    York Tr. 903:1-905:9 (Abowd); Tr. 484:17:25 (Barreto).  In addition, the natural experiment

8    assumed that individuals whose citizenship information was missing from administrative records

9    were citizens, which had the effect of reducing the estimated difference between the response

10   rates of all-citizen households and noncitizen households.  Tr. 165:25-166:15 (O'Muircheartaigh).

11        714.    The Brown, et al. Memo also confirmed the findings in Dr. Abowd's January 19

12   Memo that showed that (1) Hispanics were more than twice as likely as non-Hispanic whites to

13   skip the citizenship question on the ACS and that the differential in such item nonresponse rates

14   increased between 2013 and 2016, and (2) the breakoff rate for the citizenship question on the

15   2016 ACS was more than eight times higher for Hispanics than for non-Hispanic whites.  PTX-

16   160 at 8-11.  Based on these data, the Census Bureau has concluded that "Hispanics are more

17   sensitive to survey questions about citizenship than they were a few years ago" but that non-

18   Hispanic whites "are not."  Census Bureau 30(b)(6) Dep. Vol. II 369:1-19.  These data suggest

19   that nonresponse rates to the citizenship question on the 2020 Census will be higher for Hispanics

20   than for non-Hispanic whites.  New York Tr. 910:7-13, 914:9-11 (Abowd).

21        715.    Recent Census Bureau data show that the differential breakoff is escalating.  After

22   the January 19 Memo and the Brown, et al. Memo were issued, the Census Bureau made the 2017

23   ACS breakoff data publicly available.  New York Tr. 915:19-916:3 (Abowd).  Those data, which

24   were reviewed by the SWAT team, showed that the breakoff rate for the citizenship question on

25   the 2017 ACS is now twelve times higher for Hispanics than for non-Hispanic whites.  PTX-9 at

26   1; New York Tr. 916:4-917:3 (Abowd).

27

28

96

**b.  Recent Census Bureau qualitative research suggests that the citizenship question will cause an even greater differential decline in self-response rates than estimated by Brown, et al.**

716.    The macro-environment, particularly the political environment around immigration, may amplify the negative effect of the citizenship question on self-response rates. New York Tr. 926:21-927:10 (Abowd).  Recent Census Bureau qualitative research supports Brown, et al.'s observation that the 5.8 percent estimate is conservative because the macro-environment for the citizenship question is changing.  This research includes Center for Survey Measurement (CSM) focus group testing in 2017, which revealed concerns among immigrants about the confidentiality of their survey responses, PTX-157, and the Census Barriers, Attitudes, and Motivators Study (CBAMS) conducted in 2018, which revealed concerns among Spanish-language respondents about the citizenship question, PTX-153.

**(1)    CSM Memo**

717.    CSM researchers summarized the respondent confidentiality concerns they observed in a September 20, 2017, memo for the Associate Directorate for Research and Methodology at the Census Bureau, PTX-157, and in presentations of their findings to the American Association of Public Opinion Research (AAPOR), PTX-158, and to the National Advisory Committee on Racial, Ethnic, and Other Populations, PTX-326.

718.    During the pretesting studies they conducted in 2017, CSM researchers "noticed a recent increase in respondents spontaneously expressing concerns about confidentiality" and "reported that respondents' fears, particularly among immigrant respondents, have increased markedly this year."  PTX-157 at 1.

719.    For example, CSM researchers observed Spanish-speaking respondents that were "uncomfortable 'registering' other household members," that "left three or four roomers off the roster" and "mentioned being worried because of their '[immigration] status,'" and that stated that "the Latino community will not sign up because they will think that Census will pass their information on and people can come looking for them."  PTX-157 at 2.

720.    CSM researchers noted that "this level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes toward immigrants, is

97

largely unprecedented in the usability interviews that CSM has been conducting since 2014 in preparation for the 2020 Census." *Id.* at 3. One field representative observed that "[t]he politics have changed everything. Recently." *Id.* at 4. CSM researchers worried that the concerns expressed by immigrant respondents might be "even more pronounced" during the 2020 Census, because respondents are generally more willing to participate in pretesting surveys "given that they are being paid a cash incentive for their participation and [are] being interviewed by a researcher with whom they have established rapport." *Id.* at 3.

721.   During focus group testing, respondents similarly expressed "fear of deportation, concerns about how the data are used, and which agencies can see it," specifically asking whether the Department of Homeland Security (DHS) or Immigration and Customs Enforcement (ICE) would have access to their data. PTX-326 at 9.

### (2)   CBAMS results

722.   The CBAMS is a survey of 50,000 households in a series of 42 focus groups designed to inform the integrated partnership and communications program for the 2020 Census about the macro-environment. Census Bureau 30(b)(6) Dep. Vol. II 437:17-438:6; New York Tr. 927:22-928:6 (Abowd). The Census Bureau finds CBAMS research sufficiently reliable to provide actionable information for the integrated partnership and communications program. Census Bureau 30(b)(6) Dep. Vol. II 438:7-11.

723.   After Secretary Ross announced that the 2020 Census would include a citizenship question, Census Bureau researchers began asking for feedback about the question from 30 of the 42 focus groups, including all Spanish-language groups. PTX-161 at 6; New York Tr. 930:16-19 (Abowd).

724.   The CBAMS found that in the Spanish-language (U.S. Mainland) focus groups, the citizenship question was a "determining factor for participation." PTX-153 at 22. Although most participants said that they were not afraid to answer the citizenship question because they are citizens or legal residents, they knew many others would not participate in the 2020 Census "out of fear." *Id.* While all participants wanted to participate in the 2020 Census, "fear of deportation outweighs any benefit." *Id.*

725.    The Census Bureau's interpretation of the results of the Spanish-language focus groups is that they indicate that the citizenship question is "extremely problematic in that population."  Census Bureau 30(b)(6) Dep. Vol. II 450:16-451:1; New York Tr. 934:8-12 (Abowd).  The CBAMS results for other immigrant and non-white groups were similar.  New York Tr. 930:9-24, 938:22-939:17, 940:4-941:14 (Abowd) (citing PTX-465).  Census Bureau researchers found that "[t]he citizenship question may be a major barrier" to participation in the 2020 Census because respondents, including citizens and legal residents, believed that the census's purpose "is to find undocumented immigrants" and because "[t]he political discourse is targeting their ethnic group."  PTX-465 at 43.

726.    The CBAMS results suggest that the citizenship question is sensitive in the current macro-environment and is a "major concern" for the Census Bureau's efforts to encourage participation in the 2020 Census.  New York Tr. 944:7-24 (Abowd).  The sensitivity to the citizenship question that was observed in the 2018 CBAMS results was not captured in Brown, et al.'s 5.8 percent estimate, which was based on 2016 data.  *Id.* at 944:25-925:4 (Abowd).

c.    **Plaintiff experts' testimony further supports the conclusion that the citizenship question will cause a greater differential decline in self-response rates than estimated by Brown, et al.**

(1)    **Dr. Colm O'Muircheartaigh**

727.    Dr. O'Muircheartaigh testified that he agrees with the Census Bureau research cited above. Tr. 145:15-166:15 (O'Muircheartaigh).  Dr. O'Muircheartaigh also cited three additional factors that will exacerbate the differential decline in self-response rates caused by the citizenship question.  *Id.* at 166:16-174:20 (O'Muircheartaigh).

728.    First, missing units in the Census Bureau's Master Address File (MAF) contain a disproportionate number of immigrant and noncitizen households.  Tr. 166:21-25 (O'Muircheartaigh).  The MAF is the "first building block" of census data collection.  *Id.* at 122:4-6.  The MAF is constantly updated throughout the census-taking process.  Tr. 803:23-805.7 (Abowd).  In general, the census is unlikely to count persons whose households do not appear on the MAF.  *Id.* at 46:1-6 (O'Muircheartaigh).  Dr. O'Muircheartaigh testified that social science research, including recent research on Mexican immigrants, has observed that the Census Bureau

99

has particular difficulty identifying household addresses for immigrants and noncitizens. *Id.* at 122:7-123:13, 124:7-17 (O'Muircheartaigh). To the extent that immigrant and noncitizen households are not identified by the Census Bureau and included in the MAF, and the residents of these households choose not to make themselves available to be counted because of the citizenship question, such households and their residents will not be included in the 2020 Census. *Id.* at 166:21-167:14 (O'Muircheartaigh). The macro-environment—assuming that it stays the same or worsens—is likely to exacerbate this problem. *Id.* at 167:4-6.

729. Second, respondents, especially those that live in households containing noncitizens, may not list certain household members on the census questionnaire because of fears generated by the citizenship question. *Id.* at 167:15-20 (O'Muircheartaigh). In particular, the 2017 CSM research observed that Spanish-speaking respondents were reluctant to provide a complete roster of household members. *Id.* at 147:18-148:16 (O'Muircheartaigh) (citing PTX-157). Dr. O'Muircheartaigh testified that such rostering omissions are problematic because "[t]he quality of the census is fundamentally dependent on complete rostering of individuals within households," and "the census protocol has no mechanism for remediating such a response." *Id.* at 147:10-16, 148:8-149:9 (O'Muircheartaigh); Census Bureau 30(b)(6) Dep. Vol. II 397:19-399:2, 459:21-460:7.

730. Third, Latino households, which are particularly likely not to respond to the 2020 Census because of the citizenship question, contain disproportionately more children in the most hard-to-count age group, children under five years of age. Tr. 168:20-25 (O'Muircheartaigh). Census Bureau research shows that Hispanic children account for more than 36 percent of the total net undercount for all children under five. *Id.* at 170:3-14 (O'Muircheartaigh) (citing PTX-210); *see also* PTX-250 at 16, 19; Tr. 1029:4-12, 1030:7-1032:14 (Abowd). Latino children are disproportionately undercounted because they are more likely to live in housing units that are difficult to locate, they tend to come from larger, multigenerational families, and their parents may incorrectly assume that children are not meant to be counted in the census. *Id.* at 171:2-172:2 (O'Muircheartaigh) (citing PTX-210). The failure to count young Latino children will especially impact California, which has the largest Latino population in the country, and over

100

twice the percentage of Latinos (39 percent) as the national population (18 percent). *Id.* at 170:15-20 (O'Muircheartaigh), 376:22-377:7 (Barreto).

731.    Dr. O'Muircheartaigh testified that NRFU cannot remediate any of these three issues because Census Bureau protocols do not require further attempts after the self-response stage to locate units missing from the MAF or household members, including children, missing from the roster. Tr. 173:10-174:20 (O'Muircheartaigh).

732.    Dr. O'Muircheartaigh reached the following overall conclusions related to the impact of the citizenship question on self-response:  (1) current survey methodology research, primarily by the Census Bureau, has observed that Latinos and immigrants hold considerable fears about participating in the 2020 Census, (2) the citizenship question will increase the Census Bureau's misidentification of households as unoccupied, particularly among Latinos and households with noncitizens, (3) the citizenship question will depress self-response rates, particularly for Latinos and households with noncitizens, and the Census Bureau's conservative estimate is that the self-response rate for households containing a noncitizen will be 5.8 percent lower than for all-citizen households, and (4) factors such as rostering errors will exacerbate the difference in the effective self-response rates of noncitizens versus citizens through noncoverage. Tr. 175:1-19 (O'Muircheartaigh).

### (2)    Dr. Matthew Barreto

733.    Dr. Matthew Barreto testified that adding a citizenship question to the 2020 Census will reduce self-response rates, particularly among immigrants and Latinos. Tr. 374:7-15 (Barreto).  Dr. Barreto's findings were based on a comprehensive literature review of research publications and reports, including those produced by the Census Bureau, related to response rates (as well as NRFU and imputation); an original survey he fielded in which he asked people about whether they intend to participate in the 2020 Census; and his expertise and years of experience implementing surveys in Latino and immigrant communities. *Id.* at 375:18-376:4, 379:19-380:7 (Barreto) (citing PTX-499).

734.    Dr. Barreto identified three interrelated factors that affect survey participation: (1) trust, (2) sensitive questions, and (3) the macro-environment in which the survey is

101

1    administered.  Tr. 380:19-381:7, 383:13-16 (Barreto).  Applying the literature on these factors to

2    the citizenship question, Dr. Barreto concluded that the citizenship question will cause a

3    significant decline in self-response rates on the 2020 Census because it is a sensitive question that

4    will exacerbate trust issues in the current macro-environment, particularly for immigrants and

5    immigrant-adjacent communities.  *Id.* at 386:21-25, 411:5-14 (Barreto).  Dr. Barreto defined

6    "immigrant-adjacent communities" as communities with mixed-status households, where one

7    family member is a U.S. citizen and another family member is not, and communities in which

8    residents would interact with immigrants daily at work, school, or in other similar environments.

9    *Id.* at 387:1-14 (Barreto).

10        735.    Dr. Barreto testified that a consistent finding in the social science research is that

11    "if a potential respondent does not trust the survey taker to keep their information confidential

12    and not put them at risk, then the survey respondent won't participate in the survey at all."  Tr.

13    381:17-23 (Barreto).  With regard to census participation specifically, Dr. Barreto observed that

14    the Census Bureau, particularly in Manuel de la Puente's ethnographic studies of the 1990 and

15    2000 Censuses, found that "immigrant and undocumented populations in particular [] don't trust

16    the federal government to fully protect or keep in confidence their information."  *Id.* at 385:3-19,

17    390:12-395:7 (Barreto) (citing PTX-308 and PTX-309), *see also id.* at 388:11-389:8 (Barreto)

18    (citing PTX-339).  To break down the barriers he observed in his studies, Dr. de la Puente

19    recommended that the Census Bureau work with community groups to assure them that the

20    Census Bureau isn't seeking information about respondents' citizenship status.  *Id.* at 393:25-

21    394:15 (Barreto).

22        736.    Dr. Barreto testified that "a sensitive question is one that asks a respondent for

23    some very personal information that they may be uncomfortable revealing."  Tr. 383:2-6

24    (Barreto).  Social science research suggests that survey takers should "reduce unnecessary

25    sensitive questions because they do create considerable trust issues with respondents."  *Id.* at

26    383:10-12 (Barreto).  Whether a question is sensitive varies in different environments and

27    contexts and across subpopulations.  *Id.* at 383:13-20, 384:19-385:2 (Barreto).  Dr. Barreto

28    observed that the citizenship question is likely to be most sensitive to "those who are closer to the

1    immigrant experience or closer to [] immigrant communities," particularly "in the Latino

2    community where there have been concerns over immigration-related issues over the past few

3    years." *Id.* at 387:15-23 (Barreto).

4          737.    Dr. Barreto testified that the macro-environment is "the context in which any

5    survey is being implemented," including "the social and political environment, the atmosphere

6    that is present when the survey is being administered." *Id.* at 395:11-19 (Barreto).  Depending on

7    the macro-environment, "a respondent may be more willing to participate if the context or the

8    environment seems very agreeable and welcoming, and they may be far less likely to participate

9    if the environment seems threatening or concerning." *Id.* at 395:20-25 (Barreto).  Dr. Barreto

10   observed that social science research has found that "immigrants and mixed-status households are

11   likely to avoid government contact when they suspect it is unsafe to participate." *Id.* at 397:19-

12   398:2 (Barreto).  This observation holds true for a census with a citizenship question, because the

13   question will be asked in a macro-environment that is perceived by many immigrants to be

14   "threatening or negative." *Id.* at 396:3-13 (Barreto).  Dr. Barreto testified about numerous

15   changes in the sociopolitical environment since 2016, such as the decision to end the Deferred

16   Action for Childhood Arrivals (DACA) program and the Trump administration's emphasis on

17   more aggressive immigration enforcement policies, that have diminished the Latino community's

18   trust in the federal government. *Id.* at 401:13-410:15 (Barreto).

19         738.    To evaluate participation in the 2020 Census, Dr. Barreto conducted an original

20   survey, specifically a large national survey that inquired about people's attitudes and behaviors.

21   *Id.* at 411:15-23 (Barreto).  He did so because "the best way to understand how people feel or will

22   respond to a situation is to just ask them." *Id.* at 411:18-19 (Barreto).  Within the scientific

23   community, survey research is considered reliable and has predictive value. *Id.* at 414:2-7

24   (Barreto).

25         739.    Dr. Barreto conducted his survey on a sample of 6,309 respondents from across the

26   United States, including oversamples of Latinos nationwide and residents of the State of

27   California, the City of San Jose, and two border counties in Texas. *Id.* at 424:8-19 (Barreto).  The

28   survey sample had all of the hallmarks of reliability—it was large enough to be representative of

103

1   the target population, respondents were randomly chosen, and weighting was applied to balance

2   out the demographic characteristics of the sample.  *Id.* at 415:19-418:12, 434:2-435:19 (Barreto).

3   In addition, the survey response rate—28.1 percent—was well within the American Association

4   of Public Opinion Research (AAPOR) response rate guidelines (at least 20 to 30 percent) for

5   telephone surveys.  *Id.* at 425:2-23 (Barreto).

6        740.    Dr. Barreto set forth the results of his survey in a number of tables.  PTX 499-A,

7   PTX-863 through PTX-890.  These tables show that, because of the citizenship question, census

8   response rates are likely to decline between 7.1 and 9.7 percent nationally and between 12.3 and

9   18 percent in the State of California, the biggest drop-off among all states.  Tr. 457:17-458:3

10  (explaining PTX-870), 461:9-20 (explaining PTX-872), 462:17-22 (explaining PTX-871)

11  (Barreto).

12       741.    California is the only state with a nonresponse rate (attributed to the citizenship

13  question) that is statistically higher than the nationwide average.  *Id.* at 463:8-465:9 (Barreto)

14  (explaining PTX-873 and PTX-874).

15       742.    Based on the Census Bureau's most current data, the average Latino household is

16  larger than the average non-Latino household.  *Id.* at 1036:12-1037:6 (Abowd).  By factoring in

17  the difference in average household size between Latino households and other households, Dr.

18  Barreto determined that Latinos would constitute approximately 35 percent (over 10 million) of

19  the total number of persons (approximately 28 million) that would not self-respond to the 2020

20  Census because of the citizenship question, far surpassing the rate of Latinos in the national

21  population (18 percent).  *Id.* at 478:1-481:6 (Barreto) (explaining PTX-880 and PTX-881).  The

22  evidence supports the conclusion that Latinos will be disproportionately affected by the

23  citizenship question.  *Id.* at 480:9-14 (Barreto).

24       743.    In addition to the factors that Brown, et al. noted, Dr. Barreto identified several

25  reasons to believe that the nonresponse estimates from his survey more accurately predict the

26  effect of the citizenship question on self-response rates than Brown, et al.'s 5.8 percent estimate,

27  including that (1) the survey was conducted recently, so it more closely reflected the likely

28  macro-environment during the 2020 Census, (2) instead of comparing old response rates, the

104

survey asked respondents directly about whether they are likely to participate in the 2020 Census, and (3) the survey asked all respondents, not just noncitizen households, whether they would participate in the 2020 Census.  *Id.* at 483:16-488:8 (Barreto).

744.  Dr. Fraga testified that Census Bureau data and Dr. Barreto's survey results both led to the same conclusion—that the citizenship question would cause a disproportionate reduction in California's population relative to other states.  Fraga Trial Decl. ¶¶ 8, 91.

### 2. The Census Bureau's NRFU Processes, Including Imputation, Will Not Remediate the Differential Decline in Self-Response Rates

745.  The Census Bureau will implement a series of Non-Response Follow Up (NRFU) operations to attempt to count the significant number of persons that will not self-respond to the 2020 Census, Undisputed Facts ¶¶ 39-47, including the millions that will not self-respond because of the citizenship question, PTX-22 at 6; PTX-160 at 42; New York Tr. 894:1-16 (Abowd).  All available evidence indicates that at every NRFU stage, including the use of undefined imputation methods, the Census Bureau will be differentially less effective at counting noncitizens and Latinos—the very subpopulations most likely not to respond to the 2020 Census because of the citizenship question.  Tr. 175:20-218:6 (O'Muircheartaigh).

### a. The Census Bureau has always struggled to count hard-to-count subpopulations, including noncitizens and Latinos

746.  Although the Census Bureau aims to "count everyone once, only once, and in the right place," doing so "is becoming an increasingly complex task, in part because the nation's population is growing larger, more diverse, and more reluctant to participate."  PTX-272 at 2.

747.  Historically, certain "hard-to-count" socioeconomic groups have been undercounted, *id.*, even when the census count for the national population has been fairly accurate, PTX-211 at 18; Tr. 57:17-60:8 (O'Muircheartaigh).

748.  For example, as measured in the Census Bureau's post-enumeration surveys, Hispanics have been differentially undercounted compared to non-Hispanic whites in each of the last three censuses.  PTX-211 at 5; Tr. 55:2-15, 56:11-57:5 (O'Muircheartaigh); Undisputed Facts ¶¶ 61, 62.  In the 2010 Census, Hispanics were undercounted by 1.54 percent and non-Hispanic whites were overcounted by .84 percent, resulting in a net differential undercount of Hispanics of

105

2.38 percent.  PTX-211 at 18.  In the 2000 Census, Hispanics were undercounted by .71 percent

and non-Hispanic whites were overcounted by 1.13 percent, resulting in a net differential

undercount of Hispanics of 1.84 percent.  *Id.*  In the 1990 Census, Hispanics were undercounted

by 4.99 percent and non-Hispanic whites were undercounted by .68 percent, resulting in a net

differential undercount of Hispanics of 4.31 percent.  *Id.*

749.    This trend of undercounting hard-to-count subpopulations "is particularly

problematic given the many uses of census data."  PTX-272 at 2.  For California and its localities,

which have a disproportionate number of Latinos and immigrants, an accurate count of hard-to-

count subpopulations is especially critical.  Tr. 60:9-61:15 (O'Muircheartaigh).

750.    The Census Bureau recognizes a range of socioeconomic and other groups as

"hard-to-count."  PTX-272 at 8-9; Tr. 1021:19-1022:2 (Abowd); Undisputed Facts ¶ 59.  These

subgroups include low-income persons, persons who do not live in traditional housing, persons

who do not speak English fluently or have limited English proficiency, persons who have distrust

in the government, racial and ethnic minorities, renters, undocumented immigrants or recent

immigrants, and young children.  PTX-272 at 9; Tr. 1022:3-1023:2 (Abowd); Undisputed Facts

¶ 60.  Census Bureau research shows that there is "substantial overlap" between these hard-to-

count subgroups and those households most likely not to respond to the 2020 Census because of

the citizenship question.  Tr. 1023:3-7 (Abowd).

751.    The Census Bureau has identified four primary obstacles to counting hard-to-count

subpopulations:  that they are hard to locate, hard to contact, hard to persuade, and hard to

interview.  PTX-272 at 9-10; Tr. 1023:8-24 (Abowd).  For some hard-to-count subgroups, more

than one of these obstacles applies.  PTX-272 at 11; Tr. 1024:7-13 (Abowd).  For example,

parents with limited English proficiency (who are hard to interview) may leave their young

children (who are hard to locate) off the roster when completing their census questionnaire.  PTX-

272 at 11; Tr. 1024:14-17 (Abowd).  Census Bureau research acknowledges that these obstacles

apply to those households most likely not to respond to the 2020 Census because of the

citizenship question.  Tr. 1023:25-1024:6 (Abowd).

106

**b.    2020 Census NRFU and associated operations will be differentially less effective at counting nonresponders deterred by the citizenship question**

**(1)    The Census Bureau's integrated partnership and communications program**

752.    The Census Bureau has developed a range of strategies to address the net differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. Undisputed Facts ¶ 64.

753.    In the 2000 and 2010 Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness, and partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count. *Id.* ¶¶ 65-66.

754.    Defendants expect that a similar integrated partnership and communications campaign, in tandem with the Census Bureau's NRFU efforts, will mitigate the decline in self-response rates in the 2020 Census.  Tr. 798:6-12, 799:21-800:14 (Abowd).

755.    Yet there is no evidence in the Administrative Record that Defendants' planned integrated partnership and communications campaign for the 2020 Census will mitigate the differential decline in self-response rates caused by the citizenship question.  PTX-1 through PTX-14 (AR).  And Dr. Abowd admits that it is "highly unlikely" that the integrated partnership and communications campaign can eliminate the negative effects of adding a citizenship question. *Id.* at 980:3-11 (Abowd).

756.    The communications campaign was one of the operations that was removed from the 2018 End-to-End Test for budgetary reasons.  Tr. 821:3-5 (Abowd).

757.    A recent GAO report to Congress that reviewed the Census Bureau's plans for enumerating hard-to-count subpopulations in the 2020 Census concluded that (1) it is critical for the Census Bureau to integrate its efforts to count hard-to-count subpopulations, but that such

107

1    integration will be challenging, and that (2) a tighter labor market in 2020, as compared to 2010,

2    could make it difficult to hire the partnership staff needed to reach hard-to-count communities.

3    PTX-272 at 2; Tr. 1025:10-1026:15 (Abowd).

4         758.    Despite the many barriers to participation in the 2020 Census, including those

5    related to the citizenship question, the Census Bureau "estimates total spending for its 2020

6    partnership and communications outreach efforts to be similar to what it reported spending on

7    those efforts for the 2010 Census after adjusting for inflation."  PTX-272 at 18; Tr. 1024:18-

8    1025:9 (Abowd).

9         759.    The Census Bureau acknowledges that the "trusted partners" that it relies on to

10   convey the importance of participating in the census will have additional challenges

11   communicating that message if the 2020 Census includes the citizenship question.  Census

12   Bureau 30(b)(6) Dep. Vol. II 451:21-452:4, 453:2-17; New York Tr. 937:16-23 (Abowd).

13        760.    The Administrative Record includes correspondence from some of the most

14   prominent trusted partners—the National Association of Latino Elected Officials (NALEO), the

15   National Conference of American Indians (NACI), and the Leadership Conference on Civil and

16   Human Rights—stating their opposition to the citizenship question.  PTX-1 at AR 773-775, 778-

17   779, 1239-1240; *see also* Tr. 503:5-504:9, 504:22-505:7 (Barreto).

18        761.    The CBAMS focus groups of Spanish-speaking respondents found that "there does

19   not seem to be a single trusted voice that could mitigate [respondents'] distrust of the government

20   to uphold the promise of confidentiality."  PTX-153 at 22.  Dr. O'Muircheartaigh testified that

21   this observation shows that the citizenship question will "reduce[] the potential impact of the

22   positive input of constituency, community, and association leaders" as these trusted voices

23   attempt to convince their constituents to participate in the 2020 Census.  Tr. 153:1-154:9

24   (O'Muircheartaigh).

25        762.    Census Bureau research has noted that one messaging strategy that is reassuring to

26   Spanish-speaking respondents is to convey that "[n]one of the questions in this survey will ask

27   about immigration status" and that "[b]y law, [the respondent's] answers cannot be shared with

28   Immigrations and Customs Enforcement."  PTX-158 at 16.  Dr. Barreto similarly observed that,

                                          108

consistent with the findings in Dr. de la Puente's ethnographic studies, the most effective way—indeed, perhaps the "only way"—to address confidentiality concerns related to the citizenship question is "to assure respondents that no citizenship information is being gathered" in the 2020 Census.  Tr. 500:17-501:5 (Barreto).  But neither the Census Bureau nor trusted partners can offer such assurances because the citizenship question will be on the 2020 Census, unless the Census Bureau is instructed to remove it.  Tr. 1052:8-12 (Abowd).

### (2)    The Census Bureau's NRFU operations

763.    The Census Bureau's NRFU workload includes all households that do not initially self-respond to the census.  Tr. 851:16-852:2 (Abowd).

764.    In the 2010 Census, over 27 percent of the persons enumerated were in the NRFU workload.  PTX-211 at 32-33 (subtracting from the U.S. total population (300,703,000) those persons not in any NRFU universe (219,207,000) and dividing by the total population).  The NRFU workload for the 2020 Census is expected to rise to 34.5 to 44.5 percent of the total population.  PTX-1 at AR 172.

765.    The Census Bureau's best conservative estimate is that adding a citizenship question to the 2020 Census will increase the NRFU workload by 2.09 million households and 6.5 million persons.  PTX-160 at 42.

766.    Based on his survey data, Dr. Barreto estimated that adding a citizenship question to the 2020 Census will increase the NRFU workload by 28 million to 35 million persons, and that Latinos will be disproportionately represented in that workload.  PTX-880; PTX-881; Tr. 480:5-481:3 (Barreto).

767.    The Bureau's NRFU operations are designed to obtain an accurate count—and thus, to prevent an undercount—at the national level.  Tr. 918:11-16 (Abowd).  In recent censuses, the Bureau's NRFU operations have been less effective at counting some subpopulations than others.  Tr. 178:7-23 (O'Muircheartaigh).

768.There is no evidence in the Administrative Record that the Census Bureau's NRFU operations for the 2020 Census will mitigate the differential decline in self-response rates caused by the citizenship question.  PTX-1 through PTX-14 (AR).

769.    Dr. Abowd testified that, in his opinion, after accounting for NRFU operations, there is no credible quantitative evidence that adding a citizenship question will increase the net differential undercount of any subpopulation.  Tr. 918:21-24 (Abowd).  Yet Dr. Abowd admitted that it is "highly unlikely" that the Census Bureau's NRFU operations will eliminate a differential undercount in the 2020 Census.  *Id.* at 980:12-981:2.

770.    Dr. Abowd also conceded that it is "highly unlikely" that the Census Bureau can adjust its NRFU operations to eliminate the negative effects of the citizenship question on self-response rates.  *Id.* at 981:3-7 (Abowd).

771.    The Census Bureau's NRFU operations for the 2020 Census include in-person follow-up enumeration, proxy enumeration, administrative record enumeration, and imputation by other methods.  Undisputed Facts ¶¶ 39-46; Tr. 176:13-177:20 (O'Muircheartaigh) (citing PTX-459).  The Census Bureau's NRFU operations for the 2010 Census included each of these processes, except administrative record enumeration, which was used on an experimental basis.  Census Bureau 30(b)(6) Dep. Vol. II 400:19-401:21.

772.    None of these operations will remediate the differential decline in self-response caused by the citizenship question:  (1) in-person follow-up enumeration is relatively less effective at obtaining direct responses in neighborhoods with a higher proportion of noncitizens, (2) proxy responses provide lower-quality count and characteristic data than self-responses, and in particular, they are more susceptible to under-reporting of household members, (3) administrative records are more difficult to locate for hard-to-count subpopulations, including Latinos and noncitizens, and (4) imputation methods differentially disfavor subpopulations with lower response rates, including Latinos and noncitizens.  Tr. 217:4-20 (O'Muircheartaigh).

### (a)    In-person follow-up enumeration

773.    The Census Bureau has repeatedly acknowledged that "[t]hose refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well. . . ."  PTX-25 at 4; PTX-160 at 41 ("Households deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door"); *id.* at 42 n. 59 (same).  Indeed, the Census Bureau does not have any empirical evidence that

110

someone who chooses not to self-respond to the citizenship question would respond in a face-to-face interaction with a census enumerator.  Census Bureau 30(b)(6) Dep. Vol. I 251:15-21.

774.    Although in-person follow-up enumeration typically might be more effective than mail solicitation, "in this case for this population, the level of threat embodied by a federal agent arriving at your residence to collect the information is far greater than the threat that might be implied by a piece of paper or that arrives at your residence which you may or may not read." Tr. 190:2-10 (O'Muircheartaigh).

775.    Given these conditions, the enumeration errors that will result "may not be avoidable simply by spending more money on fieldwork.  Once a household decides not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on their door."  PTX-160 at 43 n.60; Tr. 190:20-191:21 (O'Muircheartaigh).

776.    Recent data from ACS in-person follow-up enumeration efforts, specifically the Computer-Assisted Personal Interviewing (CAPI) operation, underscore the challenges that enumerators will face in the 2020 Census, particularly if, like the ACS, the census includes a citizenship question.  Census Bureau 30(b)(6) Dep. Vol. I 124:19-133:17; Tr. 178:24-185:19 (O'Muircheartaigh) (describing PTX-138).  The data, which are from 2010 through 2016, are consistent with the notion that questions on citizenship have become more sensitive on surveys since 2010.  Census Bureau 30(b)(6) Dep. Vol. I 131:4-11.

777.    The CAPI data exhibit the following trends:  (1) in-person follow-up enumeration has been less effective over time in all census tracts, (2) in-person follow-up enumeration has been differentially less effective in census tracts with a higher proportion of households containing a noncitizen, and (3) the differential between census tracts with a higher proportion of households containing a noncitizen and census tracts with a lower proportion of households containing a noncitizen has grown over time.  Census Bureau 30(b)(6) Dep. Vol. I 129:22-130:4, 131:4-18, 133:8-17, Tr. 180:17-181:3 (O'Muircheartaigh).

778.    The most recent CAPI data—from 2016—for the half of the population with a higher proportion of households containing a noncitizen indicate that in-person follow-up enumeration was 86.63 percent successful.  Tr. 183:21-185:9 (O'Muircheartaigh).  This rate "is

111

an approximate representation of how . . . such households might behave in the context of the census." *Id.* at 185:10-19 (O'Muircheartaigh).  Indeed, the success rate was lower (and conversely, the non-interview rate was higher) for in-person follow-up enumeration in the 2016 End-to-End Test and the 2018 End-to-End Test.  *Id.* at 186:19-187:14 (describing PTX-482 at 26).

779.    Dr. Barreto's survey results similarly provided evidence that follow-up enumeration efforts will be disproportionately ineffective with Latinos and Californians.  The survey results showed that after assurances of confidentiality were provided to those persons who stated that they would not participate in a 2020 Census with a citizenship question, Latinos were less likely than whites—by a margin of over 10 percent—to respond to a follow-up question by changing their mind and stating that they would participate in a 2020 Census with a citizenship question.  Tr. 510:25-512:18 (Barreto) (describing PTX-882).  And Californian nonresponders were also less likely than the national population—by a margin of approximately 20 percent—to change their mind and state that they would participate in a 2020 Census with a citizenship question.  Tr. 512:19-514:14 (Barreto) (describing PTX-883).  Although the survey's follow-up question is not an exact replica of in-person follow-up enumeration, the results are statistically significant and do have predictive value.  *Id.* at 513:22-515:5 (Barreto).

780.    None of the testing that has been used to plan NRFU staffing levels, the number of field offices, enumerator training, NRFU protocols, or census questionnaire assistance has accounted for a citizenship question on the 2020 Census.  Census Bureau 30(b)(6) Dep. Vol. I 198:2-10, 200:9-201:10.

781.    Although the Census Bureau's NRFU operations were used in the 2018 End-to-End Test, Tr. 819:15-820:9 (Abowd), the End-to-End Test did not include a citizenship question, Census Bureau 30(b)(6) Dep. Vol. I 225:13-16; Tr. 820:14-15 (Abowd).

782.    The Census Bureau considers the NRFU operations to have been a success in the 2018 End-to-End Test.  Tr. 820:19-23 (Abowd).  But a GAO report on NRFU implementation in the 2018 End-to-End Test "raises some serious concerns."  Tr. 98:3-8 (O'Muircheartaigh) (describing PTX-482).

783.    That the Census Bureau did not determine the procedures for late-NRFU data collection until after it started work, for example, "seriously undermines the potential of the activity to be successful." Tr. 98:9-99:7. (O'Muircheartaigh) (describing PTX-482 at 11).  This finding, in combination with similar findings that the field workforce was unprepared for certain enumeration challenges, *id.* at 99:8-100:15 (O'Muircheartaigh), and lacked adequate training, *id.* at 186:9-18 (O'Muircheartaigh) (describing PTX-482), led Dr. O'Muircheartaigh to conclude that the report was "a little disturbing." *Id.* at 101:9-12 (O'Muircheartaigh).  These findings "cast[] doubt on . . .  any projections that the Census Bureau has about how successfully it will operate in 2020, compared, for example, to 2010." *Id.* at 101:16-102:4 (O'Muircheartaigh).

### (b)    Proxy enumeration

784.    Locating a proxy respondent—a neighbor, landlord, postal worker, or other knowledgeable person will provide information about another household—is generally not easy. Tr. 195:2-10 (O'Muircheartaigh).  The Census Bureau expects that, just as with in-person follow-up enumeration, in census tracts with a higher proportion of households containing a noncitizen, the proxy enumeration rate will be lower than in other tracts.  Census Bureau 30(b)(6) Dep. Vol. II 386:2-15; Tr. 196:25-197:6 (O'Muircheartaigh).

785.    In other words, the challenge of finding willing proxy respondents will be greater in neighborhoods with households that are "fearful of the Administration and fearful of Census." Tr. 195:13-25 (O'Muircheartaigh).  Potential proxy respondents will be "less likely to want to cooperate" if they are concerned about reporting undocumented immigrants.  *Id.* at 521:15-522:2 (Barreto).  Given that "reference persons are much less likely to answer the citizenship question for nonrelatives in the household than for themselves . . . they may be even less likely to answer it for neighbors.  PTX-160 at 43; Census Bureau 30(b)(6) Dep. Vol. II 386:16-387:10; Tr. 523:3-17 (Barreto).

786.    Even if located and willing to provide a response, proxy respondents generally provide lower quality enumeration data than self-responses.  Census Bureau 30(b)(6) Vol. II 382:17-21; PTX-22 at 6; Tr. 931:14-24, 951:11-14 (Abowd).  For example, in the 2010 Census, 97.3 percent of self-responses resulted in a correct enumeration, but the correct enumeration rate

113

1   for proxy responses was just 70.2 percent.  PTX-22 at 42 (citing PTX-211 at 33); Tr. 197:14-

2   198:5 (O'Muircheartaigh).

3       787.     Proxy responses are particularly inaccurate for persons in tenuous residential

4   arrangements—a subpopulation that is disproportionately made up of Latinos and immigrants.

5   Tr. 198:6-200:4 (O'Muircheartaigh).  Because of the nature of these living arrangements—which

6   include, for example, converted garages—proxy respondents "may not actually know how many

7   people live there."  *Id.* at 522:3-8 (Barreto).

8       788.     Census Bureau research has also found that "proxies supply poor quality

9   individual demographic and socioeconomic information about the person on behalf of whom they

10  are responding."  PTX-160 at 41-42; Tr. 200:23-201:8 (O'Muircheartaigh); *id.* at 937:6-19

11  (Abowd).  Dr. Abowd conceded that the increased use of proxy responses "does impact data

12  quality," including the quality of characteristic data.  *Id.* at 887:13-24 (Abowd).

### (c)    Administrative record enumeration

14      789.     The Census Bureau's proposal to use administrative records to enumerate a limited

15  number of those households for which there is high quality administrative data has not yet been

16  approved by the Office of Management and Budget (OMB).  PTX-459 at 7.

17      790.     The Census Bureau has not made a decision yet about how it will process

18  responses to the citizenship question alongside administrative records.  New York Tr. 1030:3-6

19  (Abowd).

20      791.     Census Bureau research has observed that the quality of administrative records

21  varies depending on the subpopulation.  Tr. 204:18-205:3 (O'Muircheartiagh) (describing PTX-

22  288).  The Census Bureau is less likely to be able to use administrative records to enumerate

23  hard-to-count subpopulations, including noncitizens and Hispanics.  Jarmin Dep. 285:1-286:20;

24  Tr. 948:7-949:12 (Abowd), 205:4-12 (O'Muircheartaigh).

25      792.     In particular, undocumented immigrants are less likely to be found in

26  administrative records and will be harder to enumerate using such records.  Census Bureau

27  30(b)(6) Dep. Vol. II 391:4-19; Tr. 205:13-17 (O'Muircheartaigh).  The Census Bureau does not

28

114

1   expect administrative record enumeration to be as successful with noncitizens as with citizens.

2   Census Bureau 30(b)(6) Dep. Vol. II 391:21-392:4.

3   793.   Similarly, the Census Bureau will be unable to link Hispanics to administrative

4   records at as high a rate as it can link non-Hispanic whites.  Census Bureau 30(b)(6) Dep. Vol. II

5   389:12-390:5.

6   794.   Given the inability of the Census Bureau to use administrative records to count the

7   very subpopulations most likely not respond to the 2020 Census because of the citizenship

8   question, administrative record enumeration will not remediate the differential decline in self-

9   response rates.  Tr. 206:4-19 (O'Muircheartaigh).

10   **(d)    Imputation by other methods**

11   795.   If the Census Bureau is unable to enumerate a household through other NRFU

12   operations, it will impute, or model, the number of persons in the household and their

13   characteristics.  Tr. 942:17-20 (Abowd).  In the decennial census, the Census Bureau uses "count

14   imputation" to impute the size of the household, and "whole-person imputation" to impute both

15   the size of the household and the characteristics of the people in the household.  *Id.* at 892:10-15

16   (Abowd); PTX-22 at 5.

17   796.   The Census Bureau concedes that whole-person imputations "are not very

18   accurate."  Census Bureau 30(b)(6) Dep. Vol. I 253:7-15.

19   797.   The Census Bureau anticipates that there will be 1.477 million more whole-person

20   imputations in the 2020 Census because of the citizenship question.  PTX-160 at 42.

21   798.   The Census Bureau has not finalized the algorithms it will use for count

22   imputation in the 2020 Census.  Tr. 892:16-19 (Abowd).  The accuracy of the Census Bureau's

23   imputation model "is unknown at this time."  PTX-160 at 44.

24   799.   As in previous censuses, the Census Bureau expects to use a "hot-deck"

25   imputation model that imputes missing households based on nearby households that the Census

26   Bureau has counted and believes are similar in size, location, and other characteristics.  Tr.

27   892:10-893:11 (Abowd), 208:19-209:12 (O'Muircheartaigh).

28

800.    Because hot-deck imputation fills in missing data based on data that the Census Bureau has already collected, it is not neutral; by definition, it over-represents the household characteristics of the known population, in which those most likely not to respond to the citizenship question—in particular, noncitizens and Latinos—are underrepresented.  *Id*. at 210:14-211:6, 211:24-212:6 (O'Muircheartaigh).  Dr. Abowd confirmed that hard-to-count subpopulations will be imputed at a greater rate than the rest of the population.  *Id.* at 981:8-13 (Abowd).

801.    The Census Bureau's imputation model also fails to account for the larger household size, on average, of Hispanic households compared to other households.  Tr. 528:1-24 (Barreto), 1036:25-1037:6 (Abowd).  The Census Bureau's imputation model is built on the assumption that household size is "ignorable" missing data—that it is not correlated with nonresponse.  *Id.* at 525:10-13 (Barreto).  But given that those persons most likely not to respond to the 2020 Census because of the citizenship question tend to come from larger households, household size is, in fact, "non-ignorable" data.  *Id.* at 528:1-11 (Barreto).  The result is bias in the Census Bureau's imputation model.  *Id.* at 985:10-14 (Abowd), 525:20-25 (Barreto).

802.    Based on his survey data, Dr. Barreto presented quantitative evidence that the Census Bureau's imputation model will systematically undercount nonresponding households.  *Id.* at 529:14-530:6 (Barreto).

803.    First, Dr. Barreto's survey data reveal that, on a national level, households that will not respond to a census with the citizenship question are larger, on average, than households that will respond, and that in California, the gap between these groups expands.  *Id.* at 529:21-25, 530:7-9 (Barreto) (describing PTX-888 and PTX-889).

804.    Second, Dr. Barreto's survey data show that households that will not respond to a census with the citizenship question tend to be geographically clustered in zip codes with high Latino and immigrant populations, including many communities across California.  *Id.* at 530:16-532:4 (Barreto) (describing PTX-890).  This finding presents another challenge that the Census Bureau's imputation model must overcome, if it is to be accurate.  *Id.* at 531:17-22 (Barreto).

805.    Dr. Barreto also constructed an imputation model based on the Census Bureau's 2010 imputation model, as described in PTX-344, the Bureau's J-12 memorandum.

806.    Like the Census Bureau's imputation model, Dr. Barreto's model predicted the household size of non-responding households based on their 20 nearest neighbors, with controls for such factors as housing type, geographic proximity, and household demographics.  Tr. 535:3-14 (Barreto).  Because Dr. Barreto's survey data contained the household size of each non-responding household, he was able to compare the imputation model's predicted household size to the actual size of these households.  *Id.* at 535:15-19 (Barreto).

807.    Dr. Barreto's imputation analysis suggests that the Census Bureau's imputation model is likely to under-impute the household size of Latinos that do not respond to the 2020 Census because of the citizenship question at a rate of three-quarters of a person per household on average, as compared to similarly-situated Latino households that will respond to the census.  *Id.* at 538:22-539:6 (Barreto) (describing PTX-468).

808.    This evidence, like all available evidence on imputation, suggests that imputation will not remediate the differential decline in self-response rates, and may, in fact, exacerbate the differential.  *Id.* at 540:24-541:8 (Barreto), 212:9-17 (O'Muircheartaigh).

### c.    The Census Bureau's NRFU Processes will not prevent a differential undercount in the 2020 Census

809.    Dr. Abowd repeatedly testified that he was not aware of any "credible, quantitative evidence" that the citizenship question would cause a net undercount or net differential undercount of any subpopulation, or that it would reduce the accuracy of the count in the 2020 Census.  Tr. 841:5-12 (Abowd).  Yet all available evidence, both qualitative and quantitative, suggests otherwise—and makes clear, in particular, that the citizenship question will cause a net differential undercount of noncitizens and Latinos.

810.    The Census Bureau concedes, based on its own natural experiment, that the citizenship question will cause the self-response rate of noncitizen households to decline at least 5.8 percent.

117

811.    The Census Bureau has produced considerable qualitative research that suggests that the citizenship question will cause a much larger differential decline in the self-response rate of noncitizen households, and that the negative effect of the citizenship question will extend to other subpopulations, such as Hispanics.

812.    Dr. Barreto produced quantitative evidence that is consistent with the Census Bureau's qualitative research.  Dr. Barreto's survey results further suggest that the citizenship question will cause a decline in the self-response rate in California that will be much greater than the decline in the rest of the nation.

813.    In all recent censuses, the Census Bureau has differentially undercounted hard-to-count subpopulations, most notably Hispanics, even after implementing all NRFU operations, including imputation.

814.    There is no evidence in the Administrative Record that the Census Bureau's NRFU operations, including imputation, will remediate the differential decline in the self-response rate caused by the citizenship question.

815.    The Census Bureau's NRFU operations are not designed to count persons that are missing from the Master Address File or are left off the roster by a family member or proxy respondent.  If such persons do not self-respond to the 2020 Census because of the citizenship question, they will not be counted.

816.    The persons most likely not to self-respond to the citizenship question are also some of the most unlikely to be counted at every NRFU stage—in-person follow-up enumeration, proxy enumeration, administrative record enumeration, and imputation by other methods.  The resulting failure of the Census Bureau's NRFU operations to remediate the differential decline in self-response rates caused by the citizenship question will produce a net differential undercount.

817.    Expert testimony, particularly from Dr. O'Muircheartaigh and Dr. Barreto, further supports a finding that the citizenship question will cause a net differential undercount of noncitizens and Latinos, and that the negative consequences of the citizenship question will be more severe in California than in any other state.  Tr. 40:1-4 (O'Muircheartaigh), 374:3-375:4 (Barreto).

818.    Given all of the evidence, it is more likely than not that the citizenship question will cause a material, and likely substantial, net differential undercount of noncitizens and Latinos.

### 3.    The Citizenship Question Will Damage the Quality of Census Data

819.    Harm to the quality of census data is "[s]omething [the Census Bureau] tr[ies] to avoid."  New York Tr. 953:18-20 (Abowd).  Yet, as the Census Bureau determined, the citizenship question will damage the quality of characteristic data collected through the 2020 Census, separate and apart from the damage to the count.

820.    These characteristics include gender, age, race, and ethnicity.  Tr. 1001:17-24 (Abowd).

821.    The damage to data quality will also cause some people to be counted in the wrong place, including in the wrong area of a municipality, or even in the wrong state.  *Id.* at 1003:5-16 (Abowd).

822.    In the January 19 Memo, the Census Bureau concluded that adding a citizenship question to the 2020 Census will have an adverse impact on the quality of the data collected by the census.  PTX-22 at 4.  Because the citizenship question will lower self-response rates, the NRFU workload will increase, which will "degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates."  *Id*. at 5.  One reason that data quality will suffer is that data collected during NRFU are "much more likely to be collected from a proxy rather than a household member and, when they do come from a household member, that person has less accurate information than self-responders."  *Id*. at 6.

823.    In the March 1 Memo, the Census Bureau similarly concluded that a citizenship question will reduce data quality.  PTX-25 at 4.

824.    The Brown, et al. Memo reached the same conclusion.  PTX-160 at 54.  The Brown, et al. Memo found that, "[a] drop in the self-response rate from adding a citizenship question in Alternatives B (obtaining citizenship from the 2020 Census only) and D (obtaining citizenship from the 2020 Census and administrative records) results in increased costs in the

119

1    Nonresponse Follow-up (NRFU) operation and affects the quality of the population count." *Id*. at

2    41.  That will result in a "lower-quality population count."  *Id.* at 54.

3        825.    The Brown, et al. Memo found that households deciding not to self-respond

4    because of the citizenship question are likely to refuse to cooperate with enumerators coming to

5    their door in NRFU.  *Id*. at 41.  That will increase the use of proxy responses.  *Id.*  Census Bureau

6    research has found "that proxies supply poor quality . . . socioeconomic characteristic information

7    about the person on behalf of whom they are responding."  *Id*. at 41; *see also* Tr. 201:1-8

8    (O'Muircheartaigh)

9        826.    Dr. Abowd's testimony confirms that adding the citizenship question will damage

10    the quality of the data collected in the 2020 Census.  New York Tr. 885:17-21 (Abowd).

11        827.    Dr. Abowd observed that data produced by lower self-response rates is less

12    accurate than data produced by higher self-response rates.  *Id.* at 881:19-882:5 (Abowd).

13    Likewise, data produced by self-response is much more "reliable" than data produced by NRFU

14    efforts.  *Id*. at 953 (Abowd); Tr. 942:21-943:2 (Abowd).

15        828.    Dr. Abowd stated that, by decreasing self-response rates and thus increasing

16    reliance on NRFU efforts, the citizenship question will reduce the quality and accuracy of data

17    produced during the 2020 Census.  New York Tr. 881:19-882:5, 952:23-953:14 (Abowd); Tr.

18    934:16-935:1, 1001:17-24 (Abowd).  The quality of data obtained for households that do not self-

19    respond to the decennial census will be "degraded" as a result of the failure to self-respond.  *Id*. at

20    938:11-15 (Abowd).

21        829.    The increased degradation of data quality that results from adding a citizenship

22    question to the 2020 Census cannot be mitigated.  *Id.* at 935:3-5, 950:6-13, 1001:25-1002:8

23    (Abowd).

24        830.    Dr. Abowd agreed that the increased use of proxies that will result from adding the

25    citizenship question will harm data quality.  Tr. 887:13-24, 931:14-24, 937:6-19 (Abowd); *see*

26    *also id.* at 114:11-15, 200:5-17, 217:21-22 (O'Muircheartaigh).  That is because it is "very hard to

27    get the [demographic] characteristics in the proxy interview."  *Id.* at 887:20-21.  The Census

28    Bureau has concluded that proxy responses are likely to result in lower-quality enumeration data

1    than self-responses.  Tr. 950:23-951:18 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II 382:18-

2    21; PTX-160 at 41.

3         831.    Dr. Abowd also acknowledged that, under Alternative D, the Census Bureau will

4    be able to link fewer persons to administrative records, New York Tr. 969:2-23, 979:16-20, 981-

5    17-19 (Abowd), which will reduce data quality, *id.* at 981:20-25.  In contrast, using administrative

6    records to provide DOJ with block-level CVAP data under Alternative C would not harm the

7    quality of the census data.  *Id.* at 958:5-18 (Abowd).  Because Alternative D will result in worse

8    data quality and will be worse for the Census Bureau's goal of conducting an accurate 2020

9    Census, as compared to Alternative C (relying exclusively on administrative records to produce

10   block-level CVAP data), Tr. 936:6-17 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II 414:2-9;

11   Jarmin Dep. 117:5-118:10, 127:4-128:8, 144:20-145:9, Alternative C is superior to Alternative D

12   if the goal is to have an accurate census.  New York Tr. 968:24-969:1 (Abowd).

13        832.    Dr. Abowd conceded that imputation will not mitigate the effect of the citizenship

14   question with respect to data quality.  Tr. 981:8-982:2 (Abowd).  Increased imputation—which

15   will be necessary as a result of the citizenship question—will result in greater variance in the data.

16   *Id.* at 986:14-987:12 (Abowd).  "Variance" or "variability" in census data accuracy means that,

17   although the enumeration may be correct, measurements of data characteristics may be

18   incomplete or inaccurate.  *Id.* at 798:13-799:16.  Increased imputation will thus result in lower

19   quality and less accurate census data.  *Id.* at 986:14-987:12, 1002:3-8 (Abowd); Jarmin Dep.

20   398:22-399:4.

21        833.    Dr. O'Muircheartaigh, Dr. Barreto, and Dr. Habermann confirmed that adding a

22   citizenship question to the 2020 Census will harm the quality of the census data.  Tr. 114:11-15,

23   217:21-22 (O'Muircheartaigh); *id.* at 491:16-21 (Barreto); Habermann Trial Aff. ¶ 68.  This is the

24   consensus among scientists within and outside the Census Bureau.  Tr. 114:11-15

25   (O'Muircheartaigh).

26

27

28

**B.     The Citizenship Question Will Inflict Harm on Plaintiffs**

**1.     Plaintiffs Have Increased Census Outreach Spending Because of the Citizenship Question**

834.     The State of California has appropriated and will imminently spend increased funds on census-related community outreach due to the citizenship question.

835.     Former California Governor Jerry Brown initially proposed to the California Legislature for the FY 2018-19 state budget an appropriation of $40.3 million "to be spent over a three-year period for statewide outreach and other activities related to the 2020 Census count." Undisputed Facts ¶ 111.

836.     This budget proposal was made prior to Secretary Ross' issuance of the Decision Memo announcing the addition of the citizenship question.  *See* PTX-502 at 3 [March 8, 2018, Legislative Analyst's Office publication describing the proposed $40.3 million appropriation].

837.     The final FY 2018-19 state budget that was enacted in the summer of 2018 included an appropriation of $90.3 million "to support the California Complete Count effort, which was established within the Government Operations Agency to perform outreach focusing on hard-to-count populations for the decennial census."  Undisputed Facts ¶ 112.

838.     Early on in the budget process, before Secretary Ross issued the Decision Memo, the Legislative Analyst's Office published an analysis of the census outreach budget item.  PTX-502.  The analysis observed that the potential introduction of a citizenship question to the 2020 Census could cause an undercount.  *Id.* at 2-5 [noting that changes to the census, including "the potential for a question about citizenship[,] raise the possibility of an undercount in California in 2020"].

839.     This concern was echoed in legislative committee materials and at least one committee hearing.  The legislative history of the FY 2018-19 state budget shows that one of the driving forces behind the increased appropriation was the citizenship question.  PTX-504 at 140 (summary of FY 2018-19 state budget includes section devoted to census outreach to hard-to-count residents, and states that "[t]he Budget includes $90.3 million for statewide outreach and other efforts related to increasing the participation rate of Californians in the decennial census");

1    PTX-505 at 1 (description of FY 2018-19 state budget line items references as a "major change"

2    the $90.3 million allocated to "support the California Complete Count effort . . . to perform

3    outreach focusing on hard-to-count populations for the decennial census"); PTX-506 at 8, 76

4    (Legislative Analyst's overview of FY 2018-19 state budget includes section describing $90.3

5    million allocated for outreach activities); PTX-509 at 23 (March 15, 2018 Senate Budget and

6    Fiscal Review Subcommittee meeting staff report on the California Complete Count – Census

7    2020 agenda item notes that concerns about emphasis on Internet self-response, "in combination

8    with the potential for a question about citizenship[,] raise the possibility of an undercount in

9    California in 2020"); PTX-510 at 41-44 (April 24, 2018 Assembly Budget Subcommittee meeting

10   staff report on 2020 Census Outreach agenda item states that one change to the 2020 Census is

11   that "[t]he federal government has decided to include a citizenship question in the census, which

12   is projected to reduce the rate of response," and identifies the citizenship question as one of the

13   challenges that would justify "additional resources" for outreach); PTX-517 at 45:19-46:12

14   (statement by Assemblymember David Chiu at the April 24, 2018 Assembly Budget

15   Subcommittee meeting that the citizenship question presents "a different world" that may justify

16   doubling census outreach expenditures); PTX-518 at 1:18:05-1:18:55 (video of same; PTX-512 at

17   24 (May 22, 2018 Senate Committee on Budget and Fiscal Review meeting staff report on

18   California Complete Count – Census 2020 agenda item notes that "[d]ue to the significant

19   changes to the census, providing state funding to target hard-to-count populations is reasonable,"

20   and "[d]ue to both the extreme importance of an accurate census to the state and the high cost of

21   the necessary outreach, additional funding is warranted"); PTX-513 at 30-31 (May 24, 2018

22   Assembly Budget Subcommittee meeting staff report on the 2020 Census Outreach Funding

23   agenda item proposed $113 million increase in census outreach funding, including $12 million for

24   Los Angeles County's complete count efforts); PTX-514 at 79 (June 6, 2018 2018-19 Legislative

25   Budget Conference Committee meeting staff report on 2020 Census Outreach cites $153.3

26   million request from Assembly and $135.3 million request from the Senate for outreach efforts);

27   PTX-515 at 173 (June 8, 2018-19 Legislative Budget Conference Committee meeting staff report

28

123

on 2020 Census Outreach recommends adopting compromise of $90.3 million allocation for census outreach).

840.     Since the appropriation, the California Complete Count Committee, the body in charge of the outreach efforts, has submitted reports to the Governor and Legislature that underscore the challenge presented by the citizenship question to those outreach efforts.  PTX-508 at 4-5, 13, 19, 27-28 (October 2, 2018 report to Governor acknowledges that citizenship question presents challenge to outreach efforts, describes formation of working group on citizenship matters, observes that the question will generate fear, and identifies possible difficulties of hiring trusted messengers); PTX-507 at 9-10 (October 1, 2018 report to Legislature states that in convenings with local partners, "[p]articipants identified the most significant barrier to achieving a complete count to be the Census citizenship question and the current political environment regarding immigrants").

841.     The State's allocation of outreach funding to the County of Los Angeles also confirms increased expenditures due to the citizenship question.  Baron Trial Decl. ¶¶ 7-16.

842.     The State initially allocated to the County $8.7 million in census outreach funding. *Id.* ¶¶ 7, 12.

843.     On May 18, 2018, the County requested an additional $3.3 million in funding specifically due to the addition of the citizenship question on the Census.  *Id.* ¶¶ 11-12 & Ex. A.

844.     The State met the County's request, in part.  In November 2018, the State announced its County outreach allocations, allocating $9,393,090 to the County of Los Angeles for 2020 Census outreach to hard-to-count populations.  Undisputed Facts ¶ 113; Baron Trial Decl. ¶¶ 13-15.

### 2.     Plaintiffs Will Lose Federal Funding

#### a.     Plaintiff State of California will lose federal funding

845.     The citizenship question will cause Plaintiff State of California to lose federal funding.

846.     This is because if a citizenship question on the 2020 Census results in any measurable differential undercount of households containing noncitizens, California would lose

124

1  funding for state-share programs.  Reamer Trial Decl. ¶¶ 20, 74; Tr. at 676:1-2, 677:6-14

2  (Reamer).

3      847.    Dr. Reamer, who is an expert in the relationship between census data and federal

4  financial assistance, Reamer Trial Decl. ¶¶ 1-8, testified that a significant portion of federal

5  domestic financial assistance is distributed on the basis of statistics derived from the decennial

6  census, *id.* ¶ 10.  Dr. Reamer's testimony focused on the impact of the citizenship question on

7  geographical allocations of funding.

8      848.    At least 320 federal domestic assistance programs used census-derived data to

9  distribute about $900 billion in FY2016.  *Id.* ¶ 10.  Of these, there are 24 large federal financial

10  assistance programs with geographic allocation formulas that rely in whole or part on census-

11  derived data.  *Id.* ¶¶ 10-11, Ex. D (PTX-245); Trial Tr. 668:12-669:9 (Reamer); *see also*

12  Undisputed Facts ¶¶ 52-56.

13      849.    Eighteen of these 24 programs are "state-share" programs, in that they rely in

14  whole or part on state share of a U.S. population total.  Reamer Trial Decl. ¶¶ 11, 17, Ex. D

15  [PTX-245]. The 18 state-share programs include:  Federal Transit Formula Grants, Community

16  Block Development Grants/Entitlement Grants, Crime Victim Assistance, Title I Grants to Local

17  Educational Authorities (LEAs), Special Education Grants, Head Start, Supplemental Nutrition

18  Program for Women, Infants, and Children (WIC), Child Care and Development Block Grant,

19  Supporting Effective Instruction State Grants, Workforce Innovation and Opportunity Act

20  (WIOA) Youth Activities, Rehabilitation Services: Vocational Rehabilitation Grants to the States,

21  Unemployment Insurance administrative costs, Block Grants for Prevention and Treatment of

22  Substance Abuse, Social Services Block Grants, Career and Technical Education—Basic Grants

23  to States, WIOA Disclosed Worker Formula Grants, Special Programs for the Aging, Title III,

24  Part C, Nutrition Services.  *Id.*

25      850.    There is a strong, direct relationship between the accuracy of the decennial census

26  and the reliability of both the Population Estimates and the ACS data produced by the Census

27  Bureau because decennial census data is an essential determinant of the accuracy and reliability

28  of both.  *Id.* ¶¶ 12-13.

125

851.    Geographic allocation formulas are particularly sensitive to inaccuracies in census-derived data.  *Id.* ¶¶ 12, 31-32.

852.    Because the Decennial Census is carried out once a decade and collects data on a small number of demographic characteristics, Congress has authorized a series of more current and descriptive census-derived datasets for use in funding formulas.  *Id.* ¶¶ 24-25, Ex. E (PTX-246).

853.    Of particular note, the Census Bureau constructs annual Population Estimates and Housing Estimates by augmenting decennial population and housing numbers with more recent data, primarily from vital statistics and tax records.  *Id.* ¶ 27.

854.    While a number of these programs use the Population Estimates datasets directly, many also use other datasets derived from Population Estimates, including Per Capita Income (PCI).  *Id.* ¶ 28; Tr. 674:12-675:6 (Reamer).

855.    Additionally, the Census Bureau relies on the decennial census in several different ways to design and implement the American Community Survey (ACS), the Current Population Survey, and the Consumer Expenditure Survey.  Reamer Trial Decl. ¶ 29.

856.    Therefore, programs other than state-share programs that use funding formulas reliant on these surveys are also sensitive to undercounts in the Decennial Census.  *Id.* ¶¶ 27-30.

857.    As explained above (*see* Section V.A.2), the citizenship question will cause California to experience a differential undercount of persons living in households containing noncitizens and Hispanics among the states due to California's large immigrant and Latino populations.  This differential undercount will harm a number of states and their residents due to that undercount's impact upon a number of federal domestic financial assistance programs with census-tied geographic allocation formulas.  *Id.* ¶¶ 16-18, 74.

858.    Specifically, a differential undercount in the Decennial Census among persons who live in households containing noncitizens will lead to measurable fiscal losses across numerous federal programs for states with population percentages of households containing noncitizens that are above the national average, including California.  *Id.* ¶¶ 17-18.

126

859.    Dr. Reamer performed calculations using two alternative projections of the potential undercount of households containing at least one noncitizen resulting from the addition of a citizenship question, which undercount scenarios were applied to projections of the 2020 population by state.  *Id.* ¶ 14.

860.    These projections were prepared by Plaintiffs' expert witness Dr. Bernard Fraga. *Id.*  ¶¶ 15, 35.

861.    The two scenarios involve: (1) an undercount of 5.8 percent of households containing at least one noncitizen, and (2) an initial undercount of 5.8 percent of households with at least one noncitizen, where 86.63 percent of these households are ultimately counted successfully through nonresponse follow-up efforts.  *Id.* ¶ 36.

862.    Dr. Reamer calculated the specific financial impact of these projections on three of the 18 state-share programs—Title I grants to local education agencies, the Supplemental Nutrition Program for Women, Infants, and Children grants, and Social Services Block Grants—to illustrate certain losses that would occur in the event of a differential undercount.  *Id.* ¶¶ 17, 20, 33, 37-40, 43-48, 52-53, 57-63; Tr. 667:8-19 (Reamer).

863.    Dr. Reamer concluded that, under either undercount scenario, California, among other states, would lose funding annually under all three programs.  Reamer Trial Decl. ¶¶ 49-50, 54-55, 64-65, and charts accompanying text.

864.    Dr. Reamer's conclusion that a differential undercount will result in a lost funding extends to the other 15 state-share programs he identified, meaning that California, among other states, will lose population share and thus funding under these programs if the citizenship question causes an undercount of individuals living in households containing noncitizens.  *Id.* ¶ 34.

865.    Dr. Reamer's analysis demonstrates that the magnitude of the impact varies depending on the extent of the undercount.  *Id.* ¶¶ 15-18.

866.    Dr. Reamer's conclusion applies across the 18 state-share programs, even if the program funding formula contains variables that are not based on census data.  Tr. 678:18-679:2 (Reamer).

867.     A change in the amount of the differential undercount would impact only the magnitude of the loss to a state-share program, not the existence of a loss.  Reamer Trial Decl. ¶ 20.

868.     Similarly, a change in funding level or allocation formula would impact only the magnitude of the loss, not the existence of a loss, so long as the allocation formula retains a degree of state-share-based calculation.  *Id.* ¶ 19; Tr. at 669:24-670:11, 675:19-22 (Reamer).

869.     Therefore, if a citizenship question on the 2020 Census results in any measurable differential undercount of households containing noncitizens, no matter the size of the undercount, California would lose funding for state-share programs.  Reamer Trial Decl. ¶¶ 20, 74; Tr. at 676:1-2, 677:6-14 (Reamer).

### b.     LAUSD and the County and City Plaintiffs will lose federal funding

870.     The citizenship question will also cause LAUSD and the County and City Plaintiffs to lose federal funding.

871.     The funding for some federal assistance programs is distributed among localities within the state according to formulas prescribed by law.  Tr. at 677:23-678:10 (Reamer).  For example, Title I grants are ultimately distributed to local educational agencies, and grants authorized by the Workforce Innovation and Opportunity Act (WIOA) are distributed to local workforce development areas.  Reamer Trial Decl. ¶¶ 66, 67; *see also id.* ¶¶ 45 (WIC), 71 (Community Development Block Grants); Tr. 677:15-22, 678:11-13 (Reamer) (Community Development Block Grants and Workforce Investment Opportunity Act grants).

872.     Where there is a differential undercount of noncitizens within the locality that is a funding recipient of a state-share program, relative to the national population, those localities will experience a loss of federal funding.  Tr. 677:23-678:10 (Reamer).

873.     For example, the Los Angeles Unified School District, which has a higher-than-average share of households containing noncitizens than the state and national population, would incur a further decrease in Title I funding when the funding received by California is distributed

128

among the local educational agencies within the state.  Reamer Trial Decl. ¶ 66 n.2; Escudero Trial Decl. ¶¶ 16, 27; Ryback Trial Decl. ¶ 33.

### 3.    Plaintiffs Will Have Less Accurate Data to Make Decisions Related to Redistricting and Services

#### a.    Poor-quality census data will impair County and City Plaintiffs' decisions related to redistricting and the distribution of resources

874.    Local governments depend on accurate census data when allocating resources.  Tr. 1040:7-19 (Abowd).

875.    Lower quality demographic characteristic data will cause a misallocation of resources at the local level.  *Id.* at 1040:20-1041:10 (Abowd).  That misallocation of resources will result in one community's benefit at the expense of another community.  *Id.* (Abowd).

876.    The degradation of census data quality that will result from adding a citizenship question to the decennial census will affect any analysis that is based on and relies upon that data. *Id.* at 1005:3-24 (Abowd).

877.    Inaccurate census data will affect uses of the census data in such areas as redistricting or allocation of funds due to variances or inaccuracies in the data.  *Id.* at 799:1-16 (Abowd).

878.    Dr. Abowd testified that the degradation of data quality will harm demographers' ability to accurately determine the population size and demographic characteristics for both local jurisdictions, municipalities, and other smaller geographic areas.  *Id.* at 1005:4-24 (Abowd).  The degradation of data quality will also harm demographers' ability to make accurate population and demographic projections into the future.  *Id.* (Abowd).

### (1)    City of Los Angeles

879.    Plaintiff City of Los Angeles relies on decennial census data, including data on population count, race, age, and household status, to perform redistricting of City Council district lines and to allocate resources by neighborhood.  Westall Trial Decl. ¶¶ 24-37.

880.    Under section 204(a) of the Los Angeles City Charter, City Council districts "shall each contain, as nearly as practicable, equal portions of the total population of the City as shown

129

by the Federal Census immediately preceding the formation of districts."  Westall Trial Decl.

¶ 20.  And section 204(d) of the Charter mandates that Council districts be drawn "in

conformance with requirements of state and federal law and, to the extent feasible, shall keep

neighborhoods and communities intact, utilize natural boundaries or street lines, and be

geographically compact."  *Id.* ¶ 19.

881.    Redistricting must also comply with several legal and practical considerations and principles, including (a) ensuring districts contain equal population in compliance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (b) respecting traditional redistricting criteria such as contiguity (all parts of a district should connect), compactness (a district should be geographically compact with regard to appearance, shape, and borders), due consideration of existing boundaries (such as geographic, street, school, and political subdivisions), and preserving communities of interest (people sharing common interest); and (c) compliance with section 2 of the federal Voting Rights Act by ensuring that minority voters are not denied equal access to voting opportunities (minority voting blocks are neither fractured nor packed into a district so as to dilute their votes).  *Id.* ¶ 18.

882.    In order to comply with those provisions, laws, and principles, the Los Angeles City Council relies on data from the decennial census when redistricting to create City Council districts that are of equal size in terms of resident population.  *Id.* ¶ 27.

883.    The redistricting process requires decennial census data at multiple levels of granularity, including a "Census block"; a "Census Block Group" or "Census Tract" level; "Census Place" (unincorporated County); and at an overall city, county and state level.  *Id.* ¶ 26-27.

884.    Accuracy of census data at all levels of granularity, including the most granular block-level, is necessary to ensure properly populated and lawfully formed City Council districts.  *Id.* ¶ 28. The accuracy of the most granular census data is particularly important in the City of Los Angeles because neighborhood characteristics and population density can change dramatically from neighborhood-to-neighborhood, or even block-to-block.  *Id.* ¶ 28.

885.   Inaccurate decennial census population count data will result in an unevenly reported population distribution, which will in turn deny equal representation to the City of Los Angeles's residents. *Id.* ¶ 29.

886.   The City of Los Angeles also uses granular race and ethnicity data gathered from the decennial census when redistricting to ensure compliance with the Voting Rights Act and other state and federal voting and civil rights laws. *Id.* ¶ 31.

887.   Accurate data on race and ethnicity at all levels of granularity including the block-level is necessary given that population density and demographic diversity can vary sharply among adjacent neighborhoods and abutting city blocks in the City of Los Angeles. *Id.* ¶ 31.

888.   Without accurate block-level race and ethnicity data, the City of Los Angeles cannot ensure that district lines are drawn in compliance with the Voting Rights Act and state and federal other voting and civil rights laws. *Id.* ¶ 31.

889.   Block-level decennial census demographic data on age, race, and household status is necessary for identifying communities of interest and locating their precise geographic bounds. *Id.* ¶ 31. Without accurate block-level decennial census demographic data on age, race, and household status, the City of Los Angeles would not be able to comply with the redistricting principle that requires containment of a community of interest within one City Council district and seeks to avoid bifurcating of communities of interest with district lines. *Id.* ¶¶ 18, 31.

890.   The City of Los Angeles also relies on accurate decennial census population count and demographic characteristic data when managing the allocation of its services and resources to its residents. *Id.* ¶ 33. These services include, for example, emergency services provided by the Los Angeles Fire and Police Departments and trash pickup services provided by the Bureau of Sanitation. *Id.* ¶ 36.

891.   Los Angeles city services and resources that are allocated to particular neighborhoods are based on the Decennial Census count of people in those neighborhoods. *Id.* ¶ 34. Due to the highly varying nature of the population density from neighborhood-to-neighborhood and block-to-block in the City of Los Angeles, the granular block-level population

131

1    count data derived from the Decennial Census is crucial for properly identifying the needs of each

2    neighborhood and efficiently allocating city services and resources to meet those needs.  *Id.*

3        892.    Without reliable, precise, and accurate population count data, the City of Los

4    Angeles would not be able to identify the needs of each community, neighborhood, or high-

5    density city block.  *Id.* ¶ 35.  The combination of undercounts in some neighborhoods and

6    overcounts in others will lead to errors in measuring neighborhood populations, which will in turn

7    lead to misallocation of City resources.  *Id.*

8        893.    Having an accurate neighborhood-by-neighborhood and block-by-block

9    population count is also important in such areas as the City's Department of City Planning (for

10   urban planning and zoning updates), the City's Department of Transportation (for infrastructure

11   project assessments), the City's Economic Workforce and Development Department (for

12   redevelopment purposes), and by the Housing and Community Investment Department (for smart

13   growth analyses).  *Id.* ¶ 37.

14                           **(2)    County of Los Angeles**

15       894.    Plaintiff County of Los Angeles relies on decennial census data on the population

16   count and demographic characteristics for county planning and development purposes.  Bodek

17   Trial Decl. ¶¶ 9-15, 20-21.

18       895.    The County relies heavily upon decennial census demographic information in

19   carrying out its responsibilities under the Planning and Zoning Law.  Bodek Trial Decl. ¶ 20.  The

20   granular block-level census data is essential for the County's planning purposes.  *Id.* ¶ 20.

21       896.    The Los Angeles County 2035 General Plan serves as a "blueprint" for how and

22   where the unincorporated County will grow and develop through the year 2035.  *Id.* ¶ 6.  The

23   General Plan is the guide for long-term physical development and conservation, by establishing

24   goals, policies and programs to foster health, livable and sustainable communities.  *Id.*

25       897.    One element of the General Plan is the Housing Element, which is one of eight

26   elements required by the State.  *Id.* ¶ 7.  The Housing Element serves as a policy guide to address

27   the housing needs of the unincorporated communities, and its main focus is to ensure safe,

28   sanitary, and affordable housing for Los Angeles County residents, including those with special

1   needs.  *Id.*; "Los Angeles County Housing Element, 2014-2021," available at

2   http://planning.lacounty.gov/assets/upl/project/housing element.pdf.

3          898.    As part of the Housing Element, the County conducts a Housing Needs

4   Assessment to identify both available housing inventory and market trends that the County will

5   use to shape housing policy for the unincorporated areas.  *Id.* ¶ 8.  The assessment includes a

6   review, not only of population, but also of demographic characteristics including age, race,

7   employment, housing characteristics, and special needs.  *Id.*

8          899.    Data from the decennial census is the "main source" of information for conducting

9   the County's Housing Needs Assessment.  *Id.* ¶ 9.  The decennial census provides the requisite

10   granular data at the block-level necessary for the Housing Needs Assessment.  *Id.*

11          900.    The County relies entirely on the decennial census's population characteristic data

12   on age to identify the current and future need for types of housing.  *Id.* ¶ 10.  Granular decennial

13   census data on age is necessary to inform its planning with respect to each kind of housing

14   because younger residents typically seek smaller, affordable housing, middle-aged residents

15   demand a variety of housing options, and senior residents are projected to need intermediate care

16   and assisted living options.  *Id.*

17          901.    The County relies on granular decennial census data on race and ethnicity, which

18   can potentially indicate housing demand given that certain cultures may prefer or be accustomed

19   to living with extended family, and need larger housing units.  *Id.* ¶ 11.

20          902.    The County relies on granular decennial census data that informs "special needs"

21   characteristics of County residents (including seniors, farmworkers, single parent households,

22   large households, the homeless, and persons with disabilities) who face greater challenges when

23   seeking available housing in light of the need for certain accommodations and/or retrofitting.  *Id.*

24   ¶ 12.

25          903.    The County relies on granular decennial census data on "household population,"

26   which informs substandard housing, overcrowding, and overpayment (i.e., percentage of income

27   spent on rent), to assess the availability of appropriate, affordable housing in the County's

28   unincorporated areas.  *Id.* ¶ 13.  Accurate data on household populations is critical because higher

133

density areas have special planning needs as they are more likely to need higher access to transit, have higher social service needs, and be sensitive to changes in rent or employment. *Id.*

904.    The County can act to avoid and remedy housing issues if and only if it has accurate Census data. *Id.* ¶ 13.  For example, if the County knows overcrowding is occurring, it can plan for (i.e., rezone) those areas in order to accommodate more people. *Id.*  If these same areas also lack transit, accurate information gives the County an opportunity to plan for new transit service or new employment areas. *Id.*

905.    The County and its agencies rely on granular decennial census data to develop programs and policies aimed at addressing the problems highlighted by the data. *Id.* ¶ 14.

906.    Analysis of decennial census demographic data has resulted in the amendment of governmental constraints like the County Zoning Code, increased availability of public funds/project-based vouchers, development of affordable housing units, and the increased provision of rental assistance. *Id.* ¶ 15.  Based on such analysis, public housing has been modernized and preservation options discussed with inhabitants of at-risk housing as well. *Id.*

907.    Decennial census information forms the basis for measuring trends based on comparison with the previous census. *Id.* ¶ 20.  The County's future projections for General Plan purposes will need to include comparisons between 2010 and 2020 demographic census figures. *Id.*

908.    If the County were to use ACS data for these purposes, it would have to make large assumptions regarding local trends. *Id.* ¶ 9.  Those assumptions would later cause significant financial and planning problems if they turned out to be false. *Id.*

909.    The General Plan is also the foundation for all community-based plans, such as area plans, community plans, and coastal land use plans. *Id.* ¶ 16.  Area plans focus on land use and policy issues that are specific to a particular planning area. *Id.*

910.    An area plan will be prepared or updated for each of the County's eleven planning areas; for example, the East San Gabriel Valley Area Plan is a long-range planning and policy document that will help guide growth and development for the unincorporated areas of the

134

1    planning area.  *Id.* ¶ 17; "East San Gabriel Valley Area Plan," available at

2    http://planning.lacounty.gov/site/esgvap.

3         911.    For those area plans, the County relies on decennial census demographic

4    characteristic data including the age, race, employment, and housing characteristics of the

5    community to assess the need and plan for growth.  Bodek Trial Decl. ¶ 17.

6         912.    The County has been developing an Equity Indicators Tool, the purpose of which

7    is to facilitate the use of equity as a factor in the County's decision making.  *Id.* ¶ 19. The Tool

8    itself is a web-based mapping program that displays decennial census demographic information to

9    identify areas that are experiencing a greater degree of challenges.  *Id.*; "Report on Board Motion

10   Regarding the Equitable Development Work Program," available at

11   http://planning.lacounty.gov/assets/upl/official/official 20181129-equity.pdf.

12        913.    Without the reliable and precise demographic census data, the County would not

13   be able to readily identify the unique needs of each community in formulating and implementing

14   the County's General Plan and its many elements.  Bodek Trial Decl. ¶ 21.  This lack of accurate

15   data, in turn, could result in long-term misallocations of County resources, impairing the

16   County's ability to balance the economic, social, environmental, and other goals set out in the

17   Planning and Zoning Law and the County's General Plan.  *Id.*

18        914.    Without reliable and accurate demographic census data, the County would not be

19   able to properly allocate resources to County agencies charged with the responsibility of making

20   policy or financial decisions in accordance with California law and the County's Equitable

21   Development programs and policies.  *Id.* ¶ 21.

22                        **(3)   Los Angeles Unified School District**

23        915.    Plaintiff-in-Intervention Los Angeles Unified School District (LAUSD) relies on

24   population count and demographic characteristic data from the decennial census for redistricting

25   purposes.

26        916.    LAUSD's School Board redistricting occurs every ten years, as compelled by the

27   Los Angeles Charter and Administrative Code, art. VIII, section 802.  Crain Trial Decl. ¶ 7-8, 25;

28

ECF No. 176 [LAUSD Request for Judicial Notice] at 2; ECF No. 185 [Order Re Plfs.' Requests for Judicial Notice] at 4.

917.    Redistricting involves drawing seven LAUSD Board Districts containing, as nearly as practicable, equal portions of the total population of LAUSD.  Crain Trial Decl. ¶ 10.

918.    Each proposed Board District must be drawn in conformance with the requirements of state and federal law and to the extent feasible shall keep neighborhoods and communities intact, utilize natural boundaries or street lines, be geographically compact, and conform to high school attendance zones.  Crain Decl. ¶ 10.

919.    Members of the public are invited to review decennial census data on population count and demographic characteristics as they relate to LAUSD redistricting plans.  *Id.* ¶¶ 18, 24.

920.    To achieve those redistricting goals, LAUSD redistricting commission relies on population count and demographic characteristic data from the decennial census.  *Id.* ¶ 10.

**b.    Poor-quality census data will impair the allocation of federal domestic financial assistance**

921.    Inaccurate characteristic data will also distort the allocation of federal domestic financial assistance to Plaintiffs.  Reamer Trial Decl. ¶¶ 10-13, 30-31; Tr. 664:23-25 (Reamer).

922.    The distribution of federal assistance program funds to states and localities relies on census-derived data to geographically allocate funding through statistics-driven formulas. Reamer Trial Decl. ¶¶ 10, 31; Tr. 664:23-25, 666:11-16 (Reamer).  The census-derived datasets that are particularly important for determining the geographic allocation of funds are the Census Bureau's Population Estimates Program and the ACS.  Reamer Trial Decl. ¶ 12.

923.    There is a strong, direct relationship between the accuracy of decennial census data and the reliability of both the Population Estimates Program and the ACS.  *Id.* ¶ 12.  Decennial census data is an essential determinant of the accuracy and reliability of both.  *Id.*

924.    The accuracy of ACS estimates of the percentage distribution of various population characteristics at every level of geography is a function of the reliability of the decennial census.  *Id.* ¶ 13.  Accordingly, inaccuracies in the decennial census data—including

136

1    data on population count and demographic characteristics—would lead to inaccurate estimates of

2    population distribution by characteristics and geography from the ACS.  *Id.*

3        925.    Geographic allocation formulas are "particularly sensitive" to inaccuracies in

4    census-derived data.  *Id.* ¶ 12; Tr. 667:25-668:2 (Reamer).

5        926.    Geographic differences in the accuracy of decennial census data will lead to

6    distortions in the distribution of financial assistance across the breadth of census-guided

7    programs.  Reamer Trial Decl. ¶ 32.

8        927.    Even modest geographic differences in census data accuracy and quality can lead

9    to changes in funds distribution.  *Id.* ¶ 32.  That is because allocation formulas are determined by

10   specific statistics and are sometimes calculated to the one-hundredth or one-thousandth of a

11   percentage point.  *Id.*

12       928.    Given that Plaintiffs have a disproportionate number of persons most likely not to

13   respond to the 2020 Census because of the citizenship question, the characteristics of these

14   persons will be underrepresented when allocations of federal assistance program funds are made,

15   and as a result, Plaintiffs will not receive the funding that they deserve.

16       **4.    Plaintiffs Will Lose Political Representation**

17       929.    Adding a citizenship question to the 2020 Census creates a substantial risk of

18   California losing a congressional seat.

19       930.    Dr. Bernard Fraga testified that (1) based on Census Bureau data and Dr. Barreto's

20   survey results, California has a disproportionately high share of the population that would not be

21   enumerated if the 2020 Census includes a citizenship question, (2) California is expected to

22   maintain its current level of congressional representation (53 seats) if the 2020 Census does not

23   ask a citizenship question, but is likely to lose one or more seats if the 2020 Census does include

24   a citizenship question, and (3) under a broad range of population estimates for each of the states,

25   adding a citizenship question to the 2020 Census always increases the probability that California

26   will lose a congressional seat.  Fraga Trial Decl. ¶ 8.  These findings persist even with the

27   uncertainty of population projections and the demographic composition in each state, survey

28   sampling error, and reasonable NRFU efforts.  *Id.* ¶ 9.

931.   To estimate the quantitative effect of adding a citizenship question to the 2020 Census, Dr. Fraga looked at four scenarios of nonresponse and NRFU—two based on Dr. Barreto's survey data, and two based on Census Bureau data.  *Id.* ¶ 26.  For each scenario, Dr. Fraga determined how much of each state's population would not be counted in the 2020 Census because of the citizenship question.  *Id.* ¶¶ 57, 58.

932.   Dr. Fraga estimated that, based on Dr. Barreto's survey data, the citizenship question would cause 12.51 percent of Californians not to be reported in the census self-response (Scenario A).  *Id.* ¶¶ 57-58.  This was the largest proportional nonresponse of any state.  *Id.*

933.   Dr. Fraga performed the same calculation based on the Census Bureau's estimate of a decline in nonresponse by 5.8 percent for noncitizen households.  *Id.* ¶¶ 57, 60.  Based on this estimate, the citizenship question would cause 1.68 percent of Californians not to be reported in the census self-response (Scenario C).  Because California has a higher proportion of noncitizens than any other state, this was also the highest proportional undercount of all the states.  *Id.* ¶¶ 57, 65.

934.   Dr. Fraga testified that using either the survey results or the Census Bureau's estimate, California will always have the highest proportional undercount, as long as the Census Bureau's follow-up efforts are anything less than 100 percent effective.  *Id.* ¶ 65.

935.   Dr. Fraga used these undercount estimates to quantify the impact of adding a citizenship question on congressional apportionment, including the probability that apportionment would be affected by the question.  *Id.* ¶ 66.

936.   In the baseline scenario with no citizenship question, California is projected to keep its current 53 seats in the House of Representatives.  *Id.* ¶ 75.

937.   However, Dr. Fraga's calculations illustrate that, using Dr. Barreto's nonresponse estimates, even accounting for limited NRFU success, California would be virtually certain to lose three seats (Scenarios A and B).  *Id.* ¶¶ 73-74, 76.

938.   Dr. Fraga's calculations further illustrate that, using the Census Bureau's 5.8 percent estimate of nonresponse by noncitizen households, the likelihood of California losing at least one seat nearly doubles to fifty percent probability (Scenario C).  *Id.* ¶ 82.  After accounting

138

1    for NRFU, the likelihood of California losing at least one seat still increases by 15 percent

2    (Scenario D).  *Id.*

3           939.    California is the only state that would be predicted to lose more than one seat in

4    any of the scenarios Dr. Fraga examined.  *Id.* ¶¶ 83-85.

5           940.    In short, the citizenship question would cause a differential undercount of

6    California's population relative to other states and would substantially increase the probability

7    that California will lose a congressional seat.  *Id.* ¶¶ 76, 82, 85, 91.

8

9     Dated:  February 1, 2019                    Respectfully Submitted,

10                                                XAVIER BECERRA
                                                  Attorney General of California
11                                                MARK R. BECKINGTON
                                                  ANTHONY R. HAKL
12                                                Supervising Deputy Attorneys General
                                                  GABRIELLE D. BOUTIN
13                                                ANNA T. FERRARI
                                                  TODD GRABARSKY
14                                                NOREEN P. SKELLY
                                                  Deputy Attorneys General
15

16                                                */s/ R. Matthew Wise*
                                                  R. MATTHEW WISE
17                                                Deputy Attorney General
                                                  *Attorneys for Plaintiff State of California, by and*
18                                                *through Attorney General Xavier Becerra*

19

20

21

22

23

24

25

26

27

28

1    Dated:  February 1, 2019           */s/ Charles L. Coleman* _____

2                                 CHARLES L. COLEMAN III, SBN 65496
DAVID I. HOLTZMAN

3                                 HOLLAND & KNIGHT LLP
50 California Street, 28th Floor

4                                 San Francisco, CA 94111
Telephone: (415) 743-6970

5                                 Fax: (415) 743-6910
Email: charles.coleman@hklaw.com

6                                 *Attorneys for Plaintiff County of Los Angeles*

7

8    Dated:  February 1, 2019           MIKE FEUER
City Attorney for the City of Los Angeles

9                                 */s/ Valerie Flores* _____

10                               VALERIE FLORES, SBN 138572
Managing Senior Assistant City Attorney

11                              200 North Main Street, 7th Floor, MS 140
Los Angeles, CA  90012

12                              Telephone: (213) 978-8130
Fax: (213) 978-8222

13                              Email: Valerie.Flores@lacity.org

14    Dated:  February 1, 2019           HARVEY LEVINE
City Attorney for the City of Fremont

15

16                               */s/ Harvey Levine* _____
SBN 61880

17                              3300 Capitol Ave.
Fremont, CA 94538

18                            Telephone: (510) 284-4030
Fax: (510) 284-4031

19                            Email: hlevine@fremont.gov

20    Dated:  February 1, 2019           CHARLES PARKIN
City Attorney for the City of Long Beach

21

22                               */s/ Michael J. Mais* _____
MICHAEL K. MAIS, SBN 90444

23                            Assistant City Attorney
333 W. Ocean Blvd., 11th Floor

24                            Long Beach CA, 90802
Telephone: (562) 570-2200

25                            Fax: (562) 436-1579
Email: Michael.Mais@longbeach.gov

26

27

28

1    Dated:  February 1, 2019                 BARBARA J. PARKER
                                              City Attorney for the City of Oakland
2
                                              /s/ Erin Bernstein _____
3                                             MARIA BEE
                                              Chief Assistant City Attorney
4                                             ERIN BERNSTEIN, SBN 231539
                                              Supervising Deputy City Attorney
5                                             MALIA MCPHERSON
                                              Deputy City Attorney
6                                             City Hall, 6th Floor
                                              1 Frank Ogawa Plaza
7                                             Oakland, California 94612
                                              Telephone: (510) 238-3601
8                                             Fax: (510) 238-6500
                                              Email: ebernstein@oaklandcityattorney.org
9

10   Dated:  February 1, 2019                 JOHN LUEBBERKE
                                              City Attorney for the City of Stockton
11
                                              /s/ John Luebberke _____
12                                            SBN 164893
                                              425 N. El Dorado Street, 2nd Floor
13                                            Stockton, CA 95202
                                              Telephone: (209) 937-8333
14                                            Fax: (209) 937-8898
                                              Email: John.Luebberke@stocktonca.gov
15

16

17

18                               **FILER'S ATTESTATION**

19
         Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that
20
     concurrence in the filing of this document has been obtained from all signatories above.
21
     Dated: February 1, 2019                      /s/ R. Matthew Wise
22                                                R. MATTHEW WISE

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: **State of California, et al. v.**  No.  **3:18-cv-01865**
**Wilbur L. Ross, et al.**

I hereby certify that on February 1, 2019, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on February 1, 2019, at Sacramento, California.

| Tracie L. Campbell | */s/ Tracie Campbell* |
|:---:|:---:|
| Declarant | Signature |

SA2018100904
13430250.docx

1  XAVIER BECERRA
   Attorney General of California
2  MARK R. BECKINGTON
   ANTHONY R. HAKL
3  Supervising Deputy Attorneys General
   GABRIELLE D. BOUTIN, SBN 267308
4  ANNA T. FERRARI, SBN 261579
   TODD GRABARSKY, SBN 286999
5  NOREEN P. SKELLY, SBN 186135
   R. MATTHEW WISE, SBN 238485
6  Deputy Attorneys General
    1300 I Street, Suite 125
7   P.O. Box 944255
    Sacramento, CA 94244-2550
8   Telephone: (916) 210-6053
    Fax: (916) 324-8835
9   E-mail: Gabrielle.Boutin@doj.ca.gov
   *Attorneys for Plaintiff State of California, by and*
10 *through Attorney General Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16 **STATE OF CALIFORNIA by and through**            3:18-cv-01865
   **ATTORNEY GENERAL XAVIER**
17 **BECERRA; COUNTY OF LOS ANGELES;**
   **CITY OF LOS ANGELES; CITY OF**
   **FREMONT; CITY OF LONG BEACH;**               **PLAINTIFFS' POST-TRIAL PROPOSED**
18 **CITY OF OAKLAND; CITY OF**                     **CONCLUSIONS OF LAW**
   **STOCKTON,**
19                                                  Dept:        3
                                        Plaintiffs, Judge:       The Honorable Richard G.
20                                                               Seeborg
          **v.**                                    Trial Date:  January 7, 2019
21                                                  Action Filed: March 26, 2018

22 **WILBUR L. ROSS, JR., in his official**
   **capacity as Secretary of the U.S.**
23 **Department of Commerce; U.S.**
   **DEPARTMENT OF COMMERCE; RON**
24 **JARMIN, in his official capacity as Acting**
   **Director of the U.S. Census Bureau; U.S.**
25 **CENSUS BUREAU; DOES 1-100,**

26                                        Defendants.

27

28

---

# TABLE OF CONTENTS

Page

I. The Obligation to Conduct a Decennial Census ...................................................... 1

II. Plaintiffs Have Standing to Bring Their APA and Enumeration Clause
Claims ..................................................................................................................... 1

    A. The Court May Consider Extra-Record Evidence to Evaluate
Standing ....................................................................................................... 2

    B. Plaintiffs Have Suffered, and Will Imminently Suffer, Injuries-in-
Fact .............................................................................................................. 2

        1. The expenditure of funds for census outreach to mitigate the
substantial risk of harm ................................................................... 4

        2. Lost federal funding .......................................................................... 6

        3. Degradation of the quality of demographic data ............................. 7

        4. Lost political representation ............................................................ 10

    C. Plaintiffs' Injuries Are Traceable and Redressable .................................. 11

III. The Dispute is Ripe for Adjudication ................................................................... 13

IV. Defendants' Decision to Add a Citizenship Question to the 2020 Census
Violates the Enumeration Clause of the Constitution ........................................... 13

V. Based on the Administrative Record Alone, Defendants' Decision to Add a
Citizenship Question to the 2020 Census Violates the APA ................................. 16

    A. The Scope of Judicial Review .................................................................... 16

    B. The Decision Violates the APA as Contrary to Law ................................. 17

        1. The decision is contrary to 13 U.S.C. § 6(c) .................................. 18

        2. The decision is contrary to 13 U.S.C. § 141(f)(3) ......................... 20

    C. The Decision Violates the APA Because Its Justification Was
Pretextual .................................................................................................. 22

    D. The Decision Was Arbitrary and Capricious Because Defendants
Failed to Consider "An Important Aspect of the Problem" ...................... 23

        1. Defendants failed to consider whether the citizenship
question would cause an undercount that would harm
Plaintiffs ......................................................................................... 23

        2. Defendants failed to consider key legal obligations ..................... 24

        3. Defendants failed to independently consider whether
existing ACS CVAP data is sufficient for enforcement of
section 2 of the Voting Rights Act ................................................. 26

    E. The Decision Was Arbitrary and Capricious Because It Ran
Counter to the Evidence ........................................................................... 28

        1. The decision was counter to the evidence that using
administrative data alone would yield more accurate and
complete citizenship data than adding a citizenship question
to the census ................................................................................... 28

i

**TABLE OF CONTENTS**
(continued)

Page

2. The decision was counter to the evidence because the Decision Memo was rife with flawed assertions that were not based on any evidence or were counter to the evidence in the record..................................................................... 30

VI. Extra-Record Evidence Confirms that Defendants' Decision to Add a Citizenship Question to the 2020 Census Violates the APA ............................... 32

A. Applicable Exceptions to the Rule of Record Review............................ 32

1. The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext......................................................................... 32

2. The Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors .......... 33

B. Extra-Record Evidence Confirms that Defendants' Justification for the Decision was Pretextual .................................................................... 34

C. Extra-Record Evidence Confirms that the Decision was Arbitrary and Capricious Because Defendants Failed to Consider "An Important Aspect of the Problem" ........................................................... 35

1. Defendants failed to consider the applicable standards that required them to pretest the citizenship question....................... 35

2. Defendants failed to consider the governing burden to change a census question ............................................................ 37

3. Defendants failed to consider and irrationally departed from established practices for conferring with a requesting agency...... 38

4. Extra-record evidence confirms that Defendants failed to consider whether existing ACS CVAP data is sufficient for enforcement of section 2 of the Voting Rights Act..................... 40

5. Defendants failed to consider the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices ................................................................... 41

6. Defendants failed to consider injuries that may result at the local level from inaccurate census count and characteristic data .......................................................................................... 42

VII. Remedies ................................................................................................... 43

A. Enumeration Clause Claim .................................................................... 43

B. APA Claim ............................................................................................. 45

1. Plaintiffs are entitled to a declaratory judgment .......................... 45

2. Plaintiffs are entitled to vacatur of the decision without remand............................................................................................ 46

3. Plaintiffs are entitled to a permanent injunction .......................... 48

ii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott v. Perez*
  138 S. Ct. 2305 (2018) ........................................................................................44, 45

*All. for the Wild Rockies v. U.S. Forest Serv.*
  907 F.3d 1105 (9th Cir. 2018)..............................................................................14, 46

*Aluminum Co. of America v. Bonneville Power Admin.*
  903 F.2d 585 (9th Cir. 1989).........................................................................................7

*Am. Bioscience, Inc. v. Thompson*
  269 F.3d 1077 (D.C. Cir. 2001) ..................................................................................46

*Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*
  199 F. Supp. 2d 217 (D. N.J. 2002) ..............................................................................2

*Am. Wild Horse Pres. Campaign v. Perdue*
  873 F.3d 914 (D.C. Cir. 2017) ....................................................................................38

*Am. Wildlands v. Kempthorne*
  530 F.3d 991 (D.C. Cir. 2008) ....................................................................................33

*Asarco Inc. v. U.S. Environmental Protection Agency*
  616 F.2d 1153 (9th Cir. 1980).....................................................................................33

*Associated General Contractors of California, Inc. v. Coalition for Economic Equity*
  950 F.2d 1401 (9th Cir. 1991).......................................................................................2

*Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*
  412 U.S. 800 (1973)...............................................................................................38, 40

*Baldrige v. Shapiro*
  455 U.S. 345 (1982), 1981 WL 389922......................................................................18

*Barnum Timber Co. v. EPA*
  633 F.3d 894 (9th Cir. 2011)..................................................................................12, 47

*Bennett v. Spear*
  520 U.S. 154 (1997) ...............................................................................................2, 12

*Beno v. Shalala*
  30 F.3d 1057 (9th Cir. 1994)........................................................................................28

# TABLE OF AUTHORITIES
### (continued)

Page

*Burlington Truck Lines, Inc. v. United States*
  371 U.S. 156 (1962) ................................................................................22

*California Trout v. F.E.R.C*
  572 F.3d 1003 (9th Cir. 2009) ...........................................................38, 39

*Camp v. Pitts*
  411 U.S. 138 (1973) ................................................................................47

*Carey v. Klutznick*
  637 F.2d 834 (2d Cir. 1980) ..................................................6, 10, 45, 49

*Carpenters Indus. Council v. Zinke*
  854 F.3d 1 (D.C. Cir. 2017) .....................................................................3

*Central United Life, Inc. v. Burwell*
  128 F. Supp. 3d 321 (D.D.C. 2015) ........................................................48

*Chemical Mfrs. Ass'n v. EPA*
  28 F.3d 1259 (D.C. Cir. 1994) ................................................................48

*Chrysler Corp. v. Brown*
  441 U.S. 281 (1979) ................................................................................47

*Citizens to Pres. Overton Park v. Volpe*
  401 U.S. 402 (1971) ....................................................................17, 32, 33

*City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*
  822 F.2d 1153 (D.C. Cir. 1987) ..............................................................26

*City of Detroit v. Franklin*
  4 F.3d 1367 (6th Cir. 1993) ......................................................................6

*City of Los Angeles v. U.S. Dept. of Commerce*
  307 F.3d 859 (9th Cir. 2002) ...................................................................14

*City of New York v. U.S. Dep't of Commerce*
  713 F. Supp. 48 (E.D.N.Y. 1989) ...........................................................10

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013) ......................................................................3, 4, 5, 11

*Clean Air Council v. Pruitt*
  862 F.3d 1 (D.C. Cir. 2017) ....................................................................47

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Council of Ins. Agents & Brokers v. Molasky-Arman*
522 F.3d 925 (9th Cir. 2008)............................................................................3

*Crown Cork & Seal Co. v. NLRB*
36 F.3d 1130 (D.C. Cir. 1994) ........................................................................48

*Ctr. for Biological Diversity v. Zinke*
900 F.3d 1053 (9th Cir. 2018)........................................................................38

*Ctr. for Food Safety v. Price*
No. 17-cv-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ..............7, 10

*Czyzewski v. Jevic Holding Corp.*
137 S. Ct. 973 (2017) ...............................................................................3, 7

*Delaware Dep't of Nat. Res. & Envtl. Control*
785 F.3d 1, 16 (D.C. Cir. 2015) .....................................................................26

*Denney v. Deutsche Bank AG*
443 F.3d 253 (2d Cir. 2006)............................................................................7

*Dep't of Commerce v. U.S. House of Representatives*
525 U.S. 316 (1999) ........................................................................... *passim*

*Evenwel v. Abbott*
136 S. Ct. 1120 (2016) ..................................................................................1

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009) ......................................................................17, 38, 40

*FEC v. Akins*
524 U.S. 11 (1998) ...................................................................................7, 10

*Fed'n for Am. Immigration Reform v. Klutznick (FAIR)*
486 F. Supp. 564 (D.D.C. 1980) ..................................................................1, 14

*Federal Power Comm'n v. Texaco Inc.*
417 U.S. 380 (1974) ....................................................................................22

*Franklin v. Massachusetts*
505 U.S. 788 (1992) ................................................................................14, 50

*Gilder v. PGA Tour, Inc.*
936 F.2d 417 (9th Cir. 1991)........................................................................44, 45

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Glavin v. Clinton*
    19 F. Supp. 2d 543 (E.D. Va. 1998) .................................................................6

*Guerrero v. Clinton*
    157 F.3d 1190 (1998) ......................................................................................21

*Harmon v. Thornburgh*
    878 F.2d 484 (D.C. Cir. 1989) .......................................................................50

*Havens Realty Corp. v. Coleman*
    455 U.S. 363 (1982) .....................................................................................8, 10

*Home Box Office, Inc. v. F.C.C.*
    567 F.2d 9 (D.C. Cir. 1977) ...........................................................................22

*In re Adobe Systems, Inc. Privacy Litig.*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) .............................................................4

*In re Zappos.com, Inc.*
    888 F.3d 1020 (9th Cir. 2018) ........................................................................12

*INS v. Yueh-Shaio Yang*
    519 U.S. 26 (1996) ....................................................................................33, 38

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*
    920 F.2d 960 (D.C. Cir. 1990) .......................................................................47

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
    803 F.3d 389 (9th Cir. 2015) ..........................................................................49

*Katzenbach v. Morgan*
    384 U.S. 641 (1966) ........................................................................................41

*Kirkpatrick v. Preisler*
    394 U.S. 526 (1969) ..........................................................................................8

*Kuang v. U.S. Dep't of Defense*
    No. 18-cv-3698-JST, 2018 WL 6025611 (N.D. Cal. Nov. 16, 2018) .............27

*Lands Council v. Powell*
    395 F.3d 1019 ..................................................................................................35

*Larios v. Cox*
    300 F. Supp. 2d 1320 (N.D. Ga. 2004) .............................................................9

vi

**TABLE OF AUTHORITIES**
(continued)

**Page**

*League of Women Voters v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ..................................................................25, 44, 48

*Leonard v. Clark*
12 F.3d 885 (9th Cir. 1993)....................................................................................2

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ............................................................................................12

*Mendia v. Garcia*
768 F.3d 1009 (9th Cir. 2014)......................................................................11, 12

*Monsanto Co. v. Geertson Seed Farms*
561 U.S. 139 (2010) .........................................................................................4, 44

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ......................................................................23, 24, 28, 33

*N.L.R.B. v. Silver Bay Local Union No. 962, Int'l Bhd. of Pulp, Sulphite & Paper*
*Mill Workers, AFL-CIO*
498 F.2d 26 (9th Cir. 1974)................................................................................38

*NAACP v. Trump*
315 F. Supp. 3d 457 (D.D.C. 2018) ..................................................................50

*Nat'l Audubon Soc. v. Hoffman*
132 F.2d 7 (2d Cir. 1997)...................................................................................34

*Nat'l Wildlife Fed'n v. Espy*
45 F.3d 1337 (9th Cir. 1995)..............................................................................48

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*
384 F.3d 1163 (9th Cir. 2004)............................................................................17

*Nat'l Audubon Soc. v. U.S. Forest Service*
46 F.3d 1437 (9th Cir. 1993)..............................................................................33

*Nat'l Park Hospitality Assn. v. Dep't of Interior*
538 U.S. 803 (2003) ............................................................................................13

*NCAA v. Governor of N.J.*
730 F.3d 208 (3d Cir. 2013)..................................................................................7

*Nken v. Holder*
556 U.S. 418 (2009) ............................................................................................44

## TABLE OF AUTHORITIES
### (continued)

Page

*NRDC v. EPA*
   489 F.3d 1250 (D.C. Cir. 2007) ..........................................................47

*NRDC v. Nat'l Highway Traffic Safety Admin.*
   894 F.3d 95 (2d Cir. 2018)................................................................47

*Perez v. Abbott*
   250 F. Supp. 3d 123 (W.D. Tex. 2017)..................................................9

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*
   337 F. Supp. 3d 308 (S.D.N.Y 2018)..................................................48

*Pollinator Stewardship Council*, 806 F.3d at 532 ........................................47

*Pub. Citizen, Inc. v. Mineta*
   340 F.3d 39 (2d Cir. 2003)................................................................28

*Pub. Citizen v. U.S. Dep't of Justice*
   491 U.S. 440 (1989) ...................................................................7, 10

*Public Power Council v. Johnson*
   674 F.2d 791 (9th Cir. 1982)............................................................32

*Pursuing Am. Greatness v. FEC*
   831 F.3d 500 (D.C. Cir. 2016) .........................................................44

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*
   499 F.3d 1108 (9th Cir. 2007)..................................................32, 33, 35

*Renee v. Duncan*
   686 F.3d 1002 (9th Cir. 2012)..........................................................21

*Reynolds v. Sims*
   377 U.S. 533 (1964) ........................................................................8

*Sanchez v. City of Modesto*
   145 Cal.App.4th 660 (2006)...............................................................9

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*
   769 F.3d 1184 (D.C. Cir. 2014) .......................................................23

*Southwest Center for Biological Diversity v. U.S. Forest Service*
   100 F.3d 1443 (9th Cir. 1996)..........................................................32

# TABLE OF AUTHORITIES
### (continued)

Page

*Spokeo, Inc. v. Robins*
136 S. Ct. 1540 (2016) ...........................................................................2

*State of Tex. v. Mosbacher*
783 F. Supp. 308 (S.D. Tex. 1992) .........................................................6

*Stewart v. Azar*
313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................23

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014) ........................................................................ *passim*

*Texas v. United States*
809 F.3d 134 (5th Cir. 2015)................................................................50

*Thornburg v. Gingles*
478 U.S. 30 (1986) ..............................................................9, 27, 40

*Town of Chester v. Laroe Estates, Inc.*
137 S. Ct. 1645 (2017) ..........................................................................2

*Tummino v. Torti*
603 F. Supp. 2d 519 (E.D.N.Y. 2009) .................................................32

*U.S. ex rel. City of Atlanta, Ga. v. Steuart*
47 F.2d 979 (D.C. Cir. 1931) ..............................................................14

*U.S. Lines, Inc. v. Federal Maritime Comm'n*
584 F.2d 519 (D.C. Cir. 1978) ............................................................22

*United States Small Business Admin. v. Bensal*
853 F.3d 992 (9th Cir. 2017)................................................................20

*Utah v. Evans*
536 U.S. 452 (2002) ............................................................................15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*
139 S.Ct. 361 (2018)............................................................................21

*Wisconsin v. City of New York*
517 U.S. 1 (1996)........................................................................1, 14, 15, 16

*Wong Yang Sung v. McGrath*
339 U.S. 33 (1950) ..............................................................................17

ix

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

5 United States Code
   § 702.................................................................................................16, 46
   § 704.............................................................................................................46
   § 706.................................................................................................17, 46
   § 706(2)(A)......................................................................................17, 50
   § 706(2)(A)-(D)...........................................................................................17

13 United States Code
   § 4...............................................................................................................1
   § 6.............................................................................................................18
   § 6(c) ............................................................................................... *passim*
   § 141(a) ...................................................................................14, 26
   § 141(f).........................................................................20, 21, 22, 25
   § 141(f)(1)...................................................................................14, 20
   § 141(f)(2)............................................................................14, 20, 21
   § 141(f)(3)......................................................................................... *passim*

28 United States Code
   § 2201.............................................................................................44, 46
   § 2202.........................................................................................................44

52 United States Code
   § 10301.......................................................................................................9

1976 Census Act
   § 5(a) ........................................................................................................18

Elections Code
   § 14027.......................................................................................................9
   § 14028.......................................................................................................9
   § 14032.......................................................................................................9

Pub. L. No. 105-119
   § 209(a)(2)...............................................................................................24
   § 209(a)(5)...............................................................................................1
   § 209(a)(6)...............................................................................................1
   § 209(a)(8)...............................................................................................3

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Article I, Section 2, Clause 3 ............................................................................... *passim*
    Amendment XIV, Section 2 ................................................................................... *passim*

**COURT RULES**

Federal Rules of Evidence
    Rule 201 ......................................................................................................... 20, 21
    Rule 902(5) ........................................................................................................ 20

Plaintiffs State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton respectfully submit the following Post-Trial Proposed Conclusions of Law.

## I. THE OBLIGATION TO CONDUCT A DECENNIAL CENSUS

1. The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State." U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV § 2.

2. All residents must be counted, regardless of citizenship status. *See Fed'n for Am. Immigration Reform v. Klutznick* (*FAIR*), 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

3. The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs." Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

4. The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts. *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).

5. Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau. 13 U.S.C. § 4.

6. Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law. Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

## II. PLAINTIFFS HAVE STANDING TO BRING THEIR APA AND ENUMERATION CLAUSE CLAIMS

7. To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

1

by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

8. Where, as here, a plaintiff seeks declaratory and prospective relief only, not money damages, its claims do not require individualized proof. *Associated General Contractors of California, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991).

9. The standing inquiry is satisfied so long as a single plaintiff establishes standing. *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977)); *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017).

10. The Plaintiffs and Plaintiff-in-Intervention in this case (collectively, Plaintiffs) all have standing because they have suffered several different types of injuries-in-fact that are fairly traceable to Defendants' decision to add a citizenship question to the census, and these injuries will be redressed if Defendants' decision is enjoined.

**A.    The Court May Consider Extra-Record Evidence to Evaluate Standing**

11. Defendants concede that the Court can consider evidence outside the Administrative Record to evaluate standing in this case. Tr. 22:18-22 (Defendants' opening statement).

12. Courts adjudicating APA challenges can and do consider extra-record evidence for standing purposes. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (because "each element of Article III standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation,'" a plaintiff "must ultimately support any contested facts with evidence adduced at trial") (quoting *Lujan*, 504 U.S. at 561; *see also Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*, 199 F. Supp. 2d 217, 228 n.3 (D. N.J. 2002) (considering plaintiffs' extra-record evidence in support of standing in an APA case because "[it goes] to the issue of the Court's jurisdiction").

**B.    Plaintiffs Have Suffered, and Will Imminently Suffer, Injuries-in-Fact**

13. Allegations of a future injury qualify as an injury-in-fact "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B.*

2

1    *Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568

2    U.S. 398, 414 n.5 (2013)).

3         14.    Injury-in-fact exists where there is a "substantial risk" that harm will occur, which

4    prompts plaintiffs to reasonably incur costs to mitigate or avoid that harm. *Clapper*, 568 U.S. at

5    414 n.5 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)).

6         15.    "For standing purposes, a loss of even a small amount of money is ordinarily an

7    injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *Carpenters Indus.*

8    *Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-

9    fact for standing purposes."); *see Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d

10   925, 932 (9th Cir. 2008) (noting that Supreme Court has found injury-in-fact even where

11   magnitude of harm was only a few dollars).

12        16.    The possibility that Defendants may take undefined future steps (some of which

13   are hypothetical, not planned) to try to mitigate harms caused by their decision to add the

14   citizenship question does not undermine the showing of injury-in-fact below. *See Dep't of*

15   *Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (concluding that

16   plaintiffs established injury-in-fact based on expected effects of the use of sampling in the 2000

17   Census and that "it is certainly not necessary for this Court to wait until the census has been

18   conducted to consider the issue presented here, because such a pause would result in extreme—

19   possibly irremediable—hardship"); *see also* Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481

20   ("Congress finds that . . . the decennial enumeration of the population is a complex and vast

21   undertaking, and if such enumeration is conducted in a manner that does not comply with the

22   requirements of the Constitution or laws of the United States, it would be impracticable for the

23   States to obtain, and the courts of the United States to provide, meaningful relief after such

24   enumeration has been conducted.").

25        17.    The evidence establishes that Plaintiffs will be injured in a number of different and

26   independent ways from the addition of a citizenship question to the 2020 Census.  These injuries

27   include, (1) the expenditure of funds for census outreach to mitigate the substantial risk of harm,

28

(2) lost federal funding, (3) degradation of the quality of demographic data, and (4) lost political representation.

### 1. The expenditure of funds for census outreach to mitigate the substantial risk of harm

18.     Plaintiffs—in particular, the State of California and the County of Los Angeles—have reasonably increased their expenditures on census outreach to attempt to mitigate the decline in self-response rates and the resulting differential undercount of Plaintiffs' residents caused by the citizenship question.  Post-Trial Findings of Fact (PFOF) § V(B)(1).

19.     These additional expenditures, which constitute a direct injury to the State of California, are sufficient to establish injury-in-fact for standing purposes.  *Clapper*, 568 U.S. at 414 n.5 (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Monsanto*, 561 U.S. at 153-155 (finding injury-in-fact where alfalfa growers increased administrative costs to minimize likelihood of potential contamination of their crops from genetically-altered alfalfa plant); *In re Adobe Systems, Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1216-1217 (N.D. Cal. 2014) (costs that software customers incurred to mitigate the risk of harm following a data breach constitute injury-in-fact).

20.     Plaintiffs' expenditures were reasonably incurred because they face harm that is not only a "substantial risk," but also "certainly impending."  *See Susan B. Anthony Lists*, 573 U.S. at 158.  This harm is the result of the differential undercount and lower self-response rates of their residents.

21.     Plaintiffs, including the State of California, have proven that the citizenship question will cause them to be differentially undercounted because they have a disproportionate share of noncitizens, immigrants, and Latino residents, PFOF § V(A), and that this differential undercount will cause them to lose federal funding, *id.* § V(B)(2), and political representation, *id.* § V(B)(4).

22.     Although the exact amount of federal funding that Plaintiffs will lose is uncertain, Plaintiffs have shown that the differential undercount caused by the citizenship question will result in a material loss of federal funding.  *Id.* § V(B)(2).  Likewise, although the exact amount

4

of political representation that Plaintiffs will lose is uncertain, Plaintiffs have shown that the differential undercount caused by the citizenship question will likely result in the loss of political representation, including the possible loss of one or more congressional seats in California. *Id.* § V(B)(4).

23.     In addition, Plaintiffs have shown that lower self-response rates will damage the quality of the census data that they depend on to make decisions related to redistricting and services. *Id.* at § V(B)(3).

24.     The legislative history of California's FY 2018-19 state budget and follow-up reports to the Governor and Legislature show that the State appropriated, and Plaintiffs are spending, additional funds on census outreach to attempt to mitigate these negative impacts caused by the citizenship question. *Id.* § V(B)(1).

25.     Although it is not possible to pinpoint how much the citizenship question drove the increase in the state budget's census outreach line item, Plaintiffs have shown that the Legislature's decision to boost the Governor's initial allocation for census outreach ($40.3 million) to a higher allocation in the enacted budget ($90.3 million) is due in part to the citizenship question. *Id.*; Undisputed Facts ¶ 111-112.

26.     Plaintiffs also provided evidence that the citizenship question prompted the County of Los Angeles to request $3.3 million in additional funds to meet the County's need for funding for census outreach to the hard-to-count populations most likely not to respond to the 2020 Census because of the citizenship question. PFOF § V(B)(1). The State partially met this request by allocating hundreds of thousands of dollars of additional funding to the County for census outreach. *Id.*; Undisputed Facts ¶ 113.

27.     Because any amount of costs incurred to mitigate harm is sufficient to confer standing, as long as such costs were reasonably incurred, Plaintiffs' expenditures on census outreach constitute a direct injury to the budgets and resources of Plaintiffs that is sufficient to establish injury-in-fact for standing purposes. *See Clapper*, 568 U.S. at 414 n.5.

### 2. Lost federal funding

28.     Plaintiffs have shown that adding a citizenship question to the 2020 Census will cause a differential undercount that results in the loss of federal funding to Plaintiffs.  PFOF § V(B)(2).

29.     A plaintiff has standing when it has shown that a disproportionate undercount will result in "decreased federal funds flowing to their city and state." *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980); *City of Detroit v. Franklin*, 4 F.3d 1367, 1373-1375 (6th Cir. 1993) (standing established where "census undercount will result in a loss of federal funds" to plaintiffs' city); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313-314 (S.D. Tex. 1992) ("While the Census Bureau and the Department of Commerce are not in charge of distribution of federal funds, the Bureau's actions significantly affect the distribution of funds and therefore satisfies the requirements for injury in fact"); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) ("As a matter of law, allegations of decreased federal and state funding is fairly traceable to population counts reported in the decennial census.").

30.     A significant portion of federal domestic financial assistance is distributed based on census-derived data, including from 24 large federal financial assistance programs with geographic allocation formulas that rely in whole or part on census-derived data.  PFOF § V(B)(2)(a).

31.     If, as Plaintiffs have shown, there is any measurable differential undercount of households containing noncitizens, California will lose federal funding, because California has a larger proportion of noncitizens relative to other states.  *Id.*

32.     Similarly, some federal domestic financial assistance that is based on census-derived data is distributed among localities within the state.  *Id.* at § V(B)(2)(b).

33.     If, as Plaintiffs have shown, there is any measurable differential undercount of households containing noncitizens, the County and City Plaintiffs and LAUSD will lose federal funding, because these localities have a larger proportion of noncitizens relative to other localities.  *Id.*

34.     Lost federal funding, no matter the magnitude, confers standing upon Plaintiffs. *Czyzewski*, 137 S. Ct. at 983.

35.     Although Defendants have not presented any evidence that suggests that Plaintiffs' funding losses would be offset elsewhere, the law is clear that such a benefit would not defeat Plaintiffs' standing.  *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013) (A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it.  Our standing analysis is not an accounting exercise. . . ."), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (noting that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing"); *cf. Aluminum Co. of America v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) (electric power customers had standing to claim that particular rates were excessive, despite counterargument that rates were more favorable than unfavorable).

36.     Having shown not only a "substantial risk" that the citizenship question will cause them to lose federal funding, but that the injury is "certainly impending," Plaintiffs have established standing.  *See Susan B. Anthony Lists*, 573 U.S. at 158.

### 3.     Degradation of the quality of demographic data

37.     Plaintiffs have also proven injury-in-fact based on the harm that adding a citizenship question will cause to the quality and accuracy of the population count and demographic characteristic data generated by the census.  *See* PFOF §§ V(A)(3), V(B)(3).

38.     Where a defendant has a duty to provide accurate information, failure to do so creates an injury-in-fact sufficient to confer standing.  *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal Advisory Committee Act for failure to make publicly available reports and minutes of American Bar Association meetings relating to prospective judicial nominees); *see also FEC v. Akins*, 524 U.S. 11, 20-21 (1998) (plaintiff voters had standing to sue the Federal Election Commission on the ground that the statute in question gave plaintiffs a right to the information being withheld by the FEC); *see also Ctr. for Food Safety v. Price*, No. 17-cv-3833 (VSB), 2018 WL 4356730, at *5

7

(S.D.N.Y. Sept. 12, 2018) (informational injury satisfies the injury-in-fact requirement of standing where a statutory provision has explicitly created a right to information).

39.     An injury sufficient to create standing is created not only by a total deprivation of information to which plaintiffs have a statutory right, but also by the deprivation of accurate or truthful information.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding that because the Fair Housing Act created a statutory right to truthful information concerning the availability of housing, "testers" who were misinformed had standing to sue without demonstrating any further injury).

40.     Plaintiffs have shown that Defendants' decision to add the citizenship question to the 2020 Census will damage the accuracy and quality of census data.  *See* PFOF § V(A)(3).

41.     Adding a citizenship question to the 2020 Census will lower self-response rates, which, in turn, will result in an increase in NRFU.  *See generally* PFOF § V(A).  Because data obtained via NRFU is less accurate and of lower quality than data produced via self-response, adding a citizenship question will cause the 2020 Census to produce data that is less accurate and of poorer quality.  *See id.* § V(A)(3).

42.     Defendants conceded that the local government Plaintiffs depend on accurate census data and that lower-quality data will disrupt redistricting efforts and cause a misallocation of resources.  Tr. 799:1-16, 1005:3-24, 1040:7-1041:10 (Abowd).

43.     Plaintiffs have shown that harm to census data quality and accuracy caused by the citizenship question will concretely injure the local government Plaintiffs in at least two ways.

44.     First, the degraded data quality will injure the local government Plaintiffs' ability to draw election districts equitably and in compliance with federal and state voting rights laws. *Id.*

45.     The Equal Protection Clause of the Fourteenth Amendment requires that electoral districts afford their residents equality of representation by ensuring equality of population across legislative districts.  *Reynolds v. Sims*, 377 U.S. 533, 579 (1964); *Kirkpatrick v. Preisler,* 394 U.S. 526, 531 (1969) ("Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives.")

8

1  Even local redistricting plans with population deviations under ten percent do not enjoy a "safe

2  harbor" from legal challenge. *Larios v. Cox,* 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004), *aff'd*

3  504 U.S. 947 (2004); *Perez v. Abbott,* 250 F. Supp. 3d 123, 191 (W.D. Tex. 2017).

4      46.    In addition, section 2 of the federal Voting Rights Act and the California Voting

5  Rights Act both prohibit election districts that "dilute" the voting power of racial and ethnic

6  minority groups. *See* 52 U.S.C. § 10301; *Thornburg v. Gingles*, 478 U.S. 30, 43-52 (1986); Cal.

7  Elec. Code §§ 14027, 14028, 14032; *see also Sanchez v. City of Modesto*, 145 Cal.App.4th 660,

8  668-70 (2006).

9      47.    The evidence shows that at least the City of Los Angeles and LAUSD use granular

10  decennial census count and characteristic data to create election districts in compliance with these

11  voting rights laws and redistricting principles. Westall Trial Decl. ¶¶ 18-32; Crain Trial Decl.

12  ¶¶ 7-10.

13      48.    However, the degraded census data quality resulting from the citizenship question

14  will cause many of their residents to be counted in the wrong place and assigned the wrong racial

15  and ethnic characteristics. PFOF § V(A)(3). As a result, the citizenship question will injure

16  Plaintiffs' ability to draw election districts equitably and in compliance with applicable voting

17  rights laws.

18      49.    Second, the lower quality and inaccurate census data that results from the

19  citizenship question will impair local government Plaintiffs' ability to equitably and properly

20  allocate resources and to engage in civic planning and problem-solving efforts.

21      50.    For example, the City of Los Angeles relies on census data at all levels of

22  granularity to determine the needs of each City neighborhood and to efficiently and equitably

23  allocate City resources and services. Westall Trial Decl. ¶¶ 33-36. The City also relies on census

24  data for urban planning and development purposes. *Id.* ¶ 37. The inaccuracies caused by adding

25  the citizenship question will impair these efforts and lead to a misallocation of City resources. *Id.*

26  ¶¶ 33-37.

27      51.    Similarly, Plaintiff County of Los Angeles relies on data that is only provided by

28  the decennial census to identify housing needs of unincorporated communities and to ensure safe,

1   sanitary, and affordable housing for County residents.  Bodek Trial Decl. ¶¶ 6-15.  The County

2   relies on granular block-level census data on population count, age, race, employment, housing

3   characteristics, and "special needs."  *Id.*  The County can act to preempt and remedy housing

4   issues—such as overcrowding or homelessness—if and only if it has accurate block-level census

5   data. *Id.*  Accurate census data is also crucial for the County's assessment of and planning for

6   future growth. *Id.* ¶¶ 17-21.  The citizenship question, and its concomitant harm to data quality,

7   will disrupt those crucial efforts.

8        52.    The inaccuracies in the census data caused by the citizenship question will also

9   result in the misallocation of resources to the County's residents and agencies.  *Id.* ¶ 21.

10       53.     Accordingly, the local government Plaintiffs have a strong interest in using

11  accurate, granular census data to properly and equitably allocate resources throughout their

12  jurisdictions, to ensure that the needs of their communities are being met, and to preempt and

13  remedy civic issues. The degradation of data quality caused by the citizenship question will

14  impinge upon those interests.

15       54.    For these reasons, Defendants' decision to add a citizenship question, and the

16  resulting degradation of data quality, harms local government Plaintiffs' interests in using

17  accurate census data, and that harm is sufficient to establish a "certainly impending" injury-in-

18  fact. *See Susan B. Anthony Lists*, 573 U.S. at 158; *Havens Realty*, 455 U.S. at 373-74; *FEC*, 524

19  *U.S.* at 20-21; *Pub. Citizen*, 491 U.S. at 449-51; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

20              **4.    Lost political representation**

21       55.    Plaintiffs have shown that adding a citizenship question to the 2020 Census will

22  cause a differential undercount of the State of California's population relative to other states,

23  creating the substantial and unreasonable risk that California will lose its fair share of political

24  representation in Congress, and by extension, the Electoral College.  PFOF § V(B)(4).

25       56.    A plaintiff's "expected loss of a Representative to the United States Congress

26  undoubtedly satisfies the injury-in-fact requirement of Article III standing."  *Dep't of Commerce*,

27  525 U.S. at 331-332; *Carey*, 637 F.2d 834 at 838 (showing of disproportionate undercount that

28  results in the loss of congressional representation confers standing); *City of New York v. U.S.*

1  *Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989) (likely undercount of subpopulations

2  disproportionately represented in plaintiff states confers standing).

3      57.    Based on Dr. Fraga's calculations, California is at substantial risk of losing at least

4  one congressional seat because of the citizenship question.  PFOF § V(B)(4).  This expected loss

5  of political representation constitutes injury-in-fact sufficient to confer standing.  *Dep't of*

6  *Commerce*, 525 U.S. at 331-332.

7      58.    Such malapportionment of the State of California's congressional representation is

8  a "threat of vote dilution" that "is 'concrete' and 'actual or imminent,' not 'conjectural' or

9  'hypothetical.'"  *Id.* at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

10     59.    The court need not wait until after the census has been taken to find that Plaintiffs

11 have suffered injuries to their right to fair political representation "because such a pause would

12 result in extreme—possibly irremediable—hardship." *Id.*

13     60.    Having shown that the political representation that they will lose because of the

14 citizenship question is an injury that is "certainly impending," and at a minimum, that they face a

15 "substantial risk" of such injury, Plaintiffs have standing on this additional basis.  *See Clapper*,

16 568 U.S. at 414 n.5.

17     **C.    Plaintiffs' Injuries Are Traceable and Redressable**

18     61.    Establishing causation requires that the plaintiff demonstrate that his injury is

19 "fairly traceable to the challenged action of the defendant, and not the result of the independent

20 action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir.

21 2014) (citing *Bennett*, 520 U.S. at 167).

22     62.    "Causation may be found even if there are multiple links in the chain connecting

23 the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the

24 defendant's conduct comprise the last link in the chain." *Id.*

25     63.    The key question is whether the "government's unlawful conduct is at least a

26 substantial factor motivating the third parties' actions."  *Id.* at 1013 (internal citations and

27 quotations omitted).  "So long as the plaintiff can make that showing without relying on

28 speculation or guesswork about the third parties' motivations, she has adequately alleged Article

1    III causation." *Id.* (internal citations and quotations omitted); *see also Barnum Timber Co. v.*

2    *EPA*, 633 F.3d 894, 898-99 (9th Cir. 2011) (causation established by expert opinion about

3    "market reaction" to government conduct); *cf. In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 n.6

4    (9th Cir. 2018) (injury related to data breach fairly traceable to retailer, even though third party

5    hackers stole data).

6         64.    Plaintiffs have established that there will be a drop in self-response to the 2020

7    Census that is fairly traceable to the addition of the citizenship question.  *See* PFOF V(A)(1).

8         65.    That non-responders have a legal duty to respond to the census does not alter this

9    conclusion because the citizenship question is a "substantial factor" contributing to the

10   nonresponse.  *Mendia*, 768 F.3d at 1013.  Plaintiffs will be injured by the citizenship question's

11   "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 169.  No speculation or

12   guesswork is required to follow the chain of causation here; the Bureau and its top officials have

13   concretely affirmed the predictable impact of adding a citizenship question to the 2020 Census.

14   The harms Plaintiffs will suffer inevitably follow from the disproportionate undercount of

15   particular demographic groups that the Secretary's unlawful decision makes certainly imminent.

16   These harms are fairly traceable to that decision.

17        66.    To meet the redressability requirement, Plaintiffs must show that it is likely that a

18   favorable decision will redress their injuries.  *Lujan*, 504 U.S. at 561.

19        67.    A favorable decision vacating or enjoining the decision to add a citizenship

20   question to the 2020 Census would redress Plaintiffs' injuries by diminishing the funds that

21   would need to be expended on census outreach, by preventing harm to the accuracy of

22   demographic data used by Plaintiffs to make decisions related to redistricting and services, and by

23   ensuring that Plaintiffs do not lose federal funding and political representation because of the

24   citizenship question.

25        68.    Given that Plaintiffs have shown that their injuries are fairly traceable to

26   Defendants' decision to add a citizenship question to the 2020 Census and would be redressed by

27   an order vacating or enjoining that decision, Plaintiffs have met their burden to show standing.

28

**III.    THE DISPUTE IS RIPE FOR ADJUDICATION**

69.    Defendants argued in *State of N.Y. v. U.S. Dep't of Com.* that those plaintiffs' claims should be dismissed for lack of ripeness.

70.    In this case, however, Defendants did not preserve that argument, having failed to assert the defense in their Answer to the First Amended Complaint, ECF No. 80, in the Joint Pretrial Statement and Order, ECF No. 144, or in their pretrial Proposed Findings of Fact and Conclusions of Law, ECF No. 137.

71.    In any event, any such belated argument certainly fails here, most notably due to Defendants' recent filings in the Supreme Court related to their appeal of the decision in *State of N.Y. v. U.S. Dep't of Com.*—a petition for writ of certiorari before judgment and a motion for expedited consideration of that petition.  *See* Petition for Writ of Certiorari Before Judgment, Department of Commerce v. New York No. 18-966 (U.S. Jan. 25, 2019); Motion for Expedited Consideration of the Petition for Writ of Certiorari Before Judgment and for Expedited Merits Briefing and Oral Argument in the Event that the Court Grants the Petition, Department of Commerce v. New York No. 18-966 (U.S. Jan. 25, 2019).  In the petition and motion, Defendants seek expedited briefing and an expedited decision on the appeal so that the Census Bureau will be able to finalize and print the 2020 Census questionnaire in June of this year.

72.    The determination of ripeness requires the Court to evaluate: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Assn. v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

73.    In light of Defendants' representations to the Supreme Court, it is clear that the issues in this case are fit for judicial decision and that any delay would cause hardship to the parties.

**IV.    DEFENDANTS' DECISION TO ADD A CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE ENUMERATION CLAUSE OF THE CONSTITUTION**

74.    The United States Constitution requires that all persons in each state be counted every ten years.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2.

13

75.     The Constitution mandates the "actual Enumeration" of the population for the purpose of apportioning congressional representatives among the states.  U.S. Const. art. I, § 2, cl. 3.

76.     For this foundational step in our country's democratic process, the Constitution recognizes no exception based on citizenship status.  It is long settled that *all* persons residing in the United States—citizens and noncitizens alike—must be counted to fulfill the Constitution's "actual Enumeration" mandate.  *Id.*; *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).

77.     Congress has delegated the duty of taking the census to the Secretary of Commerce.  Under 13 U.S.C. § 141(a), "[t]he Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year."  The Secretary has authority to conduct the census "in such form and content as he may determine . . . ."  *Id.*  Likewise, the Bureau Director "is necessarily invested with discretion in matters of form and procedure when these are not specifically provided for by law . . . ."  *U.S. ex rel. City of Atlanta, Ga. v. Steuart*, 47 F.2d 979, 982 (D.C. Cir. 1931).

78.     Defendants' discretion with respect to the census questionnaire is not unfettered and is subject to congressional oversight.  Three years before the census, the Secretary must submit to Congress a report proposing the subjects to be included in the census.  13 U.S.C. § 141(f)(1).  Two years before the census, the Secretary must submit to Congress the specific questions to be included in the census.  13 U.S.C. § 141(f)(2).  The Secretary may only later modify the subjects or questions if he submits a report to Congress and "new circumstances exist which necessitate" the modification.  13 U.S.C. § 141(f)(3).

79.     Congress and the states use census data for many purposes, including for allocating federal funding.  *City of Los Angeles v. U.S. Dept. of Commerce*, 307 F.3d 859, 864 (9th Cir. 2002); *Wisconsin*, 517 U.S. at 5-6; *see also* PFOF § V(B)(2).  But the only constitutional purpose of the census is to apportion congressional representatives based on the "actual Enumeration" of the population of each state.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2; *see also Franklin v. Massachusetts*, 505 U.S. 788, 807 (1992) (reasoning that Secretary of

14

1  Commerce's decision to include overseas federal employees in the apportionment count did not

2  violate Enumeration Clause because the decision "does not hamper the underlying constitutional

3  goal of equal representation"); *see also Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J.,

4  concurring in part and dissenting in part) (observing that "[d]ebate about apportionment and the

5  census . . . focused for the most part on creating a standard that would limit political chicanery").

6       80.    The Census Bureau is not constitutionally required to perform an absolutely

7  accurate count of the population.  *Wisconsin*, 517 U.S. at 6.

8       81.    Nevertheless, there is still a "strong constitutional interest in accuracy" of the

9  census.  *Evans*, 536 U.S. at 478.

10       82.    The most important type of accuracy and that which most directly implicates the

11  constitutional purpose of the census is distributive accuracy, as opposed to numerical accuracy.

12  *Wisconsin*, 517 U.S. at 20.  Numerical accuracy refers to the accuracy of the overall count,

13  whereas distributive accuracy refers to the accuracy of the proportions in which residents are

14  counted in their proper locations.  *See id.* at 11 n.6.

15       83.    To promote distributive accuracy, the Enumeration Clause requires the Secretary's

16  actions to bear "a reasonable relationship to the accomplishment of an actual enumeration of the

17  population, keeping in mind the constitutional purpose of the census," which is to determine the

18  apportionment of the Representatives among the States.  *Id.* at 20.

19       84.    The evidence here shows that the Secretary's decision to add a citizenship question

20  was unreasonable in light of that constitutional purpose.

21       85.    Plaintiffs' evidence shows that the citizenship question significantly impairs the

22  distributive accuracy of the census because it will uniquely and substantially impact specific

23  demographic groups.  Specifically, the citizenship question will cause an undercount of

24  immigrants and Latinos and, by extension, localities where many such residents live.

25       86.    There are several factors at play that make the citizenship question "unreasonable"

26  in light of this effect on the constitutional requirement of distributive accuracy.

27       87.    First, the citizenship question has created an unreasonable risk that California will

28  lose a seat in the House of Representatives.  Dr. Barreto's survey results, the Census Bureau's

15

1  nonresponse analysis, and Dr. Fraga's calculations show that the state is at risk of losing one to

2  three congressional seats, and that it is the only state with such a high risk under a range of

3  undercount scenarios.  *See* PFOF § V(B)(4).

4         88.    Second, there is no countervailing legitimate government interest to justify the

5  citizenship question.  The evidence shows that ACS data is sufficient for Voting Rights Act

6  enforcement (*see* PFOF §§ III(C), III(I), IV(C)); there is no justification for impairing the census'

7  distributive accuracy.

8         89.    Third, the citizenship question will cause other harms that flow from distributive

9  inaccuracy, including disproportionate federal funding and less equitable local government

10 redistricting, planning and funding allocations.  *See* PFOF §§ V(B)(2), (3).

11        90.    The finding that adding a citizenship question is unconstitutional here does not

12 automatically render all demographic questions on the census unconstitutional.  There is no

13 evidence that any other demographic question results in *distributive* inaccuracy by causing only

14 certain unevenly distributed subpopulations not to respond.

15        91.    Relatedly, there is no evidence regarding whether the citizenship question affected

16 the distributive accuracy of any previous census in which it was included.  The relevant

17 consideration here is that the citizenship question will uniquely diminish the distributive accuracy

18 of the 2020 Census.

19        92.    Thus, adding a citizenship question to the 2020 Census cannot be said to bear a

20 "reasonable relationship to the accomplishment of an actual enumeration of the population."

21 *Wisconsin*, 517 U.S. at 20.  Secretary Ross's decision thus violates the "actual Enumeration"

22 clause of the Constitution.

23 **V.    BASED ON THE ADMINISTRATIVE RECORD ALONE, DEFENDANTS' DECISION TO ADD**
        **A CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE APA**
24
        **A.    The Scope of Judicial Review**
25
26        93.    "A person suffering legal wrong because of agency action . . . is entitled to judicial

27 review thereof."  5 U.S.C. § 702.

28

                                    16

94.     Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A)-(D).

95.     The APA requires this Court to conduct "plenary review of the Secretary's decision . . . to be based on the full Administrative Record that was before the Secretary at the time he made his decision."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706.

96.     The Supreme Court has made clear that this Court's review is to be "thorough, probing, [and] in-depth."  *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching and careful" review).

97.     Rigorous judicial review under the APA was intended to maintain the balance of power between the branches of government:  "[I]t would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the [APA] warrant, to give effect to its remedial purposes."  *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in the judgment) (in enacting the APA "Congress confined agencies' discretion and subjected their decisions to judicial review").

98.     The parties agree that, for the APA claim, the Court may consider at least the designated Administrative Record.

**B.     The Decision Violates the APA as Contrary to Law**

99.     An agency decision violates the APA when it is contrary to law.  5 U.S.C. § 706(2)(A); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1163 (9th Cir. 2004).

100.    Based on the Administrative Record alone, the decision to add the citizenship question violates the APA as contrary to law.

17

### 1.   The decision is contrary to 13 U.S.C. § 6(c)

101.    Section 6(c) of the Census Act required the Secretary to use administrative records to address DOJ's data request rather than adding a citizenship question on the census.

102.    Although Congress delegated to the Secretary a degree of discretion in conducting the census, section 6(c), among other provisions, limits that discretion.

103.    Title 13, section 6 states in full:

(a) The Secretary, whenever he considers it advisable, may call upon any other department, agency, or establishment of the Federal Government, or of the government of the District of Columbia, for information pertinent to the work provided for in this title.

(b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies, such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title.

(c) To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries.

13 U.S.C. § 6.

104.    Subdivision (c) of section 6 was added to the statute in the 1976 Census Act.  *See* 1976 Census Act § 5(a), 90 Stat. at 2460.  So while the statute previously merely authorized the use of government records for census-related purposes, the amendment made the use of those records a mandatory alternative to "direct inquiries" in certain circumstances.

105.    This particular limitation on the Secretary's discretion was consistent with the purpose of the 1976 Census Act to "constrain[] the Secretary's authority" and to "address[] concerns that the [Census] Bureau was requiring the citizenry to answer too many questions in the decennial census."  Brief for Respondents at 37 n.50, 40; *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (No. 98-404), 1998 WL 767637.

106.    In other words, subdivision (c) of section 6 serves "the dual interests of economizing and reducing respondent burden."  H.R. CONF. REP. No. 94-1719, at 10 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5476, 5478; *see also* Brief for Petitioners at 12 n.9; *Baldrige v. Shapiro,* 455 U.S. 345 (1982) (No. 80-1436), 1981 WL 389922 (brief filed on behalf of the

1  Secretary of Commerce and Acting Director of the Census Bureau, noting the requirements of

2  6(c) and its legislative history).

3       107.    The Administrative Record here demonstrates that it was "possible" to "acquire

4  and use" administrative records from other government agencies that would produce data

5  "consistent with the kind, timeliness, quality and scope of the statistics required."  13 U.S.C.

6  § 6(c).

7       108.    The "kind" of data here would be the same regardless of whether it is gathered by

8  administrative records or a census question—in both cases, the relevant data is simply block-level

9  data on citizens versus noncitizens.

10      109.    The Census Bureau advised Secretary Ross in the March Memo that regardless of

11 whether administrative data or a citizenship question were used, there was no difference in timing

12 on when the citizenship data would be available.  PTX-133 at 11.   There is no evidence in the

13 Administrative Record indicating that it would take longer to provide citizenship data using

14 administrative records than a citizenship question.

15      110.    The Census Bureau repeatedly advised Secretary Ross that the quality of the

16 citizenship data would be higher from administrative records than a citizenship question, due to

17 noncitizens' propensity to report as citizens.  *See* PFOF §§ III(D), (E).

18      111.    The scope of the data would be the same, regardless of source, because data would

19 be obtained for residents of the entire country (with a minority requiring imputation, regardless of

20 the data source).  *See* PFOF § III(E)(7).

21      112.    Thus, under every criterion set forth in section 6(c), with no evidence in the record

22 to the contrary, using administrative records alone was superior to adding a citizenship question

23 to the decennial census.

24      113.    Secretary Ross was therefore legally required to obtain citizenship data through

25 administrative records rather than a citizenship question on the census.  His decision to do

26 otherwise violates the APA as contrary to law.

27

28

**2. The decision is contrary to 13 U.S.C. § 141(f)(3)**

114.   Adding a citizenship question to the 2020 Census is contrary to law because

Secretary Ross failed to file the report to Congress mandated by 13 U.S.C. § 141(f)(3).

115.   Section 141(f) provides:

(f) With respect to each decennial and mid-decade census conducted under subsection (a) or (d) of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census—

> (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;

> (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and

> (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C.A. § 141(f).

116.   Secretary Ross submitted his section 141(f)(1) report in March of 2017.  PTX-264.

That report did not include the subject of citizenship.  *Id.*; Undisputed Facts ¶ 126.

117.   Secretary Ross submitted his section 141(f)(2) report in March of 2018.[1]

Consistent with his Decision Memo, that report states that a citizenship question will be included

on the 2020 Census.

---

[1] Plaintiffs request that the Court take judicial notice of the report, Questions Planned for the 2020 Census and American Community Survey, available at https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.  Fed. R. Evid. 201; *see also United States Small Business Admin. v. Bensal*, 853 F.3d 992, 1003 & n. 3 (9th Cir. 2017) (courts may take judicial notice of information made publicly available by government entities); Fed. R. Evid. 902(5) (publications of public authorities are self-authenticating).

118.   Despite the new subject matter in the section 141(f)(2) report, Secretary Ross has not submitted a report pursuant to subdivision (f)(3).[2]  *See* 13 U.S.C. § 141(f)(3).

119.   Such a report is required by section 141(f)(3) as a substantive limitation on the Secretary's ability to modify the census.  Any other reading would render the "new circumstances" clause superfluous and undermine the purpose of the statute.  Otherwise, Defendants could overhaul the census questionnaire the day before the census begins even if there were no new circumstances justifying this change.

120.   Defendants argue that only Congress can enforce section 141(f) because courts cannot redress any injury resulting from an inadequate report.

121.   However, the APA "creates a basic presumption of judicial review for one suffering legal wrong because of agency action."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S.Ct. 361, 270 (2018).

122.   The cases cited by Defendants to attempt to rebut that presumption do not apply here.  In both *Guerrero* and *Renee*, the plaintiffs challenged the adequacy of the *contents* of the report that had been submitted to Congress.  *Guerrero v. Clinton*, 157 F.3d 1190, 1191 (1998); *Renee v. Duncan*, 686 F.3d 1002, 1016 (9th Cir. 2012).  The Ninth Circuit held in both cases that the court could not police the quality of those reports for the particular reason that the reports were "purely informational" and no legal consequences flowed and no rights were affected by the reports.  *Guerrero*, 157 F.3d at 1194-1195; *Renee*, 686 F.3d at 1016-17.

123.   The situation here is distinguishable from *Guerrero* and *Renee*.  First, Plaintiffs here do not challenge the adequacy of the content of Secretary Ross's report, but rather his complete failure to submit a subdivision (f)(3) report at all, as required by law.  Second, unlike in *Guerrero* and *Renee*, the report here does have legal consequences.  Because the report is a substantive requirement that must be fulfilled before a citizenship question is included on the census, Secretary Ross's failure to submit the report legally prohibits him from adding the

---

[2] Plaintiffs request that the Court take judicial notice of the fact that Secretary Ross has not submitted a report to Congress separate and apart from the subdivision (f)(2) report and specifically pursuant to subdivision (f)(3).  This fact is not subject to reasonable dispute and has been conceded by Defendants.  *See* Fed. R. Evid. 201; *see also* ECF No. 137 (Defendants' Proposed Findings of Fact and Conclusions of Law) at 41-42.

1    question.  This Court can therefore redress Plaintiffs' injuries by enjoining the addition of the

2    citizenship question.

3         124.    Defendants also contend that only Congress can enforce section 141(f).  They

4    argue that the (f)(3) report is not the type of "final agency action" reviewable by the APA because

5    it does not determine rights that trigger legal consequences.  However, the final agency action at

6    issue in this action is not, *per se*, the Secretary's submission or non-submission of a report.  The

7    action at issue is the Secretary's decision to add the citizenship question and whether that action

8    comports with the law, including all congressional reporting prerequisites.

9         125.    The decision to add the citizenship question without submitting a report to

10   Congress under section 141(f)(3) therefore violated the APA as contrary to section 141(f)(3).

11        **C.    The Decision Violates the APA Because Its Justification Was Pretextual**

12        126.    The APA requires an agency decision-maker to "disclose the basis of its" decision

13   to "give clear indication that it has exercised the discretion with which Congress has empowered

14   it."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *accord Federal*

15   *Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 396 (1974).

16        127.    Where the agency decision-maker fails to disclose the substance of relevant

17   information that has been presented to it, the court "must treat the agency's justifications as a

18   fictional account of the actual decisionmaking process and must perforce find its actions

19   arbitrary."  *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54-55 (D.C. Cir. 1977); *see also U.S.*

20   *Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 534-535 (D.C. Cir. 1978) (basis of

21   agency's decision must be disclosed at the very latest in the final decision to permit meaningful

22   judicial review).

23        128.    Secretary Ross violated the APA by failing to disclose the basis for his decision to

24   add a citizenship question to the 2020 Census.

25        129.    As explained in the Findings of Fact, the evidence overwhelmingly shows that

26   Secretary Ross decided to add the citizenship question well before DOJ made the request in

27   December of 2017 and that his reason for doing so was not to improve enforcement of section 2

28   of the VRA.  PFOF § III(K).  That purported purpose was a mere pretext.

130.    Secretary Ross did not disclose any purpose for adding the citizenship question other than section 2 enforcement.  *See* PTX-26.

131.    The evidence strongly indicates that at least one of Secretary Ross's true purposes was to take a step toward excluding noncitizens from the census's apportionment count.  PFOF § III(K).  However, it is unnecessary to definitively ascertain his true purpose.  For the purposes of the APA, it is relevant only that section 2 enforcement did not form the basis of Secretary Ross's decision and that he disclosed no other basis.

132.    Secretary Ross has therefore violated the APA for failing to disclose the actual basis of his decision to add a citizenship question to the 2020 Census.

### D.    The Decision Was Arbitrary and Capricious Because Defendants Failed to Consider "An Important Aspect of the Problem"

133.    Agency action should be set aside as arbitrary and capricious if the agency fails "to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential harms of its changes to an airport advertising program); *Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare" (emphasis in original)).

#### 1.    Defendants failed to consider whether the citizenship question would cause an undercount that would harm Plaintiffs

134.    The Decision Memo states that "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond."  PTX-26 at 7.  But Secretary Ross failed to consider the full range of harms that will befall Plaintiffs if a citizenship question is added to the 2020 Census—harms that outweigh DOJ's purported need for citizenship data.

23

135.     The sole constitutional purpose of the census is congressional apportionment.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2; Pub. L. 105-109, § 209(a)(2).  In addition, decennial census data is used to determine the number of electoral votes each state has in the Electoral College; congressional, state, and local legislative district boundaries; and the allocation of hundreds of billions of dollars in public funding each year.  Undisputed Facts ¶¶ 50-52.  If, as Plaintiffs have shown, the 2020 Census undercounts Californians and other plaintiff jurisdictions, Plaintiffs will be denied their just representation and funding allocations.  *See* PFOF §§ V(2), (4).

136.     The Decision Memo does not consider any of these harms.  *See* PTX-26.  Indeed, there is no analysis in the Administrative Record of whether a decline in self-response rates would ultimately lead to an undercount that would affect congressional apportionment or federal funding.  *See, e.g.*, PTX-22, PTX-25, PTX-26, PTX-101, PTX-133, PTX-148.

137.     These harms—particularly the potential that the State of California could lose a congressional seat—are an "important aspect of the problem" that Secretary Ross failed to consider before adding a citizenship question to the 2020 Census.  *See State Farm*, 463 U.S. at 43.

### 2.     Defendants failed to consider key legal obligations

138.     The decision is also arbitrary and capricious under the Administrative Record because the Secretary Ross failed to consider his statutory obligations under 13 U.S.C. sections 6(c) and 141(f)(3).

139.     As explained above, section 6(c) requires the Secretary in certain circumstances to use data from other government agencies "instead of conducting direct inquiries."  13 U.S.C. § 6(c).  The Secretary "*shall*" adhere to these terms "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required."  *Id.* (emphasis added).

140.     As explained above, section 141(f)(3) required the Secretary to submit a report to Congress upon his decision to modify the subjects of the Census based on findings that new circumstances necessitated the modification.  13 U.S.C. § 141(f)(3).

1        141.    The Decision Memo does not address Secretary Ross's legal obligations under

2   either section 6(c) or section 141(f)(3).  PTX-26.

3        142.    No other evidence in the Administrative Record indicates that Defendants

4   considered Secretary Ross's legal obligations under section 6(c) or section 141(f)(3) during their

5   decision-making process.  *See* PFOF § III(J).

6        143.    The Administrative Record contains only one bare mention of the Secretary's

7   obligations more generally under 13 U.S.C. § 141(f).  *Id.*  It appears in the email between

8   Secretary Ross, Mr. Neuman, and Mr. Comstock, in which Secretary Ross expresses frustration

9   about the Census Bureau's stance on adding new questions after March of 2017, and Mr. Neuman

10  assures Secretary Ross that there would be another opportunity to report new questions in the

11  following year.  PTX-88.

12       144.    Mr. Neuman's advice was clearly contrary to section 141(f), which distinguishes

13  "subjects" from "questions," and provides additional requirements if questions are added that

14  were not among the reported subjects.  13 U.S.C. § 141(f).

15       145.    There is no communication or other mention in the Administrative Record about

16  the requirement in subdivision (f)(3) that Ross find the existence of "new circumstances" that

17  necessitate adding citizenship status to the census subjects.  PFOF § III(J).  There is no

18  communication or other mention in the Administrative Record about Secretary Ross's statutory

19  obligation to submit a report to Congress regarding that determination.  *Id.*

20       146.    Given the contents of the Administrative Record, Defendants failed to consider the

21  Secretary's legal obligations under 13 U.S.C. sections 6(c) and 141(f)(3).

22       147.    Defendants' complete failure to address these binding statutory mandates renders

23  the decision arbitrary and capricious.  *League of Women Voters v. Newby*, 838 F.3d 1, 10-12

24  (D.C. Cir. 2016) (disregard for statutory criterion renders agency decision arbitrary under the

25  APA).

26

27

28

3. **Defendants failed to independently consider whether existing ACS CVAP data is sufficient for enforcement of section 2 of the Voting Rights Act**

148.    Defendants also failed to consider whether it was necessary to act on DOJ's request as articulated in the December 12 Letter, in the first place, or whether existing ACS CVAP data is sufficient for section 2 enforcement.

149.    Secretary Ross's Decision Memo states that his decision was based on DOJ's request to add a citizenship question.  But the Census Act delegates the authority to obtain "other census information" to the Secretary of Commerce, not DOJ, and authorizes the collection of such information (subject to other statutory limitations) only "as necessary."  13 U.S.C. § 141(a).

150.    Under the APA, "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."  *City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987) (citations and internal quotations omitted); *Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d 1, 16 (D.C. Cir. 2015) ("[a]dministrative law does not permit" an agency "to excuse its inadequate responses by passing the entire issue off onto a different agency").

151.    The Administrative Record shows that Defendants failed to independently evaluate whether existing ACS CVAP data is sufficient, or whether block-level data is really necessary for section 2 enforcement.  *See* PFOF § III(I).

152.    The December 12 Letter certainly does not establish on its face that census-derived block-level CVAP data are necessary to enforce section 2 of the VRA.  PTX-32; PFOF §§ (III)(C), (K).

153.    The December 12 Letter does not state that such data is "necessary" to enforce the VRA; rather, it studiously avoids using the word "necessary" to describe the request for the data.  PTX-32.

154.    The December 12 Letter identifies no section 2 cases that a plaintiff failed to bring due to insufficient CVAP data from the ACS.  PTX-32; PFOF § (III)(C).

155.    The December 12 Letter identifies no filed section 2 cases that failed due to insufficient CVAP data from the ACS.  PTX-32; PFOF § (III)(C).

26

156.     The cases cited in the December 12 Letter—the only legal support offered in the Administrative Record for the proposition that hard-count CVAP data is important to the enforcing section 2 of the VRA—in no way support the contention that having hard-count citizenship data matters for section 2 enforcement purposes.  PTX-32 (citing *LULAC v. Perry*, 548 U.S. 399, 423-42 (2006) (discussing the district court's factual findings based on then-existing CVAP data and finding in favor of plaintiffs' vote dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (plaintiffs failed to satisfy first *Gingles* precondition using a district-level count of Spanish surnames—not ACS data—in combination with an independent expert's flawed calculation of additional Hispanic voters omitted from the surname data); *Barnett v. City of Chicago*, 141 F.3d 699, 702-05 (7th Cir. 1998) (finding that CVAP data were "the basis for determining equality of voting power that best comports with the policy of the [VRA]" and affirming judgment in favor of Hispanic plaintiffs); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569-70 (11th Cir. 1997) (rejecting challenge to accuracy of citizenship data from the long-form sample survey, finding it to be "reasonably accurate" and in accordance with "a long-standing statistical technique"); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (rejecting a vote dilution claim based on total population data, where plaintiffs conceded that they would lose if CVAP data were considered instead)).

157.     Similarly, no outside stakeholder communications provide any in-depth analysis that establishes the necessity of block-level CVAP data for section 2 enforcement.  *See* PTX 1 at AR 762-1276.

158.     The failure of Defendants to independently evaluate the merits of DOJ's request renders that decision invalid under the APA.  *Kuang v. U.S. Dep't of Defense*, No. 18-cv-3698-JST, 2018 WL 6025611, at *31 (N.D. Cal. Nov. 16, 2018) ("DoD has simply provided no explanation for how the 2017 Study's findings support its policy choice, and 'where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## E.     The Decision Was Arbitrary and Capricious Because It Ran Counter to the Evidence

159.    An agency action is also arbitrary and capricious under the APA if the agency offers an "an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

### 1.     The decision was counter to the evidence that using administrative data alone would yield more accurate and complete citizenship data than adding a citizenship question to the census

160.    The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 37 (quoting *Burlington Truck Lines*, 371 U.S. at 168.

161.    Where a decision-maker adopts a "plainly inferior" course of action, that decision is arbitrary and capricious. *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003); *see also Beno v. Shalala*, 30 F.3d 1057, 1073-74 (9th Cir. 1994).

162.    Defendants' decision to add the citizenship question to the 2020 Census is contrary to the evidence.

163.    Defendants' decision is predicated on the assertion in the Decision Memo that adding a citizenship question on the 2020 Census will result in the "most complete and accurate" citizenship data for DOJ's stated purpose of VRA enforcement.  PTX 26 at 1 ("The Department and Census Bureau's review of the DOJ request—as with all significant Census assessments— prioritized the goal of obtaining *complete and accurate data*" (emphasis in original); *see also id.* at 5 ("It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request"), 7 ("[h]owever, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns"), 8 ("To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 Decennial Census is necessary to provide complete and accurate data in response to the DOJ request.").

28

164.     In light of this stated goal, Defendants' decision to add a citizenship question to the 2020 Census plainly runs counter to the evidence in the Administrative Record that shows that adding a citizenship question will result in citizenship data that is *less* accurate and no more complete than citizenship data that would be gathered through administrative records alone (Alternative C).

165.     This was the conclusion of every scientific analysis in the Administrative Record that addressed the issue, and this conclusion was repeatedly communicated to Secretary Ross. *See, e.g.*, PTX-22 at 1 (January 19 Memo) (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources"); PTX-25 at 5 (March 1 Memo) ("Alternative D would result in poorer quality citizenship data than Alternative C.").

166.     The Census Bureau's analyses offered several explanations for the difference in accuracy between a census response and administrative record data.

167.     First, the citizenship data in administrative records is "very accurate" because that data point requires people to have provided proof of citizenship or legal resident alien status. PTX-101 at 3; PTX-22 at 7.

168.     Second, citizenship data that is self-reported in surveys is inaccurate for non-citizens.  Historical census and ACS data show that noncitizens misreport themselves as citizens "for no less than 23.8% of the cases, and often more than 30%."  PTX-22 at 7.

169.     Third, the Census Bureau found that lowered self-response rates due to the citizenship question will decrease the number of people who can be linked to administrative records, because the personal-identifying information (PII) gathered in NRFU is lower quality than PII gathered through self-response.  PTX-22 at 2; PTX-25 at 4.

170.     Fourth, imputation will be less accurate if based in part on self-reported citizenship data rather than administrative records alone.  Because many noncitizens inaccurately report that they are citizens, the imputation model will be biased under Option D.   In contrast, the imputation model under Alternative C would be benchmarked to accurate administrative records and therefore would not suffer from this bias.  PTX-24 at 13.

29

171.     Notably, there is no evidence in the Administrative Record supporting Secretary Ross's assertion that self-reported citizenship data is more accurate than citizenship data from administrative records.

172.     Thus, all of the evidence shows that citizenship information gathered through a citizenship question on the Census (Option D) will be *less* accurate than citizenship information gathered through administrative records (Alternative C).

173.     All of the evidence in the Administrative Record also shows that Option D will not yield more "complete" data than Alternative C.

174.     Secretary Ross implies in the Decision Memo that citizenship data from administrative records would be incomplete because using administrative records alone would require imputation of citizenship status for 10 percent of the population, whereas a citizenship question on the 2020 Census "may eliminate the need for the Census Bureau to have to impute an answer for millions of people." PTX-26 at 4, 5.

175.     In fact, the Census Bureau estimates that under both alternatives millions of people would need their citizenship status imputed and the total number of people assigned a citizenship status would be approximately the same (330 million). PTX-24 at 1-4.

176.     In sum, all of the evidence in the Administrative Record shows that adding a citizenship question to the 2020 Census would yield citizenship data that is *less* accurate and no more complete than gathering that data using administrative records alone.

177.     The decision to add the citizenship question was therefore arbitrary and capricious as contrary to the evidence and violates the APA.

     **2.**    **The decision was counter to the evidence because the Decision Memo was rife with flawed assertions that were not based on any evidence or were counter to the evidence in the record**

178.     The decision was also counter to the evidence because it was replete with flawed assertions that are either not based on any evidence or contrary to the evidence in the Administrative Record.

30

179.     First, the Decision Memo repeatedly claimed that there was no evidence that the citizenship question would cause a drop in self response, and that "no one has identified any mechanism for doing so." PTX-26 at 3, 4, 5; *see also* PFOF § III(J).

180.     This assertion is contrary to the evidence in the Administrative Record.  The Census Bureau performed a scientific analysis leading to an estimate that 5.1 percent of households with at least one noncitizen would not respond to the census due to the citizenship question. *See* PFOF III(E).  The Bureau repeatedly communicated that estimate to Secretary Ross. *Id.*  Nothing in the Administrative Record supports a contrary conclusion.

181.     Second, the Decision Memo states that asking the citizenship question of all people "may eliminate the need for the Census Bureau to have to impute an answer for millions of people." PTX-26 at 5.  However, the Census Bureau had estimated that with a citizenship question on the census, it would still have to impute the citizenship data of 13.8 million people. PTX 24 at 2.  Nothing in the Administrative Record supports a contrary conclusion.

182.     Third, the Decision Memo states that Option D "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," PTX-26 at 4, so as to allow for "more complete" citizenship data.  However, the Administrative Record reflects that because adding a citizenship question would drive down the self-response rate and put more households into NRFU operations, Option D actually *reduces* the Census Bureau's ability to match survey responses with administrative records.  PTX-25 at 4.

183.     Fourth, the Decision Memo also attempts to justify Option D by stating that adding the citizenship question to the census "will permit the Census Bureau to determine the inaccurate response rate" of citizenship, and suggests that this would improve the accuracy of the imputation model. PTX-26 at 5.  However, nowhere in the Administrative Record, including in the Abowd memoranda, does the Census Bureau state that adding a citizenship question would increase the accuracy of its estimate of inaccurate citizenship responses.  *See* PTX-22, PTX-24, PTX-25, PTX-101, PTX-148.  Nor is it apparent from the Administrative Record why the inaccuracy rate of responders would help impute the citizenship data of non-responders.  If actual citizenship is

1   benchmarked to administrative records, and the Bureau would be using those records in any

2   event, then adding a census question would not assist in the imputation.

3   184.   Defendants' decision is arbitrary and capricious because these key statements in

4   the Decision Memo, purportedly justifying the choice of "Option D," were counter to the

5   evidence.

6   **VI.   EXTRA-RECORD EVIDENCE CONFIRMS THAT DEFENDANTS' DECISION TO ADD A**
   **CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE APA**

7

8   **A.   Applicable Exceptions to the Rule of Record Review**

9   185.   In evaluating an APA claim, courts "typically" limit their review to the

10  Administrative Record existing at the time of the decision. *Southwest Center for Biological*

    *Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1459 (9th Cir. 1996); *accord Ranchers*

11

12  *Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108,

    1117 (9th Cir. 2007).

13

14  186.   "Under limited circumstances, however, extra-record evidence can be admitted

15  and considered." *Ranchers Cattlemen*, 499 F.3d at 1117.  These exceptions include:  (1) when

    plaintiffs make a showing of agency bad faith, and (2) when the agency failed to consider "all

16
    relevant factors" of the decision.  *Id.*
17

18          **1.   The Court may consider extra-record evidence relevant to Plaintiffs'**
            **claims that the Secretary's decision was based on pretext**

19  187.   A court may consider extra-record evidence that is relevant to the reason for an

20  agency action where there has been a strong showing of bad faith or improper behavior by the

21  decision-makers.  *Public Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir. 1982); *see also*

22  *Overton Park*, 401 U.S. at 402; *Ranchers Cattlemen*, 499 F.3d at 1117.

23  188.   In such circumstances, consideration of extra-record evidence is "necessary to

24  meaningful judicial review" to understand the agency's actual decision-making process.

25  *Tummino v. Torti*, 603 F. Supp. 2d 519, 543, 544 (E.D.N.Y. 2009).

26  189.   The Administrative Record alone provides ample evidence that Secretary Ross's

27  publicly stated reason for adding the citizenship question—enforcement of section 2 of the

28  VRA—was pretext.  Even if that evidence were to fall short of proving pretext—which it does

32

not—it is certainly sufficient to constitute the requisite "strong showing" of bad faith to look outside the record for further evidence of pretext.

190.     That is particularly true here, where the Administrative Record includes pre-decision communications between Secretary Ross and his "point person" on the citizenship question issue expressing caution about what the Administrative Record would include.  PTX-96, PTX-362.

## 2.     The Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors

191.     This Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors before deciding to add the citizenship question to the 2020 Census.  *See Ranchers Cattlemen*, 499 F.3d 1108 at 1117.

192.     An agency's decision is arbitrary and capricious under the APA if, among other things, the agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 31, 43-44; or made "an irrational departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

193.     To apply these standards, a court must as a threshold matter understand what is "relevant," "important," or "settled policy" in the field where the challenged agency decision was made.  In many cases, the Administrative Record will provide the relevant benchmarks.  But evidence outside the "bare record" may be required to determine "the applicable standard" to apply in evaluating the completeness of the agency's reasoning and in determining whether the agency ignored critical factors or information.  *See Overton Park*, 401 U.S. at 420; *see also Nat'l Audubon Soc. v. U.S. Forest Service,* 46 F.3d 1437, 1447 (9th Cir. 1993); *Am. Wildlands v. Kempthorne*, 530 U.S. 991, 1002 (D.C. Cir. 2008).

194.     "It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."   The court cannot adequately discharge its duty to engage in a "substantial inquiry" if it is required to take the agency's word that it considered all relevant matters.  *Asarco Inc. v. U.S.*

33

*Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also Nat'l Audubon Soc. v. Hoffman*, 132 F.2d 7, 15 (2d Cir. 1997) ("[t]he omission of technical scientific information is often not obvious from the record itself").

195.    In this case, as described below, the decision-making process lacked adequate consideration of several relevant factors.

> **B.    Extra-Record Evidence Confirms that Defendants' Justification for the Decision was Pretextual**

196.    It is not necessary in this action to look outside of the Administrative Record to conclude that Defendants' stated basis for adding the citizenship question—VRA enforcement—is pretextual and that the real basis has not been disclosed.

197.    In any event, extra-record evidence confirms this conclusion.  Much of this evidence is summarized in Post-Trial Findings of Fact Section IV(A).  Several facts are particularly striking.

198.    First, Secretary Ross's senior officials at the Commerce Department all claim to be entirely ignorant of why Secretary Ross wanted the citizenship question on the 2020 Census. Comstock Dep. 112, 251-54; Teramoto Dep. 32; Kelley Dep. 39.  Even Earl Comstock, the Director of Policy in charge of soliciting the DOJ request for the question, claims that he never asked Secretary Ross to explain his reasoning.  Comstock Dep. 171-72.

199.    Second, the evidence indicates that details of the VRA rationale were formulated not by DOJ, but by Commerce Department attorney James Uthmeier.  At Mr. Comstock's request, Mr. Uthmeier initially investigated "how Commerce could add the question to the Census itself."  PTX-370.  On August 11, 2017, Mr. Uthmeier emailed Secretary Ross and Ms. Teramoto a memorandum concerning the addition of a citizenship question to the census.  PTX-147.  That memorandum was not produced to Plaintiffs.  In September of 2017, Mr. Uthmeier reached out to John Gore and, after a phone call, sent Mr. Gore the August 11 memorandum, which Gore relied on in preparing the December 12 Letter.  Gore Dep. 117-18, 123-24.

200.    Third, DOJ's December 12 Letter requesting the citizenship question was drafted and reviewed almost entirely by political appointees, not VRA attorneys.  *See* PFOF § III(A)(2).

34

1    Mr. Gore initially prepared the letter and sent an early draft to Chris Herren, the Chief of the

2    Voting Rights Section, on November 1, requesting feedback and cautioning him not to share its

3    contents.  Gore Dep. at 126, 130.  This was the only involvement by anyone in the Voting Rights

4    Section, as the letter continued to be reviewed and revised by political appointees in the office

5    (including those in the Executive Office) for more a month afterwards.  *Id.*  These facts also

6    suggest the December 12 Letter was drafted and sent for political purposes, not the policy

7    purpose of VRA enforcement.

8           201.    Fourth, DOJ's decision to refuse to meet with the Census Bureau to discuss its

9    request for a citizenship question was both "very unusual" for a requesting agency and directed

10   by Attorney General Sessions himself.  Tr. 1055:5-9 (Abowd); Gore Dep. 271:21-272:13.  That

11   DOJ would choose not to pursue an offered alternative that the Census Bureau believed would

12   better suit DOJ's stated needs is extraordinary—and all the more so given that the Attorney

13   General himself made the decision.  This evidence strongly suggests that VRA enforcement was

14   not the true goal of the DOJ officials who prepared the request.

15        **C.    Extra-Record Evidence Confirms that the Decision was Arbitrary and**
           **Capricious Because Defendants Failed to Consider "An Important Aspect**
16         **of the Problem"**

17          202.    It is also appropriate here to consider extra-record evidence to assess what factors

18   were "important" to the decision and to explain technical terms and complex subject matter

19   related to the census.  *See Ranchers Cattlemen*, 499 F.3d at 1117; *Lands Council v. Powell*, 395

20   F.3d 1019. 1030 (9th Cir. 2005).

21          **1.    Defendants failed to consider the applicable standards that required**
                  **them to pretest the citizenship question**
22
           203.    Defendants failed to consider the applicable agency standards that required them to
23
     pretest the citizenship question before adding it to the census questionnaire.
24
           204.    The Decision Memo states that the citizenship question is "well tested" because it
25
     has been on the ACS since 2005.  PTX-26 at 2.
26
           205.    However, the evidence shows that pretesting the citizenship question was required
27
     by the Census Bureau's Statistical Quality Standards, the Office of Management and Budget's
28

1   (OMB) Standards and Guidelines for Statistical Surveys, as well as the Census Bureau's "well-

2   established process" for testing new questions.  PFOF § IV(B)(1).

3          206.   The Census Bureau's Statistical Quality Standards provide that a question from

4   another survey is exempt from pretesting only if the question "performed adequately in another

5   survey," or if a waiver was obtained through a specified internal process.  PFOF § IV(B)(1)(a).

6          207.   Defendants' decision to add the citizenship question was arbitrary and capricious

7   because they failed to consider whether the citizenship question was "performing adequately" on

8   the ACS for the purposes of pretesting.  PFOF § III(H).  Secretary Ross, in particular, ignores this

9   requirement in the Decision Memo, taking for granted the question's performance because it had

10  supposedly been "well tested."

11         208.   Defendants also did not consider whether a waiver was necessary to add the

12  citizenship question, in light of the fact that the citizenship question was performing inadequately.

13  PFOF § III(H); *see also* PTX-26.

14         209.   The OMB Standards and Guidelines for Statistical Surveys require pretesting of all

15  components of the decennial census to gauge how individual questions perform on their own and

16  in the full context in which those questions appear.  PFOF § IV(B)(1)(b).  Defendants also did not

17  consider this OMB standard.  PFOF § III(H); *see also* PTX-26.

18         210.   Even if the citizenship question were performing "adequately" on the ACS and all

19  other applicable standards had been met, Defendants still should have considered pretesting the

20  citizenship due to the current macro environment and the different operating conditions in which

21  the ACS and the decennial census are conducted.  Habermann Trial Aff. ¶ 68; Tr. 1047:20-23,

22  1050:7-16 (Abowd).  They failed to do so.

23         211.   The decision to add the citizenship question is arbitrary and capricious due to

24  Defendants' failure to consider the applicable agency standards that required them to pretest the

25  citizenship question.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2.      **Defendants failed to consider the governing burden to change a census question**

212.    Defendants failed to consider important aspects of the problem because the Secretary applied an incorrect (and insurmountable) standard for determining when new questions would unreasonably harm the census count or data quality.  The Secretary's decision does not meet the applicable standard for adding new questions to the census.  Defendants bear the burden to demonstrate the need for the question, and to confirm that the change will not cause harm.  *See* Habermann Trial Aff. ¶ 18.

213.    Dr. Habermann has testified that "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public." *Id.*

214.    But the Secretary's decision makes clear that Defendants made no affirmative finding that the citizenship demand would *not* harm the decennial census; instead, the Secretary based his decision on the purported absence of evidence of harm.  *See* PTX-26 at 7 ("[t]he Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."); *see also id.* at 3 ("[N]o empirical data existed on the impact of a citizenship question on responses."); *id.* at 4 ("Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey."); *id.* at 5 ("[T]here is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.").

215.    On the other hand, the Administrative Record is replete with evidence demonstrating that adding the citizenship question to the census would "increase response burden" and "harm the quality of the census count." *See, e.g.* PTX-22 at 1, 5.

37

216.     Even setting aside such evidence, the Secretary's reliance on the purported absence of evidence effectively inverts the relevant burden of proof and introduces unacceptable—and unlawful—risk to the census.  *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1075 (9th Cir. 2018) (agency action was arbitrary and capricious where the agency failed to consider scientific evidence "solely because of 'uncertainty'").

217.     In light of the irreparable impact of adding a citizenship question for the next decade, Secretary Ross's failure to consider and apply the appropriate standard is arbitrary and capricious.  *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

### 3.     Defendants failed to consider and irrationally departed from established practices for conferring with a requesting agency

218.     Defendants irrationally departed from the established Census Bureau policy of meeting with the requesting agency (here, DOJ) to better understand the agency's needs and to plan how to meet those needs.  *See* PFOF IV(A)(2).

219.     A decision is arbitrary and capricious if it involves "an irrational departure from [settled] policy."  *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *accord California Trout v. F.E.R.C*, 572 F.3d 1003, 1023 (9th Cir. 2009).

220.     The Supreme Court explained this rule in *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*:

> A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.

> There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.  From this presumption flows the agency's duty to explain its departure from prior norms…

> Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

412 U.S. 800, 807-808 (1973); *see also Fox Television Stations*, 556 U.S. at 514-515 & n.2 (agency must "provide *some* explanation for a change" (emphasis in original)).

221.     Thus, "an agency may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case."  *N.L.R.B. v. Silver Bay Local Union No.*

38

1    *962, Int'l Bhd. of Pulp, Sulphite & Paper Mill Workers, AFL-CIO*, 498 F.2d 26, 29 (9th Cir.

2    1974); *accord California Trout*, 572 F.3d at 1022.

3        222.    According to both Dr. Jarmin and Plaintiffs' expert and former Census Bureau

4    employee, Dr. Hermann Habermann, meeting with a requesting agency is the "normal Census

5    Bureau procedure" when an agency requests data from the Census Bureau.  Jarmin Dep. 33:1-15,

6    36:14-19; Habermann Trial Aff. ¶¶ 28-29.

7        223.    Dr. Jarmin contacted DOJ several times to attempt to schedule a meeting.  *See*

8    PFOF III(F).  But DOJ refused to meet, claiming that the December 12 Letter adequately

9    explained DOJ's request.  *Id.*  This was despite the fact that Dr. Jarmin's response had advised

10   DOJ of the Census Bureau's conclusion that using administrative records would better suit DOJ's

11   needs for block-level CVAP data than adding a citizenship question to the decennial census.  *Id.*

12       224.    Dr. Jarmin disagreed with this reasoning and believed that a meeting would have

13   been useful to the Census Bureau.  Jarmin Dep. 101:9-20.

14       225.    There is no evidence that, after DOJ refused to meet and before the Decision

15   Memo was issued, the Census Bureau or Commerce Department consulted DOJ about the choice

16   of either adding a citizenship question to the census or using only administrative records to obtain

17   the citizenship data.  PFOF § III(F).

18       226.    The decision to add the citizenship question was a departure from the established

19   Census Bureau policy of meeting with a requesting agency to ascertain its needs.  This departure

20   was irrational.

21       227.    There is no evidence that, before sending the December 12 Letter, DOJ had ever

22   considered the possibility of obtaining block-level CVAP from administrative records.  In light of

23   the potential consequences of adding the citizenship question and the eventual disagreement

24   between the Census Bureau and Secretary Ross about the decision, there was no rational basis to

25   stray from the policy of obtaining a requesting agency's input.

26       228.    Secretary Ross failed to "clearly set forth" in the Decision Memo or anywhere else

27   his grounds for failing to obtain DOJ's input before deciding to add the citizenship question.  *See*

28

1   PTX-26; *Atchison*, 412 U.S. at 808.  In other words, he failed to provide even "*some* explanation"

2   for the departure from established policy.  *Fox Television Stations*, 556 U.S. at 514 n.2.

3        229.   Secretary Ross also failed, more generally, to consider this important factor in his

4   decision-making process.

5        230.   Given Defendants' irrational departure from the settled policy of meeting with a

6   requesting agency, the decision to add the citizenship question was arbitrary and capricious.

7        **4.   Extra-record evidence confirms that Defendants failed to consider**
              **whether existing ACS CVAP data is sufficient for enforcement of**

8             **section 2 of the Voting Rights Act**

9        231.   Extra-record evidence introduced at trial provides further evidence that Defendants

10  failed to analyze and consider whether hard-count citizenship data would aid in VRA

11  enforcement.

12       232.   This evidence explains in detail how plaintiffs use citizenship data to enforce the

13  VRA.  PFOF §§ IV(C)(1), IV(C)(3).  This evidence further explains the standards and

14  benchmarks that are used to determine whether census-derived block-level data is "necessary" for

15  VRA enforcement.  PFOF §§ IV(C)(1), IV(C)(3).

16       233.   The unrebutted expert testimony of Plaintiffs' voting rights expert Dr. Lisa

17  Handley confirms that a citizenship question on the census is not "necessary" to enforce the

18  VRA.  PFOF § IV(C)(3).  Dr. Handley testified that, in her experience, CVAP estimates at the

19  census tract or block group level are generally sufficient to satisfy the first *Gingles* precondition

20  in VRA cases.  New York Tr. 807:24-811:6 (Handley).  Dr. Handley testified that, where it would

21  be helpful to present CVAP data at the block level, this information can be reliably and accurately

22  estimated using block-level CVAP data by applying the CVAP ratios from the census tract level

23  to the block-level figures for total voting-age population.  *Id.* at 808:10-815:5.

24       234.   Dr. Handley also explained how each of the purported limitations with currently

25  available CVAP data discussed in the December 12 Letter from Arthur Gary has not impacted

26  any plaintiff's ability to bring or prevail in litigation under section 2 of the VRA, and has not

27  otherwise impeded her work as a voting rights expert.  PFOF § IV(C)(3).

28

235.    The unrebutted expert testimony of Plaintiffs' voting rights expert Professor Pamela Karlan also confirms that a citizenship question on the census is not "necessary" to enforce the VRA.  PFOF § IV(C)(4).  Ms. Karlan explained that no section 2 case has ever failed on account of the purported inadequacy of ACS data (or, prior to the advent of the ACS, data from the long-form census questionnaire) as a measure of CVAP.  Karlan Trial Dep. 52:14-53:18. Extra-record evidence confirms that data produced pursuant to Option D will have associated margins of error, and that Defendants do not know whether these error margins for block-level CVAP data produced from a citizenship question on the census will be larger or smaller than currently available block-level CVAP data.  PFOF § IV(C)(2).  This evidence directly controverts the Secretary's argument that "hard-count" citizenship data from the decennial enumeration will provide DOJ with the "most complete and accurate" data.  PTX-26 at 5.

236.    Extra-record evidence also establishes that the Secretary failed to consider how adding a citizenship question to the decennial questionnaire, in addition to being completely unnecessary to enforce the VRA, will in fact undermine the goals the VRA was enacted to protect.

237.    The purpose of the VRA is to accomplish "nondiscriminatory treatment by government—both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement." *Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

238.    Because adding a citizenship question will predictably undercount some communities, those communities will not achieve nondiscriminatory treatment in the application of voting qualifications or of the administration of governmental services.  *See* PFOF § V(A)(1); Fraga Trial Decl. ¶¶ 69, 85, 91; Reamer Trial Decl. ¶¶ 18-19, 31-34, 56-66.

### 5.    Defendants failed to consider the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices

239.    The decision to add the citizenship question was arbitrary and capricious because Defendants failed to consider the effect of the Census Bureau's confidentiality obligations and

1    disclosure avoidance practices on the fitness of citizenship data for DOJ's stated purpose,

2    enforcement of section 2 of the VRA.  PFOF §§ IV(C)(2), IV(C)(3).

3        240.     Under its disclosure avoidance protocols, the Census Bureau will apply disclosure

4    avoidance techniques to data collected from every census block, meaning that even after adding a

5    citizenship question, there will not be a single census block for which the reported citizenship

6    data directly reflects the responses of the census block's inhabitants to the 2020 Census

7    questionnaire, unless by random chance.  New York Tr. 1033:16-21 (Abowd); Census Bureau

8    30(b)(6) Dep. Vol. I 53:12-17, 69:6-71:12; PFOF § IV(C)(2).

9        241.     Therefore, even if the citizenship data is obtained through enumeration, some

10    margin of error will unavoidably exist.  *Id.*

11        242.     The Census Bureau does not know how that margin of error will compare to the

12    margin of error for the ACS citizenship data currently in use.  *Id.*

13        243.     The Bureau has not determined if, after disclosure avoidance, the error margins for

14    block-level CVAP data based on information collected through the decennial enumeration will

15    "still allow redistricting offices and the Department of Justice to use the data effectively."  Census

16    30(b)(6) Dep. Vol. I 100:21-101:15; PFOF § IV(C)(2).

17        244.     This complete absence of certainty, confirmed by Dr. Abowd, of whether the

18    Census Bureau's disclosure avoidance protocols will result in greater error margins than the ones

19    associated with currently available CVAP data, or will generate a product that is "effective" for

20    its intended use, directly controverts the Secretary's argument that "hard-count" citizenship data

21    from the decennial enumeration will provide DOJ with the "most complete and accurate" data.

22    PTX-26 at 5.  Defendants' failure to consider this factor is arbitrary and capricious.

23             **6.**     **Defendants failed to consider injuries that may result at the local**

24                 **level from inaccurate census count and characteristic data**

25        245.     The Secretary's assertion in the Decision Memo that providing information to DOJ

26    "is of greater importance" than "any adverse effect" caused by the citizenship question

27    demonstrates a failure to consider the harms to local governments that stem from the degradation

28    of data quality caused by the citizenship question.  PTX-26 at 7.

246.    As described above, the citizenship question will damage the accuracy and quality of census data.  *See* Section II(B)(3), *supra*; PFOF § V(A)(3).  That adverse effect on data quality and accuracy is the product of the citizenship question's negative impact on self-response rates, which will increase the amount of less accurate and lower quality data that will be obtained through such NRFU efforts as proxy responses, matching of administrative records, and imputation.  *See generally* PFOF § V(A).

247.    The Census Bureau informed the Secretary that the citizenship question would have an adverse effect on data quality and accuracy in the 2020 Census.  PTX-22; PTX-25.  In particular, the Census Bureau informed the Secretary that Alternatives B and D, which would add a citizenship question to the 2020 Census, would produce worse quality data than Alternative C, which would not add a citizenship question.  PTX-22; PTX-25.

248.    Local governments depend on accurate census data, and less accurate and lower quality data will disrupt redistricting efforts and cause a misallocation of resources.  Tr. 799:1-16, 1005:3-24, 1040:7-1041:10 (Abowd).

249.    Yet the Administrative Record contains no evidence that any of the Defendants considered the adverse effects the citizenship question would have on local governments.  PFOF § III(E)(7).

250.    Defendants' failure to consider the adverse effects of the citizenship question on the data relied on by local governments is arbitrary and capricious.

## VII.  REMEDIES

### A.    Enumeration Clause Claim

251.    The Constitution requires the "actual Enumeration" of all people in each state every ten years for the purpose of apportioning representatives among the states.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2.

252.    Defendants violated the Enumeration Clause for the reasons explained above.

253.    Defendants' violation of the Enumeration Clause harms Plaintiffs and their residents because they have been forced to expend, and will continue to expend, funds to mitigate an undercount of their residents; will suffer a decrease in federal funding; will suffer harm to their

43

1   ability to accurately plan, allocate resources, and comply with the law as a consequence of the

2   degradation of census data quality; and will lose political representation.

3       254.    Defendants' violation has caused and will continue to cause ongoing, irreparable

4   harm to Plaintiffs and their residents.

5       255.    Accordingly, Plaintiffs are entitled to a declaratory judgment, under 28 U.S.C.

6   §§ 2201 and 2202, that including the citizenship question on the 2020 Census questionnaire

7   violates Article I, Section 2, Clause 3 of the United States Constitution.

8       256.    Plaintiffs also seek to permanently enjoin Defendants from placing the citizenship

9   question on the 2020 Census questionnaire.  A plaintiff seeking a permanent injunction must

10  show:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

11  monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance

12  of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

13  public interest would not be disserved by a permanent injunction."  *Monsanto*, 561 U.S. at 156-

14  57.  Because the government is a party, and "the government's interest is the public interest," the

15  last two factors merge.  *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016);

16  *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

17      257.    If the citizenship question is added to the 2020 Census questionnaire, Plaintiffs

18  will suffer harm in the form of lost funding across federal programs that allocate funds based on

19  census-derived data, degradation of information that is an important tool of state sovereignty, and

20  lost political representation.  Each of these harms would be irreparable—and without any

21  adequate remedy at law.  *Cf., e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (noting that

22  a state's inability to implement its laws constitutes irreparable harm); *Dep't of Commerce*, 525

23  U.S. at 344 (holding that the prospective loss of representation in Congress warrants injunctive

24  relief); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (noting that where the

25  measure of injury defies calculation, damages will not provide an adequate remedy at law).

26  Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action.

27  On the contrary, there is a substantial public interest in having governmental agencies abide by

28  the federal laws that govern their existence and operations."  *League of Women Voters of U.S. v.*

44

1   *Newby*, 838 F.3d. 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  As is

2   relevant to the facts here, "the public interest . . . requires obedience . . . to the requirement that

3   Congress be fairly apportioned, based on accurate census figures.  Furthermore, it is in the public

4   interest that the federal government distribute its funds, when the grant statute is keyed to

5   population, on the basis of accurate census data."  *Carey*, 637 F.2d at 839.

6         258.    Plaintiffs have proven that the Secretary's decision violates the Enumeration

7   Clause of the Constitution and, thus, that any attempt to institute a citizenship question on the

8   2020 Census questionnaire now would be unlawful.

9         259.    Any efforts by Defendants to continue pursuing the citizenship question would risk

10   inflicting further irreparable harm on Plaintiffs because the Secretary's decision to add the

11   citizenship question has inflamed fears among populations who are sensitive to the question,

12   particularly in the current political climate.  *See generally* PFOF § V(A).

13         260.    Allowing Defendants to continue perpetuating these harms in a futile pursuit to

14   remedy the defects identified by this Court will severely injure Plaintiffs and their residents.

15         261.    These harms cannot be compensated with monetary damages or otherwise

16   redressed absent injunctive relief.  *See Abbott*, 138 S. Ct. at 2324 n.17; *Dep't of Commerce*, 525

17   U.S. at 344; *Gilder*, 936 F.2d at 423.

18         262.    Finally, the balance of the hardships and the public interest weighs heavily in favor

19   of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the

20   law or to forgo futile attempts to reinstate a citizenship question, particularly when no such

21   question has appeared on the decennial census for nearly seventy years.  In contrast, Plaintiffs and

22   the public will suffer widespread and irreparable harm absent an injunction.

23         263.    Accordingly, Plaintiffs are entitled to a permanent injunction prohibiting all

24   Defendants and all those acting in concert with them from including a citizenship question on the

25   2020 Census questionnaire.

26   **B.    APA Claim**

27         **1.    Plaintiffs are entitled to a declaratory judgment**

28         264.    Plaintiffs are entitled to declaratory relief on their APA claim.

45

265.     Plaintiffs have asserted a claim under the APA, which provides a cause of action for any "person suffering legal wrong because of agency action." 5 U.S.C. §§ 702, 704.

266.     The APA requires courts to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. Defendants violated the APA for the reasons explained above.

267.     These violations harm Plaintiffs and their residents, because they have been forced and will continue to expend funds to mitigate an undercount of their residents; will suffer a decrease in federal funding; will suffer harm to the ability to accurately plan, allocate resources, and comply with the law as a consequence of the degradation of census data quality; and will lose political representation.

268.     Defendants' violations have caused and will continue to cause ongoing, irreparable harm to Plaintiffs and their residents.

269.     Accordingly, Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. sections 2201 and 2202 that including the citizenship question on the 2020 Census violates the APA as contrary to 13 U.S.C. section 6(c), contrary to 13 U.S.C. section 141(f)(3), and arbitrary and capricious.

**2.     Plaintiffs are entitled to vacatur of the decision without remand**

270.     Plaintiffs are entitled to vacatur of the decision to add the citizenship question without remand to the Secretary of Commerce.

271.     "[O]rdinarily, when a regulation is not promulgated in accordance with the APA, the regulation is invalid" and must be vacated. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled to relief under that statute, which normally will be a vacatur of the agency's [decision]").

272. Vacatur properly reflects the sound principle that an agency action that violates the APA cannot be afforded the force and effect of law and is, therefore, void. *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).

273. Vacatur is an appropriate remedy under the APA both when an agency acts contrary to law, *see, e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule that "conflicts with the plain meaning" of statute), and when an agency action is arbitrary and capricious, *see, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's] finding is not sustainable on the administrative record made, the [agency's] decision must be vacated . . . .").

274. Although courts may remand to the agency after invalidating an improper determination, courts have also not hesitated to vacate agency actions without remand when they are taken in violation of statutory or procedural requirements. *See, e.g.*, *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018); *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017).

275. Such a disposition reflects the fact that statutory or procedural violations can be so fundamental as to render the agency's basic choice—and not merely its particular articulation of that choice—"substantively fatal." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand").

276. Plaintiffs have proven at least one statutory violation that warrants vacatur without remand. Section 6(c) of Title 13 requires the Defendants to use administrative records rather than add the citizenship question to the Census. The decision to do otherwise was therefore "substantively fatal." *See Int'l Union*, 920 F.2d at 967. There would be no purpose in remanding the decision to the Secretary because adoption of the same rule would be exceedingly "unlikely." *See Pollinator Stewardship Council*, 806 F.3d at 532. For the Secretary to make the same decision without re-violating section 6(c) and the APA, some new evidence would have to come to light in the decision-making process that would suddenly render the use of administrative

47

1   records inferior to a citizenship question given the "kind, timeliness, quality and scope" of the

2   data required.  There is no evidence suggesting that this is a reasonable possibility.

3        277.    Remand is also improper here because the Secretary's stated rationale for the

4   citizenship question was pretext, particularly because the Secretary has never suggested an

5   alternative basis for his decision.  *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43

6   (D.C. Cir. 1994) (remand unnecessary when NLRB "suggested no alternative bases for

7   upholding" its determination); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994)

8   ("No remand for further administrative proceedings is warranted because the EPA did not suggest

9   in the rulemaking under review that there is any alternative basis in the record" for its decision).

10              **3.    Plaintiffs are entitled to a permanent injunction**

11       278.    Finally, regardless of whether or not the decision to add the citizenship question is

12  remanded to the Secretary, Plaintiffs are entitled to a permanent injunction based on their APA

13  claim.

14       279.    The decision to grant injunctive relief under the APA is "controlled by principles

15  of equity."  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted);

16  *see, e.g.*, *Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F.

17  Supp. 3d 308, 342-43 (S.D.N.Y 2018) (applying equitable factors for permanent injunction in

18  APA challenge to agency decision).  All of these factors counsel in favor of an injunction here.

19       280.    An injunction prohibiting an agency from taking an action is appropriate where the

20  court has found that action to be contrary to law under the APA.  *See Planned Parenthood*, 337 F.

21  Supp. 3d at 343; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

22       281.    Under such circumstances, an injunction properly prohibits "the perpetuation of

23  unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and

24  ensures that the agency complies with the law going forward, *see Central United Life, Inc. v.*

25  *Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing

26  federal agencies to comply with the law is undoubtedly in the public interest.").

27       282.    Plaintiffs have proven that the Secretary's decision is contrary to law and that any

28  attempt to institute a citizenship question on the 2020 Census now would also be unlawful.

48

283.     Moreover, previous cases related to conduct of the census show that an injunction is in the public interest in these circumstances.  *See Dep't of Commerce*, 525 U.S. at 344; *Carey*, 637 F.2d at 839

284.     An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts

285.     Allowing Defendants to continue perpetuating these harms in a futile pursuit to remedy the defects identified by this Court will severely injure Plaintiffs and their residents.

286.     These harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief.  *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).

287.     Finally, granting an injunction on these facts would have substantive and procedural benefits beyond mere vacatur of Secretary Ross's March 26, 2018 memorandum.  Absent an injunction, Secretary Ross could simply reinstate his decision to include a citizenship question on the 2020 Census questionnaire by revising his memorandum in some immaterial way.  Such an outcome is possible because Secretary Ross retains the same statutory authority over the census that he had before Plaintiffs filed this action to challenge his decision.  However, given the evidence adduced at trial, an injunction is necessary to make the Court's vacatur effective, since it will prevent Secretary Ross from arriving at the same decision without curing the defects proven by Plaintiffs at trial.  Moreover, an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court if Defendants take actions that are inconsistent with this decision.  This is particularly crucial here given the June 2019 deadline for printing the 2020 Census questionnaires.

288.     The balance of the hardships also weighs heavily in favor of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years.  By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

49

289.     The fair and orderly administration of the census is one of the Secretary of Commerce's most important duties, and it is critically important that the public have confidence in the integrity of the process underlying this mainstay of our democracy.  *Franklin*, 505 U.S. at 818 (Stevens, J., concurring in part and concurring in the judgment)).

290.     An injunction prohibiting the addition of a citizenship question to the 2020 Census will provide the public with the certainty and confidence that is necessary to protect the integrity of the 2020 Census.

291.     This Court therefore grants Plaintiffs' requested injunction based on their APA claim.

292.     The appropriate scope of injunction in this case is nationwide.

293.     First, Secretary Ross's decision itself was nationwide in application; it involves a single questionnaire that will be used through the country during the 2020 Census.  *Cf. Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform immigration rules).

294.     Second, nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C. § 706(2)(A).

295.     Thus, a nationwide injunction here under the APA does not implicate more general concerns about the power of courts to issue nationwide injunctive relief.  *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018).

296.     Plaintiffs are therefore entitled to a permanent injunction prohibiting all Defendants and all those acting in concert with them from including a citizenship question on the 2020 Census questionnaire.

1    Dated:  February 1, 2019                Respectfully Submitted,

2

XAVIER BECERRA
Attorney General of California
3                               MARK R. BECKINGTON
ANTHONY R. HAKL
4                               Supervising Deputy Attorneys General
ANNA T. FERRARI
5                               TODD GRABARSKY
NOREEN P. SKELLY
6                               R. MATTHEW WISE
Deputy Attorneys General

7

8                               */s/   Gabrielle D. Boutin*
GABRIELLE D. BOUTIN
9                               Deputy Attorney General
*Attorneys for Plaintiff State of California, by and*
10                               *through Attorney General Xavier Becerra*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated:  February 1, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14  Dated:  February 1, 2019

15

16

17

18

19

20  Dated:  February 1, 2019

21

22

23

24

25

26

27

28

*/s/ Charles L. Coleman* _____
CHARLES L. COLEMAN III, SBN 65496
DAVID I. HOLTZMAN
HOLLAND & KNIGHT LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Telephone: (415) 743-6970
Fax: (415) 743-6910
Email: charles.coleman@hklaw.com
*Attorneys for Plaintiff County of Los Angeles*

Dated:  February 1, 2019        MIKE FEUER
City Attorney for the City of Los Angeles

*/s/ Valerie Flores* _____
VALERIE FLORES, SBN 138572
Managing Senior Assistant City Attorney
200 North Main Street, 7th Floor, MS 140
Los Angeles, CA  90012
Telephone: (213) 978-8130
Fax: (213) 978-8222
Email: Valerie.Flores@lacity.org

HARVEY LEVINE
City Attorney for the City of Fremont

*/s/ Harvey Levine* _____
SBN 61880
3300 Capitol Ave.
Fremont, CA 94538
Telephone: (510) 284-4030
Fax: (510) 284-4031
Email: hlevine@fremont.gov

CHARLES PARKIN
City Attorney for the City of Long Beach

*/s/ Michael J. Mais* _____
MICHAEL K. MAIS, SBN 90444
Assistant City Attorney
333 W. Ocean Blvd., 11th Floor
Long Beach CA, 90802
Telephone: (562) 570-2200
Fax: (562) 436-1579
Email: Michael.Mais@longbeach.gov

52

1    Dated February 1, 2019                        BARBARA J. PARKER
                                                   City Attorney for the City of Oakland
2
                                                   /s/ Erin Bernstein _____
3                                                  MARIA BEE
                                                   Chief Assistant City Attorney
4                                                  ERIN BERNSTEIN, SBN 231539
                                                   Supervising Deputy City Attorney
5                                                  MALIA MCPHERSON
                                                   Deputy City Attorney
6                                                  City Hall, 6th Floor
                                                   1 Frank Ogawa Plaza
7                                                  Oakland, California 94612
                                                   Telephone: (510) 238-3601
8                                                  Fax: (510) 238-6500
                                                   Email: ebernstein@oaklandcityattorney.org
9

10   Dated:  February 1, 2019                      JOHN LUEBBERKE
                                                   City Attorney for the City of Stockton
11
                                                   /s/ John Luebberke _____
12                                                 SBN 164893
                                                   425 N. El Dorado Street, 2nd Floor
13                                                 Stockton, CA 95202
                                                   Telephone: (209) 937-8333
14                                                 Fax: (209) 937-8898
                                                   Email: John.Luebberke@stocktonca.gov
15

16

17                             **FILER'S ATTESTATION**

18        Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

19   concurrence in the filing of this document has been obtained from all signatories above.

20   Dated: February 1, 2019                       /s/ Gabrielle D. Boutin
                                                   GABRIELLE D. BOUTIN
21

22

23

24

25

26
     SA2018100904
27   13428260.docx

28

                                        53

# CERTIFICATE OF SERVICE

Case Name: **State of California, et al. v.**     No.    **3:18-cv-01865**
             **Wilbur L. Ross, et al.**

I hereby certify that on <u>February 1, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFF'S POST-TRIAL PROPOSED CONCLUSIONS OF LAW**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>February 1, 2019</u>, at Sacramento, California.

<table>
<tr><td>Tracie L. Campbell</td><td>*/s/ Tracie Campbell*</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2018100904
13430250.docx