Xavier Becerra
Attorney General of California
Mark R. Beckington
Anthony R. Hakl
Supervising Deputy Attorneys General
Gabrielle D. Boutin, SBN 267308
Anna T. Ferrari, SBN 261579
Todd Grabarsky, SBN 286999
Noreen P. Skelly, SBN 186135
R. Matthew Wise, SBN 238485
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6053
  Fax: (916) 324-8835
  E-mail: Gabrielle.Boutin@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA by and through ATTORNEY GENERAL XAVIER BECERRA; COUNTY OF LOS ANGELES; CITY OF LOS ANGELES; CITY OF FREMONT; CITY OF LONG BEACH; CITY OF OAKLAND; CITY OF STOCKTON,**<br><br>                                    Plaintiffs,<br><br>        **v.**<br><br>**WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU; DOES 1-100,**<br><br>                                    Defendants. | 3:18-cv-01865<br><br><br>**PLAINTIFFS' POST-TRIAL PROPOSED CONCLUSIONS OF LAW**<br><br>Dept:          3<br>Judge:        The Honorable Richard G. Seeborg<br>Trial Date:   January 7, 2019<br>Action Filed: March 26, 2018 |

# TABLE OF CONTENTS

Page

I.   The Obligation to Conduct a Decennial Census .................................................... 1

II.  Plaintiffs Have Standing to Bring Their APA and Enumeration Clause
     Claims .................................................................................................................... 1

     A.   The Court May Consider Extra-Record Evidence to Evaluate
          Standing ....................................................................................................... 2

     B.   Plaintiffs Have Suffered, and Will Imminently Suffer, Injuries-in-
          Fact .............................................................................................................. 2

          1.   The expenditure of funds for census outreach to mitigate the
               substantial risk of harm .................................................................... 4

          2.   Lost federal funding .......................................................................... 6

          3.   Degradation of the quality of demographic data ............................... 7

          4.   Lost political representation .............................................................. 10

     C.   Plaintiffs' Injuries Are Traceable and Redressable .................................... 11

III. The Dispute is Ripe for Adjudication .................................................................. 13

IV.  Defendants' Decision to Add a Citizenship Question to the 2020 Census
     Violates the Enumeration Clause of the Constitution .......................................... 13

V.   Based on the Administrative Record Alone, Defendants' Decision to Add a
     Citizenship Question to the 2020 Census Violates the APA ................................ 16

     A.   The Scope of Judicial Review .................................................................... 16

     B.   The Decision Violates the APA as Contrary to Law .................................. 17

          1.   The decision is contrary to 13 U.S.C. § 6(c) .................................. 18

          2.   The decision is contrary to 13 U.S.C. § 141(f)(3) .......................... 20

     C.   The Decision Violates the APA Because Its Justification Was
          Pretextual .................................................................................................... 22

     D.   The Decision Was Arbitrary and Capricious Because Defendants
          Failed to Consider "An Important Aspect of the Problem" ...................... 23

          1.   Defendants failed to consider whether the citizenship
               question would cause an undercount that would harm
               Plaintiffs ......................................................................................... 23

          2.   Defendants failed to consider key legal obligations ...................... 24

          3.   Defendants failed to independently consider whether
               existing ACS CVAP data is sufficient for enforcement of
               section 2 of the Voting Rights Act ................................................. 26

     E.   The Decision Was Arbitrary and Capricious Because It Ran
          Counter to the Evidence .............................................................................. 28

          1.   The decision was counter to the evidence that using
               administrative data alone would yield more accurate and
               complete citizenship data than adding a citizenship question
               to the census ................................................................................... 28

i

**TABLE OF CONTENTS**
(continued)

Page

2.    The decision was counter to the evidence because the Decision Memo was rife with flawed assertions that were not based on any evidence or were counter to the evidence in the record.................................................................... 30

VI.    Extra-Record Evidence Confirms that Defendants' Decision to Add a Citizenship Question to the 2020 Census Violates the APA .............................. 32

A.    Applicable Exceptions to the Rule of Record Review............................ 32

1.    The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext........................................................................................ 32

2.    The Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors .......... 33

B.    Extra-Record Evidence Confirms that Defendants' Justification for the Decision was Pretextual .................................................................... 34

C.    Extra-Record Evidence Confirms that the Decision was Arbitrary and Capricious Because Defendants Failed to Consider "An Important Aspect of the Problem" ............................................................ 35

1.    Defendants failed to consider the applicable standards that required them to pretest the citizenship question........................ 35

2.    Defendants failed to consider the governing burden to change a census question ............................................................ 37

3.    Defendants failed to consider and irrationally departed from established practices for conferring with a requesting agency...... 38

4.    Extra-record evidence confirms that Defendants failed to consider whether existing ACS CVAP data is sufficient for enforcement of section 2 of the Voting Rights Act..................... 40

5.    Defendants failed to consider the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices ...................................................................... 41

6.    Defendants failed to consider injuries that may result at the local level from inaccurate census count and characteristic data .......................................................................................... 42

VII.    Remedies ....................................................................................................... 43

A.    Enumeration Clause Claim .................................................................... 43

B.    APA Claim .............................................................................................. 45

1.    Plaintiffs are entitled to a declaratory judgment .......................... 45

2.    Plaintiffs are entitled to vacatur of the decision without remand.......................................................................................... 46

3.    Plaintiffs are entitled to a permanent injunction .......................... 48

ii

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Abbott v. Perez*
    138 S. Ct. 2305 (2018) .................................................................................44, 45

*All. for the Wild Rockies v. U.S. Forest Serv.*
    907 F.3d 1105 (9th Cir. 2018) ......................................................................14, 46

*Aluminum Co. of America v. Bonneville Power Admin.*
    903 F.2d 585 (9th Cir. 1989) ..............................................................................7

*Am. Bioscience, Inc. v. Thompson*
    269 F.3d 1077 (D.C. Cir. 2001) .........................................................................46

*Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*
    199 F. Supp. 2d 217 (D. N.J. 2002) .....................................................................2

*Am. Wild Horse Pres. Campaign v. Perdue*
    873 F.3d 914 (D.C. Cir. 2017) ...........................................................................38

*Am. Wildlands v. Kempthorne*
    530 F.3d 991 (D.C. Cir. 2008) ...........................................................................33

*Asarco Inc. v. U.S. Environmental Protection Agency*
    616 F.2d 1153 (9th Cir. 1980) ...........................................................................33

*Associated General Contractors of California, Inc. v. Coalition for Economic Equity*
    950 F.2d 1401 (9th Cir. 1991) .............................................................................2

*Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*
    412 U.S. 800 (1973) .....................................................................................38, 40

*Baldrige v. Shapiro*
    455 U.S. 345 (1982), 1981 WL 389922 ...............................................................18

*Barnum Timber Co. v. EPA*
    633 F.3d 894 (9th Cir. 2011) ........................................................................12, 47

*Bennett v. Spear*
    520 U.S. 154 (1997) ......................................................................................2, 12

*Beno v. Shalala*
    30 F.3d 1057 (9th Cir. 1994) .............................................................................28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Burlington Truck Lines, Inc. v. United States*
  371 U.S. 156 (1962) ...........................................................................................22

*California Trout v. F.E.R.C*
  572 F.3d 1003 (9th Cir. 2009) .......................................................................38, 39

*Camp v. Pitts*
  411 U.S. 138 (1973) ...........................................................................................47

*Carey v. Klutznick*
  637 F.2d 834 (2d Cir. 1980) ...........................................................6, 10, 45, 49

*Carpenters Indus. Council v. Zinke*
  854 F.3d 1 (D.C. Cir. 2017) ................................................................................3

*Central United Life, Inc. v. Burwell*
  128 F. Supp. 3d 321 (D.D.C. 2015) ..................................................................48

*Chemical Mfrs. Ass'n v. EPA*
  28 F.3d 1259 (D.C. Cir. 1994) ..........................................................................48

*Chrysler Corp. v. Brown*
  441 U.S. 281 (1979) ...........................................................................................47

*Citizens to Pres. Overton Park v. Volpe*
  401 U.S. 402 (1971) ...............................................................................17, 32, 33

*City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*
  822 F.2d 1153 (D.C. Cir. 1987) ........................................................................26

*City of Detroit v. Franklin*
  4 F.3d 1367 (6th Cir. 1993) ................................................................................6

*City of Los Angeles v. U.S. Dept. of Commerce*
  307 F.3d 859 (9th Cir. 2002) .............................................................................14

*City of New York v. U.S. Dep't of Commerce*
  713 F. Supp. 48 (E.D.N.Y. 1989) .....................................................................10

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013) ..............................................................................3, 4, 5, 11

*Clean Air Council v. Pruitt*
  862 F.3d 1 (D.C. Cir. 2017) ..............................................................................47

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Council of Ins. Agents & Brokers v. Molasky-Arman*
    522 F.3d 925 (9th Cir. 2008)..................................................................................................3

*Crown Cork & Seal Co. v. NLRB*
    36 F.3d 1130 (D.C. Cir. 1994) ............................................................................................48

*Ctr. for Biological Diversity v. Zinke*
    900 F.3d 1053 (9th Cir. 2018)............................................................................................38

*Ctr. for Food Safety v. Price*
    No. 17-cv-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ..............................7, 10

*Czyzewski v. Jevic Holding Corp.*
    137 S. Ct. 973 (2017) ..................................................................................................3, 7

*Delaware Dep't of Nat. Res. & Envtl. Control*
    785 F.3d 1, 16 (D.C. Cir. 2015) .........................................................................................26

*Denney v. Deutsche Bank AG*
    443 F.3d 253 (2d Cir. 2006)................................................................................................7

*Dep't of Commerce v. U.S. House of Representatives*
    525 U.S. 316 (1999) .............................................................................................. *passim*

*Evenwel v. Abbott*
    136 S. Ct. 1120 (2016) .......................................................................................................1

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) .............................................................................................17, 38, 40

*FEC v. Akins*
    524 U.S. 11 (1998) .......................................................................................................7, 10

*Fed'n for Am. Immigration Reform v. Klutznick (FAIR)*
    486 F. Supp. 564 (D.D.C. 1980) ....................................................................................1, 14

*Federal Power Comm'n v. Texaco Inc.*
    417 U.S. 380 (1974) .........................................................................................................22

*Franklin v. Massachusetts*
    505 U.S. 788 (1992) ...................................................................................................14, 50

*Gilder v. PGA Tour, Inc.*
    936 F.2d 417 (9th Cir. 1991)........................................................................................44, 45

Plaintiffs' Post-Trial Proposed Conclusions of Law (3:18-cv-01865)

1

2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Glavin v. Clinton*
    19 F. Supp. 2d 543 (E.D. Va. 1998)..................................................................6

5

*Guerrero v. Clinton*
    157 F.3d 1190 (1998).....................................................................................21

6

7

*Harmon v. Thornburgh*
    878 F.2d 484 (D.C. Cir. 1989) .......................................................................50

8

9

*Havens Realty Corp. v. Coleman*
    455 U.S. 363 (1982)....................................................................................8, 10

10

*Home Box Office, Inc. v. F.C.C.*
    567 F.2d 9 (D.C. Cir. 1977) ...........................................................................22

11

12

*In re Adobe Systems, Inc. Privacy Litig.*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) .............................................................4

13

14

*In re Zappos.com, Inc.*
    888 F.3d 1020 (9th Cir. 2018)........................................................................12

15

*INS v. Yueh-Shaio Yang*
    519 U.S. 26 (1996)....................................................................................33, 38

16

17

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*
    920 F.2d 960 (D.C. Cir. 1990) .......................................................................47

18

19

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
    803 F.3d 389 (9th Cir. 2015)..........................................................................49

20

*Katzenbach v. Morgan*
    384 U.S. 641 (1966) .......................................................................................41

21

22

*Kirkpatrick v. Preisler*
    394 U.S. 526 (1969) .........................................................................................8

23

*Kuang v. U.S. Dep't of Defense*
    No. 18-cv-3698-JST, 2018 WL 6025611 (N.D. Cal. Nov. 16, 2018)............27

24

25

*Lands Council v. Powell*
    395 F.3d 1019 ................................................................................................35

26

27

*Larios v. Cox*
    300 F. Supp. 2d 1320 (N.D. Ga. 2004) ...........................................................9

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*League of Women Voters v. Newby*
    838 F.3d 1 (D.C. Cir. 2016) .................................................................25, 44, 48

4

*Leonard v. Clark*

5
    12 F.3d 885 (9th Cir. 1993)....................................................................................2

6

*Lujan v. Defs. of Wildlife*

7
    504 U.S. 555 (1992) .............................................................................................12

8

*Mendia v. Garcia*
    768 F.3d 1009 (9th Cir. 2014)........................................................................11, 12

9

*Monsanto Co. v. Geertson Seed Farms*

10
    561 U.S. 139 (2010) .........................................................................................4, 44

11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*

12
    463 U.S. 29 (1983) .............................................................................23, 24, 28, 33

13

*N.L.R.B. v. Silver Bay Local Union No. 962, Int'l Bhd. of Pulp, Sulphite & Paper*
    *Mill Workers, AFL-CIO*

14
    498 F.2d 26 (9th Cir. 1974)..................................................................................38

15

*NAACP v. Trump*

16
    315 F. Supp. 3d 457 (D.D.C. 2018) .....................................................................50

17

*Nat'l Audubon Soc. v. Hoffman*
    132 F.2d 7 (2d Cir. 1997)......................................................................................34

18

*Nat'l Wildlife Fed'n v. Espy*

19
    45 F.3d 1337 (9th Cir. 1995)................................................................................48

20

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*

21
    384 F.3d 1163 (9th Cir. 2004)..............................................................................17

22

*Nat'l Audubon Soc. v. U.S. Forest Service*
    46 F.3d 1437 (9th Cir. 1993)................................................................................33

23

*Nat'l Park Hospitality Assn. v. Dep't of Interior*

24
    538 U.S. 803 (2003)..............................................................................................13

25

*NCAA v. Governor of N.J.*
    730 F.3d 208 (3d Cir. 2013)...................................................................................7

26

*Nken v. Holder*

27
    556 U.S. 418 (2009)..............................................................................................44

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*NRDC v. EPA*

4

489 F.3d 1250 (D.C. Cir. 2007) ........................................................................47

5

*NRDC v. Nat'l Highway Traffic Safety Admin.*
894 F.3d 95 (2d Cir. 2018)................................................................................47

6

*Perez v. Abbott*

7

250 F. Supp. 3d 123 (W.D. Tex. 2017)...............................................................9

8

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*
337 F. Supp. 3d 308 (S.D.N.Y 2018)................................................................48

9

*Pollinator Stewardship Council*, 806 F.3d at 532 ........................................................47

10

*Pub. Citizen, Inc. v. Mineta*

11

340 F.3d 39 (2d Cir. 2003)................................................................................28

12

*Pub. Citizen v. U.S. Dep't of Justice*

13

491 U.S. 440 (1989) .....................................................................................7, 10

14

*Public Power Council v. Johnson*
674 F.2d 791 (9th Cir. 1982)............................................................................32

15

16

*Pursuing Am. Greatness v. FEC*
831 F.3d 500 (D.C. Cir. 2016) .........................................................................44

17

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't*

18

*of Agric.*
499 F.3d 1108 (9th Cir. 2007).................................................................32, 33, 35

19

*Renee v. Duncan*

20

686 F.3d 1002 (9th Cir. 2012)..........................................................................21

21

*Reynolds v. Sims*

22

377 U.S. 533 (1964) ...........................................................................................8

23

*Sanchez v. City of Modesto*
145 Cal.App.4th 660 (2006)...............................................................................9

24

25

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*
769 F.3d 1184 (D.C. Cir. 2014) .......................................................................23

26

*Southwest Center for Biological Diversity v. U.S. Forest Service*

27

100 F.3d 1443 (9th Cir. 1996)..........................................................................32

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Spokeo, Inc. v. Robins*
   136 S. Ct. 1540 (2016) ...........................................................................................2

4

5

*State of Tex. v. Mosbacher*
   783 F. Supp. 308 (S.D. Tex. 1992) .......................................................................6

6

*Stewart v. Azar*
   313 F. Supp. 3d 237 (D.D.C. 2018) ...................................................................23

7

8

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149 (2014) .................................................................................. *passim*

9

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015)..............................................................................50

10

11

*Thornburg v. Gingles*
   478 U.S. 30 (1986) ...........................................................................9, 27, 40

12

13

*Town of Chester v. Laroe Estates, Inc.*
   137 S. Ct. 1645 (2017) ...........................................................................................2

14

*Tummino v. Torti*
   603 F. Supp. 2d 519 (E.D.N.Y. 2009) ...............................................................32

15

16

*U.S. ex rel. City of Atlanta, Ga. v. Steuart*
   47 F.2d 979 (D.C. Cir. 1931) .............................................................................14

17

18

*U.S. Lines, Inc. v. Federal Maritime Comm'n*
   584 F.2d 519 (D.C. Cir. 1978) ...........................................................................22

19

*United States Small Business Admin. v. Bensal*
   853 F.3d 992 (9th Cir. 2017)..............................................................................20

20

21

*Utah v. Evans*
   536 U.S. 452 (2002) ...........................................................................................15

22

23

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*
   139 S.Ct. 361 (2018) ...........................................................................................21

24

*Wisconsin v. City of New York*
   517 U.S. 1 (1996).........................................................................1, 14, 15, 16

25

26

*Wong Yang Sung v. McGrath*
   339 U.S. 33 (1950) .............................................................................................17

27

28

ix

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

5 United States Code
§ 702.................................................................................................................16, 46
§ 704.................................................................................................................46
§ 706.................................................................................................................17, 46
§ 706(2)(A).......................................................................................................17, 50
§ 706(2)(A)-(D)................................................................................................17

13 United States Code
§ 4.....................................................................................................................1
§ 6.....................................................................................................................18
§ 6(c)................................................................................................................*passim*
§ 141(a)............................................................................................................14, 26
§ 141(f).............................................................................................................20, 21, 22, 25
§ 141(f)(1)........................................................................................................14, 20
§ 141(f)(2)........................................................................................................14, 20, 21
§ 141(f)(3)........................................................................................................*passim*

28 United States Code
§ 2201...............................................................................................................44, 46
§ 2202...............................................................................................................44

52 United States Code
§ 10301.............................................................................................................9

1976 Census Act
§ 5(a)................................................................................................................18

Elections Code
§ 14027.............................................................................................................9
§ 14028.............................................................................................................9
§ 14032.............................................................................................................9

Pub. L. No. 105-119
§ 209(a)(2)........................................................................................................24
§ 209(a)(5)........................................................................................................1
§ 209(a)(6)........................................................................................................1
§ 209(a)(8)........................................................................................................3

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Article I, Section 2, Clause 3 ........................................................................... *passim*
    Amendment XIV, Section 2 ............................................................................ *passim*

**COURT RULES**

Federal Rules of Evidence
    Rule 201 ............................................................................................................20, 21
    Rule 902(5) ......................................................................................................20

Plaintiffs State of California, County of Los Angeles, City of Los Angeles, City of Fremont, City of Long Beach, City of Oakland, and City of Stockton respectfully submit the following Post-Trial Proposed Conclusions of Law.

## I.   THE OBLIGATION TO CONDUCT A DECENNIAL CENSUS

1.   The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State." U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV § 2.

2.   All residents must be counted, regardless of citizenship status.  *See Fed'n for Am. Immigration Reform v. Klutznick* (*FAIR*), 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

3.   The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs." Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

4.   The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts.  *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).

5.   Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau.  13 U.S.C. § 4.

6.   Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law.  Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

## II.   PLAINTIFFS HAVE STANDING TO BRING THEIR APA AND ENUMERATION CLAUSE CLAIMS

7.   To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

1

1    by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing

2    *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

3         8.    Where, as here, a plaintiff seeks declaratory and prospective relief only, not money

4    damages, its claims do not require individualized proof. *Associated General Contractors of*

5    *California, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991).

6         9.    The standing inquiry is satisfied so long as a single plaintiff establishes standing.

7    *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v. Population Servs. Int'l*, 431

8    U.S. 678, 682 (1977)); *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017).

9         10.   The Plaintiffs and Plaintiff-in-Intervention in this case (collectively, Plaintiffs) all

10   have standing because they have suffered several different types of injuries-in-fact that are fairly

11   traceable to Defendants' decision to add a citizenship question to the census, and these injuries

12   will be redressed if Defendants' decision is enjoined.

13        **A.    The Court May Consider Extra-Record Evidence to Evaluate Standing**

14        11.   Defendants concede that the Court can consider evidence outside the

15   Administrative Record to evaluate standing in this case.  Tr. 22:18-22 (Defendants' opening

16   statement).

17        12.   Courts adjudicating APA challenges can and do consider extra-record evidence for

18   standing purposes. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (because "each

19   element of Article III standing 'must be supported . . . with the manner and degree of evidence

20   required at the successive stages of the litigation,'" a plaintiff "must ultimately support any

21   contested facts with evidence adduced at trial") (quoting *Lujan*, 504 U.S. at 561; *see also Am.*

22   *Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*, 199 F. Supp. 2d 217, 228 n.3 (D. N.J. 2002)

23   (considering plaintiffs' extra-record evidence in support of standing in an APA case because "[it

24   goes] to the issue of the Court's jurisdiction").

25        **B.    Plaintiffs Have Suffered, and Will Imminently Suffer, Injuries-in-Fact**

26        13.   Allegations of a future injury qualify as an injury-in-fact "if the threatened injury

27   is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B.*

28

*Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

14.     Injury-in-fact exists where there is a "substantial risk" that harm will occur, which prompts plaintiffs to reasonably incur costs to mitigate or avoid that harm. *Clapper*, 568 U.S. at 414 n.5 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)).

15.     "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."); *see Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (noting that Supreme Court has found injury-in-fact even where magnitude of harm was only a few dollars).

16.     The possibility that Defendants may take undefined future steps (some of which are hypothetical, not planned) to try to mitigate harms caused by their decision to add the citizenship question does not undermine the showing of injury-in-fact below. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (concluding that plaintiffs established injury-in-fact based on expected effects of the use of sampling in the 2000 Census and that "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issue presented here, because such a pause would result in extreme— possibly irremediable—hardship"); *see also* Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481 ("Congress finds that . . . the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.").

17.     The evidence establishes that Plaintiffs will be injured in a number of different and independent ways from the addition of a citizenship question to the 2020 Census.  These injuries include, (1) the expenditure of funds for census outreach to mitigate the substantial risk of harm,

3

(2) lost federal funding, (3) degradation of the quality of demographic data, and (4) lost political representation.

### 1. The expenditure of funds for census outreach to mitigate the substantial risk of harm

18.     Plaintiffs—in particular, the State of California and the County of Los Angeles—have reasonably increased their expenditures on census outreach to attempt to mitigate the decline in self-response rates and the resulting differential undercount of Plaintiffs' residents caused by the citizenship question.  Post-Trial Findings of Fact (PFOF) § V(B)(1).

19.     These additional expenditures, which constitute a direct injury to the State of California, are sufficient to establish injury-in-fact for standing purposes.  *Clapper*, 568 U.S. at 414 n.5 (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Monsanto*, 561 U.S. at 153-155 (finding injury-in-fact where alfalfa growers increased administrative costs to minimize likelihood of potential contamination of their crops from genetically-altered alfalfa plant); *In re Adobe Systems, Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1216-1217 (N.D. Cal. 2014) (costs that software customers incurred to mitigate the risk of harm following a data breach constitute injury-in-fact).

20.     Plaintiffs' expenditures were reasonably incurred because they face harm that is not only a "substantial risk," but also "certainly impending."  *See Susan B. Anthony Lists*, 573 U.S. at 158.  This harm is the result of the differential undercount and lower self-response rates of their residents.

21.     Plaintiffs, including the State of California, have proven that the citizenship question will cause them to be differentially undercounted because they have a disproportionate share of noncitizens, immigrants, and Latino residents, PFOF § V(A), and that this differential undercount will cause them to lose federal funding, *id.* § V(B)(2), and political representation, *id.* § V(B)(4).

22.     Although the exact amount of federal funding that Plaintiffs will lose is uncertain, Plaintiffs have shown that the differential undercount caused by the citizenship question will result in a material loss of federal funding.  *Id.* § V(B)(2).  Likewise, although the exact amount

4

1  of political representation that Plaintiffs will lose is uncertain, Plaintiffs have shown that the

2  differential undercount caused by the citizenship question will likely result in the loss of political

3  representation, including the possible loss of one or more congressional seats in California. *Id.*

4  § V(B)(4).

5        23.    In addition, Plaintiffs have shown that lower self-response rates will damage the

6  quality of the census data that they depend on to make decisions related to redistricting and

7  services. *Id.* at § V(B)(3).

8        24.    The legislative history of California's FY 2018-19 state budget and follow-up

9  reports to the Governor and Legislature show that the State appropriated, and Plaintiffs are

10  spending, additional funds on census outreach to attempt to mitigate these negative impacts

11  caused by the citizenship question. *Id.* § V(B)(1).

12        25.    Although it is not possible to pinpoint how much the citizenship question drove

13  the increase in the state budget's census outreach line item, Plaintiffs have shown that the

14  Legislature's decision to boost the Governor's initial allocation for census outreach ($40.3

15  million) to a higher allocation in the enacted budget ($90.3 million) is due in part to the

16  citizenship question. *Id.*; Undisputed Facts ¶ 111-112.

17        26.    Plaintiffs also provided evidence that the citizenship question prompted the

18  County of Los Angeles to request $3.3 million in additional funds to meet the County's need for

19  funding for census outreach to the hard-to-count populations most likely not to respond to the

20  2020 Census because of the citizenship question. PFOF § V(B)(1). The State partially met this

21  request by allocating hundreds of thousands of dollars of additional funding to the County for

22  census outreach. *Id.*; Undisputed Facts ¶ 113.

23        27.    Because any amount of costs incurred to mitigate harm is sufficient to confer

24  standing, as long as such costs were reasonably incurred, Plaintiffs' expenditures on census

25  outreach constitute a direct injury to the budgets and resources of Plaintiffs that is sufficient to

26  establish injury-in-fact for standing purposes. *See Clapper*, 568 U.S. at 414 n.5.

27

28

### 2.    Lost federal funding

28.    Plaintiffs have shown that adding a citizenship question to the 2020 Census will cause a differential undercount that results in the loss of federal funding to Plaintiffs.  PFOF § V(B)(2).

29.    A plaintiff has standing when it has shown that a disproportionate undercount will result in "decreased federal funds flowing to their city and state." *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980); *City of Detroit v. Franklin*, 4 F.3d 1367, 1373-1375 (6th Cir. 1993) (standing established where "census undercount will result in a loss of federal funds" to plaintiffs' city); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313-314 (S.D. Tex. 1992) ("While the Census Bureau and the Department of Commerce are not in charge of distribution of federal funds, the Bureau's actions significantly affect the distribution of funds and therefore satisfies the requirements for injury in fact"); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) ("As a matter of law, allegations of decreased federal and state funding is fairly traceable to population counts reported in the decennial census.").

30.    A significant portion of federal domestic financial assistance is distributed based on census-derived data, including from 24 large federal financial assistance programs with geographic allocation formulas that rely in whole or part on census-derived data.  PFOF § V(B)(2)(a).

31.    If, as Plaintiffs have shown, there is any measurable differential undercount of households containing noncitizens, California will lose federal funding, because California has a larger proportion of noncitizens relative to other states.  *Id.*

32.    Similarly, some federal domestic financial assistance that is based on census-derived data is distributed among localities within the state.  *Id.* at § V(B)(2)(b).

33.    If, as Plaintiffs have shown, there is any measurable differential undercount of households containing noncitizens, the County and City Plaintiffs and LAUSD will lose federal funding, because these localities have a larger proportion of noncitizens relative to other localities.  *Id.*

34.     Lost federal funding, no matter the magnitude, confers standing upon Plaintiffs. *Czyzewski*, 137 S. Ct. at 983.

35.     Although Defendants have not presented any evidence that suggests that Plaintiffs' funding losses would be offset elsewhere, the law is clear that such a benefit would not defeat Plaintiffs' standing.  *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013) (A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it.  Our standing analysis is not an accounting exercise. . . ."), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (noting that "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing"); *cf. Aluminum Co. of America v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) (electric power customers had standing to claim that particular rates were excessive, despite counterargument that rates were more favorable than unfavorable).

36.     Having shown not only a "substantial risk" that the citizenship question will cause them to lose federal funding, but that the injury is "certainly impending," Plaintiffs have established standing.  *See Susan B. Anthony Lists*, 573 U.S. at 158.

### 3.     Degradation of the quality of demographic data

37.     Plaintiffs have also proven injury-in-fact based on the harm that adding a citizenship question will cause to the quality and accuracy of the population count and demographic characteristic data generated by the census.  *See* PFOF §§ V(A)(3), V(B)(3).

38.     Where a defendant has a duty to provide accurate information, failure to do so creates an injury-in-fact sufficient to confer standing.  *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal Advisory Committee Act for failure to make publicly available reports and minutes of American Bar Association meetings relating to prospective judicial nominees); *see also FEC v. Akins*, 524 U.S. 11, 20-21 (1998) (plaintiff voters had standing to sue the Federal Election Commission on the ground that the statute in question gave plaintiffs a right to the information being withheld by the FEC); *see also Ctr. for Food Safety v. Price*, No. 17-cv-3833 (VSB), 2018 WL 4356730, at *5

7

(S.D.N.Y. Sept. 12, 2018) (informational injury satisfies the injury-in-fact requirement of standing where a statutory provision has explicitly created a right to information).

39.     An injury sufficient to create standing is created not only by a total deprivation of information to which plaintiffs have a statutory right, but also by the deprivation of accurate or truthful information.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding that because the Fair Housing Act created a statutory right to truthful information concerning the availability of housing, "testers" who were misinformed had standing to sue without demonstrating any further injury).

40.     Plaintiffs have shown that Defendants' decision to add the citizenship question to the 2020 Census will damage the accuracy and quality of census data.  *See* PFOF § V(A)(3).

41.     Adding a citizenship question to the 2020 Census will lower self-response rates, which, in turn, will result in an increase in NRFU.  *See generally* PFOF § V(A).  Because data obtained via NRFU is less accurate and of lower quality than data produced via self-response, adding a citizenship question will cause the 2020 Census to produce data that is less accurate and of poorer quality.  *See id.* § V(A)(3).

42.     Defendants conceded that the local government Plaintiffs depend on accurate census data and that lower-quality data will disrupt redistricting efforts and cause a misallocation of resources.  Tr. 799:1-16, 1005:3-24, 1040:7-1041:10 (Abowd).

43.     Plaintiffs have shown that harm to census data quality and accuracy caused by the citizenship question will concretely injure the local government Plaintiffs in at least two ways.

44.     First, the degraded data quality will injure the local government Plaintiffs' ability to draw election districts equitably and in compliance with federal and state voting rights laws.  *Id.*

45.     The Equal Protection Clause of the Fourteenth Amendment requires that electoral districts afford their residents equality of representation by ensuring equality of population across legislative districts.  *Reynolds v. Sims*, 377 U.S. 533, 579 (1964); *Kirkpatrick v. Preisler,* 394 U.S. 526, 531 (1969) ("Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives.")

8

Even local redistricting plans with population deviations under ten percent do not enjoy a "safe harbor" from legal challenge. *Larios v. Cox,* 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004), *aff'd* 504 U.S. 947 (2004); *Perez v. Abbott,* 250 F. Supp. 3d 123, 191 (W.D. Tex. 2017).

46.    In addition, section 2 of the federal Voting Rights Act and the California Voting Rights Act both prohibit election districts that "dilute" the voting power of racial and ethnic minority groups. *See* 52 U.S.C. § 10301; *Thornburg v. Gingles,* 478 U.S. 30, 43-52 (1986); Cal. Elec. Code §§ 14027, 14028, 14032; *see also Sanchez v. City of Modesto,* 145 Cal.App.4th 660, 668-70 (2006).

47.    The evidence shows that at least the City of Los Angeles and LAUSD use granular decennial census count and characteristic data to create election districts in compliance with these voting rights laws and redistricting principles. Westall Trial Decl. ¶¶ 18-32; Crain Trial Decl. ¶¶ 7-10.

48.    However, the degraded census data quality resulting from the citizenship question will cause many of their residents to be counted in the wrong place and assigned the wrong racial and ethnic characteristics. PFOF § V(A)(3). As a result, the citizenship question will injure Plaintiffs' ability to draw election districts equitably and in compliance with applicable voting rights laws.

49.    Second, the lower quality and inaccurate census data that results from the citizenship question will impair local government Plaintiffs' ability to equitably and properly allocate resources and to engage in civic planning and problem-solving efforts.

50.    For example, the City of Los Angeles relies on census data at all levels of granularity to determine the needs of each City neighborhood and to efficiently and equitably allocate City resources and services. Westall Trial Decl. ¶¶ 33-36. The City also relies on census data for urban planning and development purposes. *Id.* ¶ 37. The inaccuracies caused by adding the citizenship question will impair these efforts and lead to a misallocation of City resources. *Id.* ¶¶ 33-37.

51.    Similarly, Plaintiff County of Los Angeles relies on data that is only provided by the decennial census to identify housing needs of unincorporated communities and to ensure safe,

9

sanitary, and affordable housing for County residents.  Bodek Trial Decl. ¶¶ 6-15.  The County relies on granular block-level census data on population count, age, race, employment, housing characteristics, and "special needs."  *Id.*  The County can act to preempt and remedy housing issues—such as overcrowding or homelessness—if and only if it has accurate block-level census data. *Id.*  Accurate census data is also crucial for the County's assessment of and planning for future growth.  *Id.* ¶¶ 17-21.  The citizenship question, and its concomitant harm to data quality, will disrupt those crucial efforts.

52.     The inaccuracies in the census data caused by the citizenship question will also result in the misallocation of resources to the County's residents and agencies.  *Id.* ¶ 21.

53.      Accordingly, the local government Plaintiffs have a strong interest in using accurate, granular census data to properly and equitably allocate resources throughout their jurisdictions, to ensure that the needs of their communities are being met, and to preempt and remedy civic issues. The degradation of data quality caused by the citizenship question will impinge upon those interests.

54.     For these reasons, Defendants' decision to add a citizenship question, and the resulting degradation of data quality, harms local government Plaintiffs' interests in using accurate census data, and that harm is sufficient to establish a "certainly impending" injury-in-fact. *See Susan B. Anthony Lists*, 573 U.S. at 158; *Havens Realty*, 455 U.S. at 373-74; *FEC*, 524 *U.S.* at 20-21; *Pub. Citizen*, 491 U.S. at 449-51; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

### 4.     Lost political representation

55.     Plaintiffs have shown that adding a citizenship question to the 2020 Census will cause a differential undercount of the State of California's population relative to other states, creating the substantial and unreasonable risk that California will lose its fair share of political representation in Congress, and by extension, the Electoral College.  PFOF § V(B)(4).

56.     A plaintiff's "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement of Article III standing."  *Dep't of Commerce*, 525 U.S. at 331-332; *Carey*, 637 F.2d 834 at 838 (showing of disproportionate undercount that results in the loss of congressional representation confers standing); *City of New York v. U.S.*

*Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989) (likely undercount of subpopulations disproportionately represented in plaintiff states confers standing).

57.     Based on Dr. Fraga's calculations, California is at substantial risk of losing at least one congressional seat because of the citizenship question.  PFOF § V(B)(4).  This expected loss of political representation constitutes injury-in-fact sufficient to confer standing.  *Dep't of Commerce*, 525 U.S. at 331-332.

58.     Such malapportionment of the State of California's congressional representation is a "threat of vote dilution" that "is 'concrete' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'"  *Id.* at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

59.     The court need not wait until after the census has been taken to find that Plaintiffs have suffered injuries to their right to fair political representation "because such a pause would result in extreme—possibly irremediable—hardship."  *Id.*

60.     Having shown that the political representation that they will lose because of the citizenship question is an injury that is "certainly impending," and at a minimum, that they face a "substantial risk" of such injury, Plaintiffs have standing on this additional basis.  *See Clapper*, 568 U.S. at 414 n.5.

**C.     Plaintiffs' Injuries Are Traceable and Redressable**

61.     Establishing causation requires that the plaintiff demonstrate that his injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (citing *Bennett*, 520 U.S. at 167).

62.     "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."  *Id.*

63.     The key question is whether the "government's unlawful conduct is at least a substantial factor motivating the third parties' actions."  *Id.* at 1013 (internal citations and quotations omitted).  "So long as the plaintiff can make that showing without relying on speculation or guesswork about the third parties' motivations, she has adequately alleged Article

11

1   III causation." *Id.* (internal citations and quotations omitted); *see also Barnum Timber Co. v.*

2   *EPA*, 633 F.3d 894, 898-99 (9th Cir. 2011) (causation established by expert opinion about

3   "market reaction" to government conduct); *cf. In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 n.6

4   (9th Cir. 2018) (injury related to data breach fairly traceable to retailer, even though third party

5   hackers stole data).

6       64.     Plaintiffs have established that there will be a drop in self-response to the 2020

7   Census that is fairly traceable to the addition of the citizenship question.  *See* PFOF V(A)(1).

8       65.     That non-responders have a legal duty to respond to the census does not alter this

9   conclusion because the citizenship question is a "substantial factor" contributing to the

10  nonresponse.  *Mendia*, 768 F.3d at 1013.  Plaintiffs will be injured by the citizenship question's

11  "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 169.  No speculation or

12  guesswork is required to follow the chain of causation here; the Bureau and its top officials have

13  concretely affirmed the predictable impact of adding a citizenship question to the 2020 Census.

14  The harms Plaintiffs will suffer inevitably follow from the disproportionate undercount of

15  particular demographic groups that the Secretary's unlawful decision makes certainly imminent.

16  These harms are fairly traceable to that decision.

17      66.     To meet the redressability requirement, Plaintiffs must show that it is likely that a

18  favorable decision will redress their injuries.  *Lujan*, 504 U.S. at 561.

19      67.     A favorable decision vacating or enjoining the decision to add a citizenship

20  question to the 2020 Census would redress Plaintiffs' injuries by diminishing the funds that

21  would need to be expended on census outreach, by preventing harm to the accuracy of

22  demographic data used by Plaintiffs to make decisions related to redistricting and services, and by

23  ensuring that Plaintiffs do not lose federal funding and political representation because of the

24  citizenship question.

25      68.     Given that Plaintiffs have shown that their injuries are fairly traceable to

26  Defendants' decision to add a citizenship question to the 2020 Census and would be redressed by

27  an order vacating or enjoining that decision, Plaintiffs have met their burden to show standing.

28

**III.    THE DISPUTE IS RIPE FOR ADJUDICATION**

69.     Defendants argued in *State of N.Y. v. U.S. Dep't of Com.* that those plaintiffs' claims should be dismissed for lack of ripeness.

70.     In this case, however, Defendants did not preserve that argument, having failed to assert the defense in their Answer to the First Amended Complaint, ECF No. 80, in the Joint Pretrial Statement and Order, ECF No. 144, or in their pretrial Proposed Findings of Fact and Conclusions of Law, ECF No. 137.

71.     In any event, any such belated argument certainly fails here, most notably due to Defendants' recent filings in the Supreme Court related to their appeal of the decision in *State of N.Y. v. U.S. Dep't of Com.*—a petition for writ of certiorari before judgment and a motion for expedited consideration of that petition.  *See* Petition for Writ of Certiorari Before Judgment, Department of Commerce v. New York No. 18-966 (U.S. Jan. 25, 2019); Motion for Expedited Consideration of the Petition for Writ of Certiorari Before Judgment and for Expedited Merits Briefing and Oral Argument in the Event that the Court Grants the Petition, Department of Commerce v. New York No. 18-966 (U.S. Jan. 25, 2019).  In the petition and motion, Defendants seek expedited briefing and an expedited decision on the appeal so that the Census Bureau will be able to finalize and print the 2020 Census questionnaire in June of this year.

72.     The determination of ripeness requires the Court to evaluate: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Assn. v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

73.     In light of Defendants' representations to the Supreme Court, it is clear that the issues in this case are fit for judicial decision and that any delay would cause hardship to the parties.

**IV.    DEFENDANTS' DECISION TO ADD A CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE ENUMERATION CLAUSE OF THE CONSTITUTION**

74.     The United States Constitution requires that all persons in each state be counted every ten years.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2.

13

75.    The Constitution mandates the "actual Enumeration" of the population for the purpose of apportioning congressional representatives among the states.  U.S. Const. art. I, § 2, cl. 3.

76.    For this foundational step in our country's democratic process, the Constitution recognizes no exception based on citizenship status.  It is long settled that *all* persons residing in the United States—citizens and noncitizens alike—must be counted to fulfill the Constitution's "actual Enumeration" mandate.  *Id.*; *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).

77.    Congress has delegated the duty of taking the census to the Secretary of Commerce.  Under 13 U.S.C. § 141(a), "[t]he Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year."  The Secretary has authority to conduct the census "in such form and content as he may determine . . . ."  *Id.*  Likewise, the Bureau Director "is necessarily invested with discretion in matters of form and procedure when these are not specifically provided for by law . . . ."  *U.S. ex rel. City of Atlanta, Ga. v. Steuart*, 47 F.2d 979, 982 (D.C. Cir. 1931).

78.    Defendants' discretion with respect to the census questionnaire is not unfettered and is subject to congressional oversight.  Three years before the census, the Secretary must submit to Congress a report proposing the subjects to be included in the census.  13 U.S.C. § 141(f)(1).  Two years before the census, the Secretary must submit to Congress the specific questions to be included in the census.  13 U.S.C. § 141(f)(2).  The Secretary may only later modify the subjects or questions if he submits a report to Congress and "new circumstances exist which necessitate" the modification.  13 U.S.C. § 141(f)(3).

79.    Congress and the states use census data for many purposes, including for allocating federal funding.  *City of Los Angeles v. U.S. Dept. of Commerce*, 307 F.3d 859, 864 (9th Cir. 2002); *Wisconsin*, 517 U.S. at 5-6; *see also* PFOF § V(B)(2).  But the only constitutional purpose of the census is to apportion congressional representatives based on the "actual Enumeration" of the population of each state.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2; *see also Franklin v. Massachusetts*, 505 U.S. 788, 807 (1992) (reasoning that Secretary of

14

1    Commerce's decision to include overseas federal employees in the apportionment count did not

2    violate Enumeration Clause because the decision "does not hamper the underlying constitutional

3    goal of equal representation"); *see also Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J.,

4    concurring in part and dissenting in part) (observing that "[d]ebate about apportionment and the

5    census . . . focused for the most part on creating a standard that would limit political chicanery").

6         80.    The Census Bureau is not constitutionally required to perform an absolutely

7    accurate count of the population. *Wisconsin*, 517 U.S. at 6.

8         81.    Nevertheless, there is still a "strong constitutional interest in accuracy" of the

9    census. *Evans*, 536 U.S. at 478.

10        82.    The most important type of accuracy and that which most directly implicates the

11   constitutional purpose of the census is distributive accuracy, as opposed to numerical accuracy.

12   *Wisconsin*, 517 U.S. at 20.  Numerical accuracy refers to the accuracy of the overall count,

13   whereas distributive accuracy refers to the accuracy of the proportions in which residents are

14   counted in their proper locations.  *See id.* at 11 n.6.

15        83.    To promote distributive accuracy, the Enumeration Clause requires the Secretary's

16   actions to bear "a reasonable relationship to the accomplishment of an actual enumeration of the

17   population, keeping in mind the constitutional purpose of the census," which is to determine the

18   apportionment of the Representatives among the States. *Id.* at 20.

19        84.    The evidence here shows that the Secretary's decision to add a citizenship question

20   was unreasonable in light of that constitutional purpose.

21        85.    Plaintiffs' evidence shows that the citizenship question significantly impairs the

22   distributive accuracy of the census because it will uniquely and substantially impact specific

23   demographic groups.  Specifically, the citizenship question will cause an undercount of

24   immigrants and Latinos and, by extension, localities where many such residents live.

25        86.    There are several factors at play that make the citizenship question "unreasonable"

26   in light of this effect on the constitutional requirement of distributive accuracy.

27        87.    First, the citizenship question has created an unreasonable risk that California will

28   lose a seat in the House of Representatives.  Dr. Barreto's survey results, the Census Bureau's

15

1  nonresponse analysis, and Dr. Fraga's calculations show that the state is at risk of losing one to

2  three congressional seats, and that it is the only state with such a high risk under a range of

3  undercount scenarios.  *See* PFOF § V(B)(4).

4      88.    Second, there is no countervailing legitimate government interest to justify the

5  citizenship question.  The evidence shows that ACS data is sufficient for Voting Rights Act

6  enforcement (*see* PFOF §§ III(C), III(I), IV(C)); there is no justification for impairing the census'

7  distributive accuracy.

8      89.    Third, the citizenship question will cause other harms that flow from distributive

9  inaccuracy, including disproportionate federal funding and less equitable local government

10 redistricting, planning and funding allocations.  *See* PFOF §§ V(B)(2), (3).

11     90.    The finding that adding a citizenship question is unconstitutional here does not

12 automatically render all demographic questions on the census unconstitutional.  There is no

13 evidence that any other demographic question results in *distributive* inaccuracy by causing only

14 certain unevenly distributed subpopulations not to respond.

15     91.    Relatedly, there is no evidence regarding whether the citizenship question affected

16 the distributive accuracy of any previous census in which it was included.  The relevant

17 consideration here is that the citizenship question will uniquely diminish the distributive accuracy

18 of the 2020 Census.

19     92.    Thus, adding a citizenship question to the 2020 Census cannot be said to bear a

20 "reasonable relationship to the accomplishment of an actual enumeration of the population."

21 *Wisconsin*, 517 U.S. at 20.  Secretary Ross's decision thus violates the "actual Enumeration"

22 clause of the Constitution.

23 **V.    BASED ON THE ADMINISTRATIVE RECORD ALONE, DEFENDANTS' DECISION TO ADD
         A CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE APA**

24

25      **A.    The Scope of Judicial Review**

26     93.    "A person suffering legal wrong because of agency action . . . is entitled to judicial

27 review thereof."  5 U.S.C. § 702.

28

94.     Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A)-(D).

95.     The APA requires this Court to conduct "plenary review of the Secretary's decision . . . to be based on the full Administrative Record that was before the Secretary at the time he made his decision."  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706.

96.     The Supreme Court has made clear that this Court's review is to be "thorough, probing, [and] in-depth."  *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching and careful" review).

97.     Rigorous judicial review under the APA was intended to maintain the balance of power between the branches of government:  "[I]t would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the [APA] warrant, to give effect to its remedial purposes."  *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in the judgment) (in enacting the APA "Congress confined agencies' discretion and subjected their decisions to judicial review").

98.     The parties agree that, for the APA claim, the Court may consider at least the designated Administrative Record.

**B.     The Decision Violates the APA as Contrary to Law**

99.     An agency decision violates the APA when it is contrary to law.  5 U.S.C. § 706(2)(A); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1163 (9th Cir. 2004).

100.    Based on the Administrative Record alone, the decision to add the citizenship question violates the APA as contrary to law.

17

1

**1.    The decision is contrary to 13 U.S.C. § 6(c)**

2      101.    Section 6(c) of the Census Act required the Secretary to use administrative records

3  to address DOJ's data request rather than adding a citizenship question on the census.

4      102.    Although Congress delegated to the Secretary a degree of discretion in conducting

5  the census, section 6(c), among other provisions, limits that discretion.

6      103.    Title 13, section 6 states in full:

7      (a) The Secretary, whenever he considers it advisable, may call upon any other
       department, agency, or establishment of the Federal Government, or of the
8      government of the District of Columbia, for information pertinent to the work
       provided for in this title.

9
       (b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities,
10     or other units of government, or their instrumentalities, or from private persons and
       agencies, such copies of records, reports, and other material as may be required for
11     the efficient and economical conduct of the censuses and surveys provided for in this
       title.

12
       (c) To the maximum extent possible and consistent with the kind, timeliness, quality
13     and scope of the statistics required, the Secretary shall acquire and use information
       available from any source referred to in subsection (a) or (b) of this section instead of
14     conducting direct inquiries.

15  13 U.S.C. § 6.

16     104.    Subdivision (c) of section 6 was added to the statute in the 1976 Census Act.  *See*

17  1976 Census Act § 5(a), 90 Stat. at 2460.  So while the statute previously merely authorized the

18  use of government records for census-related purposes, the amendment made the use of those

19  records a mandatory alternative to "direct inquiries" in certain circumstances.

20     105.    This particular limitation on the Secretary's discretion was consistent with the

21  purpose of the 1976 Census Act to "constrain[] the Secretary's authority" and to "address[]

22  concerns that the [Census] Bureau was requiring the citizenry to answer too many questions in the

23  decennial census."  Brief for Respondents at 37 n.50, 40; *Dep't of Commerce v. U.S. House of*

24  *Representatives*, 525 U.S. 316 (1999) (No. 98-404), 1998 WL 767637.

25     106.    In other words, subdivision (c) of section 6 serves "the dual interests of

26  economizing and reducing respondent burden."  H.R. CONF. REP. No. 94-1719, at 10 (1976),

27  *reprinted in* 1976 U.S.C.C.A.N. 5476, 5478; *see also* Brief for Petitioners at 12 n.9; *Baldrige v.*

28  *Shapiro,* 455 U.S. 345 (1982) (No. 80-1436), 1981 WL 389922 (brief filed on behalf of the

18

1   Secretary of Commerce and Acting Director of the Census Bureau, noting the requirements of

2   6(c) and its legislative history).

3       107.    The Administrative Record here demonstrates that it was "possible" to "acquire

4   and use" administrative records from other government agencies that would produce data

5   "consistent with the kind, timeliness, quality and scope of the statistics required."  13 U.S.C.

6   § 6(c).

7       108.    The "kind" of data here would be the same regardless of whether it is gathered by

8   administrative records or a census question—in both cases, the relevant data is simply block-level

9   data on citizens versus noncitizens.

10      109.    The Census Bureau advised Secretary Ross in the March Memo that regardless of

11  whether administrative data or a citizenship question were used, there was no difference in timing

12  on when the citizenship data would be available.  PTX-133 at 11.   There is no evidence in the

13  Administrative Record indicating that it would take longer to provide citizenship data using

14  administrative records than a citizenship question.

15      110.    The Census Bureau repeatedly advised Secretary Ross that the quality of the

16  citizenship data would be higher from administrative records than a citizenship question, due to

17  noncitizens' propensity to report as citizens.  *See* PFOF §§ III(D), (E).

18      111.    The scope of the data would be the same, regardless of source, because data would

19  be obtained for residents of the entire country (with a minority requiring imputation, regardless of

20  the data source).  *See* PFOF § III(E)(7).

21      112.    Thus, under every criterion set forth in section 6(c), with no evidence in the record

22  to the contrary, using administrative records alone was superior to adding a citizenship question

23  to the decennial census.

24      113.    Secretary Ross was therefore legally required to obtain citizenship data through

25  administrative records rather than a citizenship question on the census.  His decision to do

26  otherwise violates the APA as contrary to law.

27

28

19

## 2. The decision is contrary to 13 U.S.C. § 141(f)(3)

114.    Adding a citizenship question to the 2020 Census is contrary to law because

Secretary Ross failed to file the report to Congress mandated by 13 U.S.C. § 141(f)(3).

115.    Section 141(f) provides:

 (f) With respect to each decennial and mid-decade census conducted under subsection (a) or (d) of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census—

> (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;

> (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and

> (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C.A. § 141(f).

116.    Secretary Ross submitted his section 141(f)(1) report in March of 2017.  PTX-264.

That report did not include the subject of citizenship.  *Id.*; Undisputed Facts ¶ 126.

117.    Secretary Ross submitted his section 141(f)(2) report in March of 2018.[1]

Consistent with his Decision Memo, that report states that a citizenship question will be included

on the 2020 Census.

---

[1] Plaintiffs request that the Court take judicial notice of the report, Questions Planned for the 2020 Census and American Community Survey, available at https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.  Fed. R. Evid. 201; *see also United States Small Business Admin. v. Bensal,* 853 F.3d 992, 1003 & n. 3 (9th Cir. 2017) (courts may take judicial notice of information made publicly available by government entities); Fed. R. Evid. 902(5) (publications of public authorities are self-authenticating).

118.    Despite the new subject matter in the section 141(f)(2) report, Secretary Ross has not submitted a report pursuant to subdivision (f)(3).[2]  *See* 13 U.S.C. § 141(f)(3).

119.    Such a report is required by section 141(f)(3) as a substantive limitation on the Secretary's ability to modify the census.  Any other reading would render the "new circumstances" clause superfluous and undermine the purpose of the statute.  Otherwise, Defendants could overhaul the census questionnaire the day before the census begins even if there were no new circumstances justifying this change.

120.    Defendants argue that only Congress can enforce section 141(f) because courts cannot redress any injury resulting from an inadequate report.

121.    However, the APA "creates a basic presumption of judicial review for one suffering legal wrong because of agency action."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S.Ct. 361, 270 (2018).

122.    The cases cited by Defendants to attempt to rebut that presumption do not apply here.  In both *Guerrero* and *Renee*, the plaintiffs challenged the adequacy of the *contents* of the report that had been submitted to Congress.  *Guerrero v. Clinton*, 157 F.3d 1190, 1191 (1998); *Renee v. Duncan*, 686 F.3d 1002, 1016 (9th Cir. 2012).  The Ninth Circuit held in both cases that the court could not police the quality of those reports for the particular reason that the reports were "purely informational" and no legal consequences flowed and no rights were affected by the reports.  *Guerrero*, 157 F.3d at 1194-1195; *Renee*, 686 F.3d at 1016-17.

123.    The situation here is distinguishable from *Guerrero* and *Renee*.  First, Plaintiffs here do not challenge the adequacy of the content of Secretary Ross's report, but rather his complete failure to submit a subdivision (f)(3) report at all, as required by law.  Second, unlike in *Guerrero* and *Renee*, the report here does have legal consequences.  Because the report is a substantive requirement that must be fulfilled before a citizenship question is included on the census, Secretary Ross's failure to submit the report legally prohibits him from adding the

---

[2] Plaintiffs request that the Court take judicial notice of the fact that Secretary Ross has not submitted a report to Congress separate and apart from the subdivision (f)(2) report and specifically pursuant to subdivision (f)(3).  This fact is not subject to reasonable dispute and has been conceded by Defendants.  *See* Fed. R. Evid. 201; *see also* ECF No. 137 (Defendants' Proposed Findings of Fact and Conclusions of Law) at 41-42.

21

1   question.  This Court can therefore redress Plaintiffs' injuries by enjoining the addition of the

2   citizenship question.

3       124.    Defendants also contend that only Congress can enforce section 141(f).  They

4   argue that the (f)(3) report is not the type of "final agency action" reviewable by the APA because

5   it does not determine rights that trigger legal consequences.  However, the final agency action at

6   issue in this action is not, *per se*, the Secretary's submission or non-submission of a report.  The

7   action at issue is the Secretary's decision to add the citizenship question and whether that action

8   comports with the law, including all congressional reporting prerequisites.

9       125.    The decision to add the citizenship question without submitting a report to

10  Congress under section 141(f)(3) therefore violated the APA as contrary to section 141(f)(3).

11      **C.    The Decision Violates the APA Because Its Justification Was Pretextual**

12      126.    The APA requires an agency decision-maker to "disclose the basis of its" decision

13  to "give clear indication that it has exercised the discretion with which Congress has empowered

14  it."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *accord Federal*

15  *Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 396 (1974).

16      127.    Where the agency decision-maker fails to disclose the substance of relevant

17  information that has been presented to it, the court "must treat the agency's justifications as a

18  fictional account of the actual decisionmaking process and must perforce find its actions

19  arbitrary."  *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54-55 (D.C. Cir. 1977); *see also U.S.*

20  *Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 534-535 (D.C. Cir. 1978) (basis of

21  agency's decision must be disclosed at the very latest in the final decision to permit meaningful

22  judicial review).

23      128.    Secretary Ross violated the APA by failing to disclose the basis for his decision to

24  add a citizenship question to the 2020 Census.

25      129.    As explained in the Findings of Fact, the evidence overwhelmingly shows that

26  Secretary Ross decided to add the citizenship question well before DOJ made the request in

27  December of 2017 and that his reason for doing so was not to improve enforcement of section 2

28  of the VRA.  PFOF § III(K).  That purported purpose was a mere pretext.

130.    Secretary Ross did not disclose any purpose for adding the citizenship question other than section 2 enforcement.  *See* PTX-26.

131.    The evidence strongly indicates that at least one of Secretary Ross's true purposes was to take a step toward excluding noncitizens from the census's apportionment count.  PFOF § III(K).  However, it is unnecessary to definitively ascertain his true purpose.  For the purposes of the APA, it is relevant only that section 2 enforcement did not form the basis of Secretary Ross's decision and that he disclosed no other basis.

132.    Secretary Ross has therefore violated the APA for failing to disclose the actual basis of his decision to add a citizenship question to the 2020 Census.

### D.    The Decision Was Arbitrary and Capricious Because Defendants Failed to Consider "An Important Aspect of the Problem"

133.    Agency action should be set aside as arbitrary and capricious if the agency fails "to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential harms of its changes to an airport advertising program); *Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare" (emphasis in original)).

#### 1.    Defendants failed to consider whether the citizenship question would cause an undercount that would harm Plaintiffs

134.    The Decision Memo states that "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond."  PTX-26 at 7.  But Secretary Ross failed to consider the full range of harms that will befall Plaintiffs if a citizenship question is added to the 2020 Census—harms that outweigh DOJ's purported need for citizenship data.

23

135.    The sole constitutional purpose of the census is congressional apportionment.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2; Pub. L. 105-109, § 209(a)(2).  In addition, decennial census data is used to determine the number of electoral votes each state has in the Electoral College; congressional, state, and local legislative district boundaries; and the allocation of hundreds of billions of dollars in public funding each year.  Undisputed Facts ¶¶ 50-52.  If, as Plaintiffs have shown, the 2020 Census undercounts Californians and other plaintiff jurisdictions, Plaintiffs will be denied their just representation and funding allocations.  *See* PFOF §§ V(2), (4).

136.    The Decision Memo does not consider any of these harms.  *See* PTX-26.  Indeed, there is no analysis in the Administrative Record of whether a decline in self-response rates would ultimately lead to an undercount that would affect congressional apportionment or federal funding.  *See, e.g.*, PTX-22, PTX-25, PTX-26, PTX-101, PTX-133, PTX-148.

137.    These harms—particularly the potential that the State of California could lose a congressional seat—are an "important aspect of the problem" that Secretary Ross failed to consider before adding a citizenship question to the 2020 Census.  *See State Farm*, 463 U.S. at 43.

### 2.    Defendants failed to consider key legal obligations

138.    The decision is also arbitrary and capricious under the Administrative Record because the Secretary Ross failed to consider his statutory obligations under 13 U.S.C. sections 6(c) and 141(f)(3).

139.    As explained above, section 6(c) requires the Secretary in certain circumstances to use data from other government agencies "instead of conducting direct inquiries."  13 U.S.C. § 6(c).  The Secretary "*shall*" adhere to these terms "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required."  *Id.* (emphasis added).

140.    As explained above, section 141(f)(3) required the Secretary to submit a report to Congress upon his decision to modify the subjects of the Census based on findings that new circumstances necessitated the modification.  13 U.S.C. § 141(f)(3).

1    141.   The Decision Memo does not address Secretary Ross's legal obligations under

2    either section 6(c) or section 141(f)(3).  PTX-26.

3    142.   No other evidence in the Administrative Record indicates that Defendants

4    considered Secretary Ross's legal obligations under section 6(c) or section 141(f)(3) during their

5    decision-making process.  *See* PFOF § III(J).

6    143.   The Administrative Record contains only one bare mention of the Secretary's

7    obligations more generally under 13 U.S.C. § 141(f).  *Id.*  It appears in the email between

8    Secretary Ross, Mr. Neuman, and Mr. Comstock, in which Secretary Ross expresses frustration

9    about the Census Bureau's stance on adding new questions after March of 2017, and Mr. Neuman

10   assures Secretary Ross that there would be another opportunity to report new questions in the

11   following year.  PTX-88.

12   144.   Mr. Neuman's advice was clearly contrary to section 141(f), which distinguishes

13   "subjects" from "questions," and provides additional requirements if questions are added that

14   were not among the reported subjects.  13 U.S.C. § 141(f).

15   145.   There is no communication or other mention in the Administrative Record about

16   the requirement in subdivision (f)(3) that Ross find the existence of "new circumstances" that

17   necessitate adding citizenship status to the census subjects.  PFOF § III(J).  There is no

18   communication or other mention in the Administrative Record about Secretary Ross's statutory

19   obligation to submit a report to Congress regarding that determination.  *Id.*

20   146.   Given the contents of the Administrative Record, Defendants failed to consider the

21   Secretary's legal obligations under 13 U.S.C. sections 6(c) and 141(f)(3).

22   147.   Defendants' complete failure to address these binding statutory mandates renders

23   the decision arbitrary and capricious.  *League of Women Voters v. Newby*, 838 F.3d 1, 10-12

24   (D.C. Cir. 2016) (disregard for statutory criterion renders agency decision arbitrary under the

25   APA).

26

27

28

### 3. Defendants failed to independently consider whether existing ACS CVAP data is sufficient for enforcement of section 2 of the Voting Rights Act

148.    Defendants also failed to consider whether it was necessary to act on DOJ's request as articulated in the December 12 Letter, in the first place, or whether existing ACS CVAP data is sufficient for section 2 enforcement.

149.    Secretary Ross's Decision Memo states that his decision was based on DOJ's request to add a citizenship question.  But the Census Act delegates the authority to obtain "other census information" to the Secretary of Commerce, not DOJ, and authorizes the collection of such information (subject to other statutory limitations) only "as necessary."  13 U.S.C. § 141(a).

150.    Under the APA, "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives."  *City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987) (citations and internal quotations omitted); *Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d 1, 16 (D.C. Cir. 2015) ("[a]dministrative law does not permit" an agency "to excuse its inadequate responses by passing the entire issue off onto a different agency").

151.    The Administrative Record shows that Defendants failed to independently evaluate whether existing ACS CVAP data is sufficient, or whether block-level data is really necessary for section 2 enforcement.  *See* PFOF § III(I).

152.    The December 12 Letter certainly does not establish on its face that census-derived block-level CVAP data are necessary to enforce section 2 of the VRA.  PTX-32; PFOF §§ (III)(C), (K).

153.    The December 12 Letter does not state that such data is "necessary" to enforce the VRA; rather, it studiously avoids using the word "necessary" to describe the request for the data. PTX-32.

154.    The December 12 Letter identifies no section 2 cases that a plaintiff failed to bring due to insufficient CVAP data from the ACS.  PTX-32; PFOF § (III)(C).

155.    The December 12 Letter identifies no filed section 2 cases that failed due to insufficient CVAP data from the ACS.  PTX-32; PFOF § (III)(C).

156.    The cases cited in the December 12 Letter—the only legal support offered in the Administrative Record for the proposition that hard-count CVAP data is important to the enforcing section 2 of the VRA—in no way support the contention that having hard-count citizenship data matters for section 2 enforcement purposes.  PTX-32 (citing *LULAC v. Perry*, 548 U.S. 399, 423-42 (2006) (discussing the district court's factual findings based on then-existing CVAP data and finding in favor of plaintiffs' vote dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (plaintiffs failed to satisfy first *Gingles* precondition using a district-level count of Spanish surnames—not ACS data—in combination with an independent expert's flawed calculation of additional Hispanic voters omitted from the surname data); *Barnett v. City of Chicago*, 141 F.3d 699, 702-05 (7th Cir. 1998) (finding that CVAP data were "the basis for determining equality of voting power that best comports with the policy of the [VRA]" and affirming judgment in favor of Hispanic plaintiffs); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569-70 (11th Cir. 1997) (rejecting challenge to accuracy of citizenship data from the long-form sample survey, finding it to be "reasonably accurate" and in accordance with "a long-standing statistical technique"); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (rejecting a vote dilution claim based on total population data, where plaintiffs conceded that they would lose if CVAP data were considered instead)).

157.    Similarly, no outside stakeholder communications provide any in-depth analysis that establishes the necessity of block-level CVAP data for section 2 enforcement.  *See* PTX 1 at AR 762-1276.

158.    The failure of Defendants to independently evaluate the merits of DOJ's request renders that decision invalid under the APA.  *Kuang v. U.S. Dep't of Defense*, No. 18-cv-3698-JST, 2018 WL 6025611, at *31 (N.D. Cal. Nov. 16, 2018) ("DoD has simply provided no explanation for how the 2017 Study's findings support its policy choice, and 'where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).

1

**E.    The Decision Was Arbitrary and Capricious Because It Ran Counter to the Evidence**

2

3

159.    An agency action is also arbitrary and capricious under the APA if the agency

offers an "an explanation for its decision that runs counter to the evidence before the agency."

4

*State Farm*, 463 U.S. at 43.

5

6

**1.    The decision was counter to the evidence that using administrative data alone would yield more accurate and complete citizenship data than adding a citizenship question to the census**

7

8

160.    The agency must "articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'" *Id.* at 37 (quoting *Burlington*

9

*Truck Lines*, 371 U.S. at 168.

10

11

161.    Where a decision-maker adopts a "plainly inferior" course of action, that decision

is arbitrary and capricious. *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003); *see also*

12

*Beno v. Shalala*, 30 F.3d 1057, 1073-74 (9th Cir. 1994).

13

14

162.    Defendants' decision to add the citizenship question to the 2020 Census is contrary

to the evidence.

15

16

163.    Defendants' decision is predicated on the assertion in the Decision Memo that

adding a citizenship question on the 2020 Census will result in the "most complete and accurate"

17

18

citizenship data for DOJ's stated purpose of VRA enforcement.  PTX 26 at 1 ("The Department

and Census Bureau's review of the DOJ request—as with all significant Census assessments—

19

prioritized the goal of obtaining *complete and accurate data*" (emphasis in original); *see also id.*

20

21

at 5 ("It is my judgment that Option D will provide DOJ with the most complete and accurate

CVAP data in response to its request"), 7 ("[h]owever, even if there is some impact on responses,

22

the value of more complete and accurate data derived from surveying the entire population

23

24

outweighs such concerns"), 8 ("To conclude, after a thorough review of the legal, program, and

policy considerations, as well as numerous discussions with the Census Bureau leadership and

25

interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020

26

Decennial Census is necessary to provide complete and accurate data in response to the DOJ

27

request.").

28

28

164.     In light of this stated goal, Defendants' decision to add a citizenship question to the 2020 Census plainly runs counter to the evidence in the Administrative Record that shows that adding a citizenship question will result in citizenship data that is *less* accurate and no more complete than citizenship data that would be gathered through administrative records alone (Alternative C).

165.     This was the conclusion of every scientific analysis in the Administrative Record that addressed the issue, and this conclusion was repeatedly communicated to Secretary Ross. *See, e.g.*, PTX-22 at 1 (January 19 Memo) (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources"); PTX-25 at 5 (March 1 Memo) ("Alternative D would result in poorer quality citizenship data than Alternative C.").

166.     The Census Bureau's analyses offered several explanations for the difference in accuracy between a census response and administrative record data.

167.     First, the citizenship data in administrative records is "very accurate" because that data point requires people to have provided proof of citizenship or legal resident alien status. PTX-101 at 3; PTX-22 at 7.

168.     Second, citizenship data that is self-reported in surveys is inaccurate for non-citizens.  Historical census and ACS data show that noncitizens misreport themselves as citizens "for no less than 23.8% of the cases, and often more than 30%."  PTX-22 at 7.

169.     Third, the Census Bureau found that lowered self-response rates due to the citizenship question will decrease the number of people who can be linked to administrative records, because the personal-identifying information (PII) gathered in NRFU is lower quality than PII gathered through self-response.  PTX-22 at 2; PTX-25 at 4.

170.     Fourth, imputation will be less accurate if based in part on self-reported citizenship data rather than administrative records alone.  Because many noncitizens inaccurately report that they are citizens, the imputation model will be biased under Option D.   In contrast, the imputation model under Alternative C would be benchmarked to accurate administrative records and therefore would not suffer from this bias.  PTX-24 at 13.

29

171.    Notably, there is no evidence in the Administrative Record supporting Secretary Ross's assertion that self-reported citizenship data is more accurate than citizenship data from administrative records.

172.    Thus, all of the evidence shows that citizenship information gathered through a citizenship question on the Census (Option D) will be *less* accurate than citizenship information gathered through administrative records (Alternative C).

173.    All of the evidence in the Administrative Record also shows that Option D will not yield more "complete" data than Alternative C.

174.    Secretary Ross implies in the Decision Memo that citizenship data from administrative records would be incomplete because using administrative records alone would require imputation of citizenship status for 10 percent of the population, whereas a citizenship question on the 2020 Census "may eliminate the need for the Census Bureau to have to impute an answer for millions of people."  PTX-26 at 4, 5.

175.    In fact, the Census Bureau estimates that under both alternatives millions of people would need their citizenship status imputed and the total number of people assigned a citizenship status would be approximately the same (330 million).  PTX-24 at 1-4.

176.    In sum, all of the evidence in the Administrative Record shows that adding a citizenship question to the 2020 Census would yield citizenship data that is *less* accurate and no more complete than gathering that data using administrative records alone.

177.    The decision to add the citizenship question was therefore arbitrary and capricious as contrary to the evidence and violates the APA.

**2.    The decision was counter to the evidence because the Decision Memo was rife with flawed assertions that were not based on any evidence or were counter to the evidence in the record**

178.    The decision was also counter to the evidence because it was replete with flawed assertions that are either not based on any evidence or contrary to the evidence in the Administrative Record.

179.    First, the Decision Memo repeatedly claimed that there was no evidence that the citizenship question would cause a drop in self response, and that "no one has identified any mechanism for doing so."  PTX-26 at 3, 4, 5; *see also* PFOF § III(J).

180.    This assertion is contrary to the evidence in the Administrative Record.  The Census Bureau performed a scientific analysis leading to an estimate that 5.1 percent of households with at least one noncitizen would not respond to the census due to the citizenship question.  *See* PFOF III(E).  The Bureau repeatedly communicated that estimate to Secretary Ross.  *Id.*  Nothing in the Administrative Record supports a contrary conclusion.

181.    Second, the Decision Memo states that asking the citizenship question of all people "may eliminate the need for the Census Bureau to have to impute an answer for millions of people."  PTX-26 at 5.  However, the Census Bureau had estimated that with a citizenship question on the census, it would still have to impute the citizenship data of 13.8 million people.  PTX 24 at 2.  Nothing in the Administrative Record supports a contrary conclusion.

182.    Third, the Decision Memo states that Option D "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," PTX-26 at 4, so as to allow for "more complete" citizenship data.  However, the Administrative Record reflects that because adding a citizenship question would drive down the self-response rate and put more households into NRFU operations, Option D actually *reduces* the Census Bureau's ability to match survey responses with administrative records.  PTX-25 at 4.

183.    Fourth, the Decision Memo also attempts to justify Option D by stating that adding the citizenship question to the census "will permit the Census Bureau to determine the inaccurate response rate" of citizenship, and suggests that this would improve the accuracy of the imputation model.  PTX-26 at 5.  However, nowhere in the Administrative Record, including in the Abowd memoranda, does the Census Bureau state that adding a citizenship question would increase the accuracy of its estimate of inaccurate citizenship responses.  *See* PTX-22, PTX-24, PTX-25, PTX-101, PTX-148.  Nor is it apparent from the Administrative Record why the inaccuracy rate of responders would help impute the citizenship data of non-responders.  If actual citizenship is

1    benchmarked to administrative records, and the Bureau would be using those records in any

2    event, then adding a census question would not assist in the imputation.

3        184.    Defendants' decision is arbitrary and capricious because these key statements in

4    the Decision Memo, purportedly justifying the choice of "Option D," were counter to the

5    evidence.

6    **VI.    EXTRA-RECORD EVIDENCE CONFIRMS THAT DEFENDANTS' DECISION TO ADD A
          CITIZENSHIP QUESTION TO THE 2020 CENSUS VIOLATES THE APA**

7

8        **A.    Applicable Exceptions to the Rule of Record Review**

9        185.    In evaluating an APA claim, courts "typically" limit their review to the

10    Administrative Record existing at the time of the decision. *Southwest Center for Biological

11    Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1459 (9th Cir. 1996); *accord Ranchers

12    Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108,

13    1117 (9th Cir. 2007).

14        186.    "Under limited circumstances, however, extra-record evidence can be admitted

15    and considered." *Ranchers Cattlemen*, 499 F.3d at 1117. These exceptions include: (1) when

16    plaintiffs make a showing of agency bad faith, and (2) when the agency failed to consider "all

17    relevant factors" of the decision. *Id.*

18        **1.    The Court may consider extra-record evidence relevant to Plaintiffs'
              claims that the Secretary's decision was based on pretext**

19        187.    A court may consider extra-record evidence that is relevant to the reason for an

20    agency action where there has been a strong showing of bad faith or improper behavior by the

21    decision-makers. *Public Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir. 1982); *see also

22    Overton Park*, 401 U.S. at 402; *Ranchers Cattlemen*, 499 F.3d at 1117.

23        188.    In such circumstances, consideration of extra-record evidence is "necessary to

24    meaningful judicial review" to understand the agency's actual decision-making process.

25    *Tummino v. Torti*, 603 F. Supp. 2d 519, 543, 544 (E.D.N.Y. 2009).

26        189.    The Administrative Record alone provides ample evidence that Secretary Ross's

27    publicly stated reason for adding the citizenship question—enforcement of section 2 of the

28    VRA—was pretext. Even if that evidence were to fall short of proving pretext—which it does

not—it is certainly sufficient to constitute the requisite "strong showing" of bad faith to look outside the record for further evidence of pretext.

190.    That is particularly true here, where the Administrative Record includes pre-decision communications between Secretary Ross and his "point person" on the citizenship question issue expressing caution about what the Administrative Record would include.  PTX-96, PTX-362.

### 2.    The Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors

191.    This Court may consider extra-record evidence to evaluate whether Defendants failed to consider all relevant factors before deciding to add the citizenship question to the 2020 Census.  *See Ranchers Cattlemen*, 499 F.3d 1108 at 1117.

192.    An agency's decision is arbitrary and capricious under the APA if, among other things, the agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 31, 43-44; or made "an irrational departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

193.    To apply these standards, a court must as a threshold matter understand what is "relevant," "important," or "settled policy" in the field where the challenged agency decision was made.  In many cases, the Administrative Record will provide the relevant benchmarks.  But evidence outside the "bare record" may be required to determine "the applicable standard" to apply in evaluating the completeness of the agency's reasoning and in determining whether the agency ignored critical factors or information.  *See Overton Park*, 401 U.S. at 420; *see also Nat'l Audubon Soc. v. U.S. Forest Service,* 46 F.3d 1437, 1447 (9th Cir. 1993); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

194.    "It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."  The court cannot adequately discharge its duty to engage in a "substantial inquiry" if it is required to take the agency's word that it considered all relevant matters.  *Asarco Inc. v. U.S.*

33

1   *Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also Nat'l Audubon*

2   *Soc. v. Hoffman*, 132 F.2d 7, 15 (2d Cir. 1997) ("[t]he omission of technical scientific information

3   is often not obvious from the record itself").

4       195.    In this case, as described below, the decision-making process lacked adequate

5   consideration of several relevant factors.

6       **B.    Extra-Record Evidence Confirms that Defendants' Justification for the Decision was Pretextual**

7

8       196.    It is not necessary in this action to look outside of the Administrative Record to

9   conclude that Defendants' stated basis for adding the citizenship question—VRA enforcement—

10  is pretextual and that the real basis has not been disclosed.

11      197.    In any event, extra-record evidence confirms this conclusion.  Much of this

12  evidence is summarized in Post-Trial Findings of Fact Section IV(A).  Several facts are

13  particularly striking.

14      198.    First, Secretary Ross's senior officials at the Commerce Department all claim to be

15  entirely ignorant of why Secretary Ross wanted the citizenship question on the 2020 Census.

16  Comstock Dep. 112, 251-54; Teramoto Dep. 32; Kelley Dep. 39.  Even Earl Comstock, the

17  Director of Policy in charge of soliciting the DOJ request for the question, claims that he never

18  asked Secretary Ross to explain his reasoning.  Comstock Dep. 171-72.

19      199.    Second, the evidence indicates that details of the VRA rationale were formulated

20  not by DOJ, but by Commerce Department attorney James Uthmeier.  At Mr. Comstock's

21  request, Mr. Uthmeier initially investigated "how Commerce could add the question to the Census

22  itself."  PTX-370.  On August 11, 2017, Mr. Uthmeier emailed Secretary Ross and Ms. Teramoto

23  a memorandum concerning the addition of a citizenship question to the census.  PTX-147.  That

24  memorandum was not produced to Plaintiffs.  In September of 2017, Mr. Uthmeier reached out to

25  John Gore and, after a phone call, sent Mr. Gore the August 11 memorandum, which Gore relied

26  on in preparing the December 12 Letter.  Gore Dep. 117-18, 123-24.

27      200.    Third, DOJ's December 12 Letter requesting the citizenship question was drafted

28  and reviewed almost entirely by political appointees, not VRA attorneys.  *See* PFOF § III(A)(2).

34

1    Mr. Gore initially prepared the letter and sent an early draft to Chris Herren, the Chief of the

2    Voting Rights Section, on November 1, requesting feedback and cautioning him not to share its

3    contents.  Gore Dep. at 126, 130.  This was the only involvement by anyone in the Voting Rights

4    Section, as the letter continued to be reviewed and revised by political appointees in the office

5    (including those in the Executive Office) for more a month afterwards.  *Id.*  These facts also

6    suggest the December 12 Letter was drafted and sent for political purposes, not the policy

7    purpose of VRA enforcement.

8        201.    Fourth, DOJ's decision to refuse to meet with the Census Bureau to discuss its

9    request for a citizenship question was both "very unusual" for a requesting agency and directed

10   by Attorney General Sessions himself.  Tr. 1055:5-9 (Abowd); Gore Dep. 271:21-272:13.  That

11   DOJ would choose not to pursue an offered alternative that the Census Bureau believed would

12   better suit DOJ's stated needs is extraordinary—and all the more so given that the Attorney

13   General himself made the decision.  This evidence strongly suggests that VRA enforcement was

14   not the true goal of the DOJ officials who prepared the request.

15       **C.    Extra-Record Evidence Confirms that the Decision was Arbitrary and
             Capricious Because Defendants Failed to Consider "An Important Aspect
16           of the Problem"**

17       202.    It is also appropriate here to consider extra-record evidence to assess what factors

18   were "important" to the decision and to explain technical terms and complex subject matter

19   related to the census.  *See Ranchers Cattlemen*, 499 F.3d at 1117; *Lands Council v. Powell*, 395

20   F.3d 1019. 1030 (9th Cir. 2005).

21           **1.    Defendants failed to consider the applicable standards that required
                   them to pretest the citizenship question**
22

23       203.    Defendants failed to consider the applicable agency standards that required them to

     pretest the citizenship question before adding it to the census questionnaire.
24

25       204.    The Decision Memo states that the citizenship question is "well tested" because it

     has been on the ACS since 2005.  PTX-26 at 2.
26

27       205.    However, the evidence shows that pretesting the citizenship question was required

28   by the Census Bureau's Statistical Quality Standards, the Office of Management and Budget's

---

35

(OMB) Standards and Guidelines for Statistical Surveys, as well as the Census Bureau's "well-established process" for testing new questions.  PFOF § IV(B)(1).

206.    The Census Bureau's Statistical Quality Standards provide that a question from another survey is exempt from pretesting only if the question "performed adequately in another survey," or if a waiver was obtained through a specified internal process.  PFOF § IV(B)(1)(a).

207.    Defendants' decision to add the citizenship question was arbitrary and capricious because they failed to consider whether the citizenship question was "performing adequately" on the ACS for the purposes of pretesting.  PFOF § III(H).  Secretary Ross, in particular, ignores this requirement in the Decision Memo, taking for granted the question's performance because it had supposedly been "well tested."

208.    Defendants also did not consider whether a waiver was necessary to add the citizenship question, in light of the fact that the citizenship question was performing inadequately.  PFOF § III(H); *see also* PTX-26.

209.    The OMB Standards and Guidelines for Statistical Surveys require pretesting of all components of the decennial census to gauge how individual questions perform on their own and in the full context in which those questions appear.  PFOF § IV(B)(1)(b).  Defendants also did not consider this OMB standard.  PFOF § III(H); *see also* PTX-26.

210.    Even if the citizenship question were performing "adequately" on the ACS and all other applicable standards had been met, Defendants still should have considered pretesting the citizenship due to the current macro environment and the different operating conditions in which the ACS and the decennial census are conducted.  Habermann Trial Aff. ¶ 68; Tr. 1047:20-23, 1050:7-16 (Abowd).  They failed to do so.

211.    The decision to add the citizenship question is arbitrary and capricious due to Defendants' failure to consider the applicable agency standards that required them to pretest the citizenship question.

1

2

### 2.    Defendants failed to consider the governing burden to change a census question

212.    Defendants failed to consider important aspects of the problem because the Secretary applied an incorrect (and insurmountable) standard for determining when new questions would unreasonably harm the census count or data quality.  The Secretary's decision does not meet the applicable standard for adding new questions to the census.  Defendants bear the burden to demonstrate the need for the question, and to confirm that the change will not cause harm.  *See* Habermann Trial Aff. ¶ 18.

213.    Dr. Habermann has testified that "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public." *Id.*

214.    But the Secretary's decision makes clear that Defendants made no affirmative finding that the citizenship demand would *not* harm the decennial census; instead, the Secretary based his decision on the purported absence of evidence of harm.  *See* PTX-26 at 7 ("[t]he Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."); *see also id.* at 3 ("[N]o empirical data existed on the impact of a citizenship question on responses."); *id.* at 4 ("Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey."); *id.* at 5 ("[T]here is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.").

215.    On the other hand, the Administrative Record is replete with evidence demonstrating that adding the citizenship question to the census would "increase response burden" and "harm the quality of the census count." *See, e.g.* PTX-22 at 1, 5.

37

216.     Even setting aside such evidence, the Secretary's reliance on the purported absence of evidence effectively inverts the relevant burden of proof and introduces unacceptable—and unlawful—risk to the census.  *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1075 (9th Cir. 2018) (agency action was arbitrary and capricious where the agency failed to consider scientific evidence "solely because of 'uncertainty'").

217.     In light of the irreparable impact of adding a citizenship question for the next decade, Secretary Ross's failure to consider and apply the appropriate standard is arbitrary and capricious.  *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

### 3.    Defendants failed to consider and irrationally departed from established practices for conferring with a requesting agency

218.     Defendants irrationally departed from the established Census Bureau policy of meeting with the requesting agency (here, DOJ) to better understand the agency's needs and to plan how to meet those needs.  *See* PFOF IV(A)(2).

219.     A decision is arbitrary and capricious if it involves "an irrational departure from [settled] policy."  *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996); *accord California Trout v. F.E.R.C*, 572 F.3d 1003, 1023 (9th Cir. 2009).

220.     The Supreme Court explained this rule in *Atchison, T. & S. F. Ry. Co. v. Wichita Bd. of Trade*:

> A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.

> There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.  From this presumption flows the agency's duty to explain its departure from prior norms…

> Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

412 U.S. 800, 807-808 (1973); *see also Fox Television Stations*, 556 U.S. at 514-515 & n.2 (agency must "provide *some* explanation for a change" (emphasis in original)).

221.     Thus, "an agency may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case."  *N.L.R.B. v. Silver Bay Local Union No.*

38

1    *962, Int'l Bhd. of Pulp, Sulphite & Paper Mill Workers, AFL-CIO*, 498 F.2d 26, 29 (9th Cir.

2    1974); *accord California Trout*, 572 F.3d at 1022.

3         222.    According to both Dr. Jarmin and Plaintiffs' expert and former Census Bureau

4    employee, Dr. Hermann Habermann, meeting with a requesting agency is the "normal Census

5    Bureau procedure" when an agency requests data from the Census Bureau.  Jarmin Dep. 33:1-15,

6    36:14-19; Habermann Trial Aff. ¶¶ 28-29.

7         223.    Dr. Jarmin contacted DOJ several times to attempt to schedule a meeting.  *See*

8    PFOF III(F).  But DOJ refused to meet, claiming that the December 12 Letter adequately

9    explained DOJ's request.  *Id.*  This was despite the fact that Dr. Jarmin's response had advised

10   DOJ of the Census Bureau's conclusion that using administrative records would better suit DOJ's

11   needs for block-level CVAP data than adding a citizenship question to the decennial census.  *Id.*

12        224.    Dr. Jarmin disagreed with this reasoning and believed that a meeting would have

13   been useful to the Census Bureau.  Jarmin Dep. 101:9-20.

14        225.    There is no evidence that, after DOJ refused to meet and before the Decision

15   Memo was issued, the Census Bureau or Commerce Department consulted DOJ about the choice

16   of either adding a citizenship question to the census or using only administrative records to obtain

17   the citizenship data.  PFOF § III(F).

18        226.    The decision to add the citizenship question was a departure from the established

19   Census Bureau policy of meeting with a requesting agency to ascertain its needs.  This departure

20   was irrational.

21        227.    There is no evidence that, before sending the December 12 Letter, DOJ had ever

22   considered the possibility of obtaining block-level CVAP from administrative records.  In light of

23   the potential consequences of adding the citizenship question and the eventual disagreement

24   between the Census Bureau and Secretary Ross about the decision, there was no rational basis to

25   stray from the policy of obtaining a requesting agency's input.

26        228.    Secretary Ross failed to "clearly set forth" in the Decision Memo or anywhere else

27   his grounds for failing to obtain DOJ's input before deciding to add the citizenship question.  *See*

28

PTX-26; *Atchison*, 412 U.S. at 808.  In other words, he failed to provide even "*some* explanation" for the departure from established policy.  *Fox Television Stations*, 556 U.S. at 514 n.2.

229.    Secretary Ross also failed, more generally, to consider this important factor in his decision-making process.

230.    Given Defendants' irrational departure from the settled policy of meeting with a requesting agency, the decision to add the citizenship question was arbitrary and capricious.

### 4. Extra-record evidence confirms that Defendants failed to consider whether existing ACS CVAP data is sufficient for enforcement of section 2 of the Voting Rights Act

231.    Extra-record evidence introduced at trial provides further evidence that Defendants failed to analyze and consider whether hard-count citizenship data would aid in VRA enforcement.

232.    This evidence explains in detail how plaintiffs use citizenship data to enforce the VRA.  PFOF §§ IV(C)(1), IV(C)(3).  This evidence further explains the standards and benchmarks that are used to determine whether census-derived block-level data is "necessary" for VRA enforcement.  PFOF §§ IV(C)(1), IV(C)(3).

233.    The unrebutted expert testimony of Plaintiffs' voting rights expert Dr. Lisa Handley confirms that a citizenship question on the census is not "necessary" to enforce the VRA.  PFOF § IV(C)(3).  Dr. Handley testified that, in her experience, CVAP estimates at the census tract or block group level are generally sufficient to satisfy the first *Gingles* precondition in VRA cases.  New York Tr. 807:24-811:6 (Handley).  Dr. Handley testified that, where it would be helpful to present CVAP data at the block level, this information can be reliably and accurately estimated using block-level CVAP data by applying the CVAP ratios from the census tract level to the block-level figures for total voting-age population.  *Id.* at 808:10-815:5.

234.    Dr. Handley also explained how each of the purported limitations with currently available CVAP data discussed in the December 12 Letter from Arthur Gary has not impacted any plaintiff's ability to bring or prevail in litigation under section 2 of the VRA, and has not otherwise impeded her work as a voting rights expert.  PFOF § IV(C)(3).

235.    The unrebutted expert testimony of Plaintiffs' voting rights expert Professor

Pamela Karlan also confirms that a citizenship question on the census is not "necessary" to

enforce the VRA.  PFOF § IV(C)(4).  Ms. Karlan explained that no section 2 case has ever failed

on account of the purported inadequacy of ACS data (or, prior to the advent of the ACS, data

from the long-form census questionnaire) as a measure of CVAP.  Karlan Trial Dep. 52:14-53:18.

Extra-record evidence confirms that data produced pursuant to Option D will have associated

margins of error, and that Defendants do not know whether these error margins for block-level

CVAP data produced from a citizenship question on the census will be larger or smaller than

currently available block-level CVAP data.  PFOF § IV(C)(2).  This evidence directly controverts

the Secretary's argument that "hard-count" citizenship data from the decennial enumeration will

provide DOJ with the "most complete and accurate" data.  PTX-26 at 5.

236.    Extra-record evidence also establishes that the Secretary failed to consider how

adding a citizenship question to the decennial questionnaire, in addition to being completely

unnecessary to enforce the VRA, will in fact undermine the goals the VRA was enacted to

protect.

237.    The purpose of the VRA is to accomplish "nondiscriminatory treatment by

government—both in the imposition of voting qualifications and the provision or administration

of governmental services, such as public schools, public housing and law enforcement."

*Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

238.    Because adding a citizenship question will predictably undercount some

communities, those communities will not achieve nondiscriminatory treatment in the application

of voting qualifications or of the administration of governmental services.  *See* PFOF § V(A)(1);

Fraga Trial Decl. ¶¶ 69, 85, 91; Reamer Trial Decl. ¶¶ 18-19, 31-34, 56-66.

**5.    Defendants failed to consider the effect of the Census Bureau's**
**confidentiality obligations and disclosure avoidance practices**

239.    The decision to add the citizenship question was arbitrary and capricious because

Defendants failed to consider the effect of the Census Bureau's confidentiality obligations and

41

disclosure avoidance practices on the fitness of citizenship data for DOJ's stated purpose, enforcement of section 2 of the VRA.  PFOF §§ IV(C)(2), IV(C)(3).

240.     Under its disclosure avoidance protocols, the Census Bureau will apply disclosure avoidance techniques to data collected from every census block, meaning that even after adding a citizenship question, there will not be a single census block for which the reported citizenship data directly reflects the responses of the census block's inhabitants to the 2020 Census questionnaire, unless by random chance.  New York Tr. 1033:16-21 (Abowd); Census Bureau 30(b)(6) Dep. Vol. I 53:12-17, 69:6-71:12; PFOF § IV(C)(2).

241.     Therefore, even if the citizenship data is obtained through enumeration, some margin of error will unavoidably exist.  *Id.*

242.     The Census Bureau does not know how that margin of error will compare to the margin of error for the ACS citizenship data currently in use.  *Id.*

243.     The Bureau has not determined if, after disclosure avoidance, the error margins for block-level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively."  Census 30(b)(6) Dep. Vol. I 100:21-101:15; PFOF § IV(C)(2).

244.     This complete absence of certainty, confirmed by Dr. Abowd, of whether the Census Bureau's disclosure avoidance protocols will result in greater error margins than the ones associated with currently available CVAP data, or will generate a product that is "effective" for its intended use, directly controverts the Secretary's argument that "hard-count" citizenship data from the decennial enumeration will provide DOJ with the "most complete and accurate" data. PTX-26 at 5.  Defendants' failure to consider this factor is arbitrary and capricious.

### 6.     Defendants failed to consider injuries that may result at the local level from inaccurate census count and characteristic data

245.     The Secretary's assertion in the Decision Memo that providing information to DOJ "is of greater importance" than "any adverse effect" caused by the citizenship question demonstrates a failure to consider the harms to local governments that stem from the degradation of data quality caused by the citizenship question.  PTX-26 at 7.

42

246.    As described above, the citizenship question will damage the accuracy and quality of census data.  *See* Section II(B)(3), *supra*; PFOF § V(A)(3).  That adverse effect on data quality and accuracy is the product of the citizenship question's negative impact on self-response rates, which will increase the amount of less accurate and lower quality data that will be obtained through such NRFU efforts as proxy responses, matching of administrative records, and imputation.  *See generally* PFOF § V(A).

247.    The Census Bureau informed the Secretary that the citizenship question would have an adverse effect on data quality and accuracy in the 2020 Census.  PTX-22; PTX-25.  In particular, the Census Bureau informed the Secretary that Alternatives B and D, which would add a citizenship question to the 2020 Census, would produce worse quality data than Alternative C, which would not add a citizenship question.  PTX-22; PTX-25.

248.    Local governments depend on accurate census data, and less accurate and lower quality data will disrupt redistricting efforts and cause a misallocation of resources.  Tr. 799:1-16, 1005:3-24, 1040:7-1041:10 (Abowd).

249.    Yet the Administrative Record contains no evidence that any of the Defendants considered the adverse effects the citizenship question would have on local governments.  PFOF § III(E)(7).

250.    Defendants' failure to consider the adverse effects of the citizenship question on the data relied on by local governments is arbitrary and capricious.

## VII.  REMEDIES

### A.    Enumeration Clause Claim

251.    The Constitution requires the "actual Enumeration" of all people in each state every ten years for the purpose of apportioning representatives among the states.  U.S. Const. art. I, § 2, cl. 3, and amend. XIV, § 2.

252.    Defendants violated the Enumeration Clause for the reasons explained above.

253.    Defendants' violation of the Enumeration Clause harms Plaintiffs and their residents because they have been forced to expend, and will continue to expend, funds to mitigate an undercount of their residents; will suffer a decrease in federal funding; will suffer harm to their

43

1    ability to accurately plan, allocate resources, and comply with the law as a consequence of the

2    degradation of census data quality; and will lose political representation.

3    254.    Defendants' violation has caused and will continue to cause ongoing, irreparable

4    harm to Plaintiffs and their residents.

5    255.    Accordingly, Plaintiffs are entitled to a declaratory judgment, under 28 U.S.C.

6    §§ 2201 and 2202, that including the citizenship question on the 2020 Census questionnaire

7    violates Article I, Section 2, Clause 3 of the United States Constitution.

8    256.    Plaintiffs also seek to permanently enjoin Defendants from placing the citizenship

9    question on the 2020 Census questionnaire.  A plaintiff seeking a permanent injunction must

10   show:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

11   monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance

12   of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

13   public interest would not be disserved by a permanent injunction."  *Monsanto*, 561 U.S. at 156-

14   57.  Because the government is a party, and "the government's interest is the public interest," the

15   last two factors merge.  *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016);

16   *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

17   257.    If the citizenship question is added to the 2020 Census questionnaire, Plaintiffs

18   will suffer harm in the form of lost funding across federal programs that allocate funds based on

19   census-derived data, degradation of information that is an important tool of state sovereignty, and

20   lost political representation.  Each of these harms would be irreparable—and without any

21   adequate remedy at law.  *Cf., e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (noting that

22   a state's inability to implement its laws constitutes irreparable harm); *Dep't of Commerce*, 525

23   U.S. at 344 (holding that the prospective loss of representation in Congress warrants injunctive

24   relief); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (noting that where the

25   measure of injury defies calculation, damages will not provide an adequate remedy at law).

26   Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action.

27   On the contrary, there is a substantial public interest in having governmental agencies abide by

28   the federal laws that govern their existence and operations."  *League of Women Voters of U.S. v.*

44

1  *Newby*, 838 F.3d. 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  As is

2  relevant to the facts here, "the public interest . . . requires obedience . . . to the requirement that

3  Congress be fairly apportioned, based on accurate census figures.  Furthermore, it is in the public

4  interest that the federal government distribute its funds, when the grant statute is keyed to

5  population, on the basis of accurate census data."  *Carey*, 637 F.2d at 839.

6        258.    Plaintiffs have proven that the Secretary's decision violates the Enumeration

7  Clause of the Constitution and, thus, that any attempt to institute a citizenship question on the

8  2020 Census questionnaire now would be unlawful.

9        259.    Any efforts by Defendants to continue pursuing the citizenship question would risk

10  inflicting further irreparable harm on Plaintiffs because the Secretary's decision to add the

11  citizenship question has inflamed fears among populations who are sensitive to the question,

12  particularly in the current political climate.  *See generally* PFOF § V(A).

13        260.    Allowing Defendants to continue perpetuating these harms in a futile pursuit to

14  remedy the defects identified by this Court will severely injure Plaintiffs and their residents.

15        261.    These harms cannot be compensated with monetary damages or otherwise

16  redressed absent injunctive relief.  *See Abbott*, 138 S. Ct. at 2324 n.17; *Dep't of Commerce*, 525

17  U.S. at 344; *Gilder*, 936 F.2d at 423.

18        262.    Finally, the balance of the hardships and the public interest weighs heavily in favor

19  of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the

20  law or to forgo futile attempts to reinstate a citizenship question, particularly when no such

21  question has appeared on the decennial census for nearly seventy years.  In contrast, Plaintiffs and

22  the public will suffer widespread and irreparable harm absent an injunction.

23        263.    Accordingly, Plaintiffs are entitled to a permanent injunction prohibiting all

24  Defendants and all those acting in concert with them from including a citizenship question on the

25  2020 Census questionnaire.

26    **B.    APA Claim**

27        **1.    Plaintiffs are entitled to a declaratory judgment**

28        264.    Plaintiffs are entitled to declaratory relief on their APA claim.

45

265.    Plaintiffs have asserted a claim under the APA, which provides a cause of action for any "person suffering legal wrong because of agency action."  5 U.S.C. §§ 702, 704.

266.    The APA requires courts to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706. Defendants violated the APA for the reasons explained above.

267.    These violations harm Plaintiffs and their residents, because they have been forced and will continue to expend funds to mitigate an undercount of their residents; will suffer a decrease in federal funding; will suffer harm to the ability to accurately plan, allocate resources, and comply with the law as a consequence of the degradation of census data quality; and will lose political representation.

268.    Defendants' violations have caused and will continue to cause ongoing, irreparable harm to Plaintiffs and their residents.

269.    Accordingly, Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. sections 2201 and 2202 that including the citizenship question on the 2020 Census violates the APA as contrary to 13 U.S.C. section 6(c), contrary to 13 U.S.C. section 141(f)(3), and arbitrary and capricious.

**2.    Plaintiffs are entitled to vacatur of the decision without remand**

270.    Plaintiffs are entitled to vacatur of the decision to add the citizenship question without remand to the Secretary of Commerce.

271.    "[O]rdinarily, when a regulation is not promulgated in accordance with the APA, the regulation is invalid" and must be vacated.  *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled to relief under that statute, which normally will be a vacatur of the agency's [decision]").

46

1    272.    Vacatur properly reflects the sound principle that an agency action that violates the

2    APA cannot be afforded the force and effect of law and is, therefore, void. *Chrysler Corp. v.*

3    *Brown*, 441 U.S. 281, 313 (1979).

4    273.    Vacatur is an appropriate remedy under the APA both when an agency acts

5    contrary to law, *see, e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule that

6    "conflicts with the plain meaning" of statute), and when an agency action is arbitrary and

7    capricious, *see, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's] finding is not

8    sustainable on the administrative record made, the [agency's] decision must be vacated . . . .").

9    274.    Although courts may remand to the agency after invalidating an improper

10    determination, courts have also not hesitated to vacate agency actions without remand when they

11    are taken in violation of statutory or procedural requirements. *See, e.g.*, *NRDC v. Nat'l Highway*

12    *Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018); *Clean Air Council v. Pruitt*, 862 F.3d 1,

13    14 (D.C. Cir. 2017).

14    275.    Such a disposition reflects the fact that statutory or procedural violations can be so

15    fundamental as to render the agency's basic choice—and not merely its particular articulation of

16    that choice—"substantively fatal." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety*

17    *& Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council*

18    *v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in

19    the agency's decision make it unlikely that the same rule would be adopted on remand").

20    276.    Plaintiffs have proven at least one statutory violation that warrants vacatur without

21    remand.  Section 6(c) of Title 13 requires the Defendants to use administrative records rather than

22    add the citizenship question to the Census.  The decision to do otherwise was therefore

23    "substantively fatal."  *See Int'l Union*, 920 F.2d at 967.  There would be no purpose in remanding

24    the decision to the Secretary because adoption of the same rule would be exceedingly "unlikely."

25    *See Pollinator Stewardship Council*, 806 F.3d at 532.  For the Secretary to make the same

26    decision without re-violating section 6(c) and the APA, some new evidence would have to come

27    to light in the decision-making process that would suddenly render the use of administrative

28

47

1    records inferior to a citizenship question given the "kind, timeliness, quality and scope" of the

2    data required.  There is no evidence suggesting that this is a reasonable possibility.

3        277.    Remand is also improper here because the Secretary's stated rationale for the

4    citizenship question was pretext, particularly because the Secretary has never suggested an

5    alternative basis for his decision.  *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43

6    (D.C. Cir. 1994) (remand unnecessary when NLRB "suggested no alternative bases for

7    upholding" its determination); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994)

8    ("No remand for further administrative proceedings is warranted because the EPA did not suggest

9    in the rulemaking under review that there is any alternative basis in the record" for its decision).

### 3.    Plaintiffs are entitled to a permanent injunction

11        278.    Finally, regardless of whether or not the decision to add the citizenship question is

12    remanded to the Secretary, Plaintiffs are entitled to a permanent injunction based on their APA

13    claim.

14        279.    The decision to grant injunctive relief under the APA is "controlled by principles

15    of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted);

16    *see, e.g.*, *Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F.

17    Supp. 3d 308, 342-43 (S.D.N.Y 2018) (applying equitable factors for permanent injunction in

18    APA challenge to agency decision).  All of these factors counsel in favor of an injunction here.

19        280.    An injunction prohibiting an agency from taking an action is appropriate where the

20    court has found that action to be contrary to law under the APA.  *See Planned Parenthood*, 337 F.

21    Supp. 3d at 343; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

22        281.    Under such circumstances, an injunction properly prohibits "the perpetuation of

23    unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and

24    ensures that the agency complies with the law going forward, *see Central United Life, Inc. v.

25    Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing

26    federal agencies to comply with the law is undoubtedly in the public interest.").

27        282.    Plaintiffs have proven that the Secretary's decision is contrary to law and that any

28    attempt to institute a citizenship question on the 2020 Census now would also be unlawful.

283.    Moreover, previous cases related to conduct of the census show that an injunction is in the public interest in these circumstances. *See Dep't of Commerce*, 525 U.S. at 344; *Carey*, 637 F.2d at 839

284.    An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts

285.    Allowing Defendants to continue perpetuating these harms in a futile pursuit to remedy the defects identified by this Court will severely injure Plaintiffs and their residents.

286.    These harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief. *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).

287.    Finally, granting an injunction on these facts would have substantive and procedural benefits beyond mere vacatur of Secretary Ross's March 26, 2018 memorandum. Absent an injunction, Secretary Ross could simply reinstate his decision to include a citizenship question on the 2020 Census questionnaire by revising his memorandum in some immaterial way. Such an outcome is possible because Secretary Ross retains the same statutory authority over the census that he had before Plaintiffs filed this action to challenge his decision. However, given the evidence adduced at trial, an injunction is necessary to make the Court's vacatur effective, since it will prevent Secretary Ross from arriving at the same decision without curing the defects proven by Plaintiffs at trial. Moreover, an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court if Defendants take actions that are inconsistent with this decision. This is particularly crucial here given the June 2019 deadline for printing the 2020 Census questionnaires.

288.    The balance of the hardships also weighs heavily in favor of an injunction. Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years. By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

289.    The fair and orderly administration of the census is one of the Secretary of Commerce's most important duties, and it is critically important that the public have confidence in the integrity of the process underlying this mainstay of our democracy. *Franklin*, 505 U.S. at 818 (Stevens, J., concurring in part and concurring in the judgment)).

290.    An injunction prohibiting the addition of a citizenship question to the 2020 Census will provide the public with the certainty and confidence that is necessary to protect the integrity of the 2020 Census.

291.    This Court therefore grants Plaintiffs' requested injunction based on their APA claim.

292.    The appropriate scope of injunction in this case is nationwide.

293.    First, Secretary Ross's decision itself was nationwide in application; it involves a single questionnaire that will be used through the country during the 2020 Census. *Cf. Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform immigration rules).

294.    Second, nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C. § 706(2)(A).

295.    Thus, a nationwide injunction here under the APA does not implicate more general concerns about the power of courts to issue nationwide injunctive relief. *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018).

296.    Plaintiffs are therefore entitled to a permanent injunction prohibiting all Defendants and all those acting in concert with them from including a citizenship question on the 2020 Census questionnaire.

1    Dated:  February 1, 2019                    Respectfully Submitted,

2                                                XAVIER BECERRA
                                                Attorney General of California
3                                                MARK R. BECKINGTON
                                                ANTHONY R. HAKL
4                                                Supervising Deputy Attorneys General
                                                ANNA T. FERRARI
5                                                TODD GRABARSKY
                                                NOREEN P. SKELLY
6                                                R. MATTHEW WISE
                                                Deputy Attorneys General

7

8                                                */s/   Gabrielle D. Boutin*
                                                GABRIELLE D. BOUTIN
9                                                Deputy Attorney General
                                                *Attorneys for Plaintiff State of California, by and*
10                                               *through Attorney General Xavier Becerra*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Dated:  February 1, 2019        */s/ Charles L. Coleman* _____

2

CHARLES L. COLEMAN III, SBN 65496
DAVID I. HOLTZMAN

3

HOLLAND & KNIGHT LLP
50 California Street, 28th Floor

4

San Francisco, CA 94111
Telephone: (415) 743-6970

5

Fax: (415) 743-6910
Email: charles.coleman@hklaw.com

6

*Attorneys for Plaintiff County of Los Angeles*

7

8

Dated:  February 1, 2019        MIKE FEUER
City Attorney for the City of Los Angeles

9

*/s/ Valerie Flores* _____
VALERIE FLORES, SBN 138572

10

Managing Senior Assistant City Attorney
200 North Main Street, 7th Floor, MS 140

11

Los Angeles, CA  90012
Telephone: (213) 978-8130

12

Fax: (213) 978-8222
Email: Valerie.Flores@lacity.org

13

14

Dated:  February 1, 2019        HARVEY LEVINE
City Attorney for the City of Fremont

15

*/s/ Harvey Levine* _____

16

SBN 61880
3300 Capitol Ave.

17

Fremont, CA 94538
Telephone: (510) 284-4030

18

Fax: (510) 284-4031
Email: hlevine@fremont.gov

19

20

Dated:  February 1, 2019        CHARLES PARKIN
City Attorney for the City of Long Beach

21

*/s/ Michael J. Mais* _____

22

MICHAEL K. MAIS, SBN 90444
Assistant City Attorney

23

333 W. Ocean Blvd., 11th Floor
Long Beach CA, 90802

24

Telephone: (562) 570-2200
Fax: (562) 436-1579

25

Email: Michael.Mais@longbeach.gov

26

27

28

1

Dated February 1, 2019                         BARBARA J. PARKER
                                               City Attorney for the City of Oakland

2

3                                              */s/ Erin Bernstein* _____
                                               MARIA BEE
                                               Chief Assistant City Attorney
4                                              ERIN BERNSTEIN, SBN 231539
                                               Supervising Deputy City Attorney
5                                              MALIA MCPHERSON
                                               Deputy City Attorney
6                                              City Hall, 6th Floor
                                               1 Frank Ogawa Plaza
7                                              Oakland, California 94612
                                               Telephone: (510) 238-3601
8                                              Fax: (510) 238-6500
                                               Email: ebernstein@oaklandcityattorney.org

9

10   Dated:  February 1, 2019                  JOHN LUEBBERKE
                                               City Attorney for the City of Stockton

11

12                                             */s/ John Luebberke* _____
                                               SBN 164893
13                                             425 N. El Dorado Street, 2nd Floor
                                               Stockton, CA 95202
                                               Telephone: (209) 937-8333
14                                             Fax: (209) 937-8898
                                               Email: John.Luebberke@stocktonca.gov

15

16

17                              **FILER'S ATTESTATION**

18        Pursuant to Civil Local Rule 5-1(i)(3), regarding signatures, I hereby attest that

19   concurrence in the filing of this document has been obtained from all signatories above.

20   Dated: February 1, 2019                   */s/ Gabrielle D. Boutin*
                                               GABRIELLE D. BOUTIN

21

22

23

24

25

26
     SA2018100904
27   13428260.docx

28

                                         53

# CERTIFICATE OF SERVICE

Case Name: **State of California, et al. v.**     No.    **3:18-cv-01865**
**Wilbur L. Ross, et al.**

I hereby certify that on <u>February 1, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFF'S POST-TRIAL PROPOSED CONCLUSIONS OF LAW**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>February 1, 2019</u>, at Sacramento, California.

<table>
<tr><td>Tracie L. Campbell</td><td>*/s/ Tracie Campbell*</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2018100904
13430250.docx